EXECUTION COPY

# SECOND AMENDED AND RESTATED

# ASSET PURCHASE AGREEMENT

# FOR THE PURCHASE OF CERTAIN ASSETS

# OF

# BERNARD L. MADOFF INVESTMENT SECURITIES LLC

# BY

# CASTOR POLLUX SECURITIES, LLC

**April 21,29, 2009**

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS ........................................................................................... ~~1~~2

    Section 1.1      Certain Definitions ....................................................................... ~~1~~2

ARTICLE II      PURCHASE AND SALE OF ASSETS ..................................................... 6

    Section 2.1      Purchase and Sale of Acquired Assets .............................................. 6

    Section 2.2      Excluded Assets ........................................................................... ~~7~~6

    Section 2.3      Transaction Data License ............................................................... 7

ARTICLE III     ASSUMED LIABILITIES............................................................................ 7

    Section 3.1      Assumed Liabilities; Post-Closing Liabilities .................................... 7

    Section 3.2      Other Liabilities ........................................................................... 7

    Section 3.3      Non-Assignment of Contracts ....................................................... 8

ARTICLE IV     PAYMENT; CLOSING; POST-CLOSING .................................................. 8

    Section 4.1      Purchase Price .............................................................................. 8

    Section 4.2      Acknowledgement and Allocation of Purchase Price................... ~~11~~10

    Section 4.3      Date, Time and Place of Closing ................................................... 10

    Section 4.4      Prepayment ................................................................................. 10

    Section 4.5      Right of Rescission ...................................................................... 11

    Section 4.6      Termination of Obligations ......................................................... 11

ARTICLE V      REPRESENTATIONS AND WARRANTIES OF TRUSTEE ............... ~~12~~11

    Section 5.1      Authorization and Validity ..................................................... ~~12~~11

    Section 5.2      Title and Ownership .............................................................. ~~12~~11

    Section 5.3      Intellectual Property .............................................................. ~~12~~11

    Section 5.4      Brokers .................................................................................. ~~12~~11

    Section 5.5      SALE ON AN OTHERWISE "AS IS" AND "WHERE IS"
                  BASIS .................................................................................... 12

    Section 5.6      NO OTHER REPRESENTATIONS OR WARRANTIES........... ~~13~~12

ARTICLE VI     REPRESENTATIONS AND WARRANTIES OF PURCHASER ......... ~~13~~12

    Section 6.1      Status ................................................................................... ~~13~~12

    Section 6.2      Authority; Effective Agreement .............................................. ~~13~~12

    Section 6.3      Brokers or Finders .................................................................. ~~13~~12

    Section 6.4      Litigation or Proceedings ........................................................ 13

TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 6.5 | Financial Capability | 13 |
| Section 6.6 | NO OTHER REPRESENTATIONS OR WARRANTIES | ~~14~~13 |
| ARTICLE VII | FURTHER COVENANTS AND AGREEMENTS | ~~14~~13 |
| Section 7.1 | Cooperation | ~~14~~13 |
| Section 7.2 | Solicitation | ~~14~~13 |
| Section 7.3 | Disclosure to Parties | ~~14~~13 |
| Section 7.4 | Post Closing Cooperation and Preservation of Records | 14 |
| Section 7.5 | Notice to Third Parties | ~~15~~14 |
| Section 7.6 | Purchaser's Due Diligence Investigation; Certain Acknowledgements | ~~15~~14 |
| Section 7.7 | Tax Covenants | ~~16~~15 |
| Section 7.8 | Notice of Certain Events | ~~16~~15 |
| Section 7.9 | Certain Filings | 16 |
| Section 7.10 | Commercially Reasonable Efforts | ~~17~~16 |
| Section 7.11 | Residual Information | ~~17~~16 |
| Section 7.12 | Patent License | ~~17~~16 |
| Section 7.13 | FINRA Filings; Access | 16 |
| ARTICLE VIII | CONDITIONS TO OBLIGATIONS OF PURCHASER | 17 |
| Section 8.1 | Representations and Warranties | 17 |
| Section 8.2 | Covenants and Agreements | 17 |
| Section 8.3 | Bankruptcy Matters | 17 |
| Section 8.4 | No Injunctions | ~~18~~17 |
| Section 8.5 | FINRA Approval | 17 |
| Section 8.6 | Deliveries | ~~18~~17 |
| ARTICLE IX | CONDITIONS TO OBLIGATIONS OF TRUSTEE | 18 |
| Section 9.1 | Representations and Warranties | 18 |
| Section 9.2 | Covenants and Agreements | 18 |
| Section 9.3 | Bankruptcy Matters | 18 |
| Section 9.4 | No Injunctions | 18 |
| Section 9.5 | Governmental and Regulatory Approvals | 18 |

TABLE OF CONTENTS
(continued)

**Page**

Section 9.6          Deliveries.................................................................... ~~19~~18

ARTICLE X          BANKRUPTCY/SIPA CONDITIONS ................................. ~~19~~18

Section 10.1          Sale Order and SIPC Approval........................................ 19

Section 10.2          ~~Procedures Order ...................................................... 19~~Section 10.3 Final Order

ARTICLE XI          CLOSING ............................................................... ~~20~~19

Section 11.1          Trustee's Deliveries ................................................. ~~20~~19

Section 11.2          Purchaser's Deliveries .............................................. ~~21~~20

ARTICLE XII          TERMINATION OF AGREEMENT.................................... ~~21~~20

Section 12.1          Termination ......................................................... ~~21~~20

Section 12.2          Effect of Termination ............................................... ~~22~~21

ARTICLE XIII          SURVIVAL OF REPRESENTATIONS AND WARRANTIES;
                     SURVIVAL OF COVENANTS ........................................ ~~23~~22

Section 13.1          Survival of Representations and Warranties ................... ~~23~~22

Section 13.2          Survival of Covenants .............................................. ~~23~~22

ARTICLE XIV          GENERAL ............................................................... ~~23~~22

Section 14.1          Notices .............................................................. ~~23~~22

Section 14.2          Entire Agreement.................................................... ~~23~~22

Section 14.3          Severability.......................................................... ~~23~~22

Section 14.4          Governing Law ...................................................... ~~23~~22

Section 14.5          JURISDICTION; WAIVER OF JURY TRIAL ........................ ~~24~~23

Section 14.6          Waiver ............................................................... ~~24~~23

Section 14.7          Expenses............................................................. ~~24~~23

Section 14.8          Assignability; Binding Effect; No Beneficiaries ............... ~~24~~23

Section 14.9          Counterpart Execution............................................... ~~25~~24

**THIS  SECOND**  **AMENDED AND RESTATED ASSET PURCHASE AGREEMENT** (this "Agreement") is entered into as of April ~~21,~~29, 2009, by and between the Trustee for the Liquidation of the Business of Bernard L. Madoff Investment Securities LLC, a New York limited liability company ("Trustee") and Castor Pollux Securities, LLC, a Delaware limited liability company ("Purchaser").

**W I T N E S S E T H:**

WHEREAS, on December 11, 2008 (the "Filing Date"), the SEC filed a complaint (the "Complaint") in the United States District Court for the Southern District of New York against defendants Bernard L. Madoff Investment Securities LLC ("Debtor") and Mr. Bernard L. Madoff, individually (No. 08 CV 10791).  On December 15, 2008, Judge Stanton entered an order pursuant to SIPA (as defined below), which, in pertinent part, appointed Trustee, pursuant to Section 78eee(b)(3) of SIPA, and removed the case, pursuant to Section 78eee(b)(4) of SIPA, to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Adv. Pro. No. 08-01789 (BRL), SIPA Liquidation (the "Bankruptcy Case"), pursuant to Section 78fff(b) of SIPA, chapters 1, 3 and 5 and subchapters I and II of Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, Trustee is liquidating the market making operations business previously operated by Debtor (as previously operated, the "Business");

WHEREAS, Purchaser desires to purchase the Acquired Assets (as defined in Section 2.1 below), and Trustee desires to sell the Acquired Assets to Purchaser, on the terms and conditions set forth in this Agreement, in accordance with Sections 78 fff (a)(2) and (b) of SIPA and Sections 105, 363 and 365 of the Bankruptcy Code and in accordance with other applicable provisions of the Bankruptcy Code;

WHEREAS, Trustee and Purchaser entered into an agreement dated March 27, 2009 (as amended and restated on April 21, 2009, the "Original Agreement"), where upon the execution thereof Purchaser delivered to Trustee, in the form of a cashier's check payable to Trustee, a non-refundable deposit in the amount of Fifty Thousand Dollars ($50,000) (the "Initial Deposit") and now wish to amend and restate the terms of the Original Agreement and intend that this Agreement supersede the Original Agreement in all respects; and

WHEREAS, in connection herewith, on March 30, 2009, Trustee ~~will request that~~filed with the Bankruptcy Court ~~enter an order approving~~a motion seeking approval of (i) procedures to be employed in connection with a proposed auction sale of the Business and excluding all other assets as detailed more particularly below, ~~and approving~~including, without limitation, notice and bidding procedures to be employed therewith~~, in substantially the form of Exhibit A attached hereto (the "Procedures Order"); and~~**WHEREAS**, ~~Trustee and Purchaser entered into an agreement dated March 27, 2009 (the "Original Agreement") and now wish to amend and restate the terms of the Original Agreement and intend that this Agreement supersede the Original Agreement in all respects~~ and approval of a Fifteen Thousand Dollar Break-Up Fee (the "Break-Up Fee") and (ii) the proposed sale of the Acquired Assets to Purchaser, subject to a higher and better offer.  On April 7, 2009, the Bankruptcy Court entered an order approving the

auction procedures and the Break-Up Fee, a copy of which is attached hereto as Exhibit A (the "Procedures Order").

