1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------x

      In the Matter

          of                     Index No.

                                   08-01789

      THE SIPA LINK,

                Debtors.

---------------------------------x

                     April 30, 2009

                     United States Custom House

                     One Bowling Green

                     New York, New York 10004

      Pretrial Conference; motion to approve sale of the
market making operations business previously operated by
the Debtor, et al.

B E F O R E:

                HON. BURTON R. LIFLAND,

                     U.S. Bankruptcy Judge

2

1

A P P E A R A N C E S:

2

3          BAKER HOSTETLER, LLP
                   Attorneys for Irving H. Picard, SIPA
4                  Trustee and Counsel for the Trustee
                   45 Rockefeller Plaza
5                  New York, New York 10017
6          BY:    MARC E. HIRSCHFIELD, ESQ.
                       -and-
7                  JOE CONTI, ESQ.
                       -and-
8                  ALISSA NANN, ESQ.
                       -and-
9                  DOUG NEVIN, ESQ.
10
11
12         SECURITIES INVESTOR PROTECTION CORPORATION
                   805 15th Street, Suite 800
13                 Washington, D.C.  20005
14         BY:    KEVIN H. BELL, ESQ.
15
16
17
18
19
20
21
22
23
24
25

3

1           THE COURT:  The SIPA Link.

2           MR. HIRSCHFIELD:  Good morning, Your Honor.

3    Marc Hirschfield from Baker Hostetler.

4           THE COURT:  Yes.  Good morning.

5           MR. HIRSCHFIELD:  Good morning.

6           With me today in Court is Irving Picard,

7    the Trustee; Kevin Bell, from SIPC; as well as Joe Conti

8    and Alissa Nann and Doug Nevin from my office.  We are

9    here today for the second time on the sale of the Debtor's

10   market maker assets.

11          As I have discussed with chambers this

12   morning, there are still a few moving pieces that need to

13   get nailed down in terms of the form of the agreement and

14   perhaps the proposed order.

15          What we would like to do with Your Honor's

16   permission is proceed with the hearing today, and keep the

17   record open at the end of the hearing.  To the extent that

18   things get resolved later today we could submit the order.

19   If not, we would have the need to come back.  But I am

20   fairly confident that we will be able to get things

21   resolved and that we will be able to submit the order in

22   short order.

23          Is that okay?

24          THE COURT:  You may proceed.

25          MR. HIRSCHFIELD:   Great.   Thank you, Your

4

1    Honor.

2              When we were here last before the Court on

3    April 7th to establish bid procedures, I informed the

4    Court, between the time we filed the motion and that

5    hearing date, that we had received a number of inquiries

6    about people who were potentially interested in bidding for

7    the market maker assets, and I had said that we hoped to

8    receive a number of bids by the bid deadline.   We received

9    several bids, three to be exact, by the April 26th bid

10   deadline.

11             At that prior hearing I also informed the

12   Court that we hoped to have a full and vibrant auction when

13   the auction came to pass.

14             And, in fact, we did have a full and

15   vibrant auction, Your Honor.   One bidder withdrew its bid

16   prior to the auction.   The other two bidders along with

17   the stalking horse bidder participated in auction earlier

18   this week, and the results are pretty compelling.

19             The stalking horse bidder, Castor Pollux,

20   is the highest and best bidder in our view.   Their bid was

21   a $500,000 cash at closing and earn-out of up to $15

22   million increased substantially.   The cash portion went

23   from $500,000 to $1 million and the earn-out went from, as

24   I said, 15 million to $24.5 million.   And, in addition, to

25   the amount going up the mechanics under which it is getting

5

1    paid is more favorable to the estate.

2            As the Court may be made aware, at various

3    times that Mr. Madoff valued the market maker at hundreds

4    of million dollars and obviously what we are seeking

5    approval for today is well below that.  It appeared that

6    Bernard Madoff overstated the value of the assets just as

7    he overstated the value of people's investment with him.

8    In short, you can't trust any number that Mr. Madoff puts

9    out.

10           In addition, as we went through the process

11   we went through from a number of potential bidders that the

12   fact that the market maker platform associated with Bernie

13   Madoff was something that made people feel that they didn't

14   want to build.  So there was a certain amount of taint

15   having been associated with Bernie Madoff.

16           With the Court's permission I would like to

17   proffer the testimony of Timothy Dana from Lazard.  The

18   Trustee obtained Lazard to assist with the sales process,

19   and if Your Honor would permit I would proffer his

20   testimony as to the procedures.

21           THE COURT:  Does anyone else want to be

22   heard with respect to the subject of the proffer and

23   subject to any question?

24           You may continue.

25           MR. HIRSCHFIELD:  Your Honor, Mr. Dana

6

1    would testify as follows.  He would say he is a managing

2    director with Lazard & Freres Company; that he has over 15

3    years experience in the financial industry as an investment

4    banker and that he specializes  in transactions involving

5    financial institutions.

