David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Amy Vanderwal
Email: avanderwal@bakerlaw.com
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone:    (212) 589-4200
Facsimile:    (212) 589-4201

Attorneys for Irving H. Picard, Esq.,
Trustee for the SIPA Liquidation of
Bernard L. Madoff Investment Securities
LLC

**Hearing Date and Time: June 16, 2009 at 10:00 a.m.**
**Objection Deadline: June 11, 2009**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-1789 (BRL) <br><br> SIPA Liquidation |

**MOTION FOR ENTRY OF ORDER PURSUANT TO
SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AN
AGREEMENT BY AND AMONG THE TRUSTEE AND OPTIMAL STRATEGIC
U.S. EQUITY LIMITED AND OPTIMAL ARBITRAGE LIMITED**

TO:   THE HONORABLE BURTON R. LIFLAND
      UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the

business of Bernard L. Madoff Investment Securities LLC (the "Debtor" or "BLMIS"), by

and through his undersigned counsel, submits this motion (the "Motion") seeking entry of an order, pursuant to section 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking approval of an agreement (the "Agreement")[1] by and among the Trustee on the one hand and Optimal Strategic U.S. Equity Limited ("SUS") and Optimal Arbitrage Limited ("Arbitrage," SUS and Arbitrage are collectively referred to as the "Opimal Companies") on the other hand and, in support thereof, the Trustee respectfully represents as follows:

## BACKGROUND

1.  On December 11, 2008 (the "Filing Date"),[2] the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against defendants Bernard L. Madoff and the Debtor (together, the "Defendants") (Case No. 08 CV 10791). The complaint alleged that the Defendants engaged in fraud through investment advisor activities of the Debtor.

2.  On December 12, 2008, the Honorable Louis L. Stanton of the United States District Court for the Southern District of New York entered an order which appointed Lee S. Richards, Esq. as receiver (the "Receiver").

---

[1] The form of Agreement is annexed hereto as Exhibit "A."

[2] Section 78*lll*(7)(B) of the Securities investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA") states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

2

3. On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

4. On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part:

(a) appointed the Trustee for the liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA;

(b) appointed Baker & Hostetler, LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

(c) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

5. On December 18, 2008, the District Court entered the Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants (the "Preliminary Injunction Order"). Among other things, the Preliminary Injunction Order clarified that the Receiver is only appointed as to assets concerning the London entity, Madoff Securities International Ltd.

6. At a plea hearing (the "Plea Hearing") on March 12, 2009 in the Criminal Action, Bernard Madoff pled guilty to an 11-count criminal information, which counts included securities fraud, money laundering and theft and embezzlement, filed against him by the United States Attorneys' Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (Plea Hr'g Tr. at 23:14-17.)

## THE CLAIMS AGAINST THE OPTIMAL COMPANIES

7. Prior to the Filing Date, both of the Optimal Companies, either directly or through a customer agreement with Optimal Multiadvisors Limited or its predecessor and BLMIS, were customers of BLMIS.

8. Specifically, SUS maintained a customer account commencing in January of 1997. Between then and the Filing Date, SUS deposited $1,411,084,183.00 in excess of the amount of withdrawals made from the account. Among other withdrawals, SUS withdrew $151,831,876.00, including BLMIS's withholding tax payments on SUS's behalf, from the account within the 90 day period prior to the Filing Date. The amount reflected on SUS's BLMIS account statement for the period ending November 30, 2008, which is the last available account statement, is $2,919,934,627.70, including option positions.

9. Arbitrage maintained a customer account with BLMIS commencing in February of 1996. Between then and the Filing Date, Arbitrage withdrew a total of $96,516,185.00 in excess of the amount that Arbitrage deposited in the account. Among other withdrawals, Arbitrage withdrew $125,087,004.00, including BLMIS's withholding tax payments on Arbitrage's behalf, within the 90 day period before the Filing Date. Arbitrage also withdrew an additional $20,000,000.00 in October of 2007 and $15,000,000.00 in February of 2003. The amount reflected on Arbitrage's BLMIS account statement for the period ending November 30, 2008, which is the last available account statement, is $14,597,639.02, including option positions.

