Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com

Attorneys for Helen Davis Chaitman and Stephen M. Schwebel

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,

                Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                Defendant.
-----------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

Helen Davis Chaitman, *pro se,* and Stephen M. Schwebel object to the Notice of Trustee's Determination of Claim dated April 21, 2009 and state as follows:

**Background facts**

1.      As one of two equal members of the Chaitman/Schwebel LLC (the "LLC"), Chaitman opened an account with Bernard L. Madoff Investment Securities LLC ("Madoff") in February 2005. The account bears Account No. 401 (the "Account").

2.      Some of the Account opening forms were signed by Chaitman in her individual capacity; some were signed in her capacity as managing member of the LLC.

3. The LLC was formed for the specific purpose of investing in Madoff in order to meet Madoff's then-stated minimum investment requirement. The only members of the LLC were Chaitman and Schwebel, each owning 50%.

4. In February 2005, Chaitman and Schwebel each wired funds to Madoff from their personal checking or brokerage accounts in the same amount. The funds were credited to the Account.

5. No funds were ever withdrawn from the Account by either Chaitman or Schwebel and no further investments were made by either Chaitman or Schwebel after the initial investments.

6. On January 12, 2009, Chaitman sent a SIPC claim to Picard on behalf of the LLC annexing all of the relevant documents. On January 30, 2009, Chaitman sent an amended SIPC claim to Picard on behalf of the LLC, again annexing all of the relevant documents. On May 12, 2009, Chaitman sent a SIPC claim to Picard on behalf of herself individually. On June 22, 2009, Schwebel sent to Picard a SIPC claim on behalf of himself individually.[1]

7. On April 21, 2009, Picard sent Chaitman and Schwebel a determination letter (the "Determination Letter") with respect to the LLC's claim, rejecting the claim based upon the November 30, 2008 balance but agreeing to recognize the claim in the amount of the initial investment exclusive of any appreciation. Picard offered to send the LLC a check for $500,000 from SIPC upon execution by Chaitman and Schwebel of an Assignment and Release.

8. By letter dated April 30, 2009, Chaitman responded to the Determination Letter, explaining to Picard that she would like to avoid litigation but she questioned Picard's legal authority for two propositions.

---

[1] Because Picard has all of the relevant documents, Chaitman has not made these documents part of this filing but they will be introduced into the record at the time of trial.

9. First, Chaitman questioned the fact that Picard was utilizing a definition of "net equity" which was inconsistent with the definition of "net equity" in the Securities Investor Protection Act ("SIPA"). She pointed out to Picard that SIPA prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A); *In re New Times Securities Services, In*c., 371 F.3d 68 (2d Cir. 2004).

10. Second, Chaitman pointed out to Picard that he was not treating each of Chaitman and Schwebel as separate "customers" entitled to SIPC insurance, despite the fact that SIPA defines customer to include "any person who has deposited cash with the debtor for the purpose of purchasing securities." 15 U.S.C. § 78lll(2). Chaitman pointed out that she deposited funds with Madoff directly from her personal checking account for the purpose of purchasing securities while Schwebel deposited funds with Madoff directly from his brokerage account. No investment was made by the LLC as such.

11. By letter dated May 11, 2009, Picard indicated that he was waiting for "guidance" from the Securities and Exchange Commission (the "SEC") with respect to the issues raised by Chaitman's letter and he voluntarily extended the time to object to his determination for 30 days, until June 21, 2009.

12. By letter dated May 28, 2009, Picard stated that, with respect to his definition of "net equity," he was "waiting for a response" from the SEC and would "defer responding to your request for clarification and legal authorities until such time as we receive a response from the SEC."

13. In the May 28, 2009 letter, Picard cited two authorities in support of his position that Chaitman and Schwebel were not each "customers" entitled to $500,000 in SIPC insurance. Both authorities were irrelevant. First, Picard cited 17 CFR 300.105(b), a regulation

3

promulgated by SIPC. However, he did not acknowledge the fact that SIPA expressly prohibits SIPC from promulgating regulations that change the definition of "customer." 15 U.S.C. § 78ccc(b)(4)(A). In any event, this regulation is irrelevant because it applies only to "qualifying joint accounts" and states that "qualifying joint accounts are accounts "owned jointly, whether by the owners thereof as joint tenants with the right of survivorship, as tenants by the entirety or as tenants in common, or by husband and wife as community property, but only if each co-owner possesses authority to act with respect to the entire account." The LLC account is not a joint account and neither Chaitman nor Schwebel had authority to act with respect to the entire account – a fact of which Picard was well aware because he conditioned payment to the LLC of $500,000 in SIPC insurance on execution by both Chaitman and Schwebel of the Partial Assignment and Release.

14. The only other authority Picard cited for the proposition that Chaitman is not a "customer" entitled to SIPC insurance is *SIPC v. Morgan, Kennedy & Co.,* 533 F. 2d 1314, 1317-18 (2d Cir. 1976). In that case, the Second Circuit rejected the argument that each of the 108 beneficiaries of a profit sharing plan was a "customer" under SIPA because the employees

> were neither investors nor traders. The funds in the trust account came from [the employer corporation]; the decision to entrust those funds to the debtor was the Trustees'. Appellees' counsel conceded at oral argument that none of the one hundred and eight would have had any standing as a 'customer' of the then-solvent broker-dealer to give any buy or sell orders in the account.

