1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------x

In the Matter

      of                         Index No.

                                1-08-01789


SIPC V. MADOFF,

               Debtor.

--------------------------------x

                    June 16, 2009

                    United States Custom House

                    One Bowling Green

                    New York, New York 10004


Motion to approve an agreement by and among the Trustee and Optional Strategic U.S. Equity Limited and Optimal Arbitrage Limited, et al.


B E F O R E:

                   HON. BURTON R. LIFLAND,

                             U.S. Bankruptcy Judge

2

1    A P P E A R A N C E S:

2

3        BAKER HOSTETLER, LLP
         Attorneys for Irving H. Picard, SIPA Trustee
4            45 Rockefeller Plaza
             New York, New York 10017
5
         BY:   MARC E. HIRSCHFIELD, ESQ.
6                  -and-
             MARC D. POWERS, ESQS
7                  -and-
             DAVID J. SHEEHAN, ESQ.
8

9

10

11       SECURITIES INVESTOR PROTECTION CORPORATION
             805 15th Street, Suite 800
12           Washington,  D.C.  20005
13       BY:   KEVIN H. BELL, ESQ.
14

15

16       GOODWIN PROCTER, LLP
             Attorneys for Defendant
17           620 Eighth Avenue
             New York, New York 10018
18
         BY:  DAVID PITOFSKY, ESQ.
19

20

21

22

23

24

25

3

1
    APPEARANCES:   (Continued)

2

3

4          KOBRE & KIM, LLP
               Attorneys for Maxam Capital Management LLC

5               800 Third Avenue
               New York, New York 10022

6
          BY:    BENJAMIN A. O'NEIL, ESQ.

7                 -and-
                JONATHAN D. COGAN  ESQ.

8                 -and-
               CARRIE A. TENDLER, ESQ.

9

10

11

12

13         WOLLMUTH MAHER & DEUTSCH LLP
               Attorneys for Maxam Absolute Return Fund LP

14              One Gateway Center
               Newark, New Jersey 07102

15
         BY:   JAMES N. LAWLOR, ESQ.

16

17

18

19

20         ANDREW M. CUOMO
         OFFICE OF ATTORNEY GENERAL

21              Investor Protection Bureau
              120 Broadway

22              New York, New York 10271-0332

23         BY:    DAVID MARKOWITZ, ESQ.
               -and-

24              DANIEL SANGEAP, ESQ.

25

4

1

APPEARANCES:   (Continued)

2

3

4           SCHULTE ROTH & ZABEL, LLP
                    Attorneys for Ascot Partners LP
5                   919 Third Avenue
                    New York, New York 10022

6
            BY:   LAWRENCE V. GELBER, ESQ.

7

8

9

10

11
            GOODWIN PROCTER, LLP
12                  Attorney for Defendant
                    620 Eighth Avenue
13                  New York, New York 10018
14          BY:   DAVID PITOFSKY, ESQ.

15

16

17          DECHERT, LLP
                    Attorneys for J. Ezra Merkin and Gabriel
18                  Capital Corporation
                    1095 Avenue of the Americas
19                  New York, New York 10036-6797
20          BY:   JAMES S. BUINO, ESQ.

21

22

23

24

25

5

1                           PROCEEDINGS

2                 THE COURT:  SIPC v. Madoff.

3                 MR. HIRSCHFIELD:  Marc Hirschfield, from

4      the law firm of Baker Hostetler.  I am here today with my

5      two colleagues on behalf of Irving Picard, the Trustee.

6      They are Marc Powers and and David Sheehan we have two

7      matters on the calendar this morning.

8                     The first is a motion under Rule 9019 to

9      settle with the Optimal funds and the other is Bank of

10     America for a preliminary injunction.

11                    With Your Honor's permission we do like to

12     do the settlement first.

13                THE COURT: Go ahead.

14                MR. HIRSCHFIELD:  Thank you, Your Honor.

15                    As I said, the first motion relates to

16     settlement with two funds operated by Optimal Strategic US

17     Equity Limited and Optimal Arbitrage Limited.   Under the

18     settlement Optimal will return to the Trustee approximately

19     235 million dollars.   This amount reflects a payment to

20     the Trustee of 85 percent of the preference claims the

21     Trustee has asserted against Optimal.

22                    By way of explanation, Optimal Strategic,

23     U.S., opened up an account with BLMIS in January of 1997.

24     They withdrew about 152 million dollars within the 90-day

25     preference period before the case was commenced.

6

1          The other fund, Optimal Arbitrage Limited

2     opened up an account with BLMIS in February of 2006 and it

3     withdrew approximately 125 million within the 90-day

4     preference period.

5          The Trustee believes that the amounts

6     received during the preference period are recoverable under

7     Section 547 and 550 of the Bankruptcy Code and the Trustee

8     sets a demand on Optimal under a 2004 subpoena requesting

9     discovery information from Optimal.

10          Therefore, Optimal approached us to

11     commence some negotiations, and as I mentioned these

12     negotiations went well.   We reached an agreement under

13     which will return to the Trustee 85 percent of the amount

14     it received during the preference period which is about 235

15     million dollars.

