Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com

Attorneys for Donald A. Benjamin

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

SECURITIES INVESTOR PROTECTION
CORPORATION,

Adv. Pro. No. 08-01789 (BRL)

       Plaintiffs

SIPA Liquidation

vs.

**OBJECTION TO TRUSTEE'S
DETERMINATION OF
CLAIM**

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

       Defendant.
--------------------------------------------------------

Donald A. Benjamin hereby objects to the Notice of Trustee's Determination of Claim

dated June 9, 2009 and states as follows:

**Background facts**

    1.      On June 24, 1996, Benjamin established an individual retirement account ("IRA")

with Bernard L. Madoff Investment Securities LLC ("Madoff") through NTC & Co, a qualified

custodian. The account was designated NTC & Co. f/b/o Donald A. Benjamin, which bore

Madoff account No. 1CM402 (the "Account").

    2.      During the period from June 24, 1996 through November 30, 2008, Benjamin

deposited a total of $1,684,009.39 into the Account. See Exh. A at 2.

3.      Benjamin retired in 2001 at the age of 69 and began withdrawing funds from the Account in order to support himself. During the period from 2001 through 2007, Benjamin withdrew a total of $1,455,045 and paid taxes on the money withdrawn. *Id.*

4.      The November 30, 2008 market value of securities on the Account was $ 4,175,700.77. See Exh. B.

5.      On January 19, 2009, Benjamin sent a SIPC claim to Picard for the Account asserting a claim for securities in the amount of $4,116,000, based upon the November 30, 2008 Madoff statement. See Exh. C.

6.      On June 9, 2009, Picard sent Benjamin a determination letter (the "Determination Letter") with respect to the Account, rejecting the claim for securities based upon the November 30, 2008 balance but agreeing to recognize the claim (presumably for cash) in the amount of $228,964.39, representing the difference between the sums Benjamin had invested and the sums he had withdrawn from the Account. See Exh. A. Picard offered to send Benjamin a check for $228,964.39 upon execution by Benjamin of an Assignment and Release.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

7.      The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that Benjamin did not have a "legitimate expectation" that the balance on the Account statement represented his property. In fact, in each year that he withdrew funds from the Account, Benjamin paid ordinary income taxes on the

2

withdrawals from the Account, which were duly accepted from the federal and state taxing

authorities. Benjamin would not have paid those sums if he did not believe that the assets in the

Account belonged to him.

8.    Picard has failed to state a basis in the Determination Letter for the position he

has taken. Thus, he has not complied with the requirement that an "objection to a claim should .

. . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it

should allege facts necessary to affirmative defenses; and it should describe the theoretical bases

of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-

16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

**B. Picard has violated the requirement that
he honor a customer's "legitimate expectations"**

9.    The legislative history of the Securities Investor Protection Act ("SIPA") makes

clear that Congress' intent was to protect a customer's "legitimate expectations." For example,

Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be
> remedied by [the 1978 amendments] is the failure to meet legitimate customer
> expectations of receiving what was in their account at the time of their broker's
> insolvency.

>       *        *        *

> A customer generally expects to receive what he believes is in his account at the
> time the stockbroker ceases business. But because securities may have been lost,
> improperly hypothecated, misappropriated, never purchased, or even stolen, this
> is not always possible. Accordingly, [when this is not possible, customers] will
> receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

10.     SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide

for the classification of claims in accordance with the "legitimate expectations" of a customer

based upon the written transaction confirmations sent by the broker-dealer to the customer.

11.     Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations."

This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein

SIPC assured the appeals court that its policy was to honor the legitimate expectations of

investors, even where the broker never purchased the securities.  SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling
> even where inconsistent with transaction reality.  Thus, for example, **where a
> claimant orders a securities purchase and receives a written confirmation
> statement reflecting that purchase, the claimant generally has a reasonable
> expectation that he or she holds the securities identified in the confirmation
> and therefore generally is entitled to recover those securities (within the
> limits imposed by SIPA), even where the purchase never actually occurred
> and the debtor instead converted the cash deposited by the claimant to fund
> that purchase** . . . [T]his emphasis on reasonable and legitimate claimant
> expectations frequently yields much greater 'customer' protection than would be
> the case if transaction reality, not claimant expectations, were controlling, as this
> Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

12.     Picard's position in the Madoff case is contradicted, not only by SIPC's prior

treatment of customers in the *New Times* case, but also by a statement that SIPC's general

counsel, Josephine Wang, gave to the press on  December 16, 2008 wherein Ms. Wang

acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if
> clients were presented statements and had reason to believe that the securities
> were in fact owned, the SIPC will be required to buy these securities in the open
> market to make the customer whole up to $500K each.  So if Madoff client
> number 1234 was given a statement showing they owned 1000 GOOG shares,
> even if a transaction never took place, the SIPC has to buy and replace the 1000
> GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

13.     As indicated in paragraph 19 *infra,* in the *New Times* case, SIPC voluntarily

recognized its obligation under SIPA to pay customers up to $500,000 based on their final

brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker

had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the

securities reflected on the customers' monthly statements.  In fact, SIPC's president, Stephen

Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to

$500,000 including the appreciation in their accounts.

