Judith L. Spanier [JS-5065]
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, New York 10016
212-889-3700
jspanier@abbeyspanier.com

Attorneys for ELEM Youth in Distress in Israel, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPPORATION,<br><br>                  Plaintiff,<br><br>      vs.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                  Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM** |

    ELEM/Youth in Distress in Israel, Inc., by and through its attorneys, hereby objects to the

Notice of Trustee's Determination of Claim dated June 26, 2009, attached as Exhibit A, and

states as follows:

Background Facts

    1.    ELEM/Youth in Distress in Israel Inc. ("ELEM") is a 501(c)(3)charitable

organization with offices in the State of New York.    At all times relevant, ELEM was a

"customer," as defined by the Securities Investor Protection Act ("SIPA"), of Bernard L. Madoff

Investment Securities LLC ("BMIS").

    2.    ELEM received a BMIS statement dated November 30, 2008 (the "final BMIS

Statement") for Account 1-CM645-3-0 (the "Account") showing a credit balance of

$4,729,990.44, which reflected gross proceeds from sales of securities in the amount of $4,724,447.13 and dividends of $5,543.31, owing to ELEM, and a debit balance of $98,018.90 due to BMIS. In addition, the final BMIS statement showed securities in the Account with a market value of $862,738.72 as of November 30, 2008.

3.    On December 11, 2008, the above-captioned liquidation proceeding was commenced against BMIS, pursuant to SIPA. *See* Order, *Securities and Exchange Commission v. Madoff,* No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York). Irving Picard was appointed Trustee ("Trustee" or "Picard") charged with overseeing the liquidation of BMIS and processing customer claims for money and securities pursuant to SIPA. *Id.;* 15 U.S.C. 78fff-1(a).

4.    On December 23, 2008, the Court issued an Order directing the Trustee to disseminate notice and claim forms to BMIS customers and setting forth deadlines for filing claims. The December 23, 2008 Order expressly provided that, to the extent that the Trustee disagreed with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, *and the reason therefore..."* *See* Order at 6 (emphasis added) [Dkt. No. 12].

5.    On or about February 16, 2009, ELEM submitted a SIPC claim to the Trustee for the Account asserting a claim in the amount of $4,729,990.44, which reflected gross proceeds from sales of securities in the amount of $4,724,447.13 and dividends of $5,543.31, owing to ELEM, and a debit balance of $98,018.90 due to BMIS. In addition, ELEM asserted a claim based on the final BMIS statement showing securities in the Account with a market value of

$862,738.72 as of November 30, 2008. *See* Exh. B (ELEM SIPC Customer Claim Form for Account No. 1-CM645-3-0).[1]

6.     On June 26, 2009, Picard sent ELEM a determination letter (the "Determination Letter") with respect to the ELEM claim, designated as "Claim Number 2772." Specifically, Picard denied in its entirety the claim for a credit balance in the amount of $4,729,990.44 and for the securities reflected in the final BMIS statement. Picard allowed the claim for a credit balance in the amount of $26,365.35, representing the difference between the $1,546,365.35 ELEM had invested between February 8, 2001 and March 2, 2007 and the $1,520,000 it had withdrawn from the Account between November 1, 2001 and September 29, 2005. See Exh. A. Picard offered to send ELEM a check for $26,365.35, conditioned upon execution by ELEM of an Assignment and Release.

**Grounds for objection**

**A.    Picard has failed to comply with the Court's December 23, 2008 Order**

7.     The Determination Letter fails to comply with the Court order dated December 23, 2008 that directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The final BMIS statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that ELEM did not have a "legitimate expectation" that the balance on the Account statement represented ELEM's property.

---

[1] The voluminous exhibits filed with the claim form are not included as they are already in the possession of the Trustee. ELEM notes that it filed two claims in this proceeding. As of the date of this objection, ELEM has received no determination from the Trustee as to its second claim, designated by the Trustee as Claim No. 2773.

8.      As part of its claim, ELEM submitted the final BMIS statement. The final BMIS statement is the best evidence of the amount owed to ELEM based on BMIS's books and records. Accordingly, the ELEM claim should be allowed in full.

9.      Picard has failed to state any basis in the Determination Letter for his denial of ELEM's claims. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶3007.01(3)(15th ed.); *In re Enron Corp.*, No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003). The Determination Letter is inadequate to rebut the *prima facie* validity of ELEM's claim as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f).

