# EXHIBIT M

Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin and*
*Maureen Ebel, with the support of more than*
*100 other customers*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**DECLARATION OF MAUREEN EBEL IN SUPPORT OF OBJECTION TO FIRST**
**APPLICATION OF IRVING H. PICARD, TRUSTEE, AND BAKER & HOSTETLER**
**LLP FOR ALLOWANCE OF INTERIM COMPENSATION FOR SERVICES**
**RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED FROM**
**DECEMBER 15, 2008 THROUGH APRIL 30, 2009**

I, Maureen Ebel, hereby declare, under penalty of perjury pursuant to 28 U.S.C. §1746,

as follows:

1.      I submit this declaration in support of the objection to the application for fees

filed by Irving H. Picard, Trustee, and his counsel, Baker & Hostetler LLP ("B&H") filed by

myself, Diane Peskin and Roger Peskin, with the support of over 100 other customers of Bernard

L. Madoff Investment Securities, LLC ("Madoff"). I have personal knowledge of the facts and circumstances stated herein.

2.      My husband, Dr. Marc Ebel, died as a result of medical malpractice in 2000 at the age of 53. At the time of his death, we had been married 27 years.

3.      I had been a nurse but stopped working in 1989.

4.      In 2003, a relative of mine recommended that I invest all of my funds with Bernard L. Madoff Investment Securities LLC ("Madoff"). The relative told me that Madoff had been in existence for more than 25 years; that he had been approved by the SEC; and that he had a very conservative investment strategy.

5.      I opened two accounts with Madoff. The first account was a direct IRA account in which I invested $1,348,877.12 on February 24, 2003. I never withdrew any funds from this account and it had a balance on November 30, 2008 of $2,532,140.66.

6.      I also opened a direct investment account with Madoff in which I invested a total of $3,831,387.49 beginning on March 17, 2003 and ending on July 23, 2004.   The balance in this account as of November 30, 2008 was $4,729,125.04.

7.      With respect to each account, every month I received from Madoff trade confirmations indicating the purchase and sale of Fortune 100 company stocks; the purchase and sale of Treasury securities; and the purchase and sale of options to hedge the securities positions. In addition, I received monthly account statements showing the securities positions.

8.      In each instance, the trade confirmations and account statements reflected the purchase and sale of securities of Fortune 100 companies at prices consistent with those reported in the media.

2

9.      I withdrew funds from my direct investment account on a regular basis and utilized the funds to provide support for myself and my family, to pay for the educational expenses of family members, and to fund charitable donations. This was my sole source of income.

10.      As part of my normal withdrawal of funds from my account, on September 15, 2008 I received a $102,000 check from Madoff dated September 11, 2008. I deposited the check in my account on September 15, 2008.

11.      After December 11, 2008, I was forced to go to work in order to support myself. I worked as a house maid; a caretaker for an elderly patient; a driver; at a cash register; and in a ladies' clothing store. In short, I did anything I could to earn money to pay my living expenses. I have also been forced to sell a car, jewelry, household items, and a condominium I had in Florida since 1984, at greatly depressed prices because I needed money to live on and had not promptly received my SIPC insurance.

12.      I filed my SIPC claim for both accounts on February 14, 2008.

13.      I heard nothing from the Trustee for several months. Finally, on May 20, 2009, I received a determination letter requiring that I acknowledge that my claim with respect to the IRA account was for only $1,348,877.12, the amount of my original investment.

14.      I was informed that it was a pre-condition to my receiving SIPC insurance on this account for me to acknowledge that I was not entitled to a claim for any appreciation in that account. Because I was financially desperate and I had no alternative but to accede to the Trustee's demand, I signed the required acknowledgments and, on June 6, 2009, I received a check from SIPC for $500,000 with respect to this account.

15.    Thereafter, I had several communications with an attorney from B&H who told me that, under the law, the Trustee was obligated to withhold $102,000 from my SIPC payment with respect to my direct investment account because the Trustee was entitled to deduct the $102,000 payment I received in September 2008.  I was also told that this money would simply reduce SIPC's obligations.  The money would not be used to pay other investors.

16.    I asked if I could accept the $398,000 check and yet reserve my right to claim the $102,000 that the Trustee was going to withhold.  I was told that I would not be able to do that and, if I wanted the check for $398,000, I would have to relinquish my claim to the $102,000.  I explained that I was uncertain whether I should waive my claim to the $102,000.

17.    My attorney has since informed me that the Bankruptcy Code was not intended to enrich SIPC at the expense of a customer.

18.    On May 29, 2009, I received another phone call from the attorney for Picard with whom I had been speaking.  He told me that there had been a change in strategy by the Trustee and that I would not have to relinquish my claim to the $102,000 if I accepted the $398,000.  I was told that I would be sent a revised determination letter and accompanying documents.

19.    I received a determination letter dated June 9, 2009 which stated that, because I qualified for the "Hardship Program," I would receive the undisputed portion of my claim, $398,000.  The "Hardship Program" was a program instituted by the Trustee which I applied for, although the application process was very invasive and embarrassing, as it requested minute details about my finances.  Also, despite the Hardship Program's promise to "expedite" payment, I still have not received my check.

20.    The June 9, 2009 letter required me to sign a partial release and assignment in order to receive the $398,000 which the Trustee admits is due and owing to me.

4

21.    The securities positions shown on my November 30, 2008 statement in my IRA

account is $2,532,140.66, and the amount of the securities positions shown on my November 30,

2008 statement in my direct investment account is $4,729,125.04.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 3, 2009

/s/ Maureen Ebel

1087488.1