# EXHIBIT A

Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin and
Maureen Ebel,* with the support of more than
100 other Customers

**Hearing:  August 6, 2009 at 10 a.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

Adv. Pro. No. 08-01789 (BRL)

SIPA LIQUIDATION

(Substantively Consolidated)

**OBJECTION TO FIRST APPLICATIONS OF IRVING H. PICARD, TRUSTEE,
AND BAKER & HOSTETLER LLP FOR ALLOWANCE OF INTERIM
COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF
EXPENSES INCURRED FROM DECEMBER 15, 2008 THROUGH APRIL 30, 2009**

Diane and Roger Peskin and Maureen Ebel ("Objectors"), by their attorneys, Phillips

Nizer LLP, with the support of over 100 other customers of Bernard L. Madoff Investment

Securities, LLC ("Madoff"), object to the applications for interim compensation of Irving H.

Picard, Trustee, and his counsel, Baker & Hostetler LLP ("B&H").  The Trustee was appointed

by this Court at the request of the Securities Investor Protection Corporation ("SIPC") in the

proceeding instituted in the United States District Court for the Southern District of New York

on December 15, 2008 for the liquidation of Madoff under the Securities Investor Protection Act,

15 U.S.C. § 78aaa, *et seq.* ("SIPA").

1.    SIPA was enacted at the behest of the financial services industry to relieve the

industry of the significant expense of registering securities in the names of investors and to allow

the industry to profit from holding securities in street name. The inducement to investors to

assume the risks of having their securities held in street name was the promise that their accounts

were insured against the brokers' dishonesty by an insurance fund managed by SIPC and funded

by the financial services industry.

2.    SIPC is obligated under SIPA to "promptly" pay up to $500,000 in SIPC

insurance to Madoff customers (the "Customers") based upon their November 30, 2008

statements (their "Statutory Balances"). Customers who reasonably relied upon the promise of

SIPC insurance are now being told by the Trustee that their accounts were not insured for their

Statutory Balances but only for their net investment. If the Trustee prevails, SIPC will save

billions of dollars it would otherwise have to pay in SIPC insurance to Customers.

3.    The Trustee has served as SIPC trustee in numerous SIPA liquidations. SIPC, as

the insurer of Customer accounts, is in a direct adversarial position to the Customers, putting the

Trustee and B&H in an untenable conflict of interest. As set forth herein, the Trustee and B&H

have taken actions to enrich SIPC at the expense of the Customers. Their actions have been (a)

in violation of the express provisions of SIPA, (b) in contravention of national policy as

evidenced by SIPA's legislative history, (c) in contradiction of controlling Second Circuit

authority, with which SIPC and the Securities and Exchange Commission ("SEC") concurred,

and (d) in direct abrogation of the rights of the Customers both under SIPA and under the due

process clause of the Fifth Amendment to the United States Constitution.

4.      The Trustee and B&H have a fiduciary duty to Customers.  This obligation is

particularly crucial here because the Madoff fraud has caused an economic tsunami, leaving

thousands of innocent people in the United States with no means of support, and because this

case has received worldwide focus at a time when the integrity of the United States financial

system is subject to legitimate question.

5.      The Trustee and B&H are acting in direct contravention of their fiduciary and

statutory duty to Customers and to the public and, in the process, are increasing exponentially

and unnecessarily the administrative costs of the estate, depleting SIPC funds that should be used

to pay Customer claims at a time when SIPC is insolvent.  Indeed, SEC Commissioner Mary

Schapiro testified before Congress on July 14, 2009:

> The tragic truth is there is not enough money available to pay off
> all the customer claims.

See Exh. B at 2. (Webcast at 52:51.)

6.      In the circumstances of this case which has bankrupted SIPC, the Trustee and

B&H have a conflict of interest which disables them from serving.  For this reason, and for the

other reasons set forth below, Objectors file this objection and offer to prove the facts set forth

herein at an evidentiary hearing at a time set by the Court.  This objection constitutes their offer

of proof.

**INTRODUCTION**

7.      Objectors are typical of thousands of Customers who invested with Madoff, many

over a period of 20 – 30 years, in reliance on the SEC's oversight of the securities industry.  In

3

1992, the SEC publicly stated that it had investigated Madoff and found no evidence of fraud.  In

total, the SEC conducted at least seven investigations involving more than 27 SEC personnel as a

result of repeated complaints that Madoff's trading strategy was not accurately represented to

Customers.  The SEC repeatedly gave Madoff its stamp of approval.   Now, Customers are told

that, at least since the 1980's, Madoff never purchased any of the securities reflected on

Customer statements but, instead, used investors' money for his other business and personal

interests.  See Exh. A, ¶ 4 at 2 and ¶ 9 at 5.

8.    Based upon the purchase and sale confirmations that Madoff sent to Customers,

he went into the market five or six times a year, purchased a portfolio of approximately 25 S&P

100 company stocks; hedged the positions with options to protect against the downside; held the

positions for approximately six weeks; then sold the positions and put the proceeds into US

Treasury bills.   Thus, Madoff appeared to have a conservative, diversified trading strategy.

While his returns were relatively consistent, they were not extraordinary.  For example, during

the period of time that Objectors invested in Madoff, they had short term capital gains

appreciation of approximately 10% per year whereas they could have invested in funds of any of

the large mutual fund companies and, over this period of time, earned 20-30% per year on a long

term capital gains basis.

9.    By virtue of the fact that Madoff began his investment advisory business in the

1960's and by virtue of the esteem with which he was treated by the SEC and FINRA, thousands

of Customers had put all of their life savings and retirement accounts into Madoff.  The

Customers, a substantial portion of whom are 70 or older, relied upon regular periodic

distributions from their Madoff accounts in order to fund their daily living expenses, the payment

of their taxes, and their support obligations for family members, as well as to comply with the

4

mandatory withdrawals from their tax-deferred retirement accounts. The collapse of Madoff on December 11, 2008 terminated without warning the sole means of support of many Customers and their family members across the United States, leaving them without the ability to pay their mortgages, their taxes, their food bills, or their medical bills.

10.    If ever there was a case where it was essential to comply with Congress' mandate that SIPC insurance be paid "promptly" to investors, this is such a case. Yet, with full knowledge of the devastation that Madoff caused to Customers, and despite the clear provisions of SIPA as incorporated into this Court's December 23, 2008 order, the Trustee and B&H have caused needless devastation to Customers by ignoring SIPA's mandate that Customer claims be paid "promptly" based upon their Statutory Balances. In the process, the Trustee and B&H have misrepresented the law to destitute Customers who cannot afford to retain their own counsel, with the clear intent of inducing Customers to accept less in SIPC insurance than they are entitled to receive.

11.    While the Trustee has reported that he has already "recovered" $1,088,507,818 (Trustee's First Interim Report at 3), of this amount, $946 million was simply sitting in bank accounts in Madoff's name at the time the Trustee was appointed, including $301,407,190 at Mellon Bank, $233,500,000 at JP Morgan Chase, $300 million in securities, and $29 million at Bank of New York. Bloomberg.com 1/29/09.

12.    The Trustee's most important function is to promptly pay SIPC insurance to customers because the United States Attorney's Office has the duty to assure restitution to victims of Madoff's fraud. On this score, the Trustee has been an abysmal failure. Of the more than 15,400 Customer claims in this case, the Trustee has allowed a mere 747 claims in eight months, although even these 747 Customers have not all been paid by SIPC.

5

http://madofftrustee.com/AdditionalInformation.html.  Despite this pathetic track record, the

Trustee and B&H, exclusive of the numerous other professionals the Trustee has hired, seek

approval of fees and expenses for the period December 15, 2008 through April 30, 2009 as

follows:

> Baker & Hostetler LLP as Counsel to the Trustee
> Fees: $14,662,319.83    Expenses: $274,203.03

> Irving H. Picard, Esq. as SIPA Liquidation Trustee
> Fees: $759,228.75        Expenses:  $45.00

13.    The payment of $15 million of SIPC's money to the Trustee and B&H means that

30 destitute Customers will not be paid the SIPC insurance to which they are entitled by the

express language of SIPA.  This depletion of SIPC's funds is unjustifiable.  The Trustee still has

not paid SIPC insurance to hundreds of Customers who, as readily determinable from Madoff's

records, are indisputably entitled to $500,000 from SIPC.  Indeed, there are Customers who, the

Trustee has acknowledged in writing, are entitled to $500,000 in SIPC insurance and yet the

Trustee has refused to pay these Customers because the Customers have additional claims and

will not release them as a condition of payment.  Nowhere in SIPA is the Trustee authorized, as

he has done, to withhold insurance payments from customers solely because they have additional

claims against SIPC or because they will not give SIPC a general release.  *See* the various

Objections to the Trustee's Determination that have been filed with the Court which are

incorporated in full herein by reference.  The Trustee has not scheduled a hearing on a single one

of these Objections.

14.    At this rate, the Trustee and B&H, exclusive of all the other professionals retained

in this case, will incur administrative expenses of $45 - $60 million a year and, undoubtedly, will

keep the case open for seven to ten years.  Thus, the administrative expenses for the Trustee and

6

B&H alone could easily exceed $500 million.  The administrative expenses are to be paid by

SIPC which, itself, is insolvent and does not have sufficient money to fulfill its insurance

obligations to Customer.  Thus, every dollar paid to the Trustee and B&H is a dollar taken away

from Customers – innocent, law abiding citizens who believed that SIPA was the law of the land

and that their accounts were insured by SIPC for up to $500,000 against the dishonesty of their

broker.

15.    Rather than draw upon the lines of credit available to SIPC under SIPA, SIPC,

with the concurrence of the Trustee and B&H, have devised a scheme to allow SIPC to avoid

paying the insurance to which Customers are indisputably entitled.  This scheme began with the

Trustee's invention of a new definition of "net equity."

16.    In blatant disregard of the law, the Trustee has denied SIPC insurance to anyone

who does not have a net investment over the life of his investment with Madoff.  Under the

Trustee's theory, an investor who invested $100,000 in 1970, which appreciated to $1,600,000 in

2008, is not entitled to any SIPC insurance if, over the course of 37 years, the investor took out

$100,000 to pay taxes.   Similarly, according to the Trustee and B&H, a Customer who had an

IRA account from which the Customer took the annual withdrawals mandated by federal law and

paid taxes on the money is not entitled to SIPC insurance if his mandatory withdrawals exceeded

his investment.

