# EXHIBIT F

# SiPC

## SECURITIES INVESTOR PROTECTION CORPORATION

THIRD
ANNUAL REPORT
1973

 **SECURITIES INVESTOR PROTECTION CORPORATION**
900 SEVENTEENTH STREET, N.W. • SUITE 800
WASHINGTON, D.C. 20006 • (202) 223-8400

# LETTER OF TRANSMITTAL

April 16, 1974

The Honorable Ray D. Garrett, Jr.
Chairman
Securities and Exchange Commission
500 North Capitol Street, N.W.
Washington, D.C. 20549

Dear Chairman Garrett:

On behalf of the Board of Directors I submit herewith the Third Annual Report of the Securities Investor Protection Corporation pursuant to the provisions of Section 7(c)(2) of the Securities Investor Protection Act of 1970.

Respectfully,

Hugh F. Owens
Chairman

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Directors, Securities Investor Protection Corporation (SIPC) | iv |
| A Message from the Chairman | 1 |
| Highlights | 2 |
| Introduction | 6 |
| The Corporation | 9 |
|     Members | 9 |
|     Directors | 9 |
|     Corporate Powers | 9 |
| The SIPC Fund | 11 |
|     Assessments | 11 |
|     Borrowing Authority Other Than from Commercial Sources | 14 |
| Notice to SIPC that a Firm Is in or Approaching Financial Difficulty | 16 |
|     Securities Exchanges | 16 |
|     NASD and SEC | 17 |
| SIPC Application for Court Decree that Customers Need the Protection Provided by the Act | 18 |
| Liquidation Proceedings | 20 |
|     General Nature of a SIPC Liquidation | 20 |
|     Rights of Customers | 21 |
|     Open Contractual Commitments | 22 |
|     Advances | 22 |
|     Claims Procedures | 23 |
|     SIPC's Subrogation and Recoupment Rights | 23 |
|     Selection of Trustees | 23 |
|     Characteristics of Firms Being Liquidated | 24 |
| Litigation | 26 |
| Disciplinary and Criminal Actions Taken against Principals and Associates of Firms Being Liquidated | 28 |
| Role of SIPC in Relation to Securities Industry Regulation and Reporting | 29 |
| Advertising of SIPC Membership and Customer Protection | 30 |
| Administration | 31 |
|     Directors | 31 |
|     Personnel | 31 |
|     Facilities | 31 |
|     SIPC Expenses | 31 |
| Financial Statements | 32 |
| APPENDIX I    Firms Placed in Liquidation under the 1970 Act | 36 |
| APPENDIX II    Analysis of SIPC Revenue and Expense and Trustees' Distributions for Accounts of Customers for the Three Years Ended December 31, 1973. | 50 |

**SECURITIES INVESTOR PROTECTION CORPORATION**
**(SIPC)**

# Directors

| | | Term expires December 31 |
|---|---|---|
| Hugh F. Owens | Chairman | 1976 |
| Jerome W. Van Gorkom Vice Chairman | President, Trans Union Corporation, Chicago, Illinois | 1975 |
| Glenn E. Anderson | President, Carolina Securities Corporation, Raleigh, North Carolina | 1975 |
| Ralph D. DeNunzio | Executive Vice President and Chairman of the Executive Committee, Kidder Peabody & Co., Inc:, New York, New York | 1976 |
| Henry W. Meers | Vice Chairman, White, Weld & Co., Inc., Chicago, Illinois | 1974 |
| J. Charles Partee | Managing Director for Research and Economic Policy, Board of Governors of the Federal Research System, Washington, D.C. | 1974 |
| Edward C. Schmults | General Counsel, Department of the Treasury, Washington, D.C. | 1976 |

Changes in Directors since the 1972 Annual Report are contained in Highlights.

# Staff Officers

Theodore H. Focht
    General Counsel—Secretary

Wilfred R. Caron
    Associate General Counsel

John B. Bourne
    Manager—Accounting & Assessments

Lloyd W. McChesney
    Vice President—Finance

Eugene K. Snyder
    Assistant Vice President—Finance

Thomas R. Cassella
    Manager—Operations and Examination of Liquidations

Dr. John L. Peterman
Economist

# A MESSAGE FROM THE CHAIRMAN

This report, the first since I took office as Chairman and Chief Executive Officer last November, covers a year in which the provisions of the Securities Investor Protection Act of 1970, the policies adopted by the first Board of Directors, and the procedures and practices developed by the Corporation under my predecessor, Byron D. Woodside, were given their severest test.

During 1973 the two largest member firms to be placed in SIPC liquidation to date—Weis Securities, Inc., New York, New York, and J. Shapiro Co., Minneapolis, Minnesota—failed within a month of one another. They alone accounted for $175 million in cash and securities distributed to customers out of $202 million distributed during the year; whereas in the two previous years, assets aggregating $17 million were distributed to customers.

Last year $35 million were advanced to trustees from the SIPC Fund to satisfy customer claims and for administrative expenses. In 1971 the comparable figure was $476,000, and in 1972, $8.1 million.

An additional 30 SIPC member firms were placed in liquidation, bringing the total to 94. Of this number six liquidations were completed and in 78 others, substantially all customers' claims had been satisfied.

In the few months I have been privileged to serve as SIPC's Chairman, I have had the opportunity to participate in the deliberations of the Board and to observe the work of the staff and review their accomplishments. The Corporation has achieved substantially all that the sponsors of the legislation intended and experience so far attests to the foresight of Congress, the securities industry, and the SEC in the development and promulgation of the 1970 Act.

Much of the credit for SIPC's success must go to its first Chairman, my former fellow Commissioner at the Securities and Exchange Commission, "Barney" Woodside. Barney had completed a long and successful career on the staff of the Commission and subsequently served seven years as a Commissioner with distinction. He had been retired from that position for four years when he was named by President Nixon to be SIPC's fiirst Chairman.

The first SIPC Board of Directors, in addition to the Chairman, consisted of George J. Stigler, Professor of Economics, University of Chicago, Vice Chairman; Glenn E. Anderson, President, Carolina Securities Corporation, North Carolina; J. Charles Partee, Managing Director for Research and Economic Policy, Board of Governors of the Federal Reserve System, Washington, D.C.; Donald T. Regan, Chairman, Merrill Lynch, Pierce, Fenner & Smith, Inc., New York; Bruce K. MacLaury, then Deputy Under Secretary for Monetary Affairs, who served representing the Department of the Treasury until July, 1971; and Andrew J. Melton, Jr., then Chairman, Executive Committee, Smith, Barney & Co., Inc., New York. Samuel R. Pierce, Jr., then General Counsel, Department of the Treasury, Washington, D.C., succeeded Mr. MacLaury in 1971 and served as a Director until June, 1973.

During its first few months SIPC's Board met almost weekly, initially in space provided by the SEC. The Board's first major test was that of establishing a $75 million fund within 120 days from the date of the statute's enactment. With the cooperation of the Commission, the self-regulatory organizations, and other industry representatives, the assessment procedures were developed and implemented and this goal was met. Assessment and contributions totaling $10 million were collected and a $65 million line of credit was negotiated with a group of twenty-nine banks. In addition, establishing bylaws, finding office accommodations, building a staff and preparing for a possible large liquidation—as well as a number of small ones—were problems which faced the Chairman and the Board. And in the first quarter of 1971 receivers were appointed for six broker-dealers which failed and ultimately required SIPC's assistance. All this happened before March 15, 1971, when the Corporation's first staff member was employed.

As one can readily see, the Board had its work cut out for it almost before the ink was dry on the statute. That work was done. The foundation was laid, and the investment community owes Chairman Woodside and the members of the Board, both past and present, a vote of thanks for a job well done.

The Corporation has established a policy of working closely with members of the self-regulatory organizations and the Commission in the development of new rules, regulations and reporting procedures designed to improve broker-dealer operations as well as monitoring and surveillance techniques. This has been done in a spirit of cooperation with a view to the general improvement of the industry.

It is my intention to continue that policy; indeed, one of my first official acts was to establish a special Task Force of industry leaders to make recommendations to the SIPC Board for legislative changes in the 1970 Act.

SIPC has been tested and proven. Since its inception nearly a hundred firms, from Boston to Guam, have been placed in liquidation under its aegis. More than $92 million of revenues have been received and $47 million disbursed. The "SIPC Fund," including a line of credit, stands at $85 million. We are proud of what has been accomplished. We look forward to building on those accomplishments.

April 16, 1974

*Hugh J. Owens*

# HIGHLIGHTS

## The Corporation

SIPC was created by the Securities Investor Protection Act of 1970 (1970 Act), a federal statute which became effective December 30 of that year. It is a nonprofit membership corporation. It is not an agency or establishment of the United States Government, and it receives no appropriation of government funds. Under certain circumstances it has authority to borrow from the United States Treasury (see page 14).

## Customer Protection

SIPC's primary purpose is to provide financial protection within the limits specified in the Act for customers of failing brokers and dealers who are members of SIPC. The protective provisions of the Act work in various ways for the benefit of customers of failing firms. For example, customers' fully paid for property, which is on hand in the brokerage firms which fail, and which is specifically identifiable for customers, is returned without limitation as to dollar value. For customers having valid net equity claims on the date the liquidation begins (see "Filing Date," page 18), SIPC advances funds through the trustee conducting the liquidation in amounts necessary to cover the customer claims up to a maximum of $50,000 for each customer, except that in the case of claims for cash, as distinct from securities, not more than $20,000 may be paid with funds advanced by SIPC.

## SIPC Members

The membership of SIPC is composed of all brokers or dealers registered under the Securities Exchange

- Trustees were appointed in 1973 to liquidate 30 SIPC members that failed, including Weis Securities, Inc., the largest liquidation to date under the 1970 Act.

- Distributions having an aggregate value of over $200 million in cash and securities were made to customers in 1973.

- SIPC advanced over $35 million to trustees during 1973.

- Revenue from all sources in 1973 exceeded $25 million.

- During 1973 the balance in the "SIPC Fund" decreased $20 million due to a number of factors including substantial increases in advances to trustees, a partial phasing out of confirmed lines of credit pursuant to the credit agreement, and a decline in assessment revenues.

- In November Hugh F. Owens was appointed Chairman of the Board by President Nixon to succeed Byron D. Woodside, SIPC's first Chairman, who retired.

- Chairman Owens appointed a special Task Force to make recommendations to the SIPC Board for legislative changes in the 1970 Act.

Act of 1934 and all members of a national securities exchange other than those whose business consists exclusively of one or more of four categories (see page 9). At the end of 1973 there were approximately 4,000 SIPC members.

## Assessments

Funds required for the protection of customers of SIPC members are provided by assessments on SIPC members. These assessments are currently at the rate of ½ of 1 percent of each member's gross revenues from the securities business. The member assessments for 1973 were $22,859,000. From December 30, 1970 (inception) through December 31, 1973 assessment revenue aggregated approximately $84,970,000, including $5,670,000 of initial assessments based on 1969 gross revenues.

## "SIPC Fund"

The "SIPC Fund" (as defined in the 1970 Act) consists of cash, United States Government or agency securities and confirmed lines of credit. At the end of 1973, it amounted to approximately $85 million. Estimated assessments for the fourth quarter and adjustments based on 1973 revenues which were received after year end aggregated $6,000,000. Initially, the "SIPC Fund" included confirmed lines of credit in the amount of $65 million. Under the terms of the Credit Agreement the available credit declines each year and expires in October 1976. On April 1, 1973, the lines of credit were reduced to $45 million and on April 1, 1974, they were further reduced to $35 million.

It is expected that the "SIPC Fund" will accumulate until it approximates $150 million, exclusive of lines of credit. The rate at which this can be accomplished depends upon many circumstances, including the

health of the securities industry, the demands for monies for the liquidation of SIPC member firms, and the flow of assessments. During 1973, there was a reduction in the "SIPC Fund" due principally to: the advances to the trustee in the Weis liquidation, the reduction in lines of credit, and a decline in assessment revenues.

## Borrowing Authority Other Than from Commercial Sources

If necessary for the protection of customers in the event of a crisis of extreme severity, SIPC may borrow from the Securities and Exchange Commission (hereinafter throughout this report sometimes referred to as the Commission or SEC) which, in turn, will issue notes to the United States Treasury in amounts up to $1 billion.

## Liquidations under the Act

SIPC does not, itself, liquidate a failing firm. Upon receipt of a notice that a SIPC member firm is in financial difficulty or approaching financial difficulty, and the occurrence of certain other events specified in the Act, SIPC may apply to a federal court for the appointment of a trustee. If the court grants the application, the trustee will take possession of the premises and property of the debtor firm and carry out the applicable statutory objectives. In brief, these are to:

a. return specifically identifiable property to customers entitled thereto;
b. distribute to customers the fund of cash and securities held for the accounts of customers and pay to customers moneys advanced by SIPC, if necessary;
c. complete open contractual commitments made in the ordinary course of business by the debtor firm where customers have an interest; and
d. liquidate the business of the debtor firm.

In connection with the foregoing, SIPC enforces its rights of subrogation. The Act specifically precludes the reorganization of a debtor firm. SIPC funds cannot be used to rehabilitate a firm, reorganize it or operate it in the hope it may recover.

## Data on Firms Placed in Liquidation

As of December 31, 1973, 94 broker-dealers had been placed in liquidation under the 1970 Act. The table below indicates the number of trustees appointed by quarter since the inception of SIPC. No firms were placed in liquidation during the 4th quarter of 1973.

|  | Number of Trustees Appointed | | |
|---|---|---|---|
|  | 1971 | 1972 | 1973 |
| 1st Quarter | 1 | 15 | 15 |
| 2nd Quarter | 6 | 4 | 8 |
| 3rd Quarter | 6 | 8 | 7 |
| 4th Quarter | 11 | 13 | 0 |
|  | 24 | 40 | 30 |

Trustees had completed the liquidation of 6 firms and had been fully or partially discharged by the courts as of December 31, 1973. In 78 other liquida-

### Trustees Appointed by Quarter and Status of Liquidation Proceedings



☐ Customer claims still being processed—10
☐ Customer claims substantially satisfied—78
    (over 90% of valid customers' claims paid)
▦ Liquidations completed—6

3

tions distributions of cash and/or securities to customers had been substantially completed by the end of 1973. In the 10 remaining cases, substantial progress had been made and trustees were in the process of validating claims and making distributions to customers. Overall, about 95% of all claims filed in the 94 liquidations had been satisfied or adjudicated by December 31, 1973.

In the 94 liquidations notices of the appointment of trustees and claim forms had been mailed to about 240,000 customers and claims were received from 84,000 customers. There have been distributions of customers' specifically identifiable property, single and separate fund cash and securities and advances from SIPC for customers with an aggregate value of approximately $219,690,000. Of this amount $180,-240,000 in securities and cash came from debtors' estates and $39,450,000 from SIPC advances.

Of the total customers' claims processed (excluding those in the Weis liquidation) 33 claims, aggregating $2,064,000, exceeded the $50,000/$20,000 limitations. These customers have received $117,000 from debtors' assets and $1,093,000 from SIPC advances. Their remaining claims against the estates of the debtor firms amount to $854,000. In addition, approximately 100 customer claims in the Weis liquidation over the $50,000/$20,000 limits have been processed and partially satisfied.

## Weis Securities, Inc. Liquidation

A trustee was appointed for the liquidation of Weis Securities, Inc., on May 30, 1973. This liquidation, the first involving a New York Stock Exchange member firm, is the largest liquidation commenced to date. The firm had 27 offices in the United States and 3 foreign offices. Claim forms were mailed to 55,000 securities customers and to more than 900 broker-dealers.

By Friday, June 8, the trustee began mailing checks to customers for payment of their free credit balances, and on Monday, June 11, mailing of specifically identified securities was begun. By June 15—two weeks after the trustee was appointed—more than $250,000 of customers' free credits had been paid.

Weis held approximately 16,000 security issues with an estimated market value of $150,000,000 for customers and proprietary accounts. To perform the many functions necessary to inventory, allocate, register and distribute this volume of securities, over 400 people were initially utilized by the trustee, including personnel of an independent public accounting firm.

By August 7, 1973, approximately two months after the trustee's appointment, over 26,000 customer claims had been processed, 15,000 checks totaling $20,000,000 had been mailed, and 16,500 certificates delivered to claimants.

At December 31, 1973, more than 98% of the Weis customer claims had been approved for distribution and $40,000,000 in cash and $120,000,000 in value of securities had been distributed to the claimants. SIPC had advanced $20,773,695 to the trustee for payments to customers.

The Weis liquidation involved areas not encountered in prior SIPC liquidations: regulated and non-regulated commodities accounts; writers and buyers of options, including those traded on the Chicago Board Options Exchange; and customer accounts introduced on a fully disclosed basis to Weis by other broker-dealers. The resolution of these involved the efforts of the trustee, his counsel, accountants, members of the securities industry, and industry organizations as well as the SIPC staff. Notable was the treatment and handling of put and call options in securities. With the cooperation and assistance of the Put and Call Brokers and Dealers Association, Inc., and the Association of Member Firms Option Departments (AMFOD), a Division of the Securities Industry Association, a procedure was devised which enabled the trustee to process long and short options for customers.

## Characteristics of Firms Being Liquidated and Actions against Principals

Fraud and manipulation, lack of control due to poor books and records, mismanagement and the inexperience of principals are prominent factors contributing to the failure of a number of these broker-dealers. Action is being taken by the Commission, the self-regulatory organizations and other authorities having jurisdiction to proceed against principals who have been culpable in these failures. In nine instances principals have been convicted of criminal conduct (see page 28). In other cases indictments have been obtained and trials are pending. Administrative proceedings by the Commission to determine whether or not persons should be barred from the securities industry have been begun in some instances and are under consideration in others. A number of principals have been barred from association with any broker-dealer by the Commission and/or the NASD. In this connection, in support of possible action under Section 10(b) of the 1970 Act, SIPC has forwarded to the Commission and the self-regulatory organizations a list of persons associated with firms for which trustees were appointed.

## Designation of Examining Authority

Section 9(c) of the Act provides that where a member of SIPC is a member of more than one self-regulatory

organization, SIPC shall designate one of the self-regulatory organizations to examine the member for compliance with applicable financial responsibility rules. Effective July 1, 1973, after consultation with the several self-regulatory organizations, designations of examining authorities were made in those cases where SIPC members were members of more than one self-regulatory organization. Since July 1, 1973, SIPC has redesignated examining authorities as necessitated by changes in the status of its members.

## Task Force To Recommend Changes in the Act

One of the significant events during 1973 was Chairman Owens' creation of a special Task Force to consider ways and means, including legislative proposals, for improving the program of customer protection under the 1970 Act.

The Task Force, of which Chairman Owens is a member ex officio, is chaired by Theodore H. Focht, SIPC's General Counsel. Its other members are Robert M. Bishop, Senior Vice President of the New York Stock Exchange; Benjamin L. Lubin, Managing Partner of Bruns, Nordeman & Co.; Robert J. Millstone, a special counsel of the Securities and Exchange Commission; Edward S. Redington, the trustee for the liquidation of Weis Securities, Inc.; Kenneth Rosenblum, Counsel to the Midwest Stock Exchange; James W. Walker, Jr., Executive Vice President of the American Stock Exchange; and Frank J. Wilson, Senior Vice President of the National Association of Securities Dealers.

In announcing the composition of the Task Force Chairman Owens said: "The Securities Investor Protection Act of 1970 was an innovative and exemplary piece of remedial legislation, evolved principally through the cooperative efforts of the Congress, the Securities and Exchange Commission, and the securities industry itself. In general it has worked well, and thousands upon thousands of securities investors have been greatly benefited. However, as with any new legislation, only experience can demonstrate its precise efficacy and suggest areas of possible improvement. Now that SIPC has had experience in the liquidation of 94 firms over a three-year period, it is appropriate for it to join with other interested and knowledgeable parties in a common effort to improve this program of customer protection." The Task Force is completing its deliberations and will be making its report to Chairman Owens for submission to SIPC's Board of Directors in the near future.

