Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin and*
*Maureen Ebel, with the support of more than*
*100 other Customers*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Case No._____ |
| Plaintiff, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**MEMORANDUM OF LAW IN**
**SUPPORT OF MOTION FOR LEAVE TO APPEAL**

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ..........................................................................................2

STATEMENT OF FACTS ...................................................................................................4

    THE TRUSTEE AND B&H HAVE TREATED THE PESKINS DISHONESTLY .................9

    THE CALLOUS TREATMENT OF MS. EBEL BY THE TRUSTEE AND B&H ...............12

        Ms. Ebel's Madoff investment .......................................................................12

STATEMENT OF QUESTIONS PRESENTED AND RELIEF SOUGHT .................................15

ARGUMENT ....................................................................................................................16

I.    THE COURT SHOULD GRANT LEAVE TO APPEAL ....................................................16

    A.    This Appeal Involves A Controlling Question of Law ....................................16

    B.    There Is Substantial Ground for Difference of Opinion .................................24

    C.    An Immediate Appeal Will Advance The Ultimate Termination
        Of The Litigation ..........................................................................................25

CONCLUSION ................................................................................................................25

1088750.1

## TABLE OF AUTHORITIES

### CASES

*In re AFI Holding, Inc.*, 355 B.R. 139 (9th Cir. BAP 2006) .......................................... 18

*In re Angelika Films 57th, Inc.*, 246 B.R. 176 (S.D.N.Y. 2000) .................................... 19

*Aurelius Capital Master, Ltd. v. Tousa Inc.*, 2009 U.S. Dist. LEXIS 12735 (S.D. Fla. Feb
6, 2009) .......................................................................................................................... 17

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147
(D.N.J. 2005) ................................................................................................................. 24

*In re Big Rivers Electric Corp.*, 266 B.R. 100 (W.D.Ky. 2000) .................................... 25

*Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602 (1993) .............. 22, 23

*In re Drouin*, 1999 Bankr. LEXIS 1878 (B.D.N.H. Nov. 19, 1999) .............................. 23

*Garcia v. U.S.*, 666 F.2d 690 (5th Cir. 1982) ................................................................ 22

*Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447 (1st Cir. 1983) ................... 23

*In re Hot Tin Roof*, 205 B.R. 1000 (1st Cir BAP 1997) ................................................ 18

*In re Jartran, Inc.*, 886 F.2d 859 (7th Cir. 1989) .......................................................... 16

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave*, 921 F.2d 21
(2d Cir. 1990) ................................................................................................................ 24

*Louisville Bank v. Radford*, 295 U.S. 555 (1935) .......................................................... 22

*McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251 (11th Cir. 2004) ............................. 16

*In re Mercury*, 122 Fed. Appx. 528 (2d Cir. 2004) ...................................................... 18

*In re Miguel*, 30 B.R. 893 (B.E.D.CA 1983) ................................................................. 23

*In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) .......................... 18

*Northeast Savings F.A. v. Geremia*, 191 B.R. 275 (D.R.I. 1996) ................................. 24

*In re Pappas*, 207 B.R. 379 (2d Cir. BAP 1997) ........................................................... 24

*In re Phillips*, 13 B.R. 82 (B. C.D. Ill. 1981) ............................................................... 22

*In re Plaza Hotel Corp.*, 111 B.R. 882 (B.E.D. Cal. 1990) ........................................... 18

ii

*S & D Maintenance Co., Inc. v. Goldin*, 844 F.2d 962 (2d. Cir. 1988)..........................22

*Schweiker v. McClure*, 456 U.S. 188 (1982) .................................................................23

*Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361 (9th Cir. 1976)......................22

*U.S. v. Doyle*, 130 F.3d  523 (2d Cir. 1997) ..................................................................21

*In re Vebeliunas,* 231 B.R. 181 (B.S.D.N.Y. 1999) ........................................................18

*Young v. Paramount Comm'ns Inc.*, 186 B.R. 803 (S.D.N.Y. 1995) ...............................16

## STATUTES

15 U.S.C. § 78(fff-3) ...................................................................................................22

15 U.S.C. § 78ccc(b)(4).............................................................................................17

15 U.S.C. §§ 78eee(b)(6) ..........................................................................................19

15 U.S.C. § 78fff(a)(1) ...............................................................................................17

15 U.S.C. § 78ggg(b)..................................................................................................22

15 U.S.C. §78lll(11) ...................................................................................................17

28 U.S.C. § 158(a) .......................................................................................................1

28 U.S.C. § 1292(b)....................................................................................................16

22 N.Y.C. R.R. § 1200.7(a) ....................................................................................18, 19

1088750.TOA

Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin and*
*Maureen Ebel, with the support of more than*
*100 other Customers*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                         Plaintiff,<br><br>             v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                         Defendant. | Case No._____<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                         Debtor. | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO APPEAL

Diane and Roger Peskin and Maureen Ebel ("Objectants"), with the support of more than

100 other customers of Bernard L. Madoff Investment Securities LLC ("Madoff"), submit this

memorandum of law in support of their motion for leave to appeal, pursuant to 28 U.S.C.

§ 158(a) and Federal Rule of Bankruptcy Procedure 8003, the August 6, 2009 order of the United

States Bankruptcy Court for the Southern District of New York Approving Applications for

Allowance of Interim Compensation for Services Rendered and Reimbursement of Expenses

(the "Order"), to the extent that the Order approved the first applications for interim

compensation of Irving H. Picard, Trustee (the "Trustee"), and his counsel, Baker & Hostetler
LLP ("B&H").

## PRELIMINARY STATEMENT

The Trustee and B&H have an egregious conflict of interest which disables them from
serving in this proceeding under the Securities Investor Protection Act ("SIPA") for the
liquidation of Madoff.  That conflict of interest also bars them from receiving any compensation.
It is axiomatic that the Trustee has a fiduciary duty to the customers of Madoff (the
"Customers").  Indeed, SIPA was enacted by Congress specifically to protect customers of SEC-
regulated broker/dealers and the statute expressly requires the Trustee to "promptly" pay
Customers up to $500,000 in SIPC insurance based upon their last account statements (their
"Statutory Balances") so as to reduce any loss Customers may suffer.

