James H.M. Sprayregen, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Anna G. Rotman, P.C. (admitted *pro hac vice*)
Jamie Aycock (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Facsimile:    (713) 836-3601

James A. Stempel (admitted *pro hac vice*)
Andrew R. McGaan, P.C. (*pro hac vice* pending)
Joseph M. Graham (admitted *pro hac vice*)
Angela M. Snell (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NINE WEST HOLDINGS, INC., *et al.*,[1] | ) | Case No. 18-10947 (SCC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**REPLY IN SUPPORT OF DEBTORS' APPLICATION PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) TO RETAIN ALVAREZ & MARSAL NORTH AMERICA, LLC TO PROVIDE THE DEBTORS AN INTERIM CHIEF EXECUTIVE OFFICER AND CERTAIN ADDITIONAL PERSONNEL AND (B) DESIGNATE RALPH SCHIPANI AS INTERIM CHIEF EXECUTIVE OFFICER FOR NINE WEST HOLDINGS, INC. AND ITS DEBTOR AFFILIATES, *NUNC PRO TUNC* TO THE PETITION DATE**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Nine West Holdings, Inc. (7645); Jasper Parent LLC (4157); Nine West Management Service LLC (4508); Kasper Group LLC (7906); Kasper U.S. Blocker LLC (2390); Nine West Apparel Holdings LLC (3348); Nine West Development LLC (2089); Nine West Distribution LLC (3029); Nine West Jeanswear Holding LLC (7263); One Jeanswear Group Inc. (0179); and US KIC Top Hat LLC (3076).  The location of the Debtors' service address is:  1411 Broadway, New York, New York 10018.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ........................................................................................................... 1

Background ............................................................................................................................. 3

Argument ............................................................................................................................... 5

    I.    The Court May Authorize the Debtors' Retention of Mr. Schipani as Interim CEO and A&M Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code. .......................................................................................................... 5

    II.    The Fact that the Debtors' Retention of A&M Complies with the Jay Alix Protocol in All Material Respects Further Demonstrates Retention Under Section 363(b) Is Appropriate ............................................................. 10

    III.    Retention of A&M to Provide the Interim CEO and Additional Personnel Is of Critical Importance in these Cases. ................................................. 13

Exhibit A ............................................................................................................................. 17

KE 54856147

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 21st Century Oncology Holdings, Inc.*,
No. 17-22779 (RDD) (Bankr. July 19, 2017) ...........................................................6

*In re Adelphia*,
No. 02-41729 (REG) (Bankr. S.D.N.Y. July 31, 2002)...........................................11

*In re Aeropostale, Inc.*,
No. 16-11275 (SHL) (Bankr. S.D.N.Y. 2016)...........................................................6

*In re Ajubeo LLC*,
No. 17-17924, 2017 WL 5466655 (Bankr. D. Col. Sept. 27, 2017)....................5, 8

*In re Answers Holdings, Inc.*,
No. 17-10496 (SMB) (Bankr. S.D.N.Y. April 5, 2017) ...........................................6

*In re Avaya Inc.*,
No. 17-10089 (SMB) (Bankr. S.D.N.Y. March 21, 2017) .......................................6

*In re Baldwin-United Corp. Litig.*,
765 F.2d 343 (2d Cir. 1985).....................................................................................14

*In re BCBG Max Azria Global Holdings, LLC*,
No. 17-10466 (SCC) (Bankr. S.D.N.Y. March 29, 2017) .......................................6

*In re Bethlehem Steel Corp.*,
No. 02 Civ. 2854 (MBM), 2003 WL 2173864 (S.D.N.Y. July 27, 2003) ...............7

*In re Bicoastal Corporation (Bicoastal Corporation v. Clear)*,
149 B.R. 216 (Bankr. M.D. Fla 2004) .....................................................................8

*In re Bidermann Indus. U.S.A., Inc.*,
No. 95-43098 (TLB) (Bankr. S.D.N.Y. Sep. 21, 1995)...........................................6

*In re Bill's Dollar Stores, Inc.*,
No. 01-0435 (PJW) (Bankr. D. Del. March 14, 2001)...........................................11

*In re Binder & Binder*,
No. 14-23728 (RDD) (Bankr. S.D.N.Y. Jan. 1, 2015)..............................................6

*In re Blue Stone Real Estate, Constr. & Dev. Corp.*,
392 B.R. 897 (Bankr. M.D. Fla. 2008) .....................................................................8

*In re Chateaugay Corp.*,
    80 B.R. 279 (S.D.N.Y. 1987) ...................................................................................14

*In re Chateaugay Corp.*,
    973 F.2d 141 (2d Cir. 1992) ....................................................................................13

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
    722 F.2d 1063 (2d Cir. 1983) ............................................................................5, 14

*In re Copenhaver*,
    506 B.R. 757 (Bankr. C.D. Ill. 2014) ...................................................................5, 8

*In re Dana Corp.*,
    No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 29, 2006) ..........................................6

*In re Dewey & LeBoeuf LLP*,
    No. 12-12321 (MG) (Bankr. S.D.N.Y. May 28, 2012) ............................................6

*In re Enron Corp.*,
    335 B.R. 22 (S.D.N.Y. 2005) ..................................................................................6

*In re Enron Corp.*,
    No. 01-16034 (AJG), 2002 WL 3215052 (Bankr. S.D.N.Y. April 4, 2002) ...........11

*In re Enron Corp.*,
    No. 01-16034 (AJG), 2006 WL 1030421 (Bankr. S.D.N.Y. Apr. 12, 2006)............5

*In re Forstmann & Co., Inc.*,
    No. 95-44190 (JLG) (Bankr. S.D.N.Y. Dec. 7, 1995) ............................................6

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982) ................................................................................................9

*In re Harnischfeger Indus. Inc.*
    No. 99-2171 (Bankr. D. Del. Oct. 4, 2001) .....................................................10, 12

*In re Iridium Operating, LLC*,
    No. 99-45005 (CB) (Bankr. S.D.N.Y. 1999) ........................................................11

*In re Lehman Brothers Holdings, Inc.*,
    No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 17, 2008) .........................................6

*In re Lyondell Chemical Company*,
    No. 09-10023 (MG) (Bankr. S.D.N.Y. Mar. 10, 2009) ..........................................6

*In re Maidenform Worldwide Inc.*,
    No. 97-44869 (CB) (Bankr. S.D.N.Y. Oct. 31, 1997) ............................................6

iii

*In re Mark IV Indus., Inc.*,
No. 09-12795 (SMB) (Bankr. S.D.N.Y. May 28, 2009)...........................................6

*In re PRC, LLC*,
No. 08-10239 (MG) (Bankr. S.D.N.Y. Feb. 27, 2008)............................................6

*In re Relativity Fashion, LLC*,
No. 15-11989 (MEW) (Bankr. S.D.N.Y. Sep. 28, 2015)..........................................6

*In re Residential Capital, LLC*,
No. 12-12020 (MG) (Bankr. S.D.N.Y. Mar. 5, 2013)..............................................6

*In re Sabine Oil & Gas Corp.*,
No. 15-11835 (SCC) (Bankr. S.D.N.Y. Aug. 10, 2015)..........................................6

*In re Safety-Kleen Corp.*
No. 00-02303 (Bankr. D. Del. 2000) ...............................................................10, 12

*In re Saint Vincent's Catholic Med. Centers of New York*,
No. 05 B 14945 (ASH), 2007 WL 2492787 (Bankr. S.D.N.Y. Aug. 29, 2007).....................10

*In re SunEdison, Inc.*,
No. 16-10992 (SMB) (Bankr. S.D.N.Y. June 8, 2016)...........................................6

*In re Toisa Limited*,
No. 17-10184 (SCC) (Bankr. S.D.N.Y. Jan. 1, 2018) ...................................6, 7, 11

