Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
Attorneys for Theresa Rose Ryan

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,

            Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

            Defendant.
---------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S
DETERMINATION OF
CLAIM**

        Theresa Rose Ryan hereby objects to the Notice of Trustee's Determination of Claim

dated August 18, 2009 and states as follows:

**Background facts**

        1.     On December 9, 1992, Ryan established an individual retirement account ("IRA")

with Bernard L. Madoff Investment Securities LLC ("Madoff"),  which bore  Madoff account

number 1-ZR039 (the "Account").

        2.      During the period from December 9, 1992 through November 30, 2008, Ryan

deposited a total of $128,772.58 into the account and withdrew a total of $58,031. See Exh. A at

2.

        3.     The November 30, 2008 market value of securities in the Account was

$ 811,800.43.  See Exh. B.

4.      On  January 15, 2009, Ryan sent a SIPC claim to Picard for the Account asserting

a claim for securities in the amount of $811,800.43 based upon the November 30, 2008 Madoff

statement.   See Exh. C.

5.      On August 18, 2009, Picard sent Ryan a determination letter (the "Determination

Letter") with respect to the Account, rejecting the claim for securities based upon the November

30, 2008 balance but agreeing to recognize the claim (presumably for cash) in the amount of

$128,714.58.  See Exh. A.  Picard offered to send Ryan a check for $128,714.58 upon execution

by Ryan of an Assignment and Release.

**Grounds for objection**

**A.  Picard has failed to comply with the Court's December 23, 2008 Order**

6.      The Determination Letter fails to comply with the Court order dated December

23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance

with "the Debtor's books and records."  December 23, 2008 Order at 5 (Docket No. 12).  The

November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books

and records" by which Picard is bound, absent proof that Ryan did not have a "legitimate

expectation" that the balance on the Account statement represented her property.  In fact, in each

year that she withdrew funds from the Account, Ryan paid ordinary income taxes on the

withdrawals from the Account, which were duly accepted from the federal and state taxing

authorities.  Ryan would not have paid those sums if she did not believe that the assets in the

Account belonged to her.

7.      Picard has failed to state a basis in the Determination Letter for the position he

has taken.  Thus, he has not complied with the requirement that an "objection to a claim should .

. . meet the [pleading] standards of an answer.  It should make clear which facts are disputed; it

2

should allege facts necessary to affirmative defenses; and it should describe the theoretical bases

of those defenses."  Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-

16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

**B.  Picard has violated the requirement that he honor a customer's "legitimate expectations"**

8.    The legislative history of the Securities Investor Protection Act ("SIPA") makes

clear that Congress' intent was to protect a customer's "legitimate expectations."   For example,

Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be
> remedied by [the 1978 amendments] is the failure to meet legitimate customer
> expectations of receiving what was in their account at the time of their broker's
> insolvency.

*        *        *

> A customer generally expects to receive what he believes is in his account at the
> time the stockbroker ceases business. But because securities may have been lost,
> improperly hypothecated, misappropriated, never purchased, or even stolen, this
> is not always possible. Accordingly, [when this is not possible, customers] will
> receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

9.    SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide

for the classification of claims in accordance with the "legitimate expectations" of a customer

based upon the written transaction confirmations sent by the broker-dealer to the customer.

10.    Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations."

This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein

SIPC assured the appeals court that its policy was to honor the legitimate expectations of

investors, even where the broker never purchased the securities.  SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling
> even where inconsistent with transaction reality.  Thus, for example, **where a**

3

> **claimant orders a securities purchase and receives a written confirmation
> statement reflecting that purchase, the claimant generally has a reasonable
> expectation that he or she holds the securities identified in the confirmation
> and therefore generally is entitled to recover those securities (within the
> limits imposed by SIPA), even where the purchase never actually occurred
> and the debtor instead converted the cash deposited by the claimant to fund
> that purchase** . . . [T]his emphasis on reasonable and legitimate claimant
> expectations frequently yields much greater 'customer' protection than would be
> the case if transaction reality, not claimant expectations, were controlling, as this
> Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

