SONNENSCHEIN NATH & ROSENTHAL LLP
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
cneville@sonnenschein.com

*Attorneys for the Marsha Peshkin IRA*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff,<br><br>                v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation |

## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

Marsha Peshkin, hereby objects to the Notice of Trustee's Determination of Claim dated August 18, 2009 ("Determination Letter"), attached as Exhibit A, as described herein.

## BACKGROUND

1.  In or about June, 2002, Marsha Peshkin opened an account (Account No. 1-ZR312-3) with Bernard L. Madoff Investment Securities LLC ("Madoff"). Mrs. Peshkin established the account as a self directed Individual Retirement Account designating Retirement Accounts, Inc., as Trustee.[1] A copy of the Self-Directed Individual Retirement Account Application is annexed

---

[1] In 2004, First Trust Corporation, Retirement Accounts, Inc and other entities were consolidated into a company called FISERV Investment Support Services ("FISERV"). On information and belief, Madoff directed that all IRA and other retirement plans be administered through FISERV. FISERV declined to file a claim.

hereto as Exhibit B. The account was opened in the name of Retirement Accts Inc. as Custodian of the IRA FBO Marsha Peshkin (the "Peshkin IRA Account"). [2]

2.  The Peshkin IRA Account was initially funded by direct rollover from the business retirement plan maintained by Mrs. Peshkin's husband, Roy Peshkin, with Madoff (the "Superweb Press DB Plan Account") upon his death. The statement for Superweb Press DB Plan Account (No.1 ZB039) for the period ended June 30, 2002 shows a transfer of $736,454.43 on or about June 21, 2002 to Account No. 1 ZR 312-30. A copy of the statement is attached hereto as Exhibit C. In addition, Madoff sent Retirement Accounts, as the custodian of the Peshkin Ira Account, and Mrs. Peshkin confirmation of the transfer of $736,454.43 dated June 21, 2002, A copy of the credit advice is annexed hereto as Exhibit D.

3.  From the creation of the account, in addition to the communications from Madoff regarding the account, Mrs. Peshkin regularly received quarterly statements from FISERV, including a statement for the period from October 1, 2008 through December 31, 2008 (the "Fourth Quarter 2008 Statement"), reflecting the balance in her brokerage account in securities and cash, as well as transactions within the account and from the account. A copy of the Fourth Quarter 2008 Statement showing a balance of $1,475,026.97 is annexed hereto as Exhibit E.

4.  Mrs. Peshkin made other deposits into the Peshkin IRA Account, including a transfer into Madoff on December 1, 2008 of $125,000, which, with transfers from the Superweb DB Plan Account, totaled $1,162,506.53, and she withdrew from the account a total of $450,000.

5.  On December 11, 2008, an action was commenced against Madoff by the Securities & Exchange Commission in the United States District Court for the Southern District of New York. On December 15, 2008, this liquidation proceeding was commenced pursuant to the

---

[2] All personal information relating to the Peshkin IRA Account has been redacted for security reasons.

17653668                                      2

Securities Investment Protection Act ("SIPA"). See Order, Securities and Exchange Commission v. Madoff, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Dkt. No. 4]. Irving Picard was appointed Trustee ("Trustee"), charged, *inter alia*, with overseeing the liquidation of Madoff and processing customer claims for money pursuant to SIPA. Id.; 15 U.S.C. 78fff-1(a).

6. On December 23, 2008, the Court issued an Order directing the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines. See Order [Dkt. No. 12].

7. The December 23, 2008 Order further provided that, to the extent the Madoff Trustee disagrees with the amount set forth on a customer claim form, the BMIS Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, **and the reason therefor** . . . ." See Order at 6 (emphasis added) [Dkt. No. 12].

8. On or about February 18, 2009, Mrs. Peshkin timely filed a claim for the Peshkin IRA Account for securities (the "Peshkin IRA Customer Claim") based on the November 30, 2008 statement from Madoff in the amount of $1,397,245.83 (the "Final Madoff Statement") plus a subsequent $125,000 deposit and the Fourth Quarter 2008 Statement, among other supporting documentation. A copy of the Peshkin IRA Customer Claim is attached as Exhibit F.

9. On August 18, 2009, the Trustee sent Mrs. Peshkin the Determination Letter rejecting the claim for $1,397,245.83 and stating she was only entitled to a payment of $176,354.66 based on (a) the total in the Peshkin IRA Account less withdrawals, and (b) the total investments in the Superweb DB Plan Account, less any appreciation.[3]

---

[3] There is no dispute that the Peshkin Ira Account is a customer account within the meaning of SIPA.

