Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
Attorneys for Sondra and Norman Feinberg

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------    Adv. Pro. No. 08-01789 (BRL)

SECURITIES INVESTOR PROTECTION
CORPORATION,

           Plaintiffs                    SIPA Liquidation

vs.                                     **OBJECTION TO TRUSTEE'S**
                                     **DETERMINATION OF**
BERNARD L. MADOFF INVESTMENT        **CLAIM**
SECURITIES LLC,

           Defendant.
-------------------------------------------------------

       Sondra and Norman Feinberg hereby object to the Notice of Trustee's Determination of

Claim dated September 2, 2009 sent by Irving H. Picard and state as follows:

**Background facts**

       1.      The Feinbergs had two accounts with Bernard L. Madoff Investment Securities

LLC ("Madoff"): Account No. 1-F0141 (the "First Account") and Account No. 1F0189 (the

"Second Account")(together, the "Accounts").  Each of Sondra and Norman Feinberg had

deposited money into the Accounts for the purpose of purchasing securities and each of them had

the power to direct the investments in the Accounts.  The Accounts were joint accounts with a

right of survivorship.

2.      During the period from November 26, 1997 through December 11, 1997, the

Feinbergs deposited $1 million into the Accounts.  See Exh. A at 5.  During the period from

December 1, 1997 through October 1, 2008, the Feinbergs withdrew $644,500 from the

Accounts, although Picard erroneously claims that the Feinbergs withdrew $1,644,500.  See Exh.

A at 5.

3.      Throughout the period that the Feinbergs had the Accounts, they paid taxes

annually on the appreciation in the Accounts.

4.      The November 30, 2008 market value of securities in the First Account was

$ 2,668,016.24 and in the Second Account was $772,350.14.  See Exh. B.

5.      On _____, 2009 , the Feinbergs sent two SIPC claims to Picard for each

Account asserting a claim for securities in the amount of $2,668,016.24 for the First Account and

$772,350.14 for the Second Account, based upon the November 30, 2008 Madoff statements.

See Exh. B.

6.      On September 2, 2009, Picard sent the Feinbergs a determination letter (the

"Determination Letter") with respect to the Accounts, rejecting the claim for securities based

upon the November 30, 2008 balance and stating that he was entitled, under SIPC Rule 105, to

combine the Accounts and treat the Feinbergs as if they are entitled to a single SIPC insurance

payment of $500,000, instead of two payments of $500,000 for the First Account and two

payments for the Second Account, one in the amount of $500,000 and the other in the amount of

$272,350.14.  See Exh. A at 1-2.

**Grounds for objection**

**A.  Picard has failed to comply with the Court's December 23, 2008 Order**

2

7.      The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records."  December 23, 2008 Order at 5 (Docket No. 12).  The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that the Feinbergs did not have a "legitimate expectation" that the balance on the Account statements represented their property.  In fact, in each year that they had the Accounts, the Feinbergs paid ordinary income taxes on the appreciation in the Accounts, which were duly accepted by the federal and state taxing authorities.  The Feinbergs would not have paid those sums if they did not believe that the assets in the Accounts belonged to them.

8.      Picard has failed to state a basis in the Determination Letter for the position he has taken.  Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer.  It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses."  Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

**B.  Picard has violated the requirement that
he honor a customer's "legitimate expectations"**

9.      The legislative history of the Securities Investor Protection Act ("SIPA") makes clear that Congress' intent was to protect a customer's "legitimate expectations."   For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.

3

\*       \*       \*

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

10.     SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

11.     Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities.  SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality.  Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

12.     Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general

4

counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang

acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if
> clients were presented statements and had reason to believe that the securities
> were in fact owned, the SIPC will be required to buy these securities in the open
> market to make the customer whole up to $500K each.  So if Madoff client
> number 1234 was given a statement showing they owned 1000 GOOG shares,
> even if a transaction never took place, the SIPC has to buy and replace the 1000
> GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

13.    As indicated in paragraph 19 *infra,* in the *New Times* case, SIPC voluntarily

recognized its obligation under SIPA to pay customers up to $500,000 based on their final

brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker

had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the

securities reflected on the customers' monthly statements.  In fact, SIPC's president, Stephen

Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to

$500,000 including the appreciation in their accounts.

