Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
Attorneys for Nancy Feldman

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,

          Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

          Defendant.
-------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

Nancy Feldman hereby objects to the Notice of Trustee's Determination of Claim dated August 28, 2009 sent by Irving H. Picard and states as follows:

**Background facts**

1. Feldman had an account with Bernard L. Madoff Investment Securities LLC ("Madoff"): Account No. 1F0152 (the "Account").

2. During the period from May 19, 1998 through December 11, 2008 a total of $805,248 was deposited into the Account. During the period from May 19, 1998 through December 11, 2008, $110,000 was withdrawn from the Account.

3. On June 6, 2007, $455,248 was transferred into the Account as a gift from Feldman's parents, who filed a gift tax return reflecting this transfer.

1091750.1

4. Throughout the period of the Account's existence, Feldman paid taxes annually on the appreciation in the Account.

5. The November 30, 2008 market value of securities in the Account was $1,637,498.61.

6. Feldman sent a SIPC claim to Picard asserting a claim for securities in the amount of $1,637,498.61, based upon the November 30, 2008 Madoff statement.

7. On August 7, 2009, Picard sent Feldman a determination letter (the "Determination Letter") with respect to the Account, rejecting the claim for securities based upon the November 30, 2008 balance and stating that Feldman was entitled to be paid only $399,333.33 by the Securities Investor Protection Corporation ("SIPC"). Picard reduced the transfer from Feldman's father of $455,248 to $159,333.33. Presumably, Picard's reasoning is that Feldman's father had a net investment in his account of only $159,333.33, although Picard gave no reason for his determination.

8. Picard extended Feldman's time to object to his determination until October 7, 2009.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

9. The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that Feldman did not have a "legitimate expectation" that the balance on the Account statements represented her property. In fact, in

2

each year of the Account, Feldman paid ordinary income taxes on the appreciation in the Account, which taxes were duly accepted by the federal and state taxing authorities. Feldman would not have paid those sums if she did not believe that the assets in the Account belonged to her.

10. Picard has failed to state a basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.*, No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

## B. Picard has violated the requirement that he honor a customer's "legitimate expectations"

11. The legislative history of the Securities Investor Protection Act ("SIPA") makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
>
> \* \* \*
>
> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

12. SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

13. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

14. Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

4

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

15. As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00) (emphasis added).

**C. Without legal authority, Picard has invented his own definition of "net equity"**

16. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –

5

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus

(B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

17. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

18. The Second Circuit has recognized that:

Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.*, 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

19. In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of long-term Madoff investors who, like Feldman, have relied upon their Madoff investments for their retirement and financial planning. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

20. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

1091750.1

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by Feldmanee.

21. Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

22. After nine months of his tenure, Picard has identified only a handful of Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. For example, Picard has sued two Madoff customers, Stanley Chais and Jeffrey Picower who, Picard has alleged, took out of Madoff $6 billion more than they invested. Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

23. However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

24. Feldman, like thousands of other investors, received monthly statements from Madoff in the past several years indicating returns on their Madoff investment in the range of 9 – 11% per year. Feldman had entered into a standard brokerage agreement with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Account had specific numbers; Feldman received on a monthly basis trade confirmations for every securities transaction in the

7

Account which accurately set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis to claim that Feldman did not have a "legitimate expectation" that the assets reflected on the Account statements sent to her by Madoff belonged to Feldman. Thus, Feldman is entitled to a claim for securities in the amount of $1,637,498.61 as reflected on the November 30, 2008 Madoff statement.

**D. Feldman is entitled to prejudgment interest on the investment and profits.**

25.    Under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted the Feldman' funds, that fact also entitles her to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.S.* Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

26.    Although it is not legally relevant, Picard cannot prove that Madoff earned no money on Feldman's investment. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which Feldman and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

27.    In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g., Donell v. Kowell,* 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme

is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers*, 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

### E. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit

28.  Although Picard has not explained the legal basis for his position, he presumably is relying upon the avoidance provisions of the Bankruptcy Code, *i.e.*, 11 U.S.C. §§ 544, 546 and 547. However, Picard has no right to utilize these provisions for the purpose of enriching SIPC at Feldman's expense. The legislative history of these provisions makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g.*, 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt,*

*Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

29. Here, however, Picard is not acting to assure equal distribution among prepetition creditors. On the contrary, he is simply acting as SIPC's puppet in depriving Feldman of the $500,000 in SIPC insurance to which she is statutorily entitled.

**30.** Moreover, even assuming, *arguendo,* that Picard had a right to utilize his "cash in/cash out" methodology to limit SIPC's liability to Feldman, Picard cannot possibly circumvent the statute of limitations in the fraudulent conveyance laws to offset withdrawals from the Account which pre-date the limitations period.

31. In derogation of his fiduciary duty to Feldman, Picard is, in effect, imposing upon Feldman a fraudulent conveyance judgment for $50,000 that Feldman withdrew from the Account on May 17, 2000, beyond the statute of limitations period applicable to fraudulent conveyances. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived Feldman of the claim to which she is absolutely entitled.

**F. Picard has violated SIPA by delaying the payment of SIPC insurance**

32.     Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace Feldman's securities up to a value of $500,000 as valued on the November 30, 2008 statement.

**Conclusion**

Feldman is entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of $500,000 as of November 30, 2008.

Feldman is entitled to have her claim recognized in the amount of $1,637,498.61, consistent with the November 30, 2008 statement.

Feldman is entitled to judgment against Picard and Baker & Hostetler LLP for the damages she has suffered as a result of the breach of fiduciary duty of Picard and his counsel.

October 5, 2009

PHILLIPS NIZER LLP

By s/s Helen Davis Chaitman

666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
Attorneys for Nancy Feldman