JOSEPHINE WANG
General Counsel
SECURITIES INVESTOR
 PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, DC 20005
Telephone: (202) 371-8300
Facsimile: (202)371-6728
E-mail: jwang@sipc.org

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | ) ) ) | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | ) ) ) | SIPA Liquidation |
| v. | ) ) | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, Defendant. | ) ) ) ) | |
| IN RE: | ) ) ) | |
| BERNARD L. MADOFF, | ) ) | |
| Debtor. | ) ) ) | |

## MEMORANDUM OF LAW OF THE
## SECURITIES INVESTOR PROTECTION CORPORATION
## IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER
## UPHOLDING TRUSTEE'S DETERMINATION DENYING
## "CUSTOMER" CLAIMS FOR AMOUNTS LISTED ON
## LAST STATEMENT, AFFIRMING TRUSTEE'S DETERMINATION
## OF NET EQUITY, AND EXPUNGING THOSE
## OBJECTIONS WITH RESPECT TO THE
## <u>DETERMINATIONS RELATING TO NET EQUITY</u>

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ..................................................... iii

PRELIMINARY STATEMENT ................................................ 1

STATEMENT OF THE ISSUES ............................................... 1

STATEMENT OF FACTS .................................................... 2

    The Claimant-Investors ............................................... 2

    The Broker ........................................................ 3

SUMMARY OF THE ARGUMENT ........................................... 6

ARGUMENT .............................................................. 7

OVERVIEW OF SIPA ...................................................... 7

    A.    The Circumstances of Adoption: An Operational Crisis .............. 8

    B.    Stockbroker Liquidations Before 1938 ........................... 10

    C.    Section 60e of the Bankruptcy Act .............................. 10

    D.    SIPA As Enacted in 1970 ...................................... 11

    E.    SIPC as Amended ........................................... 12

    F.    SIPC and Its Funds ........................................... 14

    G.    Use of SIPC Funds to Satisfy Customer Claims ................... 15

    H.    Nature of a SIPA Proceeding ................................... 15

    I.    The Burden of Proof .......................................... 16

I.    UNDER THE CIRCUMSTANCES OF THIS CASE,
AN INVESTOR'S NET EQUITY CANNOT BE DETERMINED
WITH REFERENCE TO THE INVESTOR'S LAST ACCOUNT
STATEMENT ................................................... 18

1.    In Determining Claims In BLMIS, The Trustee Cannot Legally Rely Solely Upon Account Statements . . . . . . . . . . . . . . . . . . 18

2.    Reliance Upon the Last Account Statement Furthers the Fraud and Undermines SIPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3.    The Series 500 Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

4.    Ensminger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A.   The Broker as the Claimant's Agent . . . . . . . . . . . . . . . . . . . . . . . . 27

B.   The Fraudulent Trades Are Unenforceable . . . . . . . . . . . . . . . . . . . 29

    i.    Section 10(b) of the 1934 Act, and Rule 10b-5 . . . . . . . . . . . . . . . . 29

    ii.   The Martin Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    iii.  Unenforceability of Illegal Contracts . . . . . . . . . . . . . . . . . . . . . . 32

C.   Avoidable Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    i.    Power to Avoid Under SIPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    ii.   The Salmon Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

II.   THE CUSTOMER'S NET EQUITY IS THE NET AMOUNT DEPOSITED BY THE CUSTOMER WITH BLMIS . . . . . . . . . . . . . . . . . . 38

    A.  The Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    B.  General Creditor Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CONCLUSION    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## TABLE OF AUTHORITIES

**CASES:**                                                 **PAGE**

In re Adler Coleman Clearing Corp., 195 B. R. 266 (Bankr. S.D.N.Y. 1996) . . . . . . . . . . 23

In re Adler, Coleman Clearing Corp., 198 B.R. 70 (Bankr. S.D.N.Y. 1996) . . . . . . . . 17, 21

In re Adler Coleman Clearing Corp., 204 B.R. 111 (Bankr. S.D.N.Y. 1997) . . . . . . . . 18, 40

In re Bell & Beckwith, 124 B.R. 35 (Bankr. N.D. Ohio 1990) . . . . . . . . . . . . . . . . . . . . . . 42

In re Bell & Beckwith (Murray v. McGraw), 821 F.2d 333 (6th Cir. 1987) . . . . . . . . 23, 24

In re Brentwood Securities, Inc., 925 F.2d 325 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . 18, 41

In re Carolina First Securities Group, Inc., 173 B.R. 884
    (Bankr. M.D.N.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Cathay Pacific Airways, Ltd. v. Fly and See Travel, Inc.,
    3 F.Supp.2d 443 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

In re Chitwood, 3 Bankr. Ct. Dec. (CRR) 1033 (Bankr. S. D. Ala. 1977) . . . . . . . . . . . . . . 17

In re C. J. Wright & Co., 162 B. R. 597 (Bankr. M. D. Fla. 1993) . . . . . . . . . . . . . . . . . 38, 40

Curtis, Collins & Holbrook v. United States, 262 U.S. 215 (1923) . . . . . . . . . . . . . . . . . . 28

Duel v. Hollins, 241 U.S. 523 (1916) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 30

E. F. Hutton & Co. v. Penham, 547 F.Supp. 1286 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . 32

Eitel v. Schmidlapp, 459 F.2d 609 (4th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Exchange National Bank of Chicago v. Wyatt, 517 F.2d 453
    (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

**CASES**:                                                                    **PAGE**

First Nat. Bank of Cicero v. United States, 625 F.Supp.
    926 (N.D. Ill. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Gold v. Hyman, [1974-75 Transfer Binder] Fed. Sec. L.
    Rep. (CCH) ¶95,043 (S.D.N.Y. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

In re Government Securities Corp., 90 B.R. 539 (Bankr. S.D. Fla. 1988) . . . . . . . . . . . . . . 17

In re Hanover Square Securities, 55 B.R. 235 (Bankr. S.D.N.Y. 1985) . . . . . . . . . . . . . . 17

Harriss v. Tams, 258 N.Y. 229, 179 N.E. 476 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Hurd v. Hodge, 334 U.S. 24 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re Investors Funding Corp., 523 F.Supp. 533 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . 28-29

Kaiser Steel Corp. v. Mullins, 455 U.S. 72 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re Klein, Maus & Shire, Inc., 301 B.R. 408 (Bankr. S.D.N.Y. 2003) . . . . . . . . . . . . . . . 41

In the Matter of Lewellyn, 26 B.R. 246 (Bankr. S. D. Iowa 1982) . . . . . . . . . . . . . . . . . . . . 16

In re Lloyd Securities, Inc., 75 F.3d 853 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re Maxwell Newspapers, Inc., 164 B.R. 858 (Bankr. S.D.N.Y. 1994) . . . . . . . . . . . . . . . 28

McMullen v. Hoffman, 174 U.S. 639 (1899) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),
    247 B. R. 51 (Bankr. S.D.N.Y. 1999), aff'd,
    263 B.R. 406 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24-28, 33

In re MV Securities, Inc., 48 B.R. 156 (Bankr. S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . 41

National Union Fire Ins. Co. v. Camp (In re Government Sec. Corp.),
    972 F.2d 328 (11th Cir. 1992), cert. den., 507 U.S. 952 (1993) . . . . . . . . . . . . . . . . . 40

**CASES:** (cont.)                                                                                    **PAGE**

New York v. Barysh, 95 Misc.2d 616, 408 N.Y.S.2d 190 (1978) . . . . . . . . . . . . . . . . . . . . . 31

In re New Times Securities Services, Inc., 371 F.3d 68 (2d Cir. 2004) . . . . . 6, 20, 22-24, 38

In re New Times Securities Services, Inc., 463 F.3d 125 (2d Cir. 2006) . . . . . . . . . . . 21-22

In re Oberweis Securities, Inc., [1992 Decisions]
    Fed. Sec. L. Rep. Transfer Binder
    (CCH) ¶96,890 (Bankr. N.D. Ill. May 21, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

In re Oberweis Securities, Inc., 135 B.R. 842 (Bankr. N.D. Ill. 1991) . . . . . . . . . . . . . 40, 42

In re O.P.M. Leasing Services, Inc., 60 B.R. 679 (Bankr. S.D.N.Y. 1986) . . . . . . . . . . . . . 17

In re Park South Securities, LLC, 326 B. R. 505 (Bankr. S.D.N.Y. 2005) . . . . . . . . . . . . . 34

People v. Electro Process, Inc., 284 A.D. 833,
    132 N.Y.S.2d 531 (4th Dep't 1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

People v. Federated Radio Corp., 244 N.Y. 33, 154 N.E. 655 (1926) . . . . . . . . . . . . . . . . 31

People v. Florentino, 116 Misc.2d 692,
    456 N.Y.S.2d 638 (N. Y. Crim. Ct. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Redington v. Touche Ross & Co., 592 F.2d 617 (2d Cir. 1978),
    rev'd on other grounds, 442 U.S. 560 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-41

Schultz v. Omni Mutual, Inc., [1993-94] Fed. Sec. L. Rep. (CCH)
    ¶98,095 (S.D.N.Y. Dec. 30, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

SEC v. Aberdeen Securities Co., 480 F.2d 1121 (3d Cir.),
    cert. den. sub nom., Seligsohn v. SEC, 414 U.S. 1111 (1973) . . . . . . . . . . . 16, 18, 34

SEC v. Albert & Maguire Securities Co., 378 F. Supp. 906
    (E.D. Pa. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

SEC v. First Securities of Chicago, 507 F.2d 417 (7th Cir. 1974) . . . . . . . . . . . . . . . . . . . 40

SEC v. Howard Lawrence & Co., 1 Bankr. Ct. Dec. (CRR) 577
    (Bankr. S.D.N.Y. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**CASES:** (cont.)                                                          **PAGE**

SEC v. Kenneth Bove & Co., 378 F.Supp. 697 (S.D.N.Y. 1974) . . . . . . . . . . . . . . . . . . . . . 40

SEC v. Packer, Wilbur & Co., 498 F.2d 978 (2d Cir. 1974) . . . . . . . . . . . . . 8, 15, 25, 41, 42

SEC v. S.J. Salmon & Co., 375 F.Supp. 867 (S.D.N.Y. 1974) . . . . . . . . . . . . . . . . . . . 21, 40

SIPC v. Ambassador Church Finance/Development Group, Inc.,
    788 F.2d 1208 (6th Cir.), cert. den. sub nom.,
    Pine Street Baptist Church v. SIPC, 479 U.S. 850 . . . . . . . . . . . . . . . . . . . . . . . 15-16

SIPC v. Associated Underwriters, Inc., 423 F.Supp. 168
    (D. Utah 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 41

