JOSEPHINE WANG
General Counsel
SECURITIES INVESTOR
 PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, DC 20005
Telephone: (202) 371-8300
Facsimile: (202)371-6728
E-mail: jwang@sipc.org

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| IN RE: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**DECLARATION OF HEMANT SHARMA**

I, Hemant Sharma, Esq., of full age, hereby declare as follows:

1.     I am Assistant General Counsel of the Securities Investor Protection Corporation.

2. As an attorney of record, I am fully familiar with this case and the facts set forth herein.

3. I submit this Declaration to place before the Court true and correct copies of documents relevant to the Memorandum of Law of the Securities Investor Protection Corporation In Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying "Customer" Claims for Amounts Listed on Last Statement, Affirming Trustee's Determination Of Net Equity, and Expunging Those Objections with Respect to the Determinations Relating to Net Equity.

4. Attached hereto as Exhibit A is a true and correct copy of the decision in *SIPC v. S.J. Salmon & Co.*, No. 72 CV 560 (Bankr. S.D.N.Y. February 5, 1974).

Pursuant to 28 U.S.C. § 1746, I hereby declare that the foregoing statements made by me are true and correct. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED: Washington, D.C.
October 16, 2009

Respectfully submitted,

HEMANT SHARMA
Assistant General Counsel
SECURITIES INVESTOR PROTECTION CORPORATION
805 Fifteenth Street, N.W.
Suite 800
Washington, DC 20005
Telephone: (202) 371-8300
Email: hsharma@sipc.org

2

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,    :    72 Civ. 560

                          Plaintiff,    :

SECURITIES INVESTOR PROTECTION          :
CORPORATION,
                       Applicant,    :
                                  DECISION #2 ON TRUST
        -against-            :    MOTION FOR SUMMARY
                                      JUDGMENT AVOIDING
S. J. SALMON & CO., INC.,               :    CERTAIN TRANSACTIONS
                                      WHICH OCCURRED
                      Defendant.    :    FEBRUARY 2D, 1972.

----------------------------------------x

APPEARANCES:

        For the Motion

HUGHES, HUBBARD & REED, ESQS.
Attorneys for JOHN C. FONTAINE, ESQ., Trustee

WILLIAM D. MORAN, ESQ.
Attorney for SECURITIES AND EXCHANGE COMMISSION

THEODORE H. FOCHT, ESQ.
Attorney for SECURITIES INVESTOR PROTECTION CORPORATION


        Opposed to the Motion

See list appended.

ASA S. HERZOG, REFEREE IN BANKRUPTCY:

        The trustee filed an application, dated June 5,

1973, setting forth in paragraph 35 thereof his objection

to certain alleged customer claims arising from specified

transactions which purported to take place on February 2, 1972 regarding certain securities which the trustee has labelled the "Salmon Nine".[1] The trustee's objections relate to 27 sales (involving 13 accounts) allegedly made on February 2, 1972 by the respondent customers of the debtor of shares of one or more of the "Salmon Nine" to the debtor's trading account.[2]

The trustee's position is that the aforesaid alleged sales and cancellations of prior purchases recorded on the books and records of debtor on February 2d were not *bona fide* transactions, could not have been effected in arm's length transactions in the open market, were inconsistent with and contrary to any effort to improve debtor's net capital position, and were recorded solely for the purpose of improving the cash claims of selected customers of debtor, the principals of debtor knowing that (i) a liquidation of debtor was imminent (ii) cash claims in such a liquidation would be paid with

---

[1] The "Salmon Nine" consisted of the common stock of the following corporations: Comfax Communications Industries, Inc.; Enviornmental Pollution Research Corp.; Ferronics, Inc.; Fiberstatics Corp.; Galaxy Group Inc.; Jaymee Industries, Inc.; Professional Data Sciences; Project 7 Inc.; and Schnur Appel, In

[2] The trustee initially objected to two "purchases cancelled in the accounts of Martin Harris and Nathan Dombers, but has since withdrawn his objections as to these claimants.

