**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>　　　　　　　Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>　　　　　　　Debtor. | |

**DECLARATION OF JOSEPH LOOBY IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER UPHOLDING TRUSTEE'S DETERMINATION DENYING "CUSTOMER" CLAIMS FOR AMOUNTS LISTED ON LAST CUSTOMER STATEMENT, AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE OBJECTIONS WITH RESPECT TO THE DETERMINATIONS RELATING TO NET EQUITY**

I, Joseph Looby, pursuant to 28 U.S.C. § 1746, declare as follows:

1.　　I am a Senior Managing Director with FTI Consulting, Inc. ("FTI"). I have more than 20 years of combined experience in the military, regulatory enforcement, investigations and technology, much of which has involved financial and fraud investigations. I am a certified fraud examiner ("CFE"), with a Bachelors degree in Economics, a Juris Doctorate, and am listed as the co-inventor of U.S. Patent "System, Software and Method for Examining a Database in a Forensic Accounting Environment." Additional information regarding my personal and professional experience is included in my Curriculum Vitae annexed hereto as **Exhibit 1.**

2.　　On or about December 30, 2008, FTI was retained by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for

the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC

("BLMIS"), under the Securities Investor Protection Act ("SIPA"), and for Bernard L. Madoff

("Madoff"), to examine, among other things, the financial affairs of BLMIS.

3.     I make this declaration based upon the information and knowledge acquired

during the course of my retention, as described herein, and in support of the Trustee's motion

("Motion") for an order upholding the Trustee's determination denying "customer" claims for

amounts listed on last customer statements, affirming the Trustee's determination of net equity,

and expunging those objections with respect to the determinations relating to net equity.

4.     During the course of carrying out my investigative duties in this matter, my

colleagues and I have interviewed, in person or by telephone, business associates and other

persons who have had business dealings with, or who we were told had information relevant to,

the business and financial affairs of BLMIS and Madoff.

5.     Also during the course of my involvement in this matter, I have personally

reviewed thousands of documents, as well as schedules prepared and information collected by

my colleagues, relating to the books and records of BLMIS, third party records, bank records and

other documentation relevant to BLMIS and its customer accounts and information systems.

6.     I have personally reviewed the BLMIS customer agreements executed by each of

the 78 claimants that are the subject of the Trustee's Motion.

### Organization of BLMIS

7.      Corporate records[1] reveal that Madoff was the sole member and chairman of BLMIS at the time of its failure.  Originally formed as a sole proprietorship in 1960, BLMIS was reorganized as a single member LLC on or around December 4, 2000.

8.      BLMIS operated for many years up until the Filing Date[2] from its principal place of business at 885 Third Avenue, New York, New York.  Madoff ran BLMIS together with several Madoff family members and a number of employees.

9.      BLMIS was organized into three business units, the market making unit, the proprietary trading unit, and the investment advisory business (*hereinafter*, interchangeably referred to as "BLMIS" or the "IA  Business").

10.      BLMIS was registered with the SEC as a broker-dealer under § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78$o$(b)) as of January 19, 1960, and, beginning in 2006, as an investment adviser.  However, the Investment Advisor registration was falsified and only 23 of the thousands of IA Business customers were reported to the SEC.  By virtue of the registration as a broker-dealer, BLMIS was a member of SIPC.

11.      Madoff also operated a branch of the broker-dealer in London, England since February 1983, which was incorporated under the name Madoff Securities International Ltd. ("MSIL").

---

[1] The books and records of BLMIS are, at best, incomplete.  The Trustee, through his counsel and his consultants such as FTI, is endeavoring to supplement the corporate books and records with third party records, including bank records, customer records, etc., where available.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed in the Trustee's Memorandum of Law in support of the Motion.

12.     BLMIS's annual audits were purportedly performed by Friehling & Horowitz, CPAs P.C., an accounting firm of three employees, one of whom was semi-retired. The firm's offices were located in a strip mall in Rockland County, New York.

13.     BLMIS employees generally referred to the IA Business as "House 17" and the market maker and proprietary trading businesses combined as "House 5."

14.     In or around 1993, the staff of the IA Business were physically separated from the other business units and relocated to the 17th floor of 885 Third Avenue ("17th Floor"). The market maker and proprietary trading business staff were located on the 18th and 19th floors of that address.

15.     In or around 1993, BLMIS began using computer systems and software programs known as an IBM AS/400. Two (2) AS/400 computer systems were implemented on or around 1993; one for House 5 ("House 5 AS/400") and one for House 17 ("House 17 AS/400"). Both were located on the 17th floor.

16.     The House 17 AS/400 was used only in connection with the IA Business. The House 5 AS/400 and other computer systems were used in connection with the market making and proprietary trading business.

### BLMIS Bank Accounts & Customer Deposits

17.     BLMIS used two primary bank accounts to fund its disbursements, one held at The Bank of New York Mellon (the "621 Account") and another held at JP Morgan Chase Bank, N.A. (the "703 Account").

18.     The 703 Account was primarily used for customer deposits and withdrawals from the IA Business. Amounts invested in BLMIS by customers were deposited into the 703

Account.  Similarly, the majority of redemptions by customers were withdrawn from the 703
Account.

19.    Remaining cash balances in this account at the end of each business day were
transferred to affiliated overnight investment accounts at J.P. Morgan Chase Bank and other
investments until additional monies were needed to fund additional withdrawal requests by
customers, capital needs of the broker-dealer operation of BLMIS, or Madoff's (and other
insiders') personal needs.

20.    BLMIS maintained a book which tracked certain customers' cash deposits and
withdrawals from BLMIS.

21.    Each day, BLMIS employees on the 17th floor prepared reports for Madoff
indicating amounts of customer deposits into and withdrawals from the 703 Account.  These
funds were not reflected on the books and records of the House 5 operations.

22.    By early December 2008, BLMIS generated client account statements for about
4,900 customer accounts (the "November 30, 2008 Statements").  When added together, and
after netting out approximately $8.3 billion of amounts shown as owed to BLMIS, these
statements erroneously showed approximately $64.8 billion of investments with BLMIS.  In
reality, BLMIS had assets on hand worth a small fraction of that amount.

23.    The $64.8 billion balance recorded on BLMIS customer statements is net of
"negative" accounts that approximate $8.3 billion.  The total amount shown on the November
30, 2008 customer statements for the 4,900 accounts with purported positive equity balances
aggregates to $73.1 billion.

24.    Although the investigation is still ongoing, the total amount of funds that
customers deposited but did not withdraw from their BLMIS accounts was less than $20 billion.

25.      At all times relevant hereto, the monthly purported equity balances of BLMIS customer accounts far exceeded the amount of capital in the 703 Account.

