# EXHIBIT C



## US2C2002-6166-01

{D4E769BA-2DDB-4CE1-955B-1ECD31E32F8F}
{51036}{41-040409:121043}{101702}

# APPELLANT'S

# BRIEF

# 02-6166

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

In re:

### NEW TIMES SECURITIES SERVICES, INC. and NEW AGE FINANCIAL SERVICES, INC.,

*Debtors,*

MYRNA K. JACOBS, SIMON and HELGA NOVECK, MIRIAM SEIDENBERG, FELICE LINDER, ANGELO SCARLATA, the ROSE MARIE CEPARANO IRREVOCABLE TRUST, the ESTATE of ALLAN A. BLYND, SALVATORE and STELLA DIGIORGIO, PROJECT EARTH ENVIRONMENTAL FUNDRAISERS, INC., NEW YORK OPTICAL, INC., the CARL CARTER IRREVOCABLE TRUST, CRAIG ROFFMAN, ELLEN ESCHEN, and JILL GUNDRY,

*Claimants-Appellees.*



ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLANTS JAMES W. GIDDENS AS TRUSTEE FOR THE LIQUIDATION FOR THE BUSINESSES OF NEW TIMES SECURITIES SERVICES, INC. and NEW AGE FINANCIAL SERVICES, INC., and SECURITIES INVESTOR PROTECTION CORPORATION

JAMES B. KOBAK, JR.
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Attorneys for Appellant James W. Giddens
as Trustee for the Liquidation of the
Businesses of New Times Securities Services Inc.,
and New Age Financial Services, Inc.*

STEPHEN P. HARBECK
KAREN A. CAPLAN
SECURITIES INVESTOR PROTECTION CORPORATION
*Appellant*
805 Fifteenth Street, N.W., Suite 800
Washington, D.C. 20005-2207
(202) 371-8300

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellants James W. Giddens, as Trustee
for the liquidation of the businesses of the substantively consolidated estates of
New Times Securities Services, Inc., and New Age Financial Services, Inc., and
the Securities Investor Protection Corporation certify that they have no corporate
parents, affiliates and/or subsidiaries which are publicly held.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

PRELIMINARY AND JURISDICTIONAL STATEMENT ..................................... 1

STATEMENT OF ISSUES .................................................................... 2

STATEMENT OF THE CASE ................................................................ 3

STATEMENT OF FACTS .................................................................... 4

SUMMARY OF THE ARGUMENT ........................................................ 9

STANDARD OF REVIEW .................................................................. 13

ARGUMENT .............................................................................. 14

I.    THE TRUSTEE CORRECTLY DETERMINED THAT THE
      DISPUTED CLAIMS SHOULD BE TREATED AS CLAIMS
      FOR CASH AND NOT CLAIMS FOR THE FICTITIOUS
      VALUE OF THE BOGUS MUTUAL FUND ......................................... 14

      A.   ALL CASE LAW ON POINT SUPPORTS THE
           TRUSTEE'S DETERMINATIONS .............................................. 14

      B.   SIPA AND ITS LEGISLATIVE HISTORY AND
           PURPOSE SUPPORT THE TRUSTEE'S
           DETERMINATIONS ........................................................... 19

           1.   SIPA's Legislative History Confirms that Claimants
                have Claims for Cash ................................................. 21

           2.   Following the Statutory Definitions and Case Law is
                Consistent with the Policies of the Nation's
                Securities Laws of which SIPA is a Part ........................... 28

      C.   THE SERIES 500 RULES DO NOT APPLY TO
           TRANSACTIONS IN BOGUS SECURITIES ................................... 31

# TABLE OF CONTENTS
## (Continued)

**Page**

II.   CLAIMANTS' CLAIMS FOR FICTITIOUS DIVIDENDS
      OR INTEREST EARNED ARE NOT ALLOWABLE
      CUSTOMER CLAIMS ............................................................................... 37

CONCLUSION ......................................................................................................... 40

NY 679376_7 i

# TABLE OF AUTHORITIES

**Page**

In re A.R. Baron & Co., 226 B.R. 790 (Bankr. S.D.N.Y. 1998) ...................... 21, 31

In re Adler Coleman Clearing Corp., 195 B.R. 266 (Bankr. S.D.N.Y. 1996).. 21, 22

In re Adler Coleman Clearing Corp., 204 B.R. 111 (Bankr. S.D.N.Y. 1997)........ 14

In re Adler, Coleman Clearing Corp., 263 B.R. 406 (S.D.N.Y. 2001)....... 35, 36, 37

Appleton v. Hardy (In re First Ohio Secs., Co.), No. 590-0072, Adv. No. 92-5085 (Bankr. N.D. Ohio 1992) .......................................................................... 17

In re Bell & Beckwith, 937 F.2d 1104 (6th Cir. 1991)..................................... 19, 36

Focht v. Athens (In re Old Naples Secs., Inc.), No. 2:00-cv-181-FTM-29D (M.D. Fla. Sept. 30, 2002) ................................................................................. 37

Gans v. Reddington (In re Weis Secs., Inc.), [1974-1975 Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶ 94,780 (S.D.N.Y. 1974) ......................................... 32

Gervis v. Berg, No. 00-CV-3362 (E.D.N.Y. filed June 9, 2000) ........................... 30

Gurary v. Nu Tech Bio Med, Inc., 303 F.3d 212 (2d Cir. 2002)............................ 13

Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18 (2d Cir. 2002)................................................................................................... 13

In re Investors Center, Inc., 129 B.R. 339 (Bankr. E.D.N.Y. 1991)...................... 34

In re Investors Sec. Corp., 6 B.R. 415 (Bankr. W.D. Pa. 1980) ....................... 19, 31

In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or. 1985).................. 19, 31, 32, 33

In re MV Secs., Inc., 48 B.R. 156 (Bankr. S.D.N.Y. 1985) .................................... 19

Murray v. McGraw (In re Bell & Beckwith), 821 F.2d 333 (6th Cir. 1987).... 31, 36

In re Oberweis Secs., Inc., 135 B.R. 842 (Bankr. N.D. Ill. 1991)........................... 38

NY 679376_7 i

TABLE OF AUTHORITIES

(Continued)

**Page**

Plumbers & Steamfitters Local 490 Severance & Ret. Fund v. Appleton
(In re First Ohio Secs. Co.), 39 F.3d 1181, 1994 WL 599433
(6th Cir. 1994), cert. denied, 514 U.S. 1018 (1995) ............................... 15, 16, 18

Plumbers & Steamfitters Local 490 Severance & Ret. Fund v. Appleton
(In re First Ohio Secs. Co.), No. 92CV0349 (N.D. Ohio Feb. 18, 1993) .......... 16

Reiter v. Sonotone Corp., 442 U.S. 330 (1979) ........................................ 19

SEC v. Aberdeen Secs., Co., 480 F.2d 1121 (3d Cir.), cert. denied sub
nom. Seligsohn v. SEC, 414 U.S. 1111 (1973) ......................................... passim

SEC v. Albert & Maguire Secs. Co., 378 F. Supp. 906 (E.D. Pa. 1974) ............... 19

SEC v. Ambassador Church Fin./Dev. Group, Inc., 679 F.2d 608 (6th Cir.
1982) .................................................................................. 19

SEC v. F.O. Baroff Co., 497 F.2d 280 (2d Cir. 1974) ............................... 29

SEC v. Goren, 206 F. Supp. 2d 344 (E.D.N.Y. 2002) ......................... 1, 20, 25, 37

SEC v. Howard Lawrence & Co., 74 Civ. 193, 1975 Bankr. LEXIS 15
(Bankr. S.D.N.Y. 1975) ............................................................... 22

SEC v. Packer, Wilbur & Co., 498 F.2d 978 (2d Cir. 1974) ..................... 14, 21, 30

SEC v. S.J. Salmon & Co., 375 F. Supp. 867 (S.D.N.Y. 1974) ....................... 22

SIPC v. Barbour, 421 U.S. 412 (1975) ................................................ 35

SIPC v. C.J. Wright & Co., (In re C.J. Wright & Co.), 162 B.R. 597
(Bankr. M.D. Fla. 1993) ........................................................... 19, 38

SIPC v. Morgan, Kennedy & Co., 3 B.C.D. 15 (S.D.N.Y. 1977) ...................... 32

SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314 (2d Cir.) cert. denied,
426 U.S. 936 (1976) ................................................................. 21

SIPC v. Oberweis Secs., Inc. (In re Oberweis Secs., Inc.), 135 B.R. 842
(Bankr. N.D. Ill. 1991) ............................................................. 34

# TABLE OF AUTHORITIES

**(Continued)**

<u>Page</u>

SIPC v. Old Naples Secs., Inc., (In re Old Naples Secs., Inc.), 218 B.R. 981
(Bankr. M.D. Fla. 1998), <u>aff'd</u>, 223 F.3d 1296 (11th Cir. 2000) ................ 18, 37

SIPC v. Pepperdine Univ., (In re Brentwood Secs., Inc.), 925 F.2d 325 (9th
Cir. 1991) ................................................................................................... 18

SIPC v. Stratton Oakmont, Inc., 229 B.R. 273 (Bankr. S.D.N.Y. 1999)................ 14

SIPC v. Wise (In re Stalvey & Assocs.), 750 F.2d 464 (5th Cir. 1985)................. 29

Schultz v. Omni Mut. Inc., No. 93-3700, 1993 WL 546671 (S.D.N.Y. Dec.
30, 1993) .................................................................................................... 21

United States v. Leon, 203 F.3d 162 (2d Cir. 2000)............................................. 15

## STATUTES

Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa <u>et. seq</u> ......... <u>passim</u>

28 U.S.C. § 1291 (1993) ....................................................................................... 1

28 U.S.C. § 158(a) (2002).................................................................................... 1

Series 500 Rules, 17 C.F.R. § 300.500 (2002) ................................................ 31, 37

## RULES

Fed. R. App. P. 26.1 (2002) .................................................................................. 1

Rules of the Securities Investor Protection Corp., 53 Fed. Reg. 1793, 1998
WL 236666 (1988)................................................................................ 31, 33

## LEGISLATIVE MATERIALS

SIPA Amendments: Hearing Before the Subcomm. on Securities of the
Comm. on Banking, Housing, and Urban Affairs, H.R. 8331, 95th Cong.
2d Sess. 2 (1978)...................................................................................... 26

SIPA Amendments: Hearings on H.R. 6831 Before the Subcomm. on
Consumer Protection and Fin. of the Comm. on Interstate and Foreign
Commerce, 96th Cong., 2d Sess. 17 (1980) ......................................... 27

NY 679376_7 i

**TABLE OF AUTHORITIES**

**(Continued)**

**Page**

SIPA:  Hearings on H.R. 13308, H.R. 17585, H.R. 18081, H.R. 18109, and
18458 Before the Subcomm. on Commerce and Fin. of the House
Comm. and Interstate and Foreign Commerce, 91st Cong., 2d Sess. 149
(1970) .......................................................................................................... 27

## MISCELLANEOUS

David E. Riggs, Securities Regulation of Mutual Funds: A Banker's
Primer, 113 Banking L.J. 864, 865 (Oct. 1996) .......................................... 28

## PRELIMINARY AND JURISDICTIONAL STATEMENT

Appellants James W. Giddens, (the "Trustee") as Trustee for the liquidation of the businesses of the substantively consolidated estates of New Times Securities Services, Inc. ("New Times") and New Age Financial Services, Inc. ("New Age") (together, the "Debtor") and the Securities Investor Protection Corporation ("SIPC") submit this brief in support of their Joint Appeal from the Judgment of the U.S. District Court for the Eastern District of New York (Judge Thomas C. Platt), which denied their motion for an order upholding the Trustee's determinations with respect to claims filed by fourteen claimants seeking SIPC cash advances equal to the fictitious value of one or more non-existent money market funds ("bogus mutual funds"). See SEC v. Goren, 206 F. Supp. 2d 344 (E.D.N.Y. 2002).

The District Court had jurisdiction over this contested matter pursuant to 15 U.S.C. § 78eee(b)(2)(A) (2002) and 28 U.S.C. § 158(a) (2002). This Court has jurisdiction over this Joint Appeal pursuant to 28 U.S.C. § 1291 (1993).

The District Court's judgment was entered on June 25, 2002. The Trustee and SIPC filed a timely Joint Notice of Appeal on July 1, 2002.

## STATEMENT OF ISSUES

1.      Whether the Trustee correctly determined that claimants should be treated as having claims for cash rather than securities covered by the Securities Investor Protection Act ("SIPA") where claimants deposited monies with an insolvent brokerage firm to purchase non-existent shares in bogus mutual funds that were:

(a)     never organized as mutual funds or registered with the Securities and Exchange Commission ("SEC");

(b)     never had any assets or market value;

(c)     never issued prospectuses or complied with the nation's securities laws; and

(d)     had no class or series of securities that could be identified or purchased on the open market.

2.      Whether the Trustee correctly determined that claimants who seek cash advances from SIPC cannot be treated as having claims for SIPC advances with respect to wholly fictitious dividends and interest which were never in fact generated by bogus mutual funds, never received by the broker-dealer, and never deposited in the claimants' accounts.

## STATEMENT OF THE CASE

This is an appeal from an order of the District Court sustaining the objections filed by fourteen claimants (the "Claimants")[1] to the Trustee's determinations of their claims. These Claimants (among a host of others who have not disputed the Trustee's position on this issue) deposited cash with the Debtor in order to purchase shares of bogus mutual funds. The Claimants received fictitious confirmations and fictitious account statements from the Debtor, indicating the purchase of the bogus shares. Even though the bogus mutual funds they intended to purchase never existed, were never registered with the SEC, never issued prospectuses, and never advertised or had their share prices listed in print (such as the newspaper), electronic, or live media, Claimants filed claims seeking their return or fictitious cash values. The Trustee determined that since no real "securities" under SIPA ever existed or could be purchased on the open market for return to Claimants, and since the bogus mutual funds had no market value, the Claimants could not have a claim for the return of the bogus mutual funds shares under SIPA. Instead, the only allowable SIPA claim that the Claimants could have was a claim for the return of the cash that they deposited with the Debtor in order to purchase securities, less any withdrawals or redemptions.

---

1.    These Claimants are:  Myrna K. Jacobs ("Jacobs"); Simon and Helga Noveck ("Novecks"); Miriam Seidenberg ("Seidenberg"); Felice Linder ("Linder"); Angelo Scarlata ("Scarlata"); the Rose Marie Ceparano Irrevocable Trust ("Ceparano Trust"); the Estate of Allan A. Blynd ("Blynd Estate"); Salvatore and Stella DiGiorgio ("DiGiorgios"); Project Earth Environmental Fundraisers, Inc., ("Project Earth"); New York Optical, Inc. ("New York Optical"); the Carl Carter Irrevocable Trust ("Carter Trust"); Craig Roffman ("Roffman"); Ellen Eschen ("Eschen"); and Jill Gundry ("Gundry").

3

The District Court disagreed with the Trustee's determination and held that claims for the fictitious value of the bogus mutual funds were claims for securities under SIPA. It ordered the Trustee to satisfy the claims with cash advances from SIPC equal to the wholly fictitious value of the bogus mutual funds as shown on the Claimants' final account statements. The District Court also determined that claims for completely fictitious interest/dividends that were supposedly to have been generated by the non-existent funds were allowable customer claims for securities. In its decision, the District Court relied entirely on rules adopted by SIPC (the "Series 500 Rules") that address whether an <u>actual</u> security transaction gives rise to a claim for cash or a claim for securities. The District Court, without discussion, assumed that the Series 500 Rules applied so as to convert bogus transactions into real ones, thereby ignoring all relevant case law. The relevant case law, SIPA, its legislative history and purpose, and the federal securities laws[2] confirm that the Series 500 Rules do not apply to convert fictitious transactions in fictitious securities into real ones that would give rise to a customer claim for securities as opposed to cash under SIPA.

