Lawrence R. Velvel
Massachusetts School of Law
500 Federal Street
Andover, MA 01810
Tel:  (978) 681-0800
Fax: (978) 681-6330
Email: velvel@mslaw.edu

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | ) | **SIPA LIQUIDATION** |
| | ) | **No. 08-01789 (BRL)** |
| **BERNARD L. MADOFF INVESTMENT** | ) | |
| **SECURITIES LLC,** | ) | |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

**MEMORANDUM OF OBJECTOR, LAWRENCE R. VELVEL, IN OPPOSITION
TO THE POSITION OF THE TRUSTEE AND SIPC ON NET EQUITY.**

# TABLE OF CONTENTS

A.    Preliminary Statement …………………………………………………..    1

B.    SIPA Is Not Merely A Branch Of Bankruptcy Law, And The
      Normal Rule Of SIPA Must Take Precedence Here ……………………    3

C.    The Victims' Expectations, Derived From Their Statements, Not
      Madoff's Fakery, Is Controlling ………………………………………    6

D.    The Briefs' Arguments From Expediency Are Both Impermissible
      And Incorrect ……………………………………………………………    8

E.    SIPC And The Trustee Are *Required* To Provide Madoff Customers
      With The Securities Shown In Their November 30th Statements …………  14

F.    SIPC And The Trustee Must Lose even If Their Intent Was Pure,
      And A Fortiori Must Lose If It Was Not …………………………………  20

G.    Conclusion …………………………………………………………………...  22

# TABLE OF AUTHORITIES

## Legislative Reports

S. Rep. No. 95-763, (1978), *reprinted in* 1978
    U.S.C.C.A.N. 764 ………..………………………………    1, 15, 16


H. Rep. No. 95-746, (1977) ………..…………………………………  1, 7, 16

## STATUTES

Securities Investor Protection Act of 1970, as amended

15 U.S.C. § 78fff(b) ……………………………………………………  4

15 U.S.C. § 78fff-2(c)(1) ……………………………………………. 6

A.    <u>Preliminary Statement</u>.

1.    "The Securities Investor Protection Act of 1970 (SIPA) was enacted to provide to customers of securities broker-dealers protection against losses which might occur as a result of the financial failure of broker-dealers."   This is the very first substantive statement in the Senate Report on the 1978 amendments to SIPA.  S. Rep. No. 95-763, at 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764, 764.  The House Report on the 1978 amendments says, "The bill would make SIPA more responsive to the reasonable expectations of public investors and would provide investors with greater protection against the financial failure of stockbrokers, thereby enhancing investor confidence in the securities markets."  H. Rep. No. 95-746, at 21 (1977).

These Congressional purposes are not much focused on, if focused on at all, by the briefs of SIPC and the Trustee.  This is in a way "understandable," since the purposes of Congress are deeply thwarted, perhaps even destroyed, by the position on net equity of SIPC and the Trustee.  This destruction is not only true in the Madoff case itself, but *far* more widely.  For, as occurred in Madoff itself, *no* investor with a broker-dealer can be certain that his investment is not part of a Ponzi scheme. After all, one cannot know that one has invested in a Ponzi scheme until *after* it is revealed.  So no investor will be able to withdraw earnings from his investment with confidence that he will not later be told that the withdrawn monies never existed, that the withdrawals diminish his net equity, possibly making it a negative number, that he will lose SIPC protection if it *is* a negative number, that he will also lose claims against customer property and the estate, and that he is subject to clawbacks.

Thus *every* investor with a broker-dealer will be at risk, will be threatened with potential economic disaster, if he takes out income from an investment, although taking out income to live, to pay expenses and taxes, and to make other investments is one of the main purposes people have when *making* an investment in the first place. Investors will have no guaranty of protection -- contrary to the purposes of Congress. They will *know* they have no protection and that their reasonable expectations, which Congress intended to protect, are irrelevant. Confidence in the securities markets -- another purpose of Congress -- will be vastly diminished. People will quickly realize that they might be much better off simply putting their money in a bank or splitting it among several or many banks, at lower rates of return but with assurance that the FDIC will pay them up to $250,000 for each separate account if a bank should prove fraudulent and bankrupt so that the money the depositors *thought* was in their accounts was not there in fact.[1]

This kind of destruction of Congress' purposes to protect investors, enable people to rely on reasonable expectations, and promote confidence in the securities markets should not occur by fiat of SIPC and the Trustee, given sanction by a federal court. If such destruction of Congress' purposes is to be worked, it should be only by supervening dictate of Congress itself, expressed in an amendment to SIPA. Until there is such an amendment, it is the responsibility of SIPC and the Trustee to uphold, not destroy, the existing Congressional purposes, and it is equally or even more the responsibility of federal courts to stand against, rather than give way to, efforts by SIPC and the Trustee that would injure or destroy the Congressional purposes.

---

[1] The mind reels at the national outrage -- or worse -- that would arise if the FDIC were to say it will *not* pay depositors, whose bank statements show money in their accounts, because over the course of time they took out in interest more than they had deposited. Yet that is precisely what SIPC and the Trustee are doing here.

