Lawrence R. Velvel
Massachusetts School of Law
500 Federal Street
Andover, MA 01810
Tel: (978) 681-0800
Fax: (978) 681-6330
Email: velvel@mslaw.edu

Hearing Date: Nov. 24, 2009
Hearing Time: 10:00 a.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** ) | **SIPA LIQUIDATION** |
| ) | **No. 08-01789 (BRL)** |
| **BERNARD L. MADOFF INVESTMENT** ) | |
| **SECURITIES LLC,** ) | |
| ) | |
| **Debtor.** ) | |

**RESPONSE OF OBJECTOR, LAWRENCE R. VELVEL,**
**TO THE MOTIONS OF SIPC AND THE TRUSTEE**
**FOR PROTECTIVE ORDERS DENYING DISCOVERY**

1.    <u>Discovery Relating To The Intent, Or Motive, Or Purpose Underlying Actions By Governments Or Private Bodies Is Now A Staple Of The American Legal System.</u>

In case after case, in legal subject after legal subject, the "intent," or "motive" or "purpose" underlying an action makes all the difference as to whether an action of a private or governmental body is legal or illegal.

In discrimination law, the question often is, and the case will turn on, whether an action that disadvantages a person because of her race, her sex, or her age was taken because she was, for example, an inept employee on the one hand, or because she was

1

black, a woman, or, say, over 65 years old on the other hand.   Intent, or motive, or purpose, is the all important factor in determining legality.   In constitutional cases involving religion, the case will turn on whether an action was taken to further a goal applied to *all* persons, regardless of religion or irreligion, on the one hand, or with the intent to harm a particular religious group on the other.   The intent, or motive, or purpose behind the action is all important to determining legality.   In antitrust law the case will turn on whether an action was taken in order to complete more effectively, and/or produce a better product or service at a cheaper price, on the one hand, or with the intent to injure or destroy a competitor on the other.   Intent, or motive, or purpose is all important in determining legality.   In tax law involving tax shelters, the question whether there was an intent to make a business profit, on the one hand, or only to avoid taxes on the other, is the critical factor in determining legality.   In fraud cases, the question of whether there was an intent or purpose to defraud can be the question on which legality will turn.  Intent or motive or purpose is again all important.[1]

The list goes on and on, throughout much of American law.   And wherever the question of intent or purpose or motive arises, there is discovery on the issue because the issue is critical in determining legality.   The list of relevant fields, and the discovery, reflect the *inevitable* fact that smart lawyers always can come up with innocent sounding justifications for *anything*, and it is thus crucial to learn via discovery the *real* reasons for

---

[1] In regard to the intent, or motive, or purpose underlying the actions of private or governmental bodies, see *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); *Church of the Lakumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540-41 (1993); *Wisconsin v. Mitchell*, 508 U.S. 476, 485-86 (1993); *Rogers v. Lodge*, 458 U.S. 613, 617-19 (1982); *Board of Education v. Pico*, 457 U.S. 853, 870-71 (1982); *Epperson v. Arkansas*, 393 U.S. 97, 107-109 (1968); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (1985). There are now hundreds, if not many thousands, of cases in which intent or purpose or motive was the crucial factor.
.

an action -- the *real* intent or motive or purpose underlying it -- in order to judge its legality.

Yet, according to the Trustee and SIPC, the intent, the motive, the purpose underlying their determination to use cash-in/cash-out is completely irrelevant. It can therefore be the subject of no discovery, they say. It does not matter if their files were to contain smoking gun documents, or collections of documents, establishing the following set of propositions: They were aware that, in the past, brokers' statements received by investors were the measure of net equity, that this was true even in fraud cases such as *New Times* when real though unpurchased securities were involved, as in Madoff too. They were aware that Mr. Harbeck and Ms. Wang had respectively testified and/or publicly said that securities would be acquired for investors whose statements showed they owned securities. They knew that the statements investors received from Madoff were the measure of investors' legitimate expectations regarding the ownership of securities and the dollar value owned. *They knew or suspected that using cash-in/cash-out would provide less protection than Congress intended and would frustrate investors' legitimate expectations as Congress thought of legitimate expectations*. But they nonetheless desired to use cash-in/cash-out because otherwise SIPC would be bankrupted by the huge dollar size of the Madoff matter, SIPC's management might be fired for not having taken sufficient precautions against a huge loss, and the only way to avoid these results, if cash-in/cash-out were *not* used, would be to assess the brokerage industry for huge sums of money, which would create a firestorm of protest in the industry, or to ask Congress for billions of dollars, which would create a firestorm in Congress. They also knew that their lawyers would be able to put forth (as occurs in discrimination,

3

constitutional, antitrust, tax, and other cases) perfectly innocent sounding, perfectly legitimate sounding, plausible reasons for using cash-in/cash-out, so that the real intent, the real motive, the real purpose behind using cash-in/cash-out might never come out and would therefore never undermine its legality (as they undermine legality in other fields).

