Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
Attorneys for Margaret Forrest,
Leonard Forrest, and the Leonard
Forrest Revocable Trust

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

SECURITIES INVESTOR PROTECTION
CORPORATION,                                                  Adv. Pro. No. 08-01789 (BRL)

        Plaintiffs                                       SIPA Liquidation

vs.                                                          **OBJECTION TO TRUSTEE'S**
                                                             **DETERMINATION OF**
BERNARD L. MADOFF INVESTMENT                                 **CLAIM**
SECURITIES LLC,

        Defendant.
-----------------------------------------------------------

       Margaret Forrest, Leonard Forrest (together, the "Beneficiaries"), and the Leonard

Forrest Revocable Trust  (the "Trust") hereby object to the Notice of Trustee's Determination of

Claim dated October 29, 2009 and state as follows:

**Background facts**

       1.      The Trust was formed pursuant to a written instrument under which both Leonard

Forest and his wife, Margaret Forrest, were equal beneficiaries.

       2.      On November 30, 1992, the Trust opened an account with Bernard L. Madoff

Investment Securities LLC ("Madoff"): Account No. 1ZA013 (the "Account").

       3.      Each of Margaret Forrest and Leonard Forrest deposited money into the Account

for the purpose of purchasing securities.

1096696.1

4.      According to the Trustee, during the period from November 30, 1992 through

December 11, 2008, $2,260,131.82 was deposited into the Account and $3,838,750 was

withdrawn from the Account.  See Exh. A at 4 - 5.   However, the Trustee is not giving full credit

to two transfers from Madoff Account No. 1ZB09230 as follows:

| Date | Transfer | Debit |
|---|---|---|
| February 25, 1999 | $384,815.51 | $150,250 |
| October 29, 1999 | $316.31 | $0 |
| | $385,131.82 | |

The Trust does not accept the Trustee's calculations.

5.      Throughout the period of the Account's existence, taxes were paid annually on

the appreciation in the Account.

6.      The November 30, 2008 market value of securities in the Account was

$1,795,999.77.

7.      On January 10, 2009, the Trust sent a SIPC claim to Picard asserting a claim for

securities in the amount of $1,795,999.77.

8.      On July 14, 2009, Leonard Forrest was accepted into the Trustee's Hardship

Program.

9.      On October 19, 2009, Picard sent the Trust a determination letter (the

"Determination Letter") with respect to the Account, rejecting the claim for securities and stating

that the Trust had withdrawn $1,813,500 in excess of the funds invested, disregarding all

appreciation in the Account from inception.  See Exh. A at 1-2.

**Grounds for objection**

**A.  Picard has failed to comply with the Court's December 23, 2008 Order**

1096696.1

1.     The Determination Letter fails to comply with the Court order dated December 23,

2008 which directs Picard to satisfy customer claims and deliver securities in accordance with

"the Debtor's books and records."  December 23, 2008 Order at 5 (Docket No. 12).  The

November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books

and records" by which Picard is bound, absent proof that the Trust did not have a "legitimate

expectation" that the balance on the Account statement represented its property.  In fact, in each

year of the investment, the Trust paid short term capital gains tax on the appreciation in the

Account.   It would not have done so if the Trust had any belief whatsoever that the assets in the

Account did not belong to it.

2.     Picard has failed to state a basis in the Determination Letter for the position he has

taken.  Thus, he has not complied with the requirement that an "objection to a claim should . . .

meet the [pleading] standards of an answer.  It should make clear which facts are disputed; it

should allege facts necessary to affirmative defenses; and it should describe the theoretical bases

of those defenses."  Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-

16034, 2003 Bankr. LEXIS 2261, at * (B.S.D.N.Y. Jan. 13, 2003(.

**B.  Picard has violated the requirement that**
**he honor a customer's "legitimate expectations"**

3.     The legislative history of SIPA makes clear that Congress' intent was to protect a

customer's "legitimate expectations."   For example, Congressman Robert Eckhardt commented

when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be
> remedied by [the 1978 amendments] is the failure to meet legitimate customer
> expectations of receiving what was in their account at the time of their broker's
> insolvency.

