Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York  10017
Telephone:     (212) 450-4000
Facsimile:     (212) 701-5800
Karen E. Wagner (karen.wagner@davispolk.com)
Denis J. McInerney (denis.mcinerney@davispolk.com)
Jonathan D. Martin (jonathan.martin@davispolk.com)

*Attorneys for Sterling Equities Associates
and Certain Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : : : | |
| Plaintiff-Appellant, | : : | SIPA LIQUIDATION (Substantively Consolidated) Adv. Pro. No. 08-01789 (BRL) |
| v. | : : | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : : : | |
| Defendant. | : : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                             :
                                                   :
BERNARD L. MADOFF,                                 :
                                                   :
                    Debtor.                        :
                                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW OF STERLING EQUITIES ASSOCIATES**
**AND CERTAIN AFFILIATES REGARDING NET EQUITY AND AVOIDANCE**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES .......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT .................................................................................................................. 2

I. THE TRUSTEE IS REQUIRED TO CALCULATE BLMIS CUSTOMERS' "NET EQUITY" CLAIMS IN ACCORDANCE WITH SIPA .......................................... 2

    A.    SIPA's Plain Meaning Governs the Definition of "Net Equity" ................... 2

    B.    The Trustee's "Cash-In/Cash-Out" Approach Has No Legal Basis .............. 6

        1.    The Trustee's Views of "Fairness" Cannot Justify Unlawful Actions ................................................................................................ 6

        2.    Claiming That All Customers Are Guilty Is No Justification ....... 11

II. THE TRUSTEE HAS NO POWER TO AVOID PAYMENTS TO INNOCENT CUSTOMERS ....................................................................................................... 14

    A.    Bankruptcy Code Section 546(e) Limits the Trustee's Avoidance Power to Section 548(a)(1)(A) ............................................................................... 14

    B.    The Trustee Cannot State Any Claims Under Section 548(a)(1)(A) Because BLMIS Was Legally Obligated to Make the Transfers ................. 16

        1.    The Transfers Satisfied Antecedent Debts Owed to Customers ... 17

        2.    No Intentional Fraud Can Be Alleged Where a Transfer Satisfied Antecedent Debt ........................................................................... 21

CONCLUSION ............................................................................................................. 28

# TABLE OF AUTHORITIES

### CASES

PAGE

*105 East Second Street Assoc. v. Bobrow*,
175 A.D.2d 746, 573 N.Y.S.2d 503 (1st Dep't 1991) ................................20

*In re Adler, Coleman Clearing Corp.*, 263 B.R. 406 (S.D.N.Y. 2001) ............11

*In re Bayou Group, LLC*, 362 B.R. 624 (Bankr. S.D.N.Y. 2007) ....................25

*Bevill Bresler & Schulman Asset Management Corp. v. Spencer Savings & Loan Ass'n*,
878 F.2d 742 (3d Cir. 1989).................................................................15

*Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562 (7th Cir. 1986).............11

*Boston Trading Group v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987) .........................22, 23

*Butner v. United States*, 440 U.S. 48 (1979).................................................................7

*CFTC v. Equity Fin. Group*,
No. Civ. 04-1512, 2005 WL 2143975 (D.N.J. Sept. 2, 2005) ......................9

*CFTC v. Franklin*, 652 F. Supp. 163 (W.D. Va. 1986) ......................................9

*CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107 (9th Cir. 1999).............................9

*In re C.J. Wright & Co.*, 162 B.R. 597 (Bankr. M.D. Fla. 1993) ....................10

*In re Carrozzella & Richardson*, 286 B.R. 480 (D. Conn. 2002)....................24

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ................................................................11

*In re Chase & Sanborn Corp.*, 813 F.2d 1177 (11th Cir. 1987)........................21

*Coder v. Arts*, 213 U.S. 223 (1909) ..............................................22

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992).................................2

*Contemporary Indus. Corp. v. Frost*, 564 F.3d 981 (8th Cir. 2009)................................15

*Cunningham v. Brown*, 265 U.S. 1 (1924)..................................................8, 22

*Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008) ........................................ 25-26

*Ferguson v. Lion Holding, Inc.*, 312 F. Supp. 2d 484 (S.D.N.Y. 2004) ...........................12

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ......................................................23

*Grippo v. Perazzo*, 357 F.3d 1218 (11th Cir. 2004) ................................................... 18-19

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999)...............................................................................................26

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) ...............................................21

*In re Hanover Square Sec.*, 55 B.R. 235 (Bankr. S.D.N.Y. 1985) ....................................12

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1 (2000)...........15

*Harwood v. Int'l Estate Planners*, 33 F. App'x 903 (9th Cir. 2002) .................................17

*In re Hedged-Investments Associates, Inc.*, 84 F.3d 1286 (10th Cir. 1996) .....................26

*In re Highland Superstores, Inc.*, 154 F.3d 573 (6th Cir. 1998).........................................7

*Howell v. Freifeld*, 631 F. Supp. 1222 (S.D.N.Y. 1986) ...................................................19

*In re Indep. Clearing House Co.*, 77 B.R. 843 (D. Utah 1987)..........................................26

*Irving Trust Co. v. Chase Nat'l Bank*, 65 F.2d 409 (2d Cir. 1933) ...................................17

*Lamie v. United States Tr.*, 540 U.S. 526 (2004) ...............................................................1

*In re Lapiana*, 909 F.2d 221 (7th Cir. 1990) ......................................................................7

*Levy v. Bessemer Trust Co.*,
   No. 97 Civ. 1785, 1999 WL 199027, at *5 (S.D.N.Y. Apr. 8, 1999).........................20

*Lipkien v. Krinski*, 192 A.D. 257, 182 N.Y.S. 454 (1st Dep't 1920)................................19

*Lowenbraun v. L.F. Rothschild*, 685 F. Supp. 336 (S.D.N.Y. 1988)...........................19, 20

*In re Manhattan Investment Fund Ltd.*, 310 B.R. 500 (Bankr. S.D.N.Y. 2002) ..............24

*In re Manhattan Investment Fund Ltd.*, 397 B.R. 1 (S.D.N.Y. 2007) ..............................25

*McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044 (2d Cir. 1995).........19

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) ......................18

*In re Moore*, 39 B.R. 571 (Bankr. M.D. Fla. 1984)..........................................................26

*Nathel v. Siegal*, 592 F. Supp. 2d 452 (S.D.N.Y. 2008)..............................................19

*In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004)................................. *passim*

*In re New Times Sec. Servs., Inc.*, 463 F.3d 125 (2d Cir. 2006)......................................4-5

*In re Old Naples Securities, Inc.,* 311 B.R. 607 (M.D. Fla. 2002) ...................................10

*Osofsky v. Zipf*, 645 F.2d 107 (2d Cir. 1981)...............................................................19

*Panos v. Island Gem Enters.*, 880 F. Supp. 169 (S.D.N.Y. 1995)...................................19

*Partridge v. Presley*, 189 F.2d 645, 651 (D.C. Cir. 1951) .........................................11-12

*In re QSI Holdings, Inc.,* 571 F.3d 545 (6th Cir. 2009)..................................................15

*Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000) .......................................................7

*Redstone v. Goldman, Sachs & Co.*, 583 F. Supp. 74 (D. Mass. 1984)............................18

*In re Resorts Int'l, Inc.,* 181 F.3d 505 (3d Cir. 1999).......................................................15

*Richardson v. Germania Bank*, 263 F. 320 (2d Cir. 1919).........................................16-17

*In re Rubin Bros. Footwear, Inc.*, 119 B.R. 416 (S.D.N.Y. 1990) ...................................17

*SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987)..............................................9

*SEC v. Byers*,
   637 F. Supp. 2d 166 (S.D.N.Y. 2009)...........................................................................9

*SEC v. Credit Bancorp, Ltd.*,
   No. 99 Civ. 11395, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000) ..............................9

