**GIBBONS P.C.**
One Pennsylvania Plaza
New York, New York 10119
Telephone: 212-613-2009
Facsimile: 212-554-9696
By:   Jeffrey A. Mitchell, Esq.
      Don Abraham, Esq.
*Attorneys for Donald G. Rynne*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC<br><br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Debtor. | |

**MEMORANDUM OF LAW OF DONALD G. RYNNE IN OPPOSITION TO MOTION FOR AN ORDER UPHOLDING TRUSTEE'S DETERMINATION DENYING "CUSTOMER" CLAIMS FOR AMOUNTS LISTED ON LAST CUSTOMER STATEMENT, AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE OBJECTIONS WITH RESPECT TO THE DETERMINATIONS RELATING TO NET EQUITY**

## FACTS RELEVANT TO THIS OPPOSITION

### A.    Background

Donald G. Rynne ("Rynne") is an 86 year-old World War II veteran. During and after the war, he flew missions as an Air Force pilot in support of allied operations throughout North Africa, the Middle East, China, Burma and India. Rynne is also a lung cancer survivor, having had one half of one lung removed after his diagnosis nearly five years ago. He has never in his life been charged with any crime, and is not alleged to have had any role whatsoever in the criminal activity that led to the demise of BLMIS. Rynne is simply an innocent BLMIS customer who on December 10, 2008 believed he had over $6-million in account number 100072 (the "Account") to generate sufficient income to finance his retirement, only to learn the next day that his nest egg had vaporized. The Trustee nevertheless cavalierly identifies Rynne as a "net winner," as if anyone who lost his life savings overnight could ever be a *winner*. He appears to use that phrase to marginalize Rynne and other long-term innocent Madoff customers like him, because the formula he proposes is plainly intended to punish them as if they knowingly profited from a criminal enterprise.

The Trustee primarily argues that because BLMIS operated as a ponzi scheme, there is no basis under the law to ever rely on account statements it issued for any purpose whatsoever. Because the statements were, according to the Trustee, the product of a "fantasy" world which existed only within the walls of BLMIS, customers should only be entitled to a "cash in"/ "cash-out" calculation of their respective positions, regardless of statutes of limitations, tax refund periods, statutory interest or other similar protections to which they would ordinarily be entitled. Indeed, for people the Trustee calls *net winners*, who withdrew money over the years to pay taxes and fund retirement expenses, he cavalierly says they should actually give back whatever

-2-

#1446809 v2
109422-67219

they received in excess of their initial cash deposits to pay later investors, who are being prioritized even though everyone's investment goal was identical – to achieve the profits BLMIS historically reported to its customers. In the case of Rynne, he is an innocent long time customer who honestly believed he had managed his assets carefully, and had retained sufficient funds in an account with a regulated and SIPC protected investment advisor to have a healthy balance for future security. To characterize people like this as "winners" plainly ignores the reality of the unique situation they find themselves in. They were required by law to withdraw funds over many years to pay taxes on reported income (phantom or not), but can only receive from the government a maximum possible tax benefit of five years (*see*, Internal Revenue Bulletin: 2009-19, Rev. Proc. 2009-26). Yet, the Trustee looks to reach back to account inception further to make his own calculation, even if, as in the case of Rynne, inception is longer ago than even the statute of limitations period, let alone the five years offered by the IRS.

The Trustee's and SIPC's analyses give no consideration to taxes paid on reported profits by customers who had accounts for longer than the IRS is offering tax relief, nor do they explain why the Trustee should be permitted to reach farther back in time than the government. In the case of Rynne, this amounts to hundreds of thousands of dollars which should properly be accounted for in some way, as he had no choice in the matter of paying taxes on reported income. If the Trustee's position stands, innocent customers will be paying twice for many of the years their accounts were open – once to the government for taxes on non-existent profits for which no tax relief is being afforded, and next to the estate in having to refund those same non-existent profits. The "cash-in"/"cash-out" formula proposed by the Trustee is therefore far too simplistic when it comes to equitably unwinding the largest and longest running financial crime in American history.

