BERNFELD, DEMATTEO &
  BERNFELD, LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1661
Facsimile: (212) 557-9610
David B.Bernfeld (DBB 0177)
Jeffrey Bernfeld (JLB-1615)
 *Attorneys for: Dr. Michael Schur and Mrs. Edith A. Schur*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SECURITIES INVESTOR PROTECTION
CORPORATION,
                          Plaintiff,
            v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
                          Defendant.

                                                            Adv. Pro. No. 08-01789  (BRL)

                                                            SIPA Liquidation

                                                            (Substantively Consolidated)
_____

In re:

BERNARD L. MADOFF,
                          Debtor.
_____

**MEMORANDUM OF LAW IN OPPOSITION TO
TRUSTEE'S MOTION FOR AN ORDER UPHOLDING TRUSTEE'S
DETERMINATION DENYING "CUSTOMER" CLAIMS FOR AMOUNTS
LISTED ON LAST CUSTOMER STATEMENT, AFFIRMING TRUSTEE'S
DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE OBJECTIONS
WITH RESPECT TO THE DETERMINATIONS RELATING TO NET EQUITY**

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iii**

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**SUMMARY OF ARGUMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

**POINT I**
**THE TRUSTEE'S DEFINITION OF NET**
**EQUITY IS CONTRARY TO THE**
**CLEAR LANGUAGE OF THE SIPA**
**STATUTE, THE LEGISLATIVE**
**HISTORY OF SIPA AS WELL AS**
**THE APPLICABLE CASE LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

    **The Statute** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

    **The Statutory History and Goals of SIPA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

    **The Case Law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

**POINT II**
**BY VIRTUE OF POSITIONS TAKEN**
**BY SIPC AND ITS TRUSTEES IN PAST**
**COURT PROCEEDINGS, THEY ARE**
**JUDICIALLY ESTOPPED FROM TAKING**
**THE CONTRADICTORY POSITION**
**REGARDING THE DEFINITION OF NET EQUITY**
**THAT THEY ARE CURRENTLY ASSERTING** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

**POINT III**
**THE TRUSTEE'S PROPOSED**
**DEFINITION SHOULD BE REJECTED**
**FOR PUBLIC POLICY AND**
**EQUITABLE CONSIDERATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

i

**POINT IV**
**THE TRUSTEE CITES INAPPLICABLE AUTHORITY**
**WHICH DO NOT SUPPORT HIS PROPOSED DEFINITION**
**OF NET EQUITY. MOREOVER, THE OTHER**
**REASONS HE PROFFERS TO SUPPORT**
**THAT DEFINITION ARE WITHOUT MERIT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

**SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

## TABLE OF AUTHORITIES

**CASES**                                                                                                          **Page**

*AXA Marine and Aviation Insurance (UK) Limited v. Seajet Industries, Inc.,*
**84 F.3d 622 (2nd Cir.1996)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Bates v. Long Island Railroad Co.,* **997 F.2d 1028 (2nd Cir.),**
*cert. denied,* **510 U.S. 992, 114 S.Ct. 550 (1993)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Bridgeway Corp. v. Citibank,* **201 F.3d 134 (2nd Cir.2000)** . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*In Re Investors Center, Inc.,* **129 B.R. 339 (Bkrtcy. E.D.N.Y. 1991)** . . . . . . . . **5, 13, 14, 15, 28**

*In re New Times Securities Services, Inc,*
**371 F.3d 68 (2nd Cir. 2004)** . . . . . . . . . . . . . . . . . . . . **3, 4, 6, 7, 8, 11, 12, 13, 18, 20, 21, 22, 23, 30**

*In re Oberweis Securities,* **135 B.R. 842 (Bkrtcy. N.D. Ill. 1991)** . . . . . . . . . . . . . . . . . . . **15, 16**

*In Re Adler Coleman Clearing Corp,* **247 B.R. 51 (Bkrtcy. S.D.N.Y. 1999)** . . . . . . . . . . . . . **5, 6**

*Maharaj v. Bankamerica Corp.,* **128 F.3d 94 (2nd Cir.1997)** . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Mitchell v. Washingtonville Central School District,* **190 F.3d 1 (2nd Cir.1999)** . . . . . . . . . . . **19**

*Sec Investor Prot. Corp.* v. *BDO Seidman, LLP,* **222 F.3d 63 (2nd Cir. 2000)** . . . . . . . . . . . . . **7**

*Simon v. Safelite Glass Corp.,* **128 F.3d 68 (2nd Cir.1997)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Tchererpnin v. Knight,* **389 U.S. 332, 8 S. Ct. 548 (1967)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

*Visconsi v. Lehman Bros., Inc.* **2007 WL 2258827 (6th Cir. 2007)** . . . . . . . . . . . . . . . . . **6, 16, 17**

**STATUTES**

**15 U.S.C. §78lll(11)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

**15 U.S.C. §78 ccc(b)(4)(A)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

**OTHER AUTHORITIES**

**H.R. REP NO.91-1613 at 2-4 (1970)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

**S. Rep. No. 763, 95th Cong. 2d Sess.2 (1978)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8, 9, 17**

**H.R. Rep. 95-746, 95th Cong., 1st Sess. (1977)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9, 17**

**SIPC Series 500 Rules, 17 C.F.R. 300.500** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

**SIPC Series 500 Rules, 17 C.F.R. 300.502** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

**Insiders' Blog December 16, 2008,**
**www.occ.treas.gov/ftp/alert/2008-37.html** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22, 31**

## PRELIMINARY STATEMENT

This Memorandum of Law is respectfully submitted on behalf of Claimants, Dr. Michael Schur and Edith A. Schur in opposition to the motion of the Trustee which seeks Court approval for the improper definition of Net Equity adopted by the Trustee.

The relevant background facts relative to the narrow and focused scope of this motion are not in dispute.

Simply stated, for decades Bernard L. Madoff ("Madoff") and his company Bernard L. Madoff Securities ("BLMIS") perpetrated a massive Ponzi scheme and fraud upon thousands of investors, causing a loss to investors in the billions of dollars. The fraud came to light in December 2008, when Madoff confessed his scheme and was arrested.

The scheme involved the reported purchase and sale of securities of existing, publicly-traded companies by BLMIS for the various customer accounts. Each reported transaction was confirmed in writing to each customer and the monthly customer statements reiterated and reconfirmed the transactional representations made by BLMIS in those specific transaction confirmations. The account statements were consistent with the market prices for the securities listed so that any BLMIS customer could confirm the existence and the value of the securities and the transactions reported as having been conducted for their BLMIS account.

Following the public disclosure of the fraud, actions were commenced by the SEC and SIPC which resulted in the appointment of Irving H. Picard as the Trustee to supervise the liquidation of BLMIS under the provisions of the SIPA statute. Mr. Picard then hired his law firm, Baker & Hostetler, to act as counsel to the Trustee.

