Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin, Maureen
Ebel and a group of other customers*

Hearing Date: February 2, 2010
Hearing Time: 10:00 A.M.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | SIPA Liquidation <br><br> No. 08-1789 (BRL) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**CUSTOMERS' MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION FOR AN ORDER APPROVING THE TRUSTEE'S RE-DEFINITION OF "NET EQUITY" UNDER THE SECURITIES INVESTOR PROTECTION ACT**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................2

I.   SIPA REQUIRES SIPC TO REPLACE SECURITIES UP TO $500,000
     BASED UPON THE BALANCE ON THE CUSTOMER'S LAST
     STATEMENT .........................................................................................................5

     A.   SIPC Is Prohibited From Changing the Definition of Net Equity.........................13

     B.   The Trustee Is Destroying Investor Confidence Nationally In
          Direct Violation Of Congressional Intent.............................................................16

     C.   The Trustee's Position Is Unprecedented In SIPC's History ...............................18

     D.   The Trustee's Reading Of *New Times* Is Incorrect................................................19

          1.   The Customers Had A Legitimate Expectation That They
               Held the Securities Listed on Their Last Statements.............................19

          2.   The Fictitious Nature of Madoff's Operations Is Irrelevant......................20

II.  THE TRUSTEE'S RELIANCE ON NON-SIPA PONZI SCHEME
     CASES IS MISPLACED.......................................................................................22

III. SIPC IS JUDICIALLY ESTOPPED FROM RENEGING ON ITS
     INSURANCE OBLIGATIONS .................................................................................27

IV.  SIPA'S STATUTORY SCHEME IS NOT INEQUITABLE...........................................28

V.   THE TRUSTEE'S RE-DEFINITION OF NET EQUITY
     CONTRAVENES VARIOUS FEDERAL AND STATE LAWS................................31

VI.  THE TRUSTEE IS UNLAWFULLY DELAYING PAYMENT TO
     CUSTOMERS ......................................................................................................33

VII. THE TRUSTEE HAS NO POWER TO CLAW BACK FROM A
     CUSTOMER ........................................................................................................37

     A.   The Trustee Has No Right to Use The Avoidance Powers to Enrich
          SIPC..................................................................................................................37

     B.   The Trustee Has No Right to Avoid Transfers Earlier Than
          December 11, 2006 And No Right At All To Avoid Preferential
          Transfers ..........................................................................................................38

     C.   There Is No Evidence The Ponzi Scheme Started Before 1993 ............................42

i

D.    The Trustee's Misuse of the Avoidance Powers Violates Their Purpose ............................................................................................... 43

E.    The Trustee Has No Basis to Void Preferential Transfers ................................... 45

VIII.  THE TRUSTEE'S OTHER ARGUMENTS ARE WITHOUT MERIT ........................... 47

A.    There Are No Illegal Contracts ........................................................................ 47

B.    The Customers Are Not Liable For Madoff's Fraud ........................................... 48

C.    The Claims Are "Customer" Claims .................................................................. 50

CONCLUSION ........................................................................................................................ 51

1096903.1

# TABLE OF AUTHORITIES

## CASES

Abrams v. Eby, 294 F.1 (4th Cir. 1923) ...................................................23

In re Adler Coleman Clearing Corp., 247 B.R. 51 (B. S.D.N.Y. 1999) *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001)...................................................................................15, 48, 49

Appleton v. First National Bank of Ohio, 62 F.3d 791 (6th Cir. 1995).........................................16

Bell & Beckwith v. McGraw, 937 F.2d 1104 (6th Cir. 1991) ...................................6, 34

CFTC v. Equity Finance Group, LLC, 2005 WL. 2143975 (D.N.J. Sept. 2, 2005) .....................23

CFTC v. Franklin, 652 F. Supp. 163 (W.D.Va. 1986), *rev'd on other grounds sub nom*, Anderson v. Stephens, 875 F.2d 76 (4th Cir. 1989) .......................................23

CFTC v. Topworth International, Ltd., 205 F.3d 1107 (9th Cir. 1999).........................................23

In re: C.J. Wright & Co., 162 B.R. 597 (B. M.D.Fla. 1993) ...................................26, 27

In re Coleman, 285 B.R. 892 (B.W.D.Va. 2002)...................................................44

In re Contemporary Industries Corp., 564 F.3d 981 (8th Cir. 2009) .............................................39

Cunningham v. Brown, 265 U.S. 1 (1924) ...................................................45

In re Donald Sheldon & Co., Inc., 153 B.R. 661 (B. S.D.N.Y. 1993)...........................................35

Donell v. Kowell, 533 F.3d 762 (9th Cir.), *cert. denied* 1295 S. Ct. 640 (2008) ....................41, 42

In re Dorholt, Inc., 224 F.3d 871 (8th Cir. 2000) ...........................................46

Eighteen Holding Corp. v. Drizin, 701 N.Y.S.2d 427 (1st Dep't 2000) .......................................26

In re: Elrod Holdings Corp., 394 B.R. 760 (B.D.Del. 2008) .........................................40

HSBC Bank USA v. Adelphia Commc'ns. Corp., 2009 U.S. Dist. LEXIS 10675 (W.D.N.Y. Feb. 12, 2009) ...................................................28

Hurd v. Hodge, 334 U.S. 24 (1948)...................................................48

In re Independent Clearing House Co., 77 B.R. 843 (D. Utah 1987) ...........................................42

Jackson v. Mishkin, 263 B.R. 406 (S.D.N.Y. 2001)...................................................48, 49

In re: Join-In International (U.S.A.) Ltd., 56 B.R. 555 (B.S.D.N.Y. 1986) .................................44

Kaiser Steel Corp. v. Mullins, 455 U.S. 72 (1982).........................................................................48

McMullen v. Hoffman, 174 U.S. 639 (1899) ..................................................................................48

Mitchell v. Washingtonville Central School District, 190 F.3d 1 (2d Cir. 1999).........................28

In re Murphy, 331 B.R. 107 (B.S.D.N.Y. 2005).....................................................................43, 44

In re National Forge Co., 344 B.R. 340 (W.D.Pa. 2006)..............................................................40

Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101 (C.D. Cal. 2003)............................41

In re New Times Securities Services, Inc., 463 F.3d 125 (2d Cir. 2006) ......................................10

In re New Times Securities Services, Inc., 371 F.3d 68 (2d Cir. 2004) ..................................7, 8, 9,
14, 16, 22,
28, 30, 50

In re Oberweis Securities, Inc., 135 B.R. 842 (B. N.D. Ill. 1991)...................................................9

In re Old Naples Securities, Inc., 311 B.R. 607 (M.D. Fla. 2002)..........................................26, 27

Patterson v. Shumate, 504 U.S. 753 (1992).................................................................................32

Pereira v. United Jersey Bank, N.A., 201 B.R. 644 (S.D.N.Y. 1996) ...........................................46

In re QSI Holdings, Inc., 571 F.3d 545 (6th Cir.), pet. for cert. filed, 78 U.S.L.W. 3239
(Oct. 5, 2009) ................................................................................................................................40

SEC v. Byers, 2009 WL. 2185491 (S.D.N.Y. July 23, 2009) .................................................24, 25

SEC v. Credit Bancorp, Ltd., 2000 WL. 175297 (S.D.N.Y. Nov. 29, 2000), aff'd 290 F.3d
80 (2d Cir. 2002)...........................................................................................................................23

SEC v. Funding Resources Group, 2004 WL. 1189996 (N.D.Tex. May 27, 2004)......................23

SEC v. Packer, Wilbur & Co., 498 F.2d 978 (2d Cir. 1974) ...........................................................6

SIPC v. SJ Salmon & Co., No. 72 Civ. 560 (S.D.N.Y. 1972) ......................................................36

Securities & Exchange Commission v. Packer, Wilbur & Co., Inc., 362 F. Supp. 510
(S.D.N.Y. 1973), aff'd, 498 F.2d 978 (2d Cir. 1974)....................................................................48

iv

Securities Investor Protection Corp. v. BDO Seidman, LLP, 49 F. Supp. 2d 644 (S.D.N.Y. 1999), *aff'd*, 245 F.3d 174 (2d Cir. 2001) ..................... 14

Securities Investor Protection Corp. v. Barbour, 421 U.S. 412 (1975) .......................... 16

Sender v. Buchanan, 84 F.3d 1286 (10th Cir. 1996) ..................... 42

Simon v. Safelite Glass Corp., 128 F.3d 68 (2d Cir. 1997) ..................... 27, 28

In re: Slatkin, 525 F.3d 805 (9th Cir. 2008) ..................... 39

Steinberg v. Sherman, No. 07-1001, 2008 U.S. Dist. LEXIS 35786 (S.D.N.Y. May 2, 2008) ..................... 26

In re: Stewart Finance Co., 367 B.R. 909 (B.M.D. Ga. 2007) ..................... 39

In re Taubman, 160 B.R. 964 (B.S.D. Ohio 1993) ..................... 42

In re Tedlock Cattle Co., 552 F.2d 1351 (9th Cir. 1977) ..................... 23

United States v. Bonnano Organization Crime Fam. of La Cosa Nostra, 879 F.2d 20 (2d Cir. 1989) ..................... 48

*Visconsi v. Lehman Bros., Inc.*, 244 Fed. App'x 708 (6th Cir. 2007) ..................... 25, 26, 42

Warfield v. Alaniz, 453 F. Supp. 2d 1118 (D. Ariz. 2006), *aff'd* 569 F.3d 1015 (9th Cir. 2009) ..................... 41

Wellman v. Wellman, 933 F.2d 215 (4th Cir.), *cert. denied*, 502 U.S. 925 (1991) ..................... 44

## STATUTES

11 U.S.C. § 101(53A) ..................... 39

11 U.S.C. § 541(b)(7)(I) ..................... 32

11 U.S.C. § 544 ..................... 31

11 U.S.C. § 547(b) ..................... 45

11 U.S.C. § 548 ..................... 42

11 U.S.C. § 548(a)(1) ..................... 38, 40

11 U.S.C. § 741(2) ..................... 39

15 U.S.C. § 78ccc(b)(4) ..................................................13, 16, 17, 48

15 U.S.C.A. § 78eee(a)(1) ..................................................35

15 U.S.C. § 78fff(a)(1) ..................................................13, 22

15 U.S.C.A. § 78fff(a) ..................................................35

15 U.S.C.A. § 78fff-1(d) ..................................................35

15 U.S.C. § 78fff-2(d) ..................................................15, 17, 33, 34, 35, 37

15 U.S.C.A. § 78fff-2(b) ..................................................35

15 U.S.C. § 78fff-3(a) ..................................................15, 24, 27, 34, 35

15 U.S.C. § 78fff-3 ..................................................35, 45

15 U.S.C. § 78ggg(b) ..................................................7

15 U.S.C. § 78lll(11) ..................................................13, 15

17 C.F.R. § 300.502 ..................................................6

29 U.S.C. § 1144(a) ..................................................31

15 U.S.C. § 78fff-3(a) ..................................................15

11 U.S.C. § 547 ..................................................45, 47

Cal. Civ. Pro. Code § 704.115 ..................................................32

Fla. Stat. Ann.§ 222.21 ..................................................32

N.Y.C.P.L.R. § 5004 ..................................................26, 32, 41

N.Y. Gen. Oblig. Law § 5-501, *et seq* ..................................................26, 32, 41

Tex. Prop. Code § 42.0021 ..................................................32

17 C.F.R. § 300.300 *et seq* ..................................................15

17 C.F.R. 300.500 ..................................................6

vi

29 U.S.C. § 1001 *et seq*................................................................................................31

Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin, Maureen*
*Ebel, and a group of other customers*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
SECURITIES INVESTOR PROTECTION            :
CORPORATION,                              :   Adv. Pro. No. 08-01789 (BRL)
                                          :
                          Plaintiff,      :   SIPA Liquidation
                                          :
              v.                          : (Substantively Consolidated)
                                          :
BERNARD L. MADOFF INVESTMENT              :
SECURITIES LLC,                           :
                                          :
                          Defendant.      :
-----------------------------------------------------------:
                                          :
In re:                                    :
                                          :
BERNARD L. MADOFF,                        :
                                          :
                          Debtor.         :
-----------------------------------------------------------x

**CUSTOMERS' MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S**
**MOTION FOR AN ORDER APPROVING THE TRUSTEE'S RE-DEFINITION OF**
**"NET EQUITY" UNDER THE SECURITIES INVESTOR PROTECTION ACT**

Phillips Nizer LLP files this memorandum of law on behalf of a group of customers (the

"Customers") of Bernard L. Madoff Investment Securities LLC ("Madoff") for whom the Firm

has filed objections to the Trustee's determination letters, as well as on behalf of Diane and

Roger Peskin and Maureen Ebel, who are "net losers" in the Trustee's terminology but

nevertheless believe that the Trustee's definition of "net equity" is a direct violation of the

Securities Investor Protection Act ("SIPA") and is violative of their rights.[1]   This memorandum is submitted in opposition to the motion by Irving H. Picard, Trustee, for an Order upholding the Trustee's re-definition of "net equity" under SIPA and in opposition to the position taken by the Securities Investor Protection Corporation ("SIPC") in support of the Trustee's motion.

