# EXHIBIT B

**Calendar No. 1236**

| 91st Congress 2d Session | SENATE | Report No. 91-1218 |

# SECURITIES INVESTOR PROTECTION CORPORATION

SEPTEMBER 21, 1970.—Ordered to be printed

Mr. MUSKIE, from the Committee on Banking and Currency, submitted the following

# REPORT

[To accompany S. 2348]

The Committee on Banking and Currency, to which was referred the bill (S. 2348) to establish a Federal Broker-Dealer Insurance Corporation, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

## THE NATURE AND PURPOSE OF THE LEGISLATION

By amendment of the Securities Exchange Act of 1934, S. 2348 establishes the Security Investor Protection Corporation (SIPC), the broad purpose of which is to afford financial protection for the customers of registered brokers and dealers and members of national securities exchanges. The Corporation would be private, nonprofit, and membership in nature, with a five member board of directors the majority of whom would be public officials serving *ex officio*. The Corporation would maintain and administer an insurance fund which would provide coverage against customer losses up to $50,000 resulting from broker-dealer firms' insolvency. The fund would, at the outset, aggregate $75 million in lines of credit and cash raised by assessment of member firms. It would eventually total $150 million composed entirely of cash. For backstop protection, Treasury borrowing authority of $1 billion would be available in the event of exhaustion of these funds. The Securities and Exchange Commission is given, in this proposal, plenary authority over the Corporation's exercise of its powers and responsibilities. The Commission is accorded, moreover, unambiguous power to provide safeguards with respect to the financial responsibility of brokers and dealers to whatever extent is required by the public interest. This is accomplished through redefinition and clarification of existing rule-making authority.

48-010

2

## HISTORY OF THE LEGISLATION

The bill, S. 2348, was introduced by Senator Edmund S. Muskie on June 9, 1969, and was referred to the Committee on Banking and Currency. An amendment to this bill was introduced by Senator Muskie on April 9, 1970, and hearings were held by the Committee on April 16 and 17, June 18, and July 16, 1970. On September 15, the full Committee met in executive session and ordered S. 2348, as amended, to be reported to the Senate.

The title of the original S. 2348 has been changed to be more consistent with the provisions of the amended bill, the title reported by the Committee is, "To provide greater protection for customers of registered brokers and dealers and members of national securities exchanges."

## THE NEED FOR LEGISLATION

The economic function of the securities markets is to channel individual and institutional savings to private industry and thereby contribute to the growth of capital investment. Without strong capital markets it would be difficult for our national economy to sustain continued growth; indeed, the state of U.S. capital market development more advanced than that of any other industrial country, is an important contributing factor in the rapid economic growth this country has experienced. Securities brokers support the proper functioning of these markets by maintaining a constant flow of debt and equity instruments. The continued financial well-being of the economy thus depends, in part, on public willingness to entrust assets to the securities industry.

There are in this country approximately 26 million securities investors, many of whom have either cash or securities or both in the custody of broker-dealers. There are, in addition, perhaps 100 million people who have interests in securities through mutual funds, banks, pension funds, insurance companies, and other institutions. At the beginning of 1970, New York Stock Exchange member firms held just under $3 billion in free credit balances; a year earlier, the figure was as high as $3.7 billion. Free credit balances are funds left with a brokerage firm by customers who have the right to withdraw them on demand. These credit balances are used by the broker, as by banks, in the conduct of his business—to maintain positions in securities, to finance margin purchases of other customers, and for other general purposes.

Similarly, broker-dealer firms hold substantial amounts of securities for safekeeping; customers have an unrestricted right to delivery of those securities which belong to them. Typically, these securities are freely transferable by the broker-dealer. This permits prompt execution of customer orders, but also invites the risk that transfer may occur without express customer orders, or may be reached by creditors of the firm if the requirements of "segregation" are not properly observed. Data are not available to indicate the value of securities thus held, but it is known that the largest brokerage firm has holdings of about $18 billion. A common estimate of cash and securities in the custody of brokers is $50 billion.

The securities industry has for some time been in a precarious condition. A number of events have conspired over the past few

3

years to create a significant number of failures of brokerage firms both large and small, and substantial operating losses in many others. The rapid growth of the industry during the 1960's, spurred by the enormous unanticipated increase of trading volume, laid the foundation for the industry's present difficulties. Increasing volume could not be handled by traditional methods, and by the latter part of the decade evidence mounted of general breakdown in the industry. "Fails" to deliver securities became a commonplace complaint; errors of reporting and accounting, as well as fraud, multiplied.

Brokerage houses began, sporadically, to take steps to correct the ills created by high volume. Automation and other innovations were gradually introduced, albeit at high cost. Such costs could be sustained in the high-profit period that came to a close in 1969, as could the expanded commitments of office space, personnel and other administrative factors that the industry undertook in this period. But with the decline of stock market volume and price, the high-cost inheritance of the earlier years added an unmanageable burden to the problems of the industry. Insolvencies rose sharply in 1969 and 1970, and dollar losses mounted correspondingly.

