# EXHIBIT F

(134004.1)

Ted A. Berkowitz (TB-3384)
FARRELL, FRITZ, P.C.
EAB Plaza
Uniondale, New York 11556-0120
(516) 227-0700

Sigmund S. Wissner-Gross (SW-0001)
May Orenstein (MO-2948)
HELLER, HOROWITZ & FEIT, P.C.
292 Madison Avenue
New York, New York 10017
(212) 685-7600

*ORIGINAL*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

In re New Times Securities Services , Inc.                    *8178*
                                            Case No. 800-8718 (SB) SIPA

                    Debtor.

------------------------------------------------------------X

## LIMITED OBJECTION TO TRUSTEE'S
## DETERMINATION OF CLAIM

      Claimant Myrna K. Jacobs hereby submits her limited objection to the Trustee's determination regarding a customer claim asserted by her (the "Claim") in this proceeding.

      In her Claim, Ms. Jacobs asserts, for reasons explained below, that she is owed for purchases of shares of the New Age Securities Money Market Fund ("NASMMF"). In his March 2, 2001 determination with respect to the Claim, the Trustee advised that, while Ms. Jacobs had deposited $207,958.05 for the purchase of shares of the NASMMF, the Trustee will pay (or satisfy) the claim only to the extent of $100,000. (A copy of Ms. Jacobs' Claim is annexed as Exhibit A hereto; a copy of the Trustee's determination is annexed as Exhibit B hereto).

      As explained below, Ms. Jacobs is entitled to have her claim satisfied in the amount of $220,816.81, which is the value of her net equity claim for shares of NASMMF held for her account by the Debtor. The Trustee's determination here is contrary to applicable regulations and

(134004.1)

law, is inconsistent with the Trustee's determination of certain similarly situated mutual fund claims in this proceeding, and is inequitable and unjust.

Ms. Jacobs respectfully represents as follows:

## BACKGROUND

1.     On February 17, 2000, the United States Securities and Exchange Commission ("SEC") filed a Complaint (the "SEC Complaint") in the United States District Court for the Eastern District of New York (the "District Court") against William Goren ("Goren"), New Age Financial Services, Inc. ("New Age") and New Times Securities Services, Inc. ("NTSSI"). The SEC Complaint alleges that Goren conducted a long-running "ponzi" scheme, defrauding hundreds of investors and causing investor losses currently estimated by the SEC at $32.7 million. NTSSI was named as a relief defendant in the SEC action, *inter alia*, because of its receipt of transfers from the New Age "ponzi" scheme account at Fleet Bank of not less than $1,243,000 in 1998 and $340,000 in 1999. On March 9, 2001, Goren, who had pled guilty to his criminal conduct, was sentenced to a prison term of 87 months for his role in the "ponzi" scheme.

2.     By application, dated May 16, 2000, to the District Court, the Securities Investor Protection Corporation ("SIPC") sought the issuance of a Protective Decree adjudicating that the customers of NTSSI were in need of the protection afforded by the Securities Investor Protection Act of 1970 ("SIPA"). By Order of the District Court, (i) all proceedings relating to NTSSI were transferred to this Court; (ii) NTSSI was placed into liquidation; and (iii) James W. Giddens, Esq. of Hughes Hubbard & Reed LLP was appointed as Trustee for the liquidation of NTSSI.

3.     By motion, dated November 6, 2000, the Trustee sought an order substantively consolidating the NTSSI and New Age estates. The District Court subsequently authorized the Receiver for New Age to consent to the Trustee's substantive consolidation motion, and this Court approved the Trustee's motion and entered an Order, dated November 27, 2000 (the

2

(134004.1)

"Consolidation Order"), substantively consolidating these estates. Pursuant to the Consolidation Order, the assets and liabilities of NTSSI and New Age are to be pooled, all intercompany liabilities, guarantees and claims are to be cancelled, and the combined estate is to be administered by the Trustee in accordance with SIPA and the Bankruptcy Code under the jurisdiction of this Court.

4.      Pursuant to the Consolidation Order, for purposes of determining "customer" claims under SIPA, the "Debtor" includes NTSSI and New Age for claims arising after April 19, 1995, the date that, according to the Trustee, NTSSI became an SEC registered broker-dealer and SIPC member. The consolidated entities are referred to herein collectively as the "Debtor".

## THE CLAIM

5.      Myrna K. Jacobs is a retired teacher, and widow, who resides in Manhattan, New York. Ms. Jacobs, who was introduced to William Goren by Adriane Berg of WABC and invested with him as a result of her endorsement and touting of Goren, invested a substantial portion of her life savings with Goren. At the time Ms. Jacobs met Goren, she was a widow and had recently lost her mother, and was battling cancer. As Goren was aware, Ms. Jacobs had no siblings nor children and was entirely dependent on her savings to fund her retirement. As a result, she was looking for only the most conservative investment possible.

