# EXHIBIT H

ORIGINAL

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In re:

NEW TIMES SECURITIES SERVICES, INC.
and NEW AGE FINANCIAL SERVICES

Hearing Date: June 25, 2001
Time: 10:00 a.m.

Case No. 800-8178(SB) SIPC

(Substantively Consolidated)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## CLAIMANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO JOINT MOTION OF TRUSTEE AND SECURITY INVESTOR PROTECTION CORPORATION FOR AN ORDER UPHOLDING THE TRUSTEE'S DETERMINATIONS

*Of Counsel:*
   Ted A. Berkowitz

**FARRELL FRITZ, P.C.**
EAB Plaza, 14th Floor
Uniondale, New York 11556-0120
(516) 227-0700

- and -

**HELLER, HOROWITZ & FEIT, P.C.**
292 Madison Avenue
New York, New York 10017
(212) 685-7600

*Of Counsel:*
   Sigmund S. Wissner-Gross
   May Orenstein

Attorneys for Claimants



(SIPC Brief Post Crash May 29.WPD)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    CLAIMANTS' OBJECTIONS TO THE TRUSTEE'S DETERMINATIONS
    SHOULD BE SUSTAINED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.    SIPA Is a Remedial Statute Which Should Be
    Liberally Construed to Effect its Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II.    Classification of Claims Should be Based Upon A Customer's Legitimate
    Expectations as to the Nature of Assets in Brokerage Account . . . . . . . . . . . . . . 20

III.    The Series 500 Rules Support Claimants' Position . . . . . . . . . . . . . . . . . . . . . . . 35

IV.    The Viability of Claimants' SIPA Claims Is Not to
    Be Determined By the Existence of a Claim for Fraud . . . . . . . . . . . . . . . . . . . . 40

V.    Claimants' Claims for Dividends Are Allowable Customer Claims . . . . . . . . . . . 42

VI.    The Court, Alternatively, Should Direct Limited Discovery
    With Respect to the Trustee's Determinations of Other
    Mutual Fund Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

i

(Table of Authorities 6-1-01.WPD)

## TABLE OF AUTHORITIES

**CASES**

*In re A.R. Baron & Co.*, 226 B.R. 790 (Bankr. S.D.N.Y. 1998)..........................................39

*In re Adamo*, 619 F.2d 216 (2nd Cir. 1980).................................................................19

*In re Adler Coleman Clearing Corp.*, 195 B.R. 266 (Bankr. S.D.N.Y. 1996)...................39

*In re Adler Coleman Clearing Corp.*, 198 B.R. 70 (Bankr. S.D.N.Y. 1996)....................42

*In re Adler Coleman Clearing Corp.*, 218 B.R. 689 (Bankr. S.D.N.Y. 1998)...................6, 32, 43

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972)....................................21

*In re Ames Dept. Stores Inc. Stock Litig.*, 991 F.2d 953 (2nd Cir. 1993)......................23

*Appleton v. Hardy (In re First Ohio Secs. Co.)* No. 590-0072, Adv. No. 92-5085 (Bankr. N.D. Ohio 1992)...............................................................................................32

*In re Brentwood Securities Inc.*, 925 F.2d 325 (9th Cir. 1991)...................................34

*Brooklyn Bridge Coalition v. Port Authority of New York and New Jersey*, 951 F. Supp. 383 (E.D.N.Y. 1997). .......................................................................................19

*In re Buchferer*, 216 B.R. 332 (Bankr. E.D.N.Y. 1997) ...........................................19

*City of New York v. United States Department of Transportation*, 700 F. Supp. 1294 (S.D.N.Y. 1988)...................................................................................................39

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)................................................21

*In re First State Securities Corp.*, 34 B.R. 492 (Bankr. S.D. Fla. 1983).......................22

*In re Investors Center, Inc.*, 129 B.R. 339 (Bankr. E.D.N.Y. 1991)............................32, 42

*In re Investors Sec. Corp.*, 6 B.R. 415 (Bankr. W.D. Pa. 1980).................................35

*In re June S. Jones Co.*, 52 B.R. 810 (Bankr. D.Or. 1985)......................................35

*Local 875 I.B.T Pension Fund v. Pollack*, 992 F. Supp. 545 (E.D.N.Y 1998)..................................................................................................22

*Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531 n.10 (S.D.N.Y. 1990)..................................................................................................22

*In re MV Securities, Inc.*, 48 B.R. 156 (Bankr. S.D.N.Y. 1985)...............................42

(Table of Authorities 6-1-01.WPD)

*In re Omni Mutual, Inc.*, 193 B.R. 678 (S.D.N.Y. 1996)................................................31

*Plumbers & Steamfitters Local 490 Severance & Retirement Fund v. Appleton (In re First Ohio Sec. Co.)*, 39 F.3d 1181 (6th Cir. 1994) (unpublished opinion), *cert. denied*, 514 U.S. 1918 (1995)..............................................................................................30, 31, 32, 33

*SEC v. Aberdeen Securities*, 480 F.2d 1121 (3rd Cir. 1973), *cert. denied sub. nom Seligsohn v. SEC*, 414 U.S. 1111 (1973)...........................................................................34

*SEC v. Ambassador Church Finance/Dev. Group, Inc.*, 679 F.2d 608, 611 (6th Cir. 1982).........20

*SEC v. Bremont*, 954 F. Supp. 726 (S.D.N.Y. 1997)........................................................22

*SEC v. Credit Bancorp., Ltd*, 2000 WL 1752979 (S.D.N.Y Nov. 29, 2000)................................20

*SEC v. F.O. Baroff Co., Inc.*, 497 F.2d 280 (2nd Cir. 1974)...........................................12

*SEC v. Howard Lawrence & Co.*, 74 Civ. 193, 1975 Bankr. LEXIS 15 (Bankr. S.D.N.Y. 1975)......................................................................................................42

*SIPC v. C.J. Wright & Co., Inc.* (In re C.J. Wright & Co., Inc.), 162 B.R. 597 (Bankr. M.D. Fla. 1993).....................................................................................................44

*SIPC v. Old Naples Secs., Inc.*, 218 B.R. 981 (Bankr. M.D. Fla. 1998), *aff'd*, 223 F.3d 1296 (11th Cir. 2000)..........................................................................................32, 33, 43

*Securities Investor Protection Corp. v. Oberweis Securities, Inc.*, 135 B.R. 842 (N.D. Ill. 1991)..........................................................................................2, 24, 43, 44

*In re Stratton Oakmont, Inc.*, 257 B.R. 644 (S.D.N.Y. 2001)................................12, 21

*In re Sunpoint Securities, Inc.*, Securities Exchange Act of 1934, Release No. 44255/ May 3, 2001, Administrative Order ..........................................................................20

*In re Sunpoint Securities, Inc.*, 2001 WL 484001 (Bankr. E.D.Tex. Apr. 23, 2001)..................20

*Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)........................................................21, 22

*United States v. Hendrickson*, 26 F.3d 321 (2nd Cir. 1994).............................................19

*United States v. International Business Machines Corp.*, 517 U.S. 843 (1996)............................39

(Table of Authorities 6-1-01.WPD)

## STATUTES/RULES

17 C.F.R. § 300.500 - 300.503 ("Series 500 Rules").............................................passim

53 F.R. 10367-10369, 1998 WL 263894 (March 31, 1998)........................................37

53 F.R. 1793 (Jan. 23, 1998)..................................................................37, 38

Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et seq................................passim

## LEGISLATIVE HISTORY

Conf. Rep. 91-1788, 91ˢᵗ Cong. 2ⁿᵈ Sess. (1970), 1979 U.S.C.C.A.N. 5281, 1970 WL 5921.............................................................................................16

H.R. Rep. 91-1613, *reprinted in* 1970 U.S.C.C.A.N. 5255........................................14

H.R. Rep. 96-1321 .........................................................................17

Pub. L. No. 93-495, 88 Stat. 1500 (1974)....................................................17

Pub. L. No. 96-221, 94 Stat. 132 (1980).....................................................17

Pub. L. No. 96-433, 94 Stat. 1855 (1980)....................................................17

Pub. L. No. 91-598 (1970)...................................................................17

Pub. L. No. 95-283, 92 Stat. 249 (1978).....................................................17

*Hearings on Federal Broker-Dealer Insurance Corporation: Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency*, 91ˢᵗ Cong. 10 (1970).............................4

*Hearings on Securities Investor Protection Before the Subcomm. on Commerce and Fin. of the House Comm. on Interstate and Foreign Commerce*, 91ˢᵗ Cong. 2nd Sess. (1970)...................14

Rules of the Securities Investor Protection Corp., 53 Fed. Reg. 1793, 1988 WL 236666 (1988)........................................................................................38

S. Rep. No. 91-1218 (1970)...............................................................13, 14

(Table of Authorities 6-1-01.WPD)

## MISCELLANEOUS

2B N. Singer, *Sutherland on Statutory Construction* § 53.03, p. 233 (rev. 5th ed.1992)..............21

John C. Bogle, *Mutual Funds*, (1994).......................................................................28

S. Harrigan, *Cheated of Cash, Robbed of Trust*, Newsday, March 25, 2001, at A2....................11

Gretchin Morgenson, *Many Holes Weaken Safety Net For Victims of Failed
Brokerages/Investors Beware*, The New York Times, Sept. 25, 2000, at A1..............................10

James M. Storey & Thomas M. Clyde, *Mutual Fund Law Handbook*,
"The Legal Framework," § 29.1......................................................................27

The Vanguard Group, *Education Center: Money Market Funds*, http://majestic.vanguard.com,
May 28, 2001...............................................................................................28
Gordon K. Williamson, *Low Risk Investing* (1993)...................................................27
Gordon K. Williamson, *The 100 Best Mutual Funds You Can Buy/2001* (2000).........................27

(SIPC Brief Post.Crash May 29.WPD)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In re:                                          Hearing Date:  June 25, 2001
                                                Time:  10:00 a.m.

NEW TIMES SECURITIES SERVICES, INC.              Case No. 800-8178(SB) SIPC
and NEW AGE FINANCIAL SERVICES
                                                (Substantively Consolidated)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## CLAIMANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO JOINT MOTION OF TRUSTEE AND SECURITY INVESTOR PROTECTION CORPORATION FOR AN ORDER UPHOLDING THE TRUSTEE'S DETERMINATIONS

### PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of Myrna K. Jacobs, Simon and

Helga Noveck, Miriam Seidenberg, Felice Linder, Angelo Scarlata, the Rose Marie Ceparano

Irrevocable Trust, Allan A. Blynd, Salvatore and Stella DiGiorgio, Project Earth Environmental

Fundraisers, Inc. and New York Optical (collectively, the "Claimants") in opposition to the motion

for an Order upholding the Trustee's determinations (the "Motion") of James W. Giddens, as Trustee

(the "Trustee") for the liquidation under the Securities Investor Protection Act ("SIPA" or the "Act"),

15 U.S.C. § 78aaa, *et seq.*, of the substantively consolidated estates of New Times Securities

Services, Inc. ("New Times") and New Age Financial Services ("New Age") (collectively, the

"Debtor") and of the Securities Investor Protection Corporation ("SIPC").

