# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - X
In re:                                                : **Hearing Date:  June 25, 2001**
                                                       : **Time:  10:00 a.m.**
    NEW TIMES SECURITIES SERVICES, INC.                :
    and NEW AGE FINANCIAL SERVICES,                    : Case No. 800-8178 (SB) SIPA
    INC.,                                              : (Substantively Consolidated)
                                                       :
                                       Debtors.        :
- - - - - - - - - - - - - - - - - - - - X

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF JOINT MOTION FOR AN ORDER UPHOLDING THE TRUSTEE'S DETERMINATIONS TREATING CLAIMS FILED FOR INVESTMENTS IN NEW AGE SECURITIES MONEY MARKET FUND AS NET EQUITY CLAIMS FOR CASH AND EXPUNGING OBJECTIONS FILED WITH RESPECT TO THOSE DETERMINATIONS

<div style="margin-left:40%">

James B. Kobak, Jr. (JK-1218)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

Attorneys for James W. Giddens as
Trustee for the liquidation of the
business of New Times Securities
Services, Inc., and New Age
Financial Services

-and-

Stephen P. Harbeck (SH-7734)
General Counsel

</div>

Of Counsel:

Karen A. Caplan
Assistant General Counsel

<div style="margin-left:40%">

Securities Investor Protection Corp.
805 Fifteenth Street, N.W., Suite 800
Washington D.C. 20005-2207
(202) 371-8300

</div>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................... 2

STATEMENT OF FACTS .................................................................. 4

ARGUMENT ............................................................................ 6

   I.    THE SIPA STATUTORY SCHEME AUTHORITATIVELY
       ESTABLISHES THE BASIS FOR DETERMINING AND
       SATISFYING CUSTOMER CLAIMS. ...............................................6

  II.   CASE LAW CONFIRMS THAT CLAIMANTS ARE ENTITLED
       ONLY TO THE RETURN OF THE CASH THEY DEPOSITED
       WITH THE DEBTOR FOR THE PURCHASE OF THE NON-
       EXISTENT FUND.............................................................14

       A.   The Relevant Case Law .............................................. 14

       B.   Claimants' Disparate Treatment Argument ................................. 18

 III.  SIPC'S SERIES 500 RULES DO NOT APPLY. ...................................20

 IV.  THE VIABILITY OF CLAIMANTS' SIPA CLAIMS WAS NOT
       DETERMINED BY THE EXISTENCE OF A FRAUD CLAIM. ........................21

  V.   CLAIMANTS' CLAIMS FOR DIVIDENDS ARE NOT
       ALLOWABLE CUSTOMER CLAIMS.............................................22

 VI.  THERE IS NO NEED FOR ANY DISCOVERY IN THIS CASE ......................23

 CONCLUSION........................................................................ 24

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

In re A.R. Baron & Co., 226 B.R. 790 (Bankr. S.D.N.Y. 1998) ................................9

In re Adler Coleman Clearing Corp., 195 B.R. 266 (Bankr. S.D.N.Y. 1996) ...................10

In re Adler Coleman Clearing Corp., 198 B.R. 70 (Bankr. S.D.N.Y. 1996) ......................9

In re Adler Coleman Clearing Corp., 204 B.R. 111 (Bankr. S.D.N.Y. 1997) ....................7

Appleton v. Hardy (In re First Ohio Secs., Co.), No 590-0072, Adv. No. 92-5085
    (Bankr. N.D. Ohio 1992) .............................................................17, 19

In re Chicago Partnership Bd., Inc., 237 B.R. 726 (Bankr. N.D. Ill. 1999) .....................16

In re Chitwood, 3 Bankr. Ct. Dec. 1033 (Bankr. S.D. Ala. 1977) .......................................7

Gans v. Reddington (In re Weis Secs., Inc.), [1974-1975 Transfer Binder], Fed.
    Sec. L. Rep. (CCH) ¶ 94,780 (S.D.N.Y. 1974) ...............................................21

In re Government Secs., Corp., 90 B.R. 539 (Bankr. S.D. Fla. 1988) ..............................9

In re Hanover Square Secs., 55 B.R. 235 (Bankr. S.D.N.Y. 1985) ....................................9

In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or. 1985) ..........................................12, 21

Local 875 I.B.T. Pension Fund v. Pollack, 992 F. Supp. 545 (E.D.N.Y. 1998) ...............22

In re MV Secs., Inc., 48 B.R. 156 (Bankr. S.D.N.Y. 1985) ...............................................10

Mitchell v. Chicago Partnership Bd., Inc., 246 B.R. 854 (N.D. Ill. 2000) ........................16

Murray v. McGraw (In re Bell & Beckwith), 821 F.2d 333 (6th Cir. 1987) ...............12, 21

In re OPM Leasing Servs., Inc., 60 B.R. 679 (Bankr. S.D.N.Y. 1986) ..............................7

Plumbers & Steamfitters Local 490 Severance & Retirement Fund v. Appleton
    (In re First Ohio Secs. Co.), 39 F.3d 1181, No. 93-3313, 1994 U.S. App.
    LEXIS 31347, (6th Cir. 1994), cert. denied, 514 U.S. 1018 (1995) .............3, 15, 16, 22

SEC v. Aberdeen Secs., 480 F.2d 1121 (3d Cir.), cert. denied sub. nom, Seligsohn
    v. SEC, 414 U.S. 1111 (1973) ..............................................................4, 17, 18

SEC v. Albert & Maguire Secs., Co., 560 F.2d 569 (3d Cir. 1977) ....................................9

# TABLE OF AUTHORITIES
## (Continued)

**Page**

SEC v. Ambassador Church Fin./Dev. Group, Inc., 679 F.2d 608 (6th Cir. 1982)..............6

SEC v. F.O. Baroff, Inc., 497 F.2d 280 (2d Cir. 1974).........................................9

SEC v. Howard Lawrence & Co., 74 Civ. 193, 1975 Bankr. LEXIS 15 (Bankr.
   S.D.N.Y. 1975) ........................................................................10

SEC v. Packer, Wilbur & Co., 498 F.2d 978 (2d Cir. 1974) ...............................9, 11

SEC v. S. J. Salmon & Co., 375 F. Supp. 867 (S.D.N.Y. 1974) .............................10

Shultz v. Omni Mutual Inc., No. 93-3700, 1993 WL 546671 (S.D.N.Y. Dec. 30,
   1993) .................................................................................9

SIPC v. Barbour, 421 U.S. 412 (1975) .......................................................21

SIPC v. Executive Secs., Corp., 556 F.2d 98 (2d Cir. 1977)...................................9

SIPC v. I.E.S. Mgmt., 612 F. Supp. 1172 (D.N.J. 1985), aff'd without opinion,
   791 F.2d 921 (3d Cir. 1986)............................................................9

