# EXHIBIT J

🗐 Original Image of this Document (PDF)

2002 WL 32487939 (2nd Cir.)
For opinion see 371 F.3d 68

**Briefs and Other Related Documents**

United States Court of Appeals,
Second Circuit.
IN RE: NEW TIMES SECURITIES SERVICES, INC. and New Age Financial Services,
Inc., Debtors,
Myrna K. Jacobs, Simon and Helga Noveck, Miriam Seidenberg, Felice Linder,
Angelo Scarlata, the Rose Marie Ceparano Irrevocable Trust, the Estate of Allan
A. Blynd, Salvatore and Stella Digiorgio, Project Earth Environmental
Fundraisers, Inc., New York Optical, Inc., the Carl Carter Irrevocable Trust,
Craig Roffman, Ellen Eschen, and Jill Gundry, Claimants-Appellees.
No. 02-6166.
October 17, 2002.
ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

Brief for Appellants James W. Giddnes as Trustee for the Liquidation of the
Businesses of New Times Securities Services, Inc. and New Age Financial
Services, Inc., and Securities Investor Protection Corporation

James B. Kobak, Jr., Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York
10004, (212) 837-6000, Attorneys for Appellant James W. Giddens, as Trustee for the Liquidation of
the Businesses of New Times Securities Services Inc., and New Age Financial Services, Inc., Stephen
P. Harbeck, Karen A. Caplan, Securities Investor Protection Corporation, Appellant, 805 Fifteenth
Street, N.W., Suite 800, Washinton, D.C. 20005-2207, (202) 371-8300

### *i CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellants James W. Giddens, as Trustee for the liquidation of the
businesses of the substantively consolidated estates of New Times Securities Services, Inc., and New
Age Financial Services, Inc., and the Securities Investor Protection Corporation certify that they have
no corporate parents, affiliates and/or subsidiaries which are publicly held.

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ... iii

PRELIMINARY AND JURISDICTIONAL STATEMENT ... 1

STATEMENT OF ISSUES ... 2

STATEMENT OF THE CASE ... 3

STATEMENT OF FACTS ... 4

SUMMARY OF THE ARGUMENT ... 9

STANDARD OF REVIEW ... 13

ARGUMENT ... 14

I. THE TRUSTEE CORRECTLY DETERMINED THAT THE DISPUTED CLAIMS SHOULD BE TREATED AS
CLAIMS FOR CASH AND NOT CLAIMS FOR THE FICTITIOUS VALUE OF THE BOGUS MUTUAL FUND ...
14

A. ALL CASE LAW ON POINT SUPPORTS THE TRUSTEE'S DETERMINATIONS ... 14

B. SIPA AND ITS LEGISLATIVE HISTORY AND PURPOSE SUPPORT THE TRUSTEE'S DETERMINATIONS ... 19

1. SIPA's Legislative History Confirms that Claimants have Claims for Cash ... 21

2. Following the Statutory Definitions and Case Law is Consistent with the Policies of the Nation's Securities Laws of which SIPA is a Part ... 28

C. THE SERIES 500 RULES DO NOT APPLY TO TRANSACTIONS IN BOGUS SECURITIES ... 31

*ii II. CLAIMANTS' CLAIMS FOR FICTITIOUS DIVIDENDS OR INTEREST EARNED ARE NOT ALLOWABLE CUSTOMER CLAIMS ... 37

CONCLUSION ... 40

## *iii TABLE OF AUTHORITIES

In re A.R. Baron & Co., 226 B.R. 790 (Bankr. S.D.N.Y. 1998) ... 21, 31

In re Adler Coleman Clearing Corp., 195 B.R. 266 (Bankr. S.D.N.Y. 1996) ... 21, 22

In re Adler Coleman Clearing Corp., 204 B.R. 111 (Bankr. S.D.N.Y. 1997) ... 14

In re Adler. Coleman Clearing Corp., 263 B.R. 406 (S.D.N.Y. 2001) ... 35, 36, 37

Appleton v. Hardy (In re First Ohio Secs., Co.), No. 590-0072, Adv. No. 92-5085 (Bankr. N.D. Ohio 1992) ... 17

In re Bell & Beckwith, 937 F.2d 1104 (6th Cir. 1991) ... 19, 36

Focht v. Athens (In re Old Naples Secs., Inc.), No. 2:00-cv-181-FTM-29D (M.D. Fla. Sept. 30, 2002) ... 37

Gans v. Reddington (In re Weis Secs, Inc.), [1974-1975 Transfer Binder], Fed. Sec. L.Rep. (CCH) ¶ 94, 780 (S.D.N.Y. 1974) ... 32

Gervis v. Berg, No. 00-CV-3362 (E.D.N.Y. filed June 9, 2000) ... 30

Gurary v. Nu Tech Bio Med, Inc., 303 F.3d 212 (2d Cir. 2002) ... 13

Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18 (2d Cir. 2002) ... 13

In re Investors Center, Inc., 129 B.R. 339 (Bankr. E.D.N.Y. 1991) ... 34

In re Investors Sec. Corp., 6 B.R. 415 (Bankr. W.D. Pa. 1980) ... 19, 31

In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or. 1985) ... 19, 31, 32, 33

In re MV Secs., Inc., 48 B.R. 156 (Bankr. S.D.N.Y. 1985) ... 19

Murray v. McGraw (In re Bell & Beckwith), 821 F.2d 333 (6th Cir. 1987) ... 31, 36

In re Oberweis Secs., Inc., 135 B.R. 842 (Bankr. N.D. Ill. 1991) ... 38

*iv Plumbers & Steamfitters Local 490 Severance & Ret. Fund v. Appleton (In re First Ohio Secs. Co.), 39 F.3d 1181, 1994 WL 599433 (6th Cir. 1994), cert. denied, 514 U.S. 1018 (1995) ... 15, 16, 18

*Plumbers & Steamfitters Local 490 Severance & Ret. Fund v. Appleton (In re First Ohio Secs. Co.)*,
No. 92CV0349 (N.D. Ohio Feb. 18, 1993) ... 16

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ... 19

*SEC v. Aberdeen Secs., Co.*, 480 F.2d 1121 (3d Cir.), *cert. denied sub nom. Seligsohn v. SEC*, 414
U.S. 1111 (1973) ... *passim*

*SEC v. Albert & Maguire Secs. Co.*, 378 F. Supp. 906 (E.D. Pa. 1974) ... 19

*SEC v. Ambassador Church Fin./Dev. Group, Inc.*, 679 F.2d 608 (6th Cir. 1982) ... 19

*SEC v. F.O. Baroff Co.*, 497 F.2d 280 (2d Cir. 1974) ... 29

**SEC v. Goren**, *206 F. Supp. 2d 344 (E.D.N.Y. 2002)* ... 1, 20, 25, 37

*SEC v. Howard Lawrence & Co.*, 74 Civ. 193, 1975 Bankr. LEXIS 15 (Bankr. S.D.N.Y. 1975) ... 22

*SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir. 1974) ... 14, 21, 30

*SEC v. S.J. Salmon & Co.*, 375 F. Supp. 867 (S.D.N.Y. 1974) ... 22

*SIPC v. Barbour*, 421 U.S. 412 (1975) ... 35

*SIPC v. C.J. Wright & Co., (In re C.J. Wright & Co.)*, 162 B.R. 597 (Bankr. M.D. Fla. 1993) ... 19, 38

*SIPC v. Morgan, Kennedy & Co.*, 3 B.C.D. 15 (S.D.N.Y. 1977) ... 32

*SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314 (2d Cir.) *cert. denied*, 426 U.S. 936 (1976) ... 21

*SIPC v. Oberweis Secs., Inc. (In re Oberweis Secs., Inc.)*, 135 B.R. 842 (Bankr. N.D. Ill. 1991) ... 34

**\*v** *SIPC v. Old Naples Secs., Inc., (In re Old Naples Secs., Inc.)*, 218 B.R. 981 (Bankr. M.D. Fla.
1998), *aff'd*, 223 F.3d 1296 (11th Cir. 2000) ... 18, 37

*SIPC v. Pepperdine Univ., (In re Brentwood Secs., Inc.)*, 925 F.2d 325 (9th Cir. 1991) ... 18

*SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273 (Bankr. S.D.N.Y. 1999) ... 14

*SIPC v. Wise (In re Stalvey & Assocs.)*, 750 F.2d 464 (5th Cir. 1985) ... 29

*Schultz v. Omni Mut. Inc.*, No. 93-3700, 1993 WL 546671 (S.D.N.Y. Dec. 30, 1993) ... 21

*United States v. Leon*, 203 F.3d 162 (2d Cir. 2000) ... 15

**STATUTES**

Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa *et seq* ... *passim*

28 U.S.C. § 1291(1993) ... 1

28 U.S.C. § 158(a) (2002) ... 1

Series 500 Rules, 17 C.F.R. § 300.500 (2002) ... 31, 37

**RULES**

Fed. R. App. P. 26.1 (2002) ... 1

Rules of the Securities Investor Protection Corp., 53 Fed. Reg. 1793, 1998 WL 236666 (1988) ... 31, 33

## LEGISLATIVE MATERIALS

*SIPA Amendments: Hearing Before the Subcomm. on Securities of the Comm. on Banking, Housing, and Urban Affairs*, H.R. 8331, 95th Cong. 2d Sess. 2 (1978) ... 26

*SIPA Amendments: Hearings on H.R. 6831 Before the Subcomm. on Consumer Protection and Fin. of the Comm. on Interstate and Foreign Commerce*, 96th Cong., 2d Sess. 17 (1980) ... 27

***vi** SIPA: Hearings on H.R. 13308, H.R. 17585, H.R. 18081, H.R. 181 09, and 18458 Before the Subcomm. on Commerce and Fin. of the House Comm. and Interstate and Foreign Commerce*, 91st Cong., 2d Sess. 149 (1970) ... 27

## MISCELLANEOUS

David E. Riggs, *Securities Regulation of Mutual Funds: A Banker's Primer*, 113 Banking L.J. 864, 865 (Oct. 1996) ... 28

## *1 PRELIMINARY AND JURISDICTIONAL STATEMENT

Appellants James W. Giddens, (the "Trustee") as Trustee for the liquidation of the businesses of the substantively consolidated estates of New Times Securities Services, Inc. ("New Times") and New Age Financial Services, Inc. ("New Age") (together, the "Debtor") and the Securities Investor Protection Corporation ("SIPC") submit this brief in support of their Joint Appeal from the Judgment of the U.S. District Court for the Eastern District of New York (Judge Thomas C. Platt), which denied their motion for an order upholding the Trustee's determinations with respect to claims filed by fourteen claimants seeking SIPC cash advances equal to the fictitious value of one or more non-existent money market funds ("bogus mutual funds"). See **SEC v. Goren, 206 F. Supp. 2d 344 (E.D.N.Y. 2002)**.

