# EXHIBIT T



# 2008 Annual Report

## Securities Investor Protection Corporation

SiPC



SECURITIES INVESTOR PROTECTION CORPORATION
805 FIFTEENTH STREET, N.W., SUITE 800
WASHINGTON, D.C. 20005-2215
(202) 371-8300  FAX (202) 371-6728
WWW.SIPC.ORG

April 30, 2009

The Honorable Mary L. Schapiro
Chairman
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

Dear Chairman Schapiro:

On behalf of the Board of Directors I submit herewith the
Thirty-eighth Annual Report of the Securities Investor Protection
Corporation pursuant to the provisions of Section 11(c)(2) of the
Securities Investor Protection Act of 1970.

Respectfully,

Armando J. Bucelo, Jr.
Chairman

# CONTENTS

Message from the Chairman................................................................3

Overview of SIPC..............................................................................4

Directors & Officers..........................................................................5

Customer Protection Proceedings.......................................................6

Membership and the SIPC Fund.........................................................8

Litigation.......................................................................................11

Disciplinary and Criminal Actions....................................................14

Financial Statements and Auditor's Report........................................15

SIPC Fund Comparison....................................................................23

Appendix 1: Distributions for Accounts of Customers for the..............24
    Thirty-eight Years Ended December 31, 2008

Appendix 2: Analysis of SIPC Revenues and Expenses for the..............25
    Five Years Ended December 31, 2008

Appendix 3: Customer Protection Proceedings....................................26

    A:  Customer Claims and Distributions Being Processed................26

    B:  Customer Claims Satisfied, Litigation Matters Pending.............28

    C:  Proceedings Completed in 2008.............................................30

    D:  Summary..........................................................................34

"**SIPC** shall not be an agency or establishment of the United States Government . . . . SIPC shall be a membership corporation the members of which shall be all persons registered as brokers or dealers* . . . ."

—Securities Investor Protection
Act of 1970
Sec. 3(a)(1)(A) & (2)(A)

Except those engaged exclusively in the distribution of mutual fund shares, the sale of variable annuities, the insurance business, furnishing investment advice to investment companies or insurance company separate accounts, and those whose principal business is conducted outside the United States. Also excluded are government securities brokers and dealers who are registered as such under section 15C(a)(1) (A) of the Securities Exchange Act of 1934, and persons who are registered as brokers or dealers under section 15(b) (11)(A) of the Securities Exchange Act of 1934.

# MESSAGE FROM THE CHAIRMAN



ARMANDO J. BUCELO, JR.

What a difference a year makes. In 2007, SIPC recorded its first year without the need for initiating any customer protection proceedings whatsoever. In 2008, SIPC initiated three small liquidation proceedings, and two proceedings of unprecedented size and scope.

## Lehman Brothers Inc.

The Lehman Brothers Inc. ("LBI") liquidation was preceded by the Chapter 11 filing of Lehman Brothers Holdings Inc. on September 15, 2008. The Holding Company owned a SIPC member brokerage firm, LBI, which in turn held securities customer accounts. In order to facilitate the sale of brokerage assets, SIPC initiated a customer protection proceeding on Friday, September 19th. On application by SIPC to the United States District Court for the Southern District of New York, LBI was placed in liquidation under the Securities Investor Protection Act ("SIPA"), and a trustee was appointed to oversee the liquidation of the firm. That day, upon removal of the proceeding by the District Court, the United States Bankruptcy Court for the Southern District of New York held an extended hearing and approved the sale of assets of LBI to Barclays Bank.

In a matter of weeks, the trustee for LBI transferred more than 135,000 customer accounts, which contained more than $140 billion in customer assets, to two broker-dealers, one of which was the brokerage arm of Barclays. As a result, many of the customers of the defunct firm were able to exercise control over their respective portfolios in a seamless way. In addition, over $2 billion of property was returned to scores of prime brokerage accountholders. While much remains to be done in every aspect of the LBI matter, the initial stages have proceeded very well.

