# EXHIBIT CC

**United States General Accounting Office**

# GAO

## Report to Congressional Requesters

**July 2003**

# SECURITIES INVESTOR PROTECTION

## Update on Matters Related to the Securities Investor Protection Corporation



**G A O**
Accountability ★ Integrity ★ Reliability

July 2003



**GAO**

Accountability•Integrity•Reliability

# Highlights

Highlights of GAO-03-811, a report to
congressional requesters

## SECURITIES INVESTOR PROTECTION

## Update on Matters Related to the Securities Investor Protection Corporation

## Why GAO Did This Study

As result of ongoing concerns about the adequacy of disclosures provided to investors about the Securities Investor Protection Corporation (SIPC) and investors' responsibilities to protect their investments, GAO issued a report in 2001 entitled *Securities Investor Protection: Steps Needed to Better Disclose SIPC Policies to Investors (GAO-01-653)*. GAO was asked to determine the status of recommendations made to the Securities and Exchange Commission (SEC) and SIPC in that report. GAO was also asked to review a number of issues involving excess SIPC insurance, private insurance securities firms purchase to cover accounts that are in excess of SIPC's statutory limits.

## What GAO Recommends

To ensure that investors have access to relevant information about SIPC, GAO recommends that SIPC provide more specific references to investor education information in its brochure.

In addition, GAO recommends that SEC, in conjunction with the SROs, ensure that firms are providing investors with meaningful disclosures about excess SIPC and monitor firm disclosures about any changes in the coverage.

SEC and SIPC generally agree with the report's findings and recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-03-811.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Richard J. Hillman, (202) 512-8678, hillmanr@gao.gov.

## What GAO Found

SEC has taken steps to implement each of the seven recommendations directed to SEC in GAO's May 2001 report. SEC has updated its Web site to provide investors with more information about SIPC's policies and practices, particularly with regard to unauthorized trading and nonmember affiliate claims. SEC has taken other steps consistent with our recommendations to improve its oversight of SIPC and is working with self-regulatory organizations (SRO) to increase investor awareness of SIPC's policies through distribution of the SIPC brochure and disclosures on account statements.

Likewise, SIPC has taken steps to implement the three recommendations directed to SIPC in our 2001 report, but additional work is needed on one. SIPC has updated its brochure and Web site to clarify that investors should complain in writing to their securities firms about suspected unauthorized trades. SIPC also expanded a statement in its brochure that discusses market risk and SIPC coverage and amended its advertising bylaws to require firms that display an expanded statement about SIPC to include a reference or link to SIPC's Web site. Moreover, SEC, the NASD, and many securities firms provide the recommended disclosures about the scope of SIPC coverage to investors on their Web sites. SIPC also added links to Web sites in its brochure that offer information about investment fraud. However, investors could benefit from more specific links to investor education information.

Until this year, certain well-capitalized, large, and regional securities firms were able to purchase and provide excess SIPC coverage from four major insurers. The insurance policies varied by firm and insurer in terms of the amount of coverage offered per customer and in aggregate per firm. Attorneys familiar with the policies agreed that the disclosure of the coverage and the terms of coverage could be improved. During the review, GAO found that three of the four major insurers that offered excess SIPC coverage in 2002 stopped underwriting these policies in 2003. Consequently, as the policies expire in 2003, most insurers are not renewing their existing policies and have stopped underwriting new policies. At this time, holders of the insurance policies have not decided what to do going forward. However, several options are being explored including self-insuring and purchasing policies from the remaining major insurer.

# Contents

| Letter | | 1 |
|---|---|---|
| | Results in Brief | 2 |
| | Background | 5 |
| | SEC Has Taken Steps to Address Our Recommendations | 11 |
| | SIPC Has Taken Steps to Improve Investor Education | 16 |
| | Terms of Existing Excess SIPC Policies Vary, and Most Insurers Have Stopped Underwriting New Policies | 20 |
| | Conclusions | 28 |
| | Recommendations | 29 |
| | Agency Comments | 29 |
| | Objectives, Scope, and Methodology | 30 |

| Appendixes | | |
|---|---|---|
| Appendix I: | Comments from the U.S. Securities and Exchange Commission | 32 |
| Appendix II: | Comments from the Securities Investor Protection Corporation | 34 |
| Appendix III: | GAO Contacts and Staff Acknowledgments | 36 |
| | GAO Contacts | 36 |
| | Acknowledgments | 36 |

| Table | | |
|---|---|---|
| | Table 1:  Examples of How SIPC Protects Investors | 11 |

Contents

## Abbreviations

| | |
|---|---|
| FDIC | Federal Deposit Insurance Corporation |
| IG | Inspector General |
| NERO | Northeast Regional Office |
| NYSE | New York Stock Exchange |
| OCIE | Office of Compliance Inspections and Examinations |
| OGC | Office of General Counsel |
| PSA | public service announcement |
| SEC | Securities and Exchange Commission |
| SIA | Securities Industry Association |
| SIPA | Securities Investor Protection Act of 1970 |
| SIPC | Securities Investor Protection Corporation |
| SRO | self-regulatory organization |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

# G A O
**Accountability ∗ Integrity ∗ Reliability**

**United States General Accounting Office**
**Washington, D.C. 20548**

July 11, 2003

The Honorable John D. Dingell
Ranking Minority Member
Committee on Energy and Commerce
House of Representatives

The Honorable Barney Frank
Ranking Minority Member
Committee on Financial Services
House of Representatives

The Honorable Paul E. Kanjorski
Ranking Minority Member
Subcommittee on Capital Markets,
   Insurance and Government Sponsored Enterprises
Committee on Financial Services
House of Representatives

Disclosure has an important role in securities market regulation, and the
Securities Investor Protection Corporation (SIPC) has a responsibility to
inform investors of actions they can take to protect their investments and
help ensure that investors are afforded the full protections allowable under
the Securities Investor Protection Act of 1970 (SIPA). In our 2001 report,
we concluded that many investors were unaware of the steps they should
take to protect their investments.[1] We found that SIPC and the Securities
and Exchange Commission (SEC), which play vital roles in investor
education, had missed opportunities to disclose information on SIPC's
policies, practices, and coverage to investors. Our report contained 10
recommendations to SEC and SIPC about ways to improve the information
available to the public about SIPC and SEC's oversight of SIPC.

This report responds to your August 16, 2001, and October 30, 2001,
requests that we followup on our 2001 report recommendations. As
requested, this report also includes information about "excess SIPC,"
which refers to private insurance that securities firms can purchase to
cover customer claims that are in excess of the $500,000 (which includes
$100,000 cash) limits established by SIPA. Excess SIPC policies typically

---

[1]U.S. General Accounting Office, *Securities Investor Protection: Steps Needed to Better
Disclose SIPC Policies to Investors*, GAO-01-653 (Washington, D.C.: May 25, 2001).

cover cash and securities like SIPC, but the dollar amount of the coverage can vary from net equity coverage to a specific dollar amount. Although the policies are advertised as excess SIPC, not all policies may be consistent with SIPA. In light of these concerns, you asked that we review implications for investors and possible investor misunderstanding about these policies.

To determine the status of our 2001 report recommendations to SEC and SIPC, we interviewed relevant officials from SEC and SIPC to determine what steps they had taken to implement our recommendations since May 2001. We verified changes to SEC and SIPC Web sites and SIPC's brochure to determine what SEC and SIPC disclosed to investors regarding SIPC's policies and practices regarding unauthorized trading[2] and nonmember affiliate issues.[3] We also spoke with self-regulatory organization (SRO) officials about related disclosure issues.[4] To address issues surrounding excess SIPC coverage, we interviewed SEC, SIPC, and SRO staff; representatives from underwriters and insurance brokers; securities firms (policy holders); SIPC trustees; and attorneys knowledgeable about excess SIPC. We also reviewed a sample of excess SIPC policies, including one policy from each of the four major underwriters that provided coverage in 2002. We conducted our work from October 2002 through July 2003 in accordance with generally accepted government auditing standards.

## Results in Brief

SEC has completed or is in the process of implementing each of the seven recommendations made in our May 2001 report. Three recommendations were aimed at improving the information SEC provides to investors about SIPC's policies and practices, particularly with regard to unauthorized trading and nonmember affiliate claims. In response to our recommendations, SEC updated the investor education section of its Web site to include more consistent information about documenting

---

[2]Unauthorized trading occurs when a firm buys or sells securities for a customer's accounts without the customer's approval.

[3]Most registered firms automatically become members of SIPC. However, affiliates (firms that are formally tied within the same financial holding company) of securities firms are not required to become members of SIPC.

