# EXHIBIT FF



**United States General Accounting Office**
Washington, DC 20548

July 9, 2004

The Honorable John D. Dingell
Ranking Minority Member
Committee on Energy and Commerce
House of Representatives

The Honorable Barney Frank
Ranking Minority Member
Committee on Financial Services
House of Representatives

The Honorable Paul E. Kanjorski
Ranking Minority Member
Subcommittee on Capital Markets,
  Insurance and Government Sponsored Enterprises
Committee on Financial Services
House of Representatives

Subject: *Follow-Up on GAO Recommendations Concerning the Securities Investor Protection Corporation*

The Securities Investor Protection Act of 1970 (SIPA), which established the Securities Investor Protection Corporation (SIPC) to provide certain financial protections to the customers of insolvent securities firms, gave the Securities and Exchange Commission (SEC) responsibility to oversee SIPC. Our May 2001 report *Securities Investor Protection: Steps Needed to Better Disclose SIPC Policies to Investors* stated that both SIPC and SEC could better disclose information on SIPC's policies, practices, and coverage to investors.[1] In July 2003 we reported that SEC had taken steps to improve its oversight of SIPC and that both SEC and SIPC had enhanced their efforts to educate investors but additional steps were needed.[2] In that report, we

- noted that both entities could still do more to disseminate information to investors about SIPC and how to avoid investment fraud;

---

[1] U.S. General Accounting Office, *Securities Investor Protection: Steps Needed to Better Disclose SIPC Policies to Investors*, GAO-01-653 (Washington, D.C.: May 25, 2001).
[2] U.S. General Accounting Office, *Securities Investor Protection: Update on Matters Related to the Securities Investor Protection Corporation*, GAO-03-811 (Washington, D.C.: July 11, 2003).

**GAO-04-848R Follow-Up on SIPC**

- summarized a 2003 SEC examination report of SIPC that recommended, among other things, that SIPC improve its controls over trustee fees and establish guidance to determine the validity of unauthorized trading claims;[3]

- found that three of the four major insurance companies that offered excess SIPC insurance—private insurance that securities firms can purchase to cover claims that are in excess of the $500,000 (which includes $100,000 cash) limits set by SIPA—had stopped underwriting such policies; and

- found that disclosures were lacking concerning the scope and terms of excess SIPC coverage and the claims process.

This letter responds to your August 11, 2003, request that we report on the status of our recommendations relating to SEC's oversight of SIPC and investor education. As requested, this letter also includes information on SIPC's progress in implementing SEC's recommendations from its January 2003 examination of SIPC and the status of excess SIPC coverage. Specifically, our objectives were to (1) determine the status of our recommendations to SEC and SIPC from our two previous reports on SIPC, (2) review recent actions SIPC has taken to address recommendations from the 2003 SEC examination report, and (3) determine the status of excess SIPC coverage after three U.S. insurers ceased offering the product.

To determine the status of our recommendations to SEC and SIPC, we interviewed officials from SEC, SIPC, the New York Stock Exchange (NYSE), and the National Association of Securities Dealers (NASD) and reviewed sections of SIPC's Trustee Guide and other relevant documents. To review SIPC's progress in implementing SEC's recommendations, we interviewed representatives from SEC's Office of Compliance, Inspections, and Examinations (OCIE) and reviewed sections of SIPC's Trustee Guide regarding SIPC's policies on documentation of fees and services and record retention. To determine the status of excess SIPC coverage, we interviewed officials representing the only two insurers currently offering the product, the Customer Assets Protection Company (CAPCO), a consortium of 14 large securities firms created in response to the three insurance companies leaving the market; and Lloyd's of London. We conducted our work from April through June 2004 in accordance with generally accepted government auditing standards.

**Results in Brief**

SEC has implemented three of the five outstanding recommendations from our previous two reports on SIPC and is still responding to two of them, and SIPC has implemented our recommendation. First, in response to our recommendation that SEC establish a formal procedure to share information about SIPC among its various divisions and offices, SEC held a few formal meetings and subsequently determined that holding informal meetings on an as needed basis was more effective. In our discussions, SEC

---

[3]A trade is considered as unauthorized when the securities firm buys or sells securities from a customer's account without approval.

staff representing the various divisions and offices involved with SIPC issues agreed that this format allowed for the sharing of relevant information; therefore, we considered this to be an effective response to our recommendation. Second, SEC has implemented our two recommendations aimed at improving the information that securities firms provide to investors about excess SIPC protection. As recommended, SEC directed the self-regulatory organizations (SRO)—NYSE and NASD—to send notices to member firms instructing them to tell their customers about any changes in or loss of excess SIPC protection and to provide them with meaningful disclosures about the protections the policies now offer. However, SEC is still in the process of responding to our recommendations requiring (1) that clearing firms include information on account statements about documenting unauthorized trades in writing and (2) that securities firms distribute SIPC brochures to new customers. SIPC has also taken steps to implement our recommendation on improving investor awareness of SIPC and cautioning investors to avoid unintentionally ratifying an unauthorized trade. As recommended, SIPC has updated its brochure and Web site to provide links to specific Web pages to help investors access relevant information about investment fraud and other potentially useful information on investing.

