UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- )
SECURITIES INVESTOR PROTECTION )    Adv. Pro. No. 08-01789 (BRL)
CORPORATION, )
                             )
             Plaintiff, )    SIPA Liquidation
                             )
          v. )    (Substantively Consolidated)
                             )
BERNARD L. MADOFF INVESTMENT )
SECURITIES, LLC, )
                             )
            Defendant. )
_____ )
In re: )
                             )
BERNARD L. MADOFF, )
                             )
          Debtor. )
_____ )

## SAMDIA FAMILY, LP'S OBJECTION TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM ON BLMIS ACCOUNT NO. 1ZB412 DESIGNATED AS CLAIM NO. 001490

Joel L. Herz
Law Offices of Joel L. Herz
3573 E. Sunrise Drive, Suite 215
Tucson, AZ 85718
(520)529-8080 – telephone
(520)529-8077 – facsimile
joel@joelherz.com

Arnold Herz
14 Vanderventer Ave., Ste. 255
Port Washington, NY 11050
(516) 767-8790 – telephone
(516) 706-1416 – facsimile
arnie@arnieherz.com

Attorneys for Samdia Family, LP

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS ...........................................................................................................2

          A.  THE MESSINGS ARE UNSOPHISTICATED PEOPLE WHO HAVE BEEN
              DEVASTATED AND RUINED BY MADOFF ...........................................................2

          B.  THE MESSINGS HAD NO INKLING OF ANY WRONGDOING BY
              MADOFF ......................................................................................................................4

          C.  THE TRUSTEE HAS NOT CLAIMED THAT THE MESSINGS OR
              SAMDIA HAD ANY INKLING OF ANY WRONGDOING BY
              MADOFF AND SHOULD BE BOUND BY THE MESSINGS'
              LEGITIMATE EXPECTATIONS STAEMENT .........................................................5

ARGUMENT

I.      THE TRUSTEE HAS ATTEMPTED TO RE-WRITE CLEAR CONGRES-
           SIONAL LANGUAGE, AND UNEQUIVOCAL SEC REGULATIONS, BY
           COMBINING THE MESSINGS' TENANT IN COMMON ACCOUNT,
           WITH THE SAMDIA PARTERSHIP ACCOUNT FOR PURPOSES OF
           DETERMINING "NET EQUITY" UNDER SIPA .............................................................6

II.     THE TRUSTEE HAS ATTEMPTED TO "CLAW BACK" MONEY FROM
           THE MESSINGS TRANSFERRED TO SAMDIA IN NOVEMBER OF 2001,
           MORE THAN SEVEN YEARS AGO, IN VIOLATION OF ANY
           THEORETICAL CLAWBACK PERIOD.......................................................................11

III.    EVEN IF THIS COURT ADOPTS THE ANALYSIS USED IN *S.E.C*
           *V. BYERS*, 637 F.SUPP.2D 166 (S.D.N.Y. 2009), SAMDIA IS ENTITLED TO
           $500,000 FROM SIPA ...................................................................................................13

IV.    THE TRUSTEE'S DETERMINATION IGNORES THE FACT THAT
           THE MESSINGS HAVE PAID MORE THAN $2.16 MILLION IN
           TAXES TO THE UNITED STATES AND THE STATE OF NEW
           YORK ON FICTITIOUS INCOME.  NEITHER SAMDIA NOR
           THE MESSINGS ARE NET WINNERS .......................................................................15

V.     THE TRUSTEE'S DETERMINATION ENTIRELY FAILS TO
           PROVIDE THE MESSINGS OR SAMDIA WITH ANY RETURN
           ON THEIR MONEY OVER THE LAST 16 YEARS .......................................................17

VI.    SIPA REQUIRES THE SIPC TO PAY SAMDIA BASED UPON THE
       SAMDIA ACCOUNT'S LAST STATEMENT ................................................................. 18

VII.   THE SIPC IS DESTROYING THE MESSINGS' REMAINING DAYS,
       AND THE MESSINGS AND SAMDIA SHOULD BE PROVIDED
       WITH EXPEDITED RELIEF ............................................................................................ 24

CONCLUSION ............................................................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

*Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791 (6th Cir. 1995)............................................. 24

*Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008). ......................................................................... 15

*In re New Times Securities Services, Inc.*, 371 F.3d 68 (2nd Cir. 2004)............................... passim

*In re New Times Securities Services, Inc.*, 463 F.3d 125 (2nd Cir. 2006) ............................. 19, 20

*McNellis v. Raymond*, 420 F.2d 51 (2nd Cir. 1970) ..................................................................... 12

*S.E.C. v. Byers*, 637 F.Supp.2d 166 (S.D.NY. 2009).............................................................. 13, 15

*Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443 (2007)................................................ 17

*United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d
290 (1989)...................................................................................................................................... 8

*Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827 (6th Cir. Aug. 8, 2007) ......... 15

### Statutes

15 U.S.C. § 78............................................................................................... 7, 8, 17, 18, 23

17 CFR § 300.................................................................................................................... 10

N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501........................................................................ 17

Securities Investor Protection Act of 1970, as amended ....................................................... passim

### Other Sources

D. 922 Cong. Rec. H. 36326 (daily ed. Nov. 1, 1977) ................................................................24

H.R. Rep. No. 95-746  .............................................................................................................23, 24

H.R. Rep. No. 91-1613(1970).................................................................................................... 23

Rev. Proc. 2009-20 .................................................................................................................... 16

## PRELIMINARY STATEMENT

The Securities Investor Protection Corporation ("SIPC") should not be allowed to delay its obligations to Samdia Family, LP ("Samdia"), and its partners Samuel and Diana Messing (the "Messings") any longer. Indeed, what the SIPC and Irving Pickard, as the Trustee for Bernard L. Madoff Investment Securities, LLC ("the Trustee"), are attempting to do to Samdia and the Messings, has never been approved by any Court. What the Trustee and the SIPC are attempting to do to Samdia and the Messings is directly contradicted by the Securities Investor Protection Act ("SIPA"). The Trustee is attempting to aggregate two separate entity accounts, one held by Samdia, a distinct partnership, and one held by the Messings as tenants in common, to deny them relief under SIPA, while Congress explicitly said the SIPC could not do so. The Trustee is attempting to treat money rolled over from one account to another, when even the case most favorable to the Trustee has stated that doing so would be "inequitable" and refused to allow such to happen. The Trustee is attempting to refuse credit to the Messings and Samdia for more than $1.4 million dollars in taxes paid more than five years ago, for which the Messings and Samdia now have no recourse. The Trustee is refusing to credit the Messings or Samdia with any return on the millions of dollars that was invested for more than 16 years. The Trustee's position with regard to Samdia and the Messings is so extreme, and so inconsistent with SIPA, that Samdia and the Messings should not have to wait any longer. Regardless of how this Court decides the "net equity" issues, this Court should immediately require the Trustee to pay Samdia $500,000 under SIPA, plus interest. As further set forth herein, this Court should also allow the Samdia Account claim in its entirety based on the very clear direction of Congress as set forth in SIPA.

1

## STATEMENT OF FACTS[1]

### A.    THE MESSINGS ARE UNSOPHISTICATED PEOPLE WHO HAVE BEEN DEVASTATED AND RUINED BY MADOFF.

Beginning in 1993, the Messings invested their **ENTIRE** life savings in Bernard L. Madoff Investment Securities, LLC ("Madoff"). In 1993, Samuel Messing opened with Madoff, an individual account which he shortly thereafter converted to a tenant in common account with his wife, Diana (Madoff Account number 1ZB13730)("the Messings' Tenant In Common Account"). The tax identification number for the Messings' Tenant In Common Account was Samuel Messing's social security number, which will be provided to the Court upon request. Deposits in the Messings' Tenant In Common Account totaled more than $2.2 million.

In November 2001, the Messings rolled over from the Messings' Tenant In Common Account $3,879,902.26 to Samdia, which is an entirely separate entity and a family limited partnership. Samuel Messing is the general partner of Samdia. Diana Messing is the limited partner.

Samdia opened an entirely new account (Madoff Account Number 1ZB412)("the Samdia Account") with Madoff with a separate tax identification number. The tax identification number for the Samdia Account is 22-3837521. As of November 30, 2008, the Samdia Account statement showed a balance of **$5,153,534.30**. A true and correct copy of the November 30, 2008 Samdia Account Statement is attached hereto as Exhibit C.

Samuel Messing also had his retirement account with Madoff (Madoff Account Number 1ZR189)("the Samuel Messing Retirement Account") in which he placed all of his retirement money. Samuel Messing deposited millions of dollars in the retirement account. As of November 30, 2008, the Samuel Messing Retirement Account statement showed a balance of

---

[1] Samdia's Objection is supported by the Declaration of Samuel Messing attached here to as Exhibit A, and the Declaration of Diana Messing, attached hereto as Exhibit B.

