**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : <br> : <br> : |
| Plaintiff, | Adv. Pro. No. 08-01789 (BRL) <br> : <br> : SIPA Liquidation |
| v. | : <br> : (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, | : <br> : <br> : |
| Defendant. | : |

---------------------------------------------------------------x

| | |
|---|---|
| In re: | : <br> : |
| BERNARD L. MADOFF, | : <br> : |
| Debtor. | : |

---------------------------------------------------------------x

### MEMORANDUM OF CARL J. SHAPIRO AND ASSOCIATED ENTITIES IN OPPOSITION TO TRUSTEE'S NET EQUITY MOTION

SHEARMAN & STERLING LLP
Stephen Fishbein
James Garrity
Richard Schwed
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
sfishbein@shearman.com

*Attorneys for Carl J. Shapiro and Associated Entities (complete list set forth in footnote 1 herein)*

Carl J. Shapiro, together with certain family members ("Shapiro Family") and the Carl and Ruth Shapiro Family Foundation ("Foundation"), respectfully submits this memorandum of law and accompanying Declaration of Liane Willis ("Willis Decl.") in opposition to the net equity motion of trustee Irving H. Picard ("Trustee"), dated October 16, 2009 ("Trustee Mem.").[1]

## Introduction

Bernard L. Madoff Investment Securities, LLC ("BLMIS") did not pursue the so-called "split-strike conversion" strategy for all investors. (Trustee Mem. 12-13.) There was another group of investors who held positions in common stocks and bonds without the options trading characteristic of the split-strike conversion strategy. (*Id.*) Carl J. Shapiro and his family are in this second category of what the Trustee calls the "non-split-strike conversion" investors. (*Id.*) Because the Shapiro account statements from BLMIS showed positions in real securities that in most cases were held for many years, the Shapiros' net equity should be determined on the basis of their November 2008 BLMIS account statements.

## The Shapiro Investments With BLMIS

Carl J. Shapiro was a successful entrepreneur who made a fortune in the 1950s and 60s in the women's clothing business.[2] Mr. Shapiro and his family began investing with BLMIS in about 1960 and continued to invest until Bernard Madoff was arrested in December 2008.

---

[1] This memorandum is submitted on behalf of the following customers that filed SIPA claims in this proceeding: Andrew Jaffe Trust U/D/T DTD 5/12/75 As Amended; Andrew N. Jaffe 1993 Irrev. Trust U/D/T DTD 6/11/93 As Amended; Carl Shapiro Trust U/D/T 4/9/03; Carl Shapiro and Ruth Shapiro Family Foundation; Ellen Jaffe Trust U/D/T DTD 5/8/03 As Amended; Jaffe Family 2004 Irrevocable Trust; Jaffe GC-1 LLC; Jennifer Segal Herman Trust U/D/T DTD 5/1/67 As Amended; Jennifer Segal Herman 1985 Trust Dated 4/16/84; Jonathan M. Segal Trust U/D/T DTD 12/1/70; Jonathan M. Segal 1989 Trust U/D/T DTD 3/8/89 As Amended; Jonathan M. Segal 2007 Trust; Kimberly Strauss 1988 Trust; Kimberly Strauss 2006 Irrevocable Trust; L. Shapiro Family Trust; Linda Shapiro Family Trust Dated 12/03/76; Linda Shapiro Waintrup 1992 Trust; LSW 2006 Irrevocable Trust; Michael S. Jaffe Trust U/D/T 9/25/71 As Amended; Michael Jaffe 1989 Trust U/D/T DTD 8/24/89 As Amended; Michael S. Jaffe 2007 Trust; Rhonda Shapiro Zinner 1993 Trust U/D/T DTD 7/7/93 As Amended; RSZ-JSH Partnership; Ruth Shapiro Trust U/D/T 4/9/03; Samantha Strauss 1985 Trust; Samantha L. Strauss 2003 Irrevocable Trust; Shapiro Family CLAT Joint Venture; Shapiro Family Ltd. Partnership; Shapiro GGC-1 LLC; Steven C. Jaffe Trust U/D/T DTD 9/25/71 As Amended; Steven Jaffe 1989 Trust U/D/T DTD 8/24/89 As Amended; and Steven C. Jaffe 2007 Trust.

[2] *See, e.g.*, *'Work Horse' Dress Builds a $22,000,000 Business*, New York Times, Jan. 27, 1957, at F1 (referring to Mr. Shapiro as the "cotton king of the dress industry" and estimating annual revenues of his company, Kay Windsor, to be

The Shapiro investments were managed on a day-to-day basis by Wellesley Capital Management ("Wellesley"), a private company established to administer the Shapiro Family and Foundation investments. (Willis Decl. ¶ 2.) The vast majority of the Shapiro investments at BLMIS were in stocks and bonds that were held for at least a year, and in many cases, for several years or even decades.[3] (*Id.* ¶ 4.) The Shapiro Family and Foundation accounts did not engage in the short-term options trading characteristic of the "split-strike conversion" strategy. (*See id.*)

Beginning in about 1996, Wellesley began using a computerized investment portfolio management system, called Axys, to track and monitor the Shapiro Family and Foundation investments. (*Id.* ¶ 5.) The Axys system included an electronic link to a third-party independent data service, called FT Interactive Data, that provided actual market data on stock prices and dividends. (*Id.*) Each month, a Wellesley employee would receive and review the monthly account statements from BLMIS. (*Id.* ¶ 6.) The employee would compare the month-end account values on the BLMIS statements with the month-end values in Axys. (*Id.*) Because Axys obtained actual market prices from an independent source, the Wellesley employee was able to confirm that the value of the securities positions listed on the BLMIS statements were accurate. (*Id.*) Moreover, since the Axys system would have given an error message if "fake" securities were entered for which no actual market pricing was available, the Wellesley employee would have known if the BLMIS statements contained anything other than real, publicly traded securities. (*Id.* ¶ 7.) No such fake securities were detected. (*Id.*) By all appearances, these were real securities positions that could have been held and, if held as indicated on the statements, would have yielded the stated returns. (*See id.* ¶¶ 6-7.)

