# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br><br><br>Hearing Date: February 2, 2010, at 10:00 a.m. |

## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

Wachovia Bank, National Association ("Wachovia"), by and through its attorneys,

McCarter & English, LLP, hereby objects to the Notice of Trustee's Determination of Claim[1]

submitted by Irving H. Picard, the Trustee for the SIPA liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), with respect to the Customer Claim submitted by

Wachovia, and in support of its Objection states:

## BACKGROUND

1.      Wachovia submitted a Claim (the "Claim"), regarding the customer account of

Hollyplant Investment Limited Partnership ("Hollyplant")[2], Account Number 1-H0071-3-0 (the

"Account"), a true and correct copy of which Claim is attached hereto as Exhibit A (from which

---

[1] Since, as set forth herein, it is Wachovia's position that a determination of "net equity" under the "cash-in-cash-out" method is not permitted under SIPA, the Trustee is obligated to issue a claim determination letter that does not follow this method.  Wachovia reserves all rights and defenses to such determination letter if and when issued.

[2] Wachovia filed the Claim because the Account was pledged as collateral for a loan given by Wachovia to Hollyplant.  Hollyplant is a "customer" as that term is defined under SIPA. Wachovia assumed exclusive control over the Account, and therefore Wachovia is entitled to receive the proceeds to which Hollyplant is entitled under SIPA.

the taxpayer identification numbers of the parties have been redacted).

2.    Wachovia received a determination letter from the Trustee with regard to the Claim, a true and correct copy of which is attached hereto as <u>Exhibit B</u>. As set forth in the letter, the Claim was deemed to be allowed in the amount of $7,901,539.29, representing the sum of deposits minus withdrawals from the Account, <u>i.e.</u>, based on the "cash-in-cash-out" method.

3.    As shown from the last statement for the Account, a true and correct copy of which is attached hereto as <u>Exhibit C</u>, BLMIS claimed that the market value of the securities in the Account was $44,531,795.04 as of November 30, 2008.

## <u>LEGAL ARGUMENT</u>

4.    The Trustee's determination of customers' "net equity" under the "cash-in-cash-out" method is in derogation of SIPA's plain language and unambiguous purpose.

5.    The legislative history of SIPA makes clear that the purpose of SIPA is to protect customers' "legitimate expectations."[3] <u>See</u> H.P. 95-746 at 21. SIPA should be interpreted so as to effectuate this purpose. <u>See</u> <u>Tcherepnin v. Knight</u>, 389 U.S. 332, 336 (1967) ("remedial legislation should be construed broadly to effectuate its purposes").

6.    SIPA protects customers' "legitimate expectations" by creating a statutory scheme in which, in the event of the failure of a broker-dealer, "the trustee must 'satisfy net equity claims of customers' of the failed broker-dealer." <u>In re New Times Sec. Servs.</u>, 371 F.3d 68, 72 (2d Cir. 2004) ("<u>New Times</u>"). SIPA thus provides a "customer" with a statutory entitlement to satisfaction of its "net equity" claim.

7.    SIPA dictates that customers' "net equity" be determined by their "securities positions": "net equity" is determined on the basis of the amount "which would have been owed

---

[3] A number of interested parties have developed this point at length, and Wachovia joins in their arguments.

by the debtor to such customer if the debtor had liquidated . . . all securities positions of such customer." 15 U.S.C. § 78lll(11). The plain language of the statute does not leave room for any other determination of "net equity."

8.      Here, the Trustee has not determined "net equity" on the basis of customers' "securities positions" as proscribed by SIPA. The Trustee has decided that, in this case, "net equity" shall be determined by a customer's deposits minus withdrawals. The Trustee has no authority to determine "net equity" in this manner. "Net equity" is a defined term under SIPA, and the Trustee may not re-write the statute enacted by Congress, on which "customers" of a broker-dealer are entitled to rely for protection.

9.      Despite the clear definition in the statute, the Trustee is apparently attempting to do equity in the context of a Ponzi scheme by utilizing the "cash-in-cash-out" method. The Trustee, however, makes no assertion that "customers" such as Hollyplant were active participants in wrongdoing. They are merely victims entitled to the protections of SIPA. If the Trustee believes that the consequences of "cash-out" require adjustment, then the Trustee has available to him the fraudulent conveyance laws. But there is no need to torture the statutory definition of "net equity."

