**Schulte Roth & Zabel LLP**
919 Third Avenue
New York, New York  10022
Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955
William D. Zabel
Email:  william.zabel@srz.com
Michael L. Cook
Email:  michael.cook@srz.com
Marcy Ressler Harris
Email:  marcy.harris@srz.com
Frank J. LaSalle
Email:  frank.lasalle@srz.com

Hearing Date:  February 2, 2010
Hearing Time:  10:00 AM (EST)

*Attorneys for the SRZ Claimants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

       Plaintiff,

       v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

       Defendant.

Adv. Pro. No. 08-01789-BRL

SIPA Liquidation

In re:

BERNARD L. MADOFF,

       Debtor.

**MEMORANDUM OF LAW SUBMITTED BY THE SRZ CLAIMANTS**
**IN OPPOSITION TO THE TRUSTEE'S INTERPRETATION OF "NET EQUITY"**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.     "NET EQUITY" IS TO BE CALCULATED BASED ON THE LIQUIDATION
       VALUE OF CLAIMANTS' SECURITIES POSITIONS REFLECTED ON
       THEIR LAST ACCOUNT STATEMENTS AS OF THE FILING DATE....................... 3

       A.     Section 78*lll*(11) Defines "Net Equity" As The Liquidation Value Of The
              Securities Reflected On A Claimant's Last Account Statement............................ 4

       B.     Interpreting "Net Equity" As The Liquidation Value Of The Securities
              Reflected On A Claimant's Last Account Statement Is Entirely Consistent
              With SIPA's Purpose. ............................................................................. 6

       C.     Interpreting "Net Equity" As The Liquidation Value Of The Securities
              Positions Reflected On Claimants' Last Account Statements Is Consistent
              With SIPC's Application Of "Net Equity" In *New Times*.. ...................................... 9

       D.     The Trustee Erroneously Relies On *Old Naples* And Ponzi Scheme Cases......... 13

II.    INTERPRETING "NET EQUITY" TO MEAN THE LIQUIDATION VALUE
       OF THE SECURITIES REFLECTED ON THE CUSTOMER'S LAST
       ACCOUNT STATEMENT IS CONSISTENT WITH SIPA AND THE
       TRUSTEE'S POWERS UNDER SIPA........................................................................... 16

III.   IF THEY ARE RELEVANT AT ALL, EQUITY AND PUBLIC POLICY
       REQUIRE ADHERENCE TO CUSTOMERS' LEGITIMATE EXPECTATIONS
       AS REFLECTED ON THEIR LAST ACCOUNT STATEMENTS............................... 21

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Conn. Nat'l Bank v. Germain*,
   503 U.S. 249 (1992), *cert. denied*, 129 S. Ct. 640 (2008) ........................................................4

*Donell v. Kowell*,
   533 F.3d 762 (9th Cir. 2008)...................................................................................15, 20

*First Fed. Sav. & Loan Ass'n v. Bevill, Bressler & Schulman, Inc. (In re Bevill, Bressler & Schulman, Inc.)*, 59 B.R. 353 (D.N.J. 1986) ...........................................................5

*Focht v. Athens (In re Old Naples Sec., Inc.)*,
   311 B.R. 607 (M.D. Fla. 2002) ...............................................................................14

*Gross v. FBL Fin. Serv., Inc.*,
   – U.S. –, 129 S. Ct. 2343 (2009)...............................................................................4

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1 (2000)......................................................................................................22

*In re Hanover Square Sec.*,
   55 B.R. 235 (Bankr. S.D.N.Y. 1985) .......................................................................18

*In re New Times Sec. Servs., Inc.*,
   371 F.3d 68 (2d Cir. 2004).............................................................................*Passim*

*In re New Times Sec. Servs., Inc.*,
   463 F.3d 125 (2d Cir. 2006) ..........................................................................*Passim*

*In re U.S. Lines, Inc.*,
   199 B.R. 476 (Bankr. S.D.N.Y. 1996) .....................................................................22

*Jiminez v. Quarterman*,
   – U.S. –, 129 S. Ct. 681 (2009) ...............................................................................4

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*,
   247 B.R. 51 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406 (S.D.N.Y. 2001)............................19, 20

*SEC v. Aberdeen Sec. Co.*,
   480 F.2d 1121 (3d Cir. 1973)......................................................................................5

*SEC v. S.J. Salmon & Co.*,
   72 Civ. 560, 1973 U.S. Dist. LEXIS 15606 (S.D.N.Y. Aug. 8, 1973) .....................21

*SIPC v. Barbour*,
 421 U.S. 412 (1975)............................................................................6

*SIPC v. C.J. Wright & Co. (In re C.J. Wright & Co.)*,
 162 B.R. 597 (Bankr. M.D. Fla. 1993) ...................................................14

*Tese-Milner v. Moon (In re Moon)*,
 385 B.R. 541 (Bankr. S.D.N.Y. 2008) .....................................................4

*U.S. v. Kozeny*,
 541 F.3d 166 (2d Cir. 2008).....................................................................4

*U.S. v. Ron Pair Enters., Inc.*,
 489 U.S. 235 (1989).................................................................................4

*Universal Church v. Geltzer*,
 463 F.3d 218 (2d Cir. 2006), *cert. denied,* 549 U.S. 1113 (2007) ............4


## STATUTES

15 U.S.C. §§ 78aaa, *et seq* (2009)................................................................1

15 U.S.C. § 78fff-2(a) (2009) ........................................................................5

15 U.S.C. § 78fff-2(d) (2009) ............................................................ 5-6, 7, 12

15 U.S.C. § 78fff-3(a) (2009) ..................................................................14, 22

15 U.S.C. § 78*lll*(2) (2009) ..................................................................... 17-18

15 U.S.C. § 78*lll*(11) (2009) ...............................................................*Passim*

17 C.F.R. § 300.502 (2009) ...........................................................................6


## LEGISLATIVE MATERIALS

H.R. Rep. No. 95-746 (1977).................................................................*Passim*

S. Rep. No. 91-1218 (1970) .................................................................... 6-7

S. Rep. No. 95-763 (1978), *reprinted in* 1978 U.S.C.C.A.N. 765............9, 16

*Securities Investor Protection: Hearing on H.R. 13308, H.R. 17585, H.R. 18081, H.R. 18109, and H.R. 18458 Before the Subcomm. on Commerce and Finance of the H. Comm. on Interstate and Foreign Commerce*, 91st Cong. 149-150 (1970) (Statement of Hamer H. Budge, Chairman, SEC)......................................................................24


**MISCELLANEOUS**

Brief of Appellant James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc., *In re New Times Sec. Servs., Inc.*, 463 F.3d 125 (2d Cir. 2006) (No. 05-5527(bk)), 2005 WL 5338147 ..................................................................7, 8

Brief of Appellant SIPC, *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125 (2d Cir. 2006) (No. 05-5527-bk), 2005 WL 5338148 ..............................*Passim*

