Bruce S. Schaeffer (7934)
404 Park Avenue South
New York, NY 10016
(212)689-0400
Bschaef123@aol.com
Attorney for Customers Irving J. Pinto Revocable Trust,
Irving J. Pinto Grantor Retained Annuity Trust of 1994,
Irving J. Pinto Grantor Retained Annuity Trust of 1996,
and Amy Lome Pinto Revocable Trust

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X

SECURITIES INVESTORS PROTECTION
CORPORATION

       Plaintiff,

 -against-

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

       Defendants,
----------------------------------------------------X
In re:

BERNARD L. MADOFF,

       Debtor
----------------------------------------------------X

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

(Substantively Consolidated)

MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION FOR AN ORDER UPHOLDING TRUSTEE'S DETERMINATION DENYING "CUSTOMER" CLAIMS FOR AMOUNTS LISTED ON LAST CUSTOMER STATEMENT, AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE OBJECTIONS WITH RESPECT TO THE DETERMINATIONS RELATING TO NET EQUITY

Preliminary Statement

Customers, Irving J. Pinto and Amy Lome Pinto, by their attorney Bruce S.

Schaeffer, with respect to accounts 1EM427-3-0 (Irving J. Pinto Revocable Trust), 1EM311-3-0 (Irving J. Pinto Grantor Retained Annuity Trust of 1994), 1EM358-3-0 (Irving J. Pinto Grantor Retained Annuity Trust of 1996) and 1EM457-3-0 (Amy Lome Pinto Revocable Trust) submit this Memorandum of Law in opposition to the Trustee's motion for an order upholding the Trustee's determination denying customer claims for amounts listed on the customer's last statement, affirming the Trustee's determination of net equity, and expunging those objections with respect to the determinations relating to net equity

Even if the Trustee's determinations with respect to "net equity" are determined to be dispositive for calculating a customer's entitlement to a SIPC recovery, we submit that the Trustee's contention that the same calculation should apply with respect to the propriety of the Trustee bringing clawback suits should be rejected. We argue that the Trustee's own contention that "equality is equity" is impossible of achievement in this case because of many factors not least of which are: 1) the statute of limitations, 2) the likelihood of substantial un-collectability from many of those whose accounts were "net positive" because of either death or impoverishment, and 3) the Trustee's anticipated exercise of discretion with respect to small claims and charitable organizations.

Thus, the Trustee's claim for justifying clawback actions based on his "net equity" calculation should be denied.  Additionally, sitting with equity jurisdiction this Court should determine that tax refunds obtained by customers for the theft suffered in this investment scheme should specifically be exempt from any clawback suits.

## FACTS

Defendant BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS")

was "the biggest Ponzi scheme in modern history" and was perpetrated by Debtor, Bernard L. Madoff ("Madoff"). According to Trustee Picard's news conference on October 28, 2009, at the time of BLMIS's demise there were 4,903 active accounts of which 2,335 had net losses of approximately $21.2 billion. There were also 2,568 other accounts which were considered by the Trustee to be "net positive", i.e. there was more cash withdrawn than deposited. In his calculations the Trustee ignored any "artificial" profits that were reported to customers on their monthly and annual account statements – in the case of these customers for more than a decade.

According to news reports, the total value of supposed assets on clients' account statements from BLMIS for November 2008 was more than $65 billion, making this scheme not only the largest Ponzi scheme in history but probably larger than all the other Ponzi schemes put together. And Madoff's larceny went on for decades despite the SEC being "handed the case on a platter" repeatedly by analyst Harry Markopolis (as he described his attempts to Congress). The Trustee reported that he has collected approximately $1.4 billion to date and anticipates that total rising to $1.5 billion by the end of this year.[1]

All accounts at issue herein were set up in the 1990s (beyond any six year claw back statute of limitations). The Amy Lome Pinto Revocable Trust account was set up with gifted transfers from other BLMIS accounts. The Amy Lome Pinto Revocable Trust filed a SIPC insurance claim which was rejected by the Trustee based on his determination that because the millions of dollars used to initially fund the account (in

---

[1] More recent news reports hint that the Trustee may collect an additional $2 billion or more from the estate of Jeffrey Picower

the 1990s) came from other BLMIS accounts, the Amy Lome Pinto Revocable Trust had no investment whatsoever. Hence a zero investment, on the Trustee's reasoning, entitled the Amy Lome Pinto Revocable Trust to no SIPC recovery whatsoever and presumably exposed the account to a clawback suit for withdrawals.

