SONNENSCHEIN NATH & ROSENTHAL LLP
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
cneville@sonnenschein.com

*Attorneys for the Sonnenschein Investors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br>Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation |

**SONNENSCHEIN INVESTORS' OPPOSITION TO THE TRUSTEE'S MOTION FOR AN ORDER UPHOLDING TRUSTEE'S DETERMINATION DENYING "CUSTOMER" CLAIMS FOR AMOUNTS LISTED ON LAST STATEMENT, AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY AND EXPUNGING THOSE OBJECTIONS WITH RESPECT TO THE DETERMINATION S RELATING TO NET EQUITY**

# TABLE OF AUTHORITIES

## Cases

*In re First St. Sec. Corp.*,
34 B.R. 492 (Bankr. S.D. Fla. 1983) ........ 6

*In re New Times Sec. Servs.*,
371 F.3d 68 (2d Cir. 2004 ........ 12

*In re New Times Sec. Servs., Inc*,
.463 F.3d 125 (2d Cir. 2006) ........ 13

*In re New Times Sec. Servs., Inc.*,
No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000) ........ 10, 11, 12

*In re New Times Sec. Servs., Inc.*,
No. 05-5527 (Dec. 30, 2005) ........ 12

*Rich v. NYSE*,
522 F.2d 153 (2d Cir. 1975) ........ 6

## Statutes

15 U.S.C. § 780(b) ........ 2

15 U.S.C. § 78ccc(a)(2) ........ 4

15 U.S.C. § 78ddd(a)(1) ........ 4

15 U.S.C. § 78ddd(c) ........ 4

15 U.S.C. § 78eee ........ 3

15 U.S.C. § 78eee(C)(3) ........ 5

15 U.S.C. § 78eee(c)(4) ........ 5

15 U.S.C. § 78fff ........ 5

15 U.S.C. § 78fff (2)(b)(a)(2) ........ 7

15 U.S.C. § 78fff-2(b) ........ 7

15 U.S.C. § 78fff-3 ........ 5

15 U.S.C. § 78ffff-2 ........ 5, 6

15 U.S.C. § 78lll(11) ........ 6

17 C.F.R. § 300.502(a)(1) ........ 7

Securities Exchange Act of 1934 § 15(b) ........ 2

## Other Authorities

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html ........ 10

H.R. Report No. 95-746 at 21 (1977) ........................................................................................ 6

H.R. Report No. 95-746 at 23; 95 Congress 1st Sess.(1978) ........................................................ 9

S. Rep. No. 95-763, at 2 95th Congress 1st Sess. (1978) ................................................................ 8

The investors in Bernard L. Madoff Securities LLC ("BMIS"), listed on Schedule A hereto and represented by Sonnenschein Nath & Rosenthal LLP (the "Sonnenschein Investors"), file this Opposition to the Trustee's Motion For an Order Upholding Trustee's Determination Denying "Customer" Claims For Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity and Expunging those Objections with Respect to the Determinations Relating to Net Equity (the "Trustee's Motion").

**PRELIMINARY STATEMENT**

The Trustee goes to great lengths in his Motion to (a) prove the fraud in the operations of BMIS and (b) to import the treatment of claims of creditors in a classic Ponzi scheme case into this proceeding under the Securities Investor Protection Act ("SIPA") in order to justify denying the Sonnenschein Investors' customers claims, in whole or part. The goal of this effort is not, as the Trustee contends, to protect the recoveries of other customers, whose recovery from the funds advanced to the Trustee under SIPA and share in the collected assets would not be affected, or to protect the integrity of the securities laws. The point of the Trustee's position, vigorously supported the Securities Investor Protection Corporation for obvious reasons, is to avoid paying SIPA advances to the hundreds of Madoff investors who, like the Sonnenschein Investors have depended upon their Madoff investments for their current and future living expenses.

To accomplish the goal, the Trustee must ignore (or more correctly, torture) the express language of SIPA, the legislative history of SIPA clearly setting forth congressional goal of protecting defrauded investors as well as the victims of failed broker dealers, and the controlling precedent interpreting the statute and rules. In summary, instead of respecting the legitimate expectations of investors in the payment on their accounts memorialized in the last statement

received from BMIS, as the statute requires, the Trustee calculates the claims of customer based upon their aggregate investments, less their aggregate withdrawals. The Trustee's Motion seeks approval of the flawed methodology.

