# EXHIBIT 1



1 of 1 DOCUMENT

THE SECURITIES INVESTOR PROTECTION ACT AMENDMENT OF 1978

APRIL 25, 1978 (legislative day APRIL 24), 1978. - Ordered to be printed

**ACT:** Securities Exchange Act of 1934-amend

**CITE:** SENATE REPORT No. 95-763; 95TH CONGRESS *2d Session* ; H.R. 8331

Mr. WILLIAMS, from the Committee on Banking, Housing and Urban Affairs, submitted the following

REPORT

[To accompany H.R. 8331]

The Committee on Banking, Housing and Urban Affairs, to which was referred the bill (H.R. 8331) to amend the Securities Investor Protection Act of 1970 having considered the same, reports favorably thereon with amendment(s) and recommends that the bill as amended do pass.

COMMITTEE DELIBERATIONS

H.R. 8331 was pased by the House of Representatives on November 1, 1977 and referred on November 3, 1977 to the Committee on Banking, Housing and Urban Affairs.The Subcommittee on Securities held hearings on H.R. 8331 on April 25, 1978 and ordered H.R. 8331, as amended, to be reported to the Senate.

A.  AMENDMENTS TO SECURITIES INVESTOR PROTECTION ACT OF 1970

The Securities Investor Protection Act of 1970 (SIPA) was enacted to provide to customers of securities broker-dealers protection against losses which might occur as a result of the financial failure of broker-dealers.  SIPA established the Securities Investors Protection Corporation (SIPC), a nonprofit corporation, to administer SIPA through statutory assessments of SIPC members.

SIPA has demonstrated considerable success since its enactment in 1970.  As a result of broker-dealer inquidations in which SIPC has been involved, approximately 105,000 customers has benefited directly from its protections.  Those customers have received in such liquidations cash and securities worth approximately $ 279 million, of which about $ 54.5 million was advanced by SIPC to trustees; the remainder consists of funds and securities acquired and recovered by trustees during the liquidation proceedings.  All of this has been accomplished without the expenditure of any Federal funds.

There have been 129 liquidation proceedings under SIPA since 1970, the great majority of those liquidations commenced in 1973 and earlier years.  Because of better surveillance and other factors, the number of liquidations has been declining since that time.

SENATE REPORT No. 95-763; 95TH CONGRESS 2d Session ; H.R. 8331

Although the foregoing discussion illustrates the overall success of SIPA, limitations exist upon SIPC's ability to provide the type and degree of protection for securities customers for which SIPA was enacted. Specifically, these limitations in some cases impair the satisfaction of customers' claims as fully, promptly and efficiently as the Committee believes is desirable. H.R. 8331 addresses these limitations in order to promote the enhancement of investor confidence in the securities markets. The bill also responds to a number of specific problems that have arisen in SIPA liquidation proceedings.

1. *Coverage* . - The bill increases the amounts available to be distributed in liquidations to each customer from $ 50,000 to $ 100,000; no more than $ 40,000 (instead of the present $ 20,000) is available to satisfy claims for cash.

In addition, H.R. 8331 modifies existing law by directing that the trustee purchase securities when necessary in order to deliver such securities to customers in order to satisfy claims. The trustee's duty in this respect is qualified to the extent that such action is to be taken "to the extent that securities can be purchased in a fair and orderly market."

Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, never purchased or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. Instead, when the customer claims for a security exceed the supply available to the trustee in the debtor's estate, then customers generally receive pro rata portions of the securities claims, and as to any remainder, they receive cash based on the market value as of the filing date (normally the day the liquidation proceeding is initiated). In addition, customers owing cash or securities to the stockbroker (for example, margin customers) are not now permitted either to deliver the securities in or to pay their debit balances: instead their accounts are netted out.

A principal underlying purpose of the bill is to permit a customer to receive securities to the maximum extent possible instead of cash, in satisfaction of a claim for securities. By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments not only would satisfy the customers' legitimate expectations, but also would restore the customer to his position prior to the broker-dealer's financial difficulties. This will enable the customer to pursue his investment objectives without being disturbed by the forced sale of securities, a result which also has resulted in unfavorable tax consequences for some investors.

2. *Delays in Liquidations* . - The liquidation proceeding under SIPA have often been lengthy and have consequently resulted in substantial unnecessary delays to the detriment of customers. Until claims are settled, customers who have claims for securities are unable to implement investment decisions insofar as their cash or securities are tied up in the liquidation proceeding. While some delays are inevitable, some requirements of SIPA have proved unnecessary, particularly in smaller liquidations.

The bill would address these problems by authorizing streamlined procedures in cases where a significant savings in time would result, while at the same time preserving appropriate safeguards to assure that expedited procedures do not prejudice the rights of customers to have their claims considered equitably.

The bill would enable the trustee, subject to prior approval by SIPC, to transfer customers' accounts in bulk to another broker-dealer. In situations in which this procedure is practicable, it is expected that it will make SIPA far more responsive to the needs of customers. The customer would not, of course, be obligated to continue to maintain an account with the broker-dealer to whom it is transferred by the trustee.

