MILBERG LLP
Jonathan M. Landers
Matthew Gluck
Brad N. Friedman
Sanford P. Dumain
Jennifer L. Young
One Pennsylvania Plaza
48th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

SEEGER WEISS LLP
Stephen A. Weiss
Christopher M. Van de Kieft
Parvin K. Aminolroaya
One William Street
New York, NY 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>                               Plaintiff, <br><br>        v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br>                       Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br><br> SIPA Liquidation |
| In re <br><br> BERNARD L. MADOFF, <br><br>                       Debtor. | |

**MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION FOR AN ORDER UPHOLDING TRUSTEE'S DETERMINATION DENYING CUSTOMER CLAIMS FOR AMOUNTS LISTED ON LAST STATEMENT, AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE OBJECTIONS WITH RESPECT TO THE DETERMINATIONS RELATING TO NET EQUITY**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................1

II.  FACTS & PROCEDURAL HISTORY ....................................................................5

    A.  Madoff's Ponzi Scheme .................................................................................5

    B.  The Customers ...............................................................................................7

    C.  A SIPA Liquidation Proceeding is Commenced ...........................................7

    D.  The Trustee Disallows the Customers' Claims..............................................8

    E.  An Overview of a SIPA Liquidation Proceeding .........................................12

        1.  SIPC ..................................................................................................12

        2.  SIPA Liquidation Proceedings..........................................................13

III.  ARGUMENT .........................................................................................................16

    A.  In Accordance With SIPA's Plain Meaning, the Customers' Respective "Net Equity" Amounts Should Be Based on Their Reasonable Expectations....................................................................................................16

        1.  Principles of Statutory Construction.................................................17

        2.  The Language of the Statute ..............................................................18

        3.  The Reasonable Expectations Approach Advanced by the Customers Has Been Applied in Other SIPA Liquidations in Accordance With Applicable Case Law...............................................20

        4.  Cases Within This Jurisdiction Generally Hold that Innocent Investors in a Ponzi Scheme Are Entitled to Claim Their Principal *Plus* Interest ......................................................................................27

    B.  SIPA's Legislative History Demonstrates that Congress Sought to Protect Customers' Reasonable Expectations, Even When Securities Were Never Purchased ........................................................................................31

        1.  Congress Passed SIPA in 1970 to Serve as a Backstop When SEC Regulation Fails to Prevent Fraud............................................32

        2.  Congress Amended SIPA in 1978 to Allow the Trustee to Purchase Missing Securities, Underscoring that SIPA Protects Reasonable

i

Customer Expectations Even Where Securities Were Never
Purchased ..................................................................................................... 35

3. In 1980, Congress Increased the Protection Available to Customers
Under SIPA in Part to Promote the Immobilization of Securities ............. 36

4. In 1988, SIPC Promulgated the Series 500 Rules, Which
Emphasize Written Confirmations Provided to Customers Rather
than Transactional Reality ........................................................................ 36

C. Madoff Was Not Acting as the Customers' Agent When He Committed
the Fraud ......................................................................................................... 37

D. The Trustee's "Cash In/Cash Out" Approach is Unsupported by the
Trustee's Avoidance Powers............................................................................. 42

IV. CONCLUSION ............................................................................................................. 46

# TABLE OF AUTHORITIES

## CASES

*Appleton v. First National Bank*,
   62 F.3d 791 (6th Cir. 1995) ......................................................................................17

*In re Asia Global Crossing, LTD.*,
   344 B.R. 247 (Bankr. S.D.N.Y. 2006) .......................................................................46

*Balaber-Strauss v. Sixty-Five Brokers*
*(In re Churchill Mortgage Investment Corp.)*,
   264 B.R. 303, 308 (S.D.N.Y. 2001).............................................................................43

*Bank of China v. NBM LLC*,
   359 F.3d 171 (2d Cir. 2004).......................................................................................40

*Blanck v. Young*,
   No. 276-73, 1978 U.S. Dist. LEXIS 20346 (D. Utah Jan. 5, 1978)............................34

*Breeden v. Thomas (In re Bennett Funding Group, Inc.)*,
   No. 98-61376, 1999 Bankr. LEXIS 1843 (Bankr. N.D.N.Y. Apr. 29, 1999)....4, 29, 42

*Capital Wireless Corp. v. Deloitte & Touche*,
   627 N.Y.S.2d 794 (App Div. 3d Dept. 1995) ............................................................40

*CBI Holding Co. v. Ernst & Young*,
   529 F.3d 432 (2d Cir. 2008).......................................................................................40

*CFTC v. Equity Fin. Group, LLC*,
   No. 04-1512, 2005 WL 2143975, (D.N.J. Sept. 2, 2005) ...........................................27

*CFTC v. Franklin*,
   652 F. Supp. 163 (W.D. Va. 1986) .............................................................................27

*C.J. Wright & Co.*,
   162 B.R. 597 (M.D. Fla. 1993) ..................................................................................26

*Coty v. Steigerwald*,
   692 N.Y.S.2d 556 (N.Y. App. Div. 4th  Dep't 1999)................................................41

*CTFC v. Topworth International, Ltd.*,
   205 F.3d 1107 (9th Cir. 2000) ...................................................................................27

*Cromer Finance Ltd. v. Berger*,
   245 F. Supp. 2d 552 (S.D.N.Y. 2003).........................................................................40

*Daly v. Deptula (In re Carrozzella & Richardson)*
    286 B.R. 480 (D. Conn. 2002) ............................................................... *passim*

*FCC v. NextWave Personal Communs. Inc.*,
    537 U.S. 293 (2003)...........................................................................17

*Gecker v. Goldman Sachs & Co. (In re Automobile Prof'ls, Inc.)*,
    398 B.R. 256 (Bankr. N.D. Ill. 2008) ...........................................................41

*In re Hedfed Investment Associates, Inc.*,
    84 F.3d 1281 (10th Cir. 1996) ...................................................................41

*Hill v. Spencer S&L Association (In re Bevill, Bresler & Schulman, Inc.)*,
    83 B.R. 880 (D.N.J. 1988) ......................................................................14

*In re Investors Ctr., Inc.*,
    129 B.R. 339 (Bankr. E.D.N.Y. 1991).........................................................19, 26, 37

*In re Ira Haupt & Co.*,
    234 F. Supp. 167 (S.D.N.Y. 1964)................................................................33

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
    263 B.R. 406 (S.D.N.Y. 2001) ................................................................41, 46

*Johnson v. Studholme*,
    619 F. Supp. 1347 (D. Col. 1985) ..............................................................4, 30

*Knox v. Agria Corp.*,
    613 F. Supp. 2d 419 (S.D.N.Y. 2009).............................................................17

*Lamie v. United States Trustee*,
    540 U.S. 526 (2004)...........................................................................17

*Lee v. Bankers Trust Co.*,
    166 F.3d 540 (2d Cir. 1999)....................................................................17

*Lustig v. Weisz & Associates, Inc. (In re Unified Commercial Capital, Inc.)*,
    260 B.R. 343 (Bankr. W.D.N.Y. 2001) .....................................................3, 27, 28, 29

*Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*,
    920 F.2d 183 (2d Cir. 1990)....................................................................17

*In re McBryde*,
    120 F.3d 519 (5th Cir. 1997) ..................................................................19

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*,
    247 B.R. 51 (Bankr. S.D.N.Y. 1999) .........................................................................45

*National Union Fire Insurance Co. v. Bonnanzio (In re Bonnanzio)*,
    91 F.3d 296 (2d Cir. 1996) .........................................................................................40

*In re New Times Securities Services*,
    371 F.3d 68 (2d Cir. 2004) ................................................................................ *passim*

*In re New Times Securities Services, Inc.*,
    463 F.3d 125 (2d Cir. 2006) .......................................................................................24

*In re Oberwies Securities, Inc.*,
    135 B.R. 842 (Bankr. N.D. Ill. 1991) .......................................................................25

*Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*,
    437 F.3d 1145 (11th Cir. 2006) .................................................................................41

*In re Old Naples Securities, Inc.*,
    311 B.R. 607 (M.D. Fla. 2002) .................................................................................26

*Orlick v. Kozyak (In re Finance Federated Title & Trust, Inc.)*,
    309 F.3d 1325 (11th Cir. 2002) .................................................................................43

*Rosen ex rel. Egghead.com, Inc. v. Brookhaven Capital Management Co.*,
    113 F. Supp. 2d 615 (S.D.N.Y. 2000) .......................................................................20

*Savage & Associates v. Mandl (In re Teligent Inc.)*,
    380 B.R. 324 (Bankr. S.D.N.Y. 2008) ......................................................................44

*SEC v. Byers*,
    637 F. Supp. 2d 166 (S.D.N.Y. 2009) .......................................................................31

*SEC v. S.J. Salmon & Co.*,
    No. 72-560, 1973 U.S. Dist. LEXIS 15606 (S.D.N.Y. Aug. 8, 1973) ........................45

*SEC v. Securities Northwest, Inc.*,
    573 F.2d 622 (9th Cir. 1978) .....................................................................................13

*SEC v. Zandford*,
    535 U.S. 813 (2002) ...................................................................................................38

*Securities Investor Protection Corp. v. Barbour*,
    421 U.S. 412 (1975) .....................................................................................................3

*Securities Investor Protection Corp. v. BDO Seidman, LLP,*
    222 F.3d 63 (2d Cir. 2000).........................................................13

*Securities Investor Protection Corp. v. Old Naples Sec., Inc.*
*(In re Old Naples Securities, Inc.)*,
    236 B.R. 854 (Bankr. M.D. Fla. 1999) ....................................26

*Smith v. Babcock*,
    19 F.3d 257 (6th Cir. 1994) .....................................................19

*Upton v. SEC*,
    75 F.3d 92 (2d Cir. 1996) ........................................................34

*Visconsi v. Lehman Bros.*,
    244 Fed. Appx. 708, 713-14 (6th Cir. 2007) ..........................31

*Wachovia Corp. v. Citigroup, Inc.*,
    634 F. Supp. 2d 445 (S.D.N.Y. 2009).....................................32

## FEDERAL STATUTES, REGULATIONS, & LEGISLATIVE HISTORY

11 U.S.C. § 96e (repealed 1979).......................................................18

15 U.S.C. § 78ccc ......................................................................12, 18

15 U.S.C. § 78ddd..............................................................................12

15 U.S.C. § 78eee ..............................................................................13

15 U.S.C. § 78fff.........................................................................14, 15

15 U.S.C. § 78fff-1 ............................................................................14

15 U.S.C. § 78fff-2 ............................................................................35

15 U.S.C. § 78fff-3 ...................................................................2, 12, 16

15 U.S.C. § 78fff-4 ............................................................................42

15 U.S.C. § 78ggg..............................................................................12

15 U.S.C. § 78k-1 ..............................................................................36

15 U.S.C. § 78lll ........................................................................ *passim*

17 C.F.R. § 240.15c3-1 ..............................................................34

17 C.F.R. § 240.15c3-3 ..............................................................33

17 C.F.R. § 300.501 ............................................................19, 38

17 C.F.R. § 300.502 ......................................................19, 36, 38

17 C.F.R. § 300.503 ..............................................................42

Fed. R. Bankr. P. 3001 ..........................................................38

Fed. R. Bankr. P. 7001 ..........................................................44

H.R. Rep. No. 91-1613 (1970)............................................33, 34

H.R. Rep. No. 95-595 (1977)..................................................34

H.R. Rep. No. 95-746 (1977)..................................................35

H.R. Rep. No. 96-1321 (1980)................................................36

S. Rep. No. 95-763(1978) ......................................................35

Pub. L. No. 91-598 (1970)......................................................33

Pub. L. No. 96-433 (1980)......................................................36

Rules of the Securities Investor Protection Corporation,
      53 Fed. Reg. 10368 (Mar. 31, 1988)...........................37

## MISCELLANEOUS

*Thomas W. Joo, Who Watches the Watchers? The Securities Investor Protection
      Act, Investor Confidence, and the Subsidization of Failure,*
      72 S. Cal. L. Rev. 1071 (1999) ....................................15, 32, 33

Daniel J. Morse, *When a Securities Brokerage Firm Goes Broke: A Primer on the
Securities Investment Protection Act of 1970,*
      25-1 Am. Bankr. Inst. J. 34 (2006) ...............................14

Jerry W. Markham, *Manipulation of Commodity Futures Prices -- The
Unprosecutable Crime,*
      8 Yale J. Reg. 281 (1991) .............................................33

Pursuant to the Court's September 16, 2009 Order Scheduling Adjudication of "Net Equity" Issue [Dkt. No. 437], Objecting Claimants Norton Eisenberg, Harold A. Thau, The Aspen Company, Stephen R. Goldenberg, Bernard Seldon, Martin Rappaport, Ann Denver, Orthopaedic Specialty Group PC, Paul J. Robinson, Jerry Guberman, Anita Karimian, Albert J. Goldstein U/W FBO Ruth E. Goldstein, Export Technicians Inc., and Judith Rock Goldman (collectively "Customers") hereby submit this memorandum of law in opposition to the Trustee's Motion for an Order Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections with Respect to the Determinations Relating to Net Equity ("Trustee's Motion") [Dkt. Nos. 524, 530], Memorandum of Law in Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections with Respect to the Determinations Relating to Net Equity ("Trustee MOL") [Dkt. No. 525], and Memorandum of Law of the Securities Investor Protection Corporation in Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections With Respect to the Determinations Relating to Net Equity ("SIPC MOL") [Dkt. No. 519].

