GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
Daniel M. Glosband
  Email: dglosband@goodwinprocter.com
David J. Apfel
  Email: dapfel@goodwinprocter.com
  (*pro hac vice* application pending)
Brenda R. Sharton
  Email: bsharton@goodwinprocter.com
  (*pro hac vice* application pending)
Larkin M. Morton
  Email: lmorton@goodwinprocter.com

*Attorneys for Jeffrey A. Berman, Russell deLucia, Ellenjoy Fields, Michael C. Lesser, Norman E. Lesser Rev. 11/97 Rev. Trust, Paula E. Lesser 11/97 Rev. Trust  and Jane L. O'Connor as Trustee of the Jane O'Connor Living Trust*

Hearing Date: February 2, 2010
Hearing Time: 10:00 AM (EST)
Objection Deadline: November 13, 2009

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br>                  Plaintiff, <br>      v. <br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br>                  Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br>                Debtor. | |

# GOODWIN CLAIMANTS' MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION RE: DETERMINATION OF NET EQUITY

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 2

ARGUMENT .................................................................................................................... 5

1.    The Goodwin Claimants are "Customers" All of Whom Have Claims
      for Securities. ................................................................................................ 5

2.    The Goodwin Claimants Are Claiming "Real Securities." ............................... 6

3.    The Goodwin Claimants' Net Equity Claims Should Be Based On
      Customer Expectations and Calculated According to the Account
      Statement Method. .......................................................................................... 7

4.    New Times I Supports the Goodwin Claimants' Account Statement
      Method for Determining Net Equity. ............................................................. 11

5.    Neither the Standard Treatment of Ponzi Schemes Nor the Old Naples
      Case Supports the Trustee's Method of Determining Net Equity. ................. 15

6.    The Goodwin Claimants' Legitimate Expectations Include the Securities
      In Their Accounts. ........................................................................................ 19

7.    The Trustee's Fictitious Market/Fictitious Profits Arguments Are Not
      Persuasive. .................................................................................................... 22

8.    The Trustee's and SIPC's Books and Records, Burden of Proof, and
      Ordinary Course of Business Arguments Are Illogical and Wrong. ............. 23

9.    The Power To Avoid Fraudulent Transfers Depends On But Does Not
      Determine Net Equity. .................................................................................. 26

10.   The Trustee's and SIPC's Arguments Regarding Imputed Frauds and
      Illegal Contracts Are Inapplicable. .............................................................. 28

11.   Public Policy Supports the Efficacy of the Account Statement Method
      For Determining Net Equity. ........................................................................ 31

CONCLUSION .............................................................................................................. 34

# TABLE OF AUTHORITIES

CASES

Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.
 (In re Bayou Group, LLC), 396 B.R. 810 (Bankr. S.D.N.Y. 2008)........................................16

Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P.
 (In re Bayou Group, LLC), 362 B.R. 624 (Bankr. S.D.N.Y. 2007)........................................16

CFTC v. Topworth Int'l, Ltd.,
 205 F.3d 1107 (9th Cir. 2000) ...............................................................................................16

Cohen v. de la Cruz,
 523 U.S. 213 (1998)...............................................................................................................21

Cunningham v. Brown,
 265 U.S. 1 (1924)...................................................................................................................15

Donell v. Kowell,
 533 F.3d 762 (9th Cir. 2008) .................................................................................................16

In re Adler Coleman Clearing Corp.,
 204 B.R. 111 (S.D.N.Y. 1997)...............................................................................................24

In re C. J. Wright & Co.,
 162 B. R. 597 (Bankr. M.D. Fla. 1993) ............................................................................18, 19

In re Hanover Square Sec.,
 55 B.R. 235 (Bankr. S.D.N.Y. 1985)......................................................................................24

In re June S. Jones Co.,
 52 B.R. 810 (Bankr. D. Or., 1985)..................................................................................... 20-21

In re New Times Sec. Servs., Inc.,
 371 F.3d 68 (2d Cir. 2003)............................................................................. 4, 11-14, 15, 22

In re Old Naples Sec., Inc.,
 311 B.R. 607 (M.D. Fla. 2002) ................................................................................... 15, 18-19

In re Old Naples Sec., Inc.
 218 B.R. 981 (Bankr. M.D. Fla. 1998) ........................................................................... 18-19

In re Old Naples Sec., Inc.,
 223 F.3d 1296 (11th Cir. 2000) ..................................................................................... 18-19

In re Old Naples Sec., Inc.,
    230 B.R. 41 (M.D. Fla. 1999) ............................................................................ 18-19

In re Taubman,
    160 B.R. 964 (S.D. Ohio 1993) ..............................................................................16

Jackson v. Mishkin
    (In re Adler, Coleman Clearing Corp.), 263 B.R. 406 (S.D.N.Y. 2001) ........................... 28-30

Merrill v. Abbott
    (In re Indep. Clearing House Co.), 77 B.R. 843 (D. Utah 1987) .............................................16

Mishkin v. Ensminger
    (In re Adler, Coleman Clearing Corp.), 247 B.R. 51 (Bankr. S.D.N.Y. 1999) ................. 28-30

Official Cattle Contract Holders Comm. v. Commons
    (In re Tedlock Cattle Co.), 552 F.2d 1351 (9th Cir. 1977).......................................................16

Patterson v. Shumate,
    504 U.S. 753 (1992)....................................................................................................21

Scholes v. Lehmann,
    56 F.3d 750 (7th Cir. 1995) ....................................................................................16

SEC v. Ambassador Church Finance/Development Group, Inc.,
    679 F.2d 608 (6th Cir. 1982) .................................................................................. 24-25

SEC v. Credit Bancorp, Ltd.,
    No. 99 CIV. 11395, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000), aff'd, 290 F.3d 80
    (2nd Cir. 2002)....................................................................................................15, 16

SEC v. Funding Res. Group,
    No. 3-98-CV-2689-M, 2004 WL 1189996 (N.D. Tex. May 27, 2004), adopted as
    modified, 2004 WL 1882972 (N.D. Tex. Aug. 20, 2004) ......................................................16

SEC v. S.J. Salmon & Co.,
    No. 72 Civ. 560, 1973 U.S. Dist. LEXIS 15606 (S.D.N.Y. Aug. 8, 1973) ....................... 30-31

Sender v. Buchanan
    (In re Hedged-Investments Assoc., Inc.), 84 F.3d 1286 (10th Cir. 1996) ...............................16

Teletronics, Ltd. v. Kemp,
    649 F.2d 1237, 1241 (7th Cir. 1981) .....................................................................................15

STATUTES

11 U.S.C. § 101, et seq..............................................................................................26

11 U.S.C. § 548(c) ....................................................................................................26

11 U.S.C. § 548(d)(2)(A) ................................................................................26

15 U.S.C. § 78aaa, *et seq.* ..............................................................................1

15 U.S.C. § 78fff-2(c)(1)(B) ...........................................................................8

15 U.S.C. § 78fff-3(a) .....................................................................................8

15 U.S.C. § 78fff-3(a)(3) ..............................................................................6, 7

15 U.S.C. § 78lll(2) ......................................................................................5, 25

15 U.S.C. § 78lll(11) ....................................................................................7-8

15 U.S.C. § 78eee-(b)(2)(A)(iii) ....................................................................27

New York Debt. & Cred. Law § 273 ..............................................................26

## RULES

SIPC Series 500 Rules ............................................................................. 19-20

SIPC Rule 502(a)(1) .......................................................................................30

SIPC Rule 502(a)(2) .......................................................................................30

## OTHER AUTHORITIES

H.R. Rep. No. 95-746 (1977) .................................................... 8-9, 14, 18, 20, 23, 32

Lewis Carroll, Through the Looking Glass, Chapter IV ............................................23

Michael E. Don & Josephine Wang, Stockbroker Liquidations Under the Securities
    Investor Protection Act and Their Impact on Securities Transfers, 12 Cardozo L. Rev.
    509 (1990) .................................................................................................7

Rules of the Sec. Investor Prot. Corp., 53 Fed. Reg. 10368-69 (Mar. 31, 1988) (to be
    codified at 17 C.F.R. pt. 300) ....................................................................20

S. Rep. No. 91-1218 (1970) ...................................................................2, 5, 32

S. Rep. No. 95-763 (1978) ...................................................................2, 9, 23, 32

In response to this Court's Order Scheduling Adjudication of the "Net Equity Issue" (the

"Scheduling Order")[1], Goodwin Procter LLP respectfully submits this memorandum on behalf of

the following customers of BLMIS each of whom has filed customer claims with the Trustee:

Jeffrey A. Berman, Russell deLucia, Ellenjoy Fields, Michael C. Lesser, Norman E. Lesser Rev.

