**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                              :
SECURITIES INVESTOR PROTECTION                :
CORPORATION,                                  :   SIPA Liquidation
                                              :
                    Plaintiffs,               :
                                              :   No. 08-01789 (BRL)
            vs.                               :
                                              :   Adv. Pro. No. 09-01265 (BRL)
BERNARD L. MADOFF INVESTMENT                   :
SECURITIES LLC,                               :   (Substantively Consolidated)
                                              :
                    Defendant.                :
                                              :
------------------------------------------------------ :
                                              :
In re:                                        :
                                              :
BERNARD L. MADOFF                             :
                                              :
                    Debtor.                   :
------------------------------------------------------------x
```

---

**MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S**
**MOTION FOR AN ORDER UPHOLDING TRUSTEE'S**
**DETERMINATION DENYING CUSTOMER CLAIMS FOR AMOUNTS**
**LISTED ON LAST STATEMENT, AFFIRMING TRUSTEE'S**
**DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE OBJECTIONS**
**WITH RESPECT TO THE DETERMINATIONS RELATING TO NET EQUITY**

---

**LAX & NEVILLE, LLP**

Barry R. Lax, Esq.
Brian J. Neville, Esq.
Brian Maddox, Esq.
1412 Broadway, Suite 1407
New York, NY 10018
Tel:  (212) 696-1999

## Table of Contents

PRELIMINARY STATEMENT…………………………………………………………………….2

PROCEDURAL HISTORY………………………..…………………………………………..3

ARGUMENT……………………………………………………………………………………..5

I.  THE TRUSTEE'S DEFINITION OF "NET EQUITY" IS INCORRECT AS A
MATTER OF LAW AS A CUSTOMER'S "NET EQUITY" UNDER SIPA IS
THE VALUE OF THE SECURITIES REFLECTED IN THE CUSTOMER'S
NOVEMBER 30, 2008 BMLIS ACCOUNT STATEMENT……………………………..…5

A.  The Movants' View of "Net Equity" is Directly at Odds with SIPA………..……..5

B.  The Movants' View of "Net Equity" Runs Counter to SIPA's Legislative
History and Purpose……………………………………………………………..7

C.  The Leading Second Circuit Authority is Contrary to the Movants' Position……11

D.  The Movants Improperly Apply the Holdings of *New Times*……………………17

1.  The Holding of *New Times I* Refutes Movants "Cash-in/Cash-out"
Approach…………………………………………………………………17

2.  The Holding of *New Times II* Refutes Movants "Cash-in/Cash-out"
Approach…………………………………………………………………21

E.  Movants' Cash-in/Cash-out Approach Contradicts Its Prior Actions and
Initial Statements Regarding Madoff…………………………………………..23

II.  MOVANTS' PRECEDENT DOES NOT SUPPORT IGNORING THE STATUTORY
MANDATE………………………………………………………………………………28

A.  The Movants' Reliance Upon Non-SIPA Ponzi Scheme Precedent
Is Improper…………………………………………………………………..…28

B.  SIPC Advancements Are Made Prior to the *pro rata* Determination……………29

C.  The Precedent Utilized By The Movants Is Misplaced and Distinguishable……..30

D.  Reliance Upon *Ensminger* Is Misplaced…………………………………………32

III.  THE MOVANTS AVOIDANCE ARGUMENTS ARE SUPERFLUOUS AND IN

COMPLETE CONTRACTION TO THE EXPEDITED PROCEDURES REQUIRED
FOR SIPC ADVANCEMENTS…………………………………………………………33

IV.   TRUSTEE'S REQUEST TO EXPUNGE THE OBJECTIONS SHOULD BE
DENIED, BECAUSE THE TRUSTEE'S DETERMINATION LETTERS
ARE INADEQUATE AND UNSUBSTANTIATED…………………………………...36

CONCLUSION…..……………………………………………………………………………38

## Table of Authorities

### Cases

*Appleton v. First Nat'l Bank of Ohio*
    62 F.3d 791, 794 (6th Cir. 1995)……………………………………………..…8, 28

*Butner v. U.S.*
    440 U.S. 48, 55-56 (1979)………………………………………………...…….23

*Ct. Nat'l Bank v. Germain*
    503 U.S. 249, 253-254 (1992)……………………………………...……...………2

*Cunningham v. Brown*
    265 U.S. 1, 10-11(1924)…………………………………………...……………28

*Duncan v. Walker*
    533 U.S. 167, 174 (2001)…………………………………………………………..7

*Focht v. Athens (In re Old Napes, Sec., Inc.)*
    311 B.R. 607, (M.D. Fla 2002)……………………………………………28, 30

*In re Adler Coleman Clearing Corp.*
    247 B.R. 51, 62 n.2 (Bankr. S.D.N.Y. 1999)……………………………………5

*In re Enron Corp.*
    No. 01-16034, 2003 Bankr. LEXIS 2261 (Bankr. S.D.N.Y. Jan. 13, 2003)………….…37

*In re Donald Sheldon & Co., Inc.*,
    153 B.R. 661, 667 (Bankr.S.D.N.Y. 1993)…………………….……………………29-30

*In re First Street Sec. Corp.*
    34 B.R. 492, 497 (Bankr. S.D. Fla. 1983)………………………..……………………5

*In re Old Naples Sec., Inc.*
    311 B.R. 607, 616 (M.D. Fla. 2002)……………………………………………30

*In re New Times Sec. Servs.*
    371 F.3d 68, 86 (2d Cir. 2004)………………8, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 28, 30

*In re New Times Sec. Servs., Inc.*
    463 F.3d 125, 128 (2d Cir. 2006)………………………………………..21, 22, 23

*In re Oberweis Sec., Inc.*
    135 B.R. 842, 847 n.1 (Bankr.N.D. Ill. 1991)………………………………...…….16

*In re Tedlock Cattle Co.*
    552 F.2d 1351 (9th Cir. 1977)……………………………………………..……..31

*McKenny v. McGraw (In re Bell & Beckwith)*
    104 B.R. 852 (Bankr. N.D. Ohio 1989), *aff'd* 937 F.2d 1104 (6th Cir. 1991)………………..29

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*
    247 B.R. 51 (Bankr. S.D.N.Y. 199), *aff'd*, 236 B.R. 406 (S.D.N.Y. 2001)…………………32

*Oneale v. Thornton*
    6 Cranch 53, 68 (1810)……….………………………………………………………2

*Raleigh v. Ill. Dep't of Revenue*
    530 U.S. 15, 24-25 (2000)………………………………………………..……..23

*Rich v. NYSE*
    522 F.2d 153, 156 (2d Cir. 1975)…………………………………………..………………5

*SEC v. Byers*
    637 F.Supp.2d 166,182-83(S.D.N.Y. 2009)………………………………………....…31, 37

*SEC v. Stanford Int'l Bank, Ltd.*
    No. 3-09-0298-N (N.D. Tex), *aff'd in part, rev'd in part, remanded by*
    *Janvey v. Adams et.al.,* No. 09-10761 (5th Cir. Nov. 13, 2009)……………………....………30

*Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*
    533 F.2d 1314, 1318 n.5 (2d Cir. 1976)…………………………………………………8, 29

*SIPC v. Barbour*
    421 U.S. 412, 415, 95 S.Ct. 1733, 1736 (1975)……………...………………………...8, 29

*SIPC v. C.J. Wright & Co. (In re C.J. Wright & Co.)*
    162 B.R. 597 (Bankr. M.D. Fla. 1993)…………………………………..…………28, 30

*State St. Bank & Trust Co. v. Salovaara*
    326 F.3d 130, 139 (2d Cir. 2003)……………………………………………..…….7

*U.S.  v. Goldenberg*
    168 U.S. 95, 102-103 (1897)……………………………………………………2

*U.S.  v. Ron Pair Enter., Inc.*
    489 U.S. 235, 241-242 (1989)…………………………………….……………..2

2

*Visconsi v. Lehman Brothers, Inc.*
    244 Fed. Appx. 708 (6th Cir. 2007)……………………………………….……………31

## **Statutes**

Federal Declaratory Judgment Act, 28 U.S.C. § 2201……………………………………...……..4

11 U.S.C. §546(e)…………………………………………………………………………..35

15 U.S.C. § 78ccc(b)(4)(A)………………………………………………………………….……..24

15 U.S.C. § 78fff-1(a)………………………………………………………………………....3

15 U.S.C. § 78fff-2………………………………………………………………………9, 34

15 U.S.C. § 78lll(11)………………………………………...……………………………2, 5

NY. D.C.L §276……………………………………………………………………………34

## **Other Authorities**

Collier on Bankruptcy I-3007.01(3) (15th ed.)………………………………………………..37

D 922 Cong. Rec. H. 36326 (daily ed. Nov. 1, 1977)………………………………….…………9

Hearing on H.R. 8064 Before the Subcomm. on Consumer Protection and Finance
of the H. Comm. on Interstate and Foreign Commerce, 94th Cong. 63 (1975)…………..………9

Hearing on H.R. 8331 Before the Subcomm. on Consumer Protection and Finance
of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81 (1977)………………..9

H.R. Rep. No. 91-1613 (1970)……………………………………………………...……8, 28

H.R. Rep. No. 95-746 (1977)……...……………………………………………….....5, 9, 10

*How SIPC Protects You, available at http://www.sipc.orgpdf/SIPC_Brochure_revised020*
*422.pdf*………………………………………………………………………….…………24, 25

*New York Times DealBook,* Irving Picard, SIPC Trustee, and Stephen Harbeck,
SIPC President (May 6, 2009)…………………………………………………………...27

Quote Check of Fidelity Fund, *available at  http://finance.yahoo.com/q?s=FDLXX*...................19

S. Rep. No. 95-763, at 2 (1978)…………………………………………………………………10

SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat. 1636, 1648-50 (1970)…………………..8

SIPA § 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978)……………………………..….9

SIPC/SIFMA brochure *Understanding Your Brokerage Account Statements*, at 5,
*available at www.sipc.org*............................................................................................................25

*SIPC Annual Report*, at 21 (1973)……………………………………………….…………25

SIPC's Role In Maddoff-Of-All-Scams Could Save The Stock Market,
*available at StreetInsider.com*, December 16, 2008……………………………………………..27

SIPC's Series 500 Rules ("SIPC Rules"), 17 C.F.R. §§ 300.500-300.503………………....15, 30

Pursuant to this Court's Order Scheduling Adjudication of the "Net Equity" Issue, dated September 16, 2009, and in response to Irving H. Picard's ("Trustee"), trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), memorandum of law,[1] and the Securities Investor Protection Corporation's ("SIPC" and collectively with Trustee "Movants"), memorandum of law,[2] Mary Albanese, the Brow Family Partnership, Allan Goldstein, Laurence Kaye, Suzanne Kaye, Rose Less and Gordon Bennett ("Class Action Plaintiffs"), on behalf of themselves and the prospective Class[3] in *Less, et al. v. Picard, Trustee*, Adv. Pro. No. 09-1265 (BRL), and those individuals that have filed Objections to the Trustee's determination letters regarding their SIPC claims,[4] by and through

---

1    Memorandum of Law in Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying "Customer" Claims for Amounts Listed on Last Customer Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections With Respect To The Determinations Relating To Net Equity ("Trustee's Net Equity Memo")[Docket No. 525].

