RUSSELL M. YANKWITT
YANKWITT & ASSOCIATES LLC
One Barker Avenue, Suite 260
White Plains, New York 10601
Telephone: (914) 358-5541
Facsimile:  (914) 801-5930
russell@yankwitt.com
Attorneys for Carol Rosen

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,

       Plaintiffs,
vs.

BERNARD L. MADOFF INVESTMENT CLAIM
SECURITIES LLC,

       Defendant.
-----------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S DETERMINATION OF NET EQUITY**

CAROL ROSEN ("Respondent") hereby objects to the Notice of Trustee's Determination of Claim dated October 19, 2009, sent by Irving H. Picard ("Picard") and states as follows:

**Background facts:**

1. Faye Schlesinger ("Decedent") maintained an account with Bernard L. Madoff Investment Securities LLC ("Madoff"):  Account No. 1ZA380 (the "Account").

2. Upon Decedent's death on or about December 27, 2006, Respondent inherited the assets in the Account at a total value of $401,087.

3. On or about January 15, 2008, a mediation settlement was entered into regarding the estate of Decedent granting 30 percent to Isadore Rosen.  The other 70 percent was distributed as follows:  30 percent to Edith Borin and 40 percent to intestate beneficiaries (collectively, the "Other Beneficiaries").

4. Thereafter, on reliance on the fact that there was $401,987 in the Account, Respondent decided to retain the entire 100 percent of the Account and pay the Other Beneficiaries their 70 percent of the Account. Respondent's interest was calculated to be $121,122 and the Other Beneficiaries 70 percent interest was calculated to be $282,618.

5. Respondent sold every other available liquid asset to pay the Other Beneficiaries, and has no other assets upon which to live today except for social security.

6. After disposing of all of her available liquid assets, Respondent, wrote checks on April 17, 2008, in the amount of $282,618 to the Other Beneficiaries.

7. Two withdrawals were made from the Account in the amounts of $20,727 and $5,536.47, on July 7, 2008, and October 6, 2008, respectively, leaving a principle cash balance of $44,186 plus securities.

8. During the time Respondent owned the Account, she legitimately expected that the funds invested were used to purchase securities on the open markets.

9. Respondent would not have sold her other available assets if she knew that the Account was not funded with any legitimate assets.

10. Respondent has no other assets on which to live and has suffered an extreme hardship. Respondent has, therefore, asserted a claim to recover the funds she expended based upon the justifiable fact that she did not know the Account was the product of fraud.

11. On or about December 11, 2008, all customers of Madoff were mailed correspondence regarding the liquidation of the Madoff business which included (a) a Notice; (b) A customer Claim Form; and (c) a brochure entitled "How SIPC Protects You".

12. Based upon Respondent's actions, detrimentally relying upon the expected funds, Respondent filed her claim under hardship for the $44,186 in cash as of December 11, 2008, plus

all other securities that were purportedly in the account and to which she relied upon.

13. On October 19, 2009, Picard sent Respondent a determination letter (the "Determination Letter") with respect to the Account, rejecting the claim for securities based upon no securities ever being purchased and the amount being withdrawn from the Account during the time Decedent owned the account, had exceeded that which was deposited, resulting in Respondent suffering severe hardship.

## GROUNDS FOR OBJECTION

### A. Picard Has Failed to Comply With the Court's Prior Order

14. The Determination Letter fails to comply with the Court order dated December 23, 2008, which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12).

15. The November 2008 account statement generated by Madoff is reflective of "the Debtor's books and records," by which Picard is bound, absent proof that the Account did not have a "legitimate expectation" that the balance on the Account statements represented Account property.

16. Picard has, thus, failed to state a basis in the Determination Letter for the position he has taken. Accordingly, Picard has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3) (15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

17. In addition, here Respondent detrimentally relied on the books and records of the Account before she distributed 70 percent of the Account to the Other Beneficiaries. Respondent

has a clear and legitimate expectation that the balance on the Account statements represented Account property and detrimentally relied on this fact. Accordingly, Respondent should be entitled, pursuant to the Court's prior orders, to recover for this loss.

### B. Picard Has Failed to Honor Respondent's

18. The legislative history of the Securities Investor Protection Act ("SIPA") makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
>
> * * *
>
> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

19. SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

20. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater „customer" protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*) (emphasis added).

21.     Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008, Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

22.     As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the

*New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00) (emphasis added).

23. Thus, to honor Congress' intent was to protect a customer's "legitimate expectations," Respondent must be compensated for her loss.

### C. Without Legal Authority, Picard Has Invented His Own Definition of "Net Equity"

24. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor. The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by –

> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus

>   (B) any indebtedness of such customer to the debtor on the filing
>   date . . .

15 U.S.C. § 78*lll*(11).

   25.   SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

   26.   The Second Circuit has recognized that:

>   Each customer's "net equity" is "the dollar amount of the account
>   or accounts of a customer, to be determined by calculating the sum
>   which would have been owed by the debtor to such customer if the
>   debtor had liquidated, by sale or purchase on the filing date, all
>   securities positions of such customer" [corrected for] any
>   indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also ,In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999) ("Net equity is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

   27.   In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." to Respondent's determinant.

   28.   Picard has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts, and disregarding that investors may have relied on the Account to their financial detriment.

   29.   Thus, under Picard's reasoning, he would be able to avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors, like Plaintiff who have depended upon their Madoff investments for their daily living expenses.  He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

30. This conduct flies in the fact of equity and justice. As noted by Stephen Harbeck, the President of SIPC:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme.
>
> It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

31. Hardback's statement is a rationalization of what appears to be SIPC"s goal, *i.e.,* to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff and relied that the Accounts were accurate statements.

32. To date, Picard has identified only a handful of Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate.

33. The Account, like thousands of other investors, received monthly statements from Madoff in the past several years indicating returns on their Madoff investment in the range of 9 – 11 percent per year.

34. There is no basis to claim that the Account did not have a "legitimate expectation" that the assets reflected on the Account statements sent by Madoff belonged to Respondent. Thus, Respondent is entitled to a claim for the value of her securities as they were purported to exist, plus the $44,816 in cash, as reflected on the November 2008 Madoff statement.

**D.   Respondent Is Entitled To Prejudgment Interest**

35. Under New York law, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, because Madoff converted the Account's funds, that fact also entitles them to prejudgment interest. *See, e.g., The*

*Trustberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

36. In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007).

37. In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their bargain to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.) (district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

### E. Picard has violated SIPA by delaying the payment of SIPC insurance

38. Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace Respondent's securities and cash value on the November 2008 statements.

### Conclusion

Based on Congressional intent, the language of the stature, and fairness and equity, Respondent is entitled to an order compelling Picard and SIPC to replace immediately the securities in the Account to the extent of a valuation as of the period ending November 30, 2008.

November 16, 2009.

                        YANKWITT & ASSOCIATES LLC

By:    /s/_____
     Russell M. Yankwitt
     One Barker Avenue, Suite 260
     White Plains, New York 10601
     Telephone: (914) 358-5541
     Facsimile: (914) 801-5930
     russell@yankwitt.com

     Attorneys for Carol Rosen