UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,

                      Plaintiff

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                      Defendant.
-------------------------------------------------------

SIPA LIQUIDATION

Adv. Pro. No. 08-01789(BRL)

## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

Arnold Goldman and Madeleine Goldman, by and through their undersigned attorney, hereby object to the Notice of Trustee's Determination of Claim dated October 19, 2009 ("Determination Letter"), and state as follows:

**BACKGROUND**

1. Arnold Goldman and Madeleine Goldman ("Goldman") maintained accounts numbered 1-ZA739-3-0 and 1ZA739-4-0 ("Accounts") with Bernard L. Madoff Investment Securities, LLC ("Madoff"). [1] Each month during the entire duration of their investment, Goldman received monthly statements from Madoff ("Statements") reflecting the securities positions in their accounts. During the months when trading on the Accounts was allegedly conducted by Madoff, as reflected in the Statements, Goldman would also receive, Trading Slips for each alleged purchase or sale of securities in the Accounts. At the top of each Trading Slip, it states:

        "Member: FINRA NSX SIPC NSCC DTC".

---

[1] According to Table 1 attached to the Determination Letter, Account number 1ZA739-3-0, was opened by Goldman on 12/22/92. The Determination Letter does not address Account number 1ZA739-4-0, at all.

A copy of one such Trading Slip received by Goldman during November, 2008, is attached hereto as Exhibit A. [2]

2.  Goldman filed their Customer Claims ("Claims"), dated June 16, 2009, with the Trustee on or about June 26, 2009. Copies of the Claims are attached hereto as Exhibit B. Goldman's Claims seek the replacement of the securities that were listed on the Madoff Statements for the Accounts, dated November 30, 2008 ("November Statements"), or the equivalent value of the securities. The total value of the securities listed on the November Statement for Account Number 1ZA739-3-0 was $194,571.16 and the balance listed on the November Statement for Account Number 1ZA739-4-0 was $21,463.00. Under the law, Goldman is entitled to recover the securities listed on the November Statements, or payment in the amount of $216,034.16, on their Claims.

3.  On October 19, 2009 the Trustee issued the Determination Letter to Goldman, denying their Claim. The Determination Letter states: "Your claim for securities is DENIED. No securities were ever purchased for your account." See Determination Letter, attached hereto as Exhibit C. The Determination Letter further states that their Claim is denied because Goldman withdrew more than they deposited into the account and do not have a positive "net equity". See Exhibit C.

**GROUNDS FOR OBJECTION**

**A.  The Determination Letter Fails To Comply With The Court's Order.**

4.  Goldman objects to the Determination Letter as it fails to comply with the Court's Order dated December 23, 2008, that directs the Trustee to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." Dec. 23, 2008 Order at 5

---

[2] Exhibit A is demonstrative of the reaffirmation that was made, each time a Trading Slip was received by Goldman, that Madoff was a member of SIPC and that their Accounts were insured under SIPA.

2

(Docket No. 12). Included with Goldman's Claims were copies of the November Statements for their Accounts. See Claims attached hereto as Exhibit B. These Statements constitute the "Debtor's books and records" and are clearly the best evidence of the amount owed to Goldman, in keeping with Goldman's legitimate expectations. Accordingly, Goldman's Claims should be satisfied by SIPC based on the securities listed on the November Statements or the equivalent value in the amount of $216,034.16.

### B. The Determination Letter Fails To State A Legal Basis For Denial

5. The Determination Letter fails to state a legal basis for denying Goldman's Claims. In fact, the Trustee fails to cite a single statute, case or rule in support of the denial of Goldman's Claims. Furthermore, the Determination Letter is insufficient since it does not meet the general pleading requirements that were articulated by this Court in *In Re: Enron Corp.*, No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003), as follows:

> The best practice is to denominate an objection to a claim as just that. The body of the objection should identify the claim. It should also, at a minimum, allege those facts necessary to support the objection . . . and provide a description of the theories on which it is based. In short, proofs of claim have been held analogous to complaints initiating civil actions; an objection to a claim should therefore meet the standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses.

Citing Collier on Bankruptcy P 3007.01[3]

6. The Determination Letter does not do any of the foregoing. Rather, it states two reasons for the denial of Goldman's Claims: (1) that no securities were ever purchased for Goldman's account; and (2) Goldman withdrew more money from the Account than they deposited and do not have a positive "net equity". These reasons, advanced by the Trustee, in order to deprive Goldman of their entitlement to recover up to $500,000.00 in either replacement

securities as reflected on their November Statements or the equivalent value of the securities listed on the November Statements, in the total amount of $216,034.16, is untenable.

7. The Trustee's position is completely contrary to: (1) the clear mandate of the Securities Investor Protection Act of 1970 ("SIPA"), *15 U.S.C. §§ 78aaa-78lll (2003)*, the controlling statute at issue; (2) *In Re: New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004), the leading case in this Circuit on the issues presented herein; and (3) the policy of the Securities Investor Protection Corporation ("SIPC") for the past three decades.

