**TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.**
425 Park Avenue
New York, New York 10022
(212) 754-9400
Barton Nachamie
Janice B. Grubin
Jill L. Makower

  and

**MANSFIELD TANICK & COHEN P.A.**
1700 Pillsbury Center South
220 South Sixth Street
Minneapolis, Minnesota 55403-1409
(612) 339-4295
Earl Cohen

  and

**PARKER & WENNER, P.A.**
220 South 6th Street
1700 US Bank Plaza
Minneapolis, MN 55402
(612) 355-2201
Boris Parker

**Counsel for ABG Partners** and
**The Graybow Group, Inc., Claimants**

UNITED STATES BANRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x
SECURITIES INVESTOR PROTECTION     :    Adv. Pro. No.: 08-01789 (BRL)
CORPORATION,
        Plaintiff,     :    SIPA Liquidation

     v.            :    (Substantively Consolidated)

BERNARD L. MADOFF INVESTMENT    :
SECURITIES, LLC.,
                :
        Defendant.
---------------------------------------- x
In re:                  :

BERNARD L. MADOFF,          :

        Debtor.        :
---------------------------------------- x

**ABG PARTNERS' AND THE GRAYBOW GROUP, INC.'S (I) OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM AND (II) CROSS-MOTION FOR ENTRY OF ORDER FOR AUTHORITY TO AMEND CLAIM TO IDENTIFY MULTIPLE CUSTOMERS AND THEIR DEPOSITS OR, ALTERNATIVELY, TO PERMIT FILING OF LATE CLAIM**

ABG Partners and The Graybow Group, Inc. f/k/a Graybow Communications Group, Inc. ("Graybow Group", and, together with ABG Partners, the "Objectors"), creditors and parties in interest in the above-captioned adversary proceeding, by their attorneys, Todtman, Nachamie, Spizz & Johns, P.C., Mansfield Tanick & Cohen P.A. and Parker & Wenner, P.A., hereby submit this Objection to the Notice of Trustee's Determination of Claim dated October 19, 2009 (the "Notice of Determination") and Cross-Motion to amend their claim or, in the alternative, to permit the filing of a late claim, together with the supporting affidavit of Bruce Graybow (the "Graybow Aff."). In support of their Objection and Cross-Motion, the Objectors respectfully state as follows:

**BACKGROUND**

1. At all times relevant herein and dating back to at least 1985, ABG Partners maintained an account and derivatives thereof, with Bernard L. Madoff Investment Securities, LLC ("BLMIS") denominated as Account No. G0068 (the "Account"). The Account was created by Marvin Graybow, the now-deceased father of Bruce Graybow, a partner of ABG Partners and the President of its affiliate, Graybow Group.

2. By letter dated November 19, 2007, Graybow Group notified BLMIS that it would be wiring $700,000 to BLMIS and requested that BLMIS "establish, upon receipt of the $700,000.00 wire transfer from Signature Bank that you will receive shortly, an account titled The Graybow Group, Inc. and deposit the $700,000.00 in that specific account." The letter also stated that "an additional wire transfer of $750,000.00 [should] be deposited in the already

existing ABG Partners account…." (A copy of the letter from Graybow Group is annexed to the Graybow Aff. as **Exhibit "A"**.)

3. After the filing of this proceeding, ABG Partners received a Customer Claim form with instructions. No Customer Claim form was ever received by Graybow Group. (See Graybow Aff., ¶ 5.)

4. The Customer Claim form received by ABG Partners specifically states on page 1 that: "A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT…". By the time that ABG Partners received the Customer Claim form, ABG Partners and Graybow Group had learned that BLMIS had never established an account in the name of Graybow Group as Graybow Group had requested. Since the Customer Claim form required a separate claim form for each account, and only one account had been established, which Account was in the name of ABG Partners, ABG Partners filed the claim, which was docketed as claim no. 6258 (the "Claim") for that one Account. The Claim showed positive net equity of $810,000.00. The Claim attached ABG Partners' final statement dated September 30, 2008 from BLMIS (the "Final Statement") showing that the Account had a total equity value of $1,531,456.63.

