Renee Kurland and Steven Kurland
202 Normandy Drive
Piscataway, NJ 08854
(732) 271-0715



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

SECURITIES INVESTOR PROTECTION
CORPORATION,

    Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

    Defendant.

-----------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S
DETERMINATION OF
CLAIM**

We, Renee Kurland and Steven Kurland hereby object to the Notice of Trustee's

Determination of Claim dated October 19, 2009 sent by Irving H. Picard and state as

follows:

**Background facts**

On December 15, 1992, we opened an account with Bernard L. Madoff Investment

Securities LLC ("Madoff"): Account No. 1ZA575 (the "Account") in the name of Renee

Kurland and Steven Kurland, JTWROS.  Both of us had deposited money into the

Account for the purpose of purchasing securities and each of us had the power to direct

the investments in the Account.  Each of us communicated with Madoff Investment

Securities, LLC, concerning our account.

During the period from December 15, 1992 through December 11, 2008,

according to the Trustee, we deposited a total of $350,000 into the Account and

withdrew a total of $421,066.52 from the Account. (See spreadsheet prepared by Irving H. Picard). We dispute the Trustee, Irving H. Picard's calculations.

Throughout this period that we had the Account, we paid both NJ State taxes and Federal Income Tax annually on the appreciation in the Account.

The November 30, 2008 market value of securities in the Account was $ 254,495.20. See enclosed copy of November 30, 2008 BLM account.

On February 12, 2009 , we sent a SIPC claim to Picard for the Account asserting a claim for securities in the amount of $ 254,495.20 based upon the November 30, 2008 Madoff statement.   See enclosed copy of November 30, 2008 BLM account.

On October 19, 2009, Picard sent us a determination letter (the "Determination Letter") with respect to our Account, rejecting the claim for securities based upon the November 30, 2008 balance and stated that the we were not entitled to a customer claim because we had withdrawn $71,066.52 more than we had invested, ignoring all appreciation in our Account and ignoring the fact that each of us is a "customer" under the Securities Investor Protection Act ("SIPA"), which entitled to up to $500,000 in SIPC insurance.  See copy of enclosed Picard Determination Letter.

 **Grounds for objection**

**A.  Picard has failed to comply with the Court's December 23, 2008 Order**

The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof

that we did not have a "legitimate expectation" that the balance on the Account

statements represented their property.  In fact, in each year that we had the Accounts,

we paid both state and Federal income taxes on the appreciation in the Account, which

were duly accepted by the federal and state taxing authorities.  We would not have paid

those sums if we did not believe that the assets in the Account belonged to us.  Our

accountant also confirmed that these amounts were due.

Picard has failed to state a basis in the Determination Letter for the position he

has taken.  Thus, he has not complied with the requirement that an "objection to a claim

should . . . meet the [pleading] standards of an answer.  It should make clear which

facts are disputed; it should allege facts necessary to affirmative defenses; and it should

describe the theoretical bases of those defenses."  Collier on Bankruptcy ¶

3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at *25

(B.S.D.N.Y. Jan. 13, 2003).

**B.  Picard has violated the requirement that he honor a customer's "legitimate expectations"**

The legislative history of the Securities Investor Protection Act ("SIPA") makes

clear that Congress' intent was to protect a customer's "legitimate expectations."  For

example, Congressman Robert Eckhardt commented when SIPA was amended in

1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.

> \*       \*       \*

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may

have been lost, improperly hypothecated, misappropriated, never
purchased, or even stolen, this is not always possible. Accordingly, [when
this is not possible, customers] will receive cash based on the market
value as of the filing date.

H.R. Rep. 95-746 at 21.

1.      SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA,

provide for the classification of claims in accordance with the "legitimate expectations"

of a customer based upon the written transaction confirmations sent by the broker-

dealer to the customer.

2.      Thus, SIPC is statutorily bound to honor a customer's "legitimate

expectations." This was acknowledged by SIPC in a brief it submitted to the Second

Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the

legitimate expectations of investors, even where the broker never purchased the

securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are
> controlling even where inconsistent with transaction reality. Thus, for
> example, **where a claimant orders a securities purchase and receives
> a written confirmation statement reflecting that purchase, the
> claimant generally has a reasonable expectation that he or she holds
> the securities identified in the confirmation and therefore generally is
> entitled to recover those securities (within the limits imposed by
> SIPA), even where the purchase never actually occurred and the
> debtor instead converted the cash deposited by the claimant to fund
> that purchase . . .** [T]his emphasis on reasonable and legitimate claimant
> expectations frequently yields much greater 'customer' protection than
> would be the case if transaction reality, not claimant expectations, were
> controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

3.      Picard's position in the Madoff case is contradicted, not only by SIPC's

prior treatment of customers in the *New Times* case, but also by a statement that

SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008

wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in

his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang,
> if clients were presented statements and had reason to believe that the
> securities were in fact owned, the SIPC will be required to buy these
> securities in the open market to make the customer whole up to $500K
> each. So if Madoff client number 1234 was given a statement showing
> they owned 1000 GOOG shares, even if a transaction never took place,
> the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

4.      As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its

obligation under SIPA to pay customers up to $500,000 based on their final brokerage

statement, inclusive of appreciation in their accounts, despite the fact that the broker

had operated a Ponzi scheme for a period of approximately 17 years and had never

purchased the securities reflected on the customers' monthly statements. In fact,

SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that

customers would receive securities up to $500,000 including the appreciation in their

accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities,
> without question. Whether – if they triple in value, you'll get the securities
> . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the
> people their securities positions.**

5

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y.

