**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Alissa M. Nann
Email: anann@bakerlaw.com

*Attorneys for Irving H. Picard, Esq. Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*And Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**TRUSTEE'S SECOND INTERIM REPORT**
**FOR THE PERIOD ENDING OCTOBER 31, 2009**

300040417

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................3

II.     BACKGROUND ....................................................................................................5
        A.  PROCEDURAL HISTORY ........................................................................5
        B.  MADOFF CHAPTER 7 LIQUIDATION ...................................................7
        C.  MSIL AND JOINT PROVISIONAL LIQUIDATORS ...............................8
        D.  CRIMINAL AND CIVIL CASES ...............................................................9

III.    LIQUIDATION PROCEEDING........................................................................15

IV.     ADMINISTRATION OF THE ESTATE............................................................16
        A.  RETENTION OF PROFESSIONALS .......................................................17
        B.  MARSHALLING AND LIQUIDATION OF ESTATE ASSETS................17
        C.  WIND-DOWN OF ESTATE OPERATIONS.............................................21

V.      FINANCIAL CONDITION OF ESTATE ..........................................................24

VI.     GOVERNMENT FORFEITURE ........................................................................25

VII.    CLAIMS ADMINISTRATION ..........................................................................26
        A.  CUSTOMER CLAIMS ..............................................................................26
        B.  CLAIMS OF GENERAL CREDITORS .....................................................34

VIII.   TRUSTEE INVESTIGATION............................................................................35
        A.  INTERNATIONAL PROCEEDINGS ........................................................36
        B.  DOMESTIC PROCEEDINGS ....................................................................42
        C.  BANKS & FEEDER FUNDS .....................................................................45
        D.  POTENTIAL INSIDERS AND CORPORATE ASSETS .............................45
        E.  EVIDENCE GATHERING .........................................................................47

IX.     BANKRUPTCY COURT PROCEEDINGS .......................................................49
        A.  NET EQUITY DISPUTE ............................................................................49
        B.  THIRD-PARTY ACTIONS AGAINST THE TRUSTEE .............................51
        C.  OBJECTIONS TO CLAIMS DETERMINATIONS ....................................54
        D.  OBJECTION TO FEE APPLICATIONS .....................................................55
        E.  AVOIDANCE ACTIONS BY THE TRUSTEE ...........................................56
        F.  SETTLEMENTS .........................................................................................69
        G.  MOTIONS TO INTERVENE .....................................................................70

X.      CONCLUSION ...................................................................................................72

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, Esq. (the "Trustee"), trustee for the substantively consolidated

liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard

L. Madoff ("Madoff" and together with BLMIS, each a "Debtor" and collectively, the

"Debtors"), respectfully submits his Second Interim Report (this "Report") pursuant to section

78fff-1(c) of the Securities Investor Protection Act[1] and in accordance with the terms of the

Order on Application for an Entry of an Order Approving Form and Manner of Publication and

Mailing of Notices, Specifying Procedures For Filing, Determination, and Adjudication of

Claims; and Providing Other Relief entered on December 23, 2008 (the "Housekeeping Order"

or "Claims Procedures Order") [Dkt. No. 12].  Pursuant to the Housekeeping Order, the Trustee

shall file additional interim reports at least every six (6) months hereafter. This Report covers the

period ending October 31, 2009, or as otherwise indicated (the "Report Period").

## I.    **INTRODUCTION**

1.      The Trustee and his counsel (including, but not limited to, B&H, various

international special counsel retained the Trustee as described in ¶ 116 below ("International

Counsel"), Windels Marx Lane & Mittendorf, LLP ("Windels Marx"), special counsel to the

Trustee, and together with International Counsel and B&H, collectively referred to herein as

"Counsel"), made significant headway into the investigation of Madoff's fraud.  To date, the

Trustee has filed fourteen (14) avoidance actions seeking to recover more than $14.8 billion in

funds from various feeder funds, Madoff friends and family members and related parties. The

Trustee anticipates filing extensive additional litigation based on investigation conducted by the

---

[1] The Securities Investor Protection Act ("SIPA") is found at 15 U.S.C. 78aaa et seq.  For convenience, subsequent references to SIPA will omit "15 U.S.C. ____."

Trustee's counsel and consultants. Because of efforts made by the Trustee and his counsel, as of November 18, 2009, $1,183,779,811.89 has been recovered for the benefit of customers.

2.       During the Report Period, the Trustee and B&H also made substantial progress in processing and determining the claims of customers of BLMIS. As further described in section VII.A *infra*, as of October 31, 2009, the Trustee had determined 2,870 claims, allowed 1,561 customers claims ($4.4 billion in allowed claims), and had committed to pay approximately $535 million in SIPC advances, leaving approximately $3.9 billion in over-the-limits claims.[2]

3.       In addition, the Trustee implemented a Hardship Program, which allows customers suffering from the worst financial circumstances to apply to a streamlined program aimed at getting out advances provided by SIPC in a timely manner to those customers who qualify.

4.       Given the task of liquidating BLMIS, and in doing so, cooperating with those federal and state authorities investigating the criminal, civil and regulatory matters, the Trustee and his counsel have also dealt with issues spanning a broad spectrum of legal and administrative specialties and disciplines. The Trustee's ability to call on the resources of B&H in such areas as corporate, real estate, bankruptcy, securities, employment, tax, banking, litigation (and others) has been of material assistance in pursuing the Trustee's statutorily-mandated investigations, achieving results, establishing protocols, and directing the efforts of the Trustee's financial professionals.

5.       During the Report Period, the Trustee and his counsel and staff have met extraordinary challenges, in a manner beneficial to the customers, creditors, and other investors

---

[2] Additional progress has been made in the determination of customer claims since the conclusion of the Report Period. From October 31, 2009 through November 19, 2009, the Trustee determined 151 additional customer claims, and allowed 65 of those claims, for a total of $4,672,030,364.53 in allowed claims, $554,790,758.86 in committed SIPC advances and $4,117,239,605.67 in over-the-limit claims as of November 19, 2009.

of BLMIS.  This Report is meant to provide an overview of all the efforts engaged in by the

Trustee and his team of professionals and to summarize all of the results achieved, as well as

challenges faced by the Trustee during the Report Period.

## II.  **BACKGROUND**

6.    BLMIS was founded by Madoff in 1960 and engaged in three primary types of

business: market making, proprietary trading and investment advisory services.  BLMIS was

registered with the SEC as a broker-dealer and beginning in 2006 as an investment advisor.

Pursuant to such registration as a broker-dealer, BLMIS was a member of SIPC.  BLMIS was

also a member of the Financial Industry Regulatory Authority ("FINRA"), formerly known as

the National Association of Securities Dealers, Inc. ("NASD").

## A.    **PROCEDURAL HISTORY**

7.    On December 11, 2008, Madoff was arrested by the FBI in his Manhattan home

and was criminally charged with a multi-billion dollar securities fraud scheme in violation of 15

U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. 240.10b-5 in the United States District Court for the

Southern District of New York ("District Court"), captioned USA v. Madoff (No. 08-2735).

[That case number was terminated on March 10, 2009, and a new case number, USA v. Madoff

(No. 09 CR 213) was opened and assigned to District Court Judge Denny Chin] (the "Criminal

Case").

8.    Also on December 11, 2008 (the "Filing Date" for the SIPA liquidation

proceeding),  the SEC filed a complaint in the District Court against defendants Madoff and

BLMIS, captioned Securities and Exchange Commission v. Madoff, et al. (No. 08 CV 10791)

(the "Civil Case").  The complaint alleged that the defendants engaged in fraud through the

investment advisor (or "IA") activities of BLMIS.

9.      Based on allegations brought by the SEC against Madoff and BLMIS in the Civil Case, on December 12, 2008, the Honorable Louis L. Stanton of the District Court entered an order which appointed Lee S. Richards, Esq. as receiver for BLMIS (the "Receiver").

10.     On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of the Civil Case with an application filed by SIPC.  Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that the Debtor was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

11.     On that date, the District Court entered the Protective Decree (Civil Case Dkt. No. 4), to which BLMIS consented, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA, therefore, effectively replacing the Receiver as to BLMIS;

(b)     appointed Baker & Hostetler LLP ("B&H") as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

(c)     removed the case to the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court" or "Court") pursuant to section 78eee(b)(4) of SIPA.[3]

12.     On December 18, 2008, the District Court entered the Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants (the "Preliminary Injunction Order").  Among other things, the Preliminary Injunction Order clarified that the Receiver's authority was limited to assets of Madoff's U.K. entity, Madoff Securities International Ltd. ("MSIL").

13.     On February 26, 2009, the Receiver submitted a report and application to Terminate the Receivership to the District Court.  After receipt of submissions by the Trustee,

the SEC, and the Department of Justice, and after a hearing on March 23, 2009, the District

Court issued an order discharging the Receiver and terminating the receivership.

B.    **MADOFF CHAPTER 7 LIQUIDATION**

14.    On April 10, 2009, the District Court entered an order in the Civil Case modifying

article V of the Order on Consent Imposing Preliminary Injunction, Freezing Assets and

Granting Other Relief Against Defendants dated December 18, 2008, to allow the Petitioning

Creditors (as defined below) to file an involuntary bankruptcy petition against Madoff [Civil

Case Dkt. No. 46].  The District Court in its Order noted that:

> A Bankruptcy Trustee has direct rights to Mr. Madoff's individual
> property, with the ability to maximize the size of the estate
> available to Mr. Madoff's creditors through his statutory authority
> to locate assets, avoid fraudulent transfers, and preserve or increase
> the value of assets through investment or sale, as well as provide
> notice to creditors, process claims, and make distributions in a
> transparent manner under the procedures and preferences
> established by Congress, all under the supervision of the
> Bankruptcy Court.

15.    On April 13, 2009, Blumenthal & Associates Florida General Partnership, Martin

Rappaport Charitable Remainder Unitrust, Martin Rappaport, Marc Cherno and Steven

Morganstern (collectively, the "Petitioning Creditors"), filed an involuntary chapter 7 bankruptcy

petition against Madoff individually in the Bankruptcy Court (Case No. 09-11893 (BRL)) (the

"Chapter 7 Case").

16.    On April 21, 2009, pursuant to an Order of the Bankruptcy Court signed on April

20, 2009 directing the appointment of an interim chapter 7 trustee in the Chapter 7 Case, the

United States Trustee's Office for the Southern District of New York appointed Alan Nisselson,

Esq. as interim trustee for the Chapter 7 Case (the "Chapter 7 Trustee").

---

[3] Pursuant to section 78fff(b) of SIPA, "[t]o the extent consistent with [SIPA], [this] liquidation proceeding [is] be[ing] conducted
in accordance with, and as though it [is] being conducted under chapter 1, 3, 5 and subchapters I and II of chapter 7 of [the

17.    On May 5, 2009, the Trustee and SIPC filed a joint motion for entry of an order pursuant to section 105(a) of the Bankruptcy Code substantively consolidating the Madoff chapter 7 estate into the BLMIS SIPA Liquidation (the "Substantive Consolidation Motion").

18.    On June 9, 2009, this Court approved and entered a Consent Order [Dkt. No. 252] which, among other things, approved the Substantive Consolidation Motion *nunc pro tunc* to December 11, 2008.

19.    Windels Marx, which had previously been counsel to the Chapter 7 Trustee, was subsequently retained on behalf of the consolidated estate as special counsel to the Trustee and the Chapter 7 Trustee by order dated July 16, 2009, *nunc pro tunc* as of June 9, 2009 [Dkt. No. 327].

C.    **MSIL AND JOINT PROVISIONAL LIQUIDATORS**

20.    On June 9, 2009, the Bankruptcy Court approved two protocols between the Trustee and the Joint Provisional Liquidators ("JPLs") for MSIL.  The protocols provide for cooperation between the Trustee and the JPLs.  Specifically, the Trustee and the JPLs entered into the Cross-Border Insolvency Protocol for the Bernard Madoff Group of Companies (the "Cross Border Protocol") and an Information Sharing Protocol (the "Information Protocol").

21.    The Cross Border Protocol provides that the Trustee and the JPLs will keep each other updated with respect to their activities, including any court proceedings and will work together regarding any assets that the representatives locate.  The Information Protocol sharing of information regarding the affairs of BLMIS and MSIL, including by their respective agents.

22.    On June 9, 2009, the MSIL proceeding also was recognized by the Bankruptcy Court as a foreign main proceeding pursuant to Chapter 15 of the Bankruptcy Code.

---

Bankruptcy Code]."

23.     The JPLs and the Trustee have had a number of discussions regarding updates on each investigation including on July 30, August 26, and September 10, 2009 and they and their counsel or consultants also have exchanged information of mutual interest.   The JPLs have interviewed certain MSIL employees and have expressed an ongoing interest in speaking with certain BLMIS employees.   The JPLs have also updated the Trustee on their attempts to recover the yacht "Bull" located in France.

24.     FTI has been in attendance at all of the interviews by the JPLs and has also been assisting the JPLs and Grant Thornton with the reconstruction of finances at MSIL.

D.     **CRIMINAL AND CIVIL CASES**

USA v. Madoff, 09-cr-213, SDNY.

25.     At a plea hearing (the "Plea Hearing") on March 12, 2009 in the Criminal Case, Madoff pled guilty to an 11-count criminal information, which counts included securities fraud, money laundering and theft and embezzlement, filed against him by the United States Attorney's Office for the Southern District of New York ("USAO").   At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."   (Plea Hr'g Tr. at 23:14-17.)   Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."   (Id. at 23:20-21.)   Madoff filed a plea allocution describing some of the details of his fraud (the "Allocution") [Criminal Case Dkt. No. 50].

26.     Madoff represented to clients and prospective clients that he would invest their money in shares of common stock, options and other securities and would, at their request, return profit and principal.   (See Allocution at pg. 1).   As the world is now aware, no such securities were purchased by Madoff.

27.     In pleading guilty to the crimes he committed, Madoff admitted that since at least the early 1990's the IA business of BLMIS was used to operate a Ponzi scheme.  (See Allocution

at p. 2).  Madoff solicited billions of dollars under false pretenses and failed to invest investors'

funds as promised.  Instead, he deposited investors funds in a bank account at Chase Manhattan

Bank.  (*See* Allocution at pg. 1).  In his Allocution, Madoff also described how he moved funds

between this account and other BLMIS accounts in an attempt to conceal the fraud.  (*See*

Allocution at pg. 4).

