RICHARDS KIBBE & ORBE LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 530-1800
Facsimile: (212) 530-1801
Daniel C. Zinman
Joon P. Hong
Email: dzinman@rkollp.com
Email: jhong@rkollp.com

Attorneys for Receiver, LEE S. RICHARDS

Hearing Date: December 17, 2009
Hearing Time: 10:00 a.m.
Objection Deadline: December 14, 2009

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES INVESTOR PROTECTION
CORPORATION,

                Plaintiff-Applicant,

v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

BERNARD L. MADOFF,

                Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Adv. Pro. No. 08-1789 (BRL)

SIPA Liquidation

(Substantively Consolidated)

**FIRST AND FINAL APPLICATION OF LEE S. RICHARDS, RECEIVER, RICHARDS
KIBBE & ORBE LLP, COUNSEL TO THE RECEIVER, AND ALIXPARTNERS LLP,
FORENSIC ACCOUNTANTS FOR THE RECEIVER, FOR ALLOWANCE OF
COMPENSATION FOR  PROFESSIONAL SERVICES RENDERED AND FOR
REIMBURSEMENT  OF ACTUAL AND NECESSARY EXPENSES INCURRED
FOR THE PERIOD FROM DECEMBER 11, 2008 THROUGH FEBRUARY 28, 2009**

TO:    THE HONORABLE BURTON R. LIFLAND,
        UNITED STATES BANKRUPTCY JUDGE

Lee S. Richards, former receiver (the "Receiver") for defendant Bernard L. Madoff

Investment Securities LLC ("BMIS") and for the assets of Madoff Securities International Ltd.

("MSIL"), Madoff Ltd. and any other foreign corporate entity owned by the debtor Bernard L.

Madoff ("Madoff"),[1] Richards Kibbe & Orbe LLP ("RK&O"), as counsel for the Receiver, and

AlixPartners LLP ("AlixPartners"), as the forensic accountants for the Receiver, hereby submit

this first and final application (the "Application") pursuant to section 78eee(b)(5) of the

Securities Investor Protection Act ("SIPA"), sections 330 and 331 of title 11 of the United States

Code, 11 U.S.C. §§ 101 et seq., and Rule 2016(a) of the Federal Rules of Bankruptcy Procedure

for (i) with respect to the Receiver and RK&O, allowance of final compensation for services

rendered in the amount of $300,000 and reimbursement of actual and necessary expenses in the

amount of $6,449 incurred during the period from December 11, 2008 through February 28,

2009 (the "Compensation Period") and (ii) with respect to AlixPartners, allowance of final

compensation for services rendered in the amount of $316,000, and reimbursements of actual

and necessary expenses in the amount of $15,000 incurred during the Compensation Period.

### SUMMARY OF PROFESSIONAL FEES AND REIMBURSEMENT OF EXPENSES REQUESTED BY THE RECEIVER, RK&O AND ALIXPARTNERS

1.    The Receiver and RK&O attorneys and paraprofessionals have expended a total

of 1,225.80 hours working on this matter during the Compensation Period.  The total fees for

services rendered by the Receiver and RK&O with respect to BMIS and MSIL during the

---

[1] On March 23, 2009, the United States District Court for the Southern District of New York entered an Order approving the Report of the Receiver Lee S. Richards and Application to Terminate the Receivership, in which the Receiver requested termination of the Receivership.

491449.13/2643-00001

Compensation Period based on the firm's customary hourly rates are $651,642.50. Total disbursements for actual and necessary expenses incurred by the Receiver and RK&O during the Compensation Period are $27,696.49, which amount reflects voluntary deductions with respect to long distance travel expenses.

2.      After consulting with the Securities Investor Protection Commission ("SIPC"), following earlier consultations with the Securities and Exchange Commission (the "SEC"), the Receiver and RK&O have decided to reduce the fee amounts for which they seek compensation from this Court, and the expense amounts for which they seek reimbursement. Accordingly, the total amount of fees sought by the Receiver and RK&O on this Application is $300,000, and expenses in the amount of $6,449. The reduced amount of the fee request reflects (i) an initial 10% discount from the customary billing rates of the Receiver and RK&O (as described in paragraphs 28 and 29 below), (ii) a 50% reduction in non-working travel time of the Receiver and RK&O professionals totaling $19,112.50 (as described in paragraph 49 below), and (iii) an additional fee discount of $269,277.[2] The reduced amount of the expense request reflects a discount of $21,247.49.

3.      The Receiver retained AlixPartners as forensic accountants. AlixPartners professionals expended a total of 717.35 working hours on this matter during the period from December 11 through December 31, 2008. The services rendered by AlixPartners total $352,995.75. This fee amount reflects a 10% discount in the customary billing rates of AlixPartners (as was originally requested by the SEC) and a 50% travel time reduction of

---

[2] Adding together the initial 10% discount provided by the Receiver and RK&O to their customary billing rates, the 50% travel time reduction, and the additional fee discount of $269,277, the total fee discount provided by the Receiver and RK&O comes to $351,642.50.

- 3 -

$8,313.75 (as described in paragraph 62 below). In addition, the actual and necessary expenses incurred by AlixPartners totals $18,484.79.

