# EXHIBIT G

**Receiver's Report**

491449.13/2643-00001

RICHARDS KIBBE & ORBE LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 530-1800
Facsimile: (212) 530-1801

Daniel C. Zinman
Attorneys for Receiver, LEE S. RICHARDS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

SECURITIES AND EXCHANGE COMMISSION, :   08 Civ. 10791 (LLS)
                                      :   ECF Case
                    Plaintiff,        :
                                      :
        -against-                     :
                                      :
BERNARD L. MADOFF and BERNARD L.      :
MADOFF INVESTMENT SECURITIES LLC,     :
                                      :
                    Defendants.       :
                                      :
------------------------------------x

## REPORT OF THE RECEIVER LEE S. RICHARDS AND APPLICATION TO TERMINATE THE RECEIVERSHIP

Lee S. Richards, as receiver (the "Receiver") for the assets of Madoff Securities

International Ltd. ("MSIL"), Madoff Ltd. and any other foreign corporate entity owned by the

defendants Bernard L. Madoff ("Madoff") and Bernard L. Madoff Investment Securities LLC

("BMIS"), respectfully submits this report and application to terminate the receivership and

represents as follows:

### I.     Procedural History and Receivership Orders

On December 11, 2008, the Securities and Exchange Commission ("SEC") commenced a

civil enforcement action against Madoff and BMIS to halt a massive fraud on investment

advisory clients of BMIS. (See Docket No. 1). The SEC's complaint alleges that for many years the defendants engaged in a Ponzi scheme, paying returns to certain investors out of the principal received from other, different investors, in violation of Section 206(1) and 206(2) of the Advisers Act of 1940, Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934. The SEC sought equitable relief, including injunctions against future violations of the securities laws, disgorgement, prejudgment interest and civil monetary penalties.

Simultaneously with the filing of the complaint, the SEC also sought emergency relief, including a temporary restraining order ("TRO") and a preliminary injunction, an order freezing the assets of the defendants (the "Freeze Order") and the appointment of a receiver over the assets of BMIS. Pursuant to an order dated December 11, 2008, the Court initially appointed Lee S. Richards, of Richards Kibbe & Orbe LLP, as receiver over all assets and accounts of BMIS outside of the United States with authority to exercise power over BMIS's foreign business and transactions.

Also on December 11, 2008, the United States Attorney's Office filed a criminal complaint against Madoff, alleging one count of securities fraud. Mr. Madoff has been ordered released on bail pending trial. The time to indict Madoff has been extended by Court order to March 13, 2009.

On December 12, 2008, the Court signed an order to show cause (the "December 12th Order") pursuant to which the Court granted the SEC's request for a temporary restraining order and a freeze on Madoff's assets and the assets of the Madoff corporate entities, pending a hearing and determination of the SEC's application for a preliminary injunction. The Court also

appointed Mr. Richards as receiver for the assets of BMIS, as well as the assets of MSIL and Madoff Ltd. (See Docket No. 2).

On December 15, 2008, the Court entered an order granting an application filed by the Securities Investor Protection Corporation ("SIPC") to intervene in the SEC action (the "Protective Decree"), which order, in pertinent part, (1) found that customers of BMIS were in need of the protection afforded by the Securities Investor Protection Act of 1970 ("SIPA"), (2) appointed Irving H. Picard, Esq. as SIPA Trustee for BMIS, and (3) removed the SIPA liquidation of BMIS to the Bankruptcy Court for the Southern District of New York. (See Docket No. 4).

On December 18, 2008, the Court entered a preliminary injunction order (the "December 18th Order") with the consent of all parties to the action that, among other things, terminated the receivership over the assets of BMIS (given the institution of the SIPA liquidation) but provided for Mr. Richards to "continue as the appointed receiver for the assets of [MSIL], Madoff Ltd., and any other broker-dealer, market making, or investment advisory businesses (the 'Foreign Entities') not located in the United States of America that are owned or controlled, in whole or in part, by Madoff, BMIS and their partners, agents, employees, attorneys, or other professionals, anyone acting in concert with them or on their behalf, and any third party."

