Richard Levin (RL 1651)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Telephone:    (212) 474-1000
Facsimile:    (212) 474-3700

*Attorneys for Optimal Strategic U.S. Equity
Limited and Optimal Arbitrage Limited*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                                Plaintiff,<br><br>                v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                                Defendant.<br>In re:<br><br>BERNARD L. MADOFF,<br><br>                                Debtor. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |

**STATEMENT OF
OPTIMAL STRATEGIC U.S. EQUITY LIMITED AND
OPTIMAL ARBITRAGE LIMITED IN SUPPORT OF
<u>TRUSTEE'S MOTION RELATING TO "NET EQUITY" ISSUE</u>**

Optimal Strategic U.S. Equity Limited ("<u>SUS</u>") and Optimal Arbitrage Limited ("<u>Arbitrage</u>", and collectively, "<u>Optimal</u>") submit this Statement in support of the "Trustee's Motion For an Order Upholding Trustee's Determination Denying Customer Claims' For Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections With Respect to The Determinations Relating To Net Equity" (the "<u>Trustee's Motion</u>"), filed October 16, 2009

[Dkt. No. 524] by Irving H. Picard, trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA") and for Bernard L. Madoff ("Madoff") (together with BLMIS, the "Debtor").

## INTRODUCTION

### Background

1.   The facts and the procedural history of this case on which Optimal bases this Statement are set forth in detail in the Trustee's Motion and supporting documents and in the Trustee's Memorandum of Law in Support of the Trustee's Motion (the "Trustee's Memorandum"), filed October 16, 2009 [Dkt. No. 525].

2.   SUS has an allowed customer claim of $1,540,141,277.60, and Arbitrage has an allowed customer claim of $9,807,768.40.  (Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement By and Among the Trustee and Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited, entered June 16, 2009 [Dkt. No. 270].)  Both of these amounts were stipulated with the Trustee based on a "cash in/cash out" calculation.[1]  A ruling against the Trustee and in favor of the objecting claimants on the net equity issue would have a material adverse effect on Optimal's recoveries in this case, by greatly—and unfairly—expanding the pool of claims that would share in whatever customer property the Trustee recovers and distributes.

---

[1] Optimal believes that if the Court determines that net equity claims should be based on account balances that determination should apply to all claims that have previously been allowed and Optimal reserves the right to amend its claim in that case.

- 2 -

**The "Net Equity" Issue**

3.      Optimal agrees with the Trustee that customer net equity positions must be calculated based on the amount of cash deposited by the customer into the BLMIS customer account, less any amount already withdrawn from the account (the "cash in/cash out" approach), rather than, as the objecting claimants contend, on the value of the fictitious securities positions and credit balance reflected in the customer's November 30, 2008 account statement provided by BLMIS (the "account balance" approach). Therefore, Optimal joins in and adopts the arguments relating to the net equity issue set forth in the Trustee's Motion and supporting documents, the Trustee's Memorandum, and the Memorandum of Law of SIPC in Support of the Trustee's Motion, filed October 16, 2009 [Dkt. No. 519].

4.      In addition to the reasons set forth in the those Memoranda, calculating a customer's net equity claim based on a fictitious account statement balance is contrary to both SIPA and the fraudulent transfer laws and would result in an inequitable distribution of customer property. Therefore, the Court should grant the Trustee's Motion.

**ARGUMENT**

**I.      Calculating Net Equity Based on a Fictitious Account Balance Is Contrary to SIPA and the Fraudulent Transfer Laws**

5.      Section 8(c)(1)(B) of SIPA, 15 U.S.C. 78fff-2(c)(1)(B), requires the Trustee to allocate customer property in this case "to customers of [a] debtor who shall share ratably in such customer property on the basis and to the extent of their respective net equities". SIPA defines "net equity", to the extent relevant here, as "the dollar amount of the account of a customer, to be determined by—(A) calculating the

- 3 -

sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer". 15 U.S.C. § 78*lll*(11). By its terms, the "net equity" definition does not permit the Trustee in this case to distribute funds based on account balances, because "securities positions of such customer[s]" did not exist. The securities positions shown on the account statements were totally fictitious.

