Katharine B. Gresham (*pro hac vice* pending)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20548
Telephone: (202) 551-5148
Facsimile: (202) 772-9260
email: greshamk@sec.gov

Hearing Date: February 2, 2010
Hearing Time: 10:00 a.m

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK**

_____
:
SECURITIES INVESTOR PROTECTION :
CORPORATION, :
:
                              Plaintiff, : Adv. Pro. No. 08-1789 (BRL)
: SIPA Liquidation
         v. : (Substantively Consolidated)
:
BERNARD L. MADOFF INVESTMENT :
SECURITIES LLC, :
:
                              Defendant. :
_____:
:
In re: :
:
BERNARD L. MADOFF, :
:
                              Debtor. :
_____:

**MEMORANDUM OF LAW OF THE SECURITIES AND EXCHANGE COMMISSION
SUPPORTING TRUSTEE'S DETERMINATION THAT NET EQUITY SHOULD NOT
BE BASED ON SECURITIES POSITIONS LISTED ON LAST STATEMENTS, AND
SUPPORTING IN PART TRUSTEE'S DETERMINATION THAT NET EQUITY
SHOULD BE BASED UPON AMOUNTS DEPOSITED LESS AMOUNTS WITHDRAWN**

**TABLE OF CONTENTS**

                                                                                               **Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.       SIPA AND THE SECOND CIRCUIT'S DECISIONS IN *NEW TIMES*
          SUPPORT THE TRUSTEE'S DETERMINATION THAT NET EQUITY
          CANNOT BE BASED UPON THE SECURITIES POSITIONS SHOWN
          ON THE BLMIS CUSTOMERS' FINAL ACCOUNT STATEMENTS. . . . . . . . . . . . 3

          A.       SIPA Does Not Allow Net Equity To Be Determined Based Upon
                    the Securities Positions Shown on the Final Account Statements on
                    the Facts of This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          B.       Based upon the Second Circuit's Rulings in *New Times*, the
                    Customers Have Claims for Securities Measured by Their Net
                    Investment, Which Serves as a Proxy for the Imaginary Securities
                    Positions Shown on Their Account Statements. . . . . . . . . . . . . . . . . . . . . . . . 5

                    1.       There is no dispute that, based on *New Times I*, the Madoff
                            customers have claims for securities. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                    2.       Under the principles of *New Times*, the Madoff customers'
                            claims should be valued based on the money they invested,
                            not the imaginary securities positions shown on their account
                            statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.      THE NET EQUITY CLAIMS OF THE BLMIS CUSTOMERS ARE NOT
          LIMITED BY THE "RETURN OF PRINCIPAL" ANALYSIS APPLIED IN
          CASES INVOLVING PONZI SCHEMES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page**

*In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) . . . . . . . . . . . . . . .  5, 6, 7, 8

*Stafford v. Giddens (In re New Times Securities Services, Inc.)*, 463 F.3d 125
    (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8


**STATUTES**

Securities Investor Protection Act

Section 6, 15 U.S.C. 78fff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Section 8(b), 15 U.S.C. 78fff-2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5
Section 16(11), 15 U.S.C. 78lll(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**MISCELLANEOUS**

H.R. Rep. No. 91-1613 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

H.R. Rep. No. 95-746 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**INTRODUCTION**

Pursuant to this Court's Order of September 15, 2009, establishing a schedule for adjudication of the net equity issue in this proceeding under the Securities Investor Protection Act ("SIPA"), the Securities and Exchange Commission respectfully submits this Memorandum of Law supporting the Trustee's determination that net equity should not be based on the securities positions listed on the customers' last statements (the "final account statement method"). The Commission also supports in part the Trustee's determination that net equity should be based upon the amounts customers deposited in their accounts with Bernard L. Madoff Investment Securities LLC (BLMIS) less any amounts withdrawn (the "cash-in/cash-out method").

