# EXHIBIT B

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

Hearing Date:   February 2, 2010
Hearing Time:  10:00 AM (EST)
Objection Deadline: November 13, 2009

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>            Plaintiff,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>            Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>            Debtor. | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER UPHOLDING TRUSTEE'S DETERMINATION DENYING "CUSTOMER" CLAIMS FOR AMOUNTS LISTED ON LAST CUSTOMER STATEMENT, AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE OBJECTIONS WITH RESPECT TO THE DETERMINATIONS RELATING TO NET EQUITY**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

PROCEDURAL HISTORY ......................................................................................3

STATEMENT OF FACTS ........................................................................................6

I.    The Structure of BLMIS And Its Collapse ...............................................6

II.   The Fraudulent Scheme .............................................................................9

    A.    The Purported "Split-Strike Conversion" Strategy .......................9

    B.    Non-Split-Strike Conversion Customer Accounts ......................12

    C.    Entry Into The BLMIS Fund .......................................................13

    D.    The BLMIS 703 Account .............................................................14

    E.    Generation Of The BLMIS Customer Statements.......................16

    F.    Customers Did Not Have Enough Funds To Purchase Securities
        On Their Statements ...................................................................17

    G.    BLMIS Customers' Investments Were Never Exposed To The
        Market.........................................................................................18

III.   SIPA and SIPC ........................................................................................20

    A.    Congress Enacted SIPA To Promote And Protect The Market
        Economy By Providing Protection To Customers Against Broker
        Insolvency...................................................................................20

        1.    The Chandler Act...........................................................21

        2.    SIPA As Enacted In 1970..............................................22

        3.    SIPA As Amended .........................................................24

        4.    Net Equity Under SIPA ..................................................24

        5.    Use Of SIPC Funds To Satisfy Customer Claims .........25

        6.    Determination Of Whether Claims Are For Cash Or For
            Securities .......................................................................25

        7.    The "Books and Records" Requirement.........................26

IV.   Customer Claimants ................................................................................27

    A.    "Net Winners" .............................................................................27

    B.    "Over-the-Limits Net Losers That Have Received Full SIPC
        Protection"...................................................................................28

    C.    "Under-the-Limits Net Losers That Will Not Receive A Full
        $500,000 in SIPC Protection" ....................................................28

# TABLE OF CONTENTS
(continued)

Page

ARGUMENT ...................................................................................................30

I.  The Trustee's "Cash-In/Cash-Out" Calculation Of Net Equity Mirrors The
    Standard Judicial Treatment of Ponzi Schemes And Has Been Specifically
    Upheld Under SIPA.....................................................................................30

    A.  The Standard Treatment Of Ponzi Schemes Is Based On Net
        Investment. ......................................................................................30

    B.  The "Cash In/Cash Out" Methodology Has Been Applied To Prior
        Ponzi Schemes Under SIPA. ..............................................................33

    C.  Fictitious Profits Paid Out In Ponzi Schemes Are Recoverable..............33

    D.  The Second Circuit's Decision In *New Times I* Supports The
        Trustee's Methodology ......................................................................35

        1.  *New Times I* Held That Customers Have Claims For
            Securities Where They Receive Confirmation Statements
            and That Net Equity Claims In A Ponzi-Scheme Case
            Should Not Be Based Upon Fictitious Profits.............................35

        2.  SIPA Does Not Protect Customer Expectations In Fictitious
            Profits. ....................................................................................37

        3.  Because BLMIS Created Fictitious Transactions In A
            Fictitious Market, Customer Claims Should Not Include
            Paper Profits That Have No Relation to Reality. ........................40

II. The Trustee's "Cash in/Cash out" Methodology Is The Only One
    Consistent With SIPA.................................................................................44

    A.  The Fictitious Customer Statements Do Not Reflect Real
        "Securities Positions" ........................................................................44

    B.  The "Books and Records" Requirement Precludes Claims Based
        Upon Fictitious Profits ......................................................................44

    C.  "Customer" Claims Cannot Be Based On Fraudulent Transactions. .......45

    D.  The "Cash In/Cash Out" Method Is The Only One Consistent With
        The Trustee's Power To Avoid Fraudulent Transfers Under SIPA
        and Other Applicable Law...................................................................46

    E.  Customers Must Have Valid Net Equity Claims Before They Are
        Entitled  to SIPC Protection. ...............................................................49

    III. *Visconsi v. Lehman Brothers* Does Not Support the Objectors...........................51

    IV. Basing Net Equity Upon Fictitious BLMIS Customer Statements Would
        Be Inequitable And Make for Poor Public Policy. .................................52

CONCLUSION ...............................................................................................53

# TABLE OF AUTHORITIES

Page

## Cases

*Abrams v. Eby (In re Young)*, 294 F. 1 (4th Cir. 1923) ................................................................31

*Anderson v. Stephens,* 875 F.2d 76 (4th Cir. 1989) ......................................................................32

*Arford v. Miller (In re Stratton Oakmont, Inc.)*, 239 B.R. 698 (S.D.N.Y. 1999),
   *aff'd*, 210 F.3d 420 (2d Cir. 2000) .......................................................................................51

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou
   Group, LLC)*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008) .........................................................34

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group,
   LLC)*, 362 B.R. 624 (Bankr. S.D.N.Y. 2007) .....................................................................34

*CFTC v. Equity Fin. Group, LLC*, No.  Civ. 04-1512, 2005 WL 2143975 (D.N.J.
   Sept. 2, 2005), *adopted in* No. Civ. 04-1512, 2005 WL 2864783 (D.N.J. Oct.
   26, 2005) ..............................................................................................................................31

*CFTC v. Franklin,* 652 F. Supp. 163 (W.D. Va. 1986) .................................................................32

*CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107 (9th Cir. 2000) ......................................................31

*Cunningham v. Brown,* 265 U.S. 1 (1924) ...............................................................30, 31, 32, 52

*Danning v. Bozek (In re Bullion Reserve of N. Am.*), 836 F.2d 1214 (9th Cir.
   1988) .....................................................................................................................................45

*Donell v. Kowell*, 533 F.3d 762 (9th Cir.), *cert. denied*, 129 S. Ct. 640 (2008) .........................34

*Duel v. Hollins*, 241 U.S. 523 (1916) ...........................................................................................21

*Exch. Nat'l Bank of Chicago v. Wyatt,* 517 F.2d 453 (2d Cir. 1975) ...........................................20

*Focht v. Athens (In re Old Naples Sec., Inc.)*, 311 B.R. 607 (M.D. Fla. 2002) .....................32, 33

*In re Adler Coleman Clearing Corp.*, 195 B.R. 266 (Bankr. S.D.N.Y. 1996) ........................46, 52

*In re Adler Coleman Clearing Corp.*, 198 B.R. 70 (Bankr. S.D.N.Y. 1996) ...........................20, 21

*In re Brentwood Sec., Inc.*, 925 F.2d 325 (9th Cir. 1991) .............................................................52

*In re New Times Sec. Servs.*, 371 F.3d 68 (2d Cir. 2004)....................................................passim

*In re Taubman*, 160 B.R. 964, 986-88 (Bankr. S.D. Ohio 1993) .................................................34

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406
   (S.D.N.Y. 2001)....................................................................................................................49

**TABLE OF AUTHORITIES**

(continued)

**Page**

*Lawless v. Anderson (In re Moore)*, 39 B.R. 571 (Bankr. M.D. Fla 1984)...................................34

*McKenny v. McGraw (In re Bell & Beckwith)*, 104 B.R. 852 (Bankr. N.D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991) ...............................................................25

*Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843 (D. Utah 1987).....................34

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51 (Bankr. S.D.N.Y. 1999), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001) ........................................48, 49

*Official Cattle Contract Holders Comm. v. Commons (In re Tedlock Cattle Co.)*, 552 F.2d 1351 (9th Cir. 1977)..............................................................................31

*Official Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442 (Bankr. S.D.N.Y. 2007).........................................45

*Picard v. Madoff, et al.*, No. 09-1503 (BRL) ...............................................................15

*Picard v. Madoff*, No. 09-1391 (BRL) .......................................................................15

*Picard v. Taylor (In re Park South Securities LLC)*, 326 B.R. 505 (Bankr. S.D.N.Y. 2005)................................................................................................46

*Scholes v. Lehmann*, 56 F.3d 750, 757-58 (7th Cir. 1995)...........................................34

*SEC v. Albert & Maguire Sec. Co.*, 378 F. Supp. 906 (E.D. Pa. 1974).......................................21

*SEC v. Byers*, 08 Civ. 7104, --- F.Supp.2d ----, 2009 WL 2185491 (S.D.N.Y. Jul. 23, 2009)..............................................................................................32

*SEC v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000), *aff'd*, 290 F.3d 80 (2d Cir. 2002) ................................................32

*SEC v. F.O. Baroff Co.*, 497 F.2d 280 (2d Cir. 1974) ...................................................20

*SEC v. Funding Res. Group*, No. 3-98-CV-2689-M, 2004 WL 1189996 (N.D. Tex. May 27, 2004), *adopted as modified*, No. Civ.A 398CV2689M, 2004 WL 1882972 (N.D. Tex. Aug. 20, 2004)..............................................................31

*SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir. 1974)............................................20, 48, 51

*SEC v. S.J. Salmon & Co.*, 375 F. Supp. 867 (S.D.N.Y. 1974)....................................................52

*SEC v. S.J. Salmon & Co.*, 72 Civ. 560, 1973 U.S. Dist. LEXIS 15606 (Aug. 8, 1973).....................................................................................................47, 48

*Secs. Investor Prot. Corp. v. Barbour*, 421 U.S. 412 (1975) ..............................................20

## TABLE OF AUTHORITIES
(continued)

**Page**

*Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 401 B.R. 629 (Bankr. S.D.N.Y. 2009)................................................................................45

*Secs. Investor Prot. Corp. v. C.J. Wright & Co. (In re C.J. Wright & Co.)*, 162 B.R. 597 (Bankr. M.D. Fla. 1993)....................................................................32

*Secs. Investor Prot. Corp. v. Charisma Sec. Corp.*, 371 F. Supp. 894 (S.D.N.Y.), *aff'd*, 506 F.2d 1191 (2d Cir. 1974)...........................................................52

*Secs. Investor Prot. Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314 (2d Cir. 1976)........................................................................................................51

*Sender v. Buchanan (In re Hedged-Investments Assoc., Inc.)*, 84 F.3d 1286 (10th Cir. 1996)..............................................................................................34

*Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Investments Assocs.)*, 48 F.3d 470 (10th Cir. 1995)...................................................45

*Stafford v. Giddens (In re New Times Secs. Servs.)*, 463 F.3d 125 (2d Cir. 2006) ......49

*Teletronics, Ltd. v. Kemp*, 649 F.2d 1237 (7th Cir. 1981)..................................32, 33

*United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) .............11

*United States v. Friehling*, No. 09-MJ-00729 (S.D.N.Y. Mar. 17, 2009)....................8

*United States v. Madoff*, No. 09-CR-213 (DC) ..........................................................8

*Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827 (6th Cir. 2007)......51

*Wider v. Wootton*, 907 F.2d 570 (5th Cir. 1990).....................................................45

**Statutes**

§ 15(b) of the Securities Exchange Act of 1934..........................................................6

Section 10(b) of the Securities Exchange Act of 1934................................................48

11 U.S.C. § 96e (repealed 1979) .............................................................................22

11 U.S.C. § 96e(2) (repealed 1979)..........................................................................22

15 U.S.C. § 78aaa *et seq.* .......................................................................................1

78ccc ....................................................................................................................20

78ddd ...................................................................................................................20

# TABLE OF AUTHORITIES
(continued)

Page

78eee(a)(3) ....................................................................................................................4

78eee(a)(4)(A) ..............................................................................................................4

78eee(b)(3) ....................................................................................................................4

78eee(b)(4) ....................................................................................................................4

78ff ................................................................................................................................3

78fff(b) ..............................................................................................................5, 20, 21

78fff-1(a) ......................................................................................................................5

78fff-2(a)(2) ..................................................................................................................4

78fff-2(b) ....................................................................................................26, 39, 44

78fff-2(b),(c)(1) ..........................................................................................................50

78fff-2(c)(1)(B) ..........................................................................................................24

78fff-2(c)(3) ........................................................................................................35, 46

78fff-2(d) ............................................................................................................26, 39

78fff-3(a) ......................................................................................................25, 26, 50

78fff-3(a)(3) ........................................................................................................26, 39

78j(b) ....................................................................................................................3, 48

78*lll*(11) ......................................................................................................5, 24, 43, 44

78*lll*(2) ........................................................................................................................45

78*lll*(3) ........................................................................................................................24

78*lll*(4) ........................................................................................................................24

78*lll*(7)(B) ..................................................................................................................4

78*o*(b) ..........................................................................................................................6

15 U.S.C. 78j(b) ..........................................................................................................6

N.Y. Gen. Bus. L. § 352 (McKinney 2009) ..............................................................48

## TABLE OF AUTHORITIES
(continued)

**Page**

Section 10(b) of the Securities Exchange Act of 1934...................................................................48

