Marjorie Forrest, Trustee
12100 SW Keating Drive
Port Saint Lucie, FL 34987
(772)345-3773
marlen84@earthlink.net
Trustee for the Levy GST Trust
Dtd 3/14/02 FBO Francine Levy



RECEIVED
DEC 11 2009
U.S. BANKRUPTCY COURT, SDNY

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
        Defendant.
--------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S
DETERMINATION OF
CLAIM**

The Levy GST Trust dtd 3/14/02 FBO Francine Levy, Marjorie Forrest, Trustee

(the 'Trust"), having been granted a 30 day extension by the Trustee, Irving H. Picard

(see Exh. A), hereby objects to the Notice of Trustee's Determination of Claim dated

November 10, 2009 and states as follows:

**Background facts**

    1.    The Trust opened an account with Bernard L. Madoff Investment

Securities LLC ("Madoff"): Account No. 1ZB450 (the "Account") on December 31,

2002.

    2.    According to the Trustee, during the period from December 31, 2002

through December 11, 2008, $1,216,051.44 was deposited into the Account and

$438,700.00 was withdrawn from the Account. However, the Trustee is only crediting the

Account with deposits of $197,255.72. See Exh. B at 4 – 5. The Trustee is not fully

crediting the Account with transfers from Madoff Account Nos. 1ZB38730, 1ZB30730, 1ZB30830, and 1ZB30630 (the "Transferor Accounts"). The Trust disputes the Trustee's calculations.

3.     Throughout the period of the Account's existence, taxes were paid annually on the appreciation in the Account. Throughout the period of existence of the Transferor Accounts, approximately $1,588,309 was paid in estate taxes and $1,578,000 was paid in income taxes, all based upon the values reflected on the statements received by the account owners from Madoff.

4.     The November 30, 2008 market value of securities in the Account was $1,693,909.17.

5.     On January 16, 2009, the Trust sent a SIPC claim to Picard asserting a claim for securities in the amount of $1,693,909.17 based upon the November 30, 2008 Madoff statements.

6.     On November 10, 2009, Picard sent the Trust a determination letter (the "Determination Letter") with respect to the Account, rejecting the claim for securities based upon the November 30, 2008 balance and stating that the Trust had no claim in the Madoff bankruptcy case because the Trust had withdrawn from the Account $241,444.28 in excess of the funds deposited, disregarding all appreciation in the Account from inception and failing to credit the full amount of the transfers into the Account. See Exh. B at 1-2.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

1.      The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that the Trust did not have a "legitimate expectation" that the balance on the Account statement represented its property. In fact, in each year of the investment, the Trust paid short term capital gains tax on the appreciation in the Account. It would not have done so if the Trust had any belief whatsoever that the assets in the Account did not belong to it.

2.      Picard has failed to state a basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . .meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at * (B.S.D.N.Y. Jan. 13, 2003).

**B. Picard has violated the requirement that he honor a customer's "legitimate expectations"**

3.      The legislative history of SIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
>
>          *                *                *

A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

4.      SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

5.      Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

6.      Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's

general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

7.    As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

## C. Without legal authority, Picard has invented his own definition of "net equity"

8.      SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

9.      SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

10.      The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

11.      In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize investors' claims only for the amount of their net investment,

disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who have depended upon their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

12. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

13. Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

14. After almost 12 months of his tenure, Picard has identified only two Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. Picard has sued two Madoff customers, Stanley Chais and Jeffry Picower who, Picard has alleged, took out of Madoff $7.2 billion more than they invested. Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

15.     However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

16.     The Trust, like thousands of other investors, received monthly statements from Madoff indicating returns on the Madoff investment in the range of 9 – 14% per year, subject to short term capital gains tax rates. The Trust had entered into standard brokerage agreements with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Trust had specified, numbered accounts for the purchase and sale of securities; it received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. The Trust paid taxes on the annual growth of the investments with Madoff. There is no basis to claim that the Trust did not have a "legitimate expectation" that the assets reflected on the Trust's statements sent by Madoff belonged to the Trust.

17.     Thus, the Trust is entitled to a claim for $1,693,909.17, the November 30, 2008 balance on the Account as reflected on the Madoff statement.

