MILBERG LLP
Jonathan M. Landers
Matthew Gluck
Brad N. Friedman
Sanford P. Dumain
Jennifer L. Young
One Pennsylvania Plaza
48th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

SEEGER WEISS LLP
Stephen A. Weiss
Christopher M. Van de Kieft
Parvin K. Aminolroaya
One William Street
New York, NY 10004
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br>Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation |
| In re<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |

**REPLY BRIEF IN OPPOSITION TO ARGUMENTS OF THE SEC AND THE OPTIMAL ENTITIES SUPPORTING TRUSTEE'S MOTION RELATING TO "NET EQUITY" ISSUE**

Pursuant to the Court's September 16, 2009 Order Scheduling Adjudication of "Net Equity" Issue [Dkt. No. 437], Objecting Claimants Norton Eisenberg, Harold A. Thau, The Aspen Company, Stephen R. Goldenberg, Bernard Seldon, Martin Rappaport, Ann Denver, Orthopaedic Specialty Group P.C., Paul J. Robinson, Jerry Guberman, Anita Karimian, Albert J. Goldstein U/W FBO Ruth E. Goldstein, Export Technicians Inc., and Judith Rock Goldman (collectively "Customers") submit this Reply Memorandum of Law in response to the:

1) Statement of Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited in Support of Trustee's Motion Relating to "Net Equity" Issue ("Optimal Brief") [Dkt. No. 1051]; and

2) Memorandum of the Securities and Exchange Commission Supporting Trustee's Determination That Net Equity Should Not Be Based on Securities Positions Listed on Last Statements, and Supporting in Part Trustee's Determination That Net Equity Should Be Based Upon Amounts Deposited Less Amounts Withdrawn ("SEC Brief") [Dkt. No. 1052].

Although the Customers object to all of the arguments raised in the foregoing briefs, the discussion herein is generally limited to opposing arguments not previously raised in connection with the "net equity" dispute, in accordance with the Court's September 16, 2009 Order.

* * * * * * * * * *

The Securities Investor Protection Act ("SIPA") was designed to protect customers' reasonable expectations, which are generally derived from customers' brokerage account statements. *See* Customers' Memorandum of Law in Opposition to Trustee's "Net Equity" Motion at 20-27, 31-36 (filed Nov. 13, 1009) ("Customers' Net Equity Brief") [Dkt. No. 785]. As such, the Customers' respective "net equity" amounts should be based upon their final BMIS account statements, which best reflect what BMIS "owed" the Customers on the filing date in accordance with SIPA's definition of "net equity," SIPA's goal of protecting customers'

reasonable expectations, SIPC's practices in other SIPA liquidations, and applicable case law. *See id*. at 16-46.

As discussed below, the arguments raised by the Securities and Exchange Commission ("SEC") and Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited (collectively, the "Optimal Entities") in support of the Trustee's "cash in/cash out" claims calculation approach must be rejected in favor of the reasonable expectations approach required by SIPA and applicable case law.

## I. The Internally Inconsistent Statutory Construction Advanced by the SEC and the Optimal Entities Contradicts SIPA's Language and Purpose.

The SEC argues that the reasonable expectations approach, which has been applied in prior SIPA liquidations, is now improper because SIPA purportedly requires the Trustee to satisfy customer claims based on the "books and records of the debtor." SEC Brief at 3 (quoting 15 U.S.C. § 78fff-2(b)). Because BMIS's books and records show that BMIS did not purchase the securities set forth on the Customers' BMIS account statements, the SEC argues, the Customers' claims must be denied to the extent they include purportedly fictional earnings. *Id*. Similarly, the Optimal Entities argue that because the Customers' securities "did not exist" because Madoff never purchased them, the Customers' claims must be limited to their principal deposits. Optimal Brief at 3-4.

