Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin, Maureen Ebel, and a group of other customers*

Hearing Date: February 2, 2010
Hearing Time: 10:00 A.M.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
SECURITIES INVESTOR PROTECTION
CORPORATION,

                Plaintiff,

          v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                Defendant.
-----------------------------------------------------------:

In re:

BERNARD L. MADOFF,

                Debtor.
-----------------------------------------------------------x

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

(Substantively Consolidated)

**MEMORANDUM OF LAW ON "NET EQUITY" IN REPLY TO MEMORANDA OF THE SECURITIES AND EXCHANGE COMMISSION AND OPTIMAL STRATEGIC U.S. EQUITY LIMITED AND OPTIMAL ARBITRAGE LIMITED**

1100463.1

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................2

I.     THE SEC HAS NO POWER TO REWRITE SIPA .........................................................4

II.    USING SIPC'S DEFINITION OF "NET EQUITY" IS NOT
       CONTRARY TO SIPA AND FRAUDULENT TRANSFER LAWS ............................9

CONCLUSION..................................................................................................................10

# TABLE OF AUTHORITIES

## CASES

Chevron U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984)..............5

In re New Times Securities Services Inc., 371 F.3d 68 (2d Cir. 2004)...................................5, 6, 8

SEC v. Byers, 637 F. Supp. 2d, 166 (S.D.N.Y. 2009).........................................................3, 4, 7, 8, 9

United States v. Gayle, 342 F.3d 89 (2d Cir. 2003)................................................................5

## STATUTES

11 U.S.C. § 546(e) ...............................................................................................................9

15 U.S.C. § 78fff-2(b)......................................................................................................5, 6

15 U.S.C. § 78lll(11).........................................................................................................5, 9

17 C.F.R. § 300.502............................................................................................................6

Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin, Maureen Ebel, and a group of other customers*

Hearing Date: February 2, 2010
Hearing Time: 10:00 A.M.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
SECURITIES INVESTOR PROTECTION
CORPORATION,

       Plaintiff,

    v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

       Defendant.
-----------------------------------------------------------:

In re:

BERNARD L. MADOFF,

       Debtor.
-----------------------------------------------------------x

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

(Substantively Consolidated)

**MEMORANDUM OF LAW ON "NET EQUITY" IN REPLY TO MEMORANDA OF THE SECURITIES AND EXCHANGE COMMISSION AND OPTIMAL STRATEGIC U.S. EQUITY LIMITED AND OPTIMAL ARBITRAGE LIMITED**

Phillips Nizer LLP files this reply memorandum of law on behalf of a group of customers (the "Customers") of Bernard L. Madoff Investment Securities LLC ("Madoff") for whom the Firm has filed objections to the Trustee's determination letters, as well as on behalf of Diane and Roger Peskin and Maureen Ebel, who are "net losers" in the Trustee's terminology but nevertheless believe that the Trustee's definition of "net equity" is a direct violation of the

1100463.1

Securities Investor Protection Act ("SIPA") and is violative of their rights.[1] This memorandum is submitted in reply to the memorandum of law of the Securities and Exchange Commission ("SEC") and statement of Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited (together, "Optimal") filed in support of the motion by Irving H. Picard, Trustee, for an Order upholding the Trustee's re-definition of "net equity" under SIPA.

## PRELIMINARY STATEMENT

The Trustee's re-definition of "net equity" will leave thousands of destitute Customers with no Securities Investor Protection Corporation ("SIPC") insurance and will save Wall Street $1 - $2 billion. The SEC argues that the Trustee's re-definition of "net equity" under SIPA is essentially correct. Thus, rather than protect defrauded investors, the SEC is rejecting the statutory definition of "net equity" in order to save Wall Street the $1 - $2 billion necessary for SIPC to fulfill its statutory obligations to the Madoff investors.

This insurance was promised to investors, not only by Madoff, but also by SIPC, by the SEC, and by Congress.[2] Yet, the SEC, which is charged by Congress with protecting the public against securities fraud, is blessing the fraud perpetrated by SIPC on investors, even today, who are led to believe that their accounts are insured up to $500,000 against the dishonesty of a broker.

There is not a single document that put the investors on notice that their accounts were insured up to $500,000 by SIPC only for their net investment over generations. Indeed, even

---

[1] A list of the Customers on whose behalf the Firm has filed objections is annexed to the November, 13, 2009 Declaration of Helen Davis Chaitman ("Chaitman") as Exhibit A.

