Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York  10017
Telephone:    (212) 450-4000
Facsimile:    (212) 701-5800
Karen E. Wagner (karen.wagner@davispolk.com)
Denis J. McInerney (denis.mcinerney@davispolk.com)
Brian S. Weinstein (brian.weinstein@davispolk.com)
Jonathan D. Martin (jonathan.martin@davispolk.com)

*Attorneys for Sterling Equities Associates
and Certain Affiliates*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------ x
                               :
SECURITIES INVESTOR            :
PROTECTION CORPORATION,        :
                               :
            Plaintiff-Appellant, :   SIPA LIQUIDATION
                               :     (Substantively Consolidated)
      v.                       :     Adv. Pro. No. 08-01789 (BRL)
                               :
BERNARD L. MADOFF INVESTMENT   :
SECURITIES LLC,                :
                               :
            Defendant.         :
                               :
------------------------------ x
                               :
In re:                         :
                               :
BERNARD L. MADOFF,             :
                               :
            Debtor.            :
                               :
------------------------------ x

**REPLY MEMORANDUM OF LAW OF STERLING EQUITIES ASSOCIATES
AND CERTAIN AFFILIATES REGARDING NET EQUITY AND AVOIDANCE**

## TABLE OF CONTENTS

P<small>AGE</small>

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I. THE TRUSTEE IS REQUIRED TO CALCULATE BLMIS CUSTOMERS' "NET EQUITY" CLAIMS IN ACCORDANCE WITH SECTION 78*lll*(11) OF SIPA ................................................................................................................................. 2

II. THE TRUSTEE HAS NO POWER TO AVOID PAYMENTS TO INNOCENT CUSTOMERS ............................................................................................................... 6

CONCLUSION ..................................................................................................................... 11

## TABLE OF AUTHORITIES

PAGE

### Cases

*In re A.R. Baron Co., Inc.*, 226 B.R. 790 (Bankr. S.D.N.Y. 1998) .................................. 2-3

*Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987) .......................... 9

*In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) ................................................................ 7-8

*In re Enron Creditors Recovery Corp.*, No. 09 Civ. 9030 (CM), Ch. 11 Case No. 01-16034 (AJG), Adv. Nos. 03-92677, 03-92682, slip op. (S.D.N.Y. Nov. 19, 2009) ............................................................................................................................. 7

*Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980) ..................................................................... 6

*In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004) ...................................... 3, 8

*Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123 (2d Cir. 2009) ......................................... 8

*In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005) ........................................................... 10

*Thomas v. Whalen*, 962 F.2d 358 (4th Cir. 1992) ............................................................... 6

*Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86 (1st Dep't 1993) ............................................................................................................................ 10

*Union Bank v. Wolas*, 502 U.S. 151 (1991) ........................................................................ 6

*United States v. Noland*, 517 U.S. 535 (1996) .................................................................... 9

*William L. Rudkin Testamentary Trust v. Comm'r of Internal Revenue*, 467 F.3d 149 (2d Cir. 2006) ............................................................................................................. 8

### Statutes and Rules

11 U.S.C. § 510(c) ................................................................................................................. 9

11 U.S.C. § 544 ...................................................................................................................... 7

11 U.S.C. § 546(e) ..................................................................................................... 6, 7, 8, 9

11 U.S.C. § 548(a)(1)(A) ....................................................................................................... 7

11 U.S.C. § 741(7)(A) ........................................................................................................ 8, 9

15 U.S.C. § 78ccc(b)(4)(A) ................................................................................................ 3

15 U.S.C. § 78fff-2(b) ............................................................................................... 1, 2, 3

15 U.S.C. § 78fff-2(c)(3) ................................................................................................. 8

15 U.S.C. § 78*lll*(11) ............................................................................................ 1, 2, 3, 4

## Other Authorities

1 G. Glenn, *Fraudulent Conveyances and Preferences*, § 289 (rev. ed. 1940) .................. 9

H.R. Rep. No. 95-746 (1977) ............................................................................................ 5

*Mem. of Law in Opp. to Herald Fund SPC's Mot. to Dismiss the Second Am.
    Compl.*, dated Nov. 13, 2009, Adv. Pro. No. 09-1359 (BRL) ............................ 7, 8, 10

*Mem. of Law of Sterling Equities Associates and Certain Affiliates Regarding Net
    Equity and Avoidance*, dated Nov. 12, 2009 .............................................................. 7, 9

