**LAX & NEVILLE, LLP**
Brian J. Neville (BN 8251)
Barry R. Lax (BL 1302)
Brian Maddox (BM 6128)

1412 Broadway, Suite 1407
New York, NY 10018
Tel: (212) 696-1999
Fax: (212) 566-4531

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
:
SECURITIES INVESTOR PROTECTION     :
CORPORATION,                       :   SIPA Liquidation
:
Plaintiffs,      :
:   No. 08-01789 (BRL)
vs.                        :
:   Adv. Pro. No. 09-01265 (BRL)
BERNARD L. MADOFF INVESTMENT       :
SECURITIES LLC,                    :   (Substantively Consolidated)
:
Defendant.       :
:
------------------------------------------------------------ :
:
In re:                             :
:
BERNARD L. MADOFF                  :
:
Debtor.          :
------------------------------------------------------------x

**REPLY MOMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION FOR AN ORDER UPHOLDING TRUSTEE'S DETERMINATION DENYING CUSTOMER CLAIMS' FOR AMOUNTS LISTED ON LAST STATEMENT, AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE OBJECTIONS WITH RESPECT TO THE DETERMINATIONS RELATING TO NET EQUITY**

**Table of Contents**

PRELIMINARY STATEMENT……………………………………………………………..2

    ARGUMENT……………………………………………………………………………..4

  A.   The "Cash-In/Cash-Out" Approach Contradicts The Rational And Purpose
      Behind SIPA, Which Is To Advance Up to $500,000 Based Upon The
      Customer's Legitimate Expectation..…………………………………………..……….4

  B.  The "Cash-In/Cash-Out" Method Supported By the SEC And Optimal
     Is Not Found Within The Plain Language of SIPA………………………………………6

     1.  *New Times I* and *II* Established The Basis For A Customer's
        Legitimate Expectations..............................................................................................8

     2.  The Confirmations And Account Statements Are Sufficient To
        Meet The "Books and Records" Requirement of 15 U.S.C. 78fff-2(b)…….……..12

  C.  The "Zero-Sum" Argument Is A Red Herring……………...……………………….13

CONCLUSION……………………………………………………………………….………15

# Table of Authorities

## Cases

*Appleton v. First Nat. Bank of Ohio*
   62 F.3d 791 (6th Cir. 1995)……………………………………………………………………..5

*In re Adler, Coleman Clearing Corp.*
   247 B.R. 51, 62 n.2 (Bankr. S.D.N.Y. 1999)………………………………………………………7

*In re A.R. Baron Co., Inc.*
   226 B.R. 790, 795 (Bankr. S.D.N.Y.1998)……………………………………………………12

*In re First Street Sec. Corp.*
   34 B.R. 492, 497 (Bankr. S.D. Fla. 1983)…………………………………………………………7

*In re New Times Sec. Serv., Inc.*
   371 F.3d 68, 87 (2d Cir. 2004)..……………………......……...................….5, 8, 9, 10, 11

*In re New Times Sec. Servs., Inc.*
   463 F.3d 125, 128 (2d Cir. 2006)………………………………………………………….8, 9

*In re Oberweis Sec., Inc.*
   135 B.R. 842, 847 n.1 (Bankr.N.D. Ill. 1991)…………………………………………………..8

*Rich v. NYSE*
   522 F.2d 153, 156 (2d Cir. 1975)……………………………………………………………7

*S.E.C. v. Goren*
   206 F. Supp. 2d 344 (E.D.N.Y. 2002)………………………………………………………......8

*Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co., Inc.*
   533 F.2d 1314, 1318 n.5 (2d Cir. 1976)…………………………………………………..5

*SIPC v. Barbour*
   421 U.S. 412, 415, 95 S.Ct. 1733, 1736 (1975)…………………………………………………...5

## Statutes

15 U.S.C. § 78ccc(b)(4)(A)…………………………………………………..…………………3

15 U.S.C. § 78lll(11)……………………………………………………………...……………7

## Miscellaneous Authorities

 922 Cong. Rec. H. 36326 (Nov. 1, 1977)………………………………………………………7

10/28/09 Statement of Irving H. Picard, Court-Appointed Trustee, BLMIS,
*available at* http://www.sipc.org/pdf/2009-10-28%20IHP%20Press%20Conference
%20Statement.pdf……………………………………………………………..………12

