# REPORT OF INVESTIGATION

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## OFFICE OF INSPECTOR GENERAL

## Case No. OIG-509

### Investigation of Failure of the SEC
### To Uncover Bernard Madoff's Ponzi Scheme

#### Executive Summary

The OIG investigation did not find evidence that any SEC personnel who worked on an SEC examination or investigation of Bernard L. Madoff Investment Securities, LLC (BMIS) had any financial or other inappropriate connection with Bernard Madoff or the Madoff family that influenced the conduct of their examination or investigatory work. The OIG also did not find that former SEC Assistant Director Eric Swanson's romantic relationship with Bernard Madoff's niece, Shana Madoff, influenced the conduct of the SEC examinations of Madoff and his firm. We also did not find that senior officials at the SEC directly attempted to influence examinations or investigations of Madoff or the Madoff firm, nor was there evidence any senior SEC official interfered with the staff's ability to perform its work.

The OIG investigation did find, however, that the SEC received more than ample information in the form of detailed and substantive complaints over the years to warrant a thorough and comprehensive examination and/or investigation of Bernard Madoff and BMIS for operating a Ponzi scheme, and that despite three examinations and two investigations being conducted, a thorough and competent investigation or examination was never performed. The OIG found that between June 1992 and December 2008 when Madoff confessed, the SEC received six[1] substantive complaints that raised significant red flags concerning Madoff's hedge fund operations and should have led to questions about whether Madoff was actually engaged in trading. Finally, the SEC was also aware of two articles regarding Madoff's investment operations that appeared in reputable publications in 2001 and questioned Madoff's unusually consistent returns.

The first complaint, brought to the SEC's attention in 1992, related to allegations that an unregistered investment company was offering "100%" safe investments with high and extremely consistent rates of return over significant periods of time to "special" customers. The SEC actually suspected the investment company was operating a Ponzi scheme and learned in their investigation that all of the investments were placed entirely

---

[1] There were arguably eight complaints, since as described in greater detail below, three versions of one of these six complaints were actually brought to the SEC's attention, with the first two versions being dismissed entirely, and an investigation not opened until the third version was submitted.

through Madoff and consistent returns were claimed to have been achieved for numerous years without a single loss.

The second complaint was very specific and different versions were provided to the SEC in May 2000, March 2001 and October 2005. The complaint submitted in 2005 was entitled "The World's Largest Hedge Fund is a Fraud" and detailed approximately 30 red flags indicating that Madoff was operating a Ponzi scheme, a scenario it described as "highly likely." The red flags included the impossibility of Madoff's returns, particularly the consistency of those returns and the unrealistic volume of options Madoff represented to have traded.

In May 2003, the SEC received a third complaint from a respected Hedge Fund Manager identifying numerous concerns about Madoff's strategy and purported returns, questioning whether Madoff was actually trading options in the volume he claimed, noting that Madoff's strategy and purported returns were not duplicable by anyone else, and stating Madoff's strategy had no correlation to the overall equity markets in over 10 years. According to an SEC manager, the Hedge Fund Manager's complaint laid out issues that were "indicia of a Ponzi scheme."

The fourth complaint was part of a series of internal e-mails of another registrant that the SEC discovered in April 2004. The e-mails described the red flags that a registrant's employees had identified while performing due diligence on their own Madoff investment using publicly-available information. The red flags identified included Madoff's incredible and highly unusual fills for equity trades, his misrepresentation of his options trading and his unusually consistent, non-volatile returns over several years. One of the internal e-mails provided a step-by-step analysis of why Madoff must be misrepresenting his options trading. The e-mail clearly explained that Madoff could not be trading on an options exchange because of insufficient volume and could not be trading options over-the-counter because it was inconceivable that he could find a counterparty for the trading. The SEC examiners who initially discovered the e-mails viewed them as indicating "some suspicion as to whether Madoff is trading at all."

The fifth complaint was received by the SEC in October 2005 from an anonymous informant and stated, "I know that Madoff [sic] company is very secretive about their operations and they refuse to disclose anything. If my suspicions are true, then they are running a highly sophisticated scheme on a massive scale. And they have been doing it for a long time." The informant also stated, "After a short period of time, I decided to withdraw all my money (over $5 million)."

The sixth complaint was sent to the SEC by a "concerned citizen" in December 2006, advising the SEC to look into Madoff and his firm as follows:

> Your attention is directed to a scandal of major proportion
> which was executed by the investment firm Bernard L.
> Madoff . . . . Assets well in excess of $10 Billion owned by
> the late [investor], an ultra-wealthy long time client of the

Madoff firm have been "co-mingled" with funds controlled by the Madoff company with gains thereon retained by Madoff.

In March 2008, the SEC Chairman's office received a second copy of the previous complaint, with additional information from the same source regarding Madoff's involvement with the investor's money, as follows:

> It may be of interest to you to that Mr. Bernard Madoff keeps two (2) sets of records. The most interesting of which is on his computer which is always on his person.

The two 2001 journal articles also raised significant questions about Madoff's unusually consistent returns. One of the articles noted his "astonishing ability to time the market and move to cash in the underlying securities before market conditions turn negative and the related ability to buy and sell the underlying stocks without noticeably affecting the market." This article also described that "experts ask why no one has been able to duplicate similar returns using [Madoff's] strategy." The second article quoted a former Madoff investor as saying, "Anybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story. To take it at face value is a bit naïve."

The complaints all contained specific information and could not have been fully and adequately resolved without thoroughly examining and investigating Madoff for operating a Ponzi scheme. The journal articles should have reinforced the concerns about how Madoff could have been achieving his returns.

The OIG retained an expert in accordance with its investigation in order to both analyze the information the SEC received regarding Madoff and the examination work conducted. According to the OIG's expert, the most critical step in examining or investigating a potential Ponzi scheme is to verify the subject's trading through an independent third party.

The OIG investigation found the SEC conducted two investigations and three examinations related to Madoff's investment advisory business based upon the detailed and credible complaints that raised the possibility that Madoff was misrepresenting his trading and could have been operating a Ponzi scheme. Yet, at no time did the SEC ever verify Madoff's trading through an independent third-party, and in fact, never actually conducted a Ponzi scheme examination or investigation of Madoff.

The first examination and first Enforcement investigation were conducted in 1992 after the SEC received information that led it to suspect that a Madoff associate had been conducting a Ponzi scheme. Yet, the SEC focused its efforts on Madoff's associate and never thoroughly scrutinized Madoff's operations even after learning that the investment decisions were made by Madoff and being apprised of the remarkably consistent returns over a period of numerous years that Madoff had achieved with a basic trading strategy.

