BERNFELD, DEMATTEO &
 BERNFELD, LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1661
Facsimile: (212) 557-9610
David B.Bernfeld (DBB 0177)
Jeffrey Bernfeld (JLB-1615)
 *Attorneys for: Dr. Michael Schur and Mrs. Edith A. Schur*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES INVESTOR PROTECTION
CORPORATION,
                      Plaintiff,

      v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
                      Defendant.

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

(Substantively Consolidated)

---

In re:

BERNARD L. MADOFF,
                      Debtor.

---

**REPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO
TRUSTEE'S MOTION RELATING TO THE DETERMINATION OF NET EQUITY**

**PRELIMINARY STATEMENT**

This brief is respectfully submitted in accordance with the schedule set forth by this Court, in response to the brief submitted by the SEC.[1]

As set forth in the initial briefs opposing the Trustee's motion, the Trustee's new, proposed "cash in/cash out" definition of Net Equity is wholly incompatible with the SIPA statute and the relevant controlling case law.

Recognizing the inherent deficiencies in the Trustee's proposed "definition," the SEC now proposes to replace it with its own novel and equally artificial "definition" which it subjectively apparently prefers.

However, neither the Trustee's nor the SEC's proposed "definitions" can be found in the SIPA statute. To the contrary, SIPA statute contains a straightforward definition of Net Equity specifically designed to satisfy reasonable customer expectations, consistent with the explicit, core Congressional purpose for the SIPA statute.[2]

On the conceded facts of this case, the law mandates that Net Equity be determined by reference to the final customer account statements, which best reflect the customers' reasonable expectations. More specifically, where, as here: (i) customers receive trade confirmations and account statements involving real securities which exist in the market and could have been

---

[1] Dr. Micahel Schur and Mrs. Edith Schur (the "Claimants") also oppose the arguments submitted by Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited and incorporate the arguments included in other briefs (including the arguments set forth in the Milberg brief and the Chaitman brief) in opposition thereto as if fully set forth herein.

[2] The proposed definitions of the Trustee and the SEC are also at odds with the secondary stated Congressional core purpose, namely to restore and instill investor confidence in the securities markets. Under the cash in/cash out approach, investors would actually be put on notice that they cannot trust the securities markets or their brokers and must demand prompt physical delivery to them of all securities, properly registered in their name, not in street name.

purchased and (ii) the customer was neither complicit in the scheme nor had actual knowledge of it, Net Equity is equal to, and determined by, the customer's last account statement.

Realistically, the Trustee asks this Court to approve a result-driven approach rather than one guided by the Congressional intent as manifested in the SIPA statute - with a result which is directly opposite to the stated legislative intent. Bluntly, the Trustee has predetermined what he wishes to accomplish: to minimize the financial costs to SIPC and ultimately to SIPC's securities industry members, without real regard for investor protection and expectations. With that as the goal, the Trustee then crafted a definition of Net Equity to achieve that result. In doing so, the Trustee seeks to trump Congressional authority and the clearly expressed intent to protect reasonable customer expectations and foster investor confidence in the capital markets. In the process, the Trustee and the SEC are mangling the SIPA statute and the controlling case law virtually beyond recognition.

Despite the Trustee's misleading claims that he is protecting the so-called "net loser" class of Madoff victims, the primary beneficiary of the Trustee's new construct is SIPC and its membership, the registered broker-dealer industry. As discussed in greater detail below, that benefit is achieved to the significant detriment and expense of the already-victimized BLMIS customers - the very class of persons that Congress passed SIPA in order to protect.

The simple fact is that the Trustee's cash in/cash out construct (even as modified by the SEC's alternative construct) not only disenfranchises thousands of BLMIS customers who would be denied all SIPC protection and benefits, but in what is perhaps the ultimate irony, it will not even benefit the so-called "net loser" class of investors which the Trustee disingenuously claims he is seeking to help. To the contrary, even for that victim class, the cash in/cash out methodology will

actually *increase* SIPC's *pro rata* share of future customer property distributions and *reduce* the percentage to be paid to these customers.[3] The unavoidable ultimate result will be that the securities industry will bear virtually *none* of the costs of the Madoff fraud and the investor-victims will bear virtually *all* of those costs. Such a result is unsupportable under the SIPA statute and the applicable authorities.

