# Exhibit B

Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin,*
*Maureen Ebel, and a large group of other*
*customers*

**Hearing Date: December 17, 2009**
**Hearing Time: 10:00 a.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, |
| Plaintiff, |
| v. |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, |
| Defendant. |
| In re: |
| BERNARD L. MADOFF, |
| Debtor. |

Adv. Pro. No. 08-01789 (BRL)

SIPA LIQUIDATION

(Substantively Consolidated)

**OBJECTION TO SECOND APPLICATIONS OF IRVING H. PICARD, TRUSTEE,**
**AND BAKER & HOSTETLER LLP FOR ALLOWANCE OF INTERIM**
**COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF**
**EXPENSES INCURRED FROM MAY 1, 2009 THROUGH SEPTEMBER 30, 2009**

Diane and Roger Peskin, Maureen Ebel, and a large group of other customers of Bernard

L. Madoff Investment Securities, LLC ("Madoff") [1] ("Objectors"), by their attorneys, Phillips

Nizer LLP, object to the second applications for interim compensation of Irving H. Picard,

Trustee, and his counsel, Baker & Hostetler LLP ("B&H").  The Trustee was appointed by this

---

[1] Phillips Nizer LLP files this objection on behalf of all of the customers for whom it has filed objections to the Trustee's determinations of claims.

1099795.1

Court at the request of the Securities Investor Protection Corporation ("SIPC") in the proceeding

instituted in the United States District Court for the Southern District of New York on December

15, 2008 for the liquidation of Madoff under the Securities Investor Protection Act, 15 U.S.C. §

78aaa, *et seq.* ("SIPA").

     1.     SIPA was enacted at the behest of the financial services industry to relieve the

industry of the significant expense of registering securities in the names of investors and to allow

the industry to profit from holding securities in street name. The inducement to investors to

assume the risks of having their securities held in street name was the promise that their accounts

were insured against the brokers' dishonesty by an insurance fund managed by SIPC and funded

by the financial services industry.

     2.     SIPC is obligated under SIPA to "promptly" pay up to $500,000 in SIPC

insurance to Madoff customers (the "Customers") based upon their November 30, 2008

statements (their "Statutory Balances").

     3.     The promise of SIPC insurance has been made, for the 40 years of SIPC's

existence, on SIPC's website, in public statements made by Stephen Harbeck, SIPC's President,

by SIPC's members, and by SIPC and the SEC in court filings. Yet, the Trustee and SIPC have

breached that promise to the Customers, after they placed their reliance on the representation of

coverage.

     4.     Instead, the Trustee has invented a new qualification for SIPC insurance: a

customer is only insured, according to the Trustee, for his net investment over generations of

account holders.

     5.     However, even as to Customers who have a net investment, the Trustee has defied

his statutory obligation to promptly pay Customers up to $500,000 in SIPC insurance. As he

2

admits on his website, the Trustee has determined only 3,062 claims, and has allowed only 1,641

of such claims.  http://www.madofftrustee.com/Status.aspx.  The Trustee has also admitted that,

of the 4,903 active accounts that Madoff had as of December 11, 2008, only 2,335 customers,

whose claims total approximately $20 billion, actually lost money under the Trustee's net

investment calculation, even though the November 30, 2008 balances on all the accounts totaled

$64.8 billion.  Exh. A hereto.  Thus, in a period of one year, the Trustee has determined only

approximately 70% of the claims *he acknowledges are valid* and he has wrongfully denied SIPC

insurance to the 2,569 account holders (and others) who are clearly entitled to SIPC insurance

under the plain language of SIPA.

   6.  The Trustee has served as SIPC trustee in numerous SIPA liquidations.  SIPC, as

the insurer of Customer accounts, is in a direct adversarial position to the Customers, putting the

Trustee and B&H in an untenable conflict of interest.  As set forth herein, the Trustee and B&H

have taken actions to enrich SIPC at the expense of the Customers, and have done so in direct

contravention of the law.  The adversarial attitude of the Trustee and his counsel is evidenced,

*inter alia,* by the argument they made in their net equity brief that the Customers are chargeable

with Madoff's fraud.   Exh. B at 48-49.

   7.  The breach of fiduciary duty by the Trustee and B&H is particularly egregious in

this case because the Madoff fraud has caused an economic tsunami, leaving thousands of

innocent people in the United States with no means of support, and because this  case has

received worldwide focus at a time when the integrity of the United States financial system is

subject to legitimate question.

8.     Yet, rather than fulfill his fiduciary duty, the Trustee is persecuting innocent people who have lost their life savings by threatening to take away their homes and their theft loss tax refunds, which is all they have in the world.

9.     The Trustee and B&H are acting in direct contravention of their fiduciary and statutory duty to Customers and to the public and, in the process, are increasing exponentially and unnecessarily the administrative costs of the estate, depleting SIPC funds that should be used to pay Customer claims at a time when SIPC is insolvent.  Indeed, SEC Commissioner Mary Schapiro testified before Congress on July 14, 2009:

> The tragic truth is there is not enough money available to pay off
> all the customer claims.

See Exh. C at 2. (Webcast at 52:51.)

10.     In the circumstances of this case which has bankrupted SIPC, the Trustee and B&H have a conflict of interest which disables them from serving.  For this reason, and for the other reasons set forth below, Objectors file this objection and offer to prove the facts set forth herein at an evidentiary hearing at a time set by the Court.  This objection constitutes their offer of proof.

