SONNENSCHEIN NATH & ROSENTHAL LLP
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
cneville@sonnenschein.com

*Attorneys Elizabeth D. French*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br>                              Plaintiff,<br><br>                    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>                              Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation |

**CORRECTED OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

Elizabeth D. French, hereby submits this Corrected Objection[1] to the Notice of Trustee's

Determination of Claim dated October 19, 2009 ("Determination Letter"), attached hereto as

Exhibit A, as described herein.

**BACKGROUND**

1.    In or about January 1993, Ms. French opened an account (Account No. 1-CM008-3

and 1-CM008-4) with Bernard L. Madoff Investment Securities LLC ("Madoff") in the name of

the Elizabeth D. French (the "French Customer Account").[2]  Ms. French is a "customer" of

Madoff, as defined by the Securities Investor Protection Act ("SIPA").

---

[1]   This Corrected Objection corrects any errors in the amount claimed in the November 16, 2009 Objection.
[2]   All personal information relating to the French Customer Account has been redacted for security reasons.

2.      From the creation of the French Customer Account, Ms. French received regular communications from Madoff, including monthly statements, trade confirmations, and quarterly portfolio management reports.

3.      Ms. French's final Madoff statement dated November 30, 2008 (the "Final Madoff Statement") shows that Ms. French owned securities with a market value of $745,743.14 in the French Customer Account.  A copy of the Final Madoff Statement is annexed to the French Customer Claim (defined below).

4.      On December 11, 2008, an action was commenced against Madoff by the Securities & Exchange Commission in the United States District Court for the Southern District of New York.  On December 15, 2008, this liquidation proceeding was commenced pursuant to the SIPA.  *See* Order, Securities and Exchange Commission v. Madoff, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Dkt. No. 4].  Irving Picard was appointed Trustee ("Trustee"), charged, *inter alia*, with overseeing the liquidation of Madoff and processing customer claims for money pursuant to SIPA.  *Id.*; 15 U.S.C. § 78fff-1(a).

5.      On December 23, 2008, the Court issued an Order directing the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines.  *See* Order [Dkt. No. 12].

6.      The December 23, 2008 Order further provided that, to the extent the Madoff Trustee disagrees with the amount set forth on a customer claim form, the Madoff Trustee "shall notify such claimant by mail of their determination that the claim is disallowed, in whole or in part, **and the reason therefor** . . . "  *See* Order at 6 (emphasis added) [Dkt. No. 12].

7.      On or about June 16, 2009, Ms. French timely filed a claim for the French Customer Account for securities (the "French Customer Claim") based on the November 30, 2008 Final

Madoff Statement in the amount of $745,743.14.  A copy of the French Customer Claim with the Final Madoff Statement is attached hereto as Exhibit B.

8.   On October 19, 2009, the Trustee sent Ms. French the Determination Letter rejecting the French Customer Claim and stating that Ms. French is not entitled to a payment because (a) no securities were purchased for the French Customer Account and (b) the French Customer Account does not have a positive net equity because Ms. French had withdrawn more funds than she deposited into the account.

## GROUNDS FOR OBJECTION

### I.   The Determination Letter Fails To Comply With The Court's Order.

9.   The Determination Letter fails to comply with this Court's December 23, 2008 Order, which directs the Trustee to satisfy customer claims in accordance "with the Debtor's books and records."  Dec. 23, 2008 Order at 5 [Dkt. No. 12].  Ms. French's claim was evidenced by the Final Madoff Statement showing a value of $745,743.14 and listing the securities purportedly purchased for the account, which reflects the "Debtor's books and records" and by which the Trustee is bound absent proof that the owner of the French Customer Account did not have a "legitimate expectation" that the balance on the Final Madoff Statement, confirmations, credit advices and portfolio management report represented her property.

