DEC 3 1 2009

December 28, 2009

Clerk of the United State Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, NY 10004

RE: Bankruptcy Case No. 08-7189 (BRJ)

To Whom It May Concern:

The Gigi Family Limited Partnership (hereby referred to as a "Victim") asks for a reconsideration in your determination dated December 16, 2009 (see copy enclosed) denying our claims on BLMIS Account No. IM0115 designated as Claim Number 2379.

Rep. Paul Kanjorski (D-PA) said he was concerned that each claim must be judged on its own merit because if not it would lead to unfair treatment of later investors in the Madoff scheme. Please take a moment to re-evaluate my argument based on this statement.

My argument for reconsideration of your denial is primarily focused on the concept that the government watchdog, the Securities and Exchange Commission (SEC), failed to expose the ponzi scheme as far back as 1992. Joel Seligman, an SEC historian and president of the University of Rochester in New York stated recently, "This is a debacle for the SEC; the commission has a lot to answer for". I relied on the SEC agency to expose a scheme of this magnitude; I reacted and invested further money in 2007 and 2008 with Madoff and accordingly I feel justified for damages from their negligence.

Mr. Madoff has had a history of creditability in the security industry since the 1960's. He was a former chairman of the Nasdaq Stock Market. *The SEC itself tapped* his expertise, naming him to a 25-member advisory committee on market structure nine years ago and frequently calling on him to be a commentator or at agency round table discussions. He even got his name informally applied to a SEC rule. The "Madoff exception" allowed market makers such as Mr. Madoff to sell stock short to facilitate a customer buy order, even if the stock in question was ticking downward.

The inspection unit of the SEC reviewed Mr. Madoff's market making business in 2005 and found that he violated technical rules about executing trades. The agencies enforcement division in 2007 investigated a part of whistle-blowers concerns, but closed the probe without bringing a case. It should be highlighted that I invested *new monies* in 2007 and 2008.

Mr. Madoff registered his firm as an investment adviser in September 2006, and newly registered advisers are supposed to be examined in the first year. There is no indication the SEC ever conducted that examination. His registration form said he was paid through trading commissions, rather than the usual method of taking a percentage of his client's assets and investment profits. That apparently failed to raise red flags. *Are you suggesting from your denial of my claim that a prudent investor should not be entitled to an award on its claim if the account was probed by a federal agency before new monies were contributed to the account?*

It is my understanding that if money is stolen from brokerage; as much as $500,000 per client should be covered by the Securities Investor Protection Corp., a not for profit funded by the securities industry. *Why shouldn't you award my claim for the $200,000 invested after 2006 based on the facts at hand?*

Furthermore, there were additional assurances from licensed public accountants that I relied on before I invested more monies with Madoff in 2007: from a small three man certified public accounting firm called Friehling and Horowitz to international sized certified public accounting firms, Ernest and Young and BDO Seidman. All three public accountants gave credence to Madoff endeavors without even a footnote or hint of impropriety. Internally Mr. Madoff's top lieutenant in the fraud, Frank DiPascali Jr. accepted additional funds from me in 2007 without a word of the ponzi scheme deception. I have been deceived and I believe I am justified for a damage award from the SIPC.

I received monthly statements as well as details for all trades made, usually in blue chip stocks and stock index options. At the end of the year, the statement reflected that Mr. Madoff had sold all the securities and put the proceeds in Treasury Bills, before starting the strategy again in January. I find it unsettling that any investigation of Madoff did not disclose this scam instantaneously. *I am outraged that you organization denied my claim based on the fact that no securities were ever made. How absurd a statement rendered for denial of this claim.*

The gains (cash distributions) as detailed on your TABLE 1 were credited to my account; however, the rapid trading led to high tax bills (debit to my personal aaccount). Accordingly, using the cash in-cash-out approach shouldn't the total withdrawals be reduced by income taxes paid (adjustment for the cash-out)? I believe the average applied tax rate for New York and Federal is equal to 35% or more of the distribution. Applying this formula would entitle me to a settlement in excess of $60,000 at a minimum, using the SIPC net equity method approach for determining claims.

