**Exhibit B**

## CUSTOMER CLAIM

Claim Number_____

Date Received_____

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008

(Please print or type)

Name of Customer: Miguel Lomeli
Mailing Address: Campestre # 105
City: Col. San Angel Inn          State:  MEXICO          Zip: 01060 D.F.
Account No.: 1-FN012-3-0; 1-FN045-3-0; 1-FN069-4-0; and 1-FN070-4-0   (SEE ALSO EXH. A
Taxpayer I.D. Number (Social Security No.): _____   AND EXH B.,
                                                                       PAR. 13)

NOTE:    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY
         THE ACCOMPANYING INSTRUCTION SHEET.  A SEPARATE CLAIM FORM
         SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL
         PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE
         RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009.  CLAIMS
         RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE
         SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS
         LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY
         CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

*************************************************************************

1.    Claim for money balances as of **December 11, 2008**:

      a.    The Broker owes me a Credit (Cr.) Balance of     $ 0.00

      b.    I owe the Broker a Debit (Dr.) Balance of        $ 0.00

      c.    If you wish to repay the Debit Balance,
            please insert the amount you wish to repay and
            attach a check payable to "Irving H. Picard, Esq.,
            Trustee for Bernard L. Madoff Investment Securities LLC."
            If you wish to make a payment, **it must be enclosed**
            with this claim form.                            $ 0.00

      d.    If balance is zero, insert "None."               None

2.    Claim for securities as of **December 11, 2008**:

**PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.**

|  | | YES | NO |
|---|---|---|---|
| a. | The Broker owes me securities | ✓ | |
| b. | I owe the Broker securities | | ✓ |

c.    If yes to either, please list below:

| Date of Transaction (trade date) | Name of Security | The Broker Owes Me (Long) | I Owe the Broker (Short) |
|---|---|---|---|
| | | **Number of Shares or Face Amount of Bonds** | |

Please see Exhibits A and B. The entity described in Exhibit A is believed to be a customer

of BMIS and the party filing this claim thus has an interest in the assets of such entity.

Claim amount: 208.288 shares of Fairfield Sentry Ltd. x $1,349.78 = $281,143.55*

**Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.**

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.
**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.**

502180406                                2

* Fairfield Sentry Ltd., invested 99% of its assets with BMIS. The above claim amount reflects the claimant's proportionate share of this investment, as demonstrated in Exhibit A.

**NOTE:** **IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.**

|  |  | YES | NO |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. | _____ | ✓ |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? | _____ | ✓ |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? | _____ | ✓ |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) | _____ | ✓ |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. | _____ | ✓ |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. | _____ | ✓ |
| 9. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? if so, give name of that broker. | _____ | ✓ |

Please list the full name and address of anyone assisting you in the preparation of this claim form: Kristi Stahnke McGregor & Kent Bronson, Esqs., Milberg LLP, One Pennsylvania Plaza, New York, NY 10119                .

If you cannot compute the amount of your claim, you may file an estimated claim.  In that case, please indicate your claim is an estimated claim.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date _June 11, 2009_          Signature _Miguel Loretti_

Date _____          Signature _____

(If ownership of the account is shared, all must sign above.  Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet.  If other than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity and authority.  Please supply the trust agreement or other proof of authority.)

**This customer claim form must be completed and mailed promptly, together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

# **EXHIBIT A**

# StanChart Securities International, Inc.

1111 Brickell Avenue, 16th Floor, Miami, FL 33131
tel 305.350.2169   fax 305.373.3804

# Brokerage
## Account Statement

NOT FDIC INSURED • NOT A BANK DEPOSIT •
NO BANK GUARANTEE • MAY LOSE VALUE

Account Number:
Statement Period: 11/01/2008 - 11/30/2008

REDACTED

\* 00000050 XP1875M1 010000

MIGUEL LOMELI
& LUIS ERNESTO LOMELI
CAMPESTRE 105
COL SAN ANGEL INN
MEXICO 01060 D F
MEXICO

**Your Registered Representative:**
ANTONIO GARCIA ADANEZ

## Valuation at a Glance

|  | This Period |
|---|---|
| Beginning Account Value | $0.00 |
| Change in Account Value | 281,143.25 |
| Ending Account Value | $281,143.25 |

## Asset Allocation

| | Value Prior Year-End | Value Last Period | Value This Period | Percent Allocation | |
|---|---|---|---|---|---|
| Mutual Funds | 0.00 | 0.00 | 281,143.25 | 100% | Your Account is 100% Invested in Mutual Funds. |
| Account Total | $0.00 | $0.00 | $281,143.25 | 100% | |

DALBAR RATED
FOR COMMUNICATION

A0000241C5F4100P

PAR-02-ROLL

Clearing Through Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation
Member FINRA, NYSE, SIPC

# Customer Service Information

**Your Registered Representative:** 133

ANTONIO GARCIA ADANEZ
1111 BRICKELL AVENUE
SUITE 1600
MIAMI        FL 33131

### Customer Service Information

Customer Service Telephone Number: (305) 350-2169
Web Site: www.privatebankstandardchartered.com

## Portfolio Holdings

**Mutual Funds  100.00% of Portfolio**

| Quantity | Acquisition Date | Unit Cost | Cost Basis | Market Price | Market Value | Unrealized Gain/Loss | Estimated Annual Income | Estimated Yield |
|---|---|---|---|---|---|---|---|---|
| Mutual Funds | | | | | | | | |
| §FAIRFIELD SENTRY LTD SHS HEDGE FD (OFFSHORE) ISIN VGG3299L1004 Open End Fund | | N/A | Please Provide | 1,349.7800 | 281,143.25 | N/A | | |
| Security Identifier: G3299L100 | | | | | | | | |
| Dividend Option: Cash; Capital Gains Option: Cash | | | | | | | | |
| 208.288 | 11/25/08 | | | | | | | |
| **Total Mutual Funds** | | | $0.00 | | $281,143.25 | $0.00 | $0.00 | |

| | Cost Basis | Market Value | Unrealized Gain/Loss | Accrued Interest | Estimated Annual Income |
|---|---|---|---|---|---|
| **Total Mutual Funds** | $0.00 | $281,143.25 | $0.00 | | $0.00 |
| **Total Portfolio Holdings** | $0.00 | $281,143.25 | $0.00 | $0.00 | $0.00 |

REDACTED

§ Unrealized gains and losses are not reported for securities for which cost basis or market value is not available.

**Disclosures and Other Information**

Pricing - Securities prices may vary from actual liquidation value. Prices shown should only be used as a general guide to portfolio value. Prices are received from various pricing services. However, pricing services are sometimes unable to provide timely information. Where pricing sources are not readily available, particularly on certain debt securities, estimated prices may be generated by a matrix system taking various factors into consideration. The pricing of listed options takes into account the last closing price, as well as the current bid and offer prices. Where securities have not been priced, such securities have not been included in the Asset Allocation information at the beginning of this statement.

DALBAR RATED FOR COMMUNICATION  Account Number: MIGUEL LOMELI

Clearing Through Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation
Member FINRA, NYSE, SIPC

PAR-02-ROLL

Page 2 of 4

A000241C3F11T02P



## StanChart Securities International, Inc.
1111 Brickell Avenue, 16th Floor, Miami, FL 33131
tel. 305 350 2169   fax. 305 373 3804

# Brokerage
## Account Statement

Statement Period: 11/01/2008 - 11/30/2008

**NOT FDIC INSURED • NOT A BANK DEPOSIT •**
**NO BANK GUARANTEE • MAY LOSE VALUE**

## Portfolio Holdings (continued)

Reinvestment - The dollar amount of Mutual Fund distributions, Money Market Fund dividend income, Bank Deposit interest income, or dividends for other securities shown on your Statement may have been reinvested. You will not receive confirmations of these reinvestments. However, information pertaining to these transactions which would otherwise appear on confirmations, including the time of execution and the name of the person from whom your security was purchased, will be furnished to you upon written request to your Introducing firm. In dividend reinvestment transactions, Pershing acts as your agent and receives payment for order flow, the source and nature of which payment will be furnished to you upon written request to your Introducing firm.

Option Disclosure - Information with respect to commissions and other charges incurred in connection with the execution of option transactions has been included in confirmations previously furnished to you. A summary of this information is available to you promptly upon your written request directed to your Introducing firm. In order to assist your Introducing firm in maintaining current background and financial information concerning your option accounts, please promptly advise them in writing of any material change in your investment objectives or financial situation. Expiring options which are valuable are exercised automatically pursuant to the exercise by exception procedure of the Options Clearing Corporation. Additional information regarding this procedure is available upon written request to your Introducing firm.

Foreign Currency Transactions - Pershing may execute foreign currency transactions as principal for your account. Pershing may automatically convert foreign currency to or from U.S. dollars for dividends and similar corporate action transactions unless you instruct your financial organization otherwise. Pershing's currency conversion rate will not exceed the highest interbank conversion rate identified from customary banking sources on the conversion date or the prior business day, increased by up to 1%, unless a particular rate is required by applicable law. Your financial organization may also increase the currency conversion rate. This conversion rate may differ from rates in effect on the date you executed a transaction, incurred a charge, or received a credit. Transactions converted by agents (such as depositories) will be billed at the rates such agents use.

Proxy Vote - Securities held by you on margin (securities not fully paid for by you) may be lent by Pershing to itself or others in accordance with the terms outlined in the Margin Agreement. The right to vote your shares held on margin will be reduced by the amount of shares on loan. The Proxy Voting Instruction Form sent to you may reflect a smaller number of shares entitled to vote than the number of shares in your margin account.

## Transactions in Date Sequence

| Process/ Settlement Date | Trade/ Transaction Date | Activity Type | Description | Quantity | Price | Accrued Interest | Amount | CCY |
|---|---|---|---|---|---|---|---|---|
| 11/06/08 | 11/05/08 | BOOKS & RECORDS CUSTOMER INFORMATION PRINT FEE | CHARGE FOR BOOKS AND RECORDS PRINT ACCT IS206772 COPIES: 1 MONTH: NOV 2008 | | | | -1.50 | USD |
| 11/07/08 | | BOOKS & RECORDS CUSTOMER INFORMATION PRINT FEE | REV BOOKS&RECORDS 11/05/2008 | | | | 1.50 | USD |
| 11/25/08 | | CORRESPONDENT CONVERSION | FAIRFIELD SENTRY LTD SHS HEDGE FD (OFFSHORE) ISIN VGG3299L1004 A/C CONV 103592 I | 208.288 | | | 0.00 | USD |

### Total Value of all Transactions
The price and quantity displayed may have been rounded.

REDACTED

$0.00

Account Number: MIGUEL LOWELI

PAR-02-ROLL

Clearing Through Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation
Member FINRA, NYSE, SIPC

Page 3 of 4

N000021355F41 00F

## Customer Account Information

**Account Investment Objective:** BALANCED/GROWTH

INVESTMENT APPROACH WITH AN EMPHASIS ON CAPITAL APPRECIATION. PRIMARY OBJECTIVE IS MAXIMIZING CAPITAL GROWTH; WILLING TO TOLERATE MORE THAN ONE YEAR OF NEGATIVE RETURNS.

**Account Mailing Address:**
MIGUEL LOMELI
& LUIS ERNESTO LOMELI
CAMPESTRE 105
COL SAN ANGEL INN
MEXICO 01060 D F
MEXICO

**Account Annual Income:** $100,000 - $999,999,999
**Account Net Worth:** $1,000,000 - $999,999,999

**Account Participant:**

**Legal Address:**
MIGUEL LOMELI
CAMPESTRE 105
**Home Telephone Number:**
**Work Telephone Number:**
**E-mail Address:**
**Employment Status:**
**Occupation:** MEDICAL / HEALT

Employed by this broker-dealer:
Related to an employee of this broker-dealer:

Employed by another broker-dealer:
Related to an employee of another broker-dealer:

Please carefully read the Customer Account Information section. If any of the information is either missing or incorrect, please indicate any corrections on the statement and return this document to your introducing broker-dealer at the address listed above. You may also send a letter with any changes to the address listed above. If you are aware of any impending changes to the data displayed above, please notify your Investment Professional.

This information is being provided to you in accordance with the Securities and Exchange Commission Rule 17a-3.

Please note that your investment objective term and/or explanation have changed.

The Customer information reflected on this statement was received from your financial institution and has not been verified by Pershing.

REDACTED

## Messages

Although a money market mutual fund seeks to preserve the value of your investment at $1.00 per share, it is possible to lose money by investing in a money market mutual fund. Please see the money market mutual fund's prospectus or contact your investment professional for additional information.

DALBAR RATED
FOR COMMUNICATION

Account Number:.
MIGUEL LOMELI

PAR-02-ROLL

Clearing Through: Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation,
Member FINRA, NYSE, SIPC

X00O024JCSF41CGP

## EXHIBIT B

1. The Claimant is not a direct customer of Bernard L. Madoff Investment Securities LLC ("BMIS"), but instead is an investor in Fairfield Sentry Ltd., which is believed to be a BMIS customer with claims to securities and other assets of BMIS. The Claimant believes it has or may have in the future a claim in this liquidation proceeding and/or rights to all or a portion of the claims of Fairfield Sentry Ltd.

2. This Claim Form, exhibits, and supporting documentation (collectively "Claim Form") is submitted pursuant to the December 23, 2008 Order of the Honorable Burton R. Lifland and the instructions disseminated by Irving H. Picard, Trustee for Bernard L. Madoff Investment Securities LLC ("Trustee"), on December 11, 2008.

3. The information provided in the Claim Form is based on information known by the Claimant as of the date of the submission of the Claim Form. The Claimant reserves the right to amend and/or supplement this Claim Form upon the receipt of further information, or upon request by the Trustee for additional information.

4. The Claimant reserves the right to amend the Claim Form in the event of any recoveries by the Trustee or any other party under the avoidance powers of the Bankruptcy Code or otherwise, or in the event of rejections of executory contracts pursuant to Bankruptcy Code Section 365, whether such amendments are made pursuant to Bankruptcy Code Sections 105, 502(g), or 502(h), Bankruptcy Rule 3002(c)(3), (4), other provisions of applicable bankruptcy law, or general principles of law or equity.

5. The Claimant hereby requests that the Claim Form be considered as a proof of claim in *In re Bernard L. Madoff Investment Securities LLC*, No. 08-01789 (Bankr. S.D.N.Y.).

6. This Claim Form is required to be submitted pursuant to the Court's January 2, 2009 Order and the Trustee's instructions to the Claimant. To the extent permitted by applicable law, the Claimant does not, by submitting the Claim Form, consent to the jurisdiction of the Bankruptcy Court nor does Claimant waive any right to trial by jury.

7. The Claimant reserves all rights, claims, and/or defenses as to and/or against any and all parties potentially liable for the losses sustained by the Claimant, including, without limitation, BMIS and its owners, partners, employees, and affiliates, as well as any potentially liable third parties including, without limitation, investment advisors, "feeder funds," accountants, and auditors.

Claimant: Miguel Lomeli (Account Nos. 1-FN012-3-0; 1-FN045-3-0; 1-FN-069-4-0; 1-FN-070-4-0)

8. The Claimant further reserves all rights, claims, and/or defenses as to and/or against any persons and/or creditors asserting claims against BMIS, its employees, owners, and/or affiliates, in bankruptcy or otherwise.

9. The Claimant reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever, notwithstanding the submission of any such information to the Trustee.

10. To the extent the Claimant has disclosed to the Trustee documents containing accounting and/or legal advice, the Claimant does not waive any potential privileges applicable thereto.

11. The Claimant reserves all rights with respect to submitting information to the Internal Revenue Service regarding gains, losses, and/or theft of assets.

12. The Claim Form and supporting documents contain confidential information. The Claimant submits this information to the Trustee subject to the condition that this information will not to be disclosed to any third parties, other than under seal to the Court, absent the Claimant's express consent or Court order.

13. Although Claimant has identified BMIS account numbers apparently in the name of Fairfield Sentry Ltd., the Claimant does not know the total number of BMIS accounts owned by Fairfield Sentry Ltd. or whether the Claimant has an ownership or other interest in any such accounts. Notwithstanding the foregoing, the Claimant reserves any and all rights, claims, and defenses as to any and all BMIS accounts owned by Fairfield Sentry Ltd.

14. The Claimant submits herewith documents (as Exhibit A) in support of the Claimant's claim, including documents containing information regarding account transactions, such as contributions and/or withdrawals. The Claimant reserves any arguments that such documents are not relevant to the Trustee's inquiry. The Claimant further reserves the right to supplement this submission, including the submission of additional documents, if deemed necessary. Below is a list of the documents submitted herewith:

**2008:**

- Account Statement from StanChart Securities International, Inc. for Statement Period: 11/01/2008 - 11/30/2008

2

Claimant: Miguel Lomeli (Account Nos. 1-FN012-3-0; 1-FN045-3-0; 1-FN-069-4-0; 1-FN-070-4-0)

# **EXHIBIT C**

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

---------------------------------------------------------- x

MORNING MIST HOLDINGS LIMITED and
MIGUEL LOMELI,

                    Plaintiffs,

    vs.

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD
GREENWICH (BERMUDA) LTD., FAIRFIELD
GREENWICH ADVISORS LLC, FAIRFIELD RISK
SERVICES LTD., CITCO FUND SERVICES
(EUROPE) BV, CITCO BANK NETHERLAND
N.V., DUBLIN BRANCH, CITCO GLOBAL
CUSTODY N.V., WALTER M. NOEL, JR.,
JEFFREY TUCKER, ANDRES PIEDRAHITA,
BRIAN FRANCOEUR, AMIT VIJAYVERGIYA,
JAN R. NAESS, PETER P. SCHMID,
PRICEWATERHOUSECOOPERS LLP, and
PRICEWATERHOUSE COOPERS
ACCOUNTANTS N.V. and PRICEWATERHOUSE
COOPERS INTERNATIONAL LIMITED,

                    Defendants,

    and

FAIRFIELD SENTRY LIMITED,

                    Nominal Defendant.

---------------------------------------------------------- x

Index No.: 601511/09
Date Purchased: 5/15/09

Plaintiffs designate New York
County as the place of trial.

**SUMMONS**

NEW YORK
COUNTY CLERK'S OFFICE

MAY 15 2009

NOT COMPARED
WITH COPY FILED

TO THE ABOVE NAMED DEFENDANTS:

    **YOU ARE HEREBY SUMMONED TO** answer the complaint in this action and to

serve a copy of your answer, or, if the complaint is not served with this summons, to serve a

notice of appearance on the Plaintiffs' Attorneys **within 20 days** after the service of this

summons, exclusive of the day of service (or within 30 days after the service is complete if this

summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

Dated: May 15, 2009

Defendants' Addresses:
**(SEE ATTACHED SCHEDULE A)**

Attorneys for Plaintiffs:

**MILBERG LLP**

By: _____
      Robert A. Wallner
      Kent Bronson
      Kristi Stahnke McGregor
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
rwallner@milberg.com
kbronson@milberg.com
kmcgregor@milberg.com

Stephen A. Weiss
James A. O'Brien III
Christopher M. Van de Kieft
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
Telephone: (212) 584-0700
sweiss@seegerweiss.com
jobrien@seegerweiss.com
cvandekieft@seegerweiss.com

## SCHEDULE A

**FAIRFIELD GREENWICH GROUP**
c/o Walter M. Noel, Jr.
55 East 52nd Street
New York, NY 10022

**FAIRFIELD GREENWICH LIMITED**
55 East 52nd Street
New York, NY  10055

**FAIRFIELD GREENWICH (BERMUDA) LTD.**
55 East 52nd Street
New York, NY 10022

**FAIRFIELD GREENWICH ADVISORS LLC**
55 East 52nd Street
New York, NY 10022

**FAIRFIELD RISK SERVICES LTD.**
55 East 52nd Street
New York, NY 10022

**CITCO FUND SERVICES (EUROPE) BV**
Telestone 8, Teleport, Naritaweg 165
1043 BW Amsterdam
The Netherlands

**CITCO BANK NETHERLAND N.V., DUBLIN BRANCH**
Custom House Plaza
Block 6
International Financial Services Center
Dublin 1
Ireland

**CITCO GLOBAL CUSTODY N.V.**
Telestone 8, Teleport
Naritaweg 165
1043 BW Amsterdam
The Netherlands

**WALTER M. NOEL, JR.**
175 Round Hill Rd.
Greenwich, CT  06831-3724
or
55 East 52nd Street

New York, NY 10022

**JEFFREY TUCKER**
1035 Fifth Avenue
New York, NY 10028

**ANDRES PIEDRAHITA**
c/o Fairfield Greenwich Limited
Attn: Mark McKeffrey, Esq.
55 East 52nd Street
New York, NY 10055

**BRIAN FRANCOEUR**
c/o Fairfield Greenwich Limited
Attn: Mark McKeffrey, Esq.
55 East 52nd Street
New York, NY 10055

**AMIT VIJAYVERGIYA**
c/o Fairfield Greenwich Limited
Attn: Mark McKeffrey, Esq.
55 East 52nd Street
New York, NY 10055

**JAN R. NAESS**
c/o Fairfield Greenwich Limited
55 East 52nd Street
New York, NY 10055
or
66 Field Point Road
Greenwich, CT 06830

**PETER P. SCHMID**
c/o Fairfield Greenwich Limited
55 East 52nd Street
New York, NY 10055

**PRICEWATERHOUSECOOPERS LLP**
Royal Trust Tower
Suite 3000
Toronto-Dominion Centre
77 King Street West
Toronto, Ontario M5K 1G8
Canada

or

c/o Pricewaterhousecoopers LLP
300 Madison Avenue, 24th Floor
New York, NY 10017

**PRICEWATERHOUSECOOPERS ACCOUNTANTS N.V.**
Thomas R. Malthusstraat 5
1066 JR AMSTERDAM
The Netherlands

or

c/o PRICEWATERHOUSECOOPERS LLP
300 Madison Avenue, 24th Floor
New York, NY 10017

**PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED**
300 Madison Avenue, 24th Floor
New York, NY 10017

**FAIRFIELD SENTRY LIMITED**
c/o Codan Trust Company (B.V.I.) Ltd.
Romasco Place
Wickhams Cay
Road Town, Tortola
British Virgin Islands

or

c/o Fairfield Greenwich Limited
55 East 52nd Street
New York, NY 10055

**SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK**

---------------------------------------------------------------- x

MORNING MIST HOLDINGS LIMITED and MIGUEL
LOMELI,

               Plaintiffs,

     vs.

