# Exhibit B

**REDACTED**

## CUSTOMER CLAIM

Claim Number_____

Date Received_____

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008

(Please print or type)

Name of Customer: David I. Ferber SEP IRA
Mailing Address: 530 Fifth Avenue, 23rd Floor
City: New York                State: New York          Zip: 10036
Account No.: 1-G0092-3 and 1-G0092-4  ( SEE EXH. B, PAR. 13)(SEE ALSO EXH. A)
Taxpayer I.D. Number (Social Security No.):   7352

NOTE:    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY
THE ACCOMPANYING INSTRUCTION SHEET. A SEPARATE CLAIM FORM
SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL
PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE
RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009. CLAIMS
RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE
SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS
LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY
CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

*************************************************************************

1.    Claim for money balances as of **December 11, 2008:**

a.    The Broker owes me a Credit (Cr.) Balance of          $ 0.00

b.    I owe the Broker a Debit (Dr.) Balance of          $ 0.00

c.    If you wish to repay the Debit Balance,

please insert the amount you wish to repay and

attach a check payable to "Irving H. Picard, Esq.,

Trustee for Bernard L. Madoff Investment Securities LLC."

If you wish to make a payment, **it must be enclosed**

with this claim form.          $ 0.00

d.    If balance is zero, insert "None."          None

2.      Claim for securities as of **December 11, 2008**:

**PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.**

|   |   | YES | NO |
|---|---|---|---|
| a. | The Broker owes me securities | ✓ | |
| b. | I owe the Broker securities | | ✓ |

c.      If yes to either, please list below:

| Date of Transaction (trade date) | Name of Security | The Broker Owes Me (Long) | I Owe the Broker (Short) |
|---|---|---|---|
| | | Number of Shares or Face Amount of Bonds | |
| See Exhibits A and B. | | | |
| $431,215 per October 2008 Greenwich Sentry L.P. statement | | | |
| attached hereto as Exhibit A. | | | |
| | | | |
| | | | |

**Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.**

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.
**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.**

502180406                                    2

**NOTE:** **IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.**

|  |  | YES | NO |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. |  | ✓ |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? |  | ✓ |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? |  | ✓ |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) |  | ✓ |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. |  | ✓ |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. |  | ✓ |
| 9. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? if so, give name of that broker. |  | ✓ |

Please list the full name and address of anyone assisting you in the preparation of this claim form: Kristi Stahnke McGregor & Kent Bronson, Esqs., Milberg LLP, One Pennsylvania Plaza, New York, NY 10119

502180406

3

If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate your claim is an estimated claim.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date __June 9, 2009__    Signature _____

Date _____    Signature _____

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, e.g., corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

**This customer claim form must be completed and mailed promptly, together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

# EXHIBIT A



**CITCO**

*Citco Fund Services
(Europe) B.V.*

## GREENWICH SENTRY, L.P.
### FOR THE CALENDAR MONTH OF OCTOBER 2008
### (EXPRESSED IN US DOLLARS & UNAUDITED)

Ferber Chan & Essner, LLP
530 Fifth Avenue, 23rd Floor
New York, NY 10036-5101
United States
E-Mail: ferber@ferberchan.com

Capital Account Statement for :  David I. Ferber, SEP IRA

|  | | October | | Year-to-Date |
|---|---|---|---|---|
| Beginning Equity | $ | 430,583 | $ | 388,140 |
| Capital Additions | | - | | 18,884 |
| Capital Withdrawals | | - | | - |
| Profit/(Loss) * | | 632 | | 24,191 |
| Ending Equity | $ | 431,215 | $ | 431,215 |

\* Net results reflect the deduction of all operational expenses (including brokerage commissions), management fees and potential profit allocation to the General Partner.

Inquiries may be directed to the Sub-Administrator, Citco (Canada) Inc., by phone to 416-969-6700, by fax to 416-966-0925 or by email to irton@citco.com.

Telestone 8 - Teleport
Naritaweg 165
P.O. Box 7241
1007 JE Amsterdam
The Netherlands

amsterdam-fund@citco.com
www.citco.com

Phone: +31 (0)20 572 2850
Fax:  +31 (0)20 572 2610
Chamber of Commerce: 33253773

ROBSON FERBER FROST CHAN & ESSNER, LLP
530 FIFTH AVENUE
NEW YORK, NEW YORK 10036-5101

TEL: (212) 944-2200
FAX: (212) 944-7630
e-mail: ferber@robsonferber.com

November 8, 2001

<u>VIA FACSIMILE 303-294-5764 and
FIRST CLASS MAIL</u>

First Trust Corporation
717 17th Street
Suite 2600
Denver, Colorado 80202-3323

Attention: Tony

      Re:   <u>SEP IRA Transfer</u>

Dear Sirs:

    I am enclosing an original completed IRA application and the IRA
Transfer/Rollover form, intended to transfer to you for investment into Greenwich
Sentry, L. P. the sum of $190,630 from my SEP IRA at Morgan Stanley. Please call me
if there are any questions. The original of this letter and of the forms are being mailed to
you together with my check in the amount of $25 in payment of the Establishment Fee.

                Very truly yours,

                David I. Ferber

DIF:alg
Enclosure



REDACTED

**REDACTED**

**Please do not use this form for a Roth or an Education IRA.**

**FIRST TRUST**
Another Resource From Fiserv

First Trust Corporation
717 17th St., Suite 2600
Denver CO 80202-3323
303-293-2223
1-800-525-8188
Please direct mail to:
P.O. Box 173301, Denver CO 80217-3301

# IRA Transfer/Rollover Form

*Please type or print in black ink. Complete all sections or your request may be delayed. For transfers or rollovers into a business plan, use the Qualified Business Retirement Plan Transfer/Rollover Form.*

### Section 1 – Current (Resigning) Trustee Information *Complete for Transfers and Direct Rollovers*

Current Trustee: Richard Greenspan, Sr.VP, Morgan Stanley

Mailing Address: 330 Madison Avenue

City / State / Zip: New York, N.Y. 10017

Current Trustee Account Number: 227

Telephone (include area code): (212) 883-7754

### Section 2 – IRA Owner Information

Your Name: DAVID I. FERBER

Mailing Address: 530 FIFTH AVENUE, 23 flr.

City / State / Zip: NEW YORK, NY. 10036

First Trust Account #:

Social Security #:

Date of Birth: 07-31-42

Telephone (home) 212 254 9034    (business) 212 944 2200

### Section 3 – Transfer/Direct Rollover/Rollover Option *This will be a (choose one)*

☑ **Transfer:** Describes the movement of assets directly between IRA Trustees without distribution to the individual. As such, no tax forms are generated by either Trustee.

☐ **Direct Rollover:** Describes a movement of cash and/or assets that takes place directly between the Trustee of a business retirement plan (such as a profit sharing, money purchase, defined benefit, etc.), or the administrator of a 403(a) or (b) annuity, and the Trustee of an IRA. By directly rolling an eligible rollover distribution to this First Trust IRA (as opposed to receiving an outright distribution as described below under "Rollover"), the individual can avoid the mandatory 20% federal income tax withholding imposed on such distributions.

☐ **Rollover:** Describes a cash and/or asset contribution to an IRA by an individual within sixty (60) days of receipt of the eligible rollover distribution. To make a rollover, the individual must have received an eligible distribution outright. The individual may roll over all or any part of the actual amount received and, if the distribution was from a business retirement plan or 403(a) or (b) annuity (thus subject to the mandatory 20% federal income tax withholding), he/she may roll over up to 100% of the distribution by making up the 20% difference that was previously withheld.

### Section 4 – Asset List and Instructions. *This will be a (choose one):* ☐ Complete **OR** ☐ Partial

With this form please provide a copy of your most recent Trustee Account Statement.

A. ☐ Full Liquidation – Sell (liquidate all assets in my account and send the proceeds to First Trust) *(Go to Section 5.)*

| B. Cash/Money Market | Specify # of Shares To Be Liquidated or All Shares | Account Number |
|---|---|---|
| $ 190,630. | | 227 |

| C. Mutual Funds/Stocks/ Limited Partnerships | Type of Security (i.e., mutual fund, stock, LP) | Specify # of Shares or All Shares | Sell | or | Transfer In Kind | Account Number |
|---|---|---|---|---|---|---|
| | | | ☐ | or | ☐ | |
| | | | ☐ | or | ☐ | |
| | | | ☐ | or | ☐ | |

| D. Annuities | Value | Surrender | or | Change of Ownership | Contract (Policy) Number |
|---|---|---|---|---|---|
| | | ☐ | or | ☐ | |

| E. Other Securities | Number of Shares | Sell | Transfer In Kind |
|---|---|---|---|
| | | ☐ | ☐ |
| | | ☐ | ☐ |
| | | ☐ | ☐ |

© First Trust Corporation, 2001    3 of 4    IRA-1752 (rev. 3/01)

## IRA Transfer/Rollover Form (continued)

**Section 5 - Signatures**

I certify that I have read the applicable section for the transaction I have chosen and understand and agree to all the terms thereunder. In the case of a transfer or direct rollover, the current Trustee is authorized to send cash and/or assets to First Trust Corporation as specified. In the case of a rollover, I understand it is my sole responsibility to determine the validity of any rollover contribution and to initiate and make such rollover deposit. I hereby agree to indemnify and hold harmless First Trust Corporation and its officers, directors, shareholders, agents and employees for any and all costs, obligations, losses, claims, damages and expenses (including reasonable attorney's fees) related to or associated with its agreement to accept the above-referenced assets.

Account Owner's
Signature  **X** _____

Date  November 8, 2001

Most Trustees require a Signature Guarantee. Please have your signature Guaranteed prior to submitting this request to First Trust Corporation.

Signature Guaranteed by
**X** _____

Name of Firm or Bank

Signature
of Officer  **X** _____

Title of Officer _____

**Section 6 - Acceptance by First Trust Corporation**

(To be completed by First Trust.) First Trust hereby accepts the appointment as Trustee of the assets listed. This acceptance is not to be construed as validation of any rollover or direct rollover contribution, if any.

First Trust Corporation by
**X** _____

Title _____

Date _____

---

### Delivery Instructions

**Tax Identification Number 84-0519832**

| | |
|---|---|
| **Make Checks Payable to** | First Trust Corp<br>FBO (client's name), IRA#<br>P.O. Box 173301<br>Denver, CO 80217-3301 |
| **Overnight Delivery Address** | First Trust Corp<br>FBO (client's name), IRA#<br>717 17th Street, Suite 2600<br>Denver, CO 80202-3323 |
| **Wiring Instructions for Cash** | Bank of New York<br>ABA #021000018<br>For Credit to: First Trust Corporation<br>A/C # 8900382740<br>For Further Credit to: Client's Full Name<br>A/C # (Client's First Trust Account No.) |
| **Send and Register Physical Securities and Limited Partnerships to** | First Trust Corp TTEE<br>FBO (client's name), IRA#<br>P.O. Box 173301<br>Denver, CO 80217-3301 |
| **Mutual Fund Reregistration Instructions** | First Trust Corp TTEE<br>FBO (client's name), IRA#<br>P.O. Box 173301<br>Denver, CO 80217-3301<br><br>Tax ID Number 84-0519832 | Broker/Dealer _____<br>Account Executive _____<br>Address _____ |
| **DTC Eligible Securities** | DTC #00902<br>First Trust's Institutional #93287<br>Agent Account #054337<br>Client Name _____<br>FTC Account # _____ |

# Traditional IRA Application

## FIRST TRUST

*Another Resource From Fiserv*

First Trust Corporation
717 17th Street, Suite 1700
Denver, Colorado 80202-3323
303-293-2223
1-800-525-8188

Please direct mail to:
P.O. Box 173301
Denver, CO 80217-3301
www.firstrust.com

### Things To Do To Complete This Application

1. Read the following Instructions.
2. Complete the Traditional IRA Application. Please be sure to supply all of the information requested and sign the Application.
3. Make a copy of your completed Application for your records.
4. Detach the Application from this booklet and send it to First Trust at the address above. Or, you may follow the faxing instructions below. Attach your check(s) for your contribution amount and the plan establishment fee to the Application.
5. Keep the Instructions, your copy of the Application and the Plan and Trust Agreement and Disclosure Statement for your records. All of these documents tell you what you can expect from First Trust as your Trustee and what is expected of you as an IRA Participant. They constitute your agreement with First Trust for your Traditional IRA.

### April Deadline

Your signed Application must be received by First Trust Corporation ("First Trust") in Denver on or before your tax-filing due date, with no extensions (generally April 15"), to be eligible to receive contributions for that tax year. You may also transmit the completed and signed Application by facsimile telecopier ("fax") to 303-294-5764 by midnight (Mountain time) on your tax-filing due date only. If you transmit your Application by fax on your tax-filing due date, your *original* Application must then be received by First Trust in Denver no later than the following business day.

However, your contribution check must still be postmarked to First Trust on or before your tax-filing due date (no extensions).

## Instructions for Traditional IRA Application

### Account Owner Information

Please type or print clearly the information requested in the space provided. You, as the IRA "Account Owner," are referred to as the "Participant" throughout the IRA Plan and Trust Agreement.

### Beneficiary Designation

If you die before your IRA balance has been fully distributed, your IRA will be distributed to your designated primary beneficiary(ies), or, if deceased, to your designated contingent beneficiary(ies). You may designate as many beneficiaries, contingently or successively, as you wish; use a separate sheet of paper if necessary. If your spouse is not your primary beneficiary and if the IRA includes or will include property in which your spouse possesses a community property interest, have your spouse complete and sign the Spousal Consent on the IRA Application. If you do not make a beneficiary designation, your IRA will be distributed according to the default provisions of the IRA Plan and Trust Agreement.

### Financial Representative Information

Your Financial Representative (F/R) should help complete this portion of the Application. Please indicate the F/R, if any, whom you are authorizing to execute transactions for your account according to the "Terms and Conditions of Appointment of Financial Representative."

### Terms and Conditions of Appointment of Financial Representative:

By execution of the Adoption Agreement, the named F/R has been designated subject to the following terms and conditions:

1. The F/R is the authorized agent of the Account Owner and is not an agent of First Trust.
2. The F/R is authorized to execute transactions for the plan and to direct First Trust to execute transactions for the plan on behalf of an Account Owner. Such direction may include making or receiving payment pursuant to the F/R's investment directions or upon receipt of security transaction confirmations.
3. First Trust shall be fully protected in relying on and acting on any notice, instruction, direction or approval received from the F/R. First Trust shall be under no duty to make any investigation or inquiry with respect to any notice, instruction, direction or approval received from the F/R.
4. Account Owner may remove an F/R by written notice to First Trust on the form provided by First Trust; however, the removal of an F/R shall not have the effect of canceling any notice, instruction, direction or approval from that F/R received by First Trust before First Trust receives the written notice of the removal of the F/R.
5. Account Owner may designate a new F/R by written notice to First Trust on the form provided by First Trust; however, First Trust shall not rely and/or act on any notice, instruction, di-

rection or approval from the designated F/R received by First Trust before First Trust receives the written notice of the designation of the F/R.

6. First Trust shall have no liability for any loss or diminution of the plan assets resulting from the changes in the market value of an asset; or resulting from reliance or action taken in reliance upon notice, instruction, direction or approval received from an Account Owner or the F/R; or by reason of any exercise or failure to exercise investment direction authority by an Account Owner or by the F/R; or by reason of First Trust's refusal on advice of counsel to act in accordance with any exercise of investment direction by an Account Owner or the F/R; or by reason of any other act or failure to act by an Account Owner or by the designated F/R; or by reason of any prohibited transaction or plan disqualification occurring as a result of any action taken or not taken by First Trust in reliance on direction from an Account Owner or the F/R.

7. The Account Owner by execution of this Appointment waives and will hold First Trust harmless from any and all claims including but not limited to damages, court costs, legal fees and costs of investigation arising as a result of changes in the market value of any asset; resulting from reliance or action taken in reliance upon notice, instruction, direction or approval received from an Account Owner or the F/R; or by reason of any exercise or failure to exercise investment direction authority by an Account Owner or by the F/R; or by reason of First Trust's refusal on advice of counsel to act in accordance with any exercise of investment direction by an Account Owner or the F/R; or by reason of any other act or failure to act by an Account Owner or by the F/R; or by reason of any prohibited transaction or plan disqualification occurring as a result of any action taken or not taken by First Trust in reliance on direction from an Account Owner or the F/R.

8. First Trust shall reflect the name and business address of the Account Owner's designated F/R (if any) on each quarterly account statement and shall assume the F/R information reflected on the account statement is accurate unless the Account Owner and/or the F/R notifies First Trust in writing of the discrepancy within 90 days of the date on the account statement.

## Plan Information

### IRA

This is a Traditional IRA for individuals who wish to make regular annual cash contributions (deductible and/or nondeductible) to an IRA. This IRA can also be used as a spousal IRA; however, a separate IRA must be established for each spouse and each spouse must complete a separate Application. Spousal IRAs may not be combined for investment purposes. This IRA can also hold an eligible rollover distribution from a qualified business retirement plan or rollover from another IRA. A First Trust IRA Transfer /Rollover Form, providing written rollover designation, must be completed if you wish to roll over assets other than cash.

### IRA SEP

This is a Traditional IRA established to receive employer contributions under a Simplified Employee Pension Plan. In order for employer contributions to be considered valid, the employer must complete and sign an IRS Form 5305-SEP or a SEP prototype before contributing to the IRA. Employee contributions (i.e., regular annual cash contributions) can also be made to this IRA.

Details such as contribution limits and contribution deductibility are discussed in the IRA Disclosure Statement included in this Application. If you have questions or require more detail, please contact your F/R, or read IRS Publication 590 – Individual Retirement Arrangements (IRAs).

### Transfer/Rollover

If you have an IRA at another Trustee, you may move those assets to your First Trust IRA by completing and attaching a First Trust IRA Transfer/Rollover Form. This form also includes a definition of a direct rollover.

## IRA Features and Fees

Your choices for IRA features and First Trust's IRA fee schedules are included with these Instructions. Choose the IRA that best fits your needs by checking the appropriate box in this section of the Application. If you choose the FocusPlus IRA, please complete and attach the First Trust FocusPlus Authorization form to the IRA Application. If no box is marked, your IRA will be covered by the Focus IRA fee schedule unless you purchase, transfer or roll over assets which are not allowed under the Focus IRA. When the plan has been accepted by First Trust, you will receive an Account Establishment Confirmation letter showing your First Trust account number and account information. Once your IRA has been accepted, trading can begin. Each quarter you will receive an account statement showing the reported value of your assets, all transactions that have taken place and all fees that have been charged. (See the "First Trust Valuation Reporting Policy.") Unfunded accounts and accounts with zero value continue to incur quarterly administration fees. Earnings on your contributions will be paid directly to your IRA, where they will accumulate tax-deferred until withdrawn.

## Cash Investment Option

First Trust will automatically deposit all contributions, rollovers, transfers, earnings and other cash into the selected option upon receipt of any cash. Under either option, your cash is available whenever needed for other investments, as directed by you or your designated F/R. The First Trust Money Market Account is a money market savings account which pays a competitive rate of interest which may be adjusted weekly to market conditions. Rate information can be obtained by calling 1-800-441-9931 for Account Owners outside Colorado, or 1-800-842-9109 in Colorado. Funds in the Money Market Account are invested in a portfolio of professionally-managed, well-diversified securities. First Trust also offers the First Trust Passbook Savings Account as a cash option.

## Telephone Trading Authorization and Recorded Phone Lines

By checking the "yes" box on the IRA Application, you authorize First Trust to honor eligible transaction requests in your retirement account that are placed by telephone. When requesting a transaction by telephone, First Trust must be provided with your Social Security number for identification purposes and you agree that First Trust is not responsible for determining whether or not a caller is authorized, other than verifying that such caller has provided your Social Security number as reflected in First Trust's records. It is important to keep your First Trust account number and your Social Security number confidential so that unauthorized transaction requests cannot be made in your account by telephone. You further agree that First Trust is not responsible for unauthorized transactions in your account that were placed by telephone.

Transaction requests may include the purchase, liquidation or exchange of mutual funds. All transaction requests on nonmutual fund assets must be submitted on a First Trust Investment Authorization form and must be signed by the Account Owner or the Account Owner's designated agent.

First Trust reserves the right not to honor transaction requests by telephone if you do not have Telephone Trading Authorization on file with First Trust, if there are insufficient funds or shares in the account, or if First Trust receives incomplete information to process the requested transaction.

First Trust has automatic telephone recording equipment on certain telephone lines used by Account Service Agents who handle trading functions and client inquiries. By signing the IRA Application, you give First Trust consent to record and play back such calls.

## Check Enclosure Summary
### (Contribution Description)

Please attach your check(s) for the amount of your contribution and the $25 establishment fee securely to the Application. You must indicate the tax year for each "regular" IRA contribution made. In the case of spousal IRAs, you may combine the establishment fees and contributions in one check, as long as you include clear, specific instructions about how the funds are to be allocated between the two accounts. You may wish to include a separate sheet showing allocation. If you are making a cash rollover contribution, please show the amount of cash to be included.

## Acknowledgement and Signature

Sign and date the Application. Make a copy of the completed Application and keep it, the Instructions (including the fee schedule), the IRA Plan and Trust Agreement and the IRA Disclosure statement for your records. Staple the Application to your check(s) for the establishment fee and contribution, and the Investment Authorization form or transfer/rollover form, if applicable. Trading cannot begin until a First Trust account number has been assigned. Remember, if you are establishing a spousal IRA, each spouse must complete a separate set of documents and each pay the $25 establishment fee.

Send to:  First Trust Corporation
P.O. Box 173301
Denver, Colorado 80217-3301

If you have questions regarding the establishment of your account, call First Trust's Telemarketing Services Group at 1-800-525-2124, ext. 5116, or, in Colorado, call 303-293-2223, ext. 5116, or 1-800-233-0407, ext. 5116 (outside of Denver).

## Administratively Feasible Investment Policy/Special Fees for Focus, Spectrum and Jumbo IRAs
### (Effective April 1, 1999)

Basic guidelines for this policy are set by the IRS; other investment restrictions are set by First Trust for administrative purposes. We reserve the right not to honor an Account Owner's investment authorization if adequate information has not been provided or if First Trust cannot meet special administrative requirements of the investment. Please refer to the valuation reporting policy and special investment authorization forms for illiquid assets as defined herein. First Trust does not recommend or comment on the investment merits or management of any administratively feasible investment identified herein.

### The First Trust Money Market Account *(Focus, Spectrum and Jumbo cash investment option)*

The FDIC-insured First Trust Money Market Account is available as an Account Owner designated cash investment option. The program provides for automatic deposits and withdrawals of account balance. Rate information is available by calling First Trust at 1-800-441-9931 (outside Colorado) or 1-800-842-9109 (within Colorado).

### First Trust Passbook Savings *(Focus, Spectrum and Jumbo cash investment option)*

The FDIC-insured account pays a competitive interest rate based on local market conditions.

### Mutual Funds *(Focus, Spectrum and Jumbo IRAs)*

Mutual fund purchases and liquidations will be processed upon First Trust's receipt of the Account Owner's instructions. Jumbo accounts may invest only in non-money market mutual funds.

### Publicly-Traded Securities *(Spectrum and Jumbo IRAs)*

Publicly-traded securities with price quotes readily obtainable from a recognized securities exchange, the Nasdaq, or over-the-counter "pink sheets" may be purchased through the Account Owner's brokerage firm. First Trust must receive a copy of the trade confirmation in time to make a payment by settlement date.

