CLAYMAN & ROSENBERG
Seth L. Rosenberg    (SR4563)
Paul S. Hugel    (PH4749)
305 Madison Avenue
New York, NY 10165
Telephone:    (212) 922-1080
Telefax:    (212) 949-8255

*Attorneys for ARC-BDG Setauket Enterprise*
(BLMIS Account No. 1-B0081 designated Claim Number 011221)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

SECURITIES INVESTOR PROTECTION          :
CORPORATION,
                                        :          Adv. Pro. No. 08-01789(BRL)
                    Plaintiff,
                                        :

         -against-                      :
                                        :          SIPA Liquidation
BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,                         :

                    Defendant           :

-------------------------------------------------------X

**OBJECTION TO TRUSTEE'S DETERMIMNATION OF CLAIM**

ARC-BDG Setauket Enterprise ("Objector"), by counsel, CLAYMAN & ROSENBERG,

hereby objects to the Notice of Trustee's Determination of Claim dated December 8, 2009 (the

"Determination Letter"), appended hereto as Exhibit A, as set forth herein.

## BACKGROUND

1.      Objector is a "Customer" as that term is defined by the Securities Investor

Protection Act ("SIPA") of Bernard L. Madoff Investment Securities LLC ("BLMIS").

2.      Objector was and is a member of Bull Market Fund, a general partnership

organized in the State of New York in 1986.

3.      The Bull Market Fund partnership was organized with the knowledge and

encouragement of BMLIS for the purpose of consolidating the bookkeeping for the investment

of certain small investors with BLMIS.

4.      Bull Market Fund received a final statement from BLMIS which indicated that

Bull Market Fund owned securities valued at $36,833,462.86.

5.      On or about December 31, 2008, Objector received a statement from Bull Market

Fund which indicated that Objector's funds invested by Bull Market Fund in BLMIS were

valued at $176,429.

6.      On December 11, 2008, the above-captioned liquidation proceeding was

commenced against BLMIS, pursuant to the Securities Investor Protection Act of 1970 ("SIPA").

Irving Picard was appointed Trustee ("BLMIS Trustee") with oversight of the liquidation of

BLMIS and responsibility for processing customer claims for money pursuant to SIPA.

7.      By Order dated December 23, 2008, the Court directed the Trustee to disseminate

notice and claim forms to BLMIS customers and set forth claim-filing deadlines.  The Order

further authorized the Trustee, *inter alia*, "to satisfy, within the limits provided by SIPA, those

portions of any and all customer claims and accounts which agree with the Debtor's books and

records," and provided that, where the BLMIS Trustee disagrees with the amount claimed in a

customer's claim form, the BLMIS Trustee, "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, and the reason therefor…"

8.      On or about June 24, 2009, Objector timely submitted a customer claim form to SIPC setting forth his claim in the amount of $176,429 ("Objector's claim"). Objector's claim cross-referenced the BLMIS account of Bull Market Fund. A copy of Objector's claim form is appended hereto as Exhibit B.

9.      On December 8, 2009, the BLMIS Trustee sent Objector a Determination Letter denying Objector's claim, "in its entirety." Exhibit A. The Determination Letter stated, in part, "Based upon a review of available books and records of BLMIS by the Trustee's staff, you did not have an account with BLMIS. Because you did not have an account, you are not a customer of BLMIS under SIPA as that term is defined at 15 U.S.C. Section 78lll (2). Accordingly, your Claim for securities and/or a credit balance is **DENIED**."

10.      Objector objects to the BLMIS Trustee's disallowance of his claim for the reasons set forth hereinbelow.

## GROUNDS FOR OBJECTION

11.      First:          The Trustee's definition and application of the term, "account" as set forth in the Determination Letter is incorrect.

12.      Second:          The Trustee's definition and application of the term, "customer" as set forth in the Determination Letter is incorrect.

13.      Objector reserves the right to revise or amend this Objection. Objector's failure to assert an objection on a particular ground or grounds shall not be construed as a waiver of its right to object or join in the objection of other claimants on any additional grounds.

14.      Objector reserves all rights set forth in Rule 9014.

15.    Objector incorporates herein by reference all claims and reservations of rights set forth in Objector's claim form. Exhibit B.

## RELIEF SOUGHT

16.    Objector's claim should be allowed in its entirety.

17.    The Court should direct SIPC to pay Objector the full amount of Objector's claim together with interest thereon commencing not later than the date of the Determination Letter.

18.    Such other and further relief as the Court may deem just and equitable.

Dated: New York, New York
      January 6, 2010

CLAYMAN & ROSENBERG
By:    Seth L. Rosenberg (SR 4563)
       Paul S. Hugel (PH 4749)
305 Madison Avenue
New York, NY 10165
Telephone:   (212) 922-1080
Telefax:      (212) 949-8255
rosenberg@clayro.com
hugel@clayro.com

4

EXHIBIT A

DETERMINATION LETTER

**BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

In Liquidation

**DECEMBER 11, 2008[1]**


**NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM**

December 8, 2009

ARC-BDG SETAUKET ENTERPRISE
ONE ATLANTA PLAZA
950 EAST PACES FERRY ROAD, SUITE 2575
ATLANTA, GA  30326


Dear ARC-BDG SETAUKET ENTERPRISE:

**PLEASE READ THIS NOTICE CAREFULLY.**

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim designated as Claim No. 011221:

Based on a review of available books and records of BLMIS by the Trustee's staff, you did not have an account with BLMIS. Because you did not have an account, you are not a customer of BLMIS under SIPA as that term is defined at 15 U.S.C. § 78*lll* (2). Accordingly, your Claim for securities and/or a credit balance is **DENIED**.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after December 8, 2009, the date on which the Trustee mailed this notice.

------------------------------

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
Attn: Claims Department
45 Rockefeller Plaza
New York, New York 10111

**Irving H. Picard**

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC.

cc:  DAVID KAPLAN
     300 ROBBINS LANE
     SYOSSET, NY 11791

EXHIBIT B

CUSTOMER CLAIM FORM

ARC-BDG SETAUKET ENTERPRISE
300 ROBBINS LANE
SYOSSET, NY 11791

June 24, 2009                                                          *Via UPS Overnight*

Irving H. Picard, Esq.
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Avenue, Suite 800
Dallas, Texas 75201

Re:     Account Number: 1-B0081
        ARC-BDG Setauket Enterprise through Bull Market Fund
        300 Robbins Lane
        Syosset, New York 11791

Dear Mr. Picard:

ARC-BDG Setauket Enterprise is a partner in Bull Market Fund, which had an account with Bernard L. Madoff Investment Securities ("BLMIS"), Account No. 1-B0081.

It is our understanding that Bull Market Fund has submitted its own SIPC Customer Claim Form to your office.

We wish to submit our own personal SIPC Customer Claim Form at this time. We are attaching the following:

1. Our SIPC Customer Claim Form;
2. Bull Market Fund's November 30, 2008 BLMIS statement;
3. Our 2007 Schedule K-1;
4. Our personal account balance as of December 11, 2008; and
5. Joint Venture Agreement of ARC-BDG Setauket Enterprise and Assignment and Assumption of Joint Venture Interest.

We reserve the right to amend or modify this claim if and to the extent warranted by facts and circumstances not presently known to us, or as a result of a subsequent determination by a court of competent jurisdiction with respect to any issue pertaining to our claim.

This letter is hereby incorporated by reference in and made a part of our SIPC Customer Claim Form.

Very truly yours,

ARC-BDG Setauket Enterprise
By: Blumco Setauket, LLC,
    General Partner
    By: BDG Asset Management, Inc.,
        its General Manager

By: _____
    Name:  Edward Blumenfeld
    Title:    President

By: Coblum Setauket, LLC,
    General Partner
    By: BDG Asset Management, Inc.,
        its General Manager

By: _____
    Name:  Edward Blumenfeld
    Title:    President

UPS: Tracking Information                                Page 1 of 2
08-01789-cgm    Doc 1393    Filed 01/07/10    Entered 01/07/10 11:22:23    Main Document
Pg 10 of 83

⊠Close Window



## Tracking Detail

**Your package has been delivered.**

| | |
|---|---|
| Tracking Number: | 1Z 12X 236 13 9126 483 6 |
| Type: | Package |
| Status: | **Delivered** |
| Delivered On: | 06/25/2009  1:10 P.M. |
| Signed By: | THOMASSON |
| Location: | OFFICE |
| Delivered To: | 2100 MCKINNEY AVE<br>800<br>DALLAS, TX, US 75201 |
| Shipped/Billed On: | 06/24/2009 |
| Reference Number(s): | 01/SM, ARC-BDG SETAUKETENTERPERPRISE BMF |
| Service: | NEXT DAY AIR SAVER |

**Package Progress**

| Location | Date | Local Time | Description |
|---|---|---|---|
| DALLAS, TX, US | 06/25/2009 | 1:10 P.M. | DELIVERY |
| | 06/25/2009 | 6:42 A.M. | OUT FOR DELIVERY |
| | 06/25/2009 | 6:07 A.M. | ARRIVAL SCAN |
| DALLAS/FT. WORTH A/P, TX, US | 06/25/2009 | 5:40 A.M. | DEPARTURE SCAN |
| | 06/25/2009 | 4:54 A.M. | ARRIVAL SCAN |
| ROCKFORD, IL, US | 06/25/2009 | 3:13 A.M. | DEPARTURE SCAN |
| ROCKFORD, IL, US | 06/24/2009 | 11:29 P.M. | ARRIVAL SCAN |
| JAMAICA, NY, US | 06/24/2009 | 10:16 P.M. | DEPARTURE SCAN |
| | 06/24/2009 | 9:18 P.M. | ARRIVAL SCAN |
| UNIONDALE, NY, US | 06/24/2009 | 8:39 P.M. | DEPARTURE SCAN |
| | 06/24/2009 | 8:23 P.M. | ORIGIN SCAN |
| | 06/24/2009 | 7:12 P.M. | PICKUP SCAN |
| | 06/24/2009 | 7:12 P.M. | PICKUP SCAN |

## CUSTOMER CLAIM

Claim Number_____

Date Received_____

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

### In Liquidation

### DECEMBER 11, 2008

(Please print or type)

Name of Customer: ARC-BDG SETAUKET ENTERPRISE THROUGH BULL MARKET FUND
Mailing Address: 300 ROBBINS LANE
City: SYOSSET    State: NY    Zip: 11791
Account No.: BULL MARKET FUND'S ACCOUNT NO.: 1-B0081
Taxpayer I.D. Number (Social Security No.): 56-2383817

NOTE:    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY THE ACCOMPANYING INSTRUCTION SHEET. A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009. CLAIMS RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

*********************************************************************

1.    Claim for money balances as of **December 11, 2008**:

    a.    The Broker owes me a Credit (Cr.) Balance of    $___-0-___

    b.    I owe the Broker a Debit (Dr.) Balance of    $___-0-___

    c.    If you wish to repay the Debit Balance,

        please insert the amount you wish to repay and

        attach a check payable to "Irving H. Picard, Esq.,

        Trustee for Bernard L. Madoff Investment Securities LLC."

        If you wish to make a payment, **it must be enclosed**

        with this claim form.    $___-0-___

    d.    If balance is zero, insert "None."    ___NONE___

2.        Claim for securities as of December 11, 2008:

**PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.**

|   |   | YES | NO |
|---|---|---|---|
| a. | The Broker owes me securities | X | |
| b. | I owe the Broker securities | | X |

c.        If yes to either, please list below:

| Date of Transaction (trade date) | Name of Security | Number of Shares or Face Amount of Bonds | |
|---|---|---|---|
| | | The Broker Owes Me (Long) | I Owe the Broker (Short) |
| | SEE BULL MARKET FUND ACCOUNT STATEMENT | $176,429 * | |
| | | | |
| | | | |
| | | | |

Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.
PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.

502180406

2

* PROVIDED BY BULL MARKET, SEE SUPPLEMENTAL CLAIM INFORMATION
ATTACHMENT A

**NOTE:** IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

|  |  | YES | NO |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. | | X |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? | | X |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? | | X |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) | | X |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. | | X |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. | X * | |
| 9. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? if so, give name of that broker. | | X |

Please list the full name and address of anyone assisting you in the preparation of this claim form: DAVID KAPLAN, 300 ROBBINS LANE, SYOSSET, NY 11791

* SEE SUPPLEMENTAL CLAIM INFORMATION ATTACHMENT A

If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate your claim is an estimated claim.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**        ARC-BDG SETAUKET ENTERPRISE

Date ___JUNE 24 , 2009___        Signature _____
                                            EDWARD BLUMENFELD, PRESIDENT OF GENERAL MANAGER OF
                                                                         GENERAL PARTNE

Date _____        Signature _____
                                            EDWARD BLUMENFELD, PRESIDENT OF GENERAL MANAGER OF
                                                                         GENERAL PARTNE

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

**This customer claim form must be completed and mailed promptly, together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

502180406

SUPPLEMENTAL CLAIM INFORMATION
ATTACHMENT A

Claimant is filing this claim form as a customer of Bernard L. Investment Securities LLC ("BLMIS"), having invested in BLMIS through a partnership, Bull Market Fund ("BMF"). Pursuant to the partnership agreement of BMF and other written agreements amongst the Partners of BMF, BMF invested all of its funds with BLMIS. BMF has informed claimant that its customer account number with BLMIS was 1-B0081. BMF has also advised claimant that it is filing a customer claim for the losses in its customer account with BLMIS.

BMF typically issued quarterly statements showing each partner's account summary. In light of the BLMIS fraud, BMF issued a statement to each partner showing their closing balance as of December 10, 2008, a copy of which is enclosed. Claimant believes that as of December 11, 2008, the amount of claimant's investment was all held in the securities as shown on the November 30, 2008 BLMIS statement for BMF, a copy of which is also enclosed.

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY : 11791

1-B0081-3-0    11/30/08    *******6934    1

| Date | Amount | Description | Price | Amount |
|---|---|---|---|---|
| | | BALANCE FORWARD | | 1,420,340.08 |
| 11/06 | 3,800 | ABBOTT LABORATORIES | | |
| 11/06 | 4,992 | | | |
| 11/06 | 3,432 | AMGEN INC | 60,350 | 207,258.20 |
| 11/06 | 2,496 | BOEING CORP | 51,120 | 127,657.57 |
| 11/06 | 1,872 | | | |
| 11/06 | 3,744 | BANK OF NEW YORK MELLON CORP | 32,290 | 121,042.76 |
| 11/06 | 6,240 | BRISTOL MYERS SQUIBB COMPANY | 20,510 | 128,855.40 |
| 11/06 | 7,472 | | | |
| 11/06 | 9,360 | | | |
| 11/06 | 13233 | COMCAST CORP CL A | 15,790 | 148,168.40 |
| 11/06 | 13936 | CVS CAREMARK CORP | 30,510 | 142,973.20 |
| 11/06 | 14173 | CHEVRON CORP | 72,740 | 493,405.18 |
| 11/06 | 14859 | GENERAL ELECTRIC CO | | |
| 11/06 | 624 | GOOGLE | 356,520 | 222,492.48 |
| 11/06 | 14878 | GOLDMAN SACHS GROUP INC | 91,300 | 114,702.76 |
| 11/06 | 15113 | MERCK & CO INC | | |
| 11/06 | 15818 | INTERNATIONAL BUSINESS MACHS | 92,800 | 405,524.40 |

**BERNARD L. MADOFF**
MADF
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY   11791

1-B0081-3-0     11/30/08     *****6934     2

| Date | Amount Bought Received | Description | Price | Amount Long Credit |
|---|---|---|---|---|
| 11/06 | 17,784 | INTEL CORP | 16.070 | 286,499.88 |
| 11/06 | 9,040 | JOHNSON & JOHNSON | 61.310 | 555,193.68 |
| 11/06 | 11,058 | J.P. MORGAN CHASE & CO | 40.910 | 452,521.78 |
| 11/06 | 4,992 | KRAFT FOOD INC | 29.310 | 146,380.99 |
| 11/06 | 6,240 | COCA COLA CO | 44.490 | 277,966.60 |
| 11/06 | 3,744 | MCDONALDS CORP | 57.900 | 217,436.00 |
| 11/06 | 3,744 | METHRONIC INC | 43.660 | |
| 11/06 | 9,156 | 3M COMPANY | 62.590 | |
| 11/06 | 6,552 | ALTRIA GROUP INC | 19.160 | 126,798.32 |
| 11/06 | 8,864 | MERCK & CO | 30.780 | 211,567.52 |
| 11/06 | 257,272 | MICROSOFT CORP | 20.110 | |
| 11/06 | 1,776 | ORACLE CORPORATION | 16.110 | |
| 11/06 | 2,808 | OCCIDENTAL PETROLEUM CORP | 54.290 | 152,558.32 |
| 11/06 | 4,992 | PEPSICO INC | 54.290 | 284,743.00 |
| 11/06 | 9,672 | PFIZER INC | 17.690 | 187,019.00 |
| 11/06 | 6,864 | PROCTER & GAMBLE CO | 42.730 | 293,572.72 |
| 11/06 | 6,304 | PHILLIP MORRIS INTERNATIONAL | 42.730 | 200,750.24 |
| 11/06 | 3,744 | QUALCOMM INC | 31.910 | |
| 11/06 | 20,968 | SCHLUMBERGER LTD | | |
| 11/06 | 18,720 | AT&T INC | 10.060 | 165,813.60 |
| 11/06 | 11,544 | TIME WARNER INC | 52.790 | 116,593.64 |
| 11/06 | 3,120 | UNITED PARCEL SVC INC | | 164,828.80 |
| 11/06 | 5,616 | U S BANCORP | 29.550 | |
| 11/06 | 3,120 | UNITED TECHNOLOGIES CORP | 54.920 | 171,474.40 |

