CLAYMAN & ROSENBERG
Seth L. Rosenberg    (SR 4563)
Paul S. Hugel    (PH 4749)
305 Madison Avenue
New York, NY 10165
Telephone:    (212) 922-1080
Telefax:    (212) 949-8255

*Attorneys for Gotham Plaza Associates, LLC*
(BLMIS Account No. 1-B0081 designated Claim Number 011048)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

SECURITIES INVESTOR PROTECTION        :
CORPORATION,

                                      :        Adv. Pro. No. 08-01789(BRL)

                        Plaintiff,

                                      :

    -against-
                                      :        SIPA Liquidation

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,                       :

                        Defendant     :

--------------------------------------------------------X

### OBJECTION TO TRUSTEE'S DETERMIMNATION OF CLAIM

Gotham Plaza Associates, LLC ("Objector"), by counsel, CLAYMAN & ROSENBERG,

hereby objects to the Notice of Trustee's Determination of Claim dated December 8, 2009 (the

"Determination Letter"), appended hereto as Exhibit A, as set forth herein.

## BACKGROUND

1.    Objector is a "Customer" as that term is defined by the Securities Investor

Protection Act ("SIPA") of Bernard L. Madoff Investment Securities LLC ("BLMIS").

2.    Objector was and is a member of Bull Market Fund, a general partnership

organized in the State of New York in 1986.

3.    The Bull Market Fund partnership was organized with the knowledge and

encouragement of BMLIS for the purpose of consolidating the bookkeeping for the investment

of certain small investors with BLMIS.

4.    Bull Market Fund received a final statement from BLMIS which indicated that

Bull Market Fund owned securities valued at $36,833,462.86.

5.    On or about December 31, 2008, Objector received a statement from Bull Market

Fund which indicated that Objector's funds invested by Bull Market Fund in BLMIS were

valued at $1,234,992.

6.    On December 11, 2008, the above-captioned liquidation proceeding was

commenced against BLMIS, pursuant to the Securities Investor Protection Act of 1970 ("SIPA").

Irving Picard was appointed Trustee ("BLMIS Trustee") with oversight of the liquidation of

BLMIS and responsibility for processing customer claims for money pursuant to SIPA.

7.    By Order dated December 23, 2008, the Court directed the Trustee to disseminate

notice and claim forms to BLMIS customers and set forth claim-filing deadlines.  The Order

further authorized the Trustee, *inter alia*, "to satisfy, within the limits provided by SIPA, those

portions of any and all customer claims and accounts which agree with the Debtor's books and

records," and provided that, where the BLMIS Trustee disagrees with the amount claimed in a

customer's claim form, the BLMIS Trustee, "shall notify such claimant by mail of his

determination that the claim is disallowed, in whole or in part, and the reason therefor…"

    8.     On or about June 23, 2009, Objector timely submitted a customer claim form to

SIPC setting forth his claim in the amount of $1,234,992 ("Objector's claim"). Objector's claim

cross-referenced the BLMIS account of Bull Market Fund. A copy of Objector's claim form is

appended hereto as Exhibit B.

    9.     On December 8, 2009, the BLMIS Trustee sent Objector a Determination Letter

denying Objector's claim, "in its entirety." Exhibit A. The Determination Letter stated, in part,

"Based upon a review of available books and records of BLMIS by the Trustee's staff, you did

not have an account with BLMIS. Because you did not have an account, you are not a customer

of BLMIS under SIPA as that term is defined at 15 U.S.C. Section 78111 (2). Accordingly,

your Claim for securities and/or a credit balance is **DENIED**."

    10.    Objector objects to the BLMIS Trustee's disallowance of his claim for the reasons

set forth hereinbelow.

## GROUNDS FOR OBJECTION

    11.    First:      The Trustee's definition and application of the term, "account" as

set forth in the Determination Letter is incorrect.

    12.    Second:      The Trustee's definition and application of the term, "customer" as

set forth in the Determination Letter is incorrect.

    13.    Objector reserves the right to revise or amend this Objection. Objector's failure

to assert an objection on a particular ground or grounds shall not be construed as a waiver of its

right to object or join in the objection of other claimants on any additional grounds.

    14.    Objector reserves all rights set forth in Rule 9014.

15.    Objector incorporates herein by reference all claims and reservations of rights set forth in Objector's claim form. Exhibit B.

## RELIEF SOUGHT

16.    Objector's claim should be allowed in its entirety.

17.    The Court should direct SIPC to pay Objector the full amount of Objector's claim together with interest thereon commencing not later than the date of the Determination Letter.

18.    Such other and further relief as the Court may deem just and equitable.

Dated: New York, New York
     January 6, 2010

CLAYMAN & ROSENBERG
By:    Seth L. Rosenberg  (SR4563)
       Paul S. Hugel      (PH4749)
305 Madison Avenue
New York, NY 10165
Telephone:    (212) 922-1080
Telefax:        (212) 949-8255
rosenberg@clayro.com
hugel@clayro.com

4

EXHIBIT A

DETERMINATION LETTER

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]

### NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

December 8, 2009

GOTHAM PLAZA ASSOCIATES, LLC
6800 JERICHO TURNPIKE
SYOSSET, NY  11791

Dear GOTHAM PLAZA ASSOCIATES, LLC:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim designated as Claim No. 011048:

Based on a review of available books and records of BLMIS by the Trustee's staff, you did not have an account with BLMIS. Because you did not have an account, you are not a customer of BLMIS under SIPA as that term is defined at 15 U.S.C. § 78lll (2). Accordingly, your Claim for securities and/or a credit balance is **DENIED**.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after December 8, 2009, the date on which the Trustee mailed this notice.

------------------------------

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004


and


Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
Attn: Claims Department
45 Rockefeller Plaza
New York, New York 10111

**Irving H. Picard**

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc: DAVID KAPLAN
300 ROBBINS LANE
SYOSSET, NY 11791

EXHIBIT B

CUSTOMER CLAIM FORM

**GOTHAM PLAZA ASSOCIATES, LLC**
**300 ROBBINS LANE**
**SYOSSET, NY 11791**

June 23, 2009                                                    *Via UPS Overnight*

Irving H. Picard, Esq.
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Avenue, Suite 800
Dallas, Texas 75201

Re:    Account Number: 1-B0081
       Gotham Plaza Associates, LLC through Bull Market Fund
       300 Robbins Lane
       Syosset, New York 11791

Dear Mr. Picard:

Gotham Plaza Associates, LLC is a partner in Bull Market Fund, which had an account with Bernard L. Madoff Investment Securities ("BLMIS"), Account No. 1-B0081.

It is our understanding that Bull Market Fund has submitted its own SIPC Customer Claim Form to your office.

We wish to submit our own personal SIPC Customer Claim Form at this time. We are attaching the following:

1. Our SIPC Customer Claim Form;
2. Bull Market Fund's November 30, 2008 BLMIS statement;
3. Our 2007 Schedule K-1;
4. Our personal account balance as of December 11, 2008; and
5. Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC

We reserve the right to amend or modify this claim if and to the extent warranted by facts and circumstances not presently known to us, or as a result of a subsequent determination by a court of competent jurisdiction with respect to any issue pertaining to our claim.

This letter is hereby incorporated by reference in and made a part of our SIPC Customer Claim Form.

Very truly yours,

Gotham Plaza Associates, LLC

By: BDG 125th Street, LLC, its General Manager

By: BDG Asset Management, Inc., its General Manager

By: _____
    Name: Edward Blumenfeld
    Title:    President

G:\Legal\MADOFF\Correspondence\Picard\Entity Investors\IHPicard Ltr - Gotham Plaza Associates, LLC 6-09.doc



## Shipment Receipt

**Transaction Date:** 23 Jun 2009
**Tracking Number:** 1Z12X2361394891046

### Address Information

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Trustee for Bernard L. Madoff Sec. | Blumenfeld Dev. Group, Ltd. | Blumenfeld Dev. Group, Ltd. |
| Irving H. Picard, Esq. | BDG | BDG |
| 2100 McKinney Avenue | 300 Robbins Lane | 300 Robbins Lane |
| Suite 800 | Syosset NY 11791 | Syosset NY 11791 |
| Claims Processing Center | Telephone: 5169210800 | Telephone: 5169210800 |
| DALLAS TX 75201-6910 | | |

### Package Information

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1. | Letter | UPS Letter | | {Reference#1 - 01 lmc} |

### UPS Shipping Service and Shipping Options

**Service:**
UPS Next Day Air Saver
**Guaranteed By:[1]:**
3:00 P.M. Wednesday, 6/24/2009

| | |
|---|---|
| **Shipping Fees Subtotal:** | 20.15 USD |
| Transportation | 19.95 USD |
| Fuel Surcharge | 0.20 USD |

### Payment Information

**Bill Shipping Charges to:**        Shipper's Account 12X236

| **Total Charged:** | **20.15 USD** |
|---|---|

**Note:** Your invoice may vary from the displayed reference rates.
[1] * For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

**Responsibility for Loss or Damage**
Unless a greater value is recorded in the declared value field as appropriate for the UPS shipping system used, the shipper agrees that the released value of each package covered by this receipt is no greater than $100, which is a reasonable value under the circumstances surrounding the transportation. If additional protection is desired, a shipper may increase UPS's limit of liability by declaring a higher value and paying an additional charge. UPS does not accept for transportation and shipper's requesting service through the Internet are prohibited from shipping packages with a value of more than $50,000. The maximum liability per package assumed by UPS shall not exceed $50,000, regardless of value in excess of the maximum. Claims not made within nine months after delivery of the package (sixty days for international shipments), or in the case of failure to make delivery, nine months after a reasonable time for delivery has elapsed (sixty days for international shipments), shall be deemed waived. The entry of a C.O.D. amount is not a declaration of value for carriage purposes. All checks or other negotiable instruments tendered in payment of C.O.D. will be accepted by UPS at shipper's risk. UPS shall not be liable for any special, incidental, or consequential damages. All shipments are subject to the terms and conditions contained in the UPS Tariff and the UPS Terms and Conditions of Service, which can be found at www.ups.com.

☒Close Window



# Tracking Detail

**Your package has been delivered.**

| | |
|---|---|
| Tracking Number: | 1Z 12X 236 13 9489 104 6 |
| Type: | Package |
| Status: | **Delivered** |
| Delivered On: | 06/24/2009  12:49 P.M. |
| Signed By: | DOSS |
| Location: | OFFICE |
| Delivered To: | 2100 MCKINNEY AVE 800 DALLAS, TX, US 75201 |
| Shipped/Billed On: | 06/23/2009 |
| Reference Number(s): | 01 LMC |
| Service: | NEXT DAY AIR SAVER |

**Package Progress**

| Location | Date | Local Time | Description |
|---|---|---|---|
| DALLAS, TX, US | 06/24/2009 | 12:49 P.M. | DELIVERY |
| | 06/24/2009 | 7:21 A.M. | OUT FOR DELIVERY |
| | 06/24/2009 | 6:40 A.M. | ARRIVAL SCAN |
| DALLAS/FT. WORTH A/P, TX, US | 06/24/2009 | 6:25 A.M. | DEPARTURE SCAN |
| | 06/24/2009 | 5:28 A.M. | ARRIVAL SCAN |
| LOUISVILLE, KY, US | 06/24/2009 | 4:37 A.M. | DEPARTURE SCAN |
| | 06/24/2009 | 12:47 A.M. | ARRIVAL SCAN |
| JAMAICA, NY, US | 06/23/2009 | 10:51 P.M. | DEPARTURE SCAN |
| | 06/23/2009 | 9:56 P.M. | ARRIVAL SCAN |
| UNIONDALE, NY, US | 06/23/2009 | 9:28 P.M. | DEPARTURE SCAN |
| | 06/23/2009 | 9:15 P.M. | ORIGIN SCAN |
| | 06/23/2009 | 7:09 P.M. | PICKUP SCAN |
| | 06/23/2009 | 7:08 P.M. | PICKUP SCAN |

# CUSTOMER CLAIM

Claim Number_____

Date Received_____

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008

(Please print or type)

Name of Customer: GOTHAM PLAZA ASSOCIATES, LLC
THROUGH BULL MARKET FUND
Mailing Address: 300 ROBBINS LANE
City: SYOSSET    State: NY    Zip: 11791
Account No.: BULL MARKET FUND'S ACCOUNT NO.: 1-B0081
Taxpayer I.D. Number (Social Security No.): 11 - 3552639

NOTE:    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY
THE ACCOMPANYING INSTRUCTION SHEET. A SEPARATE CLAIM FORM
SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL
PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE
RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009. CLAIMS
RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE
SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS
LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY
CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.    Claim for money balances as of **December 11, 2008**:

a.    The Broker owes me a Credit (Cr.) Balance of    $   –0–

b.    I owe the Broker a Debit (Dr.) Balance of    $   –0–

c.    If you wish to repay the Debit Balance,

please insert the amount you wish to repay and

attach a check payable to "Irving H. Picard, Esq.,

Trustee for Bernard L. Madoff Investment Securities LLC."

If you wish to make a payment, **it must be enclosed**

with this claim form.    $   –0–

d.    If balance is zero, insert "None."    NONE

502180406

1

2.        Claim for securities as of December 11, 2008:

**PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.**

|   |   | YES | NO |
|---|---|---|---|
| a. | The Broker owes me securities | X | |
| b. | I owe the Broker securities | | X |
| c. | If yes to either, please list below: | | |

|  |  | Number of Shares or Face Amount of Bonds | |
|---|---|---|---|
| Date of Transaction (trade date) | Name of Security | The Broker Owes Me (Long) | I Owe the Broker (Short) |
| | SEE BULL MARKET FUND ACCOUNT STATEMENT | $1,234,992* | |
| | | | |
| | | | |
| | | | |

Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received. PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.

