CLAYMAN & ROSENBERG
Seth L. Rosenberg  (SR4563)
Paul S. Hugel       (6589 PH4749)
305 Madison Avenue
New York, NY 10165
Telephone:       (212) 922-1080
Telefax:         (212) 949-8255

*Attorneys for BDG Yaphank, LLC*
(BLMIS Account No. 1-B0081 designated Claim Number 011222)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

SECURITIES INVESTOR PROTECTION          :
CORPORATION,
                                        :        Adv. Pro. No. 08-01789(BRL)
                 Plaintiff,
                                        :
        -against-
                                        :        SIPA Liquidation
BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,                         :

                 Defendant              :

-------------------------------------------------------X

### OBJECTION TO TRUSTEE'S DETERMIMNATION OF CLAIM

BDG Yaphank, LLC ("Objector"), by counsel, CLAYMAN & ROSENBERG, hereby objects

to the Notice of Trustee's Determination of Claim dated December 8, 2009 (the "Determination

Letter"), appended hereto as Exhibit A, as set forth herein.

## BACKGROUND

1.      Objector is a "Customer" as that term is defined by the Securities Investor

Protection Act ("SIPA") of Bernard L. Madoff Investment Securities LLC ("BLMIS").

2.      Objector was and is a member of Bull Market Fund, a general partnership

organized in the State of New York in 1986.

3.      The Bull Market Fund partnership was organized with the knowledge and

encouragement of BMLIS for the purpose of consolidating the bookkeeping for the investment

of certain small investors with BLMIS.

4.      Bull Market Fund received a final statement from BLMIS which indicated that

Bull Market Fund owned securities valued at $36,833,462.86.

5.      On or about December 31, 2008, Objector received a statement from Bull Market

Fund which indicated that Objector's funds invested by Bull Market Fund in BLMIS were

valued at $2,299,789.

6.      On December 11, 2008, the above-captioned liquidation proceeding was

commenced against BLMIS, pursuant to the Securities Investor Protection Act of 1970 ("SIPA").

Irving Picard was appointed Trustee ("BLMIS Trustee") with oversight of the liquidation of

BLMIS and responsibility for processing customer claims for money pursuant to SIPA.

7.      By Order dated December 23, 2008, the Court directed the Trustee to disseminate

notice and claim forms to BLMIS customers and set forth claim-filing deadlines.  The Order

further authorized the Trustee, *inter alia*, "to satisfy, within the limits provided by SIPA, those

portions of any and all customer claims and accounts which agree with the Debtor's books and

records," and provided that, where the BLMIS Trustee disagrees with the amount claimed in a

2

customer's claim form, the BLMIS Trustee, "shall notify such claimant by mail of his

determination that the claim is disallowed, in whole or in part, and the reason therefor…"

8.      On or about June 24, 2009, Objector timely submitted a customer claim form to

SIPC setting forth his claim in the amount of $2,299,789 ("Objector's claim"). Objector's claim

cross-referenced the BLMIS account of Bull Market Fund. A copy of Objector's claim form is

appended hereto as Exhibit B.

9.      On December 8, 2009, the BLMIS Trustee sent Objector a Determination Letter

denying Objector's claim, "in its entirety." Exhibit A. The Determination Letter stated, in part,

"Based upon a review of available books and records of BLMIS by the Trustee's staff, you did

not have an account with BLMIS. Because you did not have an account, you are not a customer

of BLMIS under SIPA as that term is defined at 15 U.S.C. Section 78111 (2). Accordingly,

your Claim for securities and/or a credit balance is **DENIED.**"

10.     Objector objects to the BLMIS Trustee's disallowance of his claim for the reasons

set forth hereinbelow.

## GROUNDS FOR OBJECTION

11.     First:        The Trustee's definition and application of the term, "account" as

set forth in the Determination Letter is incorrect.

12.     Second:       The Trustee's definition and application of the term, "customer" as

set forth in the Determination Letter is incorrect.

13.     Objector reserves the right to revise or amend this Objection. Objector's failure

to assert an objection on a particular ground or grounds shall not be construed as a waiver of its

right to object or join in the objection of other claimants on any additional grounds.

14.     Objector reserves all rights set forth in Rule 9014.

15.    Objector incorporates herein by reference all claims and reservations of rights set

forth in Objector's claim form. Exhibit B.

## RELIEF SOUGHT

16.    Objector's claim should be allowed in its entirety.

17.    The Court should direct SIPC to pay Objector the full amount of Objector's claim

together with interest thereon commencing not later than the date of the Determination Letter.

18.    Such other and further relief as the Court may deem just and equitable.

Dated: New York, New York
        January 6, 2010

CLAYMAN & ROSENBERG
By:    Seth L. Rosenberg    (SR4563)
        Paul S. Hugel    (PH4749)
305 Madison Avenue
New York, NY 10165
Telephone:    (212) 922-1080
Telefax:    (212) 949-8255
rosenberg@clayro.com
hugel@clayro.com

EXHIBIT A

DETERMINATION LETTER

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]


### NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

December 8, 2009

BDG YAPHANK, LLC
300 ROBBINS LANE
SYOSSET, NY 11791


Dear BDG YAPHANK, LLC:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim designated as Claim No. 011222:

Based on a review of available books and records of BLMIS by the Trustee's staff, you did not have an account with BLMIS. Because you did not have an account, you are not a customer of BLMIS under SIPA as that term is defined at 15 U.S.C. § 78lll (2). Accordingly, your Claim for securities and/or a credit balance is **DENIED**.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after December 8, 2009, the date on which the Trustee mailed this notice.

---------------------------------

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004


and


Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
Attn: Claims Department
45 Rockefeller Plaza
New York, New York 10111

**Irving H. Picard**

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

EXHIBIT B

CUSTOMER CLAIM FORM

300 ROBBINS LANE
SYOSSET, NY 11791

June 2¼, 2009                                                     *Via UPS Overnight*

Irving H. Picard, Esq.
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Avenue, Suite 800
Dallas, Texas 75201

Re:    Account Number: 1-B0081
       BDG Yaphank, LLC through Bull Market Fund
       300 Robbins Lane
       Syosset, New York 11791

Dear Mr. Picard:

BDG Yaphank, LLC is a partner in Bull Market Fund, which had an account with Bernard L. Madoff
Investment Securities ("BLMIS"), Account No. 1-B0081.

It is our understanding that Bull Market Fund has submitted its own SIPC Customer Claim Form to your
office.

We wish to submit our own personal SIPC Customer Claim Form at this time. We are attaching the
following:

1. Our SIPC Customer Claim Form;
2. Bull Market Fund's November 30, 2008 BLMIS statement;
3. Our 2007 Schedule K-1;
4. Our personal account balance as of December 11, 2008; and
5. Amended and Restated Operating Agreement of BDG Yaphank, LLC

We reserve the right to amend or modify this claim if and to the extent warranted by facts and
circumstances not presently known to us, or as a result of a subsequent determination by a court of
competent jurisdiction with respect to any issue pertaining to our claim.

This letter is hereby incorporated by reference in and made a part of our SIPC Customer Claim Form.

Very truly yours,

BDG Yaphank, LLC

By:  BDG Asset Management, Inc., its
     General Manager

By: _____
    Name: Edward Blumenfeld
    Title:    President

G:\Legal\MADOFF\Correspondence\Picard\Entity Investors\IHPicard Ltr - BDG Yaphank, LLC 6-09.doc



⊠Close Window

## Tracking Detail

**Your package has been delivered.**

| | |
|---|---|
| Tracking Number: | 1Z 12X 236 13 9242 080 7 |
| Type: | Package |
| Status: | **Delivered** |
| Delivered On: | 06/25/2009  1:10 P.M. |
| Signed By: | THOMASSON |
| Location: | OFFICE |
| Delivered To: | 2100 MCKINNEY AVE<br>800<br>DALLAS, TX, US  75201 |
| Shipped/Billed On: | 06/24/2009 |
| Reference Number(s): | 01/SM, BDG YAPHANK, LLC- BMF |
| Service: | NEXT DAY AIR SAVER |

### Package Progress

| Location | Date | Local Time | Description |
|---|---|---|---|
| DALLAS, TX, US | 06/25/2009 | 1:10 P.M. | DELIVERY |
| | 06/25/2009 | 7:35 A.M. | OUT FOR DELIVERY |
| | 06/25/2009 | 6:07 A.M. | ARRIVAL SCAN |
| DALLAS/FT. WORTH A/P, TX, US | 06/25/2009 | 5:40 A.M. | DEPARTURE SCAN |
| | 06/25/2009 | 4:54 A.M. | ARRIVAL SCAN |
| ROCKFORD, IL, US | 06/25/2009 | 3:13 A.M. | DEPARTURE SCAN |
| ROCKFORD, IL, US | 06/24/2009 | 11:29 P.M. | ARRIVAL SCAN |
| JAMAICA, NY, US | 06/24/2009 | 10:16 P.M. | DEPARTURE SCAN |
| | 06/24/2009 | 9:18 P.M. | ARRIVAL SCAN |
| UNIONDALE, NY, US | 06/24/2009 | 8:39 P.M. | DEPARTURE SCAN |
| | 06/24/2009 | 8:21 P.M. | ORIGIN SCAN |
| | 06/24/2009 | 7:13 P.M. | PICKUP SCAN |
| | 06/24/2009 | 7:12 P.M. | PICKUP SCAN |

# CUSTOMER CLAIM

Claim Number_____

Date Received_____

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008

(Please print or type)

Name of Customer:    **BDG YAPHANK, LLC**
THROUGH BULL MARKET FUND

Mailing Address:    300 ROBBINS LANE

City:    SYOSSET    State: NY    Zip: 11791

Account No.:    BULL MARKET FUND'S ACCOUNT NO.: 1-B0081

Taxpayer I.D. Number (Social Security No.): 56-2552057

NOTE:    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY THE ACCOMPANYING INSTRUCTION SHEET. A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009. CLAIMS RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.    Claim for money balances as of **December 11, 2008:**

     a.    The Broker owes me a Credit (Cr.) Balance of    $ -0-

     b.    I owe the Broker a Debit (Dr.) Balance of    $ -0-

     c.    If you wish to repay the Debit Balance,

       please insert the amount you wish to repay and

       attach a check payable to "Irving H. Picard, Esq.,

       Trustee for Bernard L. Madoff Investment Securities LLC."

       If you wish to make a payment, **it must be enclosed**

       with this claim form.    $ -0-

     d.    If balance is zero, insert "None."    NONE

2.        Claim for securities as of December 11, 2008:

**PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.**

|  | | YES | NO |
|---|---|---|---|
| a. | The Broker owes me securities | X | |
| b. | I owe the Broker securities | | X |
| c. | If yes to either, please list below: | | |

| Date of Transaction (trade date) | Name of Security | Number of Shares or Face Amount of Bonds | |
|---|---|---|---|
| | | The Broker Owes Me (Long) | I Owe the Broker (Short) |
| | SEE BULL MARKET FUND ACCOUNT STATEMENT | $2,299,789* | |
| | | | |
| | | | |
| | | | |

Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.**

S02180406

2

\* PROVIDED BY BULL MARKET, SEE SUPPLEMENTAL CLAIM INFORMATION ATTACHMENT A

**NOTE:** **IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.**

|  |  | YES | NO |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. | | X |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? | | X |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? | | X |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) | X * | |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. | | X |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. | X * | |
| 9. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? if so, give name of that broker. | | X |

Please list the full name and address of anyone assisting you in the preparation of this claim form: DAVID KAPLAN, 300 ROBBINS LANE, SYOSSET, NY 11791

502180406

3

* SEE SUPPLEMENTAL CLAIM INFORMATION ATTACHMENT A

If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate your claim is an estimated claim.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

BDG YAPHANK, LLC
By: BDG Asset Management, Inc., its General Manag

Date ___JUNE 24, 2009___    Signature _~~Edward Blumenfeld~~_
Edward Blumenfeld, President

Date _____    Signature _____

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, e.g., corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

**This customer claim form must be completed and mailed promptly, together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

4

502180406

## SUPPLEMENTAL CLAIM INFORMATION
### ATTACHMENT A

Claimant is filing this claim form as a customer of Bernard L. Investment Securities LLC ("BLMIS"), having invested in BLMIS through a partnership, Bull Market Fund ("BMF"). Pursuant to the partnership agreement of BMF and other written agreements amongst the Partners of BMF, BMF invested all of its funds with BLMIS. BMF has informed claimant that its customer account number with BLMIS was 1-B0081. BMF has also advised claimant that it is filing a customer claim for the losses in its customer account with BLMIS.

BMF typically issued quarterly statements showing each partner's account summary. In light of the BLMIS fraud, BMF issued a statement to each partner showing their closing balance as of December 10, 2008, a copy of which is enclosed. Claimant believes that as of December 11, 2008, the amount of claimant's investment was all held in the securities as shown on the November 30, 2008 BLMIS statement for BMF, a copy of which is also enclosed.

Essex Realty Development, LLC has a 50% non-voting interest in BDG Yaphank, LLC.

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET        NY    11791

| 1-B0031-3-0 | 11/30/08 | ******46934 | 1 |

| DATE | AMOUNT | | | BALANCE FORWARD | | | |
|---|---|---|---|---|---|---|---|
| | | | | BALANCE FORWARD | | | 1,428,340.08 |
| 11/06 | 2,800 | | 10100 | APPLE INC | | | |
| 11/06 | 4,992 | | 10110 | ABBOTT LABORATORIES | 105,890 | | |
| 11/06 | 3,432 | | 11355 | AMGEN INC | | | |
| 11/06 | 2,496 | | 11688 | BOEING CO | 51,120 | | 121,696.52 |
| 11/06 | 1,872 | | 12202 | BANK OF AMERICA | | | |
| 11/06 | 3,744 | | 12299 | BANK OF NEW YORK MELLON CORP | 32,290 | | 121,042.76 |
| 11/06 | 6,240 | | 12321 | BRISTOL MYERS SQUIBB COMPANY | 20,610 | | 128,855.40 |
| 11/06 | 9,360 | | 13233 | COMCAST CORP | 15,790 | | 148,168.40 |
| 11/06 | | | 13700 | CUSCO SYSTEMS INC | | | |
| 11/06 | 4,680 | | 13936 | CVS CAREMARK CORP | 30,510 | | 142,973.80 |
| 11/06 | 6,552 | | 14172 | CHEVRON CORP | 73,740 | | 283,306.48 |
| 11/06 | 6,720 | | | GENERAL ELECTRIC CO | | | |
| 11/06 | 624 | | 14878 | GOOGLE | 356,520 | | 222,492.43 |
| 11/06 | 5,616 | | 15131 | GOLDMAN SACHS GROUP INC | 91,870 | | 114,702.76 |
| 11/06 | 7,800 | | | | | | |
| 11/06 | 4,368 | | 15818 | INTERNATIONAL BUSINESS MACHS | 92,800 | | 405,524.40 |
| | | | | CONTINUED ON PAGE 2 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY   11791

| Account No. | Date | Page |
|---|---|---|
| 1-B0081-3-0 | 11/30/08 | ******6934 / 2 |

| Date | Quantity | Description | Price | Amount |
|---|---|---|---|---|
| 11/06 | 17,764 | INTEL CORP | 16.070 | 286,499.88 |
| 11/06 | 9,021 | JOHNSON & JOHNSON | 61.310 | 553,093.88 |
| 11/06 | | J.P. MORGAN CHASE & CO | 40.910 | |
| 11/06 | 4,952 | KRAFT FOODS INC | 29.110 | |
| 11/06 | 6,240 | COCA COLA CO | 44.490 | 277,865.60 |
| 11/06 | | MCDONALDS CORP | 57.900 | 216,926.60 |
| 11/06 | 21,164 | | | |
| 11/06 | 6,552 | SYSCO COMPANY | 25.560 | |
| 11/06 | 6,864 | ALTRIA GROUP INC | 19.160 | 125,798.32 |
| 11/06 | | MERCK & CO | 30.780 | 211,547.92 |
| 11/06 | 12,792 | SYSCO COMPANY | | |
| 11/06 | 2,808 | MICROSOFT CORP | | |
| 11/06 | 4,992 | ORACLE CORPORATION | | 152,558.32 |
| 11/06 | | OCCIDENTAL PETROLEUM CORP | 54.290 | 284,743.00 |
| 11/06 | 9,672 | PEPSICO INC | 57. | |
| 11/06 | | VERIZON | | |
| 11/06 | 6,864 | PROCTER & GAMBLE CO | 64.570 | 627,907.04 |
| 11/06 | 5,304 | PHILLIP MORRIS INTERNATIONAL | 42.730 | 293,572.72 |
| 11/06 | 3,744 | QUALCOMM INC | 37.810 | 209,756.24 |
| 11/06 | 18,720 | SCHLUMBERGER LTD | 51.760 | 19,796.40 |
| 11/06 | 11,544 | AT&T INC | 26.900 | 505,068.96 |
| 11/06 | 3,120 | TIME WARNER INC | 10.060 | 116,593.64 |
| 11/06 | 5,616 | UNITED PARCEL SVC INC | 52.790 | 1,644,828.80 |
| 11/06 | 3,120 | U S BANCORP | 29.550 | 160,976.80 |
| 11/06 | | UNITED TECHNOLOGIES CORP | 54.920 | 171,474.40 |

