# Exhibit B

# REDACTED

## CUSTOMER CLAIM

Claim Number _____

Date Received _____

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008

(Please print or type)

**Name of Customer:** Frank Pierce

**Mailing Address:** 196 East 75th Street.

**City:** New York        **State:** New York        **Zip:** 10021

**Account No.:** 1-G0371-3 and 1-G0371-4.   *(SEE ALSO EXH. A AND EXH. B, PAR. 13)*

**Taxpayer I.D. Number (Social Security No.):** ·8619

**NOTE:** BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY THE ACCOMPANYING INSTRUCTION SHEET. A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009. CLAIMS RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1. Claim for money balances as of **December 11, 2008**:

   a.  The Broker owes me a Credit (Cr.) Balance of        $ 0.00

   b.  I owe the Broker a Debit (Dr.) Balance of        $ 0.00

   c.  If you wish to repay the Debit Balance,
       please insert the amount you wish to repay and
       attach a check payable to "Irving H. Picard, Esq.,
       Trustee for Bernard L. Madoff Investment Securities LLC."
       If you wish to make a payment, **it must be enclosed**
       with this claim form.        $ 0.00

   d.  If balance is zero, insert "None."        None

2.    Claim for securities as of **December 11, 2008**:

**PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.**

|  |  | YES | NO |
|---|---|---|---|
| a. | The Broker owes me securities | ✓ | |
| b. | I owe the Broker securities | | ✓ |

c.    If yes to either, please list below:

| Date of Transaction (trade date) | Name of Security | The Broker Owes Me (Long) | I Owe the Broker (Short) |
|---|---|---|---|
| | | **Number of Shares or Face Amount of Bonds** | |
| See Exhibits A and B. | | | |
| $145,405 per October 2008 Greenwich Sentry Partners, L.P. | | | |
| statement attached hereto as Exhibit A Minus $2,500 redeemed | | | |
| 11/01/08 per redemption receipt dated 09/26/08 attached hereto as | | | |
| Exhibit A. TOTAL: $142,909 | | | |

**Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.**

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.
**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.**

**NOTE:**    IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT.    IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

|  |  | YES | NO |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. |  | ✓ |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? |  | ✓ |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? |  | ✓ |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) |  | ✓ |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. |  | ✓ |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. |  | ✓ |
| 9. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? if so, give name of that broker. |  | ✓ |

Please list the full name and address of anyone assisting you in the preparation of this claim form: Kristi Stahnke McGregor & Kent Bronson, Esqs., Milberg LLP, One Pennsylvania Plaza, New York, NY 10119                    .

S02180406                                    3

If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate your claim is an estimated claim.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date _6/10/09_          Signature _____

Date _____          Signature _____

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

**This customer claim form must be completed and mailed promptly, together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

502180406                          4

# **EXHIBIT A**

Citco Fund Services
(Europe) B.V.

# CONTRACT NOTE

Frank Pierce

196 East 75th Street
New York, NY 10021-3257
United States

| | | |
|---|---|---|
| Order No. | : | 001034416418 |
| Date | : | 09/26/2008 |
| Email | : | fepierce@taconic.net |
| Fax | : | |

Account : Frank E. Pierce, III

## Greenwich Sentry Partners, L.P.

In accordance with your instructions, we confirm your REDEMPTION in
Greenwich Sentry Partners, L.P. as below.

| | |
|---|---|
| Order Date | 09/26/2008 |
| Effective Date | 11/01/2008 |

| Total Redemption | USD | 2,500.00 |
|---|---|---|

Inquiries may be directed to the Sub-Administrator, Citco (Canada) Inc., by phone to 416-969-6700, by fax to 416-966-0925 or
by email to irtor@citco.com.

Citco Fund Services
(Europe) B.V.

# GREENWICH SENTRY PARTNERS, L.P.
### FOR THE CALENDAR MONTH OF OCTOBER 2008
### (EXPRESSED IN US DOLLARS & UNAUDITED)

Frank Pierce
196 East 75th Street
New York, NY 10021-3257
United States
E-Mail: fepierce@taconic.net

Capital Account Statement for :    Frank E. Pierce, III

|  | October | Year-to-Date |
|---|---|---|
| Beginning Equity | $ 145,259 | $ 143,114 |
| Capital Additions | - | |
| Capital Withdrawals | - | (5,500) |
| Profit/(Loss) * | 146 | 7,791 |
| Ending Equity | $ 145,405 | $ 145,405 |

* Net results reflect the deduction of all operational expenses (including brokerage commissions), management fees and potential profit allocation to the General Partner.

Inquiries may be directed to the Sub-Administrator, Citco (Canada) Inc., by phone to 416-969-6700, by fax to 416-966-0925 or by email to irtor@citco.com.

Telestone 8 - Teleport
Naritaweg 165
P.O. Box 7241
1007 JE Amsterdam
The Netherlands

amsterdam-fund@citco.com
www.citco.com

Phone: +31 (0)20 572 2850
Fax: +31 (0)20 572 2610
Chamber of Commerce: 33253773

## EXHIBIT B

1. The Claimant is not a direct customer of Bernard L. Madoff Investment Securities LLC ("BMIS"), but instead is an investor in Greenwich Sentry Partners, L.P., which is believed to be a BMIS customer with claims to securities and other assets of BMIS. The Claimant believes it has or may have in the future a claim in this liquidation proceeding and/or rights to all or a portion of the claims of Greenwich Sentry Partners, L.P.

2. This Claim Form, exhibits, and supporting documentation (collectively "Claim Form") is submitted pursuant to the December 23, 2008 Order of the Honorable Burton R. Lifland and the instructions disseminated by Irving H. Picard, Trustee for Bernard L. Madoff Investment Securities LLC ("Trustee"), on December 11, 2008.

3. The information provided in the Claim Form is based on information known by the Claimant as of the date of the submission of the Claim Form. The Claimant reserves the right to amend and/or supplement this Claim Form upon the receipt of further information, or upon request by the Trustee for additional information.

4. The Claimant reserves the right to amend the Claim Form in the event of any recoveries by the Trustee or any other party under the avoidance powers of the Bankruptcy Code or otherwise, or in the event of rejections of executory contracts pursuant to Bankruptcy Code Section 365, whether such amendments are made pursuant to Bankruptcy Code Sections 105, 502(g), or 502(h), Bankruptcy Rule 3002(c)(3), (4), other provisions of applicable bankruptcy law, or general principles of law or equity.

5. The Claimant hereby requests that the Claim Form be considered as a proof of claim in *In re Bernard L. Madoff Investment Securities LLC*, No. 08-01789 (Bankr. S.D.N.Y.).

6. This Claim Form is required to be submitted pursuant to the Court's January 2, 2009 Order and the Trustee's instructions to the Claimant. To the extent permitted by applicable law, the Claimant does not, by submitting the Claim Form, consent to the jurisdiction of the Bankruptcy Court nor does Claimant waive any right to trial by jury.

7. The Claimant reserves all rights, claims, and/or defenses as to and/or against any and all parties potentially liable for the losses sustained by the Claimant, including, without limitation, BMIS and its owners, partners, employees, and affiliates, as well as any potentially liable third parties including, without limitation, investment advisors, "feeder funds," accountants, and auditors.

Claimant: Frank Pierce (Account No. 1-G-0371)

8. The Claimant further reserves all rights, claims, and/or defenses as to and/or against any persons and/or creditors asserting claims against BMIS, its employees, owners, and/or affiliates, in bankruptcy or otherwise.

9. The Claimant reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever, notwithstanding the submission of any such information to the Trustee.

10. To the extent the Claimant has disclosed to the Trustee documents containing accounting and/or legal advice, the Claimant does not waive any potential privileges applicable thereto.

11. The Claimant reserves all rights with respect to submitting information to the Internal Revenue Service regarding gains, losses, and/or theft of assets.

12. The Claim Form and supporting documents contain confidential information. The Claimant submits this information to the Trustee subject to the condition that this information will not to be disclosed to any third parties, other than under seal to the Court, absent the Claimant's express consent or Court order.

13. Although Claimant has identified BMIS account numbers apparently in the name of Greenwich Sentry Partners, L.P., the Claimant does not know the total number of BMIS accounts owned by Greenwich Sentry Partners, L.P. or whether the Claimant has an ownership or other interest in any such accounts. Notwithstanding the foregoing, the Claimant reserves any and all rights, claims, and defenses as to any and all BMIS accounts owned by Greenwich Sentry Partners, L.P.

14. The Claimant submits herewith documents (Exhibit A) in support of the Claimant's claim, including documents containing information regarding account transactions, such as contributions and/or withdrawals. The Claimant reserves any arguments that such documents are not relevant to the Trustee's inquiry. The Claimant further reserves the right to supplement this submission, including the submission of additional documents, if deemed necessary. Below is a list of those documents submitted herewith:

**2008:**
- 09/26/08 Contract Note for a Total Redemption of $2,500.00 effective 11/01/08
- Greenwich Sentry Partners Capital Account Statement for October 2008 reflecting capital account balance of $145,405 (final statement)

2

Claimant: Frank Pierce (Account No. 1-G-0371)

# **EXHIBIT C**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------x

FRANK E. PIERCE and FRANK E. PIERCE IRA,

                   Plaintiffs,

     vs.

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH (BERMUDA) LTD., FAIRFIELD
GREENWICH ADVISORS LLC, GLOBEOP
FINANCIAL SERVICES LLC, CITCO FUND
SERVICES (EUROPE) BV, CITCO (CANADA)
INC., WALTER M. NOEL, JR., JEFFREY TUCKER,
ANDRES PIEDRAHITA, BRIAN FRANCOEUR,
AMIT VIJAYVERGIYA, and
PRICEWATERHOUSECOOPERS LLP,

                 Defendants,

     and

GREENWICH SENTRY PARTNERS, L.P.,

             Nominal Defendant.

---------------------------------------------------------x

INDEX No. 600498/2009
DATE PURCHASED: 2/17/2009

**LIMITED PARTNERS
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

## <u>LIMITED PARTNERS' DERIVATIVE COMPLAINT</u>

Plaintiffs, by their undersigned attorneys, for their complaint against defendants allege

the following upon information and belief, except as to information about themselves, which is

alleged upon personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, the

investigation conducted by Plaintiffs' counsel, including a review of Fairfield Greenwich

Group's publicly issued press releases, interviews with its former employees, the Confidential

Offering Memorandum for Greenwich Sentry Partners L.P and press articles.

## NATURE OF THE CASE

1.      This is a derivative action brought by Plaintiffs who are now and at all relevant

times have been Limited Partners of Greenwich Sentry Partners, L.P. ("Greenwich Sentry

Partners" or the "Fund"). This action has been brought in the name of and for the benefit of

Greenwich Sentry Partners and its Limited Partners (the "Limited Partners") against defendants

Fairfield Greenwich Group ("FGG"), Fairfield Greenwich (Bermuda) Ltd., Fairfield Greenwich

Advisors LLC, GlobeOp Financial Services LLC, Citco Fund Services (Europe) BV, Citco

(Canada) Inc., Walter M. Noel, Jr., Jeffrey Tucker, Andres Piedrahita, Brian Francoeur and Amit

Vijayvergiya ("the Fund Defendants") for breaches of their fiduciary duties owed to Greenwich

Sentry Partners and the Limited Partners and for aiding and abetting breaches of fiduciary duty.

This action is also brought against PricewaterhouseCoopers LLP ("PwC") for professional

negligence, breach of contract, and negligent misrepresentation in connection with purported

auditing services performed for Greenwich Sentry Partners.

2.      Greenwich Sentry Partners is a "feeder fund" which placed almost all of the

monies invested by its Limited Partners in the Fund with Bernard Madoff and his firm Bernard

L. Madoff Investment Securities, LLC ("BMIS"). On December 10, 2008, it was disclosed that

Madoff, acting through BMIS, had been running a Ponzi scheme so that assets and profits

reported to investors for years were in fact nonexistent, and the payment of such "profits" to

earlier investors were in fact being made from the capital of newer investors.

3.      On December 11, 2008, the FBI arrested Madoff for violating the federal

securities laws. Upon arrest, he told the agents that "there is no innocent explanation" for the

scheme and confessed that he "paid investors with money that wasn't there." On that same day,

the United States Attorney brought criminal charges against Madoff, alleging that he admitted to running a $50 billion Ponzi scheme. *United States v. Madoff*, No. 08-mj-2735 (S.D.N.Y. filed Dec. 11, 2008).

