# EXHIBIT B

# CUSTOMER CLAIM

Claim Number_____

Date Received_____

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008

(Please print or type)

Name of Customer: __Archand S.à.r.l.__

Mailing Address: __c/o Ropes & Gray LLP, Attention: Andrew G. Devore, One International Place__

City: __Boston__                State: __MA__            Zip: __02110__

Account No.: __see Attachment and Appendices__

Taxpayer I.D. Number (Social Security No.): _____

**NOTE:**    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY THE ACCOMPANYING INSTRUCTION SHEET.  A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009.  CLAIMS RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.    Claim for money balances as of **December 11, 2008**:

    a.    The Broker owes me a Credit (Cr.) Balance of        $ __€ 450,213__

    b.    I owe the Broker a Debit (Dr.) Balance of           $ __0__

    c.    If you wish to repay the Debit Balance,

        please insert the amount you wish to repay and

        attach a check payable to "Irving H. Picard, Esq.,

        Trustee for Bernard L. Madoff Investment Securities LLC."

        If you wish to make a payment, **it must be enclosed**

        with this claim form.                              $ __0__

    d.    If balance is zero, insert "None."             _____

2.        Claim for securities as of **December 11, 2008**:

**PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.**

|   |   | YES | NO |
|---|---|-----|-----|
| a. | The Broker owes me securities | ✓ | |
| b. | I owe the Broker securities | | ✓ |
| c. | If yes to either, please list below: | | |

| Date of Transaction (trade date) | Name of Security | The Broker Owes Me (Long) | I Owe the Broker (Short) |
|---|---|---|---|
| | *see Attachment and Appendices* | | |
| | | | |
| | | | |
| | | | |
| | | | |

Number of Shares or Face Amount of Bonds

**Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.**

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.
**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.**

**NOTE:** **IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.**

|  |  | <u>YES</u> | <u>NO</u> |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. |  | ✓ |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? |  | ✓ |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? |  | ✓ |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) |  | ✓ |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. |  | ✓ |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. |  | ✓ |
| 9. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? if so, give name of that broker. |  | ✓ |

Please list the full name and address of anyone assisting you in the preparation of this claim form: Andrew G. Devore, Ropes & Gray LLP, One International Place, Boston, Massachusetts 02110-2624.

502180406                                          3

If you cannot compute the amount of your claim, you may file an estimated claim. In that case, please indicate your claim is an estimated claim.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date ___17.06.09___    Signature _____

Date _____    Signature _____

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

**This customer claim form must be completed and mailed promptly, together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

502180406                                4

Attachment to Customer Claim Form, Bernard L. Madoff Investment Securities LLC.

08-01789-cgm    Doc 1487-2    Filed 01/07/10    Entered 01/07/10 15:18:23    Exhibit B
Pg 6 of 58

**Name of Customer:**     **Archand S.à.r.l.**
**Mailing Address:**      **c/o Ropes & Gray LLP, Attention: Andrew G. Devore,**
                          **One International Place, Boston MA 02110**

Archand S.à.r.l. (the "Customer") deposited cash in the amount of € 450,000, with Thybo International Fund Ltd. ("TIF") to be invested in Thybo Stable Fund Ltd. ("TSF"). The Customer's € 450,000 cash was then deposited by TSF with Bernard L. Madoff Investment Securities LLC ("BLMIS"). The Customer did not redeem or otherwise withdraw any amount of its cash deposited with BLMIS. The foregoing structure of Customer's investment in BLMIS is diagramed as follows:



The prospectuses of TIF and TSF are attached hereto as Appendices 1 and 2.

Attached hereto as Appendix 3 is the Customer's subscription confirmation setting forth the amount of € 450,000 deposited with TIF for investment in BLMIS. As set forth in Appendix 3, the subscription was executed through a bank account of the Customer with Pictet & Cie Banquiers in Switzerland (the "Custodian Bank").

Attached hereto as Appendix 4 is the portfolio statement from the Custodian Bank setting forth the value of the Customer's investment in BLMIS (through TIF) as € 450,213 as of October 31, 2008.

The Customer acknowledges that the Trustee has reported to have found no securities purchased on behalf of customers for at least the past thirteen years and does not expect to discover any such securities. Accordingly, the Trustee has reported that he does not foresee any valid claims for securities. To the extent that any valid securities claims exist due to any future recovery of securities by the Trustee, or otherwise, the Customer expressly claims any and all such securities purchased for its benefit.

**Appendices to Attachment Customer Claim**

1. Prospectus of Thybo Stable Fund Ltd.
2. Prospectus of Thybo International Fund Ltd.
3. Subscription confirmation
4. Portfolio statement as of October 31, 2008
5. Appendix to the Attachment Customer Claim Form – Archand S.à.r.l.
   Short description of the corporation and signing authority
6. Abstract Chamber of Commerce
7. Authorised Signatures
8. Copy passport
9. Copy passport

**Appendix 1**

**NOT FOR USE OR DISTRIBUTION IN THE
UNITED STATES OF AMERICA**

---

**PROSPECTUS**

---

Relating to an offering of shares of

# THYBO STABLE FUND LTD.

October 2006

# TABLE OF CONTENTS

DIRECTORY.................................................................................................... 1

SUMMARY OF THE OFFERING OF CLASS B SHARES................................... 2

INVESTMENT OBJECTIVE............................................................................... 3

INVESTMENT STRATEGY................................................................................ 4

SELECTION PROCESS.................................................................................... 4

STRUCTURE.................................................................................................... 4

PRIVATE PLACEMENT OF SHARES............................................................... 5

ANTI-MONEY LAUNDERING REGULATIONS.................................................. 5

REDEMPTION OF SHARES............................................................................. 6

SUSPENSION OF DEALINGS.......................................................................... 7

TRANSFERABILITY OF SHARES.................................................................... 7

DETERMINATION OF NET ASSET VALUE...................................................... 8

PORTFOLIO MANAGER................................................................................... 8

INVESTMENT ADVISOR.................................................................................. 9

RISKS OF INVESTMENT; SUITABILITY.......................................................... 9

CHARGES AND EXPENSES............................................................................ 10

REPORTS TO SHAREHOLDERS.................................................................... 10

DIVIDENDS...................................................................................................... 10

TAX CONSIDERATIONS................................................................................. 10

MANAGEMENT............................................................................................... 10

PLACEMENT AGENT, SALES COMMISSIONS............................................... 10

ADMINISTRATOR AND TRANSFER AGENT................................................... 11

AUDITORS...................................................................................................... 11

CUSTODIAN.................................................................................................... 11

SHARE CERTIFICATES.................................................................................. 12

REGULATION.................................................................................................. 12

POTENTIAL CONFLICTS OF INTEREST........................................................ 12

APPENDIX A.................................................................................................... 14

APPLICATION FORM FOR SHARES............................................................... 22

**THYBO STABLE FUND LTD. (the "Company")**

**SUMMARY OF THE OFFERING OF CLASS B SHARES**

**INVESTMENT OBJECTIVE**

The Company's investment objective is to provide investors with consistent and reasonable capital appreciation while seeking to minimise risk.

The Company intends to invest in several investment themes managed by reputable investment managers, specialised in those investment schemes. Investments will be made in separate accounts and/or in offshore investment vehicles.

These investment managers/ portfolio managers will collectively invest the Company's assets and have been selected on the basis of their proven risk adjusted rate of returns and their demonstrated expertise in the selected investment schemes.

**STRUCTURE**

The Company is incorporated in the British Virgin Islands as an investment company which is structured to operate in a similar manner to an open-ended unit trust. The Company was incorporated with limited liability on July 25, 2006.

**SECURITIES OFFERED**

The minimum initial subscription amount is USD 5,000,000 or such other amount that the Directors may decide at their discretion.

The net proceeds from the issuance of the Class B Shares (the "Shares") will be invested in the investment program as described herein. Investors will be able to subscribe for Shares subject to approval by the Board of Directors. Each Share will be sold at a purchase price equal to the Net Asset Value per Share. Applications for Shares should be made by completing and signing the application form at the end of this Information Memorandum and sending the same to the Administrator and Transfer Agent prior to the last business day of each calendar month.

**REDEMPTION OF SHARES**

Shareholders may redeem their shares on the last Business Day of each calendar month or at other times as the Directors may determine provided that the Administrator and Transfer Agent receives the redemption request 30 days before the required redemption date.

Partial redemptions which could have the effect of reducing a shareholder's remaining investment to less than USD 1,000,000 will generally not be accepted.

**SHAREHOLDERS' MEETINGS AND REPORTS**

A monthly unaudited update on the Net Asset Value of the Company will be sent out to the Shareholders. Shareholders will receive annual audited financial statements and annual general meetings of Shareholders will be held at such date, time and venue as shall be notified to Shareholders.

## INVESTMENT STRATEGY

The Directors have delegated the responsibility for the investment policy to the Portfolio Manager, who has the authority to select the investment themes and relevant investment managers. The Investment Advisor will provide non-binding investment advice to the Portfolio Manager and will advise the Portfolio Manager on its selection of investment managers.

The Company may invest in securities selected by the investment managers and will consist of equity and equity-related securities, including common and preferred stocks, convertible securities, warrants, options and other derivatives. When deemed appropriate by the investment managers, the Company may also make substantial investments in bonds and other fixed income securities, repurchase and reverse repurchase agreements, foreign currencies, futures and forward contracts and money market instruments. The portfolio will generally include both long and short positions (hedge funds).

## SELECTION PROCESS

The investment themes selected by the Portfolio Manager will focus on low volatility strategies. Those strategies may partially expose the Company to general stock, fixed income or other market risk, other strategies will seek market neutral type of investments or a combination of strategies. Only well proven and reputable investment managers with a proven investment record and adequate infrastructure will be selected. The selection of the low volatility strategies should provide a stable and attractive risk adjusted return.

