Melissa Donelson
5708 Twain Drive
Flower Mound, TX 75028

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

SECURITIES INVESTOR PROTECTION
CORPORATION,

          Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

          Defendant.

------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

      Melissa Donelson, a member of Guardian Angel Trust, LLC (the "Investment Group"), and S&P Associates, General Partnership (the Partnership) hereby objects to the Notice of Trustee's Determination of Claim dated December 8, 2009 (the "Determination Letter") and states as follows:

**Background facts**

1. Guardian Angel Trust was organized in January 2002, for the specific purpose of investing in Bernard L. Madoff Investment Securities LLC. The Investment Group is a general partner of the partnership direct Madoff Account # 1ZA874-3-0 (the "Account")

2. "The partnership's" customary practice was to deposit within three days any funds received from investors for investment with Madoff.

3. On or about the third quarter of 2001, Mr. Madoff complained to the managing partner of the partnership, that the frequent number and small nature of the

investments and withdrawals were over burden some. Mr. Madoff insisted money be sent to him or withdrawn on a quarterly basis.

4. In January 2002, Guardian Angel Trust was created to satisfy Mr. Madoff's demand.

5. In January 1993, the Partnership was formed pursuant to a written agreement and with the knowledge and direction of Bernard L. Madoff. The Partnership opened an account with Bernard L. Madoff Investment Securities LLC ("Madoff"), Account No. 1ZA874-3-0 (the "Account").

6. The purpose of the Investment Group was for each of the Members to deposit money with Madoff for the purpose of purchasing securities. Each of the Members deposited money with Madoff for the purpose of purchasing securities. On November 30, 2008, Melissa Donelson 's account was valued at $19,100.92 with the Investment Group.

7. On February 25, 2009, the Partnership Group filed a SIPC claim in the amount of $44,768,253.86 representing the Investment Group's November 30, 2008 balance in the Account. Melissa Donelson 's share of the Partnerships', November 30, 2008 balance was $19,100.92

8. On February 25, 2009, the Investment Group filed a SIPC claim in the amount of $6,506,630.83 representing the Investment Group's November 30, 2008 balance in the Account. Melissa Donelson 's share of the Investment Groups' November 30, 2008 balance was $19,100.92

9. In the Determination Letter, Picard rejected the Partners' and Members' claims for securities on the ground that each of them did not have an account with

Madoff in his/her own name. Picard ignored the fact that each of the Partners and Members is a "Customer" under the Securities Investor Protection Act ("SIPA") and is entitled to SIPC insurance.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

1. Picard has failed to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that the Investment Group did not have a "legitimate expectation" that the balance on the Account statement represented its property.

2. Picard has failed to state a legitimate basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.*, No. 01-16034, 2003 Bankr. LEXIS 2261, at * (B.S.D.N.Y. Jan. 13, 2003).

**B. Picard has violated the requirement that
he honor a customer's "legitimate expectations"**

3. The legislative history of SIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be
> remedied by [the 1978 amendments] is the failure to meet legitimate customer

3

expectations of receiving what was in their account at the time of their broker's insolvency.

* * *

A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

4. SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

5. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of Partners, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

6. Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general

4

counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

7.  As indicated *infra*, in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

5

Tr. at 37-39, *In re New Times Securities Services, Inc.*, No 00-8178 (B.E.D.N.Y. 7/28/00) (emphasis added).

8. Picard's position on the definition of a customer, in the Madoff case is further contradicted by the following SIPA definition: "Whether claimants deposited funds with now insolvent broker-dealer, as required for them to qualify as "customers" under the Securities Investor Protection Act (SIPA), does not depend simply on whom was named as payee on claimants' checks; relevant inquiry is whether broker-dealer actually received, acquired or possessed claimants' property." Securities Investor Protection Act of 1970, § 16(2), as amended, 15 U.S.C.A. § 78*lll*(2).

### C. Without legal authority, Picard has invented his own definition of "net equity"

9. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

10. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

11. The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on

6

the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

12. In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize Partners' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff Partners who have depended upon their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

13. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

14. Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent Partners who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

15. After 12 months of his tenure, Picard has identified only two Madoff Partners who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. Picard has sued two Madoff customers, Stanley Chais

and Jeffrey Picower who, Picard has alleged, took out of Madoff $7.2 billion more than they invested. Picard has further alleged that these two Partners received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

16. However, the fact that a few out of more than 8,000 Madoff Partners may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent Partners of their statutory maximum payment of $500,000 in SIPC insurance.