**NOW, THEREFORE**, in consideration of the foregoing premises and of the mutual agreements and covenants hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

# ARTICLE I
# DEFINITIONS

Section 1.1    Certain Definitions.  For purposes of this Agreement, the following terms shall have the following meanings:

"**Acquired Assets**" has the meaning ascribed to it in Section 2.1.

"**Affiliate**" means, with respect to any Person, any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such Person.  For purposes of this Agreement, "control" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise (and the terms "controlled by" and "under common control with" shall have correlative meanings).

"**Agreement**" has the meaning ascribed to it in the preamble hereto.

"~~**Alternative Transaction**~~" ~~means any one of the following transactions with or by any Person or group (other than Purchaser): (a) a merger, consolidation, recapitalization or similar transaction involving Debtor, or (b) a sale, lease or other disposition directly or indirectly by merger, consolidation, recapitalization, tender offer, share exchange or otherwise of any asset of Debtor included in the Acquired Assets.~~

"**Assumed Liabilities**" has the meaning ascribed to it in Section 3.1.

"**Assumption Agreement**" means the Assumption Agreement, in substantially the form attached hereto as Exhibit B-2.

"~~**Auction**~~" ~~has the meaning ascribed to it in Section 10.2.~~

"**Bankruptcy Case**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Rules**" has the meaning ascribed to it in Section 10.1.

"**Bill of Sale**" means the Bill of Sale, in substantially the form attached hereto as Exhibit B-1.

"**Break-up Fee**" has the meaning ascribed to it in ~~Section 10.2.~~ the recitals hereto.

"**Business**" has the meaning ascribed to it in the recitals hereto.

"**Business Day**" means any day other than a Saturday or Sunday or any day that is a bank holiday in New York City.

"~~**Cap Amounts**" has the meaning ascribed to it in Section 4.1(f)(i).~~

"**Closing**" has the meaning ascribed to it in Section 4.3.

"**Closing Date**" has the meaning ascribed to it in Section 4.3.

"**Closing Payment**" has the meaning ascribed to it in Section 4.1(a).

"**Complaint**" has the meaning ascribed to it in the recitals hereto.

"**Contract**" means any contract, agreement, indenture, note, bond, loan, instrument, lease, sub-lease, deed of trust, conditional sales contract, mortgage, franchise, license, commitment or other binding arrangement, express or implied, currently in effect.

"**Debtor**" has the meaning ascribed to it in the recitals hereto.

"**Deposits**" has the meaning ascribed to it in Section 4.1(a)(i).

"**Designated Contracts**"  has the meaning ascribed to it in Section 2.1(a).

"**Earn-Out**" ~~means either of the Revenue Earn-Out or the Trading Earn-Out~~ **Cap**" has the meaning ascribed to it in Section 4.1(b).

"**Earn-Out Payments**" has the meaning ascribed to it in Section 4.1(a).

"**Earn-Out Period**" means the period comprised of ~~the twelve full consecutive calendar quarters~~ each full or partial consecutive calendar quarter ending March 31, June 30, September 30 and December 31 during such period, commencing with the calendar quarter ~~beginning January 1, 2010~~ ending June 30, 2009 and terminating upon the conclusion of the calendar quarter ending December 31, ~~2012.~~ 2013.

"**Earn-Out Remainder**" has the meaning ascribed to it in Section 4.1(~~f~~d)(i).

"**Earn-Out Report**" has the meaning ascribed to it in Section 4.1(~~d~~c).

"**Employee**" means any individual who is classified as either a full-time or part-time employee of Debtor on the payroll records maintained in connection with the Business or any individual who otherwise performs personal services exclusively for the Business on a substantially full-time basis.

"**Encumbrances**" has the meaning ascribed to it in Section 2.1.

"**Enhanced Deposit**" has the meaning ascribed to it in Section 4.1(a)(i).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Excluded Liabilities**" has the meaning ascribed to it in Section 3.2.

"**Filing Date**" has the meaning ascribed to it in the recitals hereto.

"**Final Order**" means an order or judgment of the Bankruptcy Court (a) which is not the subject of a pending appeal, petition for certiorari, or other proceeding for review, rehearing or reargument, (b) which has not been reversed, stayed, modified or amended and (c) respecting which the time to appeal from or petition for certiorari or to seek review, rehearing or reargument of such order shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules and other applicable Law, and there shall not be in effect any preliminary or permanent injunction, stay or order or decree or ruling by any Governmental Entity preventing consummation of the transactions contemplated by this Agreement.

"**FINRA**" means the Financial Industry Regulatory Authority, Inc.

"**GAAP**" means U.S. generally accepted accounting principles, consistently applied.

"**Governmental Entity**" means any federal, state, local, multi-national or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental, regulatory or administrative authority, body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

"~~**Gross Revenue**~~**Initial Deposit**" has the meaning ascribed to it in ~~Section 4.1(b)~~the recitals hereto.

"**Intellectual Property Assignment**" means the Intellectual Property Assignment, in substantially the form attached hereto as Exhibit C.

"**Law**" means any law in any jurisdiction (including common Law), statute, code, ordinance, rule, regulation, permit, order, judgment, writ, decree or other requirement or guideline of any Governmental Entity.

~~"**Objection/Counter Bid Deadline**" means the second Business Day prior to the date of the Sale Hearing.~~

"**Net Trading Revenue**" has the meaning ascribed to it in Section 4.1(b).

"**Order**" (or "**Orders**," where the context requires) means any order, judgment, injunction, writ or decree of any court or Governmental Entity.~~.~~

"**Original Agreement**" has the meaning ascribed to it in the ~~preamble~~recitals hereto.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or any other entity or organization.

"**Plan**" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) or any other bonus, deferred compensation, pension, profit-sharing, retirement, stock purchase, stock option, stock appreciation, other forms of incentive or equity compensation, excess benefit, supplemental pension insurance, disability, medical, dental, vision, supplemental unemployment, other paid time-off, vacation benefits, payroll practice, fringe benefit, scholarship, sickness, accident, severance, legal or post-retirement compensation or benefit, welfare or any other employee benefit plan, arrangement or practice, whether written or oral.

"**Pre-Closing Tax Period**" means, with respect to any Tax, any reporting period beginning on or before the Closing Date (in the case of a Straddle Period, including only the portion of such taxable period ending on and including the Closing Date).

"**Prepaid Earn-Out Payment**" has the meaning ascribed to in Section 4.4.

"**Procedures Order**" has the meaning ascribed to it in the recitals hereto.

"**Purchase Documents**" means this Agreement, the Bill of Sale, the Assumption Agreement and the Intellectual Property Assignment.

"**Purchase Price**" has the meaning ascribed to it in Section 4.1(a).

"**Purchaser**" has the meaning ascribed to it in the preamble hereto.

"**Qualifying Competing Bids**" has the meaning ascribed to it in Section 10.2.

"**Related Records**" has the meaning ascribed to it in Section 7.4.

"**Residual Information**" has the meaning ascribed to it in Section 7.11.

"**Revenue Earn-Out Cap**" has the meaning ascribed to it in Section 4.1(b).

"**Revenue Earn-Out Payment**" has the meaning ascribed to it in Section 4.1(b).

"**Revenue Earn-Out Period**" has the meaning ascribed to it in Section 4.1(b).

"**Sale Hearing**" has the meaning ascribed to it in Section 10.2.

"**Sale of the Purchaser**" means the sale of the Purchaser (whether by merger, consolidation, recapitalization, reorganization, sale of securities, sale of assets or otherwise) in one transaction or series of related transactions to a Person or group (within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) of Persons pursuant to which such Person or group of Persons (together with its Affiliates) acquires (i) securities representing at least a majority of the voting power of all securities of the Purchaser, assuming the conversion, exchange or exercise of all securities convertible, exchangeable or exercisable for or into voting securities, or (ii) all or substantially all of the Purchaser's assets on a consolidated basis.

"**Sale Order**" has the meaning ascribed to it in Section 10.1.

"**Sale Proceeds**" has the meaning ascribed to it in Section 4.1(f̶d̶)(i).

"**Share**" means any share of capital or other stock or any share of capital or other stock issuable or exchangeable under any option, share appreciation right, warrant or other equity-linked security.

"**SEC**" means the Securities and Exchange Commission.

"**SIPA**" means the Securities Investor Protection Act of 1970, 15 U.S.C. § 78 et seq.

"**SIPC**" means the Securities Investor Protection Corporation.

"**Straddle Period**" means any taxable period that begins on or before the Closing Date and ends after the Closing Date.

"**Tax**" (or "**Taxes**" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, transfer, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or nonstatutory rules and whether or not measured in whole or in part by net income, and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto, and expenses associated with contesting any proposed adjustment related to any of the foregoing.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Trading Amount**" has the meaning ascribed to it in Section 4.1(c).

"**Trading Day**" means any day on which the New York Stock Exchange is open for trading.

"**Trading Earn-Out Cap**" has the meaning ascribed to it in Section 4.1(c).