6              He would say that on or about December 19,

7    2008, Lazard was retained by Irving Picard, the Trustee,

8    appointed by the Securities Investor Protection Corporation

9    for the liquidation of Bernard L. Madoff Investment

10   Securities LLC, under the Securities Investor Protection

11   Act.

12             Lazard was retained to assist the Trustee

13   in efforts to market and locate a buyer for the market

14   maker and proprietary trading assets of BLMIS.

15             He would testify that shortly thereafter,

16   the Trustee issued a press release announcing the retention

17   of Lazard and the proposed sale of the market maker and

18   proprietary trading assets.

19             He would testify that Lazard contacted

20   approximately 110 parties, including strategic buyers,

21   customers of the market maker business, private equity and

22   venture capital firms, hedge funds and individuals in order

23   to solicit interest from potential bidders.

24             He would testify that Lazard as well as

25   Baker & Hostetler engaged in due diligence and extensive

7

1   document review to prepare an online data room.

2                In late December 2008, Lazard and Baker &

3   Hostetler began to send out packages with informational

4   materials to potential bidders who had signed

5   confidentiality agreements.  46 potential bidders executed

6   confidentiality agreements and returned them to Baker.

7                All 46 potential bidders that executed

8   confidentiality agreements were provided a data pack of

9   information and ten of them were granted access to the data

10  room.

11               He would testify that Baker and Lazard

12  worked with the employees of BLMIS's market maker and

13  proprietary trading businesses to prepare management

14  presentations.  The management team discussed the

15  presentation with seven potential bidders.

16               Four offers were received for the market

17  maker assets, and the Trustee and his professionals entered

18  into extensive negotiations with the offerors to maximize

19  these offers and the returns for the benefit of the BLMIS

20  estate, customers and creditors.

21               Ultimately, after a reasonable period of

22  marketing under the circumstances and negotiations with

23  other parties, the Trustee selected Castor Pollux

24  Securities, LLC to serve as the stalking horse bidder in

25  the proposed auction.

8

1          He would further state that the trustee and

2     Castor Pollux agreed to the terms and conditions in the

3     asset purchase agreement, pursuant to which the Trustee

4     proposed to sell certain assets related to BLMIS's market

5     maker and proprietary trading operations, subject to higher

6     and better offers.

7          He would testify further, subject to and

8     consistent with the agreement, the Trustee proposed bidding

9     procedures, designed to maximize the value of the assets

10    for the estate of BLMIS, customers, creditors, and other

11    interested parties.

12         He would also say that after filing the

13    Trustee's motion, Lazard contacted approximately 36

14    parties, who had previously expressed interest in the

15    assets to determine whether any of those parties had

16    renewed interest in participating in the sale process and

17    submitting a competing bid.  Lazard was contacted by six

18    new parties who expressed an interest in submitting a

19    competing bid.

20         He would say that he was contacted by six

21    new bidders who executed a confidentiality agreement at

22    this point.  Ten bidders in total received the updated

23    confidential informational package  Of these ten bidders,

24    three bidders conducted further due diligence and attended

25    a management presentation.

9

1           He would further say that by the bid

2    deadline of April 22, the Trustee received three bids in

3    addition to its stalking horse bidder, though one bid was

4    withdrawn on April 24.

5           He would further say that between April 22

6    and April 27, the date on which the auction was held,

7    Lazard engaged in numerous discussions with the bidders

8    regarding the potential terms of their bids.

9           An auction took place on Monday, April 27,

10   at the offices of Baker & Hostetler where the stalking

11   horse bidder and the two remaining competing bidders

12   participated in the auction.

13          He would state that the auction was

14   conducted in four phases and was transcribed by a court

15   reporter.

16          The first was an open cry auction where

17   participants were able to bid up each of the earn-out and

18   cash portions of their bids.

19          Phase 2 of the auction he would say

20   involved the Trustee and his professionals speaking with

21   each bidder in private to identify the noneconomic aspects

22   of their bid that could be improved.  And at that point the

23   bidders also had the chance to increase any component of

24   their bid and monetary amounts at that time.

25          He would further testify that phases 3 and

10

1    4 of the auction involved final bidding on the earn-out and

2    cash portion of the bid payable at closing.

3              He would say that the bids were evaluated

4    by the Trustee and his professionals in their totality and

5    the further factors that were considered among others

6    including: Total value; cash at closing; net present value

7    of bid; certainty, amount and source of funding available

8    for the capital needs of the business; likelihood and

9    timing of successfully starting up the operations;

10   experience of the buyer and its management team; earn-out

11   mechanism and the likelihood of the earn-out being paid;

12   regulatory risk-i.e., whether the bidder had a

13   broker-dealer and FINRA-approved risks; business

14   intentions, including the ability of the bidder to gain

15   back customers and maximize order flow.

16             He would then testify after a careful

17   review of all bids, the Trustee and his professionals

18   conferred regarding their views of the various bids

19   submitted by the bidders.

20             He would say upon Lazard's recommendation

21   in the Trustee's business judgment, the bid of Castor

22   Pollux was determined to be the highest and best offer for

23   the assets and the Guzman & Company bid was selected as the

24   second highest bid.