10. The Trustee believes that the withdrawals made by or on behalf of the Optimal Companies in the 90 days prior to the Filing Date (the "90 Day Payments") are preferences, recoverable by the Trustee pursuant to sections 547 and 550 of the Bankruptcy

Code. Pursuant to these sections, a trustee may avoid and recover, for the benefit of the estate, any transfer of an interest of the debtor in property made (i) to or for the benefit of a creditor; (ii) on account of an antecedent debt owed by the debtor before such transfer was made; (iii) made while the debtor was insolvent; (iv) made within 90 days of the filing of the petition; (v) and which allowed the creditor to receive more than the creditor would have otherwise received. 11 U.S.C. §§ 547 and 550.

11.  Applying these sections of the Bankruptcy Code to the instant case, there is ample evidence to show that BLMIS was insolvent at all times relevant hereto. In fact, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS. In addition, there is no suggestion that the Optimal Companies provided new value after the withdrawals that could provide the Optimal Companies with a defense under section 547(c)(1)(A) to the recovery of the withdrawals. The Optimal Companies received transfers on behalf of antecedent debts, while BLMIS was insolvent and within 90 days of the Filing Date. Given the disparity between the value of the assets and the liabilities of BLMIS, the Optimal Companies certainly received more than they would have received if the transfers had not been made.

12.  The Trustee has also asserted that Arbitrage may be liable to the BLMIS estate under section 544(b) and 550 of the Bankruptcy Code and the New York Uniform Fraudulent Conveyance Law (New York Debtor and Creditor Law §§ 270 – 281) for the $35,000,000.00 which Arbitrage withdrew in 2003 and 2007. The Trustee issued a subpoena under Rule 2004 of the Federal Rule of Bankruptcy Procedure in this regard on February 27, 2009, seeking relevant documents (the "Subpoena"). Section 544(b) of the Bankruptcy Code allows a trustee to avoid a transfer that is voidable under state law. The

5

New York Uniform Fraudulent Conveyance Law provides a six year look-back period for fraudulent transfers.

13.     The Trustee believes that the 90 Day Payments made to each of the Optimal Companies are recoverable pursuant to Bankruptcy Code provisions and that the earlier payments made to Arbitrage may be recoverable under state law. However, in the interest of avoiding costly litigation and bringing the claims against the Optimal Companies to a speedy resolution, the Trustee has determined that the appropriate course of action is to seek to settle his claim against each of the Optimal Companies.

14.     In particular, the Trustee has reached an agreement with the Optimal Companies, subject to this Court's approval of the Agreement, whereby SUS will pay to the Trustee the sum of $129,057,094.60, which sum represents eighty-five percent of the amounts received by SUS in the 90 days prior to the Filing Date. Arbitrage will pay to the Trustee $106,323,953.40, which sum represents eighty-five percent of the amounts received by Arbitrage in the 90 days prior to the Filing Date. The terms of the Agreement are more fully described below.

## THE AGREEMENT

15.     The principal terms and conditions of the Agreement[3] are generally as follows (as stated, the form of Agreement is attached as Exhibit "A" and should be reviewed for a complete account of its terms):

- At Closing, SUS shall pay to the Trustee for the benefit of the BLMIS estate, the sum of $129,057,094.60, representing eighty-five percent of the amounts transferred to or for the benefit of SUS in the 90 days prior to

---

[3] Terms not otherwise defined in this section shall have the meaning ascribed in the Agreement. In the event of any inconsistency between the summary of terms provided in this section and the terms of the Agreement, the Agreement shall prevail.

the Filing Date. Upon the filing of a timely claim by SUS, the execution of a Partial Assignment and Release and the occurrence of the Closing, SUS shall have an allowable claim in the amount of $1,540,141,277.60. The Trustee shall make an initial distribution to SUS on account of its allowed claim in the amount of $500,000.00 in respect of the customer advance provided for by Section 9 of SIPA. The advance may be paid by setoff against the payment required to be made by SUS.