*Id.* This holding has absolutely no relevance to Chaitman and Schwebel because they were both investing their own funds into Madoff and each had authority to direct buy and sell orders in the Account with respect to their respective halves of the Account.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

4

15. The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that Chaitman and Schwebel did not have a "legitimate expectation" that the balance on the Account statement represented their property. In fact, in each year of their investment, Chaitman and Schwebel each paid short term capital gains tax on their half of the appreciation in the Account. They would not have done so if they had any belief whatsoever that the assets in the Account did not belong to them.

16. Picard has failed to state a basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at * (B.S.D.N.Y. Jan. 13, 2003(.

**B. Picard has violated the requirement that
he honor a customer's "legitimate expectations"**

17. The legislative history of SIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.

\*   \*   \*

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

18. SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

19. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

20. Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

6

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

21. As indicated in paragraph 19 *supra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00) (emphasis added).

**C. Without legal authority, Picard has**

7

1083689.1
1083689.1

**invented his own definition of "net equity"**

  22. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

  23. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

  24. The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

  25. In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who have depended upon their Madoff investments for their

8

1083689.1
1083689.1

daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

26. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

27. Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

28. After six months of his tenure, Picard has identified only a handful of Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. For example, Picard has sued two Madoff customers, Stanley Chais and Jeffrey Picower who, Picard has alleged, took out of Madoff $6 billion more than they invested. Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

29. However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

30. Chaitman and Schwebel, like thousands of other investors, received monthly statements from Madoff indicating returns on their Madoff investment in the range of 9 – 11%

9

per year, subject to short term capital gains tax rates. Chaitman and Schwebel had entered into standard brokerage agreements with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the LLC had specified, numbered accounts for the purchase and sale of securities; they each separately and individually received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. They each paid Federal and State taxes on the annual growth of their investments with Madoff. There is no basis to claim that each of them did not have a "legitimate expectation" that the assets reflected on the LLC's statements sent by Madoff to each of them belonged to them.

   31. Thus, Chaitman and Schwebel are each entitled to a claim for 50% of the November 30, 2008 balance on the Account as reflected on the Madoff statement.

**D. Chaitman and Schwebel are entitled to prejudgment
interest on their investment and profits.**

   32. At a minimum, under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted Chaitman's and Schwebel's funds, they are also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

   33. Although it is not legally relevant, Picard cannot prove that Madoff earned no money on Chaitman's and Schwebel's investments. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored

10

customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which Chaitman, Schwebel and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

**E.  Chaitman and Schwebel are each a "customer"
under SIPA entitled to $500,000 in SIPC insurance.**

34.    Chaitman and Schwebel are each a "customer" under the plain definition of "customer" in SIPA. Thus, each is entitled to receive $500,000 in SIPC insurance. 15 U.S.C. § 78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.").

35.    Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder." Instead, Congress' definition of "customer" is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor")(emphasis added).

36.    Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of Chaitman and Schwebel because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

**F.  Picard has no right to condition payment
of SIPC insurance on execution of a release.**

11

1083689.1
1083689.1

37. Picard has conditioned payment to Chaitman/Schwebel LLC of the $500,000 SIPC payment which he does not dispute, on execution by both Chaitman and Schwebel of a Partial Assignment and Release that would "release and forever discharge the SIPA Trustee and SIPC . . . from any and all claims arising out of or relating to [their account], the Customer Claim filed with the SIPA Trustee. . ., and any and all circumstance giving rise to the Customer Claim." There is no legal basis for requiring such a Partial Assignment and Release in exchange for SIPC insurance to which Chaitman and Schwebel are unconditionally entitled.

38. While Schwebel was prepared to execute the release in return for prompt payment to him of $250,000, and did execute it on that condition, Picard has declined to make that payment to him, maintaining, in a June 19, 2009 letter, that "it is clear that Chaitman/Schwebel LLC is not bound by the Partial Assignment and Release executed by . . . Schwebel." Hence, Schwebel is not bound by his execution of the Partial Assignment and Release and he has decided to join with Chaitman in filing this Objection to the Trustee's Determination.

**G.  Picard has violated SIPA by delaying in payment of SIPC insurance**

39. Picard has breached his statutory obligation to "promptly" pay SIPC insurance or provide customers with replacement securities. 15 U.S.C. § 78fff-2(b)("... the Trustee shall promptly discharge . . . all obligations of the debtor to a customer . . . by the . . . making of payments to or for the account of such customer").

40. Picard has no right to delay payment to Chaitman and Schwebel, or to their LLC, of the undisputed portion of their claim.

**Conclusion**

41. Chaitman and Schwebel are entitled to an order compelling SIPC to immediately pay each of them $500,000 based on their status as "customers."

12

42. Chaitman and Schwebel are entitled to have their claims recognized, each in the amount of 50% of the LLC's November 30, 2008 statement.

43. Picard is not entitled to a release of any claims as a condition to Chaitman's and Schwebel's respective receipt of $500,000 each in SIPC insurance.

June 20, 2009

                             PHILLIPS NIZER LLP

                             By   s/s Helen Davis Chaitman

                             666 Fifth Avenue
                             New York, NY 10103-0084
                             (212) 841-1320
                             hchaitman@phillipsnizer.com

                             Attorneys *pro se* for Helen Davis Chaitman
                             and for Stephen M. Schwebel

1083689.1
1083689.1