16          The settlement agreement is memorialized in

17     an agreement and as such SUS upon the timely filing of a

18     claim in the SIPA proceeding will have an customer claim of

19     approximately 1.5 billion dollars.   It will be permitted

20     to offset the 500,000 SIPC advance, it would be entitled to

21     on account of its allowed claim in its distribution by the

22     Trustee.

23          Arbitrage will in a single payment and five

24     installments of and 18 million dollars each month for five

25     months thereafter.

7

1           It, too, will offset the $500,000 SIPC

2     advance it would have received, and it will do that from

3     the last payment it owes us.  And it will have upon the

4     filing of the claim, a claim in the amount of 9.8 million

5     dollars.

6           The Trustee will withdraw the rule 2004

7     subpoena and will not seek any other discovery with respect

8     to claims released under the agreement.  Under the

9     settlement agreement both the Trustee and Optimal will

10    exchange releases and under the most favored nation clause.

11    It is the goal of the agreement to serve as a benchmark for

12    future settlement under the terms of the agreement if the

13    Trustee resolves claims similar to the claims resolved with

14    Optimal equal to this 85 percent benchmark.  If the Trustee

15    settles for more than $40 million or less than the

16    benchmark 85 percnet, the Trustee may be required to return

17    certain amounts to Optimal under these circumstances.

18          In connection with that we did extend due

19    diligence to Optimal to see if we had any claims against

20    them.  And based upon that we conclude Optimal was not

21    complicit in the fraud that BLMIS and Madoff committed and

22    did not have actual knowledge of the fraud on BLMIS

23    customers, and based on that review we do not believe we

24    have had any claims against Optimal other than those

25    avoiding power claims or to disallow any claim that SUS or

8

1      Arbitrage may have against BLMIS or its estate if we do.

2                Under the terms of the settlement we did

3      receive information subsequently that Optimal, that

4      basically would have affected the Trustee's decision to

5      enter into the agreement.

6                We do have the ability to void the

7      agreement by giving notice to Optimal and return the money

8      we are getting under the settlement and each of the parties

9      will have all rights and defenses as through the agreement

10     was never executed.

11               I should mention that certain other funds

12     that Optimal will use to repay the funds, are being held by

13     affiliates of and by HSBC and we would request that they

14     freeze those amounts.

15               In connection with that we will ask HSBC to

16     release that information and they agreed and we will

17     release claims that we may have or potentially have against

18     HSBC that arise from their dealings with Optimal, and that

19     will be set off in a separate letter agreement with HSBC.

20               We believe the settlement is a very good

21     one, and we do hope it will be a benchmark for future

22     settlements.   Among other things Optimal asserted a

23     potential standing defense and jurisdictional defense it

24     may have if we commence litigation against Optimal.

25               Given those defenses and what we believe

9

1    would prevail, we think it is appropriate to resolve the

2    claims as set forth in the settlement because it gives

3    certainty, both in Court and on any appeal, and it also

4    resolves the claims.

5              We do hope this will provide a basis for

6    future settlements, and we hope that the other funds will

7    do what Optimal has done, and do the right thing and go

8    forward to resolve claims, and in that regard we appreciate

9    Optimal having come forward to resolve those claims.

10             THE COURT:   Does anyone want to be heard?

11             MR. BELL:   Kevin Bell from the Securities

12   Investor Protection Corporation.   We support the

13   settlement.   We find this to be an encouraging sign and

14   that the Trustee is getting that amount of money we will

15   have available to distribute to the victims beyond the

16   limits of the SIPC protection, and we would encourage the

17   Court to approve the settlement.

18             THE COURT:  Does anyone else want to be

19   heard?

20             Hearing no one respond, let me see if I

21   understand two points of the bottom line here.   Optimal

22   has filed a 1.5 billion dollars claim if --

23             MR. HIRSCHFIELD:   They have not yet.

24   They will after the settlement is approved.

25             THE COURT:  I take it that is a reflection

10

1    on the statements that they have been receiving from the

2    Madoff --

3                    MR. HIRSCHFIELD:   No.   It is cash in and

4    cash out, Your Honor.

5                    THE COURT:  So it has nothing to do with

6    the reflection on the statements?

7                    MR. HIRSCHFIELD:   No.

8                    THE COURT:   And they end up with a 9.8

9    million dollars claim?

10                   MR. HIRSCHFIELD:   No.   There are two

11   funds.   The one fund has a claim SUS for 9.8 million

12   dollars, that is Arbitrage.   The other one SUS will have a

13   claim for 1.5 billion dollars.

14                   THE COURT:   I see.   Does anyone else want

15   to be heard?

16                   I am most interested in the most favored

17   nation aspect of this which puts the Trustee more or less

18   in a rigid negotiating stance as it loses the benefits of

19   this settlement to the extent that other settlements come

20   in substantially less.

21                   Does anyone want to be heard with respect

22   to that?

23                   MR. HIRSCHFIELD:   I do, Your Honor.   We

24   negotiated very heavily on the most favored nations clause,

25   and it only applies in very limited circumstances where the

11

1   settlement is under similar circumstances and facts of the

2   settlement.   So, for instance, and the agreement lists

3   other factors the Court would consider if we don't agree

4   with Optimal, including jurisdictional basis, the ability

5   to pay, what kind of claims we assert.