> HARBECK:  . . . if you file within sixty days, you'll get the securities, without
> question.  Whether – if they triple in value, you'll get the securities . . . Even if
> they're not there.
>
> COURT:  Even if they're not there.
>
> HARBECK:  Correct.
>
> COURT:  In other words, if the money was diverted, converted –
>
> HARBECK:  And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK:  **And if those positions triple we will gladly give the people their
> securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

## C. Without legal authority, Picard has invented his own definition of "net equity"

14.     SIPA defines "net equity" as the value of the securities positions in the customer's

account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts
> of a customer, to be determined by --

5

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus

(B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

15.     SIPA specifically prohibits SIPC from changing the definition of "net equity."  15 U.S.C. § 78ccc(b)(4)(A).

16.     The Second Circuit has recognized that:

Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.*, 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

17.     In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity."  Picard has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts.  By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who have depended upon their Madoff investments for their daily living expenses.  He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

18.     Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

6

Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

19.     Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.*, to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

20.     After six months of his tenure, Picard has identified only a handful of Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. For example, Picard has sued two Madoff customers, Stanley Chais and Jeffrey Picower who, Picard has alleged, took out of Madoff $6 billion more than they invested. Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

21.     However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

22.     Benjamin, like thousands of other investors, received monthly statements from Madoff indicating returns on his Madoff investment in the range of 9 – 11% per year. Benjamin had entered into a standard brokerage agreement with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Account had a specific number; he received on a monthly basis trade confirmations for every securities transaction in the Account which accurately set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks

7

and the purchase of US Treasury securities. There is no basis to claim that Benjamin did not

have a "legitimate expectation" that the assets reflected on the Account statements sent to him by

Madoff belonged to him. Thus, Benjamin is entitled to a claim for $4,116,000 as reflected on

the November 30, 2008 Madoff statement.

**D. Benjamin is entitled to prejudgment
interest on their investment and profits.**

23.    Under New York law, which is applicable here, funds deposited with Madoff are

entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover,

since Madoff converted Benjamin's funds, that fact also entitles him to prejudgment interest.

*See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.*S. Dist. LEXIS 35786, at *14-15

(S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify

for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d

427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and

conversion).

24.    Although it is not legally relevant, Picard cannot prove that Madoff earned no

money on Benjamin's investment. To the extent the funds were deposited into a bank, they

earned interest while on deposit. Madoff disbursed customer funds to favored customers, to

family members, and for other purposes. Those funds may have yielded substantial profits to

which Benjamin and other customers are entitled once the ultimate recipients of Madoff's

thievery are known.

**E. Picard has no right to condition payment
of SIPC insurance on execution of a release.**

25.    Picard has conditioned payment to Benjamin of the $228,964.39 SIPC payment

which Picard does not dispute, on execution by Benjamin of a Partial Assignment and Release

that would "release and forever discharge the SIPA Trustee and SIPC . . . from any and all

claims arising out of or relating to [their account], the Customer Claim filed with the SIPA

Trustee. . ., and any and all circumstance giving rise to the Customer Claim." There is no legal

basis for requiring such a Partial Assignment and Release in exchange for SIPC insurance to

which Benjamin is unconditionally entitled.

**F. Picard has no power to claw back withdrawals from an IRA**

26.     Although Picard has not explained the legal basis for his position that SIPC is not

liable to Benjamin for $500,000 of insurance with respect to the Account, he presumably is

relying upon the avoidance provisions of the Bankruptcy Code, *i.e.,* 11 U.S.C. §§ 544, 546 and

547.

27.     However, Picard has no right to utilize these provisions for the purpose of

enriching SIPC at Benjamin's expense. The legislative history of these provisions makes clear

that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's

assets among its creditors. *See, e.g., 5 Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also*

*In re Dorholt, Inc.,* 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to

discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote

equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.,* 201

B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from

racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the

preference provisions facilitate the prime bankruptcy policy of equality of distribution among

creditors of the debtor. Any creditor that received a greater payment than others of his class is

required to disgorge so that all may share equally") (quotations omitted).

9

28. Here, however, Picard is not acting to assure equal distribution among prepetition creditors. On the contrary, he is simply acting as SIPC's agent in depriving Benjamin of the $500,000 in SIPC insurance to which he is statutorily entitled.

29. Moreover, the Account was established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, whose provisions preempt State fraudulent conveyance law, upon which Picard presumably relies pursuant to 11 U.S.C. § 544. 29 U.S.C. § 1144(a) (the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section [1003(a)]. . . ")

30. As evidence of Congressional intent to protect ERISA-qualified plans, the Bankruptcy Code was amended in 2005 to protect such plans from the claims of creditors. 11 U.S.C. § 541(b)(7)(a)(i)(I) (exempting from property of the estate "any amount withheld by an employer from the wages of employees for payment as contributions to an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 . . ."). *See also, Patterson v. Shumate*, 504 U.S. 753 (1992)(holding that debtor's interest in an ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2)).

**G. Picard has violated SIPA by delaying the payment of SIPC insurance**

31. Picard has breached his statutory obligation to "promptly" pay SIPC insurance or provide customers with replacement securities. 15 U.S.C. § 78fff-2(b)("... the trustee shall promptly discharge . . . all obligations of the debtor to a customer . . . by the . . . making of payments to or for the account of such customer . . ."). Picard has no right to delay payment to Benjamin of the undisputed portion of his claim.

10

**Conclusion**

32.    Benjamin is entitled to an order compelling SIPC to immediately pay him

$500,000 in SIPC insurance with respect to the Account.

33.    Benjamin is entitled to have his claim recognized in the amount of $4,116,000.00

consistent with the November 30, 2008 statement from Madoff.

34.    Picard is not entitled to a release of any claims as a condition to Benjamin's

receipt of $500,000 in SIPC insurance.

June 30, 2009

PHILLIPS NIZER LLP


By   s/s Helen Davis Chaitman

666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com


Attorneys for Donald Benjamin

11