**B.      Picard has ignored the statutory definition of "net equity"**

10.     15 U.S.C. § 78fff-2(b) provides that a customer's claim shall be allowed in the amount of a customer's "net equity." The Securities Investor Protection Act ("SIPA") expressly defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtors to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11). SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A). The trustee's calculation of the value of ELEM's claim based upon the difference between the sums deposited and the sums

4

withdrawn has no basis or foundation in the SIPA statutory provisions.    Nor, as

demonstrated herein, is it supported by the case law, the legislative history or SIPC's own

policies and practices.

11.    The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.*, 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re*

*Adler Coleman Clearing Corp.*, 247 B.R. 51, 62 .2 (Bankr.S.D.N.Y. 1999) ("'Net equity'

is calculated as the difference between what the debtor owes the customer and what the

customer owes the debtor on the date the SIPA proceeding is filed."). ELEM is situated

no differently than the investors in *New Times* who "were misled . . . to believe that they

were investing in mutual funds" that were never purchased. Those investors' claims were

deemed to be "securities" claims and such investors were eligible to receive $500,000 in

SIPC advances. *In re New Times Secs. Services*, 371 F.3d at 74.

12.    In derogation of his obligations to carry out the provisions of SIPA, Picard has

ignored the provisions of SIPA and redefined "net equity." Picard has asserted that he has a right

to recognize investor's claims only for the amount of their net investment, disregarding all

appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to

ELEM and the thousands of Madoff investors that have depended upon their Madoff

investments. He also would be able to reduce all claims to the net investment, thus enhancing

SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

13.    Stephen Harbeck, the President of SIPC, justifies Picard's position by claiming:

5

Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of their assets collected by the Trustee.

14.     Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.*, to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

15.     After six months of his tenure, Picard has identified only a handful of Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. For example, Picard has sued two Madoff customers, Stanley Chais and Jeffrey Picower who, Picard has alleged, took out $6 billion more than they invested. Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

16.     However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving ELEM and the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

17.     ELEM, like thousands of other investors, received monthly statements from Madoff indicating returns on its Madoff investment in the range of 9 – 11% per year. ELEM had entered into a standard brokerage agreement with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Account had a specific number; it received on a monthly basis trade confirmations for every securities transaction in the Account which accurately set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks

and the purchase of US Treasury securities. There is no basis to claim that ELEM did not have a

"legitimate expectation" that the assets reflected on the Account statements sent to it by Madoff

belonged to it. Thus, ELEM is entitled to a claim for $862,738.72 reflected on the November 30,

2008 Madoff statement.

**C.    Picard has violated the requirement that he honor a customer's "legitimate expectations"**

18.    Apart from the clear language of SIPA, the statute's legislative history makes

clear that Congress' intent was to protect a customer's "legitimate expectations." For example,

Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be
> remedied by [the 1978 amendments] is the failure to meet legitimate customer
> expectations of receiving what was in their account at the time of their broker's
> insolvency.

> *                *                *

> *A customer generally expects to receive what he believes is in his account* at the
> time the stockbroker ceases business. *But because securities may have been* lost,
> improperly hypothecated, misappropriated, *never purchased,* or even stolen, this
> is not always possible. Accordingly, [when this is not possible, customers] will
> receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21 (emphasis added).

19.    SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide

for the classification of claims in accordance with the "legitimate expectations" of a customer

based upon the written transaction confirmations sent by the broker-dealer to the customer.

20.    Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations."

This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006 in which

SIPC advised the appeals court that its policy was to honor the legitimate expectations of

investors, even where the broker never purchased the securities. SIPC wrote:

Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, *where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase* . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*) (emphasis added).

21.    Picard's position in the Madoff case is contradicted by SIPC's prior treatment of customers in the *New Times* case, and by a recent statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 in which Ms. Wang acknowledged that a Madoff customer was entitled to the securities in his account:

Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

22.    As indicated in paragraphs 11 and 20 *infra*, in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

8

HARBECK:    . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.

COURT:    Even if they're not there.

HARBECK:    Correct.

COURT:    *In other words, if the money was diverted, converted –*

HARBECK:    *And the securities were never purchased.*

COURT:    Okay.

HARBECK:    *And if those positions triple we will gladly give the people their securities positions.*

Tr. at 37-39, *In re New Times Securities, Inc.*, No. 00-8178 (Bankr.E.D.N.Y.  7/28/00)

(emphasis added).