17.    By ignoring SIPA, the Trustee has necessitated the additional administrative

expense of having "forensic" accountants determine the net investment of each Customer, in

many cases encompassing 30 – 40 years of records.   The "forensic" accountants, of course, are

also being paid by SIPC with money which should be paid to Customers.  The Trustee's self-

serving *legerdemain* is calculated to save SIPC billions of dollars and, at the same time,

7

necessitates the incurrence of tens of millions of dollars of unnecessary administrative expenses that would be avoided if the Trustee simply complied with the law.

18.      As a result of the Trustee's defiance of SIPA, Customers have suffered tragic additional losses.  Many Customers have been forced to sell their homes on a fire-sale basis in an extraordinarily depressed market, simply because they did not have the money to cover the monthly housing expenses for a sufficient period to sell their homes over a more reasonable time period.  Customers have been forced to put loved ones into nursing homes because they could not afford to continue to support them in their own homes.  Customers on chemotherapy drugs have not had the funds to pay for their medical treatment.

19.      In recognition of the unconscionable delay in payment of SIPC insurance to destitute Customers, but without any statutory authority, the Trustee established a "Hardship Program" pursuant to which Customers who, through the disclosure of the most intimate personal information, are deemed in the Trustee's sole discretion to be hardship cases, are entitled to receive "expedited" treatment.

20.      However, the Trustee has given himself more time to pay "hardship" cases than SIPA contemplates a trustee will need to pay all customers.  The Trustee has given himself an initial period of 20 days to decide whether or not an individual qualifies for the Hardship Program.  See Exh. C, ¶ 3.c at 1.  If an individual does qualify, then his claim "will be expedited in the claims process" but "the Trustee cannot guaranty the timing of determination of any claim."  *Id*.  The best that an individual can hope for is that, if his account was opened after January 1, 2006, "the Trustee will endeavor to mail a determination of [the] claim within 20 days of [the] claim qualifying for the Hardship Program."  *Id*.  Thus, if an individual's account was opened after January 1, 2006, the Trustee will "endeavor" (but does not promise) to mail a

8

determination of claim within 40 days, but only if the Customer discloses absolutely everything

about his finances first.  Of course, the time between determination and payment can be another

60 days.

21.    There is no provision in SIPA that contemplates that a trustee will take 60 days to

determine a claim, no matter when the investment was made.  There is nothing in SIPA that

restricts prompt payment to those who can demonstrate to the Trustee's satisfaction that they are

suffering "hardship."  There is nothing in SIPA which allows a trustee to provide for prompt

payment to recent customers and delayed payment to long-standing customers.  That is precisely

why SIPA requires the Trustee to fix a customer's claim at his Statutory Balance.

22.    The Trustee's conduct has been particularly injurious to elderly investors.  He has

denied SIPC insurance to "hardship" Customers whose investments in Madoff date back 15-40

years who did not retain their records of deposits.  The Trustee and B&H have taken the position

that it is the Customer's burden to prove his investments and, if the Customer did not retain

records from 15-40 years ago, the Customer loses and SIPC wins.  In fact, B&H has informed

Customers that the Trustee will not provide Customers with Madoff's own records – as to which

the Trustee has exclusive access.  Thus, even if the Trustee has a record of Customer deposits,

the Trustee will not make those records available to Customers.  In this way, of course, SIPC can

deny coverage to Customers who had no reason to, and did not, retain records of deposits going

back 15-40 years.

23.    As to the remainder of the "hardship cases, the Trustee and B&H have taken

months to resolve "hardship" cases, during which the Trustee has sought to exact compromises

from elderly, destitute Customers.  In several instances, attorneys at B&H have affirmatively

misrepresented the law to "hardship" cases in order to induce them to accept from SIPC less than

9

the sums to which they are indisputably entitled.  In addition, the Trustee has regularly deducted

from Customers' SIPC insurance alleged "preferences," despite the fact that SIPC does not

authorize such offsets and despite the fact that there is a substantial question as to whether the

preference provision of the Bankruptcy Code applies to Customers who simply received

distributions from their accounts of their own money, in the ordinary course of business of

themselves and Madoff.

**THE TRUSTEE AND B&H HAVE A CONFLICT OF INTEREST**

24.     This Court has a fundamental obligation to monitor the integrity of proceedings

before it.  *In re Plaza Hotel Corp.,* 111 B.R. 882, 891 (B.E.D. Cal. 1990).

25.     The Trustee owes a fiduciary duty to Customers.  *See In re Adler, Coleman

Clearing Corp.*, 1998 Bankr. LEXIS 1076 (B. S.D.N.Y. Aug. 25, 1998) ("The parties agree that

a SIPA trustee owes a fiduciary duty to the customers and creditors of a liquidating broker dealer

akin to the fiduciary duty a bankruptcy trustee owes a debtor's estate and creditors"); *Germain v.

The Connecticut National Bank,* 988 F. 2d 1323, 1330 n. 8 (2d Cir. 1993).   A fiduciary duty is

the highest duty imposed by law.  *See Roberts v. Dayton Hudson Corp*., 914 F. Supp. 1421, 1423

(N.D. Tex. 1996); *see also Enzo Biochem, Inc. v. Johnson & Johnson,* 1992 U.S. Dist. LEXIS

15723, at *29 (S.D.N.Y. Oct. 15, 1992).

26.     The disinterestedness of a trustee's counsel is "so crucial to the proper functioning

of the bankruptcy system that a court may raise it and dispose of it whenever its sanctity is

questioned."  *In re Vebeliunas,* 231 B.R. 181 (B.S.D.N.Y. 1999), *citing In re Martin*, 817 F. 2d

175, 180 (1st Cir. 1978).  A "trustee/fiduciary must be free from any hint of bias," and "either an

appearance of impropriety or a potential conflict of interest . . . is a viable cause for removal" of

10

a trustee.  *In re AFI Holding, Inc.*, 355 B.R. 139 (9th Cir. BAP 2006) (affirming bankruptcy

court's removal of Chapter 7 trustee).

27.    The attorney for a trustee must be "disinterested," meaning that the attorney does

not have an interest materially adverse to a party in interest in the bankruptcy.  *In re Marvel*

*Entertainment Group, Inc.,* 140 F. 3d 463, 476 (3d Cir. 1998).  *See* Collier Bankruptcy Manual §

101.13 ("professionals engaged in the conduct of a bankruptcy case should be free of the

slightest personal interest which might be reflected in their decisions concerning matters of the

debtor's estate or which might impair the high degree of impartiality and detached judgment

expected of them during the course of administration.").  *See also, In re Crivello,* 134 F. 3d 831,

835 (7th Cir. 1998)*; In re Cook,* 223 B.R. 782, 798 (10th Cir. BAP 1998);  *In re BH & P, Inc.,*

119 B.R. 35, 42 (D.N.J. 1990); *In re Leslie Fay Cos.,* 175 B.R. 525, 532 (B.S.D.N.Y.

1994)(counsel removed from all new matters in case where counsel was investigating financial

irregularities of debtor and did not disclose relationships with directors who were targets of

investigation).

28.    Aside from the disinterestedness standard in bankruptcy, under the Rules of

Professional Conduct, an attorney cannot represent adverse interests.  Rule 1.7(a) of the New

York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.7(a).  An attorney must avoid even

the "appearance of a conflict" pursuant to § 327(a) of the Bankruptcy Code.  *In re Hot Tin Roof,*

205 B.R. 1000, 1003 (1st Cir BAP 1997).  Here, B&H represents the Trustee who has a fiduciary

duty to Customers.  Yet, B&H is deliberately acting to delay and frustrate the payment of

Customer claims, even to the point of misrepresenting the law to destitute Customers who cannot

afford to retain their own counsel.  Such misrepresentation is grounds for denial of fees.  *See In*

*re Mercury*, 122 Fed. Appx. 528 (2d Cir. 2004) (affirming denial of compensation to firm that

11

acted as counsel for debtors and counsel for trustee, where the attorneys acted in the interest of

the trustee instead of debtors and incorrectly advised debtors regarding their rights to convert

Chapter 7 filing to Chapter 11 filing).  It also violates B&H's ethical obligations.  *See* Rule 4.1 of

the New York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.32 ("In the course of

representing a client, a lawyer shall not knowingly make a false statement of fact or law to a

third person.")

29.     Under SIPA, SIPC is deemed to be "disinterested."  15 U.S.C. §§ 78eee(b)(6)(A).

However, SIPA does not, and could not, provide that a trustee, who is not an employee of SIPC,

is "disinterested" or that an attorney retained by the Trustee is deemed, as a matter of law, to be

"disinterested," particularly in a case like this where the Trustee and his counsel have flatly

rejected the fundamental mandates of SIPA that were intended to protect customers.   In *In re*

*First State Securities Corp.,* 39 B.R. 26 (B.S.D. Fla. 1984), the bankruptcy court assumed,

without analysis or authority, that a trustee who, the court found, was a mere "puppet" of SIPC,

was entitled to the imputation of disinterestedness provided by 15 U.S.C. § 78eee(b)(6)(A).  The

court simply cited the statute which states:

> SIPC shall in all cases be deemed disinterested, and an employee of SIPC shall be
> deemed disinterested if such employee would, except for his association with
> SIPC, meet the standards set forth in this subparagraph.

Since neither the Trustee nor B&H is an employee of SIPC, this provision cannot insulate them

from the requirement that the Trustee and his counsel be free of any conflict of interest.

30.     The Trustee and B&H have a conflict of interest as a result of which they are

barred from receiving any compensation under established precedents and principles of

professional conduct.  *See In re Angelika Films 57*[th]*, Inc*., 246 B.R. 176 (S.D.N.Y. 2000)

(affirming bankruptcy court's denial **in its entirety** of fee application of debtor's counsel where

12

counsel represented debtor's principal in other matters and took actions in the bankruptcy that

"placed the interests of the Debtor's principal. . . over those of the Debtor.")

## SIPA VIOLATES THE CUSTOMERS' RIGHT TO DUE PROCESS OF LAW

31.    If this Court holds that the Trustee and B&H are deemed as a matter of law to be

disinterested notwithstanding their obvious conflict of interest, then the Customers have been

denied due process of law as guaranteed to them under the Due Process Clause of the Fifth

Amendment to the United States Constitution.  "The bankruptcy power, like other great

substantive powers of Congress, is subject to the Fifth Amendment." *Louisville Bank v. Radford*,

295 U.S. 555, 589, 602 (1935); *see also In re Phillips*, 13 B.R. 82 (B. C.D. Ill. 1981).

Accordingly, any statutory scheme resulting from Congress' exercise of its Constitutional

bankruptcy powers must be constrained by the requirements of the Due Process Clause of the

Fifth Amendment.