## Changes in SIPC Directors

The Honorable Hugh F. Owens was nominated by President Nixon on October 9, 1973 and after con-firmation by the U. S. Senate took office on November 21, 1973, as successor to the Honorable Byron D. Woodside, first Chairman of SIPC. Mr. Woodside's intimate knowledge of securities regulation and his administrative abilities were invaluable in the recruiting and development of staff personnel and the establishment of operating procedures during SIPC's formative years. Mr. Owens is a former SEC Commissioner. He served on the Commission from 1964 until his appointment as Chairman of SIPC. Prior to 1964 Mr. Owens was Administrator of the Oklahoma Securities Commission.

Professor George J. Stigler of the University of Chicago, who served as Vice Chairman since the inception of SIPC, was succeeded by Mr. Jerome W. Van Gorkom, President, Trans Union Corporation. Mr. Samuel R. Pierce was succeeded by Mr. Edward C. Schmults representing the Department of the Treasury. Mr. Donald T. Regan, Chairman, Merrill Lynch, Pierce, Fenner and Smith, Inc., was succeeded by Mr. Ralph D. DeNunzio, Executive Vice President and Chairman of the Executive Committee, Kidder Peabody and Co., Inc.

Mr. Glenn E. Anderson, President, Carolina Securities Corporation, was reappointed as director to serve until December 31, 1975.

The Corporation wishes to express its appreciation to all of the directors who have made invaluable contributions to SIPC during its formative years.

## Auditors

The Board of Directors selected S. D. Leidesdorf & Co. as the Corporation's auditors beginning with the calendar year 1973. The decision to appoint new auditors was made to avoid any question of independence which might be raised since the firm of Coopers and Lybrand, with SIPC's approval, was selected as accountants to assist trustees in three of the larger liquidations.

## General

SIPC is not a regulatory organization and, therefore, is not a new regulatory layer in the structure of the securities industry. SIPC has a small staff and relies on the securities exchanges, the NASD, the Commission, the trustees and industry sources for its information. It is subject to oversight by the Commission and the Congress. SIPC has an advisory role in relation to the organizations mentioned above in matters concerning financial responsibility of SIPC member firms and their reporting and inspection procedures and, in the exercise of that role, has commented upon many rule proposals of the Commission, the NASD and the exchanges.

5

# INTRODUCTION

The Corporation (SIPC) was created by the Securities Investor Protection Act of 1970, a federal statute which became effective December 30, 1970. Its principal purpose is to provide certain financial protections to the customers of failing brokers or dealers. SIPC is a nonprofit membership corporation and receives no appropriation of government funds. The Corporation's role and method of operation can best be understood against certain background facts and events which were explained in some detail in its first annual report published in April of 1972.

In order to perform its primary role, SIPC has established and is accumulating a fund represented by assessments paid by its members based on their revenues from the securities business. This fund is, and in the future may be, supplemented if necessary by confirmed lines of credit. It is hoped that the fund as so constituted will at all times be sufficient for SIPC to discharge its responsibilities.

Although SIPC is not an agency or establishment of the United States Government, the ties between the two are close and continuing. Five directors are appointed by the President with the advice and consent of the Senate and two by government agencies. The activities of SIPC are subject to SEC and Congressional oversight. In the event the SIPC fund should be insufficient for its purposes, SIPC is authorized to borrow not in excess of $1 billion through the SEC from the United States Treasury and arrange for a repayment plan subject to SEC approval. Finally, the 1970 Act states that the provisions of the Securities Exchange Act of 1934 (unless otherwise provided) apply as if the 1970 Act was an amendment to the 1934 Act.

Advances are made by SIPC to trustees appointed by a federal court to liquidate failing broker-dealer firms. The trustee establishes the claims of customers for cash or securities and pays customers' net equity claims with funds advanced by SIPC, if necessary, within the limits prescribed by the Act.

The liquidation is carried out under the special procedures of the 1970 Act which, while they draw upon certain aspects of the Bankruptcy Act, are quite different in their operation from the latter Act. These procedures give effect to the unique nature of the securities business and the intent of the Congress to make evident to investors the governmental concern with and commitment to the public interest and public confidence in our securities markets.

The extent to which certain of SIPC's activities must mesh with existing regulatory and self-regulatory organizations and procedures is demonstrated by a brief review of the manner in which the system has operated in a typical case.

Under existing regulations of the Commission, the exchanges and the NASD, financial and other reports are submitted by broker-dealer firms to one or more of the self-regulatory organizations to which they belong, i.e., the National Association of Securities Dealers, Inc., the national securities exchanges, and the SEC. The firms, likewise, are subject to inspections by the examiners of one or more of these organizations. The Act provides that when it appears to the Commission or any self-regulatory organization that a broker or dealer is in or is approaching financial difficulty, SIPC is to be notified immediately.

If SIPC determines that any member has failed or is in danger of failing to meet its obligations to customers and that there exists one or more of the conditions specified in the 1970 Act (see page 18), SIPC, upon notice to the member, may apply to an appropriate federal district court for a decree adjudicating that the customers of the member are in need of the protection provided by the Act.

Members of SIPC file financial and operating statements and reports with the Commission or one or more of the self-regulatory agencies, and the firms are inspected or examined by the personnel of these agencies. SIPC does not, and it was intended that it should not, become involved in activities which duplicate or become pyramided upon the existing reporting and inspection machinery. Accordingly, SIPC considers information supplied by the staff of the Commission or one of the self-regulatory agencies, or both, as well as pertinent information from any other sources bearing on the question of whether a firm is in or is approaching financial difficulty. SIPC's principal concern in most instances is with the question of the probable ability of a firm, even if in financial difficulty, to meet its obligations to public customers. At all times between receipt of a notice that a firm is in or approaching financial difficulty, until the firm recovers or is otherwise dealt with, the principal judgment to be made by SIPC has to do with the threat of danger to customers and their need for the protections of the Act. In every case one or more of the five conditions specified in Section 5(b) of the Act must exist as a prerequisite to filing an application for the appointment of a trustee.

6

SIPC endeavors to file its applications concurrently with the Commission's application for an injunction and the appointment of a receiver. In most cases it has been possible to so coordinate the activities of the two staffs that the applications have been filed at the same time. Typically, these actions by the Commission have been based on violations of the net capital rules or such inadequacy of books and records that the firm is unable to make such computations as may be necessary to establish compliance with the rules concerning financial responsibility or hypothecation of customers' securities. An additional financial responsibility rule (Rule 15c3–3) adopted by the Commission became effective on January 15, 1973, and the failure to comply with the requirements of this rule has in a number of instances been the basis of the existence of the statutory condition. This rule, entitled "Customer Protection—Reserves and Custody of Securities," imposes varying requirements on broker-dealers to better safeguard customer property. In most cases SIPC expects to rely upon the Commission to establish one or more of the five statutory conditions mentioned on page 18. To date there have been several instances where SIPC has applied for the appointment of a trustee on the basis of the information supplied by the Commission and the self-regulatory organization where no court action was sought by the Commission. In some cases SIPC has delayed filing its application for a period after the issuance of an injunction or restraining order and the appointment of a receiver on application by the Commission until there appeared to be no reasonable doubt that customers would need the protection of the Act even though the Commission was prepared to go forward at an earlier date with its own action pursuant to its own enforcement policies. This situation could arise in at least four ways:

1. A violation of the net capital rule might not portend as serious a situation from the point of view of customer protection as originally feared. This rule basically is a test of liquidity as of a particular time. It does not necessarily follow that a temporary or possibly inadvertent failure to comply with the net capital rule makes losses to customers inevitable.

2. On some occasions additional capital is invested in the firm or it is determined that adjustments can be made correcting the capital deficiency.

3. In some cases it develops that the firm has no public customers.

4. In some situations a firm will propose, as an alternative to a SIPC liquidation, that it will liquidate under the supervision of one of the self-regulatory organizations, or the court, without loss to customers.

If in fact there is no real danger to customers, SIPC should not seek an adjudication and the appointment of a trustee. This is so because SIPC can only liquidate; it may not reorganize or furnish funds for the rehabilitation of a firm. Accordingly, it is important that SIPC not enter a case unless it is clear that protection of customers requires it. There have been several instances where SIPC has not filed an application for appointment of a trustee and receivers have handled liquidations without loss to customers.

The system of relying upon a flow of information from the field offices of the National Association of Securities Dealers, Inc., the Commission and the examiners of the exchanges, through the central offices of these organizations to SIPC, at times has produced delays. These arise partly because of the number of people involved, the geographic dispersion of the industry, problems of communication caused by the need to coordinate the work of two or more agencies, and the frequent inability to secure up-to-date and reliable information because of the inadequacies of records or the ignorance or uncooperative attitudes of principals. Delays of this character have been reduced as procedures have been developed and improved and staff personnel have become more familiar with the Act.

A principal problem in many cases arises from the fact that the broker-dealer has failed to establish and maintain on a current basis adequate and reliable records. In some instances it has been necessary to attempt to reconstruct records or rely upon the investigatory efforts of a receiver in order to determine the situation as to customers. In a few cases the courts have appointed temporary receivers or fiscal agents for the purpose of determining the status of a firm. The various officers and personnel of the Commission and the self-regulatory organizations consistently have demonstrated a desire to furnish all the help and assistance their resources permit and the efforts of all concerned are to be commended.

Certain other characteristics of the regulatory structure should be mentioned since they bear upon the judgments which must be made in developing an appropriate form of organization and effective and uniform procedures.

SIPC has no control over who or what firms enter the securities business and thus become "members" of SIPC or continue as such.

As indicated above, SIPC has no regulatory authority of the character conferred upon the National Association of Securities Dealers, Inc., the Securities

7

and Exchange Commission and the securities exchanges by the federal securities acts. As will be explained, however, SIPC has an advisory role to perform in this area and has increasingly expressed a point of view on various proposals affecting the industry as experience has been gained with liquidation problems and the causes of failures.

The statute confers no subpoena power on SIPC and does not provide specific authority to conduct investigations.[1] It has become clear, however, that the review of claims, the search for assets, the ascertainment of preferences, the revelation of misconduct, and the determination of whether to sue the principals of firms or others, require the development of a skilled investigative staff and the exercise of at least informal investigative procedures to supplement

the more formal activities and procedures of the Commission and the self-regulatory authorities and the procedures of the trustees. In other words, although SIPC attempts to carry out its statutory obligations to pay customers' claims promptly, SIPC also has an obligation to take all reasonable steps to prevent the disbursement of its funds in payment of false, fraudulent or erroneous claims, or those barred by the Act (all of which have been encountered to date).

SIPC again wishes to acknowledge and express its appreciation for the continuing cooperation, assistance and support of the officials and staffs of the various agencies and self-regulatory organizations without which SIPC could not function. Finally, SIPC wishes to acknowledge the work and cooperation of the growing number of trustees and their counsel and accountants who have assumed the primary burden in a new and difficult field.

---

[1] The trustee, of course, has available the processes of the court under the Bankruptcy Act.

# THE CORPORATION

SIPC is a nonprofit membership corporation subject to the District of Columbia Nonprofit Corporation Act, except where inconsistent with some provision of the 1970 Act.[2] It is to exist until dissolved by Act of Congress and, except for taxation on real property and on certain tangible personal property, is exempt from any taxation by federal or local taxing authorities.

## Members

The membership of SIPC is composed of all persons registered as brokers or dealers under Section 15(b) of the Securities Exchange Act of 1934 and all persons who are members of a national securities exchange other than persons in certain excluded categories.[3]

As of December 31, 1973, there were approximately 3,970 members of SIPC and approximately 850 persons claiming exclusion from membership. The following table reflects the number of members and their affiliation for purposes of collection of SIPC assessments at the end of the year, as well as the changes during the year:

| Agent for Collection of SIPC Assessments and For Examination for Compliance with Applicable Financial Responsibility Rules | Number of SIPC Members | | |
|---|---|---|---|
| | Added [4] | Terminated [4] | December 31, 1973 |
| National Association of Securities Dealers, Inc. | 118 | 244 | 1,836 |
| New York Stock Exchange, Inc. | 93 | 87 | 721 |
| SIPC (Securities and Exchange Commission only) [5] | 227 | 160 | 348 |
| Chicago Board Options Exchange, Inc. | 330 | 20 | 310 |
| PBW Stock Exchange, Inc. | 21 | 45 | 209 |
| American Stock Exchange, Inc. | 49 | 33 | 187 |
| Midwest Stock Exchange, Inc. | 16 | 24 | 156 |
| National Stock Exchange | 6 | 18 | 69 |
| Boston Stock Exchange | 9 | 8 | 67 |
| Pacific Stock Exchange, Inc. | — | 13 | 53 |
| Spokane Stock Exchange | 1 | — | 11 |
| Intermountain Stock Exchange | — | — | 4 |
| Detroit Stock Exchange | — | — | 3 |
| | 870 | 652 | 3,974 |

Section 3(f)(1) of the Act provides that any person subject thereto who is excluded from membership under Section 3(a)(2) may become a member under such terms and conditions as SIPC shall require. No action has been taken by SIPC under Section 3(f)(1).

## Directors

Section 3(c) of the Act provides for a board of seven directors to determine the policies and govern the operations of SIPC. One director is appointed by the Secretary of the Treasury and one by the Federal Reserve Board. Five directors are appointed by the President of the United States, by and with the advice and consent of the Senate, as follows:

a. three from persons associated with and representative of different aspects of the securities industry, not all of whom shall be from the same geographical area,

b. two from the general public who are not associated with any broker or dealer or a national securities exchange or other securities industry group and have not had any such association during the two years preceding appointment.

The Act further provides that the President shall designate the Chairman and Vice Chairman from those persons listed in (b) above. Directors are to be appointed for a term of three years. A director may serve after the expiration of his term until his successor has taken office.

Directors are identified on page iv.

## Corporate Powers

Section 3(b) of the 1970 Act gives SIPC the usual and customary general corporate powers which were specified in detail in SIPC's first annual report.

These general corporate powers are in addition to the specific grants of authority or statutory directives relative to the funding and liquidation functions and

---

[2] Section 3(a)
[3] These categories include persons whose broker-dealer business consists exclusively of:
   a. the distribution of shares of registered open-end investment companies or unit investment trusts,
   b. the sale of variable annuities,
   c. the business of insurance, or
   d. the business of rendering investment advisory services to one or more registered investment companies or insurance company separate accounts.
[4] Excluding transfers (387) of persons to a successor collection agent and additions (63) resulting from persons terminating their previous claim for exclusion.
[5] SIPC is the collection agent and the SEC is the examining authority for brokers and dealers which are not members of any self-regulatory organization.

those relative to the self-regulatory organizations and SIPC's membership.

SIPC is directed to establish a fund, collect assessments, and borrow monies, if necessary (Sections 4 and 8); to apply for the appointment of trustees and to assist in the liquidation of debtor firms (Sections 5 and 6); to consult and cooperate with self-regulatory organizations with respect to inspections and reports concerning SIPC member firms (Section 9); and to prescribe the means by which members of SIPC may advertise the protection afforded customers and their accounts under the Act (Section 11).

The statute authorizes oversight of many of SIPC's activities by the Securities and Exchange Commission and, in some situations, the role of the Commission is controlling. To the extent that SIPC elects or is required to proceed by rule or bylaw, these must be filed with the Commission. Each bylaw or rule takes effect upon the 30th day after filing a copy with the Commission, or such earlier date as the Commission may determine, unless the Commission disapproves the same as being contrary to the public interest or contrary to the 1970 Act. Thereafter, any change in, supplement to, or repeal of an existing bylaw likewise must be filed with the Commission. Further, the Commission may, by its rules and regulations, require the adoption, amendment, alteration of, supplement to, or rescission of any bylaw or rule by SIPC, whenever adopted. SIPC's bylaws and rules are available for public inspection.

In the event of the refusal of SIPC to commit its funds or otherwise to act for the protection of customers of any member of SIPC, the Commission may apply to the district court of the United States in which the principal office of SIPC is located for an order requiring SIPC to discharge its obligations under the Act and for such other relief as the court may deem appropriate to carry out the purposes of the Act.

The Commission may make examinations and inspections of SIPC and require SIPC to furnish it with reports and records. The Act requires, in addition, that promptly after the close of each fiscal year SIPC shall submit a written report relative to the conduct of its business and the exercise of its functions during the year. These reports are required to include financial statements examined by independent public accountants selected by SIPC with the approval of the Commission. The Commission, in turn, is required to transmit such report to the President and the Congress, with such comment thereon as the Commission deems appropriate.

Although it was recognized that under Section 3 of the Act the procedures for adopting bylaws and rules would be identical, SIPC determined as a matter of policy that bylaws would be employed to set forth standards for the conduct of its internal operations, and that rules would be used to set forth matters of more general interest, including the exercise of rights and powers granted by the Act.

# THE SIPC FUND

The "SIPC Fund" (as defined in the Act) consists of the aggregate of cash, investments in United States Government obligations and confirmed lines of credit. At December 31, 1973, the Fund totaled approximately $84,800,000 as follows:

| | |
|---|---|
| Cash | $ 4,572,253 |
| U.S. Government obligations at amortized cost and accrued interest | 35,213,379 |
| Confirmed lines of credit | 45,000,000 |
| | $84,785,632 |

SIPC derives its revenues principally from member assessments, supplemented by income from investments in U.S. Government obligations. In 1971 it received a $3,011,925 contribution from the trust fund of the American Stock Exchange, Inc., members of which shall be entitled to a reduction, as provided in the Act, in assessments due in the future. An assessment reduction proposal received from that Exchange was approved by the SIPC board in January, 1974 and forwarded to the Securities and Exchange Commission for approval pursuant to Section 4(e)(1) of the Act. SIPC has not been advised when the Commission may take action on this proposal.

SIPC expenses consist principally of provision for possible losses on advances to trustees appointed under the Act to liquidate failed SIPC members and, to a lesser extent, the operating expenses of the corporation. Such advances are made for the completion of open contractual commitments, administration expenses and payments to customers.

SIPC is entitled to be repaid advances made to trustees for the completion of open contractual commitments and to recoup advances made for payment of administration expenses in priority to other claims against assets in the debtor's estate.

Additionally, SIPC is entitled to recover portions of advances made for payments to customers from the single and separate fund, and the general estate, on claims of customers to which SIPC becomes subrogated as provided in the Act. These repayments, recoupments and recoveries have been as follows: 1973—$56,630; 1972—$187,725; 1971—none. Such amounts are applied upon receipt as a reduction of advances to trustees and the related allowance for possible losses on advances.

SIPC has accepted a contribution made by a broker-dealer respondent in an administrative proceeding against it by the Commission. By stipulation of the parties to that proceeding the respondent made a $15,000 payment to the "SIPC Fund" in 1973.

SIPC entered into a Credit Agreement on April 14, 1971 which provided for a maximum availability of $65 million. The agreement provided that the balance of the available unused credit would be reduced by $10 million on April 1 of the next succeeding five years, with a final balance of $15 million expiring on October 13, 1976, assuming no borrowing under the agreement. Accordingly, the line of credit was reduced by $10 million in April 1973.

The Act requires a phase out of the lines of credit when the "SIPC Fund" aggregates $150,000,000 or such other amount as the Commission may determine. In connection with the Credit Agreement, SIPC maintains compensating balances with the participating banks equal to ten percent of their respective commitments and in addition, pays a commitment fee, quarterly, of one half of one percent per annum based on the unused commitment.