Yet, rather than fulfill this clear statutory mandate, the Trustee has acted to enrich the
Securities Investor Protection Corporation ("SIPC") at the expense of customers.  He has
invented an entirely new standard for allowance of customer claims with the sole purpose of
reducing, by billions of dollars, SIPC's liability to customers.  Without any statutory authority, in
direct defiance of SIPC's own practices and regulations for 38 years, and in direct contradiction
of controlling Second Circuit authority with which SIPC and the Securities and Exchange
Commission ("SEC") agreed in 2004, the Trustee has rejected the Customers' Statutory Balances
as the determinant of their claims and, instead, is compensating Customers based upon their net
investment.  Thus, a customer who invested $100,000 in 1970, whose account appreciated to
$1.6 million in 2008, and who took out $100,000 over the course of 38 years to pay taxes on a
portion of the appreciation, would not be entitled to any money from SIPC.

2

1088750.1

SIPA was enacted to protect the "legitimate expectations" of customers based upon their Statutory Balances and SIPC's own regulations state that a customer's expectations are determined by the monthly account statements the customer received. Yet, in the face of over 15,400 Customers whose lives have been decimated by the Madoff fraud, the Trustee has refused to pay SIPC insurance to any Customer who does not have a positive net investment, on the Trustee's theory. Moreover, in further derogation of his fiduciary and professional duty, the Trustee has steadfastly refused to put the issue of his statutory invention before the court so that the issue can be promptly litigated. The Trustee's strategy is clear: he is seeking to delay payment of SIPC insurance to the vast majority of Customers for a period of five or more years.

The Trustee's conflict of interest – representing the defaulting insurance company against the injured insureds – is patent. This conflict is particularly egregious here because the Trustee and his counsel are being compensated at the rate of approximately $1 million per week  by SIPC at a time when SIPC is insolvent. Thus, every dollar paid to the Trustee and B&H is a dollar that is not available to pay Customer claims.

The bankruptcy court swept these issues aside, relying on the court's finding, in February 2009, that the Trustee and his counsel were "disinterested." Thus, the bankruptcy court ignored the overwhelming evidence of the conflict of interest of the Trustee and B&H which only became apparent after the disinterestedness hearing and ignored its obligation to continuously monitor for conflicts of interest throughout the proceeding.

The bankruptcy court also ignored the undisputed evidence presented by Objectors that SIPC was insolvent, holding that the sworn testimony of SEC Commissioner Mary Schapiro before a House Committee on July 14, 2009 was hearsay. The bankruptcy court did not even comment on the Objectors' due process argument and simply granted the fee application in full.

3

It is urgent that an immediate appeal be permitted so as to mitigate the damages already

inflicted upon the thousands of Customers who have been denied SIPC insurance. The

continuation of this case under the management of a Trustee and his counsel who are disabled by

an egregious conflict of interest must be remedied immediately in order to avoid further

devastation to the Customers and destruction to the national policy of honoring the legitimate

expectations of customers of a liquidated SEC-regulated broker/dealer. Moreover, the conflict of

interest issue goes to the very integrity of this proceeding at a time when the world is focusing on

the American economic and legal system.

## STATEMENT OF FACTS

The facts set forth herein are taken from the Objection filed by Objectors to the fee

applications of the Trustee and B&H in which they asked the court to set an evidentiary hearing

at which they could prove the facts set forth in the Objection. A copy of the Objection is

annexed to the Declaration of Helen Davis Chaitman as Exh. A. The Objection expressly states

that it is an "offer of proof." Neither the Trustee nor B&H submitted any affidavits in opposition

to the Objection. Thus, the Objection contains the undisputed facts in the record on appeal.

SIPA was enacted in 1970 at the behest of the SEC-regulated broker/dealers (the

"Financial Services Industry") in order to relieve the Industry of the financial and administrative

burden of registering securities in the names of investors with each of the issuing corporations.

In order to induce investors to assume the risk of their brokers' dishonesty and to allow the

Financial Services Industry to hold their life savings in "street name," SIPA established SIPC to

provide insurance to protect investors against brokers who were dishonest and either never

purchased the securities or purchased the securities and then stole them. Objection ¶¶ 42-46.

By holding securities in "street name," broker/dealers were able to profit from the securities and

4

not share those profits with the investors who owned them. For example, broker/dealers could lease out the securities, sell them and buy them back, or borrow against them, while the securities were in street name. Objection ¶ 44.

Rather than charge its members based upon the insurance risk assumed, for the past ten years SIPC charged each member a mere $150 per year for the privilege of printing on hundreds of billions of dollars of trade confirmations that customer accounts were insured up to $500,000 by SIPC. Objection ¶ 46. This allowed the Financial Services Industry to make tens of billions of dollars of profits because the false assurance that accounts were insured induced gullible investors to pour money into brokerage firms. *Id.*

SIPC's generosity towards its members left it with insufficient funds to pay Customer claims. *Id.* ¶ 47. Indeed, SEC Commissioner Mary Schapiro testified before Congress on July 14, 2009:

> The tragic truth is there is not enough money available to pay off
> all the customer claims.

*Id.* ¶ 5. While SIPC can borrow money under SIPA, SIPC has apparently decided that it would rather cheat Customers out of their insurance than borrow money and have to assess the Financial Services Industry to repay the loans. *Id.* ¶ 47.

The Trustee has served as SIPC trustee in numerous SIPA liquidations and has acted in this case to enrich SIPC at the expense of Custoemrs. *Id.* ¶ 3. SIPC, as the insurer of Customer accounts, is in a direct adversarial position to the Customers, putting the Trustee and B&H in an untenable conflict of interest. *Id.* With full knowledge of the devastation that Madoff caused to Customers, and despite the clear provisions of SIPA as incorporated into the Bankruptcy Court's December 23, 2008 order, the Trustee and B&H have caused needless devastation to Customers

5

by ignoring SIPA's mandate that Customer claims be paid "promptly" based upon their Statutory Balances.