*United States v. Venturella*,
391 F.3d 120 (2d Cir. 2004)..........................................................................10

*In re Velo Holdings, Inc.*,
No. 12-11384 (MG) (Bankr. S.D.N.Y. May 29, 2012).............................................6

**Statutes**

11 U.S.C. § 105(a) ..............................................................................................3, 6

11 U.S.C. § 363(b) ............................................................................................3, 5, 6

iv

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file this reply in further support of their application [Docket No. 207] (the "Application") to retain Alvarez & Marsal North America, LLC ("A&M") and designate Ralph Schipani as Interim CEO for Nine West Holdings, Inc. and its Debtor affiliates and in response to the objection [Docket No. 408] (the "Objection") by the Office of the United States Trustee (the "U.S. Trustee") to the Application.[2]  In response to the Objection, and in further support of the Application, the Debtors respectfully state as follows:

## Preliminary Statement

1.      All of the economic stakeholders in these chapter 11 cases support the Debtors' retention of Mr. Schipani and A&M to ensure continuity in the Debtors' operations and to avoid needlessly disrupting these cases.  The U.S. Trustee's Objection ignores these grave concerns.  Instead, it makes a purely technical but erroneous point—that section 363(b) is inapplicable.  Robust case law, ignored by the U.S. Trustee, holds otherwise.  Also, the Objection contradicts the U.S. Trustee's policy of allowing retention under section 363(b) in similar circumstances over the last 14 years.

2.      Mr. Schipani and A&M are neither new nor easily replaceable.  The Debtors retained them over four years ago, on April 8, 2014.  Since then Mr. Schipani and A&M have played a vital role in managing the Debtors' day-to-day and strategic operations, and have provided management stability during this time.  Mr. Schipani has served as President since May 2015 and Interim CEO since June 2016.  Over these years, other A&M personnel have worked with Mr. Schipani to manage the business, including Stuart Loop, an A&M analyst who also started in April 2014 and remains at the Debtors.  Mr. Schipani and the A&M team have gained critical

---

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed such term in the Application.

experience and institutional knowledge related to the Debtors' customers, trade vendors, cash flow, and other operations, none of which can be replaced easily or quickly. The Debtors and their stakeholders are in the midst of plan negotiations and various investigations, making this a particularly precarious time to oust senior management. And to what end? The U.S. Trustee has no answer. Recognizing the crucial role Mr. Schipani and A&M are playing, *all* of the Debtors' key economic stakeholders support the retention.

3.    The harmful outcome that would result from the U.S. Trustee's position is not mandated by the Bankruptcy Code because section 363(b) is an appropriate and well-supported basis to seek retention of Mr. Schipani and A&M. That provision expressly provides that a debtor may use estate assets outside the ordinary course of business if such use is supported by a good business reason. Both case law and, more commonly, entered orders on chapter 11 dockets establish that dozens of courts throughout the country have approved retention of firms like A&M to provide officers to debtors under sections 105 and 363 of the Bankruptcy Code. No party— including the U.S. Trustee—has even suggested the Debtors lack a good business reason to retain Mr. Schipani and A&M or that providing for competent corporate leadership during their chapter 11 cases is not in the best interest of the Debtors' estates. Nor has the U.S. Trustee even attempted to articulate how the interests of the creditors or any of the Debtors' stakeholders could possibly be served by abruptly removing the Debtors' Interim CEO or A&M.

4.    Although the Debtors appreciate the U.S. Trustees' vigilance in carrying out their chapter 11 oversight duties, their policy position regarding the use of sections 105 and 363 of the Bankruptcy Code to retain advisory firms and company officers is neither supported by the law nor the facts of these cases. As set forth more fully herein, the Debtors believe that case law and precedent strongly support the Debtors' requested relief and that the U.S. Trustee's Objection

2

should be overruled.  Accordingly, in light of this precedent and the circumstances of these cases, the Debtors respectfully request that the Court approve the retentions of Mr. Schipani and A&M.

## Background[3]

5.      A&M was first engaged by the Debtors on April 8, 2014, to help improve the businesses organized under two separate companies—Jones Holdings LLC ("Jones Businesses") and Nine West Holdings, Inc. (the "Nine West Businesses").  Schipani Supp. Decl. ¶ 2.  A&M's retention was approved by the Debtors' then existing board of directors.  *Id*.  The Debtors later entered into an engagement letter defining the scope and cost of A&M's services (the "2014 Engagement Letter," attached hereto as **Exhibit A**).  *Id*.

6.      Pursuant to the 2014 Engagement Letter, A&M provided personnel to assist the Jones Businesses and the Nine West Businesses in achieving strategic and operational goals, namely an internal restructuring of operational functions across both companies' business units. *Id*. ¶ 3.  Mr. Schipani served initially as Interim Vice President of Operations.  *Id*.  The duties of A&M personnel and Mr. Schipani included, among other things, (a) supervising and assisting in operations, finance, accounting, and treasury functions, (b) assisting in the identification of cost reductions and other operational improvements, and (c) assisting in the evaluation and development of budgets and business plans.  Exhibit A ¶ 1(b).  The boards and other officers of the Jones and the Nine West Businesses supervised A&M's work, as applicable.  Schipani Supp. Decl. ¶ 2.  The A&M personnel's duties were limited to implementing proposals and strategies set by these boards.  *Id*.

---

[3]   The facts and circumstances supporting this reply are set forth in the *Supplemental Declaration of Ralph Schipani in Support of Debtors' Application Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Retain Alvarez & Marsal North America, LLC to Provide the Debtors an Interim Chief Executive Officer and Certain Additional Personnel and (B) Designate Ralph Schipani as Interim Chief Executive Officer For Nine West Holdings, Inc. and Its Debtor Affiliates, Nunc Pro Tunc to the Petition Date* (the "Schipani Supplemental Declaration"), filed contemporaneously herewith.

3

7.      During 2014 and 2015, the boards made significant changes to each company's corporate structures, consolidating and reorganizing business units. *Id.* ¶¶ 2–3. Mr. Schipani became responsible for managing larger segments of Nine West Businesses' activities—first becoming president of Nine West Holdings, Inc. ("NWHI") following the departure of a different A&M corporate officer in May 2015, and later assuming additional financial oversight duties following the departure of the NWHI's CFO in September 2015. *Id.* ¶¶ 11–12. To carry out his expanded duties effectively, Mr. Schipani also assumed (at the direction of the parent company board) the board positions each of these officers held at NWHI's subsidiaries, and replaced another resigning employee on two additional subsidiary boards. *Id.* ¶ 12. In June 2016, Mr. Schipani was appointed Interim CEO of NWHI. *Id.* ¶ 5. At all times, the A&M personnel and Mr. Schipani provided services under the supervision of the parent company board and pursuant to the 2014 Engagement Letter. *Id.* ¶¶ 2, 18.

8.      Since the outset of A&M's engagement, Mr. Schipani has been involved in implementation of various operational objectives set by the NWHI Board including: (a) consolidating and redistributing shared services across the company's business units; (b) overseeing and managing the leadership of different business units, (c) managing the company's relationships with vendors and customers, (d) reducing the company's brick-and-mortar retail presence, (d) facilitating the sale of the company's Easy Spirit brand, (e) overseeing the attempted rehabilitation of Nine West Canada, and (f) preparing the company's business operations for these chapter 11 cases. *See id.* ¶¶ 3, 5–6. Mr. Schipani is highly regarded by the Debtors' various creditor constituencies and employees and has been incredibly valuable in plan and financing negotiations. Having played an integral role in the Debtors' day-to-day operations for over four years, Mr. Schipani and A&M cannot be terminated without causing severe

4

disruption. Accordingly, the Debtors seek authority from the Court to continue Mr. Schipani's and A&M's retention postpetition.

<u>**Argument**</u>

**I.     The Court May Authorize the Debtors' Retention of Mr. Schipani as Interim CEO and A&M Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code**.