11.    Picard's position in the Madoff case is contradicted, not only by SIPC's prior

treatment of customers in the *New Times* case, but also by a statement that SIPC's general

counsel, Josephine Wang, gave to the press on  December 16, 2008 wherein Ms. Wang

acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if
> clients were presented statements and had reason to believe that the securities
> were in fact owned, the SIPC will be required to buy these securities in the open
> market to make the customer whole up to $500K each.  So if Madoff client
> number 1234 was given a statement showing they owned 1000 GOOG shares,
> even if a transaction never took place, the SIPC has to buy and replace the 1000
> GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

12.    As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its

obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement,

inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi

scheme for a period of approximately 17 years and had never purchased the securities reflected

on the customers' monthly statements.  In fact, SIPC's president, Stephen Harbeck, assured the

*New Times* bankruptcy court that customers would receive securities up to $500,000 including

the appreciation in their accounts.

4

HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.

COURT: Even if they're not there.

HARBECK: Correct.

COURT: In other words, if the money was diverted, converted –

HARBECK: And the securities were never purchased.

COURT: Okay.

HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

## C.  Without  legal authority, Picard has invented his own definition of "net equity"

13.    SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

14.    SIPA specifically prohibits SIPC from changing the definition of "net equity."  15 U.S.C. § 78ccc(b)(4)(A).

15.    The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on

5

the filing date, all securities positions of such customer" [corrected for] any
indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re*

*Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is

calculated as the difference between what the debtor owes the customer and what the

customer owes the debtor on the date the SIPA proceeding is filed.").

16.      In derogation of his obligations to carry out the provisions of SIPA, Picard has

created his own definition of "net equity."  Picard has asserted that he has a right to recognize

investors' claims only for the amount of their net investment, disregarding all appreciation in

their accounts.  By this procedure, Picard would avoid paying SIPC insurance to the thousands of

elderly, long-term Madoff investors who have depended upon their Madoff investments for their

daily living expenses.  He also would be able to reduce all claims to the net investment, thus

enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to

customers.

17.      Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a
> claimant is owed perpetuates the Ponzi Scheme.  It allows the thief . . . Mr.
> Madoff . . . to determine who receives a larger proportion of the assets collected
> by the Trustee.

18.      Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to

save money for the brokerage community at the expense of innocent investors who relied upon

the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

19.      After nine months of his tenure, Picard has identified only a handful of Madoff

investors who **might not** have had a "legitimate expectation" that the trade confirmations and

account statements they received were accurate.  For example, Picard has sued two Madoff

6

customers, Stanley Chais and Jeffrey Picower who, Picard has alleged, took out of Madoff $6

billion more than they invested.  Picard has further alleged that these two investors received

returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their

accounts.  Assuming these allegations are true, Chais and Picower were Madoff's co-

conspirators and certainly could not have had a "legitimate expectation" that their accounts were

genuine.

20.    However, the fact that a few out of more than 8,000 Madoff investors may have

been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining,

totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

21.     Ryan, like thousands of other investors, received monthly statements from

Madoff indicating returns, in the past few years, on her Madoff investment in the range of 9 –

11% per year.  Ryan had entered into a standard brokerage agreement with Madoff, a licensed

SEC-regulated broker-dealer, pursuant to which the Account had a specific number; she received

on a monthly basis trade confirmations for every securities transaction in the Account which

accurately set forth the names and prices of securities indicating the purchase and sale of Fortune

100 company stocks and the purchase of US Treasury securities.  There is no basis to claim that

Ryan did not have a "legitimate expectation" that the assets reflected on the Account statements

sent to her by Madoff belonged to her.  Thus, Ryan  is entitled to replacement securities with a

value, as of November 30, 2008 of $500,000 and a claim for $811,800.43 as reflected on the

November 30, 2008 Madoff statement.