17653668                                                3

**GROUNDS FOR OBJECTION**

10. **First Objection.** The Determination Letter fails to comply with this Court's December 23, 2008 Order, which directs the Trustee to satisfy customer claims in accordance "with the Debtor's books and records." Dec. 23, 2008 Order at 5 [Dkt. No. 12]. The Peshkin IRA Customer Claim was evidenced by the Final Madoff Statement showing a final balance of $1,397,245.83 and listing the securities purportedly purchased for the account, which reflects the "Debtor's books and records" and by which the Trustee is bound absent proof that the owner of the Peshkin IRA Account did not have a "legitimate expectation" that the balance on the Final Madoff Statement, confirmations, credit advices and the quarterly FISERV statements represented her property.

11. **Second Objection.** The Trustee failed to set forth a legal basis for the position he has taken for the calculation of the claim  *See* Determination Letter. The Determination Letter:

   (a) does not clearly provide "the reason" for the disallowance, as required by the Court's December 23, 2008 Order, *see* Order [Dkt. No. 12];

   (b) is insufficient to rebut the prima facie validity of the Customer Claim as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f);

   (c) violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based. *See, e.g.*, Collier on Bankruptcy ¶ 3007.01(3) (15th ed.) ("[A]n objection to a claim should . . . meet the [pleading] standards of an answer; *In re Enron Corp.*, No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (Bankr. S.D.N.Y. Jan. 13, 2003) (same); and

   (d) includes an exhibit which purportedly calculates the money deposited less subsequent withdrawals, but is completely unsubstantiated..

12. **Third Objection.**  The Trustee has failed to fulfill the requirement that he honor the legitimate expectations of a customer.

13. The legislative history of SIPA makes clear that Congress' intent in enacting the legislation was to protect the legitimate expectations of customers.  Congressman Robert Eckhardt, (D) Texas, sponsor of amendments to SIPA to increase the amount of advance available to customers and expedite the process, commented on the purpose of the legislation as follows:

> "Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations . . . ."

S. Rep. No. 95-763, at 2 (1978) (*emphasis added*).

> A customer generally expects to receive *what he believes* is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectations . . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

14. The Securities Investor Protection Corporation ("SIPC") acknowledged that it was bound by the statute and the rules to satisfy the reasonable expectations of customers even when the securities had never been purchased, in the brief it submitted to the Court of Appeals for the Second Circuit as follows:

17653668

5

> Reasonable and legitimate expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits of SIPA) even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase…[T]his emphasis on the reasonable and legitimate customer expectations frequently yields much greater customer protection than would be the case if the transaction reality, not the claimants expectations, were controlling, as this court's earlier opinion in this liquidation well illustrates.

Brief of the Appellant SIPC at 23-24.

15. Based on regular statements and other communications received from Madoff and FISERV, Mrs. Peshkin at all times reasonably believed and expected that Madoff executed such transactions and that the Peshkin IRA Account actually held such securities.

16. The Trustee's position in the Madoff case is completely inconsistent with the purpose and goals of SIPA and the position that SIPC, the corporation charged with administering the Act, has taken unequivocally with respect to the treatment of customers in accordance with their reasonable expectations reflected in the communications from the broker-dealer.

17. **Fourth Objection.** The Trustee failed to set forth a legal basis for the position he has taken that he can reduce the amount of the claim by appreciation in the Superweb DB Plan Account and appreciation in the Peshkin IRA Account or calculate the claim by counting only investment principal less withdrawals. No legal basis for the method exists. The Trustee's calculation violates SIPA.

18. 15 U.S.C. Section 78fff-2(b) provides that a customer's claim shall be allowed in the amount of the customer's "net equity." 15 U.S.C. § 78fff-2(b). The Trustee calculates "net equity" by reducing the principal contributed to the account less any withdrawals or appreciation, without regard to any gains reflected in the Final Madoff Statement and any prior statement delivered by Madoff and/or FISERV to the customer. This is incorrect for the following reasons:

(a) the Trustee's method of calculating the customer claim is inconsistent with the language of the statute. SIPA defines a customer's net equity claim as the value of the customer's "securities positions" in customer's account, less any amount the customer owes the debtor, as of the date of the filing of the SIPA liquidation:

> "The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . ."[4]

15 U.S.C. § 78lll(11). The Trustee's proposed formulation has no support in the language of the statute or interpreting case law and in fact, adds words and concepts to the statute which do not exist.