> HARBECK:  . . . if you file within sixty days, you'll get the securities, without
> question.  Whether – if they triple in value, you'll get the securities . . . Even if
> they're not there.
>
> COURT:  Even if they're not there.
>
> HARBECK:  Correct.
>
> COURT:  In other words, if the money was diverted, converted –
>
> HARBECK:  And the securities were never purchased.
>
> COURT:  Okay.
>
> HARBECK:  **And if those positions triple we will gladly give the people their
> securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

### C.  Without legal authority, Picard has invented his own definition of "net equity"

14.     SIPA defines "net equity" as the value of the securities positions in the customer's

account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts
> of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to
> such customer if the debtor had liquidated, by sale or purchase on the
> filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

15.     SIPA specifically prohibits SIPC from changing the definition of "net equity."  15

U.S.C. § 78ccc(b)(4)(A).

16.     The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a
> customer, to be determined by calculating the sum which would have been owed
> by the debtor to such customer if the debtor had liquidated, by sale or purchase on
> the filing date, all securities positions of such customer" [corrected for] any
> indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re*

*Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is

calculated as the difference between what the debtor owes the customer and what the

customer owes the debtor on the date the SIPA proceeding is filed.").

17.     In derogation of his obligations to carry out the provisions of SIPA, Picard has

created his own definition of "net equity."  Picard has asserted that he has a right to recognize

investors' claims only for the amount of their net investment, disregarding all appreciation in

6

their accounts.  By this procedure, Picard would avoid paying SIPC insurance to the thousands of

elderly, long-term Madoff investors who, like the Feinbergs, have depended upon their Madoff

investments for their daily living expenses.  He also would be able to reduce all claims to the net

investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does

pay to customers.

18.    Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a
> claimant is owed perpetuates the Ponzi Scheme.  It allows the thief . . . Mr.
> Madoff . . . to determine who receives a larger proportion of the assets collected
> by the Trustee.

19.    Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to

save money for the brokerage community at the expense of innocent investors who relied upon

the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

20.    After nine months of his tenure, Picard has identified only a handful of Madoff

investors who **might not** have had a "legitimate expectation" that the trade confirmations and

account statements they received were accurate.  For example, Picard has sued two Madoff

customers, Stanley Chais and Jeffrey Picower who, Picard has alleged, took out of Madoff $6

billion more than they invested.  Picard has further alleged that these two investors received

returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their

accounts.  Assuming these allegations are true, Chais and Picower were Madoff's co-

conspirators and certainly could not have had a "legitimate expectation" that their accounts were

genuine.

7

21.     However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

22.     The Feinbergs, like thousands of other investors, received monthly statements from Madoff in the past several years indicating returns on their Madoff investment in the range of 9 – 11% per year.  The Feinbergs had entered into a standard brokerage agreement with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Accounts had specific numbers; they received on a monthly basis trade confirmations for every securities transaction in the Accounts which accurately set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis to claim that the Feinbergs did not have a "legitimate expectation" that the assets reflected on the Account statements sent to them by Madoff belonged to them.   Thus, the Feinbergs are entitled to a claim for securities in the amount of $2,668,016.24 on the First Account and $772,350.14 on the Second Account, as reflected on the November 30, 2008 Madoff statement.

**D.  Each of the Feinbergs is a "customer" for each Account under
SIPA and each is entitled to $500,000 in SIPC insurance for each Account.**

23.     Each of the Feinbergs is a "customer" under the plain definition of "customer" in SIPA.  Thus, each is entitled to receive replacement securities equal to $500,000 in value as of November 30, 2008 for each Account for a total of $1 million in securities, at the value as of November 30, 2008, to each of them for each Account for a total of $2 million in securities.  15 U.S.C. § 78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.").