SIPC v. Barbour, 421 U.S. 412 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SIPC v. Christian-Paine & Co., 755 F.2d 359 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . 16

SIPC v. I.E.S. Management Group, Inc., 612 F.Supp. 1172 (D.N.J. 1985),
    aff'd w/o opinion, 791 F.2d 921 (3d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

SIPC v. Morgan Kennedy & Co., 533 F.2d 1314 (2d Cir. 1976),
    cert. denied, 426 U.S. 936 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

SIPC v. S. J. Salmon, No. 72 Civ. 560, 1973 U.S. Dist. LEXIS 15606 (S.D.N.Y.) . . . . . . . 35

SIPC v. S. J. Salmon, No. 72 Civ. 560, slip op. (S.D.N.Y. Feb. 5, 1974) . . . . . . . . . . . . . . 36

SIPC v. Stratton Oakmont, Inc., 229 B.R. 273 (Bankr. S.D.N.Y.),
    aff'd, 239 B.R. 698 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

In re Stalvey & Assoc., Inc., 750 F.2d 464 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 40

State v. Sonifer Realty Corp., 212 A.D.2d 366 (1995), 622 N.Y.S.2d 516 (1995) . . . . . . . . 31

In re Stratton Oakmont, Inc., 239 B.R. 698 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . 21

In re Stratton Oakmont, Inc. (Miller v. DeQuine),
    42 Bank. Ct. Dec. (LRP) 48 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**CASES**: (cont.)                                                          **PAGE**

Theodore H. Focht, Trustee v. Tessie C. Athens
    (In re Old Naples Securities, Inc.), 311 B.R. 607 (M. D. Fla. 2002)  . . . . . . . . . . . . 38

United States v. Bonanno Org. Crime Fam. of La Cosa Nostra,
    879 F.2d 20 (2d Cir. 1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re Waddell Jenmar Securities, Inc., 126 B.R. 935 (Bankr. E.D.N.C. 1991)  . . . . . . . . . . . 18

## STATUTES AND RULES:

Securities Investor Protection Act, as amended, 15 U.S.C. §

78bbb  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
78ccc(a)(1)(A)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
78ccc(a)(2)(A)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
78ccc(e)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
78ddd  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
78ddd(f)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
78ddd(g)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
78ddd(h)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
78eee(a)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
78fff(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
78fff(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 34
78fff(e)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
78fff-1(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 34
78fff-2(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19
78fff-2(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
78fff-2(c)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
78fff-2(c)(1)(B)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
78fff-2(c)(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
78fff-3(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17, 18
78jjj(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
78kkk(g)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
78lll(3)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
78lll(4)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
78lll(7)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
78lll(11)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**STATUTES AND RULES** (cont.):                          **PAGE**

Securities Investor Protection Act of 1970, 15 U.S.C. §

78fff(c)(2)(A)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
78fff(c)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
78fff(c)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
78fff(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Bankruptcy Act (repealed 1979), 11 U.S.C. §

96e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11, 16, 17
96e(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
96e(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bankruptcy Code, 11 U.S.C. §

726 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

The Martin Act, N.Y. Gen. Bus. L. §

352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
352(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
352-c(1)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32
353 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Securities Exchange Act of 1934, 15 U.S.C. §

78a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
78cc(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32-33
78j(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31, 33
78o(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
78q . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

SIPC Rules (2009), 17 C.F.R. § 240

300.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25
300.503(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

53 Fed. Reg. 10368 (Mar. 31, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**STATUTES AND RULES (cont.):**                                                **PAGE**

Rules of the Securities and Exchange Commission, 17 C.F.R. §240

10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31, 33
17a-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**OTHER STATUTORY PROVISIONS:**

Pub. L. No. 91-598, 84 Stat. 1636 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Pub. L. No. 94-29, 89 Stat. 163 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Pub. L. No. 95-283, 92 Stat. 249 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13
Pub. L. No. 95-598, 92 Stat. 2674 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Pub. L. No. 96-433, 94 Stat. 1855 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Pub. L. No. 97-258, 96 Stat. 1067 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Pub. L. No. 97-303, 96 Stat. 1410 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Pub. L. No. 99-514, 100 Stat. 2095 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Pub. L. No. 100-181, 101 Stat. 1265 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Pub. L. No. 106-554, 114 Stat. 2763 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Pub. L. No. 109-8, 119 Stat. 185 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Pub. L. No. 109-390, 120 Stat. 2698 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**LEGISLATIVE MATERIALS:**

H. R.  Rep. No. 91-1613 (1970),
        reprinted in 1970 U.S.C.C.A.N. 5254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

H.R. Rep. No. 95-746 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

S. Rep. No. 91-1218 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

S. Rep. No. 95-763 (1978),
        reprinted in 1978 U.S.C.C.A.N. 764 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Securities and Exchange Commission, Report of Special Study of Securities Markets,
        H.R. Doc. No. 88-95, Pt. 1 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

115 Cong. Rec. 15,165 - 15,166 (June 9, 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Staff of S. Comm. on Banking, Housing and Urban Affairs, 92d Cong.,
        Securities Industry Study, (Comm. Print 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**LEGISLATIVE MATERIALS** (cont.):                                    **PAGE**

Subcommittee on Securities of the Committee on Banking, Housing and Urban Affairs,
  Securities Industry Study Report, Doc. No. 93-13 (1973)  . . . . . . . . . . . . . . . . . . . . . . 8

Hearing Before the Subcomm. on Securities of the Committee on Banking, Housing,
  and Urban Affairs on H.R. 8331, 95th Cong. (1978)  . . . . . . . . . . . . . . . . . . . . . . . . 13

**PUBLICATIONS AND TREATISES:**

3 Collier on Bankruptcy,  ¶¶ 60.73-60.76 (14th ed. 1978)  . . . . . . . . . . . . . . . . . . . . . . . . 11

New York Institute of Finance, Introduction to Brokerage
  Operations Dept. Procedures (2d ed. 1988)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## PRELIMINARY STATEMENT

The Securities Investor Protection Corporation ("SIPC") submits this memorandum of law in support of the motion of the Trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") to affirm his determination of the claims of investors challenging the Trustee's calculation of their net equity under the Securities Investor Protection Act, 15 U. S. C. §78aaa et al. ("SIPA").[1] As discussed infra, "net equity" is the net amount owed by the broker to the investor on the "filing date." The Trustee contends that under the facts of this case, each customer's net equity is the total amount of money deposited by the customer with BLMIS for the customer's account less the total amount of money withdrawn by the customer from its account. In contrast, the claimants contend that their net equity is the value of their accounts as measured by their last account statement.

The account statements in this case were fictitious; no trades were actually made for the investors; "trades" that appeared on account statements were on paper only and were backdated and chosen to correspond with yields that were pre-determined by Bernard Madoff ("Madoff"); all profits as such were fake; investors did not pay for the "trades" upon which they base their claims; instead, the "trades" that appeared on their account statements as of the filing date were paid for out of fictitious sums. Under these circumstances, the Trustee's calculation of net equity is correct, and his determination of the claims should be affirmed.

## STATEMENT OF THE ISSUES

I. Where

    1) a broker, and not market forces, determines the "profit" in an investor's account;

---

[1] For convenience, references hereinafter to provisions of SIPA shall omit "15 U.S.C."

2) the broker issues to the investor fake account statements showing fake backdated trades that the broker has selected based on historical data to yield the pre-determined "profit;" and

3) the broker is placed in SIPA liquidation,

whether the investor has a valid claim to what is shown on his last fictitious account statement.

SIPC submits that the answer is "no."

II. Where the Second Circuit has held that under SIPA, a customer is entitled to the return of cash deposited with a brokerage where the "securities" and "profits" in the customer's account are fictitious, whether the Trustee properly returns to an investor the net amount of cash deposited by the investor with the broker where all trades in the investor's account are backdated and all profits are fictitious.

SIPC submits that the answer is "yes."

**STATEMENT OF FACTS**

The facts in this case are set forth in detail in the Trustee's Motion to Affirm[2] and supporting documents. The salient facts are as follow.

**The Claimant-Investors:**

In opening a "customer" account at BLMIS, the claimants, as investors, signed at least three documents. These documents were entitled: 1) Customer Agreement ("Agreement"); 2) Trading Authorization Limited to Purchases and Sales of Securities ("Trading Authorization"); and 3) Option Agreement.

---

[2] Trustee's Motion for an Order Upholding Trustee's Determination Denying "Customer" Claims for Amounts Listed On Last Statement, Affirming Trustee's Determination of Net Equity, And Expunging Those Objections With Respect to the Determinations Relating to Net Equity ("Motion to Affirm")

The Customer Agreement specified that in order to induce the broker to open or maintain an account for it, the claimant agreed to abide by the terms of the Agreement. Among other things, the Agreement also provided that BLMIS was the claimant's agent unless the claimant was otherwise notified in writing before the settlement date of a trade.

Under the Trading Authorization, the claimant conferred discretionary authority upon Madoff to buy and sell securities for the claimant's account.

The Option Agreement contained an acknowledgment by the investor of the risks of options trading and an authorization to the broker to take any necessary steps in the event the claimant failed to satisfy its transaction obligations on a timely basis.

Having opened accounts with BLMIS, the claimants typically received periodic account statements issued on BLMIS letterhead, as well as a "Year-End Summary Report" issued by an accounting firm. The statements and reports reflected numerous securities positions bought and sold by BLMIS for the claimant and the dates and prices of the trades. The securities included stocks, U. S. Treasury Bills, and shares of a Fidelity Cash Reserves money market fund.

The claimants made deposits to, and withdrawals from, their accounts. In certain cases, because of the sizeable "appreciation" of the accounts, the total amounts withdrawn by the claimants exceeded many times over the total amounts they deposited.

**The Broker:**

The money received by BLMIS from investors was never invested for them. The "trades" that appeared on their account statements were on paper only and were backdated based on historical data. The "trades" were selected to correspond with returns that were pre-determined by Madoff. The "Split Strike strategy" that formed the basis for the "investments" was part of a

carefully orchestrated scheme. As stated in the criminal information against Madoff confederate

Frank DiPascali, Jr. ("DiPascali") who pled guilty to the ten criminal counts against him:

> 10. Madoff, [DiPascali] and other co-conspirators knew that the Split Strike strategy was a fiction in that the Split Strike Clients' funds were not invested in the securities recorded on those clients' account statements. The reported performance of the Split Strike strategy was fabricated by Madoff, [DiPascali] and other co-conspirators through a process in which transactions were "executed" only on paper, based on historically reported prices of securities, for the purpose of producing and sending to Split Strike Clients documents that falsely made it appear that BLMIS had achieved the promised "returns" of approximately 10 to 17 percent per year.