SIPC advances, and (iii) the values of a substantial number of securities held by debtor's customers would be severely depressed by debtor's withdrawal as a market maker for such securities.

Accordingly, the trustee urges that those February 2d transactions be treated as a nullity and be reversed on the debtor's books and records.

Of the 27 transactions objected to by the trustee, the customer-respondents involved in 20 transactions oppose the trustee's application. Those customer-respondents do not deny that a sale of the securities in question was purportedly effected for their benefit, but in every case assert that the alleged sale was bona fide, and, in some instances, claim that the trustee lacks power to reverse the alleged sale. Certain of the customer-respondents assert that their transactions were effected prior to February 2d, 1972, and these claims will be discussed separately.[3] Except as to these claimants, no material issue of fact is raised and the rights of the parties may be determined on the basis of the uncontroverted facts as set forth in the trustee's said application and his affidavits, and that of the National Association of Security

---

[3] Accounts of Abe Baron and Mildred Katz, Herman Knoller, Elyse Lacher and Robert Weinger, see p. 15, infra.

Dealers, Inc., submitted in support of the trustee's motion to reverse the February 2d entries and nullify the transactions in question.

The following facts are uncontrovered: The debtor was underwriter or co-underwriter and a principal market maker for the securities labelled by the trustee as the "Salmon Nine". Shares of 8 of the "Salmon Nine" corporations constituted the debtor's principal assets for net capital purposes. The ninth, Jaymee, was not sold to the public until January 1972. The trustee's affidavit in support of the motion has attached as an exhibit (1) the "bid" and "asked" quotations by each of the market makers (including the debtor) for each security of the "Salmon Nine" for the period January 31, 1972, through February 2, 1972, the last day the debtor engaged in business, and (2) the high "bid" and "asked" quoted by other market makers each day from February 3, 1972 to February 29, 1972, after the debtor ceased doing business. It appears from this exhibit that as soon as the debtor ceased to act as a market maker for the "Salmon Nine", the "bid" and "asked" price for each of the securities plummeted. For several days after February 2d, other broker-dealers published virtually no quotations whatsoever, and when they resumed, the "bid" and "asked" prices were well below the February 2d level. For illustratic

the average bid on Comfax from January 31 through February 2 was 23-3/8, but from February 3 through February 11 was 3-7/8. The average bid on Fiberstatics for the first period was 14-3/8 and for the second period, 4-1/8. Project 7 had an average bid of 11 for the first period, and 5/8 for the period after February 2d. This sharp decrease was true in the case of each security included in the "Salmon Nine".

Of great importance to a decision, and probably the crux of it, is the action taken by the National Association of Security Dealers, Inc. ("NASD"), of which debtor was a member, during the period January 28, 1972 through February 2d, 1972, in reviewing the debtor's capital position in order to determine whether the debtor was in compliance with the net capital rules to which broker-dealers are subject pursuant to §15(c)(3) of the Securities Exchange Act of 1934 (the "1934 Act"), as appears from the affidavit of Jerome S. Pilpel, an Assistant Director of "NASD" for District No. 12, submitted in support of the trustee's motion.

On January 28, 1972, "NASD" examiners made an examination at debtor's offices, of the debtor's December 31, 1971 trial balance and supporting schedules for the purpose of computing the debtor's net capital position. They noted that a significant portion of the debtor's capital consisted of long positions in the eight of the "Salmon Nine" for which

it was then acting as market maker.[4] Thereupon they investigated the net capital positions of most of the other market makers in these eight securities to determine their liquidity, that is whether debtor could, if the need arose, sell these securities to such firms at or near the prevailing prices. Based upon their examination of the debtor and the aforesaid related investigation, the NASD came to the conclusion that because of their own net capital positions, only a minimal amount of said securities had any market value. Because of this illiquidity of each of the eight securities in question, the NASD concluded that there was a market for only 1,000 shares per each market maker for the security and that the balance of the shares were without value. Accordingly the NASD permitted the debtor in computing its net capital position, to include in net capital only 1,000 shares of each of the eight securities multiplied by the number of market makers for that security. The limited number of shares thus included in the debtor's capital were valued at their then purported market value, less 30% to allow for market fluctuations, in accordance with normal NASD procedures.