### The Proprietary Trading and Market Making Businesses

26.      The proprietary trading and market making units of BLMIS were largely run as enterprises separate and apart from the BLMIS IA Business.

27.      Review of the financial history of BLMIS demonstrates that neither of these business units would have been viable without the fraudulent IA Business, the proceeds of which were used to sustain those business operations from at least 2007 forward.

28.      The market making and proprietary trading business units appear to have been largely involved in legitimate trading with institutional counterparties and utilized live computer systems including the House 5 AS/400 and trading platforms that interfaced with multiple third-party feeds and outside data sources often necessary for trading. BLMIS employed a sizeable information technology staff to support and maintain these trading platforms, as well as other technology associated with these business units.

29.      The House 5 computer systems, including the House 5 AS/400, were connected, and/or reconciled to (i.e., interfaced with) the systems required to conduct legitimate securities trading with the outside world. For example, these systems interfaced with other trading platforms and programs including order entry, trade execution, securities clearing, and the Depository Trust & Clearing Corporation ("DTCC"). A diagram illustrating key differences between the House 17 and House 5 AS/400's is annexed hereto as **Exhibit 2**.

30.      Unlike the House 17 AS/400, the House 5 AS/400 included outputs for regulatory review including FINRA, the Securities & Exchange Commission ("SEC"), and financial reporting. It was an open AS/400, consistent with a legitimate securities trading business.

31.    In addition, the market making and proprietary trading units were subject to compliance and risk monitoring programs, by the exchanges they traded on, the clearing houses they utilized, and the Financial Industry Regulatory Authority ("FINRA"), among others.

### The IA Business

32.    Outwardly, the IA Business functioned as both an investment adviser to its customers and a custodian of their securities. The precise date on which BLMIS began purportedly engaging in investment advisory services has not been established, but it appears that BLMIS was offering such services as far back as the 1960s.

33.    There were 25 individuals that worked for the IA Business of BLMIS.

34.    Based on a review of standard customer opening agreements, BLMIS customers deposited their cash and were able to make withdrawals, but ceded all other rights associated with their accounts, including the authority to make investment decisions, to Madoff or BLMIS.

35.    Upon the opening of their BLMIS customer account, customers signed a document such as a "Trading Authorization Limited to Purchases and Sales of Securities and Options," an example of which is annexed hereto as **Exhibit 3.**  As indicated in **Exhibit 3**, the forms pertaining to IA account #1B0094 authorized Madoff as the account holder's "agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities in accordance with [Madoff's] terms and conditions."

36.    Further, the account holder agreed that, "[i]n all such purchases, sales or trades [Madoff is] authorized to follow the instructions of Bernard L. Madoff in every respect concerning the undersigned's account with [Madoff]; and [Madoff]is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades as well

as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades. All purchases, sales or trades shall be executed strictly in accordance with the established trading authorization directive."

37.     BLMIS did not provide its customers with electronic real-time online access to their accounts, which certainly by the year 2000 was customary in the industry.[3]  BLMIS utilized technology that was severely outmoded relative to other participants in the exchange traded equity market to communicate with his clients, such as paper trade confirmations, transmitted through the United States Mail.

38.     There were essentially two groups of IA Business customer accounts, the split-strike conversion strategy accounts, administered by Frank DiPascali ("DiPascali"), and the non-split-strike conversion accounts, administered by other BLMIS employees.

39.     DiPascali started at BLMIS on September 11, 1975.

40.     The House 17 AS/400 was designed to record and assist with the printing of the fictitious securities purportedly bought and sold by BLMIS, customer cash transactions, customer statements, trade confirmations, management reports, and Internal Revenue Service 1099 forms.

41.     Importantly, the House 17 AS/400 was not connected, interfaced and/or reconciled to any of the systems used to facilitate or execute the purchase and sale of securities at BLMIS.  It was a closed system, separate and distinct from any computer system utilized by the other BLMIS business units; consistent with one designed to mass produce fictitious customer statements.

---

[3] Of its thousands of customers, BLMIS provided customer statements in electronic form to only two customers, with six accounts between them.  Even though they were electronic, the statements consisted of merely data files. No customer had real time access to its account information and trading data because there was no such data or information to be had in light of the fact that no trading was conducted.

42.     As of about November 30, 2008, DiPascali was identified in the House 17 AS/400 as administering 4,659 active customer accounts, primarily the split-strike conversion accounts.

43.     As of about November 30, 2008, the House 17 AS/400 identified 244 active accounts administered by other BLMIS employees. A summary schedule of account management and purported equity and cash trend activity is annexed hereto as **Exhibit 4.**

44.     The House 17 AS/400 had software that could be utilized to enter fictitious "trades" with any desired price or trade date that could then be allocated, *pro rata*, to the various BLMIS customer accounts residing within its database.

45.     BLMIS employees input the components of alleged security trades (e.g. stock/option, price, date, and volume) into the House 17 AS/400.

46.     Inputting trade data into the House 17 AS/400 did not execute a buy or sell of a security, it merely created a record that could then be printed on a fictitious customer statement and trade confirmation.

47.     Because fictitious trades require no opposite broker to execute and complete the trade, no counterparties existed and none were identified in the House 17 AS/400 system.  None of the split-strike trades entered into the House 17 AS/400 were reconciled (or reconcilable) with the DTCC.

### DiPascali and the "Split-Strike Conversion" Strategy

48.     The strategy executed by DiPascali simulated a "basket of securities and options" based on a split-strike conversion strategy.  This strategy consisted of purported investment in a basket of common stocks within the S&P 100 Index hedged by a collar of put and call options to limit the potential client investment loss (or gain) that may be caused by normal stock price volatility.

49.     An examination of the BLMIS books and records reveals that the fictitious investment strategy focused on large cap stocks, presumably to preclude inquiry into the volume of stocks in which BLMIS was purportedly trading.

50.     The split-strike conversion strategy involved the purported "sale" of the baskets, moving customer funds completely "out of the market" to purported investments in Treasuries, money market funds, and cash reserves until the next presumed trading opportunity arose. At the end of each quarter, all baskets would be allegedly "sold" and allegedly "invested" in Treasuries or money market funds, and cash reserves.  The purported pricing and volume, i.e. purported value, of these alternative investments included the fictitious gains carried over from the BLMIS advantageous liquidation of purported baskets.

51.     However, no securities were actually purchased by BLMIS for its customers and the money received from a customer was not invested in securities for the benefit of that customer, but was instead primarily used to make distributions to, or payments made on behalf of, other investors as well as withdrawals and payments to Madoff family members and employees.

52.     Per SEC Rule 15c3-3 promulgated under the Securities Exchange Act of 1934, 17 C.F.R. § 240.15c3-3, brokers and dealers are required to maintain a "special reserve bank account for the exclusive benefit of customers."  This special reserve bank account is "separate from any other bank account of the broker or dealer."  The special reserve account is required to maintain a certain minimum balance according to the specifics of SEC Rule 15c3-3.