## STATEMENT OF FACTS

On May 18, 2000, the United States District Court for the Eastern District of New York entered an Order pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. § 78aaa <u>et. seq.</u>,[3] finding that the customers of New Times were in need of the protections afforded by SIPA. (Protective Decree ¶ I,

---

2.   Pursuant to 15 U.S.C. § 78bbb, "the provisions of the Securities Exchange Act of 1934 apply [to SIPA] as if this chapter [of SIPA] constituted an amendment to, and was included as a section of, such Act."

3.   For convenience, references hereinafter to provisions of SIPA shall omit "15 U.S.C."

4

J.A. 48.) Pursuant to SIPA § 78eee(b)(3), James W. Giddens was appointed as
Trustee (the "Trustee") for the liquidation of the business of New Times, and
Hughes Hubbard & Reed LLP his counsel. (Id. ¶ II, J.A. 48.) Pursuant to SIPA
§ 78eee(b)(4), the liquidation proceeding was removed to the Bankruptcy Court.
(Id. ¶ IX, J.A. 51.)

In accordance with a standard Administrative Order, the Trustee sent notices
and claim materials to each person who appeared from New Times' books and
records to have been a customer of New Times during the year prior to the filing
date. (Administrative Order, J.A. 93.)

While claims were being filed, the Trustee examined the operations of New
Times and New Age and their principal William Goren ("Goren"). Based on his
investigation, which revealed extensive intermingling of the two entities in
communications with the public, the Trustee moved for an order substantively
consolidating the estates of New Times and New Age. The Trustee, with SIPC's
approval, sought the order so as to maximize recovery to victims of Goren's
fraudulent activities, irrespective of whether they had dealt with New Times, the
broker- dealer entity or New Age, the non broker-dealer entity. The Bankruptcy
Court granted the Order on November 27, 2000 (the "Substantive Consolidation
Order"). (Substantive Consolidation Order, J.A. 134.) Pursuant to the Substantive
Consolidation Order, for purposes of determining "customer" claims under SIPA,
the Debtor includes New Times and New Age for claims arising after April 19,
1995, the date that New Times became registered with the SEC and a member of
SIPC. (Id., J.A. 137.) As a result of the Substantive Consolidation Order, these
fourteen objecting Claimants have claims eligible for SIPC cash advances even
though they actually transacted with Goren through an unregistered entity.

Nine hundred five (905) claims have been filed in the liquidation
proceeding. One hundred seventy-four (174) of these claims relate to funds

deposited with the Debtor and the subsequent confirmation of a supposed purchase of non-existent shares of one or more bogus mutual funds. The Trustee has determined one hundred seventy three (173) of the 174 bogus mutual fund claims filed. The Trustee notified each claimant that his or her claim was allowed as a claim for cash in the amount deposited with the Debtor for the purpose of purchasing the bogus shares, minus any withdrawals or redemptions. The Trustee also notified claimants that amounts shown on account statements as dividends or interest earned on the fictitious funds were not allowable customer claims. Most claimants accepted the Trustee's determination of their claims. In fact, of all the bogus mutual fund claims determined, only these fourteen Claimants objected to the Trustee's determination by filing written objections to be resolved pursuant to the Claims Resolution Procedures set forth in the Administrative Order. Because the limit of protection for securities claims is higher than the limit on cash claims, these Claimants, though seeking only cash, sought to have their claims treated as claims for return of securities in order to be eligible for the higher level of SIPC cash advance.[4]

Claimants' objections arise from the fact that they were fraudulently induced by Goren or his employees to part with cash or other property that supposedly was to be invested in one or more bogus mutual funds—often called the New Age Securities Money Market Fund but sometimes called something else—allegedly held at Fleet Bank.[5] Claimants deposited money with New Age for investment in the bogus mutual funds based on Goren's misrepresentations. Allegedly, Goren

---

4. Thirteen of the objecting Claimants have claims that are over the $100,000 limit that SIPC may advance to satisfy claims for cash.

5. Goren also offered investors a tax-free version of the New Age Money Market Fund and another fictitious fund which he called the New Times Prime Money Market Fund.

6

misrepresented that the bogus mutual funds yielded higher interest rates than bank money market funds, that they would maintain constant share values of $1.00 per share, and that they would provide returns that were better than bank deposits. Goren promised the Claimants returns 1 to 1 ½ points higher than most bank savings accounts; these promised returns ranged from 5 ¼ to 6 ½ percent. The bogus mutual funds never existed; they were never organized as mutual funds, registered with the SEC, or issued prospectuses for investors as required by the Securities Act of 1933 and the Investment Company Act of 1940. The cash that Goren received for the bogus mutual funds was used to support his lavish lifestyle, to finance the Debtor's operating costs, to fund returns of principal, or to make supposed interest payments on promissory notes and to redeem mutual funds[6] allegedly purchased on behalf of other claimants.

---

6.    Goren also purported to sell to other claimants shares in mutual funds that actually existed. Investors in this fund scheme believed that Goren was purchasing bona fide mutual funds (e.g., Vanguard, Putnam, Kemper) for their accounts and received written confirmations of such purchases and monthly account statements. Although these transactions were never executed, the information provided on the account and confirmation statements mirrored what would have happened had the given transaction been executed. Goren tracked each mutual fund that he purported to purchase on behalf of an investor in order to generate account statements that accurately reflected the value of the bona fide mutual fund in question. Because real securities existed at all times and could be purchased to satisfy these claims to complete the claimants' transactions with the Debtor, the Trustee has treated these claims as securities claims, rather than cash claims. In contrast to the situation with the Claimants in this appeal, claimants checking on their mutual funds would receive every indication that the fund existed, complied with all regulatory requirements and performed as Goren represented. Moreover, unlike the situation with respect to Claimants here, the Trustee could identify the shares of the real securities involved and use SIPC advances to purchase missing securities to return to claimants.

NY 679376_7 i

Pursuant to the Claims Resolution Procedures set forth in the Administrative
Order, a hearing was held before the Honorable Stan Bernstein on June 25, 2001,
to resolve the Claimants' objections. (Hr'g Tr., J.A. 511.) Judge Bernstein issued
a "preliminary decision" in December 2001 denying the Trustee's motion to
uphold his determination with regard to these Claimants. (Prelim. Op., J.A. 735.)
Subsequently, on January 30, 2002, Judge Bernstein sua sponte recused himself
from the case and vacated his preliminary decision. (Order Withdrawing Bench
Op. and Recusing Ct., J.A. 750.) Claimants sought reconsideration of Judge
Bernstein's recusal. (Claimants' Joint Mot. Recons., J.A. 757.) Judge Bernstein
denied their motion for reconsideration on February 19, 2002, and suggested to the
District Court that it withdraw the reference as to this contested matter. (Mem. and
Order Den. Recons., J.A. 759.) On March 6, 2002, Judge Platt withdrew the
reference and agreed to decide the issue de novo. (Mem. and Order, J.A. 761.)

Subsequently, on May 28, 2002, Judge Platt issued a Memorandum and
Order denying the Trustee's motion to uphold his determinations and sustaining
the Claimants' objections. (Mem. and Order, J.A. 773.) The District Court held
that the receipt of bogus share purchase confirmations and monthly statements
established that Claimants somehow had securities claims, whether or not the
transactions confirmed involved actual securities. In addition, because the account
statements indicated that bogus dividends were being reinvested to purchase
additional bogus shares of the bogus mutual funds, the District Court held that the
Claimants also were entitled to satisfaction of the fictitious dividends as securities
claims. According to the District Court, the receipt of confirmation and account
statements confirming only the purchase of bogus shares and reinvestment of

NY 679376_7 i

bogus dividends created a legitimate expectation in Claimants that they held securities in their accounts.[7]

## SUMMARY OF THE ARGUMENT

The District Court ignored the relevant case law and the provisions of SIPA dealing with the satisfaction of customer claims, as well as SIPA's legislative history and purpose, in holding that the issuance of a fictitious confirmation of the purchase of a non-existent mutual fund gives rise to a claim for securities under SIPA. All of the case law on point -- which the District Court did not discuss or even cite -- makes clear that the proper way to treat claims for fictitious securities consistent with SIPA is for the Trustee to determine (as here) that Claimants have net equity claims for cash equal to the amounts deposited with the broker-dealer minus any withdrawals or redemptions. The decisions in these cases reach the only result that is consistent with the language of SIPA, its legislative history and purpose, and the federal securities laws of which SIPA is a part.

SIPA protects the "custodial" function broker-dealers perform for claimants and remedies claimants' losses by having the Trustee return to them the actual property that the broker-dealer should be holding for them in their accounts. Where a claimant's account should contain certain existent securities, but does not, the Trustee is authorized to use SIPC cash advances—up to $500,000—to purchase

---

7.  In its May 28, 2002, Memorandum and Order, the District Court purported to calculate what each Clamant had claimed. Upon review of the District Court's decision, the parties realized that the District Court had improperly calculated some of the claims. The Trustee and Claimants entered into a Stipulation, which was subsequently signed by the District Court, agreeing on amounts that would be owed to Claimants if their claims were for securities and if they were entitled to the payment of non-existent dividends. (Stipulation Regarding Total Claimants' Claims, J.A. 794.)

NY 679376_7 i

securities of the "same class and series of an issuer" on the open market to the
extent practicable to return to the claimant. SIPA §§ 78fff-1(b), 78fff-2(d). If the
security in question is for some reason not available for purchase, SIPA authorizes
the Trustee to provide cash in lieu of the security to the claimant based on the
security's filing date market value. SIPA §§ 78fff-2(b), 78lll(11). Where a
claimant's account should contain cash, but does not, the Trustee is authorized to
use SIPC cash advances—up to $100,000—to return to the claimant. SIPA §
78fff-3(a)(1).

Though classifying Claimants' claims as claims for cash results in a lower
SIPC advance being made to Claimants in satisfaction of their customer claims,
this result is unavoidable. Since SIPA's enactment more than thirty years ago, a
distinction has existed between the amount SIPC can advance to a SIPA Trustee to
pay a claim for return of securities as opposed to a claim for return of cash. This
distinction exists so that cash on deposit with a broker-dealer will not be better
protected than cash deposited with a federally-insured bank, a situation that
Congress believed would place the federally regulated banking system at a
disadvantage to the federally regulated securities broker-dealer system. SIPA is a
custodial statute which was never intended to be a panacea that protects against
unscrupulous brokers' frauds. The theory behind the higher limit on securities
claims is that a SIPA Trustee ordinarily will use the higher cash advance from
SIPC to purchase identifiable securities for return to claimants who hold securities
claims. In contrast, claimants whose broker-dealer could only have been holding
cash for them will receive a SIPC cash advance similar to what the FDIC would
pay for cash held in a bank account.

As all the cases on point hold, Claimants only can have claims for return of
"cash" and not for return of "securities" where they deposit money with a broker-
dealer for the purchase of non-existent or fictitious securities. A fictitious security,

10

such as the bogus mutual funds touted by Goren, is simply not a "security" covered
by SIPA. It is not a security that the broker-dealer could have purchased. In turn,
it cannot be returned to, or purchased on the open market for, a claimant by a SIPA
trustee. A SIPA trustee cannot assign a filing date value (other than "zero") to a
fictitious security or find a "similar" security to replace it without compounding
the fiction.

Moreover, classifying the claims as claims for cash results in Claimants
being afforded some degree of SIPA protection. If Claimants' claims in fact had
been for securities, no delivery could have been made by the Trustee because no
security existed to deliver. Instead, the statute would require the Trustee to treat
the non-existent fund as "unavailable" and to satisfy the claim with cash in lieu of
the non-existent security. Pursuant to the net equity definition in SIPA, the amount
remitted to Claimants would be the filing date value of the bogus mutual fund.
The filing date value of the bogus mutual fund is not the fraudulent value assigned
to it by Goren on fictitious account statements, as the District Court held. Rather,
it is the amount that would have been owed to Claimants had the debtor liquidated
"by sale or purchase on the filing date, all securities positions of such customer"
less any net indebtedness owed by the customer. SIPA § 78lll(11). Under this
calculation the amount owed to Claimants would be zero. Thus, although
classifying the Claimants' net equity claims as claims for securities would allow
for the higher upper limit on SIPA protection to apply, it also would result in the
Claimants having zero net equity claims.

The decision below ignores, and to a large extent undermines, the scheme of
the securities laws, of which SIPA is a part. Indeed, the decision is an open
invitation to fraud by broker-dealers and encourages a lack of vigilance by
investors. Before something can be recognized as a security under SIPA, it must

11

have the basic requisites of a security under federal laws. The bogus mutual funds
had none of these requisites.

There is no dispute that Claimants had the intent to deposit funds to purchase
securities and therefore became "customers" of the Debtor entitled to some degree
of SIPA protection. But no purchase of any actual security was ever entered into
on their behalf or confirmed to them. Nor did the bogus mutual funds listed on
their confirmations have any of the indicia of a real security that a prudent investor
might have expected. For example, the account statement prices of the securities
were not listed in newspapers or other sources. There were no prospectuses to
review. No regulatory authority had any record of the funds' existence.

If a claim for securities can exist for unregistered, non-existent phantom
entities, investors will have every incentive to believe unscrupulous brokers or
even to go along with a wink and a nod as long as they receive a written
confirmation or account statement. Such actions make the SIPC fund, which is
funded by the legitimate portion of the securities industry, the guarantor of fraud
and imprudence and turns the theory of investor protection and system of investor
safeguards on its head. Allowing claims for fictitious securities as securities
claims does not foster SIPA's goal of encouraging individuals to trade in the public
securities market, but rather fosters fraud, and promotes a lack of vigilance among
investors.

The District Court relied entirely on the Series 500 Rules to mandate that the
Trustee treat the disputed claims as claims for securities. This reliance was
manifest error. The Series 500 Rules do not govern a situation such as the one
here, where the confirmation received purported to confirm the purchase of a non-
existent security. The Series 500 Rules were passed for a limited purpose: to deal
with the classification of claims where the trade date of a securities transaction (i.e.
purchase or sale) straddled the filing date of the SIPA liquidation. The Series 500

12

rules do not rewrite the nation's securities laws to make fraudulent transactions bona fide or convert non-existent securities into real ones. The Series 500 Rules create bright-line, black letter rules for determining when an actual security has been purchased or sold for a customer. The Series 500 Rules have no bearing on determining whether a claimant has a customer claim for the return of fictitious securities rather than a claim for the return of funds deposited to purchase the fictitious securities. In order for Series 500 Rules to apply, the security in question must exist.

Finally, the District Court compounded the fiction and distortion of SIPA protection by adding non-existent interest and dividends to the supposed value of wholly fictitious securities. Like piling Pelion on Ossa, this may seem possible in a metaphorical world but is not possible in the real world of the securities laws and not under a statute crafted as precisely as SIPA. The case law under the statute is clear that non-existent dividends or interest supposedly "earned" on non-existent shares are not customer claims protected by SIPA.

## STANDARD OF REVIEW

This Court reviews the District Court's conclusions of law de novo. Gurary v. Nu Tech Bio Med, Inc., 303 F.3d 212, 219 (2d Cir. 2002); Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 26 (2d Cir. 2002). There are no contested facts in this case.