2

2.    Although this case should turn on Congress' desire to protect investors, honor reasonable expectations, and promote confidence in markets, the net equity question has produced a legion of arguments, as this Court knows and as the briefs of SIPC and the Trustee show.  It is not Objector's purpose in this brief to reprise most of the arguments made on behalf of those who, like Objector, believe that one's net equity must be measured by one's November 30, 2008 statement rather than by cash-in/cash-out. Rather, Objector will for the most part focus on a few major themes raised in the briefs of SIPC and the Trustee and in their prior papers, themes designed to take the focus off of the Congressional purposes of protecting investors, honoring reasonable expectations, and promoting confidence in markets.  Arguments over the meaning of various cases and technical statutory wording will, with but few exceptions, be left to other lawyers, whose prior briefs have shown mastery of all aspects of the case[2] and whose forthcoming briefs will presumably do the same.[3]

**B.**    <u>SIPA Is Not Merely A Branch Of Bankruptcy Law, And The Normal Rule Of SIPA Must Take Precedence Here</u>.

The briefs of SIPC and the Trustee both devote page after page to exegeses of the history preceding the enactment of SIPA.  The reason(s) for this are somewhat opaque to Objector, but seem designed to persuade the Court that SIPA is nothing but a branch of

---

[2] Objector would especially point to the brief dated June 23, 2009 submitted by Brian Neville of Lax and Neville, and the brief dated August 3, 2009 submitted by Helen Chaitman of Phillips Nizer.

[3] There can be little doubt that briefs will be filed on behalf of numerous victims.  Yet they may represent only a small fraction of the true objectors.  Apparently, many Madoff victims have not yet received determination letters from the Trustee, and will likely become objectors after they do receive them.  Also it is well known that many other victims have hung back because they are concerned that, if they file briefs or papers taking SIPC and the Trustee to task, the Trustee will publicly reveal all the details of their relevant financial positions, as has already occurred in many instances.  This is very frightening to many people, and often is regarded by them as a form of coercion by the Trustee.

bankruptcy law, that a SIPC proceeding is nothing but, and should be treated merely as, a bankruptcy proceeding, and that the rules of bankruptcy law and bankruptcy cases should apply here.   As said in the Trustee's brief, "A liquidation under SIPA, however, is *essentially a bankruptcy proceeding*," and "Notwithstanding the special protection afforded customers and although it has some elements that are different, *a SIPA proceeding is basically a bankruptcy* liquidation."   Trustee's Brief, pp. 14,15 (emphases added).   Under the rules of bankruptcy law, which SIPC and the Trustee wish to apply, it is claimed that cash-in/cash-out should govern here because a SIPA liquidation is basically, is essentially nothing more than, a bankruptcy proceeding.

The problem, however, is that the SIPA is not merely a branch of bankruptcy law. Rather the SIPA was enacted to achieve specific purposes involving broker dealers who go bankrupt:  SIPA was enacted, as repeatedly said, to protect investors, honor reasonable expectations, and promote confidence in markets. Even if the Trustee and SIPC are correct in claiming that cash-in/cash-out governs the bankruptcy proceedings of *ordinary* businesses, this does *not* mean it covers the special cases of *broker dealers*, for whom Congress provided special rules to accomplish special purposes.   Those purposes are thwarted or destroyed by cash-in/cash-out, and require use of the November 30th statements in order to be achieved.

The Trustee and SIPC concede that, as SIPA itself says, the rules of bankruptcy do *not* prevail when inconsistent with SIPA.   That is explicit in the statute.   15 U.S.C. § 78fff(b).   Yet it seems that SIPC assesses consistency or inconsistency simply by the effect on SIPC itself, by what it thinks is in its own best financial interests.   For example, the three-percent-of-the estate limitation that bankruptcy law places on the compensation

4

of Trustees appears not to be followed in a SIPA proceeding where SIPC desires to pay a Trustee more than three percent -- which can make great financial sense for SIPC because, by playing hardball with victims, a tough Trustee and his tough counsel can save SIPC far more than it spends on them in fees.  That this hardball, and often unjustifiable, attitude prevails has been infamous, at least since the lengthy article by Gretchen Morgenson in 2000 (*INVESTOR BEWARE; Many Holes Weaken Safety Net For Victims of Failed Brokerages*, *New York Times*, September 25, 2000, p. A1), and has been exemplified in the Madoff case by what happened to clients of various lawyers *before* the lawyers were retained to combat SIPC and the Trustee and forced SIPC and the Trustee to back off.  (The lawyers have detailed this in filed papers.)  The larger point here, though, is that even SIPC and the Trustee admit what the statute provides -- that bankruptcy law must give way when inconsistent with SIPC.  Thus, the cash-in/cash-out rule of bankruptcy law must give way here unless SIPC, the Trustee and courts are to act contrary to Congress' express purpose of protecting investors, honoring reasonable expectations, and promoting confidence in markets.

A related point, mentioned in the briefs of SIPC and the Trustee, is that net equity, as measured for SIPC purposes, will control investors' shares in customer property or the bankruptcy estate.  In other words, if someone has a positive net equity because the *November 30th statement* controls, the persons is eligible both for SIPC protection up to $500,000, and to receive a share in customer property and the estate for net equity amounts exceeding $500,000.  But if the same person has a negative net equity as measured by *cash-in/cash-out*, the person will be eligible for *neither* SIPC protection *nor* for a share in the customer property or estate.  Frankly, because SIPA and bankruptcy law

do not have the same purposes, it conceivably might be better if the November 30th statement governed one's net amount for SIPA purposes and cash-in/cash-out governed one's amount for purposes of a share of the estate. However, the wording of SIPA appears to confirm the position of SIPC and the Trustee that the same measure of net equity, whether it be the November 30th statements or cash-in/cash-out, will control for all purposes. 15 U.S.C. § 78fff-2(c)(1). Thus, unless one is to frustrate the Congressional purposes of protecting investors, honoring reasonable expectations, and promoting confidence in markets, one must follow the November 30th statements in the special case of a broker-dealer, *a special case that in SIPA has been specially provided for by Congress*.