As said, even if smoking gun or collections of documents in their files were to establish all these propositions, SIPC and the Trustee say there can be no discovery of those documents because they supposedly are irrelevant and are privileged.   The complete, continuing secrecy of all such documents is the burden of their briefs -- which, perhaps curiously, do not *deny* that documents pertinent to the above propositions exist, but instead say they cannot be discovered no matter what.

According to SIPC and the Trustee, then, their actions are not subject to, and are lawful despite, the stricture that governs judicial assessment of the legality of actions of private and public bodies across vast swaths of American law:   their actions, they maintain, are lawful *despite* the possible intent or motive or purpose with which they were taken.   They are lawful even if taken with intent to thwart the will of Congress in order to save SIPC's coffers and management.   But judicial disregard of underlying intent, purpose or motive is emphatically *not* the state of American law and should not be the position followed here.

> 2.    The Remaining Arguments Of SIPC And The Trustee Do Not Justify Denial Of Discovery.

A.    When Objector filed his first request for production of documents, he simultaneously filed a *Notification To The Court* explaining his reasons for doing so. The *Notification* made explicit that the request for production only "seeks documents relating to whether SIPC and the Trustee, to any extent, decided to use the cash-in/cash-

out method to determine net equity in order to advance or save SIPC's economic position." *Notification To The Court Of Request For Production Of Documents*, p. 1 (Exhibit 1, *infra*). The *Notification* went on to explain why there already was evidence this could have occurred, citing the testimony of Mr. Harbeck in *New Times* that securities would be provided, the statement to the same effect reportedly made by Ms. Wang to an internet publication when the Madoff fraud was disclosed, and then the later change of view under which it was decided to use cash-in/cash-out after the size of Madoff's fraud, and the size of SIPC's liability if it had to provide securities or use the November 30th statements, began to sink in.  The *Notification* then said, "In sum, the question is whether a desire to save SIPC's economic position, and conceivably the jobs of management, played any role in the decision to use cash-in/cash-out rather than the standard method, and to do so even though use of the cash-in/cash-out method would, for the benefit of SIPC, result in enormous hardship to victimized investors whom it was Congress' purpose to help." *Notification*, p. 3 (Exhibit 1).

The *Notification* thus made clear that, oppositely of what is claimed in the briefs for a protective order filed by SIPC and the Trustee, Objector seeks no discovery of legal analyses of counsel -- which are available in final form anyway in the briefs on net equity filed by SIPC and the Trustee on October 16, 2009.  Objector has no interest, for example, in documents discussing the holdings or facts of cases relied upon or distinguished in the briefs.  Objectors' only interest, the *Notification* made clear, is in the underlying intent or motive or purpose that caused the cash-in/cash-out position to be adopted in the first place, *not* in lawyers' analyses used to defend it.

B.     Counsel for the Trustee and for SIPC called Objector on October 16th to confer, and advised him that they would be seeking a protective order.  Objector asked why they were seeking a protective order rather than simply filing objections to the requested discovery.  The answer was that the filing of objections implicitly presumed that discovery could be had if it were properly framed, but there can be no discovery whatever here.  The answer that there can be *no* discovery here was memorialized in three emails written to counsel for the Trustee and SIPC and was never denied or gainsaid by them.  In an email to David Sheehan on October 16th, it was said, "I understand that your filing will in fact be of a protective order taking the position that, for whatever reasons you choose to assert, the Trustee can never be required to produce the requested documents."  (Email of October 16th to David Sheehan, Exhibit 2, *infra*.)  In an email of October 27th, it was said, "I know that you do not wish to file objections before Judge Lifland rules on your request for a protective order because you feel, Mr. Sheehan has said on the phone, that objections presume a right to discovery, but you deny any such right can exist here."  (Email of October 27th to Marc Hirschfield, copies to counsel for SIPC, Exhibit 3, *infra*.)

Also, in view of SIPC's and the Trustee's broad denial of any right to discovery on *any* subject, in an email of October 28th to Marc Hirschfield it was said, with regard to a then forthcoming and now filed second document request that seeks materials on why securities were not purchased for investors, "No doubt your forthcoming motions for a protective order will implicitly cover this matter, since your position, as I understand it, is that no discovery can be had on *any* question.  It would be perfectly understandable, however, and perfectly alright with me, if you were to choose to explicitly say that your

position also covers discovery about acquiring securities to satisfy customers' claims."
(Email of October 28th to Marc Hirschfield, copies to counsel for SIPC (emphasis in original) (Exhibit 4, *infra*).)    The motions filed by SIPC and the Trustee *have* said this, again evidencing the motions' uncabined scope.