*              *              *

3

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

4.      SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

5.      Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities.  SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality.  Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

6.      Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on  December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

4

1096696.1

> Based on a conversation with the SIPC general counsel, Josephine Wang, if
> clients were presented statements and had reason to believe that the securities
> were in fact owned, the SIPC will be required to buy these securities in the open
> market to make the customer whole up to $500K each.  So if Madoff client
> number 1234 was given a statement showing they owned 1000 GOOG shares,
> even if a transaction never took place, the SIPC has to buy and replace the 1000
> GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

      7.     As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its

obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement,

inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi

scheme for a period of approximately 17 years and had never purchased the securities reflected

on the customers' monthly statements.  In fact, SIPC's president, Stephen Harbeck, assured the

*New Times* bankruptcy court that customers would receive securities up to $500,000 including

the appreciation in their accounts.

> HARBECK:  . . . if you file within sixty days, you'll get the securities, without
> question.  Whether – if they triple in value, you'll get the securities . . . Even if
> they're not there.
>
> COURT:  Even if they're not there.
>
> HARBECK:  Correct.
>
> COURT:   In other words, if the money was diverted, converted –
>
> HARBECK:  And the securities were never purchased.
>
> COURT:  Okay.
>
> HARBECK:  **And if those positions triple we will gladly give the people their
> securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

**C.  Without legal authority, Picard has
invented his own definition of "net equity"**

8.    SIPA defines "net equity" as the value of the securities positions in the customer's

account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts
> of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to
> such customer if the debtor had liquidated, by sale or purchase on the
> filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

9.    SIPA specifically prohibits SIPC from changing the definition of "net equity."  15

U.S.C. § 78ccc(b)(4)(A).

10.    The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a
> customer, to be determined by calculating the sum which would have been owed
> by the debtor to such customer if the debtor had liquidated, by sale or purchase on
> the filing date, all securities positions of such customer" [corrected for] any
> indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re*

*Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is

calculated as the difference between what the debtor owes the customer and what the

customer owes the debtor on the date the SIPA proceeding is filed.").

11.    In derogation of his obligations to carry out the provisions of SIPA, Picard has

created his own definition of "net equity."  Picard has asserted that he has a right to recognize

investors' claims only for the amount of their net investment, disregarding all appreciation in

their accounts.  By this procedure, Picard would avoid paying SIPC insurance to the thousands of

1096696.1

elderly, long-term Madoff investors who have depended upon their Madoff investments for their

daily living expenses.  He also would be able to reduce all claims to the net investment, thus

enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to

customers.

12.    Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a
> claimant is owed perpetuates the Ponzi Scheme.  It allows the thief . . . Mr.
> Madoff . . . to determine who receives a larger proportion of the assets collected
> by the Trustee.

13.    Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to

save money for the brokerage community at the expense of innocent investors who relied upon

the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

14.    After ten months of his tenure, Picard has identified only two Madoff investors

who **might not** have had a "legitimate expectation" that the trade confirmations and account

statements they received were accurate.  Picard has sued two Madoff customers, Stanley Chais

and Jeffry Picower who, Picard has alleged, took out of Madoff $7.2 billion more than they

invested.  Picard has further alleged that these two investors received returns in their accounts of

100 – 400% and that Madoff back-dated $100 million losses in their accounts.  Assuming these

allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not

have had a "legitimate expectation" that their accounts were genuine.

15.    However, the fact that a few out of more than 8,000 Madoff investors may have

been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining,

totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

16.    The Trust, like thousands of other investors, received monthly statements from

Madoff indicating returns on the Madoff investment in the range of 9 – 14% per year, subject to

short term capital gains tax rates.  The Trust had entered into standard brokerage agreements

with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Trust had specified,

numbered accounts for the purchase and sale of securities; it received regular monthly statements

and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the

purchase of US Treasury securities.  The Trust paid taxes on the annual growth of the

investments with Madoff.   There is no basis to claim that each of the Beneficiaries did not have

a "legitimate expectation" that the assets reflected on the Trust's statements sent by Madoff

belonged to them.

17.    Thus, the Trust is entitled to a claim for $1,795,999.77, the November 30, 2008

balance on the Account as reflected on the Madoff statement.

**D.  The Trust is entitled to prejudgment
interest on its investment and profits.**

18.    At a minimum, under New York law, which is applicable here, funds deposited

with Madoff are entitled to interest.  *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et*

*seq.*  Moreover, since Madoff converted the Trust's funds, it is also entitled to prejudgment

interest.  *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.*S. Dist. LEXIS 35786, at *14-15

(S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify

for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d

427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and

conversion).