*SEC v. Funding Res. Group*,
   No. 3-98-CV-2689-M, 2004 WL 1189996 (N.D. Tex. May 27, 2004)........................9

*SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir. 1974) ...........................................13

*SEC v. Zandford*, 535 U.S. 813 (2002) ...........................................................................18

*SIPC v. Charisma Sec. Corp.*, 371 F. Supp. 894 (S.D.N.Y. 1974)...................................13

*Scalp & Blade, Inc. v. Advest, Inc.*,
    309 A.D.2d 219, 765 N.Y.S.2d 92 (4th Dep't 2003)......................................17

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995).............................................26

*In re Sharp International Corp.,* 403 F.3d 43 (2d Cir. 2005)...............................23, 24, 26

*In re Taubman*, 160 B.R. 964 (Bankr. S.D. Ohio 1993)....................................26

*In re Tedlock Cattle Co.,* 552 F.2d 1351 (9th Cir. 1977)....................................9

*Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*,
    191 A.D.2d 86 (1st Dep't 1993) ...............................................................23

*In re Unified Commercial Capital*, 260 B.R. 343 (Bankr. W.D.N.Y. 2001).........25, 26-27

*In re Unified Commercial Capital*,
    Nos. 01-MBK-6004L, 01-MBK-6005L,
    2002 WL 32500567 (W.D.N.Y. June 21, 2002)......................................24-25

*United States v. Noland*, 517 U.S. 535 (1996).........................................7, 8, 10

*United States v. Reorganized CF & I Fabricators of Utah, Inc.*,
    518 U.S. 213 (1996)..............................................................................7, 10

*Van Iderstine v. National Discount Co.*, 227 U.S. 575 (1913) ........................21

*Visconsi v. Lehman Bros.*, 244 F. App'x 708 (6th Cir. 2007) ....................17, 18

*In re World Vision Entm't, Inc.*, 275 B.R. 641 (Bankr. M.D. Fla. 2002) .........25

*In re Young*, 294 F. 1 (4th Cir. 1923)................................................................9

STATUTES & RULES

11 U.S.C. § 101(5)(A).......................................................................................20

11 U.S.C. § 101(12).........................................................................................20

11 U.S.C. § 510(c) ........................................................................................8, 9

11 U.S.C. § 544...............................................................................................20

11 U.S.C. § 546...............................................................................................15

11 U.S.C. § 546(e) ...............................................................................................14, 15, 21

11 U.S.C. § 547(b) ........................................................................................................22

11 U.S.C. § 548(a)(1)(A) ...................................................................................14, 16, 24

11 U.S.C. § 548(a)(1)(B) ...............................................................................................20

11 U.S.C. § 548(d)(2)(A) ...............................................................................................20

11 U.S.C. § 741(7)(A) ...................................................................................................15

15 U.S.C. § 78ccc(b)(4)(A) ..............................................................................................3

15 U.S.C. § 78ddd ...........................................................................................................8

15 U.S.C. § 78ddd(c)(1) ...................................................................................................8

15 U.S.C. § 78ddd(c)(2) ...................................................................................................8

15 U.S.C. § 78fff-2(b) .................................................................................................2, 12

15 U.S.C. § 78fff-2(c)(1) ............................................................................................1, 7

15 U.S.C. § 78fff-3 .....................................................................................................1, 8

15 U.S.C. § 78fff(a)(1)(A)-(B) .........................................................................................2

15 U.S.C. § 78*lll*(2) ......................................................................................................12

15 U.S.C. § 78*lll*(11) ...........................................................................................1, 2, 3, 5

N.Y. U.C.C. § 8-102(a)(9)(i) .........................................................................................18

N.Y. U.C.C. § 8-102(a)(17) ...........................................................................................18

N.Y. U.C.C. § 8-501(b)(1) .............................................................................................18

N.Y. Debt. & Cred. Law § 270 ......................................................................................20

N.Y. Debt. & Cred. Law § 272 ......................................................................................20

N.Y. Debt. & Cred. Law § 273 ......................................................................................20

O<small>THER</small> A<small>UTHORITIES</small>

5 *Collier on Bankruptcy* ¶ 547.01 (15th ed.) ..................................................................22

1 G. Glenn, *Fraudulent Conveyances and Preferences* (rev. ed. 1940) ...................... 22-23

H.R. Rep. No. 95-746 (1978).............................................................................................4

Irving H. Picard & Stephen P. Harbeck, *Another View: Unwinding Madoff's Fraud,*
*Fairly*, N.Y. Times Dealbook, May 6, 2009..................................................................6

S. Rep. No. 95-763 (1978)..................................................................................................4

SIPC 2008 Annual Report ...................................................................................................8

SIPC, et al., *Understanding Your Brokerage Account Statements* ......................................3

## PRELIMINARY STATEMENT

Pursuant to this Court's Order Scheduling Adjudication of "Net Equity" Issue, dated September 16, 2009, Sterling Equities Associates and certain of its affiliates (the "Customers")[1] respectfully submit this memorandum of law and the accompanying declaration in opposition to the motion of Irving H. Picard ("Trustee"), trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), for an order approving the Trustee's proposed calculation of "net equity" claims.

This case is governed by the plain language of the Securities Investor Protection Act, 15 U.S.C. § 78aaa, *et seq.* ("SIPA").  SIPA includes an express definition of "net equity."  15 U.S.C. § 78*lll*(11).  "Net equity" claims are satisfied from customer property, 15 U.S.C. § 78fff-2(c)(1)(A), and from a fund that the Securities Investor Protection Corporation ("SIPC") maintains for that purpose (the "SIPC Fund").  15 U.S.C. § 78fff-3.

The Trustee and SIPC ask the Court to replace SIPA's statutory mandate with a "cash-in/cash-out" approach that is based on personal views of fairness and impermissible theories of avoidance.  It is beyond the province of the Court, however, to depart from the plain language of the statute to provide for what the Trustee and SIPC "might think . . . is the preferred result."  *Lamie v. United States Tr.*, 540 U.S. 526, 542 (2004).

---

[1] As listed in the *Declaration of Arthur Friedman* dated November 11, 2009 ("*Friedman Decl.*"), at n.1.

<u>**ARGUMENT**</u>

**I.**

<u>**THE TRUSTEE IS REQUIRED TO CALCULATE BLMIS
CUSTOMERS' "NET EQUITY" CLAIMS IN ACCORDANCE WITH SIPA**</u>

SIPA requires the Trustee to "satisfy net equity claims of customers" of a failed

broker.  15 U.S.C. § 78fff(a)(1)(A)-(B).  SIPA defines "net equity" in unambiguous

terms.  15 U.S.C. § 78*lll*(11).  "[C]ourts must presume that a legislature says in a statute

what it means and means in a statute what it says there.  When the words of a statute are

unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

**A.      SIPA's Plain Meaning Governs
            <u>the Definition of "Net Equity"   </u>**

Determining "net equity" claims begins – and ends – with SIPA's definition:

"The term 'net equity' means the dollar amount of the account or accounts
of a customer, to be determined by –

(A) calculating the sum which would have been owed by the debtor to
such customer if the debtor had liquidated, by sale or purchase on the
filing date, all securities positions of such customer . . .; minus

(B) any indebtedness of such customer to the debtor on the filing date[.]"
15 U.S.C. § 78*lll*(11).

A customer's "net equity" claim is the "dollar amount" that would result if the

broker had "liquidated [the customer's securities positions] by sale or purchase on the

filing date."  15 U.S.C. § 78*lll*(11).  "Securities positions" are established by reference to

the "books and records of the debtor," 15 U.S.C. § 78fff-2(b) – here, the customers'

November 30, 2008 account statements, which detail the "securities positions" that

2

BLMIS owed the customers as of the liquidation filing date.[2]  *Friedman Decl.* ¶ 7 & Ex.

D.  The only permissible deduction from that amount is "any indebtedness of such

customer to the debtor on the filing date" – i.e., any margin obligations.  15 U.S.C.