#1446809 v2
109422-67219

The evidentiary support for the calculation is also problematic. It is grounded solely in the records of a convicted felon whose business model was objectively based on falsifying records. In even the most charitable of circumstances, there is little prospect that the Trustee could ever successfully introduce into evidence all of the unspecified records upon which he appears to have relied, knowing that BLMIS's very survival depended on fraud. Stated differently, the Trustee, on the one hand, points to all of the fraudulent documentation issued by BLMIS to perpetrate its crime – "[t]he trades, order tickets, customer statements and other records created in furtherance of the fraud were fabricated" (Trustee Memorandum of Law, p. 11) – yet on the other hand picks and chooses those he deigns to treat as truthful. Who could the Trustee even offer as a witness to authenticate these records? Both convicted felons Madoff and DiPascali, whose allocution transcripts are provided as exhibits, certainly cannot and have not done so. The Trustee, who is only conducting a forensic review, also cannot offer these records for the truth of all the matters asserted in them. Here, no one can credibly argue that any records of BLMIS are reliable, certainly for the purpose of making the calculations the Trustee offers.

Finally, while the Trustee purports to cite to precedent of other cases, none is really anything like this one. Here, Madoff himself was, until his arrest at least, a respected industry icon, not only among his customers, but among his peers as well. His business was supposedly regulated, audited, and monitored by government authorities and outside accountants. Yet, despite all of the objective external controls that gave comfort to individual investors like Rynne over the course of decades, no one ever uncovered any fraud at BLMIS, that is, until Madoff turned himself in. Until that day, everyone – customers, industry professionals, and regulators – treated account statements issued by BLMIS as accurately reflecting customer positions, and in the case of Rynne, showing what he had to fund his retirement. It is all well and good for the

-4-

#1446809 v2
109422-67219

Trustee to say that the account statements and confirmations "were routinely printed containing the ever-increasing output of this fiction" (Trustee Memorandum of Law, p. 19), but that "fiction" was effectively certified by those who had oversight responsibility. Nowhere does that factor into the Trustee's analysis.

Here, it is the value reflected on Rynne's account statement at the time of Madoff's arrest that is entitled to protection because that was what everyone – net "winners" and net "losers" alike – expected. Taxes had been paid over the years on reported profits, and remaining balances net of taxes were legitimately considered part of a customer's liquid net worth. As a result, given the uniqueness of the situation, for purposes of calculating loss, every investor should be treated equally, with their last account statements used to reflect the value of their respective net equity interests. No one who had an account at BLMIS is a winner here, and for the Trustee to argue otherwise is simply not true.

**B.      The Nature of the Parties' Relationship**

The investment strategy described by the Trustee that Rynne and other customers like him believed was being implemented supposedly consisted of purchases and sales of securities in such a manner that at four times during the year, their respective accounts were in cash. During "out of the market" periods (Trustee Memorandum of Law, p. 11), customers could make withdrawals believing their securities had been liquidated. Supposed gains were realized each year, and Rynne paid taxes on what was reported out of the cash he thought he had on hand.

While the Trustee focuses on the fraudulent securities transactions to undermine the value of account statements issued to BLMIS customers, those statements nevertheless reflected to those customers an amount they believed was "owed" to them by the firm. Whether or not BLMIS engaged in fraudulent activity throughout its existence, the account statements it issued,

#1446809 v2
109422-67219

most especially when customers were "out of the market" in cash, represented an obligation of the firm to its customers. While it may not now have sufficient assets to satisfy those obligations, the obligations remain much like those any other business that becomes insolvent.

Rynne had an honest and good faith belief, supported by years of a relationship and supposed third party oversight, that the account statements he received reflected amounts owed to him by BLMIS. Since the customer has no way to audit the business activities of the institution, he relies on his account statements to accurately reflect the value of his assets. However, rather than allow claims based on what Trustee knows were the legitimate expectations of customers, the Trustee instead looks to treat what he calls "net winners" as if they were knowing participants in fraud because they get no credit for anything other than "cash in" and "cash out," regardless of circumstance and length of investment. Rynne, an 85 year old World War II veteran, had the same right to believe his account statements as did what are called "net losers." He paid taxes on reported profits for years, and never once was given any objective reason to suspect that BLMIS was not legitimate.