Several months after his appointment, the Trustee, following consultation with SIPC, began issuing Determination Letters with respect to the various claims filed by the BLMIS

investor victims seeking, *inter alia*: (a) financial relief under SIPA; and (b) to have their net equity claims allowed in accordance with their final account statements in order to be eligible to participate in potential future distributions of customer property recovered for distribution.

In those Determination Letters, and in other public pronouncements, the Trustee has declared that he will totally ignore the final BLMIS customer statements and the securities reflected in those Statements in determining net equity, even though they clearly reflect what each customer reasonably believed his or her net equity was. Instead, the Trustee has declared that an investor's net equity is to be determined by what he has labeled a "cash in/cash out" method which counts only the moneys put in by a customer, deducts all withdrawals from the account, and otherwise ignores the reasonable beliefs and understandings of the investor with respect to the appreciation and profits reflected in the BLMIS account statements.

The Trustee now seeks Court approval for his "cash in/cash out" definition. But as explained below, the Trustee's "definition" is contrary to the statute and regulations, the legislative history and purpose of the statute, the customers' reasonable expectations, as well as the applicable case law. Moreover, it is contrary to the definition urged by SIPC in other SIPC liquidation cases. Therefore, the Trustee's construct should be forcefully rejected by the Court and the Trustee should be directed to determine net equity on the basis of the November 30, 2008, BLMIS customer account statements - as the SIPA statute clearly requires.

## SUMMARY OF ARGUMENTS

1.  The Trustee's "definition" is contrary to the clear language of the SIPA statute. Subject to the statutory dollar limitations, SIPA was enacted for the express purpose of protecting investors from, and reimbursing them for, losses suffered where, as here, a SIPC member firm fails. The statutory measure of the protected loss is what the investor would receive on a liquidation of his or her account if the broker were solvent, i.e., the amount that the broker represented was in the account through trade confirmations and reflected in the customer's account statement.

2.  The Trustee's "definition" is contrary to the legislative history and statutory purpose of SIPA. The statute originated in response to the many brokerage firm failures that took place in the late 1960's. Those failures caused many investors to lose their life's savings and created a dramatic loss of investor confidence in the nation's securities markets as they then existed. The statute was specifically designed to restore that confidence by insuring that the investor's reasonable expectations would be preserved and protected by SIPC if the investor's brokerage firm failed.

3.  Consistent with the statutory purpose, the applicable regulations provide that when an investor receives trade confirmations and account statements showing that real, existing securities have been purchased for the account, those securities will be deemed to be in the investor's account and the investor will be entitled to recover based on those trade confirmations and account statements. In other words, in determining an investor's net equity for SIPA purposes, those confirmations and account statements are to be given full force and effect - even if the broker lied to the investor and the securities were never purchased. Any other conclusion would be in direct contradiction to the very purpose of the statute and would effectively emasculate SIPA, reviving the chaos and loss of investor confidence that existed before SIPA was enacted.

4.  The Trustee's "definition" is contrary to the applicable case law in this Circuit. In *New Times Square Securities,* the lower court and the Second Circuit confirmed the rule (which was acknowledged and, indeed, asserted by SIPC and the *New Times* Trustee) in which net equity is conclusively defined by the customer's account statement where, as here, the customer received confirmations of securities transactions for securities that were real (i.e., securities that exist in the market place and could actually be purchased).

5.  The Trustee's "definition" leads to absurd results contrary to the fundamental purposes of SIPA. Instead of making an aggrieved investor whole, it would serve only to benefit SIPC at the expense of the investing public and the victims in this

3

case by drastically reducing the scope of SIPC coverage.  Moreover, it would put SIPC in conflict with the IRS treatment of Ponzi scheme losses as reflected in the Safe Harbor revenue ruling and procedure issued in response to the Madoff scheme.[1]  It would undermine the public's confidence in the securities markets and make clear to every investor that, despite SIPC's promises, no investor has any real protection if a brokerage firm fails.

6.      The Trustee's "definition" leads to inequitable results, victimizing the victims once again and primarily benefitting SIPC (not other investors as the Trustee disingenuously claims).

7.      The Trustee's "definition" relies on inapplicable cases and distorted interpretations of the relevant cases and statute.

8.      The Trustee's "definition" is contrary to SIPC's own previous positions with respect to the definition of net equity.  In *New Times Security*, SIPC acknowledged and took the position that, when dealing with confirmations of transactions in real securities (capable of being bought and sold in the marketplace), an investor's net equity is defined by what is set forth on his or her account statement - even if the broker lied to the customer and those confirmed transactions were never actually executed.  SIPC's  position was accepted by both the lower court and the Second Circuit.  Accordingly, the Trustee and SIPC are judicially estopped from asserting the Trustee's current  "cash in/cash out" construct.

---

[1]      The  revenue ruling and procedure allows investors to claim as a theft loss not only the amount of principal invested but the appreciation/profits on the investments on which taxes were paid as well. Moreover, it should be noted that the Trustee's approach would greatly increase the cost to the treasury. This is because when an investor receives a SIPC payment, that reduces the amount of the investors theft loss for tax purposes and thus reduces the cost to the Treasury for tax refunds based on that theft loss. Conversely, if an investor does not receive a SIPC payment, there is no such reduction in the allowable IRS theft loss deduction or the amount of the tax refund that the treasury will have to pay. See discussion in Point III, *infra.* at p. 23.

4

**ARGUMENT**

**POINT ONE**

**THE TRUSTEE'S DEFINITION OF NET
EQUITY IS CONTRARY TO THE
CLEAR LANGUAGEOF THE SIPA
STATUTE, THE LEGISLATIVE
HISTORY OF SIPA AS WELL AS
THE APPLICABLE CASE LAW**.

The Statute

The SIPA statute (15 U.S.C. §78lll(11)) defines Net Equity in clear and straightforward

terms, as follows:

> The term 'net equity' means the dollar amount of the account or
> accounts of a customer, to be determined by -
> (A) calculating the sum which would have been owed by the debtor
> to such customer if the debtor had liquidated, by sale or purchase
> on the filing date, all securities positions of such customer...; minus
> (B) any indebtedness of such customer to the debtor on the filing
> date...

Thus, net equity is what the brokerage firm would owe the customer if the brokerage firm

were not in liquidation and the customer closed his or her account. *In Re Adler Coleman*

*Clearing Corp*, 247 B.R. 51, 62 (Bkrtcy. S.D.N.Y. 1999) ("Net equity is calculated as the

difference between what the debtor owes the customer and what the customer owes the debtor on

the date the SIPA proceeding is filed"). See also, *In Re Investors Center, Inc.*, 129 B.R. 339

(Bkrtcy. E.D.N.Y. 1991)

In the instant case, each transaction attributed to a BLMIS customer account - each

reported securities purchase and sale - was specifically confirmed to the customer by a written

BLMIS transaction confirmation as well as in the monthly account statements reaffirming and

5

repeating the representations made in those trade confirmations.[2]

Under such circumstances, on liquidation of his account, Claimant would clearly have been entitled to receive from BLMIS the full value reflected in the account statement in accordance with the repeated written representations by BLMIS. See, e.g., *Visconsi v. Lehman Bros., Inc.* 2007 WL 2258827 (6th Cir. 2007); see also, *In re New Times Securities Services, Inc,* 371 F.3d 68 (2nd Cir. 2004); *In Re Adler Coleman*; *In Re Investors Center, Inc.*

This result is consistent with the plain statutory language defining "net equity". This conclusion is reinforced by reference to: (i) the legislative history and purpose of SIPA; (ii) the applicable case law; and (iii) prior positions on net equity successfully asserted by SIPC and accepted by the court in formal judicial proceedings as well as in non-judicial public statements by senior SIPC officials.