## PRELIMINARY STATEMENT

Reduced to its essence, the position of the Trustee and SIPC is that, because Bernard Madoff was a monstrous thief, SIPC is entitled to violate the clear mandates of the Securities Investor Protection Act, by which it was created.  In the process, the Trustee and SIPC are single-handedly destroying the investor confidence in the capital markets that Congress enacted SIPA to instill.

Congress intended, through SIPA, to provide specific insurance protection to people who chose to invest their life savings through SEC-regulated broker/dealers.  Over the course of its 38-year existence, SIPC repeatedly promised customers of SEC-regulated broker/dealers that, if it turned out they dealt with a thief, SIPC would promptly replace securities up to $500,000 as reflected on the customers' last statements.  As of December 31, 2008, SIPC had assets of $1.7 billion and it was facing a loss in the Madoff case of approximately $2.5 billion.[2]  SIPC had two choices:  It could draw on the $2 billion lines of credit available to it under SIPA and fulfill its statutory obligations; or it could default on its obligations, leaving thousands of defrauded and destitute Madoff investors and their families without funds to support themselves.  SIPC chose to default.

---

[1] A list of the Customers on whose behalf the Firm has filed objections is annexed to the November, 13, 2009 Declaration of Helen Davis Chaitman ("Chaitman") as Exhibit A.

[2] The Trustee has announced to the public that, of the 4,903 active accounts that Madoff had as of November 30, 2008, only 2,335 customers actually lost money on the Trustee's net investment calculation (and only 2,275 of those 2,335 actually filed claims).  The account balances of all the account holders as of November 30, 2008 totaled $64.8 billion.  Thus, if successful in re-writing SIPA, the Trustee would have reduced by half SIPC's exposure.  Chaitman Exh. O.  *See also*, SIPC's 2008 Annual Report indicating that, with administrative expenses, the total Madoff loss would cost SIPC $1.4 billion.  Chaitman Exh. T at 18.

The Trustee's motion is SIPC's attempt to obtain this Court's blessing for SIPC's default of its statutory obligations. Just as the American taxpayers were required to bail out Wall Street to the tune of hundreds of billions of dollars, after Wall Street recklessly brought the global economy to its knees, so too, Madoff's destitute customers are being forced to bail out SIPC, whose members, the same Wall Street firms, enjoyed essentially free SIPC insurance during the boom years of 1996 through 2008, all the while inducing tens of millions of innocent investors to entrust their life savings to SEC-regulated broker/dealers who profited from holding the investors' securities in street name. [3]

SIPC has repeatedly ignored warnings from Congress that it was under-funded and would not be capable of handling a major liquidation.[4] Yet, when Bernard Madoff confessed on December 11, 2008, instead of drawing on the statutory lines of credit available to SIPC so that it could fulfill its obligations to the Customers, SIPC decided to deny the Customers their promised, statutorily mandated, insurance in order to enrich its own members. This has left the Customers in dire financial straits, many of whom are elderly, unwell, and unable to support themselves.[5]

SIPC's bait-and-switch is a violation of the express provisions of SIPA. SIPC repeatedly represented to courts and to the public that it would replace securities in an investor's account, up to $500,000, based upon the customer's last statement. SIPC's President, Stephen Harbeck, personally represented to the court in a 2003 SIPA liquidation that, where a customer invested with a Ponzi schemer who took the customer's money and never purchased the securities

---

[3] For the entire period from 1996 through 2008, and despite warnings from Congress that SIPC was seriously under-funded, SIPC continued to charge its members, such as Goldman Sachs, Bank of America and Merrill Lynch a token fee of $150 per year per firm for hundreds of billions of dollars of SIPC insurance. Chaitman Exhs. T at 9, Z, AA, CC, DD.

[4] See Chaitman Exhs. AA and DD.

[5] Chaitman at ¶¶ 2-7.

reflected on the customer's statement, SIPC would replace the securities even if they had tripled in value. As Mr. Harbeck acknowledged, if customers are led to believe that "real, existing" securities had been purchased for their accounts, then those customers are entitled to get the full value of their securities positions as of the filing date, even if the securities had never been purchased:

> MR. HARBECK: **Even if they're not there**.
>
> THE COURT: Even if they're not there.
>
> MR. HARBECK: Correct.
>
> THE COURT: **In other words, if the money was diverted, converted –**
>
> MR. HARBECK: And the **securities were never purchased.**
>
> THE COURT: Okay.
>
> MR. HARBECK: **And, if those positions triple, we will gladly give the people their securities positions.**[6]

In a February 26, 2003 News Release available on SIPC's website, Harbeck bragged about SIPC's prompt replacement of securities for investors in the Park South liquidation:

> The Park South case is a textbook illustration of why Congress created SIPC to protect investors at troubled brokerage firms. While misuse of customer cash and securities is uncommon, it is important for investors to know that SIPC is here as a safety net when they need us in those situations. SIPC's mission also was met here in terms of making sure that more than 2,000 Park South investors were not further victimized by having their assets tied up for months or longer in a bankrupt brokerage firm.[7]

Just five days after Madoff's confession, on December 16, 2008, Josephine Wang, the General Counsel of SIPC, consistent with SIPC's conduct for 38 years, assured the public that a Madoff customer is entitled to the securities in his account:

---

[6] July 28, 2000 Tr. at 37-38, *In re New Times Sec. Servs. Inc.* (B. E.D.N.Y. 2000) (emphasis added) (Chaitman Exh. E).

[7] http://www.sipc.org/media/release26feb03.cfm; emphasis added.

Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.[8]

Yet, despite SIPC's repeated representations of coverage, and the representations of coverage which continue to be made to this day by SIPC's members,[9] all of which induced the American public to entrust their life savings to Wall Street, SIPC is taking the position in this Court – for the first time in its history – that it only insures the net investment of the investor, regardless of how long the investor had his or her account.

ARGUMENT

I.     **SIPA REQUIRES SIPC TO REPLACE SECURITIES UP TO $500,000 BASED UPON THE BALANCE ON THE CUSTOMER'S LAST STATEMENT**

Congress enacted SIPA with the specific goal of instilling investor confidence in the capital markets by insuring customer accounts against the risk that the broker either stole the customer's money and never purchased the securities reflected on the customer's statement, or stole the securities themselves. Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.

*          *          *

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. **But because securities may have been**

---

[8] Chaitman Exh. M: December 16, 2008 Insiders' Blog, http://www.streetinsider.com/Insiders+Blog/
SIPCs+Role+In+Madoff-Of-All-Scams+Could+Save+The+Stock+Market/4243249.html.
[9] *See, e.g.,* Chaitman Exhs. R and MM.

5

**lost, improperly hypothecated, misappropriated, never purchased, or even stolen**, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date. (Emphasis added.) [10]

*See also, SEC v. Packer, Wilbur & Co.,* 498 F. 2d 978, 984 (2d Cir. 1974)(purpose of SIPA was to protect investors whose funds were misappropriated).

SIPC was required to "maintain and administer an insurance fund which would provide coverage against customer losses. . . resulting from broker-dealer firms' insolvency." S.Rep. No. 91-1218, p. 1 (1970)[11]. The Senate described SIPC as "an insurance plan for the industry," and one of several "federally sponsored insurance programs." *Id.* at 4 - 5, 7 - 9. *See also, Bell & Beckwith v. McGraw,* 937 F.2d 1104, 1106 (6th Cir. 1991)("one primary purpose of SIPA was to provide for the establishment of a fund to be used to make it possible for the public customers in the event of the financial insolvency of their broker, to recover that to which they are entitled . . ."). In light of its function as a quasi-governmental insurance company, SIPC's default on its obligations to the Customers is destructive not only to the Customers but to the national interests in the same way that a default by the FDIC would be devastating to the national economy.

In order to fulfill customer expectations and instill confidence in the capital markets, SIPC's Series 500 Rules, 17 C.F.R. 300.500, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer. *See* 17 C.F.R. § 300.502. For 38 years of SIPC's existence, a customer's SIPC claim was determined by the brokerage statements the customer received, regardless of whether they were accurate.

Thus, it is irrelevant that Madoff perpetrated a massive fraud. The only issue in a SIPA liquidation is what was the **customer's** "legitimate expectation." Here, other than Jeffry Picower

---

[10] Chaitman Exh. C: H.R. Rep. 95-746 at 21; emphasis added.
[11] Chaitman Exh. B.

and Stanley Chais, the Trustee has not identified a single customer who did not have a legitimate expectation that his monthly Madoff statements were accurate. Indeed, the Looby Declaration confirms the accuracy of the statements and thus the legitimacy of the Customers' expectations.[12]

In 2004, the Securities and Exchange Commission ("SEC") and SIPC argued successfully in the Second Circuit that customers in precisely the same situation as the Customers here, were entitled to up to $500,000 in replacement securities where they received statements from their broker indicating that securities had been purchased for their account, even though, in fact, the broker had never purchased any securities.[13] *In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004). This Court is bound by that decision and the SEC and SIPC are estopped from taking a different position here. Thus, the Trustee should be ordered to replace the securities in the account of every Customer, as reflected on their November 30, 2008 statements, up to $500,000 based upon the November 30, 2008 values.

While the Trustee argues that *New Times* is not applicable, that argument cannot withstand scrutiny. The facts in *New Times* are indistinguishable from the facts here. New Times' principal, William Goren, engaged in a "classic 'Ponzi scheme'" where new investors' money was used to pay earlier investors. 371 F.3d at 72 n.2. Just as with Madoff, New Times customers received statements showing investments in mutual funds that actually existed (the "Existent Securities"). However, in *New Times,* there was another group of customers who received statements showing that they were invested in money market funds that were totally fictitious (the "Non-Existent Securities"). 371 F.3d at 71-72.

With the SEC's blessing, SIPC treated the two categories of customers differently. SIPC applied the statutory "net equity" definition to the Existent Securities customers' claims by

---

[12] *See* Looby Decl ¶¶ 58-71.
[13] The SEC has plenary jurisdiction over SIPC and the power to enforce SIPA against SIPC. 15 U.S.C. § 78ggg(b).

replacing securities to the full value of those securities positions as of the date of the liquidation filing (the "Statutory Balances"). The Second Circuit endorsed that treatment. However, with respect to customers whose statements showed Non-Existent Securities, SIPC used the net investment methodology that the Trustee is using in this case. SIPC reasoned that a customer whose statements showed Non-Existent Securities could not have had a legitimate expectation that the securities existed because they could not be confirmed or verified.

The customers with Non-Existent Securities appealed SIPC's treatment. The Second Circuit took particular note of SIPC's position:

> investors who were misled by Goren to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds – because Goren never executed the transactions –the information that these claimants received on their account statements "mirrored what would have happened had the given transaction been executed." [Br. for New Times Trustee and SIPC] at 7 n.6. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. *Id.* **The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims.** *Id.* Furthermore, **the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," in contrast to the "cash claimants" bringing this appeal, could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements.** *Id.*

371 F.3d at 74; emphasis added.

The Second Circuit held that the sole issue in determining a customer's claim in a SIPA liquidation is whether the customer had a legitimate expectation, based on written confirmations and account statements, that he owned securities. The Court cited SIPC's Series 500 Rules, 17 C.F.R. §§ 300.500-300.503, which confirm the fact that an investor has a right to rely upon the written confirmations he receives from his broker and those written confirmations **alone** control the investor's entitlement to SIPC insurance. The Court explained that "the premise underlying

8

the Series 500 Rules [is] that a customer's 'legitimate expectations,' based on written confirmations of transactions, ought to be protected." 371 F.3d at 87. It noted that:

> Under the Series 500 Rules, whether a claim is treated as one for securities or cash depends not on what is actually in the customer's account, but on what the customer has been told by the debtor in written confirmations.