In April of this year, the Securities and Exchange Commission approved a temporary surcharge on brokerage commissions because of the industry's deteriorating financial condition. Chairman Budge, after expressing his concern with "the financial problems of the industry and the losses sustained in the past year and during the first quarter of 1970," stated that the Commission had imposed the surcharge on the understanding that the industry required "immediate financial relief." Following a recent SEC hearing, the Commission decided to extend the surcharge indefinitely; the financial circumstances of the industry had not improved by that date.

The self-regulated stock exchanges had by 1964 begun to create voluntary trust funds based on assessments of member firms, and by 1968 all major exchanges had established such funds. But they are small in comparison with the total dollar volume of trading, with the value of customer assets held by brokerage firms, or with the net losses created by insolvencies of member firms in the past two years. Moreover, the exchanges maintain that the establishment of trust funds and associated publicity nevertheless creates no legal obligation to the customers of member firms, although questions in this regard have recently been raised. The New York Stock Exchange alone has commitments against its trust fund totalling about $55 million, which required an infusion of $30 million this spring. But without additional assessments, the industry's ability to meet any new customer losses is at best conjectural. Finally, no trust fund exists for the customers of broker-dealers who are not members of an exchange.

Apart from the voluntary trust funds, there is no protection presently available under existing securities laws for the investor whose broker goes bankrupt. The Securities Act of 1933 requires that investors have adequate information to exercise sound judgment concerning the securities they purchase; and the Securities Exchange Act of 1934 insures that they will not be victimized by fraudulent, manipulative, or deceptive selling schemes. But neither statute prevents the investor from losing his entire investment if his broker fails because of operational and, ultimately, financial difficulties.

4

The Security Investors Protective Corporation (SIPC), like the Federal corporations that ensure savings and demand deposits, is intended to serve several purposes: to protect individual investors from financial hardship; to insulate the economy from the disruption which can follow the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss.

This bill makes no change in existing law relating to the acceptance of deposits by brokers and dealers. Section 21 of the Banking Act of 1933 forbids underwriters to accept deposits. That section also makes it a criminal offense for others to engage in the business of accepting deposits unless they conform to the requirements which banks are chartered, supervised and examined (Title 12 U.S.C. 378).

### SECTION-BY-SECTION ANALYSIS

The purposes of this legislation are accomplished by amending existing section 15(c)(3) of the Securities Exchange Act of 1934 and by adding, as section 2, new section 35 to the Act.

*Section 35(a)* establishes the Securities Investor Protection Corporation (SIPC) as a non-profit corporation under the District of Columbia Non-Profit Corporation Act, and specifically designates it not to be an agency of the United States Government. This provision is intended to maintain consistency with the self-regulatory character of the securities industry under the overall supervision and oversight of the SEC. The Corporation is a membership corporation whose members are to consist of brokers and dealers registered with the Commission, and members of national securities exchanges. Unless otherwise exempted by the Commission, membership is obligatory except for those brokers and dealers who neither hold free credit balances for customers nor hold securities for them which may be "hypothecated"—i.e., pledged by the broker against loans. For this category, membership in SIPC is voluntary. The purpose of this distinction is to place the burden of membership costs in SIPC upon those brokers and dealers whose activities place their customers' securities and or cash holdings at risk. At the same time, there may well be brokers and dealers who, although they create no such risks for their customers, may wish to take advantage of SIPC membership as a general asset in the conduct of their business.

*Section 35(b)* vests control of the Corporation in a Board of Directors of not more than five persons. Control of the Board is vested in a majority of three directors serving *ex officio:* The Chairman of the Securities and Exchange Commission, the Chairman of the Federal Reserve Board, and the Secretary of the Treasury. The Committee indicated its preference that the Chairman of the Securities and Exchange Commission serve as Chairman of the Board of SIPC, but determined to leave this choice, from among these three directors, to the discretion of the President. In addition, two members would be appointed by the President, with the advice and consent of the Senate, from the public.

The Chairman of the SEC lends to the SIPC the authority and experience with securities regulatory matters that will be essential to the proper operation of an insurance plan for the industry. The

5

Chairman of the Federal Reserve Board represents the important relationship that exists between the securities industry and the banking community, already acknowledged by the fact that the Federal Reserve Board exercises control over margin requirements. A place on the Board of Directors for the Secretary of the Treasury is appropriate because of the important role that the Treasury borrowing authority plays in the SIPC proposal. The minority membership of the Board is reserved to two Presidential appointees who, in the Committee's recommendation, would be selected, among other reasons, for their experience and background in the securities industry. This will ensure a high degree of industry participation in the management of SIPC.