6.      All of Ms. Jacobs' investments involved purchases of shares of the NASMMF. As with other investors, Goren had offered the NASMMF to Ms. Jacobs as a safe and secure Fund, offering a fixed rate of return slightly better than most bank deposit accounts. Ms. Jacobs received a confirmation for each purchase, and her brokerage statements reflected dividend reinvestments. At all times, the shares of the Fund maintained a price per share of $1.00.

7.      Ms. Jacobs made the following purchases of shares of NASMMF on or about the following dates:

(i)      June 11, 1998.  Ms. Jacobs purchased 102,958.05 shares for $102,958.05.

3

(134004.1)

(ii)    July 23, 1998. Ms. Jacobs purchased 20,000 shares for $20,000.

(iii)    July 30, 1998. Ms. Jacobs purchased 50,000 shares for $50,000.

(iv)    September 23, 1998. Ms. Jacobs purchased 10,000 shares for $10,000.

(v)    December 21, 1998. Ms. Jacobs purchased 10,000 shares for $10,000.

(vi)    February 25, 1999. Ms. Jacobs purchased 7,000 shares for $7,000.

(vii)    May 7, 1999. Ms. Jacobs purchased 8,000 shares for $8,000.[1]

8.    Copies of relevant documents, previously supplied to the Trustee in support of this claim, are annexed as Exhibit C hereto. In all, Ms. Jacobs invested $207,958 in shares of NASMMF. As reflected in her final brokerage statement, dated December 31, 1999, Ms. Jacobs owned 220,816.81 shares of NASMMF, which amount includes 12,858.76 shares of the fund purchased through dividend reinvestment.

9.    By notice dated March 2, 2001 (the "Notice"), the Trustee communicated his finding that Ms. Jacobs had deposited $207,958.05 with the Debtor for the purchase of shares of NASMMF and that the Claim, to the extent of such deposit, was a "valid customer claim." *See* Exhibit B hereto. Based upon such finding and determination, the Trustee allowed the Claim "as a claim for cash in the amount of $207,958.05." The Notice also communicated the Trustee's disallowance of the balance of the claim ($ 12,858.76 ), representing the value of shares acquired by Ms. Jacobs through dividend reinvestment. Notwithstanding the allowance of the Claim to the extent of $207,958.05, Ms. Jacobs was advised pursuant to the Notice that the Trustee will pay the claim only to the extent of $100,000. As explained in the Notice, the difference between the portion of the Claim allowed and the amount undertaken to be paid by the Trustee is based upon the application by the Trustee to the Claim of the payment limitation found in 15 U.S.C. § 78fff-3(a)(1).

---

[1] Ms. Jacobs also paid taxes on a Form 1099 she received for purported dividends on her investments.

(134004.1)

Such section, which applies only to a claim "for cash," limits the payment obligation of the Trustee to $100,000.

## OBJECTIONS

10.    Ms. Jacobs objects to the Notice to the extent that it characterizes the Claim as one "for cash" rather than "for securities" and, based upon such characterization, applies the $100,000 statutory limit to the Trustee's payment obligation in respect of the Claim. Upon characterization of Ms. Jacobs's claim as one "for securities," the $500,000 statutory limit would be applicable and the Trustee would be obligated to satisfy the full amount of Ms. Jacobs's claim. 15 U.S.C. § 78fff-3(a). Ms. Jacobs also objects to the disallowance of that portion of her claim representing 12,858.76 shares of NASMMF, representing shares of NASMMF purchased by her through dividend reinvestment.

11.    As a statutory customer of the Debtor, Ms. Jacobs is entitled to SIPA protection to the extent of her "net equity." [2] 15 U.S.C. § 78lll(11). SIPA defines "net equity" as "the dollar amount of the account or accounts of a customer, to be determined by ... calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer...." *Id.* As established by Ms. Jacobs's account statements, Ms. Jacobs's net equity as of the February 17, 2000 filing date was $220,816.81 based upon ownership of $220,816.81 shares of NASMMF having a value of $1.00 per share. *See* Exhibit C hereto.

---

[2] The Trustee has determined that Ms. Jacobs was a customer of the Debtor for the purposes of SIPA and accordingly, such status is not at issue. "Customer" is statutorily defined as "any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term customer includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities..." 15 U.S.C. § 78lll(2).

5

(Doc2.wpd)

12.   After receipt of a statement of claim, SIPA requires that a trustee promptly discharge "all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by delivery of securities or the making of payments to or for the account of such customer." 15 U.S.C. § 78fff-2(b).