Claimants in these proceedings have each asserted claims "for securities" ("Claims")

based on account statements and transaction confirmations showing that their brokerage accounts

with the Debtor held, as of the filing date, shares of the New Age Securities Money Market Fund (the

"NASMMF"). By the Motion, the Trustee seeks an Order confirming the Trustee's classification

of the Claims as claims "for cash" rather than claims "for securities" based upon the non-existence

{SIPC Brief Post Crash May 29.WPD}

of the NASMMF and the consequent application to these claims of the $100,000 coverage limit

rather than the $500,000 limit applicable to claims for securities.

The Trustee and SIPC[1] would have the Court believe that the coverage issue presented

here has long been settled, and that the Trustee and SIPC are constrained by explicit statutory

language and controlling precedent from recognizing the Claims as "claims for securities." The

reality is that the Act does not define a "claim for securities"; the specific coverage issue presented

here is one of first impression in this Court and in the Second Circuit; and the relevant legislative

history, statutory language and regulations actually support Claimants' arguments.[2] Moreover, none

of the cases involving sham investments relied upon by the Trustee and SIPC involve (as here)

investors who received and relied upon *confirmations* identifying specified securities purchased for

their account (which however did not exist), nor do they involve the purchase (as here) of shares of

a money market fund which maintained and which were redeemable at all times prior to the filing

date by such investors for a $1.00 per share stated net asset value.[3]

The Trustee's and SIPC's principal objection to classification of Claims as "for

securities" is that such coverage would "compound" the fiction of the existence of the NASMMF.

This purported concern is misguided. To a degree, the entire SIPA statutory scheme and the

---

[1] SIPC has joined the Trustee's motion and filed with him a Joint Memorandum of Law in Support of the Trustee's Motion (hereinafter, the "Joint Memorandum").

[2] As explained below, the precise issues presented here — involving the treatment of the purchase of shares of a nonexistent money market fund under the circumstances of this case, and the disparate treatment accorded claims for the nonexistent shares of the New Age Securities Money Market Fund and claims for shares of mutual funds never purchased by Goren — have not been analyzed by any Court and are, in fact, issues of first impression.

[3] Only one case cited by the Trustee and SIPC involved shares of a money market fund that was not actually purchased — *Securities Investor Protection Corp. v. Oberweis Securities, Inc.*, 135 B.R. 842 (N.D. Ill. 1991). However, as explained *infra*, *Oberweis* did not involve a situation where the broker sent the customer a confirmation of the purchase of shares of a money market fund, a distinction expressly noted by the Court in *Oberweis*. *Oberweis* actually supports Claimants' position here.

Trustee's own conduct here in recognizing as claims "for securities" other claims (for mutual funds never purchased by Goren) asserted by customers of the Debtor, is predicated on a species of legal fiction. Pursuant to this legal fiction, customers of the insolvent debtor are "restored to their pre-insolvency positions" by putting them in a position consistent with their legitimate expectations rather than based upon any reality which necessarily existed at any time prior to the filing date. Reliance on legal fictions is a feature of most remedial statutes, including SIPA.

As the Trustee acknowledges, in contrast to the classification of the Claims based upon the fictional NASMMF as "cash claims," net equity claims which have been asserted by customers of the Debtor based upon account statements showing holdings of mutual funds having names conforming or similar to actual mutual funds, are being treated by the Trustee as claims for securities even though no securities were ever purchased for the account of such customers. As a result, investors who believed that their accounts held shares of mutual funds that actually existed (but were never purchased for their accounts) are having their claims (both as to shares of mutual funds never purchased by Goren and shares shown in customer statements as purchased through dividend reinvestment) satisfied by the Trustee up to the statutory maximum of $500,000; and investors who believed that they were buying shares of the NASMMF, which did not exist, have been advised that their claims will be paid only to the extent of $100,000, the statutory limit applicable to "claims for cash." Claimants' legitimate expectations were identical, in every respect, to the legitimate expectations of investors who thought that they had purchased shares of other mutual funds. This bizarrely disparate treatment by the Trustee of similarly situated victims of the same scheme based upon the classification of claims (all of which arise from the misappropriation of monies entrusted to William Goren for the purchase of securities) as either "for cash" or "for securities," demands a thorough examination of the provisions of SIPA which the Trustee argues compels this result. Such an examination reveals that the provisions the Trustee relies upon to achieve this inequitable and absurd result, by no means compel it and, in fact, support Claimants' position here. A review of the relevant legislative record confirms that the Trustee's interpretation

3

of the Act does not effectuate Congressional intent in enacting SIPA, nor, more particularly, in creating two classes of claims which can be asserted under SIPA and establishing different coverage limits for each.

    The legislative history of SIPA demonstrates that the purpose of SIPA in respect of brokerage house customers was broadly remedial — to protect the individual investor from economic loss resulting from broker insolvency. In urging the prompt enactment of the Bill that became SIPA, Senator Edmund S. Muskie in 1970 proclaimed: "After this Bill is enacted, no American will lose his savings through a brokerage firm bankruptcy."[4]

    In fact, contrary to the oft-repeated SIPC canards about the limited purposes of SIPA and the narrowness of the coverage intended to be afforded, the *stated and explicit* objective of members of Congress who sponsored SIPA or were most connected to its passage was to provide *full* protection to customers from losses due to misappropriation and theft of their property.[5] In contrast to the broad remedial purpose of the Act reflected in the legislative record, the classification of claims as either cash or securities represents an accommodation to the narrow and limited purpose of preventing the anomaly whereby customers who *chose* to keep cash in their brokerage accounts would be afforded greater insurance coverage of their cash balances than depositors in federally insured banking institutions. Such greater coverage could foreseeably promote the use of brokerage

---

    [4] *Federal Broker-Dealer Insurance Corporation: Hearings on S. 2348, 3988 and 3989 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency*, 91st Cong. 10 (1970) (hereinafter, the "FBDIC Hearings"), at 147.

    [5] Since SIPA and the Trustee concede that each of the Claimants is a "customer" for SIPA purposes, the cases cited by SIPC and the Trustee discussing the limitations under SIPA of "customer" status are irrelevant to the issues before the Court. For the same reason, the cases cited by the Trustee and SIPC to the effect that a claimant has the burden of establishing customer status are also irrelevant.

(SIPC Brief Post Crash May 29.WPD)

houses as cash depositories instead of banks and disadvantage banks *vis-a-vis* brokerages in competing for customer funds, an inappropriate result.

Notably, the Joint Memorandum of the Trustee and SIPC ignores the purpose of the varying coverage limits and instead creates the impression that limitation of coverage by classification as "cash claims" is an end in itself to be pursued by SIPC without reference either to the overriding remedial purpose of the Act or to considerations of fairness and equity. In construing the Act, the limited purpose of the lower coverage provided to cash claims should be harmonized, to the extent possible within the bounds of express statutory language, with its broad remedial purpose. Consistently with the Act and with regulations promulgated by SIPA, this harmony can be achieved by classification of the nature of a customers' claim as either "for cash" or "for securities" *based upon the customers' legitimate expectations as to the nature of the assets held by them in their brokerage accounts.* In contrast to the "legitimate expectation approach," the Trustee's and SIPC's approach, whereby the nature of customer claims and hence the scope of coverage turns upon the permutations of a particular criminal scheme in furtherance of which customers are deliberately deceived as to the transactions in their account, simply cannot be reconciled with the remedial purposes of the Act. Nor, as discussed below, is this construction compelled by any statutory language. Moreover, the cases relied upon by the Trustee and SIPC as precedent all involve court decisions from other circuits, including an unpublished Sixth Circuit *per curiam* ruling (cited in violation of the Sixth Circuit's own rules), are uniformly bereft of any meaningful analysis of the pertinent provisions of the Act or the legislative record, and do not address the precise coverage issues before this Court.

In defense of the Trustee's determinations in this case, the Trustee and SIPC claim that the Trustee has acted "logically" and has "upheld the law," given the statutory scheme and relevant precedent.    Upon examination, however, the statutory and practical impediments to recognition of the Claims as "for securities" are non-existent.   The statute fully contemplates the satisfaction of certain securities claims by the payment of cash where securities held in customer accounts cannot be delivered by the trustee.   Unlike shares of other mutual funds or equity securities, shares of money market funds (and hence the Claims) are uniquely simple to value since they always maintain a fixed stated value of $1.00 per share.   In fact, it is apparent that in a misguided and myopic effort to "draw the line," the Trustee has ignored the both the remedial purposes of the Act and of the plain language of the Series 500 Rules.[6]

The Trustee's duties and obligations in respect of valid customer claims are mandatory, not discretionary:   "[T]he trustee *shall promptly discharge*, in accordance with this section, all obligations of a debtor to a customer ...."   SIPA § 78fff-2 (emphasis added). Notwithstanding the Trustee's and SIPC's distortion of Claimants' arguments (*see* Joint Memorandum at 25, n.17), Claimants do not argue that the disparate treatment of the mutual fund claimants and the NASMMF claimants results from an improper exercise of discretion but rather, from the Trustee's faulty construction of SIPA.   Nothing in the Act accommodates the Trustee's implicit claim that he has discretion in the proper characterization of claims as "for cash" or "for securities." To the contrary, the Series 500 Rules were promulgated by the SEC "to provide a bright line rule for future litigants and future claimants as to when a claimant is entitled to cash and

---

[6] As defined in the Claimants' Objections, the Series 500 Rules are set forth in 17 C.F.R. §§ 300.500 - 300.503.

6

(SIPC Brief Post-Crash May 29.WPD)

when a claimant is entitled to securities." *In re Adler, Coleman Clearing Corp.*, 218 B.R. 689

(S.D.N.Y. 1998) (quoting Stephen P. Harbeck, then Senior Associate General Counsel for SIPC).

The Series 500 Rules have the force and effect of law. *Id.* at 699.   To the extent that SIPA § 78fff-

2(b) grants to the trustee discretion as to how a particular claim may be "established" (either from

"the books and records of the debtor or ... otherwise ... to the satisfaction of the Trustee"), the

Trustee has exercised such authority in these proceedings by determining that each Claimant has a

valid customer claim in the full amount of monies deposited with the Debtor for the purchase of

shares of NASMMF and has *allowed* such claims based on the total amount invested less any

redemptions. (*See* Exhibit A to the Joint Motion of the Trustee and SIPC.)[7] The Trustee's error here

is a legal error, not a matter of his "discretion," and the Court is not required to accord any deference

to the Trustee's erroneous interpretation of SIPA, its legislative history and its regulations.

---

[7] Because SIPA affords the Trustee no discretion as to the characterization of established
customer claims, the non-SIPA cases cited by the Trustee and SIPC (in footnote 17 of the Joint
Memorandum) as to the scope of judicial review, each of which pertain to acts and
determinations made pursuant to a discretionary grant of authorization, are irrelevant.

## STATEMENT OF FACTS

As the Trustee and SIPC note, eleven Claimants have filed Limited Objections and/or Objections to the Trustee's determinations.[8]   While the Trustee and SIPC state that the Trustee has determined 148 of the 174 New Age Money Market Fund claims filed, the vast majority of such claims involved claimed losses under $100,000.