SIPC v. Morgan, Kennedy & Co., 3 Bankr. Ct. Dec. 15 (S.D.N.Y. 1977)....................21

SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314 (2d Cir.) cert. denied, 426 U.S.
   936 (1976).............................................................................9

SIPC v. Oberweis Secs., (In re Oberweis Secs.), 135 B.R. 842 (Bankr. N.D. Ill.
   1991) ...............................................................................11, 12

SIPC v. Old Naples Secs., Inc., (In re Old Naples Secs., Inc., 218 B.R. 981
   (Bankr. M.D. Fla. 1993), aff'd, 223 F.3d 1296 (11th Cir. 2000)....................18, 22

SIPC v. Pepperdine Univ., (In re Brentwood Secs., Inc.), 925 F.2d 325 (9th Cir.
   1991) .................................................................................9

SIPC v. Wise (In re Stalvey Assoc.), 750 F.2d 464 (5th Cir. 1985)...........................10

In re Stanley B. Young & Co., 33 F. Supp. 444 (W.D. Ky. 1940) ............................12

In re Traba, Exchange Act Release No. 33-7727, 1999 WL 627531 (Aug. 19,
   1999) ................................................................................13

## FEDERAL STATUTES

Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et. seq ............................1

15 U.S.C. § 78fff-2(b)...........................................................................6, 7, 11



**TABLE OF AUTHORITIES**
(Continued)

Page

15 U.S.C. § 78fff-2(d)..........................................................................................................7

15 U.S.C. § 78lll(2)..............................................................................................................6

15 U.S.C. § 78lll(11).............................................................................................................8

Rules of the Securities Investor Protection Corp., 53 Fed. Reg. 1793, 1998 WL
        236666 (1988) ......................................................................................................20, 21

**MISCELLANEOUS**

Securities Investor Protection Corp., 2000 Annual Report (2001)......................................5

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - X
In re:                                          :
                                                :
    NEW TIMES SECURITIES SERVICES, INC.         :
    and NEW AGE FINANCIAL SERVICES,             :   Case No. 800-8178 (SB) SIPA
    INC.,                                       :   (Substantively Consolidated)
                                                :
                                    Debtors.    :
- - - - - - - - - - - - - - - - - - - - - - - - X

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF JOINT MOTION FOR AN ORDER UPHOLDING THE TRUSTEE'S DETERMINATIONS TREATING CLAIMS FILED FOR INVESTMENTS IN NEW AGE SECURITIES MONEY MARKET FUND AS NET EQUITY CLAIMS FOR CASH AND EXPUNGING OBJECTIONS FILED WITH RESPECT TO THOSE DETERMINATIONS

James W. Giddens, as Trustee (the "Trustee") for the liquidation under the

Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et. seq., of the

substantively consolidated estates of New Times Securities Services, Inc. ("New Times")

and New Age Financial Services ("New Age") (together, the "Debtor"), and the

Securities Investor Protection Corporation ("SIPC") respectfully submit this Reply

Memorandum of Law in further support of their Joint Motion for an order upholding the

Trustee's determinations that claims based on cash transferred to the Debtor for

investment in the bogus, non-existent New Age Securities Money Market Fund ("New

Age Money Market Fund" or "non-existent fund") are net equity claims for the amount of

cash transferred minus withdrawals and expunging objections with respect to those

determinations (the "Motion").

PRELIMINARY STATEMENT

Although Claimants concede that the only question to be resolved by this Court is

a question of law, they spend much time distorting the Trustee's and SIPC's actions and

intentions in this case. Claimants' argument that the Trustee and SIPC are attempting to

avoid paying customers by classifying their claims as claims for cash is wholly

inappropriate and unfounded based on the record in this case. Had the Trustee and SIPC

wished to limit customer recovery as Claimants allege they would not have: (1) moved

for substantive consolidation,[1] or (2) allowed money market fund claims for New Age

Money Market Fund as claims for cash. Contrary to Claimants' assertion, the Trustee

and SIPC have acted, consistently with SIPA, to maximize recoveries for customers of

the Debtor on a group or individual basis and have treated similarly situated customers

alike. Thus, the only real dispute here is a legal one concerning the interpretation of

SIPA and the pertinent case law insofar as the appropriate treatment of allowed claims.

Claimants' opposition can best be described as an attempt to rewrite SIPA in

favor of their self-contrived "legitimate expectations" approach. Claimants contend that

they have asserted claims "for securities" because they received fictitious account

statements and confirmation statements showing that their brokerage accounts with the

Debtor apparently held shares of one or more non-existent New Age money market

funds.[2] (See Claimants' Opp. Mem. at 1.) The New Age money market funds never

existed; none of these funds were ever organized as a mutual fund registered with the

---

1. Notably, had not the Trustee, with the approval of SIPC, moved for substantive consolidation the Claimants herein would have received nothing from the New Age estate and the SEC Receivership.

2. Goren also offered investors a tax-free version of the New Age Money Market Fund and another fictitious fund, which he called the New Times Prime Money Market Fund.

SEC or issued a prospectus for investors. Claimants concede that no such fund or funds existed. (See id. at 1-2.) They insist, however, that the Trustee should have classified their customer claims as "claims for securities" because they did not intend to maintain cash in an account with the Debtor and believed that the Debtor had purchased either a taxable or a tax-free money market fund from New Age for them as evidenced by "*apparently* bona fide account statements and confirmations showing that such securities were in fact purchased for [their] account[s]." (Id. at 17.)

Despite their complete disregard of SIPA, mischaracterization of applicable case law, and reliance upon wholly irrelevant case law, it is well settled that Claimants are entitled only to the return of their "net equity." Here, the Trustee determined that Claimants have net equity claims for cash where they deposited money with the Debtor for the purchase of a non-existent security. The Trustee and SIPC reached this determination not in a "misguided and myopic effort to draw the line" but in accordance with SIPA, its legislative history, and relevant case law. Though Claimants denigrate case law cited by the Trustee and SIPC in their moving papers, such case law is exactly on point and was properly relied upon by the Trustee and SIPC. As discussed in the Trustee's and SIPC's moving papers and briefly infra, the Sixth and Third Circuits have held that customers who deposit money for the purchase of non-existent securities whose purchase is later confirmed to them by the debtor have net equity claims for cash. (See Joint Mem. at 18-22; discussion infra at 14-18.) See Plumbers & Steamfitters Local 490 Severance & Retirement Fund v. Appleton (In re First Ohio Secs. Co.), 39 F.3d 1181, No. 93-3313, 1994 U.S. App. LEXIS 31347, at *2 (6th Cir. 1994) (unpublished opinion), cert.