The District Court had jurisdiction over this contested matter pursuant to 15 U.S.C. § 78eee(b)(2)(A) (2002) and 28 U.S.C. § 158(a) (2002). This Court has jurisdiction over this Joint Appeal pursuant to 28 U.S.C. § 1291(1993).

The District Court's judgment was entered on June 25, 2002. The Trustee and SIPC filed a timely Joint Notice of Appeal on July 1, 2002.

## *2 STATEMENT OF ISSUES

1. Whether the Trustee correctly determined that claimants should be treated as having claims for cash rather than securities covered by the Securities Investor Protection Act ("SIPA") where claimants deposited monies with an insolvent brokerage firm to purchase non-existent shares in bogus mutual funds that were:

(a) never organized as mutual funds or registered with the Securities and Exchange Commission ("SEC");

(b) never had any assets or market value;

(c) never issued prospectuses or complied with the nation's securities laws; and

(d) had no class or series of securities that could be identified or purchased on the open market.

2. Whether the Trustee correctly determined that claimants who seek cash advances from SIPC cannot be treated as having claims for SIPC advances with respect to wholly fictitious dividends and interest which were never in fact generated by bogus mutual funds, never received by the broker-dealer, and never deposited in the claimants' accounts.

## *3 STATEMENT OF THE CASE

This is an appeal from an order of the District Court sustaining the objections filed by fourteen claimants (the "Claimants") [FN1] to the Trustee's determinations of their claims. These Claimants (among a host of others who have not disputed the Trustee's position on this issue) deposited cash with the Debtor in order to purchase shares of bogus mutual funds. The Claimants received fictitious confirmations and fictitious account statements from the Debtor, indicating the purchase of the bogus shares. Even though the bogus mutual funds they intended to purchase never existed, were never registered with the SEC, never issued prospectuses, and never advertised or had their share prices

listed in print (such as the newspaper), electronic, or live media, Claimants filed claims seeking their return or fictitious cash values. The Trustee determined that since no real "securities" under SIPA ever existed or could be purchased on the open market for return to Claimants, and since the bogus mutual funds had no market value, the Claimants could not have a claim for the return of the bogus mutual funds shares under SIPA. Instead, the only allowable SIPA claim that the Claimants could have was a claim for the return of the cash that they deposited with the Debtor in order to purchase securities, less any withdrawals or redemptions.

> FN1. These Claimants are: Myrna K. Jacobs ("Jacobs"); Simon and Helga Noveck ("Novecks"); Miriam Seidenberg ("Seidenberg"); Felice Under ("Linder"); Angelo Scarlata ("Scarlata"); the Rose Marie Ceparano Irrevocable Trust ("Ceparano Trust"); the Estate of Allan A. Blynd ("Blynd
>
> Estate"); Salvatore and Stella DiGiorgio ("DiGiorgios"); Project Earth Environmental Fundraisers, Inc., ("Project Earth"); New York Optical, Inc. ("New York Optical"); the Carl Carter Irrevocable Trust ("Carter Trust"); Craig Roffman ("Roffinan"); Ellen Eschen ("Eschen"); and Jill Gundry ("Gundry").

**\*4** The District Court disagreed with the Trustee's determination and held that claims for the fictitious value of the bogus mutual funds were claims for securities under SIPA. It ordered the Trustee to satisfy the claims with cash advances from SIPC equal to the wholly fictitious value of the bogus mutual funds as shown on the Claimants' final account statements. The District Court also determined that claims for completely fictitious interest/dividends that were supposedly to have been generated by the non-existent funds were allowable customer claims for securities. In its decision, the District Court relied entirely on rules adopted by SIPC (the "Series 500 Rules") that address whether an actual security transaction gives rise to a claim for cash or a claim for securities. The District Court, without discussion, assumed that the Series 500 Rules applied so as to convert bogus transactions into real ones, thereby ignoring all relevant case law. The relevant case law, SIPA, its legislative history and purpose, and the federal securities laws [FN2] confirm that the Series 500 Rules do not apply to convert fictitious transactions in fictitious securities into real ones that would give rise to a customer claim for securities as opposed to cash under SIPA.

> FN2. Pursuant to 15 U.S.C. § 78bbb, "the provisions of the Securities Exchange Act of 1934 apply [to SIPA] as if this chapter [of SIPA] constituted an amendment to, and was included as a section of, such Act."

### STATEMENT OF FACTS

On May 18, 2000, the United States District Court for the Eastern District of New York entered an Order pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. § 78aaa et seq., [FN3] finding that the customers of New Times were in need of the protections afforded by SIPA. (Protective Decree ¶ I, **\*5** J.A. 48.) Pursuant to SIPA § 78eee(b)(3), James W. Giddens was appointed as Trustee (the "Trustee") for the liquidation of the business of New Times, and Hughes Hubbard & Reed LLP his counsel. (Id ¶ II, J.A. 48.) Pursuant to SIPA § 78eee(b)(4), the liquidation proceeding was removed to the Bankruptcy Court. (Id. ¶ IX, J.A. 51.)

> FN3. For convenience, references hereinafter to provisions of SIPA shall omit "15 U.S.C."

In accordance with a standard Administrative Order, the Trustee sent notices and claim materials to each person who appeared from New Times' books and records to have been a customer of New Times during the year prior to the filing date. (Administrative Order, J.A. 93.)

While claims were being filed, the Trustee examined the operations of New Times and New Age and their principal William Goren ("Goren"). Based on his investigation, which revealed extensive intermingling of the two entities in communications with the public, the Trustee moved for an order substantively consolidating the estates of New Times and New Age. The Trustee, with SIPC's approval, sought the order so as to maximize recovery to victims of Goren's fraudulent activities, irrespective of whether they had dealt with New Times, the broker- dealer entity or New Age, the non broker-dealer entity. The Bankruptcy Court granted the Order on November 27, 2000 (the "Substantive Consolidation Order"). (Substantive Consolidation Order, J.A. 134.) Pursuant to the Substantive Consolidation Order, for purposes of determining "customer" claims under SIPA, the Debtor includes New Times and New Age for claims arising after April 19, 1995, the date that New Times became registered with the SEC and a member of SIPC. (Id., J.A. 137.) As a result of the Substantive Consolidation Order, these fourteen objecting Claimants have claims eligible for SIPC cash advances even though they actually transacted with Goren through an unregistered entity. Nine hundred five (905) claims have been filed in the liquidation proceeding. One hundred seventy-four (174) of these claims relate to funds *6 deposited with the Debtor and the subsequent confirmation of a supposed purchase of non-existent shares of one or more bogus mutual funds. The Trustee has determined one hundred seventy three (173) of the 174 bogus mutual fund claims filed. The Trustee notified each claimant that his or her claim was allowed as a claim for cash in the amount deposited with the Debtor for the purpose of purchasing the bogus shares, minus any withdrawals or redemptions. The Trustee also notified claimants that amounts shown on account statements as dividends or interest earned on the fictitious funds were not allowable customer claims. Most claimants accepted the Trustee's determination of their claims. In fact, of all the bogus mutual fund claims determined, only these fourteen Claimants objected to the Trustee's determination by filing written objections to be resolved pursuant to the Claims Resolution Procedures set forth in the Administrative Order. Because the limit of protection for securities claims is higher than the limit on cash claims, these Claimants, though seeking only cash, sought to have their claims treated as claims for return of securities in order to be eligible for the higher level of SIPC cash advance. [FN4]

FN4. Thirteen of the objecting Claimants have claims that are over the $100,000 limit that SIPC may advance to satisfy claims for cash.