## Bernard L. Madoff Investment Securities LLC

The failure of Lehman Brothers Inc. was linked to the subprime mortgage situation and the accompanying broader financial turmoil. The failure of Bernard L. Madoff Investment Securities LLC, a registered securities broker-dealer and SIPC member, involved a very different problem: the theft of customer assets on an unprecedented scale. The firm was placed in SIPA liquidation and a trustee was appointed on December 15, 2008, after the principal of the firm, Bernard Madoff, confessed to having stolen customer property over a period of many years.

Unlike the LBI case, where customer records were accurate, it became apparent very early in the Madoff case that the customer statements Mr. Madoff had been sending to investors bore little or no relation to reality. The statements sent to customers were inaccurate when compared to the inventory of securities actually held by the brokerage firm. For that reason, it was not possible to transfer all or part of any customer's account to another, solvent brokerage firm. Instead, pursuant to SIPA, the trustee sought and received authority from the United States Bankruptcy Court for the Southern District of New York to publish a notice to customers and creditors, and to mail claim forms to them. This was accomplished on January 2, 2009. As this Annual Report goes to press, the trustee in the Madoff case has begun to satisfy customer claims with SIPC's funds.

## SIPC's Finances

Although SIPC has reflected in its financial statements the total estimated obligations for all open SIPA proceedings, I would emphasize that the Corporation has sufficient funds to continue to perform its statutory functions. The Board of Directors has reinstituted assessments on the SIPC members based upon net operating revenues, in order to replenish anticipated expenditures in the ongoing liquidation proceedings.

SIPC stands ready to meet the challenges of the current economic environment and the Board is dedicated to making sure that SIPC has sufficient resources to accomplish its mission of investor protection.

Armando J. Bucelo, Jr.
Chairman

# OVERVIEW OF SIPC



The Securities Investor Protection Corporation (SIPC) had its origins in the difficult years of 1968-70, when the paperwork crunch, brought on by unexpectedly high trading volume, was followed by a very severe decline in stock prices. Hundreds of broker-dealers were merged, acquired or simply went out of business. Some were unable to meet their obligations to customers and went bankrupt. Public confidence in our securities markets was in jeopardy.

Congress acted swiftly, passing the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa *et seq.* (SIPA). Its purpose is to afford certain protections against loss to customers resulting from broker-dealer failure and, thereby, promote investor confidence in the nation's securities markets. Currently, the limits of protection are $500,000 per customer except that claims for cash are limited to $100,000 per customer.[A]

SIPC is a nonprofit, membership corporation. Its members are, with some exceptions, all persons registered as brokers or dealers under Section 15(b) of the Securities Exchange Act of 1934 and all persons who are members of a national securities exchange.[*]

A board of seven directors determines policies and governs operations. Five directors are appointed by the President of the United States subject to Senate approval. Three of the five represent the securities industry and two are from the general public. One director is appointed by the Secretary of the Treasury and one by the Federal Reserve Board from among the officers and employees of those organizations. The Chairman and the Vice Chairman are designated by the President from the public directors.

The self-regulatory organizations—the exchanges and the Financial Industry Regulatory Authority (FINRA)—and the Securities and Exchange Commission (SEC or Commission) report to SIPC concerning member broker-dealers who are in or approaching financial difficulty. If SIPC determines that the customers of a member require the protection afforded by the Act, the Corporation initiates steps to commence a customer protection proceeding. This requires that SIPC apply to a Federal District Court for appointment of a trustee to carry out a liquidation. Under certain circumstances, SIPC may pay customer claims directly.

The SIPC staff, numbering 29, initiates the steps leading to the liquidation of a member, advises the trustee, his counsel and accountants, reviews claims, audits distributions of property, and carries out other activities pertaining to the Corporation's purposes. In cases where the court appoints SIPC as Trustee and in direct payment proceedings, the staff responsibilities and functions are all encompassing—from taking control of customers' and members' assets to satisfying valid customer claims and accounting for the handling of all assets and liabilities.

The resources required to protect customers beyond those available from the property in the possession of the trustee for the failed broker-dealer are advanced by SIPC. The sources of money for the SIPC Fund are assessments collected from SIPC members and interest on investments in United States Government securities. As a supplement to the SIPC Fund, a revolving line of credit was obtained from a consortium of banks. In addition, if the need arises, the SEC has the authority to lend SIPC up to $1 billion, which it, in turn, would borrow from the United States Treasury.