[4]SROs have an extensive role in regulating the U.S. securities markets, including ensuring that members comply with federal securities laws and SRO rules. SROs include all the registered U.S. securities exchanges and clearing houses, the NASD (formerly known as National Association of Securities Dealers) and the New York Stock Exchange (NYSE).

unauthorized trading claims and updated a Web page dedicated to providing information about SIPC policies and practices. SEC has also implemented two recommendations intended to improve its oversight of SIPC operations. As recommended, SEC adjusted the sample of liquidations it examined in its recently completed review of SIPC to include a larger number of liquidations involving unauthorized trading or nonmember affiliate issues. In response to the SEC Inspector General (IG) and our recommendation that SEC establish a formal procedure to share information about SIPC among its various divisions and offices, SEC began holding quarterly meetings. SEC has subsequently determined that more frequent, informal meetings were more effective. If this format continues to allow SEC to share information with all the relevant parties, it would be an effective response to our recommendation. Finally, SEC is still in the process of implementing our recommendations to require firms to distribute the SIPC brochure to customers and to require clearing firms to include information about documenting unauthorized trades in writing on account statements. SEC officials have sent letters to the New York Stock Exchange (NYSE) and NASD asking them to explore how these recommendations could be implemented through SRO rulemaking or notices to members, and the SROs are evaluating possible approaches to implement these recommendations.

SIPC has taken steps to implement each of our three recommendations, but needs to complete additional work on one. We made recommendations to SIPC aimed at improving the information it provides to investors about its policies and practices, particularly regarding unauthorized trading and nonmember affiliate claims. First, we recommended that SIPC revise its informational brochure and Web site to include a full explanation of the steps necessary to document an unauthorized trading claim. In response to our recommendation, SIPC has updated its brochure and Web site to clarify that investors should complain in writing to their securities firms about suspected unauthorized trades. Second, we recommended that SIPC amend its advertising bylaws to include a statement that SIPC does not protect against losses due to market fluctuations. According to SIPC officials, such a statement would be misleading unless additional explanations were added. However, SIPC has expanded a statement in its brochure that discusses market risk and SIPC coverage and amended its advertising bylaws to require firms that display an expanded statement to include a reference or link to SIPC's Web site. In addition, we found that SEC, SROs, and many securities firms provide the recommended disclosures to investors on their Web sites. In combination, such actions collectively respond to our recommendation. Third, we recommended that

SIPC revise its brochure to warn investors to exercise caution when calling to complain about an unauthorized trade in order to avoid unintentionally ratifying an unauthorized trade. In response, SIPC provided investors with links to Web sites, such as SEC's, that offer information about investment fraud. However, SIPC provides links to only the main Web site and not to specific Web pages that contain the relevant information, so investors may have difficulty locating information about specific types of fraud. For example, based on the Web address provided in the brochure, investors searching SEC's Web site for "fraud," would be linked to over 5,000 possible references. Providing more specific links to investor education information would make it much easier for investors to locate relevant information.

Until this year, excess SIPC coverage was generally available to certain well-capitalized, large, and regional securities firms. The policies varied by firm and insurer in terms of the amount of coverage offered per customer and in aggregate per firm. Attorneys familiar with the policies agreed that the disclosure of the coverage and the terms of coverage are sometimes unclear. In our review of some of the policies, it was unclear who was covered and how the claims process would work in the case of a firm's bankruptcy. The policies were also unclear in terms of when a claim can be filed and whether the trustee or the customer would file it. During our review, three of the four major insurers that offered excess SIPC coverage in 2002 stopped underwriting these policies in 2003. Some of these insurers said they had stopped providing coverage primarily because of the complexity of quantifying their potential risk exposure in relation to the relatively low premiums.[5] Consequently, as the policies expire in 2003, most insurers are not renewing their existing policies and have stopped underwriting new policies. At this time, some of the policyholders have not decided what to do going forward. However, several options are being explored, including self-insuring and purchasing policies from the remaining major insurer.

---

[5] To evaluate and measure the impact of losses to a firm, maximum potential loss and maximum probable loss must be determined. The maximum potential loss, which is the absolute maximum dollar amount of loss, could be significant because it is simply the aggregate of all customer account balances over SIPC's $500,000 limit. Conversely, the maximum probable loss is the likely dollar loss if a firm were to become part of a SIPC liquidation proceeding. This type of calculation is usually based on historical loss data for the particular event, but unlike most other insurance products, actuaries have no historical loss data for excess SIPC products because no claims-related losses have been incurred.

Given the important and ongoing role that SEC and SIPC play in investor education and protection, we make new recommendations to SEC and SIPC aimed at further improving investor education and protection. First, we recommend SIPC modify its brochure to provide more specific links to investor education information as SIPC continues its efforts to improve investor awareness of SIPC's policies and practices and to educate investors in general. Finally, as existing excess SIPC policies expire and are replaced with new policies or are not replaced at all, we recommend that SEC take actions to monitor these ongoing developments.

We requested comments on a draft of this report from the Chairman, SEC, and the Chairman, SIPC. We received comments from the Director, Division of Market Regulation, SEC, and President, SIPC. Both generally agreed with the report's findings and recommendations. SEC's and SIPC's comments are discussed in greater detail at the end of this letter, and the written comments are reprinted as appendixes I and II, respectively.

## Background

SIPA established SIPC to provide certain financial protections to the customers of insolvent securities firms. As required under law, SIPC either liquidates a failed firm itself (in cases where the liabilities are limited and there are less than 500 customers) or a trustee selected by SIPC and appointed by the court liquidates the firm.[6] In either situation, SIPC is authorized to make advances from its customer protection fund to promptly satisfy customer claims for missing cash and securities up to amounts specified in SIPA. Between 1971 and 2002, SIPC initiated a total of 304 liquidation proceedings and paid about $406 million to satisfy such customer claims.

## SIPC's Mission

SIPC was established in response to a specific problem facing the securities industry in the late 1960s: how to ensure that customers recover their cash and securities from securities firms that fail or cease operations and cannot meet their custodial obligations to customers. The problem peaked in the late 1960s, when outdated methods of processing securities trades, coupled with the lack of a centralized clearing system able to handle a large surge in trading volume, led to widespread accounting and

---

[6]SIPA authorizes an alternative to liquidation under certain circumstances when all customer claims aggregate to less than $250,000.

reporting mistakes and abuses at securities firms. Before many firms could modernize their trade processing operations, stock prices declined sharply, which resulted in hundreds of securities firms merging, failing, or going out of business. During that period, some firms used customer property for proprietary activities, and procedures broke down for proper customer account management, making it difficult to locate and deliver securities belonging to customers. The breakdown resulted in customer losses exceeding $100 million because failed firms could not account for their customers' property. Congress became concerned that a repetition of these events could undermine public confidence in the securities markets.

SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash and/or securities held at a failed firm. SIPC fulfills its mission by initiating liquidation proceedings when appropriate and transferring customer accounts to another securities firm or returning the cash or securities to the customer by restoring to customer accounts the customer's "net equity." SIPC defines net equity as the value of cash or securities in a customer's account as of the filing date, less any money owed to the firm by the customer, plus any indebtedness the customer has paid back with the trustee's approval within 60 days after notice of the liquidation proceeding was published. The filing date typically is the date that SIPC applies to a federal district court for an order initiating proceedings.[7]  SIPA sets coverage at a maximum of $500,000 per customer, of which no more than $100,000 may be a claim for cash. SIPC is not intended to keep firms from failing or to shield investors from losses caused by changes in the market value of securities.

SIPC is a nonprofit corporation governed by a seven-member Board of Directors that includes two U.S. government, three industry, and two public representatives. SIPC has 31 staff located in Washington, D.C. Most securities firms that are registered as broker-dealers under Section 15(b) of the Securities Exchange Act of 1934 automatically become SIPC members, regardless of whether they hold customer property. As of December 31, 2002, SIPC had 6,679 members. SIPA excludes from membership securities firms whose principal business—as determined by SIPC subject to SEC review—is conducted outside of the United States, its territories, and

---

[7]Under SIPA, the filing date is the date on which SIPC files an application for a protective decree with a federal district court, except that the filing date can be an earlier date under certain circumstances, such as the date on which a Title 11 bankruptcy petition was filed.

possessions. Also, a securities firm is not required to be a SIPC member if its business consists solely of (1) distributing shares of mutual funds or unit investment trusts,[8] (2) selling variable annuities,[9] (3) providing insurance, or (4) rendering investment advisory services to one or more registered investment companies or insurance company separate accounts. SIPA, as recently amended, also exempts a certain class of firms that are registered with SEC solely because they may affect transactions in single stock futures.

SIPA covers most types of securities such as notes, stocks, bonds, and certificates of deposit.[10] However, some investments are not covered. SIPA does not cover any interest in gold, silver, or other commodity; commodity contract; or commodity option. Also, SIPA does not cover investment contracts that are not registered as securities with SEC under the Securities Act of 1933. Shares of mutual funds are protected securities; but securities firms that deal only in mutual funds are not SIPC members, and thus their customers are not protected by SIPC. In addition, SIPA does not cover situations where an individual has a debtor-creditor relationship, such as a lending arrangement, with a SIPC member firm.

Investors who attain SIPC customer status are a preferred class of creditors compared with other individuals or companies that have claims against the failed firm and are much more likely to get a part or all of their claims satisfied. This is because SIPC customers share in any customer property that the bankrupt firm possesses before any other creditors may do so. Although bankers and brokers are customers under SIPA, they are not eligible for SIPC fund advances. SIPA states that most customers are eligible for SIPC assistance, but SIPC funds may not be used to pay claims of any failed brokerage firm customer who is

---

[8]A unit investment trust is an SEC-registered investment company, which purchases a fixed, unmanaged portfolio of income-producing securities and then sells shares in the trust to investors.