SEC staff are currently following up on SEC's recommendations to SIPC contained in the SEC's examination report of SIPC dated January 2003. Although SEC staff are in the process of determining whether all of SIPC's responses to their 2003 recommendations are adequate, their preliminary findings indicate that SIPC has taken steps to improve its policies and operations. In response to SEC's recommendations, SIPC has updated its Trustee Guide to include (1) additional guidance on establishing valid unauthorized trading claims, (2) additional requirements for trustees and counsel concerning record keeping and filing of invoices for their services and expenses, and (3) a requirement governing record retention on liquidation proceedings.

Currently, only two insurers underwrite excess SIPC policies—CAPCO and Lloyd's of London. After three major domestic insurers discontinued offering excess SIPC coverage in December 2003, a consortium of 14 securities firms organized and capitalized CAPCO to offer excess SIPC coverage to customers of the securities firms. CAPCO's policy is similar to those previously offered by the domestic insurers. To help the securities firms provide meaningful disclosures on the level of coverage, CAPCO designed its Web site to include information on its excess SIPC policy, instructions on filing claims for excess coverage, a sample copy of the policy, and a sample claim form.

We provided a copy of the draft report to SEC and SIPC for comment and both SEC and SIPC generally agreed with the contents of our report.

**Background**

SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash or securities held at a failed securities firm. As required under law, SIPC either liquidates a failed securities firm itself (in cases where the liabilities are limited and there are fewer than 500 customers) or a trustee selected by SIPC and appointed by the court liquidates the securities firm. When

possible, accounts at a failed securities firm are transferred to another securities firm, and when necessary, SIPC or a trustee attempt to satisfy the "net equity" claims of customers.[4] SIPC is not intended to keep securities firms from failing or to shield investors from losses caused by changes in the market value of securities.

Customers of a failed brokerage firm will receive all securities (such as stocks and bonds) that are already registered in their name or are in the process of being registered. After this first step, the firm's remaining customer assets are then divided on a pro rata basis, with funds shared in proportion to the size of claims. If sufficient funds are not available in the firm's customer accounts to satisfy claims within these limits, the reserve funds of SIPC are used to supplement the distribution, up to a ceiling of $500,000 per customer, including a maximum of $100,000 for cash claims. For example, if only 98 percent of a liquidated firm's customer assets could be accounted for, customers would receive 98 percent each of their net equity claims. Thus, a customer with net equity of $10 million would receive 98 percent, or $9.8 million. SIPC would then use its reserve fund to purchase $200,000 in securities, assuming that the customer had a valid claim for securities, and the customer would recover the entire $10 million.

To protect customers who have claims in excess of the SIPC limit, insurers began offering excess SIPC coverage to securities firms. However, such claims above the SIPA limit have been rare. The amount of customer funds recovered determines if the investor will have a loss and whether excess SIPC coverage would be triggered. For example, if the trustee determined that 50 percent of the customer assets were missing, a customer who is owed $1 million in assets would receive a $500,000 pro rata share from the estate and an advance from SIPC at its statutory limit of $500,000. However, a customer with $5 million in net equity with the same 50 percent pro rata share would receive a pro rata share of $2.5 million from the firm's customer assets and an SIPC advance of $500,000, and would have an unsatisfied net equity claim of $2 million that could be eligible for excess SIPC coverage, if offered by the securities firm. Conversely, a customer with $5 million in assets and a pro rata share of 90 percent or higher would be made whole by SIPC.

SIPA gives SEC oversight responsibility for SIPC. SEC must approve all proposed changes to rules or bylaws and may require SIPC to adopt, amend, or repeal any of them. In addition, SIPA authorizes SEC to conduct inspections and examinations of SIPC and requires SIPC to furnish any reports and records that SEC believes fulfill the purposes of SIPA, are necessary or appropriate, or are "in the public interest." A number of the SEC's divisions and offices have various responsibilities with respect to SIPC, with the Division of Market Regulation having the primary responsibility for ensuring SIPC's compliance with SIPA.