2

**$13,397,204.00**. The total balance on the two accounts showed **$18,550,738.30** as of November 30, 2008.

Yet, to date, Samuel Messing, Diana Messing, Samdia and the Samuel Messing Retirement Account have not received a single penny from the SIPC or the Trustee.

The Messings have now been completely wiped out. They have now been forced to sell the home in which they raised their children and where they lived for over 40 years.

Ironically, the Trustee is calling the Messings "net winners" from Madoff. The Trustee is claiming that Samdia is entitled to nothing from the SIPC. Yet, when the Court factors in the amount that the Messings paid to the United States and the State of New York in taxes on "fictitious income"[2] from Madoff, the Messings are not "net winners" in the remotest way. Assuming no return on their money of any kind for over 16 years, after factoring in taxes paid on fictitious income, the Messings are "net losers" and not "net winners" by millions of dollars.

None of the facts that might apply to others to allow the SIPC and the Trustee to treat the Messings so poorly, apply here. Neither Samuel nor Diana Messing are sophisticated investors. Samuel Messing, the son of Russian immigrants, is a nearly 78 year-old doctor. He held several part-time jobs throughout college and medical school to pay for his education. He has no investment training or experience of any kind, and dedicated his life to treating those who were sick or ill.

Diana Messing was a housewife who raised the Messings' three children, and cared for her husband and family. She too, has no investment training of any kind. In February of 2008, shortly before she found out about the Madoff fraud, Diana Messing was diagnosed with Stage II breast cancer, and has recently undergone a double-mastectomy and chemotherapy. She is

---

[2]  The Trustee has in no way proved that any income of Samdia was fictitious and Samdia does not waive its rights on this issue.

attempting to recover from her cancer. On the heels of her cancer, and the failure of the SIPC to honor its commitment to promptly pay any money on the Samdia Account or the Samuel Messing IRA Account, the Messings were forced to sell the home that they lived in for over 40 years and where they raised their children.

**B.      THE MESSINGS HAD NO INKLING OF ANY WRONGDOING BY MADOFF.**

When investing with Madoff in 1993 and thereafter, the Messings were not looking for 20-30% returns that other funds were achieving, but rather a **SAFE** place to keep their savings and obtain around a 10% return. They understood Madoff to be such a safe place, and even encouraged their son Andrew to place his savings with Madoff, which he did. The Messings were completely and entirely unaware of any wrongdoing being committed by Madoff. Nor should they have been. The Messings were not part of any "feeder-funds" that received extraordinary returns from Madoff. Nor were the Messings in any way involved in "hedge-funds" who had more sophisticated due diligence know how. The Messings received none of the warnings that the United States Securities and Exchange Commission ("SEC") received, and ignored. At all times, the Messings believed that the more than $5 million balance on their Samdia Account November 2008 Statement from Madoff was real and legitimate. It showed real, Fortune 500 stocks, such as Wells Fargo, Wal-Mart, Hewlett Packard, IBM and Exxon, to name just a few.

Indeed, beginning in 1993, the Messings received monthly statements from Madoff every single month showing the account balance that they had, listing the securities that they owned (which always contained well known and well recognized companies like those listed above), and showed a rate of return that generally **UNDERPERFORMED** the stock market.

4

Beginning in November 2001, Samdia received monthly statements from Madoff in the same manner. The Messings and Samdia had a truly legitimate expectation that the statements that they received were legitimate. Had they had any inkling of fraud, they would have never invested every penny of their savings with Madoff, and talked their son into doing so too. They would have made significant withdrawals from their Madoff accounts. They did not. Indeed, in 2007, they invested another $300,000 in Madoff via the Samdia account. Nor was there anything extraordinary in their returns that would have alerted them to any fraud. The performance of their accounts, for most of the 16 years they had money with Madoff overall **UNDERPERFORMED** the leading stock indices and other leading funds. This was acceptable to the Messings because they understood that what Madoff was providing them was a safer investment that did not contain the same amount of risk as other funds and indices.

C.      **THE TRUSTEE HAS NOT CLAIMED THAT THE MESSINGS OR SAMDIA HAD ANY INKLING OF ANY WRONGDOING BY MADOFF AND SHOULD BE BOUND BY THE MESSINGS' LEGITIMATE EXPECTATIONS.**

In his objection to the Samdia claim, the Trustee has not remotely claimed that the Messings were sophisticated investors, had knowledge of the Madoff fraud, or that they should have known of the Madoff fraud. For Samdia, there should be no further inquiry. As discussed in more detail below, the extent of the relief owed to the Messings and Samdia should be based on their legitimate expectations on the filing date.

At the ages of 77 and 70, Samuel and Diana Messing, who have been married for more than 50 years, had the legitimate expectation that they could live out their remaining days in some level of comfort. They had a legitimate expectation that the over $5 million in the Samdia Account and the other $13 million in the Samuel Messing Retirement Account, which generally underperformed the stock market, was real. Samdia could legitimately expect that if something

5

went wrong with Madoff for any reason, the government, via the SIPC, would step in and provide Samdia with $500,000 on the Samdia Account to allow them to not have to sell their home. As discussed below, the Court should not allow the SIPC or the Trustee to delay any further and should order that $500,000 be paid to Samdia immediately.

## ARGUMENT

### POINT I

#### THE TRUSTEE HAS ATTEMPTED TO RE-WRITE CLEAR CONGRESSIONAL LANGUAGE, AND UNEQUIVOCAL SEC REGULATIONS, BY COMBINING THE MESSINGS' TENANT IN COMMON ACCOUNT, WITH THE SAMDIA PARTERSHIP ACCOUNT FOR PURPOSES OF DETERMINING "NET EQUITY" UNDER SIPA.

As set forth in his October 19, 2009 "Notice of Determination of Claim," in denying the Samdia claim, the Trustee boldly admits that he is treating the Messings' Tenant In Common Account as the same customer as the Samdia Account, even though Congress has told him he cannot do so. More specifically, the Trustee states in his October 19, 2009 Notice of Determination of Claim at page 2, paragraph 2, as follows:

> Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

*See* October 19, 2009 Notice of Determination of Claim at page 2, a copy of which is attached hereto as Exhibit E.

Thereafter, when the Court examines the "Table 1" attached to the Trustee October 19, 2009 "Notice of Determination of Claim," the Trustee noted that $3,883,484.20 was transferred

6

from the Messings' Tenant In Common Account into the Samdia Account. However, the

Trustee reduced that amount in the Samdia Account by $2,508,484.20 to $1,375,000.00. The

Trustee then claimed that because of this $2,508,484.20 reduction, the Samdia Account had a

$900,000 net withdrawal. Absent the $2,508,484.20 reduction, the Samdia Account would have

a positive balance of $1,608,484.20, and Samdia would clearly be entitled to $500,000 in

benefits from the SIPC. The only way the Trustee created the $2,508,484.20 reduction was to

treat the Messings' Tenant In Common Account into the Samdia Account as a single "customer."

However, as set forth in more detail below, Congress has explicitly said this cannot happen.

In defining the very term at issue "net equity" in the SIPA, Congress specifically

discussed how accounts in separate entities such as limited partnerships should be treated, as

follows:

> (11) **Net equity**
>
> The term "net equity" means the dollar amount of the account or accounts of a
> customer, to be determined by—
>
> (A) calculating the sum which would have been owed by the debtor to such
> customer if the debtor had liquidated, by sale or purchase on the filing date, all
> securities positions of such customer (other than customer name securities
> reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date; plus
>
> (C) any payment by such customer of such indebtedness to the debtor which is
> made with the approval of the trustee and within such period as the trustee may
> determine (but in no event more than sixty days after the publication of notice
> under section 78fff-2(a) of this title).
>
> **In determining net equity under this paragraph, accounts held by a customer
> in separate capacities shall be deemed to be accounts of separate customers.**

15 U.S.C. § 78lll(11)(emphasis and underlying added).

7

The above emphasized and highlighted language cannot be emphasized enough. It demarcates the clear choice of Congress in enacting SIPA that an account held in a family limited partnership, such as Samdia, must be treated as separated customers from a tenant in common account, such as the Messings' Tenant In Common Account. It is beyond axiomatic, and the Supreme Court has repeatedly emphasized, that statutes must be interpreted as written. *See e.g. United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989)("[W]here, as here, the statute's language is plain, 'the sole function of the court is to enforce it according to its terms'"), quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). Here, Congress has explicitly spoken that separate entity accounts cannot be aggregated for SIPA purposes.