---

$22 million); *V.F. Agrees to Acquire Kay Windsor for Stock Valued at $20.9 Million*, The Wall Street Journal, Dec. 17, 1970, at 19.

[3] For example, the Shapiro Family and Foundation accounts held stocks such as Procter & Gamble (20 years), Pfizer (19 years), Coca-Cola (18 years), General Electric (18 years), Dow Chemical (17 years), Microsoft (15 years), Citigroup (15 years) and Intel (10 years).

# ARGUMENT

## Investors Whose Account Statements Show Positions In Real Securities At Real Market Values Are Entitled To Net Equity Determined On The Basis Of Their Last Account Statement

The Shapiro Family and Foundation hereby adopt and incorporate by reference the arguments set forth in the Memorandum of Law of Sterling Equities Associates and Certain Affiliates Regarding Net Equity and Avoidance (the "Sterling Equities Memorandum"), filed November 12, 2009. The arguments in the Sterling Equities Memorandum are equally compelling in the context of the non-split-strike conversion investors such as the Shapiro Family and the Foundation.

The Trustee accepts that *In re New Times Securities Services*, 371 F.3d 68 (2d Cir. 2004) is controlling precedent in this case. (*See* Trustee Mem. at 35-44.) The Shapiro investors are in the same position as the group of *New Times* investors whose net equity was determined based on their last account statements; accordingly, the Shapiros should be given the same treatment here.

*New Times* involved two groups of investors in a Ponzi scheme. One group was told they were invested in money market funds that turned out to be non-existent.[4] *New Times*, 371 F.3d at 74. The other group was told they were invested in real money market funds that did exist, but the broker never made the investments and instead embezzled the funds. *Id.* The Second Circuit held that, for the first group of investors, net equity is the amount they paid the broker to purchase the fake money market funds, minus any withdrawals (*i.e.,* the cash in/cash out method). *Id.* at 87-88. For the second group of investors, the SIPA trustee determined net equity based on their last account statements.

---

[4] The Second Circuit described this group as follows: "To be clear – and this is the crucial fact in this case – the New Age Funds in which the Claimants invested *never* existed. They were not organized as mutual funds, they were never registered with the SEC and they did not issue any of the requisite prospectuses for investors." *New Times*, 371 F.3d at 74 (emphasis in original).

3

The cash in/cash out approach applied to the first group of *New Times* investors was motivated by the Court's desire to avoid "the potential absurdities created by reliance on the *entirely artificial numbers* contained in fictitious account statements." *Id.* at 88 (emphasis added). To allow a customer to recover arbitrary earnings on artificial securities would mean that a net equity claim would have "no relation to reality." *Id.* But neither the Court nor the SIPA trustee had this concern with respect to those investors whose statements listed real securities, because the earnings on such securities bore a *direct* relation to reality. The trustee reasoned that the investors in real securities were entitled to the amount reflected on their last statements because, "[a]lthough these transactions were never executed, the information provided on the account and confirmation statements mirrored what would have happened had the given transaction been executed." Brief of Appellant at 7 n.6, *New Times* (cited to in Trustee Mem. at 42, Brown Affidavit, Ex. C at 7 n.6); *see New Times*, 371 F.3d at 74.

The Shapiro Family and Foundation accounts at BLMIS, like the second group of *New Times* investors, mirrored the value of such investments had they actually been made. First, the Shapiro monthly account statements showed positions in real, publicly traded securities. (Willis Decl. ¶ 7.) Had there been fictitious securities listed on the statements, they would have been detected by the Wellesley employee who regularly compared them with actual market data provided by an independent service. (*Id.*) Second, the value of the securities positions reflected on the monthly BLMIS statements bore a direct relation to reality. Each month, the Wellesley employee compared the values on the BLMIS statements with the values provided by the independent service, and the employee did not detect discrepancies. (*Id.* ¶ 6.) Unlike the "entirely artificial numbers" of the first group of *New Times* investors, the real securities on the Shapiro statements behaved on paper the way such securities actually performed in the marketplace.

The Trustee attempts to distinguish the BLMIS customers from the *New Times* investors on the basis that "the final fictitious BLMIS customer statements did not represent the growth of long-term holdings over time, as Madoff purported to regularly cash out the stock positions of his customers." (Trustee Mem. at 42.) This is not true with respect to the Shapiro Family and Foundation accounts, in which the vast majority of positions were held for years and sometimes even for decades. (Willis Decl. ¶ 4.) Thus, the value of the securities positions on the Shapiro statements reflected long-term growth of real securities, just like the second group of *New Times* investors whose net equity was determined on the basis of their last account statements.

## **CONCLUSION**

For the reasons discussed above, and for those addressed in the Sterling Equities Memorandum, this Court should deny the Trustee's motion and rule that BLMIS customers' "net equity" claims equal the market value, as of the filing date, of the securities positions reflected on the customers' November 2008 account statements.

Dated: New York, New York
November 13, 2009

Respectfully submitted,

SHEARMAN & STERLING LLP

By: /s/Stephen Fishbein
Stephen Fishbein
James Garrity
Richard Schwed
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
sfishbein@shearman.com

*Attorneys for Carl J. Shapiro and Other Movants (complete list set forth in footnote 1 herein)*

5