10.      The Trustee argues that it cannot determine "net equity" with regard to customers' "securities positions" because such positions were not "real."[4] Trustee's Memorandum of Law, p. 44. Yet there is no basis for reading into SIPA a requirement that "securities positions" be real or actual.

---

[4] The "securities positions" were not real in the sense that BLMIS did not actually purchase the securities. But, apart from limited exceptions (see Trustee's Memorandum of Law, p. 41), the Trustee does not appear to dispute that the securities set forth on customer account statements include shares of stock in well-known corporations, such as Apple, Inc., Chevron Corp., and Google, and other securities that actually existed in the marketplace.

3

ME1 9288334v.3

11.     Indeed, SIPA would fail in its mission to protect customers' "legitimate expectations" if there were a requirement that "securities positions" be real or actual.  SIPA liquidations often involve claims of fraud or embezzlement where, as here, the securities reflected on customer account statements were either never purchased or were purchased but then misappropriated.  See, e.g., New Times, 371 F.3d at 71 (involving "shares of bona fide mutual funds . . . that were never, in fact, purchased").   In such circumstances, SIPA steps in to protect "customers" that were victims of fraud or criminal activity[5] by allowing them to share in the distribution of the broker-dealer according to their "securities positions."  Whether a customer has a "securities position" for purposes of SIPA should turn on the customer's legitimate expectations as formed by the representations of the broker-dealer, and not on whether the broker-dealer actually held securities on behalf of the customer.

12.     If, as the Trustee contends, a "customer" does not have a "securities position" under SIPA when the broker-dealer successfully misappropriated (or never purchased) the securities, then such victims would have no "net equity" and hence would not be protected by SIPA.  Thus, importing into SIPA a requirement that "securities positions" be real or actual would deny protection to a common class of SIPA victims.  This would be inconsistent with SIPA's remedial Purpose of "protecting investors and inspiring confidence in the securities markets."  New Times, 371 F.3d at 87.

13.     The Trustee attempts to avoid this result by simply crafting a different definition of "net equity."  The Trustee relies on New Times to do so, but there is nothing in New Times

---

[5] Allegations of criminal activity are commonplace in SIPA liquidations.  See SIPC 2008 Annual Report, p. 14, available at http://www.sipc.org/pdf/SIPC%20Annual%20Report%202008%20FINAL.pdf ("Criminal actions have been initiated in 129 of the 322 SIPC proceedings commenced since enactment of the Securities Investor Protection Act in December 1970.")

that provides that a trustee may disregard customer statements where, as here, the broker-dealer fraudulently claimed to have purchased "real" securities.  Indeed, as the Trustee concedes, "it is true that for claimants who believed that they had invested in 'real' mutual funds in New Times, the trustee calculated net equity based upon the 'earnings' on those investments as represented on their customer statements."  Trustee's Memorandum of Law, p. 41.  In other words, if a customer believed the broker-dealer had invested in, for example, shares of IBM or some other security that actually existed in the marketplace, the trustee in New Times looked to the customer's account statement to determine its "net equity."

14.    As to Hollyplant, its account statements (on which Wachovia relied in granting a $32,500,000 loan), reflect stock in well-known, existing corporations and funds.  Hollyplant, and by extension Wachovia, was entitled to rely upon these statements and was entitled to rely on the regulatory oversight applicable to BLMIS and to the protections afforded to customers under SIPA upon the economic failure of BLMIS.  The Trustee may not alter that entitlement after-the-fact by creating a new definition of "net equity."

## CONCLUSION

15.    The Trustee cannot determine "net equity" under the "cash-in-cash-out" method. The Trustee is bound by SIPA to determine "net equity" in accordance with customers' "securities positions," and the Trustee should honor the "securities positions" set forth on customers' most recent statements.  Doing so accords with the plain language of SIPA and is consistent with SIPA's aim of protecting investors' "legitimate expectations."

16.    Wachovia reserves the right to amend or supplement this Objection based upon additional legal arguments raised by the Trustee or other claimants.

ME1 9288334v.3

Dated: November 13, 2009

McCARTER & ENGLISH, LLP
Attorneys for Wachovia Bank, National
Association

By:   /s Joseph Lubertazzi, Jr.
Joseph Lubertazzi, Jr. (JL-3798)
A Member of the Firm

245 Park Avenue, 27th Floor
New York, NY 10167
Phone: (212) 609-6800
Fax: (212) 609-6921

-AND-

Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Phone: (973) 622-4444
Fax: (973) 624-7070

ME1 9288334v.3