Brief for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of the Substantively Consolidated Estates of New Times Securities Services, Inc. and New Age Financial Services, Inc., and Securities Investor Protection Corporation, *In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004) (No. 02-6166), 2003 WL 24132249.....................................4, 6, 14

Brief for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc., and Securities Investor Protection Corporation, *In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004) (No. 02-6166), 2002 WL 32487939 .....................................................................................15, 16, 21

Brief of the Securities and Exchange Commission, Amicus Curiae, in Partial Support of the Position of Appellees, *In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004) (No. 02-6166), 2003 WL 24132250.............................................18

Reply Brief for Appellant James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc., *In re New Times Sec. Servs., Inc.*, 463 F.3d 125 (2d Cir. 2006) (No. 05-5527(bk)), 2006 WL 4452912 ................................................................................13

Schulte Roth & Zabel LLP represents eighteen claimants who are identified in Schedule A attached hereto (collectively, the "SRZ Claimants"). The SRZ Claimants timely filed customer claims in accordance with the Court's Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing Other Relief, dated December 23, 2008 (the "Claims Order"). To date, the Trustee of Debtor Bernard L. Madoff Securities, LLC ("BLMIS") has determined the claims of three of the SRZ Claimants, allowing one in part and denying two in their entirety, based on a misinterpretation of the term "net equity," which is defined in Section 78*lll*(11) of the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA").[1]

Pursuant to the Court's Order Scheduling Adjudication of "Net Equity" Issue, dated September 16, 2009, the SRZ Claimants respectfully submit this memorandum of law in opposition to the "net equity" submissions made by the Securities Investor Protection Corporation ("SIPC") and the Trustee (collectively, the "Trustee") on October 16, 2009,[2] and in support of the interpretation of "net equity" that the SIPA statute mandates, which is the filing date liquidation value of the securities positions reflected on customers' last account statements.

## **PRELIMINARY STATEMENT**

Under the Claims Order, the Trustee is charged with "satisfying a customer's 'net equity' claim, as defined in 15 U.S.C. § 78*lll*(11)." As the Trustee acknowledges, "[u]nder

---

[1]   The status of each of the SRZ Claimants' claims are set forth on Schedule A attached hereto.

[2]   References to the Trustee's Memorandum Of Law In Support Of Trustee's Motion For An Order Upholding Trustee's Determination Denying "Customer" Claims For Amounts Listed On Last Customer Statement, Affirming Trustee's Determination Of Net Equity, And Expunging Those Objections With Respect To The Determinations Relating to Net Equity are cited herein as "Trustee Mem. at ___." References to the Memorandum Of Law Of The Securities Investor Protection Corporation In Support Of Trustee's Motion For An Order Upholding Trustee's Determination Denying "Customer" Claims For Amounts Listed On Last Statement, Affirming Trustee's Determination Of Net Equity, And Expunging Those Objections With Respect To The Determinations Relating To Net Equity are cited herein as "SIPC Mem. at ___."

section 78*lll*(11) of SIPA, 'net equity' is defined in relevant part as the 'dollar amount of the account or accounts of a customer, to be determined by . . . (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus (B) any indebtedness of such customer to the debtor on the filing date[.]'"  (Trustee Mem. at 24 (quoting 15 U.S.C. § 78*lll*(11)).)  Yet, from the outset of this SIPA liquidation, the Trustee has refused to satisfy net equity claims "as defined in 15 U.S.C. § 78*lll*(11)."  Instead, the Trustee has utilized his own definition of "net equity," which inures only to the benefit of SIPC and denies BLMIS customers their statutory entitlements under SIPA.

Specifically, the Trustee has determined that "net *equity*" actually means "net *investment*."  Thus, instead of calculating "net equity" based on the liquidation value of claimants' securities positions, as Section 78*lll*(11) and SIPC's own prior interpretations of SIPA require, the Trustee instead has calculated each claimant's "net investment" by netting the claimant's deposits in and withdrawals from BLMIS.  Using that erroneous methodology, the Trustee has determined that claimants whose withdrawals from BLMIS exceeded their deposits into BLMIS have no net equity claim at all.  Moreover, the Trustee has determined that no claimants can have a valid net equity claim greater than the amounts of their respective BLMIS deposits, regardless of the liquidation value of the securities reflected on their last BLMIS account statements.

The Trustee's interpretation of "net equity" is contrary to the plain language and purpose of SIPA, contradicts SIPC's own prior interpretation and application of Section 78*lll*(11), contravenes public policy, and unfairly penalizes long-term BLMIS investors.  The Court should

2

direct the Trustee to fulfill his statutory mandate and satisfy claimants' net equity claims in accordance with the requirements of Section 78*lll*(11) of SIPA.

## ARGUMENT[3]

I.    **"NET EQUITY" IS TO BE CALCULATED BASED ON THE LIQUIDATION VALUE OF CLAIMANTS' SECURITIES POSITIONS REFLECTED ON THEIR LAST ACCOUNT STATEMENTS AS OF THE FILING DATE.**

The Trustee's submission[4] is devoted entirely to arguing why, under the facts of this case, or in the context of a Ponzi scheme generally, "net equity" should not be interpreted as being the liquidation value of the securities reflected on the claimant's last account statement. Conspicuously absent from the Trustee's arguments is any attempt to demonstrate that SIPA, and more particularly Section 78*lll*(11) of SIPA, is in any way susceptible to the Trustee's "net investment" interpretation. Indeed, in its memorandum, SIPC does not even bother to set forth the language of Section 78*lll*(11) at all. The Trustee's only substantive discussion of Section 78*lll*(11) is found in his Statement of Facts. (*See* Trustee Mem. at 24.)

SIPC and the Trustee avoid arguing that their interpretation of "net equity" is consistent with Section 78*lll*(11) because there is no argument to be made. Indeed, as SIPC itself explained in connection with the liquidation in this district of New Times Securities, Inc. ("New Times"), which also involved a Ponzi scheme, where, as here, "the claims are for securities, the *only* proper measure [of a customer's 'net equity' claim] permitted by [Section 78*lll*(11)] is the

---

[3]    The "net equity" issue presents a question of statutory interpretation, to which the facts underlying BLMIS' Ponzi scheme or individual claimants' account histories are superfluous. The only facts that are relevant here are that (1) SIPC and the Trustee have determined, as they must, that all claimants' claims are being treated as "claims for securities" under SIPA (Trustee Mem. at 26; SIPC Mem. at 7); and (2) with only one purported (and nominal) exception, all claimants' claims relate to real securities positions or to United States Treasury Bills (*see* note 5 *infra*). To the extent additional facts are useful for illustrative purposes, they will be discussed in connection with the argument to which they apply.