Argument

POINT I

THE TRUE CULPRITS ARE MADOFF AND THE REGULATORS – NOT THE CUSTOMERS - AND THIS CASE IS NEITHER A "STANDARD" OR ORDINARY PONZI SCHEME

The first thing that should be addressed is the tone and tenor of the Trustee's arguments implying that the "net positive" customers are "stealing" from other customers as if all the "net positive" investors are nefarious miscreants. His position, so often averred in his moving papers, is insulting to the victims and misdirected. The true culprits in this case are Madoff and the regulators who utterly failed to unearth the fraud despite a tragic-comic series of screw ups with ineptitude that defies belief. Again and again they were handed information that should have resulted in Madoff's arrest but failed so badly that it took an SEC study 450 pages merely to paraphrase their missed chances and blunders.

Secondly, this Court – sitting as a Court of Equity – is not bound by the Trustee's oft-repeated contention that "This cannot be the law", because this Court is not bound to sit purely as a law court but has the power to fashion a fair and equitable determination based on the actual circumstances rather than one bound entirely by precedent. Contrary to the Trustee's repeated references, this is not a "standard" Ponzi scheme.

This is the biggest Ponzi scheme in history and probably embodies statement losses greater than all the others combined!

And it went on for decades, right under the noses of the regulators. Indeed Madoff was considered as a candidate to chair the NASD at one point. So how can it be equitable to argue that the "net positive" customers, who relied on the stature of Madoff and the supposed proficiency of the regulators, be called thieves in this argument from the Trustee?

The Court should take note of just how extraordinary this Madoff scheme was when determining whether or not to treat it as a "standard" or normal Ponzi scheme. According to press reports:

1. The Madoff scheme defrauded investors of approximately $65 billion;
2. A distant second in terms of the magnitude of the fraud was the Alan Stanford scheme (which occurred during the watch of the same SIPC and SEC regulators as the Madoff scheme) valued at approximately $7 billion;
3. Next largest was Tom Petters – whose fraud lasted 13 years until he was turned in by one of his lieutenants – and cost about $3.5 billion; and
4. Following those chart toppers there are about four others that ran to about $1 billion each; the remaining cases all drop to the hundreds of millions, such as the Scientologist Reed Slatkin who swindled investors out of about $240 million, Steven Hoffenberg who defrauded investors of about $469 million and Daniel Heath who bilked 1,800 primarily elderly investors out of about $187 million in the early 1990s.

Madoff's larceny appears to be more than double all the other frauds combined.

Thus, it is obvious that a scheme so massive should not be lumped in with others as "standard" or ordinary. It is the most *extra*-ordinary Ponzi scheme of all time and this Court of Equity should treat the customers as victims rather than as thieves. Obvious proof of the extraordinary nature of this case is the fact that SIPC is paying the Trustee's tens of millions of dollars in fees rather than charging it to the bankruptcy estate as is usual.

POINT II

THE TRUSTEE'S "NET EQUITY" CALCULATION SHOULD NOT IGNORE TRANSFERS FROM OTHER MADOFF ACCOUNTS IN ESTABLISHING THE AMOUNT INVESTED

The Trustee takes the position that his calculation of net equity should exclude transfers from other Madoff accounts which were made more than a decade ago. This contention should be rejected because it is based on 20-20 hindsight and values form over substance. It is submitted that if actual funds had been withdrawn, transferred as a gift and then contributed to a Madoff account, the account holder would be credited for an investment in his or her Madoff account entitling the customer to SIPC coverage. To disallow the customer credit because it was a direct inter-account transfer is surely to elevate form over substance and inequitable to the customer who had no knowledge of BLMIS being a fraud in the 1990s at the time of transfer.

POINT III

THE TRUSTEE'S "NET EQUITY" CALCULATION IS NOT THE ONLY ACCEPTABLE METHOD, DIFFERS COMPLETLEY FROM THAT PROVIDED BY THE IRS, AND DOES NOT DO EQUITY

The Trustee takes the position that his calculation of "net equity" for purposes of 1) SIPC coverage, and 2) characterization of voidable transfers giving him grounds for

6

clawback suits, is the only one available; the only one that's fair; and that any other calculation would be just plain stupid (arguing that it would be rewarding thieves, letting Madoff make the determination etc.).

The Trustee's contentions ignore the fact that the U.S. Department of Treasury through its agency, the Internal Revenue Service, differs completely. In Revenue Procedure 2009-20[2], issued specifically to address Madoff losses, the IRS – an agency we would argue that is just as authoritative as the Trustee – provided for calculating the loss as follows:

Computation of Deductible Theft Loss Pursuant to Rev. Proc. 2009-20

1. Initial investment
2. Plus: Subsequent investments
3. Plus: Income reported in prior years
4. Less: Withdrawals
5. Total qualified investment (combine lines 1 through 4)
6. Percentage of qualified investment (95% of line 5 for investors with no potential third-party recovery; 75% of line 5 for investors with potential third-party recovery)
7. Actual recovery
8. Potential insurance/SIPC recovery
9. Total recoveries (add lines 7 and 8)
10. Deductible theft loss (line 6 minus line 9)

This calculation basically allows a loss for the full amount on the last account statement. Contrary to the Trustee's argument that his way is the only way, obviously other respectable government agencies have adopted a different method. We submit the Trustee's method, in this instance, is glaringly inequitable and seeks to further torment people who have already suffered egregious losses primarily because of government

---

[2] The purpose of which was, "This revenue procedure provides an optional safe harbor treatment for taxpayers that experienced losses in certain investment arrangements discovered to be criminally fraudulent."