As more fully described below, the goal of SIPA, as its name implies, is to protect investors, and more precisely, to protect the legitimate expectations of investors in their accounts, whether or not the securities were actually purchased. If the statute and rules were correctly applied by the Trustee, each of the Sonnenschein Investors (and other similarly situated investors) would be entitled to a SIPA advance of up to $500,000 and some share of the collected assets.

Based on SIPA, the rules and the legislative history, the Trustee's Motion should be denied.

## FACTUAL BACKGROUND

The parties agree that BMIS was registered as a broker dealer with the SEC un Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. Section 780(b as of January, 1960.

On December 11, 2008, Bernard Madoff ("Madoff") was arrested by the FBI and charged with securities fraud. It is undisputed that Madoff pled guilty to fraud and was sentenced to jail.

Although the Trustee goes into substantial unnecessary detail about how the fraud was committed, one key fact bears note. As the Trustee and SIPC concede, in furtherance of its operations, BMIS prepared and customers were sent regular statements and confirmations based on the actual trading records of real (existing) securities purported in each customer's account. As shown below, it is irrelevant from the perspective of SIPA, the rules promulgated thereunder, and the agency and case law interpretation of the both that the securities never existed.

### A. THE SEC ACTION AGAINST BMIS

On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission ("SEC") filed a complaint against Madoff and BMIS charging violations of federal securities

and other laws, and seeking an emergency application for a temporary restraining order in the United States District Court for the Southern District of New York. The SEC sought, among other things, to (a) freeze the assets of BMIS and its affiliates, (b) appoint a receiver over the assets, (c) enjoin Madoff or BMIS, their owners, partners, employees, agents, attorneys or any third party from filing an bankruptcy proceeding against BMIS or Madoff, (d) require a verified accounting of assets from Madoff of his interests in BMIS and other entities, and (e) allow for expedited discovery. Madoff and BMIS consented to the relief and District Court Judge Louis Stanton granted the relief on December 12, 2008.

The Order of the District Court froze the assets of BMIS and Madoff and appointed Lee Richards, Esq. ("Richards") of Richards Kibbe & Orbe LLP, as receiver for the assets of BMIS, including assets of Madoff Securities International Ltd and Madoff Ltd. The receivership generally and, in particular, his jurisdiction over the assets of BMIS, was short-lived.

**B. THE SIPC PROCEEDING**

On December 15, 2008, the United States District Court, presiding over the receivership action, entered an order on the complaint and application of the Securities Investor Protection Corporation ("SIPC") to appoint a trustee for the liquidation of BMIS under the United States Bankruptcy Code. The Court appointed Irving Picard, as trustee (the "Trustee") and Baker & Hostetler LLP, his law firm as his counsel. The case was transferred to the bankruptcy court as provided by the Securities Investor Protection Act ("SIPA"). 15 U.S.C. § 78eee

On December 23, 2008, the Court issued an Order On Application For Entry Of An Order Approving Form And Manner Of Publication and Mailing of Notices, Specifying Procedures For Filing, Determination, And Adjudication Of Claims And Providing Other Relief. (the "December 23 Order"), which, among other things, directed the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines, and to

comply with the statutory mandates (described below) with respect to the customer claim satisfaction.. *See* Order [Dkt. No. 12]. The December 23 Order set up a procedure for the adjudication of the customer claim, notification by the Trustee of his determination, and opposition by the customer to the determination in the event of a disagreement.

Pursuant to the December 23 Order, each of the Sonnenschein Investors timely filed a claim with, among other things, evidence of the claim in the form of the last statement sent by BMIS for the period ended November 30, 2008. Each of the Sonnenschein Investors has filed or upon receiving a determination based upon the Trustee's method of calculating net equity will file an opposition to the Trustee's determination based on a number of grounds including the Trustee's failure to use the proper definition of net equity.