The bill also provides for a "Direct Payment Procedure" which is intended to shorten the delays incident to a liquidation by eliminating the requirement of judicial supervision under limited circumstances. Many of the judicial procedures required under present law are clearly necessary in major liquidations; however, in smaller liquidations they have often proved to be time-consuming and expensive, while providing little, if any, benefit. In order to use the direct payment procedure SIPC must determine among other things, based upon the available information, that (1) no customer claim exceeds the limits of protection set forth in section 9(a) of SIPA as amended, (2) customer claims

SENATE REPORT No. 95-763; 95TH CONGRESS 2d Session ; H.R. 8331

aggregate less than $ 250,000, and (3) use of the procedure will be less expensive than a judicially supervised liquidation proceeding. Assuming that the enumerated conditions exist, a decision to use the direct payment procedure is within SIPC's discretion. The bill requires SIPC to give notice to customers of the liquidation and explicitly provides for judicial resolution of contested claims.

The direct payment procedure is available only where the member's registration as a broker-dealer ha been terminated or where the member has consented to the use of the procedure.

The fact that SIPC has initiated or carried out a direct payment procedure does not prejudice a person's right to pursue any other remedy he may have, except to the extent that SIPC has satisfied his claim.

In liquidations where a direct payment procedure is used by SIPC, references in SIPA to the "trustee" are understood to refer to SIPC.

3.*Costs of Administration* . - The procedures prescribed in SIPA are unnecessarily expensive in many cases. In every liquidation a trustee must be appointed by the court and in almost every liquidation counsel for the trustee is appointed and accountants are retained. This is necessary and appropriate for larger broker-dealers, but, under SIPA, the same procedures must be utilized whether a broker-dealer has thousands of customers or only a few. In small liquidation proceedings the expenses of administration are disproportionately high.

The reported bill is designed to address this problem. Its provisions will reduce administrative expenses where possible and add speed and flexibility. In order to pare administrative expenses, the bill would specifically authorize SIPC to designate itself or one of its employees as trustee in smaller cases (those where the failed firm's liabilities appear to be less than $ 750,000 and where there appear to be fewer than 500 customers). Local counsel would still be retained. Neither SIPC nor a SIPC employee would receive compensation for services rendered as trustee, though expenses would be reimbursed. This procedure has been used in a few cases under SIPA, with substantial savings in the time and expense of liquidation. However, because the present statute does not explicitly authorize its use, some courts have been reluctant to appoint SIPC or its employees as trustee.

In addition to the foregoing matters, the bill contains a number of other changes to existing law. Among other changes, the bill empowers SIPC to make substantive rules, subject to review by the Securities and Exchange Commission, in furtherance of the purposes of SIPA. Such rulemaking authority is needed because of the problems which arise incident to SIPA liquidations.

The bill also contains authority for SIPC to require minimal requirements for each SIPC member to provide public notice of the fact of membership in SIPC. This provision is included because of the usefulness of promoting public awareness of the existence of SIPC and the customer protections which it provides. Nevertheless, the Committee does not envision that SIPC will require more than that its members display bare minimum notice.

B. AMENDMENT TO SECTION 11(A), SECURITIES EXCHANGE ACT OF 1934

The House has passed a bill, H.R. 11567, which, in addition to authorizing appropriations for the Securities and Exchange Commission, also delays from May 1, 1978 until November 1, 1979 the effective date of Section 11(a) of the Securities Exchange Act of 1934.

During the consideration of H.R. 8331, the Committee adopted an amendment to the bill relating to Section 11(a). That amendment provides that the effective date of Section 11(a) is extended from May 1, 1978 until November 1, 1978, and further provides that the effective date of Section 11(a) is also postponed with respect to persons who became members of a national securities exchange between May 1, 1975 and February 1, 1978.

Section 11(a) of the Securities Exchange Act of 1934 was adopted as part of the Securities Acts Amendments of 1975 ("1975 Amendments"). Section 11(a) became effective immediately upon its enactment for persons who became

SENATE REPORT No. 95-763; 95TH CONGRESS 2d Session ; H.R. 8331

exchange members after May 1, 1975.  Its effectiveness is delayed until May 1, 1978, for transactions by persons who were exchange embers on May 1, 1975.  Commencing on May 1, 1978, the Section will prohibit all exchange members from effecting transactions on exchanges for their own accounts, the accounts of their associated persons and accounts over which they or their associated persons exercise investment discretion.

On February 22, the SEC requested legislation to extend the effective date of Section 11(a) for pre-May 1, 1975 exchange member for eighteen months, until November 1, 1979.  The House of Representatives passed the requested legislation as part of H.R. 11567 on April 4, 1978.

During the House Committee's consideration of the SEC's legislative request, the SEC issued a series of long awaited rules and interpretations ti implement Section 11(a) on the date it becomes effective and enforceable.  The rules appear to address most, if not all, of the problems identified by the Commission which it raised in support of its proposed extension: (1) the full effectiveness of Section 11(a) on May 1, 1978, would be premature in light of the continuing rapid pace of economic, technological and regulatory changes in the markets; (2) regional and smaller firms will not be competitive or viable unless able to provide brokerage and money management services; (3) the section presents difficult enforcement problems; and (4) the uncertainly over the scope and meaning of the section frustrates sensible business planning which could not possibly be concluded before May 1, 1978.

Whatever merit these arguments may have had at one time, they were caused in large part by the SEC's failure to act in a timely or reasonable manner to interpret the will of the Congress.  Section 11(a) has been law since June 4, 1975.  The Commission has had year to adopt rules, but chose to do so less than two months before the effective date.