## I.  INTRODUCTION

The Securities Investor Protection Act ("SIPA") provides that in a stockbroker liquidation proceeding, the Securities Investor Protection Corporation ("SIPC") shall advance to the trustee up to $500,000 per customer "[i]n order to provide for prompt payment and satisfaction of net equity claims of customers" for securities and up to $100,000 to satisfy claims

for cash. 15 U.S.C. § 78fff-3(a).[1]  The Trustee concedes that the Customers are "customers" under SIPA with claims for securities, not cash.  *See* Trustee MOL at 26.  At issue is *how* the Customers' claims for "net equity" should be calculated.[2]

The Customers submit that their respective "net equity" amounts should be based upon their final BMIS account statements, which best reflect what BMIS "owed" the Customers on the filing date in accordance with SIPA's definition of "net equity," SIPA's goal of protecting reasonable customer expectations, SIPC's practices in other SIPA liquidations, and applicable case law.

In contrast, the Trustee argues that "net equity" should be based solely on the Customers' principal contributions to BMIS less any withdrawals.  Under this so-called "cash in/cash out" approach, which ignores the earnings the Customers reasonably believed they accrued over the years, the amounts of Customer claims are significantly reduced, and more than *half* of BMIS's customers recover nothing.  *See* Oct. 28, 2009 Interview with Trustee (audio file available at www.madofftrustee.com).

The Trustee's approach is improper because under SIPA and SIPC's own Rules, when a customer entrusts funds with a broker to invest in securities and the broker sends the customer written confirmation that specific securities were purchased, the customer has a "net equity"

---

[1] Future citations to SIPA will omit "15 U.S.C."

[2] The limited issue before the Court is whether "net equity" should be determined based on (1) Whether a customer's "net equity" under SIPA is equal to "cash in/cash out"; or (2) Whether a customer's "net equity" under SIPA is equal to the value of the securities positions and credit balance reflected in the customer's last statement.  *See* Order Scheduling Adjudication of "Net Equity" Issue [Dkt. No. 437].  The Customers reserve all rights, claims, and defenses as to all other grounds for objecting to the Trustee's disallowance of their claims.  In addition, the Customers incorporate herein by reference any arguments raised by other Objecting Claimants or Interested Parties, as those terms are defined in the Court's Order, to the extent any such arguments do not conflict with the arguments raised herein.

claim for those securities, even if they were never in fact purchased. This approach comports with SIPA's "plain meaning" and protects customers' reasonable expectations, thus effectuating SIPA's goal of promoting investor confidence. *Nothing* in SIPA or SIPC's regulations supports the interpretation advanced by the Trustee and SIPC.

Instead, the Trustee bases his approach on what he thinks is "equitable." Yet, the Trustee's "cash in/cash out" approach fails to promote equity and in fact compounds the injuries suffered by Madoff's customers. The "cash in" portion of the Trustee's "cash in/cash out" approach fails to compensate customers for the time value of their money or any profits their investments earned throughout the years from Madoff's "legitimate" market making and propriety trading businesses, which were supported by customer funds. Likewise, the "cash out" portion of the Trustee's approach assumes that customers had beneficial use of monies withdrawn, when in fact many customers withdrew monies to pay the tax liabilities created by the "fictional" profits reported by Madoff. Under the Trustee's "cash in/cash out" approach, such tax payments are deducted from customers' claims. This is not equity.

The only real beneficiary of the Trustee's "cash in/cash out" approach is SIPC, which will save more than $1 billion in payments customers expected to receive. At the same time, it must be noted that SIPC is supervised by the SEC, who failed to detect Madoff's fraud despite numerous warnings. *See* SEC Office of Inspector General, Executive Summary: Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme (Aug. 31, 2009) (Ex. 1); *see also Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 418 (1975) (noting that the SEC has "plenary authority" to supervise SIPC).

In other Ponzi scheme cases, courts have rejected the "equity" arguments asserted by the Trustee. *See Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital, Inc.)*, 260 B.R.

343, 351 (Bankr. W.D.N.Y. 2001) ("Although many courts . . . believe it is more 'just' to require that an innocent investor victim who received . . . interest . . . return it so that it can be redistributed among the investors who did not recover all of their principal, I do not believe that partial solution is more 'fair' or 'just' than allowing that victim to keep the interest."); *Breeden v. Thomas (In re Bennett Funding Group, Inc.)*, No. 98-61376, 1999 Bankr. LEXIS 1843, at *37 (Bankr. N.D.N.Y. Apr. 29, 1999) ("[T]he Trustee argues that it is simply inequitable to allow Defendant to keep his payments when other equally innocent investors lost most or all of their money. [H]owever, the payments to Defendant cannot be avoided under Code § 548 without doing violence to the language and structure of the Bankruptcy Code."). As one court explained:

> [I]t is not clear that restitution is appropriate between the innocent investors who lost money and innocent investors who obtained fictitious profits. Here, the mistake of all investors was to trust [the fraudster]. Whether general principles of equity require that completely innocent investors in a Ponzi scheme should be required to share in the losses with, or be divested of "profits" for the benefit of persons whom they have never met or dealt with is not an easy question.
>
> Some investors who received "fictitious profits" may have spent the money on education or other necessities many years ago. What else in equity and good conscience should plaintiffs who received money in good faith pursuant to an "investment contract" have done? In contrast, some investors who lost money may have been speculators who were prepared to lose their investments. There is simply no neat answer to the various equities involved here where the investors never knew each other and were equally at fault for trusting [the fraudster].

*Johnson v. Studholme*, 619 F. Supp. 1347, 1350 (D. Col. 1985), *aff'd Johnson v. Hendricks*, 833 F.2d 908 (10th Cir. 1987).

No customer stands to gain a windfall under the reasonable expectations approach advanced by the Customers. At best, some customers will recover from SIPC what they thought they already owned, while others -- those whose BMIS statements showed investments in excess

of SIPC's $500,000 limit -- may receive only their SIPC advance and a minute share of customer property. Although the reasonable expectations approach does not make all Customers whole, it blunts the severity of many Customers' injuries by providing them limited protection. As the BMIS estate is unlikely to be a significant source of recovery to satisfy customer claims, the $500,000 SIPC advance is an essential element of customer protection, but this protection is meaningless if customer claims are not properly calculated.

The Trustee incorrectly argues that honoring reasonable customer expectations in the claims process would somehow "legitimize" or "perpetuate" Madoff's fraud, Trustee MOL at 3, while the Customers correctly argue that this approach would help to "protect" Customers from the fraud, in accordance with SIPA's name -- the Securities Investor *Protection* Act -- language, and purpose. The Customers respectfully request that the Court issue an order rejecting the Trustee's "cash in/cash out" approach and directing that customer claims be calculated in accordance with the reasonable expectations standard described herein.

## II.     FACTS & PROCEDURAL HISTORY

### A.     Madoff's Ponzi Scheme

Bernard L. Madoff Investment Securities LLC ("BMIS") is a New York limited liability company founded in 1960 and wholly owned by Bernard L. Madoff ("Madoff"). *See* Declaration of Joseph Looby in Support of Trustee's MOL ¶ 7 ("Looby Decl."). BMIS was organized into three business units: the market making unit, the proprietary trading unit, and the investment advisory business. *Id.* at ¶ 9. BMIS was registered with the SEC as a broker-dealer under Section 15(b) of the Securities Exchange Act of 1934. *Id.* at ¶ 10. By virtue of this registration, BMIS was a member of SIPC. *Id.*

On December 11, 2008, Madoff was arrested and charged with securities fraud, mail and wire fraud, embezzlement, and several other criminal counts based upon the operation of his

investment advisory business as a Ponzi scheme.[3]  *See* Information, *United States v. Madoff*, No. 09-213 (S.D.N.Y. filed Mar. 10, 2009) [Dkt. No. 38].  Madoff pled guilty to all charges and is currently serving a 150-year prison sentence.  In his plea allocution, Madoff described the Ponzi scheme as follows:

> The essence of my scheme was that I represented to clients . . . that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

*See* Plea Allocation of Bernard L. Madoff, No. 09-213 (S.D.N.Y.) [Dkt. No. 50].

Unlike his investment advisory business, Madoff's market making and propriety trading divisions purportedly operated as "legitimate" enterprises.  Looby Decl. at ¶ 28.  However, both of these divisions were "propped up" with customer monies Madoff obtained through his investment advisory Ponzi scheme.  *Id*. at ¶ 27.  The Trustee has not provided any information regarding transfers of money between the investment advisory business and the market making and proprietary trading businesses or profits earned by those businesses during the duration of the Ponzi scheme.[4]

---

[3] "[I]n a 'Ponzi' scheme, an enterprise makes payments to investors with monies received from newly attracted investors, rather than from profits of a legitimate business venture."  *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 483 n.2 (D. Conn. 2002).

[4] The Customers reserve the right to argue that they are entitled to a share of any such profits on various theories, including unjust enrichment.  *See* footnote 2, *supra*.

## B.     The Customers

The Customers were clients of Madoff's investment advisory business.  They provided monies to Madoff in good faith to invest on their behalf, and they received monthly statements and voluminous trade confirmations evidencing that Madoff purportedly purchased on their behalf blue chip securities (such as Wal-Mart Stores Inc., Johnson & Johnson, Coca Cola Co., Microsoft, and Pfizer).  *See* "Exemplar" BMIS Account Statement (Ex. 2).[5]  The Customers never requested a specified rate of return, nor was one promised to them.  According to the Trustee, the Customers' accounts showed annual returns between 10-17%.[6]  Looby Decl. ¶ 66.  None of the Customers knew, or had any reason to know, that Madoff never purchased any of the securities reflected in any of the Customers' BMIS account statements or trade confirmations, or that BMIS was a Ponzi scheme.

## C.     A SIPA Liquidation Proceeding is Commenced

On December 11, 2008, the above-captioned liquidation proceeding was commenced against BMIS, pursuant to SIPA.[7]  *See* Order, *Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Dkt. No. 4].

---

[5] All of the Customers submitted their final BMIS account statements with their customer claim forms and as exhibits to their objections.  The Customers' claim numbers and the docket numbers of their respective objections are set forth in Section II.D, *infra*.