11/97 Rev. Trust, Paula E. Lesser 11/97 Rev. Trust and Jane L. O'Connor as Trustee of the Jane

O'Connor Living Trust (collectively, the "Goodwin Claimants").  The memorandum addresses

the two questions (collectively, the "Net Equity Issue") set forth in the Scheduling Order:

1.    Whether a customer's "net equity" under SIPA is equal to "cash in/cash out"

("Cash in/Cash out Method"); or

2.    Whether a customer's "net equity" under SIPA is equal to the value of the

securities positions and credit balance reflected in the customer's last statement

("Account Statement Method").

Interested Parties, comprised of customers of BLMIS who have filed customer claims

with the Trustee, are permitted to file briefs in opposition to the Trustee's Net Equity Motions on

or before November 13, 2009.  The Goodwin Claimants respectfully submit this brief in

opposition to the Trustee's Net Equity Motion and seek an Order from this Court that "net

equity" under SIPA should be determined by the Account Statement Method.

---

[1]    Irving H. Picard, Trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff
Investment Securities LLC ("BLMIS") under the Securities Investor Protection Corporation Act, 15 U.S.C. § 78aaa,
*et seq.* ("SIPA"), and for Bernard L. Madoff ("Madoff") (collectively, "Debtor") submitted his motions ("Net Equity
Motions") for an order to schedule a hearing on the "Net Equity Issue" and seeking an order: (a) upholding the
Trustee's determinations denying certain claims for the securities and credit balances listed on the claimants' last
BLMIS customer statements; (b) affirming the Trustee's "cash in/cash out" determinations of net equity with respect
to each customer claim and; (c) expunging the objections to the Trustee's determinations to the customer claims in
question insofar as they relate to net equity.  The Scheduling Order was entered in response to the Net Equity
Motions.

## **INTRODUCTION**

The Goodwin Claimants endorse the Trustee's guiding principle that the Net Equity Issue

should be determined by the law and not by a desire to achieve a particular outcome.

Specifically, in his memorandum, the Trustee states:

> Regardless of the particular impact on any particular investor, the
> Net Equity *issue is a legal one that must be consistent with and
> supported by the provisions and policies of SIPA.* Interpretation of
> Net Equity should not be outcome-determinative, but instead based
> upon the proper interpretation and reading of the requirements of
> the law.

Trustee Memo at 29 (emphasis added).[2]  Notwithstanding his own admonition, the Trustee

proceeds to follow an outcome-determinative route to his cash in/cash out conclusion.  In the

process, he disregards the clear history and plain language of SIPA.

In contrast, the Goodwin Claimants seek to have the Net Equity issue determined as

contemplated by SIPA and its founding premise of enhancing *"public willingness to entrust

assets to the securities industry."*  S. Rep. No. 91-1218, at 2 (1970) (emphasis added).  The

Account Statement Method is nothing more than an articulation of SIPA's mandate "to make

customer accounts whole," and "satisfy the customers' legitimate expectations."  S. Rep. No. 95-

763, at 2 (1978).  Where, as here, BLMIS customers, including the Goodwin Claimants, received

monthly account statements reflecting what appeared to be real trades in real, well-known

securities, and likewise received confirmation slips for each and every security purportedly

purchased and sold by BLMIS, the only way to satisfy those customers' legitimate expectations

per SIPA is by means of the Account Statement Method.  The Cash In/Cash Out Method,

---

[2]      Each of the Trustee and SIPC submitted a Memorandum of Law in Support of the Trustee's Net Equity
Motions (cited hereinafter, respectively, as "Trustee Memo" and "SIPC Memo").

notwithstanding its simplicity and equitable appeal, is not in keeping with the language or spirit of SIPA.

It is axiomatic that under SIPA and Second Circuit precedent, the analysis leading to a determination of a customer's net equity claim must follow a logical sequence:

i.      Is the claimant a "customer"?

ii.     If the claimant is a customer, does the customer have a claim for securities or cash?

iii.    If the customer has a claim for securities, are the securities "real" (meaning verifiable as existing in the public market; "Real Securities") or "fictitious" (meaning they do not exist in the public market; "Fictitious Securities")?

iv.     How is the amount of the customer's net equity claim for Real Securities determined, *i.e.* is the claim amount calculated based on the value of the securities shown on the customer's account statement or is the claim amount the result of a cash in/cash out calculation?

The narrow issue before this Court implicates *only* the foregoing four-part analysis.  The Trustee looks for answers to the four fundamental questions in all the wrong places.  The answers cannot be found in fraudulent transfer law or in Ponzi scheme cases that do not involve SIPC proceedings with customer claims for Real Securities.  The answers cannot be found in decisions in SIPC cases limited to customer claims for Fictitious Securities or in cases involving frauds committed by one broker against another.  Still, the Trustee, apparently concerned that protecting the legitimate expectations of customers as required by SIPA will somehow condone BLMIS's egregious fraud, restricts his analysis to all of this inapposite precedent.  Not

surprisingly, since he looks in all the wrong places, the Trustee comes to the wrong answer concerning how net equity must be determined.

The Goodwin Claimants rely on the language of SIPA, its legislative history, prior statements of the Securities Investor Protection Corporation ("SIPC") and directly applicable precedent in the Second Circuit. These sources unanimously support the determination that a customer's net equity must be based on the value of the Real Securities reflected in the customer's last account statement. In all past litigation over the rights of investors in Real Securities that existed in the public markets but which had never been actually purchased for the investors, SIPC has steadfastly supported the payment of market value of the securities to the investors, notwithstanding the fact that actual purchases had not been made on the investors' behalf. See In re New Times Sec. Servs., Inc., 371 F.3d 68 (2d Cir. 2003). Where, as here, customers have received confirmations and monthly account statements that reflect *bona fide* securities, SIPC has been unwavering in its recognition of the validity of customer claims for the securities. SIPC's approach has been very much in keeping with SIPA's purpose of protecting the legitimate expectations of customers, and thereby encouraging investment in the capital markets.

When a customer receives confirmations and statements regarding real, recognizable securities, he has every reason to rely upon the information he receives, *i.e.,* his expectations are legitimate. In contrast, if the confirmations and statements the customer receives indicate trades in unknown and totally fake securities, those statements should send up red flags, and any reliance on or expectations based upon such confirmations and statements cannot be deemed legitimate. In the past, it has only been where customers had no legitimate basis for believing that their investments had been in Real Securities that SIPC and the courts have determined a

customer's net equity using the Cash in/Cash out Method.  Otherwise, in all instances involving

Real Securities, SIPC and the courts have honored the customers' legitimate expectations.  This

has always been, and remains (notwithstanding the dimension of the Madoff fraud) the right and

equitable thing to do, and it is also the law.

Under the clear mandate of the case law, the Goodwin Claimants – who received trade

confirmations and statements listing actual *bona fide* securities in which they legitimately

believed they were invested – are entitled to the value of those securities as reflected on their

account statements.  To determine otherwise would turn the case law and SIPA's founding

mandate of upholding investor "willingness to entrust assets to the securities industry" on its

head.  See S. Rep. No. 91-1218, at 2 (1970).  The proper definition of "net equity" for BLMIS

customers is the Account Statement Method.  And this Court should not find otherwise.

## ARGUMENT

### 1.   The Goodwin Claimants are "Customers" All of Whom Have Claims for Securities.

There can be no dispute that the Goodwin Claimants satisfy the definitional requirements

to qualify as "customers" for purposes of the claims that they filed with the Trustee.  SIPA

defines customer, in pertinent part, as follows:

> **The term "customer" includes any person** who has a claim
> against the debtor arising out of sales or conversions of such
> securities, and any person **who has deposited cash with the
> debtor for the purpose of purchasing securities** . . . .[3]

SIPA § 78lll(2) (emphasis added).

---

[3]   The first half of the customer definition provides:  "The term 'customer' of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer."  SIPA § 78lll(2).