2    Memorandum of Law in Support of the Securities Investor Protection Corporation in Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying "Customer" Claims for Amounts Listed on Last Customer Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections With Respect To The Determinations Relating To Net Equity ("SIPC's Net Equity Memo")[Docket No. 519]. (collectively with Trustee's Net Equity Memo "Movants' Net Equity Memoranda").

3    The Class is defined as all persons and entities who: (i) maintained one or more customer accounts with Madoff as of December 11, 2008, the value of which is/are adversely affected by the Trustee's unlawful calculation of "net equity" in contravence of 15 U.S.C. § 78lll(11); and (ii) have suffered and will suffer damages thereby.    Excluded from the Class are the (i) Trustee, members of his immediate family and their legal representatives, heirs, successors, or assigns and any entity in which Defendant has or had a controlling interest; and (ii) Bernard L. Madoff, members of his immediate family and their legal representatives, heirs, successors, or assigns and any entity in which Bernard L. Madoff has or had a controlling interest, including their officers, directors, agents and employees.

4    Mary Albanese; Mary Albanese, as trustee for the Dominick Albanese Trust Acct B; William Jay Cohen, as Trustee for the William Jay Cohen Trustee Dated 11/14/89; Eleanor P. Cohen, as Trustee for the Eleanor P. Cohen Trustee dated 11/14/89; Jacob Davis; Fammad, LLC; Myron Feuer; Jerome Fox; Selma Fox; Robert Allen Greene; Julian Greene; Robert Allen Greene as Custodian; Bruce P. Hector MD; Howard Kamp; Bonnie Kansler; Matthew S. Kanlser; Marjorie Kleinman; Dale Kleinman; Elliot S. Kaye; Robert Kehlmann, as trustee for the Trust UW William Kehlmann U/A DTD 1/23/65;  Robert Kehlmann, as trustee for the Robert Kehlmann & Diana Tosto Kehlmann Living Trust U/A DTD 3/19/90; Robert Kehlmann, as trustee for the Trust FBO Ephraim Kehlmann U/A DTD 12/30/72; Donald Kent MD; Robert Korn, as Trustee for the Robert Korn Revocable Trust; Rose Less; Ruth Mechaneck; Harriet Meiss, as Trustee of the Harriet K. Meiss Trust; The Morse Family Foundation; Lanny Rose, as Trustee for the Lanny Rose Revocable Trust; Robert L. Schwartz, as trustee of the Robert L. Schwartz 2004 Revocable Trust; Elaine Schlessberg; Angelo Viola and Angelo Viola IRA; Allan Goldstein; and Rodger & Miriam Williams.  Counsel represents numerous other Madoff investors that, as of the submission of this memorandum,

1

the undersigned counsel, submit this memorandum of law and accompanying declarations in opposition.

## PRELIMINARY STATEMENT

"Net Equity" is explicitly defined by the Securities Investor Act ("SIPA"), 15 U.S.C. § 78lll(11), as the value of the customer's "security positions" in his account, less any margin balance, as of the date of the filing of the SIPC liquidation. Here, the value of the securities on a customer's November 30, 2008 BLMIS account statement is equal to that customer's "net equity" under SIPA. Despite the simplicity of the statutory language, the Movants have chosen to ignore and replace SIPA's definition of "net equity" with an unprecedented and unsupported "cash-in/cash-out" approach based upon a policy argument for fairness and unsubstantiated avoidance claims. In essence, the Movants seek to substitute their desired approach for managing broker-dealer insolvencies for the clearly defined method within SIPA. As the Supreme Court has said, "time and again [] courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Ct. Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992).[5]

Besides ignoring the actual language contained in the statute, the Movants concede that their current methodology deviates from their prior actions in other SIPC liquidations, misinterpret relevant precedent, rely on irrelevant precedent that does not address SIPA related Ponzi Schemes, and disregard the legislative history and intent of SIPA. Accordingly, and as more thoroughly discussed below, the "cash-in/cash-out" approach is unlawful, and the Movants

---

have not received their determination letters from the Trustee (collectively with the Class Action Plaintiffs and proposed Class "Claimants") and who join this memorandum.

　　5　　*See, e.g., U.S. v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241-242 (1989); *U.S. v. Goldenberg*, 168 U.S. 95, 102-103 (1897); *Oneale v. Thornton*, 6 Cranch 53, 68 (1810).

should be Ordered to utilize the statutorily mandated definition that a BLMIS customer's "net equity" claim is equal to the value of the securities positions on his November 30, 2008 account statement.

## PROCEDURAL HISTORY

On December 11, 2008, Madoff was arrested and the above-captioned liquidation proceeding was commenced, pursuant to SIPA. *See* December 11, 2008 Order, *Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Docket. No. 4]. On December 15, 2008, this Court appointed the Trustee and charged him with overseeing and administering the liquidation of BLMIS and processing BLMIS customer claims pursuant to SIPA. *Id*.; 15 U.S.C. 78fff-1(a) (2009).

On December 23, 2008, this Court issued an Order directing Trustee to disseminate and make available notice and claim forms to Madoff customers and advise Madoff customers of the claim-filing deadlines. *See* December 23, 2008 Order [Docket No. 12]. The December 23, 2008 Order further directs the Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's books and records." *Id.* at 5.

The December 23, 2008 Order also provides that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, and the reason therefore." *Id.* at 6 (emphasis added). In accordance with this directive, the Trustee began issuing formulaic letters ("Determination Letters") detailing the Trustee's calculation of the customers' "net equity" based upon the "amount of cash deposited by the customer into her BLMIS account, less

3

any amounts withdrawn from her BLMIS customer account, otherwise known as the 'cash-in/cash-out' approach." (Trustee's Net Equity Memo at pg. 6).

In response to the Trustee's and SIPC's position regarding the "cash-in/cash-out" approach, the Class Action Plaintiffs, on behalf of themselves and the Class, filed an Amended Class Action Complaint on June 23, 2009 seeking to obtain a declaratory judgment, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, that: (i) the Trustee's definition of "net equity" as deposits minus withdrawals is incorrect as a matter of law; (ii) a customer's "net equity" under SIPA is the value of the securities positions reflected in that customer's Madoff account(s) as of the SIPA filing date; (iii) the Amended Class Action Complaint be deemed a written statement of claim for all class members who fail to file their individual SIPC Customer Claim Forms prior to the Bar Date; (iv) the Amended Class Action Complaint is not a waiver of any Plaintiff's or prospective class member's right to a jury trial, nor may it be used by the Trustee to contest any Plaintiff or prospective class member's right to a jury trial; (v) the Amended Class Action Complaint does not confer jurisdiction over any prospective class member, nor may it be used by Trustee to assert jurisdiction over any prospective class member; (vi) the Trustee cease and desist from requiring the execution of a release as a condition precedent to the distribution of SIPC funds to a class member; and (vii) all releases executed by any class member in the Madoff liquidation be declared void. *Less, et al. v. Picard, Trustee*, Adv. Pro. No. 09-1265 (BRL) [Docket No. 3].

In response to the pending Class Action, other adversarial actions, and objections filed by other claimants, the Trustee moved this Court for a briefing schedule and hearing regarding the "net equity" issue.  This Court issued the September 16, 2009 Order detailing the briefing schedule and issues to be resolved.

4

## ARGUMENT

## I.

### THE TRUSTEE'S DEFINITION OF "NET EQUITY" IS INCORRECT AS A MATTER OF LAW AS A CUSTOMER'S "NET EQUITY" UNDER SIPA IS THE VALUE OF THE SECURITIES REFLECTED IN THE CUSTOMER'S NOVEMBER 30, 2008 BMLIS ACCOUNT STATEMENT

**A.**    **The Movants' View of**
       **"Net Equity" Is Directly At Odds with SIPA**

The Movants must not be allowed to engraft upon the SIPA regime a wholesale replacement of its statutory definition with an unprecedented and unsupportable "cash-in/cash-out" valuation methodology.  SIPA defines a customer's "net equity" claim as the value of the customer's "securities positions" in his account, less any amount the customer owes the debtor, as of the date of the filing of the SIPA liquidation:

> "The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date."[6]

15 U.S.C. § 78lll(11); *see also In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 n.2 (Bankr. S.D.N.Y. 1999) ("'Net equity' is calculated as the difference between what the debtor owes the

---

[6]    The "indebtedness" of the customer to the debtor refers to cash or securities owed to the debtor, which is most often in the context of a customer having borrowed from the debtor on margin. *See e.g.*, H.R. Rep. No. 95-746, at 21 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (noting that, under the 1970 statutory regime, when there were shortages in available securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *In re First Street Sec. Corp.*, 34 B.R. 492, 497 (Bankr. S.D. Fla. 1983) (offsetting against claim amount of indebtedness customer owed to the debtor where unauthorized stock purchase was funded in part by borrowing on margin).

customer and what the customer owes the debtor on the date the SIPA proceeding is filed."). The trustee is required to calculate BLMIS customers' net equity in accordance with SIPA. All BLMIS customers received written trade confirmations, and monthly account statements, reflecting the customer's "securities positions" in real securities at publicly verifiable prices.[7] SIPA explicitly provides that the customer's "net equity" is the amount "owed by the debtor to [the] customer," determined by calculating what the value of the customer's "securities positions" would have been had those positions been liquidated on the filing date.