### (1) SIPA Mandates That Goldman's Claims Be Allowed For The Full Amount Reflected On Their November Statements.

8. SIPA was enacted by Congress in 1970 to protect investors and restore confidence in the U.S. securities markets. *Id at 84*. As stated by the Court in *New Times*,

> First, the legislation immediately established a 'substantial reserve fund … to provide protection to customers of broker-dealers … to reinforce the confidence that investors have in the U.S. securities markets. Second, SIPA 'strengthened … the financial responsibilities of broker-dealers.

*Id.*

9. The legislative history further establishes that an investor's brokerage account is insured by SIPC irrespective of whether securities were actually purchased by the broker-dealer. The Senate Report on the 1978 amendments to SIPA, states, "Under present law, because securities belonging to the customers may have been lost, improperly hypothecated, misappropriated, **never purchased** or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account … By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments … would satisfy the customers' legitimate expectations …" S. Rep. No. 95-763 at 2 (1978) (emphasis added).

4

Clearly, this Report reflects the intent of Congress to include customer claims where the broker never purchased any securities for the customer's account.

10. The House Report on the 1978 amendment to SIPA also reflects that SIPC coverage includes the loss of securities due to the broker's failure to purchase securities. As stated in the Report, "A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, **never purchased,** or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date." H.R. Rep. No. 95-746 at 21 (1978) (emphasis added).

11. Furthermore, the purpose of the Securities Investor Protection Act is to protect a class of investors from loss, without regard to the presence or absence of wrongdoing as the cause of broker-dealer insolvency. *Rich v New York Stock Exchange*, 379 F Supp 1122, 1124 ft. nt. 1, (SDNY 1974), revd on other grounds 522 F2d 153 (2d Cir. 1975). In accordance with these authorities, the first reason stated in the Determination Letter for denying Goldman's Claims, that no securities were purchased for their Account, is erroneous. Whether the securities were lost, stolen, misappropriated or never even purchased by Madoff, is entirely irrelevant to the consideration of Goldman's Claims. As such, the Determination Letter fails to state a proper, legal basis for the denial of Goldman's Claims.

12. The Determination Letter further states that the Claim is denied because Goldman's Account does not have a positive "net equity". The Trustee's "net equity" determination is based on a calculation of the difference between the total amount of deposits or payments made to Madoff, by Goldman, and the total amount of payments made to Goldman, by Madoff. The Trustee's "net equity" determination is not based on the statutory language of

SIPA, which defines "net equity", as "the dollar amount of the account or accounts of a customer, to be determined by (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer; minus (B) any indebtedness of such customer to the debtor on the filing date ..." . 15 U.S.C. §78*lll*(11) 2009.

13. Applying the clear and unambiguous definition of "net equity" set forth in 15 U.S.C. §78*lll*(11), the value of the Accounts, as reflected in the November Statements, is the correct measure of the amount that is owed to Goldman. As the House report reflects, "A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, **never purchased,** or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date." H.R. Rep. No. 95-746, at 21 (1978) (emphasis added).

14. In accordance with the purpose of SIPA, the only true measure of a customer's legitimate expectations is based on what the customer believes is in his accounts and that belief should not be questioned where it was based entirely on the documents provided to the customer by the broker. The fact that Madoff was engaged in a Ponzi Scheme for decades should not affect the outcome here. Goldman had every right to rely upon these documents, i.e. the Madoff Statements that were provided each and every month from the inception of the investment until the final November Statements. The Trading Slips which were sent out each month in which trading allegedly occurred on the Accounts, only buttressed the already established legitimate expectation that Madoff was operating a lawful, legitimate and profitable brokerage firm. To now have the Trustee, who was appointed by this Court to help the Madoff victims and to

administer the SIPC fund expeditiously so as to carry out the purposes of SIPA, deny Goldman's Claims, only adds insult to the injury already suffered here. It cannot be disputed that Goldman was an innocent investor and clearly is entitled to the status afforded to customers under SIPA. Furthermore, Goldman had a legitimate expectation that SIPC and the Trustee would return the securities which were listed on the November Statements and if those securities did not exist they would either replace them or pay the equivalent value of those securities. The lack of any legal basis for the Trustee's denial, compounds the injustice inflicted upon Goldman, who invested their entire life savings with Madoff.

15. The fact that Madoff, who was supposed to be regulated by the Securities and Exchange Commission ("SEC") and SPIC, was cloaked with a false legitimacy by the SEC and SPIC, only further enhances the customer's legitimate expectations that their investment with Madoff was safe, secure and insured with SIPC. Furthermore, each time Goldman received a Trading Slip that stated Madoff was a member of SIPC, their legitimate expectations that the investment was SIPC insured was reaffirmed. Whether or not securities existed is immaterial to the investor's protection, as it is the <u>legitimate expectations</u> of the customer that control. The cause of the broker's failure, whether or not as a result of wrongdoing on the part of the broker, is also irrelevant under SIPA. Whether or not Madoff actually purchased securities has no bearing on the determination of the Claims any more than if the securities stated to be in the Accounts as of November, 2008 had been lost, improperly hypothecated, misappropriated or stolen.