5. With the Claim, Brian E. Weisberg, Esq., counsel to ABG Partners and Graybow Group, submitted a letter to the Trustee dated March 3, 2009 asking to "[p]lease advise the undersigned if a separate claim is available for the account that was not established and one will be filed." The Trustee never responded to Mr. Weisberg's letter. (A copy of Mr. Weisberg's letter and the Claim are annexed to the Graybow Aff. together as **Exhibit "B"**).

6. On October 19, 2009, Irving H. Picard, Trustee under the Securities Investor Protection Act ("Trustee"), issued the Notice of Determination for the Account to ABG Partners, Attention: Bruce Graybow, denying the Claim in its entirety. In the Notice of Determination, the Trustee denied (a) a claim for securities due to the fact that no securities were ever purchased for the account and (b) a claim for cash because he determined that there was no positive "net equity" in the Account. (A copy of the Notice of Determination is annexed hereto as **Exhibit 1**.).

251276.3                                            3

**RELIEF REQUESTED**

7. With respect to the denial of the Claim based on securities, the Objectors request that the Court overrule the Notice of Determination because the Trustee has provided no factual documentation or legal support for his disallowance.

8. The Objectors object to the Trustee's denial of the Claim based on cash, because they hold positive net equity in the Account, and any disallowance contrary to that fact must also be supported by legal and factual grounds and, at minimum, await the adjudication of the net equity issue by this Court next year. Moreover, as a result of the inflow of funds from Graybow Group (a new, wholly distinct and entirely separate customer entity from ABG Partners), and the written and verbal requests to BLMIS for those funds to be deposited into a new brokerage account in the name of the Graybow Group, the net equity calculation set out by the Trustee as a basis for his denial of the Claim based on cash is simply incorrect.

9. By this Objection and Cross-Motion, the Objectors also respectfully request that the Court authorize the Objectors to amend the Claim pursuant to Bankruptcy Rule 7015 and Fed. R. Civ. P. 15(a)(2) to clarify that two separate customers under the definition of The Securities Investor Protection Act of 1970, 15 U.S.C. §78aaa et seq. ("SIPA"), i.e., ABG Partners and Graybow Group, have asserted two separate claims based upon the deposits to the Account.

10. As an independent and alternative ground for relief, the Objectors respectfully request that the Court permit Graybow Group to file a late proof of claim based on excusable neglect, pursuant to Bankruptcy Rule 9006(b).

## ARGUMENT AND AUTHORITIES

### I. OBJECTION TO TRUSTEE'S NOTICE OF DETERMINATION - THE CLAIM SHOULD BE ALLOWED IN FULL

#### A. THE TRUSTEE'S DEFINITION OF "NET EQUITY" IS INCONSISTENT WITH SIPA AND SIPA RULES, PRACTICE AND PRONOUNCEMENT AND CASE LAW INTERPRETING THE STATUTE AND RULES

11. SIPA was enacted in response to the failure of many brokerage firms during the financial crisis of 1969-1970. The purpose of SIPA is set out in the preamble to the statute, which states that the Act is designed "to provide greater protection for customers of registered brokers and dealers." The Securities Investor Protection Corporation ("SIPC") was established under SIPA "as a nonprofit membership corporation for the purpose, inter alia, of providing financial relief to the customers of failing broker-dealers with whom they had left cash or securities on deposit." SIPC v. Barbour, 421 U.S. 412, 413, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); see also SEC v. Packer, Wilbur & Co., 498 F.2d 978, 980 (2d Cir. 1974).

12. Notwithstanding the special protection afforded customers, a SIPA proceeding basically is bankruptcy liquidation. Exchange National Bank of Chicago v. Wyatt, 517 F.2d 453, 457-59 (2d Cir. 1975); In re Lloyd Securities, Inc., 75 F.3d 853, 857 (3d Cir. 1996); In re Adler Coleman Clearing Corp., 198 B.R. 70, 74 (Bankr. S.D.N.Y. 1996). The SIPA trustee has "the same powers and title with respect to the debtor" and its property as a trustee in bankruptcy, as well as powers that enable him to perform the special functions of a SIPA liquidation. SIPC v. Christian-Paine & Co., 755 F.2d 359, 361 (3d Cir. 1985); SIPA §§78fff(e), 78fff-1(a).