7/28/00) (emphasis added).

**C. Without legal authority, Picard has invented his own definition of "net equity"**

5.    SIPA defines "net equity" as the value of the securities positions in the

customer's account as of the SIPA filing date, less any amount the customer owes the

debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

6.    SIPA specifically prohibits SIPC from changing the definition of "net

equity."  15 U.S.C. § 78ccc(b)(4)(A).

7.    The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See*

*also, In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y.

1999)("'Net equity' is calculated as the difference between what the debtor owes

6

the customer and what the customer owes the debtor on the date the SIPA

proceeding is filed.").

8.      In derogation of his obligations to carry out the provisions of SIPA, Picard

has created his own definition of "net equity." Picard has asserted that he has a right to

recognize investors' claims only for the amount of their net investment, disregarding all

appreciation in their accounts. By this procedure, Picard would avoid paying SIPC

insurance to the thousands of elderly, long-term Madoff investors who, like us, have

depended upon their Madoff investments for their daily living expenses. He also would

be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation

claim for reimbursement of the insurance it does pay to customers.

9.      Stephen Harbeck, the President of SIPC, justifies this conduct by claiming

that:

> Using the final statements created by Mr. Madoff as the sole criteria for
> what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief
> . . . Mr. Madoff . . . to determine who receives a larger proportion of the
> assets collected by the Trustee.

10.      Harbeck's statement is a rationalization of what appears to be SIPC's

goal, *i.e.*, to save money for the brokerage community at the expense of innocent

investors who relied upon the SEC's competence and integrity in investigating Madoff

seven times over an 11-year period.

11.      After ten months of his tenure, Picard has identified only two Madoff

investors who **might not** have had a "legitimate expectation" that the trade

confirmations and account statements they received were accurate. For example,

Picard has sued two Madoff customers, Stanley Chais and Jeffrey Picower who, Picard

has alleged, took out of Madoff $7 billion more than they invested. Picard has further

7

alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

12.     However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

13.     We, like thousands of other investors, received monthly statements from Madoff over the past 16 years indicating returns on their Madoff investment in the range of 9.58% to 20.05% per year. We had entered into a standard brokerage agreement with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Account had specific numbers; we received on a monthly basis trade confirmations for every securities transaction in the Account which accurately set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis to claim that we did not have a "legitimate expectation" that the assets reflected on the Account statements sent to us by Madoff belonged to us. Thus, we are entitled to a claim for securities in the amount of $ 257,895.20, as reflected on the November 30, 2008 Madoff statement.

**D. We are each a "customer" under SIPA and are each entitled to $500,000 in SIPC insurance.**

14.     Each of us is a "customer" under the plain definition of "customer" in SIPA. Thus, each is entitled to receive up to $500,000 in SIPC insurance. 15 U.S.C. § 78lll(2)

8

("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.").

15.    Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words:  "A "customer" is an account holder." Instead, Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor").

16.    Any ambiguity in the definition of "customer," and there is none here, should be construed in our favor because "SIPA is remedial legislation.  As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

17.    The Trustee erroneously relies upon SIPC Rule 105.  SIPA does not permit SIPC, by the promulgation of Rules, to change the definition of "customer" under the statute.  Hence, Rule 105 is invalid.  15 U.S.C. § 78ccc(b)(4)(A).

**E.  We are entitled to prejudgment interest on our investment and profits.**

18.    Under New York law, which is applicable here, funds deposited with Madoff are entitled to interest.  *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-

501, *et seq.* Moreover, since Madoff converted our funds, that fact also entitles them to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.S.* Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

19.    Although it is not legally relevant, Picard cannot prove that Madoff earned no money on our investment. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which we and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

20.    In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g., Donell v. Kowell,* 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.,* No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi,* Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow.

10

Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

## F. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit

21.     In derogation of his fiduciary duty to us, Picard has applied his net investment calculation to determine the amount of our claim. However, he has no right to reduce our claim in this manner and to deduct withdrawals from our Account balances. Without any legal authority, Picard is, in effect, imposing upon us a fraudulent conveyance judgment for sums we withdrew from the Accounts beyond the statute of limitations period applicable to fraudulent conveyances. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived us of the claim to which we are absolutely entitled.

## H. Picard has violated SIPA by delaying the payment of SIPC insurance

22.     Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace our securities up to a value of $500,000 for each of them as of November 30, 2008.

11

## Conclusion

We are entitled to an order compelling Picard and SIPC to immediately replace the securities in our Account to the extent of a valuation of $500,000 for each of us as of November 30, 2008.  Thus, we should receive securities valued at $ 254,495.20 as of November 30, 2008.

We are entitled to have our claim recognized in the amount of $254,495.20, consistent with the November 30, 2008 statements.

We are entitled to judgment against Picard and Baker & Hostetler LLP for the damages we have suffered as a result of the breach of fiduciary duty of Picard and his counsel.

November 16, 2009

_____          11/16/09
Renee Kurland                                              Date

_____          11/16/09
Steven Kurland                                             Date