28.     On June 29, 2009, Madoff was sentenced by the District Court to serve, in

consecutive terms, the maximum term of incarceration recommended under the U.S. Federal

Sentencing Guidelines on each count to which Madoff pled guilty.  The sentence totals 150 years

in prison.  Madoff is currently serving his sentence at a federal correctional facility in North

Carolina.

SEC v. Madoff, No. 08-cv-10791, SDNY.

29.     As described above in ¶ 8, on December 11, 2008, the SEC filed the Civil Case

against Madoff and BLMIS.  The complaint alleged that the defendants engaged in fraud through

investment advisor activities of BLMIS.

USA vs. DiPascali, 09-cr-764, SDNY.

30.     In 1975, Frank DiPascali, Jr. ("DiPascali"), who was 18 years old at the time,

began working at BLMIS as a stock researcher and as Peter Madoff's assistant.  DiPascali

quickly rose within the company ranks to became Director of Options Trading in 1986, and

Chief Financial Officer in 1996.  DiPascali eventually became a key lieutenant in Madoff's

operation and oversaw the day-to-day operations of Madoff's investment-advisory business.

DiPascali frequently interacted with investors as they were told that he was the one who

executed their trades.

31.    In August 2009, DiPascali plead guilty in the District Court to ten criminal counts, including: conspiracy, securities fraud, mail fraud, wire fraud, investment fraud, two counts of falsifying the books of a broker dealer, international money laundering, perjury and federal income tax evasion.  He faces a maximum of 125 years in prison.  In his statement to the court, DiPascali said that he helped Madoff defraud investors from as early as the late 1980's until December 2008.  DiPascali admitted that, during this time period, BLMIS did not buy or sell securities through its investment advisory business, and that he had fabricated account statements, knowingly lied to investors and committed perjury before the SEC.  Said DiPascali:

> From at least the early 1990s through December of 2008, there was one simple fact that Bernie Madoff knew, that I knew, and that other people knew but that we never told the clients nor did we tell the regulators like the SEC. No purchases of sales of securities were actually taking place in their accounts. It was all fake. It was all fictitious. It was wrong and I knew it was wrong at the time, sir.

Plea Hr'g Tr. at 46:9-15.

32.    According to media reports, DiPascali has been cooperating with federal investigators looking into the Madoff fraud since February.  Upon DiPascali's guilty plea, U.S. District Judge Richard Sullivan denied the federal prosecutor's request that DiPascali be released on $2.5M bail. Judge Sullivan commented that he believed that DiPascali was a flight risk and that he could not ignore the years of deception by DiPascali.  On October 28, DiPascali appeared again in front of Judge Sullivan under an adjusted bail package negotiated by federal prosecutors.  While Judge Sullivan did not agree to release DiPascali on bail, he did agree to receive information under seal from the prosecutors respecting DiPascali's cooperation with federal authorities and reconsider the matter.

SEC v. DiPascali, 09-cv-7085, SDNY.

33.    On August 11, the SEC filed civil charges against DiPascali, citing securities fraud related to his overseeing of a fictitious investment strategy and the creation of millions of fake documents and trading records.   The SEC charges indicate that DiPascali sustained the fraud from at least the 1980's all the way up to firm's December 2008 collapse.   The complaint also states that this level of fraud took great effort due to DiPascali's ability to hide thousands of BLMIS investor advisory accounts from SEC registration.   To continue the deception, DiPascali even prepared a "cooked" set of books and records to provide regulators false information upon a review of the true scope and size of BLMIS.   Finally, the SEC complaint states that DiPascali misappropriated investor funds for his personal gain – from which he withdrew more than $5M between 2002 and 2008.

34.    The SEC complaint seeks financial penalties and a court order requiring DiPascali to return all ill-gotten gains.

USA v. Friehling, 09-cr-700, SDNY.

35.    Since the late 1970's, Friehling & Horowitz, a little-known accounting office in New York City's northern suburb of New City, New York, conducted the independent accounting and auditing work for BLMIS.   The tiny firm consisted of one partner, Jerome Horowitz, an accountant and a secretary.   In 1991, Jerome Horowitz began to work part-time and handed the majority of the firm's accounts to his son-in-law, David Friehling.   Friehling held his post until Madoff's 2008 confession.   From 2004 to 2007, Friehling was paid about $13,500 per month by BLMIS - despite never verifying the firm's sources of revenue, assets, bank account statements or alleged stock purchases.

36.     On November 3, 2009, Friehling pled guilty in District Court for his role as independent BLMIS auditor.  Friehling told District Judge Alvin Hellerstein that he (a) didn't conduct an independent investigation of BLMIS (b) didn't follow the generally accepted accounting rules required of his profession and (c) accepted Madoff's claims about the firm's finances at "face value".  Friehling pled guilty to nine counts including securities fraud, investment-advisor fraud and obstructing tax law administration.  Friehling also admitted that he prepared false returns for Madoff and "others".  It is possible that Friehling is cooperating with federal law enforcement authorities.

37.     Friehling was released on a $2.5M bond and is due back in court in late February 2010.  He faces up to 114 years in prison.

SEC v. Friehling, 09-cv-2467, SDNY.

38.     On March 18, the SEC charged Friehling with committing securities fraud by falsely representing that he had conducted a legitimate audits of BLMIS, when, in fact, he had not.  The SEC's complaint alleges that Friehling enabled the Ponzi scheme by falsely stating in annual audit reports that his accounting firm, Friehling and Horowitz, had conducted annual audit reports pursuant to the Generally Accepted Auditing Standards (GAAP) required by the profession. These statements were materially false as Friehling never performed a meaningful audit nor did he ever perform any auditing procedures to confirm that the securities being held on behalf of BLMIS investors even existed.  Finally, in an effort to absolve himself from peer review, Friehling openly lied to the American Institute of Certified Public Accountants by denying that he conducted any audit work whatsoever.

39.     The SEC's complaint seeks permanent injunctions, civil penalties and a court ordering requiring Friehling to return all ill-gotten gains.

USA v. O'Hara, et al., 09-cr-2484 SDNY.

40.     On November 13, Jerome O'Hara and George Perez, two BLMIS computer programmers, were arrested and appeared in District Court on federal charges for their role in helping Madoff cover up his fraudulent Ponzi scheme.   The USAO complaint allege that, for over a fifteen-year period, Madoff and DiPascali routinely asked O'Hara and Perez to, among other things, create records that combined the actual positions and activity from BLMIS' market-making and proprietary trading business with the fictional balances on customer accounts.   The programmers used this data to manipulate and create false trading documents, DTC reports, trade blotters and stock records. Furthermore, O'Hara and Perez used an out-dated and technologically insufficient computer on the 17th floor (known internally as "House 17") to print millions of phony customer statements and trade records.

41.     The complaint further alleges that, in 2006, O'Hara and Perez had a crisis of conscience and attempted to delete 218 of the 225 special programs on the House 17 computer. The programmers allegedly decided afterward to cash out hundreds of thousands of dollars from their BLMIS accounts and promptly tell Madoff that they would refuse to create any more false records for BLMIS.   Madoff responded by offering them as much money necessary to keep them quiet on the matter and not expose the fraud.   Madoff ended up paying both Perez and O'Hara a 25% salary increase and a one-time bonus of more than $60,000 each.   In exchange, the programmers modified the House 17 computer so that the trading statements could be easily manipulated by DiPascali.

42.     O'Hara and Perez face up to 30 years in prison on conspiracy, 20 years for falsifying books and records of a broker-dealer, and five years for falsifying books and records of an investment adviser.

SEC v. O'Hara and Perez, 09-cv-9425 SDNY.

43.    On November 13, the SEC filed civil charges against O'Hara and Perez for their role in helping Madoff cover up his fraudulent Ponzi scheme. The SEC's complaint is seeking financial penalties and a court order requiring the programmers return their ill-gotten gains

### III.    LIQUIDATION PROCEEDING

44.    On December 23, 2008, this Court approved the Trustee's Bond (Dkt. No. 11). Pursuant to an application of the Trustee dated December 21, 2008 (Dkt. No. 8), this Court entered the Housekeeping Order (Dkt. No. 12), which directed, among other things, that on or before January 9, 2009 (a) a notice of the commencement of this SIPA proceeding be published in all editions of The New York Times, The Wall Street Journal, The Financial Times, USA Today, Jerusalem Post and Ye'diot Achronot; (b) notice of the liquidation proceeding and claims procedure be given to persons who appear to have been customers of BLMIS by mailing to each such person, at the last known address appearing on the books of BLMIS, a copy of the notice, proof of claim form and instructional materials approved by the Court; (c) notice of the liquidation proceeding and a claim form be mailed to all known general creditors of the Debtor; and (d) notice be given of the hearing on disinterestedness of the Trustee and his counsel (see section 78eee(b)(6) of SIPA) scheduled for February 4, 2009 and the meeting of creditors, scheduled for February 20, 2009.

45.    As discussed in further detail in ¶ 80 below, the required notice was published on January 2, 2009, in all required publications [Dkt. No. 57], and a mailing to customers and

general creditors of BLMIS was completed on January 9, 2009 [Dkt. No. 76].[4]  Potential

claimants were advised of the court-approved and statutory time limits for filing claims.

46.     On February 4, 2009, this Court entered the Order Regarding Disinterestedness of

the Trustee and Counsel to the Trustee (Dkt. No. 69), finding that the Trustee and B&H are

disinterested pursuant to section 78eee(b)(6) of SIPA, section 327(a) of 11 U.S.C. §§ 101, et seq.

(the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule")

2014(a) and therefore met the disinterestedness standard required by section 78eee(b)(3) of SIPA,

section 327(a) of the Bankruptcy Code, and Bankruptcy Rule 2014(a).  Accordingly, the Trustee

is duly qualified to serve and act on behalf of the Debtor's estate.

47.     On February 20, 2009, a meeting of creditors under section 341(a) of the

Bankruptcy Code was held.  No representative of the Debtor appeared for examination at that

meeting.  The Trustee and his counsel, as well as the SIPC staff, attended the meeting of

creditors and reported on the then current state of affairs as well as the process for filing and

determining customer claims.  The Trustee and counsel then responded to inquiries made by over

150 customers and creditors who attended the meeting and to questions received via email prior

to the meeting.  In addition, the Trustee made over 1,000 phone lines available for those

customers and creditors who could not attend the 341 meeting to listen in live, and also posted a

video link to the 341 meeting on the Trustee website.

## IV.    **ADMINISTRATION OF THE ESTATE**

48.     The Trustee has made every effort to keep customers and other interested parties

informed of his ongoing efforts to administer the BLMIS estate, including responding to

---

[4] In addition, materials were mailed in response to requests from customers or general creditors.  Furthermore, all claims packages were made available for download on the Trustee's website, www.madofftrustee.com, and on SIPC's website, www.sipc.org.

hundreds of phone calls, emails, and letters, establishing a telephone call center to respond to inquiries from claimants and their representatives (see discussion on customer claims process *infra* at Section VII.A), creating a website to serve as a clearinghouse for information (www.madofftrustee.com), and meeting with representatives of customers, creditors, regulatory authorities and other interested parties.

A.    **RETENTION OF PROFESSIONALS**

49.    In addition to the professionals already retained by the Trustee as described in ¶ 23 of the Trustee's First Interim Report, dated July 9, 2009 (the "First Interim Report") [Dkt. No. 314], the Trustee has retained Windels Marx as special counsel, Schifferli Vafadar Sivilotti as local counsel in Switzerland, SCA Creque as local counsel in the British Virgin Islands and a number of consultants and expert witnesses.[5]   The three counsel were retained pursuant to orders of this Court.

B.    **MARSHALLING AND LIQUIDATION OF ESTATE ASSETS**

50.    The Trustee and his counsel have worked diligently to investigate, examine and evaluate the Debtor's activities, assets, rights, liabilities, customers and other creditors.  Thus far, the Trustee has been successful in recovering a significant number of assets and in liquidating some of those assets for the benefit of customers, totaling $1,165,756,394.37.[6]   These assets include: the sale of the Debtor's market making operations; the settlement of BLMIS' trades and short positions; cash recoveries from banks and brokerage accounts that held BLMIS' funds; class action settlement recoveries; the sale of sports tickets; insurance refunds; refunds of

---

[5] A SIPA trustee has authority, subject to approval from the Securities Investor Protection Corporation ("SIPC") but without need for Court approval, among other things, to "hire and fix the compensation of all personnel (including officers and directors of the debtor and of its examining authority) and other persons (including accountants) that are deemed necessary for all or any purposes of the liquidation proceeding." 15 U.S.C. §78fff-1(a)(1).  Each of the Trustee's hiring decisions to date has been reviewed and approved by SIPC.

[6] This number for recoveries was as of the end of the Report Period.  From October 31, 2009 through November 18, 2009, the Trustee recovered an additional $18,023,417.52, for total recoveries of $1,183,779,811.89.

political contributions; tax recoveries; the sale of BLMIS loan participations; the sale of BLMIS

DTCC shares; settlements with various funds and entities for the return of customer property (see

Section IX.F *infra*); and various other miscellaneous recoveries.  For a more detailed discussion

of these recoveries, see the First Interim Report, Section V.B.  During the Report Period, the

Trustee has made recoveries from the following estate assets:

Earn-out from Surge Trading.

51.     Surge Trading Inc. (f/k/a Castor Pollux Inc.) ("Surge") was deemed the winning

bidder of the Debtor's market making operations, with a total purchase price of up to

$25,500,000.  This purchase price included a closing payment of $1,000,000 and a revenue-

based earn-out which could total up to $24,500,000.

52.     In accordance with section 4.1 (c) of the Second Amended and Restated Purchase

Agreement, dated April 29, 2009, by and between the Trustee and Surge, for the quarter ending

September 30, 2009, the Trustee received an earn-out of $3,385.73 from Surge.

Trustee's Various Accounts and Recoveries From BLMIS Accounts.

53.     The Trustee maintains a regular operating account at Citibank, which is primarily

funded by SIPC advances, and from which he pays administrative expenses and customer claims.

54.     On August 27, 2009, the Trustee opened a preferred custody interest-bearing

account at Citibank, and $800,000,000 was transferred into the account. Out of the funds

transferred, an investment of $199,999,256.40 was made in 90-day US Treasury Bills. As of

October 31, 2009, the balance of the preferred custody account was $800,514,256.78.