4.    After consulting with the SEC and SIPC, AlixPartners has decided to reduce the fee amounts for which it seeks compensation, and the expense amounts for which it seeks reimbursements. Accordingly, AlixPartners requests final compensation for services rendered in the amount of $316,000, and reimbursements of actual and necessary expenses in the amount of $15,000.[3]

5.    Pursuant to the mandatory guidelines of this Court for fees and disbursements for professionals (the "Guidelines"), attached hereto are the following exhibits:

a.    Certification regarding compliance by the Receiver and RK&O with the Guidelines (attached hereto as Exhibit A);

b.    Certification regarding compliance by AlixPartners with the Guidelines (attached hereto as Exhibit B);

c.    Fee Schedule setting forth all RK&O professionals and paraprofessionals who have performed services in this matter during the Compensation Period, the capacity in which each individual is employed by RK&O, the hourly billing rate charged by RK&O for services performed by each individual, the aggregate number of hours expended in this matter and fees billed therefor (attached hereto as Exhibit C);[4]

---

[3] Adding together the 10% discount provided by AlixPartners to its customary billing rates, the 50% travel time reduction, and the additional fee discount of $36,995.75, the total fee discount provided by AlixPartners comes to $84,531.25. The expense reimbursement requested by AlixPartners reflects a discount of $3,484.79.

[4] All of RK&O's time records billed during the Compensation Period, by activity categories with descriptions of the services rendered and arranged in chronological order with respect to each task category, were previously provided to SIPC, the SIPA Trustee and the SEC and will be made available to the Court, *in camera*, upon request so as to preserve the confidentiality of the information contained in the detailed time records. Providing SIPC, the SIPA Trustee, the SEC, or any other party with the time records is not intended to be, nor shall it be, deemed a waiver of

- 4 -

d.     Fee Schedule setting forth all AlixPartners professionals and paraprofessionals who have performed services in this matter during the Compensation Period, the capacity in which each individual is employed by AlixPartners, the hourly billing rate charged by AlixPartners for services performed by each individual, the aggregate number of hours expended in this matter and fees billed therefor (attached hereto as Exhibit D);[5]

e.     Schedule specifying the categories of expenses for which the Receiver and RK&O are seeking reimbursement, and the total amount for each such expense category (attached hereto as Exhibit E);

f.     Schedule specifying the categories of expenses for which AlixPartners is seeking reimbursement, and the total amount for each such expense category (attached hereto as Exhibit F);

6.     The Receiver is not in possession or control of any assets of the estates of either BMIS or MSIL and has not received nor disbursed any funds from the BMIS or MSIL estates during the Compensation Period.[6]

---

any attorney/client privilege.

[5] All of AlixPartners' time records billed during the Compensation Period, by activity categories with descriptions of the services rendered and arranged in chronological order with respect to each task category, were previously provided to SIPC, the SIPA Trustee and the SEC and will be made available to the Court , *in camera*, upon request so as to preserve the confidentiality of the information contained in the detailed time records. Providing SIPC, the SIPA Trustee, the SEC, or any other party with the time records is not intended to be, nor shall it be, deemed a waiver of any attorney/client privilege.

[6] On February 17, 2009, the Receiver received a check in the amount of $227,000 in connection with BMIS's Fiduciary Fidelity Bond for Employee Benefits Plan and the Financial Institution Bond. The Receiver was advised by counsel for the SIPA Trustee that the check represented a return of premium, previously paid for by BMIS, for BMIS's Employee Benefits Plan and the Financial Institution Bond, which was being returned as a result of the insurer's rescission of those bonds. In accordance with the SIPA Trustee's request, the Receiver delivered the check to the SIPA Trustee on February 18, 2009.

- 5 -

7.    This is the first and final application for fees and expenses. The Receiver, RK&O and AlixPartners have not received any previous payments with respect to the fees and expenses sought in this Application. Inasmuch as this is a final application for fees and expenses, the Receiver, RK&O and AlixPartners request that the amounts sought herein not be subject to any holdback.

## BACKGROUND

### U.S. Proceedings

8.    On December 11, 2008, the SEC commenced a civil enforcement action in the United States District Court for the Southern District of New York ("District Court") against Madoff and BMIS (Case No. 08 CV 10791) to halt a massive fraud on investment advisory clients of BMIS. The SEC's complaint alleged that for many years the defendants engaged in a Ponzi scheme, paying returns to certain investors out of the principal received from other investors, in violation of Sections 206(1) and 206(2) of the Advisers Act of 1940, Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934.

9.    Simultaneously with the filing of the complaint, the SEC also sought emergency relief, including a temporary restraining order and a preliminary injunction, an order freezing the assets of the defendants and the appointment of a receiver over the assets of BMIS. Pursuant to an order dated December 11, 2008, the District Court initially appointed Lee S. Richards, of RK&O, as receiver over all assets and accounts of BMIS outside of the United States with authority to exercise power over BMIS's foreign business and transactions.