The December 18 Order directs the Receiver to: "(i) preserve the status quo, (ii) ascertain the extent of commingling of funds between Madoff, BMIS and the Foreign Entities; (iii) ascertain the true financial condition of the Foreign Entities and the disposition of investor funds; (iv) prevent further dissipation of the property and assets of the Foreign Entities; (v) prevent the encumbrance or disposal of property or assets of the Foreign Entities and the investors; (vi)

preserve the books, records and documents of the Foreign Entities; (vii) respond to investor inquiries regarding the foreign entities; (viii) protect the assets of the Foreign Entities from further dissipation ; (ix) determine whether the Foreign Entities should undertake bankruptcy filings; and (x) determine the extent to which the freeze should be lifted as to certain assets in the custody of the Foreign Entities." (See Docket No. 8).

In addition, the December 18th Order also (i) directed the Receiver to make a report to the Court and the parties by January 26, 2009, subject to such reasonable extensions as the Court may grant, and (ii) develop a preliminary plan for administration of the assets of the receivership of the Foreign Entities, including a recommendation regarding whether bankruptcy cases should be filed for all or a portion of the assets subject to the receivership and a recommendation whether litigation against third parties should be commenced on a contingent fee basis to recover assets of the Foreign Entities for the benefit of the receivership.

By letter dated January 23, 2009, the Receiver, through his counsel, requested a one month extension of time to submit the Receiver's report required by the December 18th Order. The Court granted the request for an extension of time on January 26, 2009. (See Docket No. 17).

## II.     Brief Summary of Steps Taken by the Receiver

Upon his appointment, the Receiver hired the law firm of Richards Kibbe & Orbe LLP, the forensic accounting firm of AlixPartners LLP and the English barrister, Tom Smith, to assist with, among other things, (1) securing assets (including the premises in the United States and the United Kingdom), (2) restricting access to the firms' hard copy and electronic files and systems, (3) dealing with customers and employees of both the United States and the United Kingdom

firms, (4) investigating the affairs of each entity, and (5) dealing with the multitude of other issues posed by the Receivership.

The Receiver and his professional advisors immediately took steps to ascertain the financial condition of BMIS and MSIL and to locate and preserve the assets and records of those two entities.

With respect to BMIS, the Receiver dispatched representatives of Richards Kibbe & Orbe and AlixPartners to the BMIS offices at 885 Third Avenue, New York, New York. The Receiver and these representatives took a number of actions. First, they secured the BMIS offices by hiring security firms to guard the offices 24 hours a day. In addition, the card keys of BMIS employees were confiscated so that they could no longer access the BMIS office space on their own, and their entry into and egress from the BMIS office were recorded on a log. The Receiver and his staff also identified and secured two warehouses in Queens, where BMIS stored some of its data, by hiring security firms to guard those premises.

Second, counsel for the Receiver, with assistance from AlixPartners, conducted interviews of many of the employees of BMIS. The purpose of those interviews was to identify key employees and to assess their duties and responsibilities, to obtain any relevant information relating to the fraud, and to assess whether any business of BMIS could be sustained as a going concern. In all, sixty-eight employees of BMIS were interviewed.

Third, the Receiver's representatives restricted access to BMIS' internal computer network, and assumed control of the electronic data and computer systems of the company to ensure that no one could delete, alter, or otherwise corrupt the electronic data of BMIS.

Fourth, the Receiver and his team conferred with traders at BMIS to help identify and assess the firm's outstanding trades. As counterparties and settlement banks learned of BMIS' potential lack of liquidity, many threatened to abandon their open trades with BMIS. The Receiver and his staff analyzed these outstanding positions and took steps to unwind them in an orderly fashion in order to reduce the potential for greater losses for BMIS.

Fifth, the Receiver and his representatives searched for, located, and began examining many of the hard-copy documents located in the BMIS office – including copies of account statements and trade confirmations sent out to investors, as well as the firm's check ledger.

Sixth, the Receiver and his team advised BMIS management and employees of the details of the Court's order, including the freeze of BMIS' assets. Each BMIS employee signed a written statement indicating his or her understanding of this directive. The Receiver and his team also conferred with BMIS employees and representatives from the firm's human resources and legal departments on a host of employment, compensation and other human-resource related issues.

Seventh, in the course of their work, the Receiver and his staff identified other organizations, including Cohmad Securities and various other entities, that operated out of BMIS's office space. Cohmad is a broker-dealer that shared space with BMIS on the 18th floor of BMIS's offices located at 885 Third Avenue. Its presence within the BMIS office space presented issues concerning the security of the premises, the preservation of documents, and the protection of the computer networks and electronic data that the Receiver's representatives identified and addressed.