6. In re New Times Secs. Servs. Inc., 371 F.3d 68 (2d Cir. 2000), does not hold otherwise. New Times construed section 9(a) of SIPA, 15 U.S.C. § 78fff-3(a), which specifies the limits on SIPA advances, and the phrase "claims for securities" as used in that section. See New Times, 371 F.3d at 71 ("We hold today that the District Court properly determined that the Claimants had 'claims for securities' under SIPA").[2] New Times did not address section 8(c) of SIPA or the amount of a customer's net equity claim, which are at issue here. The only reference in the New Times decision to section 8 of SIPA is a comment in the Court of Appeal's description of the background of the case: "To the extent that a customer's net equity exceeds his ratable share of customer property, the trustee may use SIPC advances from this fund to pay customers in cash or to purchase replacement securities for a customer. 15 U.S.C. §§ 78fff-2(d), 78fff-3(a)." 371 F.3d at 73 (footnote omitted). Therefore, New Times does not foreclose the interpretation that is most consistent with the statute's plain meaning, which is the

---

[2] In the same paragraph, the Court of Appeals also said, "each Claimant's net equity should be calculated by reference to the amount of money the Claimants originally invested with the Debtors (*not* including any fictitious interest or dividend reinvestments)." (emphasis in original). To the extent the Second Circuit's reference to "net equity" strayed from its announced holding regarding the meaning of "claims for securities", it actually supports the Trustee's cash in/cash out approach.

- 4 -

preferred interpretation.  See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992).

8. Section 548(a)(1) of the Bankruptcy Code empowers a trustee to avoid not only "any transfer . . . of an interest of the debtor in property" but also "any obligation . . . incurred by the debtor" if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud" creditors or if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation [and] was insolvent on the date that such transfer was made or such obligation was incurred".  New York's UFCA is to the same effect. See N.Y. DEBT. & CRED. LAW §§ 273, 276.  There is no dispute that all profits shown on the account statements are fictitious, nor is there is any dispute that the Debtor here incurred the obligations shown on the account statements with actual intent to hinder, delay, or defraud creditors and for less than a reasonably equivalent value in exchange, nor that the Debtor was insolvent. See Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC), 396 B.R. 810 (Bankr. S.D.N.Y. 2008).  Therefore, any purported claim
- 5 -

preferred interpretation.  See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992).

7. Determining a customer's net equity claim based on its account balance, which includes fictitious profits, is also inconsistent with the fraudulent transfer avoiding powers of section 548 of the Bankruptcy Code, 11 U.S.C. §548, and New York's Uniform Fraudulent Conveyance Act ("UFCA"), on which the Trustee may rely under section 544(b) of the Bankruptcy Code, 11 U.S.C. § 544(b).  SIPA grants the Trustee the power to use a bankruptcy trustee's avoiding powers under sections 548 and 544(b) of the Bankruptcy Code.  15 U.S.C. § 78fff(b).

8. Section 548(a)(1) of the Bankruptcy Code empowers a trustee to avoid not only "any transfer . . . of an interest of the debtor in property" but also "any obligation . . . incurred by the debtor" if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud" creditors or if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation [and] was insolvent on the date that such transfer was made or such obligation was incurred".  New York's UFCA is to the same effect. See N.Y. DEBT. & CRED. LAW §§ 273, 276.  There is no dispute that all profits shown on the account statements are fictitious, nor is there is any dispute that the Debtor here incurred the obligations shown on the account statements with actual intent to hinder, delay, or defraud creditors and for less than a reasonably equivalent value in exchange, nor that the Debtor was insolvent. See Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC), 396 B.R. 810 (Bankr. S.D.N.Y. 2008).  Therefore, any purported claim

based on a fraudulently incurred obligation is avoidable and should not be recognized. See 11 U.S.C. § 502(d).