The Commission agrees generally that, on the facts of this case, net equity should be based upon the cash-in/cash-out method. The Commission believes, however, that in determining customer claims under the cash-in/cash-out method, the amount of the payment should be calculated in constant dollars by adjusting for the effects of inflation (or deflation). Bcause customers will be receiving *pro rata* distributions from the limited pool of assets recovered for the BLMIS estate, calculating claims in constant dollars treats all investors fairly by taking into account the economic reality that a dollar invested in 2008 has a different value than a dollar invested twenty years earlier.

Because this Court has limited briefing at this stage to whether net equity should be determined using the cash-in/cash-out or the final account statement method, the Commission will, at the appropriate time, file a brief addressing why its position that claims should be calculated in constant dollars is consistent with SIPA and court decisions construing SIPA.

## STATEMENT OF FACTS

The customers of BLMIS deposited money into brokerage accounts with the expectation that it would be invested in securities pursuant to what the firm's principal, Bernard L. Madoff, called his "split-strike conversion strategy." The customers received confirmations and account statements purporting to document securities transactions, but the money they deposited was never invested in any securities. Instead, the trades shown on the confirmations and statements had been concocted from historically reported securities prices to produce annual returns for Madoff's "strategy" that generally ranged from 10% to 17%. *See* Declaration of Joseph Looby, filed as Attachment #1 to Trustee's Motion for an Order Upholding Trustee's Determination, Dkt. No. 524, ¶¶ 62, 63, 66 ("Looby Declaration"). These returns could not have been achieved through actual trading in the securities markets. *See* Looby Declaration, (¶ 73) ("Because customer funds were never exposed to the market, customer funds were not exposed to the uncertain risks associated with price movement in the market.").

The BLMIS scheme collapsed in early December 2008, and the firm was placed in a liquidation under SIPA. The Trustee appointed to oversee the liquidation has been determining customer claims using the cash-in/cash-out method. Many of the claimants have objected to this method and urge that claims should instead be determined using the final account statement method.

**ARGUMENT**

I. SIPA AND THE SECOND CIRCUIT'S DECISIONS IN *NEW TIMES* SUPPORT THE TRUSTEE'S DETERMINATION THAT NET EQUITY CANNOT BE BASED UPON THE SECURITIES POSITIONS SHOWN ON THE BLMIS CUSTOMERS' FINAL ACCOUNT STATEMENTS.

   A. SIPA Does Not Allow Net Equity To Be Determined Based Upon the Securities Positions Shown on the Final Account Statements on the Facts of This Case.

Customers of brokerage firms in liquidations under SIPA have claims for the net equity that should be in their accounts. 15 U.S.C. 78fff (one of purposes of SIPA proceeding is to "satisfy net equity claims"). Net equity is defined by SIPA Section 16(11) as the "dollar amount" of a customer's account, determined by calculating the liquidation value of "all securities positions of such customer" on the filing date of the liquidation proceeding and subtracting any amounts owed by the customer. 15 U.S.C. 78lll(11). [1] Under SIPA Section 8(b), the trustee must promptly discharge customer net equity claims "by the delivery of securities or the making of payments to or for the account of such customer . . . *insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee*." 15 U.S.C. 78fff-2(b) (emphasis added).

The BLMIS customers' final account statements do not provide a basis for determining net equity because the information on those statements with respect to the securities positions of the BLMIS customers does not satisfy either of the two conditions of Section 8(b). BLMIS's other books and records contradict the statements, showing that the securities positions were a complete fabrication and that no securities were ever purchased for the accounts. The statements

---

[1] The amount of a customer's net equity affects (1) the amount of the customer's *pro rata* share of the customer property held by the Trustee, and (2) the amount of money paid to the customer from the SIPC Fund.

-3-

also fail to satisfy Section 8(b)'s alternate condition that the debtor's obligations be "otherwise established to the satisfaction of the trustee." The customers cannot show that they paid for the securities positions on the last statements. Although arguably a customer's initial cash investment could be said to have "paid" for the initial equity securities "purchases" in the account, those securities were never "sold," which means that any subsequent "purchases" were made with fictitious dollars. *See* Looby Declaration, ¶¶ 68, 69, 72. Thus, the customers cannot establish to the Trustee's satisfaction that they are entitled to a claim for net equity based upon the value of those imaginary securities positions.