### Rules

12 C.F.R. § 220.1.........................................................................................................................41

17 C.F.R. § 240.13f-1 ..................................................................................................................10

17 C.F.R. § 240.15c3-3 .................................................................................................................9

17 C.F.R. § 300.501(a) ................................................................................................................38

17 C.F.R. § 300.502(a)(1).............................................................................................................25

17 C.F.R. § 300.503(a) ................................................................................................................47

17 C.F.R. § 300.503(b)...........................................................................................................46, 47

17 C.F.R. 240.10b-5 ......................................................................................................................3

### Treatises

3 *Collier on Bankruptcy* ¶¶ 60.73-60.76 (14th ed. 1978)............................................................21

### Other Authorities

Michael E. Don & Josephine Wang, *Stockbroker Liquidations Under the
Securities  Investor Protection Act and Their Impact on Securities Transfers*,
12 Cardozo L. Rev. 509, 526 (1990)...........................................................................21, 22, 23

*Report of Special Study of Securities Markets of the Securities and Exchange
Commission*, H.R. Doc. No. 95, pt. 1, at  411-412 (1963) ........................................................23

Pursuant to this Court's Order of September 16, 2009 scheduling adjudication of the net

equity issue (the "Scheduling Order"), Irving H. Picard, trustee ("Trustee") for the substantively

consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the

Securities Investor Protection Corporation Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and for

Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this Memorandum

of Law in Support of the Trustee's motion ("Motion") seeking an order (a) upholding the

Trustee's determinations denying the claims in question for the securities and credit balances

listed on the claimants' last BLMIS customer statement, (b) affirming the Trustee's "cash in/cash

out" determinations of net equity with respect to each customer claim, and (c) expunging the

objections to the Trustee's determinations to the customer claims in question insofar as they

relate to net equity.  This memorandum is based upon the law set forth below as well as the facts

set forth in the declarations of Joseph Looby ("Looby Dec."), Seanna R. Brown ("Brown Dec."),

and Bik Cheema ("Cheema Dec."), filed herewith.

## INTRODUCTION

Certain claimants have objected to the Trustee's calculation of their Net Equity[2] under

SIPA, asserting that it should be exclusively calculated based upon the amounts listed on their

last customer statements from BLMIS, rather than upon the actual net amount that they invested

with BLMIS.  The Trustee has calculated each customer's Net Equity by crediting the amount of

cash deposited by the customer into his BLMIS customer account, less any amounts already

withdrawn by him from his BLMIS customer account (the "cash in/cash out approach").  The

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

[2] Capitalized terms used in the Introduction but not defined herein shall have the meanings assigned to them in this Memorandum of Law.

Trustee submits that only the Trustee's method of calculating Net Equity is consistent with the letter and spirit of SIPA, bankruptcy law, and principles of equity, as well as common sense.

As will be described below, the labor of many individuals was required in order to fabricate the fraudulent world of the stock brokerage or investment advisory business ("IA Business") of BLMIS, through which customer funds were purportedly invested. At bottom, however, this fraudulent "world" was created solely by Madoff, and existed only as a complete fantasy. Regardless of whether the stocks of actual, existing companies or government debt obligations were reflected on customer statements, no such transactions were ever executed on behalf of the split-strike conversion customers of BLMIS's stock brokerage or IA Business. Because there is no evidence of any profitable economic activity having been undertaken by the IA Business of BLMIS, any gains that appeared to be associated with BLMIS customer accounts were entirely fabricated. As a result, the only source of funds that BLMIS had to pay each customer was those sent to BLMIS by the collective pool of BLMIS customers.

During the operation of the Madoff Ponzi scheme, when customers requested and received distributions of purported "profits" in their accounts, they were paid with the cash available on hand. Because the BLMIS IA Business was no more than a Ponzi scheme, and the profits nonexistent, the money these customers withdrew was simply taken from the money invested by other customers. In short, they received nothing more than other people's money.

The alleged split-strike conversion trading or investments described in the BLMIS customer statements did not actually take place. Although BLMIS customers received regular customer statements from BLMIS listing the securities that were purportedly held in or had been traded through their accounts and the alleged growth in value of and profit from those securities over time, the trades reported on the BLMIS customer statements, and hence, any profits

associated with these trades, were fabricated. The split-strike securities trades depicted in the BLMIS customer statements never occurred, and the profits reported were entirely fictitious. The only place those securities transactions existed was within the closed system of BLMIS's AS/400 computer system.

Because no securities were purchased, and no profits obtained, the customers that benefited the most from the last customer statement approach were those that were in the Ponzi scheme for the maximum amount of time, which allowed their fictitious profits to accrue year after year. Thus, the claims of earlier customers are largely made up of fictitious profits. The claims of later customers are largely for their real dollars. To allow customers' Net Equity claims in the amounts listed on their last BLMIS customer statement is to legitimize and perpetuate a fiction – that the securities and "profits" listed on their customer statements were purchased and achieved.

At bottom, a distribution in this SIPA liquidation, similar to those in all Ponzi schemes, is a zero-sum game. Every dollar paid to reimburse a fictitious profit would be one less dollar available to pay a claim for money actually invested. Instead, the Trustee's approach of returning to customers only their real dollars invested puts *all* customers on equal footing. To allow Net Equity claims on the basis of anything other than "cash in/cash out" is to permit certain claimants to reap the benefits of Madoff and BLMIS's fraud at the expense of others.

**PROCEDURAL HISTORY**

On December 11, 2008, Madoff was arrested by the FBI in his Manhattan home and was criminally charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. 240.10b-5 in the United States District Court for the Southern District of New York, captioned *United States v. Madoff*, No. 08-MJ-2735 (the "Criminal

Action").[3]   Also on December 11, 2008 (the "Filing Date"),[4]  the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against Madoff and BLMIS, among others (Case No. 08-CV-10791) (the "SEC Action").

On December 15, 2008, under section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of the SEC Action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, under section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging that BLMIS was not able to meet its obligations to securities customers as they came due and that its customers needed the protection afforded by SIPA.

That same day, the District Court entered a protective decree, to which BLMIS consented, which, in pertinent part:

1.      appointed the Trustee for the liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA;

2.      appointed Baker & Hostetler, LLP ("B&H") as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

3.      removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

On December 23, 2008, this Court entered a claims procedure order specifying the procedures for filing, determining, and adjudicating customer claims in this proceeding.  The order provides, in pertinent part, that under section 78fff-2(a)(2) of SIPA, all claims against BLMIS must be filed with the Trustee.  The order further provides that the Trustee will determine customer and creditor claims in writing and allows any claimant who opposes the

---

[3] On March 10, 2009, the Criminal Action was assigned to Judge Denny Chin in the United States District Court for the Southern District of New York and was assigned a new docket number, No. 09-CR-213 (DC).

[4] In this case, the Filing Date is the date on which the SEC commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* Section 78*lll*(7)(B) of SIPA.

Trustee's determination to file an objection with this Court, after which the Court will hear the matter.

The Trustee appointed under SIPA is responsible for recovering and distributing customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee, in addition to the powers granted by SIPA.  Pursuant to section 78fff(b) of SIPA, Chapters 1, 3, 5 and subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case, to the extent they are consistent with SIPA.

In accordance with his statutory responsibilities, the Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets for the benefit of the estate's customers and creditors is well underway.  To date, the Trustee has recovered more than $1.2 billion in assets to date, although it is not expected that the total value of assets ultimately recovered will be sufficient to fully reimburse the customers of BLMIS for the many billions of dollars they invested with BLMIS over the years.  In addition, the Trustee has determined more than 1,530 customer claims and has committed to pay over $484 million to BLMIS customers in funds advanced from SIPC in full or partial satisfaction of those claims, upon the return of the appropriate assignment and release.

The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that customers share *pro rata* in customer property to the extent of their "net equity," as defined in section 78*lll*(11) of SIPA ("Net Equity").  For customers with a valid Net Equity claim,  SIPC shall advance funds to the SIPA trustee up to $500,000 for securities for that customer, if their ratable share of customer property is insufficient to make them whole up, to the amount of their Net Equity.  Thus, at the outset of the claims determination process, regardless of

the funds to be advanced by SIPC, it is necessary to calculate correctly each customer's *pro rata* share of customer property vis-à-vis other customers.

The Trustee has determined each customer's Net Equity by crediting the amount of cash deposited by the customer into her BLMIS account, less any amounts withdrawn from her BLMIS customer account, otherwise known as the "cash in/cash out" approach. After certain claimants objected to the Trustee's interpretation of Net Equity, the Trustee moved the Court for a briefing schedule and hearing on the matter. This memorandum follows.

## STATEMENT OF FACTS

### I.     The Structure of BLMIS And Its Collapse

BLMIS is a New York limited liability company wholly owned by Madoff. Initially founded in 1960 as a sole proprietorship, BLMIS operated for many years up until the Filing Date from its principal place of business at 885 Third Avenue, New York, New York. (Looby Dec. ¶ 8). Madoff, as founder, chairman, and chief executive officer, ran BLMIS, together with several Madoff family members and a number of employees. (*Id.*). BLMIS had three business units: market making, proprietary trading, and investment advisory. (Looby Dec. ¶ 9). BLMIS registered with the SEC as a broker-dealer on January 19, 1960 under § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b)), and, beginning in 2006, as an investment adviser. However, the investment advisory registration was falsified, and only 23 of the thousands of the investment advisory business ("IA Business") customers were reported to the SEC. By virtue of its registration as a broker-dealer, BLMIS was a member of SIPC. (Looby Dec. ¶ 10). In addition, Madoff also began operating a London branch of the broker-dealer in London, England in February 1983, which was incorporated under the name Madoff Securities International Ltd. ("MSIL"). (Looby Dec. ¶ 11).

Although the business units were financially interconnected, the proprietary trading and market making desks of BLMIS were largely run as enterprises separate and apart from the IA Business. (Looby Dec. ¶ 26). The market making desk competed with other market makers. The proprietary trading desk was used to trade on behalf of the firm for profit.

As the market making and proprietary trading business units were involved generally in legitimate trading with institutional counterparties, they utilized live computer systems and trading platforms that interfaced with multiple third-party feeds and outside data sources often necessary for trading. (Looby Dec. ¶ 28). BLMIS employed a sizeable information technology staff to support and maintain these trading platforms, as well as other technology associated with these business units. (*Id.*). In addition, the market making and proprietary trading desks were subject to compliance and risk monitoring programs, by the exchanges they traded on, the clearing houses they utilized, and the National Association of Securities Dealers ("NASD"), and then its successor, Financial Industry Regulatory Authority ("FINRA"), among others. (Looby Dec. ¶ 31). In short, these businesses appear to have been largely conducted as legitimate, if ultimately unprofitable, enterprises. Neither of these business units would have been viable without the fraudulent IA Business, the proceeds of which were used to prop up these business units from at least 2007 forward. (Looby Dec. ¶ 27).

Madoff operated his fraudulent IA Business from the 17th floor of the BLMIS offices (the "17th Floor") at 885 Third Avenue with a cadre of employees. Outwardly, BLMIS functioned as both an investment adviser to its customers and a custodian of their securities. (Looby Dec. ¶ 32). Its annual audits were purportedly performed by Friehling & Horowitz, CPAs, P.C., an accounting firm of three employees, one of whom was semi-retired, with offices

located in a strip mall in Rockland County, New York.[5]  (Looby Dec. ¶ 12).  The precise date on which BLMIS began purportedly engaging in investment advisory services has not been established, but it appears that BLMIS was offering such services as far back as the 1960s. (Looby Dec. ¶ 32).  The Trustee's investigation to date establishes that, to the extent records are available, BLMIS never acted as a true investment adviser in the interest of its customers. (Looby Dec. ¶ 80).

Madoff solicited billions of dollars from investors for his fraudulent IA Business.  The final customer statements issued by BLMIS as of November 30, 2008 falsely record nearly $64.8 billion[6] of net investments and related fictitious gains from those investments with BLMIS as of the Filing Date.  (Looby Dec. ¶ 22).  Madoff himself admitted that, "I never made the investments I promised clients, who believed they were invested with me in the split strike conversion strategy."  *See* Plea Allocution of Bernard L. Madoff, *United States v. Madoff*, No. 09-CR-213 (DC), Dkt. No. 50 at p. 3 ("Madoff Allocution"), annexed to the Brown Dec. as Exhibit 1.  Instead, investors' funds were principally deposited into a bank account at J.P. Morgan Chase Manhattan Bank ("Chase Bank"), Account Number 140081703 (the "703 Account").  *See* Madoff Allocution, at p. 1.

Madoff's purported "split-strike conversion" strategy appeared to generate remarkably consistent and above-average returns for his customers.  Instead of investing client monies, BLMIS used customer funds to support operations and meet withdrawal requests made by or on behalf of investors and to make other improper transfers.  (Looby Dec. ¶ 19).  The money

---

[5] David Friehling is the subject of a criminal information filed by the United States charging him with, *inter alia*, securities fraud.  *See* Friehling Information, *United States v. Friehling*, No. 09-CR-0700 (AKH) (S.D.N.Y. July 17, 2009), Dkt. No. 14.