**D. The Trust is entitled to prejudgment interest on its investment and profits.**

18.     At a minimum, under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted the Trust's funds, it is also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.S.* Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest.");

*Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

19.     Although it is not legally relevant, Picard cannot prove that Madoff earned no money on the Trust's investments. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which the Trust and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

20.     In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g., Donell v. Kowell,* 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.,* No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi,* Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id.*

*Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

### E. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit

21.     In derogation of his fiduciary duty to the Trust, Picard is, in effect, imposing upon the Trust a fraudulent conveyance judgment for sums that the Trust withdrew from the Account, and for sums that were transferred into the Account, beyond the statute of limitations period applicable to fraudulent conveyances. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Trust of SIPC insurance and the claim to which the Trust is absolutely entitled.

22.     Moreover, the Transferor Accounts had sums withdrawn from them to pay estate taxes to the federal government, as required by the Internal Revenue Code, and to pay income taxes. But for the false statements sent by Madoff, taxes would not have been due on the purported profits in these accounts.

23.     Picard has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for Picard to utilize the avoidance powers of a trustee to enrich SIPC at the Trust' expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g.,* 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008);

*see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

24. Here, however, Picard is not acting to assure equal distribution among prepetition creditors. On the contrary, he is simply acting as SIPC's agent in depriving the Trust of the $500,000 in SIPC insurance to which the Trust is statutorily entitled.

**F. Picard has violated SIPA by delaying the payment of SIPC insurance**

25. Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace the Trust' securities up to a value of $500,000 as valued on the November 30, 2008 statement.

**Conclusion**

The Trust is entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of $500,000 as of November 30, 2008,

The Trust is entitled to have its claim recognized in the amount of $1,693,909.17, consistent with the November 30, 2008 statement.

The Trust is entitled to judgment against Picard and Baker & Hostetler LLP for the damages it has suffered as a result of the breach of fiduciary duty of Picard and his counsel.

December 7, 2009

*Marjorie Forrest, ttee*

Marjorie Forrest, Trustee
Levy GST Trust
Dtd 3/14/02
FBO Francine Levy

12100 SW Keating Dr.
Port Saint Lucie, FL 34987
(772)345-3773

# EXHIBIT A



RECEIVED

DEC 1 1 2009

U.S. BANKRUPTCY COURT, SDNY

Levy GST Trust dtd 3/14/02 FBO Francine Levy

**From:** Picard, Irving H.
**To:** marlen84@earthlink.net
**Date:** 11/16/2009 5:39:09 PM
**Subject:** RE: Marjorie Forrest IRA reference 349/R13297/BM2DOM -CHANGE OF
ADDRESS

---

Dear Ms. Forrest:

Yes, you can have an additional 30 days to object.   I will follow up with the claims processing group to take care of the address change for all the accounts.

Irving H. Picard, Trustee

---

**From:** Marge & Len Forrest [mailto:marlen84@earthlink.net]
**Sent:** Monday, November 16, 2009 4:59 PM
**To:** Picard, Irving H.
**Subject:** Re: Marjorie Forrest IRA reference 349/R13297/BM2DOM -CHANGE OF
ADDRESS

Dear Mr. Picard,

Today, 11/16/09, I received a determination letter from you that was dated 11/10/09 and mailed to my old address, despite repeated requests to have my address changed and assurance by you that it was taken care of.

The determination letter is regarding the *Levy GST Trust dtd 3/13/02 FBO Francine Levy*. The Madoff account number was ZB450.

I would appreciate an extension of the 30 days for my written opposition, should I decide to file one.

I would also appreciate it if you would, again, direct all pertinent parties to communicate with us at the correct address.

Just in case any other letters have been mailed, I want to be perfectly clear that we have received **only** 1) *The Leonard Forrest Revocable Trust,* Madoff account number ZA013 which was mailed to both the new and the old address and 2) the above referenced *Levy GST Trust FBO Francine Levy,* Madoff account number ZB450 which was mailed only to the old address.