These arguments demonstrate precisely why the Trustee's novel cash in/cash out approach cannot be the proper interpretation of "net equity." In any Ponzi scheme or theft case, customer account statements will not reflect how the fraudster actually used customer funds, but they will reflect customer expectations. If the debtor's internal "books and records" exclusively dictated the calculation of customer claims, customer expectations would never be considered. This cannot be the case, because it is well-established that SIPA was designed to protect

customers' reasonable expectations where customer funds are stolen rather than invested. *See, e.g.*, S. Rep. No. 95-763, at *2 (stating that SIPA would protect "customer expectations" where securities were "never purchased"); Brief of SIPC, *Stafford v. Giddens (In re New Times Secs. Servs., Inc.)*, No. 05-5527, 2005 U.S. 2d Cir. Briefs LEXIS 259, at *23-24 (Dec. 30, 2005) ("[R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality. [W]here a claimant orders a securities purchase and receives a *written confirmation* statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation *and therefore generally is entitled to recover those securities . . . even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund the purchase*.") (emphasis added). The Customers' BMIS account statements are the best evidence of the Customers' reasonable expectations,[1] not internal BMIS records, which the Customers have never seen and which may be incomplete or inaccurate.

Moreover, in *New Times*, relied upon heavily by the SEC and the Optimal Entities, customer claims were based on customers' final account statements depicting ownership of existing mutual funds that were never purchased, not the debtor's "books and records." Trustee MOL at 41 ("It is true that for claimants who believed that they had invested in 'real' mutual funds in *New Times*, the trustee calculated net equity based upon 'earnings' on those investments as represented on their customer statements.") [Dkt. No. 525]. Neither the SEC nor the Optimal

---

[1] In addition to sending customers account statements, BMIS provided customers Form 1099s, setting forth the "earnings" upon which they "owed" income taxes. Unlike most brokerage accounts, wherein capital gains are not realized until the investment positions are closed (often many years into the future), BMIS's purported "split-strike conversion" strategy resulted in customer investment positions generally being closed out at the end of each month, annually triggering capital gains reporting and tax payment obligations. The Form 1099s further

Entities explain why BMIS's internal books and records should exclusively govern the calculation of customer claims here, while in *New Times*, the fraudster's books and records were deemed not dispositive.

Moreover, calculating the Customers' claims based exclusively on BMIS's internal books and records is contrary to SIPA's "net equity" definition. SIPA defines "net equity," in pertinent part, as:

> the dollar amount of the account or accounts of a customer, to be determined by --
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated . . . on the filing date, all [of the customer's] securities positions; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

15 U.S.C. § 78lll(11). In other words, a customer's "net equity" is the amount the broker owes the customer on the filing date, less any amounts the customer owes the broker. *Id.* This definition includes no reference to the "books and records of the debtor" as a basis for calculating customer claims, as customer account statements best reflect what the debtor promised the customer, not the debtor's internal books and records. Instead, the reference to the "books and records of the debtor" is contained in Section 78fff-2(b), which governs the Trustee's obligations in satisfying customer claims, *not the amounts of those claims, which are governed by the definition of "net equity."* *See* 15 U.S.C. § 78fff-2(b) ("[T]he trustee shall promptly discharge . . . all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the

---

demonstrate that customers reasonably believed that their investments were earning income on their investments.

account of such customer . . . insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee.”). There is no basis for reading SIPA’s reference to the “books and records of the debtor” as a broad limitation on SIPA’s net equity definition.

The arguments raised by the SEC and the Optimal Entities are also contradicted by the Series 500 Rules, promulgated by SIPC, which the SEC had the authority to reject or amend. *See* 15 U.S.C. § 78ccc(e) (providing that the SEC may “require SIPC to adopt, amend, or repeal any SIPC bylaw or rule, whenever adopted”). The Series 500 Rules provide that a customer has a claim for securities “[w]here the Debtor held cash in an account for a customer [and] the Debtor has sent *written confirmation* to the customer that the securities in question have been purchased for the customer’s account.” 17 C.F.R. § 300.502(a) (emphasis added). “[U]nder SIPC’s rules it is not performance that is critical, but receipt of written confirmation of sale. This is clear from the Rules themselves.” *In re Investors Ctr., Inc*., 129 B.R. 339, 350 (Bankr. E.D.N.Y. 1991).

In light of the Series 500 Rules, the cash in/cash out approach supported by the SEC and the Optimal Entities is internally inconsistent in that the Customers clearly have claims for securities because they received written confirmations that securities were purchased, yet the SEC and the Optimal Entities urge that these claims for securities should be limited to the amount of the customers’ principal deposits. Yet, under this rationale, customer account statements would dictate the *type* of claim (i.e. cash versus securities), but not the *amount* of the claim. “As a general principle of statutory construction, an interpretation that produces . . . inconsistencies or that works to negate legislative intent must be avoided.” *See, e.g., Rosen ex*

*rel. Egghead.com, Inc. v. Brookhaven Capital Mgmt. Co.*, 113 F. Supp. 2d 615, 626 (S.D.N.Y. 2000).