[2] As evidenced by the numerous references to SIPC insurance in the legislative history of SIPA, Congress' purpose in creating SIPC was to "maintain and administer an insurance fund which would provide coverage against customer losses. . . resulting from broker-dealer firms' insolvency." S.Rep. No. 91-1218, p. 1 (1970). The Senate described SIPC as "an insurance plan for the industry," and one of several "federally sponsored insurance programs." Id. at 4 - 5, 7 – 9.

1100463.1                                    2

today, SIPC's website assures investors that, in the event of a liquidation, they can prove the amount of their customer claim by producing the last statement they received from their broker.

> In the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you. **This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement.**

*See* SIPC/SIFMA brochure Understanding Your Brokerage Account Statements, at 5, SIPC Website 2009; emphasis added.

> How is the amount of a customer's claim determined? The amount of the customer's claim, excluding any securities registered in his name and returned to him, is called his "net equity." **The net equity of a customer's account is determined by adding the total value of cash and securities the firm owes the customer and subtracting the total value of cash and securities the customer owes the firm.**

*See* How SIPC Protects You at 14, 1994 (emphasis added), www.jprcapital.com/howsipc.pdf.

> A customer's "net equity" is, in general, what the broker owes the customer less what the customer owes the broker, exclusive of "specifically identifiable property." Essentially, Section 6(c)(2)(A)(iv) [codified at 15 U.S.C. § 78lll(11)] defines "net equity" as the dollar amount of a customer's account determined after giving effect to the completion of any open contractual commitments (discussed below), excluding therefrom any specifically identifiable property reclaimable by the customer, and subtracting the indebtedness (if any) of the customer to the debtor from the sum which would have been owing by the debtor to the customer had the debtor liquidated all other securities and contractual commitments to the customer on the filing date. In short, a customer's "net equity" claim is for a liquidated sum.

*See* SIPC Annual Report 1973, at 21 (Chaitman Exh. S).

The SEC's position not only violates the plain language of SIPA but also directly contradicts the position the SEC took five months ago in a non-SIPA liquidation of a Ponzi scheme in *SEC v. Byers,* 637 F. Supp. 2d, 166 (S.D.N.Y. 2009). There, the SEC argued that it would be "fair and reasonable" to fix defrauded investors' claims in the amount of their net

investment **plus** any rolled over distributions, even though such "distributions" never existed and did not correlate to an out of pocket loss. The *Byers* approach is consistent with SIPA because "net equity" as defined in SIPA is the customer's last statement (the "Statutory Balance"); that is, a customer's net investment plus undistributed earnings. For some inexplicable reason, the SEC believed the law required recognition of undistributed earnings for defrauded investors in *Byers,* but not in this case.

The SEC's failure to abide by the law compounds the effects of its own incompetence. As set forth in painful detail in the 477-page report of SEC Inspector General, H. David Kotz, the SEC failed to expose Madoff's fraud despite repeated investigations, thereby allowing Madoff to operate unfettered for years. Yet, the SEC now seeks to protect Wall Street from the effects of its incompetence by depriving Customers of the SIPC insurance to which they are indisputably entitled and of which they are desperately in need.

Optimal, in essence, makes the same arguments as made by the SEC and the Trustee.

## ARGUMENT

### I. THE SEC HAS NO POWER TO REWRITE SIPA

The SEC argues incorrectly that SIPA does not "provide an explicit remedy in the circumstances presented by Madoff's fraud." SEC Mem. at 5. Nowhere in SIPA did Congress indicate an intent to condition SIPC insurance on how the fraudulent broker conducted his fraud. Rather, the statute provides SIPC insurance to any investor whose broker stole the investor's money or securities and focuses on the "legitimate expectations" of the customer. Indeed, there is no provision in SIPA at all which deals with how the dishonest broker conducted his fraud.

Congress clearly intended that SIPC insurance would protect a customer's Statutory Balance where the broker never purchased the securities reflected on the customers' statements,

1100463.1                                    4

as in this case. The Second Circuit recognized this in *In re New Times Securities Servs. Inc.*, 371 F.3d 68 (2d Cir. 2004).

Although it is a government agency, the SEC's views are entitled to no deference where, as here, Congressional intent can be ascertained from the face of the statue. *Chevron U.S.A., Inc. v. National Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well."). The statutory definition of "net equity" is clear:

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date. . .