*Reply Mem. of Law in Further Supp. of Herald Fund SPC's Mot. to Dismiss the
    Second Am. Compl.*, dated Dec. 2, 2009, Adv. Pro. No. 09-1359 (BRL) ..................... 7

Statement of Michael A. Conley, Deputy Solicitor, Securities and Exchange
    Commission, Before the Capital Markets, Insurance, and Government
    Sponsored Enterprises Subcommittee, dated Dec. 9, 2009 .......................................... 4

Pursuant to this Court's Order Scheduling Adjudication of "Net Equity" Issue, dated September 16, 2009, Sterling Equities Associates and certain of its affiliates respectfully submit this reply memorandum of law in further opposition to the motion of Irving H. Picard ("Trustee"), trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), for an order approving the Trustee's proposed calculation of "net equity" claims under the Securities Investor Protection Act, 15 U.S.C. § 78aaa, *et seq.* ("SIPA").

## PRELIMINARY STATEMENT

There is no dispute that BLMIS customers have "claims for securities," or that they are entitled to the "net equity" in their accounts. The only issue before the Court is the method by which the value of their claims is to be determined. The answer to that question is provided by Section 78*lll*(11) of SIPA, which defines "net equity." Net equity is determined by "calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer." 15 U.S.C. § 78*lll*(11).

The Securities and Exchange Commission ("SEC"), arguing for a modified "cash-in/cash-out" calculation of net equity, ignores SIPA's express, statutory definition of "net equity." The only legal basis offered for the SEC's position, Section 8(b) of SIPA, 15 U.S.C. § 78fff-2(b), addresses a different issue and has nothing to do with how "net equity" is calculated. Nor does Optimal offer any statutory basis for its support of the Trustee's position.

SIPA defines "net equity." Efforts to evade that definition must be rejected.

## ARGUMENT

## I.

## THE TRUSTEE IS REQUIRED TO CALCULATE BLMIS CUSTOMERS' "NET EQUITY" CLAIMS IN ACCORDANCE WITH SECTION 78*lll*(11) OF SIPA

There is no statutory foundation in SIPA for the Trustee's "cash-in/cash-out" approach (or the SEC's modified "cash-in/cash-out" approach) for calculating the value of a customer's "net equity" claim. The SEC rightly rejects the Trustee's reliance on non-SIPA Ponzi scheme cases, because "net equity" must be determined "in accordance with the provisions of SIPA." (SEC Br. at 9.) But the SEC points the Court to Section 78fff-2(b) as support for a "cash-in/cash-out" approach – a provision that has no bearing whatsoever on the calculation of net equity.

Section 78fff-2(b) requires the Trustee to promptly discharge "all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash … *insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee*." 15 U.S.C. § 78fff-2(b) (emphasis added). Among other things, the SEC contends that the italicized portion of Section 78fff-2(b) permits the Trustee to ignore Section 78*lll*(11) and leaves him free to come up with an approach that meets with his satisfaction.

The SEC is wrong.

First, the SEC misreads Section 78fff-2(b). That section provides that, before the Trustee is required to make payments to a claimant, the claimant must demonstrate – by reference to account statements, or, if there are none, to the trustee's satisfaction – that the claimant is a customer and has a preferred claim under SIPA to either cash or securities. *See, e.g., In re A.R. Baron Co., Inc.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y.

2

1998) (explaining that cited language in Section 78fff-2(b) requires SIPA claimants to establish their preferred status as cash or securities claimants, just as in ordinary bankruptcy where "claimants seeking a preferred status bear the burden of showing that they are within the class of eligible persons"). Once this initial showing is made, as required by Section 78fff-2(b), the Trustee must make the payments required by SIPA. Notably, the SEC acknowledges that BLMIS customers have made the showing called for by Section 78fff-2(b). (SEC Br. at 6.)[1]

Contrary to the SEC's assertion, however, Section 78fff-2(b) does not address the subsequent question of the calculation of the value of a customer's net equity claim. Instead, the calculation of the "dollar amount" of such a claim is made in accordance with the statutory definition of "net equity" set forth in Section 78*lll*(11).