Hearing on H.R. 8064 Before the Subcomm. on Consumer Protection
and Finance of the H. Comm. on Interstate and Foreign Commerce,
94th Cong. 63 (1975)…………………………………………………………………8

H.R. Rep. No. 95-746 (1977)……………………………………………………………...7

H.R. Rep. No. 91-1613 (1970)…….………………………………………………………5

http://www.sec.gov/investor/pubs/holdsec.htm..............................................................................5

http://www.sec.gov/about/whatwedo.shtml (last viewed 12/19/09)..............................................11

Joel Seligman, *The Transformation of Wall Street: A History of the Securities
Exchange  Commission and Modern Corporate Finance* (Aspen Pub. N.Y. 3d ed.
2003) 451 n.31…………………………………………………………………...…4

Thomas W. Joo, *Who Watches the Watchers? The Securities Investor Protection
Act, Investor Confidence, and the Subsidization of Failure*, 72 S. Cal. L. Rev.
1071, 1080 (1999)……………………………………………………………….……4

Pursuant to this Court's Order Scheduling Adjudication of the "Net Equity" Issue, dated September 16, 2009, and in response to Securities and Exchange Commission's ("SEC") memorandum of law[1] and Optimal Strategic U.S. Equity and Optimal Arbitrage Limited's (collectively "Optimal Entities") statement in support[2] of Irving H. Picard's ("Trustee"), trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), motion relating to "net equity," Mary Albanese, the Brow Family Partnership, Allan Goldstein, Laurence Kaye, Suzanne Kaye, Rose Less and Gordon Bennett ("Class Action Plaintiffs"), on behalf of themselves and the prospective Class[3] in *Less, et al. v. Picard, Trustee*, Adv. Pro. No. 09-1265 (BRL), and those individuals that have filed Objections to the Trustee's determination letters regarding their SIPC claims,[4] by and through the undersigned counsel, submit this Reply Memorandum of Law.

---

[1] Memorandum of Securities and Exchange Commission Supporting Trustee's Determination That Net Equity Should Not Be Based on Securities Positions Listed on Last Statements, and Supporting in Part Trustee's Determination That Net Equity Should Be Based Upon Amounts Deposited Less Amounts Withdrawn ("SEC Brief") [Docket No. 1052].

[2] Statement of Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited in Support of Trustee's Motion Relating to "Net Equity" Issue ("Optimal Brief")[Docket No. 1051].

[3] The Class is defined as all persons and entities who: (i) maintained one or more customer accounts with Madoff as of December 11, 2008, the value of which is/are adversely affected by the Trustee's unlawful calculation of "net equity" in contrivance of 15 U.S.C. § 78lll(11); and (ii) have suffered and will suffer damages thereby. Excluded from the Class are the (i) Trustee, members of his immediate family and their legal representatives, heirs, successors, or assigns and any entity in which Defendant has or had a controlling interest; and (ii) Bernard L. Madoff, members of his immediate family and their legal representatives, heirs, successors, or assigns and any entity in which Bernard L. Madoff has or had a controlling interest, including their officers, directors, agents and employees.

[4] Mary Albanese; Mary Albanese, as trustee for the Dominick Albanese Trust Acct B; William Jay Cohen, as Trustee for the William Jay Cohen Trustee Dated 11/14/89; Eleanor P. Cohen, as Trustee for the Eleanor P. Cohen Trustee dated 11/14/89; Jacob Davis; Fammad, LLC; Myron Feuer; Jerome Fox; Selma Fox; Robert Allen Greene; Julian Greene; Robert Allen Greene as Custodian; Bruce P. Hector MD; Howard Kamp; Bonnie Kansler; Matthew S. Kanlser; Larry Kaye; Marjorie Kleinman; Dale Kleinman; Elliot S. Kaye; Robert Kehlmann, as trustee for the Trust UW William Kehlmann U/A DTD 1/23/65; Robert Kehlmann, as trustee for the Robert Kehlmann & Diana Tosto Kehlmann Living Trust U/A DTD 3/19/90; Robert Kehlmann, as trustee for the Trust FBO Ephraim