3

While the SEC ensured that all of Madoff's associate's customers received their money back, they took no steps to investigate Madoff. The SEC focused its investigation too narrowly and seemed not to have considered the possibility that Madoff could have taken the money that was used to pay back his associate's customers from other clients for which Madoff may have had held discretionary brokerage accounts. In the examination of Madoff, the SEC did seek records from the Depository Trust Company (DTC) (an independent third-party), but sought copies of such records from Madoff himself. Had they sought records from DTC, there is an excellent chance that they would have uncovered Madoff's Ponzi scheme in 1992.[2]

In 2004 and 2005, the SEC's examination unit, OCIE, conducted two parallel cause examinations of Madoff based upon the Hedge Fund Manager's complaint and the series of internal e-mails that the SEC discovered. The examinations were remarkably similar. There were initial significant delays in the commencement of the examinations, notwithstanding the urgency of the complaints. The teams assembled were relatively inexperienced, and there was insufficient planning for the examinations. The scopes of the examination were in both cases too narrowly focused on the possibility of front-running, with no significant attempts made to analyze the numerous red flags about Madoff's trading and returns.

During the course of both these examinations, the examination teams discovered suspicious information and evidence and caught Madoff in contradictions and inconsistencies. However, they either disregarded these concerns or simply asked Madoff about them. Even when Madoff's answers were seemingly implausible, the SEC examiners accepted them at face value.

In both examinations, the examiners made the surprising discovery that Madoff's mysterious hedge fund business was making significantly more money than his well-known market-making operation. However, no one identified this revelation as a cause for concern.

Astoundingly, both examinations were open at the same time in different offices without either knowing the other one was conducting an identical examination. In fact, it was Madoff himself who informed one of the examination teams that the other examination team had already received the information they were seeking from him.

In the first of the two OCIE examinations, the examiners drafted a letter to the National Association of Securities Dealers (NASD) (another independent third-party) seeking independent trade data, but they never sent the letter, claiming that it would have been too time-consuming to review the data they would have obtained. The OIG's expert opined that had the letter to the NASD been sent, the data would have provided the information necessary to reveal the Ponzi scheme. In the second examination, the OCIE Assistant Director sent a document request to a financial institution that Madoff claimed he used to clear his trades, requesting trading done by or on behalf of particular Madoff

---

[2] As discussed in the body of the Report of Investigation, this is premised upon the assumption that Madoff had been operating his Ponzi scheme in 1992, which most of the evidence seems to support.

feeder funds during a specific time period, and received a response that there was no transaction activity in Madoff's account for that period. However, the Assistant Director did not determine that the response required any follow-up and the examiners testified that the response was not shared with them.

Both examinations concluded with numerous unresolved questions and without any significant attempt to examine the possibility that Madoff was misrepresenting his trading and operating a Ponzi scheme.

The investigation that arose from the most detailed complaint provided to the SEC, which explicitly stated it was "highly likely" that "Madoff was operating a Ponzi scheme," never really investigated the possibility of a Ponzi scheme. The relatively inexperienced Enforcement staff failed to appreciate the significance of the analysis in the complaint, and almost immediately expressed skepticism and disbelief. Most of their investigation was directed at determining whether Madoff should register as an investment adviser or whether Madoff's hedge fund investors' disclosures were adequate.

As with the examinations, the Enforcement staff almost immediately caught Madoff in lies and misrepresentations, but failed to follow up on inconsistencies. They rebuffed offers of additional evidence from the complainant, and were confused about certain critical and fundamental aspects of Madoff's operations. When Madoff provided evasive or contradictory answers to important questions in testimony, they simply accepted as plausible his explanations.

Although the Enforcement staff made attempts to seek information from independent third-parties, they failed to follow up on these requests. They reached out to the NASD and asked for information on whether Madoff had options positions on a certain date, but when they received a report that there were in fact no options positions on that date, they did not take any further steps. An Enforcement staff attorney made several attempts to obtain documentation from European counterparties (another independent third-party), and although a letter was drafted, the Enforcement staff decided not to send it. Had any of these efforts been fully executed, they would have led to Madoff's Ponzi scheme being uncovered.

The OIG also found that numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was unwise. Specifically, Madoff's description of both his equity and options trading practices immediately led to suspicions about Madoff's operations. With respect to his purported trading strategy, many simply did not believe that it was possible for Madoff to achieve his returns using a strategy described by some industry leaders as common and unsophisticated. In addition, there was a great deal of suspicion about Madoff's purported options trading, with several entities not believing that Madoff could be trading options in such high volumes where there was no evidence that any counterparties had been trading options with Madoff.

The private entities' conclusions were drawn from the same "red flags" in Madoff's operations that the SEC considered in its examinations and investigations, but ultimately dismissed.

We also found that investors who may have been uncertain about whether to invest with Madoff were reassured by the fact that the SEC had investigated and/or examined Madoff, or entities that did business with Madoff, and found no evidence of fraud. Moreover, we found that Madoff proactively informed potential investors that the SEC had examined his operations. When potential investors expressed hesitation about investing with Madoff, he cited the prior SEC examinations to establish credibility and allay suspicions or investor doubts that may have arisen while due diligence was being conducted. Thus, the fact the SEC had conducted examinations and investigations and did not detect the fraud, lent credibility to Madoff's operations and had the effect of encouraging additional individuals and entities to invest with him.

A more detailed description of the circumstances surrounding the five major investigations and examinations that the SEC conducted of Madoff and his firm is provided below. In June 1992, several customers of an investment firm known as Avellino & Bienes approached the SEC conveying concerns about investments they had made. The SEC was provided with several documents that Avellino & Bienes created that indicated they were offering "100%" safe investments, which they characterized as loans, with high and extremely consistent rates of return over significant periods of time. Not everyone could invest with Avellino & Bienes, as this was a "special" and exclusive club, with some special investors getting higher returns than others.

As the SEC began investigating the matter, they learned that Madoff had complete control over all of Avellino & Bienes' customer funds and made all investment decisions for them, and, according to Avellino, Madoff had achieved these consistent returns for them for numerous years without a single loss. Avellino described Madoff's strategy for these extraordinarily consistent returns as very basic: investing in long-term Fortune 500 securities, with hedges of the Standard & Poor's (S&P) index.

The SEC suspected that Avellino & Bienes was operating a Ponzi scheme and took action to ensure that all of Avellino & Bienes' investors were refunded their investments. Yet, the OIG found that the SEC never considered the possibility that Madoff could have taken the money that was used to pay back Avellino & Bienes' customers from other clients as part of a larger Ponzi scheme.