The Trustee's cash in/cash out construct (even as modified by the SEC's alternate proposal) violates the clear statutory mandates of SIPA and must be forcefully rejected.[4]

### The SEC's Statement of Facts

The SEC concedes the dispositive facts for this motion: (i) the BLMIS customers received contemporaneous trade confirmations and monthly account statements reflecting the various transactions that BLMIS represented were done for each customers' account; and (ii) the reported transactions all involved real securities which existed in the marketplace and whose existence and pricing could be verified by the customers.

It cannot be seriously disputed that the account statements received by the BLMIS customers represented their reasonable expectations concerning what their accounts contained and what their accounts were worth. Those reasonable expectations were then reinforced by the history of the SEC's own dealings with Madoff over the lengthy period of the scam. As detailed in the Inspector

---

[3] As discussed in greater detail below, when SIPC makes a payment to a customer, it becomes entitled to a *pro rata* share of that customer's property distribution in the liquidation. SIPC's percentage portion of the customer's distribution is equal to the percentage of that customer's Net Equity represented by the SIPC advance payment. Since the Trustee's cash in/cash out construct reduces all of the Madoff victims' Net Equity, it necessarily increases SIPC's proportionate share of all of the customer distributions.

[4] It is also inconsistent as well with numerous prior statements from SIPC itself concerning the proper definition of Net Equity in these circumstances.

3

General's scathing report, the SEC squandered numerous opportunities to discover and disclose the fraud. Compounding those failures, the SEC then literally gave Madoff a public "clean bill of health," advising that it had investigated and found no evidence of fraud or wrongdoing at BLMIS. This necessarily added to the reasonableness of the customers' reliance on the account statements as reflective of their legitimate expectations.

Despite these undisputed facts, the SEC, in conclusory fashion, then simply states that "in this case, net equity should mainly be determined by cash in/cash out methodology" without any real explanation or analysis of why this would properly reflect customer expectations or instill investor confidence in the capital markets - the twin bases of Congressional purpose in enacting SIPA. Instead, the SEC focuses exclusively on the so-called limited pool of assets that allegedly will be available to customers for subsequent *pro rata* distribution - which has absolutely nothing to do with the separate threshold issue of why SIPC should be allowed to avoid its obligations to make SIPC payments to aggrieved customers - many of whom have lost literally everything and desperately require a SIPC payment to enable them to pay their basic living expenses. Those SIPC payments in no way reduce the size of the customer property pool available for *pro rata* distribution.

The SEC brief attempts to convey the impression that BLMIS sent customer confirmations long after the dates of the reported transactions, essentially creating instant profit without any theoretical market risk exposure. That, however, is contrary to the actual facts.

Confirmations were sent to customers within days of the transactions reported, consistent with normal brokerage practice treatment. Moreover, with respect to the so-called "basket of stocks" that BLMIS represented it periodically purchased for the investors, that purchase transaction did not, by itself, create any profit. It was simply the establishment of an opening securities position which was

4

confirmed to the customer relatively contemporaneously. That opening position *was* at market risk. If that basket of stocks had decreased in value during the interval between the establishment of the position and its closing, there would be a loss not a profit.

Further, although BLMIS was given discretion in terms of timing of purchases, as far as the customer understood, these purchases were to be executed within defined guidelines and established methodology. For example, BLMIS represented that it would only be dealing with S&P 100 stocks and would create a basket essentially replicating the S&P 100. Further, the investor understood that the basket of stocks would be covered by a put and call "collar" essentially protecting against the possibility of a dramatic loss on the downside.

Significantly, the confirmations received for the specific trades and the monthly statements were consistent with the methodology represented, namely periodic purchases of a basket of S&P 100 stocks with accompanying put/call collars. At any point in time, a BLMIS investor could check the market values of the reported positions and determine not only that the securities existed but whether the values reported by BLMIS were consistent with the market place.