**INTRODUCTION**

11.     Objectors are typical of thousands of Customers who invested with Madoff, many over a period of 20 – 30 years, in reliance on the SEC's oversight of the securities industry.  In 1992, the SEC publicly stated that it had investigated Madoff and found no evidence of fraud.  In total, the SEC conducted at least seven investigations involving more than 27 SEC personnel as a result of repeated complaints that Madoff's trading strategy was not accurately represented to Customers.  The SEC repeatedly gave Madoff its stamp of approval.  Now, Customers are told

4

that, at least since the 1980's, Madoff never purchased any of the securities reflected on

Customer statements but, instead, used investors' money for his other business and personal

interests.  See Exh. D, ¶ 4 at 2 and ¶ 9 at 5.

12.     Based upon the purchase and sale confirmations that Madoff sent to Customers,

he went into the market five or six times a year, purchased a portfolio of approximately 25 S&P

100 company stocks; hedged the positions with options to protect against the downside; held the

positions for approximately six weeks; then sold the positions and put the proceeds into US

Treasury bills.   Thus, Madoff appeared to have a conservative, diversified trading strategy.

While his returns were relatively consistent, they were not extraordinary.

13.     By virtue of the fact that Madoff began his investment advisory business in the

1960's and by virtue of the esteem with which he was treated by the SEC and the NASD/FINRA,

thousands of Customers had put all of their life savings and retirement accounts into Madoff.

The Customers, a substantial portion of whom are 70 or older, relied upon regular periodic

distributions from their Madoff accounts in order to fund their daily living expenses, the payment

of their taxes, and their support obligations for family members, as well as to comply with the

mandatory withdrawals from their tax-deferred retirement accounts.  The collapse of Madoff on

December 11, 2008 terminated without warning the sole means of support of many Customers

and their family members across the United States, leaving them without the ability to pay their

mortgages, their taxes, their food bills, or their medical bills.

14.     If ever there was a case where it was essential to comply with Congress' mandate

that SIPC insurance be paid "promptly" to investors, this is such a case.  Yet, with full

knowledge of the devastation that Madoff caused to Customers, and despite the clear provisions

of SIPA as incorporated into this Court's December 23, 2008 order, the Trustee and B&H have

caused needless devastation to Customers by ignoring SIPA's mandate that Customer claims be paid "promptly" based upon their Statutory Balances. In the process, the Trustee and B&H have misrepresented the law to destitute Customers who cannot afford to retain their own counsel, with the clear intent of inducing Customers to accept less in SIPC insurance than they are entitled to receive.

15.    While the Trustee has reported that he has already "recovered" $1,183,779,811.89 (Trustee's Second Interim Report at 17), of this amount, $946 million was simply sitting in bank accounts in Madoff's name at the time the Trustee was appointed, including $301,407,190 at Mellon Bank, $233,500,000 at JP Morgan Chase, $300 million in securities, and $29 million at Bank of New York. Bloomberg.com 1/29/09.

16.    The Trustee's most important function is to promptly pay SIPC insurance to customers because the United States Attorney's Office has the duty to assure restitution to victims of Madoff's fraud. On this score, the Trustee has been an abysmal failure. Of the more than 15,400 Customer claims in this case, the Trustee has allowed a mere 1,641 claims in approximately one year, although even these 1,641 Customers have not all been paid by SIPC. http://www.madofftrustee.com/Status.aspx. Despite this pathetic track record, the Trustee and B&H, exclusive of the numerous other professionals the Trustee has hired, seek approval of fees and expenses for the period May 1, 2009 through September 30, 2009 as follows:

> Baker & Hostetler LLP as Counsel to the Trustee
> Fees: $21,279,101.85    Expenses: $280,681.62
>
> Irving H. Picard, Esq. as SIPA Liquidation Trustee
> Fees: $835,605.00    Expenses:  $921.25

17.    The payment of $22 million of SIPC's money to the Trustee and B&H means that 44 destitute Customers will not be paid the SIPC insurance to which they are entitled by the

6

express language of SIPA. This depletion of SIPC's funds is unjustifiable. The Trustee still has

not paid SIPC insurance to hundreds of Customers who, as readily determinable from Madoff's

records, are indisputably entitled to $500,000 from SIPC.

18.    At this rate, the Trustee and B&H, exclusive of all the other professionals retained

in this case, will incur administrative expenses of $52 million a year and, undoubtedly, will keep

the case open for seven to ten years. Thus, the administrative expenses for the Trustee and B&H

alone could easily exceed $500 million. The administrative expenses are to be paid by SIPC

which, itself, is insolvent and does not have sufficient money to fulfill its insurance obligations

to Customer. Because of SIPC's insolvency, every dollar paid to the Trustee and B&H is a

dollar taken away from Customers – innocent, law abiding citizens who believed that SIPA was

the law of the land and that their accounts were insured by SIPC for up to $500,000 against the

dishonesty of their broker.

19.    Rather than draw upon the $2 billion lines of credit available to SIPC under SIPA,

SIPC, with the concurrence of the Trustee and B&H, have devised a scheme to allow SIPC to

avoid paying the insurance to which Customers are indisputably entitled. This scheme began

with the Trustee's invention of a new definition of "net equity." Although the Trustee's

definition of "net equity" will not be discussed at length here in light of the anticipated

determination of that issue through a separate briefing schedule, his use of such definition should

be mentioned.

20.    In blatant disregard of the law, the Trustee has denied SIPC insurance to anyone

who does not have a net investment over the life of his investment with Madoff. Under the

Trustee's theory, an investor who invested $100,000 in 1970, which appreciated to $1,600,000 in

2008, is not entitled to any SIPC insurance if, over the course of 37 years, the investor took out

7

$100,000 to pay taxes. Similarly, according to the Trustee and B&H, a Customer who had an IRA account from which the Customer took the annual withdrawals mandated by federal law and paid taxes on the money is not entitled to SIPC insurance if his mandatory withdrawals exceeded his investment.