### II.   The Trustee Does Not Set Forth the Legal Basis for Disallowing the Claim in Full.

10.   The Trustee failed to set forth a legal basis for the position he has taken for the calculation of the claim.  *See* Determination Letter.  The Determination Letter:

(a)   does not clearly provide "the reason" for the disallowance, as required by the Court's December 23, 2008 Order, *see* Order [Dkt. No. 12];

(b)   is insufficient to rebut the prima facie validity of the French Customer Claim as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f);

(c)      violates general principles of applicable law requiring that an objection

to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the

objection is based, *see, e.g.*, Collier on Bankruptcy ¶ 3007.01(3) (15th ed.) ("an objection to a

claim should . . . meet the [pleading] standards of an answer"); *In re Enron Corp.*, No. 01-

16034, 2003 Bankr. LEXIS 2261, at *25 (Bankr. S.D.N.Y. Jan. 13, 2003) (same); and

(d)      includes an exhibit, which purportedly calculates the money deposited

less subsequent withdrawals without any supporting documentation, that is completely

unsubstantiated and incorrect.  To the extent that the Trustee's "reconciliation" differs from the

French Customer Claim, the Trustee should produce evidence supporting his "reconciliation."

## III.      The Trustee Has Failed to Honor Customer Expectation.

11.   The Trustee has failed to fulfill the requirement that he honor the legitimate

expectations of a customer.

12.   The legislative history of SIPA makes clear that Congress' intent in enacting the

legislation was to protect the legitimate expectations of customers.  Congressman Robert

Eckhardt, (D) Texas, sponsor of amendments to SIPA to increase the amount of advance

available to customers and expedite the process, commented on the purpose of the legislation as

follows:

> Under present law, because securities belonging to customers
> may have been lost, improperly hypothecated, misappropriated,
> *never purchased* or even stolen, it is not always possible to
> provide to customers that which they expect to receive, that is,
> securities which they maintained in their brokerage account . . .
> By seeking to make customer accounts whole and returning them
> to customers in the form they existed on the filing date, the
> amendments  .  .  .  would  satisfy  the  customers'  legitimate
> expectations . . .

S. Rep. No. 95-763, at 2 (1978) (*emphasis added*).

4

> A customer generally expects to receive *what he believes* is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectations . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

13.    The Securities Investor Protection Corporation ("SIPC"), charged with administering SIPA, acknowledged that it was bound by the statute and the rules to satisfy the reasonable expectations of customers even when the securities had never been purchased, in the brief it submitted to the Court of Appeals for the Second Circuit as follows:

> Reasonable and legitimate expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits of SIPA) even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase . . . [T]his emphasis on the reasonable and legitimate customer expectations frequently yields much greater customer protection than would be the case if the transaction reality, not the claimants expectations, were controlling, as this court's earlier opinion in this liquidation well illustrates.

Brief of the Appellant SIPC at 23-24.

14.    Based on regular statements, confirmation reports and other communications received from Madoff, Ms. French at all times reasonably believed and expected that Madoff executed such transactions and that the French Customer Account actually held such securities.

15.    The Trustee's position in the Madoff case is completely inconsistent with the purpose and goals of SIPA and the position that SIPC has taken unequivocally with respect to

the treatment of customers in accordance with their reasonable expectations reflected in the communications from the broker-dealer.

**IV.    The Trustee's Definition of "Net Equity" is Inconsistent
With SIPA and SIPA Rules, Practice and Pronouncement
and Case Law Interpreting the Statute and Rules.**

16.   The Trustee failed to set forth a legal basis for the position he has taken that he can reduce the amount of the claim by appreciation in the French Customer Account or calculate the claim by counting only investment principal less withdrawals without regard to the securities reflected in the Final Madoff Statement.  No legal basis for the method exists.  The Trustee's calculation violates SIPA.