Income taxes that have been paid by Ponzi investors on "phantom income" represent fake profit that never existed may be recovered by amended returns, but even this approach for recovery has a cost attached to it, for a Victim like me.

My claim for recovery of funds is particular (not standard) than other claims submitted to Securities Investor Protection Corp (SIPC) because of latter investments made in 2007 and 2008 (new monies) relying on Federal probes and public accountant clean opinions that Madoff's operation was legit..

***Madoff was in fact a broker-dealer and regulated as such by the SEC.*** An enforcement case seventeen (17) years ago gave the Securities and Exchange Commission its first shot at figuring out how Bernie Madoff could rack up favorable returns with such uncanny consistency. After that, it received repeated warnings from outside whistle-blowers and at least twice looked into Mr. Madoff's brokerage itself. Each time, the watch-dog blew its chance. However, I was watching with great interest before I invested more monies in this operation.

***Though Madoff gathered investor's money and chose how it was invested, he wasn't a registered investment advisor until 2006.*** Some people describe his business as a hedge fund, but he didn't create a formal fund into which investors could put their money. Several former SEC regulators said they thought Mr. Madoff's broker-dealer business dealt entirely with trading by Wall Street firms, not by individual investors. The negligence in this case is disconcerting and fraudulent and I demand restitution for my losses.

Please note that I'm aging and it will be difficult to be present for any formal hearing to discuss this matter in New York City. I'm hopeful and prepared to settle this matter and move on, if at all possible. I'm outraged of your denial of my claim. I authorize my grandson, Michael Morrone to represent me in these proceedings; if necessary. If you need to discuss this matter please call @ 631 849-4592. My son Anthony is also is authorized to represent this claim.

And please and most foremost please recognize that I'm not trained as an attorney to build a case for this claim; I'm the Victim. I don't have the means to engage a high priced attorney for representation. But please keep in mind one thing in your determination, it is one thing to be taken by a ponzi operation whereby one person's principal is another person's profit but to be mislead by bogus assurances from a federally regulative body such as the SEC (a snoring watch-dog that has apparently lost its oversight) and receiving creditability opinions from public accounting firms on the Madoff's operation is appalling. As a United States taxpayer this is beyond pardonable and damages to this victim must be reconsidered.

Very truly yours,

Carmela Morrone

Michael Morrone

Anthony Morrone

*Notary Public*     12/28/2009

Cc:  Irving H. Picard, Trustee          Michael Morrone
     c/o Baker&Hostetler LLP            18 Whitewood Drive
     45 Rockefeller Plaza               Rocky Point, New York, 11778
     New York, NY  10111

LAURA LEE VECCHIONE
Notary Public - State of New York
NO. 01VE6093119
Qualified in Suffolk County
My Commission Expires May 2, 2011

# BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

## DECEMBER 11, 2008[1]

### NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

December 16, 2009

Gigi Family Limited Partnership
125 Knolls Drive
Stoney Brook, NY 11790

Dear Gigi Family Limited Partnership:

**PLEASE READ THIS NOTICE CAREFULLY.**

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1M0115 designated as Claim Number 2379:

Your claim for a credit balance of $400,000.00 and for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $267,243.70), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $234,927.92). As noted, no securities were ever purchased by BLMIS for your account. Any and

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($32,315.78) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

**Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.**

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after December 16, 2009, the date on which the Trustee mailed this notice.

2

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

> Clerk of the United States Bankruptcy Court for
> the Southern District of New York
> One Bowling Green
> New York, New York 10004
>
> and
>
> Irving H. Picard, Trustee
> c/o Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York 10111

_____
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

Cc: Anthony Morrone
9 Ernest Court
Kings Park, NY 11754

3

## Table 1

### DEPOSITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---:|:---:|---:|---:|
| 6/10/1997 | TRANS FROM 1M004710 | $185,109.65 | $34,927.92 |
| 3/29/2007 | CHECK | $100,000.00 | $100,000.00 |
| 4/28/2008 | CHECK | $100,000.00 | $100,000.00 |
| **Total Deposits:** | | $385,109.65 | $234,927.92 |