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD GREENWICH
(BERMUDA) LTD., FAIRFIELD GREENWICH
ADVISORS LLC, FAIRFIELD RISK SERVICES LTD.,
CITCO FUND SERVICES (EUROPE) BV, CITCO
BANK NETHERLAND N.V., DUBLIN BRANCH,
CITCO GLOBAL CUSTODY N.V., WALTER M.
NOEL, JR., JEFFREY TUCKER, ANDRES
PIEDRAHITA, BRIAN FRANCOEUR, AMIT
VIJAYVERGIYA, JAN R. NAESS, PETER P.
SCHMID, PRICEWATERHOUSECOOPERS LLP, and
PRICEWATERHOUSE COOPERS ACCOUNTANTS
N.V. and PRICEWATERHOUSE COOPERS
INTERNATIONAL LIMITED,

               Defendants,

     and

FAIRFIELD SENTRY LIMITED,

               Nominal Defendant.

---------------------------------------------------------------- x

Index No. 601511/09
Date Purchased. 5/15/09

**SHAREHOLDERS'
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

NEW YORK
COUNTY CLERK'S OFFICE

MAY 15 2009

NOT COMPARED
WITH COPY FILED

## SHAREHOLDERS' DERIVATIVE COMPLAINT

Plaintiffs, by their undersigned attorneys, for their Complaint against Defendants, allege

the following upon information and belief, except as to information about themselves, which is

alleged upon personal knowledge. Plaintiffs' information and belief is based upon the

investigation conducted by Plaintiffs' counsel, including, *inter alia*: a review of Fairfield Sentry

Limited's ("Fairfield Sentry" or the "Fund") publicly issued press releases; the Private Placement Memoranda for the Fund; the Administrative Complaint (and exhibits thereto) filed by the Commonweath of Massachusetts in the Matter of Fairfield Greenwich Advisors LLC and Fairfield Greenwich (Bermuda) Ltd., Docket No. 2009-0028 (the "Massachusetts Administrative Complaint" and the "Massachusetts Proceeding," respectively); the April 29, 2009 Answer of Fairfield Greenwich Advisors LLC and Fairfield Greenwich (Bermuda) Ltd. in the Massachusetts Proceeding (the "Massachussets Answer"); and various news articles.

## NATURE OF THE CASE

1.      This is a derivative action brought by Plaintiffs, who are shareholders of Fairfield Sentry.  This action has been brought in the name of and for the benefit of Fairfield Sentry against Defendants Fairfield Greenwich Group ("FGG"), Fairfield Greenwich Limited, Fairfield Greenwich (Bermuda) Ltd., Fairfield Greenwich Advisors LLC, Fairfield Risk Services Ltd., Citco Fund Services (Europe) BV, Citco Bank Nederland N.V. Dublin Branch, Citco Global Custody N.V., Walter M. Noel, Jr., Jeffrey Tucker, Andres Piedrahita, Brian Francoeur, Amit Vijayvergiya, Jan R. Naess, and Peter P. Schmid (the "Fund Defendants") for breaches of their fiduciary duties owed to Fairfield Sentry, aiding and abetting breaches of fiduciary duty, negligent misrepresentation, and breach of contract.

2.      This    action    is    also    brought    against    PricewaterhouseCoopers    LLP, PricewaterhouseCoopers    Accountants    N.V.,    and    PricewaterhouseCoopers    International (collectively "PwC") for professional negligence, breach of contract, and negligent misrepresentation in connection with purported auditing services performed for Fairfield Sentry.

3.      Fairfield Sentry is a "feeder fund" which placed all or nearly all of its billion of dollars in reported Fund assets with Bernard Madoff and his firm Bernard L. Madoff Investment

- 2 -

Securities, LLC ("BMIS"). On December 10, 2008, it was disclosed that Madoff, acting through BMIS, had been running a Ponzi scheme.

4.    On December 11, 2008, the FBI arrested Madoff for violating the federal securities laws. Upon arrest, he told the agents that "there is no innocent explanation" for the scheme and confessed that he "paid investors with money that wasn't there." On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme. *United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y. filed Dec. 11, 2008). On March 12, 2009, Madoff pled guilty to 11 felony counts. He is currently incarcerated and awaiting sentencing.

5.    On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BMIS. *SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

6.    Fairfield Sentry reportedly had approximately $7 billion in assets as of December 31, 2007.

7.    FGG is an umbrella fund entity intimately involved with many aspects of the Fund's operations, acting in multiple capacities, as both agent and principal of the Fund. FGG, like many of the entity defendants, was controlled by the same people who controlled the Fund. FGG and its other related entities marketed the Fund to investors and purported to conduct due diligence on behalf of the Fund. FGG posted on its website a letter dated January 8, 2009 to

- 3 -

investors, stating that as of November 1, 2008, FGG had total assets under management of approximately $14.1 billion, approximately $6.9 billion of which was invested in vehicles connected to BMIS. Plaintiffs believe that nearly all of Fairfield Sentry's assets invested with BMIS have been lost.

8.     In documents issued in connection with its funds, FGG represented that it conducted "deeper and broader" due diligence than a typical fund of funds, due diligence "resembling that of an asset management company acquiring another asset manager rather than a passive investor entering into a disposable investment," and performed continued risk monitoring of its fund managers, which include Madoff and BMIS. This was untrue. The Madoff story bristled with red flags that a financial professional performing due diligence in good faith would not have missed. Indeed, other investment advisors advised their clients not to invest with Madoff or BMIS after performing due diligence.

9.     The Fund Defendants were paid hefty management, incentive, and administrator fees, amounting to hundreds of millions of dollars over the years, and at least tens of millions of dollars annually, for their claimed expertise and professional experience in selecting and monitoring fund managers. While touting their "higher level" of due diligence over their competitors, the Fund Defendants, in fact, allowed Madoff and BMIS to go unchecked, while issuing false reports presenting nonexistent (or, at the very least, highly inflated) profits, and collecting fees based on such fictitious profits.

10.     Massachusetts Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts ("Massachusetts Securities Division") conducted an investigation of FGG and its affiliates' dealings with Madoff and concluded that FGG's much-touted "due diligence" was in fact simply part of its marketing pitch, and nothing more.

- 4 -

Essentially, the Massachusetts Securities Division found that FGG's affiliates (including Fairfield Greenwich Advisors LLC and Fairfield Greenwich (Bermuda) Ltd.) were blinded by the enormous fees generated by the funds which were invested with Madoff, and failed to engage in any meaningful due diligence of Madoff. When FGG investors raised concerns about Madoff, instead of seriously investigating those concerns, these FGG affiliates engaged in actions to "defend against redemptions."

11.    Indeed, in their Answer in the Massachusetts Proceedings, Fairfield Greenwich Advisors LLC and Fairfield Greenwich (Bermuda) Ltd.) admitted to having abundant opportunities to perform the due diligence and risk monitoring that they falsely claimed was in fact being performed, stating that FGG had "direct and frequent access to BLMIS," that "[o]ver the course of almost twenty years, multiple FGG employees regularly communicated with BLMIS, including Madoff, on hundreds of occasions via telephone and in person," and that "[a] number of FGG partners and employees ... regularly interfac[ed] with BLMIS." (Massachusetts Answer at 5, 6). Accordingly, although the Fairfield Defendants (defined in paragraph 34 below) failed to conduct adequate due diligence and risk monitoring of Madoff and his operation, they had ample opportunities to do so.

12.    The Fairfield Defendants their fiduciary duties and aided and abetted the breach of fiduciary duties to the Fund by failing to conduct adequate due diligence, as they were required to do in their roles as fiduciaries, and further breached those duties by falsely touting their supposed due diligence, while collecting hundreds of millions of dollars in fees on fictitious assets and profits.

- 5 -

13.     Citco Europe, the Fund's Administrator, breached its duties to the Fund by failing to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, and distribute accurate monthly reports, while collecting fees on inflated net asset value.

14.     Citco Bank and Citco Global, as the Fund's Custodians, breached their duties to the Fund by failing to exercise due care in selecting BMIS as the Fund's sub-custodian and failing to maintain an appropriate level of supervision over BMIS or make appropriate inquiries to determine or confirm whether the obligations of BMIS as sub-custodian were, had been or were being competently discharged.

15.     PwC, as the Fund's independent auditors, failed to perform their audits of the Fund in accordance with generally accepted auditing standards ("GAAS") and International Standards on Accounting ("ISA") and issued false audit opinions. PwC had a fundamental duty, heightened by the circumstances, to go behind the mere numbers generated by the Fund's single manager who held all of the Fund's assets, lacked transparency, was riddled with conflicts of interest, and miraculously was able to consistently generate positive results even in down markets.

## VENUE AND JURISDICTION

16.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims herein occurred in New York County and all of the Defendants are subject to personal jurisdiction in New York County.

17.     This Court has jurisdiction over the Defendants pursuant to CPLR §§ 301 and 302(a). Defendants either reside or transact business within the State, have committed tortious acts within the State, and/or have committed tortious acts outside the State that have caused

- 6 -

injury to persons and property within the State.  Also, FGG and its affiliates maintain their

principal place of business within the State of New York, New York County.

## THE PARTIES

### Plaintiffs

18.    Plaintiff Morning Mist Holdings Limited ("Morning Mist Holdings") is a

shareholder of Fairfield Sentry.  Morning Mist Holdings is an international business company,

organized and existing under the laws of the British Virgin Islands ("BVI").  According to the

last statement received by Morning Mist Holdings, its shares in Fairfield Sentry had a value of

$899,449.67.

19.    Plaintiff Miguel Lomeli ("Lomeli"), a resident of Mexico, is a shareholder of

Fairfield Sentry.  According to the last statement received by Lomeli, his shares in Fairfield

Sentry had a value of $281,143.25.

20.    Morning Mist Holdings and Lomeli are referred to herein collectively as

"Plaintiffs."  Plaintiffs owned shares of Fairfield Sentry during the period of wrongdoing alleged

herein and continue to own shares.

### The Fund Defendants (Consisting of the Fairfield Defendants and the Citco Defendants, as Defined Below)

21.    Nominal Defendant Fairfield Sentry is an international business company

organized and existing under the laws of the BVI.  Fairfield Sentry was formed in 1990.

Fairfield Sentry's registered office in the BVI is located at c/o Codan Trust Company (B.V.I.)

Ltd., P.O. Box 3140, Romasco Place, Wickhams Cay, Road Town, Tortola, British Virgin

Islands.  Upon information and belief, the Fund maintains an office at 55 East 52nd Street, 33rd

Floor, New York, New York. The Fund maintained an account with BMIS, which is located in

- 7 -

New York, and the Fund was invested in that account. The Fund also maintained an escrow account at an HSBC branch located in New York.

## 1.    The Fairfield Defendants

22.    Defendant FGG, founded in 1983, describes itself as "a global family of companies" that offers a variety of single manager funds, multi-strategy funds and fund-of-funds to investors. FGG reportedly had assets under management of over $14 billion as of November 1, 2008, according to correspondence to investors dated January 8, 2009 posted on FGG's website. FGG is a *de facto* partnership or partnership by estoppel. FGG acted as both agent and principal of the Fund, and was controlled by Defendants Noel, Tucker and Piedrahita, the same individuals that controlled the Fund's Placement Agent and Investment Manager. FGG purported to perform due diligence for the Fund and it marketed the Fund to investors. FGG has its principal place of business at 55 East 52nd Street, 33rd Floor, New York City, in New York County, New York.

23.    Defendant Fairfield Greenwich Limited ("FG Limited") is a company organized under the laws of the Cayman Islands registered to do business in New York, and is an affiliate of FGG. FG Limited is the parent company of FG Bermuda, FG Advisors, and FRS, described below. Defendants Noel, Tucker and Piehrahita are the main principals of FG Limited. FG Limited serves as the Placement Agent of the Fund and served as the Fund's Investment Manager prior to FG Bermuda's assumption of that role. FG Limited has its principal place of business at 55 East 52nd Street, New York, New York. According to the August 14, 2006 Private Placement Memorandum for the Fund (the "2006 Private Placement Memorandum" or "2006 PPM"), the Placement Agent oversees the marketing of the shares of the Fund.

- 8 -

24.     Defendant Fairfield Greenwich (Bermuda) Ltd. ("FG Bermuda") was organized as a corporation under the laws of Bermuda on June 13, 2003 and is an affiliate of FGG. It was listed as one of FGG's "[l]ocal operating entities" on FGG's website. FG Bermuda is a wholly-owned subsidiary of FG Limited, of which Defendants Noel, Tucker and Piedrahita are the main principals. FG Bermuda is registered with the SEC as an investment advisor under the Investment Advisers Act of 1940 effective April 20, 2006 (SEC File No. 801-66439). FG Bermuda is located at 131 Front Street, 1st Floor, Hamilton, Bermuda HM11, and is the Investment Manager of the Fund. Pursuant to the 2006 Private Placement Memorandum, the Investment Manager is responsible for "directing the Fund's investment and trading activities, selection of the Fund's investments, monitoring the investments and maintaining the relationships between the Fund and its custodian, administrator, registrar and transfer agent."

25.     Defendant Fairfield Greenwich Advisors LLC ("FG Advisors") is a limited liability company, organized under the laws of Delaware. FG Advisors is a wholly owned subsidiary of FG Limited. FG Advisors has its principal place of business at 55 East 52nd Street, New York, New York. FG Advisors is registered with the SEC as an investment advisor under the Investment Advisers Act of 1940 (SEC File No. 801-62504). According to the Uniform Application for Investment Advisor Registration on Form ADV ("ADV") filed by FG Bermuda, and attached as Appendix B to the 2006 Private Placement Memorandum, FG Advisors assists FG Bermuda with "conduct[ing] a detailed manager selection and due diligence process, analyzing such important issues as liquidity management, market and credit risks, management quality (which includes on-site visit(s), background, and reference checks), and operational, compliance, and regulatory risk." Upon information and belief, FG Advisors also provides the Fund with certain administrative and back-office support.

- 9 -

26.    Defendant Fairfield Risk Services Ltd. ("FRS") is incorporated under the laws of Bermuda. It is a wholly owned subsidiary of FG Limited and shares offices with FG Bermuda. According to FG Bermuda's ADV filing, FRS and FG Bermuda serve as FGG's Risk Management team. The ADV states that "FRS primarily conducts both the pre- and post-investment quantitative analysis of hedge fund managers, monitors the market risk and provides the quantitative analysis supporting the asset allocation decisions across the firm's multi-strategy funds." The tools FRS uses are further described in ¶65 below.

27.    Defendant Walter M. Noel, Jr. ("Noel") is a founder of FGG, and according to FGG's own description, continues to oversee all of FGG's activities together with Defendants Tucker and Piedrahita. According to FGG's own marketing materials, Noel is also a member of FGG's Board of Directors. Noel is a principal of FG Limited, which is the parent company of FG Bermuda, FG Advisors, and FRS. Noel also serves as a Director for many FGG funds and management company entities, including Fairfield Sentry. The Fund's Board of Directors (the "Fund Directors," which also include Defendants Naess and Schmid) has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, custodian, any officers of the Fund, and other persons or entities with management or administrative responsibilities to the Fund.    Defendant Noel resides in New York and Connecticut.

28.    Defendant Jeffrey Tucker ("Tucker") is a founder of FGG and (according to FGG's own marketing materials) is a member of the Board of Directors of FGG.  Tucker is a principal of FG Limited, which is the parent company of FG Bermuda, FG Advisors, and FRS. According to FGG's own description, Tucker directs FGG's business and operations activities

- 10 -

and also serves as a Director for many FGG funds and management company entities. Defendant Tucker resides in New York. According to the Massachusetts Answer (at page 5), Tucker is "one of FGG's founding partners."

29.     Defendant Andres Piedrahita ("Piedrahita") is a founder of FGG. Piedrahita is a principal of FG Limited, which is the parent company of FG Bermuda, FG Advisors, and FRS. Piedrahita is a member of the Executive Committee of FGG and serves as a Director for many FGG funds and management company entities. He also serves as President and Director of the Fund's Investment Advisor, FG Bermuda. Defendant Piedrahita resides in Miami, Florida; London, England; and Madrid, Spain.

30.     Defendant Brian Francoeur ("Francoeur") is a Director of FG Bermuda, the Investment Advisor of the Fund. Francoeur is also the Managing Director of Citco Fund Services (Bermuda) Limited, an affiliate of the Fund's Administrator, Citco Europe, and the Fund's Custodians, Citco Bank and Citco Global. Francoeur qualified as a chartered accountant in 1994, and was employed by Ernst & Young in Bermuda from 1995 to 1997. Upon information and belief, Francoeur regularly travels to New York to conduct business in FGG's New York office.

31.     Defendant Amit Vijayvergiya ("Vijayvergiya") is a partner of FGG and serves as its Chief Risk Officer, as well as Managing Director of FG Bermuda, the Investment Manager of the Fund. Vijayvergiya is a Chartered Financial Analyst and certified Financial Risk Manager. Upon information and belief, Vijayvergiya resides in New York, New York.

32.     Defendant Jan R. Naess ("Naess") is a director of the Fund. Upon information and belief, Naess maintains an office at 66 Field Point Road, Greenwich, Connecticut.

33.     Defendant Peter P. Schmid ("Schmid") is a director of the Fund.

- 11 -

34.    Defendants FGG, FG Limited, FG Bermuda, FG Advisors, FRS, Noel, Tucker,
Piedrahita, Francoeur, Vijayvergiya, Naess, and Schmid are referred to herein collectively as the
"Fairfield Defendants."

## 2.    The Citco Defendants

35.    Defendant Citco Fund Services (Europe) BV ("Citco Europe") is a company
formed under the laws of the Netherlands with its principal place of business at Telestone 8 -
Teleport, Naritaweg 165, 1043 BW Amsterdam, The Netherlands.  Citco Europe serves as the
Administrator of the Fund.  As the Fund's Administrator, Citco Europe received information
from, and relayed information to, BMIS in New York, New York.