### New Issues Registered with the SEC *(Spectrum IRAs only)*

New issues registered with the SEC for interstate sales are "administratively feasible investments" if, after the underwriting period, they meet the requirements of a publicly-traded security.

### Dividend Reinvestment Programs *(Focus and Spectrum IRAs)*

Dividend reinvestment programs (DRPs) of common stock will be purchased by First Trust (generally, working with the issuing company/transfer agent) upon receipt of written instructions from the Account Owner or the Account Owner's designated agent.

### Treasury Issues *(Spectrum IRAs only)*

Treasury bills, notes or bonds may be purchased by First Trust upon receipt of written instructions, from the Account Owner or Account Owner's designated agent.

### Listed Put and Call Options *(Spectrum IRAs only)*

Listed put and call options are permitted when Account Owners and their authorized F/R have completed First Trust's "Option Agreement and Release" form. Trading is limited to the cash purchase and subsequent sale or exercise of United States stock options listed on a recognized exchange (but not index options). Covered call writing is also allowed (if sufficient shares of the underlying stock are owned), but the writing of put contracts is strictly prohibited. A $50 fee may be assessed to Spectrum IRAs which violate First Trust's "Option Agreement" by or through writing naked calls, writing put options, selling assets "short," trading index options, trading in a margin account and/or trading options without first executing First Trust's "Option Agreement and Release" form.

### Certificates of Deposit *(Spectrum IRAs only)*

Certificates of deposit issued by commercial banks or savings and loans which are able to provide First Trust with quarterly updates of accrued interest may be purchased upon receipt of written instructions from the Account Owner or Account Owner's designated agent. Upon maturity, First Trust should receive written instructions as to how to proceed.

### Annuities *(Focus, Spectrum and Jumbo IRAs)*

Fixed and variable annuities issued by commercial insurance companies will be purchased by First Trust upon receipt of the "Investment Authorization" form and annuity application completed by the Account Owner or Account Owner's designated agent. First Trust should be named as owner and beneficiary, and the Account Owner should be named as the annuitant.

**Instructions for IRA Application** *(continued)*

### Real Estate Investment Trusts *(Focus and Spectrum IRAs)*

Real estate investment trusts (REITs) must meet certain administrative requirements before they can be held in a First Trust retirement plan. Any such requirement or information must be provided by the investment sponsor. First Trust does not conduct due diligence and does not review or retain investment related information. Any required subscription or enrollment documents must be provided by the Account Owner along with an "Investment Authorization" form signed by the Account Owner or the Account Owner's designated agent. If and when the offering is publicly traded, First Trust will require additional handling instructions from the Account Owner's authorized F/R or investment sponsor. Publicly-traded REITs may be purchased in Jumbo IRAs. The value of private REITs is not included in any asset value fee.

### Limited Partnership Interests *(Focus and Spectrum IRAs)*

Limited partnership interests must meet certain administrative requirements before they can be held in a First Trust retirement plan. Any such requirement or information must be provided by the general partner. First Trust does not conduct due diligence and does not review or retain investment related information. Any required subscription or enrollment documents must be provided by the Account Owner along with an "Investment Authorization" form signed by the Account Owner or the Account Owner's designated agent. The value of limited partnerships that are not service priced is not included in any asset value fee.

### Deeds of Trust *(Spectrum IRAs only)*

The participant must complete First Trust's "Deed of Trust Checklist" before purchasing or transferring a trust deed. An independent third party servicing agent (not First Trust) must be designated to service the deed and enforce default proceedings if necessary. An annual fee of $125 ($31.25 quarterly) will be assessed for each trust deed held and additional requirements are noted on the Checklist. The value of deeds of trust is not included in any asset value fee.

### United States Gold and Silver Coins *(Spectrum IRAs only)*

Account Owners may request First Trust to purchase U.S. minted gold and silver coins (as allowed by law) by completing First Trust's "Gold and Silver Coin Investment Authorization" form. An annual fee of $25 ($6.25 quarterly) will be assessed for each type of coin held. Further fees may be assessed by the gold dealer, and storage and insurance fees are to be directly remitted to the gold dealer by the Account Owners. Rollovers and transfers of such coins are not allowed. First Trust cannot accept physical delivery of the coins. The value of coins is not included in any asset value fee.

### Private/Restricted Equity and Debt Instruments *(Spectrum IRAs only)*

Private offerings must meet certain administrative requirements before they can be held in a First Trust retirement plan. Any such requirement or information must be provided by the investment sponsor. First Trust does not conduct due diligence and does not review or retain investment related information. Any required subscription or enrollment documents must be provided by the Account Owner along with an "Investment Authorization" form signed by the Account Owner or the Account Owner's designated agent. Private debt instruments require an independent third party servicing agent (not First Trust). The value of private assets is not included in any asset value fee.

### Secondary Market Transactions *(Focus and Spectrum IRAs)*

Illiquid assets may be bought/sold between "disinterested" parties provided Account Owners complete First Trust's "Secondary Market Investment Authorization" form. A $25 fee will be assessed for each secondary market transaction. Further instructions are noted on the form.

### Illiquid Asset Holding Fee List

The following assets have been identified as "illiquid," and are subject to special holding and reregistration fees instead of an asset value fee (see Traditional IRA fee schedules):

• Private Real Estate Investment Trusts
• Limited Partnerships that are not service priced
• Limited Partnership Notes
• Deeds of Trust
• U.S. Minted Gold and Silver Coins
• Private/Restricted Equity or Debt Instruments
• Offshore investments (subject to restrictions and extraordinary fees)
• Other Miscellaneous Assets

### The following investments may not be permitted within First Trust's IRA plans:

Commodities and/or commodity futures contracts; short sales or positions; margin accounts and/or debit interest; real property (except as part of a preceding "administratively feasible" investment); precious metals, stones, jewelry, art objects and other "collectibles" (except as part of a preceding "administratively feasible" investment); foreign currencies and securities (unless traded ADR); index options, life insurance; general partnerships; joint ventures; working interests; loans to third party individuals; "S" corporation stock; private debt instruments without a Trust Indenture or Servicing Agreement; assets purchased on installment; and bank-sponsored money market accounts.

## First Trust Valuation Reporting Policy

Each account statement you receive reflects the reported value of your assets, all transactions that have taken place and all fees (if any) that have been charged. First Trust reports the value of account assets as accurately as possible using the resources available to it. The values listed on your First Trust account statement may differ from the values listed on your brokerage account or other investment sponsor statements.

Individual values for securities that have publicly-quoted prices are reported based solely on such quoted prices, which are obtained from a quotation service or other source generally available to the public. First Trust does not guarantee the accuracy of prices obtained from quotation services, nor the length of availability of such prices.

Values for illiquid assets are generally reported at their original offering price to investors. First Trust classifies illiquid assets into two types: illiquid equity investments and illiquid debt investments. Investments that First Trust has classified as illiquid equities include, but are not limited to, Non-Service Priced Limited Partnerships, Private Common and Preferred Stocks, and Private Real Estate Investment Trusts. On an annual basis (or more frequently, if requested), First Trust requests updated valuation information from such persons as general partners of limited partnerships, officers of private corporations and sponsors of other assets it has classified as illiquid equity investments. First Trust will normally adjust the reported value of an illiquid equity investment if the general partner, officer or sponsor provides First Trust with an updated value. If two

years from April 1, 1999 or the date the illiquid asset first becomes administratively feasible for First Trust (whichever is later), First Trust has not received an updated value from the asset sponsor, it will begin reporting the value as "N/A" or "Not Available." First Trust does not request updated valuation information for assets it classifies as illiquid debt investments. However, First Trust will normally adjust the reported value of an illiquid debt investment if it receives updated valuation information from the Investment Sponsor or Servicing Agent. Investments that First Trust has classified as illiquid debt include, but are not limited to, Deeds of Trust, Limited Partnership Notes, and other Private Debt Offerings. Information regarding whether an illiquid asset has been classified as equity or debt is available upon request. A "Pricing Source" code may appear on the front of your account statement indicating the source of the price(s) being reported for illiquid assets. Any changes in First Trust's valuation reporting policy will be disclosed on the back of your account statement, so please refer to the front and back of your account statement and to any inserts for important information.

First Trust does not conduct appraisals of investments and it does not seek to verify any values provided to it. The reported value of any asset may differ materially from its actual value. First Trust does not guarantee the accuracy of reported values, or whether you will be able to obtain the value indicated on your account statement in the event of a sale. Please refer to reports received from brokers, general partners, officers, or other asset sponsors (or contact these sources directly) with regard to the current operation and status of your chosen asset(s). The account statement (and the reported value therein) should not be used as a basis for making, retaining or disposing of an investment. Please contact your F/R with additional questions.

Values reported as N/A indicate that updated valuation information was not available at the time of reporting or that the asset had no value.

Note: Mutual funds and other investments sometimes pay dividends or distribute income on or shortly before quarter-end. Such transactions generally will not be reflected on the account statement until the quarter in which First Trust receives payment or confirmation from the investment sponsor verifying the transaction and share position. Please keep this in mind when reviewing your security positions and account value.

## Statement Review Period

Please review the activity and balances on your First Trust account statement for accuracy. You must report any discrepancies to First Trust in writing within 90 days of the date of the account statement. If we do not receive your written exceptions or objections within the stated period, First Trust shall be relieved of all liability for the report, act or procedure.

## Arbitration Statement

The Account Owner hereby agrees that all claims and disputes of every type and matter which may arise between the Account Owner and First Trust shall be submitted to binding arbitration pursuant to the Commercial Arbitration rules of the American Arbitration Association located in Denver, Colorado; that such arbitration proceedings and hearings shall take place only in Denver, Colorado; and that, to the extent not preempted by federal law, Colorado statutory law (including without limitation the statutes governing the award of damages in arbitration) and Colorado common law shall control during arbitration. The Account Owner expressly waives any right he/she may have to institute or conduct litigation or arbitration in any other forum or location, or before any other body, whether individually, representatively or in another capacity. Arbitration is final and binding

on the parties. An award rendered by the arbitrator(s) may be entered in any court having jurisdiction over the parties. Under the rules of the American Arbitration Association there may be no right to prearbitration discovery, including depositions or written questions and document production. The arbitrator's award is not required to include factual findings or legal reasoning, and any party's right to appeal or to seek modification of rulings by the arbitrator(s) is strictly limited.

## Privacy Policy

First Trust Corporation ("First Trust") recognizes that its customers have an expectation that First Trust and its affiliates will maintain the confidentiality of customers' nonpublic personal information. As a result, First Trust has adopted this Privacy Policy concerning information that you provide and information that is obtained in servicing your account.

Information about you is collected for purposes of administering your account or accounts with us. We collect information about you for specific business purposes and not for resale or transfer to unaffiliated parties. The information we collect, the source of the information and the purposes it is used for are explained below. If you close your account or it becomes inactive, First Trust will adhere to the privacy policies and practices described in this notice.

### Information Collected

Nonpublic personal information is collected and retained by First Trust for purposes of administering your account. It is not furnished to third parties for any purpose other than to administer the account. The information we collect can be summarized as follows:

1. *Account Establishment Information.* This is information furnished by you on forms creating your account with First Trust and its affiliated companies. Examples are your name and address, Social Security number and beneficiary designations (if applicable).

2. *Account Transaction Information.* This includes information obtained from you and the various entities that comprise the assets in your account. It includes correspondence and phone contacts with us concerning the account, account assets, and our services. If the account was transferred from another financial institution, it may contain records from that institution.

### Nonpublic Information That Is Disclosed

All information in your account may be disclosed to any person or entity you have authorized pursuant to your account establishment documents. In addition, information may be disclosed to affiliated or nonaffiliated third parties to further your goals in establishing an account with First Trust. Categories of information that are disclosed are as follows:

1. *Identifying information.* Examples of this information include your name, address and Social Security or tax identification number.

2. *Transaction information.* Examples include your directives to purchase or sell an asset in your account and the receipt of income to the account or distributions from the account.

*(Continued)*

Instructions for IRA Application *(continued)*

---

### Parties To Whom We May Disclose Nonpublic Information

First Trust may disclose both identification and transaction information to affiliated and nonaffiliated parties for the following reasons:

1. *Financial Services Providers.* Examples are brokers, transfer agents, mutual fund companies or other representatives of the seller or purchaser of the asset or a firm that provides valuations for securities.
2. *Non-financial Companies.* Examples are companies that mail reports and prospectuses to you, statement printers and tax form providers.

First Trust does not disclose nonpublic personal information about our clients to any party, except as permitted by law.

### How First Trust Protects the Confidentiality of Your Nonpublic Personal Information

First Trust and its affiliates value the trust you place in us. To maintain that trust, we have put into place safeguards to protect the privacy of your nonpublic personal information. We do not sell or trade your information with nonaffiliated companies. When information is provided to third party providers to service the account, safeguards are in place to make certain that the information is used only for the purpose it is provided.

Internally, First Trust maintains its records on secured computers. Prospective employees are screened for criminal convictions and drug use. Once hired, employees are advised of First Trust privacy policies and of the confidential nature of the information they handle. Employees are limited to accessing only that customer information that is necessary to perform their job functions.

## Traditional IRA Fee Schedules

### Focus IRA

#### Allowable Investments

First Trust's cash options, mutual funds, dividend reinvestment programs, annuities, real estate investment trusts and limited partnerships.

The following fees are applicable only as long as the account is invested in the above assets. Upon the purchase of any investment not specified as allowed, the account will be assessed an ineligible asset fee of $10 per asset. If the ineligible asset is not removed prior to the next statement period, the account will be changed to the Spectrum fee schedule and a $25 conversion fee will be assessed.

Establishment Fee          $25

#### Annual Administration Fee

$40 plus $8 for each different asset held

#### Special Maintenance Fees

Special maintenance fees will be charged for some assets, including offshore investments and limited partnership secondary market transactions. See special investment authorization forms for full disclosure.

#### Partial Withdrawal Fee

1% of asset value; a minimum of $10 and a maximum of $300, plus applicable reregistration fees.*

#### Termination Fee

1% of asset value; a minimum of $100 and a maximum of $300, plus applicable reregistration fees.*

(*) Illiquid assets will not be included in the asset value for partial withdrawal/termination fee calculations and instead will be charged a $25 per asset reregistration fee in addition to the asset value fee (or minimum) for other assets.

### FocusPlus

FocusPlus allows certain plans to have a single stock holding for a $10 per year fee in addition to regular Focus fees. To be eligible, the account must contain at least $50,000 in a single stock holding and/or cash. For additional information concerning FocusPlus, please contact First Trust's Telemarketing Services Group at 1-800-525-2124, ext. 5116.

### Spectrum IRA

#### Allowable Investments

First Trust's full "List of Administratively Feasible Investments," including First Trust's cash options, mutual funds, publicly-traded securities, new issues registered with the SEC, U.S. Treasury issues, listed put and call options, certificates of deposit, annuities, real estate investment trusts, limited partnerships, deeds of trust, U.S. minted gold and silver coins, private/ restricted equity or debt instruments and others.

Establishment Fee          $25

#### Annual Administration Fee

Based on asset value of account assets (excluding illiquid assets):

| | |
|---|---|
| Up to $10,000: | 1% of asset value, minimum $40 per year. |
| $10,001 to $75,000: | .4% of asset value in excess of $10,000. |
| More than $75,000: | .3% of asset value in excess of $75,000. |

The maximum percentage-based annual administration fee is $500.

#### Spectrum Asset Holding Fee

$10 annually ($2.50 quarterly) will be charged for each asset on the Illiquid Asset Holding Fee List (see Administratively Feasible Investment Policy). These assets will not be included in the asset value calculation for Spectrum annual administration fees, and the $10 annual fee is in addition to the annual administration fee (or minimum) for other assets.

#### Spectrum Special Maintenance Fees

Special maintenance fees will be charged for some assets, including deeds of trust, offshore investments, gold and silver coins and limited partnership secondary market transactions. See special investment authorization forms for full disclosure.

#### Partial Withdrawal Fee

1% of asset value; a minimum of $10 and a maximum $300, plus applicable reregistration fees.*

#### Termination Fee

1% of asset value; a minimum of $100 and a maximum of $300, plus applicable reregistration fees.*

(*) Illiquid assets will not be included in the asset value for partial withdrawal/termination fee calculations and will be charged a $25 per asset reregistration fee. In addition to the asset value fee (or minimum) for other assets.

### Jumbo IRA

#### Allowable Investments

First Trust's cash options, non-money market mutual funds, publicly-traded stocks and bonds, annuities and publicly-traded real estate investment trusts.

Annual administration fees are waived as long as the Jumbo IRA maintains an asset value of $100,000 or more and the account remains solely invested in the above "allowable investments." Upon the purchase, transfer or roll over into the account of any

---

## Instructions for IRA Application (continued)

investment not specified above, the account will be assessed an ineligible asset fee of $10 per asset. If the ineligible asset is not removed prior to the next statement period, the account will be changed to a Focus or Spectrum fee schedule (depending on the assets in the account), and a $25 conversion fee will be charged.

Establishment Fee                None

Annual Administration Fee        None

Partial Withdrawal Fee

1% of asset value; a minimum of $10 and a maximum $300, plus applicable reregistration fees.

Termination Fee

1% of asset value; a minimum of $100 and a maximum of $300, plus applicable reregistration fees.

### Additional Information Applicable to All Fee Schedules

#### Fee Schedule Conversions

First Trust Traditional IRA Account Owners who wish to change or "convert" their existing IRA fee schedule to the Traditional Focus, Spectrum or Jumbo IRA may request conversion at any time. To convert the account, each Account Owner must sign and date a conversion card and return the card to First Trust with a check for $25. (There is no charge to convert to a Jumbo IRA.) The conversion request will become effective the first day of the subsequent quarter following First Trust's receipt of the conversion card. Upon the purchase, transfer or rollover into the account of any investment not specified as "allowable" for the fee schedule, the account will be assessed an ineligible asset fee of $10 per asset. If the ineligible asset is not removed prior to the next statement period, the account will be changed to the appropriate fee schedule (depending on the assets in the account), and a $25 conversion fee will be charged.

#### Billing and Miscellaneous Fees

Fees (if applicable) are assessed quarterly and are not adjusted for partial quarters based on establishment or termination dates. Applicable fees are due and payable upon receipt of any fee invoice included with the quarterly statement.

If fees are not paid and cannot be deducted from available cash within 45 days, a $10 late fee will be assessed and billed to the account. Unfunded accounts and accounts with zero value continue to incur quarterly administration fees until written notice is received by the First Trust from the Account Owner on a form acceptable to First Trust, instructing First Trust to close the account.

A vault holding fee of $8 per year ($2 quarterly) will be charged under the Focus, Spectrum and Jumbo IRA fee schedules for assets held in First Trust's vault; some exceptions may apply.

First Trust reserves the right to charge for extraordinary services, and such fees are disclosed to affected clients and/or provided upon request. Fees are subject to change on 30 days' written notice.

#### $100 Account Value Minimum Requirement

If a request for distribution of cash/assets leaves a Traditional IRA balance with total cash and noncash assets of $100 or less fair market value, the account may be automatically closed and the termination fee will apply.

### Have You ...

❑ Read the Instructions?

❑ Supplied all of the information requested on the Application and signed it?

❑ Made a copy of your completed Application for your records? Remember to keep the Instructions, your copy of the Application and the Plan and Trust and Disclosure Statement for your records.

*Please complete and sign the Application starting on page 8.*

ROBSON FERBER FROST CHAN & ESSNER, LLP
530 FIFTH AVENUE
NEW YORK, NEW YORK 10036-5101

TEL: (212) 944-2200
FAX: (212) 944-7630
e-mail: ferber@robsonferber.com

November 21, 2001

Michele Gleicher
The Greenspan Group
Morgan Stanley Dean Witter
330 Madison Avenue
8th Floor
New York, New York 10017

Dear Michele:

As requested, I am returning to you copies of the outgoing wire transfer requests, authorizing the transfer of the cash funds from my SEP IRA account to a substitute SEP IRA account maintained with First Trust Corporation. As you know, copies of these documents have already been sent to you by facsimile transmission; the enclosed are original executed copies.

Many thanks.

Very truly yours,

David I. Ferber

DIF:alg
Enclosure

49425

# TERMS AND CONDITIONS

By placing on Outgoing Wire Transfer Request with Morgan Stanley, you agree to the following terms and conditions.

**RELIANCE BY MORGAN STANLEY.** You agree that Morgan Stanley may rely upon the information you have provided on the other side of this form in making your Outgoing Wire Transfer and agree that any errors in that information, including misidentification of beneficiaries, incorrect or inconsistent account names and numbers, and misspellings, are your responsibility. Morgan Stanley is authorized to charge your account, for any Outgoing Wire Transfer made by Morgan Stanley utilizing instructions indicated on the opposite side of this form even where use of these instructions may result in a person other than the final beneficiary being paid or the transfer of funds to a bank other than the final beneficiary's bank or the intermediary bank designated by you.

**TRANSFER TO FINAL DESTINATION BANK.** When you place an Outgoing Wire Transfer Request with Morgan Stanley, you must select a financial institution as the final destination bank for the transfer. The final destination bank must be a member of the Federal Reserve System or a correspondent bank of such a member, or a CHIPS (Clearing House Interbank Payment System) member.

By signing this form, you authorize all fees and charges of Morgan Stanley in executing this Outgoing Wire Transfer Request and other charges related thereto to be deducted from your account.

Once the Outgoing Wire Transfer is completed, the funds will be deposited to a particular account at the final destination bank. The final destination bank will be responsible for following your instructions and of notifying the final beneficiary that the funds are available. If you identify a final beneficiary by name and account number, the final destination bank may pay the funds to the person identified by the account number, and your payment will be final even if the account number provided does not correspond to your final beneficiary.

Once the funds are transferred to the final destination bank, the funds become the property of the final destination bank, and the final destination bank is responsible to locate, identify and make payment to your final beneficiary as per your instructions.

**CURRENCY OF TRANSFER.** Outgoing Wire Transfers are made only in U.S. dollars.

For International Outgoing Wire Transfer Requests, because of the laws of the country in which the final destination bank is located, Morgan Stanley cannot guarantee that your final beneficiary will be able to receive U.S. dollars. If your Outgoing Wire Transfer must be converted to the local currency, the final destination bank may charge a fee for this exchange. Regardless of the currency transferred, the actual amount that your final beneficiary receives may be reduced by charges imposed by the final destination bank, including those for exchanging currency.

While Morgan Stanley will make every reasonable effort to ensure that your request is properly processed, we do not guarantee that the transfer of funds will reach the final beneficiary since processing by intermediary banks may be necessary to complete the transfer.

**MEANS OF TRANSFER.** To complete Outgoing Wire Transfers, Morgan Stanley uses a variety of banking channels and facilities, but will ordinarily use electronic means. You agree that we may choose any conventional means that we deem suitable to transfer your funds to your final beneficiary.

Because we do not maintain banking relations with every bank, it may be necessary for us to use one or more intermediary banks before your funds are transferred to the final destination bank. Once we transmit your request to an intermediary bank, it will be that bank's responsibility to ensure that your request is completed.