CONTINUED ON PAGE

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET        NY  11791

1-80081-3-0          11/30/08          3

*******6934

| DATE | PURCHASED | SOLD | DESCRIPTION | PRICE | AMOUNT |
|------|-----------|------|-------------|-------|--------|
| 11/06 | 9,048 | | 22163 | VERIZON COMMUNICATIONS | 29.980 | 271,620.04 |
| 11/06 | 10,600 | | 22339 | WELLS FARGO & CO NEW | 33.660 | 357,489.20 |
| 11/06 | 1,176 | | 22031 | WAL MART STORES INC | 56.530 | 66,601.56 |
| 11/06 | 167,048 | | 22668 | EXXON MOBIL CORP | 75.080 | 12,545,036.64 |
| 11/06 | | | | FIDELITY SPARTAN | DIV | 2.54 |
| | | | | U S TREASURY MONEY MARKET | | |
| | | | 406010 | FIDELITY SPARTAN | | 1 |
| 11/06 | 2817.84 | | | U S TREASURY MONEY MARKET | | 2817.84 |
| 11/06 | | 3,925,000 | 48465 | U S TREASURY BILL | 99.909 | 3,921,439.42 |
| | | | | DUE 01/08/2009 | | |
| 11/06 | | 1,925,000 | 48599 | U S TREASURY MONEY MARKET | 1 | 24,408.00 |
| | | | | DUE 12/11/2008 | | |
| | | | | U S TREASURY BILL | 12/11/2008 | |
| 11/06 | | 3,925,000 | 48824 | U S TREASURY BILL | 99.960 | 3,923,430.00 |
| | | | | DUE 01/08/2009 | | |
| | | | | 12/16/2008 | | |
| 11/06 | | 490,000 | 49033 | U S TREASURY BILL | 99.946 | 3,922,880.50 |
| | | | | DUE 01/15/2009 | | |
| 11/06 | | 3,925,000 | 49240 | U S TREASURY BILL | 99.954 | 3,922,940.50 |
| | | | | DUE 01/22/2009 | 1/22/2009 | |
| | | | | DUE 01/22/2009 | 1/22/2009 | |

CONTINUED ON PAGE 4

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

# BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET NY 11791

1-B0081-3-0    11/30/08    4    ********6934

| Date | Bought | Sold | Description | Price | Amount |
|---|---|---|---|---|---|
| 11/06 | | 3,925,000 | 49461 | U S TREASURY BILL DUE 01/29/2009 | 99.928 | 3,922,174.00 |
| 11/06 | 1,650,000 | 49671 | U S TREASURY BILL DUE 2/12/2009 | 99.902 | 1,649,385.00 |
| 11/06 | 2,575,000 | 49958 | U S TREASURY BILL DUE 03/26/2009 | 99.802 | 2,569,401.50 |
| 11/06 | | 50027 | U S TREASURY BILL DUE 3/26/2009 | 99.751 | 2,568,588.25 |
| 11/06 | 2,575,000 | 50356 | U S TREASURY BILL DUE 04/02/2009 | 99.726 | 2,567,944.50 |
| 11/07 | 1,944 | 28360 | APPLE INC | 98.800 | 192,156.20 |
| 11/07 | 3,456 | 236639 | ABBOTT LABORATORIES | 56.590 | 195,712.04 |
| 11/07 | 2,376 | 29874 | AMGEN INC | 62.070 | 147,573.32 |
| 11/07 | 1,728 | 24534 | BOEING CO | 42.840 | 74,079.52 |
| 11/07 | 11,016 | 24744 | BANK OF AMERICA | 23.720 | 261,575.52 |
| 11/07 | 1,296 | 245799 | BAXTER INTERNATIONAL INC | 61.740 | 80,066.04 |
| 11/07 | 2,376 | 24814 | BANK OF NEW YORK MELLON CORP | 34.210 | 81,377.96 |
| 11/07 | 1,320 | 25174 | BRISTOL-MYERS SQUIBB COMPANY | 21.400 | 28,347.40 |
| 11/07 | 1,512 | 2528₺ | ANHEUSER-BUSCH COS INC | 54.490 | 82,493.70 |
| 11/07 | 11,664 | 25519 | CITI GROUP INC | 14.410 | 168,544.24 |

CONTINUED ON PAGE 5

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET            NY  11791

1-B0081-3-0          11/30/08          *******6934          5

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| Date | Quantity | Number | Description | Price | Amount |
|---|---|---|---|---|---|
| 11/07 | 6,264 | 25754 | COMCAST CORP | 17.390 | 109,180.96 |
| 11/07 | 3,240 | | CONOCOPHILLIPS | | |
| 11/07 | 12,744 | | TESCO SYSTEMS INC | | |
| 11/07 | 3,024 | 26459 | CVS CAREMARK CORP | 31.720 | |
| 11/07 | 4,536 | 26629 | CHEVRON CORP | 75.450 | |
| 11/07 | 4,104 | | TULLOW OIL | | |
| 11/07 | 22,680 | | GENERAL ELECTRIC CO | | |
| 11/07 | 432 | 27399 | GOOGLE | 349.160 | |
| 11/07 | 864 | 27637 | GOLDMAN SACHS GROUP INC | 89.070 | |
| 11/07 | 3,672 | | HOME DEPOT INC | | |
| 11/07 | 5,400 | | HEWLETT PACKARD CO | | |
| 11/07 | 3,024 | 28339 | INTERNATIONAL BUSINESS MACHS | 92.430 | |
| 11/07 | 12,096 | | INTEL CORP | 16. | |
| 11/07 | 8,208 | | JOHNSON & JOHNSON | | |
| 11/07 | 3,240 | 292079 | JP MORGAN CHASE & CO | 29.710 | |
| 11/07 | 4,320 | | KRAFT FOOD INC | | |
| 11/07 | 2,376 | 29551 | COCA COLA CO | | |
| 11/07 | 2,376 | 29749 | MCDONALDS CP | | |
| 11/07 | 432 | | MERCK PRODUCTS INC | | |
| 11/07 | 1,512 | 302119 | 3M COMPANY | 64.880 | |
| 11/07 | 4,536 | 30456 | ALTRIA GROUP INC | 19.370 | |
| 11/07 | 4,752 | 30952 | MERCK & CO INC | | |
| 11/07 | 17,280 | | MICROSOFT CORP | | |
| 11/07 | 8,640 | 31159 | ORACLE CORPORATION | 18.470 | 159,925.80 |

CONTINUED ON PAGE 6

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP Ltd
300 ROBBINS LANE
SYOSSET          NY    11791

| | | | |
|---|---|---|---|
| 1-B0081-3-0 | 11/30/08 | 6 | *****-6934 |

| Date | Bought Received In | Sold Delivered Out | Description | Price | Amount |
|---|---|---|---|---|---|
| 11/07 | 1,728 | 31864 | OCCIDENTAL PETROLEUM CORP. | 54.380 | 94,037.64 |
| 11/07 | 3,456 | 32099 | PEPSICO, INC. | 58.630 | 202,763.28 |
| 11/07 | 6,928 | 32235 | PROCTER & GAMBLE CO | 64.460 | 266,971.00 |
| 11/07 | 4,536 | 32606 | PHILIP MORRIS INTERNATIONAL | 43.640 | 198,192.04 |
| 11/07 | 3,672 | 32909 | QUALCOMM INC | 37.650 | 138,543.68 |
| 11/07 | | 33024 | | | |
| 11/07 | 12,528 | 33509 | TIME WARNER INC | 10.110 | 126,665.48 |
| 11/07 | 7,776 | 33746 | UNITED PARCEL SVC INC | 53.680 | 78,926.36 |
| 11/07 | 2,160 | 33979 | U S BANCORP | | 116,034.80 |
| 11/07 | 3,888 | 34214 | UNITED TECHNOLOGIES CORP | | 111,866.57 |
| 11/07 | 2,160 | 34449 | VERIZON COMMUNICATIONS | 56 | 121,046.00 |
| 11/07 | 6,048 | 34684 | WELLS FARGO & CO NEW | 31.810 | 192,627.88 |
| 11/07 | 7,908 | 35154 | WAL-MART STORES INC | 56.000 | 250,575.72 |
| 11/07 | 11,448 | 35369 | EXXON MOBIL CORP | 75.280 | 862,262.44 |
| 11/07 | | | FIDELITY SPARTAN | DIV. | |
| 11/07 | 10883 | 11174 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 18,784.00 |
| 11/07 | 18,784 | | DUE 02/05/09 | | 24,375,141.25 |

CONTINUED ON PAGE 7

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                NY  11791

| 1-B0081-3-0 | 11/30/08 | 7 | ******6934 |

| DATE | BOUGHT (RECEIVED) | SOLD (DELIVERED) | | PRICE | AMOUNT |
|---|---|---|---|---|---|
| 11/07 | 2,450,000 | | 11382  U S TREASURY BILL  DUE 02/19/2009 | 99.887 | 2,447,231.50 |
| 11/07 | 2,450,000 | | 11597  U S TREASURY BILL  DUE 02/26/2009 | 99.889 | 2,447,280.50 |
| 11/07 | 2,450,000 | | 12019  U S TREASURY BILL  DUE 3/05/2009 | 99.880 | 2,447,020.50 |
| 11/07 | | 1,175,000 | 12141  U S TREASURY BILL  DUE 04/30/2009 | 99.720 | 1,171,710.00 |
| 11/07 | 1,175,000 | | 12365  U S TREASURY BILL  DUE 4/16/2009 | 99.720 | 2,446,080.00 |
| 11/07 | 30,635 | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | | 30,635.40 |
| 11/10 | 2,376 | | 35864  APPLE INC. | 108.720 | 258,413.72 |
| 11/10 | 4,224 | | 30997  ABBOTT LABORATORIES | 55.910 | 236,331.84 |
| 11/10 | 2,594 | | 32939  AMGEN INC | 55.470 | 143,919.18 |
| 11/10 | 2,412 | | 36669  BOEING CO | 52.190 | 125,932.28 |
| 11/10 | 13,728 | | 36804  BANK OF AMERICA | 24.050 | 330,707.40 |
| | | | CONTINUED ON PAGE 8 | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

## BERNARD L. MADOFF
**INVESTMENT SECURITIES LLC**
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD - EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                NY    11791

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| TAX LOT ACCT # | 1-B0081-3-0 | PERIOD ENDING | 11/30/08 | ***** 6934 | B |
|---|---|---|---|---|---|

| DATE | BOUGHT | SOLD | DESCRIPTION | PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|---|---|---|---|---|---|---|
| 11/10 | 1,848 | | 37039 | BAXTER INTERNATIONAL INC | 60.770 | 112,375.96 | |
| 11/10 | 3,160 | | 37274 | BANK OF NEW YORK MELLON CORP | 33.490 | 106,190.64 | |
| 11/10 | 5,776 | | 37784 | | 21.300 | 118,263.64 | |
| 11/10 | 5,408 | | 37974 | ANHEUSER-BUSCH COS INC | 64.890 | 118,513.32 | |
| 11/10 | 15,048 | | 37979 | CITI GROUP INC | 14.270 | 215,335.96 | |
| 11/10 | 7,920 | | 38314 | COMCAST CORP | 17.410 | 138,203.20 | |
| 11/10 | 4,222 | | 38444 | CONOCOPHILLIPS | 54.190 | 229,085.12 | |
| 11/10 | 16,104 | | 38684 | CISCO SYSTEMS INC | 18.080 | 291,804.32 | |
| 11/10 | 3,960 | | 38934 | CVS CAREMARK CORP | 31.300 | 124,106.00 | |
| 11/10 | 5,408 | | 39019 | WALT DISNEY CO | 75.410 | 410,417.28 | |
| 11/10 | 28,776 | | 39654 | GENE WALT DISNEY CO | 29.660 | 128,710.56 | |
| 11/10 | 528 | | 39624 | GENERAL ELECTRIC CO | 591,922.28 | |
| 11/10 | 528 | | 39652 | GOOGLE | 363.580 | 191,971.24 | |
| 11/10 | 772 | | 40307 | GOLDMAN SACHS GROUP INC | 95.090 | 122,905.60 | |
| 11/10 | 4,152 | | 40564 | HOME DEPOT INC | 25.890 | 105,420.56 | |
| 11/10 | 6,864 | | 40564 | HEWLETT PACKARD CO | 37.290 | 256,232.56 | |
| 11/10 | 15,576 | | 40797 | INTERNATIONAL BUSINESS MACHS | 92.660 | 342,619.36 | |
| 11/10 | 7,856 | | 41267 | JOHNSON & JOHNSON | 59.430 | 469,437.92 | |
| 11/10 | 10,032 | | 42504 | J-P-MORGAN CHASE & CO | 41.730 | 419,036.36 | |
| 11/10 | 4,224 | | 41732 | KRAFT FOOD INC | 30.100 | 127,310.40 | |
| 11/10 | 5,544 | | 42207 | MCDONALDS CORP | 57.250 | 254,443.60 | |
| 11/10 | 3,168 | | 42444 | MEDTRONIC INC | 40.300 | 127,796.40 | |

CONTINUED ON PAGE 24

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

# BERNARD L. MADOFF
### INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                NY    11791

**1-B0081-3-0**   **11/30/08**   **9**   ******-6934**

| DATE | | | | SECURITY | | | |
|---|---|---|---|---|---|---|---|
| 11/10 | 1,848 | | 42679 | 3M COMPANY | 64,690 | 119,620.12 | |
| 11/10 | 5,544 | | 42914 | ALTRIA GROUP INC | 18,890 | 104,943.16 | |
| 11/10 | 5,808 | | 21149 | MERCK & CO INC | 29,510 | 171,712.08 | |
| 11/10 | 21,584 | | 43694 | MICROSOFT CORP | 20,500 | 442,472.00 | |
| 11/10 | 10,824 | | 43619 | ORACLE CORPORATION | 18,600 | 201,758.40 | |
| 11/10 | 2,376 | | 44324 | OCCIDENTAL PETROLEUM CORP | 56,010 | 133,174.76 | |
| 11/10 | 7,222 | | 25555 | RRR SICDIAN | | 300,936.20 | |
| 11/10 | 8,184 | | 44754 | PFIZER INC | 17,660 | | |
| 11/10 | 8,184 | | 45029 | PROCTER & GAMBLE CO | 65,250 | 534,166.32 | |
| 11/10 | 5,544 | | 45264 | PHILIP MORRIS INTERNATIONAL | 44,630 | 264,323.32 | |
| 11/10 | 7,452 | | 45497 | QUALCOMM INC | 30,600 | 228,783.60 | |
| 11/10 | 16,368 | | 45734 | SCHLUMBERGER LTD | 50,600 | 540,070.00 | |
| 11/10 | 9,504 | | 45969 | AT&T INC | 28,580 | 468,451.44 | |
| 11/10 | 2,640 | | 46204 | TIME WARNER INC | 11,010 | 105,019.04 | |
| 11/10 | | | 46439 | UNITED PARCEL SVC INC | | | |
| | | | | CLASS B | | | |
| 11/10 | 4,752 | | 46674 | U S BANCORP | 31,510 | 149,925.52 | |
| 11/10 | 2,640 | | 46909 | UNITED TECHNOLOGIES CORP | 56,430 | 149,080.20 | |
| 11/10 | 4,950 | | 47144 | VERIZON COMMUNICATIONS | 32,400 | 258,592.00 | |
| 11/10 | 6,072 | | 47379 | WELLS FARGO & CO NEW | 55,710 | 338,513.52 | |
| 11/10 | 14,256 | | 47614 | WAL-MART STORES INC | 75,800 | 1,081,512.00 | |
| 11/10 | | | 47849 | EXXON MOBIL CORP | | | |
| | | | | FIDELITY SPARTAN | | | |
| | | | | U S TREASURY MONEY MARKET | | | |
| 11/10 | | | | DIV 11/10/08 | | | |
| | | | | CONTINUED ON PAGE 10 | | | |

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7408 6222

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY    11791

1-B0081-3-0    11/30/08    10    *******6934

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| DATE | BOUGHT (RECEIVED OR LONG) | SOLD (DELIVERED OR SHORT) | DESCRIPTION | PRICE | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|
| 11/10 | | 30,199 12816 | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | 1 | | 30,199.00 |
| 11/10 | | 2,500,000 13204 | U.S. TREASURY BILL DUE 05/19/2009 | 99.887 | | 2,500,542.00 |
| 11/10 | | 2,575,000 13422 | U.S. TREASURY BILL DUE 03/19/2009 | 99.834 | | 2,570,735.50 |
| 11/10 | | 2,575,000 13625 | U.S. TREASURY BILL DUE 04/02/2009 | 99.770 | | 2,569,077.50 |
| 11/10 | | 3,750,000 13628 | U.S. TREASURY BILL DUE 04/09/2009 | 99.742 | | 3,740,325.00 |
| 11/10 | | 4,175,000 14061 | U.S. TREASURY BILL DUE 04/16/2009 | 99.706 | | 4,172,510.50 |
| 11/10 | 50,000 | 14281 | U.S. TREASURY BILL DUE 04/16/2009 | 99.686 | 49,843.00 | |
| 11/10 | 685 | 14508 | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | 1 | 685.00 | |
| 11/24 | 104,402 | 25942 | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET CHECK | | | 104,402.00 |
| 11/24 | | | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET DIV. | DIV. | 100,000.00 | .05 |