502180406

2

* PROVIDED BY BULL MARKET, SEE SUPPLEMENTAL CLAIM INFORMATION ATTACHMENT A

NOTE:   IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT.   IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

|  |  | YES | NO |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. | | X |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? | | X |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? | | X |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) | | X |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. | | X |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. | X * | |
| 9. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? if so, give name of that broker. | | X |

Please list the full name and address of anyone assisting you in the preparation of this claim form: DAVID KAPLAN, 300 ROBBINS LANE, SYOSSET, NY  11791

502180406

3

*  SEE SUPPLEMENTAL CLAIM INFORMATION ATTACHMENT A

If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate your claim is an estimated claim.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

GOTHAM PLAZA ASSOCIATES, LLC
By: BDG 125th Street LLC, its General Manager
By: BDG Asset Management, Inc., its General Mana

Date    JUNE 23, 2009          Signature _____
Edward Blumenfeld, President

Date _____          Signature _____

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, e.g., corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

**This customer claim form must be completed and mailed promptly, together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

502180406                              4

SUPPLEMENTAL CLAIM INFORMATION
ATTACHMENT A

Claimant is filing this claim form as a customer of Bernard L. Investment Securities LLC ("BLMIS"), having invested in BLMIS through a partnership, Bull Market Fund ("BMF"). Pursuant to the partnership agreement of BMF and other written agreements amongst the Partners of BMF, BMF invested all of its funds with BLMIS. BMF has informed claimant that its customer account number with BLMIS was 1-B0081. BMF has also advised claimant that it is filing a customer claim for the losses in its customer account with BLMIS.

BMF typically issued quarterly statements showing each partner's account summary. In light of the BLMIS fraud, BMF issued a statement to each partner showing their closing balance as of December 10, 2008, a copy of which is enclosed. Claimant believes that as of December 11, 2008, the amount of claimant's investment was all held in the securities as shown on the November 30, 2008 BLMIS statement for BMF, a copy of which is also enclosed.

# BERNARD L. MADOFF
### INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET        NY  11791

| | | | 1-B0081-3-0 | 11/30/08 | *****6934 | 1 |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

| Date | Quantity | | Description | | Amount |
|---|---|---|---|---|---|
| | | | BALANCE FORWARD | | 1,428,340.08 |
| 11/06 | 9,360 | 13223 | COMCAST CORP CL A | 15,790 | 148,168.40 |
| 11/06 | | | CVS CAREMARK CORP | 30,510 | |
| 11/06 | | | CHEVRON CORP | 73,740 | |
| 11/06 | | | BANK OF NEW YORK MELLON CORP | 32,290 | |
| 11/06 | | | BRISTOL MYERS SQUIBB COMPANY | 28,810 | |
| 11/06 | | | BAXTER INTERNATIONAL INC | 60,600 | |
| 11/06 | | 11658 | BOEING CO | 51,120 | |
| 11/06 | | 11353 | AMGEN INC | 60,350 | 207,228.20 |
| 11/06 | | | ABBOTT LABORATORIES | | |
| | | | GENERAL ELECTRIC CO | | |
| 11/06 | | 14878 | GOOGLE | 356,520 | 222,492.48 |
| 11/06 | | 15113 | GOLDMAN SACHS GROUP INC | 91,870 | 114,702.76 |
| 11/06 | | 15818 | INTERNATIONAL BUSINESS MACHS | 92,800 | 405,524.40 |

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-1061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY  11791

1-B0081-3-0

11/30/08      2      *******6934

| Date | Quantity | Symbol | Description | Price | Amount |
|---|---|---|---|---|---|
| 11/06 | 17,784 | 16053 | INTEL CORP | 16.070 | 286,499.88 |
| 11/06 | 27,048 | 16498 | JOHNSON & JOHNSON | 61.310 | 555,093.88 |
| 11/06 | 11,856 | 16598 | JPMORGAN CHASE & CO | 40.930 | |
| 11/06 | 992 | 16755 | KRAFT FOODS INC | 29.110 | |
| 11/06 | 6,240 | 16995 | COCA COLA CO | 44.490 | 277,866.60 |
| 11/06 | 3,744 | 37229 | MCDONALDS CORP | 57.800 | 216,926.40 |
| 11/06 | 2,184 | 37699 | SUPERVALU INC | | |
| 11/06 | 2,184 | 17933 | ALTRIA GROUP INC | 19.160 | 125,798.32 |
| 11/06 | 6,552 | 181465 | MERCK & CO | 30.780 | 211,547.52 |
| 11/06 | 6,864 | 163529 | ORACLE CORPORATION | | |
| 11/06 | 12,792 | 19343 | OCCIDENTAL PETROLEUM CORP | 54.290 | 152,558.32 |
| 11/06 | 2,808 | 19190 | VERISIGN INC | 57 | 784,743.00 |
| 11/06 | 9,672 | 200149 | PROCTER & GAMBLE CO | 62.910 | |
| 11/06 | 6,864 | 200283 | PHILLIP MORRIS INTERNATIONAL | 42.730 | 293,572.72 |
| 11/06 | 5,304 | 20518 | QUALCOMM INC | 37.010 | 200,256.24 |
| 11/06 | 18,720 | 20988 | ANR PIPE | | |
| 11/06 | 11,544 | 21223 | TIME WARNER INC | 10.060 | 116,593.64 |
| 11/06 | 3,120 | 21465 | UNITED PARCEL SVC INC | 52.790 | 164,828.80 |
| 11/05 | 5,616 | 21695 | U S BANCORP | 29.550 | |
| 11/06 | 3,120 | 21928 | UNITED TECHNOLOGIES CORP | 54.920 | 171,474.40 |

CONTINUED ON PAGE  3

# BERNARD L. MADOFF

**INVESTMENT SECURITIES LLC**

New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

MADF

BULL MARKET FUND EMPLOYEES
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY   11791

BERNARD L. MADOFF INVESTMENT SECURITIES LLC
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| Account Number | Date | Page |
|---|---|---|
| 1-B0081-3-0 | 11/30/08 | 3 |
| ******6934 | | 2-54 |

| DATE | BOUGHT (Received) | SOLD (Delivered) | DESCRIPTION | PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|---|---|---|---|---|---|---|
| 11/06 | 9,040 | | VERIZON COMMUNICATIONS | 29.980 | 271,620.04 | |
| 11/06 | 10,600 | | WELLS FARGO & CO NEW | 33.660 | 357,489.28 | |
| 11/06 | 7,176 | | WAL MART STORES INC | 55.550 | | |
| 11/06 | 16,848 | | EXXON MOBIL CORP | 75.680 | | |
| | | 22163 | FIDELITY SPARTAN | | | |
| | | | U S TREASURY MONEY MARKET | DIV. | | |
| 11/05 | 105,794 | | FIDELITY SPARTAN | | 105,794.00 | 105,794.00 |
| | | 10545 | U S TREASURY MONEY MARKET | | | |
| 11/06 | | 24,408 | FIDELITY SPARTAN | | | 24,408.00 |
| 11/06 | 1,735,000 | 48165 | U S TREASURY MONEY MARKET | 1 | | 1,735,000.00 |
| 11/06 | 4,960,000 | 48599 | U S TREASURY BILL | 99.969 | | |
| | | | DUE 12/11/2008 | | | |
| 11/06 | 3,830,000 | 48524 | U S TREASURY BILL | 99.960 | | |
| | | | DUE 12/18/2008 | | | |
| 11/06 | 3,925,000 | 49033 | U S TREASURY BILL | 99.946 | 3,923,630.00 | |
| | | | DUE 01/15/2009 | | | |
| 11/06 | 3,925,000 | 48240 | U S TREASURY BILL | 99.904 | 3,922,880.50 | |
| | | | DUE 01/22/2009 | 1/22/2009 | | |

CONTINUED ON PAGE 4

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY      11791

MADOFF SECURITIES INTERNATIONAL Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| Account No. | 1-B0081-3-0 |
| Date | 11/30/08 |
| | *****6934 |
| Page | 4 |

| DATE | BOUGHT | SOLD | DESCRIPTION | PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|------|--------|------|-------------|-------|----------------|-----------------|
| 11/06 | | 3,925,000 | 49461 | U S TREASURY BILL DUE 01/26/2009 | 99.928 | | 3,922,174.00 |
| 11/06 | 2,575,000 | | 1,050,000 49671 | U S TREASURY BILL DUE 2/12/2009 | 99.962 | 2,568,701.50 | |
| 11/06 | 2,575,000 | | 78610 | U S TREASURY BILL DUE 03/26/2009 | 99.702 | 2,568,701.50 | |
| 11/06 | 2,575,000 | | 50127 | U S TREASURY BILL DUE 03/26/2009 | 99.751 | 2,568,588.25 | |
| 11/06 | 2,575,000 | | 50356 | U S TREASURY BILL DUE 04/09/2009 | 99.726 | 2,567,944.50 | |
| 11/07 | 1,944 | | 23407 | APPLE INC | 106.000 | 206,158.80 | |
| 11/07 | 3,456 | | 22639 | ABBOTT LABORATORIES | 56.590 | 195,713.04 | |
| 11/07 | 2,376 | | 23077 | AMGEN INC | 62.070 | 147,573.12 | |
| 11/07 | 1,728 | | 22949 | BANK OF AMERICA | 35.620 | 61,587.52 | |
| 11/07 | 1,296 | | 24579 | BAXTER INTERNATIONAL INC | 62.420 | 80,866.04 | |
| 11/07 | 2,376 | | 24414 | BANK OF NEW YORK MELLON CORP | 34.210 | 81,795.52 | |
| 11/07 | 4,320 | | 22840 | JOHNSON & JOHNSON | 64.420 | 101,377.96 | |
| 11/07 | 1,512 | | 22580 | ANHEUSER-BUSCH COS INC | 64.490 | 97,615.80 | |
| 11/07 | 11,664 | | 25519 | CITI GROUP INC | 14.410 | 168,544.24 | |
| | | | CONTINUED ON PAGE | | | |

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY    11791

1-B0081-3-0          11/30/08          *******6934          5

| Date | Quantity | | Description | | |
|---|---|---|---|---|---|
| 11/07 | 6,264 | 25754 | COMCAST CORP | 17,390 | 109,180.96 |
| 11/07 | 13,440 | 25939 | CONT AIRLINES | | 112,043.40 |
| 11/07 | 3,744 | 26224 | CISCO SYSTEMS INC | | 229,640.52 |
| 11/07 | 3,024 | 26459 | CVS CAREMARK CORP | 31,720 | 96,041.28 |
| 11/07 | 4,836 | 26694 | CHEVRON CORP | 75,450 | 362,422.20 |
| 11/07 | 4,104 | 26929 | GENERAL DYNAMICS CORP | | 386,305.43 |
| 11/07 | 22,680 | 27164 | GENERAL ELECTRIC CO | | 458,157.80 |
| 11/07 | 432 | 27399 | GOOGLE INC | 349,160 | 150,854.12 |
| 11/07 | 864 | 27634 | GOLDMAN SACHS GROUP INC | 89,070 | 76,950.48 |
| 11/07 | 5,400 | 27869 | HEWLETT PACKARD CO | | 202,844.40 |
| 11/07 | 3,024 | 28104 | INTERNATIONAL BUSINESS MACHS | 92,430 | 279,628.32 |
| 11/07 | 12,096 | 28339 | INTEL CORP | 16 | 194,019.00 |
| 11/07 | 5,808 | 28574 | JOHNSON & JOHNSON | | 347,122.00 |
| 11/07 | 3,240 | 28809 | JPMORGAN CHASE & CO | | 305,562.00 |
| 11/07 | 4,320 | 29044 | KRAFT FOODS INC | 29,710 | 150,369.40 |
| 11/07 | 2,376 | 29279 | COCA COLA CO | 46,580 | 201,337.60 |
| 11/07 | 29,760 | 29514 | MCDONALDS CORP | | 128,631.00 |
| 11/07 | 1,512 | 29749 | MERCK & CO INC | 64,860 | 97,842.00 |
| 11/07 | 4,536 | 29984 | 3M COMPANY | 19,370 | 98,158.56 |
| 11/07 | 30,456 | 30219 | ALTRIA GROUP INC | | 88,043.32 |
| 11/07 | 4,752 | 30454 | MERCK & CO | | |
| 11/07 | 30,924 | 30689 | MICROSOFT CORP | 22,040 | 315,002.76 |
| 11/07 | 8,640 | 30924 | ORACLE CORPORATION | 18,470 | 159,925.80 |
| | | 31159 | CONTINUED ON PAGE 6 | | |