CONTINUED ON PAGE 3

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

# BERNARD L. MADOFF
**INVESTMENT SECURITIES LLC**
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

MADOFF SECURITIES INTERNATIONAL LIMITED
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET NY 11791

| | | | | | | |
|---|---|---|---|---|---|---|
| 1-B008I-3-0 | | 11/30/08 | | ******46934 | | 3 |

| DATE | BOUGHT / RECEIVED | SOLD / DELIVERED | DESCRIPTION | PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|---|---|---|---|---|---|---|
| 11/06 | 9,048 | | 22163 | VERIZON COMMUNICATIONS | 29.980 | 271,620.04 | |
| 11/06 | 10,600 | | 223308 | WELLS FARGO & CO NEW | 33.660 | 357,489.28 | |
| 11/06 | 74,176 | | 220000 | J P MORGAN CHASE & CO | 53.560 | 400,491.56 | |
| 11/06 | 169,848 | | 220000 | EXXON MOBIL CORP | 75.080 | 1,274,085.04 | |
| 11/06 | | | | FIDELITY SPARTAN | | | |
| 11/06 | | | | U S TREASURY MONEY MARKET | | | |
| 11/06 | 169,784 | | -000040 | NEW/0/0/0R | DIV | | 2-54 |
| 11/06 | | | | FIDELITY SPARTAN | | | |
| 11/06 | | | | U S TREASURY MONEY MARKET | 1 | | 169,784,000.00 |
| 11/06 | | 24,408 | 181165 | U S TREASURY SPARTAN | | | 24,408.00 |
| 11/06 | 3,925,000 | | 48599 | U S TREASURY MONEY MARKET | 1 | 3,925,000.00 | |
| 11/06 | | 3,925,000 | 48601 | U S TREASURY BILL | | | 3,925,000.00 |
| 11/06 | | | | DUE 12/11/2008 | | | |
| 11/06 | | 3,925,000 | 48624 | U S TREASURY BILL | | | 3,925,430.00 |
| 11/06 | | | | DUE 12/18/2008 | 99.960 | | |
| 11/06 | 3,925,000 | | 49033 | U S TREASURY BILL | 99.946 | 3,922,880.50 | |
| 11/06 | | | | DUE 01/15/2009 | | | |
| 11/06 | | 3,925,000 | 49240 | U S TREASURY BILL | 99.924 | | 3,922,140.00 |
| 11/06 | | | | DUE 01/22/2009 | | | |
| 11/06 | | | | CONTINUED ON PAGE | 1/22/2009 | | |

CONTINUED ON PAGE

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

MADOFF SECURITIES INTERNATIONAL Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD - EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET NY 11791

| 1-B0081-3-0 | 11/30/08 | 4 | *****6934 |
|---|---|---|---|

| Date | Amount | Number | Security | Price | Amount |
|---|---|---|---|---|---|
| 11/06 | 3,925,000 | 49461 | U.S TREASURY BILL DUE 03/26/2009 | 99.928 | |
| 11/06 | 1,650,000 | 49677 | U.S TREASURY BILL DUE 2/19/2009 | 99.905 | |
| 11/06 | | 49697 | U.S TREASURY BILL DUE 2/12/2009 | 99.902 | |
| 11/06 | 2,575,000 | 49597 | U.S TREASURY BILL DUE 3/26/2009 | | |
| 11/06 | 2,575,000 | 50127 | U.S TREASURY BILL DUE 2/05/2009 | 99.751 | 2,568,588.25 |
| 11/06 | 2,575,000 | 50356 | U.S TREASURY BILL DUE 04/09/2009 | 99.726 | 2,567,944.50 |
| 11/07 | 1,954 | 39004 | APPLE INC | 98.800 | |
| 11/07 | 3,456 | 23639 | ABBOTT LABORATORIES | 56.590 | 195,713.04 |
| 11/07 | 2,376 | 23876 | AMGEN INC | 62.070 | 147,573.32 |
| 11/07 | 11,928 | 33103 | BERING CO | | |
| 11/07 | 1,296 | 24544 | BANK OF AMERICA | 29.720 | |
| 11/07 | 2,376 | 24579 | BAXTER INTERNATIONAL INC | 61.740 | |
| 11/07 | 4,752 | 24874 | BANK OF NEW YORK MELLON CORP | 34.210 | 81,377.96 |
| 11/07 | 12,051 | 25036 | PHILIP MORRIS | | |
| 11/07 | | 25804 | ANHEUSER-BUSCH COS INC | 64. | |
| 11/07 | 11,664 | 25519 | CITI GROUP INC | 14.410 | 168,544.24 |

CONTINUED ON PAGE 5

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
MADF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY  11791

| ACCOUNT NUMBER | DATE | PAGE | |
|---|---|---|---|
| 1-B0081-3-0 | 11/30/08 | 5 | ******669314 |

| DATE | BOUGHT / RECEIVED | SOLD / DELIVERED | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|---|
| 11/07 | 6,264 | 25754 | COMCAST CORP CL A | 17.390 | 109,180.96 |
| 11/07 | 3,740 | 25938 | CONOCOPHILLIPS | | |
| 11/07 | 12,744 | 26224 | CISCO SYSTEMS INC | | |
| 11/07 | 3,024 | 26459 | CVS CAREMARK CORP | 31.720 | 96,041.28 |
| 11/07 | 4,156 | 26954 | CHEVRON CORP | 75.450 | |
| 11/07 | 8922 | | WALT DISNEY CO | | |
| 11/07 | 22,432 | 24104 | GENERAL ELECTRIC CO | | |
| 11/07 | 27399 | | GOOGLE | 349.160 | |
| 11/07 | 654 | 27636 | GOLDMAN SACHS GROUP INC | 89.070 | |
| 11/07 | 3,672 | 28400 | HOME DEPOT INC | | |
| 11/07 | 3,024 | 28439 | INTERNATIONAL BUSINESS MACHS | 92.430 | |
| 11/07 | 12,096 | 28574 | INTEL CORP | 16. | |
| 11/07 | 6,708 | 29059 | JP MORGAN CHASE & CO | | |
| 11/07 | 3,240 | 29279 | KRAFT FOOD INC | 29.710 | |
| 11/07 | 4,320 | 29514 | COCA COLA CO | 44.580 | |
| 11/07 | 2,970 | 29732 | MERCK & CO | | |
| 11/07 | | 30053 | MICROSOFT CORP | | |
| 11/07 | 2,376 | 30219 | 3M COMPANY | 64.880 | |
| 11/07 | 1,512 | 30435 | ALTRIA GROUP INC | 19.370 | |
| 11/07 | 4,536 | 30674 | PEPSICO INC | | |
| 11/07 | | 30924 | PROCTER & GAMBLE | | |
| 11/07 | 8,640 | 31159 | ORACLE CORPORATION | 18.470 | 159,925.80 |

CONTINUED ON PAGE 6

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY    11791

| 1-B0081-3-0 | 11/30/08 | ******6934 | 6 |
|---|---|---|---|

| DATE | AMOUNT | TRN | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|---|
| 11/07 | 1,728 | 31864 | OCCIDENTAL PETROLEUM CORP | 54.380 | 94,037.64 |
| 11/07 | 3,456 | 33099 | PEPSICO INC | 58.630 | 202,764.28 |
| 11/07 | 14,768 | 33226 | PFIZER INC | 18.650 | 264,774.00 |
| 11/07 | 6,696 | 32569 | PROCTER & GAMBLE CO | 65.280 | 436,192.28 |
| 11/07 | 4,536 | 32804 | PHILLIP MORRIS INTERNATIONAL | 43.640 | 198,132.04 |
| 11/07 | 3,672 | 33039 | QUALCOMM INC | 37.680 | 138,543.68 |
| 11/07 | 2,552 | 33274 | SCHLUMBERGER LTD | 85.770 | 218,922.00 |
| 11/07 | 12,528 | 33509 | AT&T INC | 28.920 | 362,809.40 |
| 11/07 | 7,776 | 33744 | TIME WARNER INC | 10.110 | 78,926.36 |
| 11/07 | 2,160 | 33979 | UNITED PARCEL SVC INC CLASS B | 53.680 | 116,034.80 |
| 11/07 | 3,888 | 34214 | U S BANCORP | 30.690 | 119,380.32 |
| 11/07 | 2,160 | 34449 | UNITED TECHNOLOGIES CORP | 56 | 121,046.00 |
| 11/07 | 6,648 | 34684 | VERIZON COMMUNICATIONS | 31.810 | 212,677.88 |
| 11/07 | 7,344 | 33919 | WELLS FARGO & CO NEW | 27.880 | 205,197.12 |
| 11/07 | 4,768 | 35154 | WAL-MART STORES INC | 56.730 | 270,920.47 |
| 11/07 | 11,448 | 35389 | EXXON MOBIL CORP | 75.280 | 862,262.44 |
| 11/07 | | | DIV-11/07/08 | DIV | .34 |
| 11/07 | | 10883 | FIDELITY SPARTAN | 1 | 18,784.00 |
| 11/07 | 18,784 | 11174 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | | 2,373,784.25 |
| | | | DUE 02/05/09 | | |
| | | | U S TREASURY MONEY MARKET | | 18,784.00 |

CONTINUED ON PAGE 2/05/2009

# BERNARD L. MADOFF
## INVESTMENT SECURITIES LLC
### New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

FINANCIAL INTERMEDIARIES LIMITED
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

**Account Holder:**
BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET        NY  11791

| | | | |
|---|---|---|---|
| Account No. | 1-B0081-3-0 | | |
| Date | 11/30/08 | | |
| Tax ID | ******6934 | 7 | |

| Date | Quantity | Price | Description | | Amount |
|---|---|---|---|---|---|
| 11/07 | | 11382 | U S TREASURY BILL DUE 02/19/2009 | 99.887 | |
| 11/07 | 2,450,000 | 11382 | U S TREASURY BILL DUE 02/19/2009 | 99.887 | 2,447,231.50 |
| 11/07 | 2,450,000 | 11597 | U S TREASURY BILL DUE 02/26/2009 | | |
| 11/07 | 2,374,000 | 12063 | U S TREASURY BILL DUE 03/05/2009 | | |
| 11/07 | 2,450,000 | 12019 | U S TREASURY BILL DUE 03/05/2009 | | |
| 11/07 | 121.41 | | U S TREASURY BILL DUE 04/09/2009 | 99.840 | |
| 11/07 | 1,175,000 | 12701 | U S TREASURY BILL DUE 04/16/2009 | 99.720 | 1,171,710.00 |
| 11/07 | 1,175,000 | 12501 | U S TREASURY BILL DUE 04/16/2009 | | |
| 11/07 | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | | |
| 11/10 | 2,376 | 35864 | APPLE INC | 108.720 | 258,413.72 |
| 11/10 | 4,224 | 36099 | ABBOTT LABORATORIES | 55.910 | 236,331.84 |
| 11/10 | 2,904 | 36391 | AGENT | | |
| 11/10 | 2,112 | 36569 | BOEING CO | | |
| 11/10 | 137,728 | 36804 | BANK OF AMERICA | 24.050 | 330,707.40 |

CONTINUED ON PAGE

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

**BERNARD L. MADOFF**
**MADF** INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET            NY    11791

| ACCOUNT NUMBER | DATE | PAGE |
|---|---|---|
| 1-B0081-3-0 | 11/30/08 ******6934 | 8 |

| DATE | AMOUNT DEBITED TO YOUR ACCOUNT | TRAN CODE | DESCRIPTION | PRICE | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|
| 11/10 | 1,648 | 37039 | BAXTER INTERNATIONAL INC | 60.770 | 112,375.96 |
| 11/10 | 3,168 | 37274 | BANK OF NEW YORK MELLON CORP | 33.480 | 106,190.64 |
| 11/10 | 5,544 | 37510 | BRISTOL MYERS SQUIBB COMPANY | 19.860 | 110,353.68 |
| 11/10 | 1,848 | 37744 | ANHEUSER BUSCH COS INC | 59.970 | 110,851.92 |
| 11/10 | 15,048 | 37979 | CITI GROUP INC | 14.270 | 215,335.96 |
| 11/10 | 7,920 | 38214 | COMCAST CORP | 17.410 | 138,203.20 |
| 11/10 | 4,224 | 38449 | CONOCOPHILLIPS | 54.430 | 229,987.32 |
| 11/10 | 16,104 | 38684 | CISCO SYSTEMS INC | 18.080 | 291,804.32 |
| 11/10 | 3,960 | 38919 | CVS CAREMARK CORP | 31.300 | 124,105.00 |
| 11/10 | 5,808 | 39154 | CHEVRON CORP | 76.410 | 444,021.28 |
| 11/10 | 5,016 | 39389 | THE WALT DISNEY CO | 20.560 | 103,910.96 |
| 11/10 | 28,776 | 39624 | GENERAL ELECTRIC CO | 20.530 | 591,922.28 |
| 11/10 | 528 | 39859 | GOOGLE | 363.400 | 191,991.84 |
| 11/10 | 1,320 | 40094 | SUDBAN MACHINES GROUP INC | 22.680 | 126,319.60 |
| 11/10 | 4,752 | 40329 | HOME DEPOT INC | 22.690 | 107,826.88 |
| 11/10 | 6,864 | 40564 | HEWLETT PACKARD CO | 37.290 | 256,231.56 |
| 11/10 | 3,696 | 40799 | INTERNATIONAL BUSINESS MACHS | 92.660 | 342,619.36 |
| 11/10 | 11,616 | 41034 | JOHNSON & JOHNSON | 55.920 | 649,714.92 |
| 11/10 | 10,032 | 41269 | J P MORGAN CHASE & CO | 41.730 | 418,936.36 |
| 11/10 | 4,224 | 41504 | KRAFT FOODS INC | 30.100 | 127,310.40 |
| 11/10 | 5,544 | 41739 | COCA COLA CO | 44.850 | 248,725.00 |
| 11/10 | 3,168 | 41974 | MCDONALDS CORP | 57.250 | 181,478.04 |
| 11/10 | 3,168 | 42209 | MEDTRONIC INC | 40.300 | 127,796.40 |
|  |  | 42444 | CONTINUED ON PAGE 9 |  |  |

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET            NY   11791

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

1-B0081-3-0     11/30/08     ******6934     9

| DATE | BOUGHT/RECEIVED | SOLD/DELIVERED | | DESCRIPTION | PRICE | AMOUNT DEBITED/CREDITED |
|---|---|---|---|---|---|---|
| 11/10 | 1,848 | | 42679 | 3M COMPANY | 64.690 | 119,620.12 |
| 11/10 | 5,544 | | 42014 | ALTRIA GROUP INC | 18.890 | 104,947.16 |
| 11/10 | 21,354 | | 43147 | MERCK & CO | 30.510 | |
| 11/10 | 10,824 | | 43864 | MICROSOFT CORP | 23.260 | |
| 11/10 | 2,976 | | 43659 | ORACLE CORPORATION | 18.600 | 201,758.40 |
| 11/10 | 4,324 | | 44324 | OCCIDENTAL PETROLEUM CORP | 56.010 | |
| 11/10 | 10,176 | | 44759 | PEPSICO INC | 52.550 | |
| 11/10 | 44,704 | | 44794 | PFIZER INC | 17.960 | |
| 11/10 | 8,184 | | 45029 | PROCTER & GAMBLE CO | 65.230 | 534,169.32 |
| 11/10 | 5,401 | | 45264 | PHILIP MORRIS INTERNATIONAL | 44.030 | 244,323.32 |
| 11/10 | 34,452 | | 45454 | QUALCOMM INC | | |
| 11/10 | 16,368 | | 45954 | SCHLUMBERGER LTD | | |
| 11/10 | 9,504 | | 45969 | AT&T INC | 28.580 | |
| 11/10 | | | 46204 | TIME WARNER INC | 11.010 | |
| 11/10 | | | 46459 | UNITED PARCEL SVC INC CLASS B | | |
| 11/10 | 4,752 | | 46674 | U S BANCORP | 31.510 | 149,925.52 |
| 11/10 | 2,640 | | 46909 | UNITED TECHNOLOGIES CORP | 56.430 | 149,080.20 |
| 11/10 | 7,920 | | 47144 | VERIZON COMMUNICATIONS | | |
| 11/10 | 8,976 | | 47379 | WELLS FARGO CO NEW | | |
| 11/10 | 6,072 | | 47614 | WAL-MART STORES INC | 55.710 | 338,513.12 |
| 11/10 | 14,256 | | 47849 | EXXON MOBIL CORP | 75.800 | 1,081,174.80 |
| 11/10 | | | | U S TREASURY MONEY MARKET | | |
| 11/10 | | | | DIV 11/10/08 | | |
| | | | | CONTINUATION PAGE 10 | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

BERNARD L. MADOFF
[MADF]
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY    11791

1-B0081-3-0   11/30/08   *******6934   10

| DATE | BOUGHT RECEIVED | SOLD DELIVERED | | PRICE | AMOUNT DEBITED/CREDITED |
|---|---|---|---|---|---|
| 11/10 | | 30,199 | 12816 FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | 1 | 30,199.00 |
| 11/10 | | 28,000,000 | 13204 U S TREASURY BILL DUE 03/19/2009 | 99.67 | 28,000,000.00 |
| 11/10 | | 2,575,000 | 13423 U S TREASURY BILL DUE 02/26/2009 | 99.834 | 2,570,725.50 |
| 11/10 | | 2,575,000 | 13625 U S TREASURY BILL DUE 02/26/2009 | 99.770 | 2,569,077.50 |
| 11/10 | | 3,750,000 | 13628 U S TREASURY BILL DUE 04/09/2009 | 99.442 | 3,740,362.00 |
| 11/10 | | 14,061 | U S TREASURY BILL DUE 04/09/2009 | 99.000 | 1,171,315.50 |
| 11/10 | 50,000 | 142,81 | U S TREASURY BILL DUE 4/16/2009 | 99.686 | 49,843.00 |
| 11/10 | 685 | 14508 | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | 1 | 685.00 |
| 11/14 | | 10,100 | CHECK FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | | 100/0100.00 |
| 11/14 | | | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET | DIV | |
| 11/14 | | | CONTINUED ON PAGE 11 | | .05 |

CONTINUED ON PAGE 11

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

# BERNARD L. MADOFF

INVESTMENT SECURITIES LLC

New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                     NY    11791

| | | | | |
|---|---|---|---|---|
| 1-B0081-3-0 | 11/30/08 | \*\*\*\*\*\*6934 | 11 | |

| DATE | | | DESCRIPTION | | |
|---|---|---|---|---|---|
| 11/14 | | 685 | 29393 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 685.00 |
| 11/14 | 1,357 | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1,357.00 |
| 11/18 | | 29804 | | CHECK | CA | 255,000.00 |
| 11/18 | | | | CHECK | CA | 115,000.00 |
| 11/18 | | | | CHECK | CA | 100,000.00 |
| 11/18 | | | 49588 | CHECK | CA | 200,000.00 |
| 11/18 | 375,000 | 5,544 | 49586 | U S TREASURY BILL DUE 4/16/2009 | 374,062.50 |
| 11/18 | | 1977 | | U S TREASURY BILL DUE 4/16/2009 | 1,357.00 |
| 11/18 | | 49954 | | U S TREASURY BILL DUE 4/16/2009 | 119,025.00 |
| 11/18 | 450,000 | | | U S TREASURY MONEY MARKET | 449,235.00 |
| 11/18 | | | 99,830 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 99,830 |
| 11/19 | 5,765 | 49985 | | FIDELITY SPARTAN U S TREASURY MONEY MARKET 5/26/2009 | 5,765.00 |
| 11/19 | | 50057 | 1 | FIDELITY SPARTAN U S TREASURY MONEY MARKET FW 11/19/08 | |
| 11/19 | 20,839 | | DIV | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 20,839.00 |
| | | | | CONTINUED ON PAGE 12 | |