4.    On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BMIS. *SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

5.    Greenwich Sentry Partners had approximately $9 million in assets, all or almost all of it invested with Madoff and BMIS. FGG is an umbrella fund company intimately involved with many aspects of the Fund's operations, acting in multiple capacities, as both agent and principal of the Fund. FGG, like many of the entity defendants, was controlled by the same people who controlled the Fund. FGG, and its other related entities, marketed the Fund to investors and purported to conduct due diligence on behalf of the Fund. FGG posted on its website a letter dated January 8, 2009 to its investors, stating that as of November 1, 2008, FGG had total assets under management of approximately $14.1 billion, of which approximately $6.9 billion was invested in vehicles connected to BMIS. Plaintiffs believe that nearly all of Greenwich Sentry Partners' assets invested with BMIS have been lost.

6.    In documents issued in connection with its funds, FGG represented that it conducted "deeper and broader" due diligence and performed continued risk monitoring of its fund managers, which include Madoff and BMIS. This was untrue. The Madoff story bristled

- 3 -

with red flags that a financial professional performing due diligence in good faith could not have missed. Indeed, other investment advisors advised their clients not to invest with Madoff or BMIS after performing due diligence.

7.    The Fund Defendants were paid hefty management, incentive, and administrator fees, amounting to hundreds of millions of dollars over the years and at least tens of millions a year, for their expertise and professional experience in selecting and monitoring fund managers. While touting their "higher level" of due diligence over their competitors, the Fund Defendants, in fact, allowed Madoff and BMIS to go unchecked, while issuing false reports to investors presenting nonexistent, or, at the very least, highly inflated, profits, and collecting fees based on such fictitious profits.

8.    The Fund Defendants breached their fiduciary duties and aided and abetted the breach of fiduciary duties to the Fund and the Limited Partners by failing to conduct adequate due diligence, as they were required to do in their roles as fiduciaries, and further breached those duties by falsely touting their supposed due diligence, and collecting hundreds of millions of dollars in fees on fictitious assets and profits.

9.    The Fund's administrators and sub-administrator breached their fiduciary duties and aided and abetted the breach of fiduciary duties to the Fund and the Limited Partners by failing to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, and distribute accurate monthly reports to the Limited Partners, while collecting fees on inflated net asset value.

10.    PwC, as the Fund's independent auditor, failed to perform its audits of the Fund in accordance with generally accepted auditing standards ("GAAS") and issued false audit opinions. PwC had a heightened duty to go behind the mere numbers generated by the Fund's

- 4 -

single manager who held all of the Fund's assets, lacked transparency, was riddled with conflicts of interest, and miraculously was able to consistently generate positive results even in down markets.

## VENUE AND JURISDICTION

11.    Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims herein occurred in New York County and all of the defendants are subject to personal jurisdiction in New York County.

12.    This Court has jurisdiction over the defendants pursuant to CPLR §§ 301 and 302(a). Defendants either reside in or transact business within the State, have committed tortious acts within the State and/or have committed tortious acts outside the State that have caused injury to persons and property within the State. Also, Greenwich Sentry Partners, Fairfield Greenwich Group and Fairfield Greenwich Advisors LLC maintain their principal place of business within the State of New York, New York County.

## THE PARTIES

### Plaintiffs

13.    Plaintiffs Frank E. Pierce and Frank E. Pierce IRA ("Pierce and Pierce IRA" or "Plaintiffs") are Limited Partners of Greenwich Sentry Partners. Pierce and Pierce IRA became Limited Partners of Greenwich Sentry Partners when their interest in its predecessor fund, Greenwich Sentry, L.P., was redeemed and transferred to Greenwich Sentry Partners effective May 1, 2006. Pierce is a resident of New York.

14.    Pierce and Pierce IRA held their limited partnership interest in Greenwich Sentry Partners during the wrongdoing alleged herein and continue to hold such interest. Pierce and Pierce IRA are not general partners of Greenwich Sentry Partners. According to Pierce and Pierce IRA's October 2008 statements, the last month for which a Fund statement was received,

Pierce and Pierce IRA's capital account balances with Greenwich Sentry Partners were $145,405 and $104,452 respectively. Pierce redeemed $2,500 from the Fund effective November 1, 2008, after the October 2008 statement.

**The Fund Defendants**

15.    Nominal Defendant Greenwich Sentry Partners is a limited partnership organized and existing under the laws of the State of Delaware and registered to do business in New York, with its principal place of business at 55 East 52nd Street, 33rd Floor, New York City in New York County, New York.  Greenwich Sentry Partners was formed effective May 1, 2006 when Greenwich Sentry, L.P. converted from a 3(c)(1) fund to a 3(c)(7) fund under the Investment Company Act of 1940 in order to permit Greenwich Sentry, L.P. to have more than 100 beneficial owners.  Investors who met the criteria for a "qualified purchaser" retained their limited partnership interest in Greenwich Sentry, L.P., and investors who did not meet the criteria, were transferred to the newly created Greenwich Sentry Partners effective May 1, 2006. Those investors transferred to Greenwich Sentry Partners had their limited partnership interest in Greenwich Sentry, L.P. fully redeemed effective April 30, 2006 and placed in Greenwich Sentry Partners effective May 1, 2006.

16.    Defendant FGG, founded in 1983, is a limited liability company organized under the laws of Delaware and registered to do business in New York.  FGG has its principal place of business at 55 East 52nd Street, 33rd Floor, New York City, in New York County, New York. FGG describes itself as "a global family of companies" that offers a variety of single manager funds, multi-strategy funds and fund-of-funds to investors and had assets under management of over $14.16 billion as of November 1, 2008, of which approximately $6.9 billion was invested in vehicles connected to BMIS. FGG acted as both agent and principal of the Fund, and was controlled by defendants Noel, Tucker and Piedrahita, the same individuals that controlled the

- 6 -

Fund's General Partner. Defendants Noel and Tucker were the original general partners of

Greenwich Sentry, L.P., the predecessor to Greenwich Sentry Partners, from 1993 to 1998. The

Fund delegated due diligence to FGG and FGG marketed the Fund to investors.

17.    Defendant Fairfield Greenwich (Bermuda) Ltd. ("FG Bermuda" or "General

Partner") was organized as a corporation under the laws of Bermuda on June 13, 2003 and is an

affiliate of FGG listed as one of FGG's "[l]ocal operating entities" on FGG's website. FG

Bermuda is the Funds' General Partner, as well as the general partner of the Fund's predecessor,

Greenwich Sentry, L.P. FG Bermuda is a wholly-owned subsidiary of Fairfield Greenwich

Limited. Fairfield Greenwich Limited is also an affiliate of FGG and was the general partner of

the Fund's predecessor, Greenwich Sentry, L.P., prior to FG Bermuda. Defendants Noel, Tucker

and Piedrahita are the main principals of both FG Bermuda and Fairfield Greenwich Limited.

FG Bermuda is registered as an investment advisor under the Investment Advisers Act of 1940,

as amended.

18.    Defendant Fairfield Greenwich Advisors LLC ("FG Advisors") is a limited

liability company organized under the laws of Delaware and registered to do business in New

York. FG Advisors has its principal offices at 55 East 52nd Street, 33rd Floor, New York City,

in New York County, New York. FG Advisors is an affiliate of FGG and FG Bermuda, and

listed as one of FGG's "[l]ocal operating entities" on FGG's website. FG Advisors provides

Greenwich Sentry Partners with certain administrative services and back-office support.

19.    Defendant GlobeOp Financial Services LLC ("GlobeOp"), is a limited liability

company organized under the laws of Delaware and registered to do business in New York.

GlobeOp has its principal place of business at 450 Mamaroneck Ave., Harrison, Westchester

County, New York, and was the Fund's Administrator from its inception on May 1, 2006 to

- 7 -

August 31, 2006. GlobeOp describes itself as a leading independent financial technology

specialist providing automated, integrated middle- and back-office, administration and risk

reporting services to hedge funds and asset management firms.

20. Defendant Citco Fund Services (Europe) BV ("Citco Europe") is a limited

liability company formed under the laws of the Netherlands with its principle place of business

in Amsterdam, The Netherlands. Citco Europe has been the Fund's Administrator since

September 1, 2006.

21. Defendant Citco (Canada) Inc. ("Citco Canada") is a Canadian corporation with

its principal place of business in Ontario, Canada. Citco Canada, by delegation of Citco Europe,

acted as a sub-administrator of Greenwich Sentry Partners since September 1, 2006.

22. Citco Europe and Citco Canada are wholly owned subsidiaries of Citco Group, a

self-described global organization of financial services companies and pre-eminent hedge fund

administrators. Citco Europe, Citco Canada and Citco Group are referred to herein collectively

as "Citco." For funds of funds, according to its website, Citco offers "a complete outsourced

solution which combines fund administration, banking, financing, trade execution and custody,

using an on-line research-enabling trading platform, middle office services and centralized

dedicated pricing services and reporting."

23. As the Fund's Administrators, Citco Europe and GlobeOp were responsible

respectively for performing certain day-to-day administrative services for the Fund, including

preparing and distributing monthly reports containing the amount of the Fund's net assets, the

amount of any distributions from the Fund and incentive allocations, accounting and legal fees

and all other fees and expenses of the Partnership. The Administrator is also responsible for

maintaining the financial books and records, calculating the net asset value, handling shareholder

- 8 -

communications and supervising the payment of expenses by the Fund. The Fund paid the

Administrators a monthly service fee, in advance, based on the beginning net asset value, after

subscriptions and redemptions.

24.    Defendant Walter M. Noel, Jr. ("Noel") is a founding partner of FGG, and

according to FGG's own description, continues to oversee all of FGG's activities together with

defendants Tucker and Piedrahita. Noel is a member of the Board of Directors of FGG and

serves as a Director for many FGG funds and management company entities. Defendant Noel

was a general partner of the Fund's predecessor fund, Greenwich Sentry, L.P., together with

defendant Tucker from 1993 to 1998. Defendant Noel resides in New York and Connecticut.

25.    Defendant Jeffrey Tucker ("Tucker") is a founding partner of FGG and is a

member of the Board of Directors of FGG. According to FGG's own description, Tucker directs

FGG's business and operations activities and also serves as a Director for many FGG funds and

management company entities. Defendant Tucker was a general partner of the Fund's

predecessor fund, Greenwich Sentry, L.P., together with defendant Noel from 1993 to 1998.

Defendant Tucker resides in New York.

26.    Defendant Andres Piedrahita ("Piedrahita") is a founding partner of FGG.

Piedrahita is a member of the Executive Committee of FGG and serves as a Director for many

FGG funds and management company entities. He also serves as President and Director of the

Fund's General Partner, FG Bermuda. Defendant Piedrahita resides in Miami, Florida; London,

England; and Madrid, Spain.

27.    Defendant Brian Francoeur ("Francoeur") is a Director of FG Bermuda, the

General Partner of the Fund. Francoeur is the Managing Director of Citco Fund Services

(Bermuda) Limited, an affiliate of the Fund's administrator, Citco Europe. Francoeur qualified

- 9 -

as a chartered accountant in 1994 and was employed by Ernst & Young in Bermuda from 1995 to 1997.

28.    Defendant Amit Vijayvergiya ("Vijayvergiya") is Managing Director of FG Bermuda, the General Partner of the Fund, and, according to the Fund's Offering Memorandum, focuses on manager selection and risk management for the Fund. Vijayvergiya is a Chartered Financial Analyst and certified Financial Risk Manager.

29.    Defendants FGG, FG Bermuda, FG Advisors, GlobeOp, Citco Europe, Citco Canada, Noel, Tucker, Piedrahita, Francoeur and Vijayvergiya are referred to collectively herein as the "Fund Defendants."

**PricewaterhouseCoopers LLP**

30.    Defendant PwC is a limited liability partnership organized under the laws of the province of Ontario, Canada with its principal place of business in Ontario, Canada. PwC was the accountant and auditor of the Fund for 2006-2008.

31.    PwC is a member firm of PricewaterhouseCoopers International Limited ("PwC Int'l"). PwC Int'l and all of its member firms operate as a self-described network of inter-connected member firms providing auditing and accounting services across an international platform by which means they are globally operational. PwC Int'l and its member firms maintain centralized control over training, standards of care, marketing, and quality of accounting and auditing work throughout the world. PwC Int'l and its member firms hold themselves out as and operate as a unified business entity.

32.    PwC Int'l's member firms are engaged in the business of providing auditing, accounting and other investment and advisory services. As of December 2006, PwC Int'l touted its member firms publicly as serving "70 of the top 100 asset managers around the world."