The investment managers of Thybo Stable Fund Ltd. will generally meet four key criteria:
- Sufficient number of years of investment management experience.
- A substantial portion of managers' net worth is co-invested with clients' capital.
- A clear and concise investment strategy.
- A consistent and reasonable risk adjusted rate of return.

## STRUCTURE

The Company is incorporated in the British Virgin Islands as an investment company which is structured to operate in a similar manner to an open-ended unit trust. The Company was incorporated with limited liability on July 25, 2006 with a perpetual duration and has the status of a BVI Business Company.

The Company has been recognised as a professional fund for the purposes of the Mutual Funds Act, 1996 (British Virgin Islands). As a professional fund each investor must represent that it is a professional investor. Pursuant to its Memorandum of Association, the Company will have no more than fifty investors.

The Company has two classes of Shares which have such rights and privileges as are determined with reference to the Memorandum and Articles of Association. The respective rights and privileges of each class of shares are set out in detail in the section entitled "Shares" in Appendix A.

The B Shares (the "Shares") are offered to investors and have a preferential right to the assets of the Company. The Shares are redeemable.

The A Shares in the Company are owned by Thybo Investments Limited and these shares have limited rights to participate in the assets of the Company on the winding-up of the Company.

4

provide written confirmation that they have completed the necessary verification checks on their client.

By way of example an individual may be required to produce a copy of a passport or identification card duly certified by a public authority such as a notary public, the police or the ambassador in his country of residence, together with evidence of his address such as a utility bill or bank statement. In the case of corporate applicants, this may require production of a certified copies of the Certificate of Incorporation (and any change of name), the Memorandum and Articles of Association (or equivalent), the names and residential and business addresses of all directors and beneficial owners and proof of name and address of at least two directors (certified copies of passport or national identity card and utility bill or bank/building society statement).

The details given above are by way of example only and the Administrator and Transfer Agent will request such information and documentation as it considers is necessary to verify the identity or source of funds of an applicant.   In the event of delay or failure by the applicant to produce any information required for verification purposes, the Administrator and Transfer Agent may refuse to accept the application and the subscription monies relating thereto or may refuse to process a redemption request until proper information has been provided. Investors should note specifically that where redemption proceeds are requested to be remitted to an account which is not in the name of the investor, the Administrator and Transfer Agent reserves the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the redemption proceeds will be paid. The redemption proceeds will not be paid to a third party account if the investor and/or owner of the account fails to provide such information.

Each applicant for Shares acknowledges that the Administrator and Transfer Agent shall be held harmless against any loss arising as a result of a failure to process his application for or his request for redemption of Shares if such information and documentation as has been requested by the Administrator and Transfer Agent has not been provided by the applicant.

If any person who is resident in the British Virgin Islands has a suspicion that a payment to the Company (by way of subscription or otherwise) contains the proceeds of criminal conduct that person is required to report such suspicion pursuant to the Proceeds of Criminal Conduct Act, 1996 of the British Virgin Islands.

## REDEMPTION OF SHARES

Shareholders may redeem their Shares on the last Business Day of each calendar month ("Dealing Day"), or at other times as the Directors may determine, provided that the redemption request is received by the Administrator and Transfer Agent no later than 4:00 pm (C.E.T.) 30 days before the relevant Dealing Day, or the next Business Day if such a day is not a Business Day, (unless otherwise determined by the Directors). Partial redemption of Shares which would reduce a shareholder's remaining investment in the company to less that US dollar 1,000,000 will not normally be accepted.

The Shares will be redeemed (the "Redemption Price") at the prevailing Net Asset Value as at the relevant Dealing Day. Full details of the calculation of Net Asset Value are set out in the section entitled "Determination of Net Asset Value" in Appendix A. There will be no redemption charge imposed by the Company or its agents. Payment of redemption proceeds will usually be made within 30 days of the redemption date.

Redemption requests should be made to the Administrator and Transfer Agent and must include the number of Shares to be redeemed and any special instructions for dispatch of the redemption proceeds. Contract Notes and replacement Share Certificates (if relevant) confirming details of the redemption will be posted to shareholders as soon as the transaction has been effected.

sole and absolute discretion). Consent to the transfer of Shares, if granted, ordinarily will only be granted for a transfer of all of the Shares of the relevant Shareholder to a single transferee.

The Directors and the Administrator and Transfer Agent may in their sole discretion decline to register a transfer of Shares in the absence of satisfactory evidence that the proposed transferee is not a resident of the British Virgin Islands or a US Person and/or if the proposed transferee does not provide to the Directors and the Administrator and Transfer Agent such evidence as either of them may require to verify the identity of the proposed transferee in order to comply with statutory obligations in relation to the offence of money laundering.

If any assignment, transfer or disposition occurs by reason of the death of a Shareholder or assignee, the notice may be given by the duly authorised representative of the estate of the Shareholder or assignee. The notice must be supported by proof of legal authority and valid assignment acceptable to the Directors.

No transfer shall be deemed to be effective until the name of the transferee has been entered in the Company's Share register.

## DETERMINATION OF NET ASSET VALUE

On the last Business Day of each calendar month, or such other times as the Directors may determine, the Net Asset Value of the Shares in the Company shall be determined (the "Valuation Day") by the Administrator and Transfer Agent.

The Net Asset Value of the Company will be equivalent to its gross assets less its gross liabilities as of any Valuation Day. To the extent feasible, expenses, fees and other liabilities will be accrued.

The Net Asset Value per Share is determined by dividing the Net Asset Value of the Company by the number of Shares in issue and deemed to be in issue, pursuant to their allotment for issue. For the purpose of this calculation the value attributable to A Shares is assumed to be zero.

The Board of Directors of the Company may, at its discretion, establish the basis for ascertaining bid and ask prices for securities comprised in the investment portfolio and to establish other methods for determining the value of securities and other assets when such other methods are deemed by it to be necessary or desirable.

However, after any valuation, the Board may, if necessary, cancel the valuation and carry out another. In the event that the assets are revalued all transactions effected on the relevant calendar month end will be concluded on the basis of the price established as a result of the revised valuation.

Further details of the calculation of the Net Asset Value are set out in the section entitled "Determination of Net Asset Value" in Appendix A.

## PORTFOLIO MANAGER

The Company has entered into a Portfolio Management Agreement with the Portfolio Manager whereby the discretionary management of the Company's portfolio of assets has been delegated to the Portfolio Manager. The Portfolio Manager will be responsible for the selection and appointment of, and allocation of assets to, the investment managers. The Portfolio Manager will, as part of its responsibility, constantly review and monitor the performance of the investment managers.

## CHARGES AND EXPENSES

The Company will bear all the expenses in relation to its incorporation and operations. The Directors of the Company will be paid nominal fees and have the right to waive these fees. The Company has no employees and has delegated its administrative affairs to the Administrator and Transfer Agent.

## REPORTS TO SHAREHOLDERS

The Company will, as a policy, and when possible, inform shareholders within 15 days following the end of a monthly period of the Net Asset Value of the Shares.

An annual audited report on the financial position of the Company will be prepared and sent to shareholders following the end of each fiscal year.

## DIVIDENDS

The Company's objective is capital appreciation, which will be pursued in part by the reinvestment of investment income. Consequently, it is not the intention of the Board to propose the payment of a dividend in the normal course of the Company's business.

## TAX CONSIDERATIONS

The following information is based on the law and practice in force in the British Virgin Islands at the date hereof and is subject to changes therein.

At the date of this Information Memorandum, the Company is exempt from all provisions of the Income Tax Act of the British Virgin Islands, including with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Company to persons who are not persons resident in the British Virgin Islands. Capital gains realised with respect to any shares, debt obligations or other securities of the Company by persons who are not persons resident in the British Virgin Islands are also exempt from all provisions of the Income Tax Act of the British Virgin Islands. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the British Virgin Islands with respect to any shares, debt obligations or other securities of the Company.

## MANAGEMENT

The Board of Directors of the Company is responsible for the overall investment policy, objectives and management of the Company, for its administration and for the investment policy within the overall objective.

The Board of Directors of the Company has delegated the discretionary management of the Company's portfolio of assets to the Portfolio Manager who has the authority to execute the investment objectives of the Company.

## PLACEMENT AGENT, SALES COMMISSIONS

The Company may, at its discretion, appoint Placement Agents for the Company.

10

## SHARE CERTIFICATES

Share Certificates will only be issued upon request, otherwise the Shares will be issued in non-certificated form.

## REGULATION

The Company has been recognised as a professional fund under the Mutual Funds Act, 1996 (British Virgin Islands).  As such, each investor will have to represent that it is a "professional investor".  A professional investor is a person (i) whose ordinary business involves, whether for its own account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Company, or (ii) has a net worth in excess of US$1,000,000 or its equivalent in any other currency (individuals may include the worth of his or her spouse in determining his or her own worth) and consents to being treated as a professional investor.

As a professional fund, the Company is required to pay an annual government fee of USD 350 to the British Virgin Islands Financial Services Commission (the "FSC).  The Company is subject the supervision of the FSC.   The FSC may direct the Company to furnish information or provide access to any records, books or other documents relating to the business of the Company which, in the opinion of the FSC, are necessary to enable them to ascertain compliance with the Mutual Funds Act, 1996 and its regulations.   However, recognition as a professional  fund does not involve an examination of the merits of an investment in the Company, or supervision of the investment performance or investment restrictions of the Company by the FSC.  A certificate of recognition may be cancelled if, inter alia, the Company is carrying on business in a manner detrimental to the interests of investors or to the public interest.