17. The Investment Group and Partnership, like thousands of other customers, received monthly statements from Madoff indicating returns on their Madoff investment in the past few years in the range of 9 – 11% per year, subject to short-term capital gains tax rates. The Investment Group had entered into standard brokerage agreements with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Investment Group had specified, numbered accounts for the purchase and sale of securities; it received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. The Partners paid Federal and State taxes on the annual growth of the investments with Madoff. There is no basis to claim that each of the Partners did not have a "legitimate expectation" that the assets reflected on the Investment Group's statements sent by Madoff belonged to them.

18. Thus, the Partnership is entitled to a claim for $44,768,253.86, the November 30, 2008, balance on the Account as reflected on the Madoff statement.

19. Thus, the Investment Group is entitled to a claim for $6,506,630.83, the November 30, 2008, balance on the Account as reflected on the Madoff statement.

20. Thus, Melissa Donelson is entitled to a claim for $19,100.92, the November 30, 2008, balance on the Account as reflected on the Madoff statement.

### D. The Investment Group is entitled to prejudgment interest on its investment and profits.

21. At a minimum, under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted the Investment Group's funds, it is also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.S.* Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

22. Although it is not legally relevant, Picard cannot prove that Madoff earned no money on the Investment Group' investments. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which the Investment Group and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

23. In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g., Donell v. Kowell,* 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, Partners are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.,* No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes

9

here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers*, 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to Partners in Ponzi scheme whereby Partners' claims were allowed in the amount of their net investment plus their re-invested earnings).

### E. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit

24.  In derogation of his fiduciary duty to the Investment Group, Picard is, in effect, imposing upon the Investment Group a fraudulent conveyance judgment for sums that the Investment Group withdrew from the Account beyond the statute of limitations period applicable to fraudulent conveyances. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Partners of SIPC insurance and the claim to which the Investment Group is absolutely entitled.

25.  Moreover, Picard has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for Picard to utilize the avoidance powers of a trustee to enrich SIPC at the Investment Group' expense. The

10

legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g.,* 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

26. Here, however, Picard is not acting to assure equal distribution among prepetition creditors. On the contrary, he is simply acting as SIPC's agent in depriving the Investment Group of the SIPC insurance to which the Partners are statutorily entitled.

**F. Picard has violated SIPA by delaying the payment of SIPC insurance**

27. Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace the Partners' securities up to a value of $500,000 each, as valued on the November 30, 2008 statements.

**G. The Partners are each "customers" under SIPA entitled to up to $500,000 in SIPC insurance.**

28. Each of the Partners is a "customer" under the plain definition of "customer" in SIPA. Thus, each is entitled to receive $500,000 in SIPC insurance. 15 U.S.C. § 78lll(2)("The

11

term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities."). *Rosenman Family, LLC v. Picard*, 401 B.R. 629, 635 (B.S.D.N.Y. 2009)("the mere act of entrusting . . . cash to the debtor for the purpose of effecting securities transactions . . . triggers customer status. . ."); *SEC v. Ambassador Church Financial Devel. Group, Inc.*, 679 F. 2d 608, 614 (6th Cir. 1982); *In re Primeline Sec. Corp.*, 295 F. 3d 1100, 1107 (10th Cir. 2002)("SIPA does . . . protect claimants who try to attempt to invest through their brokerage firm but are defrauded by dishonest brokers . . . If a claimant intended to have the brokerage purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds"); *Miller v. DeQuine (In re Stratton Oakmont, Inc.)*, 2003 WL 22698876 at *3 (S.D.N.Y. Nov. 14, 2003)("Stratton Oakmont's conversion of Claimants' property makes the customers within the meaning of SIPA.").

29. Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder." Instead, Congress' definition of "customer" is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor")(emphasis added).

30. Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Investment Group because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight*, 389 U.S. 332 (1967).

31. Moreover, it is clear that Congress intended for "customer" to be broadly interpreted. In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. Section 7(d)(June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (Aug.4, 1969). The final bill dropped this restriction.

32. The Trustee may erroneously rely upon SIPC Rule 103. SIPA does not permit SIPC, by the promulgation of Rules, to change the definition of "customer" under the statute. Hence, Rule 103 is invalid. 15 U.S.C. § 78ccc(b)(4)(A).

**Conclusion**

The Partnership is entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of up to $500,000 for each of the Partners using the values as of November 30, 2008, and $44,768,253.86 for the Partnership

The Investment Group is entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of up to $500,000 for each of the Investors using the values as of November 30, 2008, and $6,506,630.81, for the Investment Group.

Melissa Donelson is entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of up to $500,000 for each of the

investors using the values as of November 30, 2008, and $19,100.92, for the account of Melissa Donelson.

The Partners and members are entitled to judgment against Picard and Baker & Hostetler LLP for the damages they have suffered as a result of the breach of fiduciary duty of Picard and his counsel.

January 4, 2010.

*Melissa Donelson* 1/5/09
Melissa Donelson
5708 Twain Drive
Flower Mound, TX 75028