"**Trading Earn-Out Payment**" has the meaning ascribed to it in Section 4.1(c).

"**Trading Earn-Out Period**" means the period comprised of the twelve full consecutive calendar quarters commencing with the calendar quarter beginning January 1, 2010 and terminating upon the conclusion of the calendar quarter ending December 31, 2012.

"**Transfer Taxes**" has the meaning ascribed to it in Section 7.7(a).

"**Trustee**" has the meaning ascribed to it in the preamble hereto.

"**Trustee's Knowledge**" means the actual knowledge of Trustee after due inquiry of Deborah Koster.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

Section 2.1    Purchase and Sale of Acquired Assets.  Upon and subject to the terms and conditions set forth in the Procedures Order, this Agreement and the Sale Order, on the Closing Date Trustee will sell, assign, convey, transfer and deliver to Purchaser pursuant to Sections 78 fff (a) (2) and (b) of SIPA and Sections 363(f) and 365 of the Bankruptcy Code, free and clear of all liens, claims, charges or encumbrances of any kind (collectively, "Encumbrances"), and Purchaser will purchase and acquire from Trustee, all of Trustee's right, title and interest in, to and under the following assets, properties and rights used by Debtor in the Business (collectively, the "Acquired Assets"):

(a)    all rights of Trustee under and in connection with all Contracts set forth on Schedule 2.1(a) hereto (the "Designated Contracts");

(b)    all rights of Trustee to the information technology assets, including tangible personal property, in each case, as set forth on Schedule 2.1(b) hereto, in perpetuity, but specifically excluding any customer or other transaction data;

(c)    all rights of Trustee to the intellectual property (including software and algorithms) set forth on Schedule 2.1(c) hereto, in perpetuity, together with all associated goodwill;

(d)    to the extent transferrable under applicable Law, all rights of Trustee to all those permits, authorizations and licenses issued by any Governmental Entity to Debtor primarily related to the Business and set forth on Schedule 2.1(d), along with any pending applications related thereto;

(e)    all rights of Trustee to copies (in each case) of all lists and information containing contact information for customers and suppliers of Debtor primarily related to the Business, trade correspondence, accounts receivable ledgers, documents related to invoices and all shipping records, in each case primarily related to the Business, whether in hard copy or electronic form; and

(f)    all rights of Trustee to all other assets primarily relating to, required for the conduct of, or primarily used in or held for use in connection with the Business, other than, for the avoidance of doubt, cash, securities or other investments.

In confirmation of the foregoing sale, assignment and transfer, Purchaser and Trustee shall execute and deliver at the Closing the Bill of Sale.

Section 2.2    Excluded Assets.  Except for the Acquired Assets, Trustee is not selling, assigning or conveying to Purchaser, and Purchaser shall have no right to, any other asset of Trustee, Debtor or the Business whatsoever.  In no event shall Trustee be deemed to be selling or transferring any other assets not expressly delineated above in Section 2.1, including, but not limited to all rights and causes of action under Chapter 5 of the Bankruptcy Code, or as otherwise arising under SIPA or applicable state and federal Law, all of which assets shall be and are retained by Trustee.

Section 2.3    <u>Transaction Data License</u>.  Upon the terms and subject to the conditions hereof, Trustee hereby grants to Purchaser a non-exclusive, royalty-free, fully paid-up, non-transferable license to use any transaction data owned by Trustee and created in the Business prior to December 1, 2008.

**ARTICLE III
ASSUMED LIABILITIES**

Section 3.1    <u>Assumed Liabilities; Post-Closing Liabilities</u>.  Purchaser shall assume and agree to perform in accordance with their terms, the Designated Contracts, but only to the extent the obligations to be performed are attributable to the period subsequent to the Closing Date. The liabilities and obligations assumed by Purchaser pursuant to this <u>Section 3.1</u> shall be referred to as the "<u>Assumed Liabilities</u>."

Section 3.2    <u>Other Liabilities</u>.  Except as otherwise provided in <u>Section 3.1</u>, as between the parties, Purchaser expressly does not assume, and Trustee agrees that, without affecting the applicability of the Bankruptcy Code to his rights and obligations with respect to third parties, Trustee, subject to all of Trustee's rights under the Bankruptcy Code, SIPA and other applicable Law (including, without limitation, the right to reject any Contract or Plan), will be responsible for:

(a)    any other direct or indirect liability, known or unknown, fixed or unfixed, choate or inchoate, accrued, absolute, contingent or otherwise, whether arising out of any Contract, Plan, tort, statute or otherwise, of Debtor including, without limitation, any severance-related liability pertaining to Employees of Debtor or any of its Affiliates;

(b)    the ongoing sponsorship, administration, funding and maintenance of any and all Plans sponsored or maintained as of the Closing Date for the benefit of employees and former employees of the Business (including specifically and without limitation, the Bernard L. Madoff Investment Securities LLC Employee Benefit Plan (Medical, Prescription Drug, Vision and Dental), and the Bernard L. Madoff Investment Securities LLC Cafeteria Plan);

(c)    all liabilities and obligations of Debtor relating to any environmental, health or safety matter, including, without limitation, any liability or obligation arising under any state or federal environmental Law;

(d)    all accounts payable of the Business incurred prior to the Closing Date and all claims related to the foregoing;

(e)    all amounts owed by Debtor to any Affiliate of Debtor;

(f)    all Taxes with respect to the Business or the Acquired Assets that are attributable to or allocable to any Pre-Closing Tax Period; and

(g)    all liabilities and obligations of Debtor of whatever nature, whether presently in existence of hereafter arising, other than the Assumed Liabilities.

The liabilities and obligations retained by Debtor pursuant to this <u>Section 3.2</u> shall be referred to as the "<u>Excluded Liabilities</u>."

To effectuate the assumption by Purchaser of the Assumed Liabilities, Purchaser and Trustee shall execute and deliver at the Closing the Assumption Agreement.

      Section 3.3    <u>Non-Assignment of Contracts</u>.  This Agreement shall not constitute an agreement to assign any Designated Contract, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of the third party thereto, would be unenforceable.  Any assignment to Purchaser of any Designated Contract that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent of any third party for such assignment as aforesaid shall be made subject to such consent being obtained.  Nothing in this <u>Section 3.3</u> shall be deemed to limit anything in <u>Section 8.2</u> or <u>Section 9.3</u>.

**ARTICLE IV**
**PAYMENT; CLOSING; POST-CLOSING**

      Section 4.1    <u>Purchase Price</u>.

      (a)    The total consideration for the Acquired Assets and the covenants of Trustee herein (the "<u>Purchase Price</u>") shall be (i) ~~Five Hundred Thousand~~<u>One Million</u> Dollars ($~~500,000~~<u>1,000,000</u>) (the "<u>Closing Payment</u>"), plus (ii) certain additional payments (the "<u>Earn-Out Payments</u>") in an amount determined in accordance with, and pursuant to the terms and conditions of <u>Sections 4.l(b)</u>, <u>4.1(c)</u>~~,~~ <u>and</u> <u>4.1(d)</u>~~, 4.1(e) and 4.1(f)~~.  The Purchase Price shall be paid as follows:

      (i)    Upon the execution of this Agreement, Purchaser shall pay to Trustee, in the form of a cashiers check payable to Trustee, a non-refundable (except as provided in <u>Section 12.2</u>) deposit in the amount of ~~Fifty~~<u>Four Hundred Eighty-Five</u> Thousand Dollars ($~~50,000~~<u>485,000</u>) (the "<u>Enhanced Deposit" and, collectively with the Initial Deposit, the "Deposits</u>") to be applied against the full Closing Payment, as more fully described in the Procedures Order;

      (ii)    On the Closing Date, Purchaser shall pay in cash the Closing Payment <u>less</u> the Deposit<u>s</u> directly to Trustee pursuant to a wire transfer of immediately available funds to an account specified in writing by Trustee at least two (2) Business Days prior to the Closing Date; and

      (iii)    Purchaser shall pay in cash, as and when due pursuant to <u>Section 4.1(d)</u>, the Earn-Out Payments directly to Trustee pursuant to wire transfers of immediately available funds to an account specified in writing by Trustee (or to such other accounts as Trustee may direct in writing at least two (2) days prior to the date any relevant payment is due). All payments made by Purchaser to Trustee hereunder shall be on a first priority basis in respect of the operating expenses of Purchaser and without any set-off, counterclaims, deductions or any other offset of any kind with respect to Trustee.

(b)    For each calendar quarter after the Closing Date ~~until the Revenue Earn-Out Cap shall have been met and paid in the aggregate to Trustee (the "Revenue~~during the Earn-Out Period~~")~~, Purchaser shall pay to Trustee as part of the Purchase Price hereunder an Earn-Out Payment that shall be equal to ~~ten~~fifteen percent (~~10~~15%) of the ~~Gross~~Net Trading Revenue earned by Purchaser during such calendar quarter ~~(the "Revenue Earn-Out Payment")~~, provided, however, that Purchaser's obligation to make ~~payments in respect of the Revenue~~ Earn-Out ~~Payments~~ shall cease upon Trustee receiving from Purchaser ~~Three~~Twenty Four Million Five Hundred Thousand Dollars ($~~3,000,000~~24,500,000) in the aggregate solely in respect of the ~~Revenue~~ Earn-Out Payments (the "~~Revenue~~ Earn-Out Cap").    The term "~~Gross~~Net Trading Revenue" means, for any applicable calendar quarter, ~~the total gross revenue earned by Purchaser in respect of the Business as determined in accordance with GAAP.~~gross trading revenue, plus net rebate, net commission,  net market access fees paid by or to Purchaser (including DOT gross-up and ECN expenses) and income from market data provision, stock borrow loans, dividends, tape revenue and class action lawsuits, less service bureau transaction fees and per share or per trade clearing and regulatory fees (including SRO execution fees). Net Trading Revenue shall not include all profits, losses or expenses arising from any proprietary trading activities.