25             The Castor Pollux bid is for $1.0 million

11

1    payable at closing and up to $24.5 million in earn-out

2    payments.  The Guzman bid is for $550,000 payable at

3    closing and up to $24.0 million in earn-out payments.

4              He would finally testify that he believes

5    that the asset purchase agreement was negotiated in good

6    faith and is the result of arms-length negotiations.

7              Accordingly, I believe at Castor Pollux

8    would be a good faith purchaser.  That would be his

9    testimony.

10             THE COURT: Does anyone else want to be

11   heard with respect to the proffer or does anyone want to

12   examine the witness?

13             Hearing there is no response, the proffer

14   is accepted.

15             MR. HIRSCHFIELD:   Thank you, Your Honor.

16             As I mention, we did file last week a

17   revision of the APA as well as a proposed sale order.   As

18   I said earlier there might be some earlier to the APA, as

19   they principally form into three categories.

20             One is to change the economics based upon

21   the results of the auction; secondly, we had to revise the

22   earn-out.  As I mentioned, the earn-out mechanism changed

23   in order to make it more favorable to the estate and

24   finally it changed because of the Primex.

25             That requires a little bit background for

12

1    Your Honor.   Primex is a company that owns certain

2    intellectual property that was formerly listed in NASDAQ.

3    Primex is nominally owned by various members of the Madoff

4    family and others.   In fact, all or substantially all of

5    the money used to capitalize Primex came from BLMIS.

6           Accordingly, we believe this asset should

7    be the property of BLMIS and while we didn't wish to engage

8    in a fight about that, as part of the sale, Castor Pollux

9    and other bidders requested a nonexclusive license to use

10   that intellectual property.

11          Primex led by Peter Madoff, Bernie Madoff's

12   brother said they would only grant the license if we pay

13   the licensing fee of $500,000.   Obviously, we rejected

14   that as out of hand, and we then had negotiations with

15   Castor Pollux and the other bidders to get them to remove

16   that condition as a condition to the closing.

17          Each of the bidders including Castor Pollux

18   and the Guzman company agreed to that, Your Honor.

19          That said, Your Honor, we did agree with

20   Castor Pollux and with Guzman and others to the extent we

21   acquire Primex, subsequently we would grant the license to

22   the winning builders on a nonexclusive basis.

23          Just a few things up to the Court.   There

24   is likely to be a litigation in the near future where we

25   seek to bring Primex in this estate.   As we said this is

13

1   our intention.  BLMIS paid for Primex.  It, in fact,

2   belongs to all of us and not to the Madoff family members;

3   and as such we would move to sign and assume several

4   executory contracts to the purchaser.

5                   Notice of that was given to each

6   counterparty along with the proposed cure amount in which

7   each case was zero.   No responses were received by any of

8   the counterparties and, therefore, we would ask that Your

9   Honor approve that with the motion.   Speaking objections,

10  none were filed to any portion of the motion.

11                  So in summary we believe Castor Pollux had

12  the highest and best bid; Guzman had the second and highest

13  bid; and subject to any modifications of the agreement we

14  have today we would ask that the Court ultimately approve

15  the motion.

16                  THE COURT:  Does anyone else want to be

17  heard?

18                  MR. BELL:  Your Honor, SIPC supports the

19  Trustee's motion to sell this market maker asset, and I

20  would note to the Court that the entire cost of the effort

21  to market and sell this asset as will be be borne by

22  advances from administrative expenses by SIPC and the

23  entire proceeds will be available for the benefit of the

24  customer victims of this case.

25                  THE COURT:   Does anyone else want to be

14

1    heard?

2              Hearing no response, this record does

3    support a finding that justifies the Trustee's view that

4    what it has in hand is the highest and best offer and I do

5    approve the motion.

6              MR. HIRSCHFIELD:    We could keep the record

7    open and if there is any corrections we would inform you of

8    that.

9              THE COURT:  Very well.

10             MR. HIRSCHFIELD:    Thank you, Your Honor.

11             THE COURT:  Submit the appropriate order.

12             MR. HIRSCHFIELD:  Thank you.

13             THE COURT:  Thank you.

14

15              *      *      *

16

17

18

19

20

21

22

23

24

25

15

1                        C E R T I F I C A T E

2

3    STATE OF NEW YORK          }

                                }   ss.:

4    COUNTY OF NEW YORK         }

5                        I, MINDY CORCORAN, a Shorthand Reporter

6    and Notary Public within and for the State of New York, do

7    hereby certify:

8                        That I reported the proceedings in the

9    within entitled matter, and that the within transcript is a

10   true record of such proceedings.

11                       I further certify that I am not related, by

12   blood or marriage, to any of the parties in this matter and

13   that I am in no way interested in the outcome of this

14   matter.

15                       IN WITNESS WHEREOF, I have hereunto set my

16   hand this 30th day of April, 2009.

17

18                       _____

                                 MINDY CORCORAN

19

20

21

22

23

24

25