- At Closing, Arbitrage shall pay to the Trustee for the benefit of the BLMIS estate, the sum of $16,323,953.40 with five additional installments of $18,000,000.00 each to be paid every 30 days after the Closing, the total payment representing eighty-five percent of the amounts transferred to or for the benefit of Arbitrage in the 90 days prior to the Filing Date. Upon the filing of a timely claim by Arbitrage, the execution of a Partial Assignment and Release and the occurrence of the Closing, Arbitrage shall have an allowable claim in the amount of $9,807,768.40. The Trustee shall make an initial distribution to Arbitrage on account of its allowed claim in the amount of $500,000.00 in respect of the customer advance provided for by Section 9 of SIPA. The advance may be paid by setoff against the final installment payment required to be made by Arbitrage.

- The Trustee shall withdraw the Subpoena and shall not seek any other discovery from the Optimal Companies with respect to claims released by the Agreement.

- The Trustee will release the Optimal Companies from any and all claims and causes of action that are based on or arise out of the affairs of BLMIS, the SUS Account or the Arbitrage Account and that are based on or arise out of the Optimal Companies' actions, statements, conduct or omissions in connection with the Optimal Companies and certain related entities.

- The Optimal Companies will release the Trustee and all his agents and BLMIS and its estate from all actions or causes of action arising out of or in any way related to BLMIS, except with respect to the customer claims of the Optimal Companies described in the Agreement.

- As noted above, the payments by the Optimal Companies represent eighty-five percent of the amounts transferred to or for the benefit of each within the 90 days before the Filing Date. The parties intend that this amount be established as a minimum benchmark for future settlements of similar claims by the Trustee. In certain situations, if the Trustee settles a similar claim for less than eighty-five percent of the amount transferred to or for the benefit of the transferee in the relevant period, the Trustee may be required to return a portion of the consideration paid by the Optimal

7

Companies. Specifically, if the Trustee settles a similar claim for an amount of $40,000,000 or more, and the amount of the settlement is less than eighty-five percent of the total claim, the Trustee will return consideration to the Optimal Companies so that the Optimal Companies will have paid a percentage that is equal to that received in the subsequent settlement.

- If the Trustee obtains new information relating to the BLMIS accounts of the Optimal Companies that materially affects the Trustee's decision to enter into the Agreement, the Trustee shall provide such information to the Optimal Companies and permit them to respond within ten days. After reviewing the response, the Trustee may declare the Agreement and the settlement contained therein void and return the amounts paid by the Optimal Companies.

- The Optimal Companies will submit to the Bankruptcy Court's jurisdiction only with respect to the enforcement of the Agreement.

## RELIEF REQUESTED

16. By this Motion, the Trustee respectfully requests that the Court enter an order substantially in the form of the proposed Order annexed hereto as Exhibit "B" approving the Agreement.

## LEGAL BASIS

I. The Agreement is Fair, Equitable and in
   Best Interests Of The Debtor, its Estate and Customers

17. Bankruptcy Rule 9019(a) provides, in pertinent part, that: "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Courts have held that in order to approve a settlement or compromise under Bankruptcy Rule 9019(a), a bankruptcy court should find that the compromise proposed is fair and equitable, reasonable and in the best interests of a debtor's estate. In re Ionosphere Clubs, Inc., 156 BR 414, 426 (S.D.N.Y. 1993), accord, 17 F.3d 600 (2d Cir. 1994) (citing Protective Comm. for Index. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).

18.  The Second Circuit has stated that a bankruptcy court, in determining whether to approve a compromise, should not decide the numerous questions of law and fact raised by the compromise, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir.), cert. denied sub nom. Cosoff v. Roman, 464 U.S. 822 (1983) (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir.), cert. denied sub nom. Benson v. Newman, 409 U.S. 1039 (1972)); accord Nellie v. Shugrue, 165 BR 115, 121-22 (S.D.N.Y. 1994); In re Ionosphere Clubs, 156 BR at 426; In re Purified Down Prods. Corp., 150 BR 519, 522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying litigation"); In re Drexel Burnham Lambert Group, Inc., 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

19.  In deciding whether a particular compromise falls within the "range of reasonableness," courts consider the following factors:

> (i)   the probability of success in the litigation;
> 
> (ii)  the difficulties associated with collection;
> 
> (iii) the complexity of the litigation, and the attendant expense, inconvenience, and delay; and
> 
> (iv)  the paramount interests of the creditors.