6               There is a whole litany of factors that the

7   Court would ultimately consider, and we feel comfortable,

8   ultimately, if we settle other claims similar to the ones

9   that are settled here that they should follow at 85

10  percent.

11              THE COURT:  Does anyone else want to be

12  heard?

13              Under any circumstance I just find it a

14  highly appropriate settlement and in the best interests of

15  this estate, and to the extent that the Madoff victims see

16  a more enhanced pot to look at, it certainly is a salutary

17  agreement and I will approve it.

18              MR. HIRSCHFIELD:   May I approach with an

19  order, Your Honor?

20              THE COURT: Yes.

21              MR. HIRSCHFIELD:   Thank you.

22              THE COURT:  I have approved the order.

23              MR. HIRSCHFIELD: Thank you, Your Honor.

24  The next motion is by Bank of America.

25              MR. JANOVSKY:   Good morning, Your Honor.

12

1    Peter Janovsky.  I am an attorney with the law firm of

2    Zeichner Ellman & Krause.  I am here today on behalf of the

3    plaintiffs, Bank of America and Bank of America Securities.

4            I think the Court is familiar with

5    circumstances from the conference we had on the TRO a

6    couple of weeks ago.

7            Basically, the two bank entities have

8    certain accounts in the name of two entities and the banks

9    has received notice from the Trustee that the amounts in

10   all those accounts were customer property under SIPA, and

11   instructing the bank if they permit any withdrawal it would

12   be a willful violation of the automatic stay.

13           Before the bank came to this Court the

14   Maxam entities, some of the defendants here, brought an

15   action in the Connecticut State Court.   Then we brought

16   this interpleader and removed that action in Connecticut

17   Federal Court.

18           And now we and the Trustee believe that

19   this Court is the most appropriate place to determine

20   whether the funds at issue are actually customer property,

21   property of this estate.   We received opposition from the

22   Maxam entities, and they make two arguments that I would

23   like to address.

24           One of the arguments, Your Honor, is that

25   the stay can be extended only in a reorganization case and

13

1    this is not a reorganization case.

2                Well, Your Honor, that is simply incorrect.

3    There are cases in which the stay has been extended in

4    Chapter 7 liquidations.  There is In re:  Fisher in the

5    Seventh Circuit, 155 F.3d 876 and there is another case, at

6    least one other case in the Middle District of Florida.

7                So it is simply untrue that that can't be

8    done.  In fact, the language of those cases, even the

9    reorganization cases, the language of those cases say that

10   the 105(a) injunction can be applied if the other actions

11   are going to impair the reorganization or which would

12   defeat or impair this Court's jurisdiction or may affect

13   the amount of property in the bankruptcy estate.

14               So that language which I believe this Court

15   cited in the Calpine case certainly leaves the door open to

16   have this kind of injunction even in a liquidation

17   proceeding such as this.

18               In fact, under the concerns that the Court

19   just expressed in terms of the settlement and to get

20   maximum return for the Madoff investors, I believe it is

21   even more important that this Court be the Court to

22   determine whether the funds in these bank accounts are

23   actually property of the estate.

24               The other issue that the opponent brought

25   up is whether there would be irreparable harm to the Bank

14

1    of America in the event that the Connecticut action

2    proceeds.

3                    As far as that is concerned, this Court has

4    ruled in the Second Circuit and in a number of cases, the

5    court in the Second Circuit has ruled there is an exception

6    to the irreparable harm standard under 105(a) where, again,

7    there is a danger that the other action would impair the

8    jurisdiction of this Court.

9                    So while I don't believe that there is

10   irreparable harm to Bank of America other than

11   substantially more litigation costs, I think we should

12   imagine the scenario if this relief is not granted.

13                   We would be going back up to Connecticut

14   and the Trustee is not a party in that case.   I don't know

15   whether the Trustee would join that case.   We would have

16   to come back here and make a motion to lift the stay to

17   name the Trustee in that case in Connecticut.   And that

18   motion may not be granted.

19                   There would be also be issues of discovery

20   relating to the possible subpoenas of 30 parties, et

21   cetera.   So to summarize, Your Honor, 105(a) need not be

22   asserted only in reorganizations.   There is no irreparable

23   harm required in a case such as this.

24                   And finally, the harm would be great in

25   terms of impairing this Court's jurisdiction, having

15

1   another Court determine what might be customer property

2   and, generally, creating a situation in which I think that

3   it would be extremely inconvenient for all parties and with

4   some risk to the investors in this case.

5           So in terms of that last factor, I think we

6   have a balance of equities and we have public interest in

7   recovering these funds heavily tilted towards the Trustee's

8   and Bank of America's position.

9           Thank you, Your Honor.

10          THE COURT:  Does anyone else want to be

11  heard.

12          MR. O'NEIL:  Benjamin O'Neil, with the law

13  firm of Kobre & Kim.  I am here on behalf of Maxam Capital

14  Management, what we refer to in the papers as the

15  investment manager, there is no disagreement this Court is

16  the proper forum to determine the issue of whether the

17  funds contained in the Bank of America accounts are

18  customer property.