**D.    ELEM is entitled to prejudgment interest on its investment.**

23.    In the event that the Court determines that claimed gains on deposited funds should not be allowed, then ELEM is entitled to recover interest on the monies it deposited in the Account from 2001 - 2007.  Under New York law, which is applicable here, funds deposited with Madoff are entitled to interest.  *See, e.g.*, N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.*  Moreover, since Madoff converted ELEM's funds, that fact also entitles ELEM to prejudgment interest.  *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest." ); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S. 2d 427, 428 (1st Dept. 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).  Accordingly, ELEM's claims should be recalculated by adding interest on all funds deposited by ELEM.

24.     Although it is not legally relevant, Picard cannot prove that Madoff earned no money on ELEM's investment. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff reportedly disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which ELEM and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

**E.     Picard has no right to condition payment of SIPC insurance on execution of a release.**

25.     Picard has conditioned payment to ELEM of the $26,365.35 SIPC payment which Picard does not dispute, on execution by ELEM of an Assignment and Release that would "release and forever discharge the SIPA Trustee and SIPC . . . from any and all claims arising out of or relating to [the ELEM account], the Customer Claim filed with the SIPA Trustee. . ., and any and all circumstances giving rise to said Customer Claim." There is no legal basis for requiring such an Assignment and Release in exchange for SIPC insurance to which ELEM is unconditionally entitled.

26.     Indeed, conditioning the payment of funds to which customers are statutorily entitled on the execution of a release is contrary to the provisions of SIPA which direct that customer claims be paid "promptly." *See* 15 U.S.C. § 78fff(a)(1) (noting that one of the purposes of a SIPA liquidation proceeding is "to distribute customer property and . . . otherwise satisfy net equity claims of customers . . . as *promptly as possible* after the appointment of a trustee."); 15 U.S.C. § 78fff-2(b) ("[T]he trustee shall *promptly* discharge . . . all obligations of the debtor to a customer . . . by the . . . making of payments to or for the account of such customer."). Moreover, the demand for a release and assignment violates specific provisions of SIPA providing limited subrogation rights to the Trustee, which do not include the assignment

10

and release sought by the Trustee. *See, e.g.,* 15 U.S.C. § 78fff(a)(3) (providing that Trustee has "rights of subrogation as provided in this chapter"); 15 U.S.C. § 78fff-2(c)(3) (providing that Trustee's rights as subrogee are subordinate to rights of customers to customer property). In addition, the Trustee's demand is both unconscionable and contrary to public policy and should be stricken.

**F.     Picard has violated SIPA by delaying the payment of SIPC insurance**

27.     Picard has breached his statutory obligation to "promptly" pay SIPC insurance or provide customers with replacement securities. 15 U.S.C. § 78fff-2(b) ("…the trustee shall promptly discharge . . . all obligations of the debtor to a customer . . . by the . . . making of payments to or for the account of such customer . . ."). Picard has no right to delay payment to ELEM of the undisputed portion of its claim.

**Relief Requested**

28.     For the reasons stated herein, the ELEM claim should be allowed in its entirety.

29.     For the reasons stated herein, the Court should direct SIPC to issue immediate payment to ELEM in the amount of $500,000, plus interest from the date of the Determination Letter, and such equitable relief as the Court deems appropriate.

30.     The Trustee's determination amounts to an improper disallowance of a claim that is *prima facie* valid. *See* Bankruptcy Code § 502(a). The Trustee has offered no factual or legal basis for his Determination. The Determination Letter, and the objections contained therein, should be stricken, or alternatively, the Trustee should describe his position in detail including all relevant facts, legal theories, and authorities. Upon the filing of such a statement, this matter will be a contested proceeding under Rule 9014, and ELEM will file a response.

31.     ELEM requests such other relief as may be just and equitable.

11

**Conclusion**

32.    ELEM reserves the right to revise, supplement, or amend this Objection and any failure to object on a particular ground or grounds shall not be construed as a waiver of ELEM's right to object on any additional grounds.

33.    ELEM reserves all rights set forth in Rule 9014, including, without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014.

34.    ELEM reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

July 22, 2009

ABBEY SPANIER RODD & ABRAMS, LLP

By: _____
Judith L. Spanier (JS-5065)
212 East 39th Street
New York, New York 10016
212-889-3700

Attorneys for ELEM/Youth in Distress in Israel, Inc.