32.    Evaluating a Fifth Amendment due process claim begins with a two-part analysis:

1) whether the interest asserted rises to the level of a "property interest"; and 2) if it does, the

court must weigh the competing interests of the individual and the state to determine what

process is constitutionally required.  *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361 (9th

Cir. 1976).  Congress, through SIPA, has statutorily created a property interest for the

Customers: the right to receive SIPC insurance of up to $500,000.  *See* 15 U.S.C. § 78(fff-3).

This is a protected "property interest" under the Fifth Amendment  because it is an entitlement to

a government benefit conferred by statute.  *See S & D Maintenance Co., Inc. v. Goldin*, 844 F.2d

962, 965 (2d. Cir. 1988); *Garcia v. U.S.*, 666 F.2d 690 (5th Cir. 1982).

33.    While SIPC is not a governmental agency, it is a creation of Congress and

performs public functions, one of which is the designation of trustees and counsel in bankruptcy

13

proceedings who have the power, in the first instance, to determine claims. The conduct of a private entity amounts to state action when, like SIPC, it acts in a judicial or quasi-judicial capacity pursuant to a legislative delegation of authority. *See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 617 (1993); *see also Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447 (1st Cir. 1983). Here, Congress has created SIPC which functions in a quasi-judicial capacity pursuant to a legislative delegation of authority.

34.    It is axiomatic that "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). Congress has impermissibly created a statutory scheme that is permeated by partiality, conflicts of interest, and bias by permitting SIPC to appoint and control the Trustee and the Trustee's counsel, regardless of the obvious conflict of interest between SIPC and the Customers. SIPC has a financial incentive to deny Customer claims and has acted solely to protect its members, the Financial Services Industry, from the obligation to fund the payments to Customers.

35.    In *Schweiker*, the Supreme Court would have found a violation of due process if the carriers, who appointed the hearing officers, had a financial interest in the outcome. *Schweiker*, 456 U.S. at 197 ("In the absence of proof of financial interest on the part of the carriers, there is no basis for assuming a derivative bias among their hearing officers"). SIPA's grant of power to SIPC to select the trustee who, in turns, chooses counsel in bankruptcy proceedings, and designation of SIPC and its employees as statutorily disinterested, violates the Customers' due process rights. *See Concrete Pipe,* 508 U.S. at 618-19 (where trustee functions in an adjudicative capacity, appearance of bias alone violates Due Process).

14

**THE TRUSTEE AND B&H HAVE VIOLATED SIPA'S
MANDATE TO "PROMPTLY" PAY CUSTOMER CLAIMS**

36.    Congress made absolutely clear its intent to minimize the devastation to

customers of an insolvent broker/dealer through prompt payment of SIPC insurance.  SIPA

requires that SIPC "promptly" pay SIPC insurance to investors of a liquidated brokerage firm:

GENERAL PROVISIONS OF A LIQUIDATION PROCEEDING

**(a) PURPOSES**

The purposes of a liquidation proceeding under this chapter shall be—

(1) **as promptly as possible** after the appointment of a trustee in such liquidation
proceeding, and in accordance with the provisions of this chapter—

(A) to deliver customer name securities to or on behalf of the customers of the
debtor entitled thereto as provided in §78fff-2(c)(2) of this title; and

(B) to distribute customer property and (in advance thereof or concurrently
therewith) otherwise satisfy net equity claims of customers to the extent provided
in this section.

**PAYMENT TO CUSTOMERS.-SIPC shall promptly satisfy all obligations of
the member to each of its customers relating to, or net equity claims** based
upon, securities or cash by the delivery of securities or the effecting of payments
to such customer (subject to the provisions of section8 (d) and section **9** (a) )
insofar as such obligations are ascertainable from the books and records of the
member or are otherwise established to the satisfaction of SIPC.

15 U.S.C. §78fff-2(c)(2); emphasis added.  *See also,* 15 U.S.C. § 78fff-3(a).

37.    Congress intended for the trustee to promptly pay customer claims based upon the

debtor's books and records, without the filing of proofs of claim:

**[SIPA] establishes procedures** for prompt orderly liquidation of SIPC members
when required and **for making prompt distributions and payments on account
of customers' claims without need for formal proofs of claim.**

\*        \*        \*

15

The committee also believes that **it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations.**

*    *    *

**Because of the difficulties involved in filing proofs of claim . . ., the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.**

See Exh. D; emphasis added. (S. Rep. 91-1218, at 10, 11, 12 (1970), *reprinted in* Federal Securities Laws Legislative History 1933-1982, Vol. IV, at 4642, 4643, 4644 (1983)).

38.    This Court itself has recognized Congress' intent that SIPC proceedings be conducted quickly in order to minimize the devastation to customers:

> Congress itself has commanded **swift** action.  For example, the SEC and self-regulatory organizations are required to "**immediately notify**" SIPC of concerns about the financial stability of a SIPC member.  15 U.S.C.A. § 78eee(a)(1).  A Court determining that a protective decree is warranted must "**forthwith**" appoint a trustee, 15 U.S.C.A. § 78eee(b)(3), and remove the case to a Court with jurisdiction over bankruptcy cases.  15 U.S.C.A. § 78eee(b)(4).  The trustee is required to investigate the operation of the debtor's business and report its results to SIPC "**as soon as practicable**."  15 U.S.C.A. § 78fff-1(d).  Among the stated purposes of a liquidation proceeding is to make customers whole "**as promptly as possible after the appointment of a trustee," 15 U.S.C.A. § 78fff(a), who is required to "promptly discharge .** . all obligations of the debtor to a customer relating to securities."  15 U.S.C.A. § 78fff-2(b).  **SIPC fund moneys must be advanced to the trustee up to certain limits "to provide for prompt payment and satisfaction of . . . claims of customers."  15 U.S.C.A. § 78fff-3(a). Congress has commanded customer damages to be repaired promptly.**

*In re Donald Sheldon & Co., Inc.*, 153 B.R. 661, 667 (B. S.D.N.Y. 1993); emphasis added.

39.    The December 23, 2008 order entered in this case specifically incorporates the time periods mandated by SIPA.  The Order states:

> ORDERED, that the Trustee be, and he hereby is, authorized to satisfy, **within the limits provided by SIPA**, those portions of any and all customer claims and

16

accounts which agree with the Debtor's books and records, or are otherwise
established to the satisfaction of the Trustee pursuant to 15 U.S.C. §78fff-2(b),
provided that the Trustee believes that no reason exists for not satisfying such
claims and accounts

December 23, 2008 Order at 5; emphasis added.

40.    The Trustee's complete failure to fulfill his statutory obligations is shown by the

contrast between the treatment of customers by the FDIC and the treatment of Customers in this

case.  As stated in the legislative history of SIPA:

The intention of SIPC, like the FDIC, is to minimize losses to and to maintain
public confidence in the institutions the public deals with.

S. Rep. 91-1218, at 9, *reprinted in* Federal Securities Laws Legislative History 1933-

1982, Vol. IV, at 4641.  See Exh. D**.**

41.    According to the FDIC's website, "It is the FDIC's goal to make deposit

insurance payments within two business day[s] of the failure of the insured institution."

http://www.fdic.gov/consumers/banking/facts/payment.html.  Yet in this case, more than eight

months after the institution of the liquidation proceedings, the Trustee has allowed only 747

claims out of at least 15,400 claims filed, and not all 747 claims have been paid.

**THE TRUSTEE AND B&H HAVE VIOLATED SIPA'S MANDATE
TO HONOR THE "LEGITIMATE EXPECTATIONS" OF CUSTOMERS**

**The Motivation of the Financial Services Industry to Enact SIPA**

42.    SIPA was enacted in 1970 at the behest of the SEC-regulated broker/dealers (the

"Financial Services Industry") which was seeking to relieve itself of the administrative burden of

having to register customer securities with the issuing corporations every time a customer

purchased new securities for his account.  *See* Joel Seligman, *The Transformation of Wall Street:*

*A History of the Securities Exchange Commission and Modern Corporate Finance,* 451 n.31

17

(1995) (Prior to enactment of SIPA, "Stock certificates and related documents were 'piled halfway to the ceiling' in some offices; clerical personnel were working overtime, six and seven days a week, with some firms using a second or even a third shift to process each day's transactions.").

43.    In addition to the administrative burden of registering securities, the Financial Services Industry wanted the flexibility and profits that would come with investors allowing the firms to hold securities in street name. *See An Investor's Guide to the Alternatives of Holding Physical Certificates,* published by the Securities Industry and Financial Market Association, available at http://www.sifma.org/services/publications/pdf/PhysCertGuide2alternatives.pdf (stating that the Securities Industry and Financial Market Association "strongly supports and encourages [street name] type of ownership".

44.    Securities held in street name could be utilized by the brokerage firms to generate profits for themselves.  The securities could be loaned out, could be sold and repurchased, and could be borrowed against, while in the possession of the brokerage firms, whereas securities directly registered in the name of the customer could not be utilized for any purpose by the brokerage firms**.** *See, e.g.,* 17 C.F.R. 240.8c-1; 17 C.F.R. 15c-1.

45.    In order to induce investors to allow brokerage firms to hold securities in street name, the Financial Services Industry realized it would have to provide some insurance to investors for the risk that a broker might be dishonest and steal the street name securities or not purchase them in the first place.  Hence, the Industry developed the idea of SIPA to provide SIPC insurance to investors and, thereby, to induce them to invest in securities held in street name.  This would allow the Financial Services Industry to utilize the investors' securities for their own enrichment while in the brokers' possession.  As a result of the enactment of SIPA,

18

tens of billions of dollars was invested in the Financial Services Industry in street name securities.

46.    SIPC insurance is funded by the Financial Services Industry which constitutes SIPC's membership.  In order to enrich its membership, SIPC chose to charge each member a mere $150 per year for the privilege of printing on hundreds of billions of dollars of trade confirmations that customer accounts were insured up to $500,000 by SIPC.  Thus, for example, Goldman Sachs paid a mere $150 per year to SIPC.  This allowed the Financial Services Industry to make tens of billions of dollars of profits in the past ten years because the false assurance that accounts were insured up to $500,000 induced gullible investors to pour money into brokerage firms.