Any borrowings under the Credit Agreement would require interest payments at one percent per annum greater than the prime rate charged by the bank that is the agent on the credit agreement on ninety day loans to "substantial and responsible borrowers." If any such borrowing is not paid when due, an additional interest charge of one percent per annum would be payable. Coincident with any such borrowing, SIPC would be required to pledge assessment collections, limited however, to one quarter percent of members' SIPC gross revenues during any period that SIPC has any borrowings from the Commission under Section 4(g) of the Act. There have been no borrowings by SIPC under the Credit Agreement or otherwise.

## Assessments

### General

The Act provides authority for SIPC to impose a general assessment upon each of its members at a rate of not less than ½ of 1 percent of the gross revenues from the securities business [a] of such

---

[a] Gross revenues from the securities business are defined in Section 4(i) of the Act and the instructions to the assessment forms.

The assessment forms are based on the Commission's Form X-17A-10 which prescribes the income and expenses and related financial and other information which must be filed by members of a national securities exchange and every broker or dealer registered under the 1934 Act not later than 120 days after the close of each calendar year.

11

member. This general authority is subject to several qualifications.

A general assessment may be made at a rate in excess of ½ of 1 percent during any twelve month period if SIPC determines, in accordance with a bylaw or rule, that such rate will not have a materially adverse effect on the financial conditions of its members or their customers. No such assessment may be made, however, upon a member which would require payments in excess of one percent of the member's gross revenues from the securities business for the period.

The Act contemplates that the rate of ½ of 1 per cent will be imposed (a) until the balance of the "SIPC Fund" aggregates not less than $150 million or such other amount as the Commission may determine in the public interest, (b) during any period when there is any outstanding borrowing, and (c) whenever the balance of the Fund (exclusive of confirmed lines of credit) is below $100 million or such other amount as the Commission may determine.

During any period in which (a) the Fund (exclusive of confirmed lines of credit) aggregates less than $150 million or such other amount as the Commission may determine or (b) SIPC is required under Section 4(d)(2)(B) to phase out of the Fund all confirmed lines of credit, the aggregate assessments payable by SIPC members shall not be less than ¼ of 1 percent per annum.

According to SIPC's bylaws, assessments may be paid quarterly on the basis of estimates of gross revenues for each quarter (not less than one quarter of the assessments payable for the preceding year) or on the basis of actual gross revenues for each quarter. Not later than 120 days after the close of each calendar year, SIPC member firms are required to file a reconciliation of revenues reported to SIPC with revenues reported on Form X–17A–10 (the Commission's Annual Income and Expense Report) or the equivalent report of a self-regulatory organization and pay any additional assessments due on the income for the prior calendar year. Any overpayments may be credited against future assessments payable.

## Uniform Assessments

Inquiries from members continue to indicate some lack of understanding that the rate of ½ of 1 per cent is prescribed by the Act and that the decision by Congress to impose assessments based upon a uniform base and rate during the early years of SIPC was a deliberate one. This policy decision stemmed in part from a desire to build up the "SIPC Fund" rapidly from industry sources and thus minimize the risk that government borrowing might be necessary.

There was also an intention to spread the cost of the program, which is designed to contribute to public confidence in the securities markets, broadly over the industry, since it benefits from the attainment of these objectives.

The uniform rate of assessment results in some members of the industry bearing what they consider to be a disproportionate and discriminatory burden of the costs of SIPC. Many SIPC member firms, including, for example, some of the trading houses and the exchange specialists, do no business directly with public customers; yet assessments are imposed upon them by the Act at the same rate paid by the firms doing a substantial retail business.

## Future Assessments

After the "SIPC Fund" has reached the desired level, SIPC is expected, as indicated in Section 4(c)(2) of the 1970 Act, to vary assessments as between classes of members. Thus, as to any one or more classes of members, assessments may be based in whole or in part on the amount of their gross revenues from the securities business, or all or any of the following factors: the amount or composition of their gross revenues from the securities business, the number or dollar volume of transactions effected, the number of customer accounts maintained or the amounts of cash and securities in such accounts, their net capital, the nature of their activities (whether in the securities business or otherwise) and the consequent risks, or other relevant factors.

It is not possible to indicate the time at which SIPC can undertake to vary assessments as between classes of members on the basis of allocations of risks, costs, or other factors.

Much will depend upon the time required to build the "SIPC Fund" to the prescribed $150 million. This will be affected primarily by the assessments received and the demands for advances to trustees for the benefit of customers and related liquidation costs, and SIPC's administrative costs.

The work of assembling and preparing the basic data required to support the decisions ultimately to be made on this subject has commenced. Industry personnel will be called on to facilitate this work.

## Assessment Revenues from Inception through December 31, 1973.

Assessment revenues received and accrued for the periods since inception (December 30, 1970) through December 31, 1973 aggregated $84,969,345. Assessment revenues classified by principal collection agents follow:

## SIPC Assessments

| SIPC Collection Agents to Whom Assessments Are Paid | 1971 [a] | 1972 [b] | 1973 | Total |
|---|---|---|---|---|
| NYSE | $25,257,961 | $27,725,356 | $19,221,887 | $72,205,204 |
| NASD | 3,790,129 | 3,780,945 | 2,306,206 | 9,877,280 |
| ASE | 488,374 | 487,568 | 307,179 | 1,283,121 |
| All other exchanges [c] | 104,497 | 55,092 | 731,570 | 891,159 |
| SIPC | 137,308 | 283,195 | 292,078 | 712,581 |
| | $29,778,269 | $32,332,156 | $22,858,920 | $84,969,345 |

Notes:
a. Includes $5,669,180 initial assessments (based on 1969 gross revenues).
b. Includes $4,143,321 of 1971 revenues received in 1972 in excess of the December 31, 1971, accrual.
c. Other exchanges:
   Boston Stock Exchange
   Chicago Board Options Exchange, Incorporated
   Detroit Stock Exchange
   Midwest Stock Exchange, Inc.
   National Stock Exchange
   Pacific Stock Exchange, Inc.
   PBW Stock Exchange, Inc.
   Spokane Stock Exchange

The revenues above do not purport to reflect the volume of business conducted on the respective exchanges or in the over-the-counter market.

The assessments are processed for SIPC members for whom the self-regulatory organizations are the designated SIPC collection agent. SIPC collection agents deposit member assessment payments they receive in SIPC bank accounts. Such deposits are promptly invested by SIPC in U.S. Government obligations to the extent that cash is not required for advances to trustees and for payment of administrative expenses.

Review of Collection Agents' Procedures

During March, 1973 SIPC's independent public accountants were engaged to review the adherence to prescribed procedures by the SIPC collection agents and to report on:

(1) SIPC collection agents' progress in comparing the 1969 and 1971 gross revenues reflected in the members' assessment form filings with the revenues reported by them in Form X-17A-10;

(2) identification of any significant weaknesses in the SIPC collection agents' systems of internal accounting control with respect to their processing of SIPC assessment forms and payments;

(3) SIPC collection agents' efforts to eliminate deficiencies in form filing and assessment payment.

SIPC representatives reviewed the accountants' findings with the affected collection agents' personnel, and remedial measures, where necessary, were proposed by the agents.

The 1969 and 1971 comparisons have resulted in the collection of delinquent assessments, recomputation of assessment overpayments and the payment of assessments due by members who had originally filed invalid claims for exclusion from SIPC membership.

The collection agents are now in the process of comparing the gross revenues for 1972 reflected in the members' assessment form filings with the applicable Form X-17A-10 revenues.

The Commission's rule 17a-5(b)(4) under the Securities Exchange Act of 1934, effective October 15, 1972, requires that persons subject to the rule obtain annually an independent public accountant's report on the accuracy of the assessment payments or claim for exclusion. SIPC's review of the reports received thereunder has indicated a significant degree of lack of understanding of the rule. A major deficiency has been the failure to report on prior years' assessments.

SIPC has begun the notification of those persons filing deficient Rule 17a-5(b)(4) reports, through their respective SIPC collection agent, of the specific items requiring correction.

Failure To File and Overdue Assessments

Failure to file required SIPC forms or to pay SIPC assessments when due can result in a broker or dealer being prohibited from lawfully continuing to engage in business. Late payment of assessments must be accompanied by interest due, computed at the rate of 8 percent per annum.

On May 25, July 9, and December 6, 1973, SIPC mailed notices pursuant to Section 10(a) [7] of the Act to 239 persons who had failed to respond to prior correspondence. The number of such notices mailed and the corrective actions reported by the respective SIPC collection agents are as follows:

### Status of Notices Mailed as of December 31, 1973

| SIPC Collection Agent | Notices Mailed | Deficiencies Corrected | Unde-liverable | 1934 Act Regis-tration Revoked Cancelled or Withdrawn [8] | Not Corrected |
|---|---|---|---|---|---|
| National Association of Securities Dealers, Inc. | 151 | 60 | 18 | 21 | 52 |
| SIPC | 53 | 14 | 11 | 6 | 22 |
| PBW Stock Exchange, Inc. | 23 | 13 | 1 | — | 9 |
| National Stock Exchange | 9 | 4 | 1 | — | 4 |
| Midwest Stock Exchange, Inc. | 1 | — | — | — | 1 |
| New York Stock Exchange, Inc. | 2 | 2 | — | — | — |
| | 239 | 93 | 31 | 27 | 88 |

Both the Commission and the SIPC collection agent affected are provided by SIPC with copies of the Section 10(a) Notices mailed and with periodic status reports of corrective filings. SIPC is maintaining contact with the Commission regarding the above indicated deficiencies.

If a member of SIPC fails to pay when due all or any part of an assessment, the unpaid portion may be subject to an interest charge.[9] SIPC received $10,900 in interest during 1973, the first year the interest charge was in effect.

### Borrowing Authority Other Than from Commercial Sources

In the event that the "SIPC Fund" is or may reasonably appear to be insufficient for the purposes of the Act, the Commission is authorized to make loans to SIPC. With the application for, and as a condition to such loan, SIPC must file with the Commission a statement respecting the anticipated use of the loan proceeds. If the Commission determines that a loan is necessary and that SIPC has submitted a plan which provides, under the circumstances, a reasonable assurance of prompt repayment, then the Commission shall so certify to the Secretary of the Treasury and issue notes or other obligations to the Secretary of the Treasury in an aggregate amount not to exceed $1 billion. If the Commission determines that the amount of, or time for, payment of the assessments pursuant to such plan would not satisfactorily provide for the repayment of the loan, it may impose a transaction fee upon the purchasers of equity securities in transactions on national securities exchanges and in over-the-counter markets. This fee may vary but is not to exceed one-fiftieth of 1 percent of the purchase price of the securities. However, no fee shall be imposed on a transaction (as defined by rules or regulations of the Commission) of less than $5,000. The term "purchasers" does not include a broker or dealer registered under Section 15(b) of the 1934 Act or a member of a national securities exchange unless such purchase is for an investment account of such broker, dealer or member. The Commission may exempt any transaction in the over-the-counter markets in order that assessment of fees on purchasers in those markets be on a basis comparable to the assessment of fees on purchasers in transactions on national securities exchanges. The

---

[7] Section 10(a) is quoted in full:
SEC. 10. PROHIBITED ACTS
(a) FAILURE TO PAY ASSESSMENT, ETC.—If a member of SIPC shall fail to file any report or information required pursuant to this Act, or shall fail to pay when due all or any part of an assessment made upon such member pursuant to this Act, and such failure shall not have been cured, by the filing of such report or information or by the making of such payment, together with interest thereon, within five days after receipt by such member of written notice of such failure given by or on behalf of SIPC, it shall be unlawful for such member, unless specifically authorized by the Commission, to engage in business as a broker or dealer. If such member denies that he owes all or any part of the amount specified in such notice, he may after payment of the full amount so specified commence an action against SIPC in the appropriate United States district court to recover the amount he denies owing.
[8] After the Notice was mailed, SIPC received advice from the Commission that the registration of the recipient had subsequently been revoked, cancelled or withdrawn.

[9] SIPC bylaw Article 6, Section 2(g) is quoted in full: Article 6, Section 2. (g) Interest on Assessments.
Effective January 1, 1973, if all or any part of an assessment payable under Section 4 of the Act has not been received by the collection agent within 15 days after the due date thereof, the member shall pay, in addition to the amount of the assessment, interest at the rate of 8% per annum of the unpaid portion of the assessment for each day it has been overdue. If any broker or dealer has incorrectly filed a claim for exclusion from membership in the Corporation, such broker or dealer shall pay, in addition to all assessments due, interest at the rate of 8% per annum of the unpaid assessment for each day it has not been paid since the date on which it should have been paid."

fees are to be collected by the broker or dealer effecting the transaction for the purchaser and are to be paid to SIPC in the same manner as assessments are otherwise paid under the Act.

The Secretary of the Treasury prescribes the terms and conditions of any notes issued by the Commission for purposes of a loan to SIPC. During any period when any treasury borrowing is outstanding, no pledge of any assessment upon a member to secure any other borrowing shall exceed $\frac{1}{4}$ of 1 percent of the member's gross revenues from the securities business for any twelve-month period.

# NOTICE TO SIPC THAT A FIRM IS IN OR APPROACHING FINANCIAL DIFFICULTY

Section 5(a)(1) requires the Commission or the self-regulatory organizations to notify SIPC immediately upon discovery of facts which indicate that a broker-dealer subject to its regulation "is in or is approaching financial difficulty." A primary purpose of an early warning system is to afford a self-regulatory organization the opportunity to initiate procedures so that the broker-dealer in question does not become a SIPC casualty. The notice to SIPC resulting from the early warning system is to afford SIPC ample opportunity to prepare for the selection and appointment of a trustee and supporting personnel capable of handling the problems of a particular case as well as to prepare to assume the financial burden which may devolve upon it to satisfy claims of customers.

The statute does not define "financial difficulty." SIPC has not defined this term nor has it established specific guidelines for the determination that a condition of financial difficulty exists for industry-wide application. There are seven different capital rules of general application now in operation in the industry and there are differences in the manner in which the various reporting and surveillance systems operate.[10] In view of the number of self-regulatory organizations involved and the differences in their rules, procedures, and problems, SIPC has relied upon the judgment and experience of the examining staffs of each of the self-regulatory organizations and the Commission as to the circumstances under which a Section 5(a) notice [11] shall be given. Experience to date indicates that the decision to leave the evaluation of what constitutes financial difficulty to these subjective analyses was the most logical one. The SIPC staff reviews the facts furnished to it and frequently consults with the examining authority as to additional data, such as results of examinations and current financial reports, both at the time of referral and on a continuing basis until such time as the firm corrects its difficulties or must be liquidated.

Occasionally a firm's financial position may deteriorate very rapidly if customers fail to deliver securities, other firms fail to honor commitments, the market price of particular securities declines very sharply, or for other reasons. Therefore, the time span from early warning to SIPC entry may be relatively short. During 1973 there was noticeable improvement in the monitoring of brokers' and dealers' financial condition and the self-regulatory organizations' procedures in giving notice to SIPC of firms in or approaching financial difficulty.

As soon as it is brought to SIPC's attention that a firm is in trouble, a file is established, information is collected from available sources and an effort is made to determine whether and to what extent there may be customer exposure. Where it appears that failure of a firm may be imminent, SIPC seeks qualified candidates in the community in which the firm operates for the position of trustee, trustee's counsel, if necessary, and an accounting firm familiar with brokerage accounting.

## Securities Exchanges

The New York Stock Exchange has continued its practice of submitting written reports to SIPC in the form of letters from its Department of Member Firms. These reports, based largely upon the Joint Regulatory Report,[12] are submitted monthly. They provide relevant data on the member firms which are on the Exchange's special surveillance or early warning list due to failure of the members to comply with certain of the Exchange's rules or other criteria. The reports also indicate the actions being taken or proposed to be taken by the member or the Exchange, or both, to identify the nature and magnitude of any problem and the steps being taken to remedy it. These monthly reports are supplemented by short form weekly reports to record any material events or interim changes.

In 1973 the New York Stock Exchange reported to SIPC that an aggregate of 118 firms carrying customers accounts and 75 firms introducing customers' accounts were under special surveillance or early warning surveillance at various times during the year.

---

[10] The Securities & Exchange Commission, with industry assistance, has under consideration and development both a uniform net capital rule and a uniform reporting system.

[11] These notifications and the information on which they are based are not made public by SIPC when received since to do so might make difficult, if not impossible, efforts to prevent failure of a firm. When SIPC files an application and a trustee is appointed the public file includes the notification as well as the court record.

---

[12] The Joint Regulatory Report of Broker/Dealers' Financial and Operational Condition was adopted in January, 1972, by the New York Stock Exchange and the American Stock Exchange. The report is designed to assure uniform reporting and fair and equal regulatory treatment.

The special surveillance category consists of those firms exceeding a set of more stringent criteria.[13] Many of the reported firms exceeded the criteria established by the Exchange only temporarily and immediately corrected their difficulties. The status as of December 31, 1973, follows:

|  | Firms Carrying Accounts | Firms Introducing Accounts |
|---|---|---|
| In liquidation under the 1970 Act | 1 | — |
| Merged with other organizations or withdrew from the securities business | 19 | 13 |
| Remaining in business as members of other exchanges, the NASD or SECO | 5 | 3 |
| On early warning list as of 12/31/73 | 17 | 18 |
| On special surveillance list | — | — |
| No longer reported on special surveillance or early warning lists | 76 | 41 |
|  | 118 | 75 |

As of December 31, 1973, there were no firms meeting the criteria for being under special surveillance. As of that date there were 17 firms carrying accounts and 18 firms introducing accounts on the early warning list. Of these 35 firms, based on reports received through March 7, 1974, 7 carrying firms and 5 introducing firms had corrected their temporary difficulties and were removed from the early warning list. There were no firms added to the list in this period.

[13] The present policy of the Exchange is to place a firm under special surveillance if its net capital is less than 120% of minimum requirements, its capital ratio exceeds 1200% under Rule 326, its capital ratio is in excess of 1000% under Rule 326 for more than fifteen consecutive business days, or the firm otherwise warrants special attention in the judgment of the staff.

Under present NYSE rules a ratio in excess of 1500% is a violation of the Exchange's net capital rule (Rule 325).

SIPC received referrals under Section 5(a) of the Act or other information on 196 of their members from securities exchanges other than the New York Stock Exchange. The tabulation which follows shows the Section 5(a) referrals and those firms under the caption Special Reporting which, while not meeting the criteria for 5(a) referrals, warranted closer than normal surveillance:

|  | 5(a) Referrals | Special Reporting |
|---|---|---|
| American Stock Exchange, Inc. | 1 | 18 |
| Boston Stock Exchange | 4 | 13 |
| Midwest Stock Exchange, Inc. | 6 | 58 |
| Pacific Stock Exchange, Inc. | 10 | 37 |
| PBW Stock Exchange, Inc. | 26 | 23 |
|  | 47 | 149 |

### NASD and SEC

During 1973 there were 214 Section 5(a) referrals made by the National Association of Securities Dealers, Inc., and 5 by the Commission for firms which are not members of any self-regulatory organization.

**Status as of December 31, 1973, of the 266 Firms Referred under Section 5(a) or Reported as Being Under Closer Than Normal Surveillance by the ASE, BSE, MSE, PSE, PBW, the NASD and the SEC**

| | |
|---|---|
| In liquidation under the 1970 Act | 29 |
| Liquidations pending (Trustees appointed 1974) | 3 |
| Out of business, SEC Form BDW filed | 66 |
| In process of self-liquidation or in receivership | 26 |
| Inactive or suspended | 20 |
| Under special reporting & surveillance | 49 |
| Merged or consolidated | 11 |
| No longer under special reporting & surveillance | 62 |
| | 266 |

# SIPC APPLICATION FOR COURT DECREE THAT CUSTOMERS NEED THE PROTECTION PROVIDED BY THE ACT

One purpose [14] of the notice under Section 5 is, of course, to provide SIPC with the facts upon which to base its decision whether to seek the appointment of a trustee and thus initiate the liquidation of a firm in accordance with the specialized procedures of the Act.