Under SIPA, the Trustee's most important function is to promptly pay SIPC insurance to customers. *Id.* ¶ 10. The Trustee has been an abysmal failure on this issue. Of the more than 15,400 Customer claims filed, the Trustee has allowed a mere 872 claims in eight months, although even these 872 claims have not all been paid. Despite this pathetic track record, the Trustee and B&H were awarded the following amounts for the period December 15, 2008 through April 30, 2009:

> Baker & Hostetler LLP as Counsel to the Trustee
> Fees: $14,662,319.83    Expenses: $274,203.03
>
> Irving H. Picard, Esq. as SIPA Liquidation Trustee
> Fees: $759,228.75    Expenses:  $45.00

*Id.* ¶ 12. The Order granted the application, subject to an agreed upon holdback.

The payment of $15 million of SIPC's money to the Trustee and B&H means that 30 destitute Customers will not be paid the SIPC insurance to which they are entitled by the express language of SIPA. This depletion of SIPC's funds cannot be justified. At this rate, the Trustee and B&H, exclusive of all the other professionals retained in this case, will incur administrative expenses of $45 - $60 million a year and, undoubtedly, will keep the case open for seven to ten years. Thus, the administrative expenses for the Trustee and B&H alone could easily exceed $500 million. The administrative expenses are to be paid by SIPC which, itself, is insolvent and does not have sufficient money to fulfill its insurance obligations to Customers. *Id.* ¶ 14.

By disregarding the express provisions of SIPA requiring prompt payment of SIPC insurance to Customers based upon their Statutory Balances, the Trustee has necessitated the additional administrative expense of having "forensic" accountants determine the net investment of each Customer, in many cases encompassing 30 – 40 years of records. *Id.* ¶ 17. The

6

"forensic" accountants, of course, are also being paid by SIPC with money which should be paid

to Customers. The Trustee's self-serving *legerdemain* is calculated to save SIPC billions of

dollars and, at the same time, necessitates the incurrence of tens of millions of dollars of

unnecessary administrative expenses that would be avoided if the Trustee simply complied with

the law. *Id.* ¶ 17.

As a result of the Trustee's defiance of SIPA, Customers have suffered tragic additional

losses. Many Customers have been forced to sell their homes on a fire-sale basis in an

extraordinarily depressed market, simply because they did not have the money to cover the

monthly housing expenses for a sufficient period to sell their homes over a more reasonable time

period. Customers have been forced to put loved ones into nursing homes because they could

not afford to continue to support them in their own homes. Customers on chemotherapy drugs

have not had the funds to pay for their medical treatment. *Id.* ¶ 18.

In recognition of the unconscionable delay in payment of SIPC insurance to destitute

Customers, but without any statutory authority, the Trustee established a "Hardship Program"

pursuant to which Customers who, through the disclosure of the most intimate personal

information, are deemed in the Trustee's sole discretion to be hardship cases, are entitled to

receive "expedited" treatment. *Id.* ¶ 19. However, the Trustee has given himself more time to

pay "hardship" cases than SIPA contemplates a trustee will need to pay all customers. *Id.* ¶ 20.

There is nothing in SIPA that restricts prompt payment to those who can demonstrate to the

Trustee's satisfaction that they are suffering "hardship." *Id.* ¶ 21. That is precisely why SIPA

requires the Trustee to fix a customer's claim at his last statement.

The Trustee's conduct has been particularly injurious to elderly investors. He has denied

SIPC insurance to "hardship" Customers whose investments in Madoff date back 15-40 years

7

who did not retain their records of deposits. *Id.* ¶ 22. The Trustee and B&H have taken the position that it is the Customer's burden to prove his investments and, if the Customer did not retain records from 15-40 years ago, the Customer loses and SIPC wins. *Id.* In fact, B&H has informed Customers that the Trustee will not provide Customers with Madoff's own records – to which the Trustee has exclusive access. *Id.* Thus, even if the Trustee has a record of Customer deposits, the Trustee will not make those records available to Customers. In this way, of course, SIPC can deny coverage to Customers who had no reason to, and did not, retain records of deposits going back 15-40 years. *Id.* ¶ 22.

As to the remainder of the "hardship cases, the Trustee and B&H have taken months to resolve "hardship" cases, during which the Trustee has sought to exact compromises from elderly, destitute Customers. In several instances, attorneys at B&H have affirmatively misrepresented the law to "hardship" cases in order to induce them to accept from SIPC less than the sums to which they are indisputably entitled. In addition, the Trustee has regularly deducted from Customers' SIPC insurance alleged "preferences," despite the fact that SIPC does not authorize such offsets and despite the fact that there is a substantial question as to whether the preference provision of the Bankruptcy Code applies to Customers who simply received distributions from their accounts of their own money, in the ordinary course of business of themselves and Madoff. *Id.* ¶ 23.

B&H is deliberately acting to delay and frustrate the payment of Customer claims, even to the point of misrepresenting the law to destitute Customers who cannot afford to retain their own counsel. *Id.* ¶ 28. At the first and only creditors' meeting, the Trustee and B&H announced their definition of "net equity" as if it were the law, without any indication that SIPA contradicts what they were saying. *Id.* ¶ 50. By this conduct, the Trustee chilled the filing of SIPC claims

8

by Customers who believed the Trustee and his counsel would not misrepresent the law and

concluded that they had no right to SIPC insurance. *Id.* This is another example of the conflict

of interest which prohibits the Trustee and B&H from continuing to serve in this case.

The Trustee's defiance of SIPA's definition of net equity, despite the fact that Customers

received account statements and written confirmations showing investments in real securities, is

inconsistent with 39 years of SIPC's history. *Id.* ¶ 84. Stephen Harbeck admitted as much in

January 2009 when he announced: "We've modified our usual claim form to ask investors a

question that's unique to this case, which is how much money did you put in and how much

money did you take out." *Id.* He also stated that "[O]ne of the first things that we did . . . was to

modify our standard claim form to make sure that we asked the claimants themselves what

evidence they had in terms of money in and money out, because that's going to be one of the

critical factors." *Id.* Thus, Harbeck recognized the unprecedented nature of SIPC's approach

which, in fact, is inconsistent with the position it has taken in its 39 year history. *Id.* ¶85.