9.     Under section 363(b) of the Bankruptcy Code, after notice and hearing, a debtor has broad discretion to "use, sell, or lease, other than in the ordinary course of business, property of the estate," so long as such use is supported by a good business reason. 11 U.S.C. § 363(b)(1) *See, e.g.*, *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a §363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."). Recognizing this hornbook law, numerous courts have authorized debtors to retain officers and management and turnaround consulting firms pursuant to section 363(b) of the Bankruptcy Code. *See, e.g.*, *In re Enron Corp.*, No. 01-16034 (AJG), 2006 WL 1030421, at *2 (Bankr. S.D.N.Y. Apr. 12, 2006) (noting that court authorized the debtors, under section 363(b), to retain a management consulting firm to provide a chief executive and chief restructuring officer and additional individuals to serve as additional personnel during the chapter 11 cases); *In re Ajubeo LLC*, No. 17-17924, 2017 WL 5466655 (Bankr. D. Col. Sept. 27, 2017) (approving retention of management consulting firm to provide a chief restructuring officer under section 363(b)); *see also In re Copenhaver*, 506 B.R. 757, 764 (Bankr. C.D. Ill. 2014) (holding that the retention of a current director as consultant and chief restructuring officer under section 363(b) would be appropriate given the "unique and compelling circumstances" of the case,

5

subject to modification of the court's oversight of the officers' fees).[4]  In addition to this case law,

courts in this district routinely approve retentions pursuant to section 363(b) similar to the one

sought in the Application.  *See, e.g.*, *In re Toisa Limited*, No. 17-10184 (SCC) (Bankr. S.D.N.Y.

Jan. 1, 2018) [Doc. 458] (authorizing retention of an advisor and approving employment of a chief

restructuring officer pursuant to section 363(b)).[5]

      10.     Courts in this district have also held that section 327 of the Bankruptcy Code is not

the exclusive means by which a debtor may retain and pay professionals.  In *In re Enron Corp.*,

335 B.R. 22, 29 (S.D.N.Y. 2005), the district court overruled the objection of an unsecured

creditors committee arguing that section 327(e) of the Bankruptcy Code provided the exclusive

---

[4]    Courts have also approved the retention of restructuring advisors solely under the Court's inherent equitable powers encompassed in section 105 of the Bankruptcy Code.  *See In re Maidenform Worldwide Inc.*, No. 97-44869 (CB) (Bankr. S.D.N.Y. Oct. 31, 1997) (approving the retention of a restructuring advisor and senior management pursuant to section 105); The Committee on Bankruptcy and Corporate Reorganization, Corporate Crisis Managers and Disinterestedness under the Bankruptcy Code, Bankruptcy and Corporate Reorganization at 208 n.65 (2005) (noting that the Bankruptcy Court for the Southern District of New York has approved retention of crisis managers under section 105(a)) (citing *Maidenform*; *In re Bidermann Indus. U.S.A., Inc.*, No. 95-43098 (TLB) (Bankr. S.D.N.Y. Sep. 21, 1995); and *In re Forstmann & Co., Inc.*, No. 95-44190 (JLG) (Bankr. S.D.N.Y. Dec. 7, 1995)).

[5]    *See also In re 21st Century Oncology Holdings, Inc.*, No. 17-22779 (RDD) (Bankr. July 19, 2017) [Dkt. 229] (authorizing the retention of an advisor and employment of a CEO, CFO, vice-president of tax, and certain additional personnel pursuant to section 363(b)); *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. April 5, 2017) [Dkt. 112] (authorizing the retention an advisor and the employment of a CRO and certain additional personnel pursuant to sections 105(a) and 363(b)); *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. March 21, 2017) [Dkt. 284] (similar); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y.  March 29, 2017) [Dkt. 242] (similar); *In re Aeropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. 2016) [Dkt. 879] (similar); *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. June 8, 2016) [Dkt. 512] (similar); *In re SunEdison, Inc.*, No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 11, 2016) [Dkt. 967] (similar); *In re Relativity Fashion, LLC*, No. 15-11989 (MEW) (Bankr. S.D.N.Y. Sep. 28, 2015) [Dkt. 669] (similar); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. Aug. 10, 2015) [Dkt. 145] (similar); *In re Binder & Binder*, No. 14-23728 (RDD) (Bankr. S.D.N.Y. Jan. 1, 2015) [Dkt. 100] (similar); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Mar. 5, 2013) [Dkt. 3103] (similar); *In re Velo Holdings, Inc.*, No. 12-11384 (MG) (Bankr. S.D.N.Y. May 29, 2012) [Dkt. 204] (similar); *In re Dewey & LeBoeuf LLP*, No. 12-12321 (MG) (Bankr. S.D.N.Y. May 28, 2012) [Dkt. 224] (similar); *In re Mark IV Indus., Inc.*, No. 09-12795 (SMB) (Bankr. S.D.N.Y. May 28, 2009) [Dkt. 170] (similar); *In re Lyondell Chemical Company*, No. 09-10023 (MG) (Bankr. S.D.N.Y. Mar. 10, 2009) [Dkt. 1141] (similar); *In re Lehman Brothers Holdings, Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y.  Dec. 17, 2008) [Dkt. 2278] (similar); *In re PRC, LLC*, No. 08-10239 (MG) (Bankr. S.D.N.Y. Feb. 27, 2008) [Dkt. 182] (similar); *In re Dana Corp.*, No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 29, 2006) [Dkt. 740] (similar).  Because of the voluminous nature of the orders cited herein, such orders have not been attached to this reply.  Copies of these orders are available upon request to the Debtors' proposed counsel.

means by which to retain a law firm that would provide advice to a debtor's employees. The court stated that "a transaction outside the ordinary course of business may be approved under section 363(b) if the transaction meets the requirements of that section, even if another provision of the code touches upon the subject matter of that transaction." *Id.* (citing *In re Bethlehem Steel Corp.*, No. 02 Civ. 2854 (MBM), 2003 WL 2173864, at *11 (S.D.N.Y. July 27, 2003) (holding that attorneys for the debtor's employees could be appropriately retained under section 363(b) even though attorneys "for a special purpose" could also be employed under section 327(e) and stating "[t]he authorization of certain payments under § 363(b) is not prohibited simply because there is another section of the Bankruptcy Code related to the same type of payment.").

11.    Ignoring all of this precedent, the U.S. Trustee asserts that the Debtors cannot follow this well-settled path to retain management consulting firms pursuant to sections 363 and 105 of the Bankruptcy Code. Moreover, the Objection fails to address those cases where courts approved retention under section 363 of the Bankruptcy Code over the U.S. Trustee's argument, like here, that only section 327 applied. For example, *In re Toisa Limited*, No. 17-10184 (SCC) (Bankr. S.D.N.Y. Jan. 18, 2018), the debtors sought to retain Zolfo Cooper ("Zolfo") to provide them with a chief restructuring officer (a "CRO") and certain additional personnel, which retention was part of a broader settlement among the disparate economic stakeholders. The U.S. Trustee argued that the debtor could proceed only under section 327 but could not satisfy it because Zolfo had previously served as a financial advisor. Hr'g Tr. 23:20–24 ("Now you're telling me that even though the debtor has moved to retain Mr. Mitchell under 363 and not pursuant to 327, it's still kind of like he should be retained under 327 and you don't believe he could be retained under 327."). The court firmly rejected the U.S. Trustee's argument, observing that section 363 is

7

frequently used in the Second Circuit to permit the retention of CRO's.  Hr'g Tr. 25: 19–22.  The

court then approved Zolfo's retention as CRO under section 363 [Dkt. 458].