**D.     Ryan  is entitled to prejudgment interest on their investment and profits.**

22.    Under New York law, which is applicable here, funds deposited with Madoff are

entitled to interest.  *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Obligg. § 5-501, *et seq.*  Moreover,

7

since Madoff converted Ryan's funds, that fact also entitles her to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.*S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

23.    Although it is not legally relevant, Picard cannot prove that Madoff earned no money on Ryan's investment.  To the extent the funds were deposited into a bank, they earned interest while on deposit.   Madoff disbursed customer funds to favored customers, to family members, and for other purposes.  Those funds may have yielded substantial profits to which Ryan and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

**E.  Picard has no right to condition payment of SIPC insurance on execution of a release.**

24.    Picard has conditioned payment to Ryan of the $128,772.58 SIPC payment which Picard does not dispute, on execution by Ryan of a Partial Assignment and Release that would "release and forever discharge the SIPA Trustee and SIPC . . . from any and all claims arising out of or relating to [their account], the Customer Claim filed with the SIPA Trustee. . ., and any and all circumstance giving rise to the Customer Claim."   There is no legal basis for requiring such a Partial Assignment and Release in exchange for SIPC insurance to which Ryan  is unconditionally entitled.

**F.  Picard has no power to claw back withdrawals from an IRA**

25.    Although Picard has not explained the legal basis for his position that SIPC is not liable to Ryan for $500,000 of insurance with respect to the Account, he presumably is relying upon the avoidance provisions of the Bankruptcy Code, *i.e.,* 11 U.S.C. §§ 544, 546 and 547.

8

26.    However, Picard has no right to utilize these provisions for the purpose of enriching SIPC at Ryan's expense.  The legislative history of these provisions makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors.  *See, e.g.,* 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.  Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

27.    Here, however, Picard is not acting to assure equal distribution among prepetition creditors.  On the contrary, he is simply acting as SIPC's agent in depriving Ryan of the $500,000 in SIPC insurance to which she is statutorily entitled.

28.    Moreover, the Account was established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, whose provisions preempt State fraudulent conveyance law, upon which Picard presumably relies pursuant to 11 U.S.C. § 544.  29 U.S.C. § 1144(a) (the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section [1003(a)]. . . ")

29.    As evidence of Congressional intent to protect ERISA-qualified plans, the Bankruptcy Code was amended in 2005 to protect such plans from the claims of creditors.  11

9

U.S.C. § 541(b)(7)(a)(i)(I) (exempting from property of the estate "any amount withheld by an employer from the wages of employees for payment as contributions to an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 . . ."). *See also, Patterson v. Shumate,* 504 U.S. 753 (1992)(holding that debtor's interest in an ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2)).

30.    Similarly, applicable state law protects Ryan's IRA account.

**G.  Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit**

31.    In derogation of his fiduciary duty to Ryan, Picard has applied his net investment calculation to determine the amount of their claim.  However, he has no right to reduce their claim in this manner and to deduct withdrawals from their Account balances.  Without any legal authority, Picard is, in effect, imposing upon Ryan a fraudulent conveyance judgment for sums Ryan withdrew from the Accounts beyond the statute of limitations period applicable to fraudulent conveyances.  Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations.  Yet, he has done so here and deprived Ryan of the claim to which they are absolutely entitled.

**H.  Picard has violated SIPA by delaying the payment of SIPC insurance**

32.    Picard has breached his statutory obligation to "promptly" pay SIPC insurance or provide customers with replacement securities.  15 U.S.C. § 78fff-2(b)("... the trustee shall promptly discharge . . . all obligations of the debtor to a customer . . . by the . . . making of payments to or for the account of such customer . . .").  Picard has no right to delay payment to Ryan of the undisputed portion of her claim.

10

**Conclusion**

33.     Ryan is entitled to an order compelling SIPC to immediately replace securities in her account up to $500,000 based upon the November 30, 2008 values.

34.     Ryan is entitled to have her claim recognized in the amount of $811,800.43 consistent with the November 30, 2008 statement from Madoff.

35.     Picard is not entitled to a release of any claims as a condition to Ryan's receipt of $500,000 in replacement securities from SIPC.

September 14, 2009

PHILLIPS NIZER LLP


By s/s Helen Davis Chaitman

666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
Attorneys for Therese Rose Ryan

11

1091029.1