(b) The Trustee's method is inconsistent with the Rules promulgated under SIPA. The Series 500 Rules promulgated under SIPA by the Securities Investor Protection

---

[4] The "indebtedness" of the customer to the debtor refers to cash or securities owed to the debtor, which is most often in the context of a customer having borrowed from the debtor on margin. *See, e.g.*, H.R. Rep. No. 95-746 at 21 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (noting that, under the 1970 statutory regime, when there were shortages in available securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *In re First Street Sec. Corp.*, 34 B.R. 492, 497 (Bankr. S.D. Fla. 1983) (offsetting against claim amount of indebtedness customer owed to the debtor where unauthorized stock purchase was funded in part by borrowing on margin).

17653668

7

Corporation ('SIPC") provide for the classification of claims for cash or securities in accordance with the written transaction confirmations sent by the broker-dealer to the customer. 17 C.F.R. 300.500.  Pursuant to the Rule, a customer has a claim for securities if the customer has received written confirmation that the securities have been purchased or sold for the account.

(c) The Trustee's method is inconsistent with the legislative history of the statute.  SIPA's legislative history emphasizes Congress' intention that the statute protect customer expectations by ensuring that customers of retail brokerage firms can rely on their account statements.  The Madoff and FISERV statements and confirmations sent to the custodian for the Peshkin IRA Account and Mrs. Peshkin indicated that the Peshkin IRA Account owned a list of blue chip securities.  It makes no difference whether the securities were ever actually purchased.

(d) The Trustee's formula is an improper and wholly inadequate measure of loss.  Mrs. Peshkin deposited funds with Madoff in the expectation the amount would grow, the Peshkin IRA Accounts statements showed such growth, and the balance on the Final Madoff Statement reflects the benefit of this bargain. In *Visconsi v. Lehman Brothers, Inc.*, No. 06-3304, 244 Fed. Appx. 708, 713-14 (6th Cir. 2007) the Court declined to set aside an arbitration award that appeared to apply an expectancy measure of damages against a successor in a Ponzi scheme case and rejected the money in / money out formula as not reflecting the expectations of the parties. *Id*. The Court explained:

> Lehman's out-of-pocket theory misapprehends the harm suffered by Plaintiffs and the facts of this case. Plaintiffs gave $21 million to Gruttadauria, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope – indeed a reasonable expectation – that it would grow. Thus, the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals,

17653668

8

>    is a wholly inadequate measure of damages. Had Gruttadauria invested Plaintiffs' money as requested, their funds would have likely grown immensely, especially considering that Plaintiffs invested primarily throughout the mid-1990s, which, had they hired an honest broker . . . , would have placed their money in the stock market during one of the strongest bull markets in recent memory. In fact, the fictitious statements issued by Lehman, which were designed to track Plaintiffs' funds as if they had been properly invested, indicate that Plaintiffs' accounts would have grown to more than $37.9 million (even accounting for the withdrawal of more than $31.3 million). Plaintiffs thus could have reasonably believed that they were entitled to the full $37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals.

*Id.* This applies precisely to the Goldstein Trust's claim.

    (e)  The Trustee's Determination Letter is contrary to SIPC's own policies and practices, as reflected in the sworn testimony of Stephen Harbeck, SIPC's president and CEO, and its actions in similar liquidation proceedings. For example, in the *New Times* SIPA liquidation, in the context of discussing claims filing deadlines, Harbeck acknowledged that if broker-dealer customers have been led to believe that "real existing" securities had been purchased for their accounts, then those customers are entitled to the full value of their securities positions as of the filing date, even if that value represents a substantial increase from the purported purchase price of the securities and even if the securities had never been purchased. Harbeck testified as follows:

>    Harbeck: [I]f you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities. . . . Even if they're not there.
>
>    Court: Even if they're not there.
>
>    Harbeck: Correct.
>
>    Court: In other words, if the money was diverted, converted –
>
>    Harbeck: And the securities were never purchased.
>
>    Court. Okay.

17653668

9

>   Harbeck: And if those positions triple, we will gladly give the
>   people their securities positions.

Transcript at 37-39, *In re New Times Securities Services, Inc.*, No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000) (Exhibit C).