8

24.     Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words:  "A "customer" is an account holder." Instead, Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor").

25.     Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Feinbergs because "SIPA is remedial legislation.  As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

26.     The Trustee erroneously relies upon SIPC Rule 105.  SIPA does not permit SIPC, by the promulgation of Rules, to change the definition of "customer" under the statute.  Hence, Rule 105 is invalid.  15 U.S.C. § 78ccc(b)(4)(A).

**E.  Picard has no right to condition payment of SIPC insurance on execution of a release.**

27.     Picard has conditioned payment to the Feinbergs of the $500,000 SIPC payment, which he does not dispute, on execution by them of a Partial Assignment and Release that would "release and forever discharge the SIPA Trustee and SIPC . . . from any and all claims arising out of or relating to [their account], the Customer Claim filed with the SIPA Trustee. . ., and any and all circumstance giving rise to the Customer Claim."   There is no legal basis for requiring

9

such a Partial Assignment and Release in exchange for SIPC insurance to which the Feinbergs

are unconditionally entitled.

      28.    Under a new policy announced by the Trustee on August 4, 2009, he is obligated

to pay customers the undisputed amount he owes them, even if they will not execute a release.

**F.  The Feinbergs are entitled to prejudgment interest on his investment and profits.**

      29.    Under New York law, which is applicable here, funds deposited with Madoff are

entitled to interest.  *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.*  Moreover,

since Madoff converted the Feinbergs' funds, that fact also entitles them to prejudgment interest.

*See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.*S. Dist. LEXIS 35786, at *14-15

(S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify

for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d

427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and

conversion).

      30.    Although it is not legally relevant, Picard cannot prove that Madoff earned no

money on the Feinbergs' investment.  To the extent the funds were deposited into a bank, they

earned interest while on deposit.   Madoff disbursed customer funds to favored customers, to

family members, and for other purposes.  Those funds may have yielded substantial profits to

which the Feinbergs and other customers are entitled once the ultimate recipients of Madoff's

thievery are known.

**G. Picard has no power to claw back withdrawals beyond the statute of limitations period
    and solely for SIPC's benefit**

      31.    In derogation of his fiduciary duty to the Feinbergs, Picard is allowing them only

one claim in the amount of $1,275,500 – their net investment in the Accounts.  However, he has

no right to reduce their claim in this manner and to deduct withdrawals from their Account

balances.  Without any legal authority, Picard is, in effect, imposing upon the Feinbergs a

fraudulent conveyance judgment for sums the Feinbergs withdrew from the Accounts beyond the

statute of limitations period applicable to fraudulent conveyances.  Thus, even if Picard were

entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against

customers, he could not possibly do so beyond the applicable statute of limitations.  Yet, he has

done so here and deprived the Feinbergs of the claim to which they are absolutely entitled.

**H.  Picard has violated SIPA by delaying the payment of SIPC insurance**

32.    Picard has breached his statutory obligation to "promptly" replace a customer's

securities.  15 U.S.C. § 78fff-2(b).  Picard is obligated to replace the Feinbergs' securities up to a

value of $500,000 as of November 30, 2008 for each of them for each Account, for a total of $1

million of securities for each Account, as valued on their November 30, 2008 statements.

**Conclusion**

The Feinbergs are entitled to an order compelling Picard and SIPC to immediately

replace the securities in both Accounts to the extent of a valuation of $500,000 for each of the

Feinbergs as of November 30, 2008 for a total of $2 million of securities valued as of November

30, 2008.

The Feinbergs are entitled to have their claim recognized in the amount of $2,668,106.24

for the First Account and $772,350.14 for the Second Account, consistent with the November 30,

2008 statements.

11

The Feinbergs are entitled to judgment against Picard and Baker & Hostetler LLP for the

damages they have suffered as a result of the breach of fiduciary duty of Picard and his counsel.

September 29, 2009

PHILLIPS NIZER LLP


By s/s Helen Davis Chaitman

666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
Attorneys for
Sondra and Norman Feinberg

12

1091574.1