> 11. On a regular basis, Madoff provided guidance to [DiPascali], and, through [DiPascali], to other co-conspirators, about the gains or losses that Madoff wanted to be reflected in the account statements of the Split Strike Clients. Based on that guidance, [DiPascali] and other co-conspirators prepared model baskets of S&P 100 stocks based on historical market prices and tracked how those hypothetical baskets would have performed in the actual marketplace to determine whether and when to "enter the market." Whenever Madoff informed [DiPascali] that he had decided to "enter the market," [DiPascali] and other co-conspirators caused BLMIS computer operators to enter the data related to the chosen basket of securities into the computer that maintained the books and records of the [investment advisory services] business. Madoff, [DiPascali], and other co-conspirators used computer programs to allocate multiples of the chosen basket to Split Strike Clients on a pro rata basis, based on each such client's purported account balance. When Madoff made a final decision to "enter the market," [DiPascali] and other co-conspirators would cause the computer to produce tens of thousands of false documents that purported to confirm the purchases of securities that in fact had not been purchased.

> 12. The purported trades by which BLMIS supposedly "entered the market" were sometimes priced using data from market activity that occurred one or more days prior to the date on which the decision to "enter the market" was finalized. Because none of the "trades" actually occurred, Madoff, [DiPascali], and other co-conspirators relied on historical price and trading volume data obtained from published sources of market information. With the benefit of hindsight, Madoff and [DiPascali] chose

the prices at which securities purportedly were purchased in light of Madoff's objectives. * * *

13. A similar process to that described in paragraphs 11 and 12, above, was used in "exiting the market" by "selling out" of the purported stock and option positions and "buying" United States Treasury bills and shares in a money market fund with the "proceeds" of those purported sales. With the benefit of hindsight, Madoff and [DiPascali] evaluated whether and when to "sell out" of the securities positions that previously had been reported to Split Strike Clients. After such decisions were made, [DiPascali] and other co-conspirators caused BLMIS computer operators to input data that generated tens of thousands of false confirmations of the purported transactions, which were subsequently printed out and sent to Split Strike Clients through United States Mails.

* * *

15. In practice, the growth in account values reported on the Split Strike Clients' account statements generally approximated the annualized rates of return that had been targeted by Madoff. As directed by Madoff, [DiPascali] and other co-conspirators routinely added fictitious options "trades" to certain Split Strike Clients accounts for the purpose of making it appear that those accounts, among other things, had achieved their respective targeted annual rates of return.

Information filed on August 11, 2009 at 6-9, United States v. Frank DiPascali, Jr., No. 1:09-cr-00764-RJS-1 (S.D.N.Y.) (Dkt. No. 7). See also id., Minute Entry on August 11, 2009.

The claimants were Split Strike Clients. Thus, when they withdrew funds from their accounts, the money did not consist of investment profits because there were none. As in the classic Ponzi scheme, Madoff used new investors' money disguised as profits to pay previous investors in order to perpetuate the scam. Any "profits" in the account were phantom profits – the product of Madoff's imagination.

## SUMMARY OF THE ARGUMENT

When the emotional and financial toll that Bernard Madoff has wrought upon his victims is set aside, and the facts are viewed in the light of day, the fundamental question in this case is whether the Trustee has followed the law of this Circuit by treating the customers' claims as ones for securities but returning to customers the net amount of cash deposited by them with the broker. The answer is an emphatic "yes."

In the satisfaction of claims, SIPA seeks to give effect to the legitimate expectations of the customer. The claimants in this case deposited funds with the brokerage intending to buy securities and they received account statements that appeared to show that securities were being held for them. Their reasonable expectations were that the broker was holding securities for them and that if their brokerage failed, their claims would be for securities. In <u>In re New Times Securities Services, Inc.</u>, 371 F.3d 68, 86 (2d Cir. 2004), the Second Circuit held that customers whose claims were based on fictitious securities nevertheless had claims for securities because the customers had deposited funds in order to buy securities and had received confirmations and account statements showing that securities, although fictitious, were in their accounts. This created a "claim for securities" instead of a "claim for cash" which only would arise when the broker was performing for the customer "depository-like functions with respect to cash deposits." 371 F.3d at 86. The <u>New Times</u> customers each would be eligible for up to $500,000 of SIPC protection.

Although the customers' intent as substantiated by their receipt of statements from the broker dictated the nature of the claim, what the customers were owed, that is, their "net equity," was a different matter. The fictitious account statements in <u>New Times</u> showed fake interest and

dividends generated on fictitious securities. The Court declined to give effect to the statements. Recognizing the "potential absurdities created by reliance on the entirely artificial numbers contained in fictitious account statements," the Court held that the customers' net equity was the amount of money deposited by them with the broker. 371 F.3d at 88.

The rule of law in this Circuit is the guidepost by which the Trustee must determine, and is determining, "customer" claims in the BLMIS case. The fictitious BLMIS account statements show fictitious securities positions generating fictitious "profits" predetermined by Bernard Madoff. The claimants have "claims for securities," but their net equity is the net amount deposited by them with the broker. Any other approach carries out the BLMIS fraud and price manipulation that violate the securities laws, and undermines the ratable sharing of assets by customers intended under SIPA.

## ARGUMENT

### OVERVIEW OF SIPA

Under the facts of this case, the calculation of the customer's net equity as the net amount deposited by him with the broker is not only fully supported, but mandated, by SIPA. In evaluating what a customer's net equity is under SIPA, it is helpful preliminarily to consider the nature, purposes, and functions of a SIPA liquidation. Accordingly, an overview of SIPA through an examination of the circumstances under which SIPA was adopted, the legislative history of the statute, and some of its key provisions, is provided below.

**A.**     **The Circumstances of Adoption: An Operational Crisis**[3]

SIPA was not intended to address every possible loss by securities investors. See SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983 (2d Cir. 1974). Instead, a central purpose of the statute was to ensure that customers would not lose, within limits, cash and securities on deposit with their broker if the brokerage failed financially.

The need for SIPA grew out of market conditions in the late 1960s. Around 1967, the volume of trading in the securities markets began to grow unexpectedly and substantially, and with it, the related paperwork necessary to clear, settle and complete trades. As market activity increased, back-offices of brokerages became inundated with paperwork that they were unable to keep up with due to a lack of automation. This situation led to poor record keeping, mistakes, and excessive failures to complete trades or "fails." In 1969, as the crisis persisted, the volume of trading suddenly changed course, dropping precipitously and continuing downward. The loss of business and operational problems spelled the end for many brokerage firms.

Brokerages that were unable to keep current and accurate books and records and the closing of such firms in large numbers necessarily had consequences for the safety of customer assets, and investor confidence. During this period of crisis, the broker-dealer net capital requirements of the Securities and Exchange Commission ("SEC") and the stock exchanges were the main safeguards to protect the public, but they proved inadequate. In 1969, Senator Muskie introduced into legislation a precursor to SIPA. In doing so, he stated:

---

[3]     See Staff of S. Comm. on Banking, Housing and Urban Affairs, 92d Cong., Securities Industry Study 7-11 (Comm. Print 1972); Subcomm. on Securities of the S. Comm. on Banking, Housing and Urban Affairs, Securities Industry Study Report, Doc. No. 93-13, at 28-29, 32-33 (April 6, 1973).

The back-office, fails, and paperwork problems of the securities industry have caused the present situation which endangers the entire industry. The ability of the securities industry to process transactions has not kept pace with the level of activity which has grown fourfold in 7 years. Firms which are unable to properly handle the prevailing levels of activity experience a number of substantial difficulties. These are manifested by books and records, which do not accurately reflect securities transactions consummated on their own and on their customer's behalf; they do not accurately reflect capital position, conceal losses and thefts; and they lead to unprofitable operations and which eventually can cause situations which may deteriorate to the point of failure.

\* \* \* \*

...The bill that I am introducing today will provide insurance against loss occasioned by the financial collapse of broker-dealers.

115 Cong. Rec. 15,165 - 15,166 (June 9, 1969) (statement of Sen. Muskie).[4]

Against this background, a final version of SIPA was enacted in December 1970,[5] to guard customers only against "loss occasioned by the financial collapse of broker-dealers." Because it was designed to protect customers solely in the event of a brokerage failure, the protection would be provided in the context of a bankruptcy. Thus, SIPA expressly incorporated, and carried forward, many of the concepts of a stockbrokerage liquidation under section 60e of the Bankruptcy Act, 11 U.S.C. §96e (repealed 1979). See H. R. Rep. No. 91-1613, at 9 (1970), reprinted in 1970 U.S.C.C.A.N. 5254, 5262-5263.

---

[4]   Although its goal also was to protect customers, the legislation that was introduced by Senator Muskie, called the "Federal Broker-Dealer Insurance Corporation Act," sought to do so through the creation of a securities equivalent of the Federal Deposit Insurance Corporation. The proposal failed to garner sufficient support in Congress and was superseded by a different non-governmental and non-insurance approach in legislation introduced in 1970. See S. Rep. No. 91-1218, at 2 (1970), and H. R. Rep. No. 91-1613, at 4 (1970), reprinted in 1970 U.S.C.C.A.N. 5254, 5257 (both discussing the history of precursor bills to SIPA).

[5]   Pub. L. No. 91-598, 84 Stat. 1636 (1970).

**B.     Stockbroker Liquidations Before 1938**

Before 1938, customers of a bankrupt stockbroker were considered as general creditors if they could not reclaim cash or securities which they could trace into the broker's possession. Duel v. Hollins, 241 U.S. 523, 527-29 (1916). Because serious inequities could and did result from these requirements, Congress enacted section 60e of the Bankruptcy Act in 1938.[6]

**C.     Section 60e of the Bankruptcy Act**

Section 60e of the former Bankruptcy Act, 11 U.S.C. §96e (repealed 1979), permitted "cash customers," as defined in the Act, to reclaim fully paid securities which were "specifically identifiable" as their property. Otherwise, customers' cash, securities, or property of a similar character (not "specifically identifiable"), comprised a "single and separate fund." That fund was used to satisfy claims (other than for specifically identifiable property) of the "single and separate class of creditors" on a pro rata basis, subject only to prior payment of certain administrative expenses. 11 U.S.C. §96e(2) (repealed 1979).

The rights established by section 60e were carefully delineated. In order to reclaim "specifically identifiable" property or share in the "single and separate fund," it was necessary that a claimant be a "customer." 11 U.S.C. §96e(1) (repealed 1979). A person who qualified as a customer received a pro rata distribution of the fund according to the "net equity" of his account, that is, the net amount owed to him. As for the unpaid balance of their net equities, customers

---

[6] Securities and Exchange Commission Report of Special Study of Securities Markets, H.R. Doc. No. 88-95, Pt. 1, at 411 (1963). (Under §60e, the rights of customers "are not dependent upon the fortuitous circumstances ... of the extent to which securities can be traced to the stockbroker's pledgee." Id. at 412.).