---

[4] The Jaymee underwriting was not closed until late January 1972, and, therefore, the Jaymee shares were not reflected in debtor's capital position on December 31, 1971.

On January 31, 1972, representatives of NASD advised debtor's president and another of its principals, that debtor's capital position was illiquid and the securities substantially valueless, that the NASD had determined that debtor was in violation of its net capital rules and that it would require additional capital in excess of $1 million to be in compliance with said rules.

On February 2d, NASD representatives reviewed debtor's January 31, 1972 trading, investment and subordinated accounts, and found that debtor's position had deteriorated since December 31, 1972. Subsequently, a more complete review disclosed that based on debtor's January 31 figures (recognizing that only 1,000 shares per market maker for each of the eight securities in which debtor was a market maker had realizable value), additional capital in the amount of $1,391,395.46 would be required in order for debtor's aggregate indebtedness not to exceed its net capital by more than the 20 to 1 maximum ratio then permitted under the 1934 Act.

We come now to the February 2d transactions which are the subject of the trustee's motion. On that date, instead of trying to improve its net capital position through sales of its securities, the debtor purported to

effect, <u>for its own account</u>, purchases of 43,150 shares of stock of the Salmon Nine from selected customers at the prices it had been quoting as a market maker, for a total purchase price of $442,515.80. If these alleged "purchases" were valid, the consequence was a worsening of the debtor's already inadequate position by $442,515.80. Additionally, on the same day the debtor purported to "cancel" previous sales to customers of a total of 28,250 shares of the Salmon Nine, and these so-called cancellations, viewed as "sales", if valid, would further impair the debtor's capital position by $262,375.00.

The total of 145 "sales" by customers to the debtor and cancellation of prior customer purchases which allegedly took place on February 2d, stands out in marked contrast to the average of 33 such transactions during each of the preceding 30 trading days.

At 5:30 A.M. on February 2d, debtor sent a telegram to the Securities and Exchange Commission stating that "it appears that our net capital is less than the minimum required to be maintained by the applicable net capital rules of the NASD".

But several things make it perfectly clear, and I find, that prior to February 2d the debtor knew that the liquidation of its business was both inevitable and imminent

and that the quoted values of the "Salmon Nine" would dip sharply with its withdrawal as a market maker for those securities. If it did not know sooner, it certainly knew on January 31, 1972, that it was at least $1 million dollars short of being in capital compliance.

Knowledge that it was not in capital compliance certainly did not come to the debtor for the first time at 5:30 P.M. on February 2d when it dispatched the aforesaid telegram to the SEC. If it knew the facts concerning its capital position at 5:30 P.M., then it assuredly was well aware of them when it purported to enter into the transactions earlier in the day which merely worsened its capital position. Under all the uncontradicted circumstances, the motivation for the February 2d transactions is transparent: the positions of certain customers in shares of the "Salmon Nine" were converted into cash credit balances <u>at pre-liquidation prices</u> so that cash claims would be paid with advances to be made by the Securities Investor Protection Corporation ("SIPC").

The debtor ceased doing business after February 2, 1972, which fell on a Wednesday. On the following Monday, February 7, 1972, the SEC instituted an action to enjoin the debtor and two of its principals from engaging in acts alleged to constitute violations of the 1934 Act. At the

same time, SIPC applied to the court for a decree adjudicating that the customers of the debtor were in need of protection under the Securities Investor Protection Act and appointing a trustee pursuant to §5(b)(3) of said Act. On the said day, February 7, 1972, the court permanently enjoined the debtor and its two principals as requested by the SEC, granted the application of SIPC, decreed the debtor's customers were in need of protection, and appointed John C. Fontaine, trustee to liquidate the business of the debtor.