53.     Institutional investment managers who exercise investment discretion over accounts having $100 million or more in Section 13(f) securities (i.e., exchange traded or NASDAQ-quoted securities) must report their holdings on Form 13F to the SEC.  Form 13F

requires disclosure of the names of the institutional investment managers, the names of the securities they manage and the class of securities, the CUSIP number, the number of shares owned, and the total market value of each security.

54.      BLMIS maintained a balance of $20,000 in its 15c3-3 account from late 2002 until the Filing Date, which was wholly inadequate given the purported value of the customer accounts according to the specifics of SEC Rule 15c3-3.

55.      By allegedly "selling" the baskets before the end of the quarter, the equities in the baskets were not required to be disclosed in SEC Form 13F filings.

56.      At no point while customer funds were purportedly either "in the market" or "out of the market," however, were such funds invested as shown on the fictitious statements. Instead, to the extent that customer funds had not already been expended, they were held in the BLMIS 703 Account at Chase Bank.

57.      In fact, one of the money market funds in which customer resources were purportedly invested through BLMIS, as reflected on customer statements as late as 2008, was the Fidelity Brokerage Services LLC's "Fidelity Spartan U.S. Treasury Money Market Fund." However, Fidelity has acknowledged that, from 2005 onwards, Fidelity did not offer participation in any such money market fund for investment.

58.      To facilitate the efficient inputting of alleged trades, DiPascali allocated, and IA Business staff confirmed, that DiPascali directed the programming of a "basket trade" program within the AS/400.  This was essentially a mail-merge program, but instead of printing names and addresses from a data file to a boilerplate letter, this program applied a basket (or fraction or multiple thereof) of purported security trades to a BLMIS customer statement.

59.     Thus, one basket data file containing many fictitious trades could be replicated in customer statements of hundreds or thousands of customers without the need to manually type each trade on each customer statement.

60.     Baskets were created by DiPascali and his staff to initiate purported trading for a specific trade date. Stocks in a basket were "priced" after the market closed (i.e., with knowledge of the prior published price history), and customer statements were then fabricated by BLMIS personnel using the House 17 AS/400 based on the basket and available funds reported in a customer's account.  BLMIS staff confirmed it, the system facilitated it, and consistent returns could not have been achieved without it.

61.     For example, if a basket was $400,000 and a customer had $800,000 available, two (2) baskets of securities and options would be purportedly "purchased" for the account.

62.     The reported performance of the basket of stocks, selected from the S&P 100 Index, largely outperformed the movement of the S&P 100 Index overall due to the fabricated pricing and timing of the fictional basket "purchases" and "sales."  To create the illusion that these stocks had been purchased or sold, BLMIS employees would use the AS/400 and its software programs to fabricate customer statements printed with the purchase and sale of baskets mimicking the purported split-strike conversion strategy.

63.     BLMIS employees picked advantageous historical prices in order to achieve the sought after investment returns.

64.     Once a basket "trade" was identified as one that achieved the fictitious return desired, certain employees, known as "key punch operators," were provided with the relevant basket information that they entered manually into the House 17 AS/400.   The basket trade was then routinely (e.g., monthly) replicated in the selected BLMIS split-strike customer accounts

automatically and proportionally according to the fraction or number of baskets each customer's purported net equity could purportedly afford.

65.   The baskets were monitored via a Microsoft Excel model to ensure that the prices chosen after-the-fact obtained returns that were neither too high nor too low.

66.   With the benefit of backdating (i.e., with knowledge of previously published priced history), Madoff and his employees at BLMIS were able to consistently generate purported annual returns for split-strike conversion customer accounts generally between about 10 and 17%.

67.   Over the course of its existence, millions of pages of fictitious customer statements and confirmations were printed containing the increasing output of this compounded false profit fiction.

68.   Consistent with this strategy, the initial basket on a customer statement reflected purported purchases of stock and/or options comparable to the amount of principal invested with BLMIS.   By the time of the basket's purported liquidation, remnants of the principal were commingled in the BLMIS bank account or diverted for other purposes.

69.   By the time the next basket was "purchased," the false profits reportedly "earned" from the first basket were used to purportedly "buy" additional securities.

70.   These false profits were compounded time and again, every time the IA Business accounts purportedly "got into the market" or "out of the market."

71.   Accordingly, for each month after the initial customer statement, the only truthful and accurate information contained on BLMIS customer statements was the subsequent deposits and/or withdrawals of cash into the particular customer account.   Whether or not the customer conducted any cash transactions, the customer statements would reflect purported trading activity

and resulting gains on the securities purportedly purchased and/or sold on behalf of that customer.

72.     Because of the mass "buys" and "sells" in each fictitious basket over time; the fact that the IA Business "made up" trade dates and prices; the fact that in the aggregate, market volumes were exceeded; and, that trades were not directed by customers, it is impossible to trace a customer's money to specific trades.  Even with respect to the first purported basket purchase, a customer's money may not equal the value of the securities purportedly purchased because the prices and trade dates were advantageously fabricated by the IA Business.  For this reason, no market price can be ascertained.

73.     Because customer funds were never exposed to the market, customer funds were not exposed to the uncertain risks associated with price movement in the market.

### The Non-Split-Strike Accounts

74.     The purported trading strategy executed on behalf of the non-split-strike conversion accounts was equally as fictitious as DiPascali's purported "split-strike conversion" strategy.

75.     The non-split-strike conversion customer accounts included many long time customers of Madoff, including Stanley Chais's feeder funds and personal accounts, Jeffry Picower's personal and business accounts, and accounts held by various Madoff family members and employees.  There were less than 245 of these and other accounts (i.e., accounts not assigned to Frank DiPascali), representing approximately 5% of the total active accounts as of November 30, 2008.

76.     The non-split-strike conversion accounts reported unusually high rates of return, often in excess of 100%, in excess of the purported 10-17% that the accounts utilizing the split-

strike strategy reported.  This rate of return is based on the IA Business AS/400 and/or company books and records including portfolio management reports.

77.    BLMIS prepared customer statements for non-split-strike conversion strategy customer accounts that simulated engineered gains and losses through simulated one-off trades (i.e., not basket trades as described above).  The customer statements were based on selections of stock and related prices using already published trading data in hindsight.  Based on the analysis of BLMIS books and records conducted, there was backdating.  This analysis included the reconstruction of timelines using time-stamped records or proxies of approximate time-stamps.

78.    The non-split-strike conversion strategy customer accounts were handled on an account-by-account basis, meaning each of the trades were keyed into the trading system manually.  Thousands of documents including customer statements, IA staff notes, account folders, and programs in the AS/400 were reviewed, and these documents confirm the fact that such statements were prepared on an account-by-account basis (i.e., not basket trading).