13

## ARGUMENT

**I.    THE TRUSTEE CORRECTLY DETERMINED THAT
THE DISPUTED CLAIMS SHOULD BE TREATED AS
CLAIMS FOR CASH AND NOT CLAIMS FOR THE
FICTITIOUS VALUE OF THE BOGUS MUTUAL FUND.**

The District Court ignored relevant case law, provisions of SIPA dealing

with the satisfaction of customer claims, as well as SIPA's legislative history and

purpose, in holding that the confirmation of the purchase of non-existent mutual

funds gives rise to a claim for securities under SIPA.  Under no circumstance can

the confirmation of the purchase of non-existent securities transform bogus mutual

funds into real ones.  Claimants have conceded that the bogus mutual funds at issue

here did not exist.  They cannot meet their burden of demonstrating that they have

claims for return of securities as opposed to claims for return of cash.  SIPA

§ 78fff-2(b); SIPC v. Stratton Oakmont, Inc., 229 B.R. 273, 278 (Bankr. S.D.N.Y.

1999) ("Claimants bear the burden of proving that they are the type of priority

creditors known as 'customers'"); In re Adler Coleman Clearing Corp., 204 B.R.

111, 115 (Bankr. S.D.N.Y. 1997) (burden of proof on claimants); see also SEC v.

Packer, Wilbur & Co., 498 F.2d 978 (2d Cir. 1974).

**A.    ALL CASE LAW ON POINT SUPPORTS THE
TRUSTEE'S DETERMINATIONS.**

The central issue in this appeal is whether claims that are based on the

intended purchase of non-existent securities are claims for return of cash or claims

for return of securities under SIPA.  Although this is an issue of first impression in

this Circuit, this exact question has been decided directly by two Courts of Appeals

and indirectly by a Bankruptcy Court.  Both the Sixth and Third Circuits have held

that claimants who deposit money for the purchase of non-existent securities

whose purchase is later confirmed to them by the debtor have net equity claims for

14

cash. Plumbers & Steamfitters Local 490 Severance & Ret. Fund v. Appleton (In re First Ohio Secs. Co.), 39 F.3d 1181, No. 93-3313, 1994 WL 599433, at *1 (6th Cir. 1994) (unpublished opinion),[8] cert. denied, 514 U.S. 1018 (1995); SEC v. Aberdeen Secs., Co., 480 F.2d 1121, 1127 (3d Cir.), cert. denied sub nom. Seligsohn v. SEC, 414 U.S. 1111 (1973).

In Plumbers & Steamfitters Local 490 Severance & Retirement Fund, investors believed that they had purchased, collectively, over $3 million worth of "pooled certificates of deposit" offered by the debtor, First Ohio Securities Company ("First Ohio"). Plumbers & Steamfitters Local 490 Severance & Ret. Fund, 1994 WL 599433, at *1. Gilmartin, the founder of First Ohio, sent investors bogus purchase-confirmation notices and fictitious account statements, and used the investors' funds for his own personal use. Id. After SIPC initiated a liquidation proceeding, the investors filed claims with the Trustee for approximately $3 million in securities and cash. Id. The Trustee determined that the securities in question never existed and therefore treated their claims as claims for cash rather than for securities based on the information in the bogus account statements and confirmations. Id. The Trustee rejected claimants arguments that they had a legitimate expectation that their accounts contained securities. The District Court agreed with the Trustee's determination:

> All of the rules and legislative history cited by appellants on the legitimate expectations and satisfaction of claims for securities is

---

8.   Appellants cite to this unpublished opinion of the Sixth Circuit (a copy of which is contained in the addendum to the brief) because, as this Court has previously recognized, "the Sixth Circuit allows parties (and, by extension, courts) to cite its unpublished opinion when such opinions have precedential value in relation to a material issue in a case and . . . there is no published opinion that would serve as well." United States v. Leon, 203 F.3d 162, 164 n.3 (2d Cir. 2000) (quoting 6th Circuit Rule 24(c)).

15

determinative of a security of such type being in existence. Not only
were these "securities" never purchased, they never existed.
Therefore, with no evidence presented that would enable this Court to
find the non-existence of the securities clearly erroneous, the
conclusion of law that [claimants] were each entitled to one cash
claim was correct as a matter of law.

Plumbers & Steamfitters Local 490 Severance & Ret. Fund v. Appleton (In re First
Ohio Secs. Co.), No. 92CV0349, at 3 (N.D. Ohio Feb. 18, 1993) (Lambros, J.)
(unpublished order)[9].

On appeal, the Sixth Circuit affirmed, stating:

[u]nfortunately for the plaintiffs here, the record fully supports the
finding by the trustee and by both the bankruptcy and district courts
that the "pooled certificates of deposit" which were the subject of the
agreement between the plaintiffs and the broker-dealer not only were
not purchased by Gilmartin but, indeed, never even existed. Given
this fact, the only legal conclusion possible is that the claims against
First Ohio were ones "for cash" and not "for securities." As the
district judge noted, SIPA is intended to protect investors against a
broker-dealer's insolvency; it is not designed to achieve restitution for
fraud.

Plumbers & Steamfitters Local 490 Severance & Ret. Fund, 1994 WL 599433, at
*1 (emphasis added).

In SEC v. Aberdeen Securities Company, the claimant had purchased shares
of a prospective new issue. Aberdeen Secs., Co., 480 F.2d at 1127. The shares
were paid for, and the trade confirmed to the claimant by its broker, Aberdeen
Securities Co. ("Aberdeen"). Although Aberdeen remitted the funds to the broker-
dealer underwriting the offer, no certificates were received. Id. Instead, before the
stock could be issued, both the issuer and the underwriter went into bankruptcy. A
SIPA liquidation proceeding subsequently was initiated for Aberdeen, and the

---

9.    A copy of Judge Lambros' order is contained in the addendum to the brief.

claimant filed a claim in that proceeding. Because the non-existent security had no value, the Aberdeen Trustee determined that no payment could be made to the claimant, a conclusion that was affirmed by the lower court. Id. On appeal, the Third Circuit disagreed, commenting as follows:

> because the facts demonstrate that since this particular stock was not in existence, the purchase never could be made. [Claimants], therefore, do not have a claim for the stock itself. . . . We have no doubt, however, that the "dollar amount" of a customer's account includes his cash which the broker has, or should have, been holding. . . . Thus, if under local law, or by virtue of regulations under which it operated, the debtor was obligated to refund the $500 to the [claimants] because of inability to deliver the Boatland stock, then there would be a claim for cash properly included in the term "net equity."

480 F.2d at 1127 (following remand the Trustee returned to claimants the cash they had deposited for the purchase of the Boatland stock).

In addition, in Appleton v. Hardy (In re First Ohio Secs., Co.), No. 590-0072, Adv. No. 92-5085 (Bankr. N.D. Ohio 1992) (unpublished Order),[10] the claimants deposited $140,000 with the debtor for the purchase of securities which included certificates of deposit ("CDs") and a mutual fund, the "All America Fund." Id. at 2. The Trustee determined that the claimants had a net equity claim for securities and paid them $141,203.58 (including interest). The Trustee made this payment based on his belief that the CDs and the "All America Fund" actually existed. Subsequently, the Trustee discovered that neither the CDs nor the All America Fund existed. Id. Because the securities were fictitious the Trustee asserted that the claimants' claim was not for securities but for cash and thus subject to the $100,000 statutory limit on SIPC advances for cash claims. He therefore filed a turnover proceeding to recover the $41,203.58 excess payment.

---

10. A copy of the Appleton order is contained in the addendum to the brief.

17

Id. The claimants filed a motion to dismiss the Trustee's action. Claimants argued
that the Trustee could not recover the excess payment on two grounds: (1) a SIPA
proceeding does not create an "estate" and pursuant to the Bankruptcy Code only
"property of the estate" is recoverable by a Trustee, and (2) even if an estate is
created, SIPC advances are not property of the estate. Id. After reviewing all the
relevant materials and construing the facts in the light most favorable to claimants,
the court held that the claimants' arguments were "specious" and therefore denied
their motion to dismiss. Id. at 4. In doing so, the court implicitly acknowledged
that the Trustee had a right to recover the overpayment made to the claimants
based on his incorrect classification of their claim as one for securities when
neither the funds nor the CDs existed. Accord Plumbers & Steamfitters Local 490
Severance & Ret. Fund, 1994 WL 599433, at *2 (affirming bankruptcy court's and
district court's decision to uphold Trustee's determination that where certificates of
deposit did not exist claimants had claims for cash not securities).

In all of these cases the purchase of a non-existent security was confirmed to
the claimant. In all of these cases the courts relied on the fact that the security did
not exist in ruling that the claimant had a claim for the return of cash and not on
the existence, or lack of, a confirmation statement. These cases are directly on
point and reach the only result that is consistent with SIPA, its purposes and
legislative history and the securities regulatory scheme of which SIPA is a part.
See also, SIPC v. Old Naples Secs., Inc., (In re Old Naples Secs., Inc.), 218 B.R.
981, 985-86 (Bankr. M.D. Fla. 1998), aff'd, 223 F.3d 1296 (11th Cir. 2000)
(finding that claimants had asserted customer claim for cash in situation where
claimants had received monthly account statements indicating investments in non-
specified bonds but where no such bonds were "in fact" purchased); SIPC v.
Pepperdine Univ., (In re Brentwood Secs., Inc.), 925 F.2d 325, 329 (9th Cir. 1991)
(debtor broker-dealer did not hold shares of a security for a claimant where the

18

shares did not issue); SIPC v. C.J. Wright & Co., (In re C.J. Wright), 162 B.R. 597,
610 (Bankr. M.D. Fla. 1993) (because debtor misappropriated their money and
certificates of deposit were not purchased claimants had a claim for the principal
they invested and not for the interest promised); In re Investors Sec. Corp., 6 B.R.
415, 419-20 (Bankr. W.D. Pa. 1980) (where claimants intended to purchase bona
fide certificates of deposit and had received interest payments on such purchases
for seven months, but where no such purchases had in fact been made, and where
certificate of deposit would have nonetheless matured into cash prior to the filing
date even if it had been purchased, claimants had a claim for cash); In re June S.
Jones Co., 52 B.R. 810, 813-14 (Bankr. D. Or. 1985) (distinguishing case from
Aberdeen and Investors based on the fact that June S. Jones' claimants placed
orders to purchase bona fide securities even though they were not actually
purchased, while claimants in Aberdeen and Investors placed orders to purchase
non-existent securities (Aberdeen) or securities that would have matured into cash
on the filing date (Investors)).

## B.    SIPA AND ITS LEGISLATIVE HISTORY AND PURPOSE SUPPORT THE TRUSTEE'S DETERMINATIONS.

In interpreting SIPA, this Court must look first to its language. See Reiter v.
Sonotone Corp., 442 U.S. 330, 337 (1979); SEC v. Ambassador Church Fin./Dev.
Group, Inc., 679 F.2d 608, 611 (6th Cir. 1982); In re MV Secs., Inc., 48 B.R. 156,
159 (Bankr. S.D.N.Y. 1985). The language of SIPA makes clear that whether a
customer has a "cash" or a "securities" claim depends upon whether his or her "net
equity" is based on cash or securities as shown on the debtor's books and records
or as otherwise established to the satisfaction of the Trustee. SIPA § 78fff-2(b).
See In re Bell & Beckwith, 937 F.2d 1104, 1106 (6th Cir. 1991); SEC v. Albert &

Maguire Secs. Co., 378 F. Supp. 906, 911 (E.D. Pa. 1974)..[11] The fact that
Claimants deposited monies with the Debtor for the purpose of purchasing
securities qualifies them as "customers," but this does not change the fictitious
transaction confirmed to them—a purported purchase of a bogus security—into the
purchase of a real security that can be returned to them. See SIPA § 78lll(2).
Indisputably, the bogus mutual fund at issue here was not a bona fide fund. Had it
been, it would have been required to: (1) register with the SEC pursuant to Section
8 of the Investment Company Act of 1940 (the "1940 Act"), (2) comply with the
registration requirements of the Securities Act of 1933 and periodic reporting
requirements of the Securities Exchange Act of 1934, and (3) issue a prospectus
for investors. In fact, Claimants conceded and the District Court acknowledged
that the bogus mutual funds did not exist. SEC v. Goren, 206 F. Supp. 2d 344, 351
(E.D.N.Y. 2002). Since no securities ever existed, the Claimants' net equity
claims had to be for cash.

Congress has mandated in clear and specific terms how a claimant's "net
equity" is to be determined for purposes of permitting SIPC cash advances, and the
courts as well as SIPA trustees and SIPC itself must adhere to that language. A
claimant's net equity claim is determined by "calculating the sum which would
have been owed by the debtor to such customer if the debtor had liquidated, by sale
or purchase on the filing date, all securities position of such customer" minus any

---

11. In pertinent part, section 78fff-2(b) of SIPA provides:

> After receipt of a written statement of claim . . . , the trustee shall promptly
> discharge, in accordance with the provisions of this section, all obligations
> of the debtor to a customer relating to, or net equity claims based upon,
> securities or cash, by the delivery of securities or the making of payment to
> or for the account of such customer . . . insofar as such obligations are
> ascertainable from the books and records of the debtor or are otherwise
> established to the satisfaction of the trustee.

NY 679376_7 i

indebtedness. SIPA § 78lll(11). Here, there were no securities that the Debtor
could have liquidated by sale on the filing date. Instead, Claimants' accounts
should have contained the cash that they had deposited with the Debtor to purchase
securities. The fact that Claimants may have thought, reasonably or otherwise, that
their accounts contained securities does not alter the nature of their net equity
claims. Nowhere in the net equity definition does SIPA state that whether a
claimant has a net equity claim for cash or securities depends upon his or her
subjective legitimate expectation. The legislative history of SIPA does not support
such a proposition.

> 1.    SIPA's Legislative History Confirms that
>        Claimants have Claims for Cash.

With roots in Section 60e of the Bankruptcy Act, a reclamation statute, SIPA
is a federal statutory scheme designed to restore "customers" to the position they
were in vis a vis their broker-dealer before it was placed in liquidation. A SIPA
"customer" claim is similar to a claim for reclamation. As this Court has
recognized, "SIPA was not designed to provide full protection to all victims of a
brokerage collapse." SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983 (2d Cir.
1974) (emphasis added). See SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314,
1317, n.4 (2d Cir.), cert. denied, 426 U.S. 936 (1976) (noting that Congress
enacted SIPA with the intent to protect the small investor only as is apparent in that
at the time it was enacted 90% of the total dollar value of all accounts were
unprotected); Schultz v. Omni Mut. Inc., No. 93-3700, 1993 WL 546671, at *1
(S.D.N.Y. Dec. 30, 1993) (noting that protections of SIPA are limited and SIPC
"does not function as an insurer of all claims against an insolvent broker"). See
also In re A.R. Baron & Co., 226 B.R. 790, 793 (Bankr. S.D.N.Y. 1998)
(explaining that "SIPA is a federal statutory scheme designed to afford limited
financial protection to the customers of registered broker-dealers who experience

financial difficulty"); In re Adler Coleman Clearing Corp., 195 B.R. 266, 273 (Bankr. S.D.N.Y. 1996) (recognizing that "SIPC's role in a SIPA liquidation is limited by statute; it does not attempt to make all customers whole.").[12]  Instead, SIPA remedies customers' losses by having the Trustee return to them the actual property that the broker should have been holding for them in their accounts and that they could have claimed from the broker-dealer on the filing date.  See SEC v. S.J. Salmon & Co., 375 F. Supp. 867, 871 (S.D.N.Y. 1974); SEC v. Howard Lawrence & Co., 74 Civ. 193, 1975 Bankr. LEXIS 15, at *7 (Bankr. S.D.N.Y. 1975) ("The Act is designed to remedy situations where the loss arises directly from the insolvency of the broker-dealer."); S. Rep. No. 95-763 at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 764.  Where a customer's account should contain certain real securities, but does not, the Trustee is authorized to use SIPC cash advances only to purchase securities of the "same class and series of an issuer" on the open market to the extent practicable.  SIPA §§ 78fff-1(b), 78fff-2(d).  See In re Adler Coleman Clearing Corp., 195 B.R. 266, 273 (Bankr. S.D.N.Y. 1996) ("The distribution of a security of the same class and series of an issuer as the

---

12. As discussed earlier, SIPA was intended to insure against such practices as the broker-dealers' misappropriation of customer property in its possession, and failure to properly segregate securities entrusted to the broker-dealer for safekeeping, sale, or as collateral for margin loans.  SIPA was not intended to provide protection in addition to that already provided by law for other types of claims against broker-dealers such as fraud and breach of contract. Hearings on Securities Investor Protection Act Before the Subcomm. on Commerce and Fin. of the House Comm. on Interstate and Foreign Commerce, 91st Cong. 2d Sess., at 230 (1970).  See In re Adler Coleman Clearing Corp., 198 B.R. 70, 75 (Bankr. S.D.N.Y. 1996) (No SIPA protection for claims based on fraud or breach of contract.); Howard Lawrence Co., 1975 Bankr. LEXIS 15, at *7 ("The SIPA does not protect customer claims based on fraud or breach of contract.").