C.    The Victims' Expectations, Derived From Their Statements, Not Madoff's Fakery, Is Controlling.

The briefs of SIPC and the Trustee spend page after page giving the details of what all have known anyway since December 11, 2008: that the Madoff operation was a fake. The purpose seems to be to persuade the Court that Madoff's victims should not be treated as investors are treated when an operation is *not* a fake -- when, for example, investors' accounts *do* have the money needed to buy particular securities, or *have* earned the interest accruing to an investment.

The problem with the line of argument, however, is that, despite all the fakery, there was one dispositive fact that is true: investors received statements which they had no reason to disbelieve, which they had every right to think were true and accurate, which they relied on at all times and *which therefore governed their spending and their lives*, and which were the exact type of statements that historically have been the measure of the legitimate expectation of investors. As said in the House Report on the 1978

6

amendments, "A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business," and it is unchallengeable that an innocent customer's statement from the broker is the measure of "what he believes is in his account."  H. Rep. No. 95-746, at 21 (1977).  It is not as if we are discussing here the statements received by people who were part of Madoff's conspiratorial group and, as the Trustee has made clear in complaints filed against such persons, knew or plainly should have known that something *had* to be wrong. We are discussing here *innocent* persons who believed the statements of account that were sent to them and had no inkling of a fraud,[4] just as one believes in the reality of statements of account sent him by a bank and has no inkling that the bank may be committing fraud.  Those statements, as said, have historically been the measure of legitimate expectations, and the Trustee and SIPC cannot change that if they were to write *100* pages giving the details of what was done by the likes of Frank DiPascali.

There is one unusual fillip relating to this.  The brief of the Trustee concedes that investors' legitimate expectation was that they owned securities, but claims that they did not have a legitimate expectation as to the amount.  Trustee's Brief, p. 38 (Victim's "legitimate expectations" are "that she has a claim for securities," but she cannot legitimately expect the "fruits" of this, i.e., the false profit shown in the statements

---

[4] It has been asserted that, under cash-in/cash-out, which destroys Congress' purposes, the only way for an investor to protect himself against fraud would be to personally see the securities allegedly possessed by his broker on his behalf, or to check with the Depository Trust Company to be sure it holds the claimed securities.  Even then, however, the investor could not know if the securities he physically saw were borrowed rather than his; one understands that the Depository Trust Company will not make disclosure to non governmental persons or entities; and the securities in the Depository Trust Company are in street name anyway if Objector understands correctly.  But, more importantly, for an ordinary investor - - a man in the street, so to speak -- to have to resort to such extreme actions to safeguard himself is completely out of keeping with investment practice and with practicality, and shows how far the cash-in/cash-out theory takes one from the intent of Congress to protect investors.

received from Madoff.)  This is a truly remarkable position -- one could justifiably say a desperate position.  Has anyone ever heard of an innocent Madoff investor, or any innocent investor, who legitimately thought she owned the securities shown in her statement of account but did not simultaneously expect that the dollar figure shown for purchase price or sale price or current value were true?  Does anyone know *any* Madoff (or other) investor who thought to herself, "Well yes, I expect that I own the securities shown on my statement, but simultaneously I do not expect that the purchase price or the sale price of the security was the amount shown on the statement."[5]

      D.      <u>The Briefs' Arguments From Expediency Are Both Impermissible And Incorrect</u>.

Instead of using the November 30th statements to measure net equity in order to fulfill Congress' intent to protect investors and promote confidence in markets, for many months now, and in their briefs, SIPC and the Trustee have argued it would be *unfair to do what Congress wants*, and therefore they have the *duty* to *disregard Congress* by using cash-in/cash-out.  They argue by potpourri in this connection:  they claim that using the November 30th statements will result in the money of the latest investors being used to pay prior ones, that such use will lessen the amounts received by later investors, that the claims of later investors are mainly for real money but the claims of earlier ones are mainly for phantom profits, that using the November 30th statements allows Madoff to determine how much money an investor made, and that cash-in/cash-out represents equity and equality.

---

[5] Another remarkable, desperate argument made by the Trustee is that the November 30th statements are not the measure of net equity because the victims are principals and Madoff is their agent in the fraud. Trustee's Brief, pp. 25-29.  Under this logic the victims defrauded themselves out of their life savings, using Madoff as their agent.  The argument, like the one discussed in text above, shows how far SIPC and the Trustee will go in trying to avoid paying victims.

Objector must first note that, even if the arguments of SIPC and the Trustee were factually and morally correct, SIPC and the Trustee have absolutely no right, let alone a duty, to evade the will of Congress that investors be protected, reasonable expectations be honored, and confidence in markets be promoted, or to evade this Congressional intent by importing bankruptcy law of cash-in/cash-out into SIPA in order to cancel SIPA's different Congressional requirements and purposes.