Naturally, because the position of SIPC and the Trustee was that there can be no discovery on any question here, when conferring by phone with Objector on October 16th, the sole agreement they were interested in reaching was an agreement that they would never have to produce any documents, or, at minimum, that they would not have to do so until the motion to deny all discovery is rejected by the Court:  As counsel for SIPC says in his affidavit filed with SIPC's brief:

> I have requested that Velvel withdraw his requests for production of documents served by him on, and directed to, SIPC in the above-captioned proceeding or, in the alternative, that he agree that SIPC need not respond to those requests until the Trustee's motion to uphold his determination of Velvel's claim is finally resolved and that it need not do so if the Trustee's motion is granted.[2]

Being interested only in complete withdrawal or deferral of Objector's request for production of documents, SIPC and the Trustee evinced no interest in the usual subject of discovery conferences such as the one on October 16th:  they showed no interest whatever in pursuing whether, if they thought the document request overbroad or that there were documents subject to privilege, it would be possible, at least as a first crack, to reach an agreement that would result in some but not all documents being produced.  Nor did they offer to produce *any* documents even if the foregoing type of agreement were *not*

---

[2] After saying the foregoing, in his affidavit, which was of course sworn to under penalty of perjury, counsel for SIPC says, "Velvel has indicated that he is unwilling to take either of these actions."  This is incorrect, as admitted in SIPC's own brief, which says that Objector "has indicated that SIPC need not respond to the First and Second Production requests until after the Court rules on the instant motion."  SIPC brief, p. 2.  The Trustee's brief likewise concedes that "Velvel has agreed that the Trustee need not respond to the Document Requests until this motion has been decided by the Court."  Trustee's brief, p. 7.

reached.  Their position was unvarnished and unmitigated, as was the only agreement they were willing to entertain:  their position, and consequently the agreement they would enter, was that Objector should give up all right to discovery of any documents whatsoever by withdrawing his document requests,[3] or should, at minimum, agree that no responses to his requests need be made unless and until after the Court were to rule in his favor.

Naturally, Objector could not and did not agree to the (arrogant?) demand that he give up all right to discovery and withdraw his document requests.  Now, therefore, SIPC and the Trustee, in their briefs, seek an order barring all discovery relating to net equity. Seeking a bar against *all* discovery, the Trustee's brief says, "Many of the documents sought by Velvel are confidential communications prepared by the Trustee's counsel for the purpose of providing legal advice.  These documents reflect the analysis and advice of the Trustee's counsel regarding the appropriate manner of determining a customer's net equity and thus fall squarely within the protection provided by the attorney-client privilege.  To the extent the Trustee has in his possession any responsive documents that were not prepared by his counsel, those documents are also protected, as described below."  Trustee's brief, pp. 8-9.  SIPC's brief says that, "Nearly all of the documents that Velvel seeks are either protected from disclosure by privilege or other doctrine (e.g., documents reflecting SIPC's internal communications with or among its in-house counsel, communications between SIPC and the Trustee, etc.) or already available to Velvel in the public record (e.g., pleadings and memoranda filed in the BLMIS liquidation)."  SIPC brief, p. 5.  SIPC and the Trustee seek an order barring all discovery without any effort to seek narrowing of the discovery requests if they consider them too

---

[3] Some might think this a somewhat arrogant, cocksure position.

broad, and without providing any privilege log that enables Objector to assess and the Court to knowledgeably determine whether privilege does or does not exist.[4]

Yet Objector has made clear that he seeks only a narrow class of documents and does not seek to intrude on privilege. As said above, Objector is not interested in legal analyses; he is not interested in the lawyers' conceptions of cases such as *New Times*, or in legal exegeses of the Bankruptcy Act, for example. He seeks only materials on the underlying intent, or motive, or purpose that caused those legal analyses and exegeses to be brought into being or resulted from them -- he only seeks materials showing the intent or motive or purpose to use cash-in/cash-out to benefit SIPC financially, and/or to save its management -- an intent or motive or purpose that could and likely did arise because providing securities or using the November 30th statements instead of cash-in/cash-out would injure or bankrupt SIPC financially and/or would injure its management.

It is very hard to accept that documentary materials on such purposes number in the thousands, as proclaimed by SIPC -- unless every document authored by SIPC, the Trustee, or their counsel said something to the explicit or implied effect of "We have researched and prepared this document in order to carry forward the goal of saving SIPC's fisc and its management from the harm or destruction that would be wrought by use of the November 30th statements." It is *far* more probable that most of the supposed thousands of documents referred to in the Trustee's brief are straight legal analyses of

---

[4] It is possible that SIPC and the Trustee are in violation of Fed. R. Civ. P. 26(b)(5)(A)(ii) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankruptcy P. 7026), which requires them to "describe the nature of the documents . . . in a manner that . . . will enable other parties to assess the claim" of privilege. As said in 6-26 Moore's Federal Practice at § 26.90[1] in a segment authored by the esteemed former Federal trial judge and now 5th Circuit appellate judge Patrick E. Higginbotham, SIPC and the Trustee must provide sufficient information to "enable other parties to assess the applicability of the privilege or protection." 6 James Wm. Moore et al., Moore's Federal Practice § 26.90 (3d. ed. 2009). As further discussed, *infra*, they have not done so here.