1096696.1

19.    Although it is not legally relevant, Picard cannot prove that Madoff earned no money on the Trust's investments. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which the Trust and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

20.    In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

1096696.1

**E.  Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit**

21.    In derogation of his fiduciary duty to the Trust, Picard is, in effect, imposing upon the Trust a fraudulent conveyance judgment for sums that the Trust withdrew from the Account , and for sums that were transferred into the Account, beyond the statute of limitations period applicable to fraudulent conveyances.  Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations.  Yet, he has done so here and deprived the Trust and the Beneficiaries of SIPC insurance and the claim to which the Trust is absolutely entitled.

22.    Moreover, Picard has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit.   There is no authority in SIPA or the Bankruptcy Code for Picard to utilize the avoidance powers of a trustee to enrich SIPC at the Trust' expense.  The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors.  *See, e.g.,* 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.  Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

1096696.1

23. Here, however, Picard is not acting to assure equal distribution among prepetition

creditors. On the contrary, he is simply acting as SIPC's agent in depriving the Trust of the

$1,000,000 in SIPC insurance to which the Beneficiaries are statutorily entitled.

**F. Picard has violated SIPA by delaying the payment of SIPC insurance**

24. Picard has breached his statutory obligation to "promptly" replace a customer's

securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace the Trust' securities up to a

value of $500,000 each, for a total of $1 million, as valued on the November 30, 2008

statements.

**G. The Beneficiaries are each "customers"**
**under SIPA entitled to $500,000 in SIPC insurance.**

25. Each of the Beneficiaries is a "customer" under the plain definition of "customer"

in SIPA. Thus, each is entitled to receive $500,000 in SIPC insurance. 15 U.S.C. §

78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor

for the purpose of purchasing securities."). *Rosenman Family, LLC v. Picard,* 401 B.R. 629, 635

(B.S.D.N.Y. 2009)("the mere act of entrusting . . . cash to the debtor for the purpose of effecting

securities transactions . . . triggers customer status. . ."); *SEC v. Ambassador Church Financial*

*Devel. Group, Inc.,* 679 F. 2d 608, 614 (6th Cir. 1982); *In re Primeline Sec. Corp.,* 295 F. 3d

1100, 1107 (10th Cir. 2002)("SIPA does . . . protect claimants who try to attempt to invest

through their brokerage firm but are defrauded by dishonest brokers . . . If a claimant intended to

have the brokerage purchase securities on the claimant's behalf and reasonably followed the

broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the

brokerage or its agents misappropriate the funds"); *Miller v. DeQuine (In re Stratton Oakmont,*

*Inc.),* 2003 WL 22698876 at *3 (S.D.N.Y. Nov. 14, 2003)("Stratton Oakmont's conversion of

Claimants' property makes the customers within the meaning of SIPA.").

26.     Clearly, if Congress had intended to limit customers to account holders the

definition of customer could have been six words:  "A "customer" is an account holder."

Instead, Congress' definition of "customer" is 20 lines long and is further clarified in 15 U.S.C. §

78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are

all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise

satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the

extent that it shall be established . . . that the net equity claim of such broker or dealer or bank

against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in

which event each such customer of such broker or dealer or bank shall be deemed a

separate customer** of the debtor")(emphasis added).

27.     Any ambiguity in the definition of "customer," and there is none here, should be

construed in favor of the Trust because "SIPA is remedial legislation.  As such, it should be

construed liberally to effect its purpose."  *Tcherepin v. Knight,* 389 U.S. 332 (1967).

28.     Moreover, it is clear that Congress intended for "customer" to be broadly

interpreted.  In the first draft of the bill, there was no entitlement to SIPC insurance for any

customer whose name or interest was not disclosed on the records of the broker/dealer "if such

recognition would increase the aggregate amount of the insured customer accounts or insured

liability in such closed broker or dealer."  S. 2348, 91st Cong. Section 7(d)(June 9, 1969); H.R.

13308, 91st Cong. Section 7(d) (Aug.4, 1969).  The final bill dropped this restriction.

**Conclusion**

1096696.1

The Trust is entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of $1,000,000 as of November 30, 2008, $500,000 for each of the Beneficiaries.

The Trust is entitled to have its claim recognized in the amount of $1,795,999.77, consistent with the November 30, 2008 statement.

The Beneficiaries are entitled to judgment against Picard and Baker & Hostetler LLP for the damages they have suffered as a result of the breach of fiduciary duty of Picard and his counsel.

November 11, 2009

PHILLIPS NIZER LLP

By  Helen Davis Chaitman

666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320

Attorneys for Margaret Forrest,
Leonard Forrest, and the
Leonard Forrest Revocable Trust

1096696.1