§ 78*lll*(11).[3]

In *In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) ("*New*

*Times I*"), the Second Circuit, SIPC, and the Securities and Exchange Commission

("SEC") agreed that the statutory text applies without ambiguity to customers with

account statements reflecting securities positions in real securities.  New Times, like

BLMIS, involved a broker engaged in a Ponzi scheme in which no securities were

actually purchased.  Most New Times customers were issued account statements

reflecting investments in real securities (the "Real Securities Claimants"), and SIPC, with

the concurrence of the SEC, paid their "net equity" claims based on their final account

statements.  *See New Times I*, 371 F.3d at 71-72, 74.

This outcome, mandated by the statute's plain language, is supported by SIPA's

legislative history.  The Senate and House reports on the 1978 amendments to SIPA show

---

[2] SIPC informs customers that, in the event of a broker's bankruptcy, their account statements will be the best way to prove what the broker owed them:

> "In the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you.  This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement."  SIPC, et al., *Understanding Your Brokerage Account Statements*, at 5, *available at* http://www.sipc.org/pdf/Broker_Statements_2_13.pdf.

[3] Congress made clear in SIPA that SIPC has no power to alter the statutory definition of "net equity" in Section 78*lll*:

> "SIPC shall have the power . . . to adopt, amend, and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to . . . the definition of terms in this chapter, *other than those terms for which a definition is provided in section 78lll of this title* . . ."  15 U.S.C. § 78ccc(b)(4)(A) (emphasis added).

that Congress contemplated that a customer's "net equity" would include "securities positions" in securities that the broker never actually purchased:

> "Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations. . . ." S. Rep. No. 95-763, at 2 (1978) (emphasis added).

> "A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date." H.R. Rep. No. 95-746, at 21 (1978) (emphasis added).

Some New Times customers, however, received account statements reflecting imaginary securities (the "Fake Securities Claimants"). *See New Times I*, 371 F.3d at 71-72. Their "net equity" claims could not be determined by direct application of the statute because the imaginary securities "did not exist and, thus, could not be liquidated or replaced by the Trustee." *See id.* at 76, 87-88. "To be clear – and this is the crucial fact in this case – the New Age Funds in which the [Fake Securities] Claimants invested *never* existed." *See id.* at 74 (emphasis in original).

The Second Circuit concluded that the Fake Securities Claimants' "net equity" claims could be valued on a "cash-in/cash-out" basis, but *only* because it would be impossible for the imaginary securities to be "liquidated by sale or purchase on the filing date," as SIPA requires. *See id.* at 88. As another Second Circuit panel later emphasized:

> "Because there were no such securities, and it was therefore *impossible to reimburse customers with the actual securities or their market value on the filing date* (the usual remedies when customers hold specific securities), the [*New Times I* panel] determined that the securities should

be valued according to the amount of the initial investment. The court declined to base the recovery on the rosy account statements telling customers how well the *imaginary* securities were doing, because treating the fictitious paper profits as within the ambit of the customers' 'legitimate expectations' would lead to the absurdity of 'duped' investors reaping windfalls as a result of fraudulent promises made on *fake* securities. . . . The court looked to the initial investment as the measure for reimbursement because the initial investment amount was the best proxy for the customers' legitimate expectations." *In re New Times Sec. Servs., Inc.*, 463 F.3d 125, 129-30 (2d Cir. 2006) ("*New Times II*") (citations omitted) (emphasis added).

The Trustee argues that BLMIS customers should be treated like the Fake Securities Claimants because – even though the securities listed on their account statements were real – Madoff purportedly could not have obtained the aggregate securities positions set forth on *all* of his thousands of customers' account statements.[4] (Tr. Br. at 40-41.)[5] The argument finds no support in the statute's plain language or its purpose. As SIPA and *New Times I* make clear, if customers' account statements reflect securities positions in real securities that can be "liquidated by sale or purchase on the filing date," the Trustee must either purchase the securities or pay customers the market value of those securities on the filing date. 15 U.S.C. § 78*lll*(11). Moreover, SIPA's

---

[4] As explained in the text, the argument is irrelevant to the determination of "net equity" under the statute. The argument fails for the additional reason that SIPA considers only "the account or accounts of a customer," 15 U.S.C. § 78*lll*(11), not all of the broker's customer accounts in the aggregate, which is consistent with the statute's purpose of protecting each customer's legitimate expectations.

Moreover, the Trustee's suggestion that BLMIS customers do not have "net equity" claims because their securities positions were allegedly impossible to achieve (Tr. Br. at 40-41), or because the Trustee now believes "red flags" of Madoff's fraud were evident, just reprises a similar argument that SIPC made – and that was flatly rejected – in *New Times I*. Both the SEC and the Second Circuit made clear in *New Times I* – over SIPC's objection – that SIPA has no "goal of greater investor vigilance." *See New Times I*, 371 F.3d at 87 (rejecting SIPC's contention that customers should be compelled to perform sufficient diligence to confirm that their securities positions are not fake).

[5] "Tr. Br." refers to the Memorandum of Law in Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying "Customer" Claims for Amounts Listed on Last Customer Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections with Respect to the Determinations Relating to Net Equity. "SIPC Br." refers to the Memorandum of Law in Support of the Securities Investor Protection Corporation in Support of Trustee's Motion for an Order Denying "Customer" Claims for Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections with Respect to the Determinations Relating to Net Equity.

purpose is to protect broker-dealer customers; the statute does not, as the Trustee

suggests, impose an obligation on "investors to research and monitor their investments

(and their brokers) with greater care." *New Times I*, 371 F.3d at 87.

## B. The Trustee's "Cash-In/Cash-Out" Approach Has No Legal Basis

The Trustee and SIPC have asserted that, in *this* case, SIPA's definition of "net

equity" should be replaced with their alternative "cash-in/cash-out" approach.  SIPC has

conceded that the approach deviates from its standard practice.[6]  SIPC and the Trustee

contend that their approach offers a "fair, equitable and compassionate approach to the

allowance of customer claims."  Irving H. Picard & Stephen P. Harbeck, *Another View:*

*Unwinding Madoff's Fraud, Fairly*, N.Y. Times Dealbook, May 6, 2009.[7]  They also

argue that BLMIS customers cannot claim what they are entitled to under the statute

because they are themselves responsible for Madoff's fraud.  (Tr. Br. at 33-35, 48-49, 52-

53; SIPC Br. at 27-33.)  Neither argument withstands scrutiny.

### 1. The Trustee's Views of "Fairness" Cannot Justify Unlawful Actions

The Trustee's and SIPC's argument that the "cash-in/cash-out" approach should

be adopted because it is "fair" and "equitable" is unsupportable.

---

[6] SIPC President Stephen Harbeck conceded the ad hoc nature of the Trustee's proposed approach in this case when he made the following statements very shortly after the January 2, 2009 SIPC customer claim form was mailed out to the thousands of BLMIS customers:

- "*We've modified our usual claim form to ask investors a question that's unique to this case*, which is how much money did you put in and how much money did you take out."  (Jan. 6, 2009, CNBC (emphasis added)).

- "*[O]ne of the first things that we did . . . was to modify our standard claim form* to make sure that we asked the claimants themselves what evidence they had in terms of money in and money out, because that's going to be one of the critical factors."  (Jan. 5, 2009, Stephen Harbeck, testimony before House Financial Services Committee (emphasis added)).

[7] *Available at* http://dealbook.blogs.nytimes.com/2009/05/06/another-view-unwinding-madoffs-fraud-fairly/ (May 6, 2009, 11:46 EST).

First, customers' "net equity" claims must be based on applicable law – not "undefined considerations of equity." *Butner v. United States*, 440 U.S. 48, 55-56 (1979). Accordingly, neither the Trustee nor this Court is "authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements." *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 24-25 (2000); *see also In re Highland Superstores, Inc.*, 154 F.3d 573, 579 (6th Cir. 1998) (bankruptcy court may not "sweep aside [substantive] law – in favor of general equitable principles – in computing [a creditor's claim]"); *In re Lapiana*, 909 F.2d 221, 224 (7th Cir. 1990) ("[B]ankruptcy judges are not empowered to dissolve rights in the name of equity.").