Indeed, the Trustee cannot truthfully say that *all* the money paid to long-time customers came directly from others anyway, as both he and SIPC nevertheless suggest. For example, BLMIS apparently deposited funds in "Fidelity Spartan U.S. Treasury Money Market Fund" prior to 2005. (Trustee Memorandum of Law, p. 11) Other funds were "transferred to affiliated overnight investment accounts at Chase Bank to purchase United States Treasuries or other short-term paper…" (Trustee Memorandum of Law, p. 15) Madoff also apparently transferred assets among BLMIS and his other legitimate businesses, which apparently were operating profitably prior to 2007. (Trustee Memorandum of Law, p. 7) While his conduct may have been fraudulent, there was likely billions of dollars of income generated over the years by these other

#1446809 v2
109422-67219

activities which became comingled with customer deposits. It is simply not possible to separate out those "profits" of BLMIS and its affiliates that were generated by deposits and investments from those which were not.

## C.    SIPC Protection

The Securities Investor Protection Corporation publishes a brochure entitled *How SIPC Protects You* (Exhibit "A" hereto), which describes to customers the extent of SIPC protection. For example, it describes the role of the SIPC as follows:

> SIPC is the first line of defense in the event a brokerage firm fails owing customers cash and securities that are missing from customer accounts.

> When a brokerage is closed due to bankruptcy or other financial difficulties and customer assets are missing, SIPC steps in as quickly as possible and, within certain limits, works to return customers' cash, stock and other securities. Without SIPC, investors at financially troubled brokerage firms might lose their securities or money forever...or wait for years while their assets are tied up in court. However, because not everyone, and not every loss, is protected by SIPC, you are urged to read this whole brochure carefully to learn about he limits of protection.

The brochure goes on to explain how assets of customers are valued when a firm fails, and SIPC steps in. It states:

> How claims are valued. Typically, when SIPC asks a court to put a troubled brokerage firm in liquidation, the financial worth of a customers' account is calculated as of the "filing date."

Here, the Trustee and SIPC look to totally disregard account statements upon which all BLMIS investors relied, and essentially unwind everything as if Madoff himself never existed. One dollar invested 15 or 20 years ago is treated at the same value as a dollar invested today, and taxes paid on reported profits beyond five years are completely ignored. Isn't one purpose of SIPC protection to assure investors that a firm is legitimate, and its business real? Weren't innocent customers of BLMIS like Rynne, who received account statements, entitled to presume

#1446809 v2
109422-67219

that the balances reflected on their statements were SIPC protected? That was the purpose for the protection in the first place.

The situation presented here is unprecedented, both in terms of scope and duration. Unprecedented situations required unprecedented solutions. The solution offered by the Trustee and SIPC fails to account for the historic purpose of SIPC protection, or the genuine harm Madoff caused to retired veterans like Rynne, whose life savings evaporated in a heartbeat.

## D. Reliance on Madoff and DiPascali Allocutions is Misplaced

Both the Trustee and SIPC place heavy emphasis on the allocutions of Madoff and DiPascali to support their position that all withdrawals by BLMIS customers were funded solely by deposits of others. However, Madoff hardly said anything in his allocution, other than to take responsibility for his actions, and presumably deflect attention away from family members by claiming he engaged in fraud mostly by himself. DiPascali, who is cooperating with the government in the hope of obtaining leniency, has not been subject to the rigors of cross-examination, and has only described the operations of BLMIS, in what has been publicly released, at least, in the most general sense.

However, the Trustee acknowledges that deposits were made by BLMIS into bank accounts, treasury certificates and treasury fund instruments were purchased, and Madoff's other legitimate business generated revenue and presumably profit prior to 2007. Accordingly, while BLMIS misrepresented that each customer was in fact invested in the market, it did earn money on what was fraudulently obtained that did not come simply from customer deposits. Regardless, there is simply not enough credible evidence to allow the Court to rely on the unchallenged allocutions of known criminals as a primary basis for denying SIPC protection based on the last account statements issued by BLMIS, as is customarily the practice.

-8-

**E.**     **Using the Last Account Statement Does Not Rubber Stamp the Fraud**

Both SIPC and the Trustee argue that accepting the last account statement as a basis for dividing proceeds would give effect to Madoff's fraud. That is not true. What it would do is establish, on a relative basis, a percentage that all customers are entitled to share in ratably on whatever proceeds are ultimately recovered, which as everyone knows, will be tens of billions of dollars less than what was reflected on account statements. SIPC concedes that it "seeks to give effect to the legitimate expectations of the customer." (SIPC Memorandum of Law, p. 6). The expectation of all BLMIS customers – whether they are identified as *net winners* or *net losers* – was the same; that their account statements reflected the amount BLMIS owed them in cash or securities. What is lost in both the Trustee's and SIPC's analyses is that supposed *net winners*, like Rynne, relied on their account statements as part of their net worth. For him, a *real* $6-million vaporized. Likewise for *net losers*, for them, their loss was what they believed was in their accounts as reflected on statements.