The Statutory History and Goals of SIPA

During the mid to late 1960's, the brokerage industry experienced a staggering number of brokerage firm failures causing substantial investor losses which, in turn generated great mistrust of, and impaired investor confidence in, the financial and capital markets.

The loss of investor confidence in the integrity of the Capital Markets was of great concern not only to the industry, but to Congress as well.

As a result, at the urging of the securities industry, in 1970 Congress enacted SIPA for the express purpose of providing investor protection and restoring shattered investor confidence.

---

[2]    Each confirmation and account statement contained the SIPC logo and the representation that BLMIS was a member of SIPC. Thus, each customer reasonably believed that his or her investment account was protected up to the dollar limits of SIPA, in the event BLMIS failed.

6

As explained by the Second Circuit Court of Appeals:

> Congress enacted SIPA in 1970, in response to 'a rash of failures among securities broker-dealers in the late 1960's' that had resulted in 'significant losses to customers whose assets either were unrecoverable or became tied up in the broker-dealers' bankruptcy proceedings' The statute 'was designed to effect two aims.' First, the legislation immediately established 'a substantial reserve fund... [to] provide protection to customers of broker-dealers... to reinforce the confidence that investors have in the U.S. securities markets.' Second, SIPA 'strengthened ... the financial responsibilities of broker-dealers.' Later amendments to the statute have reiterated this emphasis on investor protection.

*New Times Securities Services, Inc,* 371 F.3d 68 at 84 (quoting, *Sec Investor Prot. Corp*. v. *BDO Seidman, LLP*, 222 F.3d 63,66 (2nd Cir. 2000) and H.R. REP NO.91-1613 at 2-4 (1970), *reprinted* in 1970 U.S.C.C.A.N. 5254,5257).

SIPA is a remedial statute. Accordingly, "[w]e are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes" *Id.* at 84 (quoting, *Tchererpnin v. Knight,* 389 U.S. 332, 336, 88 S. Ct. 548 (1967).

Since the statutory definition of net equity is clear on its face, it must be implemented as written by Congress, i.e., the net equity of the BLMIS customers must be determined by the amounts BLMIS represented in writing it owed to the customers. Indeed, since net equity is a specifically-defined term in the SIPA statute, neither SIPC nor the SIPC Trustee have any authority or power to change that statutory definition.[3] But that is precisely what the Trustee here seeks to accomplish - changing the statutory definition of net equity in order to save SIPC's treasury from having to satisfy customer claims under the statutory definition.

---

[3]    15 U.S.C. §78 ccc(b)(4)(A) prohibiting SIPC from changing the definition of any "term for which a definition is provided in Section 78 lll of this title". Net equity is a defined term under that section; that definition cannot be changed other than by Congress.

7

Indeed, even if, *arguendo,* the Court were to view the statutory definition as somewhat unclear, nevertheless, the Trustee's customer-hostile "definition" should be rejected as at odds with the fundamental remedial goals and purposes of the statute. See, *New Times Securities.*

One of these statutory goals was to foster "public willingness to entrust assets to the securities industry" S. Rep. No. 763, 95th Cong. 2d Sess.2 (1978). In order for this to occur, customers had to know that if they deposited their securities with their broker, in street name, they would be protected by getting their securities back if a brokerage firm failed. SIPA expressly provides for this in the 1978 amendment, as the Senate Report on the bill explains:

> By seeking to make customer accounts whole and returning them
> to customers in the form they existed on the filing date, the
> amendment not only would satisfy the customers' legitimate
> expectations, but would also restore the customer to his position
> prior to the broker-dealer's financial difficulties.

S.Rep No. 763, 95th Cong., 2d Sess. (1978 ) at 2.

In his brief, the Trustee acknowledges the primacy under SIPA of satisfying the reasonable expectations of the investor and thereby enhance investor confidence in the securities markets, which Congress rightfully deemed to be of national concern. The Trustee's definition, if adopted, would significantly undermine those goals.

The reasonable expectations of an investor is explained quite clearly in both the Senate and House reports on the 1978 amendment to SIPA. These reports specifically explain that SIPA protection provides the customer with protection for the value of the securities he reasonably believed were in his account - even if those securities were never purchased for the customer or are otherwise unavailable.

8

Thus, the House Report explains:

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business.  But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, this is not always possible.  Accordingly, when the customer's claims for a particular stock exceed the supply available to the trustee in the debtor's estate, then customers, generally receive pro rata portions of the securities claims, and as to any remainder, *they will receive cash based on the market value as of the filing date....*
>
> (Emphasis added)

H.R. Rep. 95-746, 95th Cong., 1st Sess. (1977) at 21.  See also, S.Rep. 95-763, 95th Cong.2d Sess. (1978) Sess.(1978) at 2.[4]

The Trustee's net equity definition would literally deprive thousands of BLMIS customers of any SIPC protection despite their BLMIS account statements reflecting and representing that each was owed substantial sums of money by BLMIS.  Such a result is wholly inconsistent with the core goals of  SIPA.

It would, instead, be sending a clear message to all  customers of every brokerage firm that they *cannot rely* on *anything* they receive from their brokers - not written trade confirmations and not account statements.  Such a message is an invitation to market chaos.[5]

---

[4]    In his  statement to Congress, recorded in the House Report at H.R. Rep. 95-746, at 39, SIPC'S then Chairman, Hugh F. Evans, expressly acknowledged that "customers generally expect to receive what is in their accounts when the member stops doing business".  Further, he confirmed that if it is not possible to provide the customers with the actual number of shares of the stocks in the account statement "because securities have been lost...never purchased or even stolen" the investor will get a pro rata distribution of shares "and he will receive cash in lieu of stock based on the market price on the date the liquidation proceeding is initiated" .