*Id.* at 86 (emphasis in original). *See also In re Oberweis Secs., Inc.*, 135 B.R. 842, 847 n. 1 (B. N.D. Ill. 1991) ("The court agrees with the trustee's argument that Congress did not intend to treat customers without confirmations the same as those with confirmations; that customers with confirmations have a legitimate expectation of receiving securities, but customers without confirmations do not have the same expectation.").

In contrast to those New Times customers whose statements showed Existent Securities, the Second Circuit held that the net equity of New Times customers whose statements showed Non-Existent Securities should be determined as the amount of money invested minus any withdrawals because customer recoveries based on Non-Existent Securities "would allow customers to recover arbitrary amounts that necessarily have no relation to reality." 371 F.3d at 88. Obviously, customers whose confirmations indicated the purchase of Non-Existent Securities could not have had a legitimate expectation that they owned those securities. Thus, only when securities positions "necessarily have no relation to reality," *i.e.*, are based on securities that do not exist, should a "cash in minus cash out" methodology be employed in a SIPA liquidation.

Here, each Customer received trade confirmations and account statements showing investments in real securities. Thus, each Customer had a legitimate expectation that he owned the securities shown on his last statement and is entitled to a claim in the amount of the balance on his November 30, 2008 statement, his Statutory Balance.

9

In *New Times II*, a different Second Circuit panel considered related issues and found,

once again, "**[i]t is a customer's legitimate expectations on the filing date . . . that determines**

**the availability, nature, and extent of customer relief under SIPA.**" *In re New Times Secs.*

*Servs., Inc.*, 463 F.3d 125, 128 (2d Cir. 2006) (*New Times II*)(emphasis added). The Court

added that, in the case of customers who believed they held fictitious securities:

> Because there were no such securities, and it was therefore impossible to
> reimburse customers with the actual securities or their market value on the filing
> date (the usual remedies when customers hold specific securities), the [*New Times
> I* Court] determined that the securities should be valued according to the amount
> of the initial investment. The court declined to base the recovery on the rosy
> account statements telling customers how well the imaginary securities were
> doing, because treating the fictitious paper profits as within the ambit of the
> customers' "legitimate expectations" would lead to the absurdity of "duped"
> investors reaping windfalls as a result of fraudulent promises made on fake
> securities . . . The court looked to the initial investment as the measure for
> reimbursement because the initial investment amount was the best proxy for the
> customers' legitimate expectations.

*New Times II*, 463 F.3d at 129-30 (citations omitted).

SIPC and the *New Times* Trustee valued Existent Securities customers' claims in

accordance with the statutory definition of net equity even when those claims included mutual

fund shares that were purchased through "dividend reinvestments," despite the fact that, since the

initial securities had never been purchased, the **customers had received no dividends to**

**reinvest**. Specifically:

> [I]nvestors who believed that their accounts held shares of mutual funds that
> actually existed (but were never purchased for their accounts) are having their
> claims (both as to shares of mutual funds never purchased by Goren and shares
> shown in customer statements as purchased through dividend reinvestment)
> satisfied by the Trustee up to the statutory maximum of $500,000. . . .[14]

> [W]hereas the Trustee has disallowed that portion of the claim of [the Non-
> existent Securities] investors representing shares of [the Non-existent Securities]
> purchased through dividend reinvestment, the Trustee has allowed that portion of

---

[14] Chaitman Exh.H: Claimants' Joint Mem. of Law in Opposition to Joint Motion of Trustee and SIPC for Order
Upholding the Trustee's Determinations at 3, *In re New Times Sec. Services, Inc.* (B.E.D.N.Y.) (No. 00-CV-970).

1096903.1

the mutual fund investors' claims [i.e., "Existent Securities" investors' claims] as represents shares of such mutual funds purchased by them through dividend reinvestment.[15]

SIPC and the Trustee described their method in the *New Times* liquidation:

In every case [of an 'Existent Security' customer], the Trustee has been able to identify the actual mutual fund in question by cross-checking the information supplied by Goren on the customer statements, including share price information, with publicly available information and then been able to purchase that security.[16]

They further stated that where customers' statements reflected securities positions in closed mutual funds, "the Trustee properly gave the customers cash equal to the filing date values of the closed mutual funds." [17]

In their briefs, SIPC and the SEC repeated the view that SIPA protects the legitimate expectations of the customer, based upon the written statements the customer received from the broker. In an *amicus curiae* brief, the SEC wrote:

Our view [is] that when possible, SIPA should be interpreted consistently with a customer's legitimate expectations based on confirmations and account statements. [18]

The Trustee wrote in his brief in *New Times I* that:

In those cases [concerning the payment of interest and dividends on bona fide mutual funds] the claimants had an objectively legitimate expectation of receiving interest/dividends because the security in question had actually earned them. Here, the bogus mutual fund [the Ficitious New Age Fund] was never organized as a mutual fund and had no assets or investments.[19]

---

[15] Chaitman Exh. F: Limited Objection to Trustee's Determination of Claim at 6 n.4, *In re New Times Sec. Services, Inc.* (B.E.D.N.Y.) (No. 00-CV-970).
[16] Chaitman Exh. G: Joint Mem. of Law in Support of Trustee's Motion for an Order Upholding the Trustee's Determinations with Respect to Claims Filed for Investments in Non-Existent Money Market Funds and Expunging Objections to Those Determinations at 26, *In re New Times Sec. Services, Inc.* (B.E.D.N.Y.) (No. 00-CV-970). .
[17] Chaitman Exh. I: Reply Mem. in Further Support of Joint Motion for Order Upholding Determinations at 20, *In re New Times Sec. Services, Inc.* (B.E.D.N.Y.) (No. 00-CV-970).
[18] Chaitman Exh. K: Br. of the SEC, Amicus Curiae, In Partial Support of the Position of Appellants and In Partial Support of the Position of Appellees ("SEC Amicus Curiae Brief"), available at 2003 WL 24132250 at *13, *New Times I* (No. 02-6166).
[19] Chaitman Exh. J: Br. for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc. and Securities Investor Protection Corporation, available at 2002 WL 32487939 at *38, *New Times I* (No. 02-6166).

11

SIPC wrote in its brief in *New Times II* that:

[R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality. **Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.[20]

Thus, SIPC recognized that it is "claimant expectations," rather than "transactional reality" that controls. This principle is at the very core of the entire SIPA statutory scheme. There were no "imaginary securities" listed on the Madoff account statements. Yet, in direct contravention of SIPC's position in *New Times*, in which SIPC "gladly" replaced securities with a value up to $500,000 for customers whose statements showed Existent Securities that were never purchased, even if the actual securities' value had "triple[d]," here, the Trustee has refused to recognize the Customers' claims in the amounts shown on their last statements. As a matter of law, the Customers are entitled to be treated in the same manner as the holders of Existent Securities in *New Times*.

The Customers had the legitimate expectation that they owned real securities. Indeed, they could have had no other expectation, based upon the trade confirmations and monthly account statements they received. Thus, the Trustee must employ the same method used in *New Times* and honor Customers' claims in the amount of their Statutory Balances. There is no justification for changing the law, *sua sponte,* simply because SIPC's members do not want to

---

[20] Chaitman Exh. L: Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at *11-12 , *New Times II* (citing *New Times*)(emphasis added).

12

fulfill their obligations or SIPC does not want to borrow the funds to do so. While this *legerdemain* may save SIPC and its members one or two billion dollars, it deprives the Customers, made destitute by the Madoff fraud, of the SIPC insurance to which they are statutorily entitled and it threatens to utterly destroy investor confidence in the capital markets.

## A. SIPC Is Prohibited From Changing the Definition of Net Equity

SIPA mandates that the Trustee "satisfy net equity claims of customers." 15 U.S.C. § 78fff(a)(1)(A)-(B). SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date. . .

15 U.S.C. § 78lll(11).

As if Congress anticipated that Wall Street would try to take advantage of investors, Congress specifically prohibited SIPC from changing any definitions contained in § 78lll, which section includes the definition of "net equity." As stated in SIPA:

> SIPC shall have the power. . . to adopt, amend and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to . . .the definition of terms used in this chapter, **other than those terms for which a definition is provided in section 78lll of this title**. . .

15 U.S.C. § 78ccc(b)(4)(A) (emphasis added). Because SIPC has no power to change the statutory definition of "net equity," the Trustee has no power to employ his "cash in minus cash out" definition of net equity.

The United States General Accounting Office ("GAO"), and all courts to consider the matter, have employed the statutory definition of "net equity." For example, a May 2001 GAO Report stated:

> SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash and/or securities held at a failed firm. **SIPC fulfills its mission** by initiating liquidation proceedings where appropriate and transferring customer accounts to another securities firm or returning the cash or securities to the customer **by restoring to the customer accounts the customer's "net equity." SIPA defines net equity as the value of cash or securities in a customer's account as of the filing date, less any money owed to the firm by the customer, plus any indebtedness the customer has paid back** with the trustee's approval within 60 days after notice of the liquidation proceeding was published.[21]

Moreover, the Second Circuit has recognized the statutory definition of net equity in the *New Times* case which, like the Madoff liquidation, involved a long-term Ponzi scheme in which customers received statements showing securities as purchased which, in fact, had never been purchased. Although the Trustee argues here that SIPA's definition of "net equity" should not be followed where the statements are fictitious, that is precisely what happened in *New Times* where the Second Circuit wrote:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" corrected for "any indebtedness of such customer to the debtor on the filing date."

*In re New Times Securities Services, Inc.*, 371 F.3d 68, 72 (2d Cir. 2004); *see also Securities Investor Protection Corp. v. BDO Seidman, LLP*, 49 F. Supp. 2d 644, 649 (S.D.N.Y. 1999), *aff'd*, 245 F.3d 174 (2d Cir. 2001) ("As defined by SIPA, 'net equity' is the amount that the broker would have owed a customer had it liquidated all the customer's holdings on the date

---

[21] Chaitman Exh. Z: GAO Report to the Ranking Minority Member, Energy and Commerce Committee, House of Representatives entitled "Securities Investor Protection: Steps Needed to Better Disclose SIPC Policies to Investors," (the "GAO Report") at 15; emphasis added).

SIPC filed for a protective decree, less any outstanding debt the customer owed to the broker.");

*In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 61 n. 2 (B. S.D.N.Y. 1999) *aff'd*, 263 B.R.

406 (S.D.N.Y. 2001) ("'Net equity' is calculated as the difference between what the debtor owes

the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

This Court itself in this case adopted the statutory definition of "net equity" when it

wrote, in the Claims Procedure Order that:

> **ORDERED, that the Trustee be, and he hereby is, authorized to satisfy such customer claims and accounts** (i) by delivering to a customer entitled thereto "customer name securities," as defined in 15 U.S.C. § 78lll(3); (ii) **by satisfying a customer's "net equity" claim, as defined in 15 U.S.C. § 78lll(11),** by distributing on a ratable basis securities of the same class or series of an issue on hand as "customer property," as defined in 15 U.S.C. § 78lll(4), and, if necessary, by distributing cash from such customer property or cash advanced by SIPC, or purchasing securities for customers as set forth in 15 U.S.C. § 78fff-2(d) within the limits set forth in 15 U.S.C. § 78fff-3(a); and/or (iii) by completing contractual commitments where required pursuant to 15 U.S.C. § 78fff-2(e) and **SIPC's Series 300 Rules, 17 C.F.R. § 300.300 et seq.**, promulgated pursuant thereto; and it is further
>
> **ORDERED, that with respect to claims for "net equity," as defined in 15 U.S.C. § 78lll(11), the Trustee be, and he hereby is, authorized to satisfy claims out of funds made available to the Trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the Debtor available to satisfy such claims;**

Claims Procedure Order at 5; emphasis added.