The Committee considered several alternative Board arrangements. In structuring SIPC, the Committee has been conscious of the history of self-regulation in the securities industry and of the desire of the industry to preserve that system. Thus, SIPC is established as a private membership corporation. But because SIPC will have ultimate access to public funds by provision of the $1 billion of Treasury borrowing authority, it was considered in the public interest to provide a majority of the Board of Directors, including the Chairman, from the public sector. Similarly, proposals were rejected that would involve a private Board which, in the event of a Treasury borrowing, would add public officials to constitute a public majority. Since the rate of use of the private funds, under a private majority, must affect the speed with which SIPC arrives at the need for Treasury borrowing, it is evident that the private board would in this case have a real and potentially undesirable influence on the use of public funds.

*Section 35(c)* establishes the general corporate powers of SIPC, which will, in addition, have the powers of a corporation under the D. C. Non-Profit Corporation Act. The powers conferred here are in addition to those specifically granted elsewhere in section 35.

*Section 35(d)(1) and (2)* grants power to the Securities and Exchange Commission to inspect the Corporation and to require books and reports without resort to subpoena power. The SIPC is also authorized and directed to establish a fiscal year and to prepare and submit annual reports, including certified financial statements, to the Commission upon which the Commission may comment and then forward to the President and the Congress.

*Section 35(e)* establishes the insurance fund, into which all moneys are to be paid and from which all expenditures are made. Moneys collected or received may be revenues from regular assessments, revenues from a transaction charge when and if levied, any transfers to the Corporation from existing trust funds, the proceeds of any borrowing by the Corporation, and recoveries the Corporation may make, as subrogee, from the estates of bankrupt brokers and dealers, and interest earnings. Expenditures include the salaries of officers, directors, or employees of the Corporation, administrative and business expenses, advances to complete open contracts for customers, and advances to pay the claims which are the main purpose of this proposal: to pay unsatisfied claims of customers up to $50,000.

This section also establishes initial and future funding levels for the Corporation. The fund is to aggregate $75 million within 120 days. Part of this will be a firm line of credit which industry representatives are presently negotiating with a consortium of banks. The Committee

6

understands that this firm line of credit will initially amount to $65 million, and will decline annually by $10 million. The Committee further understands that negotiation of this firm line of credit is not yet complete, but will in fact be so by the effective date of this proposed legislation.

In addition to the line of credit, the fund will be invested at the outset—within 120 days—with at least $10 million in cash. This will result from an assessment of one-eighth of 1 percent of 1969 gross revenues of SIPC members, which is expected to yield approximately $7 million, and a transfer of about $3 million from existing trust funds of self-regulatory bodies. Thus the Corporation will commence operations with assets within 120 days of $75 million to provide almost immediate protection against customer losses. Industry representatives have made clear to the Committee that such losses sustained by firms in capital violation prior to the effective date of this legislation are regarded as an industry responsibility. The Committee is nevertheless aware that additional weaknesses may appear on the horizon which may require substantial financial assistance. Hopefully, the very establishment of SIPC will serve to reduce this likelihood.

Apart from the initial assessment rate of one-eighth of 1 percent, the regular annual assessment, to be in effect until the fund aggregates $150 million, will be one-half of 1 percent of the gross revenues of the previous 12 month period. The dollar implications of this assessment rate, which commences with enactment of the legislation, will of course depend on the course of future gross revenues in the securities industry. On the assumption of growth of 5 percent annually, this assessment rate would enable the fund to reach $150 million before the end of the fifth year of operation. More or less rapid growth of industry revenues would, of course, either shorten or lengthen this period.

The proposal provides that upon reaching $150 million, the Corporation will phase out of its fund all lines of credit, replacing these lines with cash. During this period of credit phase-out, the Corporation will endeavor to reduce the annual assessment rate to an average level no higher than one-quarter of 1 percent. When eventually the fund consists of all cash, the assessment rate presumably would be reduced further to a sustaining level. In the event that the fund at any time falls below $100 million (or a lesser amount, if the Commission, with the approval of the Secretary of the Treasury, determines) the assessment rate is to revert to the one-half of 1 percent level.

Except during periods when the maximum rate is in effect, the Committee does not contemplate that all members of SIPC would pay the same assessment rate. The bill contemplates that the SIPC, subject to Commission determination, will develop a formula by which assessments will be geared to any or all of several risk factors, as well as to gross revenues of the member firm: such factors specifically include net capital, the nature of the business, the number of customers, the dollar volume of transactions, and such other factors as the Commission may regard as pertinent.

In developing the assessment schedule, the Committee was guided by a number of considerations. Among these is the recent history of numerous failures in the industry, and the evidently substantial amounts required to protect customers of the major exchanges against loss. In addition, there emerged some question about the viability of

7

the proposee bank line of credit, which seemed to be based on uncertainty on the part of the banking community over the adequacy of the Fund's cash endowment as contemplated in an earlier industry proposal. Accordingly, after consultation with Treasury officials and others, the present assessment schedule was adopted; the Administration and the Committee agree that this schedule provides for adequate growth of financial strength, without being excessively onerous by comparision with other federally sponsored insurance programs.