13.   SIPA defines "security" broadly.  15 U.S.C. § 78lll(14).  It is not disputed by the Trustee or SIPC that the statutory definition of a security covers shares of a money market fund.[3]

14.   In the context of this proceeding, the Trustee has explained that he has characterized all claims based upon purchases of shares of NASMMF, including Ms. Jacobs's Claim, as cash claims based upon the fictitious nature of NASMMF.  In contrast to its classification of NASMMF claims as "cash claims," net equity claims which have been asserted by customers of the Debtor based upon account statements showing holdings of mutual funds having names conforming to, similar to or close to actual funds, are being treated by the Trustee as claims for securities.[4] Thus, in classifying claims as either "for cash" or "for securities" the Trustee is making a critical distinction between sham transactions involving sham securities — *i.e.*, the "fictional" NASMMF, shares of which never existed (but which are fungible like hundreds of other money markets) — and sham transactions involving the purported purchases of mutual funds denominated

_____

[3]Shares of money market funds have been acknowledged by SIPC to be securities within the protection of the statute.  As stated by SIPC:

> Shares of money market funds, although often thought of by investors as cash, are in fact securities when such funds are organized as mutual funds.  When held by a SIPC member in a customer's securities account, such fund shares are as protected as any other covered security.

Publication of SIPC, "How SIPC Protects You," at page 7.

[4]   As a consequence of the characterization of the claims of mutual fund investors as claims for securities, the Trustee has undertaken to pay such claims to the extent of the $500,000 statutory maximum.  In addition, whereas the Trustee has disallowed that portion of the claim of NASMMF investors representing shares of NASMMF purchased through dividend reinvestment, the Trustee has allowed that portion of the mutual fund investors' claims as represents shares of such mutual funds purchased by them through dividend reinvestment.

(134004.1)

on account statements with names of actual funds *or* mutual funds with names similar or close to mutual funds which may be quoted in the newspaper, in which neither the investors nor the Debtor ever acquired an interest. Ms. Jacobs, like the other victims of Goren, does not dispute the Trustee's conclusion that the NASMMF was never actually organized as a money market fund. However, at the same time, the Trustee does not dispute that Ms. Jacobs was entirely innocent of any culpability in connection with her purchase of shares of the NASMMF and concedes that Ms. Jacobs had no knowledge or suspicion of the non-existence of the NASMMF, which was confirmed to her as shown on her statements as a legitimate money market fund.

15.    Although the Trustee has identified the fictitious nature of the NASMMF as determinative of the classification of Ms. Jacobs's claim as one "for cash" for the purposes of application of 15 U.S.C. §78fff-3 (a)(1), it has not specified any authority for reliance on this factor. It is submitted, however, that the Trustee's reliance on the fictitious nature of the NASMMF in characterization of the Claim is contradicted by the rules adopted by SIPC for determining whether a customer claim is for cash or for securities. 17 C.F.R. §§ 300.500 - 300.503 ("Series 500 Rules").

16.    Rule 501 - "Claim for Cash" provides in applicable part that:

> Where the Debtor held cash in an account for a customer, the customer has a "claim for cash," notwithstanding the fact that the customer has ordered securities purchased for the account, *unless: (1) the Debtor has sent written confirmation to the customer that the securities in question have been purchased or sold to the customer's account.*

17 C.F.R. § 300.501(b)(1) (emphasis supplied).

17.    Rule 502 – "Claim for Securities," is the corollary of Rule 501 and provides that "Where the Debtor held cash in an account for a customer, the customer has a 'claim for securities' with respect to any authorized securities purchase: (i) if the Debtor has sent a written confirmation to the customer that the securities in question have been purchased for or sold to the customer's account[.]" 17 C.F.R. § 300.502.

7

(134004.1)

18.    Accordingly, the Series 500 Rules direct that where a customer has authorized a purchase of securities, it is the sending of a confirmation of that purchase or sale, rather than the execution of a trade, that determines whether the customer's net equity claim is for cash or securities. Here, the Notice includes the Trustee's determination that Ms. Jacobs authorized purchases of the NASMMF for her account. Moreover, it is not disputed that Ms. Jacobs received written confirmation of her initial purchase of shares, and, in the form of monthly or regular account statements, received confirmation of subsequent purchases by means of dividend reinvestment. In characterizing the Claim as one for cash, the Trustee disregards the apparent purpose and effect of the Series 500 Rules, *i.e.*, to bind the investor to and to allow the investor's reliance upon, written confirmation of his securities transactions. By apparently relying on the distinction between a fictitious money market fund and the fictitious purchase of shares of a money market fund (a distinction without substance) as the basis for the cash/securities determination, the Trustee is substituting a criterion which is beyond the control and verification of the investor for the objective, mechanical, criteria provided by the Series 500 Rules.