Each of the Claimants who are the subject of the Trustee's motion suffered staggering financial losses as a result of Goren's "ponzi" scheme. If the Claimants' Limited Objections are sustained and their claims classified as "for securities," Claimants will be entitled to the following payments from the Trustee in addition to the $100,000 that has been allowed by the Trustee in respect of their claims:[9]

| Claimant | Additional Coverage Claimed |
| --- | --- |
| Myrna K. Jacobs | $121,596.99 |
| Simon & Helga Noveck | $222,716.57 |

---

[8]  At the time of the filing of the Joint Motion, Claimants Salvatore and Stella DiGiorgio had not yet filed their Limited Objections, since the Trustee's determination of their claim was issued by the Trustee on April 25, 2001, and the DiGiorgios (who reside in Florida) had just received the Trustee's determination at the time of the filing of the Joint Motion. The DiGiorgios have since filed their Limited Objection to the Trustee's determination.

[9]The Trustee has refused to pay any of the Claimants the $100,000 to which each of them (other than Project Earth) is indisputably entitled until each Claimant has delivered to the Trustee a signed "Declaration, Release and Assignment" releasing the Trustee and SIPC from any claim of coverage in excess of $100,000. Claimants (other than Project Earth) will be separately moving for an Order directing the Trustee to immediately make payment of $100,000 to each of the Claimants (other than Project Earth) conditioned only on a release of the Trustee and SIPC and assignment to them of any claims with respect to such amount and preserving Claimants' rights to challenge the Trustee with respect to the scope of coverage over $100,000.

(SIPC Brief Post-Crash May 29.WPD)

| | |
|---|---|
| Miriam Seidenberg | $400,000.00 [10] |
| Felice Linder | $206,666.59 |
| Angelo Scarlata | $400,000.00 [11] |
| Rose Marie Ceparano | |
|     Irrevocable Trust | $174,226.58 |
| Allan A. Blynd | $ 63,602.57[12] |
| Project Earth Environmental | |
|     Fundraising, Inc. | $149,915.02 [13] |
| New York Optical | $243,340.01 |
| Stella & Salvatore | |
|     DiGiorgio | $175,760.20 |
| | |
| **Total:** | **$2,157,185.60** |

The Trustee and SIPC do not dispute that the equitable arguments (as set forth in the Claimants' respective Limited Objections and/or Objections) in favor of Claimants are compelling,

---

[10] Since Miriam Seidenberg's claim exceeds SIPA's $500,000 limitation for securities claims, Mrs. Seidenberg would only be entitled to be paid $500,000.

[11] Angelo Scarlata, like Miriam Seidenberg, has a claim that exceeds SIPC's $500,000 limit for securities claims. Accordingly, Mr. Scarlata would only be entitled to be paid $500,000.

[12] Allan Blynd passed away after the filing of his claim. Counsel for the Trustee has agreed to extend the time to formally file an Objection on behalf of the Blynd Estate until after the Estate's Preliminary Executrix is appointed. Pursuant to an agreement with the Trustee, a form of the Limited Objection that will be formally filed with the Court has been served upon the Trustee, a copy of which is annexed as Exhibit A hereto. As indicated in the Limited Objection, $5,000 of the total amount may be a customer claim for cash.

[13] Project Earth, as explained in its Objection, is asserting a claim for the accrued shares of New Age Security Money Market Fund it purchased, as a result of money market purchases (less redemptions), and dividend reinvestments. Project Earth invested approximately $121 less than it received in payments as a result of redemptions from this account. The Trustee incorrectly has contended in his motion that Project Earth received $510,568.27 more in withdrawals than deposits. Claimant's counsel has advised the Trustee's counsel of their factual error in such regard, and has endeavored to demonstrate to the Trustee's counsel the factual error with respect to the Trustee's position. As of the filing of Claimants' Joint Memorandum, the Trustee's counsel has not disputed Project Earth's factual analysis, but has not yet stipulated to withdraw its incorrect calculations with respect to Project Earth.

9

(SIPC Brief Post-Crash May 29.WPD)

and do not contest any part of the Claimants' factual presentation (with the isolated exception of the

Trustee's erroneous calculation of Project Earth's investment history). As discussed in each of the

Claimants' respective Objections, each of the Claimants purchased shares of the NASMMF

believing it to be a conventional money market fund — the *most* conservative securities investment

possible.[14] Accordingly, this is not a situation where claimants seek to avoid the consequences of

their own investment decisions or to have the SIPC Fund cover market losses.

SIPC's position here illustrates just how far SIPC has gone adrift of its original

mandate to instill confidence in the brokerage industry. Rather than serving to champion the cause

of investors and investor confidence, as Congress originally had envisioned, SIPC has regrettably

charted a course of stubborn opposition to investor claims in countless SIPA proceedings, and

according to a recent article, has paid its attorneys more than $87 million *more* than it has advanced

to investors in SIPA proceedings since 1971. *See* Morgenson, Gretchin, "Many Holes Weaken

Safety Net For Victims of Failed Brokerages/Investors Beware," *The New York Times*, Sept. 25,

2000, at A-1. SIPC's resistance to honoring investor claims is illustrated by the reluctance of SIPC

to draw upon its Fund (it maintains a $1 billion line of credit) to satisfy investor claims. As noted

in the July 27, 2000 Reply Affidavit of Sigmund S. Wissner-Gross, Esq. in this proceeding, "during

SIPC's 29-year history, approximately 93.1% of the cash and securities distributed for accounts of

---

[14] One of the Claimants, Angelo Scarlato, whom the Trustee has acknowledged has an "allowed claim" of $500,182.97, initially "invested" in *mutual funds* (which, in fact, were not purchased by Goren), and in 1999 then "sold" such *mutual funds* to purchase shares of the New Age Securities Money Market in order to have an even more conservative investment portfolio in his "OXY" account. *See* Scarlata Limited Objection ¶ 5. As a result of Mr. Scarlata's desire to hold *more conservative* investments than non-money market mutual funds, he is being unfairly penalized because at the demise of Goren's "ponzi" scheme, his "OXY" account statement showed only shares of the NASMMF.

(SIPC Brief Post Crash May 29.WPD)

customers in SIPA proceedings came from cash and securities distributed from the debtors' estate, and only approximately 6.9% came from the SIPC Fund." [15]

Given the personal circumstances of each of the Claimants, the harshness of the Trustee's determinations is shocking. The Claimants are crime victims whom Congress has targeted to be protected *by SIPC* from precisely the losses they suffered. Most of the Claimants are elderly, retired and/or in poor health and have no other savings upon which to rely. As a result, the outcome of this motion for such Claimants is the difference between the secure retirement for which they have saved and worked all their lives and a struggle to survive. And, as explained, *infra*, the extreme hardship that Claimants must suffer as a result of the Trustee's determination is not only antithetical to the broad remedial purpose of the Act as reflected in its legislative history, but is not compelled by the language of SIPA or the regulations promulgated thereunder.

---

[15] *See also* Harrigan, S., "Cheated of Cash, Robbed of Trust," *Newsday*, March 25, 2001, at A-2.

(SIPC Brief Post-Crash May 29.WPD)

## ARGUMENT

## CLAIMANTS' OBJECTIONS TO THE TRUSTEE'S
## DETERMINATIONS SHOULD BE SUSTAINED

### I.   SIPA Is a Remedial Statute Which Should Be
### Liberally Construed to Effect its Purpose [16]

The relevant legislative history of SIPA, examined below, demonstrates that SIPA

was intended to be broadly remedial and to provide full protection to investors from

misappropriation of their assets by shifting the burden of losses sustained by such misconduct away

from the small investor and onto the securities industry through the establishment of SIPC and the

SIPA Fund. *See SEC v. F.O. Baroff Co., Inc.*, 497 F.2d 280, 281-83 (2nd Cir. 1974) (SIPA was

enacted to protect the trading customer and to instill investor confidence in the securities markets).

Though courts have repeatedly recognized that SIPA must be interpreted "not technically and

restrictively, but flexibly to effectuate [its] remedial purposes," *see, e.g., In re Stratton Oakmont,*

*Inc.*, 257 B.R. 644 (S.D.N.Y. 2001), *quoting Pinter v. Dahl*, 486 U.S. 622, 653 (1988), SIPC has

consistently sought to limit recovery by adopting a highly technical and inflexible interpretation of

the Act.[17] The legislative history of SIPA, which is now examined, confirms that once again, a SIPC

---

[16] Claimants here review the legislative history relevant to the issues before the Court.
Since, as noted above, the Trustee and SIPC concede the "customer" status of Claimants,
Claimants do not carry a "burden of proof" to establish their entitlement to have their claims
treated as claims "for securities." This is a legal issue, not a factual issue, and the relevant facts
are not in dispute. The discussion by the Trustee and SIPC of the "Statutory Background"
largely focuses on issues not germane to the issues before this Court, and requires no general
response beyond the discussion of the SIPA statute and its legislative history, *infra*.

[17] As noted *supra*, SIPC's reputation for litigating claims asserted by victims of
brokerage house theft and misappropriation is so well documented in the media that the Court
can take judicial notice of SIPC's historically vigilant efforts to deny coverage for customer
losses. *See, e.g.*, "Many Holes Weaken Safety Net For Victims of Failed Brokerages," *The New
York Times*, September 25, 2000.

12

(SIPC Brief Post-Crash May 29.WPD)

trustee appointed pursuant to SIPA has adhered to the long-entrenched SIPC practice of construing the Act in a manner which subverts its remedial purposes through the denial or limitation of valid customer claims.

SIPC traces its history to 1969, when Senator Edmund S. Muskie first introduced legislation to create a "Federal Broker-Dealer Insurance Corporation." Responding to a rash of brokerage house insolvencies, the proposed insurance corporation was to parallel the Federal Deposit Insurance Corporation ("FDIC") and the Federal Saving and Loan Corporation ("FSLC"). *See* FBDIC Hearings, at 2, 15. As noted by Senator Muskie, the several purposes of SIPC were similar to those of the FDIC and FSLC: "to protect individual investors from financial hardship; to insulate the economy from the disruption which can follow the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements ... to eliminate, *to the maximum extent possible*, the risks which lead to customer loss." S. Rep. 91-1218, at 4 (1970) (emphasis added). Senator Harrison A. Williams, Jr., who presided over the FBDIC Hearings, seems to be presciently referring to the Claimants when he noted that the "real losers" in the event of a broker insolvency were "small investors, many of whom invested a significant portion of their savings in securities." FBDIC Hearings, at 1. In supporting the new legislative initiative, Senator Williams declared it imperative that "these investors be *fully* protected against brokerage firm failures." *Id.* (emphasis added). As discussed below, the adoption of coverage limits under the Act were guided by this goal of full protection.

In connection with the introduction of the bill to establish what became known as the Securities Investors Protection Corporation, it was repeatedly recognized that brokerage houses were responsible for the safeguarding of two distinct forms of assets: securities, on the one hand, and cash

13

in the form of "free credit balances," on the other. *See, e.g.,* FBDIC Hearings, at 8 (quantifying increases in "free credit balances" held by exchange members); S. Rep. No. 91-1218, at 2 (1970). "Free credit balances," the term used throughout the legislative record, referred to a specific securities industry practice with respect to customer cash. *Id.* Free credit balances were understood to be funds left with a brokerage firm by customers having the right to withdraw them on demand. These credit balances could be used by the broker, as by banks, in the conduct of its business — to maintain positions in securities, to finance margin purchases of customers, and for other general purposes. *Id.* Although free credit balances could be used by the brokerage in the operation of its business and were not required to be segregated, such funds were nonetheless payable to customers on demand. FBDIC Hearings, at 8-9. Free credit balances usually came from the proceeds of the sale of a customer's securities or from dividends paid and were left with the broker as a convenience in contemplation of further securities purchases. H.R. Rep. 91-1613, at 2 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5255.