3

denied, 514 U.S. 1018 (1995) (Joint Mem. Ex. B); SEC v. Aberdeen Secs., 480 F.2d

1121, 1127 (3d Cir.), cert. denied sub. nom, Seligsohn v. SEC, 414 U.S. 1111 (1973).

Besides misinterpreting SIPA and case law that has addressed the precise issue

presented here, Claimants' approach exposes that their real dispute is not with the

Trustee's calculation of their net equities but with the lower limit on SIPC advances that

may be used to satisfy "claims for cash." This $100,000 limit for cash claims is an

integral part of SIPA, which neither the Trustee nor this Court can circumvent through

contrived interpretation or disregard of SIPA.

Notwithstanding Claimants' equitable arguments that they are "crime victims,"

the fact remains that under SIPA Claimants are only entitled to the return of the cash that

should have been in their accounts on the filing date of the SIPA proceeding since no

purchases of securities of the same class or series as the non-existent money market fund

could have been executed. The Claimants' hardship is undeniable, but the same hardship

was involved in all the cases involving the purchase of a non-existent or non-identifiable

security. Thus, Claimants' efforts to gain a higher dollar coverage for their "cash claims"

must ultimately lie with Congress—not this Court.

## STATEMENT OF FACTS

Claimants' attack on the Trustee and SIPC is unfounded. As stated earlier, the

Trustee and SIPC have acted to augment recovery to investors, many of whom would

otherwise have recovered nothing for their losses. The record in this case demonstrates

that the Trustee, because of SIPC advances, has thus far been able to pay $9,237,814.03

to customers in satisfaction of their net equity claims. (See SIPC Memorandum dated

June 6, 2001 specifying amounts advanced in this case attached hereto as Ex. A.) In

4

contrast to this figure, SIPC has only advanced $1,235,373.94 to the Trustee for administrative expenses.[3]  (See id.)  Moreover, SIPC has not "chartered a course of stubborn opposition to investor claims in countless SIPA proceedings" and "paid its attorneys *more* than $87 million more than it has advanced to investors in SIPA proceedings since 1971."  (Claimants' Opp. Mem. at 10.)  The reality is that since its creation in 1970 SIPC has initiated 291 customer protection proceedings.  In the course of those proceedings, SIPC has paid more than 440,000 customer claims.  To make these payments, SIPC has used available assets held by failed brokerage firms totaling more than $3.5 billion and paid approximately $260 million from its Fund and advanced $132 million for administrative expenses.  See Securities Investor Protection Corp., 2000 Annual Report at 3 (2001) (attached hereto as Ex. B.).[4]  Clearly, SIPC has not paid "its attorneys" $87 million more than it has advanced to customers.[5]  The fact is that customers have received additional distributions and SIPC has been reimbursed for amounts advanced to customers by Trustees as a result of recoveries in successful litigations.  This speaks to the fact that money advanced by SIPC to fund such litigations is money well-spent.

Claimants characterize the Trustee and SIPC as the villains in this case, and themselves as "crime victims," in order to elicit this Court's sympathy and thereby appeal to its equitable powers.  (Claimants' Opp. Mem. at 11.)  Equitable arguments, however, are insufficient to change the scope of SIPA protection.  For this Court to adopt

---

3.  This sum includes SIPC advances for all administrative expenses of the estate such as: rent, supplies, back office staffing, accountants, postage, printing, as well as payment to attorneys.

4.  The Court may take judicial notice of SIPC's 2000 Annual Report.

5.  Moreover, funds are not advanced by SIPC to its counsel, but to the Trustee and his or her counsel.

Claimants' position it would have to ignore SIPA provisions that deal with satisfaction of customer claims and rewrite the statute.

<div align="center">ARGUMENT</div>

I.    THE SIPA STATUTORY SCHEME AUTHORITATIVELY ESTABLISHES THE BASIS FOR DETERMINING AND SATISFYING CUSTOMER CLAIMS.

The starting point of statutory interpretation is the language of the statute. See SEC v. Ambassador Church Fin./Dev. Group, Inc., 679 F.2d 608, 611 (6th Cir. 1982). Claimants ignore SIPA's language on the premise that it does not define the proper characterization of a claim and instead argue that because they intended to purchase securities they are owed securities. (See Claimants' Opp. Mem. at 20.) Claimants are plainly incorrect. Whether a customer has a "cash" or a "securities" claim under SIPA depends upon whether his or her "net equity" is based on cash or securities as shown on the debtor's books and records or as otherwise established to the satisfaction of the Trustee. SIPA § 78fff-2(b).[6] The fact that Claimants remitted monies to the Debtor for the purchase of securities qualifies them as "customers," it does not mean that as customers they are owed "securities." See SIPA § 78lll(2). Here, Claimants concede that New Age Money Market Fund did not exist. (See Claimants' Opp. Mem. at 1-2.) Thus,

---

6.  In pertinent part, section 78fff-2(b) provides:

    After receipt of a written statement of claim . . . , the trustee shall promptly discharge, in accordance with the provisions of this section, all obligations of the debtor to a customer, relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payment to or for the account of such customer . . . insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee.

under no circumstances can they meet their burden under SIPA of demonstrating to the satisfaction of the Trustee that their "net equity" claims are for securities.[7]

In enacting SIPA, Congress provided the exclusive framework under which qualified customer claims are satisfied. Claimants ignore the interlocking provisions of SIPA that provide for the calculation and satisfaction of "securities" claims and substitute their own. According to Claimants, the Trustee should treat their claims as securities claims and satisfy them by either: (1) returning some as yet unidentified bona fide money market fund to them, which they never bought or sought to buy, or (2) paying them cash in lieu of the non-existent fund equal to amounts shown on the Debtor's fictitious account statements.

SIPA does not authorize the Trustee to satisfy securities claims in the manner that Claimants propose, nor does SIPA's legislative history support their contention. As discussed in greater detail in the Trustee's and SIPC's opening brief and briefly below a "securities" claim is satisfied either by delivery of the security in question or by the tendering of its filing date market value. SIPA § 78fff-2(d).[8] (See Joint Mem. at 21-26.) Section 78fff-1(b)(1) provides that the Trustee shall "deliver securities to or on behalf of customers to the maximum extent practicable in satisfaction of customer claims for securities of the same class and series of an issuer. . . ." Section 78fff-2(d) authorizes the

---

7. As stated in the Trustee's and SIPC's moving papers the burden is clearly on the objecting Claimants to demonstrate that they are entitled to the special treatment they seek. See In re Chitwood, 3 Bankr. Ct. Dec. 1033, 1034 (Bankr. S.D. Ala. 1977) ("when statutes involving priorities are in issue, a strict construction must be placed thereon; and the burden falls on those asserting a priority to establish that they were within the intended class."). Accord, In re Adler Coleman Clearing Corp., 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997); In re OPM Leasing Servs., Inc., 60 B.R. 679, 680 (Bankr. S.D.N.Y. 1986).