Claimants' objections arise from the fact that they were fraudulently induced by Goren or his employees to part with cash or other property that supposedly was to be invested in one or more bogus mutual funds - often called the New Age Securities Money Market Fund but sometimes called something else - allegedly held at Fleet Bank. [FN5] Claimants deposited money with New Age for investment in the bogus mutual funds based on Goren's misrepresentations. Allegedly, Goren *7 misrepresented that the bogus mutual funds yielded higher interest rates than bank money market funds, that they would maintain constant share values of $1.00 per share, and that they would provide returns that were better than bank deposits. Goren promised the Claimants returns 1 to 1 1/2 points higher than most bank savings accounts; these promised returns ranged from 5 1/4 to 6 1/2 percent. The bogus mutual funds never existed; they were never organized as mutual funds, registered with the SEC, or issued prospectuses for investors as required by the Securities Act of 1933 and the Investment Company Act of 1940. The cash that Goren received for the bogus mutual funds was used to support his lavish lifestyle, to finance the Debtor's operating costs, to fund returns of principal, or to make supposed interest payments on promissory notes and to redeem mutual funds [FN6] allegedly purchased on behalf of other claimants.

FN5. Goren also offered investors a tax-free version of the New Age Money

Market Fund and another fictitious fund which he called the New Times Prime Money Market Fund.

FN6. Goren also purported to sell to other claimants shares in mutual funds that actually

existed. Investors in this fund scheme believed that Goren was purchasing bona fide mutual funds (e.g. Vanguard, Putnam, Kemper) for their accounts and received written confirmations of such purchases and monthly account statements. Although these transactions were never executed, the information provided on the account and confirmation statements mirrored what would have happened had the given transaction been executed. Goren tracked each mutual fund that he purported to purchase on behalf of an investor in order to generate account statements that accurately reflected the value of the bona fide mutual fund in question. Because real securities existed at all times and could be purchased to satisfy these claims to complete the claimants' transactions with the Debtor, the Trustee has treated these claims as securities claims, rather than cash claims. In contrast to the situation with the Claimants in this appeal, claimants checking on their mutual funds would receive every indication that the fund existed, complied with all regulatory requirements and performed as Goren represented. Moreover, unlike the situation with respect to Claimants here, the Trustee could identify the shares of the

real securities involved and use SIPC advances to purchase missing securities to return to claimants.

**\*8** Pursuant to the Claims Resolution Procedures set forth in the Administrative Order, a hearing was held before the Honorable Stan Bernstein on June 25, 2001, to resolve the Claimants' objections. (Hr'g Tr., J.A. 511.) Judge Bernstein issued a "preliminary decision" in December 2001 denying the Trustee's motion to uphold his determination with regard to these Claimants. (Prelim. Op., J.A. 735.) Subsequently, on January 30, 2002, Judge Bernstein sua sponte recused himself from the case and vacated his preliminary decision. (Order Withdrawing Bench Op. and Recusing Ct., J.A. 750.) Claimants sought reconsideration of Judge Bernstein's recusal. (Claimants' Joint Mot. Recons., J.A. 757.) Judge Bernstein denied their motion for reconsideration on February 19, 2002, and suggested to the District Court that it withdraw the reference as to this contested matter. (Mem. and Order Den. Recons., J.A. 759.) On March 6, 2002, Judge Platt withdrew the reference and agreed to decide the issue de novo. (Mem. and Order, J.A. 761.)
1Subsequently, on May 28, 2002, Judge Platt issued a Memorandum and Order denying the Trustee's motion to uphold his determinations and sustaining the Claimants' objections. (Mem. and Order, J.A. 773.) The District Court held that the receipt of bogus share purchase confirmations and monthly statements established that Claimants somehow had securities claims, whether or not the transactions confirmed involved actual securities. In addition, because the account statements indicated that bogus dividends were being reinvested to purchase additional bogus shares of the bogus mutual funds, the District Court held that the Claimants also were entitled to satisfaction of the fictitious dividends as securities claims. According to the District Court, the receipt of confirmation and account statements confirming only the purchase of bogus shares and reinvestment of **\*9** bogus dividends created a legitimate expectation in Claimants that they held securities in their accounts. [FN7]

> FN7. In its May 28, 2002, Memorandum and Order, the District Court purported to calculate what each Clamant had claimed. Upon review of the District Court's decision, the parties realized that the District Court had improperly calculated some of the claims. The Trustee and Claimants entered into a Stipulation, which was subsequently signed by the District Court, agreeing on amounts that would be owed to Claimants if their claims were for securities and if they were entitled to the payment of non-existent dividends, (Stipulation Regarding Total Claimants' Claims, J.A. 794.)

## SUMMARY OF THE ARGUMENT

The District Court ignored the relevant case law and the provisions of SIPA dealing with the satisfaction of customer claims, as well as SIPA's legislative history and purpose, in holding that the issuance of a fictitious confirmation of the purchase of a non-existent mutual fund gives rise to a

claim for securities under SIPA. All of the case law on point - which the District Court did not discuss or even cite - makes clear that the proper way to treat claims for fictitious securities consistent with SIPA is for the Trustee to determine (as here) that Claimants have net equity claims for cash equal to the amounts deposited with the broker-dealer minus any withdrawals or redemptions. The decisions in these cases reach the only result that is consistent with the language of SIPA, its legislative history and purpose, and the federal securities laws of which SIPA is a part.

SIPA protects the "custodial" function broker-dealers perform for claimants and remedies claimants' losses by having the Trustee return to them the actual property that the broker-dealer should be holding for them in their accounts. Where a claimant's account should contain certain existent securities, but does not, the Trustee is authorized to use SIPC cash advances - up to $500,000 - to purchase *10 securities of the "same class and series of an issuer" on the open market to the extent practicable to return to the claimant. SIPA §§ 78fff-l(b), 78fff-2(d). If the security in question is for some reason not available for purchase, SIPA authorizes the Trustee to provide cash in lieu of the security to the claimant based on the security's filing date market value. SIPA §§ 78fff-2(b), 78lll (11). Where a claimant's account should contain cash, but does not, the Trustee is authorized to use SIPC cash advances - up to $100,000 - to return to the claimant. SIPA § 78fff-3(a)(1).

Though classifying Claimants' claims as claims for cash results in a lower SIPC advance being made to Claimants in satisfaction of their customer claims, this result is unavoidable. Since SIPA's enactment more than thirty years ago, a distinction has existed between the amount SIPC can advance to a SIPA Trustee to pay a claim for return of securities as opposed to a claim for return of cash. This distinction exists so that cash on deposit with a broker-dealer will not be better protected than cash deposited with a federally-insured bank, a situation that Congress believed would place the federally regulated banking system at a disadvantage to the federally regulated securities broker-dealer system. SIPA is a custodial statute which was never intended to use a panacea that protects against unscrupulous brokers' frauds. The theory behind the higher limit on securities claims is that a SIPA Trustee ordinarily will use the higher cash advance from SIPC to purchase identifiable securities for return to claimants who hold securities claims. In contrast, claimants whose broker-dealer could only have been holding cash for them will receive a SIPC cash advance similar to what the FDIC would pay for cash held in a bank account.

As all the cases on point hold, Claimants only can have claims for return of "cash" and not for return of "securities" where they deposit money with a broker- dealer for the purchase of non-existent or fictitious securities. A fictitious security, *11 such as the bogus mutual funds touted by Goren, is simply not a "security" covered by SIPA. It is not a security that the broker-dealer could have purchased. In turn, it cannot be returned to, or purchased on the open market for, a claimant by a SIPA trustee. A SIPA trustee cannot assign a filing date value (other than "zero") to a fictitious security or find a "similar" security to replace it without compounding the fiction.

Moreover, classifying the claims as claims for cash results in Claimants being afforded some degree of SIPA protection. If Claimants' claims in fact had been for securities, no delivery could have been made by the Trustee because no security existed to deliver. Instead, the statute would require the Trustee to treat the non-existent fund as "unavailable" and to satisfy the claim with cash in lieu of the non-existent security. Pursuant to the net equity definition in SIPA, the amount remitted to Claimants would be the filing date value of the bogus mutual fund. The filing date value of the bogus mutual fund is not the fraudulent value assigned to it by Goren on fictitious account statements, as the District Court held. Rather, it is the amount that would have been owed to Claimants had the debtor liquidated "by sale or purchase on the filing date, all securities positions of such customer" less any net indebtedness owed by the customer. SIPA § 78lll(11). Under this calculation the amount owed to Claimants would be zero. Thus, although classifying the Claimants' net equity claims as claims for securities would allow for the higher upper limit on SIPA protection to apply, it also would result in the Claimants having zero net equity claims.

The decision below ignores, and to a large extent undermines, the scheme of the securities laws, of which SIPA is a part. Indeed, the decision is an open invitation to fraud by broker-dealers and encourages a lack of vigilance by investors. Before something can be recognized as a security under SIPA, it must *12 have the basic requisites of a security under federal laws. The bogus mutual funds had none of these requisites.

There is no dispute that Claimants had the intent to deposit funds to purchase securities and therefore became "customers" of the Debtor entitled to some degree of SIPA protection. But no purchase of any actual security was ever entered into on their behalf or confirmed to them. Nor did the bogus mutual funds listed on their confirmations have any of the indicia of a real security that a

prudent investor might have expected. For example, the account statement prices of the securities were not listed in newspapers or other sources. There were no prospectuses to review. No regulatory authority had any record of the funds' existence.

If a claim for securities can exist for unregistered, non-existent phantom entities, investors will have every incentive to believe unscrupulous brokers or even to go along with a wink and a nod as long as they receive a written confirmation or account statement. Such actions make the SIPC fund, which is funded by the legitimate portion of the securities industry, the guarantor of fraud and imprudence and turns the theory of investor protection and system of investor safeguards on its head. Allowing claims for fictitious securities as securities claims does not foster SIPA's goal of encouraging individuals to trade in the public securities market, but rather fosters fraud, and promotes a lack of vigilance among investors.