---

[*] Section 3(a)(2)(A) of SIPA excludes:

(i) persons whose principal business, in the determination of SIPC, taking into account business of affiliated entities, is conducted outside the United States and its territories and possessions and

(ii) persons whose business as a broker or dealer consists exclusively of (I) the distribution of shares of registered open end investment companies or unit investment trusts, (II) the sale of variable annuities, (III) the business of insurance, or (IV) the business of rendering investment advisory services to one or more registered investment companies or insurance company separate accounts.

Also excluded are government securities brokers or dealers who are members of a national securities exchange but who are registered under section 15C(a)(1)(A) of the Securities Exchange Act of 1934 and brokers or dealers registered under Section 15(b)(11)(A) of the Securities Exchange Act of 1934.

---

Further information about the pro-visions for customer account protection is contained in a booklet, "How SIPC Protects You," which is available in bulk from the Securities Industry and Financial Markets Association (SIFMA), c/o Howard Press, 450 West First St., Roselle, NJ 07203, phone number (908)620-2547, and from the FINRA Book Store, P.O. Box 9403, Gaithersburg, MD 20898-9403. The web site address for FINRA orders is www.finra.org/resources/bookstore/index.htm and the phone number is (240)386-4200.

---

[A] See the series 100 Rules Identifying Accounts of "separate customers" of SIPC members.



The Law Offices of
Armando J. Bucelo, Jr.
*Chairman of the Board*



Vice Chairman



Vice Chairman and
Chief Investment Officer
The Travelers Companies, Inc.



Senior Vice President
ING Financial
Advisers LLC



Assistant Secretary for Financial
Institutions, United States
Department of the Treasury



Managing Director
and General Counsel
Legal & Compliance, US UBS
Financial Services, Inc.



Director, Division of Research
and Statistics
Board of Governors of the
Federal Reserve System

President & CEO

General Counsel
& Secretary

Vice President—
Operations & Finance

# CUSTOMER PROTECTION PROCEEDINGS

**AN ACT** to Provide greater protection for customers of registered brokers and dealers and members of national securities exchanges."

—Preamble to SIPA

Customer protection proceedings were initiated for five SIPC members in 2008, bringing the total since SIPC's inception to 322 proceedings commenced under SIPA. The 322 members represent less than one percent of the approximately 38,600 broker dealers that have been SIPC members during the last thirty-eight years. Currently, SIPC has 5,208 members.

The five new cases compares with no cases commenced in 2007. (See Chairman's letter on page 3). Over the last ten-year period, the annual average of new cases was five.

A trustee other than SIPC was appointed in three of the cases commenced during the year, and SIPC serves as trustee in two cases. Customer protection proceedings were initiated for the following SIPC members:

| Member | Date Trustee Appointed |
|---|---|
| Hanover Investment Securities, Inc.<br>Madisonville, LA<br>(SIPC) | 2/28/08 |
| North American Clearing Inc.<br>Longwood, Florida<br>(Robert N. Gilbert, Esq.) | 7/28/08 |
| Great Eastern Securities, Inc.<br>New York, NY<br>(SIPC) | 9/03/08 |
| Lehman Brothers Inc.<br>New York, NY<br>(James W. Giddens, Esq.) | 9/19/08 |
| Bernard L. Madoff Investment Securities LLC<br>New York, NY<br>(Irving H. Picard, Esq.) | 12/15/08 |

Of the 322 proceedings begun under SIPA to date, 308 have been completed, 7 involve pending litigation matters, and claims in 7 are being processed (See Figure 1 and Appendix 3).

During SIPC's 38-year history, cash and securities distributed for accounts of customers totaled approximately $160.0 billion. Of that amount, approximately $159.7 billion came from debtors' estates and $323.8 million came from the SIPC Fund (See Appendix 1).