[9]An annuity is a contract that offers tax-deferred accumulation of earnings and various distribution options. A variable annuity has a variety of investment options available to the owner of the annuity, and the rate of return the annuity earns depends on the performance of the investments chosen.

[10]Typically, bank certificates of deposit are not securities under the Securities Exchange Act of 1934; however, they are defined as securities in SIPA.

- a general partner, officer, or director of the firm;

- the beneficial owner of 5 percent or more of any class of equity security of the firm (other than certain nonconvertible preferred stocks);

- a limited partner with a participation of 5 percent or more in the net assets or net profits of the firm;

- someone with the power to exercise a controlling influence over the management or policies of the firm; and

- a broker or dealer or bank acting for itself rather than for its own customer or customers.

The SIPC fund was valued at $1.26 billion as of December 31, 2002, which it uses to make advances to trustees for customer claims and to cover the administrative expenses of a liquidation proceeding.[11] Administrative expenses in a SIPA liquidation include the expenses incurred by a trustee and the trustee's staff, legal counsel, and other advisors. The SIPC fund is financed by annual assessments on all member firms—periodically set by SIPC—and interest generated from its investments in U.S. Treasury notes. SIPC, after consultation with the SROs, sets the amount of member assessments based on the amount necessary to maintain the fund and repay any borrowings by SIPC.[12] At different times during the 1970s, 1980s, and 1990s members were assessed at a higher rate. Rates fluctuated depending on the level of expenses. SIPC's board of directors attempted to match assessment rate increases with declines in the fund balance, so that years of high SIPC expenses were followed by periods of higher assessments. Since 1996, SIPC has charged each broker-dealer member an

---

[11]The SIPC board decided the fund balance should be raised to $1 billion to meet the long-term financial demands of a very large liquidation. The SIPC balance reached $1 billion in 1996.

[12]15 U.S.C. 78ddd(c)(2). The assessments shall be a percentage of each member's gross revenues if (1) the fund is below a level that the Commission determines is in the public interest; (2) SIPC is obligated on any outstanding borrowings; or (3) SIPC is required to phase out the lines of credit it has established. Otherwise, SIPC shall impose an annual assessment. 15 U.S.C. 78ddd(d)(1).

annual assessment of $150.[13] If the SIPC fund becomes or appears to be insufficient to carry out the purposes of SIPA, SIPC may borrow up to $1 billion from the U.S. Treasury through SEC (i.e., SEC would borrow the funds from the U.S. Treasury and then relend the funds to SIPC). In addition, SIPC has a $1 billion line of credit with a consortium of banks.

| | |
|---|---|
| **SEC Oversight of SIPC** | SIPA gives SEC oversight responsibility over SIPC. SEC's primary mission is to protect investors and the integrity of the securities markets. SEC seeks to fulfill its mission by requiring public companies to disclose financial and other information to the public. SEC is also responsible for conducting investigations of potential securities law violations and overseeing SROs such as securities exchanges, as well as broker-dealers (securities firms), mutual funds, investment advisors, and public utility holding companies. SEC may sue SIPC to compel it to act to protect investors. SIPC must submit all proposed changes to rules or bylaws to SEC for approval; and SEC may require SIPC to adopt, amend, or repeal any bylaw or rule.[14] In addition, SIPA authorizes SEC to conduct inspections and examinations of SIPC and requires SIPC to furnish SEC with reports and records that it believes are necessary or appropriate in the public interest or to fulfill the purposes of SIPA. |
| **SEC Rules Strengthen Customer Protection in the Securities Market** | The law that created SIPC also required SEC to strengthen customer protection and increase investor confidence in the securities markets by increasing the financial responsibility of broker-dealers. Pursuant to this mandate, SEC developed a framework for customer protection based on two key rules: (1) the customer protection rule and (2) the net capital rule. These rules respectively require broker-dealers that carry customer accounts to (1) keep customer cash and securities separate from those of the company itself and (2) maintain sufficient liquid assets to protect customer interests if the firm ceases doing business. SEC and SROs, such |

---

[13]15 U.S.C. 78ddd(d)(1)(C). "The minimum assessment imposed upon each member of SIPC shall be $25 per annum through the year ending December 31, 1979, and thereafter shall be the amount from time to time set by SIPC bylaw, but in no event shall the minimum assessment be greater than $150 per annum." Id.

[14]A proposed rule change becomes effective 30 days after it is filed with SEC, unless the period is extended by SIPC or SEC takes certain actions. A proposed rule change may take effect immediately if it is a type that SEC determines by rule does not require SEC approval.

as NYSE, are responsible for enforcing the net capital and customer protection rules.

## Excess SIPC Coverage Was Introduced in the 1970s

Under a typical SIPC property distribution process, SIPC customers are to receive any securities that the firms holds that are registered in their name or that are being registered in their name, subject to the payment of any debt to the firm. If some of the customer assets are missing and cannot be found by the trustee, the customer will receive a pro rata share of the firm's remaining customer property. In addition, SIPC is required to replace missing securities and cash in an investor's account up to the statutory limits. For firms with excess SIPC policies, this coverage would be available as well. For example, if a firm is liquidated by a SIPC trustee that should have $10 billion in customer assets, but the trustee can account for only $9.8 billion or 98 percent of the $10 billion in assets, each customer would receive 98 percent of their net equity (pro rata share). A customer with net equity of $10 million would receive 98 percent or $9.8 million of their $10 million. In addition the trustee may use up to $500,000 advanced from the SIPC fund to satisfy the customer's claim, but only $100,000 may be advanced for cash. With a $200,000 advance from SIPC, the customer in this example would have received the entire $10 million in assets owed. To protect customers who have claims in excess of the SIPC limit, Travelers Bond[15] first began offering excess SIPC coverage to brokerage firms in 1970, soon after SIPA was enacted. Other companies began to join the market in the mid-1980s. However, such claims above the SIPA limit are rare and regulatory and industry officials confirmed that most customers would not be affected by such policies because their accounts are within the SIPA limits.

As seen in table 1, the amount of customer funds recovered determines if the investor will have a loss and whether excess SIPC would be triggered. For example, if the trustee determined that 50 percent of the customer assets were missing, a customer who is owed $1 million in assets would receive a $500,000 pro rata share from the estate and an advance from SIPC at its statutory limit of $500,000. However, a customer with $5 million in assets with the same 50 percent pro rata share would have $2 million in excess of the $500,000 SIPC advance and could be eligible for excess SIPC coverage if offered by the securities firm. Conversely, a customer with

---

[15]Travelers Bond is now Travelers Property Casualty Corp.

$5 million in assets and a pro rata share of 90 percent or higher would be made whole by SIPC and would not have losses in excess of SIPC limits.

**Table 1: Examples of How SIPC Protects Investors**

| Customer assets | Percent of customer property recovered | Pro rata share of assets returned to customer | SIPC advance | Amount in excess of SIPC limit |
|---|---|---|---|---|
| $1,000,000 | 50 | $500,000 | $500,000 | $0 |
| 5,000,000 | 50 | 2,500,000 | 500,000 | 2,000,000 |
| 5,000,000 | 60 | 3,000,000 | 500,000 | 1,500,000 |
| 5,000,000 | 70 | 3,500,000 | 500,000 | 1,000,000 |
| 5,000,000 | 80 | 4,000,000 | 500,000 | 500,000 |
| 5,000,000 | 90 | 4,500,000 | 500,000 | 0 |
| 10,000,000 | 50 | 5,000,000 | 500,000 | 4,500,000 |
| 10,000,000 | 60 | 6,000,000 | 500,000 | 3,500,000 |
| 10,000,000 | 70 | 7,000,000 | 500,000 | 2,500,000 |
| 10,000,000 | 80 | 8,000,000 | 500,000 | 1,500,000 |
| 10,000,000 | 90 | 9,000,000 | 500,000 | 500,000 |
| 10,000,000 | 98 | 9,800,000 | 200,000 | 0 |

Source: SIPC and GAO analysis of how SIPC protects investors.

## SEC Has Taken Steps to Address Our Recommendations

In our 2001 report, we made seven recommendations to SEC to address needed improvements to information it provided to investors about SIPC's policies and practices, particularly regarding the evidentiary standard for unauthorized trading claims and to expand its review of SIPC operations among others. SEC has taken action to address all of the recommendations either directly or indirectly by delegating the implementation to the SROs.

First, we recommended that SEC review sections of its Web site and, where appropriate, advise customers to complain promptly in writing when they believe trades in their account were not authorized. This advice should include an explanation of SIPC's policies and practices regarding claims and a general warning about how to avoid ratifying potentially unauthorized trades during telephone conversations. In 2001, we found that SIPC liquidations involving unauthorized trading accounted for nearly two-thirds of all liquidations initiated from 1996 through 2000. SIPC's policies and practices in these liquidation proceedings generated controversy,

primarily because of the large numbers of claims that were denied and the methods used to satisfy certain approved claims.