---

[4]SIPA generally defines net equity as the value of cash or securities in a customer's account as of the filing date, less any money owed to the firm, plus any indebtedness the customer has paid back with the trustee's approval within 60 days after notice of the liquidation proceeding was published. The filing date typically is the date that SIPC applies to a federal district court for any order initiating proceedings.

**SEC and SIPC Have Taken Steps to Address Our Recommendations**

Our 2003 report on SIPC noted that SEC and SIPC had made significant progress toward addressing our concerns about SEC's oversight of SIPC and the information SEC and SIPC provided to investors about SIPC's policies and practices. However, we also found that additional work needed to be done. Since then, SEC has taken actions to address all five of the outstanding recommendations either directly or indirectly by delegating implementation to the SROs. SIPC has also responded fully to our recommendation.

<u>SEC Has Worked with the SROs to Address Our Recommendations</u>

First, we recommended in our 2001 report that SEC implement a recommendation made by the SEC's Inspector General in a 2000 review that the Division of Market Regulation, the Division of Enforcement, the Northeast Regional Office (NERO), and OCIE conduct periodic briefings to share information related to SIPC. When our 2003 report was issued, SEC officials said they had begun to hold quarterly meetings but questioned whether these meetings were useful. The SEC officials said that holding informal meetings as SIPC issues arise would be more effective. During this review, SEC officials said they have since met several times when SIPC-related issues have arisen. For example, officials representing General Counsel, Market Regulation, OCIE, and NERO have met a few times in 2004 to discuss the progress of OCIE's recent follow-up work at SIPC. In the view of the SEC officials involved, a reasonable amount of coordination on SIPC issues has occurred across SEC offices. Officials from several SEC offices, including Market Regulation, General Counsel, and NERO, agreed that in their view periodic meetings, as the need arises, provided effective oversight of SIPC. As long as all of the relevant SEC units continue to meet and share information about SIPC-related issues, this approach effectively responds to the concern our recommendation was intended to address.

Second, to ensure that investors were told about any changes in their excess SIPC coverage, in 2003 we recommended that SEC and the SROs monitor how securities firms informed customers of any changes in or loss of protection. In March 2003, SEC had begun a limited review of SIPC-related issues. However, because most of the securities firms that had excess SIPC coverage were NYSE members, SEC asked NYSE to gather information about excess SIPC coverage and information about the policies. When several underwriters decided to stop providing coverage, SEC suspended most of its review activity. Given the concerns that we and others had raised about excess SIPC coverage, in 2003 SEC agreed to work with the SROs on our recommendation. In July 2003, both NASD and NYSE instructed their member firms to provide customers with 30 days' notice before any reduction in or termination of the securities firms' excess SIPC coverage.

Next, we recommended in 2003 that SEC and the SROs ensure that securities firms offering excess SIPC coverage provide investors with meaningful disclosures about the protections the policies offer. According to SEC and CAPCO officials, in response to our findings CAPCO began including in its policies a more detailed explanation of how and when claims for excess SIPC coverage would be paid. Our review of CAPCO's Web site

revealed that it had posted a detailed description of policy coverage and a sample copy of the policy and had included procedures for filing a claim and a copy of the claim form. In addition, an NYSE official said that its examiners reviewed a member firm's Web site during an examination of the securities firm to ensure that the Web site contained meaningful disclosures about excess SIPC protection.

Fourth, we recommended in 2001 that SEC, in conjunction with the SROs, establish a uniform disclosure rule requiring clearing securities firms to put a standard statement about documenting unauthorized trading claims on their trade confirmations, other account statements, or both. According to SEC officials, both NASD and NYSE are supportive of this recommendation and will implement it through rule making. As of June 25, 2004, according to an SEC official, NASD had begun to draft the rule but had not submitted the draft rule to SEC.