The Trustee has not cited any authority of any kind to aggregate the Samdia Account with the Messings' Tenant In Common Account. What is more, Congress specifically prohibited the SIPC from changing any definitions contained in 15 U.S.C. § 78lll, which section includes the definition of "net equity." As stated in SIPA:

> SIPC shall have the power. . . to adopt, amend and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to. . . the definition of terms in this chapter, **other than those terms for which a definition is provided in section 78lll of this title. .**

15 U.S.C. § 78ccc(b)(4)(A)(emphasis added). Thus, under SIPA, the Trustee and the SIPC had no choice but to analyze the Samdia Account entirely separate from the Messings' Tenant In Common Account because under SIPA "<u>**[i]n determining net equity ..., accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers.**</u>"

More so, there are specific SEC published regulations that address how accounts held in separate capacities are to be treated under SIPA. More specifically, the SEC has adopted formal

8

regulations as to exactly how accounts held in separate names, such as family limited

partnerships shall be treated for purposes of SIPC insurance. Indeed, 17 CFR 300.100 provides

as follows:

TITLE 17 - COMMODITY AND SECURITIES EXCHANGES

CHAPTER II - SECURITIES AND EXCHANGE COMMISSION

PART 300 - RULES OF THE SECURITIES INVESTOR PROTECTION
CORPORATION

300.100-General.

(a) For the purpose of sections 9(a)(2) and 16(12) of the Securities Investor
Protection Act (hereinafter referred to as the Act), these rules will be applied in
determining what accounts held by a person with a member of SIPC (hereinafter
called a member) are to be deemed accounts held in a capacity other than his
individual capacity.

**(b) Accounts held by a customer in different capacities, as specified by these
rules, shall be deemed to be accounts of separate customers.**

(c) **A person as used in these rules includes,** but is not limited to, an individual,
a corporation, **a partnership,** an association, a joint stock company, a trust, an
unincorporated organization, or a government or political subdivision thereof.

(d) The burden shall be upon the customer to establish each capacity in which he
claims to hold accounts separate from his individual capacity.

17 CFR § 300.100 (emphasis added).

Moreover, the SEC regulations found at 17 CFR § 300.103 add the following clear

direction regarding partnership accounts such as the Samdia Account:

TITLE 17 - COMMODITY AND SECURITIES EXCHANGES

CHAPTER II - SECURITIES AND EXCHANGE COMMISSION

PART 300 - RULES OF THE SECURITIES INVESTOR PROTECTION
CORPORATION

300.103 - Accounts held by a corporation, partnership or unincorporated association.

A corporation, **partnership** or unincorporated association **holding an account** with a member **shall be deemed to be a separate customer distinct from the person or persons owning such** corporation or comprising such **partnership** or unincorporated association if on the filing date it existed for a purpose other than primarily to obtain or increase protection under the Act.

17 CFR § 300.103 (emphasis added).

What is more, the SEC also developed specific regulations found at 17 CFR § 300.105

for "Joint Accounts" such as the Messings' Tenant In Common Account, as follows:

TITLE 17 - COMMODITY AND SECURITIES EXCHANGES

CHAPTER II - SECURITIES AND EXCHANGE COMMISSION

PART 300 - RULES OF THE SECURITIES INVESTOR PROTECTION CORPORATION

§ 300.105 Joint Accounts.

(a) **A Joint Account shall be deemed to be a "qualifying Joint Account" if it is owned jointly**, whether by the owners thereof as joint tenants with the right of survivorship, as tenants by the entirety **or as tenants in common**, or by husband and wife as community property, but only if each co-owner possesses authority to act with respect to the entire account.

(b) Subject to paragraph (c) of this rule, each qualifying Joint Account with a member shall be deemed held by one separate customer of the member.

(c) All qualifying Joint Accounts with a member owned by the same persons shall be deemed held by the same customer so that the maximum protection afforded to such accounts in the aggregate shall be the protection afforded to one separate customer of the member.

(d) A Joint Account with a member which does not meet the requirements of paragraph (a) of this rule shall be deemed to be an individual or qualifying Joint Account of the co-owner or co-owners having the exclusive power to act with respect to it.

17 CFR § 300.105 (emphasis added).

10

As set forth above, consistent with Congressional language, the SEC has set forth specific regulations indicating that partnership accounts must be treated separately from Messings' Tenant In Common Account. Here, these regulations are binding on the SIPC and the Trustee. *See In re New Times Securities Services, Inc.*, 371 F.3d 68, 80 (2nd Cir. 2004)("New Times I") ("Ultimately, we agree with the SEC that "[w]hatever SIPC's expertise in overseeing SIPA liquidations, Congress did not intend for the Commission's interpretations of SIPA to be overruled by deference to the entity that was made subject to the Commission's oversight." Prezioso Letter at 8.") More so, in New York, a tenancy in common is not a partnership. *See* New York Partnership Law Section 11 - Rules For Determining The Existence Of A Partnership, subsection 2 ("2. Joint tenancy, **tenancy in common**, tenancy by the entireties, joint property, common property, or part ownership **does not of itself establish a partnership**, whether such co-owners do or do not share any profits made by the use of the property.")(emphasis added).

Yet, without providing any legal basis for doing so, the Trustee seeks to merge the Messings' Tenant In Common Account with the Samdia Account, and aggregate them together for purposes of determining the Samdia Account's "net equity." However, the explicit words of Congress, and the very specific regulations of the SEC, specifically prohibit the Trustee from doing so. For this reason alone, no further delay should be allowed. Samdia should be paid $500,000 under SIPA, plus interest.

## POINT II

### THE TRUSTEE HAS ATTEMPTED TO "CLAW BACK" MONEY FROM THE MESSINGS TRANSFERRED TO SAMDIA IN NOVEMBER OF 2001, MORE THAN SEVEN YEARS AGO, IN VIOLATION OF ANY THEORETICAL CLAWBACK PERIOD.

As set forth above, the Trustee's determination, in the case of Samdia, attempts to "claw back" money from Samdia based on contributions made from the Messings' Tenant In

Common Account.  As discussed above, Congress does not allow the SIPC to combine the two separate accounts for net equity analysis.  However, even if the Court rejects the Samdia position as set forth above, it still must rule in favor of Samdia, because the alleged transaction in question occurred in November of 2001 – such that any applicable "clawback" statute of limitations would have long expired.

Here, the SIPC is seeking to "claw back" money that that was transferred from the Messings' Tenant In Common Account to Samdia, claiming that $2,504,902.26 of "fictitious" income was transferred on **November 26, 2001** from the Messings' Tenant In Common Account to the Samdia Account and has "adjusted" the Samdia claim by $2,504,902.26. *See* attachment to the Trustee's October 19, 2009 Notice of Determination of Claim.  To the extent that the Trustee has any "clawback" rights against either Samdia or the Messings – he does not – such rights expired at the latest by November 25, 2007.

The longest possible "clawback" statute of limitations would be no more than six years – assuming arguendo that the Messings or Samdia participated in some fraud.  Noting the longest possible statute of limitations, the Second Circuit in *McNellis v. Raymond*, 420 F.2d 51 (2nd Cir. 1970) stated as follows:

> We agree with appellant that a six-year limitation period is the appropriate one, and that the actions tied to the usury theory should not have been dismissed. It must be remembered that the trustee in bankruptcy operates in a dual capacity. He is representative of the bankrupt and, as such, is vested with various property rights and rights of action which the bankrupt may have had. Bankruptcy Act 70(a), 11 U.S.C. 110(a). In that capacity, as successor to the bankrupt's cause of action to recover excess interest payments, the trustee's claim would be time barred. But pursuant to section 70(e) of the Act, 11 U.S.C. 110(e), and in his capacity as representative of the bankrupt's creditors, appellant also seeks to set aside payments on the loans as fraudulent conveyances under N.Y. Debtor and Creditor Law, McKinney's Consol.Laws, c. 12, 271-273, 278 (1945), and not under N.Y. General Obligations Law, McKinney's Consol.Laws, c. 24-A, 5-513. Accordingly, a six-year statute of limitations is the applicable one.

12

*McNellis v. Raymond*, 420 F.2d at 54.

Here, no claim was filed within any six year time period. Simply put, a transfer that took place seven years before the Madoff bankruptcy should not be subject to a clawback, as the Trustee and the SIPC are attempting to do. The funds that were transferred should not be adjusted to $0, but rather receive the same treatment as if they were transferred from any other brokerage account. For this reason also, no further delay should be allowed. Samdia should be paid $500,000, plus interest by the SIPC and allowed a claim in the full amount of the Samdia Account November 30, 2008 account statement which showed a balance of $5,153,534.30.

## POINT III

### EVEN IF THIS COURT ADOPTS THE ANALYSIS USED IN *S.E.C. V. BYERS*, 637 F.SUPP.2D 166 (S.D.NY. 2009), SAMDIA IS ENTITLED TO $500,000 FROM SIPA.

This Court has previously noted the opinion, *S.E.C. v. Byers*, 637 F.Supp.2d 166 (S.D.N.Y. 2009), as methodology by which "a form of the net investor method (cash in/cash out) has been considered by the District Court." *See* Footnote 18 of this Court's September 10, 2009 Opinion. Samdia submits that: 1) *S.E.C. v. Byers* is incorrectly decided; and 2) *S.E.C. v. Byers* is not applicable to the Samdia Objection because there is nothing in *S.E.C. v. Byers* which indicated that SIPC payments were at issue. However, if *S.E.C. v. Byers* is adopted by this Court, Samdia still must be provided with $500,000 in SIPC benefits.