[4]    To the extent applicable, all references to the Trustee or to the Trustee's submission also include references to SIPC and to the SIPC submission.

liquidation value of the security."  Brief for Appellants James W. Giddens as Trustee for the

Liquidation of the Businesses of the Substantively Consolidated Estates of New Times Securities

Services, Inc. and New Age Financial Services, Inc., and Securities Investor Protection

Corporation at 3, *In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004) ("*New Times I*")

(No. 02-6166), 2003 WL 24132249, at *3 ("SIPC and Trustee 2003 Br. *New Times I*") (emphasis

added).

> A.    **Section 78*lll*(11) Defines "Net Equity" As The Liquidation Value Of The Securities Reflected On A Claimant's Last Account Statement.**

The meaning of the term "net equity," as used in SIPA, is a pure question of

statutory interpretation.  As such, any inquiry into the proper meaning of "net equity" must begin

with the plain language of SIPA.  *See, e.g.*, *Gross v. FBL Fin. Servs., Inc.*, – U.S. –, 129 S. Ct.

2343, 2350 (2009); *Jiminez v. Quarterman*, – U.S. –, 129 S. Ct. 681, 685 (2009); *U.S. v. Kozeny*,

541 F.3d 166, 171 (2d Cir. 2008); *Universal Church v. Geltzer*, 463 F.3d 218, 223 (2d Cir.

2006); *Tese-Milner v. Moon (In re Moon)*, 385 B.R. 541, 556 (Bankr. S.D.N.Y. 2008).  If the

plain language is unambiguous, as it is here, the Court's inquiry must stop.  *U.S. v. Ron Pair*

*Enters., Inc.*, 489 U.S. 235, 241 (1989) ("[W]here . . . the statute's language is plain, the sole

function of the courts is to enforce it according to its terms."  (citation and internal quotation

marks omitted)); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated

time and again that courts must presume that a legislature says in a statute what it means and

means in a statute what it says there.  When the words of a statute are unambiguous, then, this

first canon is also the last:  judicial inquiry is complete."  (citations and internal quotation marks

omitted)).

Here, there is no ambiguity as to what "net equity" means under SIPA. The statutory language is susceptible only to the interpretation of "net equity" advanced by the SRZ Claimants and other claimants.

Section 78*lll*(11) provides:

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by—
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date; plus
>
> (C) any payment by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff-2(a) of this title).
>
> In determining net equity under this paragraph, accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers.

15 U.S.C. § 78*lll*(11). By its clear terms, "net equity" means the value of claimants' "securities positions," less any amounts owed by claimants to BLMIS, as of the filing date of the SIPA liquidation proceeding. *See New Times I*, 371 F.3d at 72; *SEC v. Aberdeen Sec. Co.*, 480 F.2d 1121, 1123-24 (3d Cir. 1973); *First Fed. Sav. & Loan Ass'n v. Bevill, Bressler & Schulman, Inc. (In re Bevill, Bressler & Schulman, Inc.)*, 59 B.R. 353, 364 (D.N.J. 1986).

Equally clear is that a customer's "securities positions" need not represent actually-held securities on the filing date. Consistent with SIPA's legislative history (*see* Section I.B., *infra*), SIPA expressly authorizes trustees to "purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities." 15 U.S.C.

§ 78fff-2(d).  It would not be necessary to empower trustees to purchase securities in satisfaction

of claims for net equities if such claims only could be based on actually-held securities.

       Here, the SRZ Claimants, like other claimants, received confirmations and

account statements reflecting that they held "securities positions" as of the filing date.  Moreover,

the Trustee already has determined that BLMIS' customers have claims for securities rather than

for cash.  (*See* Trustee Mem. at 26.)  Necessarily, that means that customers either actually hold

securities positions, they have received a confirmation reflecting the purchase or sale of the

securities, or the securities at issue are subject to a completed or executory contract for their

purchase or sale.  *See* 17 C.F.R. § 300.502.  Under those circumstances, the "only proper"

measure of Claimants' net equity claims consistent with the plain language of SIPA "is the

liquidation value of the security."  SIPC and Trustee 2003 Br. *New Times I* at 3, 2003 WL

24132249, at *3.

    **B.**    **Interpreting "Net Equity" As The Liquidation Value Of The Securities
Reflected On A Claimant's Last Account Statement Is Entirely Consistent
With SIPA's Purpose.**

       Because there is no ambiguity in Section 78*lll*(11), the Court does not need to

look beyond the statutory plain language to reject the Trustee's "net investment" definition of

"net equity."  However, if the Court were to look behind the statutory plain language and

consider Congress' purpose in enacting SIPA, it would be forced to conclude that the only

permissible interpretation of "net equity" is the one that the SRZ Claimants advance.

       The Supreme Court has confirmed that "Congress' primary purpose in enacting

the SIPA and creating the SIPC was . . . the protection of investors."  *SIPC v. Barbour*, 421 U.S.

412, 421 (1975); *see also New Times I*, 371 F.3d at 84 (noting SIPA's "emphasis on investor

protection"); S. Rep. No. 91-1218, at 1 (1970) ("[T]he broad purpose of [SIPA] is to afford

financial protection for the customers of registered brokers and dealers and members of national

securities exchanges."). To achieve Congress' primary purpose, Congress placed unwavering emphasis on satisfying the legitimate expectations of the customers of registered broker-dealers. *See* Brief of Appellant SIPC at 23, *Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*, 463 F.3d 125 (2d Cir. 2006) ("*New Times II*") (No. 05-5527-bk), 2005 WL 5338148, at *12 ("SIPC Br. *New Times II*") ("Claimant expectations lie at the heart of SIPA . . . ."). Customers' expectations are satisfied under SIPA when, despite losses by a failed broker-dealer, customers are restored to the positions they believed they were in as of the filing date. *See* 15 U.S.C. § 78fff-2(d) (authorizing purchase of securities "in order to restore the accounts of such customers as of the filing date"); Brief of Appellant James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc. at 27, *New Times II* (No. 05-5527(bk)), 2005 WL 5338147, at *13 ("Trustee Br. *New Times II*") ("SIPA remedies the losses of customers by returning to them the property – when necessary, through SIPC cash advances – that the broker is or should be holding for purposes of securities trading on the filing date of the liquidation proceeding.")

The Trustee's interpretation of "net equity" flies in the face of SIPA's emphasis on investor protection, which is to be carried out by satisfying customers' legitimate expectations. The Trustee's interpretation not only ignores the securities positions the SRZ Claimants and others believed were in their accounts as of the filing date, but also ignores decades-worth of transactions the SRZ Claimants and others believed had been made.

The Trustee tries to explain away the blatant inconsistency between his own interpretation of "net equity" and SIPA's clear statutory language by pointing to an unsupported and unsupportable, wholly made up distinction that is nowhere found in the SIPA statute, its legislative history, or its application over nearly four decades. The Trustee's explanation is that

7

customer expectations are relevant only with respect to the nature of the customer's SIPA claim – *i.e.*, a claim for cash or a claim for securities – but cease to have relevance when calculating "net equity." (*See* Trustee Mem. at 37-39; SIPC Mem. at 23-24.)  According to the Trustee, when it comes to determining the amount of the customer's claim, the result should be driven by the transactional reality that BLMIS purportedly never conducted any trading activity in any claimants' accounts.