7

regulators' incompetence – not their own nefarious motives or actions.

## POINT IV

### THE TRUSTEE'S "NET EQUITY" CALCULATION, IN THIS CASE, SHOULD DIFFERENTIATE BETWEEN SIPC PAYOUTS AND SIPC CLAWBACKS

The Trustee takes the position that his calculation of net equity should control both for purposes of 1) SIPC coverage and 2) exposure to clawback suits. We would argue that even if his calculation is appropriate for the first purpose, which we concede *arguendo*, nonetheless, it is inequitable and inappropriate for determining clawback exposure.

The Trustee's arguments that SIPC should not have to cover the statement losses of "net positive" customers to protect the SIPC fund may be persuasive as a rationale for denying SIPC coverage but should be denied in its entirety as a rationale for allowing clawbacks against "net positive" customers. Furthermore, the Trustee's entire argument that "equality is equity" is impossible of performance in this case (for the reasons discussed below) and therefore, should be discarded in its entirety with respect to his asserted basis for bringing clawback suits.

## POINT V

### THIS COURT SITS AS A COURT OF EQUITY AND THE TRUSTEE'S "NET EQUITY" CALCULATION RELIES ON "EQUALITY IS EQUITY" EVEN THOUGH HIS METHODOLGY DOES NOT PROVIDE THAT AND IT IS IMPOSSIBLE OF ACCOMPLISHMENT BY VIRTUE OF THE STATUTE OF LIMITATIONS

The Trustee's position that his calculation of "net equity" is correct is predicated on his argument that his calculation is properly based on the concept of "equality is

8

equity" as enunciated in *Cunningham v. Brown*[3]. In the instant case this is just a charade. Equality of treatment is impossible of accomplishment because of, at the very least, the statute of limitations.

For example, it has been reported that the charity Hadassah, invested $40 million and withdrew $130 million from BMLIS since 1993. If one were to use the Trustee's math, that would compute as a $90 million clawback exposure. But the Trustee is confronted with the hard truth that his rights of recovery, in all events, are limited by the statute of limitations, generally two years under the federal statute but in this case, because of BLMIS situs in New York, extended to six years.

In the Hadassah example press reports allege withdrawals for a period of 15 years (1993 to 2008). Assuming ratable distributions, the statute of limitations would allow the Trustee to recover for only 6 of the 15 years of withdrawals or only a 40% recovery. Thus equal treatment of the "net positive" accounts is obviously and completely impossible of achievement. The Court must consider that all the differing "net positive" accounts have different withdrawal records over different terms of years. Creating actual "equality" will be impossible. The Trustee's mantra of "equality is equity" as their guiding principle is all aura with no verity.

### POINT VI

**THIS COURT SITS AS A COURT OF EQUITY AND THE TRUSTEE'S "NET EQUITY" CALCULATION RELIES ON "EQUALITY IS EQUITY" EVEN THOUGH HIS METHODOLOGY DOES NOT PROVIDE THAT AND IT IS IMPOSSIBLE OF ACCOMPLISHMENT BECAUSE MANY CUSTOMERS MAY BE IMPOVERISHED OR DECEASED AND OTHERS MAY BE CHARITIES**

Additionally, the Trustee's purported guiding objective of "equality is equity" is

---

[3] 265 U.S. 1 (1924)

impossible of achievement because of other reasons such as the probable impoverishment or death of many "net positive" customers, the politically incorrect aspect of a bankruptcy trustee suing charities that do eleemosynary work, and the considerable likelihood that the Trustee will exhibit some element of human sympathy and consideration in exercising his discretion as to which customers to pursue and which to ignore – all of which will further undo any pretense of meeting the standard of "equality is equity".

POINT VII

THE TRUSTEE'S ARGUMENT ALLEGING "NET POSITIVE" CUSTOMERS ARE STEALING FROM OTHER CUSTOMERS IGNORES THE FACT THAT MANY "NET POSITIVE" ACCOUNTS BECAME SO SOLELY BY VIRTUE OF THE REGULATORS' INEPTITUDE AND THE MANDATES OF THE GOVERNING INSTRUMENT

As noted above, the Trustee's tone is inappropriate in this case: particularly his assertion that "net positive" accounts are stealing from other customers as if they had *mens rea* and are somehow complicit in the scandal. Additionally misplaced is the Trustee's argument that to allow the "net positive" accounts to be free from clawback suits would be to allow Madoff to determine the outcome of his fraud. This contention is so preposterous as to defy respectable description.