**C. NOTHING IN THE SIPA STATUTORY FRAMEWORK SUPPORTS THE TRUSTEE'S MEHTODOLOGY**

Relying almost exclusively on the case law developed in the context of classic Ponzi schemes, not SIPA liquidations, the Trustee and SIPC reconstruct the SIPA statutory scheme to support a calculation of net equity based on the "cash in-cash out" account transactions of each customer. The discussions about recovering investments, asset redistribution and equality of distribution in the Ponzi scheme context in the Trustee's Motion are out of place in the context of the SIPA scheme, where there has been a specific fund created to cover all or some part of investor losses and a clear statutory mandate of prompt payment on losses to investors. As is obvious from language of the statute, nothing in SIPA provides authority for the Trustee's methodology.

SIPA established a not for profit corporation, SIPC, the members of which are the domestic registered brokers or dealers, each of whom is assessed a fee to create a fund (the "SIPC Fund"). 15 U.S.C. § 78ccc(a)(2); 78ddd(a)(1)and (c). The SIPC Fund is meant to provide

a certain amount of coverage (set by statute) for customer losses in the event that the property of a failed broker is inadequate or not readily available to satisfy customer claims. 15 U.S.C. § 78fff-3

Pursuant to SIPA, SIPC has the authority if it determines the "any member of SIPC…has failed or is in danger of failing to meet its obligations to customers" to file an application for a protective decree in any court of competent jurisdiction. 15 U.S.C. § 78eee(C) (3). Upon the issuance of the protective decree and the appointment of the trustee and counsel, the court must transfer the liquidation proceeding to the bankruptcy court. 15 U.S.C. § 78eee(c)(4).

The purpose of the liquidation proceeding is not to protect the SIPC Fund, but rather as promptly as possible, to either (a) deliver to the customers either the securities held in their name or (b) "distribute customer property and (in advance thereof or concurrently therewith) otherwise satisfy net equity claims of customers…." 15 U.S.C. § 78fff.

The statute requires the trustee to send notice of the commencement of the proceeding promptly "to each person who, from the books and records of the debtor, appears to have been a customer with an open account with the past twelve months, to the addresses of such person as it appears from the books and records of the debtor." 15 U.S.C. § 78ffff-2. Customers are required to file a statement of claim within six months from the date of publication and within sixty day to be paid out of customer property. *Id*.

The trustee's obligation after receipt of the statement of claim is to deliver securities or make payments to or for the account of the customer and for purposes relevant here, the court is required to order, among other things:

> (1) with respect to net equity claims, authorize the trustee to satisfy claims out of moneys made available to the trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there has been sufficient funds of the debtor to satisfy such claims.

*Id*.

A key provision of the statute, which is obviously underlies the Trustee and SIPC' restrictive and incorrect reading of the term "net equity" is the requirement that SIPC advance to the trustee up to $500,000 "for each customer, as may be required to pay or otherwise satisfy the claims for which the amount of the net equity that each customer exceeds his ratable share of customer property…" 15 U.S.C. 78 fff-3.

SIPA defines a customer's net equity claim, without reference to fraud or financial failure of the broker as the value of the customer's "securities positions" in the customer's account on the filing date, less any amount the customer owes the debtor, as of the date of the filing of the SIPA liquidation:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . . ; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .[1]

15 U.S.C. § 78lll(11).

As is plain from the provisions referred to above, the best evidence of the securities in the customer's account on the filing date, not the recreation of the account from the initial investment. Nothing in the statutory framework authorizes the Trustee to calculate "net equity" based on the aggregate amount of the customers investment less the aggregate amount of the

[1] The "indebtedness" of the customer to the debtor refers to cash or securities owed to the debtor, which is most often in the context of a customer having borrowed from the debtor on margin. *See, e.g.*, H.R. Report No. 95-746 at 21 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (noting that, under the 1970 statutory regime, when there were shortages in available securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *In re First St. Sec. Corp.*, 34 B.R. 492, 497 (Bankr. S.D. Fla. 1983) (offsetting against claim amount of indebtedness customer owed to the debtor where unauthorized stock purchase was funded in part by borrowing on margin).

customers' withdrawals. Furthermore, nothing in the statute limits its application, as the Trustee and SIPC imply, to financially failed broker-dealers. SIPA was plainly meant to cover situations, like the situation here, where the securities may never have been purchased.