Against this background, there is a serious need for the Congress to enact a six-month extension of the effective date of Section 11(a) to avoid unnecessary disruption in the trading markets, the securities industry, and the prudent investment of billions of dollars in pension and other managed funds.  Furthermore, the Committee believes it is both appropriate and equitable for the Congress to defer the effective date for all who became exchange members prior to February 1, 1978.

First, the rules adopted by the SEC on March 14 leave the securities industry little lead time to prepare to comply with the new requirements.

Under the rule, an exchange member may "effect" a transaction for an account over hich the member has investment discretion, provided the member does not actually "execute" the transaction.  Such a member may receive compensation for "effecting" the transaction if the person authorized to transact business for the account has authorized him in writing to receive such compensation, such authorization refers to the "effect versus execute rule," and the member makes written disclosure of such compensation at least annually.

To comply with these rules, each broker-dealer money manager must renegotiate its management contract with each client; many must also reprogram their computers.  Despite the efforts of many broker-dealers, the renegotiation process is time consuming and it appears that the Commission's short notice precludes the completion of the process by May 1, 1978.

Second, the implementation of Section 11(a) in an orderly manner is rendered difficult and confusing, if not nullified to a substantial degree, by the lack of parallel and conforming rules pursuant to the Employment Retirement Income Security Act ("ERISA").  Unless the agencies administering ERISA, the Internal Revenue Service and the Depatment of Labor, take some action to exempt from ERISA conduct by broker-dealer permissible under Section 11(a) and the rules thereunder, the broker-dealers, and pension fund participants and beneficiaries, will be caught on the horns of a dilemma.

In recognition of the need for coordination between the SEC, IRS and the Labor Department, the Conference Report on the Securities Acts Amendments of 1975 reflected the conferees' belief that the Department of Labor and the Internal Revenue Service should conform the two statutes by granting an exemption from ERISA enabling a securities

firm to provide until May 1, 1978, brokerage services to an employee benefit plan with respect to which the firm exercises investment discretion.  The agencies adopted an exemption (Prohibited Transaction Exemption 75-1), which expires May 1, 1978, for certain plan fiduciaries effecting securities transactions if they performed such functions on May 1, 1975.

IRS and Labor will not be able to act May 1, 1978, to conform the treatment of accounts covered under ERISA to the SEC's requirements.  Additional time is needed to allow all of these agencies to work towards harmonizing the different statutory schemes to the maximum extent possible.  The six-month extension proposed in this amendment will allow ongoing discussions to continue and permit a coodinated response to the regulation or prohibition of brokerage and money-management relationships.

In order to avoid confusion and undue disruption respecting securities transaction involving employee benefit plans subject to the Employee Retirement Income Security Act of 1974, the committee expects that the Departments of Labor and the Treasury will act expeditiously to extend until November 1, 1978 the prohibited transaction exemption for agency transactions and services, Exemption I of prohibited Transaction Exemption 75-1, 40 F.R. 50845 (October 31, 1975).

Third, if section 11(a) goes into full effect on May 1, 1978, as scheduled, it is lisely to hve a severe adverse impact on exchange markets and exchange members.

Section 11(a) prohibits an exchange member from effecting any transaction on that exchange for its own account.  A number of statutory exemptions are available and the SEC has adopted rules to permit a member to effect proprietary transactions under specifically prescribed conditions.  Specifically, under Section 11(a)(1)(G), a member may effect transactions for its own account if (i) the member satisfies the "business mix" test contained in Section 11(a)(1)(G)(i), and (ii) the transaction is effected in accordance with Commision rules which, at a minimum, assure that such transactions are not inconsistent with the maintenance of fair and orderly markets and yield priority, parity, and precedence to orders for the accounts for persons who are not members or associated persons of members.

While the SEC has adopted a temporary rule to govern the identification and sequencing orders, there are serious practical and technical problems which the SEC's Release concedes.

As of today, none of the national securities exchanges has in place the necessary rules, procedures or computer programs to assure that members transactions actually yield priority, parity and precedence in execution to nonmembers' orders.  Moreover, few, if any, exchange members have the capability in place to identify the orders.  Thus, trading on the floors of the exchanges may be unduly disrupted; the public order protections intended may be illusory; and the law and the rules will be unenforced and, in fact, unenforceable.  With additional time, the practical problems involved in establishing an order identification process and yielding requirements can be studied and the necessary self-regulatory and administrative solutions can be developed.

### C. AMENDMENTS TO SECTION 3(B) OF THE SECURITIES ACT OF 1933

Section 18 of the bill would amend the Securities Act of 1933 to assist small businesses in raising capital.  To accomplish this objective the bill gives the Securities and Exchange Commission power by rule or regulation to increase the size of an offering of securities that may be made without compliance with the full registration requirements of the Securities Act from the present amount of $ 500,000 to $ 2,500,000.

The Federal securities laws hve always reflected the national policy of encouraging the growth and expansion of small business.  From the time of the original enactment of the Securities Act of 1933, the Congress has provided special treatment for small business by the Securities and Exchange Commission.  Under section 3(b) of the Act, the Commission is authorized to exempt certain classes of securities if the total offering price to the public does not exceed a specified amount.  In 1933, the amount was $ 100,000 and twice in the past the Congress has acted to increase the amount of the small business exemption -- in 1945 to $ 300,000, and most recently in 1970 to $ 500,000 -- in

SENATE REPORT No. 95-763; 95TH CONGRESS 2d Session ; H.R. 8331

recognition of changes in the general economic conditions and increased costs of conducting business.