[6] Courts have held that returns as high as 15% may not put investors on notice of a Ponzi scheme.  *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 484 n.7 (D. Conn. 2002).

[7] On April 13, 2009, an involuntary petition was filed against Madoff individually.  That Chapter 7 case was substantively consolidated with the liquidation of BMIS.  *See* Consent Order Substantively Consolidating The Estate of Bernard L. Madoff Into The SIPA Proceeding of Bernard L. Madoff Investment Securities LLC and Expressly Preserving All Rights, Claims and Powers of Both Estates [Dkt. No. 252].

Irving Picard was appointed Trustee, charged with overseeing the liquidation of BMIS and processing customer claims pursuant to SIPA. *Id.*

On December 23, 2008, the Court issued an Order authorizing the Trustee to disseminate notice, a claim form, and other related documents to customers and creditors of BMIS. *See* Order at 2 [Dkt. No. 12]. The Order provided that customers could submit customer claim forms to the Trustee, and the Trustee would "satisfy[] a customer's 'net equity' claim, as defined in 15 U.S.C. § 78lll(11), by distributing on a ratable basis securities of the same class or series of an issue on hand as 'customer property,' as defined in 15 U.S.C. § 78lll(4), and, if necessary, by distributing cash from such customer property or cash advanced by SIPC, or purchasing securities for customers as set forth in 15 U.S.C. § 78fff-2(d) within the limits set forth in 15 U.S.C. § 78fff-3(a) . . . ." *Id.* at 5. Should the Trustee disagree with a customer's claim, the Order provided that "[t]he Trustee shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, and the reason therefor . . . ." *Id.* at 6. If the customer disagrees with the Trustee's disallowance, "the claimant shall be required to file with this Court . . . a written statement setting forth in detail the basis for the opposition, together with copies of any documents in support of such opposition." *Id.* at 7.

### D.    The Trustee Disallows the Customers' Claims

Each of the Customers timely submitted a customer claim form setting forth the Customer's "net equity" as the balance on the Customer's November 30, 2008 BMIS account statement.

The Trustee disallowed, in whole or in part, each Customer's claim on the basis that "no securities were ever purchased for your account." *See* Determination Letters (Ex. 3). Included in each Customer's determination letter was a table setting forth the Trustee's analysis of all contributions to and withdrawals from the BMIS account for which the Customer submitted a

claim. *Id*. If the total amount of withdrawals exceeded the total amount of deposits (in the Trustee's parlance, "Net Winners"), the claim was denied outright. *Id*. If the total amount of deposits exceeded the total amount of withdrawals (in the Trustee's parlance, "Net Losers"), the claim was partially allowed in the amount of any principal remaining in the account. *Id*.

Although the Court's Order required the Trustee to disclose "the reason" for his disallowance, Order at 6 [Dkt. No. 12], the Trustee's determination letters stated only that each claim was disallowed or partially disallowed because "[n]o securities were purchased for your account. . . . Any and all profits reported to you by BLMIS on account statements were fictitious." *See* Determination Letters (Ex. 3). The Trustee provided no legal basis for using this claims calculation methodology, which, as discussed below, is improper under SIPA and applicable case law.

The Customers timely objected to the Trustee's disallowance or partial disallowance of their respective claims. The following chart demonstrates how each Customer's "net equity" fares under the reasonable expectations approach advanced by the Customers as compared to the Trustee's "cash in/cash out" approach.[8]

| Customer Name | Reasonable Expectations Approach | "Cash In/Cash Out" Approach |
|---|---|---|
| Norton Eisenberg (IRA) (Acct. No. 1CM296, Claim No. 08937, Objection Dkt. No. 435 ) | $8,274,567.27 | $(1,653,823.46) |

---

[8] These figures are taken in significant part from Exhibit A to the Trustee's Motion [Dkt. No. 530], which sets forth each Customer's name, Madoff account number, claim amount, and summary information regarding each Customers' respective deposits and withdrawals. The Trustee has not provided the Customers access to the records used by the Trustee in assessing the Customers' claims. Accordingly, the Customers reserve the right to challenge the amounts set forth in the Trustee's Exhibit A, notwithstanding the use of the figures here. *See* footnote 2, *supra*.

| Customer Name | Reasonable Expectations Approach | "Cash In/Cash Out" Approach |
|---|---|---|
| Harold A. Thau (Acct. No. 1ZA467, Claim No. 09522, Objection Dkt. No. 450) | $8,261,799.38 | $(3,281,000.00) |
| The Aspen Company (Acct. No. 1ZA471, Claim No. 09528, Objection Dkt. No. 452) | $3,540,074.13 | $(4,407,547.00) |
| Stephen R. Goldenberg (Acct. No. 1CM391, Claim No. 010950, Objection Dkt. No. 460) | $6,236,402.15 | $(4,000,000.00) |
| Bernard Seldon (IRA) (Acct. No. 1ZR050, Claim No. 006615, Objection Dkt. No. 453) | $1,169,785.47 | ($1,159,409.73) |
| Martin Rappaport (Acct. No. 1CM701, Claim No. 006125, Objection Dkt. No. 259) | $20,838,043.73 | $12,600,000.00 |
| Ann Denver (Acct. No. 1ZA470, Claim No. 0970, Objection Dkt. No. 409) | $6,825,991.14 | $1,303,000.00 |
| Orthopaedic Specialty Group PC (Acct. No. 100004, Claim No. 006261, Objection Dkt. No. 502) | $32,873,428.49 | $9,704,855.19 |
| Paul J. Robinson (Acct. No. 1EM299, Claim No. 000429 & 014257, Objection Dkt. No. 371) | $4,611,466.00 | $80,000.00 |
| Jerry Guberman (IRA) (Acct. No. 1ZR060, Claim No. 09416, Objection Dkt. No. 382) | $464,187.92 | $61,793.39 |
| Anita Karimian (IRA) (Acct. No. 1ZW019, Claim No. 010930, Objection Dkt. No. 397) | $127,479.40 | $21,532.43 |
| Albert J. Goldstein (Acct. No. 1ZA736, Claim No. 009316, Objection Dkt. No. 398) | $1,951,968.65 | $326,000.00 |
| Export Technicians Inc. (Acct. No. 1ZA794, Claim No. 005351 & 014260, Objection Dkt. No. 436) | $668,502.56 | $40,000.00 |

| Customer Name | Reasonable Expectations Approach | "Cash In/Cash Out" Approach |
|---|---|---|
| Judith Rock Goldman (IRA) (Acct. No. 1ZW013, Claim No. 009794, Objection Dkt. No. 396) | $213,900.01 | $49,378.00 |

Some examples illustrate the differences between the reasonable expectations and "cash in/cash out" approaches. Judith Rock Goldman, an "Under the Limits Net Loser" under the Trustee's parlance, Trustee MOL at 28, is a 67-year-old retired New York City public school teacher. She opened an IRA account with BMIS in 1992, and over the years invested a total of $49,378.00 in principal. Her November 30, 2008 BMIS statement showed that her investment had grown to $213,900.01. Under the Trustee's approach, she will be entitled to recover from SIPC only her $49,378.00 principal, even though she reasonably expected that she owned securities valued at $213,900.01.

Bernard Seldon, an 88-year-old retired insurance broker, is a "Net Winner" under the Trustee's parlance. Trustee MOL at 27. He began investing with Madoff in 1992 and contributed a total of $1,502,467.91 in principal over the years. Over the life of his account, he withdrew a total of $2,661,877.64 to support himself in his retirement. Under the Trustee's approach, Mr. Seldon's claim will be denied in its entirety, and he will recover nothing. Under the reasonable expectations approach, Mr. Seldon will have a claim in the amount of $1,169,785.47, based on his final BMIS statement. $500,000 of this claim will be satisfied from an advance from SIPC. Mr. Seldon will likely only recover a very small percentage of the remainder of his claim from the BMIS estate, depending on the total amount of assets the Trustee marshals for distribution. Given that Mr. Seldon thought he owned securities valued at $1,169,785.47, his recovery of $500,000 hardly constitutes "benefitting" from Madoff's fraud, as the Trustee contends. Trustee MOL at 3.

### E.    An Overview of a SIPA Liquidation Proceeding

Before turning to the specific legal arguments at issue, SIPA, the applicable statutory framework for resolving the Customers' claims, warrants brief discussion. The specific statutory language at issue and SIPA's legislative history is discussed more extensively in Sections III.A-B, *infra*.

### 1.    SIPC

SIPA, enacted in 1970, created SIPC, a nonprofit membership corporation whose members include most broker-dealers with interstate operations. *See* § 78ccc. SIPC maintains an investor protection fund by assessing fees on its member brokerage firms. § 78ddd(c). In the event of a broker-dealer liquidation, SIPC must advance from its investor protection fund up to $500,000 per customer to "promptly" satisfy "net equity" claims for securities. §78fff-3.

SIPC has the authority to adopt rules and bylaws "as may be necessary or appropriate to carry out the purposes of [SIPA]," including rules relating to "the distribution of customer property, and the advance and payment of SIPC funds." § 78ccc(b)(4). These rules and bylaws must be approved by the SEC, who has certain supervisory authority over SIPC. §§ 78ccc(e); 78ggg.

SIPC's bylaws require that each broker-dealer member of SIPC advertise the fact of membership at the member's principal place of business and in all member advertising through use of the SIPC symbol, which may be accompanied by the following "Official Explanatory Statement" in member advertising and communications with customers:

> (1) Member of SIPC, which protects securities customers of its members up to $500,000 (including $100,000 claims for cash). Explanatory brochure available upon request or at www.sipc.org. or (2) Member of SIPC. Securities in your account protected up to $500,000. For details, please see www.sipc.org.

*See* SIPC Advertising Bylaw § b-c (Ex. 4). SIPC's members are also permitted to advertise SIPC membership on trade confirmations, *Id.* at § f, as did BMIS. *See* Exemplar Trade Confirmation (Ex. 5). Nothing in SIPC's symbol or "Official Explanatory Statement" discloses that SIPC protects only customer principal when a broker steals customer monies without ever investing the funds in securities.

The United States Government Accountability Office noted in 2001 that SIPC's Advertising Bylaw resulted in advertisements that were confusing to customers, raising concerns that "[s]ome investors may confuse SIPC and state insurance Guarantee associations with FDIC."[9] *See* Steps Needed to Better Disclose SIPC Policies to Investors at 60, United States Government Accountability Office (May 2001) (Ex. 6). This concern was heightened by the fact that "SIPC does not require [its] members to disclose important coverage issues." *Id.* at 64.