In the "fraudulent world created solely by Madoff" (Trustee Memo at 2), the Trustee

acknowledges that all customers, including the Goodwin Claimants, hold claims for securities:

> Valid claims for cash or securities are satisfied in kind. With respect to securities that are not in the debtor's possession or control, the trustee may purchase them for delivery to the customer so long as there is a fair and orderly market for them. Section 78fff-2(d) of SIPA. If the securities cannot be bought in a fair and orderly market, the customer receives a cash payment based on the market value of the security as of the filing date. Sections 78fff-3(a)(3) & 78fff-2(b) of SIPA. For a variety of reasons, unless a specific fact situation calls for another conclusion, **the Trustee and SIPC have treated the claims in this case as subject to the $500,000 limit for claims for securities rather than as claims for cash.**

Trustee Memo at 26 (emphasis added). Therefore, given SIPA's definition and the Trustee's

acknowledgment, the Goodwin Claimants are "customers" under question one of the analysis set

forth above. The Trustee and SIPC acknowledge, as well, that the Goodwin Claimants have

claims for securities under question two.

## 2. The Goodwin Claimants Are Claiming "Real Securities."

In connection with question three of the analysis, the Trustee's evidence confirms that the

securities reflected in BLMIS customer confirmations and customer statements were Real

Securities traded in the public markets. Citing to the declaration of Joseph Looby, the Trustee

states as follows:

> Madoff represented that his strategy was to invest customer funds in a subset (or "basket") of common stocks that comprised the Standard & Poor's 100 Index. The fictitious strategy focused on large cap stocks . . . . (Looby Dec. ¶ 49).

> . . . Several times a year . . . . customer funds were moved completely "out of the market" to purported investments in United States Treasury Bills ("T-bills"), Fidelity money market funds, and cash reserves . . . . (Looby Dec. ¶ 50) . . . .

> BLMIS also concocted a fictitious hedging strategy for the baskets
> of stock.  BLMIS purported to purchase and sell S&P 100 index
> option contracts . . . .

Trustee Memo at 9-10.

In light of the Trustee's description of Madoff's strategy, there is no dispute that all of the

securities that were set forth on the account statements, including the index options, traded in the

public markets.[4]  As such, they were all Real Securities whose market value "as of the filing

date" could easily be determined.  SIPA § 78fff-3(a)(3).

### 3.    The Goodwin Claimants' Net Equity Claims Should Be Based On Customer Expectations and Calculated According to the Account Statement Method.

The focus then turns to the proper definition of net equity, *i.e.,* question four in the

required analysis.  SIPA defines "net equity" as follows:

> The term "net equity" means the dollar amount of the account or
> accounts of a customer, to be determined by—
>
> (A)  calculating the sum which would have been owed by the
> debtor to such customer if the debtor had liquidated, by sale or
> purchase on the filing date, all securities positions of such
> customer (other than customer name securities reclaimed by such
> customer); minus
>
> (B)  any indebtedness of such customer to the debtor on the
> filing date . . . .[5]

---

[4]    The Trustee asserts somewhat equivocally that a mutual fund – namely, the Fidelity Spartan U.S. Treasury Money Market Fund – which was shown on certain customer account statements was a Fictitious Security.  The Trustee writes that "Fidelity has acknowledged that from 2005 onwards, the organization did not offer participation in any such money market fund for investment."  Trustee Memo at 11.  If Fund in question was a Fictitious Security, then its ostensible value would not be included in Net Equity.

[5]    Net equity as defined under the 1970 version of SIPA was nearly identical in all material respects to the current definition:

> The value of each claim was based on the customer's 'net equity' as of the filing
> date.  Net equity consisted of the difference between the amount owed by the
> broker to the customer as if all of the customer's securities positions had been
> liquidated on the filing date by sale or purchase, and the amount owed by the
> customer to the broker.

Michael E. Don & Josephine Wang, <u>Stockbroker Liquidations Under the Securities Investor Protection Act and Their Impact on Securities Transfers</u>, 12 Cardozo L. Rev. 509, 533 (1990).

SIPA § 78lll(11).

Customers share in allocations of customer property "on the basis and to the extent of their respective net equities." SIPA § 78fff-2(c)(1)(B). SIPC may advance money to the Trustee to pay customer claims "for the amount by which the net equity of each customer exceeds his ratable share of customer property." SIPA § 78fff-3(a).

As discussed below, a customer's securities positions that were to be hypothetically liquidated on the filing date include securities that the customer legitimately expected to be in his account, including all securities for which the customer had received confirmations and which were reflected in the customer's account statements, but which had never actually been traded in the customer's account. Importantly, SIPA was amended in 1978 to "make SIPA more responsive to the reasonable expectations of public investors and would provide investors with greater protection against the financial failure of stockbrokers, thereby enhancing investor confidence in the securities markets."[6] H.R. Rep. No. 95-746, at 21 (1977). "In the overview the bill addresses (A) what the customer gets, (B) how fast the customer gets it, and (C) how much it costs to get it to him." Id.

The legislative history illustrates Congress's understanding that SIPA is intended to provide protection to a customer for the value of securities that he believed were in his account but that were missing or *never purchased*:

> A. *What The Customer Gets.*–**A customer generally expects to receive what he believes is in his account** at the time the stockbroker ceases business. But because **securities may have been** lost, improperly hypothecated, misappropriated, **never purchased or even stolen**, this is not always possible. Accordingly, **when the customer claims for a particular stock exceed the supply** available to the trustee in the debtor's estate, then customers generally receive pro rata portions of the securities

---

[6]    A list of all of the amendments to SIPA appears at p. 24, n.16 of the Trustee Memo.

> claims, and as to any remainder, **they will receive cash based on the market value as of the filing date** (normally the day the liquidation proceeding is initiated).

Id. (emphasis added).  The Senate Report contains language to the same effect.  S. Rep. No. 95-763, at 2 (1978).

The idea that customers should receive what they believed was in their accounts was reinforced by SIPC's report to the U.S. House of Representatives on the bill that became the 1978 SIPA amendments.  In supporting the addition to SIPA of a provision that would permit a Trustee to purchase securities to distribute to customers, SIPC Chairman Hugh F. Owens gave the following example of how the statutory scheme would work when there were inadequate securities for distribution:

> **[C]ustomers generally expect to receive what is in their accounts when the member stops doing business**.  If John Q. Investor has 100 fully-paid shares of IBM and a credit balance of $200 in his account, he expects to receive from the trustee a stock certificate for 100 shares of IBM and a check for $200.
>
> But in many instances that has not always been possible **because securities have been** lost, improperly hypothecated. misappropriated, **never purchased**, or even stolen.  When there are valid claims for more IBM stock than is on hand, under the present statute John Q. will receive only a pro rata portion of his 100 shares.  For the remainder of the shares due him, **he will receive cash in lieu of stock based on the market price** on the date the liquidation preceeding [sic] is initiated.

H.R. Rep. No. 95-746, at 39 (1977) (emphasis added).

It is clear from the foregoing that SIPC unequivocally anticipated that a customer would have a claim for securities that he believed were in his account but were stolen or *never purchased*.  SIPC's affirmation of the principle that a customer would be paid the filing date market value of securities listed in the customer's account statement was repeated in a 1990 article by SIPC's current General Counsel, Josephine Wang and her colleague at SIPC, Michael

Don.[7]  Don & Wang, *supra* note 5, at 543-44.  The SIPC authors offer the following example of

a distribution in a SIPC liquidation proceeding:

> The following illustrates, in simplified fashion, how distribution is made in a SIPA proceeding.  For purposes of the hypothetical, it is assumed that three customers file valid claims in a SIPA liquidation, seeking the following:

| Customer | Claim for Securities | Claim for Cash |
|---|---|---|
| 1. | 100 Shares of ABC | $50,000 |
| 2. | 50 Shares of ABC | None |
| 3. | 200 Shares of XYZ | $600,000 |

> The trustee has in his possession a certificate for twenty shares of ABC stock, registered in the name of Customer 1, and a certificate for thirty shares of ABC stock registered in the name of Customer 2, to which a stock power is attached.  No other stock is found.  The amount of cash in the trustee's possession is $20,000.  On the date SIPC files the application for a customer protective decree, ABC stock is trading at $100/share and XYZ stock, at $200/share.  None of the customers is indebted to the broker.