The Movants contend that because the securities were never purchased, or allegedly could not have been purchased, that the plain language of SIPA does not apply. (*See* Trustee's Net Equity Memo at pg. 3 and SIPC's Net Equity Memo at pg.7). Such an assertion is wrong. SIPA necessarily assumes – and, as discussed below, the legislative history of SIPA expressly contemplates – that the "securities positions" reflected in the customer's statements may reflect securities that were never actually purchased. This has no bearing on the fact that the broker "owes" the customer the value of those "securities positions." Under SIPA the only permitted offset to the value of the customer's "securities positions" is any indebtedness of the customer to the debtor, such as any margin loans. Therefore, a BLMIS customer's "net equity" is the value of the "real" securities identified in the customer's November 30, 2008 confirmations and account statements.

---

7    Indeed, each monthly account statement Madoff customers received included a specific section entitled "Security Positions," which set forth (1) the list of securities held in the account at the end of the calendar month, (2) the number of shares of each such security, (3) the price per share of each security position, and (4) the total market value of all the security positions (for stocks and options). *See* Declaration of Brian Maddox ("Maddox Decl.") ¶ 4.

By contrast, the Movants' approach to this critical, threshold issue for every Madoff customer has no textual support in the statute.[8]  The movants interpretation of "net equity" is completely inconsistent with SIPA's express language, and renders the SIPA "net equity" provision entirely superfluous, in contravention of firmly established canons of statutory construction.[9]

## B.    The Movants' View of "Net Equity" Runs Counter to SIPA's Legislative History and Purpose

The Movants' approach is inconsistent with the legislative history of the statute.  The paramount concern of the statute, as made clear by its title – the "Securities Investor Protection Act" – and its legislative history, is to protect investors by meeting the legitimate expectations of broker-dealer customers.  Such legitimate expectations almost always begin - and end - with what customers see in their written confirmations and monthly account statements.[10]  These information sources gave customers the legitimate expectation that their accounts, in fact, held the securities reflected therein at the prices and values delineated on the customers' confirmations.  By disregarding the plain language of the statute, the Trustee and SIPC have wholly ignored those legitimate expectations, and, in so doing, have acted in direct contravention of the purpose of the statute.

---

8    Movants's position also runs counter to what any rational investor would believe he is "owed" by his broker-dealer. Certainly, no such investor could conceive that once he has withdrawn over the life of his investment account more money than he had deposited, her broker-dealer no longer "owed" him anything.  *See* Section I., D., 1 *infra*.

9    *See State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 139 (2d Cir. 2003) ("It is well-settled that courts should avoid statutory interpretations that render provisions superfluous: 'It is our duty to give effect, if possible, to every clause and word of a statute.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

10    *See* Section I., D., 1 *infra* for a detail analysis of customers' legitimate expectation.

The Trustee recognizes that this is law:

"Under this rule, 'whether a claim is treated as one for securities or cash depends not on what is actually in the customer's account but on what the customer has been told by the debtor in written confirmations.' The Customer's 'legitimate expectations' are the focus of this rule, which makes the cash/securities determination largely dependent upon the receipt of written confirmations."

(*See* Trustee's Net Equity Memo at pg. 25 (*citing In re New Times Sec. Servs.*, 371 F.3d 68, 86 (2d Cir. 2004) (hereafter "*New Times I*").

SIPA was enacted in 1970 to protect investors and maintain their confidence in the financial markets. H.R. Rep. No. 91-1613, at 3-4 (1970) ("This legislation [SIPA] . . . is designed to effect two aims. It will establish immediately a substantial reserve fund which will provide protection to customers of broker-dealers . . . This will reinforce the confidence that investors have in the U.S securities markets. In addition, [it] will provide for a strengthening of the financial responsibilities of broker-dealers.").[11] Under its original statutory scheme, SIPA aimed to do this by satisfying customers' "net equity" securities claims with actual securities, but only if the debtor had securities of the appropriate class and kind available in sufficient quantities to satisfy customers' claims.[12] Otherwise, customers would receive the cash equivalents of the filing date value of the securities purportedly held.[13]

---

[11]    *See In re New Times*, 371 F.3d at 87 ("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 794 (6th Cir. 1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[] and upgrade the financial responsibility requirements for registered brokers and dealers.'") (citing *SIPC v. Barbour*, 421 U.S. 412, 415, 95 S.Ct. 1733, 1736 (1975)); *Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1318 n.5 (2d Cir. 1976) (same).

[12]    SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat. 1636, 1648-50 (1970); H.R. Rep. No. 95-746, at 39 (statement of SIPC Chairman Hugh F. Owens). Under its original enactment, SIPA defined "net equity," in relevant part, as "the sum which would have been owing by the debtor to the customer had the debtor liquidated, by sale or purchase on the filing date, all other securities and contractual commitments of the customer," minus any indebtedness of the customer to the debtor. SIPA § 6(c)(2)(A)(iv), Pub. L. No. 91-598, 84 Stat. at 1648.

[13]    SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat. at 1648-50; H.R. Rep. No. 95-746, at 41 (statement of SIPC Chairman Hugh F. Owens).

8

In 1978, Congress proposed amendments to SIPA to "satisfy more adequately customer expectations."[14]  As Congressman Robert Eckhardt commented at the time, "[o]ne of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments], is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency." *Id.*[15]  Those expectations were that the customers owned actual securities, as reflected on their statements, which would be returned to them, whenever possible, "in the form they existed on the filing date."  H.R. Rep. No. 95-746, at 21.  Thus, SIPA was amended to provide that "[t]he trustee shall, to the extent that securities can be purchased in a fair and orderly market, purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities." 15 U.S.C. § 78fff-2(d); SIPA § 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978).

Perhaps most importantly, the SIPA legislative history confirms Congress's intention that broker-dealer customers have valid "net equity" claims even when the securities reflected on their confirmations and account statements were never purchased.

---

14    D 922 Cong. Rec. H. 36326 (daily ed. Nov. 1, 1977) (statement of Representative Robert C. Eckhardt).

15    *See also* Hearing on H.R. 8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th Cong. 63 (1975) ("The basic framework of the 1970 Act in regard to satisfaction of customers' claims should be modified to better meet the legitimate expectations of customers.") (report to the SIPC Board of Directors by the Special Task Force to consider possible amendments to SIPA); Hearing on H.R. 8331 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81 (1977) ("The proposed [1978] amendments carry out the Task Force recommendations and are designed to make the Act more responsive to the reasonable expectations of investors.") (statement of SIPC Chairman Hugh F. Owens); Hearing on H.R. 8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th Cong. 161-62 ("[T]he principal purpose of these amendments is to meet more nearly the reasonable expectations of brokerage firm customers.") (statement of SEC Commissioner Philip A. Loomis, Jr.).

9

Both the Senate and House reports on the 1978 amendments clearly reflect that a customer's net equity claim is not dependent on whether the securities were actually purchased by the broker-dealer:

> "Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations . . . ."

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

> "A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date."

H.R. Rep. No. 95-746, at 21 (emphasis added).

Neither the 1970 statute, nor the 1978 amendments, nor the legislative history of SIPA provides any support for the Trustee/SIPC "cash-in/cash-out" net equity theory.[16] Rather, it is the straightforward and statutorily based "securities positions" definition of "net equity," and not the Trustee/SIPC "cash-in/cash-out" theory, that is in full accord with SIPA's purpose. That "securities positions" definition gives broker-dealer customers the critical comfort that SIPA was

---

16    As then-SIPC Chairman Hugh F. Owens further explained by way of a hypothetical: "[C]ustomers generally expect to receive what is in their accounts when the member stops doing business. If John Q. Investor has 100 fully-paid shares of IBM and a credit balance of $200 in his account, he expects to receive from the trustee a stock certificate for 100 shares of IBM and a check for $200. But in many instances that has not always been possible because securities have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen." H.R. Rep. No. 95-746, at 39 (explaining that where John Q. Investor only receives the filing date cash value of his IBM securities, he will fail to realize any rise in the IBM stock price since that time). Implicit in Owens's hypothetical is the premise that "John Q. Investor" has a "valid claim" for the number of shares of IBM stock identified in his account statement as of the filing date, even when the brokerage had "never purchased" the stock for him. Nothing in Owens's hypothetical suggests that John Q. Investor's claim should be reduced to the extent he has withdrawn funds from the account over time.

10

intended to provide:  knowledge that the securities positions in their accounts – the values of which are publicly verifiable – are protected by SIPC up to $500,000 per account.  Importantly, this is so regardless of whether the securities had ever, in fact, been purchased, and regardless of whether, over the life of the account, the customer had taken out more money than she had deposited.

**C.    The Leading Second Circuit Authority
Is Contrary to The Movants' Position**

SIPC faced very similar circumstances in the New Times Securities Services, Inc. ("*New Times*") liquidation.  *See New Times I*, 371 F.3d at 71.  There, the *New Times* Trustee's position on "net equity" was in full accord with SIPA, and thus directly contrary to the Madoff Trustee's and SIPC's position in this case.  Specifically, with respect to any claims that were based on confirmations and account statements reflecting securities positions in "real" securities that could have been purchased (i.e. securities that actually existed on the public market and whose valuations were objectively and publicly verifiable by the customers), the *New Times* Trustee allowed all such "net equity" claims to the full extent of the filing date valuations of those securities, even though none of the securities identified in those records had ever, in fact, been purchased by the broker-dealer.  *See New Times I*, 371 F.3d at 71-72.  Here, the Madoff customers are in precisely the same position as the "real" securities claimants in *New Times* and should be treated no differently.

As with BLMIS and Madoff, *New Times* and its principal, William Goren, defrauded scores of investors by providing them with confirmations and account statements reflecting purported securities investments made on their behalf when, in fact, no such investments had been made and their money had, instead, been misappropriated for other purposes.  Two of the

11

investment opportunities Goren purported to offer were:  (1) money-market funds that were entirely fictitious (the "Fictitious New Age Funds"); and (2) mutual funds that were entirely real, such as those offered by The Vanguard Group and Putnam Investments (the "Real Securities"). *See New Times I*, 371 F.3d at 71-72.  Goren's was "a classic Ponzi scheme," *Id.* at 72 n.2, wherein new investors' money was used to pay earlier investors.