### (2) The Denial Of Goldman's Claims Is Contrary To *New Times*

16. In *New Times,* 371 F.3d 68, the Second Circuit Court of Appeals, was faced with the issue of whether investors SPIC claims, based on the fictitious value of the fictitious

securities which were stated to be in their accounts, would control, or whether the investors' actual investment would determine their recovery. The key distinction between the *New Times* investors who had fictitious securities listed on their statements and the investors in Madoff who had real securities with real values listed on their statements, is that SIPC could not assign a value to the fictitious securities and could not replace them because they did not exist. However, those investors in *New* Times whose account statements listed real securities, although they were never actually purchased by the broker, were able to recover based on the statements they were provided with by the broker, even though no securities existed in the accounts.

17.     As explained by the trustee in *New Times,* the disparate treatment between those investors whose statements reflected non-existent money market funds and those investors whose statements reflected shares in bona fide mutual funds that were never actually purchased, was that the real securities could be purchased by the Trustee to satisfy such customer claims. Id at 74. The trustee in *New Times* further noted that the claimants, whose statements reflected real mutual funds that were never purchased by the broker who had engaged in a Ponzi Scheme, "if they were checking on their mutual funds," they, in contrast to the claimants whose statements listed fictitious securities, "could have confirmed the existence of those funds and tracked the funds' performance against [the broker's] account statements." *Id.*

18.     The Court, in *New Times*, held that the proper calculation of "net equity" for those accounts where the statements listed fictitious money market funds, was the amount of money that was invested with the broker, without including artificial interest or dividend reinvestments reflected in the fictitious account statements. Id at 88. However, this holding was limited to those situations where non-existent securities were involved and not where, as here, real

8

securities that trade on the stock exchanges and can be purchased on the open market, are at issue.

### (3) The Trustee's Denial of Goldman's Claims Is In Direct Conflict With SIPC's Policy For The Past Three Decades

19.     The Trustee's attempt to extend the holding in *New* Times to Goldman's Claims, when the Statements rendered by Madoff to Goldman reflected trades of real securities that traded on the open market, is in direct conflict with the policy of SIPC since its inception. In *New Times*, SIPC and the trustee in that bankruptcy proceeding both took the view that those investors whose account statements reflected real existing securities, even though the securities were never purchased by the broker, were entitled to receive the securities that were stated on the account statements generated by the broker. In that situation, the two factors which the trustee considered were the ability to purchase those securities in order to satisfy customer claims and the customer's ability to confirm the existence of those securities and tract the securities' performance. *New Times*, 371 F.3d at 74.

20.     The president of SIPC, Stephen Harbeck, testified in the *New* Times bankruptcy proceeding that SIPC would replace the securities listed in the customers' account statements, even if the securities were never purchased. Harbeck further testified that "if those positions triple, we will gladly give the people their securities positions." Transcript at 37-39, *In Re: New Times Securities Services, Inc.*, No. 00-8178 (B.E.D.N.Y. July 28, 2000).

21.     Furthermore, in the Brief submitted by SPIC in *In Re: New Times Securities Services, Inc.*, 463 F.3d 125 (2d Cir. 2006), its position was as follows:

> Reasonable and legitimate claimant expectations on the filing date
> are controlling even where inconsistent with transactional reality.
> Thus, for example, where a claimant orders a securities purchase
> and receives a written confirmation statement reflecting that
> purchase, the claimant generally has a reasonable expectation

> that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase ... [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times, 371 F.3d 68).*

22. Clearly the Trustee's position in the Determination Letter is completely contrary to SIPC's long standing policy that the reasonable and legitimate expectations of the claimant control, even where such expectations are inconsistent with reality. In keeping with SIPC's long standing policy, Goldman's reasonable and legitimate expectations that the securities listed on their November Statements were in the Accounts, should control here, regardless of the transactional reality.

**CONCLUSION**

23. In accordance with the foregoing and pursuant to 15 U.S.C.S. § 78fff-2(d), the Trustee is required to purchase the securities that were listed on the November Statements or pay the equivalent value of those securities, to wit, the sum of $216,034.16, in order to satisfy Goldman's Claims.

Dated: November 17, 2009

/s/ Ginny L. Goldman
GINNY L. GOLDMAN, P.A.
2799 N.W. Boca Raton Blvd., Suite 213
Boca Raton, FL 33431
Tel: (561) 447-9208
Fax: (561) 826-1109
attorneygg@aol.com
Attorney for Arnold Goldman and
Madeleine Goldman

10