13. To be characterized as a customer under SIPA, a claimant must satisfy the requirements of the statute. 15 U.S.C. §78lll(2) states in pertinent part:

> For purposes of this chapter, including the application of the Bankruptcy Act to a liquidation proceeding:
>
> (2)  Customer.
>
> The term "customer" of a debtor means any person (including any person with whom the debtor deals as a principal or agent) who has a claim on account of

251276.3                                       5

securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and **any person who has deposited cash with the debtor for the purpose of purchasing securities**, but does not include-

(A)    any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or

(B)    any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor. (Emphasis added).

15 U.S.C. § 78111(2) (emphasis added).

14.    It is clear that in defining the term "customer", Congress intended to protect customers such as ABG Partners and Graybow Group, and their legitimate expectations, who had entrusted cash to BLMIS for the purpose of trading and investing.  See In re Hanover Square Securities, 55 B.R. 235, 238 (Bankr. S.D.N.Y. 1985); see also In re Investors Security Corp., 6 B.R. 420, 424 (Bankr. W.D.Pa. 1980); SEC v. F.O. Baroff Co., 497 F.2d 280, 283 (2d Cir. 1974); In re Stalvey & Assoc., 750 F.2d 464 (5th Cir. 1985); In re John Muir & Co., 51 B.R. 150 (Bankr. S.D.N.Y. 1985).  SIPA was designed to provide protection to victims of a brokerage collapse.  In re Bevill, Bresler & Schulman Asset Management Corp., 67 B.R. 599 (D.N.J. 1986). SIPA's purpose is to extend a measure of special protection for the investments of those parties who fall within the statutory definition of the "customer".  Id. at 131.  The definition of customer consists of three basic elements:

(1)    the claimant must have a claim for securities or cash received, acquired, or held by the broker-dealer in the ordinary course of its business;

(2)    the securities or cash must have been received, acquired, or held from or for the securities account of the claimant; and

(3)    the securities or cash must have been received, acquired, or held by the broker-dealer either (i) for safekeeping, (ii) with a view to sale, (iii) to cover

251276.3                                        6

consummated sales, (iv) pursuant to purchases, (v) as collateral, or (vi) for effecting transfer.

Id. at 131-132.

15. There can be no dispute that ABG Partners and Graybow Group are "customers" based upon the application of the three basic elements cited above and are entitled to recovery as a result of unauthorized transactions which occurred in their accounts with BLMIS. See Schultz v. Omni Mutual Inc., 1993 WL 546671 (S.D.N.Y.) ("Courts within and without this Circuit have held …that SIPA coverage extends to instances of misappropriation."); In re C.J. Wright & Co., Inc., 162 B.R. 567, 607 (Bankr. M.D.Fla. 1993) ("SIPA provides customer status for claims based on misappropriation and unauthorized purchases."); see also SEC v. S.J. Salmon & Co., 375 F.Supp. 867, 871 (S.D.N.Y. 1974); In re First State Securities Corp., 34 B.R. 492, 495 (Bankr. S.D.Fla. 1983); SEC v. Howard Lawrence & Co., 1 B.C.D. 577, 580-81 (Bankr. S.D.N.Y. 1975).

16. With respect to net equity claims, §78fff-2(b) of SIPA further provides that:

After receipt of a written statement of claim pursuant to subsection (a)(2) of this section, the trustee shall promptly discharge, in accordance with the provisions of this section, all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer (subject to the provisions of subsection (d) of this section and section 78fff-3(a) of this title) insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee.  For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date.  For purposes of this subsection, the court shall, among other things-

(1) with respect to net equity claims, authorize the trustee to satisfy claims out of moneys made available to the trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the debtor available to satisfy such claims; and

(2) with respect to claims relating to, or net equities based upon, securities of a class and series of an issuer which are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee, authorize the trustee to deliver securities of such class and series if and to the extent available to satisfy such claims in whole or in part, with partial

deliveries to be made pro rata to the greatest extent considered practicable by the trustee.