55.     The Trustee has a brokerage account with Morgan Joseph & Co., Inc., clearing

through J.P. Morgan Clearing Corp.  As of October 31, 2009, the value of the Trustee's Morgan

Joseph account was $299,840,638.44, consisting of a money market position having a value of $279,393,278.44 and stock and bond positions valued at $20,447,360.00

56.    As described in the First Interim Report, the Trustee had recovered a significant amount of cash from banks at which BLMIS maintained accounts (*see* First Interim Report, ¶¶ 35-37).  Since the date of that Report, the Trustee had received an additional $6,536.52 from Bank of New York.

Settlement with NETJETS.

57.    The Trustee reached a settlement agreement with NETJETS Sales, Inc. ("NJS"), NETJETS Aviation, Inc. ("NJA") and NETJETS Services, Inc. ("Services" and together with NJS and NJA, the "NJ Companies") regarding the fractional ownership of a Citation X aircraft held by BLM Air Charter LLC ("BLM Air").

58.    BLM Air was formed to acquire, own, hold, sell and otherwise deal with and dispose of interests in aircraft.  BLM Air was organized with an effective date of January 12, 2001.  Initially, the sole member of BLM Air was Madoff.  On January 30, 2001, pursuant to an Assignment Agreement, Madoff transferred ownership of "all of the economic interest" in BLM Air to BLMIS and appears to have retained certain non-economic interest.  Accordingly, the Trustee has brought a motion, on behalf of the BLMIS and Madoff estates, as the owner of BLM Air.

59.    Pursuant to a Repurchase Agreement, the NJ Companies agreed to buy back BLM Air's 12.5% ownership (the "Interest") in the aircraft for $752,963.  In consideration of this amount the Trustee and the NJ Companies agreed to refrain from making any further claims against each other, including preference claims or claims for contribution, through the bankruptcy process or otherwise.

60.     The Bankruptcy Court approved the settlement with the NJ Companies by order dated July 28, 2009.  The settlement closed on August 18, 2009, and the Trustee received payment in the amount of $752,963.

Class Action Settlement Recoveries.

61.     To date, the Trustee has identified claims that BLMIS had in at least six class action suits.  The Trustee received distributions from five of the six class action settlements totaling $54,858.99.

62.     In addition, the Trustee has identified claims that BLMIS may have had in 36 other class action suits for which BLMIS had not completed proofs of claim.  The Trustee has filed proofs of claim in ten of these cases, supported with necessary and appropriate documentation.  The Trustee has received an award from one of those class action settlements in the amount of $34,606.74.

63.     The Trustee continues to review this area.

Madoff Assets.

64.     During the Report Period, the Trustee and his counsel have advanced in their investigation and efforts to marshal certain assets acquired with BLMIS funds located domestically and internationally that are potentially worth millions of dollars.  Among other things, the Trustee and his counsel are in the process of marshalling a fifty-percent co-ownership interest in a luxury private jet, an Embraer Legacy 600, Model EMB-135 BJ (the "Aircraft") which was acquired in 2008 using $12.4 million of BLMIS funds, and title to which was placed in BLM Air.[7]

---

[7] In furtherance of that goal, on November 12, 2009, the Trustee commenced a proceeding under chapter 11 of the Bankruptcy Code for BLM Air, which is 100% economically owned by BLMIS.  The filing was precipitated by the possibility that one of the more important agreements relating to the maintenance of the Aircraft was going to be unilaterally terminated by the counterparty on November 13, 2009, and that such a termination would have

65.     In addition to further investigation and discussions with parties in interest over the past several months, the Trustee and his professionals have consulted with the USAO regarding coordination of recovery efforts with respect to a number of potential assets including, among others, the Aircraft (*see* Section VI *infra*).  The Trustee believes that the value of a number of assets, including the Aircraft, would best be preserved by him, pursuing legal remedies uniquely afforded him under the Bankruptcy Code.

66.     With respect to potential assets located abroad, the Trustee has continued to consult extensively with his counsel and international counsel regarding alternative strategies to maximize asset recovery for the benefit of the consolidated BLMIS estate.  The Trustee and his counsel also continue to confer with the USAO and the JPLs in order to maximize efficiency in the coordination of asset recovery efforts.

Miscellaneous Recoveries.

67.     In addition to the above, the Trustee has recovered $80,999.27 in miscellaneous recoveries from sources such as cancellation of various subscriptions and memberships.

C.     **WIND-DOWN OF ESTATE OPERATIONS**

Termination of BLMIS Employees.

68.     As was described in ¶ 52 of the First Interim Report, as of December 12, 2008, 140 individuals were on the BLMIS payroll.  The two largest termination stages took place at the end of January and March, which accounted for 80% of the individuals on payroll.  The initial termination stage reduced payroll costs by approximately 42% and the March termination

---

adversely affected the value of the Aircraft.  The filing of the bankruptcy is designed to help preserve the value of the Aircraft, and the Trustee believes that ultimately the Aircraft can be marketed and sold through the bankruptcy proceeding for a significant price pursuant to relevant provisions of the Bankruptcy Code.

increased the reduction of payroll costs to approximately 95% of the total payroll costs at the beginning of January. The remaining three (3) employees on the Trustee's payroll who were needed to assist in winding down certain aspects of the business were terminated as of June 30, 2009.

Termination and Liquidation of BLMIS-Sponsored Benefit Plans.

69.    As part of the process of winding down the business operations of BLMIS and dismissing its many managers and employees in an orderly and equitable fashion, the Trustee (through counsel) reviewed the many employee benefit plans BLMIS sponsored and maintained for its employees and their dependents, incident to terminating those plans and providing for the orderly resolution and liquidation of all affected individuals' and vendors' plan-related rights and claims. Initial efforts by the Trustee, B&H and AlixPartners LLP, the Trustee's consultant and claims agent ("AlixPartners"), consisted of identifying all such plans; investigating the extent to which those plans had been administered, funded, invested and maintained; identifying and rectifying any problems associated with the communication of terms, the payment or denial of benefits, and the arrangements made with plan fiduciaries and third party service providers; identifying any circumstances under which claims might be made, or actions could be taken by federal or state regulators, against the estate; and protecting the privacy rights of BLMIS' current and former employees and dependents.

70.    As a result of the initial efforts of B&H and AlixPartners, BLMIS was found to have provided health, accident and sickness benefits, retirement-related benefits, and life insurance, disability income and accidental death and dismemberment benefits under as many as six (6) identifiable employee benefit plans; some of those benefits were provided through group insurance contracts and policies, while others were provided on a self-insured basis (including a

group health plan which covered substantially all of BLMIS' current and former employees and their respective dependents) or were provided through a separately-established trust fund (such as the BLMIS-sponsored 401(k) plan).   Substantially all of the benefit plans needed to be brought into compliance with relevant law, including the Employee Retirement Income Security Act ("ERISA") prior to termination, and several of the contractual arrangements made with third parties, including third party administrators, trustees and insurance companies, needed to be modified or replaced.

71.     On May 27, 2009, the Bankruptcy Court entered an order confirming the Trustee's authority to modify, then terminate effective May 31, 2009, and finally liquidate and wind down, all of the BLMIS-sponsored health and welfare plans by collecting and adjudicating all plan-related claims made by employees, covered dependents and third parties; negotiating agreements with vendors to provide for the handling, storage and disposal of plan records (including medical records subject to federal and state privacy laws); notifying all affected individuals and third parties of their plan-held or plan-related rights; and providing for the payment of meritorious claims and the denial and discharge of  ineligible or untimely claims. The liquidation and wind-down process is expected to be completed by the close of the 2009 calendar year, ending with the submission in 2010 of final reports prepared by the Trustee and tax reports to the federal authorities responsible for plan oversight, including the Internal Revenue Service and the United States Department of Labor ("DOL").

72.     The Trustee is also seeking a court order confirming the Trustee's authority under SIPA and the Bankruptcy Code to first modify, and then terminate effective November 30, 2009, the BLMIS-sponsored 401(k) plan, subject to any restrictions or requirements suggested by the DOL, which is currently reviewing the plan.  A hearing date to approve the Trustee's motion to

terminate the 401(k) plan is set for November 24, 2009.  To the extent that plan participants do not move their contributions out of the BLMIS-sponsored 401(k) plan within a reasonable amount of time subsequent to the plan termination date, the Trustee will select a substitute custodian and assign and transfer the balance of the remaining accounts before year-end. Winding down the 401(k) plan is expected to be completed by the close of the 2009 calendar year; however, the time required to compile and submit final reports and returns to the federal authorities responsible for plan oversight is will occur after that date.

## V.    FINANCIAL CONDITION OF ESTATE

73.    A summary of the financial condition of the estate as of October 31, 2009 is provided on Exhibit A attached hereto.   To date, the Trustee has incurred significant administrative expenses in maintaining the BLMIS office, including rent payments (although since the sale of the market making operation, this has decreased substantially), monthly payment of legal fees and consultant fees (all approved by SIPC), the digitizing of records and costs associated with determining customer claims.   All administrative costs to date associated with the liquidation proceeding have been paid from SIPC administrative advances.   Since they are chargeable to the general estate, payment has no impact on recoveries that the Trustee has obtained and will obtain, and that will be allocated to the fund of customer property.

74.    As of October 31, 2009, the Trustee had requested and SIPC had advanced a total of $557,582,372.35, of which $94,170,118.83 was for administrative expenses and the balance of $463,412,253.52 was used to pay allowed customer claims up to the maximum SIPA limit ($500,000 per account).[8]

---

[8] As of October 31, 2009, the Trustee determined and allowed 1,561 claims, committing $535,422,866.60 in SIPC advances.  As described below in ¶90, the Trustee must receive an executed assignment and release form before he obtains an advance of funds from SIPC.  Thus, the amount of SIPC advances requested by the Trustee to pay allowed customer claims during the Report Period is different than the amount of SIPC advances committed to allowed customer claims that have been determined during the Report Period.

## VI.    GOVERNMENT FORFEITURE

75.    On April 20, upon an ex parte application by the USAO, Judge Chin issued a post-indictment restraining order in the Criminal Action (the "Restraining Order"). In pertinent part, the Restraining Order restrained Madoff and Ruth Madoff from the transfer or dissipation of assets subject to forfeiture. The Restraining Order exempts the USAO from the restraining provisions, and further states that the USAO may provide specific written authorization to third parties to take actions otherwise prohibited by the Restraining Order.

76.    In connection with its criminal investigation of Madoff's fraudulent scheme and the resulting guilty pleas of several co-conspirators, the USAO has criminally forfeited proceeds pursuant to consent orders from Bernard and Ruth Madoff, Frank DiPascali, and David Friehling.

77.    On September 21, 2009, the USAO filed a motion in the District Court pursuant to Title 18, United States Code, Section 3663A(c)(3) for a finding that restitution would be impracticable in light of the large number of identifiable victims and the complex factual analysis required to assess the victims' losses. Accordingly, the USAO requested that it be able to proceed through the process of remission as authorized under the forfeiture statutes at Title 21, United States Code, Section 853(9) and the regulations promulgated thereunder. Among other options to maximize the efficiencies of the remission process and return the most value to the victims, the USAO stated in its motion papers that it would consider the possibility of appointing the SIPA Trustee, Irving Picard, as a special master to assess victim claims and distribute the forfeited proceeds in accordance with provisions of 28 CFR Part 9. [Criminal Case Dkt. No. 105]

78.    By order dated September 24, 2009, United States District Judge Denny Chin granted the USAO's motion, finding that restitution is impracticable and the government would

be permitted to proceed by remission. [Criminal Case Dkt. No. 106] Upon a motion dated September 29, 2009, certain victims of Madoff requested that Judge Chin reconsider his order and condition any order of remission on a net equity calculation based on the November 30, 2008 customer statements. [Criminal Case Dkt. No. 110] The victims also objected to the appointment of Mr. Picard to assist in the remission process. In an order dated October 27, 2009, Judge Chin denied the motion for reconsideration and ruled that any objections to the resolution of customer claims or appointment and retention of the Trustee should be filed with the Bankruptcy Court. [Criminal Case Dkt. No. 119]

VII. **CLAIMS ADMINISTRATION**

A. **CUSTOMER CLAIMS**

The Claims Processing Order and Notices of the Bar Date.

79.     The Trustee sought Court approval for and implemented a customer claims process in accordance with SIPA. As discussed in ¶ 44 above, the Claims Procedures Order approved (i) the form and manner of publication of the notice of the commencement of the liquidation proceeding (the "Notice") and (ii) specified the procedures for filing, determining and adjudicating customer claims.

80.     On January 2, 2009, the Trustee mailed a copy of the Notice and claims filing information to (i) all persons and entities that are or appear from available records to have been a customer of BLMIS at any time, (ii) creditors other than customers or broker-dealers and (iii) broker-dealers who were identified as BLMIS customers based on a review of BLMIS' books and records. More than 16,000 potential customer, general creditor and broker-dealer claimants were included in the mailing of the Notice. The Trustee published the Notice in all editions of The New York Times, The Wall Street Journal, The Financial Times, USA Today, Jerusalem Post and Ye-diot Achronot by January, 2009. The Trustee also posted claim forms and claims

filing information on the Trustee's website (www.madofftrustee.com) ("Trustee Website"), and

SIPC's website (www.sipc.org) ("SIPC Website").

81.    Under the Claims Procedures Order, claimants were to mail their claims to the

Trustee at the following address: Irving H. Picard, Esq., Trustee for Bernard L. Madoff

Investment Securities LLC, Claims Processing Center, 2100 McKinney Avenue, Suite 800,

Dallas, Texas 75201.  All customers and creditors were notified of the mandatory statutory bar

date for filing of claims under section 78fff-2(a)(3) of SIPA, which was July 2, 2009 (the "Bar

Date").  Any claims received after July 2, 2009 are deemed untimely and will not be allowed.

The Notice published in the newspapers, mailed to claimants and posted on the Trustee's and

SIPC's websites, stated in boldface that "[n]o claim of any kind will be allowed unless received

by the trustee within six (6) months after the date of this Notice."  The Instructions for

completing the Customer Claim and general creditor claim forms also included that information.

82.    On May 21, 2009, the Trustee mailed a reminder notice to customers who had not

yet filed a claim that the statutory bar date was July 2, 2009.