- 6 -

10.    Also on December 11, 2008, the United States Attorney's Office filed a criminal complaint against Madoff in the District Court, captioned <u>United States v. Madoff</u> (No. 08 CV 2735).[7]

11.    On December 12, 2008, the District Court signed an order to show cause pursuant to which the District Court granted the SEC's request for a temporary restraining order and a freeze on Madoff's assets and the assets of the Madoff corporate entities.  The District Court also appointed Mr. Richards as receiver for the assets of BMIS, as well as the assets of MSIL and Madoff Ltd.

12.    On December 15, 2008, the District Court entered an order granting an application filed by SIPC to intervene in the SEC action, which order, in pertinent part, (i) found that customers of BMIS were in need of the protection afforded by the SIPA, (ii) appointed Irving H. Picard, Esq. as SIPA Trustee for BMIS, and (iii) removed the SIPA liquidation of BMIS to the Bankruptcy Court for the Southern District of New York.

13.    On December 18, 2008, the District Court entered a preliminary injunction order (the "Preliminary Injunction Order") with the consent of all parties to the action that, among other things, terminated the receivership over the assets of BMIS (given the institution of the SIPA liquidation) but provided for Mr. Richards to "continue as the appointed receiver for the assets of [MSIL], Madoff Ltd., and any other broker-dealer, market making, or investment advisory businesses (the 'Foreign Entities') not located in the United States of America that are owned or controlled, in whole or in part, by Madoff, BMIS and their partners, agents, employees,

---

[7] On March 12, 2009, Mr. Madoff pleaded guilty to eleven criminal charges, including securities fraud, wire fraud, mail fraud, money laundering and making a false filing with the U.S. Securities and Exchange Commission.  Mr. Madoff was sentenced on June 30, 2009 to 150 years in prison.

491449.13/2643-00001

attorneys, or other professionals, anyone acting in concert with them or on their behalf, and any

third party."

14.     The Preliminary Injunction Order directed the Receiver to: "(i) preserve the status

quo, (ii) ascertain the extent of commingling of funds between Madoff, BMIS and the Foreign

Entities; (iii) ascertain the true financial condition of the Foreign Entities and the disposition of

investor funds; (iv) prevent further dissipation of the property and assets of the Foreign Entities;

(v) prevent the encumbrance or disposal of property or assets of the Foreign Entities and the

investors; (vi) preserve the books, records and documents of the Foreign Entities; (vii) respond to

investor inquiries regarding the foreign entities; (viii) protect the assets of the Foreign Entities

from further dissipation; (ix) determine whether the Foreign Entities should undertake

bankruptcy filings; and (x) determine the extent to which the freeze should be lifted as to certain

assets in the custody of the Foreign Entities."

15.     In addition, the Preliminary Injunction Order directed the Receiver to (i) make a

report to the District Court and the parties by January 26, 2009, subject to such reasonable

extensions as the District Court may grant, and (ii) develop a preliminary plan for administration

of the assets of the receivership of the Foreign Entities, including a recommendation regarding

whether bankruptcy cases should be filed for all or a portion of the assets subject to the

receivership and whether litigation against third parties should be commenced on a contingent

fee basis to recover assets of the Foreign Entities for the benefit of the receivership.

16.     By letter dated January 23, 2009, the Receiver, through his counsel, requested a

one month extension of time to submit the Receiver's report required by the Preliminary

Injunction Order. The District Court granted the request for an extension of time on January 26,

2009.

- 8 -

17.     On February 26, 2009, the Receiver submitted the Report of the Receiver Lee S. Richards and Application to Terminate Receivership (the "Receiver's Report"), which provided a report on the receivership and the Receiver's activities and a description of the status of the assets and liabilities of MSIL.  The Receiver's Report also requested the termination of the receivership and leave of the District Court to file an application for appropriate compensation and reimbursement of expenses with the District Court or in another forum at a later time.

18.     On March 23, 2009, following receipt of responses in support of the Receiver's Report from the SEC, the United States Attorney's Office for the Southern District of New York and the SIPA Trustee, the District Court entered an order approving the Receiver's Report and granting the relief sought therein.

### UK Proceeding

19.     On December 19, 2008, upon application of the directors of MSIL, and with the consent of the Receiver and the SEC, the High Court of Justice, Chancery Division, Companies Court in London (the "English Court") ordered that MSIL be placed in a provisional liquidation and appointed three representatives of the accounting firm of Grant Thornton UK LLP as Joint Provisional Liquidators ("JPLs") of MSIL.  The Receiver pressed MSIL to apply for such a Provisional Liquidation Order because (1) MSIL and its counsel took the position that the Order appointing the Receiver had no force and effect in England and (2) the Financial Services Authority ("FSA") in the UK strongly recommended that such an order be considered.  The Order of the English Court provided that the JPLs (i) "may" cooperate with both the Receiver and the SIPA Trustee and (ii) should use their best efforts to provide to the U.S. Department of Justice and the SEC the same information as that which is provided to the Receiver, the SIPA Trustee and the FSA.

- 9 -

491449.13/2643-00001

20.     On March 3, 2009, the English Court entered a Recognition Order in which the SIPA liquidation of BMIS was "recognized as a foreign main proceeding in accordance with the UNCITRAL Model Law on Cross-Border Insolvency . . ." The English Court entered this order based in part on the affidavit of the SIPA Trustee, who averred that the activities between MSIL and BMIS were extensive and consisted of a wide range of transactions, and that the two entities were closely linked.