Eighth, the Receiver and his team identified and reviewed the corporate structure, board membership and shareholdings of BMIS, in order to facilitate the protection of the assets and records of BMIS.

Ninth, the Receiver and his team set up a telephone hotline and a website for customer inquiries. Through these two methods of contact, many customers of Mr. Madoff filed various written and oral claims with the Receiver or otherwise raised issues regarding the loss of their assets. Representatives of the Receiver kept a log of these communications, and the Receiver responded to these customers by letter in which he provided information regarding the options available to defrauded investors.

Tenth, the Receiver and his team began the process of determining whether any portions of the BMIS businesses could be sold. BMIS had two main businesses: the investment advisor business that Mr. Madoff had run; and a proprietary trading and market-making business that others in the company were responsible for operating. After consulting with employees for the company, and after reviewing relevant materials, the Receiver and his team made a preliminary determination that the proprietary trading/market-making business appeared to be salable. The Receiver therefore took preliminary steps to determine the worth of that business and whether its sale was possible. To this end, he contacted investment bankers who might assist in the possible sale.

Eleventh, the Receiver and his team began an inquiry to determine whether a liquidation of BMIS would be appropriate. The Receiver and his staff engaged in a number of discussions with SIPC, the SEC and other government agencies and agreed that the liquidation would be best conducted under SIPA. After the appointment of the SIPA Trustee, the Receiver and his team

handed over the affairs of BMIS to that Trustee. In an effort to assist the SIPA Trustee and his team in their new roles, the Receiver and his staff passed on the information they had obtained about BMIS.

After the commencement of the SIPA liquidation, the Receiver joined his team in London which had been dispatched to MSIL's offices located at 12 Berkeley Street, Mayfair in London at the commencement of the Receivership. Before leaving New York, the Receiver obtained a power of attorney over the MSIL shares owned by Mr. Madoff (the "Stock Power") and, based on that power and in accordance with MSIL's articles of association, voted all Madoff family members off the MSIL board of directors, leaving four MSIL directors as board members. A copy of the Stock Power is attached hereto as Exhibit A.

Once in London, the Receiver and his team took many of the same steps that they took with respect to BMIS. For instance, they (1) secured the premises by, among other things, hiring a security firm to guard the offices 24 hours a day, (2) limited access to the computer system and established a hotline for customers, (3) began examining the contents of the offices, (4) advised management and employees of the details of the Court's order, including the freeze of MSIL's assets, (5) identified the corporate structure, board membership and shareholdings of MSIL and took steps to identify and protect the liquid assets and records of MSIL, (6) began an inquiry aimed at determining whether a liquidation of MSIL would be appropriate, and (7) began the process of determining whether any portions of the Madoff businesses could be sold.

In addition to these steps, the Receiver and his staff spent considerable time trying to ascertain information regarding MSIL's accounts at various financial institutions and to identify, protect and preserve the assets of MSIL. This proved necessary because the TRO and Freeze

Order contained in the December 12th Order and the December 18th Order had the practical effect of ceasing the business operations of MSIL and making the financial institutions with which MSIL dealt freeze MSIL's accounts and halt any transactions that they were carrying out on behalf of MSIL. Therefore, the Receiver's advisers had extensive discussions with MSIL's prime broker in the UK and other institutions to ascertain information regarding MSIL's accounts at those institutions and information regarding MSIL's open trades with and through those institutions, to obtain information regarding MSIL's accounts and open trades.

The Receiver and his team made efforts to learn more about the business activities and financial standing of MSIL and any other foreign entities. Based upon a preliminary investigation, it appears that (1) MSIL and Madoff Ltd. are the only non-domestic Madoff-related entities; (2) Madoff Ltd. is a dormant entity that has never been in operation; and (3) MSIL has no clients and serves as a proprietary trading business. (We do not know whether the SIPA Trustee or the JPLs have uncovered conflicting information.)

A significant portion of the Receiver's time was spent trying to ascertain the financial viability of MSIL as a going concern and whether it should be put into liquidation or wound down outside of a formal court proceeding.