## II. Calculating Net Equity Based on a Fictitious Account Balance Is Inequitable and Would Advance the Fraud Committed by the Debtor

9. Calculating allowed net equity claims based on the account balances would be inequitable for at least three reasons. First, the account balance approach would permit investors who already were repaid all the money they invested ("net winners") to recover even more, at the expense of those who did not recover what they had invested ("net losers"). As noted above, any claim that a customer asserts for more than the customer invested is avoidable as a fraudulent obligation. Any recovery on the unenforceable fictitious-profits claims must come from customer property available for distribution. The pool of customer property does not grow by permitting the net winners to share based on claims derived from fictitious account balances. Simple mathematics dictates, therefore, that each dollar of allowed claim will receive a smaller percentage recovery if the net winners' claims are included. As rightly noted in the Trustee's Memorandum, "Every dollar paid to reimburse a fictitious profit would be one less dollar available to pay a claim for money actually invested." (Trustee's Memorandum at p.3.)

10. The Madoff fraud resulted in tremendous losses and hardship for thousands of investors, some more so than others. The net winners lost the least, because they recovered at least all their investments. The net losers lost the most. The account balance approach is an understandable attempt by some investors to increase their recoveries and thereby mitigate their losses. However, the mitigation would come only

by shifting recoveries to net winners and shifting losses to net losers, increasing the losses of those who have already lost the most. Such an approach cannot be equitable.

11. Second, the account balance approach at its core implicitly assumes that which is not possible—that if every dollar of customer property were recovered, each customer could recover the full amount of his last account balance. In a Ponzi scheme, it is impossible for creditors to recover 100% of their cash in/cash out claims, let alone 100% of their account balance claims. In Ponzi schemes in general, and in this Ponzi scheme in particular, a portion of the investors' investments that were paid out for the expenses of the scheme and of the perpetrators is not recoverable. Therefore, even if all amounts paid out to investors were recoverable, there would be a shortfall. In fact, all amounts paid out to investors are not recoverable, because some amounts are beyond the Trustee's reach—either because they were paid out before the reach-back period, because the payments were of amounts invested and were received in good faith (see 11 U.S.C. § 548(b)), or because the recipients are judgment proof. Again, simple mathematics therefore dictates that investors cannot recover 100% of even their cash in/cash out claims. Adopting the account balance approach, which determines the net equity of each customer by treating the fictitious profits as genuine, is therefore inequitable and would augment the damage caused by the Debtor's fraud by reducing the aggregate amount available for recovery by the net losers.

12. Third, to allocate the limited amount of customer property available to satisfy claims based on a measure that treats the fictitious profits as genuine would result in inherently unfair recoveries and could perpetuate the fraud. Some customers would receive a portion of the customer property based on claims that include

fictitious profits before all customers have recovered the full amount of their investments of principal. Moreover, a debtor could exacerbate the inequality and unfairness by crediting some accounts prepetition with greater relative fictitious profits than others (as allegedly occurred in this fraud). Basing recovery on account balances would allow a debtor's dead hand to reach forward in time from its pre-bankruptcy fraud into post-bankruptcy asset distributions to continue to favor friends and family at the expense of innocent defrauded investors. Equality of treatment is equity. See Cunningham v. Brown, 265 U.S. 1, 13 (1924). The account balance approach is not equality of treatment.

## CONCLUSION

13. For the reasons set forth above, Optimal respectfully requests that the Court grant the Trustee's Motion as it relates to the net equity issue and rule that a customer's net equity is equal to the amount of cash deposited into the BLMIS customer account, less any amount already withdrawn from the customer account.

December 11, 2009

                                              CRAVATH, SWAINE & MOORE LLP

                                By:  /s/ Richard Levin
                                      Richard Levin (RL 1651)
                                      A member of the Firm

                                      Worldwide Plaza
                                        825 Eighth Avenue
                                          New York, NY 10019
                                            (212) 474-1000

                                      *Attorneys for Optimal Strategic U.S. Equity*
                                      *Limited and Optimal Arbitrage Limited*