The standard remedy provided in the statute when a failed broker promises to buy securities but does not do so – replacing the securities or, if this is not possible, crediting the customer with the cash value of the securities on the filing date – advances the legislative purpose of giving customers the securities positions that the broker could have purchased in real trading in the securities markets but never did. Here, however, treating the account statements as the basis for determining net equity would have the effect of perpetuating the fraud by crediting the securities positions Madoff created through his backdated trading scheme. *See* Looby Declaration, ¶¶ 62, 63, 66. Madoff could not have acquired these securities positions in real market trading. *See id.*, ¶ 73. The Commission does not believe that satisfying the customers' claims in this manner would be consistent with the requirements of Section 8(b) of SIPA.

B. Based upon the Second Circuit's Rulings in *New Times*, the Customers Have Claims for Securities Measured by Their Net Investment, Which Serves as a Proxy for the Imaginary Securities Positions Shown on Their Account Statements.

Although SIPA does not provide an explicit remedy in the circumstances presented by Madoff's fraud, the Second Circuit addressed a comparable situation in *In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) (*New Times I*), a case that involved a Ponzi scheme in which certain customers were solicited to invest in a non-existent money market fund (the "New Age investors") and others were solicited to invest in real mutual funds (the "Vanguard/Putnam investors"). In both situations, the money was never invested, but converted by the firm's principal, William Goren, to his own use. 371 F.3d at 71-72. In the ensuing SIPC liquidation, the trustee determined that the Vanguard/Putnam investors had claims for securities under SIPA (with coverage up to $500,000), and would receive the securities positions shown on their account statements. *See id.* at 74. [2] With regard to the New Age investors, however, the trustee determined that they were only entitled to claims for the cash they had invested (with coverage limited to no more than $100,000 under SIPA), and that the value of those claims was based on the amount the investors had paid to Goren to purchase the bogus securities less any amounts they had withdrawn from their accounts. *Id.* at 73-74.

The district court sustained the New Age investors' objections to the trustee's determinations, holding that they had claims for securities, and that the value of those claims was

---

[2] Although *New Times I* and the brief filed by the Trustee and SIPC in the case do not explain the legal basis for the determination of these customers' claims, it would appear that there was no difficulty in satisfying SIPA Section 8(b). While the New Times books and records would have shown that no securities were ever purchased, the customers would have met the alternate condition of showing to the satisfaction of the trustee that they deposited funds to pay for the real mutual fund securities that should have been in their accounts.

-5-

what was shown on their account statements—which included purported "interest" and "dividends" on the non-existent securities. *Id.* at 74-75. SIPC and the Trustee appealed. In that appeal, the Second Circuit addressed two issues: (1) whether the customers who invested in what turned out to be non-existent securities were entitled to claims for securities or were limited to claims for cash (coverage up to $100,000); and (2) how to determine net equity for such non-existent securities. The Court's rulings on both of these issues are applicable here.

> 1. <u>There is no dispute that, based on *New Times I*, the Madoff customers have claims for securities.</u>

In *New Times I*, the Commission filed an *amicus curiae* brief taking the position that, because the customers had directed that their money be used to purchase securities and received confirmations reflecting securities purchases and monthly statements showing securities positions in their accounts, they had claims for securities. The trustee and SIPC argued that because the securities were fictitious and never existed, the customers were entitled only to claims for cash. The Court, agreeing with the Commission's analysis, held that the customers were entitled to claims for the securities they thought were in their accounts. 371 F.3d at 87.

Here, there is no dispute that the BLMIS customers, who directed that their money be used to purchase securities and received confirmations and account statements reflecting such purchases, are entitled to claims for securities, not claims for cash.