[6] The $64.8 billion balance recorded on customer statements is net of "negative" accounts that approximate $8.3 billion.  The total amount shown on the November 30, 2008 customer statements aggregates to $73.1 billion. (Looby Dec. ¶ 23).  `

received from each customer was not invested in securities[7] for the benefit of that customer as

purported, but instead was primarily used to make distributions to, or payments on behalf of,

other investors, as well as withdrawals and payments to Madoff family members and employees.

In other words, BLMIS was able to stay afloat only by using the principal invested by customers

to pay other customers.  In pleading guilty to the crimes he committed, Madoff admitted that the

IA Business of BLMIS was used to operate a Ponzi scheme.  *See* Madoff Allocution, at pp. 1-2.

The Ponzi scheme worked as planned until, inevitably, customers' requests for redemptions

overwhelmed the flow of new investments and caused the collapse of the scheme in December

2008.  On June 29, 2009, Madoff was sentenced to 150 years incarceration for his crimes.

## II.    **The Fraudulent Scheme**

### A.    **The Purported "Split-Strike Conversion" Strategy**

The fraudulent IA Business of BLMIS was staffed by more than 25 employees and was

directed on a day-to-day basis by Madoff and Frank DiPascali, Jr. ("DiPascali"), among others.

(Looby Dec. ¶ 33 & ¶ 38).  Physically segregated on the 17th floor from the other BLMIS

business units, Madoff was able to limit access to the premises to certain key employees and

insiders.  (Looby Dec. ¶ 14).

Outwardly, Madoff ascribed the success he purported to achieve in his IA Business to the

"split-strike conversion" strategy, which was ostensibly carried out by Madoff, DiPascali, and

the employees who worked for them.  (Looby Dec. ¶ 48).  Madoff represented that his strategy

was to invest customer funds in a subset (or "basket") of common stocks that comprised the

---

[7] Nor were customer funds segregated in a "15c3-3" account.  Per SEC Rule 15c3-3(e), 17 C.F.R. § 240.15c3-3, promulgated under the Securities Exchange Act of 1934, brokers and dealers are required to maintain a "Special Reserve Bank Account for the Exclusive Benefit of Customers."  This special reserve bank account is "separate from any other bank account of the broker or dealer."  The special reserve account is required to maintain a certain minimum balance.  *See* Rule 15c3-3a.  BLMIS maintained a balance of $20,000 from late 2002 until the Filing Date, which was inadequate given the purported value of its customer accounts.

Standard & Poor's 100 Index.  The fictitious strategy focused on large cap stocks, presumably to preclude inquiry into the volume of stocks in which BLMIS was purportedly trading.  (Looby Dec. ¶ 49).

Madoff's purported strategy included the careful execution of purchases and sales, with the goal of timing the market by purchasing the basket before the prices increased and selling the basket after such time, so as to maximize value.  (Looby Dec. ¶ 50).  Several times a year, customer funds would purportedly move "into the market," which consisted of allegedly "purchasing" a basket of stocks.  Then customer funds were moved completely "out of the market" to purported investments in United States Treasury Bills ("T-bills"), Fidelity money market funds, and cash reserves until the next presumed trading opportunity arose.  At the end of each quarter, all baskets would be sold and invested in T-bills or other money market funds, and cash reserves.  (Id.).  By purporting to liquidate the split-strike security basket positions by quarter end, the equities in the baskets were not required to be disclosed in SEC Form 13F.[8] (Looby Dec. ¶ 55).

BLMIS also concocted a fictitious hedging strategy for the baskets of stock.  BLMIS purported to purchase and sell S&P 100 index option contracts that corresponded to the stocks in the basket, thereby controlling both the downside risk associated with possible adverse price changes in the basket of stocks and limiting profits associated with increases in underlying stock prices.[9]  (Looby Dec. ¶ 48).

---

[8] Institutional investment managers who exercise investment discretion over $100 million or more in Section 13(f) securities must report their holdings on SEC Form 13F to the SEC.  SEC Form 13F requires disclosure of the names of the institutional investment managers, the names of the securities they manage and the class of securities, the CUSIP number, the number of shares owned, and the total market value of each security.  See 17 C.F.R. § 240.13f-1.

[9] BLMIS would have had to execute massive options trades to implement the split-strike conversion strategy it was purportedly using.  Indeed, in many instances, there were not enough put and/or call option contracts available at the Chicago Board Options Exchange ("CBOE") to properly hedge the required volume, and in fact accomplish a split-strike conversion strategy, for the securities positions recorded on the BLMIS customer statements.  Thus, the

None of these investment strategies were ever implemented. The trades, order tickets, customer statements, and other records created in furtherance of the fraud were fabricated. (Looby Dec. ¶ 67). In fact, one of the money market funds in which customer resources were purportedly invested through BLMIS, as reflected on customer statements, was the Fidelity Brokerage Services LLC's "Fidelity Spartan U.S. Treasury Money Market Fund." Fidelity has acknowledged that from 2005 onwards, the organization did not offer participation in any such money market fund for investment. (Looby Dec. ¶ 57).

At no point while customer funds were purportedly either "in the market" or "out of the market," however, were such funds invested as shown on the statements. Instead, they were held in the BLMIS 703 Account at Chase Bank. (Looby Dec. ¶ 56).

To create the illusion that these stocks had been purchased or sold, BLMIS employees would compile historical price (high, low, open, and close) and volume data for each stock selected within the basket. (Looby Dec. ¶ 62). Because they were selecting stocks after the fact, BLMIS employees were able to cherry-pick advantageous historical prices. (Looby Dec. ¶ 63). Hence, the selection process was virtually guaranteeing that the purported trading would appear profitable. As DiPascali stated at his plea hearing, "[o]n a regular basis, [he] used hindsight to file historical prices on stocks then [he] used those prices to post purchase of sales [sic] to customer accounts as if they had been executed in realtime." DiPascali Plea Allocution, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), at p. 47, annexed to the Brown Dec. as Exhibit 2.

With the benefit of backdating, Madoff and his employees at BLMIS were able to consistently "generate" purported annual returns of between 10 and 17% for those customers

"fictitious market" created by BLMIS, as recorded on the customer statements, could not have been replicated in the real market based on this fact alone.

whose funds were purportedly invested in the "split-strike conversion" strategy. (Looby Dec. ¶ 66). The baskets were monitored to ensure that the prices chosen after-the-fact obtained returns that were neither too high nor too low. (Looby Dec. ¶ 65). Because no actual purchases or sales were taking place, and were "transacted" only within the fraudulent "world" of Madoff, BLMIS could engineer the trades on the perfect dates at the best available prices to achieve the targeted rates of return. (Looby Dec. ¶ 66).

### B.    Non-Split-Strike Conversion Customer Accounts

The vast majority of the BLMIS customer accounts were purportedly invested in the split-strike conversion strategy, and DiPascali had primary responsibility for those accounts. The remainder of the customer accounts, however, were not "invested" in the split-strike conversion strategy, and were administered by other BLMIS employees. As of the Filing Date, there were less than 245 active non-split-strike conversion customer accounts at BLMIS, representing approximately 5% of total active BLMIS customer accounts as of the Filing Date. (Looby Dec. ¶ 75). The non-split-strike conversion accounts included long-time customers, such as Stanley Chais, Jeffry Picower's personal and business accounts, and the customer accounts held by various Madoff family members and employees. (*Id.*). Even by BLMIS standards, the non-split-strike conversion accounts reported unusually high rates of return, in excess of the 10-17% "profits" that the split-strike strategy accounts received. (Looby Dec. ¶ 76).

Rather than execute trades using the basket approach simulated by DiPascali, the non-split-strike conversion accounts were handled on an account-by-account basis. (Looby Dec. ¶ 78). This required the manual input of fictitious, backdated transactions to represent each trade that purportedly was executed on behalf of each account, a time-consuming endeavor. (Looby Dec. ¶ 78). As labor-intensive as this may have been, however, it too boiled down to the same fraudulent scheme: the manufacturing of false customer statements based on after-the-fact

selections of stock and related prices using already published trading data.   As with the

DiPascali-managed accounts, and with the exception of a few isolated trades and physical

custody of a very limited number of securities entrusted to BLMIS by certain customers, the

trading represented on the BLMIS customer statements of the non-split-strike conversion

customer account holders did not take place.  (Looby Dec. ¶ 79).

> C.    **Entry Into The BLMIS Fund**

In part due to the cover provided by the market making and proprietary trading desks of

BLMIS, Madoff was extremely successful in soliciting investments from customers.   As a

general rule, customers sent their money to the 703 Account at Chase Bank, with the

understanding that Madoff would invest those funds on their behalf.  However, Madoff failed to

do so.

Entry into the BLMIS IA Business was portrayed, and perceived, as tightly controlled

and granted to a select array of customers.  This aura of exclusivity, akin to membership in an

elite "club," when combined with the secrecy surrounding Madoff's "proprietary trading

strategy," limited the transparency of the IA Business to prospective investors, particularly to the

non-institutional clients such as individual customers.

Upon the opening of their BLMIS customer account, customers signed standardized

customer agreements documents, in which they relinquished all investment authority to "Bernard

L. Madoff."  For example, a standard BLMIS customer agreement titled "Trading Authorization

Limited to Purchases and Sales of Securities and Options," contained terms that authorized

Madoff as the customer's "agent and attorney in fact to buy, sell and trade in stocks, bonds,

options and any other securities in accordance with [Madoff's] terms and conditions."  (Looby

Dec. ¶ 35 , Ex. 3).

Further, customers agreed that, "[i]n all such purchases, sales or trades [Madoff is] authorized to follow the instructions of Bernard L. Madoff in every respect concerning the undersigned's account with [Madoff]; and [Madoff]is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades. All purchases, sales or trades shall be executed strictly in accordance with the established trading authorization directive." (*Id.*).

In essence, customers deposited their cash and were able to make withdrawals upon request, but ceded to Madoff all other rights associated with their accounts, including the authority to make investment decisions. As may be fitting, at least in hindsight, a customer's individual dealings with BLMIS were solely in cash. She deposited cash. She withdrew cash. At no time did any customers, with the exception of one customer, direct the purchase or sale of any specific securities.[10]

### D.    The BLMIS 703 Account

The BLMIS 703 Account at Chase Bank was little more than a "slush fund" for Madoff and the other individuals who benefited from the Madoff Ponzi scheme. Customer funds were deposited into the 703 Account and, when requested, withdrawals were paid to customers from this account. (Looby Dec. ¶ 18). As Madoff stated at his plea hearing, "Up until I was arrested . . . I never invested [customer] funds in the securities, as I had promised. Instead, those funds were deposited in [the 703 Account]. When clients wished to receive the profits they believed

---

[10] The investigation thus far indicates that only one customer engaged in a small number of purchases and sales of specific securities. There were, however, "friends and family" accounts, such as Jeffry Picower, Stanley Chais, et al., which actually directed phony securities transactions for their accounts.

they had earned with me or to redeem their principal, I used the money in the [703 Account] that belonged to them or other clients to pay the requested funds." Madoff Allocution, at p. 24.

Each day, BLMIS employees on the 17th floor prepared reports for Madoff indicating the amount of customer deposits into and withdrawals from the 703 Account. (Looby Dec. ¶ 21). Any net cash balances in this account at the end of each business day were transferred to affiliated overnight investment accounts at Chase Bank to purchase United States Treasuries or other short-term paper until additional monies were needed to fund additional withdrawal requests by customers, capital needs of the broker-dealer operation of BLMIS, or Madoff's (and other insiders') personal needs. (Looby Dec. ¶ 19). Funds were misappropriated from the 703 Account for the benefit of, and to enrich, various individuals associated with BLMIS. *See, e.g.*, Slattery Aff., Dkt. No 197; Complaint against Ruth Madoff, *Picard v. Madoff*, No. 09-1391 (BRL), Dkt. No. 1; Complaint against Madoff Family, *Picard v. Madoff, et al.*, No. 09-1503 (BRL), Dkt. No. 1.

In short, the customer funds sent to BLMIS were simply used to keep the Madoff Ponzi going and, more substantially, to enrich Madoff and his associates, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme. BLMIS was only able to stay afloat as long as it had enough new principal invested by some BLMIS customers to honor requests for withdrawals by other BLMIS customers or their designees, including the withdrawal of funds used to support Madoff, his family, and his close associates in the manner to which they had become accustomed over time. At all times relevant hereto, the monthly purported equity balances of the BLMIS customer accounts far exceeded the amount of capital deposited in the 703 Account. (Looby Dec. ¶ 25).