If any other letters have been mailed to us (including for ZB305, ZB451, ZB113,

ZR004 and the indirect account referenced on the subject line above) we have not received them.

Thank you for your assistance.

Marjorie Forrest

----- Original Message -----
From: Picard, Irving H.
To: marlen84@earthlink.net
Sent: 9/27/2009 2:41:03 PM
Subject: Re: Marjorie Forrest IRA reference 349/R13297/BM2DOM -CHANGE OF ADDRESS

Ms. Forrest:

To be sure there is no misunderstanding, I have now referred all four of your e-mails directly to Alix Partners requesting the address correction.

Irving H. Picard, Trustee

----- Original Message -----
From: Marge & Len Forrest <marlen84@earthlink.net>
To: Picard, Irving H.
Sent: Sun Sep 27 15:32:37 2009
Subject: Marjorie Forrest IRA reference 349/R13297/BM2DOM -CHANGE OF ADDRESS

Dear Mr. Picard,

In reference to my claim for my IRA account, invested indirectly in Madoff through Harmony Partners Ltd, with FISERV acting as fiduciary, I have previously notified SIPC via email and telephone of my change of address.

I am still getting correspondence at my old address in Boca Raton. Most recently, the legal notice to customers regarding the 'Net Equity " issue went to the wrong address and was delayed in getting to me. I am concerned that my US Mail forwarding will expire and important documents will be lost.

I am appealing to you to make certain that all mail concerning my claim in regard to Bernard L. Madoff Investment Securities be properly addressed and mailed to:

Marjorie Forrest

12100 SW Keating Dr.
Port Saint Lucie, FL 34987

New home telephone number: (772)345-3773.
Same cell number: (561)715-2037.

Respectfully,
Marjorie Forrest

---

This email is intended only for the use of the party to which it is
addressed and may contain information that is privileged,
confidential, or protected by law. If you are not the intended
recipient you are hereby notified that any dissemination, copying
or distribution of this email or its contents is strictly prohibited.
If you have received this message in error, please notify us immediately
by replying to the message and deleting it from your computer.

Internet communications are not assured to be secure or clear of
inaccuracies as information could be intercepted, corrupted, lost,
destroyed, arrive late or incomplete, or contain viruses. Therefore,
we do not accept responsibility for any errors or omissions that are
present in this email, or any attachment, that have arisen as a result
of e-mail transmission.

---

This email is intended only for the use of the party to which it is
addressed and may contain information that is privileged,
confidential, or protected by law. If you are not the intended
recipient you are hereby notified that any dissemination, copying
or distribution of this email or its contents is strictly prohibited.
If you have received this message in error, please notify us immediately
by replying to the message and deleting it from your computer.

Internet communications are not assured to be secure or clear of
inaccuracies as information could be intercepted, corrupted, lost,
destroyed, arrive late or incomplete, or contain viruses. Therefore,
we do not accept responsibility for any errors or omissions that are
present in this email, or any attachment, that have arisen as a result
of e-mail transmission.

# EXHIBIT B



ECEIVE

DEC 1 1 2009

U.S. BANKRUPTCY COURT, SDNY

Levy GST Trust dtd 3/14/02 FBO Francine Levy

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

November 10, 2009

Levy GST Trust dtd 3/14/02 FBO Francine Levy
Marjorie Forrest, Trustee
622 Boca Marina Court
Boca Raton, Florida 33487

Dear Levy GST Trust dtd 3/14/02 FBO Francine Levy/Marjorie Forrest, Trustee:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1ZB450 designated as Claim Number 000698:

Your claim for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $438,700.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $197,255.72). As noted, no securities were ever purchased by BLMIS for your account. Any and

---

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($241,444.28) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

**Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.**

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after November 10, 2009, the date on which the Trustee mailed this notice.