Finally, it must be noted that the SEC is urging the Court to reduce customer claims based on the very "books and records of the debtor" that the SEC failed to investigate, despite numerous warnings. *See* Executive Summary, Investigation of Failure of SEC to Uncover Bernard Madoff's Ponzi Scheme at 22, Case No. OIG-509 ("[D]espite numerous credible and detailed complaints, the SEC never properly examined or investigated Madoff's trading and never took the necessary, but basic, steps to determine if Madoff was operating a Ponzi scheme."). Congress passed SIPA "on the presumption that SEC regulation [would] ensure that proper *books and records* exist and that property has been properly segregated." H.R. Rep. No. 95-595, at *267 (Sept. 8, 1977) (emphasis added). As the SEC has failed to fulfill its role in this statutory framework, its arguments against the Customers are entitled to little, if any, weight.

## II. The SEC's Analysis of *New Times* Supports the Reasonable Expectations Approach

In discussing the application of *New Times* to this case, the SEC concedes that "a customer's initial cash investment could be said to have 'paid' for the initial equity securities 'purchases' in the [customer] account[s]" while all "subsequent 'purchases' were made with fictitious dollars" and were "divorced from the uncertainty and risk of trading." SEC Brief at 4, 8. In other words, the SEC acknowledges that a BMIS customer's initial "purchase" of securities is no different from the *New Times* fact pattern, which involved customers who thought they purchased and held well-known mutual funds (which in actuality were never purchased). *See* SEC Brief at 5 n.2 ("While the *New Times* books and records would have shown that no securities were ever purchased, the customers would have met the alternate condition of showing to the satisfaction of the trustee that they deposited funds to pay for the real mutual fund

securities that should have been in their accounts.”). Despite this admission that the Customers’ initial account statements reflected existing securities, which could have and should have been purchased, the SEC fails to explain why the Trustee should not be required to replace those initial securities or provide customers their cash value.

The only difference between this case and *New Times* is that the *New Times* investors were apparently “holders” of mutual funds that were never in fact purchased, while in this case, BMIS engaged in continuous “trading” of securities that were never in fact purchased. This is a distinction without a difference. The SEC’s argument that the phony mutual fund “purchases” in *New Times* were somehow subject to market risks, SEC Brief at 4, while BMIS’s phony securities “purchases” were not, borders on the absurd. In both cases, the securities were never purchased but customers reasonably expected that they were. There is no statutory or policy reason not to honor those reasonable customer expectations.

## III. The Optimal Entities’ Attempt to Protect their Settlement Has No Relevance to the Net Equity Issue

The Optimal Entities ask the Court to approve the Trustee’s cash in/cash out methodology because the Optimal Entities entered into a May 2009 settlement with the Trustee, approved by the Court on June 16, 2009, based on the Trustee’s “cash in/cash out” calculation. Optimal Brief at 2; Order Approving Settlement [Dkt. No. 270]. The settlement provides, in part, that the Optimal Entities shall return 85% of the amounts of certain alleged preference payments to the BMIS estate in exchange for allowed claims of certain specified amounts. *See* Motion for Entry of Order Approving Settlement Between Trustee and Optimal Entities (May 26, 2009) [Dkt. No. 219]. The Optimal Entities ask the Court to approve the Trustee’s cash in/cash out approach over the reasonable expectations approach because the reasonable expectations approach would purportedly increase the total amount of claims against the BMIS

estate, thus reducing the Optimal Entities' proportionate recovery on their allowed claims. Optimal Brief at 2. The Optimal Entities' request should be rejected, because the Optimal Entities knew that the net equity issue was in dispute, yet the Optimal Entities entered into the settlement with the Trustee without addressing the possibility that the Court would reject the cash in/cash out approach.