15 U.S.C. § 78lll(11). Thus, the Customers' claims should be determined in the amount of their Statutory Balances. The Customers' November 30, 2008 Madoff statements show the "securities positions" in their accounts on the filing date. Nowhere in SIPA is there the slightest suggestion that a customer is not entitled to be paid SIPC insurance based on his Statutory Balance, if the broker defrauds the investor in any particular way. Moreover, Madoff's records indisputably include copies of all the statements that were provided to the Customers. Such statements constitute the "books and records" of Madoff, pursuant to 15 U.S.C. § 78fff-2(b), which provides that a customer's claims must be satisfied in the amount of his net equity to the extent that such obligations "are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee."

The SEC seeks to rewrite 15 U.S.C. § 78fff-2(b) by asserting that the Customers' statements are not properly the "books and records" of Madoff, because they are contradicted by other "books and records" of Madoff, which show that Madoff never actually purchased any securities. SEC Mem. at 3. However, the same argument could have been made in *New Times*, and yet the SEC represented to the Second Circuit that the *New Times* customers whose statements showed the purchase of real securities were entitled to have those securities replaced, even if they had tripled in value.

The SEC's position in *New Times* was compelled by SIPA and by SIPC's Series 500 Rules, which the SEC approved, under which the classification of claims must be made in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer. *See* 17 C.F.R. § 300.502. The internal books and records of the fraudster, to which the Customers had no access, cannot possibly trump the Customers' legitimate expectations, based on the transaction confirmations they received, showing their securities positions.

The SEC also argues that the Customers cannot "otherwise establish [their claims] to the satisfaction of the trustee" because they cannot show that they paid for the securities positions on their last statements. SEC Mem. at 4. This is impermissibly grafting a new provision onto the statute. There is no language in SIPA requiring that each "securities position" be purchased with cash, rather than sums rolled over from previous investments. Again, the SEC's position is directly contradicted by *New Times*, in which SIPC's President, Stephen Harbeck, personally represented to the court that, where a customer invested with a Ponzi schemer who took the customer's money and never purchased the securities reflected on the customer's statement, SIPC would replace the securities even if they had tripled in value. As Mr. Harbeck

acknowledged, if customers are led to believe that "real, existing" securities had been purchased for their accounts, then those customers are entitled to get the full value of their securities positions as of the filing date, even if the securities had never been purchased:

MR. HARBECK: **Even if they're not there**.

THE COURT: Even if they're not there.

MR. HARBECK: Correct.

THE COURT: **In other words, if the money was diverted, converted –**

MR. HARBECK: And the **securities were never purchased.**

THE COURT: Okay.

MR. HARBECK: **And, if those positions triple, we will gladly give the people their securities positions.**[3]

The SEC's position here is irreconcilable with the position it took just five months ago in *SEC v. Byers*, 637 F. Supp. 2d, 166 (S.D.N.Y. 2009). *Byers* was a Ponzi scheme where investors funds were stolen and the securities on the statements were never purchased. The receiver presented a plan of distribution that allowed for each investor's claim to be fixed at his investment plus any re-invested earnings. *Id.* at 182-83. Pursuant to this formula, an investor's claim would include any distribution that the investor chose to "roll over" into his account, even though such "distribution" never existed and did not correlate to an out of pocket loss. *Id.* The Court noted in approving the plan that it was "formulated in cooperation with the SEC, which supports the Plan in its entirety." *Id.* at 168.

The *Byers* court was not constrained by the "net equity" definition of SIPA because the debtor was not an SEC-regulated broker/dealer and the case was not a SIPA liquidation. Thus, the court only needed to determine whether the distribution plan was "fair and reasonable." 637

---

[3] July 28, 2000 Tr. at 37-38, *In re New Times Sec. Servs. Inc.* (B. E.D.N.Y. 2000) (emphasis added) (Chaitman Exh. E).

F. Supp. 2d at 174. Even without the constraints of SIPA, the court (with the SEC's blessing) used a formula equivalent to an investor's tax basis. In this case, an investor's tax basis would be the amount shown on his December 31, 2007 Madoff statement, adjusted for any investments or withdrawals that took place in 2008. Indeed, the Internal Revenue Service has recognized Madoff customers' claims as the amount of their tax basis. *See* Rev. Proc. 2009-20. The *Byers* formula is also similar to the method required under SIPA of fixing a claim in the amount of the investors' last statement, since the Customers' November 30, 2008 statement would reflect investments and withdrawals since the December 31, 2007 statement.