The SEC's contention that Section 78fff-2(b) somehow trumps the calculation of "net equity" prescribed by Section 78*lll*(11) does not withstand scrutiny. There is no textual support for this approach in Section 78fff-2(b), and no contorted reading of Section 78fff-2(b) can nullify the clear statutory provision defining how the "dollar amount" of "net equity" is to be calculated. Furthermore, the SEC's approach contravenes SIPA's prohibition on altering the statutory definition of "net equity." *See* 15 U.S.C. § 78ccc(b)(4)(A) (prohibiting SIPC from adopting rules that alter "those terms [including "net equity"] for which a definition is provided in section 78*lll* of this title").

Second, the SEC wrongly contends that *In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) ("*New Times I*") provides support for refusing to adhere to the

---

[1] The SEC concedes that "there is no dispute that the BLMIS customers, who directed that their money be used to purchase securities and received confirmations and account statements reflecting such purchases, are entitled to claims for securities." (SEC Br. at 6.)

3

statutory definition of "net equity" on purported "policy" grounds, regardless of whether the securities on the customer's account statement are real or imaginary. (SEC Br. at 7-8.) On the contrary, the Second Circuit was forced to consider an alternative methodology only where the imaginary securities at issue could not be "liquidated by sale or purchase" as Section 78*lll*(11) requires – and application of that section therefore would have been impossible. Here, where the securities on the account statements are real, the statutory language can and must be applied as written.

While the SEC suggests that the real securities on the BLMIS customers' account statements should be considered analogous to imaginary securities because they were not actually purchased and BLMIS was not exposed to market risk, this argument is wrong where liquidation value can in fact be determined.[2] Indeed, the SEC has conceded that it is irrelevant whether the securities on the account statement were actually purchased: "Both the Senate and House reports on the 1978 amendments make clear that SIPA's protection extends to securities that are not in the account because the broker never purchased them, even though the customer ordered the purchase and the trade was confirmed by the broker."[3]

Third, the SEC argues that BLMIS "could not have acquired these securities positions in real market trading." (SEC. Br. at 4.) In addition to the fact that such a

---

[2] The consequences of the SEC's argument, if accepted, would be far-reaching. The accepted rule that SIPA covers claims based on securities that were never purchased would effectively be limited to customers who directed specific trades. Customers who gave a broker discretionary authority would not have the same protection. Nothing in the statute suggests such a distinction, and there is no evidence – none – that Congress intended such a distinction.

[3] *See* Statement of Michael A. Conley, Deputy Solicitor, Securities and Exchange Commission, Before the Capital Markets, Insurance, and Government Sponsored Enterprises Subcommittee, dated Dec. 9, 2009, available at http://www.house.gov/apps/list/hearing/financialsvcs_dem/conley_testimony.pdf, at 9.

concept is not found in SIPA, imposing such a precondition on a customer's ability to make a SIPA claim would be at odds with the most basic principles underlying the statute. From an individual customer's perspective, the securities positions were in fact entirely consistent with market reality – precisely because the account statements reflected real securities and real trade prices that could be publicly verified. No individual customer could know the scope of BLMIS's trading operations, and no individual customer is required by SIPA to have its broker's perspective, based on information knowable only to the broker. Rather, "net equity" is determined from a customer's perspective, "assuring that a customer 'receive[s] what he believes is in his account at the time the stockbroker ceases business.'" (SEC Br. at 10 (quoting H.R. Rep. No. 95-746 at 21 (1977)).

At bottom, the SEC's efforts to avoid the "net equity" definition are premised upon its conclusion that SIPA yields a bad result here because distribution based on net equity is supposedly a "zero-sum game," in which recovery by one customer reduces recovery by another. But, in fact, every customer may recover up to $500,000 from the SIPC Fund, without reducing the amount available to pay any other customer. Under the Trustee's "cash-in/cash-out" approach, the majority of active account holders as of December 2008 – over 2500, according to the Trustee – will receive nothing. Moreover, even the Trustee's "net losers" will be denied a substantial portion of the SIPC funds to which they are entitled.[4] The primary beneficiary of the Trustee's "cash-in/cash-out"

---

[4] Suppose, for example, that a customer deposited $400,000 ten years ago, withdrew $300,000 during that period, and had an account balance of $1 million on December 11, 2008. Under the Trustee's methodology that "net loser" has a claim to the SIPC Fund of $100,000. Under SIPA's "net equity" definition, the customer's claim is $1 million, entitling the customer to $500,000 from the SIPC Fund. The Trustee's approach saves $400,000 for the SIPC Fund, but benefits no other customer.