**PRELIMINARY STATEMENT**

The Securities Investor Protection Act ("SIPA") was designed to protect a customer's legitimate expectations, which are reflected in the customer's account statements and confirmations. The SEC and Optimal Entities—and the Trustee and Securities Investor Protection Corporation ("SIPC") for that matter—are attempting to disregard the clear language of the statute and distort the precedent of this jurisdiction to create new law. Indeed, Madoff victims are the only SIPA Ponzi Scheme victims in the history of the statute whose "legitimate expectations" are being ignored. After 117 pages of briefing, the arguments in support of the "cash-in/cash-out" methodology boil down to two points: (i) Madoff victims do not have a legitimate expectation to the profits reflected on the customer account statements and confirmations because the transactions themselves were not subjected to market risk as Madoff backdated his trades, and (ii) that this is "zero sum" game, thus it is unfair to advance $500,000 to victims whose withdrawals exceeded their deposits. These two arguments are both factually incorrect and not supported by the statute or the precedent interpreting "net equity."

Point (i) is simply incorrect because it is the ***legitimacy of the customer's expectation*** that defines "net equity," ***not the legitimacy of the trades or even the profits*** themselves that defines "net equity." The SEC, SIPC and the Trustee argued in favor of the legitimate customer

---

Kehlmann U/A DTD 12/30/72; Donald Kent MD; Robert Korn, as Trustee for the Robert Korn Revocable Trust; Rose Less; Ruth Mechaneck; Harriet Meiss, as Trustee of the Harriet K. Meiss Trust; The Morse Family Foundation; Lanny Rose, as Trustee for the Lanny Rose Revocable Trust; Robert L. Schwartz, as trustee of the Robert L. Schwartz 2004 Revocable Trust; Elaine Schlessberg; Angelo Viola and Angelo Viola IRA; Allan Goldstein; and Rodger & Miriam William; Gordon Bennett (IRA); Watershed Foundation; Carol Kasbar Bulman (IRA); Richard G. Eaton (IRA); Fammad, LLC; PJFN Limited Partnership; PEDS Retirement Fund; Fox Family Partnership LLC; Zipora Wagreich Trustee U/A DTD 11/6/90; Gary Korn; Korn Family Partnership; Donna Lefkowitz; HO Marital Trust. Counsel represents numerous other Madoff investors that, as of the submission of this memorandum, have not received their determination letters from the Trustee (collectively with the Class Action Plaintiffs and proposed Class "Claimants") and who join this memorandum.

expectation approach in *New Times I* and *II*. But they have now completed their 180 degree turn in the face of a massive Ponzi scheme that threatens to bankrupt SIPC. In furtherance of this position, they resort to the last bastion for all lawyers who need to overcome a well defined statute and solid precedent—they attempt to create new law.[5] This Court should not allow the parties supporting the "cash-in/cash-out" approach to ignore the legislative intent behind SIPA, contradict SIPC's prior pronouncements, and redefine and overturn 40 years of precedent. It is the customer's legitimate expectation which defines "net equity" under SIPA—reflected on the customer's confirmations and account statements—not a *post hoc* recalculation, going back 30 years in some instances, done after the Ponzi scheme is exposed.

In regards to point (ii), this is not a "zero sum" game, as every dollar SIPC advances to a Madoff victim is not a dollar taken from some other Madoff victim. To argue as much is simply disingenuous.

The primary basis in support of points (i) and (ii) for the SEC's proposed departure from the statute is reflected in the first heading of its Argument section, which ends with "on the Facts of This Case." (SEC Brief at 3). In this one instance because of the "Facts in This Case," the

---

[5] Furthermore, neither SIPC, the SEC, nor the Trustee—or anyone else for that matter—has the authority to replace Congress' judgment with their own on the issue of what constitutes a customer's "net equity" claim. In fact, Congress explicitly prohibited SIPC from doing so:

> "SIPC shall have the power . . . to adopt, amend and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to . . . the definition of terms in this chapter, *other than those terms for which a definition is provided in section 78lll of this title*."