The SEC actually conducted an examination of Madoff that was triggered by the investigation of Avellino & Bienes, but assembled an inexperienced examination team. The examination team conducted a brief and very limited examination of Madoff, but made no effort to trace where the money that was used to repay Avellino & Bienes' investors came from. In addition, although the SEC examiners did review records from DTC, they obtained those DTC records from Madoff rather than going to DTC itself to verify if trading occurred. According to the lead SEC examiner, someone should have been aware of the fact that the money used to pay back Avellino & Bienes' customers

could have come from other investors, but there was no examination of where the money that was used to pay back the investors came from. Another examiner said such a basic examination of the source of the funds would have been "common sense." In addition, although the SEC's lead examiner indicated that the investment vehicle offered by Avellino & Bienes had numerous "red flags" and was "suspicious," no effort was made look at the investment strategy and returns.

Instead, the SEC investigative team, which was also inexperienced, brought a limited action against Avellino & Bienes for selling unregistered securities, not fraud, and did not take any further steps to inquire into Madoff's firm. The SEC lawyers working on the matter were aware of the questionable returns and the fact that all the investment decisions were made by Madoff, but the focus of the investigation was limited to whether Avellino & Bienes was selling unregistered securities or operating an unregistered investment firm. A trustee and accounting firm were retained to ensure full distribution of the assets, but its jurisdiction was limited, and they did not take any action to independently verify account balances and transaction activity included in Madoff's financial and accounting records. Even after the accounting firm was unable to audit Avellino & Bienes' financial statements and uncovered additional red flags, such as Avellino & Bienes' failure to produce financial statements or have the records one would have expected from such a large operation, no further efforts were made to delve more deeply into either Avellino & Bienes' or Madoff's operations.

The result was a missed opportunity to uncover Madoff's Ponzi scheme 16 years before Madoff confessed. The SEC had sufficient information to inquire further and investigate Madoff for a Ponzi scheme back in 1992. There was evidence of incredibly consistent returns over a significant period of time without any losses, purportedly achieved by Madoff using a basic trading strategy of buying Fortune 500 stocks and hedging against the S&P index. Yet, the SEC seemed satisfied with closing Avellino & Bienes down, and never even considered investigating Madoff, despite knowing that Avellino & Bienes invested all of their clients' money exclusively with Madoff. The SEC's lead examiner said Madoff's reputation as a broker-dealer may have influenced the inexperienced team not to inquire into Madoff's operations.

In May 2000, Harry Markopolos provided the SEC's Boston District Office (BDO) with an eight-page complaint questioning the legitimacy of Madoff's reported returns. The 2000 complaint posited the following two explanations for Madoff's unusually consistent returns: (1) that "[t]he returns are real, but they are coming from some process other than the one being advertised, in which case an investigation is in order;" or (2) "[t]he entire fund is nothing more than a Ponzi Scheme." Markopolos' complaint stated that Madoff's returns were unachievable using the trading strategy he claimed to employ, noting Madoff's "perfect market-timing ability." Markopolos also referenced the fact that Madoff did not allow outside performance audits.

Markopolos explained his analysis presented in the 2000 complaint at a meeting at the SEC's Boston office and encouraged the SEC to investigate Madoff. After the meeting, both Markopolos and an SEC staff accountant testified that it was clear that the

BDO's Assistant District Administrator did not understand the information presented. Our investigation found that this was likely the reason that the BDO decided not to pursue Markopolos' complaint or even refer it to the SEC's Northeast Regional Office (NERO).

In March 2001, Markopolos provided the BDO with a second complaint, which supplemented his previous 2000 complaint with updated information and additional analysis. Markopolos' 2001 complaint included an analysis of Madoff's returns versus the S&P 500, showing that he had only three down months versus the market's 26 down months during the same period, with a worst down month of only -1.44% versus the market's worst down month of -14.58%. Markopolos concluded that Madoff's "numbers really are too good to be true." Markopolos' analysis was supported by the experience of two of his colleagues, Neil Chelo and Frank Casey, both of whom had substantial experience and knowledge of investment funds.

Although this time the BDO did refer Markopolos' complaint, NERO decided not to investigate the complaint only one day after receiving it. The matter was assigned to an Assistant Regional Director in Enforcement for initial inquiry, who reviewed the complaint, determined that Madoff was not registered as an investment adviser, and the next day, sent an e-mail stating, "I don't think we should pursue this matter further." The OIG could find no explanation for why Markopolos' complaint, which the Enforcement attorney and the former head of NERO acknowledged was "more detailed than the average complaint," was disregarded so quickly.

Just one month after NERO decided not to pursue Markopolos' second submission to the SEC, in May 2001, *MARHedge* and *Barron's* both published articles questioning Madoff's unusually consistent returns and secretive operations. The *MARHedge* article, written by Michael Ocrant and entitled "Madoff tops charts; skeptics ask how," stated how many were "baffled by the way [Madoff's] firm has obtained such consistent, nonvolatile returns month after month and year after year," describing the fact Madoff "reported losses of no more than 55 basis points in just four of the past 139 consecutive months, while generating highly consistent gross returns of slightly more than 1.5% a month and net annual returns roughly in the range of 15.0%." The *MARHedge* article further discussed how industry professionals "marvel at [Madoff's] seemingly astonishing ability to time the market and move to cash in the underlying securities before market conditions turn negative and the related ability to buy and sell the underlying stocks without noticeably affecting the market." It further described how "experts ask why no one has been able to duplicate similar returns using [Madoff's] strategy."

The *Barron's* article, written by Erin Arvedlund and entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," discussed how Madoff's operation was among the three largest hedge funds, and has "produced compound average annual returns of 15% for more than a decade" with the largest fund "never [having] had a down year." The *Barron's* article further questioned whether Madoff's trading strategy could have been achieving those remarkably consistent returns.

The OIG found that the SEC was aware of the *Barron's* article when it was published in May 2001. On May 7, 2001, an Enforcement Branch Chief in the BDO followed up with NERO regarding Markopolos' 2001 complaint and the *Barron's* article, and asked the Director of NERO if he wanted a copy of the article. However, the decision not to commence an investigation was not reconsidered and there is no evidence the *Barron's* article was ever even reviewed. In addition, we found that former OCIE Director Lori Richards reviewed the *Barron's* article in May 2001 and sent a copy to an Associate Director in OCIE shortly thereafter, with a note on the top stating that Arvedlund is "very good" and that "This is a great exam for us!" However, OCIE did not open an examination, and there is no record of anyone else in OCIE reviewing the *Barron's* article until several years later.