* * *

In the interest of clarity, the Court should note the following :

a. The Trustee's motion papers claim that no securities transactions took place with the investor funds paid by customers to BLMIS. Claimants do not concede that this is the case and, indeed, believe that the contrary is true. In that regard, in connection with his motion to consolidate the Madoff bankruptcy with this SIPC liquidation, the Trustee has previously represented to this Court that all of Madoff's business operations - the proprietary trading,

5

the market making operation and the customer investment operation - were conducted under the same BLMIS entity umbrella. Further, the Trustee has told the Court that the funds provided by the BLMIS customers, which were to be used for security investments for them, were then used interchangeably by BLMIS in all of the other operations. Since BLMIS engaged in significant and profitable proprietary trading for the BLMIS account at a time when BLMIS had a fiduciary duty to invest first for its customers, those transactions and those profits belonged to the BLMIS customers, as reflected by the profits that Madoff credited to their accounts, even though the funds were diverted and misallocated to BLMIS. The trades, and the profits generated, should be allocated to the customers and those real transactions should be deemed to have occurred for the customers. On this point, it is significant to note that neither these Claimants nor other customers have been granted access to the relevant BLMIS books and records nor has there been an opportunity afforded to conduct even basic discovery. Therefore, even though not an issue to be determined on this motion, it should be clearly understood that Claimants specifically reserve and do not waive the right to argue and demonstrate that there were, in fact, securities transactions which took place with the customer funds paid to BLMIS.[5]

---

[5] This holds true not only for the proprietary trading operation but also for the market making operation as well. There, too, in violation of its fiduciary obligations, BLMIS took the opposite side of third party orders for itself rather than to allocating those trades - and the built in "spread profit" - to the investor customer accounts as BLMIS was legally obliged to do.

b.  Claimants similarly do not concede that there were no real profits generated by the funds they entrusted to BLMIS to invest for their account and benefit. As noted, these customer funds were used by BLMIS in its proprietary trading operation which generated millions in profits annually according to all available information. The same is true of the market making operations which the Trustee concedes was substantially underwritten by customer funds. The spread income generated by BLMIS when it made a market for a third party should likewise be credited to the customers. Thus, contrary to the facts asserted by the Trustee and the SEC, actual trades were executed, real profits were generated and, at the same time, customers were credited with transactions and profits. The Trustee has no basis (legally, equitably or morally) to deprive BLMIS customers of credit for those profits. Those trades and profits should be credited directly to the BLMIS customers instead of BLMIS' account. Not only were customer funds used to support that business but BLMIS had a fiduciary duty to execute those orders for the benefit of BLMIS customers and not trade ahead of those customers while holding customer funds. Thus it would appear that there were substantial real profits that should now be credited to the customers' benefit and not simply "phantom income" as the Trustee has claimed. Under the circumstances, Claimants specifically reserve the right to claim and demonstrate the existence of such real customer income and profits.

# ARGUMENT

## THE SEC'S ARGUMENTS ARE ERRONEOUS AND ADD NO SUPPORT TO THE FLAWED CASH IN/CASH OUT CONSTRUCT OF NET EQUITY PROPOSED BY THE TRUSTEE

### A. The Proper Remedy Under SIPA.

The SEC's first argument - that the account statements do not satisfy the so called "books and records" requirement under SIPA - is, quite simply, erroneous. If the SEC's contention were true, there would *never* be coverage under SIPA for a securities Ponzi scheme and that clearly is not the law. This argument, also made by the Trustee, is fully analyzed and refuted in the various initial briefs submitted in opposition to the Trustee's motion and in the interest of avoiding undue repetition, the Court is respectfully referred to those initial briefs on this point.

The SEC's brief concedes, as does the Trustee's, that each BLMIS customer has a claim for securities because, having provided BLMIS with funds to purchase securities, the customer's reasonable expectations were that securities in fact were purchased for the account, consistent with the trade confirmations and account statements issued by BLMIS to the customers. The brief then flatly acknowledges that "[t]he standard remedy when a failed broker promises to buy securities but does not do so - replacing the securities or, if this is not possible, crediting the customer with the cash value of the securities on the filing date advances the legislative purpose of giving customers the securities position that the broker could have purchased in real trading in the securities but never did."