21.    By ignoring SIPA, the Trustee has necessitated the additional administrative expense of having "forensic" accountants determine the net investment of each Customer, in many cases encompassing 30 – 40 years of records. The "forensic" accountants, of course, are also being paid by SIPC with money which should be paid to Customers. The Trustee's self-serving *legerdemain* is calculated to save SIPC billions of dollars and, at the same time, necessitates the incurrence of tens of millions of dollars of unnecessary administrative expenses that would be avoided if the Trustee simply complied with the law.

22.    As a result of the Trustee's defiance of SIPA, Customers have suffered tragic additional losses. Many Customers have been forced to sell their homes on a fire-sale basis in an extraordinarily depressed market, simply because they did not have the money to cover the monthly housing expenses for a sufficient period to sell their homes over a more reasonable time period. Customers have been forced to put loved ones into nursing homes because they could not afford to continue to support them in their own homes. Customers on chemotherapy drugs have not had the funds to pay for their medical treatment.

23.    In recognition of the unconscionable delay in payment of SIPC insurance to destitute Customers, but without any statutory authority, the Trustee established a "Hardship Program" pursuant to which Customers who, through the disclosure of the most intimate personal information, are deemed in the Trustee's sole discretion to be hardship cases, are entitled to receive "expedited" treatment.

8

24.     However, the Trustee has given himself more time to pay "hardship" cases than
SIPA contemplates a trustee will need to pay all customers.  The Trustee has given himself an
initial period of 20 days to decide whether or not an individual qualifies for the Hardship
Program.  See Exh. E, ¶ 3.c at 1.  If an individual does qualify, then his claim "will be expedited
in the claims process" but "the Trustee cannot guaranty the timing of determination of any
claim."  *Id.*  The best that an individual can hope for is that, if his account was opened after
January 1, 2006, "the Trustee will endeavor to mail a determination of [the] claim within 20 days
of [the] claim qualifying for the Hardship Program."  *Id.*  Thus, if an individual's account was
opened after January 1, 2006, the Trustee will "endeavor" (but does not promise) to mail a
determination of claim within 40 days, but only if the Customer discloses absolutely everything
about his finances first.  Of course, the time between determination and payment can be another
60 days.

25.     There is no provision in SIPA that contemplates that a trustee will take 60 days to
determine a claim, no matter when the investment was made.  There is nothing in SIPA that
restricts prompt payment to those who can demonstrate to the Trustee's satisfaction that they are
suffering "hardship."  There is nothing in SIPA which allows a trustee to provide for prompt
payment to recent customers and delayed payment to long-standing customers.  That is precisely
why SIPA requires the Trustee to fix a customer's claim at his Statutory Balance.

26.     In fact, the Trustee has denied SIPC insurance to most of the "hardship" cases
because they are elderly, long-term investors who took out more than then invested.  He has also
put the burden on such investors to produce documentary evidence of deposits going back 15 –
40 years.  The Trustee and B&H have taken the position that it is the Customer's burden to prove
his investments and, if the Customer did not retain records from 15-40 years ago, the Customer

9

loses and SIPC wins. In fact, B&H has informed Customers that the Trustee will not provide

Customers with Madoff's own records – as to which the Trustee has exclusive access. Thus,

even if the Trustee has a record of Customer deposits, the Trustee will not make those records

available to Customers. In this way, of course, SIPC can deny coverage to Customers who had

no reason to, and did not, retain records of deposits going back 15-40 years.

27.    As to the remainder of the "hardship" cases, the Trustee and B&H have taken

months to resolve "hardship" cases, during which the Trustee has sought to exact compromises

from elderly, destitute Customers. In several instances, attorneys at B&H have affirmatively

misrepresented the law to "hardship" cases in order to induce them to accept from SIPC less than

the sums to which they are indisputably entitled. In addition, the Trustee has regularly deducted

from Customers' SIPC insurance alleged "preferences," despite the fact that SIPA does not

authorize such offsets and despite the fact that the Trustee has no right to recover preferential

payments from Customers.

28.    The Trustee and his counsel have affirmatively misrepresented the law to elderly

"hardship" cases in order to induce them to settle threatened fraudulent conveyance actions

before the Trustee has filed a complaint.

29.    Finally, the Trustee and his counsel have secretly subpoenaed bank records

concerning Customers for no reason other than to determine if the customers have sufficient

assets to satisfy a fraudulent conveyance judgment. This conduct is unethical and impermissible

under applicable law.

## THE TRUSTEE AND B&H HAVE A CONFLICT OF INTEREST

30.    This Court has a fundamental obligation to monitor the integrity of proceedings

before it. *In re Plaza Hotel Corp.,* 111 B.R. 882, 891 (B.E.D. Cal. 1990).

10

31.    The Trustee owes a fiduciary duty to Customers. *See In re Adler, Coleman*

*Clearing Corp.*, 1998 Bankr. LEXIS 1076 (B. S.D.N.Y. Aug. 25, 1998) ("The parties agree that

a SIPA trustee owes a fiduciary duty to the customers and creditors of a liquidating broker dealer

akin to the fiduciary duty a bankruptcy trustee owes a debtor's estate and creditors"); *Germain v.*

*The Connecticut National Bank,* 988 F. 2d 1323, 1330 n. 8 (2d Cir. 1993).    A fiduciary duty is

the highest duty imposed by law. *See Roberts v. Dayton Hudson Corp.*, 914 F. Supp. 1421, 1423

(N.D. Tex. 1996); *see also Enzo Biochem, Inc. v. Johnson & Johnson,* 1992 U.S. Dist. LEXIS

15723, at *29 (S.D.N.Y. Oct. 15, 1992).