17.   15 U.S.C. § 78fff-2(b) provides that a customer's claim shall be allowed in the amount of the customer's "net equity."  15 U.S.C. § 78fff-2(b).  The Trustee calculates "net equity" by reducing the principal contributed to the account less any withdrawals or appreciation, without regard to any gains reflected in the Final Madoff Statement and any prior statement delivered by Madoff to the customer.   This is incorrect for the following reasons:

(a)        The Trustee's method of calculating the customer claim is inconsistent with the language of the statute.  SIPA defines a customer's net equity claim as the value of the customer's "securities positions" in the customer's account, less any amount the customer owes the debtor, as of the date of the filing of the SIPA liquidation:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . . ; minus

(B) any indebtedness of such customer to the debtor on the filing
date . . .[3]

15 U.S.C. § 78lll(11).  The Trustee's proposed formulation has no support in the language of the

statute or interpreting case law and in fact, adds words and concepts to the statute which do not

exist.

(b)    The Trustee's method is inconsistent with the Rules promulgated under

SIPA.  The Series 500 Rules promulgated under SIPA by SIPC provide for the classification of

claims for cash or securities in accordance with the written transaction confirmations sent by the

broker-dealer to the customer.  17 C.F.R. § 300.500.  Pursuant to the Rule, a customer has a

claim for securities if the customer has received written confirmation that the securities have

been purchased or sold for the account.

(c)    The Trustee's method is inconsistent with the legislative history of the

statute.  SIPA's legislative history emphasizes Congress' intention that the statute protect

customer expectations by ensuring that customers of retail brokerage firms can rely on their

account statements.  The Madoff statements and confirmations sent to Ms. French indicated that

she owned a list of blue chip securities.  It makes no difference whether the securities were ever

actually purchased.

(d)    The Trustee's formula is an improper and wholly inadequate measure

of loss.  Ms. French deposited funds with Madoff with the expectation the amount would

grow—the French Customer Account statements showed such growth, and the balance on the

---

[3]  The "indebtedness" of the customer to the debtor refers to cash or securities owed to the debtor, which is most
often in the context of a customer having borrowed from the debtor on margin.  *See, e.g.*, H.R. Rep. No. 95-746 at
21 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *Rich v. NYSE*,
522 F.2d 153, 156 (2d Cir. 1975) (noting that, under the 1970 statutory regime, when there were shortages in
available securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of
holders of margin accounts, amounts owed" to the broker); *In re First St. Sec. Corp.*, 34 B.R. 492, 497 (Bankr. S.D.
Fla. 1983) (offsetting against claim amount of indebtedness customer owed to the debtor where unauthorized stock
purchase was funded in part by borrowing on margin).

Final Madoff Statement reflects the benefit of this bargain.  In *Visconsi v. Lehman Brothers, Inc.*, No. 06-3304, 244 Fed. Appx. 708, 713-14 (6th Cir. 2007), the Court declined to set aside an arbitration award that appeared to apply an expectancy measure of damages against a successor in a Ponzi scheme case and rejected the money in / money out formula as not reflecting the expectations of the parties.  *Id*.  The Court explained:

> Lehman's out-of-pocket theory misapprehends the harm suffered by Plaintiffs and the facts of this case. Plaintiffs gave $21 million to Gruttadauria, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope – indeed a reasonable expectation – that it would grow. Thus, the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. Had Gruttadauria invested Plaintiffs' money as requested, their funds would have likely grown immensely, especially considering that Plaintiffs invested primarily throughout the mid-1990s, which, had they hired an honest broker . . . , would have placed their money in the stock market during one of the strongest bull markets in recent memory. In fact, the fictitious statements issued by Lehman, which were designed to track Plaintiffs' funds as if they had been properly invested, indicate that Plaintiffs' accounts would have grown to more than $37.9 million (even accounting for the withdrawal of more than $31.3 million). Plaintiffs thus could have reasonably believed that they were entitled to the full $37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals.

*Id*.  This applies precisely to Ms. French's claim.