### WITHDRAWALS

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---:|:---:|---:|---:|
| 10/10/1997 | CHECK | ($9,795.53) | ($9,795.53) |
| 1/13/1998 | CHECK | ($6,835.19) | ($6,835.19) |
| 4/8/1998 | CHECK | ($8,808.58) | ($8,808.58) |
| 7/9/1998 | CHECK | ($8,062.64) | ($8,062.64) |
| 7/15/1998 | CANCEL CHECK 7/9/98 | $8,062.64 | $8,062.64 |
| 10/9/1998 | CHECK | ($4,566.69) | ($4,566.69) |
| 1/13/1999 | CHECK | ($8,826.48) | ($8,826.48) |
| 4/13/1999 | CHECK | ($8,775.98) | ($8,775.98) |
| 7/8/1999 | CHECK | ($12,593.87) | ($12,593.87) |
| 10/8/1999 | CHECK | ($5,518.75) | ($5,518.75) |
| 1/6/2000 | CHECK | ($6,301.94) | ($6,301.94) |
| 4/7/2000 | CHECK | ($9,031.66) | ($9,031.66) |
| 7/7/2000 | CHECK | ($5,633.17) | ($5,633.17) |
| 10/11/2000 | CHECK | ($3,927.22) | ($3,927.22) |
| 1/10/2001 | CHECK | ($3,478.52) | ($3,478.52) |
| 4/6/2001 | CHECK | ($8,238.98) | ($8,238.98) |
| 7/9/2001 | CHECK | ($6,012.76) | ($6,012.76) |
| 10/9/2001 | CHECK | ($4,171.53) | ($4,171.53) |
| 1/11/2002 | CHECK | ($6,295.84) | ($6,295.84) |
| 4/10/2002 | CHECK | ($2,213.60) | ($2,213.60) |
| 7/8/2002 | CHECK | ($7,401.33) | ($7,401.33) |
| 10/7/2002 | CHECK | ($9,067.48) | ($9,067.48) |
| 1/10/2003 | CHECK | ($3,616.92) | ($3,616.92) |
| 4/9/2003 | CHECK | ($3,562.27) | ($3,562.27) |
| 7/8/2003 | CHECK | ($5,392.34) | ($5,392.34) |
| 10/9/2003 | CHECK | ($5,486.84) | ($5,486.84) |
| 1/8/2004 | CHECK | ($2,349.70) | ($2,349.70) |
| 4/8/2004 | CHECK | ($3,589.55) | ($3,589.55) |
| 7/7/2004 | CHECK | ($5,547.21) | ($5,547.21) |
| 10/7/2004 | CHECK | ($4,410.24) | ($4,410.24) |
| 1/7/2005 | CHECK | ($3,600.94) | ($3,600.94) |
| 4/7/2005 | CHECK | ($3,673.13) | ($3,673.13) |

| Date | Type | Amount | Amount |
|---:|:---:|---:|---:|
| 7/7/2005 | CHECK | ($3,915.73) | ($3,915.73) |
| 10/7/2005 | CHECK | ($3,627.41) | ($3,627.41) |
| 1/9/2006 | CHECK | ($5,683.55) | ($5,683.55) |
| 4/7/2006 | CHECK | ($4,666.85) | ($4,666.85) |
| 7/10/2006 | CHECK | ($5,161.11) | ($5,161.11) |
| 10/6/2006 | CHECK | ($8,869.45) | ($8,869.45) |
| 1/8/2007 | CHECK | ($5,192.95) | ($5,192.95) |
| 4/4/2007 | CHECK | ($3,868.31) | ($3,868.31) |
| 7/6/2007 | CHECK | ($8,314.62) | ($8,314.62) |
| 10/4/2007 | CHECK | ($8,909.38) | ($8,909.38) |
| 1/8/2008 | CHECK | ($7,062.02) | ($7,062.02) |
| 4/7/2008 | CHECK | ($3,500.88) | ($3,500.88) |
| 7/7/2008 | CHECK | ($14,106.09) | ($14,106.09) |
| 10/6/2008 | CHECK | ($5,641.11) | ($5,641.11) |
| **Total Withdrawals:** | | ($267,243.70) | ($267,243.70) |
| | | | |
| **Total deposits less withdrawals:** | | $117,865.95 | ($32,315.78) |