36.    Defendant Citco Bank Netherland N.V., Dublin Branch ("Citco Bank") is a
company formed under the laws of The Netherlands and is registered as a branch of an external
company in the Republic of Ireland.  Citco Bank has its principal place of business at Custom
House Plaza, Block 6, International Financial Services Centre, P.O. Box 6639, Dublin 1, Ireland.
Upon information and belief, since July 3, 2006, Citco Bank, together with Citco Global,
described below, have served as the Custodians of the Fund's assets.  Citco Bank was
responsible for selecting and monitoring the Fund's sub-custodian, BMIS.  Upon information
and belief, Citco Bank engaged with and transferred assets to Fund sub-custodian BMIS in New
York, New York.

37.    Defendant Citco Global Custody N.V. ("Citco Global") is incorporated under the
laws of The Netherlands and is located at Telestone 8-Teleport, Naritawag 165, 1043 BV
Amsterdam, The Netherlands. Since at least July 3, 2006, Citco Global served as Depositary for
the Fund, and, together with Citco Bank, has served as the Fund's Custodian.  As the Fund's
Depositary, Citco Global had the responsibility of holding securities on behalf of the Fund.

- 12 -

From September 20, 1994 to July 3, 2006, pursuant to a custody agreement dated September 20, 1994, Citco Global served as the Custodian of the Fund. Upon information and belief, Citco Global had numerous custodial responsibilities, including monitoring any sub-custodian used by the Fund, including BMIS. Upon information and belief, Citco Global engaged with and transferred assets to Fund sub-custodian BMIS in New York, New York.

38.    Citco Europe, Citco Bank, and Citco Global are wholly owned subsidiaries of Citco Group, a self-described global organization of financial services companies and pre-eminent hedge fund administrators. For funds of funds, according to its website, Citco Group's subsidiaries offer "a complete outsourced solution which combines fund administration, banking, financing, trade execution and custody, using an on-line research-enabling trading platform, middle office services and centralized dedicated pricing services and reporting."

39.    Citco Europe, Citco Bank, and Citco Global are referred to collectively herein as the "Citco Defendants."

40.    The Fairfield Defendants and Citco Defendants are referred to collectively herein as the "Fund Defendants."

**PricewaterhouseCoopers LLP**

41.    Defendant PricewaterhouseCoopers International Limited ("PwC Int'l"), headquartered in the United Kingdom, is a network of member firms (including, among others, PwC Canada and PwC Netherlands) engaged in the business of providing auditing, accounting and other investment and advisory services.

42.    Defendant PricewaterhouseCoopers LLP ("PwC Canada") is a limited liability partnership organized under the laws of the province of Ontario, Canada with its principal place of business in Ontario, Canada.

- 13 -

43.    Defendant PricewaterhouseCoopers Accountants N.V. ("PwC Netherlands") is a public limited liability company incorporated in The Netherlands with its principal place of business in Rotterdam, The Netherlands.

44.    PwC Canada and PwC Netherlands are member firms of PwC Int'l. PwC Canada, PwC Netherlands and PwC Int'l are referred to collectively herein as "PwC."

45.    PwC and its various affiliates and member firms around the world were directly, indirectly, and/or collectively involved in auditing the financial statements of the Fund for at least the years 2005-2007. Upon information and belief, PwC Canada led the audit and issued unqualified audit opinions for the Fund's financial statements for the years 2006 and 2007, and PwC Netherlands led the audit and issued an unqualified audit opinion for the Fund's financial statements for the year 2005.

46.    As of December 2006, PwC Int'l touted its member firms publically as serving "70 of the top 100 asset managers around the world." PwC Int'l and all of its member firms operate as a self-described network of inter-connected member firms, providing auditing and accounting services across an international platform by which means they are globally operational. PwC Int'l and its member firms maintain centralized control over training, standards of care, marketing, and quality of accounting and auditing work throughout the world. PwC Int'l and its member firms hold themselves out as, and operate as, a unified business entity.

47.    PwC Canada, PwC Netherlands and other affiliates and PwC Int'l member firms, to the extent they provided audit services to the Fund, did so as agents of PwC Int'l, and provided these services on the authority of, at the direction of, and for the benefit of PwC Int'l. PwC Int'l controlled and was responsible for the acts of its member firms and audit partners described herein.

- 14 -

48.     PwC provides auditing and accounting services to thousands of companies worldwide, including many based in, or having substantial contacts with, the United States. As a result of such regular, systematic, and continuous business activities, PwC derives substantial revenue from the United States, including in New York, New York, where it maintains an office at 300 Madison Avenue, 24th Floor, New York, New York 10017.

## SUBSTANTIVE ALLEGATIONS

49.     Throughout the 1990s and up until the present, FGG and the Fairfield Defendants raised large sums of money from investors to invest with Madoff and BMIS. In exchange, FGG and its affiliates earned many millions of dollars in fees. *Bloomberg News* reported on December 15, 2008 that if not for the revelation of Madoff's fraud, FGG and its affiliates would have collected about $135 million in fees in 2008 from its funds invested with BMIS. Indeed, the Massachusetts Administrative Complaint issued by the Massachusetts Securities Division disclosed that FG Bermuda controller, Gordon McKenzie, testified that FGG and affiliates earned over $100 million in fees for each of 2005, 2006, 2007 and 2008, respectively.

50.     FGG operates several so-called "feeder funds" which invested directly with BMIS. A feeder fund is a fund that takes investor money and gives it to another fund to manage and invest. One such feeder fund is Fairfield Sentry, which began operations in 1990 and reportedly had assets of approximately $7 billion as of December 31, 2007. Fairfield Sentry was the first of FGG's funds to invest with Madoff and BMIS.

51.     Fairfield Sentry "seeks to obtain capital appreciation of its assets through utilization of a nontraditional options trading strategy described as a 'split strike conversion'" (referred to herein as "SSC"), according to the 2006 Private Placement Memorandum. The 2006

- 15 -

Private Placement Memorandum describes the split-strike conversion, or SSC, strategy as

follows:

> The establishment of a typical position entails (i) the purchase of a group or
> basket of equity securities that are intended to highly correlate to the S&P 100
> Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a
> notional value that approximately equals the market value of the basket of equity
> securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with
> a notional value that approximately equals the market value of the basket of
> equity securities. * * * The basket typically consists of between 35 to 50 stocks in
> the S&P 100 Index.
>
> The primary purpose of the long put options is to limit the market risk of the stock
> basket at the strike price of the long puts. The primary purpose of the short call
> options is to largely finance the cost of the put hedge and to increase the stand-
> still rate of return.
>
> This position in its entirety could be characterized as a bull spread which,
> presuming the stock basket highly correlates to the S&P 100 Index, is intended to
> work as follows: (i) it sets a floor value below which further declines in the value
> of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value
> beyond which further gains in the stock basket are offset by increasing liability of
> the short calls, and (iii) defines a range of potential market gain or loss, depending
> on how tightly the options collar is struck.
>
> The degree of bullishness of the strategy can be expressed at implementation by
> the selection of the strike prices in the S&P 100 Index put and call options. The
> farther away the strike prices are from the price of the S&P 100 Index, the more
> bullish the strategy.

52.    FGG and its affiliates touted as a selling point for the Fund, and its other funds,

that it conducted "deeper and broader" pre-investment due diligence and post-investment

"multifaceted risk monitoring" of its managers and fund assets than its competitors. FGG's

website stated that FGG "probe[s] deeply into all key elements of risk" and "employs a

significantly higher level of due diligence work than typically performed by most fund of funds

and consulting firms."

53.    According to FGG's website, and a marketing brochure provided to potential

investors and also available on its website, FGG's "deeper and broader" due diligence included:

- 16 -

(1) Portfolio Evaluation, Investment Performance, and Financial Risks; (2) Structural and Operational Risks; (3) Legal, Compliance, and Regulatory Risk; and (4) Personal Background Investigations. Once a relationship with a fund manager is established the "due diligence process evolves into a similarly multi-faceted risk monitoring function." The FGG brochure goes on to say that "the purpose of this ongoing activity is to ensure that the fund continues to follow its investment methodology – and constraints – and otherwise acts in accordance with the operational and risk framework that was approved during the due diligence phase."

54.    As recently as October 2008, the Fairfield Defendants touted in a brochure specifically for Fairfield Sentry the following as "Value Added by FGG":

- Maintaining full transparency to [BMIS] accounts

- Independent verification of prices and account values

- P&L attribution analysis

- Examination of option Greeks to make sure the hedge is working as expected

- Risk oversight using Risk Metrics (reports are made available to clients who have signed non-disclosure agreements)

- Systematic investment compliance monitoring of Operating Guidelines

- Regular written communication to clients

    - Monthly reviews

    - Semi-Annual letter

    - Periodic Analyses

**Portfolio Evaluation, Investment Performance, and Financial Risks**

55.    Under the first prong of FGG's due diligence and risk monitoring strategy, "Portfolio Evaluation, Investment Performance, and Financial Risks," FGG claimed to "seek to dissect a candidate manager's investment performance, how they generate alpha, and what risks

- 17 -

are taken in doing so." FGG further claimed to "apply both qualitative and quantitative measures in this process," adding that "[p]articular focus is given to identifying and understanding various elements of the manager's investment process and strategy-specific financial risk." FGG also claimed to "attempt[] to understand the return attribution for individual securities in the portfolio, and conduct[] a full suite of VaR analysis and stress tests to model the loss distribution function under extreme market scenarios."

56.    However, had FGG and the other Fund Defendants actually followed and applied these much-touted due diligence and risk-monitoring strategy, they would have realized that the results claimed by Madoff and BMIS were impossible. Madoff's split-strike conversion strategy might tend to reduce volatility, but it would not produce gains in a declining stock market. Nevertheless, Madoff and BMIS reported small, steady gains each month, including gains in sharply declining markets.

57.    Other investment advisors and financial publications had publically stated that BMIS's trading results could not be replicated based on the model Madoff was purportedly using. The trading results reported by BMIS were not consistent with publicly traded funds that followed the same trading strategy, all of which had much lower returns and greater volatility than reported by BMIS.

58.    For example, Aksia, LLC, an independent hedge fund research and advisory firm, identified red flags as early as 2007, which prompted Aksia to advise its clients against investing with Madoff or any of his "feeder funds." Aksia reported the red flags it had found back in 2007, in a letter to its clients dated December 15, 2008 (the "Aksia Letter"). One red flag reported in the Aksia Letter was that "[t]he Madoff feeder funds marketed a purported 'Split-

strike Conversion' strategy that is remarkably simple; however, its returns could not be nearly replicated by our quant analyst."

59.    In May 2001, *Barron's* reported in the article *"Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum"* that certain option strategists for major investment banks could not understand how BMIS and Madoff achieved the results that they claimed from using the split strike conversion strategy.   Madoff responded to *Barron's* questions regarding how he achieved consistently high returns stating that: "It's a proprietary strategy.   I can't go into great detail."   When *Barron's* asked Defendant Tucker about the purported returns FGG had received he stated: "It's a private fund.   And so our inclination has been not to discuss its returns."

60.    Similarly, in May 2001, *MAR/Hedge* — a hedge fund newsletter — reported that the Fairfield Sentry Fund had "reported losses of no more than 55 basis points in just four of the past 139 consecutive months, while generating highly consistent gross returns of slightly more than 1.5% a month and net annual returns roughly in the range of 15%." *MAR/Hedge* reported that "expert skeptics ... express[ed] bewilderment and indicated they were ... grappling to understand how such results had been achieved for so long."   The Fairfield Defendants were keenly aware of this May 2001 newsletter and the May 2001 *Barron's* article; indeed, according to the Massachusetts Answer (at 5), "Jeffrey Tucker, one of FGG's founding partners," "visit[ed] BLMIS" "[i]n 2001, when the Barrons and Mar/Hedge articles first raised the issue of whether Madoff might be doing something improper."

61.    One basic technique to test the validity of a trading strategy in the securities industry is to reverse engineer the trading strategy purportedly employed to see if alleged performance results can be replicated.   According to a December 18, 2008 article in *The Wall*

- 19 -

*Street Journal*, Harry Markopolos, who worked for a BMIS rival in Boston, was asked by his superiors in 2000 why he couldn't get the same results as BMIS. Markopolos tried to reconstruct Madoff's purported strategy, but was unable to achieve the same results.

62.    Markopolos concluded Madoff must be a fraud. Markopolos's superiors told him to check his math, given that Madoff was such a renowned trader. Markopolos enlisted the help of Daniel DiBartolomeo, a top financial mathematician in Boston. DiBartolomeo spent hours pouring through Markopolos's data and came to the same conclusion: the strategy Madoff said he used could not have achieved the results he reported. Despite claiming to employ quantitative measures in evaluating a manager's performance, had FGG and the Fund Defendants reverse engineered Madoff's trading strategy, they would have seen that the advertised results were impossible.

63.    Indeed, several accounts confirm that the Fund Defendants did not understand Madoff's trading strategy. For example, according to the December 19, 2008 *The Wall Street Journal* article, David Giampaolo, chief executive of Pi Capital, a money-management firm, attended a meeting with Defendant Piedrahita about 18 months earlier in London, during which Defendant Piedrahita "stressed [at the meeting] the fund's years of steady and attractive performance," but "the performance was thin on details about the investment strategy." Piedrahita's answers, according to the news story, were "fluff." According to the news story, "[w]hen [Piedrahita was] pressed to articulate how the fund generated the performance [t]here was no deep scientific or intellectual response."

64.    According to another account reported in *The Wall Street Journal* on February 5, 2009, Neil Chelo, a portfolio manger at Benchmark Plus, upon being contacted by a marketing person who suggested that he invest with FGG via another fund, questioned FGG representatives

- 20 -

about BMIS. In response to questions about how much money Madoff managed in total, a FGG risk manager said he was not sure.

65.     FGG also could not provide an adequate explanation as to why Madoff would hire FGG to bring money into BMIS rather than hiring his own team, in which case Madoff could keep all the management fees himself. When asked why nobody could duplicate Madoff's strategy, FGG representatives told Chelo, "people don't have [sic] proprietary model to know when to enter" and exit from trades. When asked how dealers hedged themselves, a FGG manager told Chelo he "had no answer and had never thought about it." In the end, Chelo concluded FGG knew little about Madoff or BMIS. Indeed, generally, if investors questioned Madoff's investment methodology, he would threaten them with removal from the Madoff programs.

66.     Moreover, had the Fund Defendants evaluated the options positions Madoff claimed to have open using the SSC strategy, they would have understood that the positions were in excess of the actual open interest in the entire S&P put and call market in those securities. In addition, according to BMIS's ADV Report filed with the SEC, BMIS had over $17 billion of assets under management in 23 accounts. The entry and exit of over $17 billion would have overwhelmed the S&P 100 put and call market. Indeed, Aksia caught this red flag, stating in the Aksia Letter that "[i]t seemed implausible that the S&P100 options market that Madoff purported to trade could handle the size of the combined feeder funds' assets which we estimated to be $13 billion."

67.     Under the first prong of FGG's professed due diligence and risk monitoring strategy, FGG claimed that "[i]ndependent trading records are examined." As part of FGG's ongoing oversight it claimed to review the individual securities in each portfolio and have

- 21 -

discussions with the fund manager personnel several times each month.  FG Bermuda's ADV,

attached as Appendix B to the 2006 Private Placement Memorandum, explains the quantitative

analyses performed and monthly risk meetings with fund managers as follows:

> FRS primarily conducts both the pre- and post-investment quantitative analyses of
> hedge fund managers, monitors the market risk and provides the quantitative
> analyses supporting the asset allocation decisions across the firm's multi-strategy
> funds.  The risk infrastructure at FRS supporting these activities incorporates a
> number of systems and tools — including internally developed systems, off the
> shelf vendor solutions, and some customized applications built to meet FGG's
> business needs.  *An important component of the FGG product platform is the
> position level transparency that we receive from all single managers which are
> included in our multi-strategy funds.  Position information is transmitted via
> secure channels to our systems.*
>
> FRS's core risk management engine utilizes the flexible ASP version of the
> RiskManager product from RiskMetrics.  This system is populated by detailed
> position information and further supplemented by an extensive market and terms
> and conditions database.  The FRS team regularly evaluates the market risk of its
> single and multi-strategy funds by producing strategy and fund specific risk
> reports.  These reports are customizable to present risk measures and tests most
> appropriate to each portfolio's strategy.  *The FRS team prepares a monthly suite
> of reports using RiskManager that are carefully reviewed and discussed by
> FGG's Investment Committee at a formal monthly risk meeting.*  The reports [are]
> organized along the following dimensions: Exposures, Sensitivities, Scenarios and
> Stress Tests, VaR, Correlations Analysis and Attribution Analysis.  The review
> includes the full suite of VaR analytics (including marginal, incremental and
> relative VaR) and careful evaluation of the sensitivity of our managers to
> important risk factors (such as increasing or decreasing equity markets,
> volatilities, interest rate shocks/twists, FX movements and other factors).

(Emphasis added).

68.    However, there were no independent trading records for Madoff and BMIS,

because Madoff self-cleared the Fund's trades through his own broker-dealer, BMIS.  Moreover,

BMIS generated paper trade tickets despite claiming to have an automated order and execution

process for the strike-split conversion strategy, and Madoff's reputation was made as an early

and enthusiastic proponent of electronic trading.  As stated in the Aksia Letter:

- 22 -

Madoff's website claimed that the firm was technologically advanced ("the clearing and settlement process is rooted in advanced technology") and the feeder managers claimed 100% transparency.    But when we asked to see the transparency during our onsite visits, we were shown paper tickets that were sent via U.S. mail daily to the managers.    The managers had no demonstrated electronic access to their funds accounts at Madoff.    Paper copies provide a hedge fund manager with the end of the day ability to manufacture trade tickets that confirm the investment results.

Additionally, FGG affiliates did not receive the paper trade tickets until three to five days after the trades allegedly occurred.

69.    Furthermore, BMIS refused the Fund Defendants and PwC access to its trading computer. The Fund Defendants were fully aware of the red flag Madoff's lack of transparency raised, since, according to a December 19, 2007 article in *The Wall Street Journal*, in 2007 FGG attempted to capitalize on its successes by selling a stake in the firm. However, in conducting due diligence on FGG, "several" private-investment firms requested access to BMIS's trading records and "were told that Mr. Madoff wouldn't allow prospective investors to view his books."

70.    Had Defendants conducted due diligence and risk monitoring into the trades reported by BMIS, they would have discovered that many of the individual trades reported by Madoff would have shown that they could not have taken place as represented in that many were at reported prices higher than the price that the security in question traded at for the entire day the trade was claimed to have been executed.

71.    When Aksia tried to independently confirm the existence of Madoff feeder fund securities, it was unable to do so:

There was at least $13 billion in all the feeder funds, but our standard 13F review showed scatterings of small positions in small (non-S&P100) equities.    The explanation provided by the feeder fund managers was that the strategy is 100% cash at every quarter end.

- 23 -

Form 13(f) is the reporting form filed by institutional investment managers, pursuant to Section 13(f) of the Securities Exchange Act of 1934, reporting the securities holdings of institutional investors.

72.     It is now apparent that the positions in securities represented by BMIS to its customers, including Fairfield Sentry, simply did not exist.  The Financial Industry Regulatory Authority ("FINRA") has suggested that there is no record of trades through the Madoff firm for the fund accounts: "Our exams showed no evidence of trading on behalf of the investment advisor, no evidence of any customer statements being generated by the broker-dealer," said Herb Perone, spokesman for FINRA.  At the first meeting of BMIS creditors on February 20, 2009, the court-appointed trustee for the liquidation of BMIS, Irving Picard, also confirmed that he had found no evidence that Madoff purchased securities for at least the past thirteen years.

**Structural and Operational Risks**

73.     FGG's website and marketing brochure explain that "**Operational failures, including misrepresentation of valuations and outright fraud, constitute the vast majority of instances where massive investor losses occur.**" (Emphasis in original).  Operational risk, according to FGG, "refers to the risk of loss resulting from inadequate or failed internal processes, human resources, or systems or from external events."  FGG's website and brochure go on to explain:

> FGG seeks a sound understanding of whether a hedge fund possesses key controls in the areas of portfolio management, *conflicts of interest, segregation of duties,* and compliance.  FGG carefully assess[es] the controls and procedures that managers have in place and seek to determine actual compliance with those procedures, often suggesting modifications, *separations of responsibilities,* and remedial staff additions.

(Emphasis added).