**RECALLS/AMENDMENT.** You may recall or amend your Outgoing Wire Transfer Request only if we receive such request at a time that provides us a reasonable opportunity to act upon your request and if the funds have not already been made available to your final beneficiary or the final destination bank otherwise agrees to recall or amend your Outgoing Wire Transfer Request. If you decide that you do not want the funds transferred, Morgan Stanley will first have to check with the final destination bank to determine whether the final destination bank can return your funds. If the final destination bank confirms that the funds are returnable and the funds are returned to Morgan Stanley by the final destination bank, Morgan Stanley will recredit your Morgan Stanley account.

We need not, however, make any refund unless and until we are, in receipt of proof satisfactory to us that payment of this request has not been completed, that this request is no longer operative, that no charge by virtue of this request exists or will be made against the account upon which this request was drawn, and that any portion of that account which was charged or earmarked for payment is at our free disposal.

The amount that is returned to you may be less than you originally transferred because of service charges of the final destination bank or Morgan Stanley. Your refund will be in U.S. dollars.

**REJECTION OF A REQUEST.** We reserve the right to reject your Outgoing Wire Transfer Request. We may reject your request if you have insufficient available funds in your account, if your request is incomplete or unclear or if we are unable to fulfill your request for any other reason.

**DELAYS, NON-EXECUTION OF OUTGOING WIRE TRANSFER REQUEST.** While we will handle your Outgoing Wire Transfer Request as expeditiously as possible, you agree that Morgan Stanley will not be responsible for any delay, failure to execute or misexecution of your request due to circumstances beyond Morgan Stanley's reasonable control, including without limitation any inaccuracy, interruption, delay in transmission, or failure in the means of transmission, whether caused by strikes, power failures, equipment malfunctions, or acts or omissions of any intermediary bank or final destination bank. MORGAN STANLEY MAKES NO GUARANTEES, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER.

**CLAIMS.** You agree that within thirty days after you receive notification that your Outgoing Wire Transfer Request has been executed, you will notify us of any errors, delays or other problems related to your request. In the event that it is determined your Outgoing Wire Transfer Request is delayed or erroneously executed as a result of Morgan Stanley's error, Morgan Stanley's sole obligation to you, is to pay or refund such amounts as may be required by applicable law. In no event shall Morgan Stanley be responsible for any consequential or incidental damages or expenses in connection with your request. Any claim for interest payable by Morgan Stanley shall be at Morgan Stanley's Internal Cost of Funds rate.

In any event, if you fail to notify us of any claim concerning your Outgoing Wire Transfer Request within one year from the date that you receive notification that your request has been executed, any claim by you will be barred under applicable law.

**GOVERNING LAW.** This Agreement will be governed by the laws of the state of New York and United States federal law, as applicable.

please initial

X _____

**REDACTED**

DEAN WITTER REYNOLDS INC.

IRA DISTRIBUTION REQUEST FORM
ACCOUNT TERMINATION

## RETIREMENT PLAN OPERATIONS

| FOR BRANCH USE | RETIREMENT ACCOUNT NO. |
|---|---|
| Entered on System ___/___/___ | 1227 |
| Employee ID # _____ | TYPE ___ |
| | ☐ IRA/ROTH IRA  ☒ SEP/SAR-SEP/SIMPLE |

### PAYEE INFORMATION

| NAME | | SOCIAL SECURITY NO. | DATE OF BIRTH |
|---|---|---|---|
| David I Ferber | ☒ IRA OWNER  ☐ BENEFICIARY | | / / |

| ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 530 Fifth Ave #20 | New York | NY | 10036 |

### FORM OF DISTRIBUTION (Check one)

☒ Entirely in Cash   ☐ Entirely in Kind (including any Cash in the account)

☐ Specific instructions (for example, re-register securities, or distribute certain assets in kind, or sell and distribute cash.)

### REASON FOR WITHDRAWAL - (See explanations on back of form)

☐ Normal (Check one)
  ☐ Attainment of age 59½
  ☐ Mandatory after age 70½
☒ Premature-No Exception
☐ Disability
☐ Death Benefit (Attach certified Death Certificate and notarized Affidavit of Domicile and Debt.)

☐ Refund of excess contribution: Tax Year _____
  Principal $_____
  Earnings $_____
☐ Divorce (Attach Divorce Decree or other court order)

☐ First Time Home Purchase
☐ Medical Expenses/Premiums
☐ Higher Education Expenses

### METHOD OF DISTRIBUTION

☐ Direct Payment to Payee (Check one)
  ☐ Mail Automated check
  ☐ Local Branch check (customer pick-up only)

☐ Credit to DWR account number: _____
☒ Fed Fund Wire Transfer (Attach wire transfer instructions)

### FEDERAL INCOME TAX WITHHOLDING ELECTION (Check one): Before completing this section, read important notice on back of form.

Even if you elect not to have Federal income tax withheld, you are liable for payment of Federal income tax on your Retirement Account payment(s). You also may be subject to tax penalties under estimated tax payment rules if your payment of your estimated tax and withholding, if any, are not adequate to cover the income tax. If you elect to have Federal income tax withheld, your State of residence may also require that State income tax be withheld.

☒ Do not withhold Federal income tax

Withhold Federal income tax at ☐ 10%   ☐ _____%   ☐ $_____

### STATE INCOME TAX WITHHOLDING ELECTION (Check one): If applicable, attach appropriate form as required by your State.

☒ Do not withhold State income tax

Withhold required State income tax from my Retirement Account distribution as follows:

☐ Percentage of gross distribution _____%   ☐ Percentage of Federal withholding _____%   ☐ Fixed dollar amount $_____

### PAYEE CERTIFICATION

I direct Dean Witter Reynolds Inc. ("DWR"), as Custodian of the above named IRA, to terminate the account and to pay the proceeds as indicated above. I certify that this distribution request is in accordance with the provisions of the DWR Individual Retirement Plan and satisfies applicable tax laws. The Custodian may reasonably rely on my certification without further investigation or inquiry and shall not be liable for any misrepresentation of fact.

| IRA OWNER/BENEFICIARY SIGNATURE | DATE |
|---|---|
| *[signature]* | |

DWR 9467-4 (5-83) Rev. 1/98

IRA OPERATIONS

# Morgan Stanley

---

### Fax Transmission

TO: David Ferber

FAX: 212 - 944 - 16.30

RE: SEP

FROM: Michelle Greicher

PAGES TO FOLLOW: 3

David
I added another page. Please
sign the first two pages and
initial the third         thanks
                          Michelle

Contact:
Michelle Gleicher
The Greenspan Group
Morgan Stanley
330 Madison Avenue 8th Floor
New York, NY 10017
888-564-3533 212-883-7787
Fax: (212) 808-5418

---

The information contained in this summary is prepared from records, which Morgan Stanley Dean Witter
considers to be reliable. However, it is not intended to and should not be used as a substitute for monthly
statements, which you receive on a regular basis from Morgan Stanley Dean Witter.
Please compare the data on this document carefully with your monthly statements to verify its accuracy.

The firm strongly encourages you to consult with your own accountants or other advisors with the respect
to any tax question.

Morgan Stanley

# REDACTED

| TRANSACTION NOTIFICATION |

#S000000063  55 C761 T000000003 **                          IRA Standard/SEP
**DAVID FERBER**
**530 FIFTH AVENUE #23**
**NEW YORK, NY 10036-5101**

DATE: 11-21-2001                                        ACCOUNT NUMBER
                                                                  227

In accordance with your instructions, we have completed a wire transfer for $190,553.47 as follows
from your account.

                           To:   BANK OF NEW YORK
           For the benefit of:   DAVID I FERBER
           Account Number:                        _Wrong number_

Please direct any inquiries concerning this transaction to our Customer Service Department at
(201) 395-4600.

# ROBSON FERBER FROST CHAN & ESSNER, LLP #2

530 FIFTH AVENUE
NEW YORK, NEW YORK 10036-5101

TEL: (212) 944-2200
FAX: (212) 944-7630

## FACSIMILE TRANSMITTAL

DATE: 1/2/10

NUMBER OF PAGES INCLUDING
THIS COVER SHEET: 7

TO: First Trust
Att: DINA

FAX: 303-294-5947

FROM: David I. Ferber, Esq.
E-MAIL: ferber@robsonferber.com

MESSAGE:

Dina —

Please wire funds
ASAP — need to
complete this before
the end of
Many Thanks
David

This transmission is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the United States Postal Service. Thank you.

43184

REDACTED

*Need to complete transaction before end of*

*Att: Dina*

**FIRST TRUST**
*Another Resource From Fiserv*

First Trust Corporation
717 17th Street, Suite 1700
Denver, CO 80202-3323
303-293-2223
1-800-525-8188

Please direct mail to:
First Trust Corporation
P.O. Box 173301
Denver, CO 80217-3301

# Investment
# Authorization Form

**Important! Read before completing this form.** Use this form only for investments not traded over a securities exchange. Publicly traded investments (such as stock and bond trades) must generally be made through your designated Financial Representative. The IRA "Account Owner" is referred to as the "Participant" throughout this form and the IRA Plan and Trust Agreement.

Please do not use this form to authorize investments in Secondary Market Transactions, Deeds of Trust, Offshore Investments or U.S. Minted Gold and Silver Coins. Special forms/procedures for these investments are available upon request from our Telemarketing Services Department or any of our Client Service Representatives.

Important disclosures concerning the investments authorized on this form appear on page 2.

Account Owner's Name: **DAVID I. FERBER**

First Trust Account Number: .634

**Plan Type**  ☐ Profit Sharing   ☐ Money Purchase   ☑ IRA   Note: This form can be used for both Roth and Traditional IRAs.

**Investment Instructions** Many securities have similar names. Please list the full investment description; do not abbreviate. Use additional photocopies of this form, if necessary. By signing this form, you agree to the terms on page 2 which apply to your investment(s) and hereby authorize First Trust Corporation (First Trust) to process the following transaction(s):

**Purchases**

| Investment Name | (For Mutual Funds Only) Class (e.g., A, B, C, etc.) | Amount |
|---|---|---|
| Greenwich Sentry, L.P. | | $ |
| | | $ |
| | | $ |

**Liquidations** If proceeds are to be sent to the Account Owner, First Trust must receive a completed Distribution Form before funds may be distributed from the First Trust Account.

| Investment Name | Shares | or | Dollars |
|---|---|---|---|
| | | $ | |
| | | $ | |

**Exchanges** You MUST indicate dollars or shares, but not both.

| Investment Name | Shares | or | Dollars |
|---|---|---|---|
| From: | | | |
| To: | | $ | |
| From: | | | |
| To: | | $ | |

**Special Instructions** Please indicate the account number at the fund or other financial institution for each investment, if known, and any special trading instructions such as the overnight or wire service for an additional fee, N.A.V. arrangement with fund, etc. Also, designate for which transaction (if not all) the special instructions apply.

*Greenwich Sentry, L.P. has Cusip No. 397099194*
*Funds can be wired to Morgan Guaranty Trust Co. ABA #    -238*
*for account of Greenwich Sentry, L.P. acct no:    804*

**Acknowledgment and Signature** I verify that I have received and read all pertinent information relating to the above investment(s) (i.e., prospectus, offering circular, investment agreement, etc.), and that I meet the suitability requirements of the offering(s) indicated. I understand that First Trust is not related to the sponsor(s) of the investment(s) I selected and does not recommend or comment on the merits, risk, suitability or management of any offering. I further understand First Trust's valuation reporting and fee policies associated with my request (as disclosed in the plan documents and account statements) and agree to the Arbitration Statement printed on page 2 of this Investment Authorization form and the Indemnity of Trustee and Sponsor printed in Article X, Section 10.3 of the Traditional and/or Roth IRA Plan and Trust Agreements. I attest that the transaction does not constitute a prohibited transaction as defined in Internal Revenue Code Section 4975 and outlined in the plan documents.

Authorized Signature X  *David*

Date _____    Phone ( 212 ) 944-2200

*Fax 212 944-7630*

© First Trust Corporation, 2000    1 of 2    FTC-1703 (rev. 12/00)

NOV-28-2001 WED 11:37 AM                                                      P. 02

**REDACTED**

*Need to complete*
*transaction before end*
*of November*

**FIRST TRUST**
*Another Resource From Fiserv*

Att: Dina

First Trust Corporation
717 17th Street, Suite 1700
Denver, CO 80202-3323
303-293-2223
1-800-525-8188

Please direct mail to:
First Trust Corporation
P.O. Box 173301
Denver, CO 80217-3301

# Investment
# Authorization Form

**Important! Read before completing this form.** Use this form only for investments not traded over a securities exchange. Publicly traded investments (such as stock and bond trades) must generally be made through your designated Financial Representative. The IRA "Account Owner" is referred to as the "Participant" throughout the IRA Plan and Trust Agreement.

Please do not use this form to authorize investments in Secondary Market Transactions, Deeds of Trust, Offshore Investments or U.S. Minted Gold and Silver Coins. Special forms/procedures for these investments are available upon request from our Telemarketing Services Department or any of our Client Service Representatives.

Important disclosures concerning the investments authorized on this form appear on page 2.

Account Owner's Name: **DAVID I. FERBER**

First Trust Account Number: **.634**

**Plan Type** ☐ Profit Sharing  ☐ Money Purchase  ☑ IRA   Note: This form can be used for both Roth and Traditional IRAs.

**Investment Instructions** Many securities have similar names. Please list the full investment description; do not abbreviate. Use additional photocopies of this form, if necessary. By signing this form, you agree to the terms on page 2 which apply to your investment(s) and hereby authorize First Trust Corporation (First Trust) to process the following transaction(s):

**Purchases**

| Investment Name | (For Mutual Funds Only) Class (e.g., A, B, C, etc.) | Amount |
|---|---|---|
| Greenwich Sentry, L.P. | | $ 190,553.47 |
| | | $ |
| | | $ |
| | | $ |

**Liquidations** If proceeds are to be sent to the Account Owner, First Trust must receive a completed Distribution Form before funds may be distributed from the First Trust Account.

| Investment Name | | Shares | or | Dollars |
|---|---|---|---|---|
| | | | $ | |
| | | | $ | |
| | | | $ | |

**Exchanges** You MUST indicate dollars or shares, but not both.

| Investment Name | | Shares | or | Dollars |
|---|---|---|---|---|
| From: | | | $ | |
| To: | | | | |
| From: | | | $ | |
| To: | | | | |

**Special Instructions** Please indicate the account number at the fund or other financial institution for each investment, if known, and any special trading instructions such as the overnight or wire service for an additional fee, N.A.V. arrangement with fund, etc. Also, designate for which transaction (if not all) the special instructions apply:

*Greenwich Sentry, L.P. has Cusip No. 397999194*
*Funds can be wired to Morgan Guaranty Trust Co. ABA #*     238
*for account of Greenwich Sentry, L.P. acct no:*     804

**Acknowledgment and Signature** I verify that I have received and read all pertinent information relating to the above investment(s) (i.e., prospectus, offering circular, investment agreement, etc.), and that I meet the suitability requirements of the offering(s) indicated. I understand that First Trust is not related to the sponsor(s) of the investment(s) I selected and does not recommend or comment on the merits, risk, suitability or management of any offering. I further understand First Trust's valuation reporting and fee policies associated with my request (as disclosed in the plan documents and account statements) and agree to the Arbitration Statement printed on page 2 of this Investment Authorization form and the Indemnity of Trustee and Sponsor printed in Article X, Section 10.3 of the Traditional and/or Roth IRA Plan and Trust Agreement. I attest that the transaction does not constitute a prohibited transaction as defined in Internal Revenue Code Section 4975 and outlined in the plan documents.

Authorized Signature X _David_

Date 11/28   November 28, 2001        Phone ( 212 ) 944-2200

                                        Fax 212 944-7630

© First Trust Corporation, 2000              1 of 2              FTC-1703 (rev. 12/00)



| Account # | Client Name |
|---|---|
| .634 | DAVID I FERBER |

**First Trust Account Statement**
10/01/2001-12/31/2001
**Focus SEP IRA**



First Trust Corporation
P.O. Box 173301
Denver CO 80217-3301
(303) 293-2223 - (800) ___-____

9646

DAVID I FERBER
530 FIFTH AVE 23RD FLR
NEW YORK NY 10036

## ACCOUNT SUMMARY

| | | CONTRIBUTION AND DISTRIBUTION SUMMARY | |
|---|---|---|---|
| Account Value as of 09/30/2001 | $0.00 | | |
| Account Value as of 12/31/2001 | $190,553.47 | Rollovers | |
| | | Current Tax Year | $0.00 |
| Account Values as of 12/31/2001 | | | |
| Account Holdings | $190,553.47 | Contributions | |
| First Trust Cash Balance | 0.00 | Current Tax Year (2001) | $0.00 |
| | | Prior Tax Year (2000) | $0.00 |
| Total Account Value | $190,553.47 | Employer Contributions | |
| | | Received Current Year | $0.00 |
| | | Roth Conversion | |
| | | Current Tax Year | $0.00 |
| | | Distributions | |
| | | Current Tax Year | $0.00 |

## ACCOUNT HOLDINGS (as of 12/31/2001)

**Investment Products: • Not FDIC Insured • No Bank Guarantee • May Lose Value**

| Illiquid | Pricing Source | Shares/Units | Share/Unit Price | Reported Value |
|---|---|---|---|---|
| GREENWICH SENTRY LP | 30 | PENDING | N/A | $190,553.47 |
| | | | | $190,553.47 |
| **Total Value of Account Holdings** | | | | **$190,553.47** |

## ACCOUNT ACTIVITY

| Date | Transaction | Shares/Units | Description | FTC Cash | Broker Cash |
|---|---|---|---|---|---|
| Beginning Cash Balances (as of 10/01/2001) | | | | $0.00 | $0.00 |
| 11/27/2001 | TRANSFER OF CASH IN | | DEAN WITTER REYNOLDS | 190,553.47 | |
| 11/27/2001 | FEE COLLECTION | | | -10.00 | |
| 11/28/2001 | FEE ADJUSTMENT | | REVERSE FEE COLLECTION FOR PURHCASE | 10.00 | |
| 11/28/2001 | PURCHASE | | GREENWICH SENTRY LP | -190,553.47 | |
| 11/30/2001 | INTEREST | | | 3.65 | |

*For more information, please see reverse side.*

FTC-2249 (8/99)



**FIRST TRUST**
*Another Resource From*

First Trust Corporation
P.O. Box 173301
Denver, CO 80217-3301
(303) 293-2223   (800) 525-

| Account # | Client Name |
|---|---|
| :634 | DAVID I FERBER |

### First Trust Account Statement
### 10/01/2001-12/31/2001
### Focus SEP IRA



## ACCOUNT ACTIVITY

| Date | Transaction | Shares/Units | Description | FTC Cash | Broker Cash |
|---|---|---|---|---|---|
| 11/30/2001 | FEE COLLECTION | | | -3.65 | |
| **Ending Cash Balances** | (as of 12/31/2001) | | | $0.00 | $0.00 |

### Important Information

- As required by law, the fair market value reported on this statement will be furnished to the Internal Revenue Service on IRS Form 5499.
- Current First Trust Money Market account annual percentage yield earned is 0.60%.

*Please retain this Account Statement for your records. Report any discrepancies to First Trust Corporation immediately.*

### For more information, please see reverse side.

FTC-2249 (6/90)





Morgan

# REDACTED

## TRANSACTION NOTIFICATION

#S000060337  55 C761 T000000023 **          IRA Standard/SEP
DAVID FERBER
530 FIFTH AVENUE #23
NEW YORK, NY 10036-5101

DATE: 11-27-2001                                ACCOUNT NUMBER
                                                        ·227

In accordance with your instructions, we have completed a wire transfer for $190,553.47 as follows
from your account.

                                To:   FIRST TRUST CORPORATION
                For the benefit of:   DAVID I FERBER
                Account Number:              .634

Please direct any inquiries concerning this transaction to our Customer Service Department at
(201) 395-4600.

Morgan Stanley is a service mark of Morgan Stanley Dean Witter & Co.
Services are offered through Morgan Stanley DW Inc., member SIPC.

## ROBSON FERBER FROST CHAN & ESSNER, LLP

530 FIFTH AVENUE
NEW YORK, NEW YORK 10036-5101

TEL: (212) 944-2200
FAX: (212) 944-7630
e-mail: ferber@robsonferber.com

# REDACTED

January 9, 2002

First Trust Corporation
P.O. Box 173301
Denver, Colorado 80217-3301

Attention: Dina Clark

Dear Sirs:

I am enclosing a check in the amount of $16,293 made payable to First Trust Corporation, representing this past year's contribution to my SEP IRA account with you (#    ⸲634). Would you be kind enough to deposit this check and, immediately thereafter, transmit payment to Greenwich Sentry, LP, with whom my SEP IRA maintains a limited partnership interest, and forward some notification thereof to me. This transaction is consistent with the earlier opening of my account with you and transmittal of the funds to Greenwich Sentry Limited Partnership.

Please note that Greenwich Sentry, LP has Cusip #397999194 and maintains its bank account (Acct. ⸴    -804) with Morgan Guaranty Trust Company (ABA ;    -238).

If there are any questions in connection with this matter, please communicate with me at once.

Many thanks,

Very truly yours,

David I. Ferber

DIF:alg
Enclosure

49875

REDACTED

| | | | 1264 |
|---|---|---|---|

**ROBSON, FERBER, FROST, CHAN & ESSNER LLP**
530 5TH AVE.
NEW YORK, NY 10036-5101

JP MORGAN
MORGAN GUARANTY
TRUST COMPANY OF NEW YORK
62-23-311

12/31/2001

PAY TO THE
ORDER OF    First Trust Corporation

$ **16,293.00

Sixteen Thousand Two Hundred Ninety-Three and 00/100***************************************************************

DOLLARS

First Trust Corporation

MEMO

⑈0⑈    ⑆⑈J238⑈    164 82 624⑈

---

**ROBSON, FERBER, FROST, CHAN & ESSNER LLP**
First Trust Corporation

| Date | Type | Reference | Original Amt. | Balance Due | 12/31/2001 Discount | 1264 Payment |
|---|---|---|---|---|---|---|
| 12/31/2001 | Bill | DIF SEP | 16,293.00 | 16,293.00 | | 16,293.00 |
| | | | | | Check Amount | 16,293.00 |

CASH-MORGAN GUAR.

16,293.00

#2

## ROBSON FERBER FROST CHAN & ESSNER, LLP

530 FIFTH AVENUE
NEW YORK, NEW YORK 10036-5101

TEL: (212) 944-2200
FAX: (212) 944-7630

### FACSIMILE TRANSMITTAL

DATE: 1/30/02

NUMBER OF PAGES INCLUDING
THIS COVER SHEET: 2

TO: First Trust
Att: DINA

FAX: 303-294-5947

FROM:   David I. Ferber, Esq.
E-MAIL:   ferber@robsonferber.com

MESSAGE:

Dina —

Please wire funds
ASAP — need to
complete this before
the end of January!
Many thanks
David

This transmission is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the United States Postal Service. Thank you.

43184

NOV-28-2001 WED 11:37 AM                    FHA NO.        **REDACTED**

*Need to complete transaction before end of JANUARY!*

**FIRST TRUST**    *Att: Dina*
Another Resource From Fiserv

First Trust Corporation          Please direct mail to:
717 17th Street, Suite 1700      First Trust Corporation
Denver, CO 80202-3323            P.O. Box 173301
303-293-2223                     Denver, CO 80217-3301
1-800-525-8188

# Investment
# Authorization Form

**Important: Read before completing this form.** Use this form only for investments not traded over a securities exchange. Publicly traded investments (such as stock and bond trades) must generally be made through your designated Financial Representative. The IRA "Account Owner" is referred to as the "Participant" throughout the IRA Plan and Trust Agreement.