CONTINUED ON PAGE 11

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY    11791

1-B0081-3-0     11/30/08     11

*******6934

| DATE | | | | | | | | | |
|------|---|---|---|---|---|---|---|---|---|
| 11/14 | | | 685 | 29393 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | | 685.00 |
| 11/14 | 11,357 | | | 29864 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | | CA | | 11,357.00 |
| 11/18 | | | | | CHECK | | CA | 25,000.00 |
| 11/18 | | | | | CHECK | | CA | 15,000.00 |
| 11/18 | | | | | CHECK | | CA | 100,000.00 |
| 11/18 | | | | | CHECK | | CA | 100,000.00 |
| 11/18 | | | | | CHECK | | CA | 200,000.00 |
| 11/18 | 5,544 | 492203 | | | AVAILABLE RUSSELL DES INC | | CA | 15,000.00 |
| 11/18 | 3,759,000 | 49486 | | | U S TREASURY BILL | 3,744,662.50 | | 150,000.00 |
| 11/18 | | 49233 | | | U S TREASURY MONEY MARKET DUE 4/16/2009 | 3,744,662.50 | | |
| 11/18 | | 49954 | | | U S TREASURY MONEY MARKET DUE 4/16/2009 | | |
| 11/18 | 450,000 | 49954 | | | U S TREASURY MONEY MARKET DUE 4/16/2009 | 449,235.00 | |
| 11/18 | | | | | U S TREASURY BILL DUE 4/16/2009 | 99.830 | 449,235.00 | |
| 11/19 | 54,765 | 49935 | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 54,765.00 | |
| 11/19 | | | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | | | |
| 11/19 | 20,839 | 50057 | | | NEW BALANCE FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | 1 DIV | 20,839.00 | .45 |

CONTINUED ON PAGE 2

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY   11791

1-B0081-3-0     11/30/08     12     ******6934

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| DATE | BOUGHT / RECEIVED | SOLD / DELIVERED | DESCRIPTION | PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|---|---|---|---|---|---|---|
| 11/19 | 3,525,000 | | U S TREASURY BILL DUE 03/26/2009 | 99.926 | 3,522,391.50 | |
| 11/19 | 91,120 | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 91,120.00 | |
| 11/20 | | 3,525,000 | U S TREASURY BILL DUE 03/26/2009 | 99.9524 | | 3,523,660.50 |
| 11/20 | 2,850,000 | | U S TREASURY BILL DUE 3/26/2009 | 99.947 | 2,848,489.50 | |
| 11/20 | 171 | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 171.00 | |
| 11/25 | 682 | | APPLE INC | | | |
| 11/25 | 1,588 | | ABBOTT LABORATORIES | | | |
| 11/25 | 1,078 | | AMGEN INC | | | |
| 11/25 | 4,908 | | BANK OF AMERICA | | | |
| 11/25 | 508 | | BANK OF NEW YORK MELLON CORP | | | |
| 11/25 | 1,176 | | BRISTOL MYERS SQUIBB COMPANY | | | |
| 11/25 | 1,960 | | CITIGROUP INC | | | |
| 11/25 | 5,684 | | COCA COLA CO | | | |
| 11/25 | 490 | | CONOCO PHILLIPS CL A | | | |
| 11/25 | 2,842 | | CVS CAREMARK CORP | | | |

CONTINUED ON PAGE 3

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BERNARD L. MADOFF INVESTMENT SECURITIES LLC
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY  11791

| YOUR ACCOUNT NUMBER | PROCESS DATE | PAGE | TAX I.D. NO. |
|---|---|---|---|
| 1-B0081-3-0 | 11/30/08 | 13 | *****6934 |

| DATE | BOUGHT | SOLD | NUMBER | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|
| 11/25 | 1,568 | | 66797 | CONOCOPHILLIPS | 45.100 | 70,778.80 |
| 11/25 | 5,890 | | 67035 | CISCO SYSTEMS INC | 14.970 | 88,258.60 |
| 11/25 | | | 87211 | CVS/CAREMARK CORP | 27.020 | 29,806.00 |
| 11/25 | 2,609 | | | CHEVRON CORP | 68.700 | 149,407.48 |
| 11/25 | 1,842 | | 67541 | THE WALT DISNEY CO | 19.760 | 36,862.12 |
| 11/25 | 786 | | 67749 | EXELON CORP | 48.740 | 38,462.64 |
| 11/25 | 1,796 | | 67597 | GENERAL ELECTRIC CO | 14.880 | 26,907.68 |
| 11/25 | 196 | | 67022 | GOOGLE | 275 | 53,907.00 |
| 11/25 | 1,666 | | 68863 | HOME DEPOT INC | 19.530 | 32,607.66 |
| 11/25 | 2,459 | | 68701 | HEWLETT PACKARD CO | 32.990 | 80,923.58 |
| 11/25 | 762 | | 68939 | INTERNATIONAL BUSINESS MACHS | 75.000 | 57,303.00 |
| 11/25 | 1,004 | | 69477 | INTEL CORP | 12.170 | 12,242.20 |
| 11/25 | 2,842 | | 69415 | JOHNSON & JOHNSON | 57.650 | 163,954.30 |
| 11/25 | 3,724 | | 69653 | J.P. MORGAN CHASE & CO | 27.760 | 103,526.24 |
| 11/25 | 1,470 | | 69901 | KRAFT FOODS INC | 22.990 | 33,921.30 |
| 11/25 | 1,960 | | 70329 | COCA COLA CO | 42.040 | 82,478.40 |
| 11/25 | 1,176 | | 70605 | MCDONALDS CORP | 55 | 59,331.00 |
| 11/25 | 1,078 | | 70042 | MEDTRONIC INC | 30.800 | 36,267.80 |
| 11/25 | 2,058 | | 74325 | MERCK & CO | 18.100 | 40,903.00 |
| 11/25 | 888 | | 71557 | MICROSOFT CORP | 25 | 33,924.40 |
| 11/25 | 7,840 | | 72595 | MCGRAW-HILL | 163,920.00 | 142,217.00 |
| 11/25 | 3,972 | | 72259 | SCHLUMBERGER LTD | 35.950 | 63,072.00 |
| 11/25 | 682 | | 72747 | OCCIDENTAL PETROLEUM CORP | 44,500 | 39,345.74 |
| 11/25 | 1,568 | | 72985 | PEPSICO INC | 51.800 | 81,204.40 |

CONTINUED ON PAGE 14

BERNARD L. MADOFF
MADF INVESTMENT SECURITIES LLC
New York ☐ London

New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV. GROUP LTD
300 ROBBINS LANE
SYOSSET                      NY   11791

| ACCOUNT NUMBER | 1-B0081-3-0 |
| PERIOD ENDING | 11/30/08 |
| TAXPAYER ID NUMBER | *******6934 |
| PAGE | 14 |

| DATE | BOUGHT RECEIVED | SOLD DELIVERED | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|
| 11/25 | 6,762 | 73223 | PFIZER INC | 15.320 | 103,863.84 | |
| 11/25 | 2,956 | 73461 | PROCTER & GAMBLE CO | 61.840 | 182,220.69 | |
| 11/25 | 1,958 | 73937 | PHILIP MORRIS INTERNATIONAL | 38.380 | 74,952.04 | |
| 11/25 | 1,176 | 73991 | QUALCOMM INC | 29.850 | 35,096.10 | |
| 11/25 | 1,176 | 74175 | SCHLUMBERGER LTD | 46.270 | 54,460.52 | |
| 11/25 | 5,030 | 74442 | AT&T INC | 25. | 147,235.00 | |
| 11/25 | 3,630 | 74429 | TIME WARNER INC | 8.010 | 29,189.26 | |
| 11/25 | 988 | 74089 | TIME WARNER INC | 25.760 | 49,718.88 | |
| 11/25 | 1,766 | 76137 | CLASS B | | | |
| 11/25 | 980 | 75235 | U S BANCORP | 23.400 | 41,347.60 | |
| 11/25 | 2,842 | 15603 | UNITED TECHNOLOGIES CORP | 42.870 | 42,051.20 | |
| 11/25 | 3,822 | 75841 | VERIZON COMMUNICATIONS | 29.970 | 55,624.94 | |
| 11/25 | 2,256 | 76079 | WELLS FARGO & CO NEW | 23.820 | 91,192.04 | |
| 11/25 | 1,372 | 76079 | WAL-MART STORES INC | 53.450 | 116,058.30 | |
| 11/25 | 5,292 | 76555 | EXXON MOBIL CORP | 1/2 | 284,228.08 | |
| 11/25 | | | FIDELITY SPARTAN | DIV | | .93 |
| | | | U S TREASURY MONEY MARKET | | | |
| 11/25 | | 77122 | FIDELITY SPARTAN | 1 | | 9,299.00 |
| | | | U S TREASURY MONEY MARKET | | | |
| 11/25 | | 77386 | U S TREASURY BILL | 1 | | |
| | | 3,725,000 | DUE 3/26/2009 | 99.878 | | 3,720,455.50 |
| 11/25 | 42,963 | 77681 | FIDELITY SPARTAN | 1 | 42,963.00 | |
| | | | U S TREASURY MONEY MARKET | | | |
| | | | CONTINUED ON PAGE 15 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY   11791

| | | | |
|---|---|---|---|
| 1-B0083-3-0 | 11/30/08 | 15 | *****6934 |

MADOFF SECURITIES INTERNATIONAL LIMITED
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| Date | Bought/Received | Sold/Delivered | Description | Price | Amount Debited | Amount Credited |
|---|---|---|---|---|---|---|
| 11/26 | 5,000 | | CHECK | | | |
| 11/26 | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | CA | 5,000.00 |
| 11/28 | | 100 78408 | U S TREASURY MONEY MARKET | 1 | 5,000.00 | |
| 11/28 | | 100 78420 | BAXTER INTERNATIONAL INC | 52.640 | | |
| 11/28 | | | CHECK | CK | 50,000.00 | |
| 11/28 | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | | 50,000.00 | |
| 11/28 | | | DIV LW20708 FIDELITY SPARTAN U S TREASURY MONEY MARKET | CK DIV | | 2.26 |
| 11/28 | 47,963 | 78257 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | 47,963.00 |
| 11/28 | 29,724 | 79321 | U.S. TREASURY MONEY MARKET | | | |

| | NEW BALANCE | | 5,119,352.95 |
|---|---|---|---|

| Shares | Security Positions | MKT PRICE |
|---|---|---|
| 53,496 | AT&T INC | 28.560 |
| 14,240 | ABBOTT LABORATORIES | 53.300 |
| 18,600 | AMGEN INC | 55.030 |
| 9,760 | APPLE INC | 92.670 |
| 8,010 | BANK OF AMERICA | 16.250 |
| 45,966 | BANK OF NEW YORK MELLON CORP | 28.210 |
| 101,664 | BAXTER INTERNATIONAL INC | 52.640 |
| 51,564 | BOEING CO | 42.630 |
| 6,336 | | |

CONTINUED ON PAGE 16

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY   11791

1-B0081-3-0        11/30/08        16

**********6934

MADOFF SECURITIES INTERNATIONAL LIMITED
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| BOUGHT (RECEIVED/LONG) | SOLD (DELIVERED/SHORT) | DESCRIPTION | PRICE OR SYMBOL | | |
|---|---|---|---|---|---|
| 18,064 | | BRISTOL MYERS SQUIBB COMPANY | 20,700 | | |
| 13,134 | | | 28,930 | | |
| 18,954 | | CVS CAREMARK CORP | 29,100 | | |
| 53,760 | | CISCO SYSTEMS INC | 16,560 | | |
| 49,868 | | CISCO SYSTEMS INC | 16,548 | | |
| 18,864 | | CITI GROUP INC | 8,290 | | |
| 490 | | COCA COLA CO | 46,870 | | |
| 26,286 | | COLGATE PALMOLIVE CO | 65,070 | | |
| | | COMCAST CORP | 17,340 | | |
| | | CL A | | | |
| 14,024 | | CONOCOPHILLIPS | 52,520 | | |
| 17,822 | | EXELON CORP | 52,530 | | |
| 686 | | EXELON CORP | 56,200 | | |
| 47,844 | | EXXON MOBIL CORP | 80,150 | | |
| 95,620 | | GENERAL ELECTRIC CO | 17,370 | | |
| 3,132 | | GOOGLE INC | 292,960 | | |
| 1,980 | | GOOGLE INC CL A | 291,700 | | |
| 22,514 | | HEWLETT PACKARD CO | 35,280 | | |
| 15,706 | | HOME DEPOT INC | 23,110 | | |
| 51,140 | | INTEL CORP | 14,050 | | |
| 12,960 | | INTERNATIONAL BUSINESS MACHS | 81,800 | | |
| 33,820 | | J P MORGAN CHASE & CO | 31,660 | | |
| 25,594 | | JOHNSON & JOHNSON | 58,500 | | |
| 13,926 | | MCDONALDS CORP | 57,930 | | |
| 10,366 | | MEDIMMUNE CORP | 58,750 | | |
| 10,464 | | MEDTRONIC INC | 30,520 | | |

CONTINUED ON PAGE   17

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

MADF

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY   11791

Bernard L. Madoff Investment Securities Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| ACCOUNT NUMBER | DATE | PAGE |
| --- | --- | --- |
| 1-B0081-3-0 | 11/30/08 | 17 |

*******6934

| DATE | BOUGHT RECEIVED/LONG | SOLD DELIVERED/SHORT | DESCRIPTION | PRICE | AMOUNT |
| --- | --- | --- | --- | --- | --- |
| | 191,550 | | MERCK & CO | 26.720 | |
| | 71,736 | | MICROSOFT CORP | 20.220 | |
| | 71,796 | | ORACLE CORPORATION | 16.370 | |
| | 361,176 | | PEOPLES HEARTLAND GRP | 16.090 | |
| | 14,240 | | PEPSICO INC | 56.700 | |
| | 41,222 | | PFIZER INC | 16.430 | |
| | 183,002 | | PROCTER & GAMBLE CO | 67.160 | |
| | 27,492 | | QUALCOMM INC | 33.570 | |
| | 151,130 | | SCHLUMBERGER LTD | 50.740 | |
| | 10,844 | | US TREASURY GENERAL | 1 | |
| | 3,226 | | MONEY MARKET | | |
| | 6,230 | | 3M COMPANY | 66.930 | |
| | 22,050 | | TIME WARNER INC | 9.050 | |
| | 16,020 | | VERIZON | 30.330 | |
| | 8,900 | | UNITED PARCEL SVC INC | 54.600 | |
| | | | CLASS B | | |
| | 8,900 | | UNITED TECHNOLOGIES CORP | 48.530 | |
| | 28,558 | | WAL-MART STORES INC | 52.650 | |
| | 204,470 | | WELLS FARGO & CO NEW | 55.680 | |
| | 30,750 | | WYETH | 28.890 | |
| | 1,372 | | | 36.010 | |
| | 37,619,862.86 | | MARKET VALUE OF SECURITIES — LONG | | |
| | | | SHORT | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

# BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

MADOFF SECURITIES INTERNATIONAL LIMITED
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY  11791

| Account Number | Date | Page |
|---|---|---|
| 1-B0081-4-0 | 11/30/08 | 1 |
| ******6934 | | |

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | SYMBOL | | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| | | | BALANCE FORWARD | | | | 1,428,341.00 |
| 11/06 | | | | | | | |
| 11/06 | 312 | | 19108 | S & P 100 INDEX | 20.500 | 639,912.00 | |
| 11/07 | 216 | | 31629 | S & P 100 INDEX | 13.800 | 298,296.00 | |
| 11/10 | 264 | | 44089 | S & P 100 INDEX | 16.800 | 443,784.00 | |
| 11/19 | 792 | | 30303 | S & P 100 INDEX | 30 | 2,376,792.00 | |
| 11/19 | 264 | | 30779 | S & P 100 INDEX | .900 | 24,024.00 | |
| 11/19 | 264 | | 31255 | S & P 100 INDEX | .59 | | 1,557,336.00 |

CONTINUED ON PAGE 2

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

# BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY   11791

| 1-B0081-4-0 | 11/30/08 | 2 | *******6934 |

| DATE | BOUGHT / RECEIVED | SOLD / DELIVERED | DESCRIPTION | PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|---|---|---|---|---|---|---|
| | | | NEW BALANCE SECURITY POSITIONS | | | |
| | | 34 | S & P 100 INDEX DECEMBER 380 CALL | 23.300 | | 205,898.00 |
| 11/25 | | 98 | S & P 100 INDEX DECEMBER 420 CALL | | | |
| 11/25 | | 98 72033 | S & P 100 INDEX DECEMBER 370 PUT | | | |
| | 792 | 792 | S & P 100 INDEX DECEMBER 380 CALL | 16.500 | | 5,419,353.00 |
| | 98 | 98 | S & P 100 INDEX DECEMBER 420 PUT | | | |
| | | | S & P 100 INDEX DECEMBER 370 PUT | | | |
| | | | MARKET VALUE OF SECURITIES 133,561,780.00  2,443,126,000.00 | | | 333,102.00 |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

Schedule K-1
(Form 1065)

**2007**

For calendar year 2007, or tax
year beginning _____
ending _____

Department of the Treasury
Internal Revenue Service

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0099

**Partner's Share of Income, Deductions,
Credits, etc.**

► See separate Instructions.

| **Part III** Partner's Share of Current Year Income, Deductions, Credits, and Other Items | | |
|---|---|---|
| 1 Ordinary business income (loss) 0. | 15 Credits | |
| 2 Net rental real estate income (loss) | | |
| 3 Other net rental income (loss) | 16 Foreign transactions | |
| 4 Guaranteed payments | | |
| 5 Interest income 2,177. | | |
| 6a Ordinary dividends 1,309. | 17 Alternative min tax (AMT) items | |
| 6b Qualified dividends | | |
| 7 Royalties | 18 Tax-exempt income and nondeductible expenses | |
| 8 Net short-term capital gain (loss) 11,964. | | |
| 9a Net long-term capital gain (loss) | | |
| 9b Collectibles (28%) gain (loss) | 19 Distributions | |
| 9c Unrecaptured sec 1250 gain | | |
| 10 Net section 1231 gain (loss) | 20 Other information A 3,486. W* 2,177. | |
| 11 Other income (loss) C 462. | | |
| 12 Section 179 deduction | | |
| 13 Other deductions | | |
| 14 Self-employment earnings (loss) | | |

## Part I    Information About the Partnership

**A** Partnership's employer identification number
11-2796934

**B** Partnership's name, address, city, state, and ZIP code

BULL MARKET FUND
300 ROBBINS LANE
SYOSSET, NY   11791

**C** IRS Center where partnership filed return
OGDEN, UT

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II    Information About the Partner

**E** Partner's identifying number

58-2383817

**F** Partner's name, address, city, state, and ZIP code

ARC-BDG SETAUKET
300 ROBBINS LANE
SYOSSET, NY   11791

**G** ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

**H** ☒ Domestic partner    ☐ Foreign partner

**I** What type of entity is this partner?  PARTNERSHIP

**J** Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | VARIOUS% | VARIOUS% |
| Loss | VARIOUS% | VARIOUS% |
| Capital | VARIOUS% | VARIOUS% |

**K** Partner's share of liabilities at year end:

Nonrecourse .......................... $ _____
Qualified nonrecourse financing ...... $ _____
Recourse ............................. $ _____0.