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET        NY   11791

| | | | | | | |
|---|---|---|---|---|---|---|
| 1-B0083-3-0 | | 11/30/08 | | *****6934 | | 6 |

| Date | Bought/Received | Sold/Delivered | | Description | Price | Amount |
|---|---|---|---|---|---|---|
| 11/07 | 1,728 | | 31864 | OCCIDENTAL PETROLEUM CORP. | 54.380 | 94,087.64 |
| 11/07 | 3,456 | | 32090 | PEPSICO INC | 58.630 | 202,763.28 |
| 11/07 | 1,408 | | 33223 | RODGERS INC | 58.400 | 20,709.00 |
| 11/07 | 6,896 | | 32569 | PROCTER & GAMBLE CO | | 436,712.28 |
| 11/07 | 4,536 | | 32804 | PHILLIP MORRIS INTERNATIONAL | 43.640 | 198,132.04 |
| 11/07 | 3,672 | | 33090 | QUALCOMM INC | 37.690 | 138,543.68 |
| 11/07 | 2,592 | | 33270 | SCHLUMBERGER LTD | 51.170 | 132,720.80 |
| 11/07 | 1,528 | | 33509 | AT&T INC | 28.910 | 44,205.90 |
| 11/07 | 7,776 | | 33744 | TIME WARNER INC | 10.110 | 78,926.36 |
| 11/07 | 2,160 | | 33979 | UNITED PARCEL SVC INC CLASS B | 53.680 | 116,034.80 |
| 11/07 | 3,888 | | 34214 | U S BANCORP | 30.370 | |
| 11/07 | 2,160 | | 34449 | UNITED TECHNOLOGIES CORP | 56 | 121,046.00 |
| 11/07 | 6,048 | | 34684 | VERIZON COMMUNICATIONS | 31.810 | 192,577.28 |
| 11/07 | 1,944 | | 34919 | WELLS FARGO & CO NEW | 30.910 | |
| 11/07 | 4,968 | | 35154 | WAL-MART STORES INC | 56.750 | 282,082.80 |
| 11/07 | 11,448 | | 35389 | EXXON MOBIL CORP | 75.280 | 862,262.44 |
| 11/07 | | | | DEV 11/07/08 | | |
| 11/07 | | | | FIDELITY SPARTAN | | |
| 11/07 | | | | U S TREASURY MONEY MARKET | DIV | |
| 11/07 | | 18,784 | 10803 | FIDELITY SPARTAN | 1 | 18,784.00 |
| 11/07 | | | | U S TREASURY MONEY MARKET | | |
| 11/07 | 2,971,000 | | 11763 | U S TREASURY BILL | .99+523 | 2,954,471.25 |
| 11/07 | | | | DUE 02/05/09 | | |
| | | | | 2/05/2009 | | |

CONTINUED ON PAGE   7

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY   11791

| | 1-B0081-3-0 | | 11/30/08 | *******6934 | 7 |

| DATE | BOUGHT Received/Opening | | | | AMOUNT |
|---|---|---|---|---|---|
| 11/07 | 2,450,000 | 11382 | U S TREASURY BILL DUE 02/19/2009 | 99.887 | 2,447,233.50 |
| 11/07 | 2,450,000 | 11597 | U S TREASURY BILL DUE 02/26/2009 | 99.882 | 2,447,080.50 |
| 11/07 | 2,450,000 | 11888 | U S TREASURY BILL DUE 03/05/2009 | 99.866 | 2,446,726.00 |
| 11/07 | 2,450,000 | 12019 | U S TREASURY BILL DUE 03/12/2009 | 99.840 | 2,446,080.00 |
| 11/07 | 1,175,000 | 12141 | U S TREASURY BILL DUE 04/16/2009 | 99.720 | 1,171,710.00 |
| 11/07 | 1,175,000 | 12581 | U S TREASURY BILL DUE 04/16/2009 | 99.720 | 1,171,710.00 |
| 12/01 | 300,493 | | BLUE CHIP MONEY MARKET CONTINUED ON PAGE 2 | | |
| 11/10 | 2,376 | 35864 | APPLE INC | 108.720 | 258,413.72 |
| 11/10 | 4,224 | 36099 | ABBOTT LABORATORIES | 55.910 | 236,331.84 |
| 11/10 | 2,904 | 36137 | AMGEN INC | | |
| 11/10 | 2,112 | 365669 | BOEING CO | | |
| 11/10 | 13,728 | 368604 | BANK OF AMERICA | 24.050 | 330,707.40 |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

BERNARD L. MADOFF
MADF | INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                      NY   11791

1-B0081-3-0    11/30/08    8    *******6934

| DATE | BOUGHT RECEIVED IN | SOLD DELIVERED OUT | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|------|------|------|------|------|------|------|
| 11/10 | 1,848 | | BAXTER INTERNATIONAL INC | 60.770 | 112,375.96 | |
| 11/10 | 3,160 | | BANK OF NEW YORK MELLON CORP | 33.480 | 106,190.64 | |
| 11/10 | 5,664 | | BRISTOL MYERS SQUIBB COMPANY | 21.210 | 120,362.64 | |
| 11/10 | 15,048 | | ANHEUSER-BUSCH COS INC | 64.090 | 105,511.92 | |
| 11/10 | 15,048 | | CITI GROUP INC | 14.270 | 215,335.96 | |
| 11/10 | 9,920 | | COMCAST CORP | 13.410 | 138,203.20 | |
| 11/10 | 16,224 | | CONOCOPHILLIPS | 54.150 | 208,013.12 | |
| 11/10 | 18,104 | | CISCO SYSTEMS INC | 18.080 | 291,804.32 | |
| 11/10 | 3,960 | | CVS CAREMARK CORP | 31.300 | 124,106.00 | |
| 11/10 | 5,100 | | CHEVRON CORP | 72.410 | 445,102.20 | |
| 11/10 | 9,216 | | THE WALT DISNEY CO | 25.660 | 236,910.46 | |
| 11/10 | 209,776 | | GENERAL ELECTRIC CO | 20.530 | 591,922.28 | |
| 11/10 | 528 | | GOOGLE | 363.680 | 191,991.24 | |
| 11/10 | 39,852 | | GOLDMAN SACHS GROUP INC | 79.550 | 109,307.60 | |
| 11/10 | 47,752 | | HOME DEPOT INC | 23.990 | 129,320.00 | |
| 11/10 | 6,864 | | HEWLETT PACKARD CO | 37.290 | 256,232.56 | |
| 11/10 | 3,664 | | INTERNATIONAL BUSINESS MACHS | 92.660 | 342,619.36 | |
| 11/10 | 1,056 | | INTEL CORP | 15.300 | 16,156.80 | |
| 11/10 | 10,032 | | JOHNSON & JOHNSON | 62.520 | 419,036.36 | |
| 11/10 | 4,224 | | J.P. MORGAN CHASE & CO | 41.730 | 127,310.40 | |
| 11/10 | 5,574 | | KRAFT FOODS INC | 30.100 | 111,439.74 | |
| 11/10 | 3,168 | | MCDONALDS CORP | 57.320 | 181,430.64 | |
| 11/10 | 3,168 | | MEDTRONIC INC | 40.300 | 127,796.40 | |
| | | | CONTINUED ON NEXT PAGE | 91 | | |

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY    11791

1-B0081-3-0          11/30/08          9          ********6934

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| DATE | QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|
| 11/10 | 1,848 | 3M COMPANY | 64.650 | 119,620.12 |
| 11/10 | 5,544 | ALTRIA GROUP INC | 18.890 | 104,947.16 |
| 11/10 | 5,600 | MERCK & CO | 28.590 | |
| 11/10 | 21,938 | MICROSOFT CORP | | 203,926.80 |
| 11/10 | 10,824 | ORACLE CORPORATION | 18.600 | 201,758.40 |
| 11/10 | 2,272 | OCCIDENTAL PETROLEUM CORP | 56.010 | 131,174.76 |
| 11/10 | 16,744 | PEPSICO INC | 56.590 | |
| 11/10 | 8,184 | PFIZER INC | 14.680 | |
| 11/10 | 5,564 | PROCTER & GAMBLE CO | 65.230 | |
| 11/10 | 4,544 | PHILIP MORRIS INTERNATIONAL | 44.030 | 534,169.32 |
| 11/10 | 3,432 | QUALCOMM INC | 57.900 | 244,321.32 |
| 11/10 | 16,368 | SCHLUMBERGER LTD | | |
| 11/10 | 9,504 | UNITED PARCEL SVC INC | 55.008 | |
| 11/10 | 1,600 | AT&T INC | 28.580 | 46,145.00 |
| 11/10 | | TIME WARNER INC | 11.010 | 105,019.04 |
| 11/10 | | TEXAS | | |
| 11/10 | 4,752 | U S BANCORP | 31.510 | 149,925.52 |
| 11/10 | 2,640 | UNITED TECHNOLOGIES CORP | 56.430 | 149,080.20 |
| 11/10 | | VERIZON COMMUNICATIONS | | |
| 11/10 | 6,976 | WELLS FARGO & CO NEW | | |
| 11/10 | 6,072 | WAL-MART STORES INC | 55.710 | 338,526.60 |
| 11/10 | 14,256 | EXXON MOBIL CORP | 75.600 | 1,081,174.80 |
| 11/10 | | FIDELITY SPARTAN | | |
| | | U S TREASURY MONEY MARKET | | |
| | | DIV 11/10/08 | | |

CONTINUED ON PAGE

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

# BERNARD L MADOFF
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Bernard L Madoff Securities Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                NY   11791

| 1-B0081-3-0 | ****** 6934 | 11/30/08 | 10 |
| --- | --- | --- | --- |

| DATE | BOUGHT Received or Long | SOLD Delivered or Short | DESCRIPTION | PRICE or SYMBOL | AMOUNT DEBITED to your Account | AMOUNT CREDITED to your Account |
| --- | --- | --- | --- | --- | --- | --- |
| 11/10 | | 30,199 12016 | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | 1 | | 30,199.00 |
| 11/10 | | 2,600,000 12206 | U.S. TREASURY BILL DUE 03/19/2009 | 99-857 | | 2,596,347.00 |
| 11/10 | | 2,575,000 13423 | U S TREASURY BILL DUE 03/19/2009 | 99-834 | | 2,570,725.50 |
| 11/10 | | 2,575,000 13625 | U S TREASURY BILL DUE 3/26/2009 | 99.770 | | 2,569,077.50 |
| 11/10 | | 3,750,000 13620 | U S TREASURY BILL DUE 4/02/2009 | 99.742 | | 3,740,325.00 |
| 11/10 | | 2,175,000 13405 | U S TREASURY BILL DUE 4/09/2009 | | | 2,169,310.50 |
| 11/10 | 50,000 | 14281 | U S TREASURY BILL DUE 4/16/2009 | 99.686 | 49,843.00 | |
| 11/10 | 685 | 14508 | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET 4/16/2009 | 1 | 685.00 | |
| 11/14 | | 104,400 13242 | CHECK | | | 104,472.00 |
| 11/14 | | | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | DIV | | .05 |
| | | | CONTINUED ON PAGE 11 | | | |

CONTINUED ON PAGE 11

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
**BLMIS** INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET            NY    11791

1-B0081-3-0    11/30/08    ******6934    11

| DATE | | | | DESCRIPTION | | | AMOUNT |
|---|---|---|---|---|---|---|---|
| 11/14 | | 685 | 29393 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | 685.00 |
| 11/18 | | 29864 | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | CA | 285,000.00 |
| 11/18 | | | | CHECK | | CA | 15,000.00 |
| 11/18 | | | | CHECK | | CA | 100,000.00 |
| 11/18 | | | | CHECK | | CA | 100,000.00 |
| 11/18 | | | | CHECK | | CA | 200,000.00 |
| 11/18 | | 575,000 | 49408 | CHECK | | CA | 150,000.00 |
| 11/18 | | | 49406 | U S TREASURY BILL DUE 4/16/2009 | | | |
| 11/13 | 123,717 | | 49723 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | 123,717.00 |
| 11/18 | 450,000 | | 49954 | U S TREASURY BILL DUE 4/16/2009 | 99.830 | 449,235.00 |
| 11/18 | 5,765 | | 49905 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 5,765.00 |
| 11/19 | | 20,839 | 50057 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | DIV | |
| 11/19 | | | | U S TREASURY MONEY MARKET | 1 | 20,839.00 |

CONTINUED ON PAGE 12

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV. GROUP LTD
300 ROBBINS LANE
SYOSSET                        NY  11791

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel. 020 7493 6222

1-B0083-3-0        11/30/08        12        *****6934

| DATE | BOUGHT RECEIVED | SOLD DELIVERED | STOCK DESCRIPTION | PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|---|---|---|---|---|---|---|
| 11/19 | 3,525,000 | | 54708 U S TREASURY BILL DUE 03/26/2009 | 99.926 | 3,522,391.50 | |
| 11/19 | 91,120 | | 59098 FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 91,120.00 | |
| 11/20 | | 3,525,000 | 54708 U S TREASURY BILL DUE 03/26/2009 | 99.962 | | 675,000.00 |
| 11/20 | | | 63567 CHECK | | | |
| 11/20 | 2,850,000 | | 63567 U S TREASURY BILL DUE 03/26/2009 | 99.947 | 2,848,489.50 | |
| 11/20 | 171 | | 64175 FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 171.00 | |
| 11/25 | 888 | | 64635 ABBOTT LABORATORIES | 55.270 | | |
| 11/25 | 1,580 | | 64635 ABBOTT LABORATORIES | 55.270 | | |
| 11/25 | 1,078 | | 64993 AMGEN INC | 53.630 | 57,856.14 | |
| 11/25 | 4,800 | | 65123 BANK OF AMERICA | 12.989 | 65,073.04 | |
| 11/25 | 540 | | 65267 BANK OF AMERICA | 12.989 | | |
| 11/25 | 3,170 | | 65267 BANK-OF NEW YORK MELLON CORP | 27.690 | | |
| 11/25 | 1,960 | | 65645 BRISTOL MYERS SQUIBB COMPANY | 20.140 | 39,552.40 | |
| 11/25 | 5,684 | | 66083 CITI GROUP INC | 6.100 | 34,899.40 | |
| 11/25 | 790 | | 66559 COMCAST CORP | 15.970 | | |
| 11/25 | 2,842 | | 66559 COMCAST CORP CL A | 15.970 | | |
| | | | CONTINUED ON PAGE 13 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET NY 11791