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

MADOFF SECURITIES INTERNATIONAL LIMITED
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                         NY   11791

| 1-B0081-3-0 | 11/30/08 | *****6934 | 12 |

| Date | Bought Received | Sold Delivered | Security No. | Description | Price | Amount |
|---|---|---|---|---|---|---|
| 11/19 | 3,525,000 | | 54708 | U.S. TREASURY BILL DUE 03/26/2009 3/26/2009 | 99.926 | 3,522,391.50 |
| 11/19 | 91120 | | 59098 | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET 3/26/2009 | 1 | 91,120.00 |
| 11/20 | | | | U.S. TREASURY MONEY MARKET CHECK DUE 03/26/2009 | | |
| 11/20 | | 3,525,000 | 62699 | U.S. TREASURY BILL DUE 03/26/2009 | 99.923 | 675,000.00 |
| 11/20 | 2,850,000 | | 63933 | U.S. TREASURY BILL DUE 4/16/2009 | 99.947 | 2,848,489.50 |
| 11/20 | 171 | | 64175 | FIDELITY SPARTAN U.S. TREASURY MONEY MARKET 4/16/2009 | 1 | 171.00 |
| 11/25 | 882 | | 64157 | APPLE INC | 88.640 | |
| 11/25 | 1,558 | | 64655 | ABBOTT LABORATORIES | 55.240 | |
| 11/25 | 1,078 | | 64893 | AMGEN INC | 53.630 | 57,856.14 |
| 11/25 | 4,998 | | 65131 | BANK OF AMERICA | 12.880 | 65,073.04 |
| 11/25 | 588 | | 65369 | BERKLEY INTERNATIONAL INC | 52.70 | 30,932.49 |
| 11/25 | 1,176 | | 65607 | BANK OF NEW YORK MELLON CORP | 24.640 | 29,082.24 |
| 11/25 | 1,960 | | 65845 | BRISTOL MYERS SQUIBB COMPANY | 20.140 | 39,552.40 |
| 11/25 | 5,684 | | 66083 | CITIGROUP INC | 6.100 | 34,895.40 |
| 11/25 | 430 | | 66321 | COLGATE PALMOLIVE CO | 62.100 | 30,725.00 |
| 11/25 | 2,842 | | 66559 | COMCAST CORP CL A | 13.00 | 33,835.74 |

CONTINUED ON PAGE 13

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

MADOFF SECURITIES INTERNATIONAL LIMITED
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                NY  11791

| Account Number | Date | Account Number 2 | Page |
|---|---|---|---|
| 1-B0081-3-0 | 11/30/08 | *****6934 | 13 |

| Date | Quantity | No. | Security | Price | Amount |
|---|---|---|---|---|---|
| 11/25 | 1,568 | 66797 | CONOCOPHILLIPS | 45.100 | 70,778.80 |
| 11/25 | 5,830 | 67035 | CISCO SYSTEMS INC | 14.970 | 87,255.60 |
| 11/25 | 11,570 | | SYSCO NEW YORK CORP | | |
| 11/25 | 2,058 | 67511 | CHEVRON CORP | | |
| 11/25 | 1,862 | 67749 | THE WALT DISNEY CO | 19.760 | |
| 11/25 | 686 | 67987 | EXELON CORP | 48.740 | 36,867.12 |
| 11/25 | 107,730 | | GENERAL ELECTRIC CO | 14.010 | |
| 11/25 | 1,196 | 68465 | GOOGLE INC | | |
| 11/25 | 1,666 | 68701 | HOME DEPOT INC | 19.530 | 32,602.98 |
| 11/25 | 2,450 | 68939 | HEWLETT PACKARD CO | 32.890 | 80,922.50 |
| 11/25 | 13,372 | 69177 | INTERNATIONAL BUSINESS MACHS | | |
| 11/25 | 57,664 | | INTEL CORP | | |
| 11/25 | 21,842 | 69653 | JOHNSON & JOHNSON | 57.650 | |
| 11/25 | 3,724 | 69891 | JP MORGAN CHASE & CO | 27.160 | 101,156.24 |
| 11/25 | 12,710 | 70129 | KRAFT FOODS INN | | |
| 11/25 | 1,960 | 70367 | COCA-COLA CO | | |
| 11/25 | 1,478 | 70605 | MCDONALDS CORP | 55... | 82,446.80 |
| 11/25 | 1,176 | 70843 | MEDTRONIC INC | 30.800 | 36,267.80 |
| 11/25 | 2,030 | 71081 | 3M COMPANY | 55... | |
| 11/25 | | 71319 | ALTRIA GROUP INC | | |
| 11/25 | 2,156 | 71557 | MERCK & CO | 25... | 53,986.00 |
| 11/26 | 1,940 | 71795 | MICROSOFT CORP | 18.100 | |
| 11/25 | 882 | 72033 | UNITEDHEALTH GROUP INC | | |
| 11/25 | | 72509 | OCCIDENTAL PETROLEUM CORP | | |
| 11/25 | 1,568 | 72985 | PEPSICO INC | 51.800 | 81,284.40 |

CONTINUED ON PAGE 14

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY   11791

| DATE | BOUGHT RECEIVED | SOLD DELIVERED | DESCRIPTION | PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|------|------|------|------|------|------|------|
| 11/25 | 6,762 | | PFIZER INC | 15.320 | 103,863.04 | |
| 11/25 | 2,940 | | PROCTER & GAMBLE CO | 61.940 | 182,220.60 | |
| 11/25 | 2,050 | | SCHLUMBERGER TECHNOLOGY | 34.860 | 74,352.84 | |
| 11/25 | 1,666 | | QUALCOMM INC | 29.850 | 49,796.10 | |
| 11/25 | 1,176 | | SCHLUMBERGER LTD | 46.270 | 54,460.52 | |
| 11/25 | 5,890 | | AT&T INC | 25. | 147,235.00 | |
| 11/25 | 3,626 | | UNITED PARCEL SVC INC | 80010 | 291,368.60 | |
| 11/25 | 980 | | UNITED PARCEL SVC INC | 500.60 | 49,768.60 | |
| 11/25 | 1,866 | | CLASS B | | | |
| 11/25 | 980 | | U.S.BANCORP | 23.400 | 43,847.60 | |
| 11/25 | 2,842 | | VERIZON COMMUNICATIONS | 44.090 | 125,603.04 | |
| 11/25 | 3,622 | | VERIZON COMMUNICATIONS CORP | 20.670 | 75,024.74 | |
| 11/25 | 2,254 | | WELLS FARGO & CO NEW | 23.620 | 91,152.04 | |
| 11/25 | 1,372 | | WAL-MART STORES INC | 84.550 | 116,088.30 | |
| 11/25 | 5,242 | | EXXON MOBIL CORP | 72 | 381,285.00 | |
| 11/25 | | | FIDELITY SPARTAN | DIV | | .93 |
| 11/25 | | | U.S TREASURY MONEY MARKET | | | |
| 11/25 | | | FIDELITY SPARTAN | 1 | | |
| 11/25 | | 3,729,000 | U S TREASURY MONEY MARKET | | 3,729,000.00 | |
| 11/25 | | | U S TREASURY BILL | | | |
| 11/25 | 42,963 | | FIDELITY SPARTAN | 1 | 42,963.00 | |
| | | | U.S TREASURY MONEY MARKET | | | |
| | | | CONTINUED ON PAGE 15 | | | 3,728,555.50 |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

1-800-81-9-0     11/30/08     14     ******6934

# BERNARD L. MADOFF
## INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BERNARD L. MADOFF INVESTMENT SECURITIES INTERNATIONAL LIMITED
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY   11791

1-B0081-3-0    11/30/08    15    *****6934

| DATE | BOUGHT RECEIVED | SOLD DELIVERED | DESCRIPTION | | MKT PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|---|---|---|---|---|---|---|---|
| 11/26 | | | CHECK | CA | | | 5,000.00 |
| 11/26 | 5,000 | | FIDELITY SPARTAN | 1 | | 5,000.00 | |
| | | | U.S. TREASURY MONEY MARKET | | | | |
| 11/28 | | 100 | HAXTEN INTERNATIONAL INC | CW | | | |
| 11/28 | | 100 | HAXTEN INTERNATIONAL INC | DIV | 52.640 | | |
| 11/28 | | 76420 | CHECK | | | 50,000.00 | |
| 11/28 | | | FIDELITY SPARTAN | | | | 50,000.00 |
| | | | U.S. TREASURY MONEY MARKET | | | | |
| 11/28 | 47,963 | 76257 | DIV 11/28/08 | 1 | | | 2.26 |
| | | | FIDELITY SPARTAN | | | | |
| 11/28 | 47,124 | 76257 | U.S. TREASURY MONEY MARKET | 1 | | | 47,963.00 |
| | | | FIDELITY SPARTAN | | | | |
| 11/28 | 3,226 | | U.S. TREASURY MONEY MARKET | | | | |
| | | | NEW BALANCE | | | | 5,119,352.95 |
| | | | SECURITY POSITIONS | | | | |
| | 53,495 | | AT&T INC | 28.560 | | | |
| | 142,240 | | ABBOTT LABORATORIES | 52.390 | | | |
| | 18,592 | | AMGEN INC | 55.500 | | | |
| | 9,790 | | AMGEN GROUP INC | 55.540 | | | |
| | 8,010 | | APPLE INC | 92.670 | | | |
| | 45,966 | | APPLE INC | 92.670 | | | |
| | 10,564 | | BANK OF AMERICA | 16.250 | | | |
| | 51,504 | | BAXTER INTERNATIONAL INC | 52.900 | | | |
| | 6,336 | | BOEING CO | 42.630 | | | |
| | | | CONTINUED ON PAGE  16 | | | | |



# BERNARD L. MADOFF
**INVESTMENT SECURITIES LLC**
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET NY 11791

| 1—B0083—3—0 | 11/30/08 | ******6934 | 16 |
| --- | --- | --- | --- |

| WEIGHT (DESCRIPTION LONG) | SOLD | DESCRIPTION | AMOUNT |
| --- | --- | --- | --- |
| 18,664 | | BRISTOL MYERS SQUIBB COMPANY | 26,700 |
| 13,134 | | CVS CAREMARK CORP | 28,930 |
| 18,954 | | CHEVRON CORP | 79,570 |
| 55,760 | | CISCO SYSTEMS INC | 16,540 |
| 49,868 | | CITI GROUP INC | 8,290 |
| 18,464 | | COCA COLA CO | 46,370 |
| 490 | | COLGATE PALMOLIVE CO | 71,540 |
| 26,336 | | COMCAST CORP CL A | |
| 14,024 | | CONOCPHILLIPS | 52,520 |
| 17,222 | | THE WALT DISNEY CO | |
| 686 | | EXELON CORP | |
| 47,844 | | EXXON MOBIL CORP | 80,150 |
| 93,620 | | GENERAL ELECTRIC CO | 76,170 |
| 3,432 | | GOLDMAN SACHS GROUP INC | |
| 1,780 | | GOOGLE | |
| 22,514 | | HEWLETT PACKARD CO | 35,280 |
| 54,006 | | HOME DEPOT INC | 23,110 |
| 51,110 | | INTEL CORP | |
| 12,400 | | INTERNATIONAL BUSINESS MACHS | 31,660 |
| 35,820 | | J.P. MORGAN CHASE & CO | 58,580 |
| 24,554 | | JOHNSON & JOHNSON | |
| 13,326 | | KRAFT FOODS INC | |
| 10,366 | | MCDONALDS CORP | 768,750 |
| 10,464 | | MEDTRONIC INC | 30,520 |

CONTINUED ON PAGE 17

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

# BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                NY   11791

| | | |
|---|---|---|
| 1-B0081-3-0 | 11/30/08 | 17 |
| | ****46934 | |

Bernard L Madoff Investment Securities Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | DESCRIPTION | PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|---|---|---|---|---|---|---|
| | 19,580 | | MERCK & CO | 26.720 | | |
| | 71,716 | | MICROSOFT CORP | 20.220 | | |
| | 7,794 | | OCCIDENTAL PETROLEUM CORP | 54.270 | | |
| | 36,176 | | ORACLE CORPORATION | 17.090 | | |
| | 14,240 | | PEPSICO INC | 56.700 | | |
| | 64,722 | | PFIZER INC | 16.430 | | |
| | 19,002 | | PHILIP MORRIS INTERNATIONAL | 44.410 | | |
| | 27,492 | | PROCTER & GAMBLE CO | 64.350 | | |
| | 15,130 | | QUALCOMM INC | 33.570 | | |
| | 109,544 | | SCHLUMBERGER LTD | 50.740 | | |
| | 3,222 | | FIDELITY SPARTAN | | | |
| | | | US TREASURY MONEY MARKET | | | |
| | 6,230 | | 3M COMPANY | 66.930 | | |
| | 22,950 | | TIME WARNER INC | 9.050 | | |
| | 16,022 | | US BANCORP | 26.990 | | |
| | 81,900 | | UNITED PARCEL SVC INC | 54.600 | | |
| | | | CLASS B | | | |
| | 8,900 | | UNITED TECHNOLOGIES CORP | 48.530 | | |
| | 25,858 | | VERIZON COMMUNICATIONS | 33.250 | | |
| | 20,740 | | WAL-MART STORES INC | 55.080 | | |
| | 30,750 | | WELLS FARGO & CO NEW | 28.890 | | |
| | 1,372 | | WYETH | 36.010 | | |
| | | | MARKET VALUE OF SECURITIES | | | |
| | 7,919,842.86 | | LONG | SHORT | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET                    NY  11791

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

| Account No. | Date | Account | Page |
|---|---|---|---|
| 1-B0081-4-0 | 11/30/08 | *****669934 | 1 |

| DATE | BOUGHT (RECEIVED IN) | SOLD (DELIVERED OUT) | | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|
| 11/06 | | | BALANCE FORWARD | | | 1,428,341.00 |
| 11/06 | | | NOVEMBER 470 CALL | | | |
| 11/06 | 312 | 19108 | S & P 100 INDEX | 20.500 | 639,912.00 | |
| 11/07 | | | NOVEMBER 440 PUT | | | |
| 11/07 | 216 | 33629 | S & P 100 INDEX NOVEMBER 460 PUT | 13.800 | 298,296.00 | |
| 11/10 | | | NOVEMBER 475 PUT | | | |
| 11/10 | 264 | 44089 | S & P 100 INDEX NOVEMBER 475 PUT | 16.800 | 443,784.00 | |
| 11/19 | 792 | 30303 | S & P 100 INDEX DECEMBER 420 PUT | 30 | 2,376,792.00 | |
| 11/19 | 520 | 30779 | S & P 100 INDEX NOVEMBER 495 CALL | .900 | 24,024.00 | |
| 11/19 | 264 | 31255 | S & P 100 INDEX NOVEMBER 460 PUT | .59 | | |
| 11/19 | | | NOVEMBER 475 PUT | | | 1,557,336.00 |
| 11/19 | | | CONTINUED ON PAGE 2 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

BERNARD L. MADOFF
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

BULL MARKET FUND
F/K/A BLUMENFELD EMPLOYEES
C/O BLUMENFELD DEV GROUP LTD
300 ROBBINS LANE
SYOSSET          NY   11791

| Account number | 1-B0081-4-0 |
| Date | 11/30/08 |
| Tax number | *****6934 |
| Page | 2 |

| DATE | BOUGHT | SOLD | TIN | DESCRIPTION | MKT PRICE | AMOUNT DEBITED | AMOUNT CREDITED |
|---|---|---|---|---|---|---|---|
| 11/25 | | 98 | 72033 | S & P 100 INDEX | 34 | | |
| | | | | DECEMBER 380 CALL | | | |
| 11/25 | 98 | | 72033 | S & P 100 INDEX | 24 | 205,896.00 | |
| | | | | DECEMBER 370 PUT | | | |
| | | | | NEW BALANCE | | | |
| | | | | SECURITY POSITIONS | MKT PRICE | | |
| | | | | S & P 100 INDEX | 23.300 | | |
| | | 98 | | DECEMBER 430 CALL | | | |
| | 792 | | | S & P 100 INDEX | 601 | | |
| | | | | DECEMBER 380 CALL | | | |
| | | 98 | | S & P 100 INDEX | 16.500 | | |
| | 792 | | | DECEMBER 430 PUT | | | |
| | | | | S & P 100 INDEX | | | |
| | | | | DECEMBER 370 PUT | | | |
| | | | | MARKET VALUE OF SECURITIES - SHORT | | 1,356,760.00 | 5,119,353.00 |
| | | | | MARKET VALUE OF SECURITIES - LONG | | 2,443,000.00 | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

333,102.00

Schedule K-1
(Form 1065)

**2007**

| | Final K-1 | | Amended K-1 | OMB No. 1545-0099 |

Department of the Treasury
Internal Revenue Service

For calendar year 2007, or tax
year beginning _____
ending _____

**Partner's Share of Income, Deductions,
Credits, etc.**

▶ See separate instructions.

| **Part III** | **Partner's Share of Current Year Income, Deductions, Credits, and Other Items** |
|---|---|

| 1 Ordinary business income (loss) | 0. | 15 Credits |
| 2 Net rental real estate income (loss) | | |
| | | 16 Foreign transactions |
| 3 Other net rental income (loss) | | |
| 4 Guaranteed payments | | |
| 5 Interest income | | |
| 6a Ordinary dividends | | |
| 6b Qualified dividends | | 17 Alternative min tax (AMT) items |
| 7 Royalties | | |
| 8 Net short-term capital gain (loss) | | 18 Tax-exempt income and nondeductible expenses |
| 9a Net long-term capital gain (loss) | | |
| 9b Collectibles (28%) gain (loss) | | 19 Distributions |
| 9c Unrecaptured sec 1250 gain | | |
| 10 Net section 1231 gain (loss) | | 20 Other information |
| 11 Other income (loss) | | |
| 12 Section 179 deduction | | |
| 13 Other deductions | | |
| 14 Self-employment earnings (loss) | | |

**Part I** Information About the Partnership

A  Partnership's employer identification number
11-2796934

B  Partnership's name, address, city, state, and ZIP code

BULL MARKET FUND
300 ROBBINS LANE
SYOSSET, NY 11791

C  IRS Center where partnership filed return
OGDEN, UT

D  ☐ Check if this is a publicly traded partnership (PTP)

**Part II** Information About the Partner

E  Partner's identifying number

56-2552057

F  Partner's name, address, city, state, and ZIP code

BDG YAPHANK
300 ROBBINS LANE
SYOSSET, NY 11791

G  ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

H  ☒ Domestic partner    ☐ Foreign partner

I  What type of entity is this partner?    PARTNERSHIP

J  Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | VARIOUS% | VARIOUS% |
| Loss | VARIOUS% | VARIOUS% |
| Capital | VARIOUS% | VARIOUS% |

K  Partner's share of liabilities at year end:

| | | |
|---|---|---|
| Nonrecourse | $ | |
| Qualified nonrecourse financing | $ | |
| Recourse | $ | 0. |

L  Partner's capital account analysis:

| | | |
|---|---|---|
| Beginning capital account | $ | |
| Capital contributed during the year | $ | 2,250,000. |
| Current year increase (decrease) | $ | 0. |
| Withdrawals & distributions | $( | ) |
| Ending capital account | $ | 2,250,000. |

☒ Tax basis    ☐ GAAP    ☐ Section 704(b) book
☐ Other (explain)

*See attached statement for additional information.