33.    As is described further herein, PwC reported upon the financial statements and

results of operations of Greenwich Sentry Partners and issued unqualified reports thereon for the

years 2006-2007.

## SUBSTANTIVE ALLEGATIONS

34.    Throughout the 1990's and up until the present, FGG and the Fund Defendants

raised large sums of money from investors to invest with Madoff and BMIS. In exchange, FGG

and its affiliates earned millions of dollars in fees. *Bloomberg News* reported on December 15,

2008 that if not for the revelation of Madoff's fraud, FGG and its affiliates would have collected

about $135 million in fees in 2008 from its funds invested with BMIS.

35.    FGG operates several so-called "feeder funds" which invest directly with BMIS.

A feeder fund is a fund that takes investor money and gives it to another fund to manage and

invest. One such feeder fund is Greenwich Sentry Partners, which began operations on May 1,

2006 and had assets of approximately $9 million as of December 31, 2007.

36.    Greenwich Sentry Partners describes itself as "a private investment limited

partnership which seeks to obtain capital appreciation of its assets through utilization of a

nontraditional options trading strategy described as a 'split strike conversion.'" The Confidential

Offering Memorandum for the Fund dated May 2006 (the "Offering Memorandum") describes

the split-strike conversion strategy as follows:

> The establishment of a typical position entails (i) the purchase of a
> group or basket of equity securities that are intended to highly
> correlate to the S&P 100 Index, (ii) the purchase of out-of-the-
> money S&P 100 Index put options with a notional value that
> approximately equals the market value of the basket of equity
> securities, and (iii) the sale of out-of-the-money S&P 100 Index
> call options with a notional value that approximately equals the
> market value of the basket of equity securities. * * * The basket
> typically consists of between 35 to 50 stocks in the S&P 100
> Index.

- 11 -

The primary purpose of the long put options is to limit the market risk of the stock basket at the strike price of the long puts. The primary purpose of the short call options is to largely finance the cost of the put hedge and to increase the stand-still rate of return.

This position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

The degree of bullishness of the strategy can be expressed at implementation by the selection of the strike prices in the S&P 100 Index put and call options. The farther away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy.

37.    FGG and its affiliates touted as a selling point for the Fund, and its other funds, that it conducted "deeper and broader" pre-investment due diligence and post-investment "multifaceted risk monitoring" of its managers and fund assets than its competitors. FGG's website states that FGG "probe[s] deeply into all key elements of risk" and "employs a significantly higher level of due diligence work than typically performed by most fund of funds and consulting firms."

38.    According to FGG's website and a marketing brochure provided to potential investors and also available on its website, FGG's "deeper and broader" due diligence included: (1) Portfolio Evaluation, Investment Performance, and Financial Risks; (2) Structural and Operational Risks; (3) Legal, Compliance, and Regulatory Risk; and (4) Personal Background Investigations. Once a relationship with a fund manager is established the "due diligence process evolves into a similarly multi-faceted risk monitoring function." The FGG brochure goes on to say that "the purpose of this ongoing activity is to ensure that the fund continues to

- 12 -

follow its investment methodology - and constraints - and otherwise acts in accordance with the operational and risk framework that was approved during the due diligence phase."

39.     According to the Uniform Application For Investment Advisor Registration ("ADV") completed by the Fund's General Partner, FG Bermuda, and dated March 27, 2008, an affiliate of FG Bermuda, Fairfield Risk Services Ltd., serves as "FGG's Risk Management team," which includes FG Bermuda. Defendant Vijayvergiya manages FGG's Risk Management team. Fairfield Risk Services Ltd. is a wholly owned subsidiary of Fairfield Greenwich Limited, of which defendants Noel, Tucker and Piedrahita are the main principals, and shares office space with FG Bermuda.

*Portfolio Evaluation, Investment Performance, and Financial Risks*

40.     Under the first prong of FGG's due diligence and risk monitoring strategy, "Portfolio Evaluation, Investment Performance, and Financial Risks," FGG claimed to "seek to dissect a candidate manager's investment performance, how they generate alpha, and what risks are taken in doing so." FGG further claimed to "apply both qualitative and quantitative measures in this process," adding that "[p]articular focus is given to identifying and understanding various elements of the manager's investment process and strategy-specific financial risk." FGG also claimed to "attempt[] to understand the return attribution for individual securities in the portfolio, and conduct[] a full suite of VaR analysis and stress tests to model the loss distribution function under extreme market scenarios."

41.     However, had FGG and the other Fund Defendants actually applied the touted due diligence and risk-monitoring strategy to understand how Madoff and BMIS produced the results they claimed, they would have realized that those results were impossible. Madoff's split-strike conversion strategy might tend to reduce volatility, but it would not produce gains in a declining

- 13 -

stock market. Nevertheless, Madoff and BMIS reported small, steady gains each month,
including gains in sharply declining markets.

42.    Other investment advisors and financial publications had publicly stated that
BMIS's trading results could not be replicated based on the model Madoff was purportedly
using. The trading results reported by BMIS were not consistent with publicly traded funds that
followed the same trading strategy, all of which had much lower returns and greater volatility
than reported by BMIS.

43.    For example, Aksia, LLC, an independent hedge fund research and advisory firm,
identified as early as 2007, red flags which prompted Aksia to advise its clients against investing
with Madoff or any of his "feeder funds," such as Greenwich Sentry Partners. Aksia reported the
red flags it had found back in 2007, in a letter to its clients dated December 15, 2008 (the "Aksia
Letter"). One red flag reported in the Aksia Letter was that "[t]he Madoff feeder funds marketed
a purported 'Split-strike Conversion' strategy that is remarkably simple; however, its returns
could not be nearly replicated by our quant analyst."

44.    In May 2001, *Barron's* reported in the article *"Don't Ask, Don't Tell: Bernie
Madoff is so secretive, he even asks his investors to keep mum"* that certain option strategists for
major investment banks could not understand how BMIS and Madoff achieved the results that
they claimed from using the split strike conversion strategy. Madoff responded to *Barron's*
questions regarding how he achieved consistently high returns stating that "It's a proprietary
strategy. I can't go into great detail." When *Barron's* asked defendant Tucker about the returns
FGG had received he stated, "It's a private fund. And so our inclination has been not to discuss
its returns."

- 14 -

45.    Similarly, in May 2001, *MAR/Hedge* — a hedge fund newsletter — reported that the Fairfield Sentry Fund, a sister fund to Greenwich Sentry Partners, had "reported losses of no more than 55 basis points in just four of the past 139 consecutive months, while generating highly consistent gross returns of slightly more than 1.5% a month and net annual returns roughly in the range of 15%." *MAR/Hedge* reported that "expert skeptics ... express[ed] bewilderment and indicated they were ... grappling to understand how such results had been achieved for so long."

46.    One basic technique to test the validity of a trading strategy in the securities industry is to reverse engineer the trading strategy purportedly employed to see if alleged performance results can be replicated. According to a December 18, 2008 article in *The Wall Street Journal*, Harry Markopolos, who worked for a BMIS rival in Boston, was asked by his bosses in 2000 why he couldn't get the same results as BMIS. Markopolos tried to reconstruct Madoff's purported strategy, but was unable to achieve the same results. Markopolos concluded Madoff must be a fraud. Markopolos' bosses told him to check his math, given that Madoff was such a renowned trader. Markopolos enlisted the help of Daniel DiBartolomeo, a top financial mathematician in Boston. DiBartolomeo spent hours pouring through Markopolos' data and came to the same conclusion: the strategy Madoff said he used could not have achieved the results he reported. Despite claiming to employ quantitative measures in evaluating a manager's performance, had FGG and the Fund Defendants reverse engineered Madoff's trading strategy, they would have seen that the results were impossible.

47.    Indeed, several accounts confirm that the Fund Defendants did not understand Madoff's trading strategy. For example, according to a December 19, 2008 article in *The Wall Street Journal*, David Giampaolo, chief executive of Pi Capital, a money-management firm,

attended a meeting with defendant Piedrahita about 18 months earlier in London during which

defendant Piedrahita "stressed [at the meeting] the fund's years of steady and attractive

performance," but "the performance was thin on details about the investment strategy."

Piedrahita's answers, according to the news story, were "fluff." "When pressed to articulate how

the fund generated the performance [t]here was no deep scientific or intellectual response."

48.    According to another account reported in *The Wall Street Journal* on February 5,

2009, Neil Chelo, a portfolio manger at Benchmark Plus, upon being contacted by a marketing

person who suggested that he invest with FGG via another fund, questioned FGG representatives

about BMIS. In response to questions about how much money Madoff managed total, a FGG

risk manager said he wasn't sure. Chelo was surprised that the head of risk management

wouldn't even know this. FGG also could not provide an adequate explanation as to why

Madoff would hire FGG to bring money into BMIS rather than hiring his own team, in which

case Madoff could keep all the management fees himself. When asked why nobody could

duplicate Madoff's strategy, FGG representatives told Chelo, "people don't have [sic]

proprietary model to know when to enter" and exit from trades. When asked how dealers hedged

themselves, a FGG manager told Chelo he "had no answer and had never thought about it." In

the end, Chelo concluded FGG knew little about Madoff or BMIS. Indeed, generally, if

investors questioned Madoff's investment methodology, he would threaten them with removal

from the Madoff programs.

49.    Moreover, had the Fund Defendants evaluated the options positions Madoff

claimed to have open using the split-strike conversion strategy, they also would have seen that

the positions were in excess of the actual open interest in the entire S&P put and call market in

those securities. In addition, according to BMIS's ADV Report filed with the SEC, BMIS had

- 16 -

over $17 billion of assets under management in 23 accounts. The entry and exit of over $17

billion would have overwhelmed the S&P 100 put and call market. Indeed, Aksia caught this red

flag, stating in the Aksia Letter that "[i]t seemed implausible that the S&P100 options market

that Madoff purported to trade could handle the size of the combined feeder funds' assets which

we estimated to be $13 billion."

50.    Under the first prong of FGG's due diligence and risk monitoring strategy, FGG

also claimed that "[i]ndependent trading records are examined." As part of FGG's ongoing

oversight it claimed to review the individual securities in each portfolio and have discussions

with the fund manager personnel several times each month. FG Bermuda's ADV explains the

quantitative analyses performed and monthly risk meetings with fund managers as follows:

> FRS [Fairfield Risk Services Ltd.] primarily conducts both the pre-
> and post-investment quantitative analyses of hedge fund managers,
> monitors the market risk and provides the quantitative analyses
> supporting the asset allocation decisions across the firm's multi-
> strategy funds. The risk infrastructure at FRS supporting these
> activities incorporates a number of systems and tools — including
> internally developed systems, off the shelf vendor solutions, and
> some customized applications built to meet FGG's business needs.
> *An important component of the FGG product platform is the
> position level transparency that we receive from all single
> managers which are included in our multi-strategy funds. Position
> information is transmitted via secure channels to our systems.*
>
> FRS's core risk management engine utilizes the flexible ASP
> version of the RiskManager product from RiskMetrics. This
> system is populated by detailed position information and further
> supplemented by an extensive market and terms and conditions
> database. The FRS team regularly evaluates the market risk of its
> single and multi-strategy funds by producing strategy and fund
> specific risk reports. These reports are customizable to present risk
> measures and tests most appropriate to each portfolio's strategy.
> *The FRS team prepares a monthly suite of reports using
> RiskManager that are carefully reviewed and discussed by FGG's
> Investment Committee at a formal monthly risk meeting.* The
> reports organized along the following dimensions: Exposures,
> Sensitivities, Scenarios and Stress Tests, VaR, Correlations
> Analysis and Attribution Analysis. The review includes the full

> suite of VaR analytics (including marginal, incremental and
> relative VaR) and careful evaluation of the sensitivity of our
> managers to important risk factors (such as increasing or
> decreasing equity markets, volatilities, interest rate shocks/twists,
> FX movements and other factors).

(Emphasis added.)

51.    However, there were no independent trading records for Madoff and BMIS,
because Madoff self-cleared the Fund's trades through his own broker-dealer, BMIS. Moreover,
BMIS generated paper trade tickets despite claiming to have an automated order and execution
process for the strike-split conversion strategy and that Madoff's reputation was made as an early
and enthusiastic proponent of electronic trading. As stated in the Aksia Letter:

> Madoff's website claimed that the firm was technologically
> advanced ("the clearing and settlement process is rooted in
> advanced technology") and the feeder managers claimed 100%
> transparency. But when we asked to see the transparency during
> our onsite visits, we were shown paper tickets that were sent via
> U.S. mail daily to the managers. The managers had no
> demonstrated electronic access to their funds accounts at Madoff.
> Paper copies provide a hedge fund manager with the end of the day
> ability to manufacture trade tickets that confirm the investment
> results.