## POTENTIAL CONFLICTS OF INTEREST

The Portfolio Manager may act as a manager or adviser to other mutual funds or clients.  It may also invest for its own accounts.  As such, it could compete for the same trades or investments as the Company may otherwise make.  When such an occasion arises, investment opportunities are allocated based on what such persons deem to be equitable.  However, in some cases these allocation procedures may adversely affect the price paid or received by the Company or the size of the position obtained or disposed of by the Company.

Directors of the Company may be directors of companies in which the Company's assets are or may be invested.  As such, the Directors may have a conflict between their obligation to act in the best interests of the Company and their interest in generating revenues or other benefits for other entities with persons with which they are affiliated.

A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director, or may act in a professional capacity to the Company on such terms as the Directors may determine.  No Director shall be disqualified by his office from contracting with the Company in any capacity, nor shall any such contract or arrangement entered into by the Company in which any Director is in any way interested be liable to be voided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realized by any such contract or arrangement by reason of such Director holding that office if he shall declare the nature of his interest.

A Director, notwithstanding his interest, may be counted in the quorum present at any meeting at which he or any other Director is appointed to hold any such office or place of profit under the Company or at which the terms of any such appointment are arranged, and he may vote on any

## APPENDIX A

### GENERAL INFORMATION

1.      INCORPORATION AND REGISTRATION

The Company was incorporated in the British Virgin Islands for an undetermined period as an investment company.  The Company was incorporated with limited liability on July 25, 2006 and is registered under number 1041499. The Company has the status of a BVI Business Company.

2.      AUTHORISED CAPITAL

The Company has an authorised capital of 100 voting A Shares of a par value of USD 1.00 per Share and 4,990,000 B Shares with limited voting rights and a par value of USD 0.01 per share.  The Company will have only Registered Shares in issue.

3.      REGISTERED OFFICE

The Company's registered office is Romasco Place, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands.

4.      MEETINGS AND REPORTS

Meetings

The annual general meeting of shareholders of the Company (the "Annual General Meeting") will be held within nine months of the financial year-end of the Company at such time and place as the Board of Directors may determine.

Notices of general meetings and other notices are given by mail to the shareholders in accordance with the law of the British Virgin Islands and the Articles of Association of the Company.  Notices will specify the place and time of the meetings, the conditions of admission, the agenda, the quorum and the voting requirements as to attendance. Quorum and majorities at all general meetings will be those laid down in the Articles of Association of the Company.

Separate class meetings will be convened in the same manner as ordinary general meetings in all circumstances where the rights of the Shares of any one class are affected.

Reports

The financial year will be the calendar year and ends on 31st December of each year. The annual report containing the audited financial accounts of the Company in respect of the preceding financial period and with details of the portfolio of the Company, will be sent to Shareholders at their address shown in the Company's Share Register, at least fifteen days before the Annual General Meeting.

5.5    <u>Class Rights and Restrictions</u>

    a)    The Directors may impose or relax restrictions on any Shares (other than any restriction on transfer but including the requirement that Shares be issued only in registered form) and, if necessary, require transfer of such Shares, as they may think necessary to ensure that Shares are neither acquired nor held by or on behalf of any person in breach of the law or requirements of any country or governmental or regulatory authority, or which might have adverse taxation or other pecuniary consequences for the Company, including a requirement to register under any securities or investment or similar laws or requirements of any country or authority. The Directors may, in this connection, require a shareholder to provide such information as they may consider necessary to establish whether he is the beneficial owner of the Shares which he holds.

    b)    The rights attached to the shares of any one class may only be varied with the consent in writing of the holders of at least three-quarters of the shares or the sanction of a resolution passed at a separate general meeting of holders of shares relating to that class by a majority of three-quarters of the relevant class of shares in issue. The provisions of the Articles of Association relating to general meetings shall apply mutatis mutandis to every separate general meeting save that the quorum shall be two persons at least holding or representing by proxy not less than one half of the issued shares relating to that class or, at an adjourned meeting, any one person present holding or representing by proxy shares relating to that class.

6.    DETERMINATION OF NET ASSET VALUE

For the purpose of preparing financial statements of the Company US dollars have been used. The Net Asset Value of Shares in the Company shall be expressed in US dollars as a per share figure and shall be determined in respect of any Valuation Date by dividing the net assets of the Company by the number of Shares outstanding. The Net Asset Value of A Shares shall for these purposes be assumed to be zero.

The valuation of the Net Asset Value of the Company shall be made in the following manner:

6.1    The Assets of the Company shall be deemed to include those assets listed below:

    a)    investments owned or contracted to be acquired by the Company;

    b)    cash on hand or on deposit including accrued interest;

    c)    cash payments outstanding on any Shares allotted;

    d)    bills and demand notes and amounts receivable including net amounts receivable in respect of investments contracted to be realised;

    e)    interest accrued on interest-bearing investments of the Company except that accrued on securities which is included in the quoted price; and

c)      the value of participation in collective investment schemes shall be the last published redemption price of the shares or units representing such participation unless the Directors in their discretion shall have determined that any such share or unit is not worth the full amount thereof, in which event the value thereof shall be deemed to be such value as the Directors in their discretion shall determine;

d)      the Directors will rely on the investment valuations provided by the investment managers for the purposes of determining the value of the assets managed on behalf of the Company by each investment manager.    Each investment manager will furnish audited financial statements to the Directors annually.

PROVIDED ALWAYS that:-

i)      if the Directors in their discretion consider that the prices ruling on a securities market other than the Principal Securities Market provide, in all circumstances, a fairer criterion of value in relation to any such investment, it may adopt such prices; or

ii)     the Directors may, at their absolute discretion, permit some other method of valuation to be used if they consider that such valuation better reflects the fair value;

e)      if and whenever the quoted, listed or available price of an investment is a single price, such price shall be taken as the mean between the lowest available market dealing offered price and the highest available market dealing bid price;

f)      preliminary expenses (including the expenses incurred in connection with the initial issue of Shares) will be amortised over a period of five years or such shorter period as the Directors may determine from time to time and will be included as an asset at cost less amounts written off;

g)      if no price quotations are available as above provided, the value thereof shall be determined by the Directors, or their authorised agent, based on the reasonable, foreseeable sales price determined prudently and in good faith;

h)      any value (whether of a security or cash) otherwise than in US dollars shall be converted into US dollars at the rate (whether official or otherwise) which the Directors shall in their absolute discretion deem appropriate to the circumstances having regard, inter alia, to any premium or discount which they consider may be relevant and to costs of exchange.

7.      INVESTMENT RESTRICTIONS

7.1     In carrying on the business of the Company, the Company shall be entitled to acquire, hold, deal in and dispose of any investment in such manner, at such times and in such amounts as the Company shall think fit.

7.2     The Directors shall not (and shall not cause to) on behalf of the Company:-

and expenses which any Director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such Director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Company, and have priority as between the shareholders over all other claims but only if such Director or officer acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

10.    AMENDMENT TO THE MEMORANDUM AND ARTICLES OF ASSOCIATION

The Memorandum and Articles of Association may be amended at any time by either:-

    (a)    a resolution of the holders of Class A Shares together with a resolution of the holders of Class B Shares; or

    (b)    a resolution of the Directors;

subject to the quorum and voting requirements provided by the Law of the British Virgin Islands and the Articles of Association of the Company. Any amendment affecting the rights of the holders of Shares of any class vis-à-vis those of any other class shall be subject, further, to the said quorum and majority requirements in respect of each such relevant class.

11.    STATUTORY AND OTHER INFORMATION

    a)    The following contracts which are or may be material have been entered into otherwise than in the ordinary course of the Company's business:

        i)    A Portfolio Management Agreement dated with effect from October 31 2006. between the Company of the one part and the Portfolio Manager of the other part (the "Portfolio Management Agreement").

        ii)    An Administration Agreement dated with effect from October 31 2006. between the Company of the one part and the Administrator and Transfer Agent of the other part (the "Administration Agreement"); and

    b)    The Company is not engaged in any litigation or arbitration and no litigation or claim is known to the Directors to be pending or threatened against the Company.

    c)    The Company has no employees and no subsidiaries.

    d)    There are no existing or proposed service contracts between any of the Directors and the Company but the Directors may receive remuneration as referred to above in this Information Memorandum.

    e)    The Company has not purchased, nor acquired, nor agreed to purchase or acquire, any fixed property.

    f)    No Shares in the Company are under option or agreed, conditionally or unconditionally, to be put under option.

    g)    No Shares or loan capital of the Company have been or are agreed to be, proposed to be issued as fully or partly paid up otherwise than in cash.

# THYBO STABLE FUND LTD.

## APPLICATION FORM
## FOR
## SHARES

1.      I/We offer to subscribe for the number of Shares of the Company as may be subscribed by the investment of the amount of US$ _____ at a price per Share ("Subscription Price") determined as mentioned below.

2.      I/We confirm that payment of the Subscription Price has been made by US$ bank draft to the Company at the above address or by wire transfer to:

| | |
|---|---|
| Pay to: | UBS AG Stamford Branch, New York (Stamford) |
| Swift Code: | 101-WA-361135-000 |
| ABA: | 0260-0799-3 |
| Swift Code: | UBSWUS33 |
| In favour of: | UBS (Luxembourg) S.A. |
| Swift Code: | UBSWLULL |
| Beneficiary name: | THYBO STABLE FUND LTD. |
| Beneficiary Account no: | |
| Ref. | _____(applicant's name) |

3.      I/We represent that:

(a)     this application is based solely upon the information memorandum of the Company dated August 2006 and subject to the provisions of the memorandum of association and the articles of association of the Company and that I/we have received and read and am/are familiar with the contents of the said information memorandum;

(b)     I am/We are not a national or resident of or a partnership or corporation organized or existing under the laws of the United States or any state, territory or possessions thereof and nor do I/we hold or intend to hold for the benefit of any such person; and

(c)     I am/We are not making this application for any person under the age of 21 years.