~~(c)    For each calendar quarter during the Trading Earn-Out Period, Purchaser shall pay to Trustee as part of the Purchase Price hereunder an Earn-Out Payment that shall be based on Trading Amount (the "Trading Earn-Out Payment"); provided, however, that Purchaser's obligation to make payments in respect of the Trading Earn-Out shall cease upon Trustee receiving from Purchaser Twelve Million Dollars ($12,000,000) in the aggregate solely in respect of the Trading Earn-Out (the "Trading Earn-Out Cap").   The term "Trading Amount" means, for any applicable calendar quarter, a dollar amount equal to (i) $0.0005 multiplied by (ii) the average daily Share trading volume of the Business for such calendar quarter (represented by the amount equal to (x) the total aggregate Share trading volume for such calendar quarter divided by (y) the number of Trading Days in such calendar quarter) in excess of 25,000,000, multiplied by (iii) the number of Trading Days in such calendar quarter.~~

(c)    ~~(d)~~ No later than ten (10) Business Days following the conclusion of each calendar quarter during the ~~Trading~~ Earn-Out Period ~~or the Revenue Earn-Out Period, as the case may be,~~ Purchaser shall pay by wire transfer to Trustee the ~~Revenue Earn-Out Payment or the Trading~~ Earn-Out Payment for such calendar quarter and shall deliver to Trustee simultaneously with such Earn-Out Payments an earn-out report (each, an "Earn-Out Report"), setting forth in reasonable detail the basis for Purchaser's determination of the applicable Earn-Out Payment~~, Gross Revenue~~ and Net Trading ~~Amount, as applicable~~Revenue for the relevant calendar quarter~~, including, without limitation with respect to the Trading Earn-Out, (x) the number of Trading Days in such calendar quarter and (y) the aggregate Share trading volume for such calendar quarter.  For the avoidance of doubt, once Purchaser has paid in full either the Revenue Earn-Out Payment or the Trading Earn-Out Payment, Purchaser shall no longer be required to include in any Earn-Out Report information relating to such fully-paid Earn-Out, but shall continue to provide quarterly information in such Earn-Out Report relating to any Earn-Out in respect of which Earn-Out Payments are or may come due. ~~.  Purchaser shall provide any additional supporting information not set forth in the Earn-Out Report that Trustee reasonably requests in order to verify the accuracy of the determination of any applicable Earn-Out Payment~~, Gross Revenue~~ or Net Trading ~~Amount~~Revenue set forth in such Earn-Out Report.

(i)     Purchaser shall, upon request by Trustee made within ninety (90) days of receipt by Trustee of the respective Earn-Out Report, make available for review the books and records of Purchaser related to Purchaser and the Business in order for Trustee to verify the accuracy of the determination of the Earn-Out Payment, Gross Revenue and/or Net Trading Amount Revenue as set forth in the Earn-Out Report. For the avoidance of doubt, once Purchaser has paid in full either the Revenue Earn-Out Payment or the Trading Earn-Out Payment, Purchaser shall no longer be required to make available to Trustee further quarterly information relating to such fully paid Earn-Out, but shall continue to be required to make available to Trustee any quarterly information relating to any Earn-Out in respect of which Earn-Out Payments are or may come due. Trustee may request, by notice to Purchaser within such ninety (90)-day period, that such determination(s) be audited by an independent certified public accountant selected by Trustee, and the auditor shall be provided access to books and records relating to the Business and Purchaser as requested by the auditor. The auditor's decision shall, subject to Purchaser providing prompt access to the books and records as requested by the auditor, be made within ninety (90) days of his/its appointment and shall be binding upon the parties and non-appealable. Purchaser shall pay to Trustee any adjustment payment to any previous Earn-Out Payments within ten (10) Business Days of the auditor's decision thereof. Trustee shall bear all costs of any such audit, except that if the amount of any adjustment payment required by Purchaser based on the auditor's decision represents more than five percent (5%) of the amount that was the subject of the disagreement, then Purchaser shall pay all costs of such audit.

(ii)     From the Closing Date and through the conclusion of the Trading Earn-Out Period or, if later, the date of full payment of the Revenue Earn-Out Cap, (w) Purchaser shall not, and shall not permit any of its Affiliates to, engage, directly or indirectly, in the operation of a market making business other than through Purchaser; (x) in order to facilitate the determination of any Earn-Out Payments owed by Purchaser to Trustee, Purchaser shall, for accounting purposes, operate the Business as if it were a separate, stand alone entity and account to Trustee with separate financial statements of the Business as a stand-alone entity prepared in accordance with GAAP; (y) Purchaser shall provide all capital reasonably necessary for Purchaser's operation of the Business following the Closing (but which in no event shall be less than a commercially reasonable amount, given the intended and customary use of the Business as a market maker); and (z) Purchaser's operation of the Business shall be conducted in a commercially reasonable manner with the goal of maintaining the commercial viability of the Business.

(e)     For the avoidance of doubt, Purchaser hereby acknowledges that the payment obligations hereunder in respect of the Revenue Earn-Out are separate and distinct from those of the Trading Earn-Out, and that payment of any Earn-Out Payment due in respect of either Earn-Out shall not constitute payment of any Earn-Out Payment due in respect of the other Earn-Out.

(d)     (f) If, following the Closing and prior to the conclusion of Purchaser's obligations to make all Earn-Out Payments, a Sale of the Purchaser occurs, then the provisions of Sections 4.l(b) and 4.1(e) shall terminate immediately in respect of the Purchaser and in lieu thereof Purchaser shall be obligated to take the following actions:

(i)    if the amount to be received by Purchaser or the holders of its equity interests in such Sale of the Purchaser (the "Sale Proceeds") exceeds the sum (the "Earn-Out Remainder") of the ~~Trading~~ Earn-Out Cap ~~plus the Revenue Earn-Out Cap (the "Cap Amounts")~~ minus all Earn-Out Payments actually received by Trustee pursuant to Section 4.1(b~~)~~ ~~and 4.1(c)~~ as of such date, then Purchaser shall pay to Trustee at closing thereof an amount equal to such Sale Proceeds; and

(ii)    if the Sale Proceeds do not exceed the Earn-Out Remainder, then the amount of the Sale Proceeds shall be transferred to Trustee at closing thereof and the obligation to make any Earn-Out Payments constituting the Earn-Out Remainder up to the sum of the Earn-Out Cap ~~Amounts~~ minus the Sale Proceeds shall be assumed by the third-party purchaser in such Sale of the Purchaser; provided, that the third-party purchaser shall have assumed the obligation in respect of such remaining Earn-Out Payments in writing and Trustee shall have been granted third-party beneficiary rights related thereto, in form and substance satisfactory to Trustee.

Where any such Sale of the Purchaser is effected through a series of transactions, the parties acknowledge and agree that the obligations of Purchaser set forth in this Section 4.1(~~f~~d) shall be interpreted, to the maximum extent permitted by Law, so as to be triggered as of the consummation of the first transaction comprising such series of transactions.

Section 4.2    Acknowledgement and Allocation of Purchase Price.  The parties hereby acknowledge and agree that the Closing Payment and any Earn-Out Payments shall constitute Purchase Price hereunder.  The aggregate Purchase Price shall be allocated by Trustee and Purchaser among the Acquired Assets as set forth on Schedule 4.2 hereto.  Such agreed allocation is intended to comply with Section 1060 of the Tax Code and Purchaser and Trustee hereby agree to report the transactions contemplated hereby for federal income Tax purposes in accordance with such allocation.

Section 4.3    Date, Time and Place of Closing.  The transactions provided for by this Agreement shall be consummated (the "Closing") at 10:00 a.m., local time, at the offices of Baker & Hostetler LLP, 45 Rockefeller Plaza, New York, NY 10111, on the first Business Day following the date on which all of the conditions to the parties obligations set forth in Articles VIII, IX and X have been satisfied or waived in writing by the appropriate party, or such other date or place as may be agreed upon by the parties hereto.  The date and time of Closing is hereinafter sometimes called the "Closing Date."

Section 4.4    Prepayment.  At any time from the date hereof through the date on which the Earn-Out Cap is paid in full, Purchaser shall have the option to accelerate its obligations in respect of the Earn-Out Payments and pay to Trustee at such time an amount equal to (a) the Earn-Out Cap minus (b) the aggregate amount of Earn-Out Payments actually received by Trustee as of such date (the "Prepaid Earn-Out Payment").  Upon actual receipt by Trustee of payment in full of the Prepaid Earn-Out Payment, all rights and obligations of either party under this Agreement shall immediately terminate.