Nellis v. Shugrue, 165 B.R. at 122 (citing In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir. 1992), cert. dismissed, 506 U.S. 1088 (1993)).

20.  The bankruptcy court may credit and consider the opinions of the trustee or debtor and their counsel in determining whether a settlement is fair and equitable. See In re Purofied Down Prods., 150 B.R. at 522; In re Drexel Burnham Lambert Group, Inc., 134

9

B.R. at 505. The competency and experience of counsel supporting the settlement may also be considered. Nellis v. Shugrue, 165 B.R. at 122. Finally, the court should be mindful of the principle that "the law favors compromise." In re Drexel Burnham Lambert Group, Inc., 134 B.R. at 505 (quoting In re Blair, 538 F.2d 849, 851 (9th Cir. 1976)).

21.   The Trustee believes that the terms of the Agreement fall well above the lowest point in the range of reasonableness and, accordingly, the Agreement should be approved by this Court. The Agreement resolves all issues regarding the Trustee's claims against the Optimal Companies (the "Claims") without the need for protracted, costly, and uncertain litigation.  (Affidavit of the Trustee in Support of the Motion (the "Picard Affidavit") ¶ 4. A true and accurate copy of the Picard Affidavit is attached hereto as Exhibit "C.") Litigating the Claims would undoubtedly be expensive and would require a significant commitment of time by the various professionals involved in the matter and would increase the administrative burden on the estates.

22.   While it appears that the withdrawals by the Optimal Companies each represent a "textbook" preference, there are other issues that make proceeding against them for the full amount of their withdrawals less than certain. Indeed, the Optimal Companies, both of which are located in the Bahamas, have each cited to the Trustee potential jurisdictional and other issues regarding the ability of the Trustee to collect on any judgment that he might obtain.  Given these issues, and the cost and complexities involved in proceeding with litigation, the Trustee has determined that the proposed settlement with the Optimal Companies represents a fair compromise of the Claims. The Agreement also furthers the interests of the customers of BLMIS by bringing a substantial amount of money into the estate. Id. ¶ 5.

23. The Trustee conducted a confirmatory investigation, including a review of documents made available to the Trustee by the Optimal Companies that related to, among other things, due diligence conducted by the Optimal Companies and their affiliates on BLMIS. On the basis of the review, the Trustee concluded that the Optimal Companies and their affiliates were not complicit in the fraud perpetrated by BLMIS and Bernard Madoff on BLMIS's customers and did not have actual knowledge of the fraud, and based on the review, the Trustee does not believe that the conduct, acts and omissions of the Optimal Companies and their affiliates provide grounds to assert any claim against the Optimal Companies or any affiliates (other than avoiding power claims), or to disallow any claim that SUS or Arbitrage may have against BLMIS or its estate. If the Trustee obtains new information relating to the BLMIS accounts of the Optimal Companies that materially affects the Trustee's decision to enter into the Agreement, the Trustee will provide such information to the Optimal Companies and permit them to respond within ten days. After reviewing the response, the Trustee may declare the Agreement and the settlement contained therein void and return the amounts paid by the Optimal Companies. Id. ¶ 6.

24. In sum, the Trustee submits that the Agreement should be approved (a) to avoid burdensome and expensive litigation and (b) and because the Agreement represents a reasonable compromise of the Claims that benefits the estate and the customers of BLMIS. Accordingly, since the Agreement is well within the "range of reasonableness" and confers a substantial benefit on the estate, the Trustee respectfully requests that the Court enter an Order approving the Agreement.

## **NOTICE**

25.  In accordance with Bankruptcy Rules 2002 and 9019, notice of this Motion has been given to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) all known creditors of BLMIS. The Trustee shall also serve, by way of the ECF filing that will be made, each person or entity that has filed a notice of appearance in this case. The Trustee submits that no other or further notice need be given. and respectfully requests that the Court find that such notice is proper and sufficient.

WHEREFORE, the Trustee respectfully requests entry of an Order substantially in the form of Exhibit "B" granting the relief requested in the Motion.

Dated: New York, New York
       May 26, 2009

Respectfully submitted,

/s/ Marc Hirschfield
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Amy Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.
Trustee for the SIPA Liquidation of Bernard L.
Madoff Investment Securities LLC*