19          The action that Maxam is pursuing in

20  Connecticut seeks only to hold the bank responsible for

21  what Maxam considers to be tortious conduct that was done

22  to it over the last several months.

23          Your Honor, contrary to what the bank's

24  counsel has intimated, we simply are not seeking in that

25  case to determine whether the funds in the accounts are

16

1    customer property.   That is not an issue in the case, nor

2    are we seeking access to the fund in that case.

3              Rather, Your Honor, once the bank after

4    several months of proceeding without any Court Order

5    determined that it was finally time to have a Court weigh

6    in on the parties' rights with respect to the property and

7    file the interpleader action in this Court, Maxam

8    determined at that point and believed them as it believes

9    now that this is the Court in which the determination

10   should be made as to customer property.

11             Moreover, Your Honor, Maxam conveyed that

12   to both counsel for the bank and the Connecticut Court in a

13   conference call immediately after Bank of America filed the

14   interpleader action.   Indeed, Your Honor, we planned to

15   file papers in the near term in this Court to seek an

16   expedited determination of whether the accounts actually do

17   contain customer property.

18             And I realize the facts are laid out in our

19   brief, Your Honor, but I would like to briefly summarize

20   why Maxam believes it is important that it be able to

21   pursue its claims in Connecticut.

22             The Bank of America received a notice from

23   the Trustee, Trustee's counsel, in a form letter which

24   essentially intimated that certain funds belonging to Maxam

25   Absolute Return Fund may constitute customer property and

17

1    thereby be subject to the automatic stay.   That letter

2    made no reference to any funds of my client, the investment

3    manager.

4              But the bank pretty much of its own

5    volition determined that it would freeze not only the Maxam

6    Absolute Return Fund account but it would also freeze the

7    accounts of the investment manager.

8              It basically not only without a court order

9    but without any requests from the Trustee; my client then

10   contacted Bank One.   It realized its investment manager

11   accounts had been frozen and sought some sort of

12   explanation why those accounts would be frozen given it had

13   no notice of the fact that funds in those accounts might

14   constitute customer property.

15             At that point the bank said simply it had a

16   request from the Trustee and that it was freezing the

17   accounts.

18             Maxam asked for a copy of the letter

19   indicating from the Trustee the desire to have those

20   accounts frozen and the bank refused.

21             THE COURT:   Are you trying that issue

22   before me now?

23             MR. O'NEIL:   Which issue, Your Honor?

24             THE COURT:   The issue as to the bank's

25   liability separately for your client.

18

1          MR. O'NEIL:   No, we are not trying that

2    issue.

3          THE COURT:   It sounds like it.   The issue

4    is whether or not I should issue an injunction with respect

5    to the continuation of the Connecticut lawsuit.

6          MR. O'NEIL:   I understand, Your Honor.   I

7    am simply trying to explain to you what, in fact, our

8    claims in Connecticut are based on.   I could continue

9    or --

10         THE COURT:   I have read all the papers.

11         MR. O'NEIL:   Okay.   I think the point I

12   am trying to make, Your Honor, is that our claims in

13   Connecticut have absolutely nothing to do with any issue of

14   whether the funds in the account are, in fact, customer

15   property and there is simply no legal basis on which to

16   stay an action by one non-Debtor against another non-Debtor

17   where there is no risk of any harm to the estate much less

18   the irreparable harm.

19         MR. LAWLOR:   James Lawlor, Your Honor.   I

20   am with the law firm of Wollmuth Maher & Deutsch, on behalf

21   of Maxam Absolute Return Fund, LP, which is the actual

22   investment fund.

23         We didn't take a position on today's

24   motion, but I wanted to be here in case you had any

25   questions.

19

1              THE COURT:  Thank you.

2              MR. POWERS:   Marc Powers,  Your Honor.  I

3    am with the law firm of Baker Hostetler, on behalf of the

4    Trustee, Your Honor.

5              We join in the application of the Bank of

6    America.   As set forth in our papers the Trustee and the

7    estate has a 90-day preference claim of 25 million dollars

8    against the Maxam fund. We understand that fund has very

9    little money left in it other than the Bank of America

10   account which at this point is not very large.

11             Separately there have been transactions

12   identified in our papers, an additional 72.8 million

13   dollars from BLMIS to the Maxam Fund.   That money

14   subsequently was transferred further.   We believe,

15   obviously, there are direct transfers as well as subsequent

16   transferees that potentially have the liability and

17   potentially have to return money for the estate for

18   administration before this Court as presented by the

19   Trustee.

20             The two primary points that have been

21   raised are -- let me back up to say one other thing, Your

22   Honor.  The entities themselves are all related.  Since

23   Your Honor allowed the Trustee to issue 2004 subpoenas for

24   documents and testimony with no less than four different

25   subpoenas to Maxam Absolute Return Fund and Maxam Capital

20

1    to get documents, of which we still don't have to have

2    testimony from Ms. Mansky (phonetic), which they objected

3    to up until this morning.