47.    SIPC's generosity towards its members left it with insufficient funds to pay Customer claims.  While SIPA allows SIPC to borrow money, SIPC has apparently decided that it would rather cheat Customers out of their insurance than borrow money and have to assess the brokerage firms to repay the loans.  *See* 15 U.S.C. § 78 ddd(g) and (h).

**IN ORDER TO ENRICH SIPC AT THE CUSTOMERS' EXPENSE,
THE TRUSTEE HAS CHANGED SIPA'S DEFINITION OF "NET EQUITY,"
DESPITE AN EXPRESS STATUTORY PROHIBITION**

48.    Pursuant to SIPA, the Trustee is obligated to "satisfy net equity claims of customers." 15 U.S.C. § 78fff(a)(1)(A)-(B).  SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.  This is the Statutory Balance of each customer's account.

The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by –

19

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus

(B) any indebtedness of such customer to the debtor on the filing date. . .

15 U.S.C. §78lll(11).

49.    Congress specifically prohibited SIPC from changing any definitions contained in § 78lll, which section includes the definition of "net equity."  As stated in SIPA:

SIPC shall have the power. . . to adopt, amend and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to . . .the definition of terms in this chapter, **other than those terms for which a definition is provided in section 78lll of this title. .**

15 U.S.C. § 78ccc(b)(4)(A) (emphasis added).  Because SIPC has no power to change the statutory definition of "net equity," the Trustee has no power to employ his "cash in minus cash out" definition of net equity.

50.    Unfortunately, at the first and only creditors' meeting, the Trustee and B&H announced their definition of "net equity" as if it were the law, without any indication that SIPA contradicts what the Trustee and B&H were saying.  By this conduct, the Trustee chilled the filing of SIPC claims by Customers who believed the Trustee and his counsel would not misrepresent the law and concluded that they had no right to SIPC insurance.  This is another example of the conflict of interest which prohibits the Trustee and B&H from continuing to serve in this case.

51.    In a May 2001 Report, the United States General Accounting Office, wrote:

SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash and/or securities held at a failed firm.  **SIPC fulfills its mission** by initiating liquidation proceedings where appropriate and transferring customer accounts to another securities firm or returning the cash or securities to the customer **by restoring to the customer accounts the customer's "net equity."  SIPA defines net equity as the value of**

20

> **cash or securities in a customer's account as of the filing date, less any money owed to the firm by the customer, plus any indebtedness the customer has paid back** with the trustee's approval within 60 days after notice of the liquidation proceeding was published.

GAO Report to the Ranking Minority Member, Energy and Commerce Committee, House of Representatives entitled "Securities Investor Protection: Steps Needed to Better Disclose SIPC Policies to Investors," (the "GAO Report") at 15; emphasis added).

52.    The Second Circuit has recognized the statutory definition of net equity:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" corrected for "any indebtedness of such customer to the debtor on the filing date."

*In re New Times Securities Services, Inc.*, 371 F.3d 68, 72 (2d Cir. 2004); *see also Securities Investor Protection Corp. v. BDO Seidman, LLP,* 49 F. Supp. 2d 644, 649 (S.D.N.Y. 1999) ("As defined by SIPA, 'net equity' is the amount that the broker would have owed a customer had it liquidated all the customer's holdings on the date SIPC filed for a protective decree, less any outstanding debt the customer owed to the broker."); *In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 61 n. 2 (B. S.D.N.Y. 1999) ("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

53.    This Court itself in this case adopted the statutory definition of "net equity" when it wrote, in the December 23, 2008 Order that:

> **ORDERED, that the Trustee be, and he hereby is, authorized to satisfy such customer claims and accounts** (i) by delivering to a customer entitled thereto "customer name securities," as defined in 15 U.S.C. §78*lll*(3); (ii) **by satisfying a customer's "net equity" claim, as defined in 15 U.S.C. §78*lll*(11),** by distributing on a ratable basis securities of the same class or series of an issue on hand *as* "customer property," as defined in 15 U.S.C. §78*lll*(4), and, if necessary, by distributing cash from such customer property or cash advanced by SIPC, or

21

purchasing securities for customers as set forth in 15 U.S.C. §78fff-2(d) within the limits set forth in 15 U.S.C. §78fff-3(a); and/or (iii) by completing contractual commitments where required pursuant to 15 U.S.C. §78fff-2(e) and SIPC's Series 300 Rules, 17 C.F.R. §300.300 et seq., promulgated pursuant thereto; and it is further

**ORDERED, that with respect to claims for "net equity," as defined in 15 U.S.C. § 78_lll_(11), the Trustee be, and he hereby is, authorized to satisfy claims out of funds made available to the Trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the Debtor available to satisfy such claims;**

December 23, 2008 Order at 5; emphasis added.

54.     In the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a lengthy period and had never purchased the securities reflected on the customers' monthly statements.

55.     In fact, SIPC's President, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 **including the appreciation** in their accounts.  As Mr. Harbeck explained, if customers are led to believe that "real, existing" securities had been purchased for their accounts, then those customers are entitled to get the full value of their securities positions as of the filing date even if the securities had never been purchased:

MR. HARBECK:  **Even if they're not there.**

THE COURT:  Even if they're not there.

MR. HARBECK:  Correct.

THE COURT:  In other words, **if the money was diverted, converted –**

MR. HARBECK:  And the **securities were never purchased**.

THE COURT:  Okay.

22

MR. HARBECK:  **And, if those positions triple, we will gladly give the people their securities positions**.

Hearing Transcript at 37-38, *In re New Times Sec. Servs. Inc.*, 371 F.3d 68 (B. E.D.N.Y. 2000) (emphasis added), annexed as Exh. E.

56.    In a brief SIPC submitted to the Second Circuit in 2005, SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities.  SIPC wrote:

> [R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality.  Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at 23-24 (citing *New Times*)(emphasis added).

57.    The Trustee's position in the Madoff case is directly contradicted, not only by SIPC's prior treatment of customers in *New Times*, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each.  So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares,

23

even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, http://www.streetinsider.com/Insiders+Blog/SIPCs+Role+In+Madoff-Of-All-Scams+Could+Save+The+Stock+Market/4243249.html

58.    The Trustee's position conflicts with other federal statutes including the Internal Revenue Code and ERISA.  For example,

(a)    IRS Form 4506 requires the IRS to destroy returns after seven years.  Yet, the Trustee is refusing to pay SIPC insurance to Customers who cannot produce records of deposits dating back 15 – 20 years.

(b)    Rev. Proc. 2009-20, issued by Commissioner Shulman on March 17, 2009, expressly recognizes the income earned by Customers, on which they paid taxes annually. Yet, the Trustee has taken the position that the income earned by Customers is not their money.

(c)    Rev. Proc. 2009-20 provides for a five-year carryback of the theft loss. Yet, the Trustee has indicated he intends to "claw back" income withdrawn by Customers over the last six years.

(d)    Customers were required by law to take mandatory withdrawals from their IRA accounts.  Yet, the Trustee is deducting from SIPC insurance the mandatory withdrawals that Customers took and paid taxes on.

59.    Because of his refusal to comply with SIPA's mandate that he "promptly" satisfy customer claims based on the Statutory Balances, 15 U.S.C. § 78fff-3(a) and 4(c), the Trustee has decided that he needs a vast team of forensic accountants to pore through decades of records to determine each Customer's net investment before SIPC pays any amount to a Customer. Clearly, this is inconsistent with the statutory scheme and the legislative intent.

24

60.    Customers' "securities positions" are readily ascertainable from their November 30, 2008 statements.  Moreover, the Customers did not have any "indebtedness" to Madoff.  They did not owe Madoff any cash or securities since they did not borrow from Madoff on margin.  *See* H.R. Rep. No. 95-746, at 4754 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"), *Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (under the 1970 statutory regime, when there were shortages of securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *In re First Street Sec. Corp.*, 34 B.R. 492, 497 (B. S.D. Fla. 1983) (offsetting indebtedness of customer to broker from claim amount where unauthorized stock purchase was partially funded by borrowing on margin).  Because the Customers have no indebtedness to Madoff, there is no need to perform any calculations whatsoever to determine the amount of Customers' net equity.  Their net equity is simply the "securities positions" set forth on their last statements.

**THE TRUSTEE IS DESTROYING INVESTOR CONFIDENCE
NATIONALLY IN DIRECT VIOLATION OF CONGRESSIONAL INTENT**

61.    The purpose of SIPA, as evidenced by its title, was to "protect" investors who allowed the Financial Services Industry to hold their life savings in street name securities.  *See, e.g.,* H.R. Rep. No. 91-1613, at 3-4 (1970)("[SIPA] will reinforce the confidence that investors have in the U.S. securities markets.").  *See also In re New Times*, 371 F.3d at 87 ("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 794 (6th Cir. 1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[ ] and upgrade the financial responsibility requirements for registered brokers and dealers.")(citations

25

omitted).  SIPA attempted to do this initially by satisfying customers' "net equity" claims for

securities with actual securities only if the debtor held securities of the appropriate class and kind

to satisfy customers' claims, while otherwise customers would receive the cash equivalent of the

value of their securities on the filing date.  SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat.

1636, 1648-50 (1970); H.R. Rep. No. 95-746 (39-41)(statement of SIPC Chairman Hugh F.

Owens).

    62.    When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest

shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments],

*[i.e.]*, . . . **the failure to meet legitimate customer expectations of receiving what was in their**

**account at the time of their broker's insolvency**."  D 922 Cong. Rec. H. 36326 (daily ed. Nov.

1, 1977)(statement of Rep. Robert C. Eckhardt)(emphasis added).  See also Hearing on H.R.

8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. On Interstate

and Foreign Commerce, 94th Cong. 63 (1975)("The basic framework of the 1970 Act in regard to

satisfaction of customers' claims should be modified to better meet the legitimate expectations of

customers.") (report to the SIPC Board of Directors by the Special Task Force to consider

possible amendments to SIPA); Hearing on H.R. 8331 before the Subcomm. on Consumer

Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81

(1977) ("The proposed [1978] amendments carry out the Task Force recommendations and are

designed to make the Act more responsive to the reasonable expectations of investors.")