There are five conditions specified in Section 5(b), at least one of which must be found by SIPC and the Court to exist in every case.

The court shall grant the application and issue a decree if it finds that the member—

a.  is insolvent within the meaning of Section 1(19)[15] of the Bankruptcy Act, or is unable to meet its obligations as they mature, or

b.  has committed an act of bankruptcy within the meaning of Section 3 of the Bankruptcy Act,[16] or

c.  is the subject of a proceeding pending in any court or before any agency of the United States or any state in which a receiver, trustee, or liquidator for such member has been appointed, or

d.  is not in compliance with applicable requirements under the 1934 Act or rules or regulations of the Commission or any self-regulatory organization with respect to financial responsibility or hypothecation of customers' securities, or

e.  is unable to make such computations as may be necessary to establish compliance with such financial responsibility or hypothecation rules or regulations.

In addition, before filing an application for the appointment of a trustee SIPC must have determined that the member firm in question has failed or is in danger of failing to meet its obligators to customers.

If, within three days after the filing of an application, or such other period as the Court may order, the member shall consent to or fail to contest the application, or fail to controvert any material allegation of the application, the Court shall issue a decree adjudicating that the customers of the member are in need of protection under the Act. The statute provides that the Court then appoints, as trustee for the liquidation of the business of the member and as attorney for the trustee, such persons as SIPC specifies. It is provided, however, that no person shall be appointed to either position if he is not "disinterested" within the meaning of Section 158 of the Bankruptcy Act.

Section 5 (b)(4) of the Act defines the term "debtor" (a term employed throughout Section 6) to mean the SIPC member firm, and the term "filing date" (a date critical to the interpretation and administration of Section 6) to mean the date on which a SIPC application is filed with the Court, except that if

a.  a petition was filed before such date by or against the debtor under the Bankruptcy Act, or

b.  the debtor is the subject of a proceeding pending in any court or before any agency of the United States or any State in which a receiver, trustee, or liquidator for the debtor was appointed, which proceeding was commenced before the date on which the SIPC application was filed,

then the term "filing date" means the date on which such petition was filed or such proceeding commenced.

The critical question in virtually all cases, and the one as to which it is sometimes difficult to get solid facts as of the time a decision is required, is whether

---

[14] Another and very significant effect, if not purpose, of the notice provisions is to cause the self-regulatory organizations to concentrate on types of early warning signals and to seek to detect difficulties as soon as possible.

[15] "(19) A person shall be deemed insolvent within the provisions of this Act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts;"

[16] "§3. Acts of Bankruptcy. a. Acts of bankruptcy by a person shall consist of his having (1) concealed, removed, or permitted to be concealed or removed any part of his property, with intent to hinder, delay, or defraud his creditors or any of them, or made or suffered a transfer of any of his property, fraudulent under the provisions of section 67 or 70 of this Act; or (2) made or suffered a preferential transfer as defined in subdivision a of section 60 of this Act; or (3) suffered or permitted, while insolvent, any creditor to obtain a lien upon any of his property through legal proceedings or distraint and not having vacated or discharged such lien within thirty days from the date thereof or at least five days before the date set for any sale or other disposition of such property; or (4) made a general assignment for the benefit of his creditors; or (5) while insolvent or unable to pay his debts as they mature, procured, permitted, or suffered voluntarily or involuntarily the appointment of a receiver or trustee to take charge of his property; or (6) admitted in writing his inability to pay his debts and his willingness to be adjudged a bankrupt."

the firm has failed or is in danger of failing to meet its obligations to customers.

The Commission, in the discharge of its regulatory duties, usually will proceed promptly to seek an injunction and frequently will petition at the same time for the appointment of a receiver, when it learns that a broker-dealer is violating the net capital or record keeping rules or is engaged in other illegal conduct.

In some instances it is not possible to determine prior to the time the Commission goes to court whether there is, in fact, customer exposure. Accordingly, it sometimes occurs that a restraining order is issued and a receiver appointed prior to the time SIPC is prepared to make the determination required by the 1970 Act. In some cases, of course, it has developed that the firm had no public customers or that they had been paid amounts owing to them or that the violations which had prompted Commission action had been remedied. In these situations, SIPC would not apply for a trustee and would take no action except to complete its records in the matter.

In other cases the nature and scope of obligations to public customers is determined after the beginning of the SEC court action and it then becomes evident that SIPC protection of customers is necessary. In these cases SIPC files an application for the appointment of a trustee after the court has appointed a receiver on the petition of the Commission.

As the staffs of the NASD, the Commission and SIPC gained experience, an effort was made to reduce or eliminate the time lag between the actions of the Commission and SIPC. Increasingly, it has been possible for SIPC and the Commission to appear in court at the same time, with their respective applications.

Section 5(b)(2) of the Act states that "the court to which application is made shall have exclusive jurisdiction of the debtor involved and its property wherever located with the powers, to the extent consistent with the purposes of this Act, of a court of bankruptcy and of a court in a proceeding under Chapter X of the Bankruptcy Act."

In the same section the statute states that the "court shall stay" pending proceedings to reorga-

nize, conserve, or liquidate the debtor or its property, any other suit against any receiver, conservator or trustee of the debtor or its property. In addition, each SIPC application that is granted stays any action, other than administrative proceedings instituted by self-regulatory organizations and actions or proceedings brought by the Commission, unless an order of the court has first been obtained.

In designating the trustee and the attorney for the trustee to conduct liquidations under the 1970 Act, SIPC has attempted to locate attorneys and accountants who have had experience in the brokerage industry and some familiarity with bankruptcy and securities laws. Generally, the trustee is an attorney. In three instances one of SIPC's employees was appointed trustee, partly in the interest of economy, and partly to gain firsthand experience with the problems encountered in a stockbroker liquidation. In a number of cases accountants have been designated trustees.

SIPC has employed a form of consent to the SIPC application and when it is signed by the member firm it is possible for the court to make its adjudication and appoint a trustee immediately upon the filing of the application. In most cases in which the firms have not consented the court usually has directed that a hearing be held within a short period. No court has made its adjudication and appointed a trustee prior to the expiration of the three business day period prescribed in the Act in any case in which the firm has not consented.

In view of the possibility of the injection of new capital or some other corrective action during that period, earlier court action might indeed be premature. Nevertheless, SIPC considers it important in many cases to bring to an end the firm's access to its assets and books and records and it is in this connection that SIPC urges the appointment of a temporary receiver under Section 5(b)(2) to take control of assets pending adjudication.

If SIPC refuses to act for the protection of the customers of any of its members, the Commission has authority under Section 7(b) of the 1970 Act to apply to the federal court for the district in which SIPC's principal office is located for an order requiring SIPC to discharge its statutory obligations. No application under this section has been filed.

# LIQUIDATION PROCEEDINGS

As of December 31, 1973, SIPC was or had been involved in the liquidation of 94 securities firms by court-appointed trustees. These firms were in all stages of the liquidation process. In six cases all customers were satisfied, and the trustees had been discharged or partially discharged by the court. In 78 cases, the claims of customers had been settled or substantially settled and trustees were involved in later stages of dealing with the general estates and claims of other creditors. In the remaining 10 cases assets were being marshalled, claims processed and customers being paid net equities or delivered specifically identifiable property. Over 95% of all customers claims in the 94 liquidations had been satisfied or adjudicated.

### Firms Placed in Liquidation By Years in Business

| Years in Business | 1971 | 1972 | 1973 | Total No. | Total % | Cumulative No. | Cumulative % |
|---|---|---|---|---|---|---|---|
| 0- 1 | 1 | 2 | 2 | 5 | 5 | 5 | 5 |
| 1- 2 | 7 | 10 | 6 | 23 | 25 | 28 | 30 |
| 2- 3 | 7 | 10 | 4 | 21 | 22 | 49 | 52 |
| 3- 4 | 4 | 4 | 7 | 15 | 16 | 64 | 68 |
| 4- 5 | 0 | 4 | 6 | 10 | 11 | 74 | 79 |
| 5-10 | 4 | 5 | 4 | 13 | 14 | 87 | 93 |
| 10 and over | 1 | 5 | 1 | 7 | 7 | 94 | 100 |
| | 24 | 40 | 30 | 94 | 100 | | |

### General Nature of a SIPC Liquidation

Section 6 of the 1970 Act sets forth the purposes of a proceeding in which a trustee has been appointed, the procedures to be followed, the powers and duties of the trustee, and the rights and priorities of the customers of the debtor firm.

The proceeding is essentially a liquidation proceeding, and the 1970 Act denominates it as such. In order to assure that only a liquidation will take place, Congress provided that, even though the proceeding is to be governed to a very large extent by those provisions of the Bankruptcy Act (11 U.S.C. § 1 et seq.) relating to corporate reorganizations (Chapter X), in no event is a plan of reorganization to be formulated.

The powers and duties of the trustee are quite broad. Section 6(b)(1) gives the trustee the same powers and title with respect to the debtor and its property, and the same rights to avoid preferences, as a trustee in bankruptcy and a trustee under Chapter X of the Bankruptcy Act would have. In

### Geographical Distribution of Broker-Dealer Firms Placed in Liquidation

| State | | Number of Firms |
|---|---|---|
| Alabama | | 1 |
| Arizona | | 1 |
| California | | 10 |
| Delaware | | 1 |
| Florida | | 2 |
| Georgia | | 2 |
| Guam | | 1 |
| Illinois | | 2 |
| Kansas | | 2 |
| Massachusetts | | 6 |
| Minnesota | | 4 |
| Missouri | | 1 |
| Montana | | 1 |
| New Hampshire | | 1 |
| New Jersey | | 7 |
| New York: | | |
| New York City | 34 | |
| Other | 7 | 41 |
| Ohio | | 2 |
| Pennsylvania | | 1 |
| Tennessee | | 1 |
| Texas | | 1 |
| Utah | | 4 |
| Washington | | 1 |
| Wisconsin | | 1 |
| | | 94 |

addition, the trustee is given the right to operate the debtor's business so as to complete certain open contractual commitments and, with SIPC approval, to hire and fix the compensation of persons deemed necessary by the trustee for purposes of the liquidation proceedings, all without court approval.

The duties of the trustee, except where inconsistent with the 1970 Act or as otherwise ordered by the court, are the same as the duties of a trustee in bankruptcy.[37]

A liquidation proceeding is to be conducted:

"in accordance with, and as though it were being conducted under, the provisions of chapter X and such of the provisions (other than section 60e) of chapters 1 to VII, inclusive, of the Bankruptcy Act as section 102 of chapter X would make applicable if an order of the court

---

[37] However, the trustee in a 1970 Act proceeding has no obligation to reduce securities to money.

20

had been entered directly that bankruptcy be proceeded with pursuant to the provisions of such chapters I to VII, inclusive. . . ."

As indicated, where inconsistent with the provisions of the 1970 Act, the Bankruptcy Act does not apply. As a result, the above quoted provision effects a blending of the 1970 Act, the provisions of the Bankruptcy Act dealing with ordinary bankruptcy (Chapters I to VII, inclusive) and the provisions of the Bankruptcy Act dealing with corporate reorganization (Chapter X). Such a blending was intended to provide the court and the trustee with the flexibility necessary to the proper conduct of a complex proceeding.

### Rights of Customers

For purposes of the 1970 Act, a customer is one who falls within the special definition of "customers" contained in Section 6(c)(2)(A)(ii). That section defines customers, essentially, as persons who have claims on account of securities received, acquired, or held by the debtor from or for the account of such persons (1) for safekeeping, (2) with a view to sale, (3) to cover consummated sales, (4) pursuant to purchases, (5) as collateral security, or (6) by way of loans of securities by such persons to the debtor; and the term includes persons who have claims against the debtor arising out of sales or conversions of such securities, as well as persons who have deposited cash with the debtor for the purpose of purchasing securities. The term does not include, however, persons to the extent that they have claims for property which by contract, agreement, or understanding, or by operation of law, is a part of the capital of the debtor or is subordinated to the claims of the debtor's creditors.

A customer is entitled to the return of his "specifically identifiable property". This phrase denotes property which has remained in its identical form in the debtor's possession until the filing date, and property which has been allocated to or physically set aside for a customer on the filing date. Generally speaking, as regards securities, this would include (1) securities segregated individually, or segregated in bulk for customers collectively; (2) securities held for the account of the debtor as a part of a central certificate service, clearing corporation or similar depository, as long as it can be established to the satisfaction of the trustee that all or part of the securities so held are held for specified customers or for customers collectively (and, with regard to the latter, that there can be similarly established the identities of the particular customers entitled to receive specified numbers or units of securities); and (3) other fully-paid and excess margin securities in

the physical possession or control of the debtor, as provided in Rule 15c3–3 of the Commission. Cash can also be specifically identifiable, for example, if found in the debtor's Special Reserve Bank Account established under Rule 15c3–3.

To the extent a customer has a claim for cash or securities which do not qualify as "specifically identifiable property", his claim is for the "net equity" of his account as of the filing date (generally, the date upon which the SIPC application for the appointment of a trustee is filed in court). A customer's "net equity" is, in general, what the broker owes the customer less what the customer owes the broker, exclusive of "specifically identifiable property." Essentially, Section 6(c)(2)(A)(iv) defines "net equity" as the dollar amount of a customer's account determined after giving effect to the completion of any open contractual commitments (discussed below), excluding therefrom any specifically identifiable property reclaimable by the customer, and subtracting the indebtedness (if any) of the customer to the debtor from the sum which would have been owing by the debtor to the customer had the debtor liquidated all other securities and contractual commitments of the customer on the filing date. In short, a customer's "net equity" claim is for a liquidated sum.

Customers with claims based on "net equities" are entitled to the satisfaction of their claims from three sources. First, as a group they constitute a separate class of creditors with a priority right to share ratably in the "single and separate fund" after the payment of certain specified charges out of that fund. SIPC also participates to the extent of its advances for customers' claims (discussed below). The "single and separate fund" is defined as including all property at any time received, acquired, or held by or for the account of a debtor from or for the account of customers (except "specifically identifiable property"), and the proceeds of all customers' property transferred by the debtor, including property unlawfully converted. To the extent that the single and separate fund is not sufficient to satisfy customers' claims, as usually occurs, SIPC is authorized to make advances up to the limits of protection afforded by the Act. This is the second and frequently the principal source for the satisfaction of customers' "net equity" claims. The limits of this protection is $50,000 per customer, except that in the case of claims for cash, as distinguished from securities, not more than $20,000 may be paid with funds advanced by SIPC (discussed below under "Advances"). If the claim is still not satisfied because it exceeds its ratable share of the "single and separate fund" as well as what can be advanced by

SIPC, the customer then becomes a general creditor of the firm as to the remainder of his claim, and any further recovery would depend upon the remaining assets of the firm in the general estate. This is the third source.

With regard to margin accounts, a broker-dealer may obtain a bank loan (or other form of borrowing such as from stocks loaned) in order to finance its margin customers' accounts. To do this the broker-dealer may, pursuant to a standard agreement with its margin customers, pledge margin securities as collateral with banks. If a trustee is appointed to liquidate the broker-dealer under the 1970 Act, the banks may protect themselves by exercising their right to sell pledged securities sufficient to cover the amounts of their loans. After the debtor's obligations to the bank have been satisfied, the excess (if any) of pledged securities or cash proceeds therefrom are returned to the trustee and become a part of the single and separate fund. But because of the sale by the banks, many securities will not be available for distribution to customers and the customers will receive, within the limits of the 1970 Act, cash in lieu of those securities. It should be noted that once securities have been pledged with the bank, they can no longer be considered specifically identifiable property of any customer.

**Open Contractual Commitments**

One of the major innovations of the 1970 Act is the provision for the completion of open contractual commitments. Section 6(d) states that:

"The trustee shall complete those contractual commitments of the debtor relating to transactions in securities which were made in the ordinary course of debtor's business and which were outstanding on the filing date—
(1) in which a customer had an interest, except those commitments the completion of which the Commission shall have determined by rule or regulation not to be in the public interest, or
(2) in which a customer did not have an interest, to the extent that the Commission shall by rule or regulation have determined the completion of such commitments to be in the public interest." [18]

Pursuant to its foregoing rule-making power, the Commission adopted Rule S6d-1 respecting the completion of open contractual commitments, effective July 25, 1973. The rule establishes detailed procedures for the completion of those open contractual commitments which are governed by the rule. Generally, it permits the completion of fails to receive and fails to deliver between the debtor and another broker-dealer which were made in the ordinary course of the debtor's business and which were outstanding on the filing date. Such open contractual commitments must have arisen from a "current" transaction, as defined in the rule, in which the other broker was acting as agent for a customer (or in which the other dealer was acting for a customer in certain defined principal transactions), and must be bought-in, sold-out, or closed by delivery of funds and securities promptly in accordance with the provisions of the rule.

Other than specifically identifiable property of customers which is not the subject of an open contractual commitment, all property held by or for the debtor and all property in the single and separate fund may be used to complete open contractual commitments. In addition, SIPC may be required to advance monies necessary to complete certain open contractual commitments of the debtor in which customers have an interest.

**Advances**

Section 6(f) deals with SIPC advances to trustees, subsection (1) relating to advances for customers' claims. To provide for prompt payment and to satisfy the net equities of customers of the debtor, SIPC is to advance to the trustee monies to satisfy claims in full of each customer, but not to exceed $50,000 for such customer. The amount advanced by reason of such claim to cash shall not exceed $20,000.[19]

A customer who holds accounts with the debtor in bona fide separate capacities is considered a different customer in each capacity. In October 1971, SIPC issued Rules Identifying Accounts of Separate Customers of SIPC Members.

No advance may be made by SIPC to the trustee to satisfy any claims of any customer who is a general partner, officer, or director of the debtor, the beneficial owner of 5 percent or more of any class of stock, or limited partner with a participation of 5 percent or more in net assets or net profits of debtor. No advance shall be made by SIPC to the trustee to satisfy the claims of any broker or dealer or bank unless such claims arise out of transactions for customers of such broker or dealer or bank, in which event, each

---

[18] "For purposes of [Section 6(d)] (but not for any other purpose of this Act) (i) the term 'customer' means any person other than a broker or dealer, and (ii) a customer shall be deemed to have had an interest in a transaction if a broker participating in the transaction was acting as agent for a customer, or if a dealer participating in the transaction held a customer's order which was to be executed as a part of the transaction," § 6(d). In other words, a customer is deemed to have an interest in a transaction if the broker or dealer was acting for a customer either in an agency or principal capacity.

[19] In other words, advances to cover customer claims may not exceed $50,000 but if the claim is one for cash the advance to cover customer claims may not exceed $20,000. The "filing date" (see page 18) is the critical date for computing "net equities."

such customer shall be deemed a separate customer of the debtor.

SIPC may advance to the trustee such monies as may be required to hire and pay all personnel that are necessary for the liquidation proceeding and to pay proper administrative expenses. SIPC is to advance to the trustee monies required to complete open contractual commitments.

## Claims Procedures

Section 6(e) of the Act prescribes that promptly after his appointment the trustee will publish a notice of the commencement of the proceedings in appropriate newspapers. As promptly as possible the trustee is to mail a copy of the notice to each of the customers of the debtor.

Except as the trustee may otherwise permit, claims for certain specifically identifiable property and certain claims payable from the single and separate fund are not to be paid, other than from the general estate of the debtor, unless filed within such period of time (not exceeding 60 days) as may be fixed by the court. No claim may be allowed which has not been filed within six months, except as provided in Section 57 of the Bankruptcy Act.

Section 6(g) of the Act requires the trustee to discharge promptly all obligations of the debtor to each of its customers relating to, or net equities based upon, securities or cash by the delivery of securities or the payment of cash to customers insofar as such obligations are ascertainable from the debtor's books and records, or are established to the satisfaction of the trustee.[20] The court is empowered to (1) authorize the trustee to make payment out of SIPC advances for claims for securities or cash; and (2) in respect of claims for securities, authorize the trustee to the greatest extent practicable to deliver, in payment of claims of customers for their equities based on securities held on the filing date in their accounts, securities of the same class and series of an issue ratably up to the respective amounts so held in those accounts. The amounts of such advances are indicated in Appendix I.