## THE TRUSTEE AND B&H HAVE TREATED THE PESKINS DISHONESTLY

The treatment of the Peskins by the Trustee and B&H is just one example of their callous

and dishonest treatment of Customers. In August 2004, the Peskins invested with Madoff the

after-tax proceeds of the sale of their major asset, a magazine guide for the art world which Mr.

Peskin had built from the ground up, along with the proceeds of two properties they sold. On or

about October 18, 2005, they invested $2,586,412.99 with Madoff. In early May, 2008, they

invested another $181,000 into Madoff. On or about November 12, 2008, they invested

$470,265.98 into Madoff. Every month they received from Madoff trade confirmations

indicating the purchase and sale of S&P 100 company stocks; the purchase and sale of Treasury

bills; and the purchase and sale of options to hedge the securities positions. In addition, they

received monthly account statements from Madoff showing their securities positions. In each

9

instance, the trade confirmations and account statements reflected the purchase and sale of securities of S&P 100 companies at prices consistent with those reported in the media. *Id.* ¶ 89.

In the ordinary course of their lives, they regularly withdrew funds from their Madoff account to fund family living expenses, to pay taxes on their Madoff income, and for special expenditures. *Id.* ¶ 91. On September 15, 2008, they received a check from Madoff for $50,000 which cleared their account on September 17, 2008. *Id.* ¶ 92. On October 1, 2008, they received a check from Madoff for $33,000. *Id.* On November 6, 2008, they received a check from Madoff for $30,000. *Id.* As of November 30 2008, the last month for which they received a Madoff account statement, the value of their account was $3,247,367.40. *Id.* ¶ 93. At no time did the Peskins have any reason to believe that Madoff was dishonest. *Id.* ¶ 92.

Following December 11, 2008, the Peskins' lives were decimated. The sudden termination of their sole source of income left them with no funds for their regular monthly payments, for the tuition for their children's school, or to fund their other obligations. *Id.* ¶ 94. The Peskins, who later qualified for the Trustee's "Hardship Program," filed a SIPC claim on February 19, 2009. *Id.* ¶ 95. The Peskins received no response whatsoever to their SIPC claim until almost four months later. *Id.* On June 3, 2009, they were contacted by an attorney at B&H who informed them that they were only entitled to receive $387,000 as their full SIPC payment. *Id.* The attorney said that the Trustee was entitled to deduct from their SIPC payment the $113,000 that they withdrew from their Madoff account in the three months preceding December 15, 2008. *Id.*

The Peskins were astonished and devastated. They had been counting on the full $500,000 to carry them through until they could obtain a tax refund from the Internal Revenue Service based upon their theft loss. *Id.* ¶ 96. The Peskins pointed out to the Trustee's attorney

10

1088750.1

that, although they had withdrawn $113,000 from Madoff within the 90 days before December

15, 2008, they had also invested $470,265.98 with Madoff on November 12, 2008, after they

received the $113,000. *Id.* Mrs. Peskin broke down in tears on the phone and begged the

attorney for the full $500,000. *Id.* The attorney at B&H apologized to the Peskins and said that

he would review the situation with the Trustee and get back to them. *Id.*

Approximately one week later, the attorney at B&H called the Peskins and told them that

he had reviewed their situation with the Trustee and that the Trustee was very sorry but he had

no alternative under the law but to withhold $113,000 from their SIPC payment. *Id.* ¶ 97. The

attorney added that the law was absolutely clear on this subject. *Id.* The Peskins asked whether

the $113,000 would go into a fund to be distributed to Customers and the attorney told them:

"No, it would just reduce the amount that SIPC had to pay them." *Id.*

The Peskins then were forced by the situation to consult counsel and they became

plaintiffs in a lawsuit filed against the Trustee on June 10, 2009 for a declaratory judgment that

the Trustee was violating SIPA through his rejection of SIPA's definition of net equity and his

failure to promptly pay SIPC insurance to Customers, for a declaratory judgment that the Trustee

has no right to deduct from the Peskins the $113,000 that they withdrew within 90 days of

December 15, 2008, and for compensatory damages for breach of fiduciary duty. *Id.* ¶ 98.

The Trustee is seeking to utilize the preference provision of the Bankruptcy Code to

enrich SIPC because, as his attorney stated, any reduction in the SIPC insurance payments to the

Peskins (and other Customers) will simply enrich SIPC. It will not enrich the estate of Customer

property. Moreover, the Trustee's attorney misrepresented the law to the Peskins. The Trustee's

attorney ignored §§547(a)(2) of the Bankruptcy Code which provides that there is no liability for

a preferential transfer to the extent the creditor provides "new value" within the 90 day

11

preference period. The Peskins provided new value after the allegedly preferential transfers to

them because, on November 12, 2008, they invested $470,265.98, after having withdrawn a total

of $113,000 on September 15, 2008, October 1, 2008 and November 6, 2008. *Id.* ¶ 105. Thus,

there was no basis for the Trustee to deduct $113,000 from the Peskins' $500,000 SIPC payment.

> By letter dated June 26, 2009, Mr. Sheehan wrote to Ms. Chaitman that the Peskins
>
> received no preferential payment in the 90 days preceding the filing date of this
> action. Thus, we will promptly determine their customer claim for the full
> amount. Upon their receipt of the Trustee's determination letter, please have
> them execute the Partial Assignment and Release and return it to the Trustee.
> Once they have done so, the Trustee will promptly send them $500,000 advanced
> by SIPC.

*Id.* ¶ 111. Thus, after the Peskins were forced to retain counsel and file a lawsuit, the Trustee

finally acknowledged he had no preference claim against them.