12.     Similarly, in *In re Ajubeo LLC*, the court overruled the U.S. Trustee's objection to

the retention of a CRO under section 363(b) of the Bankruptcy Code.  The U.S. Trustee argued, as

here, that the retention could only be authorized under section 327.  2017 WL 5466655, at *3.  The

U.S. Trustee also argued that retention under section 327 was not possible because the proposed

CRO was an officer of the debtors and therefore could not meet the disinterestedness requirement

under sections 327 and 101(14).  *Id*.  In authorizing the CRO's retention under section 363(b), the

court stated that such retentions "recognize[] that chapter 11 is a flexible statute" and are

appropriate where the retention of such professionals satisfy the "twin goals of impartiality and

court review of fees."  *Id*. at *4.

13.     Notably, the two cases that hold section 363 is not an available avenue to retain

professionals are non-binding decisions from the Middle District of Florida.  *See In re Blue Stone

Real Estate, Constr. & Dev. Corp.*, 392 B.R. 897 (Bankr. M.D. Fla. 2008); *In re Bicoastal

Corporation (Bicoastal Corporation v. Clear)*, 149 B.R. 216 (Bankr. M.D. Fla 2004).  Both are

inconsistent with the decision law in this district.  Yet even the court in *Blue Stone* recognized that

the primary concerns of section 327 are "to permit the Court to control administrative expenses in

the form of professionals' compensation and ensure that the professional is conflict free and

impartial."  *See In re Blue Stone Real Estate, Constr. & Dev. Corp.*, 392 B.R. at 907 n.14 ("Absent

such judicial oversight and the opportunity for continuing party-in-interest scrutiny of both

professional's retention and compensation, these important goals of the Bankruptcy Code cannot

be met.");  *see also In re Copenhaver*, 506 B.R. at 764 (noting that "of particular concern is the

KE 54856147

suggestion that retention under section 363(b) may limit a court's oversight of the conduct of the employed person.").

14.     Here, these controls will remain in place.  A&M will file quarterly reports of compensation earned and expenses incurred.  A&M's compensation and expenses will be subject to Court review in the event any party in interest objects.  A&M will also file monthly staffing reports, also subject to review by the Court.  A&M has also disclosed all known connections to parties in interest in these cases and has agreed to supplement its disclosures while these cases are pending.  In short, the necessary court oversight safeguards are in place for the Debtors' request to retain A&M and Mr. Schipani pursuant to section 363(b).

15.     Finally, if section 327 of the Bankruptcy Code is the only available path for a debtor to retain a restructuring advisory firm and officers supplied by those advisory firms, it would lead to an absurd result.  As a matter of good governance, companies (both in and out of distress) retain advisory firms to help manage their business as circumstances dictate.  These firms may then provide people to fill necessary management roles at the company, including roles such as chief executive and financial officers, and play vital roles managing day-to-day operations at these companies.  Under the position taken by the U.S. Trustee, the Bankruptcy Code would dictate that advisory firms that have supplied these services must be jettisoned at the outset of a chapter 11 case, disrupting company management at a time when such management services are most needed. The Bankruptcy Code, which is designed to rehabilitate debtors, does not require this disruptive result.  The Debtors' ability to use its estate assets pursuant to section 363 ensures that the Bankruptcy Code's goal of rehabilitating debtors is not hampered by a narrow reading on retention of advisory services firms pursuant to section 327.  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be

9

avoided if alternative interpretations consistent with the legislative purpose are available."); *United States v. Venturella*, 391 F.3d 120, 126–27 (2d Cir. 2004) ("A statute should be interpreted in a way that avoids absurd results.").  This reading safeguards a company's ability to exercise prudent governance and hire management advisory consultants on an as-needed basis without the risk of losing such company's services upon commencement of a bankruptcy case, thus harmonizing sections 327 and 363 for purposes of implementing the Bankruptcy Code's rehabilitative purpose.

## II.   The Fact that the Debtors' Retention of A&M Complies with the Jay Alix Protocol in All Material Respects Further Demonstrates Retention Under Section 363(b) Is Appropriate.

16.     The Debtors' proposed retention of Mr. Schipani and A&M complies with the "Jay Alix Protocol" in all material respects— a protocol the U.S. Trustee does not even mention in its Objection although it has been a U.S. Trustee internal policy to permit financial advisor retentions under section 363 for more than a decade under that protocol.[6]  None of the concerns the protocol addresses is at issue here.  The central goal of the protocol is to prevent conflicts of interest and collusive behavior where advisors to a debtor might benefit by wearing "two hats."  *See In re Saint Vincent's Catholic Med. Centers of New York*, No. 05 B 14945 (ASH), 2007 WL 2492787, at *3 n.3 (Bankr. S.D.N.Y. Aug. 29, 2007) (noting that the Jay Alix Protocol "recognizes that there is an inherent conflict between an advisor's duty to a debtor and its own business interests where the advisory firm serves as both a financial advisor retained under Section 327 of the Bankruptcy

---

[6]     The non-binding Jay Alix Protocol reflects an internal policy decision by the U.S. Trustee arising out of a 2003 negotiated settlement between the U.S. Trustee for the District of Delaware and Jay Alix & Associates concerning their retention *In re Harnischfeger Indus. Inc.* No. 99-2171 (Bankr. D. Del. Oct. 4, 2001) and *In re Safety-Kleen Corp.* No. 00-02303 (Bankr. D. Del. 2000).  This settlement resolved the U.S. Trustee's objections concerning alleged conflicts of interest in those cases and explicitly required Jay Alix's retention under section 363(b) of the Bankruptcy Code in addition to other conditions specified in the settlement document. *See also* United States Trustee Program Policy and Practices Manual ("Although the UST has never conceded that crisis managers fall outside the scope of section 327, which governs the retention of professionals, it has been the policy of the USTP not to object to applications to retain crisis managers under section 363(b) so long as certain conditions are observed.").  Any mention of the Jay Alix Protocol is conspicuously absent from the Objection.

Code and as a crisis manager and where the advisory firm's staff serve as officers of the debtor corporation.").[7]

17.     The Jay Alix Protocol, while an important tool used by debtors and the U.S. Trustee alike for many years to manage efficiently a vast number of corporate restructurings, is but a policy approach adopted by the U.S. Trustee.  The Debtors' legal right to retain A&M here does not depend on it.  Courts were approving the retention of restructuring advisors as a matter of law under section 363(b) well before the U.S. Trustee first employed its protocol.  *See, e.g.*, *In re Adelphia,* No. 02-41729 (REG) (Bankr. S.D.N.Y. July 31, 2002) [Dkt. 253] (authorizing the retention of a restructuring advisory firm to provide personnel, including a CRO, pursuant to section 363(b)); *In re Enron Corp.*, No. 01-16034 (AJG), 2002 WL 3215052 (Bankr. S.D.N.Y. April 4, 2002) [Dkt. 2725] (authorizing the debtors to enter into an agreement with a consulting firm which then provided an individual as Acting CEO and CRO, and certain additional personnel pursuant to section 363(b)); *In re Iridium Operating, LLC*, No. 99-45005 (CB) (Bankr. S.D.N.Y. 1999) [Dkt. 86] (authorizing and approving the terms of retention for two restructuring officers pursuant to sections 105(a) and 363(b)); *In re Bill's Dollar Stores, Inc.*, No. 01-0435 (PJW) (Bankr. D. Del. March 14, 2001) [Dkt. 141] (authorizing the continued retention of an advisory firm to provide the debtors with interim management through their Interim CEO and CRO pursuant to section 363(b)).

18.     The core requirements of the protocol include the following:

> (a)     the firm sought to be retained must serve in only one capacity (i.e., as either a financial advisor, crisis manager, claims agent, or investor);

---

[7]     In *Toisa*, Zolfo's retention would not have been in technical compliance with the Jay Alix Protocol because it ran afoul of the "one hat" rule by playing multiple roles for the debtor.  Like here, however, the U.S. Trustee never raised its Jay Alix Protocol.  Still, this Court stated, "the rationale for the Alix protocol" was inapplicable and that "the so-called evils that it was designed to prevent are simply not present in this case."  Hr'g Tr. 30:8–11.