Moreover, SIPC faced very similar circumstances in the New Times Securities Services, Inc. ("New Times") liquidation and took a very different position than it is taking in the Madoff case in support of the Trustee. There, the New Times Trustee's position on "net equity" was in full accord with SIPA, and thus directly contrary to the Trustee's position in this case. Specifically, with respect to any claims that were based on confirmations and account statements reflecting securities positions in "real" securities that could have been purchased (i.e., securities that actually existed on the public market and whose valuations were objectively and publicly verifiable by the customers), the New Times Trustee allowed all such net equity claims to the full extent of the filing date valuations of those securities, even though none of the securities identified in those records had ever, in fact, been purchased by the broker-dealer. [5]

        (f)      The Trustee's determination is inconsistent with the case law. The Second Circuit's discussion of SIPC's claims processing in *New Times*, the only case in this jurisdiction dealing with the issue in the Madoff case, further indicates that, with respect to

---

[5] As with Madoff Securities and Bernard Madoff, New Times Securities and its principal, William Goren, defrauded scores of investors by providing them with confirmations and account statements reflecting purported securities investments made on their behalf when, in fact, no such investments had been made and their money had, instead, been misappropriated for other purposes. Two of the investment opportunities Goren purported to offer were: (1) money-market funds that were entirely fictitious (the "Fictitious New Age Funds"); and (2) mutual funds that were entirely real, such as those offered by The Vanguard Group and Putnam Investments (the "Real Securities"). *See In re New Times Sec. Services, Inc.*, 371 F.3d 68, 71-72 (2d Cir. 2004) ("*New Times I*"). Goren's was "a classic Ponzi scheme," *Id.* at 72 n.2, wherein new investors' money was used to pay earlier investors.

Approximately 900 customers filed claims in the New Times liquidation: 726 for whom the "Real Securities" were purportedly purchased; 174 for whom the "Fictitious New Age Funds" were purportedly purchased. Consistent with SIPA and its legislative history, the New Times Trustee appropriately applied SIPA's net equity definition to the "Real Securities" customers' claims – meaning he paid them according to the full value of those securities positions as of the date of the liquidation filing. When challenged by "Fictitious New Age Funds" customers who had objected that they had not received the same treatment, SIPC and the New Times Trustee (with the apparent concurrence of the SEC) vigorously defended their approach in court.

17653668                10

customers who thought they were invested in listed securities, SIPC properly paid customer claims based on the customers' final account statements, even where the securities had never been purchased:

> Meanwhile, investors who were misled . . . to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds – because Goren never executed the transactions – the information that these claimants received on their account statements mirrored what would have happened had the given transaction been executed. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. Furthermore, the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," . . . could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements.

*In re New Times Secs. Servs.*, 371 F.3d 68, 74 (2d Cir. 2004); *see also* Brief of Appellant SIPC at 23-24, *In re New Times Sec. Servs., Inc.*, No. 05-5527 (Dec. 30, 2005):

> "[R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase. . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates."

      (g)    The Trustee's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the New Times case, but also by a statement that

17653668      11

SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

(h) the Trustee's methodology also conflicts with other federal laws. For example, Rev. Proc.2009-20, issued by Commissioner Shulman on March 17, 2009, expressly recognizes the income earned by customers, on which they paid taxes annually. Yet the Trustee's position is that the income earned by customers on their investments is not their money. In addition, some customers were required to take distribution from their retirement accounts. Yet the Trustee is deducting from their customer claim the mandatory withdrawals that the customers were required by law to take.

19. In sum, the Trustee has created his own definition of "net equity." The procedure is designed not for the benefit of Madoff victims but rather so that the Trustee can avoid paying SIPC insurance to the thousands of Madoff investors who, like Mrs. Peshkin have depended upon their Madoff investments for their current and future living expenses.

20. **Fifth Objection.** The Trustee's action in reducing the amount shown on the Peshkin IRA Customer Claim by any prior gains reflected on the Final Madoff Statement or prior statements is an attempt to avoid such gains without alleging any grounds for avoidance or proving that such gains are avoidable under the Bankruptcy Code's avoidance provisions. Any

such disallowance is improper and unjustified, and the Determination Letter should be stricken on that ground alone. *See* Fed. R. Bankr. P. 7001(1); 7008..