-10-

shared with general creditors in the general estate. A more detailed discussion of section 60e is contained in 3 Collier on Bankruptcy, ¶¶60.73-60.76 (14th ed. 1978).

## D.    SIPA As Enacted in 1970

Because of the usually inadequate single and separate fund, section 60e did not prevent customer losses. Customer losses mounted when, as discussed above, the rate of brokerage failures accelerated in 1969 and 1970. In adopting SIPA, Congress created SIPC and, among other things, established procedures for liquidating financially troubled broker-dealers that are members of SIPC. S. Rep. No. 91-1218, at 4, 11 (1970). See also H.R. Rep. No. 91-1613, at 1 (1970), reprinted in 1970 U.S.C.C.A.N. 5254, 5255; SIPC v. Barbour, 421 U.S. 412, 415 (1975).

Like section 60e, SIPA established a "single and separate fund" in which all "customers" in the "single and separate class of creditors" shared pro rata and to the exclusion of general creditors. To the extent customers' claims could not be satisfied from the single and separate fund, SIPC's funds were used, within the limits of protection, to replace missing property. In this regard, it is important to emphasize that since the inception of SIPA, SIPC funds have served as a substitute for missing customer property, and not as a supplement.

Customers whose net equity claims could not be satisfied from the combined sources of SIPC advances and the single and separate fund, then shared pro rata with general creditors in the general estate. Thus, those who fit the definition of "customer" under section 60e were accorded preferential treatment in the form of a priority over general creditors. See Securities and Exchange Commission Report of Special Study of Securities Markets, H.R. Doc. No. 95, 88th Cong., Pt. 1, at 411-412 (1963). Similar preferential treatment is accorded "customers" under SIPA.

## E.    **SIPA As Amended**

In 1978, SIPA was amended.[7] The essential elements of a SIPA proceeding and its objectives stayed the same, but a few significant changes were made to give SIPC more flexibility in satisfying customer claims.

Under SIPA, as enacted in 1970, customers who were owed securities that were not specifically identifiable property shared on a pro rata basis in available securities held by the debtor for the benefit of customers. SIPA section 78fff(c)(2)(B) (1970). To be "specifically identifiable property," the securities had to have remained in the broker's possession or been allocated to or physically set aside by the broker for the customer. SIPA §78fff(c)(2)(C) (1970). To the extent those securities fell short of satisfying claims, the balance of customers' claims for securities was paid in cash based on the filing date market value of the security owed to the customer. SIPA sections 78fff(c)(2)(A)(iv) and 78fff(f)(1) (1970). In 1978, "specifically identifiable property" was eliminated and replaced with "customer name securities." The need to trace property into the possession of the broker thus was superseded as only customers to whom a "customer name security" was owed, that is, a security registered in the customer's name or in the process of registration on the filing date, section 78lll(3), could recover their securities outright. Concurrently, under the amendments, the concept of a "single and separate fund" was

---

[7]    SIPA has been amended by Pub. L. No. 94-29, 89 Stat. 163 (1975); Pub. L. No. 95-283, 92 Stat. 249 (1978); Pub. L. No. 95-598, 92 Stat. 2674 (1978); Pub. L. No. 96-433, 94 Stat. 1855 (1980); Pub. L. No. 97-258, 96 Stat. 1067 (1982); Pub. L. No. 97-303, 96 Stat. 1410 (1982); Pub. L. No. 99-514, 100 Stat. 2095 (1986); Pub. L. No. 100-181, 101 Stat. 1265 (1987); Pub. L. No. 106-554, 114 Stat. 2763 (2000); Pub. L. No. 109-8, 119 Stat. 185 (2005); and Pub. L. No. 109-390, 120 Stat. 2698 (2006).

altered to a fund of "customer property," section 78*lll*(4), encompassing a somewhat broader range of assets than the "single and separate fund."

At least one other significant change was made to the statute under the amendments. In 1978, SIPA was amended to authorize the trustee, subject to certain conditions, to purchase securities for customers in satisfaction of their claims for securities. Pub. L. No. 95-283, 92 Stat. 249, 263 (1978). This additional power was conferred on the trustee to effectuate more fully a purpose of SIPA, namely, restoring customers to the positions that they held on the filing date, so that customers could receive what they would have expected to receive had the firm voluntarily ceased doing business. H.R. Rep. No. 95-746, at 21 (1977) ("1977 H. Rep."). See S. Rep. No. 95-763, at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 764, 765 ("1978 S. Rep."). Whether the trustee bought securities depended on insufficient securities being available in the Debtor's estate to satisfy securities claims and there being a "fair and orderly market" in which to purchase the securities. Hearing Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing, and Urban Affairs on H.R. 8331 , 95th Cong. 33 (April 25, 1978) ("1978 S. Hearing") (Section by Section Explanation of H.R. 8331 Amendments to [SIPA]). Under no circumstance could the trustee buy securities for a customer if doing so would contribute to a market manipulation or other improper market activity. As stated in the legislative history of the amendments:

> Our expectation is that, in almost all cases, a customer's claim for securities would be satisfied by the delivery of securities, and, where necessary, to accomplish this the trustee would go into the open market and purchase securities. We believe, however, that it is advisable to provide that the trustee would not be required to purchase securities where that could not be done in a fair and orderly market. One chief concern is that

the trustee not be required to make purchases in a market which is being improperly controlled or manipulated.

* * * * * *

As I have already mentioned, one of the principal goals of the proposed legislation is to make it possible for the trustee to render accounts to customers as they stood when the member failed.

1977 H. Rep. at 41-42 (Statement of Mr. Owens, Chairman, SIPC). Thus, under the amendments, the legislative intent continued to be to return to customers property held for them by the broker upon the firm's failure and, as necessary, to use SIPC funds for that purpose. If a loss pre-existed the closing of the firm, the customer would be in no better position at closing, simply because SIPC monies were available.

## F.    SIPC and Its Funds

SIPC is a non-profit corporation whose members include most interstate brokers or dealers. Membership in SIPC is automatic upon registration as a broker or dealer with the SEC under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. section 78o(b). SIPA §78ccc(a)(2)(A). Although created under and administering a federal statute, SIPC is not an agency or establishment of the United States Government. §78ccc(a)(1)(A). SIPC has no investigatory or regulatory powers. In deciding whether to apply to a federal district court for commencement of a SIPA proceeding, SIPC relies on information from the SEC, the Financial Industry Regulatory Authority and the stock exchanges which must notify it if a firm is in or is approaching financial difficulty. §78eee(a)(1).

SIPA requires SIPC to establish a fund via assessments upon its members. §78ddd. If SIPC's funds should become inadequate, SIPA authorizes a borrowing against the U.S. Treasury

of up to one billion dollars.  §§78ddd(f), (g), and (h).  These resources are available for the satisfaction of customer claims within certain limits.

## G.    Use of SIPC Funds to Satisfy Customer Claims

The SIPC fund is "a quasi-public fund" which provides "relief  to certain classes of customers."  SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983, 985 (2d Cir. 1974).  Under section 78fff-3(a), SIPC may advance to the trustee, in order to satisfy net equity claims of customers, not more than $500,000 per customer, of which no more than $100,000 may be used to satisfy that portion of a claim which is for cash rather than for securities.  Regardless of the assets of  the failed firm, each customer with a valid claim is assured of satisfaction within the limits indicated.  However, SIPA does not attempt to make all customers whole and SIPC's role is carefully delineated.  It contemplates that customers' claims will be satisfied to the maximum extent possible from the assets of the defunct member firm.  Thus, customers share on a pro rata basis in any fund of customer property and any general estate.  §78fff-2(c)(1).  SIPC's funds replace missing customer property within the limits and in the manner provided by the statute.  The availability of SIPC's funds does not lessen the burden of customer claims on the estate or its general creditors.  To the extent of its advances, SIPC is subrogated to the claims of such customers.  §78fff-3(a).  See SIPC v. Associated Underwriters, Inc., 423 F. Supp. 168, 170-173 (D. Utah 1975).

## H.    Nature of a SIPA Proceeding

Notwithstanding the special protection afforded customers and although it has some elements that are different, a SIPA proceeding basically  is a bankruptcy liquidation.  §78fff(a).  See, e.g., In re Lloyd Securities, Inc., 75 F.3d 853, 857 (3d Cir. 1996);  SIPC v. Ambassador

Church Finance/Development Group, Inc., 788 F.2d 1208, 1210 (6th Cir.), cert. den. sub nom., Pine Street Baptist Church v. SIPC, 479 U.S. 850 (1986); Exchange National Bank of Chicago v. Wyatt, 517 F.2d 453, 457-459 (2d Cir. 1975).  With its roots in section 60e of the Bankruptcy Act, 11 U.S.C. section 96e,  a SIPA liquidation effectively is an ordinary bankruptcy liquidation remodeled to achieve the special purposes of SIPA.  See SEC v. Albert & Maguire Securities Co., 378 F. Supp. 906, 909, 911 (E.D. Pa. 1974);  SEC v. Aberdeen Securities Co., 480 F.2d 1121, 1123 (3d Cir.), cert. den. sub nom., Seligsohn v. SEC, 414 U.S. 1111 (1973).  Under SIPA section 78fff(b), the "liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7" of the Bankruptcy Code, but only to the extent consistent with SIPA.

The SIPA proceeding looks not only to the disposition of claims of customers, but also to the claims of general creditors.  In the Matter of Lewellyn, 26 B.R. 246, 253 (Bankr. S.D. Iowa 1982); Gold v. Hyman, [1974-75 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶95,043 at  97,657-- 97,658 (S.D.N.Y. April 1, 1975).  Estate property is distributed in the order provided in section 726 of the Bankruptcy Code.  §78fff(e).  The SIPA trustee has "the same powers and title with respect to the debtor" and its property as a trustee in bankruptcy, as well as powers that enable him to perform the special functions of a SIPA liquidation.  §78fff-1(a).  See SIPC v. Christian-Paine & Co., 755 F.2d 359, 361 (3d Cir. 1985).