It is upon the foregoing facts and circumstances that the trustee bases his present motion to nullify the February 2d transactions and in effect, reverse the entries in debtor's books to reflect the positions of the respondents immediately preceding the making thereof. The trustee takes the position that the transactions are fraudulent and void under applicable provisions of the Bankruptcy Act and under State law, specifically under §67d of the Bankruptcy Act and §70e of said Act and the New York Debtor and Creditor Law §§270-281.

There were 145 February 2d transactions involving the "Salmon Nine". By application dated January 11, 1973, and notice of motion dated March 29, 1973, the trustee moved to nullify and reverse 116 of the 145 transactions. By decision

dated August 8, 1974 I found the February 2d sales allegedly made by certain of debtor's customers of one or more of the "Salmon Nine" to the debtor's trading account to be fraudulent transactions under §§67d and 70e of the Bankruptcy Act and granted the trustee's motion for summary judgment.

The 27 remaining February transactions* are the subject of the present application and motion.

It would unduly prolong this decision to again set forth in detail the reasons why I held the February 2d transactions to be fraudulent under §§67d and 70e of the Act. The basic facts upon which my decision of August 8, 1973 is predicated are identical with those presently before the court, and accordingly, I incorporate herein pages 11 through 27 of my said decision of August 8, 1973. For the reasons therein set forth, I find the remaining February 2d transactions which are the subject of the present application and motion to be fraudulent under §67d of the Act and under New York Debtor and Creditor Law §§270-281 and §70e of the Act.

---

The responsive pleadings filed by the respondents herein raise a number of questions and several have submitted supporting memorandum. Many points presented are trivial and call for no discussion.

---

\* See n.2, supra.

The principal arguments of respondents fall into several general categories: **Firstly**, it is argued that the trustee's position in seeking to reverse the February 2d transactions is contrary to the purpose of SIPA. There is no validity to this point of view. It is true that SIPA was intended to afford greater protection to customers than they enjoyed under §60e of the Bankruptcy Act, essentially by providing a limited form of insurance for customer claims for cash and securities. But SIPA was not intended to make the fraudulent transfer provisions of the Bankruptcy Act inoperative as to stocbroker-debtors in SIPA proceedings. While SIPA was intended to protect customers there is nothing in its provisions to indicate that less preferred creditors are to be denied the protection of the provisions which bar a debtor from making fraudulent transfers at their expense.

**Secondly**, as to be expected, it is asserted that the February 2d transactions were made for a "fair consideratic based on the argument that "fair consideration" is measured by the quoted market value on the day of the transaction.[5] But market quotations are not _conclusive_ evidence and must give way before other evidence.[6] The evidence in the instant

---

[5] Citing such cases as Castellano v. Osborne, 16 F.2d 187 (2d Cir.1926); Cowan v. Guidry, 274 F.Supp. 22 (E.D.La.1967); Associated Seed Growers, Inc. v. Geib, et al., 125 F.2d 683 (4th Cir.1942); Halsey v. Winant, 258 N.Y. 512 (1932).

[6] Application of Marcus, 273 App.Div.725, 79 N.Y.S.2d 76; Matter of Kaufmann, Alsberg & Co., v. H.L.Green Co.,Inc., 15 App. Div. 2d 468, 222 N.Y.S. 2d 305.

case clearly shows that market value had no relationship to reality and that the securities in question simply could not be sold at the purported "market" quotation.

Moreover, since I have already determined that the February 2d transactions were made with actual intent as distinguished from intent presumed in law, to hinder, delay or defraud either existing or future creditors,[7] the question of "unfair consideration" is, at least in that context, irrelevant.

Thirdly, several of the respondents assert the bona fide nature of their transactions. As I have already indicated, lack of the respondents' good faith is not essential to the determination of the issue of fraud. The transferee's good faith becomes relevant only when the question is whether the trustee can recover some or all of the property transferred.[8]

Fourthly, it is argued that the trustee's objections raise questions of fact. The respondents do not quarrel with the basic facts alleged by the trustee. They disagree with the conclusions to be drawn from these facts.