79.    Consistent with the above, virtually none of the trades purportedly conducted on behalf of the non-split strike conversion strategy account holders took place.

**The Trading Did Not Occur**

80.    To the extent records are available, BLMIS did not act as a true investment adviser in the interest of its customers and virtually no securities were purchased on behalf of customers of the IA Business.

81.    For select months pertaining to select baskets of trades that the IA Business purportedly executed over time, ranging from 2002 to 2008, we compared basket files to the customer statements and to third party sources.

82.     DTCC serves as a custodian for stock and government securities issued in the United States.  As part of FTI's retention in this matter, transactions as recorded on BLMIS customer statements were compared to both House 5 AS/400 settled trade data and BLMIS DTCC records.  The scope of this effort was limited to available DTCC records, and these records were made available to us from February 2002 through the date of the November 2008 BLMIS customer statements, the last statements prepared by BLMIS prior to the Filing Date.

83.     In addition to DTCC and the BLMIS bank records, a review of responses received from various entities that may have information regarding possible IA Business option and equity trading activity was performed.  These entities consisted of clearing firms, exchanges, and possible trading counterparties. The determination to request information from these parties was based on evidence of BLMIS's interaction with these organizations.

84.     Specifically, a review of responses produced pursuant to subpoena, from the following entities, was performed:

a)     Options Clearing Corporation ("OCC")

b)     Clearstream Banking, S.A. ("Clearstream")

c)     Chicago Board Options Exchange ("CBOE")

d)     Chicago Mercantile Exchange/Chicago Board of Trade ("CME/CBOT")

e)     BATS Exchange, Inc.

f)     Knight Capital Group, Inc.

g)     Interactive Brokers, LLC

85.     The purpose of the review was to determine whether any materials produced by these entities were indicative of IA Business trading activity.

86.     Akin to the role of DTCC for equities and government debt securities, the OCC serves as the central clearing house for exchange traded options listed on a United States

exchange. Because the Standard and Poor's 100 Index Options (the "S&P 100 Index Options") are listed on the CBOE, these options would clear through OCC.

87.    Trading records for several specific dates from the OCC pertaining to select baskets of trades that the IA Business purportedly executed over time, ranging from 2002 to 2008, were obtained.  The OCC records confirm that the mass volume and timing of S&P 100 options trades that would have been necessary to execute the split-strike conversion strategy that the IA Business was purportedly utilizing, were not executed through OCC; and, this conclusion was further supported by information from CBOE.

88.    A review of subpoena responses received from the above listed entities for evidence of the mass equity trade executions that would have been required to effectuate the purported split-strike conversion strategy was performed.  No evidence was found to support the requisite mass trading.

89.    BLMIS had purportedly told some of its investors that it purchased the index options required to execute the split-strike conversion strategy in the OTC market. While this was unlikely due to the costs that would have been associated therewith, there was no evidence to support BLMIS' claim of transacting in the OTC market such as executed International Swaps & Derivatives Master Agreements ("ISDA") between OTC counterparties.

90.    In total, more than 99.9% of the equity trades as recorded in the IA Business customer statements could not be traced through the House 5 settled trade data file or to DTCC records.

91.    The House 5 AS/400 settled trade data file is BLMIS' system of record (i.e., corporate archive) for all House 5 trades that have settled. It is the source from which productions of trade data were historically made to regulated entities for examination and review.

92.     Consistent with our findings as to the differences between the House 5 and House 17 AS/400 systems, the House 17 system does not include a "settled trade" data file. Instead, House 17 maintained only a "settled cash" data file. This file contains all IA customer account activity, including alleged trades, deposits, withdrawals, and dividends

93.     House 5 was also not used to execute transactions for any of the purported split-strike conversion customer's accounts, described herein.

94.     No IA Business customers held legitimate equities in House 5 and/or DTCC as of November 30, 2008. However, one customer was reported to hold bonds.

95.     A relatively small amount of a single customer's IA Business transactions were similar to House 5 transactions, and there was evidence of directed trades. This customer sent checks to BLMIS with memos on the checks directing the purchase of specific securities. FTI did find similar securities purchased via the House 5 trading systems and at DTCC for this one customer.

96.     As described above, BLMIS customer statements listed the sale of Treasuries and other money market funds to generate the cash required to purportedly purchase the basket securities. Review of DTCC and third party bank records support neither BLMIS's custody of the securities, nor the funds that would have been required to purchase such basket securities.

97.     In many instances, there were not enough put and/or call option contracts available at the Chicago Board Options Exchange ("CBOE") to hedge properly the required volume, and in fact accomplish a split-strike conversion strategy, for the securities positions recorded on the BLMIS customer statements.

98.    For example, in October 2002, BLMIS customer statements for 4,128 accounts falsely report the sale of $17.9 billion of Treasuries and money market funds as the means to purchase imaginary baskets of securities of similar value.

99.    In October 2002, the 703 Account and related investments comprised less than $240 million and none of the $240 million was used to purchase securities for the 4,128 split-strike conversion account customers.  See diagram annexed hereto as **Exhibit 5.**

100.    The size of each imaginary "basket of securities and options" is staggering. For example, for the October 11, 2002 basket, the volume of S&P 100 ("OEX") options traded at the CBOE was reviewed.  On that date, CBOE reported OEX volume of 6,298 calls and 6,407 puts. In contrast, BLMIS applied an imaginary basket to 279 accounts with a volume of 82,959 OEX calls and 82,959 puts – more than approximately 13 times the CBOE volume.  See chart annexed hereto as **Exhibit 6.**

101.    As an additional example, the aggregation of trades on customer statements reflect an October 16, 2002 purchase of 17.8 million shares of Exxon Mobil ("XOM") – these purported aggregated trades for the BLMIS IA Business would have exceeded the XOM market volume for that day by 131%. In contrast, DTCC records indicate the maximum BLMIS position for XOM in October of 2002 was just 5,730 shares.

102.    These are not isolated incidents.  BLMIS customer statements routinely falsely recorded millions and tens of millions of shares within imaginary baskets; however, DTCC records indicated that BLMIS held thousands or perhaps tens of thousands of shares – shares that are traceable to the House 5 business and not the IA Business, as **Exhibit 7** annexed hereto, illustrates.

103.    Had these two basket trades of securities actually occurred, the massive volume of the transactions printed to the BLMIS customer statements in aggregate would have almost certainly had an impact on the market price of each such security, and in certain instances such as the XOM example described above, may not have been possible due to sheer volume alone.