NY 679376_7 i

security credited to the customer's account on the filing date is deemed to satisfy
that customer's claim for that security.") (Emphasis added).

In short, a SIPA Trustee is authorized to step into the shoes of the debtor and
return the property the broker-dealer should have been holding on the filing date to
the claimant. Where there is no issuer and no covered security of any class or
series, the property that can be returned can only be the cash originally entrusted to
the broker-dealer by the customer. There is no authority anywhere in the statute,
case law, or Series 500 Rules for a Trustee to use cash advances to pretend to
purchase nonexistent securities.

The statute's legislative history unambiguously reflects that the goal of a
SIPA proceeding is to restore customers as nearly as possible their accounts as they
actually existed on the filing date:

> Under present law, because securities belonging to customers may
> have been lost, improperly hypothecated, misappropriated, never
> purchased or even stolen, it is not always possible to provide to
> customers that which they expect to receive, that is, securities which
> they maintained in their brokerage account. Instead, when the
> customer claims for a security exceed the supply available to the
> trustee in the debtor's estate, then customers generally receive pro rata
> portions of the securities claims, and as to any remainder, they receive
> cash based on the market value as of the filing date. . . . A principal
> underlying purpose of the bill is to permit a customer to receive
> securities to the maximum extent possible instead of cash, in
> satisfaction of a claim for securities. By seeking to make customer
> accounts whole and returning them to customers in the form they
> existed on the filing date, the amendments not only would satisfy the
> customers' legitimate expectations, but also would restore the
> customer to his position prior to the broker-dealer's financial
> difficulties.

S. Rep. No. 95-763 at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 765 (emphasis
added).

Thus, in most instances SIPA requires that securities that actually exist but are not
in the broker-dealer's possession be purchased for customers using SIPC's funds if
necessary.[13] It is for this reason that the limit on advances on securities is higher
than for claims involving return of cash while SIPA advances for cash are subject
to the same limitations as FDIC protection for cash.[14]

---

13. This intent is clearly evidenced in the following statement:

> In broad terms, there are three problems for which the present Act does not
> provide adequate solutions. The First is that customers generally expect to
> receive what is in their accounts when the member stops doing business. If
> John Q. Investor has 100 fully-paid shares of IBM and a credit balance of
> $200 in his account, he expects to receive from the trustee a stock
> certificate for 100 shares of IBM and a check for $200. But in many
> instances that has not always been possible because securities have been
> lost, improperly hypothecated, misappropriated, never purchased, or even
> stolen. When there are valid claims for more IBM stock than is on hand,
> under the present status John Q. will receive only a pro rata share of his
> 100 shares. For the remainder of the shares due him, he will receive cash
> in lieu of stock based on the market price on the date the liquidation
> proceeding is initiated. Naturally, if IBM stock goes up in price while
> John Q. is waiting to have his claim settled, he will be decidedly unhappy
> with the check he receives from the trustee. On the other hand, if IBM
> declines in price, we may receive no complaints from John Q.

Statement by Hugh F. Owens, Chairman, SIPC Before the Subcommittee on
Consumer Protection and Fin. Comm. on Interstate and Foreign Comm.,
House of Representatives, Aug. 1, 1977, 95th Cong. 1st Sess. on H.R. 8331 at
82.

14. SIPA allows a Trustee to satisfy a customer claim for securities by paying the
customer the filing date value of the securities in question in instances where
the purchase of the securities would be detrimental to the estate. The 1978
Amendments' legislative history provides:

> Our expectation is that, in almost all cases, a customer's claim for
> securities would be satisfied by the delivery of securities, and, where
> necessary, to accomplish this the trustee would go into the open market

24

In enacting SIPA, Congress provided the exclusive framework under which qualified customer claims are satisfied. The District Court ignored the interlocking provisions of SIPA that provide for the calculation and satisfaction of "securities" claims discussed above and substituted its own. According to the District Court, the Trustee should treat Claimants' claims as securities claims and satisfy them by paying cash equal to the fictitious value of the bogus mutual funds as shown on the Claimants' final account statements, amounts that include interest and dividends never in fact earned or received by the Debtor. Goren, 206 F. Supp. 2d at 350. As the case law cited above recognizes, however, the option to satisfy claims for securities with cash in lieu of securities does not apply where the security in question is nonexistent.

As recognized in Aberdeen Securities, accepting a contrary interpretation would not benefit Claimants. In view of the net equity definition and section 78fff-2(b) which, in relevant part, provides that for "purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date," the amount remitted to the customer for the non-existent shares would be the filing date market value of the non-existent fund. SIPA § 78fff-2(b) (emphasis added). The filing date market value of the non-existent fund is not the fraudulent

---

and purchase securities. We believe, however, that it is advisable to provide that the trustee would not be required to purchase securities where that could not be done in a fair and orderly market. One chief concern is that the trustee not be required to make purchases in a market which is being improperly controlled or manipulated. This may be of particular significance where the member being liquidated was a market maker. Under those circumstances, the trustee would decline to purchase the needed securities and would instead satisfy the claim by paying cash in lieu of the securities based on the market value of the securities on the filing date.

1977 H. Rep. at 41-42.

value assigned to it by Goren on fictitious account statements as the District Court held. Rather, it is the amount that would have been owed to Claimants had the Debtor liquidated "by sale or purchase on the filing date, all [of their] securities positions" less any net indebtedness owed by them.  SIPA § 78lll(11).  Under this calculation the amount owed to Claimants for non-existent securities with no market value would be zero.  Thus, although classifying the Claimants' net equity claims as claims for securities would allow for the higher upper limit on SIPA protection to apply, it would also result in the Claimants having net equity claims of zero.  As the Third Circuit held in <u>Aberdeen Securities</u>, treatment of such claims as for cash rather than securities is the more equitable result and the only result consistent with the statutes.  <u>See</u> <u>Aberdeen Secs., Co.</u>, 480 F.2d at 1127.

The Trustee and SIPC closely followed the statute and relevant case law and in fact have gone as far as possible to treat these and other claimants not only fairly but as generously as the statute can possibly allow.  For example, had the Trustee with SIPC's consent not moved for substantive consolidation, these and other claimants would have no claims against New Times alone and would have recovered nothing for their losses.

The distinction between cash being held in an account and securities being held in an account as of the filing date of a SIPA proceeding is an integral part of the statute that courts cannot ignore.  From its inception, Congress distinguished between cash claims and securities claims by providing for a greater SIPC advance in the event of the broker-dealer's collapse for securities claims than for cash claims.  The distinction between the protection afforded to cash claimants and securities claimants in the context of a SIPA liquidation came about because Congress decided that the protection SIPA afforded to the cash component of an investor's claim should not be greater than what was provided by the FDIC to cash held in bank accounts.  <u>See</u> <u>SIPA Amendments:  Hearing Before the Subcomm. on</u>

Securities of the Comm. on Banking, Housing, and Urban Affairs, H.R. 8331, 95th
Cong. 2d Sess. 2 (1978) (opening statement of Senator Williams) (noting that
increase in coverage for cash to $100,000 from $40,000 would guarantee investors
the "same insurance protection for their cash under SIPC as bank and savings
depositors receive under FDIC coverage"); SIPA Amendments:  Hearings on H.R.
6831 Before the Subcomm. on Consumer Protection and Fin. of the Comm. on
Interstate and Foreign Commerce, 96th Cong., 2d Sess. 17, 19 (1980) (statement of
Hugh F. Owens, Chairman Securities Investor Protection Corporation) (noting that
cash coverage for cash claims has historically been on a level with the coverage for
the FDIC and FSLIC programs and that "one of the purposes of increasing the
insurance on securities maintained by customers and member brokers is to
accomplish immobilization of the stock certificate"); SIPA:  Hearings on H.R.
13308, H.R. 17585, H.R. 18081, H.R. 18109, and 18458 Before the Subcomm. on
Commerce and Fin. of the House Comm. and Interstate and Foreign Commerce,
91st Cong., 2d Sess. 149 (1970) (letter from Roy T. Englert, Acting General
Counsel of Department of the Treasury).  The distinction has been maintained
every time that SIPA has been amended and coverage increased.  SIPA coverage
for cash claims is always equal to what the FDIC provides to cash held in bank
accounts.  Currently claims for cash are entitled to $100,000 SIPC advance and
claims for securities are entitled to $500,000 SIPC advance.  These kinds of
distinctions are inherent under the statute.  Courts cannot obliterate them by
creating legal fictions to provide more protection to cash claimants by classifying
them as securities claimants where no security was or could have been held in the
account.

NY 679376_7 i

2.  Following the Statutory Definitions and
    Case Law is Consistent with the Policies of
    the Nation's Securities Laws of which SIPA
    is a Part.

The entire federal securities regulatory scheme of which SIPA is a part
supports the basic principle that non-existent securities cannot be treated as if they
were real.  To protect mutual fund investors, the federal securities laws impose
several layers of regulation.  While the Securities Act of 1933 (the "1933 Act") and
the Securities Exchange Act of 1934 (the "1934 Act") regulate the sale of mutual
funds, because mutual funds are investment companies, the Investment Company
Act of 1940 (the "1940 Act") is the primary federal securities law regulating them.
See David E. Riggs, Securities Regulation of Mutual Funds:  A Banker's Primer,
113 Banking L. J. 864, 865 (Oct. 1996) (hereinafter "Securities Regulation").
Pursuant to the 1940 Act and the 1933 Act, mutual funds must be registered with
the SEC and must issue a prospectus that has gone through the 1933 Act
registration procedures administered by the SEC in selling its shares.  Under the
1940 Act, a mutual fund prospectus must set forth the fund's investment objective
and investment policies.  See Investment Company Act §§ 8(b)(2), (b)(3), &
13(a)(3).  The requirements imposed by the Acts are intended to facilitate informed
investment decisions and protect investors by providing them with material
information concerning initial public offerings of securities.  See Securities
Regulation, 113 Bank. L. J. at 865-66.  Information regarding the market value of
money market funds that are organized as mutual funds and comport to the
requirements of the Securities Acts is publicly available. Treating the bogus mutual
funds at issue here as bona fide securities in order to gain higher coverage for
Claimants undermines SIPA, the 1933 and 1940 Acts.

By ignoring these requirements, the District Court's decision, if upheld,
would lead to absurd and self-defeating results.  Under the District Court's holding

a broker can promise anything in terms of returns, call it a security, confirm its purchase, and claimants would have a claim for the fraudulent cash value of the non-existent security, together with any promised returns. Under the District Court's holding there is absolutely no incentive for investors to check or insist on receiving documents such as prospectuses, quarterly reports, etc., which are the hallmarks of bona fide securities and the foundation for investor protection. It becomes easy for brokers to commit fraud and even easier for those who are promised better than normal returns to suppress their suspicions. The District Court's holding invites fraud and imprudence, encourages a lack of investor vigilance and circumvents the entire regulatory scheme, which requires that mutual funds be registered with the SEC and use a prospectus that has gone through the 1933 Act registration procedures administered by the SEC in selling its shares. Contrary to its belief, the District Court's holding does not promote investor confidence in the public securities market, but rather encourages investors to invest in risky, oftentimes fraudulent securities. Clearly, encouraging fraud and reckless investing is contrary to the aims of SIPA.

As this Court has recognized, SIPA does not provide general insurance against investment risk or even investment fraud, and does not provide special protection for general creditors of the broker, however meritorious their claims. See SEC v. F.O. Baroff Co., 497 F.2d 280, 283 (2d Cir. 1974) (citing assurances in legislative history that SIPA "is not to be a bailout operation; it is to protect the public customers"); accord SIPC v. Wise (In re Stalvey & Assocs.), 750 F.2d 464, 472-73 (5th Cir. 1985) (stating that "[t]he statutory scheme envisioned by the drafters of the statute was to protect persons buying and selling securities through a stockbroker" and that "there is evidence in the legislative history that Congress believed that the SIPA was only an 'interim step' that would not provide complete protection for losses occasioned by the failure of broker-dealer firms"). Given

29

SIPA's limited protections, it is unavoidable that all claimants will not be fully
satisfied for their losses by SIPA.[15]  Even claims based upon a Debtor's most
egregious acts which result in significant monetary losses to the investor will not
be compensable under SIPA.  In explaining this limited protection under SIPA, this
Court stated in SEC v. Packer, Wilbur & Co., that:

> [A]rguments based solely on the equities are not, standing alone,
> persuasive. If equity were the [sole] criterion, most customers and
> creditors of . . . [the debtor] would be entitled to reimbursement for
> their losses. Experience, on the other hand, counsels that they will
> have to settle for much less. SIPA was not designed to provide full
> protection to all victims of a brokerage collapse.

498 F.2d at 983.  In short, customers under SIPA are only entitled to the specific
relief afforded under SIPA—the return of their filing date "net equity."  See SIPA
§§ 78fff(a)(1), 78fff-2(b).  Here, there are not and never have been any securities
covered by SIPA that could be returned to Claimants and Claimants' net equities
were correctly determined by the Trustee to consist of monies deposited by the
Claimants for the purchase of non-existent securities.

_____

15. The fact that Claimants' allowable customer claims are greater than amounts
SIPC can advance in satisfaction of such claims does not mean that they will
never be fully satisfied for their losses.  Simply because Claimants will not be
fully satisfied for losses they incurred as a result of Goren's fraudulent scheme
from SIPC or the fund of customer property does not mean that they will
never be made whole.  These claimants are entitled to share in the general
estate of the Debtor.  See SIPA § 78fff-2(c)(1).  Whether Claimants will
ultimately recover for the losses they incurred depends in large part on the
Trustee's success in marshalling assets for the estate and in pending class
action filed by Claimants counsel here on behalf of all defendant New
Times/New Age investors.  See Gervis v. Berg, No. 00-CV-3362 (E.D.N.Y.
filed June 9, 2000).

## C.   THE SERIES 500 RULES DO NOT APPLY TO
##   TRANSACTIONS IN BOGUS SECURITIES.

The District Court ignored the only case law directly on point, as well as the
wording of SIPA and its relevant legislative history, when it applied the Series 500
Rules to the facts of this case.  The Series 500 Rules apply in determining whether
a "securities transaction gives rise to a 'claim for cash' or a 'claim for securities'."
17 C.F.R. § 300.500 (emphasis added).  See In re A.R. Baron & Co., 226 B.R. 790,
796 (Bankr. S.D.N.Y. 1998).  By definition, in order for the Series 500 Rules to
apply, a "securities transaction" must exist.  See 53 Fed. Reg. 10368 (Mar. 31,
1998) (a review of the cases giving rise to the Series 500 Rules reveals that in no
instance was the security in question fictitious).  The limited purpose for which the
Series 500 Rules were adopted reinforces this basic point.