Beyond this, the potpourri of arguments made by SIPC and the Trustee are at best only half right where right at all, and sometimes cross the line into the immoral. It is not true -- it is in fact totally *un*true despite the unconfined statements by SIPC and the Trustee indicating the contrary -- that paying some investors up to $500,000 based on net equity as determined by the November 30th statements would result in similar payments being denied to *other* investors. For the $500,000 (or less) payments to *any* investor come not from investors' property (customer property), *but from SIPC's own funds*; the payments do not deplete the customer property or the bankruptcy estate.

It *is* true, of course, that in the past Madoff used money from later investors to pay prior ones who redeemed. That is the *definition* of a Ponzi scheme. So it happened not just to later investors, but to *all* innocent investors (except for the initial ones), including those who ultimately took out more than they put in.[6] It also is true that, because net

---

[6] There is only one class of non-initial investor who is in a way an exception to the fact that the money of *all* was used to pay prior ones who redeemed. The money put in by an investor who redeemed his entire account more than six years before the Ponzi scheme collapsed *was* used to pay *prior* redeemers, but the investor recovered back everything he put in plus phony profits when he himself redeemed, with the redeeming monies coming from still later investors. Nor, apparently, is the fully redeemed innocent investor who redeemed over six years ago subject to clawbacks if innocent. Thus, such an investor recovered *everything* -- the money he put in, plus his phony profits -- with his recovery coming from still later investors. But SIPC and the Trustee completely ignore this when claiming that cash-in/cash-out should be used in connection with the later investors who likewise received phony profits. The only investors that SIPC and the Trustee protect are the *very* latest ones. Stated simply, the earliest investors

equity apparently must be determined the same way for purposes of the up–to- $500,000 payment from SIPC and for determining a share of customer property or in the estate, using the November 30th statements will cause persons who otherwise would be disqualified by cash-in/cash-out to instead share in customer property and the estate, thereby diminishing amounts *ultimately* available to others from these sources many years from now when the huge lawsuits against culprits are over and as much has been recovered in one way or another as is possible.   (It is not uncommon for SIPC proceedings to last five to ten years, and this one is an apt candidate for such longevity.) But none of this diminishes the fact that the initial payments of up to $500,000 come from *SIPC's* funds, not customer property or the bankruptcy estate, so that payment of up to $500,000, to one customer cannot diminish such payment to another because of a shortage of customer or estate property.   Moreover, if *little* is *ultimately* recovered for customer property or the estate, the "diminution" in money available from these sources for "other" claimants -- for those with a positive net equity based on cash-in/cash-out -- will not be major, and if *much* is recovered (and $15 billion or so is being sought), they will still get much while in the meanwhile the Trustee's cash-in/cash-out position, by causing denial of claims for up to $500,000, has driven hundreds or perhaps thousands of elderly persons to the poorhouse.   People have been left with no capital, no income, have had to sell their homes in a depressed market, and there even are reported cases in which an individual in his 90s had to take a job carrying advertising signs in a supermarket and

---

who redeemed early are protected by their "earliness", the *very* latest ones are protected by SIPC and the Trustee, and those who invested in the middle get hammered by SIPC and the Trustee.

Nor do SIPC and the Trustee tell us, as they must know, how many innocent investors fall into the category of fully redeeming over six years before December 11, 2008, so that the money of other investors was used to pay them and cannot be clawed back from them, nor how much money was involved.  They prefer to ignore all this while laying the cudgel to other innocent investors.

of individuals who have had to paw through dumpsters in search of food. People have been driven into dire poverty by a position which contravenes Congress' purpose to *protect* investors, to see them *not* driven into poverty.

The dire poverty thrust upon so many by the position of the Trustee and SIPC shows the moral bankruptcy of the position. In order to disregard Congress' desire to *protect* investors, not harm them, SIPC and the Trustee have fastened on a single idea which, *they* say, is the sole criterion of equality and therefore *must* be followed despite Congress' protective intent. The sole measure of equality, *they* say, is that regardless of the November 30th statements, one gets back only what she put in on a net basis, so that if an innocent person took out more over the years than she put in, did so in the best of faith and in the honest and legitimate belief that she had what her statements showed, conducted her economic life on the basis of the statements she received, and is now rendered hopelessly impoverished by the Trustee's method of calculating net equity, still she gets nothing because a positive net amount on a cash basis is the only possible criterion of equity and the only possible measure of equality. The Trustee's position impoverishes persons who worked and saved all their lives, and allows the still wealthy and super wealthy to remain wealthy and super wealthy, yet is said by SIPC and the Trustee to be the sole possible criterion of equity and equality. In fact, the position reminds one of the famous comment that the law in its majestic equality allows both the rich and the poor to sleep under the bridges of Paris. Not to mention that its results run directly contrary to American social and economic policy since 1932.