problems.  But SIPC and the Trustee have never evinced, either in conference with Objector or in their briefs, the slightest desire to reach an accord under which they would not have to produce documents that are straight legal analyses, and instead would produce only documents which evince intent to use cash-in/cash-out to benefit SIPC -- to the injury of Madoff's victims, whom Congress wished to protect.  SIPC and the Trustee evince no wish to narrow what they consider overbreadth in the document requests or to confine discovery to unprivileged documents.  Rather, their only goal appears to be to prevent any and all discovery of anything.[5]

At this point in time, one cannot know whether, but neither can one overlook the possibility that, the desire of SIPC and the Trustee to avoid discovery stems from knowledge that the kind of documents sought here do in fact exist and would prove disastrous to their cause if disclosed.  Better, then, to claim overbreath and across the board privilege:  let those be the grounds of battle lest narrowing, or a privilege log, lead to the disclosure of injurious documents.  One equally cannot at this point disregard the possibility that the very failure of SIPC and the Trustee to *deny* the existence of the damaging documents is itself revelatory.  After all, if there are no documents explicitly or implicitly saying that a desire to save SIPC and its management was the reason for switching to cash-in/cash-out, why not say so?  It is commonplace to answer discovery requests by saying that the recipient has no documents responsive to the request, where this is true.  (Some even say it where it isn't.) And it could only be helpful, not harmful, to SIPC and the Trustee to say, if they truthfully can, that the question of saving SIPC

---

[5] They do not, of course, wish to produce documents with privileged materials redacted if a document were to contain both privileged and unprivileged materials, a kind of combination of materials which sometimes occurs.  Rather than redact privileged materials, they wish to produce nothing.

and its management from harm or criticism did not play any role in the decision to use cash-in/cash-out. Yet they haven't said this.

With regard to privilege, moreover, SIPC and the Trustee, as indicated, provide as little information as possible relating to the attorney-client, work product and joint defense privileges. In particular, they ask the Court to grant their requested order without supplying a privilege log to enable Objector to assess and the Court to determine what might in fact be privileged and what might not be. It is very rare for a Court to preclude discovery on the ground of privilege without a privilege log being provided.[6] SIPC and

---

[6] In *Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, 240 F.R.D. 44, 46-47 (D. Conn. 2007), the court said:

> They are, or should be, aware that 'the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship.' *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir.1987) (quoting *In re Grand Jury Subpoena Dtd. January 4, 1984*, 750 F.2d 223, 224 (2d Cir.1984)).
>
> 'That burden cannot be met by mere conclusory or ipse dixit assertions in unsworn motion papers authored by attorneys.' *OneBeacon Ins. Co. v. Forman Int'l, Ltd.*, No. 04 Civ. 2271(RWS), 2006 WL 3771010, at *4 (S.D.N.Y. Dec.15, 2006). An essential step in meeting the burden of establishing the existence of a privilege or an immunity from discovery is the production of an adequately detailed privilege log 'sufficient to enable the demanding party to contest the claim.' Fed.R.Civ.P. 45(d)(2)(A); *In re Application for Subpoena to Michael I. Kroll*, 224 F.R.D. 326, 328 (E.D.N.Y. Oct.27, 2004) . . . .
>
> An invocation of a claim of privilege without producing an accompanying privilege log can be an unfair discovery tactic that increases delay in the resolution of lawsuits, fosters excessive motion practice, increases the costs of litigation, and greatly increases the work of the court . . . .
>
> If a party is claiming privilege, a full privilege log must be supplied along with the objection or within a reasonable time thereafter. *Id.* A party failing to produce a privilege log fails to perfect its claim of privilege and, therefore, may not rely upon it to forestall discovery. *Ruran v. Beth El Temple of W. Hartford, Inc.*, 226 F.R.D. 165, 168-69 (D.Conn.2005); accord *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 166 (2d Cir.1992); *Animal Legal Def. Fund, Inc. v. Dep't of the Air Force*, 44 F.Supp.2d 295, 303 (D.D.C.1999); *OneBeacon*, 2006 WL 3771010, at *4.

Also, it is said in Moore's Federal Practice, in the segment written by Judge Higginbotham, *supra*, at § 26.105[2][a], "the courts seldom order that discovery not be taken at all. [Footnote omitted.] Instead, discovery is expected to go forward, with the parties asserting their objections to particular matters during the course of discovery." Judge Higginbotham also said, at § 26.90[2], that a privilege log -- which is almost always required -- must give "sufficient detail to permit the court to determine whether each document or communication is potentially protected from disclosure." Here, however, SIPC and the

the Trustee seek this unusual order, however, strictly on their own unsupported assertions that one or another kind of privilege is applicable. Plus they tell us it would just be too much work for them to go through documents to compile a log -- it would be just too much work for them, with their armies of lawyers, to compile a privilege log *as virtually all parties to all cases are required to do when claiming privilege.*[7]

Nor is it self evident why privilege even applies in the case of many documents of enormous relevance to the question whether the intent or motive or purpose of SIPC and the Trustee in using cash-in/cash-out was to save SIPC's fisc and management despite the effect on victims whom Congress intended to protect. The fact that one *is* a lawyer does not mean he always *acts* as a lawyer. There are many instances when a person with a legal degree acts as a businessman or an executive official or in some other non legal capacity. Discovery of documents can be had and depositions taken in such circumstances.[8] (Otherwise, there could never be discovery of documents when a person sues a law firm or a law school, since almost everyone connected with such organizations is a lawyer and every document was created, sent, received, or passed on by a lawyer.)