Second, the "cash-in/cash-out" approach discriminates among customers and impermissibly effects a "categorical reordering of priorities that takes place at the legislative level." *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 229 (1996) (holding that bankruptcy courts may not rank claims within the class of general unsecured creditors in the name of equity). Contrary to 15 U.S.C. § 78fff-2(c)(1)(B), customers would not share "ratably" under the Trustee's approach, but would be treated differently if they are (in the Trustee's parlance) a "net winner" or a "net loser." The Trustee cannot ask this Court to treat individual BLMIS customers differently, because bankruptcy courts "are not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable." *United States v. Noland*, 517 U.S. 535, 540-41 (1996) (internal quotation marks omitted).

Third, the Trustee's "cash-in/cash-out" approach impermissibly elevates SIPC's fourth priority under 15 U.S.C. § 78fff-2(c)(1)(D) by permitting it to recover ahead of

customers who are entitled to level two priority.[8] "Decisions about the treatment of categories of claims in bankruptcy proceedings . . . are not dictated or illuminated by principles of equity" – precisely because, if they were, it "would empower a court to modify the operation of the priority statute at the same level at which Congress operated when it made its characteristically general judgment to establish the hierarchy of claims in the first place." *Noland*, 517 U.S. at 540-41 (internal quotation marks omitted).  The Trustee's approach reduces payments from the SIPC Fund, which in essence elevates the SIPC Fund from a fourth priority subrogee claimant (after payments are made to customers) to a second priority claimant (retaining funds otherwise payable to customers).  *See* 15 U.S.C. §§ 78ddd, 78fff-3.[9]

None of the cases proffered by the Trustee or SIPC supports their effort to circumvent these established principles and SIPA's mandate.

SIPC and the Trustee cite *Cunningham v. Brown*, 265 U.S. 1 (1924), for the principle that "equality is equity."  But *Cunningham* was not a case about "fairness" – it was a *preference* case decided under the Bankruptcy Act.  *See id.* at 10-11.  Nor did the case involve SIPA, which was not to be enacted for many decades.  *Cunningham*

---

[8] Bankruptcy trustees may seek to subordinate a particular claim based on the inequitable conduct of a specific creditor, if permitted under principles of equitable subordination.  *See* 11 U.S.C. § 510(c); *Noland*, 517 U.S. at 540.  A bankruptcy trustee may not, however, subordinate a *class* of claims based "on the supposedly general unfairness of satisfying [those claims]."  *Noland*, 517 U.S. at 541.

[9] The SIPC Fund pays up to $500,000 for securities owed to customers, and $100,000 for cash.  *See* 15 U.S.C. § 78fff-3(a).  The statute requires SIPC to impose annual assessments on its broker-dealer members so that the fund is maintained at an appropriate level.  *See* 15 U.S.C. § 78ddd(c)(2).  Since 1996, the annual assessment that SIPC imposed on each SIPC member, regardless of size (i.e., regardless of whether the member had one hundred or one million customers), was $150 – the bare minimum permitted under SIPA.  *See* 15 U.S.C. § 78ddd(c)(1); SIPC 2008 Annual Report at 9, *available at* www.sipc.org/pdf/SIPC%20Annual%20Report%202008%20FINAL.pdf.  Effective April 1, 2009, the assessment was increased to 1/4 of 1% of each member's net operating revenues.  *Id.*

therefore has no bearing on the interpretation of "net equity" in SIPA, and instead supports the principle that a governing statute must be followed.

The Trustee and SIPC also rely heavily on equity receivership cases. *See CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107 (9th Cir. 1999); *CFTC v. Equity Fin. Group*, No. Civ. 04-1512, 2005 WL 2143975 (D.N.J. Sept. 2, 2005); *SEC v. Funding Res. Group*, No. 3-98-CV-2689-M, 2004 WL 1189996 (N.D. Tex. May 27, 2004); *SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000); *CFTC v. Franklin*, 652 F. Supp. 163 (W.D. Va. 1986). But, unlike in cases governed by statute, receivership courts are given great discretion, unfettered by specific statutory mandates, to fashion remedies. These cases have no relevance to proceedings governed by SIPA and the Bankruptcy Code. As recognized in *SEC v. Byers*, a "bankruptcy court would have less flexibility in determining the most equitable approach to distribute assets to victims," than would a court overseeing a receivership. 637 F. Supp. 2d 166, 176 (S.D.N.Y. 2009).[10]

In another non-SIPA case cited by the Trustee and SIPC, *In re Tedlock Cattle Co.*, 552 F.2d 1351 (9th Cir. 1977), the bankruptcy trustee in fact agreed that under applicable state law the investors in the Ponzi scheme had allowable claims for benefit-of-the-bargain damages, not just invested principal. *See id.* at 1352. In addition, the "equitable" distribution sanctioned in *Tedlock Cattle* (relying on *In re Young*, 294 F. 1 (4th Cir. 1923)) has been foreclosed by the Supreme Court, which has squarely held that Section 510(c) of the Bankruptcy Code, not sweeping notions of "equity," governs the

---

[10] Precisely because receiverships lack "the guidance of the bankruptcy code," the Second Circuit has instructed that bankruptcy proceedings are preferable to receiverships in liquidations of broker-dealers. *See SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 437 (2d Cir. 1987).

subordination of claims in distribution. *See Reorganized CF & I Fabricators*, 518 U.S. at 228-29; *Noland*, 517 U.S. at 541.

Nor do the SIPA cases cited by the Trustee support a "cash-in/cash-out" valuation. *In re Old Naples Securities, Inc.*, 311 B.R. 607 (M.D. Fla. 2002), concerned claims for cash, not – as here – claims for securities, and the court therefore did not have to address whether the customers' "securities positions" could be "liquidated by sale or purchase on the filing date." *See id.* at 616. In a case rather the converse of this one, *In re C.J. Wright & Co.*, 162 B.R. 597 (Bankr. M.D. Fla. 1993), customers held only worthless securities, and the SIPC Trustee argued that their recovery should be limited to the securities themselves. The court concluded that the customers should instead be allowed "claims for cash" in the amount of their initial investments. *Id.* at 609.

The Trustee's contention that departure from the allowance and distribution rules of SIPA is warranted because this case involves a "zero-sum game" is both irrelevant and wrong. First, virtually all broker-dealer failures involve insolvent debtors – that is indeed the reason for the enactment of SIPA. Second, the SIPC Fund is designed to permit recovery of a full $500,000 claim for every account. One customer's receipt of the full $500,000 from the SIPC Fund does not in any way reduce another customer's payment from the SIPC Fund.[11]

Finally, SIPA and the Bankruptcy Code are not inequitable statutes, and applying them in a manner consistent with their terms and customer expectations is the only fair

---

[11] The SIPC Fund is obligated and able to satisfy all "net equity" claims in this case up to $500,000. Indeed, the very purpose of SIPA was to establish "a substantial reserve fund to provide protection to customers of broker-dealers to reinforce the confidence that investors have in the U.S. securities markets." *New Times I*, 371 F.3d at 84 (internal quotation marks and alterations omitted). The effect of the Trustee's and SIPC's approach to net equity, however, is to shift the losses caused by BLMIS's failure from the SIPC Fund – where Congress intended such losses to fall – to the broker's innocent customers.

outcome. "[E]quity in the law *is* the consistent application of legal rules. The definition of *in*equity is unequal application of norms. The bankruptcy law treats pre-bankruptcy claims of the same class equally. When one claimant gets treatment that is denied to others, they have been treated inequitably." *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 566 (7th Cir. 1986) (emphasis in original). Indeed, upending the lives of innocent customers in a manner totally inconsistent with years of legitimate expectations is the essence of inequity.[12]