The Trustee sets out three classes of BLMIS customers: (i) "net winners", (ii) "net losers" who are over the $500,000 SIPC limit, and (iii) "net losers" who are under the limit. Lumped together are hedge funds, institutional investors, charities, and individuals. Customers who never withdrew funds, or more recent customers who had not had the time yet to make significant withdrawals, are favored. According to the Trustee, despite the fact that the investment goals of all innocent investors were identical – to achieve the returns historically reported by Madoff – those who allegedly had not yet withdrawn more than they deposited are the only ones that the Trustee believes are entitled to the benefits of SIPC protection. This analysis of principal is flawed.

#1446809 v2
109422-67219

By now creating these artificial distinctions, SIPC and the Trustee look to reward those they call *net losers* by not treating them based on their legitimate expectations, but rather based on a "net equity" formula that was never even within their contemplation, and in the end exalts their status over other innocent customers simply because they had not made any or sufficient withdrawals yet.

For an individual investor like Rynne, who believed he was earning income on which he paid taxes for years, the amounts reflected on his statements were liquid assets he counted on as being *his* "net equity.". A customer who had not yet withdrawn funds had no greater expectation of value in an account, simply because nothing had yet been withdrawn. Each is identically looking at his/her/its account statement as reflecting the real value of what is on deposit. Each is also damaged, from the perspective of the investor, by the amount the customer learned upon Madoff's arrest was, in fact, *not* in his or her account. The fiction developed by the Trustee, that all that should be considered is actual "cash in" versus "cash out," was not within the contemplation of either "net winners" or "net losers" at the time of Madoff's arrest. They all expected that the amount shown on their account statements was what they had lost, and would be the amount used for SIPC protection purposes. For that reason, taking those values as of the date of Madoff's arrest is consistent with the expectations of the parties.

There is also no logic to a pure cash in/cash out analysis. That does not account for taxes paid to the government which will not be refunded, or for other legitimate income generated by BLMIS and its affiliates during the years the firm operated. If only a "net winner" must return funds, but not the government beyond a finite period of years, the government then profits from the very fraud the Trustee says the customer may not. At a minimum, if the government will

#1446809 v2
109422-67219

only allow five years of phantom profit to be adjusted, the Trustee should be similarly constrained.

Likewise, the simplistic formula proposed fails to account for the time value of money, and instead treats old deposits as equal to new money. At just two percent interest compounded only annually, a $10-million deposit of cash in 1989 would have earned interest of close to $5-million by 2009. At just five percent compounded annually, the interest would be nearly $17-million over that same 20 year period. Simply going back to day one and taking cash in, with no interest, and then cash out, arbitrarily punishes longer term investors who were guilty of nothing more than trusting that BLMIS was a legitimate enterprise, as its SIPC protection and government oversight and regulation implied.

Accordingly, the cash-in/cash-out formula offered by the Trustee should be rejected, and the last statement issued by BLMIS used for all customers, including Rynne, to calculate their net equity that is entitled to SIPC protection.

## LEGAL ARGUMENT

## POINT I

## SIPC INSURANCE SHOULD PROTECT THE CUSTOMERS' EXPECTATIONS AS SET FORTH IN THE ACCOUNT STATEMENTS

Congress passed SIPA to protect public investors against financial loss arising from the insolvency of registered brokers and dealers. *See, Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 415 (1975). The statutory scheme facilitates the return of customer property held by the insolvent firm and reimburses for cash and securities mishandled or misappropriated by the brokerage firm or its agents. *In re: Primeline Securities Corporation v. Securities Investor Protection Corporation*, 295 F.3d 1100 (10th Cir. 2002).

#1446809 v2
109422-67219

15 U.S.C. § 78fff-2(b) provides that a customer's claim shall be allowed in the amount of the customer's "net equity." 15 U.S.C. § 78fff-3(b). SIPA's express language defines "net equity" as:

> [T]he dollar amount of the account or accounts of a customer, to be determined by
> --
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date;

15 U.S.C. § 7811(11); *See also, In re Adler Colemena Corp.*, 247 b.R. 51, 62 n.2 (U.S. Bankr. Ct. S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed").