[5]    It would induce prudent investors either to avoid our securities markets entirely or to demand that every security purchased be registered in the investor's name with the certificate physically delivered to the investor.  This would cause massive back office issues for the industry similar to those that existed pre-SIPA (not to mention the elimination of an entire segment of the

9

It would effectively overrule existing industry practice, agreements and regulations relating to customer reliance on the integrity of written trade confirmations and account statements.  In that regard, the standard industry customer agreement invariably provides that unless timely challenged, confirmations and account statements are to be given full force and effect, both by the customer and the brokerage firm.[6]

Moreover, the relevant SIPC's rules flatly declare that the  written transaction confirmations received by customers will be enforced, in accordance with their contents,  as reflecting the "legitimate expectations of customers".  See, SIPC Series 500 Rules, 17 C.F.R. 300.500 *et seq*.  By way of example, Rule 502  provides that:

> Where the Debtor held cash in an account for a customer, the customer 'has a claim for securities" with respect to any authorized securities purchase: (1) if the Debtor has sent a written confirmation to the customer that the securities in question have been purchased for or sold to the customer's account

Thus, under clear SIPC regulations, the BLMIS customers have a claim for securities based on the various written transaction confirmations sent to them by BLMIS.

Under the Trustee's approach, all confirmed transactions other than actual external deposits into, and withdrawals from, the account, would be rendered nullities (as would the customer agreement provisions relating to the binding effect of written transaction confirmations).  Essentially, all of the applicable rules, regulations and industry practices

---

industry that relies on the availability of street name securities to function).  All securities transactions would be substantially delayed, causing great inconvenience.  The industry would incur substantial processing costs and delays.  SIPC would cease to serve a function as a source of fostering investor confidence.

[6]     The form BLMIS customer agreement , for example, has precisely that preclusive and binding effect.(See customer agreement attached as Exhibit 3 to  *Looby* Declaration).

concerning the binding effect of confirmations would become obsolete - all for the singular

purpose of allowing SIPC to avoid paying customers the SIPC advances that their account

statements - and their reasonable and legitimate expectations - entitle them to receive.

The Case Law

The Trustee's approach violates the controlling case law in this and other federal

jurisdictions. A prime example is the leading case of *New Time Securities Services, Inc.,371

F.3d 68* (2nd Cir. 2004).

*New Times Securities* involved a Ponzi scheme perpetrated by an individual named

William Goren. The relevant facts were summarized by the Second Circuit Court of Appeals as

follows:

> From approximately 1983 until 2000, through New Times and
> New Age, Goren defrauded hundreds of Long Island and Queens
> New York investors out of approximately $32.7 million. Goren's
> scheme was multifaceted. He solicited customers of New Age and
> New Times to invest in (i) one or more non-existent money market
> funds (often called the New Age Securities Money Market Fund),
> (ii) shares of bona fide mutual funds (from e.g., The Vanguard
> Group, and Putnam Investments) that were never in fact purchased,
> and (iii) fraudulent promissory notes issued by Goren and/or New
> Age. Instead of investing these customers' funds as represented,
> Goren misappropriated the money.

*New Times Securities Services,* 371 F.3d at 71-72.

As noted by the Court, the fraud in *New Times* involved  two distinct categories of

confirmed securities transactions: (i) those relating to bona fide existing mutual funds and (ii)

those relating to non-existent funds.

Recognizing this as *the* crucial distinction, both SIPC and the Courts gave full force and

effect to *all* of the confirmed transactions in the bona fide funds - including all appreciation in

11

value reflected in the confirmations and account statements.

> [I]nvestors that were misled by Goren to believe that they were
> investing in mutual funds that in reality existed were treated much
> more favorably [than those who were led to invest in the fictitious
> funds]. Although they were not actually invested in those real
> funds-because Goren never executed the transactions-the
> information that these claimants received on their account
> statements 'mirrored what would have happened had the given
> transactions been executed' Br. For Appellants [SIPC Trustee and
> SIPC].  As a result, the Trustee deemed those customers claims to
> be 'securities claims' eligible to receive up to $ 500,000 in SIPC
> advances.  The Trustee indicates that this disparate treatment was
> justified because he could purchase real, existing securities to
> satisfy such securities claims. Furthermore, the Trustee notes that,
> if they were checking on their mutual funds, the 'securities
> claimants' in contrast to the 'cash claimants' bringing this appeal
> could have confirmed the existence of those funds and tracked the
> funds' performance against Goren's account statements.

*Id*. at 74.

Both the SIPC Trustee and the Court reached the opposite conclusion, however, when

addressing the rights of investors who had confirmations of transactions in wholly fictitious

Funds.  Although determining that these investors had "securities claims" - because the money

they gave Goren was for the specific purpose of purchasing securities - the Court limited their

claim to the customer's net investment, without giving effect to the alleged transactions in totally

fictitious securities.

The Court explained the basis for this disparate treatment:

> To be clear– and this is the crucial fact in this case - the New Age
> Funds in which the Claimants invested *never* existed. They were not
> organized as mutual funds, they were never registered with the SEC
> and they did not issue any of the requisite prospectuses for
> investors.

*Id.* at 74.

12

The Trustee noted, and the Court acknowledged, those who thought they had purchased real mutual funds could have checked and "confirmed the existence of those funds and tracked the funds' performance against Goren's account statements." *Id.* at 74. That was not true for those investors in the totally fictitious New Age funds. Those investors had no source to check to confirm either the existence of the fund or to track the reported performance of the fund - and, as the Circuit Court explained, that is "the crucial fact in this case". *Id.* at 74.

In the instant case, all of the transactions confirmed by BLMIS in the various trade confirmations and account statements, involved real securities. The customers could thus confirm the existence of the securities. They could track their investments to confirm that the values contained in the BLMIS confirmations and account statements were appropriately priced. The customers had a reasonable and legitimate basis to understand what their account was worth - and what they could prudently afford to withdraw and spend based on the remaining value in their BLMIS account. Under such circumstances, *New Times Securities* confirms that their allowed net equity was equal to the customer's account statement balance.

Also on point is *In re Investors Center, Inc,* 129 B.R. 339 (Bkrtcy. E.D.N.Y. 1991). The Trustee in that SIPC liquidation was also Irving H. Picard, the Trustee in the BLMIS liquidation. In that case, as in BLMIS, the Trustee sought to disavow the impact of written confirmations and account statements sent by the debtor to the customers. In a sharply-worded opinion critical of the positions asserted by the Trustee, the Bankruptcy Court, in clear and unambiguous language, held that, when written confirmations are given to a customer for transactions in real, existing securities, those confirmations are binding and conclusive for purposes of determining a customer's claim under SIPC.

13

The relevant facts were summarized by the Court as follows:

> Before the Court are objections by a number of customers of
> Investors Center, Inc.... to the determinations made by Irving H.
> Picard Esq. as Trustee for the liquidation of the business of
> Investors Center pursuant to [SIPA}. Also before the Court are
> motions by the Trustee to confirm his determinations. The critical
> facts as to each of the objecting customers, or claimants, are
> virtually the same. In each case the claimants received a written
> confirmation, ...that certain stock belonging to the claimant had
> been sold. In each case the Trustee has nevertheless held that each
> claimant only has a 'claim for securities' not a 'claim for cash'
> under SIPC Rule 500, 17 C.F.R. § 300.500-300.503. The securities
> are either worthless, or nearly worthless, and each claimant is
> asking that his claim be recognized as one for cash in the amount of
> the confirmed sale. Some claimants also placed sell orders for
> which they never received written confirmation and which they also
> want to have recognized as entitling them to cash.  *** At the same
> time as Investors Center was falsely claiming purchases, it was not
> executing sales orders confirmed by their representatives.