Because of SIPC's defiance of SIPA's mandate that the Trustee "promptly" replace

securities in Customers' accounts up to $500,000, 15 U.S.C. § 78fff-3(a) and 4(c), the Trustee

has decided that he needs a vast team of forensic accountants and lawyers to pore through

decades of records to determine each Customer's net investment (through generations) before

SIPC pays any amount to a Customer. Nothing could be more destructive to the Congressional

intent to instill confidence in the capital markets and nothing could be more inconsistent with the

SIPA statute. Customers' Statutory Balances are readily ascertainable from their November 30,

15

2008 statements. Their net equity is simply the "securities positions" set forth on their last statements.

## B. The Trustee Is Destroying Investor Confidence Nationally In Direct Violation Of Congressional Intent

The purpose of SIPA, as evidenced by its title, was to "protect" investors. *See, e.g.,* H.R. Rep. No. 91-1613, at 3-4 (1970)("[SIPA] will reinforce the confidence that investors have in the U.S. securities markets."). *See also In re New Times,* 371 F.3d at 87 ("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio,* 62 F.3d 791, 794 (6th Cir. 1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[ ] and upgrade the financial responsibility requirements for registered brokers and dealers.")(citations omitted). As explained by the United States Supreme Court:

> Following a period of great expansion in the 1960's, the securities industry experienced a business contraction that led to the failure or instability of a significant number of brokerage firms. Customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings. In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a "domino effect" involving otherwise solvent brokers that had substantial open transactions with firms that failed. Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers. S.Rep. No. 91-1218, pp. 2-4 (1970); H.R.Rep. No. 91-1613, pp. 2-4 (1970).

*Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 415 (1975).

To achieve this end, SIPA created the SIPC as a nonprofit membership corporation comprised of all brokers and dealers registered under section 15(b) of the Securities Exchange Act of 1934 with some exceptions. 15 U.S.C. § 78ccc. SIPA requires members of SIPC to pay an assessment based on a percentage of their gross revenues from their securities businesses in order

16

to create a fund to provide protection for investors against losses caused by broker-dealer insolvencies. *Id.* Sec. 78ddd(c); House Report at 5258.

SIPA attempted to do this initially by satisfying customers' "net equity" claims for securities with actual securities only if the debtor held securities of the appropriate class and kind to satisfy customers' claims, while otherwise customers would receive the cash equivalent of the value of their securities on the filing date. [22] When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments], [i.e.], . . . the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency."[23] A customer's reasonable expectations were that their actual securities, as shown on their statements, would be returned to them "in the form they existed on the filing date." H.R. Rep. No. 95-746, at 21. Thus, SIPA was amended to state that "[t]he trustee shall, to the extent that securities can be purchased in a fair and orderly market, purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities. . ." [24]

Here, the legitimate expectations of the Customers were contained in the account statements and trade confirmations they received. Thus, SIPA mandates that customer claims be recognized in the amount of their Statutory Balances.

---

[22] SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat. 1636, 1648-50 (1970); H.R. Rep. No. 95-746 (39-41)(statement of SIPC Chairman Hugh F. Owens).

[23] D 922 Cong. Rec. H. 36326 (daily ed. Nov. 1, 1977)(statement of Rep. Robert C. Eckhardt)(emphasis added). *See also* Hearing on H.R. 8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. On Interstate and Foreign Commerce, 94th Cong. 63 (1975) ("The basic framework of the 1970 Act in regard to satisfaction of customers' claims should be modified to better meet the legitimate expectations of customers.") (report to the SIPC Board of Directors by the Special Task Force to consider possible amendments to SIPA); Hearing on H.R. 8331 before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81 (1977) ("The proposed [1978] amendments carry out the Task Force recommendations and are designed to make the Act more responsive to the reasonable expectations of investors.") (statement of SIPC Chairman Hugh F. Owens); Hearing on H.R. 8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th Cong. 161-162 ("[T]he principal purpose of these amendments is to meet more nearly the reasonable expectations of brokerage firm customers.")(statement of SEC Commissioner Philip A. Loomis, Jr.).

[24] 15 U.S.C. § 78fff-2(d); SIPA § 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978).

1096903.1

## C.    The Trustee's Position Is Unprecedented In SIPC's History

The Trustee's defiance of SIPA's definition of net equity, despite the fact that Customers received account statements and written trade confirmations showing investments in real securities, is inconsistent with 38 years of SIPC's history.  Harbeck admitted as much in January 2009 when he announced: "We've modified our usual claim form to ask investors a question that's unique to this case, which is how much money did you put in and how much money did you take out."[25]  He also stated that "[O]ne of the first things that we did . . . was to modify our standard claim form to make sure that we asked the Customers themselves what evidence they had in terms of money in and money out, because that's going to be one of the critical factors."[26]  In fact, the Madoff Customer Claim form contains the unprecedented language:

> In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation.  You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.

SIPC always led investors to believe that SIPC insurance was based upon their last brokerage statement:

> **In the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you.  This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement.**[27]

> How is the amount of a customer's claim determined?  The amount of the customer's claim, excluding any securities registered in his name and returned to him, is called his "net equity."  **The net equity of a customer's account is determined by adding the total value of cash and securities the firm owes the customer and subtracting the total value of cash and securities the customer owes the firm.**[28]

---

[25] Jan. 6, 2009, CNBC.

[26] Jan. 5, 2009, Stephen Harbeck, testimony before House Financial Services Committee.

[27] Chaitman Exh. P:  SIPC/SIFMA brochure Understanding Your Brokerage Account Statements, at 5, SIPC Website 2009 (emphasis added).

[28] *See* Chaitman Exh. Q:  How SIPC Protects You at 14, 1994 (emphasis added), www.jprcapital.com/howsipc.pdf.

A customer's "net equity" is, in general, what the broker owes the customer less what the customer owes the broker, exclusive of "specifically identifiable property." Essentially, Section 6(c)(2)(A)(iv) [codified at 15 U.S.C. § 78lll(11)] defines "net equity" as the dollar amount of a customer's account determined after giving effect to the completion of any open contractual commitments (discussed below), excluding therefrom any specifically identifiable property reclaimable by the customer, and subtracting the indebtedness (if any) of the customer to the debtor from the sum which would have been owing by the debtor to the customer had the debtor liquidated all other securities and contractual commitments to the customer on the filing date. In short, a customer's "net equity" claim is for a liquidated sum.[29]

SIPC has never, since its founding, taken the position that it insures only the net investment where a customer's statement showed the ownership of real (as opposed to non-existent) securities. Having induced investor reliance upon the promise of SIPC insurance based upon the investors' last statement, SIPC cannot now change the rules, simply because it did not assess its members to fund its own liabilities, notwithstanding numerous warnings to do so.

### D. The Trustee's Reading Of *New Times* Is Incorrect

Despite the inescapable fact that the Trustee and SIPC are bound by the holding in *New Times,* the Trustee makes several vain attempts to escape that precedent, focusing on irrelevant points, as set forth below, in order to enable SIPC to escape its statutory obligations.

#### 1. The Customers Had A Legitimate Expectation That They Held the Securities Listed on Their Last Statements

The Trustee argues that, although the Customers had a legitimate expectation that they had a claim for securities, they had no legitimate expectation that they actually **owned** the securities in their account. Trustee's Mem. at 37-38. This argument makes no sense and there is no legal authority to support it. The Trustee's argument flatly contradicts SIPC's position (not to mention the Court's holding) in *New Times II,* in which it wrote:

> [R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for

---

[29] *See* Chaitman Exh. S: SIPC Annual Report 1973 at 21.

example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.[30]

SIPC was clear – the customer has a "reasonable expectation that he holds the securities identified in the confirmation." Moreover, the customer is entitled to recover those securities he reasonably expects that he holds. Thus SIPC should replace securities in each Customer's account up to $500,000 as of November 30, 2008.[31] SIPC and the Trustee should not be permitted to disown SIPC's interpretation of legitimate expectations in *New Times II*, which is, in fact, the only logical interpretation.

## 2. The Fictitious Nature of Madoff's Operations Is Irrelevant

The Trustee luxuriates in the details of Madoff's fraud, as if that will somehow justify SIPC's violation of SIPA. The Trustee argues that, because Madoff's operation was fictitious, the Customers must be treated like the investors in fictitious securities in *New Times*. Trustee's Mem. at 40. This is a total *non sequitor* which ignores the distinction SIPC and the SEC urged upon the Second Circuit and which the Second Circuit accepted. All operations in any Ponzi scheme, whether New Times or Madoff, are fictitious. None of the investors in New Times had

---

[30] Chaitman Exh. L: Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at *11-12 , *New Times II* (citing *New Times*)(emphasis added).
[31] The Trustee's argument that "the Trustee's purchase of [the securities listed on the Customers' statements] now would wreak havoc in the marketplace" is untrue. Trustee's Mem. at 39. The Madoff account statements for November 30, 2008 showed ownership of 35 different Fortune 100 company stocks. This liquidation has been ongoing for 11 months and the Trustee has paid only a small percentage of the claims. Over the preceding 11 months, SIPC could easily have replaced securities in every Madoff investor's account and should be ordered to do so now, although the securities have appreciated. As Harbeck represented to the *New Times* Bankruptcy Court, SIPC is required to purchase securities even if they have tripled in value. See Chaitman Exh. E.

20

the securities in their accounts. However, those investors whose statements showed that they had real securities were entitled to have SIPC replace those securities up to a value of $500,000.

The Trustee argues that the "securities positions reflected on the customer statements could not have been purchased as shown on the statements because the fictitious trades were concocted *after the fact* based on historical prices" and thus "the entire market" was fictitious. Trustee's Mem. at 40. Congress specifically contemplated that "securities positions" reflected in a customer's statements could include securities that were never actually purchased, as was the case here. The Senate and House Reports on the 1978 amendments to SIPA show that SIPA was intended to cover securities that the broker-dealer did not actually purchase:

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, **never purchased** or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments. . . would satisfy the customers' legitimate expectations. . . .[32]

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, **never purchased**, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date. [33]

There is absolutely no support for the Trustee's "cash in minus cash out" theory in either SIPA or its legislative history. Instead, the legislative history is in accordance with the statute: Customers are entitled to claims in the amount of their Statutory Balances, consistent with their legitimate expectations.

The Trustee argues that the statements did not reflect "securities transactions that were actually contemplated by Madoff's customers" because they "delegate[ed] those decisions

---

[32] S. Rep. No. 95-763, at 2 (1978) (emphasis added).
[33] Chaitman Exh. C: H.R. Rep. No. 95-746 at 21 (emphasis added).

1096903.1

entirely to Madoff." Trustee's Mem. at 42. However, there is nothing in SIPA that limits its protections to only those customers who actually select securities themselves, or prohibits customers from delegating those investment decisions to brokers.

The Trustee's argument that the Customers should not receive the amounts shown on their last statements because the volumes purportedly "traded" by Madoff were sometimes more than the total volume of such securities traded that day on listed exchanges is insupportable. Trustee's Mem. at 40-41. SIPA does not impose upon the Customers an obligation to conduct a forensic investigation of an SEC-regulated broker/dealer. *See New Times,* 371 F. 3d at 87. Moreover, there was no way that any of the Customers could have known what Madoff's volume was, or the total volume Madoff was purportedly managing.

The Trustee also argues that this case is different from *New Times* because the Customers' statements here reflected purchases made with "profits" earned by fraud rather than the Customers' own out of pocket funds. There is no basis in SIPA for this distinction.

## II. THE TRUSTEE'S RELIANCE ON NON-SIPA PONZI SCHEME CASES IS MISPLACED

SIPA incorporates the Bankruptcy Code only to the extent that it is not inconsistent with SIPA. 15 U.S.C. § 78fff(b). Ignoring this fundamental provision of SIPA, the Trustee relies upon Ponzi scheme cases in non-SIPA liquidations where courts, using their equitable powers, have decided that it was "fair" to calculate investors' claims based upon their net investment. In none of those cases, was the court fixing the liability of a third party insurer, like SIPC. There is no provision of SIPA which suggests that a SIPC trustee has the power to limit SIPC's exposure by inventing his own definition of "net equity" to comport with his own view of what is fair and equitable to SIPC.