"The language provides, in Section 35(e)(3), that the maximum assessment for any twelve-month period shall not be in excess of one half of 1 percent. During the first twelve-month period, however, the effective rate of assessment will be five eighths of 1 percent, because of the one-time start-up assessment of one-eighth of 1 percent. The Committee has left to SIPC the responsibility for developing a suitable schedule for payment of the assessment, subject only to the limits provided by the legislation.

*Section 35(f)(1)* defines "gross revenue" as income derived from eleven enumerated sources. Each source is intended to be computed separately, and thus a loss in one area cannot be taken as a set-off against the others, nor is provision made for a carry-over from year to year. The eleven sources of revenue are (1) commissions from transactions in securities and markups on transactions; (2) execution and clearance; (3) net realized gain from trading accounts; (4) net underwriting profit; (5) interest on customer accounts; (6) advisory fees or management fees; (7) fees for proxy solicitation; (8) services charges or surcharges; (9) dividends and interests on investment accounts; (10) fees for puts and calls; and (11) income from other investment banking services. The Committee, by amendment, expressly considered the term "securities" to include real estate and oil and gas interests, whether or not they are registered with the Commission. The "business" of a broker or dealer includes subsidiaries and any business to which it has succeeded. The definitions in this section may be elaborated on by the Corporation.

*Section 35(f)(2)* provides for the filing by brokers and dealers of reports concerning their activities including the amount and sources of revenues. The reports are filed with the broker's examining authority, which is a self-regulatory body selected by the Corporation to assume responsibility for examining that broker. The provision is intended to avoid duplication in the case of membership in more than one self-regulatory organization. The Commission itself will act as examining authority for SECO brokers. These reports must be filed, in whole or in part, with the Corporation, to the extent that the Corporation prescribes.

*Section 35(f)(3)* provides that assessments are to be collected by the examining authority; where the Commission is the examining authority they are to be paid directly to the Corporation.

*Section 35(f)(4)* provides for the transfer of existing trust funds to the Corporation, and makes these transfers a credit against future assessments on the members of the organization which made the transfer. No credit is given, however, when a borrowing from the Treasury is outstanding. As noted earlier, testimony given by representatives of the industry indicated that such transfers at the outset of the program would amount to some $3 million.

8

*Section 35(f)(5)* establishes the general power of the Corporation to borrow and to pledge to secure borrowings. The Corporation may determine the terms of any borrowing except borrowings from the Treasury. Such borrowings are technically effected through the Commission, and must be at a rate of interest equal to that payable by the Commission to the Treasury.

*Section 35(g)* provides, in essence, for borrowing by the Corporation (indirectly) from the Treasury of up to $1 billion. The borrowings are to be made by the Commission from the Treasury, and thereafter lent by the Commission to the Corporation. The Corporation must file with the Commission a statement with respect to the use of the proceeds and the Commission must certify to the Secretary of the Treasury that such a loan is necessary. The interest on the loan is to be set at a level related to the then-current yield on comparable Government obligations.

The Committee sets the Treasury borrowing authority at $1 billion as a figure unlikely to be required in any except the most extreme situations of financial stress. Throughout the recent lengthy period of strain and instability in the securities markets, the accumulated losses of all firms that have become insolvent have not, taken together, begun to approach this figure—indeed, they appear not to have aggregated as much as the $75 million fund with which SIPC will start its career. But for insurance of this type to be effective, it must be adequate to meet an extreme situation, no matter how remote may be the possibility of its occurrence. The Committee believes that $1 billion is sufficient to assure that all claims will be met, even in situations of extreme financial distress.

Assessments as described in a preceding section should be sufficient to finance the insurance fund under non-extreme conditions. However, those assessments would not be adequate to service and to repay any large borrowings from the Treasury. This will be particularly true during the early years of the fund, when a large (but declining) proportion of the private fund will consist of standby credits from private banks. If, as may reasonably be expected, the Corporation will be able to confine its borrowing to commercial banks under the line of credit, the entire one-half of 1 percent would be available to service such loans, allowing full repayment is an acceptably short time period. However, if the Corporation finds it necessary, in addition, to borrow from the Treasury, only half of the annual assessment (i.e., one-quarter of 1 percent) would remain available to repay bank credit, because the rest must be set aside for servicing the Government's loan. In light of this, the bank line of credit now being negotiated by industry representatives provides that the Corporation will reduce the principal amount of the agreement by $10 million annually.