19.    The Trustee's misapplication of the Series 500 Rules is demonstrated within this proceeding by the disparate impact on the claims of similarly-positioned customers of the Debtor. In contrast to the NASMMF claimants, the Trustee apparently has determined that customers of the Debtor who entrusted funds to the Debtor for the purchase of shares of mutual funds with names (as denominated on customers' statements) similar or close to mutual funds which may be quoted in the newspaper, but whose transactions were never effected, will have their claims treated as claims for securities even though they never had any actual interest in the securities shown on their account statements. As a result, the Trustee is apparently allowing as valid customer claims "for securities" claims of customers who purchased shares of other non-existent mutual funds, while at the same time denying as valid customer claims "for securities" claims such as that of Ms. Jacobs

(134004.1)

for the purchase of shares of the NASMMF. There is nothing in the Series 500 Rules that suggests this result.

20.    Moreover, the radically disparate and inequitable treatment of the NASMMF investors, on the one hand, and the mutual fund investors, on the other, results in undue and unseemly consequence given to the capricious and criminally motivated conduct of Goren rather than to any criterion reflected in the Series 500 Rules or pertaining either to customer conduct, losses or expectations. This disparate treatment is not, however, either required or contemplated by SIPA. Such disparate treatment flies in the face of the expressed Congressional intent for SIPA to satisfy customers' legitimate expectations. *See* S. Rep. No. 763, 95th Cong. 2d Sess. 2 (1978), reprinted in [1978] U.S. Code Cong. & Admin. News 764, 765. It is, in fact, absurd to suggest that Congress, in passing SIPA, intended for the scope of protection afforded to the investing public from broker insolvency to hinge upon the contours and vagaries of the names assigned to a mutual fund sold to an investor but never purchased by the broker.[5]

21.    Like the mutual fund investors, the NASMMF investors, including Ms. Jacobs, provided funds for the purchase of securities. As with respect to the funds provided by the mutual fund investors, no securities were ever actually purchased. Like the mutual fund investors, the NASMMF investors, including Ms. Jacobs, received confirmations of their purchases and monthly statements showing their security positions. Like the mutual fund investors, the NASMMF investors, including Ms. Jacobs, had no basis to question the representations made to them that securities had been purchased for their account and were being held for them by the Debtor. Indeed,

---

[5]    The inequity of the Trustee's approach to characterizing claims is highlighted by the Trustee's apparent willingness to overlook discrepancies in the names of mutual funds (some of which actually existed and others with fictitious names) or pricing information with regard to purchases of certain mutual funds, appearing on account statements of certain investors and to nonetheless recognize such claims as securities claims. As arbitrary and unfair as it would be to deny a claim merely because Goren was less than meticulous in accurately identifying the mutual fund that he fraudulently represented had been purchased by an investor, it is equally arbitrary and unfair to penalize the NASMMF investors for having been duped into purchasing sham securities.

9

(134004.1)

the "legitimate expectations" of the NASMMF investors, including Ms. Jacobs, are indistinguishable in every respect from those of the mutual funds investors.

22.     The equities in favor of treating the NASMMF investors no less favorably than the mutual fund investors are compelling. Like other NASMMF investors, Ms. Jacobs chose to purchase money market shares believing that such investment was the most conservative available. It is respectfully submitted that to allow a small group of victims to bear crushing financial loss, while others with indistinguishable claims and expectations receive full statutory protection, is unconscionable.   The inequitably disparate treatment reflected by the Trustee's determination of their claims is not mandated by SIPA or the rules promulgated thereunder.

23.     Accordingly, it is respectfully requested that Ms. Jacobs's limited objections to the Notice be sustained and that the Court direct the Trustee to allow the full amount of her claim ($220,816.81) and to satisfy the entire amount of such claim as a claim for securities.

Dated: Uniondale, New York
        March 26, 2001

**FARRELL FRITZ, P.C.**

By: _Ted A. Berkowitz_
     Ted A. Berkowitz (TAB-3384)
     EAB Plaza, 14th Floor
     Uniondale, New York 11556-0120
     (516) 227-0700

Dated: New York, New York
        March 26, 2001

**HELLER, HOROWITZ & FEIT, P.C.**

By: _____
     Sigmund S. Wissner-Gross (SW-0001)
     292 Madison Avenue
     New York, New York 10017
     (212) 685-7600

Attorneys for Claimant Myrna K. Jacobs

10