Bills introduced to establish a brokerage insurance program set $50,000 as the coverage limit for customer claims; and provided for this coverage to apply to any combination of a customer's claim, whether it be one for a free credit balance or for reimbursement of undelivered securities. *See* S. 2348 (included in FBDIC Hearings); H.R. 13308 (included in *Hearings on Securities Investor Protection Before the Subcomm. on Commerce and Fin. of the House Comm. on Interstate and Foreign Commerce,* 91st Cong. 2nd Sess. (1970) (hereinafter "House Hearings")); *see also* Statement of Hamer H. Budge, Chairman of the Securities and Exchange Commission, FBDIC Hearings, at 7. Consistent with the goal of full protection to the individual investor, Chairman

[SIPC Brief Post Crash May 29.WPD]

Budge, who was called upon to report on the degree of coverage that would be afforded by a $50,000

limit, stated:

> We believe that the vast majority of investors would be fully
> protected by the $50,000 coverage of the proposed bill .... [An
> independent survey] found that 94.5% of cash and margin accounts
> would be fully covered by the $50,000 limitation .... 96.3% of
> accounts with customers' securities in brokers' custody would be
> fully covered as to those securities ....

House Hearings, at 340.

Although the $50,000 limit was reported to the House Subcommittee as meeting the

goal of full protection, proponents of the bill were questioned as to how such a limit could be

justified in view of the $20,000 limit which was then applicable to federally insured bank deposits.

House Hearings, at 376. The discrepancy between the treatment of bank deposits and assets held in

brokerage accounts caused the Department of the Treasury to oppose enactment of the bill. As

explained on behalf of the Treasury Department by its Acting General Counsel:

> The proposed maximum insurance limit of $50,000 per account
> would be excessive as compared to the maximum coverage provided
> by FDIC and FSLIC of $20,000 per account, and could be construed
> as an indication that the Federal Government attaches greater
> importance to the preservation of public confidence in broker dealers
> than to the preservation of confidence in the banking system .... In
> view of the foregoing, the Department would be opposed to the
> enactment of the proposed legislation.

Letter of Roy A. Englert, Acting General Counsel of the Department of Treasury, FBDIC Hearings,
at 79-80.

During the course of the FBDIC Hearings, Chairman Budge attempted to justify the

disparity between maximum coverage under the proposed legislation and the limits of federal deposit

insurance. In his testimony before the Senate Subcommittee, he explained that:

> One reason we felt it was appropriate to have a $50,000 limitation here rather than the $20,000 which is in the FDIC was that we took cognizance of this situation, that a person could have insured accounts in several banks or several savings and loans, or at least three accounts with his wife in one institution. But we felt it would be a rare case if people had separate brokerage accounts in separate brokerage houses.

FBDIC Hearings, at 278. [18]

Notwithstanding the Chairman's testimony, the final enactment of SIPA reflects an accommodation to the position voiced by the Department of the Treasury and others. House Bill 19333, which was ultimately adopted as SIPA, was amended in conference to provide that whereas a customer claim for securities could be satisfied to the extent of $50,000, a "claim for cash (as distinct from securities)" would be satisfied only to the extent of the $20,000, the coverage limit then applicable to federally insured bank deposits. Conf. Rep. 91-1788, 91st Cong. 2nd Sess. (1970), 1970 U.S.C.C.A.N. 5281, 1970 WL 5921 (Leg. Hist.). By keying the coverage limit for cash claims to the coverage limit for federal deposit insurance, Congress was able to avoid the anomaly of brokerage houses being able to offer higher insurance coverage for customer cash than insured banking institutions while still providing full coverage to securities investors.

Since the enactment of SIPA, the coverage limit on federally insured deposits has been increased twice: In 1974, from $20,000 to $40,000; and in 1980, from $40,000 to its present level of $100,000. [19] Consistent with the goal of achieving uniformity in the coverage of federally

---

[18] The Chairman made similar remarks to the House Subcommittee. *See* House Hearings, at 376.

[19] Pub. L. No. 93-495, 88 Stat. 1500 (1974) raised the federal depository insurance limit to $40,000. Pub. L. No. 96-221, 94 Stat. 132 (1980) raised the limit to $100,000.

insured cash accounts, the coverage limit for cash claims under SIPA has been raised to match federal deposit insurance in the wake of each coverage increase. [20]

The legislative history demonstrates that the lower level of protection "for cash" was intended by Congress for protection of customer assets in the form of "free credit balances" held in their brokerage accounts for convenience in anticipation of further securities purchases. There is nothing in the legislative record to suggest that such lower level of protection was intended to limit coverage to customers who had authorized the purchase of securities but whose funds had instead been misappropriated. The legislative concerns reflected in the establishment of the lower coverage limit for cash claims, in fact, are not advanced when applied to an investor who had no knowledge or intent to have cash on deposit with his broker, who authorized cash deposited with his broker to be applied to the purchase of securities and who relied upon apparently *bona fide* account statements and confirmations showing that such securities were in fact purchased for his account. Such an investor, who had no intention of maintaining a cash account, cannot have been influenced to do so in order to obtain higher coverage only available to securities accounts. Such an investor is not similarly situated to a bank customer who, knowing that coverage is limited, can choose to open deposit accounts at multiple institutions to achieve full protection of his assets. Moreover, banking

---

[20] Congress, in enacting SIPA, set initial coverage limits for cash and security claims at $20,000 and $50,000, respectively (Pub. L. No. 91-598 (1970)). Pub. L. No. 95-283, 92 Stat. 249 (1978) raised SIPA coverage levels for cash and security claims to $40,000 and $100,000, respectively. H.R. Rep. 96-1321, accompanying the enactment of Pub. L. No. 96-433, 94 Stat. 1855 (1980), which raised the SIPA coverage maximum to its current levels, specifically notes the relationship of SIPA coverage to FDIC coverage: "Because of the substantial size of the SIPC Trust Fund, inflation, and the well-recognized need to provide for further customer confidence in dealing with individual securities firms, the Committee believes that an increase in insurance levels is appropriate and would be commensurate with the recently increased insurance levels for deposits with Federally insured banks."

17

institutions are not harmed or disadvantaged *vis-a-vis* brokerages when such deceived customers are afforded the higher coverage intended for the securities investors they legitimately believed themselves to be.

Rather than seeking to effectuate any discernable statutory goal, the Trustee's determination allows the parameters of Goren's criminal scheme to determine the scope of a claimant's coverage. As the Trustee candidly states, his determinations rest entirely upon *Goren's* fabrication of the NASMMF as a feature of a criminal scheme to misappropriate customer funds. Had Goren acted otherwise — for example, offering Claimants any one of thousands of essentially generic money markets funds and had such shareholdings accordingly appeared on their account statements rather than shares of the NASMMF — the Claimants, according to the Trustee and SIPC, would be entitled to statutory coverage in the amount of $500,000. Or, had Goren in fact caused to be legally organized an entity for operation of a money market fund but misappropriated investor funds entrusted to him for purchase of its shares, the Trustee (based on his position) would apparently treat the claim as one for securities. Discriminating among victims of a brokerage insolvency in this manner is absurd, unjust and even cruel. A statute should be interpreted in a way that avoids absurd results. *See, e.g., United States v. Hendrickson,* 26 F.3d 321, 336 (2nd Cir. 1994); *In re Adamo,* 619 F.2d 216 (2nd Cir. 1980); *In re Buchferer,* 216 B.R. 332 (Bankr. E.D.N.Y. 1997). The construction of a statute which would lead to such a result, must, in accordance with established general principles of statutory construction, be rejected *even if facially required by the terms of the statute.* Here, where no statutory language mandates the result (and the statutory language, if anything, supports Claimants' position), the Trustee's position in untenable. As observed in the SIPA context:

It is not likely that Congress, in seeking to protect the assets of small transaction customers of broker-dealers, intended to make eligibility for protection depend on whether the broker complied with rules of the SEC or practices of the trade. These are matters over which the broker has complete control. The trusting customer is not to be penalized for choosing a careless, unethical or dishonest broker. The primary purpose of the Act is to assure the unsophisticated participant in securities transactions that there is protection when a bad choice of brokers is made.

*Securities and Exchange Commission v. Ambassador Church*, 679 F. 2d 608 (6th Cir. 1982).

In enacting SIPA, Congress specifically intended to protect customers from the misappropriation of their assets by brokers. *See, e.g.*, FBDIC Hearings, at 2 ("[SIPC] would ... be used for consumer protection against fails to deliver and brokerage thefts") and 143 (observing that "huge thefts" within the industry result in financial problems). To paraphrase the Sixth Circuit in *Ambassador Church*, it is not likely that Congress, in seeking to protect customers from theft, intended to make the scope of coverage depend upon whether the securities that the broker claimed to be purchasing with customer funds were real or fictitious. To attribute such an intent to Congress defies common sense. "Common sense is essential to endeavor of statutory construction[.]" *Brooklyn Bridge Coalition v. Port Authority of New York and New Jersey*, 951 F.Supp. 383 (E.D.N.Y. 1997).

It is painfully evident that the wholesale misappropriation of customer assets culminating in insolvency, while not necessarily common or widespread, is a repeating phenomenon.[21] Regardless of the superficial differences between misappropriation schemes, all of which are within the control of the perpetrators — including the legal subsistence and form of their vehicles of fraud, and the lies told to avoid discovery — the victims of these schemes have suffered losses because, as customers of a brokerage, money intended for the purchase of securities was

---

[21] In a recent SIPA proceeding, the chief executive and financial officers of Sunpoint Securities Inc. were found to have diverted over $25 million dollars of customer funds from an "omnibus money market account" and "settlement accounts" and to have concealed this misappropriation though falsified account statements. *In re Sunpoint Securities, Inc.*, Securities Exchange Act of 1934, Release No. 44255/ May 3, 2001, Administrative Order; *In re Sunpoint Securities, Inc.*, 2001 WL 484001 (Bankr. E.D.Tex. Apr. 23, 2001). According to the self-congratulatory press releases issued by SIPC, "nearly 10,000 individuals had their accounts restored" as a result of $31 million of advances from the SIPC Fund.

stolen. The fundamental principle which guides how the assets of an entity in federal receivership

should be distributed to investors who have fallen victim to a "ponzi" scheme is that any distribution

"should be done equitably and fairly, with similarly-situated investors or customers treated alike."

*SEC v. Credit Bancorp., Ltd,* 2000 WL 1752979, *13 (S.D.N.Y Nov. 29, 2000). In such contexts,

"equality is equity." *Id., citing Cunningham v. Brown,* 265 U.S. 1, 13 (1924). Equality is also equity

in the SIPA context. Where, as here, no explicit statutory constraint prohibits similarly-situated

investors from being treated alike (and the Claimants' legitimate expectations were identical to those

of other mutual fund claimants whose claims "for securities" are being honored), the fundamental

principle that "equality is equity" should guide in the determination of customer claims.