8. To the extent the securities are available or can be purchased on the open market, generally, the trustee delivers them in satisfaction of the claim. SIPA §§ 78fff-2(b), 78fff-2(d). However, if the securities are not available, the customer receives their cash value.

Trustee to purchase securities of the <u>same class and series of an issuer</u> on the open market to the extent practicable in satisfaction of claims for net equities based on securities. Nowhere do these provisions contemplate that the Trustee would satisfy a securities claim by returning anything other than the precise security in question.[9]

The fallacy of Claimants' construct is clear. If Claimants' claims in fact had been for securities no delivery could have been made by the Trustee because no security existed to deliver. Instead, the Trustee would have treated the non-existent fund as "unavailable" and would have satisfied the claim with cash in lieu of the non-existent fund. In view of the net equity definition and section 78fff-2(b) which, in relevant part, provides that for "purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date," the amount remitted to the customer would be the filing date value of the non-existent fund. The filing date value of the non-existent fund is not the fraudulent value assigned to it by Goren on fictitious account statements, nor is it the purchase price as Claimants suggest. Rather, it is the amount that would have been owed to Claimants had the debtor liquidated "by sale or purchase on the filing date, all securities positions of such customer" less any net indebtedness owed by the customer. SIPA § 78lll(11). Under this calculation the amount owed to Claimants would be zero. Thus, although classifying the Claimants' net equity claims as claims for securities would allow for the higher upper limit on SIPA protection to apply, it would also result in the Claimants having a zero net equity claim. Clearly, this is not the result

---

9.  The legislative history of SIPA reinforces this basic point. In hearings on the proposed amendments to SIPA, former Chairman of SIPC Hugh F. Owens stated: "We understand the expectations of customers who wish to have their claims satisfied in kind. Accordingly, the bill would provide that, to the extent the trustee has insufficient securities to satisfy claims, he should purchase in the open market the additional securities needed, so long as he can do so in a fair and orderly market." Statement by Hugh F. Owens, former Chairman of SIPC at the April 25, 1978 hearing on HR 831, at 16.

that Claimants seek or expect nor is it the result that the Trustee or SIPC seek to impose in this case.

Claimants seek to overcome the express terms of SIPA and avoid the above-mentioned result by arguing that SIPA is a remedial statute that was intended to provide "full protection to investors from misappropriation of their assets" and should thus be construed "flexibly" to effectuate its purposes.[10] (Claimants' Opp. Mem. at 12.) Claimants would thus have the Trustee ignore the above-stated SIPA provisions and classify their claims as claims for securities subject to the $500,000 upper limit on SIPA protection because such classification would "fully protect" Claimants.

Contrary to Claimants' broad recital of SIPA's purposes, courts of this Circuit have recognized that "SIPA was not designed to provide full protection to all victims of a brokerage collapse." SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983 (2d Cir. 1974) (emphasis added). See SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314, 1317, n.4 (2d Cir.) cert. denied, 426 U.S. 936 (1976) (noting that Congress enacted SIPA with the intent to protect the small investor only as is apparent in that at the time it was enacted 90% of the total dollar value of all accounts were unprotected); Shultz v. Omni Mutual Inc., No. 93-3700, 1993 WL 546671, at *1 (S.D.N.Y. Dec. 30, 1993) (noting that protections of SIPA are limited and SIPC "does not function as an insurer of all claims against an insolvent broker"). See also In re A.R. Baron & Co., 226 B.R. 790, 793

---

10. But see, e.g., SIPC v. Pepperdine Univ. (In re Brentwood Secs., Inc.), 925 F.2d 325, 327 (9th Cir. 1991) (SIPA should be narrowly construed) (emphasis added); SEC v. Albert & Maguire Secs., Co., 560 F.2d 569 (3d Cir. 1977) (same); SIPC v. Executive Secs., Corp., 556 F.2d 98 (2d Cir. 1977) (same); SEC v. F.O. Baroff, Inc., 497 F.2d 280 (2d Cir. 1974) (same) ; SIPC v. I.E.S. Mgmt., 612 F. Supp. 1172, 1177 (D.N.J. 1985), aff'd without opinion, 791 F.2d 921 (3d Cir. 1986) (same); In re Adler Coleman Clearing Corp., 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (same); In re Hanover Square Secs., 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) (same); In re Government Secs., Corp., 90 B.R. 539, 540 (Bankr. S.D. Fla. 1988) (same).

(Bankr. S.D.N.Y. 1998) (explaining that "SIPA is a federal statutory scheme designed to afford limited financial protection to the customers of registered broker-dealers who experience financial difficulty"); In re Adler Coleman Clearing Corp., 195 B.R. 266, 272 (Bankr. S.D.N.Y. 1996) (recognizing that "SIPC's role in a SIPA liquidation is limited by statute; it does not attempt to make all customers whole."). SIPA only protects against the particular risks associated with a broker-dealer's insolvency by restoring the customers to their position as of the filing date of the SIPA proceeding vis a vis the broker. See SIPC v. Wise (In re Stalvey Assoc.), 750 F.2d 464, 468 (5th Cir. 1985) (stating that "there is evidence in the legislative history that Congress believed that the SIPA was only an 'interim step' that would not provide complete protection for losses occasioned by the failure of broker-dealer firms."); In re MV Secs., Inc., 48 B.R. 156, 160 (Bankr. S.D.N.Y. 1985) (SIPA does not protect customer claims based on market risk, fraud or breach of contract); SEC v. Howard Lawrence & Co., 74 Civ. 193, 1975 Bankr. LEXIS 15, at *7 (Bankr. S.D.N.Y. 1975) (same); SEC v. S. J. Salmon & Co., 375 F. Supp. 867, 871 (S.D.N.Y. 1974) (investor's rescission claim for fraudulent inducement not a SIPA customer claim).