The District Court relied entirely on the Series 500 Rules to mandate that the Trustee treat the disputed claims as claims for securities. This reliance was manifest error. The Series 500 Rules do not govern a situation such as the one here, where the confirmation received purported to confirm the purchase of a nonexistent security. The Series 500 Rules were passed for a limited purpose: to deal with the classification of claims where the trade date of a securities transaction (i.e. purchase or sale) straddled the filing date of the SIPA liquidation. The Series 500 *13 rules do not rewrite the nation's securities laws to make fraudulent transactions bona fide or convert non-existent securities into real ones. The Series 500 Rules create bright-line, black letter rules for determining when an actual security has been purchased or sold for a customer. The Series 500 Rules have no bearing on determining whether a claimant has a customer claim for the return of fictitious securities rather than a claim for the return of funds deposited to purchase the fictitious securities. In order for Series 500 Rules to apply, the security in question must exist.

Finally, the District Court compounded the fiction and distortion of SIPA protection by adding non-existent interest and dividends to the supposed value of wholly fictitious securities. Like piling Pelion on Ossa, this may seem possible in a metaphorical world but is not possible in the real world of the securities laws and not under a statute crafted as precisely as SIPA. The case law under the statute is clear that non-existent dividends or interest supposedly "earned" on non-existent shares are not customer claims protected by SIPA.

## STANDARD OF REVIEW

This Court reviews the District Court's conclusions of law de novo. Gurary v. Nu Tech Bio Med, Inc., 303 F.3d 212, 219 (2d Cir. 2002); Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 26 (2d Cir. 2002). There are no contested facts in this case.

### *14 ARGUMENT

**I. THE TRUSTEE CORRECTLY DETERMINED THAT THE DISPUTED CLAIMS SHOULD BE TREATED AS CLAIMS FOR CASH AND NOT CLAIMS FOR THE FICTITIOUS VALUE OF THE BOGUS MUTUAL FUND.**

The District Court ignored relevant case law, provisions of SIPA dealing with the satisfaction of customer claims, as well as SIPA's legislative history and purpose, in holding that the confirmation of the purchase of non-existent mutual funds gives rise to a claim for securities under SIPA. Under no circumstance can the confirmation of the purchase of non-existent securities transform bogus mutual funds into real ones. Claimants have conceded that the bogus mutual funds at issue here did not exist. They cannot meet their burden of demonstrating that they have claims for return of securities as opposed to claims for return of cash. SIPA § 78fff-2(b); SIPC v. Stratton Oakmont, Inc., 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999) ("Claimants bear the burden of proving that they are the type of priority creditors known as 'customers'"); In re Adler Coleman Clearing Corp., 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997) (burden of proof on claimants); see also SEC v. Packer, Wilbur & Co., 498 F.2d 978 (2d Cir. 1974).

**A. ALL CASE LAW ON POINT SUPPORTS THE TRUSTEE'S DETERMINATIONS.**

The central issue in this appeal is whether claims that are based on the intended purchase of non-existent securities are claims for return of cash or claims for return of securities under SIPA. Although this is an issue of first impression in this Circuit, this exact question has been decided directly by two Courts of Appeals and indirectly by a Bankruptcy Court. Both the Sixth and Third Circuits have held that claimants who deposit money for the purchase of non-existent securities whose purchase is later confirmed to them by the debtor have net equity claims for *15 cash. Plumbers & Steamfitters Local 490 Severance & Ret. Fund v. Appleton (In re First Ohio Sees. Co.), 39 F.3d 1181, No. 93-3313, 1994 WL 599433, at *1 (6th Cir. 1994) (unpublished opinion), [FN8] cert. denied, 514 U.S. 1018 0995); SEC v. Aberdeen Sees., Co., 480 F.2d 1121, 1127 (3d Cir.), cert. denied sub nom. Seligsohn v. SEC,

414 U.S. 1111 (1973).

> FN8. Appellants cite to this unpublished opinion of the Sixth Circuit (a copy of which is contained in the addendum to the brief) because, as this Court has previously recognized, "the Sixth Circuit allows parties (and, by extension, courts) to cite its unpublished opinion when such opinions have precedential value in relation to a material issue in a case and... there is no published opinion that would serve as well." United States v. Leon. 203 F.3d 162, 164 n.3 (2d Cir. 2000) (quoting 6th Circuit Rule 24(c)).

In Plumbers & Steamfitters Local 490 Severance & Retirement Fund. investors believed that they had purchased, collectively, over $3 million worth of "pooled certificates of deposit" offered by the debtor, First Ohio Securities Company ("First Ohio"). Plumbers & Steamfitters Local 490 Severance & Ret. Fund, 1994 WL 599433, at *1. Gilmartin, the founder of First Ohio, sent investors bogus purchase-confirmation notices and fictitious account statements, and used the investors' funds for his own personal use. Id. After SIPC initiated a liquidation proceeding, the investors filed claims with the Trustee for approximately $3 million in securities and cash. Id. The Trustee determined that the securities in question never existed and therefore treated their claims as claims for cash rather than for securities based on the information in the bogus account statements and confirmations. Id. The Trustee rejected claimants arguments that they had a legitimate expectation that their accounts contained securities. The District Court agreed with the Trustee's determination:
All of the rules and legislative history cited by appellants on the legitimate expectations and satisfaction of claims for securities is *16 determinative of a security of such type being in existence. Not only were these "securities" never purchased, they never existed. Therefore, with no evidence presented that would enable this Court to find the non-existence of the securities clearly erroneous, the conclusion of law that [claimants] were each entitled to one cash claim was correct as a matter of law.
Plumbers & Steamfitters Local 490 Severance & Ret. Fund v. Appleton (In re First Ohio Secs. Co.). No. 92CV0349, at 3 (N.D. Ohio Feb. 18, 1993) (Lambros, J.) (unpublished order) [FN9].

> FN9. A copy of Judge Lambros' order is contained in the addendum to the brief.

On appeal, the Sixth Circuit affirmed, stating:
[u]nfortunately for the plaintiffs here, the record fully supports the finding by the trustee and by both the bankruptcy and district courts that the "pooled certificates of deposit" which were the subject of the agreement between the plaintiffs and the broker-dealer not only were not purchased by Gilmartin but, indeed, never even existed. Given this fact, the only legal conclusion possible is that the claims against First Ohio were ones "for cash" and not "for securities." As the district judge noted, SIPA is intended to protect investors against a broker-dealer's insolvency; it is not designed to achieve restitution for fraud.
Plumbers & Steamfitters Local 490 Severance & Ret. Fund, 1994 WL 599433, at * 1 (emphasis added).
In SEC v. Aberdeen Securities Company, the claimant had purchased shares of a prospective new issue. Aberdeen Secs., Co., 480 F.2d at 1127. The shares were paid for, and the trade confirmed to the claimant by its broker, Aberdeen Securities Co. ("Aberdeen"). Although Aberdeen remitted the funds to the broker-dealer underwriting the offer, no certificates were received. Id. Instead, before the stock could be issued, both the issuer and the underwriter went into bankruptcy. A SIPA liquidation proceeding subsequently was initiated for Aberdeen, and the *17 claimant filed a claim in that proceeding. Because the non-existent security had no value, the Aberdeen Trustee determined that no payment could be made to the claimant, a conclusion that was affirmed by the lower court. Id On appeal, the Third Circuit disagreed, commenting as follows:
because the facts demonstrate that since this particular stock was not in existence, the purchase never could be made. [Claimants], therefore, do not have a claim for the stock itself.... We have no doubt, however, that the "dollar amount" of a customer's account includes his cash which the broker

has, or should have, been holding.... Thus, if under local law, or by virtue of regulations under which it operated, the debtor was obligated to refund the $500 to the [claimants] because of inability to deliver the Boatland stock, then there would be a claim for cash properly included in the term "net equity."
480 F.2d at 1127 (following remand the Trustee returned to claimants the cash they had deposited for the purchase of the Boatland stock).
In addition, in Appleton v. Hardy (In re First Ohio Sees., Co.), No. 590- 0072, Adv. No. 92-5085 (Bankr. N.D. Ohio 1992) (unpublished Order), [FN10] the claimants deposited $140,000 with the debtor for the purchase of securities which included certificates of deposit ("CDs") and a mutual fund, the "All America Fund." Id. at 2. The Trustee determined that the claimants had a net equity claim for securities and paid them $141,203.58 (including interest). The Trustee made this payment based on his belief that the CDs and the "All America Fund" actually existed. Subsequently, the Trustee discovered that neither the CDs nor the All America Fund existed. Id. Because the securities were fictitious the Trustee asserted that the claimants' claim was not for securities but for cash and thus subject to the $100,000 statutory limit on SIPC advances for cash claims. He therefore filed a turnover proceeding to recover the $41,203.58 excess payment. *18 Id The claimants filed a motion to dismiss the Trustee's action. Claimants argued that the Trustee could not recover the excess payment on two grounds: (1) a SIPA proceeding does not create an "estate" and pursuant to the Bankruptcy Code only "property of the estate" is recoverable by a Trustee, and (2) even if an estate is created, SIPC advances are not property of the estate. Id. After reviewing all the relevant materials and construing the facts in the light most favorable to claimants, the court held that the claimants' arguments were "specious" and therefore denied their motion to dismiss. Id. at 4. In doing so, the court implicitly acknowledged that the Trustee had a right to recover the overpayment made to the claimants based on his incorrect classification of their claim as one for securities when neither the funds nor the CDs existed. Accord Plumbers & Steamfitters Local 490 Severance & Ret. Fund, 1994 WL 599433, at *2 (affirming bankruptcy court's and district court's decision to uphold Trustee's determination that where certificates of deposit did not exist claimants had claims for cash not securities).