## FIGURE I
### Status of Customer Protection Proceedings

December 31, 2008

▦ Customer claims being processed (7)
▩ Customer claims satisfied, litigation matters pending (7)
▦ Proceedings completed (308)

| Year | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 | 96 | 97 | 98 | 99 | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 24 | 40 | 30 | 15 | 8 | 4 | 7 | 4 | 6 | 5 | 10 | 8 | 7 | 9 | 12 | 8 | 4 | 5 | 6 | 8 | 8 | 13 | 3 | 2 | 4 | 7 | 10 | 6 | 9 | 5 | 12 | 5 | 7 | 2 | 1 | 3 | 0 | 5 |

proceedings commenced

# CUSTOMER PROTECTION PROCEEDINGS



## Claims over the Limits

Of the more than 625,100 claims satisfied in completed or substantially completed cases as of December 31, 2008, a total of 350 were for cash and securities whose value was greater than the limits of protection afforded by SIPA.

The 350 claims, a net increase of one during 2008, represent less than one-tenth of one percent of all claims satisfied. The unsatisfied portion of claims, $46.3 million, decreased $900,000 during 2008. These remaining claims approximate three-tenths of one percent of the total value of securities and cash distributed for accounts of customers in those cases.

## SIPC Fund Advances

Table 1 shows that the 90 debtors, for which net advances of more than $1 million have been made from the SIPC Fund, accounted for 92 percent of the total advanced in all 322 customer protection proceedings. The largest net advance in a single liquidation is $37.4 million in Sunpoint Securities, Inc. This exceeds the net advances in the 194 smallest proceedings combined.

In 28 proceedings SIPC advanced $344.3 million, or 66 percent of net advances from the SIPC Fund for all proceedings.

TABLE I

## Net Advances from the SIPC Fund

December 31, 2008
322 Customer Protection Proceedings

| Net Advances | | Number of Proceedings | Amounts Advanced |
|---|---|---|---|
| From | To | | |
| $10,000,001 | up | 11 | $226,861,729 |
| 5,000,001 | $10,000,000 | 17 | 117,391,970 |
| 1,000,001 | 5,000,000 | 62 | 133,948,828 |
| 500,001 | 1,000,000 | 38 | 27,971,875 |
| 250,001 | 500,000 | 41 | 14,112,753 |
| 100,001 | 250,000 | 60 | 9,700,471 |
| 50,001 | 100,000 | 43 | 3,051,005 |
| 25,001 | 50,000 | 23 | 845,893 |
| 10,001 | 25,000 | 11 | 168,668 |
| 0 | 10,000 | 9 | 26,087 |
| | Net recovery | 7 | (13,991,621)* |
| | | | $520,087,658† |

* Recovery of assets and appreciation of debtors' investments after the filing date enabled the trustee to repay SIPC its advances plus interest.
† Consists of advances for accounts of customers ($323,792,406) and for administration expenses ($196,295,252).

# MEMBERSHIP AND THE SIPC FUND

**SIPC SHALL . . .**

*impose upon its members such assessments as, after consultation with self-regulatory organizations, SIPC may deem necessary . . . ."*

—SIPA, Sec. 4(c)2

## TABLE 2
## SIPC Membership

### Year Ended December 31, 2008

| Agents for Collection of SIPC Assessments | Total | Added(a) | Terminated(a) |
|---|---|---|---|
| FINRA(b) | 4,714 | 192 | 278 |
| SIPC(c) | 51 | - | 136(d) |
| Chicago Board Options Exchange Incorporated | 274 | 26 | 10 |
| American Stock Exchange LLC | 83 | 4 | 12 |
| NYSE Arca, Inc.(e) | 19 | 4 | 4 |
| NASDAQ OMX PHLX (f) | 40 | - | 9 |
| Chicago Stock Exchange, Incorporated | 27 | 1 | 5 |
| | 5,208 | 227 | 454 |

Notes:

a.  The numbers in this category do not reflect transfers of members to successor collection agents that occurred within 2008.

b.  Effective July 30, 2007 the National Association of Securities Dealers, Inc. (NASD) and the regulatory functions of the New York Stock Exchange, Inc. (NYSE) merged to form the Financial Industry Regulatory Authority, Inc. (FINRA).

c.  SIPC serves as the collection agent for registrants under section 15(b) of the 1934 Act that are not members of any self-regulatory organization.