In addition, we found that SIPC's policies and practices were often not transparent to investors and SEC had missed opportunities to provide investors with consistent information about SIPC's evidentiary standard for unauthorized trading.  For example, some sections of SEC's Web site encouraged investors to call to complain about unauthorized trades, while other sections told the investor to complain immediately in writing. Although the telephone-based approach SEC recommended was reasonable if the firm acted in good faith to resolve problem trades, fraudulently operated firms were known to have used high pressure and/or fraudulent tactics to convince persons who called to complain about potentially unauthorized trades to ratify these trades. In response to our recommendation, SEC updated sections of its Web site to include consistent information on making unauthorized trading complaints in writing. In addition, they expanded the section entitled *Cold Calling* to include warnings about high-pressure sales tactics that some brokers may use.

Second, we recommended that SEC require firms that it determines to have engaged in or are engaging in systematic or pervasive unauthorized trading to prominently notify their customers about the importance of documenting disputed transactions in writing.  In 2001, we found that although SEC may identify and impose sanctions on firms that have engaged in pervasive unauthorized trading long before they ever become SIPA liquidations, it does not routinely require such firms to notify their clients about documenting unauthorized trading claims. For example, between 1992 and 1997, one securities firm operated under intensive SEC and court supervision in connection with, among other violations, pervasive unauthorized trading and stock price manipulation. However, there was no requirement that the firm notify their customers to document their complaints in writing. Imposing this requirement could help investors protect their interests and benefit unsophisticated investors who may not review the SIPC brochure or other disclosures made on account statements. At the time the report was issued, SEC had agreed to implement this requirement on a case-by-case basis. Since 2001, SEC officials said that they have not had a case that required this action. Moreover, SEC officials noted that their first course of action would be to shut down firms that engage in pervasive unauthorized trading.

Third, we recommended that SEC update its Web site to inform investors about the frauds that may be associated with certain SIPC member firms and their affiliates as well as the steps that can be taken to avoid falling victim to such frauds. SIPC's policies and practices in liquidations of member firms that had nonmember affiliates have also been controversial because SIPC and trustees have denied many claims in such liquidation proceedings. In 2001, we found that SEC had missed opportunities to educate investors about the potential risks associated with certain nonmember affiliates. SEC's Web site provided limited information about dealing with nonmember affiliates, and investors may not have been fully aware of the risks that can be associated with certain nonmember affiliates. In response to this recommendation, SEC updated an on-line publication called *Securities Investor Protection Corporation*, which discusses the problems that can occur when investors place their cash or securities with non-SIPC members. Investors are also told to always make sure that the securities firm and clearing firm[16] are members of SIPC because firms are required by law to tell you if they are not.

Next, we recommended that SEC take several actions to improve its oversight of SIPC. Specifically, we recommended that SEC implement the SEC IG's recommendation that the Division of Market Regulation, the Division of Enforcement, the Northeast Regional Office (NERO) and the Office of Compliance, Inspections, and Examinations (OCIE) conduct periodic briefings to share information related to SIPC. In 2000, SEC's IG found that communication among SEC's internal units regarding SIPC could be improved. Although the SEC IG report found that SEC officials tried to keep each other informed about relevant SIPC issues, there was no formal procedure for doing so. At the time our report was issued, SEC had not yet implemented this recommendation, and we recommended that they do so. SEC officials said that they began to hold quarterly meetings, but determined that more frequent, informal meetings were more effective. They said that they meet to discuss SIPC as issues arise, which is typically more than once every quarter. As long as SEC continues to meet frequently and share information among all the relevant units, this approach effectively responds to the concern our recommendation was intended to address.

Fifth, we recommended that SEC expand its ongoing examination of SIPC to include a larger number of liquidations with claims involving

---

[16]Clearing firms clear customer transactions and hold customer cash and securities.

unauthorized trading or nonmember affiliate issues. SEC periodically conducts examinations of SIPC's operations to ensure compliance with SIPA. In May 2000, the Division of Market Regulation and OCIE initiated a joint examination of SIPC. As of March 2001, SEC had included four SIPA liquidations involving unauthorized trading in its sample, but had not included any liquidations involving nonmember affiliate issues. Given the controversies involving SIPA's liquidations involving unauthorized trading and nonmember affiliates, we believed that including a larger number of liquidations with these types of claims was warranted. SEC agreed with this recommendation and included a larger number of liquidations involving unauthorized trading or nonmember affiliate issues in the sample used for the review. Of the eight liquidations in SEC's sample, five involved unauthorized trading and two involved nonmember affiliate issues.

SEC completed its examination in January 2003 and issued its examination report in April 2003, which assessed SIPC's policies and procedures for liquidating failed securities firms and identified several areas of improvement that warrant SIPC's consideration.

- SEC found that there was insufficient guidance for SIPC personnel and trustees to follow when determining whether claimants have established valid unauthorized trading claims. Although the evidentiary standards used were found to be reasonable, the standards differed between trustees. Therefore, SEC recommended that SIPC develop written guidance to help establish consistency between trustees and liquidations. SIPC agreed to adopt such written guidance for reviewing unauthorized trading claims.

- Concerning SIPC's investor education programs, SEC found that SIPC should continue to review the information that it provides to investors about its policies and practices. For example, SEC found that some statements in SIPC's brochure and Web site might overstate the extent of SIPC coverage and mislead investors. SIPC plans to continue to reexamine the adequacy of the information provided in its brochure and Web site to eliminate any potential confusion.

- SEC also found that SIPC should improve its controls over the fees awarded to trustees and their counsel for the services rendered and their expenses. SEC found that some descriptions of the work that the trustees performed were vague, making it difficult to assess whether the work was necessary or appropriate. SEC believed that SIPC could do a better job of reviewing and assessing fees that were requested. SIPC

agreed to ask trustees and counsel in SIPC cases to submit invoices at least quarterly and arrange billing records into project categories. SIPC also agreed to instruct its personnel to document discussions with trustees and counsel regarding fee applications and to note any differences in amounts initially requested by trustees and counsel and those amounts recommended for payment by SIPC.

- In addition, SEC found that SIPC lacks a record retention policy for records generated in liquidations where SIPC appoints an outside trustee. It was found that trustees had different procedures for retention of records, and SEC was not able to review records from one liquidation because the trustee had destroyed the records. SIPC has agreed to develop a uniform record retention policy for all SIPA liquidations, following a cost analysis.

- SEC also found that the SIPC fund was at risk in the case of failure of one or more of the large securities firms. SEC found that even if SIPC were to triple the fund in size, a very large liquidation could deplete the fund. Therefore, SEC suggested that SIPC examine alternative strategies for dealing with the costs of such a large liquidation. SIPC management agreed to bring this issue to the attention of the Board of Directors, who evaluates the adequacy of the fund on a regular basis.

Also as part of SEC's ongoing oversight effort, in September of 2000, SEC's Office of General Counsel (OGC) initiated a 1-year pilot program to monitor SIPA liquidations. According to SEC, the primary objective of the pilot program was to provide oversight of claims determinations in SIPA liquidation proceedings in order to make certain that the determinations were consistent with SIPA. According to SEC officials, this program has since been made permanent. SEC's OGC now enters notices of appearance in all SIPA liquidation proceedings. The cases are followed mostly by NERO and the Midwest Regional Office, given the significant numbers of SIPA liquidations in these locations. The staff can recommend that Commission staff intervene in SIPA liquidations, if appropriate.

Sixth, we recommended that SEC, in conjunction with the SROs, establish a uniform disclosure rule requiring clearing firms to put a standard statement about documenting unauthorized trading claims on their trade confirmations and/or other account statements. In 2001, we found that SEC, NASD, and the NYSE, did not have requirements that clearing firms notify customers that they should immediately complain in writing about allegedly unauthorized trades. A review of a judgmental sample of trade

confirmations and account statements found that many firms voluntarily notify their customers to immediately complain if they experience any problems with their trades, but instructions about the next course of action varied and did not necessarily specify that the investor should complain in writing. Initially, SEC expressed concern about promulgating a rule itself. However, in 2003, SEC began to take steps to implement this recommendation. Specifically, SEC has asked NYSE and NASD to explore how this recommendation can be more fully implemented through SRO rulemaking and Notices to Members. As of June 9, the SROs were still evaluating how best to implement this recommendation. According to an SRO official, concern about potentially penalizing investors who may not complain in writing but may file claims in other forums, such as arbitration proceedings, will need to be resolved. However, SEC believes that they will be able to craft acceptable language that ensures that these investors are not harmed.

Lastly, we recommended that SEC require SIPC member firms to provide the SIPC brochure to their customers when they open an account and encourage firms to distribute the brochure to existing customers more widely. This recommendation was an additional step aimed at educating and better informing customers about how to protect their investments. The SIPC informational brochure called *How SIPC Protects You* provides useful information about SIPC and its coverage. However, SIPC bylaws and SEC rules do not require SIPC members to distribute the brochure to their customers. The authority lies with SEC or the SROs to require the firms to provide the brochure to their customers. To date, it is unclear what action will be taken. SEC officials expressed concern about imposing another rule on securities firms. Instead, SEC included this recommendation in its letter to NYSE and NASD to explore how this could be implemented through SRO rulemaking and Notices to Members. According to SEC and SRO officials, both NASD and NYSE are in the process of exploring how best to implement this recommendation. SEC officials said that they did not expect the SROs to have problems implementing this recommendation.