Lastly, we recommended in 2001 that SEC require SIPC member securities firms to provide the SIPC brochure to their customers when they open an account and encourage firms to distribute the brochure to existing customers more widely. This recommendation was an additional step aimed at educating and better informing customers about how to protect their investments and the extent of SIPC coverage. The updated SIPC informational brochure, called *How SIPC Protects You*, provides useful information about SIPC and its coverage.[5] However, SIPC bylaws and SEC rules do not require SIPC members to distribute the brochure to their customers; only SEC or the SROs can institute such a requirement. SEC included this recommendation in its April 15, 2003, letter about SIPC issues to NYSE and NASD and asked them to explore how it could be implemented through SRO rule making and notices to members. According to SEC and SRO officials, the SROs will not be fully implementing the recommendation because, among other things, they are concerned that the cost of purchasing the brochures would outweigh the benefits and have instead decided to require the securities firms to add a telephone number on the new account document that interested customers can call for information on SIPC. The SIPC brochures are available to securities firms for customer distribution, but at a cost. A SIPC official told us that SIPC prints only a small number of the brochures for responding to public requests that it receives and for the federal distribution center located in Colorado.[6] The brochures are available to the securities firms through NASD and the Securities Industry Association (SIA). SIPC sends a copy of the brochure to NASD and SIA, which are responsible for the printing and the cost of the brochures. According to an NASD official, securities firms must pay NASD $15 per 25 brochures, plus shipping costs. Similarly, SIA charges 75 cents per brochure, plus shipping costs. We continue to believe it is important for investors to be adequately informed about SIPC and its coverage and that there may be other alternatives to getting the SIPC brochure to clients. However, if the SROs decide that the costs outweigh the benefits for member firms to include the SIPC brochure with every new account package, then at a minimum the SROs may want to consider

---

[5] For a copy of SIPC's brochure, see http://www.sipc.org/how/brochure.cfm.
[6] The Pueblo Public Documents Distribution Center is a branch of the Superintendent of Documents, Government Printing Office.

encouraging securities firms to provide their customers with both SIPC's telephone number and Web site address on a new account document.

SIPC Has Taken Steps to Improve Investor Education

In our 2003 report, we made one recommendation to SIPC to take an additional step to ensure that investors had access to information and guidance that would help them protect themselves against fraud and unauthorized trading. Specifically, we recommended that SIPC revise its brochure to provide links to informative pages on relevant Web sites. In responding to our recommendation, SIPC provided a reference in its brochure to the SIPC Web site, which has been updated to provide links to the Web pages it cites. This approach addresses the intent of our recommendation.

**SIPC Has Taken Steps to Address SEC's 2003 Recommendations**

In January 2003, SEC completed an examination assessing SIPC's policies and procedures for liquidating failed securities firms. The examination identified several areas that needed improving and made recommendations to that effort. As of July 2004, SEC staff were following up with SIPC to determine whether the actions it had taken adequately addressed the recommendations. SEC representatives said their preliminary findings indicated that SIPC had begun to take steps to address SEC's 2003 recommendations.

- SEC found that SIPC should continue to review the information it provides to investors about its policies and practices. For example, SEC found that some statements in SIPC's brochure and on its Web site might overstate the extent of SIPC coverage and mislead investors. In response, SIPC has included in its new brochure statements clarifying the extent of SIPC coverage. Further, SIPC has undertaken other investor education initiatives to inform the public of its mission and the protection offered under SIPA and to explain SIPC's role in protecting customers. These initiatives include, among others, radio and television public service announcements to publicize the extent of protection and a training program on SIPC and proceedings for a securities firm liquidation that was presented to the District of Columbia Bar Association.

- SEC found that there was insufficient guidance for SIPC personnel and trustees to follow when determining whether claimants had established valid unauthorized trading claims, one of the principle sources of investor complaints. As recommended, SIPC adopted written guidance in its Trustee Guide for reviewing unauthorized trading claims.

- SEC also found that SIPC had inadequate controls over the fees and expenses awarded to trustees and their counsel. To address SEC's concern, SIPC is in the process of enhancing its controls for reviewing and assessing fees. First, it has updated the Trustee Guide to require trustees and counsel in SIPC cases to submit quarterly invoices and arrange billing records into project categories. In addition, SIPC has implemented procedures requiring SIPC personnel to document discussions

with trustees and counsel regarding fee applications and to note any differences in the amounts requested and the amounts recommended for payment.

- In addition, SEC found that SIPC lacked a retention policy for records generated in liquidations with an outside trustee. In response to SEC's recommendation, SIPC updated its Trustee Guide to include a requirement that outside trustees retain records of liquidation proceedings for 5 years from the date the proceeding closes.

**Two Insurers Underwrite Excess SIPC Policies**

In 2003, we reported that three of the four major insurance companies that underwrite excess SIPC policies would stop offering this product that year. Although no claims had been paid since the coverage was first offered in the 1970s and many had viewed the coverage as a marketing or advertising cost, some securities firms felt that excess SIPC coverage policies increased investor confidence in the securities firms. As a result of the three insurers leaving the market, many of the securities firms that offered excess SIPC coverage began exploring several options, including letting the coverage expire, purchasing coverage from the remaining underwriter—Lloyd's of London—or creating a "captive" insurance company to provide the coverage.[7] Since that time, several large clearing and carrying securities firms that are NASD members have purchased excess SIPC coverage from Lloyd's. In addition, in December 2003 a consortium of 14 NYSE member firms organized and capitalized CAPCO, an insurance company licensed in the state of New York. According to CAPCO's December 2003 press release, the excess SIPC coverage offered by CAPCO will be similar to the excess SIPC coverage previously available from the domestic insurers.