The issue of "rollover" amounts, such as the Messing rollover from the Messings' Tenant in Common Account to the Samdia Account, was specifically addressed in *S.E.C. v. Byers*. Judge Chin unequivocally rejected the approach taken by the Trustee against Samdia and the Messings here, and made clear that people like the Messings who rolled over from one account to a separate entity account should be treated as "full cash" and that "[i]**gnoring the rolled-over**

13

**amount, as the objectors propose, would further penalize those investors who chose to roll over their investments rather than receive them in cash.** "

More specifically, Judge Chin stated as follows:

### C.   Treatment of Rolled-Over Distributions

Several objections have been raised to one aspect of the net investor method – namely, its treatment of rolled-over distributions. The objection is that giving credit to investors for distributions that they rolled over is inequitable because, in a Ponzi scheme, all distributions of "profit" are illusory. The following example illustrates the issue:

·    Investor A invests $100,000 in Wextrust and receives a $20,000 distribution in cash.   Under the Plan, her starting point for a distribution will be $80,000.

·    Investor B invests $100,000 in Wextrust and, at the urging of Wextrust employees, decides to roll over her $20,000 distribution rather than simply receive it in cash.   Her starting point for a distribution under the Plan will be $120,000.

Several of the objectors argue that this result is inequitable, because Investor B is actually out-of-pocket only $100,000, not $120,000.   The rolled-over distribution is illusory, they claim, as there were no profits.

These objections ignore two important points, however.   First, Investor B could have received the $20,000 distribution, but chose not to – often at the urging of Wextrust employees – and thus that money is properly akin to a loss.   **Second, and more important, is that ignoring the rolled-over distributions results in an inequity.**   Using the same examples above:

·    Investor A invests $100,000 in Wextrust and receives a $20,000 distribution in cash.   Her starting point for the distribution is $80,000, and thus she will receive $8,000.   That $8,000, however, is in addition to the $20,000 she has already received, and thus her total recovery from her gross amount invested is $28,000.

·    Investor B invests $100,000 in Wextrust and, at the urging of Wextrust employees, decides to roll over her $20,000 distribution rather than simply receive it in cash.   Her starting point for the distribution here will be $120,000, and thus she will receive $12,000.   That $12,000, however, is her total recovery.   She would have been better off, in the end, if she had received a distribution in cash.

14

> **Ignoring the rolled-over amount, as the objectors propose, would further penalize those investors who chose to roll over their investments rather than receive them in cash. Such a result would be inequitable.**
>
> Accordingly, the Receiver's proposal to account for rolled-over distributions is approved.

*S.E.C. v. Byers*, 637 F.Supp.2d at 182-183. (emphasis added). Here, the Messings could clearly have taken their money from the Messings' Tenant In Common Account in 2001 in cash, and not be subject to any "clawback" of any kind. That they in good faith rolled such amounts over to the new Samdia Account should not be unfairly penalized. As Judge Chin noted, doing so would be "inequitable." More so, other courts have made unequivocal that when a Ponzi scheme is operated by a SEC regulated broker-dealer, unwittingly duped investors such as Samdia are not limited to "out-of-pocket damages" as the Trustee now asserts. *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007); *see also, Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). The Trustee's approach with regard to the Messings and Samdia should be rejected for this reason also.

## POINT IV

## THE TRUSTEE'S DETERMINATION IGNORES THE FACT THAT THE MESSINGS HAVE PAID MORE THAN $2.16 MILLION IN TAXES TO THE UNITED STATES AND THE STATE OF NEW YORK ON FICTITIOUS INCOME. NEITHER SAMDIA NOR THE MESSINGS ARE NET WINNERS

As set forth in the October 19, 2009 Notice of Determination of Claim, the Trustee is claiming that Samdia received $900,000 in excess of deposits on the Samdia Account, after making a $2,508,484.20 adjustment based on alleged "fictitious" income from the Messings' Tenant In Common Account. Assuming arguendo that Samdia is wrong with regard to Points I, II, and III above, neither Samdia nor the Messings were "Net Winners" as alleged by the Trustee.

15

What the Trustee ignores is that Messings paid the United States and the State of New York $2,167,677 in taxes for "fictitious" income. A Tax Schedule showing the taxes paid on the Messings' Tenant in Common and Samdia Account beginning in 1993 is attached hereto as Exhibit D. Of that amount, more than $1.4 million was paid more than five years ago. As the Court is likely aware, Rev. Proc. 2009-20 provides for a five-year carryback of the theft loss. Yet, the Trustee here has made an attempt to "claw back" income from more than seven years ago some of which was earned and for which the Messings paid taxes on more than 16 years ago.

The United States and the State of New York are not about to return the more than $1.4 million paid more than 5 years ago. The Messings and Samdia now have no claim for reimbursement. Adding that $1.4 million amount back into the Trustee's "money in/money out" formula, leaves the Messings with a negative loss of over $500,000. Clearly, the Messings are not "Net Winners." It should be noted that Rev. Proc. 2009-20, issued by Commissioner Shulman on March 17, 2009, expressly recognized the income earned by customers of Madoff, on which they paid taxes annually. Yet, the Trustee has taken the position that the income earned by the Messings and Samdia is not their money, even though full taxes were paid on such amounts.

It is unfair to disallow $2.5 million of allegedly fictitious income that was transferred from one account to another, and at minimum, not add back the taxes paid on that income when calculating net equity. At a minimum, the Messings should be entitled to their $500,000 SIPC claim and a claim for amounts for which they no longer have recourse. In no way are the Messings' net winners. Their claim should not be denied on this basis.

## POINT V

## THE TRUSTEE'S DETERMINATION ENTIRELY FAILS TO PROVIDE THE MESSINGS OR SAMDIA WITH ANY RETURN ON THEIR MONEY OVER THE LAST 16 YEARS.

If the Court determines that claimed gains on deposited funds should not be allowed, then in the alternative, the Messings and Samdia are entitled to recover interest on all deposited amounts. Such interest is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law. *See Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law."). Under New York law, funds deposited with Madoff under these circumstances are entitled to interest at 9%. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Accordingly, Samdia and the Messings' claims should be recalculated by adding interest to all funds deposited at 9%. With regard to the Samdia claim, at 9% interest without adding back the taxes that were withdrawn and paid to the United States and the State of New York, the value of the Samdia Account would be in excess of $1,442,376. This amount alone would be far more than enough to qualify Samdia for SIPC benefits. If the Court determines that the taxes paid to the United States and the State of New York should be factored back in for calculating interest, the value of the Samdia Account would be in excess of $5,838,805.

## POINT VI

## SIPA REQUIRES THE SIPC TO PAY SAMDIA BASED UPON THE SAMDIA ACCOUNT'S LAST STATEMENT.[3]

It is undisputed that as of November 30, 2008, the Samdia Account statement showed a

balance of **$5,153,534.30**. Pursuant to SIPA, the SIPA is obligated to "satisfy net equity claims

of customers." 15 U.S.C. § 78fff(a)(1)(A)-(B). SIPA defines "net equity" as the value of the

securities positions in the customer's account as of the SIPA filing date, less any amount the

customer owes the debtor.

SIPA provides:

The term "net equity" means the dollar amount of the account or accounts of a
customer, to be determined by –

(A) calculating the sum which would have been owed by the debtor to such
customer if the debtor had liquidated, by sale or purchase on the filing date, all
securities position of such customer . . .; minus

(B) any indebtedness of such customer to the debtor on the filing date. . .
15 U.S.C. § 78lll(11).

15 U.S.C. § 78lll(11).

As noted previously, Congress specifically prohibited SIPC from changing any

definitions contained in § 78lll, which section includes the definition of "net equity." *See* 15

U.S.C. § 78ccc(b)(4)(A). Because SIPC has no power to change the statutory definition of "net

equity," SIPC has no power to employ a "cash in minus cash out" definition of net equity against

Samdia or the Messings.

In a May 2001 Report, the United States General Accounting Office, wrote:

---

[3] Samdia understands that other victims of Madoff have argued that the SIPC is required to pay based on the last statement provided by Madoff. For the sake of brevity, and to not repeat for the Court what has been said elsewhere, Samdia adopts herein by reference all of the arguments made by others, including the failure of the Trustee to properly object to the Samdia claim.

> **SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash and/or securities held at a failed firm.   SIPC fulfills its mission** by initiating liquidation proceedings where appropriate and transferring customer accounts to another securities firm or returning the cash or securities to the customer **by restoring to the customer accounts the customer's "net equity."   SIPA defines net equity as the value of cash or securities in a customer's account as of the filing date, less any money owed to the firm by the customer, plus any indebtedness the customer has paid back** with the trustee's approval within 60 days after notice of the liquidation proceeding was published.

GAO Report to the Ranking Minority Member, Energy and Commerce Committee, House of

Representatives entitled "Securities Investor Protection:  Steps Needed to Better Disclose SIPC

Policies to Investors," (the "GAO Report") at 15 (emphasis added).