The interpretation of "net equity" that the Trustee and SIPC advance is directly contrary to the positions the trustee and SIPC took in the New Times liquidation.  Thus, where SIPC and the Trustee here argue that claimants' legitimate expectations are irrelevant to "net equity," in *New Times* the liquidating trustee and SIPC argued the exact opposite; they argued unequivocally that the amount owed under the net equity calculation "*turns entirely* on the claimant's legitimate filing date expectations regarding his or her account."  *See* SIPC Br. *New Times II* at 25, 2005 WL 5338148, *13 (citations omitted; emphasis added); Trustee Br. *New Times II* at 18, 22, 2005 WL 5338147, at *10-11.  Likewise, where the Trustee and SIPC now argue that transactional realities should be given preference over customer expectations, in *New Times* the trustee and SIPC insisted it was "[o]f vital importance" that "reasonable and legitimate claimant expectations on the filing date are controlling *even where inconsistent with transactional reality* . . . [such as] where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund the purchase."  SIPC Br. *New Times II* at 23-24, 2005 WL 5338148, at *12 (emphasis added).

The Trustee's and SIPC's insistence in the *New Times* case that "reasonable and legitimate claimant expectations on the filing date are controlling" – even in the absence of legitimate securities trades – was consistent with the language of SIPA and firmly grounded in

8

the legislative history of the statute.  As the Senate Report explaining the 1978 amendments to

SIPA stated:

> Under present law, because securities belonging to customers may have
> been lost, improperly hypothecated, misappropriated, *never purchased*
> or even stolen, it is not always possible to provide to customers that
> which they expect to receive, that is, securities which they maintained
> in their brokerage account. . . .  By seeking to make customer accounts
> whole and returning them to customers in the form they existed on the
> filing date, *the amendments . . . would satisfy the customers' legitimate
> expectations* . . .

S. Rep. No. 95-763, at 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764, 765 (emphasis added).

Similarly, the House Report related to the 1978 amendments explained that

> *[a] customer generally expects to receive what he believes is in his
> account at the time the stockbroker ceases business.*  But because
> securities may have been lost, improperly hypothecated,
> misappropriated, *never purchased*, or even stolen, that is not always
> possible.  Accordingly, [when this is not possible, customers] will
> receive cash based on the market value as of the filing date.

H.R. Rep. No. 95-746, at 21 (1977) (emphasis added).

The interpretation of "net equity" that the Trustee advocates must be rejected, as it

is inconsistent with past precedent and with the purpose and language of SIPA itself.

**C.    Interpreting "Net Equity" As The Liquidation Value Of The Securities
Positions Reflected On Claimants' Last Account Statements Is Consistent
With SIPC's Application Of "Net Equity" In *New Times*.**

The SRZ Claimants and others, as BLMIS customers, are seeking nothing more

than the treatment SIPC afforded similarly situated customers in *New Times*.  In *New Times*, the

debtor and its principal defrauded hundreds of investors through a long-running Ponzi scheme in

which they induced customers to invest, converted customer funds received, and then provided

customers with fraudulent confirmations and account statements reflecting fictitious investments

purportedly made on the customers' behalf.  The Ponzi schemer in *New Times* offered customers

investments in one or more wholly fictional money market funds (the "Fictitious Funds"), and

investments in mutual funds offered by bona fide investment companies, such as the Vanguard Group and Putnam Investments (the "Real Funds"). *New Times I*, 371 F.3d at 71.

Upon the collapse of the Ponzi scheme, a trustee was appointed and New Times was liquidated. Investors in the Fictitious Funds filed SIPA claims, as did investors in the Real Funds. Both sets of investors were virtually identically situated in the sense that (1) no securities ever were purchased for either set of investors, (2) both sets of investors received fraudulent confirmations reflecting fictitious trades, (3) and both sets of investors received fraudulent account statements reflecting fictitious securities positions. The only difference between the two sets of investors was that one set purportedly was "invested" in Fictitious Funds, which were non-existent securities that had no objectively verifiable value and could not be bought, and the other set purportedly was "invested" in Real Funds, which were real mutual funds with values that could be ascertained and which funds could be purchased to satisfy customer claims. The trustee determined that the investors in the Real Funds had valid SIPA claims for securities based on the filing date value of the Real Funds, while the investors in the Fictitious Funds only had claims for cash. *New Times I*, 371 F.3d at 74.

On appeal, the Second Circuit held that investors in the Fictitious Funds must be treated as having claims for securities because they received confirmations and therefore had legitimate expectations that they were holding securities. *Id*. at 87. However, the Court determined that the securities could only be valued at the amount of the investors' initial investments, *id.* at 88, because, as a subsequent Second Circuit panel explained, "there were no such securities, and it was therefore impossible to reimburse customers with the actual securities or their market value on the filing date (the usual remedies when customers hold specific securities)." *New Times II*, 463 F.3d at 129.

The BLMIS claimants here are in the same position as the Real Funds investors in *New Times*. The BLMIS claimants here – whether they were split-strike or buy-and-hold investors – purportedly invested in real securities with values that could be ascertained.[5]  There is no basis to disregard BLMIS customers' legitimate expectations in this case, but to conclude that customers' legitimate expectations were "of vital importance" and even "controlling" in *New Times*.

The Trustee argues that *New Times* is distinguishable because BLMIS never bought or sold securities (Trustee Mem. at 40), the transactions reflected on the BLMIS account statements could not have happened because they were backdated "based on historical prices" (*id.*), more stocks or options were traded than possible (*id.* at 40-41), the securities were purchased with fictitious profits (*id.* at 41), the securities were not held long term or subject to market risk  (*id.*), and the BLMIS investors did not select their own trades (*id.* at 42).   The Trustee's efforts to avoid the binding effect of *New Times* are unpersuasive.

For one thing, it makes no sense to determine SIPA protection based on the purported trading strategy used by the Ponzi scheme operator.  Trades are no more or less fictitious and investors' expectations are no more or less legitimate because there is more or less purported trading activity, more or less purported market risk, or more or less purported broker discretion involved in the false trading.  Focusing on the schemer's strategy, moreover, shifts the focus away from the investor, and puts the power to determine eligibility for SIPC relief

---

[5]    The sole exception was a purported investment in Fidelity Spartan U.S. Treasury Money Market Fund ("Fidelity Spartan"), which existed prior to 2005 and either closed or was renamed thereafter.  *See* Trustee Mem. at 41; Beth Healy, *Madoff Might Not Have Made Any Trades*, THE BOSTON GLOBE, Jan. 15, 2009, http://www.boston.com/business/articles/2009/01/15/madoff_might_not_have_made_any_trades/.  Overall, the investments in Fidelity Spartan reflected on BLMIS customer account statements were extremely small in proportion to the overall investments reflected on account statements.  In the case of the SRZ Claimants, often the purported investments in Fidelity Spartan accounted for less than 1% of the total account value.  Thus, the Fidelity Spartan investments should not impact how net equity claims are valued.  At worst, the Fidelity Spartan investments could simply be ignored in valuing the SRZ Claimants' accounts.

exclusively in the hands of the Ponzi scheme operator, enabling him to pick the winners and losers, which the Trustee purportedly seeks to prevent. (*See* Trustee Mem. at 52.)