It is inconceivable that any distribution by Madoff (other than perhaps to some of his co-conspirators) was made to allow him determine the outcome of his fraud. All distributions were obviously made by him only with gritted teeth because too many redemptions would have put him out of business.

Moreover, in this instance, certain accounts became "net positive" solely because the ineptitude of the regulators allowed the Ponzi scheme to go on so long; and primarily because the terms of the governing instrument, a GRAT or Grantor Retained Annuity

Trust, mandated annual distributions as any annuity does. Madoff in no way wanted to make those distributions; rather he had to so that his massive fraud could survive while the SEC and SIPA regulators did none of the due diligence and inspection that investors in well-regulated securities markets expected from regulators and underwriters.

POINT VIII

THE TRUSTEE SHOULD IN ALL EVENTS BE PROHIBITED FROM BRINGING CLAIMS OR LEVYING AGAINST THE TAX REFUNDS RECEIVED BY "NET POSITIVE" CUSTOMERS AS THE TAX PAYMENTS WERE CLEARLY BASED ON LEGITIMATE EXPECTATIONS AND EXPOSING SUCH REFUNDS TO CLAWBACK SUITS WOULD BE EXTRAORDINARILY INEQUITABLE

As noted above, the IRS has provided an entirely different – and far more equitable – method for calculating losses by customers. The "net positive" customers paid their taxes for decades because they received statements, confirmations and even 1099 tax forms showing their accounts growing in value. They paid real money in taxes on the fictitious gains reported by Madoff. That is why the IRS applied fairness and equity as its guiding principles to allow and pay refund claims in a simple expedited process to help all the victims. To allow the Trustee to now go after such refunds would be inequitable beyond belief. Salt in the wound is far too timid a description of what such exposure would be to the defrauded customers who happen to be "net positive". At the very least this Court must find that such assets, i.e. the proceeds of tax refunds, are exempt from any Trustee claim for clawback.

CONCLUSION

For the foregoing reasons, we respectfully request that the Trustee's motion that his methodology be accepted in determining both SIPA coverage and the right to bring clawback suits based on his "net equity" computation be denied in its entirety or at least

so far as it seeks to treat both SIPA coverage and clawback exposure using the same calculation.

Dated: New York, New York
November 12, 2009

                              Respectfully yours,

                              BRUCE S. SCHAEFFER

                              By: /s/Bruce S. Schaeffer
                              BRUCE S. SCHAEFFER (7934)
                              Attorney for Customers Irving J. Pinto
                              Revocable Trust, Irving J. Pinto Grantor
                              Retained Annuity Trust of 1994 Irving J. Pinto
                              Grantor Retained Annuity Trust of 1996 and
                              Amy Lome Pinto Revocable Trust
                               404 Park Avenue South
                               New York, New York 10016
                               (212) 689-0400

Bruce S. Schaeffer (7934)
404 Park Avenue South
New York, NY 10016
(212)689-0400
Bschaef123@aol.com
Attorney for Customers Irving J. Pinto Revocable Trust,
Irving J. Pinto Grantor Retained Annuity Trust of 1994,
Irving J. Pinto Grantor Retained Annuity Trust of 1996,
and Amy Lome Pinto Revocable Trust

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X

SECURITIES INVESTORS PROTECTION
CORPORATION

                              Plaintiff,

    -against-

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                             Defendants,
----------------------------------------------------X
In re:

BERNARD L. MADOFF,

                             Debtor
----------------------------------------------------X

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

(Substantively Consolidated)

CERTIFICATE OF SERVICE

       The undersigned, a member in good standing of the bar of this Court, hereby certifies that on November 12, 2009, he caused a true and correct copy of the attached MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION FOR AN ORDER UPHOLDING TRUSTEE'S DETERMINATION DENYING "CUSTOMER" CLAIMS FOR AMOUNTS LISTED ON LAST CUSTOMER STATEMENT, AFFIRMING TRUSTEES DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE OBJECTIONS WITH RESPECT TO THE DETERMINATIONS RELATING TO NET

EQUITY on behalf of Irving J. Pinto Revocable Trust, Irving J. Pinto Grantor Retained Annuity Trust of 1994, Irving J. Pinto Grantor Retained Annuity Trust of 1996, and Amy Lome Pinto Revocable Trust to be filed electronically with the Court (and by hand) and served upon the parties in this action who receive electronic service through CM/ECF, and served by hand upon the Trustee's counsel of record:

> DAVID J. SHEEHAN, ESQ.
> Baker & Hostetler LLP
> Attorney for Trustee
> 45 Rockefeller Plaza
> New York, NY 10111

/s/ Bruce S. Schaeffer
BRUCE S. SCHAEFFER