The Rules, promulgated under SIPA, base the determination of whether a customer claim is treated as one for cash or for securities, not on what is actually in the account, but rather on the written confirmations sent to the customer that the securities were bought or sold on behalf of the customer. 17 C.F.R. § 300.502(a)(1).

In order to justify, the expensive, time consuming forensic accounting and the denial of SIPC advances to hundreds of investors, the Trustee and SIPC interpose a "book and records" limitation on the net equity calculation that would effectively bar the allowance of a SIPC claim in most fraud cases. In a nutshell, the Trustee and SIPC rely on the phrase "books and records" in one provision of the statute for the justification to reduce the net equity amount on the last station by history of transactions in the customer's account and the transactions in and out of the debtor's operations. Section 78fff-2(b) states:

> After receipt of a written statement of claim pursuant to subsection (a)(2) of this section, the trustee shall promptly discharge in accordance with the provisions of this section, all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of such payments to or for the account of a customer…insofar as such obligations are ascertainable fro the books and record of the debtor or are otherwise established to the satisfaction of the trustee.

15 U.S.C. 78fff-(2)(b).

Although the provision is not a model of clarity, it is not on its face an invitation to test the validity of every transaction in a customer account. First, the provision gives the Trustee discretion to stop his investigation at the point of the statement, which lists the securities and their market value purportedly in the account. Moreover, the provision

can be read, without the violence done to it by the Trustee and SIPC, to direct the trustee to the books and record, if necessary, to determine if a claim is for cash or securities. Based on the statute, the legislative history and the case law, it does not matter if the "the statements indicate trades that were not made on behalf of the customers or actually paid for by the customer." See Trustee Memorandum at page 27. Accordingly, the Trustee has misused this provision for an expensive and time consuming reconstruction of each account, which has not only delayed recovery to investors, but also denied them a rightful recovery in contravention of SIPA.

**D. LEGISLATIVE HISTORY OF THE STATUTE SUPPORTS ALLOWANCE OF CLAIMS BASED ON THE LAST STATEMENT**

Although the Trustee would have the Court believe that SIPA only applies in the cases where the broker failed financially, the legislative history of SIPA makes clear that Congress' intent in enacting the legislation was to protect the legitimate expectations of customers even in cases, like the one here, where there has been significant fraud and the securities never existed.. The Senate Committee report commented on the purpose of the legislation as follows:

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations . . .

S. Rep. No. 95-763, at 2 95th Congress 1st Sess. (1978) (*emphasis added*). See Exhibit 1 hereto.

Similarly, the House Report issued in connection with the amendment to SIPA acknowledges that the purpose of the amended legislation was to make SIPA "more responsive to the reasonable expectations of public investors…." The House Report states:

> A customer generally expects to receive *what he believes* is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectations . . .

H.R. Report No. 95-746 at 23; 95 Congress 1st Sess.(1978) (emphasis added). See Exhibit 2 attached hereto.

In addition, Hugh F. Owens, then chairman of SIPC, reporting to the House Committee, made it clear that the calculation of the customer's claim is based on the value of the shares in his or her account (whether or not the shares existed) when the broker stops doing business, not on the historical transactions in a customer's account. In his testimony, Mr. Owens explains at several points that the purpose of the legislation was to make it "possible for the trustee to render accounts to customers as they stood when the member failed." Id. at 37, 39

Although its position now is inexplicably changed, SIPC repeatedly acknowledged that it was bound by the statute and the rules to satisfy the reasonable expectations of customers even when the securities had never been purchased.