In the 8 years since the last amendment to section 3(b) of the Act, costs have continued to rise throughout the economy, with the result that $ 500,000 has substantially less purchasing power today. In many cases, it is an inadequate amount to finance properly a small established business seeking to modernize or expand, or a newly organized venture requiring a substantial amount of seed capital.

The $ 500,000 limitation also makes it more difficult for issuers to interest investment bankers in exempt offering under section 3(b), because the larger and more experienced investment banking houses are not interested in underwriting such small issues, partly because returns to them would not be commensurate with the effort needed to underwrite such an offering. Where an underwriter can be found, the underwriting commissions for these small issues run as high as 15 to 20 percent of the amount sold which, of course, reduces the funds available to the issuer of the securities. In times of increasingly tight money, banks and private sources may not be willing or able to provide adequate risk capital and, therefore, small business needs to have access to public financing.

The Committee and the Congress have indicated a continuing interest in promoting small business and new ventures and have provided several specific means of accomplishing this goal, such as Small Business Administration loans and the Small Business Investment Company enabling legislation. The exemption afforded under Section 3(b) of the Securities Act of 1933 is looked upon as an important adjunct to existing legislation in this field. However, to be effective, it should be realistic and reflect current price levels. To assure that small businesses are able to attract capital at reasoanble costs, it is necessary for the Congress, once again, to amend this provision of the securities laws.

The bill would amend section 3(b) of the Securities Act of 1933 by increasing the maximum aggregate dollar amount of securities from $ 500,000 to $ 2,500,000 which may be offered to the public pursuant to an exemption from the Act's registration provisions. The Committee strongly encourage the Commission to act promptly in amending its rules and regulations in order to carry out the intent of this legislation.

The bill makes a number of other changes in SIPA which are discussed in the Section-by-Section Summary of the bill.

SECTION-BY-SECTION SUMMARY

*Section 1 - Short Title*

The short title of the legislation is "Securities Investor Protection Act Amendments of 1977."

*Section 2 - Membership of SIPC*

Section 2(a) of the bill amends section 3(a)(2) of SIPA to exclude from SIPC membership those persons whose principal business, in SIPC's determination, is conducted outside the United States and its territories and possessions. SIPC's determination is reviewable by the SEC.

The bill continues the exemption from SIPC membership of all persons whose business consists exclusively of (1) the distribution of shares of registered open end investment companies or unit investment trusts, (2) the sale of variable annuities, (3) the business of insurance, or (4) the business of rendering investment advice to mutual funds or insurance company separate accounts. SIPC is authorized by rule to provide terms and conditions upon which registered broker-dealers whose principal business is conducted outside the United States and its territories and possessions can become SIPC members. The bill requires tht any broker-dealer excluded by this section make disclosure of such exclusion to persons living in the United States, its territories and possessions, as may be required by the Commission by rule.

*Section 3 - Powers of SIPC*

SENATE REPORT No. 95-763; 95TH CONGRESS 2d Session ; H.R. 8331

Section 3 of the bill amends section 3(b) of SIPA by authorizing SIPC to adopt bylaws relating to the indemnity of its directors, officers, and employees, and to adopt rules relating to the definition of terms used in SIPA and to the procedures for the liquidation of members and direct payment procedures. Notwithstanding the grant of this authority, SIPC may not redefine any term for which a definition is provided in section 16 of the bill. The definitional authority is designed to provide SIPC with flexibility in the interpretation of terms in the course of a liquidation for which no well-established legal meaning exists. The rulemaking authority is desirable in order to enable SIPC to deal with the many problems which arise in the course of the conduct of its business.

*Section 4 - Board of Directors*

Section 4 makes various technical and clarifying changes in sections 3(c)(2) and 3(c)(5) of SIPA.

*Section 5 - Bylaws and Rules*

Section 5 of the bill amends section 3(e) of SIPA by deleting provisions regarding initial bylaws and by establishing procedures for the adoption, amendment, and repeal by SIPC of bylaws and rules. Proposed bylaw changes are reviewable by the Commission, and may be subject to the rulemaking procedure where the Commission deems them significant. New procedures appropriate to legislative, rather than interpretive rules are provided since SIPC's rules will have the force and effect of law. Proposed rule changes must be specifically approved by the Commission, or be the subject of Commission proceedings to determine whether they should be disapproved.An exception is provided where the Commission determines by rule that the proposed change does not require such procedures.

*Section 6 - SIPC Fund*

Section 6 of the bill makes various technical changes in section 4 of SIPA. In addition the bill clarifies SIPC's authority to maintain confirmed lines of credit separate from the fund, thereby diminishing the possibility that SIPC might need to borrow from the United States Treasury. The bill imposes a minimum assessment on SIPC members of $ 25 per year through 1979. Thereafter SIPC is authorized to set a minimum assessment not exceeding $ 150 per year. SIPC is authorized to levy a penalty for late payment of assessments. Finally, this section continues the existing requirement that gross revenues from the securities business be computed on a consolidated basis, except that it excludes foreign subsidiaries from such consolidation. A companion change in the definition of "customer" contained in section 15 of the bill excludes from SIPC protection any person to the extent that his claim arises from transactions with a foreign subsidiary of a SIPC member.

*Sections 7, 8, and 9 - Protection of Investors, General Provisions of a Liquidation Proceeding and New Sections of SIPA*

Section 7, 8, and 9 of the bill contain most of the substantive amendments relating to the protection of investors in the event of a broker-dealer's financial failure. Discussed below are sections of SIPA as they would be amended by the bill.