## 2. SIPA Liquidation Proceedings

SIPC may petition a district court to commence a SIPA liquidation proceeding if one of its member brokerage firms "has failed or is in danger of failing to meet its obligations to customers" and certain other criteria are satisfied. § 78eee(a). Once a SIPA liquidation proceeding is commenced, the district court appoints a trustee selected by SIPC and removes the liquidation proceeding to the bankruptcy court. §§ 78eee(b)(3)-(4). The trustee then acts essentially as a bankruptcy trustee and the provisions of the Bankruptcy Code apply so long as

---

[9] Courts have noted that SIPA's goals of customer protection are similar to the protections the FDIC provides depositors. *See SEC v. Securities Northwest, Inc.*, 573 F.2d 622, 624 (9th Cir. 1978)("The SIPA thus provides financial protection to brokerage house customers not unlike that afforded bank depositors by the Federal Deposit Insurance Corporation."); *see also Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 70 (2d Cir. 2000) ("While the statutory and regulatory scheme of the SIPC is not identical to that of the RTC or the FDIC, the three entities rest on substantially similar enabling legislation and, as nonprofit government corporations, share similar features."). It is likely that many customers expected SIPC protection for their final BMIS account balances in the same way bank depositors expect protection from the FDIC.

they do not conflict with SIPA.  § 78fff-1(a) ("A trustee shall be vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under title 11 of the United States Code."); § 78fff(b) ("*To the extent consistent with the provisions of this Act*, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11 of the United States Code.") (emphasis added). In other words, "a proceeding under SIPA essentially is a bankruptcy liquidation remodeled to achieve the special purposes of SIPA."  *Hill v. Spencer S&L Ass'n (In re Bevill, Bresler & Schulman, Inc.)*, 83 B.R. 880, 886 (D.N.J. 1988).[10]

---

[10] Although a SIPA liquidation proceeding bears many similarities to a bankruptcy proceeding, the two types of proceedings are fundamentally different:

> The primary difference between these two proceedings can be found in the statutory mandates of the trustees in each proceeding. A SIPC trustee is required to distribute securities to customers to the greatest extent practicable in satisfaction of their claims against the debtor. Indeed, there is a statutory grant of authority to a SIPC trustee to purchase securities to satisfy customer net equity claims to specified securities. *Under SIPA, the trustee essentially seeks to preserve a customer's investment portfolio as it stood on the filing date.* The customer will receive securities whenever possible.
>
> In contrast, a trustee under the Code is charged with converting securities to cash as quickly as possible and, with the exception of the delivery of customer name securities, making cash distributions to customers of the debtor in satisfaction of their claims. A trustee operating under the Code is without authority and lacks the resources to purchase securities to satisfy customer claims to specified securities. Indeed, a trustee is prohibited by statute from distributing to a claimant any securities other than "customer name securities."

Daniel J. Morse, *When a Securities Brokerage Firm Goes Broke: A Primer on the Securities Investment Protection Act of 1970*, 25-1 Am. Bankr. Inst. J. 34, 72 (2006) (emphasis added).

"During a standard SIPA liquidation, the trustee must 'satisfy *net equity* claims of customers' of the failed broker-dealer." *In re New Times Secs. Servs.*, 371 F.3d 68, 72 (2d Cir. 2004) (quoting § 78fff(a)(1)(A)-(B)) (emphasis added). SIPA defines "net equity," in pertinent part, as:

> the dollar amount of the account or accounts of a customer, to be determined by --
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

§ 78lll(11). In other words, a customer's "net equity" is the amount the broker owes the customer on the filing date, less any amounts the customer owes the broker.[11] *Id.*; *see also* SIPC MOL at 18 ("'Net equity' . . . essentially is the difference between what the broker owes the customer and what the customer owes the broker on the filing date."). The interpretation of "net equity" is at the heart of the Customers' dispute with the Trustee regarding the disallowance of their claims.

To satisfy customers' net equity claims, SIPC must advance to the trustee up to $500,000 per customer "as may be required to pay or otherwise satisfy claims for the amount by which the

---

[11] Securities held in a customer's name are generally returned to the customer outright. § 78fff(a)(1)(A). "In modern practice, however, securities held by a brokerage firm for an investor are not generally registered in the investor's name. Rather, in order to enhance their transferability, they are generally registered in the name of an intermediary. Thus, very few of the securities a firm holds for investors fall into the 'customer name' category. The bulk of a SIPA debtor's estate falls under the category of "customer property" -- the cash and securities (other than customer name securities) held by the debtor for the accounts of investors. The debtor's remaining assets constitute the general estate." *See* Thomas W. Joo, *Who Watches the Watchers? The Securities Investor Protection Act, Investor Confidence, and the Subsidization of Failure*, 72 S. Cal. L. Rev. 1071, 1095-1096 (1999).

net equity of each customer exceeds his ratable share of customer property." § 78fff-3(a). If, however, "any portion of the net equity claim of a customer in excess of his ratable share of customer property is a claim for cash, as distinct from a claim for securities, the amount advanced to satisfy such claim for cash shall not exceed $ 100,000 for each such customer." § 78fff-3(a)(1). SIPC is repaid for any such advances out of "customer property" only after *all* customer claims are paid in full. § 78fff-3(a). Because of the $500,000 SIPC advance per customer, the BMIS liquidation is not a "zero sum game," as urged by the Trustee (Trustee MOL at 3), in that a payment of up to $500,000 to one customer does not reduce the size of the estate available to pay other customers.

The limited issue before the Court is whether the Customers' claims should be calculated based on the Customers' reasonable expectations, generally derived from the Customers' final BMIS account statements, or whether, notwithstanding reasonable expectations, the Customers are only entitled to claim their principal contributions less any withdrawals. As discussed below, only the reasonable expectations approach comports with SIPA's definition of "net equity" and applicable case law.

## III. ARGUMENT

### A. In Accordance With SIPA's Plain Meaning, the Customers' Respective "Net Equity" Amounts Should Be Based on Their Reasonable Expectations

It is remarkable that in almost 100 pages of briefing, neither the Trustee nor SIPC discusses the application of SIPA's definition of "net equity" to the Customers' claims. This is for good reason -- as discussed below, the statutory definition of "net equity" supports the Customers' position, and demonstrates that the Trustee's position is simply "made up."

### 1. Principles of Statutory Construction

"Construction of a statute begins with the words of the text." *Knox v. Agria Corp.*, 613 F. Supp. 2d 419, 421 (S.D.N.Y. 2009). "The principles of construction applicable to interpreting a complex statute . . . are straightforward: As long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute. The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.' In such cases, the intention of the drafters, rather than the strict language, controls." *Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 920 F.2d 183, 184 (2d Cir. 1990) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989)); *see also Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms. Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous."). Recent United States Supreme Court cases have stressed the applicability of the plain meaning rule to constructing statutes in bankruptcy cases. *See Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004) (applying "plain meaning" rule to interpret various provisions of the Bankruptcy Code); *FCC v. NextWave Pers. Communs. Inc.*, 537 U.S. 293, 303 (2003) (same).

Courts construe SIPA liberally to effectuate its remedial purpose of customer protection. *See In re New Times Secs. Servs.*, 371 F.3d 68, 84 (2d Cir. 2004) ("These statutory goals -- promoting investor confidence and providing protection to investors -- are better served by the SEC's broader reading of section 9(a)(1) [§ 78fff-3]."); *Appleton v. First Nat'l Bank*, 62 F.3d 791, 801 (6th Cir. 1995) (broadly construing SIPA to effectuate its remedial purpose). Such principles are especially pertinent here, where SIPC, situated similarly to an insurer, asks the

Court to adopt a statutory construction that would deny protection to more than half of BMIS's customers. *See* Oct. 28, 2009 Interview with Trustee (audio file available at www.madofftrustee.com).

### 2. The Language of the Statute

SIPA defines "net equity," in pertinent part, as:

> the dollar amount of the account or accounts of a customer, to be determined by--
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

§ 78lll(11).[12] SIPC is prohibited from changing this definition. § 78ccc(b)(4)(A). Significantly, SIPA's definition of "net equity" does not include any mention of the Trustee's "cash in/cash out" approach, nor does the definition provide that the "net equity" calculation differs in cases of fraud or where customers' monies are stolen rather than invested. This in itself is dispositive of the issue before the Court.

Here, each Customer deposited funds with BMIS to be invested in securities. BMIS represented to each Customer, in monthly account statements and trade confirmations, that BMIS purchased specifically identifiable securities on behalf of each Customer. Accordingly, these

---

[12] Section 60e of the Bankruptcy Act of 1938, a predecessor statute to SIPA, provided that "the 'net equity' of a customer's account shall be determined by excluding any specifically identifiable securities reclaimable by the customer and by subtracting the indebtedness of the customer to the stockbroker from the sum which would have been owing by the stockbroker to the customer had the stockbroker liquidated, by sale or purchase on the date of bankruptcy, the remaining securities or security commitments of the customer." 11 U.S.C. § 96e (repealed 1979).

account statements, and the Customers' final account statements in particular, reflect what "would have been owed by the debtor" to the Customers had BMIS been liquidated on the filing date. § 78lll(11).

Moreover, the Series 500 Rules, promulgated by SIPC, address the scenario where a customer deposits cash with a broker and receives account statements showing securities that were not in fact purchased: "Where the Debtor held cash in an account for a customer, the customer has a 'claim for securities' with respect to any authorized securities purchase *[i]f the Debtor has sent written confirmation to the customer* that the securities in question have been purchased for or sold to the customer's account." 17 C.F.R. § 300.502(a) (emphasis added). Conversely, "[w]here [the Debtor] held securities in an account for a customer, the customer has a 'claim for cash' with respect to any authorized securities sale *[i]f the Debtor has sent written confirmation to the customer* that the securities in question have been sold for or purchased from the customer's account." 17 C.F.R. § 300.501(a) (emphasis added). "[U]nder SIPC's rules *it is not performance that is critical, but receipt of written confirmation* of sale. This is clear from the Rules themselves." *In re Investors Ctr., Inc.*, 129 B.R. 339, 350 (Bankr. E.D.N.Y. 1991) (emphasis added).

Here, BMIS "held cash in an account for" the Customers and sent the Customers "written confirmation" that it purchased securities on their behalf. 17 C.F.R. § 300.502(a). Based on the plain meaning of SIPA's definition of "net equity" and SIPC's Rule 502(a), the Customers have a claim for those securities for which they received written confirmations. This is the only result that comports with the plain meaning of the statute.

Although the Trustee argues (Trustee MOL at 38) that a customer's written confirmation governs only *whether* a customer's claim is for cash or securities, but not *how* the claim should

be calculated, nothing in the Rules contemplates such a bifurcated approach and the Trustee cites no cases applying this approach. Moreover, statutes should be construed "to avoid interpretations that create internal inconsistencies or contradictions." *In re McBryde*, 120 F.3d 519, 525 (5th Cir. 1997); *see also Smith v. Babcock*, 19 F.3d 257, 263 (6th Cir. 1994) ("[I]nterpretations which yield internal inconsistencies or render some portion of the text superfluous are to be avoided."); *Rosen ex rel. Egghead.com, Inc. v. Brookhaven Capital Mgmt. Co.*, 113 F. Supp. 2d 615, 626 (S.D.N.Y. 2000) ("As a general principle of statutory construction, an interpretation that produces . . . inconsistencies or that works to negate legislative intent must be avoided.").

Likewise, the Trustee's argument that SIPA's definition of "customer" limits customer claims to securities "held by the debtor in the ordinary course of its business as a broker or dealer" must also fail. Trustee MOL at 45. SIPA's definition of "customer" expressly includes "any person who has deposited cash with the debtor for the purpose of purchasing securities." § 78lll(2) ("The term 'customer' includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities."). As to this portion of SIPA's "customer" definition, there is no requirement that the debtor hold securities in the ordinary course of its business. *Id*. Indeed, imposing such a requirement would defeat SIPA's purpose of protecting reasonable customer expectations when a broker steals customer funds or securities.

As discussed below, cases addressing the foregoing SIPA provisions follow the reasonable expectations approach advanced by the Customers.

### 3. The Reasonable Expectations Approach Advanced by the Customers Has Been Applied in Other SIPA Liquidations in Accordance With Applicable Case Law

Tellingly, the reasonable expectations approach was applied in the *New Times* SIPA liquidation, which involved highly analogous facts and was considered by the Second Circuit. In

*New Times*, William Goren perpetrated a Ponzi scheme over the course of 17 years by "solicit[ing] customers . . . to invest in (i) one or more non-existent money market funds . . . , (ii) *shares of bona fide mutual funds (from, e.g., The Vanguard Group and Putnam Investments), that were never, in fact, purchased*, and (iii) fraudulent promissory notes . . . . Instead of investing these customers' funds as represented, Goren misappropriated the money." *In re New Times Secs. Servs. Inc.*, 371 F.3d 68, 71-72 (2d Cir. 2004) (emphasis added).