> Without regard to its market value,[] the nonnegotiable twenty-share certificate of ABC stock, as a customer name security, is returned outright to Customer 1.  As a negotiable security, the thirty-share certificate of ABC stock becomes part of the fund of customer property.  The net equity, or allowable claim, of each customer is as follows:

| Customer | Filing Date Value of Securities | Cash | Net Equity |
|---|---|---|---|
| 1. | $8,000 | $50,000 | $58,000 |
| 2. | $5,000 | None | $5,000 |
| 3. | $40,000 | $600,000 | $640,000 |
| Total: | | | $703,000 |

---

[7]     While the article contains a standard disclaimer that the views expressed are those of the authors and not of SIPC, the views expressed on distributions with respect to customer net equity are consistent with those expressed by SIPC in the legislative history and subsequently.   Moreover, the notion that the SIPC counsel would author an article directly contrary to how SIPC was interpreting the statute at the time is far-fetched.

Id.  In sum, according to this example, **each customer is paid market value for its missing securities**.

The Wang and Don example demonstrates that SIPC's counsel believed that customers with claims for securities, such as the Goodwin Claimants, should receive the market value of the securities that should have been in their accounts and that they legitimately expected to be in their accounts, *regardless of whether the securities had ever been purchased*.  Remarkably, SIPC now argues the exact opposite – that missing Real Securities do not qualify for payment as net equity.  SIPC apparently now takes this position not because the Real Securities are missing but because of *why* they are missing.  Nowhere does the statute permit this type of subjective discrimination.  Indeed, the sudden shifting of SIPC's position is driven by precisely the type of outcome-determinative analysis that the Trustee purports to eschew in his Memorandum.  See Trustee Memo, p. 29 ("Interpretation of Net Equity should not be outcome-determinative, but instead based upon the proper interpretation and reading of the requirements of the law.")  SIPC should be held to the disciplined analysis heralded by its General Counsel in 1990.  SIPC also should be estopped from effectively speaking out of both sides of its mouth.  The simple, principled and fair analysis done by SIPC's counsel in 1990 – *i.e.,* long before the largest Ponzi scheme in history clouded the lens – closely aligns with the purpose and legislative history of SIPA and leads to the incontrovertible conclusion that the Account Statement Method is the only appropriate determination of net equity.

4.    **New Times I Supports the Goodwin Claimants' Account Statement Method for Determining Net Equity.**

Against the statutory backdrop comes the decision of the Second Circuit Court of Appeals in In re New Times Sec. Servs., Inc., 371 F.3d 68 (2d Cir. 2003) (hereinafter, "New Times I").  That case squarely supports the Goodwin Claimants' proposed Account Statement

Method.  In the case, New Times Securities Services, Inc and New Age Financial Services, Inc. ("New Times Debtors") solicited investments in three categories of securities, two of which were comprised of Fictitious Securities (non-existent money market funds and fraudulent promissory notes), and one category comprised of Real Securities (genuine mutual funds).  <u>New Times I</u>, 371 F.3d at 71.  Claimants-Appellees purchased shares in Fictitious Securities, the bogus mutual funds.  <u>Id.</u>  The Second Circuit left no doubt that its decision dealt solely with claims for Fictitious Securities, stating in pertinent part, "To be clear-**and this is the crucial fact in this case**-the New Age Funds in which the Claimants invested *never* existed."  <u>Id.</u> at 74 (emphasis added).

Over the opposition of SIPC and the New Times Debtors' trustee, but with the support of the Securities and Exchange Commission, *the Court ruled that the customers who invested in bogus mutual funds had claims for securities entitled to the higher level of SIPC protection*.  The Court rejected SIPC's assertion that customers cannot have legitimate expectations as to non-existent securities and also declined to endorse SIPC's desire to promote greater investor self-vigilance:  "This goal of greater investor vigilance, however, is not emphasized in the legislative history of SIPA.  Instead, as outlined *supra* . . . , the drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers."  <u>Id.</u> at 87.  Thus, the <u>New Times I</u> Court viewed the legislative history of SIPA as the Goodwin Claimants do—with an emphasis on promoting investor confidence in the securities markets.

In determining the customers' net equity with respect to the Fictitious Securities, the Court declined to accept the District Court's calculation based on "the 'value' of the bogus securities (including artificial interest and dividends) as set forth in the fictitious account statements that the Claimants received from Goren and the Debtors."  <u>Id.</u> at 87-88.  The Trustee

relies heavily on language in <u>New Times I</u> to the effect that relying on the account statement would be "irrational and unworkable" and would allow the customer to recover "arbitrary amounts that necessarily have no relation to reality." <u>Id.</u> at 88.

However, there is nothing irrational and unworkable about recognizing the value of Real Securities of the type held by BLMIS customers. In fact, this was SIPC's position throughout the evolution of the <u>New Times</u> Debtors' liquidation. Tellingly, the Trustee acknowledges that the net equity of the <u>New Times</u> Debtors' investors in Real Securities was determined based on their account statements and that their claims included earnings on the securities. Specifically, the Trustee states, "It is true that for claimants who believed that they had invested in 'real' mutual funds in <u>*New Times*</u>, the trustee calculated net equity based upon the 'earnings' on those investments as represented on their customer statements." Trustee Memo at 42. The Second Circuit uncritically acknowledged this result for Real Securities in <u>New Times I</u>:

> Meanwhile, investors who were misled by Goren to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds-because Goren never executed the transactions-the information that these claimants received on their account statements "mirrored what would have happened had the given transaction been executed." Br. for Appellants James W. Giddens and SIPC at 7 n. 6. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. *Id.* The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. *Id.* Furthermore, the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," in contrast to the "cash claimants" bringing this appeal, could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements. *Id.*

New Times I, 371 F.3d at 74. [8]

Based upon the above, the Trustee and SIPC would appear to agree with the following progression: the Goodwin Claimants are customers under SIPA; BLMIS defrauded the Goodwin Claimants; the Goodwin Claimants have claims for securities; the securities are Real Securities; the Goodwin Claimants received confirmations of the transactions in the Real Securities; the Real Securities are shown on the Goodwin Claimants' account statements. Applying SIPA literally and consistently with its history would dictate that the Goodwin Claimants' net equity be determined based on the market value of the Real Securities. In the parlance of the legislative history and the former Chairman of SIPC, that is what the customer generally expects to receive and what SIPA provides that he shall receive (subject to availability of customer property and the limits on SIPC advances). H.R. Rep. No. 95-746, at 21, 39 (1977).

Nothing in SIPA says that an innocent customer must deconstruct his account and alter his expectations because of the broker's fraud. The statute contemplates that securities may be missing *because of fraud* and that a customer will have a claim for those missing securities. SIPC and the Trustee appear to be saying that there is fraud and then there is FRAUD and the rules are different for FRAUD. There is no basis in the statute for such a distinction. That one fraudster is creative and another pedestrian or that one commits a small fraud and another a huge one, does not change the "proper interpretation and reading of the requirements of the law." Trustee Memo at 29. It is the Cash in/Cash out Method that invites an outcome-determinative approach that violates the Trustee's own admonition. Put simply, SIPC and the Trustee are saying that if the statute is applied as written and consistently with its legislative history, it

---

[8]        The "Br. for Appellants James W. Giddens and SIPC" cited in New Times I is Exhibit C to the Declaration of Seanna R. Brown, Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff), Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Oct. 16, 2009).

produces results that they think are inappropriate in this case.  That is not a matter to be resolved by the courts but rather is one that can only be addressed prospectively by Congress.  Accordingly, based upon the <u>New Times I</u> decision and the Trustee's own statements about it, the only legitimate outcome here is a determination that the Account Statement Method should be utilized.

     **5.**     **Neither the Standard Treatment of Ponzi Schemes Nor the <u>Old Naples</u> Case Supports the Trustee's Method of Determining Net Equity.**

Not only does the <u>New Times I</u> case dictate an outcome opposite to that supported by the Trustee, but other purported authority contained in the Trustee's brief likewise fails to support the use of the Cash in/Cash out Method.  Specifically, the Trustee's memorandum, despite some five pages of exposition on the applicability of the Cash in/Cash out Method and the recovery of fictitious profits in Ponzi-scheme cases – replete with fervent quotations – does not contain a single reference to a SIPC case that involved Real Securities.  Trustee Memo at 30-33, 33-35.  Mr. Ponzi's eponymous scheme and the Supreme Court's rejection of claims to profits by investors with knowledge of the fraud spawned the well-worn quotation, "Since all the funds were obtained by fraud, to allow some investors to stand behind the fiction that [the] Ponzi scheme had legitimately withdrawn money to pay them 'would be carrying the fiction to a fantastic conclusion.'"[9]  <u>Cunningham v. Brown</u>, 265 U.S. 1, 13 (1924).  Charles Ponzi was selling phony investments in postal money orders and SIPA, had it been conceived, would not have applied.