Approximately 900 customers filed claims in the *New Times* liquidation:  726 for whom the "Real Securities" were purportedly purchased; 174 for whom the "Fictitious New Age Funds" were purportedly purchased.  *Id.* Consistent with SIPA and its legislative history, the *New Times* Trustee appropriately applied SIPA's net equity definition to the "Real Securities" customers' claims – meaning he paid them according to the actual value of those securities positions as of the date of the liquidation filing.[17]  When challenged by "Fictitious New Age Funds" customers who had objected that they had not received the same treatment, SIPC and the

---

17      As SIPC President Stephen Harbeck explained to Judge Bernstein in the New Times case, if broker-dealer customers have been led to believe that "real, existing" securities had been purchased for their accounts, then those customers are entitled to get the full value of their securities positions as of the filing date even if that value represents a substantial increase from the purported purchase price of the securities and even if the securities in question had never been purchased:

MR. HARBECK:  Even if they're not there.

THE COURT:  Even if they're not there.

MR. HARBECK:  Correct.

THE COURT:  In other words, if the money was diverted, converted--

MR. HARBECK:  And the securities were never purchased.

THE COURT:  Okay.

MR. HARBECK:  And, if those positions triple, we will gladly give the people their securities positions.

Hearing Transcript at 37-39, *In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (Bankr.E.D.N.Y. 2000) (No. 00-CV-8178) (emphasis added).

12

New Times Trustee (with the apparent concurrence of the Securities Exchange Commission

"SEC") vigorously defended their approach with respect to the "Real Securities" customers'

claims:

- **SEC**:  "[O]ur view [is] that when possible, SIPA should be interpreted consistently with a customer's legitimate expectations based on confirmations and account statements."[18]

- **SIPC and New Times Trustee**:  "In every case [of a 'Real Security' customer], the Trustee has been able to identify the actual mutual fund in question by cross-checking the information supplied by Goren on the customer statements, including share price information, with publicly available information and then been able to purchase that security."[19]

- **SIPC and New Times Trustee**:  Where customers' statements reflected securities positions in closed mutual funds, "the Trustee properly gave the customers cash equal to the filing date values of the closed mutual funds."[20]

- **SIPC and New Times Trustee**:  "In those cases [that concern the payment of interest/dividends on bona fide mutual funds] the claimants had an objectively legitimate expectation of receiving interest/dividends *because the security in question had actually earned them*.  Here, the bogus mutual fund [the Fictitious New Age Fund] was never organized as a mutual fund and had no assets or investments."[21]

SIPC and the *New Times* Trustee also valued claims by "Real Securities" customers in

accordance with SIPA's definition of "net equity," even when those claims included mutual fund

shares purportedly purchased through "dividend reinvestments," notwithstanding that no such

---

18    Br. of the SEC, Amicus Curiae, In Partial Support of the Position of Appellants and In Partial Support of the Position of Appellees ("SEC Amicus Curiae Brief") at 13, New Times I (No. 02-6166).

19    Joint Mem. of Law in Support of Trustee's Motion for an Order Upholding the Trustee's Determinations With Respect to Claims Filed for Investments in Non-Existent Money Market Funds and Expunging Objections to Those Determinations ("Joint Mem. in Support of Order Upholding Determinations") at 26, *SEC v. Goren*, 206 F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-CV-970).

20    Reply Mem. in Further Support of Trustee's Motion for Order Upholding Determinations at 20, *SEC v. Goren*, 206 F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-CV-970).

21    Br. for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc. and Securities Investor Protection Corporation ("Br. for New Times Trustee and SIPC") at 38, *New Times I* (No. 02-6166) (emphasis added).

13

purchases had, in fact, taken place (precisely because there had not, in fact, been any "dividends"

to "reinvest"):

- "[I]nvestors who believed that their accounts held shares of mutual funds that actually existed (but were never purchased for their accounts) are having their claims (both as to shares of mutual funds never purchased by Goren *and shares shown in customer statements as purchased through dividend reinvestment)* satisfied by the Trustee up to the statutory maximum of $500,000."[22]

- "[W]hereas the Trustee has disallowed that portion of the claim of [the Fictitious New Age Funds] investors representing shares of [the Fictitious New Age Funds] purchased through dividend reinvestment, *the Trustee has allowed that portion of the mutual fund investors' claims [i.e., "Real Securities" investors' claims] as represents shares of such mutual funds purchased by them through dividend reinvestment.*"[23]

The *New Times* Trustee, SIPC and the SEC were not alone in their view that SIPA provides

that "real" securities claimants have "net equity" claims based on the value of their "securities

positions" as of the filing date, notwithstanding that those securities had never been purchased by

the broker-dealer.  Two separate panels of the Second Circuit have also considered this issue in

the context of the *New Times* liquidation and similarly endorsed according "real" securities

claimants more favorable treatment than "fictitious" securities claimants.

*New Times I* involved two basic issues:  (1) should "fictitious" securities claimants be

treated as (a) "cash" claimants who could receive a maximum of up to $100,000 in SIPC

advances, or (b) "securities" claimants who could receive up to $500,000 in SIPC advances; and

(2) how should "fictitious" securities claimants' (*not* "real" securities claimants') "net equity" be

calculated.  *See New Times I*, 371 F.3d at 71.  Before answering these two questions, the court

---

22    Claimants' Joint Mem. of Law in Opposition to Joint Motion of Trustee and SIPC for Order Upholding Determinations at 3, *SEC v. Goren*, 206 F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-CV-970) (emphasis added).
23    Limited Objection [of Myrna K. Jacobs] to Trustee's Determination of Claim at 6 n.4, *SEC v. Goren*, 206 F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-CV-970) (emphasis added).

14

took note of the disparate treatment the New Times Trustee had afforded the "real" and

"fictitious" securities claimants, and why he had done so:

> "Meanwhile, investors who were misled by Goren to believe that they were
> investing in mutual funds that in reality existed were treated much more
> favorably.  Although they were not actually invested in those real funds – because
> Goren never executed the transactions – the information that these claimants
> received on their account statements 'mirrored what would have happened had the
> given transaction been executed.' [Br. for New Times Trustee and SIPC] at 7 n.6.
> As a result, the Trustee deemed those customers' claims to be 'securities claims'
> eligible to receive up to $500,000 in SIPC advances.  *Id.*  The Trustee indicates
> that this disparate treatment was justified because he could purchase real, existing
> securities to satisfy such securities claims.  *Id.*  Furthermore, the Trustee notes
> that, if they were checking on their mutual funds, the 'securities claimants,' in
> contrast to the 'cash claimants' bringing this appeal, could have confirmed the
> existence of those funds and tracked the funds' performance against Goren's
> account statements.  *Id.*"[24]

Ultimately, the court concluded, with the benefit of the SEC's views, that (1) a

customer's "legitimate expectations," as evidenced by the written confirmations she receives, are

paramount, and therefore the "fictitious" securities claimants should have been treated as

"securities" claimants who could recover up to $500,000 in SIPC advances, but that (2)

"fictitious" securities – which were non-existent and therefore had no publicly verifiable market

value and could not be purchased anywhere – would have to be valued simply based on the

amount of money those "fictitious" securities customers had initially provided to the debtor.  *Id*.

at 86-88.

As to the first conclusion, the Second Circuit agreed with the SEC that it is a customer's

legitimate expectations based on written confirmations and account statements that control how a

"net equity" claim is determined.  In doing so, the court considered, *inter alia*, SIPC's Series 500

Rules ("SIPC Rules"), 17 C.F.R. §§ 300.500-300.503, which were promulgated by SIPC and

---

24    *See New Times I*, 371 F.3d at 74.

approved by the SEC, and which confirm the critical importance of written confirmations. The court explained that "the premise underlying the Series 500 Rules [is] that a customer's 'legitimate expectations,' based on written confirmations of transactions, ought to be protected." *New Times I*, 371 F.3d at 87. Although not determinative of the issue facing the court, it nonetheless found the SIPC Rules supportive of and consistent with its holding because, "[u]nder the Series 500 Rules, whether a claim is treated as one for securities or cash depends not on what is *actually* in the customer's account but on what the customer has been told by the debtor in written confirmations." *Id.* at 86 (emphasis in original).[25]

With respect to the valuation question, the SEC argued to the Second Circuit that the "net equity" of "fictitious" securities claimants should equal the amount of money invested minus any withdrawals, reasoning that, although "net equity" is equal to the sum that the debtor would have owed the customer had the customer liquidated his or her securities positions on the filing date, "a *fictitious* security cannot be 'liquidated.'" SEC Amicus Curiae Brief at 15 (emphasis added). Accordingly, the values ascribed to such "fictitious" securities on customers' account statements would "necessarily have no relation to reality" because they would be merely "subject to the whim of the broker-dealer who makes up fictitious values for securities and dividends." *Id.* at 16-17. The Second Circuit again agreed, finding that basing customer recoveries on "fictitious amounts in the firm's books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality." *New Times I*, 371 F.3d at 88 (*quoting* SEC Amicus Curiae Brief at 16).

---

25      *See also In re Oberweis Sec., Inc.*, 135 B.R. 842, 847 n.1 (Bankr.N.D. Ill. 1991) ("The court agrees with the trustee's argument that Congress did not intend to treat customers without confirmations [in a SIPA liquidation] the same as those with confirmations; that customers with confirmations have a legitimate expectation of receiving securities, but customers without confirmations do not have the same expectation.").

In short, under *New Times I*, it is only where the "securities positions" reflected on the confirmations and account statements have "no relation to reality" – because they are not objectively and publicly verifiable or capable of replacement – that a "cash-in/cash-out" valuation methodology is the only reasonable proxy for that customer's legitimate expectations. Contrary to the Trustee and SIPC's assertion otherwise, that is obviously not the situation for Madoff customers because the securities listed on their account statements were S & P 100 components and were closely tracked by many Madoff customers.