17. Filling out the statutory scheme, §78lll(11) defines "net equity" as follows:

The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by-

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus

(B) any indebtedness of such customer to the debtor on the filing date; plus

(C) any payment by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff-2(a) of this title).

18. Under the structure of the governing statute, the Trustee must satisfy net equity claims whether they are based on cash or securities in accordance with the SIPA mandate. With respect to the satisfaction of net equity claims for cash or securities, the Trustee must satisfy them with cash or securities on hand, if any, and when there are insufficient funds or property of the debtor available, the Trustee must satisfy such claims from SIPA funding, up to the ceilings provided in the statute.

19. The definition of "customer property" in §78lll(4) establishes that it is a fund consisting not of property of specific customers or investors but of cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted. It is specifically defined to include "any other property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers…." §78lll(4)(D). It is thus a common fund from which customers' net equity claims generally can be satisfied, with SIPC to make up any shortfalls within the limits of

251276.3                                    8

SIPA protection. See §78fff-3(a), which provides that SIPC shall advance moneys "to pay or otherwise satisfy claims for the amount which the net equity of each customer exceeds his ratable share of customer property."

20. To the extent a SIPA trustee is unable to deliver securities in satisfaction of a customer claim for securities, the trustee is obligated to deliver cash, with the securities valued as of the filing date. See Matter of Bevill, Bresler & Schulman, Inc., 83 B.R. 880, 892 (D.N.J. 1988). See SEC v. Howard Lawrence & Co., Inc., 1 B.C.D. 577, 580-81 (Bankr. S.D.N.Y. 1975) (where funds of claimant were invested without authority and the customer was held to have a claim covered by SIPA for the return of cash).

21. Contrary to the determination of the Trustee, a finding that Graybow Group has a separate claim to cash for the misappropriation of its $700,000 deposit with BLMIS would be consistent with the relevant authority cited herein and with basic principles of bankruptcy and non-bankruptcy law. Had BLMIS followed the instructions of Graybow Group, there would be no dispute that the $700,000 deposited by Graybow Group is not subject to any setoffs other than withdrawals, if any.

22. Allowance of the entire Claim will serve to carry out SIPA's remedial principles, which the Supreme Court has said should be interpreted "not technically and restrictively, but flexibly to effectuate [its] remedial purposes." Pinter v. Dahl, 466 U.S. 622, 653, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (citations omitted); see also In re First State Securities Corp., 34 B.R. at 496, citing Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) ("SIPA is remedial legislation. As such it should be construed liberally to effect its purpose.").

**B. MISCELLANEOUS OBJECTIONS TO TRUSTEE'S NOTICE OF DETERMINATION**

23. The Notice of Determination fails to comply with this Court's December 23, 2008 Order, which directs the Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's books and records." Dec. 23, 2008 Order at 5 [Dkt. No. 12]. Included with

the Claim was the BLMIS Final Statement showing total equity of $1,531,456.63. See Graybow Aff., Exhibit "B". The Final Statement is the best evidence of the amount owed based on the Debtor's books and records. Accordingly, the Claim should be allowed in the full amount of $1,531,456.63.

24.     The Trustee's action in reducing the amount shown on the Claim by any prior gains reflected on the Final Statement or prior BLMIS statements is an attempt to avoid such gains without alleging any grounds for avoidance or providing that such gains are avoidable under the Bankruptcy Code's avoidance provisions. As such, any such disallowance is improper and unjustified, and the Notice of Determination should be stricken. See Fed. R. Bankr. P. 7001(1); 7008.