83.    On June 22, 2009, the Trustee mailed a final bar date reminder notice (the "Final

Reminder Notice") to 7,766 known past and present customers of BLMIS from whom a claim

had not yet been received.  In addition, the Trustee posted the Final Reminder Notice on the

Trustee Website.  In the Final Reminder Notice, the Trustee acknowledged that certain litigation

had been filed regarding the Trustee's definition of "net equity" under SIPA and that this Court's

decision on this issue may affect whether or not certain customers have an allowed claim in this

proceeding (such litigation is discussed in Section IX.A, *infra*).  The Trustee urged all customers

to file a claim by the July 2, 2009 in order to ensure that the Trustee considers their claim.  The

Trustee was concerned that some claimants might mistakenly rely on the litigation and not file

claims by July 2, 2009.  The mailing of the Final Reminder Notice was unprecedented in SIPA

proceedings and represented an extraordinary effort by the Trustee.

84.     As noted above, the Bar Date for the filing of claims under section 78fff-2(a)(3)

of SIPA was July 2, 2009.  By the Bar Date the Trustee had received 16,239 customer claims.

Between the Bar Date and October 31, 2009, the Trustee received 67 untimely filed customer

claims.  The books and records of BLMIS reflect that there were 8,095 non-administrative IA

accounts.  As of December 11, 2008, 4,903 accounts were active, i.e, either a monthly customer

statement was generated for the account for the period ending November 30, 2008 or the account

was opened in December 2008.  The Trustee has received multiple claims for many accounts.

Claims Processing.

85.     In compliance with the Claims Procedures Order, the Trustee has developed a

comprehensive claims administration process for the intake, reconciliation, and resolution of

customer claims.  The Trustee's dedicated team of professionals including business consultants,

forensic accountants, and attorneys work together through the various levels of review a claim

must undergo before it can be determined and allowed.

86.     At the initial intake stage, AlixPartners, the Trustee's claims agent receives and

reviews each filed claim to insure they are filled out properly and all relevant information is

included.  If any information is missing, the claims agent sends a request for supplemental

information.  As of October 31 2009, AlixPartners had mailed over 590 requests for

supplemental information.

87.     In the next stage – the research stage - FTI, the Trustee's forensic accountants,

review each claim, information gathered from BLMIS' books and records regarding the account

at issue and information submitted directly by the claimant.  The results of this review are noted

on each account and are ultimately used by the Trustee in assessing his determination of the claim.

88.     At the third review stage, the claims are moved to SIPC where a SIPC claims review specialist provides a recommendation to the Trustee regarding how each claim should be determined.  Once a recommendation has been made by a SIPC reviewer, the Trustee and his counsel then review the recommendation and legal or other issues that have been raised in prior review stages.  Once the Trustee has decided upon a resolution of a claim, the Trustee issues a determination letter to the claimant.

89.     The Trustee has or will mail a determination letter to every claimant when their claim is determined.  The determination letter explains how the customer's claim has been determined by the Trustee, states the amount of the allowed or denied claim, based on the net equity of the customer's account on a cash in/cash out basis, and sets forth the amount of SIPC protection available to the customer, if such claim is allowed.  Pursuant to the Claims Procedures Order, if the claimant does not object to the Trustee's determination within 30 days of the date on which the Trustee mailed the determination letter, the Trustee's determination will be deemed confirmed by the Court and binding on the claimant.

90.     Together with the determination letter, the Trustee mails either a full or partial assignment and release to customers with allowed claims.  This agreement states that the claimant agrees with the Trustee's determination and treatment of the claim as set forth in the determination letter.  This agreement must be executed and notarized by the claimant and received by the Trustee before the Trustee seeks a SIPC advance to fully or partially satisfy the claim within SIPA limits.

Interim Results of the Claims Process During the Report Period.[9]

91.     Notwithstanding the monumental and unprecedented task faced by the Trustee, the Trustee has made substantial progress in reviewing and determining customer claims.  As of October 31, 2009, the Trustee had determined 2,870 claims.  Out of those determined, the Trustee allowed 1,561 claims and committed to pay approximately $535 million in cash advances made by SIPC.  Based on the committed amount of SIPC advances to date, this is the largest commitment of SIPC funds in any case and exceeds the total aggregate payments made in all SIPA liquidations to date.  As of October 31, 2009, the total amount of customer claims allowed was $4,438,101,443.32.  The total over-the-limit claim amount on these claims – the amount by which allowed customer claims exceed the $500,000 statutory limit of SIPC protection – was $3,902,678,576.72.

92.     As of October 31, 2009, the Trustee had also determined and denied 1,309 claims as having received more money out of the accounts than deposited to the accounts, applying the net investment method (cash in/cash out) to account transactions.

Settlement of Preferences.

93.     The Trustee has engaged in settlement negotiations with customers who withdrew funds from their BLMIS Accounts within 90 days of the Filing Date.  Such withdrawals are preferential transfers recoverable by the Trustee under 11 U.S.C. §§547(b) and 550(a).  To settle potential preference actions against these customers, the Trustee has proposed that the customers agree to authorize the Trustee to deduct the preferential amount from the initial payment advanced by SIPC pursuant to section 78fff-3(a)(1) of SIPA.  The allowed claim is thus

---

[9] As noted above, additional progress has been made in the determination of customer claims since the conclusion of the Report Period.  As of November 19, 2009, the Trustee had determined 3,201 customer claims, and allowed 1,626 of those claims, for a total of $4,672,030,364.53 in allowed claims, $554,790,758.86 in committed SIPC advances and $4,117,239,605.67 in over-the-limit claims.

calculated based on the amount of money the customer deposited with BLMIS for the purchase of securities, less subsequent withdrawals, plus the preferential amount.  The customer will be entitled to receive an additional distribution from the fund of customer property based on the total amount of the allowed claim.

94.     The Trustee has been working to reach settlements in connection with claims resolution in accordance with the provisions of the Claims Procedures Order.   As of October 31, 2009, the Trustee had reached agreements with 50 customers to settle the Trustee's claims against them in connection with preferential transfers.  These 50 customers agreed to return to the Trustee a combined total of approximately $25.7 million to be added to the fund of customer property and be available for future distribution.[10]  These settlements allow the Trustee to avoid the costly litigation that would be necessary to obtain and collect judgments from each of these individual customers.

The Hardship Program.

95.     In an effort to speed relief to those BLMIS customers who had been hardest hit by the BLMIS Ponzi scheme, the Trustee implemented a Hardship Program in early May 2009 to expedite the determination of eligible customer claims and, therefore, payment of SIPC protection to those individuals facing severe hardship.   The types of hardship considered includes, among others, the inability to pay for necessary living expenses (food, housing, utilities and transportation); inability to pay for necessary medical expenses; necessity to return to work, at the age of 65 or older, after having previously retired from former employment; declaring personal bankruptcy; and inability to pay for the care of dependents.

---

[10] As described above, the Trustee must receive an executed assignment and release form before any claim determination is final. Thus, the amount of preferences listed above as committed for future distribution to customers is slightly greater than the amount actually recovered as indicated on Exhibit A.

96.    The Trustee's counsel has evaluated each hardship application to determine whether or not the application should be approved for inclusion in the Hardship Program and provided written notification of the decision within 20 days of receipt of the application.  In some instances, rather than deny the application, the Trustee requested further information from the applicants in an effort to make sure the applicants receive full consideration of their hardship status.

97.    Once the Trustee accepts an applicant into the Hardship Program, the Trustee endeavors to determine the claim within 20 days of the customer's entry for the Hardship Program if the claimant's account was opened at BLMIS after January 1, 1996.  For claims on accounts that were opened at BLMIS prior to 1996, the Trustee is currently working to reconstruct the records for these years (some of which have been completed).  The Trustee is committed to determining these accounts as soon as the records are available.  As of October 31, 2009, the Trustee had received 314 Hardship Program applications and approved 207 applications.  Most of the remaining applications await the reconstruction of the account records.

98.    The Trustee has departed from the practice in past SIPC proceedings and has committed to paying the undisputed portion of any disputed or objected-to claims, including Hardship Claims, even if there is a dispute over the full amount of the claim.  The purpose of this procedure is to expedite payment of SIPC protection to claimants while preserving their rights to dispute the total amount of their claim.

The Trustee Has Worked to Keep Customers Informed of the Status of the Claims Process.

99.    Throughout the liquidation proceeding, the Trustee has kept customers, other interested parties and the public informed of his efforts by maintaining the Trustee Website, a customer hotline, holding a Section 341(a) meeting of creditors on February 20, 2009, holding

various press conferences regarding the status of customer claims and he and his counsel responding to the multitude of phone calls, e-mails and letters he receives on a daily basis.

100.   The Trustee established the Trustee Website for centralized distribution of as much information as possible, including (i) regular press releases and statements on the status and progress of the proceedings; (ii) statistics on the number of claims determined, the dollar amount of the proposed allowed claims, the dollar amount of SIPC protection provided on such claims and the dollar amount by which the proposed allowed claims exceed the statutory limits of SIPC protection (which statistics are generally updated twice a week); (iii) copies of Bankruptcy Court filings; (iv) claims-related information and claim forms; and (v) details regarding the Hardship Program, including Hardship Program application forms.

101.   The Trustee Website also allows claimants to e-mail their questions directly to the Trustee's representatives, who follow up with a return e-mail or telephone call to the claimants. As of October 31, 2009, the Trustee and his professionals have received and responded to more than 2,200 e-mails from BLMIS customers as well as their representatives.

102.   In addition, the Trustee established a toll-free hotline for BLMIS customers to call for information.   As of October 31, 2009, the Trustee's professionals have fielded more than 6,000 hotline calls from claimants as well as their representatives, and have provided status updates on claims, addressed claimants' questions or concerns and offered confirmation to claimants that their claims were received.   In addition, the Trustee and B&H have responded to hundreds of phone calls.

103.   In sum, the Trustee and his team have endeavored to respond timely to every customer inquiry and to ensure that the customers are as informed as possible about various aspects of the BLMIS proceeding.

300040417

Contingencies.

104.    As discussed above, the Trustee has made progress in determining claims. Nevertheless, substantial contingencies remain, and the Trustee must reserve for these contingencies in determining what distributions can be made immediately to customers with allowed net equity claims.  The total universe of allowed claims against customer property cannot be determined with precision until all claims have been fully analyzed, a process that will take time, given the complexity of many claims.

105.    In addition, as discussed below, as the analysis of the claims population has progressed, disputes have arisen with claimants over the Trustee's definition of "net equity" as being measured by money deposited, less money withdrawn.  This issue is the subject of pending litigation.  (See Section IX.A infra).

106.    It is the Trustee's intent, at the earliest practicable time, to seek, pursuant to §78fff-2(c)(1) and related provisions of SIPA, Bankruptcy Court approval for the allocation of all recoveries already obtained and to be obtained to the "fund of customer property."  The Trustee anticipates making applications seeking approval for interim allocations and pro rata distributions.

B.    **CLAIMS OF GENERAL CREDITORS**

107.    As of October 31, 2009, the Trustee had received 377 timely and 11 untimely secured and priority and non-priority general unsecured claims totaling approximately $1,735,838,106.73.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  As of October 31, 2009, the Trustee had received 50 general unsecured broker dealer claims totaling approximately $29,081,878.41.

108.    The Trustee does not currently believe that there will be sufficient funds in the Debtor's estate from which to make distributions to priority, non-priority general creditors and/or

broker dealers.   Accordingly, the Trustee believes that "[no] purpose would be served, [to] examine [such] proofs of claim and to object to the allowance of any [such] claim that is improper" (*see* Bankruptcy Code § 704(5)).   Further, the Trustee does not expect that there will be sufficient funds in the general estate for SIPC to recoup its advances for administrative expenses.

## VIII.   **TRUSTEE INVESTIGATION**

109.    As required by SIPA, the Trustee is obligated to, among other things, (i) investigate the acts, conduct, property, liabilities, and financial condition of the debtor, the operation of its business, and any other matter, to the extent relevant to the liquidation proceeding, and report thereon to the Court; and (ii) report to the court any facts ascertained by the trustee with respect to fraud, misconduct, mismanagement, and irregularities, and to any causes of action available to the estate.   Section 78fff(1)(d) of SIPA.

110.    Pursuant to these obligations, during the Report Period the Trustee and his professionals have extensively investigated the Debtor's financial affairs both inside and outside of the United States.   In furtherance of such investigation, the Trustee has sent more than 428 subpoenas pursuant to Bankruptcy Rule 2004 seeking documents from many individuals, funds and banks.   Additionally, the Trustee has sent hundreds of letters to these and similar entities, informing them that they may be in possession of BLMIS customer property and demanding the return of such customer property.

111.    As a result of the Trustee's investigation, the Trustee has filed fourteen (14) avoidance actions against funds and individuals who withdrew funds from their IA accounts during the relevant time periods (as further described in Section IX.E *infra*).   Collectively, these fourteen (14) actions seek to recover more than $14.8 billion in principal and fictitious profits.

112.    In addition, after extensive investigative efforts and due diligence, the Trustee settled preference claims involving the Optimal Funds, based in the Bahamas, for $235 million, which was an 85% recovery. (*See* Section IX.F *infra*).    Several other parties are currently in settlement discussions with the Trustee and others are producing documents to the Trustee without the need to resort to formal process.

113.    The Trustee is also providing information to and coordinating efforts with the SEC, Federal Bureau of Investigation ("FBI"), USAO and other regulators on an on-going basis.

114.    In addition, as further described below, through B&H and International Counsel, the Trustee has been monitoring all domestic and international third-party actions filed outside of the Bankruptcy Court that may be related to Madoff, BLMIS, any insiders thereof, or any other related parties and/or assets of the estate.

A.    **INTERNATIONAL PROCEEDINGS**

115.    The Trustee's international investigation and recovery of BLMIS estate assets takes place in three stages: (i) investigate the location and movement of estate assets and retain counsel where necessary; (ii) become involved where appropriate, whether by appearance in court or otherwise, to prevent dissipation of funds properly belonging to the estate; and (iii) bring actions before courts and government agencies to recover customer property for the benefit of the customers and creditors of the BLMIS estate.  These investigations, which are comprised of a combination of voluntary requests for information and the use of subpoena power, both in the U.S. and abroad, have focused primarily on international feeder funds, banks, related financial services entities and certain individuals.