21.     On March 6, 2009, the English Court entered an order permitting the JPLs and the SIPA Trustee to share information with each other, it being agreed by the JPLs and the SIPA Trustee that it would be in their common interest to share information relating to the affairs of BMIS and MSIL in connection with the continuing investigation and liquidation of those entities.

22.     As stated above, on March 12, 2009, Mr. Madoff pleaded guilty to eleven felony counts in the criminal proceeding brought by the United States Attorney's Office.  During his pleas allocution, Mr. Madoff said among other things, that he concealed the fraud in part by transferring money between BSIM and MSIL to make it appear that securities transactions were being conducted on behalf of his investment advisory clients.

## SUMMARY OF STEPS TAKEN BY THE RECEIVER

23.     The extensive and varied steps taken by the Receiver following his appointment as receiver by the District Court are described in greater detail in the Receiver's Report that was previously filed with the District Court, and which is attached hereto as Exhibit G.  In summary, the Receiver and his professional advisors, among other things, (i) secured the premises of BMIS and MSIL, (ii) examined the contents of the offices, (iii) advised BMIS and MSIL management and employees of the details of the District Court's orders, including the freeze of BMIS's and MSIL's assets, (iv) identified the corporate structure, board membership and shareholdings of

- 10 -

BMIS and MSIL and took steps to identify and protect the liquid assets and records of BMIS and MSIL, (v) set up a telephone hotline and website for customer inquiries, (vi) took immediate steps to limit access by employees or others to the computer systems of each company, (vii) interviewed BMIS and MSIL managers and employees, (viii) inquired into and ultimately determined that a liquidation of BMIS and MSIL was appropriate, and (ix) conducted an analysis to determine whether any portions of the Madoff businesses could be sold.

24.     The steps taken by AlixPartners following their retention by the Receiver, among other things, included (i) meeting and participating in conference calls with the Receiver and his professional advisors, regulators, DTCC, FSA, and banks, (ii) reviewing and analyzing banking and accounting records and other documents of interest, (iii) interviewing BMIS and MSIL managers and employees, (iv) setting up a telephone hotline and website for customer inquiries, (v) taking immediate steps to establish security over physical premise, offices, records and safes, (vi) conducting an E-Discovery sweep, disabling employee access to and preservation of electronic data, (vii) carrying out the process of a custodian and forensic image collection, (viii) conducting a balance sheet review of MSIL, and (ix) coordinating the transition with Grant Thornton.

25.     Following the commencement of the SIPA liquidation, the Receiver and his team handed over the affairs of BMIS to the SIPA Trustee and, over the course of a few weeks following the SIPC Trustee's appointment, worked with the Trustee and passed on the information they had obtained about BMIS to him.

26.     Similarly, following the commencement of the provisional liquidation of MSIL in the UK, the Receiver and his team passed on information they had obtained about MSIL to the JPLs and ultimately handed over the affairs of MSIL to the JPLs.  In addition, the Receiver

- 11 -

continued his attempt to preserve the assets and records of MSIL and to investigate its operations jointly with the JPLs so as to minimize costs to and maximize recovery for victims of the Madoff Ponzi scheme.

## FEES AND EXPENSES REQUESTED

27.    In connection with the Compensation Period, the Receiver and RK&O request final compensation in the amount of $300,000 and reimbursement of expenses in the amount of $6,449.

28.    The fee amount reflects the hours worked by RK&O attorneys, including the Receiver, and legal assistants and the hourly rates in effect at the time the services were rendered, as modified by a 10% discount originally requested by the SEC, a 50% travel time discount described in paragraph 49 below, and an additional discount of $269,277.   These amounts also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Rules of Professional Responsibility, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and RK&O.

29.    Pursuant to these discounts (as referenced in paragraph 28 above), the fees of the Receiver and RK&O have been reduced from $651,642.50 to $300,000.00 — a reduction of $351,642.50.

30.    The Receiver and RK&O have submitted this Application the SEC for review. We have been informed by the SEC that it has no objection to this Application.

- 12 -

31.    Prior to filing this Application, the Receiver and RK&O also submitted this Application for review to SIPC and the SIPA Trustee.

32.    The Receiver and RK&O have not filed any prior fee and expense application in this case or in another forum.  RK&O has not received a retainer in this matter.

33.    The Receiver and RK&O professionals recorded all services performed in time increments of on tenth (0.10) of an hour.   All services by RK&O paralegals and other paraprofessionals support staff were professional in nature.

**SUMMARY OF SERVICES RENDERED BY THE RECEIVER AND
RK&O DURING THE COMPENSATION PERIOD**

34.    In accordance with the Guidelines, RK&O has segregated its time during the Compensation Period into eight activity categories.   Narrative summaries of these activity categories are provided below.