In carrying out his duties, the Receiver took advice from the English insolvency barrister Mr. Tom Smith of 3-4 South Square Chambers, regarding the English law aspects of the case. After meeting with his team, Tom Smith, MSIL management and the Financial Services Authority ("FSA") in the UK[1] and reviewing the results of their preliminary investigation, the Receiver determined that the most reasonable course was for MSIL to be placed in an English

---

[1] MSIL is regulated by the FSA and a number of its directors are authorized persons for FSA compliance purposes.

court-ordered provisional liquidation – partly because MSIL and its counsel asserted repeatedly that this Court's orders had no legal effect in England. The Receiver communicated his conclusion regarding the provisional liquidation to the MSIL board of directors, representatives of the FSA, the SEC and the United States Attorney's Office in Manhattan, and he obtained the consent of each of those entities to an MSIL provisional liquidation.

Upon application of the directors of MSIL on December 19, 2008, the High Court of Justice, Chancery Division, Companies Court in London (the "English Court") ordered that MSIL be placed in a provisional liquidation and appointed three representatives of the accounting firm of Grant Thornton UK LLP as Joint Provisional Liquidators ("JPLs"). Tom Smith represented the Receiver on the application. The Order of the English Court provides that (i) the JPLs "may" cooperate with both the Receiver and the SIPA Trustee and (ii) the JPLs should use their best efforts to provide to the U.S. Department of Justice and the SEC the same information as that which is provided to the Receiver, the SIPA Trustee and the FSA. A copy of the English Court's December 19, 2008 Order is attached hereto as Exhibit B. By letter dated December 22, 2008, the Receiver reported these developments regarding the provisional liquidation to this Court.

Since the institution of the provisional liquidation, the Receiver and his counsel have been in frequent contact with the JPLs regarding the affairs of the provisional liquidation and have attempted to undertake joint efforts to preserve the assets and records of MSIL and to investigate its operations. The institution of the provisional liquidation ensured that the assets of MSIL and the evidence regarding its operations will be under the control of the JPLs, who are

independent insolvency officers recognized by the English Court under the laws of the UK, and that the assets and evidence will be protected going forward.

The JPLs, however, have not formally recognized the legal authority of the Receiver to carry out his duties under the Orders of this Court. Nor have the JPLs agreed to share critical information about MSIL that they have gathered during the course of their work.

**III.    The Current State of the Assets and Liabilities of MSIL**

The December 18th Order required the Receiver to provide to the Court a list of MSIL's (a) assets, with a description of each asset, its current location, and value, (b) secured creditors and any financial institutions with an interest in the assets of MSIL, and (c) customers of MSIL, together with the amounts received by and paid out to those customers by Madoff.  Before the institution of the Provisional Liquidation, the Receiver obtained preliminary information regarding the operations and assets of MSIL but has been unable to obtain additional, more detailed information from the JPLs, who have unilaterally continued the investigations begun by the Receiver following their appointment by the English Court.   It was the Receiver's understanding that the JPLs would share their findings with the Receiver, as contemplated by the English Court's December 19th Order.   However, as noted above, the JPLs have advised the Receiver that for a variety of reasons, they cannot provide the Receiver with the information called for by this Court's December 18th Order.

A.    Assets

At this time, we are unable to provide a description of the individual assets owned by MSIL, as required by the December 18th Order.  As noted above, we have requested that the JPLs, who are in possession of MSIL's documents and electronic data, share this information

with us in connection with our express reporting obligations under the December 18th Order; but, they have declined our requests.

Notwithstanding the significant limitation on our ability to obtain relevant information, we are aware of two recent transactions that have greatly reduced the assets held by MSIL. In November of 2008, MSIL made two fund transfers to BMIS that total approximately $164 million.

We also understand that MSIL's prime broker is in the process of winding down various open trading positions and is then expected to provide the JPLs with a full accounting of the transactions and assets in MSIL's account. In addition to MSIL's accounts at its prime broker, MSIL holds accounts at other financial institutions, although we do not know whether any funds remain in those accounts.

Other than the funds and securities in the accounts held at MSIL's prime broker, and any funds and securities existing in the accounts at the other financial institutions listed above, we are not aware of any potentially significant assets that MSIL may own or control. While MSIL has a wholly owned subsidiary named Madoff Limited, our understanding is that this entity is dormant, has no assets, and has never been operational.

B.    Secured Creditors

Based on our early investigations, we are unaware of any secured creditors or financial institutions that have an interest in the assets of MSIL. Of course, the information we have received has been extremely limited.

C.    Customers and Clients

Our current understanding is that the sole business of MSIL was to engage in proprietary trading, and that MSIL was funded almost entirely by capital from Mr. Madoff. We have uncovered no evidence to date indicating that MSIL had any customers or clients, or that it conducted any trades on behalf of third parties.