> 2. <u>Under the principles of *New Times*, the Madoff customers' claims should be valued based on the money they invested, not the imaginary securities positions shown on their account statements.</u>

Turning to the valuation of the claims based on the non-existent New Age securities, the Court in *New Times I* rejected the district court's approach, stating that "basing customer recoveries on 'fictitious amounts in the firm's books and records would allow customers to

-6-

recover arbitrary amounts that necessarily have no relation to reality ... .'" 371 F.3d at 88 (quoting *amicus curiae* brief of Securities and Exchange Commission). Instead, the Court ruled that net equity should be calculated based on the amount of money the customers gave the firm to purchase the fake securities and could not include the fictitious earnings reflected on the account statements. *Id*. In *Stafford v. Giddens (In re New Times Securities Services, Inc.)*, 463 F.3d 125 (2d Cir. 2006) (*New Times II*), the Court elaborated on the reasoning of *New Times I*, explaining that valuing claims based on non-existent securities would, in essence, require the trustee to treat an imaginary trading world as if it were real. 463 F.2d at 129-30. In this situation, the Court found that determining net equity based upon the money initially invested provided "the best proxy for the customers' legitimate expectations." *Id*. at 130.

Although *New Times* involved fictitious securities, rather than the fictitious securities transactions at issue here, the Commission believes that it would be similarly inappropriate to credit the fictitious paper profits reflected on the Madoff customers' account statements. Instead, as with the New Times investors in fictitious securities, the calculation of net equity should be based upon the money the customers invested with BLMIS.

The Commission disagrees with the claimants' view that, because the securities BLMIS purportedly purchased were not fictitious, but real, the Trustee must calculate net equity based upon the securities positions reported on the account statements. Although the claimants' situation has some similarity to the Vanguard/Putnam investors, who believed they were purchasing real mutual fund securities, there is an important difference that dictates a different result here.

The Vanguard/Putnam investors' account statements reported exactly what would have happened if the real mutual funds the investors told the broker to purchase for their accounts had actually been purchased. The BLMIS statements, in contrast, showed the results of securities transactions selected by Madoff and "executed" at prices calibrated after the fact to produce predetermined favorable returns—returns that were possible *only* because they were entirely divorced from the uncertainty and risk of actual market trading. Thus, crediting the securities positions shown on the BLMIS statements would not "'mirror[] what would have happened had the given transaction[s] been executed'" (*New Times I*, 371 F.3d at 74), as was true with the real securities shown on the Vanguard/Putnam investors' account statements. Madoff was able to concoct the securities positions on the BLMIS statements *only* by opting out of the market in favor of the fictitious trading world of his scheme.

The Commission does not believe the Second Circuit would rule that the BLMIS customers are entitled to claims for net equity based on earnings from Madoff's fraudulent investment scheme involving real securities. With respect to SIPA coverage, there is no meaningful difference between "fraudulent promises made on fake securities" (*New Times II*, 463 F.3d at 130) and fraudulent promises involving positions in real securities that are fabricated through fictitious backdated trades based on hindsight. Both situations involve "fictitious paper profits" (*id.*) and implicate the Second Circuit's concern that basing customer recoveries on fictitious amounts would "'leave[] the SIPC fund unacceptably exposed'" (*New Times I*, 371 F.3d at 88, quoting SEC *Amicus* Brief at 16).

Basing customers' recoveries on the fictitious amounts in the account statements would also inequitably distort the *pro rata* distribution of customer property held by the Trustee by

-8-

favoring customers who invested years ago and have already withdrawn the amounts they invested – at the expense of recent customers who have not yet made significant withdrawals. There would be a substantial and inequitable reduction in assets available for distribution to customers who have not recovered their principal if the final account statement method were adopted.

II. THE NET EQUITY CLAIMS OF THE BLMIS CUSTOMERS ARE NOT LIMITED BY THE "RETURN OF PRINCIPAL" ANALYSIS APPLIED IN CASES INVOLVING PONZI SCHEMES.