15

### E.    Generation Of The BLMIS Customer Statements

Unlike the market making and proprietary trading desks, which utilized a "live" trading platform to interface with third party feeds, the fraudulent machinations of the IA Business were conducted using a computer system known as the AS/400, consisting of an IBM computer and custom software programs dating to the early 1990's. (Looby Dec. ¶ 15). Information relating to BLMIS customer accounts was stored in the AS/400 computer, which was located on the 17th floor. (Looby Dec. ¶ 40). The AS/400 was additionally programmed by BLMIS to record the fictitious securities positions allegedly bought and sold, customer cash transactions, prepare BLMIS customer statements, and produce BLMIS trade confirmations. (*Id.*). The AS/400 system was not programmed or enabled to communicate, facilitate, or execute trading of any kind. (Looby Dec. ¶ 41). Because the fictitious trades required no opposite broker to execute, no counterparties existed and no such information was reflected in the AS/400 system. (Looby Dec. ¶ 47). None of the split strike trades entered into the AS/400 were reconciled (or reconcilable) with the Depository Trust & Clearing Corporation ("DTCC"),[11] which serves as a custodian for most stock and government debt securities issued in the United States. (*Id.*).

The AS/400 had software that could be utilized to enter a "basket" of fictitious "trades" with any desired price or trade date that could then be allocated, *pro rata*, to the various BLMIS customer accounts residing within the database. (Looby Dec. ¶ 64). Once a "basket trade" was identified as one that achieved the fictitious return desired, certain employees, known as "key punch operators," were provided with the relevant pricing information that they entered manually into the AS/400 database. The initial basket trade was replicated in each BLMIS customer account automatically and proportionally according to the fraction or number of

---

[11] DTCC, through its subsidiaries, provides clearing, settlement, and information services for equities, corporate and municipal bonds, government and mortgage-backed securities, money market instruments, and over-the-counter derivatives. DTCC records were made available from 2002-2008. (Looby Dec. ¶ 82).

baskets each customer could purportedly afford.   The AS/400 was then used to generate the

BLMIS customer statements and associated trade confirmations that may have been mailed or

otherwise provided to customers in the month following the initial investment of principal and

each month thereafter.   The routine and monthly application of these AS/400 programs, and the

fictitious split strike strategy as applied by BLMIS, compounded customer false profits over and

over again during the course of the Madoff Ponzi scheme (Looby Dec. ¶ 67).

   BLMIS did not provide its customers with electronic real-time online access to their

accounts, which certainly by the year 2000 was customary in the industry.[12]   (Looby Dec. ¶ 37).

Instead, BLMIS utilized technology that was severely outmoded relative to other participants in

the exchange traded equity market to communicate with its clients, such as paper trade

confirmations.   The use of paper statements and confirmations, sent by United States mail,

facilitated the Madoff Ponzi scheme by allowing BLMIS more time to alter trading records and

delay the delivery of information.   (*Id.*).

### F.    Customers Did Not Have Enough Funds To Purchase Securities On Their Statements

   BLMIS used historical information to price the purported purchase of securities, and the

initial BLMIS customer statement reflected purported purchases of stock and/or options

equivalent to the amount of principal invested with BLMIS.   (Looby Dec. ¶ 63).   The following

month, and each month thereafter, the only transactions contained on BLMIS customer

statements that bore any relation to reality were the subsequent cash deposits into and/or cash

withdrawals from the particular customer account.   (Looby Dec. ¶ 71).   Whether or not the

customer conducted any cash transactions, the BLMIS customer statements would reflect

---

[12] Of its thousands of customers, BLMIS provided customer statements in electronic form to two customers, representing only six accounts.  Even though they were electronic, the statements consisted only of data files.  No customer had real time access to her account information and trading data because there was no such data or information to be had, as no trading was actually conducted.  (Looby Dec. ¶ 37 n.3).

purported trading activity and resulting gains on the securities supposedly purchased and/or sold on behalf of customers. (*Id.*). These gains were, at all times, fictional. Although initial deposits made by BLMIS customers may have been sufficient to "cover" the initial fake "purchase" of securities reported on the BLMIS customer statements, without additional customer deposits, any subsequent "purchases" of equal or greater nominal value could generally only be afforded by virtue of the "profits" generated from fictitious sales or returns generated on fictitious securities positions. (Looby Dec. ¶ 69).

In other words, in the case of a customer who made a single initial investment, the customer did not invest sufficient capital or have any real gains or other credits to her account to purchase anything other than any securities of value equivalent to those that were listed on her BLMIS first customer statement.[13] Thus, she did not have sufficient capital for any subsequent purchases of securities, unless additional cash deposits were made. And in the case of customers who deposited additional funds beyond their initial investments, they could afford to purchase securities only in the amount of their net cash investment, as the "profits" were equally fictitious. (Looby Aff. ¶¶ 70, 71).

### G.    BLMIS Customers' Investments Were Never Exposed To The Market

The statements and confirmations sent by BLMIS to its customers were phony, created to further its fraudulent scheme. The transactions depicted on the BLMIS customer statements and confirmations were fake, as the underlying trades had not been executed. The prices "confirmed" on BLMIS trade confirmations and printed on BLMIS customer statements were simply made up by BLMIS after reviewing historic highs and lows for a given prior period, and selecting a result consistent with the desired rate of return. (Looby Dec. ¶ 66). Thus, the

---

[13] Consistent with the fact that the prices selected for the purchase of securities for customer accounts were backdated and manipulated, the customer in most instances did not probably invest adequate capital to purchase even those securities listed on her first BLMIS customer statement. (Looby Dec. ¶ 72).

components of the purported trade, (*e.g.* stock/option, price, date, and volume) could be advantageously determined by BLMIS with knowledge of the previously published price history. The AS/400 computer system used by the IA Business enabled system operators to record such fake trades, on a given date, with a selected price, and print BLMIS customer statements and confirmations that reflected these fictitious trades.  (Looby Dec. ¶ 64).  These transactions were fictitious not only because they did not occur, but because they *could not* have occurred.  Had it been possible, the massive volume of the transactions printed on BLMIS customer statements in aggregate would have had an impact on the market price of the underlying securities purportedly bought or sold by Madoff.  (Looby Dec. ¶ 103).

Because the fraudulent "world" in which the IA Business of BLMIS operated was created by its own sleight-of-hand, and bore no relation to the United States securities market in which it was purportedly transacting business, customer funds were never, at any point, exposed to the uncertainties associated with price movement in the market.  (Looby Dec. ¶ 73).  Instead, customer accounts at BLMIS generally only increased in value, regardless of the realities of investment in the actual market for any particular period because Madoff and his staff were able to fabricate trades after-the-fact.  The fictitious gains depicted on BLMIS customer statements were thus "paper profits" in the truest sense.  These false profits were compounded time and again, through the execution of the fictitious split-strike strategy.  (Looby Dec. ¶ 70).  BLMIS customer statements and confirmations were routinely printed containing the ever-increasing output of this fiction.  (Looby Dec. ¶ 67).

## III.    SIPA and SIPC

### A.    Congress Enacted SIPA To Promote and Protect The Market Economy By Providing Protection To Customers Against Broker Insolvency

Congress's goals in enacting SIPA were to prevent the failure of brokerage houses, restore investor confidence in capital markets after a period of business contraction, and upgrade financial responsibility requirements for registered broker-dealers. *See SIPC v. Barbour*, 421 U.S. 412, 415 (1975). With SIPA, Congress also created SIPC, a nonprofit, private membership corporation to which most registered broker-dealers are required to belong. *See* Section 78ccc of SIPA. The SIPC Fund, a Congressionally-mandated protection program, is authorized under section 78ddd of SIPA and is designed to protect the customers of SIPC member broker-dealers from loss in case of the financial failure of a SIPC-member brokerage house.

As described by the Second Circuit, "[t]he object of [SIPA], and the function of the [SIPC] it created, is to protect the public customers of securities dealers from suffering the consequences of financial instability in the brokerage industry." *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974); *see also SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 980 (2d Cir. 1974) (SIPA "was a legislative effort to reinforce the flagging confidence in the securities market by providing an extra margin of protection for the small investor").

SIPA created a new form of liquidation proceeding applicable only to SIPC member firms and designed to return promptly customer property. *See Barbour,* 421 U.S. at 416. A liquidation under SIPA, however, is essentially a bankruptcy proceeding. *See, e.g.*, *Exch. Nat'l Bank of Chicago v. Wyatt,* 517 F.2d 453, 457-459 (2d Cir. 1975); *In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 74 (Bankr. S.D.N.Y. 1996). Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11," to the

extent that such provisions are consistent with SIPA.  *See* Section 78fff(b) of SIPA; *In re Adler Coleman Clearing Corp.*, 198 B.R. at 74.  Where SIPA is inconsistent with the Bankruptcy Code, however, it is the specific provisions of SIPA that control.  *See* Section 78fff(b) of SIPA. SIPA is supported by "both the bankruptcy provision in the United States Constitution and also by the commerce clause."  *SEC v. Albert & Maguire Sec. Co.*, 378 F. Supp. 906, 911 (E.D. Pa. 1974).

In order to understand the application and interpretation of SIPA today, a brief historical overview is detailed herein.

### 1.    The Chandler Act

Prior to 1938, customers of a bankrupt stockbroker were treated as general creditors if they could not reclaim cash or securities that they could trace into the broker's possession.  *Duel v. Hollins*, 241 U.S. 523, 527-29 (1916).  The reclamation process prior to 1938 lent itself to uneven treatment of customers.  In response, Congress enacted Section 60e of the Bankruptcy Act of 1938,[14] also known as the Chandler Act, to deal with the liquidation of stockbrokers.[15]

The Chandler Act provided that customers of stockbrokers in bankruptcy were to be treated preferentially over other creditors.  Fully-paid securities that were identifiable to the customers as their property, such as by certificate number, could be reclaimed by "cash customers," that is, by customers who had no debit balance and who were entitled to immediate delivery of securities.  *See* Michael E. Don & Josephine Wang, *Stockbroker Liquidations Under the Securities  Investor Protection Act and Their Impact on Securities Transfers*, 12 Cardozo L. Rev. 509, 526 (1990) ("Don & Wang").  Otherwise, customers' cash and securities comprised a "single and separate fund."  *Id.*  Other than specifically identifiable property, the single and

---

[14] A more detailed discussion of section 60e is contained in 3 *Collier on Bankruptcy* ¶¶ 60.73-60.76 (14th ed. 1978).

[15] Chandler Act, ch. 575, § 60e, 52 Stat. 840 (1938) (codified at 11 U.S.C. § 96(e) (1976) (repealed 1979).

separate fund was used to satisfy claims of the "single and separate class of creditors," on a *pro rata* basis, to the exclusion of general creditors. 11 U.S.C. § 96e(2) (repealed 1979).

Claimants who were customers were preferred over other creditors. 11 U.S.C. § 96e (repealed 1979). A person who qualified as a customer received a *pro rata* distribution of the fund according the net equity of his account. "Net equity" was defined by excluding the specifically identifiable securities, and then "subtracting the indebtedness of the customer to the stockbroker from the sum which would have been owing by the stockbroker to the customer had the stockbroker liquidated, by sale or purchase on the date of bankruptcy, the remaining securities or security commitments of the customer." *Id.*

## 2.    SIPA As Enacted In 1970

Because the single and separate fund was usually inadequate to satisfy customer claims, section 60e did not prevent customer losses. Customer losses mounted when the rate of brokerage failures accelerated in 1969 and 1970. At that time, an unprecedentedly high volume of trading resulted in widespread accounting and reporting mistakes at brokerage houses, because the antiquated centralized and backroom systems then in use were unable to keep up with the volume, and costly attempts to implement data processing systems were frequently riddled with problems. Failure to complete trades became common. When a decline in trading volume and price hit in 1969 and continued through the following year, many brokerages failed. *See* Don & Wang, *supra*, at 510-11.

While in a perfect world, securities held by the failed brokers would have been available for recovery, many problems intervened, including pledges of securities (both permitted and wrongful), misappropriations, simple errors, and failures to complete transactions – sometimes even of orders that had been reported to the client as executed (a circumstance referred to as a "bucketed" order). In addition, the process of unwinding the brokerages was a lengthy one. As

a result, many brokerage clients were deprived of their holdings for reasons having nothing to do with their investment acumen, and everything to do with the business woes of their brokerages, a circumstance that many feared would lead to small investors – critical to the economy – shunning the market.  That, in turn, it was feared, would further weaken a system already in crisis because of the interlinked effects of the collapse of each brokerage upon others that dealt with it.  *See* Don & Wang, *supra*, at 521-22.

Congress responded to the crisis by enacting SIPA.  S. Rep. No. 1218 (1970); *see also* H.R. Rep. No. 1613 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5255; *Barbour*, 421 U.S. at 415.  It created SIPC to take oversee the liquidation under SIPA of failed securities brokerage firms. The liquidation would be administered by a court-appointed trustee specified by SIPC.  SIPA was intended to shore up the critical market economy by implementing financial rules to help prevent brokerage collapses in the first place, and by providing greater and swifter protections, especially to the small investor, when such collapses did occur.  One of the paramount features of SIPA is that it created SIPC to advance funds for the protection of customers of financially troubled member broker-dealers.