2

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

3

| DEPOSITS | | | |
|---|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 12/31/2002 | TRANS FROM 1ZB38730 | $369,857.88 | $197,255.72 |
| 12/31/2002 | TRANS FROM 1ZB30730 | $343,157.62 | $0.00 |
| 12/31/2002 | TRANS FROM 1ZB30830 | $348,255.00 | $0.00 |
| 12/31/2002 | TRANS FROM 1ZB30630 | $154,780.94 | $0.00 |
| **Total Deposits:** | | $1,216,051.44 | $197,255.72 |

| WITHDRAWALS | | | |
|---|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 4/1/2003 | CHECK | ($5,000.00) | ($5,000.00) |
| 7/1/2003 | CHECK | ($3,500.00) | ($3,500.00) |
| 10/1/2003 | CHECK | ($3,500.00) | ($3,500.00) |
| 12/17/2003 | CHECK | ($5,000.00) | ($5,000.00) |
| 4/1/2004 | CHECK | ($52,000.00) | ($52,000.00) |
| 6/1/2004 | CHECK | ($9,100.00) | ($9,100.00) |
| 7/1/2004 | CHECK | ($5,500.00) | ($5,500.00) |
| 9/1/2004 | CHECK | ($9,100.00) | ($9,100.00) |
| 10/1/2004 | CHECK | ($5,500.00) | ($5,500.00) |
| 1/3/2005 | CHECK | ($5,500.00) | ($5,500.00) |
| 1/3/2005 | CHECK | ($6,600.00) | ($6,600.00) |
| 2/17/2005 | CHECK | ($18,000.00) | ($18,000.00) |
| 4/1/2005 | CHECK | ($4,500.00) | ($4,500.00) |
| 4/1/2005 | CHECK | ($5,500.00) | ($5,500.00) |
| 5/18/2005 | CHECK | ($9,200.00) | ($9,200.00) |
| 7/1/2005 | CHECK | ($5,500.00) | ($5,500.00) |
| 8/23/2005 | CHECK | ($14,700.00) | ($14,700.00) |
| 10/3/2005 | CHECK | ($5,500.00) | ($5,500.00) |
| 12/21/2005 | CHECK | ($13,200.00) | ($13,200.00) |
| 1/3/2006 | CHECK | ($8,000.00) | ($8,000.00) |
| 4/3/2006 | CHECK | ($6,000.00) | ($6,000.00) |
| 4/3/2006 | CHECK | ($8,000.00) | ($8,000.00) |
| 6/1/2006 | CHECK | ($8,300.00) | ($8,300.00) |
| 7/3/2006 | CHECK | ($8,000.00) | ($8,000.00) |
| 9/1/2006 | CHECK | ($9,800.00) | ($9,800.00) |
| 10/2/2006 | CHECK | ($8,000.00) | ($8,000.00) |
| 1/2/2007 | STOP PAYMENT | $12,200.00 | $12,200.00 |
| 1/2/2007 | CHECK | ($10,000.00) | ($10,000.00) |
| 1/2/2007 | CHECK | ($12,200.00) | ($12,200.00) |
| 1/2/2007 | CHECK | ($12,200.00) | ($12,200.00) |
| 4/2/2007 | CHECK | ($10,000.00) | ($10,000.00) |
| 4/2/2007 | CHECK | ($33,900.00) | ($33,900.00) |
| 6/1/2007 | CHECK | ($12,400.00) | ($12,400.00) |

| | | | |
|---|---|---:|---:|
| 7/2/2007 | CHECK | ($3,300.00) | ($3,300.00) |
| 7/2/2007 | CHECK | ($13,000.00) | ($13,000.00) |
| 9/4/2007 | CHECK | ($12,400.00) | ($12,400.00) |
| 10/1/2007 | CHECK | ($13,000.00) | ($13,000.00) |
| 1/2/2008 | CHECK | ($16,000.00) | ($16,000.00) |
| 1/2/2008 | CHECK | ($19,400.00) | ($19,400.00) |
| 4/1/2008 | CHECK | ($16,000.00) | ($16,000.00) |
| 6/2/2008 | CHECK | ($5,400.00) | ($5,400.00) |
| 7/1/2008 | CHECK | ($10,000.00) | ($10,000.00) |
| 8/11/2008 | CHECK | ($9,200.00) | ($9,200.00) |
| **Total Withdrawals:** | | ($438,700.00) | ($438,700.00) |
| | | | |
| **Total deposits less withdrawals:** | | $777,351.44 | ($241,444.28) |