By May 2009, numerous customers had filed objections to the Trustee's cash in/cash out approach, such that the Optimal Entities knew or should of known that the propriety of the cash in/cash out approach would be litigated. The Optimal Entities could have addressed the uncertainty of the net equity issue in their settlement agreement with the Trustee. Their failure to do so is no basis for urging the Court to approve the Trustee's cash in/cash out approach, particularly given that the Customers and thousands of other claimants have continued to bear the risk that the Court's ruling on the net equity issue will be unfavorable. *See, e.g.*, *In re HHG Corp.*, No. 01-11982, 2006 Bankr. LEXIS 768, at *8 (Bankr. S.D.N.Y. May 2, 2006) ("[R]elief from a final judgment is simply not available based on a party's dissatisfaction in hindsight with choices deliberately made by counsel. . . .") (internal quotations omitted); *Wagner Spray Tech Corp. v. Wolf*, 113 F.R.D. 50, 53 (S.D.N.Y. 1986) (holding that a party's "interest in undoing the results of a litigation strategy which, in hindsight, appears unwise fails to outweigh the judiciary's interest in the finality of judgments").

The Optimal Entities' remaining arguments are factually inaccurate, incorrect as a matter of law, or both. For example, the Optimal Entities' argument that "each dollar" allowed under the reasonable expectations approach is "one less dollar available" to pay claims, Optimal Brief at 6, is inaccurate in that it ignores that SIPC must advance up to $500,000 per customer to fulfill claims. *See* Customers' Net Equity Brief at 16. While the $500,000 SIPC advance may be of

little interest to the Optimal Entities, which invested more than one *billion* dollars with BMIS, it is of paramount importance to the Customers who were smaller, "ordinary" investors.

The Optimal Entities' citation to the Bankruptcy Code's avoidance provisions as a basis for requesting that the Court approve the Trustee's cash in/cash out approach, Optimal Brief at 5, actually underscores that the Trustee must prove all of the necessary elements of an avoidance action rather than unilaterally reducing customer claims. *See* Customers' Net Equity Brief at 42-46. Moreover, numerous courts have dismissed trustee avoidance actions seeking to recover "fictional" earnings paid to innocent Ponzi scheme investors. *See* Customers' Net Equity Brief at 27-31 (citing numerous cases holding that interest payments made to innocent Ponzi scheme investors cannot be avoided).

The Optimal Entities' argument that "net losers" have lost the most and "net winners" have lost least is not supported by any evidence and is inconsistent with the SEC's view that the Trustee must recognize the time value of money in calculating customer claims. SEC Brief at 9-10. Moreover, as a practical matter, if one sought to determine who lost the "most," one would focus on how much customers had left after the fraud. Those with nothing left, as is the case with many customers, have lost the "most."

Finally, it must be noted that the Optimal Entities' argument that the reasonable expectations approach would "perpetuate" Madoff's fraud, Optimal Brief at 7, is disingenuous given that the Optimal Entities' settlement with the Trustee permits them to retain 15% (or approximately $40 million) of the payments BMIS made to the Optimal Entities during the 90-day preference period. *See* Motion for Entry of Order Approving Settlement Between Trustee and Optimal Entities (May 26, 2009) [Dkt. No. 219]. Under the Optimal Entities' rationale,

these payments were comprised of other customers' monies. As such, the Optimal Entities are in no position to argue that the Customers are not entitled to recover.

In sum, the Optimal Brief, which offers minimal legal authority in support of the Trustee's approach, is nothing more than a self-serving attempt to salvage the Optimal Entities' settlement with the Trustee. Accordingly, the Court should reject the arguments raised by the Optimal Entities.

## CONCLUSION

For the reasons discussed herein and in the Customers' Net Equity Brief, the Customers respectfully request that the Court issue an order:

(1) directing the Trustee to recalculate the Customers' claims in accordance with the reasonable expectations standard; and

(2) denying the Trustee's Motion in its entirety.

Dated: December 18, 2009
New York, New York


s/ Jonathan M. Landers
Matthew Gluck
Brad N. Friedman
Sanford P. Dumain
Jennifer L. Young
MILBERG LLP
One Pennsylvania Plaza
48th Floor
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

SEEGER WEISS LLP
Stephen A. Weiss
Christopher M. Van de Kieft
Parvin K. Aminolroaya
One William Street
New York, New York
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

*Attorneys for Plaintiffs*