Despite the SEC's "support .. in its entirety" of the distribution plan in *Byers*, it now argues that the Customers are only entitled to claims for the securities they can show that they paid for. There is no legitimate basis for this about-face; nor is there any support for this argument in SIPA.[4]

Here, of course, Customers have two sources of recovery: They are entitled to up to $500,000 in SIPC insurance, and they are entitled to a *pro rata* distribution of customer property. SEC Mem. at n. 1. Yet, in its argument, the SEC ignores the statutory right to SIPC insurance and simply argues that the *pro rata* distribution of customer property would be inequitably distorted if the Customers' claims were determined in the amount of their Statutory Balances. The denial of SIPC insurance simply enriches SIPC's members, the Wall Street firms who profited by the public's belief that SIPC would insure their accounts up to $500,000. It has no effect on the distribution of customer property.

---

[4] The SEC has adopted the Trustee's tortured reading of *In re New Times Securities Servs. Inc.*, 371 F.3d 68 (2d Cir. 2004). As the Customers stated in their initial memorandum of law at 20-22, all operations in any Ponzi scheme are fictitious and, thus, the distinction between the investors who had real securities and those who had fictitious securities was not, and could not have been, based on the fictitious nature of the operations. Rather, as the Second Circuit recognized, it was based upon the "legitimate expectations" of the customers.

1100463.1                                        8

With no statutory basis whatsoever, the SEC asserts that a customer's net investment should be calculated in "constant dollars" by adjusting for the rate of inflation. SEC Mem. at 1. The Customers reserve the right to brief this method of calculation in the event that the Court approves the Trustee's net cash investment approach and the SEC files the brief addressing the merits of its position that it stated it would do at that time. *Id.* Clearly, however, there is nothing in SIPA which suggests that a court may impose a "constant dollars" approach.[5]

## II. USING SIPC'S DEFINITION OF "NET EQUITY" IS NOT CONTRARY TO SIPA AND FRAUDULENT TRANSFER LAWS

Optimal incorrectly and illogically argues that calculating Customers' equity based on their Statutory Balances is contrary to SIPA and fraudulent transfer laws because the account statements were "totally fictitious." Statement at p. 4. Optimal's argument makes no sense. If the term "securities positions" in 15 U.S.C. § 78lll(11) cannot refer to securities positions showing investments in real securities that the broker wrongfully failed to purchase, the only logical conclusion is that each of the Madoff customers, including Optimal, has *no* net equity. For obvious reasons, Optimal does not argue that it has no net equity and, instead, argues that its net equity is equal to the net cash it invested. Yet Optimal never explains how this net cash represents a "securities position" under the statute.

Optimal further argues, as the Trustee did, that determining a Customer's net equity based on his Statutory Balance is inconsistent with the avoidance powers of section 548 of the Bankruptcy Code and New York state fraudulent conveyance law, upon which the Trustee may rely under section 544(b) of the Bankruptcy Code. Statement at 5. As set forth in pages 37-46 of the Customers' initial brief, Optimal is incorrect because the Trustee has no right, under 11

---

[5] The SEC is correct that the Court's interpretation of "net equity" is not limited by the "return of principal" analysis applied in Ponzi scheme cases that were not decided under SIPA. SEC Mem. at 9-10. As Judge Chin recognized in *Byers,* there are no statutory limits imposed upon the distribution methodology in a non-SIPA liquidation of a Ponzi scheme.

U.S.C. Section 546(e), to recover preferential payments and no right to recover fraudulent transfers except, for a period of two years from the date of the filing where he can prove actual fraud.

Optimal also makes the fallacious "zero sum game" argument. The Madoff liquidation is not a "zero sum game" because SIPC is a third party insurer which has an absolute obligation to replace securities in each customer's account up to $500,000. That obligation is totally separate from each customer's share of estate property and the payment by SIPC of insurance to each customer in no way reduces estate property.

Finally, as to the distribution of estate property, SIPA does not give the Trustee the power to determine what would be an equitable distribution in any given case. The distributions must be made on the basis of each customer's Statutory Balance.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the Customers' initial memorandum, the Court should deny the Trustee's motion and enter an order compelling SIPC to immediately replace securities in each customer's account, up to a value of $500,000, at the values as of November 30, 2008.

December 21, 2009

                PHILLIPS NIZER LLP

                By: /s/ Helen Davis Chaitman
                666 Fifth Avenue
                New York, New York 10103-0084
                (212) 841-1320

                *Counsel for Diane and Roger Peskin, Maureen Ebel, and a group of other Customers*