5

approach is the SIPC Fund, not the BLMIS customers. Indeed, the direct consequence of the Trustee's failure to pay customers their "net equity" under SIPA is that as much as $1 billion or more that should be paid to Madoff victims will be retained by the SIPC Fund and not paid to anyone.

SIPA is not an unfair statute. But, in any event, when a court interprets a statute it must "start with its plain words without pausing to consider whether a statute differently framed would yield results more consonant with fairness and reason." *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980). "A federal court, whether in law or in equity, has no authority to depart from the clear command of a statute in order to effect a result that it believes to be (or even one that would in fact be) dictated by general principles of fairness." *Thomas v. Whalen*, 962 F.2d 358, 363 (4th Cir. 1992). The SEC's speculative assertion that Congress could not have anticipated a Ponzi scheme like this one (*see* SEC Br. at 5) is no basis for disregarding the terms of the statute. "The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991).

## II.

### THE TRUSTEE HAS NO POWER TO AVOID PAYMENTS TO INNOCENT CUSTOMERS

The "cash-in/cash-out" calculation not only contravenes the plain text of SIPA, but also suggests an ability to exercise avoidance powers that the Trustee does not have. In essence, the Trustee is attempting to avoid the "cash out" transfers from BLMIS to the customers. But such avoidance is foreclosed by the Bankruptcy Code, including Section 546(e), which provides that "the trustee may not avoid a transfer … that is a transfer

6

made by or to … [a] stockbroker [or] financial institution, … in connection with a securities contract, as defined in section 741(7), … except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e).[5]  As demonstrated in our main brief, Section 546(e) of the Bankruptcy Code protects all transfers from BLMIS to innocent customers, because the requirements of Section 548(a)(1)(A) cannot be met where the transfers satisfied antecedent debt.[6]  Accordingly, apart from being precluded by SIPA, the "cash-in/cash-out" calculation reflects an effort to invoke avoidance powers not available to the Trustee.

The Trustee can offer no legal basis to refute the application of Section 546(e). Since the filing of our main brief, the Trustee has argued that Section 546(e) should not apply here because its application would be inconsistent with the purportedly narrow purpose of Section 546(e).  *See Mem. of Law in Opp. to Herald Fund SPC's Mot. to Dismiss the Second Am. Compl.*, dated Nov. 13, 2009, Adv. Pro. No. 09-1359 (BRL) ("*Herald Fund Opp.*"), at 16-17.  The argument fails, because "Congress enacts statutes, not purposes, and courts may not depart from the statutory text because they believe some other arrangement would better serve the legislative goals." *In re Cavanaugh*, 306

---

[5] A recent decision in an Enron case has recognized the breadth of application of Section 546(e), even in its prior, more limited, iteration. *See In re Enron Creditors Recovery Corp.*, No. 09 Civ. 9030 (CM), Ch. 11 Case No. 01-16034 (AJG), Adv. Nos. 03-92677, 03-92682, slip op. at 9-17 (S.D.N.Y. Nov. 19, 2009) (available on PACER).  There, the Court also noted that a departure from the plain meaning of the provision had been made in the *Adler Coleman* case, but refused to adopt such a departure in the matter before it. *See id.* at 27-28.  The current breadth of Section 546(e), enacted after *Adler Coleman*, would not permit any such limitation to its application here absent proof of complicit activity by a customer, which would belie "customer" status altogether.

[6] *See Mem. of Law of Sterling Equities Associates and Certain Affiliates Regarding Net Equity and Avoidance*, dated Nov. 12, 2009 ("*Sterling Mem.*"), at 14-16.  A brief recently filed on behalf of Herald Fund SPC mistakenly argues that the provision permits application of state law avoidance provisions. *See Reply Mem. of Law in Further Supp. of Herald Fund SPC's Mot. to Dismiss the Second Am. Compl.*, dated Dec. 2, 2009, Adv. Pro. No. 09-1359 (BRL), at 9-10.  In fact the application of Section 544 of the Code is prohibited by the terms of Section 546(e).

F.3d 726, 731-32 (9th Cir. 2002); *see also Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 139 (2d Cir. 2009) ("Congress does not enact intentions. It enacts statutes."); *William L. Rudkin Testamentary Trust v. Comm'r of Internal Revenue*, 467 F.3d 149 (2d Cir. 2006) ("[N]otwithstanding the narrow purpose the Trust attributes to Congress in enacting the second clause of § 67(e)(1), the broad statutory language is the best indication that Congress intended [the statute to apply more broadly].").