15 U.S.C. § 78ccc(b)(4)(A) (emphasis added).

3

"cash-in/cash-out" supporters ask this Court to disregard the legislative history, ignore SIPC's prior statements, and manipulate prior precedent—because in fact—the Madoff Ponzi Scheme was too big, it was too well run, it lasted too long, the SEC was negligent in uncovering it, and most importantly ***it threatens to bankrupt SIPC***.  This Court should not allow such a travesty to occur.

## ARGUMENT

### A. The "Cash-In/Cash-Out" Approach Contradicts The Rational And Purpose Behind SIPA, Which Is To Advance Up To $500,000 Based Upon The Customer's Legitimate Expectation

The "cash-in/cash-out" approach supporters have ignored the premise behind SIPA. SIPA was enacted, in part, to offset the collapse of many brokerage firms in the late 60's and early 70's in order to return investor confidence to the securities market.  With the expansion of the securities market, the issuance of securities certificates in the name of each individual investor had become an expensive, logistical nightmare for the brokerage houses.  In fact, "stock certificates and related documents were 'piled halfway to the ceiling' in some offices."[6]  The cost associated with this process was repressive and hindering the growth of the financial industry.[7]  In an effort to alleviate both the cost and hassle of issuing the individual securities certificates in the name of the investor, brokerage houses began to actively push the issuance of securities in the "street name."[8]

---

[6] Joel Seligman, *The Transformation of Wall Street: A History of the Securities Exchange Commission and Modern Corporate Finance* (Aspen Pub. N.Y. 3d ed. 2003) 451 n.31.

[7] Thomas W. Joo, *Who Watches the Watchers? The Securities Investor Protection Act, Investor Confidence, and the Subsidization of Failure*, 72 S. Cal. L. Rev. 1071, 1080 (1999).

[8] From the SEC's own web-site:

4

SIPA was part of the compromise that allowed the brokerage industry to eliminate a logistical hurdle, thus increasing the profit margin, but at the same time created a communal fund from the contributions of the broker-dealer industry that would protect the customers when a broker-dealer was placed in liquidation.[9] The SEC admits that such protection is afforded to customers on its own website:

> **Q: How are my securities protected if I choose street name ownership?**
>
> **A:** Nearly all broker-dealers are members of Securities Investor Protection Corporation ("SIPC"). As a result your securities and money held at your broker-dealer are *protected* up to $500,000 with a $100,000 limit for cash. Many broker-dealers also carry insurance in excess of SIPC's coverage. However, SIPC does not protect you against losses caused by a decline in the market value of your securities.[10]

---

> **Street Name Registration:**
> You may have your security registered in street name and held in your account at your broker-dealer. Many brokerage firms will automatically put your securities into street name unless you give them specific instructions to the contrary. Under street name registration, your firm will keep records showing you as the real or "beneficial" owner, but you will not be listed directly on the issuer's books. Instead, your brokerage firm (or some other nominee) will appear as the owner on the issuer's books.
> While you will not receive a certificate, your firm will send to you, at least four times a year, an account statement that lists all your securities at the broker-dealer. Your broker-dealer will also credit your account with your dividend and interest payments and will provide you with consolidated tax information.

*available at* http://www.sec.gov/investor/pubs/holdsec.htm (last viewed on 12/19/2009).

[9] SIPA was enacted in 1970 to protect investors and maintain their confidence in the financial markets. H.R. Rep. No. 91-1613, at 3-4 (1970) ("This legislation [SIPA] . . . is designed to effect two aims. It will establish immediately a substantial reserve fund which will provide protection to customers of broker-dealers . . . This will reinforce the confidence that investors have in the U.S securities markets. In addition, [it] will provide for a strengthening of the financial responsibilities of broker-dealers."). *See In re New Times Sec. Serv., Inc.*, 371 F.3d 68, 87 (2d Cir. 2004) ("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 794 (6th Cir. 1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers.'") (citing *SIPC v. Barbour*, 421 U.S. 412, 415, 95 S.Ct. 1733, 1736 (1975)); *Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314, 1318 n.5 (2d Cir. 1976) (same).