In May 2003, OCIE's investment management group in Washington, D.C. received a detailed complaint from a reputable Hedge Fund Manager, in which he laid out the red flags that his hedge fund had identified about Madoff while performing due diligence on two Madoff feeder funds. The Hedge Fund Manager attached four documents to his complaint, including performance statistics for three Madoff feeder funds and the *MARHedge* article.

The Hedge Fund Manager's complaint identified numerous concerns about Madoff's strategy and purported returns. According to the Hedge Fund Manager's complaint, while Madoff purported to trade $8-$10 billion in options, he and his partner had checked with some of the largest brokers and did not see the volume in the market. Further, the Hedge Fund Manager explained in his complaint that Madoff's fee structure was suspicious because Madoff was foregoing the significant management and performance fees typically charged by asset managers. The complaint also described specific concerns about Madoff's strategy and purported returns such as the fact that the strategy was not duplicable by anyone else; there was no correlation to the overall equity markets (in over 10 years); accounts were typically in cash at month end; the auditor of the firm was a related party to the principal; and Madoff's firm never had to face redemption.

According to an SEC supervisor, the Hedge Fund Manager's complaint implied that Madoff might be lying about its option trading and laid out issues that were "indicia of a Ponzi scheme." One of the senior examiners on the team also acknowledged that the Hedge Fund Manager's complaint could be interpreted as alleging that Madoff was running a Ponzi scheme.

The OIG's expert concluded that based upon issues raised in the Hedge Fund Manager's complaint, had the examination been staffed and conducted appropriately and basic steps taken to obtain third-party verifications, Madoff's Ponzi scheme should and would have been uncovered.

However, we found that OCIE did not staff or conduct the examination

adequately, and thus, missed another opportunity to uncover Madoff's fraud. The complaint was immediately referred to OCIE's broker-dealer examination group even though the complaint mainly raised investment management issues. The broker-dealer group decided not to request investment adviser staff support for the examination even though the examiners testified that such support could have been arranged whether or not Madoff was registered as an investment adviser. The OIG was informed that, at that time, the two OCIE groups rarely collaborated on examinations.[3]

The broker-dealer examination team assigned to the examination was inexperienced. According to an examiner, at the time of the Madoff examination, OCIE "didn't have many experienced people at all" noting that "we were expanding rapidly and had a lot of inexperienced people" conducting examinations. Another OCIE examiner stated that "there was no training," that "this was a trial by fire kind of job" and there were a lot of examiners who "weren't familiar with securities laws." The team was composed entirely of attorneys, who according to one member, did "not have much experience in equity and options trading" but "rather, their experience was in general litigation." As noted above, the complaint included issues typically examined by investment adviser personnel, such as verification of purported investment returns and account balances, but the group assigned to the examination had no significant experience conducting examinations of these issues.

In addition, notwithstanding the serious issues raised in the Hedge Fund Manager's complaint, the start of the examination was delayed for seven months, until December 2003. No reason was given for this delay.

The OIG investigation also found that the complaint was poorly analyzed and the focus of the examination was much too limited. The examination focused solely on front-running, notwithstanding the numerous other "red flags" raised in the complaint, and failed to analyze how Madoff could have achieved his extraordinarily consistent returns, which had no correlation to the overall markets. When asked why the other issues in the Hedge Fund Manager's complaint and the two 2001 articles were not investigated, the Associate Director stated he focused on front-running because "that was the area of expertise for my crew."

A Planning Memorandum for the examination was prepared, but it failed to address several critical issues from the complaint, including the unusual fee structure; the inability to see the volume of options in the marketplace; the remarkable returns; the fact that Madoff's trading strategy was not duplicable; the returns had no correlation to actual equity markets; the accounts were in cash at month's end; there were no third party brokers; and the auditor of Madoff's firm was a related party.

---

[3] It should be noted that the fact that Madoff's hedge fund business had not been registered at the time of the examinations would not have been an impediment to the examiners' ability to obtain information from Madoff as, at all relevant times, the SEC had authority to examine all of Madoff's firm's books and records, whether they were related to market making or hedge fund clients.

In addition, courses of action outlined in the Planning Memorandum that involved verification of trading with independent third parties should have been carried out, but were not. For example, the staff drafted a letter to the NASD (an independent third-party), which was critical to any adequate review of the complaint because the data and information from the NASD would have assisted in independently verifying trading activity conducted at Madoff's firm. However, the letter was never sent, with the explanation given by staff that it would have been too time-consuming to review the information they would have obtained. According to the OIG's expert, had the letter been sent out, the NASD would have provided order and execution data that would have indicated that Madoff did not execute the significant volume of trades for the discretionary brokerage accounts that he represented to the examiners, and the data would likely have provided the information necessary to reveal the Ponzi scheme.

During the course of the examination, the examination team discovered suspicious information and evidence, but failed to follow up on numerous "red flags." Responses by Madoff to the document requests contradicted the Hedge Fund Manager's complaint and the 2001 articles. For example, Madoff's claim that his firm did not manage or advise hedge funds was contradicted by the articles that reported Madoff was managing billions of dollars in assets. In addition, although known for advanced technology, Madoff claimed not to have e-mail communications with clients. However, the examiners did not follow up on these red flags.

We also found that Madoff's responses to the examiners' document requests should have raised suspicions because the information provided appeared incomplete and, at times, inconsistent when compared to other information provided. For example, Madoff's account statements only included average prices during each day without the actual prices for each transaction. According to the OIG's expert, based on the questions raised by the examination team with regard to differing trade patterns for certain clients, there should have been significant suspicions as to whether or not Madoff was implementing the strategy as claimed.

The examiners also made the surprising discovery that Madoff's mysterious hedge fund business was making significantly more money than his well-known market-making operation. However, this was not identified as a cause for concern. When the examination team contacted Madoff to discuss their open questions, his answers failed to clarify matters and he again claimed not to act as an investment adviser. In February 2004, the examination was expanded to analyze the question of whether Madoff was acting as an investment adviser. Legal memoranda were drafted to seek guidance on this issue, but never sent. In a subsequent draft of a supplemental document request to Madoff, the examiners sought detailed audit trail data, including the date, time, and execution price for all of his trades in 2003. But the examiners removed the request for this critical data from the supplemental request before it was sent out. The reason given was that they were generally hesitant to get audit trail data "because it can be tremendously voluminous and difficult to deal with" and "takes a ton of time" to review. No requests were made from independent third-parties for any data, although an OCIE examiner acknowledged obtaining such data should not have been difficult.