Since this is precisely what has happened to the BLMIS customers - BLMIS represented that it had purchased specific, real, market-available securities, "but never did" - the conclusion that logically should follow is that the BLMIS customers should now receive what was promised to them

8

(either the specific securities, if possible, or the value of their accounts on the filing date). But the SEC then proceeds to disregard that acknowledged "standard remedy" and declares that for these customer victims, the account statements on the filing date should not determine their Net Equity and all that should be looked at is the net of what was put in less what was withdrawn - ignoring the clear language and requirements of the SIPA statute as well as decades of real life consequences as if they had never taken place.

In an attempt to justify this bizarre result, the SEC suggests that it "would be perpetuating the fraud" if the account statements were used to calculate Net Equity (as SIPA requires) because it would be "crediting the securities positions Madoff created through his backdated trading scheme."[6] But that is the essence of a securities Ponzi scheme. All confirmations issued are after the fact and effectively backdated to reflect a non-existent transaction. Here, as noted earlier, the BLMIS confirmations were sent within days of the claimed transactions and occurred within a normal time frame for the brokerage industry community. Also, as noted above, there was a real level of market risk with respect to open positions established by contemporaneous trade confirmations sent to BLMIS customers. If the S&P basket of stock declined in market value, there would be no profits, and there would be a risk of loss down to the strike price of the put BLMIS represented was established. This is the same market risk involved whenever a Ponzi schemer falsely claims to have purchased securities for a customer. The market value of the promised securities may decline, rather than appreciate, and the customer will then be saddled with the "market loss" even though there were never any securities purchased.

---

[6] In this manner, the SEC is treating the customers as if they were participants in a fraud on the market rather than victims of a ponzi scheme.

Although the SEC's brief claims that SIPA does not provide "an explicit remedy" in the BLMIS circumstances, that is erroneous. To the contrary, the SIPA statute contains an explicit definition of Net Equity which, on these facts, clearly references the customers' last account statement and what it reflects the broker owed the customer as of the filing date. See, 15 U.S.C. § 78lll(11) ("The term 'net equity' means the dollar amount of the account or accounts of a customer, to determined by - A. calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer ...; minus B. any indebtedness of such customer on the filing date ..."). See also, *Visconsi v, Lehman Bros., Inc.*, 2007 WL 2258827 (6th Cir. 2007) (confirming that the amount owed includes interest and profits reflected on the account statements even if some or all were fictitious).

Given the clear language of the SIPA statute and the SEC's crucial concessions regarding the "standard remedy" under SIPA when a brokerage firm fails, the SEC's claimed lack of "explicit remedy" is inexplicable and untrue.

The Court should also take note of some glaring omissions in the SEC brief. For example, it omits to refer to the SIPA statutory definition of Net Equity. Similarly, it ignores all of the Congressional and legislative history that demonstrates the paramount consideration of reasonable customer expectations and the companion goal of fostering investor confidence in the capital markets. Indeed, it does not even mention any of the explicit historical representations made by SIPC, both judicially and to the public at large, confirming that when dealing with securities that exist in the marketplace, SIPC will deliver replacement securities to the customer of a failed brokerage firm which has represented that it purchased those securities for the customer - *even if those securities were never in fact purchased.*

Unless the SEC simply overlooked these otherwise highly relevant issues, which is not very likely, the only other available conclusion is that the SEC realized that any real analysis of these issues would negate the SEC's proposed new definition of the statute.

Finally there is the *New Times* decision by the Second Circuit Court of Appeals. Claimants agree that *New Times* is controlling authority in the BLMIS situation. But *New Tines* does not support the cash in/cash out methodology on the facts of this case. Any fair and proper reading of *New Times* confirms that, on these facts, it supports the contentions of Claimants that Net Equity should be determined by the final account statements.

*New Times* confirms that when a Ponzi scheme involves confirmed transactions in real securities, available for purchase in the market place, the account statement equals the customer's net equity since it clearly represents what the customer reasonably understood was in his account. *New Times* also confirms that a cash in/cash out methodology is a narrow exception only to be used when the scheme involves transactions in wholly fictitious securities - because the customer could neither confirm the existence of nor the value of such fictitious securities in the marketplace. In that narrow and limited circumstance, the Court must, as a matter of necessity, resort to a cash in/cash out approach as a proxy for the customer's reasonable expectations since there is no other available method to value the non-existent securities.