32.    The disinterestedness of a trustee's counsel is "so crucial to the proper functioning

of the bankruptcy system that a court may raise it and dispose of it whenever its sanctity is

questioned." *In re Vebeliunas,* 231 B.R. 181 (B.S.D.N.Y. 1999), *citing In re Martin,* 817 F. 2d

175, 180 (1st Cir. 1978).    A "trustee/fiduciary must be free from any hint of bias," and "either an

appearance of impropriety or a potential conflict of interest . . . is a viable cause for removal" of

a trustee. *In re AFI Holding, Inc.*, 355 B.R. 139 (9th Cir. BAP 2006) (affirming bankruptcy

court's removal of Chapter 7 trustee).

33.    The attorney for a trustee must be "disinterested," meaning that the attorney does

not have an interest materially adverse to a party in interest in the bankruptcy. *In re Marvel*

*Entertainment Group, Inc.,* 140 F. 3d 463, 476 (3d Cir. 1998). *See* Collier Bankruptcy Manual §

101.13 ("professionals engaged in the conduct of a bankruptcy case should be free of the

slightest personal interest which might be reflected in their decisions concerning matters of the

debtor's estate or which might impair the high degree of impartiality and detached judgment

expected of them during the course of administration."). *See also, In re Crivello,* 134 F. 3d 831,

835 (7th Cir. 1998); *In re Cook,* 223 B.R. 782, 798 (10th Cir. BAP 1998); *In re BH & P, Inc.,*

11

119 B.R. 35, 42 (D.N.J. 1990); *In re Leslie Fay Cos.*, 175 B.R. 525, 532 (B.S.D.N.Y. 1994)(counsel removed from all new matters in case where counsel was investigating financial irregularities of debtor and did not disclose relationships with directors who were targets of investigation).

34.    Aside from the disinterestedness standard in bankruptcy, under the Rules of Professional Conduct, an attorney cannot represent adverse interests. Rule 1.7(a) of the New York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.7(a). An attorney must avoid even the "appearance of a conflict" pursuant to § 327(a) of the Bankruptcy Code. *In re Hot Tin Roof,* 205 B.R. 1000, 1003 (1st Cir BAP 1997). Here, B&H represents the Trustee who has a fiduciary duty to Customers. Yet, B&H is deliberately acting to delay and frustrate the payment of Customer claims, even to the point of misrepresenting the law to destitute Customers who cannot afford to retain their own counsel. Such misrepresentation is grounds for denial of fees. *See In re Mercury*, 122 Fed. Appx. 528 (2d Cir. 2004) (affirming denial of compensation to firm that acted as counsel for debtors and counsel for trustee, where the attorneys acted in the interest of the trustee instead of debtors and incorrectly advised debtors regarding their rights to convert Chapter 7 filing to Chapter 11 filing). It also violates B&H's ethical obligations. *See* Rule 4.1 of the New York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.32 ("In the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person.")

35.    Under SIPA, SIPC is deemed to be "disinterested." 15 U.S.C. §§ 78eee(b)(6)(A). However, SIPA does not, and could not, provide that a trustee, who is not an employee of SIPC, is "disinterested" or that an attorney retained by the Trustee is deemed, as a matter of law, to be "disinterested," particularly in a case like this where the Trustee and his counsel have flatly

12

rejected the fundamental mandates of SIPA that were intended to protect customers.   In *In re
First State Securities Corp.,* 39 B.R. 26 (B.S.D. Fla. 1984), the bankruptcy court assumed,

without analysis or authority, that a trustee who, the court found, was a mere "puppet" of SIPC,

was entitled to the imputation of disinterestedness provided by 15 U.S.C. § 78eee(b)(6)(A).   The

court simply cited the statute which states:

> SIPC shall in all cases be deemed disinterested, and an employee of SIPC shall be
> deemed disinterested if such employee would, except for his association with
> SIPC, meet the standards set forth in this subparagraph.

Since neither the Trustee nor B&H is an employee of SIPC, this provision cannot insulate them

from the requirement that the Trustee and his counsel be free of any conflict of interest.

36.    The conflict between the Customers and the Trustee and B&H cannot be more

clear.   Indeed, in his brief on the net equity issue, the Trustee argued that the Customers should

be chargeable with Madoff's fraud.   Exh. B hereto.   Specifically, the Trustee, through his

counsel, B&H, stated that "[t]o the extent the claimants wish to give effect to the transactions

reflected on their BLMIS customer statements at the expense of other innocent parties, they

would be improperly attempting to benefit from their agent's fraud."   Exh. B at 48-49.

37.    Thus, the Trustee and B&H are far from "disinterested," as shown by their own

arguments in this case and have a conflict of interest as a result of which they are barred from

receiving any compensation under established precedents and principles of professional conduct.

*See In re Angelika Films 57th, Inc.,* 246 B.R. 176 (S.D.N.Y. 2000) (affirming bankruptcy court's

denial **in its entirety** of fee application of debtor's counsel where counsel represented debtor's

principal in other matters and took actions in the bankruptcy that "placed the interests of the

Debtor's principal. . . over those of the Debtor.").   They thus should not receive any

compensation.

13

## SIPA VIOLATES THE CUSTOMERS' RIGHT TO DUE PROCESS OF LAW

38.    If this Court holds that the Trustee and B&H are deemed as a matter of law to be disinterested notwithstanding their obvious conflict of interest, then the Customers have been denied due process of law as guaranteed to them under the Due Process Clause of the Fifth Amendment to the United States Constitution. "The bankruptcy power, like other great substantive powers of Congress, is subject to the Fifth Amendment." *Louisville Bank v. Radford*, 295 U.S. 555, 589, 602 (1935); *see also In re Phillips*, 13 B.R. 82 (B. C.D. Ill. 1981). Accordingly, any statutory scheme resulting from Congress' exercise of its Constitutional bankruptcy powers must be constrained by the requirements of the Due Process Clause of the Fifth Amendment.