(e)      The Trustee's Determination Letter is contrary to SIPC's own policies and practices, as reflected in the sworn testimony of Stephen Harbeck, SIPC's president and CEO, and its actions in similar liquidation proceedings.  For example, in the New Times Securities Services, Inc. ("New Times") SIPA liquidation, in the context of discussing claims filing deadlines, Harbeck acknowledged that if broker-dealer customers have been led to believe that "real existing" securities had been purchased for their accounts, then those customers are entitled to the full value of their securities positions as of the filing date, even if that value

represents a substantial increase from the purported purchase price of the securities and even if

the securities had never been purchased.  Harbeck testified as follows:

> Harbeck: [I]f you file within sixty days, you'll get the securities,
> without question. Whether – if they triple in value, you'll get the
> securities . . . Even if they're not there.
>
> Court: Even if they're not there.
>
> Harbeck: Correct.
>
> Court: In other words, if the money was diverted, converted –
>
> Harbeck: And the securities were never purchased.
>
> Court. Okay.
>
> Harbeck: And if those positions triple, we will gladly give the
> people their securities positions.

Transcript at 37-39, *In re New Times Sec. Servs., Inc.*, No. 00-8178 (Bankr. E.D.N.Y. July 28,

2000).

Moreover, SIPC faced very similar circumstances in the New Times liquidation and took

a very different position than it is taking in the Madoff case in support of the Trustee.  There, the

New Times Trustee's position on "net equity" was in full accord with SIPA, and thus directly

contrary to the Trustee's position in this case.  Specifically, with respect to any claims that were

based on confirmations and account statements reflecting securities positions in "real" securities

that could have been purchased (i.e., securities that actually existed on the public market and

whose valuations were objectively and publicly verifiable by the customers), the New Times

Trustee allowed all such net equity claims to the full extent of the filing date valuations of those

securities, even though none of the securities identified in those records had ever, in fact, been

purchased by the broker-dealer.[4]

---

[4] As with Madoff Securities and Bernard Madoff, New Times and its principal, William Goren, defrauded scores of
investors by providing them with confirmations and account statements reflecting purported securities investments

(f)        The Trustee's determination is inconsistent with the case law.  The

Second Circuit's discussion of SIPC's claims processing in *New Times,* the only case in this

jurisdiction dealing with the issue in the Madoff case, further indicates that, with respect to

customers who thought they were invested in listed securities, SIPC properly paid customer

claims based on the customers' final account statements, even where the securities had never

been purchased:

> Meanwhile, investors who were misled . . . to believe that they
> were investing in mutual funds that in reality existed were treated
> much more favorably. Although they were not actually invested in
> those real funds – because Goren never executed the transactions –
> the information that these claimants received on their account
> statements mirrored what would have happened had the given
> transaction been executed. As a result, the Trustee deemed those
> customers' claims to be "securities claims" eligible to receive up
> to $500,000 in SIPC advances. The Trustee indicates that this
> disparate treatment was justified because he could purchase real,
> existing securities to satisfy such securities claims. Furthermore,
> the Trustee notes that, if they were checking on their mutual
> funds, the "securities claimants," . . . could have confirmed the
> existence of those funds and tracked the funds' performance
> against Goren's account statements.

*In re New Times Sec. Servs.*, 371 F.3d 68, 74 (2d Cir. 2004); *see also* Brief of Appellant SIPC at

23-24, *In re New Times Sec. Servs., Inc.*, No. 05-5527 (Dec. 30, 2005):

> [R]easonable and legitimate claimant expectations on the filing
> date are controlling even where inconsistent with transactional

---

made on their behalf when, in fact, no such investments had been made and their money had, instead, been misappropriated for other purposes.  Two of the investment opportunities Goren purported to offer were: (1) money-market funds that were entirely fictitious (the "Fictitious New Age Funds"); and (2) mutual funds that were entirely real, such as those offered by The Vanguard Group and Putnam Investments (the "Real Securities").  *See In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 71-72 (2d Cir. 2004) ("*New Times I*").  Goren's was "a classic Ponzi scheme," *id.* at 72 n.2, wherein new investors' money was used to pay earlier investors.

Approximately 900 customers filed claims in the New Times liquidation: 726 for whom the "Real Securities" were purportedly purchased; 174 for whom the "Fictitious New Age Funds" were purportedly purchased.  Consistent with SIPA and its legislative history, the New Times Trustee appropriately applied SIPA's net equity definition to the "Real Securities" customers' claims – meaning he paid them according to the full value of those securities positions as of the date of the liquidation filing.  When challenged by "Fictitious New Age Funds" customers who had objected that they had not received the same treatment, SIPC and the New Times Trustee (with the apparent concurrence of the SEC) vigorously defended their approach in court.