- 24 -

74.    In detailing the procedures FGG performs to monitor operational risk, FGG's website described reviewing not only audited financials but also the auditor's management letter comments. It further describes reviewing accounting controls and broker reconciliations in an effort to ensure the existence of the securities. Some of the procedures FGG details include the following:

> - Review audited financials and auditor's management letter comments; look for affiliated party loans and pledged assets or collateralized loans
>
> - Review accounting controls: from trade execution; to trade capture; to trade reconciliation with the Street, administrator, and fund; to funds books and records
>
> &ast; &ast; &ast;
>
> - Review broker reconciliations to ensure completeness and existence of all securities
>
> - Infrastructure Adequacy Evaluation and disaster recovery plans

75.    The Fund Defendants could not have conducted the structural and operational due diligence and risk monitoring described on FGG's website and in FGG's marketing brochure, because, if they had, they would have observed blatantly inadequate controls, conflicts of interest, and lack of separation of duties at BMIS. They would also have had cause to question the existence of securities transactions allegedly made by BMIS on behalf of the Fund, because a comparison of transactions reported by BMIS against publicly available trade data for the securities, which were all publicly traded, would have shown that various transactions could not have been executed on the dates and/or prices reported by BMIS.

76.    As mentioned above, Madoff failed to trade through an independent broker, and, instead, self-cleared all Fund activities through his wholly-owned company, BMIS. In well-managed investment programs, in order to create an independent basis for confirming transaction

- 25 -

executions and compliance with program criteria, the fund manager processes the transactions through an independent broker. Madoff failed to follow this standard industry practice.

77.    Indeed, Andy Berg, CEO of Homrich & Berg Inc., one of Atlanta's largest independent investment advisors, told *The Atlanta Business Chronicle* in a February 5, 2009 article that BMIS's failure to use a third-party custodian firm was "a black flag" for them. Berg advised a client who brought an existing relationship with BMIS to him to sell its investments with BMIS immediately. Aksia also told its clients that BMIS's initiation and execution of trades, and custody of feeder fund assets, "seemed to be a clear conflict of interest and a lack of segregation of duties is high on our list of red flags."

78.    A further operational and structural red flag was that BMIS's entire internal audit function, as well as its external independent auditor function, were being conducted by the strip-mall based, three person firm of Friehling & Horowitz ("F&H"), only one member of which appears to have been a full time accountant. As explained in the Aksia Letter:

> The feeder funds had recognized administrators and auditors but substantially all of the assets were custodied with Madoff Securities. This necessitated Aksia checking the auditor of Madoff Securities, Friehling & Horowitz (not a fictitious audit firm). After some investigating, we concluded that Friehling & Horowitz had three employees, of which one was 78 years old and living in Florida, one was a secretary, and one was an active 47 year old accountant (and the office in Rockland County, NY was only 13ft x 18ft large). This operation appeared small given the scale and scope of Madoff's activities.

79.    Under the regulations of the American Institute of Certified Public Accountants ("AICPA"), every accounting firm that does auditing work is required to enroll in the AICPA's peer review program under which experienced auditors assess such firm's audit quality yearly. While F&H was a member of the AICPA, it had not been subjected to a peer review since 1993 because F&H had represented to the AICPA, in writing, that it did not perform any audits.

- 26 -

Whether a firm has been subject to a peer review, and the results of that review, are on public file at the AICPA.

80.    Nobody at FGG conducted any due diligence about F&H prior to late-2005, according to evidence obtained in the Massachusetts Securities Division investigation. It was not until a client began asking questions in late-2005 in the wake of the well publicized revelation that another hedge fund (Bayou) was a fraud that anybody at FGG attempted to obtain any kind of information about F&H. In response, Dan Lipton, FGG's Chief Financial Officer, had one five-to-ten minute telephone conversation with a partner at F&H and relayed a statement for Defendant Tucker to communicate to the client assuring it that F&H had "hundreds of clients" and was "well-respected in the local community." At that time, FGG also learned that F&H only had one employee and only approximately $180,000 in annual fees.

81.    Prior to late-2005, FGG had failed to learn even this minimal amount of information about Madoff's auditor, and when it did learn these minimal facts that should have raised red flags, FGG did nothing (except assure the client that everything was fine). Yet, one of the grounds provided to investors by FGG for why FGG was satisfied that adequate controls existed to ensure that assets were properly supervised at Madoff/BMIS was the clean audit opinions provided by F&H.

82.    Shortly thereafter, FGG issued a presentation dated April 2006 and titled "Investment Process and Risk Management Overview" (attached as an exhibit to the Massachusetts Administrative Complaint), which states that as part of FGG's due diligence it "check[s] for [a] 'reputable' auditor" and FGG "would question Bayou's obscure auditing firm." However, despite F&H's obscurity, neither FGG nor its affiliates did anything to question it or Madoff/BMIS.

- 27 -

83.    Also disturbing was the fact that BMIS was controlled by Madoff family members. As explained in the Aksia Letter:

> Conversations with former employees indicated a high degree of secrecy surrounding the trading of these feeder fund accounts. Key Madoff family members (brother, daughter, two sons) seemed to control all the key positions at the firm. Aksia is consistently negative on firms where key and control positions are held by family members.

84.    The failure to use an independent third party broker to clear the Fund's trades, reliance on an obscure and blatantly inadequate auditor, and the concentration of family control within BMIS should have stopped FGG's investment of Fund assets with Madoff and BMIS in its tracks.

85.    An internal e-mail dated November 14, 2008 sent to the "Sentry Team" and forwarded to Fairfield Sentry shareholders (attached as an exhibit to the Massachusetts Administrative Complaint) provided the following justification for the Fairfield Defendants' comfort that adequate controls existed to ensure that the Fund's assets were properly supervised:

> Based on the following points, it is the opinion of the Investment Manager that adequate controls exist to ensure that the assets are properly supervised:
>
> a) Federal regulatory (SEC and NASD) conduct periodic inspections of BLM to monitor compliance with rules and regulations; BLM has a virtually spotless record;
>
> b) Friehling and Horowitz, the independent auditors of BLM, conduct an annual report of the internal controls at BLM and have always provided a clean opinion;
>
> c) PWC, the Fund's auditors, conduct a bi-annual internal review of the controls and systems at BLM, the front-office and trading practices, procedures in respect to supervision and monitoring, procedures in respect of stock reconciliation, procedures in respect to trade allocation of bunched orders, error handling and a number of other items;
>
> d) Members of FGG's Finance, Operations, Risk and Investment teams periodically conduct on-site due diligence visits to BLM and

- 28 -

> independently assess the suitability of operational controls, systems
> and procedures.

86.     However, none of the four reasons given was accurate, true or complete considering, *inter alia*:

a.     As discussed below, BMIS/Madoff did not have a clean record with the SEC and NASD/FINRA.  Moreover, as also discussed below, the Fairfield Defendants themselves assisted Madoff in misleading the SEC in a 2006 investigation of Madoff.

b.     As discussed above, F&H was an inadequate, obscure auditor.

c.     PwC did not conduct bi-annual reviews of BMIS.  Rather, according to evidence provided in the Massachusetts Securities Division investigation, PWC only conducted reviews of Madoff/BMIS twice, in 2002 and 2004, and did not conduct a review thereafter. Moreover, according to PwC's report to FG Advisors (attached as an exhibit to the Massachusetts Administrative Complaint), PricewaterCoopers Bermuda's meeting with BMIS in 2004 was:

> only directed towards obtaining an understanding of certain procedures and
> organization aspects of [BMIS] for the purpose of gaining comfort thereon for the
> audits by several PwC offices of a number of funds having moneys managed by
> [BMIS].  One of these funds is Fairfield Sentry Ltd. audited by PwC Rotterdam.
> *Therefore, the procedures performed are not directed to the providing of*
> *assurance in respect of internal control,* nor to the detection of fraud, errors or
> illegal acts.  The procedures performed do not constitute an audit nor an
> investigation of the internal controls of/at [BMIS].  The procedures consisted of
> gathering factual information through an interview with Mr Madoff (hereafter
> "BM").  *No testing of controls and procedures was performed.*  [Emphasis
> added.]

d.     FGG's "on-site due diligence visits" to Madoff/BMIS consisted of a single visit by Defendant Tucker in 2001 in response to the *Barron's* article discussed above according to evidence provided in the Massachusetts Securities Division investigation.  During that single visit, Tucker did not visit the part of Madoff's office where the SSC strategy purportedly was

- 29 -

executed and did not meet any BMIS employees who worked on the purported SSC strategy other than Madoff and Frank DiPascali. (Defendants Vijayvergiya, the head of FGG's Risk Management team also had never seen that portion of Madoff's offices. Neither Tucker, Vijayvergiya, nor Dan Lipton knew of anybody from FGG who had seen that portion of Madoff's offices.) Tucker's only review of BMIS procedures consisted of viewing supposed stock trades on a computer screen for Madoff's account with the Depository Trust Corporation ("DTC"). However, Tucker had never seen a DTC account screen before. Tucker also never asked to see counterparty confirmations of trades.

## Legal, Compliance, and Regulatory Risk

87.    In connection with the third prong of FGG's professed due diligence and risk monitoring strategy, "FGG's legal, compliance, and accounting teams specialize in investment management regulation, securities compliance, corporate operations, and tax issues." According to FGG, "[t]he role of this part of the diligence exam is to determine the seriousness of any deficiencies in this area which may cause risk of sanction, loss, or reputational embarrassment."

88.    FGG also assured investors as to the existence of adequate controls to ensure that assets were properly supervised at Madoff/BMIS based on periodic inspections conducted by the SEC and NASD of Madoff/BMIS and its "virtually spotless record," according to evidence obtained in the Massachusetts Securities Division investigation.

89.    Had FGG and the other Fund Defendants conducted due diligence and risk monitoring of Madoff and BMIS they would have learned of numerous regulatory actions involving Madoff and/or BMIS.

90.    In 1992, the SEC investigated two accountants, Frank Avellino and Michael Bienes, who had illegally raised money in Florida for BMIS/Madoff and promised guaranteed

- 30 -

returns of 13.5% to 20% to investors. These two accountants sold unregistered securities to unsophisticated investors, raising $440 million. Through its investigation, the SEC discovered that Avellino and Bienes transferred their clients' funds to Madoff, who then purportedly invested the money. Yet, when investigators sought documents regarding those transactions, they discovered that Avellino and Bienes kept few if any records.

91.    According to an SEC complaint, Mr. Avellino began raising money for Madoff in 1962. Indeed, Avellino had been connected to Madoff for his entire career. After graduating from the City University of New York in 1958, Mr. Avellino began working as an accountant at a firm run by Saul Alpern, Madoff's father-in-law, where Madoff also once ran his operations. Bienes joined Avellino in raising funds for Madoff in 1965. The SEC charged Avellino and Bienes with operating an unregistered investment company and selling unregistered securities. These facts, including Madoff's involvement, were publically reported in a December 16, 1992 article in *The Wall Street Journal*.

92.    FINRA also reported five regulatory actions against BMIS, the first dating back to 1963: (1) in 1963, the National Association of Securities Dealers, Inc. ("NASD") fined and censured BMIS for violation of NASD Rule 2230; (2) in 1975, the NASD again fined BMIS; (3) in 2005, the NASD censured and fined BMIS for violation of SEC Rule 11AC1-4; (4) in 2007, the NASD censured and fined BMIS for violation of SEC Rule 604, NASD Rule 2110, and Interpretative Material 2110-2; and (5) in 2008, FINRA censured and fined BMIS for violation of NASD Ruled 8211 and 8213.

93.    In January 2006, the SEC began an investigation into Madoff and BMIS, finding that Madoff had personally "misled the examination staff about the nature of the strategy" used by the FGG funds and other hedge fund accounts, and also "withheld from the examination staff

- 31 -

information about certain of these customers' accounts," according to SEC's Case Opening Report in connection with the investigation. The SEC ultimately found that Madoff had violated rules requiring investment advisors to register with the SEC, which makes them subject to inspections and examinations, according to the SEC's Case Closing Recommendation. The SEC also found that FGG failed to disclose to investors in the FGG funds that Madoff acted as the funds' investment advisor.

94.    FGG and the Fund Defendants were aware of the allegations against Madoff and the contents of the SEC investigation, since the SEC interviewed Defendants Tucker and Vijayvergiya during its investigation and received documents from FGG entities. In fact, the Massachusetts Securities Division revealed in its administrative complaint that Madoff had in fact prepped Defendant Vijayvergiya for his interview by the SEC, coaching Vijayvergiya on what to say. The SEC ultimately closed the investigation in 2008 after Madoff agreed to register his investment advisory business and FGG agreed to disclose information about Madoff to investors. Nonetheless, Madoff's multiple violations and purposeful misleading of SEC staff should have been a red flag to FGG and the Fund Defendants.

95.    Had FGG and the other Fund Defendants conducted due diligence and risk monitoring of Madoff and BMIS, these numerous SEC, NASD and FINRA actions would have raised red flags warranting, at a minimum, further investigation into whether a manager such as Madoff/BMIS, that had repeatedly acted in blatant disregard of regulations in place to protect investors, should be managing the Fund's assets.

**Personal Background Investigation**

96.    The fourth and final prong of FGG's professed due diligence and risk monitoring strategy involves an examination of "the abilities and personalities of the individuals involved in

- 32 -

managing the fund." The required background check included, among other things, extensive interviews and litigation and regulatory checks. However, as discussed above, since Madoff generally refused to answer questions about how he achieved such seemingly high returns and the Fund Defendants had a lack of understanding of Madoff's business, it is clear that FGG and the Fund Defendants did not conduct a substantive check of Madoff. Moreover, a background check of his litigation and regulatory background would have turned up the various regulatory problems discussed above.

97.    Instead of conducting adequate due diligence and risk monitoring of Madoff and BMIS, the Fund Defendants were content to simply tout Madoff's results and collect hefty fees in exchange for handing the Fund's assets over to Madoff to manage. The Fund Defendants never questioned, at least publically, why Madoff would let feeder funds, such as those operated by or through FGG, charge fees of 20% of profits, while BMIS simply charged a commission on trades allegedly executed. According to a December 19, 2008 article in *The Wall Street Journal*, "[t]his is an unusual arrangement that raised suspicions among rival money managers, some of whom doubted that it could generate sufficient fee income."

98.    Numerous other investment professionals who advised investors about potential investments with Madoff or BMIS warned clients not to invest with Madoff. As noted above, in a letter issued to clients on December 15, 2008, Aksia, LLC, an independent hedge fund research and advisory firm, discussed the red flags it had previously identified as early as 2007, which prompted Aksia to advise its clients against investing with Madoff or any of his feeder funds, such as Fairfield Sentry. Aksia explained that "[a]s a research firm we are forced to make difficult judgments about the hedge funds we evaluate for clients. *This was not the case with the Madoff feeder funds. Our judgment was swift given the extensive list of red flags.*"

- 33 -

(Emphasis added.) In other words, this was a no-brainer for anyone doing the kind of due diligence and risk monitoring the Fund Defendants should have been doing, and represented that they were doing.

99.     According to a news account published by *Bloomberg News* on January 7, 2009, representatives of FGG were present at a meeting in 2000 with Madoff and representatives of Credit Suisse Group AG, including Oswald Gruebel, who at the time headed Credit Suisse's private-banking unit. According to *Bloomberg*, "Gruebel and two other Credit Suisse executives at the meeting with Madoff raised concern about his use of a little-known auditor who had just one client.... The bank also worried about why Madoff served as the custodian of his clients' assets.... Madoff wouldn't tell Gruebel how much money he managed, saying only that he had 12 people working with him to manage the strategy, along with six senior traders...." After the fifth or sixth query, Madoff ended the session, according to people who were at the meeting, reported *Bloomberg* on January 27, 2009. *Bloomberg* reported that Credit Suisse "urged customers ... to withdraw cash from his firm because the bank couldn't determine how he made money." The article stated that the Credit Suisse clients "proceeded to redeem about $250 million from Madoff-run funds."

100.     In 2003, a team from Société Générale's investment bank was sent to New York to perform routine due diligence of Madoff and BMIS. *The New York Times* reported in a December 17, 2008 article on the team's findings:

> What it found that March was hardly routine: Mr. Madoff's numbers simply did not add up. Société Générale immediately put Bernard L. Madoff Investment Securities on its internal blacklist, forbidding its investment bank from doing business with him, and also strongly discouraging wealthy clients at its private bank from his investments.

- 34 -

The red flags at Mr. Madoff's firm were so obvious, said one banker with direct knowledge of the case, that Société Générale "didn't hesitate. It was very strange."

101.    During 2008, investor concerns with market conditions resulted in increased requests for redemptions from the Fund. In response, the Fairfield Defendants implemented a plan to "defend redemptions," *i.e.*, to convince investors who sought to redeem their shares in the Fund not to do so. In response to questions about Madoff and BMIS that the Fairfield Defendants could not answer, the Fairfield Defendants continued to assure investors of their confidence in Madoff and BMIS despite their obvious "gaps in knowledge," according to the Massachusetts Administrative Complaint. Faced with large amounts of redemptions, "a very angry Bernie" berated the Fairfield Defendants for their failure to replace redemptions, according to evidence revealed in the Massachusetts Securities Division investigation.

102.    The Fund Defendants had responsibilities to establish due diligence procedures and performance guidelines for all fund managers with whom the Fund invested client assets. These procedures were to be applied in creating general oversight and transparency regarding how Fairfield Sentry assets were being invested. The Fund Defendants also were responsible for ensuring that these procedures and guidelines, if any, were in fact being performed. However, as is evident from the Fund Defendants' failure to heed the numerous red flags discussed above, the Fund Defendants failed to perform even a minimum level of due diligence regarding Madoff and BMIS.

103.    Indeed, according to a former employee of FGG during 2006 and 2007, that employee was told not to worry about due diligence when it came to the "Sentry Fund" (*i.e.* Fairfield Sentry, Greenwich Sentry, L.P. and Greenwich Sentry Partners, L.P.), because it is an "internal fund." A former accountant with FGG in New York from 2004 to 2008 stated that s/he

- 35 -

was not aware of any due diligence done of the Sentry Fund and none of the accountants in New York was involved in due diligence of the Sentry Fund.

104.    FGG was divided into a sales team and an investment team, according to a former assistant vice president on the investment team during 2006-2008. The investment team conducted analysis of the hedge fund managers' portfolios and evaluated prospective funds' investment processes. The former investment team member noted that the Fairfield Sentry fund "was handled very differently from [FGG's] other funds." The head of the investment group was in charge of due diligence for all of FGG's funds, with the exception of Fairfield Sentry. Defendant Vijayvergiya was responsible for due diligence of Fairfield Sentry. Fairfield Sentry's due diligence system was "inept," according to the former investment team member; the processes were not as transparent as the other funds.

105.    The former investment team member stated that little, if any, due diligence was performed with respect to Fairfield Sentry, compared to FGG's other funds. The investment team rarely went to due diligence meetings at BMIS and the former team member "never once" saw a representative from BMIS come to FGG to talk about the Fund. According to the former investment team member, the split-strike conversion strategy was not very transparent, but no one at FGG asked questions.

106.    The former investment team member attributed the lack of due diligence and oversight of Fairfield Sentry to FGG's longstanding relationship with Madoff, that FGG attributed its rise, prominence, and success to the Fund, and FGG "made a lot of money off" the Fund. FGG was just "happy with the returns" and, therefore, did not scrutinize the Fund. According to the former investment team member, most of the decision makers at FGG were salespeople who were not going to question investment strategy when things were going well.

- 36 -

107. To add insult to injury, not only did the Fund Defendants not perform any due diligence and risk monitoring, they lied to the investors about having performed a "higher level" of "deeper and broader" due diligence and risk monitoring.

108. The Fund Defendants received large fees to choose managers and perform due diligence and risk monitoring. Brad Alford, who runs Alpha Capital Management LLC in Atlanta, which helps clients choose hedge funds, was quoted by *Bloomberg News* on December 15, 2008 as saying: "It's mind-boggling that people like ... Fairfield Greenwich had been doing this for so long . . . It's the job of these funds of funds to be doing due diligence. That's why they get paid."

**Obligations of the Fund Defendants**

109. By reason of their positions and because of their ability to control the business of the Fund, the Fund Defendants owed the Fund fiduciary obligations of fidelity, trust, loyalty, candor and due care, and were and are required to use their utmost ability to control the Fund in a fair, just and equitable manner and to act in furtherance of the best interests of the Fund so as to benefit the Fund and not in furtherance of their personal interest. In addition, each of the Fund Defendants owed to the Fund the fiduciary duty to exercise due care, loyalty, good faith, candor and diligence in the management and administration of the Fund and in the use and preservation of its assets.