Please do not use this form to authorize investments in Secondary Market Transactions, Deeds of Trust, Offshore Investments or U.S. Minted Gold and Silver Coins. Special forms/procedures for these investments are available upon request from our Telemarketing Services Department or any of our Client Service Representatives.

Important disclosures concerning the investments authorized on this form appear on page 2.

Account Owner's Name: **DAVID I. FERBER**

First Trust Account Number: **-634**

**Plan Type**  ☐ Profit Sharing  ☐ Money Purchase  ☑ IRA  Note: This form can be used for both Roth and Traditional IRAs.

**Investment Instructions** Many securities have similar names. Please list the full investment description; do not abbreviate. Use additional photocopies of this form, if necessary. By signing this form, you agree to the terms on page 2 which apply to your investment(s) and hereby authorize First Trust Corporation (First Trust) to process the following transaction(s):

**Purchases**

| Investment Name | (For Mutual Funds Only) Class (e.g., A, B, C, etc.) | Amount |
|---|---|---|
| **Greenwich Sentry, L.P.** | | $ **16,293.** |
| | | $ |
| | | $ |

**Liquidations** If proceeds are to be sent to the Account Owner, First Trust must receive a completed Distribution Form before funds may be distributed from the First Trust Account.

| Investment Name | | Shares | or | Dollars |
|---|---|---|---|---|
| | | | | $ |
| | | | | $ |
| | | | | $ |

**Exchanges** You MUST indicate dollars or shares, but not both.

| Investment Name | | Shares | or | Dollars |
|---|---|---|---|---|
| From: | | | | |
| To: | | | | $ |
| From: | | | | |
| To: | | | | $ |

**Special Instructions** Please indicate the account number at the fund or other financial institution for each investment, if known, and any special trading instructions such as the overnight or wire service for an additional fee. N.A.V. arrangement with fund, etc. Also, designate for which transaction (if not all) the special instructions apply:

*Greenwich Sentry, L.P. has Cusip No. 397999194*
*Funds can be wired to Morgan Guaranty Trust Co. ABA #          -238*
*for account of Greenwich Sentry, L.P. acct no:          804*

**Acknowledgment and Signature** I verify that I have received and read all pertinent information relating to the above investment(s) (i.e., prospectus, offering circular, investment agreement, etc.), and that I meet the suitability requirements of the offering(s) indicated. I understand that First Trust is not related to the sponsor(s) of the investment(s) I selected and does not recommend or comment on the merits, risk, suitability or management of any offering. I further understand First Trust's valuation reporting and fee policies associated with my request (as disclosed in the plan documents and account statements) and agree to the Arbitration Statement printed on page 2 of this Investment Authorization form and the Indemnity of Trustee and Sponsor printed in Article X, Section 10.3 of the Traditional and/or Roth IRA Plan and Trust Agreements. I attest that the transaction does not constitute a prohibited transaction as defined in Internal Revenue Code Section 4975 and outlined in the plan documents.

Authorized Signature X  *David*

Date  **1/30/02**                    Phone ( **212** ) **944-2200**

*Fax 212 944-7630*

TRANSMISSION VERIFICATION REPORT

TIME : 01/30/2002 14:38

| | |
|---|---|
| DATE,TIME | 01/30 14:37 |
| FAX NO./NAME | 1303294594731 |
| DURATION | 00:00:49 |
| PAGE(S) | 02 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

(3)

## ROBSON FERBER FROST CHAN & ESSNER, LLP

530 FIFTH AVENUE
NEW YORK, NEW YORK 10036-5101

TEL: (212) 944-2200
FAX: (212) 944-7630
e-mail: ferber@robsonferber.com

# REDACTED

January 3, 2003

Mr. Daniel Lipton
Fairfield Greenwich Group
399 Park Avenue
36th Floor
New York, New York 10022

Dear Dan:

I am enclosing a check of my firm made payable to Greenwich Sentry, L.P., as directed
by you. These funds should be deposited into my SEP-IRA account with Greenwich Sentry, as
to which First Trust Corporation is the custodian and maintains account number        .634.

Many thanks for your kind assistance.

I wish you a healthy New Year.

Cordially,

David I. Ferber

DIF:alg
Enclosure

---

**ROBSON FERBER FROST CHAN & ESSNER LLP**
530 5TH AVE.
NEW YORK, NY 10036-5101

JPMORGAN CHASE BANK
NEW YORK, NY 10036
1-2-210

1872

12/31/2002

PAY TO THE
ORDER OF:  Greenwich Sentry, L.P.                                        $ **16,589.00

Sixteen Thousand Five Hundred Eighty-Nine and 00/100******************************************************  DOLLARS

Greenwich Sentry, L.P.

MEMO
David I. Ferber SEP 2002 Contribution

12/20/2006 13:49 FAX  212 944 7731          FERBER CHAN ESSNER                    ☑001

```
                    ***********************
                    ***   TX REPORT    ***
                    ***********************                      (4)


        TRANSMISSION OK

        TX/RX NO            0738
        DESTINATION TEL #   14169660925
        DESTINATION ID
        ST. TIME            12/20 13:48
        TIME USE            00'22
        PAGES SENT          2
        RESULT              OK
```

626

**REDACTED**

### ADDITIONAL SUBSCRIPTION FORM

Greenwich Sentry, L.P.
c/o Citco (Canada) Inc.
Attn: Investor Relations Group
2 Bloor Street East
Suite 2700.
Toronto
Ontario M4W 1A8
Canada


Fax: (416) 966-0925
E-mail: irtor@citco.com

Dear Sir or Madam:

        The undersigned hereby wishes to contribute additional capital to the fund specified
below. The undersigned shall contribute such capital by making a payment by wire pursuant to the
instructions provided upon acceptance of this subscription.

Fund Name: _GREENWICH SENTRY, LP._

Amount to be invested: _$ 18525._

Date of Additional Investment: _____ _1/1/07_

**Intermediary Bank - field 56**
HSBC Bank U.S.A., New York
BIC:       MRMDUS33
Fed wire:  021001088
**Account with institution - Field 57**
Account name:    Citco Banking Corporation N.V.
Account number:  795
BIC: CITCANCU
**Beneficiary Customer - Field 59**
Beneficiary Bank Account Number:                        -200
Beneficiary Account Name and Full Address:   Greenwich Sentry, L.P.

THE UNDERSIGNED AGREES TO NOTIFY, CITCO (CANADA) INC THE SUB-ADMINISTRATOR
PROMPTLY SHOULD THERE BE ANY CHANGE IN ANY OF THE FOREGOING INFORMATION.

Dated: _December 20, 2006_

( 4 )

Phone: 212 9442200          Phone #:_____

Fax #: 212 944 7630          Fax #:_____

E-Mail: ferber @ ferberchan.com          E-Mail: _____

15

(4)

**CITCO**

*Citco Fund Services
(Europe) B.V.*

## GREENWICH SENTRY, L.P.

### FOR THE CALENDAR MONTH OF JANUARY 2007
### (EXPRESSED IN US DOLLARS & UNAUDITED)

Ferber Chan & Essner, LLP
530 Fifth Avenue, 23rd Floor
New York, NY 10036-5101

E-Mail: ferber@ferberchan.com

Capital Account Statement for :  **David I. Ferber, Sepira**

|  | | January | | Year-to-Date |
|---|---|---|---|---|
| Beginning Equity | $ | 339,712 | $ | 339,712 |
| Capital Additions | | 18,525 | | 18,525 |
| Capital Withdrawals | | - | | - |
| Profit/(Loss) * | | 1,177 | | 1,177 |
| Ending Equity | $ | 359,414 | $ | 359,414 |

* Net results reflect the deduction of all operational expenses, management fees and potential profit allocation to the General Partner.

Inquiries may be directed to the Sub-Administrator, Citco (Canada) Inc., by phone to 416-969-6700, by fax to 416-966-0925 or by email to irtor@citco.com.

*Telestone 8 - Teleport
Naritaweg 165
P.O. Box 7241
1007 JE Amsterdam
The Netherlands*

*amsterdam-fund@citco.com
www.citco.com*

*Phone: +31 (0)20 572 2850
Fax: +31 (0)20 572 2610
Chamber of Commerce: 33253773*

(5)

# FERBER CHAN ESSNER & COLLER, LLP
### 530 FIFTH AVENUE
### NEW YORK, NEW YORK  10036-5101

TEL: (212) 944-2200

FAX: (212) 944-7630

E-MAIL:  mungioli@ferberchan.com

December 21, 2007

VIA FACSIMILE:  (800) 533-1075

Ms. Leslie Cooper
J.P. Morgan Services, Inc.
500 Stanton Christiana Road
Newark, DE  19713-2107

**REDACTED**

Re:    Ferber Chan Essner & Coller, LLP
        Checking Account No:        624

Please arrange for a wire transfer, in the amount of $18,884 as follows:

For Benefit of:            David I. Ferber SEP IRA
Fund Name:                Greenwich Sentry, L.P.
Amount to be Invested:    $18,884.00
Date of Investment:        12/21/07

Intermediary Bank (Field 56)
        HSBC Bank U.S.A., New York
        BIC:                MRMDUS33
        FED Wire:            021001088
Account with Institution (Field 57)
        Account Name:        Citco Banking Corporation NY
        Account Number:            795
        BIC:                CITCANCU
Beneficiary Customer (Field 59)
        Beneficiary Bank Account Number:            -200
        Beneficiary Account Name and Full Address: Greenwich Sentry, L.P.

Sincerely,

*Gina Mungioli*

Gina Mungioli
Office Manager

Allen P. Essner – Partner

Note:  See attached subscription form

48767

(5)

626

### ADDITIONAL SUBSCRIPTION FORM

Greenwich Sentry, L.P.
c/o Citco (Canada) Inc.
Attn: Investor Relations Group
2 Bloor Street East
Suite 2700
Toronto
Ontario M4W 1A8
Canada

# REDACTED

Fax: (416) 966-0925
E-mail: irtor@citco.com

Dear Sir or Madam:

The undersigned hereby wishes to contribute additional capital to the fund specified below. The undersigned shall contribute such capital by making a payment by wire pursuant to the instructions provided upon acceptance of this subscription.

Fund Name: _Greenwich Sentry, L.P._

Amount to be invested: _$ 18,884_

Date of Additional Investment: _12/21/07_

**Intermediary Bank - field 56**
HSBC Bank U.S.A., New York
BIC:          MRMDUS33
Fed wire:     021001088
**Account with Institution - Field 57**
Account name:          Citco Banking Corporation N.V.
Account number:                1795
BIC: CITCANCU
**Beneficiary Customer -Field 59**
Beneficiary Bank Account Number:                    200
Beneficiary Account Name and Full Address:     Greenwich Sentry, L.P.

THE UNDERSIGNED AGREES TO NOTIFY, CITCO (CANADA) INC THE SUB-ADMINISTRATOR PROMPTLY SHOULD THERE BE ANY CHANGE IN ANY OF THE FOREGOING INFORMATION.

Dated: _December 21, 2007_

For Corporations, Partnerships, Trusts, Limited
Liability Companies, Pension Plans or IRAS,
Other Entity (s):

For Individuals:

_David I. Ferber SEP IRA_
(Print Name of Entity)

(Signature)

By: _David_
(Signature)

Print: _____

Print Name: _David I. Ferber_

Title: _Self_

14

Phone: 212 - 944 - 2200

Fax #: 212 - 944 - 7636

E-Mail: ferber @ ferberchan.com

Phone #: _____

Fax #: _____

E-Mail: _____

15

(5)

## CITCO

*Citco Fund Services*
*(Europe) B.V.*

### GREENWICH SENTRY, L.P.

FOR THE CALENDAR MONTH OF JANUARY 2008
(EXPRESSED IN US DOLLARS & UNAUDITED)

Ferber Chan & Essner, LLP
530 Fifth Avenue, 23rd Floor
New York, NY 10036-5101
United States

E-Mail: ferber@ferberchan.com

Capital Account Statement for :  David I. Ferber, SEP IRA

|                     |     | January |     | Year-to-Date |
|---------------------|-----|---------|-----|--------------|
| Beginning Equity    | $   | 388,140 | $   | 388,140      |
| Capital Additions   |     | 18,884  |     | 18,884       |
| Capital Withdrawals |     | -       |     | -            |
| Profit/(Loss) *     |     | 3,384   |     | 3,384        |
| Ending Equity       | $   | 410,408 | $   | 410,408      |

* Net results reflect the deduction of all operational expenses (including brokerage commissions), management fees and potential profit allocation to the General Partner.

Inquiries may be directed to the Sub-Administrator, Citco (Canada) Inc., by phone to 416-969-6700, by fax to 416-966-0925 or by email to irtor@citco.com.

Telestone 8 - Teleport
Naritaweg 165
P.O. Box 7241
1007 JE Amsterdam
The Netherlands

amsterdam-fund@citco.com
www.citco.com

Phone: +31 (0)20 572 2850
Fax:  +31 (0)20 572 2610
Chamber of Commerce: 33253773

# CITCO

*Citco Fund Services
(Europe) B.V.*

## GREENWICH SENTRY, L.P.
### FOR THE CALENDAR MONTH OF OCTOBER 2008
### (EXPRESSED IN US DOLLARS & UNAUDITED)

Ferber Chan & Essner, LLP
530 Fifth Avenue, 23rd Floor
New York, NY 10036-5101
United States
E-Mail: ferber@ferberchan.com

Capital Account Statement for :  David I. Ferber, SEP IRA

|                      |     | October |     | Year-to-Date |
|----------------------|-----|---------|-----|--------------|
| Beginning Equity     | $   | 430,583 | $   | 388,140      |
| Capital Additions    |     | -       |     | 18,884       |
| Capital Withdrawals  |     |         |     | -            |
| Profit/(Loss) *      |     | 632     |     | 24,191       |
| Ending Equity        | $   | 431,215 | $   | 431,215      |

\* Net results reflect the deduction of all operational expenses (including brokerage commissions), management fees and potential profit allocation to the General Partner.

Inquiries may be directed to the Sub-Administrator, Citco (Canada) Inc., by phone to 416-969-6700, by fax to 416-966-0925 or by email to irfor@citco.com.

*Telestone 8 - Teleport
Norilaweg 165
P.O. Box 7241
1007 JE Amsterdam
The Netherlands*

*amsterdam-fund@citco.com
www.citco.com*

*Phone: +31 (0)20 572 2850
Fax: +31 (0)20 572 2610
Chamber of Commerce: 33253773*

## EXHIBIT B

1. The Claimant is not a direct customer of Bernard L. Madoff Investment Securities LLC ("BMIS"), but instead is an investor in Greenwich Sentry, L.P., which is believed to be a BMIS customer with claims to securities and other assets of BMIS. The Claimant believes it has or may have in the future a claim in this liquidation proceeding and/or rights to all or a portion of the claims of Greenwich Sentry, L.P.

2. This Claim Form, exhibits, and supporting documentation (collectively "Claim Form") is submitted pursuant to the December 23, 2008 Order of the Honorable Burton R. Lifland and the instructions disseminated by Irving H. Picard, Trustee for Bernard L. Madoff Investment Securities LLC ("Trustee"), on December 11, 2008.

3. The information provided in the Claim Form is based on information known by the Claimant as of the date of the submission of the Claim Form. The Claimant reserves the right to amend and/or supplement this Claim Form upon the receipt of further information, or upon request by the Trustee for additional information.

4. The Claimant reserves the right to amend the Claim Form in the event of any recoveries by the Trustee or any other party under the avoidance powers of the Bankruptcy Code or otherwise, or in the event of rejections of executory contracts pursuant to Bankruptcy Code Section 365, whether such amendments are made pursuant to Bankruptcy Code Sections 105, 502(g), or 502(h), Bankruptcy Rule 3002(c)(3), (4), other provisions of applicable bankruptcy law, or general principles of law or equity.

5. The Claimant hereby requests that the Claim Form be considered as a proof of claim in *In re Bernard L. Madoff Investment Securities LLC*, No. 08-01789 (Bankr. S.D.N.Y.).

6. This Claim Form is required to be submitted pursuant to the Court's January 2, 2009 Order and the Trustee's instructions to the Claimant. To the extent permitted by applicable law, the Claimant does not, by submitting the Claim Form, consent to the jurisdiction of the Bankruptcy Court nor does Claimant waive any right to trial by jury.

7. The Claimant reserves all rights, claims, and/or defenses as to and/or against any and all parties potentially liable for the losses sustained by the Claimant, including, without limitation, BMIS and its owners, partners, employees, and affiliates, as well as any potentially liable third parties including, without limitation, investment advisors, "feeder funds," accountants, and auditors.

Claimant: David I. Ferber SEP IRA (Account No. 1-G-0092)

8. The Claimant further reserves all rights, claims, and/or defenses as to and/or against any persons and/or creditors asserting claims against BMIS, its employees, owners, and/or affiliates, in bankruptcy or otherwise.

9. The Claimant reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever, notwithstanding the submission of any such information to the Trustee.

10. To the extent the Claimant has disclosed to the Trustee documents containing accounting and/or legal advice, the Claimant does not waive any potential privileges applicable thereto.

11. The Claimant reserves all rights with respect to submitting information to the Internal Revenue Service regarding gains, losses, and/or theft of assets.

12. The Claim Form and supporting documents contain confidential information. The Claimant submits this information to the Trustee subject to the condition that this information will not be disclosed to any third parties, other than under seal to the Court, absent the Claimant's express consent or Court order.

13. Although Claimant has identified BMIS account numbers apparently in the name of Greenwich Sentry, L.P., the Claimant does not know the total number of BMIS accounts owned by Greenwich Sentry, L.P. or whether the Claimant has an ownership or other interest in any such accounts. Notwithstanding the foregoing, the Claimant reserves any and all rights, claims, and defenses as to any and all BMIS accounts owned by Greenwich Sentry, L.P.

14. The Claimant submits herewith documents (Exhibit A) in support of the Claimant's claim, including documents containing information regarding account transactions, such as contributions and/or withdrawals. The Claimant reserves any arguments that such documents are not relevant to the Trustee's inquiry. The Claimant further reserves the right to supplement this submission, including the submission of additional documents, if deemed necessary. Below is a list of the documents submitted herewith:

**2001:**
- 11/08/01 Letter from David I. Ferber to First Trust Corporation with IRA Transfer/Rollover form attached, transferring $190,630 from Morgan Stanley to Greenwich Sentry ($25 Establishment Fee check included)
- 11/21/01 Letter from David I. Ferber to Michele Gleicher of The Greenspan Group/Morgan Stanley Dean Witter with attached copies of outgoing wire transfer requests
- 11/21/01 Receipt for transfer of $190,553.47 from Morgan Stanley to Bank of New York

2

Claimant: David I. Ferber SEP IRA (Account No. 1-G-0092)

- 11/28/01 Facsimile Transmittal from David I. Ferber to First Trust with
  undated Investment Authorization Form, 11/28/01 Investment Authorization
  Form, First Trust Account Statement from 10/01/01-12/31/01, and 11/27/01
  Receipt of Fund Transfer in the amount of $190,553.47 from Morgan Stanley
  to First Trust Corporation attached

**2002:**

- 01/09/02 Letter from David I. Ferber to First Trust, ATTN: Dina Clark with
  enclosed check in the amount of $16,293 for contribution to Greenwich
  Sentry, L.P.
- 01/30/02 Facsimile Transmittal from David I. Ferber to First Trust with
  Investment Authorization form attached

**2003:**

- 01/03/03 Letter from David I. Ferber to Daniel Lipton at Fairfield Greenwich
  Group accompanied by check in the amount of $16,589 (dated 12/31/02) to be
  deposited into account with Greenwich Sentry, L.P.

**2006:**

- 12/20/06 Additional Subscription Form for additional investment to
  Greenwich Sentry, L.P. in the amount of $18,525

**2007:**

- Greenwich Sentry, L.P. Capital Account Statement for January 2007
  reflecting contribution of $18,525
- 12/21/07 Letter from David I. Ferber to Leslie Cooper at JP Morgan
  requesting wire transfer for additional investment with Additional
  Subscription Form in the amount of $18,884 attached

**2008:**

- Greenwich Sentry, L.P. Capital Account Statement for January 2008
  reflecting contribution of $18,884
- Greenwich Sentry, L.P. Capital Account Statement for October 2008
  reflecting capital account balance of $431,215 (final statement)

Claimant: David I. Ferber SEP IRA (Account No. 1-G-0092)

# **EXHIBIT C**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------x
                                                               :
DAVID I. FERBER SEP IRA,                                       :
                                                               :
                              Plaintiff,                       :
                                                               :
              vs.                                              :
                                                               :
FAIRFIELD GREENWICH GROUP, FAIRFIELD                           :
GREENWICH LIMITED, FAIRFIELD                                   :
GREENWICH (BERMUDA) LTD., FAIRFIELD                            :
GREENWICH ADVISORS LLC, GLOBEOP                                :
FINANCIAL SERVICES LLC, CITCO FUND                             :
SERVICES (EUROPE) BV, CITCO (CANADA)                           :
INC., WALTER M. NOEL, JR., JEFFREY TUCKER,                     :
ANDRES PIEDRAHITA, BRIAN FRANCOEUR,                            :
AMIT VIJAYVERGIYA,                                             :
PRICEWATERHOUSECOOPERS LLP, and                                :
PRICEWATERHOUSE COOPERS                                        :
ACCOUNTANTS N.V.,                                              :
                                                               :
                              Defendants,                      :
                                                               :
              and                                              :
                                                               :
GREENWICH SENTRY, L.P.,                                        :
                                                               :
                              Nominal Defendant.               :
                                                               :
---------------------------------------------------------------x

NEW YORK
COUNTY CLERK'S OFFICE

FEB 1 3 2009

NOT COMPARED
WITH COPY FILED

Index No.: 600469/2009
Date Purchased: 2/13/2009

Plaintiff designates New York
County as the place of trial.