*See attached statement for additional information.

**L** Partner's capital account analysis:

Beginning capital account ........... $    146,278.
Capital contributed during the year .. $ _____
Current year increase (decrease) ..... $     15,912.
Withdrawals & distributions .......... $( _____)
Ending capital account ............... $    162,190.

For IRS Use Only

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

JWA   For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2007

711261
12-31-07

35

# MEMORANDUM

**TO:**        **ARC-BDG Setauket Enterprise**

**FROM:**    Harvey Cohen

**RE:**        Bull Market Fund

**DATE:**    **December 31, 2008**

---

Please find below your balance in the Bull Market Fund as of December 10, 2008.  This includes your November 30, 2008 balance plus any additions, if applicable, made subsequent to November 30, 2008 and sent to Bernard L. Madoff Investment Securities, LLC.

Account Balance as of December 10, 2008:  $176,429

Please call me if I can be of further service.

## JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT ("Agreement") is made and entered into as of December _18_, 1997, by and between SOUTH SETAUKET I LLC, a Connecticut limited liability company having its principal office at One Atlanta Plaza, 950 East Paces Ferry Road, Suite 2575, Atlanta, Georgia 30326 ("SSI"), and Blumco Setauket LLC, a New York limited liability company having its principal office at 6800 Jericho Turnpike, Syosset, New York 11791-4498 ("BDG")

### RECITALS

A.   SSI owns fee simple title to certain real property situated in the Town of Brookhaven, County of Suffolk and State of New York, having a Tax Map Designation of Dist. 200, Sec. 388, Blk 2, Lot 1, and as more particularly described on Exhibit A hereto (the "Property").

B.   SSI will sell the Property to a joint venture to be formed by SSI and BDG as hereinafter described to acquire, develop, own, operate, and manage the Property as an investment for the production of income (the "Project") .

C.   SSI has obtained and will also sell for no additional consideration to the joint venture those permits and approvals now or hereafter obtained or otherwise necessary for the development and completion of the Project as have been obtained to date including, without limitation, its rights and obligations under and pursuant to a D-1 Special Permit.

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, and the mutual promises contained herein, the parties hereto agree as follows:

### ARTICLE I
### FORMATION, PURPOSES, DURATION

Section 1.1   Formation and Name.

1.1.1   Formation.   The parties hereto (jointly the "Venturers" and individually a "Venturer") hereby enter into and form a joint venture (the "Joint Venture" or the "Venture") for the limited purposes and scope set forth in this Agreement. The Joint Venture shall be governed by the Uniform Partnership Act of the State of New York, as from time to time amended.

1.1.2   Name.   The name of the Joint Venture shall be ARC-BDG Setauket Enterprise, and the business of the Joint

Venture shall be conducted solely under such name and all assets of the Joint Venture shall be held under such name.

Section 1.2    <u>Purposes</u>.   The sole and only purposes of the Joint Venture are: (a) to acquire, own, develop, construct, lease, operate and manage the Property and all buildings and other improvements to be located thereon (such buildings and improvements are herein collectively called the "Improvements") as an investment for the production of income and profit, or for any other business purpose Approved by the Management Committee (as used in Section 3.1.1 below); (b) to lease, sell or otherwise transfer or dispose of the Property, the Improvements, or any part thereof or interests therein, when and to the extent expressly permitted by this Agreement; and (c) to engage in such other activities as are reasonably incidental to the foregoing with respect to the Property and the Improvements.

Section 1.3    <u>Scope of Venturers' Authority</u>.   Except as otherwise expressly and specifically provided in this Agreement, neither Venturer shall have any authority to bind or act for, or assume any obligations or responsibility on behalf of, the other Venturer or the Joint Venture.   Neither the Joint Venture nor either Venturer shall be responsible or liable for any indebtedness or obligation of the other Venturer or otherwise relating to the Project incurred or arising either before or after the execution of this Agreement, except as to those joint responsibilities, liabilities, indebtedness, or obligations incurred after the date hereof pursuant to and as limited by the terms of this Agreement, and except also as specifically provided in Subsection 3.4.2 and as set forth on Exhibit B. This Agreement shall not be deemed to create a general partnership between the Venturers with respect to any activities whatsoever other than activities within the scope and business purposes of the Joint Venture specified in Subsection 1.2.

Section 1.4    <u>Principal Place of Business</u>.   The principal place of business of the Joint Venture shall be located at One Atlanta Plaza, 950 East Paces Ferry Road, Suite 2575, Atlanta, Georgia  3026 or at such other location as may be approved by the Management Committee from time to time.

Section 1.5    <u>Term</u>.   The term of the Joint Venture shall commence as of the date first set forth above, and shall continue, unless sooner terminated in accordance with the other provisions of this Agreement, for so long as the Joint Venture holds any interest in or has any obligations relating to the Property or the Improvements, or until the Venturers agree to its termination; provided, however, that the Joint Venture shall, if not sooner terminated, terminate on December 31, 2050, unless otherwise extended by mutual written agreement of both Venturers; and provided further, that neither Venturer shall have the right and each Venturer hereby agrees not to withdraw from the Joint Venture nor to dissolve, terminate or liquidate, or to petition a

-2-

court for the dissolution, termination or liquidation of, the
Joint Venture, except as provided in this Agreement, and neither
Venturer at any time shall have the right to petition or to take
any action to subject the Project or any part thereof or the
Joint Venture assets or any part thereof to the authority of any
court of bankruptcy, insolvency, receivership or similar
proceeding.

## ARTICLE II

### FINANCING, CAPITAL CONTRIBUTIONS,
### ALLOCATIONS AND DISTRIBUTIONS

Section 2.1  <u>Initial Financing</u>.  Simultaneously with the
execution of this Agreement, Ahold Real Estate Company, SSI or an
affiliate thereof shall provide the Joint Venture with a interim
loan (the "Interim Loan") in the principal amount of six million
and three hundred thousand dollars ($6,300,000), and a
construction loan (the "Construction Loan") in the principal
amount to be determined by the unanimous consent of the Venturers
but not to exceed nine million two hundred thousand dollars
($9,200,000), each of which shall be for a term of four (4) years
at a rate of interest equal to prime plus 1% with a 1% fee to the
lender.  Fifty percent (50%) of the Interim Loan and fifty
percent (50%) of the Construction Loan shall be guaranteed by
Edward Blumenfeld pursuant to a guaranty agreement dated as of
the date of this Agreement between Edward Blumenfeld and Ahold
Real Estate Company, SSI or an affiliate thereof (the "Guaranty
Agreement").  The Interim Loan shall be evidenced by the Interim
Promissory Note and Mortgage dated as of the date of this
Agreement, the form of which is attached as Exhibit C hereto.
The Construction Loan shall be evidenced by the Construction Loan
Promissory Note, Building Loan Agreement and Mortgage, the form
of which is attached as Exhibit D hereto.  The Guaranty Agreement
shall be in the form attached as Exhibit E hereto.  The Joint
Venture shall use the Interim Loan proceeds to acquire the
Property from SSI pursuant to a purchase and sale agreement dated
as of the date of this Agreement (the "Purchase and Sale
Agreement") and develop improvements thereon.  The Purchase and
Sale Agreement shall be in the form attached as Exhibit F hereto.

Section 2.2  <u>Joint Venture Interests and Capital Accounts</u>.

2.2.1  <u>Percentage Interests</u>.  The Venturers shall have
the following undivided percentage interests in the Joint Venture
(individually a "Percentage Interest" and jointly "Percentage
Interests").

| | |
|---|---|
| SSI | 50% |
| BDG | <u>50%</u> |
| | 100% |

-3-

2.2.2  <u>Adjustments</u>.  Unless otherwise agreed by both Venturers, no adjustment to the Percentage Interest of either Venturer shall be made except as provided in Section 2.5 or as a result of a transfer of a Venturer's Percentage Interest or a portion thereof pursuant to Articles VI or VII hereof.

2.2.3  <u>Capital Accounts Defined</u>.  As used herein, the term "Capital Account" shall mean and refer to the capital account of each Venturer in the Joint Venture reflecting the value of each contribution of such Venturer to the capital of the Joint Venture as of the date of such contribution.  A Capital Account, as defined herein, shall be maintained for each Venturer and shall be subject to adjustment as provided in Sections 2.6.

Section 2.3  <u>Initial Capital Contributions by SSI</u>.  Upon the execution of this Agreement, SSI shall make an initial capital contribution of One Million Dollars ($1,000,000.00) in cash.

Section 2.4  <u>Initial Capital Contributions by BDG</u>.  Upon the execution of this Agreement, BDG shall make an initial capital contribution of One Million Dollars ($1,000,000.00) in cash.

Section 2.5  <u>Additional Capital Contributions</u>.

2.5.1  <u>General</u>.  To the extent the Joint Venture requires funds in addition to the capital contributions provided for above in Sections 2.3 and 2.4, the Venturers upon notice from the Management Committee as provided in Subsection 2.5.2, agree to make additional capital contributions from time to time in accordance with the provisions herein and in the same percentages as their Percentage Interests set forth in Subsection 2.2.1 above (as the same may be adjusted from time to time as provided hereinbelow in this Section 2.5) and in such amounts as are sufficient to enable the Joint Venture to carry out the purposes of this Agreement.

2.5.2  <u>Notice by Management Committee</u>.  If additional capital contributions are required to be made pursuant to this Section 2.5, the Management Committee shall give notice to each Venturer in the manner provided in Section 10.2.  Such notice shall specify in reasonable detail the amount and purpose of any such additional capital contributions.  Each Venturer shall, within fourteen (14) business days after the receipt of such notice from the Management Committee, deposit the additional capital contributions required by such notice with the Management Committee.

2.5.3  <u>Failure to Make Additional Capital Contributions</u>.  In the event either Venturer fails to timely make any additional capital contributions set forth in the Management Committee's notice to each Venturer in the manner provided in Section 10.2, then the following shall apply.  The non-defaulting Venturer, in lieu of any other remedies provided for under this

-4-

Agreement and as liquidated damages which both Venturers agree
are fair and reasonable due to the difficulty of calculating the
actual damages to the non-defaulting Venturer, shall loan to the
defaulting Venturer on a non-recourse basis the amount required
to be contributed by the defaulting Venturer by contributing to
the Joint Venture on behalf of the defaulting Venturer the amount
required to be loaned by the defaulting Venturer.  Such loan
shall bear interest on the unpaid principal amount at a rate
equal to the prime rate announced by The Chase Manhattan Bank,
N.A. (as published in The Wall Street Journal or other
publications of similar distribution) plus three (3%) percent,
compounded monthly (based on a 30 day month), and such loan,
together with interest thereon, shall be repaid by the defaulting
Venturer to the non-defaulting Venturer by the Joint Venture
distributing the distributions and paying the fees to the non-
defaulting Venturer on behalf of the defaulting Venturer that the
defaulting Venturer would otherwise be entitled to receive
pursuant to this Agreement.  Such loan shall be repaid in full at
the time that the defaulting Member is no longer a Venturer in
the Joint Venture.  At any time that is more than six (6) months
after such loan is made, if the loan (including interest accrued
thereon) is not repaid in full, the non-defaulting Venturer, in
addition to the remedies available pursuant to Article VII, may
elect to treat any or all of the amounts not repaid (including
interest accrued thereon) as capital contributions made by such
non-defaulting Venturer as of the date of such election rather
than as a loan, and to the extent such loan (including interest
accrued thereon) is so treated as a capital contribution, such
loan (including interest accrued thereon) shall be treated as
repaid.  In the event a capital contribution is made pursuant to
the preceding sentence, (i) the Percentage Interest of such
defaulting Venturer shall be decreased (but not below zero) by
that number of percentage points equal in amount to the product
of (1) 150% and (2) the excess of (A) a percentage determined by
dividing the aggregate initial and additional capital
contributions of the non-defaulting Venturer (including any
capital contributions made pursuant to this Section 2.5.3) by the
aggregate initial and additional capital contributions of the
non-defaulting and defaulting Venturers (including any capital
contributions made pursuant to this Section 2.5.3), over (B) the
Percentage Interest of the non-defaulting Venturer immediately
before such Percentage Interest is revised pursuant to this
Section 2.5.3 and (ii) the Percentage Interest of the non-
defaulting Venturer shall be increased by the number of
percentage interest points by which the defaulting Venturer's
Percentage Interest has been decreased.

     Section 2.6  No Interest on Capital.  Interest earned on
Joint Venture funds shall inure solely to the benefit of the
Joint Venture, and no interest shall be paid upon any contribu-
tions or advances to the capital of the Joint Venture nor upon
any undistributed or reinvested income or profits of the Joint
Venture.

-5-

Section 2.7  <u>Capital Accounts</u>.

2.7.1  <u>Initial Capital Accounts</u>.  Immediately following formation of the Joint Venture and the capital contributions by the Venturers provided in Subsections 2.3 and 2.4 and any additional contributions pursuant to Section 2.5, the Capital Account of each Venturer shall be credited by the amount of the cash contribution.

2.7.2  <u>Adjustments to Capital Accounts</u>.  The Capital Accounts of each Venturer shall from time to time be

(a)  increased by:

(i)  any additional capital contributions of such Venturer;

(ii)  such Venturer's share of the income and gain of the Joint Venture during such fiscal year, whether or not distributed; and

(b)  decreased by:

(i)  all distributions to or for the account of such Venturer whether of capital or income;

(ii)  such Venturer's share of deductions and losses of the Joint Venture during such fiscal year.

Capital Accounts shall be maintained in accordance with Treasury Regulations Section 1.704-1(b) and the foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with such Treasury Regulations.

Section 2.8  <u>Allocations</u>.

2.8.1  <u>Allocations</u>.  All items of income, gain, loss and deduction of the Joint Venture shall be allocated to the Venturers in proportion to their Percentage Interests.

2.8.2  <u>Regulatory Allocations</u>.  Any allocation pursuant to Subsection 2.8.1 shall, however, be subject to any adjustment required to comply with Treasury Regulations Section 1.704-1 and 1.704-2 including, without limitation, the alternate economic effect test and any qualified income offset within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and any nonrecourse deduction, partner nonrecourse deduction, partnership minimum gain chargeback, or partner minimum gain chargeback allocation within the meaning of Treasury Regulations Section 1.704-2.  Nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2) shall be allocated to the Venturers in accordance with their Percentage Interests.  The allocation

-6-

set forth in this Subsection 2.8.2 (the "Regulatory Allocations")
are intended to comply with certain requirements of the Treasury
Regulations.

2.8.3  Curative Allocations.  It is the intent of the
Venturers that, to the extent possible, all Regulatory
Allocations shall be offset either with other Regulatory
Allocations or with special allocations or other items of Joint
Venture income, gain, loss, or deduction.  Therefore,
notwithstanding any other provision of this Section 2.8 (other
than the Regulatory Allocations), the Management Committee shall
make such offsetting special allocations of Joint Venture income,
gain, loss or deduction in whatever manner it determines
appropriate so that, after such offsetting allocations are made,
each Venturer's Capital Account balance is, to the extent
possible, equal to the Capital Account balance such Venturer
would have had if the Regulatory Allocations were not part of the
Agreement and all Joint Venture items were allocated pursuant to
Subsection 2.8.1 hereof.  In exercising the Management
Committee's discretion under this Subsection 2.8.3, the
Management Committee shall take into account future Regulatory
Allocations in the nature of a partnership minimum gain
chargeback or partner minimum gain chargeback under Treasury
Regulations Section 1.704-2 that, although not yet made, are
likely to offset other Regulatory Allocations in the nature of
nonrecourse deduction or partner recourse deduction allocations
under Treasury Regulations Section 1.704-2.

Section 2.8.4  Other Allocation Rules.  Solely for purposes
of determining a Venturer's proportionate share of the "excess
nonrecourse liabilities" of the Joint Venture within the meaning
of Treasury Regulations Section 1.752-3(a), the Venturers'
interests in Joint Venture profits shall be in proportion to
their Percentage Interests.