Account No: 1-B0081-3-0  | Date 11/30/08 | Page 13 | ******6934

| Date | Quantity | Security | Price | Amount |
|------|----------|----------|-------|--------|
| 11/25 | 1,568 | CONOCOPHILLIPS | 45.100 | 70,778.80 |
| 11/25 | 5,880 | CISCO SYSTEMS INC | 14.970 | 88,223.60 |
| 11/25 | 1,470 | COMCAST CORP | 12.640 | |
| 11/25 | 2,058 | CVS/CAREMARK CORP | | |
| 11/25 | 1,862 | CHEVRON CORP | 65.760 | |
| 11/25 | 686 | THE WALT DISNEY CO | 19.760 | 36,867.12 |
| 11/25 | | GENERAL ELECTRIC CO | | |
| 11/25 | 1,596 | GOOGLE | 275 | |
| 11/25 | 1,666 | HOME DEPOT INC | 19.530 | 32,562.98 |
| 11/25 | 2,450 | HEWLETT-PACKARD CO | 32.890 | 80,623.50 |
| 11/25 | 5,600 | INTERNATIONAL BUSINESS MACH | 75.800 | |
| 11/25 | 3,724 | INTEL CORP | | |
| 11/25 | 2,842 | JOHNSON & JOHNSON | 57.650 | |
| 11/25 | 3,724 | J.P. MORGAN CHASE & CO | 27.760 | |
| 11/25 | 1,470 | COCA-COLA CO | | |
| 11/25 | 1,078 | MCDONALDS CORP | 55 | 59,333.00 |
| 11/25 | 1,176 | MEDTRONIC INC | | |
| 11/25 | 2,058 | 3M COMPANY | 58.290 | |
| 11/25 | 2,156 | ALTRIA GROUP INC | 16.250 | |
| 11/25 | 7,840 | MERCK & CO | 25 | |
| 11/25 | 3,920 | MICROSOFT CORP | 18.100 | |
| 11/25 | 1,862 | ORACLE CORPORATION | 16.650 | |
| 11/25 | 1,568 | OCCIDENTAL PETROLEUM CORP | | |
| 13/25 | 1,568 | PEPSICO INC | 51.800 | 81,204.40 |

CONTINUED ON REVERSE SIDE

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York ☐ London

New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY   11791

| YOUR ACCOUNT NUMBER | TAX PERIOD ENDING | PAGE | YOUR ACCOUNT |
|---|---|---|---|
| 1-B0081-3-0 | 11/30/08 | 14 | ******6934 |

| DATE | BOUGHT RECEIVED | SOLD DELIVERED | DESCRIPTION | PRICE | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|
| 11/25 | 6,762 | | PFIZER INC | 15.320 | 103,863.84 | |
| 11/25 | 2,940 | | PROCTER & GAMBLE CO | 61.940 | 182,220.60 | |
| 11/25 | 2,458 | | PHILLIP MORRIS INTERNATIONAL | 38.380 | 94,508.04 | |
| 11/25 | 1,666 | | QUALCOMM INC | 37.850 | | |
| 11/25 | 1,176 | | SCHLUMBERGER LTD | 46.270 | 54,460.52 | |
| 11/25 | 5,880 | | AT&T INC | 25. | 147,235.00 | |
| 11/25 | 3,626 | | UNITED PARCEL SVC INC CLASS B | 50.760 | 29,109.26 | |
| 11/25 | 980 | | U S BANCORP | 23,400 | 41,367.60 | |
| 11/25 | 1,764 | | UNITED TECHNOLOGIES CORP | 44,020 | | |
| 11/25 | 930 | | VERIZON COMMUNICATIONS | 28,570 | 75,582.00 | |
| 11/25 | 2,842 | | WAL-MART STORES INC | 51,450 | | |
| 11/25 | 3,622 | | WELLS FARGO & CO NEW | 23,820 | 93,192.04 | |
| 11/25 | 2,254 | | WYETH | | 116,058.30 | |
| 11/25 | 2,352 | | EXXON MOBIL CORP | 72 | | |
| 11/25 | 5,292 | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | | | |
| 11/25 | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | DIV | | .93 |
| 11/25 | 42,963 | | FIDELITY SPARTAN U S TREASURY MONEY MARKET   4/16/2009 | 1 | | 42,963.00 |
| 11/25 | | 3,735,000 | U S TREASURY BILL   DUE 4/16/2009 | 99,878 | | 3,720,455.50 |
| 11/25 | 91,291 | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | 91,291.00 |

CONTINUED ON PAGE 15

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**MADF** BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY   11791

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

1-B0081-3-0     11/30/08     *******6934     15

| DATE | BOUGHT/RECEIVED | SOLD/DELIVERED | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|---|
| 11/26 | 53,496 | | | | |
| 11/26 | 14,240 | | | | |
| 11/28 | 5,000 | | CHECK FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | CA | 5,000.00 |
| 11/28 | | 100   78106 | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | 1 | 5,000.00 |
| 11/28 | | 110   78420 | CHECK FIDELITY SPARTAN U.S. TREASURY MONEY MARKET INC | CK | 50,000.00 |
| 11/28 | | | CHECK FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | | 50,000.00 |
| 11/28 | 47,963 | 78257 | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | DIV | 2.26 |
| 11/28 | | | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | 1 | 47,963.00 |

NEW BALANCE     5,119,352.95

SECURITY POSITIONS

| | MKT/PRICE |
|---|---|
| AT&T INC | 28,560 |
| ABBOTT LABORATORIES | 52,390 |
| AMGEN INC | 52,390 |
| APPLE INC | 55,340 |
| BANK OF AMERICA | 92,670 |
| BANK OF NEW YORK MELLON CORP | 16,250 |
| BAXTER INTERNATIONAL INC | 52,900 |
| BOEING CO | 42,630 |

CONTINUED ON PAGE 16

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020) 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET        NY        11791

| YOUR ACCOUNT NUMBER | DATE | TAX ID | PAGE |
|---|---|---|---|
| 1-B0081-3-0 | 11/30/08 | ******6934 | 16 |

| AMOUNT RECEIVED/LONG | SOLD DELIVERED/SHORT | DESCRIPTION | PRICE |
|---|---|---|---|
| 18,064 | | BRISTOL MYERS SQUIBB COMPANY | 20.700 |
| 13,134 | | CVS CAREMARK CORP | 28.930 |
| 16,754 | | CHEVRON CORP | 75.010 |
| 53,160 | | CISCO SYSTEMS INC | 16.550 |
| 49,068 | | CITI GROUP INC | 8.290 |
| 18,804 | | COCA COLA CO | 46.870 |
| | | COLGATE PALMOLIVE CO | 66.070 |
| 26,306 | | COMCAST CORP CL A | 17.540 |
| 14,024 | | CONOCOPHILLIPS | 52.520 |
| 17,666 | | THE WALT DISNEY CO | 22.550 |
| 47,844 | | EXELON CORP | 56.210 |
| 95,630 | | EXXON MOBIL CORP | 80.150 |
| 3,432 | | GENERAL ELECTRIC CO | 17.170 |
| 1,760 | | GOLDMAN SACHS GROUP INC | 87.970 |
| 22,514 | | GEORGE | |
| 35,706 | | HEWLETT PACKARD CO | 35.280 |
| 53,140 | | HOME DEPOT INC | 23.110 |
| 12,460 | | INTEL CORP | 14.800 |
| 33,820 | | INTERNATIONAL BUSINESS MACHS | 82.000 |
| 25,594 | | J.P. MORGAN CHASE & CO | 31.660 |
| 13,926 | | JOHNSON & JOHNSON | 58.580 |
| 10,366 | | KRAFT FOODS INC | 27.110 |
| 10,464 | | MCDONALDS CORP | 56.750 |
| | | MEDTRONIC INC | 30.520 |
| | | CONTINUED ON PAGE 17 | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

805 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| 1-B0081-3-0 | 11/30/08 | ******6934 | 17 |

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET            NY    11791

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | | ITEM | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT | BALANCE |
|------|------|------|---|------|------|------|------|------|
| | 19,580 | | | MERCK & CO | 26.720 | | | |
| | 71,716 | | | MICROSOFT CORP | 20.220 | | | |
| | 7,794 | | | OCCIDENTAL PETROLEUM CORP | 56.760 | | | |
| | 36,176 | | | ORACLE CORPORATION | 16.600 | | | |
| | 14,240 | | | PEPSICO INC | 55.700 | | | |
| | 61,822 | | | PFIZER INC | 16.430 | | | |
| | 19,002 | | | PHILLIP MORRIS INTERNATIONAL | 42.100 | | | |
| | 27,492 | | | PROCTER & GAMBLE CO | 64.350 | | | |
| | 15,130 | | | QUALCOMM INC | 33.570 | | | |
| | 10,944 | | | SCHLUMBERGER LTD | 50.740 | | | |
| | 3,226 | | | S&P DEP RECPT | | | | |
| | | | | U.S. TREASURY MONEY MARKET | | | | |
| | 6,230 | | | 3M COMPANY | 66.930 | | | |
| | 22,000 | | | TIME WARNER INC | 9.050 | | | |
| | 16,020 | | | U.S. BANCORP | 27.600 | | | |
| | 4,900 | | | UNITED PARCEL SVC INC | | | | |
| | | | | CLASS B | | | | |
| | 8,500 | | | UNITED TECHNOLOGIES CORP | 48.530 | | | |
| | 25,558 | | | VERIZON COMMUNICATIONS | 32.090 | | | |
| | 20,740 | | | WAL-MART STORES INC | 55.880 | | | |
| | 30,750 | | | WELLS FARGO & CO NEW | 28.890 | | | |
| | 1,312 | | | XTO | 36.010 | | | |
| | | | | MARKET VALUE OF SECURITIES | | | | |
| | | 37,012,042.86 | | LONG | | SHORT | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

# BERNARD L. MADOFF
### INVESTMENT SECURITIES LLC
New York □ London

**MADF**

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY    11791

| | | | |
|---|---|---|---|
| 1-B0081-4-0 | 11/30/08 | ******6934 | 1 |

Mayfair, London W1J 8DT
12 Berkeley Street
Tel 020 7493 6222

| DATE | BOUGHT RECEIVED OR SHARES | SOLD DELIVERED OR SHARES | | PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|---|---|---|---|---|---|---|
| | | | BALANCE FORWARD | | | 1,428,341.00 |
| 11/06 | 312 | | S & P 100 INDEX NOVEMBER 470 CALL | | | |
| 11/06 | | 312 | S & P 100 INDEX NOVEMBER 470 PUT | 20.500 | 639,912.00 | |
| 11/07 | 216 | | S & P 100 INDEX NOVEMBER 470 CALL | | | |
| 11/07 | | 216 | 31629 S & P 100 INDEX NOVEMBER 470 PUT | 13.800 | 298,296.00 | |
| 11/10 | 264 | | 44089 S & P 100 INDEX NOVEMBER 475 PUT | 16.800 | 443,784.00 | |
| 11/19 | 792 | | 30303 S & P 100 INDEX DECEMBER 420 PUT | 30 | 2,376,792.00 | |
| 11/19 | 820 | | 30779 S & P 100 INDEX NOVEMBER 485 CALL | .900 | 24,024.00 | |
| 11/19 | 264 | | 31255 S & P 100 INDEX NOVEMBER 475 PUT | 59 | | 1,557,336.00 |

CONTINUED ON PAGE 2

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
MADF
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY   11791

1-B0081-4-0      11/30/08      *******6934      2

| DATE | | | | DESCRIPTION | | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| 11/25 | | | 98 | NEW BALANCE | 34 | | |
| 11/25 | | | 72033 72774 | SECURITY POSITIONS | MKT. PRICE | 12 | 2051,898.00 |
| | | | | S & P 100 INDEX | | | |
| | | | | DECEMBER 380 CALL | 23.300 | | |
| | | | | S & P 100 INDEX | | | |
| | 792 | 792 | | DECEMBER 430 CALL | | | |
| | | | | S & P 100 INDEX | | | |
| | 98 | 98 | | DECEMBER 380 CALL | 89.600 | | |
| | | | | S & P 100 INDEX | | | |
| | | | | DECEMBER 420 PUT | 16.500 | | |
| | | | | S & P 100 INDEX | | | |
| | | | | DECEMBER 370 PUT | 5.900 | | |
| | | | | MARKET VALUE OF SECURITIES – LONG | | 5,118,352.00 | |
| | | | | 11356,760.00     27437,200.00 | | | 333,102.00 |

# M E M O R A N D U M

**TO:**         **Gotham Plaza Associates, LLC**

**FROM:**      Harvey Cohen

**RE:**         Bull Market Fund

**DATE:**      **December 31, 2008**

---

Please find below your balance in the Bull Market Fund as of December 10, 2008.  This includes your November 30, 2008 balance plus any additions, if applicable, made subsequent to November 30, 2008 and sent to Bernard L. Madoff Investment Securities, LLC.

Account Balance as of December 10, 2008:  $1,234,992

Please call me if I can be of further service.

Amended and Restated
Operating Agreement of
Gotham Plaza Associates, LLC

This Operating Agreement (this "Agreement") is entered into as of this 30th day of April, 2001, by and among BDG 125th Street, LLC, as General Manager, and the Members who are the signatories hereto.

### EXPLANATORY STATEMENT

WHEREAS, BDG 125th Street, LLC, a New York limited liability company ("BDG"), formed a limited liability company styled Gotham Plaza Associates, LLC (hereafter, the "Company") on certain terms and conditions;

WHEREAS, the Members other than BDG desire to be admitted to the Company and BDG desires that the Members be admitted to the Company; and

WHEREAS, BDG and the other Members desire to amend and restate the Operating Agreement of the Company entered into as of September 26, 2000 (the "Original Operating Agreement) on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree to continue the Company under the Law and to amend and restate the Original Operating Agreement upon the following terms and conditions:

NOW, THEREFORE, for good and valuable consideration, the parties, intending legally to be bound, agree as follows:

### Article I
### Defined Terms

The following terms shall have the meaning specified in this Article I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them in their definitions.

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)   the deficit shall be decreased by the amounts
which the Interest Holder is obligated to restore pursuant
to Section 4.4.2 or is deemed obligated to restore pursuant
to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii)   the deficit shall be increased by the items
described in Regulation Sections 1.704-1(b)(2)(ii)-(d)(4),
(5), and (6).