For IRS Use Only

JWA  For Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2007

711261
12-31-07

60

# MEMORANDUM

**TO:**       **BDG Yaphank, LLC**

**FROM:**    Harvey Cohen

**RE:**       Bull Market Fund

**DATE:**    **December 31, 2008**

---

Please find below your balance in the Bull Market Fund as of December 10, 2008.  This includes your November 30, 2008 balance plus any additions, if applicable, made subsequent to November 30, 2008 and sent to Bernard L. Madoff Investment Securities, LLC.

Account Balance as of December 10, 2008:  $2,299,789

Please call me if I can be of further service.

# AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# BDG YAPHANK, LLC

# (A NEW YORK LIMITED LIABILITY COMPANY)

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS REGISTERED AND QUALIFIED UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH REGISTRATION AND QUALIFICATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, THE TERMS AND CONDITIONS OF WHICH ARE SET FORTH IN THIS AGREEMENT.

Table of Contents

|  |  | Page |
|---|---|---|
| ARTICLE I | DEFINITIONS | 2 |
| ARTICLE II | THE COMPANY | 11 |
| 2.1 | Formation and Continuation; Amendment and Restatement | 11 |
| 2.2 | Name | 11 |
| 2.3 | Term | 11 |
| 2.4 | Office | 11 |
| 2.5 | Purpose of Company | 11 |
| 2.6 | Intent | 11 |
| 2.7 | Admission of Essex LLC; Members | 11 |
| 2.8 | Agent for Process | 12 |
| 2.9 | Qualification | 12 |
| ARTICLE III | CAPITAL CONTRIBUTIONS | 12 |
| 3.1 | Capital Contributions | 12 |
| 3.2 | Default by a Member | 12 |
| 3.3 | Capital Accounts | 13 |
| 3.4 | No Priorities of Members; No Withdrawals of Capital | 12 |
| 3.5 | No Interest | 13 |
| 3.6 | Certificates of Interest | 13 |
| ARTICLE IV | MEMBERS | 14 |
| 4.1 | Withdrawals | 14 |
| 4.2 | Action by Members | 14 |
| 4.3 | Other Activities of Members | 15 |
| ARTICLE V | MANAGEMENT AND CONTROL OF THE COMPANY | 15 |
| 5.1 | Management by the Manager | 15 |
| 5.2 | Designation and Removal of the Manager | 16 |
| 5.3 | Limitations on Powers of the Manager | 17 |
| 5.4 | Transactions with the Manager and its Affiliates | 17 |
| ARTICLE VI | ALLOCATIONS OF PROFIT, LOSS AND DISTRIBUTIONS | 18 |
| 6.1 | Allocation of Profit | 18 |
| 6.2 | Allocation of Loss | 19 |
| 6.3 | Special Allocations | 19 |
| 6.4 | Tax Allocation Matters | 20 |
| 6.5 | Distributions | 22 |
| 6.6 | Additional Allocation Rules | 23 |
| 6.7 | Order of Application | 24 |
| 6.8 | Allocation of Excess Nonrecourse Liabilities | 25 |
| 6.9 | Form of Distribution | 25 |
| 6.10 | Amounts Withheld | 25 |
| ARTICLE VII | TRANSFER OF INTERESTS | 26 |
| 7.1 | Transfer of Interests | 26 |

i

|  |  | Page |
|---|---|---|
| 7.2 | Permitted Transfers | 26 |
| 7.3 | Further Restrictions on Transfers | 26 |
| 7.4 | Admission of Transferee as a Member | 26 |
| 7.5 | Right of First Refusal | 26 |
| 7.6 | Enforcement | 28 |

**ARTICLE VIII      ACCOUNTING, RECORDS AND REPORTING** .................................... 28

| 8.1 | Books and Records. | 28 |
| 8.2 | Reports | 29 |
| 8.3 | Accounts; Invested Funds | 29 |
| 8.4 | Tax Elections | 29 |
| 8.5 | Tax Matters Partner | 29 |
| 8.6 | Confidentiality | 30 |
| 8.7 | Compliance with Anti-Money Laundering Laws | 30 |

**ARTICLE IX DISSOLUTION AND WINDING UP** ...................................... 30

| 9.1 | Dissolution | 30 |
| 9.2 | Date of Dissolution | 30 |
| 9.3 | Winding Up | 30 |
| 9.4 | Liquidating Distributions | 30 |
| 9.5 | Distributions in Kind | 30 |
| 9.6 | No Liability | 30 |
| 9.7 | Limitations on Payments Made in Dissolution | 30 |
| 9.8 | Certificate of Cancellation | 30 |

**ARTICLE X  LIMITATION OF LIABILITY; STANDARD OF CARE; INDEMNIFICATION** ..................................... 32

| 10.1 | Limitation of Liability | 32 |
| 10.2 | Standard of Care | 32 |
| 10.3 | Indemnification | 33 |
| 10.4 | Contract Right; Expenses | 34 |
| 10.5 | Indemnification of Employees and Agents | 34 |
| 10.6 | Nonexclusive Right | 34 |
| 10.7 | Severability | 34 |
| 10.8 | Insurance | 34 |

**ARTICLE XI MEMBER REPRESENTATIONS** ...................................... 34

| 11.1 | Authority | 35 |
| 11.2 | Preexisting Relationship or Experience | 35 |
| 11.3 | Access to Information | 35 |
| 11.4 | Economic Risk | 35 |
| 11.5 | Investment Intent | 35 |
| 11.6 | Consultation with Attorney | 35 |
| 11.7 | Conflict | 36 |
| 11.8 | Interest is Restricted Security | 36 |
| 11.9 | No Registration of Interest | 36 |
| 11.10 | Accredited Investor | 36 |

Table of Contents

|  |  | Page |
|---|---|---|
| 11.11 | No Advertising | 36 |
| ARTICLE XII | MISCELLANEOUS | 36 |
| 12.1 | Amendments | 36 |
| 12.2 | Offset Privilege | 36 |
| 12.3 | Notices | 37 |
| 12.4 | Fees and Expenses | 37 |
| 12.5 | Waiver | 37 |
| 12.6 | Governing Law | 37 |
| 12.7 | Arbitration | 38 |
| 12.8 | Remedies | 38 |
| 12.9 | Jurisdiction | 38 |
| 12.10 | Severability | 39 |
| 12.11 | Counterparts | 39 |
| 12.12 | Further Assurances; Power of Attorney | 39 |
| 12.13 | Assignment | 39 |
| 12.14 | Binding Effect | 39 |
| 12.15 | No Third Party Beneficiary | 39 |
| 12.16 | Titles and Captions | 39 |
| 12.17 | Construction | 40 |
| 12.18 | Usage | 40 |
| 12.19 | Entire Agreement | 40 |
| 12.20 | Waiver of Partition | 40 |
| 12.21 | Waiver of Dissolution Rights | 40 |
| 12.22 | Representation | 41 |

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

BDG YAPHANK, LLC

(A NEW YORK LIMITED LIABILITY COMPANY)

This Amended and Restated Operating Agreement of BDG Yaphank, LLC, is made and entered into as of December 17, 2007, by and between the persons set forth on Schedule A.

## PRELIMINARY STATEMENTS

1.  The Company was formed pursuant to the provisions of the Law by (i) the filing of the Articles on December 14, 2005, and (ii) the execution of an operating agreement (the "Original Agreement"), dated as of October 15, 2007. As of immediately prior to the date hereof, Blumenfeld LLC was the sole member of the Company.

2.  On October 19, 2007 the Company acquired fee title to certain real property located on Walker Avenue in Bellport, New York, identified as Section 899, Block 3, Lot 7 and Section 872, Block 2, Lots 15 and 16 (collectively, the "Property").

3.  As of the beginning of the date hereof, Blumenfeld LLC transferred to Essex LLC a ninety percent (90%) Interest and Essex LLC acquired from Blumenfeld LLC such Interest.

4.  Blumenfeld LLC and Essex LLC are making additional capital contributions to the Company on the date hereof.

5.  The parties hereto desire to amend and restate the Original Agreement in its entirety, in order to reflect the above-referenced transfer and certain amendments to the Original Agreement that the parties have agreed to, and to continue the Company as a limited liability company for the purposes and on the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the premises, covenants and agreements herein contained, the parties hereto do hereby agree as follows:

## ARTICLE I

## DEFINITIONS

When used in this Agreement, the following terms have the following meanings:

"Adjusted Capital Account" of a Member means the Capital Account of that Member, increased by any amount that such Member is expressly obligated to restore pursuant to an agreement with the Company or is deemed to be obligated to restore pursuant to Treasury Regulations § 1.704-1(b)(2)(ii)(c) or the penultimate sentence of Treasury Regulations § 1.704-2(g)(1) or 1.704-2(i)(5), and reduced by the items described in Treasury Regulations § 1.704-1(b)(2)(ii)(d)(4), (5) or (6).

"Affiliate" of another Person means (a) a Person directly or indirectly (through one or more intermediaries) Controlling, Controlled by or under common Control with that other Person; (b) a Person owning or Controlling ten percent (10%) or more of the outstanding voting securities or beneficial interests of that other Person; or (c) a member of the immediate family of that other Person.

"Agreement" means this Operating Agreement of the Company.

"Articles" means the Articles of Organization of the Company filed under the Law with the New York Secretary of State.

"Blumenfeld LLC" means BDG Five Times, LLC, a New York limited liability company.

"Business" means to purchase, acquire, buy, sell, own, trade in, hold, develop, lease, manage, subdivide, and otherwise deal in and with the Property, any parcels of property adjacent to the Property, and personal property related thereto, and to do any and all things necessary, convenient or incidental to that purpose, and any other business that the Manager may determine.

"Business Day" means any day other than a Saturday, Sunday or day on which banking institutions in New York, New York are not open for business.

"Capital Account" of a Member means the capital account of that Member determined in accordance with Treasury Regulations § 1.704-1(b)(2)(iv) and this paragraph. The Capital Accounts shall be adjusted by the Manager upon an event described in Treasury Regulations § 1.704-1(b)(2)(iv)(f)(5) in the manner described in Treasury Regulations § 1.704-1(b)(2)(iv)(f) and (g) if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company, and at such other times as the Manager may determine is appropriate to reflect the economic arrangement among the parties.

"Capital Contribution" of a Member means the amount of money and the gross Fair Market Value on the date contributed of property as determined by the Manager (net of any liability assumed by the Company or to which the property is subject), contributed to the capital of the

Company by such Member, or services rendered by such Member to or for the benefit of the Company.

"Capital Percentage" of a Member means the capital percentage set forth on Schedule A for such Members, as the same may be adjusted pursuant to this Agreement.

"Capital Transaction" means a sale or other disposition (including a condemnation) of an asset or liquidation of the Company (other than in the ordinary course of business) or a financing or a refinancing of a liability by the Company.

"Code" means the Internal Revenue Code of 1986.

"Company" means BDG Yaphank, LLC, a New York limited liability company.

"Company Minimum Gain" with respect to any Fiscal Year means the "partnership minimum gain" of the Company with respect to such Fiscal Year as defined in Treasury Regulations §1.704-2(b)(2) and determined in accordance with Treasury Regulations § 1.704-2(d).

"Control" of a Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. "Controlled by", "Controlling" and "under common Control with" shall have correlative meanings.

"Cumulative Tax" for a Member with respect to a Fiscal Year or a portion thereof ("Period") means the Cumulative Tax for the Member with respect to the preceding Fiscal Year plus the federal, state and local income tax that would be paid by a hypothetical individual member of the Company, who is a citizen of the United States domiciled in New York, New York with the same Interest as the Member, on the Profit allocated to such Member pursuant to Section 6.1(d) or (e) for such Period and any increase in net taxable income to such Member as a result of a Revaluation after the date hereof, as determined by the Manager, computed by assuming that all such Profit and income is allocable solely to New York City, that the individual pays income tax on such amount at the maximum marginal income tax rate in effect for such Period based on the type of income (without regard to phase outs, alternative taxes and the like and without regard to any other tax attribute of the Member), but that such state and local income tax is currently deductible for federal income tax purposes, and by taking into account such other assumptions as may be determined by the Manager, which apply to all Members. Cumulative Tax with respect to any period preceding the date hereof is deemed to be zero.

"Distributable Cash" at any time means that portion of the cash then on hand or in accounts of the Company at a bank or other financial institution (other than Distributable Cash from a Capital Transaction) which the Manager reasonably determines is available for distribution to the Members at such time, taking into account (a) the amount of cash required for the payment of all current expenses, liabilities and obligations of the Company (whether for expense items, capital expenditures, improvements, retirement of indebtedness or otherwise), including any fees described in Section 5.4.3 and (b) the amount of cash which the Manager reasonably deems necessary or appropriate to establish reserves for the payment of future expenses, liabilities, obligations, capital expenditures, improvements, retirements of indebtedness, operations and

3

contingencies, known or unknown, liquidated or unliquidated, including any fees described in Section 5.4.3 and liabilities which may be incurred in litigation and liabilities undertaken pursuant to the indemnification provisions of this Agreement.

"Distributable Cash From a Capital Transaction" at any time means the excess, if any, of (a) the proceeds from a Capital Transaction over (b) the sum of (i) the expenses in connection with such Capital Transaction and the liabilities required to be repaid from such proceeds (including any liabilities secured by the property disposed of, and any liabilities refinanced in, the Capital Transaction) and (ii) the amount of cash which the Manager reasonably deems necessary or appropriate to establish reserves for the payment of future expenses, liabilities, obligations, capital expenditures, improvements, retirements of indebtedness, operations and contingencies, known or unknown, liquidated or unliquidated, including liabilities which may be incurred in litigation and liabilities undertaken pursuant to the indemnification provisions of this Agreement.

"Distribution" means the transfer of money or property by the Company to one or more Members with respect to their Interests, without separate consideration.

"Essex LLC" means Essex Realty Development LLC, a New York limited liability company.

"Fair Market Value" of property means the amount that would be paid for such property in cash at the closing by a hypothetical willing buyer to a hypothetical willing seller, each having knowledge of all relevant facts and neither being under a compulsion to buy or sell.

"Fiscal Year" means the Company's taxable year, which shall be the taxable year ended December 31, or such other taxable year as may be selected by the Manager in accordance with applicable law.

"Interest" means a Member's overall interest as a Member of the Company, including the Member's interest in Profit, Loss, special allocations, Distributable Cash or other Distributions, rights to vote or participate in the management of the Company and rights to information concerning the business and affairs of the Company.

"Interest Rate" means a rate of interest equal to five (5) percentage points above the prime rate of interest as reported in the "Money Rates Section" of The Wall Street Journal (New York edition) from time to time, but not more than the maximum rate permitted by applicable law.

"Law" means the New York Limited Liability Company Law.

"Manager" means a Person designated pursuant to Section 5.2, until such Person ceases to be a manager of the Company pursuant to this Agreement or a non-waivable provision of the Law.

"Member" means a Person designated on Schedule A as a Member, and any other Person that is admitted as a Member pursuant to the provisions of this Agreement, in each case until such Person ceases to be a member of the Company pursuant to this Agreement or a non-waivable provision of the Law.

"Member Minimum Gain" with respect to a Fiscal Year means the "partner nonrecourse debt minimum gain" of the Company with respect to such Fiscal Year, as defined in Treasury

4

Regulations § 1.704-2(i)(2) and determined in accordance with Treasury Regulations § 1.704-2(i)(3).

"Member Nonrecourse Debt" means the "partner nonrecourse liability" or "partner nonrecourse debt" of the Company as defined in Treasury Regulations § 1.704-2(b)(4).

"Member Nonrecourse Deductions" with respect to a Fiscal Year means the "partner nonrecourse deductions" of the Company with respect to such Fiscal Year as defined in Treasury Regulations § 1.704-2(i)(l) and determined in accordance with Treasury Regulations § 1.704-2(i)(2).

"Member Recourse Deduction" with respect to a Fiscal Year means a Company loss or deduction with respect to such Fiscal Year that is attributable (under Code Section 704(b) and the Treasury Regulations thereunder) to a Company liability that is recourse for purposes Treasury Regulations § 1.1001-2 and a Member or a related person (within the meaning of Treasury Regulations § 1.752-4(b)) to a Member bears all or a portion of the economic risk of loss under Treasury Regulations § 1.752-2 with respect to such Company liability.

"Nonrecourse Deductions" with respect to a Fiscal Year means the "nonrecourse deductions" of the Company with respect to such Fiscal Year as defined in Treasury Regulations § 1.704-2(b)(1) and determined in accordance with Treasury Regulations § 1.704-2(c).

"Original Agreement" shall have the meaning set forth in the first Preliminary Statement.

"Percentage" of a Member means the percentage set forth on Schedule A for such Member, as the same may be adjusted pursuant to this Agreement.