52.    Furthermore, BMIS refused outsiders, including the Fund Defendants and PwC,
access to its trading computer. The Fund Defendants were fully aware of the red flag Madoff's
lack of transparency caused, since, according to a December 19, 2008 article in *The Wall Street
Journal*, in 2007 FGG attempted to capitalize on its successes by selling a stake in the firm.
However, in conducting due diligence on FGG, "several" private-investment firms requested
access to BMIS's trading records and "were told that Mr. Madoff wouldn't allow prospective
investors to view his books."

53.    Had Defendants conducted due diligence and risk monitoring into the trades
reported by BMIS, they would have discovered that many of the individual trades reported by

Madoff would have shown that they could not have taken place as represented in that many were at reported prices higher than the price that the security in question traded at for the entire day the trade was claimed to have been executed.

54.    When Aksia tried to independently confirm the existence of Madoff feeder fund securities, it was unable to do so:

> There was at least $13 billion in all the feeder funds, but our standard 13F review showed scatterings of small positions in small (non-S&P100) equities. The explanation provided by the feeder fund managers was that the strategy is 100% cash at every quarter end.

Form 13(f) is the reporting form filed by institutional investment managers, pursuant to Section 13(f) of the Securities Exchange Act of 1934, reporting the securities holdings of institutional investors.

55.    It is now apparent that the positions in securities represented by BMIS to its customers, including Greenwich Sentry Partners, simply did not exist. The Financial Industry Regulatory Authority ("FINRA") has suggested that there is no record of trades through the Madoff Firm for the fund accounts: "Our exams showed no evidence of trading on behalf of the investment advisor, no evidence of any customer statements being generated by the broker-dealer," said Herb Perone, spokesman for FINRA.

*Structural and Operational Risks*

56.    FGG's website and marketing brochure explain that **"Operational failures, including misrepresentation of valuations and outright fraud, constitute the vast majority of instances where massive investor losses occur."** (Emphasis in original.) Operational risk, according to FGG, "refers to the risk of loss resulting from inadequate or failed internal processes, human resources, or systems or from external events." FGG's website and brochure go on to explain:

- 19 -

> FGG seeks a sound understanding of whether a hedge fund
> possesses key controls in the areas of portfolio management,
> *conflicts of interest, segregation of duties,* and compliance. FGG
> carefully assess the controls and procedures that managers have in
> place and seek to determine actual compliance with those
> procedures, often suggesting modifications, *separations of*
> *responsibilities*, and remedial staff additions.

(Emphasis added.)

57.     In detailing the procedures FGG performs to monitor operational risk, FGG's

website describes reviewing not only audited financials but also the auditor's management letter

comments. It further describes reviewing accounting controls and broker reconciliations in an

effort to ensure the existence of the securities. Some of the procedures FGG details include the

following:

> - Review audited financials and auditor's management letter
> comments; look for affiliated party loans and pledged assets or
> collateralized loans
>
> - Review accounting controls: from trade execution; to trade
> capture; to trade reconciliation with the Street, administrator, and
> fund; to funds books and records
>
> * * *
>
> - Review broker reconciliations to ensure completeness and
> existence of all securities
>
> - Infrastructure Adequacy Evaluation and disaster recovery plans

58.     The Fund Defendants could not have conducted the structural and operational due

diligence and risk monitoring described on FGG's website and in FGG's marketing brochure,

because, if they had, they would have observed blatantly inadequate controls, conflicts of

interest, and lack of separation of duties at BMIS. They would also have had cause to question

the existence of securities transactions allegedly made by BMIS on behalf of the Fund, because a

comparison of transactions reported by BMIS against publicly available trade data for the

securities, which were all publicly traded, would have shown that the transactions could not have

been executed on the dates and/or prices reported by BMIS.

59.     As mentioned above, Madoff failed to trade through an independent broker, and,

instead, self-cleared all Fund activities through his wholly-owned company, BMIS.  In well-

managed investment programs, in order to create an independent basis for confirming transaction

executions and compliance with program criteria, the fund manager processes the transactions

through an independent broker.  Madoff failed to follow this standard industry practice.  Indeed,

Andy Berg, CEO of Homrich & Berg Inc., one of Atlanta's largest independent investment

advisors, told *The Atlanta Business Chronicle* in a February 5, 2009 article that BMIS's failure to

use a third-party custodian firm was "a black flag" for them.  Berg advised a client who brought

an existing relationship with BMIS to him to sell its investments with BMIS immediately.  Aksia

also told its clients that BMIS's initiation and execution of trades, and custody of feeder fund

assets, "seemed to be a clear conflict of interest and a lack of segregation of duties is high on our

list of red flags."

60.     A further operational and structural red flag is that BMIS's entire internal audit

function, as well as its external independent auditor function, was being conducted by the three

person firm of Friehling & Horowitz ("F&H"), only one member of which appears to have been

a full time accountant.  As explained in the Aksia Letter:

> The feeder funds had recognized administrators and auditors but
> substantially all of the assets were custodied with Madoff
> Securities. This necessitated Aksia checking the auditor of Madoff
> Securities, Friehling & Horowitz (not a fictitious audit firm). After
> some investigating, we concluded that Friehling & Horowitz had
> three employees, of which one was 78 years old and living in
> Florida, one was a secretary, and one was an active 47 year old
> accountant (and the office in Rockland County, NY was only 13ft
> x 18ft large). This operation appeared small given the scale and
> scope of Madoff's activities.

61.     Under the regulations of the American Institute of Certified Public Accountants

("AICPA"), every accounting firm that does auditing work is required to enroll in the AICPA's

peer review program under which experienced auditors assess such firm's audit quality yearly.

While F&H was a member of the AICPA, it had not been subjected to a peer review since 1993

because F&H had represented to the AICPA, in writing, that it did not perform any audits.

Whether a firm has been subject to a peer review, and the results of that review, are on public file

at the AICPA.

62.     Also disturbing was the fact that BMIS was controlled by Madoff family

members. Close family relations within a business make it less likely that wrongdoing will be

exposed from within the entity, as it would require family members blowing the whistle on each

other. As explained in the Aksia Letter:

> Conversations with former employees indicated a high degree of
> secrecy surrounding the trading of these feeder fund accounts. Key
> Madoff family members (brother, daughter, two sons) seemed to
> control all the key positions at the firm. Aksia is consistently
> negative on firms where key and control positions are held by
> family members.

63.     The failure to use an independent third party broker to clear the Fund's trades,

reliance on a blatantly inadequate auditor, and the concentration of family control within BMIS

should have stopped FGG's investment of Fund assets with Madoff and BMIS in its tracks.

***Legal, Compliance, and Regulatory Risk***

64.     In connection with the third prong of FGG's due diligence and risk monitoring

strategy, "FGG's legal, compliance, and accounting teams specialize in investment management

regulation, securities compliance, corporate operations, and tax issues." According to FGG,

"[t]he role of this part of the diligence exam is to determine the seriousness of any deficiencies in

this area which may cause risk of sanction, loss, or reputational embarrassment."

- 22 -

65.    Had FGG and the other Fund Defendants conducted due diligence and risk monitoring of Madoff and BMIS they would have learned of numerous regulatory actions involving Madoff and/or BMIS:

a.    In 1992, the SEC investigated two accountants, Frank Avellino and Michael Bienes, who had illegally raised money in Florida for BMIS and Madoff promising guaranteed returns of 13.5% to 20%. These two accountants sold unregistered securities to unsophisticated investors raising $440 million. Through its investigation, the SEC discovered that Avellino and Bienes transferred their clients' funds to Madoff, who then purportedly invested the money. Yet, when investigators sought documents regarding those transactions, they discovered that Avellino and Bienes kept few if any records. According to an SEC complaint, Mr. Avellino began raising money for Madoff in 1962. Indeed, Avellino had been connected to Mr. Madoff for his entire career. After graduating from the City University of New York in 1958, Mr. Avellino began working as an accountant at a firm run by Saul Alpern, Mr. Madoff's father-in-law, where Mr. Madoff also once ran his operations. Bienes joined Avellino in raising funds for Madoff in 1965. The SEC charged Avellino and Bienes with operating an unregistered investment company and selling unregistered securities. These facts, including Madoff's involvement, were publicly reported in a December 16, 1992 *Wall Street Journal* article.

b.    In January 2006, the SEC began an investigation into Madoff and BMIS, finding that Madoff had personally "misled the examination staff about the nature of the strategy" used by the FGG funds and other hedge fund accounts, and also "withheld from the examination staff information about certain of these customers' accounts," according to SEC documents in connection with the investigation. The SEC also found that neither Madoff nor the

- 23 -

FGG funds disclosed to investors in the FGG funds that Madoff was the investment advisor. The SEC further found that Madoff had violated rules requiring investment advisors to register with the SEC, which makes them subject to inspections and examinations. FGG and the Fund Defendants were aware of the allegations against Madoff and the contents of the SEC investigation, since the SEC interviewed defendant Tucker and another FGG entity employee during its investigation and received documents from FGG entities. The SEC ultimately closed the investigation in 2008 after Madoff agreed to register his investment advisory business and FGG agreed to disclose information about Madoff to investors. Nonetheless, Madoff's multiple violations and purposeful misleading of SEC staff should have been a red flag to FGG and the Fund Defendants.

        c.     FINRA also reported five regulatory actions against BMIS, the first dating back to 1963: (1) In 1963, the National Association of Securities Dealers, Inc.("NASD") fined and censured BMIS for violation of NASD Rule 2230; (2) In 1975, the NASD again fined BMIS (the details of the violation are no longer available because of the age of the complaint); (3) In 2005, the NASD censured and fined BMIS for violation of SEC Rule 11AC1-4; (4) In 2007, the NASD censured and fined BMIS for violation of SEC Rule 604, NASD Rule 2110, and Interpretative Material 2110-2; and (5) In 2008, FINRA censured and fined BMIS for violation of NASD Ruled 8211 and 8213.

        66.     Had FGG and the other Fund Defendants conducted due diligence and risk monitoring of Madoff and BMIS, these numerous SEC, NASD and FINRA actions would have raised red flags warranting further investigation into whether a manager such as Madoff/BMIS that repeatedly acts in blatant disregard of regulations in place to protect investors should be managing the Fund's assets.

*Personal Background Investigation*

67.    The fourth and final prong of FGG's due diligence and risk monitoring strategy

involves an examination of "the abilities and personalities of the individuals involved in

managing the fund." The background check included, among other things, extensive interviews

and litigation and regulatory checks. However, as discussed above, since Madoff generally

refused to answer questions about how he achieved such high returns and the Fund Defendants

had an apparent lack of understanding of Madoff's business, it is clear that FGG and the Fund

Defendants did not conduct a substantive interview of Madoff. Moreover, a background check

of his litigation and regulatory background would have turned up the various regulatory

problems discussed above.

68.    Instead of conducting adequate due diligence and risk monitoring of Madoff and

BMIS, the Fund Defendants were content to tout Madoff's results and collect hefty fees in

exchange for handing the Fund's assets over to Madoff to manage. The Fund Defendants never

questioned, at least publicly, why Madoff would let feeder funds, such as those operated by or

through FGG, charge fees of 20% of profits, while BMIS simply charged a commission on trades

allegedly executed. According to a December 19, 2008 article in *The Wall Street Journal*, "[t]his

is an unusual arrangement that raised suspicions among rival money managers, some of whom

doubted that it could generate sufficient fee income."

69.    Indeed, numerous other investment professionals who advised investors about

potential investments with Madoff or BMIS warned clients not to invest with Madoff. As noted

above, in a letter issued to clients on December 15, 2008, Aksia, LLC, an independent hedge

fund research and advisory firm, discussed the red flags it had previously identified as early as

2007, which prompted Aksia to advise its clients against investing with Madoff or any of his

feeder funds, such as Greenwich Sentry Partners. Aksia explained that "[a]s a research firm we

- 25 -

are forced to make difficult judgments about the hedge funds we evaluate for clients. *This was not the case with the Madoff feeder funds. Our judgment was swift given the extensive list of red flags.*" (Emphasis added.) In other words, this was a no-brainer.