4.      I/We acknowledge that due to anti-money laundering requirements in the British Virgin Islands, the Administrator and Transfer Agent may require further identification of me/us before the application can be processed and the Company and the Administrator and Transfer Agent shall be held harmless and indemnified against any loss arising due to the failure to process this application if such information as has been required has not been provided by me/us.

5.      I/We hereby confirm that the Company and the Administrator and Transfer Agent are each authorized and instructed to accept and execute any instructions in respect of the Shares to which this application relates given by me/us by facsimile.  If instructions are given by me/us by facsimile, I/we undertake to forward the original immediately by post to the Administrator and Transfer Agent.  I/we hereby indemnify the Company and the Administrator and Transfer Agent and agree to keep each of them indemnified, against any loss of any nature whatsoever arising to each of them as a result of any of them acting on facsimile instructions.  The Company and the Administrator and Transfer Agent may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions, or other instrument believed, in good faith, to be genuine or to be signed by properly authorized persons.

6.      Rights and Liabilities
        °    I/We acknowledge that I/We have such a knowledge and experience in financial, investment and business matters as to be capable of evaluating the merits and risks

*Documentation to be provided:*

> *<u>For individuals:</u>*
> *Declaration of beneficial ownership*
> *Notarised copy of passport*
> *Latest utility bill*
> *Details of applicant's bank details:*

> > *Bank:* _____
> >
> > *Address:* _____
> >
> > _____
> >
> > *A/c name:* _____
> >
> > *a/c Nr:* _____
> >
> > *Swift/ABA:* _____
> >
> > *IBAN :* _____

> *<u>For companies:</u>*
> *Incorporation documents*
> *Memorandum and Articles of Association*
> *Certificate of Incumbency*
> *Certified Power of Attorney (if relevant)*
> *Declaration of beneficial ownership (notarised copy of the passport of the beneficial owner)*
> *Details of applicant's bank details:*

> > *Bank:* _____
> >
> > *Address:* _____
> >
> > _____
> >
> > *A/c name:* _____
> >
> > *a/c Nr:* _____
> >
> > *Swift/ABA:* _____
> >
> > *IBAN:* _____

Notes

1.    The Subscription Price of Shares issued pursuant to this application (if accepted) will be determined as described in the information memorandum and the articles of association of the Company.

2.    The minimum subscription amount is US$5,000,000. This application need only indicate the total amount to be invested. The Company will calculate the number of Shares (including fractional Shares calculated to 3 decimal places) to be issued at the relevant Subscription Price.

3.    A confirmation note will be sent upon acceptance of this application.

4.    Share will normally be held in bookstock form. Share certificates will not be issued unless specifically requested.

## BENEFICIAL OWNER

Declaration :

This declaration serves to establish the identity of the beneficial owner(s) pursuant to current provisions in Luxembourg relating to money laundering.

Client Name : _____

Account number : _____

The undersigned hereby declares (check where applicable under item 1 **and** 2) :

1.    ☐    as account holder (natural person)

      ☐    as representative/attorney of the account holder (legal entity)


2.    ☐    that he/she is the beneficial owner of the assets to be deposited
            with UBS Fund Services (Luxembourg) Ltd.

      ☐    that the following person(s) is/are the ultimate beneficial owner(s) of the
            assets to be deposited with UBS Fund Services (Luxembourg) Ltd.

Personal data : (name, first name, nationality, date and place of birth, domicile)

_____

_____

_____


Additionally, the undersigned undertakes to notify UBS Fund Services (Luxembourg) Ltd. without delay of any subsequent change concerning the identity of this/these ultimate beneficial owner(s) and to furnish UBS Fund Services (Luxembourg) Ltd. all relevant information and documents.


_____            _____
Date                             Signature

**Appendix 2**

**NOT FOR USE OR DISTRIBUTION IN THE
UNITED STATES OF AMERICA**

**PROSPECTUS**

Relating to an offering of shares of

**THYBO INTERNATIONAL FUND LTD.**

June 2007

**THYBO INTERNATIONAL FUND LTD.**
Romasco Place, Wickhams Cay 1
Road Town, Tortola
British Virgin Islands

Thybo International Fund Ltd., (the "Company") is a BVI Business Company incorporated on 19th January 2006. under the laws of the British Virgin Islands. The investment objective of the Company is to provide investors with consistent and reasonable capital appreciation while seeking to control risk. The Company is offering its Shares initially at a price of US$ 1,000 or EUR 1,000 per Share, and thereafter at a price based on net asset value. The minimum initial investment per investor is US$1,000,000 or Euro1,000,000 or such other amount at the discretion of the Directors.

If you are in any doubt about the contents of this document you should consult your stockbroker, bank manager, lawyer, accountant or other professional adviser. The distribution of this document and the offering of Shares in certain jurisdictions may be restricted and accordingly persons into whose possession this document comes are required by the Company to inform themselves about and to observe such restrictions. This document does not constitute an offer or solicitation to anyone in any jurisdiction in which such offer is not authorised or to any person to whom it is unlawful to make such offer or solicitation.

The Shares are offered on the basis of the information and representations contained in this document, and any other information given or representations made by any person may not be relied upon as having been authorised by the Company or its directors. Neither the delivery of this document nor the allotment or issue of Shares shall under any circumstances create any implication that there has been no change in the affairs of the Company since the date hereof.

No listing or other dealing facility is at present being sought for the Shares of the Company, although the Directors may consider seeking a listing in the future.

**Professional Fund:** The Company has been recognised as a professional fund for the purposes of the Mutual Funds Act, 1996 of the British Virgin Islands. As a professional fund, investment in the Company is restricted to professional investors as defined in such act.

The Shares have not been registered under any United States ("US") securities laws and, except in a transaction which does not violate US securities laws, may not be directly or indirectly offered or sold in the US, or any of its territories or possessions or areas subject to its jurisdiction, or to or for the benefit of a US person.

The Company is not a recognised collective investment scheme under any United Kingdom financial services law and, as such, Shares may not be offered or sold in the United Kingdom by means of this document except to persons authorised to carry on investment business under such laws, persons whose ordinary business involves the acquisition or disposal of investments similar to those of the Company and persons otherwise permitted to receive this document under such laws.

Any reference in this document to US$ refers to the lawful currency of the US and any reference in this document to Euros refers to the lawful currency of the European Union.

The Directors of the Company, whose names appear on page 3, accept responsibility for the information contained in this document. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case), this document does not contain any untrue statement, or omit anything which would make any statement untrue. The Directors accept responsibility accordingly.

Euro and US Dollar. The costs of such foreign exchange transactions will be attributable to the holders of the Euro class shares. Subscriptions received for Class F and Class G shares will be used to purchase shares in TSF Master Fund.

**Offering of Shares:**

Shares will be offered for sale on the first Business Day of each calendar month or at such other times as the Directors may determine. A Business Day is any day on which banks in Luxembourg are open for business (a "Business Day"). Shares will be sold at a purchase price per Share equal to the Net Asset Value per Share as at the close of business on the preceding Business Day.

**Minimum Subscription:**

The minimum initial subscription for Shares by an investor is US$1,000,000 or Euro1,000,000 and thereafter US$100,000 or Euro100,000. The Directors may accept subscriptions for lesser amounts.

**Subscription Fee:**

A sales charge of up to 3% of the gross subscription amount may be imposed on any subscription to compensate dealers, placement agents or other parties in connection with the solicitation of subscriptions.

**Subscription Procedure:**

Persons interested in subscribing for Shares should complete the subscription agreement attached to this prospectus and return the same to the Company at the address listed thereon. Payment for Shares should be made by wire transfer.

**Redemption:**

Classes B, C, D and E Shares may be redeemed on the first Business Day of each calendar quarter with 45 days prior written notice (subject to the Directors waiving such notice), or at such other times as the Directors may determine. Share Classes F and G may be redeemed on the first business day of each month with 30 days notice. Shares will be redeemed at a price per Share equal to the Net Asset Value per Share as at the close of business on the preceding Business Day. Payment of the redemption price will normally be made within thirty days following the redemption of the Shares.

If a partial redemption would result in the shareholder holding a number of Shares having an aggregate Net Asset Value of less than US$1,000,000 or Euro1,000,000, then the Company has the right to refuse to honour such request for partial redemption.

**Conversions:**

Shares are convertible between different classes of Shares without charge on the first Business Day of each calendar quarter at the option of the holder with 45 days' prior written notice.

**Net Asset Value:**

The Net Asset Value per Share will be determined in accordance with the Company's articles of association. The net asset value of a class of Shares ("Net Asset Value") is generally equivalent to the assets less the liabilities attributable to that class of Shares on any valuation date.

2

Custodian:                                      UBS (Luxembourg) S.A.
                                                36-38, Grand-Rue
                                                L-1661 Luxembourg

Administrator and Transfer Agent:               UBS Fund Services (Luxembourg) S.A.
                                                291, Route d'Arlon
                                                L-1550 Luxembourg

                                                Fees payable for these services are maximum 0.03% per
                                                annum with effect of 1st February 2007 on the aggregate Net
                                                Asset Value of the Company.