Section 4.5    Right of Rescission.  Following the Closing, in the event that FINRA provides a final determination that it has denied any approvals required for the Business as set

forth in Section 7.13(a)(i) and (ii), Trustee shall have the sole and exclusive option in his sole discretion to promptly rescind the transactions contemplated hereby and all of the Acquired Assets will be returned by Purchaser to Trustee in exchange for the return of Four Hundred Sixty-Five Thousand Dollars ($465,000), it being expressly understood that the Deposits shall remain the sole and exclusive property of Trustee as liquidated damages.

Section 4.6    Termination of Obligations.  Notwithstanding anything to the contrary set forth herein, upon actual receipt by the Trustee of Earn-Out Payments in an amount equal to the Earn-Out Cap, all rights and obligations of either party under this Agreement shall immediately terminate with no further force and effect.

<h1 style="text-align:center">ARTICLE V<br>REPRESENTATIONS AND WARRANTIES OF TRUSTEE</h1>

Trustee hereby represents and warrants to Purchaser on the date hereof and on the Closing Date that:

Section 5.1    Authorization and Validity.  Subject to the Procedures Order and Sale Order, Trustee has all requisite power and authority to enter into this Agreement and the other Purchase Documents to which he is a party and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out his obligations hereunder and thereunder, including to effect the sale of the Acquired Assets to Purchaser.  This Agreement and the other Purchase Documents have been or will be duly executed by Trustee and, subject to the Bankruptcy Court's entry of the Sale Order, constitute, or will when executed constitute, his valid and binding obligations, enforceable against him in accordance with their terms.

Section 5.2    Title and Ownership.  At the Closing, Trustee will convey, and Purchaser will obtain, good and valid title to the Acquired Assets free and clear of all Encumbrances, pursuant to Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code or SIPA, as set forth in the Sale Order.

Section 5.3    Intellectual Property.  To Trustee's Knowledge, Schedule 2.1(c) contains a complete and accurate list of all material intellectual property owned or licensed by Debtor which is used in connection with the conduct of the Business.

Section 5.4    Brokers.  Except for Lazard Frères & Co., LLC, Trustee has not dealt with any broker, finder or similar agent with respect to the transactions contemplated by this Agreement, and Trustee is not under any obligation to pay any broker's fee, finder's fee or commission other than to Lazard Frères & Co., LLC in connection with the transactions contemplated by this Agreement.

Section 5.5    SALE ON AN OTHERWISE "AS IS" AND "WHERE IS" BASIS.  EXCEPT AS EXPLICITLY SET FORTH IN THIS ARTICLE V AND SUBJECT TO THE OTHER TERMS HEREOF, THE ACQUIRED ASSETS ARE BEING SOLD ON AN "AS IS" AND A "WHERE IS" BASIS.  EXCEPT AS EXPLICITLY SET FORTH IN THIS ARTICLE V AND SUBJECT TO THE OTHER TERMS HEREOF, TRUSTEE DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR

IN WRITING) TO PURCHASER (INCLUDING ANY OPINION, INFORMATION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES BY ANY MEMBER, PARTNER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL OR OTHER AGENT, CONSULTANT OR REPRESENTATIVE OF TRUSTEE).

Section 5.6    NO OTHER REPRESENTATIONS OR WARRANTIES.  EXCEPT AS EXPLICITLY SET FORTH IN THIS ARTICLE V AND SUBJECT TO THE OTHER TERMS HEREOF, TRUSTEE MAKES NO REPRESENTATIONS OR WARRANTIES TO PURCHASER, AND ANY AND ALL STATEMENTS MADE OR INFORMATION COMMUNICATED BY TRUSTEE OR ANY OF TRUSTEE'S REPRESENTATIVES OUTSIDE OF THIS AGREEMENT (INCLUDING BY WAY OF THE DOCUMENTS PROVIDED IN CONNECTION WITH ANY DUE DILIGENCE REVIEW OF THIS TRANSACTION), WHETHER VERBALLY OR IN WRITING, ARE DEEMED TO HAVE BEEN SUPERSEDED BY THIS AGREEMENT, IT BEING INTENDED THAT NO SUCH PRIOR STATEMENT OR COMMUNICATION SHALL SURVIVE THE EXECUTION AND DELIVERY OF THIS AGREEMENT.

### ARTICLE VI
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Trustee on the date hereof and on the Closing Date that:

Section 6.1    Status.  Purchaser is a registered broker-dealer and a limited liability company duly formed and subsisting under the Laws of the State of Delaware and has full power and authority to own its properties and to carry on the business presently conducted by it.

Section 6.2    Authority; Effective Agreement.  Purchaser has the requisite power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and the Purchase Documents to which it is a party, and to consummate the transactions contemplated herein and therein.  Purchaser has taken all actions required by Purchaser to authorize the execution, delivery and performance of the Purchase Documents and the consummation of the transactions contemplated thereby.  This Agreement has been duly and validly executed and delivered by Purchaser and, subject to the Bankruptcy Court's entry of the Sale Order, constitutes, or will when executed constitute, a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

Section 6.3    Brokers or Finders.  No agent, broker, person or firm acting on behalf of Purchaser or any of its Affiliates is, or will be, entitled to any commission, broker's or finder's fees from any party, or from any Affiliate of any party, in connection with any of the transactions contemplated by this Agreement.

Section 6.4    Litigation or Proceedings.  There is no litigation or other proceeding pending, or, to the knowledge of Purchaser, threatened, against Purchaser that could reasonably be expected to affect adversely Purchaser's ability to consummate the transactions contemplated by this Agreement.

Section 6.5    <u>Financial Capability</u>.  Purchaser will have on the Closing Date the financing sufficient to enable it to perform all of its obligations hereunder, including, without limitation, payment of the Closing Payment.

Section 6.6    <u>NO OTHER REPRESENTATIONS OR WARRANTIES</u>.  EXCEPT AS EXPLICITLY SET FORTH IN THIS ARTICLE VI AND SUBJECT TO THE OTHER TERMS HEREOF, PURCHASER MAKES NO REPRESENTATIONS OR WARRANTIES TO TRUSTEE, AND ANY AND ALL STATEMENTS MADE OR INFORMATION COMMUNICATED BY PURCHASER OR ANY OF PURCHASER'S PRINCIPALS, OFFICERS OR REPRESENTATIVES OUTSIDE OF THIS AGREEMENT (INCLUDING IN CONNECTION WITH PURCHASER'S DUE DILIGENCE REVIEW OF THIS TRANSACTION), WHETHER VERBALLY OR IN WRITING, ARE DEEMED TO HAVE BEEN SUPERSEDED BY THIS AGREEMENT, IT BEING INTENDED THAT NO SUCH PRIOR STATEMENT OR COMMUNICATION SHALL SURVIVE THE EXECUTION AND DELIVERY OF THIS AGREEMENT.

## ARTICLE VII
## FURTHER COVENANTS AND AGREEMENTS

Section 7.1    <u>Cooperation</u>.

(a)    Purchaser and Trustee agree to execute and deliver all other instruments and take all such other actions that either party may reasonably request from time to time, before or after Closing and without payment of further consideration, to effectuate the transactions provided in this Agreement or any of the Purchase Documents and to confer to the parties hereto the benefits intended by such transactions.

(b)    Trustee shall promptly forward any mail or other communications relating to the Business or the Acquired Assets that are received by Trustee after the Closing, subject to <u>Section 7.4</u> below.  Purchaser agrees that Trustee may open any such mail prior to forwarding.

Section 7.2    <u>Solicitation</u>.  Subject to and in compliance with the Procedures Order, Trustee may solicit higher and better offers for the Acquired Assets and take such other steps as provided in connection with the auction of such assets under the Procedures Order.

Section 7.3    <u>Disclosure to Parties</u>.  If any of the parties hereto becomes aware, prior to the Closing Date, that any of his or its representations, warranties, covenants or other agreements is inaccurate or incapable of being performed in any material respect, such party shall promptly give written notice of such inaccuracy or incapability to the other party; <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 7.3</u> shall relieve the party bound by such representation, warranty, covenant or other agreement from complying with such representation, warranty, covenant or other agreement.

Section 7.4    <u>Post Closing Cooperation and Preservation of Records</u>.  To facilitate the orderly transition of ownership of the Acquired Assets and the continuing cooperation with Trustee and Governmental Entities in connection with their respective ongoing investigations in the pending court proceedings, each party shall assist the other party with operating and transitional issues by providing information reasonably requested by such other party regarding

the business and operations of Debtor, including by providing reasonable access to Trustee and his agents and representatives at reasonable times during reasonable business hours to Debtor's books and records included in the Acquired Assets after the Closing.  Purchaser also agrees that Trustee and his agents and representatives shall have access at reasonable times during reasonable business hours following the Closing Date to all Employees transferred to Purchaser hereunder to assist in the investigation of Debtor and that all records shall be preserved.  Debtor agrees to retain possession of all accounting, business, financial and Tax records and information relating to but not included in the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date (the "Related Records") for a period of at least six (6) years from the Closing Date, provided that if at any time during such six (6) year period, Trustee no longer desires to retain all or any portion of the Related Records, Trustee shall offer to the extent permitted by applicable Law to transfer such Related Records to Purchaser, at Purchaser's expense, and, if not accepted by Purchaser, Trustee may dispose of such Related Records.