4              They made it very difficult to get to the

5    bottom to see where there is exposure.  We still don't have

6    the testimony from Ms. Mansky, who was also one of the

7    co-owners of Tremont, where she sold her interests and she

8    received over $16 million from that sale.

9              Since the issuance of these subpoenas, we

10   tried to attempt to identify to the extent we can the

11   manner in which subsequent transfers may have liability

12   here.   What we have is the transfer of 25 million dollars

13   within the 90-day period.  That money went to two places,

14   it went to Maxam Capital Management which is Ms. Mansky's

15   company, the management company, both in fees, advisory

16   fees, which over the last two years were 2 and-a-half

17   million dollars, much more than the amount remaining in the

18   Bank of America accounts.

19             Additionally, it went to the offshore

20   account called Maxam Fund Ltd., an offshore account, which

21   is a both a domestic account and a foreign account.  Most

22   of that money was split off to the foreign account.   We

23   made a request for three or four months to learn the

24   identity of the investors that received that money to make

25   an appropriate determination through our investigation

21

1    whether or not it would make sense for the Trustee to

2    present any claims against those individuals to assets

3    whether or not they acted in good faith or not.   That is

4    part of our job and part of our responsibility.

5              In addition, looking at the Bank of America

6    account we have been able to identify this is the

7    commingling of transfers and funds among the various

8    accounts it maintains between the Maxam domestic fund,

9    Maxam Capital, Maxam Capital operating account, its money

10   market account, for which it took out $930,000 when they

11   were denied the TRO by the Connecticut Court and also money

12   that we then learned by looking at the bank statements went

13   into the Bermuda account for the Maxam foreign fund.   We

14   have been stymied in our efforts.

15             Let me address the two points raised

16   specifically in opposition to the application of Bank of

17   America.

18             The first is the bank account was

19   identified that was related to Section 105 and their

20   argument is that it only applies to reorganization.

21             As Mr. Janovsky pointed out, there is a

22   case in the Fisher case, Seventh Circuit, which

23   specifically states that it doesn't just apply to

24   reorganization and liquidations and something else that I

25   am sure Your Honor would remember.   I believe from almost

22

1   20 years ago your decision in the Pioneer case of 1990 in

2   which the case was called --

3              THE COURT:  Some people call it Eastern

4   Airlines.

5              MR. POWERS:  I guess you could tell who the

6   straight bankruptcy attorneys are and who aren't.

7              You state in the exceptions to the

8   automatic stay, which are set forth in 362(b), are simply

9   exceptions to the stay which protect the estate

10   automatically at the commencement of the case, and are not

11   limitations upon the jurisdiction of the Bankruptcy Court

12   or upon its power to enjoin.  The power is generally based

13   on Section 105 of the Code.

14              The Court has ample power to enjoin actions

15   exempted from the automatic stay which might interfere in

16   the rehabilitative process whether in a liquidation or in a

17   reorganization case.

18              So there is no merit to the argument that

19   somehow this is a different case than a reorganization.

20              The second point that is raised by counsel

21   that somehow this is not related, that their case in

22   Connecticut is completely different.  It doesn't impact the

23   jurisdiction of this Court, if doesn't impact the issues

24   about whether or not this is customer property, they don't

25   think that needs to be decided; we respectfully submit that

23

1    is not true.

2                    One of the two claims that are brought in

3    the Connecticut Court was a conversion claim, and even as

4    they state in their papers by conversion defense that the

5    Bank of America could assert it was justifiable, it was

6    proper for them to be able to hold onto those assets, to

7    make those determinations as that defense.

8                    THE COURT:  That is an obvious defense that

9    they are making.

10                    MR. POWERS:   Yes, obviously.   And as a

11    result of that their defense will be --

12                    THE COURT:  It turns on the issue of

13    customer property.

14                    MR. POWERS:   Perfect.

15                    So I would submit, Your Honor, that is

16    clearly related and there are Courts that, in fact, I would

17    say, as in a related case, as identified in the Fisher and

18    other cases, that clearly that is something that this Court

19    has the power under Section 105 to enjoin at this time.

20                    One further point on that, Your Honor, to

21    the extent you were not to enjoin, as we had the issue that

22    Mr. Janovsky has identified as a possible collateral

23    estoppel.

24                    If that court were to determine customer

25    property how does that impact us here?  The one other thing

24

1    I would like to add and ask this Court for cooperation for

2    today we had notice, and it is set forth in our papers.   We

3    ask that this Court also extend the stay in light of the

4    fact we can have yet to depose Ms. Mansky.   She had been

5    subpoenaed earlier this month to appear at a Rule 2004

6    examination.

7                 Your order back in January said on a 15-day

8    notice that person is to appear.   Tomorrow is 15 days.

9    She was properly served in that regard.   Some argument was

10   made she was not properly served and then they withdrew

11   that.   However, they asked that we push it off to a date

12   of July 2 or July 7, and that works for us.

13                But we would ask two things.   One is that

14   the Court order it so it occurs.   Secondly, I want it to

15   be clear that the only thing that could be asserted are

16   privilege issues and that assertion potentially for

17   confidentiality of trade secrets.   I think that is an

18   option that is not subject to a confidentiality agreement

19   and should not be.