(statement of SIPC Chairman Hugh F. Owens); Hearing on H.R. 8064 Before the Subcomm. on

Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th

Cong. 161-162 ("[T]he principal purpose of these amendments is to meet more nearly the

reasonable expectations of brokerage firm customers.")(statement of SEC Commissioner Philip

A. Loomis, Jr.).

63.    A customer's reasonable expectations were that their actual securities, as shown

on their statements, would be returned to them "in the form they existed on the filing date."  H.R.

Rep. No. 95-746, at 21.  Thus, SIPA was amended to state that "[t]he trustee shall, to the extent

that securities can be purchased in a fair and orderly market, purchase securities as necessary for

the delivery of securities to customers in satisfaction of their claims for net equities. . ." 15

U.S.C. § 78fff-2(d); SIPA § 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978).

64.    Here, the legitimate expectations of the Customers were contained in the account

statements and trade confirmations they received.  They expected that their accounts held the

securities reflected therein.  Thus, recognizing Customer claims in the amount of their Statutory

Balances will further the goals of SIPA, as memorialized in the legislative history.

65.    Congress **specifically contemplated** that "securities positions" reflected in a

customer's statements could include securities that were never actually purchased, as was the

case here.  The Senate and House Reports on the 1978 amendments to SIPA show that SIPA was

intended to cover securities that the broker-dealer did not actually purchase:

> Under present law, because securities belonging to customers may have been lost,
> improperly hypothecated, misappropriated, **never purchased** or even stolen, it is
> not always possible to provide to customers that which they expect to receive, that
> is, securities which they maintained in their brokerage account. . . By seeking to
> make customer accounts whole and returning them to customers in the form they
> existed on the filing date, the amendments. . . would satisfy the customers'
> legitimate expectations. . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

> A customer generally expects to receive what he believes is in his account at the
> time the stockbroker ceases business.  But because securities may have been lost,
> improperly hypothecated, misappropriated, **never purchased**, or even stolen, this

27

is not always possible.  Accordingly, [when this is not possible, customers] will
receive cash based on the market value as of the filing date.

H.R. Rep. No. 95-746 at 21 (emphasis added).

66.     Thus, there is absolutely no support for the Trustee's "cash in minus cash out"
theory in either SIPA or its legislative history.  Instead, the legislative history is in accordance
with the statute: Customers are entitled to claims in the amount of their Statutory Balances,
consistent with their legitimate expectations.

**THIS COURT IS BOUND BY SECOND CIRCUIT AUTHORITY ENTITLING
CUSTOMERS TO CLAIMS IN THE AMOUNT OF THEIR STATUTORY BALANCES**

67.     In *New Times*, the trustee and SIPC took the position that the claims of customers
who received trade confirmations and account statements reflecting the purchase of real
securities should be allowed in the amount of their last statements.  Here, the Customers are in
the exact same position as the *New Times* customers whose claims were satisfied – they all
received statements showing securities positions in actual, existing securities.

68.     *New Times'* principal, William Goren, engaged in a "classic Ponzi scheme" where
new investors' money was used to pay earlier investors.  *In re New Times Sec. Servs. Inc.* ("*New
Times I"*), 371 F.3d 68, 72 n.2 (2d Cir. 2004).  However, while Madoff presented Customers
with trade confirmations and statements showing securities positions in real securities, only some
*New Times* customers were presented with statements showing investments in mutual funds that
actually existed (the "Existent Securities"); the remaining *New Times* customers received
statements showing that they were invested in money market funds that were totally fictitious
(the "Non-Existent Securities").  371 F.3d at 71-72.

69.     SIPC treated the two categories of customers differently.  SIPC applied the
statutory net equity definition to the Existent Securities customers' claims by paying the claims

28

according to the full value of those securities positions as of the date of the liquidation filing, and

the Second Circuit endorsed that treatment.   However, with respect to customers whose

statements showed Non-Existent Securities, SIPC used the net investment methodology that the

Trustee is using in this case.  The customers with Non-Existent Securities appealed SIPC's

treatment.  The Second Circuit took particular note of SIPC's position:

> investors who were misled by Goren to believe that they were investing in mutual
> funds that in reality existed were treated much more favorably.  Although they
> were not actually invested in those real funds – because Goren never executed the
> transactions, the information that these claimants received on their account
> statements "mirrored what would have happened had the given transaction been
> executed."  [Br. for New Times Trustee and SIPC] at 7 n.6.  As a result, the
> Trustee deemed those customers' claims to be "securities claims" eligible to
> receive up to $500,000 in SIPC advances.  *Id*.  The Trustee indicates that this
> disparate treatment was justified because he could purchase real, existing
> securities to satisfy such securities claims.  *Id.*  Furthermore, the Trustee notes
> that, if they were checking on their mutual funds, the "securities claimants," in
> contrast to the "cash claimants" bringing this appeal, could have confirmed the
> existence of those funds and tracked the funds' performance against Goren's
> account statements. *Id*.

*New Times I*, 371 F.3d at 74.

70.    The Second Circuit found that the customer's legitimate expectations based on

written confirmations and account statements control how a "net equity" claim is determined,

citing SIPC's Series 500 Rules, 17 C.F.R. §§ 300.500-300.503, which confirm the importance of

written confirmations.  The Court explained that "the premise underlying the Series 500 Rules

[is] that a customer's 'legitimate expectations' based on written confirmations of transactions,

ought to be protected."  371 F.3d at 87.  It noted that "Under the Series 500 Rules, whether a

claim is treated as one for securities or cash depends not on what is *actually* in the customer's

account, but on what the customer has been told by the debtor in written confirmations."  *Id* at 86

(emphasis in original).  *See also In re Oberweis Sec., Inc*., 135 B.R. 842, 847 n. 1 (B. N.D. Ill.

1991) ("The court agrees with the trustee's argument that Congress did not intend to treat

customers without confirmations the same as those with confirmations; that customers with

confirmations have a legitimate expectation of receiving securities, but customers without

confirmations do not have the same expectation.").

71.     In contrast to those *New Times* customers whose statements showed Existent

Securities, the Second Circuit held that the net equity of *New Times* customers whose statements

showed Non-Existent Securities should be determined as the amount of money invested minus

any withdrawals. *New Times I*, 371 F.3d at 88.   The court held that customer recoveries based

on "fictitious amounts in the firm's books and records would allow customers to recover

arbitrary amounts that necessarily have no relation to reality." *Id.* Obviously, customers whose

confirmations indicated the purchase of Non-Existent Securities could not have had a legitimate

expectation that they owned those securities. Thus, only when securities positions "necessarily

have no relation to reality," *i.e.*, are based on securities that *do not exist*, should a "cash in minus

cash out" methodology be employed.

72.     Here, each Customer received trade confirmations and account statements

showing investments in real securities.  Thus, each Customer had a legitimate expectation that he

owned the assets shown on his last statement and is entitled to a claim in the amount of the

balance on his November 30, 2008 statement.

73.     In *New Times II*, a different Second Circuit panel considered related issues and

found, once again, "[i]t is a customer's legitimate expectations on the filing date . . . that

determines the availability, nature and extent of customer relief under SIPA." *In re New Times

Sec. Servs., Inc*. 463 F.3d 125, 128 (2d Cir. 2006) (*New Times II*).  The Second Circuit in *New

Times II* added that, in the case of customers who believed they held fictitious securities:

30

> Because there were no such securities, and it was therefore impossible to
> reimburse customers with the actual securities or their market value on the filing
> date (the usual remedies when customers hold specific securities), the [*New Times
> I* Court] determined that the securities should be valued according to the amount
> of the initial investment.  The court declined to base the recovery on the rosy
> account statements telling customers how well the imaginary securities were
> doing, because treating the fictitious paper profits as within the ambit of the
> customers' "legitimate expectations" would lead to the absurdity of "duped"
> investors reaping windfalls as a result of fraudulent promises made on fake
> securities . . . The court looked to the initial investment as the measure for
> reimbursement because the initial investment amount was the best proxy for the
> customers' legitimate expectations.

*New Times II*, 463 F.3d at 129-30 (citations omitted).

74.    SIPC and the *New Times* Trustee valued Existent Securities customers' claims in

accordance with the statutory definition of net equity even when those claims included mutual

fund shares that were purchased through "dividend reinvestments," despite the fact that since the

initial securities had never been purchased, the customers **had received no dividends to

reinvest**.  Specifically:

> [I]nvestors who believed that their accounts held shares of mutual funds that
> actually existed (but were never purchased for their accounts) are having their
> claims (both as to shares of mutual funds never purchased by Goren and shares
> shown in customer statements as purchased through dividend reinvestment)
> satisfied by the Trustee up to the statutory maximum of $500,000.

Claimants' Joint Mem. of Law in Opposition to Joint Motion of Trustee and SIPC for Order

Upholding Determinations at 3, SEC v. Goren 206 F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-

CV-970).

> [W]hereas the Trustee has disallowed that portion of the claim of [the Non-
> existent Securities] investors representing shares of [the Non-existent Securities]
> purchased through dividend reinvestment, the Trustee has allowed that portion of
> the mutual fund investors' claims [i.e., "Existent Securities" investors' claims] as
> represents shares of such mutual funds purchased by them through dividend
> reinvestment.

Limited Objection to Trustee's Determination of Claim at 6 n.4, SEC v. Goren, 206 F. Supp.2d

344 (E.D.N.Y. 2002) (No. 00-CV-970).

75.    SIPC and the Trustee described their method in the *New Times* liquidation:

In every case [of an 'Existent Security' customer], the Trustee has been able to
identify the actual mutual fund in question by cross-checking the information
supplied by Goren on the customer statements, including share price information,
with publicly available information and then been able to purchase that security.

Joint Mem. of Law in Support of Trustee's Motion for an Order Upholding the Trustee's

Determinations with Respect to Claims Filed for Investments in Non-Existent Money Market

Funds and Expunging Objections to Those Determinations, *SEC v. Goren*, F. Supp. 2d 344

(E.D.N.Y. 2002) (No. 00-CV-970).  They further stated that where customers' statements

reflected securities positions in closed mutual funds, "the Trustee properly gave the customers

cash equal to the filing date values of the closed mutual funds."  Reply Mem. in Further Support

of Trustee's Motion for Order Upholding Determinations at 20, *S.E.C. v. Goren*.