Any payment or delivery of property by the trustee may be conditioned upon requiring claimants to file in support of their claims appropriate receipts, sup-

porting affidavits, or properly executed assignments. Trustees have generally required copies of confirmations, cancelled checks, and statements of account in support of claims filed. Trustees have, from time to time, disallowed various claims. The nature of any additional data in support of claims has been a matter for the individual trustee to work out with the claimant, depending on the specific circumstances relating to the disallowance.

## SIPC's Subrogation and Recoupment Rights

SIPC is entitled to be repaid, in priority to all other claims payable from the single and separate fund, the amounts of all advances made by SIPC to the trustee to permit the completion of open contractual commitments and, except to the extent that other assets of the debtor may be available or as otherwise ordered by the court to be paid, all costs and expenses specified in clauses (1) and (2) of Section 64(a) of the Bankruptcy Act in priority to claims of customers against the single and separate fund.

The statute also provides that, to the extent that monies are advanced by SIPC to the trustee to pay claims of customers, SIPC shall be subrogated to the claims of such customers.

## Selection of Trustees

As of December 31, 1973, 94 trustees had been engaged in liquidations under the 1970 Act. In 17 instances a trustee who had substantially completed the payment of customer claims in a SIPC liquidation was designated as trustee in another case. It has been found that experience gained during one liquidation is helpful in a second liquidation.

In the selection of trustees and counsel, SIPC endeavors to find competent persons who have experience in broker-dealer operations, securities law and bankruptcy law. SIPC seeks recommendations from the SEC's regional offices, NASD district offices, recognized experts in the above areas, the judiciary and any others who may know of individuals competent to undertake these important assignments. SIPC has designated lawyers, accountants and retired businessmen to serve as trustees.

In the vast majority of the liquidations to date, the creditors and the debtors' estates have been well served by those holding office as trustees and counsel. SIPC recognizes the tremendous contribution they have made to the effective administration of debtors' estates pursuant to the provisions of the Act. There have been a few instances where trustees have not administered the estate with the vigor and dispatch which seemed called for. In these instances SIPC, through its staff accountants and lawyers, has sought to provide the necessary impetus to move the

---

[20] The statute contemplates that, in the interest of maintaining public confidence and minimizing the period during which investors' property is not available to them for investment or other purposes, customer claims should be paid promptly. SIPC believes that procedures now employed and being developed should result, in many cases, in the payment of non-disputed claims within a few months. However, SIPC also has taken the position that advances should not be made until the trustee and SIPC are satisfied that claims are bona fide and accurate. SIPC has followed a practice, therefore (which in no way is to be construed as a reflection on any trustee), of having its own accountants review customer claims and related debtor records.

23

proceeding along. It has been necessary for SIPC to ask for the resignation of one trustee and the appointment of a substitute trustee where it was determined to be impracticable to add the duties of trustee to an already overburdened personal work load.

## Characteristics of Firms Being Liquidated

Inquiries have been made of the trustees and the reports of the staffs of the self-regulatory organizations have been reviewed in an effort to determine the causes of failure of the debtor firms. Because investigations concerning alleged fraud and misconduct are continuing in a number of the cases, it is not believed advisable to publish the specific details of pending cases. However, some generalized reasons for these failures can be presented.

The matter of possible fraud and manipulation which has surfaced in many of these liquidations must be recognized as a major factor in these failures. Customers' securities and funds were fraudulently used. Sometimes nominee and discretionary accounts were improperly used. There were a number of market makers of highly speculative issues where prices were inflated and customer accounts manipulated to maintain these prices. Large concentrations of speculative issues in the trading accounts and imprudent trading activities contributed to other failures.

Inadequate, inaccurate and sometimes nonexistent books and records, as mentioned in SIPC's 1972 Annual Report, continue to be one of the most significant factors encountered in almost all of these cases. Records have been found in numerous instances that were falsified and customers' accounts manipulated by the principals and registered representatives. The progress of the liquidations has been impeded in varying degrees by false, incomplete or non-current records. Principals and operating management, in many cases, did not have the qualifications or experience needed to operate a general securities business.

The National Association of Securities Dealers in September, 1973, published for comment proposed new rules concerning standards for entry into the securities business. These proposed rules would: (a) impose a bar on officers, partners, principals, or controlling persons if those persons were previously involved in activities of a member which lead to the appointment of a SIPC trustee; (b) restrict an applicant's business activities in a manner consistent with its capabilities; (c) provide that each of two principals in an organization applying for membership in the Association have at least three years prior experience with a broker-dealer within the preceding five-year period; (d) require that at least one person be qualified as a "financial principal"; etc.[21] After considering the comments received on the proposals, an NASD committee had its proposed rules revised in approximately final form. SIPC was advised in March 1974 that the bylaws would be submitted to the NASD membership for vote in the near future.

Lack of adequate capital continues to be mentioned by the trustees as a major factor in firm failures. This condition results from a number of factors including too small a capital base, temporary illiquidity, over-commitment in particular issues, inability to absorb an adverse market movement, too rapid expansion, improper controls and operating losses due to reduced volume. There was over reliance on subordinated capital in a number of instances. In other cases, the subordination agreement was allegedly improperly executed, fraudulently induced or improperly withdrawn placing the firm in net capital violation.

Figures on initial capital were available for 93 of the 94 firms. The firm reporting the smallest initial capital began business in 1964 with $4,000. The firm with the largest initial capital started business in August 1965 with $2,119,000. Seventy-two of the 93 firms, or approximately 77% reported initial capital of less than $50,000; 51 of the 93 firms, or approximately 55%, reported initial capital of less than $25,000; and 20 reported initial capital of less than $10,000.

In 1972 the SEC amended its rule 15c3–1 to increase capital requirements for most brokers and dealers to a minimum of $25,000. Certain of the then existing brokers and dealers were permitted to gradually meet this requirement by having $15,000 minimum capital by July 31, 1973, and $25,000 minimum capital by July 31, 1974.[22]

Generally, the failures have resulted from various combinations of the conditions stated above. The frequency with which certain characteristics are present in the 94 firms are:

|  | Number of Firms |
| --- | --- |
| Poor books and records | 64 |
| Possible fraud or misconduct | 55 |
| Dealing in highly speculative issues | 38 |
| High operating costs—poor controls | 26 |
| Lack of knowledge of securities business | 22 |

[21] National Association of Securities Dealers, Inc. **Notice to Members: 73–63,** September 14, 1973, "Proposed New Entry Standards and Requirements for Registration of Principals and Representatives."

[22] SEC Release 9633, Securities and Exchange Act of 1934, June 14, 1972.

Of the firms in liquidation, 74 (79%) had been in business five years or less and 28 (30%) under 2 years.

SIPC has begun a project of reviewing the records and history of certain firms being liquidated under the Act. Experience to date suggests that it may not be possible in many instances to prepare a thorough analysis because of the absence or unreliability of records.

Data can be compiled on the qualifications, background, experience and training of personnel, types of securities handled, and other general aspects of a firm's operations as well as significant aspects of the liquidation process, procedures and results, including costs. In addition, although notable improvements have been made, study will continue of the surveillance systems employed by the self-regula-tory organizations and in particular the surveillance records for firms in financial difficulty.

The experience gained in working with the problems of failed broker-dealers and their customers will be of value in suggesting changes in the rules and procedures of the Commission or the self-regulatory organizations in relation to the reporting requirements and need for inspections or monitoring of SIPC member firms.

The long range objective of the regulatory and self-regulatory structure, in addition to upgrading the financial responsibility of SIPC member firms generally, is to identify and thereby, to the extent feasible, to reduce the number of failures and devise a system under which customer losses and SIPC's costs may be minimized.

25

# LITIGATION

Since the Second Annual Report, there have been important judicial decisions which interpreted and applied material aspects of the 1970 Act.

In the liquidation of Alan F. Hughes, Inc. the U.S. Court of Appeals for the Second Circuit sustained the denial of an application by the debtor's attorneys for legal fees for services in resisting the liquidation of the debtor under the 1970 Act. A petition for certiorari was filed in the Supreme Court but was denied. *SEC and SIPC v. Alan F. Hughes, Inc.,* 481 F. 2d 401 (2d Cir.), *cert. denied,* 94 S. Ct. 722 (1973).

The U.S. Court of Appeals for the Third Circuit made two important determinations in the liquidation of Aberdeen Securities, Inc. First, the court held that where a customer's securities are missing he is limited to a claim for the value of his net equity and cannot require the trustee to replace those securities by a purchase in the market under Section 6(d) of the 1970 Act. In so deciding the court concluded that Section 6(d), which requires the trustee to complete certain open contractual commitments, applies to commitments between the debtor and another broker-dealer. Second, the court held that the class action provisions of Rule 23 of the Federal Rules of Civil Procedure are not appropriate in a liquidation proceeding under the 1970 Act; it therefore rejected the claim of certain customers and their attorney that they were entitled to represent other customers similarly situated. Certiorari was denied by the Supreme Court. *SEC and SIPC v. Aberdeen Securities Co., Inc., et al.,* 480 F. 2d 1121 (3d Cir.), *cert. denied sub nom., Seligsohn v. SEC,* 94 S. Ct. 841 (1973).

The U. S. District Court for the Southern District of New York (Irving Ben Cooper, J.) decided two important questions in the liquidation of Packer, Wilbur & Co., Inc. A customer had placed a substantial purchase order with a broker-dealer. Five days later he ordered those shares delivered against payment to Packer, Wilbur, whose checks were later dishonored (insufficient funds). On the same day he instructed Packer, Wilbur to sell, which it did. The customer neither paid for these shares nor had a sufficient credit balance to pay for the purchase. In the Packer, Wilbur liquidation the customer claimed the sales price and the other broker-dealer claimed the amount of Packer, Wilbur's dishonored checks. The court held that the customer, a sophisticated trader, was guilty of a fraudulent and wilful violation of Regulation T, and was not entitled to protection from the SIPC fund which is intended to protect innocent customers. The court also denied

the other broker-dealer's claim because, although not guilty of bad faith, it had notice of the customer's unlawful scheme which it failed to prevent. In reaching both results the court stressed that traditional principles of equity applicable to bankruptcy proceedings, which also apply to liquidations under the 1970 Act, militate against the use of the SIPC fund to satisfy claims of this sort. The broker-dealer has an appeal pending before the U.S. Court of Appeals for the Second Circuit. *SEC and SIPC v. Packer, Wilbur and Co., Inc., et al.,* 362 F. Supp. 510 (S.D.N.Y. 1973).

In *SEC v. Guaranty Bond and Securities Corp., et al.,* (U.S.D.C. M.D. Tenn., Civil Action No. 5989), the SEC on December 22, 1970 filed a complaint against Guaranty Bond and Securities Corporation ("Guaranty Bond") and requested the court to enjoin that firm from further violations of the federal securities laws. On January 6, 1971 the court granted the injunction, having found that Guaranty Bond had violated the Commission's net capital rule. On January 29, 1971 a receiver was appointed. Not until May 17, 1971, after substantially completing the liquidation of Guaranty Bond, did the receiver make demand upon SIPC for 1970 Act protection. SIPC declined the receiver's demand, on the ground the 1970 Act was not intended to apply to this case under all the circumstances, including Guaranty Bond's hopeless insolvency before the effective date of the 1970 Act. The receiver petitioned the U.S. District Court for the Middle District of Tennessee, contending that SIPC should be required to enter the case and provide the protections of the 1970 Act. The Court held that, inasmuch as the firm has been both hopelessly insolvent and in net capital violation prior to the effective date of the Act, to grant the receiver's demand would be a retroactive application of the Act and a clear frustration of legislative intent. The receiver has an appeal pending before the U.S. Court of Appeals for the Sixth Circuit.

In *SEC and SIPC v. F. O. Baroff Co., Inc.,* an individual loaned securities to the debtor to help alleviate the latter's "cash bind." At the time of the loan, the debtor was authorized to hypothecate these securities to attempt to relieve the liquidity problem. Upon the debtor's failure the lender requested SIPC protection, claiming to be a "customer" within the definition of the statute. The trustee disallowed the claim on the ground that the lender was not a customer within the provisions of the 1970 Act, and on the ground that the lender had, in effect, made a

contribution to capital, a transaction expressly excluded from SIPC protection. He urged that the arrangement was not the type of transaction to which Congress intended to extend SIPC protection. The referee sustained the trustee's position, and his decision was affirmed by the U.S. District Court, Southern District of New York. The claimant has an appeal pending before the U.S. Court of Appeals for the Second Circuit.

In the liquidation of S. J. Salmon and Co., Inc. ("Salmon") Referee Asa Herzog handed down several important decisions. In one matter he held, among other things, that (1) since a subordinated lender of securities is not a "customer" with respect to such securities by express provision in the 1970 Act, such non-customer status applies equally to stock dividends received by the debtor on the subordinated securities (the subordination agreement was silent as to the treatment of such dividends); and (2) where a claim is based solely on a sale (delivery against payment) of securities to a debtor, and as of the filing date there was no delivery because payment was refused, the claimant was not a customer within the meaning of the 1970 Act. The latter conclusion is based upon the definition of "customer" in the 1970 Act coupled with the general purpose of the 1970 Act to protect persons who actually entrust property to a broker-dealer.

In a second matter in Salmon he held that claims of customers for damages arising out of misrepresentations by the debtor, or violations of a state securities law or SEC regulation, are not claims entitled to SIPC protection within the 1970 Act. The Referee again observed that such claims do not arise directly from the loss of cash or securities entrusted to a broker-dealer, and he therefore held that such claims are properly classified as claims only against the general estate.

In a third Salmon dispute Referee Herzog held that certain ostensible sales of securities which had been effected by the debtor just prior to the filing of SIPC's application for the appointment of a trustee should be reversed on the debtor's books before calculation of each customer's net equity. The Referee found that the transactions, all involving issues as to which the debtor was a market maker, were designed to place certain customers in a cash position so as to evade the impact on the value of the securities (and thus the customer's ultimate claim) which could be anticipated to result from SIPC's application. The Referee found that these transactions constituted transfer or obligations made or incurred with actual intent to hinder, delay or defraud existing or future creditors; and that they were fraudulent under applicable state law and sections of the Bankruptcy Act.

In a fourth Salmon matter Referee Herzog held that customers' claims, including claims for specifically identifiable property, are permanently barred if not filed within six months from the date fixed for the first meeting of creditors. In so holding he applied the provisions of Section 6(e) of the 1970 Act.

In the liquidation of Weis Securities Inc., a group of general creditors petitioned the court for recognition as a creditors' committee within the meaning of Section 44b of the Bankruptcy Act. In ordinary bankruptcy proceedings the creditors elect the trustee, and Section 44b provides a procedure whereby these creditors, through a committee, may consult and advise the trustee they elected. In contrast, under the 1970 Act SIPC is solely empowered to designate the trustee for appointment by the Court. Bankruptcy Judge Roy Babitt denied the creditors' petition holding that "the orientation of [section 44 of the Bankruptcy Act] is not compatible with the liquidation here."

# DISCIPLINARY AND CRIMINAL ACTIONS TAKEN AGAINST PRINCIPALS AND ASSOCIATES OF FIRMS PLACED IN LIQUIDATION

SIPC has forwarded the names of 580 principals and others associated with firms placed in liquidation through December 31, 1973, to the SEC for possible action under Section 10(b) of the Act.[23] The same names were submitted to the various securities exchanges and the NASD for review and to enable them to provide any information which would assist the SEC in any investigations. The trustees of the various firms being liquidated have also cooperated with the SEC by forwarding information about possible fraudulent activity or misconduct.

SEC investigations have resulted in 16 individuals being charged with criminal violations. Six individuals were also charged with criminal violations in the Supreme Court of the State of New York. Nine of the individuals involved in the Federal indictments have since been convicted.

The Commission barred 19 individuals from associating with any broker or dealer and the NASD has barred 30 individuals from associating with its membership. The 22 individuals charged with criminal offenses were principals or were associated with only ten of the 94 firms under liquidation as of December 31, 1973, whereas fraud and fraud-related activities were apparent in many of those firms. SEC investigations now being conducted may well increase the number of indictments significantly.

Only 39 of the firms being liquidated were represented by the 49 individuals barred. Proceedings now in progress are likely to increase that number.

---

[23] Section 10(b) of the Act provides as follows:
"Engaging in Business After Appointment of Trustee.— It shall be unlawful for any broker or dealer for whom a trustee has been appointed pursuant to this Act to engage thereafter in business as a broker or dealer, unless the Commission otherwise determines in the public interest. The Commission may by order bar or suspend for any period, any officer, director, general partner, owner of 10 per centum or more of the voting securities, or controlling person of any broker or dealer for whom a trustee has been appointed pursuant to this Act from being or becoming associated with a broker or dealer, if after appropriate notice and opportunity for hearing, the Commission shall determine such bar or suspension to be in the public interest."

# ROLE OF SIPC IN RELATION TO SECURITIES INDUSTRY REGULATION AND REPORTING

Section 9 of the 1970 Act was designed to achieve, over a period of time, an upgrading of the financial practices and financial responsibility of members of the securities industry.

Section 9(c) provides that where a member of SIPC is a member of more than one self-regulatory organization, SIPC shall designate one of them to examine the member for compliance with applicable financial responsibility rules. After consultation with the several self-regulatory authorities and effective July 1, 1973, designations of examining authorities were made where SIPC members were members of more than one self-regulatory organization. This designation of examining authorities was intended to eliminate duplicative examinations of brokers and dealers and to make the utilization of the resources of the examining authorities more effective.

The New York Stock Exchange, Inc., was designated as the examining authority for all its members. The American Stock Exchange, Inc., was designated as examining authority for all its members who are not members of the New York Stock Exchange, Inc. In addition, duplicate examinations of approximately 450 members conducted by the Boston Stock Exchange, Midwest Stock Exchange, Inc., PBW Stock Exchange, Inc., Pacific Stock Exchange, Inc., and the National Association of Securities Dealers, Inc. were eliminated by designating one of the foregoing as the examining authority.

SIPC utilized its experience in maintaining current records of changes in address and affiliations with self-regulatory organizations of its members for assessment purposes to work closely with the Commission in the formulation of the Commission's proposed Rule 17a–19 and related Form X–17A–19, concerning changes in status of its members, which were recently distributed for comment.

In accordance with the responsibility assigned by Section 9(e) of the Act,[24] SIPC sponsored a conference on September 20 and 21 in Washington, D.C. Those attending included representatives of the American Stock Exchange, the Boston Stock Exchange, the Chicago Board Options Exchange, the Midwest Stock Exchange, the National Association of Securities Dealers, the New York Stock Exchange, the Pacific Stock Exchange, the PBW Stock Exchange, the Securities and Exchange Commission, and SIPC. Examination procedures and other matters of common interest were discussed and substantial progress was made toward compliance with the statutory directive.

The Commission has addressed itself to the problems of duplicative reports and the need for standardized reports. SIPC has commented favorably on the Commission's objectives and supports the Commission, the self-regulatory organizations, and the industry in this important development.

---

[24] Subsection (e) of Section 9 specifies that "SIPC shall consult and cooperate with the self-regulatory organizations toward the end:

(1) that there may be developed and carried into effect procedures reasonably designed to detect approaching financial difficulty upon the part of any member of SIPC;

(2) that, as nearly as may be practicable, examinations to ascertain whether members of SIPC are in compliance with applicable financial responsibility rules will be conducted by the self-regulatory organizations under appropriate standards (both as to method and scope) and reports of such examinations will, where appropriate, be standard in form; and

(3) that, as frequently as may be practicable under the circumstances, each member of SIPC will file financial information with, and be examined by, the self-regulatory organization which is the examining authority for such member."