## THE CALLOUS TREATMENT OF MS. EBEL BY THE TRUSTEE AND B&H

### Ms. Ebel's Madoff investment

Ms. Ebel is a widow; her husband, Dr. Marc Ebel, died as a result of medical malpractice

in 2000 at the age of 53. At the time of his death, the Ebels had been married 27 years. Ms. Ebel

had been a nurse but she stopped working in 1989. *Id.* ¶ 114. In 2003, she invested all of her

funds with Madoff based upon the recommendation of a person who told her that Madoff had

been in existence for more than 25 years; that he had been approved by the SEC; and that he had

a very conservative investment strategy. *Id.* ¶ 115. Ms. Ebel opened two accounts with Madoff.

The first account was a direct IRA account in which she invested $1,348,877.12 on February 24,

2003. She never withdrew any funds from this account and it had a balance on November 30,

2008 of $2,532,140.66. The second account Ms. Ebel opened with Madoff was a direct

investment account in which she invested a total of $3,831,387.49 beginning on March 17, 2003

12

and ending on July 23, 2004. The balance in this account as of November 30, 2008 was $4,729,125.04. *Id.*

With respect to each account, every month Ms. Ebel received from Madoff trade confirmations indicating the purchase and sale of S&P 100 company stocks; the purchase and sale of Treasury bills; and the purchase and sale of options to hedge the securities positions. In addition, she received monthly account statements showing the securities positions. In each instance, the trade confirmations and account statements reflected the purchase and sale of securities of S&P 100 companies at prices consistent with those reported in the media. *Id.* ¶ 116.

Ms. Ebel withdrew funds from her direct investment account on a regular basis and utilized the funds to provide support for herself and her family, to pay for the educational expenses of family members, and to fund charitable donations. This was her sole source of income. As part of her normal withdrawal of funds from her account, on September 15, 2008 she received a $102,000 check from Madoff dated September 11, 2008. She deposited the check in her account on September 15, 2008. *Id.* ¶ 117.

After December 11, 2008, Ms. Ebel was forced to go to work in order to support herself. She worked as a house maid; a caretaker for an elderly patient; a driver; a cashier; and in a ladies' clothing store. In short, she did anything she could to earn money to pay her living expenses. She was forced to sell a car, jewelry, household items, and a condominium she had in Florida since 1984, at greatly depressed prices because she needed money to live on and had not promptly received her SIPC insurance. *Id.* ¶ 118

She filed her SIPC claim for both accounts on February 14, 2008. She heard nothing from the Trustee for several months. Finally, on May 20, 2009, she received a determination letter requiring that she acknowledge that her claim with respect to the IRA account was for only

13

$1,348,877.12, the amount of her original investment. She was informed that it was a pre-condition to her receiving SIPC insurance on this account for her to acknowledge that she was not entitled to a claim for any appreciation in that account. Because she was financially desperate and she had no alternative but to accede to the Trustee's demand, she signed the required acknowledgment and, on June 6, 2009, she received a check from SIPC for $500,000 with respect to this account. *Id.* ¶ 119.

Thereafter, she had several communications with an attorney from B&H. She was told that the Trustee was obligated under the law to withhold $102,000 from her SIPC payment with respect to her direct investment account because the Trustee was entitled to deduct the $102,000 payment she received in September 2008. She was also told that this money would simply reduce SIPC's obligations. The money would not be used to pay other investors. She asked if she could accept the $398,000 check and yet reserve her right to claim the $102,000 that the Trustee was going to withhold. She was told that she would not be able to do that and, if she wanted the check for $398,000, she would have to relinquish her claim to the $102,000. She explained that she was uncertain whether she should waive her claim to the $102,000. At that point, Ms. Ebel consulted with counsel. *Id.* ¶ 120.

On May 29, 2009, she received another phone call from the B&H attorney with whom she had been speaking. He told her that there had been a change in strategy by the Trustee and that, because she was a "hardship" case, she would not have to relinquish her claim to the $102,000 if she accepted the $398,000. She was told that she would be sent a revised determination letter and accompanying documents. *Id.* ¶ 121.

She received a determination letter dated June 9, 2009 which stated that because she qualified for the "Hardship Program," she would receive the undisputed portion of her claim,

$398,000. The June 9, 2009 letter required Ms. Ebel to sign a partial assignment and release in

order to receive the $398,000 which the Trustee admits is due and owing to her. *Id.* ¶ 122. By

letter dated June 26, 2009, Mr. Sheehan wrote to Ms. Chaitman enclosing the partial assignment

and release that had been sent to Ms. Ebel on June 9, 2009 and stating that Ms. Ebel would be

paid after she executed that document. By letter dated June 29, 2009, Ms. Chaitman explained to

Mr. Sheehan that Ms. Ebel could not sign the June 9, 2009 partial assignment and release

because it was unacceptable. *Id.* ¶ 126. At the time the Objection was filed, Ms. Chaitman had

received no response to this letter, despite the fact that Ms. Ebel is, in the Trustee's view, a

"Hardship" case entitled to expedited treatment. *Id.* ¶ 127.

### STATEMENT OF QUESTIONS PRESENTED AND RELIEF SOUGHT

QUESTION 1:  Should the Trustee and B&H be disqualified and their first interim fee

applications denied because of the indisputable evidence of their defiance of their statutory

obligations in order to enrich SIPC at the expense of the Customers?

**RELIEF SOUGHT 1**:   Reversal of the bankruptcy court finding that there was no

conflict of interest, disqualification of the Trustee and B&H, and an order of disgorgement of all

fees paid to the Trustee and B&H.

QUESTION 2:  May the Trustee and B&H rely on a provision of SIPA that provides for

the payment of their fees when SIPC agrees to such payment, despite the fact that the Trustee

and B&H have ignored other provisions of SIPA which mandate prompt payment of Customer

claims based upon their Statutory Balances?   In other words, can the Trustee, B&H and SIPC

treat SIPA like a Chinese menu from which they can choose to comply with one provision from

Column A and two provisions from Column B and ignore their other statutory obligations?