KE 54856147

> (b)  the firm's retention application must be filed under section 363 of the Bankruptcy Code and the application must disclose the firm's relationships with interested parties and make other disclosures showing the firm is otherwise disinterested;
>
> (c)  the firm must file monthly staffing reports, which must be subject to Court review; and
>
> (d)  retention of person's furnished by the firm must be approved by and act under the direction of an independent board of directors.

19.    The Application, the Schipani Declaration, and the proposed order attached to the Application address a number of these points which the U.S. Trustee has not challenged.  The proposed order provides that A&M and its affiliates will not act in more than one capacity, that A&M shall file monthly staffing reports and quarterly compensation reports (subject to court review), and that A&M and its affiliates cannot invest in the Debtors for three years after their engagement.  The Schipani Declaration discloses known connections with parties in interest and notes that A&M serves, and has always served, at the direction of a board of directors with no affiliation with A&M.

20.    The Debtors believe that the true origin of the U.S. Trustee's Objection is a footnote in the Jay Alix Protocol stating that a financial advisor "shall not seek to be retained in any capacity in a bankruptcy proceeding for an entity where any principal, employee or independent contractor of [the financial advisor] serves or has previously served as a director of the entity or an affiliate thereof within two years prior to the petition date."  Jay Alix Protocol, n.3.  But that footnote, and the type of conflict it is meant to prevent, are not issues here.  In *Safety-Kleen* and *Harnischfeger*, Alix Partners had principals on the debtor boards selecting the professionals to be employed in their imminent chapter 11 cases.  While Mr. Schipani served as a director at certain subsidiary boards, neither he nor any other A&M employee ever served on the Debtors' Board that approved the retention of A&M.  *See* Schipani Supp. Decl. ¶ 18.  Neither A&M nor Mr. Schipani were in

12

positions capable of preventing the Board from using its own independent business judgment in selecting A&M as a corporate advisor and management services provider or in making the Board's decision on the appropriate terms of A&M's or Mr. Schipani's employment or retention. *Id.*

21.     Moreover, Mr. Schipani's later service on Subsidiary Boards, as described in the original Schipani Declaration and his Supplemental Declaration, does not present a conflict of interest sufficient to preclude his service as the Interim CEO in these chapter 11 cases. Mr. Schipani was appointed to the Subsidiary Boards at the request of the parent company Board supervising his employment. *Id.* ¶¶ 11–13. His service on the Subsidiary Boards was an administrative convenience, meant to make his oversight and management of the enterprise more effective. The examples cited in the Objection do not prove otherwise, as such actions—such as signing credit agreement amendments and opening bank accounts—were merely extensions of Mr. Schipani's actions as President and then Interim CEO, in which capacity, and not in his capacity as a board member, he negotiated such actions at the direction of the NWHI Board. *Id.* ¶ 16.

22.     In short, Mr. Schipani's service on the Subsidiary Boards did not give him the opportunity to improperly influence the Board negotiating A&M's retention—first, because A&M had already been employed by the Debtors when Mr. Schipani was placed on the Subsidiary Boards, and second because Mr. Schipani's service at the Subsidiary Boards was done at the direction and under the supervision of the parent company Board.

## III.     Retention of A&M to Provide the Interim CEO and Additional Personnel Is of Critical Importance in these Cases.

23.     The significance to the Debtors of retaining Mr. Schipani and A&M here cannot be overstated and the U.S. Trustee says nothing to the contrary. Bankruptcy courts have substantial freedom when considering requests pursuant to section 363(b). *See In re Chateaugay Corp.*, 973 F.2d 141, 144 (2d Cir. 1992) ("First and foremost is the notion that a bankruptcy judge must not

13

be shackled with *unnecessarily rigid rules* when exercising the undoubtedly broad administrative power granted him under the Code.") (quoting *Lionel*, 722 F.2d at 1069) (emphasis added). Moreover, this Court's inherent equitable powers under section 105(a) of the Bankruptcy Code allow this Court to "issue any order, process, or judgment that is necessary to appropriate carry out the provisions of this title." 11 U.S.C. § 105(a). This broad authority is consistent with "the fundamental purpose of reorganization and [] the Act's grant of equity powers to bankruptcy courts," which "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors." *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987). This Court can and should "use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985).

24.     The Debtors have multiple business reasons of the highest importance that justify retaining Mr. Schipani and A&M. For four years preceding the chapter 11 filing, Mr. Schipani and his team have developed extensive, first-hand experience with the Debtors' finances and day-to-day operations, including strong relationships with the Debtors' customers, vendors, and employees. This experience would be impossible to replicate during the course of these chapter 11 cases. The Debtors would first have to search for a replacement, and then any executive brought in to replace Mr. Schipani and his team would require significant time to understand the Debtors' operations.[8] Moreover, the continued retention of Mr. Schipani as Interim CEO and A&M provide the Debtors with a well-regarded outward face with customers, vendors, and other creditors whose cooperation is critical to the Debtors' success. The Debtors have recently conducted a successful auction, orchestrated in no small part by Mr. Schipani. *See* [Docket No. 404]. Mr. Schipani's

---

[8]     The importance of Mr. Schipani's and A&M's continued retention was recently made starker. On June 21, the Debtors' chief financial officer notified the Debtors that he was resigning to take another job elsewhere.

participation will also be critical in the upcoming discussions with creditor constituents regarding a resolution of these chapter 11 cases and will play a crucial part in further refining the Debtors' go-forward business plan.  Even the U.S. Trustee's Objection concedes that Mr. Schipani plays a "central" role.  Obj. at 1, 18, 19.

25.     On the other hand, Mr. Schipani's ouster could put the success of the entire reorganization at risk.  The sudden removal of Mr. Schipani and the A&M team could result in the loss of jobs, and creditor recoveries could be significantly reduced.  Estate assets would be wasted while the Debtors lingered in chapter 11 seeking a replacement executive with suitable expertise and knowledge.  The otherwise universal support for A&M's retention is a testament to the Debtors' business judgment in seeking to retain A&M and Mr. Schipani.

26.     The U.S. Trustee has not objected to the Debtors' business judgment.  The U.S. Trustee has instead taken the position that the Debtors should be deprived of Mr. Schipani's and A&M's services at this time based on a flawed reading of the Bankruptcy Code that is not supported by the U.S. Trustee's own actions over the last 14 years or case law.  It appears, moreover, that the U.S. Trustee is taking this position due to the technical non-compliance with a footnote in the Jay Alix Protocol on an issue that does not raise any conflict concerns.  The U.S. Trustee has failed to articulate how the interests of creditors or any of the Debtors' stakeholders (including their approximately 1,350 employees) possibly could be served by suddenly ousting the Debtors' Interim CEO and the A&M team.  Under this position, a parochial, technical concern (that is wrong in any event) would trump the fundamental purpose of the Bankruptcy Code— rehabilitating the Debtors and preserving the economic value inherent in their business.

27.     Accordingly, the Debtors submit that good business justification exists to approve the Debtors' retention of A&M and Mr. Schipani.