21. **Sixth Objection.** The Trustee's action in reducing the amount shown on the Peshkin IRA Customer Claim by gains in the Superweb DB Plan Account is an attempt to avoid such gains without alleging any grounds for avoidance or proving that such gains are avoidable under the Bankruptcy Code's avoidance provisions. Any such disallowance is improper and unjustified, and the Determination Letter should be stricken. *See* Fed. R. Bankr. P. 7001(1); 7008.  In addition, the avoidance of those gains have been taken well beyond any limitations period for avoidance of a claim under either state or federal law.

22. **Seventh Objection.** SIPA provides that (a) SIPC shall pay the first $500,000 of each customer claim, and (b) customers have an unsecured claim against customer property for the balance of their claims which is paid pro rata with other customers. *See* 15 U.S.C. § 78fff-3(a) ("In order to provide for prompt payment and satisfaction of net equity claims of customers of debtor, SIPC shall advance to the trustee [up to] $500,000 for each customer, as may be required to pay . . . claims."); 15 U.S.C. § 78fff-2(c)(1)(B) (providing that customers of the debtor "shall share ratably in . . . customer property on the basis and to the extent of their net equities").  Here, the Trustee has acknowledged in the Determination Letter that $176,354.66 of the Peshkin Ira Customer Claim is undisputed.  As such, SIPC is obligated to pay $176,354.66 regardless of how the disputed portion of the claim is resolved.  The Trustee has recently stated a willingness to make payments of undisputed claims along the lines set forth herein, but the proposed Assignment and Release which accompanied the Trustee's Notice of Determination does not adequately preserve Mrs. Peshkin's full rights in connection with the contested portion of her claim including, without limitation, her ability to continue to assert the rights in the

17653668                                13

Objections herein, and it also requires certain assignments and releases which the Trustee is not authorized to obtain. *See* Determination Letter (Exhibit A).

23. **Eighth Objection.** As condition precedent to Mrs. Peshkin's receipt of any SIPC funds (including undisputed amounts), the Trustee is requiring the execution of a Partial Assignment and Release that would "release and forever discharge the SIPA Trustee and SIPC . . . from any and all claims arising out of or relating to the [Peshkin IRA] Account, the Customer Claim filed with the SIPA Trustee . . ., and any and all circumstances giving rise to the Customer Claim . . . ." *See* Determination Letter and Partial Assignment and Release at Exhibit A. There is no legal basis for requiring such a Partial Assignment and Release, and the Trustee's actions attempt to compel Mrs. Peshkin to waive substantial rights which are disputed as a condition to receiving amounts that are undisputed. Certainly, conditioning the payment of funds to which customers are statutorily entitled on the execution of a release is contrary to the provisions of SIPA which direct that customer claims be paid "promptly." *See* 15 U.S.C. § 78fff(a)(1) (2009) (stating that one of the purposes of a SIPA liquidation proceeding is "to distribute customer property and . . . otherwise satisfy net equity claims of customers . . . as promptly as possible after the appointment of a trustee."); *see also* 15 U.S.C. § 78fff-2(b) (2009) ("[T]he trustee shall promptly discharge . . . all obligations of the debtor to a customer by the . . . making of payments to or for the account of such customer."). Moreover, the demand for a release and assignment violates specific provisions of SIPA providing limited subrogation rights to the Trustee, which do not include the assignment and release sought by the Trustee. *See, e.g.*, 15 U.S.C. § 78fff(a)(3) (2009) (providing that Trustee has "rights of subrogation as provided in this chapter"); *see, e.g.* 15 U.S.C. § 78fff-2(c)(3) (providing that trustee's rights as subrogee are subordinate to rights of customers to customer property). In addition, the Trustee's demand should be stricken as contrary to public policy.

24. **Ninth Objection.** The Peshkin IRA Account was established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, whose provisions preempt state fraudulent conveyance law, upon which the Trustee presumably relies pursuant to 11 U.S.C. § 544. 29 U.S.C. § 1144(a) (the provisions of ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan described in section [1003(a)]. . .").

As evidence of Congressional intent to protect ERISA-qualified plans, the Bankruptcy Code was amended in 2005 to protect such plans from the claims of creditors. 11 U.S.C. § 541(b)(7)(a)(i)(I) (exempting from property of the estate "any amount withheld by an employer from the wages of employees for payment as contributions to an employee benefit plan that is subject to Title I of the Employee Retirement Income Security Act of 1974 . . ."). *See also, Patterson v. Shumate*, 504 U.S. 753 (1992) (holding that debtor's interest in an ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2)).