## I.      The Burden of Proof

"Customer" status in a SIPA proceeding is a preferred status which gives the customers priority over other creditors in the distribution of certain assets marshaled by the trustee.  SIPC v. I.E.S. Management Group, Inc., 612 F.Supp. 1172, 1177 (D.N.J. 1985), aff'd w/o opinion, 791

F.2d 921 (3d Cir. 1986) ("customers" under SIPA receive preferential treatment by being satisfied ahead of general creditors); In re Adler Coleman Clearing Corp., 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996); In re Hanover Square Securities, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment"); In re Government Securities Corp., 90 B.R. 539, 540 (Bankr. S.D. Fla. 1988) ("customers" under SIPA have "preferred status"). As previously discussed, SIPA derives from subsection "e" of section 60 of the Bankruptcy Act (repealed 1979) which was entitled "Preferred Creditors." Because of the availability of SIPC funds, one who qualifies as a customer in a SIPA proceeding may be paid, within the limits of protection, even when the debtor's estate is missing assets. SIPA §§78fff-2(b)(1) and 78fff-3(a).

In an ordinary bankruptcy, claimants seeking a preferred status bear the burden of showing that they are within the class of eligible persons and that their transactions make them eligible for preferred treatment. As stated in In re Chitwood, 3 Bankr. Ct. Dec. (CRR) 1033, 1034 (Bankr. S.D. Ala. 1977):

> When statutes involving priorities are in issue, a strict construction must be placed thereon; and the burden falls on those asserting a priority to establish that they come within the intended class.

Accord, In re O.P.M. Leasing Services, Inc., 60 B.R. 679, 680 (Bankr. S.D.N.Y. 1986). The same rule applies to a SIPA case. Provisions of SIPA make clear the claimant's burden by requiring that a debtor's obligations to its customers be "ascertainable from the books and records of the debtor" or "otherwise established to the satisfaction of the trustee." §78fff-2(b) (emphasis added). Furthermore, the satisfaction of a claim "may be conditioned upon the trustee requiring

claimants to execute, in a form to be determined by the trustee, appropriate receipts, supporting affidavits, releases and assignments." Id. In a SIPA proceeding, the burden of proof rests with the "customer." In re Adler Coleman Clearing Corp., 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997); Schultz v. Omni Mutual, Inc., [1993-94] Fed. Sec. L. Rep. (CCH) ¶98,095 at 98,763 (S.D.N.Y. Dec. 30, 1993); In re Brentwood Securities, Inc., 925 F.2d 325, 328 (9th Cir. 1991); In re Oberweis Securities, Inc., [1992 Decisions] Fed. Sec. L. Rep. Transfer Binder (CCH) ¶96,890 at 93,650 -- 93,651 (Bankr. N.D. Ill. May 21, 1992); In re Waddell Jenmar Securities, Inc., 126 B.R. 935, 942 (Bankr. E.D.N.C. 1991).

## I. UNDER THE CIRCUMSTANCES OF THIS CASE, AN INVESTOR'S NET EQUITY CANNOT BE DETERMINED WITH REFERENCE TO THE INVESTOR'S LAST ACCOUNT STATEMENT

**1.     In Determining Claims In BLMIS, The Trustee Cannot Legally Rely Solely Upon Account Statements**

As described above, customer claims are satisfied from customer property ratably, and from SIPC advances. Under SIPA §78fff-2(c)(1)(B), the amount of customer property that the customer is entitled to depends upon his net equity. Under SIPA §78fff-3(a), within limits, the SIPC advance is equal to the difference between the customer's ratable share of customer property and his net equity. Thus, in order to determine what a customer is to receive both in customer property and any SIPC advance, a SIPA trustee must calculate the customer's "net equity." "Net equity" is defined at SIPA §78lll(11)  and essentially is the difference between what the broker owes the customer and what the customer owes the broker on the filing date. See SEC v. Aberdeen Securities Co., 480 F.2d 1121, 1123-1124 (3d Cir.), cert. den. sub nom., Seligsohn v. SEC, 414 U. S. 1111 (1973) (customer account must be valued as of filing date in

order to determine net amount owed to customer or customer's "net equity"). The "filing date" ordinarily is the date on which SIPC files the application for a customer protective decree; however, if, as with respect to BLMIS, a proceeding is pending against a debtor in which a receiver is appointed, the filing date relates back to the date on which that proceeding began.[8]

There are at least a few reasons why a trustee cannot rely solely on account statements in determining a customer's net equity.

First, to do so violates SIPA. Under SIPA §78fff-2(b), a trustee is to satisfy customers' net equity claims "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." "Books and records" of a debtor are more than just account statements. See, e.g., SEC Rule 17a-3, 17 C.F.R. §240.17a-3 (2009) (specifying no fewer than twenty-two categories of "books and records" to be made and kept current by the broker or dealer). See also 15 U.S.C. §78q. Furthermore, if the books and records are unreliable, the claimant still must prove the obligation "to the satisfaction of the trustee." In the BLMIS case, the books and records and other information show that the trades were backdated and fictitious, that the profits were fictitious, that certain claimants withdrew more than they put into their accounts, and that "securities" "purchased" with fake sales proceeds in fact were never paid for by the customer. For the Trustee to ignore what the books and records show and to satisfy net equity claims based solely upon fictitious account statements would be a dereliction of his duty under SIPA §78fff-2(b).

---

[8] SIPA §78lll(7). See Order Appointing Receiver, SEC v. Bernard L. Madoff Investment Securities LLC, et al., No. 1:08-cv-10791-LLS (S.D.N.Y. Dec. 12, 2008) (Dkt. No. 2).

Second, in similar circumstances, the Second Circuit has clearly demarcated the extent to which an account statement may be relied upon. When faced with the question in a Ponzi scheme of whether a claimant's net equity included fictitious profit because the fictitious account statement showed "profits" in the account, the Court declined to honor the statement. While the customer's receipt of a statement was proof of the customer's belief as to whether he was owed cash or securities, the statement was irrelevant for purposes of determining net equity. Thus, the fact that the customer received an account statement showing securities positions demonstrated the customer's legitimate belief that his claim was for securities and not cash. The customer therefore would be eligible for up to $500,000 of SIPA protection, instead of $100,000, the limit for "cash" claims. However, the statement would not dictate what the customer was owed. As the Court of Appeals held, the claimants in the case were owed the cash deposited by them with the brokerage, and not the fictitious securities and artificial interest and dividends reflected on their statements. For purposes of determining the customers' net equity, the account statement was irrelevant. New Times I, 371 F.3d at 87-88.

Third, to give unquestioning effect to the fictitious account statements is to rubber-stamp the fraud and price manipulation perpetrated by Bernard Madoff and BLMIS. This is clearly contrary to SIPA, and endorses violations of the securities laws.

## 2. Reliance Upon the Last Account Statement Furthers the Fraud and Undermines SIPA

As previously noted and as discussed below, there are many reasons why the Trustee cannot be bound by the last fake account statement in determining net equity. One obvious reason is that doing so implements and continues the fraud perpetrated by BLMIS by awarding to each claimant the phony profits invented by Madoff.

In the ordinary course of investing, a customer deposits money with his broker. The broker buys securities for the customer. The securities yield interest or dividends. The securities may be sold. The sales proceeds and any profits in the account may be re-invested in other securities. This process continues until over time, the customer possibly accumulates a sizeable sum in his account. This is the scenario that was followed in BLMIS and such are the results that were achieved for the clients' accounts -- with one critical difference. Except for the initial deposit and any other deposits by the claimant, none of the transactions occurred or were real. The securities positions were phony and backdated; the profits were pre-set; by the time the last account statement was issued, any accumulated wealth consisted of fake dividends, fake interest and fake profits, and "securities" "paid for" out of these fake sums. The Trustee's calculation of net equity based on this fiction would give effect to and perpetuate the fraud and price manipulation. To have SIPC funds used to pay the fictitious amounts and thereby carry out the scheme is wholly without support in, and indeed, contrary to, SIPA.

As courts consistently have recognized, SIPA and rules promulgated thereunder "manifest a design to deny protection to transactions tainted by fraud." Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 435 (S.D.N.Y. 2001) ("Ensminger"). See In re Stratton Oakmont, Inc., 239 B.R. 698, 701 (S.D.N.Y. 1999); SEC v. S.J. Salmon & Co., 375 F. Supp. 867, 870-71 (S.D.N.Y. 1974); In re Adler, Coleman Clearing Corp., 198 B.R. 70, 75 (Bankr. S.D.N.Y. 1996). Of particular importance here, a claimant in a SIPA liquidation is not entitled to "customer" relief with respect to cash or securities to which the claimant would have had no claim but for market manipulation or other fraudulent activity by the liquidating broker; i.e., cash or securities owed to the claimant only because of a fraud. See, e.g., In re New Times Securities

-21-

Services, Inc., 463 F.3d 125, 130 (2d Cir. 2006) ("New Times II") (court could not base customers' recovery "on the rosy account statements telling customers how well their imaginary securities were doing, because treating the fictitious paper profits as within the customers' 'legitimate expectations' would lead to the absurdity of 'duped' investors reaping windfalls as a result of promises made on fake securities..."); New Times I, 371 F.3d at 88 ("[B]asing customer recoveries on fictitious amounts in the firm's books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality...."); Ensminger, 263 B.R. at 435. On the contrary, where the claimant experiences no actual market risk, and can claim entitlement to cash or securities only because of the broker's fraud, no "customer" relief under SIPA is available. See New Times II, 463 F.3d at 130;[9] New Times I, 371 F.3d at 88; Ensminger, 263 B.R. at 435.

---

[9] At issue in New Times II was whether claimants who had authorized their investment in securities to be liquidated and the proceeds invested in fraudulent promissory notes issued by the debtor and its principal were "customers" under SIPA. New Times II was an appeal from a ruling of the District Court reversing a decision of the Bankruptcy Court which had held that the placement of the funds into promissory notes had transformed the claimants from "customers" to lenders, thereby making them ineligible for SIPA protection. Relying upon New Times I, the District Court held that because the claimants were fraudulently induced to invest in the notes, their "legitimate expectations" froze at the time that they authorized the sale of their securities. As such, the claimants were entitled to the return of the cash realized upon the sale of their securities. In New Times II, the Second Circuit rejected the District Court's analysis and reinstated the decision of the Bankruptcy Court. The Court noted that the District Court's reliance upon New Times I was incorrect, that customer status as to some dealings with a broker does not confer customer status for all time, and that although the claimants had been defrauded by their broker, there is no protection under SIPA against fraud. 463 F.3d 129-130.

## 3.    **The Series 500 Rules**

The fact that SIPA affords no protection to fraudulent transactions is reflected in the SIPC Series 500 Rules, 17 C.F.R. §300.500 et seq. (2009) ("Series 500 Rules").[10]  The Series 500 Rules identify when a customer's claim is for securities and when it is for cash.  In New Times I, the Court referred to the Rules, noting that the underlying premise of the Rules -- "that a customer's 'legitimate expectations,' based on written confirmations of transactions, ought to be protected," -- applied with respect to fictitious securities and fictitious profits, but that the Rules themselves did not.  371 F.3d at 86-87.  As the Second Circuit observed and as apparent from their history, the Rules apply "when a transaction in real securities straddle[s] the filing date and do not govern transactions involving fictitious securities...."  371 F.3d at 87.