---

[7]   Bankr. Act §67(d)(2)(d).

[8]   4 Collier on Bankruptcy (14th Ed.) §67.37. See also In re Peoria Braumeister Co., 138 F.2d 520 (7th Cir.1943), and In re Allied Development Corporation, 435 F.2d 372 (7th Cir.197

The function of the summary judgment procedure is to promptly dispose of actions to which there is no <u>genuine issue</u> of fact, although such an issue is raised by the pleading. The object of the motion, as observed by the late Justice Benjamin Cardozo, is to separate what is formal or pretended and what is genuine and substantial, so that only the latter may subject a suitor to the burden of a trial.[9] If there is no genuine issue to a material fact, the parties are not entitled to a trial and judgment may be awarded by applying the law to the undisputed facts.[10]

Unsupported assertions that questions of fact exist are not enough to defeat a motion for summary judgment.[11] And, a mere denial of facts alleged by the moving party does not raise a triable issue of fact.[12] Federal Rule of Civil Procedure 56(e) provides, in part:

> "Where a motion for summary judgment is made and supported as provided in this rule an adverse party may not rest on mere allegations or denials of his pleading, but his response, by affidavit or as otherwise provided in this rule, must set forth <u>specific facts showing that there is</u> a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him". (emphasis added)

---

[9]   Richard v. Credit Suisse, 242 N.Y. 346 (1926).

[10]  William J. Kelly Co., v. R.F.C., 172 F.2d 865 (1st Cir. 1949); SEC v. Payne, 35 F.Supp., 873 (S.D.N.Y. 1940).

[11]  Gulf Puerto Rico Lines v. Maicera Criolla, Inc., 309 F.Supp 539 (D.C.P.R. 1969); Bruce Construction Corporation v. United States, 242 F.2d 873 (5th Cir. 1957).

[12]  Engl. v. Aetna Life Insurance Company, 139 F.2d 469 (2d Cir. 1943); Ortiz v. National Liberty Insurance Co., 75 F.Supp 550 (D.C.P.R. 1948).

Certainly, if Fed.R.Civ.P. 56(e) does not shift the burden of persuasion, it does shift the burden of going forward with the evidence. The party opposing the motion for summary judgment must present facts in proper form - conclusion of law will not suffice; any facts asserted by the opposing party must be material, of a substantial nature, not fanciful, frivolous, gauzy, or merely suspicious.[13] The affidavit in opposition is no place for ultimate facts and conclusions of law.[14] Statements made on "information and belief" will be disregarded.[15]

Finally, certain of the respondents[16] assert that the transactions which concerned them occurred prior to February 2d, 1972, and since the trustee has elected to seek avoidance of transactions which were actually consummated on February 2d, 1972, I think that these respondents raise an issue which requires clarification. Consequently, as to

---

[13] Moore's Manual of Federal Practice and Procedure, §17-10 [3], and cases cited therein.

[14] Englehard Industries v. Research Instrumental Corp., 324 F.2d 347 (9th Cir.1963), cert.denied, 377 U.S.923 (1964).

[15] Automatic Radio Mfg. Co., v. Hazeltine Research Inc., 339 U.S. 827, 831 (1950); State of Washington v. Maricopa County, 143 F.2d 871 (9th Cir. 1944).

[16] Herman Knoller, Abe Baron, Elyse Lacher, Robert Weinger, Mildred Katz.

these claimants, the matter will be set down for hearings by the trustee, and if the proof is that the transactions occurred prior to February 2d, the motion will be denied as to them. If, however, the proof is that the transactions indeed took place on February 2d, the motion will be granted as to them.

With the exceptions just noted, the motion for summary judgment is granted and the trustee will settle an order in conformity herewith on ten days' notice to all respondents.

DATED: New York, New York
       February 5th, 1974

_____
REFEREE IN BANKRUPTCY