104.    Over time the volume of the fiction grew.  For example, the volume of Amgen (AMGN) positions falsely reported on the November 30, 2008 customer statements would amount to more than 3 times the daily exchange traded volume on the Filing Date, or any other date in December of 2008 for that matter.  Similarly, HP (HPQ) would be more than 2 times such volume, and Microsoft (MSFT) would be more than 1.5 times such volume.

105.    Just as BLMIS did not have the funds to purchase the fictitious baskets of securities, it did not have the funds required to purchase the Treasuries listed on customer statements as part of that strategy.  For example, the October 2002 customer statements falsely report a face value of $23 billion of Treasuries at the start of the month and $8.2 billion at the end of the month.  At this time, DTCC reports that BLMIS never held more than $84 million in treasuries.

106.    We identified many occurrences where purported trades were outside the exchange's low/high price range for the trade date.  For example, in one instance a monthly account statement for December 2006 reported a sale of Merck (MRK) with a settlement date of December 28, 2006.  BLMIS records reflect a trade date of December 22, 2006 at a price of $44.61 for this transaction.  However, the daily price range for Merck stock on December 22, 2006 was a low of $42.78 to a high of $43.42.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 16, 2009
        New York, New York

                                        */s/ Joseph Looby*
                                        Joseph Looby, CFE
                                        Senior Managing Director
                                        FTI Consulting, Inc
                                        Three Times Square, 11th Floor
                                        New York, NY 10036

08-01789-cgm    Doc 524-1    Filed 10/16/09    Entered 10/16/09 19:54:33    Declaration
of Joseph Looby in Support of Trustees Motion    Pg 22 of 37

Exhibit 1

# JOSEPH H. LOOBY, J.D., C.F.E.

| | |
|---|---|
| **POSITION** | Senior Managing Director, FTI |
| **EDUCATION** | J.D., Union University School of Law at Albany, New York |
| | B.A. in Economics, Fordham University |

**RANGE OF EXPERIENCE**

Joe Looby is a senior managing director in FTI's Technology segment, delivering consulting expertise and advanced technology for investigations, antitrust and complex litigation matters. He has provided expert testimony and consulting on economic and technology issues and appeared before regulatory agencies on diverse technology matters.

Mr. Looby has spoken and written extensively on litigation technology, electronic evidence and computer forensics, and he is a contributing author and lecturer at the Sedona Conference, for projects including: Search & Retrieval Sciences; and, Achieving Quality in E-Discovery.

Joe has also participated in studies on search technology effectiveness, sponsored by the National Institute of Standards and Technology (NIST) and DOD Advanced Research and Development Activity (ARDA).

Prior to joining FTI, Mr. Looby provided forensic technology leadership to Deloitte's National Audit Technology Steering Committee, towards the detection of fraud in financial statement audits; he trained a team of more than 50 forensic technologists and accountants on the FASTech data interrogation approach; and, he led Deloitte's nationally deployed FASTech teams to perform forensic procedures for high-risk billion-dollar market cap audit clients.

Mr. Looby is a former U.S. Navy JAG Lieutenant, an experienced regulator, and published software developer.

**EXAMPLES OF PROFESSIONAL AND BUSINESS EXPERIENCE**

**Investigations & Antitrust – Technology:** Leader of forensic and technology teams on numerous highly confidential internal and regulatory investigations. Responded to regulator, audit committee, auditor and whistleblower concerns using forensics and technology, including for example computer forensics, investigation of accounting systems, and interviews of technology and business professionals.

**Pharmaceutical – Electronic Evidence:** Led a team that assisted an international pharmaceutical company in response to a multibillion

08-01789-cgm   Doc 524-1   Filed 10/16/09   Entered 10/16/09 19:54:33   Declaration
of Joseph Looby in Support of Trustees Motion   Pg 23 of 37

Exhibit 1

**EXAMPLES OF PROFESSIONAL AND BUSINESS EXPERIENCE (Continued)**

dollar class action, and regulatory investigation. The project involved more than 60 custodian's email and electronic files. Thousands of DVDs and numerous external hard drives were indexed and compiled into a comprehensive online review environment. FTI supported multiple review teams, across 5 client offices located throughout the EU and US. This engagement utilized advanced processing, review, and production technologies including Attenex, Ringtail and FTI proprietary software.

**Services – Accounting Investigation:** Led a team of forensic accounting and technology experts for outside counsel to a large, publicly-traded staffing company that was facing possible accounting, control and compliance issues at its North American operations that stalled the release of its financials. The company's audit and finance committee began an internal investigation into the issues while facing investigations from the SEC and U.S. Attorney's Office. FTI team assessed and analyzed the company's complex staffing management, payment, and billing systems, including the largest PeopleSoft implementation in the world. The team identified systems control issues relating to shared computer IDs that turned out to be a chief concern of the auditors.

**Manufacturing – Lost Profits:** Assisted defendant in a lawsuit alleging breach of contract and lost profits. Assisted with the discovery and analysis of financial data from plaintiff's various global accounting information systems. Tested the profitability of the product group used by plaintiff's expert and determined that he relied on the wrong one. Identified the correct one and determined that it was an unprofitable product line. This challenged plaintiff's claim for lost profits, and the case was favorably settled.

**Pharmaceutical – Licensing Dispute:** Assisted with a multibillion dollar pharmaceutical licensing dispute. The claim involved pricing, incentives, market share, and 10 years of sales. The parties provided 35 CDs of contracts, nine sales databases, four customer databases and two market share databases. Integrated the disparate data and built a computer model. The computer model showed the timing and effect of plaintiff's improper practices. Before trial, plaintiff retracted each claim that we were asked to test and respond to in our expert report.

**Health Care – Employee Fraud:** Engaged by an HMO to investigate a key executive suspected of committing a fraud. We used computer forensic technology to copy the suspect's hard drives, restore deleted files and search through e-mail and electronic files. Fraudulent invoices, e-mail, deleted and other suspicious files were recovered. Based on these leads, we designed tests to mine data and interrogate the client's financial systems. Through this process, we reduced the

08-01789-cgm   Doc 524-1   Filed 10/16/09   Entered 10/16/09 19:54:33   Declaration
of Joseph Looby in Support of Trustees Motion   Pg 24 of 37

Exhibit 1

**EXAMPLES OF
PROFESSIONAL
AND BUSINESS
EXPERIENCE
(Continued)**

number of "questionable" vendors/payments from 5,000 vendors and 35,000 payments to 48 vendors and 345 payments.

**Hospitality – Class Action:** Investigated the client's systems regarding alleged failure to pay overtime for hours worked. Our investigation revealed that overtime was tracked via monthly payroll reports and the supporting documentation was largely handwritten paper documents. We scanned and coded the documents, imported them into a litigation database (LDB), and wrote a software program to match payroll records to supporting documentation. Our client used the LDB to show that a system to track overtime was in place, significant overtime was in fact paid, and the named plaintiffs were not representative of the larger putative class.