Prior to the enactment of the Series 500 Rules, SIPC and SIPA trustees
frequently litigated whether SIPA customer claims were claims for cash or claims
for securities where a security transaction (i.e. purchase or sale of a security)
straddled the filing date.  53 Fed. Reg. 10368 (Mar. 31, 1988).[16]  See Murray v.

---

16.   Prior to the Series 500 Rules, customers sometimes objected to having their
      claim deemed a claim for cash for a securities purchase ordered but not
      completed by the filing date when their claim exceeded the maximum amount
      SIPC could advance to satisfy a cash claim.  See, e.g., Murray v. McGraw (In
      re Bell & Beckwith), 821 F.2d 333, 335 (6th Cir. 1987); In re Investors Sec.
      Corp., 6 B.R. 415 (Bankr. W.D. Pa. 1980); SIPC Proposed Rule, 1988 WL
      236666 at *1 (1988).  Conversely, customers would object to having their
      claims treated as claims for securities when the underlying value of the
      security in question had declined.  See, e.g., In re June S. Jones Co., 52 B.R. at
      813 (claimants argued they had claim for cash, not securities, where securities
      were not purchased by the filing date, and securities had declined in value);
      SIPC Proposed Rule, 1988 WL 236666 at *2.  Customers wishing to disavow
      securities purchased for their account in order to have a "claim for cash"
      argued that a purchase of securities did not occur because their broker never
      actually purchased the securities in question.  See id. (emphasis added).

McGraw (In re Bell & Beckwith), 821 F.2d 333 (6th Cir. 1987); SIPC v. Morgan,
Kennedy & Co., 3 B.C.D. 15 (S.D.N.Y. 1977); Gans v. Reddington (In re Weis
Secs. Inc.), [1974-1975 Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶ 94,780
(S.D.N.Y. 1974); In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or. 1985).  The
Series 500 Rules were promulgated to make the treatment of customers' claims
where trades straddled the filing date consistent and to make the delivery of a
confirmation (which completes a contract for statute of fraud purposes) usually
controlling.

As SIPC stated in proposing the Series 500 Rules:

> The proposed rules . . . give full effect to the Congressional intent to
> "satisfy the customers' legitimate expectations" and "restore the
> customer to his position prior to the broker-dealer's financial
> difficulties." S. Rep. No. 763, 95th Cong., 2d Sess. 2, [reprinted in], 3
> U.S. Code Cong. & Admin. News, 95th Cong., 2d Sess., at 765
> (1987).  Indeed, the results reached under the proposed rules will
> affirmatively effectuate the Commission's previously stated view on
> this subject. . . . [T]hat "[w]hen a customer sells securities, his claim
> from that time until settlement and delivery of the funds is a claim for
> cash."

> * * * *

> [T]he Proposed Rules . . . will provide both nationwide uniformity
> and reasonable certainty for customers as to how their claims will be
> treated in the event of the failure of a SIPC member, and will provide
> an objective standard for determining each claimant's legitimate
> expectations. . . .[T]he proposed rules are in complete accord with all
> final judicial decisions on this subject, including cases decided prior
> to SIPA's enactment.

---

Similarly, customers wishing to disavow a sale of securities in order to have a
"claim for securities" argued that the securities were not *actually* sold by the
broker-dealer so that they were still in their account.  See id. (emphasis
added).

NY 679376_7 i

<u>See</u> Rules of the Securities Investor Protection Corp., 53 Fed. Reg. 1793, 1988 WL
236666, at *2-3 (1988) (hereinafter "SIPC Proposed Rules") (emphasis added).
Thus, the District Court was correct that under the Series 500 Rules it is the receipt
of a confirmation of the purchase or sale of a security, rather than the execution of
a trade, that determines whether the customer's net equity claim is one for cash or
securities.  In this case, however, Claimants did not receive written confirmation of
the purchase or sale of an actual <u>security</u> and thus do not fall under the rubric of the
Series 500 Rules.  <u>See, e.g., Plumbers & Steamfitters Local 490 Severance & Ret.
Fund</u>, No. 92CV0349, at 3 (finding that the rules and legislative history cited by
claimants on legitimate expectations is "determinative of a security of such type
being in existence").

In <u>In re June S. Jones Co.</u>, 52 B.R. 810 (Bankr. D. Or. 1985), a case decided
prior to SIPC's adoption of the Series 500 Rules but noted in SIPC's Proposed
Rules as being in accord with them, 1988 WL 236666, at *3, the court specifically
addressed whether customers were entitled to receive either cash or securities in
satisfaction of their SIPA claims in a situation where the security existed but had
not been purchased prior to the filing date.  The claimants relied on <u>Aberdeen
Securities</u> and <u>Investors Security Corp.</u> to argue that they had net equity claims for
cash.  The court rejected their argument noting the distinction between real and
non-existent securities:

> In <u>Aberdeen Securities</u> and <u>Investors Security</u>, unlike this case, the
> securities either <u>never</u> could be purchased, or, if purchased, would
> have matured into cash prior to the filing date.

<u>In re June S. Jones</u>, 52 B.R. at 813 (emphasis added).  When the securities actually
existed, the return of the securities, rather than treating the claims for cash, to the
customers furthered the express purpose of SIPA.  <u>Id.</u> at 814.

NY 679376_7 i

The two cases relied on by the District Court do not support the application of the Series 500 Rules to the facts of this case. The first of these cases, SIPC v. Oberweis Secs., Inc. (In re Oberweis Secs., Inc.) 135 B.R. 842 (Bankr. N.D. Ill. 1991), concerned whether a broker-dealer's failure to execute claimants' orders to purchase bona fide money market funds entitled the claimants to interest and dividends that would have been earned had their instructions been followed, in addition to the money they deposited to purchase the bona fide funds. The court held that the claimants' claims for interest and dividends that would have been earned had the purchases been made were not "customer" claims protected by SIPA, but rather, breach of contract or fraud claims. Id. at 846-47. The court relied on the Aberdeen Securities case discussed earlier and relied on by the Trustee, but disregarded by the District Court, in reaching its decision.

In the second case relied on by the District Court, In re Investors Center, Inc., 129 B.R. 339 (Bankr. E.D.N.Y. 1991), the issue did not concern fictitious securities, but rather, whether the confirmation of the sale of a bona fide security gave rise to a claim for cash or a claim for securities. The court held that the confirmation of the sale of bona fide securities gave rise to a claim for cash under the Series 500 Rules, a proposition with which the Trustee had no issue and applied many times in his determination of claims in this liquidation. Neither Oberweis Securities nor Investors Center purported to answer or even address the question that is at issue here.

In addition to its reliance on wholly irrelevant case law, the District Court misinterpreted the basis of the Trustee's determinations. The District Court stated that the Trustee found that the Claimants did not have claims for securities because the Debtor "embezzled" their assets instead of investing them in an existing money market fund. The Trustee's determination that Claimants had claims for cash did not hinge on the Debtor's embezzlement of funds, but in what the Claimants

intended to purchase.  Indeed, the Trustee allowed the claims here as customer claims for all of the cash deposited by Claimants, less any withdrawals or redemptions.  He also allowed claims for confirmed purchases of <u>bona fide</u> mutual funds that could be identified and purchased on the open market, but were never in fact purchased because Goren embezzled the funds, as claims for securities.  Here, Claimants intended to purchase a fund that in fact did not exist.  The Debtor, even if it had not embezzled their funds, could never have purchased the bogus mutual funds for them.  The only expectation that Claimants objectively could have had, that SIPA is designed to address, was that their money would be available for return to them.  In short, it is not the fact that funds were "embezzled" that dictates the result here.  It is the wording of the SIPA statute.

Finally, the Series 500 Rules were not enacted to circumvent SIPA's prohibition against allowance of fraud claims as "customer" claims.  <u>See</u> <u>SIPC v. Barbour</u>, 421 U.S. 412 (1975) (SIPA was not designed to achieve restitution for fraud).  As discussed above and recognized by the district court in <u>In re Adler, Coleman Clearing Corp.</u>, the Series 500 Rules were enacted to meet customers "legitimate expectations" in terms of restoring their pre-liquidation position <u>vis a vis</u> the debtor with regard to claims treatment where confirmation of a <u>bona fide</u> securities transaction had occurred.  <u>See</u> <u>In re Adler, Coleman Clearing Corp.</u>, 263 B.R. 406 (S.D.N.Y. 2001).

In <u>Adler Coleman</u>, claimants contested the bankruptcy court's ruling that they failed to establish that they had claims for securities under the Series 500 Rules on the grounds that they lacked funds to purchase the securities.  <u>Id.</u> at 424-26.  In that case, fraudulent credits were posted into the claimants' accounts, on the eve of the broker's liquidation filing, from the purported sale of securities that the bankruptcy court had found were practically worthless.  <u>Id.</u> at 434.  The cash shown in the accounts supposedly derived from these sales was then shown on

confirmations to support purchases of blue chip securities that could never in fact
be purchased because their market value far exceeded the fair value of the proceeds
in claimants' accounts. Id. at 434. Claimants argued that they had securities
claims under the Series 500 Rules because of the confirmations of fictitious
purchases and were entitled to the return of the blue chip securities. The Trustee
denied their claims.

On appeal, Claimants argued that the bankruptcy court erred because the
cash was shown to be in their accounts and the Series 500 Rules did not require
immediately available cash. Id. at 430. The claimants relied on Murray v.
McGraw (In re Bell & Beckwith), 821 F.2d 333 (6th Cir. 1987) (a case which the
Series 500 Rules codified) extensively for the proposition that they had a
legitimate expectation that their accounts held securities where they received
purchase confirmations. The Adler Coleman court distinguished the facts of the
claimants' case from that of Bell & Beckwith by noting that the Bell & Beckwith
holding was premised "on the existence of fully performed and enforceable
obligations on the trade date." Id. at 432. The court noted that "in holding that
trades ordered by customers of a debtor before filing date should be treated vis-à-
vis those customers as if subsequently completed by the debtor, the Bell &
Beckwith court impliedly assumed that the debtor-broker would be able
satisfactorily to complete the transactions in relation to other brokers with which
the customers dealt." Id. at 432-33. The court noted that there was nothing in Bell
& Beckwith, as there was in Adler Coleman, that remotely resembled the
"fraudulent and criminal misconduct which actuated and accompanied the trades"
at issue and of which the claimants wished to seek to avail themselves. Id. at 433.
The district court properly noted that the Series 500 Rules "safeguard securities
customers' legitimate claims to cash and securities held by the debtor in their

accounts prior to the filing date, and also manifest a design to deny protection to transactions tainted by fraud." Id. at 435.

Like the claimants in Adler Coleman, Claimants here seek to "retain the benefits of bargains they struck with their corrupt brokers." Id. at 416. Claimants cannot do so. There are and never have been securities of any class and series that the broker or the Trustee could ever have purchased or held for Claimants. Pre-liquidation, Claimants never have had or could have had anything but a claim for the return of the cash they deposited with a potential claim for damages for fraud or breach of contract. The claim for cash deposited is a net equity claim against the fund of customer property for cash subject to the SIPA limit, and the claim for damages is a general creditor claim.[17]

## II.   CLAIMANTS' CLAIMS FOR FICTITIOUS DIVIDENDS OR INTEREST EARNED ARE NOT ALLOWABLE CUSTOMER CLAIMS.

The District Court incorrectly held that Claimants are entitled to return of cash equivalent of interest/dividends that were purportedly earned by the bogus mutual funds. Goren, 206 F. Supp. 2d at 352. The law is clear that non-existent dividends or interest supposedly "earned" on non-existent shares are not customer claims protected by SIPA, although they may be allowable general creditor claims. See Focht v. Athens (In re Old Naples Secs., Inc.), No. 2:00-cv-181-FTM-29D, slip. op. at 16 (M.D. Fla. Sept. 30, 2002) (hereinafter "Old Naples II")[18] (rejecting claimants' argument that their net equity included non-existent interest payments);

_____

17. Moreover, Rule 503 makes clear that nothing in the Series 500 Rules "shall be construed as limiting the rights of a trustee in a liquidation proceeding . . . to avoid any securities transactions as fraudulent . . . or otherwise voidable under applicable law." 17 C.F.R. § 300.503(a).

18. A copy of the Old Naples II opinion is contained in the addendum to the brief.

In re Old Naples Securities, Inc., 218 B.R. at 987 ("[t]he Claimants are entitled to
no more than a return of principal. Each claim must be reduced by the amount that
the claimant received in 'interest' payments."); SIPC v. C.J. Wright & Co. (In re
C.J. Wright & Co.), 162 B.R. 597, 610 (Bankr. M.D. Fla. 1993) ("Because debtor
misappropriated these funds, claimants have a claim for that which they entrusted
to debtor as customer property:  the principal amount that was to be invested.
Debtor did not convert the interest promised because it was never earned.  Debtor
only misused claimants' initial investment.  Likewise, net equity as defined in
SIPA does not contain any reference to providing interest on claims to customers.
Thus the most claimants are entitled to receive is the return of the principal
invested."); In re Oberweis Secs., Inc., 135 B.R. 842 (Bankr. N.D. Ill. 1991)
(rejecting claim for dividends in failure to execute purchase case and stating that
claim for dividends is more properly characterized as one for "damages" and is not
part of the Claimants' net equity but may be recovered from the general estate).

The cases relied upon by the Court and Claimants below are distinguishable
in that they concern the payment of interest/dividends on bona fide mutual funds.
In those cases the claimants had an objectively legitimate expectation of receiving
interest/dividends because the security in question had actually earned them.  Here,
the bogus mutual fund was never organized as a mutual fund and had no assets or
investments.  As noted recently by the Old Naples II court, "where the payments to
claimants will be made out of the quasi-public SIPA fund, permitting claimants to
recover not only their initial capital investment but also the phony 'interest'
payments they received and rolled into another transaction is illogical."  Old
Naples II, slip. op. at 15.  Here, as in Old Naples II, no one disputes that the
interest payments were not in fact interest at all.  To order the Trustee to pay
Claimants the heightened interest promised by a fraudster compounds the fraud
and invites even more egregious fraud in the future.  (Id. at 16 (noting that

38

allowing non-existent interest as part of a claimant's "net equity" claim is
"inconsistent with the goals of SIPA, which does not purport to make all
victimized investors whole but only to partially ameliorate the losses of certain
classes of investors").) The Trustee properly determined that the portion of
Claimants' claims that sought return of fictitious dividends or interest added to the
value of the bogus mutual fund on fictitious customer account statements are not
allowable customer claims.

## CONCLUSION

For the foregoing reasons, the Trustee and SIPC respectfully request that this Court reverse the District Court's order and uphold the Trustee's determinations treating claims filed for the value of shares in bogus mutual funds as net equity claims for cash in the amount deposited by the Claimants and expunge Claimants' objections with respect to those determinations.

Dated:      New York, New York
            October 17, 2002

                                    Respectfully submitted,

                                    HUGHES HUBBARD & REED LLP

                                    By: _____
                                        James B. Kobak, Jr. (JK-1218)
                                        One Battery Park Plaza
                                        New York, New York 10004
                                        Tel: (212) 837-6000

                                        Attorneys for James W. Giddens as
                                        Trustee for the liquidation of the
                                        businesses of New Times Securities
                                        Services, Inc., and New Age Financial
                                        Services, Inc.