And, just to put icing on this cake, it is the ironic fact that, quite often, much of the money that was withdrawn over the course of fifteen or twenty years, so that one

ended up with a negative net equity on a cash-in/cash-out basis, was taken out by investors in order to pay the federal government income tax on what turned out to be phony profits. It is accurately said that the federal government, which took in untold billions of dollars in taxes on phony profits -- which took in so much in unjustifiable taxes that it hasn't said how much that amount is -- was the largest beneficiary of Madoff's scheme, obtaining a multiple even of what was obtained by Jeffry Picower. Now a fraudulent scheme that, it is well established, the federal SEC should have uncovered and stopped as early as 17 years ago (in 1992),[7] a fraudulent scheme that caused persons to pay over the years a fortune in unjustified income taxes, much of which the federal government and its rules will not allow them to recover because of *de facto* or *de jure* statutes of limitation even though the federal SEC bears enormous guilt and the federal IRS made out like a bandit, has also resulted in a denial of the $500,000 desperately needed to live by many victims, a denial by the fiat of a Trustee appointed by a federal court at the demand of a body set up under federal statute. The irony (if that is what one calls it) is multiple.

The Trustee's and SIPC's argument that the November 30th statements should not be used because the claims of later investors are mainly for principal and those of earlier investors are for false profits is both irrelevant and a mere *ex cathedra* pronouncement which we are supposed to believe on the Trustee's unsupported say so, without evidence. It is irrelevant for reasons stated earlier: the Congressional intent is to protect investors, honor reasonable expectations, and promote confidence in markets; it is long established that the statements received from brokers are the measure of the legitimate expectations of innocent investors in this regard; and bankruptcy law does not control here -- SIPA

---

[7] See the Report of the SEC's Inspector General.

does.  Nor does the Trustee provide *any* evidence -- *though he has* the *relevant facts in his possession* -- for his claim that the claims of earlier investors are for phony profits and those of later investors are for money they put in.  For this to be true of the later investors, it would seem they would have to be *very* late investors, since anyone who invested for as long as the last five or six years of the fraud was credited with a great deal of profit, and many who invested in the early or mid 1990s can also have significant claims for money they themselves put in.  (In Objector's own case, over 45 percent of the claim based on the November 30th statement is for money he put in since he began investing with Madoff in 1995.) We would know the actual facts had the Trustee and SIPC chosen to release them in connection with their allegation regarding the supposed proportions of principal and false profits, but SIPC and the Trustee have instead chosen the path of nondisclosure.

Finally, that Madoff would be determining investors' returns unless cash-in/cash-out is used is one of those arguments that sometimes sound attractive at first blush, but whose power evaporates on analysis.  The argument is being used to eviscerate the Congressional intent to protect investors, honor their reasonable expectations, and promote confidence in markets; this disqualifies it *ab initio.*  But even if one says Madoff should not determine the rates of earnings for innocent investors who had no reason to suspect a fraud -- we are not talking here of the Picowers, Chaises, Fairfields, etc. -- still there are far better alternatives -- *alternatives commonly used in the financial world* -- than impoverishing innocent people by use of cash-in/cash-out.  One could credit investors with the increases in price over the years of the S&P 100, which are the securities Madoff claimed to be using.  One could credit investors with the increase in

value of the Dow Jones index, since Madoff claimed to be buying and selling securities

of the type and influence of the securities comprising that index. One could credit

innocent investors with prevailing rates of interest or with the earnings on Treasury

securities. All of these commonly used methods of making financial determinations

could be used here instead of using the crippling, impoverishing cash-in/cash-out method

chosen by SIPC and the Trustee.[8]

      E.      <u>SIPC And The Trustee Are *Required* To Provide Madoff Customers With The Securities Shown In Their November 30th Statements</u>.

When Bernard Madoff's Ponzi scheme was disclosed on December 11, 2008, one

ventures to estimate that most victims knew utterly nothing about the complex statute

called the Securities Investors Protection Act. Objector cannot remember ever *hearing*

the words SIPA or SIPC previously, and for certain knew nothing about the complicated

Securities Investors Protection Act. In the circumstances it was inevitable that most

victims would necessarily depend on SIPC personnel and representatives to explain the

situation, would depend, for example, on Mr. Harbeck, who by 2008 had worked for

SIPC for 33 years, and Mr. Picard, who had handled SIPC cases for so long a time that he

was described as one of SIPC's "go to" Trustees as far back as Gretchen Morgenson's

2000 article. Because most victims necessarily had to rely on such experts, one would

think the experts would have made clear to the victims early on a point that finally was

made clear by SIPC and the Trustee in their briefs filed in mid October:  that SIPC is

---

[8] That crediting investors with interest on cash they invested is a way of determining net equity if one does not use the November 30th statements, is a reason why it was seriously incorrect for the Trustee and SIPC -- as Objector is given to understand what happened -- to successfully seek to persuade the Court to *ex*clude the interest question from the current briefing and argument on net equity after the Court had *in*cluded the question of interest in its opinion holding that net equity would now be briefed and argued. Obviously, SIPC and the Trustee must believe their chances on the interest question are better if it is considered *separately* from the question of net equity than if it is considered as possibly being a *part* of net equity.

*required* to obtain and give back to victims the securities shown as being owed them in

their statements of account, so long as the securities can be acquired in a fair and orderly

market.  This is not *optional* for SIPC.  It is *mandatory*.  Here is what was said in the

1978 Senate Report:

> In addition, H.R. 8331 modifies existing law by *directing* that the trustee purchase securities when necessary in order to deliver such securities to customers in order to satisfy claims.  The trustee's duty in this respect is qualified to the extent that such action is to be taken "to the extent that securities can be purchased in a fair and orderly market."  S. Rep. No. 95-763, at 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 765, 765.  (Emphasis added.)