Here there can be no question that persons such as Mr. Picard and Mr. Harbeck are respectively acting as Trustee and as President of SIPC, not as lawyers. Objector

---

Trustee provide no logs doing this, but instead, as said in text *infra*, offer only their own, wholly unsupported assertions.

[7] As a former antitrust litigator who has been in cases involving literally millions of pages of documents sought in discovery, Objector can only say that the claim of SIPC and the Trustee that creating a privilege log involving too much work seems the ultimate in chutzpah. This is only the more true when one considers the narrowness of what is being sought in discovery and how much of what SIPC and the Trustee *claim* is being sought is in fact *not* being sought.

[8] *See, e.g., In re Grand Jury Proceedings in re Browning Arms Co.,* 528 F.2d 1301, 1303 (8th Cir. 1976); *NXIVM Corp. v. O'Hara,* 241 F.R.D. 109, 126 (N.D.N.Y. 2007); *Hardy v. New York News, Inc.,* 114 F.R.D. 633, 644 (S.D.N.Y. 1987); *Mission National Insurance Co. v. Lilly,* 112 F.R.D. 160, 163 (D. Minn. 1986).

does not even understand this to be denied by SIPC and the Trustee.  And many documents relating to the underlying intent here are very likely to have been sent by one of these to the other.  Not to mention that depositions would plumb the extent to which they discussed with each other -- as Trustee and as President, not as lawyers -- the desirability or need of protecting SIPC or its management by using cash-in/cash-out instead of providing securities or using the November 30th statements.  The matter could also have been discussed by them -- again as Trustee and as President of SIPC, not as lawyers -- with members of SIPC's Board of Directors.  They could have discussed it, individually or together, as Trustee and President, with financial analysts who would advise on SIPC's financial state if securities were provided to victims or the November 30th statements were used; with members of the brokerage community to find out what the reaction would be if securities were provided or the November 30th statements were used, and the brokerage community had to be assessed to cover the costs; with banks to learn the extent to which lines of credit might be obtainable to cover the costs; with experts on (or in) Congress to learn what Congressional reaction to SIPC would likely be if money had to be sought from Congress.  None of these discussions would be privileged.

But all of these possibilities, in which no privileges would apply, are concealed by wholesale claims of privilege that are made without providing a privilege log.

Also concealed by the failure to provide a log is the extent to which individual lawyers within SIPC, or within the Trustee's law firm, might also have been acting as a "businessman" rather than in the capacity of a lawyer when making the same inquiries or assessments for the same purposes.  Some of the highest ranking people in SIPC are

lawyers (e.g., Harbeck and Wang), close associates of the Trustee in Baker, Hostetler are lawyers, and it simply is not credible, just as it would not be credible in cases against law firms or law schools, to assert that every single thing these people in SIPC and Baker & Hostetler have done in connection with the Madoff matter is legal rather than business in nature. But the truth on these matters is concealed by the failure to provide privilege logs and by the request to have all discovery denied *without* logs, on the basis of unsupported generalized assertions made by SIPC and the Trustee.[9] [10]

    3.    <u>Conclusion</u>.

Under American law, the intent or motive or purpose underlying an action makes all the difference in determining the action's legality or illegality. It is *not* the law that, if lawyers can invent legitimate sounding reasons for a private or governmental act, the act is therefore legal. The underlying intent, motive or purpose must also be proper. Discovery to determine the underlying intent or motive or purpose for choosing cash-in/cash-out is therefore necessary here, as elsewhere.

---

[9] There are other points too that are hardly self evident with regard to SIPC's and the Trustee's unsupported claims of privilege. For example, it is claimed that documents were created in anticipation of litigation. All of them? Every one of them, going back to, say, December 2008 or early January 2009 when litigation was on no one's mind? Also, what are the community of interests shared by SIPC and the Trustee? The Trustee is appointed by the bankruptcy judge and represents the estate, while SIPC is responsible to itself. That SIPC Trustees make their living by pleasing SIPC, doing what it wants, and therefore continuously being chosen by it to *be* Trustees is not the necessary community of interest.

[10] The desire to have an order denying all discovery granted in order to spare SIPC and the Trustee the work of compiling privilege logs is also *very* ironic in view of the exceptional workload the Trustee has put on others by virtue of recent subpoenas that make extraordinarily broad and time consuming demands for documents. Some of these subpoenas have been provided to Objector. Merely describing the materials demanded by them would take excessive space. Suffice to say that the subpoenas rival document requests in antitrust cases. The Trustee is not stickling at placing huge burdens of work on elderly victims who have received subpoenas, but is unwilling to have his army of lawyers even prepare a privilege log.