## 2. Claiming That All Customers Are Guilty Is No Justification

The Trustee and SIPC also argue that by permitting Madoff to exercise discretion over their investments, the customers became liable for his fraud, and therefore the customers' contracts with BLMIS are void. (Tr. Br. at 48-49; SIPC Br. at 27-33.) The Trustee's and SIPC's argument rests on a distortion of the holding in *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406 (S.D.N.Y. 2001). The critical fact in *Adler, Coleman* was that the debtor was an innocent, third-party victim of a fraud perpetrated by certain brokers and their complicit customers. *See In re Adler, Coleman*, 263 B.R. at 440, 442, 445, 462-64. Here, by contrast, BLMIS itself defrauded the customers. The Trustee's argument – made while standing in BLMIS's shoes – that BLMIS owes the customers *less* than the amount reflected on their account statements precisely because BLMIS was defrauding them is absurd on its face and contrary to settled law.[13] *New*

_____

[12] The Trustee's after-the-fact, ad hoc approach to determining "net equity" directly conflicts with SIPA's purpose of promoting investor confidence in the nation's securities markets, because the approach permits no certainty about its future application. *See, e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 188-89 (1994) (observing that "shifting" legal standards that lack "certainty and predictability" can "exact[] costs that may disserve the goals of fair dealing and efficiency in the securities markets").

[13] The proposition that "the guilty party cannot take advantage of his own fraud to avoid his obligation under the contract should the innocent party choose to enforce it" is "so elementary that a

*Times I*, for example, makes clear that a broker's fraud does not make the customers' securities contracts with the broker any less valid and enforceable against the broker. *See New Times I*, 371 F.3d at 87-88.

To the extent the Trustee and SIPC contend that there are *no* customers, they are incorrect. SIPA defines "customer" to include "any person who has deposited cash with the debtor for the purpose of purchasing securities."[14] 15 U.S.C. § 78*lll*(2). The broker's fraud does not change the outcome; indeed, the statute's definition of "customer" specifically contemplates situations in which the broker defrauds the customer. *See* 15 U.S.C. § 78*lll*(2) ("customer" includes any person with a claim "arising out of sales or *conversions* of such securities" (emphasis added)).

The further argument that BLMIS customers are not "customers" because BLMIS was not acting "in the ordinary course of its business" is also wrong. (Tr. Br. at 45.) The "ordinary course of business" requirement is intended to limit "customer" status to those who had brokerage accounts with a broker, rather than to lenders or trade creditors. *See, e.g.*, *In re Hanover Square Sec.*, 55 B.R. 235, 239 (Bankr. S.D.N.Y. 1985) (explaining that 1978 amendments to SIPA, which added the "ordinary course" requirement, codify

---

citation of secondary authorities is sufficient." *Partridge v. Presley*, 189 F.2d 645, 651 (D.C. Cir. 1951) (citing 5 Williston, Contracts § 1488 (Rev. Ed.); 12 Am. Jur. Contracts § 146; 17 C.J.S., Contracts, 166). Indeed, it is well established under New York law that an innocent party can affirm a contract with a party that defrauded it and sue for damages. *See, e.g.*, *Ferguson v. Lion Holding, Inc.*, 312 F. Supp. 2d 484, 498-99 (S.D.N.Y. 2004).

[14] Citing 15 U.S.C. § 78fff-2(b), the Trustee and SIPC contend that BLMIS's books and records demonstrate that no trading occurred, and therefore no one has "customer" status. (Tr. Br. at 44-45; SIPC Br. at 19.) But the Trustee distorts the plain language of Section 78fff-2(b). That section provides that when a customer claims to be owed securities positions that are not reflected on an account statement or in other books and records of the broker – which is not the case here – the customer must then use other evidence to establish the claimed securities positions "to the satisfaction of the trustee." 15 U.S.C. § 78fff-2(b). There is no support in the statute for the Trustee's argument that he is not bound by books and records of the debtor – here, account statements – that clearly show what the broker said it owed to customers.

cases concluding that lenders are not customers and clarifying that "customer" includes "only a person who enjoys the type of fiduciary relationship with the debtor that characterizes customers in general" (internal quotation marks omitted)).

Finally, the Trustee and SIPC contend that SIPA does not provide insurance against fraud. Again, they misstate the law. SIPA does not provide insurance in the event that a customer is induced by fraud to purchase a security that then loses its value. *See, e.g.*, *SIPC v. Charisma Sec. Corp.*, 371 F. Supp. 894, 899 n.7 (S.D.N.Y. 1974) (stating that claims for market losses "are not included in the insurance umbrella afforded by SIPC"). But the SIPC Fund was established precisely to compensate customers who have been deprived of their securities positions – through misappropriation, conversion, or otherwise – by brokers who go bankrupt. *See, e.g.*, *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 984 (2d Cir. 1974) (SIPA was designed to protect investors "who suffered significant losses when a brokerage house collapsed, often because the house had in its last days misappropriated the investor's funds to its own use"). That the broker's collapse is brought about by fraud does not change the protections afforded to the broker's customers by SIPA.

For all of these reasons, BLMIS customers' "net equity" claims equal the liquidation value, as of the filing date, of the securities positions on the November 30, 2008 account statements. Accordingly, the Trustee's motion must be denied.

## II.

## THE TRUSTEE HAS NO POWER TO AVOID
## PAYMENTS TO INNOCENT CUSTOMERS

The Trustee and SIPC contend that fraudulent transfer law supports their "cash-in/cash-out" approach to "net equity."[15]  The argument has no basis in the text of the statute, which alone determines a customer's "net equity."  In any event, the Trustee has no power to avoid any prior payments that BLMIS made to innocent customers (hereinafter, the "Transfers").

First, Section 546(e) of the Bankruptcy Code precludes avoidance of any Transfers made in connection with a securities contract, unless the Transfer was made both (a) with actual fraudulent intent and (b) within two years of the filing date. 11 U.S.C. §§ 546(e), 548(a)(1)(A).  Second, because the Transfers discharged antecedent debts that BLMIS owed to its customers, they cannot be avoided as fraudulent.

### A.     Bankruptcy Code Section 546(e) Limits the Trustee's Avoidance Power to Section 548(a)(1)(A)

As a matter of law, the Trustee may not avoid any Transfer made prior to December 11, 2006.  Section 546(e) of the Bankruptcy Code provides, in relevant part:

> "Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer . . . that is a transfer made by or to . . . [a] stockbroker [or] financial institution, . . . in connection with a securities contract, as defined in section 741(7), . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title."[16]  11 U.S.C. § 546(e).

---

[15] Because the Trustee and SIPC have raised avoidance arguments (Tr. Br. at 46-49; SIPC Br. 34-37; Letter from David J. Sheehan, Esq., to the Court, dated Nov. 9, 2009), the Customers must respond.

[16] Section 548(a)(1)(A) governs intentional fraudulent transfers.  *See* Point II.B. *infra*.

A "securities contract" is defined broadly in Section 741(7) to include "a contract for the purchase, sale or loan of a security . . . or option on any of the foregoing, including an option to purchase or sell any such security." 11 U.S.C. § 741(7)(A)(i). A "securities contract" also includes "any other agreement or transaction that is similar to an agreement or transaction" listed in Section 741(7)(A)(i)-(vi). 11 U.S.C. § 741(7)(A)(vii).

In Section 546, which provides exceptions from the fraudulent conveyance and stay provisions of the Bankruptcy Code for particular types of financial transactions and instruments, Congress struck a balance between protection of the financial and securities markets, on the one hand, and the avoidance of fraudulent transfers in bankruptcy, on the other. *See Bevill Bresler & Schulman Asset Mgmt. Corp. v. Spencer Savings & Loan Ass'n*, 878 F.2d 742, 751 (3rd Cir. 1989) (noting that Section 546 is at the intersection of "two important national legislative policies [bankruptcy and securities law] . . . on a collision course").