SIPA's legislative history emphasizes Congress's intention that the statute protect customer expectations by ensuring that customers of retail brokerage firms can rely on their account statements. It makes no difference whether the securities were purchased:

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account . . . by seeking to make customer accounts whole and returning them to customers in the firm they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectation . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added). While there may be a basis to disallow customer claims for wholly fictitious securities of non-existing entities, here the securities set forth on the Rynne's last BMIS statement and prior statements were those of actual companies listed on the stock exchange.

-12-

#1446809 v2
109422-67219

Rynne deposited funds in the BLMIS with the expectation that the amount would grow. Rynne had every expectation based upon the BLMIS statement balances that when he withdrew funds and paid taxes on the profits he withdrew, the monetary value of his account more than covered his withdrawals. The Trustees attempt to simply deem Rynne a "net winner" fails to provide him with his legitimate expectation based upon the final balance in his BLMIS statement.

The concept of adequately protecting an investor based upon his legitimate expectations is addressed in *Visconsi v. Lehman Brothers, Inc.*, 244 Fed. Appx. 708 (6th Cir. 2007). In *Visconsi*, the Court declined to set aside an arbitration award that appeared to have applied an expectancy measure of damages against a successor in a Ponzi scheme case, and rejected the "money in/money out" formula as not reflecting the expectations of the parties. The Court held that the "out of pocket" theory, which sought to restore to plaintiffs only the amount of money they originally invested is a wholly inadequate measure of damages, especially considering that plaintiffs invested their money with the broker in order to have their money grow significantly over a period of years during a very strong bull market. That growth would have been more than enough to cover their withdrawals. *Visconsi*, 244 Fed. Appx. at 713-14; *See also, S.E.C. v. Beyers*, 2009 W.L. 2185491 (S.D.N.Y. .2009)(distributions based on fictitious profit in a ponzi scheme that were not withdrawn but rolled over by the investor were credited to the investor in order to reach a fair and equitable result)

Similarly here, it is only fair and equitable that Rynne, a long term investor, should be entitled to be protected by SIPA for his legitimate expectations of what was owed to him as reflected in his final BLMIS statement, even if that protection is only limited to the maximum amount allowed by the defrauded investors.

#1446809 v2
109422-67219

## POINT II

## RYNNE IS ENTITLED TO INTEREST ON HIS DEPOSITS

The Trustee's papers concede that the money it received from investors was put into a bank account, and earned interest. Rynne is at the very least entitled to obtain the interest his money earned over the course of many years, as the money he invested constitutes valuable consideration given to the debtor to earn that interest. Such interest is required as a matter of state law, and the United States Supreme Court has determined that, in bankruptcy cases, creditor claims, including the right to interest, are determined by state law. *See Travelers Cas. & Sur. Co. of Am. V. PG&E*, 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

Under New York law, which is applicable here, funds deposited with the Debtors under these circumstances are entitled to interest. See, e.g., N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, et seq. Accordingly, Customer claims should be recalculated by adding interest to all funds deposited by customers such as Rynne. The failure to credit Rynne with interest also unfairly favors recent investors over those investors that maintained money in their account over a long term of years.

Additionally, under New York, law, which is applicable here, customers are entitled to prejudgment interest and any returns the Debtors earned on the deposited funds under principles of unjust enrichment. Accordingly, Rynne's claim should be recalculated by adding the amount earned by his deposits. *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dis. LEXIS

-14-

35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

## POINT III

### THE TRUSTEE CANNOT SEEK TO VOID TRANSFERS MADE OUTSIDE THE STATUTE OF LIMITATIONS PERIOD

It is well settled under New York State and Federal law, that the Trustee may not void transfers outside the appropriate statute of limitations period for fraudulent transfers. *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir.2008). Under New York law, the limitations period for a fraudulent conveyance claim is six years. *Fiber Consultants, Inc. v. Fiber Optek Interconect Corp.*, 56 A.D.3d 605, 869 N.Y.S.2d 560 (2d Dep't 2008).

To the extent the Trustee is seeking to count withdrawals Rynne made from his account more than six years ago as money that was tainted by a fraudulent transfer, the Trustee is in effect seeking to improperly void these transfers outside the applicable limitations period. Accordingly, all cash withdrawn by Rynne beyond the reach of applicable limitations period must not be deemed as a cash receipt under the Trustee's "money in/money out" formula .