*In Re Investors Center Inc.*, at 340-341 and 346.

With respect to those investors who had received written confirmations of the

transactions, the Court held that the confirmations were conclusive and binding, even though the

broker "was not executing the sale orders confirmed by their representatives." *Id.* at 346.

> Under [the SIPC ] rules each of the objecting claimants, because of
> the receipt of written confirmation of a sale... has a claim for the
> [proceeds of sale] and not for securities and the Trustee's
> determination otherwise is incorrect

*Id.* at 341.

The Court then went on to explain:

> It is undisputed that each of these claimants received *written
> confirmation* from the Debtor's clearing agent that the securities in
> question had been sold for, or purchased from, the customer's
> account. Each of these creditors, therefore, comes squarely within
> the [SIPC] provisions defining when a customer has a claim for

14

> cash.  The Rules are as binding on the Trustee and on SIPC as they
> are on the public. The Trustee is not free to ignore them or rewrite
> them.

*Id.* at 341 (emphasis in original).[7]

The *Investors Center* court reached the opposite conclusion regarding claimants who had

ordered their securities sold but had never received a written confirmation of sale.  As to those

investors, the Court felt constrained to limit their relief to receiving the stock that they had

ordered sold.

> [I]nsofar as [these investors] rely on sales for which they never
> received confirmation, they are not entitled to [the proceeds from
> sale]. The Trustee's determination that each has received what he
> is entitled by the return of the securities each tried to sell, must be
> sustained....

*Id.* at 353.

The significance of a receiving a written confirmation - and the impact of the absence of

such a confirmation - is further demonstrated by the opinion in *In re Oberweis Securities,* 135

B.R. 842 (Bkrtcy. N.D. Ill. 1991).

In *Oberweis,* a customer sought to receive the dividends that would have been earned on

moneys that should have been invested by the broker but were not.  In rejecting the customer's

claim, the *Oberweis* court stressed that the determinative fact was that the customer never

received a written confirmation for that transaction:

> The [customers] also argue, based on the legislative history,
> Congress intended SIPA to satisfy customers legitimate
> expectations.  Therefore, the [customers] assert that since they

---

[7]    The Court also stated that "[t]he customers here involved all have claims under
the Securities Investors Protection Act because each one received written confirmation of a sale."
*Id.* at 351.

15

> expected to receive dividends their claim for dividends should be allowed. *However, [they] never received confirmation that the securities were in fact purchased. The court agrees with the trustee's argument that Congress did not intend to treat customers without confirmations the same as those with confirmations; that customers with confirmations have a legitimate expectation of receiving securities but customers without confirmations do not have the same expectation*. Thus, [the customers] claim for dividends they would have received had their investment instructions been followed must be denied as a matter of law *for lack of a confirmation*.

*Id.* at 846, n. 1 (emphasis added).

Here , BLMIS issued written confirmations to the customers for each transaction as well as account statements reflecting the various securities transactions. All confirmed transactions were in real securities. As the foregoing authorities confirm, the existence of those written confirmations and account statements govern the result and compel the conclusion that the BLMIS customer net equity is to be determined by those written confirmations and account statements.

See also, *Visconsi v. Lehman Bros.*, 244 Fed. Appx 708, 2007 WL 228827 (6th Cir.2007), a non-SIPA case which, nonetheless, is instructive on the analysis of "reasonable customer expectations", the core guiding principle of SIPA.

The Plaintiffs in *Visconsi* were victims of a securities Ponzi scheme perpetrated on them by a broker employed by Lehman Brothers and a predecessor firm. Those victims, like the BLMIS victims here, received written account statements purporting to represent what was in the customer's account. Those account statements, like those received by the BLMIS customers purported to reflect transactions in real securities which in fact had not occurred.

Lehman Bros. argued that the *Visconsi* victims should be limited to a "cash in/cash out"

16

recovery methodology as does the Trustee here. The Court rejected Lehman's arguments as

inconsistent with the legitimate and reasonable expectations of the investors.

> Plaintiffs gave $ 21 million to [the broker], not to hide under a rock
> or lock in a safe but for the express purpose of investment, with a
> hope- indeed a reasonable expectation -that it would grow.  Thus
> the out of pocket theory which seeks to restore to Plaintiffs only
> [their investment] less their subsequent withdrawals is a wholly
> inadequate measure of damages.

*Id.* at 713

Significantly, the Sixth Circuit took specific note of the fact that the plaintiffs received

ficticious statements from Lehman reflecting substantial profits in their accounts. Declaring that

"[p]laintiffs thus could have reasonably believed they were entitled to the full...balance shown",

the Court flatly rejected *Lehman's* out of pocket theory as "wholly inadequate". That logic and

analysis applies with equal force to the BLMIS investors.

Thus, if a customer received written confirmation from the broker that a transaction in real

securities that exist and could have been actually purchased has occurred, the transactions

reflected in the confirmations will be given full force and effect.  This is consistent with

Congressional mandate and reasonable customer expectations - even if the broker lied to the

customer and never actually executed the transactions confirmed to the customer.  *New Times

Securities; In re Oberweis Securities.  See also*, H.R. Rep. 95-746, 95th Cong., 1st Sess. (1977) at

21.  See also, S.Rep. 95-763, 95th Cong.2d Sess. (1978) Sess.(1978) at 2.

The rule could hardly be otherwise.  How, for example, could the securities markets

function if customers were unable to rely on written representations to them made by their

brokers?  Who would choose to do business under those circumstances?  Who would rely on

17

SIPC insurance coverage if it did not protect customer expectations as evidenced by confirmations for real securities from registered brokerage firms?  What could be more damaging to investor confidence in the securities market than a rule that fails to honor confirmed transactions and avoids SIPC coverage for those transactions if the brokerage firm later fails?

Surely Congress did not intend for such a result when it enacted SIPA.

As noted in *New Times Securities,* there is a narrow exception to the basic rule that written confirmations govern even if the confirmed transaction has not actually occurred.  But that exception applies only with respect to alleged  transactions in *fictitious* securities - securities the existence of which a customer could not confirm in the market place and account values that a customer could not check against real world reported prices.  In that limited circumstance, the customer has to know that any "value" ascribed to the security by the broker is necessarily subjective and arbitrary and, as such, the customer could not reasonably have relied on the value arbitrarily fixed by the broker.  Therefore, the courts have carved out this narrow exception and concluded that reasonable customer expectations can best be approximated by using the customer's net investment.

What the Trustee seeks by this motion to accomplish is to treat this narrow exception to the rule as if it were the rule, ignoring in the process the clear language of the statute, the relevant cases and the legitimate and reasonable expectations of the BLMIS customers who have received written confirmations of transactions in real world, *bona fide* existing securities.