Indeed, the term "fair and equitable" appears nowhere in SIPA and it is entirely irrelevant to the SIPA statutory scheme. Congress mandated how customer claims would be allowed where a customer dealt with an SEC-regulated broker/dealer. None of the cases on which the Trustee relies was a Ponzi scheme operated by an SEC-regulated broker/dealer. *See, CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115-16 (9th Cir. 1999) (reviewing equitable receivership plan for abuse of discretion and noting that the Court had "broad discretion to adopt the Receiver's plan as proposed"); *In re Tedlock Cattle Co. v. Commons*, 552 F.2d 1351 (9th Cir. 1977) (per curiam) (allowing bankruptcy trustee to follow the "money in minus money out" recovery "if the equities of the parties so indicate" and further finding that "[i]t is appropriate for the bankruptcy judge to recompute the measure of individual recovery as the facts develop in future proceedings"); *Abrams v. Eby*, 294 F.1 (4th Cir. 1923) (bankruptcy court applied "principles of equity"); *CFTC v. Equity Fin. Group, LLC*, 2005 WL 2143975, at *24 (D.N.J. Sept. 2, 2005) (noting that "[t]he Court has wide discretion in determining the appropriate form of relief in a receivership in equity."); *SEC v. Funding Res. Group*, 2004 WL 1189996 (N.D.Tex. May 27, 2004) (concerning equitable receiver appointed in SEC case); *SEC v. Credit Bancorp, Ltd.*, 2000 WL 175297, at *40-41 (S.D.N.Y. Nov. 29, 2000), *aff'd* 290 F.3d 80 (2d Cir. 2002) (finding that "[t]his Court has broad discretion to fashion an appropriate equitable remedy in this SEC enforcement action"); *CFTC v. Franklin*, 652 F. Supp. 163, 169-170 (W.D.Va. 1986), *rev'd on other grounds sub nom., Anderson v. Stephens*, 875 F.2d 76 (4th Cir. 1989) (distribution based on constructive trust, an "equitable remed[y]").

Again, ignoring SIPA, the Trustee argues that the rationales of *SEC v. Credit Bancorp, Ltd.*, 2000 WL 1752979, "apply equally to this case." Trustee's Mem. 32-33. In fact, each of the rationales in *Credit Bancorp* is manifestly **not** applicable here. The *Credit Bancorp* court

reasoned that "recognizing claims to profits from an illegal financial scheme is contrary to public policy because it serves to legitimate the scheme." Clearly, the court was not constrained by SIPA's mandate to honor the customer's Statutory Balance in order to instill confidence in the capital markets. And, of course, the court was not dealing with a third party insurance company seeking to renege on its insurance obligations.

The rationale that "permitting customers to retain . . . gains comes at the expense of the other customers" does not apply here because, in a SIPA liquidation, SIPC is a third party insurance company that has a statutory obligation to replace securities in a Customer's account up to $500,000. SIPC's funding comes from its members, the Wall Street firms who made fortunes based upon investors' entrusting their funds in reliance upon SIPC insurance. SIPC has no entitlement to be funded by the Customers.[34]

The Trustee also virtually ignores a recent decision of Judge Chin in the Southern District of New York in which, **with the SEC's support**, the claims of investors in a non-SEC regulated firm which operated a Ponzi scheme were fixed at the investors' net investment **plus undistributed earnings.** In *SEC v. Byers*, 2009 WL 2185491 (S.D.N.Y. July 23, 2009), unlike this case, the Court's only consideration in approving the plan of distribution was whether the plan was "fair and reasonable." 2009 WL 2185491, at *6.

The *Byers* Court approved a formula wherein each investor's claim would be fixed at his investment plus any re-invested earnings. *Id.* at *4. Pursuant to this formula, an investor's claim would include any distribution that the investor chose to "roll over" into his account, even though such "distribution" never existed and did not correlate to an out of pocket loss. *Id.*

---

[34] Like any insurance company, SIPC is subrogated to the insured's position, once the insured is paid in full. 15 U.S.C. § 78fff-3(a).

24

The *Byers* formula is the equivalent to an investor's tax basis. In this case, an investor's tax basis would be the amount shown on his December 31, 2007 Madoff statement, adjusted for any investments or withdrawals that took place in 2008. Indeed, the Internal Revenue Service has recognized Madoff customers' claims as the amount of their tax basis. See Rev. Proc. 2009-20. The *Byers* formula is also similar to the method required under SIPA of fixing a claim in the amount of the investors' last statement, since the Customers' November 30, 2008 statement would reflect investments and withdrawals since the December 31, 2007 statement.

In sum, SIPA does not leave it to a trustee chosen by SIPC, or to the court supervising a SIPA liquidation, to decide what is a "fair" methodology for determining customer claims. Any such formula would never instill confidence in the capital markets because investors would never know what their rights were. SIPC has no choice but to fulfill its statutory obligation to replace securities in each customer's account up to $500,000 based on the Statutory Balances.

The Trustee tries, unsuccessfully, to distinguish *Visconsi v. Lehman Bros., Inc.*, 244 Fed. App'x 708 (6th Cir. 2007). In that case, involving a Ponzi scheme operated by an SEC-regulated broker-dealer, the Sixth Circuit held that investors are not limited to "out-of-pocket damages." Rather, they are entitled to the profits that they had a reasonable expectation they would realize. In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow.

Thus, the court held that the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate

measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id.* [35]

The Trustee argues that *Visconsi* has "no bearing on the meaning of Net Equity" since it was a tort lawsuit "in which the victims sought to make themselves whole for the fraud perpetrated against them by their broker," which they could do without necessarily detrimentally impacting any other victim." Trustee's Mem. at 51. Here, on the other hand, the Trustee argues that there are "limited customer funds." However, the Trustee keeps forgetting that SIPC is a third party insurance company whose funds are derived from assessments of its members, not from customers. The modest contribution required by Wall Street to allow SIPC to fulfill its statutory obligations will barely make a dent in the billions of dollars that Wall Street has set aside for 2009 bonuses. While Wall Street should be grateful to the Trustee for seeking, so valiantly, to protect their profits, he has no power to do so in derogation of the plain mandates of SIPA.

The Trustee and SIPC cite only three cases involving SIPA liquidations of Ponzi schemes to support their position that the Customers' claims should be measured by the Trustee's net investment test. The reliance on these three cases is misplaced. The Trustee and SIPC purport to rely on *New Times*, without any foundation. They also rely upon *In re: C.J. Wright & Co.*, 162 B.R. 597, 609-10 (B. M.D.Fla. 1993), and *In re Old Naples Secs., Inc.*, 311 B.R. 607, 616-17 (M.D. Fla. 2002). However, *C.J. Wright* and *Old Naples* did not involve customers' claims for

---

[35] At a minimum, under New York law which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.*, N.Y.C.P.L.R. § 5004, N.Y. Gen. Oblig. Law § 5-501, *et seq.* Moreover, since Madoff converted Customers' funds, they are entitled to pre-judgment interest. *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

26

securities. In each of these cases, the customers simply had claims for cash. *See C.J. Wright, Inc.*, 162 B.R. at 609 ("claimants are customers of debtor and have claims for cash"); *Old Naples Securities Inc.*, 311 B.R. at 616 (In case where SIPC argued that customers held claims for worthless securities, court held that customers had claims for cash up to $100,000). *See* 15 U.S.C. § 78fff-3(a)).

When determining a cash claim, it makes sense for the Court to look at the customer's net investment because the customer could not have had a "legitimate expectation" that the cash would have appreciated at any specific rate. Here, the Customers' statements reflected ownership of securities. SIPC has admitted that the Customers have claims for securities because it has acknowledged that its exposure is $500,000 per customer. There is no legal justification for departing from the Congressional statutory scheme. [36]

## III. SIPC IS JUDICIALLY ESTOPPED FROM RENEGING ON ITS INSURANCE OBLIGATIONS

As set forth *supra,* SIPC repeatedly represented to the court in *New Times* that payment of claims according to the SIPA definition of net equity was appropriate for those customers whose statements indicated that there were real securities in their accounts. The Trustee and SIPC are judicially estopped from reneging on those representations.

Judicial estoppel prevents a litigant from taking one position in one case and then, when it is convenient to do so, taking a diametrically opposite position in another case, as SIPC seeks to do here. *See Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir. 1997) ("[j]udicial estoppel prevents a party in a legal proceeding from taking a position contrary to a position the

---

[36] *In re Old Naples Securities, Inc.* is distinguishable for another reason as well: the court was faced with a risk of inequitable treatment. If the customers prevailed in *Old Naples,* they would be treated differently from other customers in the same case whose claims had already been fully litigated, and they could "offer no reason why they should reap the benefit of the payments they received when none of the other claimants reaped such benefit." 311 B.R. at 617. Here, on the other hand, the court's decision on "net equity" will be applied to all Madoff customers, and no claims have yet been fully litigated. Thus, there is no issue of inequitable treatment, as there was in *Old Naples.*

party has taken in an earlier proceeding."); *see also Mitchell v. Washingtonville Central School District*, 190 F.3d 1 (2d Cir. 1999) (summary judgment appropriate where party judicially estopped from taking present position).

*New Times* explicitly endorsed the procedure of paying the claims of those customers who believed they held real securities in accordance with their Statutory Balances, noting that "investors who were misled by Goren to believe that they were investing in mutual funds that in reality existed were treated much more favorably. . . The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims." 371 F.3d at 74. Thus, the Second Circuit "accepted the claim at issue by rendering a favorable decision," as required for judicial estoppel. *Simon*, 128 F.3d at 72.

Judicial estoppel ensures that "abandonment of a claim to obtain a litigation advantage precludes the later reassertion of that claim." *HSBC Bank USA v. Adelphia Commc'ns. Corp.*, 2009 U.S. Dist. LEXIS 10675, at *46 (W.D.N.Y. Feb. 12, 2009). SIPC plainly decided in *New Times* that its net investment calculation of claims of customers whose statements showed Non-Existent Securities would be more palatable to the court if it was not also applied to the customers whose statements showed Existent Securities. SIPC cannot now argue that "net equity" should be determined as "net investment" regardless of a customer's legitimate expectations.

## IV.    SIPA'S STATUTORY SCHEME IS NOT INEQUITABLE

As if they, or this Court, had the power to repeal SIPA, the Trustee and SIPC argue that following the statutory definition of net equity would lead to an inequitable result because those investors who had withdrawn more than the amount of their investment over time would receive a SIPC advance. Trustee's Mem. at 52. SIPC's remedy, if it doesn't like the statute, is to lobby Congress to try to get the statute repealed. Under existing law, SIPC is a third party insurance

28

entity which has a statutory obligation to replace securities in a Customer's account up to $500,000 based on the November 30, 2008 statement. SIPC's own view of what is equitable is utterly irrelevant.

Moreover, there is nothing inequitable about holding SIPC to its statutory obligation. On the contrary, it would be grossly inequitable to allow SIPC to pull a "bait-and-switch" and escape its insurance obligations after inducing customers to rely upon the promise of SIPC insurance. SIPC's position is no different from that of a homeowner's insurer who accepts premiums based upon the replacement value of a home and then decides, after a total loss, that the company was not really insuring the current value of the home; it was simply insuring what the homeowner paid for the home 40 years earlier. There is no court in this country that would hold that the insurer, in that situation, was advancing an equitable result.

The Trustee and SIPC relish in the rationale that we shouldn't permit Madoff – the crook – to determine who wins and who loses. Trustee's Mem. at 52. But SIPC has utterly missed the point. Just because SIPC was insuring a crook, doesn't mean that SIPC can avoid its statutory obligations. Congress determined, in 1970, that SIPC pays the insurance when an investor through an SEC-regulated broker/dealer deals with a crook. SIPA fixes the insured amount -- $500,000 – and SIPA fixes the customer's claim at the Statutory Balance. Nobody is looking to Mr. Madoff to determine SIPC's obligations to the Customers.