The Corporation would then have revenue from the remaining one-quarter percent for servicing the borrowing from the Government, plus any unused portion of the remaining one-quarter of 1 percent. If industry gross revenues rise by 5 percent annually, this assessment rate would be enough to pay interest on, but not amortize, a Government loan ranging from $144 million to $321 million, depending upon the market rate of interest. If provision is made for repayment, the amount would be correspondingly smaller.

For this reason, the Committee considered that an additional, contingent source of revenue might prove necessary to assure repayment

9

of funds advanced by the Government. A transactions charge of up 20 cents per $1 thousand is therefore provided by determination of the Commission in the event of a borrowing from the Treasury. The transactions charge does not apply to transactions under $5,000; its incidence, therefore, falls largely on institutional and other substantial investors and only to a minor extent upon individuals with more modest security holdings. The charge would raise an estimated $31 million if imposed in the current year. The additional revenue will permit the servicing of very substantial additional amounts of Government borrowing: for example, during the first year at a 7½ percent interest rate the Corporation could pay interest on $410 million additional borrowing, or repay an additional $176 million. The transactions fee would be imposed on public purchasers or brokers buying for investment, except that the Commission may exempt certain over-the-counter transactions in order to make the conditions of imposition of fees in the over-the-counter market comparable with those pertaining to exchange transactions. This is intended to deal with the situation in the over-the-counter and exchange market where there may be more than one dealer acting as principal between the seller and the purchaser.

The assessment rate and the contingency transaction charge will make the SIPC operation self-financing to a significant degree, although not entirely. The insurance funds available from combined private and Government accounts would have been more than sufficient to meet any requirement of the recent or distant past. However, the assessment rate has not been actuarily determined on the basis of risk experience in the manner of a private insurance fund. The intention of SIPC, like the FDIC, is to minimize losses to and to maintain public confidence in the institutions the public deals with. The Committee has been informed that these arrangements meet with Treasury approval.

*Section 35(h)* provides that membership in the Corporation compulsory only for those brokers and dealers who hold securities and/or free credit balances for customers. It further provides that the Commission may exempt from membership in the Corporation any broker or dealer, or class of brokers and dealers, on any terms it finds appropriate. The thrust of this subsection is to permit exemption of those firms which do not, in the nature of their business, expose public customers to risk of loss. There is, however, provision for voluntary membership in the Corporation.

*Section 35(i)(1)* defines the terms "self-regulatory organization," "financial responsibility rules," and "examining authority" and determines which self-regulatory organization examines each broker-dealer.

*Section 35(i)(2)* exhorts the Corporation and the self-regulatory organizations to cooperate in establishing standard procedures for inspections and examinations which will minimize the risk to the fund.

*Section 35(i)(3)* provides for the filing with the Corporation of such copies of such reports of inspections and examinations as it shall prescribe.

*Section 35(j)* grants to the Commission, in addition to its existing powers under the '34 Act, the power by rule or regulation to require any self-regulatory organization: (i) to adopt or amend rules relating to the frequency and scope of inspections of the financial condition of

10

its members; (ii) to file reports of financial inspections with the Corporation and the Commission; and (iii) to conduct inspections of such of members as the Commission may designate. In exercising its rulemaking authority under this subsection the Commission is required by subsection (o) to give notice and opportunity for an Administrative Procedure Act hearing and for the submission of views. The giving a hearing, however, shall not prevent the rule or regulation from becoming effective within 30 days.

Section 35(k)(1) provides for adoption by the Board of Directors of initial bylaws, rules and regulations within 45 days after enactment of this Act and the filing of those bylaws with the Commission.

Section 35(k)(2) provides that bylaws, rules and regulations and any subsequent amendment or addition thereto shall become effective on the 30th day after filing unless the Commission disapproves them.

Section 35(k)(3) provides that the Commission may, by rule or regulation, require (i) adoption of any initial bylaw, rule or regulation and (ii) the adoption, amendment or decision of any bylaw relating to assessments whenever adopted. Like subsection (j), in exercising its rule making authority under this subsection, the Commission must give notice and opportunity for an Administrative Procedure Act hearing and for submission of views.

Section 35(k)(4) allows the Commission to request the adoption of any alteration of or supplement to any other bylaw, rule or regulation and if the request is not complied with within 30 days, to order such adoption. The Commission must, however, provide notice and opportunity for a hearing before it enters such order. This procedure is similar to the Commission's authority over exchanges under section 19(b) of the Securities Exchange Act and over the NASD under section 15A(k) of that Act.

Section 35(l) provides that it shall be unlawful for a member to engage in business if it fails to pay any assessment or file any report within 5 days after notice from the Corporation that such a report or payment is overdue. In the case of a disputed assessment the member must first pay the assessment and then sue for its recovery.