**II.    Classification of Claims Should be Based Upon A Customer's Legitimate**
**Expectations as to the Nature of Assets in Brokerage Account**

In all cases of statutory construction, the starting point is the language employed by

Congress. *SEC v. Ambassador Church Finance/Dev. Group, Inc.,* 679 F.2d 608, 611 (6th Cir. 1982)

(*citing American Tobacco Co. v. Patterson,* 456 U.S. 63, 68 (1982)). The Trustee's position is that

customer claims based upon authorized and confirmed securities purchases are "claims for cash"

under SIPA § 78fff-3(a)(1) to the extent that such securities had no existence except in the mind of

a dishonest broker. SIPA, however, does not define "claim for cash" or "claim for securities." *In*

*re Stratton Oakmont, Inc.,* 257 B.R. 644 (S.D.N.Y. 2001).[22]

Because Congress' intent in the proper characterization of a claim based upon sham

securities is not clear from the language of the Act itself or from its legislative history, a court in

construing the Act may look to similar language in other statutes that apply to "similar persons,

---

[22]There can be no dispute that shares of a money market fund are securities as defined by
SIPA. The suggestion of the Trustee and SIPC that shares of a money market fund must be
subject to a registration statement to be eligible to be considered a covered security finds no
support in SIPA. *See, generally,* SIPA § 78lll(14). While such requirement applies to
"investment contracts" it does apply to "stock" such as shares of a mutual fund. *Id.*

(SIPC Brief Post-Crash May 29.WPD)

things or relationships." 2 B N. Singer, *Sutherland on Statutory Construction* § 53.03, p. 233 (rev.

5th ed.1992). SIPA was enacted as an amendment to the Securities Exchange Act of 1934, 15

U.S.C.A. § 78a, *et seq.* (the "34 Act"), and it is therefore appropriate to look to the '34 Act for

guidance as to the construction of SIPA. *See In re Stratton Oakmont*, 257 B.R. at 656 (explaining

the relevancy of principles established under the '34 Act to interpretation of SIPA). In fact, the

provisions of the '34 Act are expressly made applicable to SIPA. 15 U.S.C. § 78bbb. The Supreme

Court has repeatedly recognized that Congress had "broad remedial goals" in enacting the securities

laws and providing civil remedies. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 200 (1976);

*Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). Accordingly, the Court has construed securities

law provisions "'not technically and restrictively, but flexibly to effectuate [their] remedial

purposes.'" *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972), *quoting SEC v.

Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963). SIPA should likewise be so

construed. "SIPA is a remedial legislation. As such it should be construed liberally to effect its

purpose." *In re First State Securities Corp.*, 34 B.R. 492, 496 (Bankr. S.D. Fla. 1983), *citing

Tcherepnin v. Knight*, 389 U.S. at 336.

In construing Section 10(b) of the '34 Act, courts have been required to address a

strikingly similar issue of statutory construction as is faced here. Section 10(b) of the '34 Act

prohibits fraud only to the extent perpetrated "in connection with the purchase or sale of a security."

Defendants in actions based upon Section 10(b) have argued that where the fraudulent scheme was

to induce the purchase of a security that in fact never existed, the "in connection with" element is

not satisfied because the scheme did not actually involve a security. Similarly, the Trustee argues

here that Claimants cannot have a "claim for securities" because such claim is based upon non-

21

(SIPC Brief Post-Crash May 29.WPD)

existent securities.  Because of the remedial nature of Section 10(b), the requirement that a

fraudulent scheme involved an actual or *bona fide* security in order to run afoul of Section 10(b) has

been squarely rejected.  It has instead long been established that a fraud in connection with the

purchase or sale of a fictitious or non-existent security is no less actionable for its fictitious quality.

*Local 875 I.B.T Pension Fund v. Pollack,* 992 F. Supp. 545, 563 (E.D.N.Y 1998) ("that the Note is

alleged to have existed nowhere but in the minds of the defendants does not remove this case from

the purview of Rule 10b-5 "); *see also SEC v. Bremont,* 954 F. Supp. 726 (S.D.N.Y. 1997); *Mishkin*

*v. Peat, Marwick, Mitchell & Co.,* 744 F. Supp. 531, 553 n.10 (S.D.N.Y. 1990).  In extending the

protection of the securities laws to the victims of schemes involving fictional securities, the court

in *Local 875* noted that such construction logically extended the reach of the statute to the most

egregious frauds and that the opposite interpretation would create the paradox that "the worse the

securities fraud, the less applicable the securities law." *Local 875,* 992 F. Supp at 564.

Like the "in connection with" requirement, the phrase "claim for securities" should

be read in a flexible manner and not "in a technical or restrictive manner." *In re Ames Dept. Stores*

*Inc. Stock Litig.,* 991 F.2d 953, 962 (2nd Cir. 1993).  Applying the higher claims coverage limitation

to customers who were deceived as to the existence of a particular security would extend such

coverage to those members of the public targeted by SIPA — *i.e.,* to investors who legitimately

expected that their brokerage accounts held securities at the time of an insolvency.  In fact, it must

be recognized that within this proceeding, the Trustee has construed the term "securities" flexibly

with respect to the "mutual fund investors" so as to satisfy their legitimate expectations.  Such

investors have been determined by the Trustee to have had a "claim for securities," notwithstanding

that at no point prior to Debtor's insolvency did these claimants ever possess interests in actual

{SIPC Brief Post Crash May 29.WPD}

securities. Identically with the Claimants' monies, the funds entrusted by the mutual fund investors

to the Debtor were diverted to *the same* commingled Fleet Bank bank account as funds entrusted by

Claimants. The determination that these claimants nonetheless had "claims for securities" can be

based *only* upon their ascertainable intent in depositing money with the Debtor for the purchase of

securities of a kind covered by SIPA and by their legitimate expectation (based upon confirmations

and account statements) that such securities were in fact purchased and held for their account.

Obviously, if SIPA permits a determination based upon these criteria that the mutual fund claimants

had claims "for securities," it can and should permit a determination, *based on the same criteria*, that

Claimants have claims "for securities."

In the only case cited by the Trustee and SIPC involving shares of a money market

fund, *Securities Investor Protection Corp. v. Oberweis Securities, Inc.*, 135 B.R. 842 (Bankr. N.D.

Ill. 1991), the court observed that legitimate expectations are established by the receipt of

confirmations. Customers with *confirmations* have a *legitimate expectation* of receiving securities,

unlike customers who have entrusted cash to a broker for the purchase of securities, but do not

receive a confirmation: "Customers with confirmations have a *legitimate expectation* of receiving

securities, but customers without confirmations do not have the same expectation." *Oberweis*, 135

B.R. at 847 (emphasis in original).[23]

---

[23]    In *Oberweis*, the claimants had instructed the broker to purchase shares of a money
market fund for $28,767.72 from funds transferred from another brokerage firm, but the broker
failed to effect such purchase and the customer's brokerage statements apparently did not reflect
such purchase, nor even credit the $28,767.72 sent from the other brokerage firm. The
customers, however, never received a confirmation of such purchase; and the Court rejected, as a
matter of law, the customers' claim for dividends they would have earned had the principal been
invested in a money market mutual fund per their instructions, because of the absence of receipt
of a confirmation.

(SIPC Brief Post Crash May 29, WPD)

In reaching its disputed classification of the Claims, the Trustee ignores the legitimate expectations of brokerage customers and, in a narrow pursuit of "logic and consistency," instead focuses inappropriately upon the Trustee's inability to satisfy the Claims by the actual delivery to the Claimants of shares of NASMMF. Indeed, the Trustee's and SIPC's principal argument is that such fact alone determines the appropriate classification of Claimants' net equity claim as one for "cash." The classification of claims based upon the nature of the assets to be used in their satisfaction is not compelled or suggested by any provision of the Act, nor, more specifically, by SIPA §§ 78fff-1(b) and 78fff-2, which set forth the trustee's duties with respect to the satisfaction of customer claims and provide for the manner in which such duties are to be discharged. Were delivery of claims for securities to be the sole and exclusive means for the Trustee to satisfy claims for securities, it was within the power of the legislature to so provide. Instead, SIPA § 78fff-1(b) specifically contemplates that securities claims will *not* always be satisfied by the delivery of securities by directing the trustee to deliver securities in satisfaction of securities claims "to the maximum extent practicable." Similarly, § 78fff-2 easily accommodates the satisfaction of securities claims with cash by specifically providing for the satisfaction of "all obligations of the debtor to a customer relating to, or net equity claims based upon securities *or* cash, by the delivery of securities *or* the making of payments to or for the account of the debtor" (emphasis added). Moreover, the provision providing for the purchase of securities by the trustee for delivery to customers with securities claims is expressly made conditional on the availability of such securities. As the Trustee acknowledges, "if the securities are unavailable, the customer receives their cash value." Joint Memorandum at 9.

Although the legislative record of the 1978 amendments to SIPA indicates that in creating the flexibility found in SIPA §§ 78fff-1(b) and 78fff-2, Congress did not specifically discuss the confirmed purchase of sham securities, the fact that such claims may not have been specifically discussed in connection with the enactment of the 1978 Amendments or with the Act itself, does not change the fact that SIPA flexibly provides for the discharge of "claims for securities" by the payment of cash. To allow satisfaction of Claimants' securities claims by the payment of cash, it is enough that Congress foresaw the possibility that for any number of reasons, customer securities would not be available for purchase by a Trustee and provided for the satisfaction of claims based on such securities by payment of cash.[24] Moreover, it is perverse to rely (as does the Trustee and SIPC) upon the SIPA trustee's securities delivery obligation, enacted by pursuant to the 1978 Amendments for the purpose of (as acknowledged by the Trustee and SIPC) *heightening* the remedial efficacy of SIPA, as a justification for limiting coverage. Because money market fund

---

[24] As the Joint Memorandum explains, in making the obligation of the trustee to purchase securities in satisfaction of claims conditional on availability, the legislative history shows that "one chief concern" of the drafters of the 1978 Amendments was that the trustee not be required to make purchases in a market which is being improperly controlled or manipulated. Although this is the only circumstance mentioned in the legislative record which would relieve the trustee of the securities deliveries obligation, a variety of other, different circumstances also preclude satisfaction of a securities claim by the delivery of securities. For example, Claimants' counsel in this proceeding has been advised that customers who had positions in mutual funds that are closed to new investors will receive cash satisfaction of their net equity claims to the extent based upon such closed funds. Other circumstances which would preclude satisfaction of a securities claim with like securities would include claims based upon debt instruments which were redeemed or retired by the issuer following the filing date or equity securities which, after the filing date, were "cashed out" in connection with a statutory merger. While none of these examples are mentioned in the legislative record of the 1978 Amendments, certainly such circumstances, while precluding the trustee from delivering securities in satisfaction of such claim, would not convert the customer's claim for securities to one "for cash."

shares are cash equivalents, the alternative means of satisfying net equity claims based on money market fund shares, either by cash or by delivery of securities, are economically indistinguishable.