Given SIPA's limited protections, it is unavoidable that all customers will not be fully satisfied for their losses by SIPA.[11] Even claims based upon a Debtor's most

---

11. The fact that Claimants' allowable customer claims are greater than amounts SIPC can advance in satisfaction of such claims does not mean that they will never be fully satisfied for their losses. Simply because Claimants will not be fully satisfied for losses they incurred as a result of Goren's fraudulent scheme from SIPC or the fund of customer property does not mean that they will never be made whole. Whether Claimants will ultimately recover for the losses they incurred depends in large part on the Trustee's success in marshalling assets for the estate. For instance, in his role as Trustee of A.R. Baron & Co., the Trustee, with the assistance of various government agencies, was able to marshal more than $35 million dollars into the general estate. This money was used to satisfy almost all of the general creditor claims of A.R. Baron investors. The Trustee may or may not be similarly successful in his efforts to marshal assets for the fund of customer property and for the general estate in this case.

egregious acts which result in significant monetary losses to the investor will not be

compensable under SIPA. In explaining this limited protection under SIPA, the Second

Circuit stated in <u>SEC v. Packer, Wilbur & Co.</u>, that:

> Arguments based solely on the equities are not, standing alone,
> persuasive. If equity were the sole criterion most customers and creditors
> of . . . [the debtor] would be entitled to reimbursement of their losses.
> Experience, on the other hand, counsels that they will have to settle for
> much less. SIPA was not designed to provide full protection to all victims
> of a brokerage collapse.

498 F.2d 978, 983 (2d Cir. 1974). In short, customers under SIPA are only entitled to the

limited relief afforded under SIPA—the return of their filing date "net equity." <u>See</u> SIPA

§§ 78fff(a)(1), 78fff-2(b). Here, Claimants' net equities were determined by the Trustee

to consist of monies deposited by the Claimants for the purchase of non-existent

securities.

Claimants contend that the Trustee improperly classified their net equities as

claims for cash subject to the $100,000 upper limit of protection. They argue that

because they did not "intend" to maintain cash in an account with the Debtor their net

equity claims cannot be for cash. (<u>See</u> Claimants' Opp. Mem. at 17.) In support of their

position, Claimants cite to the legislative history of SIPA and state that "[t]here is nothing

in the legislative record to suggest that such lower level of protection was intended to

limit coverage to a customer who had authorized the purchase of securities but whose

funds had instead been misappropriated." (Claimants' Opp. Mem. at 17.) Claimants'

argument is frivolous in light of the many cases that hold otherwise. For instance, a

customer who authorizes the purchase of a security that the Debtor fails to execute has a

claim for cash subject to the $100,000 limit even though the customer did not intend to

have a "free credit balance." <u>See</u>, <u>e.g.</u>, <u>SIPC v. Oberweis Secs.</u>, <u>(In re Oberweis Secs.)</u>,

135 B.R. 842 (Bankr. N.D. Ill. 1991). Likewise, a customer who orders his securities sold, receives confirmation of such sale, and asks that the funds be transferred to his bank account which transfer is never executed will have a claim for cash subject to the $100,000 lower limit. See, e.g., Murray v. McGraw (In re Bell & Beckwith), 821 F.2d 333 (6th Cir. 1987) (notwithstanding that claimants desired return of securities whose sale had not settled prior to brokerage collapse, claimants had claim for cash). See also In re Stanley B. Young & Co., 33 F. Supp. 444 (W.D. Ky. 1940) (non SIPA case; claimant not entitled to securities in situation in which a brokerage firm failed prior to the claimant cashing his check in satisfaction of the sold securities). In both examples, the customers did not intend to keep a "cash" account with the Debtor, but in both cases the customers will have net equity claims for cash.

Moreover, SIPA does not authorize the Trustee to classify claims based on what a customer's intent was in opening the account as Claimants suggest, but according to the customer's net equity on the filing date. The Trustee's determinations do not allow the "parameters of Goren's criminal scheme to determine the scope of claimant's coverage" but the Debtor's acts do bear on the "net equity" calculation. (See Claimants' Opp. Mem. at 18.) Allowing the Debtor's acts to impact what is owed to a customer is contemplated by SIPA. For instance, a customer who orders bona fide securities purchased for his account and whose broker fails to confirm such purchase will have a claim for cash in the event of the broker-dealer's collapse. See, e.g., Oberweis Secs., 135 B.R. at 844. In contrast, a customer who orders bona fide securities purchased and whose broker confirms such purchase will have a claim for securities in the event of a broker-dealer's collapse. See, e.g., In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or. 1985). In both

instances the customer has acted similarly. It is an act of the broker (confirming the purchase) that determines what the customer is owed by the Trustee in the event of collapse. Here, had Goren confirmed to Claimants the purchase of a <u>bona fide</u> money market fund the Trustee would have treated their claims as claims for securities.[12] Similarly, had New Age Money Market Fund actually been a real money market fund[13] whose purchase had been confirmed to Claimants the Trustee would have treated their claims as claims for securities. Indisputably, New Age Money Market Fund was not a <u>bona fide</u> fund. Had it been, it would have been required to: (1) register with the SEC pursuant to Section 8 of the Investment Company Act of 1940 ("ICA"), (2) comply with the registration requirements of the Securities Act of 1933 and periodic reporting requirements of the Securities Exchange Act of 1934, and (3) issue a prospectus for investors. Notably, had Goren properly invested Claimants' money in a <u>bona fide</u> money market fund and had the managers of such fund looted the fund all Claimants would be entitled to is the return of their money market fund shares (or the filing date market value of such shares). The net asset value per share in the aforementioned situation would undoubtedly have fallen below $1 per share.[14]

---

12. The <u>In re Sunpoint Secs., Inc.</u> case cited by Claimants in footnote 21 of their brief involved <u>bona fide</u> mutual funds. The Trustee in that case treated the customer claims consistently with what is alleged here. In other words, <u>Sunpoint</u> customers who received confirmation of the purchase of shares of <u>bona fide</u> mutual funds were classified as securities claimants.

13. Unlike "money market" savings accounts offered by many banks, which are simply higher-yield cash deposit accounts, only money market funds that are organized as mutual funds and are thus subject to regulation under the Investment Company Act of 1940, registration under the Securities Act of 1933, and reporting requirements under the Securities Exchange Act of 1934 are protected under SIPA.

14. Contrary to Claimants' assertion, money market funds do not "always" maintain a net asset value of $1.00 per share. There have been instances in which money market funds have "broken the dollar" (i.e., NAV fell below the fixed $1.00 per share price) either because of unwise investment decisions or because of the fund's managers inappropriate acts. <u>See, e.g.</u>, <u>In re Traba</u>, Exchange Act Release No. 33-7727, 1999 WL 627531 (Aug. 19, 1999) (attached hereto as Ex. C).

13

II.    CASE LAW CONFIRMS THAT CLAIMANTS ARE ENTITLED ONLY TO
THE RETURN OF THE CASH THEY DEPOSITED WITH THE DEBTOR FOR
THE PURCHASE OF THE NON-EXISTENT FUND.

Seeking to avoid the plain terms of SIPA, Claimants assert that their respective

"legitimate expectations" should guide the classification of their claims as claims for

securities. (See Claimants' Opp. Mem. at 20.)  Claimants do not cite to a single SIPA

case that supports their position that "claim for securities" should be read in the manner

that they propose because no such case exists.  Instead, Claimants criticize the case law

cited by the Trustee and SIPC in support of their treatment of the disputed claims.