FN10. A copy of the Appleton order is contained in the addendum to the brief.


In all of these cases the purchase of a non-existent security was confirmed to the claimant. In all of these cases the courts relied on the fact that the security did not exist in ruling that the claimant had a claim for the return of cash and not on the existence, or lack of, a confirmation statement. These cases are directly on point and reach the only result that is consistent with SIPA, its purposes and legislative history and the securities regulatory scheme of which SIPA is a part. See also, SIPC v. Old Naples Sees. Inc. (In re Old Naples Sees., Inc.), 218 B.R. 981, 985-86 (Bankr. M.D. Fla. 1998), aff'd, 223 F.3d 1296 (11th Cir. 2000) (finding that claimants had asserted customer claim for cash in situation where claimants had received monthly account statements indicating investments in non-specified bonds but where no such bonds were "in fact" purchased); SIPC v. Pepperdine Univ., (In re Brentwood Sees., Inc.), 925 F.2d 325, 329 (9th Cir. 1991) (debtor broker-dealer did not hold shares of a security for a claimant where the *19 shares did not issue); SIPC v. C.J. Wright & Co., (In re C.J. Wright), 162 B.R. 597, 610 (Bankr. M.D. Fla. 1993) (because debtor misappropriated their money and certificates of deposit were not purchased claimants had a claim for the principal they invested and not for the interest promised); In re Investors Sec. Corp., 6 B.R. 415, 419-20 (Bankr. W.D. Pa. 1980) (where claimants intended to purchase bona fide certificates of deposit and had received interest payments on such purchases for seven months, but where no such purchases had in fact been made, and where certificate of deposit would have nonetheless matured into cash prior to the filing date even if it had been purchased, claimants had a claim for cash); In re June S. Jones Co., 52 B.R. 810, 813-14 (Bankr. D. Or. 1985) (distinguishing case from Aberdeen and Investors based on the fact that June S. Jones' claimants placed orders to purchase bona fide securities even though they were not actually purchased, while claimants in Aberdeen and Investors placed orders to purchase non-existent securities (Aberdeen) or securities that would have matured into cash on the filing date (Investors)).
**B. SIPA AND ITS LEGISLATIVE HISTORY AND PURPOSE SUPPORT THE TRUSTEE'S**

**DETERMINATIONS**.

In interpreting SIPA, this Court must look first to its language. See Reiter v. Sonotone Corp., 442 U.S. 330, 337 (1979); SEC v. Ambassador Church Fin./Dev. Group, Inc., 679 F.2d 608, 611 (6th Cir. 1982); In re MV Sees., Inc., 48 B.R. 156, 159 (Bankr. S.D.N.Y. 1985). The language of SIPA makes clear that whether a customer has a "cash" or a "securities" claim depends upon whether his or her "net equity" is based on cash or securities as shown on the debtor's books and records or as otherwise established to the satisfaction of the Trustee. SIPA § 78fff-2(b). See In re Bell & Beckwith, 937 F.2d 1104, 1106 (6th Cir. 1991); *20SEC v. Albert & Maguire Secs. Co., 378 F. Supp. 906, 911 (E.D. Pa, 1974). [FN11] The fact that Claimants deposited monies with the Debtor for the purpose of purchasing securities qualifies them as "customers," but this does not change the fictitious transaction confirmed to them - a purported purchase of a bogus security - into the purchase of a real security that can be returned to them. See SIPA § 78111(2). Indisputably, the bogus mutual fund at issue here was not a bona fide fund. Had it been, it would have been required to: (1) register with the SEC pursuant to Section 8 of the Investment Company Act of 1940 (the "1940 Act"), (2) comply with the registration requirements of the Securities Act of 1933 and periodic reporting requirements of the Securities Exchange Act of 1934, and (3) issue a prospectus for investors. In fact, Claimants conceded and the District Court acknowledged that the bogus mutual funds did not exist. **SEC v. Goren, 206 F. Supp. 2d 344, 351 (E.D.N.Y. 2002)**. Since no securities ever existed, the Claimants' net equity claims had to be for cash.

FN11. In pertinent part, section 78fff-2(b) of SIPA provides:

After receipt of a written statement of claim..., the trustee shall

promptly discharge, in accordance with the provisions of this section, all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payment to or for the account of such customer... insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee.

Congress has mandated in clear and specific terms how a claimant's "net equity" is to be determined for purposes of permitting SIPC cash advances, and the courts as well as SIPA trustees and SIPC itself must adhere to that language. A claimant's net equity claim is determined by "calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities position of such customer" minus any *21 indebtedness. SIPA § 78111(11). Here, there were no securities that the Debtor could have liquidated by sale on the filing date. Instead, Claimants' accounts should have contained the cash that they had deposited with the Debtor to purchase securities. The fact that Claimants may have thought, reasonably or otherwise, that their accounts contained securities does not alter the nature of their net equity claims. Nowhere in the net equity definition does SIPA state that whether a claimant has a net equity claim for cash or securities depends upon his or her subjective legitimate expectation. The legislative history of SIPA does not support such a proposition.

1. SIPA's Legislative History Confirms that Claimants have Claims for Cash.

With roots in Section 60e of the Bankruptcy Act, a reclamation statute, SIPA is a federal statutory scheme designed to restore "customers" to the position they were in vis a vis their broker-dealer before it was placed in liquidation. A SIPA "customer" claim is similar to a claim for reclamation. As this Court has recognized, "SIPA was not designed to provide full protection to all victims of a brokerage collapse." SEC v. Packer, Wilbur & Co. 498 F.2d 978, 983 (2d Cir. 1974) (emphasis added). See SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314, 1317, n.4 (2d Cir.), cert. denied, 426 U.S. 936 (1976) (noting that Congress enacted SIPA with the intent to protect the small investor only as is apparent in that at the time it was enacted 90% of the total dollar value of all accounts were unprotected); Schultz v. Omni Mut. Inc., No. 93-3700, 1993 WL 546671, at *1 (S.D.N.Y. Dec. 30, 1993) (noting that protections of SIPA are limited and SIPC "does not function as an insurer of all claims against an insolvent broker"). See also In re A.R. Baron & Co., 226 B.R. 790, 793 (Bankr.

S.D.N.Y. 1998) (explaining that "SIPA is a federal statutory scheme designed to afford limited financial protection to the customers of registered broker-dealers who experience **\*22** financial difficulty"); In re Adler Coleman Clearing Corp., 195 B.R. 266, 273 (Bankr. S.D.N.Y. 1996) (recognizing that "SIPC's role in a SIPA liquidation is limited by statute; it does not attempt to make all customers whole."). [FN12] Instead, SIPA remedies customers' losses by having the Trustee return to them the actual property that the broker should have been holding for them in their accounts and that they could have claimed from the broker-dealer on the filing date. See SEC v. S.J. Salmon & Co., 375 F. Supp. 867, 871 (S.D.N.Y. 1974); SEC v. Howard Lawrence & Co., 74 Civ. 193, 1975 Bankr. LEXIS 15, at \*7 (Bankr. S.D.N.Y. 1975) ("The Act is designed to remedy situations where the loss arises directly from the insolvency of the broker-dealer."); S. Rep. No. 95-763 at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 764. Where a customer's account should contain certain real securities, but does not, the Trustee is authorized to use SIPC cash advances only to purchase securities of the "same class and series of an issuer" on the open market to the extent practicable. SIPA §§ 78fff-l(b), 78fff-2(d). See In re Adler Coleman Clearing Corp., 195 B.R. 266, 273 (Bankr. S.D.N.Y. 1996) ("The distribution of a security of the same class and series of an issuer as the **\*23** security credited to the customer's account on the filing date is deemed to satisfy that customer's claim for that security.") (Emphasis added).

> FN12. As discussed earlier, SIPA was intended to insure against such practices as the broker-dealers' misappropriation of customer property in its possession, and failure to properly segregate securities entrusted to
>
> the broker-dealer for safekeeping, sale, or as collateral for margin loans. SIPA was not intended to provide protection in addition to that already provided by law for other types of claims against broker-dealers such as fraud and breach of contract. Hearings on Securities Investor Protection Act Before the Subcomm. on Commerce and Fin. of the House Comm. on Interstate and Foreign Commerce, 91st Cong. 2d Sess., at 230 (1970). See In re Adler Coleman Clearing Corp., 198 B.R. 70, 75 (Bankr. S.D.N.Y. 1996) (No SIPA protection for claims based on fraud or breach of contract.); Howard Lawrence Co., 1975 Bankr. LEXIS 15, at \*7 ("The SIPA does not protect customer claims based on fraud or breach of contract.").

In short, a SIPA Trustee is authorized to step into the shoes of the debtor and return the property the broker-dealer should have been holding on the filing date to the claimant. Where there is no issuer and no covered security of any class or series, the property that can be returned can only be the cash originally entrusted to the broker-dealer by the customer. There is no authority anywhere in the statute, case law, or Series 500 Rules for a Trustee to use cash advances to pretend to purchase nonexistent securities.