   The "SIPC" designation is an extralegal category created by SIPC for internal purposes only. It is a category by default and mirrors the SECO broker-dealer category abolished by the SEC in 1983.

d.  This number reflects the temporary status of broker-dealers between the termination of membership in a self-regulatory organization and the effective date of the withdrawal or cancellation of registration under section 15(b) of the 1934 Act.

e.  Formerly the Pacific Stock Exchange, Inc.

f.  Formerly the Philadelphia Stock Exchange, Inc.

The net decrease of 227 members during the year brought the total membership to 5,208 at December 31, 2008. Table 2 shows the members' affiliation for purposes of assessment collection, as well as the year's changes therein.

### Delinquencies

Members who are delinquent in paying assessments receive notices pursuant to SIPA Section 14(a).[1] As of December 31, 2008, there were 23 members who were subjects of uncured notices, 17 of which were mailed during 2008, three during 2007 and 2006, and three during the period 2003 through 2005. Subsequent filings and payments by three members left 20 notices uncured. SIPC has been advised by the SEC staff that: (a) two member registrations have been can-

celed; and (b) 18 are no longer engaged in the securities business and are under review by the SEC for possible revocation or cancellation of their registrations.

### SIPC Fund

The SIPC Fund, Table 5, on page 23, consisting of the aggregate of cash and investments in United States Government securities at fair value, amounted to $1.70 billion at year end, an increase of $177 million during 2008.

Tables 3 and 4, on pages 9 and 10, present principal revenues and expenses for the years 1971 through 2008. The 2008 member assessments were $816,000 and interest from investments was $67.6 million. During the years 1971 through 1977, 1983 through 1985 and 1989 through 1995, member assessments were based on a percentage of

each member's gross revenue (net operating revenue for 1991 through 1995) from the securities business.

Appendix 2, on page 25, is an analysis of revenues and expenses for the five years ended December 31, 2008.

---

[1]14(a) Failure to Pay Assessment, etc—If a member of SIPC shall fail to file any report or information required pursuant to this Act, or shall fail to pay when due all or any part of an assessment made upon such member pursuant to this Act, and such failure shall not have been cured, by the filing of such report or information or by the making of such payment, together with interest and penalty thereon, within five days after receipt by such member of written notice of such failure given by or on behalf of SIPC, it shall be unlawful for such member, unless specifically authorized by the Commission, to engage in business as a broker or dealer. If such member denies that it owes all or any part of the full amount so specified in such notice, it may after payment of the full amount so specified commence an action against SIPC in the appropriate United States district court to recover the amount it denies owing.

TABLE 3

## SIPC Revenues for the Thirty-eight Years

Ended December 31, 2008

■ Member assessments and contributions: $736,907,652

▨ Interest on U.S. Government securities: $1,477,562,339



### History of Member Assessments*

1971: ½ of 1% plus an initial assessment of 1/8 of 1% of
1969 revenues ($150 minimum).
1972–1977: ½ of 1%.
January 1–June 30, 1978: ¼ of 1%.
July 1–December 31, 1978: None.
1979–1982: $25 annual assessment.
1983–March 31, 1986: ¼ of 1% effective May 1, 1983 ($25 minimum).
1986–1988: $100 annual assessment.
1989–1990: ⅜ of 1% ($150 minimum).
1991: .065% of members' net operating revenues ($150 minimum).

1992: .057% of members' net operating revenues ($150 minimum).
1993: .054% of members' net operating revenues ($150 minimum).
1994: .073% of members' net operating revenues ($150 minimum).
1995: .095% of members' net operating revenues ($150 minimum).
1996–2008: $150 annual assessment.

* Rates based on each member's gross revenues (net operating revenues
for 1991–1995) from the securities business. Effective April 1, 2009
member assessments will be ¼ of 1% of member's net operating revenues
($150 minimum).

TABLE 4

## SIPC Expenses for the Thirty-eight Years

Ended December 31, 2008

■ Customer protection proceedings: $1,943,887,658 (Includes net advances of
$520,087,658 and $1,425,600,000 of estimated costs to complete proceedings
less estimated future recoveries of $1,800,000.)