## SIPC Has Taken Steps to Improve Investor Education

In our 2001 report, we made three recommendations to SIPC to improve the information available to investors about its coverage, particularly with regard to unauthorized trading. In addition to taking steps to implement our recommendations, SIPC has continued a nationwide investor education program that addresses many of the specific issues raised in our 2001 report. SIPC has a responsibility to inform investors of actions they can take to protect their investments and help ensure that they are afforded

the full protections allowable under SIPA. Our 2001 report found that
investors might confuse the coverage offered by SIPC, Federal Deposit
Insurance Corporation (FDIC), and state insurance guarantee associations
and not fully understand the protection offered under SIPA. This was
significant because the type of financial protection that SIPC provides is
similar to that provided by these programs, but important differences exist.
To address these and other investor education issues, SIPC began a major
public education campaign in 2000. As part of the campaign, SIPC worked
with a public relations firm to make its Web site and brochure more reader
friendly and less focused on legal terminology. The changes were designed
to ensure that the Web site is easy to use and written in plain English. In
addition to revising its brochure and Web site, SIPC produced a series of
audio and video public service announcements (PSA).[17] From June 15,
2002, to November 15, 2002, the PSAs were aired over 76,000 times.
According to SIPC's 2002 annual report, the TV PSAs have appeared on 129
stations, in 106 cities, in 46 states; and the radio spots have aired on 415
stations, in 249 cities, in 49 states. They have also been aired nationally on
CNBC and the Fox News Channel.

SIPC and its public relations firm are continuing to work together to
improve investor awareness of SIPC and its policies. They are developing a
new television and radio campaign scheduled to begin in July 2003. They
are also working to better explain the claims process through a new
brochure and video. The claims process brochure will provide information
to individuals that do not have access to the Internet.  This investor
education campaign has increased the amount and clarity of information
available about SIPC and has provided investors who review it with
important information.

As mentioned, in addition to identifying investor education concerns in our
2001 report, we recommended that SIPC take three specific actions to
improve its disclosure. First, we recommended that SIPC revise its
brochure and Web site to include a full explanation of the steps necessary
to document unauthorized trading claims. SIPC has determined, and courts
have agreed, that an objective evidentiary standard, such as written
complaints, is necessary to protect the SIPC fund from fraudulent claims.
However, in our 2001 report, we found that SIPC had also missed
opportunities to provide investors with complete information about dealing
with unauthorized trading. For example, we found that claimants in 87

---

[17]These PSAs may also be viewed at www.sipc.org/streaming.html.

percent of the claims we reviewed telephoned complaints to their brokers. Given that many investment transactions are largely made by telephone, we were concerned that investors were not aware of the importance of documenting their complaints in writing if they were ever required to file a claim with SIPC. Furthermore, we found the SIPC brochure did not advise investors that SIPA covers unauthorized trading and that investors should promptly complain in writing about allegedly unauthorized trades. As previously mentioned, the brochure was revised as part of the investor education campaign and now includes the statement, "If you ever discover an error in a confirmation or statement, you should immediately bring the error to the attention of the [firm], in writing." In addition, SIPC has created a Web page, entitled *Documenting an Unauthorized Trade*, which includes the same information on complaining in writing to the firm about any errors.

We also recommended that SIPC amend its advertising bylaws to include a statement that SIPC does not protect against loss due to market fluctuations. SIPC officials did not agree with the recommended statement and felt that it would be misleading unless additional explanations were added. Instead, SIPC has expanded a statement in its brochure that discusses SIPC coverage of market fluctuation to read,

"Most market losses are a normal part of the ups and downs of the risk-oriented world of investing. That is why SIPC does not bail out investors when the value of their stocks, bonds, and other investments fall for any reason. Instead, SIPC replaces missing stocks and other securities where it is possible to do so…even when investments have increased in value."

In addition, SIPC amended its advertising bylaws in 2002 to require firms that choose to make an explanatory statement about SIPC to include a link to the SIPC Web site.[18] This will further enable the customer to access information about what SIPC does and does not cover. NASD and SEC have also begun to make disclosures about SIPC and market risk to investors. For example, the NASD Web site says, "SIPC does not protect against market risk, which is the risk inherent in a fluctuating market. It protects the value of the securities held by the [firm] as of the time the SIPC trustee is appointed." SEC informs investors that "SIPC does not protect you against losses caused by a decline in the market value of your securities." Furthermore, many securities firms also include similar statements about

---

[18]Firms are required to mention their SIPC membership in advertisements, but are not required to use one of the explanatory statements provided by SIPC.

SIPC protection on their Web sites. SIPC's statement about market risk and amended bylaws as well as the availability of other disclosures by the regulators and firms effectively responds to the concern our recommendation was intended to address.

Finally, we recommended that SIPC revise its brochure to warn investors to exercise caution in ratifying potential unauthorized trades in telephone discussions with firm officials. SIPC believes that the statement discussed above encouraging investors to complain in writing about unauthorized trades in its brochure and Web site will make oral ratification unlikely. SIPC officials also maintain that this type of information is best handled in those publications and Web pages that warn investors about securities fraud. Therefore, in its brochure, SIPC provides links to several Web sites, such as SEC's, that have investor education information about investment fraud. However SIPC provides links to only the main Web site and not to the specific Web pages that contain the relevant information, so investors may have difficulty locating information about specific types of fraud, such as unauthorized trading. For example, based on the Web address provided in the brochure, investors searching SEC's Web site for "fraud," would be linked to over 5,000 possible sites. SIPC also recommends the Securities Industry Association[19] (SIA) Web site for information about investment fraud. However, based on the information SIPC provided, a search for "unauthorized trading" on this Web site yields only three results, none of which send the investor to useful educational information contained on the Web site. Investors are also directed to NASD's Web site, which has a page entitled *Investors Best Practices*, which includes detailed information on cold calling and unauthorized trading. However, an investor may not be able to find this useful information without specific links to the relevant Web pages for this and other Web sites listed in the brochure. For example, a search for "unauthorized trading" on NASD's Web site only yields one result, which provides a link to a definition for unauthorized trading but no reference to the useful educational information.

---

[19]SIA is a trade group that represents broker-dealers of taxable securities. SIA lobbies for its members' interests in Congress and before SEC and educates its members and the public about the securities industry.

GAO-03-811 Securities Investor Protection

## Terms of Existing Excess SIPC Policies Vary, and Most Insurers Have Stopped Underwriting New Policies

Excess SIPC coverage is generally offered by well-capitalized, large, and regional securities firms and is generally marketed by the firms as additional protection for their large account holders. Our review of the excess SIPC policies offered by the four major insurers found the policies varied by firm and insurer in terms of the amount of coverage offered per customer and in aggregate per firm. In our review of some of the policies, we found that excess SIPC coverage was not uniform and was not necessarily consistent with SIPC protection. Attorneys familiar with the policies also agreed that the disclosure of the coverage and the terms of coverage could be improved. During our review, three of the four major insurers that offered excess SIPC coverage in 2002 stopped underwriting these policies in 2003 for a variety of reasons. Consequently, as the policies expire, most insurers are not renewing their existing policies beyond 2003 and have stopped underwriting new policies in general. At this time, it is unclear what some of the securities firms that had excess SIPC coverage plan to do going forward.

## Excess SIPC Coverage Is Generally Limited to Larger Firms

Excess SIPC is generally limited to certain well-capitalized, large, and regional firms that have a relatively low probability of being part of a SIPC liquidation. Moreover, the policies—usually structured as surety bonds—are generally purchased by clearing firms.[20] The insurance underwriters of excess SIPC policies told us that they use strict underwriting guidelines and have minimum requirements for a firm requesting coverage. Most insurers evaluate a securities firm for excess SIPC coverage by reviewing its operational and financial risks. Insurers also consider the firm's internal control and risk management systems, the type of business that the firm conducts, its size, its reputation, and the number of years in business. Some insurers also required the firms to annually submit information on the number and value of customer accounts above the $500,000 SIPC limit, to help gauge their maximum potential exposure in the unlikely event that the firm became part of a SIPC liquidation. Firms below a certain dollar net capital threshold were generally not considered for coverage.

---

[20]In general terms, a surety bond represents a contract in which one party to the contract, the "surety," is obligated to pay third parties if the other party to the contract fails to perform a duty owed to the third parties. See REST 3d ~ 1.