The policies underwritten by the two insurers differ in two areas. In addition to a cap on the amount of coverage per customer, one insurer capped the overall exposure—one policy we reviewed established an aggregate cap of $250 million—regardless of the total amount of customer claims. The other insurer did not set any specific dollar limits. The two insurers also had different customer bases that would be eligible for protection. Like SIPC coverage, which excludes certain customers such as officers and directors of the failed securities firm, one insurer also excluded these customers. Conversely, the other insurer extended coverage to officers and directors of the failed securities firm as long as they were not involved with any fraud that had contributed to the securities firm's demise.

**Agency Comments**

We provided a copy of the draft report to SEC and SIPC for comment. SEC and SIPC generally agreed with the contents of our report and provided us with written comments, which are reprinted in enclosures I and II, respectively. In addition, both SEC and SIPC

---

[7] A captive insurance company is a type of self-insurance whereby an insurance company insures all or part of the risks of its parent. This company is created when a business or a group of businesses form a corporation to insure or reinsure their own risk.

provided us with technical comments, which we incorporated into this report where appropriate.

As agreed with your offices, unless you publicly release its contents earlier, we plan no further distribution of this report until 30 days from its issue date. At that time, we will send copies of this report to the Chairman, House Committee on Energy and Commerce; the Chairman, House Committee on Financial Services; and the Chairman, Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, House Committee on Financial Services. We will also send copies to the Chairman of SEC and the Chairman of SIPC and make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

Please call me or Karen Tremba, Assistant Director, at (202) 512-8678 if you or your staff have any questions concerning this report. Nancy Eibeck also contributed to this report.

Orice M. Williams
Acting Director, Financial Markets
  and Community Investment

Enclosures

Enclosure I

## Comments from the Securities and Exchange Commission



**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549**

DIVISION OF
MARKET REGULATION

July 7, 2004

Orice M. Williams
Acting Director, Financial Markets
 and Community Investment
General Accounting Office
Washington, DC 20548

Dear Ms. Williams:

    Thank you for the opportunity to comment on the General Accounting Office's draft report entitled *Follow-Up on GAO Recommendations Concerning the Securities Investor Protection Corporation* ("SIPC"). Subject to our technical comments provided to your staff by telephone, we generally agree with the description in the report of the SEC's actions to enhance its oversight of SIPC and to educate investors about SIPC and how to avoid investment fraud. We appreciate the efforts of your staff in responding to our comments.

Sincerely,

Annette L. Nazareth
Director

Enclosure II

## Comments from the Securities Investor Protection Corporation



**SECURITIES INVESTOR PROTECTION CORPORATION**
805 FIFTEENTH STREET, N.W., SUITE 800
WASHINGTON, D.C. 20005-2215
(202) 371-8300    FAX (202) 371-6728
WWW.SIPC.ORG

July 6, 2004

**BY MESSENGER**

Orice M. Williams
Acting Director, Financial Markets
 and Community Investment
U. S. General Accounting Office
441 G Street, N. W.
Washington, D. C. 20548

RE: Follow-Up on GAO Recommendations Concerning the
     Securities Investor Protection Corporation ("SIPC")

Dear Ms. Williams:

On behalf of SIPC's Chairman and its Board of Directors, thank you for the opportunity to comment on the draft of the follow-up on the General Accounting Office's Recommendations concerning SIPC.

SIPC is pleased to note that the GAO has concluded that SIPC has fully responded to the GAO's recommendations as contained in its July 11, 2003 report on matters related to SIPC. With respect to the recommendations of the Securities and Exchange Commission that are referenced in the follow-up, please be assured that we will continue to work with the Commission to resolve any remaining concerns that the Commission may have.

Enclosed herewith are some minor technical comments on the follow-up. We appreciate the courtesies that you and your associates have extended to SIPC. If there is any other information that we can provide, please let me know.

Very truly yours,

Stephen P. Harbeck
President

SPH: pd
Enc.

(250194)

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The General Accounting Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. General Accounting Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice: (202) 512-6000<br>　　　　　　　　　　TDD: (202) 512-2537<br>　　　　　　　　　　Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. General Accounting Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Jeff Nelligan, Managing Director, NelliganJ@gao.gov (202) 512-4800<br>U.S. General Accounting Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |


PRINTED ON RECYCLED PAPER