As recently discussed by the Second Circuit in *In re New Times Securities Services, Inc.*,

463 F.3d 125 (2nd Cir. 2006)("*New Times II*"):

> It is a customer's legitimate expectations on the filing date—here, February 17, 2000—that determines the availability, nature, and extent of customer relief under SIPA. *See* 15 U.S.C. §§ 78fff-2(b), 78*lll*(7) & (11); *see also In re New Times Secs. Servs., Inc.*, 371 F.3d 68, 87 (2d Cir. 2004) (suggesting that principle that a "customer's 'legitimate expectations,' based on written confirmations of transactions, ought to be protected" informs interpretation of SIPA); *In re Stratton Oakmont*, 2003 WL 22698876, at *7 (S.D.N.Y. Nov. 14, 2003) ("[W]hether customers have claims for securities or for cash hinges on what they expected to have in their accounts on the filing date."); *Adler Coleman*, 195 B.R. at 274 ("[T]he Trustee must promptly deliver customer name securities to the debtor's customers as they are entitled to receive them and to distribute customer property and otherwise satisfy customer net equity claims to the extent provided for in § 78fff."); S.Rep. No. 95-763, at 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764, 765 ("By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the [1978] Amendments not only would satisfy the customers' legitimate expectations, but also would restore the customer to his position prior to the broker-dealer's financial difficulties.").

*New Times II*, 463 F.3d at 128 – 129.  That dictate runs particularly true here, where there is no

allegation of any kind that the Messings or Samdia had any knowledge of the Madoff fraud, or

had any reason to know of it.

What was said in *New Times II* is not controversial or new.  As the Second Circuit in *New Times I* earlier made clear, the "customers' legitimate expectations" as argued by the SEC itself, is what should control, as follows:

> Nevertheless, we are persuaded by the SEC's argument that the premise underlying the Series 500 Rules — that a customer's "legitimate expectations," based on written confirmations of transactions, ought to be protected — supports the SEC's interpretation of section 9(a)(1). *See* Rules of the Sec. Investor Prot. Corp., 53 Fed.Reg. 10368-69 & n. 3 (Mar. 31, 1988). In the SEC's view, the Claimants in this case should be treated as having claims for securities because the confirmations and account statements that they received from the Debtors stated that the Claimants held securities in their accounts. Br. for *Amicus Curiae* SEC at 8.
>
> SIPC disputes that customers can have "legitimate" expectations as to non-existent securities. We note that SIPC's approach does perhaps promote an arguably laudable policy goal — encouraging investors to research and monitor their investments (and their brokers) with greater care. This goal of greater investor vigilance, however, is not emphasized in the legislative history of SIPA. Instead, as outlined *supra* at [26-27], the drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers. We find the SEC's interpretation more in line with the goals of the statute and with the legislators' intent in introducing the securities/cash distinction in section 9(a)(1).
>
> \* \* \* \* \* \*
>
> After reviewing the language of the statute, its purposes of protecting investors and inspiring confidence in the securities markets, and the specific history surrounding the drafting of the relevant language found in section 9(a)(1) of SIPA, 15 U.S.C. § 78fff-3(a)(1), we are persuaded by and, thus, defer to the SEC's interpretation. Indeed, even if we were not to adopt the SEC's interpretation as a matter of *Skidmore* deference, we would independently conclude that it is the proper interpretation of the statute. As the SEC explains:
>
> When a customer has been sent confirmations and account statements reflecting his securities purchases and showing that he holds the securities in his account, his claim, in the Commission's view, involves the debtor's function as securities custodian and is one for securities entitled to SIPC protection up to $500,000. Conversely, if the customer is using his brokerage account as a cash depository, as reflected in his account statements, he has a claim for cash entitled to protection up to $100,000 — no more protection than that provided to bank depositors.

20

*New Times I*, 371 F.3d at 87. Here, the Samdia Account November 30, 2008 statement makes clear that the stocks held by Samdia were not fictitious, such as was the case with certain of the mutual funds in *New Times I*. They were real international Fortune 500 Companies including Wal-Mart, Exxon and IBM.

Indeed, at the urging of SIPC and the SEC, the Second Circuit in *New Times I* recognized the correct definition of "net equity" as follows:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" corrected for "any indebtedness of such customer to the debtor on the filing date."

*New Times I*, 371 F.3d at 72.

In *New Times I*, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a lengthy period and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's President, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 **including the appreciation** in their accounts. As Mr. Harbeck explained, if customers are led to believe that "real, existing" securities had been purchased for their accounts, then those customers are entitled to get the full value of their securities positions as of the filing date even if the securities had never been purchased:

> MR. HARBECK:  **Even if they're not there.**
>
> THE COURT:  Even if they're not there.
>
> MR. HARBECK:  Correct.
>
> THE COURT:  **In other words, if the money was diverted, converted –**

MR. HARBECK: And the **securities were never purchased.**

THE COURT: Okay.

MR. HARBECK: **And, if those positions triple, we will gladly give the people their securities positions.**

Hearing Transcript at 37- 38, previously submitted by others.

In a brief the SIPC submitted to the Second Circuit in 2005, the **SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities.** The SIPC wrote:

> [R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase . . .** [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at 23-24 (citing *New Times I*)(emphasis added).

The SIPC's position against the Messings is directly contradicted, not only by SIPC's prior treatment of customers in *New Times*, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares,

even if a transaction never took place, **the SIPC has to buy and replace the 1000 GOOG shares**.

December 16, 2008 Insiders' Blog,

http://www.streetinsider.com/Insiders+Blog/SIPCs+Role+In+Madoff-Of-All-

Scams+Could+Save+the+Stock+Market/4243249.html

The Messings undisputedly received trade confirmations and account statements showing investments in real securities. Thus, the Messings had a legitimate expectation that they owned the assets shown on their last statement and are entitled to a claim in the amount of the balance on their November 30, 2008 statement -- **$5,153,534.30**.

Moreover, neither Samdia nor the Messings had any "indebtedness" to Madoff. They did not owe Madoff any cash or securities since they did not borrow from Madoff on margin. Because the Messings have no indebtedness to Madoff, there is no need to perform any calculations whatsoever to determine the amount of the Messings' net equity.

The Messings' reasonable expectations were that their actual securities, as shown on their statements, would be returned to them "in the form they existed on the filing date." H.R. Rep. No. 95-746, at 21. Thus, SIPA was amended to state that "[t]he trustee shall, to the extent that securities can be purchased in a fair and orderly market, purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities. . ." 15 U.S.C. § 78fff-2(d); SIPA § 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978).

Here, the legitimate expectations of Samdia were contained in the account statements and trade confirmations Samdia received. They expected that their accounts held the securities reflected therein. By failing to provide $500,000 in securities to Samdia, the Trustee has breached his statutory obligation to "promptly" replace Samdia's securities. 15 U.S.C. § 78fff-2(b). The Trustee is obligated to replace Samdia's securities up to a value of $500,000 as of

November 30, 2008, plus interest. More so, the Court should also recognize the Samdia claim in the amount of **$5,153,534.30.**

## POINT VII

## THE SIPC IS DESTROYING THE MESSINGS' REMAINING DAYS, AND THE MESSINGS AND SAMDIA SHOULD BE PROVIDED WITH EXPEDITED RELIEF.

The purpose of SIPA, as evidenced by its title, was to "protect" investors who allowed the Financial Services Industry to hold their life savings in street name securities. *See, e.g.*, H.R. Rep. No. 91-1613, at 3-4 (1970) ("[SIPA] will reinforce the confidence that investors have in the U.S. securities markets."). *See also New Times I*, 371 F.3d at 87 ("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers."); *Appleton v. First Nat'l Bank of* Ohio, 62 F.3d 791, 794 (6th Cir. 1995) ("Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[ ] and upgrade the financial responsibility requirements for registered brokers and dealers." (citations omitted). SIPA attempted to do this initially by satisfying customers' "net equity" claims for securities with actual securities only if the debtor held securities of the appropriate class and kind to satisfy customers' claims, while otherwise customers would receive the cash equivalent of the value of their securities on the filing date. SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat. 1636, 1648-50 (1970); H.R. Rep. No. 95-746 (39-41)(statement of SIPC Chairman Hugh F. Owens).

When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments], *[i.e.]*, . . . **the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.**" D 922 Cong. Rec. H. 36326 (daily ed. Nov. 1, 1977) (statement of Rep. Robert C. Eckhardt) (emphasis added). *See also* Hearing on H.R. 8064 before

the Subcomm. on Consumer Protection and Finance of the H. Comm. On Interstate and Foreign Commerce, 94th Cong. 63 (1975) ("the basic framework of the 1970 Act in regard to satisfaction of customers' claims should be modified to better meet the legitimate expectations of customers.") (report to the SIPC Board of Directors by the Special Task Force to consider possible amendments to SIPA); Hearing on H.R. 8331 before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81 91977) ("The proposed [1978] amendments carry out the Task Force recommendations and are designed to make the Act more responsible to the reasonable expectations of investors.") (statement of SIPC Chairman Hugh F. Owens); Hearing on H.R. 8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th Cong. 161-162 ("[T]he principal purpose of these amendments is to meet more nearly the reasonable expectations of brokerage firm customers.") (statement of SEC Commissioner Philip A. Loomis, Jr.).