Similarly, the Trustee's focus on the purported transactional realities of BLMIS' scheme improperly shifts the temporal focus of SIPA away from the filing date of the liquidation, which the legislative history, SIPC and SIPA unequivocally direct should be the focus. The Trustee's cash in/cash out methodology looks back over the life of a customer's account. However, SIPA's focus is singularly directed at the filing date, with the aim of restoring a customer's account to its filing date status in satisfaction of the customer's legitimate expectations. *See* 15 U.S.C. § 78fff-2(d). In this regard, just as the FDIC concerns itself only with how much was in a bank customer's account at the time of the bank failure and has no regard for how much was deposited or withdrawn in the past, SIPA, too, is focused solely on what securities are reflected on a customer's brokerage statement on the filing date. It is at that time that the securities reflected on the customer's account statement may be valued for sale or purchase, which are "the usual remedies when customers hold specific securities," *see New Times II*, 463 F.3d at 129, and it is only that time that is relevant to determining "net equity."

Finally, denying SIPA protection to those who delegate trading authority to a broker would only serve to disadvantage investors with perhaps the greatest need for SIPA coverage. Indeed, such investors may be less sophisticated and more in need of a broker's expertise to guide their investments. Making investor stock picking a requirement for SIPA protection could cause investors to not invest at all, make investment decisions they are not qualified to make, or stay in the market without protection. None of those outcomes is beneficial to investors, the market, or consistent with SIPA's customer protection mandate.

The Trustee's efforts to distinguish the Real Funds investors in *New Times* from the equally real investors in BLMIS are unpersuasive. There simply is no good reason to treat differently the SIPA claims of investors in each scheme. In both cases, real investors in real securities were defrauded by a real Ponzi schemer. In both cases, the transactional reality differed from the reality indicated on the customers' account statements. Yet, as demonstrated previously, "reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality." SIPC Br. *New Times II* at 23, 2005 WL 5338148, at *12; *see also* Reply Brief for Appellant James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc. at 3, *New Times II* (No. 05-5527(bk)), 2006 WL 4452912, at *3 ("What counts for purposes of SIPA protection is the legitimate expectations of a claimant on the filing date, not a prior relationship or the 'fictive' nature of the transaction.").

The only true distinction between BLMIS' investors and the Real Funds investors in *New Times* is the comprehensiveness of the BLMIS investors' victimization. It should not be the case that the level of SIPA protection decreases as the severity of the broker-dealer's wrongdoing increases. Yet that is the perverse reading of SIPA that the Trustee advocates, and that the Court should reject.

**D.     The Trustee Erroneously Relies On *Old Naples* And Ponzi Scheme Cases.**

The Trustee argues that Ponzi scheme investors should be treated the same way in SIPA and non-SIPA proceedings (*see* Trustee Mem. at 30-35), even though that premise has virtually no legal support. In fact, despite nearly forty years of SIPA liquidations involving hundreds of failed broker-dealers, several of which, like *New Times*, involved Ponzi schemes, the Trustee has identified only *one* case in which a court purportedly applied a net investment

approach to SIPA claim valuation on the grounds that the case involved a Ponzi scheme.  That

case, *Focht v. Athens (In re Old Naples Sec., Inc.)*, 311 B.R. 607 (M.D. Fla. 2002), unlike the

instant one, involved claims for cash, not claims for securities,[6] and therefore provides the Court

no guidance on the "net equity" issue here.

Even SIPC has acknowledged that "[i]f the claims are for cash, SIPC believes that

the amount of cash actually deposited by the customer (less any payments or withdrawals) is the

correct measure.  But *if the claims are for securities, the only proper measure permitted by the

statute is the liquidation value of the security.*"  SIPC and Trustee 2003 Br. *New Times I* at 3,

2003 WL 24132249, at *3 (emphasis added).  This distinction makes sense because the amount a

broker-dealer owes for cash previously invested necessarily is reduced by any amounts

subsequently paid by the broker-dealer to the customer.  With a claim for securities, on the other

hand, regardless of how much was originally invested, or previously or subsequently was paid,

the broker-dealer still owes the customer the securities that are reflected on the customer's

account statement as of the filing date, absent some indebtedness of the customer to the broker-

dealer.  Consequently, the "net investment" approach followed in *In re Old Naples* simply does

not translate to claims for securities.[7]

The numerous non-SIPA Ponzi scheme cases the Trustee relies on to support his

"net investment" approach are equally irrelevant to this SIPA case.  As SIPC has explained, "[i]n

enacting SIPA, Congress provided the *exclusive* framework under which qualified customer

---

[6]   The court in *In re Old Naples* did not specifically describe the nature of the customers' claims.  However, the court indicated that "[t]he relevant statutory limit in this case is $100,000 per claimant," *In re Old Naples*, 311 B.R. at 616, which is the statutory limit for cash claims.  *See* 15 U.S.C. § 78fff-3(a).

[7]   Beside *New Times* discussed above, the only other instance in which a court has utilized a net investment approach to claim valuation is in *SIPC v. C.J. Wright & Company (In re C.J. Wright & Company)*, 162 B.R. 597 (Bankr. M.D. Fla. 1993).  However, the appropriateness of the net investment methodology was not at issue in *In re C.J. Wright* because the claimants themselves agreed with that approach and, in any event, the case involved claims for cash and not claims for securities.  *See id.* at 609-10.  Thus, as with *In re Old Naples*, *In re C.J. Wright* does not support the Trustee's position in this case.

claims are satisfied."  Brief for Appellants James W. Giddens as Trustee for the Liquidation of

the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc.,

and Securities Investor Protection Corporation at 25, *New Times I* (No. 02-6166), 2002 WL

32487939, at *25 ("SIPC and Trustee 2002 Br. *New Times I*") (emphasis added).  That

framework provides a net equity claim to a customer when a broker-dealer fails *for whatever*

*reason*, and it defines how that claim is to be calculated.  How Ponzi scheme investors are

treated in other contexts, where SIPA is not implicated, is irrelevant to the way customers of a

registered broker-dealer are required to be treated under SIPA when the broker-dealer fails.  In

fact, non-SIPA Ponzi scheme cases (particularly where recovery is sought) often are aimed at

addressing claims third party investors may have to funds paid out by the debtor in the course of

the scheme.  However, by its express terms, the "net equity" calculation under SIPA involves

solely a determination of what the debtor owes the investor, and what the investor owes the

debtor.  There is no place in the SIPA calculation for what a third party investor believes the

debtor may owe.