. The Trustee and SIPC's position with respect to "net equity" in this case is contrary to SIPC's own policies and practices, as reflected in the sworn testimony of Stephen Harbeck, SIPC's president and CEO, and its actions in similar liquidation proceedings. For example, in the New Times Securities Services, Inc. ("New Times") SIPA liquidation, in the context of

discussing claims filing deadlines, Harbeck acknowledged that if broker-dealer customers have been led to believe that "real existing" securities had been purchased for their accounts, then those customers are entitled to the full value of their securities positions as of the filing date, even if that value represents a substantial increase from the purported purchase price of the securities and even if the securities had never been purchased. Harbeck testified as follows:

> Harbeck: [I]f you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> Court: Even if they're not there.
>
> Harbeck: Correct.
>
> Court: In other words, if the money was diverted, converted –
>
> Harbeck: And the securities were never purchased.
>
> Court. Okay.
>
> Harbeck: And if those positions triple, we will gladly give the people their securities positions.

Transcript at 37-39, *In re New Times Sec. Servs., Inc.*, No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000) attached hereto as Exhibit 3.

SIPC General counsel apparently thought standard procedure would apply in this case as well. In a statement Josephine Wang, gave to the press on December 16, 2008, Ms. Wang acknowledged that a Madoff customer is entitled to the securities in their account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

**E. THE TRUSTEE AND SIPC'S POSITIONS IN THIS CASE ARE INCONSISTENT WITH CONTROLLING CASE LAW IN THIS JURISDICTION**

Although it is impossible to discern from their moving papers, the Trustee and SIPC must know that the Second Circuit Court of Appeals in the *In re New Times Securities Services, Inc. and New Age Financial Services, Inc*. SIPA liquidation, on appeal from the district court, approved the trustee's treatment of investors, like the investors here, who invested in real (existing) securities that were never purchased and were granted allowed claims in the amount of their accounts without regard to the amount of their investment and any withdrawals from their accounts..

The *New Times* case involved the fraud of William Goren who defrauded hundred of investors of $32.7 million by soliciting them to invest in either (i) one or two money market funds that were never formed, registered, or operated, (ii) shares of bona fide mutual funds that were never, in fact, purchased and (ii) fraudulent promissory notes. Goren never invested the funds in any of these securities. He, like Madoff, misappropriated the money. The parties all agreed that the securities in the case never existed. One hundred and seventy four claimants invested in the bogus mutual funds that were never organized as mutual funds, registered or operated. The other group of investors who were treated more favorably are the group of that invested in mutual funds that actually existed but never purchased.

Specifically, with respect to any claims that were based on confirmations and account statements reflecting securities positions in "real" securities that could have been purchased (i.e., securities that actually existed on the public market and whose valuations were objectively and publicly verifiable by the customers), the New Times trustee allowed all such net equity claims

to the full extent of the filing date valuations of those securities, even though none of the securities identified in those records had ever, in fact, been purchased by the broker-dealer.[2]

The Second Circuit's discussion of the claims processing in *New Times*, the controlling case in this jurisdiction dealing with the issue in this case, recognized that there were two groups of investors and approved the treatment of customers who thought they were invested in listed securities:

> Meanwhile, investors who were misled . . . to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds – because Goren never executed the transactions – the information that these claimants received on their account statements mirrored what would have happened had the given transaction been executed. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. Furthermore, the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," . . . could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements.

*In re New Times Sec. Servs*., 371 F.3d 68, 74 (2d Cir. 2004); *see also* Brief of Appellant SIPC at 23-24, *In re New Times Sec. Servs., Inc.*, No. 05-5527 (Dec. 30, 2005):

> [R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities

---

2

Approximately 900 customers filed claims in the New Times liquidation: 726 for whom the "Real Securities" were purportedly purchased; 174 for whom the "Fictitious New Age Funds" were purportedly purchased. Consistent with SIPA and its legislative history, the New Times Trustee appropriately applied SIPA's net equity definition to the "Real Securities" customers' claims – meaning he paid them according to the full value of those securities positions as of the date of the liquidation filing. When challenged by "Fictitious New Age Funds" customers who had objected that they had not received the same treatment, SIPC and the New Times Trustee (with the apparent concurrence of the SEC) vigorously defended their approach in court.