Section 5(a)(2). Action by a self-regulatory organization to assist a member of SIPC in financial difficulty or to take appropriate action with respect to such a member as may be appropriate to protect customers may obviate the need for a SIPC liquidation. This section would clarify the authority of self-regulatory organizations in this regard, and would assure that any assistance rendered by a self-regulatory organization would not result in the assumption by it of any obligation or liability to customers, other creditors, shareholders or partners of the debtor.

Section 5(a)(3). This subsection codifies existing Commission rules [see 17 C.F.R. §§ 240. 15b5-1; 240.15b6-1] under which potential subjects of a SIPC liquidation proceeding include only those persons who are members of SIPC or who have been members within the past 180 days. The subsection also makes clear that SIPC is not obliged to act where customer interests of the type protected by SIPC are not involved.

SENATE REPORT No. 95-763; 95TH CONGRESS 2d Session ; H.R. 8331

Section 5(b)(1). This subsection consolidates present subsections 5(b)(1) (A) and (B) of SIPA and is intended to eliminate possible ambiguity as to the action required of a court when presented with a SIPC application for a decree setting in motion the customer protection and liquidation procedures. The substance of existing subsection (B) is unchanged except that an application consented to by the debtor will be granted immediately.

Section 5(b)(2). This subsection, dealing with the court's jurisdiction, makes no substantive changes, but refines the relationship between SIPA and the Bankruptcy Act. The revisions limit the connection to those provisions of the Bankruptcy relating to ordinary bankruptcy, except those relating exclusively to stockbrokerage liquidations. SIPA's general incorporation of chapter X of the Bankruptcy Act is eliminated in favor of a specific incorporation of certain chapter X provisions considered desirable in a stockbroker liquidation proceeding. The pattern is continued throughout the bill.

The drafting of these revisions has been complicated by the expectation that the Bankruptcy Act may be substantially amended in the near future. Accordingly, the term "Bankruptcy Act" is defined (in subsection 16(1) of SIPA as amended) to mean the provisions of the Bankruptcy Act and bankruptcy rules relating to ordinary bankruptcy. The specific chapters of the Bankruptcy Act involved are referred to only parenthetically for purposes of clarification with a view to the possibility that equivalent provisions in an amended Bankruptcy Act will be numbered differently. The bill retains the jurisdictional provisions of SIPA (the language of which was drawn from chapter X of the Bankruptcy Act) and adds thereto language designed to codify case law precedents developed under chapter X. This is done to make clear that the elimination of the wholesale incorporation of chapter X provisions is not in any way intended to limit the jurisdiction of a court under SIPA.

Section 5(b)(2)(A)(i) of SIPA as amended would give the court authority to protect property located outside the territorial limits of the court but within the actual or constructive possession of the debtor. See, e.g., *Continental Illinois National Bank & Trust Co.* v. *Chicago Rock Island & Pacific Ry* ., 294 U.S. 648 (1935). This protection is unavailable in ordinary bankruptcy. Section 5(b)(2)(A)(i) of SIPA as amended would also incorporate the chapter X rule giving a court jurisdiction over property in the possession of a secured creditor who asserts a right to retain the property as security but who does not challenge the debtor's title. See, e.g., *6 Collier on Bankruptcy* . P3.05 (14th ed. 1976); *Continental Illinois National Bank & Trust Co* ., supra; *In re Prudence Bonds* , 77 F.2d 328 (2d Cir. 1935). The bill also incorporates various chapter X provisions relating to stays.

Section 5(b)(3). Amendments to this subsection would fortify SIPC's sole discretion to designate the trustee and his counsel, would make clear that the trustee and his counsel may be associated with the same law firm, and contains the authority discussed above for SIPC or one of its employees to be named as trustee under certain circumstances.

Section 5(b)(4). Authority for the existing practice of referring all or part of a liquidation proceeding to a referee in bankruptcy, thereby in many cases expediting liquidation proceedings, is clarified. See. e.g., *Exchange National Bank* v. *Wyatt* , 517 F. 2d 453 (2d Cir. 1975).

Section 5(b)(5). Under this subsection SIPC would be required to file a recommendation with respect to applications for compensation by trustees, their attorneys, and other persons. The recommendation would be binding on the court in "no-asset" cases unless it results in a controversy with the applicant. Cf., *SIPC* v. *Charisma Securities Corp* ., 506 F. 2d 1191 (2d Cir. 1974). In other cases, SIPC's recommendations would be entitled to great Compensation to trustees and their attorneys would be based on the services rendered and costs incurred rather than on the amount of assets marshaled. Compensation on an interim basis is expressly provided for, as is compensation to referees in bankruptcy or special masters to whom proceedings have been referred.

Section 5(b)(6). Since chapter X of the Bankruptcy Act would no longer be generally incorporated under the bill, this subsection expressly sets forth the essential provisions of sections 157, 158 and 161 of chapter X relating to disinterestedness of trustee and counsel. Under this subsection, SIPC would be deemed disinterested in all instances and a SIPC employee would be deemed disinterested except to the extent his interest arises from a source other than his

SENATE REPORT No. 95-763; 95TH CONGRESS 2d Session ; H.R. 8331

association with SIPC.