The Customers are situated like the second group of *New Times* investors, who received statements showing purchases of bona fide mutual funds (*i.e.*, The Vanguard Group and Putnam Investments), which were never in fact purchased. *Id.* As to these investors, <u>the Trustee admits that the *New Times* trustee calculated "net equity" based on customer statements showing bona fide securities, even though in *New Times*, like this case, the securities were never purchased</u>. Trustee MOL at 41 ("It is true that for claimants who believed that they had invested in 'real' mutual funds in *New Times*, the trustee calculated net equity based upon 'earnings' on those investments as represented on their customer statements."). As described by the Second Circuit,

> investors who were misled by Goren to believe that they were
> investing in mutual funds that in reality existed were treated much
> more favorably [than the customers whose statements showed
> bogus mutual funds]. Although they were not actually invested in
> those real funds -- because Goren never executed the transactions -
> - the information that these claimants received on their account
> statements mirrored what would have happened had the
> transactions been executed. As a result, the Trustee deemed those
> customers' claims to be 'securities claims' eligible to receive up to
> $500,000 in SIPC advances. The Trustee indicates that this
> disparate treatment was justified because he could purchase real,
> existing securities to satisfy such securities claims. Furthermore,
> the Trustee notes that [those customers who thought they owned
> bona fide securities, in contrast to those who purchased nonexistent
> securities,] could have confirmed the existence of those funds and
> tracked the funds' performance against Goren's account
> statements.

*New Times*, 371 F.3d at 74 (emphasis added) (alterations added).  These same considerations apply here in that the Customers' BMIS statements reflected ownership of bona fide securities (*i.e.*, Wal-Mart Stores Inc., Johnson & Johnson, Coca Cola Co., Microsoft, and Pfizer) that were never in fact purchased, the Trustee could satisfy Customer claims by purchasing replacement securities, and the Customers could confirm the securities on their BMIS statements against publicly available stock market data.  Moreover, BMIS sent the Customers voluminous trade confirmations purporting to demonstrate that it was trading securities on their behalf.

SIPC advocated in *New Times* that the reasonable expectations approach was correct, and SIPC president Stephen Harbeck represented to the *New Times* bankruptcy court as follows:

> Harbeck:  [I]f you file [a customer claim form] within sixty days, you'll get the securities, without question.  Whether -- if they triple in value, you'll get the securities. . . . Even if they're not there.
>
> Court:  Even if they're not there.
>
> Harbeck:  Correct.
>
> Court:  In other words, if the money was diverted, converted --
>
> Harbeck:  And the securities were never purchased.
>
> Court.  Okay.
>
> Harbeck:   And if those positions triple, we will gladly give the people their securities positions.

Transcript at 37-39, *In re New Times Secs. Servs., Inc.*, No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000) (Ex. 7); *see also* Brief of SIPC, *Stafford v. Giddens (In re New Times Secs. Servs., Inc.)*, No. 05-5527, 2005 U.S. 2d Cir. Briefs LEXIS 259, at *23-24 (Dec. 30, 2005) (Ex. 8) ("Of vital importance here, reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality.  Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting

that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation *and therefore generally is entitled to recover those securities* (within the limits imposed by SIPA), *even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund the purchase*.") (emphasis added).

Also in stark contrast to the approach in *New Times*, the Trustee and SIPC argue here that SIPA mandates that the "books and records" of BMIS trump customer statements as the source for calculating "net equity." Trustee MOL at 26-27, SIPC MOL at 18-20. However, in *New Times* SIPC *admitted* and indeed advocated that a customer's reasonable expectations were not derived solely from a broker's books and records, particularly where a broker is engaged in a Ponzi scheme such that customer expectations drastically differ from transactional reality:

> Congress was careful, however, to provide that a "customer" claimant may establish a "net equity" claim *independently of the broker's books and records*, to the extent that the claimant can do so "to the satisfaction of the trustee." *To do so consistent with SIPA's purposes, the claimant must prove that he or she reasonably expected that the liquidating broker owed him or her cash or securities as a brokerage customer on the filing date; ie., that the claimant believed that he or she was engaged in ongoing securities trading on the filing-date*.

Reply Brief of SIPC, *Stafford v. Giddens (In re New Times Secs. Servs., Inc.)*, No. 05-5527, 2006 U.S. 2d Cir. Briefs LEXIS 114, at *14 (2d Cir. Feb. 16, 2006) (Ex. 9) (emphasis added) (internal citations omitted). Similarly, the trustee in that case acknowledged, "What counts for purposes of SIPA protection is the legitimate expectations of a claimant on the filing date, not . . . the 'fictive' nature of the transaction." Reply Brief of Trustee, *Stafford v. Giddens (In re New Times Secs. Servs., Inc.)*, No. 05-5527, 2006 U.S. 2d Cir. Briefs LEXIS 113, at *3 (2d Cir. Feb. 15, 2006) (Ex. 10). Put another way, SIPA requires the Trustee to determine customer claims based

on the broker's books and records *only* to the extent that the broker's books and records demonstrate what securities customers reasonably expected they owned.

In an attempt to bypass this damaging precedent, the Trustee argues that the Customers here are more like the first group of investors in *New Times*, who received statements indicating ownership of bogus mutual funds that could not have been purchased because they never existed,[13] rather than the second group of investors whose statements showed bona fide mutual funds that were never in fact purchased. Trustee MOL at 40. Although the Trustee's argument in this regard is somewhat convoluted, the Trustee appears to assert that the lengthy duration of Madoff's Ponzi scheme and the frequency with which he purported to trade makes Customer statements more "fictional" and thus more analogous to the *New Times* investors whose statements showed bogus, rather than bona fide, mutual funds. *Id*. at 40-42. However, the Trustee fails to explain how this purported factual difference alters customers' reasonable expectations. Ostensible purchases of shares of Vanguard and Putnam funds in *New Times* is no different from ostensible purchases of shares of Microsoft and General Electric by BMIS.

---

[13] As to the *New Times* customers whose statements showed bogus securities that could not have been purchased because they never existed, the Second Circuit discussed that their claims should be valued based on the customers' initial investments because there was no market in which to ascertain the value of the bogus securities or purchase replacement securities. *New Times*, 371 F.3d at 74; *In re New Times Secs. Servs., Inc.*, 463 F.3d 125, 129-30 (2d Cir. 2006) ("Because there were no such securities, and it was therefore impossible to reimburse customers with the actual securities or their market value on the filing date . . . , the *New Times* court determined that the securities should be valued according to the amount of the initial investment."). This portion of the opinion is not binding on the Court because it focused *exclusively* on the first group of *New Times* investors, who received statements showing that they owned bogus securities which could never have been purchased because they never existed in the first place. *New Times.*, 371 F.3d at 74 ("To be clear -- *and this is the crucial fact in this case* -- the New Age Funds in which the Claimants invested *never existed*. They were not organized as mutual funds, they were never registered with the SEC and they did not issue any of the requisite prospectuses for investors.") (emphasis added). In contrast, the statements of the BMIS Customers showed ownership of blue chip stocks the value of which is easily ascertained, and as such, the Customers' reasonable expectations should be honored.

Moreover, the Trustee and SIPC have failed to put any evidence from the *New Times* record before the Court so that any purported factual differences could be properly examined. As such, there is nothing in the record to indicate that Madoff's purported trades were any more or less "fictional" than those in *New Times*. In both cases, the trades never occurred, yet customer statements showed purchases of bona fide securities. This is all that is necessary to satisfy the statutory definition of "net equity" under SIPA. § 78lll(11).

Other courts have likewise emphasized that under SIPA, reasonable customer expectations are generally derived from customer account statements. In *In re Oberwies Securities, Inc.*, the customers sent funds to a broker to be invested in a money market mutual fund. *In re Oberwies Secs., Inc.*, 135 B.R. 842, 844 (Bankr. N.D. Ill. 1991). However, the customers *never* received written confirmation that the broker invested their money. *Id*. When the brokerage failed, the money was missing and no securities had ever been purchased. *Id*. A SIPA liquidation proceeding ensued, and the customers filed customer claims for the amount of their principal contributions *plus* the dividends that they "would have earned had [they] been invested in a money market mutual fund per their instructions." *Id*. In denying the customers' claims for dividends, the court held:

> [The customers] *never received confirmation* that the securities were in fact purchased. *The court agrees with the trustee's argument that Congress did not intend to treat customers without confirmations the same as those with confirmations*; that customers with confirmations have a legitimate expectation of receiving securities, but customers without confirmations do not have the same expectation.

*Id*. at 847 n.1 (emphasis added). Based on this rationale, the court held that the customers' "claim for dividends they would have received had their investment instructions been followed must be denied as a matter of law *for lack of a confirmation*." *Id*. (emphasis added); *cf. In re Investors Ctr., Inc.*, 129 B.R. 339, 348 (Bankr. E.D.N.Y. 1991) ("It is undisputed that each of

these claimants received written confirmation from the Debtor's clearing agent that the securities in question had been sold . . . from, the customer's account.  Each of these creditors, therefore, comes squarely within the provision defining when a customer has a claim for cash.  The Rules are as binding on the Trustee and on SIPC as they are on the public.  The Trustee is not free to ignore them or rewrite them.").

The Trustee and SIPC rely on *In re Old Naples Secs, Inc.,* 311 B.R. 607 (M.D. Fla. 2002) in support of their argument that the "cash in/cash out" approach has been applied in other SIPA liquidations.  Trustee MOL at 33; SIPC MOL at 38-39.  However, that case is distinguishable from the present case because, as the lower court described in *Old Naples*, "[n]one of the Claimants ha[d] *any documentation whatsoever* to show that the securities were purchased on their account and on their behalf . . . ; that they owned at any particular time any specific identifiable securities; *or that they ever received a period statement informing them of the status of the account.  None of the Claimants have receipts or acknowledgements of any purchase of securities by the Debtor.*"  *Securities Investor Protection Corp. v. Old Naples Sec., Inc. (In re Old Naples Secs., Inc.)*, 236 B.R. 854, 860 (Bankr. M.D. Fla. 1999) (emphasis added).  Likewise, in *C.J. Wright & Co.,* 162 B.R. 597 (M.D. Fla. 1993), also relied upon by the Trustee and SIPC (Trustee MOL at 32; SIPC MOL at 38-39), "[n]one of the . . . investors received confirmation slips for the purchase of certificates of deposit or on other securities," and the investments at issue, participation in a "deposit account" at a specified interest rate, was not a specifically identifiable security.  *C.J. Wright & Co.,* 162 B.R. 597, 601 (M.D. Fla. 1993).  In contrast to *Old Naples* and *C.J. Wright*, the BMIS Customers received monthly account statements and voluminous trade confirmations showing purchases of specifically identifiable securities the

value of which can be easily ascertained, facts deemed dispositive by the trustee and SIPC in *New Times*.

The Trustee must honor the reasonable expectations of the Customers in accordance with *New Times* and the foregoing SIPA precedent. In addition, the reasonable expectations approach comports with numerous cases in which courts permit innocent Ponzi scheme victims to retain reasonable "profits" received in good faith. Those cases are discussed below.

        **4.**      **Cases Within This Jurisdiction Generally Hold that Innocent Investors in a Ponzi Scheme Are Entitled to Claim Their Principal *Plus* Interest**

Unable to demonstrate that SIPA supports his approach, the Trustee argues that "well established" case law involving Ponzi schemes "mandates" that the Customers' claims consist only of principal contributions less any withdrawals. Trustee MOL at 30-32. In so arguing, the Trustee cites a number of cases decided under the Commodities Exchange Act ("CEA"), an entirely separate statutory framework that is inapplicable here. *See CTFC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115-16 (9th Cir. 2000) (decided under CEA); *CFTC v. Equity Fin. Group, LLC*, No. 04-1512, 2005 WL 2143975, at *22-24 (D.N.J. Sept. 2, 2005) (decided under CEA); *CFTC v. Franklin*, 652 F. Supp. 163, 169-70 (W.D. Va. 1986) (decided under CEA). In addition, the Trustee cites several cases from outside this jurisdiction, including *Old Naples* and *C.J. Wright* (discussed above), which are factually distinguishable and not binding on this Court. *See* Trustee MOL at 31-32. Noticeably absent from the Trustee's discussion are several cases decided by courts within this jurisdiction that reject the Trustee's approach. Below is a discussion of these cases.