Other "cash in/cash out" authorities relied on by the Trustee comprise a farrago of exotic investments, none of which would have been securities for SIPA purposes and most of which

---

[9]     Trustee Memo at 32, citing  <u>SEC v. Credit Bancorp, Ltd.</u>, No. 99 CIV. 11395, 2000 WL 1752979, at *40 (S.D.N.Y. Nov. 29, 2000), <u>aff'd</u>, 290 F.3d 80 (2nd Cir. 2002) (quoting <u>Teletronics, Ltd. v. Kemp</u>, 649 F.2d 1237, 1241 (7th Cir. 1981).

were far from being Real Securities.  Investors in the Trustee's cited Ponzi cases thought that

they were putting their money into such things as precious metals (CFTC v. Topworth Int'l, Ltd.,

205 F.3d 1107, 1109 (9th Cir. 2000)), cattle feedlots (Official Cattle Contract Holders Comm. v.

Commons (In re Tedlock Cattle Co.), 552 F.2d 1351, 1352 (9th Cir. 1977)), non-existent "prime

bank securities" (SEC v. Funding Res. Group, No. 3-98-CV-2689-M, 2004 WL 1189996 at *1

(N.D. Tex. May 27, 2004), adopted as modified, 2004 WL 1882972 (N.D. Tex. Aug. 20, 2004),

and "custodial dividends" (Credit Bancorp, 2000 WL 1752979, at * 8).

        The litany of Ponzi fraudulent transfer cases is similarly deficient.  There is not one SIPA

case nor one Real Security case on the list.  Ill-advised investments include working capital loans

to Malaysian latex glove manufacturers (Donell v. Kowell, 533 F.3d 762, 767 (9th Cir. 2008)),

limited partnership interests reliant on a sophisticated options trading system (Sender v.

Buchanan (In re Hedged-Investments Assoc., Inc.), 84 F.3d 1286, 1287 (10th Cir. 1996)), 10-

20% monthly-return commodity limited partnership interests (Scholes v. Lehmann, 56 F.3d 750,

752 (7th Cir. 1995)), discounted accounts payable (Merrill v. Abbott (In re Indep. Clearing

House Co.), 77 B.R. 843, 848 (D. Utah 1987)), hedge funds (Bayou Accredited Fund, LLC v.

Redwood Growth Partners, L.P. (In re Bayou Group, LLC), 396 B.R. 810, 822 (Bankr. S.D.N.Y.

2008); Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC),

362 B.R. 624, 626 (Bankr. S.D.N.Y. 2007)) and unregistered promissory notes (In re Taubman,

160 B.R. 964, 972 (S.D. Ohio 1993)).

The contrast between the suspect investments in the cash in/cash out and Ponzi scheme cases, and the S&P 100 securities on the typical BLMIS account statement[10]: could not be more stark:



As evidenced by this sample BLMIS account statement, or by any of the many thousands of purchase and sale confirmations slips received by all BLMIS customers, the Goodwin Claimants were not invested in high-return exotica. They could, and did, check the blue chip securities listed in their statements and confirmation slips against the financial press and confirmed that the securities listed were available in the public market at comparable prices. Put simply, relying on the BLMIS statements was not unreasonable and customer expectations as to the contents of their accounts were legitimate.

---

[10]     The source of the presented account statement image is the Objection to Trustee's Determination of Claim at Ex. B, Docket No. 717, Adv. Pro. No. 08-01789-BRL, Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff) (Bankr. S.D.N.Y. Nov. 12, 2009).

Notably, with the exceptions of the Old Naples and C.J. Wright cases, discussed below, not one case cited by the Trustee involved a SIPA proceeding.  None, including Old Naples and C.J. Wright, involved customer statements showing securities available in the public markets. Not one was cloaked with the Congressional purpose of assuring that John Q. Investor would receive the securities shown on his account statement or their market value.  H.R. Rep. No. 95-746, at 39 (1977).

Both the Trustee and SIPC assert, erroneously, the precedential value of In re Old Naples Sec., Inc., 311 B.R. 607 (M.D. Fla. 2002).  According to the Trustee, "[c]onsistent with the body of case law holding that the proper method for valuing claims in Ponzi schemes is based on an investor's net investment, courts have upheld the net investment method in Ponzi scheme liquidations under SIPA."  Trustee Memo at 33.  The only "courts" to which the Trustee could refer are the Old Naples court and a reference to its citation by the Second Circuit in New Times I.  SIPC weighs in:

> The decision that in the context of a Ponzi scheme, the customer's
> net equity under SIPA is the net amount deposited by the customer
> with the broker is not novel.  As discussed above, it is the
> conclusion that was reached by the Court of Appeals in New
> Times I.  It also was the outcome in a Memorandum and Order
> filed on September 30, 2002, in Theodore H. Focht, Trustee v.
> Tessie C. Athens (In re Old Naples Securities, Inc.), 311 B. R. 607
> (M.D. Fla. 2002) ["Old Naples IV"].

SIPC Memo at 38.

Old Naples IV, however, is another case that does not involve Real Securities and is consequently inapposite.  There are three earlier reported decisions involving the failure of Old Naples Securities and the subsequent SIPA proceedings.  In re Old Naples Sec., Inc., 223 F.3d 1296 (11th Cir. 2000) ("Old Naples III"); In re Old Naples Sec., Inc., 230 B.R. 41 (M.D. Fla. 1999) ("Old Naples II"); In re Old Naples Sec., Inc. 218 B.R. 981 (Bankr. M.D. Fla. 1998) ("Old

Naples I").  All three cases primarily involved the question of whether investors promised

hyperbolic returns for investing in unidentified "bonds" were "customers" for purposes of

protection under SIPA, a status that SIPC opposed.  Old Naples III, 223 F.3d at 1300; Old

Naples IV, 311 B.R. at 610; Old Naples II, 230 B.R. at 443; Old Naples I, 218 B.R. at 985-86.

Only Old Naples I and Old Naples IV reached the issue of the amounts due to claimants.

They applied the cash in/cash out approach but they did so with respect to Fictitious Securities.

Old Naples IV, 311 B.R. at 610; Old Naples I, 218 B.R. at 985-86.  Unlike the situation of the

Goodwin Claimants, there were no customer statements or confirmation slips showing Real

Securities to rely on and no basis on which to determine the market value of securities positions

for securities that did not exist in a public market.  See id.  The Old Naples IV court looked to an

earlier Florida bankruptcy court decision in a SIPA case – In re C. J. Wright & Co., 162 B. R.

597 (Bankr. M.D. Fla. 1993) ("C. J. Wright") – and agreed with its reasoning.  Old Naples IV,

311 B.R. at 616; SIPC Memo at 38-39.  C. J. Wright's customers did not invest in public

securities but chose to entrust their capital to Mr. Wright for investment in the "Money Market

Club" and the "Deposit Account," both figments of Mr. Wright's imagination.  There was not a

Real Security to be seen.  C. J. Wright, 162 B.R. at 600, 601.

### 6.    The Goodwin Claimants' Legitimate Expectations Include the Securities In Their Accounts.

The Trustee and SIPC soundly thrash the straw man that the SIPC Series 500 Rules do

not support the Goodwin Claimants' expectations that they should receive the securities shown

on their account statements.  Trustee Memo at 37-39; SIPC Memo at 23.  Admittedly, the Series

500 Rules were designed to set a standard for determining whether a particular customer claim is

for cash or securities in the confusing context of a trade that was not completed before a SIPA

liquidation proceeding began.  SIPC Memo at 23.  The "legitimate expectations" language

appears in the Federal Register commentary on the Series 500 Rules and in cases cited as

progenitors to the Series 500 Rules. Rules of the Sec. Investor Prot. Corp., 53 Fed. Reg. 10368-

69 (Mar. 31, 1988) (to be codified at 17 C.F.R. pt. 300).