**D.     The Movants Improperly Apply The Holdings Of *New Times***

       **1.     The Holding of *New Times I* Refutes
            Movants "Cash-in/Cash-out" Approach**

The Movants' interpertation of *New Times I* raises the bar for creativity. Confronted with law that refutes their claims, Movants attempt to turn this precedent on its head and claim that the holding of the case supports their interpretation of "net equity." (*See* Trustee's Net Equity Memo at pg. 40, and SIPC's Net Equity Memo at pgs. 22-24). Movants inextricably assert that the customer account statements in *New Times I* reflecting the purchase, sale, interest and dividends of a completely non-existent mutual fund, are the factual and functional equivalent of the Madoff customer account statements that reflect actual tangible securities (Trustee's Net Equity Memo at pg. 41-43).

The Trustee recognizes the applicable holding of *New Times I*, which states, "[i]t is true that for claimants who believe that they had invested in 'real' mutual funds in *New Times*, the trustee calculated the net equity based upon the 'earnings' on those investments as represented on their customer statements" (Trustee's Net Equity Memo at pg. 41). Yet, in the very next sentence the Trustee claims that the *New Times* victims are far different than the Madoff victims,

17

because the *New Time* victims "were defrauded" of "legitimate securities that they ordered and paid for [that] were never actually purchased." *Id*.   The Trustee's attempt to distinguish the victims fails even the most simplistic of scrutiny.   Madoff's victims legitimately believed that the securities in their accounts were traded or purchased and sold, even though the securities "were never actually purchased."   Decades of income tax returns and tax payments for trading profits were levied upon BLMIS's investor victims, because they believed that the securities reflected on their Madoff account statements were actually purchased and sold on the dates listed and at prices matching those reported by the securities exchanges.   Accordingly, Trustee is required to base the Madoff customers' "legitimate expectations" those BLMIS accounts statements.

Instead, Trustee attempts to draw a distinction based upon the second holding in *New Times I*, where the court allowed SIPC to limit the advances to customers who purchased "fictions securities" to the cash value of their initial investments, when there were no "real" securities to base a market price, a sale price, or any re-investment prices on.   Understandably in that circumstance, where there were no actual securities, there was no legitimate customer expectation.   This is most certainly not the case with the securities reflected on the BLMIS accounts statements.   Every BLMIS customer received account statements that detailed the name and price of the security they legitimately believed that Madoff purchased or sold on their behalf. Over the course of a customer's relationship with Madoff, some of which lasted in excess of 20 years, customers or their accountants tracked the purchases and sales in their account down to the precise penny[26] based upon account statements they received.[27]   The Trustee inexplicably argues

---

26      *See* Maddox Decl.  ¶ 5.

18

that the Madoff victims have no legitimate expectation to the gains reflected in the account statements and that the results offered by Madoff could not be replicated (See Trustee's Net Equity Memo at pgs. 19 and 37).

In support of this assertion, the Trustee relies upon the Declaration of Joseph Looby ("Looby Declaration").  None of Madoff's victims have been provided with an opportunity to review the evidence that allegedly supports Mr. Looby's claims.  Mr. Looby's untested claims concerning the impossibility of the trading volume[28] and unverified allegations that there were insufficient "put and/or call options contracts available" to accomplish the aggregate split-strike conversion strategy[29] on behalf of the entire universe of Madoff's victims is simply irrelevant when evaluating the "legitimate expectation" of the individual investor.  As *New Times I* held, it is the individual "customer's 'legitimate expectations,' based on written confirmations of transactions, [that] ought to be protected" *New Times I*, 371 F.3d at 87.  Specifically, it is the "[customer] confirmations and account statements reflecting ***his*** securities . . . and showing that ***he*** holds the securities in ***his*** account. . . [that allow] ***his*** claim [for] . . . SIPC protection up to

---

27      The Trustee's Brief alleges that one money market fund, Fidelity Spartan U.S. Treasury Money Market Fund ("Fidelity Fund") did not offer participation from 2005 onwards and that allegedly some customer resources were "purportedly invested through BLMIS" in that fund.  (*See* Declaration of Joseph Looby in Support of Trustee's Net Equity Motion ("Looby Declaration"), at ¶ 57; *see also* Trustee's Brief at pg. 41).  The customer reviewing his or her customer statement that reflected positions in the Fidelity Fund would have no way of knowing that the Fidelity Fund was not open for participation without calling Fidelity to confirm this fact.  To the contrary, a quote check of the Fidelity Fund through Yahoo Finance provides a quote and performance history without any indication that the fund is closed for new investments, available at http://finance.yahoo.com/q?s=FDLXX (last viewed November 13, 2009).

Trustee further alleges that certain investments on the customer confirmations where purported outside the exchanges low/high ranges for that date.  *Id.*  Claimants have no way of verifying these facts, and the Trustee did not divulge the amount allegedly invested in those securities allegedly purchased outside the low/high ranges.  It goes without saying that these isolated and extremely limited instances of inaccuracy stand in stark contrast to the thousands of routine trades that fell within the high/low, and thus they should not eviscerate the Madoff Victims' reasonable reliance upon the confirmations received.  Nor does it eliminate the "legitimate expectations" of the Madoff Victims, especially in light of the fact that neither SIPC nor the SEC discovered these very same facts during the actual Madoff Ponzi Scheme.

28      *See* Looby Declaration, ¶¶ 101-104.
29      *See* Looby Declaration, ¶ 100.

19

$500,000" *Id.* (quoting SEC *Amicus Curiae* Brief at 12-13) (emphasis added).   Thus, it is the individual customer's expectation that sets the standard—not the aggregate of all of the brokerage firm's accounts.   The Movants' proposal places an impossible expectation upon the customer, because it seeks to require the customer to evaluate not just their own accounts, but those of every other investor with their broker-dealer.   Such a proposition was never contemplated under SIPA, and is simply not possible as a matter of law, because the customers cannot access to this type of information.[30]

In order to determine the scope and breadth of BLMIS's Ponzi Scheme, Trustee and/or his counsel allegedly reviewed the entirety of the "books and records" of BLMIS, issued at least seven subpoenas to third parties, reviewed six years of Depository Trust & Clearing Corporation ("DTCC") records, and hired at least one expert to review and prepare a report based upon those records.[31]   Apparently, the Movants seek to require that every broker-dealer customer conduct a similar on-going analysis to determine the accuracy of their statements in order to establish their "legitimate expectations."[32]   Obviously, that is not what Congress intended with the passage of SIPA.

Furthermore, Movants' position regarding the purported lack of trading and/or put or call options fails to address the fact that the market could have supported the individual transactions

---

30     The Securities Exchange Commission has access to this information, and apparently, the Movants seek to impose upon the customer a requirement that SEC itself could not complete.

31     *See* Looby Declaration ¶¶ 81-84.   Again, the Trustee steadfastly refuses to release this information, or released a report prepared by Mr. Looby.

32     In *New Times I*:

"We note that SIPC's approach does perhaps promote an arguably laudable policy goal-encouraging investors to research and monitor their investments (and their brokers) with greater care. This goal of greater investor vigilance, however, is not emphasized in the legislative history of SIPA. Instead, as outlined supra at [26-27], the drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers. We find the SEC's interpretation more in line with the goals of the statute and with the legislators' intent in introducing the securities/cash distinction in section 9(a)(1)." *New Times I*, 371 F.3d at 88.

reflected on any one of the individual's BLMIS customer statements.  As stated above, the customer's legitimate expectation is based upon his own account statement and the transactions reflected therein.  The Movants have not, because they cannot, assert that the transactions reflected upon the individual's BLMIS account could not have occurred.  Thus, the individual BLMIS customer's reliance upon said statements was justifiable.[33]

Movants further attempt to distinguish the "Real Securities" holding in *New Times I* by asserting that the profits advanced in that case were due, because the customer's had sufficient funds to make the initial purchase of "Real Securities" (*See* Trustee's Net Equity Memo at pg. 43).  The Movants' alleged distinction insinuates that if the perpetrator of the Ponzi Scheme only effectuates the fraud via an initial fraudulent investment in a "Real Security," that customer is entitled to their expected profits; however, if the perpetrator repeats the fraud, or the fraud grows to a scale that taxes SIPC's ability to cover the losses, the customer's legitimate expectation evaporates at the whim of SIPC.  Such a reading of *New Times I* is beyond belief.

## 2. The Holding of *New Times II* Refutes Movants "Cash-in/Cash-out" Approach

Two years after *New Times I*, a different Second Circuit panel considered related issues in the New Times liquidation and expressed the very same views regarding the importance of a customer's legitimate expectations under SIPA: "It is a customer's legitimate expectations on the filing date . . . that determines the availability, nature, and extent of customer relief under SIPA." *In re New Times Sec. Servs., Inc.*, 463 F.3d 125, 128 (2d Cir. 2006) ("*New Times II*").  *New*

---

33    The legitimate expectations of Norman Plotnick and Yetta Goldman are reflected in their Affidavit in support of this Memorandum of Law.  Neither Mr. Plotnick nor Ms. Goldman is a client of the undersigned counsel.  They are represented pro bono by Irving E. Walker, Esquire from the Baltimore office of Cole, Schotz, Meisel, Forman & Leonard, P.A.

*Times II* concerned claim determination objections brought by purchasers of a third type of instrument sold by Goren: fraudulent promissory notes. Those promissory note purchasers were challenging the trustee's position that they, as noteholders, did not qualify as "customers" under SIPA. Of particular relevance to this Proceeding is SIPC's repeated statement that customers' legitimate expectations control even when no securities were ever purchased:

> "[R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), *even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase.* . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates."

Br. of Appellant SIPC at 23-24 (citing *New Times I*) (emphasis added), *New Times II*, (No. 05-5527).

As the court in *New Times II* explained, it is only in the context of "fictitious" securities claims that the "cash-in/cash-out" valuation methodology makes sense:

> "*Because there were no such securities*, and it was therefore impossible to reimburse customers with the actual securities or their market value on the filing date (the usual remedies when customers hold specific securities), the [*New Times I* Court] determined that the securities should be valued according to the amount of the initial investment. The court declined to base the recovery on the rosy account statements telling customers how well the <u>imaginary</u> securities were doing, because treating the fictitious paper profits as within the ambit of the customers' 'legitimate expectations' would lead to the absurdity of 'duped' investors reaping windfalls as a result of fraudulent promises made on <u>fake</u> securities. . . . The court looked to the initial investment as the measure for reimbursement because the initial investment amount was the best proxy for the customers' legitimate expectations."

*New Times II*, 463 F.3d at 129-30 (citations omitted) (emphasis added).