25.     The Trustee's Notice of Determination purports to calculate the "net equity" for the Account on the basis of certain withdrawal and deposit transactions for which the Objectors have no records. Many of the transactions in question allegedly occurred many years ago. It is unreasonable to anticipate that customers would maintain records of accounts for long periods of time given (a) general limitations on record retention requirements under tax law and other applicable rules governing record retention; (b) the apparent safety and solvency of BLMIS as acknowledged by the United States Securities and Exchange Commission and other securities agencies which had investigated the affairs of BLMIS; and (c) the fact that historical records such as those in question are usually available from financial institutions, including broker-dealers, upon request. Under these circumstances, the Trustee should be required to prove that the alleged withdrawal transactions occurred by furnishing the appropriate records to the Objectors and, absent such records, such transactions should be deleted from the calculation of "net equity." Likewise, the Trustee should be required to prove that all deposit transactions are completely listed by furnishing the appropriate records to the Objectors.

26.     The Trustee has set forth no legal basis for disallowing the Claim in full as filed. The only explanations set forth in the Notice of Determination are that (1) "[n]o securities were

ever purchased for your account," and (2) that "because you have withdrawn more than was deposited into your account, you do not have a positive 'net equity' in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding." Notice of Determination at 1-2.  Neither of these purported grounds for disallowance have any statutory or other legal basis.  Moreover, the Notice of Determination:

 (a) does not clearly provide "the reason" for the disallowance, as required by the Court's December 23, 2008 Order, See Order [Dkt. No. 12];

 (b) is inadequate to rebut the prima facie validity of the Claim as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f); and

 (c) violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based.  See, e.g., Collier on Bankruptcy ¶ 3007.01(3) (15th ed.) ("[A]n objection to a claim should…meet the [pleading] standards of an answer.  It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses."); In re Enron Corp., No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (Bankr. S.D.N.Y. Jan. 13, 2003) (same).

## II. CROSS-MOTION FOR ENTRY OF ORDER FOR AUTHORITY TO AMEND CLAIM TO IDENTIFY MULTIPLE CUSTOMERS AND THEIR DEPOSITS OR, ALTERNATIVELY, TO PERMIT FILING OF LATE CLAIM

### A. AMENDMENT OF THE CLAIM SHOULD BE PERMITTED PURSUANT TO BANKRUPTCY RULE 7015

27. By this Cross-Motion, the Objectors request that they be permitted to amend the Claim to clarify their separate deposits into the Account.

28. Under the Bankruptcy Rules, courts may permit post-bar date amendments to timely filed proofs of claim.  See Fed. R. Bankr. P. 7015 (providing that Rule 15 of the Federal Rules of Civil Procedure governing amendment of pleadings applies in adversary proceedings);

Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 133 (2d Cir. 2005) (citing Fed. R. Bankr. P. 7015).

29. As stated by the Second Circuit, "[a]mendment to a claim is freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim." Enron, 419 F.3d at 133 (quoting In re Integrated Res., Inc., 157 B.R. 66, 70 (S.D.N.Y. 1993)). However, the court must subject post bar date amendments to careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment. Id. (quoting Integrated Res., Inc., 157 B.R. at 70).

30. Courts considering amendments to claims typically engage in a two-step inquiry: first, they examine "'whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable.'". Enron, 419 F.3d at 133 (quoting Integrated Res., Inc., 157 B.R. at 70). An amendment will meet this threshold if it "1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim." Enron, 419 F.3d at 133 (quoting In re McLean Indus., Inc., 121 B.R. 704, 708 (Bankr. S.D.N.Y. 1990)). Second, if an amendment does, in fact, "relate back" to the timely filed claim, courts will "examine each fact within the case and determine whether it would be equitable to allow the amendment." Enron, 419 F.3d at 133 (quoting Integrated Res., Inc., 157 B.R. at 70).

31. Courts consider the following five equitable factors in determining whether to allow an amendment: (1) undue prejudice to the opposing party; (2) bad faith or dilatory behavior on the part of the claimant; (3) whether other creditors would receive a windfall were the amendment not allowed; (4) whether other claimants might be harmed or prejudiced; and (5) the justification for the inability to file the amended claim at the time the original claim was filed. Integrated Resources, 157 B.R. at 70 (internal citation omitted). See also Enron, 419 F.3d at 133-134; McLean Indus., 121 B.R. at 708. Of these, however, "the critical consideration is

251276.3                                                12

whether the opposing party will be unduly prejudiced by the amendment." Enron, 419 F.3d at 133 (quoting Integrated Res., Inc., 157 B.R. at 70).