116.    Since the date of the First Interim Report, the Trustee has continued to actively investigate and seek to recover assets for the BLMIS estate in no fewer than eleven different jurisdictions including England, Gibraltar, Bermuda, the British Virgin Islands ("BVI"), the

Cayman Islands, the Bahamas, Ireland, France, Luxembourg, Switzerland, and Spain. Accordingly, the Trustee has retained the following International Counsel to assist him in further investigations and to represent him and the BLMIS estate in any foreign proceedings that have or may arise in connection with BLMIS: (i) Lovells - England, Wales and other European jurisdictions; (ii) Higgs Johnson Truman Bodden - Cayman Islands; (iii) Williams Barristers & Attorneys – Bermuda; (iv) Attias & Levy – Gibraltar; (v) E.F. Collins – Ireland; (vi) Schiltz & Schiltz – Luxembourg; (vii) Schifferli – Switzerland; and (viii) SCA Creque – BVI. The Trustee will continue to seek court approval to retain professionals to investigate and represent him wherever estate assets may be found across the globe.

117.    The Trustee's international investigations have to date revealed a complex web of tangled investment structures that fed money into the Ponzi Scheme, involving several billion dollars and myriad actors. In connection with that investigation, the Trustee has served no fewer than thirty-five (35) subpoenas against more than twenty-five (25) entities in ten (10) jurisdictions. The investigation is made challenging by the broad array of anti-discovery laws, bank secrecy statutes, and other foreign legislation designed to limit discovery by U.S. entities. However the Trustee is working closely with International Counsel to utilize local laws to obtain necessary discovery, most recently having a disclosure order approved by the Gibraltar Supreme Court. *See infra* at ¶¶ 120-121.

118.    To date the Trustee has received significant documentation in response to the many subpoenas and other requests for information that have been filed and the Trustee is actively pursuing legal remedies against those entities and/or persons that have refused to timely respond to the Trustee's requests for information. Where the Trustee has been able successfully to discover the location of customer property, the Trustee is taking steps to freeze or otherwise

secure such assets, most recently securing the payment of just under $75 million of customer property into the Gibraltar Supreme Court.  Below is a brief summary by jurisdiction of the international efforts currently being undertaken by the Trustee.  For a further discussion of the actions commenced in the Bankruptcy Court by the Trustee against certain of the international entities mentioned below, *see* Section IX.E *infra*.

England.

119.    In England, the Trustee, who was granted recognition as a foreign representative authorized to serve disclosure orders for the purpose of gathering evidence, continues to investigate MSIL, a Madoff-affiliated entity and in so doing continues to work with MSIL's JPLs.  The Trustee either has filed or is preparing to file several disclosure orders in England to further its investigations.

Gibraltar.

120.    As noted in the First Interim Report, the Trustee's investigations into the business and operation of BLMIS revealed numerous Gibraltar-related funds and banks with accounts and affiliations with BLMIS including an account held by Vizcaya Partners Limited ("Vizcaya"), a BVI fund with approximately $75 million located in Gibraltar.  On April 9, 2009, the Trustee filed a complaint in the Bankruptcy Court for the Southern District of New York against Vizcaya and Banque Jacob Safra (Gibraltar) Ltd. ("Safra"), seeking the return of $150,000,000 under SIPA and the Bankruptcy Code as preferential transfer and also for turnover and accounting in connection with a transfer from BLMIS to Safra for the benefit of Vizcaya.

121.    On October 28, 2009, the Supreme Court of Gibraltar (the "Gibraltar Court") ordered the payment into the Gibraltar Court of the just under $75 million previously held in various accounts at Safra.  In addition, the Gibraltar Court also recognized the Trustee as the

U.S. court-appointed Trustee for the liquidation of the business of BLMIS "with such rights as such recognition by the Supreme Court of Gibraltar affords him and entitles him to apply for" and further ordered Bank Safra to produce documents to the Trustee.  The actual production of documents has been stayed pending an appeal by Vizcaya of that portion of the Gibraltar Court's order.

Bermuda

122.    Following months of investigation, the Trustee on July 15, 2009 filed a complaint in the Bankruptcy Court against Alpha Prime Fund Ltd. ("Alpha Prime") as well as HSBC Bank plc and HSBC Securities Services (Luxembourg) S.A.   Alpha Prime is a Bermuda-based feeder fund that received more than $49 million in preference payments.  Alpha Prime failed to file an answer to the complaint and on August 19, 2009 the Trustee filed a request for an Entry of Default against Alpha Prime, which request was granted on September 1, 2009.

British Virgin Islands

123.    In BVI the Trustee has discovered and is actively investigating the involvement of no fewer than 20 feeder funds that funneled money into the Ponzi scheme.  The Trustee is currently engaged in settlement talks with a number of funds and has filed seven actions in the US Bankruptcy Court against BVI funds, as further discussed in Section IX.E *infra*.  In addition, the Trustee has served no fewer than 15 subpoenas against BVI-based funds.

124.    Kingate Euro Fund Ltd. and Kingate Global Fund Ltd. (collectively, "Kingate") are BVI-based feeder funds that received, collectively, more than $250 million in preference payments.  An action was commenced in the Bankruptcy Court against Kingate on April 14, 2009, with a second amended complaint being filed on July 21, 2009.   The parties have undertaken settlement negotiations.

125.    Thybo Asset Management Ltd, Thybo Global Fund Ltd., Thybo Return Fund Ltd. and Thybo Stable Fund Ltd. (collectively, the "Thybo Funds"), are BVI-based funds that, considered collectively, have received approximately $9 million in preference payments.  A complaint was filed against the Thybo Funds on July 15, 2009 asserting preference and fraudulent transfer causes of action.  On or about August 25, 2009, an amended complaint was filed to include a count objecting to the SIPA claim filed by the Thybo Funds in the amount of $217,163,851.

126.    For discussion of proceedings commenced against Vizcaya, *see* ¶ 120 *infra*.

Cayman Islands

127.    In the Cayman Islands the Trustee has discovered and is actively investigating the involvement of no fewer than four feeder funds that fueled the Ponzi scheme.  Complaints have been filed against three funds in the Bankruptcy Court and the Trustee is seeking leave to file a Complaint in the Cayman Islands against another.  *See* Section IX.E *infra*.

128.    Harley International (Cayman) Ltd. ("Harley") is a Cayman Islands-based feeder fund.  The Trustee's investigation has revealed that Harley has received no less than $425 million in 90-day preference payments.  A complaint was filed on May 12, 2009 in the Bankruptcy Court asserting preference and fraudulent transfer causes of action.  The clerk entered a default on July 8, 2009.  The Trustee is currently seeking leave to proceed with an action against Harley in the Cayman Islands.

129.    Herald USA Segregated One Portfolio is the sole fund of Herald Fund SPC ("Herald"), a Cayman Islands-based feeder fund.  The Trustee's investigation has revealed that Herald received at least $537 million in preference payments.  The Trustee filed a complaint against Herald initiating an adversary proceeding in the Bankruptcy Court.  On October 13,

2009, the Trustee filed a second amended complaint.  Herald filed a motion to dismiss the case, to which the Trustee has responded; an argument on the motion to dismiss is scheduled for December 22, 2009.

130.    Primeo Fund ("Primeo") is a Cayman Islands-based feeder fund that profited by more than $1.5 million dollars from its investment in BLMIS.  The fund is currently in liquidation in the Cayman Islands.  A Complaint was filed against Primeo in the Bankruptcy Court on July 15, 2009.  Primeo failed to respond to the suit papers, and the Clerk entered a Default against Primeo on Sept. 1, 2009.

Ireland

131.    In Ireland, the Trustee has discovered two feeder funds, which collectively received more than $380 million in preference payments.  The Trustee is continuing to investigate these funds and related entities and has issued several subpoenas in connection with that investigation.

Luxembourg

132.    In Luxembourg, the Trustee's investigation has revealed the existence of two feeder funds that collectively fed more than $1.5 billion into BLMIS.  One of these funds, Luxalpha SICAV, is currently in liquidation under Luxembourg law and the Trustee is in discussions with Luxalpha SICAV's liquidators concerning the disposition of its assets and access to information.

Other Jurisdictions

133.    In addition to the jurisdictions and entities identified above, the Trustee is also actively investigating other feeder funds and related institutions connected to BLMIS in Panama, St. Lucia, and Switzerland.

B.    **DOMESTIC PROCEEDINGS**

Related Civil Third Party Actions

134.    The Trustee has been monitoring since last December legal proceedings filed by various third parties who allege to have suffered losses and incurred damages resulting from Madoff's Ponzi scheme and their direct or indirect investments with BLMIS (the "Third Party Actions").   At present, there are over 160 Third Party Actions filed in state and federal courts across the country.   The plaintiffs in the Third Party Actions generally consist of: (i) investors whose funds were invested with BLMIS indirectly through feeder funds and other investment vehicles; (ii) investors who were direct customers of BLMIS who invested with BLMIS through Madoff, Madoff family members and other BLMIS insiders; and (iii) state governmental bodies which seek the return of investment losses by their respective state's residents.

135.    The plaintiffs in the Third Party Actions brought against feeder funds generally allege that these entities negligently – and even fraudulently, and in a breach of their fiduciary duty, convinced them to invest their money in a fund that was invested either fully or partially with BLMIS.   Many of these lawsuits, which generally are either private party actions, securities class actions or derivative actions, seek damages against feeder funds and management companies against which the Trustee has also asserted claims in this Court.   A majority of these Third Party Actions are pending in the Southern District of New York, although there are many cases pending nationwide.

Domestic Feeder Funds Investigations

136.    The Trustee is also continuing his investigation of the domestic feeder funds that were customers of BLMIS, perhaps facilitated the fraud, or received preferences and fraudulent transfers.   Some of the domestic feeder funds investigations are discussed below.

Tremont Group

137.    The Tremont Group Holdings companies, based in Rye, New York, comprised both multi manager proprietary funds under the Tremont name and single manager funds under the Rye Select brand name.  Five of the Rye Select funds were either entirely or significantly invested through BLMIS.  Based on BLMIS records there are over $500 million in preference and fictitious profit claims and $1.4 billion in fraudulent transfer claims that can be asserted against the various Tremont funds.  After submission of a demand letter for payment of these amounts, Tremont, through its counsel, presented a settlement proposal in late April 2009 to resolve these potential claims.  The Trustee presented a counter-proposal in late October to Tremont.  While the Trustee seeks an amicable resolution, he is prepared to commence action early next year, if one is not forthcoming.

Maxam Capital

138.    The Trustee has issued demand letters and Rule 2004 subpoenas for documentation to Maxam Capital.  Based upon restrictions placed upon Maxam's Bank of America bank account as to the use of funds which the Trustee deemed to be customer property, Maxam instituted a court action in May 2009 against Bank of America in Connecticut state court for relief and unrestricted use of the Bank of America accounts monies.  Shortly thereafter, Bank of America commenced an interpleader action in this Court against the Trustee and Maxam seeking, among other things, a declaration as to the right to the bank account monies and a stay of the Connecticut action.  The Trustee joined in seeking a stay of the Connecticut action, the state where Maxim conducted its business.  Following oral argument, this Court issued an Order, dated June 17, 2009, staying the Connecticut action and ordering the deposition of Maxam's founder and the former co-founder of Tremont.  Such deposition occurred on July 7, 2009, at

which time questions seeking the identities and financial information of foreign investors was objected to based on claims of statutory privacy obligations under Cayman Islands law.

139.    Maxam made an application in August to the court in the Cayman Islands for relief from the local privacy laws to comply with our subpoena and request for foreign investor information.    On September 14, 2009, the Cayman Islands court, after submission of a supporting affidavit by the Trustee, granted the application and allowed the disclosure of the information to the Trustee.    The Trustee is in the process of receiving and reviewing that information for further investigation.

Beacon/Andover

140.    Rule 2004 subpoenas were issued in the summer of 2009 to Beacon and Andover funds and their management companies.    Based upon the Trustee's independent investigation and information received pursuant to bank subpoenas, it was determined that only a portion of these funds' investments were placed with BLMIS.    Moreover, the Beacon fund has sufficient assets to pay a potential $25 million fraudulent transfer claim and Andover has sufficient assets to pay a $500,000 preference claim.    With this information, the Trustee sought and obtained a "standstill" agreement with the funds' management regarding segregating those amounts while an investigation as to potential liability for the fraudulent transfers predicated upon their lack of good faith was concluded.    The investigation of the funds and its sub-advisers, including Ivy Asset Management (currently owned by Bank of New York) and JP Jeannerett, is continuing.

P&S Partnership/S&P Partnership

141.    These two funds were formed shortly after the 1992 SEC enforcement action against Avellino and Bienes, SEC v. Avellino.    In light of the amount of monies involved in these funds, it was determined no further investigation of these funds was necessary or cost

effective.   Settlement agreements have been prepared and if finalized, will be presented to the Court for approval.

## C.   **BANKS & FEEDER FUNDS**

142.   During the Report Period, and primarily as a result of international and domestic feeder fund investigations, the Trustee has identified and commenced investigations of numerous banks involved with various feeder funds and BLMIS.   The Trustee's investigation of these banks is continuing.   As mentioned above and as further described in Section IX.E *infra*, the Trustee has brought suit against various feeder funds to date.

143.   Various banks were involved with the feeder funds in a number of different capacities.   For example, some were custodians of the funds, others were administrative agents charged with calculating the net asset value of the funds, others were involved in transactions associated with the BLMIS account at J.P. Morgan Chase.   Some banks wore multiple hats, assuming a number of roles.   Third party actions have been brought in both the United States and abroad that charge the banks, for instance, with some degree of complicity, money laundering or negligence in connection with the Madoff fraud.   The Trustee continues to monitor these actions as he investigates the roles of various banks.

## D.   **POTENTIAL INSIDERS AND CORPORATE ASSETS**

144.   During the Report Period, one of the many projects that the Trustee and his professionals have focused on is the investigation of potential insiders of BLMIS and Madoff, and the transactions, business investments and ventures they engaged in with BLMIS, Madoff and Madoff family members, to ascertain whether the potential insiders were the unlawful recipients of BLMIS customer property or corporate assets.