Case Administration (B110)                     Total Fees After 10% Discount: $191,863.35[8]

35.    This activity category consisted of regular in-person meetings and telephone conferences conducted by the Receiver and his professionals from the inception of this matter in order to, among other things, obtain and provide status updates, coordinate site visits, employee interviews and other activities, consult with representations of AlixPartners, and formulate strategies to protect the assets of BMIS and MSIL and preserve their records.  These meetings and conferences occurred on a daily basis in the early part of the receivership and facilitated the timely exchange of relevant information and coordination of efforts among the Receiver and his

---

[8] The fee amounts as listed in this breakdown do not reflect the additional discount of $269,277 agreed to by the Receiver and RK&O.

- 13 -

491449.13/2643-00001

team.  The Receiver and his professionals also held meetings with representatives of the SEC, the U.S. Attorney's Office, the FBI and the FSA to coordinate the efforts of the Receiver with those governmental agencies in the U.S. and the UK.  The Receiver also held numerous conference calls and several in-person meetings with the JPLs in order to share and exchange information regarding BMIS and the receivership in the U.S. and the provisional liquidation of MSIL in the UK.

36.    This category also includes efforts related to obtaining a power of attorney over the MSIL shares owned by Mr. Madoff and exercising the rights under the power of attorney to remove the Madoff family members from the MSIL board of directors.

37.    The Receiver and his team also dealt with employment, compensation and other employee related issues at BMIS and MSIL and advised management and employees of the details of the District Court's orders, including the freeze of the assets of BMIS and MSIL.  The Receiver and his team interviewed approximately one hundred employees of BMIS and MSIL to identify key employees and to assess their duties and responsibilities, to obtain any relevant information relating to the fraud, and to assess whether any business of BMIS or MSIL could be sustained as a going concern.

38.    In addition, the Receiver and his professionals communicated with the District Court and other parties regarding the status of the receivership.  The Receiver and his attorneys prepared the Receiver's Report and worked with SIPC and the SIPA Trustee in the transitioning of responsibilities and information with respect to the BMIS estate to the SIPA Trustee and in communicating with the SIPA Trustee and his professionals regarding the status of MSIL's provisional liquidation in the UK.

- 14 -

Asset Analysis and Recovery (B120)          Total Fees After 10% Discount: $16,069.50

39.    This activity category consisted of efforts to identify and locate assets of BMIS and MSIL to secure and prevent the dissipation of those assets, and included analysis of the books and records of BMIS and MSIL, and interviews of certain directors and employees of BMIS and MSIL.  Because BMIS and MSIL engaged in proprietary trading business, they had many open trades with numerous counterparties at the time SEC commenced the civil enforcement action against them in the District Court.  A detailed analysis of these trades was necessary to preserve any recovery for the defrauded investors.

Meetings and Communications with Creditors (B150)Total Fees After 10% Discount: $28,452.15

40.    This activity category consisted of communications with investors.  The Receiver and his team set up a telephone hotline and a website for customer inquiries.  Through these two methods of contact, many customers of BMIS asserted complaints with the Receiver or otherwise raised issues regarding the loss of their assets.   The Receiver received hundreds of calls, emails, letters, and other communications from concerned investors regarding the status of their accounts with BMIS.  Representatives of the Receiver kept a log of these communications, reviewed and responded to investor inquiries, prepared and memorialized all calls and inquiries from investors, created mailing and contact lists and transcribed voice messages from investors.  The Receiver responded to these customers by letter in which he provided information regarding the options available to defrauded investors.   Ultimately, the Receiver turned over the information regarding investors to the SIPA Trustee.

491449.13/2643-00001

Business Operations (B210)                    Total Fees After 10% Discount: $12,623.40

41.    This activity category consisted of analyzing the open trade positions of BMIS

and MSIL.[9]  A significant part of the time of the Receiver and his professionals was spent on

calls and negotiations with counterparties in order to resolve funding and other issues and to

identify and wind up open trades so as to minimize losses to the estates of BMIS and MSIL.

This category also covers work related to the removal of the Madoff directors from MSIL's board

of directors and meetings with the non-Madoff board members regarding the financial viability

of MSIL as a going concern.


Fact Investigation and Development (L110)     Total Fees After 10% Discount:  $177,309.00

42.    This activity category consisted of steps taken by the Receiver and his team to

understand all issues relating to the assets of BMIS and MSIL.   Among other things, the

Receiver and his team reviewed the corporate structure, board membership, shareholdings,

corporate records and filings of BMIS and MSIL in order to facilitate the identification and

protection of the assets and records of BMIS and MSIL.

43.    The Receiver and his team also conferred with traders at BMIS to help identify

and assess the firm's outstanding trades.   As counterparties and settlement banks learned of

BMIS' potential lack of liquidity, many threatened to abandon their open trades with BMIS.  The

Receiver and his staff analyzed these outstanding positions and took steps to unwind them in an

orderly fashion in order to reduce the potential for greater losses for BMIS.

---

[9] Some of the time entries for work related to dealing with open trades of BMIS and MSIL were placed under the
Asset Analysis and Recovery (B120) activity category.  Those time entries are in addition to, and not duplicative of,
the time entries placed under the Business Operations (B210) activity category.

44.    The Receiver and his representatives searched for, located, and began examining many of the hard-copy documents located in the BMIS office.  In addition, the Receiver and his team located and reviewed copies of account statements and trade confirmations sent out to investors, as well as the firm's check ledger.