IV.    **Request to Terminate the Receivership**

As discussed above, the Receiver has engaged in extensive and on-going discussions with the JPLs, the SIPA Trustee, the SEC and the United States Attorney's Office in order to ensure continued cooperation and coordinated action among the parties and formulate a working protocol for the sharing of information and the handling of assets and evidence. The Receiver was particularly concerned that MSIL's assets be protected and that the bulk of the investigation be handled, if possible, in a manner which preserved those assets to the maximum extent possible.

As a result of the many discussions the Receiver has had with various parties, the Receiver has determined that the Receiver's role has been effectively taken over by the United States and United Kingdom government authorities and the JPLs.[2] Moreover, he has been advised that the SEC has concluded that (1) the preservation and protection of the assets of MSIL and investigation into the affairs of MSIL would be most efficiently carried out by and through the JPLs, with the active participation of the UK Authorities and the SEC, and (2) the role of the

---

[2] As noted above, the Receiver's role with respect to BMIS was completely taken over by the SIPA Trustee pursuant to the Protective Decree.

Receiver is no longer necessary. Members of the SEC staff have requested that the Receiver make the instant application to the Court to terminate the receivership.

In light of these developments, it is plain that the Receiver can not discharge his court-ordered duties and there is no reason for the Receiver to continue this assignment and remain actively involved in this proceeding. Accordingly, the Receiver respectfully submits that it is appropriate for this Court to enter an order terminating the receivership and relieving and discharging the Receiver from his obligations and responsibilities under the Court's prior orders.

The Receiver also seeks the Court's approval to hold in escrow his right, title and interest in and to the Stock Power he obtained from Mr. Madoff, pending further order from the Court.

Lastly, the Receiver seeks leave of the Court to submit an appropriate fee application for his services and those of his advisers.

No prior application for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Receiver respectfully requests that this Court enter an order in the form attached hereto as Exhibit C:

a.  approving the report and account contained herein;

b.  terminating the receivership and relieving and discharging the Receiver from his obligations and responsibilities under the Court's prior orders;

c.  granting the Receiver leave to file an application for appropriate compensation and reimbursement of expenses with this Court or in another forum;

d.  authorizing the Receiver to hold in escrow the Stock Power he received from Mr. Madoff, pending further order from the Court; and

e.  granting such other and further relief as is just and proper.

Dated: New York, New York
February 26, 2009

_____
LEE S. RICHARDS
Receiver for the assets of Madoff Securities
International Ltd., Madoff Ltd. and any other
foreign corporate entity owned by Bernard L.
Madoff and Bernard L. Madoff Investment
Securities LLC

c/o Richards Kibbe & Orbe LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 530-1800
Facsimile: (212) 530-1801

RICHARDS KIBBE & ORBE LLP
One World Financial Center
New York, New York  10281
Telephone: (212) 530-1800
Facsimile: (212) 530-1801

*Attorneys for the Receiver*

# EXHIBIT A

15 December 2008

**POWER OF ATTORNEY**

This power of attorney is made on 15 December 2008 by Mr. Bernard L. Madoff (in his individual capacity) of Madoff Securities _____ (**Principal**) International, Ltd.

1.    **APPOINTMENT AND POWERS**

The Principal appoints Mr. Lee Richards, Esq., of Richards Kibbe & Orbe LLP, One World Financial Centre, New York, New York 10281-1003 and his substitutes jointly and severally as his attorneys (**Attorneys**) and in the Principal's name or otherwise and on his behalf:

1.1    To consider, settle, approve, sign, execute, deliver and/or issue all agreements, documents, certificates and instruments (all whether as a deed or not), or to vote or take any action which the Attorney in his absolute discretion considers desirable in connection with all of the issued shares in the share capital of Madoff Securities International Limited registered in the name of Mr. Bernard Madoff.

1.2    To appoint one or more persons to act as a substitute attorney for the Principal and to exercise one or more of the powers conferred on the Attorney by this power of attorney other than the power to appoint a substitute attorney and revoke any such appointment.

2.    **POWER IRREVOCABLE**

This power of attorney shall be irrevocable save with the consent of the Attorney and is given by way of security to secure the performance of obligations owed by the Principal to Madoff International Securities Limited and in furtherance of the Order to Show Cause, Temporary Restraining order, and order Freezing Assets and Granting Other Relief issued on December 12, 2008 by the United States District Court, Southern District of New York and is consented to by the Principal.   This power shall expire five years from the date hereof.