Although the Commission agrees with the Trustee's conclusion that the determination of net equity should not be based on the final account statement method, and agrees generally with his conclusion that net equity should be based on the "cash-in/cash-out method," the Commission disagrees with the Trustee's view that principles applicable in Ponzi scheme cases limit the claims of BLMIS customers to the actual net cash they invested. The customers' claims must be determined in accordance with the provisions of SIPA, not by principles courts apply in resolving claims of Ponzi scheme victims. Morever, the Commission is concerned that such principles could be interpreted to require calculation of claims in current dollars as of the dates of investments and withdrawals. This could preclude calculation of the claim in constant dollars, adjusting for the effects of inflation, which the Commission believes is the appropriate method of determining net equity in this case. See *supra*, p. 1.

The Trustee argues that "well-established case law in Ponzi schemes mandates that distributions be calculated using an investor's net investment – equivalent to the Trustee's 'cash-in/cash-out' methodology here." Trustee's Brief at 30; *see also id.* at 31 ("[C]ourts generally hold that when a Ponzi scheme collapses, and there is not enough money to repay all the funds

invested by victims, the victims should recover proportionately in accordance with their respective actual losses, *i.e.*, their unrecovered cash investments, not their phony inflated profits."). While investors should not be entitled to distributions based upon fraudulent profits promised by Ponzi-scheme perpetrators, claims for net equity in a case under SIPA that involves a Ponzi scheme are not limited to a customer's actual net investment.

Brokerage firm customers caught in Ponzi schemes that result in SIPA liquidations are treated differently than investors in Ponzi schemes that do not involve SIPC-member brokerage firms. SIPA is a product of Congressional concern that customers of failed brokerage firms receive the assets that should be in their accounts when the firm is placed in liquidation. *See* H. R. Rep. No. 91-1613 at 1-2 (1970). While customers in Ponzi schemes may be limited to a return of their initial principal, customers in SIPA liquidations have claims for the net equity in their accounts. It is this remedy that fulfills the statute's purpose of assuring that a customer "receive[s] what he believes is in his account at the time the stockbroker ceases business." H.R. Rep. No. 95-746 at 21 (1977).

**CONCLUSION**

Resolving how the BLMIS claims should be handled involves complex issues that have not arisen in the nearly 40 years that SIPA has been in effect. The Commission believes, however, that the situation, although novel, can be resolved by applying the basic principles of SIPA, as interpreted by the Second Circuit's *New Times* decisions.

In a typical SIPA liquidation involving a claim of an investor who sought to purchase securities but the broker failed to do so, the investor is a victim of conversion. If the customer receives confirmations and account statements that reflect actual investments in securities that were simply never made, SIPA provides that the customer has a claim for net equity based upon the filing date value of the securities. In BLMIS, as in *New Times*, the broker not only converted the customer's funds rather than purchasing securities, but promised the customer that the money would be invested in what turned out to be a fraudulent scheme. The securities positions on the confirmations and account statements received by the customer reflected that fraud.

Because SIPA does not provide an explicit remedy in this situation, the Second Circuit in *New Times* fashioned a remedy that compensates the customers for the securities they believed they had purchased, but that does not give them fraudulent returns. Applying this remedy to BLMIS, the customers are not entitled to have their claims for net equity determined based upon the fraudulent amounts on the account statements. The customers are, however, entitled to payments, based upon the amounts they invested with BLMIS, that serve as a proxy for the investments in securities they thought they had made.

Respectfully submitted,

/s/ Alistaire Bambach

Dated: New York, NY  
December 11, 2009

Alistaire Bambach  
Assistant Director  
Securities and Exchange Commission  
New York Regional Office  
3 World Financial Center, Suite 400  
New York, NY 10281-1022  
Telephone: (212) 336-0027  
Facsimile: (212) 336-1319  
e-mail: bambacha@sec.gov

Katharine B. Gresham (*pro hac vice* pending)  
Assistant General Counsel  
Securities and Exchange Commission  
100 F Street, N.E.  

Of Counsel  
Jacob H. Stillman  
Solicitor  

Washington, D.C. 20549  
Telephone: (202) 551-5148  
Facsimile: (202) 772-9260  
e-mail: greshamk@sec.gov