Like section 60e, SIPA established a "single and separate fund" in which all "customers" in the "single and separate class of creditors" shared *pro rata* and to the exclusion of general creditors.  Thus, those who fit the definition of "customer" under section 60e or SIPA were accorded preferential treatment in the form of a priority over general creditors.  *See Report of Special Study of Securities Markets of the Securities and Exchange Commission*, H.R. Doc. No. 95, pt. 1, at  411-412 (1970).  To the extent customer claims could not be satisfied from the single and separate fund, SIPC funds were used, within the limits of protection, to augment the single and separate fund.

### 3.    SIPA As Amended

In 1978, SIPA was amended[16] to provide greater flexibility to SIPC in satisfying customer claims in an expeditious fashion, and where possible, in kind, with actual securities. The essential elements of a SIPA proceeding remained unchanged.  The concept of a "single and separate fund" was altered to a fund of "customer property," *see* section 78*lll*(4), encompassing a somewhat broader range of assets than the "single and separate fund."   Under the 1978 version, the concept of  "specifically identifiable property" was abolished, and only customers to whom "customer name securities" were owed, that is, securities registered in the customer's name or in the process of registration on the date SIPC filed the application to place the firm into liquidation, section 78*lll*(3), could receive the securities back outright, without regard to the limits of SIPA protection.  *See* section 78*lll*(3).

### 4.    Net Equity Under SIPA

Under section 78*lll*(11) of SIPA, "net equity" is defined in relevant part as "the dollar amount of the account or accounts of a customer, to be determined by . . . (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus (B) any indebtedness of such customer to the debtor on the filing date[.]"  Section 78*lll*(11) of SIPA.   Distributions of customer property are by statute to be made to the customers "ratably  . . .on the basis or to the extent of their respective net equities."  Section 78fff-2(c)(1)(B) of SIPA.

---

[16] SIPA has been amended by Pub. L. No. 94-29, 89 Stat. 163 (1975); Pub. L. No. 95-283, 92 Stat. 249 (1978); Pub. L. No. 95-598, 92 Stat. 2674 (1978); Pub. L. No. 96-433,  94 Stat. 1855 (1980); Pub. L. No. 97-258, 96 Stat. 1067 (1982); Pub. L. No. 97-303, 96 Stat. 1410 (1982); Pub. L. No. 100-181, 101 Stat. 1265 (1987); Pub. L. No. 106-554, 114 Stat. 2763, 2763A-424  (2000); Pub. L. 109-8, 119 Stat. 217 (2005); and Pub. L. No. 109-390, 120 Stat. 2698 (2006).

### 5.    Use Of SIPC Funds To Satisfy Customer Claims

Where a customer has a valid Net Equity claim, and the customer's claim cannot be immediately satisfied from the fund of customer property, SIPC's funds are used, within the limits of protection, to supplement the fund of customer property and hasten the delivery of that property to customers.    Thus, under SIPA, recoveries to customers are accelerated, and supplemented, by having SIPC advance funds to the trustee to distribute to those customers up to the lesser of their Net Equity claims or the dollar limits set out in the Act.    SIPC retains a right of subrogation against these advances should the customer's Net Equity claim eventually be paid in full.    *See* Section 78fff-3(a) of SIPA; *see also McKenny v. McGraw (In re Bell & Beckwith)*, 104 B.R. 852 (Bankr. N.D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991).    Accordingly, a customer's net equity determines the share that each customer will receive of the "customer property" of BLMIS, and the presence or absence of net equity determines whether any SIPC advance can be made.

### 6.    Determination Of Whether Claims Are For Cash Or For Securities

Under SIPA, the limits of protection per customer are $500,000 for cash and securities, of which up to $100,000 may be based on a claim for cash alone.    Section 78fff-3(a) of SIPA.    A customer who has cash in an account nevertheless has a claim for securities as to any authorized securities purchase if the debtor has sent written confirmation to the customer that the securities have been bought for or sold to the customer.    17 C.F.R. § 300.502(a)(1).    Under this rule, "whether a claim is treated as one for securities or cash depends not on what is *actually* in the customer's account but on what the customer has been told by the debtor in written confirmations."    *In re New Times Sec. Servs.*, 371 F.3d 68, 86 (2d Cir. 2004) (hereafter "*New Times I*").    The customer's "legitimate expectations" are the focus of this rule, which makes the cash/securities determination largely dependent upon the receipt of written confirmations.    *See*

*id.* at 75 n.8. Thus, upon written confirmation that an authorized securities purchase has been made, the cash in the customer's account becomes a valid claim for securities. *Id.* Claims for securities are protected by SIPC up to $500,000. Section 78fff-3(a) of SIPA.

Valid claims for cash or securities are satisfied in kind. With respect to securities that are not in the debtor's possession or control, the trustee may purchase them for delivery to the customer so long as there is a fair and orderly market for them. Section 78fff-2(d) of SIPA. If the securities cannot be bought in a fair and orderly market, the customer receives a cash payment based on the market value of the security as of the filing date. Sections 78fff-3(a)(3) & 78fff-2(b) of SIPA. For a variety of reasons, unless a specific fact situation calls for another conclusion, the Trustee and SIPC have treated the claims in this case as subject to the $500,000 limit for claims for securities rather than as claims for cash.

### 7.    The "Books and Records" Requirement

In order to be satisfied by a SIPA trustee, obligations to customers "must be ascertainable from the books and records of the debtor or . . . otherwise established to the satisfaction of the trustee." Section 78fff-2(b) of SIPA.

Numerous customers have pointed to the last fictitious BLMIS customer statement as the only source of "books and records" to support their claims. While the BLMIS customer statements and confirmations received by customers may be construed as part of the debtor's "books and records," the books and records of BLMIS in fact comprise many more sources of information that reflect the actual financial transactions that occurred and that negate the accuracy of the BLMIS customer statements. Relevant books and records include financial records including bank records, annual reports, the DTCC account information, other corporate documents, and customer-related files such as account maintenance folders.

For example, all of the records relating to the BLMIS 703 Account constitute an important part of BLMIS's books and records, as these reflect each BLMIS's customer's deposits and withdrawals from BLMIS during the operation of the Madoff Ponzi scheme. BLMIS also maintained a book that tracked certain customers' cash deposits and withdrawals in the Ponzi scheme. Notably, these "books and records" other than the customer statements indicate that trades were not made on behalf of customers or actually paid for by the customers or a reflection of genuine market activity or pricing.

## IV.    <u>Customer Claimants</u>

For purposes of this motion, customer claimants can be broadly grouped into three categories.[17]    Certain claimants from each of these categories object to the Trustee's Net Equity methodology and, instead, claim that they are due the fabricated amounts shown on their respective fictitious final customer statements.

### A.    "Net Winners"

Under the parlance of this proceeding, a "net winner" is defined as a BLMIS customer that withdrew more funds from BLMIS than the customer deposited with BLMIS. Thus, the customer received payments constituting a full return of her principal investment, plus some amount of fictitious "profits" generated by BLMIS. Although she has already withdrawn all of her principal, along with some amount of fictitious profits (in reality, funds deposited by other customers), the "net winner" customer who objects to the Trustee's methodology is claiming that she is due the fictitious amount fabricated on her final November 30, 2008 BLMIS customer statement.

---

[17] The Cheema Declaration filed herewith sets forth information and data specific to each customer claimant whose customer claim determination the Trustee seeks to affirm in this Motion.

### B.    "Over-the-Limits Net Losers That Have Received Full SIPC Protection"

Under the "cash in/cash out" approach, the customers that fall within the category of "over-the-limits net losers that have received full SIPC protection" are customers that withdrew less money from BLMIS than they deposited over time, and had net investment amounts in excess of $500,000.  They are entitled to an allowed claim for the amount that they invested, less the amount that they have withdrawn from BLMIS.  The difference between the amount invested and the withdrawn amount over time is the customer's Net Equity.  The customer has received or will receive a *pro rata* share of any customer property based upon her Net Equity, and will receive a check from the Trustee of $500,000 from funds advanced by SIPC against her share of customer property.  Although the claims of these investors should be based on their Net Equity as measured by the net amount invested, these claimants assert that the amount of their Net Equity should be equal to the fictitious amounts represented on their final November 30, 2008 BLMIS customer statement.  Some of these claimants also argue that their claim for this last reported fictitious amount should be satisfied in securities and not cash.

### C.    "Under-the-Limits Net Losers That Will Not Receive a Full $500,000 in SIPC Protection"

Like the previous category, customers that fall within this category also have allowable claims because they invested more over time than they withdrew from the fraudulent scheme. The net investment amount is less than $500,000, so their respective SIPC protection is limited to the amount of their respective net investment.  They will not be entitled to a further distribution from the fund of customer property because their Net Equity claim will have been fully satisfied by the SIPC advance, and SIPC will receive the customers' share of customer property as subrogee.  These customers' respective final November 30, 2008 BLMIS customer statements may, however, show a balance higher than $500,000.

## SUMMARY OF ARGUMENT

Certain claimants have taken the position that the Trustee is obligated to look exclusively to the last BLMIS customer statements issued to those claimants by BLMIS as establishing their Net Equity for purposes of SIPA.  This position – which would credit phony transactions that could have never occurred in the marketplace and which would sanction the allocation of the customer fund based upon fraud – is unsupportable as a matter of statute, case law, equity, and public policy.  To allocate customer funds in a Ponzi scheme based upon fictitious gains would require more recent investors to give up a share of their actual dollars invested to benefit earlier investors, whose accounts on paper appear to have accrued additional fictitious profits over time.  At bottom, a distribution in this liquidation, as with all Ponzi schemes, is a zero-sum game.  The "cash in/cash out" methodology is the only approach consistent with prior Ponzi scheme cases, bankruptcy law, the language of SIPA, and equity.

The Net Equity issue impacts all BLMIS customers.  Because the Trustee is dealing with a limited pool of money for *pro rata* distributions, any interpretation of Net Equity that helps one group of customers will hurt others.  The ultimate amounts distributed to customers depends on a number of variables, many of which have yet to be determined.  Regardless of the particular impact on any particular investor, the Net Equity issue is a legal one that must be consistent with and supported by the provisions and policies of SIPA.  Interpretation of Net Equity should not be outcome-determinative, but instead based upon the proper interpretation and reading of the requirements of the law.  Only the "cash in/cash out" approach, and not the last fictitious statement approach, meets this test.

**ARGUMENT**

I.     **The Trustee's "Cash-In/Cash-Out" Calculation Of Net Equity Mirrors The Standard Judicial Treatment Of Ponzi Schemes And Has Been Specifically Upheld Under SIPA.**

While certain claimants advocate for the distribution of customer funds based upon fictitious account statements, well-established case law in Ponzi schemes mandates that distributions be calculated using an investor's net investment – equivalent to the Trustee's "cash in/cash out" methodology here.

       **A.**     **The Standard Treatment Of Ponzi Schemes Is Based On Net Investment.**

The "cash-in/cash-out" method of calculating net equity mirrors how courts generally treat claims and claimants in Ponzi scheme cases. Despite the façade of complexity associated with the BLMIS IA Business, at its core it was a very simple form of deception. The hallmark of a Ponzi scheme is that investors are promised – and shown or actually paid – high returns on some seemingly money-making venture when, in reality, there are no such profits and, often, not even such a venture. Instead, initial investors are paid from monies provided by other later investors. The word of the fake "profits" and the supposedly positive experience of the initial investors serves to bring more funds into the scheme. *See Cunningham v. Brown,* 265 U.S. 1, 13 (1924) (describing the scheme of Charles Ponzi and stressing the importance of treating victims in such a scheme equally).

When faced with the particular circumstances of Ponzi schemes, where there is not enough money to repay all victims in full, courts have routinely taken the position that investors are entitled to share proportionally to their actual losses on dollars invested, not based on the "fictitious" profits, and that funds that they received back during the course of the scheme must be deducted. Such an approach is consistent with the fundamental principle, whether under

equity, bankruptcy, or SIPA, that in any distribution, similarly situated investors must be treated alike in any distribution.