The Trustee also argues that "[s]uch a severe limitation of the Trustee's avoidance powers is an absurd result that Congress cannot have intended" (*Herald Fund Opp.* at 17). It is hardly absurd to permit avoidance of a transfer only where fraudulent intent is demonstrated, and only for a defined period. It is rather the Trustee's approach that is absurd – avoiding transfers occurring over many years, even decades, upon which non-complicit customers relied, so that the SIPC Fund can be protected. That absurd result is prohibited by the plain meaning of Section 546(e), and that prohibition is entirely consistent with the purpose of SIPA to promote "investor confidence in the securities markets and protect[] broker-dealer customers." *New Times I*, 371 F.3d at 87. Finally, while SIPA permits the Trustee to avoid a transfer "to the extent that such transfer is voidable or void under the provisions of title 11," 15 U.S.C. § 78fff-2(c)(3), Section 546(e) is a provision of title 11. There is no conflict between Section 546(e) and SIPA.

Any contention that Section 546(e) is inapplicable because the customers' contracts with BLMIS were not in the nature of ISDA master agreements and therefore are not "securities contracts" is remarkable.[7] (*Herald Fund Opp.* at 17-18.) Section

---

[7] The Trustee does not dispute that transfers from BLMIS to the customers were "transfer[s] made by or to … [a] stockbroker [or] financial institution." 11 U.S.C. § 546(e).

8

741(7) of the Bankruptcy Code broadly defines "securities contract" to include "a contract for the purchase, sale or loan of a security … or option on any of the foregoing, including an option to purchase or sell any such security." 11 U.S.C. § 741(7)(A)(i). A "securities contract" also includes "any other agreement or transaction that is similar to an agreement or transaction" listed in Section 741(7)(A)(i)-(vi). 11 U.S.C. § 741(7)(A)(vii). The definition is not limited to ISDA master agreements governing complex derivatives transactions.

The Trustee is also wrong that "equitable distribution" principles prevent application of Section 546(e). The Bankruptcy Code permits principles of equity to affect distribution only through equitable subordination under Section 510(c), *see United States v. Noland*, 517 U.S. 535, 540 (1996), or through preference avoidance under Section 547. The "intent of fraudulent conveyance statutes is not to provide equal distribution of the estates of debtors among their creditors." *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987) (quoting 1 G. Glenn, *Fraudulent Conveyances and Preferences*, § 289 (rev. ed. 1940)). Fraudulent transfer law is instead "a set of legal (not equitable) doctrines designed for very different purposes" – i.e., to "see that the debtor uses his limited assets to satisfy *some* of his creditors." *Id.* at 1508-09 (emphasis in original).

Finally, BLMIS was required as a matter of state and federal law to transfer to the customers the amounts owed to the customers as reflected on their account statements.[8] The Second Circuit has instructed that a "'conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if

---

[8] *See Sterling Mem.* at 17-20.

9

its effect is to prefer one creditor over another.'" *In re Sharp Int'l Corp.*, 403 F.3d 43, 54 (2d Cir. 2005) (quoting *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91 (1st Dep't 1993)).  The Trustee concedes, as he must, that *Sharp* is binding precedent. *See Herald Fund Opp.* at 19.  Accordingly, the Trustee's suggestion that he can ignore SIPA's definition of net equity based on his supposed avoidance powers is unsupportable.

## CONCLUSION

For all of the reasons discussed above, this Court must deny the Trustee's motion and rule that BLMIS customers' "net equity" claims equal the market value, as of the filing date, of the securities positions reflected on the customers' November 30, 2008 account statements, and that no avoidance provision may be applied to transfers made to innocent customers in order to reduce "net equity" or for any other purpose.

Dated:   New York, New York
         December 21, 2009

                                    DAVIS POLK & WARDWELL LLP

                                    By:   */s/ Karen E. Wagner*
                                          Karen E. Wagner
                                          Denis J. McInerney
                                          Brian S. Weinstein
                                          Jonathan D. Martin

                                    450 Lexington Avenue
                                    New York, New York  10017
                                    (212) 450-4000

                                    *Attorneys for Sterling Equities Associates
                                    and Certain Affiliates*

11