[10] *available at* http://www.sec.gov/investor/pubs/holdsec.htm (last viewed on 12/19/2009) (emphasis added).

5

After SIPA, and because most securities were held in the street name, customers were forced to rely upon the integrity of their investment manager for appropriate due diligence, government regulators—like the SEC—to monitor their broker-dealers, SIPC for its insurance, and the confirmations and account statements they received to accurately reflect the execution of transactions in their accounts. In this instance, the system has failed the Madoff victims. Their broker was a crook, the SEC—by its own admission—was negligent in exposing the fraud and monitoring the broker-dealer,[11] and SIPC has refused to advance funds because it claims that the confirmations and account statements cannot form the basis of a customer's legitimate expectation.

B.  **The "Cash-In/Cash-Out" Method Supported By The SEC And Optimal Is Not Found Within The Plain Language Of SIPA**

SIPA defines a customer's "net equity" claim as the value of the customer's "securities positions" in his account, less any amount the customer owes the debtor, as of the date of the filing of the SIPA liquidation:

> "The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –

---

[11] See Report of Investigation, United States Securities and Exchange Commission Office of Inspector General, "Investigation of Failure of the SEC To Uncover Bernard Madoff's Ponzi Scheme," August 31, 2009, attached hereto as Exhibit A to the Declaration of Brian Maddox.

> The OIG investigation did find, however, that the SEC received more than ample information in the form of detailed and substantive complaints over the years to warrant a thorough and comprehensive examination and/or investigation of Bernard Madoff and BMIS for operating a Ponzi scheme, and that despite three examinations and two investigations being conducted, a thorough and competent investigation or examination was never performed. (Page 1)
> [D]espite numerous credible and detailed complaints, the SEC never properly examined or investigated Madoff's trading and never took the necessary, but basic, steps to determine if Madoff was operation a Ponzi scheme. Had these efforts been made with appropriate follow-up at any time beginning in June of 1992 until December 2009, the SEC could have uncovered the Ponzi scheme well before Madoff confessed.

6

>   (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
>   (B) any indebtedness of such customer to the debtor on the filing date."[12]

15 U.S.C. § 78lll(11); *see also In re Adler, Coleman Clearing Corp.,* 247 B.R. 51, 62 n.2 (Bankr. S.D.N.Y. 1999) ("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed."). SIPA explicitly provides that the customer's "net equity" is the amount "owed by the debtor to [the] customer," determined by calculating what the value of the customer's "securities positions" would have been had those positions been liquidated on the filing date. Nowhere in the statute, or the legislative history, is there any requirement that the customer prove the legitimacy of the profits or the trades reflecting such profits. This makes sense, since to do so would be an impossibility for a typical customer.

Most importantly, SIPA's purpose is to "satisfy more adequately customer expectations,"[13] because as Congressman Robert Eckhardt stated, "[o]ne of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments], is

---

[12] The "indebtedness" of the customer to the debtor refers to cash or securities owed to the debtor, which is most often in the context of a customer having borrowed from the debtor on margin. *See  e.g.*, H.R. Rep. No. 95-746, at 21 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (noting that, under the 1970 statutory regime, when there were shortages in available securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *In re First Street Sec. Corp.*, 34 B.R. 492, 497 (Bankr. S.D. Fla. 1983) (offsetting against claim amount of indebtedness customer owed to the debtor where unauthorized stock purchase was funded in part by borrowing on margin).

[13]  922 Cong. Rec. H. 36326 (Nov. 1, 1977) (statement of Representative Robert C. Eckhardt).