11

Although there were numerous unresolved questions in the examination, in early April 2004, the examiners were abruptly instructed to shift their focus to "mutual funds" projects, placing the Madoff examination on the "backburner." We found that it was not unusual at that time to shift attention to high priority projects in OCIE and leave some projects incomplete

As the examination of Madoff in Washington, D.C. was shelved, in NERO, a nearly identical examination of Madoff was just beginning. In April 2004, a NERO investment management examiner had been conducting a routine examination of an unrelated registrant when it discovered internal e-mails from November and December 2003 that raised questions about whether Madoff was involved in illegal activity involving managed accounts. These internal e-mails described the red flags the registrant's employees identified while performing due diligence using widely available information on their Madoff investment. The red flags the registrant had identified included Madoff's: (1) incredible and highly unusual fills for equity trades; (2) misrepresentation of his options trading; (3) secrecy; (4) auditor; (5) unusually consistent and non-volatile returns over several years; and (6) fee structure.

Crucially, one of the internal e-mails provided a step-by-step analysis of why Madoff must be misrepresenting his options trading. The e-mail explained that Madoff could not be trading on an options exchange because of insufficient volume and could not be trading options over-the-counter because it was inconceivable he could find a counterparty for the trading. For example, the e-mail explained that because customer statements showed that the options trades were always profitable for Madoff, there was no incentive for a counterparty to continuously take the other side of those trades since they would always lose money. These findings raised significant doubts that Madoff could be implementing his trading strategy. The internal e-mails included the statement that the registrant had "totally independent evidence" that Madoff's executions were "highly unusual."

The investment management examiner who initially discovered the e-mails and his supervisors viewed them as indicating the registrant's employees were clearly "trying to find out where exactly the trades were taking place" and the e-mails evidenced that "there's some suspicion as to whether Madoff is trading at all." They indicated they would have followed up on the allegation in the e-mails about "whether Madoff was actually trading."

As with the examination, in Washington, D.C., there was a significant delay before the examination was commenced. Although the e-mails were discovered in April 2004 and immediately referred to the NERO broker-dealer examination program, a team was not assembled until December 2004.

The team assembled in NERO consisted of an Associate Director, an Assistant Director and two junior examiners in the broker-dealer examination program. A branch chief, whose role would be to oversee and assist the junior examiners, was not assigned to the examination. One of the junior examiners assigned to examination in 2004

graduated from college in 1999 and joined the SEC as his first job out of school. The other examiner had worked as an equity trader for a few years before coming to the SEC. He had worked on approximately four examinations before being assigned to the Madoff examination.

Once again, no consideration was given to performing a joint examination with investment management examiners, despite the fact that the internal e-mails raised suspicions about Madoff's performance and returns. An examiner stated that each of the examination programs in NERO was a "silo" and they almost never worked together.

In late March 2005, approximately ten months after receiving the referral, the NERO broker-dealer examination team began performing background research in preparation for an on-site examination of Madoff to begin in April. Unlike the OCIE examination team, the NERO examination team did not draft a planning memorandum laying out the scope of the examination. The examiners recalled that, at the time of the examination, NERO did not have a practice of writing planning memoranda.

Once again, although the e-mails raised significant issues about whether Madoff was engaging in trading at all, the decision was made to focus exclusively on front-running. The NERO Associate Director stated that despite identifying Madoff's returns as an issue, he did not necessarily have "an expectation" that the examiners would analyze Madoff's returns because portfolio analysis was not a strength of broker-dealer examiners.

To the extent that the NERO examiners did examine issues outside of front-running, they conducted their examination by simply asking Madoff about their concerns and accepting his answers. With respect to the significant concerns about Madoff's options trading, they asked Madoff about this issue, and when Madoff said he was no longer using options as part of his strategy, they stopped looking at the issue, despite the fact that Madoff's representation was inconsistent with the internal e-mails, the two 2001 articles, and the investment strategy Madoff claimed to employ. As to why Madoff did not collect fees like all other hedge fund managers, they accepted his response that he was not "greedy" and was happy with just receiving commissions.

Several issues, including the allegation in the internal e-mails that Madoff's auditor was a related party, were never examined at all. Yet, after Madoff confessed to operating a Ponzi scheme, a staff attorney in NERO's Division of Enforcement was assigned to investigate Madoff's accountant, David Friehling, and within a few hours of obtaining the work papers, he determined that no audit work had been done.

In addition, although one of the NERO examiners placed a "star" next to the statement in the internal e-mails about having "totally independent evidence" that Madoff's executions were "highly unusual," NERO never followed up with the registrant to inquire about or obtain this evidence. The NERO examiners explained that it was not their practice to seek information from third parties when they conducted examinations.

When the examiners began their on-site examination of Madoff, they learned Bernard Madoff would be their primary contact and Madoff carefully controlled to whom they spoke at the firm. On one occasion, when a Madoff employee was speaking to the NERO examiners at Madoff's firm, after a couple of minutes, another Madoff employee rushed in to escort her from the conversation, claiming she was urgently needed. When the examiners later asked Madoff the reason for the urgency, Madoff told them her lunch had just arrived, even though it was 3:00 o'clock in the afternoon.

Madoff made efforts during the examination to impress and even intimidate the junior examiners from the SEC. Madoff emphasized his role in the securities industry during the examination. One of the NERO examiners characterized Madoff as "a wonderful storyteller" and "very captivating speaker" and noted that he had "an incredible background of knowledge in the industry." The examiner said he found it "interesting" but also "distracting" because they were there "to conduct business."

The other NERO examiner noted that "[a]ll throughout the examination, Bernard Madoff would drop the names of high-up people in the SEC." Madoff told them that Christopher Cox was going to be the next Chairman of the SEC a few weeks prior to Cox being officially named. He also told them that Madoff himself "was on the short list" to be the next Chairman of the SEC. When the NERO examiners would seek documents Madoff did not wish to provide, Madoff became very angry, with an examiner recalling that Madoff's "veins were popping out of his neck" and he was repeatedly saying, "What are you looking for? . . . . Front running. Aren't you looking for front running," and "his voice level got increasingly loud."

Throughout the examination, the NERO examiners "had a real difficult time dealing with" Madoff as he was described as growing "increasingly agitated" during the examination, and attempting to dictate to the examiners what to focus on in the examination and what documents they could review. Yet, when the NERO examiners reported back to their Assistant Director about the pushback they received from Madoff, they received no support and were actively discouraged from forcing the issue.