This vital distinction between fictitious transactions in *real* securities on the one hand, and fictitious transactions in *fictitious* securities is at the core of the *New Times* holdings - a distinction conveniently blurred, and indeed ignored, in the SEC's brief.

While conceding that the BLMIS customer "has some similarities to" those investors in *New Times* who thought their broker had bought them real mutual funds, the SEC's brief then argues

11

that nevertheless, the BLMIS customer's should be treated differently - as if they were dealing in *fictitious* rather than *real* securities. The attempt to place the BLMIS customers into such a category is factually inaccurate, legally erroneous and otherwise lacking in merit or persuasion.

For purposes of determining Net Equity under SIPA, a BLMIS customer is analytically in a position virtually identical to the *New Times Security* customer who thought that real mutual funds had been purchased for that customer's account. In both situations, the investor placed his money with the Ponzi schemer to be invested in securities - with BLMIS in this case and with William Goren in *New Times*. In both, the customer did not determine or even know beyond broad categories the ultimate securities that would be purchased. In this case, BLMIS determined the actual securities purchased for the BLMIS customer and in *New Times,* the mutual fund determined the securities it chose to purchase.

In each case, the customer found out about the actual securities purchased after the fact. Indeed, the BLMIS customer received much more contemporaneous and detailed information concerning the specifics of the securities transactions than did a mutual fund investor who did not receive any confirmations of individual trades by the fund and whose monthly statement simply recited the net asset value of his holdings without supporting detail (except, perhaps, for quarterly/semi-annual/annual reports which did report, after the fact, the positions of the fund at a specified earlier point in time).

The purported distinction between the BLMIS customer and the *New Times* investor constitutes a distinction without any fundamental difference. Under the *New Time* analysis and mandate, the net equity of a BLMIS customer is to be determined on the basis of that customer's final account statement, in accordance with the customer's reasonable expectations and the clearly

expressed congressional intent.

**B.  SIPC is the Real Beneficiary of the Cash In/Cash Out Construct**

The SEC's brief ignores the real impact of the cash in/cash out construct on the BLMIS customers.  It fails to discuss, for example, that the primary beneficiary of this flawed methodology is SIPC and the broker-dealers who constitute its membership.

In the first instance, as has been noted and discussed at great length in the initial briefs submitted in opposition, "cash in/cash out" provides SIPC with a financial windfall in the hundreds of millions of dollars, if not more.   That is the magnitude of the benefit to SIPC if it is allowed to withhold SIPC advances from the thousands of BLMIS customers entitled to SIPC payments under the statutory definition of net equity which is determined by the last customer account statement.

Cash in/cash out also provides SIPC with an additional, significant financial windfall: it reduces the dollar amount of every BLMIS customer's allowed claim and Net Equity – including every "net loser" – which, in turn, necessarily increases SIPC's *pro rata* percentage of the eventual distribution of customer property.

When SIPC makes a payment to the victim of a failed or fraudulent broker-dealer, this payment is considered an "advance" on the victim's share of the ultimate distribution of "customer property".   In return, SIPC extracts a written *pro rata* assignment of the customer's claims as well as subrogation rights.  When customer property is ultimately distributed, each customer's share will be based on the amount of the customer's allowed claim/Net Equity.  The distribution is then divided between SIPC and the customer in a percentage equal to the ratio that the SIPC advance bears to the customer's allowed claim.  Since cash in/cash out reduces the allowed claim of every BLMIS customer (it eliminates not only withdrawals actually made but all so-called phantom income credited

13

to the account), SIPC's *pro rata* percentage of customer distribution payments will be increased, as the following example shows.

Assume that a BLMIS customer had an account statement balance of $1,500,000, including 500,000 of so-called phantom income, and the customer has made no withdrawals from the account – making the customer a "net loser" under the Trustee's terminology. On these facts the customer would be entitled to a full $500,000 SIPC advance even under the Trustee's construct. However, SIPC's percentage share of any future customer property distribution would be significantly higher under the cash in/cash out construct and the customer's share that much lower than it would using the "standard remedy" of account statement balance:

1. Using the account statement balance, the customer's net equity and allowed claim would be $1,500,000 and SIPC's percentge subrogation share would be 33%;

2. Under the Trustee's cash in/cash out construct, however, this same customer's net equity and allowed claim would be reduced to $1,000,000 and SIPC would then receive 50% of the customer distribution.