39.    Evaluating a Fifth Amendment due process claim begins with a two-part analysis: 1) whether the interest asserted rises to the level of a "property interest"; and 2) if it does, the court must weigh the competing interests of the individual and the state to determine what process is constitutionally required. *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361 (9th Cir. 1976). Congress, through SIPA, has statutorily created a property interest for the Customers: the right to receive SIPC insurance of up to $500,000. *See* 15 U.S.C. § 78(fff-3). This is a protected "property interest" under the Fifth Amendment because it is an entitlement to a government benefit conferred by statute. *See S & D Maintenance Co., Inc. v. Goldin*, 844 F.2d 962, 965 (2d. Cir. 1988); *Garcia v. U.S.*, 666 F.2d 690 (5th Cir. 1982).

40.    While SIPC is not a governmental agency, it is a creation of Congress and performs public functions, one of which is the designation of trustees and counsel in bankruptcy proceedings who have the power, in the first instance, to determine claims. The conduct of a private entity amounts to state action when, like SIPC, it acts in a judicial or quasi-judicial

14

1099795.1

capacity pursuant to a legislative delegation of authority.  *See Concrete Pipe & Prods. v. Constr.*

*Laborers Pension Trust*, 508 U.S. 602, 617 (1993); *see also Gerena v. Puerto Rico Legal*

*Services, Inc.*, 697 F.2d 447 (1ˢᵗ Cir. 1983).    Here, Congress has created SIPC which functions

in a quasi-judicial capacity pursuant to a legislative delegation of authority.

41.    It is axiomatic that "due process demands impartiality on the part of those who

function in judicial or quasi-judicial capacities." *Schweiker v. McClure*, 456 U.S. 188, 195

(1982).  Congress has impermissibly created a statutory scheme that is permeated by partiality,

conflicts of interest, and bias by permitting SIPC to appoint and control the Trustee and the

Trustee's counsel, regardless of the obvious conflict of interest between SIPC and the

Customers.  SIPC has a financial incentive to deny Customer claims and has acted solely to

protect its members, the Financial Services Industry, from the obligation to fund the payments to

Customers.

42.    In *Schweiker*, the Supreme Court would have found a violation of due process if

the carriers, who appointed the hearing officers, had a financial interest in the outcome.

*Schweiker*, 456 U.S. at 197 ("In the absence of proof of financial interest on the part of the

carriers, there is no basis for assuming a derivative bias among their hearing officers").  SIPA's

grant of power to SIPC to select the trustee who, in turns, chooses counsel in bankruptcy

proceedings, and designation of SIPC and its employees as statutorily disinterested, violates the

Customers' due process rights.  *See Concrete Pipe,* 508 U.S. at 618-19 (where trustee functions

in an adjudicative capacity, appearance of bias alone violates Due Process).

15

**THE TRUSTEE AND B&H HAVE VIOLATED SIPA'S
MANDATE TO "PROMPTLY" PAY CUSTOMER CLAIMS**

43.    Congress made absolutely clear its intent to minimize the devastation to

customers of an insolvent broker/dealer through prompt payment of SIPC insurance.  SIPA

requires that SIPC "promptly" pay SIPC insurance to investors of a liquidated brokerage firm:

GENERAL PROVISIONS OF A LIQUIDATION PROCEEDING

**(a) PURPOSES**

The purposes of a liquidation proceeding under this chapter shall be—

(1) **as promptly as possible** after the appointment of a trustee in such liquidation
proceeding, and in accordance with the provisions of this chapter—

(A) to deliver customer name securities to or on behalf of the customers of the
debtor entitled thereto as provided in §78fff-2(c)(2) of this title; and

(B) to distribute customer property and (in advance thereof or concurrently
therewith) otherwise satisfy net equity claims of customers to the extent provided
in this section.

**PAYMENT TO CUSTOMERS.-SIPC shall promptly satisfy all obligations of
the member to each of its customers relating to, or net equity claims** based
upon, securities or cash by the delivery of securities or the effecting of payments
to such customer (subject to the provisions of section8 (d) and section **9** (a) )
insofar as such obligations are ascertainable from the books and records of the
member or are otherwise established to the satisfaction of SIPC.

15 U.S.C. **§**78fff-2(c)(2); emphasis added.  *See also,* 15 U.S.C. § 78fff-3(a).

44.    Congress intended for the trustee to promptly pay customer claims based upon the

debtor's books and records, without the filing of proofs of claim:

**[SIPA] establishes procedures** for prompt orderly liquidation of SIPC members
when required and **for making prompt distributions and payments on account
of customers' claims without need for formal proofs of claim.**

                    *        *        *

16

> The committee also believes that **it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations.**
>
>         *      *      *
>
> **Because of the difficulties involved in filing proofs of claim . . ., the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.**

See Exh. F; emphasis added. (S. Rep. 91-1218, at 10, 11, 12 (1970), *reprinted in* Federal Securities Laws Legislative History 1933-1982, Vol. IV, at 4642, 4643, 4644 (1983)).