> reality. Thus, for example, where a claimant orders a securities
> purchase and receives a written confirmation statement reflecting
> that purchase, the claimant generally has a reasonable expectation
> that he or she holds the securities identified in the confirmation
> and therefore generally is entitled to recover those securities
> (within the limits imposed by SIPA), even where the purchase
> never actually occurred and the debtor instead converted the cash
> deposited by the claimant to fund that purchase . . . [T]his
> emphasis on reasonable and legitimate claimant expectations
> frequently yields much greater 'customer' protection than would
> be the case if transactional reality, not claimant expectations, were
> controlling, as this Court's earlier opinion in this liquidation well
> illustrates.

Ms. French is in the same position as those investors in the *New Times* case who received

confirmations and statements reflecting real securities.

      (g)      The Trustee's position in the Madoff case is contradicted, not only by

SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's

general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang

acknowledged that a Madoff customer is entitled to the securities in their account:

> Based on a conversation with the SIPC general counsel, Josephine
> Wang, if clients were presented statements and had reason to
> believe that the securities were in fact owned, the SIPC will be
> required to buy these securities in the open market to make the
> customer whole up to $500K each. So if Madoff client number
> 1234 was given a statement showing they owned 1000 GOOG
> shares, even if a transaction never took place, the SIPC has to buy
> and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

      (h)      The Trustee's methodology also conflicts with other federal laws. For

example, Rev. Proc.2009-20, issued by Commissioner Shulman on March 17, 2009, expressly

recognizes the income earned by customers, on which they paid taxes annually. Yet the

Trustee's position is that the income earned by customers on their investments is not their

money. In addition, some customers were required to take distribution from their retirement

accounts.  Yet the Trustee is deducting from their customer claim the mandatory withdrawals that the customers were required by law to take.

18.   In sum, the Trustee has created his own definition of "net equity" that is not based on statutes, prior practice or case law.  The procedure is designed not for the benefit of Madoff victims but rather so that the Trustee can avoid paying SIPC insurance to the thousands of Madoff investors who, like Ms. French, have depended upon their Madoff investments for their current and future living expenses.

19.   Because of his refusal to comply with SIPA's mandate that he "promptly" satisfy customer claims based on their last statements, 15 U.S.C. § 78fff- 3(a) and 4(c), the Trustee employs a vast team of forensic accountants to pore through decades of records to determine each customer's net investment before SIPC pays any amount to a customer.  Clearly, this is inconsistent with the statutory scheme and the legislative intent.  Ms. French's "securities position" is readily ascertainable from the Final Madoff Statement.

## V.      The Trustee Has No Legal Basis For Reducing The Claim.

20.   The Trustee's action in reducing the amount shown on the French Customer Claim by any prior gains or withdrawals reflected on the Final Madoff Statement or prior statements is an attempt to avoid such gains without alleging any grounds for avoidance or proving that such gains are avoidable under the Bankruptcy Code's avoidance provisions.  Any such disallowance is improper and unjustified, and the Determination Letter should be stricken on that ground alone.  *See* Fed. R. Bankr. P. 7001(1) & 7008.

## VI.     The Trustee's Reductions Are Barred By The Statue Of Limitations.

21.   The Trustee's action in reducing the amount shown on the French Customer Claim by gains or withdrawals from the account is an attempt to avoid such gains and withdrawals without alleging any grounds for avoidance or proving that such gains are avoidable under the

state law avoidance provisions or other theories of law.  The avoidance of those gains and

withdrawals have been taken well beyond any limitations period for avoidance of a claim under

either state or federal law.