**FG Bermuda, FG Limited, FG Advisors and FRS's Culpable Conduct**

110. FG Bermuda, FG Limited, FG Advisors and FRS owed duties of care, loyalty and candor to the Fund.

111. FG Bermuda, FG Limited, FG Advisors and FRS completely abdicated their responsibilities to the Fund by failing to perform even minimal due diligence into the Fund's

- 37 -

single manager and sub-custodian of the Fund's assets, BMIS, let alone perform the "higher level" of "deeper and broader" due diligence and continued monitoring promised. FG Bermuda, FG Limited, FG Advisors and FRS further breached their duties to the Fund by using the purported due diligence and risk monitoring as marketing tools to sell shares of the Fund.

112.    Among other things, FG Bermuda, FG Limited, FG Advisors and FRS utterly failed to, *inter alia*:

    a.    safely and prudently manage the Fund's assets;

    b.    perform, or supervise those tasked with performing, adequate due diligence of the Fund's single manager and sub-custodian of assets, BMIS;

    c.    investigate various red flags apparent regarding BMIS, some of which were reported in the mainstream media;

    d.    provide the Fund with accurate financial statements and reports; and

    e.    warn the Fund of the risks involved in its investments.

113.    To make matters worse, not only did FG Bermuda, FG Limited, FG Advisors and FRS fail to conduct due diligence and risk monitoring of BMIS, FG Bermuda, FG Limited, FG Advisors and FRS falsely represented to the Fund that these had in fact been performed and were continuing to be performed, in violation of their duties of candor and loyalty.

114.    FG Bermuda, FG Limited, FG Advisors and FRS were paid substantial fees for the services they failed to perform.

    a.    According to the 2006 PPM, the Placement Agent, FG Limited, collected a Management Fee of 1% (0.0833% per month) of the net asset value of the Fund before Performance Fees ("Management Fee"). In prior years, the Manager, FG Bermuda, received a Management Fee, according to the July 1, 2003 Private Placement Memorandum for the Fund

- 38 -

("2003 PPM") and the October 1, 2004 Private Placement Memorandum for the Fund ("2004 PPM"). According to the Fund's financial statements, for the period 2002 until June 30, 2008, the Fund paid FG Limited and FG Bermuda a total of over $235 million in Management Fees. Those Management Fees were paid as follows:

| | |
|---|---|
| 2002 | $  3,884,000 |
| 2003 | $  5,221,000 |
| 2004 | $ 21,549,000 |
| 2005 | $ 51,127,000 |
| 2006 | $ 50,465,000 |
| 2007 | $ 67,322,000 |
| 2008 (first 6 months) | $ 36,134,000 |
| **Total** | **$235,702,000.00** |

b.        According to the 2006 PPM, the Fund paid the Placement Agent, FG Limited, a Performance Fee of 20% of the net realized and net unrealized appreciation in the net asset value of each share in a calendar quarter ("Performance Fee"). In earlier years, FG Bermuda, as Investment Manager, would receive these fees. According to the Fund's financial statements, for the period 2002 until June 30, 2008, the Fund paid FG Limited and FG Bermuda Performance Fees totaling approximately $600 million. These payments were made as follows:

| | |
|---|---|
| 2002 | $  83,951,000 |
| 2003 | $  80,515,000 |
| 2004 | $  81,278,000 |
| 2005 | $  87,225,000 |
| 2006 | $ 107,779,000 |
| 2007 | $ 116,151,000 |
| 2008 (first 6 months) | $  46,070,000 |
| **Total** | **$602,969,000.00** |

c.        According to the 2006 PPM, FG Limited, the Fund's Placement Agent, could charge Placement Fees not to exceed 3% of the shareholder's investment ("Placement Fee"). Similarly, according to the 2003 and 2004 PPMs, FG Bermuda could charge the Placement Fee.

- 39 -

d.    According to the October 1, 2004 Investment Management Agreement between Fairfield Sentry and FG Bermuda, FG Bermuda was to pay FG Limited 15% of its own Management Fees as an expense reimbursement for bearing certain internal accounting and operational expenses for the Fund.

e.    According to the 2003 PPM, the Fund paid FG Advisors an annual expense reimbursement on a quarterly basis equal to 0.025% of the net asset value of the Fund on the last day of each calendar quarter (ten basis points per annum) for providing certain administrative services and back-office support. According to the 2006 PPM, FG Limited "may pay a portion of the Management Fee to an affiliate of [FG Limited] and the investment manager in consideration of the affiliate providing certain administrative and back-office support to the Fund."

f.    Upon information and belief, FG Advisors was also paid a portion of the fees paid to the Investment Manager and/or the Placement Agent in exchange for FG Advisor's assistance in the selection, due diligence and monitoring of the Fund's manager, BMIS.

115.    In addition to receiving hundreds of millions of dollars in fees for duties not performed, the fees paid to FG Bermuda, FG Limited, FG Advisors and FRS were calculated based on falsely inflated net asset values of the Fund, its shares, and the purported appreciation thereof.

**FGG's Culpable Participation**

116.    FGG, by its marketing materials and other documents, represented to the public that it is a partnership, and it operated as a partnership. FGG's partners include Defendants FG Bermuda, FG Limited, FG Advisors, FRS, Noel, Tucker, Piedrahita, and Vijayvergiya.

- 40 -

117.    The FGG partners (i) shared on a pro rata basis, the profits and losses realized by FGG and the other FGG entities; (ii) made pro rata contributions to the capital of FGG and the other FGG entities; (iii) intended to carry on as co-owners of FGG with the common goal of earning a profit; and (iv) participated in the management of FGG.

118.    FGG promoted itself as a partnership in order to induce the Fund to invest with Madoff/BMIS and pay FGG and its affiliates fees.    A May 2006 Fairfield Sentry Limited Presentation, in the section entitled "Value Added by FGG," touted the partnership's abilities to: "[m]aintain full transparency to [BMIS] accounts," to provide "[i]ndependent verification of prices and account values," to conduct "[r]isk oversight using Risk Metrics," and to use "[s]ystematic investment compliance monitoring of Operating Guidelines."

119.    In continuing efforts to generate confidence in the Fund, FGG prepared and utilized a September 2008 marketing brochure, entitled "Fairfield Greenwich Group — The Firm and Its Capabilities", which stated in part:  "Under the leadership of its Partners, FGG has built a team of professionals who specialize in product development, risk management, marketing, operations, compliance and client services on a global basis."  The brochure also identified as partners of FGG, among others, Noel, Tucker, Piedrahita, and Vijayvergiya.

120.    The ADV attached to the 2006 PPM also represented that FGG conducted due diligence on behalf of the Fund:  "FGG's Risk Management Team conducts both the pre- and post- investment quantitative analyses of hedge fund managers, monitors the market risk and investment compliance of these managers, and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds."

121.    Defendants' continued and repeated identification of the operating entity as "FGG" and themselves as "partners" was intended by Defendants to persuade the Fund to invest

- 41 -

with Madoff/BMIS and pay FGG and its affiliates fees. The perception that the FGG partners were responsible for the due diligence of the Fund was critical to the apparent success of Fund.

122.    FGG, through its control of its affiliates, exercised control over FG Limited, FG Bermuda, FG Advisors and FRS. FGG used its alleged "higher level" of "deeper and broader" due diligence and continued risk monitoring of its funds' managers as a marketing tool to lure investors to its funds. The duties of due diligence and continued risk monitoring of the Fund's assets and manager were delegated to FGG's Risk Management Team and FRS.

123.    FGG owed duties of care, loyalty and candor to the Fund by virtue of its control of FG Bermuda, FG Limited, FG Advisors and FRS, its representations to investors, and the delegation of due diligence and continued monitoring of fund managers to FGG's Risk Management team and FRS. FGG breached these duties and/or aided and abetted FG Limited, FG Bermuda, FG Advisors and FRS's breaches of these duties, by failing to, *inter alia*:

    a.    safely and prudently manage the Fund's assets;

    b.    perform, or supervise those tasked to perform, adequate due diligence of the Fund's single manager and sub-custodian of assets, BMIS;

    c.    investigate various red flags apparent regarding BMIS, some of which were reported in the mainstream media;

    d.    provide the Fund with accurate financial statements and reports; and

    e.    warn the Fund of the risks involved in its investments.

124.    FGG violated its duties of candor and loyalty to the Fund by falsely representing that it performed a "higher level" of "deeper and broader" pre-investment due diligence and post-investment multifaceted risk monitoring of its managers than its competitors.

- 42 -

125.    FGG benefited from the breaches of fiduciary duties by sharing in the fees paid to its affiliates, including FG Limited, FG Bermuda, FG Advisors, and FRS.

**The Individual Defendants' Culpable Conduct**

**Defendants Noel, Tucker and Piedrahita -- The Controlling Partners**

126.    Defendants Noel, Tucker and Piedrahita controlled the Investment Manager and Placement Agent for the Fund, and are the founding partners of FGG. Defendants Noel, Tucker and Piedrahita are the main principals of FG Limited, which served as the Fund's Investment Manager prior to 2003 and currently serves as the Fund's Placement Agent. FG Limited is the parent of FG Bermuda, which currently serves as the Fund's Investment Manager.

127.    Defendants Noel and Tucker controlled the Investment Manager and Placement Agent of the Fund when the Fund began investing its assets with BMIS, and thus were responsible for performing and/or supervising the initial pre-investment due diligence of BMIS.

128.    Defendants Noel, Tucker and Piedrahita, through their control of the various entities and FGG, were responsible for the continued risk monitoring of BMIS and the Fund's assets.

129.    Defendants Noel, Tucker and Piedrahita were aware, or should have been aware had they exercised the appropriate duty of care and loyalty, of the many red flags described above.

130.    Defendants Noel, Tucker, and Piedrahita were the ultimate recipients of the fees paid to FGG and its affiliates (FG Limited, FG Bermuda, FG Advisors, and FRS), including Placement Fees, Management Fees and Performance Fees. Those fees were paid with the expectation that Defendants would carry out their duties of care and loyalty to the Fund.

- 43 -

131.   Defendants Noel, Tucker and Piedrahita violated their duties of care and loyalty by failing to, *inter alia*:

    a.    safely and prudently manage the Fund's assets;

    b.    perform, or supervise those tasked to perform, adequate due diligence of the Fund's single manager and sub-custodian of assets, BMIS;

    c.    investigate various red flags apparent regarding BMIS, some of which were reported in the mainstream media;

    d.    provide the Fund with accurate financial statements and reports; and

    e.    warn the Fund of the risks involved in its investments.

132.   Defendants Noel, Tucker and Piedrahita further violated their duties of candor and loyalty by themselves falsely representing, and causing the other Fairfield Defendants to falsely represent, that they had performed due diligence and continued risk monitoring of the Fund's manager and sole custodian, BMIS.

133.   Defendants Noel, Tucker and Piedrahita put their own interests before those of the Fund when they ultimately received fees for work neither they nor any of their affiliates performed.

134.   Defendants Noel, Tucker and Piedrahita each personally benefited from the breaches by being the ultimate recipients of the fees paid to FGG and its affiliates (FG Limited, FG Bermuda, FG Advisors, and FRS).

**Defendants Noel, Naess and Schmid -- The Fund Directors**

135.   Defendants Noel, Naess and Schmid were members of the Board of Directors of the Fund. Pursuant to the 2006 Private Placement Memorandum, the Fund Directors have "overall management responsibility for the Fund, including establishing investment, dividend

- 44 -

and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, custodian, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund."

136.    The Fund Directors owed duties of care, candor, and loyalty to the Fund.

137.    The Fund Directors violated their duties of care and loyalty by failing to, *inter alia*:

    a.    safely and prudently manage the Fund's assets;

    b.    perform, or supervise those tasked to perform, adequate due diligence of the Fund's single manager and sub-custodian of assets, BMIS;

    c.    investigate various red flags apparent regarding BMIS, some of which were reported in the mainstream media;

    d.    provide the Fund with accurate financial statements and reports; and

    e.    warn the Fund of the risks involved in its investments.

138.    Defendants Naess and Schmid, as Directors not affiliated with the Investment Manager, were each paid a fee of $25,000 per annum by the Fund.

**Defendants Piedrahita, Francoeur and Vijayvergiya -- The Investment Manager Directors and Head of Risk Management**

139.    Defendants Piedrahita, Francoeur and Vijayvergiya, as directors of the Fund's Investment Manager, FG Bermuda, owed the Fund duties of care, loyalty and candor. Defendants Piedrahita, Francoeur and Vijayvergiya breached these duties by failing to, *inter alia*:

    a.    safely and prudently manage the Fund's assets;

    b.    perform, or supervise those tasked to perform, adequate due diligence of the Fund's single manager and sub-custodian of assets, BMIS;

- 45 -

DOCSW72931v1

      c.      investigate various red flags apparent regarding BMIS, some of which were reported in the mainstream media;

      d.      provide the Fund with accurate financial statements and reports; and

      e.      warn the Fund of the risks involved in their investments.

140.    Defendants Piedrahita, Francoeur and Vijayvergiya received a share of the fees paid to FGG and its affiliates (FG Limited, FG Bermuda, FG Advisors, and FRS) and including the Investment Manager. These fees were paid with the expectation that these Defendants would carry out their fiduciary duties of loyalty, care, and candor to the Fund.

141.    Defendants Piedrahita, Francoeur and Vijayvergiya put their own interests before those of the Fund when they ultimately received fees for work they did not do.

142.    Defendant Vijayvergiya, in addition to his role as manager of FG Bermuda, as FGG's Chief Risk Officer and manager of FGG's Risk Management team, owed a duty to the Fund to perform adequate due diligence and continued monitoring of the Fund's single manager and sub-custodian of assets, BMIS. Vijayvergiya breached his duties to the Fund by failing to perform due diligence or continued monitoring of BMIS.

143.    Defendant Vijayvergiya also received a share of the fees paid to FGG and its affiliates (FG Limited, FG Bermuda, FG Advisors, and FRS) and including the Investment Manager, in expectation that he would carry out his duty to perform adequate due diligence and continued monitoring of the Fund's single manager and custodian of assets, BMIS.

144.    Defendant Vijayvergiya put his own interest before that of the Fund when he ultimately received fees for work that he did not perform.

- 46 -

**The Custodians' Culpable Conduct**

145.    According to the 2006 Private Placement Memorandum, "Citco Bank shall, to the

extent it deems necessary, appoint and Citco Global shall make use of sub-custodians with

respect to certain securities of the Fund." The 2006 Private Placement Memorandum provides

that Citco Bank is liable for any act or omission or for the solvency of such sub-custodian if

Citco Bank fails to exercise due care in selecting the sub-custodian. Pursuant to the Custodian

Agreement, as summarized in the 2006 Private Placement Memorandum, "Citco Bank will

exercise reasonable skill, care and diligence in the selection of a suitable sub-custodian and shall

be responsible to the Fund for the duration of the sub-custody arrangement for satisfying itself as

to the ongoing suitability of the sub-custodian to provide custodial services to the Fund. Citco

Bank will maintain an appropriate level of supervision over the sub-custodian(s) and make

appropriate enquiries, periodically, to confirm that the obligations of the sub-custodian(s)

continue to be competently discharged."

146.    Since at least July 3, 2006, Citco Global served as the Depositary for the Fund.

According to the 2003 PPM and 2004 PPM, from September 20, 1994 to July 3, 2006, Citco

Global had responsibilities very similar to those currently held by Citco Bank, including the

monitoring of any sub-custodians used by Fairfield Sentry (including BMIS). Citco Global was

responsible for "maintain[ing] an appropriate level of supervision over the sub-custodian(s) and

mak[ing] appropriate inquiries periodically, to confirm that the obligations of the sub-

custodian(s) continued to be competently discharged.

147.    Citco Bank and Citco Global failed to exercise due care in selecting BMIS as the

Fund's sub-custodian and failed to maintain an appropriate level of supervision over BMIS or

make appropriate enquiries to determine and confirm whether the obligations of BMIS as sub-custodian were being competently discharged.

148.    Upon information and belief, Citco Bank and Citco Global were paid certain fees in consideration of the services purportedly provided as Custodian of the Fund.

**The Administrator's Culpable Conduct**

149.    According to the 2006 PPM, Citco Europe, as the Fund's Administrator, "has the responsibility for furnishing the day-to-day administrative services which the Fund may require, such as: accounting services; maintaining the Funds' books and records; preparation of reports and accounts; calculation of Net asset value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required."

150.    According to Standardized Responses dated December 2008 for the Fund (attached as an exhibit to the Massachusetts Administrative Complaint):

> Citco [Europe] has established a central pricing unit based in Ft. Lauderdale, FL that obtains independent market prices from three pricing sources: Reuters, Bloomberg, and IDC. These prices are reconciled with the broker and investment manager and verified by the finance group at [FG Bermuda].

151.    According to the Standardized Responses, in addition to calculating net asset value, Citco Europe also provides other services, including to: "process of subscription and redemptions orders, maintain the shareholder register, conduct client KYC/AML check in accordance with prescribed policies and procedures, calculate and process retrocession payments and disseminate shareholder correspondence."

- 48 -

152.    Citco Europe failed to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, distribute accurate monthly reports, and communicate accurate information to shareholders and/or governmental bodies.

153.    In consideration for the administrative services Citco Europe was supposed to perform adequately, Citco Europe received a monthly fee based on the purported net asset value of the Fund as of the last business day of each month at commercially reasonable rates.

154.    The administration fees paid to Citco Europe were inflated, because the net asset value of the Fund calculated by Citco Europe was inflated.

**PwC Int'l's Control of PwC Canada and PwC Netherlands**

155.    PwC Int'l's member firms are engaged in the business of providing auditing, accounting and other investment and advisory services.  According to documentation issued by PwC Int'l, it "is structured as a network of member firms, operating locally in countries around the world, connected through membership of PricewaterhouseCoopers Intl."  Furthermore, this network creates "a platform on which member firms share knowledge, skills, and resources and deliver services of consistently high quality to international and local clients."  PwC Int'l's role includes an undertaking to "work for the consistent application of common risk and quality standards    by    PwC's    member    firms."    *See*    PwC    website: http://www.pwc.com/extweb/service.nsf/docid/ 8A601D5FA74A7CEA85257013006558DF.

156.    PwC Int'l and its member firms hold themselves out as, and operate as, a unified business entity operating under the business name "PwC".  PwC Int'l also works to promote the PwC brand. The brand "PwC" refers to one of the world's largest accounting firms comprised of "member firms around the world." According to PwC Int'l: "Every day our more than 155,000 people in 150 countries go to work to help our clients succeed."

- 49 -

157.   PwC Int'l's quality assurance program specifically provides that its quality assurance process is intended to "evaluate a member firm's performance of its overall quality and risk management responsibilities relative to PwC global policies and procedures" and, in particular, to provide "reasonable assurance" that "[a]udit examinations are performed in accordance with generally accepted auditing standards, financial statements are prepared in conformity with generally accepted accounting principles, and reports issued are appropriate in the circumstances."

158.   PwC Int'l's quality control of its member firms purportedly enables its member firms to "deliver services of consistently high quality to international and local clients." Furthermore, PwC Int'l purports to address any shortcomings of its member firms:

> PwC has a high reputation for quality. However, the sheer size of our network makes it inevitable that we will occasionally fall short of the high standards we set for ourselves. When this happens, we discuss and resolve the issues with the client or other concerned party. We also make sure that lessons are learned and communicated to the relevant part of our business. Where appropriate, we enhance our processes, systems, and training programmes to avoid such problems in the future.

159.   PwC Int'l controls PwC Canada and PwC Netherlands through its policies, practices and procedures, and determines how each conducts its business, including audits.

160.   Moreover, here, the various PwC entities worked together in conducting the audits of the Fund, and, in particular, the review of Madoff and BMIS. According to a May 15, 2005 letter from PwC Netherlands to FG Advisors, PricewaterhouseCoopers Bermuda met with BMIS in December 2004 "in order to obtain and/or update PwC's understanding of the procedures in place at [BMIS]." PwC Bermuda did so "for the purpose of gaining comfort thereon for the audits of several PwC offices of a number of funds having money managed by [BMIS]. One of these funds is Fairfield Sentry Ltd. audited by PwC Rotterdam."