The basis of the venue is
Plaintiff's and Defendants'
Residence

**SUMMONS**

Plaintiff resides in New York,
NY

County of New York

TO THE ABOVE NAMED DEFENDANTS:

       **YOU ARE HEREBY SUMMONED TO** answer the complaint in this action and to

serve a copy of your answer, or, if the complaint is not served with this summons, to serve a

notice of appearance on the Plaintiff's Attorneys **within 20 days** after the service of this

summons, exclusive of the day of service (or within 30 days after the service is complete if this

summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

Dated: February 13, 2009

Defendants' Addresses:
**(SEE ATTACHED SCHEDULE A)**

Attorneys for Plaintiff:

**MILBERG, LLP**
By:
          Sanford Dumain
          Matthew Gluck
          Brad Friedman
          Andrei V. Rado
          Kristi Stahnke McGregorOne
Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300

Stephen A. Weiss
Christopher M. Van de Kieft
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
Telephone: (212) 584-0700

## SCHEDULE A

**FAIRFIELD GREENWICH GROUP**
c/o Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808

**FAIRFIELD GREENWICH LIMITED**
Att: Mark McKeefry, Esq.
55 East 52nd Street, 33rd Floor
New York, NY 10055

**FAIRFIELD GREENWICH (BERMUDA) LTD.**
12 Church Street, Suite 606
Hamilton, Bermuda HM11

**FAIRFIELD GREENWICH ADVISORS LLC**
c/o Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808

**GLOBEOP FINANCIAL SERVICES LLC**
450 Mamaroneck Avenue
Harrison, NY 10528

**CITCO FUND SERVICES (EUROPE) BV**
Telestone 8, Teleport, Naritaweg 165
1043 BW Amsterdam
The Netherlands

**CITCO (CANADA) INC.**
2 Bloor Street East, Suite 2700
Toronto, Ontario M4W 1A8 Canada

**WALTER M. NOEL, JR.**
175 Round Hill Rd.
Greenwich, CT 06831-3724

400 Park Ave., Apt. 2B
New York, NY 10021-2759

400 First Neck Ln.
Southampton, NY 11968-4710

**JEFFREY TUCKER**
662 Stonebridge Rd.
Schuylerville, NY 11968-4710

**ANDRES PIEDRAHITA**
2433 Fisher Island Dr. 5303
Miami Beach, FL 33109-0120

**BRIAN FRANCOEUR**
c/o Fairfield Greenwich (Bermuda) Ltd.
12 Church Street, Suite 606
Hamilton, Bermuda HM11

**AMIT VIJAYVERGIYA**
c/o Fairfield Greenwich (Bermuda) Ltd.
12 Church Street, Suite 606
Hamilton, Bermuda HM11

**PRICEWATERHOUSECOOPERS LLP**
Royal Trust Tower, Suite 3000
Toronto-Dominion Centre
77 King Street West
Toronto, Ontario M5K 1G8 Canada

**PRICEWATERHOUSECOOPERS ACCOUNTANTS N.V.**
Thomas R. Malthusstraat 5 1066 JR
AMSTERDAM

**GREENWICH SENTRY, L.P.**
c/o Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————— x

DAVID I. FERBER SEP IRA,

                Plaintiff,

     vs.

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD
GREENWICH (BERMUDA) LTD., FAIRFIELD
GREENWICH ADVISORS LLC, GLOBEOP
FINANCIAL SERVICES LLC, CITCO FUND
SERVICES (EUROPE) BV, CITCO (CANADA)
INC., WALTER M. NOEL, JR., JEFFREY TUCKER,
ANDRES PIEDRAHITA, BRIAN FRANCOEUR,
AMIT VIJAYVERGIYA,
PRICEWATERHOUSECOOPERS LLP, and
PRICEWATERHOUSE COOPERS
ACCOUNTANTS N.V.,

                Defendants,

     and

GREENWICH SENTRY, L.P.,

                Nominal Defendant.

———————————————————————— x

INDEX No: 600469/2009
DATE Purchased: 2/13/09

**LIMITED PARTNERS
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

## LIMITED PARTNER'S DERIVATIVE COMPLAINT

Plaintiff, by his undersigned attorneys, for his complaint against defendants alleges the

following upon information and belief, except as to information about himself, which is alleged

upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, the

investigation conducted by Plaintiff's counsel, including a review of Fairfield Greenwich

Group's publicly issued press releases, interviews with its former employees, the Confidential

Offering Memorandum for Greenwich Sentry L.P and press articles.

## NATURE OF THE CASE

1.     This is a derivative action brought by Plaintiff who is now and at all relevant

times has been a Limited Partner of Greenwich Sentry, L.P. ("Greenwich Sentry" or the "Fund").

This action has been brought in the name of and for the benefit of Greenwich Sentry and its

Limited Partners (the "Limited Partners") against defendants Fairfield Greenwich Group

("FGG"), Fairfield Greenwich Limited, Fairfield Greenwich (Bermuda) Ltd., Fairfield

Greenwich Advisors LLC, GlobeOp Financial Services LLC, Citco Fund Services (Europe) BV,

Citco (Canada) Inc., Walter M. Noel, Jr., Jeffrey Tucker, Andres Piedrahita, Brian Francoeur and

Amit Vijayvergiya ("the Fund Defendants") for breaches of their fiduciary duties owed to

Greenwich Sentry and the Limited Partners and for aiding and abetting breaches of fiduciary

duty.  This action is also brought against PricewaterhouseCoopers LLP and

PricewaterhouseCoopers Accountants N.V. for professional negligence, breach of contract, and

negligent misrepresentation in connection with purported auditing services performed for

Greenwich Sentry.  (PricewaterhouseCoopers LLP and PricewaterhouseCoopers Accountants

N.V. are referred to collectively herein as "PwC".)

2.     Greenwich Sentry is a "feeder fund" which placed almost all of the monies

invested by its Limited Partners in the Fund with Bernard Madoff and his firm Bernard L.

Madoff Investment Securities, LLC ("BMIS").  On December 10, 2008, it was disclosed that

Madoff, acting through BMIS, had been running a Ponzi scheme so that assets and profits

reported to investors for years were in fact nonexistent, and the payment of such "profits" to

earlier investors were in fact being made from the capital of newer investors.

- 2 -

3.      On December 11, 2008, the FBI arrested Madoff for violating the federal securities laws. Upon arrest, he told the agents that "there is no innocent explanation" for the scheme and confessed that he "paid investors with money that wasn't there." On that same day, the United States Attorney brought criminal charges against Madoff, alleging that he admitted to running a $50 billion Ponzi scheme. *United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y. filed Dec. 11, 2008).

4.      On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BMIS. *SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

5.      Greenwich Sentry had approximately $220 million in assets, all or almost all of it invested with Madoff and BMIS. FGG is an umbrella fund company intimately involved with many aspects of the Fund's operations, acting in multiple capacities, as both agent and principal of the Fund. FGG, like many of the entity defendants, was controlled by the same people who controlled the Fund. FGG, and its other related entities, marketed the Fund to investors and purported to conduct due diligence on behalf of the Fund. FGG posted on its website a letter dated January 8, 2009 to its investors, stating that as of November 1, 2008, FGG had total assets under management of approximately $14.1 billion, of which approximately $6.9 billion was invested in vehicles connected to BMIS. Plaintiff believes that nearly all of Greenwich Sentry's assets invested with BMIS have been lost.

- 3 -

6.      In documents issued in connection with its funds, FGG represented that it conducted "deeper and broader" due diligence and performed continued risk monitoring of its fund managers, which include Madoff and BMIS. This was untrue. The Madoff story bristled with red flags that a financial professional performing due diligence in good faith could not have missed. Indeed, other investment advisors advised their clients not to invest with Madoff or BMIS after performing due diligence.

7.      The Fund Defendants were paid hefty management, incentive, and administrator fees, amounting to hundreds of millions of dollars over the years and at least tens of millions a year, for their expertise and professional experience in selecting and monitoring fund managers. While touting their "higher level" of due diligence over their competitors, the Fund Defendants, in fact, allowed Madoff and BMIS to go unchecked, while issuing false reports to investors presenting nonexistent, or, at the very least, highly inflated, profits, and collecting fees based on such fictitious profits.

8.      The Fund Defendants breached their fiduciary duties and aided and abetted the breach of fiduciary duties to the Fund and the Limited Partners by failing to conduct adequate due diligence, as they were required to do in their roles as fiduciaries, and further breached those duties by falsely touting their supposed due diligence, and collecting hundreds of millions of dollars in fees on fictitious assets and profits.

9.      The Funds' administrators breached their fiduciary duties and aided and abetted the breach of fiduciary duties to the Fund and the Limited Partners by failing to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, and distribute accurate monthly reports to the Limited Partners, while collecting fees on inflated net asset value.

- 4 -

10.    PwC, as the Fund's independent auditor, failed to perform its audits of the Fund in accordance with generally accepted auditing standards ("GAAS") and issued false audit opinions. PwC had a heightened duty to go behind the mere numbers generated by the Fund's single manager who held all of the Fund's assets, lacked transparency, was riddled with conflicts of interest, and miraculously was able to consistently generate positive results even in down markets.

## VENUE AND JURISDICTION

11.    Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims herein occurred in New York County and all of the defendants are subject to personal jurisdiction in New York County.

12.    This Court has jurisdiction over the defendants pursuant to CPLR §§ 301 and 302(a). Defendants either reside in or transact business within the State, have committed tortious acts within the State and/or have committed tortious acts outside the State that have caused injury to persons and property within the State. Also, Greenwich Sentry, Fairfield Greenwich Group and Fairfield Greenwich Advisors LLC maintain their principal place of business within the State of New York, New York County.

## THE PARTIES

### Plaintiff

13.    Plaintiff David L Ferber SEP IRA ("Plaintiff") is a Limited Partner of Greenwich Sentry. In November 2001, David I. Ferber, a resident of New York, invested his SEP IRA in Greenwich Sentry. David I. Ferber SEP IRA held its limited partnership interest in Greenwich Sentry during the wrongdoing alleged herein and continues to hold such interest. David I. Ferber SEP IRA is not a General Partner of Greenwich Sentry. According to David I. Ferber SEP

- 5 -

IRA's October 2008 statement, the last month for which a Fund statement was received, David I.

Ferber SEP IRA's capital account balance with Greenwich Sentry was $431,215.

**The Fund Defendants**

14.    Nominal Defendant Greenwich Sentry is a limited partnership organized and

existing under the laws of the State of Delaware, with its principal place of business at 55 East

52nd Street, 33rd Floor, in New York County, New York.

15.    Defendant FGG, founded in 1983, is a limited liability company organized under

the laws of Delaware and registered to do business in New York. FGG has its principal place of

business at 55 East 52nd Street, 33rd Floor, New York City, in New York County, New York.

FGG describes itself as "a global family of companies" that offers a variety of single manager

funds, multi-strategy funds and fund-of-funds to investors and had assets under management of

over $14.16 billion as of November 1, 2008, of which approximately $6.9 billion was invested in

vehicles connected to BMIS. FGG acted as both agent and principal of the Fund, was controlled

by defendants Noel, Tucker and Piedrahita, the same individuals that controlled the Fund's

general partners. Defendants Noel and Tucker were the original general partners of the Fund

from 1993 to 1998. The Fund delegated due diligence to FGG and FGG marketed the Fund to

investors.

16.    Defendant Fairfield Greenwich Limited ("FG Limited") is an exempted company

organized under the laws of the Cayman Islands registered to do business in New York and is an

affiliate of FGG. FG Limited served as the General Partner of Greenwich Sentry from January

1998 until March 1, 2006. The General Partner is responsible for directing the Fund's

investment and trading activities.    Defendants Noel, Tucker and Piehrahita are the main

principals of FG Limited.

- 6 -

17.    Defendant Fairfield Greenwich (Bermuda) Ltd. ("FG Bermuda") was organized

as a corporation under the laws of Bermuda on June 13, 2003 and is an affiliate of FGG listed as

one of FGG's "[l]ocal operating entities" on FGG's website. FG Bermuda is a wholly-owned

subsidiary of FG Limited of which defendants Noel, Tucker and Piedrahita are the main

principals. FG Bermuda is registered as an investment advisor under the Investment Advisers

Act of 1940, as amended, effective April 20, 2006, and became the General Partner of

Greenwich Sentry effective March 1, 2006.

18.    Defendant Fairfield Greenwich Advisors LLC ("FG Advisors") is a limited

liability company organized under the laws of Delaware and registered to do business in New

York. FG Advisors has its principal offices at 55 East 52nd Street, 33rd Floor, New York City,

New York County, New York. FG Advisors is an affiliate of FGG and FG Bermuda, and listed

as one of FGG's "[l]ocal opperating entities" on FGG's website. FG Advisors provides

Greenwich Sentry with certain administrative services and back-office support.

19.    Defendant GlobeOp Financial Services LLC ("GlobeOp"), is a limited liability

company organized under the laws of Delaware and registered to do business in New York.

GlobeOp has its principal place of business at 450 Mamaroneck Ave., Harrison, Westchester

County, New York, and was the Fund's Administrator prior to September 1, 2006. GlobeOp

describes itself as a leading independent financial technology specialist providing automated,

integrated middle- and back-office, administration and risk reporting services to hedge funds and

asset management firms.

20.    Defendant Citco Fund Services (Europe) BV ("Citco Europe") is a limited

liability company formed under the laws of the Netherlands with its principle place of business

- 7 -

in Amsterdam, The Netherlands. Citco Europe has been the Fund's Administrator since
September 1, 2006.

21.    Defendant Citco (Canada) Inc. ("Citco Canada") is a Canadian corporation with
its principal place of business is in Ontario, Canada. Citco Canada, by delegation of Citco
Europe, acted as a sub-administrator of Greenwich Sentry since September 1, 2006.

22.    Citco Europe and Citco Canada are wholly owned subsidiaries of Citco Group, a
self-described global organization of financial services companies and pre-eminent hedge fund
administrators. Citco Europe, Citco Canada and Citco Group are referred to herein collectively
as "Citco." For funds of funds, according to its website, Citco offers "a complete outsourced
solution which combines fund administration, banking, financing, trade execution and custody,
using an on-line research-enabling trading platform, middle office services and centralized
dedicated pricing services and reporting."

23.    As the Fund's Administrators, Citco Europe and GlobeOp were responsible
respectively for performing certain day-to-day administrative services for the Fund, including
preparing and distributing monthly reports to the Limited Partners containing the amount of the
Fund's net assets, the amount of any distributions from the Fund and incentive fees, accounting
and legal fees and all other fees and expenses of the Partnership. The Administrator is also
responsible for maintaining the financial books and records, calculating the net asset value,
handling shareholder communications and supervising the payment of expenses by the Fund.
The Fund paid the Administrators a monthly service fee, in advance, based on the beginning net
asset value, after subscriptions and redemptions.

24.    Defendant Walter M. Noel, Jr. ("Noel") is a founding partner of FGG, and
according to FGG's own description, continues to oversee all of FGG's activities together with

- 8 -

defendants Tucker and Piedrahita. Noel is a member of the Board of Directors of FGG and

serves as a Director for many FGG funds and management company entities. Defendant Noel

was a general partner of the Fund together with defendant Tucker from 1993 to 1998. Defendant

Noel resides in New York and Connecticut.

25.     Defendant Jeffrey Tucker ("Tucker") is a founding partner of FGG and is a

member of the Board of Directors of FGG. According to FGG's own description, Tucker directs

FGG's business and operations activities and also serves as a Director for many FGG funds and

management company entities. Defendant Tucker was a general partner of the Fund together

with defendant Noel from 1993 to 1998. Defendant Tucker resides in New York.

26.     Defendant Andres Piedrahita ("Piedrahita") is a founding partner of FGG.

Piedrahita is a member of the Executive Committee of FGG and serves as a Director for many

FGG funds and management company entities. He also serves as President and Director of the

Fund's General Partner, FG Bermuda. Defendant Piedrahita resides in Miami, Florida; London,

England; and Madrid, Spain.

27.     Defendant Brian Francoeur ("Francoeur") is a Director of FG Bermuda, the

General Partner of the Fund. Francoeur is the Managing Director of Citco Fund Services

(Bermuda) Limited, an affiliate of the Fund's administrator, Citco Europe. Francoeur qualified

as a chartered accountant in 1994 and was employed by Ernst & Young in Bermuda from 1995

to 1997.

28.     Defendant Amit Vijayvergiya ("Vijayvergiya") is Managing Director of FG

Bermuda, the General Partner of the Fund, and, according to the Fund's Offering Memorandum,

focuses on manager selection and risk management for the Fund. Vijayvergiya is a Chartered

Financial Analyst and certified Financial Risk Manager.

29.    Defendants FGG, FG Limited, FG Bermuda, FG Advisors, Citco Europe, GlobeOp, Noel, Tucker, Piedrahita, Francoeur and Vijayvergiya are referred to collectively herein as the "Fund Defendants."

**PricewaterhouseCoopers LLP**

30.    Defendant PricewaterhouseCoopers LLP ("PwC Canada") is a limited liability partnership organized under the laws of the province of Ontario, Canada with its principal place of business in Ontario, Canada. PwC Canada was the accountant and auditor of the Fund for 2006-2008.

31.    Defendant PricewaterhouseCoopers Accountants N.V. ("PwC Netherlands") is a public limited liability company incorporated in The Netherlands with its principal place of business in Rotterdam, The Netherlands. PwC Netherlands was the accountant and auditor of the Fund for 2006.

32.    PwC Canada and PwC Netherlands are member firms of PricewaterhouseCoopers International Limited ("PwC Int'l"). PwC Int'l and all of its member firms operate as a self-described network of inter-connected member firms providing auditing and accounting services across an international platform by which means they are globally operational. PwC Int'l and its member firms maintain centralized control over training, standards of care, marketing, and quality of accounting and auditing work throughout the world. PwC Int'l and its member firms hold themselves out as and operate as a unified business entity.

33.    PwC Int'l's member firms are engaged in the business of providing auditing, accounting and other investment and advisory services. As of December 2006, PwC Int'l touted its member firms publically as serving "70 of the top 100 asset managers around the world."

- 10 -

34.    As is described further herein, PwC reported upon the financial statements and results of operations of Greenwich Sentry and issued unqualified reports thereon for the years 2005-2007.

## SUBSTANTIVE ALLEGATIONS

35.    Throughout the 1990's and up until the present, FGG and the Fund Defendants raised large sums of money from investors to invest with Madoff and BMIS. In exchange, FGG and its affiliates earned millions of dollars in fees. *Bloomberg News* reported on December 15, 2008 that if not for the revelation of Madoff's fraud, FGG and its affiliates would have collected about $135 million in fees in 2008 from its funds invested with BMIS.

36.    FGG operates several so-called "feeder funds" which invest directly with BMIS. A feeder fund is a fund that takes investor money and gives it to another fund to manage and invest. One such feeder fund is Greenwich Sentry, which began operations in 1993 and had assets of approximately $221 million as of December 31, 2007.

37.    Greenwich Sentry describes itself as "a private investment limited partnership which seeks to obtain capital appreciation of its assets through utilization of a nontraditional options trading strategy described as a 'split strike conversion.'" The Confidential Offering Memorandum for the Fund dated May 2006 (the "Offering Memorandum") describes the split-strike conversion strategy as follows:

> The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. * * * The basket typically consists of between 35 to 50 stocks in the S&P 100 Index.

- 11 -

The primary purpose of the long put options is to limit the market risk of the stock basket at the strike price of the long puts. The primary purpose of the short call options is to largely finance the cost of the put hedge and to increase the stand-still rate of return.

This position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

The degree of bullishness of the strategy can be expressed at implementation by the selection of the strike prices in the S&P 100 Index put and call options. The farther away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy.

38.    FGG and its affiliates touted as a selling point for the Fund, and its other funds, that it conducted "deeper and broader" pre-investment due diligence and post-investment "multifaceted risk monitoring" of its managers and fund assets than its competitors.  FGG's website states that FGG "probe[s] deeply into all key elements of risk" and "employs a significantly higher level of due diligence work than typically performed by most fund of funds and consulting firms."

39.    According to FGG's website and a marketing brochure provided to potential investors and also available on its website, FGG's "deeper and broader" due diligence included: (1) Portfolio Evaluation, Investment Performance, and Financial Risks; (2) Structural and Operational Risks; (3) Legal, Compliance, and Regulatory Risk; and (4) Personal Background Investigations.   Once a relationship with a fund manager is established the "due diligence process evolves into a similarly multi-faceted risk monitoring function." The FGG brochure goes on to say that "the purpose of this ongoing activity is to ensure that the fund continues to

- 12 -

follow its investment methodology - and constraints - and otherwise acts in accordance with the

operational and risk framework that was approved during the due diligence phase."

40.     According to the Uniform Application For Investment Advisor Registration

("ADV") completed by the Fund's General Partner, FG Bermuda, and dated March 27, 2008, an

affiliate of FG Bermuda, Fairfield Risk Services Ltd., serves as "FGG's Risk Management

team," which includes FG Bermuda. Defendant Vijayvergiya manages FGG's Risk

Management team. Fairfield Risk Services Ltd. is a wholly owned subsidiary of FG Limited, of

which defendants Noel, Tucker and Piedrahita are the main principals, and shares office space

with FG Bermuda.

*Portfolio Evaluation, Investment Performance, and Financial Risks*

41.     Under the first prong of FGG's due diligence and risk monitoring strategy,

"Portfolio Evaluation, Investment Performance, and Financial Risks," FGG claimed to "seek to

dissect a candidate manager's investment performance, how they generate alpha, and what risks

are taken in doing so." FGG further claimed to "apply both qualitative and quantitative measures

in this process," adding that "[p]articular focus is given to identifying and understanding various

elements of the manager's investment process and strategy-specific financial risk." FGG also

claimed to "attempt[] to understand the return attribution for individual securities in the portfolio,

and conduct[] a full suite of VaR analysis and stress tests to model the loss distribution function

under extreme market scenarios."

42.     However, had FGG and the other Fund Defendants actually applied the touted due

diligence and risk-monitoring strategy to understand how Madoff and BMIS produced the results

they claimed, they would have realized that those results were impossible. Madoff's split-strike

conversion strategy might tend to reduce volatility, but it would not produce gains in a declining

stock market. Nevertheless, Madoff and BMIS reported small, steady gains each month, including gains in sharply declining markets.

43.    Other investment advisors and financial publications had publically stated that BMIS's trading results could not be replicated based on the model Madoff was purportedly using. The trading results reported by BMIS were not consistent with publicly traded funds that followed the same trading strategy, all of which had much lower returns and greater volatility than reported by BMIS.

44.    For example, Aksia, LLC, an independent hedge fund research and advisory firm, identified as early as 2007, red flags which prompted Aksia to advise its clients against investing with Madoff or any of his "feeder funds," such as Greenwich Sentry. Aksia reported the red flags it had found back in 2007, in a letter to its clients dated December 15, 2008 (the "Aksia Letter"). One red flag reported in the Aksia Letter was that "[t]he Madoff feeder funds marketed a purported 'Split-strike Conversion' strategy that is remarkably simple; however, its returns could not be nearly replicated by our quant analyst."

45.    In May 2001, *Barron's* reported in the article *"Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum"* that certain option strategists for major investment banks could not understand how BMIS and Madoff achieved the results that they claimed from using the split strike conversion strategy. Madoff responded to *Barron's* questions regarding how he achieved consistently high returns stating that "It's a proprietary strategy. I can't go into great detail." When *Barron's* asked defendant Tucker about the returns FGG had received he stated, "It's a private fund. And so our inclination has been not to discuss its returns."

- 14 -

46.     Similarly, in May 2001, *MAR/Hedge* — a hedge fund newsletter — reported that the Fairfield Sentry Fund, a sister fund to Greenwich Sentry, had "reported losses of no more than 55 basis points in just four of the past 139 consecutive months, while generating highly consistent gross returns of slightly more than 1.5% a month and net annual returns roughly in the range of 15%." *MAR/Hedge* reported that "expert skeptics ... express[ed] bewilderment and indicated they were ... grappling to understand how such results had been achieved for so long."

47.     One basic technique to test the validity of a trading strategy in the securities industry is to reverse engineer the trading strategy purportedly employed to see if alleged performance results can be replicated. According to a December 18, 2008 article in *The Wall Street Journal*, Harry Markopolos, who worked for a BMIS rival in Boston, was asked by his bosses in 2000 why he couldn't get the same results as BMIS. Markopolos tried to reconstruct Madoff's purported strategy, but was unable to achieve the same results. Markopolos concluded Madoff must be a fraud. Markopolos's bosses told him to check his math, given that Madoff was such a renowned trader. Markopolos enlisted the help of Daniel DiBartolomeo, a top financial mathematician in Boston. DiBartolomeo spent hours pouring through Markopolos's data and came to the same conclusion: the strategy Madoff said he used could not have achieved the results he reported. Despite claiming to employ quantitative measures in evaluating a manager's performance, had FGG and the Fund Defendants reverse engineered Madoff's trading strategy, they would have seen that the results were impossible.