Section 2.9  Distributions to Venturers From Project Net
Cash Flow.  Not later than twenty (20) days after the end of each
calendar quarter, the Management Committee shall make a distribu-
tion to the Venturers, in accordance with their Percentage
Interests, of the entire Net Cash Flow of the Joint Venture from
the Project during such preceding quarter.  "Net Cash Flow" shall
be Approved by the Management Committee and shall consist of the
gross cash receipts of the Joint Venture (excluding capital
contributions) after deducting all cash expenditures, all as
determined in accordance with sound accounting principles.

Section 2.10  Withdrawals of Capital.  No portion of the
capital of the Joint Venture may be withdrawn at any time without
the Approval of the Management Committee.  Upon termination of
the Joint Venture, the Venturers' capital shall be distributed
pursuant to Section 7.4 hereof.

-7-

ARTICLE III

MANAGEMENT

Section 3.1  Management of the Venture.

3.1.1  Management Committee.  The overall management
and control of the business and affairs of the Joint Venture
shall be vested in a management committee ("Management
Committee").  All decisions with respect to the management and
control of the Joint Venture that are "Approved by the Management
Committee" shall be binding on the Joint Venture and each of the
Venturers.  The Management Committee shall be composed of two (2)
representatives for each Venturer which shall not be in default
pursuant to Section 7 hereof.  Each Venturer shall designate in
writing from time to time its respective representatives on the
Management Committee.  Each such representative shall be fully
authorized by its respective Venturer to provide any consent or
approval on behalf of its respective Venturer which may be
required hereunder of the Management Committee for so long as
such representative served in such capacity on the Management
Committee.  When the phrases "Approved by the Management
Committee" or "Approval of the Management Committee" are used in
this Agreement, such phrases shall mean approval by each Venturer
acting by consent of either one of its representatives on the
Management Committee who shall have been designated pursuant to
this Subsection 3.1.1.

3.1.2  Major Decisions.  Except as provided in Section
2.1 hereof, no act shall be taken, sum expended, decision made or
obligation incurred by the Joint Venture, the Management
Committee, or either Venturer with respect to a matter within the
scope of any of the major decisions enumerated below (the "Major
Decisions"), unless and until the same has been Approved by the
Management Committee or expressly delegated by the Management
Committee in writing.  The Major Decisions shall include:

(a)  acquisition of any land or other real property or
interest therein other than the Property pursuant to the Purchase
and Sale Agreement;

(b)  financing or refinancing of the Joint Venture or
any assets of the Joint Venture which the Venturers agree shall
be on a non-recourse basis and pursuant to commercially
reasonable terms, including, without limitation, the financing of
the acquisition of the Project, the construction of the Project,
interim and long-term financing or refinancing of the Project,
and financing operations of the Joint Venture other than with the
proceeds of the Interim Loan evidenced by the Interim Loan
Nonrecourse Promissory Note;

(c)  subject to the provisions of Section 6.4 below,
sale or other transfer of, or mortgaging or the placing or

-8-

suffering of any other encumbrance on or affecting, the Project or any part or parts thereof;

(d)   approval of the form or forms of leases and adoption of the terms, conditions and standards (the "lease guidelines") for the leasing of space within any of the Project;

(e)   execution of any lease or other arrangement involving the rental, use or occupancy of the Project or any part thereof;

(f)   termination or modification of any lease or other arrangement involving the rental, use or occupancy of the Project or any part thereof;

(g)   construction of any improvements or the making of any capital improvements, repairs, alterations or changes in, to or of the Project or any part thereof;

(h)   selecting or varying depreciation and accounting methods and making other decisions with respect to treatment of various transactions for state or federal income tax purposes or other financial purposes not otherwise specifically provided for herein;

(i)   approval of all construction and architectural contracts and all architectural plans, specifications and drawings prior to the construction, addition to and/or alterations of the Project or any portion thereof, and any modifications of such contracts, plans, specifications and drawings;

(j)   varying or changing any portion of the insurance program Approved by the Management Committee;

(k)   determining whether or not distributions should be made to the Venturers;

(l)   approving the Project Plan and all Budgets pursuant to Section 3.3 hereof;

(m)   making any expenditure or incurring any obligation by or on behalf of the Joint Venture involving a sum in excess of $5,000.00, except for expenditures set forth in the Purchase and Sale Agreement in connection with the acquisition of the Project, obligations set forth by the Interim Loan Nonrecourse Promissory Note, and expenditures made and obligations incurred pursuant to and specifically set forth in the Project Plan or a Budget theretofore Approved by the Management Committee;

(n)   making any expenditure or incurring any obligation which when added to any other expenditure for the fiscal year of the Joint Venture exceeds the amount set forth in the Project

-9-

Plan or Budget or any line item specified in the Project Plan or Budget;

(o)   selection or termination or removal of the Management Company (as defined below) other than pursuant to the terms of its Management Agreement (as defined below);

(p)   retention of independent accountants and counsel for the Joint Venture or institution of any legal action, except for such action as the Management Committee may in writing expressly authorize the Management Company to institute; or

(q)   any other decision or action which by any provision of this Agreement is required to be Approved by the Management Committee or which materially affects the Joint Venture or the assets or operations thereof.

Section 3.2   <u>Appointment of Managers; Duties and Fees of Managers</u>.

3.2.1   <u>Appointment</u>.   SSI is hereby appointed as the asset manager of the Joint Venture.  BDG is hereby appointed as the on-site operations and leasing manager of the Joint Venture. The duties, obligations and compensation of SSI and BDG, as applicable, shall be as set forth in a management agreement to be entered into between the Joint Venture and SSI and BDG, as applicable (the "SSI Management Agreement," or "BDG Management Agreement," as applicable (the "Management Agreement").  During any period of time in which SSI or BDG, as applicable, shall not be actively serving in the capacity as asset manager or on-site manager, as applicable, the Management Committee shall carry out all responsibilities of SSI and BDG, as applicable under the Management Agreement.

3.2.2   <u>Duties of Managers</u>.   SSI and BDG, as applicable, at the expense of and on behalf of the Joint Venture, shall implement or cause to be implemented all decisions Approved by the Management Committee and delegated to SSI and BDG, as applicable, in writing by the Management Committee and shall conduct or cause to be conducted the ordinary and usual business and affairs of the Joint Venture in accordance with and as limited by this Agreement and the Management Agreement.

3.2.3   <u>Prior Authorization</u>.   Any provision hereof to the contrary notwithstanding, except for expenditures made and obligations incurred previously Approved by the Management Committee or in direct pursuance to a Budget Approved by the Management Committee, SSI and BDG, as applicable shall not have any authority to make any expenditure or incur any obligation on behalf of the Joint Venture, except as otherwise set forth in the Management Agreement.

-10-

3.2.4  <u>Rights Not Assignable</u>.  The rights and obligations of SSI and BDG, as applicable, under this Agreement and under the Management Agreement shall not be assignable voluntarily or by operation of law by SSI and BDG, as applicable, except in connection with a transfer permitted by this Agreement or otherwise consented to pursuant to Article VI.

Section 3.3  <u>Project Plan and Budgets</u>.

(a)  The overall development plan (the "Overall Development Plan") is attached hereto as Exhibit G.  As soon as practicable following the date of this Agreement, the Management Committee shall prepare a final overall development plan (the "Project Plan").  The Project Plan shall be in a form that is consistent with the Overall Development Plan and shall contain the overall plan for development, construction, completion, financing, leasing and operation of the Project, including, but not limited to, the following:

(i)  A site plan, together with a description of the Improvements and intended uses of the Project as well as a statement of the conditions and restrictions applicable thereto.

(ii) Plans and specifications for construction of the Improvements sufficient to define the scope of the work.

(iii)  A plan for responding to all conditions required by the Town of Brookhaven or other governmental authorities to construct and operate the Project, including, but not limited to, all permits and approvals.

(iv)  All cost estimates for development and operating expenses, including a construction budget and pro forma income projections, which cost estimates shall include estimates of the funds, if any, to be required from the Venturers as further or Additional Capital Contributions pursuant to Section 2.5 hereof.

(v)  The final terms of the Construction Contract, including the Contract Sum (as defined in the Construction Contract).

(vi)  A comprehensive insurance program for the Venture and the Project.

(vii)  The final terms of the architectural services contract for the Project.

(b)  Not less often than one time each fiscal year following the initial operation and occupancy of the Project, the Management Committee shall prepare a budget ("Budget") setting forth the estimated receipts and expenditures (capital,

-11-

operating, and other) of the Joint Venture for the period covered
by the Budget.   The Management Committee shall review the Budget
on a quarterly basis.

Section 3.4   <u>Compensation and Reimbursement of Venturers</u>.

3.4.1   <u>No Compensation</u>.   Except as may be expressly
provided for herein or hereafter Approved by the Management
Committee, no payment will be made by the Joint Venture to either
Venturer for the services of such Venturer or any partner,
member, shareholder, director or employee of such Venturer.

3.4.2   <u>Reimbursable Expenditures</u>.   Each of the
Venturers shall be reimbursed by the Joint Venture for certain
expenditures incurred prior to the date hereof as set forth in
<u>Exhibit H</u> attached hereto.

3.4.3   <u>Development Fee</u>.   Notwithstanding anything to
the contrary in this Section 3.4 or Section 3.5, each of SSI and
BDG shall be paid by the Joint Venture a development fee, payment
of which shall commence on January 31, 1998 and terminate on
December 31, 1999, in an amount equal to ten thousand dollars
($10,000) per month, payable on the last day of each month.

Section 3.5   <u>Contracts with Related Parties</u>.   Except as
otherwise permitted by this Agreement, neither SSI, in its
capacity as asset manager, BDG, in its capacity as on-site
operations and leasing manager, nor the Joint Venture, shall
knowingly enter into any agreement or other arrangement for the
furnishing to or by the Venture of goods or services with any
individual, corporation, partnership, joint venture, association,
firm, joint stock company, trust, unincorporated association or
other entity related to or affiliated with either Venturer unless
such agreement or arrangement has been Approved by the Management
Committee after the nature of the relationship or affiliation has
been disclosed.   It is understood that certain affiliates of the
Venturers or their members may receive certain development,
leasing and management fees for their efforts during the pre-
construction and construction phases of the Project on such terms
as shall be approved by the Management Committee.

Section 3.6   <u>Time Devoted to Joint Venture</u>.   The Venturers
shall each devote such time to the Joint Venture as is reasonably
necessary to carry out the provisions of this Agreement.

ARTICLE IV

<u>ACCOUNTING</u>

Section 4.1 <u>Books and Records</u>.

4.1.1   <u>General</u>.   At all times during the term hereof,
the Management Committee, at the Joint Venture's expense, shall

-12-

cause SSI to maintain accurate books and records of account in which shall be entered all matters relating to the Joint Venture, including all income, expenditures, assets, and liabilities thereof.

4.1.2  <u>Accrual Basis</u>.  Such books and records of account shall be maintained on the accrual basis.

Section 4.2  <u>Location and Rights of Inspection</u>.  The Joint Venture's books and records of account shall be kept and maintained at all times at the place or places Approved by the Management Committee.  Each Venturer, and its authorized representatives, shall have the right to inspect, examine and copy the books, records, files and other documents of the Joint Venture at all reasonable times.

Section 4.3  <u>Fiscal Year</u>.  The fiscal year of the Joint Venture shall end on December 31 of each year.

Section 4.4  <u>Statements of Financial Condition</u>.  The Management Committee shall cause to be prepared a statement of the financial condition of the Joint Venture as of the last day of each quarter of each fiscal year, and income and Net Cash Flow statements for each calendar month of each fiscal year.  Each statement of financial condition shall be prepared in accordance with generally accepted accounting principles.

Section 4.5.  <u>Audit</u>.  The Joint Venture shall engage Deloitte and Touche as its independent auditors.  The independent auditors shall, at the end of each fiscal year, prepare review level financial statements of the Joint Venturer, and, at the election of either Venturer, shall (a) audit the records and accounts of the Joint Venture, (b) render their opinion on the statement of financial condition of the Joint Venture as of the end of each fiscal year and of the results of its operations, the changes in its financial condition and its income and Net Cash Flow for each fiscal year, as prepared by the accountants for the Joint Venture, and (c) render their opinion on the annual Net Cash Flow computations made by the accountants for the Joint Venture and as to whether distributions thereof are in accordance with Section 2.9 of this Agreement.

Section 4.6  <u>Bank Accounts</u>.  Funds of the Joint Venture shall be deposited in an account or accounts of a type, in form and name and in a bank or banks Approved by the Management Committee.  Withdrawals from bank accounts shall be made by parties Approved by the Management Committee.

Section 4.7  <u>Other Accounting Decisions</u>.  All accounting decisions for the Joint Venture (other than those specifically provided for in other Sections of this Agreement) shall be Approved by the Management Committee.

-13-

ARTICLE V

TAX RETURNS, TAX ACCOUNTING, TAX ELECTIONS

Section 5.1  Preparation of Tax Returns.  The Management Committee shall cause all federal, state and local tax returns of the Joint Venture to be prepared by the Joint Venture's independent auditors.  Copies of all tax returns of the Joint Venture shall be furnished for review and approval by the Management Committee as early as practicable prior to the statutory date for filing, including extensions thereof, if any. If the Management Committee shall fail to approve any such return, an application for extension of time to file shall be timely filed by the Management Committee.

Section 5.2  Tax Decisions Not Specified.  Tax decisions and elections for the Joint Venture not provided for herein must be Approved by the Management Committee.

Section 5.3  Classification as Partnership.  The Venturers hereby agree that the Joint Venture shall be treated as a partnership subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code and that neither the Joint Venture nor a Venturer thereof shall make an election to treat the Joint Venture as other than a partnership for federal income tax purposes.

ARTICLE VI

SALE, TRANSFER OR MORTGAGE

Section 6.1  General.

6.1.1  Required Consents.  Except as expressly permitted in this Agreement, neither Venturer shall sell, assign, transfer, mortgage, charge or otherwise encumber, or suffer any third party to sell, assign, transfer, mortgage, charge or otherwise encumber, or contract to do or permit any of the foregoing, whether voluntarily or by operation of law (herein sometimes collectively called a "transfer"), any part or all of its Joint Venture interest without the written consent of the other Venturer and any attempt to do so shall be void.  The giving of such consent in any one or more instances shall not limit or waive the need for such consent in any other or subsequent instances.

Section 6.2  Indirect Transfers.  If a Venturer is a partnership, limited partnership, limited liability company, limited liability partnership, corporation, or any other entity the sale, assignment, transfer, mortgage, charge or encumbrance of any partnership interest in such partnership, limited partnership or limited liability partnership, membership or other interest in such limited liability company, any shares of stock

-14-

in such corporation, or any other equity interest in such entity, or a contract to do or present any of the foregoing, whether voluntary or by operation of law, shall be deemed to be a "transfer" for the purpose of Subsection 6.1.1., <u>except</u> that the foregoing acts or circumstances shall not be deemed a "transfer" if the persons or entities that are partners, members or shareholders of a Venturer at the time of the execution of this Agreement shall continue to hold at least fifty percent (50%) of the voting and economic interests in the Venturer after the foregoing acts or circumstances and the foregoing acts or circumstances shall be between, among or to (i) persons or entities that were partners, members or shareholders of a Venturer at the time of the execution of this Agreement, (ii) members of the immediate families of persons (or a trust for the benefit of such persons) who were partners, members or shareholders of a Venturer at the time of the execution of this Agreement, and (iii) the beneficiaries, legatees or distributees of the estate of deceased persons who were partners, members or shareholders of a Venturer at the time of the execution of this Agreement.

Section 6.3    <u>Right of First Refusal</u>.

        6.3.1    <u>Offering Notice</u>.    Except for permitted transfers under Section 6.2 above, if either Venturer receives a bona fide offer for the purchase of all (but not less than all) of its Joint Venture interest in the Joint Venture, or if any liquidator, receiver, trustee in bankruptcy or similar authority having control over either Venturer or its assets, receives at any time such an offer (the recipient of any such offer being hereinafter called the "Offeror"), which offer complies with the provisions of Subsection 6.3.2 and which offer it desires and intends to accept, before accepting such offer it shall give notice (the "Offering Notice") to the other Venturer (the "Offeree") which shall include a true copy of such offer, whereupon the provisions set forth in this Section 6.3 shall apply.    Except for permitted transfers under Section 6.2 above, neither Venturer shall accept an offer unless such offer complies with the provisions of Subsection 6.3.2.

        6.3.2    <u>Requirements of Offer</u>.    An offer received pursuant to Subsection 6.3.1 shall comply with the following requirements:

        (a)    the proposed purchase price shall be composed solely of lawful money of the United States and obligations to pay such money (fully secured by all or portions of the Joint Venture Interest) and the assumption of any mortgages, liens, or other encumbrances on the Joint Venture interest;

        (b)    the offer shall contain provisions whereby the proposed purchaser is obligated to comply with the provisions of Section 6.7 prior to or at closing;

-15-

(c)  the offer shall be made by a principal, identified in the offer, and not an agent acting on behalf of an undisclosed principal, and such principal shall not be a party or entity related to or affiliated with the Offeror or with respect to which the Offeror has any direct or indirect ownership or control; and

(d)  the prospective purchaser shall be of good business character and reputation and shall be financially capable of carrying out all obligations of a Venturer under this Agreement and all related agreements.

6.3.3  <u>Procedure</u>.  In the Offering Notice, the Offeror shall offer (the "Sale Offer") to the Offeree the right to purchase the Joint Venture interest of the Offeror referred to in such offer, at the same price and subject to the same terms and conditions as set forth in said offer and the Offeror shall submit with the Offering Notice a true copy of said offer.  The Offeree shall notify the Offeror of its election within forty-five (45) days after the date of receipt of the Offering Notice.  Failure to give notice within the required time period shall be deemed an election not to accept the Sale Offer set forth in the Offering Notice.