"Adjusted Capital Balance" means, as of any day, an Interest
Holder's total Capital Contributions less all amounts actually
distributed to the Interest Holder pursuant to Sections 4.2.3.4.1
and 4.4 hereof.   If any Interest is `transferred in accordance
with the terms of this Agreement, the transferee shall succeed to
the Adjusted Capital Balance of the transferor to the extent the
Adjusted Capital Balance relates to the Interest transferred.

"Affiliate" means, with respect to any Member or the General
Mangager, any Person:   (i) which owns more than 50% of the voting
interests in the Member; or (ii) in which the Member owns more
than 50% of the voting interests; or (iii) in which more than 50%
of the voting interests are owned by a Person who has a
relationship with the Member described in clause (i) or (ii)
above or (iv) who otherwise controls, is controlled by, or under
common control with, another Person.

"Agreement" means this Operating Agreement, as amended from
time to time.

"Capital Account" means the account to be maintained by the
Company for each Interest Holder in accordance with the following
provisions:

(i)   an Interest Holder's Capital Account shall be
credited with the Interest Holder's Capital Contributions,
the amount of any Company liabilities assumed by the
Interest Holder (or which are secured by Company property
distributed to the Interest Holder), the Interest Holder's
distributive share of Profit and any item in the nature of
income or gain specially allocated to the Interest Holder
pursuant to the provisions of Article IV (other than Section
4.3.3); and

(ii)   an Interest Holder's Capital Account shall be
debited with the amount of money and the fair market value
of any Company property distributed to the Interest Holder,
the amount of any liabilities of the Interest Holder assumed
by the Company (or which are secured by property contributed
by the Interest Holder to the Company), the Interest
Holder's distributive share of Loss and any item in the
nature of expenses or losses specially allocated to the
Interest Holder pursuant to the provisions of Article IV
(other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest.  If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment.  It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"Capital Proceeds" means the gross receipts received by the Company from a Capital Transaction.

"Capital Transaction" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

"Cash Flow" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay Company Expenses. "Company Expenses" means all cash disbursements of the Company including, without limitation, (a) the fees and reimbursements described in Section 5.1.7.3; (b) the reimbursements described in Section 5.1.7.2; (c) management fees, leasing fees, brokerage commissions, and legal fees and expenses incurred in connection with the development and operation of the Property and Company business; (d) taxes; (e) all costs and expenses paid in connection with any sale or refinancing, including, without limitation, brokerage commissions, commitment fees, standby fees, mortgage taxes or charges, title insurance premiums, legal fees, collection costs, recording charges and appraisal fees; (f) amounts used or to be used in connection with repairs, alterations, additions, improvements, betterments or replacements, made or to be made, including, without limitation, any repair, improvement, replacement or addition required to be made as a result of any casualty or as a condition of sale,

condemnation or refinancing; (g) debt service and/or required principal payments on any loan to the Company (including, without limitation, a Member Loan); and (h) amounts reserved in the General Manager's discretion. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

"Class A Member" has the meaning set forth in Section 2.6.1.

"Class B Member" has the meaning set forth in Section 2.6.2.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Company" means the limited liability company formed in accordance with this Agreement.

"Family" means a Member's or a partner of a Member's spouse, lineal ancestors or descendants by birth or adoption, siblings, and trusts for the exclusive benefit of a Member or a partner of a Member or any of the foregoing individuals.

"General Manager" means the Person designated as such in Article V.

"Interest" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Member or an unadmitted assignee of a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

    (i)   the Member makes an assignment for the benefit of creditors;

    (ii)   the Member files a voluntary petition of bankruptcy;

    (iii)   the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

    (iv)   the Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

    (v)   the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi) the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii) if the Member is an individual, the Member's death, incapacity, or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(ix) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x) if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi) if the Member is a corporation, the dissolution of the corporation or the revocation of its charter;

(xii) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company;

"Law" means the New York Limited Liability Company Law, as amended from time to time.

"Member" has the meaning set forth in Section 2.6.3.

"Membership Interest" means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; and (iii) right to participate in the vote on matters coming before the Company to the extent provided for in this Agreement.

"Member Loan Nonrecourse Deductions" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

"Minimum Gain" has the meaning set forth in Regulation Section 1.704-2(d).  Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"Negative Capital Account" means a Capital Account with a balance of less than zero.

"Nonrecourse Deductions" has the meaning set forth in Regulation Section 1.704-2(b)(1).  The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

"Nonrecourse Liability" means any liability of the Company with respect to which no Member has personal liability, as determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

"Percentage" means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

"Person" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero.

"Priority Return" means an amount equal to eight (8%) percent per annum of the Adjusted Capital Balance of each Class A Member outstanding from time to time, calculated annually on a non-cumulative basis.

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

> (i)  all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

G:\Legal\Entities\Gotham Plaza Associates, LLC\FinalAmendedRestatedOperAgmt.doc

6

(ii)   any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(iii)   any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(iv)   gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

(v)   in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi)   notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Transfer" means, when used as a noun, any sale, hypothecation, pledge, assignment, encumbrance or other transfer, and, when used as a verb, means to sell, hypothecate, pledge, transfer, assign, encumber or otherwise dispose of.

"Voluntary Withdrawal" means a Member's disassociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

"Withdrawn Member" means a Member which is the subject of an Involuntary Withdrawal.

G:\Legal\Entities\Gotham Plaza Associates, LLC\Finalized\RestatedOperAgmt.doc

7

## Article II
### Continuation and Name: Office; Purpose; Term

2.1. *Organization and Continuation of Company.*  BDG formed the Company pursuant to the Law and the provisions of this Agreement and, for that purpose, caused Articles of Organization to be prepared, executed and filed with the New York Department of State on May 23, 2000.  BDG also caused a Certificate of Amendment of the Articles of Organization to be prepared, executed and filed with the New York Department of State on July 21, 2000, changing the name of the Company from 125th Street Associates, LLC to Gotham Plaza Associates, LLC.  The parties signatory hereto agree to continue the Company under the Law, as such Law may from time to time be amended, except to the extent any provision of the Law is inconsistent with any provision herein.  The Company shall be a limited liability company only for the purposes specified in Section 2.3 and shall not create or continue an association between the parties with respect to any other activities whatsoever.

2.2. *Name of the Company.*  The name of the Company shall be Gotham Plaza Associates, LLC.  The Company may do business under that name and under any other name or names which the General Manager selects.  If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file a certificate with the Department of State as required by General Business Law Section 130.  Its office shall be located at 6800 Jericho Turnpike, Syosset, New York or at such other location as may be selected by the General Manager from time to time.  The General Manager shall give notice to the Members of any change in the location of the principal place of business of the Company.

2.3. *Purpose.*  The Company is organized solely to purchase, acquire, buy, sell, own, trade in, hold, develop, lease, manage, subdivide, and otherwise deal in and with certain parcels of real property and improvements thereon consisting of approximately 52,100 square feet of land in the Borough of Manhattan, identified as Block 1774 (a/k/a Block 1774 East), Lots 23, 24, 25, 27, 28, 29, 30, 31, 44, 45, 47 and 49 on the Tax Map for Manhattan (collectively referred to herein as the "Property") and to do any and all things necessary, convenient, or incidental to that purpose.

2.4. *Term.*  The Company was formed on May 23, 2000 by the filing of the Articles of Organization with the New York State Department of State and shall have a perpetual existence, unless its existence is sooner terminated pursuant to Article VII of this Agreement.

2.5. *Agent for Service of Process.*  The Secretary of State is designated as agent of the Company upon whom process against it may be served.  The post office address within or without this

state to which the Secretary of State shall mail a copy of any
process against the Company served upon him or her is:

> c/o Blumenfeld Development Group, Ltd.
> 6800 Jericho Turnpike
> Syosset, New York  11791

2.6. *Members.*

2.6.1. The Class A Members of the Company shall be
those persons set forth on Exhibit A attached hereto
designated as a Class A Member along with their respective
present mailing address, taxpayer identification number and
Percentage (the holders of Class A Member interests in the
Company are sometimes referred to herein individually as a
"Class A Member" or collectively as the "Class A Members").

2.6.2. The Class B Members of the Company shall be
those persons set forth on Exhibit A attached hereto
designated as a Class B Member along with their respective
present mailing address, taxpayer identification number and
Percentage (the holders of Class B Member interests in the
Company are sometimes referred to herein individually as a
"Class B Member" or collectively as the "Class B Members")

2.6.3. The Class A Members and the Class B Members are
sometimes referred to herein individually as a "Member" or
collectively as the "Members".

## Article III
### Members; Capital; Capital Accounts

3.1. *Initial Capital Contributions.*  Upon the execution of
this Agreement, the Members shall contribute to the Company cash
in the amounts respectively set forth on Exhibit A as its initial
capital contribution.

3.2. *No Additional Capital Contributions.*  No Member shall
be required to contribute any additional capital to the Company,
and no Member shall have any personal liability for any
obligation of the Company, including compensation to and/or
indemnification of the General Manager.

3.3. *No Interest on Capital Contributions.*  Except as
otherwise provided herein, Interest Holders shall not be paid
interest on their Capital Contributions.

3.4. *Return of Capital Contributions.*  Except as otherwise
provided herein, no Interest Holder shall have the right to
receive any return of any Capital Contribution or have priority
over another Interest Holder, either as to the return of Capital

Contributions or as to Cash Flow, Profits, Losses or Capital
Proceeds.

3.5.   *Form of Return of Capital*.   If an Interest Holder is
entitled to receive a return of a Capital Contribution, the
Interest Holder shall not have the right to receive anything but
cash in return of the Interest Holder's Capital Contribution.

3.6.   *Capital Accounts*.   A separate Capital Account shall be
maintained for each Interest Holder.

3.7.   *Loans*.   The General Manager, and if requested to do so
by the General Manager, any Member or an Affiliate thereof,
singly, or in conjunction with others, including Members, may
lend money to the Company if in the opinion of the General
Manager funds are (a) necessary for the business of the Company
or (b) are desirable to maintain or effect an increase in
distributable Cash Flow to the Members, but only if and to the
extent funds are not otherwise available therefor from a lending
institution on commercially reasonable terms, it being hereby
agreed that the requirement of a personal guarantee by one or
more Members or Affiliates thereof is not a "commercially
reasonable term" (a loan meeting the criteria set forth in this
sentence, is hereinafter referred to as a "Member Loan").   If the
General Manager, a Member or an Affiliate thereof, singly or in
conjunction with others, including Members makes a Member Loan,
such entity may be referred to herein as a "Lending Party."   If a
Member Loan is made, it shall bear interest at the Interest Rate
(as hereinafter defined).   For purposes of this Agreement,
"Interest Rate" shall mean the fluctuating rate per annum equal
to two (2%) percent plus the rate announced from time to time by
The Chase Manhattan Bank as its "prime rate".   A Member Loan
shall be a limited obligation of the Company payable as to
principal and interest and any other amounts due under such
Member Loan solely from Cash Flow.   Interest on a Member Loan at
the Interest Rate shall be payable only from and to the extent of
Cash Flow on the first day of the first month following the date
of the making of such Member Loan and on the first day of each
month thereafter.   To the extent that Cash Flow for any such
immediately preceding calendar month shall be insufficient to pay
the interest due thereon for such month, the insufficiency shall
accrue, without interest, and be payable out of Cash Flow for the
next succeeding calendar month(s), until such payment of interest
shall have been paid in full.   In addition to the interest
payments required to be made under a Member Loan, an amortization
payment in reduction of the aggregate principal balance of the
Member Loan shall be payable in an amount equal to the Cash Flow
for the preceding calendar month, as reduced by interest payments
paid within such preceding calendar month, as heretofore
provided.   Notwithstanding the foregoing, if for any calendar
month it is determined that the amortization payments made during
the immediately preceding calendar month exceed the aggregate
Cash Flow for such calendar month, the Company shall be entitled

to receive a dollar for dollar credit, equal to the amount of
such excess, which credit shall be applied in reduction of the
interest and amortization obligations of the Company, as applied
by the payee of the Member Loan in its sole discretion, for the
next succeeding calendar month(s).

    3.8.   *Priority Return*.   Each Class A Member shall be
entitled each calendar year to the Priority Return payable solely
out of Cash Flow for such calendar year, if any, in the manner
set forth in Section 4.1.1. and Capital Proceeds, if any, in the
manner set forth in Section 4.2.3.   In the event that the
Adjusted Capital Balance of a Member changes during a calendar
year, the Priority Return will be computed on a daily basis,
without compounding.

## Article IV
### Profit, Loss, and Distributions

    4.1.   *Distributions of Cash Flow and Allocation of Profit or
Loss other than from Capital Transactions*.

    4.1.1.   *Cash Flow*.   For any taxable year of the
Company, Cash Flow shall be distributed to the Interest
Holders as follows:

    4.1.1.1.   first, to the Class A Members, until the
Class A Members have received an amount of Cash Flow
equal to the Priority Return for the Class A Members
for that calendar year; then

    4.1.1.2.   any Cash Flow remaining after
distributions have been made pursuant to Section
4.1.1.1., shall be distributed to all of the Interest
Holders in proportion to their respective Percentages.

    4.1.2.   *Profit or Loss*.   For any taxable year of the
Company, Profit or Loss (other than Profit or Loss resulting
from a Capital Transaction, which Profit or Loss shall be
allocated in accordance with the provisions of Sections
4.2.1 and 4.2.2) shall be allocated to the Interest Holders
as follows:

4.1.2.1.    Loss shall be allocated to all the
Interest Holders in proportion to their respective
Percentages (within the meaning of Treasury Regulation
Section 1.752-i) with respect to Loss.

4.1.2.2.    Profit shall first be allocated to all the
Interest Holders in proportion to and to the extent
that they have been allocated Loss pursuant to Section
4.1.2.1.