"Person" means any entity, corporation, company, association, joint venture, joint stock company, partnership (including a general partnership, limited partnership and limited liability partnership), limited liability company, trust, real estate investment trust, organization, individual, nation, state, government (including any agency, department, bureau, board, division and instrumentality thereof), trustee, receiver or liquidator.

"Preferred Return" of a Member means an aggregate amount equal to an annual six percent (6%) cumulative but not compounded return on a Member's Unreturned Capital Contributions as it exists from time to time. With respect to the Capital Contributions made by each Member, the Preferred Return shall accrue from the date of this Agreement. With respect to additional Capital Contributions made by each Member, the Preferred Return shall accrue from the last date that the additional Capital Contribution is required to be funded, provided that such additional Capital Contribution has in fact been funded. Unreturned Capital Contributions are reduced on the date the Company makes (or is deemed to make) a Distribution under Section 6.5.3(a).

"Profit" and "Loss" means, with respect to a Fiscal Year, the taxable income and taxable loss, as the case may be, of the Company with respect to such Fiscal Year, as determined by the Manager in accordance with federal income tax principles, including items required to be separately stated, taking into account income that is exempt from federal income taxation, items that are neither deductible nor chargeable to a capital account and rules governing depreciation and amortization, except that in computing taxable income or taxable loss, the tax "book" value of an

5

asset will be substituted for its adjusted tax basis if the two differ, and any gain, income, deductions or losses specially allocated under Section 6.3 or 6.4 shall be excluded from the computation. Any adjustment pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(*f*) and (*g*) shall be treated as Profit or Loss from the sale of property. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required to be taken into account in determining Capital Accounts pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(*m*)(*2*) or (*4*) as a result of a distribution to a Member in complete liquidation of its Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment reduces such basis) and such gain or loss shall be specially allocated to the Members in accordance with their respective Percentages if Treasury Regulations § 1.704-1(b)(2)(iv)(*m*)(*2*) applies, and to the Member to whom such distribution was made in the event Treasury Regulations § 1.704-1(b)(2)(iv)(*m*)(4) applies.

"Profits Interest" means a profits interest (within the meaning of Treasury Regulations § 1.721-1(b)(1) and Revenue Procedure 93-27) in the Company.

"Property" shall have the meaning set forth in the second Preliminary Statement.

"Revaluation" means a revaluation of the Company's property pursuant to the second sentence of the definition of Capital Account, but not solely as a result of a Capital Contribution of property to the Company having a Fair Market Value that is different from its tax basis at the time of the contribution.

"Securities Act" means the Securities Act of 1933, as amended.

"Tax Matters Partner" means the Person designated pursuant to Section 8.5.1.

"Transfer" means a sale, assignment, transfer, other disposition, pledge, hypothecation or other encumbrance, whether direct or indirect, whether voluntary, involuntary or by operation of law, and whether for value or not, including any transfer by gift, devise, intestate succession, sale, operation of law, upon the termination of a trust, as a result of or in connection with any property settlement or judgment incident to a divorce, dissolution of marriage or separation, by decree of distribution or other court order.

"Treasury Regulations" means the regulations promulgated by the United States Treasury Department pertaining to the United States federal income tax.

"Unreturned Capital Contributions" of a Member at any time means the excess, if any, of (a) the aggregate amount of Capital Contributions in money or property by such Member through such time, over (b) the aggregate amount Distributed to such Member pursuant to Section 6.5.3(a) through such time.

## ARTICLE II

## THE COMPANY

2.1    <u>Formation and Continuation; Amendment and Restatement</u>.  The Company was formed as a limited liability company pursuant to the Law by the filing of the Articles.  The Members, by execution of this Agreement, hereby continue the Company as a limited liability company pursuant to the Law, and the rights and liabilities of the Members shall be as provided in the Law except as herein otherwise expressly provided.  To the extent there is any conflict between any provision of the Law and any provision of this Agreement, the applicable provision of this Agreement shall control except to the extent a non-waivable provision of the Law requires otherwise.  This Agreement amends and restates the Original Agreement, which is hereby superseded in its entirety.

2.2    <u>Name</u>.  The name of the Company is and shall continue to be BDG Yaphank, LLC, or such other name as the Manager may determine.  The Business of the Company shall be conducted under that name.  The Company shall promptly notify the Members of any change in the name of the Company.

2.3    <u>Term</u>.  The term of the Company's existence commenced upon the filing of its Articles with the New York Secretary of State on December 14, 2005, and shall continue until such time as the Company is terminated pursuant to Article X.

2.4    <u>Office</u>.  The principal office of the Company is located at 300 Robbins Lane, Syosset, New York 11791, or at such other place as the Manager may determine from time to time.  The Manager shall promptly notify the Members of any change in the principal office of the Company.  The Company shall also have such additional offices as the Manager may determine from time to time.

2.5    <u>Purpose of Company</u>.  The purpose of the Company shall be to engage in the Business, and any activities incidental thereto or connected therewith.

2.6    <u>Intent</u>.  It is the intent of the Members that the Company shall be treated as a "partnership" for federal income tax purposes.  It also is the intent of the Members that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the United States Bankruptcy Code.  No Member or Manager shall take any action inconsistent with either such express intent without the vote of Members owning a majority of the Percentages of the Members.

2.7    <u>Admission of Essex LLC; Members</u>.  As of the beginning of the date hereof, Blumenfeld LLC hereby transfers and assigns to Essex LLC, and Essex LLC hereby accepts from Blumenfeld LLC, a 90% Interest in the Company, subject to and in accordance with the terms and provisions hereof.  The name, address, telecopy number, Capital Contribution, Percentage and Capital Percentage of each Member as of the date hereof is set forth on Schedule A.  The Company shall amend Schedule A to reflect any change pursuant to this Agreement of which the Manager is aware in any of the foregoing with respect to any Member.

7

2.8    <u>Agent for Process</u>.  The name and business address of the agent for service of process for the Company in the State of New York is BDG Five Times, LLC, c/o Blumenfeld Development Group, Ltd., 300 Robbins Lane, Syosset, New York 11791, or such other Person with such other address as the Manager may appoint from time to time.

2.9    <u>Qualification</u>.  The Company shall qualify to do business in each jurisdiction where the Manager determines that such qualification is required.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1    <u>Capital Contributions</u>.

3.1.1    <u>Capital Contributions</u>.  Each Member has contributed (or is deemed to have contributed) to the Company of the date hereof the Capital Contribution specified opposite such Member's name on Schedule A, the receipt of which is hereby acknowledged.  To the extent a Member acquires an Interest on the date hereof for services, as set forth on Schedule A, such Member shall receive only a Profits Interest.

3.1.2    <u>Additional Capital Contributions</u>.  If the Manager determines that the Company needs additional funds which the Manager determines should be funded with additional contributions from the Members, the Company shall give each Member at least twenty (20) days notice of the Company's need for the additional funds, the amount of the funds needed, the reason therefor, the Member's additional Capital Contribution required thereby (which shall be equal to the Member's Capital Percentage of the aggregate funds being called), and the date by which the additional Capital Contribution is required to be made (a "<u>Call</u>").

3.1.3    <u>No Further Capital Contributions</u>.  Except as set forth in this Section 3.1, no Member shall be required to make any capital contribution or lend money to the Company. Except as provided in this Section 3.1, no Member may make a capital contribution or lend money to the Company without the Manager's consent.

3.2    <u>Default by a Member</u>.  If a Member fails to timely make the required Capital Contribution pursuant to a Call (a "<u>Defaulting Member</u>"), the Company may take any of the following actions:

(a)    The Company may commence legal proceedings to compel the Defaulting Member to make the required capital contribution that was not paid by the Defaulting Member plus interest thereon at the Interest Rate from the due date through the date paid (the "<u>Defaulted Amount</u>") and otherwise pursue any and all rights and remedies the Company may have at law or in equity against the Defaulting Member;

(b)    The Company may request one or more non-Defaulting Members to voluntarily pay to the Company in the aggregate an amount up to the Defaulted Amount.  Such amount paid by each such non-Defaulting Member shall be treated as a loan by such non-Defaulting Member to the Defaulting Member, and a payment by the Defaulting Member of such amount to the Company as a Capital Contribution and interest payment.  The loan to the

8

Defaulting Member shall be payable upon demand and shall bear interest at the Interest Rate. Any amount otherwise Distributable by the Company to the Defaulting Member shall be paid to the Members who made such loans until the loans are repaid in full. In the event the aggregate amount such non-Defaulting Members desire to lend to the Defaulting Member exceeds the Defaulted Amount, the loans shall be made by the non-Defaulting Members in such amounts (not exceeding the amount the Member desired to lend) as determined by the Company;

(c)    The Company may treat the Capital Contributions made by the non-Defaulting Members as loans to the Company, bearing interest at the Interest Rate and maturing in one (1) year. The Company may not make any Distributions to the Members (other than a distribution for taxes under Section 6.5.1) until such loans are repaid in full; or

(d)    The Company may adjust the Percentages and Capital Percentages of the Members. In this regard, the Company may request one or more non-Defaulting Members to make additional Capital Contributions up to the Defaulted Amount. In the event the aggregate amount such non-Defaulting Members desire to contribute pursuant to this subsection (d) exceeds the Defaulted Amount, the contributions shall be made by the non-Defaulting Members in such amounts (not exceeding the amount the Member desires to contribute) as determined by the Manager. The Capital Percentage of any Defaulting Member with respect to a Call shall be reduced to an amount equal to the percentage that (i) the Defaulting Member's Capital Contributions at the time of the default (including the Capital Contributions made pursuant to the Call) is of (ii) the sum of the aggregate Capital Contributions of the Members at such time including the Capital Contributions made pursuant to the Call) plus the aggregate Capital Contribution made by the non-Defaulting Members pursuant to the Call or this subsection (d). The Defaulting Member's Percentage shall be reduced by the amount by which the Defaulting Member's Capital Percentage has been reduced. For avoidance of doubt, if a Defaulting Member's Capital Percentage is reduced from x percent to (x-1) percent, its Percentage is reduced by one (1) percentage point. The aggregate decrease in the Defaulting Member's Percentages and Capital Percentage shall be allocated among the non-Defaulting Members in proportion to the respective Capital Contributions made by each non-Defaulting Member pursuant to such Call and this subsection (d). For purposes of computing subsequent adjustments under this subsection (d), Capital Contributions shall include the deemed additional contributions from prior computations under this subsection (d).

(e)    In each case, the Defaulting Member shall be liable for any costs and expenses incurred by the Company or any non-Defaulting Member in enforcing its or its rights pursuant to this Section 3.2.

3.3    <u>Capital Accounts</u>. The Company shall establish and maintain a separate Capital Account for each Member.

3.4    <u>No Priorities of Members; No Withdrawals of Capital</u>. Except as otherwise specified in this Agreement, no Member shall have a priority over any other Member as to any Distribution, whether by way of return of capital or by way of profits, or as to any allocation of Profit, Loss or special allocations. No Member shall have any right to withdraw or reduce its Capital Contribution except as a result of the dissolution and liquidation of the Company, and no Member shall have the right to demand or receive property other than cash in return for its

9

Capital Contribution.  No Member has any right to, interest in, or claim against any specific property of the Company by reason of its Interest.

3.5    No Interest.  No Member shall be entitled to receive any interest on its Capital Contributions or Capital Account.

3.6    Certificates of Interest.  The Company may issue certificates representing the outstanding Interests.  Each certificate shall bear such legends as the Manager may determine.

ARTICLE IV

MEMBERS

4.1    Withdrawals.  Except as otherwise expressly provided herein, no Member may withdraw from the Company prior to the dissolution and liquidation of the Company.  A Member that withdraws in contravention of this Agreement shall not be entitled to any consideration for its Interest as a result of such withdrawal, and shall be liable to the Company and the other Members for any damages suffered by them as a result of such withdrawal.  A Member that withdraws from the Company shall cease to be a Member.

4.2    Action by Members.

4.2.1    Power of the Members.  Except as otherwise specifically provided herein, no Member in its capacity as a Member shall (a) take part in the management of the Company, (b) transact any business on behalf of the Company, or (c) have any power or authority to bind the Company.

4.2.2    Meetings of Members.  There is no requirement to hold annual or other meetings of the Members.  Meetings of the Members may be called by the Manager or by any Member owning a majority of the Percentages of the Members.  Such meetings shall be held at the place, date and time that the Person(s) calling such meeting shall designate in the notice of the meeting.  Members may participate in any meeting through the use of conference telephones or similar communications equipment as long as all Members participating can hear one another.  A Member so participating is deemed to be present in person at the meeting.  Except as otherwise provided herein, action at any meeting with respect to the Company requires the affirmative vote of Members owning a majority of the Percentages of the Members.

4.2.3    Notice of Meeting.  At least two (2) Business Days prior written notice shall be given to the Members entitled to vote at such meeting, stating the place, date and time of the meeting, the Person calling the meeting and the purpose for which the meeting is called.  Notice of a meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before, at or after the meeting.  All such waivers shall be filed with the Company records or made part of the minutes of the meeting.  The attendance of a Member at the meeting, whether in person or by proxy, without protesting the lack of proper notice shall constitute a waiver of notice by such Member.

4.2.4    Action by Consent.  Any action that may be taken by Members at a meeting may also be taken without a meeting, if a consent in writing setting forth the action so taken is signed by Members owning a sufficient Percentage to take such action at a meeting at

10

which all the Members entitled to vote on such action are present and voting, and such consent is delivered to the Manager within sixty (60) days after the date of the earliest signature to such consent. Consents may be signed in counterparts. The Company shall retain such consents with the books and records of the Company and shall promptly notify all Members of the action so taken.

4.3    Other Activities of Members. Nothing in this Agreement shall prevent a Member, Manager or officer of the Company from engaging or participating in any other project, activity, venture or enterprise, whether or not related to the Business and whether or not competitive with the Company. Being a Member does not entitle such Person to participate or otherwise have any interest in any other project, activity, venture or enterprise of another Member, the Manager or an officer of the Company, unless otherwise agreed between them. A Member shall not incur any liability to the Company or any other Member as a result of engaging in any such other project, activity, venture or enterprise. No Member or Manager shall be obligated to present any prospective project, activity, venture, enterprise or opportunity to the Company, even if it is within the Business of the Company or similar to any other business or activity of the Company.

## ARTICLE V

## MANAGEMENT AND CONTROL OF THE COMPANY

5.1 Management by the Manager.

5.1.1    Exclusive Management by the Manager. Except as otherwise expressly provided in this Agreement or as expressly required by a non-waivable provision of the Law, (a) the business, property and affairs of the Company shall be managed exclusively by the Manager, (b) the Manager shall have full, complete and exclusive authority, power and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters, to bind the Company and to perform any and all other actions customary or incident to the management of the Company's business, property and affairs as the Manager deems necessary, appropriate or advisable, and (c) no Member shall have any right or power to participate in the management of the Company or to bind the Company. Except as otherwise expressly provided in this Agreement, the unilateral act of the Manager with respect to the Company shall bind the Company. No Person dealing with the Company shall have any obligation to inquire into the power or authority of the Manager to act on behalf of the Company.

5.1.2    Performance of Duties. The Manager shall perform its managerial duties for the Company in accordance with the standard of care prescribed by Section 10.2. In performing its duties, the Manager shall be entitled to rely in good faith upon the records of the Company and upon such information, opinions, reports or statements, including financial statements and other financial data, presented to the Company by any Member, officer, employee or committee of the Company, or by any other Person as to matters which the Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, unless the Manager has actual knowledge concerning the matter in question that would cause such reliance to be unwarranted.

5.1.3  <u>Devotion of Time</u>. The Manager shall devote such time and effort as the Manager deems appropriate for the management and operation of the Company's business, property and affairs. The Members acknowledge that the Manager and its Affiliates are engaged in substantial other activities which require a substantial portion of their time and attention and that of their respective partners, officers, employees and agents.

5.2  <u>Designation and Removal of the Manager</u>.

5.2.1  <u>Number of Managers</u>. There shall be one (1) Manager.

5.2.2  <u>Designation</u>. The Members initially designate Blumenfeld LLC as the Manager. If the Person designated as the Manager fails to qualify or resigns as the Manager, the Person designated by Members owning a majority of the Percentages of the Members shall be the Manager, provided such Person qualifies and is willing to serve. The Company shall promptly notify all of the Members of such designation.

5.2.3  <u>Resignation</u>. The Manager may resign upon twenty (20) days prior written notice to the Members. Resignation as Manager shall not affect the Manager's Interest, if any, as a Member.

5.3  <u>Limitations on Powers of the Manager</u>. Notwithstanding anything herein to the contrary, without the consent of Members owning a majority of the Percentages of the Members, no Manager may cause or permit the Company to:

(a)  issue any additional Interest or any option or other right to acquire an Interest;

(b)  amend, restate or revoke the Articles or, except as otherwise provided herein, this Agreement;

(c)  merge or consolidate with or into another Person, enter into, transfer or terminate any business combination, partnership or joint venture with any other Person, or acquire or dispose of all or any interest in another Person or business;

(d)  take any action for which this Agreement requires the consent of Members owning a majority of the Percentages of the Members, as set forth elsewhere in this Agreement; or

(e)  agree to do any of the foregoing.

5.4  <u>Transactions with the Manager and its Affiliates</u>.

5.4.1  <u>Compensation</u>. The Manager shall not receive compensation from the Company for its services as Manager. However, the Company shall reimburse the Manager for all reasonable out-of-pocket costs and expenses incurred by the Manager in connection with the business and affairs of the Company.

12

5.4.2 <u>Arm's Length Transactions</u>. Any transaction or fees between the Company and the Manager or an Affiliate of the Manager shall be at arm's length, upon terms no less favorable to the Company than would be obtained from unrelated third parties dealing at arm's length. The Members agree that the terms and provisions of this Agreement satisfy such standard.