70.    According to a news account published by *Bloomberg News* on January 7, 2009, representatives of FGG were present at a meeting in 2000 with Bernard Madoff and representatives of Credit Suisse Group AG, including Oswald Gruebel, who at the time headed Credit Suisse's private-banking unit. According to *Bloomberg*, "Gruebel and two other Credit Suisse executives at the meeting with Madoff raised concern about his use of a little-known auditor who had just one client.... The bank also worried about why Madoff served as the custodian of his clients' assets.... Madoff wouldn't tell Gruebel how much money he managed, saying only that he had 12 people working with him to manage the strategy, along with six senior traders...." After the fifth or sixth query, Madoff ended the session, according to people who were at the meeting, reported *Bloomberg* on January 27, 2009. *Bloomberg* reported, Credit Suisse "urged customers ... to withdraw cash from his firm because the bank couldn't determine how he made money." The article stated that the Credit Suisse clients "proceeded to redeem about $250 million from Madoff-run funds."

71.    In 2003, a team from Société Générale's investment bank was sent to New York to perform routine due diligence of Madoff and BMIS. The *New York Times* reported in a December 17, 2008 article on the team's findings:

> What it found that March was hardly routine: Mr. Madoff's numbers simply did not add up. Société Générale immediately put Bernard L. Madoff Investment Securities on its internal blacklist, forbidding its investment bank from doing business with him, and also strongly discouraging wealthy clients at its private bank from his investments.

- 26 -

The red flags at Mr. Madoff's firm were so obvious, said one
banker with direct knowledge of the case, that Société Générale
"didn't hesitate. It was very strange."

72.    The Fund Defendants had responsibilities to establish due diligence procedures

and performance guidelines for all fund managers with whom it invested client assets. These

procedures were to be applied in creating general oversight and transparency regarding how

Greenwich Sentry Partners assets were being invested. The Fund Defendants were also

responsible for seeing that these procedures and guidelines, if any, were in fact being performed.

However, as is evident from the Fund Defendants' failure to heed the numerous red flags

discussed above, the Fund Defendants failed to perform even a minimum level of due diligence

regarding Madoff and BMIS.

73.    Indeed, according to a former employee of FGG during 2006 and 2007, that

employee was told not to worry about due diligence when it came to the Sentry funds, because it

is an "internal fund." A former accountant with FGG in New York from 2004 to 2008 stated that

s/he was not aware of any due diligence done of the Sentry funds and none of the accountants in

New York were involved in due diligence of the Sentry funds.

74.    Sticking their heads even further in the sand, FGG and its affiliates actively

worked to assure they would not learn the truth about Madoff and BMIS. Harry Markopolos, a

Madoff whistleblower, testified before Congress on February 4, 2009 that FGG embarked on a

three-year auditor shopping spree in 2004, switching auditors three times in three years.

Berkow, Schechter & Co. audited FGG and its funds through 2004. PricewaterhouseCoopers

Accountants N.V., a fellow member of PwC Int'l, audited FCC funds for 2005 and then PwC

took over in 2006. The switching of auditors was done by the Fund Defendants with the hope

that the lack of continuity would make it difficult for the auditor to dig too deep into Madoff and

BMIS.

- 27 -

75.    To add insult to injury, not only did the Fund Defendants not perform due diligence and risk monitoring, the General Partner and FGG lied to the Limited Partners about having performed a "higher level" of "deeper and broader" due diligence and risk monitoring.

76.    The Fund Defendants received large fees to choose managers and perform due diligence and risk monitoring. As Brad Alford, who runs Alpha Capital Management LLC in Atlanta, which helps clients choose hedge funds, was quoted by *Bloomberg News* on December 15, 2008 as saying: "It's mind-boggling that people like ... Fairfield Greenwich had been doing this for so long.... It's the job of these funds of funds to be doing due diligence. That's why they get paid."

**Obligations of the Fund Defendants**

77.    By reason of their positions and because of their ability to control the business of the Fund, the Fund Defendants owed the Fund and the Limited Partners fiduciary obligations of fidelity, trust, loyalty, candor and due care, and were and are required to use their utmost ability to control the Fund in a fair, just and equitable manner and to act in furtherance of the best interests of the Fund and the Limited Partners so as to benefit all the Limited Partners proportionately and not in furtherance of their personal interest. In addition, each of the Fund Defendants owed to the Fund and the Limited Partners, the fiduciary duty to exercise due care, loyalty, good faith, candor and diligence in the management and administration of the Fund and in the use and preservation of its assets.

*The General Partner's Culpable Conduct*

78.    Pursuant to the Offering Memorandum, the General Partner, FG Bermuda, is responsible for directing the Fund's investment and trading activities. Similarly, the Limited Partnership Agreement dated April 30, 2006 provides that the General Partner has the exclusive power to make all decisions with regard to the management of the Fund.

- 28 -

79.     By operation of law, as the General Partner of a limited partnership, the General Partner owed duties of care, loyalty and candor to the Limited Partners and the Fund.

80.     The General Partner here completely abdicated its responsibilities to the Limited Partners and the Fund by failing to perform even minimal due diligence into the Fund's single manager and custodian of the Fund's assets, BMIS, let alone perform the "higher level" of "deeper and broader" due diligence and continued monitoring that the General Partner and FGG promised investors.

81.     Among other things, the General Partner utterly failed to:

    a.      safely manage the Fund's assets;

    b.      perform, or supervise those tasked with performing, adequate due diligence of the Fund's single manager and custodian of assets, BMIS;

    c.      investigate various red flags apparent regarding BMIS, some of which was reported in the mainstream media;

    d.      provide the Fund and Limited Partners with accurate financial statements and reports; and

    e.      warn the Fund and the Limited Partners of the risks involved in their investments.

82.     To make matters worse, not only did the General Partner fail to conduct due diligence and risk monitoring of BMIS, the General Partner falsely represented to the Limited Partners and the Fund that it had in fact performed and was continuing to perform these duties, in violation of the General Partner's duties of candor and loyalty.

83.     The General Partner collected substantial fees for performing duties it did not fulfill. The General Partner collected a Management Fee of 1% (or 0.0833% per month) of each

- 29 -

Limited Partner's capital account and an Incentive Allocation of 20% of the capital appreciation

after expenses allocated to each Limited Partner's capital account. According to the Fund's

financial statements, the Management Fees and Incentive Allocations paid were as follows:

| Year | Management Fee | Incentive Allocation |
|------|----------------|----------------------|
| 2006 (May to December) | $16,003 | $92,639 |
| 2007 | $57,180 | $185,654 |

Upon information and belief, the General Partner also received eleven months of Management

Fees and Incentive Allocations prior to the Madoff Ponzi scheme being revealed on December

10, 2008.

84.     In addition to receiving $351,476 in fees during 2006 and 2007 (not including

fees received for the first eleven months of 2008), for duties not performed, the Management

Fees and Incentive Allocations paid to the General Partner were calculated based on inflated

capital accounts and appreciation thereof.

***The Individual Defendants' Culpable Conduct***

<u>*Defendants Noel, Tucker and Piedrahita*</u>

85.     Defendants Noel, Tucker and Piedrahita controlled the General Partner and are

the founding partners of FGG. Defendants Noel and Tucker served as general partners of the

Fund's predecessor fund, Greenwich Sentry, L.P., from its organization in 1993 until January

1998. Defendants Noel, Tucker and Piedrahita are the main principals of FG Bermuda, the

Fund's General Partner.

86.     Defendants Noel and Tucker were the general partners of the Fund's predecessor,

Greenwich Sentry, L.P., when it began investing its assets with BMIS, and therefore, were

responsible for performing and/or supervising the initial pre-investment due diligence of BMIS.

87.   Defendants Noel and Tucker controlled the General Partner of the Fund upon its creation, and therefore, were responsible for performing and/or supervising the initial pre-investment due diligence of BMIS.

88.   Defendants Noel, Tucker and Piedrahita, through their control of the various General Partner and FGG entities, were responsible for the continued risk monitoring of BMIS and the Fund's assets.

89.   Defendants Noel, Tucker and Piedrahita were aware, or should have been aware had they exercised the appropriate duty of care and loyalty, of the many red flags described above.

90.   Defendants Noel, Tucker and Piedrahita violated their duties of care and loyalty by failing to, *inter alia*:

   a.   safely manage the Fund's assets;

   b.   perform, or supervise those tasked to perform, adequate due diligence of the Fund's single manager and custodian of assets, BMIS;

   c.   investigate various red flags apparent regarding BMIS, some of which was reported in the mainstream media;

   d.   provide the Fund and Limited Partners with accurate financial statements and reports; and

   e.   warn the Fund and the Limited Partners of the risks involved in their investments.

91.   Defendants Noel, Tucker and Piedrahita further violated their duties of candor and loyalty by themselves falsely representing, and causing the General Partner and FGG to falsely

- 31 -

represent, that they had performed due diligence and continued risk monitoring of the Fund's

manager and sole custodian, BMIS.

92.    Defendants Noel, Tucker and Piedrahita each personally benefited from the

breaches by being the ultimate recipients of the Management Fees and Incentive Allocations paid

to the General Partner.

### Defendants Francoeur and Vijayvergiya

93.    Defendants Francoeur and Vijayvergiya, as directors of the Fund's General

Partner, FG Bermuda, owed the Fund and Limited Partners duties of care, loyalty and candor.

Defendants Francoeur and Vijayvergiya breached these duties by failing to, *inter alia*:

        a.    safely manage the Fund's assets;

        b.    perform, or supervise those tasked to perform, adequate due diligence of

the Fund's single manager and custodian of assets, BMIS;

        c.    investigate various red flags apparent regarding BMIS, some of which was

reported in the mainstream media;

        d.    provide the Fund and Limited Partners with accurate financial statements

and reports; and

        e.    warn the Fund and the Limited Partners of the risks involved in their

investments.

94.    Defendant Vijayvergiya, in addition to his role as manger of FG Bermuda, as

manager of FGG's Risk Management team, owed a duty to the Fund and the Limited Partners to

perform adequate due diligence and continued monitoring of the Fund's single manager and

custodian of assets, BMIS.  Vijayvergiya breached his duties to the Fund and Limited Partners

by failing to perform any due diligence or continued monitoring of BMIS.

- 32 -

95.    Defendants Francoeur and Vijayvergiya benefited from the breaches of fiduciary duties by sharing in the Management Fees and Incentive Allocations paid to the General Partner from the Limited Partners' capital accounts.

*FGG's Culpable Participation*

96.    FGG, through its control of its affiliates, exercised control over FG Bermuda, the Fund's General Partner, and FG Advisors.  FGG used its alleged "higher level" of "deeper and broader" due diligence and continued risk monitoring of its funds' managers as a marketing tool to lure investors to its funds.  The duties of due diligence and continued risk monitoring of the Fund's assets and manager were delegated to FGG's Risk Management Team.

97.    FGG owed duties of care, loyalty and candor to the Fund and its Limited Partners by way of its control of the Fund's General Partner, its representations to investors, and the delegation of due diligence and continued monitoring of fund managers to FGG's Risk Management team.  FGG breached these duties and/or aided and abetted the General Partner's breaches of these duties, by failing to, *inter alia*:

a.    safely manage the Fund's assets;

b.    perform, or supervise those tasked to perform, adequate due diligence of the Fund's single manager and custodian of assets, BMIS;

c.    investigate various red flags apparent regarding BMIS, some of which was reported in the mainstream media;

d.    provide the Fund and Limited Partners with accurate financial statements and reports; and

e.    warn the Fund and the Limited Partners of the risks involved in their investments.

- 33 -

98.    FGG violated its duties of candor and loyalty to the Fund and Limited Partners by falsely representing that it performed a "higher level" of "deeper and broader" pre-investment due diligence and post-investment multifaceted risk monitoring of its managers than its competitors.

99.    FGG benefited from the breaches of fiduciary duties by sharing in the Management Fees and Incentive Allocations paid to the General Partner from the Limited Partners' capital accounts, as well as the inflated expense reimbursements paid to FG Advisors discussed below.

### The Administrators' Culpable Participation

100.    The Administrator of the Fund is responsible for performing day-to-day administrative services for the Fund, including preparing and distributing monthly reports to the Limited Partners containing the amount of the Fund's net assets, the amount of any distributions from the Fund and Incentive Allocations. The Administrator is also responsible for maintaining the financial books and records, calculating the net asset value, handling shareholder communications and supervising the payment of expenses by the Fund.

101.    Prior to September 1, 2006, the Fund's Administrator was GlobeOp. Citco Europe has been the Funds' Administrator and Citco Canada its sub-administrator since September 1, 2006. Defendant Francoeur, a director of FG Bermuda, is also the Managing Director of Citco Fund Services (Bermuda) Limited, an affiliate of Citco Europe and Citco Canada. GlobeOp, Citco Europe and Citco Canada are referred to herein as the "Administrators".