Auditor:                                        Ernst & Young S.A.
                                                7, Parc d'Activité Syrdall
                                                L-5365 Munsbach

Legal Counsel:                                  Conyers Dill & Pearman
                                                Romasco Place
                                                Wickhams Cay 1
                                                Road Town, Tortola
                                                British Virgin Islands

Each respective shareholder should consider whether the Company's investment programme is suitable for him. In view of the Company's specialized investment programme, shares are suitable investments only for sophisticated investors and financial institutions to whom an investment in shares does not constitute a complete investment programme and who fully understand, or are willing to assume, and have the financial resources necessary to withstand risks that may be involved in the Company's investment programme.

## LEVERAGE

The Company will not use leverage to enhance its investment returns.

## RISK CONSIDERATIONS

An investment in the Shares involves a significant degree of risk. There can be no assurance that the Company's investment objectives will be achieved or that there will be a return of capital. Prospective investors should carefully consider the following factors in determining whether an investment in the Company is a suitable investment:

**Master/Feeder Structure:**

The Company will invest all or substantially all of its investable assets in the TAM, TRF or TSF Master Fund. It is expected that other investors will also invest in the TAM, TRF and TSF Master Funds.

**Cross-Class Liability:**

The Company has seven classes of shares. The Company may in the future issue additional classes of shares. However, the Company as a whole, including any future separate class is one legal entity. All of the assets of the Fund are available to meet all of the liabilities of the Company, regardless of the separate account to which such assets or liabilities are attributed if any.

**Operating History:**

The Company is a newly formed entity and has no operating history upon which prospective investors can evaluate their likely performance. The Master Fund TAM has been in operation since August 2000 and the Master Fund TRF has been in operation since November 2004 and the Master Fund TSF has been in operation since July 2006.

**Investment and Trading Risks in General:**

All securities investments risk the loss of capital. Investment in the various securities and other instruments contemplated by the Company involves significant economic risks. Although the Company's investment program is expected to provide some protection from the risk of loss inherent in the ownership of such investments, there can be no assurance that these strategies will completely protect against this risk or that the Company's investment objectives will be obtained.

**Possible Effect of Redemptions:**

Shareholders may redeem their Shares in accordance with the articles of association of the Company. Substantial redemptions could require the Company to liquidate investments more rapidly than otherwise desirable in order to raise the necessary cash to fund the redemptions and to achieve a market position appropriately reflecting a smaller equity base. This could adversely affect the value of the Shares.

## DIRECTORS AND OFFICERS

The following are the Directors of the Company:

## BIOGRAPHIES

<u>Carl Hughes</u>  – <u>Managing Director Thybo Advisory S.A.M.</u>
Joined TBG headquarters in Monaco 15 years ago in 1991 and worked for the corporate treasury department as executive director, trading currencies, interest rate futures and high yield bonds. Specialised in hedge funds from 1999 onwards, named vice president in 2002 of Thybo Investments Limited and managing director of Thybo Advisory S.A.M. in 2006 .
Prior to joining TBG he worked as finance director for the Troodos Shipping Group and finance manager for the EBC Corporation.  He started his career with the UK-based audit firm Moore Stephens and is a UK certified accountant.  He holds a science degree from Imperial College, London and is a member of the Royal College of Science.

<u>Hans Vijverberg</u> – <u>President Thybo Advisory S.A.M.</u>
Has  a 25 year career at TBG Holdings N.V. ("TBG"), an industrial group privately owned by the Thyssen-Bornemisza family.  He became president of Thybo Advisory S.A.M. in 2006. Prior to 2006 he was a president and corporate treasurer of the Group and also was responsible for the transport and trading division of the Group for several years.  He joined TBG in 1981 as treasurer of the European operations, based in the Netherlands.  He joined the Monaco-based headquarters of the Group in 1984.
Prior to TBG he held several senior positions at Hunter Douglas N.V., Rotterdam in planning, control, corporate development and treasury for almost 10 years.  He started his career at Imtech in 1968 in the corporate planning and control department and spent two years as deputy director in their air freight division.  Hans Vijverberg holds a masters degree in business economics and finance from Erasmus University in Rotterdam.

<u>Colin Vibert</u> – <u>Managing Director Pinnacle Trustees</u>
Joined Pinnacle Trustees in Jersey in 2001 as a Director and works in the field of trust structuring and administration.  He worked at the TBG headquarters in Monaco from 1989 to 2001 as the Finance Manager of the treasury division.  Colin worked for BAII in Jersey from 1981 to 1988 as General Manager and Director for the stockbroking arm of the group.  Prior to joining BAII he was a partner for Jersey-based chartered accounts, Honey Barret having qualified as a chartered accountant with Arthur Young (now Ernst & Young) in 1975.  Colin is a fellow of the Institute of Chartered Accountants (England and Wales) and holds an MBA from Manchester Business School.

<u>Codan Services (B.V.I.) Ltd</u>. is an International Business Company owned by the Partners of Conyers Dill & Pearman.

The remuneration of the Directors shall be determined by the Directors. The Directors may also be reimbursed, inter alia, for traveling, hotel and other expenses properly incurred by them in attending meetings of the Directors or in connection with the business of the Company.  Any Director who devotes special attention to the business of the Company may be paid such extra remuneration as the Directors may determine.

There is no provision in the memorandum or articles of association of the Company requiring a Director to retire by reason of any age limit.

## POTENTIAL CONFLICTS OF INTEREST

The Portfolio Manager and the Investment Adviser may act as managers or advisers to other mutual funds or clients.  They may also invest for their own accounts.  As such, they could compete for the same trades or investments as the Company may otherwise make.  When such an occasion arises, investment opportunities are allocated based on what such persons deem to be equitable.  However, in some cases these allocation procedures may adversely affect the price paid or received by the Company or the size of the position obtained or disposed of by the Company.

his conduct was unlawful is in the absence of fraud, sufficient for the purposes, unless a question of law is involved.

## OFFERING OF SHARES

The initial closing took place at 5:00 p.m. (Luxembourg time) on 26 May 2006. After the initial closing, Shares are offered for sale on the first Business Day of each month or at such other times as the Directors may determine. A Business Day is any day on which banks in Luxembourg are open for business. Shares will be sold at a purchase price per Share equal to the Net Asset Value per Share as at the close of business on the preceding Business Day. The Net Asset Value per Share will be available from the Administrator on request.

Application should be made by completing and signing the application form at the end of this prospectus and sending the same to the Administrator at the address referred to on that form. Alternatively, applications may be made by fax to the Administrator at the fax number shown on the application form providing the details requested on the application form and by promptly mailing the application form duly completed and signed by or on behalf of the applicant to the Administrator. Subscription monies may be sent by wire transfer or US$ bank draft (see the application form for details). When applying for Shares, applicants should apply for a minimum amount of US$ 1,000,000 or Euro1,000,000.

A sales charge of up to 3% of the gross subscription amount may be imposed on any subscription to compensate dealers, placement agents or other parties in connection with the solicitation of subscriptions.

For an application to be duly processed as of the first Business Day of any month, the application and subscription monies must be received by 5:00 pm (Luxembourg time) five business days prior to any Dealing Day. A Dealing Day will be the last Business Day of each month or such days or days as the Directors may determine.

A contract note will be issued to accepted applicants confirming acceptance. Once applications have been received and accepted by the Company, they will be irrevocable. The Company reserves the right, in its entire discretion, to reject and return any application and remittances. Shares will not be allotted or issued without an accepted application and receipt of cleared subscription monies. The Company will issue fractions of Shares up to three decimal places.

Applicants should indicate on the application form whether they require share certificates to be issued. If specifically requested, share certificates will be dispatched by the Company as soon as practicable after the Shares have been issued. If this request is not made Shares will be held in bookstock form.

There are certain restrictions on the eligibility of investors to subscribe for Shares. (See "Compulsory Redemption" for details.) Shares may only be issued in the names of companies, partnerships or individuals. Further, Shares purchased for those under 21 years of age must be registered in the name of the parent or legal guardian.

Applicants subscribing for Shares are advised that the Shares are issued subject to the provisions of the Company's memorandum of association and articles of association.

## ANTI-MONEY LAUNDERING REGULATIONS

Measures aimed at the prevention of money laundering may require an applicant for Shares to verify his identity and/or the source of funds to the Company. Depending on the circumstances of each application, verification may not be required where the applicant makes the payment from an account held in the applicant's name at a recognised financial institution, or the application is made through a recognised intermediary. These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognised as having equivalent anti-money laundering regulations. Where

such period of time as the Directors may determine, including permanently, where the Directors determine that it is appropriate or necessary to do so in order to comply with the Proceeds of Criminal Conduct Act, 1997 (British Virgin Islands), or any regulation, code of practice or guidance note promulgated thereunder, or any similar legislation applicable to the Company, directly or indirectly, in any other jurisdiction.

In the event the Directors withhold the payment of any redemption proceeds, the Directors will, to the extent permitted by law, deposit such redemption proceeds with or to the order of the Custodian in the name of the Company for the payment to the shareholder upon approval by the Directors. Upon the deposit of such redemption monies as aforesaid, the shareholder will have no further interest in the relevant Shares or any claim against the Company in respect thereof except the right to receive the money so deposited (without interest) from the Company but only when, if ever, the payment is approved by the Directors. Provided the Directors act honestly and in good faith, the Company and the Directors will not be liable to any shareholder for any loss or damages arising as a result of the Directors exercising the foregoing power.

## TRANSFER OF SHARES

Shareholders are entitled with the consent of the Directors of the Company to transfer their Shares by an instrument in writing acceptable to the Directors of the Company. Unless the Directors otherwise determine, a shareholder is not entitled to transfer Shares if as a result of such transfer either he or the person to whom the Shares are to be transferred will hold Shares having a Net Asset Value of less than US$ 1,000,000 or Euro1,000,000. Shareholders are not authorised to transfer Shares to any person who would not be entitled to subscribe for Shares (see "Offering of Shares" and "Compulsory Redemption").