Section 7.5    Notice to Third Parties.  On the Closing Date, Trustee shall execute and deliver to Purchaser for use by Purchaser with respect to any Person, anywhere throughout the world, letters prepared jointly by, and mutually acceptable to, Purchaser and Trustee advising that (a) effective as at the Closing Date, Purchaser owns Trustee's interests in or to the Acquired Assets and (b) Purchaser is entitled to receive all moneys, payments, receipts, revenues or income derived therefrom in accordance with this Agreement; and requesting that thereafter they render all required statements and activity reports and make payments of one hundred (100%) percent of all sums thereafter otherwise due in respect of any period after Closing to Purchaser in accordance with this Agreement, and provide copies of all notices, claims or other correspondence, directly to Purchaser.

Section 7.6    Purchaser's Due Diligence Investigation; Certain Acknowledgements.

(a)    Purchaser acknowledges and agrees that, except as explicitly set forth in Article V and subject to the other terms hereof, Trustee has not made any representations or warranties regarding Trustee, Debtor, the Business, the assets or operations of the Business or otherwise in connection with the transactions contemplated hereby.  Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that no projections, forecasts and predictions, other estimates, data, financial information, documents, reports, statements (oral or written), summaries, abstracts, descriptions, presentations (including any management presentation or facility tour) memoranda, or offering materials with respect to the Business, is or shall be deemed to be a representation or warranty by Trustee to Purchaser, whether under this Agreement or otherwise, and that Purchaser has not relied thereon in determining to execute this Agreement and proceed with the transactions contemplated hereby.  Purchaser further acknowledges and agrees that materials it has received from Trustee or Debtor or any of their respective Affiliates, agents, consultants, investment bankers, attorneys, advisors and representatives include projections, forecasts and predictions relating to the Business; that there are uncertainties inherent in attempting to provide these materials and to make such projections, forecasts and predictions; that Purchaser is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all materials, projections, forecasts, predictions and information so furnished; that Purchaser shall not have any claims against Trustee or Debtor or any of their respective Affiliates, agents, consultants, investment bankers, attorneys, advisors or representatives with respect thereto, and that

Purchaser has not relied thereon. Purchaser acknowledges that no Person has been authorized by Trustee to make any representation or warranty regarding Trustee, Debtor, the Business, the assets or operations of the Business or otherwise in connection with the transactions contemplated hereby and, if made, such representation or warranty may not be relied upon as having been authorized by Trustee.

(b)      Purchaser acknowledges and agrees that it (i) has made its own inquiry and investigation into, and has formed an independent judgment concerning Debtor, the Business and the assets or operations of the Business, and (ii) has conducted such investigations of Trustee, Debtor, the Business and the assets and operations of the Business as Purchaser deems necessary to satisfy itself as to the operations and conditions thereof, and will rely solely on such investigations and inquiries. Purchaser further acknowledges and agrees that it will not at any time assert any claim against Trustee or Debtor or any of their respective Affiliates, agents, consultants, investment bankers, attorneys, advisors or representatives, or attempt to hold any of such Persons liable, for any inaccuracies, misstatements or omissions with respect to the information furnished by such Persons concerning Trustee, Debtor, the Business and the assets or operations of the Business.

Section 7.7      Tax Covenants.

(a)      All federal, foreign, state and local sales, transfer, stamp, excise, value-added or other similar Taxes, recording and filing fees (collectively, "Transfer Taxes') that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and not exempt under Section 1146(c) of the Bankruptcy Code shall be paid by Purchaser.

(b)      Trustee and Purchaser agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

Section 7.8      Notice of Certain Events. Between the date hereof and the Closing Date, Trustee shall, as promptly as reasonably practicable, notify Purchaser of:

(a)      any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)      any notice or other communication from any Governmental Entity in connection with the transactions contemplated by this Agreement; and

(c)      promptly after the same is available, copies of all pleadings, motions, applications, objections, Orders, financial information and other documents filed with the Bankruptcy Court in the Bankruptcy Case, or received or served on Debtor relating to the sale or other disposition of any of the Acquired Assets.

Section 7.9    Certain Filings.    Between the date hereof and the Closing Date, Trustee and Purchaser shall reasonably cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Governmental Entity is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material Contracts, in connection with the consummation of the transactions contemplated by this Agreement and (ii) in taking such actions, causing such actions to be taken, making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 7.10    Commercially Reasonable Efforts.    Between the date hereof and the Closing Date, (a) each of the parties shall use commercially reasonable efforts to take, or cause to be taken, all reasonable actions, and do, or cause to be done, all things reasonably necessary or proper, consistent with applicable Law and their respective obligations under this Agreement, to consummate and make effective in an expeditious manner the transactions contemplated hereby, and (b) Trustee shall use commercially reasonable efforts, except as may be required by a specific Order of the Bankruptcy Court, to maintain the Acquired Assets substantially in accordance with Trustee's current practices and procedures.

Section 7.11    Residual Information.    Purchaser hereby acknowledges that certain of the Acquired Assets may contain residual data or other information relating to Debtor and the prior business operations of Debtor which may not pertain in any way to the Business (the "Residual Information").    Purchaser hereby agrees, and shall cause its director, officers, employees, agents and advisors, to keep all such Residual Information confidential and to not disclose the existence or contents of such Residual Information to any Person in any manner whatsoever.

Section 7.12    Patent License.    Trustee shall grant to Purchaser a non-exclusive, royalty-free, fully paid-up license to use the process protected by U.S. Patent No. 7,162,448 worldwide solely in connection with Purchaser's operation of the Business after Closing, in the event that Trustee obtains the applicable right, power and authority over Primex Holdings LLC necessary to grant such license.

Section 7.13    FINRA Filings; Access.

(a)    Without limiting the generality of Section 7.9, Purchaser shall (i) within seven (7) Business Days after the date hereof file the application necessary to obtain FINRA approval for a change of control of Purchaser and (ii) within fourteen (14) Business Days after the date hereof file the application necessary to obtain FINRA approval (x) to amend Purchaser's scope of business (or similar terms) to include the operation of a market making business and (y) to approve the purchase of the Acquired Assets.    Purchaser's deadline to file the applications referenced in clauses (i) and (ii) of this Section 7.13(a) may be extended with the consent of the Trustee, which consent shall not unreasonably be withheld or delayed.

(b)    Upon the reasonable request of Purchaser to access an identified document related to the Business, Trustee shall provide to Purchaser reasonable access to (i) such document in connection with the documents filed by Purchaser with FINRA in accordance with Section 7.13(a), to the extent that Trustee has the right and control over such documents and (ii) the virtual data room of the Business controlled by Trustee.

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any or all of which Purchaser may waive in writing:

Section 8.1    <u>Representations and Warranties</u>.    Each of the representations and warranties of Trustee set forth in this Agreement and any exhibit hereto shall be true and correct in all material respects on and as of the Closing Date (except for any representations and warranties that speak as of a specific date or time, which representations and warranties need only be true and correct as of such date or time).

Section 8.2    <u>Covenants and Agreements</u>.    Trustee shall have performed and complied, and shall have caused Debtor to perform and comply, in all material respects, with all of their respective covenants and agreements contained in this Agreement that are required to be performed or complied with on or prior to the Closing Date.

Section 8.3    <u>Bankruptcy Matters</u>.    All authorizations, consents, Orders and approvals of the Bankruptcy Court necessary for the consummation of the transactions contemplated by this Agreement shall have been obtained, including, but not limited to, those set forth in <u>Article X</u>; and Purchaser shall have received from the Bankruptcy Court all other Orders, approvals and consents required to transfer the Acquired Assets and to consummate the transactions contemplated by this Agreement.

Section 8.4    <u>No Injunctions</u>.    No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other Order that is in effect on the Closing Date and prohibits the consummation of the transactions contemplated hereby but, for the avoidance of doubt, is not intended to include any approval from any Governmental Entity.

<u>Section 8.5    FINRA Approval.  Purchaser shall have received approval from FINRA of the application to be filed by Purchaser pursuant to Section 7.13(a)(i).</u>

<u>Section 8.6</u>    Section 8.5 <u>Deliveries</u>.    All documents required to be delivered by Trustee at or prior to Closing shall have been delivered to Purchaser at Closing, including, without limitation, those  contemplated by <u>Section 11.1</u>.

## ARTICLE IX
## CONDITIONS TO OBLIGATIONS OF TRUSTEE

The obligations of Trustee to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any or all of which Trustee may waive in writing:

Section 9.1    <u>Representations and Warranties</u>.    Each of the representations and warranties of Purchaser set forth in this Agreement and any exhibit hereto shall be true and correct in all material respects on and as of the Closing Date (except for any representations and

warranties that speak as of a specific date or time, which representations and warranties need only be true and correct as of such date or time).

Section 9.2    <u>Covenants and Agreements</u>.    Purchaser shall have performed and complied in all material respects with all of its covenants and agreements contained in this Agreement which are required to be performed or complied with on or prior to the Closing Date.

Section 9.3    <u>Bankruptcy Matters</u>. All authorizations, consents, Orders and approvals of the Bankruptcy Court necessary for the consummation of the transactions contemplated by this Agreement shall have been obtained, including, but not limited to, those set forth in <u>Article X</u>; and Trustee shall have received from the Bankruptcy Court all other Orders, approvals and consents required to transfer the Acquired Assets and to consummate the transactions contemplated by this Agreement.

Section 9.4    <u>No Injunctions</u>.    No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or Order that is in effect on the Closing Date and prohibits the consummation of the transactions contemplated hereby but, for the avoidance of doubt, is not intended to include any approval from any Governmental Entity.