20                MR. O'NEIL:   I object, Your Honor, there is

21   no application in on that point.

22                MR. POWERS:   And we do not want, Your

23   Honor, to be able to somehow before be given an

24   understanding that it will go forward based on the

25   representation on July 2 or July 7, some sort of new

25

1   gamesmanship to prevent that from occurring.   We want to

2   make sure this issue gets dealt with so there is no delay.

3   It has been four and-a-half months since we issued that

4   subpoena, and we have yet to get what we need to conduct

5   our examination properly to make the proper determinations

6   for the Trustee.   Thank you.

7                  THE COURT:   Does anyone else want to be

8   heard?

9                  MR. O'NEIL:   I would like to respond, Your

10  Honor.

11                 Mr. Powers obviously raised a litany of

12  issues.   There has been no application for an order of the

13  Court to force Ms. Mansky to appear.   In fact, counsel and

14  I were negotiating right before this hearing to have her

15  appear.

16                 THE COURT:   There is an underlying order

17  with respect to the 2004 subpoenas.

18                 MR. O'NEIL:   Which we are not in violation

19  of.

20                 THE COURT:   I understand that, and I think

21  the argument is the quality of that deposition is somehow

22  appropriately to be discussed today.   It may be if there

23  are issues with respect to the scope of the examination

24  under our local rules that could be played out in advance

25  of the actual deposition.   Somehow or other that seems to

26

1      be happening right now.

2                    MR. O'NEIL:   I understand, Your Honor.

3      We have received no notice that would happen this morning.

4                    MR. POWERS:   Counsel for the Trustee just

5      raised it right now.

6                    MR. O'NEIL:   That is not exactly true.

7                    MR. POWERS:   I sent a letter to Mr. Kogan,

8      counsel for Ms. Mansky yesterday.

9                    THE COURT:   So far I have not heard of any

10     problem with respect to the scope and content and narrowing

11     of the deposition which has been scheduled.   And to that

12     extent I direct that the deposition go forward as has been

13     agreed to by the parties.

14                   MR. O'NEIL:   Okay.   I would like to

15     respond.   We take issue with the majority of the factual

16     assertions made by Mr. Powers.   We are more than happy to

17     litigate those issues in this Court.

18                   But they are simply not relevant to the

19     issue whether this Court should stay the Connecticut

20     action.   The Maxam claim against Bank of America.   At the

21     time that the bank was executing the freeze, it had no

22     legal authority to do so.   If, in fact, a Court later

23     determines that there was a legal basis on which the bank

24     froze the money, at the time the bank was proceeding it

25     didn't have that basis to do so.   It was doing so

27

1    completely of its own volition.  There was no court order.

2    And, in fact, there was not even a request from the Trustee

3    that Maxam Capital Management's investment accounts be

4    frozen.   The bank did it solely on its own.

5                    So, we would submit that in order for the

6    Connecticut Court to decide the issues of whether the bank

7    is liable for conversion and negligence, which is the other

8    claim in the Connecticut action, there doesn't need to be a

9    determination of whether those accounts constitute customer

10   property.  And, moreover, Your Honor, as I have mentioned,

11   we plan to seek an expedited review in this Court as to

12   whether those accounts do, in fact, contain customer

13   property.

14                   We fully agree this is the proper Court to

15   decide those issues and to litigate those issues.

16                   THE COURT:  Thank you.   Does anyone else

17   want to be heard?

18                   MR. JANOVSKY:   One more point, Your Honor.

19   This raises an important issue relating to the Bankruptcy

20   Court's jurisdiction.   What does a bank do when it gets a

21   letter that says, these are funds of the property of the

22   estate?  Does it immediately have to run to Court and bring

23   an interpleader?

24                   If there is no order and the Trustee does

25   not bring a motion, what does the bank do?  They say the

28

1    bank acted improperly.   I question some of the facts, but

2    that is something I think the Court should determine.

3              THE COURT:   Thank you.   There has been a

4    history with respect to the parties dealing with each other

5    both in this Court and in the Connecticut court.

6              As I do recall from reading all of the

7    papers, even the Connecticut Court had some reservation as

8    to the litigation being brought by the respondent here to

9    this motion.   I think the Connecticut Court refused to

10   issue a stay in their favor at one point in time.

11   However, it is still under review there.

12             The action has already been removed to the

13   Federal Court.   And the last bit of colloquy before me

14   just now reinforces the fact that all parties seem to agree

15   that the appropriate place for the Court to make almost all

16   of the determinations at issue is here and they should be

17   centralized here.

18             An express detail with respect to that

19   concession is that the Connecticut action is a two-party

20   dispute between the respondent here and the Bank of

21   America.   I don't see that.   I do see that the Connecticut

22   action would impact on the jurisdiction of this Court

23   especially with respect to the issue of customer property.

24             If the Bank of America appropriately is

25   asserting a defense both here and in Connecticut, asserting

29

1    it believes it was holding customer property, whether it

2    was property or not, that issue was customer property is

3    one that would be the subject of the collateral estoppel if

4    I didn't enjoin and grant essentially the request of all

5    the parties that the dangling litigation at issue here

6    should be decided in one Court.