76.    Even when challenged regarding their position by customers of the "Non-existent

Securities," SIPC (and the SEC) stood by their approach with respect to the Existent Securities

customers.  In an *amicus curiae* brief, the SEC stated "[o]ur view [is] that when possible, SIPA

should be interpreted consistently with a customer's legitimate expectations based on

confirmations and account statements."  Br. of the SEC, Amicus Curiae, In Partial Support of the

Position of Appellants and In Partial Support of the Position of Appellees ("SEC Amicus Curiae

Brief") at 13, New Times I (No. 02-6166).

77.    The briefs filed by SIPC and the *New Times'* Trustee likewise stated that:

In those cases [concerning the payment of interest and dividends on bona fide
mutual funds] the claimants had an objectively legitimate expectation of receiving
interest/dividends because the security in question had actually earned them.

32

> Here, the bogus mutual fund [the Ficitious New Age Fund] was never organized
> as a mutual fund and had no assets or investments.

Br. for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of New

Times Securities Services, Inc. and New Age Financial Services, Inc. and Securities Investor

Protection Corporation, at 38, *New Times I* (No. 02-6166).

78.    SIPC stated in its brief in *New Times II* that:

> [R]easonable and legitimate claimant expectations on the filing date are
> controlling even where inconsistent with transaction reality.  Thus, for example,
> **where a claimant orders a securities purchase and receives a written
> confirmation statement reflecting that purchase, the claimant generally has a
> reasonable expectation that he or she holds the securities identified in the
> confirmation and therefore generally is entitled to recover those securities
> (within the limits imposed by SIPA), even where the purchase never actually
> occurred and the debtor instead converted the cash deposited by the
> claimant to fund that purchase** . . . [T]his emphasis on reasonable and
> legitimate claimant expectations frequently yields much greater 'customer'
> protection than would be the case if transactional reality, not claimant
> expectations, were controlling, as this Court's earlier opinion in this liquidation
> well illustrates.

Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at 23-24 (citing *New

Times*)(emphasis added).  Thus, SIPC recognized that it is "claimant expectation," rather than

"transactional reality" that controls. [1]

---

[1] The complete disavowal by the Trustee and SIPC of the position they took in *New Times* is impermissible under the doctrine of judicial estoppel.  This doctrine prevents SIPC from taking one position in one case and then, when it is convenient to do so, taking a diametrically opposite position in another case.  *See Simon v. Satellite Glass Corp*., 128 F.3d 6 (2d Cir. 1997) ("judicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier proceeding.").  The Court in *New Times* explicitly endorsed the procedure of paying the claims of customers whose statements indicated the purchase of Existing Securities in accordance with their statutory net equity, noting that "investors who were misled by Goren to believe that they were investing in mutual funds that in reality existed were treated much more favorably. . . The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims."  371 F.3d at 74.  Thus, the Second Circuit "accepted the claim at issue by rendering a favorable decision," as required for judicial estoppel.  *Simon*, 128 F.3d at 12.

Judicial estoppel ensures that "abandonment of a claim to obtain a litigation advantage precludes the later reassertion of that claim."  *HSBC Bank USA v. Adelphia Comms. Corp*., 2009 U.S. Dist. LEXIS 10675, at

33

79.    There were no "imaginary securities" listed on the Madoff account statements.

Thus, *New Times II* does not apply. Yet, in direct contravention of SIPC's position in *New Times*,

in which SIPC "gladly" paid customers whose statement showed Existent Securities that were

never purchased their full claims, even if the actual securities' value had "triple[d]," here, the

Trustee has refused to recognize the Customers' Statutory Balances.

80.    Customers such as Objectors had the legitimate expectation that they owned real

securities. Indeed, they could have had no other expectation, based upon the trade confirmations

and account statements they received. Thus, the Trustee must employ the same method used in

*New Times* and honor Customer claims in the amount of their Statutory Balances.

**SIPC'S JUSTIFICATION FOR THE TRUSTEE'S VIOLATION OF SIPA IS SPECIOUS**

81.    SIPC has justified the Trustee's rejection of SIPA's definition of "net equity" by

claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a
> claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr.
> Madoff . . . to determine who receives a larger proportion of the assets collected
> by the Trustee.

www.foxbusiness.com/.../madoff-victims-greater-transparency-questions-linger/. This

justification is completely specious. SIPA honors the legitimate expectation of the customer,

even if the customer is dealing with a thief. For precisely this reason, SIPC persuaded the

Second Circuit to accept a thief's books and records in *New Times* as to all customers who had a

legitimate expectation that their statements were accurate.

---

*46 (W.D.N.Y. Feb. 12, 2009). Here, SIPC plainly decided in *New Times* that its "cash in minus cash
out" position with respect to the Non-Existent Securities customers would be more palatable to the court
if it was not also applied to the Existent Securities customers. Having prevailed in its argument in *New
Times*, SIPC cannot now take the position that "net equity" should be determined as "cash in minus cash
out" for customers who had a "legitimate expectation" that they owned real securities.

34

82.    In fact, SIPC's "thief" rationale was flatly rejected in *New Times I,* when the district court held that the Trustee's determination that holders of Non-Existent securities were not entitled to claims in the amount listed on their account statements erroneously 'hinged on the unilateral actions of the fraud-feasor who embezzled his client's funds.'" 371 F.3d at 75. The Second Circuit, similarly, did not take the fraud-feasor's role into account when vacating in part the district court's decision.

83.    After eight months of investigation, the Trustee has identified only a few Madoff investors who might not have had a "legitimate expectation" that their November 30, 2008 statements were accurate. For example, the Trustee has sued Jeffrey Picower and Stanley Chais alleging that they had extraordinary returns in their accounts and received restated account statements showing retroactive $100 million losses. Assuming these allegations are true (and Picower has raised substantial question as to their truthfulness in his July 31, 2009 motion to dismiss, including the fact that his securities were held for long-term investment), Picower and Chais could not have had a "legitimate expectation" that their account statements were accurate. However, the fact that the Trustee has identified one or two customers who may not have had a legitimate expectation that their statements were accurate does not justify rejecting the statutory definition of "net equity" and frustrating the legitimate expectations of thousands of Customers.

**THE TRUSTEE'S POSITION IS UNPRECEDENTED IN SIPC'S HISTORY**

84.    The Trustee's defiance of SIPA's definition of net equity, despite the fact that Customers received account statements and written confirmations showing investments in real securities, is inconsistent with 39 years of SIPC's history. Stephen Harbeck admitted as much in January 2009 when he announced: "We've modified our usual claim form to ask investors a question that's unique to this case, which is how much money did you put in and how much

35

money did you take out." (Jan. 6, 2009, CNBC). He also stated that "[O]ne of the first things that we did . . . was to modify our standard claim form to make sure that we asked the claimants themselves what evidence they had in terms of money in and money out, because that's going to be one of the critical factors." (Jan. 5, 2009, Stephen Harbeck, testimony before House Financial Services Committee). In fact, the Madoff Customer Claim form contains the unprecedented language:

> In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.

85.     Thus, Harbeck recognized the unprecedented nature of SIPC's approach which, in fact, is inconsistent with the position it has taken in its 39 year history. Indeed, SIPC always led investors to believe that SIPC insurance was based upon their last brokerage statement:

> In the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you. This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement.

 *See* SIPC/SIFMA brochure Understanding Your Brokerage Account Statements, at 5, SIPC Website 2009.

> How is the amount of a customer's claim determined? The amount of the customer's claim, excluding any securities registered in his name and returned to him, is called his "net equity." **The net equity of a customer's account is determined by adding the total value of cash and securities the firm owes the customer and subtracting the total value of cash and securities the customer owes the firm.**

*See* How SIPC Protects You at 14, 1994 (emphasis added), www.jprcapital.com/howsipc.pdf.

> A customer's "net equity" is, in general, what the broker owes the customer less what the customer owes the broker, exclusive of "specifically identifiable property." Essentially, Section 6(c)(2)(A)(iv) [codified at 15 U.S.C. § 78lll(11)] defines "net equity" as the dollar amount of a customer's account determined after

36

> giving effect to the completion of any open contractual commitments (discussed
> below), excluding therefrom any specifically identifiable property reclaimable by
> the customer, and subtracting the indebtedness (if any) of the customer to the
> debtor from the sum which would have been owing by the debtor to the customer
> had the debtor liquidated all other securities and contractual commitments to the
> customer on the filing date.  In short, a customer's "net equity" claim is for a
> liquidated sum.

*See* SIPC Annual Report 1973, annexed as Exh. F, at 21.

86.    Having induced investor reliance upon the promise of SIPC insurance based upon

the investors' last statement, SIPC cannot now change the rules, simply because it did not

sufficiently assess its members to fund its own liabilities.

**THE TRUSTEE AND B&H HAVE TREATED THE PESKINS DISHONESTLY**

87.    The treatment of the Peskins by the Trustee and B&H is just one example of their

callous and dishonest treatment of Customers.

**The Peskins' Madoff investment**

88.    Roger Peskin began publishing the Art Now Gallery Guide (the "Guide") in 1970

and, over time, built it up to become the most comprehensive source of information on gallery

and museum exhibitions in major cities across the United States and, at times, in Europe, South

America and Japan.  See Exh. G.  By 2004, he employed approximately 20 people and published

a 300+ page magazine which included art reproductions, gallery, museum and art fair

information, and area maps of all the major cities in the world.  *Id*. ¶ 4.

89.    The Guide was sold in August 2004 and the Peskins invested with Madoff the

after-tax proceeds of the sale, along with the proceeds of two properties they sold.  *Id*. ¶ 5.  On or

about October 18, 2005, they invested $2,586,412.99 with Madoff.  *Id*. ¶ 6.  In early May, 2008,

they invested another $181,000 into Madoff.  *Id*. ¶ 7.  On or about November 12, 2008, they

invested $470,265.98 into Madoff.  *Id*. ¶ 8.

90.     Every month they received from Madoff trade confirmations indicating the

purchase and sale of S&P 100 company stocks; the purchase and sale of Treasury bills; and the

purchase and sale of options to hedge the securities positions.  In addition, they received monthly

account statements from Madoff showing their securities positions.  *Id*. ¶ 9.  In each instance, the

trade confirmations and account statements reflected the purchase and sale of securities of S&P

100 companies at prices consistent with those reported in the media.  *Id*. ¶ 10.