# ADVERTISING OF SIPC MEMBERSHIP AND CUSTOMER PROTECTION

In 1971 the SIPC Board of Directors adopted Section 4 of Article II of the SIPC bylaws entitled "Advertisement of Membership," which established an official symbol and a brief statement of SIPC membership as the sole means by which SIPC members could advertise their membership.

In January 1974, in response to requests of SIPC members, the SIPC Board amended this bylaw as follows (new section underscored):

"Section 4.   Advertisement of Membership

Pursuant to Section 11(e) of the Act, this Section provides for the official symbol, the official advertising statement, and the official explanatory statement which members of SIPC may display and use either separately or together.

(a) The official symbol, which may be displayed in a variety of sizes, colors or materials shall be of the following design:



When the symbol is so reduced in size that the words "Member" and "Securities Investor Protection Corporation" are illegible, these words may be omitted.

(b) The official advertising statement shall be in substance as follows: "Member of the Securities Investor Protection Corporation." The word "the" or the words "of the" may be omitted. The words "This firm is a"

may be added before the word "member." The short title "Member of SIPC" or "Member SIPC" may be used by members at their option as the official advertising statement.

(c) The official explanatory statement shall be: "A member of the Securities Investor Protection Corporation. Created by Congress, SIPC provides protection for securities customers of its members. In the event of liquidation by a SIPC designated trustee, all specifically identifiable securities are returned to customers. In addition, SIPC enables the trustee to pay unsatisfied claims to each customer up to $50,000 with a limitation of $20,000 for claims for cash balances. A brochure further explaining operations of SIPC is available on request."

(d) No other sign, symbol or statement relating to the protection to customers or to their accounts, or any other protections, afforded under the Act may be displayed by any member or included in any of its advertisements.

(e) Advertisements relating primarily to commodities or commodities futures business may not include any reference to SIPC."

The brochure referred to is entitled "An Explanation of the Securities Investor Protection Act of 1970." Originally prepared by the SIPC staff in 1971, a recently revised format should be available at the time this annual report is issued. The brochure and advertising materials may be purchased by SIPC members from the National Association of Securities Dealers and the Securities Industry Association. Prices approximate cost.

# ADMINISTRATION

## Directors

SIPC is governed by a Board of Directors consisting of seven members. Two directors are public members appointed by the President of the United States, one of whom is designated by the President as Chairman and the other as Vice-Chairman. The Chairman is also the chief executive officer of the Corporation. Three members of the Board are appointed by the President from the securities industry. An appointee named by the President requires confirmation by the U. S. Senate. One member is appointed by the Secretary of the Treasury from among officers and employees of the Department of the Treasury and one director is appointed by the Federal Reserve Board from among its officers and employees.

## Personnel

SIPC continues the policy, adopted in its first year of operations, of providing a specialized, permanent staff and employing professional help on a consulting or temporary basis when necessary. SIPC relies on local legal and accounting firms to represent SIPC at distant points when required.

The Vice President—Finance, Lloyd W. McChesney, is the principal financial officer of the Corporation. He is a Certified Public Accountant and a former chief examiner of the New York Stock Exchange, Inc. He has held this position since March, 1971.

The General Counsel, Theodore H. Focht, is the principal legal officer of the Corporation, who previously had been associated with the Securities and Exchange Commission, the University of Connecticut and the House Interstate and Foreign Commerce Committee. He has held this position since March, 1971.

Wilfred R. Caron, the Associate General Counsel, joined SIPC in March 1972. In addition to nine years in the private practice of law, he had previously served as Assistant General Counsel to a publicly-held company, Special Assistant Attorney General of New York, and law assistant to the Chief Judge of the N.Y. Court of Appeals.

Eugene K. Snyder, a former Dean of the Georgetown University School of Business Administration, an attorney and a Certified Public Accountant, joined SIPC during May, 1973, and in September, 1973, was appointed Assistant Vice President—Finance.

Dr. John L. Peterman, formerly Associate Professor of Economics at the University of Chicago Law School joined SIPC in July, 1973, and was appointed to the position of Economist.

The Accounting and Assessment unit has added several staff members to further improve the research, updating and control of membership and assessment records and to handle the review of accountants' reports on SIPC assessments received pursuant to Rule 17a5(b)(4) of the 1934 Act. The Operations and Examination unit provides professional advice and assistance to the trustees and their staffs in the financial and operational aspects of the administration of debtors' estates. Members of the financial staff review proposed distributions to customers and broker-dealers and help resolve problems relating to erroneous claims, contested claims and claims not covered by the Act. The financial staff also maintains records of data from reports received by SIPC from self-regulatory organizations which provide SIPC with early warnings of member firms in, or approaching, financial difficulty.

Several attorneys joined SIPC during the year to handle the substantial increase in legal work involved in monitoring the cases, assisting the trustees with various questions arising under, the Act and the securities laws generally and preparing legal material for litigation in which SIPC had an interest.

At the end of December, 1973, the staff numbered 46. Eight were attorneys; 14 had accounting, financial or investigative backgrounds, 11 of whom had had experience in the brokerage industry. The professional staff have the support of an excellent secretarial and clerical staff.

## Facilities

SIPC moved to its present location in September, 1973, in order to acquire additional space which was not available in its prior location.

## SIPC Expenses

Expenses incurred during 1973 aggregated $36,885,972, including $35,461,348 provision for possible losses on advances to trustees and $1,424,624 of administrative expenses. The administrative expenses for 1973 were less than the interest received on investments in U. S. Government obligations.

The total expenses of the Corporation from December 30, 1970 (inception) through December 31, 1973, amounted to $47,517,125, including $44,046,033 provision for possible losses on advances to trustees and $3,471,092 administrative expenses. Such administrative expenses included commitment fees for the confirmed lines of credit which aggregated $769,375. Appendix II includes detailed classifications of expenses for 1971, 1972 and 1973.

# FINANCIAL STATEMENTS

---

## ACCOUNTANTS' REPORT

To the Board of Directors
    Securities Investor Protection Corporation
    Washington, D.C.

We have examined the statement of financial condition of Securities Investor Protection Corporation as at December 31, 1973, and the related statements of operations and fund balance and of changes in financial position for the year then ended. Our examination was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances. The financial statements as at December 31, 1972 and for the year then ended were examined by other independent public accountants; their report was qualified in a manner similar to that below.

As set forth in Note 5 to the financial statements, the liquidation costs to be incurred subsequent to December 31, 1973 for liquidations commenced under the Act on or prior to such date are not presently determinable; accordingly, no amounts have been provided therefor in the accompanying financial statements.

In our opinion, except for the matter discussed above, the aforementioned financial statements present fairly the financial position of Securities Investor Protection Corporation at December 31, 1973, and the results of its operations and the changes in its financial position for the year then ended, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year.

                                              S. D. LEIDESDORF & CO.

New York, N. Y.
February 28, 1974

---

32

## SECURITIES INVESTOR PROTECTION CORPORATION
### STATEMENT OF FINANCIAL CONDITION
#### December 31, 1973 and 1972

|  | 1973 | 1972 |
|---|---|---|
| **ASSETS** | | |
| Cash: | | |
| Operating and collection accounts ........................... | $ 72,253 | $ 19,954 |
| Compensating balances (Note 2) ........................... | 4,500,000 | 5,500,000 |
|  | 4,572,253 | 5,519,954 |
| Estimated member assessments receivable (Note 3) ............... | 6,000,000 | 7,310,000 |
| U.S. Government obligations, at amortized cost and accrued interest receivable (1973—$75,617, 1972—$189,837); (approximate market 1973—$35,101,000, 1972—$44,376,000) .................... | 35,213,379 | 44,458,298 |
| Furniture and equipment, at cost, less accumulated depreciation (1973—$10,753, 1972—$4,135), and leasehold improvements at amortized cost .......................................... | 67,842 | 76,027 |
| Advances to trustees for liquidations in progress, less allowance for possible losses (1973—$43,266,838, 1972—$8,584,684) (Note 5) .. | — | — |
| Other .................................................. | 1,453 | 1,219 |
|  | $45,854,927 | $57,365,498 |
| **LIABILITIES AND FUND BALANCE** | | |
| Advances to trustees—in process (Note 5) ........................ | $ 371,094 | $ 579,659 |
| Accounts payable and accrued expenses ........................ | 73,320 | 130,343 |
|  | 444,414 | 710,002 |
| Commitments (Notes 2 and 5) | | |
| Fund balance ......................................... | 45,410,513 | 56,655,496 |
|  | $45,854,927 | $57,365,498 |

### STATEMENT OF OPERATIONS AND FUND BALANCE
#### for the years ended December 31, 1973 and 1972

|  | 1973 | 1972 |
|---|---|---|
| Revenues: | | |
| Member assessments (Notes 3 and 4) ......................... | $22,858,920 | $32,332,156 |
| Interest on U.S. Government obligations ....................... | 2,771,131 | 1,674,257 |
| Interest on assessments ................................. | 10,938 | — |
|  | 25,640,989 | 34,006,413 |
| Expenses: | | |
| Administrative: | | |
| Salaries and employee benefits ........................... | 799,540 | 477,462 |
| Assessment collection direct costs ........................ | 13,916 | 24,047 |
| Credit agreement commitment fee (Note 2) ................. | 240,625 | 292,223 |
| Legal fees ......................................... | 44,388 | 76,574 |
| Accounting fees ...................................... | 20,313 | 70,169 |
| Other ............................................. | 305,842 | 202,154 |
|  | 1,424,624 | 1,142,629 |
| Provision for possible losses on advances to trustees (Note 5) ....... | 35,461,348 | 8,108,884 |
|  | 36,885,972 | 9,251,513 |
| Excess revenues (expenses) ................................. | (11,244,983) | 24,754,900 |
| Fund balance, beginning of year ............................. | 56,655,496 | 31,900,596 |
| Fund balance, end of year ................................. | $45,410,513 | $56,655,496 |

The accompanying notes are an integral part of the financial statements

## STATEMENT OF CHANGES IN FINANCIAL POSITION
### for the years ended December 31, 1973 and 1972

|  | 1973 | 1972 |
|---|---|---|
|  |  | (Restated to conform with 1973 classifications) |
| **Cash provided from (used in) operations:** |  |  |
| Provided: |  |  |
| Member assessments .............................. | $24,168,920 | $30,732,156 |
| Interest on U.S. Government obligations .............. | 2,461,070 | 1,187,926 |
| Interest on assessments .......................... | 10,938 | — |
|  | 26,640,928 | 31,920,082 |
| Used: |  |  |
| Administrative expenses .......................... | (1,445,320) | (1,072,724) |
| Advances to trustees ............................. | (35,669,913) | (7,815,232) |
|  | (37,115,233) | (8,887,956) |
|  | (10,474,305) | 23,032,126 |
| **Other sources (and uses) of cash:** |  |  |
| U.S. Government obligations: |  |  |
| Purchases, net ................................ | — | (24,119,907) |
| Sales, net .................................... | 9,554,980 | — |
| Miscellaneous, net .................................. | (28,376) | (45,099) |
| Decrease in cash ................................. | (947,701) | (1,132,880) |
| Cash, beginning of year .............................. | 5,519,954 | 6,652,834 |
| Cash, end of year .................................. | $ 4,572,253 | $ 5,519,954 |

The accompanying notes are an integral part of the financial statements

## NOTES TO FINANCIAL STATEMENTS

### 1. Organization

The Securities Investor Protection Corporation (SIPC) was created by an Act of Congress on December 30, 1970, for the purpose of providing protection to customers of brokers or dealers. SIPC is a non-profit membership corporation and shall have succession until dissolved by an Act of Congress. Its members include all persons registered as brokers or dealers under Section 15(b) of the Securities Exchange Act of 1934 and all persons who are members of a national securities exchange except for those persons excluded under the Act.

### 2. Lines of credit

Under a provision of the 1970 Act, SIPC entered into an agreement dated April 14, 1971, and expiring on October 13, 1976, with certain banks which extended confirmed lines of credit in an aggregate amount of $65,000,000. A 10/65th portion of the original commitment, to the extent not theretofore availed of, expires annually on the first day of April.

Accordingly, at December 31, 1973 SIPC has confirmed lines of credit with banks in an aggregate amount of $45,000,000. The Act requires a phase out of confirmed lines of credit when the balance of the "SIPC Fund" (as defined by the Act) aggregates $150,000,000. At December 31, 1973 and 1972 the "SIPC Fund" was as follows:

|  | 1973 | 1972 |
|---|---|---|
| Cash | $ 4,572,253 | $ 5,519,954 |
| U. S. Government obligations, at amortized cost and accrued interest | 35,213,379 | 44,458,298 |
| Confirmed lines of credit | 45,000,000 | 55,000,000 |
|  | $84,785,632 | $104,978,252 |

Pursuant to the April 14, 1971 agreement, SIPC has agreed to maintain compensating cash balances

equal to 10% of the confirmed lines of credit and to pay a fee of ½ of 1% per annum on the average daily unused portion thereof to each bank.

In the event that the SIPC fund is or may reasonably appear to be insufficient for the purposes of the Act, the Securities and Exchange Commission is authorized to make loans to SIPC and, in that connection, the Commission is authorized to issue to the Secretary of the Treasury, notes or other obligations in an aggregate amount not to exceed $1,000,000,000.

## 3. Estimated member assessments receivable and assessment revenues

Annual general assessments are payable quarterly at the rate of ½ of 1% per annum on gross revenues from the securities business. SIPC members are allowed to make estimated quarterly payments based upon the previous year's gross revenues. Annual general assessment reconciliation forms must be filed and underpayments for any year are due within 120 days after December 31. Overpayments for any year may be credited against future assessments.

Effective January 1, 1972, SIPC changed its method of accruing member assessments revenue whereby member assessments receivable at December 31, 1972 and subsequent years are based on estimated gross revenues of members for the respective calendar years. Had this method of accruing member assessments been in effect at December 31, 1971, the excess of revenues over expenses for 1972 would have been reduced and the fund balance at the beginning of 1972 increased by $4,143,321.

## 4. Contribution from a prior trust

In 1971, $3,011,925 was contributed from a special trust fund of the American Stock Exchange, Inc., members of which shall be entitled to a reduction in amounts payable on future assessments, as provided in the Act. An Exchange plan for granting reductions in assessments to SIPC members who are members of that exchange as of January 1, 1974, was approved by the Board of Directors on January 16, 1974 and it was forwarded to the Securities and Exchange Commission for approval pursuant to Section 4(e)(1) of the Act. Under the plan approximately 67 percent ($2,000,000) of the $3,011,025 would be used to reduce member assessments otherwise due for the year 1974 and substantially all of the balance would be used during 1975.

## 5. Advances to trustees and commitments

Trustees had been appointed under the Act for ninety-four SIPC member firms as of December 31, 1973, 30 of which were appointed during 1973. As of December 31, 1973 six of the liquidations had been completed and the trustees discharged or partially discharged by the courts. Because of inadequate and incomplete books and records of many of the firms, data presently available from the trustees, where liquidations have not been completed, are inconclusive and no determination of the amounts which will be required for advances to satisfy customer claims, or for the liquidation expenses which will be incurred in these cases, is possible at this time; accordingly, no provision has been made in the accompanying financial statements therefor.

The amounts advanced in connection with the liquidations in progress represent net amounts disbursed and amounts currently payable. SIPC has adopted the policy of providing a 100% allowance for all advances to trustees. Amounts of unexpended advances, as well as any expended advances for which SIPC has subrogated rights, which may be recovered by trustees through legal proceedings, are returnable to SIPC and are applied upon receipt as a reduction of the advances to trustees and the allowance for possible losses on advances. Amounts recovered in 1973 and 1972 were insignificant. Amounts which subsequently may be returned are not presently determinable.

## 6. Retirement Plan

SIPC has a voluntary, contributory retirement plan for employees. SIPC's policy is to fund pension expense accrued. Pension expense for 1973 was $44,700; the expense for 1972 was $43,400 including all prior service costs which approximated $25,000.

APPENDIX I

# FIRMS PLACED IN LIQUIDATION UNDER THE 1970 ACT
### PART A: Customer Claims and Distributions Being Processed By Trustees

| Company and Trustee By Date of Appointment | Date Registered as Broker-Dealer | Filing Date | Trustee Appointed | Customers To Whom Notices and Claim Forms Were Mailed | Numb Custo Clai Receiv |
|---|---|---|---|---|---|
| **Fourth Quarter, 1971** | | | | | |
| International Funding Securities, Inc.* Long Beach, Calif. (Sheldon Jaffe, Esq.) | 3/31/62 | 6/ 3/71 | 12/ 6/71 | 16,000 | ⑨ |
| | *Customers of Diversified Planning Corp. included in this liquidation by court order dated November 16, 1973. | | | | |
| **First Quarter, 1973** | | | | | |
| Provident Securities, Inc., New York, New York (Charles Seligson, Esq.) | 3/16/69 | 1/23/73 | 2/ 2/73 | 2,100 | ⑧ |
| **Second Quarter, 1973** | | | | | |
| J. Shapiro Co., Minneapolis, Minnesota (William T. Dolan, Esq.) | 7/31/68 | 4/13/73 | 4/13/73 | 32,730 | 11,5 |
| Oxford Securities, Ltd., New York, New York (Salvatore A. Adorno, Esq.) | 12/ 8/71 | 1/19/73 | 4/17/73 | 2,100 | 1 |
| R. S. Emerson Co., Agana, Guam (Hyman B. Rosenzweig) | 6/11/67 | 5/18/72 | 6/22/73 | 200 | |
| **Third Quarter, 1973** | | | | | |
| Klee & Company, Inc., Cleveland, Ohio (William M. Nelson, Jr., Esq.) | 8/18/71 | 8/10/73 | 8/20/73 | 1,400 | 2 |
| Security Planning, Inc., Long Beach, Calif. (Sheldon M. Jaffe, Esq.) | 8/23/66 | 5/30/73 | 8/27/73 | 168 | |
| Duvest Corporation, Jersey City, New Jersey (Ralph M. Lowenbach, Esq.) | 9/13/72 | 9/ 4/73 | 9/ 4/73 | 1,000 | 1 |
| Associated Underwriters, Inc., Salt Lake City, Utah (Richard L. Blanck, Esq.) | 7/ 8/70 | 9/11/73 | 9/11/73 10/23/73 Successor trustee | 150 | |
| Busec Securities Corp., Buena Park, Calif. (Harold L. Orchid, Esq.) | 8/10/69 | 9/13/73 | 9/14/73 | 575 | |
| TOTAL 10 FIRMS:  PART A | | | | 56,423 | 14,1 |

† Some of these claims were erroneous or disallowed.