1088750.1

**RELIEF SOUGHT 2**:  Reversal of the Order based upon a finding that the Trustee, B&H and SIPC have violated SIPA's fundamental mandate to promptly pay customer claims and, therefore, they are not entitled to any of the benefits of the statute.

QUESTION 3:  Were the Objectants denied due process of law by the bankruptcy court's refusal to find the Trustee and B&H were not disinterested?

**RELIEF SOUGHT 3**:  Reversal of the Order, disqualification of the Trustee and B&H, and an order of disgorgement of all fees paid to the Trustee and B&H.

## ARGUMENT

## I.    THE COURT SHOULD GRANT LEAVE TO APPEAL

The Court should exercise its broad discretion to grant leave to appeal the Order pursuant to 28 U.S.C. § 1292(b).  *See In re Jartran, Inc.,* 886 F.2d 859, 866 (7th Cir. 1989) ("review of interlocutory appeals from the bankruptcy court is in the district court's discretion").  A court may exercise its discretion to grant leave to appeal  where the order:  (1) "involves a controlling question of law," (2) as to "which there is a substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  *Young v. Paramount Comm'ns Inc.*, 186 B.R. 803, 806 (S.D.N.Y. 1995).  Here, each of those criteria are met.

### A.    This Appeal Involves A Controlling Question of Law

To show that there is a controlling question of law:

> the movant must demonstrate that there is a question of *law,* and it is *controlling. In re Pac. Forest Prods. Corp.,* 335 B.R. at 919 (quoting *Ahrenholz v. Bd. of Tr. of the Univ. of Ill.,* 219 F.3d 674, 675 (7th Cir. 2000)) (emphasis in original). Indeed, an issue meets this exacting standard if it deals with a question of "pure" law, or matters that can be decided "quickly and cleanly without having to study the record." *McFarlin v. Conseco Servs., LLC,* 381 F.3d 1251, 1258, 1260-62 (11th Cir. 2004) (finding that because the issues presented involved application of the facts to the law, the

16

movant could not prove a "controlling question of law") (quoting
*Ahrenholz*, 219 F.3d at 677 (7th Cir. 2000)) . . . [A] controlling
question is one that rises from the details of the case to a place of
relevance among similar cases.

*Aurelius Capital Master, Ltd. v. Tousa Inc.*, 2009 U.S. Dist. LEXIS 12735, at *53 (S.D. Fla. Feb

6, 2009). This appeal raises several controlling questions of law. The first is whether a SIPC

trustee and his counsel may continue to serve when they are conflicted by their loyalty to SIPC.

This question is a question of "pure law."

The conflict arises from the Trustee's defiance of SIPA's mandate to promptly pay

Customer claims based upon the Customers "net equity," 15 U.S.C. § 78fff(a)(1)(A)-(B). SIPA

defines "net equity" as the value of the securities positions in the customer's account as of the

SIPA filing date, less any amount the customer owes the debtor. The term "net equity" means

the dollar amount of the account or accounts of a customer, to be determined by –

> (A) calculating the sum which would have been owed by the debtor to such
> customer if the debtor had liquidated, by sale or purchase on the filing date, all
> securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date. . .

15 U.S.C. §78lll(11).

Congress specifically prohibited SIPC from changing any definitions contained in § 78lll,

which section includes the definition of "net equity." As stated in SIPA:

> SIPC shall have the power. . . to adopt, amend and repeal, by its Board of
> Directors, such rules as may be necessary or appropriate to carry out the purposes
> of this chapter, including rules relating to . . .the definition of terms in this
> chapter, **other than those terms for which a definition is provided in section
> 78lll of this title. .**

15 U.S.C. § 78ccc(b)(4)(A) (emphasis added). Because SIPC has no power to change the

statutory definition of "net equity," the Trustee has no power to employ his "cash in minus cash

out" definition of net equity. Yet, in conflict with his fiduciary duty to customers, the Trustee

17

has refused to apply the statutory definition of "net equity" and instead has invented a "money in

minus money out" definition, in violation of SIPA and Second Circuit law. *In re New Times*

*Securities Services, Inc.*, 371 F.3d 68, 72 (2d Cir. 2004).

It is axiomatic that the bankruptcy court has a fundamental obligation to monitor the

integrity of proceedings before it. *In re Plaza Hotel Corp.*, 111 B.R. 882, 891 (B.E.D. Cal.

1990). In addition, the disinterestedness of a trustee's counsel is "so crucial to the proper

functioning of the bankruptcy system that a court may raise it and dispose of it whenever its

sanctity is questioned." *In re Vebeliunas*, 231 B.R. 181 (B.S.D.N.Y. 1999), *citing In re Martin*,

817 F. 2d 175, 180 (1st Cir. 1978). A "trustee/fiduciary must be free from any hint of bias," and

"either an appearance of impropriety or a potential conflict of interest . . . is a viable cause for

removal" of a trustee. *In re AFI Holding, Inc.*, 355 B.R. 139 (9th Cir. BAP 2006) (affirming

bankruptcy court's removal of Chapter 7 trustee).

In addition to the Trustee's conflict, B&H are conflicted because an attorney cannot

represent adverse interests. Rule 1.7(a) of the New York Rules of Professional Conduct, 22

N.Y.C. R.R. § 1200.7(a). An attorney must avoid even the "appearance of a conflict" pursuant

to § 327(a) of the Bankruptcy Code. *In re Hot Tin Roof,* 205 B.R. 1000, 1003 (1st Cir BAP

1997). Here, B&H represents the Trustee who has a fiduciary duty to Customers. Yet, B&H is

deliberately acting to delay and frustrate the payment of Customer claims, even to the point of

misrepresenting the law to destitute Customers who cannot afford to retain their own counsel.

Such misrepresentation itself is grounds for denial of fees. *See In re Mercury*, 122 Fed. Appx.