KE 54856147

New York, New York                        /s/ Joseph M. Graham
Dated:  June 25, 2018                     James H.M. Sprayregen, P.C.
                                          Christopher J. Marcus, P.C.
                                          **KIRKLAND & ELLIS LLP**
                                          **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                          601 Lexington Avenue
                                          New York, New York 10022
                                          Telephone:    (212) 446-4800
                                          Facsimile:    (212) 446-4900

                                          - and -

                                          James A. Stempel (admitted *pro hac vice*)
                                          Andrew R. McGaan, P.C. (*pro hac vice* pending)
                                          Joseph M. Graham (admitted *pro hac vice*)
                                          Angela M. Snell (admitted *pro hac vice*)
                                          **KIRKLAND & ELLIS LLP**
                                          **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                          300 North LaSalle Street
                                          Chicago, Illinois 60654
                                          Telephone:    (312) 862-2000
                                          Facsimile:    (312) 862-2200

                                          -and-

                                          Anna G. Rotman, P.C. (admitted *pro hac vice*)
                                          Jamie Aycock (admitted *pro hac vice*)
                                          **KIRKLAND & ELLIS LLP**
                                          **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                          609 Main Street
                                          Houston, Texas 77002
                                          Telephone:    (713) 836-3600
                                          Facsimile:    (713) 836-3601

                                          *Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**2014 Engagement Letter**



As of April 8, 2014

Mr. Peter Morrow
Vice President
Jones Holdings LLC and Nine West Holdings Inc.
1411 Broadway
New York, NY 10018

Dear Mr. Morrow:

This letter confirms and sets forth the terms and conditions of the engagement between Alvarez & Marsal North America, LLC ("A&M"), on the one hand, and Jones Holdings LLC (the owner and operator of the Jones Apparel business) ("Jones") and Nine West Holdings, Inc. ("Nine West"), and their respective assigns and successors (each, a "Company"; jointly and severally, the "Company"), on the other, including the scope of the services to be performed and the basis of compensation for those services. Upon execution of this letter by each of the parties below and receipt of the retainer described below, this letter will constitute an agreement between the Company and A&M (the "Agreement"). This Agreement supersedes that certain engagement letter agreement, dated April 8, 2014, between A&M and Jones.

1.    <u>Description of Services</u>

(a)    <u>Officers</u>.  In connection with this engagement, A&M shall make available to the Company:

(i)    Andrew Hede, to serve as Interim Chief Operating Officer of the Company or such other title agreed with the Company ("Interim COO"); and

(ii)    Ralph Schipani to serve as Interim Vice President of Operations of the Company or such other title agreed with the Company ("Interim VP of Operations").

(iii)    Upon the mutual agreement of A&M and the Company, A&M will provide additional employees of A&M and/or its affiliates and wholly-owned subsidiaries ("Additional Personnel") as required (collectively, with the Interim COO and Interim VP of Operations, the "Engagement Personnel"), to assist the Interim COO in the execution of the duties set forth more fully herein.

(b)    <u>Duties</u>.  The Engagement Personnel in cooperation with the board of directors of the Company (the "Board") or other applicable officers of each Company shall:

(i)    Provide supervision and assistance in the operations, finance, accounting and treasury functions and serve in the interim officer roles as described above;

(ii)    Assist in the identification and implementation of cost reduction and operations improvement opportunities;

Jones Holdings and Nine West Holdings
As of April 8, 2014
Page 2

(iii)    Assist in the evaluation and development of the Company's budget and business plan and assistance with the preparation of revised forecasts and scenario analysis;

(iv)    Assist with cash management, liquidity analyses, and the development and management of a 13-week cash flow forecast;

(v)    Assist the Board in developing for the Board's review, possible plans or strategic alternatives for maximizing the enterprise value of the Company's various business lines;

(vi)    Perform such other services as requested or directed the Board or other Company personnel as authorized by the Board, and agreed to by A&M.

(c)    The Engagement Personnel shall report to the Board or other applicable officers, as directed by the Board and, at the request of the Board, will make recommendations to and consult with the Board.

(d)    The Engagement Personnel will continue to be employed by A&M and, while rendering services to the Company, will continue to work with other personnel at A&M in connection with unrelated matters that will not unduly interfere with the services rendered by the Engagement Personnel pursuant to this Agreement.   With respect to the Company, however, the Engagement Personnel shall operate under the direction of the Board and A&M shall have no liability to the Company for any acts or omissions of the Engagement Personnel related to the performance or non-performance of services at the direction of the Board and consistent with the requirements of the Engagement and this Agreement.

(e)    In connection with the services to be provided hereunder, from time to time A&M may utilize the services of employees of its affiliates, subsidiaries, and independent contractors as Engagement Personnel.  Such affiliates and subsidiaries are wholly owned by A&M's parent company and employees.

2.    <u>Information Provided by Company and Forward Looking Statements</u>.  The Company shall use all reasonable efforts to:  (i) provide the Engagement Personnel with access to management and other representatives of the Company; and (ii) to furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company that Engagement Personnel reasonably request in connection with the services to be provided to the Company.  The Engagement Personnel shall rely, without further independent verification, on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by Engagement Personnel in connection with the services performed for the Company.  The Company acknowledges and agrees that the Engagement Personnel are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein. A&M and



Jones Holdings and Nine West Holdings
As of April 8, 2014
Page 3

Engagement Personnel are under no obligation to update data submitted to them or to review any other areas unless specifically requested by the Board to do so.

You understand that the services to be rendered by the Engagement Personnel may include the preparation of projections and other forward-looking statements, and numerous factors can affect the actual results of the Company's operations, which may materially and adversely differ from those projections. In addition, Engagement Personnel will be relying on information provided by the Company in the preparation of those projections and other forward-looking statements.

3.    <u>Limitation of Duties</u>. Neither A&M, nor the Engagement Personnel make any representations or guarantees that, <u>inter alia</u>, (i) an appropriate operational or financial proposal or strategic alternative can be formulated for the Company, (ii) any proposal or strategic alternative presented to the Company's management or the Board will be more successful than all other possible proposals or strategic alternatives, (iii) any proposal or strategic alternative is the best course of action for the Company, or (iv) if formulated, that any proposal or strategic alternative will be accepted by any of the Company's creditors, shareholders and other constituents. Further, neither A&M, nor the Engagement Personnel, assume any responsibility for the Company's decision to pursue, or not pursue any business strategy, or to effect, or not to effect any transaction. The Engagement Personnel shall be responsible for implementation only of the proposal or alternative approved by the Board and only to the extent and in the manner authorized and directed by the Board.

4.    <u>Compensation</u>.

(a)    A&M will receive fees from the Company for the services of the Engagement Personnel based on the following hourly rates:

| | |
|---|---|
| Managing Directors | $725 - $925 |
| Directors | $525 - $725 |
| Associates | $375 - $525 |
| Analysts | $325 - $375 |

Such rates shall be subject to adjustment annually at such time as A&M adjusts its rates generally.

(b)    In addition, A&M will be reimbursed for its reasonable, documented out-of-pocket expenses incurred in connection with this assignment, such as usual and customary commercial business class travel, lodging, duplicating, messenger and telephone charges. All fees and expenses will be billed and payable on a monthly basis or, at A&M's reasonable discretion, more frequently, but in no case more frequently than on a weekly basis.



Jones Holdings and Nine West Holdings
As of April 8, 2014
Page 4

    (c)    The Company shall promptly remit to A&M a retainer in the amount of $300,000, which shall be credited against any amounts due at the termination of this engagement and returned upon the satisfaction of all obligations hereunder.

    (d)    The Company and A&M recognize that it is appropriate that A&M receive incentive compensation for its services hereunder, in addition to the compensation set forth above. To establish such incentive compensation, A&M and the Company will seek to reach agreement within 60 days from the date hereof on the amount of such incentive compensation and the terms on which it shall be payable.

5.    <u>Termination.</u>

    (a)    This Agreement will apply from the commencement of the services referred to in Section 1 and may be terminated with immediate effect by either party without cause by written notice to the other party.

    (b)    A&M normally does not withdraw from an engagement unless the Company misrepresents or fails to disclose material facts, fails to pay fees or expenses, or makes it unethical or unreasonably difficult for A&M to continue performance of the engagement, or other just cause exists.

    (c)    On termination of the Agreement, any fees and expenses due to A&M shall be remitted promptly (including fees and expenses that accrued prior to but are invoiced subsequent to such termination).