25. **Tenth Objection.** The Peshkin IRA Account was established as an individual retirement, which under the laws of the State of Colorado where the account was established and administered, or under the laws of the State of New York, where the funds were deposited are exempt from judgment and the Trustee's efforts to reduce the amounts due in the account under any theory. See e.g. Colorado C.R.S. 13-54-102 (2008); New York C.P.L.R. 5205(c). The same state laws protect the funds in the account and distribution from the Superweb Press DP Plan Account. The Trustee's reduction of the funds in the Superweb Press DP Plan Account is in violation of state law.

26. **Alternate Considerations.**  In the event that the Court should determine that customer claims should not be allowed in the amount of the Final BMIS Statement, then in the alternative, the customer is entitled to recover interest or appreciation the investments based upon the following.

(a) Under New York law, which is applicable here, funds deposited with the Debtors under these circumstances are entitled to interest. See, e.g., N.Y.C.P.L.R. § 5004; N.Y. Gen. Obl. § 5-501, et seq. Accordingly, the Peshkin IRA Customer Claim should be recalculated by adding interest to all funds deposited.

(b) Under New York law, which is applicable here, customers are entitled to any returns Madoff earned on the deposited funds under principles of unjust enrichment. Accordingly, Customer claims should be recalculated by adding the amounts earned by BMIS on the customer's deposits. *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

(c) Mrs. Peshkin is entitled to interest on her investment under federal securities laws. In *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), the Supreme Court analyzed the different measures of recovery of "actual damages" for fraud, primarily including rescission and restitution.  The *Randall* Court concluded that Congress intended to deter wrongdoers, and hence, that wide latitude in choosing the measure of damages was warranted. *See id*. at 664 (citing *Affiliated Ute Citizens of Utah v. United State*s, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)).  The Randall Court continued by holding that:

17653668                                    16

> This deterrent purpose is ill-served by a too rigid insistence on limiting plaintiffs to recovery of their "net economic loss."

*Id.* at 664 (citing *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 940 (2d Cir. 1984)).

## RESERVATION OF RIGHTS

27. Mrs. Peshkin reserves the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of Marsha Peshkin's right to object on any additional grounds.

28. Mrs. Peshkin reserves all rights set forth in Rule 9014, including, without limitation, rights of discovery. See Fed. R. Bankr. P. 9014.

29. Mrs. Peshkin reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever

30. Mrs. Peshkin incorporates by reference all reservations of rights set forth in Peshkin IRA Customer Claim.

## RELIEF REQUESTED

For the reasons stated herein, the Peshkin IRA Customer Claim should be allowed in its entirety in the amount of $1,522,245.83, which is the amount stated on her Final Madoff Statement, plus the deposit of $125,000 received by Madoff in December 2008, plus interest from the date of the Determination letter.

For the reasons stated herein, the Court should direct SIPC to immediately replace $500,000 of the securities in the Peshkin IRA Account based upon the values reflected on her November 30, 2008 account statement.

For the reasons stated herein, the Determination Letter should be stricken.

Mrs. Peshkin requests such other relief as may be just and equitable.

Dated: September 16, 2009　　　　　　　　　　SONNENSCHEIN NATH & ROSENTHAL LLP


　　　　　　　　　　　　　　　　　　　　　　By:　　/s/ Carole Neville　　　　　　
　　　　　　　　　　　　　　　　　　　　　　　　Carole Neville
　　　　　　　　　　　　　　　　　　　　　　　　1221 Avenue of the Americas
　　　　　　　　　　　　　　　　　　　　　　　　New York, New York 10020
　　　　　　　　　　　　　　　　　　　　　　　　Telephone: (212) 768-6700
　　　　　　　　　　　　　　　　　　　　　　　　Facsimile: (212) 768-6800

　　　　　　　　　　　　　　　　　　　　　　*Attorneys for the Marsha Peshkin IRA*

17653668　　　　　　　　　　　　　　　18

## **CERTIFICATE OF SERVICE**

I, Carole Neville, hereby certify that on September 17, 2009 I caused a true and correct copy of the foregoing **Objection to Trustee's Determination of Claim** on behalf of Marsha Peshkin IRA Account to be filed electronically with the Court and served upon the parties in this action who receive electronic service through CM/ECF, and served by hand upon:

> David J. Sheehan, Esq.
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, NY 10111

Dated: September 17, 2009

                                                                                                  /s/ Carole Neville
                                                                                                  Carole Neville