The need for the Series 500 Rules grew out of a few SIPA cases.  The most recent of the cases was In re Bell & Beckwith (Murray v. McGraw), 821 F.2d 333 (6th Cir. 1987) ("Murray").  See 53 Fed. Reg. at 10368, n. 1 (Mar. 31, 1988).  On February 4, 1983, the Murrays instructed their broker to sell certain stock.  The sale was executed and a statement confirming the sale was issued to the Murrays.  The statement showed a "trade date" of February 4, and a "settlement date" of February 11.  The trade date is the date on which parties enter into a contract to buy or sell a security.  The settlement date is the date on which the buyer pays for, and the seller delivers, the security.  New York Institute of Finance, Introduction to Brokerage Operations Dept. Procedures (2d ed. 1988) at 229, 233.    One day after the trade date, and before the

---

[10]    SIPC's Rules are subject to approval by the SEC, after notice and an opportunity for hearing, and have the force and effect of law. SIPA §78ccc(e)(2). See In re Adler Coleman Clearing Corp., 195 B. R. 266, 275 (Bankr. S.D.N.Y. 1996).

settlement date, the brokerage in <u>Murray</u> failed.  The Murrays argued that notwithstanding the sale, their claim was for securities.  In the intervening period between the placement of the firm in SIPA liquidation and the filing of the Murrays' claim, the stock had become more valuable. <u>Murray</u>, 821 F.2d at 334-335.  The Sixth Circuit held the Murrays' claim to be for cash.  <u>Id.</u>, 821 F.2d at 339-340.

The Rules grew out of the aforementioned circumstances, providing "nationwide uniformity and reasonable certainty" to whether claims under SIPA were for cash or securities.  53 Fed. Reg. 10368 (Mar. 31, 1988).  However, the Rules themselves make clear that they apply only to transactions made in the ordinary course and reflecting market reality.  Rule 503(a) specifically precludes application of the Rules if application interferes with a SIPA trustee's ability to "avoid any securities transactions as fraudulent, preferential, or otherwise voidable under applicable law."  17 C.F.R. § 300.503(a) (2009).  <u>See Ensminger</u>, 263 B.R. at 435 & n. 19.

All of the reasons discussed above, including in particular, the decision of the Second Circuit in <u>New Times I</u>, provide ample authority for the conclusion that while the claimants in this case must be deemed to have claims for securities so that their legitimate expectations are satisfied, their net equity consists only of the net amount deposited by them with the broker. While these reasons alone are dispositive, there are additional reasons that are as important and that merit discussion.  One such reason is that SIPC's goal of customer protection must be carried out consistent with the securities laws.

SIPA is indelibly a part of the securities laws.  SIPA section 78bbb provides that except as otherwise provided in SIPA, the provisions of the Securities Exchange Act of 1934, 15 U.S.C. §78a <u>et seq.</u> ("the 1934 Act"), apply as if SIPA were an amendment to, and a section of the 1934

-24-

Act.  Moreover, as explicitly provided in SIPA, while a primary function of the statute is to

provide some protection to investors, another central function is to reinforce the broker-dealer's

financial responsibility requirements so that the securities laws are strengthened and not

weakened.[11]  Cf., SEC v. Packer, Wilbur & Co., 498 F.2d 978, 985 (2d Cir. 1974) (purpose of

SIPA is to strengthen market.  Goal is not served by reimbursing from public funds one whose

fraudulent activities have weakened it).  The fact that SIPA has more than one purpose and that

those purposes supply the reason for the exclusion under SIPC Rule 503, was summed up by the

District Court in Ensminger, supra, 263 B.R. at 434-435, as follows:

> [The broker's] extensive fraud has overarching significance
> and implications for the transactions that culminated in the
> Challenged Trades....  Contrary to Appellants' perceptions of
> these events, [the broker's] deeds cannot be ignored in
> assessing whether Appellants are entitled to enforce the
> Challenged Trades.  While it is true that one of SIPA's
> primary objectives is to protect individual customers from
> financial hardship, the legislation also embodies parallel and
> complementary aims....
>
> * * * *
>
> The SIPC 500 Rules, promulgated in 1988, ... reflect these
> ends.  They safeguard securities customers' legitimate claims
> to cash and securities held by the debtor in their accounts
> prior to filing date, and also manifest a design to deny
> protection to transactions tainted by fraud.

If as the claimants seek, the Trustee and SIPC rely upon the last account statement, they will give

credence to the backdated trades and phony profits that were invented by Madoff and carried out

---

[11]  As one example, under SIPA §78kkk(g), Congress charged the SEC with compiling a list
of unsafe and unsound industry practices and required it to report upon the steps being taken under
existing law to eliminate such practices and to provide recommendations for additional legislation
needed to eliminate them.

by Madoff and BLMIS in blatant violation of the securities laws. While a central goal of SIPA is protection of the individual customer, the protection cannot be administered at the expense of undermining the securities laws. Because Ensminger contains an extensive analysis in this regard, the decision is discussed in detail below.

## 4. **Ensminger**

In an appeal from a decision of the Bankruptcy Court,[12] the District Court for this District, in Ensminger, discussed many of the grounds for refusing protection to an investor in the context of a SIPA case involving fraudulent activity of a broker and artificial profits created by the broker. Almost all of the grounds apply with equal force here. Some are discussed in detail below.

In Ensminger, the District Court denied "customer" protection to claimants whose broker reported to them that it had sold at inflated, above-market prices, certain near worthless "house stocks" in their accounts. The house stocks, although of negligible value, were nonetheless actual securities issued by existing corporations. The broker then used the fictional sales proceeds from these "sales" to purchase valuable "blue chip" securities for their accounts. See Ensminger, 263 B.R. at 421-22. In denying the claimants' claim for the "blue chip" securities, the Court explained, inter alia, that the "sales" of the "house stocks" were reported to claimants at prices far above those the claimants could have obtained had the stocks been sold in the open market, and that, had the sales actually occurred at those prices, claimants would not have had sufficient cash to purchase the "blue chips" sought in the liquidation. See Ensminger, 263 B.R.

---

[12]    Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 247 B. R. 51 (Bankr. S.D.N.Y. 1999) ("Mishkin v. Ensminger")

at 430 ("[T]here was no real cash in the Claimants' accounts because the trades never settled and the proceeds yielded by the Challenged Sales of House Stock, even at the inflated prices manipulated by Hanover [the broker], were not enough to cover the cost of the Blue Chips"). The Court concluded that affording the claimants customer status under SIPA was impermissible, observing that it

> would demand that during the transfiguration of credit into cash, the manifest improprieties in the methods the Appellants' broker-agents employed, by which the supposed "cash" materialized into the customers accounts in the first place, be overlooked, while at the same time maintaining that the entire trade be blessed as strictly arms-length, good faith and innocent.

Ensminger, 263 B.R. at 434.

The position of the claimants is no different in the case at hand. By asserting that the Trustee should rely only upon the last account statements, they effectively demand that the Trustee ignore the improprieties and fabrications leading to the invention of the amounts that the claimants now claim. No matter how innocent the claimants may be, the Trustee cannot. The rationale of the District Court in Ensminger in voiding the challenged trades in that case and in rejecting, on several grounds, the claimants' assertions of innocence, apply here as well.

**A.  The Broker as the Claimant's Agent**

In Ensminger, the District Court rejected the claimants' contention that they were entitled to "customer" status due to their lack of knowledge of the broker's fraud. The Court found that, as beneficiaries of their broker/agent's fraud, they were chargeable with the broker's actions and intent. See Ensminger, 263 B.R. at 453-58.

As the District Court held, the broker is the agent for the customer, and the agent's knowledge is imputed to the principal – the customer. The customer, as principal, is responsible for the fraud of its broker-agent, and cannot reap benefit from the broker's fraudulent schemes. Ensminger, 263 B.R. at 453-454. This rule applies notwithstanding the absence of the claimant's knowledge of the fraud or lack of its own fraudulent intent. Id. at 453, citing Curtis, Collins & Holbrook v. United States, 262 U.S. 215, 222 (1923) ("The general rule is that a principal is charged with the knowledge of the agent acquired by the agent in the course of the principal's business"). If a principal chooses to rely upon a transaction entered into by his agent on his behalf, the agent's knowledge will be imputed to the principal. Ensminger, 263 B.R. at 454. The principal cannot, on the one hand, claim the fruits of the agent's bad acts while repudiating the acts, on the other. As stated in Ensminger, id. at 453, citing Harriss v. Tams, 258 N.Y. 229, 179 N.E. 476, 479 (1932), as follows:

> [T]his court has held that principals, who after offer to rescind, retain or demand the fruits of a contract obtained by unauthorized representations of an agent 'stand in the same position as if they had made the representation or authorized it to be made.' (citations omitted)

See Cathay Pacific Airways, Ltd. v. Fly and See Travel, Inc., 3 F.Supp.2d 443, 445 (S.D.N.Y. 1998) ("Under New York agency law, the principal may not accept the fruits of the agent's fraud and then attempt to divorce himself from the agent by repudiating the agent and his knowledge."), cited in Ensminger, 263 B.R. at 454. See also Eitel v. Schmidlapp, 459 F.2d 609, 615 (4th Cir. 1972) ("[T]he principal cannot claim the fruits of the agent's acts and still repudiate what the agent knew"). The outcome is the same even if the agent has acted adversely to the principal. In re Maxwell Newspapers, Inc., 164 B.R. 858, 867 (Bankr. S.D.N.Y. 1994); In re

Investors Funding Corp., 523 F.Supp. 533, 540-541 (S.D.N.Y. 1980); First Nat'l Bank of Cicero v. United States, 625 F.Supp. 926, 931-932 (N.D. Ill. 1986).

In the BLMIS case, each of the claimants signed a Customer Agreement expressly designating BLMIS as the claimant's agent, as well as a Trading Authorization, giving BLMIS unfettered discretion to trade securities for the claimant's account. Any acts, knowledge and intent of BLMIS as agent are imputed to each claimant as principal and to the extent that the claimants seek to benefit from their agent's fraud and price manipulation, they are chargeable with the agent's actions, knowledge, and intent.