**Advertising Firm – Fraud Detection:** Investigated the client's purchasing system regarding an employee who allegedly colluded with vendors to transfer charges between jobs. We determined the employee's transfer method, mapped seven years of archived data into a LDB, wrote a software program to identify suspect invoices, and pinpointed 220 (out of an original population of 85,000) invoices that were fraudulent.

**Food & Feed – SEC Investigation:** Assisted with an investigation of improper revenue recognition. We gathered six years of sales data from disparate corporate systems, restored data from backup tapes and built a data warehouse of over two billion records. Accounting staff reconciled the data to financial statements filed with the SEC. Technical staff designed complex algorithms to data mine the warehouse and identify transactions not compliant with GAAP. Economic staff statistically sampled and quantified the data as the company's basis for re-statement. Forensic staff imaged laptop computers to restore deleted files and review e-mails.

**Leasing – Purchase Price Dispute:** Assisted an investment bank with a purchase price dispute for its client, the seller of a three billion dollar equipment leasing company. The seller relied on a proprietary program to manage its portfolio of millions of leases. We wrote a custom software program to convert the client's data into a useable format. We data mined the lease portfolio and rapidly identified an anomalous cluster of high value leases that were written off with low residual values. Our efforts uncovered a basis to restate millions of dollars of value to the company.

**Mining – Environmental Insurance Claim:** Assisted a law firm with an environmental insurance claim. The claim was based on coverage for the client's historic environmental events. The client had completed a merger, and its information systems were transitioning

**EXAMPLES OF PROFESSIONAL AND BUSINESS EXPERIENCE (Continued)**

from local to global operation. To prove the claim, we retrieved and quantified three decades of environmental cost evidence from the client's existing and retired information systems and archives.

**Health Care – Medical Claim Fraud:** Engaged by a leading health care provider to review medical claims to identify indicators of fraud and abuse. The client's claims data were reconcilable with its management reports. We reconciled the data, imported it into our system, and data mined for providers that met fraud and abuse indicators. From the original 20,000 health care providers, we identified 170 that were positive for the indicators. Without reviewing "paper" claims, we identified suspicious claims in the one-half to three million dollar range.

**Manufacturing – Vendor Fraud:** Investigated allegations by a whistle-blower that a company's purchasing officer was sending business to preferred vendors for kickbacks. We retrieved four years of vendor payment data and applied data mining to the vendor payment transactions. We tested the data for anomalous vendor shifts, product price spikes, and preferential payment terms. We identified 400 vendors that had been shifted to despite the fact that such vendors charged a higher price for a generic product. We quantified the loss at one million dollars over the four-year period.

**Banking – Payment Tracing:** Engaged by a foreign bank to assist with a dispute over alleged interbank payments. Plaintiff's expert extracted financial communication (SWIFT) messages from back-up tapes, matched the messages to payment requests, and quantified the matched payments. We rebutted plaintiff's expert report based upon plaintiff's unreliable matching method and its failure to consider data that indicated whether a payment message had been rejected, pended, failed or receipted.

**TESTIMONY EXPERIENCE**

Hoechst Celanese Corporation v. XL Insurance (Bermuda) Company Ltd. (testified). Mr. Looby has also presented to regulatory agencies, auditors and audit committees.

**SELECTED PUBLICATIONS**

Achieving Quality in the E-Discovery Process, The Sedona Conference, Contributor, May 2009.

What If Search Terms Only Find 50 Percent Of Relevant Documents? Information Management, December 2008.

Best Practices on the Use of Search & Information Retrieval Methods in E-Discovery, The Sedona Conference, Contributor, Fall 2007.

08-01789-cgm   Doc 524-1   Filed 10/16/09   Entered 10/16/09 19:54:33   Declaration
of Joseph Looby in Support of Trustees Motion   Pg 26 of 37

Exhibit 1

| | |
|---|---|
| **PATENTS/ COPYRIGHTS** | System, Software and Method for Examining a Database in a Forensic Accounting Environment, U.S. Patent 7,590,658, Co-Inventor. |
| | VISTA, Copyright 1999-2000. |

**REGULATORY & LEGAL EXPERIENCE**

**NYS Department of Environmental Conservation – General Counsel's Office ("DEC").** Enforcement Attorney, 4/1993 – 7/2000.

Designed and programmed VISTA, a software program used by hundreds of professionals to track the detection and resolution of environmental violations. The software includes business intelligence components that enable managers to: estimate the resolution of case backlogs, assure compliance with EPA enforcement policy, identify trends in enforcement, and prioritize staff resources.

On a statewide basis, prosecuted CAA, CWA & RCRA (air, water and solid waste) multi-media administrative enforcement actions. Analyzed proposed enforcement settlements to ensure conformance with applicable State and Federal enforcement response and penalty assessment policies.

Lead counsel for CERCLA / Superfund efforts to recover natural resource damages. Negotiated the recovery of more than twenty million dollars in damages. Advised scientific staff on proof of harm and economic staff on valuation of harm. Liaison with Federal agencies and Tribal governments.

Represented DEC to the EPA Multi-Program Enforcement Steering Committee and the Environmental Council of States' Enforcement Coordination Forum. Advised on enforcement indicators, penalties, commitments, and targeting.

Presenter of numerous speeches to forums including the NYS Bar Association, and the NYS Business Council. Authored an article for the Albany Law School Environmental Outlook.

**U.S. MILITARY SERVICE**

**US Navy Judge Advocate General's Corps ("JAG").** Lieutenant, 8/1989 -6/1993.

Served as general counsel for a US Navy Industrial Design, Manufacture and Test Center. Negotiated with EPA on all aspects of the center's environmental compliance. Prosecuted / defended at courts-martial and administrative discharge boards, investigated incidents, and handled civil matters for Navy personnel.

# Ex. 2: BLMIS Systems Detail – Open vs. Closed Systems

## 18-19th Floor – Market Maker



## 17th Floor – Investment Advisor





**Open System**

**Closed System**

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC

885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

## TRADING AUTHORIZATION LIMITED TO PURCHASES
## AND SALES OF SECURITIES AND OPTIONS

To Whom It May Concern:

The undersigned hereby authorizes Bernard L. Madoff (whose signature appears below) as his agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities in accordance with your terms and conditions for the undersigned's account and risk and in the undersigned's name, or number on your books. The undersigned hereby agrees to indemnify and hold you harmless from, and to pay you promptly on demand any and all losses arising therefrom or debit balance due thereon.

In all such purchases, sales or trades you are authorized to follow the instructions of Bernard L. Madoff in every respect concerning the undersigned's account with you; and he is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades.   All purchases, sales or trades shall be executed strictly in accordance with the established trading authorization directive.