                                    SECURITIES INVESTOR PROTECTION
                                    CORPORATION

                                    By: _____
                                        Stephen P. Harbeck (SH-7734)
                                        General Counsel
OF COUNSEL                              805 Fifteenth Street, N.W., Suite 800
                                        Washington, D.C. 20005-2207
    Karen A. Caplan                     Tel: (202) 371-8300
    Assistant General Counsel

NY 679376_7 1

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), Appellants James W.

Giddens, as Trustee for the liquidation of the businesses of New Times

Securities Services, Inc., and New Age Financial Services, Inc., and the

Securities Investor Protection Corporation hereby certify that the foregoing

brief is in 14-point New Times Roman font and contains 12,461 words (as

counted by this firm's word processing system) and thus is in compliance

with the type-volume limitation set forth in Rule 32(a)(7)(C).

Dated:        New York, New York
              October 17, 2002

                              Respectfully submitted,

                              HUGHES HUBBARD & REED LLP

                              By: _____
                                  James B. Kobak, Jr. (JK-1218)
                                  One Battery Park Plaza
                                  New York, New York 10004
                                  Tel: (212) 837-6000

                                  Attorneys for James W.
                                  Giddens as Trustee for the
                                  liquidation of the businesses of
                                  New Times Securities Services,
                                  Inc., and New Age Financial
                                  Services

                              SECURITIES INVESTOR
                              PROTECTION CORP.
                                  Stephen P. Harbeck (SH-7734)
                                  General Counsel
                                  805 Fifteenth Street, N.W., Suite 800
                                  Washington, D.C. 20005-2207
                                  Tel: (202) 371-8300

IN RE: FIRST OHIO SECURITIES COMPANY, Debtor; PLUMBERS and
STEAMFITTERS LOCAL 490 SEVERANCE AND RETIREMENT FUND, et al.,
Plaintiffs-Appellants, and INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED
CRAFTSMEN LOCAL NO. 55 HEALTH AND WELFARE FUND, Plaintiff, v. WILLIAM APPLETON,
TRUSTEE FOR LIQUIDATION OF THE FIRST OHIO SECURITIES COMPANY, et al.,
Defendants-Appellees.


No. 93-3313


UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT


1994 U.S. App. LEXIS 31347


November 1, 1994, Filed


NOTICE: [*1]

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 24 LIMITS CITATION
TO SPECIFIC SITUATIONS. PLEASE SEE RULE 24 BEFORE CITING IN A PROCEEDING IN A
COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND
THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS
REPRODUCED.

SUBSEQUENT HISTORY: Reported in Table Case Format at: 39 F.3d 1181, 1994 U.S.
App. LEXIS 37514.

Certiorari Denied March 20, 1995, Reported at: 1995 U.S. LEXIS 2043.

PRIOR HISTORY: United States District Court for the Northern District of Ohio.
District No. 92-00349. Lambros, District Judge.

CORE TERMS: investor, broker-dealer, liquidation, certificates of deposit,
customers, pooled

JUDGES: BEFORE: MARTIN, NORRIS, and DAUGHTREY, Circuit Judges.

OPINIONBY: PER CURIAM

OPINION: PER CURIAM.  This appeal stems from a liquidation action brought under
the auspices of the Security Investor Protection Act of 1970 (SIPA), as amended
in 1978, 15 U.S.C. @@ 78 aaa et seq.  The two issues before us concern the
proper characterization of certain claims filed in the proceedings and the
status of some of the parties who seek recovery of their losses.  We find no
error in the district court's ruling on these two issues and affirm.

    The plaintiffs are trustees of the two union pension funds involved in this
litigation, the funds' participants, and two named individual investors. Based

on an agreement with a securities broker-dealer named[*2] Thomas Gilmartin,
they thought they had purchased, collectively, over $ 3 million worth of "pooled
certificates of deposit" offered by First Ohio Securities Company. But, because
of fraudulent activities carried on by Gilmartin -- the founder, chairman, and
sole common stockholder of First Ohio Securities -- the certificates were never
actually purchased. Instead, Gilmartin comingled the plaintiffs' funds with his
own personal assets. He then sent bogus purchase-confirmation notices and
fictitious account statements to the various investors to cover his tracks.

When the Security Investor Protection Corporation initiated liquidation
proceedings against First Ohio and the case was removed to bankruptcy court, the
plaintiffs filed simultaneous claims with the trustee for approximately $ 3
million in securities and for the same amount in cash. The trustee determined
that the securities in which the plaintiffs believed they had invested never
existed and, therefore, treated their claims as ones for cash, rather than for
securities. The trustee also determined that the fund participants were not
individual "customers" within the meaning of SIPA and wholly denied their
claims. The[*3] bankruptcy court ruled in accordance with the trustee's
determination on both these issues, over objections by the plaintiffs, and the
district court affirmed.

The distinction between a claim for securities and a claim for cash is
significant, because under SIPA, recovery for cash loss is limited to $ 100,000,
while protection for loss of securities increases to a maximum of $ 500,000. 15
U.S.C. @ 78 fff-3(a). Unfortunately for the plaintiffs here, the record fully
supports the finding by the trustee and by both the bankruptcy and district
courts that the "pooled certificates of deposit" which were the subject of the
agreement between the plaintiffs and the broker-dealer not only were not
purchased by Gilmartin but, indeed, never even existed. Given this fact, the
only legal conclusion possible is that the claims against First Ohio were ones
"for cash" and not "for securities." As the district judge noted, SIPA is
intended to protect investors against a broker-dealer's insolvency; it is not
designed to achieve restitution for fraud. We find no error in the district
court's ruling on this issue.

The district court was equally correct[*4] in determining that the
pension fund participants were not individual "customers," as that term is
defined by 15 U.S.C. @ 78 lll(2). See SIPC v. Morgan, Kennedy & Co., 533 F.2d
1314, 1317-21 (2d Cir. 1976). Moreover, the plaintiffs' argument that Morgan,
Kennedy is inapplicable because of subsequent amendments to SIPA is, simply, not
persuasive.

For the reasons given in the district court's order in this case, we AFFIRM
the judgment entered by that court.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

In re:                                          )
                                                )   NO. 92CV0349
FIRST OHIO SECURITIES CO.,                      )
                                                )
PLUMBERS & STEAMFITTERS                         )   On Appeal from Case No.
LOCAL NO. 490 SEVERANCE AND                     )   590-0027 (SIPA)
RETIREMENT FUND, et al.,                        )
                                                )
       Appellants,                              )   O R D E R
                                                )
            v.                                  )
                                                )
WILLIAM APPLETON, TRUSTEE FOR                   )
THE LIQUIDATION OF FIRST OHIO                   )
SECURITIES CO.,                                 )
                                                )
       Appellee.                                )

THOMAS D. LAMBROS, CHIEF JUDGE

93 FEB 18 P3:27   FILED

   This appeal arises out of the Bankruptcy Court's findings and order issued on the
23rd of December, 1991, regarding the Trustee's determination of claims in a proceeding
involving the liquidation of a securities broker-dealer pursuant to the Securities Investor
Protection Act of 1970 (SIPA).  This bankruptcy appeal is taken as a matter of right
pursuant to 28 U.S.C. § 158(a) and Bankruptcy Rule 8001(a).

   Pursuant to Bankruptcy Rule 8013, the Bankruptcy Court's "findings of fact,
whether based on oral or documentary evidence, shall not be set aside unless clearly
erroneous. . . ."  Accord, Stevens Industries, Inc. v. McClung, 789 F.2d 386, 389 (6th Cir.
1986); In re Dixon, 85 B.R. 745 (Bankr. N.D. Ohio 1988).  The Bankruptcy Court's

conclusions of law, on the other hand, are subject to de novo review. In re Caldwell,
851 F.2d 852, 857 (6th Cir. 1988).

First Ohio Securities Corporation (FOSC) was a securities broker-dealer that bought
and sold securities for the public. On June 22, 1990, Judge David D. Dowd, Jr., entered
an order finding that the customers of FOSC were in need of protection, and the
liquidation proceedings of FOSC commenced pursuant to SIPA. Customers filed claims
with the trustee, and the trustee determined the validity of the claims. Subsequently,
customers objected to the trustees determination and hearings were held before Judge
Harold F. White. In the instant action, the trustee determined that 540 fund claim, the
490 fund claim, the 55 fund claim, and the Stansberrys' claim should be allowed as
claims for cash, and consequently, the trustee paid the claimants $100,000 each. Further,
the trustee determined that the claims of the individual participants in the 540 and 490
funds should be denied because they were not "customers" of FOSC as defined by the
SIPA. The trustee also denied one of the Stansberrys' claim due to the fact that their
account was held as joint tenants with right of survivorship. On December 23, 1991,
Judge White issued his findings and order which upheld the trustee's determinations of
appellants' claims.

Appellants' first eight statement of issues all contend that the Bankruptcy Court
erred when it held that the 540 fund, the 490 fund, the 55 fund, and the Stansberrys
each had one claim for cash. Appellants maintain that their claims should have been
valid claims for securities. If claims are for cash, the protection under the SIPA is limited
to $100,000, but if the claim is for securities, the protection increases to $500,000.

-2-

Appellants' assertion that the claims should have been allowed as claims for securities is not supported by the law. The Bankruptcy Court correctly determined that in order to have a claim for a "security" the security must in fact exist. SEC v. Aberdeen Securities Co., 480 F.2d 1121, 1126-27 (3d Cir. 1973); See also In re Brentwood Securities, Inc., 925 F.2d 325, 328-29 (9th Cir. 1991).

The Securities Investor Protection Corporation (SIPC), created under the SIPA, was formed to establish a fund which would act as a limited insurance policy for customers who lose money as a result of broker-dealer insolvencies.  SIPC is a non-profit corporation whose members contribute assessments which form the basis for the protection fund. The SIPA was not designed to protect customers from fraud or breach of contract, but was specifically enacted for the purpose of providing limited restitution to customers whose loss is the result of insolvent broker-dealers.  In re E.M.S. Government Securities Corp., 90 B.R. 539, 540-41 (Bankr. S.D. Fla. 1988); In re Bell & Beckwith, 124 B.R. 35, 36 (Bankr. N.D. Ohio 1990). Thereby, the appellants' claims for securities are not denied because of the fraud perpetrated, rather they are satisfied as claims for cash to the extent allowed under the SIPA. All of the rules and legislative history cited by appellants on the legitimate expectations and satisfaction of claims for securities is determinative of a security of such type being in existence.  Not only were these "securities" never purchased, they never existed.  Therefore, with no evidence presented that would enable this Court to find the non-existence of the securities clearly erroneous, the conclusion of law that 490 fund, the 540 fund, the 55 fund, and the Stansberrys were each entitled to one cash claim was correct as a matter of law.

In their ninth statement of issue, appellants maintain that the Bankruptcy Court erred when it denied the claims of the individual participants in the 540 and 490 funds. SIPA defines a "customer" as,

> [A]ny person . . . who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities account of such person. . . . The term "customers" included . . . any person who has deposited cash with the debtor for the purchase of securities. 15 U.S.C. § 78 lll(2).

In SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314 (2d Cir. 1976), the court directly addressed the issue of whether individual participants in a pension fund were "customers" of a failed broker. The individual participants did not qualify as customers because they had no direct dealings with the broker-dealers, nor did they entrust cash or securities directly to the broker-dealers. The court held that the actual customers of the broker-dealer were the funds themselves and not the individual participants in the funds. Morgan, Kennedy & Co., 533 F.2d at 1317-21. Therefore, the Bankruptcy Court was correct in denying the claims of the individual participants in the 490 and 540 funds.

In the tenth statement of issue, appellants contend that the Bankruptcy Court erred in finding and concluding that the Stansberrys held one joint account with right of survivorship and not two separate accounts, thus only entitling them to one claim for cash instead of two claims for securities. The Bankruptcy Court's finding that the Stansberry account was held as joint tenants was not clearly erroneous. Evidence indicated that the confirmation statements sent to the Stansberrys were directed to David E. Stansberry and Violet M. Stansberry JTWROS (joint tenants with right of survivorship), and further, the account application form completed by Mr. Stansberry reflected that a

-4-

02-22-93 11:00AM    FROM BAKER & HOSTETLER

single account was opened in the name of Mr. & Mrs. David E. Stansberry (Violet M.) JTWROS. Therefore, the Bankruptcy Court's finding that only one account existed was not clearly erroneous, nor was the conclusion that such an account entitled the holders to one cash claim against the SIPC fund in an amount not to exceed $100,000 contrary to the law. See Morgan, Kennedy & Co., 533 F.2d at 1319-20; In re Investors Security Corp., 6 B.R. 415, 419 (Bankr. W.D. Pa. 1980).

Therefore, after a complete review of the record, and upon full consideration of the parties' objections thereto, this Court finds that the Bankruptcy Court's findings of fact were not clearly erroneous. Additionally, after a de novo review of the Bankruptcy Court's conclusions of law, this Court finds that the Bankruptcy Court applied the relevant legal standards. Therefore, the Bankruptcy Court's Order Re: Objections to the Trustee's Determination of Claims and the Findings Re: Objections to the Trustee's Determination of Claims are fully adopted and incorporated herein and, thus, affirmed. Accordingly, this case is dismissed and terminated.

IT IS SO ORDERED.

Thomas D. Lambros
Chief Judge
United States District Court

AT CLEVELAND, OHIO

DATED: 2/18/93

-5-

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| In re:                                  ) | |
|                                         ) | NO. 92CV0349 |
| FIRST OHIO SECURITIES CO.,              ) | |
|                                         ) | |
| PLUMBERS & STEAMFITTERS                 ) | On Appeal from Case No. |
| LOCAL NO. 490 SEVERANCE AND             ) | 590-0027 (SIPA) |
| RETIREMENT FUND, et al.,                ) | |
|                                         ) | |
|         Appellants,                     ) | JUDGMENT |
|                                         ) | |
|         v.                              ) | |
|                                         ) | |
| WILLIAM APPLETON, TRUSTEE FOR           ) | |
| THE LIQUIDATION OF FIRST OHIO           ) | |
| SECURITIES CO.,                         ) | |
|                                         ) | |
|         Appellee.                       ) | |

THOMAS D. LAMBROS, CHIEF JUDGE

In accordance with the Order of this date, the findings and orders of the
Bankruptcy Court are fully adopted and incorporated herein, and thus, affirmed.
Accordingly, this action is hereby terminated and dismissed.

IT IS SO ORDERED.

_____
Thomas D. Lambros
Chief Judge
United States District Court

AT CLEVELAND, OHIO

DATED: ___2/18/93___

# FILED

92 DEC -1 AM 11: 37 IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
AKRON

IN THE MATTER OF

FIRST OHIO SECURITIES COMPANY

    Debtor

CASE NO. 590-0072 (SIPA)
ADV. NO. 92-5085

ORDER

* * * * * * * * * * * * * *

WILLIAM APPLETON, TRUSTEE for
The Liquidation of First Ohio
Securities Company

    Plaintiff

vs.

HARRY W. HARDY, et al.,

    Defendants

 

This matter is before the court on the motion to dismiss filed by defendants Harry W. Hardy and Mary C. Hardy ("the Hardys") pursuant to Federal Bankruptcy Rule 7012 and Fed. R. Civ. P. 12(b)(6).

## BACKGROUND AND DISCUSSION OF LAW

Debtor, First Ohio Securities Company ("FOSC"), was a securities broker/dealer. On June 22, 1990, pursuant to an application by the Securities Investor Protection Corporation, ("SIPC"), the United States District Court for the Northern District of Ohio entered an order placing FOSC in a liquidation proceeding under the Securities Investor Protection Act ("SIPA"), appointing Joseph Patchan, Esq., as Trustee for the liquidation

proceeding and removing the proceeding to the bankruptcy court.   On
April 19, 1991, William Appleton succeeded Joseph Patchan as
Trustee ("Trustee").