> \* \* \* \* \*

> A principal underlying purpose of the bill is to permit a customer to receive securities to the maximum extent possible instead of cash, in satisfaction of a claim for securities.  By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments not only would satisfy the customers' legitimate expectations, but also would restore the customer to his position prior to the broker-dealer's financial difficulties . . . . *Ibid.*

> \* \* \* \* \*

> This section reflects *one of the essential features of the amendments, namely the delivery of securities to customers to the greatest extent practicable* in order to make customer accounts whole.  The section provides generally that a trustee shall seek to discharge promptly all obligations of the debtor relating to cash or securities to the extent the obligations may be established from the debtor's books.  In addition to authorizing the trustee to use SIPC funds to satisfy claims, this section authorizes a trustee to deliver securities in satisfaction of claims to the extent they are available.  After the available securities have been distributed to satisfy such claims, the trustee *shall* purchase the balance of the shares in open market purchase in accordance with Section 8(d).  Securities distributed to customers are to be valued as of the filing date.  *Id.* at 775-776.  (Emphases added.)

> \* \* \* \* \*

> Section 8(d).  One of the central features of the bill is this subsection's grant of authority to the trustee to purchase securities in the open market or otherwise obtain them for the purpose of restoring customer accounts to their filing date positions.  *A key objective of the bill is the satisfaction of a customer's claim for securities by the delivery of securities to the greatest extent possible.*  *Id.* at 776 (emphases added).

The House Report was to the same effect:

> One of the principal underlying purposes of these amendments, is to permit a customer to receive securities to the maximum extent possible instead of cash, in satisfaction of a claim for securities. By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments not only would satisfy the customers' legitimate expectations, but also would allow him to continue to exercise investment prerogatives and to avoid oftentimes adverse tax consequences.  H. Rep. No. 95-746, at 21 (1977).

Furthermore, the phrase "fair and orderly market" does not refer to a market that is going up and down, but only to a market that is not being subjected to artificial influences such as manipulation.  Thus, the House Report on the 1978 amendments explicitly said:

> In order to increase the extent to which customer claims for securities are satisfied with securities rather than cash, the bill would authorize the trustee for a brokerage firm undergoing liquidation to make up for missing securities by purchasing shares, so long as this could be done in a fair and orderly market.  The words "fair and orderly market" are used to assure that the trustee will not be forced to purchase securities in a market controlled by artificial influences.  For example, a market might not be deemed fair and orderly where there were indications at manipulation by insiders or others.  H. Rep. No. 95-746, at 22 (1977).

So essential is the requirement that *securities* be provided to victimized customers in order to enable them to continue to pursue investment objectives, that, as quoted in prior briefs of parties, Mr. Harbeck testified to a judge in the *New Times* case that SIPC

will obtain and provide a customer with the securities shown on his statement even if the broker had never actually acquired them and even if their value had tripled, and Ms. Wang, SIPC's General Counsel" was quoted by an obscure publication early-on in the Madoff matter as saying SIPC would acquire and provide securities for victims if their statements showed that they owned securities.

But, as said, that SIPC was *required* to provide *securities* to victims was not generally made known to victims, who were almost all entirely in ignorance of *any* knowledge of SIPA or SIPC. Instead, the victims were told at an early stage that their recovery, if any, would be entirely in cash that reflected their net equity.

In fact, however, as said, SIPC and the Trustee were "direct[ed]" to acquire and obtain securities if the stocks could be obtained in a fair and orderly market -- *as they could have been and still can be*. There is no sign that the market has been or now is subject to artificial influences such as manipulation, which is the criterion for determining a fair and orderly market. Nor need the purchase of the necessary securities even move the market very much if at all. After reading the briefs of SIPC and the Trustee which, as said, made clear that acquiring securities is *mandatory, not* optional, if the stocks can be obtained in a fair and orderly market, Objector had research done on the size of the market for securities comprising the S&P 100, which are the securities shown on investors' statements. It turns out that the securities in the S&P 100 trade, in toto, in the *billions* of shares per month -- approximately three to five billion. S&P 100 Index Chart, Yahoo! Finance, http://finance.yahoo.com/ (last visited Nov. 4, 2009). It also turns out that a sampling of individual shares in the S&P 100 showed that they trade in the range of many millions of shares per day, and that the particular shares shown on the

November 30th statements generally trade in a range of from five or six million shares per day to scores of millions and even hundreds of millions of shares each day.  S&P 100 Index Chart, Yahoo! Finance, http://finance.yahoo.com/ (last visited Nov. 4, 2009).    Set forth below is a list of the daily trading volumes, over three months, for the securities shown on the November 30th statements.