As well, the remainder of the reasons put forth by SIPC and the Trustee to evade all need to produce documents or even to file objections and a privilege log are insufficient to achieve this highly unusual result.

For the foregoing reasons the motions for protective orders denying discovery must be denied.

Respectfully submitted,


s/Lawrence R. Velvel
Lawrence R. Velvel
Massachusetts School of Law
500 Federal Street
Andover, MA 01810
Tel:  (978) 681-0800
Fax:  (978) 681-6330
Email: Velvel@mslaw.edu

Dated:  November 11, 2009


R:\My Files\Madoff\ResponseObjector.ProtectiveOrders.doc

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | SIPA LIQUIDATION |
| | ) | no. 08-01789 (BRL) |
| BERNARD L. MADOFF INVESTMENT | ) | |
| SECURITIES LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## NOTIFICATION TO THE COURT OF
## REQUEST FOR PRODUCTION OF DOCUMENTS

Objector Lawrence R. Velvel is taking the unusual step of providing a brief notification to the Court of the filing of a short document request.[1] Velvel is doing so because of the circumstances existing in this case -- a briefing and argument schedule has recently been established on the vital issue of net equity, with the briefing to begin two weeks from now, and appeals by one side or the other likely to be taken all the way to the Supreme Court. Normally, of course, one would simply file the document request and, when its recipients object to it, would then file a motion to compel. Here the recipients of the request, the SIPC Trustee Irving Picard and SIPC itself, are certain to object to the request. And, while a motion to compel will follow, it seemed wise, because of the compressed amount of time available on the net equity issue, to provide a brief notification to the Court of the request and the fundamental reasons for it.

The request seeks documents relating to whether SIPC and the Trustee, to any extent, decided to use the cash-in/cash-out method to determine net equity in order to advance or save SIPC's economic position. There already is evidence of this possibility

---

[1] Objector's claim has been designated by the Trustee as "Combined Claim" numbers 10963 and 11245.

because SIPC's President, Stephen Harbeck, testified in a prior case - - in the *New Times* case - - that victims would receive the full value of their purported securities positions even if the securities had never been bought for the victim, and SIPC's General Counsel, Josephine Wang, is reported to have publicly asserted exactly the same position in mid December 2008, saying that SIPC would have to purchase securities which Madoff's statements showed that a customer owned even if the securities had not in fact been purchased previously. Yet, when SIPC began to better understand the full scope of the huge amounts that it would owe victims under this traditional position if the November 30th statements were used to determine net equity, SIPC and the Trustee changed their tune and began to assert that cash-in/cash-out, *not* the November 30th statements, were the measure of net equity.

In addition, it seems obvious that using other methods than cash-in/cash-out to determine net equity (e.g., use of the November 30th statements) would result in SIPC having to pay out sums of money so large that they are in all likelihood *far* more than it possesses. This would require SIPC to have to request more money from Congress, to assess the investment industry, to draw down lines of credit, and/or to take other nonstandard steps to raise the needed monies (and avoid bankruptcy). Such consequences, of course, almost surely were deeply unwanted, and cash-in/cash-out could logically have been adopted - - is *likely* to have logically been adopted - - to avoid the consequences once it was realized that use of the November 30th statements would bring them on. This is only the more probable because the consequences of using the November 30th statements were so dire that they would probably have required the replacement of current management, which had failed to foresee and guard against the

consequences and would therefore lose jobs paying several to many hundreds of thousands of dollars per year.

In sum, the question is whether a desire to save SIPC's economic position, and conceivably the jobs of management, played any role in the decision to use cash-in/cash-out rather than the standard method, and to do so even though use of the cash-in/cash-out method would, for the benefit of SIPC, result in enormous hardship to victimized investors whom it was Congress' purpose to help. (Congress' intent, one notes, was to help injured investors, not to help SIPC.) If a desire to aid or save the economic position of SIPC, and conceivably the jobs of its management, played a role in the decision to use cash-in/cash-out, then this would make such use entirely inappropriate in this case. It would do so, moreover, even if one could envision extraordinarily unusual circumstances when cash-in, cash-out might otherwise *be* proper.[2] For even if cash-in/cash-out could be proper in the appropriate circumstances, it *cannot* be used to benefit or save the economic position of SIPC, much less to benefit or save SIPC at the expense of investors -- whom Congress intended to be helped. If a desire to aid or save the economic position of SIPC (or its management) played a role here in the decision to use cash-in/cash-out, that should be the end of the question of whether it might have been lawful to use cash-in/cash-out.

On the other hand, if such a desire played no role in the decision to use cash-in/cash-out, then the Trustee and SIPC have nothing to fear from the requested discovery. For the documents would *show* that the improper purpose under discussion played no role in the decision to use cash-in/cash-out, and the question of the proper method of

---

[2] E.g., circumstances where a fraud is exposed after only one month, no interest or profit has yet been credited to investors, no statements have been received by them, some of them withdrew part of their money during the one month that the fraud was in existence and cash-in/cash-out is *not* used to benefit or save SIPC or its management. In such a case, cash-in/cash-out would seem appropriate.