This Court must enforce Section 546(e) "according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000); *see In re Resorts Int'l, Inc.*, 181 F.3d 505, 516 (3rd Cir. 1999) (plain language of Section 546(e) controls and prohibits avoidance of payments to shareholders in leveraged buyout transaction); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 986-87 (8th Cir. 2009) (same); *In re QSI Holdings, Inc.*, 571 F.3d 545, 550 (6th Cir. 2009) (same).[17]

---

[17] These cases interpreted a previous version of Section 546(e), which protected "margin payments" and "settlement payments" from a trustee's avoidance powers. In December 2006, Congress broadened the protection of Section 546(e) to include, in addition to "margin payments" and "settlement payments," any "transfer" made by or to a stockbroker or financial institution "in connection with a securities contract." 11 U.S.C. § 546(e).

There is no dispute that BLMIS and the Customers entered into contracts for the purchase and sale of securities. *Friedman Decl.* ¶¶ 3-5 & Exs. A-C. Nor can there be any dispute that, in connection with those securities contracts, BLMIS made payments from its account at JP Morgan Chase to the Customers' bank account, also at JP Morgan Chase. *Id.* ¶ 6. Accordingly, all of the elements of Section 546(e) are met, and no avoidance claim may be asserted with respect to any Transfer occurring before December 11, 2006. Any claim relating to a Transfer after that date must meet the criteria of Section 548(a)(1)(A), the intentional fraudulent transfer provision of the Bankruptcy Code.

**B.** **The Trustee Cannot State Any Claims Under Section 548(a)(1)(A) Because BLMIS Was Legally Obligated to Make the Transfers**

The Trustee has no basis under Section 548(a)(1)(A) to avoid transfers from BLMIS to customers.

To establish a claim for intentional fraudulent transfer, the Trustee must show that the debtor "made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . ., indebted." 11 U.S.C. § 548(a)(1)(A). Here, the Transfers were made on account of antecedent debts owed to specific customers. While BLMIS may have had unlawful motives in making the Transfers, and while the Transfers may result in some customers being preferred over others, a debtor's "very plain desire to prefer, and thereby incidentally to hinder creditors, is . . . not as a matter of law an intent obnoxious to

[fraudulent transfer law]." *Richardson v. Germania Bank*, 263 F. 320, 325 (2d Cir. 1919).[18]

### 1.    The Transfers Satisfied Antecedent Debts Owed to Customers

BLMIS was required as a matter of state and federal law to transfer to the customers the amounts owed to the customers as reflected on their account statements.

First, the customers entered into contracts with BLMIS pursuant to which the customers would provide funds to BLMIS for the purpose of investing in securities, BLMIS would purchase or sell such securities as authorized, and BLMIS would ultimately pay proceeds to the customers. As a matter of contract law, BLMIS was therefore liable to the customers for the total amounts on the customers' account statements. *See, e.g.*, *Visconsi v. Lehman Bros.*, 244 Fed. App'x 708, 711 (6th Cir. 2007); *Harwood v. Int'l Estate Planners*, 33 Fed. App'x 903, 906 (9th Cir. 2002) (investor's "agreement to entrust [securities broker] with her assets, coupled with the account statements, constitutes sufficient evidence that an investment contract was formed"); *Scalp & Blade, Inc. v. Advest, Inc.*, 309 A.D.2d 219, 765 N.Y.S.2d 92 (4th Dep't 2003) (claims against investment advisor/securities broker seeking damages for alleged mismanagement include cause of action for breach of contract).

In *Visconsi*, the customers deposited $21 million into their accounts at Lehman Brothers, and withdrew $25.8 million over several years. Their broker eventually admitted that he had operated a Ponzi scheme and that the customers' actual account

---

[18] *See also Irving Trust Co. v. Chase Nat'l Bank*, 65 F.2d 409, 410 (2d Cir. 1933) ("It is difficult to imagine a preferential transfer which does not incidentally hinder and delay creditors, for, whenever an insolvent debtor pays one of his creditors in full, he thereby puts the cash or property so used beyond the reach of execution by the others. *Pro tanto* every preference hinders and delays them."); *In re Rubin Bros. Footwear, Inc.*, 119 B.R. 416, 423 (S.D.N.Y. 1990) ("Mere intent to prefer one creditor over another, although incidentally hindering or delaying creditors, will not establish a fraudulent transfer under section 548(a)(1).")

balance was negative, not the $37.9 million listed on their account statements.  The court

flatly rejected Lehman's argument that, because they had withdrawn more than they had

invested, the plaintiffs could not recover the amount owed pursuant to their statements:

> "Plaintiffs gave $21 million to [the broker], not to hide under a rock or
> lock in a safe, but for the express purpose of investment, with a hope –
> indeed a reasonable expectation – that it would grow.  Thus, the out-of-
> pocket theory, which seeks to restore to Plaintiffs only the $21 million
> they originally invested less their subsequent withdrawals, is a wholly
> inadequate measure of damages.  Had [the broker] invested Plaintiffs'
> money as requested, their funds would have likely grown immensely. . . .
> In fact, the fictitious statements issued by Lehman, which were designed
> to track Plaintiffs' funds as if they had been properly invested, indicate
> that Plaintiffs' accounts would have grown to more than $37.9 million. . . .
> Plaintiffs thus . . . were entitled to the full $37.9 million balance shown,
> regardless of the amounts of their previous deposits and withdrawals."
> *Lehman*, 244 Fed. App'x at 713-14.

*See also Redstone v. Goldman, Sachs & Co.*, 583 F. Supp. 74, 76-77 (D. Mass. 1984)

(denying motion to dismiss customers' breach of contract claims against broker-dealer

seeking benefit-of-the-bargain damages); N.Y. U.C.C. § 8-501(b)(1) ("[A] person

acquires a security entitlement if a securities intermediary . . . indicates by book entry that

a financial asset has been credited to the person's securities account . . ." (a "security

entitlement" means "the rights and property interest of an entitlement holder with respect

to a financial asset [including a security, *see* N.Y. U.C.C. § 8-102(a)(9)(i)] specified in

Part 5 [of Article 8]," N.Y. U.C.C. § 8-102(a)(17))).

Federal law also protected the customers' claims for securities shown on their

statements, whether or not they were purchased.  "[A] broker who accepts payment for

securities that he never intends to deliver . . . violates § 10(b) and Rule 10b-5."  *SEC v.

Zandford*, 535 U.S. 813, 819 (2002); *see Merrill Lynch, Pierce, Fenner & Smith Inc. v.

Dabit*, 547 U.S. 71, 85 n.10 (2006) (same); *Grippo v. Perazzo*, 357 F.3d 1218, 1223-24

(11th Cir. 2004) (plaintiff "adequately pled fraud 'in connection with the purchase or sale

of any security' [under Rule 10b-5], even though he failed to identify any particular security purchased, because Perazzo accepted and deposited Grippo's monies as payment for securities"); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) ("The allegation that the Palace Defendants falsely promised to purchase securities when they never intended to do so . . . is sufficient in pleading fraud 'in connection with' a purchase of securities.").

The federal securities laws gave rise to a right to receive payment in return for a release of benefit-of-the-bargain claims. *See, e.g.*, *Osofsky v. Zipf*, 645 F.2d 107, 114 (2d Cir. 1981) (applying benefit-of-the-bargain damages under the 1934 Act); *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1050 (2d Cir. 1995) (awarding lost profits because "plaintiffs could establish benefit-of-the-bargain damages with reasonable certainty"); *Panos v. Island Gem Enters.*, 880 F. Supp. 169, 177 (S.D.N.Y. 1995) ("[W]hen benefit-of-the-bargain damages can be measured with reasonable certainty and those damages are traceable to a defendant's fraud, courts are free to award them.").