#1446809 v2
109422-67219

Dated: New York, New York
      November 13, 2009

                                 **GIBBONS P.C.**

By_____

                                 Jeffrey A. Mitchell
                                 Don Abraham
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
(212) 613-2009
*Attorneys for Donald G. Rynne*

**TO:**

Clerk of the United States Bankruptcy Court
      Southern District of New York
One Bowling Green
New York, New York 10004

Irvin H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10004

-16-

# Exhibit A

#1446809 v2
109422-67219

## THE ROLE OF SIPC

SIPC is the first line of defense in the event a brokerage firm fails owing customers cash and securities that are missing from customer accounts. Although not every investor is protected by SIPC, no fewer than 99 percent of persons who are eligible get their investments back from SIPC. From its creation by Congress in 1970 through December 2008, SIPC advanced $520 million in order to make possible the recovery of $160.0 billion in assets for an estimated 761,000 investors.

When a brokerage is closed due to bankruptcy or other financial difficulties and customer assets are missing, SIPC steps in as quickly as possible and, within certain limits, works to return customers' cash, stock and other securities. Without SIPC, investors at financially troubled brokerage firms might lose their securities or money forever...or wait for years while their assets are tied up in court. However, because not everyone, and not every loss, is protected by SIPC, you are urged to read this whole brochure carefully to learn about the limits of protection.

## WHAT SIPC COVERS...

### and what it does not

SIPC is not the FDIC. The Securities Investor Protection Corporation does not offer to investors the same blanket protection that the Federal Deposit Insurance Corporation provides to bank depositors.

How are SIPC and the FDIC different? When a member bank fails, the FDIC insures all depositors at that institution against loss up to a certain dollar limit. The FDIC's no-questions-asked approach makes sense because the banking world is "risk averse." Most savers put their money in FDIC-insured bank accounts because they can't afford to lose their money.

That is precisely the opposite of how investors behave in the stock market, in which rewards are only possible with risk. Most market losses are a normal part of the ups and downs of the risk-oriented world of investing. That is why SIPC does not bail out investors when the value of their stocks, bonds and other investments falls for any reason. Instead, SIPC replaces missing stocks and other securities where it is possible to do so...even when investments have increased in value.

SIPC does not cover individuals who are sold worthless stocks and other securities. SIPC helps individuals whose money, stocks and other securities are stolen by a broker or put at risk when a brokerage fails for other reasons.

## HOW WE HELP

### What you need to know about SIPC

**Understanding the rules is the key to protecting yourself...and your money.**

* **When SIPC gets involved.** When a brokerage firm fails owing customers cash and securities that are missing from customer accounts, SIPC usually asks a federal court to appoint a trustee to liquidate the firm and protect the customers. With smaller brokerage firm failures, SIPC sometimes deals directly with customers.

* Investors eligible for SIPC help. SIPC aids most customers of failed brokerage firms when assets are missing from customer accounts. (A list of ineligible investors may be found in the fourth question in the next section of this brochure.)

* **Investments protected by SIPC.** The cash and securities – such as stocks and bonds – held by a customer at a financially troubled brokerage firm are protected by SIPC. Among the investments that are ineligible for SIPC protections are commodity futures contracts, fixed annuity contracts, and currency, as well as investment contracts (such as limited partnerships) that are not registered with the U.S. Securities and Exchange Commission under the Securities Act of 1933.

* **Terms of SIPC help.** Customers of a failed brokerage firm get back all securities (such as stocks and bonds) that already are registered in their name or are in the process of being registered. After this first step, the firm's remaining customer assets are then divided on a pro rata basis with funds shared in proportion to the size of claims. If sufficient funds are not available in the firm's customer accounts to satisfy claims within these limits, the reserve funds of SIPC are used to supplement the distribution, up to a ceiling of $500,000 per customer, including a maximum of $100,000 for cash claims. Additional funds may be available to satisfy the remainder of customer claims after the cost of liquidating the brokerage firm is taken into account.

* **How account transfers work.** In a failed brokerage firm with accurate records, the court-appointed trustee and SIPC may arrange to have some or all customer accounts transferred to another brokerage firm. Customers whose accounts are transferred are notified promptly and then have the option of staying at the new firm or moving to another brokerage of their choosing.