The Trustee's definition of net equity is invalid and contrary to law. It must be rejected.

## POINT II

**BY VIRTUE OF POSITIONS TAKEN
BY SIPC AND ITS TRUSTEES IN PAST
COURT PROCEEDINGS, THEY ARE
JUDICIALLY ESTOPPED FROM TAKING
THE CONTRADICTORY POSITION
REGARDING THE DEFINITION OF NET EQUITY
THAT THEY ARE CURRENTLY ASSERTING**

The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by that party in a prior legal proceeding. *Bates v. Long Island Railroad Co.,* 997 F.2d 1028, 1037 (2nd Cir.), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550 (1993).  In *Bates*, the Second Circuit, after reviewing earlier authorities, said that "judicial estoppel protects the sanctity of the oath and the integrity of the judicial process." Id., 997 F.2d at 1037.   This doctrine has been repeatedly recognized in this Circuit. See, e.g.,  *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 141 (2nd Cir.2000); *Mitchell v. Washingtonville Central School District,* 190 F.3d 1, 6 (2nd Cir.1999); *Simon v. Safelite Glass Corp.,* 128 F.3d 68, 71-73 (2d Cir.1997); *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 98 (2nd Cir.1997); and *AXA Marine and Aviation Insurance (UK) Limited v. Seajet Industries, Inc.,* 84 F.3d 622, 628 (2nd Cir.1996).

In applying the doctrine, a court engages in the following analysis:

> First, the party against whom the estoppel is asserted must have
> argued an inconsistent position in a prior proceeding; and second,
> the prior inconsistent position must have been adopted by the court
> in some manner.

*Bates*, 997 F.2d at 1038.

Both of these elements are present here.

Specifically, in *New Times Securities,* both SIPC and the SIPC Trustee asserted precisely

the opposite position regarding the definition of net equity than the one that the BLMIS Trustee

(and SIPC) now urge this Court to approve.  As noted above, *New Times Securities* involved

confirmed transactions in both real/existing securities and in fictitious securities.  SIPC and the

*New Times*  Trustee represented to the court in formal brief submissions that a proper

interpretation of  SIPA required that a distinction be made in the treatment of those claimants who

received confirmations of transactions involving the real securities and those who received

confirmations of transactions in fictitious securities

     a.     With respect to confirmed transactions in real securities, the Trustee and SIPC told the Court that the basic rule required recognition of  the transactions reflected in written confirmations and account statements in determining a customer's allowable SIPA claim;

     b.     It was only with respect to claimants who received confirmations concerning transactions in wholly fictitious securities, that the Trustee and SIPC urged the Court to adopt an exception to the rule and disregard the confirmations involving make believe securities.

In urging the Court to use a different rule for fictitious securities, SIPC and the Trustee

explained in their brief to the Second Circuit why confirmed transactions in real securities must be

honored :

> Reasonable and legitimate claimant expectations on the filing Date are controlling even where inconsistent with transaction reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmations and therefore generally is entitled to recover those securities (within the limits imposed by SIPA even where the purchase never actually occurred and the Debtor instead converted the cash deposited by the claimant to fund that purchase.

*New Times*, SIPC Brief at 23-24.

The brief then noted with approval that "this emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations were controlling". *Id*. at 24.

In addition to the positions asserted to the Court in its brief, SIPC, through its President Stephen Harbeck, responding to questions from the lower court judge in *New Times*, made the following transcribed representations:

> Harbeck:   ...if you file [ a timely SIPC claim] you'll get the securities without question. Whether-if they triple in value,  You'll get the securities... *Even if they're not there.*
>
> Court:   *Even if they're not there.*
>
> Harbeck:   Correct.
>
> Court:   *In other words, if the money was diverted, converted-*
>
> Harbeck:   *And the securities were never purchased.*
>
> Court:   Okay.
>
> Harbeck:   And if those positions triple we will gladly give the people their securities positions.

Tr. at 37-39, *In re New Times Securities Services, Inc*, OO-8178 (Bkrcty. E.D.N.Y. July28, 2000) (emphasis added).

The *New Times* court specifically adopted SIPC's dichotomy of treatment contentions for real versus fictitious securities (enforcing the confirmations for the former and disregarding them for the later).

As the Second Circuit explained:

> To be clear- *and this is the crucial fact in this case* - the New Age
> Funds in which the claimants invested *never existed.*

*New Times Securities,* 371 F.3d at 74.

This core principle was so familiar and well settled that within days of the Madoff scandal surfacing, SIPC general counsel Josephine Wang was quoted to the same effect, as follows:

> [I]f clients were presented statements and had reason to believe that
> the securities were in fact owned, the SIPC will be required to buy
> these securities in the open market to make the customer whole up
> to $500k each.  So if a Madoff client ... was given a statement
> showing they owned 1000 GOOG shares, even if a transaction never
> took place, the SIPC has to buy and replace the 1000 GOOG shares.

Insiders' Blog December 16, 2008, www.occ.treas.gov/ftp/alert/2008-37.html.

Quite apart from the formal application of the judicial estoppel doctrine, SIPC's judicial acknowledgements and its other public statements confirming the obligation to recognize confirmed transactions in existing securities are, at a minimum, highly persuasive and probative on the issue of the proper definition of net equity.  Given these court holdings, and the specific admissions of SIPC and its ranking officials, it is more than somewhat disquieting for SIPC and the Trustee to now urge that the basic historical rule should be ignored in the BLMIS case simply because, a proper application of the rule will require SIPC (and the securities industry) to pay substantially more money than they apparently  wish to pay.  SIPC's current position - first articulated in February 2009, more than three months after the scandal broke - is an artificial, *ex post facto* construct designed to protect the pocketbook of SIPC and the brokerage industry at the

22

expense of the true victims here and is wholly without merit.[8]

* * *

In sum, SIPC's current proposed definition of net equity is in direct contradiction to the definition that it previously represented to the court was the correct definition in cases such as *New Times*. SIPC's success in persuading the Second Circuit to adopt SIPC's proffered dichotomy of treatment between confirmed transactions involving real and fictitious securities cannot be ignored or disavowed now simply because SIPC finds it in its pecuniary interest to take a contrary position in the BLMIS liquidation. Application of judicial estoppel to preclude the Trustee and SIPC from taking this contrary position would protect not only the integrity of judicial proceedings as noted in *Bates*, but would also serve to protect the integrity of SIPA and the protections and purposes for which it was enacted

The Trustee's newly constructed net equity definition, which is directly contrary to the position SIPC asserted in *New Times,* must be rejected.

## POINT III

### THE TRUSTEE'S PROPOSED
### DEFINITION SHOULD BE REJECTED
### FOR PUBLIC POLICY AND
### EQUITABLE CONSIDERATIONS

If the Trustee's proposed definition of net equity is sustained, it will be at the expense of investor protection and clear public policy considerations.