This is not the first time SIPC has trotted out its "thief" rationale. It tried this in *New Times*, with no success. SIPC argued in the district court that holders of Non-Existent securities were not entitled to claims in the amount listed on their account statements because the amount of their claims erroneously "'hinge[d] on the unilateral actions of the fraudfeasor who embezzled

his clients' funds.'" 371 F.3d at 75. Neither the district court nor the Second Circuit gave any credence to that argument.

There is plenty of room in SIPA to accommodate Madoff's co-conspirators because, clearly, a co-conspirator would not have had a legitimate expectation that his statements were accurate. After eleven months of investigation, the Trustee has identified only two Madoff investors who might not have had a "legitimate expectation" that their November 30, 2008 statements were accurate. The Trustee has sued Jeffry Picower and Stanley Chais alleging that they had extraordinary returns in their accounts (400 – 900%) and received restated account statements showing retroactive $100 million losses. Assuming these allegations are true, Picower and Chais could not have had a "legitimate expectation" that their account statements were accurate. However, the fact that the Trustee has identified two customers who may not have had a legitimate expectation that their statements were accurate does not justify rejecting the statutory definition of "net equity" and frustrating the legitimate expectations of thousands of Customers whose returns were never out of the ordinary and who are entirely innocent of any wrongdoing.

Moreover, the "net equity" procedure set forth in SIPA **is** equitable. It requires SIPC to treat all investors equally by replacing up to $500,000 in securities in each customer's account and it requires SIPC to recognize the Statutory Balance as the customer's claim, in accordance with the customer's legitimate expectation. This is the consideration given to investors to allow SEC-regulated broker/dealers to hold their securities in street name. SIPC's argument that the distribution is a "zero sum game" are based on a mistaken premise. SIPC was created precisely to administer an insurance fund through assessment of its members. The fact that SIPC chose to

enrich its members by providing free insurance from 1996 through 2008 is not a justification for depriving the Customers of the insurance to which they are statutorily entitled.

## V. THE TRUSTEE'S RE-DEFINITION OF NET EQUITY CONTRAVENES VARIOUS FEDERAL AND STATE LAWS

The Trustee's re-writing of SIPA demonstrates why Congress wisely prohibited SIPC from changing the definition of "net equity." The Trustee's re-definition causes direct conflicts with numerous state and federal laws. For example:

- The Internal Revenue Service recognizes customer claims in the amount of a customer's tax basis: the December 31, 2007 account balance adjusted for any investments or withdrawals in 2008. See Rev. Proc. 2009-20. This Procedure, issued by Commissioner Shulman on March 17, 2009, expressly recognizes the income earned by customers, on which they paid taxes annually. Yet, the Trustee has taken the position that the income earned by customers is not their money.

- Rev. Proc. 2009-20 provides for a five-year carryback of the theft loss. Yet, the Trustee, in order to save SIPC money, is netting out deposits and withdrawals from customer accounts going back to the 1980's and he has indicated an intention to "claw back" income withdrawn by customers over the last six years.

- The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, establishes a statutory scheme intended to encourage investors to save for their retirement and to protect retirement savings. ERISA's provisions preempt state fraudulent conveyance law, upon which the Trustee will presumably rely pursuant to 11 U.S.C. § 544 to void as fraudulent transfers any distributions that the customers received. 29 U.S.C. § 1144(a) (the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section [1003(a)]. . . "). Yet, the

31

Trustee has been reducing SIPC's liability to IRA and pension fund investors by netting out their investments and their mandatory annual withdrawals.

- The Bankruptcy Code was amended in 2005 to protect ERISA-qualified plans from the claims of creditors. 11 U.S.C. § 541(b)(7)(a)(i)(I) (exempting from property of the estate "any amount withheld by an employer from the wages of employees for payment as contributions to an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974. . . ."). *See also, Patterson v. Shumate*, 504 U.S. 753 (1992) (holding that debtor's interest in an ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2)).  Yet, the Trustee is ignoring this protection in his zeal to save SIPC money.

- Numerous states provide similar protection for ERISA-qualified accounts. *See, e.g.*, N.Y.C.P.L.R. § 5205(c), 5205(d); Cal. Civ. Pro. Code § 704.115; Fla. Stat. Ann.§ 222.21; Tex. Prop. Code § 42.0021.  Again, the Trustee is ignoring these provisions in his zeal to save SIPC money.

- Certain investors were bound by partnership agreements to withdraw all income from family partnerships annually, and thus would have been in violation of such agreements if they did not withdraw funds from their Madoff accounts.  Chaitman ¶ 5.

- IRS Form 4506 requires the IRS to destroy returns after seven years.  Yet, the Trustee is refusing to credit customers with investments made 15 – 20 years ago unless they can produce documentary evidence of the deposits – something it is impossible for people to do.

- The IRS does not allow taxpayers to go back more than three years to correct and file amended returns.  Estate and gift taxes were paid on the statement balances of customers' Madoff accounts and yet the Trustee is ignoring all appreciation in the accounts.

32

- Many customers obtained ownership of their Madoff accounts as part of an equitable distribution of marital assets in a final, non-appealable divorce decree. The Trustee is devaluing those accounts, leaving the customers with no remedy to re-open their divorce decrees.

These conflicts with federal and state laws illustrate the problems with the Trustee's approach. He is ignoring the effect of his conduct on other laws, in an effort to enrich SIPC at the customers' expense.

## VI.   THE TRUSTEE IS UNLAWFULLY DELAYING PAYMENT TO CUSTOMERS

In order to delay and reduce SIPC's exposure, the Trustee embarked upon a massive investigation of Madoff's records to determine the net investment over two or three generations of Madoff investors so that SIPC would only have to pay insurance for the Customer's net investment over generations. This is hardly what Congress had in mind. Congress made absolutely clear its intent to minimize the devastation to customers of an insolvent broker/dealer through prompt payment of SIPC insurance.

GENERAL PROVISIONS OF A LIQUIDATION PROCEEDING

**(a) PURPOSES**

The purposes of a liquidation proceeding under this chapter shall be—

(1) **as promptly as possible** after the appointment of a trustee in such liquidation proceeding, and in accordance with the provisions of this chapter—

(A) to deliver customer name securities to or on behalf of the customers of the debtor entitled thereto as provided in §78fff-2(c)(2) of this title; and

(B) to distribute customer property and (in advance thereof or concurrently therewith) otherwise satisfy net equity claims of customers to the extent provided in this section.

**PAYMENT TO CUSTOMERS.-SIPC shall promptly satisfy all obligations of the member to each of its customers relating to, or net equity claims** based upon, securities or cash by the delivery of securities or the effecting of payments to such customer (subject to the provisions of section8 (d) and section **9** (a) )

insofar as such obligations are ascertainable from the books and records of the member or are otherwise established to the satisfaction of SIPC.

15 U.S.C. §78fff-2(c)(2); emphasis added. *See also,* 15 U.S.C. § 78fff-3(a).

Congress intended for the trustee to promptly pay customer claims based upon the debtor's books and records, without the filing of proofs of claim:

> **[SIPA] establishes procedures** for prompt orderly liquidation of SIPC members when required and **for making prompt distributions and payments on account of customers' claims without need for formal proofs of claim.**
>
>       *      *      *
>
> The committee also believes that **it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations.**
>
>       *      *      *
>
> **Because of the difficulties involved in filing proofs of claim . . ., the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.**[37]

Thus, as the Sixth Circuit explained in *Bell & Beckwith v. McGraw,* 937 F. 2d 1104, 1106-1107 (6th Cir. 1991):

> Implementing this statutory scheme is complicated by the congressional requirement that SIPC make prompt payments to customers. These payments take the form of advances which are used to satisfy customer claims:
>
> > SIPC would advance to the trustee such sums from the SIPC fund as would be necessary to provide for prompt payment of claims of customers of the debtor, but only to the extent of [$500,000] for each customer. This significant provision will make it possible for public customers to receive promptly that to which they are entitled without the delay entailed in waiting for the liquidation proceeding to be completed. In addition, and subject to the

---

[37] See Chaitman Exh. B emphasis added. (S. Rep. 91-1218, at 10, 11, 12 (1970), *reprinted in* Federal Securities Laws Legislative History 1933-1982, Vol. IV, at 4642, 4643, 4644 (1983)).

limitation of [$500,000, of which not more than $100,000 may be in satisfaction of a claim based on cash], public customers of the broker-dealer would receive back 100 percent of that to which they are entitled.

House Report at 5262; 15 U.S.C. Sec. 78fff-3. SIPC makes such advances prior to a determination of each customer's ratable share of or distribution from the customer property fund.

This Court itself has recognized Congress' intent that SIPC proceedings be conducted quickly in order to minimize the devastation to customers:

Congress itself has commanded **swift** action. For example, the SEC and self-regulatory organizations are required to "**immediately notify**" SIPC of concerns about the financial stability of a SIPC member. 15 U.S.C.A. § 78eee(a)(1). A Court determining that a protective decree is warranted must "**forthwith**" appoint a trustee, 15 U.S.C.A. § 78eee(b)(3), and remove the case to a Court with jurisdiction over bankruptcy cases. 15 U.S.C.A. § 78eee(b)(4). The trustee is required to investigate the operation of the debtor's business and report its results to SIPC "**as soon as practicable.**" 15 U.S.C.A. § 78fff-1(d). Among the stated purposes of a liquidation proceeding is to make customers whole "**as promptly as possible after the appointment of a trustee," 15 U.S.C.A. § 78fff(a), who is required to "promptly discharge** . . all obligations of the debtor to a customer relating to securities." 15 U.S.C.A. § 78fff-2(b). **SIPC fund moneys must be advanced to the trustee up to certain limits "to provide for prompt payment and satisfaction of . . . claims of customers." 15 U.S.C.A. § 78fff-3(a). Congress has commanded customer damages to be repaired promptly.**

*In re Donald Sheldon & Co., Inc.*, 153 B.R. 661, 667 (B. S.D.N.Y. 1993); emphasis added.

The December 23, 2008 order entered in this case specifically incorporates the time periods mandated by SIPA. The Order states:

ORDERED, that the Trustee be, and he hereby is, authorized to satisfy, **within the limits provided by SIPA,** those portions of any and all customer claims and accounts which agree with the Debtor's books and records, or are otherwise established to the satisfaction of the Trustee pursuant to 15 U.S.C. §78fff-2(b), provided that the Trustee believes that no reason exists for not satisfying such claims and accounts

December 23, 2008 Order at 5; emphasis added.

35

The Trustee's failure to fulfill his statutory obligations is shown by the contrast between the treatment of customers by the FDIC and the treatment of customers in this case. As stated in the legislative history of SIPA:

> The intention of SIPC, like the FDIC, is to minimize losses to and to maintain public confidence in the institutions the public deals with.[38]

According to the FDIC's website, "It is the FDIC's goal to make deposit insurance payments within two business day[s] of the failure of the insured institution." [39]

While SIPC has never asserted that it could replace investors' securities within 48 hours, it has set a standard of doing so within two to three months. In *SIPC v. SJ Salmon & Co.,* No. 72 Civ. 560 (S.D.N.Y. 1972)[40], 1500 out of 2000 claims had been paid within a few months. The court wrote:

> This action was instituted early this year and the trustee is proceeding with all due speed in his investigation and orderly liquidation of the business of the defendant. Approximately 2,000 claims have been filed; securities and cash have been returned to some 1,500 customers as either specifically identifiable property or as payment of the portion of "net equities" in the single and separate fund representing free credit balances. This clearly indicates that the trustee is proceeding as swiftly as the circumstances of the case permit and negates any suggestion that he is guilty of unnecessary delay or dilatory tactics in the performance of his duties.

As recently as November 2007, Harbeck stated:

> The fastest that an investor could conceivably get back in control of one's account is one week" but he added that "In most situations, it takes two to three months." The article further stated that "the process can stretch out even longer if the brokerage firm kept shoddy records.[41]

In the Madoff case, there is no evidence that the records were shoddy. On the contrary, Picard has apparently been able to precisely reconstruct investors' net investment going back

---

[38] Chaitman Exh. B: S. Rep. 91-1218, at 9, *reprinted in* Federal Securities Laws Legislative History 1933-1982, Vol. IV, at 4641.
[39] http://www.fdic.gov/consumers/banking/facts/payment.html.
[40] Annexed to the Chaitman Decl. as Exh. D.
[41] www.kiplinger.com/printstory.php?pid=12842

into the 1980's. Yet, more than eleven months after the institution of this case, the Trustee has allowed only 1,564 claims out of at least 15,400 claims filed and out of 2,335 claims that he acknowledges are valid. In fact, not all 1,564 claims have been paid.