Section 35(m) establishes procedures for prompt orderly liquidation of SIPC members when required and for making prompt distributions and payments on account of customers' claims without need for formal proofs of claim. The liquidation of stockbrokers is at present governed by section 60e of the Bankruptcy Act (11 U.S.C. 96), enacted in 1938. Over the years certain shortcomings in section 60e have become apparent (see, for example, Report of the Special Study of Securities Markets, Part I, page 410 ff.). Because payments of SIPC funds to customers of SIPC members in liquidation can be made only as an integral part of liquidation proceedings, the bill provides that SIPC members will be liquidated in special proceedings outside the Bankruptcy Act. In so doing, it also remedies the shortcomings in section 60e referred to above.

While liquidation proceedings will be under the Securities Exchange Act of 1934, as amended by the bill, and not under the Bankruptcy Act, the bill provides (section 35(m)(6)) that the proceedings will be conducted in accordance with, and as though they were being conducted under, certain prescribed provisions of the Bankruptcy Act. In addition, the bill uses certain terms defined in section 60e with the meanings there established, except as further defined in the bill.

11

*Initiation of Proceedings.* The bill provides that SIPC may in its discretion apply to the appropriate federal district court for the appointment of a trustee whenever it appears to it that a SIPC member is in danger of failing to meet its obligations to customers and any of certain other enumerated conditions exist (such as failure to meet applicable financial responsibility rules). If a SIPC member with respect to whom an application is filed (hereinafter called a debtor) fails adequately to controvert any material allegation of the application within three days, the court is required to appoint for the debtor a trustee designated by SIPC. An application may be filed notwithstanding the pendency of any bankruptcy, receivership or other similar proceedings, and all such proceedings are required to be stayed pending and upon appointment of a trustee.

*Liquidation.* In the opinion of the committee, the completion of open securities transactions will be in the interest of the public. It is designed to minimize the disruption caused by a failure of a broker/dealer, precluding the "domino effect" of such failure. Accordingly, the bill requires the trustee to complete all the debtor's open contractual commitments relating to securities transactions in which a customer had an interest. Experience may show that there are certain types of customer transactions which should not be completed, and certain types of non-customer transactions which should be completed. The SEC is therefore given rule-making authority to prohibit or direct completion of these types of transactions. Completion essentially involves a question of the adequacy of working capital. Accordingly, if and to the extent the debtor's available funds are insufficient to complete transactions, SIPC is to provide the funds, with reimbursement to be made to it on a priority basis.

The committee also believes that it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations. The bill requires a trustee to publish and mail notice of liquidation proceedings to customers and, with certain exceptions, requires claims to be filed during a period fixed by the court, but not more than 60 days after publication of the notice. To the extent not previously distributed, securities would be distributed promptly upon the expiration of this period.

Section 60e of the Bankruptcy Act provides for the return to customers of fully paid securities which are "specifically identifiable" as their property. The bill carries forward the 60e concept, among other things, of specific identification except that identification need be made only as of the filing date of the application for appointment of a trustee and except that the bill makes it clear that securities held in bulk segregation or in central certificate services are specifically identifiable. To provide for future developments in the processing and custody of securities, the bill gives the SEC rulemaking authority to establish other types of custody which would constitute specific identification.

Section 60e also provides that property held for customers (other than specifically identifiable property) constitutes a "single and separate fund" in which customers of the debtor are entitled to share ratably. This concept is also carried forward in the bill, except that it is intended that to the extent possible the trustee will deliver to a customer against his claim for securities, the same securities (that is,

12

securities of the same issuer, class and series) which were held for his account on the filing date. For purposes of valuing claims of customers for securities and the extent to which they have been discharged, securities will be valued as of the filing date. To the extent that property in the single and separate fund is insufficient to discharge claims of customers payable out of that fund, SIPC is required to advance funds to the trustee to discharge such claims, but only to the extent that claims of a customer do not exceed $50,000. For this purpose, a broker/dealer is not considered a customer of the debtor except to the extent that claims of such broker/dealer arise out of transactions for customers of such broker/dealer, in which event, each such customer is deemed a separate customer of the debtor.

Because of the difficulties involved in filing proofs of claim involving numerous transactions and varieties of interests, the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.

*Powers of Trustee and Court.* The bill gives the trustee the powers of a trustee in bankruptcy and of a trustee in a Chapter X reorganization. The committee considers it appropriate to vest the trustee with the latter reorganization powers because such powers will be required to operate the business of the debtor pending completion of open transactions, and the delivery of cash securities to customers. The bill specifically provides that no plan of reorganization may be formulated. Reports to the court by the trustee are to be in such form and detail as shall be determined by the SEC, having regard to the record-keeping requirements under the Securities Exchange Act of 1934, and the magnitude of items and transactions involved in the securities business.

In general, the court in which an application is filed is vested with the powers of a court in a Chapter X reorganization and certain powers of a trustee in bankruptcy. The court is specifically denied the power to abrogate the rights of set-off provided in section 68 of the Bankruptcy Act or the right to enforce a valid, non-preferential lien, but it may stay enforcement of such rights for an appropriate period of short duration.