The Trustee's argument that recognition of Claimants' securities claims raises valuation problems is another red herring. The Trustee is not being asked here to satisfy securities claims based upon "imaginary dotcoms, computer companies, and biotech firms." *See* Joint Memorandum at 27. Unlike the equity securities issued by such ventures, the value of shares of a money market fund always can be ascertained without reference to market value. Although recognized by SIPC as securities, shares of money market funds are "cash-equivalents." [25] As cash equivalents, money market shares do not fluctuate in principal value. Money market funds offer to redeem shares daily at a net asset value per share of $1.00. Pursuant to regulation, money market funds must adhere to qualitative and quantitative criteria which minimize credit risk and accounting practices which permit them to maintain a constant per share value of $1.00 per share. This ongoing offer to redeem shares of a money market fund establishes the value of a share as of any date. As a result of regulations which effectively define money market funds and dictate their investment activities, literally 100% of the *thousands* of legitimate retail money market funds operating during the life of the Goren money market scheme maintained a constant share value of $1.00 per share during such period. In fact, because of the minimal credit risk involved in the underlying securities to which money markets are limited, no retail investor in any of these funds has ever lost any of his principal investment in the fund. Because they maintain a constant share value and because they are

---

[25] James M. Storey & Thomas M. Clyde, *Mutual Fund Law Handbook*, "The Legal Framework," § 29.1 (cited by SIPC and the Trustee in support of the Trustee's motion).

(SIPC Brief Post-Crash May 29.WPD)

redeemable on demand, money markets are uniquely simple to value.[26]  In fact, as reflected on the

Determinations of Claim received by each of the Claimants, the Trustee has had no trouble

quantifying the "net equity" claims of each Claimant as dictated by statute:  "the dollar amount of

the account ... of a customer, to be determined by (A) calculating the sum which would have been

owed by the debtor to such customer if the debtor had liquidated by sale or purchase on the filing

date, all securities positions of such customer[.]"  SIPA § 78lll(11).[27]

---

[26] It is widely recognized that shares of a money market fund, a form of security which is
a type of mutual fund, are the most conservative securities investment possible.  The risk of loss
of principal invested in shares of a money market is virtually nonexistent.  As one author has
noted:

> Introduced in the 1970s, money market accounts have perfect
> track record: no one has ever lost a dime in one of these funds.
> In addition to being extremely safe, they boast a rate of return that
> continues to be competitive with the general level of interest rates:
> as rates climb, so do money market yields, and vice versa.

Williamson, Gordon K., *Low Risk Investing*, at 33 (1993).  It is similarly well-established that
money market funds are safer than even the most conservative of the other categories of mutual
funds. *See* Williamson, Gordon K., *The 100 Best Mutual Funds You Can Buy/2001*, at 211 ("All
money market funds are safer than any other mutual fund or category of funds in the book.")  The
extraordinary safety of principal invested in money market funds is due, in large part, to the fact
that the SEC requires that all taxable money market funds invest in securities of the highest
quality, as rated by Moody's Investor Service, Inc. or Standard & Poor's Corporation, maturing
in a year or less. *See generally* The Vanguard Group, http:/majestic.vanguard.com.

Indeed, one of the unique features to money market funds is that such funds always
maintain a stated net asset value of $1.00 per share.  Today, there are approximately 1,600 money
market funds, all with a stated net asset value of $1.00 per share.  In the thirty-year history of
money market funds, in terms of the average investor, the importance of the safety, security and
sanctity of the $1.00 per share stated net asset value of all money market is essential. *See* Bogle,
John C., *Mutual Funds*, at 120 (1994) ("The money market fund opened the door for the average
investor to enjoy the higher short-term rates of return previously available only to large
institutions and wealthy individuals.")

[27] "Securities positions," in this context, refer not to actual securities held for the
customer, but the securities which should have been held for such customer based upon
authorized transactions as reflected in account statements.  Indeed, the very purpose of the Fund

(SIPC Brief Post-Crash May 29.WPD)

Money market shares are intended to be fully liquid. In order to "sell" shares of a money market, the shares are redeemed by the money market fund, with a check delivered to, or funds wired to, the investor. Unlike an equity security traded on the New York Stock Exchange or NASDAQ, or even mutual fund shares other than money market shares, which fluctuate in value, the actual value of the principal invested for the purchase of the money market shares always remain constant. As a result, the argument of the Trustee and SIPC that it is somehow impossible to determine the value of the New Age Securities Money Market shares as of the filing date misses the obvious — at least with respect to the principal invested, the shares maintained a constant value of $1.00 per share purchased. Similarly disingenuous is the Trustee's and SIPC's argument that if the Claims are treated as "for securities" a purported valuation quagmire would result in the Trustee not being able to pay anything at all. [28] Here, the Trustee has even acknowledged the allowed amount of each claim in the amount of the principal invested (less any redemptions). And since the principal was used to purchase shares of the New Age Securities Money Market at a fixed price of $1.00 per share, there is no risk of "perpetuating a fiction," by at a minimum, honoring as a claim "for securities" the purchase of the original money market securities here. Thus, this feature shared by all money market funds exposes the Trustee's and SIPC's argument that recognition of Claims as

_____

created by SIPA was to satisfy customer claims in respect of securities which should have existed, but as a result of misfeasance did not exist, in their account as of the date of filing.

[28] It is also unseemly for the Trustee and SIPC to insinuate that the Claimants, who hereby exercise their legal right to object to the Trustee's determination, in so doing may imperil their right to the $100,000 of SIPA coverage recognized by the Trustee.

"for securities" would require him to identify "which one of the thousands of money market funds is most like the non-existent fund," as a frivolous makeweight argument.[29]

The Trustee's argument that a claim for securities may only be satisfied by delivery of securities also overlooks that the obligation of the Trustee pursuant to SIPA § 78fff-2 is to step into the shoes of the debtor to "*discharge the obligations of the debtor*" with regard to a net equity claim based upon securities. This reference to the debtor's obligations contemplates that such obligations may not in all circumstances be to deliver securities. And, indeed, with respect to money market fund shares, the obligation of the broker to his customer is to redeem such shares *for cash* and to deliver *cash* to the customer, not securities.

When the provisions of SIPA relating to a trustee's obligations to satisfy net equity claims are read as an entirety in light of the remedial purpose for which they were enacted, rather than with a view to limiting customer recovery, it emerges that the purported statutory obstacles to the Trustee's recognition of Claimants' claims as "claims for securities" are of SIPC's own making and the practical issues alluded to are disingenuous.

An analysis of the cases upon which the Trustee and SIPC principally rely in support of their position similarly reveals that none of these cases involve the issues present here; such authorities as exist are not binding on this court; the "reasoning" of such authorities is entirely

---

[29] As noted above, the entire SIPA structure contemplates recognition of a variety of legal and factual "fictions" to effectuate its purpose. Thus, the Trustee's and SIPC's charge of "perpetuating a fiction" runs contrary, *inter alia*, to SIPA and the Series 500 Rules.

Claimants do not seek a ruling beyond that contained in their Limited Objections, which are limited to the improper treatment of purchases of shares of the NASMMF, under the circumstances of this case. The specific ruling Claimants seek here is clearly warranted, *inter alia*, by SIPA and the Series 500 Rules and is amply supported by the legislative record.

{SIPC Brief Post Crash May 29.WPD)

conclusory and perfunctory as to the classification of certain claims as cash claims; and such cases

are factually distinguishable and otherwise unpersuasive.

Plumbers & Steamfitters Local 490 Severance & Retirement Fund v. Appleton, 39

F.3d 1181 (6th Cir. 1994) ("In re First Ohio Sec. Co.") (unpublished opinion), cert. denied, 514 U.S.

1918 (1995), relied upon by the Trustee and SIPC, is not only not binding on this Court, but is an

unpublished opinion proscribed from use as precedent in the determination of other cases. [30]

More significantly, the Sixth Circuit's conclusory statement that the "only legal

conclusion possible" was that the plaintiffs' claim for coverage of interests in "pooled certificates

of deposit" was a claim "for cash" and not "for securities" offers no thoughtful guidance on the

issues raised here. The court does not indicate the authorities to be relied upon in reaching this

conclusion, nor does it make reference to any provision of SIPA or to its legislative history. The

court does not undertake an analysis of whether, had the assets purportedly purchased by the debtor

been actual, such interests were of a kind covered by SIPA's definition of security. [31]   Moreover,

------------------------------------------------

[30] Apparently, this is not the first time SIPC has improperly relied upon this unpublished
Sixth Circuit ruling. In In re Omni Mutual, Inc., 193 B.R. 678 (S.D.N.Y. 1996), Judge Stein
criticized the bankruptcy court for relying on this unpublished per curium ruling in violation of
Rule 24(c) of the Sixth Circuit, holding that "the mere citation of an unpublished disposition is
'disfavored, except for the purpose of establishing res judicata, estoppel or the law of the case.'"
The Second Circuit has a similar rule regarding unpublished opinions.  Second Circuit Rule §
0.23 proscribes the citation or use of statements issued by the court not constituting formal
opinion in unrelated cases either in the Second Circuit "or any other court."

[31] Arguably, the Plumbers & Steamfitters plaintiffs' "interests" in "pooled certificates of
deposit," by not being in the form of share ownership in an entity, were vulnerable to
classification as "investment contracts" which would not have constituted securities under SIPA
even had such interests not been fictive. See 15 U.S.C. § 78lll(14) (providing that "investment
contracts" are securities for the purposes of SIPA only if registered under the Securities Act of
1933, 15 U.S.C. § 77a, et seq.).  In contrast, shares of a money market fund are "stock" within
the meaning of the Act, for which there is no registration requirement as a condition of SIPA
coverage.

the *Plumbers & Steamfitters per curium* decision indicates reliance on the district court's

characterization of the claim as being one for "restitution for fraud." As explained *infra*, the

disallowance of a claim on such a basis is premised on a "legal fallacy" identified by the Eastern

District of New York and the Southern District of New York — *i.e.*, that the existence of a cause of

action for fraud against the debtor precludes a valid statutory net-equities claim. *See In re Investors

Center, Inc.*, 129 B.R. 339, 351 (Bankr. E.D.N.Y. 1991); *In re Adler, Coleman Clearing Corp.*, 218

B.R. 689 (Bankr. S.D.N.Y. 1998), discussed *supra*. Finally, the Sixth Circuit's recital of an

alternative basis for denial of the claims — finding that the pension fund participants were not

individual "customers" at all — further diminishes the significance of its characterization of the

denied claims as "for cash."

Similarly, *Appleton v. Hardy* (also "*In re First Ohio Secs. Co.*") No. 590-0072, Adv.

No. 92-5085 (Bankr. N.D. Ohio 1992), another unpublished Order in the same bankruptcy

proceeding as *Plumbers & Steamfitters*, offers no guidance or analysis in support of its implicit

characterization of claimants' claims for certificates of deposit and mutual fund shares as claims "for

cash." Moreover, although adherence to SIPC's and the Trustee's position that a determination turns

upon the existence of a security "outside the mind of the broker" would seem to make the manner

in which the broker identified to its customer the securities purportedly purchased for the customer

critical to the coverage issue, it is impossible to decipher from the unpublished Order in what sense

the certificates of deposit purportedly purchased for the customer "never existed." Without further

factual elaboration as to whether the customer received confirmation of the purchase of specific

certificates of deposit (which were not in fact purchased by the broker), or whether bogus certificates

of deposit identified to the customer were "fictitious," or even whether anything more than generic

(SIPC Brief Post-Crash May 29.WPD)

certificates of deposit were identified to the customer as having been purchased, *Appleton* can

provide no support for the Trustee's position.