A.    The Relevant Case Law

Claimants seek heaven with a fence around it: (1) a return (at least) of the funds

deposited with the Debtor, (2) elimination of the market risk associated with a securities

claim,[15] and (3) a higher statutory limit of protection than one afforded for cash

claimants.  In order to achieve the best of many worlds Claimants classify the Trustee's

and SIPC's arguments as "disingenuous" and dismiss the cases cited by the Trustee and

SIPC in their opening brief as: (1) not binding, (2) containing conclusory and perfunctory

reasoning, (3) distinguishable and otherwise unpersuasive.  (Claimants' Opp. Mem. at

29-30.)  As will be demonstrated below Claimants' discussion of such cases is wholly

inaccurate and Claimants' statement that: "none of the cases involving sham investments

relied upon by the Trustee and SIPC involve (as here) investors who received and relied

upon *confirmations* identifying specified securities purchased for their account (which

however did not exist), . . . " is wrong.  (Claimants' Opp. Mem. at 2.)  In fact, three of the

---

15. Though Claimants seek to have their claims classified as "securities claims" they do not wish to be
held responsible for the financial consequences of investing in a completely fictitious security, to wit,
the return of the present market value of that fraudulent investment, which is zero.

14

cases cited by the Trustee and discussed below involved investors who received and

relied upon confirmations identifying securities purchased for their account that did not

exist.

Claimants denigrate the Sixth Circuit's opinion in <u>Plumbers & Steamfitters Local</u>

<u>490 Severance & Retirement Fund v. Appleton, (In re First Ohio Secs., Co.),</u> (hereinafter

"First Ohio") and castigate the Trustee and SIPC for even citing to it.[16]  (<u>See</u> Claimant's

Opp. Mem. at 30.)  Claimants' attempt to diminish the applicability of this case is not

surprising given that the case is directly on point and supports the Trustee's treatment of

the disputed claims here.  (<u>See</u> Joint Mem. at 18-19.)  <u>First Ohio</u> involved the situation

present here where the debtor "sent bogus confirmation notices and fictitious account

statements" to investors, and the securities in question "not only were not purchased . . .

but indeed never existed."  <u>First Ohio</u>, 39 F.3d 1181, No. 93-3313, 1994 U.S. App.

LEXIS 31347, at *2 (6th Cir. 1994) (unpublished opinion), <u>cert. denied</u>, 514 U.S. 1018

(1995) (Joint Mem. Ex. B).  The Sixth Circuit held that under such circumstances "the

only legal conclusion possible is that the claims against First Ohio were ones for 'cash'

and not 'for securities.'"  <u>Id.</u>  Claimants struggle to diminish <u>First Ohio's</u> holding by

arguing that, unlike New Age Money Market Fund, the bogus certificates of deposit at

issue in <u>First Ohio</u> may not have been securities protected by SIPA if they had existed.

---

16. Given the fact that <u>First Ohio</u> is directly on point, the Sixth Circuit Rules specifically permit citation to
the case.  Claimants cite to a portion of the Sixth Circuit Rule (Claimants' Opp. Mem. at 30, n. 30), but
not the relevant portion.  In its entirety, Rule 27(g) provides:

Citation of unpublished decisions in briefs and oral arguments in this Court and in the district courts
within this Circuit is disfavored, except for the purpose of establishing res judicata, estoppel, or law of
the case.  <u>If a party believes, nevertheless, that an unpublished disposition has precedential value in
relation to a material issue in a case, and that there is no published opinion that would serve as well,
such decision may be cited if that party serves a copy thereof on all other parties and on this Court.
Such service shall be accomplished by including a copy of the decision in an addendum to the brief.</u>
(Emphasis added).

(Claimants' Opp. Mem. at 30, n.31.) Claimants attempt to distinguish the case on this premise is groundless. In order to qualify as "customers" the investors (whose claims were allowed) had to have met their burden in the first instance of establishing that they deposited funds with the debtor for the purchase of securities. If the intended purchase was not a security protected under SIPA the investors would not have qualified for SIPA protection at all. See, e.g., Mitchell v. Chicago Partnership Bd., Inc., 246 B.R. 854, 855-56 (N.D. Ill. 2000) (claimant did not give cash to the debtor for the purpose of purchasing "securities" entitling him to customer status where investment was in a non-registered limited partnership); In re Chicago Partnership Bd., Inc., 237 B.R. 726, 736 (Bankr. N.D. Ill. 1999) (upholding trustee's determination that claimant not a customer of broker-dealer where money was deposited with debtor for the purchase of a non-security). Likewise, Claimants' argument that the Sixth Circuit's finding that the individual pension fund participants were not customers "further diminishes the significance of its characterization of the denied claims as 'for cash'" reflects a profound misunderstanding of the case. (Claimants' Opp. Mem at 30-31.) The Sixth Circuit upheld the bankruptcy court's and district court's determinations that certain customers who had claims based on confirmed purchases of non-existent securities had claims for cash. First Ohio, 1994 U.S. App. LEXIS 31347, at *2. The Court's decision to uphold the lower courts determination that individual fund participants were not "customers" under SIPA has nothing to do with its characterization of the allowed customer claims in that case. Thus, the case is clearly on point; to wit: it involves customers with confirmations of nonexistent securities.

In order to diminish the significance of the result reached in <u>Appleton v. Hardy</u>
<u>(In re First Ohio Secs., Co.),</u> No 590-0072, Adv. No. 92-5085 (Bankr. N.D. Ohio 1992)
(unpublished order) (hereinafter "Appleton"), Claimants' argue that the manner in which
a security does not exist is somehow relevant to the characterization of the claim.
(Claimants' Opp. Mem. at 31.)  Claimants state that without "further factual elaboration
as to whether the customer received confirmation of the purchase of specific certificates
of deposit (which were not in fact purchased by the broker), or whether bogus certificates
of deposit identified to the customer were 'fictitious,' or even whether anything more
than generic certificates of deposit were identified to the customer as having been
purchased, *Appleton* can provide no support for the Trustee's position" is erroneous.
(Claimants' Opp. Mem. at 31.)  As Claimants acknowledge, <u>Appleton</u> arose from the
same bankruptcy proceeding as <u>First Ohio</u> and thereby involves the same factual
background as that in <u>First Ohio,</u> except that in addition to confirming the purchase of
non-existent certificates of deposits the debtor also confirmed the purchase of a non-
existent mutual fund to the investor referred to as the "All American Fund."  (<u>See</u> Joint
Mem. Ex. C at 2.)  The bankruptcy court in <u>Appleton</u> found that the Trustee had a right to
recover SIPC advances in excess of $100,000 given to the customer on the erroneous
belief that the securities in question existed.  Thus, the Court implicitly acknowledged
that the customer had a claim for cash subject to the $100,000 limit where the securities
in question did not exist.  The reason why the security in question did not exist is legally
irrelevant.