The statute's legislative history unambiguously reflects that the goal of a SIPA proceeding is to restore customers as nearly as possible their accounts as they actually existed on the filing date: Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, never purchased or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. Instead, when the customer claims for a security exceed the supply available to the trustee in the debtor's estate, then customers generally receive pro rate portions of the securities claims, and as to any remainder, they receive cash based on the market value as of the filing date.... A principal underlying purpose of the bill is to permit a customer to receive securities to the maximum extent possible instead of cash, in satisfaction of a claim for securities. By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments not only would satisfy the customers' legitimate expectations, but also would restore the customer to his position prior to the broker-dealer's financial difficulties.

S. Rep. No. 95-763 at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 765 (emphasis added). **\*24** Thus, in most instances SIPA requires that securities that actually exist but are not in the broker-dealer's possession be purchased for customers using SIPC's funds if necessary. [FN13] It is for this reason that the limit on advances on securities is higher than for claims involving return of cash while SIPA

advances for cash are subject to the same limitations as FDIC protection for cash. [FN14]

FN13. This intent is clearly evidenced in the following statement:

In broad terms, there are three problems for which the present Act does not provide adequate solutions. The First is that customers generally expect to receive what is in their accounts when the member stops doing business. If John Q. Investor has 100 fully-paid shares of IBM and a credit balance of $200 in his account, he expects to receive from the trustee a stock certificate for 100 shares of IBM and a check for $200. But in many instances that has not always been possible because securities have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen. When there are valid claims for more IBM stock than is on hand, under the present status John Q. will receive only a pro rata share of his 100 shares. For the remainder of the shares due him, he will receive cash in lieu of stock based on the market price on the date the liquidation proceeding is initiated. Naturally, if IBM stock goes up in price while John Q. is waiting to have his claim settled, he will be decidedly unhappy with the check he receives from the trustee. On the other hand, if IBM declines in price, we may receive no complaints from John Q.

Statement by Hugh F. Owens, Chairman, SIPC Before the Subcommittee on Consumer Protection and Fin. Comm. on Interstate and Foreign Comm., House

of Representatives, Aug. 1, 1977, 95th Cong. 1st Sess. on H.R. 8331 at 82.

FN14. SIPA allows a Trustee to satisfy a customer claim for securities by paying the customer the filing date value of the securities in question in instances where the purchase of the securities would be detrimental to the estate. The 1978 Amendments' legislative history provides:

Our expectation is that, in almost all cases, a customer's claim for securities would be satisfied by the delivery of securities, and, where necessary, to accomplish this the trustee would go into the open market

**\*25** In enacting SIPA, Congress provided the exclusive framework under which qualified customer claims are satisfied. The District Court ignored the interlocking provisions of SIPA that provide for the calculation and satisfaction of "securities" claims discussed above and substituted its own. According to the District Court, the Trustee should treat Claimants' claims as securities claims and satisfy them by paying cash equal to the fictitious value of the bogus mutual funds as shown on the Claimants' final account statements, amounts that include interest and dividends never in fact earned or received by the Debtor. **Goren, 206 F. Supp. 2d at 350.** As the case law cited above recognizes, however, the option to satisfy claims for securities with cash in lieu of securities does not apply where the security in question is nonexistent.

As recognized in Aberdeen Securities, accepting a contrary interpretation would not benefit Claimants. In view of the net equity definition and section 78fff-2(b) which, in relevant part, provides that for "purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date," the amount remitted to the customer for the non-existent shares would be the filing date market value of the non-existent fund. SIPA § 78fff-2(b) (emphasis added). The filing date market value of the non-existent fund is not the fraudulent

and purchase securities. We believe, however, that it is advisable to provide that the trustee would

not be required to purchase securities where that could not be done in a fair and orderly market. One chief concern is that the trustee not be required to make purchases in a market which is being improperly controlled or manipulated. This may be of particular significance where the member being liquidated was a market maker. Under those circumstances, the trustee would decline to purchase the needed securities and would instead satisfy the claim by paying cash in lieu of the securities based on the market value of the securities on the filing date.

1977 H. Rep. at 41-42. **\*26** value assigned to it by Goren on fictitious account statements as the District Court held. Rather, it is the amount that would have been owed to Claimants had the Debtor liquidated "by sale or purchase on the filing date, all [of their] securities positions" less any net indebtedness owed by them. SIPA § 78111(11). Under this calculation the amount owed to Claimants for non-existent securities with no market value would be zero. Thus, although classifying the Claimants' net equity claims as claims for securities would allow for the higher upper limit on SIPA protection to apply, it would also result in the Claimants having net equity claims of zero. As the Third Circuit held in Aberdeen Securities, treatment of such claims as for cash rather than securities is the more equitable result and the only result consistent with the statutes. See Aberdeen Secs., Co., 480 F.2d at 1127.

The Trustee and SIPC closely followed the statute and relevant case law and in fact have gone as far as possible to treat these and other claimants not only fairly but as generously as the statute can possibly allow. For example, had the Trustee with SIPC's consent not moved for substantive consolidation, these and other claimants would have no claims against New Times alone and would have recovered nothing for their losses.

The distinction between cash being held in an account and securities being held in an account as of the filing date of a SIPA proceeding is an integral part of the statute that courts cannot ignore. From its inception, Congress distinguished between cash claims and securities claims by providing for a greater SIPC advance in the event of the broker-dealer's collapse for securities claims than for cash claims. The distinction between the protection afforded to cash claimants and securities claimants in the context of a SIPA liquidation came about because Congress decided that the protection SIPA afforded to the cash component of an investor's claim should not be greater than what was provided by the FDIC to cash held in bank accounts. See SIPA Amendments: Hearing Before the Subcomm. on **\*27** Securities of the Comm. on Banking, Housing, and Urban Affairs, H.R. 8331, 95th Cong. 2d Sess. 2 (1978) (opening statement of Senator Williams) (noting that increase in coverage for cash to $100,000 from $40,000 would guarantee investors the "same insurance protection for their cash under SIPC as bank and savings depositors receive under FDIC coverage"); SIPA Amendments: Hearings on H.R. 6831 Before the Subcomm. on Consumer Protection and Fin, of the Comm. on Interstate and Foreign Commerce. 96th Cong., 2d Sess. 17, 19 (1980) (statement of Hugh F. Owens, Chairman Securities Investor Protection Corporation) (noting that cash coverage for cash claims has historically been on a level with the coverage for the FDIC and FSLIC programs and that "one of the purposes of increasing the insurance on securities maintained by customers and member brokers is to accomplish immobilization of the stock certificate"); SIPA: Hearings on H.R. 13308, H.R. 17585, H.R. 18081. H.R. 18109, and 18458 Before the Subcomm. on Commerce and Fin, of the House Comm. and Interstate and Foreign Commerce, 91st Cong., 2d Sess. 149 (1970) (letter from Roy T. Englert, Acting General Counsel of Department of the Treasury). The distinction has been maintained every time that SIPA has been amended and coverage increased. SIPA coverage for cash claims is always equal to what the FDIC provides to cash held in bank accounts. Currently claims for cash are entitled to $100,000 SIPC advance and claims for securities are entitled to $500,000 SIPC advance. These kinds of distinctions are inherent under the statute. Courts cannot obliterate them by creating legal fictions to provide more protection to cash claimants by classifying them as securities claimants where no security was or could have been held in the account.

**\*28** 2. Following the Statutory Definitions and Case Law is Consistent with the Policies of the Nation's Securities Laws of which SIPA is a Part.

The entire federal securities regulatory scheme of which SIPA is a part supports the basic principle that non-existent securities cannot be treated as if they were real. To protect mutual fund investors, the federal securities laws impose several layers of regulation. While the Securities Act of 1933 (the "1933 Act") and the Securities Exchange Act of 1934 (the "1934 Act") regulate the sale of mutual funds, because mutual funds are investment companies, the Investment Company Act of 1940 (the "1940 Act") is the primary federal securities law regulating them. See David E. Riggs, Securities Regulation of Mutual Funds: A Banker's Primer, 113 Banking L. J. 864, 865 (Oct. 1996) (hereinafter "Securities Regulation"). Pursuant to the 1940 Act and the 1933 Act, mutual funds must be registered

with the SEC and must issue a prospectus that has gone through the 1933 Act registration procedures administered by the SEC in selling its shares. Under the 1940 Act, a mutual fund prospectus must set forth the fund's investment objective and investment policies. See Investment Company Act §§ 8(b) (2), (b)(3), & 13(a)(3). The requirements imposed by the Acts are intended to facilitate informed investment decisions and protect investors by providing them with material information concerning initial public offerings of securities. See <u>Securities Regulation, 113 Bank. L. J. at 865-66</u>. Information regarding the market value of money market funds that are organized as mutual funds and comport to the requirements of the Securities Acts is publicly available. Treating the bogus mutual funds at issue here as bona fide securities in order to gain higher coverage for Claimants undermines SIPA, the 1933 and 1940 Acts.

By ignoring these requirements, the District Court's decision, if upheld, would lead to absurd and self-defeating results. Under the District Court's holding **\*29** a broker can promise anything in terms of returns, call it a security, confirm its purchase, and claimants would have a claim for the fraudulent cash value of the non-existent security, together with any promised returns. Under the District Court's holding there is absolutely no incentive for investors to check or insist on receiving documents such as prospectuses, quarterly reports, etc., which are the hallmarks of bona fide securities and the foundation for investor protection. It becomes easy for brokers to commit fraud and even easier for those who are promised better than normal returns to suppress their suspicions. The District Court's holding invites fraud and imprudence, encourages a lack of investor vigilance and circumvents the entire regulatory scheme, which requires that mutual funds be registered with the SEC and use a prospectus that has gone through the 1933 Act registration procedures administered by the SEC in selling its shares. Contrary to its belief, the District Court's holding does not promote investor confidence in the public securities market, but rather encourages investors to invest in risky, oftentimes fraudulent securities. Clearly, encouraging fraud and reckless investing is contrary to the aims of SIPA.