▦ Other expenses: $194,259,117



\* Net recoveries

# LITIGATION



During 2008, SIPC and SIPA trustees were actively involved in litigation at both the trial and appellate levels. The more noteworthy matters are summarized below:

I n *In re Continental Capital Investment Services, Inc. and Continental Capital Securities, Inc.*, Adv. Pro. No. 03-3370 (Bankr. N.D. Ohio 2008), the trustee prevailed on four summary judgment motions involving objections by investors to the trustee's determination of their "customer" claims.

The first objection involved a claimant who failed to object to withdrawals from his account, received statements for three years showing a zero balance, was induced to invest in notes and other investments based on false information, but objected to the investments as unauthorized only after payments to him on the investments ceased. The Bankruptcy Court upheld the trustee's determination that the claimant was not a "customer" under SIPA, finding that the claim was for market loss that was not protected by SIPC or for fraud that at best could be pursued as a general creditor claim. The Court also found that no timely objection had been made to any allegedly unauthorized transactions.

In the second matter, funds were taken from the claimant's pension plan account and were invested through the debtors' parent company. The Court found that because the investments were made through the parent company, and not held at either of the debtors, the claimant was not a "customer" of the debtors eligible for protection.

The Court also upheld the denial of the claim by a claimant who failed to identify an account held for him at the debtors. Moreover, the two transactions referenced in the claim formed the basis of two other claims that had been filed by the claimant and family members and satisfied by the trustee.

In the last objection, the claimant submitted two claims, the first for loans made to the debtors' parent company, and the second, for shares of a security. The second claim was filed well after the claims bar date. The Court sustained the trustee's denial of the first claim on the ground that it was based on a transaction with the parent company, and not the debtors. Regarding the second claim, the Court upheld the denial of the claim on the ground that the claimant had possession of the shares, that market loss in the security was not protected under SIPA, and that, in any event, the claim properly had been denied as untimely.

In *Zaremba v. Pheasant (In re Continental Capital Investment Services, Inc. and Continental Capital Securities, Inc.)*, Adv. Pro. No. 05-3322 (Bankr. N.D. Ohio 2008), an action for turnover, an accounting, avoidance of various transfers, and denial of a "customer" claim submitted in the liquidation proceeding by the defendant, the Court granted the trustee's motion to dismiss the defendant's counterclaims and to strike the defendant's jury demand. The defendant had counterclaimed, asserting first that the complaint was not warranted under existing law and was filed only to harass or maliciously injure him, and second that the trustee had denied his customer claim in bad faith. In dismissing the first counterclaim, the Court found that the state statute relied upon provided no cause of action in federal court. The Court dismissed the second counterclaim because the defendant identified no viable legal theory for a cause of action in tort for asserted bad faith denial of a claim in a SIPA case. The Court struck the defendant's jury demand because by filing a claim in the debtors' liquidation, defendant had subjected himself to the Bankruptcy Court's jurisdiction and waived any right to a jury trial.

*Litigation continued*

In *Zaremba v. Ello (In re Continental Capital Investment Services, Inc. and Continental Capital Securities, Inc.)*, 398 B.R. 583 (N.D. Ohio 2008), the District Court affirmed the Bankruptcy Court's issuance of a preliminary injunction prohibiting any disposal or encumbrance of certain real property by the defendant. The defendant was the romantic partner of a former employee of the debtors. After the employee was sued by the trustee, the employee bought and improved certain real property, which he titled in the name of the defendant. The trustee filed a fraudulent transfer action and sought to enjoin the defendant from encumbering or disposing of the property until the conclusion of the case against the employee. On appeal, the District Court found that the trustee had established a likelihood of success on the merits in the fraudulent transfer action and that the trustee could suffer irreparable harm in the form of a diminished asset pool in the absence of a preliminary injunction. The Court also affirmed the denial of a motion to intervene by the employee because he had no legal interest in the property.