## Excess SIPC Coverage Is Not Uniform and Is Not Necessarily Consistent with SIPC Coverage

Although an excess SIPC claim has never been filed in the more than 30 years that the coverage has been offered, we identified several potential investor protection issues.[21] Our review of excess SIPC policies, which included one from each of the four major insurers, revealed that excess SIPC coverage is not uniform and that some policies are not always consistent with SIPC coverage. Although the policies were advertised as covering losses (or losses up to an amount specified in the policy) that would otherwise be covered by SIPC except for the $500,000 limit, we found that claims under the policies could be subject to various terms and limitations that do not apply to SIPC coverage. Attorneys familiar with SIPA and excess SIPC have also raised questions about who is covered in the policies and how the claims process would work in the case of a firm's bankruptcy. These potential inconsistencies or concerns include

- **Some policies included customers that would generally be ineligible under SIPA.** The wording in some of the policies could be interpreted as protecting individuals who are not customers eligible for SIPC advances. Others contained specific riders that expanded the excess SIPC policy to include classes of customers beyond those covered by SIPC. For example, some policies have riders that extend coverage to officers and directors of the failed firm, as long as they are not involved with any fraud that contributed to the firm's demise. As mentioned previously, SIPC coverage excludes certain customers, such as officers and directors of the failed firm and broker-dealers and banks acting on their own behalf.

- **Some policies limited the duration of coverage.** Each policy we reviewed provided coverage only if SIPC were to institute judicial proceedings to liquidate the firm while the policy was in effect. Three of the four policies provided for specific periods of time during which they were in effect, as well as for cancellation by the insurer under specified conditions. Although each of the three policies required the securities firm to notify its customers of a cancellation, none of the policies expected notification to the customers regarding expiration.[22]

---

[21]According to one insurer, while no claims have been filed, certain attorney fees and a very small number of settlements have been paid to a few investors.

[22]Two of the policies specified that it was the broker-dealer's "responsibility" to notify its customers of discontinuance of the coverage, but neither the insurer nor the firm was obligated to make this disclosure.

According to NYSE and NASD, there are not any specific SRO rules that require these firms to notify their customers. However, NYSE said that they generally expect firms to notify investors of any changes in their excess SIPC protection under rules involving disclosure requirements for fees changes. NASD generally expects firms to notify their customers under NASD's Just and Equitable Rule.

- **Some excess SIPC policies varied from SIPA in scope of coverage.** Certain policies also differed from SIPA in terms of the scope of excess coverage. Specifically, customer cash, which would generally be covered under SIPA, was not covered by two of the policies we reviewed. One of the policies specifically restricted coverage to lost securities; the other described coverage as pertaining only to a customer's claim for "loss of securities."[23] Also, in addition to a cap on the amount of coverage per customer, one policy contained a cap on the insurer's overall exposure—the policy established an aggregate cap of $250 million—regardless of the total amount of customer claims. SIPC has no such aggregate cap.

- **The mechanics of the claims process were unclear.** In addition to limitations on coverage, at least one policy had other characteristics that could either restrict a customer's ability to recover losses that exceed the amount covered under SIPA or delay a customer's recovery until long after the net equity covered by the insurance has been determined. The policy conditioned the customer's recovery upon the customer providing the insurer with a claim notice subject to specific time, form, and content specifications. Among other things, the customer was required to submit a written claim accompanied by evidence satisfactory to the insurer and an assignment to the insurer of the customer's rights against the firm. The other policies did not address when a customer must file a claim.

- **The role of the trustee in the claims process was unclear.** Another difference we found is the role of the trustee regarding customer claims under SIPA and excess SIPC coverage policies. Under SIPA, the trustee acts on behalf of customers who properly file claims to see that they recover losses as provided in SIPA. It is unclear whether the trustee could represent customers on claims for excess insurance because, in

---

[23]A similar policy contained a rider specifying coverage for lost cash in excess of the $100,000 SIPA cap.

some cases, the policies indicate that only individual customers could bring claims and, in any case, the trustee may not have authority under the bankruptcy laws to do so.[24] SIPC trustees and other attorneys experienced with SIPA liquidations also agreed that it was not clear who was responsible for filing the claim, the customer or the trustee.

- **The policies did not clearly state when a claim would be paid.** The policies also differed from SIPC coverage regarding when customers could recover their losses. For purposes of SIPC coverage, the trustee discharges obligations of the debtor from available customer property and, if necessary, SIPC advances, without waiting for the court to rule on customer property and net equity share calculations. Under the excess coverage policies, it is unclear when customers would be eligible to recover assets in excess of those replaced by SIPC. Some of the policies provide for "prompt" replacement or payment of the portion of a customer's covered net equity. In contrast to SIPC coverage, however, they specify that the insurer shall not be liable for a claim until the customer's net equity has been "finally determined by a competent tribunal or by written agreement between the Trustee and the Company," which could take years. Under another policy, the insurer could wait until after liquidation of the broker-dealer's general estate before replacing a customers' missing assets. The general creditor claims process could also take several years. An attorney knowledgeable about SIPC and excess SIPC said that some policies indicate that the insurance company has no liability until the customer claim is paid by SIPC. However, in many cases SIPC does not directly pay investors, but does so through a trustee. Therefore, the policy, if taken literally, would preclude an investor from ever being paid through excess SIPC insurance.

- **Excess SIPC coverage appears to be limited to clearing firm failures.** Most of the excess SIPC polices we reviewed provide that only the policy holder, usually a clearing firm, is covered under the policy. Introducing firms of clearing firms may advertise the coverage provided by their clearing firm. For example, we reviewed the Web sites of 53 introducing firms and found that about 25 percent advertised the excess

---

[24]See *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434, 32 L. Ed. 2d 195, 92 S. Ct. 1678 (1972) (Bankruptcy trustee did not have standing to assert debenture holders' claims of misconduct against respondent indenture trustee where the cause of action belonged solely to the debenture holders and not to the bankruptcy estate.)

SIPC protection provided by the clearing firm. This creates the potential for investor confusion because the coverage would apply only in the case of the clearing firm's failure. Because introducing firms do not clear securities transactions or hold customer cash or securities, the customer's assets should be unaffected in the event of an introducing firm's failure. However, there have been cases where customer funds were "lost" before they were sent to the clearing firm, typically due to fraudulent activity.  If the introducing firm fails while the assets are still with the introducing firm but the clearing firm continues to operate, investors may not be aware that the excess SIPC protection would only apply in the event of the clearing firm's failure. Conversely, SIPC will initiate liquidation proceedings against introducing firms and protect their investors in certain situations.

## Three of the Four Major Insurers Identified Stopped Underwriting Excess SIPC Policies in 2003

During our review, three of the four major insurers that offered excess SIPC coverage in 2002 stopped underwriting these policies beyond 2003. The insurers provided various reasons for not continuing to underwrite excess SIPC policies, such as their concern about the complexity of quantifying their maximum probable loss. In addition, officials from securities firms and attorneys knowledgeable about excess SIPC had opinions about why the insurers are no longer underwriting excess SIPC policies.

According to the insurers that have stopped offering excess SIPC, they made a business decision to stop offering the coverage after reviewing their existing product offerings. They said that this practice of periodically reviewing product lines and profitability is not uncommon. Most of the underwriters were property and casualty insurance companies, and the excess SIPC product was viewed as a relatively small part of their standard product line and provided low return in the form of premiums relative to the significant potential risk exposure. Some of the underwriters said that documenting and explaining the potential risk associated with excess SIPC policies is difficult. For example, the maximum potential loss for excess SIPC could be significant because it is simply the aggregate of all customer account balances over SIPC's $500,000 limit. Quantifying the probability of loss, which would be significantly less, is much more difficult because insurers have never had a claims-related loss associated with the excess SIPC policies; therefore, no historical loss data exists.

Another insurer said credit rating agencies began to ask questions about potential risk exposures from excess SIPC; and rather than risk a change to

its credit rating, it opted to stop providing the coverage given the limited number of policies it underwrote.[26] Others in the industry said that in light of the Enron Corporation failure and the losses experienced by the insurance underwriters that had exposure from Enron-related surety bonds, credit rating agencies have begun to more closely scrutinize potential losses and risk exposures of insurance companies overall. While surety bonds are still considered relatively low-risk products, insurers are more sensitive to their potential risk exposures. As mentioned, given the absence of actuarial data it is difficult for insurers to quantify the maximum probable losses from excess SIPC.

Securities firms and others also had opinions about why insurers stopped underwriting the policies. Some believed that a general lack of knowledge about the securities industry and SIPC, in particular, might have contributed to the products being withdrawn from the market. Many firms said that the risk of an excess SIPC claim ever being filed is low for two primary reasons. First, securities firms that carry customer accounts are required to adhere to certain customer protection rules. Specifically, firms must keep customer cash and securities separate from those of the firm itself and maintain sufficient liquid assets to protect customer interests if the firm ceases doing business. Moreover, SEC and the SROs have established inspection schedules and procedures to routinely monitor broker-dealer compliance with customer protection (segregation of assets) and net capital rules. Firms not in compliance can be closed.