The Messings have been wrecked by Madoff. The Messings have now waited almost a year to even get one written determination from the Trustee despite having account balances on the Samdia Account and the Samuel Messing Retirement Account in an amount exceeding $18,000,000, and they have not received a penny from the SIPC. Indeed, the Trustee has still not even provided Samuel Messing with any written determination on the Samuel Messing Retirement Account. They should not have to wait until the Court's February 2010 hearing on net equity because they are not "net winners" in the remotest way.

## CONCLUSION

The Trustee's determination is incorrect for the reasons set forth herein. The Messings have suffered enough. At the ages of 77 and 70, while suffering from breast cancer, the

Messings should not be required to engage in long term litigation with the SIPC and the Trustee.

Immediate relief via payment of $500,000 plus interest should be expeditiously granted.[4]

November 13, 2009

/s/ Joel L. Herz
Joel L. Herz
Law Offices of Joel L. Herz
3573 E. Sunrise Drive, Suite 215
Tucson, AZ 85718
(520)529-8080 – telephone
(520)529-8077 - facsimile
joel@joelherz.com

Arnold Herz
14 Vanderventer Ave., Ste. 255
Port Washington, NY 11050
(516) 767-8790 – telephone
(516) 706-1416 - facsimile
arnie@arnieherz.com

Attorneys for Samdia Family, LP

---

[4] Samdia reserves:  1) the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of any right to object on any other grounds; 2) all rights set forth in Rule 9014, including, without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014; 3) all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 13th day of November, 2009, he caused a true and correct copy of Samdia Family, LP's Objection to Notice of Trustee's Determination of Claim on BLMIS Account No. IZB412 Designated As Claim No. 001490 to be filed electronically with the Court and served upon the parties in this action who receive electronic service through CM/ECF, and served by mail upon:

> David J. Sheehan
> Baker & Hostetler, LLP
> 45 Rockefeller Plaza
> New York, NY 10111
> Attorneys for Irving H. Picard, Esquire
> Trustee for the Liquidation of the
> Business of Bernard L. Madoff
> Investment Securities, LLC

> /s/ Joel L. Herz

# **<u>EXHIBIT A</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ------------------------------------------------ ) | |
| SECURITIES INVESTOR PROTECTION ) | Adv. Pro. No. 08-01789 (BRL) |
| CORPORATION,. ) | |
| ) | |
| Plaintiff, ) | SIPA Liquidation |
| ) | |
| v. ) | (Substantively Consolidated) |
| ) | |
| BERNARD L. MADOFF INVESTMENT ) | |
| SECURITIES, LLC, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |
| In re: ) | |
| ) | |
| BERNARD L. MADOFF, ) | |
| ) | |
| Debtor. ) | |
| _____ ) | |

## DECLARATION OF SAMUEL MESSING

I, SAMUEL MESSING, declare, certify, verify, and state under penalty of perjury that

the foregoing is true and correct as follows:

1.    I make this Declaration of my own personal knowledge.

2    I am 77 years of age.

3.    My wife and I are the partners of the Samdia Family LP ("Samdia") Account at

Bernard L. Madoff Investment Securities, LLC ("Madoff") (1ZB412).

4.    I have been invested in Madoff since 1993.

5.    I am not a sophisticated investor.

6.    I was unaware of any wrongdoing being committed by Madoff until I heard that

he was arrested.

7.     I believed that the over $5 million balance on the Samdia November 2008 account statement provided to us by Madoff was real.  A true and correct copy of the November 30, 2008 account statement that we received for the Samdia Account from Madoff is attached to  the November 12, 2009 "SAMDIA FAMILY, LP'S OBJECTION TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM ON BLMIS ACCOUNT NO. 1ZB412 DESIGNATED AS CLAIM NO. 001490" as Exhibit C.   Throughout the entire time we were with Madoff, I received, on a monthly basis, similar type account statements from Madoff on the Samdia Account, on my retirement account, and on our tenant in common account from Madoff.  I never saw anything on any of those statements that caused me any alarm, as most of the stocks were usually blue chip Fortune 500 companies, and not "tech type stocks."  That was okay with me as I did not want the risk of high tech stocks.

8.     Much of the money that was withdrawn from the Samdia account was used to pay taxes on the Madoff income which I now understand may have been fictitious.  A Tax Schedule showing the taxes paid on the Tenant in Common Account and later on the Samdia Account beginning in 1993 is attached to the November 12, 2008 "SAMDIA FAMILY, LP'S OBJECTION TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM ON BLMIS ACCOUNT NO. 1ZB412 DESIGNATED AS CLAIM NO. 001490" as Exhibit D.   Exhibit D reflects the taxes that were paid with regard to the Samdia Account, and earlier on our Tenant in Common Account.

9.     I have read and reviewed the November 12, 2008 "SAMDIA FAMILY, LP'S OBJECTION TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM ON BLMIS ACCOUNT NO. 1ZB412 DESIGNATED AS CLAIM NO. 001490." All of the factual statement as they relate to me are true and correct.  I adopt them herein.

2

10.    I declare, certify, verify and state under penalty of perjury that the foregoing is

true and correct.