       Moreover, the non-SIPA Ponzi scheme decisions the Trustee cites universally put

the transactional reality of the Ponzi scheme first, with the investor's expectations as to the

legitimacy of the investment a distant second, if they are considered at all.  *See, e.g.*, *Donell v.*

*Kowell*, 533 F.3d 762, 778 (9th Cir. 2008) (explaining that, even though investor "was getting

what looked like real profits," he was not entitled to retain payments because "in fact" it was just

part of "an elaborate shell game"), *cert. denied*, 129 S. Ct. 640 (2008).  As demonstrated above,

however, SIPA demands that the order of priorities must be reversed.  Under SIPA, as

demonstrated above, customers' filing-date expectations "are controlling."  (*See* Section I.B.

*supra*.)

Finally, while the clear goal of non-SIPA Ponzi scheme cases is to restore investors to the positions they were in when they initially invested in the scheme by denying them their "false profits," the clear goal under SIPA is to restore a customer's account to the place it was when the scheme *failed – i.e.*, on the filing date. *See, e.g.*, S. Rep. No. 95-763, at 12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764, 775 (noting that "one of the essential features of the amendments [is] the delivery of securities to customers to the greatest extent possible in order to make customer accounts whole."); SIPC and Trustee 2002 Br. *New Times I* at 21, 2002 WL 32487939, at *21 ("With roots in Section 60e of the Bankruptcy Act, a reclamation statute, SIPA is a federal statutory scheme designed to restore 'customers' to the position they were in vis <u>a</u> vis their broker dealer before it was placed in liquidation."); *id.* at 23 ("The statute's legislative history unambiguously reflects that the goal of a SIPA proceeding is to restore customers as nearly as possible their accounts as they actually existed on the filing date.").

Given that the aims served in non-SIPA Ponzi scheme cases are fundamentally different from and, in some cases, incompatible with the aims of SIPA, the non-SIPA cases the Trustee relies on in support of a "net investment" approach should not inform the Court's "net equity" decision in this SIPA proceeding.

## II.    INTERPRETING "NET EQUITY" TO MEAN THE LIQUIDATION VALUE OF THE SECURITIES REFLECTED ON THE CUSTOMER'S LAST ACCOUNT STATEMENT IS CONSISTENT WITH SIPA AND THE TRUSTEE'S POWERS UNDER SIPA.

Unable to find support for his interpretation of "net equity" in the text or goals of SIPA, the Trustee suggests a number of makeweight arguments that purportedly would preclude application of SIPA as it is written and as Congress intended it to be applied. None of the Trustee's arguments allows the Court to set aside four decades of precedent as well as the statute's text and purpose.

16

First, the Trustee contends that claimants' "net equity" claims cannot be based on the liquidation value of the securities reflected on their BLMIS account statements and confirmations because other books and records of the debtor may have been inconsistent with those statements and confirmations. (*See* Trustee Mem. at 44-45; SIPC Mem. at 19.) However, SIPA provides that claimants who receive account statements and trade confirmations from their broker have a reasonable expectation that the security positions reflected on those documents are real, regardless of the totality of "books and records" that their broker may possess.[8] (*See* Section I, *supra*.)

Second, the Trustee argues that basing net equity on the securities positions reflected on a customer's last account statement is contrary to the definition of "customer," because "transfers" in furtherance of a Ponzi scheme are not made in the "ordinary course of business." (*See* Trustee Mem. at 45; *see also* SIPC Mem. at 24.) According to the Trustee, "while a claimant is a customer for purposes of the cash she entrusted to BLMIS to purchase securities, she cannot be a customer for claims to particular securities whose purported 'purchase' was made in furtherance of Madoff's Ponzi scheme." (Trustee Mem. at 46.) This argument, too, is contrary to SIPA.

Section 78*lll*(2) of SIPA defines "customer," in relevant part, as "any person . . . who has a claim on account of securities received, acquired, or held by the debtor in the ordinary

---

[8]    In a similar vein, the Trustee also contends that "inherent in the definition of Net Equity is that securities actually be paid for by the customer," which the Trustee posits is evident from the fact that Section 78*lll*(11) requires an offset to "net equity" for the "indebtedness of [the] customer to the debtor on the filing date." (Trustee Mem. at 43.) The Trustee, however, has it backwards. The purpose of the "indebtedness" offset is to account for the fact that customers may not pay for the securities bought for their account at the time of a transaction, but, rather, may buy such securities on margin. *See* H.R. Rep. No. 95-746, at 35 (1977) ("The bill modifies the definition of 'net equity' in order to make clear that margin and cash customers are to be treated equally . . . ."). What is more, the Trustee is again doing precisely what SIPC has stated cannot be done – putting the transactional realities ahead of the legitimate expectations of the customer (*see* SIPC Br. *New Times II* at 23-34, 2005 WL 5338148, at *12). BLMIS customers had an expectation that they actually held securities in their accounts; actually were receiving money when BLMIS sold those securities; and actually were paying for any new securities that were subsequently acquired. Those expectations were legitimate, and are controlling.

course of its business as a broker." 15 U.S.C. § 78*lll*(2). Whether "transfers" made in connection with a Ponzi scheme are made "in the ordinary course of business" has no bearing on whether a broker has "received, acquired or held" securities in the ordinary course of its business.

Moreover, as to the "ordinary course" requirement under SIPA, courts are clear that the requirement is satisfied where, as here, "the claimant entrusts cash or securities to the broker for some purpose connected with participation in the securities market." *In re Hanover Square Sec.*, 55 B.R. 235, 240 (Bankr. S.D.N.Y. 1985) (internal quotation marks and citations omitted). To hold that customers lose their entitlement to the liquidation value of their securities simply because their broker engages in fraud would defeat the very protection SIPA was enacted to provide: protection of customers' expectation interest in their securities positions from a broker who is *not* acting in the ordinary course of business – *i.e.*, one who has "misappropriated, never purchased, or even stolen" a customer's securities. H.R. Rep. No. 95-746, at 21 (1977); *see also* Brief of the Securities and Exchange Commission, Amicus Curiae, in Partial Support of the Position of Appellants and in Partial Support of the Position of Appellees at 17 n.5, *New Times I* (No. 02-6166), 2003 WL 24132250, at *18 n.5 ("There are two distinct risks . . . facing broker-dealer customers: the risk that the security purchased will be a bad investment and the risk that the broker-dealer will not execute the order, convert the customer's funds and become insolvent, leaving the customer with no cash or securities. SIPA was intended to protect customers against the latter risk . . . ."). The customers of BLMIS expected – and deserve – the full measure of SIPA protection because of Madoff's fraud, not in spite of it.