> (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Two years later, in the same case, the Second Circuit considered related issues in the New Times liquidation and expressed the same view regarding the treatment of customers claims consistent with the customer expectation: "it is the customer's legitimate expectation in the filing date…that determines the availability, nature and extent of the customer relief under SIPA." *In re New Times Sec. Servs., Inc,* .463 F.3d 125, 128 (2d Cir. 2006). The Second Circuit approved the method used by the Trustee here **only** in the context of fictitious securities, where it was impossible to value securities:

> Because there were no such securities and it was therefore impossible to reimburse customers with actual securities or their market value on the filing date (the usual remedies when customers hold specific securities, the court determined that the securities should be valued according to the amount of the initial investment.

Id. at 129-30.

In this case the value of the securities in each customer's account is readily ascertainable and in fact, according to the Trustee's Motion those values on the statement reflected fairly exact historical trading prices.

In sum, the Trustee has created his own definition of "net equity" that is not based on statutes, prior practice or case law. The procedure is designed not for the benefit of Madoff victims but rather so that the Trustee can avoid paying SIPC advances to the thousands of

Madoff investors who, like the Sonnenschein Investors have depended upon their Madoff investments for their current and future living expenses.

**F. THE TRUSTEE'S METHODOLIGY IS INCONSISTENT WITH OTHER LAWS**

In order to reconstruct a "legitimate" account for each customer, the Trustee has gone back in time past any period where he might be able to void a transaction or to reduce investments by the amount of withdrawals. He has also reduced balances transferred from other accounts received by the customer in good faith and without knowledge of any fraud. The Trustee has also avoided transfers from pension funds and other accounts, which distributions are protected under state law from avoidance or recovery. Accordingly, the Trustee method of calculating net equity based on the "cash in-cash out method, cannot be upheld.

**CONCLUSION**

Based upon the above, the Sonnenschein Investors respectfully request that the Court deny the Trustee's Motion, direct that Trustee allow the customer claims in the amount of the final statements, and direct the Trustee to promptly make the SIPC Fund payments to each investor.

Dated: November 13, 2009

SONNENSCHEIN NATH & ROSENTHAL LLP

By: /s/ Carole Neville

Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

*Attorneys for Sonnenschein Investors*

# SCHEDULE A

**SONNENSCHEIN INVESTORS**[3]

Alexander A. Stein Trust
Alvin Gindel Revocable Trust Agreement
Alvin R. Rush
BAM LP
Barbara Berdon
Barry Weisfeld
David R. Markin 2003 Trust
Davina Greenspan and Lori Friedman J/T WROS
Elaine Roberts
Elaine Stein Roberts IRA
Elizabeth D. French
Elliott J. Goldstein MD PC
Eric P. Stein
Eric P. Stein IRA
Estate of Helen Shurman
George and Sarah Berman
Greg Goldberg IRA
Harold Hein (IRA)
Jennifer Kelman Revocable Trust, Dated 12/22/04
Joel Goldberg-Pension Profit Sharing Plan
Joel Goldberg-Pension Profit Sharing Plan (not First Trust)
Kerri Goldberg IRA
Kings Park Inc.
L Rags Inc.
Lapin Children LLC
Lauren Goldberg IRA
Lena M. Stein Trust
Lesley Koeppel
LI RAM L.P.
Loren W. Stein
LS Zahn
MAR Partners
Margot Stein
Marilyn and Edward Kaplan
Marsha Peshkin
Marsha Peshkin IRA
Marvin E. Bruce (IRA)
Maurice S. Sage Foundation Inc.
Melvin H. Gale and Leona Gale Trust Dated 01/04/94
Michael Mann and Meryl Mann
Millicent Rudnick
MMRN Associates
Mona and Alan Fisher

[3] Sonnenschein reserves the right to amend this list.

Neil Reger Profit Sharing Keogh
Norma Shapiro IRA
Norma Shapiro Trustee
Richard E. Winer Revocable Trust
Robert C. Lapin IRA
Robert T. Schoen MD and Cynthia B. French J/T WROS
Robert W. Renfield Living Trust
Sage Associates
Sage Associates II
Sage Realty
Sharon Stein
Sidney Horowitz (IRA)
SRF Partners
Stanley Elias
Stanley T. Miller IRA
Toby T. Hobish
Trust of Bernice L. Rudnick, Cecil N. Rudnick, et al TSTEES
Trust U/W/O Philip Shapiro