Section 5(d). Under this subsection, whose language is drawn from section 208 of chapter X of the Bankruptcy Act, SIPC's right to participate fully in any matter arising in a liquidation proceeding, whether that matter is deemed a proceeding in bankruptcy or a controversy arising in a proceeding in bankruptcy, is confirmed. Cf., *SEC* v. *Krensman*, 397 F. 2d 55 (5th Cir. 1968). This right, including the right of appeal, is essential for SIPC to carry out its proper functions as the entity charged with the administration of SIPA, as an advisor to the court, as the party initiating a liquidation proceeding, and as the party which, to a large extent, is responsible for overseeing the funds available for use in a liquidation proceeding.

Section 6(a). Changes in terminology have been made in this section to reflect substantive changes in the consepts of "specifically identifiable property" and "single and separate fund" which under the bill would be termed "customer name securities" and "customer property," respectively.A new statement of purpose is added - that of selling or transferring offices and other productive units of the debtor's business.

Section 6(b). The bill would eliminate the wholesale incorporation of chapter X of the Bankruptcy Act. Except for incorporation of specific chapter X sections, liquidation proceedings under SIPA subject to those Bankruptcy Act provisions relating to ordinary bankruptcy, except those provisions related solely to stockbrokerage liquidations for which SIPA itself is a substitute.

SIPA's definition of the term "property" is deleted as no longer being useful since the substantive provisions of the bill make clear whether they apply to cash or securities or both. The term "security" would be defined by section 15 of the bill (section 16(14) of SIPA as amended) and the somewhat confusing reference to "property of a similar character" has been deleted.

Section 6(c). The bill would codify the present SIPC practice of providing protection to customers who, in good faith, enter into transactions with the debtor after the filing date but before the appointment of a trustee.

§ 6(e). It is made clear in this subsection that certain advances by SIPC will be deemed to be costs and expenses of administration, and will be recouped as such. Other claims against the general estate have the same priority they would have under the Bankruptcy Act.

Section 7(a). The bill here specifies the powers vested in a trustee. They are the powers of a trustee under the Bankruptcy Act together with certain specifically granted powers which may be exercised only with SIPC approval. The use of SIPC employees to aid the trustees in carrying out a liquidation proceeding is specifically authorized. The trustee is further authorized to margin and maintain customer accounts so as to facilitate any possible transfer of accounts to other broker-dealers.

Section 7(b). The bill charges the trustee with the duties of a trustes under the Bankruptcy Act, plus special duties relating to the satisfaction of customer claims for securities by the distribution of securities to the maximum extent possible.

Section 7(c). The bill incorporates the reporting requirements of bankruptcy rule 218 and adds other special requirements.

Section 7(d). The bill incorporates the investigatory and reporting requirements of section 167 of chapter X, which is broader than the comparable provision relating to ordinary bankruptcy. Investigation of the causes of a brokerage firm's failure may be quite helpful in marshaling assets for the estate.

Section 8(a). The bill would make the trustee's duty to give notice of his appointment to customers applicable only to those customers who appear to have had an open account with the debtor within the year preceding the filing date. Notice to creditors other than customers will, under the bill, be the same as under the Bankruptcy Act though given by

the trustee rather than by the court.

The bill would require customers to file some written statement of claim promptly, reflecting the need for early certainty in regard to the allocation of customer property.

Claims of customers and other creditors must actually be received by the trustee within a six-month period from the date of publication of notice. The trustee would be authorized to satisfy claims filed more than the time established by the court, not to exceed 60 days but less than six months after the date of publication of notice in the most economical way, thereby protecting SIPC against speculation by customers who might withhold their claims for a period of time to see if a change in the market might give them a more valuable distribution. Claims filed more than six months after publication would be barred except for certain claims by a government authority, an infant or an incompetent. In anticipation of the possibility that first meetings of creditors may be eliminated when the Bankruptcy Act is revised, the period runs from the date of publication of notice rather than from the date set for the first meeting of creditors.

Section 8(b). This section reflects one of the essential features of the amendments, namely the delivery of securities to customers to the greatest extest practicable in order to make customer accounts whole.The section provides generally that a trustee shall seek to discharge promptly all obligations of the debtor relating to cash or securities to the extent the obligations may be established from the debtor's books. In addition to authorizing the trustee to use SIPC funds to satisfy claims, this section authorizes a trustee to deliver securities in satisfaction of claims to the extent they are available. After the available securities have been distributed to satisfy such claims, the trustee shall purchase the balance of the shares in open market purchase in accordance with Section 8(d). Securities distributed to customers are to be valued as of the filing date.

Section 8(c). This section establishes the priority in which customer property shall be allocated.

First, SIPC is entitled to reimbursement for discretionary advances made to recover securities through payment or guarantee of any indebtedness of the debtor to a bank, lender, or other person, to the extent that the securities are apportioned to customer property under section 6(d). The recovery of securities given by the debtor to others as collateral for loans is an important means of facilitating the delivery of securities to customers.

Second, remaining customer property would be allocated ratably among customers in satisfaction of their respective net equity claims. To the extent that a customer's net equity claim is unsatisfied by customer property, the customer is entitled to an advance of funds from SIPC up to the amount permitted by the bill.

Third, SIPC shall then be reimbursed as subrogee for the claims of customers which it has satisfied with its own funds.

Finally, SIPC shall be reimbursed for any advances it has made to guarantee or secure any indemnity pursuant to section 9(c)(2).

Any customer property remaining after the satisfaction of claims by customers and SIPC becomes part of the general estate. A customer may file a claim against the general estate to the extent that his net equity exceeds his share of customer property plus SIPC protection.