In *In re Unified Commercial Capital, Inc.*, the court dismissed a bankruptcy trustee's avoidance action seeking to recover interest payments made to innocent investors in a Ponzi scheme. *Lustig v. Weisz & Assocs (In re Unified Commercial Capital, Inc.)*, 260 B.R. 343, 345-

46 (Bankr. W.D.N.Y. 2001).  The investors invested their money with Samuel Yacono, who purported to purchase "certificates of deposit"[14] offering annual interest of 12%.  *Id*. at 345. Yacono did not purchase the certificates of deposit, instead satisfying "[his] obligations to [his] investors using funds obtained from new investors."  *Id*.  The Trustee brought an avoidance action against those investors who received from Yacono their principal plus interest, seeking return of the interest payments as fraudulent transfers under Sections 544(b)(1), 548(a) and 550(a) of the Bankruptcy Code  and Article 10 of the New York Debtor & Creditor Law.  *Id*. at 347.  The investors moved to dismiss, arguing that they received the interest payments in good faith and for equivalent value.  *Id*.

The Court dismissed the trustee's avoidance action, holding that it was unsupported by law or policy.  First, the court held that the "fictional" interest was paid to the investors for equivalent value -- namely, the use of their money:

> Although I do not condone "Ponzi" schemes, I do not understand why courts have found them to be so different from the many other fraudulent schemes seen in bankruptcy cases where innocent individuals lose money, that they are willing, in the name of public policy, to do what I consider to be such an injustice to the fraudulent conveyance statutes by ignoring the universally accepted fundamental commercial principal that, when you loan an entity money for a period of time in good faith, you have given value and are entitled to a reasonable return.  Although many courts that have decided this issue seem to believe that it is more "just" to require that an innocent investor victim who received reasonable contractual interest return it so that it can be redistributed among the investors who did not recover all of their principal, I do not believe that partial solution is more "fair" or "just" than allowing that victim to keep the interest.  Furthermore, I believe that the majority of the general public would agree that allowing those victims to keep their interest is as fair or even a more fair solution.

*Id*. at 351.  The court further held that:

---

[14] Certificates of deposit are "securities" under SIPA.  § 78lll(14).

> For courts to make the payment of reasonable contractual interest . . . not value, as a matter of law, without extending that same determination to payments made by the schemer to other creditors, makes no sense. If a "Ponzi" schemer did not receive value for the use (loan) of funds because those funds diminished its estate and allowed it to perpetuate its fraudulent scheme, then the payments for all otherwise commercially recognizable value that also diminished the estate and allowed it to perpetuate the scheme, such as supplying utilities, space, supplies and labor, should also be found to be avoidable fraudulent transfers. As a matter of law, those payments to trade creditors were no more for value received than the use of funds in the hands of a fraudulent "Ponzi" schemer.

*Id*. at 353. Finally, in rejecting the trustee's arguments that the innocent investors were not entitled to interest because they purportedly facilitated the continuation of the Ponzi scheme, the Court held that:

> [A]llowing investors to retain any reasonable contractual interest does not further a Ponzi scheme any more than allowing other investors or that same investor to retain repaid principal. Furthermore, in this case, goods and services provided by trade creditors, such as telephone service, office space, and power to run computers, allowed [the Ponzi scheme] to appear to be a legitimate business and also furthered its fraudulent scheme.

*Id*. at 352.

Other courts have followed this approach. *See Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 491 (D. Conn. 2002) (affirming bankruptcy court's dismissal of trustee's avoidance action against innocent Ponzi scheme investors because "there is nothing in the plain language of either the Bankruptcy Code or Connecticut's Uniform Fraudulent Transfer Act suggesting an illegality exception to the "reasonably equivalent value" requirement."); *Breeden v. Thomas (In re Bennett Funding Group, Inc.)*, No. 98-61376, 1999 Bankr. LEXIS 1843, at *38 (Bankr. N.D.N.Y. Apr. 29, 1999) (dismissing trustee's avoidance action for interest payments made to innocent Ponzi scheme investors because the payments "cannot be avoided

under Code § 548 without doing violence to the language and structure of the Bankruptcy Code").

Although the Trustee argues that his net equity approach is the only "equitable" result, courts have questioned the "equities" of requiring innocent investors to disgorge reasonable profits they thought they earned. *See In re Carrozzella & Richardson*, 286 B.R. at 491 ("To create what is perceived by some to be an 'equitable' exception to the plain language of the [fraudulent transfer] statute is to usurp the function of the legislature."); *Unified Commercial Capital*, 260 B.R. at 351 ("Although many courts . . . believe it is more 'just' to require that an innocent investor victim who received . . . interest . . . return it so that it can be redistributed among the investors who did not recover all of their principal, I do not believe that partial solution is more 'fair' or 'just' than allowing that victim to keep the interest."); *Johnson v. Studholme*, 619 F. Supp. 1347, 1350 (D. Colo. 1985) ("Some investors who received 'fictitious profits' may have spent the money on education or other necessities many years ago. What else in equity and good conscience should plaintiffs who received money in good faith pursuant to an investment contract' have done?") *aff'd sub nom Johnson v. Hendricks*, 833 F.2d 908 (10th Cir. 1987).[15]

_____

[15] As described in a non-Bankruptcy context in another case involving a Ponzi scheme:

> Plaintiffs gave $ 21 million to Gruttadauria, *not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope -- indeed a reasonable expectation -- that it would grow. Thus, the out-of-pocket theory, which seeks to restore to Plaintiffs only the $ 21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages.* Had Gruttadauria invested Plaintiffs' money as requested, their funds would have likely grown immensely, especially considering that Plaintiffs invested primarily throughout the mid-1990s, which . . . would have placed their money in the stock market during one of the strongest bull markets in recent memory. In fact, the fictitious statements issued by Lehman,

Here, BMIS customers reasonably believed they earned money for retirement, education, living expenses, and a multitude of other entirely legitimate purposes. Moreover, many BMIS customers withdrew funds to pay taxes on the "fictitious" profits they thought they earned. In that sense, the United States was a primary beneficiary of the Madoff fraud. Also, customers holding the funds in IRA accounts were required to make withdrawals after reaching age 70 ½. The Trustee fails to explain how his "cash in/cash out" approach is "equitable" for such customers.

Based on the foregoing, the Customers are entitled to claim the amounts of their final BMIS account statements. As discussed below, this approach is also well-supported by SIPA's legislative history.

### B. SIPA's Legislative History Demonstrates that Congress Sought to Protect Customers' Reasonable Expectations, Even When Securities Were Never Purchased

"If the text of the statute itself is not clear, . . . a court applying the statute may consult the legislative history to discern the legislative purpose as revealed by the history of the statute. Additionally, courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as

---

which were designed to track Plaintiffs' funds as if they had been properly invested, indicate that Plaintiffs' accounts would have grown to more than $ 37.9 million (even accounting for the withdrawal of more than $ 31.3 million). Plaintiffs thus could have reasonably believed that they were entitled to the full $ 37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals. We therefore reject Lehman's argument because it is founded on an improper -- and wholly inadequate -- measure of damages.

*Visconsi v. Lehman Bros.*, 244 Fed. Appx. 708, 713-14 (6th Cir. 2007) (emphasis added); *see also SEC v. Byers*, 637 F. Supp. 2d 166, 182 (S.D.N.Y. 2009) (approving equitable distribution in Ponzi scheme liquidation allowing victims to claim "illusory" profits that were reinvested) (Chin, J.).

the meaning of particular provisions in it. [W]here . . . examination of [a] statute as a whole demonstrates that a party's interpretation would lead to absurd or futile results . . . plainly at variance with the policy of the legislation as a whole, that interpretation should be rejected." *Wachovia Corp. v. Citigroup, Inc.*, 634 F. Supp. 2d 445, 451-52 (S.D.N.Y. 2009) (citing *Leo Sheep Co. v. United State*s, 440 U.S. 668, 669 (1979)) (internal citations omitted).

As discussed above, the text of SIPA and SIPC's rules clearly and unambiguously provides that the Customers' respective "net equity" amounts should be calculated based on their final BMIS statements because the final statements reflect what BMIS "owed" the Customers on the filing date. However, even if SIPA and SIPC's Rules were ambiguous on this issue, SIPA's legislative history conclusively demonstrates that in enacting SIPA, Congress sought to protect reasonable customer expectations where securities are lost, stolen, or never purchased.

### 1.    Congress Passed SIPA in 1970 to Serve as a Backstop When SEC Regulation Fails to Prevent Fraud

The Trustee and SIPC seek to downplay SIPA's customer protection purpose by asserting that in enacting SIPA, Congress was primarily focused on the lack of automation and outdated systems that contributed to the back office problems of the 1960s. SIPC MOL at 8-9; Trustee MOL at 22. Yet Congress was equally concerned with protecting customers from theft and fraud. Indeed, "[e]rrors were only part of the problem as back office chaos . . . facilitated outright fraud and theft by brokers." Thomas W. Joo, *Who Watches the Watchers?  The Securities Investor Protection Act, Investor Confidence, and the Subsidization of Failure*, 72 S.

Cal. L. Rev. 1071, 1077 (1999). "Put bluntly, the immediate cause of the swamping of back offices was not technological backwardness, but rampant securities fraud." *Id*. at 1084.[16]

In that regard, SIPA's legislative purpose was twofold: (1) "It will establish immediately a substantial reserve fund which will provide protection to customers of broker-dealers [to] reinforce the confidence that investors have in the U.S. securities markets;" and (2) "the reported bill would provide for a strengthening of the financial responsibilities of broker dealers." H.R. Rep. 91-1613 at 4653-54 (1970) (Ex. 11). The "reserve fund" was intended to be a front line remedy for investors where the increased regulation of broker dealers failed to deter fraud.

In furtherance of the latter purpose, Congress granted the SEC "rulemaking power with respect to financial responsibility and related practices of brokers and dealers." *Id*. at 4672-73; *see also* Pub. L. No. 91-598, § 7(d) (1970) (codified in 15 U.S.C. § 78o(c)(3)). Pursuant thereto, in 1972 the SEC promulgated the customer protection rule, 17 C.F.R. § 240.15c3-3, which "prevent[s] broker-dealers from using funds or securities held on behalf of customers to finance proprietary and other non-customer transactions, by requiring that the broker-dealer keep a separate bank account for the benefit of customers." *Upton v. SEC*, 75 F.3d 92, 93 (2d Cir. 1996) (discussing the customer protection rule, 17 C.F.R. § 240.15c3-3); *see also* SEC Release

---

[16] As a basis for passing SIPA, Congress cited the failure of Ira Haupt & Co. ("Haupt"), a New York brokerage firm that lost millions of dollars of customer money due to its participation in the "Salad Oil Swindle" of the 1960s. H. Rep. No. 91-1613, at 4653 (1970) (Ex. 11); *see also In re Ira Haupt & Co*., 234 F. Supp. 167, 168 (S.D.N.Y. 1964); Jerry W. Markham, *Manipulation of Commodity Futures Prices -- The Unprosecutable Crime*, 8 Yale J. Reg. 281, 325 n.308 (1991). "[I]n an effort to preserve public confidence in the stock market, the Exchange and Haupt's creditor banks entered into an agreement whereby the Exchange would advance a fund to pay the Haupt creditors -- 20,0000 customers among them." *In re Ira Haupt & Co*., 234 F. Supp. at 168. During its hearings on SIPA, Congress referred to the Salad Oil scandal and the need to provide "an appropriate accommodation which will adequately protect[] public investors." *Bills to Provide Greater Protection for Customers of Registered Brokers and Dealers*, Hearing Before the Subcommittee on Commerce and Finance of the Committee on Interstate and Foreign Commerce 91st Cong. 91-67 at 1 (1970) (Ex. 13) (excerpt).