However, the concept of satisfying the customers' legitimate expectations is in no way

limited to answering the cash versus securities question under the Series 500 Rules. Whether a

claim is for cash or securities is only one question guided by the customers' legitimate

expectations. Legitimate expectations also guide the determination of the "securities positions"

comprised of the securities shown on the account statement. The customers' legitimate

expectations as to the securities in their accounts is afforded deference by SIPA and that

deference is in no way diminished or even addressed by the Series 500 Rules. The legislative

history discussed above establishes this:

> A customer generally expects to receive what he believes is in his
> account at the time the stockbroker ceases business . . . . [W]hen
> the customer claims for a particular stock exceed the supply
> available to the trustee in the debtor's estate, then customers
> generally receive pro rata portions of the securities claims, and as
> to any remainder, they will receive cash based on the market value
> as of the filing date.

H.R. Rep. No. 95-746, at 21 (1977).

This legislative history makes clear that the Trustee's inability to purchase all of the Real

Securities listed on the account statements does not provide the Trustee with license to throw up

his hands and treat them as Fictitious Securities. To the contrary, Congress expressly

contemplated that the Trustee would provide a distribution instead. Among the cases cited as

supporting the need for the Series 500 Rules, the decision in In re June S. Jones Co., 52 B.R. 810

(Bankr. D. Or., 1985) is particularly instructive. Customers of failed broker June S. Jones Co.

protested the Trustee's satisfaction of their SIPC claim by delivery of Real Securities of MSM

Marketing, Ltd. ("MSM"), the value of which had plunged during a delay in delivery and was at

a nadir when Jones went into liquidation. The customers preferred a claim for the cash they

deposited for the purchase, which now exceeded the value of the securities. June S. Jones, 52

B.R. at 812. In ruling that the customers' legitimate expectations were that their accounts held

MSM shares, the Jones court quoted the Senate Report on the 1978 SIPA amendments:

> By seeking to make customer accounts whole and returning them
> to customers in the form they existed on the filing date, the
> amendments not only would satisfy the customers' legitimate
> expectations, but also would restore the customer to his position
> prior to the broker-dealer's financial difficulties [quoting S. Rep.
> No. 95-763, at 2 (1978)].
>
> It seems clear that in the present case, claimants' legitimate
> expectations were that their accounts held MSM stock as of the
> filing date. Indeed, some claimants initially filed claims for
> securities. Under the facts presented, the statutory scheme requires
> a finding that claimants are entitled to securities, not cash.

June S. Jones, 52 B.R. at 814.

While the MSM securities were available for distribution and the Real Securities in the

BLMIS accounts were missing, the rule is the same. The customer's claim for securities is for

the securities in his account as he legitimately expected. SIPC and the Trustee are asserting a

position that acknowledges there are securities in the customer's account. After acknowledging

the securities, the Trustee then ignores his conclusion to argue that those very securities and their

market value are not relevant to determining net equity. In the Trustee's view, somehow

securities has one meaning for determining the customer's status as a claimant for cash versus

securities and a different meaning for determining net equity. But there is no basis in law for this

double standard. In fact, the Supreme Court teaches that a word is presumed to have the same

meaning in all subsections of the same statute. Cohen v. de la Cruz, 523 U.S. 213, 220, 221

(1998); Patterson v. Shumate, 504 U.S. 753, 758 n.2 (1992). SIPC's position is tantamount to

saying that the "rule" for determining net equity should be whatever produces the lowest amount

of customer net equity and the least amount of protection from SIPC.  This is decidedly outcome-determinative, not consistent with SIPA and contrary to SIPA's goals of protecting customers and inspiring confidence in the integrity of the broker community.  Accordingly, such a determination should not be countenanced and this Court should instead rule that the Account Statement Method applies.

**7.     The Trustee's Fictitious Market/Fictitious Profits Arguments Are Not Persuasive.**

The Trustee asserts, with no factual or legal foundation, "that BLMIS customers most closely resemble those investors in <u>New Times I</u> whose customer statements reflected investments in imaginary mutual funds, who also sought to recover fictitious profits."  Trustee Memo at 40.  Premised on this conclusion, the Trustee argues that customer account statements – the determinative factor in the case of Real Securities – must be disregarded because the underlying transactions that led to a particular customer's position could not have been achieved in the market:  "This made not just the trades, but the entire market, fictitious."  <u>Id.</u>  This is another straw man.  The Trustee attempts to substitute the "fictitious market" for the "Fictitious Security;" the Real Security is then transformed into a Real Security generated in a fictitious market, ergo it becomes a Fictitious Security, ergo the customer's account statements are no longer determinative of his securities position and his net equity.  This is a shell game, not a principled argument.  It finds no support in SIPA or its history and is again driven by outcome not statutory predicate.  Such an argument would penalize innocent customers because BLMIS committed a FRAUD and not a fraud, …because Madoff was not a one-event fraudster but compounded his scheme for decades.  But only Congress can change the law to discriminate between victims of different sizes and varieties of frauds, not SIPC and not the Trustee.

8.      **The Trustee's and SIPC's Books and Records, Burden of Proof, and
Ordinary Course of Business Arguments Are Illogical and Wrong.**

SIPC and the Trustee advance a series of arguments to the effect that the fraud committed

by BLMIS vitiates the customers' ability to prove a claim for the securities in their accounts:  (a)

a "books and records argument" to the effect that BLMIS records – other than account

statements – show that the statements do not reflect reality (Trustee Memo at 43, 44; SIPC

Memo at 19); (b) a "burden of proof argument" that the customers cannot satisfy their burden of

proving their "preferred" customer status or that their claims are "ascertainable from the books

and records of the debtor or otherwise established to the satisfaction of the trustee"  (SIPC Memo

at 16-22, Trustee Memo at 44, 45); and (c) an "ordinary course of business argument" whereby

the customers do not have claims for securities not purchased in the ordinary course of business

as there is no ordinary course of the business of a fraudster (Trustee Memo at 45).

Specifically, the Trustee and SIPC come to the spectacular and circular conclusion that

because forensic examination of books and records, in addition to account statements, show that

there are no securities in the "securities positions," the claimant cannot prove a claim for

securities.  In other words, claimants cannot prove a claim for securities because crooked brokers

don't keep honest books and records.  SIPC Memo at 19; Trustee Memo at 44, 45.  This

argument could have been written by Lewis Carroll.[11]  If it were correct, then a customer would

*never* have a claim for securities when "**securities may have been** lost, improperly

hypothecated, misappropriated, **never purchased or even stolen**" even though the purpose of

SIPA is to protect a customer in just this situation.  H.R. Rep. No. 95-746, at 21 (1977)

(emphasis added); S. Rep. No. 95-763, at 2 (1978).  When securities reported on an account

---

[11]      "'Contrariwise,' continued Tweedledee, 'if it was so, it might be; and if it were so, it would be; but as it
isn't, it ain't. That's logic.'"  Lewis Carroll, Through the Looking Glass, Chapter IV.

statement were missing, the debtor's records would ultimately show that they were missing.  As a result, the customer could never prove a claim based on those securities, even though the customer's net equity, by definition, is based on the market value of those missing securities on the filing date.

SIPC and the Trustee further contend that, if the books and records are "unreliable," a claimant must prove the debtor's obligation "to the satisfaction of the trustee."  SIPC Memo at 19; Trustee Memo at 44-45.  As the Trustee notes in his brief, the books and records of the debtor do in fact support the customer statements.  Trustee Memo at 16-17.  BLMIS utilized a computer system that contained the data used to generate the account statements and trade confirmations.  Trustee Memo at 16-17.  The fact that the computer records that show the securities are themselves fictitious does not contravene the fact that sufficient records exist to ascertain the obligations BLMIS owed to customers.

In addition to the stunning illogic of the "books and records" and "burden of proof arguments," these arguments are contrary to precedent.  A customer has the burden of proving that he has a claim.  In re Adler Coleman Clearing Corp., 204 B.R. 111, 115 (S.D.N.Y. 1997) (stating that potential claimants must show that they were a customer as defined in SIPA and that they entrusted their assets to debtor as a broker-dealer to trade them in the securities market). However, in a case in which a claim was allowed despite the fact that the books and records of the broker did not even list a customer account in the name of the claimant, the court noted that it was unlikely that Congress "intended to make eligibility for protection depend on whether the broker complied with rules of the SEC or practices of the trade."  SEC v. Ambassador Church Finance/Development Group, Inc., 679 F.2d 608, 614 (6th Cir. 1982); In re Hanover Square Sec., 55 B.R. 235, 240 (Bankr. S.D.N.Y. 1985) (If the only flaw preventing the claimant from being

recognized as a customer under SIPA is that there was no customer account in the name of the

claimant in the books and records of the crooked broker dealer, then the courts "may well find

customer status."). The <u>Ambassador Church</u> court also noted: "The trusting customer is not to

be penalized for choosing a careless, unethical or dishonest broker. The primary purpose of the

Act is to assure the unsophisticated participant in securities transactions that there is protection

when a bad choice of brokers is made." 679 F.2d at 614.