22

The "cash-in/cash-out" valuation methodology employed in *New Times I* with respect to "fictitious" securities has no place in this instance, where the BMLIS customers' confirmations and account statements reflected "real," well-known and publicly verifiable securities. Because the prices and values ascribed to the "securities positions" on those records "mirrored what would have happened had the given transaction been executed," Br. for *New Times* Trustee and SIPC at 7 n.6, the liquidation filing date value of those "securities positions" is the "best proxy for the customers' legitimate expectations." *New Times II*, 463 F.3d at 130.

**E.    Movants' Cash-in/Cash-out Approach Contradicts
Its Prior Actions and Initial Statements Regarding Madoff**

Movants in this liquidation seek to ignore SIPA and replace it with an entirely different approach to determining customers' net equity claim; notwithstanding the fact that the Madoff customers consistently received written confirmations and account statements reflecting purchases and holdings of "real securities." Movants' rational for this departure from their past practices and statements to the contrary is that "cash-in/cash-out" approach is the most fair and equitable method.[34] Equity cannot be the basis for disregarding the law or the denying the plain meaning of the statute. *See Butner v. U.S.*, 440 U.S. 48, 55-56 (1979); *see also Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 24-25 (2000). Neither SIPC, nor Trustee, nor anyone else, has the authority to replace Congress' judgment with their own on the issue of what constitutes a customer's "net equity" claim. In fact, Congress explicitly prohibited SIPC from doing so:

> "SIPC shall have the power . . . to adopt, amend and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to . . . the definition of terms in this chapter, *other than those terms for which a definition is provided in section 78lll of this title*."

---

34    *See* Trustee's Net Equity Brief at 31.

23

15 U.S.C. § 78ccc(b)(4)(A) (emphasis added).[35]

Additionally, the Movants' "zero-sum game" position is wrong. SIPA was enacted to specifically deal with insolvent or failed broker-dealers, and when properly applied, the advances of up to $500,000 to one customer has no effect upon the sum advanced to another customer. It is the Trustee's "cash-in/cash-out" approach that subjectively subrogates older longer-term investors to newer investors. Trustee's assertion that the "cash-in/cash-out" approach is the most equitable solution is simply false and has been rejected by thousands of Madoff victims.

In the name of "fairness" it seems unfathomable that the Trustee and SIPC could ever refer to any Madoff Victim as a "net winner." (*See* Trustee's Brief at 27). Yet, Trustee in an attempt to justify the unconscionable position of denying Madoff Victims the protection they so rightly deserve, chose this terminology to cast even the most innocent Madoff Victim as someone that benefited from the Madoff Ponzi Scheme. Thus, even if a Madoff Victim over the course of 20 years received one dollar more than their principal, even though the disbursements may have been mandatory based upon the applicable retirement account laws or simply disbursements to cover the income taxes levied on their "fictions profits," they became "net winners" in the eyes of the Trustee and SIPC when they found out that their entire investment portfolio disappeared overnight. Such a description is clearly not within the letter of SIPA, nor the spirit of a statute enacted to return investor confidence to the capital markets.

---

35    Ironically, SIPC publications have underscored the fact that SIPA protection is unalterable:

"NO PERSON MAY, BY ANY REPRESENTATION, INTERPRETATION, OR OTHERWISE, AFFECT THE EXTENT OF THE COVERAGE PROVIDED CUSTOMERS' ACCOUNTS BY THE ACT"

How SIPC Protects You, Foreword (Oct. 1994, 7th ed.) (Bold and Uppercase in original).

The Movants' approach is not only contrary to SIPA, but it also runs completely counter to the many statements SIPC itself has consistently published throughout its 39-year history explaining what a customer's "net equity" claim is, which statements have always been faithful to SIPA:

- "In the unlikely event your brokerage firm fails, you will need to prove that *cash and/or securities are owed to you. This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement*." *See* SIPC/SIFMA brochure *Understanding Your Brokerage Account Statements*, at 5, *available at* www.sipc.org (emphasis added);

- "How is the amount of a customer's claim determined? The amount of the customer's claim, excluding any securities registered in his name and returned to him, is called his 'net equity.' *The net equity of a customer's account is determined by adding the total value of cash and securities the firm owes the customer and subtracting the total value of cash and securities the customer owes the firm.*" *See How SIPC Protects You*, at 14, *available at http://www.sipc.org/pdf/SIPC_Brochure_revised 020422.pdf* (emphasis added);

- "*A customer's 'net equity' is, in general, what the broker owes the customer less what the customer owes the broker, exclusive of 'specifically identifiable property.' Essentially, Section 6(c)(2)(A)(iv) [codified at 15 U.S.C. § 78lll(11)] defines 'net equity' as the dollar amount of a customer's account determined after giving effect to the completion of any open contractual commitments (discussed below), excluding therefrom any specifically identifiable property reclaimable by the customer, and subtracting the indebtedness (if any) of the customer to the debtor from the sum which would have been owing by the debtor to the customer* had the debtor liquidated all other securities and contractual commitments of the customer on the filing date. *In short, a customer's 'net equity' claim is for a liquidated sum.*" *See SIPC Annual Report*, at 21 (1973) (emphasis added).

As SIPC President Stephen Harbeck stated (more than once) in January of this year, just a few days after the Trustee had sent out claim forms to the Madoff customers on January 2, 2009:

"We've *modified our usual claim form* to ask investors a question that's *unique to this case*, which is how much money did you put in and how much money did you take out."

(Jan. 6, 2009; *CNBC*) (emphasis added);

"[O]ne of the first things that we did . . . was to *modify our standard claim form* to make sure that we asked the claimants themselves what evidence they had in terms of *money in and money out*, because that's going to be one of the critical factors." [36]

(Jan. 5, 2009; Stephen Harbeck, Testimony before House Financial Services Committee)

(emphasis added).

Indeed, the Movants' approach is even contrary to the position taken by SIPC General Counsel Josephine Wang when discussing the Madoff liquidation, as reported less than a week after Madoff was arrested:

"[I]f clients were presented statements and had reason to believe that the securities were in fact owned, then SIPC will be *required* to buy these securities in the open market to make the customer whole up to $500K each. So if [Madoff] client number 1234 was given a statement showing that they owned 1000 GOOG shares, *even if a transaction never took place*, then SIPC *has* to buy and replace the 1000 GOOG shares.

\* \* \* \*

Ms. Wang indicated to us that SIPC has a budget of just $1.6 billion and a few credit lines worth $2 billion total. While SIPC is a non-profit organization, they have indicated to us that they will try to make as many people as whole as possible. They claim to be free from any conflicts of interest, even if the amount needed would eclipse their budget. When asked if the Madoff claims came in at $5 billion what would be done, Ms. Wang indicated to us that they could look to Congress for the money."

---

36    The Madoff Customer Claim Form includes the following new language: "In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor." Madoff Customer Claim Form (Maddox Decl. Ex. A) (emphasis added).

26

(SIPC's Role In Maddoff-Of-All-Scams Could Save The Stock Market, *available at* *StreetInsider.com*, December 16, 2008) (emphasis added).

To justify the departure from the legislative history and SIPC's prior actions, Trustee and SIPC have noted one major distinguishing characteristic that contrasts the Madoff matter from prior SIPA proceedings—its size and magnitude:

- "This fraud was of a *completely different order of magnitude of anything in SIPC's history*." (Jan. 6, 2009; *CNBC*) (emphasis added);

- "As the *largest and most complex securities fraud in history, the Madoff firm presents many unique difficulties rarely encountered* in the typical failure of a broker or dealer." (*New York Times DealBook,* Irving Picard, SIPC Trustee, and Stephen Harbeck, SIPC President (May 6, 2009)) (emphasis added);

- "[F]orensic accountants and lawyers continue to untangle what is believed to be the *most complicated and far-reaching financial fraud in U.S. history*." (May 24, 2009; SIPC Press Conference) (emphasis added).

The fact that the Madoff fraud is larger in scale than any prior fraud in history, is obviously not a legitimate basis upon which to change the Congressionally mandated statutory process for treating the victimized customers of that broker-dealer. There is simply no "size" exception to SIPA's definition of "net equity." Whether the failure or fraud of a broker-dealer is small, medium, large or extra-large, SIPA's requirements are the same.

## II.

## MOVANTS' PRECEDENT DOES NOT
## SUPPORT IGNORING THE STATUTORY MANDATE

**A.    The Movants' Reliance Upon
Non-SIPA Ponzi Scheme Precedent Is Improper**

The Movants' reliance upon *Cunningham v. Brown*, 265 U.S. 1, 10-11(1924)[37] and its

progeny is inappropriate.  These cases are not factually relevant to the situation at bar, as all the

cases, excluding two,[38] relied upon by the Trustee do not involve SIPA or SIPC.

The methodologies and rationales behind the *pro rata* equity driven distributions of the

non-SIPA Ponzi Scheme cases cited by the Movants' bear no relationship to the Congressional

goals behind the enactment of SIPA.  SIPA was enacted to protect investors and maintain their

confidence in the financial markets.  H.R. Rep. No. 91-1613, at 3-4 (1970) ("This legislation . . .

is designed to effect two aims.  It will establish immediately a substantial reserve fund which

will provide protection to customers of broker-dealers . . . This will reinforce the confidence that

investors have in the U.S securities markets.  In addition, [it] will provide for a strengthening of

the financial responsibilities of broker-dealers.").  "[T]he [SIPA] drafters' emphasis was on

promoting investor confidence in the securities markets and protecting broker-dealer customers."

*In re New Times,* 371 F.3d at 87; *see also Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 794

(6th Cir. 1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital

---

37      *Cunningham v. Brown*, involved the original Ponzi Scheme perpetrated by Charles Ponzi where
the return of customer property was facilitated under the preference provisions of the Bankruptcy Act. Cunningham,
265 U.S. at 2.

38      The Trustee's Brief cites *Focht v. Athens (In re Old Napes, Sec., Inc.),* 311 B.R. 607, (M.D. Fla
2002) and *SIPC v. C.J. Wright & Co. (In re C.J. Wright & Co.),* 162 B.R. 597 (Bankr. M.D. Fla. 1993) as the only
two cases supporting the Trustee's position regarding the "cash-in/cash-out" methodology within the context of a
SIPA liquidation.  Those cases are distinguishable on their facts and will be discussed in greater detail *infra* Section
II., C.