32. "This equitable analysis of belated amendments to claims closely resembles Pioneer's 'excusable neglect' analysis of belated new claims." Enron, 419 F.3d at 133. See Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P., 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993). "If there is a difference between the two analyses, it is the following: While belated *amendments* will ordinarily be 'freely allowed' where other parties will not be prejudiced, belated *new* claims will ordinarily be denied, even absent prejudice, unless the reason for the delay is compelling." Enron, 419 F.3d at 133-134 (emphasis in original).

33. Bankruptcy Rule 9006 governs the admission of late-filed new claims, as opposed to amendments, whereas Bankruptcy Rule 7015 governs amendments. Enron, 419 F.3d at 133-34. As recognized by the Second Circuit, "there may well be instances in which a claim, considered as an amendment to an earlier-filed claim, might be permitted in a court's equitable discretion because accepting it is not unduly prejudicial to other parties, even though the same claim, considered as a new claim under *Pioneer*, might not be permitted because the reason for the delay is not sufficiently compelling." Id. at 134.

34. The Objectors clearly satisfy the two-step inquiry articulated by the Second Circuit in Enron, 419 F.3d at 133, in order for this Court to authorize the Objectors to amend the Claim pursuant to Bankruptcy Rule 7015 and Fed. R. Civ. P. 15(a)(2) to clarify that two separate customers under the definition of SIPA, i.e., ABG Partners and Graybow Group, have asserted two separate claims based upon the deposits to the Account. The first prong is satisfied because the Claim timely asserted a claim based on Graybow's $700,000 investment. The "Summary of Account Transactions" page annexed to the Claim shows that there were Capital Additions of $1,450,000, including the $700,000 deposit made in November 2007. Moreover, the Claim was accompanied by Mr. Weisberg's March 3, 2009 cover letter and Graybow Group's November 19, 2007 letter. The proposed amendment meets the threshold to show

that there was a timely assertion of a similar claim or demand, for two separate reasons. First, the proposed amendment merely corrects a defect of form in the original Claim, and second, the proposed amendment would describe the original Claim with greater particularity. See Enron, 419 F.3d at 133.

35.     The second prong of the two-part test also is satisfied because consideration of the five equitable factors leads to the inescapable conclusion that it would be wholly equitable to allow the amendment.

36.     First, there would be no undue prejudice to the opposing party if the proposed amendment were permitted. With respect to prejudice to the debtor or other parties in interest, courts consider: (1) the size of the claim in relation to the estate, (2) whether the plan has been filed with knowledge of the existence of the claim, and (3) the disruptive effect allowance of the claim would have on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated. In re Calpine Corp., 2007 U.S. Dist. LEXIS 86514 (S.D.N.Y. Nov. 21, 2007); *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 101 (Bankr. S.D.N.Y. 2007); see *In re Keene Corp.*, 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995).

37.     The size of the Claim does not support a finding of prejudice in this case. It has been observed that prejudice means more than "a simple dollar-for-dollar depletion of assets otherwise available for timely filed claims." In re R.H. Macy & Co., Inc., 166 B.R. 799, 802 (S.D.N.Y. 1994). However, "the size of the claim cannot be irrelevant to the analysis," and courts have found prejudice in situations where the size of the claims threatens the plan of reorganization. Enron Corp., 419 F.3d at 130; cf. In re AM Intern, Inc., 67 B.R. 79, 82 (N.D. Ill. 1986) ("Ordinarily, to be within the scope of a permissible amendment, the second claim should not only be of the same nature as the first but also reasonably within the amount to which the first claim provided notice."). Here, the proceeding is a liquidation, no plan of liquidation has been filed or even negotiated, and the Objectors, by the proposed amendment, are not increasing the total claims against the estate. Moreover, no prejudice would result from the

proposed amendment because the Trustee was certainly made aware of Graybow Group's $700,000 investment prior to the bar date. Permitting the proposed amendment would not have any disruptive effect in this proceeding.