145.   The on-going nature of the investigation into potential insiders prohibits the Trustee from disclosing the specific targets, excessive details or preliminary findings of the

investigation.  In the course of the investigation into potential BLMIS insiders and their related affiliates, the Trustee and his professionals have:

- collected and reviewed hundreds of thousands of documents collected from the BLMIS premises, including investment account statements of the potential insiders, bank account statements, wire transfers and other related financial account records, corporate formation documents, operating agreements, tax returns, emails and other related correspondence between the potential insiders and BLMIS, Madoff and Madoff family members;

- drafted document requests and issued subpoenas to numerous third party entities, and reviewed thousands of pages of documents produced in compliance with the subpoenas;

- reviewed notes of interviews with former BLMIS employees;

- conferred extensively with FTI regarding the investment advisory accounts and records of the transactions, business investments and ventures between the potential insiders and BLMIS, Madoff and Madoff family members;

- conducted analyses of the personal and professional relationships between the potential insiders and BLMIS, Madoff and Madoff family members;

- conducted analyses of the corporate structure of affiliates of potential insiders, including entities in which Madoff or Madoff family members invested;

- conducted extensive legal research and analyses relating to, among other things, potential claims against potential insiders; and

- drafted memoranda regarding the status and findings of the investigations of potential insiders.

146.     Many of the potential insiders and their affiliates had dozens, and in some cases, hundreds of IA accounts with BLMIS, each of which are being analyzed.  Given the duration and size of Madoff's fraud, this necessitates the review of several decades' worth of IA account records, bank account statements and account maintenance files for the hundreds of IA accounts held by the potential insiders.

147.     Adding to the scope and complexity of the Trustee's investigation is the vast number of transactions and business ventures between the potential insiders and Madoff and Madoff family members.  Each transaction, business investment or venture between the potential insiders and Madoff and Madoff family members and the documents related thereto are being analyzed.  Furthermore, the flow of funds between the potential insiders and their affiliates and BLMIS, Madoff and Madoff family members are being analyzed to determine which funds originated from BLMIS customer funds.

148.     Upon completion of his investigation, the Trustee intends to seek through litigation recovery of any customer property or corporate assets that were improperly transferred to the potential insiders.

E.     **EVIDENCE GATHERING**

149.     Within hours of the appointment of the Receiver, AlixPartners began certain efforts to identify and preserve evidence at the three (3) physical locations used by BLMIS – the main office at 885 Third Avenue in Manhattan, the disaster recovery site at the Bulova Building in Astoria, Queens and a warehouse in Long Island City, Queens.  Starting on December 11, 2008, AlixPartners coordinated efforts with the FBI to identify and provide forensic images and server data for review and analysis  and conducted numerous forensic analysis of electronic data.

150.     In addition, AlixPartners engaged in the following activities to gather and preserve evidence: coordinated the recovery of data from hard drives and other media that were

physically damaged or had failed during the normal course of use; conducted a site survey of the 885 3rd Avenue and Bulova facilities to identify and preserve loose media (i.e. floppy disks, DVD/CDs, etc.); previewed each collected computer hard drive to document all user profiles; and extracted for analysis and review data identified for relevant custodians, including certain Madoff family members and employees.

151.    With the assistance of AlixPartners, the Trustee has identified and preserved various items of computer media.  The preserved data have been forensically imaged allowing analysis and future use as evidence.  AlixPartners has identified and collected server data, from both the 885 3rd Avenue and Bulova facilities, and has coordinated the backup of all relevant server data for preservation purposes.  This data has been loaded into a secure web-based document review program which B&H attorneys continue to review.

152.    The Trustee has engaged AlixPartners to retain BLMIS paper documents and electronic data which were obtained from the main BLMIS office at 885 Third Avenue in Manhattan, the BLMIS Disaster Recovery site at the Bulova Building in Astoria, Queens and a warehouse in Long Island City, Queens.

153.    Through attorneys and consultants the Trustee has organized within a warehouse approximately seven thousand boxes of BLMIS' paper documents, reviewed those documents to develop an index of boxes containing paper documents at the folder level to identify approximately 8.3 million pages of those documents to scan and a significant portion of those documents to process so as to enable full-text searching.

154.    In addition, the Trustee has accumulated and stored in secure and forensically sound formats more than 1.4 million emails, and more than 1,500 sources of electronically stored

information which include but are not limited to desktop computers, laptop computers, AS/400 computers, hard drives, network storage, PDAs, floppy disks, compact discs and memory cards.

155.    As a result of this work and under the Trustee's direction, attorneys and AlixPartners' and FTI's accountants, computer scientists and consultants have indexed, organized and extracted information pertaining to BLMIS' operations, communications, books and records.   This enabled B&H, AlixPartners and FTI to assess many of BLMIS' paper documents and electronic data.   Consequently, the Trustee has assembled in substantial detail and for extensive periods of time BLMIS' financial history and relationships with BLMIS' investors, employees, vendors and others.

156.    Beyond identifying and analyzing BLMIS documents and electronic documents, the Trustee has accumulated and prepared for review documents received from more than 100 parties in response to subpoenas.   The Trustee receives these documents in a variety of formats.   Like the BLMIS documents and electronic data, responses to subpoenas are processed and imported into a litigation support database.

157.    Under the Trustee's direction attorneys, AlixPartners and FTI accountants and consultants have assessed many of these responses to subpoenas and have indexing them with respect to various investigations and current and prospective law suits.   Consequently, the Trustee has grown substantially the Trustee's understanding of BLMIS' relationships with BLMIS' investor, employees, vendors and others.

## IX.    **BANKRUPTCY COURT PROCEEDINGS**

### A.    **NET EQUITY DISPUTE**

158.    As discussed in Section VII.A *supra*, as of November 19, 2009 the Trustee had issued 3,021 customer claim determinations in accordance with SIPA and the Claims Procedures Order.   For purposes of determining each customer's "net equity," as that term is defined under

SIPA, the Trustee has credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn by him from his BLMIS customer account (the "cash in/cash out approach").

159.    Various customers have filed adversary proceedings, *see infra*, and objections to the Trustee's determination of their claims, in which they argue that the Trustee's cash in/cash out approach is contrary to the statutory definition of "net equity" (the "Net Equity Dispute"). These customers argue instead that the Trustee is required to allow customer claims in the amount shown on the November 30, 2008 BLMIS customer statements.

160.    Because the Net Equity Dispute is an issue of comprehensive application in this SIPA liquidation, the Trustee filed a motion for a scheduling order on the Net Equity Dispute. On September 16, 2009, the Court issued an order scheduling adjudication of the "net equity" issue (the "Scheduling Order"), setting forth a briefing schedule and hearing date that permitted customers and other interested parties to participate in the adjudication of this issue. [Dkt. No. 437]  In addition, the Court limited the briefing to be submitted pursuant to the Scheduling Order solely to the Net Equity Dispute, and barred briefing on any issues ancillary to that dispute.

161.    In accordance with the Claims Procedures Order and the Scheduling Order, on October 16, 2009, the Trustee submitted his memoranda of law and other papers in support of his motion for an order (a) upholding the Trustee's determinations denying 78 customer claims for the amounts listed on the last customer statement,[11] (b) affirming the Trustee's determination of "net equity," and (c) expunging those objections with respect to the determinations relating to "net equity." [Dkt. No. 525]  The Trustee argues that the cash in/cash out approach to calculating "net equity" is the only one consistent with SIPA, bankruptcy law, principles of equity, and

---

[11] As of the date of the Trustee's Motion, 78 customer claimants had filed an objection to the Trustee's determination of their claim on the basis of the Net Equity Dispute.

common sense.  The briefing schedule concludes on January 15, 2009 and a hearing before this

Court on the Net Equity Dispute is set for February 2, 2009.

B.    **THIRD-PARTY ACTIONS AGAINST THE TRUSTEE**

Rosenman Family LLC v. Picard, et al., Adv. Pro. No. 09-1000 (BRL).

162.    On January 1, 2009, Rosenman Family LLC, a BLMIS customer, filed an

adversary proceeding seeking the return of $10 million dollars it deposited mere days before

BLMIS collapsed.  The Trustee moved to dismiss the complaint under Federal Rule of Civil

Procedure 12(b)(6), arguing that Rosenman Family LLC was a "customer," as that term is

defined under SIPA, and could thus only recover through the customer claims process set forth in

that statute.  This Court granted the Trustee's motion, and Rosenman Family LLC appealed the

decision to the United States District Court for the Southern District of New York.  The appeal

was assigned to the Honorable Naomi R. Buchwald.  After full briefing, oral argument was held

on October 26, 2009.  The District Court has not yet issued its decision.

Hadleigh Holdings LLC v. Picard, et. al., Adv. Pro. No. 09-1005 (BRL).

163.    A similar complaint was filed on January 7, 2009 against the Trustee by Hadleigh

Holdings LLC ("Hadleigh"), a BLMIS customer which deposited $1 million dollars just a few

days before the collapse of BLMIS.  The Trustee filed a motion to dismiss the complaint under

Federal Rule of Civil Procedure 12(b)(6).  While the motion was pending, Hadleigh Holdings

LLC filed an amended complaint.  After the Trustee filed a motion to dismiss the amended

complaint, the case was voluntarily dismissed by Hadleigh.  The customer claim of Hadleigh has

been determined and partially satisfied by the Trustee.

Albanese, et al. v. Picard, Adv. Pro. No 09-1265 (BRL).

164.    On June 5, 2009, a class action ("Class Action") complaint was filed by several

BLMIS customers on behalf of a prospective class against the Trustee regarding the Net Equity

Dispute.  Plaintiffs sought a declaratory judgment that the Trustee's cash in/cash out approach to "net equity," as that term is defined under SIPA, is invalid.  Instead, they allege that the Trustee should allow claims based on the November 30, 2008 BLMIS customer account statements.  The Class Action seeks to certify a class of customers who "are adversely affected by the Trustee's definition of 'net equity' under SIPA."

165.    The Trustee answered the complaint on July 17, 2009.  As discussed above, the Court issued a Scheduling Order on the Net Equity Dispute on September 16, 2009.  Thereafter, the parties entered into a stipulation staying the pendency of the Class Action until a final, non-appealable order regarding the Net Equity Dispute is issued.

Peskin, et al. v. Picard, Adv. Pro. No. 09-1272 (BRL).

166.    On June 10, 2009, three BLMIS customers filed an adversary proceeding seeking declarations that the Trustee must allow their customer claims in the amounts shown on their November 30, 2008 customer statement and that the Trustee is not permitted to deduct preference monies from their SIPC advances.  Plaintiffs also sought compensatory damages for breach of fiduciary duty, alleging that the Trustee breached his duties to them by failing to promptly determine their customer claims and by "inventing" a new definition of "net equity."

167.    On July 17, 2009, the Trustee moved to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, to strike certain portions thereof.  The Trustee moved on several bases, including: (i) Plaintiffs failed to adhere to the Claims Procedures Order; (ii) Plaintiffs lacked standing because the harm they alleged – the Trustee's interpretation of "net equity" – would benefit them rather than harm them; and (iii) that, in the alternative, certain paragraphs should be stricken pursuant to Federal Rule of Civil Procedure 12(f).  On August 17, 2009, Plaintiffs filed an opposition to the Trustee's motion to

dismiss the Complaint.  (*Peskin*, Dkt. No. 30).  The Trustee filed a reply on August 28, 2009 and this Court heard oral argument on September 9, 2009.

168.    The following day, this Court issued a memorandum decision and order granting the Trustee's motion to dismiss the complaint.  This Court held that the Plaintiffs' action violated the Claims Procedures Order and that permitting Plaintiffs to litigate their case was fundamentally unfair to other customers.  In addition, the Court found that permitting such a course of action would lead to an unwieldy process of adjudicating claims.  In light of the Trustee's motion for a scheduling order regarding the Net Equity Dispute in which Plaintiffs and all other customers may participate, the Court dismissed the portion of the complaint concerning the Net Equity Dispute.

169.    The Court also dismissed the remaining causes of action in Plaintiffs' complaint. With regard to the preference issue, the Court held that the dispute was not ripe because the Trustee did not deduct preference monies from Plaintiffs' SIPC advances.  As for the breach of fiduciary duty claim, the Court found that whether the Trustee breached a fiduciary duty cannot be decided until the appropriateness of the "net equity" methodology is resolved.  Thus, the Court dismissed that portion of the complaint without prejudice with leave to re-file pending the outcome of the Net Equity Dispute.

170.    On September 18, 2009, Plaintiffs filed a notice of appeal from the order dismissing their complaint.  The appeal was assigned to the Honorable John G. Koeltl in the Southern District of New York.  Plaintiffs' moving brief is due on November 23, 2009, the Trustee's opposition is due on December 23, 2009, and Plaintiffs' reply is due on January 4, 2010.  The District Court will set a date for oral argument after briefing has concluded.

C.    **OBJECTIONS TO CLAIMS DETERMINATIONS**

171.    In connection with the determination of customer claims, as of October 31, 2009

there have been 108 objections filed by customers with the Bankruptcy Court to the Trustee's

determination of such claims.[12]  As required by the Claims Procedures Order, and as described in

each Determination Letter sent by the Trustee, customers of BLMIS have thirty (30) days from

the receipt of the Determination Letter to object to the Trustee's determination of their claim.

Notice of and reasons for such objection must be provided to the Trustee and to the Bankruptcy

Court.

172.    The 108 objectors have cited, among others, the following reasons for objecting to

the Trustee's determination of their claims: (i) the use of the "cash in, cash out" method for

calculating the value of claims is inappropriate and claims should be valued based on the BLMIS

November 30, 2008 statement; (ii) claimants should receive interest on deposited amounts; (iii)

the Trustee is required to commence an adversary proceeding as the Trustee is attempting to

avoid gains on claimants' investments; (iv) there is no legal basis for requiring execution of a

Partial Assignment and Release prior to payment of SIPC advance; and (v) claimants are entitled

to *immediate* payment of the $500,000 SIPC advance; (vi) claimants also focus on the obligation

of the Trustee to ascertain the payments due to customers from the books and records of the

Debtor (*inter alia*); (vii) other objectors argue that as a result of their joint account status, *each*

named account holder should be entitled to payment of a SIPC advance.

173.    As described in ¶ 98 *supra*, the Trustee has departed from the practice in past

SIPC proceedings and has committed to paying the undisputed portion of any disputed or

objected-to claim, even if there is a dispute over the full amount of the claim.  The purpose of

---

[12] As of November 19, 2009, a total of 388 objections to the Trustee's determination of claims have been filed in the Bankruptcy Court by customers of BLMIS.

this procedure is to expedite payment of SIPC protection to claimants while preserving their rights to dispute the total amount of their claim

D.    **OBJECTION TO FEE APPLICATIONS**

174.    On August 3, 2009, the Peskin plaintiffs also filed a fifty-one page objection (the "Objection") in the Bankruptcy Court to the first fee applications of B&H and the Trustee (the "Fee Applications"), which were filed on July 10, 2009 [Dkt. Nos. 320 and 321].  Raising issues ancillary to the services and compensation of the Trustee and B&H, the Objection was essentially a reiteration of the Complaint the Peskin plaintiffs filed.  In short, it raised the very same arguments and allegations previously raised by the Peskin plaintiffs regarding the Net Equity Dispute and certain factual allegations relating to their particular customer accounts.  The Objection attempted to use the Peskin plaintiffs' prior arguments about the Net Equity Dispute as a basis for alleging that the Trustee and B&H have a conflict of interest and should be disqualified from serving.