Analysis/Strategy (L120)                    Total Fees After 10% Discount:  $117,140.85

45.    This activity category consisted of analyzing the businesses of BMIS and MSIL and developing strategies with respect to maximizing and preserving the assets of those entities. The Receiver and his team began the process of determining whether any portions of the BMIS businesses could be sold.  BMIS had two main businesses, the investment advisor business that Mr. Madoff had run and a proprietary trading and market-making business that others in the company were responsible for operating.  After consulting with employees for BMIS, and after reviewing relevant materials, the Receiver and his team made a preliminary determination that the proprietary trading/market-making business appeared to be salable.  The Receiver therefore took preliminary steps to determine the worth of that business and whether its sale was possible. To this end, he contacted investment bankers who might assist in the possible sale.[10]

46.    The Receiver and his team also began an inquiry to determine whether a liquidation of BMIS would be appropriate.  Working with his advisors and the SEC, and after reviewing the books and records of the company, the Receiver determined that BMIS' liabilities exceeded its assets and that a liquidation of the company was in order.  The Receiver and his staff engaged in a number of discussions with SIPC, the SEC and other government agencies and

---

[10] The market-making business of BMIS was subsequently sold by the SIPA Trustee and the sale was approved by this Court pursuant to an order approving the sale on April 30, 2009.

491449.13/2643-00001

determined that the liquidation would be best conducted under SIPA. After the appointment of the SIPA Trustee, the Receiver and his team handed over the affairs of BMIS to the SIPA Trustee and passed on the information they had obtained about BMIS.

47.    Similarly, the Receiver conducted an investigation to ascertain the financial viability of MSIL as a going concern and whether it should be put into liquidation or wound down outside of a formal court proceeding. Based upon the results of the Receiver's preliminary investigation, the Receiver determined that the most reasonable course was for MSIL to be placed in a court-ordered provisional liquidation. The Receiver communicated his conclusion regarding the provisional liquidation to the MSIL board of directors, representatives of the FSA, the SEC and the United States Attorney's Office in Manhattan, and after the commencement of the provisional liquidation in the UK, the Receiver and his team handed over the affairs of MSIL to the JPLs and passed on the information they had obtained about MSIL.

48.    As part of his efforts to work cooperatively with the JPLs, the Receiver and his counsel considered jurisdictional issues and the authority of the Receiver over MSIL in light of the fact that although MSIL was majority owned by Mr. Madoff, it was not owned directly by BMIS and was a separate foreign entity organized under UK law. The Receiver considered various options to deal with issues raised by the parallel U.S. and UK proceedings and reviewed the efficacy of continuing the receivership and the role and duties of the Receiver in light of the on-going SIPA liquidation of BMIS and the provisional liquidation of MSIL.

Travel Time (B195)          Total Fees After Travel Time and 10% Discount:  $17,201.25

49.    This activity category covers all non-working travel time of the Receiver and RK&O professionals during the Compensation Period. Exhibit C reflects the actual travel time

- 18 -

491449.13/2643-00001

of the professionals. The Billing Instructions for Receivers in Civil Actions Commenced by the

U.S. Securities and Exchange Commission permit non-working travel time to be billed at fifty

percent of the professional's billing rate. The Receiver and RK&O reduced the amount in this

category by 50% from $38,225.00 to $19,112.50, and then further reduced the resulting amount

by the 10% discount requested by the SEC to arrive at the $17,201.25 amount.

<u>Court Mandated Conferences (L230)</u>    <u>Total Fees After 10% Discount: $8,617.50</u>

    50.    This category covers time spent in preparing for and attending hearings before the

Bankruptcy Court and the English Court related to the SIPA liquidation of BMIS and the

provisional liquidation of MSIL, respectively.

                    *        *        *        *

    As mentioned earlier, in addition to the initial 10% discount for fees, and the 50%

discount for non-working travel time, the Receiver and RK&O have further reduced the fee

amounts for which they seek compensation by $269,277 — leaving a total compensation amount

of $300,000.

## SUMMARY OF SERVICES RENDERED BY ALIXPARTNERS
## DURING THE COMPENSATION PERIOD

<u>Case Administration [CA]</u>    Total Fees After 10% Discount: $156,712.95[11]

    51.    This activity category consisted of regular in-person meetings and telephone

conferences conducted by the Receiver and the professionals from RK&O and AlixPartners from

the inception of the SEC action against Madoff and BMIS in order to, among other things, obtain

---

[11] The fee amounts as listed in this breakdown do not reflect the additional fee discount of $36,995.75 agreed to by
AlixPartners.

491449.13/2643-00001

and provide status updates, draft a work plan and develop task lists, conduct employee interviews and other activities, and formulate strategies to protect the assets of BMIS and MSIL and preserve their records.  These meetings and conferences occurred on a daily basis in the early part of the receivership and facilitated the timely exchange of relevant information and coordination of efforts between the Receiver and his team and AlixPartners.  AlixPartners professionals also participated in meetings and conference calls with representatives of the SEC, the U.S. Attorney's Office, the FBI and the FSA to coordinate the efforts of the Receiver with those of the governmental agencies in the U.S. and the UK.