3.    **RATIFICATION**

The Principal undertakes to ratify and confirm whatever the Attorney does or purports to do in good faith in the exercise of any power conferred by this power of attorney.

4.    **VALIDITY**

The Principal declares that a person who deals with Attorney in good faith may accept a written statement signed by that Attorney to the effect that this power of attorney has not been revoked as conclusive evidence of that fact.

5.    INDEMNITY

The Principal undertakes to indemnify the Attorney fully against all claims, losses, costs, expenses, damages or liability which he sustains or incurs as a result of any action taken in good faith pursuant to this power of attorney (including any cost incurred in enforcing this indemnity).

6.    JURISDICTION

This power of attorney (and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this power of attorney or its formation or any act performed or claimed to be performed under it) shall be governed by and construed in accordance with English law.

This document has been executed as a deed and is delivered and takes effect on the date stated at the beginning of it.

Signed as a deed by
Mr. Bernard L. Madoff
in his individual capacity

                             MR. BERNARD L.
                             MADOFF

in the presence of

*MARIA A. MORAGNE*
NAME OF WITNESS

                            SIGNATURE OF
                            WITNESS

                            *MARIA A. MORAGNE*
                            PRINT NAME OF
                            WITNESS

                            ADDRESS OF
                            WITNESS
                            *DICKSTEIN SHAPIRO LLP*
                            *1177 AVENUE OF THE*
                                   *AMERICAS*
                            *NEW YORK, NY 10036*

# EXHIBIT B

IN THE HIGH COURT OF JUSTICE                          No 11527 of 2008
CHANCERY DIVISION
COMPANIES COURT

THE HONOURABLE SIR JOHN LINDSAY (sitting as a Judge of the High Court)
Friday the 19th December 2008

IN THE MATTER OF MADOFF SECURITIES INTERNATIONAL LIMITED
AND IN THE MATTER OF THE INSOLVENCY ACT 1986

BETWEEN:



STEPHEN ERNEST JOHN RAVEN
CHRISTOPHER JAMES DALE
MALCOLM STEVENSON
PHILIP JOHN TOOP
LEON FLAX

Applicants

and

MADOFF SECURITIES INTERNATIONAL LIMITED

Respondent

---

ORDER

---

**UPON THE APPLICATION** of Stephen Ernest John Raven, Christopher James Dale, Malcolm Stevenson, Philip John Toop, the directors of the above-named company ("the Company")

**AND UPON HEARING** counsel for the Applicant, counsel for the Financial Services Authority, counsel for Lee Richards and counsel for the joint provisional liquidators hereafter appointed.

**AND UPON READING** the petition to wind up the Company and the evidence.

**AND UPON THE COURT** being satisfied on the evidence before it that the EC Regulation on Insolvency Proceedings (No 1346/2000)("the EC Regulation") does apply and that these proceedings are main proceedings as defined by Article 3 of the EC Regulation

2

**IT IS ORDERED** that Mark Richard Byers, Andrew Laurence Hosking and Stephen John Akers all of Grant Thornton UK LLP of 30 Finsbury Square, London EC2P 2YU be appointed joint provisional liquidators of the Company.

**AND IT IS ORDERED** that:

1.    During the period for which this Order is in force the affairs, business and property of the Company be managed by the joint provisional liquidators.

2.    During the period for which this Order is in force the joint provisional liquidators shall, subject to any further order of the Court:

        (i)    co-operate as shall be appropriate with Lee Richards appointed as receiver ("the Receiver") by the United States District Court, Southern District of New York in Case No. 08 Civ 10791 (LLS) ECF Case in its Order of 12 December 2008 made by Judge Louis L. Stanton and to the extent that is appropriate also with any trustee appointed by the United States Securities Investor Protection Corporation ("the Trustee");

        (ii)    co-operate as shall be appropriate with the Financial Services Authority ("FSA");

        (iii)    use their best endeavours to provide to the US Department of Justice ("DoJ") and the Securities and Exchange Commission ("SEC") the same information as that provided to the Receiver, the Trustee and the FSA, as early as is practicable;

and in each case the joint provisional liquidators in providing such co-operation may do so to the Receiver, the FSA, the Trustee, the DoJ and the SEC or through their respective representatives and agents.