In *Cunningham v. Brown*, the Supreme Court set forth the principle that all investors in a Ponzi scheme must be treated equally and that "equality is equity and this is the spirit of the bankrupt law." 265 U.S. at 13. To recognize fictitious gains would do precisely the opposite – it would unfairly require more recent investors to give up a share of their actual dollars to subsidize earlier investors, whose accounts appeared on paper to have accrued additional fictitious profits. Accordingly, courts generally hold that when a Ponzi scheme collapses, and there is not enough money to repay all the funds invested by victims, the victims should recover proportionately in accordance with their respective actual losses, *i.e.*, their unrecovered cash investments, not their phony inflated profits. *See, e.g., CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115-16 (9th Cir. 2000) (upholding net investment method); *Official Cattle Contract Holders Comm. v. Commons (In re Tedlock Cattle Co.)*, 552 F.2d 1351 (9th Cir. 1977) (per curiam) (investors in Ponzi scheme treated *pro rata* on "cash-in-cash-out" basis, following *Abrams v. Eby (In re Young)*, 294 F. 1 (4th Cir. 1923) (claimant who received back amount of his initial investment could not share in remaining funds until he had accounted for false profits, which had been paid at expense of other equally innocent investors)); *CFTC v. Equity Fin. Group, LLC*, No. Civ. 04-1512, 2005 WL 2143975, at *22-24 (D.N.J. Sept. 2, 2005), *adopted in* No. Civ. 04-1512, 2005 WL 2864783 (D.N.J. Oct. 26, 2005) (*pro rata* distribution based on initial investment, with previously paid "profits" offset); *SEC v. Funding Res. Group*, No. 3-98-CV-2689-M, 2004 WL 1189996 (N.D. Tex. May 27, 2004), *adopted as modified*, No. Civ.A 398CV2689M, 2004 WL 1882972 (N.D. Tex. Aug. 20, 2004) (in equity receivership arising out of Ponzi scheme, no claim or further recovery allowed to "victim" who had already received back more than he had paid in); *Focht v.*

*Athens (In re Old Naples Sec., Inc.)*, 311 B.R. 607, 616-17 (M.D. Fla. 2002) (*citing SIPC v. C.J. Wright & Co. (In re C.J. Wright & Co.)*, 162 B.R. 597, 609-10 (Bankr. M.D. Fla. 1993)) (Ponzi-scheme participants in SIPA case are entitled to receive amount invested less any payments received, not fictitious profits); *SEC v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395, 2000 WL 1752979, at *40-41 (S.D.N.Y. Nov. 29, 2000), *aff'd*, 290 F.3d 80 (2d Cir. 2002) (*pro rata* recoveries are based on investment losses and not on paper profits); *CFTC v. Franklin,* 652 F. Supp. 163, 169-70 (W.D. Va. 1986)*, rev'd on other grounds sub nom. Anderson v. Stephens,* 875 F.2d 76 (4th Cir. 1989) (pro rata distribution based on initial investment).  *But cf.  SEC v. Byers*, 08 Civ. 7104, --- F.Supp.2d ----, 2009 WL 2185491, at *14 (S.D.N.Y. Jul. 23, 2009) (approving plan using "net investor method," under which cash distributions received prior to SEC's lawsuit were added to total amount invested to form starting point for *pro rata* distribution).

In *SEC v. Credit Bancorp, Ltd.*, 2000 WL 1752979, the district court was presented with competing distribution proposals in a Ponzi-scheme receivership.   The court set forth two rationales for adopting a net investment approach instead of a fictitious profits approach:  First, the court held "it is in the nature of a Ponzi scheme that customer returns are generated not from legitimate business activity but, rather, through the influx of resources from new customers.  'Since all the funds were obtained by fraud, to allow some investors to stand behind the fiction that [the] Ponzi scheme had legitimately withdrawn money to pay them 'would be carrying the fiction to a fantastic conclusion.'"  *Id.* at *40 (*quoting Teletronics, Ltd. v. Kemp*, 649 F.2d 1237, 1241 (7th Cir. 1981) (*quoting Cunningham v Brown,* 265 U.S. at 13)).  As a result, "permitting customers to retain such gains comes at the expense of the other customers."  *Id.*  Second, the court continued, "recognizing claims to profits from an illegal financial scheme is contrary to

public policy because it serves to legitimate the scheme." *Id.* (internal citations omitted).  Both

of these rationales apply equally to this case.

> **B.      The "Cash In/Cash Out" Methodology Has Been Applied To Prior Ponzi
> Schemes Under SIPA.**

Consistent with the body of case law holding that the proper method for valuing claims in

Ponzi schemes is based on an investor's net investment, courts have upheld the net investment

method in Ponzi scheme liquidations under SIPA.

In *In re Old Naples Securities*, 311 B.R. 607, the district court was confronted with facts

similar to those here.  The court held that a net investment approach, not a fictitious-statement

approach, was the proper way to calculate a customer's net equity in an investment Ponzi scheme

case.  The court noted that "permitting claimants to recover not only their initial capital

investment but also the phony 'interest' payments they received and rolled into another

transaction is illogical.  No one disputes that the interest payments were not in fact interest at all,

but were merely portions of other victims' capital investments."  *In re Old Naples Sec., Inc.*, 311

B.R. at 616-17.  The court further held that if the promised fictitious returns were upheld, "the

fund would likely end up paying out more money than was invested in [the] Ponzi scheme."  *Id.*

at 617.  "This result is not consistent with the goals of SIPA, which does not purport to make all

victimized investors whole but only to partially ameliorate the losses of certain classes of

investors."  *Id*.  *In re Old Naples Securities* was cited with approval by the Second Circuit in

*New Times I,* 371 F.3d 68, discussed more fully below.

> **C.      Fictitious Profits Paid Out In Ponzi Schemes Are Recoverable.**

Not only do courts generally make distributions in Ponzi scheme cases based on original

investments net of return payments, they uphold the use of fraudulent conveyance principles to

recover payments in excess of the net amounts paid in to the scheme to prevent earlier

participants in Ponzi investment schemes from profiting at the expense of later investors.  *See,*

*e.g., Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir.), *cert. denied*, 129 S. Ct. 640 (2008) (in

Ponzi-scheme cases, "the general rule is that to the extent innocent investors have received

payments in excess of the amounts of principal that they originally invested, those payments are

avoidable as fraudulent transfers . . . ."); *Sender v. Buchanan* (*In re Hedged-Investments Assoc.,*

*Inc.*), 84 F.3d 1286, 1290 (10th Cir. 1996) (allowing bankruptcy trustee in Ponzi scheme case to

recover payments in excess of investor's investment on fraudulent conveyance grounds); *Scholes*

*v. Lehmann*, 56 F.3d 750, 757-58 (7th Cir. 1995) (receiver in Ponzi-scheme case could recover

transfers to investors in excess of investors' actual payments into the scheme); *Merrill v. Abbott*

(*In re Indep. Clearing House Co.*), 77 B.R. 843, 869-70 (D. Utah 1987) (payouts of false Ponzi

scheme profits avoidable as fraudulent transfers); *Bayou Accredited Fund, LLC v. Redwood*

*Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 843, 854, 860 (Bankr. S.D.N.Y.

2008) (awarding debtor summary judgment in fraudulent conveyance cases against investors

who had closed out Ponzi scheme accounts; as to claimants establishing issue of fact as to good

faith defense, recovery by the debtor is limited to payments made in respect of fictitious profits);

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R.

624, 636 (Bankr. S.D.N.Y. 2007) ("Plaintiffs are correct in asserting in their brief that virtually

every court to address the question has held unflinchingly that to the extent that investors have

received payments in excess of the amounts they have invested, those payments are voidable as

fraudulent transfers.") (internal quotations omitted); *In re Taubman*, 160 B.R. 964, 986-88

(Bankr. S.D. Ohio 1993) (allowing trustee of Ponzi scheme estate to avoid payments of "false

profits" by debtor to investor because such payments were fraudulent transfers); *Lawless v.*

*Anderson* (*In re Moore*), 39 B.R. 571, 574-75 (Bankr. M.D. Fla 1984) (payment to Ponzi scheme

victim in excess of investment was fraudulent transfer recoverable by chapter 7 trustee of Ponzi-scheme estate).

Indeed, in enacting SIPA, Congress specifically granted SIPA trustees the power to avoid fraudulent transfers. *See* section II(D) *infra*, at p. 46; *see also* Section 78fff-2(c)(3) of SIPA ("[T]he trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11"). Thus, as in other Ponzi cases, the Trustee here is empowered to avoid "false profits" obtained by certain investors for the benefit of all customers.

> **D.    The Second Circuit's Decision In *New Times I* Supports The Trustee's Methodology**

In various filings, certain claimants have asserted that the Trustee's interpretation of net equity is inconsistent with the decision of the Second Circuit in *New Times I*, 371 F.3d 68  To the contrary, *New Times I* not only supports the Trustee's interpretation, it is a logical extension of the body of law developed concerning Ponzi schemes and prior SIPA decisions.

> **1.    *New Times I* Held That Customers Have Claims For Securities Where They Receive Confirmation Statements And That Net Equity Claims In A Ponzi-Scheme Case Should Not Be Based Upon Fictitious Profits**

The *New Times* litigation involved a Ponzi scheme in which investors were fraudulently induced to purchase three sets of securities: (i) fake promissory notes that did not fall under the SIPA definition of "securities," (ii) real mutual funds that were never purchased despite being otherwise represented on customer statements, and (iii) nonexistent money market funds. Instead of investing these customers' funds as represented, the debtors misappropriated the money. *See New Times I*, 371 F.3dd at 71-72.

The *New Times* trustee determined that those customers who invested in the non-existent money market funds had "claims for cash," eligible for SIPC protection of up to $100,000.  Their

claims were valued according to the amount paid to the debtors to purchase the bogus shares, less any withdrawals or redemptions by the claimants. Thus, amounts shown as interest or dividends on the bogus funds were not included in the calculation of their claim. *Id.* at 71, 73-75. Meanwhile, investors who were misled to believe that they were investing in mutual funds that in reality existed – but whose funds were never actually invested – were deemed to have "claims for securities," eligible for SIPC protection of up to $500,000. *Id.* at 71, 74-75.

The claimants that purchased the nonexistent money market funds objected to the trustee's determination of their claims.[18] They set forth two bases for their objection: "(i) the Trustee's determination of their claims as cash claims, and (ii) his refusal to compensate them for interest and dividend reinvestments." *Id.* at 74. The district court agreed with the claimants as to both issues, and the trustee appealed.

The Second Circuit upheld the district court's determination that the claimants had claims for securities, not claims for cash. *Id.* at 71, 87. The SEC, the trustee, and SIPC had different positions on appeal with respect to whether the non-existent money market fund customers had claims for cash or for securities. The trustee and SIPC viewed the claims as cash claims because there were no securities to liquidate on the filing date. The SEC, on the other hand, contended that the claimants should be treated as having securities claims despite the fact that the securities were fictitious because they received confirmations and customer statements from the debtors.

The Second Circuit held that the claimants had securities claims because they had received written confirmations of transactions and because the SIPC Series 500 Rules sought to protect their legitimate expectations that they had purchased securities. This reasoning was

---

[18] The *New Times I* decisions only dealt with those investors that purchased the imaginary money market funds. The Trustee's determinations as to the claims of those investors that paid for existing mutual funds that were never purchased were not objected to.

"more in line with the goals of the statute and with the legislators' intent in introducing the securities/cash distinction . . . ." *New Times I*, 371 F.3d at 87.

The Second Circuit reversed the district court's holding that Net Equity claims should be based upon imaginary paper profits (fictitious interest and dividend reinvestments) that were listed on the customer statements. *Id.* at 71, 87-88. The Second Circuit upheld the joint position of SIPC and the SEC that net equity should be based upon the net cash invested in the scheme, not upon the fictitious interest and dividend reinvestments set forth on their customer statements. The Court agreed that basing recovery on fictitious interest was "irrational and unworkable" and that to base customer recoveries on "fictitious amounts in the firm's books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality." *Id.* at 88. The Court thus held that Net Equity should be based upon the claimant's initial cash investments and should not include "the artificial interest or dividend reinvestments reflected in the fictitious account statements that the Claimants received from the Debtors." *Id.*

### 2.    SIPA Does Not Protect Customer Expectations In Fictitious Profits.

Certain customer claimants, in arguing that they are entitled to the fictitious profits listed on their BLMIS customer statements in valuing their Net Equity, have asserted that any other result is contrary to their "legitimate expectations." In doing so, they have conflated the two distinct holdings of *New Times I* interpreting SIPA.

The Series 500 Rules, and the *New Times I* decision interpreting those Rules, credit a customer's legitimate expectation that securities have been purchased on her behalf. Under those Rules, a customer has a legitimate expectation – and thus a claim for securities (as opposed to a claim for cash) – where she received confirmations showing that securities had been purchased for her, whether or not such securities had actually been purchased. Accordingly, the customer is treated as having a claim for securities rather than cash and is entitled to receive up to the full

$500,000 securities advance limit of SIPC protection (as opposed to the $100,000 limit had it been a claim for cash).  *See New Times I*, 371 F.3d at 86; *see also* 17 C.F.R. § 300.501(a).  This is what the Trustee has done in this case.

But the Series 500 Rules do not speak to the expectation – legitimate or not – that the customer has actually earned the fictitious profits shown on her fraudulent customer statements. The Series 500 Rules treat confirmation statements as relevant only to the issue of whether it is a cash claim or a securities claim, and *New Times I* does not hold otherwise.

Unlike the trustee in the *New Times* litigation, who initially attempted to treat some customers as having claims for cash rather than claims for securities, the Trustee here is satisfying all customer claims as though they were claims for securities.  As a result, each BLMIS customer who received a statement showing securities held for her by BLMIS on the Filing Date is eligible to have her claim satisfied by the Trustee with up to $500,000 provided to her by SIPC, based on the value of her Net Equity.  Therefore, the legitimate expectations of a BLMIS customer – that she has a claim for securities – has been satisfied.  Thus, the Trustee is allowing and satisfying claims in accordance with the dictates of *New Times I* and has endeavored to treat customers as fairly and as generously as the statute and relevant case law will allow.