7

the failure to meet *legitimate customer expectations* of receiving what was in their account at the time of their broker's insolvency."[14]

### 1. *New Times I* and *II* Established The Basis For A Customer's Legitimate Expectations

*New Times I* established that it is the customer's legitimate expectations that define "net equity." *In re New Times Sec. Servs.*, 371 F.3d at 86 (hereafter "*New Times I*"). The SEC recognized this very principal when it explained that, "[o]ur view [is] that when possible, SIPA should be interpreted consistently with a customer's *legitimate expectations based on confirmations and account statements*."[15] Also in *New Times I,* SIPC supported this exact position as well noting that it is the "*reasonable and legitimate claimant expectations* on the filing date [that] are controlling even where inconsistent with transaction reality."[16] *New Times II* confirmed this position when the Second Circuit stated, "[i]t is a *customer's legitimate expectations* on the filing date . . . that determines the availability, nature, and extent of customer relief under SIPA." *In re New Times Sec. Servs., Inc.*, 463 F.3d 125, 128 (2d Cir. 2006) ("*New Times II*") (emphasis added).

---

[14] *See also* Hearing on H.R. 8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th Cong. 63 (1975) ("The basic framework of the 1970 Act in regard to satisfaction of customers' claims should be modified to better meet the *legitimate expectations of customers.")* (report to the SIPC Board of Directors by the Special Task Force to consider possible amendments to SIPA).

[15] Brief of the SEC, Amicus Curiae, In Partial Support of the Position of Appellants and In Partial Support of the Position of Appellees ("SEC Amicus Curiae Brief") at 13, New Times I (No. 02-6166) (emphasis added).

[16] Brief of SIPC, *S.E.C. v. Goren*, 206 F. Supp. 2d 344 (E.D.N.Y. 2004), at 26 (emphasis added); *See also* SIPC Rules supportive of and consistent with its holding because, "[u]nder the Series 500 Rules, whether a claim is treated as one for securities or cash depends not on what is *actually* in the customer's account but on what the customer has been told by the debtor in written confirmations." *Id.* at 86 (emphasis in original). *See also In re Oberweis Sec., Inc.*, 135 B.R. 842, 847 n.1 (Bankr.N.D. Ill. 1991) ("The court agrees with the trustee's argument that Congress did not intend to treat customers without confirmations [in a SIPA liquidation] the same as those with confirmations; that customers with confirmations have a legitimate expectation of receiving securities, but customers without confirmations do not have the same expectation.").

Yet here, both the SEC and SIPC have taken a contrary position that the confirmations and account statements no longer establish reasonable and legitimate expectations of the customer to determine "net equity" in the customer's account.[17] For the first time in SIPA's history, the SEC and SIPC argue that a customer's legitimate expectations can only be established after (i) the Ponzi scheme has been revealed, (ii) where the securities that were actually never purchased would have been subject to market risk, and (iii) the "books and records" of a broker-dealer expose that a fraudster backdated the trades. Nowhere in the statute, the legislative history, or the case law to date is there support for such a ludicrous position for establishing a customer's reasonable and legitimate expectation.

The SEC states that its position with respect to "net equity" is that "there is no meaningful difference between 'fraudulent promises made on fake securities' (*New Times II*, 463 F.3d at 130) and fraudulent promises involving positions in real securities that are fabricated through fictitious backdated trades based on hindsight." (SEC Brief at 8). In this argument, the SEC is blind to the fact that there is no way for any investor to have knowledge of the "fictitious backdated trades," where as in *New Times I*, there was an obvious method for confirming "fake securities." Confirming the legitimacy of a security in *New Times I* was as simple as all the investor had to do was look at the newspaper or check the various listings on the exchanges to determine if that security was actually legitimate. Whereas here, none of the supporters for the

---

[17] Furthermore, SIPC noted in *New Times I* that "[i]n those cases [that concern the payment of interest/dividends on bona fide mutual funds] the claimants had an ***objectively legitimate expectation*** of receiving interest/dividends." Brief for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc. and Securities Investor Protection Corporation at 38, *New Times I* (No. 02-6166) (emphasis added).

9

"cash-in/cash-out" approach have offered a single method for the customer to identify the illegitimate backdating.