One effort was made to verify Madoff's trading with an independent third-party, but even after they received a very suspicious response, there was no follow-up. The Assistant Director sent a document request to a financial institution that Madoff claimed he used to clear his trades, requesting records for trading done by or on behalf of particular Madoff feeder funds during a specific time period. Shortly thereafter, the financial institution responded, stating there was no transaction activity in Madoff's account for that period. Yet, the response did not raise a red flag for the Assistant Director, who merely assumed that Madoff must have "executed trades through the foreign broker-dealer." The examiners did not recall ever being shown the response from the financial institution, and no further follow-up actions were taken.

At one point in the NERO examination, the examiners were planning to confront Madoff about the many contradictory positions he was taking, particularly as they related to Madoff's changing stories about how many advisory clients he had. However, when

14

the NERO examiners pushed Madoff for documents and information about his advisory clients, he rebuffed them, pointing out that he had already provided the information to the Washington, D.C. staff in accordance with their examination. The NERO examiners were taken aback, since they were unaware that the D.C. office of OCIE had been conducting a simultaneous examination of Madoff on the identical issues they were examining.

When the NERO examiners asked the Washington, D.C. examiners about Madoff's claim, they first learned about the Washington, D.C. examination, which by that time, had been dormant for months. There were a couple of brief conference calls between the two offices about their examinations, but relatively little sharing of information. One of the few points that was made in a conference call between the offices was a comment by a senior-level Washington D.C. examiner reminding the junior NERO examiners that Madoff "was a very well-connected, powerful, person," which one of the NERO examiners interpreted to raise a concern for them about pushing Madoff too hard without having substantial evidence. While the Washington, D.C. examination team decided not to resume their examination and sent their workpapers to NERO, the NERO examiners reported conducting only a cursory review of the workpapers and did not recall even reviewing the Hedge Fund Manager's detailed complaint that precipitated the D.C. examination, appear to have never discussed the D.C. examiners' open questions about Madoff's representations and trading, and did not compare the list of clients Madoff produced to them with the list he produced to the D.C. team.

Meanwhile, as the NERO examination continued, Madoff was failing to provide the NERO examiners with requested documents and the examiners continued to find discrepancies in the information Madoff did provide. As the examiners continued to review the documents Madoff produced, their confusion and skepticism grew. While the NERO examiners had significant questions about Madoff's trade executions and clearance, as well as Madoff's claim that he used his "gut feel" to time the market based on "his observations of the trading room," Madoff was pushing them to finish the examination.

As had been the case with the Washington, D.C. examination, the NERO examiners learned that Madoff's well-known market making business would be losing money without the secretive hedge fund execution business. Although they described this revelation as "a surprising discovery," the issue was once again never pursued.

Although the NERO examiners determined Madoff was not engaged in front-running, they were concerned about issues relating to the operation of his hedge fund business, and sought permission to continue the examination and expand its scope. Their Assistant Regional Director denied their request, telling them to "keep their eyes on the prize," referring to the front-running issue. When the examiners reported that they had caught Madoff in lies, the Assistant Director minimized their concerns, stating "it could [just] be a matter of semantics." The examiners' request to visit Madoff feeder funds was denied, and they were informed that the time for the Madoff examination had expired.

The explanation given was that "field work cannot go on indefinitely because people have a hunch or they're following things."

Thus, the NERO cause examination of Madoff was concluded without the examination team ever understanding how Madoff was achieving his returns and with numerous open questions about Madoff's operations. Many, if not most, of the issues raised in both the Hedge Fund Manager's complaint that precipitated the Washington, D.C. examination and the internal e-mails that triggered the NERO examination had not been analyzed or resolved. In September 2005, NERO prepared a closing report for the examination that relied almost entirely on information verbally provided by Madoff to the examiners for resolution of numerous "red flags." One of the two primary examiners on the NERO examination team was later promoted based on his work on the Madoff examination.

Only a month after NERO closed its examination of Madoff, in October 2005, Markopolos provided the SEC's BDO with a third version of his complaint entitled "The World's Largest Hedge Fund is a Fraud." Markopolos' 2005 complaint detailed approximately 30 red flags indicating Madoff was operating a Ponzi scheme, a scenario Markopolos described as "highly likely." Markopolos' 2005 complaint discussed an alternative possibility – that Madoff was front-running – but characterized that scenario as "unlikely." The red flags identified by Markopolos were similar to the ones previously raised in the Hedge Fund Manager's complaint and the internal e-mails that led to the two cause examinations of Madoff, although somewhat more detailed. They generally fell into one of three categories: (1) Madoff's obsessive secrecy; (2) the impossibility of Madoff's returns, particularly the consistency of those returns; and (3) the unrealistic volume of options Madoff was supposedly trading.

The BDO found Markopolos credible, having worked with him previously and took his 2005 complaint seriously. While senior officials with the BDO considered Markopolos' allegation that Madoff was operating a Ponzi scheme worthy of serious investigation, they felt it made more sense for NERO to conduct the investigation because Madoff was in New York and NERO had already conducted an examination of Madoff. The BDO made special efforts to ensure that NERO would "recognize the potential urgency of the situation" which was evidenced by the Director of the BDO e-mailing the complaint to the Director of NERO personally, and by following up to ensure the matter was assigned within NERO.

While the Madoff investigation was assigned within NERO Enforcement, it was assigned to a team with little to no experience conducting Ponzi scheme investigations. The majority of the investigatory work was conducted by a staff attorney who recently graduated from law school and only joined the SEC nineteen months before she was given the Madoff investigation. She had never previously been the lead staff attorney on any investigation, and had been involved in very few investigations overall. The Madoff assignment was also her first real exposure to broker-dealer issues.

16

The NERO Enforcement staff, unlike the BDO, failed to appreciate the significance of the evidence in the 2005 Markopolos complaint and almost immediately expressed skepticism and disbelief about the information contained in the complaint. The Enforcement staff claimed that Markopolos was not an insider or an investor, and thus, immediately discounted his evidence. The Enforcement staff also questioned Markopolos' motives, indicating concerns that "he was a competitor of Madoff's" who "was looking for a bounty." These concerns were particularly misplaced because in Markopolos' complaint, he described that it was "highly likely" that Madoff was operating a "Ponzi scheme," and acknowledged that if he were correct, he would **not** be eligible for a bounty. Moreover, even after the branch chief assigned to the Madoff Enforcement investigation spoke with a senior official at the BDO, who vouched for Markopolos' credibility, she remained skeptical of him throughout the investigation.

The OIG investigation also found the Enforcement staff was skeptical about Markopolos' complaint because Madoff did not fit the "profile" of a Ponzi scheme operator, with the branch chief on the Madoff investigation noting that there was "an inherent bias towards [the] sort of people who are seen as reputable members of society."