Thus, the Trustee's construct benefits SIPC to the detriment of *all* of the Madoff fraud victims - including the so-called "net-losers" whose interests the Trustee disingenuously claims to be protecting. In fact, the Trustee's cash in/cash out construct is designed to benefit SIPC and the industry throughout the various stages of the liquidation proceedings: (a) it allows SIPC to avoid making hundreds of millions in SIPC advances to customer; (b) it increases SIPC's percentage share of any customer property distributions.

The SEC is charged with protecting the investing public and has oversight of SIPC to ensure that SIPA is enforced in a manner consistent with this responsibility. The position taken in its brief, however, is an abdication of that responsibility. Instead of protecting investors, the SEC, in its

14

support of a cash in/cash out construct is focused on protecting SIPC's financial interests - protecting the securities industry at the expense of the BLMIS customers. This is a complete reversal of what the SIPA statute requires and Congress intended.

Based on the SEC's role in allowing the Madoff fraud to continue undetected for so long, one would have expected a greater level of sensitivity from the SEC towards the victims and less of a focus and concern for the pocketbook of the securities industry. After all, SIPC and the broker dealers are legislatively mandated to provide full SIPA protection to *all* customers when a broker dealer fails and leaves customers with staggering financial losses. That obligation is in no way lessened when the SIPC member broker dealer has defrauded his customers in a devastating Ponzi scheme.

## C.  The SEC's Brief does not Actually Support the Trustee's Motion.

Although ostensibly submitted in support of the Trustee's motion, , the SEC's brief nevertheless acknowledges that the Trustee's cash in/cash out construct, in its current form, is inadequate, and inequitable because, *inter alia,* it does not provide a "time value of money" adjustment.[7]

The Trustee's motion specifically seeks approval *only* for his construct, without the "time value of money" calculation that the SEC proposes. Since the SEC's brief argues that, absent provision for the "time value of money" the Trustee's construct would be unfair, the SEC brief cannot

---

[7]    These competing proposed, new definitions highlight both the danger and the impropriety of the Trustee's result-oriented attempt to rewrite the SIPA statute. In simple terms, Congress has spoken and neither the Trustee nor the SEC have the authority to rewrite a statute to bring it in line with the result (spoken or unspoken) they hope to achieve. Indeed, all of the various parties hereto could just as easily invent and submit their own proposed definition of Net Equity to fit the result they would like to see. While, as a matter of policy, Congress might one day decide to revisit the burden placed on the broker-dealer industry through SIPC in the case of a large Ponzi scheme fraud such as the one presented here, there is no place for such rewriting of statutes during litigation.

15

be understood to approve the Trustee's cash in/cash out approach in its current form.[8]

There is no motion by any party to adopt the SEC's "time value of money" proposal. Thus, properly understood, the SEC's brief actually opposes the Trustee's approach. However, neither this "time value of money" concept nor the Trustee's even more harsh, straight cash in/cash out methodology are to be found in the SIPA statute. Instead, these definitions were created out of whole cloth and presented to the Court in place of the simple and straightforward definition contained in the statute. As such, the Court should simply implement the definition of Net Equity contained in the SIPA statute and reject the construct offered by the Trustee and the equally flawed arguments offered by the SEC.

## CONCLUSION

For all of the reasons set forth herein and in all of the initial and reply briefs submitted in opposition to the Trustee's motion, the motion should be denied in its entirety along with such other and further relief in favor of the Claimants as the Court deems just and proper.

Dated: New York, New York
       December 21, 2009

                              Bernfeld, DeMatteo & Bewrnfeld, LLP

                              By: /s/
                              David B. Bernfeld (DBB-0177)
                              600 Third Avenue
                              New York, New York 10016
                              (212) 661-1661

---

[8]     Assuming *arguendo*, that a "time value of money" adjustment is included, the most logical reference point is the rate applicable to judgments which in New York is 9 %.