45.     This Court itself has recognized Congress' intent that SIPC proceedings be conducted quickly in order to minimize the devastation to customers:

> Congress itself has commanded **swift** action. For example, the SEC and self-regulatory organizations are required to "**immediately notify**" SIPC of concerns about the financial stability of a SIPC member. 15 U.S.C.A. § 78eee(a)(1). A Court determining that a protective decree is warranted must "**forthwith**" appoint a trustee, 15 U.S.C.A. § 78eee(b)(3), and remove the case to a Court with jurisdiction over bankruptcy cases. 15 U.S.C.A. § 78eee(b)(4). The trustee is required to investigate the operation of the debtor's business and report its results to SIPC "**as soon as practicable**." 15 U.S.C.A. § 78fff-1(d). Among the stated purposes of a liquidation proceeding is to make customers whole "**as promptly as possible after the appointment of a trustee," 15 U.S.C.A. § 78fff(a), who is required to "promptly discharge** . . all obligations of the debtor to a customer relating to securities." 15 U.S.C.A. § 78fff-2(b). **SIPC fund moneys must be advanced to the trustee up to certain limits "to provide for prompt payment and satisfaction of . . . claims of customers." 15 U.S.C.A. § 78fff-3(a). Congress has commanded customer damages to be repaired promptly.**

*In re Donald Sheldon & Co., Inc.*, 153 B.R. 661, 667 (B. S.D.N.Y. 1993); emphasis added.

46.     The December 23, 2008 order entered in this case specifically incorporates the time periods mandated by SIPA. The Order states:

> ORDERED, that the Trustee be, and he hereby is, authorized to satisfy, **within the limits provided by SIPA**, those portions of any and all customer claims and accounts which agree with the Debtor's books and records, or are otherwise

> established to the satisfaction of the Trustee pursuant to 15 U.S.C. §78fff-2(b),
> provided that the Trustee believes that no reason exists for not satisfying such
> claims and accounts

December 23, 2008 Order at 5; emphasis added.

47.     The Trustee's complete failure to fulfill his statutory obligations is shown by the

contrast between the treatment of customers by the FDIC and the treatment of Customers in this

case.  As stated in the legislative history of SIPA:

> The intention of SIPC, like the FDIC, is to minimize losses to and to maintain
> public confidence in the institutions the public deals with.

S. Rep. 91-1218, at 9, *reprinted in* Federal Securities Laws Legislative History 1933-

1982, Vol. IV, at 4641.  See Exh. F.

48.     According to the FDIC's website, "It is the FDIC's goal to make deposit

insurance payments within two business day[s] of the failure of the insured institution."

http://www.fdic.gov/consumers/banking/facts/payment.html.  Yet in this case, the Trustee has

allowed a mere 1,641 claims in approximately one year, although even these 1,641 Customers

have not all been paid by SIPC.  http://www.madofftrustee.com/Status.aspx.

## THE TRUSTEE AND B&H HAVE VIOLATED SIPA'S MANDATE
## TO HONOR THE "LEGITIMATE EXPECTATIONS" OF CUSTOMERS

### The Motivation of the Financial Services Industry to Enact SIPA

49.     SIPA was enacted in 1970 at the behest of the SEC-regulated broker/dealers (the

"Financial Services Industry") which was seeking to relieve itself of the administrative burden of

having to register customer securities with the issuing corporations every time a customer

purchased new securities for his account.  *See* Joel Seligman, *The Transformation of Wall Street:*

*A History of the Securities Exchange Commission and Modern Corporate Finance,* 451 n.31

(1995) (Prior to enactment of SIPA, "Stock certificates and related documents were 'piled

18

halfway to the ceiling' in some offices; clerical personnel were working overtime, six and seven

days a week, with some firms using a second or even a third shift to process each day's

transactions.").

50.    In addition to the administrative burden of registering securities, the Financial

Services Industry wanted the flexibility and profits that would come with investors allowing the

firms to hold securities in street name. *See An Investor's Guide to the Alternatives of Holding*

*Physical Certificates,* published by the Securities Industry and Financial Market Association,

available at http://www.sifma.org/services/publications/pdf/PhysCertGuide2alternatives.pdf

(stating that the Securities Industry and Financial Market Association "strongly supports and

encourages [street name] type of ownership".

51.    Securities held in street name could be utilized by the brokerage firms to generate

profits for themselves.  The securities could be loaned out, could be sold and repurchased, and

could be borrowed against, while in the possession of the brokerage firms, whereas securities

directly registered in the name of the customer could not be utilized for any purpose by the

brokerage firms. *See, e.g.,* 17 C.F.R. 240.8c-1; 17 C.F.R. 15c-1.

52.    In order to induce investors to allow brokerage firms to hold securities in street

name, the Financial Services Industry realized it would have to provide some insurance to

investors for the risk that a broker might be dishonest and steal the street name securities or not

purchase them in the first place.  Hence, the Industry developed the idea of SIPA to provide

SIPC insurance to investors and, thereby, to induce them to invest in securities held in street

name.  This would allow the Financial Services Industry to utilize the investors' securities for

their own enrichment while in the brokers' possession.  As a result of the enactment of SIPA,

tens of billions of dollars was invested in the Financial Services Industry in street name
securities.

53.    SIPC insurance is funded by the Financial Services Industry which constitutes
SIPC's membership. In order to enrich its membership, SIPC chose to charge each member a
mere $150 per year for the privilege of printing on hundreds of billions of dollars of trade
confirmations that customer accounts were insured up to $500,000 by SIPC. Thus, for example,
Goldman Sachs paid a mere $150 per year to SIPC. This allowed the Financial Services Industry
to make tens of billions of dollars of profits in the past ten years because the false assurance that
accounts were insured up to $500,000 induced gullible investors to pour money into brokerage
firms.

54.    SIPC's generosity towards its members left it with insufficient funds to pay
Customer claims. While SIPA allows SIPC to borrow money, SIPC has apparently decided that
it would rather cheat Customers out of their insurance than borrow money and have to assess the
brokerage firms to repay the loans. *See* 15 U.S.C. § 78 ddd(g) and (h).