## VII.    The Trustee's Denial Is Inconsistent With SIPA.

22.    SIPA provides that (a) SIPC shall pay the first $500,000 of each customer claim,

and (b) customers have an unsecured claim against customer property for the balance of their

claims which is paid pro rata with other customers.  *See* 15 U.S.C. § 78fff-3(a) ("In order to

provide for prompt payment and satisfaction of net equity claims of customers of debtor, SIPC

shall advance to the trustee [up to] $500,000 for each customer, as may be required to pay . . .

claims."); 15 U.S.C. § 78fff-2(c)(1)(B) (providing that customers of the debtor "shall share

ratably in . . . customer property on the basis and to the extent of their net equities").  As

evidenced by the Final Madoff Statement, Ms. French has valid claim in the amount of

$13,172,848.  Therefore, Ms. French is entitled to an advance of $500,000 and a claim against

customer property for the remainder.

## VIII.    Ms. French Is Entitled To Interest On Her Investments.

23.    In the event that the Court should determine that customer claims should not be

allowed in the amount of the Final Madoff Statement, then in the alternative, Ms. French is

entitled to recover interest or appreciation on Ms. French's investments based upon the

following.

(i)        Under New York law, which is applicable here, funds deposited with

the Debtors under these circumstances are entitled to interest.  *See, e.g.,* N.Y. C.P.L.R. § 5004;

N.Y. Gen. Oblig. § 5-501, *et seq.*  Accordingly, the French Customer Claim should be

recalculated by adding interest to all funds deposited.

(j)      Under New York law, which is applicable here, customers are entitled to any returns Madoff earned on the deposited funds under principles of unjust enrichment. Accordingly, customer claims should be recalculated by adding the amounts earned by Madoff on the customer's deposits.  *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

(k)      Ms. French is entitled to interest on her investment under federal securities laws.  In *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), the Supreme Court analyzed the different measures of recovery of "actual damages" for fraud, primarily including rescission and restitution.  The *Randall* Court concluded that Congress intended to deter wrongdoers, and hence, that wide latitude in choosing the measure of damages was warranted.  *See id.* at 664 (citing *Affiliated Ute Citizens of Utah v. United State*s, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)).  The *Randall* Court continued by holding that:

> This deterrent purpose is ill-served by a too rigid insistence on limiting plaintiffs to recovery of their "net economic loss."

*Id.* at 664 (citing *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 940 (2d Cir. 1984)).

## RESERVATION OF RIGHTS

24.   Ms. French reserves the right to revise, supplement, or amend this Corrected Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of Elizabeth D. French's right to object on any additional grounds.

25.   Ms. French reserves all rights set forth in Rule 9014, including, without limitation, rights of discovery.  *See* Fed. R. Bankr. P. 9014.

26.    Ms. French reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

27.    Ms. French incorporates by reference all reservations of rights set forth in the French Customer Claim.

## RELIEF REQUESTED

For the reasons stated herein, Ms. French's claim should be allowed in its entirety in the amount of $745,743.14, which is the amount stated on the Final Madoff Statement, plus interest from the date of the Determination Letter.

For the reasons stated herein, this Court should direct SIPC to immediately replace $500,000 of the securities in the French Customer Account based upon the values reflected on Ms. French's Final Madoff Statement and/or advance Ms. French $500,000 from the SIPC fund..

For the reasons stated herein, the Determination Letter should be stricken.

Ms. French requests such other relief as may be just and equitable.

Dated: December 23, 2009                    SONNENSCHEIN NATH & ROSENTHAL LLP


By:    ___/s/ Carole Neville_____
       Carole Neville
       1221 Avenue of the Americas
       New York, New York 10020
       Telephone:  (212) 768-6700
       Facsimile:  (212) 768-6800


*Attorneys for Elizabeth D. French*

## <u>CERTIFICATE OF SERVICE</u>

I, Carole Neville, hereby certify that on December 23, 2009 I caused a true and correct

copy of the foregoing **Corrected Objection to Trustee's Determination of Claim** on behalf of

Elizabeth D. French to be filed electronically with the Court and served upon the parties in this

action who receive electronic service through CM/ECF, and served by hand upon:

> David J. Sheehan, Esq.
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, NY 10111

Dated: December 23, 2009

>      /s/ Carole Neville
> Carole Neville