- 50 -

161.    The Respondents in the Massachusetts Proceeding also recognized that PwC operated as a single entity. In their Answer filed in the Massachusetts Proceeding, Fairfield Advisors and Fairfield Bermuda state that "FGG retained PricewaterhouseCoopers as the funds' auditor," "PwC, the world's largest accounting firm, has served as auditor for the Fairfield Sentry fund since 1993," and that "PwC ... conducted at least two on-site visits to review Madoff's operations ...." (Massachusetts Answer at 6).

**PwC Violated GAAS & ISA**

162.    PwC Int'l describes its member firms as having:

> [t]he knowledge and experience necessary to help [clients] with complex financial accounting issues.... Our member firms audit many of the world's best-known companies and thousands of other organizations both large and small. Our audit approach, at the leading edge of best practice, is tailored to suit the size and nature of [the client's] organization and draws upon our extensive industry knowledge.

http://www.PwC.com/extweb/service.nsf/docid/87737d18d5e2913885256e6d0062a0f6

163.    PwC is subject to regulations by various accounting bodies, including, but not limited to, the American Institute of Certified Public Accountants ("AICPA") which promulgates national auditing standards known as Generally Accepted Auditing Standards in the United States of America ("GAAS") and the International Auditing & Assurance Standards Board ("IAASB") which promulgates International Standards on Auditing ("ISA"). These standards set the minimum level of performance and quality that auditors are expected to meet. Under GAAS and ISA, the auditor has an overall responsibility to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement, whether caused by error or fraud. AU § 110.02 and ISA 240.21. In addition, PwC is subject to the regulations of the International Accounting Standards Board ("IASB") which promulgates

- 51 -

international standards known as International Financial Reporting Standards ("IFRS") and International Accounting Standards ("IAS")

164.    PwC was engaged by Fairfield Sentry to provide independent auditing and accounting services. Pursuant to such engagement, PwC agreed and undertook a duty to provide professional services to audit the annual statements in accordance with GAAS and ISA and to render an opinion as to whether those financial statements were fairly presented in conformity with IFRS and IAS.

165.    Among other things, PwC was required to opine on the Fund's Balance Sheet and the related Income Statement, the Statement of Changes in Net Assets Attributable to Holders of Redeemable Participating Shares and Cash Flow Statement as of the years ended December 31, 2007, 2006 and 2005. This included, among other things, verifying that the investments included in the Balance Sheet existed and were appropriately valued, and understanding and assessing the Fund and BMIS' internal control environment.

166.    On April 7, 2008, the Fund issued its Directors' report and financial statements for the years ended December 31, 2007 and 2006. These documents contained the report of PwC, addressed to the Directors and shareholders of the Fund. The report stated:

> In our opinion, the accompanying balance sheet and the related income statement, the statement of changes in net assets attributable to holders of redeemable participating shares and the cash flow statement present fairly, in all material respects, the financial position of Fairfield Sentry Limited (the "Company") as of December, 31, 2007 and the results of its operations, the changes in its net assets attributable to holders of redeemable participating shares and its cash flows for the year then ended in conformity with International Financial Reporting Standards. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit of these financial statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence

- 52 -

supporting the amounts and disclosures in the financial statements, assessing the
accounting principles used and significant estimates made by the Partnership's
management, and evaluating the overall financial statement presentation. We
believe that our audit provides a reasonable basis for our opinion.

167.    On June 26, 2006 the Fund issued its Directors' report and financial statements

for the years ended December 31, 2005. These documents contained the report of the PwC,

addressed to the Directors and shareholders of the Fund. The report stated:

> In accordance with your assignments we have audited the accompanying balance
> sheet of Fairfield Sentry Limited (the "company") as at December 31, 2005 and
> the related statements of income, changes in net assets attributable to holders of
> redeemable participating shares and cash flows for the year then ended. These
> financial statements are the responsibility of the Company's management. Our
> responsibility is to express an opinion on these financial statements based on our
> audit.
>
> We conducted our audit in accordance with International Standards on Auditing.
> Those standards require that we plan and perform the audit to obtain reasonable
> assurance about whether the financial statements are free of material
> misstatements. An audit includes examining, on a test basis, evidence supporting
> the amounts and disclosures in the financial statements. An audit also includes
> assessing the accounting principles used and significant estimates made by
> management as well as evaluating the overall presentation of the financial
> statements. We believe that our audit provides a reasonable basis for our opinion.
>
> In our opinion the financial statements give a true and fair view of the financial
> position of the Company as at December 31, 2005 and of the results of its
> operations and its cash flows for the year then ended in accordance with
> International Financial Reporting Standards.

168.    In issuing its opinions, PwC opined that the Fund's financial statements were

presented in conformity with IFRS and stated that its audits were performed in accordance with

GAAS and ISA. As part of its audit opinion, PwC also asserted that the Fund's investments

existed and were properly valued, and that it had assessed the internal control environment at the

Fund and BMIS in accordance with GAAS and ISA.

169.    However, PwC's audit was, at a minimum, negligently conducted. PwC knew its

audit opinions would be disseminated to the Fund. Had PwC performed its audits in accordance

- 53 -

DOCS\472931v1

with GAAS and ISA, the fact that the Fund's investments did not exist and were not appropriately valued would have been revealed to the users of the financial statements, and the Ponzi scheme would have been uncovered.

## PwC Was Required by GAAS and ISA to Obtain Sufficient Audit Evidence

170.    GAAS and ISA require that an auditor obtain sufficient audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit. AU § 326.01 and ISA 500.2. Audit evidence is all the information used by the auditor in arriving at the conclusions on which the audit opinion is based, and includes the information contained in the accounting records underlying the financial statements and other information. AU § 326.02 and ISA 500.3.

171.    The auditor should obtain audit evidence by testing the accounting records, for example, through analysis and review, re-performing procedures followed in the financial reporting process and reconciliations. AU § 326.04 and ISA 500.4. Other information that the auditor may use as audit evidence includes minutes of meetings, confirmations from third parties, controls manuals and information obtained by the auditor from such audit procedures as inquiry, observation, and inspection. AU § 326.05 and ISA 500.6. In the case of a third party investment manager, a typical audit procedure to verify the existence of investments is to send a confirmation request of the investments' balances as of the balance sheet date. Other procedures include, but are not limited to, obtaining an understanding of and testing an entity's information systems and related controls to initiate, process and record investments and review of trade, cash, dividend and interest reconciliations.

- 54 -

## PwC Was Required by GAAS and ISA to Exercise Due Professional Care and Professional Skepticism

172.    GAAS also requires that auditors exercise due professional care in performing the audit and preparing the audit report. AU § 230.01.  Due professional care concerns what the auditor does and how well the auditor does it.  AU § 230.04.

173.    Additionally, due professional care requires the auditor to exercise professional skepticism.  Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence.  The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence.  AU § 230.07 and ISA 200.15 - 200.16.

174.    Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence.   Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process.  AU § 230.08 and ISA 200.15.  Additionally, in exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest.  AU § 230.09 and ISA 200.16.  Accordingly, representations from management are not a substitute for obtaining sufficient appropriate audit evidence to be able to draw reasonable conclusions on which to base the auditor's opinion. ISA 200.16.

175.    GAAS and ISA require the auditor to exercise an appropriate level of professional skepticism throughout the process of auditing investments.  AU § 330.15. ISA 505.27.  GAAS and ISA also state that the auditor's understanding of the client's arrangements and transactions with third parties is key to determining the information to be confirmed and that the auditor should obtain an understanding of the substance of such arrangements and transactions to

- 55 -

determine the appropriate information to include on the confirmation request.  AU § 330.25 and

ISA 505.30.

176.    Auditors are required to exercise a higher degree of professional skepticism in

certain circumstances:

> If information about the respondent's competence, knowledge, *motivation*, ability,
> or willingness to respond, or about the *respondent's objectivity and freedom from
> bias* with respect to the audited entity comes to the auditor's attention, the auditor
> should consider the effects of such information on designing the confirmation
> request and evaluating the results, including determining whether other
> procedures are necessary.  In addition, there may be circumstances (such as for
> significant, unusual year-end transactions that have a material effect on the
> financial statements or *where the respondent is the custodian of a material
> amount of the audited entity's assets) in which the auditor should exercise a
> heightened degree of professional skepticism relative to these factors about the
> respondent*.  In these circumstances, the auditor should consider whether there is
> sufficient basis for concluding that the confirmation request is being sent to a
> respondent from whom the auditor can expect the response will provide
> *meaningful and appropriate audit evidence.*

AU § 330.27 [emphasis added]. ISA 505.34 provides a similar requirement.

177.    PwC failed in its duties to obtain sufficient and appropriate audit evidence and

failed to exercise the appropriate degree of professional skepticism and due professional care

during the audit of the financial statements of the Fund.  This was particularly true with respect

to verifying the existence and valuation of the Fund's investments for the following reasons:

    a.    BMIS was the ONLY third party investment manager of the Fund;

    b.    BMIS was also the SOLE custodian of the Fund's assets; and

    c.    The Fund invested nearly ALL of its investments with BMIS.

178.    One of these facts alone should have caused PwC to heighten its professional

skepticism.  However, not only did PwC fail to confirm investments or transactions with BMIS

or any counter parties, it also failed to appropriately assess the need for alternative audit

procedures, such as reviewing broker reconciliations.  In fact, PwC did no audit work to test the

existence or valuation of the single largest balances on the Fund's financial statements which represented 89% to 99% of total assets from 2005-2007.

179.    With all of these factors present and the additional red flags described herein, PwC's failure to obtain sufficient and appropriate audit evidence, and its lack of due professional care, and professional skepticism concerning the Fund's investments was astounding.

## PwC was Required by GAAS and ISA to Assess the Work Performed by Other Auditors

180.    Under GAAS and ISA, it is possible for one auditor to rely on the work of another auditor in issuing its audit opinion.  Specifically, GAAS and ISA state that an auditor considering whether he may serve as principal auditor (*i.e.*, PwC) may have performed all but a relatively minor portion of the work, or significant parts of the audit may have been performed by other auditors (*i.e.*, F&H).  In the latter case, the principal auditor must decide whether his own participation is sufficient to enable him to serve as the principal auditor and to report as such on the financial statements.  In deciding this question, the auditor should consider, among other things, the materiality of the portion of the financial statements he has audited in comparison with the portion audited by other auditors, the extent of his knowledge of the overall financial statements, and the importance of the components he audited in relation to the enterprise as a whole.  AU § 543.02 and ISA 600.6

181.    With respect to its audit of the Fund, if PwC was able to satisfy itself as to the independence and professional reputation of F&H and took appropriate steps to satisfy itself as to the audit performed by F&H, PwC could have expressed an opinion on the financial statements of the Fund without making reference in its report to the audit of F&H.

182.    By not referencing F&H in its audit opinions for 2007, 2006 and 2005, PwC assumed responsibility for all of the audit work conducted by F&H, including the work done on

- 57 -

the existence of investments and related investment income. In relying on F&H, PwC was required by GAAS and ISA to:

    a.    Make inquiries as to the professional reputation and standing of F&H to the AICPA, other practitioners, bankers and credit grantors. PwC failed to do this. If it had, PwC would have found out that F&H was a strip-mall based, three person accounting firm with virtually no other clients that had not been subjected to any recent peer reviews and therefore had a questionable reputation.

    b.    Obtain a representation from F&H representing that it is independent under the requirements of the AICPA and, if appropriate, the requirements of the SEC. PwC failed to do this. F&H was also the internal auditor for BMIS, and with BMIS being its only client, PwC should have reached the conclusion that F&H was clearly not independent.

    c.    Ascertain through communication with F&H:

        (i)    That it is aware that the financial statements of the Fund which PwC will report on rely on F&H's report of BMIS.

        (ii)    That F&H is familiar with accounting principles generally accepted in the United States of America and with the generally accepted auditing standards (GAAS) promulgated by the American Institute of Certified Public Accountants and will conduct its audit and will report in accordance therewith.

        (iii)    That F&H has knowledge of the relevant financial reporting requirements for statements and schedules to be filed with regulatory agencies such as the SEC, if appropriate.

PwC failed to do any of this. F&H was a three person accounting firm with virtually no other audit clients and PwC should have concluded that it did not have the appropriate resources or knowledge of the relevant financial reporting requirements.

- 58 -

DOCS\472931v1

d.    Visit F&H and discuss the audit procedures followed and results thereof.

PwC did not visit F&H. If it had it would have seen that it did not have appropriate offices, staff

or resources for the audits at issue, or for a firm that supposedly audited hundreds of clients.

e.    Review the audit programs of F&H and consider issuing instructions to

F&H as to the scope of audit work. PwC failed to do this.

f.    Review the documentation outlining F&H's understanding of BMIS's

internal controls and F&H's assessment of control risk. PwC failed to do this.

183.    Additionally, given the materiality of the investment balances on the Fund's

financial statements, PwC was grossly negligent in deciding to rely on F&H. It is unfathomable

how PwC could properly have issued a clean audit opinion for the Fund without itself auditing

$7.2 billion (99% of total assets), $5.6 billion (89% of total assets) and $4.9 billion (99% of total

assets) of investments as of 2007, 2006 and 2005, respectively. Moreover, as F&H was a three

person audit firm with no recent peer review, was not independent from BMIS and had no other

known audit clients, PwC's reliance on F&H's work clearly violated GAAS and ISA.

**PwC Failed to follow the AICPA Investment Guide & Alternative**
**Investments Practice Aid and Perform "Look-Through Audits" into BMIS**

184.    The AICPA *Investment Company Audit & Accounting Guide* (the "Investment

Guide") is an industry standard for auditing public or private investment companies. The basic

GAAS and ISA requirements of obtaining sufficient audit evidence, due professional care and

professional skepticism, necessarily leads any auditor in the investment industry to use this

guide. The Investment Guide describes the objectives of auditing investments in other funds.

Section 5.84 specifically addresses the audit risk associated with funds of funds or feeder funds

and establishes a "look-through" duty for auditors of funds of funds. It states that "significant

audit risks may exist if management does not use strong procedural controls in selecting and

- 59 -

monitoring a fund's investments in investee companies and determining the investments fair

value." In highlighting this audit risk, the Investment Guide states that the auditor's approach to

an investor fund's investments in investee funds (*i.e.* funds of funds) might focus on:

    a.    Evaluating the investor and investee funds' control environments; and

    b.    Substantiating the fair value attributed to investments in the investee

funds.

    185.    Additionally, Section 5.85 of the Investment Guide suggests the following audit

tests for investments in non public funds:

> Participation in management site visits or telephone calls to investee funds....
> Participation in management site visits would be more appropriate if the investee
> funds represented a *significant investment by the investor fund* or if *serious
> concerns as to the management controls at the investee fund* existed.

[Emphasis added].

    186.    Although PwC visited BMIS offices in 2002 and 2004, these were simply cursory

visits that failed to procure credible audit evidence. In 2005, PwC issued a written report which

set forth the scope of its visit in December 2004. A written summary was not issued for 2002.

The 2005 report consisted of a letter to FG Advisors outlining the visit, a "summary of

procedures performed at BLM" and "facts gathered through the interview."

    187.    There is very little substance to the contents of PwC's 2005 written report. The

"summary of procedures performed" by PwC consisted of nothing more than a generic laundry

list of interview points *to be discussed* in a meeting with Bernard Madoff. The "facts gathered

through the interview" consisted of nothing more than a statement that there were no changes

from prior years (which PwC had not issued reports on) and various statements indicating that

"PwC was informed" of several answers by Madoff, *e.g.*, "PwC was informed that SOX

[Sarbanes-Oxley] is not applicable to BLM", "PwC was informed that there have not been any

regulatory matters impacting BLM", and "PwC was informed that there is an Internal Audit department that does periodic reviews of systems and reconciliation processes." It is apparent from this report that PwC did very little, if any, audit testwork with respect to Fairfield Sentry investments with BMIS; relied solely on representations by Madoff; and blatantly failed to adhere to GAAS and ISA and the Investment Guide with respect to the audit.

188.    The Investment Guide states in Sections 5.59 - 5.83 that the auditor of a fund of fund must take into account a variety of considerations in planning and performing its audit. In short, the Investment Guide and GAAS required PwC to:

a.    Discuss with BMIS' auditor (F&H) the results of the most recent audits of BMIS. PwC failed to do this in 2006 and 2007.

b.    Obtain sufficient knowledge of the control environment at BMIS to understand the attitudes, awareness and actions of those charged with governance concerning the internal control environment and its importance in achieving reliable financial reporting and assess the risk of fraud in the financial statement audit. PwC failed to do this.

c.    Obtain from BMIS management and from others such as production and internal audit personnel and other employees with different levels of authority, information regarding the risk of material misstatement at BMIS. PwC failed to do this.

d.    Review F&H's audit documentation related to the evaluation and testing of the BMIS' control environment. In limiting its discussions to Madoff, PwC failed to do this.

e.    Request F&H to perform, or directly perform, additional tests of controls based upon results of the evaluation of the control environment at BMIS. PwC failed to do this.

      f.     Obtain an understanding of the nature of securities held by the BMIS and the procedures used to value these securities with consideration given to requesting F&H to perform, or directly perform, additional procedures. PwC failed to do this.

      g.     Review F&H's audit documentation related to valuation testing, existence testing, or both types of testing, as of the most recent BMIS audit. PwC failed to do this.

      h.     Discuss with Fairfield Sentry and BMIS management and review BMIS accounting records to assess whether significant transactions of BMIS had been accounted for properly and disclosed properly. PwC failed to do this.

      i.     Make inquiries of BMIS management with respect to the results of investment restrictions compliance monitoring, including any detected compliance violations and related resolutions. PwC failed to do this.

189.    PwC's brief interviews with Madoff in 2002 and 2004 did not meet these detailed requirements. Moreover, it appears that PwC did not perform any audit tests or procedures in 2006 and 2007.

190.    Additionally, the AICPA *Alternative Investments - Audit Considerations Practice Aid* ("Practice Aid") provides guidance as to the valuation and existence of investments of funds of funds. It states that an auditor should confirm investments with the fund manager as of the balance sheet date and should exercise considerable judgment in performing alternative procedures towards assessing the existence of investments. This judgment should include the following audit tests:

      a.     Observing management sites;

      b.     Reviewing executed partnership, trust or similar agreements;

- 62 -

c.    Inspecting other documentation supporting the investor's interest in the fund;

d.    Reviewing periodic statements of the fund and comparing activity with amounts recorded by the investor; and

e.    Vouching relevant cash receipts and disbursements to supporting documentation.

191.    The tests outlined above by the AICPA in the Investment Guide and the Practice Aid are critical in the case of a single third party investment manager, and a sole custodian of investments of all of the Fund's investments, such as BMIS.

192.    PwC was required, but failed, to perform significant audit testing on BMIS, including an assessment of BMIS' control environment, to obtain sufficient audit evidence, and to exercise due professional care and professional skepticism.

**PwC Was Required by GAAS and ISA to Obtain an Understanding of the Fund's Internal Controls**

193.    GAAS and ISA state that the auditor must obtain a sufficient understanding of the entity and its environment, including its internal controls, to assess the risk of material misstatement of the financial statements, whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.  AU § 314.01 and ISA 315.2.

194.    Obtaining an understanding of the entity and its environment is an essential aspect of performing an audit in accordance with GAAS and ISA.  In particular, that understanding establishes a frame of reference within which the auditor plans the audit and exercises professional judgment about assessing risks of material misstatement of the financial statements and responding to those risks throughout the audit.  AU § 314.04 and ISA 315.4.

- 63 -

195.    Additionally, GAAS and ISA require that auditor consider the existence of an internal audit function in determining the nature, timing and extent of audit procedures to be performed.  AU § 332.01 and ISA 315.41.  An auditor is also required to assess the internal auditors' competence, including factors such as the educational level and professional experience, and also assess the internal auditors' objectivity.  PwC failed to do this.