48.     Indeed, several accounts confirm that the Fund Defendants did not understand Madoff's trading strategy. For example, according to a December 19, 2008 article in *The Wall Street Journal*, David Giampaolo, chief executive of Pi Capital, a money-management firm, attended a meeting with defendant Piedrahita about 18 months earlier in London during which

- 15 -

defendant Piedrahita "stressed [at the meeting] the fund's years of steady and attractive performance," but "the performance was thin on details about the investment strategy." Piedrahita's answers, according to the news story, were "fluff." "When pressed to articulate how the fund generated the performance [t]here was no deep scientific or intellectual response."

49.    According to another account reported in *The Wall Street Journal* on February 5, 2009, Neil Chelo, a portfolio manger at Benchmark Plus, upon being contacted by a marketing person who suggested that he invest with FGG via another fund, questioned FGG representatives about BMIS. In response to questions about how much money Madoff managed total, a FGG risk manager said he wasn't sure. Chelo was surprised that the head of risk management wouldn't even know this. FGG also could not provide an adequate explanation as to why Madoff would hire FGG to bring money into BMIS rather than hiring his own team, in which case Madoff could keep all the management fees himself. When asked why nobody could duplicate Madoff's strategy, FGG representatives told Chelo, "people don't have [sic] proprietary model to know when to enter" and exit from trades. When asked how dealers hedged themselves, a FGG manager told Chelo he "had no answer and had never thought about it." In the end, Chelo concluded FGG knew little about Madoff or BMIS. Indeed, generally, if investors questioned Madoff's investment methodology, he would threaten them with removal from the Madoff programs.

50.    Moreover, had the Fund Defendants evaluated the options positions Madoff claimed to have open using the split-strike conversion strategy, they also would have seen that the positions were in excess of the actual open interest in the entire S&P put and call market in those securities. In addition, according to BMIS's ADV Report filed with the SEC, BMIS had over $17 billion of assets under management in 23 accounts. The entry and exit of over $17

- 16 -

billion would have overwhelmed the S&P 100 put and call market. Indeed, Aksia caught this red

flag, stating in the Aksia Letter that "[i]t seemed implausible that the S&P100 options market

that Madoff purported to trade could handle the size of the combined feeder funds' assets which

we estimated to be $13 billion."

51.    Under the first prong of FGG's due diligence and risk monitoring strategy, FGG

also claimed that "[i]ndependent trading records are examined." As part of FGG's ongoing

oversight it claimed to review the individual securities in each portfolio and have discussions

with the fund manager personnel several times each month. FG Bermuda's ADV explains the

quantitative analyses performed and monthly risk meetings with fund managers as follows:

> FRS [Fairfield Risk Services Ltd.] primarily conducts both the pre-
> and post-investment quantitative analyses of hedge fund managers,
> monitors the market risk and provides the quantitative analyses
> supporting the asset allocation decisions across the firm's multi-
> strategy funds. The risk infrastructure at FRS supporting these
> activities incorporates a number of systems and tools — including
> internally developed systems, off the shelf vendor solutions, and
> some customized applications built to meet FGG's business needs.
> *An important component of the FGG product platform is the
> position level transparency that we receive from all single
> managers which are included in our multi-strategy funds. Position
> information is transmitted via secure channels to our systems.*
>
> FRS's core risk management engine utilizes the flexible ASP
> version of the RiskManager product from RiskMetrics. This
> system is populated by detailed position information and further
> supplemented by an extensive market and terms and conditions
> database. The FRS team regularly evaluates the market risk of its
> single and multi-strategy funds by producing strategy and fund
> specific risk reports. These reports are customizable to present risk
> measures and tests most appropriate to each portfolio's strategy.
> *The FRS team prepares a monthly suite of reports using
> RiskManager that are carefully reviewed and discussed by FGG's
> Investment Committee at a formal monthly risk meeting.* The
> reports organized along the following dimensions: Exposures,
> Sensitivities, Scenarios and Stress Tests, VaR, Correlations
> Analysis and Attribution Analysis. The review includes the full
> suite of VaR analytics (including marginal, incremental and
> relative VaR) and careful evaluation of the sensitivity of our

- 17 -

> managers to important risk factors (such as increasing or
> decreasing equity markets, volatilities, interest rate shocks/twists,
> FX movements and other factors).

(Emphasis added.)

52.      However, there were no independent trading records for Madoff and BMIS,

because Madoff self-cleared the Fund's trades through his own broker-dealer, BMIS. Moreover,

BMIS generated paper trade tickets despite claiming to have an automated order and execution

process for the strike-split conversion strategy and that Madoff's reputation was made as an early

and enthusiastic proponent of electronic trading.  As stated in the Aksia Letter:

> Madoff's website claimed that the firm was technologically
> advanced ("the clearing and settlement process is rooted in
> advanced technology") and the feeder managers claimed 100%
> transparency. But when we asked to see the transparency during
> our onsite visits, we were shown paper tickets that were sent via
> U.S. mail daily to the managers. The managers had no
> demonstrated electronic access to their funds accounts at Madoff.
> Paper copies provide a hedge fund manager with the end of the day
> ability to manufacture trade tickets that confirm the investment
> results.

53.      Furthermore, BMIS refused outsiders, including the Fund Defendants and PwC,

access to its trading computer.  The Fund Defendants were fully aware of the red flag Madoff's

lack of transparency caused, since, according to a December 19, 2007 article in *The Wall Street

Journal*, in 2007 FGG attempted to capitalize on its successes by selling a stake in the firm.

However, in conducting due diligence on FGG, "several" private-investment firms requested

access to BMIS's trading records and "were told that Mr. Madoff wouldn't allow prospective

investors to view his books."

54.      Had Defendants conducted due diligence and risk monitoring into the trades

reported by BMIS, they would have discovered that many of the individual trades reported by

Madoff would have shown that they could not have taken place as represented in that many were

- 18 -

at reported prices higher than the price that the security in question traded at for the entire day

the trade was claimed to have been executed.

55.    When Aksia tried to independently confirm the existence of Madoff feeder fund

securities, it was unable to do so:

> There was at least $13 billion in all the feeder funds, but our
> standard 13F review showed scatterings of small positions in small
> (non-S&P100) equities. The explanation provided by the feeder
> fund managers was that the strategy is 100% cash at every quarter
> end.

Form 13(f) is the reporting form filed by institutional investment managers, pursuant to Section

13(f) of the Securities Exchange Act of 1934, reporting the securities holdings of institutional

investors.

56.    It is now apparent that the positions in securities represented by BMIS to its

customers, including Greenwich Sentry, simply did not exist. The Financial Industry Regulatory

Authority ("FINRA") has suggested that there is no record of trades through the Madoff Firm for

the fund accounts: "Our exams showed no evidence of trading on behalf of the investment

advisor, no evidence of any customer statements being generated by the broker-dealer," said

Herb Perone, spokesman for FINRA.

***Structural and Operational Risks***

57.    FGG's website and marketing brochure explain that **"Operational failures,**

**including misrepresentation of valuations and outright fraud, constitute the vast majority**

**of instances where massive investor losses occur."** (Emphasis in original.) Operational risk,

according to FGG, "refers to the risk of loss resulting from inadequate or failed internal

processes, human resources, or systems or from external events." FGG's website and brochure

go on to explain:

- 19 -

> FGG seeks a sound understanding of whether a hedge fund
> possesses key controls in the areas of portfolio management,
> *conflicts of interest, segregation of duties,* and compliance. FGG
> carefully assess the controls and procedures that managers have in
> place and seek to determine actual compliance with those
> procedures, often suggesting modifications, *separations of*
> *responsibilities,* and remedial staff additions.

(Emphasis added.)

58.     In detailing the procedures FGG performs to monitor operational risk, FGG's

website describes reviewing not only audited financials but also the auditor's management letter

comments. It further describes reviewing accounting controls and broker reconciliations in an

effort to ensure the existence of the securities. Some of the procedures FGG details include the

following:

> - Review audited financials and auditor's management letter
> comments; look for affiliated party loans and pledged assets or
> collateralized loans
>
> - Review accounting controls: from trade execution; to trade
> capture; to trade reconciliation with the Street, administrator, and
> fund; to funds books and records
>
>                     * * *
>
> - Review broker reconciliations to ensure completeness and
> existence of all securities.
>
> - Infrastructure Adequacy Evaluation and disaster recovery plans.

59.     The Fund Defendants could not have conducted the structural and operational due

diligence and risk monitoring described on FGG's website and in FGG's marketing brochure,

because, if they had, they would have observed blatantly inadequate controls, conflicts of

interest, and lack of separation of duties at BMIS. They would also have had cause to question

the existence of securities transactions allegedly made by BMIS on behalf of the Fund, because a

comparison of transactions reported by BMIS against publicly available trade data for the

- 20 -

securities, which were all publicly traded, would have shown that the transactions could not have

been executed on the dates and/or prices reported by BMIS.

60.    As mentioned above, Madoff failed to trade through an independent broker, and,

instead, self-cleared all Fund activities through his wholly-owned company, BMIS. In well-

managed investment programs, in order to create an independent basis for confirming transaction

executions and compliance with program criteria, the fund manager processes the transactions

through an independent broker. Madoff failed to follow this standard industry practice. Indeed,

Andy Berg, CEO of Homrich & Berg Inc., one of Atlanta's largest independent investment

advisors, told *The Atlanta Business Chronicle* in a February 5, 2009 article that BMIS's failure to

use a third-party custodian firm was "a black flag" for them. Berg advised a client who brought

an existing relationship with BMIS to him to sell its investments with BMIS immediately. Aksia

also told its clients that BMIS's initiation and execution of trades, and custody of feeder fund

assets, "seemed to be a clear conflict of interest and a lack of segregation of duties is high on our

list of red flags."

61.    A further operational and structural red flag is that BMIS's entire internal audit

function, as well as its external independent auditor function, was being conducted by the three

person firm of Friehling & Horowitz ("F&H"), only one member of which appears to have been

a full time accountant. As explained in the Aksia Letter:

> The feeder funds had recognized administrators and auditors but
> substantially all of the assets were custodied with Madoff
> Securities. This necessitated Aksia checking the auditor of Madoff
> Securities, Friehling & Horowitz (not a fictitious audit firm). After
> some investigating, we concluded that Friehling & Horowitz had
> three employees, of which one was 78 years old and living in
> Florida, one was a secretary, and one was an active 47 year old
> accountant (and the office in Rockland County, NY was only 13ft
> x 18ft large). This operation appeared small given the scale and
> scope of Madoff's activities.

- 21 -

62.    Under the regulations of the American Institute of Certified Public Accountants

("AICPA"), every accounting firm that does auditing work is required to enroll in the AICPA's

peer review program under which experienced auditors assess such firm's audit quality yearly.

While F&H was a member of the AICPA, it had not been subjected to a peer review since 1993

because F&H had represented to the AICPA, in writing, that it did not perform any audits.

Whether a firm has been subject to a peer review, and the results of that review, are on public file

at the AICPA.

63.    Also disturbing was the fact that BMIS was controlled by Madoff family

members. Close family relations within a business make it less likely that wrongdoing will be

exposed from within the entity, as it would require family members blowing the whistle on each

other. As explained in the Aksia Letter:

> Conversations with former employees indicated a high degree of
> secrecy surrounding the trading of these feeder fund accounts. Key
> Madoff family members (brother, daughter, two sons) seemed to
> control all the key positions at the firm. Aksia is consistently
> negative on firms where key and control positions are held by
> family members.

64.    The failure to use an independent third party broker to clear the Fund's trades,

reliance on a blatantly inadequate auditor, and the concentration of family control within BMIS

should have stopped FGG's investment of Fund assets with Madoff and BMIS in its tracks.

**Legal, Compliance, and Regulatory Risk**

65.    In connection with the third prong of FGG's due diligence and risk monitoring

strategy, "FGG's legal, compliance, and accounting teams specialize in investment management

regulation, securities compliance, corporate operations, and tax issues." According to FGG,

"[t]he role of this part of the diligence exam is to determine the seriousness of any deficiencies in

this area which may cause risk of sanction, loss, or reputational embarrassment."

- 22 -

66.     Had FGG and the other Fund Defendants conducted due diligence and risk monitoring of Madoff and BMIS they would have learned of numerous regulatory actions involving Madoff and/or BMIS:

a.     In 1992, the SEC investigated two accountants, Frank Avellino and Michael Bienes, who had illegally raised money in Florida for BMIS and Madoff promising guaranteed returns of 13.5% to 20%. These two accountants sold unregistered securities to unsophisticated investors raising $440 million. Through its investigation, the SEC discovered that Avellino and Bienes transferred their clients' funds to Madoff, who then purportedly invested the money. Yet, when investigators sought documents regarding those transactions, they discovered that Avellino and Bienes kept few if any records. According to an SEC complaint, Mr. Avellino began raising money for Madoff in 1962. Indeed, Avellino had been connected to Mr. Madoff for his entire career. After graduating from the City University of New York in 1958, Mr. Avellino began working as an accountant at a firm run by Saul Alpern, Mr. Madoff's father-in-law, where Mr. Madoff also once ran his operations. Bienes joined Avellino in raising funds for Madoff in 1965. The SEC charged Avellino and Bienes with operating an unregistered investment company and selling unregistered securities. These facts, including Madoff's involvement, were publically reported in a December 16, 1992 *Wall Street Journal* article.

b.     In January 2006, the SEC began an investigation into Madoff and BMIS, finding that Madoff had personally "misled the examination staff about the nature of the strategy" used by the FGG funds and other hedge fund accounts, and also "withheld from the examination staff information about certain of these customers' accounts," according to SEC documents in connection with the investigation. The SEC also found that neither Madoff nor the

FGG funds disclosed to investors in the FGG funds that Madoff was the investment advisor. The

SEC further found that Madoff had violated rules requiring investment advisors to register with

the SEC, which makes them subject to inspections and examinations. FGG and the Fund

Defendants were aware of the allegations against Madoff and the contents of the SEC

investigation, since the SEC interviewed an official from FGG and another FGG entity employee

during its investigation and received documents from FGG entities. The SEC ultimately closed

the investigation in 2008 after Madoff agreed to register his investment advisory business and

FGG agreed to disclose information about Madoff to investors. Nonetheless, Madoff's multiple

violations and purposeful misleading of SEC staff should have been a red flag to FGG and the

Fund Defendants.

        c.     FINRA also reported five regulatory actions against BMIS, the first dating

back to 1963: (1) In 1963, the National Association of Securities Dealers, Inc.("NASD") fined

and censured BMIS for violation of NASD Rule 2230; (2) In 1975, the NASD again fined BMIS

(the details of the violation are no longer available because of the age of the complaint); (3) In

2005, the NASD censured and fined BMIS for violation of SEC Rule 11AC1-4; (4) In 2007, the

NASD censured and fined BMIS for violation of SEC Rule 604, NASD Rule 2110, and

Interpretative Material 2110-2; and (5) In 2008, FINRA censured and fined BMIS for violation

of NASD Ruled 8211 and 8213.

      67.     Had FGG and the other Fund Defendants conducted due diligence and risk

monitoring of Madoff and BMIS, these numerous SEC, NASD and FINRA actions would have

raised red flags warranting further investigation into whether a manager such as Madoff/BMIS

that repeatedly acts in blatant disregard of regulations in place to protect investors should be

managing the Fund's assets.

*Personal Background Investigation*

68.    The fourth and final prong of FGG's due diligence and risk monitoring strategy

involves an examination of "the abilities and personalities of the individuals involved in

managing the fund." The background check included, among other things, extensive interviews

and litigation and regulatory checks. However, as discussed above, since Madoff generally

refused to answer questions about how he achieved such high returns and the Fund Defendants

had an apparent lack of understanding of Madoff's business, it is clear that FGG and the Fund

Defendants did not conduct a substantive interview of Madoff. Moreover, a background check

of his litigation and regulatory background would have turned up the various regulatory

problems discussed above.

69.    Instead of conducting adequate due diligence and risk monitoring of Madoff and

BMIS, the Fund Defendants were content to tout Madoff's results and collect hefty fees in

exchange for handing the Fund's assets over to Madoff to manage. The Fund Defendants never

questioned, at least publically, why Madoff would let feeder funds, such as those operated by or

through FGG, charge fees of 20% of profits, while BMIS simply charged a commission on trades

allegedly executed. According to a December 19, 2008 article in *The Wall Street Journal*, "[t]his

is an unusual arrangement that raised suspicions among rival money managers, some of whom

doubted that it could generate sufficient fee income."

70.    Indeed, numerous other investment professionals who advised investors about

potential investments with Madoff or BMIS warned clients not to invest with Madoff. As noted

above, in a letter issued to clients on December 15, 2008, Aksia, LLC, an independent hedge

fund research and advisory firm, discussed the red flags it had previously identified as early as

2007, which prompted Aksia to advise its clients against investing with Madoff or any of his

feeder funds, such as Greenwich Sentry. Aksia explained that "[a]s a research firm we are forced

- 25 -

to make difficult judgments about the hedge funds we evaluate for clients. *This was not the case with the Madoff feeder funds. Our judgment was swift given the extensive list of red flags.*" (Emphasis added.) In other words, this was a no brainer.

71.    According to a news account published by *Bloomberg News* on January 7, 2009, representatives of FGG were present at a meeting in 2000 with Bernard Madoff and representatives of Credit Suisse Group AG, including Oswald Gruebel, who at the time headed Credit Suisse's private-banking unit. According to *Bloomberg*, "Gruebel and two other Credit Suisse executives at the meeting with Madoff raised concern about his use of a little-known auditor who had just one client.... The bank also worried about why Madoff served as the custodian of his clients' assets.... Madoff wouldn't tell Gruebel how much money he managed, saying only that he had 12 people working with him to manage the strategy, along with six senior traders...." After the fifth or sixth query, Madoff ended the session, according to people who were at the meeting, reported *Bloomberg* on January 27, 2009. *Bloomberg* reported, Credit Suisse "urged customers ... to withdraw cash from his firm because the bank couldn't determine how he made money." The article stated that the Credit Suisse clients "proceeded to redeem about $250 million from Madoff-run funds."

72.    In 2003, a team from Société Générale's investment bank was sent to New York to perform routine due diligence of Madoff and BMIS. The *New York Times* reported in a December 17, 2008 article on the team's findings:

> What it found that March was hardly routine: Mr. Madoff's numbers simply did not add up. Société Générale immediately put Bernard L. Madoff Investment Securities on its internal blacklist, forbidding its investment bank from doing business with him, and also strongly discouraging wealthy clients at its private bank from his investments.

- 26 -

> The red flags at Mr. Madoff's firm were so obvious, said one
> banker with direct knowledge of the case, that Société Générale
> "didn't hesitate. It was very strange."

73.    The Fund Defendants had responsibilities to establish due diligence procedures

and performance guidelines for all fund managers with whom it invested client assets. These

procedures were to be applied in creating general oversight and transparency regarding how

Greenwich Sentry assets were being invested. The Fund Defendants were also responsible for

seeing that these procedures and guidelines, if any, were in fact being performed. However, as is

evident from the Fund Defendants' failure to heed the numerous red flags discussed above, the

Fund Defendants failed to perform even a minimum level of due diligence regarding Madoff and

BMIS.

74.    Indeed, according to a former employee of FGG during 2006 and 2007, that

employee was told not to worry about due diligence when it came to the Sentry funds, because it

is an "internal fund." A former accountant with FGG in New York from 2004 to 2008 stated that

s/he was not aware of any due diligence done of the Sentry funds and none of the accountants in

New York were involved in due diligence of the Sentry funds.

75.    Sticking their heads even further in the sand, FGG and its affiliates actively

worked to assure they would not learn the truth about Madoff and BMIS. Harry Markopolos, a

Madoff whistleblower, testified before Congress on February 4, 2009 that FGG embarked on a

three-year auditor shopping spree in 2004, switching auditors three times in three years.

Berkow, Schechter & Co. audited FGG and its funds through 2004. PwC Netherlands audited

FCC funds for 2005 and then PwC Canada took over in 2006. The switching of auditors was

done by the Fund Defendants with the hope that the lack of continuity would make it difficult for

the auditor to dig too deep into Madoff and BMIS.

76.     To add insult to injury, not only did the Fund Defendants not perform due
diligence and risk monitoring, the General Partner and FGG lied to the Limited Partners about
having performed a "higher level" of "deeper and broader" due diligence and risk monitoring.

77.     The Fund Defendants received large fees to choose managers and perform due
diligence and risk monitoring. As Brad Alford, who runs Alpha Capital Management LLC in
Atlanta, which helps clients choose hedge funds, was quoted by *Bloomberg News* on December
15, 2008 as saying: "It's mind-boggling that people like ... Fairfield Greenwich had been doing
this for so long.... It's the job of these funds of funds to be doing due diligence. That's why they
get paid."

**Obligations of the Fund Defendants**

78.     By reason of their positions and because of their ability to control the business of
the Fund, the Fund Defendants owed the Fund and the Limited Partners fiduciary obligations of
fidelity, trust, loyalty, candor and due care, and were and are required to use their utmost ability
to control the Fund in a fair, just and equitable manner and to act in furtherance of the best
interests of the Fund and the Limited Partners so as to benefit all the Limited Partners
proportionately and not in furtherance of their personal interest. In addition, each of the Fund
Defendants owed to the Fund and the Limited Partners, the fiduciary duty to exercise due care,
loyalty, good faith, candor and diligence in the management and administration of the Fund and
in the use and preservation of its assets.

*The General Partners' Culpable Conduct*

79.     Pursuant to the Offering Memorandum, the General Partner is responsible for
directing the Fund's investment and trading activities. Similarly, the Amended and Restated
Limited Partnership Agreement dated April 30, 2006 provides that the General Partner has the
exclusive power to make all decisions with regard to the management of the Fund.

- 28 -

80.    By operation of law, as the General Partner of a limited partnership, the General
Partner owed duties of care, loyalty and candor to the Limited Partners and the Fund.

81.    Each of the General Partners here completely abdicated its responsibilities to the
Limited Partners and the Fund by failing to perform even minimal due diligence into the Fund's
single manager and custodian of the Fund's assets, BMIS, let alone perform the "higher level" of
"deeper and broader" due diligence and continued monitoring that the General Partner and FGG
promised investors.

82.    Among other things, the General Partner utterly failed to:

    a.    safely manage the Fund's assets;

    b.    perform, or supervise those tasked with performing, adequate due
diligence of the Fund's single manager and custodian of assets, BMIS;

    c.    investigate various red flags apparent regarding BMIS, some of which was
reported in the mainstream media;

    d.    provide the Fund and Limited Partners with accurate financial statements
and reports; and

    e.    warn the Fund and the Limited Partners of the risks involved in their
investments.

83.    To make matters worse, not only did the General Partners fail to conduct due
diligence and risk monitoring of BMIS, each of the General Partners falsely represented to the
Limited Partners and the Fund that it had in fact performed and was continuing to perform these
duties, in violation of the General Partners' duties of candor and loyalty.