6.3.4  <u>Acceptance of Sale Offer</u>.  If the Sale Offer is accepted by the Offeree, and notice in writing is given within the period specified in Subsection 6.3.3, the Offeror shall thereupon be bound to sell to such Offeree and the Offeree shall thereupon be bound to purchase the Joint Venture interest referred to in the Sale Offer in accordance with the terms of the Sale Offer and the Closing of the purchase shall take place in accordance with Section 6.6.

6.3.5  <u>Right to Sell to Third Party</u>.  If the Offeree has not accepted the Sale Offer as provided in Subsection 6.3.3 within the time limits referred to therein, the Sale Offer shall be deemed to have been declined by the Offeree and the Offeror shall be free to sell its Joint Venture interest to the maker of said offer at a price and upon terms and conditions not less favorable to the Offeror than those set forth in the Offering Notice within the time period set forth below, and all rights of the Offeree under this Section with respect to such sale only shall be deemed void and of no further force or effect, but the Offeree shall continue to enjoy the rights granted in this Section with respect to any and all subsequent sales.  If in any instance the Offeree elects not to exercise its rights hereunder or to waive such rights, such election shall not constitute a waiver of the Offeree's right to an Offering Notice in the case of any subsequent sale.  If such Joint Venture interest is not so sold and the transfer not consummated within sixty (60) days after the expiration of the time limits referred to in Subsection 6.3.3, the relevant Joint Venture interests shall then again become subject to all the provisions of this Section 6.3.

-16-

6.3.6    Limitations on Exercise.  Notwithstanding anything to the contrary contained in this Section 6.3, no transfer of any Joint Venture interest pursuant to this Section 6.3 shall be permitted in the event that either Venturer is engaged in any exercise of its or his rights under Sections 6.4 or 6.5 hereof prior to the Offeree's receipt of an Offering Notice pursuant to this Section 6.3.

Section 6.4    Right of First Refusal on All Joint Venture Assets.

6.4.1    Third Party Offering Notice.  If at any time during the term of this Agreement either Venturer receives or obtains a bona fide written offer for the purchase of the entire Project and all other Joint Venture assets, which offer complies with the provisions of Subsection 6.4.2 and which offer it desires and intends to accept, and such Venturer (the "Offeror") gives notice (the "Third Party Offering Notice") to the other Venturer (the "Offeree") which shall include a true copy of such offer, the following provisions set forth in this Section 6.4 shall apply.

6.4.2    Requirements of Offer.  For the purposes of this Section 6.4, an offer received pursuant to Subsection 6.4.1 shall comply with the following requirements:

(i)   the proposed purchase price, (the "Third Party Price") shall be composed solely of lawful money of the United States and the assumption of all mortgages, liens, or other encumbrances on the assets of the Joint Venture; and

(ii)   the offer shall be made by a principal, identified in the offer, and not an agent acting on behalf of an undisclosed principal, and such principal shall not be a party or entity related to or affiliated with the Offeror or with respect to which the Offeror has any direct or indirect ownership or control.

6.4.3    Acceptance of Third Party Sale Offer.

(a)   In the Third Party Offering Notice, the Offeror shall offer (the "Third Party Sale Offer") to the Offeree the right to purchase all and not less than all of the Joint Venture interest of the Offeror at a price equal to the Net Equity (as defined in Section 8.3) of the Offeror's Joint Venture interest determined as if the Gross Fair Market Value (as defined in Section 8.1) of the Joint Venture were the Third Party Price, subject to adjustment as set forth in Subsection 6.6.2, and otherwise subject to the same terms and conditions as set forth in said offer.  The Offeree shall notify the Offeror of its election within fifteen (15) days after the date of receipt of the notice of the amount of the Net Equity of the Offeree

-17-

prepared by the accountants pursuant to Section 8.3. Failure to give notice within the required time period shall be deemed an election not to purchase.

(b)    If the Third Party Sale Offer is accepted by the Offeree, and notice in writing is given within the applicable time periods specified in subparagraph (a), the Offeror shall be bound to sell to the Offeree and the Offeree shall be bound to purchase the Offeror's entire Joint Venture interest in accordance with the terms of the Third Party Sale Offer set forth in Subsection 6.4.3(a) hereof and the purchase shall be closed in accordance with Section 6.6.

(c)    If the Offeree has not accepted the Third Party Sale Offer within the applicable time periods set forth in subparagraph (a), the Offeree shall be deemed to have elected to join the Offeror in selling the Project and all other Joint Venture assets to the third party identified in the Third Party Offering Notice on the terms and conditions set forth therein, and the Venturers shall execute, acknowledge and deliver such conveyances and other documents and make such payments as shall be required to effectuate the sale in accordance with such offer.

6.4.4    <u>Limitation on Exercise</u>. Notwithstanding anything to the contrary contained in this Section, no transfer of any Joint Venture interest or any interest in the Project or other Joint Venture assets pursuant to this Section shall be permitted in the event that either Venturer is engaged in the exercise of its rights under Sections 6.3 or 6.5 hereof prior to the Offeree's receipt of a Third Party Sale Offer pursuant to this Section.

Section 6.5    <u>Put/Call Option</u>.

6.5.1    <u>Put/Call Offering Notice</u>. At any time that is ninety (90) days after there is substantial completion of the on-site work of the Project, either Venturer which is not in default under Section 7 hereof (the "Initiating Venturer") may give written notice (the "Put/Call Offering Notice") to the other Venturer (the "Responding Venturer") of intent to rely on this Section 6.5 and to sell all, but not less than all, of its Joint Venture interest, whereupon the provisions set forth in this Section 6.5 shall apply.

6.5.2    <u>Purchase Price</u>. The Initiating Venturer shall specify in its Offering Notice the amount (the "Stated Amount") to be used as the Gross Fair Market Value (as defined in Section 8.1) in computing the Net Equity of the Venturers' interests in the Joint Venture.

6.5.3    <u>Exercise of Put/Call</u>. Upon receipt of the Put/Call Offering Notice, the Responding Venturer shall then be obligated either:

-18-

(a)   To sell to the Initiating Venturer for cash its interest in the Joint Venture at a price equal to the Net Equity (as defined in Section 8.3) of the Responding Venturer's Joint Venture interest determined as if the Gross Fair Market Value (as defined in Section 8.1) of the Joint Venture were the price set forth in the Put/Call Offering Notice, subject to adjustment as provided in Subsection 6.6.2; or

(b)   To purchase for cash the interest of the Initiating Venturer in the Joint Venture at a price equal to the Net Equity (as defined in Section 8.3) of the Initiating Venturer's Joint Venture interest determined as if the Gross Fair Market Value (as defined in Section 8.1) of the Joint Venture were the price set forth in the Put/Call Offering Notice, subject to adjustment as provided in Subsection 6.6.2.

The Responding Venturer shall notify the Initiating Venturer of its election within forty-five (45) days after the date of receipt of the notice of the amount of the Net Equity of the Initiating Venturer and the Responding Venturer prepared by the accountants pursuant to Section 8.3.  Failure to give notice within the required time period shall be deemed an election not to purchase.

(c)   If following an election by the Responding Venturer to purchase under Subsection 6.5.3(b), the Responding Venturer shall fail to consummate the purchase of the Initiating Venturer's entire interest in accord with Section 6.6, then the Responding Venturer shall sell to the Initiating Venturer pursuant to Subsection 6.5.3(a).

6.5.4   <u>Limitation on Exercise</u>.  Notwithstanding anything to the contrary contained in this Section, no transfer of any Joint Venture interest pursuant to this Section shall be permitted in the event that either Venturer is engaged in the exercise of its rights under Section 6.3 or 6.4 hereof prior to the Responding Venturer's receipt of the Put/Call Offering Notice pursuant to this Section.

Section 6.6   <u>Closings</u>.

6.6.1   <u>Location and Time Periods</u>.  The closing of any sale of an interest in the Joint Venture to the other Venturer pursuant to this Article VI or Section 7.3 (the "Closing") shall be held at the principal offices of the Joint Venture, unless otherwise mutually agreed, on a mutually acceptable date not more than: sixty (60) days after (a) the receipt by the Offeror of the written notices of election by the Offeree, (b) receipt of the written notices of election provided in Section 7.3; or (e) receipt by the Initiating Venturer of the written notice or notices of election by the Responding Venturer or after the expiration of the time within which the Responding Venturer must so elect, as provided in Subsection 6.5.3.

-19-

6.6.2  <u>Closing Adjustments</u>.  At the Closing, any
closing adjustments which are then usual and customary in Suffolk
County, New York, shall be made between the purchasing party or
parties and each selling Venturer as of the date of Closing.  The
price to be paid for the selling Venturer's interest also shall
be adjusted as follows.  There shall be determined, as of the
date of the Closing, (a) the aggregate amount of all additional
capital contributions made by the selling Venturer pursuant to
Section 2.5 between the date as of which the price for such
interest was established and the date of the Closing, and (b) the
aggregate amount of all distributions made to the selling
Venturer during such period pursuant to Section 2.9.  If the
amount determined under (a) exceeds the amount determined under
(b), the price shall be increased by an amount equal to such
excess; if the amount determined under (b) exceeds the amount
determined under (a), the price shall be decreased by an amount
equal to such excess.  Any Venturer transferring its interest
shall transfer such interest free and clear of any liens,
encumbrances or any interests of any third party and shall
execute or cause to be executed any and all documents required to
fully transfer such interest to the acquiring Venturer,
including, but not limited to, any documents necessary to
evidence such transfer, and all documents required to release any
interest in such Venturer's Joint Venture interest.  Any monetary
default by the selling Venturer must be cured out of the proceeds
from such sale at the Closing.  Following the date of Closing,
the selling Venturer shall have no further rights to any
distributions of Net Cash Flow or other Joint Venture income
attributable to any period or event following the date of Closing
and all such rights shall vest in the selling Venturer's
transferee.

6.6.3  <u>Termination of Obligations</u>.  As of the effective
date of any transfer not prohibited hereunder by a Venturer of
its entire interest in the Venture, such Venturer's rights and
obligations hereunder shall terminate except as to items accrued
as of such date and except as to any indemnity obligations of
such Venturer attributable to acts or events occurring prior to
such date.  Thereupon, except as limited by the preceding
sentence, this Agreement shall terminate as to the transferring
Venturer but shall remain in effect as to the other Venturer.  In
the event of a transfer of its entire Joint Venture interest by a
Venturer to the other Venturer, the Venturer to whom such
interest is transferred shall indemnify, defend and hold harmless
the Venturer so transferring its Joint Venture interest from and
against any and all claims, demands, losses, liabilities,
expenses, actions, lawsuits, and other proceedings, judgments,
awards, and costs and expenses (including but not limited to
reasonable attorneys' fees) incurred in or arising directly or
indirectly, in whole or in part, out of operation of the business
of the Joint Venture, excluding only those liabilities, if any,
accruing prior to the date of such transfer.

-20-

Section 6.7  <u>Agreements with Transferees</u>.  In the event that pursuant to the provisions of this Article VI, any Venturer (the "Transferor") shall transfer its Joint Venture interest to any person or entity other than the other Venturer ("Transferee"), no such transfer shall be made or shall be effective to make such Transferee a Venturer or entitle such Transferee to any benefits or rights hereunder until the proposed Transferee agrees in writing to assume and be bound by all the obligations of the Transferor and be subject to all the restrictions to which the Transferor is subject under the terms of this Agreement and any further agreement with respect to the Project contemplated by this Agreement to which the Transferor is then subject or is then required to be a party.  In the event a Venturer's Joint Venture interest is transferred by operation of law and the Venturer's Transferee fails to sign such a writing within ninety (90) days after the date it is determined such transfer has been made, such failure shall entitle either Venturer (i) to treat such failure as a default under this Agreement, or (ii) if the Venturer elects not to treat such failure to sign as a default hereunder, nonetheless to invoke the appraisal or the dissolution procedures as set forth in Section 7.3 hereof and in such event, such transferee shall be treated in the same manner as a "Defaulter" under Section 7.3.

Section 6.8  <u>Restraining Order</u>.  In the event that either Joint Venturer shall at any time transfer or attempt to transfer its Joint Venture interest in violation of the provisions of this Agreement and any rights hereby granted, then the other Venturer shall, in addition to all rights and remedies at law and in equity, be entitled to a decree or order restraining and enjoining such transfer and the offending Venturer shall not plead in defense thereto that there would be an adequate remedy at law; it being hereby expressly acknowledged and agreed that damages at law will be an inadequate remedy for a breach or threatened breach of the violation of the provisions concerning transfer set forth in this Agreement.

ARTICLE VII

<u>DEFAULT AND DISSOLUTION</u>

Section 7.1  <u>Events of Default</u>.

7.1.1  <u>Definitions and Cure Periods</u>.  The occurrence of any of the following events shall constitute an event of default ("Event of Default") hereunder on the part of the Venturer with respect to whom such event occurs ("Defaulter") if within thirty (30) days following notice of such default from the other Venturer (ten (10) days if the default is due solely to the nonpayment of monies), the Defaulter fails to pay such monies, or in the case of non-monetary defaults, fails to commence substantial efforts to cure such default or thereafter fails within a reasonable time to prosecute to completion with diligence and

-21-

continuity the curing of such default; provided, however, that
the occurrence of any of the events described in subparagraphs
(a), (c)-(j) and (l) below shall constitute an Event of Default
immediately upon such occurrence without any requirement of
notice or passage of time except as specifically set forth in any
such paragraph:

(a)   the violation by a Venturer of any of the
restrictions set forth in Article VI of this Agreement upon
the right of a Venturer to transfer its Joint Venture
interest;

(b)   the failure of a Venturer's transferee to assume
in writing and agree to be bound by all of the transferring
Venturer's obligations, as provided in Section 6.7;

(c)   institution by a Venturer of proceedings of any
nature under any laws of the United States or of any state,
whether now existing or subsequently enacted or amended, for
the relief of debtors wherein such Venturer is seeking
relief as debtor;

(d)   a general assignment by a Venturer for the benefit
of creditors;

(e)   the institution by a Venturer of a case or other
proceeding under any section or chapter of the federal
Bankruptcy Code as now existing or hereafter amended or
becoming effective;

(f)   the institution against a Venturer of a case or
other proceeding under any section or chapter of the federal
Bankruptcy Code as now existing or hereafter amended or
becoming effective, which proceeding is not dismissed,
stayed or discharged within a period of sixty (60) days
after the filing thereof or if stayed, which stay is there-
after lifted without a contemporaneous discharge or
dismissal of such proceeding;

(g)   a proposed plan of arrangement or other action by
a Venturer's creditors taken as a result of a general
meeting of the creditors of such Venturer;

(h)   the appointment of a receiver, custodian, trustee
or like officer, to take possession of assets having a value
in excess of $100,000 of a Venturer if the pendency of said
receivership would reasonably tend to have a materially
adverse effect upon the performance by said Venturer of its
obligations under this Agreement; which receivership remains
undischarged for a period of thirty (30) days after the date
of its imposition;

-22-

(i)   admission by a Venturer in writing of its inability to pay his or its debts as they mature;

(j)   attachment, execution or other judicial seizure of all or any substantial part of a Venturer's assets or of a Venturer's Joint Venture interest, or any part thereof, such attachment, execution or seizure being with respect to an amount not less than $100,000 and remaining undismissed or undischarged for a period of fifteen (15) days after the levy thereof, if the occurrence of such attachment, execution or other judicial seizure would reasonably tend to have a materially adverse effect upon the performance by said Venturer of its obligations under this Agreement; provided, however, that said attachment, execution or seizure shall not constitute an Event of Default hereunder if said Venturer posts a bond sufficient to fully satisfy the amount of such claim or judgment within fifteen (15) days after the levy thereof and the Venturer's assets are thereby released from the lien of such attachment;

(k)   default in performance of or failure to comply with any other agreements, obligations or undertakings of a Venturer herein contained except for Section 2.5; and

(l)   any other matter specifically deemed an Event of Default hereunder.

7.1.2   Act of Insolvency.   The occurrence of any events described in subparagraphs (c)-(j) of Subsection 7.1.1 shall also constitute an "Act of Insolvency," as said term is used in this Agreement.

Section 7.2   Causes of Dissolution.   The Joint Venture shall be dissolved only in the event that:

(a)   an Event of Default has occurred as provided in Section 7.1 and the non-defaulting Venturer elects to dissolve the Joint Venture as provided in Section 7.3 hereof;

(b)   the Venturers mutually agree to terminate the Joint Venture;

(c)   the Joint Venture ceases to maintain any interest (which term shall include but not be limited to a security interest) in the Project;

(d)   one or both of the Venturers elect to dissolve or terminate the Joint Venture pursuant to any provision of this Agreement permitting such election to be made; or

(e)   the Joint Venture by its terms, as set forth in this Agreement, is terminated.

-23-

Section 7.3   <u>Election of Non-Defaulting Venturer</u>.

7.3.1   <u>Purchase of Defaulter's Interest</u>.   Upon the occurrence of an Event of Default by either Venturer ("Defaulter"), the other Venturer (a "non-Defaulter") shall have the right to acquire the Joint Venture interest of the Defaulter for cash, except as provided in Subsection 7.3.2 hereof, at a price equal to the Net Equity (as defined in Section 8.3) of the Defaulter determined pursuant to the appraisal procedure set forth in Article VIII, subject to adjustment as set forth in Subsection 6.6.2. In furtherance of such right, the non-Defaulter may notify the Defaulter at any time following an Event of Default of its election to institute the appraisal procedure set forth in Article VIII.  Within fifteen (15) days after receipt of notice of determination of the Net Equity of the Defaulter's Joint Venture interest prepared by the accountants pursuant to Section 8.3, the non-Defaulter may notify the Defaulter of its election to purchase the interest of the Defaulter.