4.1.2.3.    Profit shall then be allocated to all the
Interest Holders in accordance with, and in the order
and priority of, the distributions made (other than
distributions representing, in the judgment of the
General Manager a return of capital which are
hereinafter referred to as "Excluded Distributions")
pursuant to this Agreement with respect to the current
fiscal year and for all prior fiscal years until the
aggregate amount allocated to each Member pursuant to
this Section 4.1.2.3. equals the aggregate amount
distributed to each Interest Holder (other than
Excluded Distributions) pursuant to Section 4.1;
provided, however, that if the profits allocable under
this Section 4.1.2.3 for the current fiscal year and
all prior fiscal years exceed the cumulative
distributions (other than Excluded Distributions)
pursuant to Article 4 with respect to the current
fiscal year and all prior fiscal years (the "Excess
Profits"), the portion of the Excess Profits derived in
the current fiscal year shall be allocated to the
Interest Holders in accordance with, and in the order
and priority of, the distributions that would have been
made pursuant to Article 4 had distributions been made
in the current fiscal year in an amount equal to the
Excess Profits derived in the current fiscal year.

4.2.    *Distributions of Capital Proceeds and Allocation of
Profit or Loss from Capital Transactions.*

4.2.1.    *Profit.*    After giving effect to the special
allocations set forth in Section 4.3., Profit from a Capital
Transaction shall be allocated as follows:

4.2.1.1.    If one or more Interest Holders has a
Negative Capital Account, to those Interest Holders, in
proportion to their Negative Capital Accounts, until
all of those Negative Capital Accounts have been
increased to zero.

4.2.1.2.    Any Profit not allocated pursuant to
Section 4.2.1.1 shall be allocated to the Interest
Holders in proportion to, and to the extent of, the

amounts distributable to them pursuant to Section
4.2.3.4.1 and 4.2.3.4.2.

4.2.1.3. Any Profit in excess of the foregoing
allocations shall be allocated to the Interest Holders
in proportion to their Percentages.

4.2.2. *Loss*. After giving effect to the special
allocations set forth in Section 4.3, Loss from a Capital
Transaction shall be allocated as follows:

4.2.2.1. If one or more Interest Holders has a
Positive Capital Account, to those Interest Holders, in
proportion to their Positive Capital Accounts, until
all Positive Capital Accounts have been reduced to
zero.

4.2.2.2. Any Loss not allocated to reduce Positive
Capital Accounts to zero pursuant to Section 4.2.2.1
shall be allocated to the Interest Holders in
proportion to their Percentages.

4.2.3. *Capital Proceeds*. Capital Proceeds shall be
distributed and applied by the Company in the following
order and priority:

4.2.3.1. to the payment of all expenses of the
Company incident to the Capital Transaction; then

4.2.3.2. to the payment of debts and liabilities of
the Company then due and outstanding (including,
without limitation, any Member Loan or any other debts
due to any Interest Holder); then

4.2.3.3. to the establishment of any reserves which
the General Manager deems necessary for liabilities or
obligations of the Company; then

4.2.3.4. The balance shall be distributed as
follows:

4.2.3.4.1. first, to the extent that the Class
A Members have not received the Priority Return for
the then current calendar year in accordance with
Section 4.1.1.1., to the Class A Members, until the
Class A Members have received an amount of Capital
Proceeds equal to the Priority Return for the Class
A Members prorated for the period beginning with the
commencement of the taxable year during which the
Capital Transaction occurs and ending upon the date
of distribution of such Capital Proceeds;

4.2.3.4.2.   any Capital Proceeds remaining after distributions have been made pursuant to Section 4.2.3.4.1., shall be distributed to the Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.3.   the balance, to the Interest Holders in proportion to their Percentages.

4.3.  *Regulatory Allocations.*

4.3.1.  *Qualified Income Offset.*  No Interest Holder shall be allocated Losses or deductions if the allocation causes the Interest Holder to have an Adjusted Capital Account Deficit.  If an Interest Holder receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible.  This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.3.2.  *Minimum Gain Chargeback.*  Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Article IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g).  Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year.  It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

4.3.3.  *Contributed Property and Book-ups.*  In accordance with Code Section 704(c) and the Regulations

thereunder, as well as Regulation Section
1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction
with respect to any property contributed (or deemed
contributed) to the Company shall, solely for tax purposes,
be allocated among the Interest Holders so as to take
account of any variation between the adjusted basis of the
property to the Company for federal income tax purposes and
its fair market value at the date of contribution (or deemed
contribution). If the adjusted book value of any Company
asset is adjusted as provided herein, subsequent allocations
of income, gain, loss, and deduction with respect to the
asset shall take account of any variation between the
adjusted basis of the asset for federal income tax purposes
and its adjusted book value in the manner required under
Code Section 704(c) and the Regulations thereunder.

    4.3.4.  *Code Section 754 Adjustment.*  To the extent an
adjustment to the tax basis of any Company asset pursuant to
Code Section 734(b) or Code Section 743(b) is required,
pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be
taken into account in determining Capital Accounts, the
amount of the adjustment to the Capital Accounts shall be
treated as an item of gain (if the adjustment increases the
basis of the asset) or loss (if the adjustment decreases
basis), and the gain or loss shall be specially allocated to
the Interest Holders in a manner consistent with the manner
in which their Capital Accounts are required to be adjusted
pursuant to that Section of the Regulations.

    4.3.5.  *Nonrecourse Deductions.*  Nonrecourse Deductions
for a taxable year or other period shall be specially
allocated among the Interest Holders in proportion to their
Percentages.

    4.3.6.  *Member Loan Nonrecourse Deductions.*  Any Member
Loan Nonrecourse Deduction for any taxable year or other
period shall be specially allocated to the Interest Holder
who bears the risk of loss with respect to the loan to which
the Member Loan Nonrecourse Deduction is attributable in
accordance with Regulation Section 1.704-2(b).

    4.3.7.  *Guaranteed Payments.*  To the extent any
compensation paid to any Member by the Company, including
any fees payable to any Member pursuant to Section 5.3
hereof, is determined by the Internal Revenue Service not to
be a guaranteed payment under Code Section 707(c) or is not
paid to the Member other than in the Person's capacity as a
Member within the meaning of Code Section 707(a), the Member
shall be specially allocated gross income of the Company in
an amount equal to the amount of that compensation, and the
Member's Capital Account shall be adjusted to reflect the
payment of that compensation.

4.3.8.   *Unrealized Receivables.*   If an Interest Holder's Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holder's Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture.   Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the General Manager.

4.3.9.   *Withholding.*   All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

4.4. *Liquidation and Dissolution.*

4.4.1.   If the Company is liquidated, the assets of the Company which shall have been reduced to cash in accordance with Section 7.2 shall be distributed as follows:

4.4.1.1.   to the Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full; then

4.4.1.2.   the balance, to the Interest Holders in proportion to their Percentages.

4.4.2.   No Interest Holder shall be obligated to restore a Negative Capital Account.

4.5. *General.*

4.5.1.   Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the General Manager.

4.5.2.   If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall

receive that interest as a tenant-in-common with all other Interest Holders so entitled.  Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the General Manager.  The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3.  All Profit and Loss shall be allocated, and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made.  Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to a Capital Transaction or to any other extraordinary nonrecurring items of the Company.

4.5.4.  The General Manager is hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.

## Article V
## Management: Rights, Powers, and Duties

5.1. *Management*.

5.1.1.  *General Manager*.  The Company shall be managed by a general manager, who may, but need not, be a Member. BDG 125th Street, LLC, a Class B Member of the Company, is hereby designated to serve as the general manager of the Company.

5.1.2.  *Management Powers of the General Manager*.

5.1.2.1.  Except as otherwise provided herein, including, without limitation, Section 5.1.3 hereof, management, operation and control of the Company and

its business and affairs shall vest solely in the
General Manager.  In such capacity, the General Manager
shall have the power on behalf of and in the name of
the Company to carry out any and all of the purposes of
the Company set forth in Section 2.3 and to perform all
acts and enter into and perform all contracts and other
undertakings which it may deem necessary or advisable
or incidental thereto on behalf of the Company.
Without limiting the generality of the foregoing, the
General Manager is hereby authorized, empowered,
obligated and responsible on behalf of the Company:

    (i)    to carry on the business referred to in
Section 2.3 hereof and to execute and deliver in the
Company name any and all instruments necessary in
connection therewith;

    (ii)    to employ, engage or consult such
persons, firms or corporations as it shall deem
advisable for the operation and management of the
Company business including, without limitation,
brokers, accountants, managing agents, attorneys or
specialists in any field of endeavor whatsoever,
including any Person (including a Member or an
Affiliate of a Member);

    (iii)    to deposit the funds of the Company in
the Company name in any bank or trust company and to
entrust to such bank or trust company the
securities, monies, documents and papers belonging
to or relating to the Company;

    (iv)    to own, possess, renovate, improve, sell,
transfer, mortgage, pledge, lease or otherwise deal
with, and to exercise all rights, powers, privileges
and other incidents of ownership or possession with
respect to, all or any portion of the Property;

    (v)    to borrow monies from any party, issue
evidences of indebtedness, mortgages, pledges or
other collateral in connection therewith, increase
the amount of, modify, amend or change the terms of,
endorse and execute promissory notes, drafts, bills
of exchange, warrants, bonds, debentures and other
negotiable or non-negotiable instruments and
evidences of indebtedness, and to secure the payment
thereof and of the interest thereon by mortgage upon
or by pledge, conveyance or assignment in trust of
the whole or any part of the Property whether at the
time owned or thereafter acquired, and to sell,
pledge or otherwise dispose of such bonds or other
obligations of the Company;

(vi)    to pay all expenses and fees incurred in connection with the Company and its business;

(vii)   to sue on, defend or compromise any and all claims or liabilities in favor of or against the Company, and submit any or all such claims or liabilities to arbitration;

(viii)  to file applications, communicate and otherwise deal with any and all governmental agencies having jurisdiction over, or in any way affecting, the Property or any aspect of the Company's business;

(ix)    to make or revoke any election permitted to the Company by any taxing authority;

(x)     to maintain such insurance coverage for public liability, fire and casualty, and any and all other insurance, necessary or appropriate to the business of the Company;

(xi)    to determine whether or not to apply any insurance proceeds for any property to the restoration of Company property or to distribute the same;

(xii)   to purchase, lease, rent, or otherwise acquire or obtain the right to use machinery, equipment, tools, materials, and all other kinds and types of personal property that may in any way be deemed necessary, convenient, or advisable in connection with carrying on the business of the Company;

(xiii)  to enter into, make and perform all contracts, agreements and other undertakings, to execute all other instruments of any kind or character and to perform any and all other acts that the General Manager determines to be necessary, advisable or incidental to the carrying out of the foregoing objects and purposes.

5.1.2.2.  The General Manager shall use ordinary care and reasonable diligence in carrying out the affairs of the Company.  Neither the General Manager nor any of its Affiliates, to the extent that such Affiliates are acting within the scope of the authority of the General Manager, will be liable to the Company or to any Member for any action taken or failure to act, on behalf of the Company, within the scope of authority conferred on the General Manager unless there shall be a non-appealable judgment or other final

G:\Legal\Watitien\Gotham Plaza Associates. LLC\FinalDocs\Restated\OperAgmt.doc

19

adjudication adverse to the General Manager establishing that the General Manager's acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law; or the General Manager personally gained in fact a financial profit or other advantage to which General Manager was not legally entitled. The General Manager may consult with legal counsel selected by it on matters relating to the Company, and any action taken or omitted to be taken by it in good faith in reliance and in accordance with the opinion or advice of such counsel shall be full protection and justification to it with respect to the action taken or omitted to be taken.

5.1.2.3.   The General Manager shall not be obligated to devote substantially all of its time and effort to the Company and its affairs.

5.1.2.4.   Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

5.1.2.5.   Except as otherwise expressly provided in Section 5.1.2.4., nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, or the General Manager, or any officer, director or shareholder of the General Manager, to conduct any other business or activity whatsoever, and no Member nor the General Manager, shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member, the Member's Affiliates, the General Manger, or any officer, director or shareholder of the General Manager.

### 5.1.3. *Restrictions on Powers of the General Manager:*

The General Manager shall have no authority to:

(i) alter the purposes of the Company as set forth in Section 2.3 above;

(ii)   confess a judgment against the Company;

(iii)   possess any Company property or assign the rights of the Company in specific Company property for other than a Company purpose;

(iv)   borrow money from the Company; or .

(v) sell or otherwise dispose of all of the Property, without obtaining the prior consent of the Class A Members holding not less than fifty (50%) percent of the Percentages of the Class A Members unless such transfer is to a newly created entity having the same ownership, organization and management structure as that of the Company, and if, in the good faith determination of the General Manager (a) more beneficial or favorable financing terms could be obtained in respect of such individual Property rather than that currently available with respect to all of the Properties, or (b) the Members of the Company would otherwise benefit from such a transfer. If a Class A Member does not notify the General Manager in writing of its approval or disapproval of any proposed sale within ten (10) business days after its receipt of a written request for approval, the General Manager shall again request the approval of the Class A Member in accordance with the notice provisions set forth in Section 9.2 of this Agreement which notice will make specific reference to this Section 5.1.3.(v). If the Class A Member then does not notify the General Manager of its disapproval of the transaction or action within five (5) business days following such request, the matter shall conclusively be deemed approved by such Class A Member. Any purchaser of the Property and any title insurer insuring the title of the purchaser may rely on an affidavit furnished by a principal officer of the General Manager with regard to the attainment of the required percentage of approval and, with regard to such approval, the furnishing of such affidavit shall be conclusive as to its contents as between such purchaser and its title insurer and each and all of the Class A Members at the time. Notwithstanding anything contained herein to the contrary, the General Manager shall have the authority to sell or otherwise dispose of any portion of the Property.