5.4.3 <u>Specific Agreements</u>. It is specifically understood and agreed by each Member hereto that the Company may contract with the Manager or any Member, or any Affiliate of any Member or the Manager, to have such Person provide services to the Company, and may make payment for such services, including, without limitation, site construction management, financing services, development, leasing, property management, and disposition, if such services are required by the Company's Business and as if such services would otherwise be provided by an unrelated party; <u>provided</u> that the compensation or fee for such services does not exceed prevailing market rates and the terms of such contract, including payment terms, are fair and reasonable to the Company and consistent with accepted industry practices. Each of the Members acknowledges and agrees that the following fees shall be payable to Blumenfeld LLC or its Affiliates for the services described below and that such fees satisfy the standards of Section 5.4.2 and 5.4.3 or, to the extent that, with respect thereto, such requirements are not so satisfied, that the same are hereby waived:

(a) <u>Site Construction Management Fee</u>: for providing owner's representative services to the Company in connection with construction, 5.0% of the sum of all hard costs and soft costs, excluding land. The Site Construction Management Fee shall be paid monthly based on the construction budget, subject to the approval of the construction lender, and adjusted upon closing of the initial permanent financing;

(b) <u>Financing Fee</u>: for arranging financing on behalf of the Company, 0.5% of the total financing amount of any financing obtained by the Company, including construction, permanent and refinancing, paid upon closing of such financing;

(c) <u>Leasing Fee</u>: for leasing services provided to the Company, 25.0% of prevailing market rate commissions in the area for new leases, extensions and renewals;

(d) <u>Development Fee</u>: for project development services provided to the Company, 2.0% of the sum of all hard costs and soft costs, including land, paid upon closing of the initial permanent financing;

(e) <u>Property Management Fee</u>: for property management services provided to the Company, 4.0% of annual rental income, which shall in no event be less than $2,000 per month, plus reimbursement for wages and salaries of the employees of Blumenfeld LLC or its Affiliates at or below the level of building manager (provided, however, that if anyone receiving such renumeration performs services both at the Property and elsewhere, such renumeration shall be appropriately apportioned; and

(f) <u>Disposition Fee</u>: for services provided to the Company in connection with disposition of the Property, 1.0% of the gross sales price on the sale of the Property, paid upon closing of such sale.

Any such fee payable to Blumenfeld LLC shall be treated as a guaranteed payment under Section 707(c) of the Code.

## ARTICLE VI

## ALLOCATIONS OF PROFIT, LOSS AND DISTRIBUTIONS

6.1    Allocation of Profit.  From and after the date hereof, Profit for each Fiscal Year shall be allocated to the Members in accordance with the following order of priority:

(a)    Profit up to the excess, if any, of the aggregate Loss allocated pursuant to Section 6.2(e) for any prior Fiscal Year from and after the date hereof over the aggregate Profit previously allocated pursuant to this Section 6.1(a) from and after the date hereof shall be allocated to the Members in proportion to such excess for each Member;

(b)    Any remaining Profit, up to the excess, if any, of the aggregate Loss allocated pursuant to Section 6.2(d) for any prior Fiscal Year from and after the date hereof over the aggregate Profit previously allocated pursuant to this Section 6.1(b) from and after the date hereof shall be allocated to Essex LLC (and its permitted transferees) in proportion to such excess for each such Member;

(c)    Any remaining Profit up to the excess, if any, of the aggregate Loss allocated pursuant to Section 6.2(c) for any prior Fiscal Year from and after the date hereof over the aggregate Profit previously allocated pursuant to this Section 6.1(c) from and after the date hereof shall be allocated to the Members in proportion to such excess for each Member;

(d)    Any remaining Profit up to the excess, if any, of the aggregate Preferred Return of the Members from and after the date hereof over the aggregate Profit previously allocated pursuant to this Section 6.1(d) from and after the date hereof (to the extent not previously offset by Section 6.2(b) from and after the date hereof) shall be allocated to the Members in proportion to such excess for each Member; and

(e)    Any remaining Profit shall be allocated to the Members in proportion to their respective Percentages.

6.2    Allocation of Loss.  From and after the date hereof, Loss for each Fiscal Year shall be allocated to the Members in accordance with the following order of priority:

(a)    Loss up to the excess, if any, of the aggregate Profit allocated pursuant to Section 6.1(e) for any prior Fiscal Year from and after the date hereof over the sum of the aggregate Loss previously allocated pursuant to this Section 6.2(a) from and after the date hereof and the aggregate amount previously distributed pursuant to Section 6.5.2(b), 6.5.3(c), or Section 6.5.1 with respect to Profit allocable pursuant to Section 6.1(d) from and after the date hereof, shall be allocated to the Members in proportion to such excess for each Member;

(b)    Any remaining Loss up to the excess, if any, of the aggregate Profit allocated pursuant to Section 6.1(d) for any prior Fiscal Year from and after the date hereof over the sum of the aggregate Loss previously allocated pursuant to this Section 6.2(b) and the

14

aggregate amount previously distributed pursuant to Section 6.5.2(a), 6.5.3(b), or Section 6.5.1 with respect to Profit allocable pursuant to Section 6.1(d) from and after the date hereof, shall be allocated to the Members in proportion to such excess for each Member;

(c)    Any remaining Loss shall be allocated to the Members having positive Adjusted Capital Account balances in proportion to their respective Percentages until the Adjusted Capital Account balance of Blumenfeld LLC (and its permitted transferees) is reduced to zero;

(d)    Any remaining Loss shall be allocated to Essex LLC (and its permitted transferees) until the Adjusted Capital Account balance of Essex LLC (and its permitted transferees) is reduced to zero; and

(e)    Any remaining Loss shall be allocated to the Members in proportion to their respective Percentages.

### 6.3    Special Allocations.

6.3.1    <u>Minimum Gain Chargeback</u>.   In the event there is a net decrease in the Company Minimum Gain during any Fiscal Year, the minimum gain chargeback provisions described in Treasury Regulations § 1.704-2(f) and (g) shall apply.

6.3.2    <u>Member Minimum Gain Chargeback</u>.   In the event there is a net decrease in Member Minimum Gain during any Fiscal Year, the partner minimum gain chargeback provisions described in Treasury Regulations § 1.704-2(i) shall apply.

6.3.3    <u>Qualified Income Offset</u>.   In the event a Member unexpectedly receives an adjustment, allocation or Distribution described in Treasury Regulations § 1.704-1(b)(2)(ii)*(d)(4), (5)* or *(6)*, which adjustment, allocation or distribution creates or increases a deficit balance in that Member's Adjusted Capital Account, the "qualified income offset" provisions described in Treasury Regulations § 1.704-1(b)(2)(ii)*(d)* shall apply.

6.3.4    <u>Nonrecourse Deductions</u>.   Nonrecourse Deductions shall be allocated to the Members in proportion to their respective Percentages.

6.3.5    <u>Member Nonrecourse Deductions</u>.   Member Nonrecourse Deductions shall be allocated to the Members as required by Treasury Regulations § 1.704-2(i)(1).

6.3.6    <u>Intention</u>.   The special allocations in Section 6.3 are intended to comply with certain requirements of the Treasury Regulations and shall be interpreted consistently therewith.  It is the intent of the Members that any special allocation pursuant to Section 6.3 shall be offset with other special allocations pursuant to Section 6.3.  Accordingly, special allocations of Company income, gain, loss or deduction shall be made in such manner that, in the reasonable determination of the Manager, taking into account likely future allocations under Section 6.3, after such allocations are made, each Member's Capital Account is, to the extent possible, equal to the Capital Account it would have been were Section 6.3 not part of this Agreement.

G:\Legal\Entities\BDG Yaphank, LLC\Operating Agreement\A&R Operating Agreement.5.doc

6.4    Tax Allocation Matters.

6.4.1    Contributed or Revalued Property.  Each Member's allocable share of the taxable income or loss of the Company, depreciation, depletion, amortization and gain or loss with respect to any contributed property, or with respect to Company property that is revalued pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(f) and (g) or the second sentence of the definition of Capital Account, shall be determined in the manner (and as to revaluations, in the same manner as) provided in Section 704(c) of the Code. The allocation shall take into account, to the full extent required or permitted by the Code, the difference between the adjusted basis of the property to the Member contributing (or deemed to be contributing) it and the Fair Market Value of the property at the time of its contribution or revaluation, as the case may be, as determined by the Manager. The Company shall apply Section 704(c)(1)(A) by using the "traditional method" as set forth in Treasury Regulations § 1.704-3(b).

6.4.2    Member Recourse Deductions.  Member Recourse Deductions for any Fiscal Year shall be allocated to the Members in proportion to their respective economic risk of loss under Treasury Regulations § 1.752-2 with respect to the underlying Company liability.  To the extent that a Member is allocated a deduction pursuant to this Section 6.4.2 in a Fiscal Year, such Member shall be allocated Company income and gain (other than amounts required to be specially allocated pursuant to other provisions hereof) in the next Fiscal Year (and, if necessary, for subsequent Fiscal Years) until such allocation is reversed.

6.4.3    Recapture Items.  In the event that the Company has taxable income in any Fiscal Year that is characterized as ordinary income under the recapture provisions of the Code, each Member's distributive share of taxable gain or loss from the sale of Company assets (to the extent possible) shall include a proportionate share of this recapture income equal to that Member's share of prior cumulative depreciation deductions with respect to the assets which gave rise to the recapture income.

6.4.4    Imputed Interest.  If the Company is required to recognize any interest income pursuant to Section 483 or Sections 1271 through 1288 of the Code in connection with any Member's obligation to make a Capital Contribution, such interest income shall be specially allocated to such Member and the amount of such interest income shall be excluded from the Capital Contributions credited to such Member's Capital Account in connection with the payment of such obligation.

6.4.5    Profits Interests Received for Services.

(a)    In connection with the grant of a Profits Interest to a Person in connection with the performance of services to or for the benefit of the Company (including the additional Percentage to Blumenfeld LLC over its pro rata share of the Capital Contributions), except as otherwise required by applicable law:

(1) The Person shall be treated as receiving the Profits Interest on the date of grant;

(2) The Person shall take into account the distributive share of Company income, gain, loss, deduction and credit associated with such Profits Interest for the

16

entire period during which the Person has such Profits Interest (without regard to any vesting schedule that may apply to such Interest); and

(3)     Upon the grant of the Profits Interest, neither the Company nor any Member may deduct any amount (as wages, compensation or otherwise) for the fair market value of such Profits Interest.

(b)     If Treasury Regulations or other rules similar to Proposed Treasury Regulations § 1.83-3(l)(1)(ii) or the safe harbor set forth in the Revenue Procedure contained in Notice 2005-43 are promulgated, with respect to each grant of a Profits Interest for services:

(1)     The Company is authorized and directed to elect the safe harbor under which the fair market value of the Profits Interest is treated as being equal to its liquidation value; and

(2)     The Company and each Member (including the Person to whom the Profits Interest is granted) agrees to comply with all requirements of the safe harbor with respect to all Profits Interest granted in connection with the performance of services.

(c)     The Manager may amend this Agreement to the extent the Manager determines is reasonable necessary to comply with the aforementioned regulations as they may be finalized or amended, including provisions relating to the use of liquidation values to value a Profits Interest and provisions relating to forfeiture allocations.

6.4.6   Intent of Allocations.  The Members intend that the allocation provisions of this Agreement will produce a final Capital Account balance immediately prior to the Distributions in liquidation of the Company (after giving effect to all contributions, allocations, distributions (other than in liquidation) and other Capital Account adjustments for all Fiscal Years, including the Fiscal Year in which the liquidation occurs) for each Member that will be equal to the amount such Member will receive upon the dissolution and liquidation of the Company.  If such allocations would fail to produce such final Capital Account balances, the Manager may, in its sole discretion, require Profit, Loss, special allocations or items thereof to be allocated among the Members so as, in the determination of the Manager, to achieve such result to the extent possible.

6.4.7   Consistent Treatment.  All items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members for federal income tax purposes in a manner consistent with the allocation of the corresponding items under this ARTICLE VI. Each Member is aware of the income tax consequences of the allocations made by this ARTICLE VI and hereby agrees to be bound by the provisions of this ARTICLE VI in reporting its share of Company income, gain, loss, deduction and credit for income tax purposes.  No Member shall report on its tax return any transaction by the Company, any amount allocated or distributed from the Company or contributed to the Company inconsistently with the treatment reported (or to be reported) by the Company on its tax return nor take a position for tax purposes that is inconsistent with the position taken by the Company.

6.5    Distributions.

6.5.1    Tax Distributions.  As soon as practicable following the end of each Fiscal Year, the Company shall distribute cash, to the extent there is Distributable Cash or Distributable Cash from a Capital Transaction, to the Members in an amount equal to the excess, if any, of the Cumulative Tax with respect to such Fiscal Year over the aggregate amounts previously distributed pursuant to this Section 6.5.1.  Such amounts shall be distributed to the Members in proportion to such excess for each Member.  The Company may designate Distributions of Distributable Cash or Distributable Cash from a Capital Transaction during the Fiscal Year as advance distributions under this Section 6.5.1.  To the extent such advance distributions exceed the amount required to be distributed under this Section 6.5.1 with respect to the Fiscal Year, such excess shall be treated as a Distribution pursuant to Section 6.5.2 if the Manager so determines, or as a loan from the Company to the recipient Member.  If such loan is not repaid within thirty (30) days after notice from the Manager, the loan shall bear interest at a rate equal to the Interest Rate from the date of such notice to the date of repayment.  In addition to all other remedies the Company may have, the Company may withhold Distributions that would otherwise be payable to such Member and apply such amount toward repayment of the loan and interest.

6.5.2    Additional Distributions.    The Company shall make additional Distributions in cash to the extent there is Distributable Cash (after reduction for any distribution under Section 6.5.1) (other than Distributable Cash From a Capital Transaction), or in property, at such times and in such amounts as the Manager may determine.  Prior to the dissolution of the Company which shall be governed by ARTICLE VIII, any remaining Distributions shall be distributed to the Members in the following order of priority:

(a)    Distributions up to the excess, if any, of the aggregate Preferred Return of the Members over the aggregate amount previously distributed pursuant to this Section 6.5.2(a), Section 6.5.3(b) or Section 6.5.1 with respect to Profit allocable pursuant to Section 6.1(d) shall be distributed to the Members in proportion to such excess for each Member; and

(b)    Any remaining Distributions shall be distributed to the Members in proportion to their respective Percentages.

6.5.3    Distributions From a Capital Transaction.  Within thirty (30) days after a Capital Transaction, the Company shall distribute the Distributable Cash from the Capital Transaction to the Members in the following order of priority:

(a)    Distributions up to the aggregate Unreturned Capital Contribution of the Members shall be distributed to the Members in proportion to their respective Unreturned Capital Contributions;

(b)    Any remaining Distributions up to the excess, if any, of the aggregate Preferred Return of the Members over the aggregate amount previously distributed pursuant to Section 6.5.2(a), this Section 6.5.3(b) or Section 6.5.1 with respect to Profit allocable pursuant to Section 6.1(d) shall be distributed to the Members in proportion to such excess for each Member; and

18

(c)     Any remaining Distributions shall be distributed to the Members in proportion to their respective Percentages.

### 6.5.4   Limitations on Distributions.

(a)     Notwithstanding anything herein to the contrary, a Member may not receive a Distribution to the extent that, at the time of the Distribution, after giving effect to the Distribution, all liabilities of the Company (other than to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company) exceed the fair value of the assets of the Company (except that property that is subject to a liability for which the recourse of the creditors is limited to such property shall be included in the assets of the Company only to the extent the fair value of such property exceeds that liability).

(b)     Notwithstanding anything herein to the contrary, a Member may not receive a Distribution in the event such Distribution would cause or increase a deficit balance in the Member's Adjusted Capital Account.

### 6.5.5   Distributions of Nonrecourse Liabilities.

To the extent permitted by Treasury Regulation § 1.704-2(h)(3), the Manager shall endeavor to treat Distributions of Distributable Cash as having been made from the proceeds of a Nonrecourse Debt or a Member Nonrecourse Debt only to the extent that such Distribution would cause or increase a deficit balance in a Member's Adjusted Capital Account.

### 6.6    Additional Allocation Rules.

6.6.1   Allocation.   If there is a change in any Member's Percentage for any reason during any Fiscal Year, each item of income, gain, loss, deduction or credit of the Company for that Fiscal Year shall be assigned pro rata to each day in that Fiscal Year in the case of items allocated based on Percentages, and the amount of such item so assigned to any such day shall be allocated to the Member based upon that Member's Percentage at the close of that day.  Notwithstanding the foregoing, the net amount of gain or loss realized by the Company in connection with the sale or other disposition of property other than in the ordinary course of business shall be allocated solely to Members having a Percentage on the date of such sale or other disposition.

6.6.2   Distributions.  Except as otherwise provided herein, all Distributions shall be allocated among the Members in accordance with their respective Percentages on the date of the Distribution.

6.6.3   Percentage and Capital Account.  If any Interest is Transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Percentage and Capital Account of the transferor to the extent they are attributable to the Interest so Transferred.

6.6.4   Effect of Revaluation.  Notwithstanding anything herein to the contrary, following a Revaluation after the date hereof (a) no Profit or Loss shall be applied to offset any Loss or Profit for a period prior to the Revaluation, (b) no special allocation for a period following a Revaluation shall be applied to offset any special allocation for a period prior to the

19

Revaluation, (c) no Distribution following a Revaluation shall take into account any Preferred Return, Profit, Loss or special allocation for a period prior to the Revaluation, and (d) in each case, Profit, Loss, special allocations, Preferred Return, distributions and Capital Accounts shall be computed as if a new partnership was formed upon the Revaluation.

6.7    Order of Application.    To the extent that any allocation, Distribution or adjustment specified in this Agreement affects the results of any other allocation, Distribution or adjustment required herein, the allocations, Distributions and adjustments specified in the following Sections shall be made in the priority listed and in the order set forth therein:

(a)    Section 6.5;

(b)    Section 6.4;

(c)    Section 6.3;

(d)    Section 6.2;

(e)    Section 6.1; and

(f)    Section 9.4.

To the extent possible, these provisions shall be applied as if all Distributions and allocations were made at the end of the Company's Fiscal Year. Where any provision depends on the Capital Account of any Member, that Capital Account shall be determined after the operation of all preceding provisions for the Fiscal Year.

6.8    Allocation of Excess Nonrecourse Liabilities. "Excess nonrecourse liabilities" of the Company as used in Treasury Regulations § 1.752-3(a)(3) shall first be allocated among the Members pursuant to the "additional method" described in such section and then in accordance with the Members' respective Percentages.