102.    The Administrators had a duty to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, and distribute accurate monthly reports to the Limited Partners. The Administrators failed in all three duties.

- 34 -

103.    Despite their failures to accurately calculate the net asset value of the Fund, maintain accurate financial books and records, and distribute accurate monthly reports to the Limited Partners, the Administrators were paid a monthly service fee, in advance, based on beginning monthly net asset value of the Fund, after subscriptions and redemptions.  According to the Fund's financial statements, the Administration Fees paid were as follows:

| Year | Administration Fee |
|------|--------------------|
| 2006 (May to December) | $9,808 |
| 2007 | $6,844 |

104.    The Administration Fees paid to the Administrators were also inflated, because the net asset value of the Fund calculated by the Administrators was inflated.

105.    FG Advisors provides the Fund with certain administrative services and back-office support.  FG Advisors received expense reimbursements from the Fund payable quarterly based on the beginning quarterly net asset value, after subscriptions and redemptions, computed at the rate of 0.10% per annum.  According to the Fund's financial statements, expense reimbursement paid were as follows:

| Year | Expense Reimbursement |
|------|-----------------------|
| 2006 (May to December) | $3,919 |
| 2007 | $6,946 |

106.    The expense reimbursements paid to FG Advisors were inflated, because the Fund's net asset value was inflated.

**PwC Violated GAAS & GAAP**

107.    The PwC Int'l member firms describe themselves as having:

> The knowledge and experience necessary to help [clients] with complex financial accounting issues....Our member firms audit many of the world's best-known companies and thousands of other organizations both large and small. Our audit approach, at the leading edge of best practice, is tailored to suit the size and nature

- 35 -

of [the clients'] organization and draws upon our extensive
industry knowledge.

http://www.PwC.com/extweb/service.nsf/docid/87737d18d5e2913885256e6d0062a0f6

108.    PwC is subject to regulations by various accounting bodies, including, but not

limited to, the American Institute of Certified Public Accountants ("AICPA") which promulgates

national auditing standards known as Generally Accepted Auditing Standards ("GAAS"). These

standards set the minimum level of performance and quality that auditors are expected to meet.

Under GAAS, the auditor has an overall responsibility to plan and perform the audit to obtain

reasonable assurance that the financial statements are free of material misstatement, whether

caused by error or fraud.  AU § 110.02

109.    PwC was engaged by the General Partner of the Fund to provide independent

auditing and accounting services.  Pursuant to such engagement, PwC agreed and undertook a

duty to provide professional services to audit the annual statements sent to the Limited Partners

in accordance with GAAS and to render an opinion as to whether those financial statements were

fairly presented in conformity with Generally Accepted Accounting Principles ("GAAP") in the

US.

110.    Among other things, PwC was required to opine that the Fund's Statement of

Assets, Liabilities & Partners' Capital, including the Schedule of Investments and related

Statements of Operations, Changes in Partners Capital and Cash Flows, presented in all material

respects, the financial position of the Fund at December 31, 2007 and 2006.  This included

verifying that the investments included in the Statement of Assets , Liabilities & Partners'

Capital of $9,595,370 and $10,307,719 as of December 31, 2007 and December 31, 2006,

respectively, existed and were appropriately valued.

111.    On April 18, 2008, PwC issued an unqualified ("clean") opinion for the year

ended December 31, 2007 as follows:

> In our opinion, the accompanying statement of assets, liabilities
> and partners' capital, including the schedule of investments, and
> the related statements of operations, changes in partners' capital
> and cash flows present fairly, in all material respects, the financial
> position of **Greenwich Sentry Partners, L.P.** (the "Partnership")
> as at December, 31, 2007 and the results of its operations, the
> changes in its partners' capital and its cash flows for the year then
> ended in conformity with accounting principles generally accepted
> in the United States of America. These financial statements are the
> responsibility of the Partnership's management; our responsibility
> is to express an opinion on these financial statements based on our
> audit. We conducted our audit of these financial statements in
> accordance with auditing standards generally accepted in the
> United States of America. Those standards require that we plan
> and perform the audit to obtain reasonable assurance about
> whether the financial statements are free of material misstatement.
> An audit includes examining, on a test basis, evidence supporting
> the amounts and disclosures in the financial statements, assessing
> the accounting principles used and significant estimates made by
> the Partnership's management, and evaluating the overall financial
> statement presentation. We believe that our audit provides a
> reasonable basis for our opinion.

112.    Upon information and belief, PwC also issued an unqualified audit opinion for the

year ended December 31, 2006.

113.    Additionally, the Fund's audited financial statements identified investments as a

significant accounting policy.

114.    In issuing these opinions, PwC asserted that the Fund's financial statements were

presented in conformity with GAAP and that its audit was performed in accordance with GAAS.

As part of those financial statements, PwC also asserted that the Fund's investments existed and

were properly valued in accordance with GAAS and GAAP.

115.    PwC's audit was negligently conducted. PwC knew its audit opinions would be

disseminated to the Fund and its Limited Partners. Had PwC performed its audit in accordance

with GAAS and GAAP, the fact that the Fund's investments did not exist or were not

appropriately valued would have been known to the Fund and its Limited Partners.

*PwC was required by GAAS to Obtain Sufficient Audit Evidence*

116.    GAAS requires that an auditor must obtain sufficient audit evidence by

performing audit procedures to afford a reasonable basis for an opinion regarding the financial

statements under audit.  AU § 326.01.  Audit evidence is all the information used by the auditor

in arriving at the conclusions on which the audit opinion is based and includes the information

contained in the accounting records underlying the financial statements and other information.

AU § 326.02.

117.    The auditor should obtain audit evidence by testing the accounting records, for

example, through analysis and review, re-performing procedures followed in the financial

reporting process and reconciliations.  AU § 326.04.  Other information that the auditor may use

as audit evidence includes minutes of meetings, **confirmations from third parties**, controls

manuals and information obtained by the auditor from such audit procedures as inquiry,

observation, and inspection.  AU § 326.05.  In the case of a third party investment manager, a

typical audit procedure to verify the existence of investments is to send a confirmation request of

the investments balance as of the balance sheet date.

*PwC was required by GAAS to Exercise Due Professional Care and Professional
Skepticism*

118.    GAAS also requires that auditors must exercise due professional care in

performing the audit and preparing the audit report.  AU § 230.01.  Due professional care

concerns what the auditor does and how well he does it.  AU § 230.04.

119.    Additionally, due professional care requires the auditor to exercise professional

skepticism.  Professional skepticism is an attitude that includes a questioning mind and a critical

- 38 -

assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence. AU § 230.07.

120.    Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process. AU § 230.08. Additionally, in exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest. AU § 230.09.

121.    As stated above, confirmation requests are a typical audit procedure to audit investments held be third party investment managers. Statement of Auditing Standard ("SAS") No. 67, *The Confirmation Process*, requires the auditor to exercise an appropriate level of professional skepticism throughout the confirmation process. AU § 330.15.

122.    SAS No. 67 states that:

> The auditor's understanding of the client's arrangements and transactions with third parties is key to determining the information to be confirmed. The auditor should obtain an understanding of the substance of such arrangements and transactions to determine the appropriate information to include on the confirmation request.

123.    More importantly, SAS No. 67 highlights the need for auditors to exercise a higher degree of professional skepticism in certain circumstances:

> If information about the respondent's competence, knowledge, **motivation**, ability, or willingness to respond, or about the **respondent's objectivity and freedom from bias** with respect to the audited entity comes to the auditor's attention, the auditor should consider the effects of such information on designing the confirmation request and evaluating the results, including determining whether other procedures are necessary. In addition, there may be circumstances (such as for significant, unusual year-

- 39 -

end transactions that have a material effect on the financial statements or **where the respondent is the custodian of a material amount of the audited entity's assets) in which the auditor should exercise a heightened degree of professional skepticism relative to these factors about the respondent.** In these circumstances, the auditor should consider whether there is sufficient basis for concluding that the confirmation request is being sent to a respondent from whom the auditor can expect the response will provide **meaningful and appropriate audit evidence.**

(Emphasis added.)

124.    PwC failed in its duties to obtain sufficient competent audit evidence and exercise the appropriate degree of professional skepticism and due professional care during the audit of the financial statements of the Fund. This was particularly true with respect to confirmation of the Fund's investments for the following reasons:

a.    BMIS was the ONLY third party investment manager of the Fund;

b.    BMIS was also the SOLE custodian of the Fund's assets; and

c.    The Fund invested ALL of its investments with BMIS.

125.    One of these facts alone should have caused PwC to heighten its professional skepticism during its audit testing of the Fund's investments. With all of these factors present and the additional red flags described previously, PwC's failure to obtain appropriate audit evidence concerning the Fund's investments was astounding.

126.    PwC failed to exercise due professional care because it failed to obtain sufficient evidence to support the assertions of the existence of the Fund's investments, maintain an attitude of professional skepticism; and render an accurate audit report on behalf of the Fund as required by GAAS.

- 40 -

***PwC was required by the AICPA Investment Guide & Alternative Investments Practice
Aid to Perform "Look-Through Audits" into BMIS***

127.    The AICPA *Investment Company Audit & Accounting Guide* (the "Guide") is an

industry standard when it comes to auditing public or private investment companies. It describes

the objectives of auditing investments in other funds. Section 5.84 specifically addresses the

audit risk associated with funds of funds or feeder funds and establishes a "look-through" duty

for auditors of funds of funds. It states that significant audit risks may exist if management does

not use strong procedural controls in selecting and monitoring a fund's investments in investee

companies and determining the investments fair value. In highlighting this audit risk, the Guide

states that the auditors approach to an investor fund's investments in investee funds (i.e. funds of

funds) might focus on:

> a.    Evaluating the investor and investee funds' control environments; and
>
> b.    Substantiating the fair value attributed to investments in the investee

funds.

128.    Additionally, Section 5.85 of the Guide suggests the following audit tests for

investments in non public funds.

> Participation in management site visits or telephone calls to
> investee funds....Participation in management site visits would be
> more appropriate if the investee funds represented a **significant
> investment by the investor fund** or if **serious concerns as to the
> management controls at the investee fund** existed.

(Emphasis added.)

129.    The AICPA *Alternative Investments - Audit Considerations Practice Aid*

("Practice Aid") provides similar guidance as to the valuation and existence of investments of

funds of funds. It states that an auditor should confirm investments with the fund manager as of

the balance sheet date and should exercise considerable judgment in performing alternative

- 41 -

procedures towards assessing the existence of investments. This judgment should include the

following audit tests:

a.    Observing management sites;

b.    Reviewing executed partnership, trust or similar agreements;

c.    Inspecting other documentation supporting the investor's interest in the

fund;

d.    Reviewing periodic statements of the fund and comparing activity with

amounts recorded by the investor; and

e.    Vouching relevant cash receipts and disbursements.

130.    Such testing suggested by the AICPA in the Guide and the Practice Aid is critical

in the case of a single third party investment manager and a sole custodian of investments of

ALL of the Fund's investments such as BMIS. In this situation, PwC should, for all intents and

purposes, have performed a full scope audit of the underlying fund, *i.e.* BMIS, including an

assessment of BMIS' control environment.

131.    The alternative to this would have been for PwC to issue a reliance report stating

that the auditor of the underlying fund, *i.e.* F&H, is responsible for the audit. It did not do that.

However, where the underlying auditor is a three person audit firm with no recent Peer Review,

is a related party to BMIS and has no other known audit clients, PwC was obligated to have

performed significant audit testing on BMIS.

132.    PwC's audit "look-through" testing should have at a minimum included a robust

assessment of BMIS' control environment, visiting BMIS' offices, interviewing BMIS

management, reviewing cash receipts and payments details and inspecting other relevant

- 42 -

information including legal agreements, trading tickets etc. PwC knowingly failed to do this and as a result issued an audit opinion which was in violation of GAAS.

**PwC was required by GAAS to obtain an Understanding of the Fund's Internal Controls**

133.    GAAS states that the auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements, whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures. AU § 314.01.

134.    Obtaining an understanding of the entity and its environment is an essential aspect of performing an audit in accordance with GAAS. In particular, that understanding establishes a frame of reference within which the auditor plans the audit and exercises professional judgment about assessing risks of material misstatement of the financial statements and responding to those risks throughout the audit. AU § 314.04.