## CONVERSIONS OF SHARES

Shares of a different class are convertible into shares of another class at the option of the holder without charge. Conversions are effected on the first Business Day of each calendar quarter with 45 days prior written notice (subject to the Directors waiving such notice), or at such other times as the Directors may determine. The conversion shall be calculated based on the following formula:

$$A = \frac{(B \times RP)}{SP}$$

where:

A is the number of new Shares to be allotted

B is the number of existing Shares to be converted

RP is the redemption price of the existing Shares

SP is the subscription price of the new Shares

Shareholders who hold their Shares in bookstock form should send written instructions to the Administrator. Shareholders holding share certificates must complete the form on the reverse of the share certificate and send the same to the Administrator. Conversion instructions not received 45 days prior to a day set for conversion shall be treated as a request for conversion on the next day available for conversions.

any trades, at the mean between the last offer price and the last bid price) on the principal exchange for such investments as at the close of business on the day for which such calculation is to be made, provided always that:-

(i)    if the Directors at their discretion consider that the prices ruling on an exchange other than the principal exchange provide in all the circumstances a fairer criterion of value in relation to any such investment, they may adopt such prices; and

(ii)    the Directors may, at their absolute discretion, permit some other method of valuation to be used if they consider that such valuation better reflects the value;

(c)    if no price quotations are available as above provided, the value of an asset shall be determined from time to time in such manner as the Directors shall determine;

(d)    preliminary expenses (including the expenses incurred in connection with the initial issue of shares) will be amortised over a period of one year or such other period as the Directors may determine from time to time and will be included as an asset at cost less amounts written off; and

(e)    any value (whether of a security or cash) otherwise than in US dollars or Euros shall be converted into US dollars or Euros at the rate (whether official or otherwise) which the Directors shall in their absolute discretion deem appropriate to the circumstances having regard, inter alia, to any premium or discount which they consider may be relevant and to costs of exchange and with regard to the relevant share class.

The articles of association of the Company provide that any certificate as to the Net Asset Value per Share and/or the subscription price and/or redemption price per Share given in good faith by or on behalf of the Directors is binding on all parties.

## COMPULSORY REDEMPTIONS

The Directors of the Company have the power to impose such restrictions on the issue of Shares as they may think necessary for the purpose of ensuring that no Shares are acquired or held by any person in breach of the law or requirements of any country or governmental authority, or any person or persons in circumstances (whether directly or indirectly affecting such person or persons and whether taken alone or in conjunction with any other persons, connected or not, or any other circumstances appearing to the Directors to be relevant) which in the opinion of the Directors might result in the Company incurring any liability to taxation or suffering any other pecuniary disadvantage which the Company might not otherwise have incurred or suffered.

If it comes to the notice of the Directors that any Shares are held by any such non-qualified person, the Directors may give notice to such person requiring the redemption or transfer of such Shares in accordance with the provisions of the articles of association of the Company. If a person becomes aware that he is holding or owning Shares in breach of any such restriction he is required either to deliver to the Company a written request for redemption of the Shares or to transfer the same to a person who is not such a non-qualified person.

Pursuant to the articles of association of the Company, the Directors of the Company have the power to redeem all or any portion of the Shares held by any person.

class) with the consent in writing of all of the holders of the issued shares of the class or with the sanction of a resolution passed by a simple majority of the votes cast at a separate general meeting. The rights attached to any class of shares (unless otherwise expressly provided by the conditions of issue of such shares) are deemed not to be varied by the creation, allotment or issue of shares ranking pari passu therewith.

**Voting Rights:**

At any general meeting, every holder of Shares who is present in person or by proxy, shall have one vote on a show of hands. On a poll, every such holder of Shares present in person or by proxy shall have one vote for every Share held. Shareholders' resolutions of the Company require a simple majority of the votes cast by the shareholders voting at the meeting at which the resolution is proposed in order to be passed.

## SUSPENSION OF DEALINGS

The Directors may suspend the determination of the Net Asset Value per Share for the whole or any part of a period:

    (a)    during which any exchange or over-the-counter market on which any significant portion of the investments of the Company are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such exchange or market is restricted;

    (b)    when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Company to dispose of investments comprised in the Company or as a result of which any such disposal would be materially prejudicial to shareholders;

    (c)    when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Company cannot reasonably or fairly be ascertained; or

    (d)    during which the Company is unable to repatriate funds required for the purpose of making payments due on redemption of the Shares or during which any transfer of funds involved in the realisation or acquisition of investments or payments due on redemptions of the Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

When the determination of the Net Asset Value of the Shares has been suspended, Shares may not be issued or redeemed.

## CUSTODIAN

UBS (Luxembourg) S.A. (the "Custodian") has been appointed by the Company as custodian of the investments of the Company. The Custodian receives fees for approximately 0.024% per annum on the Net Asset Value of the Company.

The Custodian was appointed pursuant to a Custodian Agreement dated 1st April 2006. The Custodian Agreement may be terminated by either party on three months written notice. Pursuant to the terms of the Custodian Agreement, the Company has indemnified the Custodian and its Officers, Directors and employees from any and all costs, liabilities and expenses resulting directly or indirectly from the fact that these persons have acted for the Custodian in its capacity as Custodian of the Company other than those costs, liabilities and expenses arising from gross negligence or willful misconduct of the Custodian or of such agent or correspondent may be appointed from time to time by the Custodian, for which the

## MATERIAL CONTRACTS

The following contracts (not being contracts in the ordinary course of business) have been entered into by the Company and are, or may be, material:

(a)      the Portfolio Management Agreement between the Company and the Portfolio Manager dated 1st April 2006  pursuant to which the Portfolio Manager has been appointed to provide investment management services to the Company;

(b)      the Custodian Agreement between the Company and the Custodian dated lst April 2006 pursuant to which the Custodian has been appointed custodian of the assets of the Company; and

(c)      the Administration Agreement between the Company and the Administrator dated 1st April 2006 pursuant to which the Administrator has been appointed administrator of the Company.

## MISCELLANEOUS

**Dividends:**

The Company's objective is capital appreciation.  Consequently it is not the intention of the Company to propose the payment of a dividend in the normal course of the Company's business.

**British Virgin Islands Disclosure:**

**Professional Fund:**

The Company has been recognised as a professional fund under the Mutual Funds Act, 1996 (British Virgin Islands).  As such, the minimum investment in the Company is US$ $1,000,000, and each investor will have to represent that it is a "professional investor".  A professional investor is a person (i) whose ordinary business involves, whether for its own account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Company, or (ii) has a net worth in excess of US$1,000,000 or its equivalent in any other currency (individuals may include the worth of his or her spouse in determining his or her own worth) and consents to being treated as a professional investor.

As a professional fund, the Company is required to pay an annual fee of $350 to the British Virgin Islands Financial Services Commission (the "FSC"). The Company is subject to the supervision of the FSC.  The FSC may direct the Company to furnish information or provide access to any records, books or other documents relating to the business of the Company which, in the opinion of the FSC, are necessary to enable it to ascertain compliance with the Mutual Funds Act, 1996 and its regulations.   However, recognition as a professional fund does not involve an examination of the merits of an investment in the Company, or supervision of the investment performance or investment restrictions of the Company by the FSC.  A certificate of recognition may be cancelled if, inter alia, the Company is carrying on business in a manner detrimental to the interests of investors or to the public interest.

**Commissions:**

Save as disclosed in this prospectus, no commissions, discounts, brokerages or other special terms have been granted by the Company in connection with the issue or sale of any Shares.  No person has, or is entitled to be given, an option to subscribe for any Shares or loan capital of the Company.

THYBO INTERNATIONAL FUND LTD.

**APPLICATION FORM**

**FOR**

**SHARES**

1.(a)   **Class B – TAM Feeder – US dollars**
I/We offer to subscribe for the number of Class B Shares of the Company as may be subscribed by the investment of the amount of US$_____ at a price per Share ("Subscription Price") determined as mentioned below.  (Feeder to TAM – Master Fund)

1.(b)   **Class C – TAM Feeder – Euros**
I/We offer to subscribe for the number of Class C Shares of the Company as may be subscribed by the investment of the amount of EURO_____ at a price per Share ("Subscription Price") determined as mentioned below. (Feeder to TAM – Master Fund/Currency Hedged)

1. (c)   **Class D – TRF Feeder – US Dollars**
I/We offer to subscribe for the number of Class D Shares of the Company as may be subscribed by the investment of the amount of US$_____ at a price per Share ("Subscription Price") determined as mentioned below.  (Feeder to TRF – Master Fund)

1 (d)   **Class E – TRF Feeder - Euros**
I/We offer to subscribe for the number of Class E Shares of the Company as may be subscribed by the investment of the amount of EURO_____ at a price per Share ("Subscription Price") determined as mentioned below. (Feeder to TRF – Master Fund/Currency Hedged)

1 (e)   **Class F – TSF Feeder – US Dollars**
I/We offer to subscribe for the number of Class F Shares of the Company as may be subscribed by the investment of the amount of US$_____ at a price per Share ("Subscription Price") determined as mentioned below. (Feeder to TSF – Master Fund)

1 (f)   **Class G – TSF Feeder - Euros**
I/We offer to subscribe for the number of Class G Shares of the Company as may be subscribed by the investment of the amount of EURO_____ at a price per Share ("Subscription Price") determined as mentioned below. (Feeder to TSF – Master Fund/Currency Hedged)

2.     I/We declare that (i) my/our ordinary business involves, whether for my/our account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Company, or (ii) I/We each have a net worth (in the case of a natural person, either individually or jointly with its spouse) in excess of US$ 1,000,000 or its equivalent in any other currency and consent to being treated as a professional investor.