Section 9.5    <u>Governmental and Regulatory Approvals</u>.    Purchaser shall have advised Trustee that Purchaser has received all required or necessary approvals or consents from all applicable Governmental Entities, including, without limitation, from FINRA, in connection with the transactions contemplated hereby.  Notwithstanding the foregoing, Purchaser shall not be required to obtain FINRA'S approval of the application to be filed by Purchaser pursuant to Section 7.13(a)(ii) on or prior to the Closing Date.

Section 9.6    <u>Deliveries</u>.    All documents required to be delivered by Purchaser at or prior to Closing shall have been delivered to Trustee at Closing, including, without limitation, those contemplated by <u>Section 11.2</u>.

## ARTICLE X
## BANKRUPTCY/SIPA CONDITIONS

The obligations of each party to consummate the transactions contemplated hereby shall be subject to the fulfillment or waiver of each of the following conditions (any one or more of which may be waived in writing in whole or in part by the written consent of both parties hereto):

Section 10.1    <u>Sale Order and SIPC Approval</u>.  This Agreement is subject to approval by SIPC and the entry by the Bankruptcy Court of an Order (the "<u>Sale Order</u>") on or before May 30, 2009 which shall be in form and substance reasonably satisfactory to Trustee and Purchaser, and which shall approve the transactions contemplated by this Agreement including, but not limited to the sale of all of the Acquired Assets free and clear of all Encumbrances and shall, without limitation, contain findings of fact and conclusions of Law that: (a) Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and the sale contemplated by this Agreement does not violate and is not subject to avoidance under Section 363(n) of the Bankruptcy Code; (b) all of the requirements of Sections 363 and 365 of the Bankruptcy Code, including, but not limited to, one or more of the requirements set forth in the

subsections of Section 363(f), have been satisfied; (c) the Acquired Assets are being sold free and clear of all Encumbrances; (d) any Encumbrances on the Acquired Assets shall attach to the proceeds received by Trustee pursuant to this Agreement to the same extent, and with the same validity, priority, perfection and enforceability, as such Encumbrances had with respect to the Acquired Assets; (e) notice of the hearing on the transactions contemplated by this Agreement (i) was given in accordance with the applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and (ii) constitutes such notice as is appropriate under the particular circumstances and in accordance with the Bankruptcy Code and applicable Law; (f) neither Purchaser nor its designees shall be considered successors of Debtor or any of Debtor's Affiliates and none of Purchaser, any of Purchaser's Affiliates or any designee shall have any liability for any debts, liabilities or obligations of, or claims against Debtor or any of its Affiliates, except as expressly assumed in writing by Purchaser pursuant to this Agreement; and (g) provisions for the Bankruptcy Court's retention of jurisdiction over matters arising out of or related to this Agreement and the transactions contemplated hereby.

In addition to the above, the Sale Order shall provide for the assumption by and assignment to Purchaser of the Designated Contracts.

Section 10.2 Procedures Order. Trustee shall, as promptly as practicable, seek a hearing before the Bankruptcy Court on an expedited basis for approval of the Procedures Order, this Agreement and the transactions contemplated hereby, including, without limitation, the sale of Acquired Assets free and clear of Encumbrances and the assumption and assignment of Designated Contracts. The Trustee shall obtain entry of the Procedures Order on or before April 30, 2009. The entry of the Procedures Order shall be in form and substance reasonably satisfactory to Trustee and Purchaser and shall contain, without limitation, the following provisions: (a) the proposed sale to Purchaser shall be subject to better and higher competing bids; (b) to qualify as a better and higher competing bid ("Qualifying Competing Bids"), the competing bid must (i) be on substantially the same terms and conditions as this Asset Purchase Agreement, except for price; (ii) require the payment at closing of such transaction of a cash purchase price to Trustee of not less than Five Hundred Thousand Dollars ($500,000) plus additional consideration with a present value equal to at least the value proposed to be provided by the Purchaser, as determined in the Trustee's sole and absolute discretion; (iii) be accompanied by an earnest money deposit of ten percent (10%) of the Competing Bid; and (iv) be served on Trustee and Purchaser on or before the Objection/Counter Bid Deadline; (c) if there are any Qualifying Competing Bids on the Acquired Assets, Trustee will hold an open auction (the "Auction") on the Acquired Assets as between Qualified Competing Bids, at the offices of Baker & Hostetler LLP, 45 Rockefeller Plaza, New York, New York 10111, 11th Floor, on a date to be fixed by the Bankruptcy Court, which higher and better offer, together with the second highest offer, shall be presented to the Bankruptcy Court at a hearing to confirm the sale, to be held the day following the conclusion of the Auction of the Acquired Assets (the "Sale Hearing"). The highest and best bid on the Acquired Assets will be determined by traditional auction procedures rather than the use of sealed bids consistent with the Bankruptcy Code; (d) at the Auction, parties submitting Qualified Competing Bid(s), if any, and Purchaser may increase their respective bids for the subject assets provided each higher bid shall be in increments of not less than Thirty Five Thousand Dollars ($35,000); (e) in the event that this Agreement is terminated pursuant to Section 12.1(e), Trustee shall pay Purchaser a fee of Fifteen Thousand Dollars ($15,000) from the proceeds of a higher and better sale as reimbursement of Purchaser's

~~expenses, including attorneys, investment banking, accounting and other professional fees and expenses incurred in pursuit of its bid (the "Break-Up Fee") to compensate Purchaser for its efforts in connection with it being the "stalking horse" bidder for the Acquired Assets, including the costs Purchaser incurred in performing due diligence, negotiating and documenting the terms of this Agreement and representing its interests with respect to the proposed sale and Trustee's Bankruptcy Case; (f) the Break-Up Fee constitutes first priority administrative expenses of Trustee pursuant to Section 503(b) of the Bankruptcy Code and shall be paid within ten (10) days of any closing in connection with the Acquired Assets and without further Order of or application to the Bankruptcy Court; and (g) any counter-parties to Contracts subject to assumption shall be provided notice of the pending sale and assumption, together with a list of the cure obligations, if any.~~

Section 10.2 ~~Section 10.3~~ Final Order.  The Sale Order shall have become a Final Order; provided, however, that this condition may be waived in writing by the parties.  Trustee shall seek entry of an Order waiving any stay requirement under, *inter alia*, Federal Rules of Bankruptcy Procedures 6004 and 6006.

## ARTICLE XI
## CLOSING

Section 11.1    Trustee's Deliveries.  At the Closing, Trustee shall deliver or cause to be delivered to Purchaser each of the following:

(a)    (i)  the Bill of Sale, duly executed by Trustee, and (ii) the Assumption Agreement, duly executed by Trustee;

(b)    a certificate of Trustee to the effect that each of the conditions specified in Sections 8.1 and 8.2 has been satisfied, in form and substance reasonably acceptable to Purchaser;

(c)    a certified copy of the Sale Order, in form acceptable to Purchaser, providing for the sale of the Acquired Assets and assumption and assignment of the Designated Contracts;

(d)    the Intellectual Property Assignment, duly executed by Trustee; and

(e)    such other documents and agreements as shall vest in Purchaser Trustee's and Debtor's right, title and interest in and to the Acquired Assets or as Purchaser shall reasonably request to further evidence consummation of the transactions contemplated by this Agreement.

Section 11.2    Purchaser's Deliveries.  At the Closing, Purchaser shall deliver or cause to be delivered to Trustee or any other applicable party each of the following:

(a)    the Closing Payment;

(b)    the Bill of Sale, duly executed by Purchaser;

(c)      the Assumption Agreement, duly executed by Purchaser;

(d)      resolutions, certified by an officer of Purchaser, evidencing Purchaser's authority to (i) execute and deliver this Agreement and the other Purchase Documents and (ii) consummate the transactions contemplated herein and therein;

(e)      an incumbency certificate of Purchaser, certified by an officer of Purchaser, certifying the accuracy of the specimen signature of the authorized representative of Purchaser executing this Agreement and the Purchase Documents;

(f)      certificate of an officer of Purchaser to the effect that each of the conditions specified in Sections 9.1 and 9.2 has been satisfied, in form and substance reasonably satisfactory to Trustee; and

(g)      such other documents or instruments as Trustee shall reasonably request to further evidence consummation of the transactions contemplated by this Agreement.

## ARTICLE XII
## TERMINATION OF AGREEMENT

Section 12.1    Termination.    This Agreement may be terminated by written notice promptly given to the other party hereto, at any time prior to the Closing Date:

(a)      by mutual consent of Purchaser and Trustee;

(b)      by either Purchaser or Trustee, if any permanent injunction or other Order of any Governmental Entity that prevents the consummation of the transactions contemplated hereby shall have become final and non-appealable;

(c)      by either Purchaser or Trustee, if either (i) the Procedures Order is not entered by April 30, 2009 or (ii) the Procedures Order is not a Final Order by May 11, 2009;

(c)      (d) by either Purchaser or Trustee, if either (i) the Sale Order is not entered by May 30, 2009 or (ii) the Sale Order is not a Final Order by June 11, 2009;

(d)      (e) by either Purchaser or Trustee, if the Closing has not occurred by the date that is seventhree (73) daysBusiness Days after the date on which the Sale Order is a Final OrderPurchaser has received notice of FINRA's approval of Purchaser's application for a change of control of Purchaser as set forth in Section 7.13(a)(i);

(f)      by either Purchaser or Trustee, if the Bankruptcy Court approves an Alternative Transaction or an Alternative Transaction is consummated;

(e)      (g) by Purchaser, upon the voluntary or involuntary dismissal of the Bankruptcy Case;

(f)      (h) by Purchaser, if there has been a material breach by Trustee of any of the representations, warranties, covenants or other agreements of Trustee set forth herein, which

breach is not curable, or if curable, is not cured within five (5) days after written notice of such breach is given by Purchaser to Trustee, or if any of the conditions set forth in <u>Article VIII</u> are incapable of being met; or

        <u>(g)</u>    (i) by Trustee, if there has been a material breach by Purchaser of any of its representations, warranties, covenants or other agreements set forth herein, which breach is not curable, or if curable, is not cured within five (5) days after written notice of such breach is given by Trustee to Purchaser, or if any of the conditions set forth in <u>Article IX</u> are incapable of being met.