7              That undercuts also the argument that an

8    injunction need not be purely one applicable to a

9    reorganization.

10             I find that there is no merit to that and

11   we have the cases that would say the same.

12             Under all these circumstances I think it is

13   appropriate for me to grant the relief requested by Bank of

14   America, joined in by the Trustee and with respect to one

15   respondent taking no position, that is either a no vote or

16   a yes vote and is more likely a yes vote since there is an

17   alignment of issues here, not taking a position is a very

18   interesting point that this Court takes note of.

19             Accordingly, the motion is granted and the

20   other part of it is the removal action which is now sitting

21   in the District Court in Connecticut; is that correct?

22             MR. JANOVSKY:  Yes.

23             THE COURT:  Is that subject to further

24   removal on a separate application or is it automatic based

25   upon removal statutes and rules that exist under Title 11?

30

1           MR. JANOVSKY:  It is not subject to further

2  removal.

3           THE COURT:  The Trustee is not a party.

4  But the Trustee is involved in the issues.   I leave it to

5  the parties to work it out.   In any event, the injunction

6  with respect to the Connecticut action is granted.  If the

7  parties can agree we could open up that litigation and have

8  it determined, so it is not something that is sitting

9  around subject to further collateral estoppel based on the

10  outcome of the proceedings in this Court as it might affect

11  that matter.   But all parties seem to be really willing to

12  come to grips and get the issues determined once and for

13  all.

14           Please submit an appropriate order.

15           MR. HIRSCHFIELD: Thank you.   That is all

16  we have on the calendar this morning for the Madoff.

17           (Chambers conference)

18           (Second call.)

19           THE COURT:  Madoff.

20           MR. SHEEHAN: Good morning, Your Honor.

21           THE COURT:  Good morning.

22           MR. SHEEHAN: As Your Honor is aware on

23  behalf of the Trustee we filed an application for a

24  temporary restraining order and a respective date for

25  another hearing with regards to certain funds being held by

31

1    Morgan Stanley pursuant to direction by the Trustee's

2    counsel which has now become the subject of a focus by the

3    Attorney General of the State of New York by virtue of an

4    action instituted against Ascot Capital Partners which is,

5    in fact, the name associated with that account.

6              We have arrived at an agreement with

7    counsel for the Attorney General of the State of New York

8    with regard to this particular issue, and I want to put it

9    on the record so we fully understand what it is.   The

10   agreement is as follows:   That --

11             THE COURT:   This is as we discussed in

12   chambers --

13             MR. SHEEHAN:   Yes, Your Honor.

14             THE COURT:   -- of a proceeding that already

15   exists and that is adversary proceeding 09-11982, involving

16   Gabriel Capital, Ascot Partners, and Gabriel Capital

17   Corporation, and the recently filed request by the SIPC

18   Trustee, Irving Picard, for a temporary restraining order

19   and a preliminary injunction and they are addressed to the

20   current parent --

21             MR. SHEEHAN:   Yes, Your Honor.

22             THE COURT:   -- with the involvement of the

23   Attorney General of the State of New York.

24             MR. SHEEHAN:   Absolutely, Your Honor.   And

25   under that umbrella case that Your Honor is speaking of,

32

1   what we have agreed to is this.

2            We will basically withdraw our application

3   for TRO, subject to an agreement to be entered into with

4   the Attorney General to the effect that, first of all with

5   respect to these funds, they will remain frozen and until

6   such time the agreement was entered into.

7            Therefore, pursuant to this amendment in

8   the sum of $350,000 will be released by the Trustee to and

9   from that account at Morgan Stanley to the Attorney General

10   of the State of New York.

11            Therefore, a receiver will be appointed for

12   Ascot Capital Partners.   That receiver will then make an

13   evaluation of several things including the preference and

14   avoidance actions instituted by the Trustee against Ascot

15   Capital Partners and a settlement that has been offered to

16   the Attorney General of the State of New York with regard

17   to the settlement of those claims by the Trustee against

18   Ascot Capital Partners.

19            The funds that are being held, Your Honor,

20   by the Trustee at Morgan Stanley would also be utilized to

21   help fund the settlement engaged in by the Trustee.   In

22   fact, the vast majority of those funds would come to the

23   Trustee pursuant to that agreement.

24            Therefore, the receiver as we understand

25   it, is in contemplating the cause of action against the

33

1    Merkin individual, and Mr. Merkin for its breach in Gabriel

2    Capital Management, which was also involved in the

3    management of those enterprises.

4                    Pursuant to our agreement with the receiver

5    which will be entered into as part of the overall payment

6    of the preference and fraudulent conveyance will take place

7    of funds retrieved, hopefully, out of Mr. Merkin and at

8    that point the receiver will receive payment towards the

9    preference and avoidance actions as part of the settlement

10   that is being entered here with the Attorney General.

11                   It is in the best interests of the Trustee

12   to enter into this settlement for two reasons that I could

13   readily think of.