91.     During the years of their investment in Madoff, the Peskins earned 9 – 11% each

year, in short term capital gains, subject to the highest tax rate.  *Id*. ¶ 12.  In the ordinary course

of their lives, they regularly withdrew funds from their Madoff account to fund family living

expenses, to pay taxes on their Madoff income, and for special expenditures.  *Id*. ¶ 13.

92.     On September 15, 2008, they received a check from Madoff for $50,000 which

cleared their account on September 17, 2008.  *Id*. ¶ 14.  On October 1, 2008, they received a

check from Madoff for $33,000.  *Id*. ¶ 15.  On November 6, 2008, they received a check from

Madoff for $30,000.  *Id*. ¶ 16.  At no time did the Peskins have any reason to believe that Madoff

was dishonest.  *Id*. ¶ 17.

93.     As of November 30 2008, the last month for which they received a Madoff

account statement, the value of their account was $3,247,367.40.  *Id*. ¶ 18.

94.     Following December 11, 2008, the Peskins' lives were decimated.  The sudden

termination of their sole source of income left them with no funds for their regular monthly

payments, for the tuition for their children's school, or to fund their other obligations.  *Id*. ¶ 19.

**The Trustee's deliberate frustration of the Peskins' right to prompt payment**

95.     The Peskins, who later qualified for the Trustee's "Hardship Program," filed a

SIPC claim on February 19, 2009.  See Exh. H.  The Peskins received no response whatsoever to

their SIPC claim until almost four months later.  On June 3, 2009, they were contacted by an

attorney at B&H who informed them that they were only entitled to receive $387,000 as their full

SIPC payment.  The attorney said that the Trustee was entitled to deduct from their SIPC

payment the $113,000 that they withdrew from their Madoff account in the three months

preceding December 15, 2008.  See Exh. I.

96.    The Peskins were astonished and devastated.  They had been counting on the full

$500,000 to carry them through until they could obtain a tax refund from the Internal Revenue

Service based upon their theft loss.  *Id*. ¶ 4.  The Peskins pointed out to the Trustee's attorney

that, although they had withdrawn $113,000 from Madoff within the 90 days before December

15, 2008, they had also invested $470,265.98 with Madoff on November 12, 2008, after they

received the $113,000.  *Id*. ¶ 5.  Mrs. Peskin broke down in tears on the phone and begged the

attorney for the full $500,000.  *Id*. ¶ 6.  The attorney at B&H apologized to the Peskins and said

that he would review the situation with the Trustee and get back to them.  *Id*. ¶ 7.

97.    Approximately one week later, the attorney at B&H called the Peskins and told

them that he had reviewed their situation with the Trustee and that the Trustee was very sorry but

he had no alternative under the law but to withhold $113,000 from their SIPC payment.   The

attorney added that the law was absolutely clear on this subject.  *Id*. ¶ 8.  The Peskins asked

whether the $113,000 would go into a fund to be distributed to Customers and the attorney told

them: "No, it would just reduce the amount that SIPC had to pay them."  *Id*. ¶ 9.

98.    The Peskins then were forced by the situation to consult counsel and they became

plaintiffs in a lawsuit filed against the Trustee on June 10, 2009 for a declaratory judgment that

the Trustee was violating SIPA through his rejection of SIPA's definition of net equity and his

failure to promptly pay SIPC insurance to Customers, for a declaratory judgment that the Trustee

39

has no right to deduct from the Peskins the $113,000 that they withdrew within 90 days of

December 15, 2008, and for compensatory damages for breach of fiduciary duty.  *Id.* ¶ 20.

99.     As set forth in the complaint, the Trustee's counsel had flatly misrepresented the

law to the Peskins.  The legislative history of the preference provision of the Bankruptcy Code,

11 U.S.C. § 547, makes clear that its purpose was to assure an equal distribution of the debtor's

assets among all creditors.  Congress recognized that, in the 90 days before a debtor files in

chapter 11, some creditors may be able to exert more pressure on the debtor to pay them on

antecedent debt than other creditors and, hence, Congress felt it was equitable to reverse all

payments out of the ordinary course of business, to require creditors who received preferential

transfers to return them to the estate for the benefit of all creditors.  Thus, 11 U.S.C. § 547(b)

provides:

>   b) Except as provided in subsection (c) of this section, the trustee may avoid any
>   transfer of an interest of the debtor in property -
>
>     (1) to or for the benefit of a creditor;
>
>     (2) for or on account of an antecedent debt owed by the debtor before such
>   transfer was made;
>
>     (3) made while the debtor was insolvent;
>
>     (4) made -
>
>     (A) on or within 90 days before the date of the filing of the petition; or
>
>     (B) between ninety days and one year before the date of the filing of the
>   petition, if such creditor at the time of such transfer was an insider; and
>
>     (5) that enables such creditor to receive more than such creditor would receive
>   if -
>
>     (A) the case were a case under chapter 7 of this title;
>
>     (B) the transfer had not been made; and

40

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

100.    The purpose of this provision is twofold: first, by permitting the trustee to avoid pre-bankruptcy transfers that occur within a short period before the bankruptcy, creditors are discouraged from racing to the courthouse during the debtor's slide into bankruptcy, and second (and more importantly) the preference provision facilitates the bankruptcy policy of equality of distribution among the debtor's creditors by requiring any creditor that received a preferential payment to disgorge that payment so that all creditors of the estate may share equally in the debtor's assets. 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

101.    Because of the circumstances here, the "race to the courthouse" rationale is irrelevant. The only relevant purpose here would be to bring money back into the estate so that all the Customers can share equally in the debtor's assets. However, that purpose is not being effectuated here. Instead, the Trustee is seeking to utilize the preference provision of the Bankruptcy Code to enrich SIPC because, as his attorney stated, any reduction in the SIPC insurance payments to the Peskins (and other Customers) will simply enrich SIPC. It will not

41

enrich the estate of Customer property.  Thus, the Trustee's invocation of § 547 of the

Bankruptcy Code violates its purpose and violates the Trustee's duty to carry out the provisions

of SIPA.

102.    Moreover, the Trustee's attorney misrepresented the law to the Peskins.  Within

90 days of the filing of this proceeding, the Peskins withdrew $113,000 from their Madoff

account and, thereafter, deposited $470,000 into their Madoff account.  The Peskins were

informed by the Trustee's attorney that the Trustee had no choice under the law but to reduce

their SIPC insurance by $113,000.  The Trustee's attorney ignored §§547(a)(2) of the

Bankruptcy Code which provides that there is no liability for a preferential transfer to the extent

the creditor provides "new value" within the 90 day preference period.  "New value" is defined

as:

> money or money's worth in goods, services, or new credit, or release by a
> transferee of property previously transferred to such transferee in a transaction
> that is neither void nor voidable by the debtor or the trustee under any applicable
> law, including proceeds of such property, but does not include an obligation
> substituted for an existing obligation.

103.    Pursuant to § 547(c)(4) of the Bankruptcy Code:

(c)  The trustee may not avoid under this section a transfer –

(4)  to or for the benefit of a creditor, to the extent that, after such transfer,
such creditor gave new value to or for the benefit of the debtor –

(A)  not secured by an otherwise unavoidable security interest; and

(B)  on account of which new value the debtor did not make an otherwise
unavoidable transfer to or for the benefit of such creditor.

104.    The policy behind this exception is to encourage creditors to work with troubled

companies and also serves to facilitate the purpose of equality of creditors because, if a creditor

advances new value to the debtor, the debtor's assets have not been depleted to the disadvantage

42

of other creditors. *Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 257 (8th Cir.

1996); *see also In re: David Schick*, 1998 U.S. Dist. LEXIS 10603, at *13 (S.D.N.Y. July 16,

1998) ("The purpose of the "new value" defense is to protect transactions to the extent they

simultaneously replenish the bankruptcy estate."). Generally, to qualify for a new value defense,

a creditor must prove (1) new value was given to the debtor after the preferential transfer, (2) the

new value was unsecured, and (3) the new value remains unpaid. *Mosier v. Ever-Fresh Food

Co.*, 52 F.3d 228, 230 (9th Cir. 1995).

105.    Here, the Peskins can prove each of those elements. The Peskins provided new

value after the allegedly preferential transfers to them because, on November 12, 2008, they

invested $470,265.98, after having withdrawn a total of $113,000 on September 15, 2008,

October 1, 2008 and November 6, 2008. Exh G ¶ 14-16, 22. Thus, there is no basis for the

Trustee to deduct $113,000 from the $500,000 SIPC payment to which they are entitled.

106.    Aside from the new value defense, the preference provision is inapplicable to

customers in a SIPA liquidation for several reasons. First, any withdrawal by a customer from

his account constitutes a withdrawal of the customer's money; it does not constitute "property of

the debtor." Thus, 11 U.S.C. § 547(b) is inapplicable.

107.    Second, the purpose of § 547 is to bring back assets of the debtor for equal

distribution to all creditors. Here, however, the Trustee's counsel admitted that the $113,000 not

paid to the Peskins would not go into a fund for distribution to Customers; rather it would simply

save SIPC $113,000. Congress did not enact § 547 to enrich the Financial Services Industry at

the expense of customers. On the contrary, Congress created SIPC to protect customers of the

Financial Services Industry against the dishonesty of broker-dealers by insuring the legitimate

43

expectations of customers.  Clearly, it is inconsistent with SIPA for the Trustee to reduce the

SIPC insurance payable to each customer so as to save SIPC money.

108.    Even if a SIPC trustee is empowered to utilize the avoidance provisions of the

Bankruptcy Code against a customer, the Trustee cannot recover from the Peskins under 11

U.S.C. § 547 because the withdrawals they received within 90 days of December 15, 2008

constituted their own property and were transferred to them in the ordinary course of business of

the Peskins and Madoff on ordinary business terms.   Thus, they were not transfers on account of

antecedent debt.

109.    Although this was not disclosed to the Peskins by the Trustee or B&H, 11 U.S.C.

§ 547(c) provides an affirmative defense to a preference claim.  It provides that:

The trustee may not avoid under this section a transfer –

(1) to the extent that such transfer was -

(A) intended by the debtor and the creditor to or for whose benefit such
transfer was made to be a contemporaneous exchange for new value given to the
debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was -

(A) in payment of a debt incurred by the debtor in the ordinary course of
business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor
and the transferee; and

(C) made according to ordinary business terms.

110.    The balance of the securities positions reflected on the Peskins' November 30,

2008 account statement (the last statement prior to the liquidation proceeding filing date) was

44

$3,247,367.40. They are entitled to a claim in this amount. Moreover, they are entitled to the full $500,000 of SIPC insurance.