**DECEMBER 31, 1973**

| Distributions of Properties Held by Trustees | | | | SIPC Advances to Trustees | | | | | |
| Specifically Identifiable | | Single and Separate Fund | | | | | | | |
| Value | Number Customers | Value | Number Customers | Total Advanced | Administration Expenses | Open Contractual Commitments | Cash in Lieu of Securities | Free Credit Balances | Number of Customers |
|---|---|---|---|---|---|---|---|---|---|
| 16,761 | 63 | | | $ 483,646 | $ 95,539 | | $ 246,324 | $ 141,783 | 503 |
| 191,988 | 645 | | | 411,036 | 109,949 | | 77,292 | 223,795 | 441 |
| 15,298,368 | 7,678 | | | 1,644,063 | 10,000 | | 1,029,502 | 604,561 | 2,799 |
| 22,520 | 56 | | | 20,420 | | | 17,620 | 2,800 | 26 |
| 322,931 | 257 | 20,336 | 25 | 32,659 | 8,468 | $6,984 | 4,557 | 12,650 | 27 |
| 181 | 4 | | | 51,375 | 21,488 | | 26,701 | 3,186 | 54 |
| 43,064 | 88 | 22,631 | 42 | 18,750 | | | 6,605 | 12,145 | 19 |
| | | | | 1,205 | 1,205 | | | | |
| 5,975 | 4 | | | 31,007 | 2,661 | | 28,286 | 60 | 35 |
| 15,901,788 | 8,795 | $42,967 | 67 | $2,694,161 | $249,310 | $6,984 | $1,436,887 | $1,000,980 | 3,904 |

37

APPENDIX I

# FIRMS PLACED IN LIQUIDATION UNDER THE 1970 ACT

**PART B:** Substantially All Customer Claims (Except Problem Claims) Have Been Satisfied

| Company and Trustee By Date of Appointment | Date Registered as Broker-Dealer | Filing Date | Trustee Appointed | Customers To Whom Notices and Claim Forms Were Mailed | Number Customer Claim Receiv |
|---|---|---|---|---|---|
| **Second Quarter 1971** | | | | | |
| Howard Carlton, Inc., New York, New York (Clark J. Gurney, Esq.) | 5/31/69 | 2/ 1/71 | 4/ 8/71 | 350 | 12: |
| Joseph Garofalo d/b/a Josephson Company New York, New York (Sidney H. Leeds) | 12/ 8/68 | 3/ 5/71 | 4/23/71 | 550 | 3: |
| Stan Ingram & Associates, Los Angeles, California (Harold L. Orchid, Esq.) | 12/22/68 | 2/22/71 | 6/ 8/71 | 400 | 4: |
| First Investment Savings Corp., Birmingham, Alabama (William Green, Esq.) | 3/16/56 | 6/17/71 | 6/18/71 | 204 | 19( |
| Packer, Wilbur & Co., Inc., New York, New York (Martin R. Gold, Esq.) | 6/22/61 | 3/25/71 | 6/21/71 | 475 | 25( |
| **Third Quarter 1971** | | | | | |
| John, Edward & Co., Inc., Lebanon, New Hampshire (George L. Manias, Esq.) | 1/17/68 | 3/ 5/71 | 7/ 1/71 | 1,800 | 18: |
| Karle R. Berglund d/b/a Colonial Investment Securities, Worcester, Massachusetts (Gordon A. Martin, Esq.) | 12/13/68 | 1/12/71 | 8/ 6/71 | 48 | 2: |
| Security Planners, Ltd., Boston, Massachusetts (William C. Foehl, Esq.) | 2/12/68 | 3/18/71 | 8/ 6/71 | 300 | 15( |
| Barnes, Ryder, Waddles and Co., Inc. Wichita, Kansas (Thomas R. Brunner) | 11/13/69 | 6/25/71 | 8/18/71 | 2,782 | 1,17! |
| Securities Brokers Associates, Inc. Securities Brokers Investment, Inc. Fort Lauderdale, Florida (Carmen A. Accordino, Esq.) | 2/26/69 } 3/26/70 | 8/13/71 | 8/20/71 | 42 | 4: |
| **Fourth Quarter 1971** | | | | | |
| Buttonwood Securities, Inc., LaJolla, California (Edwin M. Lamb) | 4/15/70 | 9/ 8/71 | 10/18/71 | 3,780 | 1,50: |
| Commonwealth Securities Corp., Nashville, Tennessee (Fred D. Bryan) | 12/ 1/62 | 8/25/71 | 10/22/71 | 4,100 | 31! |
| Financial Equities, Ltd., Los Angeles, California (Gilbert Robinson, Esq.) | 3/26/70 | 9/17/71 | 11/ 8/71 | 4,000 | 66! |
| Aberdeen Securities Co., Inc., Wilmington, Delaware (Claude P. Hudson) | 5/14/69 | 9/15/71 | 11/22/71 | 1,800 | 28: |
| Baron & Co., Inc., Jersey City, New Jersey (Mark F. Hughes, Jr., Esq.) | 9/26/69 | 11/22/71 | 12/ 1/71 | 275 | 18: |
| Rodney B. Price & Co., Inc., Atlanta, Georgia (Robert E. Hicks, Esq.) | 4/29/70 | 12/ 7/71 | 12/ 7/71 | 891 | 5! |
| Securities Northwest, Inc., Seattle, Washington (George M. McBroom, Esq.) | 6/23/71 | 12/ 7/71 | 12/ 7/71 | 940 | 117 |

38

**DECEMBER 31, 1973**

Distributions of Properties Held by Trustees

| Specifically Identifiable | | Single and Separate Fund | | SIPC Advances to Trustees | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Value | Number Customers | Value | Number Customers | Total Advanced | Administration Expenses | Open Contractual Commitments | Cash in Lieu of Securities | Free Credit Balances | Number of Customers |
| 157,300 | 44 | | | $ 19,290 | $ 7,299 | $ 8,225 | $ 251 | $ 3,515 | 9 |
| | | | | 76,936 | 12,970 | | 36,192 | 27,774 | 37 |
| 3,293 | 9 | $ 500 | 2 | 46,229 | 3,777 | | 33,382 | 9,070 | 37 |
| 81,574 | 185 | | | 67,028 | 33,566 | 2,380 | 478 | 30,604 | 47 |
| 14,728 | 18 | 15,812 | 13 | 401,482 | 30,562 | | 268,598 | 102,322 | 174 |
| 1,484 | 2 | 10,270 | 12 | 97,621 | 21,884 | | 14,382 | 61,355 | 75 |
| 11,500 | 9 | | | 67,232 | 47,244 | | | 19,988 | 5 |
| | | | | 169,560 | | | 148,172 | 21,388 | 107 |
| 188,246 | 210 | 315,588 | 725 | 287,594 | | | 236,837 | 50,757 | 552 |
| | | 16,265 | 11 | 144,991 | | | 127,783 | 17,208 | 34 |
| 680,406 | 643 | 318,040 | 603 | 461,545 | 312,536 | | 60,773 | 88,236 | 335 |
| 5,683 | 15 | 5,425 | 54 | 56,746 | 4,802 | | 38,964 | 12,980 | 157 |
| 313,960 | 258 | 99,852 | 244 | 154,094 | 10,603 | | 105,603 | 37,888 | 269 |
| 13,013 | 33 | 40,558 | 107 | 115,319 | | 23,022 | 75,295 | 17,002 | 158 |
| 65,605 | 124 | 7,563 | 51 | 43,651 | 11,779 | | 1,683 | 30,189 | 79 |
| 29,100 | 10 | 5,846 | 28 | 63,353 | | | 30,113 | 33,240 | 33 |
| 69,581 | 18 | 23,116 | 7 | 66,856 | | 31,823 | 1,875 | 33,158 | 47 |

APPENDIX I

# FIRMS PLACED IN LIQUIDATION UNDER THE 1970 ACT

**PART B: Substantially All Customer Claims (Except Problem Claims) Have Been Satisfied**

| Company and Trustee By Date of Appointment | Date Registered as Broker-Dealer | Filing Date | Trustee Appointed | Customers To Whom Notices and Claim Forms Were Mailed | Number Custom Claims Receive |
|---|---|---|---|---|---|
| **Fourth Quarter 1971 (continued)** | | | | | |
| E. P. Seggos & Co., Inc., New York, New York (Clark J. Gurney, Esq.) | 2/6/70 | 12/13/71 | 12/14/71 | 450 | 250 |
| Kelly, Andrews & Bradley, Inc., New York New York (Edwin L. Gasperini, Esq.) | 8/10/68 | 12/15/71 | 12/21/71 | 1,327 | 205 |
| **First Quarter 1972** | | | | | |
| Mid-Continent Securities Co., Inc., Wichita, Kansas (Thomas R. Brunner) | 12/13/50 | 1/ 3/72 | 1/ 3/72 | 1,191 | 588 |
| F. O. Baroff Company, Inc., New York, New York (Edward S. Davis, Esq.) | 10/29/66 | 1/ 6/72 | 1/ 6/72 | 4,225 | 1,591 |
| A. H. Simon Securities, New York, New York (Winthrop J. Allegaert, Esq.) | 9/14/70 | 1/17/72 | 1/17/72 | 94 | 45 |
| Quodar Equities, Ltd., Great Neck, New York (Edward J. Rosner, Esq.) | 12/30/70 | 1/14/72 | 1/21/72 | 530 | 168 |
| Murray, Lind & Co., Inc., Jersey City, New Jersey (Mark F. Hughes, Jr., Esq.) | 5/23/69 | 1/14/72 | 1/24/72 | 1,186 | 749 |
| S. J. Salmon & Co., Inc., New York, New York (John C. Fontaine, Esq.) | 8/17/68 | 2/ 7/72 | 2/ 7/72 | 3,774 | 1,720 |
| JNT Investors, Inc., New York, New York (Jerry B. Klein) | 6/17/70 | 2/15/72 | 2/15/72 | 1,572 | 938 |
| C. H. Wagner & Co., Inc., Boston, Massachusetts (Thomas J. Carens, Esq.) | 6/23/69 | 2/22/72 | 2/28/72 | 14,000 | 839 |
| Charisma Securities Corp., New York, New York (Edwin L. Gasperini, Esq.) | 7/ 4/69 | 3/ 8/72 | 3/ 9/72 | 804 | 34 |
| J. R. Radin & Co. Inc., New York, New York (William W. Golub, Esq.) | 3/30/70 | 3/ 9/72 | 3/ 9/72 | 1,190 | 384 |
| Robert E. Wick d/b/a Robert E. Wick Company, Oak Park, Illinois (J. Kirk Windle, Esq.) | 1/15/70 | 3/14/72 | 3/14/72 | 49 | 22 |
| Barrett & Company, Inc., Minneapolis, Minnesota (Lawrence Perlman, Esq.) | 5/17/71 | 3/29/72 | 3/29/72 | 558 | 296 |
| White and Co., St. Louis, Missouri (Hugh S. Hauck) | 3/ 5/47 | 3/23/72 | 3/30/72 | 150 | 59 |
| **Second Quarter 1972** | | | | | |
| Marrocco & Co., Inc., Brookline, Massachusetts (Michael M. Marx) | 9/ 9/70 | 4/19/72 | 4/19/72 | 457 | 45 |
| Parker, England & Co., Inc., Hicksville, New York (John R. Dunne, Esq.) | 10/23/68 | 11/12/71 | 4/20/72 | 600 | 230 |
| John E. Samuel & Co., White Plains, New York (Henry J. Smith, Esq.) | 5/ 9/62 | 2/ 3/72 | 5/30/72 | 350 | 10 |

40

Distributions of Properties Held by Trustees

| Specifically Identifiable | | Single and Separate Fund | | SIPC Advances to Trustees | | | | | |
| Value | Number Customers | Value | Number Customers | Total Advanced | Administration Expenses | Open Contractual Commitments | Cash in Lieu of Securities | Free Credit Balances | Number of Customers |
|---|---|---|---|---|---|---|---|---|---|
| 53,100 | 145 | $ 92,000 | 141 | $ 50,102 | $ 2,500 | | $ 27,388 | $ 20,214 | 65 |
| 23,050 | 54 | 13,249 | 34 | 146,570 | 77,684 | | 12,713 | 56,173 | 57 |
| 93,215 | 126 | 51,231 | 329 | 889,142 | 50 | | 752,457 | 136,635 | 353 |
| 1,275,540 | 1,205 | | | 1,125,745 | | $137,790 | 752,475 | 235,480 | 1,258 |
| 27,355 | 37 | 16,713 | 15 | 39,818 | 10,137 | | 12,995 | 16,686 | 21 |
| 3,070 | 15 | | | 226,898 | 9,052 | 125 | 70,194 | 147,527 | 126 |
| 203,000 | 498 | 196,000 | 353 | 171,666 | 69,453 | 4,426 | 21,950 | 75,837 | 315 |
| 2,441,851 | 1,630 | 199,916 | 363 | 1,373,708 | 311,525 | 205,054 | 135,447 | 721,682 | 1,223 |
| 1,685,406 | 882 | 150,979 | 140 | 266,208 | 109,817 | | 22,989 | 133,402 | 116 |
| 54,889 | 8 | | | 1,128,257 | 69,312 | 9,887 | 67,846 | 981,212 | 251 |
| | | | | 60,180 | 17,974 | | 1,360 | 40,846 | 29 |
| 339,490 | 408 | 20,012 | 51 | 254,854 | 35,109 | 79,521 | 66,206 | 74,018 | 196 |
| | | | | 152,797 | 8,661 | | 131,283 | 12,853 | 22 |
| 126,573 | 160 | 88,208 | 199 | 91,419 | 33,331 | | 54,713 | 3,375 | 138 |
| 2,229 | 1 | | | 406,077 | 52,051 | | 333,107 | 20,919 | 44 |
| 160 | 2 | | | 9,204 | 2,500 | | 6,237 | 467 | 15 |
| 9,723 | 19 | 80,683 | 160 | 48,816 | 16,560 | | 19,030 | 13,226 | 111 |
| | | 10,775 | 1 | 254,698 | 36,957 | 172,888 | 16,848 | 28,005 | 64 |

41

APPENDIX 1

# FIRMS PLACED IN LIQUIDATION UNDER THE 1970 ACT

PART B: Substantially All Customer Claims (Except Problem Claims) Have Been Satisfied

| Company and Trustee By Date of Appointment | Date Registered as Broker-Dealer | Filing Date | Trustee Appointed | Customers To Whom Notices and Claim Forms Were Mailed | Number o Customer Claims Received |
|---|---|---|---|---|---|
| **Second Quarter 1972 (continued)** | | | | | |
| Maurice Timothy Sullivan d/b/a Timothy Sullivan, Boston, Massachusetts (Michael M. Marx) | 7/23/59 | 6/12/72 | 6/12/72 | 104 | 39 |
| **Third Quarter 1972** | | | | | |
| Centaur Securities, Ltd., Salt Lake City, Utah (D. Spencer Nilson) | 9/14/70 | 7/14/72 | 7/17/72 | 2,000 | 472 |
| G. M. Stanley & Co., Inc., New York, New York (Winthrop J. Allegaert, Esq.) | 4/11/69 | 7/17/72 | 7/18/72 | 1,044 | 409 |
| Holt, Murdock Securities, Inc., Helena, Montana (Thomas F. Dowling, Esq.) | 11/10/70 | 7/26/72 | 7/26/72 | 650 | 180 |
| North American Planning Corp., New York, New York (Joseph D. Ellison) | 4/ 9/70 | 7/25/72 | 8/ 8/72 | 2,700 | 947 |
| Kenneth Bove & Co., Inc., New York, New York (William W. Golub, Esq.) | 5/17/66 | 5/25/72 | 8/17/72 | 12,500 | 6,332 |
| Northeast Investors Planning Corp., Bronx, New York (David Handel) | 12/22/69 | 8/21/72 | 8/23/72 | 1,050 | 300 |
| Doores Securities Corp., New York, New York (Peter H. Morrison, Esq.) | 4/ 9/70 | 8/25/72 | 8/31/72 | 185 | 22 |
| King Securities of Chicago, Inc., Chicago, Illinois (J. Kirk Windle, Esq.) | 9/29/71 | 9/14/72 | 9/15/72 | 74 | 24 |
| **Fourth Quarter 1972** | | | | | |
| Trio Securities, Inc., New York, New York (Bernard L. Augen) | 5/20/71 | 9/29/72 | 10/ 3/72 | 90 | 67 |
| G. L. Equities Corp., New York, New York (Charles H. Kaufman) | 12/10/69 | 9/14/72 | 10/11/72 | 537 | 245 |
| Equitable Equities, Inc., New York, New York (Herbert S. Camitta, Esq.) | 2/4/70 | 10/13/72 | 10/13/72 | 134 | 69 |
| Bovers, Parnass & Turel, Inc., Jersey City, New Jersey (Edward J. Rosner, Esq.) | 10/12/68 | 10/19/72 | 10/19/72 | 1,180 | 307 |
| Albert & Maguire Securities Co., Inc., Philadelphia, Pennsylvania (Donald M. Collins, Esq.) | 9/ 9/68 | 10/19/72 | 10/19/72 | 5,181 | 1,310 |
| Havener Securities Corp., New York, New York (Ezra G. Levin, Esq.) | 11/13/59 | 10/13/72 | 10/24/72 | 900 | 533 |
| C. I. Oren & Co., Inc., New York, New York (Martin R. Gold, Esq.) | 11/10/68 | 10/13/72 | 10/26/72 | 345 | 61 |
| J. R. Narwitz & Co., Sacramento, California (Loren S. Dahl, Esq.) | 11/19/67 | 11/ 8/72 | 11/ 8/72 | 1,000 | 42 |

42

Distributions of Properties Held by Trustees

| Specifically Identifiable | | Single and Separate Fund | | SIPC Advances to Trustees | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Value | Number Customers | Value | Number Customers | Total Advanced | Administration Expenses | Open Contractual Commitments | Cash in Lieu of Securities | Free Credit Balances | Number of Customers |
| | | | | $ 21,405 | $ 3,500 | | $ 7,656 | $ 10,249 | 18 |
| 109,069 | 202 | | | 92,911 | 9,046 | | 20,949 | 62,916 | 234 |
| 101,912 | 210 | | | 79,936 | 57,712 | | 20,736 | 1,488 | 80 |
| 144,541 | 150 | | | 188,510 | 44,573 | $ 5,137 | 68,729 | 70,071 | 96 |
| 1,058,779 | 806 | | | 302,112 | 153,091 | 11,334 | 28,042 | 109,645 | 144 |
| 2,475,806 | 6,447 | $793,785 | 2,808 | 891,077 | 100 | 12,098 | 142,565 | 736,314 | 3,434 |
| 20,552 | 39 | 23,492 | 45 | 74,768 | 2,500 | 550 | 47,617 | 24,101 | 127 |
| 56,166 | 10 | | | 62,972 | 26,392 | 12,073 | 5,205 | 19,302 | 9 |
| 3,281 | 13 | | | 22,342 | 14,374 | | 6,087 | 1,881 | 8 |
| 4,164 | 16 | 5,062 | 10 | 81,953 | 1,500 | 868 | 73,007 | 6,578 | 49 |
| 159,845 | 238 | 15,008 | 97 | 45,445 | 23,926 | | 8,944 | 12,575 | 54 |
| 128,362 | 45 | | | 80,465 | | 27,604 | 16,034 | 36,827 | 33 |
| 17,680 | 39 | 187,991 | 236 | 148,823 | 36,761 | 26,874 | 33,677 | 51,511 | 218 |
| 420,643 | 364 | 549,822 | 557 | 1,099,410 | 12,439 | | 928,991 | 157,980 | 551 |
| 261,966 | 59 | 391,008 | 273 | 159,433 | 71,881 | | 12,361 | 75,191 | 167 |
| | | | | 32,735 | 3,000 | | 16,039 | 13,696 | 19 |
| | | | | 77,953 | | | 68,152 | 9,801 | 26 |