528 (2d Cir. 2004) (affirming denial of compensation to firm that acted as counsel for debtors

and counsel for trustee, where the attorneys acted in the interest of the trustee instead of debtors

and incorrectly advised debtors regarding their rights to convert Chapter 7 filing to Chapter 11

filing). It also violates B&H's ethical obligations. *See* Rule 4.1 of the New York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.32 ("In the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person.").

Although SIPC is deemed to be "disinterested," 15 U.S.C. §§ 78eee(b)(6)(A), SIPA does not, and could not, provide that a trustee, who is not an employee of SIPC, is "disinterested" or that an attorney retained by the Trustee is deemed, as a matter of law, to be "disinterested," particularly in a case like this where the Trustee and his counsel have flatly rejected the fundamental mandates of SIPA that were intended to protect customers.

The Trustee and B&H have a conflict of interest as a result of which they are barred from receiving any compensation under established precedents and principles of professional conduct. *See In re Angelika Films 57th, Inc.*, 246 B.R. 176 (S.D.N.Y. 2000) (affirming bankruptcy court's denial **in its entirety** of fee application of debtor's counsel where counsel represented debtor's principal in other matters and took actions in the bankruptcy that "placed the interests of the Debtor's principal. . . over those of the Debtor.")

Here, the bankruptcy court ignored its responsibility to monitor the proceedings and simply rested on its February 2009 finding that there was no conflict, even though the conflict did not arise until the Trustee began to advance his incorrect interpretation of "net equity," **after** the disinterestedness hearing.  At that point, the Trustee and his counsel became conflicted and should have been disqualified and their fee application should have been denied.

The second controlling question of law is whether the bankruptcy court was required to approve the first interim fee applications because SIPC recommended that such applications be approved.  SIPC argued that 15 U.S.C. § 78eee(b)(5)(C) required the Court to approve the amounts requested because it provided that:

> Whenever an application for allowances is filed pursuant to
> subparagraph (B), SIPC shall file its recommendation with respect
> to such allowances with the court prior to the hearing on such
> application and shall, if it so requests, be allowed reasonable time
> after such hearing within which to file a further recommendation.
> In any case in which such allowances are to be paid by SIPC
> without reasonable expectation of recoupment thereof as provided
> in this chapter and there is no difference between the amounts
> requested and the amounts recommended by SIPC, the court shall
> award the amounts recommended by SIPC. . . .

Because the Trustee had stated in his fee application that he had "no reasonable expectation that

the general estate will be sufficient to make any distribution to general creditors or pay any

administrative expenses" (Trustee Fee App. ¶ 37), SIPC argued that the bankruptcy court was

required to allow payment of all amounts sought in accordance with SIPC's recommendation.

However, SIPC and the bankruptcy court did not address whether SIPC and the Trustee

were entitled to the benefit of that provision when they had ignored their fundamental obligation

under SIPA to promptly pay Customer claims based upon the Customers' Statutory Balances.

In other words, can the Trustee, B&H and SIPC simply decide to reject certain of their statutory

obligations and yet seek the protection of others. This issue is particularly important in this case

in view of the fact that SIPC is insolvent and unable to pay its debts to the Customers.

The Trustee argued in response to the Objection that the "granting of the Applications

will not effect the amount of funds available for distribution to customers" because SIPC was

advancing the funds to pay the fees. However, the Trustee failed to address the issue of whether

SIPC had enough funds to pay him and B&H and still fulfill its statutory obligations to

Customers. (Trustee Resp. to Objections ¶ 2). According to the Trustee's website, over 15,400

claims have been filed. (Objection ¶ 12). If each of those claimants had an account holding at

least $500,000, that would mean SIPC has a liability to the claimants of $7.7 billion. SIPC has

stated publicly that it has approximately $1.4 billion and, under SIPA, it has a $1 billion line of

20

credit with the SEC and a $1 billion line of credit with the US Treasury. Of course, those lines

of credit constitute loans which would have to be repaid by SIPC's members, the SEC-regulated

broker/dealers. Objection ¶ 47.

The fact that SIPC is insolvent and unable to pay its debts as they become due is

indisputable. SEC Commissioner Mary Schapiro so testified before a House Subcommittee on

July 14, 2009, in response to a question as to when Customers would be paid. She testified:

> The tragic truth is there is not enough money available to pay off
> all the customer claims.

(Objection, Exh. B). Thus, every dollar paid to the Trustee and B&H – and their fees alone are

accruing at the rate of $1 million per week – is a dollar taken away from Customers. (See

Objection ¶ 14). At the rate the Trustee and B&H are going, they will be paid $50 million per

year for 5 – 10 years, for a total of $250 million to $500 million.

With the other administrative expenses SIPC is incurring in this case, it is incurring

expenses of $2 million per week. Objection ¶ 14. Because of their patent conflict of interest,

the Trustee and B&H have overseen the incurrence of those expenses which have been

necessitated solely because they have defied SIPA's mandate to promptly pay Customer claims

based upon the Statutory Balances.

The bankruptcy court dismissed Commissioner Schapiro's testimony as "hearsay."

However, such testimony should have been considered pursuant to the hearsay exception

contained in FRE 803(8), which includes "[r]ecords, reports, statements, or data compilations, in

any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or

(B) matters observed pursuant to duty imposed by law as to which matters there was a duty to

report. . ." Commissioner Schapiro's statements are records of a public office, Congress, and

thus should have been admitted even without foundation testimony. *See U.S. v. Doyle*, 130 F.3d

21

523, 546 (2d Cir. 1997). This is particularly true because the SEC has plenary jurisdiction over SIPC. 15 U.S.C. § 78ggg(b).

The third controlling question of law is whether the Customers have been denied due process of law as guaranteed to them under the Due Process Clause of the Fifth Amendment to the United States Constitution. "The bankruptcy power, like other great substantive powers of Congress, is subject to the Fifth Amendment." *Louisville Bank v. Radford*, 295 U.S. 555, 589, 602 (1935); *see also In re Phillips*, 13 B.R. 82 (B. C.D. Ill. 1981). Accordingly, any statutory scheme resulting from Congress' exercise of its Constitutional bankruptcy powers must be constrained by the requirements of the Due Process Clause of the Fifth Amendment.