    (d)    If the Company terminates this Agreement without "Cause" or if A&M terminates this Agreement for "Good Reason", A&M shall also be entitled to receive the incentive compensation upon the occurrence of the event specified as agreed (if applicable) pursuant to Section 4(d) if such event occurs within 6 months of the termination. "Cause" shall mean gross negligence, willful default or fraud by A&M; "Good Reason" shall mean the Company's misrepresentation of or failure to disclose material facts, failure to pay fees or expenses when due (or circumstances indicating to A&M that fees or expenses will not be paid when due), circumstances such that it is unethical or unreasonably difficult for A&M to continue performance of the engagement, or other just cause.

    (e)    The provisions of this Agreement that give the parties rights or obligations beyond its termination shall survive and continue to bind the parties.

6.    <u>No Audit.</u> Company acknowledges and agrees that A&M and Engagement Personnel are not being requested to perform an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of the AICPA, SEC or other state or national professional or regulatory body.



Jones Holdings and Nine West Holdings
As of April 8, 2014
Page 5

7.     <u>No Third Party Beneficiary</u>.  The Company acknowledges that all advice (written or oral)
       provided by A&M and the Engagement Personnel to the Company in connection with this
       engagement is intended solely for the benefit and use of the Company (limited to its Board and
       management) in considering the matters to which this engagement relates.  The Company
       agrees that no such advice shall be used for any other purpose or reproduced, disseminated,
       quoted or referred to at any time in any manner or for any purpose other than accomplishing the
       tasks referred to herein without A&M's prior approval (which shall not be unreasonably
       withheld, conditioned or delayed), except as required by law.

8.     <u>Conflicts</u>.  A&M is not currently aware of any relationship that would create a conflict of
       interest with the Company or those parties-in-interest of which you have made us aware.
       Because A&M and its affiliates and subsidiaries comprise a consulting firm (the "<u>Firm</u>") that
       serves clients on an international basis in numerous cases, both in and out of court, it is possible
       that the Firm may have rendered or will render services to, or have business associations with,
       other entities or people which had or have or may have relationships with the Company,
       including creditors of the Company.  The Firm will not be prevented or restricted by virtue of
       providing the services under this Agreement from providing services to other entities or
       individuals, including entities or individuals whose interests may be in competition or conflict
       with the Company's, provided the Firm makes appropriate arrangements to ensure that the
       confidentiality of information is maintained, and, in the event of any conflict of interest, A&M
       provides the Company with written notice of such conflict of interest as promptly as practicable
       after becoming aware of it, subject to restrictions on confidentiality. Each of Jones and Nine
       West acknowledge and agree that the services being provided hereunder are being provided on
       behalf of both of them and each of them  hereby waives any and all conflicts of interest that
       may arise on account of the services being provided on behalf the other. Each of Jones and
       Nine West represent that they have taken any and all corporate action necessary and are
       authorized to waive such potential conflicts of interest.

9.     <u>Confidentiality/Non-Solicitation</u>.

       A&M and the Engagement Personnel shall keep as confidential all non-public information
       received from the Company in conjunction with this engagement and use such information
       solely for the purpose of performing its duties hereunder, except:  (i) as requested by the
       Company or its legal counsel; (ii) as required by legal proceedings; or (iii) as reasonably
       required in the performance of this engagement.  All obligations as to non-disclosure shall
       cease as to any part of such information to the extent that such information is, or becomes,
       generally available to the public other than as a result of a breach of this provision.  The
       Company, on behalf of itself and its subsidiaries and affiliates and any person which may
       acquire all or substantially all of its assets agrees that, until twelve (12) months subsequent to
       the termination of this engagement, it will not solicit, recruit, hire or otherwise engage any
       employee of A&M or any of its affiliates who worked 5 hours or more on this engagement
       while employed by A&M or its affiliates ("<u>Solicited Person</u>").  Should the Company or any of
       its subsidiaries or affiliates or any person who acquires all or substantially all of its assets
       extend an offer of employment to or otherwise engage any Solicited Person and should such
       offer be accepted, A&M shall be entitled to a fee from the party extending such offer equal to

Jones Holdings and Nine West Holdings
As of April 8, 2014
Page 6

the Solicited Person's hourly client billing rate at the time of the offer multiplied by 4,000 hours for a Managing Director, 3,000 hours for a Senior Director and 2,000 hours for any other A&M employee. The Company acknowledges and agrees that this fee fairly represents the loss that A&M will suffer if the Company breaches this provision. The fee shall be payable at the time of the Solicited Person's acceptance of employment or engagement.

10.  Indemnification/Limitations on Liability. The Company shall indemnify the Engagement Personnel acting as officers (the "Indemnified Professionals") to the same extent as the most favorable indemnification it extends to its officers or directors, whether under the Company's bylaws, its certificate of incorporation, by contract or otherwise, and no reduction or termination in any of the benefits provided under any such indemnities shall affect the benefits provided to the Indemnified Professionals. The Indemnified Professionals shall be covered as officers under the applicable Company's existing director and officer liability insurance policy. As a condition of A&M accepting this engagement, a Certificate of Insurance evidencing such coverage shall be furnished to A&M prior to the effective date of this Agreement. The Company shall give thirty (30) days' prior written notice to A&M of cancellation, non-renewal, or material change in coverage, scope, or amount of such director and officer liability policy. The Company shall also maintain such insurance coverage for the Indemnified Professionals for a period of not less than six years following the date of the termination of the Indemnified Professionals' services hereunder. The provisions of this section are in the nature of contractual obligations and no change in applicable law or the Company's charter, bylaws or other organizational documents or policies shall affect the Indemnified Professionals' rights hereunder. The attached indemnity and limitation on liability agreement ("Indemnity Agreement") is incorporated herein and the termination of this agreement or the engagement shall not affect those provisions, which shall remain in full force and effect.

11.  Joint & Several Liability. Each Company hereby acknowledges and agrees that they are each jointly and severally liable to A&M and its affiliates and the "Indemnified Parties" (as defined in the Indemnity Agreement) for all of the Company's representations, warranties, covenants, liabilities and obligations set forth in the Agreement (including but not limited to the Indemnity Agreement). Any beneficiary of this agreement may seek to enforce any of its rights and remedies hereunder against either or both Companies in any order at any time in its sole discretion.

12.  Miscellaneous. Any notice, demand, approval, consent, or instruction by or to either Company with respect to this Agreement (including the Indemnity Agreement) or the services provided in connection herewith shall be deemed to have been by or to both Companies unless expressly indicated otherwise. This Agreement (together with the attached indemnity provisions), including, without limitation, the construction and interpretation of thereof and all claims, controversies and disputes arising under or relating thereto, shall be governed and construed in accordance with the laws of the State of New York, without regard to principles of conflict of law that would defer to the laws of another jurisdiction. The Company and A&M agree to waive trial by jury in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the engagement or the performance or non-performance of A&M hereunder. The Company and A&M agree, to the

Jones Holdings and Nine West Holdings
As of April 8, 2014
Page 7

extent permitted by applicable law, that any Federal Court sitting within the Southern District
of New York shall have exclusive jurisdiction over any litigation arising out of this Agreement;
to submit to the personal jurisdiction of the Courts of the United States District Court for the
Southern District of New York; and to waive any and all personal rights under the law of any
jurisdiction to object on any basis (including, without limitation, inconvenience of forum) to
jurisdiction or venue within the State of New York for any litigation arising in connection with
this Agreement.

This Agreement shall be binding upon A&M and the Company, their respective heirs,
successors, and assignees, and any heir, successor, or assignee of a substantial portion of
A&M's or the Company's respective businesses and/or assets, including any Chapter 11
Trustee.  Notwithstanding the foregoing, no party hereto may assign, transfer or, except as set
forth in paragraph 1(b) hereof, delegate any of its rights or obligations without the prior written
consent of the other parties.  This Agreement incorporates the entire understanding of the
parties with respect to the subject matter hereof and may not be amended or modified except in
writing executed by the Company and A&M.  Notwithstanding anything herein to the contrary,
A&M may reference or list the Company's name and/or a general description of the services in
A&M's marketing materials, including, without limitation, on A&M's website.