## B.     The Fraudulent Trades Are Unenforceable

In Ensminger, the District Court agreed with the lower Court that irrespective of whether the trustee in that case could maintain a cause of action for damages against the claimants grounded on the broker's fraud, he "nonetheless is entitled to rescind the Challenged Trades as products of an authorized agent's fraud." 263 B. R. at 457. The Court sustained the Bankruptcy Court's finding that the challenged trades were unenforceable as illegal contracts under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; New York's Martin Act, N. Y. Gen. Bus. L. §352(1) (McKinney 1996); and SIPA section 78jjj(c). As the trades were unenforceable, the claimants could not rely upon them. The trades in BLMIS are illegal contracts and therefore, equally unenforceable.

### i.     Section 10(b) of the 1934 Act, and Rule 10b-5

In pertinent part, section 10(b) of the 1934 Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may

-29-

prescribe ...." In pertinent part, SEC Rule 10b-5 makes it unlawful for any person to engage in various acts of fraudulent or deceptive conduct.[13] As stated in Ernst & Ernst v. Hochfelder, 425 U. S. 185, 195 (1976), "[t]he 1934 Act was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges...." The Court further remarked in that case:

> Use of the word "manipulative" is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.

Id., 425 U. S. at 199.

On behalf of the claimants and other investors, BLMIS pretended to enter into contracts to buy or sell securities that were at pre-determined and backdated, and therefore, artificial, prices.

---

[13] Under Rule 10b-5, it is unlawful for any person

"(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

17 C.F.R. §240.10b-5 (2009).

The elements of a 10(b) action include 1) a material misrepresentation or omission; 2) scienter; 3) a connection with the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) a causal connection between the material misrepresentation and the loss. Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-342 (2005).

In doing so, BLMIS engaged in a price manipulation that operated as a fraud or deceit upon the investors and others. Further, in making untrue statements of material fact by means of the fake account statements and confirming to investors the fictitious "trades" at pre-determined returns, BLMIS engaged in an artifice or act to defraud and deceive, all in violation of section 10(b) of the 1934 Act and SEC Rule 10b-5.[14]

### ii. The Martin Act[15]

In relevant part, section 352-c(1)(a) of the Martin Act provides that

> It shall be illegal and prohibited for any person, ... to use or employ any of the following acts or practices:
>
> (a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;....

In order for the Martin Act to be violated, only proof of the qualifying act need be shown; reliance and scienter are not required. See State v. Sonifer Realty Corp., 212 A.D.2d 366, 622 N.Y.S.2d 516 (1995); New York v. Barysh, 95 Misc.2d 616, 620-621, 408 N.Y.S.2d 190, 193 (1978). The reach of the Martin Act is broad. People v. Federated Radio Corp., 244 N.Y. 33, 38-39, 154 N.E. 655, 657 (1926) (fraud "includes all deceitful practices contrary to the plain rules of common honesty.) The victim need not be a buyer or seller of securities; nor need there be privity between the victim and the wrongdoer. People v. Florentino, 116 Misc.2d 692, 701-704, 456 N.Y.S.2d 638, 645-647 (N. Y. Crim. Ct. 1982). Once fraudulent activity has taken place,

---

[14] In its action against BLMIS and Madoff, the SEC alleged that both defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5. Complaint at 9, SEC v. Bernard L. Madoff, et al., No. 08 Civ. 10791 (S.D.N.Y. Dec. 11, 2008) (Dkt. No. 1).

[15] N. Y. Gen. Bus. Law §§352 - 353 (McKinney 1996)

there need not even be any sale of securities for liability to be incurred. People v. Electro Process, Inc., 284 A.D. 833, 132 N.Y.S.2d 531, 532 (4ᵗʰ Dep't 1954). Any misrepresentation and omission must be of a material fact. E. F. Hutton & Co. v. Penham, 547 F.Supp. 1286, 1297 (S.D.N.Y. 1982).

BLMIS's backdating of "trades," its creation of fictitious profits, and its issuance of phony confirmation statements showing pretended purchases and sales, are clear violations of section 352-c(1)(a) of the Martin Act and therefore, are illegal.

### iii. **Unenforceability of Illegal Contracts**

In concluding, like the Bankruptcy Court, that the challenged trades were unenforceable or voidable, the District Court in Ensminger relied upon at least two authorities:

One, the rule that under both federal and New York law, illegal contracts cannot be enforced. Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 77 (1982) ("illegal promises will not be enforced in cases controlled by the federal law"); Hurd v. Hodge, 334 U.S. 24, 34-35 (1948) (courts will not enforce private agreements that violate public policy as manifested in federal statutes); United States v. Bonanno Org. Crime Fam. of La Cosa Nostra, 879 F.2d 20, 28 (2d Cir. 1989) (under federal and state law, illegal agreements and those contrary to public policy are unenforceable and void). See Ensminger, 263 B. R. at 493, and McMullen v. Hoffman, 174 U.S. 639, 645-47, 652, 654 (1899) (when parties make illegal contract intended to create fraud, courts will not "enforce any alleged rights directly springing from such contract").

Two, with respect to the violations of the federal securities laws, section 29(b) of the 1934 Act, 15 U.S.C. §78cc(b) ('Section 29(b)"). That section provides:

**Validity of contracts**

**(b) Contract provisions in violation of chapter**

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract ... heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter, or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation.

The District Court agreed with the Bankruptcy Court that the defense that section 29(b) is directed only at direct violators with actual knowledge, and not innocent parties, was unavailable to claimants inasmuch as they sought, as principals, to benefit from their agent's violations. See Ensminger, supra, 263 B. R. at 493-495, and Mishkin v. Ensminger, supra, 247 B. R. at 126-127 (§29(b) is complementary to other remedies. Even if the section does no compel rescission of trades, §10(b) of the Exchange Act and SEC Rule 10b-5 do.)

In all respects, the same result should obtain here. The "trades" are void and unenforceable by the claimants.[16]

---

[16] In Ensminger, the District Court also upheld the rescission of the trades based upon fraud and false representation. 263 B. R. at 486-492. Although not discussed here, those grounds are equally applicable.

## C. **Avoidable Transfers**

### i. **Power to Avoid Under SIPA**

Although SIPA is part of the federal securities laws, it also makes applicable to the liquidation, to the extent consistent with SIPA, all of the provisions of Title 11 that apply in ordinary bankruptcy. SIPA §78fff(b). For that reason, as mentioned above, a SIPA proceeding has been described as a bankruptcy proceeding with special customer protection measures superimposed upon it. SEC v. Aberdeen Securities Co., 480 F.2d 1121, 1123 (3d Cir.), cert. den. sub nom., Seligsohn v. SEC, 414 U. S. 1111 (1973).

The SIPA trustee has powers that are unique to the SIPA proceeding, as well as powers that are prescribed by the Bankruptcy Code. SIPA §78fff-1(a). Thus, when customer property is insufficient to satisfy customers, SIPA expressly gives to the trustee the authority and power to recover property transferred by the debtor which, except for the transfer, would have been customer property. For purposes of recovery, the transferred property is deemed property of the debtor and if the transfer was made to a customer, the customer is deemed to have been a creditor notwithstanding state law to the contrary. Once recovered, the property again becomes "customer property" to be shared by "customers." SIPA §78fff-2(c)(3). See In re Park South Securities, LLC, 326 B. R. 505, 512-513 (Bankr. S.D.N.Y. 2005). As the District Court in Ensminger noted, the authority is critical to an important objective of both ordinary bankruptcy and SIPA liquidations, namely, maximizing recovery for ratable distribution to all customers. As the Court stated:

> ...[T]he underlying philosophy of the Bankruptcy Code and SIPA establishes certain equitable principles and priorities designed to maximize assets available for ratable distribution

> to all creditors similarly situated.... To this end, the rules seek
> to prevent unjust enrichment and to avoid placing some
> claims unfairly ahead of others by distinguishing transactions
> truly entered in good faith and for value from those somehow
> induced and tainted by preference, illegality or fraud....

Ensminger, 263 B. R. at 463.  In Ensminger, the challenged trades were held avoidable as

fraudulent transfers under various provisions of the Bankruptcy Code and under New York

Debtor and Creditor Law.

### ii.  The Salmon Cases

The Ensminger Courts have not been the only ones to allow trades to be avoided under

similar circumstances, as seen in two decisions issued in the S. J. Salmon & Co., Inc. ("Salmon")

SIPA liquidation proceeding.  At issue in those cases were trades that the trustee alleged were

neither bona fide nor the result of arm's length transactions in the open market, but recorded only

on the books and records of the brokerage in order to improve the position of certain preferred

customers in the face of the imminent liquidation of the firm.  The trustee sought to avoid the

transactions as fraudulent and void under avoidance provisions of the former Bankruptcy Act and

New York Debtor and Creditor Law.  In ruling in favor of the trustee, the Court concluded that

the "trades" were transfers made with actual intent to defraud creditors, a deliberate attempt to

defraud SIPC under SIPA, and done "without fair consideration."  The Court also noted that the

true value of the trades was "not the prices quoted on that date, but rather the quotations

published by dealers after debtor's cessation of business...," and that the "artificially high prices

would vanish when [the broker] ceased acting as a market maker."  SIPC v. S. J. Salmon, No. 72

Civ. 560, 1973 U. S. Dist. LEXIS 15606, at *19, *20.  Significantly, the Court also remarked:

> ...[I]t is argued that the trustee's position in seeking to reverse the February 2d transactions is contrary to the purpose of SIPA. There is no validity to this point of view. It is true that SIPA was intended to afford greater protection to customers than they enjoyed under § 60e of the Bankruptcy Act, essentially by providing a limited form of insurance for customer claims for cash and securities. But SIPA was not intended to make the fraudulent transfer provisions of the Bankruptcy Act inoperative as to stockbroker-debtors in SIPA proceedings. While SIPA was intended to protect customers there is nothing in its provisions to indicate that less preferred creditors are to be denied the protection of the provisions which bar a debtor from making fraudulent transfers at their expense.

Id. at *31. The Court reached the same conclusion with respect to similar transactions in a later decision. SIPC v. S. J. Salmon, Case No. 72 Civ. 560, slip op. ( S.D.N.Y. Feb. 5, 1974).

The avoidance provisions under federal and state law further the bankruptcy goal of ratable sharing of assets by creditors. Unless the fictitious trades in BLMIS are avoided, claimants who were advantaged by the broker's fraud, that is, investors who received withdrawals from BLMIS that actually consisted of other investors' money under the guise of investment profits -- including those innocent investors who received large sums of other investors' money over and above the amounts that they put into the scheme -- will be allowed to benefit at the expense of other equally innocent investors. The Trustee pursuit's pursuit of existing and potential avoidance actions in BLMIS may be complicated even though the suits involve the potential recovery of billions of dollars for the benefit of all customers.