The undersigned hereby ratifies and confirms any and all transactions with you heretofore or hereafter made by the aforesaid agent or for the undersigned's account.

This authorization and indemnity is in addition to (and in no way limits or restricts) any rights which you may have under any other agreement or agreements between the undersigned and your firm.

This authorization and indemnity is also a continuing one and shall remain in full force and effect until revoked by the undersigned by a written notice addressed to you and delivered to your office at 885 Third Avenue New York, NY.  Such revocation shall not affect any liability in any way resulting from transaction initiated prior to such revocation.  This authorization and indemnity shall enure to the benefit of your present firm and any successor firm or firms irrespective of any change or changes at any time in the  personnel thereof for any cause whatsoever, and of the assigns of your present firm or any successor firm.

Dated, _11/8/04_



(City)                                    (State)

Very truly yours, _____

(Client Signature)

Signature    of    Authorized    Agent: _____

**Affiliated with:**
**Madoff Securities International Limited**
**12 Berkeley Street, Mayfair, London W1J 8DT. Tel 020-7493 6222**

AMF00151195

**MADF**    **BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

## OPTION AGREEMENT

In order to induce you to carry accounts ("Option Accounts") for me (however designated) for transactions in option contracts (including, without limitations, purchase, sale, transfer and exercise) ("Option Transaction"), I hereby warrant, represent and agree with you as set forth below on this Option Agreement.

1.    I understand, and am well aware, that option trading may be speculative in nature. I am also aware that on certain days, option trading may cease and this could result in a financial loss to me.  I agree to hold the company, its other divisions, and its officers, directors and agents harmless for such loss.

2.    I understand that any option transaction made for any account of mine is subject to the rules, regulations, customs and usages of The Options Clearing Corporation  and of the registered national securities exchange, national securities association, clearing organization or market where such transaction was executed. I agree to abide by such rules, regulations, custom and usages and I agree that,  acting individually or in concert with others, I will not exceed any applicable position or exercise limits imposed by such exchange, association, clearing organization or other market with respect to option trading.

3.    If I do not satisfy my transaction obligations on a timely basis,  you  are authorized in your sole discretion and without notification, to take  any and all steps you deem necessary to protect yourself (for any reason)  in connection with option transactions for my account including the right  to buy and/or sell  for my  account and risk any part or all of the shares represented by options  handled, purchased, sold for my account, or to buy  for my account and risk any option as you may deem necessary or  appropriate.  Any and all expenses or losses incurred in this connection will be reimbursed by me.

4.    In addition to the terms and conditions  hereof,  my option account will be subject to all of the terms and conditions of all other agreements heretofore or hereafter at any time entered into with you relating to the  purchase and sale of securities except to the extent that such other agreements are contrary to  or inconsistent herewith.

**Affiliated with:**
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1J 8DT. Tel 020-7493 6222

AMF00151196

EXHIBIT 3

5.    This agreement shall apply to all puts or calls which you may have executed, purchased, sold or handled for any account of mine and also shall apply to all puts, or calls which you may hereafter purchase, sell, handle or execute for any account of mine.

6.    I have received from the company the most recent risk disclosure document entitled "Characteristics and Risks of Standardized Options". I have read and understand the information contained in this document.

7.    I understand that you assign exercise notices on a random basis. You may preferentially assign exercises of block-size (i.e. covering $1,000,000 or more of underlying securities) to block-size writing positions and you may preferentially assign smaller exercises to smaller writing positions. I understand that upon my request you will provide me with further information regarding the procedure used to assign exercise notices.

DATED _____    ACCOUNT NO. 1B00943 _____

SIGNATURES

(If a Corporation)    (If Individuals)

_____    ████████████████
(Name of Corporation)

By_____    _____
(Second Party if Joint Account)

Title_____    (If a Partnership)

_____
(Name of Partnership)

SEAL

By_____
(A Partner)

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

### CUSTOMER AGREEMENT

In consideration for you (the "Broker") opening or maintaining one or more accounts (the "Customer"), the Customer agrees to the terms and conditions contained in this Agreement. The heading of each provision of the Agreement is for descriptive purposes only and shall not be deemed to modify or qualify any of the rights or obligations set forth in each such provision. For purposes of this Agreement, "securities and other property" means, but is not limited to money, securities, financial instruments of every kind and nature and related contracts and options. This definition includes securities or other property currently or hereafter held, carried or maintained by you or by any of your affiliates, in your possession or control, or in the possession or control of any such affiliate, for any purpose, in and for any of my accounts now or hereafter opened, including any account in which I may have an interest.

**1. APPLICABLE RULES AND REGULATIONS**

All transactions in the Customer's Account shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed by the Broker or its agents, including its subsidiaries and affiliates. Also, where applicable, the transactions shall be subject (a) to the provisions of the Securities Exchange Act of 1934, as amended, and (b) to the rules and regulations of (1) the Securities and Exchange Commission and (2) the Board of Governors of the Federal Reserve System.

**2. AGREEMENT CONTAINS ENTIRE UNDERSTANDING/ASSIGNMENT**

This Agreement contains the entire understanding between the Customer and the Broker concerning the subject matter of this Agreement. Customer may not assign The rights and obligations hereunder without first obtaining the prior written consent of the Broker.

**3. SEVERABILITY**

If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not effect the validity of the remaining provisions of this Agreement.

**4. WAIVER**

Except as specifically permitted in this Agreement, no provision of this Agreement can be, nor be deemed to be, waived, altered, modified or amended unless such is agreed to in a writing signed by the broker.

**5. DELIVERY OF SECURITIES**

Without abrogating any of the Broker's rights under any other portion of this Agreement and subject to any indebtedness of the Customer to the Broker, the Customer is entitled, upon appropriate demand, to receive physical delivery of fully paid securities in the Customer's Account.

**6. SALES BY CUSTOMER**

The Customer understands and agrees any order to sell "short" will be designated as such by the Customer, and that the Broker will mark the order as "short". All other sell orders will be for securities owned ("long"), at that time, by the Customer by placing the order the Customer affirms that he will deliver the securities on or before the settlement date.

Affiliated with:
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1J 8DT. Tel 020-7493 6222

AMF00151198

**7. BROKER AS AGENT**

The customer understands that the Broker is acting as the Customer's agent, unless the Broker notifies the Customer, in writing before the settlement date for the transaction, that the Broker is acting as dealer for its own account or as agent for some other person.

**8. CONFIRMATIONS AND STATEMENTS**

Confirmations of transactions and statements for the Customer's Account(s) shall be binding upon the Customer if the Customer does not object, in writing, within ten days after receipt by the Customer.

**9. SUCCESSORS**

Customer hereby agrees that this Agreement and all the terms thereof shall be binding upon Customer's heirs, executors, administrators, personal representatives and assigns. This Agreement shall ensure to the benefit of the Broker's present organization, and any successor organization, irrespective of any change or changes at any time in the personnel thereof, for any cause whatsoever.