Prior to the commencement of this case, the Hardys paid FOSC
$140,000 for the purchase of securities.   The Hardys made three
payments to FOSC totalling $130,000 for the purchase of three
certificates of deposit as follows:

   a. $10,000.00 paid to FOSC on December 5, 1989;

   b. $50,000.00 paid to FOSC on December 13, 1989;

   c. $70,000 paid to FOSC on June 8, 1989.

The Hardys made a fourth payment of $10,000 to FOSC on January
18, 1990 which was to be invested in the All America Fund ("AAF").
The AAF was purported to be a mutual fund investing in Northeastern
Ohio manufacturing businesses.   It was later determined that the
AAF never existed.

SIPA was enacted to protect individual investors from
financial hardship resulting from broker/dealer failures.   SIPC is
a non-profit corporation which comprises most registered brokers-
dealers.   Members of SIPC are assessed in order to create a fund
which is used to satisfy customer claims resulting from broker-
dealer insolvencies.   (See 15 U.S.C. §§ 78aaa et seq. and In re
First Ohio Securities Co., Case No. 590-0072, slip op. at 2, N. D.
Ohio Dec. 23, 1991.)   SIPC is a non-profit organization with funds
available for the satisfaction of customer claims resulting from
broker-dealer insolvencies.   Id. at 9.

The Hardys filed a claim in this case for $140,000.   Pursuant
to the provisions of SIPA, the Trustee makes a determination of

2

customer claims.   (See 15 U.S.C. §§ 78fff et seq.)   In August 1990,
the Trustee paid the Hardys $141,203.58 on the certificate of
deposit portion of the Hardys claim ($130,000 and interest).   The
Trustee asserts that he made this payment based on the belief that
the certificates of deposit were in existence.   However, the
Trustee later determined that neither the certificates of deposit
nor the AAF investment actually existed.

   The Trustee asserts that because their investments never
existed, the Hardys' claim is not for securities, but instead is
one for cash.   Payment of cash claims is limited to $100,000. [See
15 U.S.C. §§ 78fff-3(a)(1).]   Therefore, the Trustee argues that
the Hardys are not entitled to receive more than $100,000 for
payment of their claims and has filed this turnover proceeding
pursuant to Title 11 U.S.C. § 542(a) to recover the $41,203.58
allegedly paid in excess on the Hardys' claim.

   In their motion to dismiss filed May 15, 1992, the Hardys
assert that the Trustee should be prevented from recovering the
$41,203.58 because a SIPA proceeding does not create an "estate" as
that term is defined in § 541, and § 542 limits recovery to
"property of the estate."   The Hardys further argue that even if an
estate is created, SIPC advances are not property of the estate but
instead are distinct from the "general estate."

   When considering a motion to dismiss for failure to state a
claim, a court must assume that all of the facts alleged in the
complaint are true; and dismissal is inappropriate unless the
plaintiff can prove no set of facts entitling him to relief.   In re
Edmonds, 924 F. 2d 176, 180 (10th Cir. 1991).

3

After reviewing the parties' briefs and the law in this matter, the court concludes that the defendants' arguments are specious and therefore their motion to dismiss should be denied.

The court finds that pursuant to § 78fff(b), liquidations under SIPA proceed in accordance with the provisions of Title 11, including the creation of an estate pursuant to Title 11 U.S.C. § 541. In re Bell & Beckwith, 112 B. R. 863, 866 (Bankr. N. D. Ohio 1990). See also In re Investment Bankers, Inc., 135 B. R. 659 (Bankr. D. Colo. 1991). The court further finds that the Trustee has the power to recover overpayments. See In re Bell & Beckwith, 937 F. 2d 1104 (6th Cir. 1991).

The defendants shall have 10 days from the date of this order within which to file an answer in this adversary proceeding.

IT IS SO ORDERED.

H. F. White
Bankruptcy Judge

I certify that on the 1st day of Dec , 1992, I sent a copy of this Order to:

David J. Naftzinger
Dean D. Gamin
1100 National City Bank Bldg.
629 Euclid Avenue
Cleveland, Ohio  44114

Thomas R. Lucchesi
Hilary W. Rule
3200 National City Center
Cleveland, Ohio  44114

10/03/2002 16:18 FAX                    FULBI & LARDNER

FROM   SEP-30-2002  16:52        651 849 1152      (THU) 10. 3' 02 15:21/ST. 15:16/NO. 4863354266  P  2
                                                                                     P. 02/21

FILED

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

2002 SEP 30  PM 4:?0

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT MYERS DIVISION

In re: Old Naples Securities, Inc.,

              Debtor.

**MEMORANDUM AND ORDER**

Theodore H. Focht, as Trustee, and
Securities Investor Protection Corp.,

Case No. 2:00-cv-181-FTM-29D

              Appellants,

v.

Tessie C. Athens, Stephen and Linda
Compos, Charles and Holly Conroy,
Patricia Fotopoulos, John and Margaret
Helst, Theodore and Katina Kournas,
David and Anita Linden, and Peter and
Deborah Loupos,

              Appellees.

Dean P. McDermott, and Compos-
McDermott Securities, Inc.,

Case No. 2:00-cv-182-FTM-29D

              Appellants,

v.

Theodore H. Focht, as Trustee, and
Securities Investor Protection Corp.,

              Appellees.

Theodore H. Focht, as Trustee, and
Securities Investor Protection Corp.,

Case No. 2:00-cv-327-FTM-29D

              Appellants,

v.

Kathleen Kovacs,

              Appellee.

10/03/2002 16:18 FAX                    POLEY &  _____

FROM                                    (THU) 10.  3' 02 15:22/ST. 15:16/NO. 4863354266 P  3

This matter is before the Court[1] on consolidated appeals from three orders of the
United States Bankruptcy Court for the Middle District of Florida.

**BACKGROUND**

This case arises out of the insolvency of Old Naples Securities, Inc. ("ONSI"). ONSI
was a securities broker-dealer with offices in Naples, Florida and Bethlehem and
Wyomissing, Pennsylvania.  The President and sole shareholder of ONSI, James
Zimmerman, operated out of the Naples office. The Bethlehem branch office was owned and
operated by Stephen Compos and Dean McDermott, who are brothers-in-law and who are
also both claimants in these proceedings.  Together, Compos and McDermott also owned
Compos-McDermott Securities, Inc. ("CMSI"), an insurance agency and another claimant
herein.  The Wyomissing branch was operated by Daniel Shaffer.

ONSI was never profitable. To sustain operations, Zimmerman continually borrowed
money.  Eventually, when the substantial loans became due, he hatched a Ponzi scheme.  He
convinced Compos, McDermott, and Shaffer to persuade their clients to send him money for
the alleged purchase of bonds. The clients were promised a risk-free investment with a 30-
to 45-day return of the principal plus a guaranteed percentage return on the principal, usually
7%. The branch office operators earned an additional 9% commission on each "investment."
Compos, McDermott, CMSI, and Shaffer also provided their own money to Zimmerman,

[1] These appeals were originally assigned to the Hon. Patricia C. Fawsett.  They were
subsequently reassigned to the Hon. John E. Steele.  Pursuant to an inter-circuit assignment under
28 U.S.C. § 294(d), the undersigned is now the Judge of record in this case.

- 2 -

OCT-04-2002  12:37                                      95%                        P.03

10/03/2002 16:18 FAX                    FOLEY & LARDNER

FROM                                    (THU)10.  3' 02 15:22/ST. 15:16/NO. 4563354266 P  4

with the same promise that they would receive a risk-free return on their principal of 16% (7% plus the 9% commission) within 45 days.[3]

In reality, Zimmerman was not buying any bonds but was using the funds from one group of clients to pay the principal and return of the other group of clients. The scheme eventually collapsed in August 1996, after McDermott confronted Zimmerman about his failure to pay some of the clients and Zimmerman confessed the scheme. McDermott and his attorney then notified the FBI.

On August 28, 1996, the District Court entered an order finding that the customers of ONSI were in need of the protections of the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et seq., and appointing Theodore H. Focht as Trustee. The Bankruptcy Court then established a procedure for filing and resolving customer claims. Under the relevant provisions of SIPA, only "customers" of ONSI are entitled to SIPA's protections and may recover under SIPA's reimbursement provisions. "Customer" is defined in pertinent part as "any person who has deposited cash with [ONSI] for the purpose of purchasing securities." Id. § 78lll(2). The Trustee eventually denied many of the claims, finding that the claimants were not "customers" of ONSI because the transactions were loans, not the purchase of securities as required by SIPA § 78lll(2) and (14). Four groups of claimants appealed the Trustee's decision to the Bankruptcy Court, and three of those cases are now before this

---

[3] The Trustee points out that McDermott, Compox, and CMSI were thus all promised an annualized rate of return of 128% to 192%.

- 3 -

Court.

The claims of one group of claimants have been completely disposed of. This group, referred to as the Hoebner and Brown claimants, was initially denied customer status by the Trustee. The Bankruptcy Court reversed the decision of the Trustee, finding that the three claimants were customers of ONSI and were entitled to the protections of SIPA. The District Court and Eleventh Circuit affirmed. In re Old Naples Sec., Inc., 230 B.R. 441 (M.D. Fla. 1999); In re Old Naples Sec., Inc., 223 F.3d 1296 (11th Cir. 2000). The parties disagree about the import of that case to the instant appeals.

The Bankruptcy Court similarly overturned the Trustee's decision with respect to another group of claimants (the "Athens claimants"). This group is made up of Tessie Athens, Charles and Holly Conroy, Patricia Fotopoulos, John and Margaret Heist, Theodore and Katina Kourpas, David and Anita Linden, Peter and Debra Loupos, and Stephen and Linda Compos. As mentioned above, Stephen Compos is one of the owners of CMSI and, together with McDermott, operated ONSI's branch office in Bethlehem, PA. The Trustee[3] has appealed the Bankruptcy Court's decision on customer status only as to Compos. The Trustee also contends that the Bankruptcy Court erred in determining the payment amounts due to the other Athens claimants.

In a separate opinion, the Bankruptcy Court held that another claimant, Kathleen

_____

[3] The Trustee and the Securities Investor Protection Corporation ("SIPC") are joint appellants/appellees in these consolidated matters. The Court will refer to them collectively as the "Trustee."

- 4 -

10/03/2002 16:18 FAX                    FOLEY & LARDNER                         @007

FROM                              (THU) 10. 3' 02 15:22/ST. 15:16/NO. 4863354266 P  6

Kovacs, was a customer of ONSI. The Trustee appeals that order. The briefing for the

Kovacs and Athens appeals has been consolidated.

Finally, the Bankruptcy Court denied customer status for the last group of claimants,

made up of McDermott and CMSI. They have appealed that decision, and the briefing on

that appeal is separate from the Athens/Kovacs briefing.

## DISCUSSION

### A.    Standard of Review

One of the key issues to be decided in these cases is whether Compos, McDermott,

and CMSI are entitled to customer status under SIPA. There is no dispute that this issue is

a question of law that receives de novo review in this Court. See Investor Prot. Corp. v.

Wise (In re Stalvey & Assocs.), 750 F.2d 464, 468 (5th Cir. 1983). The Bankruptcy Court's

factual findings, however, are reviewed only for clear error. Green Tree Acceptance, Inc.

v. Calvert (In re Calvert), 907 F.2d 1069, 1071 (11th Cir. 1990).

### B.    McDermott and CMSI's Appeal

McDermott and CMSI contend that the Bankruptcy Court erred in determining that

they were not "customers" of ONSI and thus are not entitled to the protections of SIPA.

According to McDermott and CMSI, the Bankruptcy Court's findings as to the other

claimants mandate a finding that they, too, were customers of ONSI. Further, McDermott

argues that the Bankruptcy Court erred in applying the doctrine of judicial estoppel to

preclude McDermott from contending in this proceeding that the money he provided to ONSI

- 5 -

10/03/2002 16:18 FAX                FOLEY & LARDNER                        ☒008

FROM                                (TEU) 10. 3' 02 15:23/ST. 15:16/NO. 4863354266 P 7

was anything other than a loan. The Trustee opposes the appeal. He asserts as an alternative

ground for affirmance that the Bankruptcy Court could have determined as a matter of law

that McDermott was not entitled to the protections of SIPA because the SEC found that

McDermott violated the securities laws with respect to the transactions at issue.

### 1.    Law of the case

McDermott and CMSI's claim that because the Bankruptcy Court found that the other

claimants were customers of ONSI necessarily means that McDermott and CMSI were

customers as well is without merit. There are distinct differences between the other

claimants (aside from Compos, whose claim will be discussed in more detail below) and

McDermott and CMSI. First, McDermott and CMSI are not the "unsophisticated

participant[s] in securities transactions" that SIPA was designed to protect. In re Old Naples

Sec., 223 F.3d at 1305 (quoting In re Gilbraleo, Inc., 53 B.R. 324, 329 (Bankr. C.D. Cal.

1985)). McDermott is an experienced securities broker and has a doctorate degree in finance

with a concentration in municipal finance. McDermott's high level of knowledge about

securities transactions in general and about ONSI in particular sets him apart from the other

claimants and itself justifies the differential treatment he received from the Bankruptcy

Court.

Further, as the Bankruptcy Court found, McDermott (and through McDermott,

- 6 -

10/03/2002 16:18 FAX                    FOLEY & LARDNER

FROM                                    (THU)10. 3'02 15:23/ST. 15:16/NO. 4863354266 P  6

CMSI") has failed to show that he entrusted money to ONSI "for the purpose of purchasing securities." 15 U.S.C. § 78*lll*(2). "When a claimant entrusts cash with a brokerage, and the broker misappropriates the money, courts must determine whether the intended investment as understood by the claimant would have been in a 'security' as defined by SIPA." In re Old Naples, 223 F.3d at 1304 (emphasis added).

In this situation it is clear that the transactions as understood by McDermott were not purchases of securities.  First, McDermott testified that he understood the transactions as loans, or as payments to escrow to allow Zimmerman to purchase the unspecified bonds. Whether or not McDermott should be judicially estopped from disavowing this testimony, the Bankruptcy Court was within its discretion to consider this testimony when determining what McDermott knew or did not know about the transactions in question.  McDermott's previous testimony, even in light of his later testimony to the contrary, gives ample support to the Bankruptcy Court's conclusions regarding his status as a customer of ONSI.

Moreover, it stretches credulity that McDermott would have believed that these supposedly "risk-free" transactions with extraordinary guaranteed rates of return were in fact legitimate transactions in securities. Although bonds are certainly one of the safest securities investments, the Court is aware of no bonds that pay the astronomical rates of return that were promised to the claimants in this case. An unsophisticated investor might be forgiven

---

* The Bankruptcy Court seemingly found that the majority of CMSI's claim was for unpaid commissions, for which CMSI is not entitled to customer status. (See Feb. 9, 2000, Order at 11.)

- 7 -

for believing that the transactions actually involved bonds. McDermott must have known differently, and he cannot now claim that he, too, was duped. As the Eleventh Circuit noted in the case involving the Heebner and Brown claimants, "willful ignorance on the claimant's part in the face of clear indications that an investment scheme is suspect may preclude a finding that the claimant intended to purchase 'securities' covered by the Act." Id. at 1505. McDermott's profession of ignorance in this case is tantamount to willful ignorance. His claim and the claim of CMSI were properly disallowed by the Bankruptcy Court.