| **Company** | **Average daily volume over the past 3 months[9]** |
| --- | --- |
| Abbott Laboratories | 8,539,280 |
| Amgen Inc. | 7,924,580 |
| Apple Inc. | 16,657,700 |
| AT&T Inc. | 27,605,000 |
| Bank of America | 228,625,000 |
| Chevron Corp. | 9,508,640 |
| Cisco Systems Inc. | 45,846,100 |
| CITI Group Inc. | 812,346,000 |
| CL A | |
| Class B | |
| Coca Cola Co. | 10,844,700 |
| Comcast Corp. | 9,231,020 |
| Conocophillips | 12,669,900 |
| Exxon Mobil Corp. | 21,071,300 |
| Fidelity Spartan | |
| General Electric Co. | 102,765,000 |
| Google | 2,743,080 |
| Hewlett Packard Co. | 14,738,800 |
| Intel Corp. | 58,678,800 |
| IBM | 6,513,420 |
| Johnson & Johnson | 10,522,300 |
| J.P. Morgan Chase | 37,036,400 |
| McDonalds Corp. | 9,479,240 |
| Merck & Co. | 16,733,500 |
| Microsoft Corp. | 55,703,200 |
| Oracle Corp. | 32,284,800 |
| Pepsico Inc. | 7,913,770 |
| Pfizer Inc. | 50,601,900 |
| Philip Morris Intl. | 7,268,420 |
| Procter & Gamble Co. | 12,020,200 |
| Qualcomm Inc. | 17,214,300 |
| Schlumberger Ltd. | 9,197,110 |
| United Parcel SVC Inc. | 4,077,960 |

[9] This list was compiled from Yahoo! Finance on October 26, 2009, http://finance.yahoo.com/.

| | |
|---|---|
| United Technologies Corp. | 5,170,060 |
| US Bancorp | 16,154,000 |
| US Treasury Money Market | |
| Verizon Communications | 17,251,100 |
| Wal-Mart Stores Inc. | 16,985,100 |
| Wells Fargo & Co. | 50,059,800 |

With a market of this size,[10] it is self evident that the shares shown as belonging to Madoff investors on their November 30th statements not only could be acquired in a market that is not being subjected to artificial influences such as manipulation, but could be acquired without disturbing the market. Such acquisition would be even the easier because there is *no* requirement that the shares be acquired in one fell swoop. Rather, as is *commonly done* by traders who buy or sell huge blocks of securities and do not wish to disturb the market or cause large price movements, the required securities can be acquired in segments over time, over two or three or six months, let us say.[11]

But as far as is *publicly* known, SIPC and the Trustee did not give thought to acquiring and providing securities (except for Wang's statement in an obscure internet publication) even though such acquisition and provision is *required,* and did not insure that victims -- who mainly were in complete ignorance of SIPA -- were plainly informed that SIPC was *required* to provide securities if this can be done through acquisition in a

---

[10] It is likely that a reason that the volumes of trades in S&P 100 securities is so (surprisingly?) huge is that stocks in the S & P 100 comprise "about 59 percent of the market capitalization of the S&P 500 and almost *45 percent of the market capitalization of the U.S. equity markets*". Standard & Poor's, S&P 100 Fact Sheet (Dec. 31, 2008) *available at* http://www2.standardandpoors.com/spf/pdf/index/SP_100_Factsheet.pdf. (Emphasis added.)

[11] Madoff's statements showed approximately 65 billion dollars in securities owned by investors. The total collective price of S&P 100 securities traded each month is approximately 1.65 *trillion* dollars (estimate based on data compiled from Yahoo! Finance using the closing price for each stock in the S&P 100 on Nov. 4, 2009, and the three month daily trading average for each stock on Nov. 5, 2009, http://finance.yahoo.com), in three months is thus about 4.95 *trillion* dollars, and in six months is nearly ten *trillion* dollars. The total dollar value of shares of Madoff investors is thus a bit less than 4% of one month's trading of the S&P 100, only about 1.3 percent of three months' trading of the S&P 100, and less than seven-tenths of one percent of six months' trading of the S&P 100.

19

fair and orderly way.  They simply took advantage of victims' vast ignorance of SIPA in order to circumvent the requirement of providing securities.

To have acquired and given investors securities would have made, and would still make, a tremendous difference in their lives.  (This is true even if one used cash-in/cash-out, so long as one had a positive net equity under this method.)  For the stock market has risen dramatically in 2009, and Madoff customers would have benefited greatly from the rise had they been given securities.  This would have accorded with Congress' intent to protect investors and to allow them to pursue their investment objectives.  But Madoff investors, as said, were kept in ignorance that it is *mandatory* to acquire and provide securities, and were instead preemptively informed that only cash would be provided.  As far as Objector is aware, the question of the mandatory duty to provide securities has not previously been briefed in this Court -- and conceivably has not even been brought up here before.  It should be brought up and it should be briefed, and Objector urges the Court to require this.[12]

> F.    SIPC And The Trustee Must Lose Even If Their Intent Was Pure, And A Fortiori Must Lose If It Was Not.

As Objector made clear above, he believes that SIPC and the Trustee must lose on the net equity question even if their intent were as pure as the driven snow.  It is widely thought, of course, that the intent was not so pure.  It is widely thought that, even though the use of cash-in/cash-out would thwart Congress' intent to protect investors, honor their

---

[12] As far as Objector knows, the only circumstance in which the requirement of obtaining and providing securities would make no difference is if cash-in/cash-out were to prevail, one had a negative net equity by this method, *and* that negative net equity disqualified one from receiving securities.  Although the legislative history does contain language implicitly indicating that securities shown as belonging to an investor on her statement would still have to be provided to her under these circumstances, Objector thinks the opposite more likely on the basis of some legislative history and certain statutory language.  In any event, the whole issue of the requirement to provide securities should be briefed and argued because it is *surely* applicable if net equity is based on the November 30th statements, and is *surely* applicable to those with a positive net equity under cash-in/cash-out.