3

determining net equity in the Madoff proceeding could be decided on other grounds entirely.[3]

In arguing in a memorandum of August 27th that the net equity question should be decided not in a case brought by only a few victims, but rather in a proceeding that includes *all* victims, the Trustee recently said, "Moreover, in resolving the Net Equity Dispute, the Court as well as all the parties would benefit from the submission *of a full and complete record. Reply To Plaintiffs' Opposition To Defendant Irving H. Picard, Trustee's, Motion To Dismiss Complaint, Or In The Alternative To Strike*, p. 6 (emphasis added). Though the Trustee doubtlessly did not think that, as would occur in a more standard case, "a full and complete record" would include information, on his and SIPC's motive, that is obtained in discovery, his own statement nonetheless *is* applicable here. For the record here cannot be "full and complete" without discovery on the potentially dispositive question of the motives underlying the use of cash-in/cash-out. Such information is not only vital in this Court, but will be important in, and to, appellate tribunals.

Also, in an order dated September 10, 2009 establishing that there would be one overall procedure for all to participate in with regard to the question of net equity, (*Memorandum Decision And Order Granting Trustee's Motion To Dismiss Plaintiffs' Complaint*), this Court said, when speaking of the benefits of having all victims participate in the procedure rather than just a few, that this "will provide everyone

---

[3] That SIPC and the Trustee would have nothing to fear from the documents if they were to show that the improper purpose under discussion played no role in the decision to use cash-in/cash-out, makes one wonder why SIPC and the Trustee would object to the requested production, which would *benefit* them, at least to the extent of eliminating a dispositive point against them. One understands, however, that wholesale objections to any and all discovery, no matter how warranted the discovery may be, is the way the "game has been played" in "big time litigation" for at least 45 to 50 years.

involved with the benefits from a submission of a comprehensive and complete record on this issue." (*Id.* at p. 13.) There cannot be a "comprehensive and complete record on this issue" of net equity without discovery of information on why SIPC and the Trustee decided to use cash-in/cash-out to determine net equity, including whether a reason for using it was to save the economic position of SIPC and, possibly, its management.

Respectfully submitted,

Lawrence R. Velvel
Massachusetts School of Law
500 Federal Street
Andover, MA 01810
Tel: (978) 681-0800
Fax: (978) 681-6330
Email: Velvel@mslaw.edu

Dated: September 29, 2009

R:\My Files\Madoff\NotificationRequestForDocuments.doc

5

# EXHIBIT 2

**Lawrence Velvel**

**From:** Lawrence Velvel [velvel@mslaw.edu]
**Sent:** Friday, October 16, 2009 2:32 PM
**To:** 'dsheehan@bakerlaw.com'
**Cc:** 'mhirschfield@bakerlaw.com'

Dear Mr. Sheehan:

This will confirm that I orally agreed on today's phone call that, rather than produce, object, or file a protective order on or prior to November 3rd with regard to my request for production of documents, you can have until November 10th to do so. I understand that your filing will in fact be of a protective order taking the position that, for whatever reasons you choose to assert, the Trustee can never be required to produce the requested documents. I also understand that you are required to and will set up a conference call with Judge Lifland to discuss with him, and obtain his approval for, the procedure you request.

Please either confirm that what I have said in this email is correct, or tell me what I have said that may be mistaken.

Thank you.

Sincerely,

Lawrence R. Velvel

cc:    Marc Hirschfield

11/9/2009

# EXHIBIT 3

## Lawrence Velvel

**From:** Lawrence Velvel [velvel@mslaw.edu]
**Sent:** Tuesday, October 27, 2009 4:26 PM
**To:** 'mhirschfield@bakerlaw.com'
**Cc:** 'clarosa@sipc.org'; 'Vanderwal, Amy E.'

Dear Mr. Hirschfield:

Having had an opportunity to think more about your proposal, I have some thoughts that should be set before you.

It seems to me that a schedule should be arranged so that, if Judge Lifland rules that there should be discovery, the discovery can be had and briefed in time to be part of the February 2nd argument? (Do I correctly remember you affirming this, or is my recollection incorrect?) This does not seem to me to be possible, however, under your proposed schedule. For it would seem that, under your proposed schedule, you will be filing objections to my discovery requests only *after* the Judge rules there should be discovery (if he were in fact to rule that way). I would then have to file a second motion to compel, there might have to be an argument and decision, that decision would probably not come until January sometime, only *after that* would documents be produced, and still later would there be depositions. The bottom line is that information learned in discovery could not be used -- assuming, of course, that it *is* usable -- until well after the February 2nd argument.

Let me, then, suggest an alternative schedule in an effort to ensure that discovery, if it is allowed by Judge Lifland, is had in time to be presented, if desired, at the February 2nd hearing. The proposed schedule is this:

1.    The Trustee and SIPC would file their protective order *and* their objections by November 10th.

2.    I will file my responses by November 24th.

3.    The Trustee and SIPC will file their replies by December 1st.

4.    There would be a hearing on December 9th.

5.    If the Court allows discovery, documents will be turned over no later than one week after its decision, with depositions, if any, to be scheduled and taken as soon as possible thereafter.