Finally, in New York, a "broker who has discretionary powers over an account owes his client fiduciary duties." *Lowenbraun v. L.F. Rothschild*, 685 F. Supp. 336, 343 (S.D.N.Y. 1988). "The law is well settled that where a customer deposits with brokers moneys to be used in the purchase of securities, a fiduciary relationship arises between them." *Lipkien v. Krinski*, 192 A.D. 257, 263, 182 N.Y.S. 454 (1st Dep't 1920). "This impose[s] upon [the broker] broad fiduciary duties to plaintiff with respect to the management of the account." *Howell v. Freifeld*, 631 F. Supp. 1222, 1224 (S.D.N.Y. 1986) (internal quotation marks omitted). Where such a relationship exists, a broker's failure to invest in securities, thereby "abusing the position as broker-agent to gain profits

at the client's expense," gives rise to a damages claim against the faithless fiduciary.

*Lowenbraun*, 685 F. Supp. at 343; *see also 105 East Second Street Assoc. v. Bobrow*, 175

A.D.2d 746, 746-47, 573 N.Y.S.2d 503, 504 (1st Dep't 1991) (damages for breach of

fiduciary duties include "lost opportunities for profit . . . by reason of the faithless

fiduciary's conduct"); *Levy v. Bessemer Trust Co.*, No. 97 Civ. 1785, 1999 WL 199027,

at *5 (S.D.N.Y. Apr. 8, 1999) ("Under New York law, lost profits are available on breach

of fiduciary duty claims.").

Therefore, BLMIS was obligated as a matter of law to transfer funds to the

customers, and when the customers received the Transfers, they contemporaneously

released corresponding claims that they held under contract law, securities law, and

fiduciary duty law. This dollar-for-dollar satisfaction of the antecedent debts owed by

BLMIS to the customers constituted "fair consideration" and "reasonably equivalent

value" under New York law and Section 548 of the Bankruptcy Code, respectively.[19]

---

[19] Accordingly, even if Section 546(e) did not apply, the Trustee could not state a claim for constructive fraudulent transfer under the Bankruptcy Code or New York law. To state a claim for constructive fraudulent transfer under Section 548(a)(1)(B), the Trustee must establish, in addition to insolvency at the time of the transfer, that BLMIS made a transfer and "received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U.S.C. § 548(a)(1)(B). Likewise, under Section 544 of the Code, applying New York law, the Trustee must establish that the challenged transfer was made "without a fair consideration." N.Y. Debt. & Cred. Law § 273.

A transfer that satisfies an antecedent debt cannot be constructively fraudulent. The Bankruptcy Code expressly defines "value" to include the "satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). New York law provides that "[f]air consideration is given for property . . . [w]hen in exchange for such property . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied." N.Y. Debt. & Cred. Law § 272. New York law defines "debt" broadly to include "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." N.Y. Debt. & Cred. Law § 270. The Bankruptcy Code similarly defines "debt" to mean "liability on a claim," 11 U.S.C. § 101(12), and "claim" is defined to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).

## 2. No Intentional Fraud Can Be Alleged Where a Transfer Satisfied Antecedent Debt

No intentional fraud claim may be stated, regardless of BLMIS's intent, with respect to a Transfer that satisfied an antecedent debt owed to a customer.

As noted, Section 548(a)(1)(A) is excepted from Section 546(e). It states:

"The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . ., indebted[.]" 11 U.S.C. § 548(a)(1).

An intent to "hinder, delay, or defraud" is demonstrated when the debtor transfers assets beyond the reach of all of its creditors, not when the debtor transfers an asset to a legitimate creditor. *See, e.g.*, *Van Iderstine v. National Discount Co.*, 227 U.S. 575, 582 (1913) (transfers are intentionally fraudulent when the debtor "intends to hinder and delay [its creditors] as a class"); *In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1181 (11th Cir. 1987) ("Fraudulent transfers are avoidable because they diminish the assets of the debtor to the detriment of all creditors.").

A transfer to a legitimate creditor may be avoided, if at all, only as a preference. "[T]he preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because '[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them.'" *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) (quoting *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987)). "A preference merely violates the bankruptcy rule of equal distribution among all creditors. A fraudulent transfer goes

further.  By a fraudulent transfer, the debtor places its assets beyond the reach of its creditors."  5 *Collier on Bankruptcy* ¶ 547.01 (15th ed.).  As the Supreme Court long ago cautioned,"[a]n attempt to prefer is not to be confounded with an attempt to defraud, nor a preferential transfer with a fraudulent one."  *Coder v. Arts*, 213 U.S. 223, 241 (1909).

*Cunningham*, the case proffered by the Trustee and SIPC as justification for their "equality is equity" approach, is a case applying the preference provision of the former Bankruptcy Act.  In *Cunningham*, the bankruptcy trustee for Charles Ponzi was seeking to avoid *preferential* transfers to victims that had occurred during the preference period. The Supreme Court espoused the bankruptcy policy of equality given effect by the preference provision:

> "After August 2d, the victims of Ponzi were not to be divided into two classes, those who rescinded for fraud and those who were relying on his contract to pay them. They were all of one class, actuated by the same purpose to save themselves from the effect of Ponzi's insolvency. Whether they sought to rescind or sought to get their money as by the terms of the contract, they were, in their inability to identify their payments, creditors, and nothing more. It is a case the circumstances of which call strongly for the principle that equality is equity, and this is the spirit of the bankrupt law.  Those who were successful in the race of diligence violated not only its spirit, but its letter, and secured an unlawful preference."  *Cunningham*, 265 U.S. at 13.

*Cunningham* provides no support for the avoidance of transfers by BLMIS to innocent customers that occurred more than 90 days before BLMIS's SIPA filing.  *See* 11 U.S.C. § 547(b).

Fraudulent transfer law, by contrast, is not directed to leveling payments to creditors.  Its objective is to recover assets that an insolvent debtor transferred for less than fair value.  "[T]he intent of fraudulent conveyance statutes is not to provide equal distribution of the estates of debtors among their creditors."  *Boston Trading Group*, 835 F.2d at 1509 (quoting 1 G. Glenn, *Fraudulent Conveyances and Preferences*, § 289 (rev.

ed. 1940)).  Fraudulent transfer law is instead "a set of legal (not equitable) doctrines

designed for very different purposes."  *Id.* at 1508.  The Supreme Court has thus observed

that fraudulent transfer actions "more nearly resemble state-law contract claims brought

by a bankrupt corporation to augment the bankruptcy estate than they do creditors'

hierarchically ordered claims to a pro rata share of the bankruptcy res."  *Granfinanciera,*

*S.A. v. Nordberg*, 492 U.S. 33, 56 (1989).[20]

The Second Circuit has expressly held that a transfer on account of antecedent

debt is not a fraudulent transfer, regardless of the mental state or intent of the transferor.

In *In re Sharp International Corp.*, 403 F.3d 43 (2d Cir. 2005), a lender began to suspect

Sharp of fraud, and demanded that Sharp repay its loan.  Sharp fraudulently induced

investments from unsuspecting investors, some of which were then used to repay the debt

to Sharp.  *Id.* at 47-48.  The Second Circuit ruled that Sharp's payment to State Street

constituted a preference, but not a fraudulent conveyance.  A "'conveyance which

satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor

otherwise improper, even if its effect is to prefer one creditor over another.'"  *Id.* at 54

(quoting *Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91,

599 N.Y.S.2d 816 (1st Dep't 1993)).

That Sharp defrauded new investors to raise money to pay State Street – even if

State Street knew about that fraud – did not change the fact that the transfer to State

---

[20] Fraudulent transfer laws have specific statutes of limitation – two years under federal law, and six years under New York law – that restrict the period during which transfers may be avoided.  Even if any avoidance provision were applicable to the Transfers, it would permit avoidance only within the relevant period.  The customer's account statement immediately preceding that period would reflect the customer's equity at the start of the period.  The Trustee's "cash-in/cash-out" approach ignores these temporal limitations on his avoidance power.