* **How claims are valued.** Typically, when SIPC asks a court to put a troubled brokerage firm in liquidation, the financial worth of a customer's account is calculated as of the "filing date." Wherever possible, the actual stocks and other securities owned by a customer are returned to him or her. To accomplish this, SIPC's reserve funds will be used, if necessary, to purchase replacement securities (such as stocks) in the open market. It is always possible that market changes or fraud at the failed brokerage firm (or elsewhere) will result in the returned securities having lost some – or even all – of their value. In other cases, the securities may have increased in value.

issued by the SIPC member and not by a non-SIPC affiliate. Deposits for credit to your securities account, by check or otherwise, should not be made payable to your account executive, registered representative, or to any other individual but generally only to your SIPC member broker-dealer or, if your account is carried at another SIPC member who provides clearing services for your SIPC member broker-dealer, then to that other SIPC member. If your check or deposit is payable to other than a SIPC member broker-dealer (such as to the issuer of the securities you are purchasing or to a bank escrow agent), you should take steps to insure that your funds are properly applied.

You should be vigilant to assure that you receive your periodic statements on a timely basis. The failure to provide statements may indicate the broker-dealer has gone out of business. If you do not receive your statement when due and cannot get a satisfactory explanation, or if for any other reason you believe your broker-dealer may have ceased doing business, you should promptly contact the nearest office of the Commission. If your broker-dealer ceases to be a member of SIPC. Normally, the SEC will attempt to prevent the termination of the registration and SIPC membership of a broker-dealer if the firm owes securities or cash to customers. However, a SIPC membership may be terminated if the Commission is unaware the firm owes securities or cash to customers.

*2. What should I be vigilant about before a problem strikes?*

Some SIPC members have affiliated or related companies or persons that conduct financial or investment businesses but are not members of SIPC. Some of these affiliates have names which are similar to the name of the SIPC member, or which operate from the same offices or with the same employees. Be sure you receive written confirmation of each securities transaction in your securities account with the SIPC member, and that each confirmation statement and each statement of account is

## SEVEN QUESTIONS

### Investors ask most often

*1. How can I be sure I am dealing with a SIPC member? Why is that important?*

Look for this language:

**Member Securities Investor Protection Corporation**

Those words – or "Member SIPC" – appear in all signs and ads of SIPC members. If you have a question as to whether or not a particular firm is a member of SIPC, you may call the SIPC Membership Department at (202) 371-8300 or visit us on the Web at www.sipc.org.

Why is the issue of SIPC membership relevant to you? SIPC protects customers of broker-dealers as long as the broker-dealer is a SIPC member. However, if a SIPC member's registration with the U.S. Securities and Exchange Commission is terminated, the broker-dealer's SIPC membership is also automatically terminated. SIPC loses its power to protect customers of former SIPC members 180 days after the broker-dealer ceases to be a member of SIPC. Normally, the SEC will attempt to prevent the termination of the registration and SIPC membership of a broker-dealer if the firm owes securities or cash to customers.

*3. How quickly will I get my investments back?*

Most customers can expect to receive their property in one to three months. When the records of the brokerage firm are accurate, deliveries of some securities and cash to customers may begin shortly after the trustee receives the completed claim forms from customers, or even earlier if the trustee can transfer customer accounts to another brokerage firm. Delays of several months usually arise when the failed brokerage firm's records are not accurate. It also is not uncommon for delays to take place when the troubled brokerage firm or its principals were involved in fraud.

# How SIPC Protects *You*



*Understanding the*
*Securities Investor*
*Protection Corporation*

**SIPC**

---

**4. *Who is not eligible for SIPC protections?***

Most customers with cash and securities missing from customer accounts are eligible for SIPC assistance. However, SIPC's funds may **not** be used to pay claims of any failed brokerage firm customer who also is:

° A general partner, officer, or director of the firm.

° The beneficial owner of five percent or more of any class of equity security of the firm (other than certain nonconvertible preferred stocks).

° A limited partner with a participation of five percent or more in the net assets or net profits of the firm.

° Someone with the power to exercise a controlling influence over the management or policies of the firm.

° A broker or dealer or bank acting for itself rather than for its own customer or customers.