---

[8]    Moreover, since the hallmark of SIPA and the purpose behind it is to protect a customer's "reasonable expectations" it would be inequitable in the extreme to change the definition of the reasonableness of those expectations after both SIPC and the courts (including the Second Circuit) have indicated that "reasonable expectations" equal the balances on account statements arising from confirmations of real securities.

As noted earlier, the Trustee's definition would: (a) effectively nullify the investor protections that Congress mandated when enacting the SIPA statute; (b) cause investor confidence in the securities markets to be seriously undermined since investors will understand that they cannot rely on the written transactional representations made to them by the brokerage firms; and (c) cause tremendous upheaval in the brokerage industry as it currently exists.

The logical consequence of the Trustee's approach will be that investors will no longer be comfortable entrusting their securities to their brokers to be possessed in street name. Instead, they will insist on having the securities registered to them and physically delivered to them, as was the practice before SIPA was enacted.

The practical impact of a return to pre-SIPA practice would be catastrophic for investors and brokerage firms alike. Some examples–and they are only examples– follow:

    a.    It would intolerably clog the brokerage firms' back offices and, as before, transactions would languish as certificates literally piled up waiting for the clerical processing of registration and delivery. This process would occur when securities were purchased and it would occur again when those securities were eventually sold by the investor. It would adversely affect investors who will be delayed for unacceptable periods both in receiving proceeds of sale and certificates for securities purchased

    b.    The increased processing requirements would add significantly to the transaction costs to brokerage firms–which would eventually wind up being passed on the customers.

    c.    The brokerage industry has developed an entire "cottage industry" around the ability to persuade customers to leave their securities in street name. That all would be lost.

    d.    SIPA was based with the urging and approval of the brokerage industry. In exchange for the benefits to be derived from fostering investor confidence, the brokerage industry essentially entered into a compact-with congress and the investing public- to fund a comprehensive broad based insurance program so that investors would not be at risk or at the mercy of brokerage

24

firm failures. The Trustee's definition essentially retroactively revokes that
compact for the benefit of the securities industry and to the great detriment
of the investor–precisely the reverse of what congress intended SIPA to
accomplish.

When SIPA was enacted, the cost of financing SIPC protection was to be borne by the
brokerage industry.  For years, the cost to the individual brokerage firms for the right to advertise
that the firm is a "member of SIPC" has been essentially *de minimus* .  For example, Goldman
Sachs which has generated billions in annual profits has paid a flat $150 per year for SIPC
membership.

From a public policy perspective, it is simply unacceptable for this Trustee to propose  a
definitional methodology that would allow the industry to shirk its statutory responsibilities at the
expense of thousands of innocent investors, many of whom have been left literally destitute, and
all of whom had legitimate expectations that they would, at a minimum, receive their promised
SIPC insurance payments if their broker failed and had to be liquidated.  As noted, this violates
the clear Congressional public policy underlying SIPA.  It also represents extraordinarily bad
public policy independent of SIPA.

There is also the matter of the impact on the Treasury.  As noted, SIPC is a private, not for
profit membership corporation consisting of registered broker-dealers.  It is not a government
agency.  SIPA expressly imposed the financial burdens of SIPC on the industry.  Under the
Trustee's proposed definition, not only will the BLMIS investors be subsidizing what should be
the industry's cost, but so will the U.S. Treasury.

Under the Internal Revenue Code, losses from a Ponzi scheme are properly characterized
as "theft losses" and are deductible by the taxpayer.  In calculating the amount of the theft loss,

25

the investor includes not only his or her principal investment but the taxable appreciation in the account on which taxes were reported.  For comparison purposes, an investor's net equity is - or at least should be- the functional equivalent of the investor's theft loss under the Code.  But clearly, under the Trustee's proposed definition, the investor is treated much more harshly - almost punitively - under SIPA than by the IRS (an agency that has not historically been accused of being overly taxpayer-friendly).

The Trustee's net equity definition will dramatically increase the aggregate tax cost to the U.S. Treasury with respect to BLMIS customer theft loss claims and refunds.

Under the applicable IRS revenue ruling and procedure for Ponzi schemes adopted in the wake of the BLMIS scandal, if an investor receives reimbursement for any portion of his/her theft loss, that reimbursement reduces the amount of the investor's theft loss deduction and that, in turn, reduces the amount of the tax refund that the IRS must pay.

SIPC payments have that precise impact: they reduce the amount of the investor's theft loss and reduce the amount of the tax refund paid by the IRS.

Conversely, if an investor does not receive a SIPC payment - because, for example, the Trustee's definition deprives the investor of such a payment - there will be a direct, adverse impact on the public treasury.  If there is no SIPC payment, there is no reduction in the amount of the theft loss.  Similarly, there is no reduction in the amount of the tax refunds required to be paid by the government.

In the BLMIS case, the disputed SIPC payments that will be lost to BLMIS customers will impact literally thousands of victims and millions of dollars in withheld SIPC payments. Therefore, the cost to the IRS and the public treasury if the Trustee's definition is adopted will be

26

considerable.

Thus, SIPC (and the brokerage community) seek to shift a significant portion of the cost of investor protection to the investors and to the government when, under SIPA, the entire cost was to be borne by the industry. Such a public bailout of the industry at the expense of investors and the treasury violates clear public policy and must be rejected.

It is instructive when considering the public policy implications of the Trustee's proposed definition to compare the Trustee's vision of limited coverage under SIPC insurance with that afforded by FDIC insurance.[9]

Assume hypothetically that a long time BLMIS customer had deposited $100,000 in an FDIC insured bank fifteen years ago, at the same time the customer invested with BLMIS. Assume further that each year the customer withdrew all interest earned on the bank account and all appreciation/profits from the BLMIS accounts so that in December 2008, the customer had withdrawn from the bank and from the BLMIS account more money in the aggregate than the customer had originally invested. Finally, assume that in December 2008, it was disclosed that the bank's president had been involved in a massive Ponzi scheme dating back at least 15 years and as a result, the bank failed and had to be liquidated.

Under FDIC insurance, the depositor would clearly receive $100,000, the amount that the customer's account statement said was still on deposit with the bank. FDIC could not claim - would not dare to claim - that since the depositor had already taken withdrawals of interest aggregating in excess of the original deposit, the depositor would be treated as having no money

---

[9]    SIPC does not insure a customer against market value losses. Other than that exception, which is not relevant to the BLMIS customers, the insurance coverage under SIPA and under FDIC should be the same.

on deposit and would be entitled to no FDIC insurance coverage or payment.

That is precisely the result that the Trustee is urging under SIPC's insurance. This core conflict between these two intertwined investor protections cannot be justified. Public policy clearly favors the FDIC approach which provides investor protection, as Congress intended.[10] The Trustee's contrived definition of net equity under SIPC is inconsistent with that core public policy goal.