## VII. THE TRUSTEE HAS NO POWER TO CLAW BACK FROM A CUSTOMER

### A. The Trustee Has No Right to Use The Avoidance Powers to Enrich SIPC

Congress' mandate in SIPA to honor the legitimate expectations of a customer cannot be fulfilled if a SIPC trustee can claw back funds an investor withdrew from his account over the course of years and reduce SIPC's exposure by that amount. Yet, without any judicial determination, the Trustee is depriving Customers of the SIPC insurance to which they are statutorily entitled, on the theory that he can net out investments over the course of 20 – 30 years, and through generations of account holders.

The Trustee argues that he has the authority to reduce the amount of a SIPC advance by the amount he claims is a fraudulent or preferential transfer. However, the avoidance provisions of the Bankruptcy Code were not enacted to enrich SIPC at the expense of innocent investors who entrusted their life savings to SEC-regulated broker/dealers. While SIPA incorporates the avoidance provisions of the Bankruptcy Code to the extent they are not inconsistent with SIPA, SIPA does not provide the Trustee with the ability to deduct amounts he believes are fraudulent or preferential transfers from a customer's SIPC payment. Instead, it merely provides that "the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11." 15 U.S.C. § 78fff-2(c)(3).

There is no provision in SIPA that allows the Trustee to reduce the amount of a Customer's SIPC advance, as he has been doing, and the Trustee has cited no cases which suggest that he has such authority. The Trustee cannot, simply because it saves SIPC money,

37

effectively impose upon customers a fraudulent conveyance judgment for the sums they or their predecessors withdrew from their accounts over a period of 20-30 years. Instead, SIPC should promptly replace securities in all customers' accounts up to $500,000 and then, if the Trustee feels he has a claim against a Customer, he has two years from the date of the filing to institute such an action.

Moreover, it is doubtful that the Trustee could establish a right to recover preferences or fraudulent conveyances from customers.[42] The Trustee's obligation to customers, to whom he owes a fiduciary duty, is to require SIPC to promptly replace securities in the customers' accounts up to a value of $500,000 as of November 30, 2008. Then, if he feels he has a claim against any customer, he can assert that claim at a later date.

## B.  The Trustee Has No Right to Avoid Transfers Earlier Than December 11, 2006 And No Right At All To Avoid Preferential Transfers

Even if the Trustee has a right under SIPA to recover withdrawals in excess of investments from a customer who had a legitimate expectation that his account statements were accurate, the Trustee is limited to a two-year statute of limitations. Section 546(e) of the Bankruptcy Code, which was amended in 2006 to significantly broaden its scope, limits a trustee's avoidance powers to those authorized under 11 U.S.C. Section 548(a)(1) (providing only for actions for intentional fraud, going back only two years). Section 546(e) provides as follows:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, **the trustee may not avoid a transfer . . . that is a transfer made by . . . a stockbroker [or] financial institution, . . . in connection with a securities contract,** as defined in section 741(7) . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title. (Emphasis added.)

---

[42] See, e.g., the Certifications of Diane Peskin, Roger Peskin, and Maureen Ebel, annexed to the Chaitman Decl. as Exhs. II, JJ, and KK.

Section 741(7) defines a securities contract to be all-encompassing and it certainly covers

the transactions here. [43] Certainly, the payment by Madoff of withdrawals from customers'

accounts were transfers made by a stockbroker in connection with a securities contract. It is

undisputed that Madoff was a stockbroker,[44] although there is no requirement in the statute that

Madoff must be acting as a stockbroker with respect to the transfers at issue. *See, e.g., In re:*

*Stewart Finance Co.*, 367 B.R. 909, 918 (B.M.D. Ga. 2007) (rejecting Trustee's argument that

the requirements of Section 546(e) "cannot be satisfied since MSDW was not acting as a

'stockbroker' with regard to the subject transfers" – requirement was only that the stockbroker

*have* customers, not that the transfer at issue be made to a customer); *cf. In re: Slatkin*, 525 F.3d

805 (9th Cir. 2008) (finding Section 546(e) did not apply where Ponzi schemer was not a

licensed stockbroker).

Since 2006, when the scope of Section 546(e) was significantly broadened, courts have

found that various types of transfers were shielded from a trustee's avoidance powers by Section

546(e). For example, in *In re Contemporary Industries Corp.*, 564 F.3d 981 (8th Cir. 2009), the

Eighth Circuit held that "settlement payments" could include payments received in exchange for

non-public stock and thus were exempt from avoidance under Section 546(e). The court relied

on the plain meaning of the statute and rejected the arguments of the corporation and its creditors

that interpreting the statute to cover non-public stock would not effectuate the statute's purpose

---

[43] (7) "securities contract"-- (A) means--(i) a contract for the purchase, sale, or loan of a security, . . . or option on any of the foregoing, including an option to purchase or sell any such security, . . . (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph; . . . or (xi) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph, including any guarantee or reimbursement obligation by or to a stockbroker . . .

[44] A stockbroker is a person "(A) with respect to which there is a customer, as defined in Section 741(2) of this title; and (B) that is engaged in the business of effecting transactions in securities – (i) for the account of others; or (ii) with members of the general public, from or for such person's own account." 11 U.S.C. § 101(53A). The Customers were "customers" for purpose of this statute because they had "a claim against a person arising out of . . (ii) a deposit of cash, a security or other property with such person for the purpose of purchasing or selling a security." 11 U.S.C. § 741(2).

of protecting the stability of the financial markets. *See also In re: Elrod Holdings Corp.*, 394 B.R. 760 (B.D.Del. 2008) (holding that Section 546(e) applied to protect "settlement payments" concerning non-public stock); *In re National Forge Co.*, 344 B.R. 340 (W.D.Pa. 2006) (redemption of the class of stock that was not part of the debtor's employee stock ownership plan, which was made by two transfers, a transfer from the lenders to the corporation which then made transfers to the shareholders, was a single integrated transaction protected under Section 546(e)).

In *In re QSI Holdings, Inc.*, 571 F.3d 545, 549 (6th Cir.), *pet. for cert. filed*, 78 U.S.L.W. 3239 (Oct. 5, 2009), the Sixth Circuit held that, when construing Section 546(e), "the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." In that case, the court held that payments to selling shareholders in a leveraged buyout were in connection with a securities contract and thus protected under Section 546(e). The court held that, even though the financial institution at issue never had "dominion or control" over the funds, the transfer was still protected under Section 546(e) because the statute does not require a beneficial interest over the funds to be acquired by the transferee. *Id.* at 550. Accordingly, the mere fact that Madoff may have been operating a Ponzi scheme does not mean that the transfer is not protected under Section 546(e), where the transfer falls within the plain meaning of the section.

Under Section 546(e), the Trustee has no power to void preferential transfers and his only power to void alleged fraudulent transfers is under 11 U.S.C. Section 548(a)(1)(A), which limits fraudulent conveyance actions to two years before the filing of the case and only for intentional fraud. This section provides as follows:

> (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or

within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.[45]

While the Trustee cites non-SIPA Ponzi scheme cases to bolster his net investment theory, he ignores the fact that courts have uniformly held that "the appropriate statute of limitations restricts the payments the Ponzi scheme investor may be required to disgorge. Only transfers made within the limitations period are avoidable." *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir.), *cert. denied* 1295 S. Ct. 640 (2008) (district court properly limited the receiver's recovery to amounts transferred to defendant within the California Uniform Fraudulent Transfer Act statute of limitations, and thus, "although [Defendant] actually netted $50,431.78 in total, the district court entered judgment for $26,396.10 [the amount received during the statutory period] plus pre-judgment interest"]; *see also Warfield v. Alaniz*, 453 F. Supp. 2d 1118, 1131 (D. Ariz. 2006), *aff'd* 569 F.3d 1015 (9th Cir. 2009) (court-appointed receiver could not base his claims under the Arizona Uniform Fraudulent Transfer Act on transfers that took place outside the limitations period); *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1145-46 (C.D. Cal. 2003) (plaintiffs could prevail if they could prove that transfers made pursuant to a Ponzi scheme were made within the limitations period provided by the California Uniform Fraudulent Transfers Act).

None of the cases cited by the Trustee for the proposition that fraudulent conveyance principles may be used to recover payments in excess of net amounts invested support the Trustee's decision to ignore the statute of limitations. Indeed, nearly every case cited by the Trustee that considered the issue of statute of limitations found that transfers beyond the statute

---

[45] If the Trustee were not bound by Section 546(e) to a two-year statute of limitations, he would be bound by New York's six-year statute of limitations for fraudulent conveyance actions. N.Y.C.P.L.R. § 213(1).

of limitations were not avoidable. *See, e.g., Donell,* 533 F.3d at 772; *Sender v. Buchanan,* 84 F.3d 1286, 1290 (10th Cir. 1996) (bankruptcy trustee can only recover transfers to defendant made during the one year prior to the bankruptcy under 11 U.S.C. § 548); *In re Independent Clearing House Co.,* 77 B.R. 843, 887 (D. Utah 1987) ("Arguably, therefore, the trustee should be able to recover all transfers without regard for the one-year limitation period. But under the current Code, in an adversary action he cannot."). [46]

Finally, under 11 U.S.C. § 548(a)(1)(A), the Trustee cannot succeed on a fraudulent conveyance action against a customer who simply received funds that were in his account because the customer had a contractual right to such funds and Madoff's debt to the customer was reduced to the extent of the withdrawal. *See, e.g., Visconsi v. Lehman Bros.,* 244 Fed. App.'x 708, 711 (6th Cir. 2007).

## C.     There Is No Evidence The Ponzi Scheme Started Before 1993

In order to reduce SIPC's exposure, the Trustee has, in numerous instances, reduced the opening deposit in an account that was established in 1992 by netting out the investment made by the transferor account holder for an unspecified period ending in 1992. The Trustee has done this despite the fact that there is no evidence the Ponzi scheme started before 1993. The Declaration of Joseph Looby, on which the Trustee relies, describes the separation of the investment advisory business from the other Madoff business units "[i]n or around 1993" and states that the Madoff investment advisory business began using a computer system and software programs known as an IBM AS/400 "[i]n or around 1993." Looby Decl. ¶¶ 14-15. According to Looby, this IBM AS/400 was "designed to record and assist with the printing of the fictitious

---

[46] In *In re Taubman,* 160 B.R. 964 (B.S.D. Ohio 1993), the court held that the trustee could reach back to recover Ponzi scheme payments for an unlimited period, since the claim was brought within four years of discovery of the fraud and was thus timely under Ohio law. However, the discovery rule cannot be used against a customer who had a legitimate expectation that his statements were accurate.

securities purportedly bought and sold by BLMIS, customer cash transactions, customer statements, trade confirmations, management reports, and Internal Revenue Service 1099 forms." *Id.* ¶ 40. Looby describes in detail the method by which the IBM AS/400 was used to create the fraudulent records of trades produced by Madoff. *Id.* ¶¶ 58-64. There is no indication in Looby's declaration that there was any fraud prior to the use of the IBM AS/400 in 1993.

The Bernard Madoff Plea Allocution states that "to the best of my recollection, my fraud began in the early 1990s." [47] In his interview with SEC Inspector General H. David Kotz, Madoff stated that, when the SEC investigated him in 1992 in connection with its investigation of Avellino and Bienes, the trades were real, and he produced DTC records to the SEC which proved that the trades occurred. [48]

Frank DiPascali, who worked for Madoff, stated in his plea hearing that "from the early 1990s until December of 2008 I helped Bernard Madoff, and other people, carry out the fraud that hurt thousands of people." [49] Thus, there does not appear to be any evidence that the fraud began prior to 1993 and the Trustee has not made a case for netting out investments and withdrawals before that date.