*Section 35(m)(1)* permits the Corporation to apply to a court for a decree adjudicating that customers of a member are in need of protection whenever it concludes that such member is in danger of failing to meet its obligations to customers or is notified of such a situation by the Commission or any self-regulatory body and determines that one or more of certain specified conditions exist. The court must grant such application if it finds any of five specified conditions to exist. These are (i) insolvency in the bankruptcy or equity sense, (ii) the commission of an act of bankruptcy, (iii) the pendency of a proceeding in which a receiver, trustee, or liquidator has been appointed, (iv) noncompliance with financial responsibility rules or rules governing the hypothecation of customers' securities or, (v) inability to make computations necessary to establish compliance.

The paragraph further provides that the Commission may join any other action with such application and finally, that such application supersedes any previously instituted action of a nature indicative of bankruptcy or financial difficulty (e.g. mortgage foreclosure or reorganization) against the member (hereafter called the debtor).

              Exhibit B    Pg 14 of 17

13

*Section 35(m)(2)* gives the court exclusive jurisdiction over the property of the debtor and allows the court to stay any previous action against the debtor which relates to bankruptcy or the like.

*Section 35(m)(3)* provides for the prompt appointment of a trustee for the liquidation of the debtor's business if the debtor consents to or fails to controvert adequately any material allegation of the application.

*Section 35(m)(4)* provides the trustee with the same powers as a bankruptcy or Chapter X trustee have with respect to the debtor's property and the additional powers to hire persons to liquidate the debtor and to operate the business in order to complete open contractual commitments (the limits of which are defined in paragraph (m)(9) below). The Corporation is authorized to advance monies to pay expenses of liquidation, and is required to advance monies to the extent required to complete open contractual commitments.

*Section 35(m)(5)* imposes on the trustee the same duties as a trustee under the Bankruptcy Act except that he need not reduce securities to cash.

*Section 35(m)(6)* provides that, except that the debtor may not be reorganized, the proceedings shall be conducted in accordance with Chapter X of the Bankruptcy Act and so much of Chapters I-VII as § 102 of Chapter X makes applicable. In addition the court may stay, but not abrogate, the rights of set-off provided in section 68 of the Bankruptcy Act and the right to enforce a valid lien.

*Section 35(m)(7)* defines the purposes of a proceeding under this subsection as: (A) The appointment of a trustee to return "specifically identifiable" property and distribute the "single and separate fund" (as set up in section 60e of the Bankruptcy Act with the modifications introduced by subsection (m)) as quickly as possible. (B) To complete certain contractual commitments which in general are those in which a customer had an interest and those others whose completion the Commission may determine to be in the public interest. (C) To enforce the Corporation's rights of subrogation, and (D) To liquidate the debtor.

*Section 35(m)(8)* sets up a number of terms or rights applicable to subsection (m) proceedings. In brief: (A) All terms have the same meaning as in 60e of the Bankruptcy Act except where specifically changed. (B) "Stockbroker" means the debtor and "customer" means those who deal with the debtor but not those whose claim against the debtor is for property which is part of the debtor's capital. (C) Customers have the same rights as in 60e in addition to those provided in this section. (D) The trustee may use any property of the debtor to complete contractual commitments. (E) In distributing the "single and separate fund" property is valued as of the filing date and advances by the Corporation to the trustee for completion of open contracts and certain priority claims specified in section 64a of the Bankruptcy Act are paid first. Securities are to be delivered to customers in kind to the extent possible. (F) To the extent that securities are in bulk or individual segregation or in a central depository they are considered specifically identified and therefore directly recoverable by the customer. In addition, the Commission may define other methods of holding property as constituting specific identification. Customers share ratably in these securities if they are insufficient

14

to pay all claims. Each customer, however, shares ratably only in the "pool" of securities of the issuer and class which he owned.

Section 35(m)(9) makes it the obligations of the trustee to discharge as promptly as possible obligations of the debtor which are ascertainable from the books and records whether or not the customer files a formal proof of claim. Customers must, however, file with the trustee such documents or execute such releases or other papers as the trustee requires.

Section 35(m)(10) excludes "associated persons" or persons owing 5 percent of the stock of the debtor from participation without formal proof of claim, though such persons may file such proof and thereby recover on their claims.

Section 35(m)(11) authorizes the Corporation to advance monies to the trustee to satisfy the claims of each customer up to $50,000. Further, a customer who holds accounts in separate capacities is a different customer in each capacity. Claims of partners, officers, directors or substantial owners (5 percent) of the debtor may not be paid from the moneys of the Corporation. Finally, to the extent that monies are advanced, the Coproration is subrogated to the claims of the customers who are paid.

Section 35(m)(12) simply reiterates the rights of persons to make claims against the debtor under the existing Bankruptcy Act.