In *SIPC v. Old Naples Secs., Inc.*, 218 B.R. 981 (Bankr. M.D. Fla. 1998), *aff'd*, 223

F.3d 1296 (11th Cir. 2000), customers sought coverage based upon the transmission of funds for

unidentified "discount" bonds. As in *Plumbers & Steamfitters,* the court characterized these

customer claims as a "claims for cash" without analysis and without reference to any statutory

provision purportedly requiring such result. *Old Naples*, 218 B.R. at 986. Unlike the present case,

the customers in *Old Naples* never received confirmations or statements purporting to identify the

securities purchased for their account. *Id.* at 984. In fact, instead of showing securities in their

accounts, account statements received by claimants consistently showed instead the amount invested

through the debtor and the rate of interest applicable to the investment. *Id.* Accordingly, it is

questionable whether the *Old Naples* claimants had a "legitimate expectation" that their accounts

held securities. On appeal by SIPC from the allowance of the claims, the court did not address the

characterization of the claims in affirming their allowance over SIPC's objections. In view of the

questionable legitimacy of the *Old Naples* claimants' expectations as to account interests in

securities based upon their account statements as well as the absence of any analysis on this point,

the *Old Naples* decisions are most interesting as an example of a SIPA trustee's unwarranted

determination to disallow the customer claims asserted. The trustee argued, *inter alia,* that the funds

transmitted for the purchase of bonds were intended as a direct loan to the broker; that the claimants

were not customers because their interests in the securities purchased with their money was indirect;

and finally that because the customers were promised such a high rate of return and their investments

were so poorly documented, the customers had not met the requirement of SIPA § 78lll(2) of dealing

(SIPC Brief Post-Crash May 29.WPD)

with the debtor "in the ordinary course of business." *Old Naples*, 223 F.3d 1302-1306. The

Eleventh Circuit affirmed the Bankruptcy Court's rejection of each of these arguments, finding that

the claimants were statutory customers of the debtor and that the losses that they suffered as a result

of the "ponzi" scheme which had resulted in the broker's demise were of the kind that SIPA was

enacted to remedy. *Id.* at 1299.

   *S.E.C. v. Aberdeen Securities*, 480 F.2d 1121 (3rd Cir. 1973), *cert. denied sub. nom*

*Seligsohn v. SEC*, 414 U.S. 1111 (1973), relied upon by the Trustee and SIPC apparently because

of the court's reference to the stock intended for purchase as "not in existence," is factually and

legally inapposite. In *Aberdeen*, the securities intended for purchase were unavailable, not because

they were fictitious but because the issuer had become bankrupt at some point after the claimant had

deposited money with his broker but before stock had been issued. The case was remanded for

additional factual findings to determine whether in view of the fact that the stock had never been

issued, the claimant was entitled under "local law" to the return of his funds. Thus, the issue on

remand was whether, as a factual matter, the purchase of the securities had been executed as of the

relevant date or, in the alternative, whether claimant was entitled to a refund of the funds intended

for, but not applied to, the purchase of the stock.

   The Trustee's and SIPC's reliance on *In re Brentwood Securities Inc.*, 925 F.2d 325

(9th Cir. 1991), again apparently based on a reference to securities that did not "come into existence,"

is similarly misplaced. In *Brentwood*, claimant had attempted to purchase securities directly from

the issuer, American Mineral Resources ("AMR"), an actual business enterprise but one which never

issued the shares to be purchased. The claimant had made out two checks for the purchase of AMR

securities, one solely to the issuer and the other jointly to AMR and her broker, who was also

(SIPC Brief Post Crash May 29.WPD)

Chairman of AMR. The purported purchases never appeared on the claimant's brokerage statements. Accordingly, the court determined that the attempted purchase of these securities had not been done through the debtor and, accordingly, that the claim for these securities was not a customer claim.

In re Investors Sec. Corp., 6 B.R. 415 (Bankr. W.D. Pa. 1980), relied upon by the Trustee and SIPC, does not support their position because, as they acknowledge, the certificate of deposit upon which claimants premised their SIPA claim in that case had matured at the time of the debtor's insolvency. Accordingly, the claimants had only an expectation of cash in their account and, in fact, are described as having waited for the maturity date of the certificate of deposit as an opportunity to seek return of their funds. Moreover, the court's construction of SIPA § 78fff-3(a)(1)[32] "as contemplat[ing] situations ... where money is deposited with the broker for the purpose of purchasing securities, but where the broker has failed to purchase the securities" is not only clearly erroneous as a matter of legislative history but also overbroad as it would compel classification as "cash" any customer claim, including claims for specific "real securities" appearing on account statements, for which purchase orders had not in fact been executed.

In re June S. Co., 52 B.R. 810 (Bankr. D.Or. 1985), also does not support the Trustee's and SIPC's position and does not address the issue of sham securities. In June S. Jones, claimants, who had ordered purchases of the securities of a subsisting corporation, sought to have the claims classified as "cash claims" because the securities orders had not been completed as of the filing date. The court rejected their claims because the claimants had received confirmations that the

---

[32] Cited by the court as SIPA § 6(f)(1)(A).

securities had been purchased even though they were not. *June Jones,* 52 B.R. at 813-14. The court explained that:

> In the present case, claimants' legitimate expectations were that their accounts held MSM stock as of the filing date .... Under the facts presented, the statutory scheme requires a finding that claimants are entitled to securities, not cash.

*Id.* at 814. Such reliance on the legitimate expectations of customers is, of course, consistent with Claimants' position here.

In summary, the factually distinguishable case law cited by the Trustee and SIPC on the issue of the proper characterization of claims for sham securities — none of which involve customer claims where *confirmations* of the purchase of shares of a money market fund were present or where legitimate customer expectations mandated treating the claims as "for securities" — fails to support the Trustee's and SIPC's position. Moreover, the legislative history of SIPA confirms that it would be at variance with the remedial purpose and the legislative intent of SIPA to characterize Claimants' NASMMF claims as claims for cash. The lower coverage limit for "cash claims" included in SIPA was intended to limit recovery of "free credit balances" left by customers in their brokerage accounts in contemplation of prospective purchases or as a convenience, and not to limit recovery by customers who legitimately believed and expected that funds entrusted to their brokers had been invested in the purchase of securities. SIPA flexibly provides for the satisfaction of securities claims to be made by payments of cash under circumstances, such as here, where the securities which should have been in customer accounts cannot be purchased by the SIPA trustee. Consistently with SIPA's remedial purpose and the absence of statutory language precluding such result, the Claims should be characterized based upon their legitimate expectations that their

accounts held securities in order that they can receive the full protection intended and provided for

by Congress in enacting SIPA.

### III.    The Series 500 Rules Support Claimants' Position

In January 1988, the SEC issued, for comment, a proposed set of rules referred to

herein as the "Series 500 Rules." *SEC* 53 F.R. 1793 (Jan. 23, 1998). While the Trustee and SIPC

may be correct that *some* of the litigation issues that triggered this rulemaking process involved

"straddling" cases, the rule was intended to establish uniform, objective standards for *all* types of

claims "for cash" and "for securities." According to the SEC notice:

> The purpose of the proposed rule change is to establish a *uniform*
> procedure for the satisfaction of *claims for cash* and *claims for*
> *securities* in either a liquidation proceeding pursuant to the
> Securities Investor Protection Act of 1970 as amended ("SIPA"),
> or a direct payment procedure pursuant to Section 10 of SIPA....
>
> SIPC believes that the proposed rules submitted herewith will
> provide both nationwide uniformity and reasonable certainty
> for customers as to how their claims will be treated in the event
> of the failure of a SIPC member, and will provide an *objective*
> standard for determining each claimant's legitimate expectations.

*Id.* (emphasis added).

In issuing its approval order for the Series 500 Rules, the SEC reiterated the same

themes. *SEC* 53 F.R. 10367-10369, 1998 WL 263894 (March 31, 1998) (The proposed rules will

provide "both national uniformity and reasonable certainty for customers as to how their claims will

be treated in the event of the failure of a SIPC member, and will provide an objective standard for

determining each claimant's legitimate expectations"; "the proposed rules also give full effect to the

Congressional intent to satisfy the customers' legitimate expectations..."; and by "providing such an

[objective] standard, the rules alleviate potential uncertainty and improve investor confidence in the securities markets.")

It is therefore clear, from the relevant rulemaking history of the Series 500 Rules, that the Series 500 Rules were intended to have an omnibus reach — *i.e.*, they were not promulgated to address and apply only to the narrow circumstances of straddling transactions. Had the SEC or SIPC intended to so limit the Series 500 Rules, the proposed rules could have been more narrowly drawn. Quite simply, the Series 500 Rules contain no language limiting their application to transactions which straddle the filing date and, instead, clearly cover circumstances where false or erroneous confirmations have been received and relied upon by customers at any time prior to the filing date. Thus, the Series 500 Rules should apply in the instant case, unless such application would produce a result contrary to a discernable, overriding statutory goal. This is not the case here.

The Series 500 Rules are entitled "Rules Relating to Satisfaction of a 'Claim for Cash' or a 'Claim for Securities.'" The Series 500 Rules were proposed to effectuate the principle that "a customer be satisfied based upon the customer's legitimate expectation of what the customer had in his or her account at the time of the demise of the SIPC member firm." Rules of the Securities Investor Protection Corp., 53 Fed. Reg. 1793, 1988 WL 236666 (1988) ("SIPC Proposed Rules"). By their terms, the Rules direct that where a customer has authorized a purchase of securities, it is the sending of a confirmation of that purchase or sale, rather than the execution of a trade, that determines whether the customer's net equity claim is for cash or securities. Rule 502, entitled "Claim for Securities," provides that "[w]here the Debtor held cash in an account for a customer, the customer has a 'claim for securities' with respect to any authorized securities purchase: (i) if the Debtor has sent a written confirmation to the customer that the securities in question have

been purchased for or sold to the customer's account[.]" 17 C.F.R. § 300.502. Indisputably then, were the Claims to be characterized by operation of the Rule 502, Claimants' NASMMF claims would be claims "for securities."