Finally, Claimants' argument that the holding of the Third Circuit in <u>SEC v.</u>
<u>Aberdeen Secs.</u>, 480 F.2d 1121 (3d Cir.), <u>cert. denied sub. nom,</u> <u>Seligsohn v. SEC,</u> 414

U.S. 1111 (1973) is "legally inapposite" because the securities in question in <u>Aberdeen</u>
were "unavailable, not because they were fictitious but because the issuer had become
bankrupt at some point after the claimant had deposited money with his broker but before
the stock had been issued" is baseless. (Claimants' Opp. Mem. at 33.) Whether a
security does not exist because it is a figment of the debtor's imagination or because a
corporation has failed to issue the stock is irrelevant. What matters is that in <u>Aberdeen</u>,
as here, the security in question never existed though its purchase was confirmed to the
customer by Aberdeen. <u>Aberdeen Secs.</u>, 480 F.2d at 1127.[17]

In sum, all three of the above-mentioned cases are directly on point and support
the Trustee's and SIPC's treatment of the disputed claims herein.

B.    <u>Claimants' Disparate Treatment Argument</u>

Claimants also argue that the Trustee's "flexible" treatment of the claims of the
mutual fund claimants in this case as "claims for securities" requires him to treat their
claims as "claims for securities." Contrary to Claimants' assertion the Trustee has not
construed the term "securities" flexibly with respect to mutual fund investors so as to
satisfy their legitimate expectations and thereby allow a claim for securities where no

---

17. Similarly, Claimants' argue that the nature of the securities in question in <u>SIPC v. Old Naples Secs,
Inc. (In re Old Naples Secs., Inc.</u>, 218 B.R. 981 (Bankr. M.D. Fla. 1993), <u>aff'd</u>, 223 F.3d 1296 (11th
Cir. 2000) limits the case's applicability to the case at hand. They argue that the type of security in
which the Old Naples investors intended to invest was determinative to the classification of the claim
as one for cash. However, the type of security in which investors intend to invest is only important in
deciding whether the investors are "customers" (<u>i.e.</u>, whether the intended purchase was a protected
"security"). Once that determination is made, it is wholly irrelevant to the classification of a net equity
claim what the security is, so long as it exists and is identifiable from the Debtor's books and records.
Clearly, the "legitimate expectation" of one investing in a non-existent security is in no way
distinguishable or better than the "legitimate expectation" of one investing in a non-specified security.
In both cases the problem is not that the customer did not intend to purchase a protected security but
that the Trustee cannot identify the security in question. In such instances, the customer cannot have a
claim for securities. This is because nothing of the same class and series can be purchased for return to
the customer and providing cash in lieu of the security would result in the Claimant receiving nothing.
In order to avoid this absurd result, courts have held in such circumstances that customers have a claim
for the cash that was deposited with the broker-dealer minus withdrawals.

18

security exists, but has simply fulfilled his statutory duty by endeavoring to identify the

security in question and return it to the customer. (See Claimants' Opp. Mem. at 22.)

Claimants' distort the Trustee's acts in this case in a fruitless effort to legitimize

their "disparate treatment" and "legitimate expectations" argument. Again, as stated in

the Trustee's and SIPC's opening brief, the Trustee has not allowed as "securities claims"

any claims where the mutual fund in question did not exist.[18] (See Mutual Fund Chart

attached hereto as Ex. D.) In all but three instances, the name, symbol, and

corresponding net asset value of mutual funds used in Goren's fictitious account

statements corresponded almost exactly with that found in publicly available materials.

(See Ex. D.) In the three instances in which the Trustee could not authenticate the

existence of the security shown on the account statements he treated the corresponding

customer claims as claims for cash. Thus, in all cases these were registered mutual funds

that complied with the reporting requirements of the SEC and issued a prospectus to its

investors.[19] In no instance has the Trustee allowed a securities claim where no securities

exist and chosen to satisfy that claim as a claim for securities. In fact, the Trustee has

only satisfied the claims of a handful of mutual fund claimants with cash in lieu of the

---

18. It is difficult to understand why attorneys who also represent mutual fund claimants in this case would
want to bring to light instances in which the Trustee allegedly allowed as "claims for securities" claims
of mutual fund holders where the mutual fund in question did not exist. Though the Trustee has not in
fact done so, had he it would have been under the mistaken belief that the mutual fund in question did
exist. As such, he would have the power to file a demand for turnover under the Bankruptcy Code to
recover the excess funds given to the claimant. See, e.g., Appleton v. Hardy (In re First Ohio Secs.,
Co.), No. 590-0072, Adv. No. 92-5085 (Bankr. N.D. Ohio 1992) (unpublished Order) (Joint Mem. Ex.
C.) To the extent Claimants' counsel is arguing that the mutual fund claimants should be treated the
same as the money market fund claimants because in both instances the securities in question do not
exist he is arguing against the interests of the mutual fund claimants he represents—claimants who
have not objected to the Trustee's treatment of their claims. Thus, it appears to the Trustee and SIPC
that Claimants' counsel may have a conflict of interest in this case.

19. In fact, Goren provided many of the mutual fund claimants with copies of the prospectus issued by the
mutual funds in question.

19

mutual funds in question and that was because investment in the funds was closed to new

investors. Notably, the fact that a mutual fund is presently "closed" to new investors

does not mean that such fund does not exist but rather that it is "unavailable" for

purchase. Thus, the Trustee properly gave the customers cash equal to the filing date

values of the closed mutual funds. Clearly, Claimants' "disparate treatment" argument is

frivolous.

Moreover, the Trustee's and SIPC's argument in their opening brief that allowing

as a securities claim a claim involving non-existent securities poses valuation problems is

that not a "red herring" or a "frivolous makeweight argument" as Claimants allege.

(Claimants' Opp. Mem. at 26 & 29.) If Claimants' argument were adopted by this Court

it would apply to all instances in which the purchase of a non-existent security was

confirmed to a customer not only in those instances in which the non-existent security in

question happens to be a money market fund. Thus, if this Court were to adopt

Claimants' approach the Trustee could be forced in the future to classify and satisfy

securities claims based on "imaginary dotcoms, computer companies, and biotech firms."

Not only would this be a logistical nightmare, it would successfully circumvent SIPA's

express prohibition on not serving as a vehicle for restitution for fraud.