As this Court has recognized, SIPA does not provide general insurance against investment risk or even investment fraud, and does not provide special protection for general creditors of the broker, however meritorious their claims. See SEC v. P.O. <u>BaroffCo., 497 F.2d 280, 283 (2d Cir. 1974)</u> (citing assurances in legislative history that SIPA "is not to be a bailout operation; it is to protect the public customers"); accord SIPC v. Wise <u>(In re Stalvey & Assocs.), 750 F.2d 464, 472-73 (5th Cir. 1985)</u> (stating that "[t]he statutory scheme envisioned by the drafters of the statute was to protect persons buying and selling securities through a stockbroker" and that "there is evidence in the legislative history that Congress believed that the SIPA was only an 'interim step' that would not provide complete protection for losses occasioned by the failure of broker-dealer firms"). Given **\*30** SIPA's limited protections, it is unavoidable that all claimants will not be fully satisfied for their losses by SIPA. [FN15] Even claims based upon a Debtor's most egregious acts which result in significant monetary losses to the investor will not be compensable under SIPA. In explaining this limited protection under SIPA, this Court stated in SEC v. Packer, Wilbur & Co. that:

> FN15. The fact that Claimants' allowable customer claims are greater than amounts SIPC can advance in satisfaction of such claims does not mean that they will never be fully satisfied for their losses. Simply because Claimants will not be fully satisfied for losses they incurred as a result of Goren's fraudulent scheme from SIPC or the fund of customer property does not mean that they will never be made whole. These claimants are entitled to share in the general estate of the Debtor. See SIPA § 78fff-2(c)(1). Whether Claimants will ultimately recover for the losses they incurred depends in large part on the Trustee's success in marshalling assets for the estate and in pending class action filed by Claimants counsel here on behalf of all defendant New Times/New Age investors. See Gervis v. Berg, No. OO-CV-3362 (E.D.N.Y. filed June 9, 2000).


[Arguments based solely on the equities are not, standing alone, persuasive. If equity were the [sole] criterion, most customers and creditors of... [the debtor] would be entitled to reimbursement for their losses. Experience, on the other hand, counsels that they will have to settle for much less. SIPA was not designed to provide full protection to all victims of a brokerage collapse. <u>498 F.2d at 983.</u> In short, customers under SIPA are only entitled to the specific relief afforded under

SIPA - the return of their filing date "net equity." See SIPA §§ 78fff(a)(1), 78fff-2(b). Here, there are not and never have been any securities covered by SIPA that could be returned to Claimants and Claimants' net equities were correctly determined by the Trustee to consist of monies deposited by the Claimants for the purchase of non-existent securities.

**\*31 C. THE SERIES 500 RULES DO NOT APPLY TO TRANSACTIONS IN BOGUS SECURITIES**. The District Court ignored the only case law directly on point, as well as the wording of SIPA and its relevant legislative history, when it applied the Series 500 Rules to the facts of this case. The Series 500 Rules apply in determining whether a "securities transaction gives rise to a 'claim for cash' or a 'claim for securities'." 17 C.F.R. § 300.500 (emphasis added). See In re A.R. Baron & Co., 226 B.R. 790, 796 (Bankr. S.D.N.Y. 1998). By definition, in order for the Series 500 Rules to apply, a "securities transaction" must exist. See 53 Fed. Reg. 10368 (Mar. 31, 1998) (a review of the cases giving rise to the Series 500 Rules reveals that in no instance was the security in question fictitious). The limited purpose for which the Series 500 Rules were adopted reinforces this basic point.

Prior to the enactment of the Series 500 Rules, SIPC and SIPA trustees frequently litigated whether SIPA customer claims were claims for cash or claims for securities where a security transaction (i.e. purchase or sale of a security) straddled the filing date. 53 Fed. Reg. 10368 (Mar. 31, 1988). [FN16] See **\*32**Murray v. McGraw (In re Bell & cBeckwith), 821 F.2d 333 (6th Cir. 1987); SIPC v. Morgan. Kennedy & Co., 3 B.C.D. 15 (S.D.N.Y. 1977); Gans v. Reddington (In re Weis Sees, Inc.). [1974-1975 Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶ 94, 780 (S.D.N.Y. 1974); In re June S. Jones Co.,52 B.R. 810 (Bankr. D. Or. 1985). The Series 500 Rules were promulgated to make the treatment of customers' claims where trades straddled the filing date consistent and to make the delivery of a confirmation (which completes a contract for statute of fraud purposes) usually controlling.

> FN16. Prior to the Series 500 Rules, customers sometimes objected to having their claim deemed a claim for cash for a securities purchase ordered but not completed by the filing date when their claim exceeded the maximum amount SIPC could advance to satisfy a cash claim. See, e.g., Murray v. McGraw (In re Bell & Beckwith). 821 F.2d 333, 335 (6th Cir.
>
> 1987); In re Investors Sec. Corp., 6 B.R. 415 (Bankr. W.D. Pa. 1980); SIPC Proposed Rule, 1988 WL 236666 at \*1 (1988). Conversely, customers would object to having their claims treated as claims for securities when the underlying value of the security in question had declined. See, e.g. In re June S. Jones Co., 52 B.R. at 813 (claimants argued they had claim for cash, not securities, where securities were not purchased by the filing date, and securities had declined in value); SIPC Proposed Rule, 1988 WL 236666 at \*2. Customers wishing to disavow securities purchased for their account in order to have a "claim for cash" argued that a purchase of securities did not occur because their broker never *actually* purchased the securities in question. See id (emphasis added). Similarly, customers wishing to disavow a sale of securities in order to have a "claim for securities" argued that the securities were not *actually* sold by the broker-dealer so that they were still in their account. See id. (emphasis added).

As SIPC stated in proposing the Series 500 Rules:
The proposed rules... give full effect to the Congressional intent to "satisfy the customers' legitimate expectations" and "restore the customer to his position prior to the broker-dealer's financial difficulties." S. Rep. No. 763, 95th Cong., 2d Sess. 2, [reprinted in] 3 U.S. Code Cong. & Admin. News, 95th Cong., 2d Sess., at 765 (1987). Indeed, the results reached under the proposed rules will affirmatively effectuate the Commission's previously stated view on this subject.... [T]hat "[w]hen a customer sells securities, his claim from that time until settlement and delivery of the funds is a claim for cash."
[T]he Proposed Rules... will provide both nationwide uniformity and reasonable certainty for customers as to how their claims will be treated in the event of the failure of a SIPC member, and will provide an objective standard for determining each claimant's legitimate expectations... [T]he proposed rules are in complete accord with all final judicial decisions on this subject, including cases decided prior to SIPA's enactment. **\*33** See Rules of the Securities Investor Protection Corp., 53 Fed.

Reg. 1793, 1988 WL 236666, at *2-3 (1988) (hereinafter "SIPC Proposed Rules") (emphasis added). Thus, the District Court was correct that under the Series 500 Rules it is the receipt of a confirmation of the purchase or sale of a security, rather than the execution of a trade, that determines whether the customer's net equity claim is one for cash or securities. In this case, however, Claimants did not receive written confirmation of the purchase or sale of an actual security and thus do not fall under the rubric of the Series 500 Rules. See, e.g. Plumbers & Steamfitters Local 490 Severance & Ret. Fund, No. 92CV0349, at 3 (finding that the rules and legislative history cited by claimants on legitimate expectations is "determinative of a security of such type being in existence").

In In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or. 1985), a case decided prior to SIPC's adoption of the Series 500 Rules but noted in SIPC's Proposed Rules as being in accord with them, 1988 WL 236666, at *3, the court specifically addressed whether customers were entitled to receive either cash or securities in satisfaction of their SIPA claims in a situation where the security existed but had not been purchased prior to the filing date. The claimants relied on Aberdeen Securities and Investors Security Corp. to argue that they had net equity claims for cash. The court rejected their argument noting the distinction between real and non-existent securities:

In Aberdeen Securities and Investors Security, unlike this case, the securities either never could be purchased, or, if purchased, would have matured into cash prior to the filing date.

In re June S. Jones, 52 B.R. at 813 (emphasis added). When the securities actually existed, the return of the securities, rather than treating the claims for cash, to the customers furthered the express purpose of SIPA. Id at 814.

**\*34** The two cases relied on by the District Court do not support the application of the Series 500 Rules to the facts of this case. The first of these cases, SIPC v. Oberweis Sees., Inc. (In re Oberweis Sees. Inc.) 135 B.R. 842 (Bankr. N.D. 111. 1991), concerned whether a broker-dealer's failure to execute claimants' orders to purchase bona fide money market funds entitled the claimants to interest and dividends that would have been earned had their instructions been followed, in addition to the money they deposited to purchase the bona fide funds. The court held that the claimants' claims for interest and dividends that would have been earned had the purchases been made were not "customer" claims protected by SIPA, but rather, breach of contract or fraud claims. Id at 846-47. The court relied on the Aberdeen Securities case discussed earlier and relied on by the Trustee, but disregarded by the District Court, in reaching its decision.