In *Zaremba v. Davis (In re Continental Capital Investment Services, Inc. and Continental Capital Securities, Inc.)*, Adv. Pro. No. 05-3147 (Bankr. N.D. Ohio 2008), the trustee sued the former principal of the debtors for conversion and fraudulent misrepresentation after the principal pleaded guilty to various federal counts involving fraud and theft. In denying, in part, and granting, in part, a motion for summary judgment by the trustee, the Court found that the elements of a fraudulent misrepresentation claim differed from the elements of the defendant's fraud crimes, and thus admission to all elements was not made by the defendant by virtue of his guilty plea. However, the Court found that the elements of a conversion claim were satisfied with the defendant's admissions of various facts related to his crimes. The Court also found that the defendant was not a "customer" for SIPA purposes with respect to his loan of securities to the debtors' parent company.

In a suit by the trustee against the debtors' former legal counsel in *In re Continental Capital Investment Services, Inc. and Continental Capital Securities, Inc.*, Adv. Pro. No. 03-3370 (Bankr. N.D. Ohio 2008), the Court denied without prejudice the trustee's motion to compel the law firm to comply with three document subpoenas issued under Rule 2004 of the Federal Rules of Bankruptcy Procedure. After the third subpoena was issued, the trustee commenced an adversary proceeding against the law firm. The firm objected to the subpoenas, claiming that the use of Rule 2004 was improper after the adversary proceeding was commenced. The firm also asserted the attorney-client privilege and work product doctrine, despite waivers obtained by the trustee from representatives of the debtors. The Court found that the trustee could not enforce the subpoenas under Rule 2004 because of the "pending proceeding" rule: the documents sought pursuant to the subpoenas related to the allegations of fraudulent conveyances in the trustee's adversary proceeding against the law firm and, as such, could only be sought under the Federal Rules of Civil Procedure applicable in an adversary proceeding. However, the Court held that most of the waivers of the attorney-client privilege presented by the trustee were valid and would apply to future discovery requests.

In *Mishkin v. Gurian (In re Adler, Coleman Clearing Corp.)*, Case No. 06-80157-Ryskamp/Vitunac (S.D. Fla. April 2008), the trustee held an uncollected multimillion judgment against the defendant's son for activity detrimental to the debtor. After having earlier stricken the defendant's pleadings and entered a default against her, the Court ordered final judgment against the defendant, avoided a transfer of real property by her son to her, authorized the trustee to levy the property and apply the sales proceeds towards the trustee's judgment against her son, ordered that a writ of execution be issued to the United States Marshals directing them to levy the property, permanently enjoined the defendant from any sale or encumbrance of the property, and taxed costs in the action to the defendant.

In *Stephenson v. El-Batrawi (In re MJK Clearing, Inc.)*, 524 F.3d 907 (8th Cir. 2008), the Court of Appeals affirmed the District Court's denial of the defendant's motion to set aside the default judgment against him, but vacated the default judgment and remanded the case for additional findings regarding the judgment amount. The trustee served the defendant with the complaint by various means, including by first class mail and by publication. More than three years after the defendant defaulted, the trustee moved for a default judgment for $67.5 million in damages. The defendant then made his first appearance and moved to set aside the default arguing that he never obtained actual notice of the proceeding and that he had meritorious defenses. In affirming the denial of the motion to set aside entry of default, the Court of Appeals found that the defendant had been effectively served with the complaint and that his assertions were

inadequate to support the existence of any meritorious defense. The Court remanded the case with instructions for the district court to make specific findings regarding a damage award.

The Bankruptcy Court in *In re Lehman Brothers Inc.*, Case No. 08-01420 (Bankr. S.D.N.Y. 2008), granted a motion for leave to conduct discovery under Rule 2004 of the Federal Rules of Bankruptcy Procedure filed by certain former employees of the debtor ("movants"), who were participants under the debtor's deferred compensation plans. The trustee had denied their request to furnish a list of contact information for all other similarly situated persons, arguing that the movants were using Rule 2004 for the improper purpose of soliciting additional clients by the movants' law firm. The movants acknowledged that they wanted the names of others similarly situated to form a more robust group of jointly represented creditors. The Court found that such discovery, although in aid of soliciting individuals to join a creditor group, fit within the broad categories of permitted discovery under Rule 2004.