Second, SIPA liquidations are rare in general and claims in excess of the SIPA limit are even more rare. For example, since 1998, more than 4,000 firms have gone out of business, but less than 1 percent or 37 firms became part of a SIPA liquidation proceeding. This is consistent with historical data dating back to the 1970s. Moreover, since 1971 of the almost 623,000 claims satisfied in completed or substantially completed cases as of December 31, 2002, a total of 310 were for values in excess of SIPC limits (less than one-tenth of 1 percent). Of these 310 claims, 210 were filed before 1978 when the limit was raised to $500,000. Only two firms involved in a SIPA

---

[26]Credit ratings produced by credit rating agencies are widely circulated; many investors rely on these ratings to make investment decisions. These ratings include opinions about the creditworthiness of certain public companies and their financial obligations, including bonds, preferred stock, and commercial paper. The credit ratings that result from analyses of this information can affect securities markets in a number of important ways, including an issuer's access to and cost of capital, the structure of financial transactions, and the ability of certain entities to invest in certain rated obligations.

liquidation have offered excess SIPC, but no claims have been filed to date. According to officials knowledgeable about a 2001 proceeding, which included a firm with an excess SIPC policy, claims for excess SIPC are likely to be filed. However, the amount of claims to be filed are unclear at this time.

## Securities Firms Are Exploring a Variety of Options

Most of the six holders of the excess SIPC policies we contacted are currently exploring a number of options; but at this time, it is unclear what most will do. Although most said that the coverage is largely a marketing tool, some felt that the policies increased investor confidence in the firm because an independent third party (the insurance company) had examined the financial and operational risks of the firm prior to providing them coverage. Several of the firms and those in the securities industry we contacted said that they were surprised to learn that the insurers planned to stop providing excess SIPC coverage. Therefore, most firms are still exploring a number of options on how best to proceed, including

- Self-insuring or creating a "captive" insurance company that would offer the coverage.[26] However, firm officials involved in exploring the captive expressed concerns about whether they could establish the insurance company by the end of 2003. Others questioned whether this option was feasible given the competitive nature of the securities industry.

- Purchasing policies from the remaining major insurer. While some have already chosen this option, officials from some of the larger firms said that this might not be an acceptable option because the remaining insurer generally limits the amount of the coverage per firm. Firms that currently offer net equity coverage were concerned that their high net worth customers may not be satisfied with a policy that has a cap on its coverage. Additionally, the policy of the remaining underwriter raised the most questions about its consistency with SIPC coverage.

- Letting the policies expire and not replacing them. Some of the firms we spoke with said that the larger firms really do not need the excess SIPC because they are well capitalized and the existing customer protection rules offer sufficient protection. However, some officials said that if one

---

[26]A captive insurance company is a type of self-insurance whereby a insurance company insures all or part of the risks of its parent. This company is created when a business or group of businesses form a corporation to insure or reinsure their own risk.

larger firm continued to offer the coverage, they all would have to continue to offer the coverage in order to effectively compete for high, net worth client business. Other firm officials suggested that SIPA might need to be reexamined in light of the numerous changes that have occurred in securities markets since 1970. Some officials said that at a minimum, the SIPA securities limit of $500,000 should be raised to $1.5 million. Another said that it is still possible that another insurance company may decide to fill the void left by the companies exiting the business. Other industry officials said that they were still in negotiations with the remaining insurer to increase the coverage limits, which was a concern for the larger firms.

Many of the securities firms we spoke with had policies that will expire by the end of 2003. All planned to notify affected customers, but many had not developed specific time frames. Most firms said that they planned to have some type of comparable coverage, which could mitigate the importance of notifying customers. In the interim, several securities firms have asked SIA to produce information for the firms to use when talking to their customers about SIPA and the protections they have under the act. The information being developed for the securities firms is to also include information about SIPC, excess SIPC, and how securities markets work. As mentioned previously, NYSE officials said that there is no specific rule that requires securities firms to notify investors if the SIPC coverage expires without being replaced. However, they generally expect firms to notify customers under rules concerning fee disclosure requirements. Likewise, NASD officials said that it had no specific rule requirements but would generally expect firms to notify affected investors under general rules concerning just and equitable principles.

In March 2003, in response to concerns raised about excess SIPC coverage and the potential investor protection issues, SEC began its own limited review of these issues. Initially, SEC planned to collect information on the securities firms that offer the coverage, the major providers, and the nature of the coverage offered. Because most of the firms that have excess SIPC coverage are NYSE members, SEC asked NYSE to gather information about excess SIPC coverage and information about the policies. In response, NYSE compiled information on its members with excess SIPC insurance policies and their insurers. NYSE also analyzed other data and descriptive statistics such as assets protected under excess SIPC. NYSE also reviewed the coverage offered by the major insurers. Out of more than 250 NYSE members, they determined that 123 had excess SIPC insurance coverage and that most of the members were insured by one of the four

major insurance providers. However, when several underwriters decided to stop providing the coverage, SEC suspended most of its review activity and has not actively monitored the changes in the availability of the coverage or the firms' plans going forward. Given the changes occurring in this market and the potential concerns about the policies, SEC officials agreed that they should continue to monitor these ongoing developments to ensure that investors are obtaining adequate and accurate information about whether excess SIPC coverage exists and what protection it provides.

## Conclusions

SEC and SIPC have taken steps to implement all of the recommendations made in our May 2001 report. However, SEC has some additional work to do with the SROs to implement two of our recommendations. Although SEC has asked the SROs to explore actions to encourage broader dissemination of the SIPC brochure to customers and to include information on periodic statements or trade confirmations to inform investors that they should document any unauthorized trading complaints, no final actions have been taken to implement these recommendations.

We also found that SIPC has substantially revamped its brochure and Web site and continues to be committed to improving its investor education program to ensure that investors have access to information about investing and the role and function of SIPC. By doing so, SIPC has shown a commitment to making its operations more transparent. We did note, however, that SIPC's response to our recommendation about warning customers about unintentionally ratifying unauthorized trades, has not completely addressed our concern that investors have specific information about the risks of unintentionally ratifying trades when talking to brokers. In 2001, we recommended that SIPC revise its brochure to warn investors to exercise caution in discussions with firm officials. Rather than including this information in its brochure, SIPC revised its brochure to provide references or links to Web sites, such as SEC and NASD, but not to the specific investor education oriented Web pages discussing ratifying potentially unauthorized trades or fraud. We found that these broad references make it difficult or virtually impossible for investors to find the relevant information. More specific links to investor education Web pages within each Web site would mitigate this problem.

Concerning excess coverage, three of the four major insurance companies stopped underwriting excess SIPC policies in 2003 after reevaluating their potential risk exposures and product offerings. Although an excess SIPC claim has never been filed to date, insurance companies have become more

sensitive to potential risk exposures in light of their recent experience with Enron and other high profile failures. Most made business decisions to stop offering this apparently low-risk product. Many of the firms appear to have been surprised by this decision and are exploring several options, including letting the coverage expire, purchasing coverage from the remaining underwriter, or creating a captive insurance company to provide the coverage. Given the limitations and concerns we and others have raised about the protection afforded investors under excess SIPC, including limitations on scope and terms of coverage and an overall lack of information on the claims process and when claims would be paid, SEC and the SROs have vital roles to play in ensuring that existing and future disclosures concerning excess SIPC accurately reflect the level of protection afforded customers.

## Recommendations

As SIPC continues to revamp and refine its investor education program, we recommend that the Chairman, SIPC, revise SIPC's brochure to provide links to specific pages on the relevant Web sites to help investors access information about avoiding ratifying potentially unauthorized trades in discussions with firm officials and other potentially useful information about investing.

Given the concerns that we and others have raised about excess SIPC coverage, we also recommend that the Chairman SEC, in conjunction with the SROs, ensure that firms are providing investors with meaningful disclosures about the protections provided by any new or existing excess SIPC policies. Furthermore, we recommend that SEC and the SROs monitor how firms inform customers of any changes in or loss of excess SIPC protection to ensure that investors are informed of any changes in their coverage.

## Agency Comments

SEC and SIPC generally agreed with our report findings and recommendations. However, SIPC said that providing more specific linkages in its brochure would prove problematic because of the frequency in which Web sites are changed. Rather, they agreed to provide a reference in the brochure to the SIPC Web site, which will provide more specific links to the relevant portions of the sited web pages. We agree that this alternative approach would implement the intent of our recommendation to provide investors with more specific guidance about fraud and unauthorized trading.

SEC agreed that securities firms have an obligation to ensure that investors are provided accurate information about the extent of the protection afforded by excess SIPC policies and that the policies should be drafted to ensure consistency with SIPC protection as advertised. SEC officials reaffirmed their commitment to work with the SROs to ensure that excess SIPC as advertised, is consistent with the policies. Moreover, SEC agreed that investors should be properly notified of any changes in the coverage. Finally, SEC reiterates the recommendations it made to SIPC in its 2003 examination report, which as SEC describes are "important to enhance the SIPA liquidation process for the benefit of public investors."

## Objectives, Scope, and Methodology

Our objectives were to (1) discuss the status of the recommendations that we made to SEC in our 2001 report, (2) discuss the status of the recommendations that we made to SIPC in our 2001 report, and (3) discuss the issues surrounding excess SIPC coverage. Finally, SEC reiterates the recommendations made to SIPC in its 2003 examination report, which the letter describes as "important to enhance the SIPA liquidation process for the benefit of public investors."