DATED: _11-13-09_

_Samuel Messing_

**SAMUEL MESSING**

3

# **EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------- )
SECURITIES INVESTOR PROTECTION )          Adv. Pro. No. 08-01789 (BRL)
CORPORATION,                            )
                                        )
                Plaintiff,              )          SIPA Liquidation
                                        )
            v.                          )          (Substantively Consolidated)
                                        )
BERNARD L. MADOFF INVESTMENT            )
SECURITIES, LLC,                        )
                                        )
                Defendant.              )
_____ )
In re:                                  )
                                        )
BERNARD L. MADOFF,                      )
                                        )
                Debtor.                 )
_____ )
```

## DECLARATION OF DIANA MESSING

I, DIANA MESSING, declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct as follows:

1.    I make this Declaration of my own personal knowledge.

2    I am 70 years of age. In February 2008 I was diagnosed with Stage II breast cancer. I have had a double mastectomy and have undergone chemotherapy.

3.    My husband and I are the partners of the Samdia Family LP ("Samdia") Account at Bernard L. Madoff Investment Securities, LLC ("Madoff") (1ZB412).

4.    I am not a sophisticated investor.

5.    I was unaware of any wrongdoing being committed by Madoff until I heard that he was arrested.

6.     I believed that the over $5 million balance on the Samdia November 2008 account statement provided to us by Madoff was real. A true and correct copy of the November 30, 2008 account statement that we received for the Samdia Account from Madoff is attached to the November 12, 2009 "SAMDIA FAMILY, LP'S OBJECTION TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM ON BLMIS ACCOUNT NO. 1ZB412 DESIGNATED AS CLAIM NO. 001490" as Exhibit C. Throughout the entire time we were with Madoff, we received, on a monthly basis, similar type account statements from Madoff on the Samdia Account, on my husband's retirement account, and on our tenant in common account. I never saw anything on any of those statements that caused me any alarm. I largely left these types of decisions to my husband.

7.     I have read and reviewed the November 12, 2008 "SAMDIA FAMILY, LP'S OBJECTION TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM ON BLMIS ACCOUNT NO. 1ZB412 DESIGNATED AS CLAIM NO. 001490." All of the factual statements as they relate to me are true and correct. I adopt them herein.

8.     I declare, certify, verify and state under penalty of perjury that the foregoing is true and correct.

Dated: 11/13/09

DIANA MESSING

2

# **EXHIBIT C**

COPY



**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair. London W1J 8DT
Tel 020 7493 6222

SANDIA FAMILY LP

28 TERRA MAR DRIVE
HUNTINGTON          NY   11743

| PERIOD ENDING | PAGE |
|---|---|
| 11/30/03 | 1 |

M

| YOUR ACCOUNT NUMBER | YOUR TAX PAYER IDENTIFICATION NUMBER |
|---|---|
| 1-Z8412-3-0 | ******7521 |

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| | | | | BALANCE FORWARD | | 316,313.14 | |
| 11/12 | 4,662 | | 1502 | WELLS FARGO & CO NEW | 29.800 | 139,113.60 | |
| 11/12 | 3,330 | | 2004 | HEWLETT PACKARD CO | 34.900 | 116,350.00 | |
| 11/12 | 2,886 | | 5828 | WAL-MART STORES INC | 55.830 | 161,240.38 | |
| 11/12 | 1,887 | | 6330 | INTERNATIONAL BUSINESS MACHS | 87.270 | 164,753.49 | |
| 11/12 | 6,993 | | 10154 | EXXON MOBIL CORP | 72.880 | 509,928.84 | |
| 11/12 | 7,659 | | 10656 | INTEL CORP | 14.510 | 111,438.09 | |
| 11/12 | 3,663 | | 14982 | JOHNSON & JOHNSON | 59.560 | 218,387.54 | |
| 11/12 | 4,995 | | 19307 | J.P. MORGAN CHASE & CO | 38.530 | 192,656.35 | |
| 11/12 | 2,664 | | 23633 | COCA COLA CO | 44.660 | 119,080.24 | |
| 11/12 | 1,554 | | 27959 | MCDONALDS CORP | 55.370 | 86,106.98 | |
| 11/12 | 2,886 | | 32285 | MERCK & CO | 28.550 | 82,510.30 | |
| 11/12 | 10,545 | | 36611 | MICROSOFT CORP | 21.810 | 230,407.45 | |
| 11/12 | 5,328 | | 40937 | ORACLE CORPORATION | 17.300 | 92,387.40 | |
| 11/12 | 2,109 | | 53915 | PEPSICO INC | 56.410 | 119,052.69 | |
| 11/12 | 1,221 | | 54417 | APPLE INC | 100.780 | 123,100.38 | |
| 11/12 | 8,991 | | 58241 | PFIZER INC | 16.940 | 152,666.54 | |
| 11/12 | 2,109 | | 58743 | ABBOTT LABORATORIES | 54.610 | 115,256.49 | |
| 11/12 | 3,996 | | 62567 | PROCTER & GAMBLE CO | 64.080 | 256,222.68 | |
| 11/12 | 1,443 | | 63069 | AMGEN INC | 59.180 | 85,424.88 | |
| 11/12 | 2,775 | | 66893 | PHILLIP MORRIS INTERNATIONAL | 43.600 | 121,101.00 | |
| 11/12 | 6,660 | | 67395 | BANK OF AMERICA | 21.590 | 144,055.40 | |
| 11/12 | 2,220 | | 71219 | QUALCOMM INC | 33.770 | 75,057.40 | |
| 11/12 | 7,215 | | 71721 | CITI GROUP INC | 12.510 | 90,547.65 | |

CONTINUED ON PAGE    2

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

SANDIA FAMILY LP

28 TERRA MAR DRIVE
HUNTINGTON          NY   11743

| PERIOD ENDING | PAGE | |
|---|---|---|
| 11/30/08 | 2 | M |

YOUR ACCOUNT NUMBER: 1-Z8412-3-0
YOUR TAX PAYER IDENTIFICATION NUMBER: ******7521

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| 11/12 | 1,665 | | 75545 | SCHLUMBERGER LTD | 49.480 | 82,450.20 | |
| 11/12 | 3,996 | | 76047 | COMCAST CORP CL A | 16.510 | 66,132.96 | |
| 11/12 | 7,881 | | 79871 | AT&T INC | 27 | 213,102.00 | |
| 11/12 | 1,998 | | 80373 | CONOCOPHILIPS | 52.510 | 104,993.98 | |
| 11/12 | 1,332 | | 84197 | UNITED PARCEL SVC INC CLASS B | 52.040 | 69,370.28 | |
| 11/12 | 8,103 | | 84699 | CISCO SYSTEMS INC | 16.730 | 135,887.19 | |
| 11/12 | 2,331 | | 83523 | U S BANCORP | 29.530 | 68,927.43 | |
| 11/12 | 2,775 | | 89025 | CHEVRON CORP | 73.430 | 203,879.25 | |
| 11/12 | 1,332 | | 92849 | UNITED TECHNOLOGIES CORP | 53.160 | 70,862.12 | |
| 11/12 | 14,097 | | 93351 | GENERAL ELECTRIC CO | 19.630 | 277,287.11 | |
| 11/12 | 3,774 | | 97175 | VERIZON COMMUNICATIONS | 30.410 | 114,917.34 | |
| 11/12 | 333 | | 97677 | GOOGLE | 337.400 | 112,367.20 | |
| 11/12 | | 5,075,000 | 24108 | U S TREASURY BILL DUE 2/12/2009  2/12/2009 | 99.936 | | 5,071,752.00 |
| 11/12 | | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET DIV 11/12/08 | DIV | | 8.15 |
| 11/12 | | 14,179 | 19212 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | 14,179.00 |
| 11/12 | 36,495 | | 28580 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 36,495.00 | |
| 11/14 | | 3,996 | 29479 | COMCAST CORP CL A | 15.830 | | 63,177.60 |
| | | | | CONTINUED ON PAGE     3 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
MADF INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

SAMDIA FAMILY LP

| PERIOD ENDING | PAGE | |
|---|---|---|
| 11/30/08 | 3 | M |

28 TERRA MAR DRIVE
HUNTINGTON        NY   11743

YOUR ACCOUNT NUMBER: 1-ZB412-3-0

YOUR TAX PAYER IDENTIFICATION NUMBER: ******7521

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| 11/14 | | 100 | 29480 | U S BANCORP | 26.315 | | -2,677.00 |
| 11/14 | | | | CHECK | CW | 100,000.00 | |
| 11/14 | | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET DIV 11/14/08 | DIV | | 1.30 |
| 11/14 | | 36,495 | 29435 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | 36,495.00 |
| 11/14 | 2,351 | | 29908 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 2,351.00 | |
| 11/19 | | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET DIV 11/19/08 | DIV | | .20 |
| 11/19 | | 2,351 | 54118 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | 2,351.00 |
| 11/19 | 325,000 | | 58544 | U S TREASURY BILL DUE 03/26/2009             3/26/2009 | 99.926 | 324,759.50 | |
| 11/19 | 10,147 | | 63154 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 10,147.00 | |
| | | | | NEW BALANCE | | 626,447.22 | |
| | | | | SECURITY POSITIONS | MKT PRICE | | |
| | 7,881 | | | AT&T INC | 28.560 | | |
| | 2,109 | | | ABBOTT LABORATORIES | 52.390 | | |
| | | | | CONTINUED ON PAGE      4 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

SAMDIA FAMILY LP

PERIOD ENDING **11/30/08**    PAGE **4**    M

28 TERRA MAR DRIVE
HUNTINGTON          NY   11743

YOUR ACCOUNT NUMBER **1-ZB412-3-0**    YOUR TAX PAYER IDENTIFICATION NUMBER ********7521**

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| | 1,443 | | | AMGEN INC | 55.540 | | |
| | 1,221 | | | APPLE INC | 92.670 | | |
| | 6,660 | | | BANK OF AMERICA | 16.250 | | |
| | 2,775 | | | CHEVRON CORP | 79.010 | | |
| | 8,103 | | | CISCO SYSTEMS INC | 16.540 | | |
| | 7,215 | | | CITI GROUP INC | 8.290 | | |
| | 2,664 | | | COCA COLA CO | 46.870 | | |
| | 1,998 | | | CONOCOPHILIPS | 52.520 | | |
| | 6,993 | | | EXXON MOBIL CORP | 80.150 | | |
| | 14,097 | | | GENERAL ELECTRIC CO | 17.170 | | |
| | 333 | | | GOOGLE | 292.960 | | |
| | 3,330 | | | HEWLETT PACKARD CO | 35.280 | | |
| | 7,659 | | | INTEL CORP | 13.800 | | |