Third, the Trustee contends that only the "net investment" interpretation of "net equity" is consistent with his power to avoid fraudulent transfers because, he argues, it "cannot be the law" that the Trustee can avoid fraudulent transfers and be required to distribute customer

property based on the legitimate expectations of BLMIS' customers as reflected by their account statements. (*See* Trustee Mem. at 46-47; *see also* SIPC Mem. at 34-35.) Despite the Trustee's apparent confusion, there is no conflict between the claimants' "net equity" interpretation and the Trustee's avoidance powers, whatever they may be. The recovery and distribution of customer property are two distinct acts, both of which are aimed at alleviating the impact of BLMIS' fraud.

The real issue appears to be SIPC's misperception that it perpetuates Madoff's fraud by attempting to return BLMIS' customers, as nearly as possible, to the positions they believed they were in on the filing date. (*See* SIPC Mem. at 20-21.) The fraud that was committed was making BLMIS' customers believe they owned securities they did not own. Endeavoring to return the value of those securities to the victims is an effort to *undo* the fraud, which is exactly what SIPA is intended and required to do. Indeed, if anything perpetuates or "rubber-stamp[s] the fraud" (*see* SIPC Mem. at 20), it is SIPC's and the Trustee's rewriting of SIPA to deny BLMIS' customers the protections afforded by SIPA.

Finally, relying principally on the decision in *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406 (S.D.N.Y. 2001), SIPC and the Trustee argue that basing "net equity" on the liquidation value of claimants' filing date securities positions is inconsistent with the Trustee's authority to nullify fraudulent transactions. (Trustee Mem. at 47-49; SIPC Mem. at 25-37.) Reliance on *Ensminger* is misplaced.

In *Ensminger*, the debtor, Adler, Coleman Clearing Corp. ("Adler"), was a clearing firm for several introducing brokers, including Hanover Sterling & Company ("Hanover"). Hanover was a registered broker-dealer principally engaged in the business of underwriting initial public offerings and then acting as a market maker for the underwritten

19

securities (the "House Stocks").  In early 1995, Hanover became the target of an illegal short

selling scheme that decimated the value of the House Stocks, which caused Hanover to fall

below its SEC-mandated net capital requirements.  Aware that Hanover was on the verge of

liquidation, several Hanover brokers generated a series of fraudulent trades, cleared through

Adler, to create beneficial SIPA claims for certain customers.  Adler was unaware of the

fraudulent nature of the trades at issue, and itself went into liquidation as a result of Hanover's

failure.

In connection with Adler's liquidation, some of the beneficiaries of the Hanover

brokers' fraudulent trades asserted SIPA claims based on the fraudulent transactions.  The trustee

initiated an adversary proceeding to avoid and/or expunge the fraudulent trades.  After a trial, the

court granted judgment to the Trustee disallowing the claimants' claims on the grounds that,

among other things, the trades constituted fraudulent transfers and were illegal under federal

securities laws, the Martin Act and SIPA's criminal provisions.  *Ensminger*, 247 B.R. at 64-65.

Central to the court's ruling was its determination that the claimants were responsible for

Hanover's brokers' acts because the brokers were the claimants' agents and, under New York

law, principals are liable for their agents' fraud committed within the scope of their agency.  *See*

*id.* at 95-101.

This case, however, is fundamentally different from *Ensminger*.  First, unlike in

*Ensminger*, where the claimants were the intended beneficiaries of the fraudulent SIPA claims,

the claimants here were the targets of BLMIS' fraud.  Indeed, "even the winners were

defrauded."  *Donell*, 533 F.3d at 779.  It makes no sense to hold BLMIS' customers responsible

for their own fraud simply because they had a brokerage relationship with BLMIS.  If that were

the law, no brokerage customer ever could have a claim against a broker for the broker's tortious

conduct.

Moreover, in contrast to *Ensminger*, the Trustee is not seeking to reverse trades

that were designed to create beneficial SIPA claims for certain customers. Rather, the Trustee is

attempting to reverse *every* customer's trades and to reduce *every* customer's protection under

SIPA. Permitting the Trustee to void BLMIS' trades here serves no ameliorative purpose, but

instead only serves to further damage all of BLMIS' customers.

For these reasons, the Trustee's attempted application of *Ensminger* to this case

cannot be reconciled with the clear intent of SIPA, which aims "to make customer accounts

whole and return[] them to customers in the form they existed on the filing date." H.R. Rep. 95-

746, at 21 (1977); SIPC and Trustee 2002 Br. *New Times I* at 23, 2002 WL 32487939, at *23

("The statute's legislative history unambiguously reflects that the goal of a SIPA proceeding is to

restore customers as nearly as possible their accounts as they actually existed on the filing

date. . . . .").  Applying *Ensminger* here would render the goals of SIPA illusory.[9]

## III. IF THEY ARE RELEVANT AT ALL, EQUITY AND PUBLIC POLICY REQUIRE ADHERENCE TO CUSTOMERS' LEGITIMATE EXPECTATIONS AS REFLECTED ON THEIR LAST ACCOUNT STATEMENTS.

As a final gambit, the Trustee argues that equity and public policy dictate that

BLMIS customers should be denied their legitimate expectations as to the securities they held at

the time Madoff's Ponzi scheme unraveled.  (*See* Trustee Mem. at 52-53.)  It is well settled that

equity and public policy have no place in statutory interpretation, and here "net equity" must be

---

[9]    The Trustee also cites *SEC v. S.J. Salmon & Co.*, 72 Civ. 560, 1973 U.S. Dist. LEXIS 15606 (S.D.N.Y. Aug. 8, 1973), in support of his purported entitlement to void the claimants' BLMIS transactions.  (Trustee Mem. at 47-48.) However, *S.J. Salmon*, like *Ensminger*, involved transactions effected on the eve of liquidation for the purpose of creating SIPA claims for certain customers that "were deliberately made to place favored customers in a position so that they could assert cash claims against SIPC."  *S.J. Salmon & Co.*, 1973 U.S. Dist. LEXIS 15606, at *33.  That is not the case here and, thus, for the same reasons that *Ensminger* is inapplicable, *S.J. Salmon* also is inapplicable.

interpreted according to SIPA's plain language and clear purpose. *See, e.g.*, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 13-14 (2000) ("It suffices that the natural reading of the text produces the result we announce. Achieving a better policy outcome . . . is a task for Congress, not the courts."); *In re U.S. Lines, Inc.*, 199 B.R. 476, 481 (Bankr. S.D.N.Y. 1996) ("[W]hen a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code." (quotation omitted)).

However, even if equity and public policy were to be considered in interpreting the meaning of "net equity" under SIPA, they would yield the same result that the SRZ Claimants seek and the statute mandates. The Trustee's equity argument, by contrast, is based on an oversimplification and mischaracterization of the equities at issue. In the Trustee's view, because there purportedly are limited funds to distribute, applying SIPA the way it was written and intended "would reward [earlier] claimants who have already received back all their capital, at the expense of those who lost everything." (Trustee Mem. at 52.)