Under subsection 8(c)(2) the trustee is directed to deliver customer name securities to customers if they are not indebted to the debtor.If a customer has any outstanding indebtedness, he may pay the trustee, and with the trustee's approval reclaim customer name securities. If a customer does not liquidate any existing indebtedness, the trustee shall net the customer's account and pay to the customer his net equity on the filing date.

The bill would preserve the substance of SIPA subsection 6(c)(2) (D) which describes transactions deemed to be voidable under SIPA. Such transactions include those void or voidable under the Bankruptcy Act and those which have the effect of granting preferential treatment to individual customers.

Section 8(d). One of the central features of the bill is this subsection's grant of authority to the trustee to purchase securities in the open market or otherwise obtain them for the purpose of restoring customer accounts to their filing date positions. A key objective of the bill is the satisfaction of a customer's claim for securities by the delivery of securities to the greatest extent possible. SIPE funds may be made available to the trustee to purchase securities to replace that part of a customer's deficiency in securities whose value on the filing date did not exceed the limits of SIPC protection provided in subsection 9(a) of SIPA as amended.

Section 8(e). This section describes the procedure to be followed for the closing out or the completion of contracts with other broker-dealers left open by the insolvency of the debtor. Although the Commission may issue rules concerning the completion or the closing out of contracts, currently SIPC lacks such authority. This bill would amend SIPA by providing that contracts shall be completed or closed out by the trustee pursuant to SIPC rule. Until such rules with respect to trustee competition or close out are adopted, the other broker-dealer shall close out the contract in the best available market pursuant to SIPC rules. Until SIPC adopts rules relating to closeouts by the other broker-dealer, those broker-dealers shall close them out in accordance with Commission Rule S6(d)-1. That rule and the Commission's power to amend it from time to time shall be preserved by this statute until such times as SIPC adopts its own rules.

The broker or dealer will be entitled to SIPC protection up to $ 40,000 for losses sustained for each of his customers if he was in fact acting for a customer as defined in subsection 8(e)(4) of SIPA as amended. Any loss suffered by the broker or dealer who was not acting for a customer will constitute a claim against the general estate and not be payable from SIPC advances. Persons with contracts not wholly executory shall have a claim against the general estate for any losses.

The provisions allowing the payment of close-out losses will apply neither to a registered clearing agency that has its own rules on closeouts for its members, not to participants in such an agency, to the extent their claims may be processed within the clearing agency, unless SIPC provides otherwise by rule. Clearing agencies which suffer losses have claims against the general estate only, and may not be paid from SIPC funds. SIPC's rulemaking authority in this regard is subject to certain limits set forth in subsection (e)(3). It is recognized that the creation of a national clearance and settlement system is certain to cause changes in the operation of registered clearing agencies. Therefore, in exercising its rulemaking authority under this section, SIPC shall consult and cooperate with the Commission in carrying out the congressional directive in section 17A of the 1934 act to create a national clearance and settlement system.

Section 8(f). As described earlier in this Report, this section enables the trustee, subject to prior approval by SIPC, to transfer a customer's account to another broker-dealer. The benefits to customers and the potential savings to SIPC which may result from such transfers make it appropriate that SIPC funds be available to facilitate such transfers.

Section 9(a). In addition to increasing the amounts available to satisfy each customer's claim, Section 9(a) of the bill would continue to apply these limits to the shortage remaining after the allocation of customer property rather than to the net value of a customer's account. This makes the benefit of SIPC advances additional to whatever bankruptcy-type remedy the customer may have had. Finally, the bill makes clear that the dollar limits apply to the filing date value of the securities in respect of which the SIPC advance is made, rather than to the cash advance itself.

Section 9(b). Advances for customer-related losses on closed out contracts and expenses of administration where the debtor's estate is not sufficient to pay them are made mandatory.

Section 9(c). This new subsection is added to permit SIPC to make discretionary advances to aid in reclaiming pledged securities under section 7(b)(2), in transferring accounts under section 8(f) and in purchasing securities under section 8(d).

Section 10. The direct payment procedure described earlier in this report is the subject of Section 10, which

authorizes its use and sets forth the procedures applicable to the direct payment procedure. The section provides for the discontinuance of the procedure if SPIC determines that it is no longer appropriate. The right of a claimant to an adjudication of a disputed claim is explicitly recognized.

*Section 10 - Commission Functions*

This section of the bill makes conforming changes only.

*Section 11 - Examining Authority Functions*

This section of the bill makes conforming changes only.

*Section 12 - Function of Self-Regulatory Organizations*

For the sake of efficiency, the bill gives SIPC a certain amount of flexibility in the designation of self-regulatory organizations to collect assessments from SIPC members who are members of or participants in such self-regulatory organizations.

In order toencourage self-regulatory organizations to take prompt action to assist members in financial difficulty they are granted immunity from liability for good faith acts or omissions in connection with such action.

The bill provides that, if the only self-regulatory organization is a registered clearing agency, then the Commission may designate itself as responsible for the examination of the member.

The bill deletes from section 9(f) of SIPA certain Commission powers now granted to the Commission under the Securities Exchange Act of 1934.

*Section 13 - Prohibited Acts*

Drawing on concepts developed in connection with bankruptcy proceedings (see, 18 U.S.C.§ 152) the bill makes it a criminal offense to defraud or to attempt to defraud any person and makes criminal under SIPA any act which would be criminal if taken in relation to a bankruptcy proceeding.