No. 9856 at *1-3 (Nov. 17, 1972) (Ex. 12) (stating that Rule 15c-3-3 was enacted pursuant to SIPA "to protect customer assets in the event of a SIPC liquidation"). Similarly, in 1975, the SEC strengthened its "net capital rule," which requires brokers to have sufficient liquid assets to satisfy customer and creditor claims. *See* 17 C.F.R. 240.15c3-1; *see also Blanck v. Young*, No. 276-73, 1978 U.S. Dist. LEXIS 20346, at *6 (D. Utah Jan. 5, 1978) ("[T]he net capital requirements are designed to provide customers with 'an extra cushion' in the event a broker-dealer is placed in liquidation."). The Trustee admits that BMIS did not segregate customer property in accordance with the customer protection rule, Trustee MOL at 9 n.7, and it appears that BMIS likewise failed to comply with the net capital rule.

SIPA was intended to provide protection to customers when brokerages failed to comply with these rules. *See* H.R. Rep. No. 95-595, at *267 (Sept. 8, 1977) (Ex. 14) (excerpt) ("The improvements under SIPA are premised on the presumption that the SEC regulation will insure that proper books and records exist and that property has been properly segregated."); Securities Investor Protection: The Regulatory Framework Has Minimized SIPC's Losses at 22, 39, United States General Accounting Office (Sept. 1992) (Ex. 15) ("[T]he regulatory framework -- including the net capital and customer protection rules -- serves as the primary means of customer protection while SIPC serves in a back-up role. . . . *Most of the firms that slipped through the regulatory framework and became SIPC liquidations failed because of fraud*.") (emphasis added).

The customer protection and net capital rules for which SIPA was to be a backstop clearly anticipate, and are in fact designed to deter, theft of customer funds. If the SEC fails to identify such theft over a period of decades, the injury to customers includes not just the loss of their principal, but also the loss of the use of their money. As SIPA was intended to protect

customers when the customer protection and net capital rules fail, it necessarily follows that customer claims under SIPA should include such losses.

> ### 2. Congress Amended SIPA in 1978 to Allow the Trustee to Purchase Missing Securities, Underscoring that SIPA Protects Reasonable Customer Expectations Even Where Securities Were Never Purchased

In 1978, Congress amended SIPA to add Section 78fff-2(d), which requires a trustee to "purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities . . . in order to restore the accounts of such customers as of the filing date." § 78fff-2(d). This provision enables a trustee to purchase securities for customers where those securities are missing, as is the case here, to protect customers' reasonable expectations. Section 78fff-2(d) contains no exceptions for situations where securities are missing because they were never purchased.

The legislative history surrounding this provision confirms this:

> A customer generally expects to receive *what he believes* is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . . By seeking to make customer accounts whole and returning them to the form they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectations . . . .

S. Rep. No. 95-763, at *2 (1978) (Ex. 16) (emphasis added); H.R. Rep. No. 95-746, at 21 (1977) (same). By empowering the trustee to purchase missing securities, Congress further emphasized the need to protect reasonable customer expectations.

3. **In 1980, Congress Increased the Protection Available to Customers Under SIPA in Part to Promote the Immobilization of Securities**

Prior to 1975, when Congress directed the SEC to establish a national automated market in which to trade securities, 15 U.S.C. § 78k-1(a)(2), investors often received actual paper stock certificates evidencing stock ownership. In 1980, Congress increased the limits of SIPA protection from $40,000/$100,000 to the current limits of $100,000/$500,000. *See* Pub. L. No. 96-433, 94 Stat. 1855 (1980). In recommending this increase, Congress noted that "the increased coverage for securities (including cash) would encourage customers to maintain their securities with broker/dealers, thus promoting the immobilization of stock certificates, which was one of the objectives of the Securities Acts Amendments of 1976." H.R. Rep. 96-1321, at *2 (1980) (Ex. 17); *see also* footnote 11, *supra*.

However, when investors rely on mere brokerage statements, rather than receiving actual stock certificates, they have no verification that the shares of stock represented on their account statements were actually purchased. SIPA was designed to alleviate investor concerns in this regard by providing customers protection where securities depicted on customer statements were never in fact purchased or are missing or stolen.

4. **In 1988, SIPC Promulgated the Series 500 Rules, Which Emphasize Written Confirmations Provided to Customers Rather than Transactional Reality**

In 1988, SIPC promulgated the Series 500 Rules, which govern whether a customer has a claim for cash or a claim for securities. The Rules provide that a customer has a claim for securities "[w]here the Debtor held cash in an account for a customer [and] the Debtor has sent *written confirmation* to the customer that the securities in question have been purchased for the customer's account." 17 C.F.R. § 300.502(a) (emphasis added). "[U]nder SIPC's rules it is not

performance that is critical, but receipt of written confirmation of sale.  This is clear from the Rules themselves."  *In re Investors Ctr., Inc*., 129 B.R. 339, 350 (Bankr. E.D.N.Y. 1991).

In promulgating these Rules, SIPC sought to protect reasonable customer expectations and provide uniformity in SIPA's application:

> SIPC believes that the proposed rules will provide both nationwide uniformity and reasonable certainty for customers as to how their claims will be treated in the event of the failure of a SIPC member, and will provide an objective standard for determining each claimant's legitimate expectations. . . .  By providing such a standard, the rules alleviate potential uncertainty and improve investor confidence in the securities markets.

Rules of the Securities Investor Protection Corporation, 53 Fed. Reg. 10368 (Mar. 31, 1988) (codified at 17 C.F.R. §§ 300.501, 300.502).

The foregoing legislative history demonstrates that Congress contemplated that SIPC would protect customers' reasonable expectations, even when customer funds were stolen rather than invested.

## C.    Madoff Was Not Acting as the Customers' Agent When He Committed the Fraud

The Trustee and SIPC argue that as a result of a purported principal-agent relationship between the Customers and Madoff, Madoff's misconduct is imputed to the Customers, thus barring their argument that their "net equity" should be based on their final BMIS account statements.  Trustee MOL at 48-49; SIPC MOL at 27-33.  In addition, the Trustee and SIPC insinuate throughout their briefs, without expressly stating, that the Customers either knew or should have known of Madoff's fraud.[17]  This argument is not only offensive, it is unsupported

---

[17] Examples of these types of "blame the victim" insinuations include the following:

by law or fact.  Although any such knowledge would be relevant to a Customer's reasonable expectations, the Trustee did not deny any of the Customers' claims, which are presumptively valid, on the basis that they had knowledge of the fraud.  *See* Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."); *see also* Determination Letters (Ex. 3).

As an initial matter, SIPA's definition of "customer" *expressly includes* persons who deal with a stockbroker debtor as principal or agent:

> The term "customer" of a debtor means any person (*including any person with whom the debtor deals as principal or agent*) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping,

---

- The Trustee implies that because online account access was purportedly standard practice by 2000, the receipt of paper statements and trade confirmations should have alerted the Customers to the fraud.  Trustee MOL at 17.  Yet, many of the Customers are elderly, computer illiterate, unsophisticated investors who had no reason to suspect that hard copy communications from BMIS were unusual.

- The Trustee suggests that the Customers should have known that the Fidelity Spartan U.S. Treasury Money Market Fund, one of the securities purportedly appearing on certain BMIS customer statements, was discontinued in 2005.  Trustee MOL at 41.  In addition, the Trustee notes that in some instances, BMIS customer statements showed securities bought or sold outside the high/low range for given day.  *Id*.  However, it is not reasonable to expect customers to "audit" their brokerage statements for the issues identified by the Trustee.  In any event, a customer could reasonably conclude that stock trades outside a given day's hi/low range could be the result of after hours trading.

- The Trustee asserts that "particular levels of returns [were] promised to investors." Trustee MOL at 42.  The Customers never requested nor were they promised any rate of return on their deposits with BMIS.

- The Trustee and SIPC imply that customers were negligent in granting BMIS discretionary authority to buy and sell securities on customers' behalf.  Trustee MOL at 13-14; SIPC MOL at 29.  However, such an agreement is generally standard when an unsophisticated investor hires an investment advisor.  *See SEC v. Zandford*, 535 U.S. 813, 823 (2002) ("The benefit of a discretionary account is that it enables individuals . . . who lack the time, capacity, or know-how to supervise investment decisions, to delegate authority to a broker who will make decisions in their best interests without prior approval.").

> with a view to sale, to cover consummated sales, pursuant to
> purchases, as collateral security, or for purposes of effecting
> transfer. The term "customer" includes any person who has a
> claim against the debtor arising out of sales or conversions of such
> securities, and any person who has deposited cash with the debtor
> for the purpose of purchasing securities

§ 78lll(2) (emphasis added). Clearly, Congress envisioned that a stockbroker's agency relationship with his customers would not result in the denial of customer claims. To hold otherwise would render SIPA meaningless, as all customer claims could be denied based on an agency rationale anytime a broker commits fraud. *See* legislative history discussion at Section III.B, *supra*. As a result, the agency arguments asserted by the Trustee and SIPC must fail, and in particular, SIPC's attempt to impute Madoff's securities fraud and Martin Act violations to Customers, SIPC MOL at 29-33, must fail.

Moreover, even if the Customers' claims could be denied on this basis, such a denial is unwarranted here because in committing his fraud, Madoff was acting well beyond the scope of any agency relationship, which in any event is delineated by the terms of his trading authorization agreements with his customers. In the "exemplar" trading agreement submitted with the Trustee's brief, the language provides that the customer "authorizes Bernard L. Madoff . . . as his agent and attorney in fact to buy, sell, and trade in stocks, bonds, options and any other securities . . . for the [customer's] account . . . ."[18] Looby Decl. ¶ 35. *Nothing* in this language contemplates that Madoff would commit fraud. In fact, Madoff's conduct is in violation of the trading authorization agreement, in that Madoff did not "buy, sell, or trade" securities as provided in the agreement. *Id.*

---

[18] The Trustee provides only one such agreement, signed in 2004. Other agreements may contain different language.

"[F]or an agency relationship to exist, an agent must be acting 'on behalf' of the principal, with consent and subject to control." *Cromer Fin. Ltd. v. Berger*, 245 F. Supp. 2d 552, 562 (S.D.N.Y. 2003). Here, the Trustee admits that "BLMIS *never* acted as a true investment advisor in the interest of its customers." Trustee MOL at 8. As such, Madoff could not have acted as the Customers' agent in committing his fraud.

Moreover, even if BMIS was the Customers' agent, "when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, the presumption that knowledge held by the agent was disclosed to the principal fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose." *Capital Wireless Corp. v. Deloitte & Touche*, 627 N.Y.S.2d 794, 797 (App Div. 3d Dept. 1995); *see also CBI Holding Co. v. Ernst & Young*, 529 F.3d 432, 451 (2d Cir. 2008) (holding that adverse interest exception applied even where the agent's fraud unintentionally provided a benefit to the principal); *Bank of China v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004) ("[W]hen an agent acts adversely to its principal, the agent's actions and knowledge are not imputed to the principal.").