These cases demonstrate that courts are willing to overlook deficiencies in the broker's

books and records where the claimant can establish through other means that he is a customer.

Significantly, SPIC does not cite a single case in which a claim was disallowed due to

deficiencies in the books and records of its fraudulent broker. Courts understand that it is

illogical to punish the victim of a fraud because the fraudster kept fraudulent or inaccurate books

and records. To hold otherwise would devastate the ability of the SPIC to protect investors and

create investor confidence.

The "ordinary course of business" argument fares no better. The phrase "ordinary course

of business" is found in one of the alternative definitions of "customer." As noted, *supra*, at

note 3, a customer "is a person… who has a claim on account of securities received, acquired, or

held by the debtor in the ordinary course of its business[.]" A customer is also "any person who

has a claim against the debtor arising out of sales or conversions of such securities, and any

person who has deposited cash with the debtor for the purpose of purchasing securities[.]" SIPA

§ 78lll(2). The latter SIPA customer has a claim precisely because the debtor's business was out

of the ordinary course of an honest business. The Trustee recognizes that the BLMIS customers

are customers with claims for securities and SIPC supports the Trustee. Trustee Memo at 26;

SIPC Memo, *passim*. The ordinary course of business argument is not relevant to the

determination of net equity.  Indeed, since they acknowledge the customer status of the

claimants, SIPC and the Trustee should be estopped from taking an inconsistent position and

raising the "ordinary course of business" argument.

> **9.    The Power To Avoid Fraudulent Transfers Depends On But Does Not Determine Net Equity.**

Both the Trustee and SIPC assert the erroneous argument that the Trustee's standing to

avoid fraudulent transfers mandates adoption of the Cash in/Cash out Method of calculating net

equity.  Trustee Memo at 46; SIPC Memo at 34.  Assuming that every penny paid by BLMIS to

customers is a *prima facie* fraudulent transfer under the Ponzi scheme cases cited at pages 33 and

34 of the Trustee Memo, the question of whether those transfers are avoidable cannot be

answered until the amount of the debtor's obligations to its customers is determined.  In other

words, "net equity" cannot be informed by the fraudulent transfer power.  Instead, net equity

informs that issue and must therefore be determined first.

The fraudulent transfer provision of the Bankruptcy Code[12] provides that

> a **transferee** or obligee of such a transfer or obligation **that takes for value and in good faith** has a lien on or **may retain any interest transferred** or may enforce any obligation incurred, as the case may be, **to the extent that such transferee or obligee gave value** to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).  "'[V]alue'" means property, or satisfaction or securing of a present or

antecedent debt of the debtor…."  11 U.S.C. § 548(d)(2)(A).  Should the Trustee seek to apply

New York fraudulent conveyance law, he will encounter a similar provision.  New York Debt. &

Cred. Law § 273.  If BLMIS owed its customers the amounts shown on their account statements,

any transfer to them would be in satisfaction of antecedent debt.  The antecedent debt is the

---

[12]    11 U.S.C. § 101, et seq. ("Bankruptcy Code").

obligation to pay customers the values shown on their statements.  Assuming the requisite good

faith, a transfer will only be avoidable if it exceeds the value given to the debtor, *i.e.* if it

exceeded the amount owed to the customer by BLMIS.  Thus, the amount owed – the net equity

– must be determined before a transfer can be evaluated as fraudulent.

        SIPA itself illustrates the circularity of the argument advanced by SIPC and the Trustee.

The Court has the powers conferred by the Bankruptcy Code "except as inconsistent with the

provisions of [SIPA][.]"  SIPA § 78eee-(b)(2)(A)(iii).  Similarly, Title 11 of the Bankruptcy

Code applies "to the extent consistent with the provisions of [SIPA][.]"  SIPA § 78fff(b).  The

specific reference in SIPA to the Trustee's rights to recover fraudulently transferred customer

property does not purport to override the requirement that bankruptcy law and avoidance powers

in particular must be consistent with SIPA.  If a provision of SIPA establishes the correct

methodology for determination of a customer's net equity (and it does), then a fraudulent transfer

action premised on a different methodology is inconsistent with the provisions of SIPA.  If net

equity is calculated based on the market value of the securities shown in a customer's account,

then a customer is entitled to be paid the amount of that net equity.  A payment up to the amount

of that net equity cannot be a fraudulent transfer because it is, by statutory definition, for value.

To base a fraudulent transfer claim on a cash in/cash out methodology – to claim as fraudulent

the excess of withdrawals over deposits – when the customer is owed net equity greater or equal

at any given transfer date to the total of deposits less withdrawals, would be inconsistent with

SIPA and beyond the scope of the application of the Bankruptcy Code permitted by SIPA.

10.   **The Trustee's and SIPC's Arguments Regarding Imputed Frauds and Illegal Contracts Are Inapplicable.**

Beginning at page 26 of its brief, SIPC attacks the account statement methodology with the artillery of the Ensminger Cases.[13]  The Trustee fires a second salvo.  Trustee Memo at 46-49.  While the uniquely compelling facts of the Ensminger Cases actually distinguish them from the BLMIS net equity determination, SIPC asserts:  "Almost all of the [Ensminger Cases'] grounds apply with equal force here."  SIPC Memo at 26.  These arguments appear compelling only when carefully extracted from the context of the facts of the Ensminger Cases.  The Trustee and SIPC assert the following:

- A customer cannot have a claim for securities purchased with the proceeds of fictional sales.  SIPC Memo, p. 26-27.

- As beneficiaries of a broker's fraud, the customers are charged with the broker's actions and intent.  SIPC Memo at 27-29.

- Transactions can be rescinded or avoided as illegal or as products of the agent/broker's fraud.  SIPC Memo at 29-33; Trustee Memo at 48.

- Because the Trustee would have the right to avoid or rescind transfers made pursuant to Madoff's scheme, even if the claimants had no knowledge of the fraud, SIPA cannot be read to give force to the "legitimate expectations of the bargains of . . . concededly fraudulent transactions[.]" Jackson at 433. To the contrary, the bankruptcy court in Ensminger observed that it would "not permit the Claimants to reap the benefits of the fraud" of the broker. 247 B.R. at 127. Trustee Memo at 49.

As presented by the Trustee and SIPC, the Ensminger Cases appear to involve claims by customers against a broker whose fraud is imputed to deny so much of the customers' net equity claims as derive from fraudulent transactions.

---

[13]      Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406 (S.D.N.Y. 2001) ("Jackson"); Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 247 B.R. 51 (Bankr. S.D.N.Y. 1999) ("Ensminger") (together, the "Ensminger Cases").

In fact, and in contrast to the Trustee's and SIPC's portrayal, the Ensminger Cases involved fraud committed by Hanover Sterling & Company ("Hanover"), one broker, against Adler, Coleman Clearing Corp. ("Adler"), a second broker and a debtor in a SIPA liquidation. The claimants were customers of Hanover ("Hanover Customers") who ostensibly sold low value "House Stocks" for inflated prices and used the proceeds to purchase certain "Blue Chips" within the final week of Hanover's operations (the "Challenged Trades"). Jackson, 263 B.R. at 418. Hanover was frantically (and illegally) engaging in fictitious transactions in customer accounts to deceive Adler and regulators about Hanover's failure to comply with net capital requirements. Id. at 420. The fraud was accomplished by Hanover's abuse of its access to Adler's computer system to book the phony trades. Id. at 434. Of 15,000 customer claimants in the Jackson case, several hundred were Hanover customers whose claims were based on the Challenged Trades made by Hanover. Id. at 418. The eight appellants in Jackson were among those whose claims were denied. Id. The Jackson and Ensminger appellants' protestations of innocence were colored by their "elided view of the transactions," whereby, "the purchase of Appellants' House Stocks was simultaneously entered into their accounts by the same brokers at manipulated, artificially high prices which far exceeded the proceeds that could be expected to be derived from the fair market value of Appellants' House Stocks." Id. at 434. The appellants in Jackson were trying to advantage themselves at the expense of other Adler customers by relying on the fraud of their broker, Hanover.