28

markets[] and upgrade the financial responsibility requirements for registered brokers and dealers.'") (citing *Barbour*, 421 U.S. at 415); *Sec. Investor Prot. Corp.*, 533 F.2d at 1318 n.5 (same).

## B.    SIPC Advancements Are Made Prior To The *pro rata* Determination

In the non-SIPA Ponzi Scheme cases, it maybe appropriate to first calculate the *pro rata* shares of customer property for allocation to the creditors; however, in SIPA cases that is not the case. Trustee alleges that "at the outset of the claims determination process . . . it is necessary to calculate correctly each customer's pro rata share of customer property vis-à-vis other customers." (*See* Trustee's Net Equity Memo at pg. 6). This is simply a misstatement of the law. "SIPC makes such advances **prior** to a determination of each customer's ratable share of or distribution from the customer property fund." *McKenny v. McGraw* (*In re Bell & Beckwith*), 104 B.R. 852 (Bankr. N.D. Ohio 1989), *aff'd* 937 F.2d 1104 (6th Cir. 1991) (emphasis added). The point of the SIPC advancements is to expeditiously return investors property. *Barbour*, 421 U.S. at 416 (holding that "most important for present purposes, the Act [SIPA] creates a new form of liquidation proceeding, designed to accomplish . . . the speedy return of most customer property."[39] This Court recognized Congress' intent that SIPC proceeding must be resolved hastily to elieviate the devastation rendered or facing insolvent broker-dealer customers, "Congress itself has commanded swift action . . . [A]mong the stated purposes of a liquidation proceeding is to make the customers whole 'as promptly as possible after the appointment of a trustee,' 15 U.S.C.A. §78fff(a) . . . [and] [C]ongress has commanded customer damages to be repaired promptly." *In re Donald Sheldon & Co., Inc.*, 153 B.R. 661, 667 (Bankr.S.D.N.Y.

---

39    *See also* Trustee's Net Equity Memo at pg. 24.

29

1993).  Thus, consistent with the explicit purpose of SIPA, the Trustee must make prompt

advancements prior to determining the *pro rata* allocation of the yet to be determined customer

property.  The Movants' reliance upon non-SIPA Ponzi Scheme cases is irrelevant to the "net

equity" determination in this matter.

In fact, just hours before the filing of this memorandum of law, the Fifth Circuit found in

a non-SIPC Ponzi Scheme case that innocent investors had a legitimate claim to the proceeds

they obtained through a Ponzi Scheme.   The SEC filed a securities fraud action against Stanford

Companies, owned and operated by Allen Stanford, where an alleged multi-billion Ponzi Scheme

was perpetrated against innocent investors through the purchase of CDs.  The SEC argued that it

was inequitable to bring clawbacks against the innocent investors.   The lower court agreed and

held that the receiver had failed to establish that the innocent investors lacked a legitimate claim

to the proceeds received in the Ponzi scheme.  The Fifth Circuit affirmed that holding, thus, the

receiver was not allowed to clawback proceeds from the innocent investors.  *SEC v. Stanford*

*Int'l Bank, Ltd.*, No. 3-09-0298-N (N.D. Tex), *aff'd in part, rev'd in part, remanded by Janvey v.*

*Adams et.al.,* No. 09-10761 (5th Cir. Nov. 13, 2009).

C.    **The Precedent Utilized By The**
      **Movants Is Misplaced and Distinguishable**

The Movants' reliance upon two Florida SIPA cases as its primary support for excluding

interest and/or profits from the "net equity" determination is misplaced, as those cases failed to

analyze the customers' "legitimate expectations."[40]   As the District Court held, and the Second

Circuit affirmed in *New Times I* and *II*, it is the customers' "legitimate expectation" based upon

---

40        *See Focht v. Athens (In re Old Naples Sec., Inc.)*, 311 B.R. 607 (M.D. Fla. 2002), and *SIPC v. C.J.*
*Wright & Co. (In re C.J. Wright & Co.)*, 162 B.R. 597 (Bankr. M.D.Fla. 1993).

the customer confirmations and account statements that determines the amount protected by a SIPA. *In re New Times Sec. Servs., Inc.*, 371 F.3d at 87-88.   Neither *In re Old Naples Sec., Inc.*, nor *In re C.J. Wright & Co. Inc.* analyzed the Series 500 Rules, which dictate that a customer's "legitimate expectation," is based upon the written confirmations received.[41]   In *In re Old Naples Securities, Inc.*,  the United Stated District Court for the Middle District of Florida's ("M.D. Fla. Court") analysis was incomplete, which is understandable, as it noted that "[t]here is very little caselaw on point for determining what constitutes a customer's net equity." *In re Old Naples Sec., Inc.*, 311 B.R. 607, 616 (M.D. Fla. 2002).[42]   *In re Old Naples Sec., Inc.*, is further distinguishable from this case on the facts, as it involved customer claims for cash, not securities as in this matter.  *Id*.

Furthermore, two other cases utilized by Trustee, contradict the Movants' "cash-in/cash-out" approach and specifically allow, at least partially, the inclusion of "benefit-of-the-bargain"[43] and "roll over" damages within the *pro rata* calculations.[44]   Both of those cases allowed the customers' return on investment based upon their expectations or the forfeiture of dully owed compensation.[45]   The *Byers* Court approved the inclusion of re-invested—"roll over"—earnings, based upon securities that were never purchased.  Thus, the investors in that instance received the benefit of profits.  *Byers,* 637 F.Supp.2d at 182-83.  Yet, Trustee tersely dispenses of this case

---

41      *See New Times I*, 371 F.3d at 87-88; *see also* 17 C.F.R. § 300.501(a).

42      The M.D. Fla Court's analysis of "net equity" was further hindered by the fact that, SIPC's opposition failed to provide any case law supporting its position.  *In re Old Naples Sec., Inc.*, 311 B.R. at 616.

43      *See In re Tedlock Cattle Co*., 552 F.2d 1351 (9th Cir. 1977) (holding that bankruptcy trustee allowance of appreciation on principal was acceptable).

44      *See SEC v. Byers*, 637 F.Supp.2d 166, 182-83 (S.D.N.Y. 2009) (holding that the use of rolled-over distributions in calculating pro rata distributions of funds recovered from Ponzi scheme to investors was equitable in Securities and Exchange Commission's (SEC) civil fraud enforcement action, even if rolled-over distribution was illusory).

45      *See In re Tedlock Cattle Co.*, 552 F.2d at 1353; and *See Byers*, 637 F.Supp.2d at 183.

31

with a *But cf.* cite and never delves into the importance of the case.  (Trustee's Net Equity Memo at pg. 32).

Trustee's methodology for calculating "net equity" is an improper measure of loss.   The Madoff customers invested money in their Madoff account with the reasonable expectation that it would grow, and the balance on their November 30, 2008 account statement reflects the benefit of that bargain.   Indeed, the Madoff account statements indicate such growth.   In *Visconsi v. Lehman Brothers, Inc.,* 244 Fed. Appx. 708 (6th Cir. 2007), the Court in opining on a Ponzi scheme case rejected the very same "money in/money out" methodology being utilized by the Trustee.   The Court stated, "the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages."   *Visconsi,* 244 Fed. Appx. at 713.   Like the investors in *Visconsi,* Madoff customers are entitled to the full amount reflected in their November 30, 2008 account statement, regardless of their previous deposits and withdrawals.

## D.   <u>Reliance Upon *Ensminger* Is Misplaced</u>

The Movants' repeated reliance upon the *Ensminger* case is simply inexplicable.[46] *Ensminger* turns on the transparent manipulation by a broker-dealer, and insiders thereof, who attempted to specifically avail themselves of SIPA protection and SIPC distributions when their broker-dealer failed.   The broker-dealer utilized its own worthless house stock, sold at inflated prices, to assist a few select family members and preferred customers in the brokerage house's dying moments.   *Ensminger*, 236 B.R. at 434.   These insiders then utilized the manipulated

---

46    *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51 (Bankr. S.D.N.Y. 199), *aff'd*, 236 B.R. 406 (S.D.N.Y. 2001).  Trustee's Net Equity Memo at pgs. 48, 49 and SIPC's Net Equity Brief at pgs. 22, 24-28, 33.

inflated profits to purchaser blue chip stocks, which they knew or likely knew, could not be purchased to specifically avail themselves to SIPC distributions when the broker-dealer eventually collapsed.  *Id.*  Obviously, these insiders had no reasonable, legitimate expectation that these securities were purchased.  Such transparent manipulation of the provisions of SIPA clearly should not stand; however, the precedents and dicta of that case cannot be utilized to bludgeon Madoff's victims who had no idea of the scope and magnitude of the Madoff Ponzi Scheme.  Furthermore, the Movants have not alleged, and cannot allege, that Madoff was executing his Ponzi Scheme to avail his victims to the protections of SIPA.  Accordingly *Ensminger* is irrelevant to this case.

### III.

### THE MOVANTS AVOIDANCE ARGUMENTS ARE SUPERFLUOUS AND IN COMPLETE CONTRADICTION TO THE EXPEDITED PROCEDURES REQUIRED FOR SIPC ADVANCEMENTS

Setting aside for the moment the Movants' blatant disregard for this Court's September 16, 2009 Order and the negotiations amongst interested parties prior to said Order, which limited the scope of the briefing to the "proper interpretation of 'net equity'" (September 16, 2009 Order at pg. 4),[47] the Movants' reliance upon Trustee's avoidance powers is a *non sequitur* when determining the proper definition and use of "net equity."  First and foremost, nowhere in the definition of "net equity" under SIPA does it require the Trustee to first determine if the customer received fraudulent transfers.  Indeed, in support of this inappropriate and novel position, neither the Trustee nor SIPC cite a single case postulating this onerous requirement.

---

47     Even though the September 16, 2009 Order was quite clear that the scope of the briefing to be submitted was limited to the "proper interpretation of 'net equity'" (September 16, 2009 Order at pg. 4), the Trustee and SIPC, took it upon themselves to brief the additional topic of the Trustees' avoidance power under both SIPA and the Bankruptcy Code (*See* Trustee's Net Equity Memo at pg. 33-35 and 46-49; and SIPC Net Equity Memo at pg. 29-35).