38. Second, there was absolutely no bad faith or dilatory behavior on the part of the Objectors. Mr. Weisberg specifically asked the Trustee in his March 3, 2009 letter whether "a separate claim is available for the account that was not established…".

39. Third, other creditors would not receive a windfall were the amendment not allowed. While other creditors may receive a larger distribution if the amendment is disallowed, this would not constitute a windfall. See In re Enron Recovery Creditors Corp., 370 B.R. at 99.

40. Fourth, other claimants would not be harmed or prejudiced by the amendment of the Claim. As discussed above, the total claims against the estate would not be increased by the amendment of the Claim.

41. Finally, the Objectors have provided a sufficient justification for their inability to file the amended claim at the time the original Claim was filed. The Objectors' failure to file the amended claim at the time the original Claim was filed was fully understandable, particularly given that BLMIS had never established an account in the name of Graybow Group as Graybow Group had requested, both in writing and verbally; ABG Partners received a Customer Claim form, and Graybow Group had not; the Customer Claim form required a separate claim form for each account, and only one account had been established (in the name of ABG Partners).

42. In cases such as the instant case where the proposed amendment relates back and it is equitable to allow the amendment, courts authorize the claimant to amend its claim after the bar date. See, e.g. In re Telephone Company of Central Florida, 308 B.R. 579, 582-83 (Bankr. M.D. Fla. 2004) (permitting IRS to amend its claim post-confirmation, finding that the IRS had provided adequate notice that the examination regarding the claim amount was pending, had not intentionally or negligently delayed in seeking an amendment, and that it may well have filed the claim earlier had the debtor cooperated with the IRS; noting that "[a] proof of

251276.3                              15

claim for unpaid taxes that effectively increases the amount sought does not bar amendment, unless the claim asserts a different tax or a different fiscal time frame.").[1]

### B. ALTERNATIVELY, A LATE CLAIM SHOULD BE PERMITTED ON THE GROUNDS OF EXCUSABLE NEGLECT PURSUANT TO BANKRUPTCY RULE 9006(b)

43.   As demonstrated above, the Court should allow the Objectors to amend their Claim pursuant to Bankruptcy Rule 7015 to clarify that two separate customers, i.e., ABG Partners and Graybow Group, have asserted claims based upon the deposits to the Account, in order to correct a defect of form in the original Claim, and to describe the original Claim with greater particularity and accuracy.  The Objectors further submit, as an alternative ground for relief, that the Court should permit Graybow Group to file a late proof of claim based on excusable neglect, pursuant to Bankruptcy Rule 9006(b).  See Pioneer, 507 U.S. 380 (1993).

44.   Bankruptcy Rule 9006(b) provides that when a party moves for an extension of time after the expiration of the time period, the party must show that its failure to act before the deadline was due to excusable neglect.  Fed. R. Bankr. P. 9006(b).  Bankruptcy Rule 9006(b)(1) provides:

> Except as provided in paragraphs (2) and (3) of this subdivision, when an act is required or allowed to be done at or within a specified period by the rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion ... on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

---

[1] It appears that the majority of reported decisions on the issue of whether to permit amendment of proofs of claim for pre-petition claims involve situations where amendment was sought after plan confirmation, or at least after plan negotiation.  See, e.g., In re Spiegel, Inc., 337 B.R. 816, 820 (Bankr. S.D.N.Y. 2006)(BRL) (denying request to allow amended claims which did not correct a defect of form, did not describe the original claim with greater particularity and did not plead a new theory of recovery, and which asserted new liabilities against the debtor at a time when a plan had already been negotiated based, in part, upon the timely filed claims and allowing claims filed at confirmation "would wreak havoc with the entire Plan negotiation process."); Holstein v. Brill, 987 F.2d 1268, 1270-71 (7th Cir. 1993) (noting that post-confirmation amendments make an end run around Bankruptcy Code provisions § 1141(d)(1)(A) and § 1127 and "may throw monkey wrenches into the proceedings, making the plan infeasible or altering the distributions to remaining creditors"). These cases are easily distinguishable in that no plan has been filed or even negotiated in the instant case.