175.    SIPC and the Trustee each filed a reply to the Objection on August 3, 2009, and August 5, 2009, respectively.  A hearing was held before the Bankruptcy Court on the Fee Applications on August 6, 2009.  At the hearing, the Court stated that the Net Equity Dispute was raised in the context of the adversary proceeding, and was not properly before the Court at that time.  After consideration of each of the applications and responses, the Court further stated that it found "no merit to the objections."  Ultimately, the Bankruptcy Court found that there was no basis to challenge the Trustee's disinterestedness, and that despite the disagreement of methodology for calculating claims, the Bankruptcy Court held that the services rendered were reasonable, were done responsibly, and had been done with a salutary effect.  The Bankruptcy Court approved the Fee Applications.

176.    On August 14, 2009, the Peskin plaintiffs filed a notice of appeal, a motion for leave to appeal, and a related memorandum of law ("Motion for Leave") seeking interlocutory review of the Bankruptcy Court's order granting the prior Fee Applications.  Once again, the Peskin plaintiffs' motion and supporting papers filed contained the same allegations - alleged bad acts of the Trustee, his alleged improper interpretation and implementation of SIPA with regard to "net equity," spurious allegations regarding the purposes and history of SIPA and SIPC, as well as ad hominem attacks against the Trustee and SIPC.

177.    On August 24, 2009, the Trustee filed his memorandum and supporting documents in opposition to the Motion for Leave detailing multiple grounds as to why the Motion for Leave is improper and should be denied, including that the Peskin plaintiffs lack standing to appeal and that they filed to meet the necessary requirements for leave to appeal an interlocutory order.  The matter thereafter was submitted to the District Court and was assigned to the Honorable George B. Daniels.  As of the date of filing of this Report, no decision on the Motion for Leave has been issued.

E.    **AVOIDANCE ACTIONS BY THE TRUSTEE**

Picard v. Vizcaya Partners Limited and Banque Jacob Safra (Gibraltar) Ltd. Adv. Pro. No 09-1154 (BRL).

178.    On April 9, 2009, the Trustee filed a complaint in the Bankruptcy Court for the Southern District of New York against Vizcaya Partners Limited ("Vizcaya") and Banque Jacob Safra (Gibraltar) Ltd. ("Bank Safra"), seeking return of $150,000,000 under SIPA §§ 78lll(4) and 78fff-2(c)(3), and sections 542, 547, 550(a)(1), and 551 of the Bankruptcy Code as a preferential transfer and also for turnover and accounting in connection with a transfer from BLMIS to Safra for the benefit of Vizcaya.

179.    Of that $150 million, approximately $75 million was held in various accounts at Bank Safra or in a Gibraltar Court, which money was frozen by the Gibraltar authorities and which the Trustee is claiming for the benefit of the estate.  The Trustee was added as an interested party to a Gibraltar-based Judicial Review Action, which was filed by Vizcaya against the Gibraltar Attorney General and Bank Safra in order to regain control over frozen funds held in its account at Bank Safra.

180.    Following a recent order by the Gibraltar Supreme Court, approximately $75 million frozen at Bank Safra by the Gibraltar authorities was directed to be turned over to the Gibraltar Supreme Court.  The Judicial Action was filed by Vizcaya Partners, Limited on February 18, 2009.  It is Case No. 2009-Misc-13.  Interested parties include Bank J. Safra (Gibraltar) Limited and Irving H. Picard.

Picard v. Kingate Global Fund Ltd., Kingate Euro Fund Ltd. and Bank of Bermuda Limited, Adv. Pro. No 09-1161 (BRL).

181.    On April 17, 2009, the Trustee filed a complaint against Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Kingate Euro"), seeking return of $395 million under SIPA §§ 78lll(4) and 78fff-2(c)(3), and Bankruptcy Code sections 542, 547, 550(a)(1), and 551 and other applicable law for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the defendants.

182.    On July 21, 2009, the Trustee filed a second amended complaint against Kingate Global and Kingate Euro, seeking return of $874 million under SIPA §§ 78lll(4) and 78fff-2(c)(3), and Bankruptcy Code sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a), and 551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq.* (McKinney 2001)) and other applicable law for turnover, accounting, preferences, fraudulent conveyances

and objection to claim in connection with certain transfers of property by BLMIS to or for the benefit of Kingate Global and Kingate Euro.    The complaint also named Bank of Bermuda Limited as a defendant.    The defendants' answers are currently due on January 8, 2010 and a pretrial conference has been scheduled for January 14, 2010.

183.    Kingate Global and Kingate Euro are in liquidation in BVI.    The Trustee and the BVI Court-appointed liquidators have been diligently engaged in negotiations regarding a settlement agreement since July 2009.    Any final settlement agreement would have to be approved by the Bankruptcy Court and the BVI Court.

Picard v. Stanley Chais, et al., Adv. Pro. No 09-1172 (BRL).

184.    On May 1, 2009, the Trustee filed an adversary complaint against Stanley Chais, Pamela Chais (the "Chais Defendants") and a number of related entities (collectively, the "Chais-related entities") seeking return of more then $1.1 billion under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, N.Y. Debt & Cred. § 270 et seq. (the "New York Fraudulent Conveyance Act"), and other applicable law, for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the defendants.

185.    On September 29, 2009, the Chais Defendants filed a motion with the Bankruptcy Court seeking a declaration that the Chais Defendants should be free to use certain funds they hold at Goldman Sachs.    The Trustee had previously requested that Goldman Sachs freeze such assets and not permit the Chais Defendants to withdraw any such amounts.    In response to such motion, the Trustee filed a motion seeking a temporary restraining order and preliminary injunction formally freezing all assets of the Chais Defendants.    Following a Chambers conference on October 6, 2009, the Chais Defendants consented to the entry of a temporary

restraining order that formally froze their assets but made certain amounts available to them for living and other expenses.   After two extensions of the October 7, 2009 order, the Chais Defendants and the Trustee entered into a stipulation which extends the asset freeze indefinitely.

186.   One of the Chais-related entities, Michael Chaslow, filed a motion to dismiss the Trustee's complaint.  A hearing on the motion is scheduled for January 14, 2010.  Other of the Chais-related entities have filed motions to dismiss.   The Chais Defendants answered the complaint and filed counter-claims against the Trustee.

Picard v. Gabriel Capital, L.P., et al., Adv. Pro. No. 09-1182(BRL).

187.   On May 7, 2009, the Trustee filed an adversary complaint against Gabriel Capital, L.P., Ariel Fund, Ltd., Ascot Partners, L.P., Gabriel Capital Corporation and J. Ezra Merkin (collectively, the "Merkin Funds") seeking return of more then $557 million under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the defendants.

188.   In late June 2009, pursuant to an action commenced by the New York State Attorney General in the Supreme Court of New York, New York County, Receivers were appointed over each of the funds.  Bart Schwartz, Esq., was appointed Receiver of Ariel Fund Ltd. and Gabriel Capital, L.P., and is utilizing his law firm of Reed Smith.  David Pitosky, Esq. was appointed Receiver over Ascot Partners, L.P. and is utilizing his firm of Goodwin Procter.

189.   On or about August 6, 2009, the Trustee filed an Amended Complaint.  On or about September 4, 2009, Defendants Ariel Fund Ltd. and Gabriel Capital, L.P., through their above-mentioned state court appointed Receiver, filed a Motion to Dismiss the Amended

Complaint.  On that same date, J. Ezra Merkin and Gabriel Capital Corporation filed a Motion to Dismiss the Amended Complaint.  On November 2, 2009, the Trustee filed his Memoranda in Opposition to the foregoing motions to dismiss the Amended Complaint.  The Trustee has had ongoing negotiations with the court appointed Receiver for Ascot Partners, L.P., and has extended the time for Ascot Partners, L.P. to respond to the Amended Complaint while those negotiations continue.  Replies in support of the motions to dismiss are due to be filed on or before November 23, 2009, and the motions are scheduled for hearing before the Court on December 17, 2009.

Picard v. Harley International (Cayman) Limited, Adv. Pro. No. 09-1187 (BRL).

190.    On May 12, 2009, the Trustee filed a complaint against Harley International (Cayman) Limited ("Harley"), seeking return of approximately $1.1 billion pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a), 550(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of Harley.  As Harley failed to answer the Trustee's complaint, a default was entered against Harley on July 8, 2009 by the Clerk of the Bankruptcy Court.

Picard v. Jeffry Picower, et al., Adv. Pro. No. 09-1179 (BRL).

191.    On May 12, 2009, the Trustee filed an adversary complaint against Jeffry M. Picower, individually and as trustee for the Picower Foundation, Barbara Picower, individually and trustee for the Trust FBO Gabrielle H. Picower and the Picower Foundation, Capital Growth Company, Favorite Funds, JA Primary Limited Partnership, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JFM Investment Company, JLN

Partnership, JMP Limited Partnership, Jeffry M. Picower Special Co., Jeffry M. Picower, P.C.,
Decisions Incorporated, The Picower Foundation, The Picower Institute For Medical Research,
The Trust FBO Gabrielle H. Picower and Does 1-25 (collectively, the "Picower-related entities")
seeking return of more then $6.7 billion under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections
105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent
Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent
conveyances and damages in connection with certain transfers of property by BLMIS to or for
the benefit of the defendants.  The defendants filed a partial motion to dismiss certain claims and
parties on July 31, 2009.  The Trustee filed his opposition to the defendants' motion on
September 30, 2009.  In his opposition the Trustee, among other things, notified the defendants
that the Trustee's continuing investigation has determined that the fictitious profit withdrawn by
the Picower-related entities was in excess of $7.2 billion, which correspondingly increases the
recovery sought by the Trustee in this matter.  The Trustee also confirmed that the Picower-
related entities had withdrawn more of other investors' money than any other customer of
BLMIS.

192.    On October 25, 2009, Mr. Picower was found dead in the swimming pool of his
home in Florida.  Although the hearing on defendants' motion has been delayed pending the
appointment of a representative for the Picower estate, the Trustee expects the motion to be
heard on January 7, 2010.  The Trustee will continue to fully pursue the litigation.

Picard v. Fairfield Sentry Limited, et al., Adv. Pro. No 09-1239 (BRL).

193.    On May 18, 2009, the Trustee filed a complaint against Fairfield Sentry Limited,
Greenwich Sentry Limited, L.P., and Greenwich Sentry Partners, L.P., (collectively, "the
Fairfield Funds") seeking return of approximately $3.5 billion pursuant to SIPA §§ 78fff(b) and

78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent conveyances, damages and objection to claim in connection with certain transfers of property by BLMIS to or for the benefit of the Fairfield Funds.

194.    Since the commencement of this adversary proceeding, extensive additional investigation pursuant to 2004 subpoenas has focused on subsequent transferees, including certain financial institutions such as JP Morgan Chase, which withdrew over $200 million from one of the Fairfield funds during the summer of 2009.

195.    No answers or motions have been filed in the adversary proceeding to date.  There have been a series of discussions with the liquidators, who are represented by both BVI counsel and Brown Rudnick in New York, to seek to work cooperatively and most advantageously in the filing of claims against various responsible parties, the individual principals of the Fairfield Greenwich Group, and the management companies.

196.    The individual principals are represented by Simpson Thacher, who have met with the Trustee also to discuss settlement.    Thus far, their proposed resolution is deemed inadequate as forming a realistic basis for a settlement at this juncture.    Accordingly, it is the Trustee's intention to vigorously investigate and litigate this matter.  He also intends to amend his complaint, or file a new complaint, as appropriate, as further investigative information develops.

Picard v. Cohmad Securities Corporation, et al., Adv. Pro. No. 09-1305 (BRL).

197.    On June 22, 2009, the Trustee filed a complaint in the Bankruptcy Court against Cohmad Securities Corporation ("Cohmad"), Maurice "Sonny" J. Cohn, Marcia B. Cohn, Robert Jaffe, Alvin "Sonny" Delaire, Jr., Milton S. Cohn, Stanley Berman, Jonathan Greenberg, Cyril

Jalon, Morton Kurzrok, Linda McCurdy, Richard Spring, Rosalie Buccellato, Marilyn Cohn,

Jane M. Delaire a/k/a Jane Delaire Hackett, Carole Delaire, Gloria Kurzrok, Joyce Berman, S &

J Partnership, Janet Jaffin Revocable Trust, The Spring Family Trust, Jeanne T. Spring Trust,

The Estate of Elena Jalon, The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger,

The Joint Tenancy of Robert Pinchou and Fabian Guenzburger and Elizabeth M. Moody.

198.    The following defendants filed motions to dismiss the complaint, or portions

thereof, pursuant to Fed. R. Civ. P. 12(b)(6): (1) Cohmad, Maurice "Sonny" J. Cohn, Marcia B.

Cohn, Milton Cohn and Marilyn Cohn; (2) Robert Jaffe; (3) Richard Spring, The Spring Family

Trust, Jeanne T. Spring Trust (collectively, the "Spring Defendants"); and (4) Jane M. Delaire

a/k/a Jane Delaire Hackett.  The following defendants joined in the motion filed by the Spring

Defendants: (1)  Cyril Jalon and the Estate of Elana Jalon; (2) Alvin "Sonny" Delaire, Jr. and

Carole Delaire; and (3) Stanley Berman, Joyce Berman, S & J Partnership.  These motions were

all rendered moot by the Trustee's amended complaint, discussed in further detail below.

199.    The following defendants answered the complaint: Jonathan Greenberg, Linda

McCurdy, Rosalie Buccellato, Moton Kurzrok, Gloria Kurzrok, the Janet Jaffin Revocable Trust,

and Elizabeth M. Moody.  Gloria Kurzrock also filed a counterclaim seeking recognition of her

SIPA claim.

200.    The following defendants moved to dismiss for lack of personal jurisdiction and

improper service: The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger, The Joint

Tenancy of Robert Pinchou and Fabian Guenzburger (collectively, the "Tenancy Defendants").