52.    The Receiver, his lawyers, and AlixPartners also managed employment, compensation and other employee related issues at BMIS and MSIL and advised management and employees of the details of the Court's orders, including the freeze of the assets of BMIS and MSIL.  Professionals from AlixPartners participated in interviews of approximately sixty employees of BMIS and MSIL to identify key employees and to assess their duties and responsibilities, to obtain any relevant information relating to the fraud, and to assess whether any business of BMIS or MSIL could be sustained as a going concern.

Asset Analysis and Recovery [AA]                Total Fees After 10% Discount: $71,954.33

53.    This activity category consisted of efforts to identify and locate assets of BMIS and MSIL to secure and prevent the dissipation of those assets, and included analysis of the books and records of BMIS and MSIL, and interviews of certain directors and employees of BMIS and MSIL.  Because BMIS and MSIL engaged in proprietary trading business, they had many open trades with numerous counterparties at the time the SEC commenced the civil enforcement action in the District Court against them.  Thereafter, a timely identification and

- 20 -

491449.13/2643-00001

preliminary understanding of these trades were necessary to preserve any recovery for the defrauded investors.

54.     This activity category consisted of analyzing the open trade positions of BMIS and MSIL. A significant part of this time was spent on calls and negotiations with counterparties to open trades and settlement banks in order to resolve funding and other issues and to identify and wind up open trades so as to minimize losses to the estates of BMIS and MSIL. This category also covers work related to the removal of the Madoff directors from MSIL's board of directors and meetings with the non-Madoff board members regarding the financial viability of MSIL as a going concern.

<u>Business Operations [BO]</u>          Total Fees After 10% Discount: $26,559.90

55.     This activity category consisted of taking immediate steps to establish security over physical premise, offices, records and safes. During the Compensation Period for BMIS, AlixPartners had a presence maintaining security at the lobby level and BMIS' main floor level to allow select employees and guests' entrance to the building. AlixPartners was also responsible for overseeing building security, which was done by outsourcing this duty. The fee for this expense is included in the expense schedule.

<u>Analysis/Strategy [AS]</u>          Total Fees After 10% Discount: $24,246.90

56.     This activity category consisted of analyzing the businesses of BMIS and MSIL and developing strategies with respect to maximizing and preserving the assets of those entities. AlixPartners' professionals assisted the Receiver and his team with determining whether any portions of the BMIS businesses could be sold. After consulting with employees for BMIS, and

- 21 -

491449.13/2643-00001

after reviewing relevant materials, the Receiver and his team made a preliminary determination that the proprietary trading/market-making business appeared to be salable. AlixPartners assisted the Receiver in taking the preliminary steps to determine the worth of that business and whether its sale was possible. To this end, AlixPartners contacted investment bankers who might assist in the possible sale.[12]

57.    AlixPartners also began an inquiry to determine whether a liquidation of BMIS would be appropriate. Working with the Receiver and his team and the SEC, and after reviewing the books and records of the company, it was determined that BMIS' liabilities exceeded its assets and that a liquidation of the company was in order. AlixPartners' professionals engaged in a number of discussions with SIPC, the SEC and other government agencies and determined that the liquidation would be best conducted under SIPA. After the appointment of the SIPA Trustee, AlixPartners worked with the Receiver and his team to hand over the affairs of BMIS to the SIPA Trustee and passed on the information they had obtained about BMIS.

58.    Similarly, AlixPartners assisted the Receiver with conducting an investigation to ascertain the financial viability of MSIL as a going concern and whether it should be put into liquidation or wound down outside of a formal court proceeding. Based upon the results of the preliminary investigation, AlixPartners, along with the Receiver, determined that the most reasonable course was for MSIL to be placed in a court-ordered provisional liquidation. This decision was then communicated to representatives of the FSA, the SEC and the United States Attorney's Office in Manhattan, and after the commencement of the provisional liquidation in

---

[12] As noted in footnote 10 above, the market-making business of BMIS was sold by the SIPA Trustee and the sale was approved by this Court pursuant to an order entered on April 30, 2009.

491449.13/2643-00001

the UK, the AlixPartners team handed over the affairs of MSIL to the JPLs and passed on the information they had obtained about MSIL.


Claims Management [CM]                    Total Fees After 10% Discount:  $19,074.60

59.    This activity category covers the expenses in formulating, gaining approval of and administering any claims procedure.  This category also includes creating and maintaining the web site, maintaining the hotline telephone system, and retrieving calls and logging hotline activity.


Computer Forensics and Electronic Discovery [ED]   Total Fees After 10% Discount: $38,335.95

60.    This activity category consisted of efforts to provide electronic discovery and computer forensics analysis and to ensure that data was appropriately preserved for investigation and analysis.


Data Analysis [DA]                        Total Fees After 10% Discount:  $8,628.75

61.    This category includes management information systems review, installation and analysis, construction, maintenance and reporting of significant case financial data, lease rejection, and claims.