3.    The powers and functions of the joint provisional liquidators shall be as set out in Schedule 1 to this Order.

4.    The remuneration of the joint provisional liquidators shall be fixed in accordance with Rule 4.30 of the Insolvency Rules 1986 from time to time upon an application of which adequate notice shall be served on the Receiver.

5.    The joint provisional liquidators shall be entitled to be paid their reasonable expenses and remuneration out of any property which upon enquiry by them may appear to be trust property if the Company's assets are found to be insufficient to discharge in full

3

the remuneration and the expenses of the provisional liquidation provided always that such payment is made with the consent of this Court.

6.  Prior to any such application as is described in paragraphs 4 and 5 above, the joint provisional liquidators shall use their best endeavours to consult with the Receiver.

7.  During the period for which this Order is in force any act required or authorised under any enactment or by this Order to be done by the joint provisional liquidators may be done by all or any one or more of the persons for the time being holding the office of provisional liquidator.

8.  Notice of this Order be given to the Company forthwith.

9.  The costs of and occasioned by this application (including the costs of the joint provisional liquidators so appointed) be paid as an expense of the provisional liquidation.

### NOTICE TO OFFICERS OF COMPANY

You are required by section 235 of the Insolvency Act 1986 to give the joint provisional liquidators all the information as they may reasonably require relating to the Company's property and affairs and to attend upon them at such times as they may reasonably require.

4

## SCHEDULE 1

## POWERS OVER THE COMPANY TO BE GRANTED TO THE JOINT PROVISIONAL LIQUIDATORS

The Joint Provisional Liquidators shall have power to carry out the following functions:

1.  To locate, protect, secure, take possession of, collect and get in all property or assets (of whatever nature) to which the Company is or appears to be entitled including in particular sums of money currently being held in accounts with Barclays Bank PLC or brokerage accounts at Barclays Capital and, for that purpose, to take such proceedings as may seem to them expedient.

2.  To locate, protect, secure, take possession of, collect and get in the books, papers and records of the Company including the accounting and statutory records.

3.  To investigate the affairs of the Company.

4.  to exercise any and all powers available to provisional liquidators under sections 234, 235 and 236 of the Insolvency Act 1986.

5.  to sell or otherwise dispose of the property of the Company by public auction or private auction or private contract or, in Scotland, to sell, feu, hire out or otherwise dispose of the property of the Company by public roup or private bargain.

6.  To raise or borrow money and grant security thereof over the property of the Company.

7.  To incur and pay out of the assets of the Company the normal administrative expenses of the Company and any other payments which they are empowered to make pursuant to this Order.

8.  To terminate, cancel, complete or perfect any contracts or transactions relating to the business of the Company.

9.  To appoint a solicitor or accountant or other professionally qualified person to assist them in the performance of their functions.

5

10.    To make payments out of the Company's assets of such sums as may be necessary to discharge any professional, legal and accounting advisers' costs, charges and expenses, incurred by them.

11.    To bring or defend or intervene in any action or other legal proceedings whether in their own names or in the name and on behalf of the Company in the jurisdiction of this Court or in any other jurisdiction.

12.    To refer to arbitration any question affecting the Company.

13.    To effect and maintain insurances in respect of the business and property of the Company.

14.    To use the Company's seal.

15.    To do all acts and to execute in the name and on behalf of the Company any deed, receipt or other document.

16.    To draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of the Company.

17.    To appoint any agent to do any business which they are unable to do themselves or which can more conveniently be done by an agent and to employ and dismiss employees.

18.    To do all such things (including the carrying out of works) as may be necessary for the realisation of the property of the Company.

19.    To make any payment which is necessary or incidental to the performance of their functions.

20.    To pay any class of creditors of the Company in full.

21.    To carry on the business of the Company.

22.    To establish subsidiaries of the Company.

23.    To transfer to subsidiaries of the Company the whole or any part of the business and property of the Company.

6

24. To grant or accept a surrender of a lease or tenancy of any of the property of the Company, and to take a lease or tenancy of any property required or convenient for the business of the Company.

25. To make any arrangement or compromise on behalf of the Company.

26. To call up any uncalled capital of the Company.

27. To rank and claim in the bankruptcy, insolvency, sequestration or liquidation of any person indebted to the Company and to receive dividends, and to accede to trust deeds for the creditors of any such person.