But to read into SIPA a requirement that a customer's expectations that she has earned the fruits of the Ponzi scheme must be validated would run afoul of SIPA, the Trustee's power to avoid fraudulent transfers, and the net investment method of asset distribution embraced by courts confronted by Ponzi schemes.  It would improperly legitimize Madoff's fraud by allocating funds based upon the "success" of one's participation in that fraud.  It would allow the fraudster, not the markets, to determine who wins and who loses.  And it would embrace

fictitious, backdated trades effectuated only in Madoff's fraudulent "world" that have no relation to reality or the normal functioning of the marketplace. That cannot be the law.

It bears noting that under SIPA, valid claims for securities are satisfied in kind where there is a fair and orderly market for them. Section 78fff-2(d) of SIPA. If the securities cannot be bought in a fair and orderly market, the customer receives a cash payment based on the market value of the securities as of the filing date. Sections 78fff-3(a)(3) & 78fff-2(b) of SIPA. Here, even though the Trustee has deemed claims in this liquidation proceeding as claims for securities, he cannot satisfy those claims with the securities listed on the last BLMIS customer statements for a variety of reasons. First, because of the substantial number of "buys" and "sells" purportedly occurring over a long period of time in any single account, it is impossible to trace a customer's "real" money to any particular securities. (Looby Dec. ¶ 72). In fact, as set forth above, other than the amount of her initial investment of principal, no customer ever had enough actual funds to purchase the securities listed on her last BLMIS customer statement. Because the particular securities that were actually paid for by a customer are unidentifiable, no market price can be ascertained. (Looby Dec. ¶ 73).

Second, even if the particular securities that the customer purchased were somehow identifiable, because none were ever bought, the Trustee's purchase of them now would wreak havoc in the marketplace. Given the large volume of securities and options involved, there is no "fair and orderly" market in which to purchase them, even assuming that the funds in the customer account were sufficient to do so. *See* Section 78fff-2(b) of SIPA.

In sum, the Trustee has allowed valid customer claims in this liquidation to be partially satisfied up to the full $500,000 SIPC advance limit for claims for securities, thereby satisfying the customers' "legitimate expectations" in accordance with the statute and relevant case law.

3.    **Because BLMIS Created Fictitious Transactions In A Fictitious Market, Customer Claims Should Not Include Paper Profits That Have No Relation To Reality.**

The Second Circuit's holding in *New Times I* that Net Equity should be valued according the claimants' net investment, without regard to any bogus interest or dividend reinvestments in the fake mutual funds in which their funds were purportedly invested, applies equally here. *New Times I,* 371 F.3d at 88. Just as in *New Times I*, to base Net Equity here on fictitious customer statements that bear no relationship to the actual securities markets would allow "customers to recover arbitrary amounts that necessarily have no relation to reality." *Id.* at 88. The securities listed on BLMIS customer statements were neither bought nor sold, and no profits were ever realized on any securities transactions. The BLMIS customer statements were merely fictitious vehicles used to deceive customers into believing that they were making certain rates of return in order to perpetuate Madoff's Ponzi scheme.

When viewed in their totality, the factual underpinnings of the fraud as executed by Madoff demonstrate that BLMIS customers most closely resemble those investors in *New Times I* whose customer statements reflected investments in imaginary mutual funds, who also sought to recover fictitious profits. First, as with imaginary mutual funds, the securities positions reflected in BLMIS customer statements could not have been purchased as shown on the statement because the fictitious trades were concocted *after the fact* based on historical prices. *See* DiPascali Plea Allocution, at p. 47. The purchases and sales reflected on customer statements could not have been obtained in the market, but only through the fictitious backdating and historical analysis utilized by BLMIS. (Looby Dec. ¶ 60). This made not just the trades, but the entire market, fictitious.

The transactions were impossible for other reasons as well. On certain days, BLMIS "confirmed" to customers the purchase of stock or options that, in the aggregate, totaled more

than the total volume of such securities or options traded that day on listed exchanges. (Looby Dec. ¶ 100). Moreover, BLMIS customers did not have enough actual monies in their accounts to permit "purchases" of the securities shown on the final fictitious BLMIS customer statements. (Looby Dec. ¶ 71). To do so would have been in clear violation of the margin rules. *See* 12 C.F.R. § 220.1. Certain securities listed on the BLMIS customer statements did not exist; some customer statements showed investments (while purportedly "out of the market") in Fidelity Spartan U.S. Treasury Money Market Fund as late as 2008, despite the fact that Fidelity has not offered a fund by that name since 2005. (Looby Dec. ¶ 57). And the fictitious BLMIS customer statements sometimes showed securities bought and sold outside the price range that the securities traded on a given day. (Looby Dec. ¶ 106).

Thus, the BLMIS customer statements reflect ex post facto paper justifications for resulting fictitious profits, based upon an after-the-fact examination of the movements that stocks had taken from day to day, and even based upon investments in illusory funds. These "transactions" thus were not subject to any of the risks of the market, because these "transactions" were mere collections of fictitious backdated trades. This made the market itself, like the trades, fictitious. As with the imaginary mutual fund investors in *New Times,* to credit customers for these fake BLMIS "transactions" would effectuate fictitious trades in a fictitious marketplace and not reflect the actual risks associated with investing in securities.

It is true that for claimants who believed that they had invested in "real" mutual funds in *New Times*, the trustee calculated net equity based upon the "earnings" on those investments as represented on their customer statements. But those claimants are far different from the BLMIS claimants. In *New Times*, those customers were defrauded because legitimate securities that they ordered and paid for were never actually purchased. The subsequent "earnings" of those

securities in the marketplace, as reflected on the customers' customer statements, were real, ascertainable, un-manipulated, and subject to market risks. These customers' securities (although they had not been purchased) behaved "on paper" the way the actual securities performed in the marketplace. (*See* Brown Affidavit, Ex. 3, p. 7 n.6). Based on their statements, these customers received only what those securities would have earned had they been purchased as represented, whether those investments increased or decreased in value. In other words, Net Equity was based upon the profits that investors would have achieved in the market *but for* the fraud.

Here, in contrast, the objecting claimants desire their net equity to be based upon profits they "earned" only *as a result* of the fraud – by crediting imaginary transactions manufactured after the fact from historical prices to justify particular levels of returns promised to investors. The purported transactions had no relationship to the marketplace, nor could they have.

Moreover, there is no way to know what the customers would have purchased under legitimate circumstances with the funds actually available to them, were they doing anything other than delegating those decisions entirely to Madoff. Given that the transactions were backdated, the BLMIS customer statements did not and could not reflect securities transactions that were actually contemplated by BLMIS customers. Indeed, the final fictitious BLMIS customer statements did not represent the growth of long-term holdings over time, as Madoff purported to regularly cash out the stock positions of his customers. Accordingly, the net cash value of the BLMIS customer investments is the best proxy for the value of securities that the BLMIS customers might have purchased had BLMIS not been a Ponzi scheme.

Another key distinction between those *New Times* investors who believed that they had purchased real mutual funds and BLMIS customers is that the *New Times* investors paid for their

securities.   The definition of "net equity" under SIPA requires the Trustee to offset securities positions with the "indebtedness of such customer to the debtor on the filing date."   Section 78*lll*(11) of SIPA.   Thus, inherent in the definition of Net Equity is that securities actually be paid for by the customer.

BLMIS customers, in contrast to *New Times* investors in real mutual funds, did not pay for the securities reflected on their BLMIS customer statements, except to the extent of their net cash investments.   (Looby Dec. ¶ 72).   Because BLMIS customers should not be permitted to pay for real securities with fictitious and manipulated profits, in order to receive the securities listed on their final fictitious BLMIS customer statements, customers would have to pay the astronomical sum reflecting the difference between the value of the securities positions reflected on their BLMIS customer statements and what those customers actually paid in to the fraudulent BLMIS scheme.   Accordingly, the net cash value of the BLMIS customer investments is the best measure of Net Equity.

Given the absence of "securities positions" in the BLMIS customer accounts at all, much less ones that legitimately reflected a fair and orderly marketplace in securities, Net Equity cannot be calculated based upon the amounts set forth in these final fictitious BLMIS customer statements.   As a result, the Trustee has calculated Net Equity based upon the only ascertainable property that was custodied with the broker-dealer by or for the claimants and is attributable to the claimants – the actual cash that these customers deposited with BLMIS, net of the amount that these customers withdrew.   This is the result that comports with SIPA.

Moreover, objecting claimants here seek securities positions that, although they exist in name, do not exist in sufficient volume such that the securities can be purchased in a "fair and orderly" market to be returned to the customers.   Like the *New Times I* investors who

"purchased" imaginary mutual funds – transactions which could not have ever been effected –

the transactions purportedly conducted by BLMIS could not – and cannot – have been effected in

the volumes indicated on the final customer statements in a fair and orderly market.  They could

only, and did only, exist within the confines of the fraudulent world of BLMIS.

For each of these reasons, as between calculating Net Equity based upon the fictitious

securities positions set forth in the final fictitious BLMIS customer statements or based on the

"cash-in/cash-out" method, only the latter is consistent with *New Times I.*

II.    **The Trustee's "Cash in/Cash out" Methodology Is The Only One Consistent With
       SIPA**

    A.    **The Fictitious Customer Statements Do Not Reflect Real "Securities
          Positions"**

Under section 78*lll*(11), "net equity" requires "calculating the sum which would have

been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the

filing date, all securities positions of such customer (other than customer name securities

reclaimed by such customer)[.]"

The claimants contend that their last account statements show their "securities positions."

But, as described above, the claimants have no real securities positions, as Madoff (with a few

inconsequential exceptions) did not purchase and sell the securities reflected on BLMIS

customer statements.  Thus, Net Equity cannot be based upon those statements.

    B.    **The "Books and Records" Requirement Precludes Claims Based Upon
          Fictitious Profits**

In order to be satisfied by a SIPA trustee, obligations to customers "must be ascertainable

from the books and records of the debtor or . . . otherwise established to the satisfaction of the

trustee."  Section 78fff-2(b) of SIPA.  A claim for cash or securities based on fictitious trades

does not establish a broker's obligation to a customer under SIPA to the satisfaction of the

trustee where the records otherwise demonstrate that the position has been purportedly "bought" with fictitious dollars. In such a circumstance, the Trustee must be able to ascertain to his satisfaction the actual obligation to a customer.

While the BLMIS customer statements are one aspect of BLMIS's books and records, those particular records are false. The other books and records of BLMIS, in contrast, confirm that none of the transactions reflected on those BLMIS customer statements were actually consummated, nor could they have been. The only hard numbers available to the Trustee, viewing the books and records of BLMIS as a whole, are the amounts of cash invested and withdrawn. (Looby Dec. ¶ 24).

### C.    "Customer" Claims Cannot Be Based On Fraudulent Transactions.

The Trustee's methodology is also the only one consistent with the definition of "customer." While a claimant is a "customer" under SIPA if, as here, she entrusts her cash for the purchase of securities, *see SIPC v. Bernard L. Madoff Inv. Sec., LLC*, 401 B.R. 629, 635 (Bankr. S.D.N.Y. 2009), she has no claim as a "customer" to the particular securities set forth on her BLMIS customer statement unless the purchase of those securities occurred in the broker-dealer's "ordinary course of business." *See* Section 78*lll*(2) of SIPA ("customer" defined as person with a "claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer"). Transfers to investors in furtherance of a Ponzi scheme from other investors' accounts are not in a broker's "ordinary course of business." *See Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Investments Assocs.)*, 48 F.3d 470, 475-76 (10th Cir. 1995); *Wider v. Wootton*, 907 F.2d 570, 572 (5th Cir. 1990); *Danning v. Bozek* (*In re Bullion Reserve of N. Am.*), 836 F.2d 1214, 1219 (9th Cir. 1988); *see also Official Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 462 (Bankr. S.D.N.Y. 2007) (ordinary course of business

defense to preference action unavailable to investors in Ponzi schemes because "the ordinary business terms of investment companies does not include payment to early investors of profits fraudulently derived from later investors rather than from legitimate business activity").

Thus, while a claimant is a customer for purposes of the cash she entrusted to BLMIS to purchase securities, she cannot be a customer for claims to particular securities whose purported "purchase" was made in furtherance of Madoff's Ponzi scheme. Accordingly, just as the Trustee's methodology with respect to Net Equity values cash deposited but not transfers made in furtherance of the Ponzi scheme, the definition of "customer" recognizes claims for cash deposited with the intent to purchase securities, but not claims based upon fictitious transactions.

**D.    The "Cash In/Cash Out" Method Is The Only One Consistent With The Trustee's Power To Avoid Fraudulent Transfers Under SIPA And Other Applicable Law.**

The Trustee's "cash-in/cash-out" method is the only one consistent with the Trustee's authority under section 78fff-2(c)(3) and SIPC Rule 503 to avoid fraudulent transfers. The Trustee has authority under SIPA to recover property constituting a fraudulent transfer when, as here, customer property is not sufficient to pay in full the claims of customers. *See* Section 78fff-2(c)(3) of SIPA ("the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11"); *see also Picard v. Taylor (In re Park South Securities LLC)*, 326 B.R. 505, 512 (Bankr. S.D.N.Y. 2005) (SIPA trustee has standing to avoid fraudulent transfers).