The SEC attempts to support its argument with a misapplication of the seminal portion of *New Times I*. The SEC argues that "crediting the securities positions shown on the BLMIS statements would not 'mirror[] what would have happened had the given transaction[s] been executed'" (SEC Brief at 8 (citing *New Times I*, 371 F.3d at 74)). However, the SEC's version of the quote is incomplete and taken out of context. The complete quote and rational for this statement is:

> the information that these claimants received on their account statements 'mirrored what would have happened had the given transaction been executed.' [Br. for New Times Trustee and SIPC] at 7 n.6. As a result, the Trustee deemed those customers' claims to be 'securities claims' eligible to receive up to $500,000 in SIPC advances. *Id.* The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. *Id.* ***Furthermore, the Trustee notes that, if they were checking on their mutual funds, the 'securities claimants,' in contrast to the 'cash claimants' bringing this appeal, could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements***. *Id.*"[18](emphasis added).

Thus, the seminal point for supporting the position that the trades "mirrored what would have happened had the given transaction been executed" is the fact that the customers could have tracked the trades and thus reasonably believed that they had occurred. Again, it is the ***legitimacy of the customer's expectation***, as reflected in documents that the customer could verify—such as, the confirmations, account statements and Form 1099s—that is the determining factor, not the legitimacy of the actual trade or the profits reflected therein.

---

[18] *See New Times I*, 371 F.3d at 74.

10

Madoff's victims legitimately believed that the securities in their accounts were traded or purchased and sold, even though the securities "were never actually purchased." Decades of income tax returns and tax payments for trading profits were levied upon BLMIS's investor victims, because they believed that the securities reflected on their Madoff account statements were actually purchased and sold on the dates listed and at prices matching those reported by the securities exchanges. Accordingly, Trustee is required to base the Madoff customers' "legitimate expectations" on those BLMIS accounts statements.

Lastly, now because of the publication of SIPC's and the SEC's newly created position, future investors are now forewarned that the SEC—the government institution whose mission it "is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation,"[19]—is more concerned about "'leaving the SIPC Fund unacceptably exposed'" (SEC Brief at 8 citing *New Times I*, 371 F.3d at 88) than it is about leaving the investor community "unacceptably exposed," since the customer cannot rely upon their customer account statements or confirmations—or the SEC. Certainly SIPC and the SEC will be amending their web sites to adjust their previous statements to reflect their new found positions so all brokerage account holders will know to move their accounts to new firms every few years.

Furthermore, SIPC would not be left "unacceptably exposed" if it follows the statutorily mandated definition of "net equity." The Trustee has stated, there were over 4,903 active accounts with Madoff on November 30, 2008, at $500,000 per account, the maximum exposure

---

[19] U.S. Securities and Exchange Commission web-site, *available at* http://www.sec.gov/about/whatwedo.shtml (last viewed 12/19/09).

11

would be $2.5 billion.[20] A sum SIPC could easily raise through its access to $2 billion in lines of credit.

To be clear, this is not a bail-out as has been misreported in the press, it is an assessment against the investment industry for the right to issue securities in street names. If the securities industry does not want to "insure" its customers through a communal fund, then similar to the judicial activism requested by the SEC, SIPC, and the Trustee concerning "net equity," this Court should also direct all SIPC member firms to begin issuing securities certificates to each individual customer, as they will no longer be able to rely upon their confirmations or account statements under the position proffered by the SEC, SIPC and the Trustee.

### 2. The Confirmations And Account Statements Are Sufficient To Meet The "Books and Records" Requirement of 15 U.S.C. 78fff-2(b)

The SEC reliance upon 15 U.S.C. 78fff-2(b) as a rational for supporting the "cash-in/cash-out" approach takes the manipulation of statutory construction arguments to new heights. As a basis for disallowing a Madoff victim's claim based upon the final account statement, the SEC argues that 15 U.S.C. 78fff-2(b) provides a reason to simply ignore the pertinent provision of the statute—Section 78*lll*(11). This is unsupportable, as Section 78fff-2(b) is limited to establishing a customer's status as a preferred customer in order to qualify for a SIPC advance, s*ee In re A.R. Baron Co., Inc.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y.1998), but does nothing to establish the methodology or cash calculation of that same customer's claims.