The NERO Enforcement staff also received a skeptical response to Markopolos' complaint from the NERO examination team who had just concluded their examination. Even though the NERO examination had focused solely on front-running, NERO examination team downplayed the possibility that Madoff was conducting a Ponzi scheme, saying, "these are basically some of the same issues we investigated" and that Markopolos "doesn't have the detailed understanding of Madoff's operations that we do which refutes most of his allegations." In testimony before the OIG, the examiners acknowledged that their examination "did not refute Markopolos' allegations regarding a Ponzi scheme" and that the examiners' reaction may have given the impression their examination had a greater focus than it did. Indeed, since the NERO examination had ruled out front-running, the NERO examiners should have encouraged the Enforcement staff to analyze Markopolos' more likely scenario, the Ponzi scheme. Yet, that scenario was never truly analyzed.

The Enforcement staff delayed opening a matter under inquiry (MUI) for the Madoff investigation for two months, which was a necessary step at the beginning of an Enforcement investigation for the staff to be informed of other relevant information that the SEC received about the subject of the investigation. As a result of the delay in opening a MUI, the Enforcement staff never learned of another complaint sent to the SEC in October 2005 from an anonymous informant stating, "I know that Madoff [sic] company is very secretive about their operations and they refuse to disclose anything. If my suspicions are true, then they are running a highly sophisticated scheme on a massive scale. And they have been doing it for a long time." The informant also stated, "After a short period of time, I decided to withdraw all my money (over $5 million)." As a result, there was no review or analysis of this complaint.

In addition, as was the case with the SEC examinations of Madoff, the focus of the Enforcement staff's investigation was much too limited. Markopolos' 2005

17

complaint primarily presented evidence that Madoff was operating a Ponzi scheme, calling that scenario "highly likely." However, most of the Enforcement staff's efforts during their investigation were directed at determining whether Madoff should register as an investment adviser or whether Madoff's hedge fund investors' disclosures were adequate. In fact, the Enforcement staff's investigative plan primarily involved comparing documents and information that Madoff had provided to the examination staff (which he fabricated) with documents that Madoff had sent his investors (which he also fabricated).

Yet, the Enforcement staff almost immediately caught Madoff in lies and misrepresentations. An initial production of documents the Enforcement staff obtained from a Madoff feeder fund demonstrated Madoff had lied to the examiners in the NERO examination about a fundamental component of his claimed trading activity. Specifically, while Madoff told the examiners he had stopped using options as part of his strategy after they scrutinized his purported options trading, the Enforcement staff found evidence from the feeder funds that Madoff was telling his investors that he was still trading options during that same time period. Yet, the Enforcement staff never pressed Madoff on this inconsistency. After an interview with an executive from a Madoff feeder fund, the Enforcement staff noted several additional "discrepancies" between what Madoff told the examiners in the NERO examination and information they received in the interview. The Enforcement staff also discovered that the feeder fund executive's testimony had been scripted and he had been prepped by Madoff.

As the investigation progressed, in December 2005, Markopolos approached the Enforcement staff to provide them additional contacts and information. However, the branch chief assigned to the Madoff Enforcement investigation took an instant dislike to Markopolos and declined to even pick up the "several inch thick file folder on Madoff" that Markopolos offered. One of the Enforcement staff described the relationship between Markopolos and the Branch Chief as "adversarial."

In February 2006, the Enforcement staff contacted the SEC's Office of Economic Analysis (OEA) seeking assistance in analyzing Madoff's trading. OEA failed to respond to the request for two and a half months. In April 2006, the Enforcement staff went back to OEA, but failed to provide OEA with a copy of Markopolos' 2005 complaint. An expert on options trading in OEA did review certain documents that OEA received from the Enforcement staff and, based upon a 20 minute review, concluded Madoff's split-strike conversion strategy "was not a strategy that would be expected to earn significant returns in excess of the market." However, this analysis was not conveyed to the Enforcement staff. In addition, the OEA options trading expert told the OIG that if he had been made aware of the amount of assets that Madoff had been claiming to manage, he would have ruled out "front-running" as a possible explanation for Madoff's returns. In the end, the Enforcement staff never obtained any useful information or analysis from OEA.

Throughout the Enforcement staff's investigation, the Enforcement staff was confused about certain critical and fundamental aspects of Madoff's operations. They

had trouble understanding Madoff's purported trading strategy, basic custody of assets issues and, generally, how Madoff's operation worked. Despite the Enforcement staff's confusion, after their unsuccessful attempt to seek assistance from OEA, they never consulted the SEC's own experts on broker-dealer operations, the SEC's Division of Trading and Markets (formerly the Division of Market Regulation), who could have facilitated inquiries with independent third-parties such as the NASD and DTC. Similarly, after Madoff claimed his purported trading activity took place in Europe, the Enforcement staff did not seek help from the SEC's Office of International Affairs (OIA). Had they simply sought assistance from OIA on matters within its area of expertise, the Enforcement staff should have discovered that Madoff was not purchasing equities from foreign broker dealers and that he did not have Over-the-Counter (OTC) options with European counterparties.

At a crucial point in their investigation, the Enforcement staff was informed by a senior-level official from the NASD that they were not sufficiently prepared to take Madoff's testimony, but they ignored his advice. On May 17, 2006, two days before they were scheduled to take Madoff's testimony, the Enforcement staff attorney contacted the Vice President and Deputy Director of the NASD Amex Regulation Division to discuss Madoff's options trading. The NASD official told the OIG that he answered "extremely basic questions" from the Enforcement staff about options trading. He also testified that, by the end of the call, he felt the Enforcement staff did not understand enough about the subject matter to take Madoff's testimony. The NASD official also recalled telling the Enforcement staff that they "needed to do a little bit more homework before they were ready to talk to [Madoff]," but that they were intent on taking Madoff's testimony as scheduled. He testified that when he and a colleague who was also on the call hung up, "we were both, sort of, shaking our heads, saying that, you know, it really seemed like some of these [options trading] strategies were over their heads." Notwithstanding the advice, the Enforcement staff did not postpone Madoff's testimony.

On May 19, 2006, Madoff testified voluntarily and without counsel in the SEC investigation. During Madoff's testimony, he provided evasive answers to important questions, provided some answers that contradicted his previous representations, and provided some information that could have been used to discover that he was operating a Ponzi scheme. However, the Enforcement staff did not follow-up with respect to the critical information that was relevant to uncovering Madoff's Ponzi scheme.