## THE TRUSTEE IS DESTROYING INVESTOR CONFIDENCE
## NATIONALLY IN DIRECT VIOLATION OF CONGRESSIONAL INTENT

55.    The purpose of SIPA, as evidenced by its title, was to "protect" investors who
allowed the Financial Services Industry to hold their life savings in street name securities. *See,
e.g.,* H.R. Rep. No. 91-1613, at 3-4 (1970)("[SIPA] will reinforce the confidence that investors
have in the U.S. securities markets."). *See also In re New Times*, 371 F.3d at 87 ("[T]he [SIPA]
drafters' emphasis was on promoting investor confidence in the securities markets and protecting
broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 794 (6th Cir.
1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[ ] and

20

upgrade the financial responsibility requirements for registered brokers and dealers.")(citations

omitted). SIPA attempted to do this initially by satisfying customers' "net equity" claims for

securities with actual securities only if the debtor held securities of the appropriate class and kind

to satisfy customers' claims, while otherwise customers would receive the cash equivalent of the

value of their securities on the filing date. SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat.

1636, 1648-50 (1970); H.R. Rep. No. 95-746 (39-41)(statement of SIPC Chairman Hugh F.

Owens).

56.     When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest

shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments],

*[i.e.], . . .* **the failure to meet legitimate customer expectations of receiving what was in their**

**account at the time of their broker's insolvency.**" D 922 Cong. Rec. H. 36326 (daily ed. Nov.

1, 1977)(statement of Rep. Robert C. Eckhardt)(emphasis added). See also Hearing on H.R.

8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. On Interstate

and Foreign Commerce, 94th Cong. 63 (1975)("The basic framework of the 1970 Act in regard to

satisfaction of customers' claims should be modified to better meet the legitimate expectations of

customers.") (report to the SIPC Board of Directors by the Special Task Force to consider

possible amendments to SIPA); Hearing on H.R. 8331 before the Subcomm. on Consumer

Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81

(1977) ("The proposed [1978] amendments carry out the Task Force recommendations and are

designed to make the Act more responsive to the reasonable expectations of investors.")

(statement of SIPC Chairman Hugh F. Owens); Hearing on H.R. 8064 Before the Subcomm. on

Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th

Cong. 161-162 ("[T]he principal purpose of these amendments is to meet more nearly the

21

reasonable expectations of brokerage firm customers.")(statement of SEC Commissioner Philip

A. Loomis, Jr.).

57.    A customer's reasonable expectations were that their actual securities, as shown

on their statements, would be returned to them "in the form they existed on the filing date." H.R.

Rep. No. 95-746, at 21.  Thus, SIPA was amended to state that "[t]he trustee shall, to the extent

that securities can be purchased in a fair and orderly market, purchase securities as necessary for

the delivery of securities to customers in satisfaction of their claims for net equities. . ." 15

U.S.C. § 78fff-2(d); SIPA § 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978).

58.    Here, the legitimate expectations of the Customers were contained in the account

statements and trade confirmations they received.  They expected that their accounts held the

securities reflected therein.  Thus, recognizing Customer claims in the amount of their Statutory

Balances will further the goals of SIPA, as memorialized in the legislative history.

59.    Here, the legitimate expectations of the Customers were contained in the account
statements and trade confirmations they received.  They expected that their accounts held the
securities reflected therein.  Thus, recognizing Customer claims in the amount of their Statutory
Balances will further the goals of SIPA, as memorialized in the legislative history.

59.    Congress **specifically contemplated** that "securities positions" reflected in a

customer's statements could include securities that were never actually purchased, as was the

case here.  The Senate and House Reports on the 1978 amendments to SIPA show that SIPA was

intended to cover securities that the broker-dealer did not actually purchase:

> Under present law, because securities belonging to customers may have been lost,
> improperly hypothecated, misappropriated, **never purchased** or even stolen, it is
> not always possible to provide to customers that which they expect to receive, that
> is, securities which they maintained in their brokerage account. . . By seeking to
> make customer accounts whole and returning them to customers in the form they
> existed on the filing date, the amendments. . . would satisfy the customers'
> legitimate expectations. . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

> A customer generally expects to receive what he believes is in his account at the
> time the stockbroker ceases business.  But because securities may have been lost,
> improperly hypothecated, misappropriated, **never purchased**, or even stolen, this

22

is not always possible.  Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. No. 95-746 at 21 (emphasis added).

60.    Thus, there is absolutely no support for the Trustee's "cash in minus cash out" theory in either SIPA or its legislative history.  Instead, the legislative history is in accordance with the statute: Customers are entitled to claims in the amount of their Statutory Balances, consistent with their legitimate expectations.

## THE TRUSTEE HAS WASTED SIPC'S FUNDS

61.    The fees of the Trustee and B&H should not be granted for that portion of their fees that relates to subpoenaing Customers' financial records from their banks and other sources. The subpoenas, which have been issued under Bankruptcy Rule of Procedure 2004, seek information from Customer's banks regarding the Customer's general assets, not just any investments or withdrawals in Madoff.  Specifically, the subpoenas seek:

All documents concerning any Fund Account, including:

(a) monthly statements, including account numbers;

(b) present and historical account balance information;

(c) incoming and outgoing wire transfer records;

(d) copies of checks, both deposited and drawn;

(e) records reflecting cash activity:

(f) account opening documents and any credit file;

(g) administrative or custodial agreements between the holder of the Fund Account and [bank]; and

(h) account closing documents.

23

62.    The subpoenas also seek "documents reflecting transfers and/or transactions between Fund Accounts," "documents that reflect or relate to any communications and/or correspondence pertaining to any Fund Account," and "documents, agreements and/or contracts . . . related to any lines of credit/letters of credit maintained by or for the benefit of any of the Fund Accounts or holders of the Fund Accounts." "Fund Account" is defined as "any account into which any [bank] customer received funds, whether by wire transfer or check, from Madoff. . ."