196.    Given the facts surrounding the custody and management of the Fund's investments by BMIS described above, PwC had a "look-through" audit responsibility to assess BMIS' control environment and internal auditors.  PwC knowingly failed to do this.  Had PwC carried out its responsibilities, it would have concluded that:

a.    There was a lack of transparency into BMIS' investment strategy and activities;

b.    BMIS' trades for the Fund were not supported by an automated order and execution process; instead, BMIS prepared paper trading tickets;

c.    FGG performed little or no due diligence on BMIS and did not test the validity of the Fund's performance or strategy;

d.    FGG did not independently verify prices or account values;

e.    FGG did not oversee investment compliance monitoring;

f.    FGG did not engage in any risk oversight of BMIS;

g.    BMIS' internal audit function was performed by its external auditors, F&H, who were the external auditors of BMIS for many years and lacked any objectivity to properly carry out this function;

h.    F&H was not experienced, competent or qualified to perform an internal audit function as it was only a three person auditing firm (of which only one appears to have

- 64 -

been a full time accountant) with no other known audit or internal audit clients. It also had not

had any peer reviews conducted on it as required by the AICPA; and

       i.     F&H did not have the appropriate level of access to BMIS' accounting or

operational information.

197.    Knowing these facts, PwC failed to appropriately assess the Fund's control

environment in designing and executing its audit. It also failed to consider the objectivity and

qualifications of BMIS' internal auditors, *i.e.*, F&H, as part of its annual audit of the Fund in

violation of GAAS and ISA.

**PwC Was Required by GAAS and ISA to Assess Audit Risk and the Risk of
Material Misstatement to Fraud or Error**

198.    GAAS and ISA state that audit risk and materiality, among other matters, need to

be considered together in designing the nature, timing, and extent of audit procedures and in

evaluating the results of those procedures. AU § 312.01 and ISA 315.15.

199.    GAAS and ISA also require that risk assessments, and accordingly, any

reevaluations of risk assessments, be made with consideration of applicable risk factors. AU

§ 316.02 and ISA 240.48. In addition, the auditor should use professional judgment in

determining whether a risk factor is present and should be considered in identifying and

assessing the risks of material misstatement due to fraud. AU § 316.32 and ISA 240.50.

200.    The auditor also has a responsibility to plan and perform the audit to obtain

reasonable assurance about whether the financial statements are free of material misstatement,

whether caused by fraud or error. AU § 316.12 and ISA 240.23. In performing the audit, the

auditor should be concerned with matters that, either individually or in the aggregate, could be

material to the financial statements.

- 65 -

201.    Furthermore, because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. AU § 316.13 states:

> The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and *regardless of the auditor's belief about management's honesty and integrity*. Furthermore, professional skepticism requires an *ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred*. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

[Emphasis added]. ISA 240.24 outlines a similar requirement.

202.    PwC was required under GAAS and ISA to actively consider whether there was a risk that the financial statements it was auditing contained material misstatements due to fraud, to identify the risks thereof, and to communicate those concerns, if any, to the Fund.

203.    However, PwC knowingly ignored the numerous fraud risk factors during its audit of the Fund. These factors included but were not limited to the following:

a.    Unusual year after year steady profitability, especially compared to that of other companies in the same industry;

b.    Managements' personal financial situation was threatened by the Fund's financial performance, including significant portions of their compensation being contingent upon fees and performance allocations paid by the Fund;

c.    Ineffective monitoring by the Fund of BMIS as outlined above;

d.    Ineffective oversight over the financial reporting process and internal controls at the Fund and BMIS;

- 66 -

  e.  Inadequate segregation of duties between trade execution and custody of assets without compensating controls at BMIS;

  f.  BMIS went to 100% cash every December 31, irrespective of market conditions;

  g.  Reliance on a blatantly inadequate internal audit function; and

  h.  Conflicts of interest at BMIS and a concentration of family control.

  204.  In addition to the above fraud risk factors, PwC ignored the numerous red flags that existed at the Fund and BMIS as outlined previously in violation of GAAS and ISA.

**PwC Was Required by GAAS & ISA to Audit Investments**

  205.  GAAS and ISA provide guidance to auditors in planning and performing auditing procedures for assertions about derivative instruments, hedging activities, and investments in securities that are made in an entity's financial statements. AU § 332.01 and ISA 545.3. They state that the auditor may need special skill or knowledge to plan and perform auditing procedures for certain assertions about derivatives and securities, including:

> Obtaining an understanding of an *entity's information system for derivatives and securities, including services provided by a service organization,* which may require that the auditor have special skill or knowledge with respect to computer applications when significant information about derivatives and securities is transmitted, processed, maintained, or accessed electronically; and
>
> *Identifying controls placed in operation by a service organization that provides services to an entity that are part of the entity's information system* for derivatives and securities, which may require that the auditor have an understanding of the operating characteristics of entities in a certain industry.

[Emphasis Added]. AU § 332.05. ISA 454.10 oultines a similar requirement.

  206.  GAAS and ISA also state that the understanding of an entity's information system may include controls over securities transactions from their initiation to their inclusion in the financial statements. It also states that this may encompass controls placed in operation by the

- 67 -

entity and by service organizations whose services are part of the entity's information system. AU § 332.11 and ISA 545.12. Had PwC followed GAAS and ISA it would have concluded that BMIS did not have appropriate information systems and controls over investments that it claimed to have and did not operate an automated order and execution process for its SSC strategy, but instead prepared paper trading tickets. This was a significant red flag at BMIS which PwC recklessly disregarded.

207. PwC was required by GAAS and ISA to obtain an appropriate understanding of the Fund's information systems for investments, including those systems at BMIS. PwC failed to do this. This failure represented a complete and systematic breakdown of PwC's audit responsibilities under GAAS and ISA. Additionally, PwC's audit failures caused the Fund's investments to be reported in violation of IFRS.

**PwC Failed in its Duty as the Auditor of the Fund**

208. In summary, PwC failed in its duty as the purported independent auditor of the Fund as follows:

a. PwC failed to exercise due professional care and professional skepticism in its audit of the Fund. PwC should have exercised heightened care and professional skepticism in light of the facts and red flags discussed previously;

b. PwC failed to obtain sufficient audit evidence with respect to the existence and valuation of the Fund's investments;

c. PwC failed to appropriately perform "look-through audits" into the underlying fund, and assess the impact of its findings on its audit of the Fund's financial statements;

- 68 -

d.    PwC failed to obtain an understanding of the Fund's and BMIS' internal control environment and assess the qualifications and competency of internal auditors;

e.    PwC failed to appropriately assess audit risk and the risk of material misstatement due to fraud or error; and

f.    PwC failed to audit investments in accordance with GAAS and ISA.

209.    PwC knowingly ignored the GAAS and ISA requirements and numerous facts and red flags discussed above which should have led it to either:

a.    disclaim an opinion or issue an adverse opinion on the Fund's 2007, 2006 and 2005 financial statements; or

b.    withdraw, correct or modify its opinions to recognize the Fund's improper accounting and financial reporting as stated above.

**Fairfield Sentry's Financial Statements Were Not In Accordance With IFRS and IAS**

210.    At all relevant times, Defendants represented that Fairfield Sentry's financial statements, when issued, were prepared in accordance with IFRS and IAS. IFRS and IAS are those principles recognized by the accounting profession as the principles, conventions, and procedures necessary to define accepted accounting practice at a particular time. However, in violation of IFRS and IAS, Defendants used improper accounting practices to falsely report investments and investment income, management fees and provisions.

211.    As set forth in IAS 1, Presentation of Financial Statements (September 1997), one of the fundamental requirements of financial reporting is that it provide useful information to a wide range of users in making economic decisions. IAS 1, ¶ 7, states:

> Financial statements are a structured representation of the financial position and financial performance of an entity. The objective of general purpose financial statements is to provide information about the financial position, financial

- 69 -

performance and cash flows of an entity that is useful to a wide range of users in making economic decisions. Financial statements also show the results of management's stewardship of the resources entrusted to it. To meet this objective, financial statements provide information about an entity's (a) assets; (b) liabilities; (c) equity; (d) income and expenses, including gains and losses; (e) other changes in equity; and (f) cash flows. This information, along with other information in the notes, assists users of financial statements in predicting the entity's future cash flows and, in particular, their timing and certainty.

212.    Additionally, IAS 1 ¶ 13 states financial statements should be fairly presented:

Financial statements shall present fairly the financial position, financial performance and cash flows of an entity. Fair presentation requires the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework. The application of IFRS, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation.

213.    Management is responsible for preparing financial statements that are fairly presented and conform with IFRS and IAS.  As noted by the IASB Framework for the Preparation and Presentation of Financial Statements ("IASB Framework"), approved by the International Accounting Standards Committee ("IASC") Board in April 1989, and adopted by the IASB in April 2001:

The management of an entity has the primary responsibility for the preparation and presentation of the financial statements of the entity. Management is also interested in the information contained in the financial statements even though it has access to additional management and financial information that helps it carry out its planning, decision-making and control responsibilities. Management has the ability to determine the form and content of such additional information in order to meet its own needs.

IASB Framework at ¶ 11.

214.    Fairfield Sentry's materially false and misleading financial statements resulted from a series of deliberate or reckless management decisions that concealed the truth regarding the financial condition and operation of the Fund.  Specifically, Defendants caused the Fund to violate IFRS and IAS, and its own accounting policies, by:

- 70 -

a.     Falsely reporting investments (financial assets at fair value) and related investment income that did not exist and failing to recognize provisions associated with those investments.  This resulted in total assets being overstated by $7.2 billion, $5.6 billion and $4.9 billion in 2007, 2006 and 2005, respectively, and investment income being overstated by $683 million, $639 million and $514 million in 2007, 2006 and 2005 respectively;

b.     Falsely expensing management and performance fees which were not true expenses of the Fund.  This resulted in operating expenses being overstated by at least $183 million, $158 million and $8 million in 2007, 2006 and 2005, respectively.

c.     Failing to operate a system of basic internal accounting controls, thereby rendering the Fund's financial reporting wholly unreliable and false.

**The Fund's Improper Reporting of Investments (Financial Assets at Fair Value)**

215.   The IASB's Framework defines an asset and states that the future economic benefit embodied in an asset is the potential to contribute, directly or indirectly, to the flow of cash and cash equivalents to the entity.  ¶ 53

216.   Additionally the IASB Framework states that an asset is recognized on the balance sheet when it is probable that the future economic benefits will flow to the entity and the asset has a cost or value that can be measured reliably. ¶ 89.  Moreover, the IASB Framework states that an asset is *not* recognized on the balance sheet when expenditure has been incurred for which it is considered improbable that economic benefits will flow to the entity beyond the current accounting period.  Instead such a transaction results in the recognition of an expense in the income statement. ¶ 90.

- 71 -

217.    Specifically, IAS 39 Financial Instruments: Recognition and Measurement (March 1999) ¶ 43 and ¶ 46 states that a financial asset is measured at its fair value through the profit and loss.

218.    Fairfield Sentry's financial statements for the year ended December 31, 2007 included the following disclosure with respect to the Fund's policy of accounting for investments, the largest single asset reported in its financial statements:

> Management designates the Company's investments in debt and equity securities, and related derivatives as financial assets at fair value through profit and loss... Listed securities are valued at the last reported bid price if owned and asked price if short on the last business day of the valuation period.

219.    Similar disclosures were made in 2005. Defendants violated IFRS and IAS and their own disclosed accounting policies by falsely stating the value of its investments in 2007, 2006 and 2005. At all times, Defendants recklessly disregarded that the underlying assets in the financial assets portfolio of Fairfield Sentry did not exist, did not represent any future economic benefit or potential to contribute to the cash flows of the Fund and should not have been recognized at fair value through profit and loss. This resulted in total assets and profit being overstated by $7.3 billion, $5.6 billion and $4.9 and in 2007, 2006 and 2005, respectively, representing a staggering 89% to 99% of total assets.

220.    Additionally, IAS provides that a provision shall be recognized when: (i) an entity has a present obligation as a result of a past event; (ii) it is probable that an outflow of resources embodying economic benefits will be required; and (iii) a reliable estimate can be made of the amount of the obligation. IAS 37 Provisions, Contingent Liabilities and Contingent Assets, (September 1998) at ¶14. IAS 37 also requires that financial statements disclose a contingent liability unless the possibility of an outflow of resources embodying economic benefits is remote. ¶ 28. The disclosure shall indicate the nature of the contingency, an estimate of its financial

- 72 -

effect, an indication of the uncertainties relating to the amount of the outflow, and the possibility of any reimbursement. ¶ 86.

221.    Moreover, the IASB Framework states that an expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated. ¶ 87.

222.    In violation of IFRS and IAS, Fairfield Sentry's financial statements improperly failed to disclose the true nature of the investments invested with Madoff, subjecting the Fund to probable future provisions.  Fairfield Sentry's financial statements failed to disclose that the investments held with Madoff did not exist and were part of a Ponzi scheme.  This was a necessary disclosure for a proper understanding and evaluation of the Fund's operating performance and an informed investment decision. *See* IASB Framework ¶14.

**The Fund's Improper Reporting of Investment Income**

223.    The IASB Framework states that income is recognized in the income statement when an increase in future economic benefits related to an increase in an asset has arisen that can be measured reliably. ¶ 92.  The IASB Framework further states that recognition as income be restricted to those items that can be measured reliably and have a sufficient degree of certainty. ¶ 93.

224.    Additionally, IAS 18 Revenue (December 1993) states:

> Revenue arising from the use by others of entity assets yielding interest, royalties and dividends shall be recognized when (a) it is probable that the economic benefits associated with the transaction will flow to the entity; and (b) the amount of the revenue can be measured reliably. ¶ 29.

225.    Fairfield Sentry's December 31, 2007 financial statements included the following disclosure with respect to the Fund's policy of accounting for investment income (with a similar disclosure in 2005):

- 73 -

> Interest income and expense are recognized in the income statements on an accrual basis... Dividend income is recognized when the right to receive payment is established.

226.    Since the Fund's investments did not exist, the investment income derived from these investments did not represent an increase in the future economic benefits to the Fund. However, Defendants improperly recognized this investment income in direct contravention of IFRS and IAS resulting in an overstatement of total income and profit of $683 million, $639 million and $514 million in 2007, 2006 and 2005, respectively.

**The Fund's Improper Expensing of Management and Performance Fees**

227.    Expenses are recognized in the income statement when a decrease in future economic benefits related to a decrease in an asset or an increase of a liability has arisen that can be measured reliably.    IASB Framework ¶ 94.    Additionally, an expense is recognized immediately in the income statement when an expenditure produces no future economic benefits or when, and to the extent that, future economic benefits do not qualify, or cease to qualify, for recognition in the balance sheet as an asset.    IASB Framework ¶ 97.

228.    Fairfield Sentry's December 31, 2007 financial statements included the following disclosure with respect to the Fund's policy of accounting for management and fees:

> The Investment Manager receives a monthly management fee in an amount equal to one-twelfth of one percent 0.0833% of the net asset value before performance fees, as calculated at the opening of the first day of each calendar month, which will include capital activity as of the first day of the month. The fee is payable monthly in arrears. A portion of this fee may be paid to an affiliate of Fairfield Greenwich Limited ("FGL") and the Investment Manager in consideration of the affiliate providing certain administrative services and back office support to the company.

229.    A similar disclosure was made in the 2007 financial statements with respect to performance fees:

DOCS\472931v1

The investment manager receives a performance fee of 20% of the new appreciation in share value each quarter. The performance fees are calculated and payable quarterly in arrears.

230. A similar disclosure was also made in the 2005 financial statements. The Investment Manager referred to in the above disclosures is FG Bermuda. Since the investments invested with Madoff did not exist, the combined management fees and performance fees of $183 million, $158 million and $8 million in 2007, 2006 and 2005, respectively, paid to FG Bermuda were not true expenses of the Fund. There had been no increase in a liability, as no services had been rendered by the Investment Manager on behalf of the Fund as required by IFRS and IAS. If Defendants had performed the due diligence on BMIS they claimed to have performed, for which management and performance fees were paid, the fact that the investments invested with Madoff did not exist would have been known to the users of the financial statements.

## The Fund's Lack of Internal Controls

231. In addition to the foregoing improper accounting practices, Fairfield Sentry also suffered from a chronic and systematic breakdown of its internal accounting controls which rendered the Fund's financial reporting unreliable and inaccurate, resulting in materially false and misleading financial statements.

232. Generally, companies are required to (A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets; and (B) devise and maintain a system of internal accounting controls sufficient to reasonably assure, among other things, that transactions are recorded as necessary to permit preparation of financial statements in conformity with IFRS. Companies are required to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed

- 75 -

as authorized, to properly record transactions and, at reasonable intervals, to compare accounting records with physical assets.

233.    Fairfield Sentry failed to maintain a system of internal accounting controls, as outline described above, and as a result issued materially false and misleading financial statements in violation of IFRS and IAS.

## Additional IFRS and IAS Violations

234.    As a result of the foregoing accounting improprieties, Defendants caused Fairfield Sentry's reported financial results to violate, among other things, the following additional requirements of IFRS and IAS for which each Defendant is responsible:

a.    The requirement that the objective of financial statements is to provide information about the financial position, performance and changes in financial position of an entity that is useful to a wide range of users in making economic decisions.  IASB Framework ¶12.

b.    The requirement that to be useful, information must be relevant to the decision-making needs of users.  Information has the quality of relevance when it influences the economic decisions of users by helping them evaluate past, present or future events or confirming, or correcting, their past evaluations.  IASB Framework ¶26.

c.    The requirement that the relevance of information is affected by its nature and materiality.  Information is material if its omission or misstatement could influence the economic decisions of users taken on the basis of the financial statements.  Materiality depends on the size of the item or error judged in the particular circumstances of its omission or misstatement.  IASB Framework ¶ 29-30.

- 76 -

     d.    The requirement that to be useful, information must also be reliable. Information has the quality of reliability when it is free from material error and bias and can be depended upon by users to represent faithfully that which it either purports to represent or could reasonably be expected to represent. IASB Framework ¶ 31.

     e.    The requirement that to be reliable, information must represent faithfully the transactions and other events it either purports to represent or could reasonably be expected to represent. IASB Framework ¶ 33.

     f.    The requirement that to be reliable, the information contained in financial statements must be neutral, that is, free from bias. Financial statements are not neutral if, by the selection or presentation of information, they influence the making of a decision or judgment in order to achieve a predetermined result or outcome. IASB Framework ¶ 36.

     g.    The requirement that prudence is the inclusion of a degree of caution in the exercise of the judgments needed in making the estimates required under conditions of uncertainty, such that assets or income are not overstated and liabilities or expenses are not understated. IASB Framework ¶ 37.

     h.    The requirement that to be reliable, the information in financial statements must be complete within the bounds of materiality and cost. IASB Framework ¶ 38.

## DEMAND FUTILITY

    235.    Plaintiffs bring this derivative action in good faith and in the best interests of the Fund, and it is in the best interests of the Fund if the conduct and prosecution of this action be left to the Plaintiffs, and not the Directors of the Fund or their affiliates. The instant derivative action is meritorious and the claims herein are likely to succeed, and Plaintiffs will honestly,

- 77 -

fairly and adequately represent the interests of nominal Defendant Fairfield Sentry in prosecuting the wrongs detailed herein.

236.    The Fund reportedly had investments in excess of $5 billion in BMIS and/or Madoff, which has been lost. Any recovery of part or all of the losses from the Defendants is in the best interests of the Fund, and a recovery will exceed the legal fees payable.

237.    The claims asserted herein are derivative claims and not direct claims, and a reasonable alternative to derivative claims on behalf of the Fund is not possible.

238.    Plaintiffs have not made demand on the Directors of the Fund in connection with bringing these derivative claims, since such demand would be a futile and useless act that is excused by governing law, as set forth below.

239.    The unlawful acts and practices alleged herein cannot be defended by the Directors (or any of the Defendants, for that matter), and are not subject to the protection of any independent business judgment, and since it would undoubtedly be to the benefit of the Fund to assert these derivative claims and to recover the damages caused by the Defendants' wrongdoing.

240.    The wrongs alleged herein constitute violations of the fiduciary duties owed by the Directors, among others, to the Fund. The Directors are subject to liability for breaching their fiduciary duties to the Fund by, *inter alia,* causing the Fund's assets to be invested with Madoff or BMIS without performing due diligence or continued monitoring, causing or permitting the reckless investment practices alleged herein, failing to adequately monitor BMIS' financial reporting, and failing to detect, prevent, or halt the wrongful acts alleged herein.