84.    The General Partners collected substantial fees for performing duties it did not
fulfill. The General Partners collected a Management Fee of 1% (0.0833% per month) of each

- 29 -

Limited Partner's capital account and an Incentive Allocation of 20% of the capital appreciation after expenses allocated to each Limited Partner's capital account. According to the Fund's financial statements, the Management Fees and Incentive Allocations paid were as follows:

| Year | Management Fee | Incentive Allocation |
|------|----------------|----------------------|
| 2005 | None (General Partner began charging Management Fee in 2006) | $2,451,275 |
| 2006 | $282,277 | $2,928,945 |
| 2007 | $785,421 | $3,054,146 |

Upon information and belief, the General Partner also received eleven months of Management Fees and Incentive Allocations prior to the Madoff ponzi scheme being revealed on December 10, 2008.

85. In addition to receiving fees over $9.5 million in fees during the last three years alone (not including those for the eleven months of 2008), for duties not performed, the Management Fees and Incentive Allocations paid to the General Partners were calculated based on inflated capital accounts and appreciation thereof.

*The Individual Defendants' Culpable Conduct*

    *Defendants Noel, Tucker and Piedrahita*

86. Defendants Noel, Tucker and Piedrahita controlled the General Partners and are the founding partners of FGG. Defendants Noel and Tucker served as the Fund's General Partners from its organization in 1993 until January 1998. Defendants Noel, Tucker and Piedrahita are the main principals of FG Limited, which, upon information and belief, served as the Fund's General Partner from January 1, 1998 until April 30, 2006. FG Bermuda, a wholly owned subsidiary of FG Limited, of which defendants Noel, Tucker and Piedrahita are the main principals, has served as the Fund's General Partner since March 1, 2006.

87.     Defendants Noel and Tucker controlled the general partners of the Fund when the Fund began investing its assets with BMIS, and therefore, were responsible for performing and/or supervising the initial pre-investment due diligence of BMIS.

88.     Defendants Noel, Tucker and Piedrahita, through their control of the various General Partners and FGG, were responsible for the continued risk monitoring of BMIS and the Fund's assets.

89.     Defendants Noel, Tucker and Piedrahita were aware, or should have been aware had they exercised the appropriate duty of care and loyalty, of the many red flags described above.

90.     Defendants Noel, Tucker and Piedrahita violated their duties of care and loyalty by failing to, *inter alia*:

        a.     safely manage the Fund's assets;

        b.     perform, or supervise those tasked to perform, adequate due diligence of the Fund's single manager and custodian of assets, BMIS;

        c.     investigate various red flags apparent regarding BMIS, some of which was reported in the mainstream media;

        d.     provide the Fund and Limited Partners with accurate financial statements and reports; and

        e.     warn the Fund and the Limited Partners of the risks involved in their investments.

91.     Defendants Noel, Tucker and Piedrahita further violated their duties of candor and loyalty by themselves falsely representing, and causing the other General Partners and FGG to

- 31 -

falsely represent, that they had performed due diligence and continued risk monitoring of the

Fund's manager and sole custodian, BMIS.

92.    Defendants Noel, Tucker and Piedrahita each personally benefited from the

breaches by being the ultimate recipients of the Management Fees and Incentive Allocations paid

to the General Partners.

*Defendants Francoeur and Vijayvergiya*

93.    Defendants Francoeur and Vijayvergiya, as directors of the Fund's General

Partner, FG Bermuda, owed the Fund and Limited Partners duties of care, loyalty and candor.

Defendants Francoeur and Vijayvergiya breached these duties by failing to, *inter alia*:

a.    safely manage the Fund's assets;

b.    perform, or supervise those tasked to perform, adequate due diligence of

the Fund's single manager and custodian of assets, BMIS;

c.    investigate various red flags apparent regarding BMIS, some of which was

reported in the mainstream media;

d.    provide the Fund and Limited Partners with accurate financial statements

and reports; and

e.    warn the Fund and the Limited Partners of the risks involved in their

investments.

94.    Defendant Vijayvergiya, in addition to his role as manger of FG Bermuda, as

manager of FGG's Risk Management team, owed a duty to the Fund and the Limited Partners to

perform adequate due diligence and continued monitoring of the Fund's single manager and

custodian of assets, BMIS.  Vijayvergiya breached his duties to the Fund and Limited Partners

by failing to perform any due diligence or continued monitoring of BMIS.

95.     Defendants Francoeur and Vijayvergiya benefited from the breaches of fiduciary duties by sharing in the Management Fees and Incentive Allocations paid to the General Partners from the Limited Partners' capital accounts.

### FGG's Culpable Participation

96.     FGG, through its control of its affiliates, exercised control over the General Partners, FG Limited, FG Bermuda, and FG Advisors. FGG used its alleged "higher level" of "deeper and broader" due diligence and continued risk monitoring of its funds' managers as a marketing tool to lure investors to its funds. The duties of due diligence and continued risk monitoring of the Fund's assets and manager were delegated to FGG's Risk Management Team.

97.     FGG owed duties of care, loyalty and candor to the Fund and its Limited Partners by way of its control of the Fund's General Partners, its representations to investors, and the delegation of due diligence and continued monitoring of fund managers to FGG's Risk Management team. FGG breached these duties and/or aided and abetted the General Partners' breaches of these duties, by failing to, *inter alia*:

            a.     safely manage the Fund's assets;

            b.     perform, or supervise those tasked to perform, adequate due diligence of the Fund's single manager and custodian of assets, BMIS;

            c.     investigate various red flags apparent regarding BMIS, some of which was reported in the mainstream media;

            d.     provide the Fund and Limited Partners with accurate financial statements and reports; and

            e.     warn the Fund and the Limited Partners of the risks involved in their investments.

98.    FGG violated its duties of candor and loyalty to the Fund and Limited Partners by falsely representing that it performed a "higher level" of "deeper and broader" pre-investment due diligence and post-investment multifaceted risk monitoring of its managers than its competitors.

99.    FGG benefited from the breaches of fiduciary duties by sharing in the Management Fees and Incentive Allocations paid to the General Partners from the Limited Partners' capital accounts, as well as the inflated expense reimbursements paid to FG Advisors discussed below.

**The Administrators' Culpable Participation**

100.    The Administrator of the Fund is responsible for performing day-to-day administrative services for the Fund, including preparing and distributing monthly reports to the Limited Partners containing the amount of the Fund's net assets, the amount of any distributions from the Fund and Incentive Allocations. The Administrator is also responsible for maintaining the financial books and records, calculating the net asset value, handling shareholder communications and supervising the payment of expenses by the Fund.

101.    Prior to September 1, 2006, the Fund's Administrator was GlobeOp. Citco Europe has been the Funds' Administrator and Citco Canada its sub-administrator since September 1, 2006. Defendant Francoeur, a director of FG Bermuda, is also the Managing Director of Citco Fund Services (Bermuda) Limited, an affiliate of Citco Europe and Citco Canada.

102.    The Administrators had a duty to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, and distribute accurate monthly reports to the Limited Partners. The Administrators failed in all three duties.

- 34 -

103.    Despite their failures to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, and distribute accurate monthly reports to the Limited Partners, the Administrators were paid a monthly service fee, in advance, based on beginning monthly net asset value of the Fund, after subscriptions and redemptions.  According to the Fund's financial statements, the Administration Fees paid were as follows:

| Year | Administration Fee |
| --- | --- |
| 2005 | $8,680 |
| 2006 | $25,251 |
| 2007 | $19,732 |

104.    The Administration Fees paid to the Administrators were also inflated, because the net asset value of the Fund calculated by the Administrator was inflated.

105.    FG Advisors provides the Fund with certain administrative services and back-office support.  FG Advisors received expense reimbursements from the Fund payable quarterly based on the beginning quarterly net asset value, after subscriptions and redemptions, computed at the rate of 0.10% per annum.  According to the Fund's financial statements, expense reimbursement paid were as follows:

| Year | Expense Reimbursement |
| --- | --- |
| 2005 | $30,878 |
| 2006 | $67,050 |
| 2007 | $19,732 |

106.    The expense reimbursements paid to FG Advisors were inflated, because the Fund's net asset value was inflated.

### PwC Violated GAAS & GAAP

107.    The PwC Int'l member firms describe themselves as having:

> The knowledge and experience necessary to help [clients] with complex financial accounting issues....Our member firms audit many of the world's best-known companies and thousands of other organizations both large and small. Our audit approach, at the

leading edge of best practice, is tailored to suit the size and nature
of [the clients'] organization and draws upon our extensive
industry knowledge.

http://www.PwC.com/extweb/service.nsf/docid/87737d18d5e2913885256e6d0062a0f6

108.    PwC is subject to regulations by various accounting bodies, including, but not

limited to, the American Institute of Certified Public Accountants ("AICPA") which promulgates

national auditing standards known as Generally Accepted Auditing Standards ("GAAS"). These

standards set the minimum level of performance and quality that auditors are expected to meet.

Under GAAS, the auditor has an overall responsibility to plan and perform the audit to obtain

reasonable assurance that the financial statements are free of material misstatement, whether

caused by error or fraud. AU § 110.02

109.    PwC was engaged by the General Partner of the Fund to provide independent

auditing and accounting services. Pursuant to such engagement, PwC agreed and undertook a

duty to provide professional services to audit the annual statements sent to the Limited Partners

in accordance with GAAS and to render an opinion as to whether those financial statements were

fairly presented in conformity with Generally Accepted Accounting Principles ("GAAP") in the

US.

110.    Among other things, PwC was required to opine that the Fund's Statement of

Assets, Liabilities & Partners' Capital, including the Schedule of Investments and related

Statements of Operations, Changes in Partners Capital and Cash Flows, presented in all material

respects, the financial position of the Fund at December 31, 2007, 2006, and 2005. This

included verifying that the investments included in the Statement of Assets , Liabilities &

Partners' Capital of $223,148,625, $148,788,428 and $120,866,796 as of December 31, 2007,

December 31, 2006 and December 31, 2005 respectively, existed and were appropriately valued.

111.    On April 18, 2008, PwC Canada issued an unqualified ("clean") opinion for the

year ended December 31, 2007 as follows:

>In our opinion, the accompanying statement of assets, liabilities
>and partners' capital, including the schedule of investments, and
>the related statements of operations, changes in partners' capital
>and cash flows present fairly, in all material respects, the financial
>position of **Greenwich Sentry, L.P.** (the "Partnership") as at
>December, 31, 2007 and the results of its operations, the changes
>in its partners' capital and its cash flows for the year then ended in
>conformity with accounting principles generally accepted in the
>United States of America. These financial statements are the
>responsibility of the Partnership's management; our responsibility
>is to express an opinion on these financial statements based on our
>audit. We conducted our audit of these financial statements in
>accordance with auditing standards generally accepted in the
>United States of America. Those standards require that we plan
>and perform the audit to obtain reasonable assurance about
>whether the financial statements are free of material misstatement.
>An audit includes examining, on a test basis, evidence supporting
>the amounts and disclosures in the financial statements, assessing
>the accounting principles used and significant estimates made by
>the Partnership's management, and evaluating the overall financial
>statement presentation. We believe that our audit provides a
>reasonable basis for our opinion.

112.    PwC Canada also issued an unqualified audit opinion for the year ended

December 31, 2006. On June 26, 2006, PwC Netherlands issued a unqualified opinion for the

year ended December 31, 2005 as follows:

>In our opinion, the accompanying balance sheet and the related
>statements of operations, partners' capital and cash flows present
>fairly, in all material respects, the financial position of Greenwich
>Sentry L.P. as at December 31, 2005, and the results of its
>operations and its cash flows for the year then ended in conformity
>with accounting principles generally accepted in the United States
>of America. These financial statements are the responsibility of the
>Partnership's management; our responsibility is to express an
>opinion on these financial statements based on our audit. We
>conducted our audit of these statements in accordance with
>auditing standards generally accepted in the United States of
>America, which require that we plan and perform the audit to
>obtain reasonable assurance about whether the financial statements
>are free of material misstatement. An audit includes examining, on

- 37 -

a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statements presentation. We believe that our audit provides a reasonable basis for our opinion. The financial statements of the Partnership as at December 31, 2004 and for the year then ended were audited by other auditors whose report dated February 21, 2005 expressed an unqualified opinion on those statements.

113.    Additionally, the Fund's financial statements identified investments as a

significant accounting policy from 2005 to 2007:

Investments in listed securities are valued at the last reported sales or bid as determined on the exchange on which such securities are principally traded. Investment transactions are accounted for on a trade-date basis.

114.    In issuing these opinions, PwC asserted that the Fund's financial statements were

presented in conformity with GAAP and that its audit was performed in accordance with GAAS.

As part of those financial statements, PwC also asserted that the Fund's investments existed and

were properly valued in accordance with GAAS and GAAP.

115.    PwC's audit was negligently conducted. PwC knew its audit opinions would be

disseminated to the Fund and its Limited Partners. Had PwC performed its audit in accordance

with GAAS and GAAP, the fact that the Fund's investments did not exist or were not

appropriately valued would have been known to the Fund and its Limited Partners.

*PwC was required by GAAS to Obtain Sufficient Audit Evidence*

116.    GAAS requires that an auditor must obtain sufficient audit evidence by

performing audit procedures to afford a reasonable basis for an opinion regarding the financial

statements under audit. AU § 326.01. Audit evidence is all the information used by the auditor

in arriving at the conclusions on which the audit opinion is based and includes the information

- 38 -

contained in the accounting records underlying the financial statements and other information. AU § 326.02.

117.    The auditor should obtain audit evidence by testing the accounting records, for example, through analysis and review, re-performing procedures followed in the financial reporting process and reconciliations. AU § 326.04. Other information that the auditor may use as audit evidence includes minutes of meetings, **confirmations from third parties**, controls manuals and information obtained by the auditor from such audit procedures as inquiry, observation, and inspection. AU § 326.05. In the case of a third party investment manager, a typical audit procedure to verify the existence of investments is to send a confirmation request of the investments balance as of the balance sheet date.

*PwC was required by GAAS to Exercise Due Professional Care and Professional Skepticism*

118.    GAAS also requires that auditors must exercise due professional care in performing the audit and preparing the audit report. AU § 230.01. Due professional care concerns what the auditor does and how well he does it. AU § 230.04.

119.    Additionally, due professional care requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence. AU § 230.07.

120.    Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process. AU § 230.08. Additionally, in exercising professional skepticism, the auditor should

not be satisfied with less than persuasive evidence because of a belief that management is honest.

AU § 230.09.

121.    As stated above, confirmation requests are a typical audit procedure to audit

investments held be third party investment managers.  Statement of Auditing Standard ("SAS")

No. 67, *The Confirmation Process*, requires the auditor to exercise an appropriate level of

professional skepticism throughout the confirmation process.  AU § 330.15.

122.    SAS No. 67 states that:

> The auditor's understanding of the client's arrangements and
> transactions with third parties is key to determining the
> information to be confirmed. The auditor should obtain an
> understanding of the substance of such arrangements and
> transactions to determine the appropriate information to include on
> the confirmation request.

123.    More importantly, SAS No. 67 highlights the need for auditors to exercise a

higher degree of professional skepticism in certain circumstances:

> If information about the respondent's competence, knowledge,
> **motivation, ability, or willingness to respond, or about the
> respondent's objectivity and freedom from bias** with respect to
> the audited entity comes to the auditor's attention, the auditor
> should consider the effects of such information on designing the
> confirmation request and evaluating the results, including
> determining whether other procedures are necessary. In addition,
> there may be circumstances (such as for significant, unusual year-
> end transactions that have a material effect on the financial
> statements or **where the respondent is the custodian of a
> material amount of the audited entity's assets) in which the
> auditor should exercise a heightened degree of professional
> skepticism relative to these factors about the respondent.** In
> these circumstances, the auditor should consider whether there is
> sufficient basis for concluding that the confirmation request is
> being sent to a respondent from whom the auditor can expect the
> response will provide **meaningful and appropriate audit
> evidence.**

(Emphasis added.)

- 40 -

124. PwC failed in its duties to obtain sufficient competent audit evidence and exercise the appropriate degree of professional skepticism and due professional care during the audit of the financial statements of the Fund. This was particularly true with respect to confirmation of the Fund's investments for the following reasons:

    a.    BMIS was the ONLY third party investment manager of the Fund;

    b.    BMIS was also the SOLE custodian of the Fund's assets; and

    c.    The Fund invested ALL of its investments with BMIS.

125. One of these facts alone should have caused PwC to heighten its professional skepticism during its audit testing of the Fund's investments. With all of these factors present and the additional red flags described previously, PwC's failure to obtain appropriate audit evidence concerning the Fund's investments was astounding.

126. PwC failed to exercise due professional care because it failed to obtain sufficient evidence to support the assertions of the existence of the Fund's investments, maintain an attitude of professional skepticism; and render an accurate audit report on behalf of the Fund as required by GAAS.

***PwC was required by the AICPA Investment Guide & Alternative Investments Practice Aid to Perform "Look-Through Audits" into BMIS***

127. The AICPA *Investment Company Audit & Accounting Guide* (the "Guide") is an industry standard when it comes to auditing public or private investment companies. It describes the objectives of auditing investments in other funds. Section 5.84 specifically addresses the audit risk associated with funds of funds or feeder funds and establishes a "look-through" duty for auditors of funds of funds. It states that significant audit risks may exist if management does not use strong procedural controls in selecting and monitoring a fund's investments in investee companies and determining the investments fair value. In highlighting this audit risk, the Guide

- 41 -

states that the auditors approach to an investor fund's investments in investee funds (i.e. funds of funds) might focus on:

    a.    Evaluating the investor and investee funds' control environments; and

    b.    Substantiating the fair value attributed to investments in the investee funds.

128.    Additionally, Section 5.85 of the Guide suggests the following audit tests for investments in non public funds.

> Participation in management site visits or telephone calls to investee funds....Participation in management site visits would be more appropriate if the investee funds represented a **significant investment by the investor fund** or if **serious concerns as to the management controls at the investee fund** existed.

(Emphasis added.)

129.    The AICPA *Alternative Investments - Audit Considerations Practice Aid* ("Practice Aid") provides similar guidance as to the valuation and existence of investments of funds of funds. It states that an auditor should confirm investments with the fund manager as of the balance sheet date and should exercise considerable judgment in performing alternative procedures towards assessing the existence of investments. This judgment should include the following audit tests:

    a.    Observing management sites;

    b.    Reviewing executed partnership, trust or similar agreements;

    c.    Inspecting other documentation supporting the investor's interest in the fund;

    d.    Reviewing periodic statements of the fund and comparing activity with amounts recorded by the investor; and

    e.    Vouching relevant cash receipts and disbursements.

130.    Such testing suggested by the AICPA in the Guide and the Practice Aid is critical in the case of a single third party investment manager and a sole custodian of investments of ALL of the Fund's investments such as BMIS. In this situation, PwC should, for all intents and purposes, have performed a full scope audit of the underlying fund, *i.e.* BMIS, including an assessment of BMIS' control environment.

131.    The alternative to this would have been for PwC to issue a reliance report stating that the auditor of the underlying fund, *i.e.* F&H, is responsible for the audit. It did not do that. However, where the underlying auditor is a three person audit firm with no recent Peer Review, is a related party to BMIS and has no other known audit clients, PwC was obligated to have performed significant audit testing on BMIS.

132.    PwC's audit "look-through" testing should have at a minimum included a robust assessment of BMIS' control environment, visiting BMIS' offices, interviewing BMIS management, reviewing cash receipts and payments details and inspecting other relevant information including legal agreements, trading tickets etc. PwC knowingly failed to do this and as a result issued an audit opinion which was in violation of GAAS.

***PwC was required by GAAS to obtain an Understanding of the Fund's Internal Controls***

133.    GAAS states that the auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements, whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures. AU § 314.01.

134.    Obtaining an understanding of the entity and its environment is an essential aspect of performing an audit in accordance with GAAS. In particular, that understanding establishes a frame of reference within which the auditor plans the audit and exercises professional judgment

- 43 -

about assessing risks of material misstatement of the financial statements and responding to those risks throughout the audit. AU § 314.04.

135.    Additionally, GAAS requires that auditors consider the existence of an internal audit function in determining the nature, timing and extent of audit procedures to be performed. AU § 332.01. Auditors are also required to assess the internal auditors' competence, including factors such as the educational level and professional experience and also assess the internal auditors' objectivity.

136.    Given the facts surrounding the custody and management of the Fund's investments by BMIS described above, PwC had a "look-through" audit responsibility to assess BMIS' control environment and internal auditors. PwC knowingly failed to do this. Had PwC carried out its responsibilities, it would have concluded that:

a.    There was a lack of transparency into BMIS' investment strategy and activities;

b.    BMIS' trades for the Fund were not supported by an automated order and execution process but were supported by manual trading tickets;

c.    The Fund performed little or no due diligence on BMIS and did not test the validity of the Fund's performance or strategy;

d.    The Fund changed its auditor three times from 2004 to 2006 from Berkow, Schecter & Co. in 2004 to PwC Netherlands in 2005 to PwC Canada in 2006;

e.    BMIS' internal audit function was performed by its external auditors, F&H, who were the external auditors of BMIS for many years and lacked any objectivity to properly carry out this function;

f.      F&H was not experienced or qualified to perform an internal audit

function as it was only a three person auditing firm (of which only one appears to have been a

full time accountant) with no other known audit or internal audit clients. It also had not had any

Peer Reviews conducted on it as outlined by the AICPA; and

g.      F&H did not have the appropriate level of access to BMIS' accounting or

operational information.

137.    Knowing these facts, PwC failed to appropriately assess the Fund and BMIS'

internal controls and control environment in designing and executing its audit plan. It also failed

to consider the objectivity and qualifications of BMIS' internal auditors as part of its annual

audit of the Fund in violation of GAAS.

**PwC was required by GAAS to Assess Audit Risk and the Risk of Material Misstatement to Fraud or Error**

138.    GAAS states that audit risk and materiality, among other matters, need to be

considered together in designing the nature, timing, and extent of audit procedures and in

evaluating the results of those procedures. AU § 312.01.

139.    GAAS also requires that risk assessments, and accordingly, any reevaluations of

risk assessments, should be made with consideration of applicable risk factors. AU § 316.02. In

addition, the auditor should use professional judgment in determining whether a risk factor is

present and should be considered in identifying and assessing the risks of material misstatement

due to fraud. AU § 316.32.

140.    The auditor also has a responsibility to plan and perform the audit to obtain

reasonable assurance about whether the financial statements are free of material misstatement,

whether caused by fraud or error. AU § 316.12. SAS No. 99, *Consideration of Fraud in a*

- 45 -

*Financial Statement Audit.* In performing the audit, the auditor is concerned with matters that,

either individually or in the aggregate, could be material to the financial statements.

141.    Furthermore, because of the characteristics of fraud, the auditor's exercise of

professional skepticism is important when considering the risk of material misstatement due to

fraud.  AU § 316.13 states that:

> The auditor should conduct the engagement with a mindset that
> recognizes the possibility that a material misstatement due to fraud
> could be present, regardless of any past experience with the entity
> **and regardless of the auditor's belief about management's
> honesty and integrity. Furthermore, professional skepticism
> requires an ongoing questioning of whether the information and
> evidence obtained suggests that a material misstatement due to
> fraud has occurred.** In exercising professional skepticism in
> gathering and evaluating evidence, the auditor should not be
> satisfied with less-than-persuasive evidence because of a belief that
> management is honest.