7.3.2   <u>Purchase in Event of Act of Insolvency</u>.   If the Event of Default is also an Act of Insolvency, a Venturer who elects to purchase the Joint Venture interest of the Defaulter shall have the right to purchase such Venturer's interest at a price equal to the Net Equity (as defined in Section 8.3) of the Defaulter determined pursuant to the appraisal procedure set forth in Article VIII, subject to adjustments as set forth in Subsection 6.6.2 by payment of twenty percent (20%) of such purchase price at Closing, the balance of the purchase price to be payable in equal monthly installments over a period of five (5) years, the unpaid balance to bear interest at the legal rate of interest as provided under New York law as of the date of Closing, with the right of prepayment of any amount at any time without premium.

7.3.3   <u>Closing</u>.   Closing of the purchase shall take place as provided in Section 6.6; provided that upon the closing of such purchase the non-Defaulter may elect to offset against the purchase price the amount of any loss, damage or injury, the amount of which has been established by a final non-appealable judgment, caused to it by the default of the Defaulter.

7.3.4   <u>Election to Dissolve</u>.   If the non-Defaulter does not elect to acquire the entire interest of the Defaulter as set forth in Subsection 7.3.1 or 7.3.2, the non-Defaulter may elect (i) to dissolve and terminate the Joint Venture pursuant to Section 7.2 of this Agreement by written notice to the Defaulter or (ii) to pursue any other right of the non-Defaulter.  The right of the non-Defaulter to institute the procedures for purchase of the Defaulter's Joint Venture interest as set forth in this Section 7.3 shall continue until such non-Defaulter elects to exercise its right to terminate the Joint Venture as provided in this Subsection 7.3.4.

-24-

Section 7.4    <u>Procedure in Dissolution and Liquidation</u>.

7.4.1    <u>Winding Up</u>.    Upon dissolution of the Joint Venture pursuant to Section 7.2 hereof, the Joint Venture shall immediately commence to wind up its affairs and the Venturers shall proceed with reasonable promptness to liquidate the business of the Joint Venture.

7.4.2    <u>Management Rights During Wind Up</u>.    During the period of the winding up of the affairs of the Joint Venture, the rights and obligations of the Venturers set forth herein with respect to the management of the Joint Venture shall continue. For purposes of winding up, the Management Committee shall continue to act as such and shall make all decisions relating to the conduct of any business or operations during the winding up period and the sale or other disposition of Joint Venture assets; provided that if the termination of the Venture results from an Event of Default, the defaulting Venturer shall have no further right to participate in the management or affairs of the Venture or to attend Management Committee meetings or vote on decisions by the Management Committee, but shall nonetheless be bound by all decisions made by the non-Defaulter.    Each Venturer hereby waives any claims it may have against the non-Defaulter of the Joint Venture, so long as such non-Defaulter acts in good faith.

7.4.3    <u>Work in Progress</u>.    If the Joint Venture is dissolved for any reason while there is work in progress on the development or construction of the Property and Improvements, winding up of the affairs and termination of the business of the Joint Venture may include completion of the work in progress to the extent of constructing and leasing improvements then being developed on such Property or Improvements as the Management Committee may determine to be necessary to bring the matters under construction to a state of completion convenient to permit a sale of the Joint Venture's interest in such work, giving due regard to the interests of the Venturers.

7.4.4    <u>Allocations</u>.    Income, gain, loss and deduction of the Joint Venture following the date of dissolution shall be determined in accordance with the provisions of this Agreement and shall be credited or charged to the Capital Accounts of each Venturer in the same manner as income, gain, loss and deduction of the Joint Venture would have been credited or charged if there were no termination, dissolution and liquidation.

7.4.5    <u>Distributions in Liquidation</u>.    The assets of the Joint Venture shall be applied or distributed in liquidation in the following order of priority:

(a)    In payment of debts and obligations of the Joint Venture owed to third parties;

-25-

(b)   In payment of debts and obligations of the Joint
Venture to either Venturer;

(c)   To the Venturers in payment of any positive
balances remaining in their Capital Accounts as determined
in accordance with Section 2.7.

7.4.6  <u>Non-Cash Assets</u>.  Every reasonable effort shall be
made to dispose of the assets of the Joint Venture so that the
distribution may be made to the Venturers in cash.  If at the
time of the termination of the Joint Venture, the Joint Venture
owns any assets in the form of work in progress, notes, or other
non-cash assets, such assets, if any, shall be distributed in
kind to the Venturers, in lieu of cash, proportionately to their
right to receive the assets of the Joint Venture on an equitable
basis reflecting the Gross Fair Market Value of the assets so
distributed, which Gross Fair Market Value shall be determined by
appraisal in accord with Article VIII.

7.5  <u>Compliance With Certain Requirements of Regulations</u>.
In the event the Joint Venture is "liquidated" within the meaning
of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), (a)
distribution shall be made pursuant to this Section 7.5 to the
Venturers who have positive Capital Accounts in compliance with
Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2), and (b) if
any Venturer's Capital Account has a deficit balance (after
giving effect to all contributions, distributions and allocations
for all fiscal years, including the fiscal year during which such
liquidation occurs), such Venturer shall not have any obligation
to contribute to the capital of the Joint Venture the amount
necessary to restore such deficit balance to zero.  In the
discretion of the Management Committee a pro rata portion of the
distributions that would otherwise be made to the Venturers
pursuant to Subsection 7.4.5(c) hereof may be:

(a)   distributed to a trust established for the benefit
of the Venturers for the purpose of liquidating Joint
Venture assets, collecting amounts owed to the Joint
Venture, and paying any contingent or unforeseen liabilities
or obligations of the Joint Venture or of the Venturers
arising out of or in connection with the Joint Venture.  The
assets of any such trust shall be distributed to the
Venturers from time to time, in the reasonable discretion of
the Management Committee, in the same proportions as the
amount distributed to such trust by the Joint Venture would
otherwise have been distributed to the Venturers pursuant to
Subsection 7.4.5 hereof; or

(b)   withheld to provide a reasonable reserve for Joint
Venture liabilities (contingent or otherwise) and to reflect
the unrealized portion of any installment obligations owed
to the Joint Venture, provided that such withheld amounts

-26-

shall be distributed to the Venturers as soon as
practicable.

Section 7.6  <u>Deemed Distribution and Recontribution</u>.
Notwithstanding any other provisions of this Article 7, in the
event the Joint Venture is liquidated within the meaning of
Treasury Regulations Section 1.704-1(b)(2)(ii)(g), but such
liquidation is merely a tax termination under Code Section
708(b)(1)(B), the Joint Venture assets shall not be liquidated,
the Joint Venture liability shall not be paid or discharged, and
the Joint Venture's affairs shall not be wound up.

Section 7.7  <u>Disposition of Documents and Records</u>.  All
documents and records of the Joint Venture including, without
limitation, all financial records, vouchers, cancelled checks and
bank statements, shall be retained by the party in possession
thereof upon termination of the Joint Venture and shall be made
available during normal business hours to the Venturers for
inspection and copying at the Venturer's cost and expense.  In
the event either Venturer ("Withdrawing Venturer") for any reason
ceases as provided herein to be a Venturer at any time prior to
termination of the Joint Venture, and the Joint Venture is
continued without the Withdrawing Venturer, the other Venturer
("Surviving Venturer") agrees that said documents and records of
the Joint Venture up to the date of the termination of the
Withdrawing Venturer's interest shall be maintained by the
Surviving Venturer, its successors and assigns, for a period of
not less than seven (7) years thereafter; provided, however, that
if there is an audit or threat of audit, such documents and
records shall be retained until the audit is completed and any
tax liability finally determined.  Said documents and records
shall be available for inspection, examination and copying by the
Withdrawing Venturer upon reasonable notice.

ARTICLE VIII

APPRAISAL

Section 8.1  <u>Gross Fair Market Value and Appraisal
Procedure</u>.  "Gross Fair Market Value," as of any day, shall be
equal to the fair market value of the Joint Venture as of such
day, free and clear of liens and encumbrances.  Whenever this
Agreement provides for the determination of Gross Fair Market
Value, the parties shall first attempt to agree upon the Gross
Fair Market Value and furnish the certified public accountant for
the Joint Venture with a copy of the agreed-upon appraisal.  In
the event the Venturers are unable to mutually agree upon the
Gross Fair Market Value and furnish the certified public
accountant for the Joint Venture with a copy of the agreed-upon
appraisal within fifteen (15) days after the date the appraisal
procedure of this Article VIII is instituted as provided in this
Agreement, then each Venturer shall select an appraiser who shall
be a member of the American Institute of Appraisers, and the two

-27-

appraisers shall select, a third appraiser who shall also be a member of the American Institute of Appraisers. Each appraiser so selected shall furnish the Venturers and the certified public accountants for the Venture with a written appraisal within fifteen (15) days after his selection, setting forth his determination of the Gross Fair Market Value of the Joint Venture. The average of the two closest valuations of such appraisers shall be treated as the Gross Fair Market Value and the determination shall be final and binding on the Venturers. The cost of the appraisal shall be an expense of the Venture, except that if the appraisal is instituted pursuant to Section 7.3, the cost shall be at the expense of the Defaulter.

Section 8.2  Appraisal of Non-Cash Assets.  The procedures set forth in Section 8.1 for determining the Gross Fair Market Value of the Venture shall be followed in determining the Gross Fair Market Value of noncash assets of the Venture as described in Subsection 7.4.6; provided, however, that all references to the Gross Fair Market Value of the Venture shall be deemed to be references to the Gross Fair Market Value of such non-cash assets.

Section 8.3  Net Equity.  The "Net Equity" of a Venturer's interest in the Joint Venture, as of any day, shall be the amount that would be distributed to such Venturer in liquidation of the Joint Venture pursuant to Article 7 hereof if (1) all of the Joint Venture's assets were sold for their Gross Fair Market Value (as defined in Section 8.1 hereof), (2) the Joint Venture paid its accrued, but unpaid, liabilities and established reserves pursuant to Section 7.5(b) hereof for the payment of reasonably anticipated contingent or unknown liabilities, and (3) the Joint Venture distributed the remaining proceeds to the Venturers in liquidation, all as of such day, provided that in determining such Net Equity, no reserve for contingent or unknown liabilities shall be taken into account if such Venturer (or its successors in interest) agrees to indemnify the Joint Venture and all other Venturers for that portion of any such reserve as would be treated as having been withheld pursuant to Section 7.5(b) hereof from the distribution such Venturer would have received pursuant to Subsection 7.4.5 hereof if no such reserve was established.

The Net Equity of a Venturer's interest in the Joint Venture shall be determined, without audit or certification, from the books and records of the Joint Venture by the firm of independent certified public accountants regularly employed by the Joint Venture. The Net Equity of a Venturer's interest shall be determined within fifteen (15) days of the day upon which such accountants are apprised in writing of the Gross Fair Market Value of the Project, and the amount of such Net Equity shall be disclosed to the Joint Venture and each of the Venturers by written notice. The Net Equity determination of such accountants

-28-

shall be final and binding in the absence of a showing of gross negligence or willful misconduct.

## ARTICLE IX

### ARBITRATION

Section 9.1  <u>Initiation</u>.  All disputes and controversies between the Venturers arising under this Agreement shall be settled and finally determined by arbitration in Accordance with the Rules of Commercial Arbitration of the American Arbitration Association.  Any arbitration pursuant to this Agreement shall be conducted by three arbitrators in New York City, New York.  The judgment upon the award rendered in any such arbitration shall be final and binding upon the parties and may be entered in any court having jurisdiction thereof.

Section 9.2  <u>Costs</u>.  All fees and expenses of the arbitrators and all other expenses of the arbitration, except for attorneys fees, shall be shared equally by the Venturers.  Each Venturer shall bear its own attorneys' fees.

## ARTICLE X

### GENERAL PROVISIONS

Section 10.1  <u>Complete Agreement; Amendment</u>.  This Agreement constitutes the entire agreement between the parties and supersedes all agreements, representations, warranties, statements, promises and understandings, whether oral or written, with respect to the subject matter hereof, and neither party hereto shall be bound by nor charged with any oral or written agreements, representations, warranties, statements, promises or understandings not specifically set forth in this Agreement or the exhibits hereto.  This Agreement may not be amended, altered or modified except by a writing signed by both the Venturers.

Section 10.2  <u>Notices</u>.

10.2.1  <u>Addresses</u>.  All notices under this Agreement shall be in writing and shall be sent by reputable overnight courier, telecopier, or by mail, charges prepaid, to the addresses herein set forth and to the Joint Venture at its principal place of business.

The addresses for notices are as follows:

South Setauket I LLC                    Blumco Setauket LLC
c/o Ahold Real Estate Company 6800 Jericho Turnpike
One Atlanta Plaza                       Syosset, New York  11791-4498
Suite 2575                              Telecopy Number:  (516) 921-0053
950 East Paces Ferry Road
Atlanta, Georgia 30326
Telecopy Number: (404) 262-6027

With a copy to:                         With a copy to:

James H. Shulman, Esquire        Andrew E. Lippmann, Esquire
Murtha, Cullina, Richter and     Loeb & Loeb LLP
   Pinney                        345 Park Avenue
CityPlace I                      New York, New York  10154-0037
185 Asylum Street                Telecopy Number: 212-407-4990
Hartford, CT 06103
Telecopy Number 860-240-6150

      10.2.2  <u>Effective Date</u>.  All notices, demands and requests
shall be deemed delivered, given and received when receipt of
such notice, demand or request is electronically confirmed if by
telecopier, when delivered if by reputable overnight courier or
three (3) days from the date of deposit in the United States
mail.

      10.2.3  <u>Changes</u>.  By giving to the other parties written
notice thereof, the parties hereto and their respective permitted
successors and assigns shall have the right from time to time and
at any time during the term of this Agreement to change their
respective addresses for notices and each shall have the right to
specify as its address for notices any other address within the
United States of America.

      Section 10.3  <u>Attorneys' Fees</u>.  Should any litigation be
commenced between the parties hereto or their representatives or
should any party institute any proceeding in a bankruptcy or
similar court which has jurisdiction over any other party hereto
or any or all of its property or assets concerning any provision
of this agreement or the rights and duties of any person or
entity in relation thereto, the party or parties prevailing in
such litigation shall be entitled, in addition to such other
relief as may be granted, to a reasonable sum as and for its or
their attorneys' fees and court costs in such litigation which
shall be determined by the court in such litigation or in a
separate action brought for that purpose.

      Section 10.4  <u>Validity</u>.  In the event that any provision of
this Agreement shall be held to be invalid or unenforceable, the
same shall not affect in any respect whatsoever the validity or
enforceability of the remainder of this Agreement.

-30-

Section 10.5 <u>Survival of Rights</u>.  Except as provided herein to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties signatory hereto, their respective heirs, executors, legal representatives and permitted successors and assigns.

Section 10.6  <u>Governing Law</u>.  This Agreement has been entered into in the State of New York and all questions with respect to this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of that state.

Section 10.7  <u>Waiver</u>.  No consent or waiver, express or implied, by a Venturer to or of any breach or default by the other Venturer in the performance by such other Venturer of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Venturer of the same or any other obligations of such other Venturer hereunder.  Failure on the part of a Venturer to complain of any act or failure to act of the other Venturer or to declare the other Venturer in default, irrespective of how long such failure continues, shall not constitute a waiver by such Venturer of its rights hereunder. The giving of consent by a Venturer in any one instance shall not limit or waive the necessity to obtain such Venturer's consent in any future instance.

Section 10.8  <u>Remedies In Equity</u>.  The rights and remedies of either of the Venturers hereunder shall not be mutually exclusive, i.e., the exercise of one or more of the provisions hereof shall not preclude the exercise of any other provisions hereof.  Each of the Venturers confirms that damages at law will be an inadequate remedy for a breach or threatened breach of this Agreement and agree that, in the event of a breach or threatened breach of any provision hereof, the respective rights and obliga- tions hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein con- tained is intended to, nor shall it, limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other for a breach or threatened breach of any provision hereof, it being the intention by this Section to make clear the agreement of the Venturers that the respective rights and obligations of the Venturers hereunder shall be enforceable in equity as well as at law or otherwise.

Section 10.9  <u>Terminology</u>.  All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, shall include all other genders; and the singular shall include the plural and vice versa.  Titles of Articles, Sections and Subsections are for convenience only, and neither limit nor amplify the provisions of this Agreement itself.

Section 10.10 <u>Counterparts</u>.  This Joint Venture Agreement may be executed in any number of counterparts, each of which

-31-

shall be deemed to be an original and all of which shall constitute one and the same agreement.

Section 10.11 <u>Survival of Indemnity Obligations</u>. Any and
all indemnity obligations of either party hereto shall survive
any termination of the Joint Venture.

Section 10.12 <u>Fees and Commissions</u>. Each Venturer hereby
represents and warrants that as of the date of this Agreement
there are no known claims for brokerage or other commissions or
finder's or other similar fees in connection with the transactions covered by this Agreement insofar as such claims shall be
based on actions, arrangements or agreements taken or made by or
on its behalf, and each Venturer hereby agrees to indemnify and
hold harmless the other Venturer from and against any
liabilities, costs, damages, and expenses from any party making
any such claims through such Venturer.

Section 10.13 <u>Further Assurances</u>. Each party hereto agrees
to do all acts and things and to make, execute and deliver such
written instruments, as shall from time to time be reasonably
required to carry out the terms and provisions of this Agreement.