5.1.4.    *Members Have No Management Powers;*
*Limitation on Authority of Members.*

5.1.4.1.    The Members shall have no voice or participation in the management of the Company business, and no power to bind the Company or to act on behalf of the Company in any manner whatsoever.

5.1.4.2.    No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

5.1.4.3.    This Section 5.1 supersedes any authority granted to the Members pursuant to Section 401 of the Law.    Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

5.1.5.    *Removal of Manager.*    The Members holding three fourths (3/4) of the Percentages then held by the Members, at any time and from time to time and with or without cause, may remove any or all general managers of the Company then acting and elect a new general manager or managers or make other provisions or arrangements for the management of the Company.

5.1.6.    *Resignation of General Manager.*    The General Manager may resign as such only upon thirty (30) days prior written notice to each Member; provided that such resignation shall not become effective until a successor General Manager shall have been elected or other provisions or arrangements for the management of the Company have been made by the Members holding three-fourths (3/4) of the Percentages then held by the Members.

5.1.7.    *Compensation of the General Manager;*
*Reimbursement for Expenses.*

5.1.7.1.    The General Manager shall be entitled to compensation of $100.00 per year for acting as general manager of the Company.

5.1.7.2.    All costs and expenses actually incurred in connection with the organization of the Company and the ongoing operation or management of the business of the Company shall be borne by the Company.    The General Manager shall be entitled to prompt reimbursement for all out-of-pocket costs and expenses incurred by the General Manager or its agents, attorneys or advisors in

connection with such organization, operation and
management.

5.1.7.3.   The General Manager is hereby authorized
and directed to hire Blumenfeld Development Group, Ltd.
("BDG") or an affiliated entity thereof, either of
which is an Affiliate of the General Manager, as
managing agent of the Property and hereby notifies the
other Members that it has done so.   In consideration
for managing the Property, BDG or such affiliated
entity shall be paid a commercially reasonable monthly
management fee.   As of the date of this Agreement, BDG
charges a commercially reasonable monthly management
fee equal to four (4%) percent of the Property's
collected gross monthly receipts derived from the
Property.   In addition, BDG shall be reimbursed for a
pro rata portion of the salaries of persons employed by
BDG or an affiliated entity for their on site
management, leasing and construction activities.

5.1.8. *Indemnification.*   The General Manager and its
officers, directors, employees, shareholders, agents and
Affiliates shall be indemnified and held harmless by the
Company (but not by any Member except to the extent of its
Capital Contributions) to the fullest extent permitted by
law from and against any and all claims, demands,
liabilities, costs, damages and causes of action of any
nature whatsoever arising out of or in connection with the
transactions contemplated by this Agreement or the General
Manager's management of the Company's affairs; provided,
however, that no indemnification may be provided to, or on
behalf of, the General Manager if a non-appealable judgment
or other final non-appealable adjudication establishes that
either the General Manager's acts were committed in bad
faith or were the result of active and deliberate dishonesty
and were material to the cause of action so adjudicated or
the General Manager personally gained in fact a financial
profit or other advantage to which the General Manager was
not legally entitled.   The indemnification authorized by
this Section shall include, without limitation, payment of
(i) reasonable attorneys' fees or other expenses incurred in
connection with settlement or in defense of any legal
proceeding and (ii) the removal of any liens affecting the
property of the indemnitee.   Such attorneys' fees and
expenses shall be paid by the Company as they are incurred
upon receipt, in each case, of an undertaking by or on
behalf of the indemnified Person to repay such amounts if it
is ultimately determined that such Person is not entitled to
indemnification with respect thereto.   The indemnification
rights contained in this Section shall be cumulative of, and
in addition to, any and all rights remedies and recourse to
which the General Manager, its officers, directors,
employees, shareholders, agents and Affiliates may be

entitled, whether pursuant to the provisions of this Agreement, at law or in equity. Indemnification hereunder shall be made from assets of the Company and no Member shall be personally liable to any indemnitee.

5.2.   *Power of Attorney.*

5.2.1.   *Grant of Power.* Each Member constitutes and appoints the General Manager as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place, and stead, to make, execute, sign, acknowledge, and file:

5.2.1.1.   one or more articles of organization;

5.2.1.2.   all documents (including amendments to articles of organization) which the Attorney-in-Fact deems appropriate to reflect any amendment, change, or modification of this Agreement which has been adopted by the Members in accordance with the terms hereof;

5.2.1.3.   any and all other certificates or other instruments required to be filed by the Company under the laws of the State of New York or of any other state or jurisdiction, including, without limitation, any certificate or other instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of New York;

5.2.1.4.   one or more fictitious or trade name certificates;

5.2.1.5.   all documents which may be required to dissolve and terminate the Company and to cancel its articles of organization; and

5.2.1.6.   any amendment to this Agreement which may be required by any institutional lender as a condition to its providing financing to the Company, provided that the subject matter of such amendment is limited to bankruptcy remoteness matters, including, without limitation, preserving and ensuring the separate and distinct identity of the Company.

5.2.2.   *Irrevocability.* The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the Transfer of an Interest, except that if the transferee is admitted as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute,

acknowledge, and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate, or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

## Article VI
## Transfer of Interests and Withdrawal of Members

6.1. *Transfers.* A Member may not Transfer all or any portion of its interest as a Member of the Company either voluntarily or by operation of law (hereinafter collectively referred to as an "Assignment"), except as follows:

6.1.1. A Member may make an Assignment of all, but not less than all, of its interest as a Member if such assignment is in compliance with this Section 6.1 and Section 6.3.

6.1.2. A Member may make an Assignment of its interest as a Member in the Company, provided that (a) the assignee shall not be a natural person younger than 18 years of age nor a natural person who shall have been adjudged incompetent; (b) the Assignment shall be in writing and form reasonably satisfactory to the General Manager; (c) the assignee shall have agreed in writing and form reasonably satisfactory to the General Manager to be bound by the terms of this Agreement; and (d) the General Manager shall have consented in writing to the Assignment.

6.1.3. An assignee shall be required to reimburse the Company and the General Manager in connection with such Assignment to cover any legal fees, accounting fees, overhead charges, and other fees or expenses incurred as a result of any such Assignment.

6.1.4. The General Manager may require an opinion of counsel, in form and substance satisfactory to it in its sole discretion, by experienced tax and securities law counsel, to the effect (i) that the proposed Assignment will be in compliance with applicable securities laws, rules and regulations, (ii) that the proposed Assignment will not cause adverse tax consequences, and (iii) such other matters as may be determined by the General Manager in its reasonable discretion. The fee for such opinion shall be the responsibility of the assignor:

6.1.5. Any purported Assignment which is not in compliance with this Agreement is null and void and of no

force or effect whatsoever.  Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 6.1 in view of the purposes of the Company and the relationship of the Members.

6.2. *Assignee's Rights.*

   6.2.1.  An assignee or transferee of the interest of a Member shall be entitled to receive allocations and distributions attributable to the interest acquired by reason of such Assignment from and after the Effective Date (as hereafter defined) of the Assignment of such interest to such assignee; however, anything herein to the contrary notwithstanding, the Company and the General Manager shall be entitled to treat the assignor of such interest of the Member as the absolute owner thereof in all respects, and shall incur no liability for allocations of net income, net loss, or gain or loss on sale of Company property, or transmittal of reports and notices required to be given to Members hereunder which are made in good faith to such assignor until such time as the written assignment has been received by the Company, approved and recorded on its books and the Effective Date of the Assignment has passed.  The "Effective Date" of an Assignment shall be that date specified in the written instrument whereby the General Manager consents to the Assignment, which date shall not be later than sixty (60) days following receipt by the General Manager of a written notice of Assignment and the fulfillment of all conditions precedent to such Assignment provided for in this Agreement.

   6.2.2.  *Assignment of Rights to Distributions by Members.*    Any Member may assign the right to receive all distributions applicable to its interest as a Member of the Company, and such assignment of distributions shall be effective notwithstanding failure to satisfy the conditions set forth in Section 6.1, provided that (a) the instrument of assignment shall be in form reasonably satisfactory to the General Manager, and (b) a duly executed and acknowledged counterpart of such instrument shall be delivered to the Company.  Any purported assignment which does not meet the requirements set forth in this Section shall be void and shall not bind the Company.  Such an assignment shall not entitle the assignee to become or to exercise any rights of a Member.

6.3. *Right of First Refusal on Sale or Transfer of Interest.*

   6.3.1.  If a Member or assignee thereof proposes to sell, assign, or transfer its interest, it shall first offer the interest in writing to the General Manager at the price and on the terms on which such Member proposes to sell,

assign, or transfer the interest (the "Price" and the "Terms").

6.3.2.   The General Manager shall, in its sole discretion, decide whether to accept or reject the offer within thirty (30) days after receipt of the offer.   If the offer is rejected by the General Manager or its designee, then the Member or assignee may, subject to this Article 6, sell its interests to an outside party at the Price and on the Terms.   If such sale is not completed at the Price and on the Terms within (90) days after the rejection by the General Manager, then the Member or assignee must reoffer his interest to the General Manager in accordance with this Section 6.3 before any other sale, assignment or transfer of all or any part of its interest can be effected.

6.3.3.   This Section 6.3 shall not apply to transfers, sales, assignments, gifts, and devices to the spouse or lineal descendants of the transferring Member or assignee, to a trust for the benefit of that spouse or a Member's or assignee's lineal descendants, or to an entity if there is no change in beneficial interest to the interest transferred.   Nevertheless, all such transferees shall take the transferred interests subject to this Section 6.3. Notwithstanding the foregoing, Section 6.1 shall apply to any transfer of an interest in the Company.

6.4.   *Voluntary Withdrawal*.   No Member shall have the right or power to Voluntarily Withdraw from the Company.   Any withdrawal in violation of this Agreement shall entitle the Company to damages for breach, which may be offset against the amounts otherwise distributable to such member.

6.5.   *Involuntary Withdrawal*.   Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Withdrawn Member shall thereupon become an Interest Holder, but shall not become a Member.   If the Company is continued as provided in Section 7.1.3, the successor Interest Holder shall have all the rights of an Interest Holder, but shall not be entitled by reason of the withdrawal to receive in liquidation of the   Interest, the fair market value of the Member's   Interest as of the date the Member Involuntarily Withdrew from the Company.

### Article VII
### Dissolution, Liquidation, and
### Termination of the Company

7.1.   *Events of Dissolution*.   The Company shall be dissolved upon the happening of any of the following events:

7.1.1.   upon the written agreement of all of the Members; or

7.1.2. the occurrence of an Involuntary Withdrawal, unless remaining Members holding a majority or more of the Percentages then held by Members, within ninety (90) days after the occurrence of the Involuntary Withdrawal, elect to continue the business of the Company pursuant to the terms of this Agreement.

7.2. *Liquidating Trustee*. If the Company is dissolved, the General Manager shall act as liquidating trustee. The General Manager shall liquidate and reduce to cash the assets of the Company in accordance with the requirements of Section 5.1.4.2. as promptly as is consistent with obtaining a fair value therefor and, unless otherwise required by law, shall apply and distribute the proceeds of liquidation, as well as any other Company assets, first, to the payment of creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section 4.4.

7.3. *Filing of Articles of Dissolution*. If the Company is dissolved, the General Manager shall promptly file Articles of Dissolution with the Department of State. If there is no General Manager, then the Articles of Dissolution shall be filed by the remaining Members; if there are no remaining Members, the Articles shall be filed by the last Person to be a Member; if there is neither a General Manager, remaining Members, or a Person who last was a Member, the Articles shall be filed by the legal or personal representatives of the Person who last was a Member.

## Article VIII
### Books, Records, Accounting, and Tax Elections

8.1. *Bank Accounts*. All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The General Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2. *Books and Records*.

8.2.1. The General Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the Company's business. The records shall include, but not be limited to:

(1) a current alphabetized list of the names and addresses of all of the Members, as well as the contribution and the share of profits and losses of

each Member or information from which such share can be readily derived;

(2) a copy of the articles of organization and all amendments thereto or restatements thereof, together with executed copies of any powers of attorney pursuant to which any certificate or amendment has been executed;

(3) a copy of the operating agreement and any amendments thereto and any amended and restated operating agreement; and

(4) a copy of the Company's federal, state, and local income tax or information returns and reports, if any, for the three most recent fiscal years.

8.2.2.   The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

8.2.3.   Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

8.3.   *Annual Accounting Period*.   The annual accounting period of the Company shall be its taxable year.   The Company's taxable year shall be selected by the General Manager, subject to the requirements and limitations of the Code.

8.4.   *Reports*.   Within seventy-five (75) days after the end of each taxable year of the Company, the General Manager shall cause to be sent to each Person who was a Member at any time during the taxable year then ended:   (i) an annual compilation report, prepared by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants; and (ii) a report summarizing the fees and other remuneration paid by the Company to any Member, the General Manager, or any Affiliate in respect of the taxable year.   In addition, within seventy-five (75) days after the end of each taxable year of the Company, the General Manager shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year.   At the request of Class A Members holding fifty (50%) percent or more of the Percentages then held by Class A Members, the General Manager shall cause an audit of the Company's books and records to be prepared by independent accountants for the period so requested.

8.5. *Tax Matters Member*.  BDG 125th Street, LLC shall be the Company's tax matters Member ("Tax Matters Member").   The Tax Matters Member shall have all powers and responsibilities provided in Code Section 6221, *et seq*.   The Tax Matters Member shall keep all Members informed of all notices from government taxing authorities, which may come to the attention of the Tax Matters Member. The Company shall pay and be responsible for all reasonable third party costs and expenses incurred by the Tax Matters Member in performing those duties.   A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company.   The Tax Matters Member shall not compromise any dispute with the Internal Revenue Service without the approval of the Members.