6.9    Form of Distribution.    No Member has the right to demand or receive any Distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a Distribution of any asset in kind in lieu of a proportionate Distribution of money being made to other Member(s), and except with respect to a Distribution of an asset in kind pro rata to all of the Members with an Interest or upon a dissolution and the winding up of the Company, no Member may be compelled to accept a Distribution of any asset in kind. No Member may be compelled to assume any liability of the Company in connection with a Distribution, except its proportionate share in connection with the liquidation of the Company.

6.10    Amounts Withheld.    Any amounts withheld with respect to a Member pursuant to any federal, state, local or foreign tax law from a Distribution by the Company to the Member shall be treated as distributed to such Member pursuant to Section 6.5 or 9.4. Any other amount that the Manager determines is required to be paid by the Company to a taxing authority with respect to a Member pursuant to any federal, state, local or foreign tax law in connection with any payment to or tax liability (estimated or otherwise) of the Member shall be treated as a loan

20

from the Company to such Member. If such loan is not repaid within thirty (30) days from the date the Manager notifies such Member of such withholding, the loan shall bear interest at the Interest Rate from the date of the applicable notice to the date of repayment. In addition to all other remedies the Company may have, the Company may withhold Distributions that would otherwise be payable to such Member and apply such amount toward repayment of the loan and interest. Each Member shall fully cooperate with the efforts of the Company to determine and comply with its withholding and reporting obligations, and agrees to provide the Company with such information as the Manager may reasonably request in connection therewith.

## ARTICLE VII

### TRANSFER OF INTERESTS

7.1    Transfer of Interests. Except as otherwise expressly provided in this ARTICLE VII, no Member may Transfer all or any portion of its Interest. Any attempted Transfer in violation of this ARTICLE VII hereof shall be null and void *ab initio*, and shall not bind the Company. Unless the transferee is a Member or is admitted as a Member, a permitted Transfer shall only Transfer a right to allocations and Distributions hereunder.

7.2    Permitted Transfers. Subject to the provisions of Sections 7.3 through 7.7, the restrictions upon Transfer specified in Section 7.1 shall not apply to any Transfer by a Member, and the Member may Transfer all or a portion of its Interest, (a) to an Affiliate of such member, or (b) with the prior written consent of the Manager, which consent may be withheld, delayed or conditioned in its sole discretion, to any other Person; provided, however, that such permitted transferee (other than a Person who is already a Member) agrees in writing to become a party to this Agreement and to be subject to the terms and conditions hereof.

7.3    Further Restrictions on Transfers. Notwithstanding anything herein to the contrary, in addition to any other restrictions on a Transfer of an Interest, no Interest may be Transferred (a) without compliance with the Securities Act and any other applicable securities or "blue sky" laws, (b) if, in the determination of the Manager, the Transfer could result in the Company not being classified as a partnership for federal income tax purposes, (c) if, in the determination of the Manager, the Transfer could cause the Company to become subject to the Investment Company Act of 1940, (d) if, in the determination of the Manager, the Transfer results in the termination of the Company under Section 708 of the Code and such termination has a material adverse effect on the Company or the Members, or (e) the transferee is a minor or incompetent.

7.4    Admission of Transferee as a Member. Upon a Transfer of an Interest to a permitted transferee pursuant to Section 7.2, the permitted transferee shall be admitted as a Member. Except as provided in the preceding sentence, no transferee of an Interest who is not already a Member shall become a Member without the prior written consent of the Manager, which consent may be withheld, delayed or conditioned in its sole discretion, and the transferee pays to the Company a transfer fee in cash which is sufficient, in the Manager's sole determination, to cover all expenses incurred by the Company in connection with the Transfer and admission of the transferee as a Member.

7.5   Right of First Refusal.

7.5.1   Offer to Sell. Except in the case of a sale to an Affiliate, a Member may Transfer all or a portion of its Interest only by means of a sale solely for cash and only after complying with this Section 7.5. If a Member (the "Seller") receives and is willing to accept a *bona fide* written offer (the "Offer") from an unrelated third party to sell all or a portion of the Seller's Interest (the "Offered Interest") for cash, the Seller shall give the Company and the other Members (the "Other Members") at least forty-five (45) days' prior written notice of its intention to sell the Offered Interest (the "Notice"). The Notice shall contain an offer to sell all (but not less than all) of the Offered Interest to the Company and the Other Members upon the same terms and conditions as the Offer. The Notice shall also set forth the name and address of the proposed transferee, the amount of the Offered Interest, the consideration and the terms of payment proposed in the Offer, and shall be accompanied by a copy of the Offer.

7.5.2   Acceptance. The Company shall have thirty (30) days after the date of the Notice within which to accept the offer to purchase any or all of the Offered Interest by notice to the Seller. If the Company does not accept the Offer with respect to all of the Offered Interest, the Other Members shall have fifteen (15) days after the expiration of the thirty (30) day period within which to accept the Offer to purchase all (but not less than all) of the Offered Interest for which the Offer was not accepted by the Company. Such acceptances shall be made by notice to the Seller. The Company shall also notify the Other Members as to the amount, if any, of the Offered Interest for which the Company accepts the Offer, and the amount, if any, that is available to the Other Members. Any acceptance by the Other Members under this Section 7.5.2 shall be in proportion to their respective Percentages, or in such other proportion as the Other Members may agree.

7.5.3   Closing. The closing of a sale of the Offered Interest pursuant to Section 7.5.1 and 7.5.2 shall take place at the principal office of the Company at 10:00 a.m. local time on the (10th) day after the rights to purchase all of the Offered Interest are exercised, or at such other place, date and time as the Seller and the buyers may agree. At the closing, each buyer shall pay to the Seller the purchase price, in cash, for the portion of the Offered Interest being purchased by such buyer. The Seller shall execute and deliver to the buyers such documents as the buyers may reasonably request to effect the transfer. In addition, the Seller shall release the Company and each Other Member, and the Company and the Other Members shall release the Seller, from any claim arising out of or pursuant to this Agreement.

7.5.4   Limited Sale. In the event the Company and the Other Members do not elect to purchase all of the Offered Interest within such forty-five (45) day period, the Seller shall be free to sell all (but not less than all) of the Offered Interest, but only upon terms none of which is more favorable to the purchaser than originally set forth, and only to the purchaser set forth, in the Notice, provided such sale is consummated within ninety (90) days after the date of the Notice. Prior to the closing, the Seller shall furnish to the Company and the Other Members such evidence as the Company may reasonably request to show the conditions of the prior sentence are met. Absent such proof, the Company shall not be required to recognize the sale. In the event of a sale pursuant to this Section 7.5.4, this Agreement shall be appropriately adjusted by the Manager. If the sale is not consummated within such ninety (90) day period, any

22

of the terms is more favorable to the purchaser or the purchaser changes, the Offered Interest shall again become subject to the restrictions and procedures set forth herein.

       7.6    <u>Enforcement</u>.  The restrictions on Transfer contained in this Agreement are an essential element in the ownership of an Interest.  Upon application to any court of competent jurisdiction, a Member shall be entitled to a decree against any Person violating or about to violate such restrictions, requiring their specific performance, including those requiring or prohibiting a Transfer of all or a portion of its Interest.

ARTICLE VIII

ACCOUNTING, RECORDS AND REPORTING

    8.1    <u>Books and Records</u>.

       8.1.1    <u>Maintenance and Access</u>.  The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the Company's method of accounting, consistently applied.  The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.  The Company shall maintain all of the following at its principal office, with copies available at all times during normal business hours for inspection and copying upon reasonable notice by any Member or its authorized representatives for any purpose reasonably related to the Interest of that Member:

       (a)    a current list of the full name set forth in alphabetical order and last known mailing address of each Manager;

       (b)    a current list of the full name set forth in alphabetical order and last known mailing address of each Member, together with its Capital Contribution and share of Profits and Losses;

       (c)    a copy of the Articles and all amendments thereto and restatements thereof, together with executed copies of any powers of attorney pursuant to which any certificate or amendment has been executed;

       (d)    a copy of this Agreement, any amendment hereto and any amended and restated Agreement, and

       (e)    a copy of the Company's federal, state and local income tax or information returns and reports, if any, for the three most recent Fiscal Years.

       8.1.2    <u>Confidential Information</u>. Notwithstanding Section 8.1.1, the Company may keep confidential from a Member any information which (a) the Manager reasonably believes to be in the nature of trade secrets, or other information the disclosure of which the Manager in good faith believes is not in the best interest of the Company or could damage the

23

Company or its business, or (b) which the Company is required by law or agreement with a third party to keep confidential.

### 8.2    Reports.

8.2.1    Financial Reports.    Within ninety (90) days after the end of each Fiscal Year, the Company shall distribute to each Member an income statement of the Company for such Fiscal Year and a balance sheet of the Company as of the end of such Fiscal Year. Each such financial statement shall be unaudited and shall be prepared in accordance with the Company's method of accounting, consistently applied (except that neither footnotes nor post-closing adjustments shall be required).

8.2.2    Tax Reports.    The Company shall cause to be prepared and duly and timely filed, at the Company's expense, all tax returns required to be filed by the Company, as determined by the Manager. Within ninety (90) days after the end of each Fiscal Year, the Company shall send to each Member such information relating to the Company as the Manager determines is necessary for the Member to complete its federal, state and local income tax returns that include such Fiscal Year.

### 8.3    Accounts; Invested Funds.

All funds of the Company shall be deposited in such account or accounts of the Company as may be determined by the Manager and shall not be commingled with the funds of any other Person. All withdrawals therefrom shall be made upon checks signed by such Persons and in such manner as the Manager may determine. Temporary surplus funds of the Company may be invested in commercial paper, time deposits, short-term government obligations or other investments determined by the Manager.

### 8.4    Tax Elections.

Except as otherwise expressly provided herein, the Company shall make such tax elections as the Manager may determine, in its sole discretion.

### 8.5    Tax Matters Partner.

8.5.1    Designation.    As long as it qualifies as tax matters partner under the Code, the Manager shall be the Tax Matters Partner. If there is no Tax Matters Partner, the Person meeting the requirements for a tax matters partner under Code Section 6231(a)(7) and designated by vote of Members owning a majority of the Percentages of the Members shall be the Tax Matters Partner. The Tax Matters Partner may resign in the same manner as the Manager pursuant to Section 5.2.3, which shall be applied by substituting "Tax Matters Partner" for "Manager".

8.5.2    Powers.    The Tax Matters Partner shall have all of the powers and authority of a tax matters partner under the Code. The Tax Matters Partner shall represent the Company at the Company's expense in connection with all administrative or judicial proceedings by the Internal Revenue Service or any taxing authority involving any tax return of the Company, and may expend the Company's funds for professional services and costs associated therewith. The Tax Matters Partner shall provide to the Members prompt notice of any communication to or from or agreements with a federal, state or local taxing authority regarding any tax return of the Company, including a summary of the provisions thereof.

8.6    <u>Confidentiality</u>.  All books, records, financial statements, tax returns, budgets, business plans and projections of the Company, all other information concerning the business, affairs and properties of the Company and all of the terms and provisions of this Agreement shall be held in confidence by each Member and Manager and their respective Affiliates, subject to any obligation to comply with (i) any applicable law, (ii) any rule or regulation of any legal authority or securities exchange, or (iii) any subpoena or other legal process to make information available to the Persons entitled thereto.  Such confidentiality shall be maintained until such time, if any, as any such confidential information either is, or becomes, published or a matter of public knowledge (other than as a result of a breach of this Section 8.6 by such Person or its Affiliate).

8.7    <u>Compliance with Anti-Money Laundering Laws</u>.  Notwithstanding anything herein to the contrary, the Manager on its own behalf and on behalf of the Company shall be authorized without the consent of any Person, including any Member, to take such action as it determines in its sole discretion to be necessary or advisable to comply with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures.

## ARTICLE IX

## DISSOLUTION AND WINDING UP

9.1    <u>Dissolution</u>.  The Company shall be dissolved, its assets disposed of and its affairs wound up upon the first to occur of the following:

(a)    a determination of the Manager to dissolve the Company;

(b)    the sale of all or substantially all of the assets of the Company; or

(c)    the entry of a judicial decree of dissolution of the Company pursuant to the Law.

9.2    <u>Date of Dissolution</u>.  Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until its assets have been liquidated and distributed as provided herein.  Notwithstanding a dissolution, prior to termination, the business and the rights and obligations of the Members, as such, shall continue to be governed by this Agreement.

9.3    <u>Winding Up</u>.  Upon the occurrence of any event specified in Section 9.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, satisfying the claims of its creditors, and distributing any remaining assets in cash or in kind, to the Members.  The Manager shall be responsible for overseeing the winding up and liquidation of the Company and shall cause the Company to sell or otherwise liquidate all of the Company's assets except to the extent the Manager determines to distribute any assets to the Members in kind, discharge or make reasonable provision for all of the liabilities of the Company and all costs relating to the dissolution, winding up, and liquidation and distribution of assets, establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such reserves shall be deemed to be an expense of the Company, and any

25

subsequent reduction in such reserves (other than on account of payment) shall be treated as income), and distribute the remaining assets to the Members, in the manner specified in Section 9.4. The Manager shall be allowed a reasonable time for the orderly liquidation of the Company's assets and discharge of its liabilities, so as to preserve and upon disposition maximize, to the extent possible, the value of such assets.

9.4    Liquidating Distributions.    The Company's assets, or the proceeds from the liquidation thereof, shall be applied in cash or in kind in the following order:

(a)    to creditors (including Members who are creditors (other than on account of their Capital Accounts)) to the extent otherwise permitted by applicable law in satisfaction of all liabilities and obligations of the Company, including expenses of the liquidation (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Members and former Members under Section 507 or 509 of the Law;

(b)    to the establishment of such reserves for contingent liabilities of the Company as are deemed reasonably necessary by the Manager (other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Members and former Members under Section 507 or 509 of the Law); provided, however, that such reserves shall be held for the purpose of disbursing such reserves for the payment of such contingent liabilities and, at the expiration of such period as the Manager may reasonably deem advisable, for the purpose of distributing the remaining balance in accordance with subparagraph (c) and (d) below;

(c)    to Members and former Members in satisfaction of any liabilities for distributions under Section 507 or 509 of the Law; and

(d)    to the Members in accordance with Section 6.5.3.

9.5    Distributions in Kind.    Any non-cash asset distributed to one or more Members (whether or not in liquidation) shall first be valued at its Fair Market Value as determined by the Manager to determine the Profit, Loss and special allocations that would have resulted if that asset had been sold for that value, which amounts shall be allocated pursuant to Article VI, and the Members' Capital Accounts shall be adjusted to reflect those allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in the distributed asset shall be the Fair Market Value of such interest as determined by the Manager (net of any liability secured by the asset that the Member assumes or takes subject to).

9.6    No Liability.    Notwithstanding anything herein to the contrary, upon a liquidation within the meaning of Treasury Regulations § 1.704-1(b)(2)(ii)(g), if any Member has a deficit Capital Account balance (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all Fiscal Years, including the Fiscal Year in which such liquidation occurs), neither that Member nor any Manager shall have any obligation to make any contribution to the capital of the Company, and the deficit balance of that Member's Capital Account shall not be considered a debt owed by that Member or any Manager to the Company or to any other Person for any purpose whatsoever.

9.7    Limitations on Payments Made in Dissolution.  Each Member shall be entitled to look only to the assets of the Company for the return of that Member's positive Capital Account balance and no Member, Manager or officer of the Company shall have any personal liability therefor.

9.8    Certificate of Cancellation.  Within ninety (90) days following the dissolution and commencement of winding up of the Company, the Company shall file Articles of Dissolution of the Company  with the New York Secretary of State.   The Company shall also file such withdrawals of qualification to do business and take such other actions in such jurisdictions as the Manager determines are necessary or appropriate to terminate the legal existence or qualification of the Company.

## ARTICLE X

## LIMITATION OF LIABILITY; STANDARD OF CARE; INDEMNIFICATION

10.1    Limitation of Liability.  The debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company.  No Member, Manager or officer of the Company shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or acting as a Manager or officer of the Company.  Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formality or requirement relating to the exercise of its powers or the management of its business and affairs shall not be grounds for imposing personal liability on any Member for any debt, obligation or liability of the Company.

10.2    Standard of Care.  No Member, Manager or member or manager of the Manager shall have any personal liability whatsoever to the Company, any Member, any Affiliate of the Company or any Affiliate of any Member on account of (a) such Person's status as a Member, Manager or member or manger of the Manager or any of the foregoing, (b) such Person's acts or omissions in connection with the conduct of the business of the Company, so long as such Person acts in good faith for a purpose which the Person reasonably believes to be in, or not opposed to, the best interests of the Company, or (c) any act or omission by an employee, independent contractor or agent of the Company, so long as the selection and retention of such employee, independent contractor or agent was within the scope of such Person's authority and such Person exercised reasonable care in selecting and retaining such employee, independent contractor or agent; provided, however, that nothing contained herein shall protect any such Person against any liability to which such Person would otherwise be subject if a judgment or other final adjudication adverse to such Person establishes (i) that its acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (ii) that such Person personally gained in fact a financial profit or other advantage to which such Person was not legally entitled.

10.3    Indemnification.  The Company shall indemnify and hold harmless, to the fullest extent permitted by applicable law, any Person made, or threatened to be made, a party to an action or proceeding, whether civil, criminal or investigative (a "proceeding"), including an action by or in the right of the Company, by reason of the fact that such Person was or is a Member (including in the capacity of the Tax Matters Partner), Manager or officer of the

27

Company or of any of the foregoing, from and against all judgments, fines, amounts paid in settlement and reasonable expenses (including investigation, accounting and attorneys' fees) incurred as a result of such proceeding, or any appeal therein  if (a) such Person acted in accordance with the standard of care prescribed in Section 10.2, and (b) in a criminal proceeding, in addition, such Person had no reasonable cause to believe that its conduct was unlawful; provided, however, that nothing contained herein shall permit any Person to be indemnified or held harmless if and to the extent the liability sought to be indemnified or held harmless against results from a judgment or other final adjudication adverse to such Person that establishes (i) that its acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (ii) that such Person personally gained in fact a financial profit or other advantage to which such Person was not legally entitled.  The termination of any such civil or criminal proceeding by judgment, settlement, conviction or upon a plea of *nolo contendere*, or its equivalent, shall not in itself create a presumption that any such Person did not act in good faith, for a purpose which he reasonably believed to be in, or not opposed to, the best interests of the Company, that he did not exercise reasonable care in selecting or retaining an employee, independent contractor or agent, that an act or omission involved actual fraud or willful misconduct, or that he had reasonable cause to believe that its conduct was unlawful.  The Company's indemnification obligations hereunder shall survive the termination of the Company.  Each indemnified Person shall have a claim against the net assets of the Company for payment of any indemnity amounts from time to time due hereunder, which amounts shall be paid or properly reserved for prior to the making of Distributions by the Company to the Members.