135.    Additionally, GAAS requires that auditors consider the existence of an internal audit function in determining the nature, timing and extent of audit procedures to be performed. AU § 332.01. Auditors are also required to assess the internal auditors' competence, including factors such as the educational level and professional experience and also assess the internal auditors' objectivity.

136.    Given the facts surrounding the custody and management of the Fund's investments by BMIS described above, PwC had a "look-through" audit responsibility to assess BMIS' control environment and internal auditors. PwC knowingly failed to do this. Had PwC carried out its responsibilities, it would have concluded that:

a.    There was a lack of transparency into BMIS' investment strategy and activities;

- 43 -

b.    BMIS' trades for the Fund were not supported by an automated order and execution process but were supported by manual trading tickets;

c.    The Fund performed little or no due diligence on BMIS and did not test the validity of the Fund's performance or strategy;

d.    FGG changed its auditor three times from 2004 to 2006 from Berkow, Schechter & Co. in 2004 to Pricewaterhouse Coopers Accountants N.V. in 2005 to PwC in 2006;

e.    BMIS' internal audit function was performed by its external auditors, F&H, who were the external auditors of BMIS for many years and lacked any objectivity to properly carry out this function;

f.    F&H was not experienced or qualified to perform an internal audit function as it was only a three person auditing firm (of which only one appears to have been a full time accountant) with no other known audit or internal audit clients.  It also had not had any Peer Reviews conducted on it as outlined by the AICPA; and

g.    F&H did not have the appropriate level of access to BMIS' accounting or operational information.

137.    Knowing these facts, PwC failed to appropriately assess the Fund and BMIS' internal controls and control environment in designing and executing its audit plan.  It also failed to consider the objectivity and qualifications of BMIS' internal auditors as part of its annual audit of the Fund in violation of GAAS.

***PwC was required by GAAS to Assess Audit Risk and the Risk of Material Misstatement to Fraud or Error***

138.    GAAS states that audit risk and materiality, among other matters, need to be considered together in designing the nature, timing, and extent of audit procedures and in evaluating the results of those procedures.  AU § 312.01.

- 44 -

139.    GAAS also requires that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors. AU § 316.02. In addition, the auditor should use professional judgment in determining whether a risk factor is present and should be considered in identifying and assessing the risks of material misstatement due to fraud. AU § 316.32.

140.    The auditor also has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by fraud or error. AU § 316.12. SAS No. 99, *Consideration of Fraud in a Financial Statement Audit*. In performing the audit, the auditor is concerned with matters that, either individually or in the aggregate, could be material to the financial statements.

141.    Furthermore, because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. AU § 316.13 states that:

> The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and **regardless of the auditor's belief about management's honesty and integrity**. Furthermore, professional skepticism requires an **ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred**. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

(Emphasis added.)

142.    PwC was required under GAAS to actively consider whether there was a risk that the financial statements it was auditing contained material misstatements due to fraud, to identify the risks thereof and to communicate those concerns, if any, to the management of the Fund.

- 45 -

143.    However, PwC knowingly ignored the numerous fraud risk factors during its audit of the Fund. These factors included but were not limited to:

a.    Unusual year after year steady profitability, especially compared to that of other companies in the same industry;

b.    Managements' personal financial situation was threatened by the Fund's financial performance, including significant portions of their compensation being contingent upon fees paid by BMIS;

c.    Ineffective monitoring by the Fund of BMIS as outlined above;

d.    Ineffective oversight over the financial reporting process and internal controls; and

e.    Inadequate segregations of duties.

144.    In addition to the above fraud risk factors, PwC also ignored the numerous red flags that existed at the Fund and BMIS as outlined previously in violation of GAAS.

**PwC was required by GAAS & GAAP to Audit Investments**

145.    SAS No. 92 *Auditing Derivative Instruments, Hedging Activities, and Investments in Securities* provides guidance to auditors in planning and performing auditing procedures for assertions about derivative instruments, hedging activities, and investments in securities that are made in an entity's financial statements. AU § 332.01. It states the auditor may need special skill or knowledge to plan and perform auditing procedures for certain assertions about derivatives and securities, including:

> Obtaining an understanding of an **entity's information system for derivatives and securities, including services provided by a service organization,** which may require that the auditor have special skill or knowledge with respect to computer applications when significant information about derivatives and securities is transmitted, processed, maintained, or accessed electronically; and

> **Identifying controls placed in operation by a service organization that provides services to an entity that are part of the entity's information system** for derivatives and securities, which may require that the auditor have an understanding of the operating characteristics of entities in a certain industry.

(Emphasis added.) AU § 332.05

146.    SAS No. 92 also states that the understanding of an entity's information system may include controls over securities transactions from their initiation to their inclusion in the financial statements. It also states that this may encompass controls placed in operation by the entity and by service organizations whose services are part of the entity's information system. AU § 332.11. The Fund's investments were required to be reported in accordance with GAAP and FAS 115, *Accounting for Certain Investments in Debt and Equity Securities*, (May 1993).

147.    PwC was required by GAAS to obtain an appropriate understanding of the Fund's information systems for investments, including those systems at BMIS. PwC failed to do this. This failure represented a complete and systematic breakdown of PwC's audit responsibilities under GAAS. Additionally, PwC's audit failures caused the Fund's investments to be reported in violation with GAAP.

*PwC Failed in its Duty As the Independent Auditor of the Fund*

148.    PwC failed in its duty as the independent auditor of the Fund as follows:

a.    PwC failed to exercise due professional care and professional skepticism in its audit of the Fund. PwC should have exercised heightened care and professional skepticism in light of the facts and red flags discussed previously;

b.    PwC failed to obtain sufficient audit evidence with respect to existence of the Fund's investments;

- 47 -

    c.     PwC failed to appropriately perform "look-through audits" into the underlying fund, *i.e.* BMIS, and assess the impact of its findings on its audit of the Fund's financial statements;

    d.     PwC failed to obtain an understanding of the Fund's internal controls and assess the qualifications and competency of internal auditors;

    e.     PwC failed to appropriately assess audit risk and the risk of material misstatement due to fraud or error; and

    f.     PwC failed to audit investments in accordance with GAAS and GAAP.

149.   PwC knowingly ignored the GAAS and GAAP requirements and numerous facts and red flags discussed above which should have led it to either:

    a.     disclaim or issue an adverse opinion on the Fund's 2007 and 2006 financial statements; or

    b.     withdraw, correct or modify its opinion to recognize the Fund's improper accounting and financial reporting as stated above.

### DEMAND FUTILITY

150.   Plaintiffs will fairly and adequately represent the interests of nominal defendant Greenwich Sentry Partners and its Limited Partners in prosecuting the wrongs detailed herein.

151.   Plaintiffs have not made demand on the General Partner or any other partner of the Fund, or on any manager of the Fund, to bring these derivative claims since such demand would be a futile and useless act that is excused by governing law, as shown below.

152.   Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the General Partner and are not subject to the protection of any independent business judgment, since it would undoubtedly be to the benefit of the Fund to recover the damages caused by the General Partner's wrongdoing and to assert these derivative claims.

- 48 -

153.    Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by the General Partner to the Limited Partners and the Fund.  The General Partner is subject to liability for breaching its fiduciary duties to the Fund by, *inter alia,* causing the Fund's assets to be invested with Madoff or BMIS without performing due diligence or continued monitoring, causing or permitting the reckless investment practices alleged herein, failing to adequately monitor BMIS's financial reporting, and failing to detect, prevent, or halt the misstatements and omissions of material fact alleged herein.

154.    Demand is excused because the General Partner exercises ultimate authority over the Fund and profited at the expense of the Fund by receiving monthly Management Fees and Incentive Allocations from the Fund and Limited Partners.

155.    Demand is excused because the General Partner faces a substantial likelihood of liability in this action because of its acts and omissions alleged herein.  The dramatic breakdowns and gaps in those controls were so widespread and systematic that the General Partner faces substantial exposure to liability, under the "Caremark doctrine," for total abrogation of its duty of oversight.  *See In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).  The General Partner either knew or should have known that the Fund's assets were employed as part of a massive Ponzi scheme and took no steps in a good faith effort to prevent or remedy that situation, proximately causing billions of dollars of losses and possible complete collapse of the Fund.

156.    In addition, demand is also excused because the General Partner has ratified the egregious actions outlined herein, and the General Partner cannot be expected to prosecute claims against itself, and persons or entities with whom it has extensive inter-related business, professional and personal entanglements, if Plaintiffs demanded that it do so.  The General

- 49 -

Partner, because of these relationships, has developed debilitating conflicts of interest that prevent it from taking the necessary and proper action on behalf of the Fund.

157.    Demand is also excused because the General Partner participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly or negligently disregarded them, and is therefore not a disinterested party and lacks sufficient independence to exercise business judgment as alleged herein.

158.    Demand is also excused because insurance policies covering the liability of a fund's General Partner generally purport to exclude legal claims asserted directly by the Fund against such persons.  Thus, there was, and is, a substantial disincentive for the Fund to bring any action directly against the General Partner.  Generally, under the terms of such insurance policies, a partnership would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon the General Partner for misconduct and mismanagement.  Thus, if the policy or policies which the Fund maintains contain the foregoing provision, the insurance carriers would argue that the Fund and its General Partner are thereby contractually disabled from complying with any demand that would cause the Fund to institute, or prosecute any action against the General Partner for such misconduct and mismanagement; because to do so could result in the loss to the Fund of its insurance coverage. Similarly, the Fund would be disabled from pursuing the General Partner, as it would not benefit from any insurance they may have.

159.    Demand is also excused because the General Partner participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly, or negligently disregarded them, and is therefore not a disinterested party and lacks sufficient independence to exercise business judgment as alleged herein.

- 50 -

160.    Given the size, scope, and blatancy of the wrongdoing and the misrepresentations alleged above, the General Partner either knew of the financial risks or turned a blind eye to them. Such conduct is also not protected by the business judgment rule and exposes the General Partner to a substantial threat of liability in this action.

161.    The General Partner lacks the sufficient independence with which to render a disinterested decision on whether to pursue the derivative claims alleged herein against Defendants.

162.    In addition, demand would be futile and useless for the additional following reasons:

a.    The General Partner, because of its inter-related business, professional and personal relationships, has developed debilitating conflicts of interest that prevent it from taking the necessary and proper action on behalf of the Fund as requested herein;

b.    The General Partner, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Fund's Limited Partners or recklessly and/or negligently disregarded the wrongs complained of herein, and is therefore not a disinterested party. The General Partner exhibited a sustained and systemic failure to fulfill its fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

c.    In order to bring this suit, the General Partner would be forced to sue itself and persons with whom it has extensive business and personal entanglements, which it will not do, thereby excusing demand;

- 51 -

d.      The acts complained of constitute violations of the fiduciary duties owed

by the General Partner and these acts are incapable of ratification; and

e.      The Fund has been and will continue to be exposed to significant losses

due to the wrongdoing complained of herein, yet the General Partner has not filed any lawsuits

against itself or the Fund Defendants for breach of fiduciary duties or others who were

responsible for that wrongful conduct to attempt to recover for the Fund any part of the damages

the Fund suffered and will suffer thereby.

163.    Finally, Plaintiffs have not made any demand on the Limited Partners to institute

this action since such demand would be a futile and useless act for the following reasons:

a.      The Fund has a large number of Limited Partners; and

b.      Making demand on all the Limited Partners would force Plaintiffs to incur

huge expenses, assuming all the Limited Partners could be individually identified.

164.    Demand is excused because the General Partner still has not sued PwC despite its

failure to find during its audit that the Fund's assets did not exist and that the Fund lacked

adequate internal controls.

## FIRST CAUSE OF ACTION

### Grossly Negligent, Willful and Reckless Breach of Fiduciary Duties
### Against the Fund Defendants

165.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth

herein.

166.    The Fund and the Limited Partners have suffered damages due to the Fund

Defendants' conduct as detailed above.  The claims asserted herein against the Fund Defendants

are asserted on behalf of Greenwich Sentry Partners to recover from the Fund Defendants the

- 52 -

damages sustained and to be sustained by the Fund and the Limited Partners due to the gross,

willful and wrongful mismanagement of the Fund's assets.

167.    The conduct detailed above was not due to an honest error of judgment but to the

Fund Defendants' gross, reckless, bad faith and/or willful disregard of their duties and of the

rights and interests of the Fund and the Limited Partners. The Fund Defendants' conduct cannot

be justified as valid acts of business judgment because they engaged in systematic, gross

mismanagement and materially misled the Fund and the Limited Partners in order to enrich

themselves personally.