3.(e)   **Class F Shares (TSF Feeder – US Dollars)**

I/We confirm that payment of the Subscription Price has been made by US$ bank draft to the Company at the above address or by wire transfer to:

| | |
|---|---|
| Pay to : | UBS AG Stamford Branch , New York (Stamford) |
| SWIFT Address: | UBSWUS33 |
| For further credit to: | UBS (Luxembourg) S.A. |
| Account No: | 101-WA-361135-000 |
| For further credit to : | Thybo International Fund Limited |
| Account No: | 5398530 |
| Ref: | _____ (applicant's name) |

3. (f)   **Class G (TSF Feeder – Euros)**

I/We confirm that payment of the Subscription Price has been made by EURO bank draft to the Company at the above address or by wire transfer to:

| | |
|---|---|
| Pay to : | UBS Deutschland AG, Frankfurt am Main, Germany |
| SWIFT Address: | UBSWDEFF |
| For further credit to: | UBS (Luxembourg) S.A. |
| Account No: | 0230-60805.70M |
| Bankleitzahl : | BLZ 501 306 00 |
| For further credit to: | Thybo International Fund Limited |
| Account No: | 5398540 |
| Ref: | _____ (applicant's name) |

4.      I/We represent that:

      (a)    this application is based solely upon the current prospectus of the Company and subject to the provisions of the memorandum of association and the articles of association of the Company and that I/we have received and read and am/are familiar with the contents of the said prospectus;

      (b)    I am/We are not a national or resident of or a partnership or corporation organised or existing under the laws of the United States or any state, territory or possessions thereof and nor do I/we hold or intend to hold for the benefit of any such person; and

      (c)    I am/We are not making this application for any person under the age of 21 years.

5.      I/We acknowledge that due to anti-money laundering requirements in the British Virgin Islands, the Administrator may require further identification of me/us before the application can be processed and the Company and the Administrator shall be held harmless and indemnified against any loss arising due to the failure to process this application if such information as has been required has not been provided by me/us.

6.      I/We hereby take notice and acknowledge that UBS Fund Services (Luxembourg) S.A. in its function as Administration Agent may need to provide some information about my/our subscriptions into Thybo International Fund Limited (hereinafter referred to as the "Fund") to the Custodian of the Fund – UBS (Luxembourg) S.A. – in order to ensure the execution of any subscription/redemption request especially smooth settlement and payment of redemption proceeds upon my/our request.  For such purpose, I/we hereby instruct UBS Fund Services (Luxembourg) S.A. to disclose to UBS (Luxembourg) S.A. any information with regard to my/our relationship with the Fund, especially but not restricted to any personal data, data referring to my/our holdings in the Fund and banking relationships/payment instructions and agree that UBS Fund Services (Luxembourg) S.A. shall not be liable for any consequences arising out of or related to said disclosure of data.

7.      I/We hereby take notice and acknowledge that UBS Fund Services (Luxembourg) S.A. in its function as an Administration Agent may need to provide some information about my/our

***For companies:***
***Certificate of Incorporation***
***Memorandum and Articles of Association***
***Certificate of Incumbency***
***Certified Power of Attorney (if relevant)***
***Declaration of beneficial ownership (notarised copy of the passport of the beneficial owner)***
***Details of applicant's bank details:***

| | |
|---|---|
| ***Bank:*** | _____ |
| ***Address:*** | _____ |
| | _____ |
| ***A/c name:*** | _____ |
| ***a/c Nr:*** | _____ |
| ***Swift/ABA:*** | _____ |
| ***IBAN:*** | _____ |

Notes

1.      The Subscription Price of Shares issued pursuant to this application (if accepted) will be determined as described in the prospectus and the articles of association of the Company.

2.      The minimum subscription amount is US$ 1,000,000 or EURO 1,000,000•. This application need only indicate the total amount to be invested. The Company will calculate the number of Shares (including fractional Shares calculated to 3 decimal places) to be issued at the relevant Subscription Price.

3.      A confirmation note will be sent upon acceptance of this application.

4.      Share will normally be held in bookstock form. Share certificates will not be issued unless specifically requested.

Applications may be delivered to the Administrator at the address below:

THYBO INTERNATIONAL FUND LTD. (the "Company")
c/o UBS Fund Services (Luxembourg) S.A.
291 Route d'Arlon
L-1150 Luxembourg
Attention: Order Desk
Phone : 352.44 10 10 64 75
Fax : 352.44 10 10 6417/6418
E-mail: SH-UBSFSL-Transferagent@ubs.com

Copy to :
Thybo Advisory SAM
24, boulevard Princesse Charlotte
MC-98000 Monaco
Attention : Rod Morley
Phone : 377.97 97 23 65
Fax: 377.97 97 23 70
E-mail: r.morley@thyboinvestments.com

Appendix 3

ARCHAND SARL

 **PICTET**
1805

Account ▮Redact▮5.001

# Final execution

**Out**

| EUR 450'000 | THYBO INTERNATIONAL FUND G-T.REC- | Telekurs ID | ZZZP06635 |
|---|---|---|---|
| | | ISIN | ZZ 00P06635 0 |

**In**

| 395.371 | THYBO INTERNATIONAL FUND G | Telekurs ID | 2757894 |
|---|---|---|---|
| | | ISIN | VG G8877P159 5 |

Net asset value (NAV)    EUR   1'138.17

Ex date    01.10.2008

**Value date 01.10.2008**

S.E. & O.

| Deposit | CCC UBS FUND SERVICES (LUXEMBOURG) SA |
|---|---|
| | LUXEMBOURG |

Yours faithfully

Pictet & Cie

Advice without signature

Transaction ref. 50330031

**Appendix 4**



PICTET
1805

FINANCIAL STATEMENT IN EUR (Euro)
AS AT 31 OCTOBER 2008

**ARCHAND SARL**

5.001 [Redacted]

# PICTET
1805

# Table of contents

Portfolio valuation                                              1

Currency breakdown and portfolio structure in %                 3

Evolution of exchange rates                                      4

Quarterly and annual performance                                5

Performance details                                             6

Monthly and annual performance (in %)                           7

12 JUNE 2009

# Portfolio valuation as at 31 October 2008 in EUR



[Redacted]

R.001

**PICTET**
1805

| Quantity | Description | | Market price (Gross unit cost) | Total net cost EUR (Orig.) | Valuation EUR (Orig.) | % of total | Unrealised (Orig.) EUR |
|---|---|---|---|---|---|---|---|
| **PORTFOLIO TOTAL** | | | | | **10'058'554** | **100.00** | **0.00** |
| Of which accrued income EUR -215 | | | | | | | |
| **Current accounts** | | | | | **32'552** | **0.32** | **0.00** |
| 327'767 | Euro | | | | 32'552 | 0.32 | 0.00 |
| EUR | | | | | (32'552) | | |
| **Short term** | | | | **7'560'000** | **7'560'000** | **75.16** | **0.00** |
| 7'560'000 | Fiduciary Call EUR,16.09.08, LLOYDS A'DAM (6024) | | | 7'560'000 (7'560'000) | 7'560'000 (7'560'000) | 75.16 | 0.00 |
| EUR | | | | | | | |
| **Equities - Other Europe** | | | | **832'782** | **861'400** | **8.56** | **26.44** |
| 36'500 | ISHARES DJ STOXX 50 | EUR | 23.60 | 832'782 | 861'400 | 8.56 | 16.44 |
| | | EUR | (22.79) | (832'782) | (861'400) | | |
| **Equities - Japan** | | | | **107'380** | **108'555** | **1.08** | **1.09** |
| 19'000 | IKANO FUNDS-JAPANESE EQUITY M | EUR | 5.71 ^ | 107'380 | 108'555 | 1.08 | 1.09 |
| | | EUR | (5.62) | (107'380) | (108'555) | | |
| **Equities - Others** | | | | **400'642** | **394'804** | **3.93** | **-1.45** |
| 567.263 | EIM CLEAR FUND D EUR | EUR | 695.98 ^ | 400'642 | 394'804 | 3.93 | -1.45 |
| | | EUR | (705.14) | (400'642) | (394'804) | | |
| **Real estate ex Switzerland** | | | | **185'347** | **179'226** | **1.78** | **-3.30** |
| 1650 | EII PROPERTY WORLD INVEST (EX US) | EUR | 108.62 | 185'347 | 179'226 | 1.78 | -3.30 |
| | | EUR | (112.16) | (185'347) | (179'226) | | |

12 JUNE 2009

Exhibit B

PICTET
1805

2/7

# Portfolio valuation as at 31 October 2008 in EUR

[Redacted] 5.001

| Quantity | Description | | Market price (Gross unit cost) | Total net cost EUR (Orig.) | Valuation EUR (Orig.) | % of total | Unrealised 100% EUR (Orig.) |
|---|---|---|---|---|---|---|---|
| **Hedge funds** | | | | **925'006** | **922'017** | **9.17** | **-0.32** |
| 1'400 | GAM COMPOSITE ABSOLUTE RETURN EUR | EUR EUR | 132.58 ^ (134.64) | 188'789 (188'789) | 185'612 (185'612) | 1.85 | -1.88 |
| 236 | PERMAL MULTI MANAG.MACRO PFD A EUR | EUR EUR | 1'212.68 (1'207.38) | 285'591 (285'591) | 286'192 (286'192) | 2.85 | 0.21 |
| 395.371 | THYBO INTERNATIONAL FUND G | EUR EUR | 1'138.71 ^ (1'138.17) | 450'627 (450'627) | 450'213 (450'213) | 4.48 | |

^ Price provided by the issuer or the fund administrator

Valuation based on the latest available prices, without guarantee of accuracy

12 JUNE 2009

**Appendix 5**

**Appendix to the Attachment Customer Claim Form – Archand S.à.r.l.**
**Short description of the corporation and signing authority**

Archand S.à.r.l. is a limited liability company incorporated under Luxemburg law with its statutory seat in Luxemburg.