        Section 12.2    <u>Effect of Termination</u>.  Upon any termination of this Agreement pursuant to <u>Section 12.1</u>, except as set forth in the second and third sentences of this <u>Section 12.2</u>, this Agreement shall be void and have no effect, without any liability on the part of any party hereto or any equityholders thereof (including, without limitation, in the case of either Trustee or Purchaser, such party's respective agents, Affiliates, consultants, investment bankers, attorneys, advisors and other representatives).  In the event that this Agreement is terminated either (a) pursuant to <u>Sections</u> <u>12.1(a)</u>, <u>12.1</u>(b), <u>12.1(c)</u>, <s>12.1(d), or</s> <u>12.1(e)</u>, <s>12.1(g) or 12.1(i), the Deposit</s>the Initial Deposit shall be immediately forfeited by Purchaser and retained exclusively for the account of Trustee and Purchaser shall, to the extent permitted by applicable Law, be relieved of any further liability with respect to this Agreement or the transactions contemplated hereby or (b) pursuant to Sections 12.1(d) or 12.1(g), the Deposits shall be immediately forfeited by Purchaser and retained exclusively for the account of Trustee and Purchaser shall, to the extent permitted by applicable Law, be relieved of any further liability with respect to this Agreement or the transactions contemplated hereby.  In the event that this Agreement is terminated pursuant to <s>Sections</s>Section 12.1(f) <s>and 12.1(h)</s>, Trustee shall return the Deposits to Purchaser as promptly as reasonably practicable as liquidated damages and Trustee and his Affiliates (including, without limitation, Trustee's agents, Affiliates, consultants, investment bankers, attorneys, advisors and other representatives) and shall, to the extent permitted by applicable Law, be relieved of any further liability with respect to this Agreement or the transactions contemplated hereby.

**ARTICLE XIII**
**SURVIVAL OF REPRESENTATIONS AND WARRANTIES;**
**SURVIVAL OF COVENANTS**

        Section 13.1    <u>Survival of Representations and Warranties</u>.  None of the representations and warranties included in the Purchase Documents or in any certificate to be delivered at Closing will survive the Closing and consummation of the transactions contemplated hereby.

        Section 13.2    <u>Survival of Covenants</u>.  Except for the covenants and agreements expressly by their terms to be performed by the parties after the Closing Date (which shall survive until performed in full), none of the respective covenants and agreements of the parties included in the Purchase Documents or in any other certificate to be delivered at Closing will survive the Closing and the consummation of the transactions contemplated hereby.

## ARTICLE XIV
## GENERAL

Section 14.1    Notices.    All notices and other communications hereunder shall be in writing and shall be sent by certified mail, postage prepaid, return receipt requested; by an overnight express courier service that provides written confirmation of delivery; or by facsimile with confirmation, in each case addressed and copied as set forth on the signature pages hereto. Any party may change his or its address for receiving notice by giving notice of a new address in the manner provided herein.  Any notice so given, shall be deemed to be delivered on the second Business Day after the same is deposited in the United States mail, on the next Business Day if sent by overnight courier, or on the same Business Day if sent by facsimile before the close of business, or the next Business Day, if sent by facsimile after the close of business on such day.

Section 14.2    Entire Agreement.    This Agreement and the other Purchase Documents, together with exhibits and schedules attached to this Agreement, constitute the entire agreement between the parties pertaining to this subject matter and supersede all prior or contemporaneous agreements and understandings of the parties relating to the same.  This Agreement may be amended only in writing signed by the parties hereto.

Section 14.3    Severability.    If any term or provision of this Agreement or any application thereof shall be invalid or unenforceable, the remainder of this Agreement and any other application of such term or provision shall not be affected thereby.

Section 14.4    Governing Law.    This Agreement and any claim related directly or indirectly to this Agreement (including any claim concerning advice provided pursuant to this Agreement) shall be governed by and construed in accordance with the laws of the State of New York (without regard to the principle of conflicts of law thereof), the Bankruptcy Code and the Securities Investor Protection Act.  No such claim shall be commenced, prosecuted or continued in any forum other than the Bankruptcy Court and, in the event that such Bankruptcy Court does not have jurisdiction, the Supreme Court of the State of New York in New York County and the United States District Court for the Southern District of New York and each of the parties hereby submits to the co-exclusive jurisdiction of such courts.  Notwithstanding the foregoing, nothing in this Section 14.4 is intended to limit any applicable appellate process.  Each of the parties hereby waives on behalf of himself or itself and his or its successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable in any legal proceeding. Each of the parties further waives all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of this Agreement.

Section 14.5    JURISDICTION; WAIVER OF JURY TRIAL.

(a)    THE BANKRUPTCY COURT (AS DEFINED HEREIN) WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER PURCHASE DOCUMENT; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE SUPREME COURT OF THE STATE OF NEW YORK IN NEW

YORK COUNTY AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK WILL HAVE SOLE AND CO-EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER PURCHASE DOCUMENT.   ANY PARTY MAKING AN INITIAL FILING IN THE SUPREME COURT OF THE STATE OF NEW YORK MUST DESIGNATE THE CASE OF ASSIGNMENT TO THE COMMERCIAL DIVISION OF THAT COURT.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 14.6    Waiver.  Any of the terms or conditions of this Agreement may be waived at any time by the party entitled to the benefit thereof, but only by written notice signed by the party waiving such terms or conditions.

Section 14.7    Expenses.  Except as expressly provided herein, Purchaser and Trustee shall each bear their respective expenses relating to or arising out of this Agreement, including, but not limited to, fees for attorneys, accountants and other advisors.

Section 14.8    Assignability; Binding Effect; No Beneficiaries.  (a) This Agreement may not be assigned by either party without the prior written consent of the other party.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement shall not confer any rights or remedies upon any Person, other than the parties hereto and their respective successors and permitted assigns.

(b)    Purchaser hereby acknowledges and agrees that (i) it shall not sell, assign or otherwise transfer any right, title or interest in, to and under any Acquired Asset to any Affiliate thereof without Trustee's prior written consent and (ii) any sale, assignment or transfer of any such Acquired Asset to any other Person shall be effected on a third-party, arm's length basis.

Section 14.9    Counterpart Execution.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any counterpart signature page delivered by facsimile transmission shall be deemed to be and have the same force and effect as an originally executed signature page.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the parties hereto have duly executed and delivered this Agreement as of the date first set forth above.

<u>**TRUSTEE**</u>

**The Trustee for the Liquidation of the Business of Bernard L. Madoff Investment Securities LLC**

Address:

Irving H. Picard, Esq.

c/o Baker & Hostetler LLP

45 Rockefeller Plaza

New York, New York 10111

Facsimile No.: (212) 589-4201

By: Irving H. Picard, Esq., in his capacity as the Trustee for the Liquidation of the Business of Bernard L. Madoff Investment Securities LLC

_____

Irving H. Picard, Esq.

With copies to:

Baker & Hostetler LLP

45 Rockefeller Plaza

New York, New York  10111

Attention:  David J. Sheehan Esq.
　　　　　　　Steven H. Goldberg Esq.

Facsimile No.: (212) 589-4201

300003522.7
300003522.11

**PURCHASER**

**CASTOR POLLUX SECURITIES, LLC**

Address:
229 South Street                            By: _____
Medfield, MA 02052                          Name: Darin Oliver
Attention:  President                       Title:   Managing Member
Facsimile No.:  (508) 359-2932


with copies to:

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
Attention:  Jolie M. Siegel, Esq.
Facsimile No.:  (617) 502-5297

[PURCHASER SIGNATURE PAGE TO SECOND AMENDED AND RESTATED
ASSET PURCHASE AGREEMENT]

300003522.7
300003522.11

Document comparison by Workshare Professional on Wednesday, April 29, 2009
10:04:00 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://SIPCDMS/SIPC/300003522/7 |
| Description | #300003522v7<SIPC> - Castor Pollux Amended and Restated Asset Purchase Agreement (Bernard L Madoff Investment Securities LLC) v7 |
| Document 2 ID | interwovenSite://SIPCDMS/SIPC/300003522/11 |
| Description | #300003522v11<SIPC> - Castor Pollux Second Amended and Restated Asset Purchase Agreement (Bernard L Madoff Investment Securities LLC) v11 |
| Rendering set | BH 2 Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 155 |
| Deletions | 157 |
| Moved from | 8 |
| Moved to | 8 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 328 |