14                   One is that the presence of a receiver will

15   facilitate the ability of the Trustee when he reaches that

16   point in time when he is making a distribution of the

17   customer property to put it into the hands of a Court

18   appointed fiduciary for the purpose of distributing it to

19   the investors of Ascot Capital.

20                   Secondly, Your Honor, the receiver is in a

21   position to pursue causes of action which the Trustee is

22   not by way of its avoidance actions to pursue, and we

23   believe that represents the best and sue surest way of

24   retrieving a monies from Mr. Merkin for the purpose of

25   paying and funding payment of the preference and avoidance

34

1   actions.

2              So we could even utilize those fund not

3   only for the benefit of the investors in Ascot but to the

4   benefit of everyone who was a victim of Madoff Enterprise.

5              For those reasons I would ask that a

6   settlement be put on the record.  Well, actually I would

7   ask my counsel whether he agrees to that, and I would wish

8   simply for Your Honor to say so ordered.

9              THE COURT:  Mr. Markowitz.

10             MR. MARKOWITZ:  Thank you, Your Honor.

11  David Markowitz, from the Investor Protection Bureau of the

12  State of New York.

13             While I am not a party to this action we

14  thank the Court for the opportunity to be heard today.

15             THE COURT: You are a designated respondent

16  in the application before me.

17             MR. MARKOWITZ:  Correct.   There are two

18  separate issues which were discussed by counsel.

19             First is the resolution of the immediate

20  application.

21             And secondly, there is thesubstantive

22  settlement with respect to the SIPC Trustee's claim against

23  Ascot.

24             With respect to the first, Your Honor, I

25  believe that counsel by and large accurately described what

35

1    that resolution is, which is an agreement by all parties to

2    keep the monies frozen at Morgan Stanley with the exception

3    of $350,000 that will be used to initially fund the

4    receivership at which point the receiver will make the

5    independent determinations about the settlement of the

6    substantive claim.

7                    We are in agreement with that proposal.

8    We are also in agreement, which we had discussed earlier,

9    but I don't believe it was mentioned, of a standout of any

10   other claims with respect to the $10 million and to give

11   all parties notice and, of course, the Court notice if any

12   intention to seek any further action with respect to those

13   claims.

14                   Thank you, Your Honor.

15                   THE COURT: Well, to the extent this is a

16   subset of an agreement with respect to an agreement to the

17   now pending motion for a preliminary injunction, I am

18   prepared to so order this record.

19                   However, it does appear to me that the

20   appropriate thing for me to do is to set down for a hearing

21   the application without the need for me to enter or grant a

22   preliminary temporary restraining order because the parties

23   have agreed to eliminate that.

24                   MR. SHEEHAN:   Thank you, Your Honor.

25                   THE COURT: So if you will carve out the

36

1    papers that are before me to eliminate the TRO, we could

2    set this down to an appropriate hearing.

3              MR. SHEEHAN:   Thank you, Your Honor.   We

4    will take it out.

5              THE COURT:   Which is, as we understand, is

6    necessary because the parties who are not here need notice

7    of this resolution.

8              MR. MARKOWITZ:   That is correct.   We

9    don't have standing to enter into that agreement and we

10   would agree, Your Honor.

11             MR. HIRSCHFIELD: Thank you.

12             MR. SHEEHAN:   Thank you, Your Honor.   We

13   will take care of submitting the appropriate order.

14             THE COURT:   Yes, it will be a different one

15   or somewhat modified than the one that's attached to your

16   application for TRO and a preliminary injunction.

17             Does anyone else want to be heard?

18             Are there any other parties in interest

19   here?

20             MR. PITOFSKY:   My name is David Pitofsky.

21   I am with the law firm of Goodwin Procter.   I am not yet a

22   party in interest, but I believe as a result of this

23   agreement I an perhaps a future party.

24             MR. GELBAR:   Lawrence Gelbar, from the law

25   firm of Schulte Roth & Zabel, on behalf of Ascot Partners,

37

1    LP.

2                   We support the agreement between the

3    Trustee and the Attorney General's Office and the

4    appointment of the receiver for Ascot.

5                   THE COURT:  Thank you.

6                   MR. BUINO:  James Buino, from the Dechert

7    law firm for J. Ezra Merkin and Gabriel Capital

8    Corporation.

9                   I was also here for Carey Management, who

10   also was in chambers, and we have no opposition to the

11   agreement.

12                  THE COURT:  Thank you.

13

14                        *     *     *

15

16

17

18

19

20

21

22

23

24

25

38

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK          }

                                }    ss.:

4    COUNTY OF NEW YORK         }

5                    I, MINDY CORCORAN, a Shorthand Reporter

6    and Notary Public within and for the State of New York, do

7    hereby certify:

8                    That I reported the proceedings in the

9    within entitled matter, and that the within transcript is a

10   true record of such proceedings.

11                   I further certify that I am not related, by

12   blood or marriage, to any of the parties in this matter and

13   that I am in no way interested in the outcome of this

14   matter.

15                   IN WITNESS WHEREOF, I have hereunto set my

16   hand this 17th day of June, 2009.

17

18              _____

                     MINDY CORCORAN

19

20

21

22

23

24

25