111.    By letter dated June 26, 2009, Mr. Sheehan wrote to Ms. Chaitman that the Peskins

> received no preferential payment in the 90 days preceding the filing date of this action. Thus, we will promptly determine their customer claim for the full amount. Upon their receipt of the Trustee's determination letter, please have them execute the Partial Assignment and Release and return it to the Trustee. Once they have done so, the Trustee will promptly send them $500,000 advanced by SIPC.

See Exh. J.

112.    Thus, after the Peskins were forced to retain counsel and file a lawsuit, the Trustee finally acknowledged he had no preference claim against them. However, the Trustee waited until July 16, 2009 to send the Peskins a determination letter with a proposed partial assignment and release. See Exh. K.

113.    The form of the partial assignment and release was unacceptable, as Ms. Chaitman explained to the Trustee's counsel by letter dated July 21, 2009. See Exh. L. By letter dated July 22, 2009, the Trustee's counsel sent a revised partial assignment and release which was acceptable. This document has been signed by the Peskins and mailed to the Trustee. Hopefully, the Peskins will receive their $500,000 SIPC insurance check within the next few days.

1087614.1

**THE CALLOUS TREATMENT OF MS. EBEL BY THE TRUSTEE AND B&H**

**Ms. Ebel's Madoff investment**

114.    Ms. Ebel is a widow.  Her husband, Dr. Marc Ebel, died as a result of medical malpractice in 2000 at the age of 53.  At the time of his death, the Ebels had been married 27 years.  See Exh. M.  Ms. Ebel had been a nurse but she stopped working in 1989.  *Id.* ¶ 3.

115.    In 2003, she invested all of her funds with Madoff based upon the recommendation of a person who told her that Madoff had been in existence for more than 25 years; that he had been approved by the SEC; and that he had a very conservative investment strategy.  *Id.* ¶ 4.  Ms. Ebel opened two accounts with Madoff.  The first account was a direct IRA account in which she invested $1,348,877.12 on February 24, 2003.  She never withdrew any funds from this account and it had a balance on November 30, 2008 of $2,532,140.66.  *Id.* ¶ 5.  The second account Ms. Ebel opened with Madoff was a direct investment account in which she invested a total of $3,831,387.49 beginning on March 17, 2003 and ending on July 23, 2004. The balance in this account as of November 30, 2008 was $4,729,125.04. *Id.*  ¶ 6.

116.    With respect to each account, every month Ms. Ebel received from Madoff trade confirmations indicating the purchase and sale of S&P 100 company stocks; the purchase and sale of Treasury bills; and the purchase and sale of options to hedge the securities positions.  In addition, she received monthly account statements showing the securities positions. *Id.* ¶ 37.  In each instance, the trade confirmations and account statements reflected the purchase and sale of securities of S&P 100 companies at prices consistent with those reported in the media.  *Id.* M ¶ 8.

117.    Ms. Ebel withdrew funds from her direct investment account on a regular basis and utilized the funds to provide support for herself and her family, to pay for the educational expenses of family members, and to fund charitable donations.  This was her sole source of

income.  *Id.* ¶ 9.  As part of her normal withdrawal of funds from her account, on September 15,

2008 she received a $102,000 check from Madoff dated September 11, 2008.  She deposited the

check in her account on September 15, 2008.  *Id.* ¶ 10.

118.    After December 11, 2008, Ms. Ebel was forced to go to work in order to support

herself.  She worked as a house maid; a caretaker for an elderly patient; a driver; a cashier; and in

a ladies' clothing store.  In short, she did anything she could to earn money to pay her living

expenses.  She was forced to sell a car, jewelry, household items, and a condominium she had in

Florida since 1984, at greatly depressed prices because she needed money to live on and had not

promptly received her SIPC insurance.  *Id.* ¶ 11.

119.    She filed her SIPC claim for both accounts on February 14, 2008.  *Id.* ¶ 12.  She

heard nothing from the Trustee for several months.  Finally, on May 20, 2009, she received a

determination letter requiring that she acknowledge that her claim with respect to the IRA

account was for only $1,348,877.12, the amount of her original investment.  See Exh. N.  She

was informed that it was a pre-condition to her receiving SIPC insurance on this account for her

to acknowledge that she was not entitled to a claim for any appreciation in that account.  Because

she was financially desperate and she had no alternative but to accede to the Trustee's demand,

she signed the required acknowledgment and, on June 6, 2009, she received a check from SIPC

for $500,000 with respect to this account.  Exh. M ¶ 14.

120.    Thereafter, she had several communications with an attorney from B&H

concerning her other account.  She was told that the Trustee was obligated under the law to

withhold $102,000 from her SIPC payment with respect to her direct investment account because

the Trustee was entitled to deduct the $102,000 payment she received in September 2008.  She

was also told that this money would simply reduce SIPC's obligations.  The money would not be

47

used to pay other investors. *Id.*¶ 15. She asked if she could accept the $398,000 check and yet reserve her right to claim the $102,000 that the Trustee was going to withhold. She was told that she would not be able to do that and, if she wanted the check for $398,000, she would have to relinquish her claim to the $102,000. She explained that she was uncertain whether she should waive her claim to the $102,000. *Id.* ¶ 16. At that point, Ms. Ebel consulted with counsel. She did not advise B&H that she was willing to relinquish her claim to the $102,000.

121.    On May 29, 2009, she received another phone call from the B&H attorney with whom she had been speaking. He told her that there had been a change in strategy by the Trustee and that, because she was a "hardship" case, she would not have to relinquish her claim to the $102,000 if she accepted the $398,000. She was told that she would be sent a revised determination letter and accompanying documents. *Id.* ¶ 18.

122.    She received a determination letter dated June 9, 2009 which stated that because she qualified for the "Hardship Program," she would receive the undisputed portion of her claim, $398,000. See Exh. O. The June 9, 2009 letter required Ms. Ebel to sign a partial assignment and release in order to receive the $398,000 which the Trustee admits is due and owing to her.

123.    By letter dated June 16, 2009, Ms. Ebel's counsel, Helen Davis Chaitman, wrote to the Trustee explaining that Ms. Ebel accepted the Trustee's offer to pay her $398,000 with her reserving her claim for the additional $102,000 "provided that you also agree that, in the event your definition of "net equity" is rejected by the courts, Ms. Ebel's claim will be recognized for the full amount of $4,729,125.04." See Exh. P.

124.    By letter dated June 23, 2009, the Trustee's counsel, David J. Sheehan, wrote to Ms. Chaitman, stating:

48

> Several individuals, including you and your clients, have disputed the propriety of
> the money in/money out approach.  This issue will be determined by the court in
> due course.  Should a final order overrule the use of the money in/money out
> approach, we will be bound by that order and will apply it retroactively to all
> previously determined allowed customer claims.  Thus, any future rulingS
> regarding the satisfaction of customer claims will apply to all customers, whether
> or not their individual claim has been determined at that time.

See Exh. Q at 1.

125.    Mr. Sheehan requested, based upon this position, that the Peskins and Ms. Ebel

withdraw their complaint.  Ms. Chaitman responded to Mr. Sheehan's letter on June 23, 2009

explaining that the Peskins and Ms. Ebel could not possibly withdraw the complaint until their

claims were resolved, particularly in view of the substantial damages they had incurred as a

result of the Trustee's delay in paying them their SIPC insurance.  See Exh. R.

126.    By letter dated June 26, 2009, Mr. Sheehan wrote to Ms. Chaitman enclosing a

form of partial assignment and release that had been sent to Ms. Ebel on June 9, 2009 and stating

that Ms. Ebel would be paid after she executed that document.  See Exh. S.  By letter dated June

29, 2009, Ms. Chaitman explained to Mr. Sheehan that Ms. Ebel could not sign the June 9, 2009

partial assignment and release (the "Document") for three reasons:

a.    The Document did not state that Ms. Ebel's claim would be the balance on her

November 30, 2008 statement if the Trustee's determination of the amount of her claim was

rejected by the courts.

b.    The Document required Ms. Ebel to give the Trustee and SIPC a general release,

which she could not possibly do given her substantial claims against the Trustee.

c.    The Document required Ms. Ebel to leave in the Trustee's control the timing of

the judicial determination of her claim for the remaining $102,000.  In the June 29, 2009 letter,

49

1087614.1

Ms. Chaitman explained that Ms. Ebel would be breaching her duty to mitigate her damages if she agreed to such a provision.  See Exh. T at 2.

127.    Ms. Chaitman has received no response to this letter, despite the fact that Ms. Ebel is, in the Trustee's view, a "Hardship" case entitled to expedited treatment.  Nevertheless, the Trustee's counsel has finally dealt with two of these objections with respect to the Peskins because, in the form of partial assignment and release that B&H sent Ms. Chaitman for the Peskins on July 22, 2009, the document does not include a general release but a release "only to the extent that the SIPA Trustee and/or SIPC has paid monies to the Assignor to satisfy Assignor's Customer Claim."  Thus, the Trustee has agreed, with respect to the Peskins, to pay the $500,000 in SIPC insurance while they are preserving their claims as asserted in their complaint.

128.    In addition, the July 22, 2009 form of partial assignment and release for the Peskins provides that their claim will be recognized for the balance on their November 30, 2008 statement in the event the Trustee's interpretation of "net equity" is rejected by the courts.  See Exh. U at 3.  The Trustee has not agreed to similar provisions for Ms. Ebel.

129.    The balance of the securities positions reflected on Ms. Ebel's November 30, 2008 IRA account statement was $2,532,140.66 and the balance of the securities positions reflected on Ms. Ebel's direct investment November 30, 2008 account statement was $3,831,387.49.  These are the amounts of her claims pursuant to SIPA.

50

**CONCLUSION**

For the foregoing reasons, Objectors, joined by more than 100 additional Customers, ask

the Court to set a date for an evidentiary hearing at which they can prove that the Trustee and

B&H are disabled from serving because they have a fundamental conflict of interest and are

therefore not entitled to any compensation for the services they have rendered in this case.

August 3, 2009

PHILLIPS NIZER LLP

By: /s/ Helen Davis Chaitman
666 Fifth Avenue
New York, New York 10103-0084
(212) 841-1320

*Counsel for Diane and Roger Peskin and
Maureen Ebel,* with the support of more than
100 other Customers

1087614.1