43

APPENDIX I

# FIRMS PLACED IN LIQUIDATION UNDER THE 1970 ACT

**PART B: Substantially All Customer Claims (Except Problem Claims) Have Been Satisfied**

| Company and Trustee By Date of Appointment | Date Registered as Broker-Dealer | Filing Date | Trustee Appointed | Customers To Whom Notices and Claim Forms Were Mailed | Number Custom Claim Receiv |
|---|---|---|---|---|---|
| **Fourth Quarter 1972 (continued)** | | | | | |
| Comstock Securities, Ltd., Salt Lake City, Utah (Herschel J. Saperstein, Esq.) | 8/24/71 | 11/20/72 | 11/20/72 | 350 | 20: |
| First Midwest Investment Corp., Milwaukee, Wisconsin (Frank C. Verbest) | 8/ 1/68 | 11/28/72 | 11/28/72 | 2,500 | 92: |
| Horizon Securities, Inc., New York, New York (Alan Palwick, Esq.) | 6/ 4/70 | 12/ 1/72 | 12/ 1/72 | 1,050 | 48 |
| First Eastern Investment Corp., Red Bank, New Jersey (Burton Peskin, Esq.) | 1/29/58 | 12/11/72 | 12/11/72 | 700 | 3. |
| Project Securities & Co., Inc., Union, New Jersey (Martin D. Moroney, Esq.) | 4/15/70 | 12/13/72 | 12/13/72 | 1,230 | 57 |
| **First Quarter 1973** | | | | | |
| Ridgewood Securities Corp., Miami, Florida (Oscar J. Keep, Esq.) | 9/23/70 | 12/28/72 | 1/ 8/73 | 205 | 5 |
| N. F. James & Co., Inc., Jersey City, New Jersey (Milton Rosenkranz, Esq.) | 8/14/71 | 2/ 1/73 | 2/ 9/73 | 150 | 11 |
| Forma Securities, Inc., New York, New York (Lawrence P. King, Esq.) | 3/27/69 | 2/ 9/73 | 2/ 9/73 | 2,399 | 25 |
| Frank & Drake, Inc., New York, New York (Daniel F. Callahan, Esq.) | 1/ 8/69 | 2/22/73 | 2/22/73 | 1,900 | 42. |
| A. J. Orsino Securities, Inc., New York, New York (Edward Farman, Esq.) | 1/26/69 | 2/22/73 | 2/22/73 | 25 | |
| Teig Ross, Inc., Bloomington, Minnesota (Lawrence Perlman, Esq.) | 5/31/72 | 2/20/73 | 2/26/73 | 6,700 | 3,50 |
| Media Financial Services, Los Angeles, California (Edwin M. Lamb) | 5/ 2/65 | 2/13/72 | 2/26/73 | 218 | 1. |
| First Minneapolis Investment Corp., Minneapolis, Minnesota (James T. Hale, Esq.) | 8/ 4/70 | 3/ 2/73 | 3/ 2/73 | 1,275 | 44 |
| Custodian Security Brokerage Corp., New York, New York (Lyonel E. Zunz, Esq.) | 4/25/71 | 3/ 6/73 | 3/ 7/73 | 673 | 6 |
| Stewart Securities Corporation, Dallas, Texas (Theodore Mack, Esq.) | 9/ 4/57 | 3/ 2/73 | 3/12/73 | 25 | 1 |
| Morgan, Kennedy & Co., Inc., New York, New York (Eugene L. Bondy, Jr., Esq.) | 1/19/66 | 3/ 9/73 | 3/13/73 | 3,114 | 1,44 |
| Dickinson, Rothbart & Co., Inc., New York, New York (Courtlandt Nicoll, Esq.) | 3/ 1/72 | 3/15/73 | 3/16/73 | 351 | 5 |
| Lexington Capital Corp., New York, New York (Peter H. Morrison, Esq.) | 11/19/69 | 3/21/73 | 3/26/73 | 1,918 | 62 |
| Pacific Western Securities, Inc., Los Angeles, California (Edwin M. Lamb) | 8/ 7/66 | 3/26/73 | 3/28/73 | 3,023 | 52 |

Distributions of Properties Held by Trustees

| Specifically Identifiable | | Single and Separate Fund | | SIPC Advances to Trustees | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Value | Number Customers | Value | Number Customers | Total Advanced | Administration Expenses | Open Contractual Commitments | Cash in Lieu of Securities | Free Credit Balances | Number of Customers |
| $ 3,809 | 5 | $ 61 | 5 | $ 82,911 | $ 11,062 | | $ 34,113 | $ 37,736 | 167 |
| 1,918,168 | 701 | 385,406 | 181 | 390,815 | 17,193 | $ 1,890 | 230,455 | 141,277 | 258 |
| 37,324 | 65 | 164,364 | 400 | 175,859 | 70,067 | 3,056 | 27,276 | 75,460 | 155 |
| 15,701 | 8 | | | 78,690 | | | 24,363 | 54,327 | 36 |
| 196,093 | 308 | | | 47,535 | 1,394 | 2,582 | 12,079 | 31,480 | 88 |
| | | | | | | | | | |
| 5,860 | 8 | | | 39,099 | | | 22,376 | 16,723 | 39 |
| 23,494 | 35 | 28,547 | 15 | 1,169,588 | 35,539 | | 1,082,740 | 51,309 | 85 |
| 6,661 | 33 | | | 84,172 | 29,182 | | 46,881 | 8,109 | 77 |
| 410,920 | 211 | | | 55,357 | | | 27,887 | 27,470 | 40 |
| | | | | 5,575 | 500 | | 410 | 4,665 | 5 |
| 1,869,277 | 2,700 | | | 218,046 | 86,035 | | 44,490 | 87,521 | 464 |
| 4,522 | 7 | | | 14,118 | 700 | | 5,603 | 7,815 | 6 |
| 361,999 | 386 | | | 89,475 | 16,855 | | 70,039 | 2,581 | 33 |
| 1,219 | 3 | | | 34,653 | 27,405 | | 4,537 | 2,711 | 14 |
| | | | | 143,372 | | | 140,611 | 2,761 | 19 |
| 1,633,653 | 1,571 | | | 485,302 | 82,253 | 23,085 | 205,143 | 174,821 | 661 |
| 10,712 | 31 | 1,499 | 3 | 55,593 | 12,769 | 2,715 | 19,945 | 20,164 | 17 |
| 318,714 | 360 | | | 170,571 | 35,000 | 26,000 | 43,681 | 65,890 | 110 |
| 273,054 | 157 | 79,179 | 118 | 1,076,936 | 150,873 | | 827,927 | 98,136 | 312 |

## APPENDIX I

# FIRMS PLACED IN LIQUIDATION UNDER THE 1970 ACT

### PART B: Substantially All Customer Claims (Except Problem Claims) Have Been Satisfied

| Company and Trustee By Date of Appointment | Date Regis- tered as Broker-Dealer | Filing Date | Trustee Appointed | Customers To Whom Notices and Claim Forms Were Mailed | Number Custom Claim: Receive |
|---|---|---|---|---|---|
| **Second Quarter 1973** | | | | | |
| P & H Associates, New York, New York (Edward Brodsky, Esq.) | 9/23/70 | 3/13/73 | 4/17/73 | 2,201 | 450 |
| Schreiber Bosse & Co., Inc., Cleveland, Ohio (Sterling Newell, Jr., Esq.) | 12/ 5/69 | 5/ 1/73 | 5/ 7/73 8/15/73 Successor Trustee | 739 | 212 |
| Glendale Securities Corp., New York, New York (Brian P. McNulty, Esq.) | 5/24/70 | 5/25/73 | 5/29/73 | 544 | 169 |
| Weis Securities, Inc., New York, New York (Edward S. Redington, Esq.) | 8/ 1/65 | 5/24/73 | 5/30/73 | 55,026 | 32,098 |
| Smith & Medford, Inc., Atlanta, Georgia (William Green, Esq.) | 9/ 2/70 | 5/31/73 | 6/ 1/73 | 1,705 | 528 |
| **Third Quarter 1973** | | | | | |
| Gary L. Jones & Associates, Salt Lake City, Utah (D. Spencer Nilson) | 11/ 6/71 | 5/ 8/73 | 7/12/73 | 4,004 | 1,152 |
| Hill, Curtin & Ackroyd, Inc., Framingham, Massachusetts (Joseph P. Rooney, Esq.) | 4/29/70 | 7/30/73 | 7/30/73 | 2,500 | 130 |
| TOTAL 78 FIRMS:  PART B | | | | 178,443 | 69,371 |

ᵃ Value of securities distributed to customers.
ᵇ Includes some distributions for free credit balances to be reported by the trustee.
ᶜ Debtor's cash.

Distributions of Properties Held by Trustees

| Specifically Identifiable | | Single and Separate Fund | | SIPC Advances to Trustees | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Value | Number Customers | Value | Number Customers | Total Advanced | Administration Expenses | Open Contractual Commitments | Cash in Lieu of Securities | Free Credit Balances | Number of Customers |
| 176,561 | 229 | | | $  145,607 | | $  1,500 | $  46,401 | $  97,706 | 318 |
| 122,178 | 76 | | | 145,861 | $  19,361 | | 100,440 | 26,060 | 38 |
| 20,723 | 126 | | | 91,335 | 61,760 | | 29,392 | 183 | 36 |
| 20,000,000 [a] 2,746,085 [c] | 12,500 2,000 Estimated | $15,908,233 | 10,500 Estimated | 22,415,000 | 1,641,305 | | 20,773,695 [b] | | 14,000 Estimated |
| 140,768 | 291 | | | 226,568 | 24,788 | 25,323 | 171,208 | 5,249 | 268 |
| 339,389 | 884 | | | 147,864 | 8,141 | 6,030 | 34,549 | 99,144 | 469 |
| 63,860 | 64 | | | 113,745 | | | 100,190 | 13,555 | 51 |
| 43,637,634 | 38,165 | $20,312,058 | 18,891 | $40,201,583 | $4,152,672 | $863,860 | $29,316,841 | $5,868,210 | 29,587 |

## APPENDIX 1

# FIRMS PLACED IN LIQUIDATION UNDER THE 1970 ACT

### PART C: Liquidations Completed

| Company and Trustee By Date of Appointment | Date Regis-tered as Broker-Dealer | Filing Date | Trustee Appointed | Customers To Whom Notices and Claim Forms Were Mailed | Number c Custome Claims Received |
|---|---|---|---|---|---|
| **First Quarter 1971** | | | | | |
| Orin R. Dudley d/b/a Orlin R. Dudley Co., New York, New York (J. Lincoln Morris, Esq.) | 12/12/63 | 2/18/71 | 3/29/71 | 1,250 | 128 |
| **Second Quarter 1971** | | | | | |
| PLM Securities, Inc., Syracuse, New York (Howard A. Port) | 8/ 9/67 | 4/ 7/71 | 6/28/71 | 900 | 44 |
| **Third Quarter 1971** | | | | | |
| Lang-Lasser & Co., Inc., Beverly Hills, California (Kevin O. Lewand, Esq.) | 1/30/70 | 6/ 8/71 | 9/14/71 | 200 | 6 |
| **Fourth Quarter 1971** | | | | | |
| Far Western Securities, Inc., Tucson, Arizona (Thomas A. Latta, Esq.) | 4/15/70 | 8/26/71 | 10/31/71 | 453 | 64 |
| **First Quarter 1972** | | | | | |
| Alan F. Hughes, Inc., Schenectady, New York (William J. Quinlan, Esq.) | 12/ 9/65 | 8/18/71 | 1/17/72 | 664 | 251 |
| First Continental Securities, Inc. Dallas, Texas (Theodore Mack, Esq.) | 12/ 2/64 | 3/14/72 | 3/14/72 7/18/72 Successor Trustee | 125 | 33 |
| TOTAL 6 FIRMS: PART C | | | | 3,592 | 526 |

° Some of these claims were erroneous or disallowed.

SUMMARY FOR 94 FIRMS PLACED IN LIQUIDATION UNDER THE 1970 ACT AS AT DECEMBER 31, 1973:

| | | |
|---|---|---|
| Part A: 10 Firms—Customer Claims and Distributions Being Processed By Trustees | 56,423 | 14,198 |
| Part B: 78 Firms—Substantially All Customer Claims (Except Problem Claims) Have Been Satisfied | 178,443 | 69,371 |
| Sub Total | 234,866 | 83,569 |
| Part C: 6 Firms—Liquidations Completed | 3,592 | 526 |
| Total | 238,458 | 84,095 |

GENERAL NOTES:

1. The books and records of the debtors being liquidated are generally found by the trustee to be (a) not up to date, (b) i complete, (c) irreconcilable, (d) non-existent, or a combination of these. Construction of the necessary financial data is task of major proportions and a cause of considerable administrative expense.

2. Based upon claims processed to date, Trustees have paid up to the limits the following number of claims that exceede the $50,000/$20,000 limitations provided in the Act (This does not include about 100 claims over the limits in the We liquidation which have been partially satisfied):

| | No. of claims reported | | |
|---|---|---|---|
| Claims for free credit balances . . . . . . . . . . . | 19 | Amount in excess of limit for cash . . . . . . . | $268,216 |
| Claims for securities . . . . . . . . . . . . . . . . . . . | 14 | Amount in excess of limit for securities . . . . | $585,740 |
| | 33 | | $853,956 |

48

**DECEMBER 31, 1973**

Distributions of Properties Held by Trustees

| Specifically Identifiable | | Single and Separate Fund | | SIPC Advances to Trustees | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Value | Number Customers | Value | Number Customers | Total Advanced | Administration Expenses | Open Contractual Commitments | Cash in Lieu of Securities | Free Credit Balances | Number of Customers |
| $112,519 | 75 | $ 4,881 | 2 | $300,225 | $ 84,174 | | $ 177,405 | $ 38,646 | 36 |
| 6,907 | 5 | 763 | 1 | 37,787 | 7,915 | | 29,521 | 351 | 22 |
| | | | | 35,005 | 12,627 | | 22,378 | | 5 |
| 3,557 | 23 | 57 | 1 | 33,066 | 8,448 | | 24,102 | 516 | 45 |
| 164,711 | 70 | 43,918 | 5 | 366,772 | 40,588 | | 316,936 | 9,248 | 59 |
| 8,373 | 9 | 2,589 | 3 | 6,339 | | | 3,991 | 2,348 | 17 |
| $296,067 | 182 | $52,208 | 12 | $779,194 | $ 153,752 | — | $ 574,333 | $ 51,109 | 184 |
| 5,901,788 | 8,795 | $ 42,967 | 67 | $ 2,694,161 | $ 249,310 | $ 6,984 | $ 1,436,887 | $1,000,980 | 3,904 |
| 3,637,634 | 38,165 | 20,312,058 | 18,891 | 40,201,583 | 4,152,672 | 863,860 | 29,316,841 | 5,868,210 | 29,587 |
| 9,539,422 | 46,960 | 20,355,025 | 18,958 | 42,895,744 | 4,401,982 | 870,844 | 30,753,728 | 6,869,190 | 33,491 |
| 296,067 | 182 | 52,208 | 12 | 779,194 | 153,752 | — | 574,333 | 51,109 | 184 |
| 9,835,489 | 47,142 | $20,407,233 | 18,970 | $43,674,938 | $4,555,734 | $870,844 | $31,328,061 | $6,920,299 | 33,675 |

**APPENDIX II**

## Analysis of SIPC Revenue and Expense and Trustees' Distributions
### For Accounts of Customers for the Three Years Ended December 31, 1973

| | 1971 | 1972 | 1973 | Total |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Member assessments and contributions | $32,790,194 | $32,332,156 | $ 22,858,920 | $ 87,981,270 |
| Interest: | | | | |
| U.S. Government obligations | 490,042 | 1,674,257 | 2,771,131 | 4,935,430 |
| Assessments | — | — | 10,938 | 10,938 |
| | 33,280,236 | 34,006,413 | 25,640,989 | 92,927,638 |
| **Expenses:** | | | | |
| Administrative: | | | | |
| Salaries and employee benefits: | | | | |
| Salaries | 178,036 | 411,075 | 705,424 | 1,294,535 |
| FICA taxes | 4,509 | 10,681 | 25,362 | 40,552 |
| Federal unemployment tax | 250 | 567 | 1,145 | 1,962 |
| D.C. unemployment tax | 1,298 | 3,113 | 5,358 | 9,769 |
| Group life insurance | 2,943 | 3,423 | 7,381 | 13,747 |
| Group health insurance | 2,842 | 2,799 | 3,786 | 9,427 |
| Contribution to Employees' Retirement Trust | — | 43,400 | 44,700 | 88,100 |
| Other employee benefits | — | 2,404 | 6,384 | 8,788 |
| | 189,878 | 477,462 | 799,540 | 1,466,880 |
| Assessment collection direct costs | 35,780 | 24,047 | 13,916 | 73,743 |
| Credit commitment fee | 236,527 | 292,223 | 240,625 | 769,375 |
| Legal fees | 70,987 | 76,574 | 44,388 | 191,949 |
| Accounting fees | 22,074 | 70,169 | 20,313 | 112,556 |
| Other: | | | | |
| Printing and mailing Annual and Quarterly reports | — | 23,901 | 21,671 | 45,572 |
| Directors fees and expenses | 8,609 | 6,096 | 6,667 | 21,372 |
| Travel and subsistence | 4,154 | 23,981 | 55,587 | 83,722 |
| Personnel recruitment | 3,790 | 5,832 | 14,312 | 23,934 |
| Rent-office space | 10,849 | 34,073 | 45,227 | 90,149 |
| Depreciation and amortization | 1,548 | 10,923 | 12,865 | 25,336 |
| Insurance | 2,549 | 3,137 | 4,073 | 9,759 |
| Postage | 1,069 | 3,471 | 3,013 | 7,553 |
| Office supplies and expense | 13,140 | 25,920 | 35,946 | 75,006 |
| Telephone and telegraph | 4,583 | 17,966 | 25,533 | 48,082 |
| Custodian fees | 4,538 | 15,940 | 18,523 | 39,001 |
| Relocation | — | — | 36,439 | 36,439 |
| Miscellaneous | 9,805 | 30,914 | 25,986 | 66,705 |
| | 64,634 | 202,154 | 305,842 | 572,630 |
| Preparation costs—potential major liquidations | 156,328 | — | — | 156,328 |
| Start-up expense—attorneys' and accountants' fees and printing expense related to credit agreement and assessment procedures | 127,632 | — | — | 127,632 |
| | 903,840 | 1,142,629 | 1,424,624 | 3,471,093 |
| Provision for possible losses on advances to trustees: | | | | |
| For completion of open contractual commitments | 51,675 | 135,183 | 693,142 | 880,000 |
| Cash in lieu of securities | 173,012 | 3,489,969 | 27,868,208 | 31,531,189 |
| Free credit balances | 176,132 | 3,717,741 | 3,144,691 | 7,038,564 |
| | 400,819 | 7,342,893 | 31,706,041 | 39,449,753 |
| Administration expenses | 74,981 | 765,991 | 3,755,307 | 4,596,279 |
| | 475,800 | 8,108,884 | 35,461,348 | 44,046,032 |
| | 1,379,640 | 9,251,513 | 36,885,972 | 47,517,125 |
| Excess revenues (expenses) | $31,900,596 | $24,754,900 | ($ 11,244,983) | $ 45,410,513 |
| Trustees' distributions for the accounts of customers: | | | | |
| From debtors' estates | 271,000 | 9,300,000 | 170,672,000 | 180,243,000 |
| From SIPC advances | 400,819 | 7,342,893 | 31,706,041 | 39,449,753 |
| | $ 671,819 | $16,642,893 | $202,378,041 | $219,692,753 |

50

# FORM OF NOTICE ENCLOSED WITH TRUSTEES' CHECKS IN PAYMENT OF CUSTOMERS' CLAIMS



SECURITIES INVESTOR PROTECTION CORPORATION

SIPC

SECURITIES INVESTOR PROTECTION CORPORATION • 900 SEVENTEENTH STREET, N.W., SUITE 800 • WASHINGTON, D.C. 20006 • (202) 223-8400

FUNDS COVERING PART OR ALL OF THE AMOUNT OF THE ENCLOSED CHECK HAVE BEEN ADVANCED TO THE TRUSTEE BY THE **SECURITIES INVESTOR PROTECTION CORPORATION,** A FEDERALLY-CREATED, NONPROFIT CORPORATION ESTABLISHED FOR THE PURPOSE OF PROTECTING SECURITIES CUSTOMERS OF BROKER-DEALERS IN CERTAIN LIQUIDATIONS AND FUNDED BY ASSESSMENTS ON BROKER-DEALER MEMBERS OF SIPC.

# SECURITIES INVESTOR PROTECTION CORPORATION

900 SEVENTEENTH STREET, N.W., SUITE 800, WASHINGTON, D.C. 20006