Evaluating a Fifth Amendment due process claim begins with a two-part analysis: 1) whether the interest asserted rises to the level of a "property interest"; and 2) if it does, the court must weigh the competing interests of the individual and the state to determine what process is constitutionally required. *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361 (9th Cir. 1976). Congress, through SIPA, has statutorily created a property interest for the Customers: the right to receive SIPC insurance of up to $500,000. *See* 15 U.S.C. § 78(fff-3). This is a protected "property interest" under the Fifth Amendment because it is an entitlement to a government benefit conferred by statute. *See S & D Maintenance Co., Inc. v. Goldin*, 844 F.2d 962, 965 (2d. Cir. 1988); *Garcia v. U.S.*, 666 F.2d 690 (5th Cir. 1982).

While SIPC is not a governmental agency, it is a creation of Congress and performs public functions, one of which is the designation of trustees and counsel in bankruptcy proceedings who have the power, in the first instance, to determine claims. The conduct of a private entity amounts to state action when, like SIPC, it acts in a judicial or quasi-judicial capacity pursuant to a legislative delegation of authority. *See Concrete Pipe & Prods. v. Constr.*

22

*Laborers Pension Trust*, 508 U.S. 602, 617 (1993); *see also Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447 (1st Cir. 1983).    Here, Congress has created SIPC which functions in a quasi-judicial capacity pursuant to a legislative delegation of authority.

It is axiomatic that "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). Congress has impermissibly created a statutory scheme that is permeated by partiality, conflicts of interest, and bias by permitting SIPC to appoint and control the Trustee and the Trustee's counsel, regardless of the obvious conflict of interest between SIPC and the Customers.  SIPC has a financial incentive to deny Customer claims and has acted solely to protect its members, the Financial Services Industry, from the obligation to fund the payments to Customers.

In *Schweiker*, the Supreme Court would have found a violation of due process if the carriers, who appointed the hearing officers, had a financial interest in the outcome. *Schweiker*, 456 U.S. at 197 ("In the absence of proof of financial interest on the part of the carriers, there is no basis for assuming a derivative bias among their hearing officers").  SIPA's grant of power to SIPC to select the trustee who, in turns, chooses counsel in bankruptcy proceedings, and designation of SIPC and its employees as statutorily disinterested, violates the Customers' due process rights. *See Concrete Pipe,* 508 U.S. at 618-19 (where trustee functions in an adjudicative capacity, appearance of bias alone violates Due Process).

All of these questions are questions of law, not of fact, because the Objection constituted an offer of proof, and the Trustee's failure to introduce any evidence in opposition to the offer of proof rendered it indisputable. *See, e.g., In re Drouin*, 1999 Bankr. LEXIS 1878, at *7 (B.D.N.H. Nov. 19, 1999)(court based finding of fact on unrefuted offer of proof)). *See also In re Miguel*, 30 B.R. 893, 894 (B.E.D.CA 1983) (judgment granted to plaintiffs upon their offer of

1088750.1

proof because of failure of defendants or their counsel to appear at trial). Moreover, as set forth above, the questions are controlling because they concern other cases beyond this case – in fact, they are directly applicable in all SIPC cases.

**B.     There Is Substantial Ground for Difference of Opinion**

There is also a "substantial ground for difference of opinion" here because the questions involve "one or more difficult and pivotal questions of law not settled by controlling authority." *Northeast Savings F.A. v. Geremia*, 191 B.R. 275,278 (D.R.I. 1996); see *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave*, 921 F.2d 21, 25 (2d Cir. 1990) (hearing interlocutory appeal involving the difficult issue of first impression concerning the PLO's functional immunity as an observer of the United Nations); *In re Pappas*, 207 B.R. 379, 381-82 (2d Cir. BAP 1997) (hearing interlocutory appeal where there is a difference of opinion on whether court may extend the time of a creditor to commence an adversary proceeding based on another creditor's general motion without a particularized showing). There is often a substantial ground for difference of opinion where, as here, "precedent bearing on the matter is relatively thin," *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 156 (D.N.J. 2005).

Plainly, there is substantial ground for a difference of opinion concerning the Trustee's conflict of interest as evidenced by his defiance of his statutory responsibilities. There is virtually no case law on this issue of which we are aware. Because it is an issue of first impression in this Circuit, this Court should hear the appeal and rule on the matter. In addition, there is substantial ground for a difference of opinion with respect to the bankruptcy court's obligation to honor SIPC's request for payment of a SIPA trustee's fees when SIPC is insolvent and unable to honor its insurance obligations. That too is an issue of first impression.

24

Finally, the due process issue is subject to a substantial difference of opinion because there are no cases directly on point in which a court found that a biased SIPA Trustee violated the due process rights of customers. Indeed, the broader issue here of the propriety of payment of interim fees has even been found to be an issue of law over which a substantial difference of opinion existed. *See also In re Big Rivers Electric Corp.*, 266 B.R. 100, 105 (W.D.Ky. 2000) (issue of the propriety of the bankruptcy court's order for payment of interim fees to examiner's counsel was issue of law over which a substantial difference of opinion existed).

## C.   An Immediate Appeal Will Advance The Ultimate Termination Of The Litigation

This case will be materially advanced for the benefit of all Customers if the Order is immediately appealable. Appointment of a new trustee who will fulfill his fiduciary duty to Customers is urgently needed. If a new trustee were appointed who complied with his statutory obligations, Customers could receive SIPC insurance based upon their Statutory Balances within weeks, rather than within years as will otherwise occur.

## CONCLUSION

For the foregoing reasons, Objectants' motion for leave to appeal the Order should be granted.

August 14, 2009

<div style="margin-left:4em">

PHILLIPS NIZER LLP

By ___s/s Helen Davis Chaitman___
666 Fifth Avenue
New York, New York 10103-0084
(212) 841-1320
*Attorneys for Diane and Roger Peskin and
Maureen Ebel, with the support of more than
100 other customers*

</div>

25