Jones Holdings and Nine West Holdings
As of April 8, 2014
Page 8


If the foregoing is acceptable to you, kindly sign the enclosed copy to acknowledge your agreement with its terms.

Very truly yours,

Alvarez & Marsal North America, LLC

By: _____
Andrew D. J. Hede
Managing Director


Accepted and agreed:

Jones Holdings LLC

By: _____
Peter Morrow
Vice President

Nine West Holdings, Inc.

By: _____
Peter Morrow
Vice President



## INDEMNIFICATION AND LIMITATION ON LIABILITY AGREEMENT

This indemnification and limitation on liability agreement is made part of an agreement, dated as of April 8, 2014 (which together with any renewals, modifications or extensions thereof, is herein referred to as the "Agreement") by and between Alvarez & Marsal North America, LLC ("A&M"), on the one hand, and Jones Holdings LLC ("Jones") and Nine West Holdings, Inc. ("Nine West"; each of Jones and Nine West a "Company"; jointly and severally, the "Company"), for services to be rendered to the Company by A&M.

A.       The Company agrees to indemnify and hold harmless each of A&M, its affiliates and their respective shareholders, members, managers, employees, agents, representatives and subcontractors (each, an "Indemnified Party" and collectively, the "Indemnified Parties") against any and all losses, claims, damages, liabilities, penalties, obligations and reasonable expenses, including the reasonable out of pocket costs for counsel or others , in investigating, preparing or defending any action or claim, whether or not in connection with litigation in which any Indemnified Party is a party, or enforcing the Agreement (including these indemnity provisions), as and when incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Indemnified Parties' acceptance of or the performance or nonperformance of their obligations under the Agreement; provided, however, such indemnity shall not apply to any such loss, claim, damage, liability or expense to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from such Indemnified Party's fraud, gross negligence or willful misconduct.  The Company also agrees that (a) no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with the engagement of A&M, except to the extent that any such liability for losses, claims, damages, liabilities or expenses are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from such Indemnified Party's fraud, gross negligence or willful misconduct and (b) in no event will any Indemnified Party have any liability to the Company for special, consequential, incidental or exemplary damages or loss (nor any lost profits, savings or business opportunity). The Company further agrees that it will not, without the prior consent of an Indemnified Party (which consent shall not be unreasonably delayed, withheld or conditioned), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which such Indemnified Party seeks indemnification hereunder (whether or not such Indemnified Party is an actual party to such claim, action, suit or proceedings) unless such settlement, compromise or consent includes an unconditional release of such Indemnified Party from all non-monetary liabilities arising out of such claim, action, suit or proceeding.  No Indemnified Party shall, without the prior written consent of the Company (which consent shall not be unreasonably delayed, withheld or conditioned), settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action suit or proceeding in respect of which such Indemnified Party seeks indemnification hereunder (whether or not such Indemnified Party is an actual party to such claim, action, suit or proceedings).

B.     These indemnification provisions shall be in addition to any liability which the Company may otherwise have to the Indemnified Parties. In the event that, at any time whether before or after termination of the engagement or the Agreement, as a result of or in connection with the Agreement or A&M's and its personnel's role under the Agreement, A&M or any other Indemnified Party is required to produce any of its personnel (including former employees) for examination, deposition or other written, recorded or oral presentation, or A&M or any of its personnel (including former employees) or any other Indemnified Party is required to produce or otherwise review, compile, submit, duplicate, search for, organize or report on any material within such Indemnified Party's possession or control pursuant to a subpoena or other legal (including administrative) process, the Company will reimburse the Indemnified Party for its reasonable, documented out of pocket expenses, including the reasonable fees and expenses of its counsel, and will compensate the Indemnified Party for the time reasonably expended by its personnel based on such personnel's then current hourly rate.

C.     If any action, proceeding or investigation is commenced to which any Indemnified Party proposes to demand indemnification hereunder, such Indemnified Party will notify the Company with reasonable promptness; provided, however, that any failure by such Indemnified Party to notify the Company will not relieve the Company from its obligations hereunder, except to the extent that such failure shall have actually prejudiced the defense of such action. The Company shall as promptly as reasonably practicable pay expenses reasonably incurred by any Indemnified Party in defending, participating in, or settling any action, proceeding or investigation in which such Indemnified Party is a party or is threatened to be made a party or otherwise is participating in by reason of the engagement under the Agreement, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Indemnified Party hereby undertakes, and the Company hereby accepts its undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor. If any such action, proceeding or investigation in which an Indemnified Party is a party is also against the Company, the Company may, in lieu of advancing the expenses of separate counsel for such Indemnified Party, provide such Indemnified Party with legal representation by the same counsel who represents the Company, provided such counsel is reasonably satisfactory to such Indemnified Party, at no cost to such Indemnified Party; provided, however, that if such counsel or counsel to the Indemnified Party shall determine that due to the existence of actual or potential conflicts of interest between such Indemnified Party and the Company such counsel is unable to represent both the Indemnified Party and the Company, then the Indemnified Party shall be entitled to use separate counsel of its own choice, and the Company shall promptly advance its reasonable expenses of such separate counsel upon submission of invoices therefor. Nothing herein shall prevent an Indemnified Party from using separate counsel of its own choice at its own expense. The Company will be liable for any settlement of any claim against an Indemnified Party made with the Company's written consent.

D.     In order to provide for just and equitable contribution if a claim for indemnification pursuant to these indemnification provisions is made but it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) that such indemnification may not

be enforced in such case, even though the express provisions hereof provide for indemnification, then the relative fault of the Company, on the one hand, and the Indemnified Parties, on the other hand, in connection with the statements, acts or omissions which resulted in the losses, claims, damages, liabilities and costs giving rise to the indemnification claim and other relevant equitable considerations shall be considered; and further provided that in no event will the Indemnified Parties' aggregate contribution for all losses, claims, damages, liabilities and expenses with respect to which contribution is available hereunder exceed the amount of fees actually received by the Indemnified Parties pursuant to the Agreement. No person found liable for a fraudulent misrepresentation shall be entitled to contribution hereunder from any person who is not also found liable for such fraudulent misrepresentation.

E.      In the event the Company and A&M seek judicial approval for the assumption of the Agreement or authorization to enter into a new engagement agreement pursuant to either of which A&M would continue to be engaged by the Company, the Company shall promptly pay expenses reasonably incurred by the Indemnified Parties, including reasonable, documented attorneys' fees and expenses, in connection with any motion, action or claim made either in support of or in opposition to any such retention or authorization, whether in advance of or following any judicial disposition of such motion, action or claim, promptly upon submission of invoices therefor and regardless of whether such retention or authorization is approved by any court. The Company will also promptly pay the Indemnified Parties for any expenses incurred by them, including reasonable, documented attorneys' fees and expenses, in seeking payment of all amounts owed it under the Agreement (or any new engagement agreement) whether through submission of a fee application or in any other manner, without offset, recoupment or counterclaim, whether as a secured claim, an administrative expense claim, an unsecured claim, a prepetition claim or a postpetition claim.

F.      Neither termination of the Agreement nor termination of A&M's engagement nor the filing of a petition under Chapter 7 or 11 of the United States Bankruptcy Code (nor the conversion of an existing case to one under a different chapter) shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.

G.      The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled under the certificate of incorporation or bylaws of the Company, any other agreements, any vote of stockholders or disinterested directors of the Company, any applicable law or otherwise.

JONES HOLDINGS LLC

By: _____
    Peter Morrow
    Vice President

ALVAREZ & MARSAL NORTH AMERICA, LLC

By: _____
    Andrew D. J. Hede
    Managing Director

NINE WEST HOLDINGS, INC.

By: _____
    Peter Morrow
    Vice President