It bears mention that if "net equity" is based upon the last fictitious statement, in view of the fake appreciation of the accounts, all investors will be owed larger sums than they deposited. Some of these investors will have made no withdrawals from their accounts. They will have

claims for the total amount of their deposits, as well as any fake profits and fake securities at backdated prices (collectively, "fake sums") shown in their accounts. They will be the ones most heavily penalized by the last statement approach. Other investors will have withdrawn some of their principal, and their claims will be for the principal remaining in their accounts and any fake sums. Still others will have withdrawn completely their principal and perhaps some fake amounts, and their claims will be solely for any remaining fake sums appearing on their account statements. They will benefit the most from "net equity" being based on the last statement. In contrast to the investors who made no or partial withdrawals, they will have recaptured all of their deposits with the broker, and received other investors' money as "profits." Moreover, they will still have a claim against customer property and SIPC advances based upon the fake sums. Having recovered all of the amounts that they deposited with the broker and received other investors' money while BLMIS operated, they will continue to receive other investors' money, and now, SIPC funds, while BLMIS is defunct. In short, keeping in mind that securities shown on the last account statement will have been paid for only out of fake profits or fake "sales" proceeds, the Ponzi scheme continues, with some investors having their claims to fake assets satisfied with the funds of other investors and SIPC.

The fact that some innocent victims arbitrarily will fare far better than others and at the expense of others, is one more reason for the Trustee not to be held hostage to the fictitious statements.

## II. THE CUSTOMER'S NET EQUITY IS THE NET AMOUNT DEPOSITED BY THE CUSTOMER WITH BLMIS

### A. The Precedent:

The decision that in the context of a Ponzi scheme, the customer's net equity under SIPA is

the net amount deposited by the customer with the broker is not novel.   As discussed above, it is

the conclusion that was reached by the Court of Appeal in New Times I.  It also was the outcome

in a Memorandum and Order filed on September 30, 2002, in Theodore H. Focht, Trustee v.

Tessie C. Athens (In re Old Naples Securities, Inc.), 311 B. R. 607 (M.D. Fla. 2002) ("Old

Naples").  In that case in which bonds were "sold" but never bought and other investors' money

was used to pay previous investors, the Court held with respect to "net equity" and the claimants'

assertion that phony interest should be allowed:

> Especially where the payments to claimants will be made out
> of the quasi-public SIPA fund, permitting claimants to recover
> not only their initial capital investment but also the phony
> "interest" payments they received and rolled into another
> transaction is illogical.   No one disputes that the interest
> payments were not in fact interest at all, but were merely
> portions of other victims' capital investments.  If the Court
> were to agree with the Athens claimants, the fund would
> likely end up paying out more money than was invested in
> Zimmerman's Ponzi scheme.   This result is not consistent
> with the goals of SIPA, which does not purport to make all
> victimized investors whole but only to partially ameliorate the
> losses of certain classes of investors.

311 B. R. at 616-617.

In reaching this result, the Old Naples Court agreed with the analysis set forth in In re C. J.

Wright & Co., 162 B. R. 597 (Bankr. M.D. Fla. 1993) ("C. J. Wright").  There, the Bankruptcy

Court stated in response to the claimants' argument that the claimants were entitled to the return

of their principal as well as interest that they would have earned if the debtor actually had bought

certificates of deposit ("CD") for them and the CDs had matured:

> Claimants as customers have claims for cash and are entitled
> to receive their net equity from the fund of customer property
> as defined in SIPA. Customer property is "cash ... at any time
> received, acquired, or held by or for the account of debtor ...
> including property unlawfully converted." 15 U.S.C.
> §78lll(4). Claimants entrusted cash to debtor which debtor
> used to improperly issue the deposit account evidence of
> indebtedness. Because debtor misappropriated these funds,
> claimants have a claim for that which they entrusted to debtor
> as customer property: the principal amount that was to be
> invested. Debtor did not convert the interest promised
> because it was never earned. Debtor only misused
> claimants['] initial investment. Likewise, net equity as
> defined in SIPA does not contain any reference to providing
> interest on claims to customers. Thus the most that claimants
> are entitled to receive is the return of the principal invested.
>
> Claimants agree with the trustee that the amount each
> claimant is entitled to receive must be reduced by
> distributions to claimants.

162 B. R. at 609-610.

In the BLMIS case as well, returning to the customer the amount deposited by him less

amounts already withdrawn by him is the correct result. In that regard, a failure to deduct sums

already withdrawn by the investor would continue to benefit him at the expense of others. Thus,

if previous withdrawals were ignored and the claimant were allowed to recover the gross amount

of his deposits in satisfaction of his claim filed with the Trustee, he would receive a double

recovery of the withdrawn sums and thereby reduce the amount available for other investors.

**B. General Creditor Claims**

The C. J. Wright Court accurately recognized that when a brokerage fails, SIPA protects the custodial function, that is, the property that has been entrusted to the broker by or for the customer. SEC v. Kenneth Bove & Co., 378 F.Supp. 697, 699 (S.D.N.Y. 1974); SIPC v. Stratton Oakmont, Inc., 229 B.R. 273, 279 (Bankr. S.D.N.Y.), aff'd, 239 B. R. 698 (S.D.N.Y. 1999) ("well established that SIPA protects customers ... who have entrusted to ... broker-dealers cash or securities in the ordinary course of business for the purpose of trading and investing"); In re Adler Coleman Clearing Corp., 204 B.R. 111, 114, 115 (Bankr. S.D.N.Y. 1997); SEC v. First Securities of Chicago, 507 F.2d 417, 420 (7th Cir. 1974); In re Carolina First Securities Group, Inc., 173 B. R. 884, 886 (Bankr. M.D.N.C. 1994) (no "customer" status as to property not entrusted to brokerage). See National Union Fire Ins. Co. v. Camp (In re Government Sec. Corp.), 972 F.2d 328, 331 (11th Cir. 1992), cert. den., 507 U. S. 952 (1993) (purpose of SIPA is "to return to customers of brokerage firms their property or money"); and SEC v. S. J. Salmon & Co., 375 F.Supp. 867, 871 (S.D.N.Y. 1974) (SIPA was designed to facilitate return of property to customers of insolvent firm or to replace such property when lost or misappropriated). The loss must be "occasioned by a broker's liquidation." In re Stratton Oakmont, Inc. (Miller v. DeQuine), 42 Bank. Ct. Dec. (LRP) 48, at 220 (S.D.N.Y. 2003) (SIPA's main purpose to reverse losses resulting from broker's insolvency); In re Oberweis Securities, Inc., 135 B.R. 842, 846 (Bankr. N. D. Ill. 1991) (damage that would have occurred even if debtor not insolvent is not a direct result from insolvency and not protected under SIPA). See In re Stalvey & Assoc., Inc., 750 F.2d 464, 473 (5th Cir. 1985) (SIPA only an "interim step" not providing complete protection from losses incurred by firm failure); Redington v. Touche Ross & Co., 592 F.2d 617, 624 (2d Cir.

1978), rev'd on other grounds, 442 U. S. 560 (1979) (Congress did not intend for "wrongdoers" to "receive a windfall benefit from the existence of SIPC ...." ); and SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983 (2d Cir. 1974) ("SIPA was not designed to provide full protection to all victims of a brokerage collapse.")

In the final analysis, to the extent that the claimants have been harmed by the Debtor by more than the net amounts deposited by them, their claims are for damages which are general creditor, and not customer, claims. This is the true nature of their claims, but as to such losses, investors are not protected by SIPA. As stated by the Ninth Circuit in In re Brentwood Securities, Inc., 925 F.2d 325, 330 (9th Cir. 1991):

> Every market has its dreamers and its crooks. Occasionally, they are one and the same. The SIPA protects investors when a broker holding their assets becomes insolvent. It does not comprehensively protect investors from the risk that some deals will go bad or that some securities issuers will behave dishonestly.

Accord, SIPC v. Associated Underwriters, Inc., 423 F.Supp. 168, 171 (D. Utah 1975) ("SIPC is not an insurer, nor does it guarantee that customers will recover their investments which may have diminished as a result of, among other things, market fluctuations or broker-dealer fraud"); In re Klein, Maus & Shire, Inc., 301 B.R. 408, 421 (Bankr. S.D.N.Y. 2003) (claims for damages do not involve the return of customer property entrusted to broker and are not "customer" claims. Claims for damages resulting from misrepresentation, fraud or breach of contract are not protected and are general creditor claims); In re MV Securities, Inc., 48 B.R. 156, 160 (Bankr. S.D.N.Y. 1985) (no SIPA protection for innocent investor against broker's fraud); SEC v. Howard Lawrence & Co., 1 Bankr. Ct. Dec. (CRR) 577, 579 (Bankr. S.D.N.Y. 1975) (no SIPA

protection for claims based on fraud or breach of contract); <u>In re Oberweis Securities, Inc.</u>, 135

B.R. 842, 846 (Bankr. N.D. Ill. 1991) (claim for damages resulting from broker's failure to invest

funds as instructed are basis only for general creditor claim); <u>In re Bell & Beckwith</u>, 124 B.R. 35,

36 (Bankr. N.D. Ohio 1990) (no protection for claims based on broker's fraudulent conduct).

The Trustee's approach achieves the greatest return for the greatest number of victims of

BLMIS's fraud. The fact that to some, the approach may seem inequitable is not the deciding

factor. As the Second Circuit stated in <u>SEC v. Packer, Wilbur & Co.</u>, <u>supra</u>, 498 F.2d at 983:

> However, arguments based solely on the equities are not,
> standing alone, persuasive. If equity were the criterion, most
> customers and creditors of Packer Wilbur, the bankrupt,
> would be entitled to reimbursement for their losses.
> Experience, on the other hand, counsels that they will have to
> settle for much less. SIPA was not designed to provide full
> protection to all victims of a brokerage collapse. Its purpose
> was to extend relief to certain classes of customers.

<u>Accord</u>, <u>SIPC v. Morgan Kennedy & Co.</u>, 533 F.2d 1314, 1317, n. 4 (2d Cir. 1976), <u>cert</u>. <u>denied</u>,

426 U.S. 936 (1976).

## **CONCLUSION**

For all of the aforementioned reasons, the Trustee's Motion should be granted.

Respectfully submitted,

JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior Associate General Counsel
  for Dispute Resolution

CHRISTOPHER H. LAROSA
Associate General Counsel

HEMANT SHARMA
Assistant General Counsel

SECURITIES INVESTOR
  PROTECTION CORPORATION
805 15th Street, N.W.
Suite 800
Washington, D.C.  20005-2215
Telephone: (202) 371-8300
Email: jwang@sipc.org
E-mail: kbell@sipc.org
Email: clarosa@sipc.org
Email: hsharma@sipc.org

Date:  October 16, 2009
Washington, D.C.