**10. CHOICE OF LAWS**

THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF _____ AND SHALL BE CONSTRUED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAWS OF THE STATE OF _____.

**11. CAPACITY TO CONTRACT; CUSTOMER AFFILIATION**

By signing below, the Customer, represents that he/she is of legal age, and that he/she is not an employee of any exchange, or of any corporation of which any exchange owns a majority of the capital stock, or of a member of any exchange, or of a member firm or member corporation registered on any exchange, or of a bank, trust company, insurance company or of any corporation, firm or individual engaged in the business of dealing, either as broker or as principal, in securities, bills of exchange, acceptances or other forms of commercial paper, and that the Customer will promptly notify the Broker in writing if the Customer is now or becomes so employed. The Customer also represents that no one except the Customer has an interest in the account or accounts of the Customer with you.

**12. ARBITRATION DISCLOSURES**

\* ARBITRATION IS FINAL AND BINDING ON THE PARTIES.

\* THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

\* PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.

\* THE ARBITRATORS AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.

\* THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

AMF00151199



**13. ARBITRATION**

THE CUSTOMER AGREES, AND BY CARRYING AN ACCOUNT FOR THE CUSTOMER THE BROKER AGREES THAT ALL CONTROVERSIES WHICH MAY ARISE BETWEEN US CONCERNING ANY TRANSACTION OR THE CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN US PERTAINING TO SECURITIES AND OTHER PROPERTY, WHETHER ENTERED INTO PRIOR, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED PURSUANT TO THE FEDERAL ARBITRATION ACT AND THE LAWS OF THE STATE DESIGNATED IN PARAGRAPH 10, BEFORE THE AMERICAN ARBITRATION ASSOCIATION, OR AN ARBITRATION FACILITY PROVIDED BY ANY EXCHANGE OF WHICH THE BROKER IS A MEMBER, OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. AND IN ACCORDANCE WITH THE RULES PERTAINING TO THE SELECTED ORGANIZATION. THE CUSTOMER MAY ELECT IN THE FIRST INSTANCE WHETHER ARBITRATION SHALL BE BY THE AMERICAN ARBITRATION ASSOCIATION, OR BY AN EXCHANGE OR SELF-REGULATORY ORGANIZATION OF WHICH THE BROKER IS A MEMBER, BUT IF THE CUSTOMER FAILS TO MAKE SUCH ELECTION, BY REGISTERED LETTER  ADDRESSED TO THE BROKER AT THE BROKER'S MAIN OFFICE, BEFORE THE EXPIRATION OF TEN DAYS AFTER RECEIPT OF A WRITTEN REQUEST FROM THE BROKER TO MAKE SUCH ELECTION, THEN THE BROKER MAY MAKE SUCH ELECTION, THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION.

**14. DISCLOSURES TO ISSUERS**

Under rule 14b-1(c) of the Securities Exchange Act of 1934, we are required to disclose to an issuer the name, address, and securities position of our customers who are beneficial owners of that issuer's securities unless the customer objects.  Therefore, please check one of the boxes below:

___ Yes, I do object to the disclosure of information.

_✓_ No, I do not object to the disclosure of such information.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 13.



(X)_____          (X)_____
(Customer Signature/date)                    (Customer Signature/date)

_____                1B0094-3
(Customer Address)                             (Account Number)

_____

AMF00151200

# Ex. 4: Account Managers *(active accounts only as of 11/30/08)*







| Manager | Count of Accounts | Ending Customer Statement Balance |
|---------|-------------------|-----------------------------------|
| Frank | 4,659 | $54,469,790,798 |
| Other | 244 | $10,354,616,613 |

**$64,824,407,412**

## WHAT HAPPENED AT BLMIS



**E Q U I T Y**

| 48 stocks $410,000 | 48 stocks $431,000 | 48 stocks $440,000 | 37 stocks $440,000 |
|---|---|---|---|
| 10/11/02 | 10/15/02 | 10/16/02 | 10/16/02 REG |
| $3.4B | $4.0B | $4.1B | $6.4B |
| 279 Customers | 279 Customers | 279 Customers | 3,849 Customers |

| | | | | |
|---|---|---|---|---|
| MIN | CM089 - 4.4 | 1CM089 - 4.9 | 1CM089 - 4.9 | 1A0102 - 0.1 |
| MAX | 1FN012 - 874.5 | 1FN012 - 982.4 | 1FN012 - 987.8 | 1H0148 - 25.4 |

## WHAT HAPPENED ELSEWHERE



**C A S H**

|  | **Buy** | **Sell** | **Total** |
|---|---|---|---|
| **FIDELITY SPARTAN** | $53,412,040.00 | $121,248,206.00 | ($67,836,166.00) |
| **U S Treasury Bill** | $7,692,180,476.40 | $25,497,799,792.40 | ($17,805,619,316.00) |
| **Total** | 7,745,592,516 | 25,619,047,998 | (17,873,455,482) |

**$17.9 billion**



< 240 million

"703" Account and Related Investments Ending Balances

| CBOE Volume<br>*October 11, 2002 (Trade Date)* |  | Call (420¹) | Put (410¹) |
|---|---|---|---|
| | | **6,298** | **6,407** |

| | Participants in<br>October 11, 2002 Basket | Call (420¹) | Put (410¹) |
|---|---|---|---|
| **BERNARD L. MADOFF**<br>INVESTMENT SECURITIES LLC<br>New York □ London | | **Puts/Calls**<br># of each | **% of Volume** | **% of Volume** |

| | | Puts/Calls<br># of each | % of Volume | % of Volume |
|---|---|---|---|---|
| 1 | 1-FN069 | 8,745 | 139% | 136% |
| 2 | 1-FN070 | 8,363 | 133% | 131% |
| 3 | 1-FN061 | 7,504 | 119% | 117% |
| 4 | 1-FR008 | 4,124 | 65% | 64% |
| 5 | 1-C1260 | 3,250 | 52% | 51% |
| 6 | 1-FN094 | 2,703 | 43% | 42% |
| 7 | 1-FN095 | 2,610 | 41% | 41% |
| 8 | 1-FN005 | 2,389 | 38% | 37% |
| 9 | 1-A0058 | 2,103 | 33% | 33% |
| 10 | 1-D0026 | 1,784 | 28% | 28% |
| | **Remaining 269 Accounts** | 39,384 | 625% | 615% |
| | **BLMIS BASKET TOTAL** | **82,959** | **1,317%** | **1,295%** |

¹ This represents the strike price of the option



# Ex. 7: DTCC Securities Reconciliation *(10/2002)*

* These securities are traceable to the Market Making business, and not the Investment Advisory business.