    2.    Judicial estoppel

Alternatively, the Bankruptcy Court did not err in applying the doctrine of judicial estoppel to preclude McDermott from claiming that the transactions were not loans. "Judicial estoppel is applied to the calculated assertion of divergent sworn positions." Am. Nat'l Bank of Jacksonville v. Fed. Deposit Ins. Corp., 710 F.2d 1528, 1536 (11th Cir. 1983). The policy underlying judicial estoppel "is directed against those who would attempt to manipulate the court system" through asserting divergent positions in judicial proceedings. Johnson Serv. Co. v. Transam. Ins. Co., 485 F.2d 164, 174 (5th Cir. 1973). This Court should review the Bankruptcy Court's application of the doctrine simply to determine whether that application is consistent with the policy underlying the doctrine. Chrysler Credit Corp. v. Rebban, 842 F.2d 1257, 1261 (11th Cir. 1988), abrogated on other grounds, Grogan v. Garner, 498 U.S. 279 (1991).

McDermott presses a different standard for the application of judicial estoppel, citing

- 8 -

cases from the First Circuit Court of Appeals as "informative" on the subject, and as requiring a more searching inquiry than the cases cited above. He offers no reason why this Court should disregard on-point precedent from the Eleventh Circuit in favor of non-binding precedent from another Court of Appeals. Moreover, no court in this Circuit has followed the reasoning of the cases cited by McDermott, nor has the Eleventh Circuit retreated from the description of the doctrine of judicial estoppel in American National Bank of Jacksonville. Indeed, the court very recently relied on that description. Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002). This Court is bound to follow Eleventh Circuit precedent and will do so here.

In his testimony before the SEC, McDermott repeatedly refers to the transactions at issue as "loans." He now contends that such terminology was a shorthand reference chosen by the SEC attorneys and McDermott's attorney to refer to the transactions. McDermott misrepresents the record. In fact, the term "loan" was a shorthand chosen by McDermott and his attorney because, as the attorney and McDermott both insisted, loans were how McDermott understood the transactions. (See Fochi Ex. 46 [McDermott dep.] at 24 (McDermott's attorney: " . . . for these purposes we can call them loans because this is [McDermott's] understanding of what was occurring"); 24-25 (McDermott "[Loan] is how they were described to me"); 28 (McDermott's attorney: "[McDermott] believes these were loans and Mr. McDermott will testify that he always believed these were loans").)

Given this evidence and McDermott's attempt at the evidentiary hearing before the

- 9 -

10/03/2002 16:19 FAX                    FOLEY & LARDNER                         @012

FROM                                (THU)10. 3'02 15:24/ST. 15:16/NO. 4863354266 P 11

Bankruptcy Court to assert a completely divergent position, the Bankruptcy Court was well within its discretion to apply judicial estoppel and preclude McDermott from claiming that he understood the transactions as anything other than loans. It is in precisely this situation that courts must apply the doctrine of judicial estoppel. Before the SEC, McDermott thought that characterizing the transactions as loans would help his position and lead the SEC to conclude that it had no jurisdiction. Before the Bankruptcy Court, however, he realized that characterizing the transactions as loans would preclude any recovery under SIPA, so he changed his story. The policy behind the doctrine of judicial estoppel requires the court to step in in such a situation and protect the integrity of its proceedings. The Court affirms the Bankruptcy Court's determination on judicial estoppel.

3.    The *Packer, Wilbur* Doctrine

The Trustee presses an alternative ground on which to affirm the Bankruptcy Court. He contends that because the SEC found that McDermott and Compos violated securities laws with respect to the transactions at issue, they are not entitled to the protections of SIPA. See SEC v. Packer, Wilbur & Co., 498 F.2d 978, 984-85 (2d Cir. 1974) (finding that "one who engages in a fraudulent transaction cannot reap the benefits of the Act's intended protection"). McDermott asserts that the doctrine espoused in Packer, Wilbur is limited to those who engage in a willful and/or knowing violation of the securities laws. According to McDermott, the SEC at most found that McDermott and Compos failed to conduct a sufficient investigation and ignored "red flags" that should have alerted them to the

- 10 -

10/03/2002 16:19 FAX          FOLEY & LARDNER                              ☒013

FROM                          (THU)10. 3'02 15:24/ST. 15:16/NO. 4863354266 P 12

fraudulent nature of the transactions.

The holding of Packer, Wilbur and its progeny are not as restricted as McDermott argues. In March of this year, the Bankruptcy Court for the Southern District of New York specifically found that the Packer, Wilbur doctrine was not limited to cases of knowing or active participation in the securities law violations. In re Adler, Coleman Clearing Corp. 277 B.R. 520, 558-59 (Bankr. S.D.N.Y. 2002). The court held that a claimant could be denied customer status under SIPA for merely "clos[ing] his eyes" to the wrongful nature of the transactions or for even less egregious behavior. Id. at 559. Under this reading of the Packer, Wilbur doctrine, McDermott and Compos are undoubtedly barred from obtaining customer status in this matter.

However, as McDermott points out, neither the Eleventh Circuit nor any Florida court has adopted, applied, or even cited the Packer, Wilbur doctrine. Thus, it is not clear that the doctrine applies in this case. The Court is reluctant to impose a bar on SIPA recovery based entirely on cases which are not binding precedent. Because the Court has already determined that other factors preclude McDermott and CMSI from obtaining customer status in this matter, it is not necessary to conclusively determine the applicability of the Packer, Wilbur doctrine to this case and in this court. The Court believes that the policies behind the Packer, Wilbur doctrine are sound, namely precluding customer status to those who are claimants only by virtue of their violations of the securities laws. However, the Court will leave to another day the question of whether the doctrine should be the law in this District.

- 11 -

10/03/2002 16:19 FAX                    FOLEY & LARDNER                              ☑014

FROM                              (THU)10. 3'02 15:24/ST. 15:16/NO. 4863354266 P 13

C.    Kovacs and the Athens Claimants

The Trustee does not take issue with the Bankruptcy Court's findings that Ms. Kovacs
and the majority of the Athens claimants were customers of ONSI and are entitled to the
protections of SIPA. He asserts, however, that the Bankruptcy Court erred in finding that
Stephen Compos was a customer of ONSI. He also argues that the Bankruptcy Court's
calculation of the amounts due the claimants was erroneous because it did not offset any
amounts that the claimants received as interest or return of principal from ONSI or CM3L[5]

1.    Compos' claim

The only ground on which the Trustee relies for his argument that Compos' claim
should be denied is the Packer, Wilbur doctrine, discussed in detail above. As noted,
however, that doctrine has not been adopted by the courts of this District or of this Circuit.
The Court will not apply Packer, Wilbur to preclude Compos from obtaining customer status.

However, as with McDermott, there are other grounds on which to deny Compos
customer status in this matter. Although Compos does not have a graduate degree in finance,
he is a registered securities broker with fairly significant experience in bonds. (See Fochs Ex.
57 [Compos Dep.] at 14.) Thus, like McDermott, Compos knew or should have known that

---

[5] With respect to Ms. Kovacs' claim, the Bankruptcy Court applied the offset requested by
the Trustee. Thus, it is not clear what portion of the Bankruptcy Court's decision regarding Ms.
Kovacs the Trustee is appealing. Ms. Kovacs did not take a cross-appeal, although her counsel urges
the Court to reverse the offset applied against her claim "for fairness and consistency's sake."
(Appellees' Opp'n Mem. at 25.) As the Trustee notes, however, failure to take an appeal deprives
this Court of jurisdiction over any claim Ms. Kovacs might have regarding the offset.

- 12 -

OCT-04-2002  12:37                                                95%                      P.13

10/03/2002 16:19 FAX                    FOLEY & LARDNER

    FROM                                (THU)10. 3' 02 15:25/ST. 15:16/NO. 4863354266 P 14

the extraordinarily high rates of return promised by Zimmerman could not have arisen from

legitimate bond transactions. Indeed, Compos testified that he did not do any bond work at

CMSI after 1992 because the rates were so low. (Id. at 17.) The same standard applied

above to McDermott should apply to Compos: "willful ignorance on the claimant's part in

the face of clear indications that an investment scheme is suspect may preclude a finding that

the claimant intended to purchase 'securities' covered by the Act." In re Old Naples, 223

F.3d at 1305. Compos' willful ignorance prevents him from obtaining the protections of

SIPA.[1] The Bankruptcy Court should have disallowed his claim.

    2.    <u>Amounts due to claimants</u>

The dispute over what amount is due to the remaining claimants arises, in part,

because of the inconsistent recoveries allowed by the Bankruptcy Court in this case. In the

Heebner and Brown case, the court allowed the Trustee to subtract from the final recovery

any principal amount and/or interest each claimant received from ONSI or CMSI. Similarly,

in sustaining Ms. Kovacs' objections to the Trustee's denial of her claim, the Bankruptcy

Court determined that the amount due Ms. Kovacs would be set off by any amounts she

received from ONSI or CMSI. However, in granting the Athens claimants' Motion to Alter

or Amend the Judgment, the Bankruptcy Court simply allowed the claims and did not

---

[1] Compos urges the Court to allow his wife's claim, contending that she at least is an
innocent investor. The record shows, however, that Mrs. Compos played absolutely no role in these
transactions other than as joint holder of the account from which the money was drawn. Thus, her
claim rises and falls with her husband's claim. <u>See SEC v. Provident Sec. Inc.</u>, 452 F. Supp. 477,
478 n.3 (S.D.N.Y. 1978).

OCT-04-2022  12:37

                                                    95%                        P.14

address whether those claims should be offset by any amounts the claimants received from
ONSI or CMSI.

SIPA provides that a customer of a defunct brokerage house is entitled to receive his
or her "net equity" from the SIPA fund, up to defined statutory limits. 15 U.S.C. § 78fff-
2(b). The relevant statutory limit in this case is $100,000 per claimant. Id. § 78fff-3(a). To
the extent a customer's claim exceeds the statutory limit, he or she may participate in the
general bankruptcy estate as an unsecured creditor. Id. § 78fff-2(c). The Trustee contends
that the Bankruptcy Court's failure to offset the claims was erroneous because net equity
does not include interest or other payments received. According to the Trustee, participants
in a Ponzi scheme such as that involved here are entitled only to receive their net loss, or the
amount invested less any payments received.

In support of his argument, the Trustee cites In re C.J. Wright & Co., 162 B.R. 597
(Bankr. M.D. Fla. 1993). In that case, Bankruptcy Judge Proctor found that claimants, who
believed they were investing in certificates of deposit but were in fact victims of a Ponzi
scheme not unlike the scheme in this case, were not entitled to recover any more than what
each entrusted to the broker, less any "interest" or other payments received by the claimant.
Id. at 610. As the court noted, under SIPA, claimants only have a claim to that which they
entrusted to the broker, which is only the principal amount invested. Id. Because SIPA's
definition of net equity does not include interest, the court overruled the claimants' claim that
they were entitled to recover the interest they expected to receive from the certificates of

- 14 -

deposit. Id. In that case, however, all claimants agreed that the amount payable out of the SIPA fund should be reduced by any distribution the claimants received from the broker.

The Athens claimants argue that C.J. Wright is distinguishable, but offer no concrete reason for distinguishing it. Nor do the Athens claimants point to any other case that supports their position. Their only argument is that equity requires that all claimants be allowed whatever "interest" payments they might have rolled into a subsequent transaction. They contend that a person who received an interest payment but chose to keep that payment rather than roll it into another transaction cannot now be forced to disgorge that interest payment, and thus that it would be inequitable to force the claimants to disgorge those payments. The Athens claimants also urge the Court to ignore the disposition of the claims of the Hoebner and Brown claimants because those claimants did not contest the offset applied by the Trustee.

There is very little caselaw on point for determining what constitutes a customer's net equity in a situation such as this. Indeed, C.J. Wright is one of the only cases involving a Ponzi scheme scenario that addressed the applicability of an offset for payments received. The Court is convinced, however, that the reasoning of C.J. Wright is sound and, moreover, is fully applicable to the instant matter. Especially where the payments to claimants will be made out of the quasi-public SIPA fund, permitting claimants to recover not only their initial capital investment but also the phony "interest" payments they received and rolled into another transaction is illogical. No one disputes that the interest payments were not in fact

- 15 -

10/03/2002 16:19 FAX                        FOLEY & LARDNER

FROM                                    (THU) 10. 3' 02 15:25/ST. 15:16/NO. 4863354266 P 17

interest at all, but were merely portions of other victims' capital investments. If the Court

were to agree with the Athens claimants, the fund would likely end up paying out more

money than was invested in Zimmerman's Ponzi scheme. This result is not consistent with

the goals of SIPA, which does not purport to make all victimized investors whole but only

to partially ameliorate the losses of certain classes of investors. See Packer, Wilber, 498

F.2d at 983.

Moreover, to allow the Athens claimants to keep the "interest" payments they received

would create inconsistent results within the same case. The Heebner and Brown claimants'

claims have been fully litigated, and those claims were offset by payments those claimants

received from ONSI. Similarly, Ms. Kovacs' claim is offset by the payments she received.

The Athens claimants offer no reason why they should reap the benefit of the payments they

received when none of the other claimants reaped such benefit.

The Court is convinced that the Trustee correctly calculated the amounts due the

Athens claimants, other than Stephen and Linda Compos, whose claim is denied in its

entirety. Each claimants' claim must be reduced by any amounts the claimant received from

ONSI or from CMSI, whether as "interest," return of principal, or any other payment. To the

extent the Bankruptcy Court's order failed to address this issue or failed to apply the offsets

requested by the Trustee, that order is reversed.

3.    Costs and fees

On the last page of their opposition memorandum, the Athens claimants ask the Court

- 16 -

10/03/2002 16:20 FAX                    FOLEY & LARDNER                          @019

FROM                              (THU)10. 3'02 15:26/ST. 15:16/NO. 4863354266 P 18

to give them pre- and post-judgment interest and taxable costs of litigation, or to remand that
issue to the Bankruptcy Court for determination. They offer absolutely no argument or
caselaw support for this request. There is nothing in the record to indicate that the Athens
claimants have ever filed a formal claim for such interest or costs.

SIPA does not provide for the payment of any interest to customer/claimants. C.J.
Wright, 162 B.R. at 510. Nor is there any provision for the payment of costs or attorney's
fees. Moreover, as the Trustee notes, the Athens claimants' failure to file a bill of costs in
compliance with the Local Rules precludes any claim for recovery of litigation costs. See
M.D. Fla. Bankr. L.R. 7054-1. The Athens claimants are not entitled to recover any interest,
costs, or attorney's fees from the Trustee in this matter.

## CONCLUSION

Based on the files, record, and proceedings herein, the Court determines that the
Trustee's decision to deny customer status to Compos, McDermott, and CMSI is correct, and
that the Trustee correctly calculated the amounts due the Athens claimants. Accordingly, IT
IS HEREBY ORDERED that:

1.    The Order Granting Motion to Alter/Amend Judgment (Bankr. Doc. No. 278)

is AFFIRMED in part and REVERSED in part as follows:

a.    Claimants Stephen and Linda Compos' objections to Trustee's

determination are OVERRULED;

b.    The remaining claimants' claims shall be limited to their actual

- 17 -

FOLEY & LARDNER

(THU) 10. 3' 02 15:26/ST. 15:16/NO. 4863554266 P 19

investments less any payment received as interest, return of principal, or otherwise, as set forth more fully above;

2.    The Order Overruling Objections to Trustee's Determination of Claim Nos. 137 and 138 of Dean McDermott and Compos-McDermott Securities, Inc. (Bankr. Doc. No. 305) is **AFFIRMED**;

3.    The Order Sustaining Objections to Trustee's Determination of Claim No. 136 of Kathleen Kovacs (Bankr. Doc. No. 312) is **AFFIRMED**; and

4.    The Clerk is **DIRECTED** to transmit a Certified Copy of this Order to the Clerk of the United States Bankruptcy Court.

Dated: _September 30_, 2002

Paul A. Magnuson
United States District Court Judge

- 18 -