reasonable expectations, and promote confidence in markets, it became the intent of SIPC

and the Trustee to use cash-in/cash-out -- and not to acquire and provide securities or use

the November 30th statements to determine net equity -- because SIPC was *woefully* short

of the money it would need to acquire securities or to use the November 30th statements;

did not want to have to assess the brokerage industry for the money or ask Congress for

it; and feared bankruptcy and/or the loss of management's very lucrative jobs if it had to

acquire and provide securities or used the November 30th statements to measure net

equity.  It is thus widely thought that SIPC and the Trustee made their decision to use

cash-in/cash-out in order to satisfy *SIPC's* economic intent of saving itself, its coffers,

and its management's jobs regardless of the adverse effect of the decision on innocent

investors *whom Congress intended to protect and regardless of its effect in thwarting*

*Congress' purposes.*

Because of this view, supported by actions in *New Times* regarding investors

whose supposed securities existed in the real world, the statements of Mr. Harbeck and

Ms. Wang, and other matters, discovery has been sought on the question of the intent

underpinning the decision of SIPC and the Trustee to use cash-in/cash-out.  SIPC and the

Trustee have declined to provide *any* such discovery, and the matter is being briefed and

argued.  Were discovery to be allowed, and were it to show that an intent to save SIPC's

fisc and management contributed to the decision to use cash-in/cash-out, a decision taken

though it harms the very investors Congress intended to protect, this would *in itself*

invalidate the use of cash-in/cash-out.  For it cannot be permissible for SIPC to intend to

thwart *Congress'* purposes in order to serve its *own* purposes.  Otherwise, any public,

private, or quasi public body could simply thumb its nose at Congress whenever this suits the body's own intent -- which is a preposterous position.

But even if discovery were to be allowed and were to show that no self-interested financial intent, or management protection intent, played a role in the decision to use cash-in/cash-out, so that the intent *was* pure, still SIPC and the Trustee must lose on the net equity question for all the reasons stated above, in prior briefs, and in briefs to be filed by other parties and lawyers in this case.[13]

    G.    <u>Conclusion</u>.

As said above, the decision of SIPC and the Trustee to use cash-in/cash-out has given rise to a legion of arguments on one side and the other.  But at the end of the day, only one point should be focused on.  Does the decision contravene Congress' purposes to protect investors, honor reasonable expectations, and promote confidence in markets. That it contravenes these purposes -- and that it places every investor at risk because one cannot know in advance that an investment is definitely *not* a Ponzi scheme -- seems to Objector inarguable, regardless of what arguments are made by SIPC and the Trustee -- who "understandably," and to suit their own purposes, focus very little if at all on Congress' controlling intent to protect investors, promote reasonable expectations, and promote confidence in markets.    Because the decision to use cash-in/cash-out "accomplishes" the forbidden objective of contravening Congress' intent, and threatens investors, it must be overturned.

---

[13] Other parties and lawyers have in the past, and doubtlessly will again, fully discuss the *New Times* litigation.  Therefore, all that Objector wishes to say about it is this:  As a general matter (though not always), the briefs of SIPC and the Trustee discuss *New Times* as if the portions of the *New Times'* opinions discussing the securities which existed in the real world though the fraudster had not bought them -- the precise situation in Madoff -- did not exist.  When the discussion does focus on the existence of the *relevant* part of *New Times*, the briefs usually ignore the absolutely crucial fact that the ability of Madoff investors and of the relevant *New Times* investors to check results reported in their statements against real world results were exactly the same.  This fact was a dispositive one in *New Times*.

Respectfully submitted,


s/Lawrence R. Velvel
Lawrence R. Velvel
Massachusetts School of Law
500 Federal Street
Andover, MA 01810
Tel:  (978) 681-0800
Fax:  (978) 681-6330
Email: Velvel@mslaw.edu

Dated:  November 6, 2009

R:\My Files\Madoff\MemoObjectorOppos.SIPC.Trustee.doc

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing Memorandum of Objector, Lawrence R. Velvel, In Opposition to the Position of the Trustee and SIPC on Net Equity to be served on persons listed below by first class mail, postage prepaid, on this 6th day of November, 2009.

/sLawrence R. Velvel
Lawrence R. Velvel

Josephine Wang, Esq.
Securities Investor Protection Corp.
805 15th Street, N.W., Suite 800
Washington, DC 20005-2207

Stephen P. Harbeck
President
Securities Investor Protection Corp.
805 15th Street, N.W., Suite 800
Washington, DC 20005-2207

Christopher LaRosa, Esq.
Securities Investor Protection Corp.
805 15th Street, N.W., Suite 800
Washington, DC 20005-2207

David J. Sheehan, Esq.
Baker & Hostetler, LLP
45 Rockefeller Plaza
New York, NY 10111

Marc E. Hirschfield, Esq.
David J. Sheehan, Esq.
Baker & Hostetler, LLP
45 Rockefeller Plaza
New York, NY 10111

Helen Chaitman, Esq.
Phillips Nizer, LLP
666 Fifth Avenue
New York, NY 10103

Jonathan M. Landers, Esq.
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119

Brian Neville, Esq.
Lax & Neville LLP
1412 Broadway, Suite 1407
New York, NY 10018