I know that you do not wish to file objections before Judge Lifland rules on your request for a protective order because you feel, Mr. Sheehan has said on the phone, that objections presume a right to discovery, but you deny any such right can exist here. Nonetheless, filing your protective order and objections simultaneously seems to be the only way to complete the process in time, unless you waive the right to file objections should Judge Lifland rule that there should be discovery. Also, if you were to file a protective order and objections simultaneously, I would not argue that the filing of objections is an implicit admission that the position taken in your protective order -- that there can be no discovery here -- is incorrect. I would make such argument for other reasons only.

Please let me know if you are willing to agree to the schedule I have proposed.

Sincerely,

Larry Velvel


cc:     Christopher H. LaRosa
        Amy E. Vanderwal

11/9/2009

# **EXHIBIT 4**

**Lawrence Velvel**

| | |
|---|---|
| **From:** | Lawrence Velvel [velvel@mslaw.edu] |
| **Sent:** | Wednesday, October 28, 2009 9:57 AM |
| **To:** | 'mhirschfield@bakerlaw.com' |
| **Cc:** | 'clarosa@sipc.org'; 'Vanderwal, Amy E.' |
| **Attachments:** | Clerkltr.RequestProdDocs.Second.doc; RequestForProductionofDocuments.10.28.09.doc |

Dear Mr. Hirschfield:

I have enclosed a second document request. It seeks documents relating to the reasons for or against satisfying investors' claims by acquiring and providing investors with the securities shown in their statements of November 30, 2008.

As you surely are aware, SIPA -- a name which, like SIPC, many of us had never even heard less than eleven months ago -- is an incredibly complex statute. Thus, it was not until reading the briefs recently filed on the net equity question by SIPC and the Trustee, and learning it from their own briefs, that I learned that SIPC and the Trustee are *required* to acquire securities to satisfy the claims of investors if this can be done in a fair and orderly market, and that SIPC and the Trustee cannot simply rest content with paying victims cash of up to $500,000 when securities can be appropriately obtained for the victims. Despite the obvious irony, I appreciate the fact that the recent briefs made this clear to those of us who are novices with regard to SIPC.

Having now become aware from their recent briefs that SIPC and the Trustee *must* provide securities if they can be purchased in a fair and orderly market, and believing that such purchases could have been made by use of techniques that are *standard* for persons acquiring large blocs of shares, I am seeking discovery on why it was not done here. No doubt your forthcoming motions for a protective order will implicitly cover this matter, since your position, as I understand it, is that no discovery can be had on *any* question. It would be perfectly understandable, however, and perfectly alright with me, if you were to choose to explicitly say that your position also covers discovery about acquiring securities to satisfy customers' claims.

Sincerely,

Larry Velvel

cc:    Christopher H. LaRosa
       Amy E. Vanderwal

Lawrence R. Velvel                            Hearing Date: Nov. 24, 2009
Massachusetts School of Law                   Hearing Time: 10:00 a.m.
500 Federal Street
Andover, MA 01810
Tel:  (978) 681-0800
Fax: (978) 681-6330
Email: velvel@mslaw.edu


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

**In re:**                                    )          **SIPA LIQUIDATION**
                                              )          **No. 08-01789 (BRL)**
                                              )
**BERNARD L. MADOFF INVESTMENT**              )
**SECURITIES LLC,**                           )
                                              )
                    **Debtor.**               )
                                              )
_____)


## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing Response of Objector, Lawrence
R. Velvel, to the Motions of SIPC and the Trustee for Protective Orders Denying
Discovery, to be served on persons listed below by first class mail, postage prepaid, on
this 11th day of November, 2009.


                              s/Lawrence R. Velvel_____
                              Lawrence R. Velvel


Josephine Wang, Esq.                          Jonathan M. Landers, Esq.
Securities Investor Protection Corp.          Milberg LLP
805 15th Street, N.W., Suite 800              One Pennsylvania Plaza
Washington, DC 20005-2207                     New York, NY 10119

Stephen P. Harbeck                            Brian Neville, Esq.
President                                     Lax & Neville LLP
Securities Investor Protection Corp.          1412 Broadway, Suite 1407
805 15th Street, N.W., Suite 800              New York, NY 10018
Washington, DC 20005-2207


1

Christopher LaRosa, Esq.
Securities Investor Protection Corp.
805 15th Street, N.W., Suite 800
Washington, DC 20005-2207

David J. Sheehan, Esq.
Baker & Hostetler, LLP
45 Rockefeller Plaza
New York, NY 10111

Marc E. Hirschfield, Esq.
David J. Sheehan, Esq.
Baker & Hostetler, LLP
45 Rockefeller Plaza
New York, NY 10111

Helen Chaitman, Esq.
Phillips Nizer, LLP
666 Fifth Avenue
New York, NY 10103