Street "was at most a preference between creditors and did not 'hinder, delay, or defraud either present or future creditors.'" *Sharp*, 403 F.3d at 56.[21]

> "The nub of the complaint is that State Street knew that there would likely be victims of the [Sharp principals'] fraud, and arranged not to be among them. On the one hand, this seems repugnant; on the other hand, [State Street's] discovery that Sharp was rife with fraud was an asset of State Street, and State Street had a fiduciary duty to use that asset to protect its own shareholders, if it legally could. One could say that State Street failed to tell someone that his coat was on fire; or one could say that it simply grabbed a seat when it heard the music stop. The moral analysis contributes little." *Sharp*, 403 F. 3d at 52.

Ponzi schemes are not different – they are frauds like any other – and indeed other courts in this Circuit have recognized that a payment to an innocent creditor in a Ponzi scheme cannot be avoided as fraudulent if the payment satisfied an antecedent debt. For example, in *In re Carrozzella & Richardson*, 286 B.R. 480, 491 (D. Conn. 2002), creditors had a contractual right to both the principal and the profits that the Ponzi scheme debtor had transferred to them. The court thus concluded that payment of profits could not be avoided as fraudulent, because "[i]n exchange for the [profits] paid to the Defendants, the Debtor received a dollar-for-dollar forgiveness of a contractual debt." *Id.* at 491. Similarly, in *Unified Commercial Capital*, both the district court and the bankruptcy court concluded that transfers of profit to innocent Ponzi scheme investors could not be avoided as fraudulent because the creditors had a contractual right to the profits. *See In re Unified Commercial Capital*, Nos. 01-MBK-6004L, 01-MBK-6005L,

---

[21] This Court has held that margin payments to Bear Stearns by a fraudulent fund were subject to avoidance under Section 548(a)(1)(A) despite the *Sharp* case, finding that *Sharp* is inapplicable where a complaint alleged that the targeted payments resulted in an increase, rather than a decrease, in the debtor's total liabilities, and because *Sharp* was based on New York law imported by Section 544 rather than on Section 548(a)(1)(A). *See In re Manhattan Investment Fund Ltd.*, 310 B.R. 500, 507-09 (Bankr. S.D.N.Y. 2002), *aff'd* 397 B.R. 1 (S.D.N.Y. 2007). Here, there can be no dispute that BLMIS had valid debt obligations to innocent Customers, payment of which reduced its overall liabilities. The Customers also respectfully suggest that *Sharp*'s conclusion that payment of valid antecedent debt may not be an avoidable fraudulent transfer is applicable to claims under Section 548(a)(1)(A).

2002 WL 32500567, at *8 (W.D.N.Y. June 21, 2002) (rejecting trustee's effort to claw

back profits from "an innocent investor, who has received a bargained-for, contractual

interest payment, at a commercially reasonable rate"); *In re Unified Commercial Capital*,

260 B.R. 343, 351 (Bankr. W.D.N.Y. 2001).

Notwithstanding the Second Circuit's decision in *Sharp*, some courts have applied

the so-called "Ponzi scheme presumption," but only where the transfer at issue did not

satisfy antecedent debt. *See In re Bayou Group, LLC*, 362 B.R. 624, 638 (Bankr.

S.D.N.Y. 2007) (concluding that equity holders – as opposed to creditors – of the

fraudulent enterprise did not have contractual rights to payments on their investments,

"[i]n contrast to the lawful and disclosed payment of a valid contractual antecedent debt

in *Sharp*"); *In re Manhattan Investment Fund Ltd.*, 397 B.R. 1, 11 (S.D.N.Y. 2007)

(distinguishing *Sharp* on the ground that the transfers to Bear Stearns did not repay loans

or services or satisfy other antecedent debts).

> "Simply because a debtor conducts its business fraudulently does not
> make every single payment by the debtor subject to avoidance. If so,
> every vendor supplying goods to the debtor would receive an avoidable
> fraudulent transfer when the debtor paid the vendor's invoice. Every
> employee, even lower-level custodial and clerical employees, would be
> required to return their wages, regardless of the work they performed.
> Landlords would have to return rent payments, even if the debtor actually
> occupied the leased premises. No one conducting business with a debtor
> operating a Ponzi scheme could prevent the avoidance of payments they
> received from the debtor, regardless of the extent of the transferee's
> knowledge or culpability or the actual services provided. The law does
> not require this result." *In re World Vision Entm't, Inc.*, 275 B.R. 641,
> 658 (Bankr. M.D. Fla. 2002).

Some courts have invoked "equity" or "morality" or "public policy" to justify

avoiding transfers of profits to Ponzi scheme victims, even though the transfers were

contractually required or otherwise legally mandated. *See, e.g.*, *Donell v. Kowell*, 533

F.3d 762, 776 (9th Cir. 2008) (concluding that transfers of profits to Ponzi scheme

victims are avoidable because it "is more equitable"); *Scholes v. Lehmann*, 56 F.3d 750,

756-57 (7th Cir. 1995) (in a receivership case, concluding that transferees had legal claim

to profit but not a "moral" claim); *In re Indep. Clearing House Co.*, 77 B.R. 843, 858 (D.

Utah 1987) (concluding that it was in "the interest of the public" to void valid antecedent

debts that the debtor owed to transferees for profits).[22]

These cases rest on the notion that courts can ignore or alter what the law would

otherwise require so as to redistribute assets "equitably." But the Supreme Court has

expressly rejected an "expansive view of equity" that invokes "'the grand aims of equity,'

and asserts a general power to grant relief whenever legal remedies are not 'practical and

efficient,' unless there is a statute to the contrary." *Grupo Mexicano de Desarrollo, S.A.

v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 321 (1999). "When there are indeed new

conditions that might call for a wrenching departure from past practice, Congress is in a

much better position than [the courts] both to perceive them and to design the appropriate

remedy." *Id.* at 322. Moreover, the Second Circuit specifically instructed in *Sharp* that

"moral analysis contributes little" to fraudulent transfer analysis. *See Sharp*, 403 F.3d at

52.

For just these reasons, the bankruptcy court in *Unified Commercial Capital*

properly rejected cases like *Scholes*, *Donell*, and *Independent Clearing House*, observing:

> "By forcing the square peg facts of a 'Ponzi' scheme into the round holes
> of the fraudulent conveyance statutes in order to accomplish a further
> reallocation and redistribution to implement a policy of equality of
> distribution in the name of equity, . . . many courts have done substantial

---

[22] *See also In re Hedged-Investments Associates, Inc.*, 84 F.3d 1286, 1290 (10th Cir. 1996) (refusing to follow "ordinary" rule that contractual right to profits should be respected); *In re Moore*, 39 B.R. 571, 574-75 (Bankr. M.D. Fla. 1984) (asserting that "equity" supports clawback of profits that debtor owed transferee); *In re Taubman*, 160 B.R. 964, 985-86 (Bankr. S.D. Ohio 1993) (acknowledging transferees' contractual right to profits received, but relying on *Independent Clearing House* in refusing to recognize antecedent debt satisfied by transfer).

injustice to those statutes and have made policy decisions that should be made by Congress." *Unified Commercial Capital*, 260 B.R. at 350.

Because the Transfers discharged antecedent debts that BLMIS owed to its customers, the Transfers may not be avoided as fraudulent, even if the Transfers were part of a Ponzi scheme.

## CONCLUSION

For all of the reasons discussed above, this Court must deny the Trustee's motion and rule that BLMIS customers' "net equity" claims equal the market value, as of the filing date, of the securities positions reflected on the customers' November 30, 2008 account statements, and that no avoidance provision may be applied to the Transfers in order to reduce "net equity" or for any other purpose.

Dated: New York, New York
       November 12, 2009

               DAVIS POLK & WARDWELL LLP

               By:   */s/ Karen E. Wagner*
                     Karen E. Wagner
                     Denis J. McInerney
                     Jonathan D. Martin

               450 Lexington Avenue
               New York, New York  10017
               (212) 450-4000

               *Attorneys for Sterling Equities Associates*
               *and Certain Affiliates*