**5. *Where do I submit my claim form?***

If your brokerage firm is put into liquidation, the court-appointed trustee will notify you and send a claim form and instructions. You must return the completed claim form to the trustee within the time limits set forth in the notice and as described in the instructions. Failure to do so may result in the loss of all or a portion of your claim. If you are notified that your brokerage account has been transferred to another brokerage firm, you should still file a claim form in order to preserve the right to correct any errors that may crop up during the transfer of accounts. For a step-by-step guide to this process, see the SIPC Web site at **www.sipc.org**

**6. *Is there a time limit for filing claims?***

Yes. There are two deadlines for the filing of customer claims:

**Court deadline.** The time set by the bankruptcy court for filing of customer claims is usually 60 days after the date the notice of the proceeding is published, but could be as little as 30 days after the publication date. The deadline appears in the published notice and a copy of the notice is mailed to customers along with claim forms and instructions that also prominently display the date. Pay close attention to the deadline set forth in the notice and be certain the trustee receives your claim in a timely manner.

**Federal law deadline.** If your completed claim form is received by the trustee after the date set by the bankruptcy court but no later than six months after public notice is published, the claim is subject to delayed processing and, possibly, limited payment. The six-month deadline is set out in the federal law governing SIPC. The federal deadline absolutely bars any claim that is received more than six months after the publication date. Except for some very narrow exceptions, there are no grounds for time extensions beyond the deadline.

**7. *Do I have to prove what the broker owes me?***
*How does that work?*

Yes, usually that is done by describing in your claim form the cash and securities that are owed to you. The court-appointed trustee will compare what you claim against the books and records of the brokerage firm. SIPC and court-appointed trustees assume that the brokerage firm's records are accurate.

Frequently, your entire account can be transferred to another brokerage firm for your benefit before you have even filed a claim. However, there are sometimes instances of mistakes in brokerage firm records. In rare cases, these mistakes show transactions made without your authority. You should keep copies of trade confirmations. You should keep copies of your latest monthly or quarterly statement of account from your brokerage firm. A trustee may ask you to supply copies of these documents. If you ever discover an error in a confirmation or statement, you should immediately bring the error to the attention of the brokerage firm in writing. Keep a copy of any such writing you send to the brokerage firm. Remember, if there is something wrong with the brokerage firm's records of your account, you will have to prove that, or SIPC and the trustee will assume that the firm's records are accurate.

---

## AVOIDING INVESTMENT FRAUD

*Learn about investment fraud... and where to turn for help*

SIPC urges all investors to understand the dangers of investment fraud and where to turn for help if swindled. That is why SIPC works with regulatory and self-regulatory agencies, consumer groups, and other concerned parties to increase investor awareness about scams. Check out the investment fraud warnings on the following Web sites:

**U.S. Securities and Exchange Commission**
www.sec.gov

**FINRA (Financial Industry Regulatory Authority)**
www.finra.org

**National Fraud Information Center**
www.fraud.org

**Investor Protection Trust**
www.investorprotection.org

**Alliance for Investor Education**
www.investoreducation.org

**Your state securities agency**
See the *"Find a Regulator" page* at www.nasaa.org

**Securities Industry and Financial Markets Association**
www.sifma.org

**Canadian Investor Protection Fund**
www.cipf.ca

You can find a list of the best investment fraud education resources on the Web by visiting SIPC on the Web at **www.sipc.org**, and see **"Protecting Yourself Against Fraud"**



---

**IMPORTANT NOTICE**

The Securities Investor Protection Act of 1970 (SIPA) is a complex and technical statute. This brochure provides a basic explanation of the Securities Investor Protection Corporation and SIPA. However, it does not explain the SIPA statute with respect to any particular fact pattern. Answers to questions involving particular facts depend upon interpretations of trustees' decisions, and court actions.

The U.S. Securities and Exchange Commission's Office of Investor Education and Assistance has reviewed this publication. The SEC does not endorse the commercial activities, products, or members of this or any other private organization.

*TEXT OF THIS BROCHURE ISSUED BY SIPC AND ONLY SIPC MAY MAKE CHANGES.*

© Securities Investor Protection Corporation 2009

## CERTIFICATE OF SERVICE

I herby certify that on November 13, 2009, I caused the foregoing Memorandum of Law in Opposition to the Trustee's Motion for an Order Denying Claims of Customers, Affirming Trustee's Determination of Net Equity, and Expunging Objections to Net Equity Determinations to be served on all parties by electronically filing it with the Court via CM/ECF, and caused a hard copy to be served via regular mail upon:

Irvin H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10004


Dated: November 13, 2009

_____
Don Abraham

#1452900 v1
109422-67219