The Trustee's definition improperly lumps innocent BLMIS customers with those that the Trustee contends were complicit with Madoff in the scheme. By doing so, he implies that those complicit with Madoff will somehow also be benefitted if innocent customers are provided with their proper SIPC insurance and allowed net equity. This argument is baseless and borders on the frivolous.[11]

The Trustee has brought several actions against parties he deems to have been complicit or who knew or should have known of the BLMIS fraud. If the Trustee's allegations are sustained, none of those found complicit will be able to benefit from an account statement based definition of net equity. To the contrary, those parties would hardly be in a position to assert that their account statements reflect their reasonable expectations. But there is no public policy justification for depriving innocent BLMIS customers of their legitimate customer expectations, as reflected in the written confirmations and accounts statements they received from BLMIS.

---

[10]    In that regard, the Court should take judicial notice that the FDIC has just required the banking industry to replenish FDIC by a $40 billion infusion.

[11]    This is not the first time that this Trustee has advanced such an argument. In rejecting one such arguments asserted by Trustee Picard made in *In re Investors Center, Inc.* the court suggested that it was "too frivolous even to consider" .

28

Moreover, a Trustee in a SIPC liquidation is a fiduciary who owes a fiduciary duty to the aggrieved customers. The Trustee should be an advocate for the BLMIS customers relative to their coverage under SIPA. He should be fighting, within all legitimate bounds of advocacy, for the broadest SIPC advances for the customers. Instead, by arguing for an interpretation of SIPA that deprives thousands of customers of SIPC payments (with none of the savings going to other customers), the Trustee presents himself as an advocate for SIPC and an adversary of thousands of innocent customers. This, too, raises grave public policy concerns.

As an aside, it is ironic to say the least for the Trustee to characterize certain customers as "net winners" when they have obviously lost so much in a real world sense - and in many cases everything they thought they had. The Trustee ignores that real world when he suggests, by his proposed definition, that the SIPC claims of these victims should be charged and reduced by withdrawals of moneys made by those customers from their BLMIS accounts which they used to pay taxes, their mortgages, educate their children and cover all of the expenses of living that people need to pay for from the assets they believed they possessed.

In the real world, people like the BLMIS customers make spending decisions at least in part based on the remaining assets they understand they have, whether in a bank or in a brokerage account like BLMIS. These customers had every reason to believe they were spending their own money, not someone else's. They had every reason to believe that the substantial account balances they maintained represent assets of theirs as well. It is unseemly to treat them effectively as thieves - which is ultimately the effect of the Trustee's wrongful net equity definition. To interpret a remedial statute designed to protect investors in such a draconian manner raises profound public policy considerations concerning the lawful authority of a trustee to ignore

29

Congress and rewrite a statutory definition to serve the purposes of his SIPC employer (and its members, the registered brokerage industry).

We respectfully submit that the Trustee is also acting in a manner inconsistent with his statutory obligations, and doing a disservice to the BLMIS customers to whom he owes a fiduciary obligation, by attempting to pit one group of customer victims against other customer victim groups. The reality is that neither customer group is guilty of victimizing the other customer group - both groups are victims of BLMIS and Madoff. The implications to that effect inherent in the definition of net equity the Trustee proposes are baseless.

The Trustee's proposed net equity definition must be rejected. Net equity must be determined on the basis of the customer account statement, consistent with reasonable customer expectations and the written confirmations issued by BLMIS.

**POINT IV**

**THE TRUSTEE CITES INAPPLICABLE AUTHORITY
WHICH DO NOT SUPPORT HIS PROPOSED DEFINITION
OF NET EQUITY. MOREOVER, THE OTHER REASONS
HE PROFFERS TO SUPPORT THAT DEFINITION
ARE WITHOUT MERIT**

The *New Times Securities* decision and the other relevant cases cited and quoted earlier in this Memorandum, demonstrate quite convincingly, indeed conclusively, that the Trustee has misconstrued and misapplied the rules regarding calculation of net equity. In fact, *New Times* actually supports the BLMIS customers and not the Trustee. Moreover, the Trustee has cited and purports to rely on a myriad of cases none of which actually support his contentions.

We have reviewed the Memorandum of Law to be submitted by Goodwin Procter, LLP and the already-filed Memorandum of Law of Davis Polk & Wardell, each of which contains an

30

excellent analysis of why the cases the Trustee cites are inapposite.  Their Memoranda also explain why none of the other grounds asserted by the Trustee - such as his "books and records" and his fraudulent conveyance arguments - provide a proper basis to adopt the Trustee's definition of net equity.

In the interest of avoiding undue repetition, we will not repeat the arguments or analysis at length herein and instead, will adopt them and respectfully refer the Court to them (as well as any other arguments in submitted opposition to the Trustee's position that are not contained herein or in the Goodwin Proctor and Davis Polk Memoranda).

## SUMMARY

The Trustee's definition of net equity is in direct conflict with the statutory definition, the legislative history, the applicable case law and the legitimate reasonable expectations of the BLMIS customers - the very touchstone of the SIPA statute.  The only real beneficiaries, if this definition is allowed to stand, will be SIPC and the brokerage industry SIPC members. Each will receive a windfull in the millions of dollars because it will sallow them to avoid their respective statutory obligations to investors that Congress mandated by enacting the SIPA statute.

Significantly, the Trustee's current definition of net equity is in direct conflict with the Insiders' Blog December 16, 2008, www.occ.treas.gov/ftp/alert/2008-37.html.  positions it took in prior judicial proceedings in this Circuit as well as clear public pronouncements made by ranking SIPC officials.  As a result the Trustee should be precluded from asserting these contrary positions under familiar principles of judicial estoppel.

The Trustee's definition would cause great harm to thousands of BLMIS customers and undermine the very foundation of the SIPA statute.  It would effectively emasculate SIPA and its

twin goals of providing investor protections and fostering investor confidence in the securities markets.  It would create significant investor distrust of the securities markets.  Once investors understand that they can no longer depend upon the integrity of transaction confirmations and account statement values, they will likely insist that all certificates be registered in their names and physically delivered to them.  This will cause great industry upheaval and will generate significant additional costs and burden on back room processing- all ultimately borne by the investor.

The proposed definition violates core public policy interests as well as equitable principles. Among other considerations, the Trustee's net equity definition will cost the U.S. Treasury millions of dollars in additional tax refunds and will allow the financial obligations of SIPA to be shifted to the innocent investors and to the public treasury, in flat violation of SIPA which expressly requires the securities industry to bear the SIPC costs and obligations.

In sum, the Trustee's net equity definition fails from virtually any analytic perspective - except the one that focuses solely on saving money for SIPC.

## <u>CONCLUSION</u>

The Trustee's motion for Court approval of his erroneous definition of net equity should be denied in all respects. The Trustee should be directed to determine BLMIS customer net equity based on the customer's last account statement, consistent with the statute and the reasonable expectations of the BLMIS customers.

Dated: New York, New York
         November 13, 2009

                                        Bernfeld, DeMatteo & Bewrnfeld, LLP


                                        By:_____/s/_____
                                              David B. Bernfeld (DBB-0177)
                                        600 Third Avenue
                                        New York, New York 10016
                                        (212) 661-1661