### D. The Trustee's Misuse of the Avoidance Powers Violates Their Purpose

The Trustee's misuse of the avoidance powers violates their essential purpose, to bring funds back into the bankruptcy estate for the benefit of creditors. As this Court wrote in *In re Murphy*, 331 B.R. 107, 122 (B.S.D.N.Y. 2005):

> The bankruptcy objective of the avoidance powers in Sections 544 and 548 is to protect creditors generally from prejudice resulting from transfers of the debtor's property for less than fair consideration, resulting in diminution of the debtor's estate available to pay creditors.

---

[47] Chaitman Exh. W at 2.
[48] Chaitman Exh. X at 7-8.
[49] Declaration of Seanna Brown, Exh. B, August 11, 2009 Tr. at 44:18-25.

43

1096903.1

Here, however, the Trustee is using his avoidance powers, not to recover monies that will be distributed to other creditors, but simply to reduce SIPC's insurance obligations to the customers.

In general, an avoidance action can only be pursued if there is some benefit to the creditors. An avoidance action may generally not be pursued if the sole benefit is to the debtor. *A fortiori,* then, the avoidance powers cannot be used to benefit a third party insurer like SIPC. *See, e.g., Wellman v. Wellman,* 933 F.2d 215, 218 (4th Cir.), *cert. denied,* 502 U.S. 925 (1991) (no recovery for the benefit of the estate "when the result is to benefit only the debtor rather than the estate")(quoting 4 Collier on Bankruptcy ¶ 550.02 n.3 (15th ed. 1979)); *In re: Join-In Int'l (U.S.A.) Ltd.,* 56 B.R. 555, 561 (B.S.D.N.Y. 1986) ("If the recovery of the allegedly fraudulent conveyance will solely benefit the debtor it will not be permitted to maintain the proceeding"); *In re: Murphy,* 331 B.R. at 122 (collecting cases); 5 Collier on Bankruptcy ¶ 550.02[2] (15th ed. rev. 2004) ("in general, the trustee or debtor in possession may not recover the property transferred or its value when the result is to benefit only the debtor rather than the estate"); *see also In re Coleman,* 285 B.R. 892, 912 (B.W.D.Va. 2002) (a fraudulent conveyance should be avoided only to the extent creditors in the bankruptcy case were harmed and otherwise remain enforceable because "this result most effectively upholds the policies and specific statutory provisions of the Bankruptcy Code and the [state laws] to avoid voluntary fraudulent transfers where the rights of third parties are concerned, but to uphold and enforce them as between the parties themselves"). The same logic applies here, where the avoidance action will not benefit the creditors and will only benefit SIPC.

Although the Trustee will argue that he is exercising the avoidance powers for the benefit of the customers, his conduct belies that argument. To date, he has refused inexcusably to replace securities in customers' accounts; he has delayed inordinately the payment to them of up

44

to $500,000 in cash; and he has simply reduced SIPC's obligations to the extent he can convince desperate customers to take less than that which they are statutorily entitled to receive from SIPC. [50]

Moreover, the Trustee has no power under SIPA to claw back against customers who had a legitimate expectation that their statements were accurate since SIPA fixes a customer's claim, for purposes of distribution of customer property, at the customer's net equity. 15 U.S.C. § 78fff-3. The Trustee's reliance on *Cunningham v. Brown,* 265 U.S. 1 (1924) – decided 46 years before SIPA was enacted -- demonstrates that there is no authority under SIPA to sue customers to recover fraudulent conveyances.

### E. The Trustee Has No Basis to Void Preferential Transfers

Aside from the fact that Section 546(e) of the Bankruptcy Code prohibits a trustee from voiding a preferential transfer in connection with a securities contract, the Trustee has no right to reduce SIPC payments by alleged preferential transfers. The purpose of the preference provision of the Bankruptcy Code, 11 U.S.C. § 547, is to assure an equal distribution of the debtor's assets among all creditors. Congress recognized that, in the 90 days before a debtor files in chapter 11, some creditors may be able to exert more pressure on the debtor to pay them on antecedent debt than other creditors and, hence, Congress felt it was equitable to reverse all payments outside of the ordinary course of business, to require creditors who received preferential transfers to return them to the estate for the benefit of all creditors. Thus, 11 U.S.C. § 547(b) provides:

> b) Except as provided in subsection (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property –
>
>> (1) to or for the benefit of a creditor;

---

[50] See declarations of Diane Peskin at ¶¶ 3-10; Roger Peskin at ¶¶ 21-25; Maureen Ebel at ¶¶ 13-20; Chaitman Exhs. II, JJ, and KK.

45

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made –

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if –

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The purpose of this provision is twofold: first, by permitting the trustee to avoid pre-bankruptcy transfers that occur within a short period before the bankruptcy, creditors are discouraged from racing to the courthouse during the debtor's slide into bankruptcy, and second (and more importantly) the preference provision facilitates the bankruptcy policy of equality of distribution among the debtor's creditors by requiring any creditor that received a preferential payment to disgorge that payment so that all creditors of the estate may share equally in the debtor's assets. 5 Collier on Bankruptcy 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference

46

provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

Because of the circumstances here, the "race to the courthouse" rationale is irrelevant. The only relevant purpose here would be to bring money back into the estate so that all the customers can share equally in the debtor's assets. However, that purpose is not being effectuated here. Instead, the Trustee is seeking to utilize the preference provision of the Bankruptcy Code simply to reduce SIPC's payments to customers. It will not enrich the estate of customer property. Thus, any invocation of § 547 of the Bankruptcy Code violates its purpose and violates the Trustee's duty to carry out the provisions of SIPA.

Moreover, under § 547, Customers have substantial affirmative defenses to a preference claim which require factual determinations. To the extent that either the ordinary course or new value defenses may be proved, it would be premature for the Trustee to deduct such amounts from SIPC payments. Yet, he has done precisely that.

## VIII. THE TRUSTEE'S OTHER ARGUMENTS ARE WITHOUT MERIT

### A. There Are No Illegal Contracts

SIPC and the Trustee argue that the "trades" set forth on the November 30, 2008 statements are void as "illegal contracts." SIPC Mem. at 32-33: Trustee Mem. at 48. However, again, SIPC and the Trustee are forgetting the SIPA statutory scheme. The only issue is the legitimate expectations of the Customers.

Moreover, there is nothing illegal in the contracts, except that Madoff did not fulfill them. Each case cited by SIPC and the Trustee for the principle that illegal contracts are unenforceable is thus inapplicable. In each case, both parties to the illegal contract agreed to do something illegal, such as participate in an allegedly illegal restraint of trade, agree not to transfer their

47

property to persons of a certain race, participate in an organized crime organization or collude in bidding on a public contract. *See Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982) (remanding for adjudication of illegality defense regarding clause in collective bargaining agreement); *Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948) (concerning restrictive covenant in real estate conveyances); *United States v. Bonnano Org. Crime Fam. of La Cosa Nostra*, 879 F.2d 20, 28 (2d Cir. 1989) (concerning illegal unincorporated association); *McMullen v. Hoffman,* 174 U.S. 639, 645-47, 652, 654 (1899) (concerning illegal contract among bidders on private contract). Here, the Customers did nothing illegal. There was no indication that the trades were "illegal" on their face and the Customers never intended to do anything illegal.

Moreover, the SIPC cases cited by SIPC and the Trustee are inapplicable because they concerned either attempts to enforce agreements to make specific trades or specific trades that could be rescinded. *See Jackson v. Mishkin*, 263 B.R. 406, 493 (S.D.N.Y. 2001); *Mishkin v. Ensminger*, 247 B.R. 51, 197 (S.D.N.Y. 1999); *Securities & Exchange Commission v. Packer, Wilbur & Co., Inc.*, 362 F. Supp. 510 (S.D.N.Y. 1973), *aff'd*, 498 F.2d 978 (2d Cir. 1974). Here, the customers are not seeking to enforce any specific trade. They are simply seeking to enforce SIPA which mandates that SIPC replace securities in their accounts up to a value of $500,000

For the same reasons, the violations of the securities laws by Madoff cannot justify denying Customers' claims. The provision in 15 U.S.C. § 78cc(b) that states that "[e]very contract made in violation of any provision of this chapter . . shall be void" cannot possibly have been intended to apply to dishonest brokers whom SIPC insured, since it would then nullify the protection for which the statute was enacted. SIPC Mem. at 33.

### B. The Customers Are Not Liable For Madoff's Fraud

In a crescendo of desperation, the Trustee and SIPC argue that the customers should be liable for Madoff's fraud. They base this argument on the agreements that customers signed

48

regarding Madoff's authority to act on their behalf, and the fact that the court in *Mishkin v. Ensminger*, 247 B.R. 51, 197 (S.D.N.Y. 1999), found that the customers were not entitled to customer status because the challenged trades were made in the broker's capacity as their agent. 263 B.R. at 453-58.

The broker who made the challenged trades in *Ensminger* was not the debtor in the SIPA liquidation. Rather, the clearing firm the broker used was the debtor, and the clearing firm had "no inkling" that the broker "was engaging in fraudulent trading in an effort to stay in business." 247 B.R. at 123. Thus, the SIPA rationale of protecting the customer from his broker after the broker's liquidation was not applicable. Here, on the other hand, the wrongful actions at issue were performed by the debtor, Madoff. There is no support for holding innocent investors liable for the wrongdoing of the debtor in a SIPA liquidation, as the Trustee seeks to do here. Again, this would simply vitiate the entire SIPA statutory scheme.

Also, unlike the actions taken by the broker in *Ensminger*, the actions taken by Madoff were not within the scope of his agency. The Madoff customer agreements provide that Madoff is the account holder's "agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities in accordance with [Madoff's] terms and conditions." Looby Decl. Exh. 3. Further, the account holders agreed that

> In all such purchases, sales or trades [Madoff is] authorized to follow the instructions of Bernard L. Madoff in every respect concerning the undersigned's account with [Madoff]; and [Madoff] is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades. All purchases, sales or trades shall be executed strictly in accordance with the established trading authorization directive.

*Id.*

Only "purchases, sales or trades," were within the scope of Madoff's agency. Madoff certainly wasn't authorized to steal customers' money, launder it through Chase Manhattan Bank, and divert it for his personal purposes. Any actions taken by Madoff in furtherance of his fraud were not within the scope of his agency and customers cannot possibly be held liable for such actions. If this were the law, then there would be no reason for SIPC's existence because it was created by Congress solely to insure customers against the dishonesty of a broker who either stole the customer's money and never purchased securities or stole the customer's securities.

## C. The Claims Are "Customer" Claims

The Trustee's argument that the Customers have no customer claims with respect to the securities shown on their statements is not supportable. Trustee's Mem. at 45-46. The Trustee has conceded that SIPC's exposure is $500,000 per customer and this was the precise holding in *New Times,* 371 F.3d 68 (2d Cir. 2004) (customer has claim for securities where customer had legitimate expectation that he owned securities based upon statements broker sent to him, despite the fact that the broker never purchased any securities.) The Trustee's argument that the customers do not have a claim with respect to the securities on their statements because such securities were not purchased in the "ordinary course" is nonsense. There is no distinction between the *New Times* case and this case, with respect to customer claims.

Lastly, the Trustee argues that the customers who received more from Madoff than they contributed do not have "net equity" claims. Again, the Trustee utterly ignores the prohibition in SIPA against SIPC changing the definition of "net equity." The Trustee provides no support for his argument that customers who have already withdrawn all their principal are not entitled to share in the fund of customer property in a SIPA liquidation. Moreover, it is illogical. The customers are customers, as the Trustee concedes. Thus, they should be entitled to assert claims for their net equity based upon their legitimate expectations.

50

## CONCLUSION

For the foregoing reasons, the Court should deny the Trustee's motion and enter an order compelling SIPC to immediately replace securities in each customer's account, up to a value of $500,000, at the values as of November 30, 2008.

November 13, 2009

PHILLIPS NIZER LLP


By: /s/ Helen Davis Chaitman

666 Fifth Avenue
New York, New York 10103-0084
(212) 841-1320

*Counsel for Diane and Roger Peskin,
Maureen Ebel, and a group of other
Customers*

1096903.1