Section 35(m)(13) first provides that the trustee shall publish notice of the commencement of the proceedings in accordance with the same requirements as in the Bankruptcy Act and, in addition, shall mail notice to each customer at the address appearing in the books and records of the debtor. The section limits the time for the filing of claims in a two-fold manner. First, claims in general must be filed within the time set by the court but not to exceed 60 days after publication of notice. Except as the trustee may otherwise permit, claims which are filed after that period may be paid only from the general estate of the debtor and thus are not payable from SIPC funds, or from most types of specifically identifiable property or from the single and separate fund. Secondly, claims which are not filed within the time provided in section 57 of the Bankruptcy Act are barred.

Section 35 (m)(14) provides that reports to the court by the trustee shall be in such form as the Commission determines will fairly reflect the results.

Section 35(n) bars from the business of broker-dealer any person for whom a trustee has been appointed under this Act unless the Commission otherwise determines in the public interest. In addition, the Commission may, by order, bar or suspend any officers, directors, general partners, owners of more than 10 percent of the voting stock or controlling persons of such debtor.

Section 35(o) as previously mentioned, requires notice and opportunity for a hearing as specified in section 4f of the Administrative Procedure Act and the submission of views of interested persons. In order to assure the speedy and efficient execution of the policies of this Act, such rules are not stayed within the 30-day period even though a hearing is being held. In addition, the hearing is not required to be on a record as specified in the Administrative Procedure Act.

15

*Section 35(p)* accords the Commission the power to apply to a District Court for an order in the nature of a mandatory injunction in the unlikely event that the Corporation refuses to carry out its duties.

*Section 35(q)* makes the provisions of subsection 20(a) of the '34 Act inapplicable to any liability under this section. Subsection 20(a) makes controlling persons jointly and severally liable for violations of '34 Act rules and regulations to the same extent that any controlled person is liable unless the controlled person acted in good faith and did not cause the violation of the rule or regulation. It is not considered to be appropriate to create such additional liabilities for controlling persons for acts taken or omitted under section 35.

*Section 35(r)* limits the public disclosure of reports and documents filed under this section unless the Commission or SIPC determine such disclosure to be in the public interest.

*Section 35(s)* limits the application of the provisions of this Act in relation to those offices of foreign broker-dealers which are located within the United States.

*Section 35(t)* deals with the tax ramifications of this Act. It makes the Corporation a tax exempt entity except that it is subject to State and local real and personal property taxes. In addition, it provides that the payment of assessments shall constitute an ordinary and necessary business expense of the broker or dealer. Moreover, contributions from existing trust funds by a self-regulatory body shall not result in taxable gain to the self-regulatory body. Finally, upon dissolution of the Corporation, the assets may not inure to the benefit of the Corporation's members.

*Section 35(u)* provides criminal penalties for misuse of the corporate assets.

*Section 35(v)* exculpates from liability a member of the Corporation as a member of the Corporation for the acts of any other member of the Corporation or for the debts and liabilities of the Corporation itself. It is not intended to exculpate members from liabilities they may have as members of a self-regulatory organization or otherwise.

*Section 35(w)* exculpates from liability the Corporation and its Board of Directors for actions taken in good faith. It is essentially consistent with general corporate law practice.

*Section 35(x)* exculpates the self-regulatory organization from any liability to any person for action taken or omitted in good faith in connection with the giving of notice pursuant to paragraph (m)(1). This subsection is intended only to relate to this Act and does not alter any liability of self-regulatory organizations which may already exist.

*Section 35(y)* prevents members of the Corporation from displaying in signs or advertising their participation in the Corporation and the protection provided thereby. It is intended to prevent brokers from soliciting accounts on the grounds that the customer is protected and his accounts "guaranteed."

*Section 3.* This section of the bill amends section 15(c)(3) of the 1934 Act. Testifying before the House Subcommittee on Commerce and Finance on July 9, Chairman Budge of the SEC noted that "certain doubts . . . have arisen over the years, primarily as a result of unsuccessful legislative proposals and of recommendations of the

16

Commission's Special Study of Securities Markets, as to the extent of the Commission's broad powers to provide safeguards with respect to the financial responsibility of broker-dealers to whatever extent the public interest requires, whether by capital rules or otherwise." The Committee wishes to dispel such doubts by amendment section 15(c)(3) to specify the applicability of the section to broker-dealers who do business only on an exchange and by reaffirming the Commission's authority with regard to financial responsibility of brokers and dealers, including practices that bear on that responsibility such as the custody and use of customers' securities, and the carrying and use of customers' deposits or credit balances.

*Section 4* sets the effective date of this Act as the date of its enactment.

### CORDON RULE

In the opinion of the Committee, it is necessary to dispense with the requirements of subsection 4 of rule XXIX of the Standing Rules of the Senate in order to expedite the business of the Senate in connection with this report.

O