Rule 500 provides that the Series 500 Rules "will be applied in determining whether a securities transaction gives rise to a 'claim for cash' or a 'claim for securities[.]'" 17 C.F.R. § 300.500. According to the Trustee, the Series 500 Rules are inapplicable here because pursuant to pursuant to Rule 500, the application of the Rules requires, as a threshold matter, that there have been a "securities transaction." The Trustee's attempt to thus confine the application of the Series 500 Rules to circumstances where there has been *in fact* a "securities transaction" subverts the entire purpose of the Series 500 Rules, which, having been promulgated by the SEC, have the force and effect of law. *See In re Adler, Coleman Clearing Corp.*, 195 B.R. 266, 275 (Bankr. S.D.N.Y. 1996).[33] In fact, the 500 Rules *are explicitly* intended to govern those circumstances (as here) where

---

[33] *In re Adler, Coleman Clearing Corp.* and *In re A.R. Baron Co., Inc.*, 226 B.R. 790, 796 (Bankr. S.D.N.Y. 1998), are the only cases cited on this point by the Trustee and SIPC which were decided after the promulgation of the Series 500 Rules; and neither case addresses the issue of the full and proper scope of the application of the Series 500 Rules. That several cases which preceded the passage of the Series 500 Rules may have focused on the situation where a security transaction straddled the filing date, does not mean, as discussed *infra*, that the Series 500 Rules must be limited in their application to such narrow circumstances. Indeed, the plain language of the Series 500 Rules is not so limited. *See generally City of New York v. United States Department of Transportation*, 700 F. Supp. 1294, 1302 (S.D.N.Y. 1988) ("[w]hen the language of a statute is clear, its legislative history is examined only to ascertain whether there is a clearly expressed intention contrary to the statutory language"). Moreover, even when a specific and narrow factual circumstance may have given rise to a *remedial* statute (or to its amendment), the Court should nonetheless be guided, when possible, by the plain language of the statute, when faced with applying the statute to a broader or different factual situation than may have triggered its enactment or amendment. *See, e.g., United States v. International Business Machines Corp.*, 517 U.S. 843, 859-860 (1996) ("[w]hile the original impetus may have had a narrow focus, the remedial provision that ultimately became the Export Clause does not").

a customer has authorized a transaction but where no transaction, much less a securities transaction, has taken place at all. For example, Rule 501(b)(1) applies by its terms to the situation where a customer deposited cash and ordered securities purchased for his account but where no securities were purchased. In such a situation, no security has actually been purchased and Rule 501(b)(1), to effectuate the customer's legitimate expectation, treats the security *as if* it were purchased. This, in essence, recognizes a legal fiction in order to remedy the fact that no such security exists in the customer's account. By parity of reasoning, the Series 500 Rules, by their plain language, require satisfying legitimate customer expectations in a variety of circumstances, including those present here with respect to mutual funds and the NASMMF, regardless of whether the security actually exists in the customer's account in the case of shares of a money market fund (which always has a stated net asset value of $1.00 per share) or whether the money market fund has been technically formed — provided, that confirmations are received by the customer and the claim has otherwise been allowed (as here). Clearly then, the Trustee's and SIPC's argument that "by definition" the reference in Rule 500 to a "securities transaction" requires that "a security must exist" is merely a repetition of the Trustee's *ipse dixit* statutory construction argument and adds nothing to advance the Trustee's position.

The Series 500 Rules were promulgated pursuant to SIPA § 78ccc(b)(4), which authorizes the adoption of only such rules which "may be necessary or appropriate to carry out the purposes of [SIPA]." The Series 500 Rules effectuate the remedial purposes of the Act by classifying claims not based upon circumstances beyond the control of the customer but, rather, upon the customer's legitimate expectations as ascertained from transaction confirmations and account statements. The Series 500 Rules reflect the reality that SIPA's statutory purpose of instilling

(SIPC Brief Post Crash May 29.WPD)

customer confidence in the securities industry cannot be achieved if customers cannot rely upon their accounts statements. In short, the Trustee's and SIPC's interpretation of the Series 500 Rules is incorrect. The Series 500 Rules govern the disposition of the Claims and support Claimants' position on coverage.

## IV.   The Viability of Claimants' SIPA Claims Is Not to Be Determined By the Existence of a Claim for Fraud

In this proceeding, Claimants seek recovery not based upon damages sustained from fraud, but based upon their statutory net equity as reflected on their account statements. Accordingly, the Trustee's recitation of case law finding that SIPA does not provide protection for claims based upon fraud and breach of contract is entirely irrelevant to the issue raised by Claimants' objections. In fact, the Trustee has conceded that the Claimants have valid customer claims (as distinct from common law claims) to the full extent of the monies deposited with the Debtor for the purchase of shares of the NASMMF (less any redemptions). At issue, then, is only the characterization by the Trustee of these claims as ones "for cash" and the resulting coverage limit. The Trustee has cited no authority for the proposition that the characterization of assets within a customer account turns upon whether that customer has common law causes of action for fraud or breach of contract in addition to a valid net equity claim.

Examination of the cases cited by the Trustee for the proposition that SIPA does not provide protection for claims based upon fraud or breach of contract confirms that these cases are factually and legally inapposite to the issues to be determined on this motion. For example, in *SEC v. Howard Lawrence & Co.*, 74 Civ. 193, 1975 Bankr. LEXIS 15 (Bankr. S.D.N.Y. 1975), the court affirmed the disallowance of a claim based upon a broker's failure to act on a customer's sell order

in respect of securities in the possession of the customer. The court held that the customer's losses arising from the declining value of the stock was not a net equities claim and could only be remedied in an action for breach of contract or fraud. *Id.* at *7. Similarly, in *In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 75 (Bankr. S.D.N.Y. 1996), the court explained that a claim for "fraudulent concealment" based upon the failure of the clearing broker/debtor to send confirmations which would have revealed to the customer unauthorized trading in his account by the introducing broker was, regardless of its merits, not a SIPA customer claim. In *In re MV Securities, Inc.*, 48 B.R. 156 (Bankr. S.D.N.Y. 1985), the court affirmed disallowance of a claim based upon an arbitration award in favor of an investor that directed the broker to credit the investor's account with the amount of the award. As of the filing date, the debtor had not yet funded the investor's account.

The argument attempted by the Trustee and SIPC — *i.e.*, that the existence of a common law claim for fraud or breach of contract precludes the existence of a SIPA claim for securities — has been identified as "a logical fallacy." *In re Investors Center,* 129 B.R. at 351. As explained in *Investors Center*, even though the existence of a common law cause of action is not a basis for recovery under SIPA, "it does not follow from the fact that a customer who has a recognizable claim under SIPA may also have a claim for a breach of contract that he cannot recover for the former. One does not nullify the other." *Id.* at 351. The court went onto to elaborate that the customers in that proceeding "all have claims under the Securities Investors Protection Act because each one received written confirmation of a sale. That they may, or may not, also have claims for breach of contract ..., claims which, as everyone recognizes are valueless, does not deprive them of their rights against the Fund created by SIPA." *Id.*; *see also In re Adler, Coleman Clearing Corp.*, 218 B.R. 689 (Bankr. S.D.N.Y. 1998).

(SIPC Brief Post-Crash May 29.WPD)

Claimants' claims, indistinguishable from those of the "mutual fund" investors, are

statutory net equity claims based upon assets represented to be in customer accounts.

## V.    Claimants' Claims for Dividends Are Allowable Customer Claims

As demonstrated *supra* and in Claimants' Limited Objections and/or Objections,

Claimants' regular "OXY" brokerage statements showed confirmation of the shares of the

NASMMF purchased through dividend reinvestment. In all cases, the shares purchased through

dividend reinvestment were $1.00 per share. While it is true that, apart from Project Earth, the

claims relating to dividend reinvestment are relatively small portions of the Claimants' overall

claims, they nonetheless should be honored by the Trustee for the same reasons (based, *inter alia*,

upon the customers' legitimate expectations and the receipt of confirmations) as discussed *supra*

with respect to the principal invested by Claimants.

Two of the cases cited by the Trustee and SIPC on this issue, *In re Old Naples

Securities, Inc.* and *In re Oberweis*, have already been discussed *supra*. In neither of these cases

(unlike here) were confirmations of securities purchases delivered to the investors, which, as noted

above, is a critical distinction.[34] And, in *SIPC v. C.J. Wright & Co., Inc. (In re C.J. Wright & Co.,

Inc.)*, 162 B.R. 597 (Bankr. M.D. Fla. 1993), the investors sought recovery of *interest*, not dividends,

---

[34] Moreover, the Court in *Oberweis* held that the investors' claim "for dividends they
would have received had their investment instructions been followed [was] denied ... for lack of a
confirmation." 135 B.R. at 847, n. 1. The obvious import of the Court's ruling in *Oberweis* is
that if, as here, confirmation of dividends received was present, the SIPA customer claim of the
investors for dividends should have been honored.

[SIPC Brief Post Crash May 29.WPD]

and none of the investors received "confirmation slips for the purchase of certificates of deposits or any other securities." 162 B.R. at 600.[35]

In the case of Project Earth, which had over a several-year period over $3.8 million in purchases and redemptions of shares of the NASMMF — and treated the dividends received as income for tax purposes — the Trustee's position is apparently that all purchases of shares acquired through dividend reinvestment should be ignored, and that the claim should be treated solely on the basis of "cash in" and "cash out." As noted above, the Trustee's analysis of the Project Earth account is predicated, *inter alia*, on faulty accounting. While the Joint Motion contends (in the "Claimant Chart") that Project Earth had a net "gain" on "deposits minus withdrawals" of $510,568.27, in fact the correct number is approximately $121.00.[36] In the event the Court adopts Claimants' analysis, the redemption of shares of the NASMMF by Project Earth should be factored into Project Earth's claim; and Project Earth's claim of $149,915.02 should be honored, as set forth in Project Earth's Objection.

## VI.    The Court, Alternatively, Should Direct Limited Discovery With Respect to the Trustee's Determinations of Other Mutual Fund Claims

The Trustee and SIPC contend that when other mutual fund claims involved

---

[35] It is instructive, however, that the Court in *C.J. Wright & Co.* recognized that the Supreme Court's flexible definition of security should be used in the SIPA context for purposes of interpreting the definition of "security" under Section 78lll(14) of SIPA.

[36] It also should be noted that Project Earth's principals, Craig and Joanne Roffman, have served and filed a separate Objection with respect to the Trustee's denial of their individual claim for $475,294.87 as a result of unauthorized transactions in their joint New Times account. Craig Roffman still awaits the Trustee's determination of his claim for losses in his separate, individual "OXY" account.

purchases of shares of mutual funds with names, prices or other information different than actual

mutual funds, the Trustee "has been able to identify the actual mutual fund in question by cross-

checking the information supplied by Goren on the customer statements, including share price

information, with publicly available information and then been able to purchase that security." Joint

Memorandum at 26.

While Claimants' Objections should be sustained without the necessity of

confirming the accuracy of the Trustee's and SIPC's representations as to the Trustee's

"verification" process, Claimants' alternatively should be allowed limited discovery to ascertain the

extent of the variation from names and pricing structure of actual mutual funds. Claimants believe

that such limited discovery will further support Claimants' argument that the Trustee's inability to

"value" the $1.00 per share of the NASMMF is belied by the Trustee's own conduct with respect

to honoring other mutual fund shares claims and liberally treating such claims.[37]

---

[37] To expedite such limited discovery, the Trustee can be directed to produce a chart,
certified by the Trustee as to its accuracy, identifying all other mutual fund claims that have been
honored and the discrepancies that existed between the "OXY" confirmations and brokerage
statements and the actual mutual funds.

(SIPC Brief Post Crash May 29.WPD)

## CONCLUSION

For the foregoing reasons, the Claimants' Limited Objections and/or Objections

should be sustained in their entirety.

Dated: Uniondale, New York
      June 1, 2001

**FARRELL FRITZ, P.C.**

By: *Ted A. Berkowitz*
    Ted A. Berkowitz (TAB-3384)
EAB Plaza,
West Tower, 14th Floor
Uniondale, New York 11556-0120
(516) 227-0700

Dated: New York, New York
      June 1, 2001

**HELLER, HOROWITZ & FEIT, P.C.**

By: */s/ Sigmund S. Wissner-Gross*
    Sigmund S. Wissner-Gross (SW-0001)
    May Orenstein  (MO-2948)
292 Madison Avenue
New York, New York 10017
(212) 685-7600

**Attorneys for Claimants**