III.    SIPC'S SERIES 500 RULES DO NOT APPLY.

Claimants also rely on SIPC's Series 500 Rules ("Series 500 Rules") in

challenging the Trustee's determination that their claims are for cash. (See Claimants'

Opp. Mem. at 36.) Although the Series 500 Rules relate to whether a customer has a

claim for securities or a claim for cash they have no bearing on the situation where the

security in question does not exist. Claimants do not cite to a single case that supports

20

their position that the Series 500 Rules apply to the facts of their case.[20]  Instead,

Claimants misrepresent the Trustee's and SIPC's position.  The Trustee and SIPC are not

arguing that a purchase or sale of a security has to in fact occur in order for there to be a

claim for securities but that a security must in fact exist.  Review of the cases giving rise

to the Series 500 Rules shows that in no instance was the security at issue fictitious.  See,

e.g., Murray v. McGraw (In re Bell & Beckwith), 821 F.2d 333 (6th Cir. 1987); Gans v.

Reddington (In re Weis Secs, Inc.), [1974-1975 Transfer Binder], Fed. Sec. L. Rep.

(CCH) ¶ 94,780, at ¶ 96,576 (S.D.N.Y. 1974); SIPC v. Morgan, Kennedy & Co., 3

Bankr. Ct. Dec. 15 (S.D.N.Y. 1977); In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or.

1985).

IV.    THE VIABILITY OF CLAIMANTS' SIPA CLAIMS WAS NOT
       DETERMINED BY THE EXISTENCE OF A FRAUD CLAIM.

          The Trustee and SIPC do not argue that "the existence of a common law fraud or

breach of contract claim precludes the existence of a SIPA claim for securities" as

Claimants suggest.  (Claimants' Opp. Mem. at 41.)  The Trustee has allowed Claimants'

customer claims to the full extent of the amount of money deposited for the purchase of

the non-existent fund minus withdrawals.  Though Claimants may have a fraud claim

against the Debtor such claim does not affect the fact that they also have a customer

claim.[21]  However, recognition of customer status does not provide Claimants with an

opportunity to seek restitution for fraud by calling their customer claim one for securities.

---

20. Contrary to Claimants' assertion, In re Adler Coleman Clearing Corp., and In re A.R. Baron & Co., are
    not the only cases cited by the Trustee and SIPC that were decided after the promulgation of the Series
    500 Rules.  (See Claimants' Opp. Mem. at 38, n.33.)  Both First Ohio and Appleton were decided after
    the promulgation of the Series 500 Rules.

21. In fact, Claimants are actively pursuing their fraud causes of action against various defendants in a
    class action suit in the Eastern District of New York.

See SIPC v. Barbour, 421 U.S. 412 (1975) (SIPA was not designed to achieve restitution for fraud); First Ohio, 1994 U.S. App. LEXIS 31347, at *4. Thus, Claimants reliance on cases interpreting the "in connection" with requirement of cases arising under section 10(b) of the Securities Exchange Act of 1934 ("'34 Act") in support of their argument that they have "claims for securities" is wholly misplaced. (See Claimants' Opp. Mem. at 21-22.)

Broadly speaking, these cases stand for the proposition that a fraud in connection with the purchase or sale of a non-existent security may be actionable. See e.g., Local 875 I.B.T. Pension Fund v. Pollack, 992 F. Supp. 545 (E.D.N.Y. 1998).[22] These cases say nothing about the manner in which "claim for securities" should be construed under SIPA, a statute that notably does not protect customer claims based on fraud, but provides limited and defined remedies for "customers" of the Debtor. SIPA does not provide the right to sue, and does not use the phrase "in connection with" the sale or purchase of a security as does section 10(b) of the Securities Act. Thus, Claimants reliance on cases interpreting the "in connection with" requirement of Section 10(b) adds nothing to their argument here.

V.    CLAIMANTS' CLAIMS FOR DIVIDENDS ARE NOT ALLOWABLE CUSTOMER CLAIMS.

Taken to its logical conclusion, Claimants argue that SIPC's quasi-public funds should be used to pay them fictitious high-yield dividends on a fictitious money market fund. The law is clear that non-existent dividends or interest supposedly "earned" on non-existent shares are not customer claims protected by SIPA, although they may be

---

22. Similarly, Claimants herein are entitled to SIPA protection even though the security did not exist.

allowable general creditor claims. See, e.g., In re Old Naples Secs., Inc., 218 B.R. at 987 ("The Claimants are entitled to no more than a return of principal. Each claim must be reduced by the amount that the claimant received in 'interest' payments."). As demonstrated supra and in the Trustee and SIPC's moving papers, Claimants' claims for fictitious dividends earned on fictitious money-market fund are not allowable customer claims. (See Joint Mem. at 32.) The Trustee and SIPC will not belabor the point.

As sympathetic as the Claimants' circumstances may be, SIPA simply does not provide for the kind of relief they seek. Indeed, nowhere in their papers do Claimants cite to any section of SIPA, any legislative history, or any SIPA case law to support their argument. While the fact that they deposited money with the Debtor to purchase securities qualifies them as "customers," in the end, the inescapable conclusion is that Claimants are only entitled to receive in satisfaction of their customer claims the relief offered by the Trustee—return of the cash that the Debtor should have been holding on the filing date having not made any securities purchases or confirmed to the Claimants the purchase of bona fide securities.

VI.    THERE IS NO NEED FOR ANY DISCOVERY IN THIS CASE

Although Claimants concede that the issue to be resolved here is one of law not of fact, they seek limited discovery as to the Trustee's "verification" process of bona fide mutual fund claims. The Trustee and SIPC maintain that Claimants' reliance on the Trustee's treatment of the mutual fund claimants as claims for securities in support of their position is baseless. However, in order to avoid delay, attached hereto is a chart detailing the information requested by Claimants. (Ex. D.) No further discovery is necessary or relevant to the issue of law that this Court needs to resolve.

## CONCLUSION

For the foregoing reasons, and those set forth in their moving papers, the

Trustee's and SIPC's Motion should be granted in all respects.

Dated: New York, New York
        June 18, 2001

Respectfully submitted,

HUGHES HUBBARD & REED LLP

By: _____
     James B. Kobak, Jr. (JK-1218)
     One Battery Park Plaza
     New York, New York 10004
     Tel: (212) 837-6000

     Attorneys for James W. Giddens as
     Trustee for the liquidation of the
     businesses of New Times Securities
     Services, Inc., and New Age
     Financial Services

SECURITIES INVESTOR PROTECTION
CORPORATION

By: _____
     Stephen P. Harbeck (SH-7734)
     General Counsel
     805 Fifteenth Street, N.W., Suite 800
     Washington, D.C. 20005-2207
     Tel: (202) 371-8300

OF COUNSEL

     Karen A. Caplan
     Assistant General Counsel

NY 564618_1.DOC

24