In the second case relied on by the District Court, In re Investors Center, Inc., 129 B.R. 339 (Bankr. E.D.N.Y. 1991), the issue did not concern fictitious securities, but rather, whether the confirmation of the sale of a bona fide security gave rise to a claim for cash or a claim for securities. The court held that the confirmation of the sale of bona fide securities gave rise to a claim for cash under the Series 500 Rules, a proposition with which the Trustee had no issue and applied many times in his determination of claims in this liquidation. Neither Oberweis Securities nor Investors Center purported to answer or even address the question that is at issue here.

In addition to its reliance on wholly irrelevant case law, the District Court misinterpreted the basis of the Trustee's determinations. The District Court stated that the Trustee found that the Claimants did not have claims for securities because the Debtor "embezzled" their assets instead of investing them in an existing money market fund. The Trustee's determination that Claimants had claims for cash did not hinge on the Debtor's embezzlement of funds, but in what the Claimants **\*35** intended to purchase. Indeed, the Trustee allowed the claims here as customer claims for all of the cash deposited by Claimants, less any withdrawals or redemptions. He also allowed claims for confirmed purchases of bona fide mutual funds that could be identified and purchased on the open market, but were never in fact purchased because Goren embezzled the funds, as claims for securities. Here, Claimants intended to purchase a fund that in fact did not exist. The Debtor, even if it had not embezzled their funds, could never have purchased the bogus mutual funds for them. The only expectation that Claimants objectively could have had, that SIPA is designed to address, was that their money would be available for return to them. In short, it is not the fact that funds were "embezzled" that dictates the result here. It is the wording of the SIPA statute.

Finally, the Series 500 Rules were not enacted to circumvent SIPA's prohibition against allowance of fraud claims as "customer" claims. See SIPC v. Barbour, 421 U.S. 412 (1975) (SIPA was not designed to achieve restitution for fraud). As discussed above and recognized by the district court in In re Adler, Coleman Clearing Corp., the Series 500 Rules were enacted to meet customers "legitimate expectations" in terms of restoring their pre-liquidation position vis a vis the debtor with regard to claims treatment where confirmation of a bona fide securities transaction had occurred. See In re Adler, Coleman Clearing Corp., 263 B.R. 406 (S.D.N.Y. 2001).

In Adler Coleman, claimants contested the bankruptcy court's ruling that they failed to establish that they had claims for securities under the Series 500 Rules on the grounds that they lacked funds to purchase the securities. Id. at 424-26. In that case, fraudulent credits were posted into the claimants' accounts, on the eve of the broker's liquidation filing, from the purported sale of securities that the bankruptcy court had found were practically worthless. Id. at 434. The cash shown in the accounts supposedly derived from these sales was then shown on *36 confirmations to support purchases of blue chip securities that could never in fact be purchased because their market value far exceeded the fair value of the proceeds in claimants' accounts. Id., at 434. Claimants argued that they had securities claims under the Series 500 Rules because of the confirmations of fictitious purchases and were entitled to the return of the blue chip securities. The Trustee denied their claims.

On appeal, Claimants argued that the bankruptcy court erred because the cash was shown to be in their accounts and the Series 500 Rules did not require immediately available cash. Id. at 430. The claimants relied on Murray v. McGraw (In re Bell & Beckwith). 821 F.2d 333 (6th Cir. 1987) (a case which the Series 500 Rules codified) extensively for the proposition that they had a legitimate expectation that their accounts held securities where they received purchase confirmations. The Adler Coleman court distinguished the facts of the claimants' case from that of Bell & Beckwith by noting that the Bell & Beckwith holding was premised "on the existence of fully performed and enforceable obligations on the trade date." Id. at 432. The court noted that "in holding that trades ordered by customers of a debtor before filing date should be treated vis-avis those customers as if subsequently completed by the debtor, the Bell & Beckwith court impliedly assumed that the debtor-broker would be able satisfactorily to complete the transactions in relation to other brokers with which the customers dealt." Id. at 432-33. The court noted that there was nothing in Bell & Beckwith. as there was in Adler Coleman, that remotely resembled the "fraudulent and criminal misconduct which actuated and accompanied the trades" at issue and of which the claimants wished to seek to avail themselves. Id. at 433. The district court properly noted that the Series 500 Rules "safeguard securities customers' legitimate claims to cash and securities held by the debtor in their *37 accounts prior to the filing date, and also manifest a design to deny protection to transactions tainted by fraud."]d. at 435.

Like the claimants in Adler Coleman, Claimants here seek to "retain the benefits of bargains they struck with their corrupt brokers." Id. at 416. Claimants cannot do so. There are and never have been securities of any class and series that the broker or the Trustee could ever have purchased or held for Claimants. Pre-liquidation, Claimants never have had or could have had anything but a claim for the return of the cash they deposited with a potential claim for damages for fraud or breach of contract. The claim for cash deposited is a net equity claim against the fund of customer property for cash subject to the SIPA limit, and the claim for damages is a general creditor claim. [FN17]

> FN17. Moreover, Rule 503 makes clear that nothing in the Series 500 Rules "shall be construed as limiting the rights of a trustee in a liquidation proceeding... to avoid any securities transactions as fraudulent... or otherwise voidable under applicable law." 17 C.F.R. § 300.503(a).

## II. CLAIMANTS' CLAIMS FOR FICTITIOUS DIVIDENDS OR INTEREST EARNED ARE NOT ALLOWABLE CUSTOMER CLAIMS.

The District Court incorrectly held that Claimants are entitled to return of cash equivalent of interest/dividends that were purportedly earned by the bogus mutual funds. **Goren, 206 F. Supp. 2d at 352.** The law is clear that non-existent dividends or interest supposedly "earned" on non-existent shares are not customer claims protected by SIPA, although they may be allowable general creditor claims. See Focht v. Athens (In re Old Naples Sees. Inc.), No. 2:00-cv-181-FTM-29D, slip. op. at 16 (M.D. Fla. Sept. 30, 2002) (hereinafter "Old Naples IP) [FN18] (rejecting claimants' argument that their net equity included non-existent interest payments); *38 In re Old Naples Securities. Inc.,218 B.R. at 987 ("[t]he Claimants are entitled to no more than a return of principal. Each claim must be reduced by the amount that the claimant received in 'interest' payments."); SIPC v. C.J. Wright & Co. (In re C.J. Wright & Co.), 162 B.R. 597, 610 (Bankr. M.D. Fla. 1993) ("Because debtor misappropriated these funds, claimants have a claim for that which they entrusted to debtor as customer property: the principal amount that was to be invested. Debtor did not convert the interest

promised because it was never earned. Debtor only misused claimants' initial investment. Likewise, net equity as defined in SIPA does not contain any reference to providing interest on claims to customers. Thus the most claimants are entitled to receive is the return of the principal invested."); In re Oberweis Secs. Inc., 135 B.R. 842 (Bankr. N.D. Ill. 1991) (rejecting claim for dividends in failure to execute purchase case and stating that claim for dividends is more properly characterized as one for "damages" and is not part of the Claimants' net equity but may be recovered from the general estate).

FN18. A copy of the Old Naples II opinion is contained in the addendum to the brief.


The cases relied upon by the Court and Claimants below are distinguishable in that they concern the payment of interest/dividends on bona fide mutual funds. In those cases the claimants had an objectively legitimate expectation of receiving interest/dividends because the security in question had actually earned them. Here, the bogus mutual fund was never organized as a mutual fund and had no assets or investments. As noted recently by the Old Naples II court, "where the payments to claimants will be made out of the quasi-public SIPA fund, permitting claimants to recover not only their initial capital investment but also the phony 'interest' payments they received and rolled into another transaction is illogical." Old Naples II, slip. op. at 15. Here, as in Old Naples II, no one disputes that the interest payments were not in fact interest at all. To order the Trustee to pay Claimants the heightened interest promised by a fraudster compounds the fraud and invites even more egregious fraud in the future. (Id. at 16 (noting that **\*39** allowing non-existent interest as part of a claimant's "net equity" claim is "inconsistent with the goals of SIP A, which does not purport to make all victimized investors whole but only to partially ameliorate the losses of certain classes of investors").) The Trustee properly determined that the portion of Claimants' claims that sought return of fictitious dividends or interest added to the value of the bogus mutual fund on fictitious customer account statements are not allowable customer claims.

### *40 CONCLUSION

For the foregoing reasons, the Trustee and SIPC respectfully request that this Court reverse the District Court's order and uphold the Trustee's determinations treating claims filed for the value of shares in bogus mutual funds as net equity claims for cash in the amount deposited by the Claimants and expunge Claimants' objections with respect to those determinations.

IN RE: NEW TIMES SECURITIES SERVICES, INC. and New Age Financial Services, Inc., Debtors, 2002 WL 32487939

### Briefs and Other Related Documents (Back to top)

- 2003 WL 25817232 (Appellate Brief) Brief (Jul. 3, 2003)Original Image of this Document (PDF)
- 2003 WL 25817233 (Appellate Brief) Brief (Jul. 3, 2003)Original Image of this Document (PDF)
- 2003 WL 24132249 (Appellate Brief) Brief for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of the Substantively Consolidated Estates of New Times Securities Services, Inc. and New Age Financial Services, Inc., and Securities Investor Protection Corporati on (Jun. 30, 2003)Original Image of this Document (PDF)
- 2003 WL 24132250 (Appellate Brief) Brief of the Securities and Exchange Commission, Amicus Curiae, in Partial Support of the Position of Appellants and in Partial Support of the Position of Appellees (Jun. 20, 2003)Original Image of this Document (PDF)
- 02-6166 (Docket) (Jul. 8, 2002)

END OF DOCUMENT

Adobe Reader is required to view PDF images.



(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.