In *Friedman Billings Ramsey Group v. SIPC, et al. (In re Lehman Brothers Inc.)*, Case No. 08-01587 (JMP) (Bankr. S.D.N.Y. 2008), one week after the commencement of the liquidation proceeding, the plaintiff sued the trustee and SIPC seeking to compel the completion of a Master Repurchase Agreement that was executed between the debtor, an affiliate of the debtor, and the plaintiff by requiring the delivery to the plaintiff of a particular Fannie Mae mortgage-backed security. The plaintiff also sought emergency relief by filing a motion for a temporary restraining order. Upon SIPC's motion to dismiss and the trustee's opposition to the plaintiff's motion, the Bankruptcy Court, after oral argument, denied the motion for emergency relief because, among other things, the plaintiff did not prove a likelihood of success on the merits, and demonstrated no irreparable harm. Thereafter, the plaintiff reached agreement with the defendants to terminate its adversary proceeding.



# DISCIPLINARY AND CRIMINAL ACTIONS

SIPC routinely forwards to the Securities and Exchange Commission, for possible action under Section 14(b) of SIPA, the names of principals and others associated with members for which SIPC customer protection proceedings have been initiated. Those individuals are also reported to the self-regulatory organization exercising primary examining authority for appropriate action by the organization. Trustees appointed to administer customer protection proceedings and SIPC personnel cooperate with the SEC and with law enforcement authorities in their investigations of possible violations of law.

## Criminal and Administrative Actions

Criminal actions have been initiated in 129 of the 322 SIPC proceedings commenced since enactment of the Securities Investor Protection Act in December 1970. A total of 300 indictments have been returned in federal or state courts, resulting in 269 convictions to date.

Administrative and/or criminal actions in 283 of the 322 SIPC customer protection proceedings initiated through December 31, 2008, were accomplished as follows:

| Action Initiated | | Number of Proceedings |
|---|---|---|
| Joint SEC/Self-Regulatory Administrative Actions | | 60 |
| Exclusive SEC Administrative Actions | | 41 |
| Exclusive Self-Regulatory Administrative Actions | | 53 |
| Criminal and Administrative Actions | | 102 |
| Criminal Actions Only | | 27 |
| | Total | 283 |



In the 256 customer protection proceedings in which administrative actions have been effected, the following sanctions have been imposed against associated persons:

| | SEC | Self-Regulatory Organizations |
|---|---|---|
| Notice of Suspension[1] | 117 | 113 |
| Bar from Association | 353 | 231 |
| Fines | Not Applicable | $11,733,781 |

Suspensions by self-regulatory authorities ranged from five days to a maximum of ten years. Those imposed by the SEC ranged from five days to a maximum of one year.

Bars against associated persons included exclusion from the securities business as well as bars from association in a principal or supervisory capacity.

The $11,733,781 in fines assessed by self-regulatory authorities were levied against 130 associated persons and ranged from $250 to $1,600,000.

## Members In or Approaching Financial Difficulty

Section 5(a)(1) of SIPA requires the SEC or the self-regulatory organizations to immediately notify SIPC upon discovery of facts which indicate that a broker or dealer subject to their regulation is in or is approaching financial difficulty. The Commission, the securities exchanges and the FINRA fulfill this requirement through regulatory procedures which integrate examination and reporting programs with an early-warning procedure for notifying SIPC. The primary objective of those programs is the early identification of members which are in or are approaching financial or operational difficulty and the initiation of remedial action by the regulators necessary to protect the investing public.

## Members on Active Referral

SIPC maintained active files on four (4) members referred under section 5(a) during the calendar year 2008. One referral had been carried over from prior years.

Two referrals North American Clearing, Inc. and Great Eastern Securities, Inc., became SIPC proceedings during the year.

In addition to formal referrals of members under Section 5(a), SIPC received periodic reports from the self-regulatory organizations identifying those members which, although not considered to be in or approaching financial difficulty, had failed to meet certain pre-established financial or operational criteria and were under closer-than-normal surveillance.

---

[1]Notices of suspension include those issued in conjunction with subsequent bars from association.