To meet the first two objectives, we interviewed staff from SEC's Market Regulation, OGC, OCIE, and the Division of Enforcement as well as SIPC officials to determine the status of the recommendations that we made in our 2001 report. We also reviewed a variety of SEC and SIPC informational sources, such as SIPC's brochure and SEC's and SIPC's Web sites, to determine what SEC and SIPC disclosed to investors regarding SIPC's policies and practices. We also reviewed the Web sites of the sources provided by SIPC, such as SIA, NASD, the National Fraud Information Center, Investor Protection Trust, Alliance for Investor Education, and the North American Securities Administrators Association.

To address the third objective—to discuss the issues surrounding excess SIPC coverage—we interviewed agency officials, regulators, SROs, and trade associations to determine what role, if any, they play in monitoring excess SIPC. We also interviewed representatives or brokers of the four major underwriters of excess SIPC policies to obtain information about the coverage, their claim history, and their rationale for discontinuing the excess SIPC product. In addition, we interviewed six securities firms that had excess SIPC policies to (1) obtain their views on the scope of coverage, (2) determine what they were told about the excess SIPC product being withdrawn, and (3) to identify what they planned to do about replacing the coverage going forward. We also interviewed two SIPC trustees who had

liquidated firms that had excess SIPC policies to obtain their views and opinions about the coverage. We also met with attorneys knowledgeable about SIPC and excess SIPC policies and coverage to obtain their views and perspectives on excess SIPC issues. Moreover, we also reviewed sample policies from the four major excess SIPC providers to determine the differences and similarities among the policies as well as their consistency with SIPC's coverage. We also reviewed a random sample of clearing and introducing firms' Web sites to determine if they advertised excess SIPC protection on their Web sites and the nature of the protection.

We conducted our work in New York, NY, and Washington, D.C., from October 2002 through July 2003 in accordance with generally accepted government auditing standards.

As agreed with your office, we plan no further distribution of this report until 30 days from its issuance date unless you publicly release its contents sooner. At that time, we will send copies of this report to the Chairman, House Committee on Energy and Commerce; the Chairman, House Committee on Financial Services; and the Chairman, Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, House Committee on Financial Services. We will also send copies to the Chairman of SEC and the Chairman of SIPC and will make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff have any questons about this report, please contact Orice Williams or me at (202) 512-8678. Other GAO contacts and staff acknowledgments are listed in appendix III.

Richard Hillman, Director
Financial Markets and Community Investment

Appendix I

# Comments from the U.S. Securities and Exchange Commission



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

DIVISION OF
MARKET REGULATION

July 8, 2003

Mr. Richard Hillman
Director, Financial Markets and
        Community Investment
General Accounting Office
Washington, DC 20548

Dear Mr. Hillman:

Thank you for the opportunity to comment on the General Accounting Office's ("GAO") draft report entitled <u>Update to Matters Related to the Securities Investor Protection Corporation</u> (the "Report").

The Report assesses, among other things, the progress of the Securities and Exchange Commission (the "Commission") in implementing the seven recommendations that the GAO made in its report entitled <u>Securities Investor Protection: Steps Needed to Better Disclose SIPC Policies to Investors</u>, dated May 2001 (the "May 2001 Report"). Those recommendations related to changes in the Commission's oversight of the Securities Investor Protection Corporation ("SIPC") in an effort to aid investor protection.

The Commission staff shares the Report's conclusion that it must continue to work with self-regulatory organizations ("SROs") on two of the May 2001 Report's recommendations. Specifically, the Commission staff will continue to work with the SROs on the GAO's recommendation that broker-dealers disseminate to new customers SIPC's brochure on the scope of coverage of the Securities Investor Protection Act of 1970 ("SIPA"). Likewise, we will continue to work with SROs to help ensure that broker-dealers include information in customer statements or trade confirmations recommending that customers document any complaint of unauthorized trading in writing.

The Report also examines excess SIPC coverage that some broker-dealers purchase from private insurers. According to the GAO, three of the four major insurers who provide excess SIPC coverage to broker-dealers will not renew existing policies, and will not write new policies, after 2003. The GAO recommends that the Commission and the SROs monitor how firms inform customers about any changes in, or loss of, excess SIPC coverage. Furthermore, the GAO recommends that the Commission, in conjunction with the SROs, help ensure that firms provide investors with meaningful disclosure about protection that any existing or new excess SIPC policies provide. As the Commission

**Appendix I
Comments from the U.S. Securities and
Exchange Commission**

Mr. Richard Hillman
July 8, 2003
Page 2

staff previously agreed, it will continue to monitor ongoing developments related to excess SIPC coverage policies to help ensure that investors obtain adequate and accurate information about whether such coverage will continue and the scope of coverage available under any policies provided.

The Report also summarizes Commission staff's findings and recommendations from a recent inspection of SIPC. In our inspection report, Commission staff recommended, among other issues, that SIPC improve its controls for reviewing and assessing fee requests by trustees and counsel administering SIPA liquidations to ensure that fees paid to trustees and counsel are reasonable. Commission staff also recommended that SIPC, to promote consistency in claim determinations in different liquidations, develop written guidance to help trustees and SIPC personnel determine whether claimants have established valid unauthorized trading claims. In addition, we recommended that SIPC continue to review its publicly-disseminated information describing SIPC to ensure that investors are not confused about the extent of SIPC coverage. We believe these recommendations are important to enhance the SIPA liquidation process for the benefit of public investors.

Thank you again for this opportunity to provide comments to the GAO as it prepares its final draft of the Report.

Sincerely,

Annette L. Nazareth
Director

Appendix II

# Comments from the Securities Investor Protection Corporation



**SECURITIES INVESTOR PROTECTION CORPORATION**
805 FIFTEENTH STREET, N. W., SUITE 800
WASHINGTON, D. C. 20005-2215
(202) 371-8300    FAX (202) 371-6728
WWW.SIPC.ORG

June 27, 2003

<u>HAND DELIVER</u>

Ms. Orice Williams
Assistant Director
Financial Markets and Community Investment
United States General Accounting Office
441 G Street, N.W.
Washington, D.C. 20548

Dear Ms. Williams:

This letter is in response to the draft report entitled "Securities Investor Protection: Update on Matters Related to the Securities Investor Protection Corporation." (GAO-03-811).

We appreciate your acknowledgment (report page 33) "that SIPC has substantially revamped and continues to be committed to improving its investor education program to ensure that investors have access to information about investing and the role and function of SIPC."[1] Likewise, you have recognized that "SIPC has shown a commitment to making its operations more transparent." You have recommended that SIPC revise its "brochure to provide links to specific pages on the relevant Web sites to help investors access information about avoiding ratifying potentially unauthorized trades in discussions with firm officials and other potentially useful information about investing." Report page 34. We believe that revising our brochure to add such links would result in tens of thousands of copies of the brochure becoming obsolete as the various specific web pages are changed, a factor SIPC cannot control. We believe that the

---

[1] SIPC will not comment on those portions of the report that deal with the Securities and Exchange Commission or what is referred to as "excess SIPC insurance."

Ms. Orice Williams
Page 2
June 27, 2003

goals of your recommendation can be achieved by adding more specific links to SIPC's web site so as to make it easier for customers to find discussions concerning unauthorized trades or other investment fraud. At the same time we will modify the brochure to tell customers that they can utilize our web site to find specific discussions of investment fraud. SIPC will then be in a position to periodically review the links to specific pages, and update our web site accordingly.

Very truly yours,

Michael E. Don
President

MED:ved

Appendix III

# GAO Contacts and Staff Acknowledgments

| | |
|---|---|
| **GAO Contacts** | Richard J. Hillman (202) 512-8678<br>Orice M. Williams (202) 512-8678 |
| **Acknowledgments** | In addition to those individuals named above, Amy Bevan, Emily Chalmers, Carl Ramirez, La Sonya Roberts, and Paul Thompson made key contributions to this report. |

## GAO's Mission

The General Accounting Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through the Internet. GAO's Web site (www.gao.gov) contains abstracts and full-text files of current reports and testimony and an expanding archive of older products. The Web site features a search engine to help you locate documents using key words and phrases. You can print these documents in their entirety, including charts and other graphics.

Each day, GAO issues a list of newly released reports, testimony, and correspondence. GAO posts this list, known as "Today's Reports," on its Web site daily. The list contains links to the full-text document files. To have GAO e-mail this list to you every afternoon, go to www.gao.gov and select "Subscribe to e-mail alerts" under the "Order GAO Products" heading.

## Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. General Accounting Office
441 G Street NW, Room LM
Washington, D.C. 20548

To order by Phone:  Voice:  (202) 512-6000
                    TDD:    (202) 512-2537
                    Fax:    (202) 512-6061

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

## Public Affairs

Jeff Nelligan, Managing Director, NelliganJ@gao.gov (202) 512-4800
U.S. General Accounting Office, 441 G Street NW, Room 7149
Washington, D.C. 20548



**PRINTED ON RECYCLED PAPER**

**United States**
**General Accounting Office**
**Washington, D.C. 20548-0001**

**Official Business**
**Penalty for Private Use $300**

**Address Service Requested**

**Presorted Standard**
**Postage & Fees Paid**
**GAO**
**Permit No. GI00**