| | 1,887 | | | INTERNATIONAL BUSINESS MACHS | 81.690 | | |
| | 4,995 | | | J.P. MORGAN CHASE & CO | 31.660 | | |
| | 3,663 | | | JOHNSON & JOHNSON | 58.580 | | |
| | 1,554 | | | MCDONALDS CORP | 58.750 | | |
| | 2,886 | | | MERCK & CO | 26.720 | | |
| | 10,545 | | | MICROSOFT CORP | 20.220 | | |
| | 5,328 | | | ORACLE CORPORATION | 16.090 | | |
| | 2,109 | | | PEPSICO INC | 56.700 | | |
| | 8,991 | | | PFIZER INC | 16.430 | | |
| | 2,775 | | | PHILLIP MORRIS INTERNATIONAL | 42.160 | | |
| | 3,996 | | | PROCTER & GAMBLE CO | 64.350 | | |
| | 2,220 | | | QUALCOMM INC | 33.570 | | |
| | | | | CONTINUED ON PAGE     5 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair. London W1J 8DT
Tel 020 7493 6222

SAMDIA FAMILY LP

28 TERRA MAR DRIVE
HUNTINGTON          NY   11743

| PERIOD ENDING | PAGE |
|---|---|
| 11/30/08 | 5 |

M

| YOUR ACCOUNT NUMBER | YOUR TAX PAYER IDENTIFICATION NUMBER |
|---|---|
| 1-ZB412-3-0 | ******7521 |

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| | 1,665 | | | SCHLUMBERGER LTD | 50.740 | | |
| | 10,147 | | | FIDELITY SPARTAN | 1 | | |
| | | | | U S TREASURY MONEY MARKET | | | |
| | 2,231 | | | U S BANCORP | 26.980 | | |
| | 1,332 | | | UNITED PARCEL SVC INC | 57.600 | | |
| | | | | CLASS B | | | |
| | 325,000 | | | U S TREASURY BILL | 99.971 | | |
| | | | | DUE 03/26/2009 | | | |
| | | | | 3/26/2009 | | | |
| | 1,332 | | | UNITED TECHNOLOGIES CORP | 48.530 | | |
| | 3,774 | | | VERIZON COMMUNICATIONS | 32.650 | | |
| | 2,886 | | | WAL-MART STORES INC | 55.880 | | |
| | 4,662 | | | WELLS FARGO & CO NEW | 28.890 | | |
| | | | | | | | |
| | | | | MARKET VALUE OF SECURITIES | | | |
| | | | | LONG          SHORT | | | |
| | | | | 5,153,534.30 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

SAMDIA FAMILY LP

28 TERRA MAR DRIVE
HUNTINGTON          NY   11743

| PERIOD ENDING | PAGE | |
|---|---|---|
| 11/30/08 | 6 | M |

| YOUR ACCOUNT NUMBER | YOUR TAX PAYER IDENTIFICATION NUMBER |
|---|---|
| 1-ZB412-3-0 | ******7521 |

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| | | | | YEAR-TO-DATE SUMMARY | | | |
| | | | | DIVIDENDS | | | 35,662.82 |
| | | | | GROSS PROCEEDS FROM SALES | | | 35,535,847.85 |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

# **EXHIBIT D**

|  | Madoff Income | Fed Rate | Federal | NYS |
|---|---|---|---|---|
| **1994 (Fed Bracket 33% - NY 7%)** | | | | |
| Dividend Income | 2,725 | | | |
| STC 6 | 2,424 | | | |
| | 5,149 | 33% | 1,699 | 360 |
| | | | | |
| **1995 (Federal 30% - NYS 8%)** | | | | |
| Dividend Income | 4,494 | | | |
| Capital Gains | 24,520 | | | |
| | 29,014 | 30% | 8,704 | 2,321 |
| | | | | |
| **1996 (Federal 30% - NYS 7%)** | | | | |
| Dividend Income | 9,235 | | | |
| Capital Gains | 123,514 | | | |
| | $ 132,749 | 31% | 41,152 | 9,292 |
| | | | | |
| **1997 (Federal 33% - NYS - 7%)** | | | | |
| Dividend Income | 12,597 | | | |
| Capital Gains | 335,033 | | | |
| | 347,630 | 33% | 114,718 | 24,334 |
| | | | | |
| **1998 (Federal 36% - NYS 6%)** | | | | |
| Dividend Income | 16,361 | | | |
| Capital Gains | 701,351 | | | |
| | 717,712 | 36% | 258,376 | 43,062 |
| | | | | |
| **1999 (Federal 35% - NYS 6%)** | | | | |
| Dividend Income | 15,991 | | | |
| Capital Gains | 742,324 | | | |
| | 758,315 | 35% | 265,410 | 45,499 |
| | | | | |
| **2000 (Federal 27% - NYS 6%)** | | | | |
| Dividend Income | 13,400 | | | |
| Capital Gains | 626,997 | | | |

|                              |           |        |           |         |
|------------------------------|-----------|--------|-----------|---------|
|                              | 640,397   | 27%    | 172,907   | 38,424  |
| **2001 (Federal 33% - NYS 6%)** |        |        |           |         |
| Dividend Income              | 21,473    |        |           |         |
| Capital Gains                | 537,620   |        |           |         |
|                              | 559,093   | 33%    | 184,501   | 33,546  |
| **2002 (Federal 32.5% - NYS*)** |        |        |           |         |
| Dividend Income              | 27,721    |        |           |         |
| Capital Gains                | 496,276   |        |           |         |
|                              | 523,997   | 32.50% | 170,299   | *       |
| **2003 (Federal 30%)**       |           |        |           |         |
| Dividend Income              | 41,450    |        |           |         |
| Capital Gains                | 374,801   |        |           |         |
|                              | 416,251   | 30%    | 124,875   | *       |
| **2004 (Federal 31.4%)**     |           |        |           |         |
| Dividend Income              | 73,408    |        |           |         |
| Capital Gains                | 385,652   |        |           |         |
|                              | 459,060   | 31.40% | 144,145   | *       |
| **2005 (Federal 31%)**       |           |        |           |         |
| Dividend Income              | 47,003    |        |           |         |
| Capital Gains                | 373,483   |        |           |         |
|                              | 420,486   | 31%    | 130,351   | *       |
| **2006 (Federal 31%)**       | 84,445    |        |           |         |
| Dividend Income              | 475,036   |        |           |         |
| Capital Gains                | 555,481   | 31%    | 172,199   | *       |
|                              | 535,494   | 32%    | 181,503   | *       |
| Fradulent Income             | 6,150,828 |        | 1,970,839 | 196,838 |

Total taxes on Madoff income          2,167,677

# **EXHIBIT E**

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

October 19, 2009

Samdia Family LP
17319 Duneden Court
Boca Raton, FL 33496

Dear Samdia Family LP:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1ZB412 designated as Claim Number 001490:

Your claim for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $3,675,000.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $2,775,000.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

When ever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($900,000.00) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after October 19, 2009, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

> Clerk of the United States Bankruptcy Court for
> the Southern District of New York
> One Bowling Green
> New York, New York 10004
>
> and
>
> Irving H. Picard, Trustee
> c/o Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York 10111

_____

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

CC: Gregg Grauer, Esq.
282 Katonah Avenue, #158
Katonah, NY 10536

Oct 26 09 08:52a     Samuel Messing          631 4244948                    p.4

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 11/26/2001 | TRANS FROM 1ZB13730 | $3,879,902.26 | $1,375,000.00 |
| 6/25/2002 | TRANS FROM 1ZB13730 | $3,581.94 | $0.00 |
| 11/18/2003 | CHECK | $300,000.00 | $300,000.00 |
| 11/15/2004 | CHECK | $200,000.00 | $200,000.00 |
| 10/18/2006 | CHECK | $600,000.00 | $600,000.00 |
| 4/16/2007 | CHECK | $100,000.00 | $100,000.00 |
| 12/13/2007 | CHECK | $200,000.00 | $200,000.00 |
| Total Deposits: | | $5,283,484.20 | $2,775,000.00 |

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 1/7/2002 | CHECK | ($100,000.00) | ($100,000.00) |
| 4/1/2002 | CHECK | ($100,000.00) | ($100,000.00) |
| 4/4/2002 | CHECK | ($100,000.00) | ($100,000.00) |
| 5/1/2002 | STOP PAYMENT 4/4/02 CHECK | $100,000.00 | $100,000.00 |
| 8/26/2002 | CHECK | ($150,000.00) | ($150,000.00) |
| 10/31/2002 | CHECK | ($100,000.00) | ($100,000.00) |
| 12/26/2002 | CHECK | ($75,000.00) | ($75,000.00) |
| 12/29/2003 | CHECK | ($100,000.00) | ($100,000.00) |
| 3/2/2004 | CHECK | ($200,000.00) | ($200,000.00) |
| 7/2/2004 | CHECK | ($200,000.00) | ($200,000.00) |
| 8/31/2004 | CHECK | ($50,000.00) | ($50,000.00) |
| 1/19/2005 | CHECK | ($100,000.00) | ($100,000.00) |
| 3/22/2005 | CHECK | ($200,000.00) | ($200,000.00) |
| 7/12/2005 | CHECK | ($100,000.00) | ($100,000.00) |
| 9/14/2005 | CHECK | ($100,000.00) | ($100,000.00) |
| 10/13/2005 | CHECK | ($600,000.00) | ($600,000.00) |
| 10/26/2005 | CHECK | ($100,000.00) | ($100,000.00) |
| 12/4/2006 | CHECK | ($100,000.00) | ($100,000.00) |
| 1/3/2007 | CHECK | ($100,000.00) | ($100,000.00) |
| 3/29/2007 | CHECK WIRE | ($500,000.00) | ($500,000.00) |
| 5/30/2007 | CHECK | ($100,000.00) | ($100,000.00) |
| 8/14/2007 | CHECK | ($100,000.00) | ($100,000.00) |
| 1/3/2008 | CHECK | ($100,000.00) | ($100,000.00) |
| 3/24/2008 | CHECK | ($100,000.00) | ($100,000.00) |
| 6/5/2008 | CHECK | ($100,000.00) | ($100,000.00) |
| 9/10/2008 | CHECK | ($100,000.00) | ($100,000.00) |

| 11/14/2008 | CHECK | ($100,000.00) | ($100,000.00) |
|---|---|---|---|
| Total Withdrawals: | | ($3,675,000.00) | ($3,675,000.00) |
| | | | |
| Total deposits less withdrawals: | | $1,608,484.20 | ($900,000.00) |