That characterization is false on a number of levels. As an initial matter, the funds available here are not as limited as the Trustee suggests. Unlike in a typical Ponzi scheme case, where the only funds available for distribution are the assets of the debtor and whatever funds the trustee can recover, SIPA provides up to $500,000 to every customer of a failed broker-dealer like BLMIS, irrespective of the amount of customer property available or the ultimate amount of the customer's net equity claim (provided it exceeds $500,000). *See* 15 U.S.C. § 78fff-3(a). The Trustee's interpretation of "net equity," however, deprives more than half of BLMIS' customers the benefit of that advance in its entirety and denies the full benefit of the advance to many others. The only winner is SIPC which, as a result of denying at least 2568

22

claimants their advance, can withhold more than $1.28 billion in payments from the fund created

solely to make such payments.  That is not equity, and it is not consistent with the language or

purposes of SIPA.

What is more, the Trustee's interpretation of  "net equity" unfairly pits "net

winners" against "net losers," which in many instances is a false distinction.  As the Trustee well

knows, many of Madoff's "net winners" made their withdrawals to pay taxes on fictitious profits

in their BLMIS accounts or to pay living expenses, and that money is gone.  For those "net

winners" who were fully invested with Madoff, they are in the same positions as those investors

(recent or otherwise) who never made any withdrawals from BLMIS – they have nothing.  "A

slavish adherence" to catch phrases like "net winners" and "net losers" does not serve equity

when, in reality, the two sets of investors often are similarly situated and equally deserving of the

protections guaranteed under SIPA.  (*See* Trustee Mem. at 52.)

Furthermore, the favoring of recent investors in BLMIS over earlier investors is

itself inequitable, particularly where it is coupled with clawback efforts.  More recent investors

had the opportunity to successfully invest outside of Madoff for decades, and retain and enjoy

those returns.  Today they face no threat that the Trustee is going to take away their substantial

investment returns.  Longer-term investors in BLMIS, however, are being asked to give back

decades worth of investment gains, leaving them no better off financially than they were 25 years

ago or more.  In a sense, long-term investors face a greater risk of victimization than more recent

investors, because only long-term investors are confronted, in their retirement years, with the

fear that the Trustee will come after them for clawbacks.

Finally, regardless of how long-term BLMIS investors are characterized relative

to more recent BLMIS investors, there is no question BLMIS investors as a group are being

inequitably treated by SIPC vis-à-vis other Ponzi scheme victims.  As discussed above, the *New Times* investors who invested in Real Funds also were victims of a Ponzi scheme.  Yet, unlike BLMIS' investors, the *New Times* investors were given the full benefit of the securities positions reflected on their last account statements, without regard to whether the investors benefited from "fictitious profits."  BLMIS' investors should be treated no less favorably.  If it was equitable to afford full SIPA protection to the Ponzi scheme victims in *New Times*, it cannot be inequitable to afford that same protection to the Ponzi scheme victims in this case.

Beyond issues of equity, public policy also requires that BLMIS' customers be given the liquidation value of the securities reflected on their last account statements.  One of the principal policies SIPA was designed to promote is preserving investor confidence in the safety of investments with broker-dealers.  As noted during the debates on SIPA's original enactment, "there is a definite and urgent need for some method by which public investors can receive guaranteed protection against losses from a broker-dealer firm's financial mismanagement or insolvency. . . .  Broker-dealers, among their many obligations, are responsible for safeguarding billions of dollars in cash and securities which belong to millions of investors. . . .  It is vital to the operation of our national securities markets that such investors retain confidence in the industry's ability to safeguard such customer funds and securities." *Securities Investor Protection: Hearing on H.R. 13308, H.R. 17585, H.R. 18081, H.R. 18109, and H.R. 18458 Before the Subcomm. on Commerce and Finance of the H. Comm. on Interstate and Foreign Commerce*, 91st Cong. 149-150 (1970) (statement of Hamer H. Budge, Chairman, SEC).

The Trustee's interpretation of "net equity" is antithetical to preserving investor confidence.  By denying BLMIS investors the protections afforded them under SIPA – the very protections that were given to Ponzi scheme victims in *New Times* – investors may conclude that

SIPA's protections are ephemeral and dependent on the whims of SIPC and the particular trustee appointed when their broker-dealer fails.  That will not instill confidence in investors that they are protected when they invest with broker-dealers, even broker-dealers who pass multiple SEC examinations and are headed by the former president of NASDAQ.  The way to ensure that SIPA fulfills its objective of promoting investor confidence is to apply the statute consistently and as it is written and intended.

        To those ends, the Court should direct SIPC and the Trustee to honor their statutory obligations to the customers of BLMIS, including to the SRZ Claimants, and require SIPC and the Trustee to allow net equity claims based on the liquidation value of the securities reflected on claimants' last account statements as set forth in Section 78*lll*(11) of SIPA.

Dated: New York, New York
       November 13, 2009

SCHULTE ROTH & ZABEL LLP

By: /s/ Marcy R. Harris
William D. Zabel
Marcy Ressler Harris
Frank J. LaSalle
919 Third Avenue
New York, New York  10022
(212) 756-2000

*Attorneys for the SRZ Claimants*

## SCHEDULE A:  THE SRZ CLAIMANTS

| CLAIMANT | ACCOUNT NO. | DATE OF CLAIM | CLAIM NO. | TRUSTEE'S DETERMINATION |
|---|---|---|---|---|
| **Picower-related Accounts** | | | | |
| The Picower Foundation | 1P0024 | June 24, 2009 | | |
| Capital Growth Company | 1C1006 | June 26, 2009 | | |
| JF Partnership | 1J0004 | June 26, 2009 | | |
| JEMW Partnership | 1J0003 | June 26, 2009 | | |
| JLN Partnership | 1J0008 | June 26, 2009 | | |
| JAB Partnership | 1J0002 | June 26, 2009 | | |
| Jeffry M. Picower Special Company | 1P0023 | June 26, 2009 | | |
| JA Special Limited Partnership | 1J0024 | June 26, 2009 | 12678, 13547 | Claim denied in its entirety. |
| Barbara Picower | 1P0019 | June 26, 2009 | | |
| Jeffry M. Picower | 1P0021 | June 26, 2009 | | |
| ACF Services Corporation Money Purchase Pension Plan | 1E0123 | June 26, 2009 | | |
| **Levine-related Accounts** | | | | |
| Trust U/W Abraham Hershson H. Levine, D. Gerber, N. Levine as Co-Trustees | 1H0117 | February 19, 2009 | | |
| Noel Levine #2 | 1L0021 | February 19, 2009 | | |
| Noel Levine | 1L0124 | February 19, 2009 | | |
| Harriette Levine | 1L0111 | February 19, 2009 | | |
| Noel Levine and Harriette Levine Foundation Inc. | 1L0180 | February 19, 2009 | | |
| **Other Accounts** | | | | |
| Denise Saul | 1S0221 | February 26, 2009 | 6132 | Claim allowed for $448,932.71. |
| Dale Ellen Leff | 1L0082 | June 23, 2009 | 012941 | Claim denied in its entirety. |