*Section 14 - Liability, Advertising, and Other Miscellanous Provisions*

Under SIPA both SIPC and its directors are immune from liability for actions taken or omitted in good faith. Because of the probability of SPIC employees acting as trustees in liquidation proceedings, and for other reasons, the bill also provides immunity for SPIC's officers and employees.

The bill also authorizes SPIC to require minimal requirements for each member of SPIC to provide public notice of the fact of membersuip in SPIC. This provision is included because of the usefulness of encouraging public awareness of SPIC and the investor protections which it makes available. However, the Committee does not believe that it would be proper for SIPC to require more than a minimum notice requirement.

*Section 15 - Definitions*

The term "Bankruptcy Act" is defined so that simple references to it at various places throughout SIPA as amended have the effect of incorporating the currently effective provisions relating to ordinary bankruptcy. Wholesale reference to chapter X of the Bankruptcy Act is inappropriate, since the aim of a SIPA proceeding is the liquidation of a member rather than its reorganization.

The bill defines the term "customer name securities" as those securities which are registered in the names of customers or are in the process of being so registered on the filing date. It treats those securities not as part of the

debtor's estate but as property of the individual customers, which is being held by the debtor. Such securities will be returned to those individual customers. Except to this limited extent, the concept of "specifically identifiable property" is eliminated.SIPA's definition of "cash customer," closely related to the discarded concept of "specifically identifiable property," is deleted as being no longer useful.

The bill provides for "customer property" to replace what is now termed the "single and separate fund." The bill provides that all cash and securities, exclusive of SIPC advances and customer name securities, which are available to the trustee for the satisfaction of customer claims shall be deemed to be customer property. Included in this category is property made available through the use of realization of debit cash balances in customers' accounts and, as determined by the Commission, other customer-related debit items. Also included is property which would have been set aside or held for the benefit of customers had the debtor complied with applicable provisions of law.

The bill makes conforming changes in the definitions of "debtor", "examining authority", and "filing date".

The bill also defines the term "foreign subsidiary" as meaning (1) any subsidiary of a member of SIPC which has its principal place of business in a foreign country, or (2) any subsidiary of a member which is organized under the laws of a foreign country.

The bill modifies the definition of "gross revenues" by including in gross revenues a certain percentage of commissions from transactions in money market instruments.

Because SIPA lacks a clear definition of the term "securities," SIPC has resolved the ambiguity in a way which has resulted in the use of different definitions for the purposes of protection and assessment. As a result, SIPC has extended protection to persons who have claims relating to money market instruments without assessing commissions earned from those transactions. In light of past investor losses in these securities, the committee has determined that SIPC should be able to assess revenues earned from money market instruments. However, the committee recognizes that many of these transactions are generally conducted for the benefit of large institutions rather than individuals, and that the COD nature of these transactions typically poses little or no risk to customers.

The committee has adopted a comprehensive definition of the term securities which will, among other things, resolve the dual treatment of money market instruments. In addition, the committee has decided to permit SIPC to assess only that percentage of revenues which would reflect SIPC's loss experience in these securities for the proceeding 5 years.

The bill modifies the definition of "net equity" in order to make clear that margin and cash customers are to be treated equally and that certain protections are available to persons entering into transactions in good faith after the filing date. Certain conforming changes are also made.

The present SIPA defines "security" by reference to section 60e of the Bankruptcy Act. That section, however, does not itself define the term. The bill adds a new definition of "security" patterned after the definition contained in the Securities Exchange Act of 1934. That definition is not followed exactly, however, since the purposes of the 1934 act and SIPA are different.

Commodity contracts and options relating thereto are excluded, as are investment contracts, profit sharing plans, and an interest or participation in oil and gas leases which are not issued in a distribution pursuant to a registration statement filed with the Commission under the provisions of the Securities Act of 1933.

*Section 16 - Amendment to the Securities Exchange Act of 1934*

The bill amends the 1934 act by adding thereto a definition of the term "financial responsibility rules." By reason of section 2 of SIPA as amended, that definition will be applicable to SIPA as amended.

SENATE REPORT No. 95-763; 95TH CONGRESS 2d Session ; H.R. 8331

*Section 17 - Table of Contents*

The bill makes conforming changes in SIPA's table of contents.

CHANGES IN EXISTING LAW

In the opinion of the committee, it is necessary to dispense with the requirements of subsection 4 of Rule XXIX of the Standing Rules of the Senate in order to expedite the business of the Senate.

COST OF THE LEGISLATION

Pursuant to section 252(a) of the Legislative Reorganization Act of 1970, as amended, the committee accepts as its own estimate of the cost of carrying out the legislation the following cost estimates as prepared by the Congressional Budget Office.

CONGRESSIONAL BUDGET OFFICE, U.S. CONGRESS, *Washington, D.C., April 25, 1978* .

Hon. WILLIAM PROXMIRE, *Chairman, Committee on Banking, Housing, and Urban Affairs, U.S. Senate, Washington, D.C.*

DEAR ME. CHAIRMAN: Pursuant to section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has reviewed H.R. 8331, the Securities Investor Protection Act Amendments of 1977, as ordered reported by the Senate Committee on Banking, Housing, and Urban Affairs, April 25, 1978.

Based on this review, it appears that no additional cost to the government would be incurred as a result of enactment of this bill.

Sincerely, ROBERT A. LEVINE, *Deputy Director* .