While it is true that "a principal cannot rely on an agent's adverse interest if the principal knowingly retains a benefit that resulted from the agent's fraud," here, the Customers have *lost* money and they *did not know* of Madoff's fraud. *Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 303 (2d Cir. 1996). As such, they could not have *knowingly* retained any *benefit*. That the Customers seek to avail themselves of their statutory rights under SIPA for protection of their reasonable expectations -- rights which SIPC has protected in other Ponzi scheme cases -- does not constitute "retaining a benefit of the fraud."

Finally, for the purposes of the Trustee's agency argument, the Trustee stands in the shoes of BMIS and is subject to all defenses to which BMIS would be subject, including unclean hands and comparative fault. This is because "[u]nder § 541 of the Bankruptcy Code . . . all of a debtor's pre-petition causes of action based on non-bankruptcy law become assets of the estate when the petition is filed. If a trustee asserts such a claim (e.g., a contract or tort claim), he stands in the shoes of the debtor and is subject to all defenses that could be asserted against the debtor outside of bankruptcy." *Gecker v. Goldman Sachs & Co. (In re Auto. Prof'ls, Inc.)*, 398 B.R. 256, 261 (Bankr. N.D. Ill. 2008); *see also Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006) ("If a claim . . . would have been subject to the defense of *in pari delicto* at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense."); *In re Hedfed Inv. Assocs., Inc.*, 84 F.3d 1281, 1284 (10th Cir. 1996) (barring bankruptcy trustee from acting pursuant to Section 541 to assert state law claim against innocent Ponzi scheme investor for recovery of profits because the trustee stood in the shoes of a debtor who committed the fraud). As such, the Trustee, standing in the shoes of BMIS, which stole the Customers' money, is precluded from asserting an agency relationship between BMIS and the Customers as a basis for denying their claims. *See Coty v. Steigerwald*, 692 N.Y.S.2d 556, 557 (N.Y. App. Div. 4th Dep't 1999) ("Where, as here, a party has engaged in inequitable or unconscionable conduct connected with the matter in litigation, it is not entitled to equitable relief.").[19]

---

[19] *Ensminger*, relied upon by the Trustee and SIPC (Trustee MOL at 48-49; SIPC MOL at 26) as a basis for imputing Madoff's conduct to the Customers, is distinguishable in that in *Ensminger*, the customers, who were clients of an introducing broker, sought to enforce the introducing broker's fraudulent transactions against the debtor clearing broker. *See Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 417-20 (S.D.N.Y. 2001). In contrast, the Customers here were defrauded by BMIS, and their interests are not aligned with BMIS.

### D. The Trustee's "Cash In/Cash Out" Approach is Unsupported by the Trustee's Avoidance Powers

The Trustee and SIPC argue that their interpretation of "net equity" must be correct, because SIPA grants the Trustee the power to avoid transactions to recover property of the debtor's estate. Trustee's MOL at 46-49; SIPC MOL at 34-37. Specifically, the Trustee and SIPC cite Section 78fff-2(c)(3), which provides that

> Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11 of the United States Code. Such recovered property shall be treated as customer property.

§ 78fff-2(c)(3); *see also* 17 C.F.R. § 300.503(a).[20] Notably, the Trustee does not state which Bankruptcy Code avoidance provision upon which he relies in arguing that the Customers' transactions are avoidable.

The Trustee and SIPC improperly conflate SIPA's "net equity" definition with the avoidance powers granted by SIPA and the Bankruptcy Code. The Trustee's avoidance powers, which permit the Trustee *to recover* property of the estate, are inapplicable here, where the Customers do not have the funds at issue but merely received account statements indicating ownership of specific securities. In other words, the portions of the Customers' claims the Trustee seeks to disallow were never "transferred by the debtor," which is precisely why Customers have submitted claims for these amounts. *See Breeden v. Thomas (In re The Bennett Funding Group, Inc.)*, No. 98-61376, 1999 Bankr. LEXIS 1843, at *13 (Bankr. N.D.N.Y. Apr.

_____

[20] The Trustee incorrectly cites to Rule 503(b), Trustee MOL at 47, which only applies in a SIPA direct payment proceeding under Section 78fff-4 when, among other things, "the claims of all customers of the member aggregate less than $ 250,000." *See* 17 C.F.R. § 300.503(b); 15 U.S.C. § 78fff-4. This case is not a direct payment proceeding.

29, 1999) ("Under either theory of [avoidance] action, of course, the Trustee must first prove that an actionable conveyance took place.").

Even if the Trustee's avoidance powers were applicable to the calculation of the Customers' "net equity," the Trustee must meet the specific substantive and procedural requirements of the Bankruptcy Code's avoidance provisions with regard to *each Customer and each challenged transaction*, and the Customers are entitled to present their defenses. *See Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 490-91 (D. Conn. 2002) ("The proper focus of a fraudulent transfer inquiry is on the transfer itself, not on the overall business practices of the Debtor. . . . There is nothing in the statute to support a finding that the Debtor did not receive 'reasonably equivalent value' . . . simply because the Debtor was engaged in a Ponzi scheme."); *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.)*, 256 B.R. 664, 680 (Bankr. S.D.N.Y. 2000) (rejecting bankruptcy trustee's argument that all payments made in connection with Ponzi scheme were "inherently fraudulent" and holding that an avoidance inquiry focuses on the "specific transaction" at issue, not the "Debtor's whole Ponzi scheme"), *aff'd sub nom Balaber-Strauss v. Lawrence,* 264 B.R. 303, 308 (S.D.N.Y. 2001) ("[T]he law does not require the Court to assess the transactions' impact on the Debtor's overall business [which was a Ponzi scheme]. The law requires that the Court evaluate the 'specific consideration exchanged by the debtor and the transferee in the specific transaction which the trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law.'"); *see also Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*, 309 F.3d 1325, 1332-33 (11th Cir. 2002) ("[T]he district court and the bankruptcy court erred in . . . determining that [recipient of funds from Ponzi scheme] was barred as a matter of law of asserting her affirmative defense under Section 548(c) of 'for value and in good faith.'").

Moreover, any such avoidance claims are to be litigated in the context of an adversary proceeding. *See* Fed. R. Bankr. P. 7001; Collier on Bankruptcy § 548.04 (15th ed.) ("A fraudulent transfer avoidance action in the context of a bankruptcy case requires the initiation of an adversary proceeding pursuant to Bankruptcy Rule 7001.").

It is the Trustee's burden to prove that any challenged transactions are avoidable, not the Customers' burden to prove that they are not. *See* Collier on Bankruptcy § 548.10 ("The burden of proof of establishing the existence of the elements of a voidable transfer under section 548 of the Bankruptcy Code rests on the trustee."); *Savage & Assocs. v. Mandl (In re Teligent Inc.)*, 380 B.R. 324, 332 (Bankr. S.D.N.Y. 2008) ("The trustee must prove a constructive fraudulent transfer by a preponderance of the evidence."). As each challenged transaction must be analyzed individually, the Trustee cannot summarily avoid transactions on a mass basis by conflating his avoidance powers with SIPA's definition of "net equity." This would deprive the Customers of the opportunity to present their defenses to any such avoidance claims.

In addition, although the Trustee admits that Madoff used money from his investment advisory business Ponzi scheme to "prop up" the operations of Madoff's purportedly "legitimate" market making and propriety trading divisions, Looby Decl. at ¶¶ 27-28, the Trustee has not provided any information regarding transfers between the investment advisory business and the market making and proprietary trading businesses or profits earned by those businesses during the duration of the Ponzi scheme. Just because those businesses ultimately failed does not mean that over the years no profits were earned. With regard to the Trustee's avoidance powers, the Trustee must demonstrate that any challenged transactions were not "paid" out of the "legitimate" market making and propriety trading businesses. *See Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 491 (D. Conn. 2002) ("[T]here has been no proof that

the monies these particular Defendants received from the C & R's 'pot' of common funds were investment funds deposited by other investors as opposed to law firm revenues. This is particularly true with respect to those Defendants who received payments from the Debtor at a time when C & R was still receiving income from a legitimate law practice."). Likewise, the Trustee must disclose precisely when Madoff began his Ponzi scheme before he can challenge transactions going back decades.

The cases cited by the Trustee and SIPC with regard to the Trustee's avoidance powers are distinguishable. *SEC v. S.J. Salmon & Co.*, relied upon heavily by the Trustee and SIPC (Trustee MOL at 47-48, SIPC MOL at 36-37) actually supports the Customers' position in that the trustee in that case challenged specific securities transactions, in contrast to the Trustee's improper practice of simply netting out principal contributions less withdrawals without challenging any specific transactions. *See SEC v. S.J. Salmon & Co.*, No. 72-560, 1973 U.S. Dist. LEXIS 15606, at *3 (S.D.N.Y. Aug. 8, 1973) ("The trustee's objection concerns . . . 65 sales allegedly made on February 2, 1972 . . . ."). Moreover, the challenged transactions were made for the debtor broker's own account "to place favored customers in a position so that they could assert cash claims against SIPC," rather than claims for securities which had declined in value. *Id*. at *33. Similarly, in *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, also relied upon heavily by the Trustee and SIPC (Trustee MOL at 48-49, SIPC MOL at 26-27), the trustee sought to avoid specific stock trades during an 8-day period on specific avoidance grounds (in contrast to the Trustee's approach here), because the trades were made "to give the Claimants preferred SIPA claims in [the debtor's] inevitable liquidation proceeding." *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 97 (Bankr. S.D.N.Y. 1999). Moreover, in that case, the broker "sent no confirmation notices to effectuate the [trades the

customers] seek to enforce." *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 437 (S.D.N.Y. 2001). In contrast, the Trustee presents no evidence of collusion with regard to the Customers and BMIS, and none exists, and the Customers received written confirmation of specific securities purchases forming the bases of their claims.

If Congress had intended for the Trustee to unilaterally reduce Customer claims, SIPA's incorporation of the Bankruptcy Code's avoidance provisions would be largely unnecessary. *See In re Asia Global Crossing, LTD.*, 344 B.R. 247, 254 (Bankr. S.D.N.Y. 2006) ("[S]tatutes should not be interpreted in a manner that renders any provision superfluous."). In fact, the definition of "net equity" suggests quite another explanation, that is, customer claims are determined by customers' reasonable expectations as generally demonstrated by customer account statements, and the Trustee has the normal rights to avoid prepetition payments or account credits under the avoidance powers to reflect ordinary bankruptcy policies designed to achieve equitable distribution of assets.

Based on the foregoing, the Trustee's "cash in/cash out" approach must be rejected.

## IV.    CONCLUSION

As discussed herein, the Trustee's "cash in/cash out" approach to calculating the Customers' "net equity" is incorrect as a matter of law. The Customers respectfully request that the Court issue an order:

(1)  directing the Trustee to recalculate the Customers' claims in accordance with the reasonable expectations standard described herein; and

(2)  denying the Trustee's Motion in its entirety.

In addition, the Request for Relief contained in the Trustee's Motion, which asks the Court uphold the Trustee's disallowance of the Customers' claims "to the extent such

46

determinations *relate to the Trustee's interpretation of 'Net Equity*,'" violates the limited scope

of the issues to be decided pursuant to the Court's Order. *See* Order Scheduling Adjudication of

"Net Equity" Issue [Dkt. No. 437]. The limited issue before the Court is whether the Trustee's

"cash in/cash out" approach is proper or whether the reasonable expectations approach advanced

by the Customers is proper. *Id*. at 4. Any requested relief beyond this limited scope must be

stricken.

Dated:    November 13, 2009
         New York, New York

s/ Jonathan M. Landers
Matthew Gluck
Brad N. Friedman
Sanford P. Dumain
Jennifer L. Young
MILBERG LLP
One Pennsylvania Plaza
48th Floor
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

SEEGER WEISS LLP
Stephen A. Weiss
Christopher M. Van de Kieft
Parvin K. Aminolroaya
One William Street
New York, New York
Telephone: (212) 584-0700
Facsimile:  (212) 584-0799

**Attorneys for Plaintiffs**