Ensminger and Jackson did not involve the Net Equity Issue at all. The cases did not involve determining customer claims, based on a uniform interpretation of SIPA, against a broker such as BLMIS that defrauded all customers. Instead, Ensminger and Jackson involved

the attempt of a few customers of one broker to employ the benefits of that broker's fraud to enhance their claims against a second broker.

In addition to this fundamental distinction, the Jackson and Ensminger courts noted that the Challenged Trades could be rescinded under the Clearance Agreement between Adler and Hanover and that as to some or all of them, no confirmations had been sent to customers. Jackson, 263 B.R. at 423. Jackson later noted the critical importance of the delivery of customer confirmations to the existence of a claim for securities under SIPC Rule 502(a)(1). Id. at 437-38. Absent receipt of a confirmation, a customer must prove that the securities were the subject of an enforceable contract. SIPC Rule 502(a)(2); Jackson, 263 B.R. at 438.

Unlike the Goodwin Claimants, the Jackson and Ensminger appellants were not relying on confirmed trades and securities positions set out in confirmation slips and monthly account statements to present a claim for net equity. See Jackson, 263 B.R. at 421. Appellants were attempting to achieve customer status in the liquidation of one broker based on the fraud of another broker, with no confirmations to evidence their claim to securities, no account statements to evidence their securities positions and no contracts for the securities they claimed were enforceable by their broker against the SIPA debtor. The Hanover Customers did not have SIPA claims against Adler for these and other reasons. In contrast, the Goodwin Claimants admittedly have claims for securities against BLMIS. See Trustee Memo at 26.

SIPC also cites two decisions in the liquidation of S.J. Salmon & Co., Inc. ("Salmon") (the two decisions collectively are the "Salmon Cases")[14] for the proposition that the Trustee can avoid fictitious trades and therefore the BLMIS account statements should be ignored because

---

[14]     SEC v. S.J. Salmon & Co., No. 72 Civ. 560, 1973 U.S. Dist. LEXIS 15606 (S.D.N.Y. Aug. 8, 1973); SEC v. S.J. Salmon & Co., No. 72 Civ. 560 (Bankr. S.D.N.Y. Feb. 5, 1974). The Feb. 5, 1974 opinion was attached as Exhibit A to the Declaration of Hemant Sharna, Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff), Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Oct. 16, 2009).

they reflect fictitious trades.  SIPC Memo at 35-37.  SIPC fails to mention that the <u>Salmon</u> Cases

involved securities in which Salmon was the market maker, that Salmon artificially inflated the

value of the securities days before its collapse to defraud its regulator about its net capital

compliance, and that there was no independent market for the fictitiously-priced securities.  <u>S.J.</u>

<u>Salmon</u>, 1973 U.S. Dist. LEXIS 15606, at *19-*20.  To the extent that there was any market

value to the securities, it was negligible.  <u>Id.</u> at *23.  It was Salmon's sleight of hand in

attributing inflated value to worthless securities that the court found fraudulent.

The <u>Salmon</u> Cases also did not examine the Net Equity issue.  Had the situation in the

<u>Salmon</u> Cases been analyzed from a net equity perspective, the claimants would have had no net

equity for these securities.  All of the transactions took place on a single day five days prior to

commencement of the SIPA proceeding.  <u>Id.</u> at *10, *12.  There could have been no account

statements issued that showed "securities positions" on which to calculate net equity and the

customers could not have legitimately expected to receive the suddenly inflated value of

securities for which no broker other than Salmon was then making a market.  Had there been

account statements, there would have been negligible market value to the securities.  In reality,

the <u>Salmon</u> Cases involved Fictitious Securities because there was no genuine public market for

the securities.

At bottom, none of the Trustee's or SIPC's purported authority attempting to impute

fraud to customers to deny the Account Statement Method involves a factual scenario akin to the

one found in the liquidation of BLMIS.

### 11.     Public Policy Supports the Efficacy of the Account Statement Method For Determining Net Equity.

The Trustee argues that valuing customer claims based on net equity determined by the

Account Statement Method would be poor public policy.  According to the Trustee,

> Each customer's gain in fictitious profits on their BLMIS customer
> statement would result in another person's loss of actual cash
> invested.   A slavish adherence to the final fictitious customer
> statement – in spite of all of the evidence demonstrating the falsity
> of those statements with respect to securities transactions – permits
> Madoff to determine who wins and loses.

Trustee Memo at 52.

But there is nothing slavish or improper or unfair about honoring each customer's

legitimate expectations regarding the securities in his account statements.  What would be truly

improper would be to do what the Trustee impliedly advocates which is to disregard the public

policy decision made by Congress in passing SIPA, and embedded in the language of SIPA.

Neither the Trustee nor SIPC nor this court may do that.

SIPA was designed in part to enhance "public willingness to entrust assets to the

securities industry."  S. Rep. No. 91-1218, at 2 (1970).  SIPA in its current form was shaped by

the 1978 amendments.  The legislative history of those amendments is consistent with SIPA's

focus on the legitimate expectations of customers with respect to their accounts.  This focus

guards customers against a broker's failure and relies on controlling documentation.

> According to the House report: "**The bill would make SIPA more
> responsive to the reasonable expectations of public investors**
> and would provide investors with greater protection against the
> financial failure of stockbrokers, thereby enhancing investor
> confidence in the securities markets."  H.R. Rep. No. 95-746, at 21
> (1977).
>
> According to SIPC's report to the House: "The first [problem
> addressed by the amendments] is that customers generally expect
> to receive what is in their accounts when the member stops doing
> business."  Id. at 39.
>
> According to the Senate Report:  "By seeking to make customer
> accounts whole and returning them to customers in the form they
> existed on the filing date, the amendments not only would satisfy
> the customers' legitimate expectations, but also would restore the
> customer to his position prior to the broker-dealer's financial
> difficulties."  S. Rep. No. 95-763, at 2 (1978).

The public policy articulated by Congress is that customers should be made whole based on the positions that they legitimately expected to hold as of the filing date of a SIPA proceeding, as this is the way to promote confidence of investors in the integrity of the securities markets.  When a customer has received a statement that shows ownership of Real Securities, the customer has a net equity claim based on the market value of those securities as of the filing date.  An investor's confidence in market integrity certainly is not promoted by denying the customer's legitimate expectations because the broker committed fraud or FRAUD.  Yet this is the approach advanced here by the Trustee and SIPC.  Under their approach, customer account statements and the information contained therein, instead of being items upon which investors can reasonably and legitimately rely, are transformed into objects that can only inspire trepidation, and a potential second round of victimization (this second time at the hands of the Trustee).

The position taken by the Trustee and SIPC that a Cash In/Cash Out Method trumps an Account Statement Method sets a trap for the customer instead of rewarding his confidence in the market.  Such a position is wholly inconsistent with SIPA.  The Goodwin Claimants ask this court to do nothing more than adhere to the admonition of the Trustee and SIPC that SIPA and SIPA's mandate be followed.  Endorsement of the Account Statement Method would achieve this goal.  In contrast, adoption of the Cash In/Cash Out Method would accomplish nothing other than enabling the Trustee and SIPC to avoid their obligations to protect customers and promote investor confidence.

## CONCLUSION

For the reasons set forth above, the Court should rule that a BLMIS customer's "net equity" under SIPA is equal to the value of the securities positions and credit balance reflected in the customer's last BLMIS statement.

Dated:      Boston, Massachusetts
            November 13, 2009

**GOODWIN PROCTER LLP**

By: /s/ Daniel M. Glosband
    Daniel M. Glosband
      Email: dglosband@goodwinprocter.com
    David J. Apfel
      Email: dapfel@goodwinprocter.com
      (*pro hac vice* application pending)
    Brenda R. Sharton
      Email: bsharton@goodwinprocter.com
      (*pro hac vice* application pending)
    53 State Street
    Boston, Massachusetts 02109
    Telephone: (617) 570-1000
    Facsimile: (617) 523-1231

    Larkin M. Morton
    Email: lmorton@goodwinprocter.com
    The New York Times Building
    620 Eighth Avenue
    New York, New York 10018
    Telephone: (212) 813-8800
    Facsimile: (212) 355-3333

    *Attorneys for Jeffrey A. Berman, Russell deLucia, Ellenjoy Fields, Michael C. Lesser, Norman E. Lesser Rev. 11/97 Rev. Trust, Paula E. Lesser 11/97 Rev. Trust, and Jane L. O'Connor as Trustee of the Jane O'Connor Living Trust*