33

Instead, both the Trustee and SIPC argue by reference that the inclusion of avoidance powers under Section 78fff-2(c)(3) of SIPA and the fraudulent conveyances powers promulgated in non-SIPC Ponzi Scheme cases support the Movants' definition of "net equity" (*See* Trustee's Net Equity Memo, at pg. 46-47, and SIPC's Net Equity Memo at 34).   This argument clearly contradicts both the spirit and letter of SIPA, which is designed to protect investors, and wrecks havoc upon the once simple and expedient policy behind SIPC advances.   Contrary to the Trustee's assertion, the Trustee cannot deduct amounts he believes are fraudulent or preferential transfers from a BMLIS customer's SIPC payment.   SIPA simply states that a trustee "may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11."   15 U.S.C. § 78fff-2(c)(3).

Second, the Movants' position regarding fraudulent transfers ignores the multitude of defenses available to the accused recipient of a fraudulent transfer. The Movants' papers disregard defenses, such as, "reasonably equivalent value" under Section 548(a)(1)(B) (*See* 11 U.S.C. §548(a)(1)(B)); or "transfer of an interest of the debtor in property" under 11 U.S.C §§547(b) and 548(a); or Section 546(e)[48] limitations on the avoidance provisions of Section 544, 545, 547, 548(a(1)(B), and 548(b) when the transfer was made by or to a stockbroker or financial institution in connection with a securities contract, (*See* 11 U.S.C. §546(e))[49]; or a failure to state

---

[48]      Section 546(e) provides:
Notwithstanding sections 544, 545, 547, 548(a)(1)(B) of this title, the trustee may not avoid a transfer . . . that is a transfer made by . . . a stockbroker [or] financial institution, . . . in connection with a securities contract, as defined in section 741(7) . . . that I made before the commencement of the case, except under section 548(a)(1)(A) of this title.
[49]      Under Section 546 (e), the Trustee only has the power to avoid transfers under 11 U.S.C. Section 548(a)(1)(A), which states:

34

a claim under Section 548(a)(1)(A) because debtor was legally obligated to make the transfer; or the failure of the Trustee to allege facts sufficient to show actual fraudulent intent on the part of the victims under New York law to sustain a claim under NY. D.C.L §276.[50]

Each of the aforementioned defenses to a fraudulent conveyance or preference action requires substantial pleadings and adjudication prior to a determination on the merits. The Movants are quite familiar with these issues, as they are currently involved in eleven separate disputes with multiple defendants who, either through answers or motions to dismiss, have asserted defenses to the Trustee's fraudulent conveyance or preference claims.[51]

Under the Movants' proposal, prior to any prompt SIPC advancements, the Trustee would first have to review all the documents and assess the merits of each customers' claim, then assert the fraudulent conveyance claims and adjudicate those claims prior to any SIPC advances. Such an absurd contortion of the "net equity" definition is not contemplated under the statute or supported by any relevant case law. Furthermore, the Movants' proposal clearly violates the

---

The trustee may avoid any transfer…of an interest of the debtor in property, or any obligation…incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

50    Claimants do not assert that the defenses listed constitute the entirety of the possible defenses available to a party facing fraudulent conveyance actions. Furthermore, Claimants join and incorporate the by reference the Memorandum of Law of Sterling Equities Associates and Certain Affiliates Regarding Net Equity and Avoidance filed by Davis Polk & Wardwell [Docket No. 716].

51      *See Picard v. Vizcaya Partners Limited et al.*, Adv. Pro. No. 09-01154 (BRL); *Picard v. Kingate Global Fund, Ltd. et al.*, Adv. Pro. No.09-01161 (BRL); *Picard v. Chais et al.*, Adv. Pro. No. 09-01172 (BRL); *Picard v. Merkin et al.*, Adv. Pro. No. 09-01182 (BRL); *Picard v. Harley International (Cayman) Limited*, Adv. Pro. No. 09-01187 (BRL); *Picard v. Jeffry M. Picower*, Adv. Pro. No. 09-01197 (BRL); *Picard v. Fairfield Sentry Limited et al.*, Adv. Pro. No. 09-01239 (BRL); *Picard v. Cohmad Securities Corporation et al.*, Adv. Pro. No. 09-01305 (BRL); *Picard v. Herald Fund SPC et al.*, Adv. Pro. No.09-01359 (BRL); *Picard v. Thybo Asset Management Limited et al.*, Adv. Pro. No. 09-01365 (BRL); *Picard v. Primeo Fund et al.*, Adv. Pro. No. 09-01366 (BRL).

premise and Congressional intent of SIPA, which as the Trustee acknowledges was to "satisfy[] customer claims in an expeditions fashion" and to "return promptly customer property" (Trustee's Net Equity Memo at pg. 24 and 20 respectively).[52]

Third, it is simply unfathomable that a person, whose life savings disappeared overnight, could be exposed to the fraudulent conveyance actions proffered by the Movants. If over the course of 20 years, an individual withdrew $100,000 more than they originally invested even though their last account statement reflected a balance of $500,000, they would be liable to the Trustee for $100,000 under the Movants' proposal. This is simply mindboggling and wholly inconsistent with what Congress envisioned with the passage of the SIPA. As this Court stated,

> "the Court could order investors to repay all cash distributions they received . . . and then Receiver could make a distribution based on each investors' actual investment. The practical problems associated with this approach, however, preclude it from being a viable option. Many of the investors may not have the money, and *litigation to collect it would be expensive, time-consuming, and, in some instances, cruel*."

*Byers*, 637 F.Supp.2d at 182 (emphasis added).

## IV.

### TRUSTEE'S REQUEST TO EXPUNGE THE OBJECTIONS SHOULD BE DENIED, BECAUSE THE TRUSTEE'S DETERMINATION LETTERS ARE INADEQUATE AND UNSUBSTANTIATED

Trustee's request to "expunge the Objections" should be denied, first and foremost, because his interpretation and application of "net equity" is wrong as a matter of law as discussed above, but also because it violates general principles of applicable law requiring that

---

52      The Movants have asserted that Madoff was the customer's agent and that under agency principles, the "fruit of the agent's fraud" may not be retained even if the customer was unaware of the fraud. (*See* Trustee's Net Equity Memo at pgs. 48-49 and *see generally* SIPC's Net Equity Memo at pg. 27). Again setting aside whether this argument goes beyond the scope of the September 16, 2009 Order, the defenses and counters to this argument would also require lengthy litigation and further frustrate the speedy advancement of SIPC funds as intended by SIPA.

an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based. *See, e.g.,* Collier on Bankruptcy I-3007.01(3) (15th ed.) ("[A]n objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses."); *see also In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261(Bankr. S.D.N.Y. Jan. 13, 2003) (same). The Trustee's Determination Letters include an exhibit, which purportedly calculates the money deposited less subsequent withdrawals, that in some instances are inaccurate, and in all instances, are completely unsubstantiated by a single supporting document.

Trustee has yet to produce a single document supporting the numbers proffered in the exhibits attached to the Determination Letters. Indeed, Trustee has tacitly admitted that he does not have accurate records prior to 1995,[53] and Claimants have no way of knowing or confirming what records the Trustee has utilized in preparing the exhibits attached to the Determination Letters. If this Court so decides, prior to expunging any Objections, Trustee should be required to produce records sufficient to show the authenticity and accuracy of the calculations he proffers in the Determination Letters.

---

[53]     *See* Rose Less Letter from Baker & Hostetler dated June 16, 2009, noting that "your claim falls into the Pre-1995 Accounts category and the Trustee will not be able to make a determination of you claim until full records for this period become available" attached to Maddox Decl. as Ex. B.

37

## <u>CONCLUSION</u>

For the foregoing reasons, Claimants respectfully request that this Court deny Trustee's

motion and rule that "net equity" is equal to the value of the securities reflected on the BLMIS

customers November 30, 2008 account statement, and that the avoidance provisions are

inapplicable and have no effect on "net equity."

Dated:  New York, New York
       November 13, 2009

                              Respectfully submitted,

                              LAX & NEVILLE, LLP

                           By:   /s/ *Brian J. Neville*
                                Brian J. Neville (BN 8251)
                                Barry R. Lax (BL 1302)
                                Brian Maddox (BM 6128)
                                1412 Broadway, Suite 1407
                                New York, NY 10018
                                Tel: (212) 696-1999
                                Fax: (212) 566-4531

                                *Counsel for Claimants*

38

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                  :

SECURITIES INVESTOR PROTECTION     :
CORPORATION,                    :   SIPA Liquidation
                                  :

               Plaintiffs,    :
                                  :   No. 08-01789 (BRL)
          vs.              :
                                  :   Adv. Pro. No. 09-01265 (BRL)

BERNARD L. MADOFF INVESTMENT    :
SECURITIES LLC,               :   (Substantively Consolidated)
                                  :

              Defendant.    :
                                  :
-------------------------------------------------------- :   **CERTIFICATE OF**
                                  :   **SERVICE**
In re:                       :
                                  :
BERNARD L. MADOFF            :
                                :
             Debtor.      :
------------------------------------------------------------x

      I, Brian Maddox, hereby certify that on November 13, 2009, I electronically filed the

following documents:

    (i)     Memorandum of Law in Opposition to Trustee's Motion for an Order Upholding
           Trustee's Determination Denying Customer Claims for Amounts Listed on Last
           Statement, Affirming Trustee's Determination of Net Equity, and Expunging those
           Objections with Respect to the Determinations Relating to Net Equity, and

    (ii)    Declaration of Brian Maddox, Esq. in Support of Opposition to Trustee's Motion for
           an Order Upholding Trustee's Determination Denying Customer Claims for Amounts
           Listed on Last Statement, Affirming Trustee's Determination of Net Equity, and
           Expunging those Objections with Respect to the Determinations Relating to Net
           Equity.

with the Clerk of Court using the CM/ECF system, which will send notification of such filing
electronically to registered counsel.

Dated:  New York, New York
            November 13, 2009

                                              **LAX & NEVILLE, LLP**

                                              By:  _/s/ Brian Maddox_

                                              Brian Maddox, Esq.
                                              1412 Broadway, Suite 1407
                                              New York, New York 10018
                                              Telephone:  212-696-1999
                                              Facsimile:  212-566-4531
                                              Email:  bmaddox@laxneville.com