251276.3                                          16

Fed. R. Bankr. P. 9006(b)(1). Thus, under Rule 9006(b)(1), this Court may allow Graybow Group to file a late proof of claim if the Objectors demonstrate that Graybow Group's failure to timely file a separate proof of claim was the result of excusable neglect. See Pioneer, 507 U.S. at 389; Fed. R. Bankr. P. 9006(b)(1).

45. The burden of proving excusable neglect lies with the claimant seeking to file a proof of claim after a court-ordered bar date. In re Enron Corp., 419 F.3d 115 (2d Cir. 2005); In re Xpedior Inc., 325 B.R. 392 (Bankr. N.D. Ill. 2005); In re DDI Corp., 304 B.R. 626 (Bankr. S.D. N.Y. 2004).

46. In Pioneer, the Supreme Court identified four factors that are relevant when evaluating whether a party has satisfied Bankruptcy Rule 9006(b)'s requirement of excusable neglect. The four factors are: (1) the danger of prejudice to the debtor, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith. *Id*. In *Pioneer,* the Supreme Court found that these four factors supported a finding of excusable neglect.

47. In the Second Circuit, the "*Pioneer* factors are not accorded equal weight. Typically, the length of the delay, the danger of prejudice, and the movant's good faith usually weigh in favor of the parties seeking the extension. Consequently, the Second Circuit, as well as other Circuits, focus on the reason for the delay as the predominant factor." *In re Musicland Holding Corp.,* 356 B.R. 603, 607 (Bankr.S.D.N.Y.2006). Accord, Dana Corp., 2007 WL 1577763 at *4. Consideration of the four Pioneer factors clearly demonstrates that the Objectors have established grounds of excusable neglect pursuant to Bankruptcy Rule 9006(b).

48. As demonstrated below, consideration of the four Pioneer factors leads to the conclusion that the Objectors have established grounds of excusable neglect pursuant to Bankruptcy Rule 9006(b). Accordingly, Graybow Group should be authorized to file a late proof of claim.

**RESERVATION OF RIGHTS**

49. The Objectors reserve the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of any of the Objectors' right to object on any additional grounds.

50. The Objectors reserve all rights set forth in Bankruptcy Rule 9014, including, without limitation, rights of discovery. See Fed. R. Bankr. P. 9014.

51. The Objectors reserve all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

**CONCLUSION**

52. Based on the foregoing facts and legal principles, the Objectors request that

    (a) the Notice of Determination be overruled; and

    (b) the Claim be allowed and immediately paid in the full amount of $1,531,456.63, which is the September 30, 2008 equity value stated in BLMIS' Final Statement; or, alternatively,

        (i) that the Objectors be permitted to amend the Claim to identify their separate deposits; or, in the alternative,

        (ii) that the Court permit the filing of a late claim by Graybow Group; and

   (c) that the Court grant such other and further relief as it deems just and proper.

Dated: New York, New York
   November 18, 2009

            TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
            Attorneys for Claimants,
            **ABG Partners and The Graybow Group, Inc.**
            **f/k/a Graybow Communications Group, Inc.**

            By: s/ Janice B. Grubin
              Janice B. Grubin, Esq.
              Barton Nachamie, Esq.
              Jill L. Makower, Esq.
            425 Park Avenue
            New York, NY 10022
            (212) 754-9400

                and

            **MANSFIELD TANICK & COHEN P.A.**
            1700 Pillsbury Center South
            220 South Sixth Street
            Minneapolis, Minnesota 55403-1409
            (612) 339-4295
            Earl Cohen

                and

            **PARKER & WENNER, P.A.**
            220 South 6th Street
            1700 US Bank Plaza
            Minneapolis, MN 55402
            (612) 355-2201
            Boris Parker