The Trustee opposed these motions, and indicated that it was in the process of serving the

complaint on the Tenancy Defendants under the Hague Convention.  Oral argument was held on

October 22, 2009, and the on October 26, 2009, the Court issued an order denying the motion filed by the Tenancy.

201. The Trustee filed a motion to dismiss Gloria Kurzrock's counterclaim. That motion is pending.

202. The following defendants also moved to have the reference to bankruptcy court withdrawn as to the Trustee's case against them: (1) Cohmad, Maurice Cohn and Marcia Cohn; and (2) Robert Jaffe. The Trustee opposed these motions, which is currently sub judice before Judge Stanton in the United States District Court.

203. The Trustee continued its investigation against the various defendants, and filed an amended complaint on October 8, 2009. The amended complaint seeks to avoid, pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, decades worth of transactions through which BLMIS paid more than approximately $114 million to Cohmad, Sonny Cohn and other Cohmad related individuals in exchange for Sonny Cohn, Marcia Cohn, Robert Jaffe and other Cohmad employees introducing victims to BLMIS and knowingly helping Madoff create, fund and maintain his massive Ponzi scheme. Over 90% or more of the income to Cohmad and others came from the referral of customers to Madoff.

204. The amended complaint portrays the unique relationships between Madoff, Cohmad, Cohn, Jaffe and other Cohmad individuals, who, though ostensibly at different companies, acted as a single enterprise. According to the amended complaint, while Madoff shrouded himself with an unapproachable, Wizard of Oz-like aura eschewing unknown investors, the reality is that Cohn, Jaffe and others were actively recruiting more than 1,000 customer accounts and infusing the Ponzi scheme with billions of dollars. The amended

complaint also adds M/A/S Capital, Inc., a company owned by Robert Jaffe, as a defendant to the action.

205.    In addition, the amended complaint seeks to recover all of the fictitious profits that the Cohmad representatives, and their family members, received over the years from their investment advisory accounts at BLMIS, an amount greater than $100 million.

206.    The defendants' response to the amended complaint shall be filed by December 1, 2009.

207.    The Trustee continues his investigation into the activities of Cohmad and the other defendants in their participation in and help in propagation of Madoff's Ponzi scheme.

Picard v. Peter B. Madoff, Mark D. Madoff, Andrew H. Madoff and Shana D. Madoff,
Adv. Pro. No. 09-1503 (BRL).

208.    On October 2, 2009, the Trustee filed an adversary complaint against Peter B. Madoff, Mark D. Madoff, Andrew H. Madoff, and Shana D. Madoff (the "Family Defendants"). Through the complaint, the Trustee is seeking the return of nearly $200 million under SIPA §§ 78fff(b), 78fff-2(c)(3), sections 105(a), 502(d), 541, 542, 544, 548(a), 550(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 et seq.), and common law.  The relief sought includes turnover of and accounting for BLMIS funds, property, and assets, the recovery of preferential and fraudulent transfers—both discovered and undiscovered—of BLMIS funds, property, and assets from BLMIS to the Family Defendants, the recovery of subsequent transfers of BLMIS funds, property, and assets from the Family Defendants to others, the disallowance, or, alternatively, the equitable subordination of the Family Defendants' claims against the estate, as well as seeking damages for breach of fiduciary duty, conversion, unjust enrichment, negligence, and the imposition of a constructive trust.

300040417                                     65

209.    Each of the Family Defendants held senior supervisory or compliance roles at BLMIS: Peter B. Madoff was the Company's Senior Managing Director and Chief Compliance Officer, Mark D. Madoff and Andrew H. Madoff were Co-Directors of Trading, and Shana D. Madoff was Compliance Counsel.  The Trustee alleges that the Family Defendants ignored their responsibilities to BLMIS and instead each improperly received tens of millions of dollars in customer funds to which they were not entitled.  The Family Defendants' answers to the complaint are due on January 8, 2010, and a pre-trial conference is scheduled to take place before Judge Lifland on January 14, 2009.

Picard v. Ruth Madoff, Adv. Pro. No. 09-1391 (BRL).

210.    On July 29, 2009, the Trustee filed an adversary complaint against Ruth Madoff. In this action the Trustee is seeking the return of more than $44 million under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 502(d), 541, 542, 544, 548(a), 550(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 et seq.), and New York common law.  The relief sought includes turnover of and accounting for BLMIS funds, property, and assets, the recovery of fraudulent transfers and subsequent transfers, disallowance of Mrs. Madoff's claims against the estate, as well as damages and the imposition of a constructive trust.

211.    Mrs. Madoff's answer currently is due on December 4, 2009.  A pre-trial conference is scheduled to take place before Judge Lifland on December 9, 2009.

Picard v. Alpha Prime Fund Limited, HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A., Adv. Pro. No. 09-1364 (BRL).

212.    On July 15, 2009, the Trustee filed a complaint against Alpha Prime Fund Limited ("Alpha Prime") seeking return of $86 million under SIPA §§ 78lll(4) and 78fff-2(c)(3), and Bankruptcy Code sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a), and 551, the New

York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq.* (McKinney 2001)) and

other applicable law for turnover, accounting, preferences, fraudulent conveyances and objection

to claim in connection with certain transfers of property by BLMIS to or for the benefit of Alpha

Prime.    The complaint also named HSBC Bank PLC and HSBC Securities Services

(Luxembourg) S.A. (collectively "HSBC") as defendants.    HSBC answered the complaint on

August 28, 2009.    Alpha Prime failed to answer or move to dismiss before its deadline and the

Clerk of the Court entered a default against Alpha Prime on September 1, 2009.    A pretrial

conference has been scheduled for December 9, 2009.

Picard v. Herald Fund SPC, HSBC Bank PLC and HSBC Securities Services (Luxembourg)
S.A., Adv. Pro. No. 09-1359 (BRL).

213.    On July 14, 2009, the Trustee filed a complaint against Herald Fund SPC

("Herald") and HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A.

(collectively "HSBC") as defendants, seeking return of $578 million under SIPA §§ 78lll(4) and

78fff-2(c)(3), and Bankruptcy Code sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a), and

551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq.* (McKinney

2001)) and other applicable law for turnover, accounting, preferences, actual fraudulent

conveyances and constructive fraudulent conveyances in connection with certain transfers of

property by BLMIS to or for the benefit of Herald.    On August 14, 2009, the Trustee filed an

amended complaint to add an objection to Herald's SIPA claim.    On October 13, 2009, the

Trustee filed a second amended complaint.    The parties filed a case management plan, which the

Court entered on October 21, 2009.

214.    HSBC answered the second amended complaint on October 26, 2009.    Herald

moved to dismiss the second amended complaint for failure to state a claim on October 26, 2009.

The Trustee's opposition to that motion was filed on November 13, 2009.  A hearing on the motion to dismiss is scheduled for December 22, 2009.

Picard v. Primeo Fund, HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A., Adv. Pro. No. 09-1366 (BRL).

215.    On July 15, 2009, the Trustee filed a complaint against Primeo Fund ("Primeo") seeking return of $145 million under SIPA §§ 78lll(4) and 78fff-2(c)(3), and Bankruptcy Code sections 105(a), 542, 544, 548(a), 550(a), and 551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 et seq. (McKinney 2001)) and other applicable law for turnover, accounting and fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of Primeo.  The complaint also named HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A. (collectively "HSBC") as defendants.  HSBC answered the complaint on August 28, 2009.  Primeo failed to respond to the suit papers before its deadline and the Clerk of the Court entered a default against Primeo on September 1, 2009.  A pretrial conference has been scheduled for December 9, 2009.  Primeo is in liquidation in the Cayman Islands.  The Trustee and the Cayman Islands court-appointed liquidators (the "Liquidators") are in negotiations regarding a partial settlement.  Any final settlement agreement would have to be approved by the Bankruptcy Court and the Cayman Islands Court.

Picard v. Thybo Asset Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited, Thybo Stable Fund Ltd., Adv. Pro. No. 09-1365 (BRL).

216.    On July 15, 2009, the Trustee filed a complaint against Thybo Asset Management Limited; Thybo Global Fund Limited; Thybo Return Fund Limited; and Thybo Stable Fund Ltd. (collectively, the "Thybo Funds"), seeking return of approximately $63 million pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a), 550(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for

turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Defendant Thybo Funds. The Trustee filed an amended complaint on August 25, 2009, adding a claim objecting to Defendant Thybo Stable Fund's SIPA claim. The Defendant Thybo Funds' answers are due on December 18, 2009 and a pretrial conference is scheduled for December 22, 2009.

F.    **SETTLEMENTS**

Optimal Companies

217.    On May 22, 2009, the Trustee reached an agreement (the "Settlement Agreement") with Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited (collectively the "Optimal Companies") to settle the Trustee's claims against them in connection with the liquidation of BLMIS. The Optimal Companies are indirectly owned by Banco Santander, S.A., a Spanish banking corporation ("Santander" and together with the Optimal Companies, collectively "Optimal"). On May 26, 2009, the Trustee filed a motion seeking approval of the Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code and Fed. R. Bankr. P. 2002 and 9019. This Court approved the Settlement Agreement at a hearing held on June 16, 2009.

218.    Pursuant to the Settlement Agreement, Optimal agreed to pay $235 million to settle potential litigation claims by the Trustee. This settlement is significant because it is the first instance where a "feeder fund" has agreed to settle with the Trustee. The Optimal Companies withdrew about $275 million within 90 days before the collapse of BLMIS. The $275 million in withdrawals were therefore considered preferences, recoverable by the Trustee pursuant to sections 547 and 550 of the Bankruptcy Code. Optimal agreed to return approximately $235 million, which is 85% of what the Trustee would have sought from Optimal as a 90-day preference claim. The settlement is considered to be a major success because it

allows the Trustee to avoid (1) the anticipated legal battles over determining the judicial plausibility of a US court holding jurisdiction over a foreign bank in Spain and (2) the costly litigation that would be necessary to collect a judgment from the funds.

219.    The Trustee conducted a confirmatory investigation, including a review of documents made available to the Trustee by the Optimal Companies that related to, among other things, due diligence conducted by the Optimal Companies and their affiliates on BLMIS.  On the basis of that review, the Trustee concluded that the Optimal Companies and their affiliates were not complicit in the fraud perpetrated by BLMIS and Bernard Madoff on BLMIS's customers and did not have actual knowledge of the fraud, and based on the review, the Trustee did not believe that the conduct, acts and omissions of the Optimal Companies and their affiliates provide grounds to assert any claim against the Optimal Companies or any affiliates (other than avoiding preference claims), or to disallow any claim that the Optimal Companies may have against BLMIS or its estate.  If the Trustee obtains new information relating to the BLMIS accounts of the Optimal Companies that materially affects the Trustee's decision to enter into the Settlement Agreement, the Trustee may declare the Settlement Agreement void and return the amounts paid by the Optimal Companies.

G.    **MOTIONS TO INTERVENE**

220.    The Trustee and his counsel successfully opposed an attempt by Ade Ogunjobi, Toks, Inc. and its related companies (collectively, "Toks") to intervene in the BLMIS proceedings.  Toks proposed to purchase BLMIS through what it described as a purported "global transaction all stock tax free $100,000,000,000 ($100 Trillion) or 400,000,000,000 shares of Class A Common shares that will be registered with the [SEC] during the closing of the proposed exchange tender offers," pursuant to which clients of BLMIS purportedly would

receive $75 billion or more in stock, and it proposed to use the funds recovered by the Trustee to fund the plan. The offer was unsolicited, and more importantly, completely unsupported.

221.    Based on the papers filed by the Trustee, and after a hearing on the matter held on June 2, 2009, the Bankruptcy Court found that Toks was not a party in interest, and that Toks failed to demonstrate any ability to complete its proposed tender offer. The Bankruptcy Court denied Toks' motion to intervene,[13] and Toks appealed to the District Court. The matter was assigned to District Court Judge Chin (Civil Case No. 09 CV 5877) (the "Toks Appeals").

222.    Counsel for the Trustee prepared a filed a joint appellate brief with SIPC, and along with Toks' appellate brief, the matter was submitted to the District Court on May 30, 2009. [Toks Appeal Dkt. No. 6]. By order dated October 30, 2009, the District Court dismissed the appeal based on Toks' failure to provide information required pursuant to a prior order issued by the District Court. [Toks Appeal Dkt. No. 12]  Toks recently filed a notice of appeal with the Second Circuit Court of Appeals.

---

[13] Mr. Ogunjobi's and Tok's emergency motion seeking a stay of the liquidation proceeding [Dkt. No. 304] was denied by the Bankruptcy Court on July 6, 2009 [Dkt. No. 306].

X.    **CONCLUSION**

The foregoing report represents a summary of the status of this proceeding and the

material events that have occurred through October 31, 2009 unless otherwise indicated.  This

Report will be supplemented and updated with further interim reports.

Dated:  New York, New York                         Respectfully submitted,
        November 23, 2009


                                                    _/s/  Irving H. Picard_____
                                                    Irving H. Picard
                                                    c/o Baker & Hostetler LLP
                                                    45 Rockefeller Plaza
                                                    New York, New York 10111
                                                    Telephone: (212) 589-4200
                                                    Facsimile: (212) 589-4201

                                                    *Trustee for the Substantively Consolidated*
                                                    *SIPA Liquidation of Bernard L. Madoff*
                                                    *Investment Securities LLC and*
OF COUNSEL[14]                                      *Bernard L. Madoff*

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirshfield
Email: mhirshfield@bakerlaw.com
Alissa M. Nann
Email: anann@bakerlaw.com

*Attorneys to Trustee for the Substantively*
*Consolidated SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC And*
*Bernard L. Madoff*

---

[14] The Trustee would like to recognize the following B&H attorneys and team members who contributed to this Report: Fritz Chockley, Elizabeth Scully, Lauren Resnick, Oren Warshavsky, John Siegel, Brian Bash, Gonzalo Zeballos, Deborah Renner, Marc Powers, Lou Colombo, Thomas Wearsch, Keith Murphy, Maryanne Stanganelli, Henry Bodenheimer, Bik Cheema, Courtni Thorpe, Michael Powell, Seanna Brown, Bill Speros and Jordan Sherman.  William Kingsford, Meaghan Schmidt and Vineet Sehgal of AlixPartners also contributed to this Report, as well as Regina Griffin of Windels Marx.