Travel Time [TT]                    Total Fees After 10% and Travel Time Discount: $7,482.38

62.    This activity category covers all non-working travel time by AlixPartners' professionals during the Compensation Period.  Exhibit D reflects the actual travel time of the professionals.  The Billing Instructions for Receivers in Civil Actions Commenced by the U.S.

- 23 -

Securities and Exchange Commission permit non-working travel time to be billed at fifty percent of the professional's billing rate. AlixPartners has reduced the amount in this category by 50% from $16,624.50 to $8,313.75, and then applied the 10% agreed upon SEC discount.

*     *     *     *

In addition to the 10% discount on fees, and the 50% discount for non-working travel time, AlixPartners has further reduced the fee amounts for which it seeks compensation by $36,995.75 — leaving a total compensation amount of $316,000.

## **EXPLANATION OF EXPENSES AND RELATED POLICIES**

63.     The Receiver and RK&O seek reimbursement of their out-of-pocket costs in the amount of $6,449, which reflects a discount of $21,247.49 as described earlier. Exhibit E sets forth the various categories of expenses for which reimbursement is sought.

64.     RK&O observed the following policies in connection with its expenses during the Compensation Period:

a.     With respect to all expenses, RK&O seeks reimbursement only for the actual costs of its fees. RK&O has not included the amortization of the cost of any investment, equipment or capital outlay in any request for expense reimbursement.

b.     In accordance with the Guidelines, RK&O has not sought reimbursement for local travel expenses, including mileage, taxis and meals.

c.     RK&O has not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

- 24 -

d.    With respect to long distance travel expenses, the Receiver and RK&O professionals have reduced the amount sought to reflect the economy airfare available at the time of travel for trips to London and have not sought reimbursement of the full amount such airfare.

e.    Exhibit E reflects a charge of $12,912.35, which charge is for the reimbursement of Tom Smith, the English insolvency barrister retained by the Receiver to advise him regarding English law and the proceeding before the English Court.

f.    In accordance with the Guidelines, RK&O seeks its internal photocopying expenses at a rate of $0.13 per page. RK&O made 413 internal photocopies during the Application period at the $0.13 rate.

## THE REQUESTED COMPENSATION SHOULD BE ALLOWED

65.    Pursuant to section 78eee(b)(5)(E) of SIPA, allowances granted by this Court are to be charged against the general estate as a cost and expense of administration. But if the general estate is insufficient to pay allowances in whole or in part, SIPC shall advance any necessary funds for such payment. Section 78eee(b)(5)(C) of SIPA directs SIPC to file a recommendation with regard to the allowance of fees and reimbursement of expenses requested by this Application and that this Court shall place considerable reliance on the recommendation of SIPC. Section 78eee(b)(5)(C) further provides that the Court shall award the amounts recommended by SIPC in any case in which such allowances are to be paid by SIPC without reasonable expectation of recoupment thereof. The Receiver, RK&O and AlixPartners expect that SIPC's recommendation will be filed with this Court separately prior to the hearing.

66.    The Receiver and RK&O also respectfully submit that the services for which they seek compensation in this Application were necessary for, and beneficial to the orderly

- 25 -

administration of BMIS and MSIL and their estates. More specifically, as highlighted above, during the Compensation Period, the Receiver and RK&O and AlixPartners professionals acted quickly to take control of the assets and records of BMIS and MSIL and preserve and protect those assets and records in order to maximize recoveries for investors.

67.    The issues addressed by the Receiver, RK&O and AlixPartners were highly complex, requiring the investigation of a massive fraud that was perpetrated over many years. The multitude of tasks faced by the Receiver, especially in the early part of the receivership, required a large team of people working long hours under intense pressure. Compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved. The professional services were performed expediently and efficiently. Accordingly, the Receiver, RK&O and AlixPartners submit that the compensation requested herein is reasonable and warranted in light of the nature, extent, and value of such services to the estates of BMIS and MSIL and all parties in interest.

68.    No previous application for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Receiver, RK&O and AlixPartners respectfully request the entry of an Order granting the following:

a.    a final allowance and award of compensation to the Receiver and RK&O in the amount of $300,000 for legal services rendered during the Compensation Period, representing the reduced amount agreed to by the Receiver and RK&O;

b.    a final allowance and award of the actual, necessary and reasonable costs and expenses incurred by the Receiver and RK&O during the Compensation Period in the amount of $6,449;

- 26 -

    c.     a final allowance and award of compensation to AlixPartners in the amount of $316,000 for services rendered during the Compensation Period, representing the reduced amount agreed to by AlixPartners;

    d.     a final allowance and award of the actual, necessary and reasonable costs and expenses incurred by AlixPartners during the Compensation Period in the amount of $15,000; and

    e.     such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       November 24, 2009

Respectfully Submitted

**RICHARDS KIBBE & ORBE LLP**

By: /s/ Joon P. Hong
     Daniel C. Zinman
     Joon P. Hong
RICHARDS KIBBE & ORBE LLP
One World Financial Center
New York, New York 10281-1003
Telephone: (212) 530-1800
Facsimile: (212) 530-1801
Email: dzinman@rkollp.com
Email: jhong@rkollp.com

Attorneys for the Receiver, Lee S. Richards

- 27 -

491449.13/2643-00001