28. To present or defend a petition for the winding up of the Company

29. To change the location of the Company's registered office.

30. To do all other things incidental to the exercise of the foregoing powers.



7

No 11527 of 2008

IN THE HIGH COURT OF JUSTICE
CHANCERY DIVISION
COMPANIES COURT

THE HONOURABLE SIR JOHN LINDSAY
(sitting as a Judge of the High Court)

IN THE MATTER OF MADOFF SECURITIES
INTERNATIONAL LIMITED

AND IN THE MATTER OF THE
INSOLVENCY ACT 1986

BETWEEN:

STEPHEN ERNEST JOHN RAVEN & ORS
Applicants

and

MADOFF SECURITIES
INTERNATIONAL LIMITED
Respondent

_____

ORDER

_____

SJ Berwin LLP
10 Queen Street Place
London
EC4R 1BE

Tel: 020 711 2222

::odma\pcdocs\practice\924082\1 s

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SECURITIES AND EXCHANGE COMMISSION, :

         Plaintiff,    :

   -against-         :

BERNARD L. MADOFF and BERNARD L.  :
MADOFF INVESTMENT SECURITIES LLC,  :

         Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

08 Civ. 10791 (LLS)
ECF Case

## ORDER (i) APPROVING THE REPORT OF THE RECEIVER; (ii) TERMINATING THE RECEIVERSHIP AND DISCHARGING THE RECEIVER FROM HIS OBLIGATIONS AND RESPONSIBILITIES UNDER THE COURT'S PRIOR ORDERS; (iii) GRANTING THE RECEIVER LEAVE TO FILE AN APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES; AND (iv) AUTHORIZING THE RECEIVER TO HOLD STOCK POWER IN ESCROW, PENDING FURTHER ORDER FROM THE COURT

WHEREAS, this action was brought by the Securities and Exchange Commission and concerns a Ponzi scheme engaged in by Bernard L. Madoff ("Madoff") and Bernard L. Madoff Investment and Securities LLC ("BMIS");

WHEREAS, the Court appointed a Receiver and ordered him to: (i) preserve the status quo; (ii) ascertain the extent of commingling of funds between Madoff, BMIS and any other broker-dealer, market maker or investment advisory business not located in the United States of America that is owned or controlled, in whole or in part, by Madoff, BMIS and/or their partners, agents, employers, attorneys or other professional, anyone acting in concert with them or on their behalf, and any third-party (the "Foreign Entities"); (iii) ascertain the financial conditions of the Foreign Entities and the disposition of investor funds; (iv) prevent the further dissipation of the property and assets of the Foreign Entities; (v) prevent the encumbrance or disposal of property

or assets of the Foreign Entities; (vi) preserve the books, records, and documents of the Foreign Entities; (vii) protect the assets of the Foreign Entities from further dissipation; (ix) determine whether the Foreign Entities should undertake bankruptcy filings; and (x) determine the extent to which the freeze should be lifted as to certain assets in the custody of the Foreign Entities;

WHEREAS, the Court has issued various Orders directing the Receiver to: (i) make a Report to the Court; and (ii) develop a preliminary plan for administration of the assets of the receivership of the Foreign Entities, including a recommendation regarding whether bankruptcy cases should be filed for all or a portion of the assets subject to the receivership and a recommendation whether litigation against third-parties should be commenced on a contingency fee basis to recover assets of the Foreign Entities for the benefit of the receivership;

WHEREAS, copies of the Receiver's Report and Application were delivered on February 26, 2009, by first class mail, postage prepaid, to the (1) Securities and Exchange Commission; (2) United States Attorney's Office; and (3) Securities Investor Protection Act Trustee, and proof of service having been filed with the Court, and it appearing that no further notice need be given;

WHEREAS, the Securities and Exchange Commission supports the Receiver's Final Report and Application; and

WHEREAS, the Court has fully considered the Receiver's Report and Application.

**The Court hereby finds and ORDERS:**

(1)    The Receiver's Report and account contained therein is approved;

(2)    The Receivership is terminated and the Receiver is relieved and discharged from his obligations and responsibilities under the Court's prior orders;

(3)    The Receiver's request to file an application with respect to payment of fees and expenses with this Court or in another forum is granted; and

(4)    The Receiver's request to hold in escrow the Stock Power he obtained from Mr. Madoff, pending further Order from the Court, is granted.

**SO ORDERED:**

Dated: New York, New York
_____, 2009

_____
UNITED STATES DISTRICT JUDGE