The SIPA Rules, which have the force of law, *see In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 275 (Bankr. S.D.N.Y. 1996), provide similarly. SIPC Rule 503, which governs voidable transactions, states that "[n]othing in these Series 500 Rules shall be construed as limiting the rights of a trustee in a liquidation proceeding under the Act to avoid any securities

transaction as fraudulent, preferential, or otherwise voidable under applicable law." 17 C.F.R. § 300.503(a). The rules further provide that "[n]othing in these Series 500 Rules shall be construed as limiting the right of the Securities Investor Protection Corporation . . . to reject a claim for cash or a claim for securities if such claim arose out of a securities transaction which could have been avoided in a liquidation proceeding under the Act." 17 C.F.R. § 300.503(b).

As the Trustee can act to recover fraudulent transfers, Net Equity should not be based upon the final fictitious BLMIS customer statements, which contained fictitious securities purchases that did not involve a reasonably equivalent exchange of value. Indeed, these powers of the Trustee – as specifically granted to him by Congress under SIPA and the Bankruptcy Code – are in direct contrast to the claimants' theory that their net equity should be valued as of the date of their last BLMIS customer statement. If the claimants' construction of net equity were upheld, in contrast, the Trustee would have the obligation to allocate customer property based upon the fictitious world created by Madoff's Ponzi scheme, but simultaneously retain the authority to avoid transactions and recover property transferred in furtherance of that same fraudulent scheme. Net Equity should not be read to credit the very transactions that the Trustee would be able to avoid under SIPA and the Bankruptcy Code. That cannot be the law.

Indeed, case law developed in prior Ponzi-scheme cases is to the contrary, upholding trustees' use of fraudulent-transfer principles to recover fictitious profits. *See* section I(C), *supra*, at p. 33. Other cases not involving Ponzi schemes hold similarly. For example, in *SEC v. S.J. Salmon & Co.*, 72 Civ. 560, 1973 U.S. Dist. LEXIS 15606 (Aug. 8, 1973), the district court upheld the trustee's right in a SIPA case to reject claims based upon transactions made by a broker in anticipation of liquidation because the transactions were fraudulent transfers. The district court rejected the notion that the prices set forth on the customers' account statements

should prevail because, the court held, those prices could not actually have been secured in the market. As the court held, "market quotations are not conclusive evidence and must give way before other evidence. The evidence in the instant case clearly shows that market value had no relationship to reality . . . ." *Id.* at *32. The court further rejected the argument that SIPA's provisions somehow negated the law of fraudulent transfer: "SIPA was not intended to make the fraudulent transfer provisions of the Bankruptcy Act inoperative as to stockbroker-debtors in SIPA proceedings. While SIPA was intended to protect customers there is nothing in its provisions to indicate that less preferred creditors are to be denied the protection of the provisions which bar a debtor from making fraudulent transfers at their expense." *Id.* at *31.

In addition to fraudulent transfer actions, trustees can also seek to avoid fictitious trades and transfers as illegal contracts under federal and state securities laws as well as common-law fraud – all of which apply with equal force here. *See, e.g., Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 247 B.R. 51, 134 (Bankr. S.D.N.Y. 1999), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001) (upholding rescission of trades as illegal contracts under Section 10(b) of the Securities Exchange Act of 1934, the criminal provisions of SIPA, 15 U.S.C. § 78j(b), the Martin Act, N.Y. Gen. Bus. L. § 352 (McKinney 2009) and common-law fraud principles); *Securities & Exchange Commission v. Packer, Wilbur & Co.*, 362 F. Supp. 510 (S.D.N.Y. 1973), *aff'd*, 498 F.2d 978 (2d Cir. 1974) (claim of an investor denied under SIPA because the investor had tried to buy stock without any actual cash investment in violation of securities rules).

Indeed, to give effect to the final fictitious customer statements would improperly allow certain claimants to benefit from the fraud of their agent at the expense of others. Pursuant to the relevant customer agreements, BLMIS customers gave full discretion to Madoff to "trade" securities on their behalf. (Looby Dec. ¶ 35). To the extent the claimants wish to give effect to

the transactions reflected on their BLMIS customer statements at the expense of other innocent parties, they would be improperly attempting to benefit from their agent's fraud. "Under New York agency law, the principal may not accept the fruits of the agent's fraud and then attempt to divorce himself from the agent by repudiating the agent and his knowledge," even if the principal has no knowledge of the fraud and no fraudulent intent. *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 454 (S.D.N.Y. 2001). The court in *Jackson* upheld the trustee's right to rescind or avoid the challenged trades on this and other grounds.

Because the Trustee would have the right to avoid or rescind transfers made pursuant to Madoff's scheme, even if the claimants had no knowledge of the fraud, SIPA cannot be read to give force to the "legitimate expectations of the bargains of . . . concededly fraudulent transactions[.]" *Jackson* at 433. To the contrary, the bankruptcy court in *Ensminger* observed that it would "not permit the Claimants to reap the benefits of the fraud" of the broker. 247 B.R. at 127. *See also Stafford v. Giddens (In re New Times Secs. Servs.),* 463 F.3d 125, 130 (2d Cir. 2006) ("treating . . . fictitious paper profits as within the ambit of the customers' 'legitimate expectations' would lead to the absurdity of 'duped' investors reaping windfalls as a result of fraudulent promises made on fake securities").

### E.    Customers Must Have Valid Net Equity Claims Before They Are Entitled To SIPC Protection.

Some customers contend that because their BLMIS customer statements show securities held for them on the Filing Date, despite the fact that they have negative Net Equity based on the "cash in/cash out" method, they are entitled to the $500,000 of SIPC protection. This is incorrect.

As discussed above in Part III of the Statement of Facts, SIPA and its statutory predecessors are limited in nature. In order to receive a distribution in a SIPA liquidation, the

claimant must be a "customer" and must have a valid claim of Net Equity as those terms are defined under SIPA. Only then are customers entitled to share in "customer property," and, if their *pro rata* share from such customer property is insufficient to fully satisfy their "net equity," receive a SIPC advance of that property. *See* Sections 78fff-2(b),(c)(1) & 78fff-3(a) of SIPA.

Because this was a Ponzi scheme, the only source of monies in the fund of "customer property" under SIPA that can be distributed is other customers' money. To the extent that a "net winner" customer has already withdrawn all of her principal from BLMIS, whether wittingly or unwittingly, she has nothing left to lay claim to in the fund of customer property because she has already received her share of that fund. In fact, she has received even more – dollar for dollar - as opposed to "net losers" who will, for the most part, not be fully repaid. Therefore, the only customers that are still entitled to share in the fund of customer property are those who have not recovered the funds they actually invested with Madoff. To calculate net Equity upon anything other than "cash in/cash out" method, given the source of the fund of customer property, is to suggest that some other resource exists to infuse cash into the fund of customer property, which consists solely of cash actually invested by customers.

Various claimants may look to funds advanced by SIPC as an alternative source. But entitlement to a SIPC advance arises only when a customer can show that she is entitled to share in the fund of customer property – *i.e.,* by having a valid Net Equity claim. Only those customers that have not received the return in full of their principal are entitled to share in the fund of customer property, and thus only those customers are entitled to a SIPC advance (and even then, only those customers that are not fully satisfied from the fund of customer property). There can be no SIPC advance without a valid Net Equity claim.

**III.**    ***Visconsi v. Lehman Brothers* Does Not Support The Objectors.**

Certain of the claimants suggest that *Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007

WL 2258827 (6th Cir. 2007), supports their interpretation of Net Equity.  In *Visconsi*, victims of

a fraudulent investment scheme perpetrated by a Lehman Brothers broker sued Lehman Brothers

for fraud.  The Sixth Circuit upheld an arbitrator's award of an amount that was less than a third

of the amount shown on the fictitious statement but substantially in excess of the cash-in/cash-

out method.

*Visconsi* has no bearing on the meaning of Net Equity.  *Visconsi* was a tort lawsuit

against a then-solvent entity, Lehman Brothers, in which the victims sought to make themselves

whole for the fraud perpetrated against them by their broker, and in which they could do so

without necessarily detrimentally impacting any other victim.  This case, by contrast, is a

liquidation proceeding under SIPA against an insolvent entity in which limited customer funds

are available for distribution.  The damages that may have been recoverable in the *Visconsi* case

are not equivalent to Net Equity under SIPA.  SIPA was designed to give certain claimants of

insolvent brokerages a preferential claim against those limited customer funds and protect

customers against brokers' misappropriation of their assets.  It was *not* designed as a substitute

for fraud or breach of contract claims, was never intended to make all customers whole from

broker fraud, and does not guarantee the results of artificial inflation of those assets by fraudulent

manipulation.  *See, e.g., Arford v. Miller (In re Stratton Oakmont, Inc.)*, 239 B.R. 698, 701-02

(S.D.N.Y. 1999), *aff'd*, 210 F.3d 420 (2d Cir. 2000) ("SIPA does not protect against all cases of

alleged dishonesty and fraud."); *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1317 n.4 (2d

Cir. 1976) (*quoting SEC v. Packer, Wilbur & Co.*, 498 F.2d at 983) ("SIPA was not designed to

provide full protection to all victims of a brokerage collapse."); *SIPC v. Charisma Sec. Corp.*,

371 F. Supp. 894, 899 n.7 (S.D.N.Y.) (general contract and fraud claims not included in umbrella

of SIPA protections), *aff'd*, 506 F.2d 1191 (2d Cir. 1974); *SEC v. S.J. Salmon & Co.*, 375 F.

Supp. 867 (S.D.N.Y. 1974) (investor's claim for rescission on account of fraudulent inducement

was not a protected customer claim under SIPA); *In re Adler Coleman Clearing Corp.*, 195 B.R.

at 273 ("SIPC's role in a SIPA liquidation is limited by statute; it does not attempt to make all

customers whole."); *see also In re Brentwood Sec., Inc.*, 925 F.2d 325, 330 (9th Cir. 1991) (SIPA

"does not comprehensively protect investors from the risk that some deals will go bad or that

some securities issuers will behave dishonestly").

## IV.  Basing Net Equity Upon Fictitious BLMIS Customer Statements Would Be Inequitable And Make For Poor Public Policy.

Calculating net equity based upon fictitious transactions is not only inconsistent with

SIPA; it is also inequitable.  As noted in *Cunningham*, 265 U.S. at 13, in a Ponzi scheme, as

among equally innocent victims, "equality is equity."  In a scheme such as Madoff's, although

many of the victims, individually, are sympathetic, the fact remains that there are limited funds

to distribute.  As in all Ponzi schemes, the investors who obtained "profits" were paid using the

money of other investors, and the latter should not be made to suffer disproportionately.

Treating the phony "profits" concocted in the fraudulent world of Madoff's Ponzi scheme as real

would reward claimants who have already received back all their capital, at the expense of those

who lost everything.   Each customer's gain in fictitious profits on their BLMIS customer

statement would result in another person's loss of actual cash invested.  A slavish adherence to

the final ficitious customer statement – in spite of all of the evidence demonstrating the falsity of

those statements with respect to securities transactions – permits Madoff to determine who wins

and loses.  Doing so would be contrary to the strong consensus among courts that have dealt with

Ponzi scheme distributions that a net investment approach is the most equitable means to allocate

limited resources among equally deserving victims.   *See* Section I(A), *supra*, at p. 30.

To allocate limited resources based upon the final fictitious BLMIS customer statements would also be bad public policy.  The position of the objecting claimants amounts to this:  if a broker-dealer pretends to have purchased securities in fictional transactions with imaginary money at orchestrated prices that are impossible under normal and orderly functioning of the markets, the SIPA trustee and SIPC may not look behind the pretense but must pay out money and assets as if each supposed transaction were a real and normal part of the legitimate securities commerce of this country.  In other words, the objecting claimants would have the obligations of the SIPA trustee and SIPC, a quasi-public entity, determined solely by the fantasies of a fraudster.  Nothing in the language of SIPA or case law dictates such a result.

## CONCLUSION

Certain claimants have suggested that the Trustee include an interest factor when calculating a customer's "cash-in/cash-out" figure to reflect the various entry points of investors in Madoff's lengthy scheme.  Whether and to what extent such a calculation is appropriate is not before the Court in this briefing, nor are other particular nuances of the "cash-in/cash-out" method.

Regardless of the outcome of these later determinations, the fact remains that only the "cash-in/cash-out" method hews to the letter and spirit of SIPA, case law, public policy, and the equities of this case, as well as common sense.  For the reasons set forth above, the Court should affirm the Trustee's determination of net equity based upon the "cash-in/cash-out" method.

Dated:  New York, New York
      October 16, 2009

Of Counsel:

Baker & Hostetler LLP
3200 National City Center
Cleveland, Ohio 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
Thomas D. Warren
Email: twarren@bakerlaw.com
Wendy J. Gibson
Email: wgibson@bakerlaw.com

Respectfully submitted,


/s/ David J. Sheehan
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Defendant Irving H. Picard,
Trustee for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and Bernard L.
Madoff*