---

[20] "Based on the money in/money out methodology we are using, 2,335 accounts of the 4,903 had net losses of approximately $21.2 billion, and 2,568 accounts received more than was deposited." *See* 10/28/09 Statement of Irving H. Picard, Court-Appointed Trustee, BLMIS, *available at* http://www.sipc.org/pdf/2009-10-28%20IHP%20Press%20Conference%20Statement.pdf. The $2.5 billion is the ceiling number, as there are likely a significant number of Madoff victims with substantially less than $500,000 in "net equity" claims.

12

Moreover, it is simply staggering that the SEC argues that customer confirmations and account statements are not proper "books and records" under 15 U.S.C. 78fff-2(b). (SEC Brief at 3-4). The SEC does not cite a single case, where a customer's claim was disregarded based upon the deficiencies of the fraudulent brokers' "books and records." The "books and records" requirement is simply a method for establishing the names and amounts for securities that the customer thought or legitimately expected were contained in his or her account. To somehow assert that the victims cannot rely upon the "books and records" of a Ponzi scheme because it was a Ponzi scheme is simply ludicrous. The basis of this argument is that the customers cannot establish that they paid for the securities positions reflected on their last statements (SEC Brief at 4). Turning this point on its head, the SEC should establish how a customer could ever be legitimately expected to prove such a fact. The SEC has offered no evidence as to how an investor could ever prove that they paid for the securities positions. This is simply another attempt to place the blame on the victim—and not the system that ultimately let them down.

**C.    The "Zero Sum" Argument Is A Red Herring**

The "zero-sum game" position is simply wrong.[21] SIPA was enacted to specifically deal with insolvent or failed broker-dealers, and when properly applied, an advance of up to $500,000 to one customer has no effect upon the sum advanced to another customer. For instance, let's

---

[21] The Trustee may argue that the SEC never utilized the phrase "zero sum game" but it intimated as much when it stated:
> Basing customers' recoveries on fictitious amounts in the account statements would also inequitably distort the pro rata distribution of customer property held by the Trustee by favoring customers who invested years ago and have already withdrawn the amounts they invested—at the expense of recent customers who have not yet made significant withdrawals. There would be a substantial and inequitable reduction in assets available for distribution to customers who have not recovered their principal if the final account statement method were adopted.

(SEC Brief at 9). See also Optimal Brief at 2 and 6.

13

assume that SIPC was unable to recover a single cent of customer property, SIPC would still be required to advance up to $500,000 to each eligible customer. In a second example, assume a customer's "net equity" under the Trustee's unlawful "cash-in/cash-out" approach is $500,000, and further assume the total amount of claims is $20 billion, but the trustee is only able to recover $2 billion in customer property. The $500,000 customer will receive a $500,000 SIPC advance (or 100% of his "net equity") even though he is only entitled to a 10% *pro rata* share of the customer property recovered, or $50,000. In that case, the overage of $450,000 that the customer received as an advance by SIPC is simply a loss to SIPC, which neither reduces any payment to any other victim, nor the amount of customer property.[22]

---

[22] Claimants join and incorporate the arguments contained in the Milberg LLP brief filed on December 18, 2009 [Docket No. 1095], pages 8-10, concerning the Optimal Entities' attempt to self-servingly salvage their settlement agreement with the Trustee.

14

## **CONCLUSION**

For the foregoing reasons, Claimants respectfully request that this Court deny Trustee's motion and rule that "net equity" is equal to the value of the securities reflected on the BLMIS customers November 30, 2008 account statement, and that the avoidance provisions are inapplicable and have no effect on "net equity."

Dated: New York, New York
December 21, 2009

Respectfully submitted,

LAX & NEVILLE, LLP

By:   /s/ *Brian J. Neville*
Brian J. Neville (BN 8251)
Barry R. Lax (BL 1302)
Brian Maddox (BM 6128)
1412 Broadway, Suite 1407
New York, NY 10018
Tel: (212) 696-1999
Fax: (212) 566-4531

*Counsel for Claimants*