For example, when Enforcement staff asked the critical question of how he was able to achieve his consistently high returns, Madoff never really answered the question but, instead, attacked those who questioned his returns, particularly the author of the *Barron's* article. Essentially, Madoff claimed his remarkable returns were due to his personal "feel" for when to get in and out of the market, stating, "Some people feel the market. Some people just understand how to analyze the numbers that they're looking at." Because of the Enforcement staff's inexperience and lack of understanding of equity and options trading, they did not appreciate that Madoff was unable to provide a logical explanation for his incredibly consistent returns. Each member of the Enforcement staff

accepted as plausible Madoff's claim that his returns were due to his perfect "gut feel" for when the market would go up or down.

During his testimony, Madoff also told the Enforcement investigators that the trades for all of his advisory accounts were cleared through his account at DTC. He testified further that his advisory account positions were segregated at DTC and gave the Enforcement staff his DTC account number. During an interview with the OIG, Madoff stated that he had thought he was caught after his testimony about the DTC account, noting that when they asked for the DTC account number, "I thought it was the end game, over. Monday morning they'll call DTC and this will be over . . . and it never happened." Madoff further said that when Enforcement did not follow up with DTC, he "was astonished."

This was perhaps the most egregious failure in the Enforcement investigation of Madoff; that they never verified Madoff's purported trading with any independent third parties. As a senior-level SEC examiner noted, "clearly if someone ... has a Ponzi and, they're stealing money, they're not going to hesitate to lie or create records" and, consequently, the "only way to verify" whether the alleged Ponzi operator is actually trading would be to obtain "some independent third-party verification" like "DTC."

A simple inquiry to one of several third parties could have immediately revealed the fact that Madoff was not trading in the volume he was claiming. The OIG made inquiries with DTC as part of our investigation. We reviewed a January 2005 statement for one Madoff feeder fund account, which alone indicated that it held approximately $2.5 billion of S&P 100 equities as of January 31, 2005. On the contrary, on January 31, 2005, DTC records show that Madoff held less than $18 million worth of S&P 100 equities in his DTC account. Similarly, on May 19, 2006, the day of Madoff's testimony with the Enforcement staff, DTC records show that Madoff held less than $24 million worth of S&P 100 equities in his DTC account and on August 10, 2006, the day Madoff agreed to register as an investment adviser and the Enforcement staff effectively ended the Madoff investigation, DTC records showed the Madoff account held less than $28 million worth of S&P 100 equities in his DTC account. Had the Enforcement staff learned this information during the course of their investigation, they would have immediately realized that Madoff was not trading in anywhere near the volume that he was showing on the customer statements.[4] When Madoff's Ponzi scheme finally collapsed in 2008, an SEC Enforcement attorney testified that it took only "a few days" and "a phone call ... to DTC" to confirm that Madoff had not placed any trades with his investors' funds.

Our investigation did find that the Enforcement staff made attempts to seek information from independent third-parties; however, they failed to follow up on these requests. On May 16, 2006, three days before Madoff's testimony, the Enforcement staff reached out to the Director of the Market Regulation Department at the NASD and asked her to check a certain date on which Madoff had purportedly held S&P 100 index option

---

[4] The $18 to $24 million in positions were associated with the firm's own account.

positions. She reported back that they had found no reports of such option positions for that day. Yet, the Enforcement staff failed to make any further inquiry regarding this remarkable finding. The Enforcement staff also failed to scrutinize information obtained in the NERO cause examination when the examination staff had attempted to verify Madoff's claims of trading OTC options with a financial institution and found that "no relevant transaction activity occurred during the period" requested. Finally, although the Enforcement staff attorney attempted to obtain documentation from U.S. affiliates of European counterparties and one of Madoff's purported counterparties was in the process of drafting a consent letter asking Madoff's permission to send the Enforcement staff the documents from its European account, the inexplicable decision was made not to send the letter and to abandon this effort. Had any of these efforts been pursued by the Enforcement staff, they would have uncovered Madoff's Ponzi scheme.

The Enforcement staff effectively closed the Madoff investigation in August 2006 after Madoff agreed to register as an investment adviser. They believed that this was a "beneficial result" as once he registered, "he would have to have a compliance program, and he would be subject to an examination by our [Investment Advisor] team." However, no examination was ever conducted of Madoff after he registered as an investment adviser.

A few months later, in December 2006, the Enforcement staff received another complaint from a "concerned citizen," advising the SEC to look into Madoff and his firm:

> Your attention is directed to a scandal of major proportion which was executed by the investment firm Bernard L. Madoff . . . . Assets well in excess of $10 Billion owned by the late [investor], an ultra-wealthy long time client of the Madoff firm have been "co-mingled" with funds controlled by the Madoff company with gains thereon retained by Madoff.

In investigating this complaint, the Enforcement staff simply asked Madoff's counsel about it, and accepted the response that Madoff had never managed money for this investor. This turned out to be false. When news of Madoff's Ponzi scheme broke, it became evident not only that Madoff managed this investor's money, but also that he was actually one of Madoff's largest individual investors.

Shortly after the Madoff Enforcement investigation was effectively concluded, the staff attorney on the investigation received the highest performance rating available at the SEC, in part, for her "ability to understand and analyze the complex issues of the Madoff investigation."

Markopolos also tried again in June 2007, sending an e-mail to the Enforcement branch chief on the Madoff investigation attaching "some very troubling documents that show the Madoff fraud scheme is getting even more brazen" and noting ominously, "When Madoff finally does blow up, it's going to be spectacular, and lead to massive

selling by hedge fund, fund of funds as they face investor redemptions." His e-mail was ignored.

After Madoff was forced to register as an investment adviser, the Enforcement investigation was inactive for 18 months before being officially closed in January 2008. A couple of months later, in March 2008, the Chairman's office received additional information regarding Madoff's involvement with the investor's money from the same source. The previous complaint was re-sent, and included the following information:

> It may be of interest to you to that Mr. Bernard Madoff keeps two (2) sets of records.[5] The most interesting of which is on his computer which is always on his person.

This updated complaint was forwarded to the Enforcement staff who had worked on the Madoff investigation, but immediately sent back, with a note stating, in pertinent part, "[W]e will not be pursuing the allegations in it."

As the foregoing demonstrates, despite numerous credible and detailed complaints, the SEC never properly examined or investigated Madoff's trading and never took the necessary, but basic, steps to determine if Madoff was operating a Ponzi scheme. Had these efforts been made with appropriate follow-up at any time beginning in June of 1992 until December 2008, the SEC could have uncovered the Ponzi scheme well before Madoff confessed.

Submitted: _____  Date: Aug. 31, 2009

H. David Kotz, Inspector General

---

[5] The allegation that Madoff kept two sets of records also turned out to be true.