63.    Although discovery under Rule 2004 is broad, it is not without limitation, particularly as to third parties and as to matters unrelated to the debtor. *See In re Drexel Burnham Lambert Group, Inc.,* 123 B.R. 702, 711 (B. S.D.N.Y. 1991). "The examination of a witness about matters having no relationship or no effect on the administration of an estate is improper." *Id.* (citing *In re Johns-Manville Corp.,* 42 B.R. 362, 364 (S.D.N.Y. 1984) (scope of Rule 2004 discovery is subject to "general restriction of inquiry to the financial affairs of the debtor")). "It is clear that Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs." *Matter of Wilcher,* 56 B.R. 428, 434 (B. N.D. Ill. 1985) (language of Rule 2004 "makes it 'evident that an examination may be had only of those persons possessing knowledge of a debtor's acts, conduct or financial affairs so far as this relates to a debtor's proceeding in bankruptcy'") (quoting *In Re GHR Energy Corp.,* 35 B.R. 534, 537 (B. D. Mass. 1983)).

64.    B&H has admitted that the sole reason for the subpoenas it has served on Customers' banks is to determine if the Customers have sufficient assets to satisfy a fraudulent conveyance judgment.    However, discovery of an adversary's assets is impermissible absent a judgment. *Sequa Corp. v. Gelmin,* 1995 WL 404726, *2 (S.D.N.Y. 1995). "[S]uch discovery is

24

properly reserved for post-judgment proceedings, when a judgment creditor seeks the

information necessary to permit it to enforce the judgment." *Id.* at *3. The only information

concerning Customers' assets that could possibly be relevant at this point in the proceedings

would be information relating to Madoff. But the subpoenas that B&H have served are

unrestricted: they seek all documents concerning the Customers.

65.    In addition, to the extent that Customers are being subpoenaed in order to obtain

information that will allow the Trustee to bolster fraudulent conveyance claims against them

when such claims are ultimately filed, they are improper. The Trustee's effort to circumvent the

traditional rules of discovery by using Rule 2004 is not permitted. *See* 10 Collier on Bankruptcy

¶ 7026.01, 7026-3 (15th ed. 2007) ("If an adversary proceeding or contested matter is pending <u>or

is likely to be filed</u>, it is improper for one of the parties to use a Rule 2004 examination as a

substitute for, or in addition to, discovery pursuant to Rule 26 . . . or to circumvent the rule's

procedural protections provided to the parties and witnesses") (emphasis added) (citing *In re

Bennet Funding Group*, 203 B.R. 24 (B. N.D.N.Y. 1996); *In re GHR Energy Corp.*, 35 B.R. 534,

538 (B. D. Mass. 1983) (once party is in position to file suit, it cannot use Rule 2004 to

circumvent FRCP procedural safeguards)).

66.    This pattern of conduct by the Trustee and B&H is another example of them

taking the law into their own hands and disregarding established law in order to accomplish

SIPC's goal of cheating Customers of their statutory rights.

67.    Any fees associated with the subpoena of Customers' bank records, such as

preparation of the subpoenas, motions to compel productions in response to the subpoenas,

responding to objections to subpoenas and related costs should not be allowed by this Court

because such fees were incurred for an illegal and improper purpose. "Sections 329 and 330

25

limit compensation in a bankruptcy case to the reasonable value of the services provided by the professional. If the compensation paid or agreed to be paid exceeds the reasonable value of services, the court may order the return of any excess payment to the bankruptcy estate. 11 U.S.C. § 329(b). Even if there are no objections to a fee application, the court has an obligation to review all fee applications to prevent waste of estate assets or overreaching by attorneys." *In re: Williams*, 2007 Bankr. LEXIS 2214, at *9 (B.N.D.Ohio June 27, 2007) (disallowing fees in Chapter 7 case arising from attorneys' filing of improper schedules). *See also In re: Bush*, 131 B.R. 364, 365-67 (B.W.D. Mich. 1991) (reducing amount of fees awarded in Chapter 13 case from amount requested due to inflated time entries and stating that "[t]he court has an obligation to examine the propriety of fees and expenses requested even if no objections are raised").

68.    Moreover, if, as here, fees are incurred for "services which were neither reasonably provided nor necessary in the context of this case," the Court may decline to award such fees. *In re: Schweitzer, Inc.*, 1999 Bankr. LEXIS 2038, at *19 (B.D.Ida. Jan. 8, 1999) (declining to award fees for services that the court did not deem necessary or beneficial). Thus, the Court should deny that portion of the fees that have any relation to the subpoenas served on the Customers' banks. It appears that these fees would have been incurred in the "Trustee Investigation" Task Code, which lists "overseeing B&H's issuance of hundreds of inquiry letters and subpoenas to potentially related third parties concerning BLMIS litigation" as one of the tasks undertaken. Second Interim Fee Application at 16. The Court should disallow all such fees and the related expenses.

## CONCLUSION

For the foregoing reasons, Objectors ask the Court to set a date for an evidentiary hearing at which they can prove the objections set forth herein. The Trustee and B&H are disabled from

26

serving because, as they have demonstrated repeatedly in the first full year of their service, they

have a fundamental conflict of interest and are working, outside the law, solely to enrich SIPC at

the expense of the Customers to whom they owe a fiduciary duty.

December 14, 2009

PHILLIPS NIZER LLP


By: /s/ Helen Davis Chaitman
666 Fifth Avenue
New York, New York 10103-0084
(212) 841-1320

*Attorneys for Diane and Roger Peskin,
Maureen Ebel, and a large group of other
customers*

1099795.1