- 78 -

241.    The Directors and their affiliates exercise ultimate authority over the Fund, and have substantially profited at the expense of the Fund by receiving monthly Management Fees and Performance Fees.

242.    The Fund Defendants face a substantial likelihood of liability in this action because of their acts and omissions alleged herein. The dramatic breakdowns and gaps in those controls were so widespread and systematic that the Directors, as well as the other Defendants, face substantial exposure to liability for total abrogation of their duties of oversight. The Directors should have known (if they did not know) that the Fund's assets were employed as part of a massive Ponzi scheme and took no steps in a good faith effort to prevent or remedy that situation, proximately causing substantial damages to the Fund.

243.    The Fund, as well as their affiliates, have ratified the egregious actions described herein, and these Defendants cannot be expected to prosecute claims against themselves, and persons or entities with whom they have extensive inter-related business, professional and personal entanglements, if Plaintiffs demanded that they do so. The Fund Defendants and their affiliates, because of these relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Fund.

244.    Insurance policies covering the liability of an entity's directors generally purport to exclude legal claims asserted directly by an entity against such persons. Thus, there was, and is, a substantial disincentive for the Fund to bring any action directly against its Directors. Generally, under the terms of such insurance policies, an entity would be required by the insurance carriers to cooperate in the defense of any claims, such as the present action, which seeks to impose liability upon the Directors and others.

- 79 -

245.  Presumably, the policy or policies which the Fund maintains contain the foregoing provision, and the insurance carriers would maintain that the Fund and its Directors are disabled from complying with any demand that would cause the Fund to institute, or prosecute any action against the Directors for the wrongful conduct alleged herein.

246.  The Directors participated in, approved, and/or permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly, and/or negligently disregarded those wrongs, and are therefore not disinterested parties and lack sufficient independence to exercise business judgment, as alleged herein. The Directors exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment.

247.  Given the size, scope, and blatancy of the wrongdoing alleged above, the Directors (and their affiliates, among others) either knew of the financial risks or turned a blind eye to them. Such conduct is not protected business judgment and exposes the Directors, among others, to substantial liability in this action.

248.  The Fund Directors and their affiliates lack the sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims alleged herein against Defendants.

249.  In addition, demand would be futile and useless for the additional following reasons:

a.    The Directors, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Fund as requested herein;

- 80 -

b.    In order to bring this suit, the Fund Directors would be forced to sue themselves and persons and entities with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand; and

c.    The acts complained of constitute violations of the fiduciary duties owed by the Directors and these acts are incapable of ratification.

250.    The Fund has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet none of the Directors, Defendants or their affiliates has filed any lawsuits or taken any other equivalent or similar actions against themselves or other culpable persons to recover for the Fund the damages the Fund has suffered and will continue to suffer.

251.    Plaintiffs have not sought the approval of the other Fund shareholders as a whole to bring this action because seeking such approval is no in the Fund's best interests, and would be futile, for the following reasons:

a.    The Fund has a large number of shareholders, whose identities and contact information are largely if not completely in the exclusive possession and control of some or all the Defendants herein; and

b.    Seeking approval would cause undue delay, to the detriment of the Fund.

## FIRST CAUSE OF ACTION

### Grossly Negligent, Willful and Reckless Breach of Fiduciary Duties
### Against the Fund Defendants

252.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

- 81 -

253.    The Fund has suffered damages due to the Fund Defendants' conduct as detailed above.    The claims asserted herein against the Fund Defendants are asserted on behalf of Fairfield Sentry to recover from the Fund Defendants the damages sustained and to be sustained by the Fund due to the gross, willful and wrongful mismanagement of the Fund's assets.

254.    The conduct detailed above was not due to an honest error of judgment but to the Fund Defendants' gross, reckless, bad faith and/or willful disregard of their fiduciary duties and of the rights and interests of the Fund.    The Fund Defendants' conduct cannot be justified as valid acts of business judgment because they engaged in systematic, gross mismanagement and materially misled the Fund in order to enrich themselves personally.

255.    The Fund Defendants have individually or in concert breached fiduciary duties of loyalty, care, candor and good faith owed to the Fund because they, among other things:

a.    failed to establish and implement an adequate and functioning system of internal financial and accounting controls to ensure the existence of the Fund's assets;

b.    failed to accurately or adequately perform, or to adequately supervise others who performed, due diligence and continued risk monitoring of the Fund's manager and portfolio;

c.    enriched themselves at the expense of the Fund by collecting fees for services not performed and based upon the artificially inflated net asset value of the Fund;

d.    failed to adequately supervise the preparation and filing of audits, reports or other information and to adequately examine and evaluate any reports of examination, audits, or other financial information concerning the Fund; and

e.    made false statements to the Fund regarding the due diligence and risk monitoring they purported to perform.

- 82 -

256.    By reason of the foregoing, the Fund has sustained and will continue to sustain damages for which relief is sought herein.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Breaches of
### Fiduciary Duties Against the Fund Defendants

257.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

258.    Each of the Fund Defendants breached the fiduciary duties owed to the Fund in a grossly negligent, willful and reckless manner, as detailed above.

259.    Each of the Fund Defendants knowingly gave substantial assistance and encouragement to each other in committing the grossly negligent, willful and reckless breach of fiduciary duties alleged above.

260.    Each of the Fund Defendants acted in concert with at least one other Fund Defendant to commit the breaches of fiduciary duties detailed above.

261.    The Fund has sustained and will continue to sustain damages by reason of the foregoing.

## THIRD CAUSE OF ACTION

### Negligent Misrepresentation Against the Fund Defendants

262.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

263.    The Fund Defendants owed to the Fund a duty: (a) to act with reasonable care in preparing and disseminating the representations relied upon by the Fund, including the financial

- 83 -

statements; and (b) to use reasonable diligence in determining the accuracy of and preparing such representation.

264.    Defendants breached their duties to the Fund by failing to investigate, confirm, prepare and review with reasonable care such representations.

265.    The representations failed to disclose that the Fund Defendants had not conducted due diligence of Madoff or BMIS, or that they did not conduct the post-investment multifaceted risk monitoring described in various FGG and Fund documents.  As a direct, foreseeable and proximate result of this negligence, the Fund has sustained, and will continue to sustain damages.

266.    By reason of the foregoing, Defendants are jointly and severally liable to the Fund.

## FOURTH CAUSE OF ACTION

### Breach of Contract
### Against FG Bermuda and FG Limited

267.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

268.    As previously set forth, FG Bermuda is the Fund's Investment Manager and FG Limited previously served as the Fund's Investment Manger.

269.    FG Bermuda entered into an Investment Management Agreement with Fairfield Sentry dated October 1, 2004.

270.    Under the Investment Management Agreement, FG Bermuda's duties included, *inter alia*:

- 84 -

a.    "management of the Fund's investment activities, the selection of the

Fund's investments, monitoring its investments and maintaining the relationship between the

Fund and its custodian, administrator, registrar asnd transfer agent;"

b.    to use "best efforts to (a) seek suitable investment opportunities and

manage the investment portfolio of the Fund; (b) perform or oversee the day-to-day investment

operations of the Fund; (c) act as investment adviser for the Fund in connection with investment

decisions; (d) provide information in connection with the preparation of all reports to the Fund's

shareholders described in the Memorandum; and (e) arrange for and oversee the services of the

Fund's administrator, custodian(s), auditors and counsel to act on behalf of the Fund; provided,

however, that the Investment Manager is not authorized to enter into agreements in the name of

the Fund with such providers of services;"

c.    "send to the Fund weekly and monthly valuations of the [split-strike

conversion] Investments;"

d.    be "available at all times' for consultation regarding this information; and

e.    execute its duties in the absence of "willful misfeasance, bad faith or gross

negligence" or a "reckless disregard of their obligations and duties.

271.    FG Bermuda and FG Limited both breached their investment management

contracts by grossly failing to meet the obligations of these agreements to provide competent

investment management services to the Fund.  They also breached their contracts by receiving

and holding fees based on fictitious profits and for services not properly performed.  Both are

liable to the Fund for breach of contract.

- 85 -

## FIFTH CAUSE OF ACTION

### Breach of Contract
### Against the Citco Defendants

272.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

273.     As previously set forth, Citco Europe is the Fund's Administrator.

274.     Citco Europe entered int an Administration Agreement with Fairfield Sentry dated February 20, 2003.

275.     Under the Administration Agreement, Citco Europe agreed to act in good faith in the performance of its services as the Fund's Administrator.

276.     Under the Administrative Agreement, Citco Europe was required to exercise good faith, due care and diligence in its execution of administrative services, including, *inter alia*, the following financial and accounting services:

        a.     Management of the Funds' customary financial and accounting books, which includes, *inter alia*, reconciliation of cash and other balances at brokers, reconciliation of bank accounts, calculation of income and expense accruals, calculation of management and performance/performance fees with supporting schedules, independent reconciliation of the Funds' portfolio holdings, and calculation of net asset value and net asset value per share on a monthly basis in accordance with the Fund documents,

        b.     Preparation of monthly financial statements in conformity with IAS;

        c.     Preparation of books and records to facilitate external audit, and liaising with the Fund's auditors in their review and preparation of the annual financial statements;

        d.     Provision of accounting or accounting related reports and/or support schedules as agreed between the Administrator and Investment Manager; and

- 86 -

e.    Disbursement of payments for third party fees and expense incurred by the Fund.

277.    Under the Administrative Agreement, Citco Europe was required to exercise good faith, due care and diligence in its execution of administrative services, including, *inter alia*, the following administrative and registrar and transfer agency services:

a.    publishing the net asset value per share as requested by the Fund;

b.    reconciliation of information provided by the Fund's prime broker and custodian with information provided by the Investment Manager;

c.    disbursement of the Management and Performance Fees; and

d.    dispatching to the shareholders and anyone else entitled to receive the same in accordance with the Fund documents and any applicable law copies of the audited annual financial statements.

278.    Citco Europe breached the Administration Agreement with the Fund by failing to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, distribute accurate monthly reports, and communicate accurate information to shareholders and/or governmental bodies.

279.    As previously set forth, Citco Bank and Citco Global are the Fund's Custodians.

280.    Citco Bank and Citco Global entered into Custodian Agreement with Fairfield Sentry dated July 3, 2006.

281.    Under the Custodian Agreement, Citco Bank was responsible for holding the Fund's assets and, if a sub-custodian was appointed, ensuring that the sub-custodian properly performed its duties. Specifically:

- 87 -

a.       Citco Bank committed to use its "best efforts and judgment and due care in performing its obligations and duties" as Custodian.  Citco Bank represented that it would act in good faith and reasonable care in its execution of its duties.

b.       One of Citco Bank's duties was to maintain an "ongoing appropriate level of monitoring" of any sub-custodian for Fairfield Sentry.

c.       Citco Bank had the authority to "act without first obtaining instructions from the Fund" if such action were necessary "in order to preserve or safeguard the Securities or other assets of the Fund."  Citco Bank did not need the Fund's approval to safeguard investors' money from the fraudulent activity of others.

d.       Citco Bank agreed to employ "financial or other experts" in execution of its duties as Custodian.  Thus, Citco Bank had discretionary responsibilities that called for the use of financial experts where necessary.

282.    Under the Custodian Agreement, Citco Bank was only able to "rely on the genuineness of any document," to the extent Citco Bank believed in "good faith" that the document was "validly executed by or on behalf of the Fund."

283.    In addition, as cepositary, Citco Global has the responsibility of holding securities on behalf of the Fund.  Under the Custodian Agreement, Citco Global received instructions from the Fund through the Custodian.  Along with Citco Bank, Citco Global was authorized to "enter into further agreements for the appointment" of sub-custodians.  Citco Global agreed to perform its services as Depositary without "willful misfeasance, bad faith, fraud or negligence."

284.    Before Citco Bank assumed the role of Custodian for Fairfield Sentry, Citco Gobal served as Fairfield Sentry's Custodian, and upon information and belief, had similar contractual obligations as Citco Bank does today.

- 88 -

285.    Citco Bank and Citco Global both breached their respective agreements to serve as the Fund's Custodian and Depositary (as to Citco Global) by grossly failing to meet the obligations of the Custodian Agreement by selecting Madoff/BMIS as sub-custodian and failing to monitor his/its performance.

## SIXTH CAUSE OF ACTION

### Professional Negligence (Malpractice)
### Against PwC

286.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

287.    As previously set forth, PwC Intl'l and its member firms, including PwC Canada and PwC Netherlands, were retained by the Fund to ensure that the financial information conveyed by the Fund was presented in conformity with GAAS/ISA, IAS, and IFAS. To that end, PwC undertook to perform audits pursuant to GAAS/ISA, IAS, and IFRS and was substantially compensated therefor.

288.    PwC accepted the engagement and undertook to discharge its duties in a proper, skillful and diligent manner and in accordance with accepted professional standards.

289.    In complete disregard of its duties, PwC failed to adhere to and carry out its duties in accordance with GAAS and ISA and other accepted professional standards.

290.    As a result of the aforementioned failure to discharge its duties in a proper, skillful and diligent manner, PwC negligently, carelessly and unskillfully failed to discover and/or advise the Fund of the materiality of various internal control problems and reporting errors.

291.    PwC's conduct proximately caused damages to the Fund.

- 89 -

DOCS\472931v1

## SEVENTH CAUSE OF ACTION

### Breach of Contract
### Against PwC

292.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth

herein.

293.    As previously set forth, the Fund retained PwC as its external auditor.

294.    PwC was retained by the Fund to ensure that the financial information conveyed

by the Fund was presented in conformity with GAAS/ISA, IAS, and IFAS.

295.    PwC accepted the engagement and in connection therewith, PwC provided the

Fund with one or more engagement letter(s) confirming the parameters of the engagement.

296.    AU § 311.09 states that an understanding with the client regarding an audit of the

financial statements includes the following auditor responsibilities:

- The auditor is responsible for conducting the audit in accordance with generally accepted auditing standards.  Those standards require that the auditor obtain reasonable rather than absolute assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.

- An audit includes obtaining an understanding of the entity and its environment, including its internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures.  An audit is not designed to provide assurance on internal control or to identify significant deficiencies.  However, the auditor is responsible for ensuring that those charged with governance are aware of any significant deficiencies that come to his or her attention.

297.    Additionally, ISA outlines the following auditor responsibilities:

- The auditor will conduct the audit in accordance with International Standards on Auditing (or refer to relevant national standards or practices). Those Standards require that the auditor plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as

- 90 -

well as evaluating the overall financial statement presentation. ISA 210 Appendix 1.

- The auditor should obtain an understanding of the entity and its environment, including its internal control, sufficient to identify and assess the risks of material misstatement of the financial statements whether due to fraud or error, and sufficient to design and perform further audit procedures. ISA 315.2.

298.    PwC breached its contracts with the Fund, because it did not perform audits of the Fund in accordance with GAAS/ISA, IAS, and IFRS. It also failed to obtain an appropriate understanding of internal control and permitted the financial statements of the Fund for 2005-2007 to be issued in violation of GAAS/ISA, IAS, and IFRS.

299.    At least for the years ending December 31, 2007 and December 31, 2006, PwC failed to apprise the Fund, among other things, that:

a.    The Fund's internal controls were virtually nonexistent, at least with respect to the asset confirmation function, which was critical to the Fund; and

b.    The Fund Defendants were disregarding stated due diligence and continued monitoring policies.

300.    As a direct result of PwC's breach of contract, the Fund suffered and will continue to suffer damages.

## EIGHTH CAUSE OF ACTION

### Negligent Misrepresentation
### Against PwC

301.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

302.    PwC owed a direct duty to the Fund to provide the Fund with correct, accurate and complete audit opinions.

- 91 -

303.   PwC knew that its audit opinions were crucially important to the Fund's business and that the Fund intended to, and did, rely on the audit opinions.

304.   PwC knew that if the audit opinions were false or erroneous, the Fund would suffer significant pecuniary damages.

305.   PwC breached its duty to the Fund because its audit opinions were false and/or erroneous.  Said breaches of PwC's duties resulted from its negligence and carelessness.

306.   The Fund suffered and will continue to suffer damages as a direct and proximate result of PwC's breach of its duties to the Fund.

## NINTH CAUSE OF ACTION

**Unjust Enrichment Against Defendants FG Limited, FG Bermuda, FG Advisors, Citco Europe, Citco Bank, And Citco Global**

307.   Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

308.   FG Limited and FG Bermuda have received as compensation Management Fees and Performance Fees to perform certain duties which they did not perform, and have been unjustly enriched thereby.

309.   FG Limited and FG Bermuda were paid Placement Fees to perform certain duties which they did not perform, and have been unjustly enriched thereby.

310.   FG Bermuda and FG Limited were paid a fee to provide managerial services to the Fund.  Upon information and belief, the Investment Manager shared in the Management Fees and Performance Fees paid to the Placement Agent.  The Investment Manager was paid these fees to perform certain duties which it did not perform, and it has been unjustly enriched thereby.

- 92 -

311.    Upon information and belief, FG Advisors was paid a portion of the fees paid to the Investment Manager and/or Placement Agent in exchange for FG Advisor's assistance in the selection, due diligence and monitoring of the Fund's manager, BMIS.  FG Advisors was also paid expense reimbursements in consideration of FG Advisors providing certain administrative services and back-office support to the Fund.  FG Advisors was paid these fees to perform certain duties which it did not perform, and it has been unjustly enriched thereby.

312.    The Administrator, Citco Europe, received a monthly fee based on the net asset value of the Fund as of the last business day of each month at commercially reasonable rates. The Administrator was paid these fees to perform certain duties, which duties the Administrator did not perform accurately, and it was unjustly enriched thereby.

313.    The Custodians of the Fund, Citco Bank and Citco Global, were paid certain fees for acting as Custodians of the Fund's assets.  Citco Bank and Citco Global were paid these fees to perform certain duties which they did not perform, and they have been unjustly enriched thereby.

314.    In addition, the fees paid to the Fund Defendants that were based on net asset value were inflated, because the net asset value of the Fund and its shares was inflated, which inflation the Fund Defendants were responsible for via the wrongful conduct as alleged above, and they have been unjustly enriched thereby.

315.    Under these circumstances, FG Bermuda, FG Limited, FG Advisors, Citco Europe, Citco Bank and Citco Global have been unjustly enriched and, in equity and good conscience, should be made to return their unjustly gained monies.

- 93 -

WHEREFORE, Plaintiffs demand judgment and preliminary and permanent relief, including preliminary and permanent injunctive relief, in Plaintiffs' favor and in favor of Fairfield Sentry, as appropriate, against all Defendants as follows:

      a.     authorizing the maintenance of this action as a derivative action, with the Plaintiffs as derivative plaintiffs;

      b.     awarding compensatory damages against Defendants, individually and severally in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

      c.     imposing a constructive trust upon all monies received, directly or indirectly, by Defendants from the Fund;

      d.     requiring Defendants to return to the Fund all monies paid to them by the Fund;

      e.     awarding Plaintiffs the costs and disbursements of this action, including reasonable allowances for Plaintiffs' attorneys' and experts' fees and expenses; and

      f.     granting such other or further relief as may be just and proper under the circumstances.

- 94 -

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

May 15, 2009

MILBERG LLP

By: _____
     Robert A. Wallner
     Kent Bronson
     Kristi Stahnke McGregor
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
rwallner@milberg.com
kbronson@milberg.com
kmcgregor@milberg.com

Stephen A. Weiss
James A. O'Brien III
Christopher M. Van de Kieft
SEEGER WEISS LLP
One William Street
New York, NY 10004
(212) 584-0700
sweiss@seegerweiss.com
jobrien@seegerweiss.com
cvandekieft@seegerweiss.com

*Attorneys for Plaintiffs*

DOCS\472931v1

Index No. 60151    Year 20 09

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK.

MORNING MIST HOLDINGS LIMITED and MIGUEL
LOMELI,

Plaintiffs,

v.

FAIRFIELD GREENWICH GROUP, et al.,

Defendants,

And

FAIRFIELD SENTRY LIMITED,

Nominal Defendant

SUMMONS AND SHAREHOLDERS'
DERIVATIVE COMPLAINT

## MILBERG LLP

Attorneys for   *Plaintiffs*

*Office and Post Office Address, Telephone*
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

To

Attorney(s) for

Service of a copy of the within                    is hereby admitted.

Dated,
........................................

Attorney(s) for

SPECIAL  Blumberg Excelsior Inc., NYC 10013