(Emphasis added.)

142.    PwC was required under GAAS to actively consider whether there was a risk that

the financial statements it was auditing contained material misstatements due to fraud, to identify

the risks thereof and to communicate those concerns, if any, to the management of the Fund.

143.    However, PwC knowingly ignored the numerous fraud risk factors during its audit

of the Fund.  These factors included but were not limited to:

a.    Unusual year after year steady profitability, especially compared to that of

other companies in the same industry;

b.    Managements' personal financial situation was threatened by the Fund's

financial performance, including significant portions of their compensation being contingent

upon fees paid by BMIS;

c.    Ineffective monitoring by the Fund of BMIS as outlined above;

- 46 -

d.      Ineffective oversight over the financial reporting process and internal

controls; and

e.      Inadequate segregations of duties.

144.    In addition to the above fraud risk factors, PwC also ignored the numerous red

flags that existed at the Fund and BMIS as outlined previously in violation of GAAS.

*PwC was required by GAAS & GAAP to Audit Investments*

145.    SAS No. 92 *Auditing Derivative Instruments, Hedging Activities, and Investments

in Securities* provides guidance to auditors in planning and performing auditing procedures for

assertions about derivative instruments, hedging activities, and investments in securities that are

made in an entity's financial statements. AU § 332.01.  It states the auditor may need special skill

or knowledge to plan and perform auditing procedures for certain assertions about derivatives

and securities, including:

> **Obtaining an understanding of an entity's information system for
> derivatives and securities, including services provided by a
> service organization,** which may require that the auditor have
> special skill or knowledge with respect to computer applications
> when significant information about derivatives and securities is
> transmitted, processed, maintained, or accessed electronically; and
>
> **Identifying controls placed in operation by a service
> organization that provides services to an entity that are part of
> the entity's information system** for derivatives and securities,
> which may require that the auditor have an understanding of the
> operating characteristics of entities in a certain industry.

(Emphasis added.) AU § 332.05

146.    SAS No. 92 also states that the understanding of an entity's information system

may include controls over securities transactions from their initiation to their inclusion in the

financial statements.  It also states that this may encompass controls placed in operation by the

entity and by service organizations whose services are part of the entity's information system.

- 47 -

AU § 332.11. The Fund's investments were required to be reported in accordance with GAAP

and FAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, (May 1993).

147.    PwC was required by GAAS to obtain an appropriate understanding of the Fund's

information systems for investments, including those systems at BMIS. PwC failed to do this.

This failure represented a complete and systematic breakdown of PwC's audit responsibilities

under GAAS. Additionally, PwC's audit failures caused the Fund's investments to be reported

in violation with GAAP.

### *PwC Failed in its Duty As the Independent Auditor of the Fund*

148.    PwC failed in its duty as the independent auditor of the Fund as follows:

a.    PwC failed to exercise due professional care and professional skepticism

in its audit of the Fund. PwC should have exercised heightened care and professional skepticism

in light of the facts and red flags discussed previously;

b.    PwC failed to obtain sufficient audit evidence with respect to existence of

the Fund's investments;

c.    PwC failed to appropriately perform "look-through audits" into the

underlying fund, *i.e.* BMIS, and assess the impact of its findings on its audit of the Fund's

financial statements;

d.    PwC failed to obtain an understanding of the Fund's internal controls and

assess the qualifications and competency of internal auditors;

e.    PwC failed to appropriately assess audit risk and the risk of material

misstatement due to fraud or error; and

f.    PwC failed to audit investments in accordance with GAAS and GAAP.

149.    PwC knowingly ignored the GAAS and GAAP requirements and numerous facts

and red flags discussed above which should have led it to either:

- 48 -

a.    disclaim or issue an adverse opinion on the Fund's 2007, 2006 and 2005

financial statements; or

b.    withdraw, correct or modify its opinion to recognize the Fund's improper

accounting and financial reporting as stated above.

### DEMAND FUTILITY

150.    Plaintiff will fairly and adequately represent the interests of nominal defendant

Greenwich Sentry and its Limited Partners in prosecuting the wrongs detailed herein.

151.    Plaintiff has not made demand on the General Partner or any other partner of the

Fund, or on any manager of the Fund, to bring these derivative claims since such demand would

be a futile and useless act that is excused by governing law, as shown below.

152.    Demand is excused because the unlawful acts and practices alleged herein cannot

be defended by the General Partner and are not subject to the protection of any independent

business judgment, since it would undoubtedly be to the benefit of the Fund to recover the

damages caused by the General Partner's wrongdoing and to assert these derivative claims.

153.    Demand is excused because the wrongs alleged herein constitute violations of the

fiduciary duties owed by the General Partner to the Limited Partners and the Fund.  The General

Partner is subject to liability for breaching its fiduciary duties to the Fund by, *inter alia,* causing

the Fund's assets to be invested with Madoff or BMIS without performing due diligence or

continued monitoring, causing or permitting the reckless investment practices alleged herein,

failing to adequately monitor BMIS's financial reporting, and failing to detect, prevent, or halt

the misstatements and omissions of material fact alleged herein.

154.    Demand is excused because the General Partner exercises ultimate authority over

the Fund and profited at the expense of the Fund by receiving monthly Management Fees and

Incentive Allocations from the Fund and Limited Partners.

- 49 -

155.    Demand is excused because the General Partner faces a substantial likelihood of liability in this action because of its acts and omissions alleged herein. The dramatic breakdowns and gaps in those controls were so widespread and systematic that the General Partner faces substantial exposure to liability, under the "Caremark doctrine," for total abrogation of its duty of oversight. *See In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996). The General Partner either knew or should have known that the Fund's assets were employed as part of a massive Ponzi scheme and took no steps in a good faith effort to prevent or remedy that situation, proximately causing billions of dollars of losses and possible complete collapse of the Fund.

156.    In addition, demand is also excused because the General Partner has ratified the egregious actions outlined herein, and the General Partner cannot be expected to prosecute claims against itself, and persons or entities with whom it has extensive inter-related business, professional and personal entanglements, if Plaintiff demanded that it do so. The General Partner, because of these relationships, has developed debilitating conflicts of interest that prevent it from taking the necessary and proper action on behalf of the Fund.

157.    Demand is also excused because the General Partner participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly or negligently disregarded them, and is therefore not a disinterested party and lacks sufficient independence to exercise business judgment as alleged herein.

158.    Demand is also excused because insurance policies covering the liability of a fund's General Partner generally purport to exclude legal claims asserted directly by the Fund against such persons. Thus, there was, and is, a substantial disincentive for the Fund to bring any action directly against the General Partner. Generally, under the terms of such insurance

- 50 -

policies, a partnership would be required by the carriers to cooperate in the defense of any

claims, such as the present action, which seek to impose liability upon the General Partner for

misconduct and mismanagement. Thus, if the policy or policies which the Fund maintains

contain the foregoing provision, the insurance carriers would argue that the Fund and its General

Partner are thereby contractually disabled from complying with any demand that would cause the

Fund to institute, or prosecute any action against the General Partner for such misconduct and

mismanagement; because to do so could result in the loss to the Fund of its insurance coverage.

Similarly, the Fund would be disabled from pursuing the General Partner, as it would not benefit

from any insurance they may have.

159.    Demand is also excused because the General Partner participated in, approved, or

permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly, or

negligently disregarded them, and is therefore not a disinterested party and lacks sufficient

independence to exercise business judgment as alleged herein.

160.    Given the size, scope, and blatancy of the wrongdoing and the misrepresentations

alleged above, the General Partner either knew of the financial risks or turned a blind eye to

them. Such conduct is also not protected by the business judgment rule and exposes the General

Partner to a substantial threat of liability in this action.

161.    The General Partner lacks the sufficient independence with which to render a

disinterested decision on whether to pursue the derivative claims alleged herein against

Defendants.

162.    In addition, demand would be futile and useless for the additional following

reasons:

- 51 -

a.   The General Partner, because of its inter-related business, professional and
personal relationships, has developed debilitating conflicts of interest that prevent it from taking
the necessary and proper action on behalf of the Fund as requested herein;

b.   The General Partner, as more fully detailed herein, participated in,
approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts
to conceal or disguise those wrongs from the Fund's Limited Partners or recklessly and/or
negligently disregarded the wrongs complained of herein, and is therefore not a disinterested
party. The General Partner exhibited a sustained and systemic failure to fulfill its fiduciary
duties, which could not have been an exercise of good faith business judgment and amounted to
gross negligence and extreme recklessness;.

c.   In order to bring this suit, the General Partner would be forced to sue itself
and persons with whom it has extensive business and personal entanglements, which it will not
do, thereby excusing demand;

d.   The acts complained of constitute violations of the fiduciary duties owed
by the General Partner and these acts are incapable of ratification; and

e.   The Fund has been and will continue to be exposed to significant losses
due to the wrongdoing complained of herein, yet the General Partner has not filed any lawsuits
against itself or the Fund Defendants for breach of fiduciary duties or others who were
responsible for that wrongful conduct to attempt to recover for the Fund any part of the damages
the Fund suffered and will suffer thereby.

163.   Finally, Plaintiff has not made any demand on the Limited Partners to institute
this action since such demand would be a futile and useless act for the following reasons:

a.   The Fund has a large number of Limited Partners; and

- 52 -

b.    Making demand on all the Limited Partners would force Plaintiff to incur

huge expenses, assuming all the Limited Partners could be individually identified.

164.    Demand is excused because the General Partner still has not sued PwC despite its

failure to find during its audit that the Fund's assets did not exist and that the Fund lacked

adequate internal controls.

## FIRST CAUSE OF ACTION

### Grossly Negligent, Willful and Reckless Breach of Fiduciary Duties
### Against the Fund Defendants

165.    Plaintiff repeats and realleges the foregoing allegations as though fully set forth

herein.

166.    The Fund and the Limited Partners have suffered damages due to the Fund

Defendants' conduct as detailed above. The claims asserted herein against the Fund Defendants

are asserted on behalf of Greenwich Sentry to recover from the Fund Defendants the damages

sustained and to be sustained by the Fund and the Limited Partners due to the gross, willful and

wrongful mismanagement of the Fund's assets.

167.    The conduct detailed above was not due to an honest error of judgment but to the

Fund Defendants' gross, reckless, bad faith and/or willful disregard of their duties and of the

rights and interests of the Fund and the Limited Partners. The Fund Defendants' conduct cannot

be justified as valid acts of business judgment because they engaged in systematic, gross

mismanagement and materially misled the Fund and the Limited Partners in order to enrich

themselves personally.

168.    The Fund Defendants have individually or in concert breached fiduciary duties of

loyalty, care, candor and good faith owed to the Fund and its Limited Partners because they:

- 53 -

a.    failed to establish and implement an adequate and functioning system of internal financial and accounting controls to ensure the existence of the Fund's assets;

b.    failed to accurately perform, or to supervise others who performed, due diligence and continued risk monitoring of the Fund's manager and portfolio;

c.    enriched themselves at the expense of the Limited Partners by collecting management fees, incentive payments, and/or administrative fees based upon the artificially inflated capital accounts of the Limited Partners and/or net asset value of the Fund;

d.    at a minimum, failed to supervise the preparation and filing of audits, reports or other information which was sent to the Limited Partners and to examine and evaluate any reports of examination, audits, or other financial information concerning the Fund; and

e.    made false statements to the Fund and Limited Partners regarding the due diligence and risk monitoring they purported to perform.

169.    By reason of the foregoing, the Fund has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

170.    Plaintiff has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Breaches of
### Fiduciary Duties Against the Fund Defendants

171.    Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

172.    Each of the Fund Defendants breached the fiduciary duties owed to the Fund and the Limited Partners in a grossly negligent, willful and reckless manner, as detailed above.

- 54 -

173.    Each of the Fund Defendants knowingly gave substantial assistance and encouragement to each other in committing the grossly negligent, willful and reckless breach of fiduciary duties alleged above.

174.    Each of the Fund Defendants acted in concert with at least one other Fund Defendant to commit the breaches of fiduciary duties detailed above.

175.    Plaintiff, and all Limited Partners, were injured as a result of the Fund Defendants' conduct.

### THIRD CAUSE OF ACTION

### Negligent Misrepresentation Against the Fund Defendants

176.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

177.    The Fund Defendants owed to the Fund and the Limited Partners a duty: (a) to act with reasonable care in preparing and disseminating the Offering Memorandum and other representations relied upon by the Fund and the Limited Partners in deciding to purchase their limited partnership investment interests in the Fund; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in the Offering Memorandum.

178.    Defendants breached their duties to the Fund and the Limited Partners by failing to investigate, confirm, prepare and review with reasonable care the information contained in the Offering Memorandum and other representations, including the audited annual financial statements.

179.    Neither the Offering Memorandum nor any other statements made to the Fund or Limited Partners ever disclosed that the Fund Defendants had not conducted due diligence of

- 55 -

Madoff or BMIS, or that they did not conduct the post-investment multifaceted risk monitoring described in various FGG and Fund documents. As a direct, foreseeable and proximate result of this negligence, the Fund and Limited Partners have sustained damages, suffered mental and emotional distress and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

180.    By reason of the foregoing, Defendants are jointly and severally liable to the Fund and Limited Partners.

181.    Defendants' fraudulent acts were willful and wanton and the Fund and Limited Partners are entitled to punitive damages.

## FOURTH CAUSE OF ACTION

### Professional Negligence (Malpractice)
### Against PwC Canada and PwC Netherlands

182.    Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

183.    As previously set forth, PwC Canada and PwC Netherlands were retained by the Fund to ensure that the financial information conveyed by the Fund to the Limited Partners was presented in conformity with GAAP. To that end, PwC Canada and PwC Netherlands undertook to perform audits pursuant to GAAS and was substantially compensated therefor.

184.    PwC Canada and PwC Netherlands accepted the engagement and undertook to discharge their duties in a proper, skillful and diligent manner and in accordance with accepted professional standards.

185.    In complete disregard of their duties, PwC Canada and PwC Netherlands failed to adhere to and carry out their duties in accordance with GAAS and other accepted professional standards.

186.    As a result of the aforementioned failure to discharge their duties in a proper, skillful and diligent manner, PwC Canada and PwC Netherlands negligently, carelessly and unskillfully failed to discover and/or advise the Fund of the materiality of various internal control problems and reporting errors.

187.    PwC Canada and PwC Netherlands' deviation from the standards of care in the industry proximately caused the Fund's and the Limited Partners' pecuniary injuries.

188.    As a result of PwC Canada and PwC Netherlands' professional negligence, the Fund and its Limited Partners suffered extensive monetary damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Breach of Contract
### Against PwC Canada and PwC Netherlands

189.    Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

190.    As previously set forth, the Fund retained PwC as its external auditor.

191.    PwC Canada and PwC Netherlands were retained by the Fund to ensure that the financial information conveyed by the Fund to the Limited Partners was presented in conformity with GAAP.

192.    PwC Canada and PwC Netherlands accepted the engagement and in connection therewith, PwC Canada and PwC Netherlands provided the Fund with one or more engagement letter(s) confirming the parameters of the engagement.

193.    AU 311.09 states that an understanding with the client regarding an audit of the financial statements includes the following auditor responsibilities:

- 57 -

- The auditor is responsible for conducting the audit in accordance with generally accepted auditing standards. Those standards require that the auditor obtain reasonable rather than absolute assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.

- An audit includes obtaining an understanding of the entity and its environment, including its internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify significant deficiencies. However, the auditor is responsible for ensuring that those charged with governance are aware of any significant deficiencies that come to his or her attention.

194.    PwC Canada and PwC Netherlands breached their contracts with the Fund, because they did not perform their audits of the Fund in accordance with GAAS by failing to obtain reasonable assurance that the financial statement were free of material misstatement. They also failed to obtain an appropriate understanding of internal control and permitted the financial statements of the Fund for 2005-2007 to be issued in violation of GAAP and GAAS.

195.    Specifically, as alleged herein, at least for the years ending December 31, 2007, December 31, 2006 and December 31, 2005, PwC Canada and PwC Netherlands failed to apprise the Fund or its Limited Partners, among other things, that:

a.    The Fund's internal controls were virtually nonexistent, at least with respect to the asset confirmation function, which was critical to the Fund and the Limited Partners;

b.    The Fund was disregarding its stated due diligence and continued monitoring policies; and

c.    As a direct result of PwC Canada and PwC Netherlands' breach of contract, the Fund and its Limited Partners suffered damages in an amount to be determined at trial.

- 58 -

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation
### Against PwC Canada and PwC Netherlands

196.    Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

197.    PwC Canada and PwC Netherlands owed a direct duty to the Fund to provide the Fund with correct, accurate and complete audit opinions.

198.    PwC Canada and PwC Netherlands knew that the audit opinions they provided to the Fund were crucially important to the Fund's business and that the Fund intended to, and did, rely on the audit opinion(s) by, among other things, including the audit opinion(s) in the annual reports which were sent to the Limited Partners.

199.    PwC Canada and PwC Netherlands knew that if the audit opinions were false or erroneous, the Fund would suffer significant pecuniary damages.

200.    PwC Canada and PwC Netherlands breached their duty to the Fund because their audit opinions were false and/or erroneous and/or because the Fund's financial reports, which were used internally and/or disseminated to investors, were similarly impaired.  Said breaches of PwC Canada and PwC Netherlands' duties resulted from PwC Canada and PwC Netherlands' negligence and carelessness.

201.    The Fund suffered pecuniary damages as a direct and proximate result of PwC Canada and PwC Netherlands' breach of its duty to provide to the Fund correct and accurate information.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment

202.    Plaintiff repeats and realleges the foregoing allegations as though fully set forth
herein.

203.    The General Partners (FG Limited from January 1, 1993 to April 30, 2006, FG
Bermuda since March 1, 2006) have received as compensation Management Fees of 1%
(0.0833% per month) of each Limited Partner's artificially capital account and Incentive
Allocations of 20% of the net capital appreciation after expenses allocated to each Limited
Partner's capital account of the Fund. The General Partners were paid these fees to perform
certain duties which it did not perform, and has been unjustly enriched thereby. The fees paid to
the General Partners were also inflated because they were based on inflated capital accounts,
which inflation the General Partner was responsible for via the wrongful conduct as alleged
above, and have been unjustly enriched thereby.

204.    The Administrators (GlobeOp prior to September 1, 2006 and Citco Europe
effective September 1, 2006) received a monthly service fee, in advance, based on a beginning
monthly net asset value, after subscriptions and redemptions. The sub-administrator, Citco
Canada, shared in those fees. The Administrators and sub-administrator were paid these fees to
perform certain duties, which duties the Administrators and sub-administrator did not perform
accurately, and were unjustly enriched thereby. The Administration Fees were also inflated,
because the net asset value of the Fund was inflated, which inflation the Administrators and sub-
administrator were responsible for via the wrongful conduct as alleged above, and have been
unjustly enriched thereby.

205.    FG Advisors received an expense reimbursement from the Fund payable monthly
based on the beginning monthly net asset value, after subscriptions and redemptions, computed

- 60 -

at the rate of 0.10% per annum. The expense reimbursements were inflated, because such

expense reimbursements were based on inflated net asset value of the Fund.

206. Such enrichment came at the Fund's and the Limited Partners' expense, as such

payments were taken directly out of the Fund assets.

207. Under these circumstances, FG Bermuda, FG Limited, FG Advisors, GlobeOp,

Citco Europe and Citco Canada have been unjustly enriched and, in equity and good conscience,

should be made to return their unjustly gained monies.

## EIGHTH CAUSE OF ACTION

### Accounting from the Fund Defendants

208. Plaintiff repeats and realleges the foregoing allegations as though fully set forth

herein.

209. During the relevant time Plaintiff and the other Limited Partners had, and

continue to have, an interest in the assets of the Fund.

210. The Fund Defendants owed fiduciary duties to Plaintiff and the other Limited

Partners and, by their above-described conduct, the Fund Defendants have grossly breached such

duties with respect to, among other things, the Fund assets in which Plaintiff and the other

Limited Partners have an interest.

211. Plaintiff and the other Limited Partners are entitled to an accounting from the

Fund Defendants concerning the Fund's assets.

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including preliminary and permanent injunctive relief, in Plaintiff's favor and in favor of Greenwich Sentry, as appropriate, against all Defendants as follows:

      a.    authorizing the maintenance of this action as a derivative action, with the Plaintiff as derivative plaintiff;

      b.    declaring that the Fund Defendants have violated their fiduciary duties to the Fund and its Limited Partners and/or aided and abetted each other in breaching those duties;

      c.    declaring that PwC Canada and PwC Netherlands committed professional negligence, negligent misrepresentation and breach of contract in rendering its services to the Fund, which proximately damaged the Fund and its Limited Partners;

      d.    declaring that the Fund Defendants have been unjustly enriched by their wrongful and grossly inequitable conduct;

      e.    awarding restitution of the monies paid to the Fund Defendants based on artificially inflated capital accounts of the Limited Partners;

      f.    ordering that PwC Canada and PwC Netherlands return any fees which it was paid by the Fund for alleged auditing services;

      g.    ordering the imposition of a constructive trust over the monies received by FG Bermuda, FG Limited and/or each of the other Fund Defendants as Management Fees and/or Incentive Allocations calculated based on the artificially inflated capital accounts of the Limited Partners;

      h.    the appointment of a receiver to oversee and manage the constructive trust;

- 62 -

i.    alternatively, awarding compensatory damages against Defendants, individually and severally in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

j.    awarding Plaintiff the costs and disbursements of this action, including reasonable allowances for Plaintiff's attorneys' and experts' fees and expenses; and

k.    granting such other or further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

February 13, 2009

**MILBERG LLP**
By: _____
Sanford Dumain
Matthew Gluck
Brad Friedman
Andrei V. Rado
Kristi Stahnke McGregor
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
sdumain@milberg.com
mgluck@milberg.com
bfriedman@milberg.com
arado@milberg.com
kmcgregor@milberg.com

Stephen A. Weiss
Christopher M. Van de Kieft
**SEEGER WEISS LLP**
One William Street
New York, NY 10004
(212) 584-0700
sweiss@seegerweiss.com
cvandekieft@seegerweiss.com

*Attorneys for Plaintiff*

- 64 -

Index No.                                    Year 20    '09

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

DAVID I. FERBER SEP IRA,

Plaintiff,

v.

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH LIMITED, FAIRFIELD GREENWICH
(BERMUDA) LTD., FAIRFIELD GREENWICH
ADVISORS LLC, GLOBEOP FINANCIAL SERVICES
LLC, CITCO FUND SERVICES (EUROPE) B.V., CITCO
(CANADA) INC., WALTER M. NOEL, JR., JEFFREY
TUCKER, ANDRES PIEDRAHITA, BRIAN
FRANCOEUR, AMIT VIJAYVERGIYA,
PRICEWATERHOUSECOOPERS LLP, and
PRICEWATERHOUSE COOPERS ACCOUNTANTS
N.V.,

Defendants,

and

GREENWICH SENTRY, L.P.,

Nominal Defendant.

SUMMONS AND LIMITED PARTNERS
DERIVATIVE COMPLAINT

MILBERG LLP
Attorneys for Plaintiffs

Office and Post Office Address, Telephone

One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

To

Attorney(s) for

Service of a copy of the within
is hereby admitted.

Dated,

Attorney(s) for

SPECIAL   Blumberg Excelsior Inc.  NYC  10013