Section 10.14 <u>SSI Representations</u>. SSI represents and
warrants to BDG that to the best of its knowledge (a) there are
no proceedings instituted or threatened to revoke any permits or
approvals for the Project or to deny any zoning or similar
variances, and (b) there are no condemnation proceedings or
litigation affecting SSI or the Property.

IN WITNESS WHEREOF, the parties have executed this Agreement
as of the day and year first above set forth.

SOUTH SETAUKET I LLC
By: Ahold Real Estate Company,
a member

By: _____
Hans A. Kempers
Its President

BLUMCO SETAUKET LLC

By: _____

-32-

## EXHIBIT A

Description of Property

CONTINENTAL ABSTRACT CORPORATION

Title No.   S-337047                    SCHEDULE A
                                        (continued)

4) North 66 degrees 29 minutes 01 seconds West 532.69 feet to the Suffolk County monument at the point or place of BEGINNING.

PARCEL 2

ALL that certain plot, piece or parcel of land, situate, lying and being at South Setauket, in the Town of Brookhaven, County of Suffolk and State of New York, bounded and described as follows:

BEGINNING at a point on the southeasterly side of Pond Path Road distant the following five (5) courses and distances from a Suffolk County monument at the corner formed by the intersection of the southeasterly side of Pond Path Road with the northeasterly side of Nicholls Road, (C.R. 97), the coordinates of which monument are North 240,129.16 feet and East 2,247,761.51 feet when measured in accordance with the New York State Plane Co-ordinate System, Long Island Zone;

1) North 23 degrees 29 minutes 49 seconds East 554.46 feet;

2) North 09 degrees 00 minutes 44 seconds East 405.95 feet;

3) North 16 degrees 28 minutes 54 seconds East 277.28 feet;

4) North 19 degrees 48 minutes 59 seconds East 224.46 feet; and

5) North 34 degrees 42 minutes 56 seconds East 510.50 feet to the true point or place of BEGINNING.

RUNNING THENCE North 34 degrees 42 minutes 56 seconds East along the southeasterly side of Pond Path Road, 61.61 feet to a monument at the intersection of the southeasterly side of Pond Path Road and the southeasterly side of Nesconset-Port Jefferson Highway (N.Y.S. Route 347);

RUNNING THENCE North 49 degrees 39 minutes 40 seconds East along the southeasterly side of Nesconset-Port Jefferson Highway (N.Y.S. Route 347), 588.11 feet to land now or formerly of Suffolk County;

THENCE along said last mentioned land the following two courses and distances:

1) South 06 degrees 19 minutes 50 seconds East 214.73 feet to a point; and

2) North 83 degrees 40 minutes 10 seconds East 175.45 feet to land now or formerly of Setauket Knolls Associates;

(continued)

SCHEDULE        MORTGAGE        TAX
   B            SCHEDULE        SEARCH        DEPARTMENTAL

CONTINENTAL ABSTRACT CORPORATION

Title No.   S-337047

SCHEDULE A
(continued)

THENCE   South   06 degrees 19 minutes 50 seconds *East* along said  last
mentioned  land,  2,512.34  feet to a point on the northerly  side of
Nicolls Road (C.R. 97);

THENCE westerly along the northerly side of Nicholls Road  (C.R. 97),
along  the  arc of a curve bearing to the right,  having a radius  of
2,063.59  feet,  a distance along said arc of 706.89 feet to a point;
and

THENCE  North  06 degrees 19 minutes 50 seconds West 2,351.82  feet to
the  southeasterly  side of Pond Path Road at the  point or place of
BEGINNING.

THE EXHIBITS TO THE JOINT VENTURE AGREEMENT CAN BE FOUND IN THE

ARC-BDG SETAUKET ENTERPRISE JOINT VENTURE

CLOSING STATEMENT

Between

South Setauket I LLC

and

Blumco Setauket LLC

## ASSIGNMENT AND ASSUMPTION OF JOINT VENTURE INTEREST

KNOW ALL MEN BY THESE PRESENTS that SOUTH SETAUKET I LLC, a Connecticut limited liability company having its principal office at One Atlanta Plaza, 950 East Paces Ferry Road, Suite 2575, Atlanta, Georgia 30326 (hereinafter referred to as "Assignor"), for and in consideration of the sum of One ($1.00) Dollar and other good and valuable consideration to it in hand paid by COBLUM SETAUKET LLC, a New York limited liability company having its principal office at 6800 Jericho Turnpike, Syosset, New York 11791 (hereinafter referred to as "Assignee"), receipt thereof being hereby acknowledged by Assignor, does hereby sell, assign, grant, transfer and convey unto Assignee, effective as of the date of this Agreement set forth below (the "Effective Date"), all of Assignor's right, title and interest (hereinafter the "SSI Joint Venture Interest") in and to that certain joint venture known as ARC-BDG Setauket Enterprise (the "Joint Venture"), the Joint Venture having been formed pursuant to that certain Joint Venture Agreement dated as of December 18, 1997 (the "Joint Venture Agreement"), to which reference may be had.   The SSI Joint Venture Interest is an undivided fifty (50%) percent interest in and to the Joint Venture, and includes all of Assignor's right, title and interest in and to all property and other assets of the Joint Venture, including but not limited to all rights in and to the capital, priority capital, and any interest or return thereon with respect to the Joint Venture, any right, title and interest, as a partner or otherwise, in and to all estates (whether fee title, leasehold or otherwise), mortgages, options or other interests in and to the property described in the Joint Venture Agreement, and all claims, rights and interests of any and every kind which Assignor may have with respect to the Joint Venture or any property and other assets of the Joint Venture.

TO HAVE AND TO HOLD the same unto the Assignee, its successors and assigns, from and after the Effective Date.   This Agreement is executed and delivered under and pursuant to that certain Purchase Agreement (the "Purchase Agreement") dated as of December 31, 1999 by and between Assignor, as Seller, and Blumco Setauket LLC ("Blumco"), a New York limited liability company and the holder of the remaining 50% interest in and to the Joint Venture, as Purchaser.   Assignee is the assignee of Blumco under and pursuant to the Purchase Agreement.

#359387

In consideration of the execution and delivery of this Agreement and for other good and valuable consideration, Assignee hereby (i) accepts the assignment and transfer of the SSI Joint Venture Interest from Assignor; (ii) recognizes that such assignment and transfer is made pursuant to and in conformity with the Purchase Agreement; and (iii) expressly assumes and agrees, for the benefit of Assignor and Blumco, to hereafter abide, observe and perform all terms, covenants, conditions and obligations as a joint venture partner in the Joint Venture under and pursuant to the Joint Venture Agreement.

This Assignment And Assumption Of Joint Venture Interest shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective successors and assigns.

In Witness Whereof, Assignor and Assignee have caused this Instrument to be executed by their respective duly authorized representatives as of December 31, 1999.

ASSIGNOR:
SOUTH SETAUKET I LLC
By: Ahold Real Estate Company,
A Member

By: _____
Hans A. Kempers
Its President


ASSIGNEE:
COBLUM SETAUKET, LLC

By: BDG ASSET MANAGEMENT, INC.,
The General Manager

By: _____
Jonathan E. Cohen
Its Vice President

-2-

In consideration of the execution and delivery of this Agreement and for other good and valuable consideration, Assignee hereby (i) accepts the assignment and transfer of the SSI Joint Venture Interest from Assignor; (ii) recognizes that such assignment and transfer is made pursuant to and in conformity with the Purchase Agreement; and (iii) expressly assumes and agrees, for the benefit of Assignor and Blumco, to hereafter abide, observe and perform all terms, covenants, conditions and obligations as a joint venture partner in the Joint Venture under and pursuant to the Joint Venture Agreement.

This Assignment And Assumption Of Joint Venture Interest shall be binding upon and shall inure to the benefit of Assignor and Assignee and their respective successors and assigns.

In Witness Whereof, Assignor and Assignee have caused this Instrument to be executed by their respective duly authorized representatives as of December 31, 1999.

ASSIGNOR:
SOUTH SETAUKET I LLC
By:  Ahold Real Estate Company,
     A Member,

By: _____
     Hans A. Kempers
     Its President


ASSIGNEE:
COBLUM SETAUKET, LLC

By:  BDG ASSET MANAGEMENT, INC.,
     The General Manager


By: _____
     Jonathan E. Cohen
     Its Vice President

-2-

<u>JOINT VENTURE AGREEMENT</u>

Between

SOUTH SETAUKET I LLC

and

BLUMCO SETAUKET LLC

DATED AS OF DECEMBER *18*, 1997

CONTENTS

Page

RECITALS

ARTICLE I.   FORMATION, PURPOSES, DURATION . . . . . . . .    1

     Section 1.1       Formation and Name   . . . . . . .    1
     Section 1.1.1     Formation
     Section 1.1.2     Name

     Section 1.2       Purposes   . . . . . . . . . . . .    2

     Section 1.3       Scope of Venturers' Authority . . .    2

     Section 1.4       Principal Place of Business . . . .    2

     Section 1.5       Term  . . . . . . . . . . . . . . .    2


ARTICLE II.    FINANCING, CAPITAL CONTRIBUTIONS
              ALLOCATIONS AND DISTRIBUTIONS  . . . . . .    3

     Section 2.1       Initial Financing . . . . . . . . .    3

     Section 2.2       Joint Venture Interests and
                      Capital Accounts   . . . . . . . .    3
     Section 2.2.1     Percentage Interests
     Section 2.2.2     Adjustments
     Section 2.2.3     Capital Accounts Defined

     Section 2.3       Initial Capital Contributions by SSI    4

     Section 2.4       Initial Capital Contributions by BDG    4

     Section 2.5       Additional Capital Contributions   .    4
     Section 2.5.1     General
     Section 2.5.2     Notice by Management Committee
     Section 2.5.3     Failure to Make Additional Capital
                      Contributions

     Section 2.6       No Interest on Capital  . . . . . .    5

     Section 2.7       Capital Accounts  . . . . . . . . .    6
     Section 2.7.1     Initial Capital Accounts
     Section 2.7.2     Adjustments to Capital Accounts

     Section 2.8       Allocations . . . . . . . . . . . .    6
     Section 2.8.1     Allocations
     Section 2.8.2     Regulatory Allocations
     Section 2.8.3     Curative Allocations
     Section 2.8.4     Other Allocation Rules

Section 2.9       Distributions to Venturers From
                  Project Net  . . . . . . . . .     7

Section 2.10      Withdrawals of Capital  . . . . . .     7

ARTICLE III.  MANAGEMENT  . . . . . . . . . . . . . .     8

Section 3.1       Management of the Venture  . . . . .     8
Section 3.1.1     Management Committee
Section 3.1.2     Major Decisions

Section 3.2       Appointment of Managers;
                  Duties and Fees of Managers  . . .     10
Section 3.2.1     Appointment
Section 3.2.2     Duties of Managers
Section 3.2.3     Prior Authorization
Section 3.2.4     Rights Not Assignable

Section 3.3       Project Plan and Budgets  . . . . .     11

Section 3.4       Compensation and Reimbursement of
                  Venturers  . . . . . . . . . . .     12
Section 3.4.1     No Compensation
Section 3.4.2     Reimbursable Expenditures
Section 3.4.3     Development Fee

Section 3.5       Contracts with Related Parties  . .     12

Section 3.6       Time Devoted to Joint Venture  . . .     12

ARTICLE IV.  ACCOUNTING . . . . . . . . . . . . . . .     12

Section 4.1       Books and Records  . . . . . . . .     12
Section 4.1.1     General
Section 4.1.2     Accrual Basis

Section 4.2       Location and Rights of Inspection  .     13

Section 4.3       Fiscal Year   . . . . . . . . . .     13

Section 4.4       Statements of Financial Condition  .     13

Section 4.5       Audit   . . . . . . . . . . . . .     13

Section 4.6       Bank Accounts   . . . . . . . . .     13

Section 4.7       Other Accounting Decisions   . . . .     13

ARTICLE V.  TAX RETURNS, TAX ACCOUNTING,
            TAX ELECTIONS . . . . . . . . . . . . . .     14

Section 5.1       Preparation of Tax Returns   . . . .     14

Section 5.2        Tax Decisions Not Specified  . . . .    14

Section 5.3        Classification as Partnership  . . .    14


ARTICLE VI.   SALE, TRANSFER OR MORTGAGE . . . . . . . .    14

Section 6.1        General  . . . . . . . . .    14
Section 6.1.1      Required Consents


Section 6.2        Indirect Transfers  . . . . . . .    14


Section 6.3        Right of First Refusal  . . . . .    15
Section 6.3.1      Offering Notice
Section 6.3.2      Requirements of Offer
Section 6.3.3      Procedure
Section 6.3.4      Acceptance of Sale Offer
Section 6.3.5      Right to Sell to Third Party
Section 6.3.6      Limitations on Exercise


Section 6.4        Right of First Refusal on
                   All Joint Venture Assets  . . . .    17
Section 6.4.1      Third Party Offering Notice
Section 6.4.2      Requirements of Offer
Section 6.4.3      Acceptance of Third Party Sale Offer
Section 6.4.4      Limitations on Exercise


Section 6.5        Put/Call Option . . . . . . . . .    18
Section 6.5.1      Put/Call Offering Notice
Section 6.5.2      Purchase Price
Section 6.5.3      Exercise of Put/Call
Section 6.5.4      Limitation on Exercise


Section 6.6        Closings  . . . . . . . . .    19
Section 6.6.1      Location and Time Periods
Section 6.6.2      Closing Adjustments
Section 6.6.3      Termination of Obligations


Section 6.7        Agreements with Transferees . . . .    21


Section 6.8        Restraining Order . . . . . . . .    21


ARTICLE VII.   DEFAULT AND DISSOLUTION . . . . . . . . .    21

Section 7.         Events of Default . . . . . . . .    21
Section 7.1.1      Definitions and Cure Periods
Section 7.1.2      Act of Insolvency


Section 7.2        Causes of Dissolution . . . . . . .    23


Section 7.3        Election of Non-Defaulting Venturer    23
Section 7.3.1      Purchase of Defaulter's Interest
Section 7.3.2      Purchase in Event of Act of Insolvency

Section 7.3.3       Closing
Section 7.3.4       Election to Dissolve

Section 7.4         Procedure in Dissolution
                      and Liquidation . . . . . . . .   25
Section 7.4.1       Winding Up
Section 7.4.2       Management Rights During Wind Up
Section 7.4.3       Work in Progress
Section 7.4.4       Allocations
Section 7.4.5       Distributions in Liquidation
Section 7.4.6       Non-Cash Assets

Section 7.5         Compliance With Certain Requirements
                      of Regulations  . . . . . . . .   26

Section 7.6         Deemed Distribution and
                      Recontribution  . . . . . . . .   27

Section 7.7         Disposition of Documents and Records   27


ARTICLE VIII.   APPRAISAL  . . . . . . . . . .   27

Section 8.1         Gross Fair Market Value
                      and Appraisal Procedure . . . . .   27

Section 8.2         Appraisal of Non-Cash Assets   . . .   28

Section 8.3         Net Equity  . . . . . . . . . .   28


ARTICLE IX.   ARBITRATION  . . . . . . . . . . .   29

Section 9.1         Initiation  . . . . . . . . . . .   29

Section 9.2         Costs . . . . . . . . . . . . .   29


ARTICLE X.   GENERAL PROVISIONS  . . . . . . . .   29

Section 10.1        Complete Agreement; Amendment  . . .   29

Section 10.2        Notices . . . . . . . . . . . .   29
Section 10.2.1      Addresses
Section 10.2.2      Effective Date
Section 10.2.3      Changes

Section 10.3        Attorneys' Fees . . . . . . . . .   30

Section 10.4        Validity  . . . . . . . . . . .   30

Section 10.5        Survival of Rights  . . . . . . .   30

Section 10.6        Governing Law . . . . . . . . . .   30

Section 10.7    Waiver . . . . . . . . . . . . .    31

Section 10.8    Remedies in Equity . . . . . . . .    31

Section 10.9    Terminology . . . . . . . . . . .    31

Section 10.10   Counterparts . . . . . . . . . .    31

Section 10.11   Survival of Indemnity Obligations .    31

Section 10.12   Fees and Commissions . . . . . . .    32

Section 10.13   Further Assurances . . . . . . . .    32

                Signatures . . . . . . . . . . .    32

## EXHIBITS

Exhibit A          Description of Property

Exhibit B          Joint Responsibilities

Exhibit C          Form of Interim Promissory Note and Interim Loan Mortgage

Exhibit D          Form of Building Loan Note, Building Loan Agreement and Building Loan Mortgage

Exhibit E          Form of Guaranty Agreement

Exhibit F          Form of Purchase and Sale Agreement

Exhibit G          Overall Development Plan

Exhibit H          Reimbursable Expenditures

## DECLARATION OF SERVICE

State of New York, County of New York )ss:

      Ramsey Hinkle an attorney admitted to practice in the courts of New York, hereby declares:

      I am not a party to this action, am over 18 years of age and am an associate at the law office of Clayman & Rosenberg, LLP 305 Madison Avenue, New York, New York 10165.

      On January 6, 2010, I served a true copy of the annexed OBJECTIONS TO TRUSTEES DETERMINATIONS by depositing the same with an overnight delivery service in a wrapper properly addressed, the address having been designated by the addressee for that purpose.  Said delivery was made prior to the latest time designated by the overnight delivery service for overnight delivery.  The address and delivery service are indicated below:

                  VIA FEDERAL EXPRESS
                  Irving H. Picard, Trustee
                  c/o Baker and Hostetler LLP
                  45 Rockefeller Plaza – 11th Floor
                  New York, New York 10111

      I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on:   January 6, 2010
               New York, New York

                                           _____
                                          Ramsey Hinkle