8.6. *Tax Elections*.   The General Manager shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754.   The decision to make or not make an election shall be at the General Manager's sole and absolute discretion.

8.7. *Title to Company Property*.

8.7.1.   Except as provided in Section 8.7.2, all real and personal property acquired by the Company shall be acquired and held by the Company in its name.

8.7.2.   The General Manager may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name provided, that the Company is and remains the beneficial owner of any such property.  Without limiting the foregoing, the General Manager may cause title to be acquired and held in its name or in the names of trustees, nominees, or straw parties for the Company.   It is expressly understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company and all of that property shall be treated as Company property.

G:\Legal\Entities\Gotham Plaza Associates, LLC\Final\Amended\Restated\Agreement .doc

30

## Article IX
## General Provisions

9.1. *Assurances*.   Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the General Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2. *Notifications*.   Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested or by facsimile transmission, provided receipt of facsimile transmission is actually acknowledged by the member or member's agent.   Any notice to be given hereunder by the Company shall be given by the General Manager.   A notice must be addressed to a Member at the Member's last known address on the records of the Company.   A notice to the Company must be addressed to the Company's principal office.   A notice that is sent by mail will be deemed given three (3) business days after it is mailed.   Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.   A notice sent by facsimile is deemed given when receipt is acknowledged.

9.3. *Specific Performance*.   The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury.   Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4. *Complete Agreement*.   This Agreement constitutes the complete and exclusive statement of the agreement among the Members with respect to the subject matter thereof.   It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.   Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of a majority of the Members. Notwithstanding the foregoing, any modification of the terms of this Agreement which increases the obligations of a Member or decrease the rights of a Member may not be made without the prior written consent of the Member affected by such modification.

9.5. *Applicable Law.*  All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of New York.

9.6. *Article and Section Titles.*  The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7. *Binding Provisions.*  This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

9.8. *Exclusive Jurisdiction and Venue.*  Any suit involving any dispute or matter arising under this Agreement or relating to the organization or operation of the Company may only be brought in a United States District Court located in the State of New York or any New York State Court having jurisdiction over the subject matter of the dispute or matter.  All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding and waive any objection to venue or inconvenient forum.

9.9. *Terms.*  Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

9.10. *Separability of Provisions.*  Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.11. *Counterparts.*  This Agreement may be executed through the use of separate counterpart signature pages, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document.  The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

9.12. *Estoppel Certificate.*  Each Member shall, within ten (10) days after written request by the General Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that:  (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof.  If the certificate is

C:\Legal\Enrities\Gotham Plaza Associates, LLC\FinalAmendedRestatedOperAgmt.doc

32

not received within that ten (10) day period, the General Manager shall execute and deliver the certificate on behalf of the requested Member, without qualification, pursuant to the power of attorney granted in Section 5.6.


## ARTICLE X
## CLASS A MEMBERS

10.1. *Class A Member Representation and Warranties*. The Class A Members, and any substitute or additional Class A Members prior to admittance to the Company in accordance with Article VI, shall represent, warrant, and agree as follows:

10.1.1. Each has full right, power and authority to execute and deliver this Agreement; this Agreement has been duly executed and delivered by the Class A Member and constitutes the valid and binding obligation of the Class A Member in accordance with its terms; and the Class A Member is not subject to any restriction or agreement which prohibits or would be violated by the execution and delivery hereof or the consummation of the transactions contemplated herein or pursuant to which the consent of any third person, firm or corporation is required in order to give effect to the transactions contemplated herein;

10.1.2. Each is (i) an "**Accredited Investor**" as such term is defined under the Securities Act of 1933, as amended (hereinafter called the "**Securities Act**") and has such knowledge of business and financial affairs as is necessary to enable it to understand the nature of and the risks attendant to an investment in the Company, and to understand the particular financial, legal and tax implication of the business to be conducted by the Company; (ii) is able to bear the economic risk of such investment; and (iii) has had access to any and all information concerning the Company which it and its legal and tax advisors requested or considered necessary to make a proper evaluation of such investment; and

10.1.3. The Class A Members understand that the Company interests being acquired hereunder have not been and, in all likelihood, will never be, registered under the Securities Act on the ground that investment in the Company is exempt under Section 4(2) of the Securities Act and/or Regulation D promulgated thereunder as not involving a public offering. Each Class A Member represents that it is acquiring its interest in the Company for investment for its own account with no present intention of reselling or otherwise disposing of the same; that to the best of its knowledge and belief there are no circumstances in the foreseeable future which would require the resale of any

portion of such interest; that it will, in no event, sell, transfer or otherwise dispose of its interest in the Company or any portion thereof unless, in the opinion of counsel to the Company, such interest may be legally sold, transferred or otherwise disposed of without registration and/or qualification under the Securities Act and under other state or Federal statutes; and it understands that the reliance of the General Manager upon such exemption is predicated upon such representations. Each Class A Member further acknowledges its understanding that no trading market for interests in the Company does or, in all likelihood, will exist at any time and that its interest will at no time be transferable without potential adverse tax consequences. Each Class A Member further understands that the disposition of its interest in the Company is also limited by other provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto intending to be legally bound, have executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

GENERAL MANAGER:

BDG 125th Street, LLC,
By BDG Asset Management,
Inc., its General Manager

By: _____
    Name:   **David Blumenfeld**
    Title:  **Vice President**

SEE ADDITIONAL SIGNATURE PAGES ATTACHED HERETO FOR CLASS A AND CLASS B MEMBER SIGNATURE PAGES

O:\Legal\Entities\Gotham Plaza Associates, LLC\FinalAmendedRestatedOperAgmt.doc

34

## Class A Member Signature Page

**IN WITNESS WHEREOF**, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member

Name: Sidney Barbanel

## Class A Member Signature Page

**IN WITNESS WHEREOF**, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member

Name: Sylvia Fisher



## Class A Member Signature Page

IN WITNESS WHEREOF, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member _____

Name: _____

Robert Golden
Managing Director
Golden Family Fund LLC.

## Class A Member Signature Page

**IN WITNESS WHEREOF,** I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member *Mildred Golden*

Name: *Hyman Golden*
HYMAN GOLDEN and
MILDRED GOLDEN, Joint Tenants

## Class A Member Signature Page

      **IN WITNESS WHEREOF**, I have executed this counterpart of the
Amended and Restated Operating Agreement of Gotham Plaza
Associates, LLC as a Member thereof, intending to be bound
thereby and instruct the General Manager to attach this
counterpart to said Agreement.

Member

Name:

## Class A Member Signature Page

**IN WITNESS WHEREOF**, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member

Name: Martin Greenberg

## Class A Member Signature Page

IN WITNESS WHEREOF, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member

Name: _____

Paul Konigsberg

## Class A Member Signature Page

**IN WITNESS WHEREOF**, I have executed this counterpart of the
Amended and Restated Operating Agreement of Gotham Plaza
Associates, LLC as a Member thereof, intending to be bound
thereby and instruct the General Manager to attach this
counterpart to said Agreement.

Member

Name: Annette Lester

## Class A Member Signature Page

IN WITNESS WHEREOF, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member

_____

Name: Richard Lester

## Class A Member Signature Page

**IN WITNESS WHEREOF,** I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member

Name: Gerald Y. Mordfin

## Class A Member Signature Page

**IN WITNESS WHEREOF**, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member

_Robert Nystrom_

Name: Robert Nystrom

## Class A Member Signature Page

IN WITNESS WHEREOF, I have executed this counterpart of the
Amended and Restated Operating Agreement of Gotham Plaza
Associates, LLC as a Member thereof, intending to be bound
thereby and instruct the General Manager to attach this
counterpart to said Agreement.

Member

Name: Harold Silverman

## Class A Member Signature Page

IN WITNESS WHEREOF, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member

_Steve M_

Name: _for SSR, LLC_

## Class A Member Signature Page

IN WITNESS WHEREOF, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member

Name: Judith Strauss

## Class A Member Signature Page

IN WITNESS WHEREOF, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby and instruct the General Manager to attach this counterpart to said Agreement.

Member

Name: Stephen Waldner

## Class B Member Signature Page

**IN WITNESS WHEREOF**, I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby, and instruct the General Manager thereof to attach this counterpart to said Agreement.

Member

BDG 125th Street, LLC

By:   BDG Asset Management, Inc.,
      its General Manager

By: _____
Name:   David Blumenfeld
Title: Vice President

## Class B Member Signature Page

**IN WITNESS WHEREOF,** I have executed this counterpart of the Amended and Restated Operating Agreement of Gotham Plaza Associates, LLC as a Member thereof, intending to be bound thereby, and instruct the General Manager thereof to attach this counterpart to said Agreement.

Member

Kensington Fifth, LLC

By _____
    Name:    Roger Chartouni
    Title:   President

## EXHIBIT A

| NAME, ADDRESS AND TAXPAYER I.D. NUMBER | PERCENTAGES | INITIAL CASH CAPITAL CONTRIBUTIONS |
|---|---|---|
| CLASS A MEMBERS | | |
| Sidney Barbanel<br>99 Crow's Nest Court<br>Manhasset, New York  11030<br>Taxpayer I.D. No. 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 | 1.25% | $115,000.00 |
| Sylvia Fisher<br>30 Dutchess Blvd.<br>Atlantic Beach, New York  11509<br>Taxpayer I.D. No. 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 | .625% | $57,500.00 |
| Golden Family Fund, LLC<br>420 Doughty Blvd.<br>Inwood, New York  11096<br>Taxpayer I.D. No. 11-3311557 | 3.75% | $345,000.00 |
| Hyman Golden and Mildred<br> Golden, Joint Tenants<br>1245 Veeder Drive<br>Hewlett Bay Park, New York  11557<br>Taxpayer I.D. No. 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 (Hyman)<br>Taxpayer I.D. No. 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 (Mildred) | 1.25% | $115,000.00 |
| Robert Golden<br>420 Doughty Blvd.<br>Inwood, New York  11096<br>Taxpayer I.D. No. 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 | 1.25% | $115,000.00 |
| Martin Greenberg<br>One North End Avenue<br>Suite 1117<br>New York, New York  10282<br>Taxpayer I.D. No. 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 | 1.25% | $115,000.00 |
| Paul J. Konigsberg<br>19 Pinecroft Road<br>Greenwich, Connecticut  06830<br>Taxpayer I.D. No. 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 | .625% | $57,500.00 |
| Annette Lester<br>19 Mary Lane<br>Greenvale, New York  11548-1127<br>Taxpayer I.D. No. 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 | .625% | $57,500.00 |

G:\Legal\Entities\Gotham Plaza Associates, LLC\Final\Amended Restated OpnAgmt.doc

1

Exhibit A (continued)

| NAME, ADDRESS AND TAXPAYER I.D. NUMBER | PERCENTAGES | INITIAL CASH CAPITAL CONTRIBUTIONS |
|---|---|---|
| **CLASS A MEMBERS** | | |
| Richard Lester<br>171 East 84th Street<br>Apartment 15D<br>New York, New York  10028<br>Taxpayer I.D. No. 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 | .625% | $57,500.00 |
| Gerald Y. Mordfin<br>c/o Silverman & Mordfin<br>150 Great Neck Road<br>Great Neck, New York  11021<br>Taxpayer I.D. No. 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 | .625% | $57,500.00 |
| SSR, LLC<br>c/o Silverman & Mordfin<br>150 Great Neck Road<br>Great Neck, New York  11021<br>Taxpayer I.D. No. 11-2516401 | .625% | $57,500.00 |
| Robert Nystrom<br>475 Berry Hill Road<br>Syosset, New York  11791<br>Taxpayer I.D. No. 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 | 2.5% | $230,000.00 |
| Harold Silverman<br>c/o Silverman & Mordfin<br>150 Great Neck Road<br>Great Neck, New York  11021<br>Taxpayer I.D. No. 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 | 1.25% | $115,000.00 |
| Judith A. Strauss<br>9 Broadmoor Drive<br>Rumson, New Jersey  07760<br>Taxpayer I.D. No. 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 | 1.25% | $115,000.00 |
| Stephen Waldner<br>125 Route 110<br>Farmingdale, New York  11735<br>Taxpayer I.D. No. 069-32-88 | 3.75% | $345,000.00 |

**Exhibit A (continued)**

| NAME, ADDRESS AND TAXPAYER I.D. NUMBER | PERCENTAGES | INITIAL CASH CAPITAL CONTRIBUTIONS |
|---|---|---|
| | | |

CLASS B MEMBERS

| | | |
|---|---|---|
| BDG 125th Street, LLC<br>c/o Blumenfeld Development<br>    Group, Ltd.<br>6800 Jericho Turnpike<br>Syosset, New York  11791<br>Taxpayer I.D. No. 11-3470671 | 68.75% | $68.75 |
| Kensington Fifth, LLC<br>127 Main Street<br>Chatham, New Jersey  07928<br>Taxpayer I.D. No. _____ | 10% | $10.00 |

100.00%

## DECLARATION OF SERVICE

State of New York, County of New York )ss:

     Ramsey Hinkle an attorney admitted to practice in the courts of New York, hereby declares:

     I am not a party to this action, am over 18 years of age and am an associate at the law office of Clayman & Rosenberg, LLP 305 Madison Avenue, New York, New York 10165.

     On January 6, 2010, I served a true copy of the annexed OBJECTIONS TO TRUSTEES DETERMINATIONS by depositing the same with an overnight delivery service in a wrapper properly addressed, the address having been designated by the addressee for that purpose.  Said delivery was made prior to the latest time designated by the overnight delivery service for overnight delivery.  The address and delivery service are indicated below:

          <u>VIA FEDERAL EXPRESS</u>
          Irving H. Picard, Trustee
          c/o Baker and Hostetler LLP
          45 Rockefeller Plaza – 11th Floor
          New York, New York 10111

     I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on:   January 6, 2010
            New York, New York

                                 _____
                                   Ramsey Hinkle