10.4    Contract Right; Expenses.    The right to indemnification conferred in this ARTICLE X shall be a contract right. The Company may advance the expenses incurred by the indemnified Person in defending any such proceeding in advance of its final disposition, provided such Person agrees to repay any amount that it is ultimately determined such Person is not entitled to receive under this ARTICLE X.

10.5    Indemnification of Employees and Agents.    In addition to the indemnification provided in Sections 10.3 and 10.4, the Company may, to the extent authorized from time to time by the Manager, grant rights to indemnification and to advancement of expenses to any employee, independent contractor or agent of the Company or to their officers, directors, shareholders, partners, members, managers, employees, independent contractors or agents, up to the extent provided to an indemnified Person pursuant to Sections 10.3 and 10.4.

10.6    Nonexclusive Right.    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this ARTICLE X shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute or agreement, or under any insurance policy obtained for the benefit of any indemnified Person.

10.7    Severability.    If any provision of this ARTICLE X is determined to be unenforceable in whole or in part, such provision shall nonetheless be enforced to the fullest extent permissible, it being the intent of this ARTICLE X to provide indemnification to all Persons eligible hereunder to the fullest extent permitted by applicable law.

28

10.8    Insurance.  In the discretion of the Manager, the Company may purchase and maintain insurance on behalf of an indemnified Person (and for each such indemnified Person who was a Manager, Member or officer of the Company for a reasonable period after ceasing to have such status) against any liability that may be asserted against that Person and incurred by that Person in any such capacity or arising out of that Person's connection with the Company.  In addition, in the discretion of the Manager, the Company may purchase and maintain insurance on behalf of any other Person who is or was an employee, independent contractor or agent of the Company, or their officers, directors, shareholders, partners, members, managers, employees, independent contractors or agents, whether or not the Company would be required to indemnify that Person against liability under the provisions of ARTICLE X or under applicable law.

## ARTICLE XI

## MEMBER REPRESENTATIONS

Each Member represents and warrants to the other Members and the Company as follows:

11.1    Authority.  The Member has the requisite power and authority to enter into this Agreement.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby do not violate any other agreement to which the Member is a party.  This Agreement constitutes a valid and binding agreement of the Member, enforceable against the Member in accordance with its terms, except that (a) such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws, whether now or hereafter in effect, relating to or limiting creditors' rights generally, and (b) enforcement of this Agreement may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

11.2    Preexisting Relationship or Experience.  By reason of the Member's business or financial experience, or by reason of the business or financial experience of the Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any Affiliate or selling agent of the Company, the Member is capable of evaluating the risks and merits of an investment in its Interest and of protecting the Member's own interests in connection with the investment.

11.3    Access to Information.  The Member has had an opportunity to review all documents, records and books pertaining to this investment and has been given the opportunity to consult with counsel of its choice with respect to all aspects of this investment and the Company's proposed business activities.  To the extent desired, such Member has met with representatives of the Manager and has been provided with such information as may have been requested and has at all times been given the opportunity to obtain additional information necessary to verify the accuracy of the information received and the opportunity to ask questions of and receive answers concerning the terms and conditions of the investment and the nature and prospects of the Company's business.

11.4    Economic Risk.  The Member is financially able to bear the economic risk of an investment in its Interest, including the total loss thereof.

11.5    Investment Intent.  The Member is acquiring its Interest for investment purposes and for the Member's own account only and not with a view to, or for sale in connection with, any distribution of all or any part of its Interest.  Except for the shareholders, partners or members of the Member, no other Person will have any direct or indirect beneficial interest in, or right to, its Interest.

11.6    Consultation with Attorney.  The Member has been advised to consult with its own attorney regarding all legal and tax matters concerning an investment in an Interest, has had adequate opportunity to do so, and has done so to the extent he considers necessary or advisable. The Member acknowledges and agrees that he has not received or relied on any legal or tax advice from the Company, the Manager, or their Affiliates.

11.7    Conflict.  The Member acknowledges and understands that the interests of each Member may be different with respect to this Agreement.  The Member waives any conflict of interest that may exist with respect to the preparation of this Agreement.

11.8    Interest is Restricted Security.  The Member acknowledges and understands that its Interest is a "restricted security" under the Securities Act in that the Interest will be acquired from the Company in a transaction not involving a public offering, that its Interest may be resold without registration under the Securities Act only in certain limited circumstances and that otherwise its Interest must be held indefinitely.  The Member further acknowledges and understands that this Agreement imposes further restrictions upon its ability to Transfer the Interest.

11.9    No Registration of Interest.  The Member acknowledges that its Interest has not been registered under the Securities Act or qualified under any state securities law in reliance, in part, upon its representations, warranties and agreements herein, and that the Company has no obligation to register or qualify, or maintain any registration or qualification of, its Interest.

11.10    Accredited Investor.  The Member is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D under the Securities Act.  If the Member is a corporation, partnership, limited liability company, trust or other entity, it was not organized for the specific purpose of acquiring its Interest.

11.11    No Advertising.  The Member has not seen, received or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or general solicitation with respect to the purchase of its Interest.

ARTICLE XII

MISCELLANEOUS

12.1    Amendments.  Except as otherwise provided herein, no amendment, supplement, modification or restatement (collectively, an "Amendment") to this Agreement shall be valid or effective unless in writing and authorized by Members owning a majority of the Percentages of the Members; provided, however, that except as otherwise provided herein, without the consent of a Member that is materially and adversely affected, no amendment shall make such Member personally liable for any obligation of the Company, change the allocation and distribution

30

provisions or change this Section 12.1. Notwithstanding the foregoing, the Manager may amend this Agreement without the consent of the Members (i) to reflect valid changes in the Members or their Interests, (ii) to reflect permitted changes in accordance with the terms of this Agreement, (iii) to clarify any ambiguity herein or to appropriately adjust any mechanics or procedures set forth herein so long as the rights of the Members are not materially and adversely prejudiced, or (iv) if the amendment is of an inconsequential nature as reasonably determined by the Manager and does not materially and adversely affect the rights of the Members. The effectiveness of an amendment to this Agreement shall not be negated by the fact that one or more Members have not signed such amendment, as long as the conditions to the effectiveness thereof as set forth in this Agreement are met.

12.2   Offset Privilege.   The Company may offset against any monetary obligation owing from the Company to any Member or Manager any monetary obligation then owing from that Member or Manager to the Company.

12.3   Notices.   Any notice or other communication (collectively, "notice") to be given to the Company, any Member or the Manager in connection with this Agreement shall be in writing and will be deemed to have been given and received (a) on the date delivered if by courier or other means of personal delivery, (b) on the date sent by telecopy with automatic confirmation by the transmitting machine showing the proper number of pages were transmitted without error, (c) on the next Business Day after being sent by a nationally recognized overnight mail service in time for and specifying next day or next Business Day delivery, or (d) on the fifth (5th) day after mailing by U.S. Postal Service certified or registered mail, in each case postage prepaid and with any other costs necessary for delivery paid by the sender. Any such notice must be given, if to the Company, to the Company at its principal place of business, and if to any Member or Manager, to such Member or Manager at the address specified for him on Schedule A. Any party or Manager may by notice pursuant to this Section 12.3 designate another address as the new address to which notice must be given.

12.4   Fees and Expenses.   Each party shall bear its own fees and expenses in connection with this transaction.

12.5   Waiver.   No course of dealing or omission or delay on the part of any party hereto in asserting or exercising any right hereunder shall constitute or operate as a waiver of any such right. No waiver of any provision hereof shall be effective, unless in writing and signed by or on behalf of the party granting the waiver. No waiver shall be deemed a continuing waiver or waiver in respect of any other or subsequent breach or default, unless expressly so stated in writing.

12.6   Governing Law.   This Agreement shall be governed by, construed, interpreted and enforced in accordance with the laws of the State of New York, without regard to choice or conflict of laws principles that would result in the application of the substantive laws of any other jurisdiction.

12.7   Arbitration.

12.7.1 <u>General</u>.  Except as otherwise expressly provided herein, in the event of any dispute, claim or controversy (collectively "<u>dispute</u>") among the parties arising out of or relating to this Agreement or the Articles, whether in contract, tort, equity or otherwise, and whether relating to the meaning, interpretation, effect, validity, performance or enforcement of this Agreement or the Articles, that cannot be resolved by the parties, such dispute shall be resolved by and through an arbitration proceeding conducted under the auspices of the American Arbitration Association (or any like organization successor thereto) (collectively, the "<u>AAA</u>") in New York, New York.  The arbitrability of a dispute shall likewise be determined by arbitration.

12.7.2 <u>Procedure</u>.  The arbitration proceeding shall be conducted under the commercial arbitration rules (formal and informal) of the AAA in as expedited a manner as is then permitted by such rules.  Both the foregoing agreement of the parties to arbitrate any and all such disputes, and the results, determinations, findings, judgments or awards rendered through any such arbitration shall be final and binding on the parties and may be specifically enforced by legal proceedings in any court of competent jurisdiction.

12.7.3 <u>Costs of Arbitration</u>.  The costs of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including each party's attorneys' fees and costs), shall be borne by the unsuccessful party or, at the discretion of the arbitrator, may be prorated between the parties in such proportion as the arbitrator determines to be equitable and shall be awarded as part of the arbitrator's award.

12.8   <u>Remedies</u>.  Notwithstanding the foregoing, in the event of any actual or prospective breach or default by any party, the other parties shall be entitled to equitable relief, including remedies in the nature of injunction and specific performance (without being required to post a bond or other security or to establish any actual damages).  In this regard, the parties acknowledge and agree that they will be irreparably damaged in the event this Agreement is not specifically enforced, since (among other things) the Interests are not readily marketable.  In addition, the parties hereby waive and renounce any defense to such equitable relief that an adequate remedy at law may exist.

12.9   <u>Jurisdiction</u>.  Each of the parties hereto hereby unconditionally and irrevocably (a) consents and submits to the exclusive jurisdiction of the Supreme Court of the State of New York and of the United States District Court for the Southern District of New York in connection with any suit, action or other proceeding arising pursuant to Section 12.7 or 12.8, including *in personam* and subject matter jurisdiction, (b) waives any objection to such jurisdiction or to venue in New York, New York, including on the grounds of the absence of *in personam* or subject matter jurisdiction or on the grounds that such venue is inconvenient, (c) agrees that service of any summons, complaint, notice or other process relating to such suit, action or other proceeding may be effected in the manner provided by clause (d) of Section 12.3, and (d) WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO SEEK A JURY TRIAL in any such action, suit or other proceeding.

12.10   <u>Severability</u>.  The provisions hereof are severable and in the event that any provision of this Agreement shall be determined to be illegal, invalid or unenforceable in any respect by a court of competent jurisdiction, the remaining provisions hereof shall not be affected, but shall, subject to the discretion of such court, remain in full force and effect, and any

32

illegal, invalid or unenforceable provision shall be deemed, without further action on the part of the parties hereto, amended and limited to the extent necessary to render such provision, as so amended and limited, legal, valid and enforceable, it being the intention of the parties that this Agreement and each provision hereof shall be legal, valid and enforceable to the fullest extent permitted by applicable law.

12.11   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

12.12   Further Assurances; Power of Attorney.   Each party hereto shall promptly execute, deliver, file or record such agreements, instruments, certificates and other documents and take such other actions as the Manager may reasonably request or as may otherwise be necessary or proper to carry out the terms and provisions of this Agreement and to consummate and perfect the transactions contemplated hereby.  Failure to comply with this Section 12.12 shall be considered a breach of a material provision.

12.13   Assignment.  Except as otherwise provided herein, this Agreement, and any right, interest or obligation hereunder, may not be assigned by any party hereto without the prior written consent of each other party hereto.  Any purported assignment without such consent shall be null and void *ab initio* and without effect.

12.14   Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns.

12.15   No Third Party Beneficiary.  This Agreement is not intended, and shall not be deemed, to create or confer any right or interest for the benefit of any Person not a party hereto.

12.16   Titles and Captions.  The titles and captions of the Articles and Sections of this Agreement are for convenience of reference only and do not in any way define or interpret the intent of the parties or modify or otherwise affect any of the provisions hereof and shall not have any affect on the construction or interpretation of this Agreement.

12.17   Construction.  This Agreement shall not be construed against any party by reason of such party having caused this Agreement to be drafted.

12.18   Usage.  References in this Agreement to "Articles," "Sections," "Schedules" shall be to the Articles, Sections, Schedules of this Agreement, unless otherwise specifically provided; all Schedules are incorporated herein by reference; any use in this Agreement of the singular or plural, or to the masculine, feminine or neuter gender, shall be deemed to include the others, unless the context otherwise requires; the words "herein," "hereof" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; the words "include," "includes" and "including" and words of similar import when used in this Agreement shall be deemed to be followed by the phrase "without limitation;" the words "or," "either" and "any" shall not be exclusive; any reference in this Agreement to a "day" (without explicit qualification as a Business Day) shall be interpreted as referring to a calendar day; if any action is required to be taken or notice is required to be given on or by a particular day, and such day is not a Business Day, then such

33

action or notice shall be considered timely if it is taken or given on or before the next Business Day; each of the words "property" and "assets" includes property and assets of any kind, whether real or personal, tangible or intangible; except as otherwise specified in this Agreement, all references in this Agreement to any agreement, document, certificate or other written instrument shall be a reference to such agreement, document, certificate or instrument, in each case together with all exhibits, schedules, attachments and appendices thereto, and as amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof; and except as otherwise specified in this Agreement, all references in this Agreement to any law, statute or regulation shall be references to such law, statute or regulation as the same may be supplemented, amended, consolidated, superseded or modified from time to time.

12.19   Entire Agreement.   This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous understandings and agreements relating thereto (written or oral), all of which are merged herein.

12.20   Waiver of Partition.   Each Member hereby waives and renounces any right that any Member may have to institute or maintain an action for partition with respect to any property of the Company.

12.21   Waiver of Dissolution Rights.   The Members acknowledge and agree that irreparable damages would occur if any Member should bring an action for judicial dissolution of the Company. Accordingly, each Member hereby waives and renounces any right such Member may have to seek a judicial dissolution of the Company or to seek the appointment by a court of a liquidator for the Company. Each Member further waives and renounces any alternative or additional rights which may otherwise provided to such Member by applicable law upon the withdrawal or resignation of such Member, and agrees that the terms and provisions of this Agreement shall govern such Member's rights and obligations upon the occurrence of any such event.

12.22   Representation.   Each of the parties acknowledges that this Agreement has been drafted on behalf of the Company by Loeb & Loeb LLP and that Loeb and Loeb LLP is counsel to Blumenfeld LLC. Each of the parties understand that their interests may be different with respect to this Agreement. Each of the parties acknowledges that such party has been fully, separately and individually apprised and advised by its own attorney of its legal rights and financial liabilities and responsibilities arising out of this Agreement and investigation with respect to all of the same. Each party hereto waives any conflict in connection with the preparation of this Agreement and any documents related hereto and acknowledges that it has had the opportunity to have this Agreement and such other documents reviewed by, and to consult with, its own separate counsel prior to executing same.

IN WITNESS WHEREOF, the Members have executed this Agreement, effective as of the date first written above.

**BDG FIVE TIMES, LLC**

By:  BDG Asset Management, Inc., its
General Manager

By: _____

Name:  Brad Blumenfeld
Title:   Vice President

**ESSEX REALTY DEVELOPMENT LLC**

By: _____

Name:  Peter Madoff
Title:   Sole Member

## SCHEDULE A

## NAMES, ADDRESSES, CAPITAL CONTRIBUTIONS, PERCENTAGES, AND CAPITAL PERCENTAGES OF THE MEMBERS AS OF DECEMBER 17, 2007

| Name, Address and Telecopy Number | Capital Contribution | Percentage | Capital Percentage |
|---|---|---|---|
| **BDG Five Times, LLC** c/o Blumenfeld Development Group, Ltd. 300 Robbins Lane Syosset, New York  11791 (516) 921-0053 | An undivided 10% interest in the assets of the Company as of the beginning of the date hereof, which the Members agree have a gross Fair Market Value of $1,529,029.50 subject to an undivided 10% of the liabilities of the Company as of the beginning of the date hereof, which the Members agree is $1,050,000, or a net Fair Market Value of $479,029.50, Cash in the amount of $264,970.50, and Services to the Company | 50% | 10% |
| **Essex Realty Development LLC** 34 Pheasant Run Old Westbury, New York  11568 (516) 626-3051 | An undivided 90% interest in the assets of the Company as of the date beginning of the date hereof, which the Members agree have a gross Fair Market Value of $13,761,265.50, subject to an undivided 90% of the liabilities of the Company as of the beginning of the date hereof, which the Members agree is $9,450,000, or a net Fair Market Value of $4,311,265.50, and Cash in the amount of $2,384,734.50. | 50% | 90% |
| Total | | 100% | 100% |

<u>Name and Address of the Manager</u>

**BDG Five Times, LLC**
c/o Blumenfeld Development
   Group, Ltd.
300 Robbins Lane
Syosset, New York  11791
(516) 921-0053

## DECLARATION OF SERVICE

State of New York, County of New York )ss:

Ramsey Hinkle an attorney admitted to practice in the courts of New York, hereby declares:

I am not a party to this action, am over 18 years of age and am an associate at the law office of Clayman & Rosenberg, LLP 305 Madison Avenue, New York, New York 10165.

On January 6, 2010, I served a true copy of the annexed OBJECTIONS TO TRUSTEES DETERMINATIONS by depositing the same with an overnight delivery service in a wrapper properly addressed, the address having been designated by the addressee for that purpose. Said delivery was made prior to the latest time designated by the overnight delivery service for overnight delivery. The address and delivery service are indicated below:

VIA FEDERAL EXPRESS
Irving H. Picard, Trustee
c/o Baker and Hostetler LLP
45 Rockefeller Plaza – 11th Floor
New York, New York 10111

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on:    January 6, 2010
New York, New York

_____
Ramsey Hinkle