168.    The Fund Defendants have individually or in concert breached fiduciary duties of

loyalty, care, candor and good faith owed to the Fund and its Limited Partners because they:

a.    failed to establish and implement an adequate and functioning system of

internal financial and accounting controls to ensure the existence of the Fund's assets;

b.    failed to accurately perform, or to supervise others who performed, due

diligence and continued risk monitoring of the Fund's manager and portfolio;

c.    enriched themselves at the expense of the Limited Partners by collecting

management fees, incentive payments, and/or administrative fees based upon the artificially

inflated capital accounts of the Limited Partners and/or net asset value of the Fund;

d.    at a minimum, failed to supervise the preparation and filing of audits,

reports or other information which was sent to the Limited Partners and to examine and evaluate

any reports of examination, audits, or other financial information concerning the Fund; and

e.    made false statements to the Fund and Limited Partners regarding the due

diligence and risk monitoring they purported to perform.

- 53 -

169.   By reason of the foregoing, the Fund has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

170.   Plaintiffs have no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Breaches of
### Fiduciary Duties Against the Fund Defendants

171.   Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

172.   Each of the Fund Defendants breached the fiduciary duties owed to the Fund and the Limited Partners in a grossly negligent, willful and reckless manner, as detailed above.

173.   Each of the Fund Defendants knowingly gave substantial assistance and encouragement to each other in committing the grossly negligent, willful and reckless breach of fiduciary duties alleged above.

174.   Each of the Fund Defendants acted in concert with at least one other Fund Defendant to commit the breaches of fiduciary duties detailed above.

175.   Plaintiffs, and all Limited Partners, were injured as a result of the Fund Defendants' conduct.

## THIRD CAUSE OF ACTION

### Negligent Misrepresentation Against the Fund Defendants

176.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

177.   The Fund Defendants owed to the Fund and the Limited Partners a duty: (a) to act with reasonable care in preparing and disseminating the Offering Memorandum and other

representations relied upon by the Fund and the Limited Partners in deciding to purchase their limited partnership investment interests in the Fund; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in the Offering Memorandum.

178.    Defendants breached their duties to the Fund and the Limited Partners by failing to investigate, confirm, prepare and review with reasonable care the information contained in the Offering Memorandum and other representations, including the audited annual financial statements.

179.    Neither the Offering Memorandum nor any other statements made to the Fund or Limited Partners ever disclosed that the Fund Defendants had not conducted due diligence of Madoff or BMIS, or that they did not conduct the post-investment multifaceted risk monitoring described in various FGG and Fund documents.  As a direct, foreseeable and proximate result of this negligence, the Fund and Limited Partners have sustained damages, suffered mental and emotional distress and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

180.    By reason of the foregoing, Defendants are jointly and severally liable to the Fund and Limited Partners.

181.    Defendants' fraudulent acts were willful and wanton and the Fund and Limited Partners are entitled to punitive damages.

## FOURTH CAUSE OF ACTION

### Professional Negligence (Malpractice)
### Against PwC

182.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

183.    As previously set forth, PwC was retained by the Fund to ensure that the financial information conveyed by the Fund to the Limited Partners was presented in conformity with GAAP. To that end, PwC undertook to perform audits pursuant to GAAS and was substantially compensated therefor.

184.    PwC accepted the engagement and undertook to discharge their duties in a proper, skillful and diligent manner and in accordance with accepted professional standards.

185.    In complete disregard of its duties, PwC failed to adhere to and carry out their duties in accordance with GAAS and other accepted professional standards.

186.    As a result of the aforementioned failure to discharge their duties in a proper, skillful and diligent manner, PwC negligently, carelessly and unskillfully failed to discover and/or advise the Fund of the materiality of various internal control problems and reporting errors.

187.    PwC's deviation from the standards of care in the industry proximately caused the Fund's and the Limited Partners' pecuniary injuries.

188.    As a result of PwC's professional negligence, the Fund and its Limited Partners suffered extensive monetary damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Breach of Contract
### Against PwC

189.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth herein.

190.    As previously set forth, the Fund retained PwC as its external auditor.

191.    PwC was retained by the Fund to ensure that the financial information conveyed by the Fund to the Limited Partners was presented in conformity with GAAP.

- 56 -

192.    PwC accepted the engagement and in connection therewith, PwC provided the Fund with one or more engagement letter(s) confirming the parameters of the engagement.

193.    AU 311.09 states that an understanding with the client regarding an audit of the financial statements includes the following auditor responsibilities:

- The auditor is responsible for conducting the audit in accordance with generally accepted auditing standards. Those standards require that the auditor obtain reasonable rather than absolute assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.

- An audit includes obtaining an understanding of the entity and its environment, including its internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures. An audit is not designed to provide assurance on internal control or to identify significant deficiencies. However, the auditor is responsible for ensuring that those charged with governance are aware of any significant deficiencies that come to his or her attention.

194.    PwC breached their contracts with the Fund, because they did not perform their audits of the Fund in accordance with GAAS by failing to obtain reasonable assurance that the financial statement were free of material misstatement. They also failed to obtain an appropriate understanding of internal control and permitted the financial statements of the Fund for 2006-2007 to be issued in violation of GAAP and GAAS.

195.    Specifically, as alleged herein, at least for the years ending December 31, 2007 and December 31, 2006, PwC failed to apprise the Fund or its Limited Partners, among other things, that:

a.    The Fund's internal controls were virtually nonexistent, at least with respect to the asset confirmation function, which was critical to the Fund and the Limited Partners;

b.    The Fund was disregarding its stated due diligence and continued monitoring policies; and

- 57 -

c.       As a direct result of PwC's breach of contract, the Fund and its Limited

Partners suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation
### Against PwC

196.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth

herein.

197.    PwC owed a direct duty to the Fund to provide the Fund with correct, accurate

and complete audit opinions.

198.    PwC knew that the audit opinions they provided to the Fund were crucially

important to the Fund's business and that the Fund intended to, and did, rely on the audit

opinion(s) by, among other things, including the audit opinion(s) in the annual reports which

were sent to the Limited Partners.

199.    PwC knew that if the audit opinions were false or erroneous, the Fund would

suffer significant pecuniary damages.

200.    PwC breached their duty to the Fund because their audit opinions were false

and/or erroneous and/or because the Fund's financial reports, which were used internally and/or

disseminated to investors, were similarly impaired.  Said breaches of PwC's duties resulted from

PwC's negligence and carelessness.

201.    The Fund suffered pecuniary damages as a direct and proximate result of PwC's

breach of its duty to provide to the Fund correct and accurate information.

- 58 -

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment

202.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth

herein.

203.    The General Partner, FG Bermuda, has received as compensation Management

Fees of 1% (or 0.0833% per month) of each Limited Partner's capital account and Incentive

Allocations of 20% of the net capital appreciation after expenses allocated to each Limited

Partner's capital account of the Fund.  The General Partner was paid these fees to perform

certain duties which it did not perform, and has been unjustly enriched thereby.  The fees paid to

the General Partner were also inflated because they were based on inflated capital accounts,

which inflation the General Partner was responsible for via the wrongful conduct as alleged

above, and have been unjustly enriched thereby.

204.    The Administrators (GlobeOp prior to September 1, 2006 and Citco Europe

effective September 1, 2006) received a monthly service fee, in advance, based on a beginning

monthly net asset value, after subscriptions and redemptions.  The sub-administrator, Citco

Canada, shared in those fees.  The Administrators and sub-administrator were paid these fees to

perform certain duties, which duties the Administrators and sub-administrator did not perform

accurately, and were unjustly enriched thereby.  The Administration Fees were also inflated,

because the net asset value of the Fund was inflated, which inflation the Administrators and sub-

administrator were responsible for via the wrongful conduct as alleged above, and have been

unjustly enriched thereby.

205.    FG Advisors received an expense reimbursement from the Fund payable quarterly

based on the beginning quarterly net asset value, after subscriptions and redemptions, computed

at the rate of 0.10% per annum. The expense reimbursements were inflated, because such

expense reimbursements were based on inflated net asset value of the Fund.

206.    Such enrichment came at the Fund's and the Limited Partners' expense, as such

payments were taken directly out of the Fund assets.

207.    Under these circumstances, FG Bermuda, FG Advisors, GlobeOp, Citco Europe

and Citco Canada have been unjustly enriched and, in equity and good conscience, should be

made to return their unjustly gained monies.

## EIGHTH CAUSE OF ACTION

### Accounting from the Fund Defendants

208.    Plaintiffs repeat and reallege the foregoing allegations as though fully set forth

herein.

209.    During the relevant time Plaintiffs and the other Limited Partners had, and

continue to have, an interest in the assets of the Fund.

210.    The Fund Defendants owed fiduciary duties to Plaintiffs and the other Limited

Partners and, by their above-described conduct, the Fund Defendants have grossly breached such

duties with respect to, among other things, the Fund assets in which Plaintiffs and the other

Limited Partners have an interest.

211.    Plaintiffs and the other Limited Partners are entitled to an accounting from the

Fund Defendants concerning the Fund's assets.

WHEREFORE, Plaintiffs demand judgment and preliminary and permanent relief, including preliminary and permanent injunctive relief, in Plaintiffs' favor and in favor of Greenwich Sentry Partners, as appropriate, against all Defendants as follows:

a.    authorizing the maintenance of this action as a derivative action, with the Plaintiffs as derivative plaintiffs;

b.    declaring that the Fund Defendants have violated their fiduciary duties to the Fund and its Limited Partners and/or aided and abetted each other in breaching those duties;

c.    declaring that PwC committed professional negligence, negligent misrepresentation and breach of contract in rendering its services to the Fund, which proximately damaged the Fund and its Limited Partners;

d.    declaring that the Fund Defendants have been unjustly enriched by their wrongful and grossly inequitable conduct;

e.    awarding restitution of the monies paid to the Fund Defendants based on artificially inflated capital accounts of the Limited Partners;

f.    ordering that PwC return any fees which it was paid by the Fund for alleged auditing services;

g.    ordering the imposition of a constructive trust over the monies received by FG Bermuda and/or each of the other Fund Defendants as Management Fees and/or Incentive Allocations calculated based on the artificially inflated capital accounts of the Limited Partners;

h.    the appointment of a receiver to oversee and manage the constructive trust;

- 61 -

    i.  alternatively, awarding compensatory damages against Defendants,

individually and severally in an amount to be determined at trial, together with pre-judgment

interest at the maximum rate allowable by law;

    j.  awarding Plaintiffs the costs and disbursements of this action, including

reasonable allowances for Plaintiffs attorneys' and experts' fees and expenses; and

    k.  granting such other or further relief as may be just and proper under the

circumstances.

- 62 -

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

February 17, 2009

MILBERG LLP
By: _____
     Sanford Dumain
     Matthew Gluck
     Brad Friedman
     Andrei V. Rado
     Kristi Stahnke McGregor
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
sdumain@milberg.com
mgluck@milberg.com
bfriedman@milberg.com
arado@milberg.com
kmcgregor@milberg.com

Stephen A. Weiss
Christopher M. Van de Kieft
SEEGER WEISS LLP
One William Street
New York, NY 10004
(212) 584-0700
sweiss@seegerweiss.com
cvandekieft@seegerweiss.com

*Attorneys for Plaintiffs*

- 63 -

Index No.                                              Year 20  09

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

FRANK E. PIERCE and FRANK E. PIERCE, IRA,,

Plaintiffs,

v.

FAIRFIELD GREENWICH GROUP, FAIRFIELD
GREENWICH (BERMUDA) LTD., FAIRFIELD
GREENWICH ADVISORS LLC, GLOBEOP
FINANCIAL SERVICES LLC, CITCO FUND SERVICES
(EUROPE) B.V., CITCO (CANADA) INC., WALTER M.
NOEL, JR., JEFFREY TUCKER, ANDRES
PIEDRAHITA, BRIAN FRANCOEUR, AMIT
VIJAYVERGIYA, and
PRICEWATERHOUSECOOPERS LLP,

Defendants,

and

GREENWICH SENTRY PARTNERS, L.P.,

Nominal Defendant.

SUMMONS AND LIMITED PARTNERS
DERIVATIVE COMPLAINT

MILBERG LLP

Attorneys for    *Plaintiffs*

*Office and Post Office Address, Telephone*

One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

Dated,

To

Attorney(s) for

Service of a copy of the within                    is hereby admitted.

Dated,

Attorney(s) for

SPECIAL  Blumberg Excelsior Inc., NYC 10013