Archand S.à.r.l. is represented by its Managing Directors, Mr. D. Wessels and Mr. H. Holterman. An abstract of the Luxemburg Chamber of Commerce is included in the appendices.

**Appendix 6**

**Registre de Commerce
et des Sociétés
Luxembourg**

R   C   S

## Document certifié conforme

Le présent  document est établi et signé électroniquement par le gestionnaire du registre de commerce et des sociétés de manière à garantir l'authenticité de l'origine et l'intégrité des informations contenues sur ce document par rapport aux informations inscrites ou par rapport aux documents déposés au registre de commerce et des sociétés.

# Marisa Andreia
# Andrade Faria

Digitally signed by Marisa Andreia Andrade Faria
DN: c=PT, l=Luxembourg, o=RCSL, ou=C24, cn=Marisa
Andreia Andrade Faria, sn=Andrade Faria, givenName=Marisa
Andreia, serialNumber=10100385530000125620,
email=info@rcsl.lu, title=Professional Person
Date: 2008.10.07 14:24:23 +02'00'

**Registre de Commerce
et des Sociétés**
Luxembourg

R    C    S

# EXTRAIT

ARCHAND S.à r.l.

**Numéro d'immatriculation :** B 81039
**Date d'immatriculation/d'inscription :** 21/03/2001

**Dénomination(s) ou raison(s) sociale(s) :**
ARCHAND S.à r.l.

**Forme juridique :** Société à responsabilité limitée

**Siège social :**
8A, Boulevard Joseph II
L - 1840 Luxembourg

**Indication de l'objet social :** La Société a pour objet toute activité relative à la gestion de trésorerie et le financement des sociétés appartenant au même groupe de sociétés que la Société, et de toute société gérée par ce même groupe. Ces activités peuvent inclure : la trésorerie, la gestion de cash, l'octroi de prêts, de garanties etc. (...). La Société est autorisée à détenir des participations, sous quelque forme que ce soit, dans toutes sociétés luxembourgeoises et étrangères, par achat, souscription ou de quelque autre manière, ainsi que le transfert par vente, échange ou de toute autre manière de valeurs mobilières, obligations et tous autres titres, ainsi que la détention, l'administration, le développement et la gestion de ses participations. (*)

**Capital social / fonds social :**

Montant : 29.000 EUR

**Date de constitution :** 27/02/2001

**Durée :**
Illimitée

**Associé(s) :**
Dénomination ou raison sociale : ARCHAND HOLDING S.A R.L.
Forme juridique : Société à responsabilité limitée
Numéro d'immatriculation : B 81040
Siège social de la personne morale :
8A, Boulevard Joseph II, L - 1840 Luxembourg
Parts détenues : 290

RC001

Adresse postale: L-2961 Luxembourg    Tél (+352) 26 428-1    Fax (+352) 26 42 85 55    www.rcsl.lu
RCSL G.I.E.    R.C.S. Luxembourg    C24    Siège et guichets: Centre administratif Pierre Werner, 13, rue Erasme  Luxembourg-Kirchberg

## Administrateur(s)/gérant(s) :

Régime de signature statutaire : La Société sera valablement engagée par la signature conjointe de deux gérants ou par la seule signature de toute(s) personne(s) à qui un tel pouvoir de signature aura été délégué par le conseil de gérance.

Organe : Conseil de gérance

Nom : NELISSEN Prénom(s) : Bernadette
Fonction : Gérante
Adresse privée ou professionnelle de la personne physique :
8A, Boulevard Joseph II, L - 1840 Luxembourg
Durée du mandat : Indéterminée      Date de nomination : 08/07/2008

Nom : HOLTERMAN Prénom(s) : Henri
Fonction : Gérant
Adresse privée ou professionnelle de la personne physique :
8 A, Boulevard Joseph II, L - 1840 Luxembourg
Durée du mandat : Indéterminée      Date de nomination : 01/02/2008

Nom : WESSELS Prénom(s) : Dirk
Fonction : Gérant
Adresse privée ou professionnelle de la personne physique :
77, J. Reviusstraat, NL - 7461 ZM Rijssen

## Personne(s) chargée(s) du contrôle des comptes:

Dénomination ou raison sociale : KPMG AUDIT S.à r.l.
Numéro d'immatriculation : B 103590
Fonction : Réviseur d'entreprise
Siège social de la personne morale :
31, Allée Scheffer, L - 2520 Luxembourg
Durée du mandat : Déterminée      Date de nomination : 06/12/2007
                                  Jusqu'à l'assemblée générale qui se tiendra en l'année :  2008

(*) Extrait de l'inscription : Pour le détail prière de se reporter au dossier.

**Pour extrait conforme (¹)**

**Luxembourg, le 07/10/2008**

**Le gestionnaire du registre de commerce et des sociétés (²)**

¹ En application de l'article 21 paragraphe 2 de la loi du 19 décembre 2002 concernant le registre de commerce et des sociétés ainsi que la comptabilité et les comptes annuels des entreprises et l'article 21 du règlement grand-ducal du 23 janvier 2003 portant exécution de la loi du 19 décembre 2002, le présent extrait reprend au moins la situation à jour des données communiquées au registre de commerce et des sociétés jusqu'à trois jours avant la date d'émission dudit extrait. Si une modification a été notifiée au registre de commerce et des sociétés entre temps, il se peut qu'elle n'ait pas été prise en compte lors de l'émission de l'extrait.

² Le présent extrait est établi et signé électroniquement.
Le gestionnaire du registre de commerce et des sociétés ne garantit l'authenticité de l'origine et l'intégrité des informations contenues sur le présent extrait par rapport aux informations inscrites au registre de commerce et des sociétés que si le présent extrait comporte une signature électronique émise par le gestionnaire du registre de commerce et des sociétés.

**Appendix 7**

Global Custody & Investor Services                PICTET
1805

# Authorised Signatures

Account Number(s)    [Reda001

LIST OF AUTHORISED SIGNATURES

| First and Last Name(s) or Company Name | Position and Job Title | Type of Signature Indiv./Collective | Specimen Signature |
|---|---|---|---|
| Wessels, Dirk | Gérant | Collective à deux | |
| Holterman, Henri | Gérant | Collective à deux | |

In all business relations with the Bank, only the signatures appearing herein or attached as an annex hereto shall be legally valid and binding as long as they have not been expressly revoked in writing by the Client.

Unless otherwise specified, any one of the persons listed above shall be deemed to be empowered to sign jointly with any one of the others.

This list nullifies and replaces all previous lists.

**The relationship between the Bank and the Client shall be governed exclusively by Swiss law.**

**Any dispute concerning the relationship between the Bank and the Client shall be subject to the exclusive jurisdiction of the Courts of Geneva. An appeal to the Federal Supreme Court of Switzerland is reserved.**

**The place of execution, of jurisdiction, and the place of any debt collection procedures shall be Geneva. The Bank shall nonetheless be entitled to initiate proceedings in the jurisdiction of domicile of the Client or in any other competent jurisdiction.**

Place    Rijssen                        Date (dd/mm/yyyy)    11 / 02 / 2009

CLIENT SIGNATURE(S)

**Appendix 8**

# ViiSAGE

## IA Examiner Document Report

Printed: 06 DEC 07 10:17:12

# PASSED

| | | | | |
|---|---|---|---|---|
| **B900 Ink** | - **Passed** | **UV Pattern** | - **Passed** |
| **Checksum** | - **Passed** | **Visible Pattern** | - **Passed** |
| **Identification** | - **Passed** | | |
| **Expiration** | - **Passed** | | |
| **IR Brightness** | - **Passed** | | |
| **UV Brightness** | - **Passed** | | |

Visible Image



**Doc Number:** [Redacted]4500          **Date/Time:** 06 DEC 07 10:15:24

**Doc Type:** Kngdm of Netherlands Passport     **Name:** DIRK WESSELS

**SSN:**

| DISPOSITION | | By _____ |
|---|---|---|
| ☐ Referred to Law Enforcement Officer | ☐ Accepted | |
| ☐ Other | _____ | |
| | _____ | |
| | _____ | |

KHC276  ICAO

Uitgegeven voor kopie van een origineel paspoort, vertoond aan ondergetekende,
mr. Rob Peter Mollema, notaris te Oldenzaal.

Getekend te Oldenzaal op 21 april 2008.




# Appendix 9

16/02/'09
R.J. GELISSEN

Providence Capital N.V.
Meerweg 7
1405 BA Bussum
The Netherlands

B.O. van Kollem
16/2/2009



GELDIG VOOR ALLE LANDEN
valid for all countries / valable pour tous les pays

OPMERKINGEN VAN BEVOEGDE INSTANTIES
Page reserved for making authorities / Page reservée aux autorités
compétentes pour délivrer le passeport (54)

Dit paspoort is afgegeven ter vervanging van
paspoort nummer/This passport has been issued
to replace passport number/Le présent passeport
remplace le passeport antérieur no. NE5779272

PASPOORT KONINKRIJK DER NEDERLANDEN
KINGDOM OF THE NETHERLANDS/ROYAUME DES PAYS-BAS

P NLD Nederlandse [Red 5332
Holterman
Hendrikus Marinus
01 JUL/JUL    1955    [Re 9240
Wierden    M    1.90 m
23 JAN/JAN 2008    23 JAN/JAN 2013
Burg. van Rijssen-Holten

P<NLDHOLTERMAN<<HENDRIKUS<MARINUS<<<<<<<<<<
[Redacted]