JOSEPHINE WANG
General Counsel
SECURITIES INVESTOR
 PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, DC 20005
Telephone: (202) 371-8300
Facsimile: (202)371-6728
E-mail: jwang@sipc.org

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| _____ ) | |
| SECURITIES INVESTOR PROTECTION ) | |
|    CORPORATION, ) | Adv. Pro. No. 08-01789 (BRL) |
| ) | |
|             Plaintiff-Applicant, ) | SIPA Liquidation |
| ) | |
| v. ) | (Substantively Consolidated) |
| ) | |
| BERNARD L. MADOFF INVESTMENT ) | |
| SECURITIES LLC, ) | |
|          Defendant. ) | |
| _____) | |
| ) | |
| IN RE: ) | |
| ) | |
| BERNARD L. MADOFF, ) | |
| ) | |
|         Debtor. ) | |
| ) | |
| _____) | |

**REPLY MEMORANDUM OF LAW OF THE**
**SECURITIES INVESTOR PROTECTION CORPORATION**
**IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER**
**UPHOLDING TRUSTEE'S DETERMINATION DENYING**
**"CUSTOMER" CLAIMS FOR AMOUNTS LISTED ON**
**LAST STATEMENT, AFFIRMING TRUSTEE'S DETERMINATION**
**OF NET EQUITY, AND EXPUNGING THOSE**
**OBJECTIONS WITH RESPECT TO THE**
**<u>DETERMINATIONS RELATING TO NET EQUITY</u>**

# TABLE OF CONTENTS

**PAGE**

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.   A REVIEW OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.   The BLMIS Structure.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.   The Account Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        C.   The "Trades". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    II.   HAD CONGRESS INTENDED SIPA
        TRUSTEES TO RELY EXCLUSIVELY ON
        ACCOUNT STATEMENTS IN DETERMINING
        CUSTOMERS' NET EQUITY,  IT WOULD HAVE
        SO PROVIDED IN SIPA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.   "Reasonable Expectations". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.   The Series 500 Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    III.   THE LAST STATEMENT APPROACH
        NECESSARILY FAVORS INVESTORS
        WHO RECAPTURED THEIR PRINCIPAL
        WHILE BLMIS WAS IN BUSINESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    IV.   WHILE DISAVOWING THAT MADOFF WAS
        THEIR AGENT, THE CLAIMANTS SEEK TO
        TAKE ADVANTAGE OF HIS ACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . 21

    V.   11 U.S.C. §546(e) DOES NOT LIMIT THE
        TRUSTEE'S AVOIDANCE POWERS TO
        SUITS UNDER 11 U.S.C. §548(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        A.   Section 546(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        B.   Section 548(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    VI.   SIPC IS NOT JUDICIALLY ESTOPPED.. . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

**CASES:**                                                                                    **PAGE**

In re Adler, Coleman Clearing Corp., 216 B. R. 719
    (Bankr. S.D.N.Y. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.,
    351 F.Supp.2d 79 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Angerosa v. White Co., 290 N.Y.S. 204 (4th Dept. 1936),
    aff'd., 11 N.E.2d 325 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

Bates v. Long Island R. Co., 997 F.2d 1028 (2d Cir.),
    cert. den., 510 U. S. 992 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Baum v. Phillips, Appel & Walden, Inc., 648 F.Supp. 1518 (S.D.N.Y. 1986),
    aff'd sub nom., Asch v. Philips, Appel & Walden, Inc.,
    867 F.2d 776 (2d Cir.), cert. den., 493 U.S. 835 (1989) . . . . . . . . . . . . . . . . . . . . . . 2-3

In re Bayou Group, LLC, 362 B.R. 624 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 33

In re Bell & Beckwith, 104 B.R. 852 (Bankr. N. D. Ohio 1989),
    aff'd., 937 F.2d 1104 (6th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Bevill, Bresler & Schulman v. Spencer Sav. & Loan,
    878 F.2d 742 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

In re Carrozzella & Richardson, 286 B. R. 480 (D. Conn. 2002). . . . . . . . . . . . . . . . . . . 32

Cathay Pacific Airways, Ltd. v. Fly and See Travel, Inc.,
    3 F.Supp.2d 443 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

Central Bank v. First Interstate Bank, 511 U. S. 176 (1994) . . . . . . . . . . . . . . . . . . . . . . . 8

Connecticut Nat. Bank v. Germain, 503 U.S. 249 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 8

DeMarco v. Robertson Stephens Inc., 318 F.Supp.2d 110 (S.D.N.Y. 2004) . . . . . . . . . . . . . 2

Dole Food Co. v. Patrickson, 538 U.S. 468 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.),
    323 B.R. 857 (Bankr. S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

**CASES**:                                                                                                   **PAGE**

In re Enron Creditors Recovery Corp., ___ F.Supp.2d ___,
    2009 WL 5174119 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fineberg v. Stone (In re Brainard Hotel Co.), 75 F.2d 481 (2d Cir. 1935). . . . . . . . . . . 21, 23

In re Hanover Square Sec., 55 B.R. 235 (Bankr. S.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . . . 10

Harriss v. Tams, 258 N.Y. 229, 179 N.E. 476 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

Kaiser Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp.),
    913 F.2d 846 (10th Cir.1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

In re Manhattan Inv. Fund Ltd., 359 B.R. 510 (Bankr. S.D.N.Y. 2007),
    aff'd., in part, and rev'd, in part, on other grounds,
    397 B.R. 1 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-32

Massachusetts v. Morash, 490 U.S. 107 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),
    263 B.R. 406 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21-25, 28, 30, 31, 35

Mobil Corp. v. Marathon Oil Co., 669 F.2d 366 (6th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . 2

In re New Times Securities Services, Inc., 371 F.3d 68 (2d Cir. 2004). . . . . . . . . 9, 27, 33, 34

Official Comm. of Unsecured Creditors of Norstan Apparel Shops
    Inc. v. Lattman (In re Norstan Apparel Shops Inc.),
    367 B.R. 68 (Bankr. E.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

SEC v. Aberdeen Securities Co., 480 F.2d 1121 (3d Cir.),
    cert. den. sub nom., Seligsohn v. SEC, 414 U.S. 1111 (1973). . . . . . . . . . . . . . . . . 9-10

SEC v. Masri, 523 F.Supp.2d 361 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

In re Sharp International Corp., 403 F.3d 43 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 31, 32

# TABLE OF AUTHORITIES

**CASES** (cont):                                                          **PAGE**

Trane Co. v. O'Connor Sec., 561 F.Supp. 301 (S.D.N.Y. 1983),
    quoting Chris-Craft Indus. Inc. v. Piper Aircraft Corp.,
    480 F.2d 341 (2d Cir.), cert. den., 414 U. S. 910 (1973) . . . . . . . . . . . . . . . . . . . . . . . 2

Visconsi v. Lehman Bros., Inc., 244 Fed. Appx. 708,
    2007 WL 2258827 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## STATUTES AND RULES:

Securities Investor Protection Act, as amended, 15 U.S.C. §

78bbb. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
78fff(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26
78fff-1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
78fff-2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
78fff-2(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
78fff-2(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
78fff-2(c)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16
78fff-2(c)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15, 17
78fff-2(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
78fff-2(c)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
78fff-2(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
78fff-3(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15
78lll(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
78lll(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
78lll(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
78lll(7)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
78lll(11). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Pub. L. No. 95-283, 92 Stat. 263 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Securities Investor Protection Act of 1970, 15 U.S.C. §

78fff(c)(2)(A)(iv). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
78fff(c)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
78fff(c)(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
78fff(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Bankruptcy Code, 11 U.S.C. §

541   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
544(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## TABLE OF AUTHORITIES

**STATUTES AND RULES (cont.):**                                                    **PAGE**

Bankruptcy Code, 11 U.S.C. §

544(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
546(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 29, 30, 31
548   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
548(a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

Pub. L. No. 109-390, 120 Stat. 2692 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Bankruptcy Act (repealed 1979), 11 U.S.C. §

96e(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Securities Exchange Act of 1934, 15 U.S.C. §

78i(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
78j(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rules of the Securities Investor Protection Corporation (2009), 17 C.F.R. §300.

502(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
503(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**LEGISLATIVE MATERIALS:**

H.R. Rep. No. 95-746 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

S. Rep. No. 95-763 (1978),
    reprinted in 1978 U.S.C.C.A.N. 764. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

H. R. Rep. No. 97-420 (1982), reprinted in 1982 U.S.C.C.A.N. 583. . . . . . . . . . . . . . . . 29

Hearing on H.R. 8331 Before the Senate Subcomm. on Sec.
    of the Comm. on Banking, Housing, and Urban Affairs,
    95th Cong. (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**PUBLICATIONS AND TREATISES:**

Collier on Bankruptcy (15th rev. ed. 2009) ¶

544.07[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
741.07. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## PRELIMINARY STATEMENT

The Trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Debtor") has filed a motion ("Motion") to affirm his determination of certain "customer" claims in this liquidation proceeding under the Securities Investor Protection Act, 15 U.S.C. §78aaa et seq. ("SIPA").[1]  At issue with respect to the claims is whether the Trustee properly has calculated the claimants' "net equity," that is, the net amount owed by a broker to a customer under SIPA.  Under the Trustee's approach, net equity is calculated as all amounts deposited with the broker by the customer for his account less all withdrawals by the customer from the account.  Certain of the claimants (collectively, "Claimants") disagree with the Trustee's approach and have filed responses opposing the Trustee's Motion.  Claimants argue that the calculation should be based not on actual deposits and withdrawals, but on the last fictitious account statements that the Claimants received from BLMIS and the backdated paper trades and false profits shown therein.

The Claimants' position is incorrect for many reasons including, at its most basic, that it contradicts two important principles underlying SIPA.  Those principles are found in the provisions and purposes of SIPA, and derive from the fact that SIPA is both a bankruptcy law and a securities law.  On the one hand, to the extent consistent with SIPA, section 78fff(b) thereof expressly makes applicable to the proceeding all of the provisions of Title 11 that apply in a bankruptcy liquidation, except for subchapters III through V of chapter 7 of Title 11.  On the other hand, except as otherwise provided in SIPA, the provisions of the Securities Exchange Act of 1934, 15 U.S.C. §78a et seq. ("the 1934 Act"), apply to the SIPA case as if SIPA were an amendment to, and a section of, the 1934 Act.  SIPA §78bbb.

---

[1]  For convenience, references hereinafter to provisions of SIPA shall omit "15 U.S.C."

Relevant here is the principle that as a bankruptcy statute, SIPA seeks to achieve, as in bankruptcy, a ratable distribution of property.  See, e.g., Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 263 B. R. 406, 463 (S.D.N.Y. 2001) ("Ensminger") ("underlying philosophy" of Bankruptcy Code and SIPA to maximize assets available for ratable distribution to all similarly situated creditors.)  Another guiding principle is that since it is like a section of the 1934 Act, SIPA must be construed so as not to undermine other sections of that law.

In a free and open market, the price of a security must be set by the forces of supply and demand.  See DeMarco v. Robertson Stephens Inc., 318 F.Supp.2d 110, 120 (S.D.N.Y. 2004) ("axiomatic that prices in an open market reflect supply and demand").  Because it violates that rule, price manipulation, that is, the "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities," is prohibited under the 1934 Act.[2] Ernst & Ernst v. Hochfelder, 425 U. S. 185, 199 (1976).  See Mobil Corp. v. Marathon Oil Co., 669 F.2d 366, 374 (6th Cir. 1981) (manipulation is affecting security price by "artificial means, i.e., means unrelated to the natural forces of supply and demand." [emphasis in original]).  See also Trane Co. v. O'Connor Sec., 561 F.Supp. 301, 304 (S.D.N.Y. 1983), quoting Chris-Craft Indus. Inc. v. Piper Aircraft Corp., 480 F.2d 341, 383 (2d Cir.), cert. den., 414 U. S. 910 (1973) ("The central purpose of section 9(a) is ... to keep an open and free market where the natural forces of supply and demand determine a security's price."); Baum v. Phillips,

---

[2]    Section 9(a) of the 1934 Act, 15 U.S.C. 78i(a), makes unlawful the manipulation of security prices in transactions relating to the purchase or sale of a security.  Price manipulation also is a violation of section 10(b) of the 1934 Act, 15 U.S.C. §78j(b), which proscribes, in pertinent part, any "manipulative or deceptive device" in connection with the purchase or sale of a security.  See SEC v. Masri, 523 F.Supp.2d 361, 367 (S.D.N.Y. 2007).

Appel & Walden, Inc., 648 F.Supp. 1518, 1530 (S.D.N.Y. 1986), aff'd sub nom., Asch v. Philips,

Appel & Walden, Inc., 867 F.2d 776 (2d Cir.), cert. den., 493 U.S. 835 (1989) (Section 9(a) of

the 1934 Act seeks to maintain "market controlled by natural forces rather than by intervention of

artificial manipulative devices...." [internal citation omitted]). To be viable, therefore, any

interpretation of SIPA herein must be consistent with the objective of ratable distribution and

with enforcement of securities law.

The Claimants' interpretation of net equity does neither and undermines both.  By

measuring net equity according to the last fictitious account statements, their position 1) effects

an unequal distribution of property that 2) relies on artificial prices and profits.  For these

reasons, as discussed in the main brief of the Securities Investor Protection Corporation ("SIPC")

in this matter[3] and more fully below, the Claimants' position is inconsistent with SIPA and must

be rejected.

SIPC submits this reply to the Responses opposing the Trustee's Motion.[4]

---

[3]  Memorandum of Law of the Securities Investor Protection Corporation In Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying "Customer" Claims for Amounts Listed On last Statement, Affirming Trustee's Determination of Net Equity and Expunging Those Objections With Respect to the Determinations Relating to Net Equity (Doc. No. 519) ("SIPC Br.")

[4]  Because a single brief ("Br.") may have been filed on behalf of more than one claimant, for convenience, the various briefs of the Claimants are referred to herein by the name of only one representative claimant per brief.  The following are the designations used herein for briefs filed by representative claimants:  Michael Schur and Edith Schur, represented by Bernfeld, DeMatteo & Bernfeld, LLP ("Schur Br.") (Doc. No. 749); Norton Eisenberg, represented by Milberg LLP and Seeger Weiss LLP ("Eisenberg Br.") (Doc. No. 785); Sterling Equities Associates, represented by Davis Polk & Wardwell LLP ("Sterling Br.") (Doc. No. 716).  The fact that this Memorandum does not reply to every argument or refer to every opposing brief does not signify agreement with the opposing party's position and is not intended as a waiver of opposition.  Furthermore, the arguments addressed herein only relate to whether net equity is properly calculated under the Trustee's

## **ARGUMENT**

## **I.  A REVIEW OF THE FACTS**

The facts behind the Ponzi scheme perpetrated by Bernard Madoff ("Madoff"), as uncovered by the Trustee in his review of the Debtor's books and records and from his investigation, are described in detail in supporting documents to the Trustee's Motion.[5]  Because they are particularly significant to the resolution of "net equity," the facts are reviewed below.

### **A.  The BLMIS Structure**

The Madoff fraud was carried out through BLMIS's Investment Advisory ("IA") business which acted both as an investment advisor to its clients and a custodian of their "securities." Looby Dec. ¶32.  Customers were of two types at BLMIS: those whose funds reportedly were placed into simulated baskets of stocks that were hedged by fictitious options positions under a "split strike conversion strategy" ("split strike") and those for whom supposed trades were customized.  Id. ¶¶38, 48, 50.  As of approximately November 30, 2008, Frank DiPascali, Madoff's chief lieutenant, administered 4,659 active accounts which constituted the bulk of the accounts and primarily were of the split strike kind.  Id. ¶42.  The non-split strike accounts numbered fewer than 245 and were administered by other BLMIS employees.  The latter investors largely were long time favored customers of BLMIS or Madoff insiders.  Id. ¶75.  No

---

methodology or under a last fictitious statement approach.  Any collateral issues will be addressed at a later date, as appropriate and as authorized by the Court.

[5]    See, e.g., Declaration of Joseph Looby In Support of Trustee's Motion for an Order Upholding Trustee's Determination Denying "Customer" Claims for Amounts Listed on last Customer Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections With Respect to the Determinations Relating to Net Equity, filed herein on October 16, 2009 (Doc. No. 524) ("Looby Dec.")

securities actually were purchased by BLMIS for the split strike customers and virtually none were purchased for the non-split strike investors. Id. ¶¶51, 56, 79, 94, 95. While fictitious investments reportedly amounted to a net sum of approximately $64.8 billion by early December 2008, in reality, the total amount of net funds deposited by customers with the broker was less than $20 billion. Id. ¶¶22, 24.

## B. **The Account Statements**

Even though no trades were placed, BLMIS issued customer account statements showing "trades" for customers over a period of months or years. The phony account statements were generated by means of a computer system that differed markedly from the computer system used in the other facets of the BLMIS business, namely, its market making and proprietary trading units. Id. ¶¶9, 15, 16, 40. Unlike the latter business units which had live computer systems that interfaced with other trading platforms, third party feeds, and data sources, the IA computer system was a closed system -- separate and distinct from the other computer systems and not connected, interfaced or reconciled with any other live system. Id. ¶¶28, 29, 30. The system made possible the mass production of fictitious customer statements. The system contained software that could be used to enter fictitious "trades" at any desired price or on any desired date that could then be allocated to the various customer accounts residing within the database. Inputting the data did not cause a trade to be made. It merely created a record that could be printed onto a phony account statement or phony trade confirmation. Id. ¶¶41, 44, 46.

BLMIS did not provide customers with electronic real-time online access to their accounts which by the year 2000 would have been customary in the industry. For obvious reasons, it continued to rely on outmoded technology that produced paper trade confirmations, transmitted through the United States mail. Id. ¶37.

-5-

## C.  The "Trades"

With respect to the split strike investors, the "trades" in any basket of securities reflected backdated prices that were selected in order to yield predetermined returns.  Once a basket "trade" had been identified as yielding a desired fictitious return, it would be keyed manually into the computer system.  The basket "trade" would then be replicated proportionately among  split strike customer accounts.  Id.  ¶¶60, 63, 64.  Because of the backdating, the split strike accounts yielded consistent annual returns generally between 10% and 17%, and largely outperformed the movement of the S&P 100 Index from which the "stocks" were chosen.  Id. ¶¶62, 66.

The prices at which "securities" were bought and sold and the purported returns were fictitious not only because of the backdating, but for other reasons as well.  For example, one money market fund in which customers allegedly invested was not available for investment from 2005 onwards.  Id. ¶57.  There was often an insufficient volume of options contracts actually being traded to hedge properly the fictitious equities positions.  Id. ¶97.  The volume of outstanding fictitious positions in securities at times far exceeded the actual volume of shares traded on the market and, of necessity, would have impacted market price.  Id. ¶¶100-104.  In many instances, prices appearing on the account statements were outside of the daily range of prices for the securities in question.  Id. ¶106.  It also is noteworthy that there was not enough cash to pay for "purchased" securities positions.  For example, in 2002, the "purchase" of $17.9 billion of securities was reported when only $240 million of customer funds was actually held by the brokerage.  Id. ¶¶98, 99.

So that federal reporting requirements could be evaded, baskets regularly were "sold" and securities positions reduced to "cash."  Id. ¶53, 55.  The fictitious cash, including false profits,

would then be reinvested in new fake securities positions, with false profits being compounded with each new "purchase" and "sale." Id. ¶¶69-70. In the midst of this fraudulent activity, therefore, the only real events that occurred in each account were the customer's deposits of funds into the account and withdrawals. However, because no trades were real and no actual profits generated, when monies were withdrawn, the money did not come from the customer's account. It came from other customers. Id. ¶¶51, 71.

The trading was equally fictitious and back-dated with respect to the non-split strike investors. The main differences were that the selected backdated "trades" were one-off "trades" instead of baskets of "trades." Moreover, instead of returns of 10% to 17%, the yields often exceeded 100%. Id. ¶¶74, 76-79.

Because no real trading took place in the accounts and customers' funds were used to pay other customers, those customers who withdrew their monies while the firm did business necessarily did "better" than others. Thus, in the scheme, some investors recovered their principal and received millions of dollars in false profits and they continue to claim millions of dollars of false profits in this proceeding. Other customers, whose monies were used to pay other investors, have yet to recapture their principal.

## II. HAD CONGRESS INTENDED SIPA TRUSTEES TO RELY EXCLUSIVELY ON ACCOUNT STATEMENTS IN DETERMINING CUSTOMERS' NET EQUITY, IT WOULD HAVE SO PROVIDED IN SIPA

The Claimants' responses reflect several misconceptions about SIPA, its operation, and the nature of the protection that it offers. This section and the next address the Claimants' misconceptions regarding the grounds for determining "customer" claims and the order of

distribution of property.

Preliminarily, it must be noted that the Claimants rely upon a standard for satisfying claims that does not exist in the statute.  Contrary to their position, SIPA does not provide that claims are to be satisfied based upon the customer's last account statement.  Instead, SIPA specifies that claims are to be satisfied "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." §78fff-2(b).

If, as Claimants assert, Congress had intended for customers to be satisfied based solely upon their last account statements, Congress could, and would, have included such a provision in SIPA.  Clearly it knew how to do so and the fact that it did not do so is telling.  Cf. Dole Food Co. v. Patrickson, 538 U.S. 468, 476 (2003) ("Where Congress intends to refer to ownership in other than the formal sense, it knows how to do so." Absence of language indicates lack of intent); Central Bank v. First Interstate Bank, 511 U. S. 176, 176-177 (1994) (That Congress did not use the words "aid" and "abet' in the statute shows lack of intent to impose aiding and abetting liability); Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." [citations omitted]).  Nowhere in SIPA does it provide that claims are to be satisfied based only upon account statements.  Instead, the obligation must be ascertainable "from the books and records of the debtor" or, if there are no books and records or the books and records are unreliable, then, "to the satisfaction of the trustee."

Although there already exists in SIPA a specific standard by which obligations are to be measured, the Claimants interpolate into it a different standard,  replacing "books and records"

-8-

and "to the satisfaction of the trustee," with "last account statement." The standard the Claimants create rests on two grounds. <u>One</u>, customers' "reasonable expectations" must be given effect. In BLMIS, Claimants' reasonable expectations were based on the account statements that they received from the firm. Therefore, Claimants must be owed what appears on their statements. <u>Two</u>, the SIPC Series 500 Rules rely upon account statements to identify whether a customer's claim is for cash or securities. In relying upon these grounds, however, the Claimants stretch the customer's "reasonable expectations" beyond reason and ignore the Series 500 Rule that makes the Rules inapplicable to this case.

## A. "Reasonable Expectations"

As certain of the Claimants correctly point out, the concept of giving effect to the customer's reasonable expectations appears in the history to the 1978 amendments to SIPA which authorized SIPA trustees, for the first time, to purchase securities for customers in order to meet their "legitimate expectations."

Under SIPA as enacted in 1970, the only customers who could reclaim their securities outright were those customers owed "specifically identifiable property." Specifically identifiable property, which was patterned after the definition of the term in section 60(e)(4) of the Bankruptcy Act, 11 U.S.C. §96(e)(4) (repealed 1979), consisted of cash or securities held by the broker for a particular customer and that remained in its identical form until the filing date or that had been allocated to or physically set aside for the customer on the filing date. SIPA §78fff(c)(2)(C) (1970).[6] All other customers who were owed property that was not specifically

---

[6]    Claims are measured as of the "filing date." <u>See</u> <u>In re New Times Securities Services, Inc.</u>, 371 F.3d 68, 72-73 (2d Cir. 2004) ("<u>New Times I</u>"); <u>SEC v. Aberdeen Securities Co.</u>, 480 F.2d

identifiable shared on a <u>pro rata</u> basis in available securities -- if owed securities -- held by the debtor for the benefit of customers.  SIPA §78fff(c)(2)(B) (1970). To the extent such securities fell short of satisfying claims, the balance of the customers' claims was paid in cash based on the filing date market value of the security owed to the customer.  SIPA §§78fff(c)(2)(A)(iv) and 78fff(f)(1) (1970).  The need for a customer to trace his property into the possession of the broker and to show that his property was being held for him on the filing date created an arbitrary outcome as to customers owed securities.  Customers who could trace recovered their securities in full.  Others who could not, because of the random act of their securities being missing, had their claims for securities satisfied through a combination of securities and cash, even though they too believed that the broker held securities for them.

In 1978, Congress abandoned in SIPA the requirement of tracing as the basis to reclaim a security.  Under the amended statute, only a customer owed "customer name securities," that is, securities registered or in the process of being registered in his name on the filing date could recover them outright irrespective of the $500,000 limit of SIPC protection, provided that the customer was not indebted to the broker.  <u>See</u> SIPA §§78<u>lll</u>(3) and 78fff-2(c)(2).   At the same time, while refining the category of persons who could recover securities outright,  Congress also broadened the category of customers whose claims for securities could be satisfied with securities.  SIPA was amended to authorize the trustee, subject to certain conditions, to purchase

---

1121, 1123-1124 (3d Cir.), <u>cert</u>. <u>den</u>. <u>sub</u> <u>nom</u>., <u>Seligsohn v. SEC</u>, 414 U. S. 1111 (1973); <u>In re Adler, Coleman Clearing Corp.</u>, 216 B. R. 719, 722 (Bankr. S.D.N.Y. 1998); <u>In re Hanover Square Sec.</u>, 55 B.R. 235, 238 (Bankr. S.D.N.Y. 1985).  In the BLMIS case, the "filing date" is the date on which the Securities and Exchange Commission commenced its suit against BLMIS which resulted in the appointment of a receiver for the firm.  <u>See</u> SIPA §78<u>lll</u>(7)(B).

securities for customers in satisfaction of their claims for securities.[7]  Pub. L. No. 95-283, 92

Stat. 263 (1978).  This additional power was conferred on the Trustee to effectuate more fully a

purpose of SIPA, namely, restoring the customer to the positions that he held on the filing date,

so that the customer could receive what he would have expected to receive had the firm

voluntarily ceased doing business.  H.R. Rep. No. 95-746, at 21 (1977) ("1977 H. Rep.").  See S.

Rep. No. 95-763, at 2 (1978) ("1978 S. Rep."), reprinted in 1978 U.S.C.C.A.N. 764, 765.

Whether the Trustee bought securities was conditioned on insufficient securities being available

in the Debtor's estate to satisfy securities claims and there being a "fair and orderly market" in

which to purchase the securities.  Hearing on H.R. 8331 Before the Senate Subcomm. on Sec. of

the Comm. on Banking, Housing, and Urban Affairs, 95th Cong. 33 (April 25, 1978) ("1978 S.

Hearing") (Section by Section Explanation of H.R. 8331 Amendments to [SIPA]).  If there was

no fair and orderly market, the customer would receive cash equal to the security's filing date

market value.  1977 H. Rep. at 41-42; 1978 S. Hearing at 33.[8]    Significantly, at this time,

---

[7]  In relevant part, section 78fff-2(d), which was added in 1978, currently provides:

> The trustee shall, to the extent that securities can be purchased in a
> fair and orderly market, purchase securities as necessary for the
> delivery of securities to customers in satisfaction of their claims for
> net equities based on securities under section 78fff-1(b)(1) of this title
> . . . , in order to restore the accounts of such customers as of the filing
> date. . . .

[8]  The legislative history of the 1978 amendments provides in pertinent part:

> Our expectation is that, in almost all cases, a customer's claim for
> securities would be satisfied by the delivery of securities, and, where
> necessary, to accomplish this the trustee would go into the open
> market and purchase securities.  We believe, however, that it is
> advisable to provide that the trustee would not be required to

-11-

Congress did not also amend SIPA to require obligations to be satisfied solely according to the investor's last account statement.

Although the objective of amending SIPA to allow a trustee to buy securities for customers in satisfaction of their claims for securities was to give effect more fully to the customer's reasonable expectations, the amendment, with good reason, was never intended to create a claim for securities where none exists.  While the Claimants stretch this concept to attempt to show that they have larger claims, the fact is that explained against the history of SIPA, "reasonable expectations" relates only to how a claim for securities is to be satisfied, that is, in cash or by the delivery of the securities themselves.  Contrary to Claimants' false construct, it does not create an entitlement in an investor to false profits or to securities "paid for" out of such "profits" simply because such phony profits and phony securities positions appear on a fictitious account statement.

**B.  The Series 500 Rules**

Likewise, as discussed in SIPC's main brief in this matter (SIPC Br. at 23-24), the Series 500 Rules which define when a customer has a claim for cash or for securities do not support the

---

purchase securities where that could not be done in a fair and orderly market.  One chief concern is that the trustee not be required to make purchases in a market which is being improperly controlled or manipulated.  This may be of particular significance where the member being liquidated was a market maker.  Under those circumstances, the trustee would decline to purchase the needed securities and would instead satisfy the claim by paying cash in lieu of the securities based on the market value of the securities on the filing date.

1977 H. Rep. at 41-42.

-12-

Claimants' position.  As reaffirmed by the Second Circuit in New Times I, 371 F.3d at 87, the

Rules apply "when a transaction in real securities straddle[s] the filing date and do not govern

transactions involving fictitious securities ...."  The failure of a firm between trade date (when an

order to buy or sell is placed) and settlement date (when cash and securities change hands in

completion of the trade) raises the question of what the investor is owed.  For example, if a

customer has placed an order to buy a security and receives a confirmation of the purchase, is the

customer owed the security if the brokerage fails before the purchase is completed?  The SIPC

Series 500 Rules address this situation. Thus, under Rule 502(a), 17 C.F.R. §300.502(a) (2009),

if the debtor has cash in his account and the customer has received a confirmation of the

purchase, the customer has a claim for the security.  In calculating the customer's net equity, the

trustee deducts the customer's indebtedness (i.e., the purchase price of the security) from the cash

in the account so that the customer can receive the security for which he has now fully paid.

As considered against the case at hand, three facts are significant.  1)  As shown above, the

impetus behind the Series 500 Rules was to address transactions that straddled the filing date

because they had not yet settled.  See SIPC Br. at 23-24.  Such is not the case here.  2)  In the

above hypothetical, in order to have a claim for the security, the claimant would have to have had

cash in his account to pay for it.  Here, false profits instead of real cash were used to pay for fake

securities trades.  3)  Most importantly, the Rules apply with respect to transactions made in the

ordinary course of business.  Rule 503(a), 17 C.F.R. §300.503(a) (2009), specifically makes the

Rules inapplicable with respect to transactions that are fraudulent or otherwise voidable.  For the

reasons previously discussed by SIPC, SIPC Br. at 24-37, the phony transactions in this case

were illegal and voidable.  The Rules are inapplicable and do not support the last statement

approach.

### III.  THE LAST STATEMENT APPROACH
### NECESSARILY FAVORS INVESTORS
### WHO RECAPTURED THEIR PRINCIPAL
### WHILE BLMIS WAS IN BUSINESS

The Responses also reflect the Claimants' misunderstanding as to the order in which property is distributed in a SIPA proceeding.  For example, some of the Claimants contend that "SIPC is repaid for [its] advances out of 'customer property' only after *all* customer claims are paid in full.  SIPA §78fff-3(a).  Because of the $500,000 SIPC advance per customer, the BLMIS liquidation is not a 'zero sum game,' as urged by the Trustee ... in that a payment of up to $500,000 to one customer does not reduce the size of the estate available to pay other customers."  Eisenberg Br. at 16.  The Claimants are mistaken.  SIPC is reimbursed for its advances to satisfy any single customer once that customer alone is fully satisfied, rather than all customers.  Every dollar given to one customer is a dollar less for another, and hence, the liquidation is a zero sum game.  The distribution of property under SIPA is explained below.

**The Distribution of Customer Property**

SIPA section 78fff-2(c)(1) establishes the order of distribution of customer property. Customer property generally includes all cash and securities held by or for a broker's account from or for its customers' securities accounts.  SIPA §78lll(4).  Only the second and third priorities of distribution under section 78fff-2(c)(1) apply here.  They are:

- As a second priority, customer property is distributed ratably among customers based on their filing date net equities.  §78fff-2(c)(1)(B).

- As a third priority, customer property is distributed to SIPC as subrogee.  §78fff-

-14-

2(c)(1)(C).  If a customer has been fully satisfied, SIPC is subrogated to the customer's

share of customer property to the extent of its advance for that customer.  §78fff-3(a).

The amount of any SIPC advance is based on the difference between the customer's

net equity and his share of customer property, subject to the limits of protection.

The distribution process is summarized in the legislative history of SIPA as follows:

> [Section §78fff-2(c)(1)], the operative provision with respect to customer
> property, provides that each customer will be allocated a ratable share of
> customer property based upon his net equity.  This allocation is fundamental
> to the process of determining the extent to which SIPC protection will be
> available to a customer, <u>because SIPC advances are applied to the difference
> between a customer's ratable share of customer property and his net equity
> claim</u>....  Any excess of a customer's  net equity over his allocated share of
> customer property plus the protection available from SIPC is a claim against
> the general estate. [Emphasis added].

1978 S. Hearing at 32.  It bears emphasis that the SIPC advance does <u>not</u> reduce the customer's

net equity and therefore, his claim against customer property.  As stated in 1977 H. Rep. at 29:

> ...customer property would be allocated ratably among customers in
> satisfaction of their respective net equity claims.  To the extent that a
> customer's net equity claim is unsatisfied by customer property, the
> customer is entitled to an advance of funds from SIPC up to the amount
> permitted by the bill.

See 1978 S. Rep. at 13 (1978), reprinted in 1978 U.S.C.C.A.N.  764, 776.  See also In re Bell &

Beckwith, 104 B.R. 852 (Bankr. N. D. Ohio 1989), aff'd., 937 F.2d 1104 (6th Cir. 1991).

The distribution scheme is illustrated as follows:

**Scenario 1:  An Illustration of A Distribution of Customer Property Followed By A SIPC
Advance**

Assume that a brokerage firm in SIPA liquidation has only two customers: Customer A

and Customer B.

-15-

Customer A has a net equity of $500,000 and Customer B has a net equity of $3.5 million. Each files an allowed securities claim in the SIPA proceeding for the corresponding amount. The combined amount of A and B's net equity claims is $4 million. The SIPA trustee collects $2 million of customer property.

Under SIPA §78fff-2(c)(1)(B), the customer property is shared pro rata by A and B. To arrive at the percentage of their claims satisfied from customer property, the amount of customer property that is available for distribution is divided by the total value of the customers' net equities. The resulting percentage is then multiplied by each customer's net equity to yield the amount of the customer's share. Thus:

$2 million (value of customer property) ÷ $4 million (total of customers' net equities)=.5

Based upon a 50% distribution, A's share of customer property is $250,000 ($500,000 x .5).

Based upon a 50% distribution, B's share of customer property is $1.75 million ($3.5 million x .5).

The net equities of A and B are not fully satisfied from the distribution of customer property. "[B]ecause SIPC advances are applied to the difference between a customer's ratable share of customer property and his net equity claim[,]" 1978 S. Hearing at 32, SIPC advances $250,000 to the trustee for Customer A. Customer A is thus made whole, having received a distribution of $250,000 in customer property and an advance of SIPC funds of $250,000. With respect to Customer B, however, the difference between his ratable share of customer property ($1.75 million) and his net equity ($3.5 million) is $1.75 million. Because the limit of SIPC protection is $500,000 per customer, Customer B will receive $1.75 million in customer property

-16-

and $500,000 in funds from SIPC for a total of $2.25 million, but will still be owed $1.25 million

on his $3.5 million allowed claim.  His claim for $1.25 million will be a claim against any

general estate of the debtor.  Ultimately, SIPC will have advanced $250,000 for A and $500,000

for B, for a total of $750,000.

If a trustee were able to collect all customer property immediately and distribute it to

customers before SIPC advanced any funds for customers, then SIPC would never share as

subrogee in customer property under SIPA §78fff-2(c)(1)(C) because no customer property

would remain for distribution to it.  However, because the collection of customer property in

reality takes time, SIPC may advance funds to a trustee for customers even when the amount of

customer property is unknown.  In pertinent part, SIPA section 78fff-2(b)(1)  provides that for

purposes of payments to customers, the court shall:

> with respect to net equity claims, authorize the trustee to satisfy claims out
> of moneys made available to the trustee by SIPC notwithstanding the fact
> that there has not been any showing or determination that there are
> sufficient funds of the debtor  available to satisfy such claims.

So that customers with allowed claims do not have to wait to have their claims satisfied

while the trustee collects customer property, the trustee may request an advance from SIPC to

satisfy customers even if ultimately, there is enough customer property to make customers whole

without the use of SIPC funds.  Once the customer is fully satisfied, SIPC is subrogated to the

customer's claim against customer property.   Whether or not customers are first satisfied with

funds from SIPC, the result is the same.   Thus, as applied to the above hypothetical, the

distribution would be as follows.

-17-

**Scenario 2:  An Illustration of A Customer's Net Equity Satisfied From A SIPC Advance Followed By A Distribution of Customer Property**

As above, assume that Customers A and B have combined net equities totaling $4 million, but in this scenario, there is no customer property immediately available for distribution. The trustee requests an advance of SIPC funds up to the limits of protection for Customers A and B.  Thus, SIPC advances a total of $1 million to the trustee.

In this scenario, Customer A whose net equity is $500,000 is fully satisfied with funds provided by SIPC.  Customer B also receives $500,000 of SIPC funds, but because his net equity is $3.5 million, he is still owed $3 million.

Assume that after Customers A and B receive the SIPC funds, the trustee collects $2 million of customer property.  Although A and B have recaptured all or part of their net equity due to the SIPC advance, their claims against customer property are still based upon their net equities measured as of the filing date.  See SIPA §78lll(11).  Thus, Customer A's share of customer property is $250,000, and Customer B's share is $1.75 million.

Because Customer A already has been fully satisfied through the advance of SIPC funds, to pay him his share of customer property would result in him being paid $750,000 on his $500,000 claim.  Customer A having been fully satisfied, SIPC is subrogated to A's claim against customer property.  Thus, A's share of customer property ($250,000) is distributed to SIPC as subrogee.  The end result is that as in Scenario 1 above, A's claim is satisfied with $250,000 of customer property and a net amount of $250,000 advanced by SIPC.

On the other hand, even after receiving the SIPC funds, B still has an outstanding claim. As such, the trustee distributes $1.75 million of customer property to B.  As in Scenario 1 above,

-18-

combined with the SIPC advance of $500,000, B receives a total of $2.25 million on his $3.5 million claim, and has a $1.25 million claim against any general estate.  Inasmuch as Customer B has not been made whole, SIPC takes nothing as subrogee with respect to B's share of customer property.  As in Scenario 1 above, each customer receives 50% of his claim in customer property. SIPC advances a net total of $750,000.  Whether the SIPC advance is made before or after customer property is distributed, the outcome is the same.

As shown above, irrespective of the timing of the SIPC advance, the calculation of the customer's share of customer property does not change.  Because net equity is calculated without reference to the SIPC advance, the amount of customer property received by one customer necessarily affects the amount received by the next.  As a final illustration:

**Scenario 3:  An illustration of the impact of "net equity" on the distribution of customer property**

Assume that the brokerage is BLMIS and that while it was in business, Customer A deposited $500,000 with the firm, and over time, withdrew a total of $8 million.  As shown on his last fictitious account statement, Customer A still has $2 million in fictitious profits in his account.  Customer A files a claim for $2 million in the SIPA proceeding.

Customer B has recently deposited $2 million into his account and withdrawn nothing. Because he has not yet accrued any fictional profits, his last fictitious statement shows an account value of $2 million.  Customer B files a claim for $2 million.

Under the fictitious statement approach, the investors' combined net equity is $4 million. Under the Trustee's approach, the net equity is $0 for A and $2 million for B, for a total of $2 million.  The Trustee collects $1 million in customer property.  Customer property is distributed

-19-

as follows under each approach:

| Investor | Fictitious Statement Approach | Trustee's Approach |
|----------|-------------------------------|--------------------|
| A | $500,000 | $0 |
| B | $500,000 | $1 million |

Under a fictitious statement approach, each would receive an additional $500,000 advanced by SIPC. Thus, while the firm was still in business, A would have recaptured his initial investment of $500,000 and received $7.5 million of other investors' money. In liquidation, A would receive an additional $500,000 of other investors' money in the form of customer property and $500,000 from SIPC. Thus, on its $500,000 investment, A would receive a total of $9 million. Under the fictitious statement approach, B would have recovered nothing while the firm was in business. In liquidation, B would recover $500,000 of customer property and $500,000 from SIPC for a total of $1 million on his $2 million claim, with $1 million still owed to him. Under the Trustee's approach, A would recover nothing in the SIPA liquidation and B would receive all of the customer property plus the SIPC advance, for a total of $1.5 million which would reduce his loss from $1 million to $500,000. From this illustration, it is clear that every dollar received by A, who already has recaptured his initial investment and more, is one dollar less for B who has yet to recover his initial investment.

Although Claimants assert that the only issue relates to the amount of money to be advanced by SIPC, the reality is that the Trustee already has collected in excess of $1.5 billion for customers, with a number of lawsuits pending in which the Trustee seeks to recover in excess of $14 billion for customers. Thus, the calculation of net equity will have a genuine impact on the amount of customer property received by each customer including those customers who

already recovered their principal and received sizeable sums of money belonging to other customers.

## IV.  WHILE DISAVOWING THAT MADOFF WAS THEIR AGENT, THE CLAIMANTS SEEK TO TAKE ADVANTAGE OF HIS ACTIONS

Curiously, while relying on the backdated trades and phony profits generated for them by Madoff as the basis for their claims, the Claimants deny that Madoff was their agent.

Under the law of agency, it is well established that a principal who seeks to avail himself of the fruits of an agent's fraud is chargeable with knowledge of, and responsibility for, that fraud even if the actions comprising the fraud would otherwise fall outside the scope of the agent's authority.[9]  See, e.g., Ensminger, 263 B.R. at 453-454.  See also, Fineberg v. Stone (In re Brainard Hotel Co.), 75 F.2d 481, 482 (2d Cir. 1935); Cathay Pacific Airways Ltd. v. Fly And See Travel, Inc., 3 F.Supp.2d 443, 455 (S.D.N.Y. 1998) ("Under New York agency law, the principal may not accept the fruits of the agent's fraud and then attempt to divorce himself from the agent by repudiating the agent and his knowledge");  Harriss v. Tams, 179 N.E. 476, 479 (1932) ("[T]his court has held that principals who ... retain or demand the fruits of a contract obtained by unauthorized representations of an agent 'stand in the same position as if they had made  the representation or authorized it to be made'"); Angerosa v. White Co., 290 N.Y.S. 204, 209 (4th Dept. 1936), aff'd., 11 N.E.2d 325 (1937) ("A principal who gives his agent authority to

---

[9] Of course, the principal is also responsible for actions taken by his agent within the scope of the agency. See, e.g., Ensminger, 263 B.R. at 454 ("The knowledge of the agent acting within the agency power may be imputed to the principal, and the principal's liability is affected by the agent's knowledge for purposes of allowing a defrauded party to rescind a transaction procured through an agent's fraud, even if the principal did not authorize the agent's fraud").

-21-

solicit a sale and accepts the fruits of his efforts will be held responsible for the fraudulent as well as the fair means by which the contract was obtained, if instrumentalities are in line with the accomplishment of the object of the agency").

This principle is especially applicable in determining "net equity" under SIPA, as the courts in this jurisdiction have recognized. See, e.g., Ensminger, 263 B.R. at 435 (SIPA, and the rules promulgated thereunder, "manifest a design to deny [customer] protection to transactions tainted by fraud"). In Ensminger, for example, the District Court for this District rejected claims of "net equity" protection by claimants who had received cash credits posted into their accounts as part of fraudulent securities trades. Id. The claimants contended that, because they had not known of the broker's fraud, they should not be responsible for it. Id. The Court rejected that contention and upheld the denial of the claimants' "net equity" claims, explaining that a contrary ruling would treat the claimants "as though the (subject) trades were entirely untouched by their brokers' fraud(s)," and would allow them to retain the benefits of the fraud, with the result "thousands of other customers and creditors who were not specifically chosen by ...(the broker) as beneficiaries of its fraud..." would be "left holding the proverbial bag." Id. at 434. As the Court recognized, SIPA's language and design simply do not countenance such a result. Id.

The foregoing principles preclude the use of the fraudulent account statements provided by BLMIS to its account holders as the basis for determining their "net equities" in this proceeding. In connection with the opening of an account at BLMIS, account holders signed documents providing BLMIS with a broad grant of discretion "[t]o buy, sell and trade in stocks, bonds, options, and other securities..." in their BLMIS accounts. (See Looby Dec. ¶ ¶35, 36.) Without question, the cash and securities positions shown on the final account statements

received by the Claimants were represented to be the product of securities purchase and sale transactions, precisely the kind of transactions which the Claimants authorized BLMIS to engage in on their behalves.  (Id.)  As a result, those transactions, even though fraudulent, fall within the scope of BLMIS's role as Claimants' agent.

Even if those transactions fall outside of that agency relationship, however, Claimants are chargeable with the underlying fraud because they rely on BLMIS's fraudulent statements as the foundation for their "net equity" claims.  On the basis of those fraudulent statements, and the fictional positions reported thereon, Claimants hope to increase the amount of their claims and ultimate recoveries - i.e., to receive a benefit -  in this proceeding.  Moreover, because, under SIPA, "customer property" is distributed to "customers" ratably on the basis of their respective "net equities," each Claimant can only achieve such a benefit at the expense of other BLMIS customers.  More specifically, as previously discussed, any enhanced "net equity" claim that produces a greater recovery for one Claimant must correspondingly reduce the recoveries of other customers.  Thus, by insisting that the Trustee compute their "net equities" on the basis of BLMIS's fraudulent account statements, Claimants can only be relying on the Debtor's wrongful acts in order to secure a benefit at the expense of other claimants.[10]    Accordingly, under applicable law, Claimants are chargeable with the Debtor's wrongdoing, whether or not that fraud fell within the scope of the Debtor's authority as Claimants' agent.  See, e.g., Ensminger, 263 B.R. at 453-54; Fineberg, 75 F.2d at 482; Cathay Pacific, 3 F.3d at 445; Harriss, 179 N.E. at

---

[10]  To the extent that Claimants  would not receive a benefit from the use of their final account statements as the basis for determining their "net equities" - and instead would be better off under the Trustee's "net equity" calculus - they lack standing to challenge the Trustee's calculus.

479; <u>Angerosa</u>, 290 N.Y.S. at 204. For the same reason, Claimants' "net equities" cannot be determined on the basis of the Debtor's fraud, or of the phony account statements reflecting it. <u>See</u> <u>Ensminger</u>, 263 B.R. at 435.

Claimants make essentially four arguments in response to the foregoing. First, they contend that to deny them "customer" relief under SIPA because of their agent's fraud "would render SIPA meaningless, as all customer claims could be denied based on an agency rationale anytime a broker commits fraud." Eisenberg Br. at 39. Second, Claimants assert that the Debtor's fraud fell outside the scope of its authority as their agent, and therefore that their "net equities" must be determined without reference to that fraud. Third, although Claimants continue to attempt to maximize their recoveries in this proceeding by basing their "net equity" claims on admittedly fraudulent account statements provided to them by BLMIS, they insist that, in so doing, they are merely asserting their purported rights under SIPA, not attempting to obtain the fruits of the fraud, and therefore are in no way responsible for it. Finally, Claimants contend that the Trustee is precluded from asserting fraud claims against them because, in so doing, he stands in the shoes of the Debtor, and is therefore barred by the doctrine of unclean hands.

None of these arguments withstands scrutiny. To the extent that the "fraud" in fact is conversion of cash or securities held by the broker for the customer,[11] the wrongful act generally does not bar or otherwise limit a claimant's access to "customer" relief, but may do so where, as here, the claimant attempts to take advantage of that fraud to secure enhanced "customer" relief.

---

[11]    Under SIPA §78<u>lll</u>(2), "customer" includes any person with a claim arising out of conversion of securities received, acquired or held by the broker for specified purposes for the account of the customer, and any person who has deposited cash with the broker in order to buy securities.

-24-

See supra.  As discussed, by insisting that the Trustee calculate their "net equities" on the basis of

their final account statements - which Claimants acknowledge to be fraudulent - Claimants hope

to take advantage of the Debtor's fraud to maximize the amount of their "customer" claims, and

their ultimate recoveries, in this proceeding, all at the expense of other customers.  That is not

permissible under either SIPA or the common law of agency.

Claimants' efforts to deny that they are relying on the Debtor's fraud, and instead are

merely seeking "to avail themselves of their statutory rights under SIPA," is flatly contradicted

by their behavior.  The first and most obvious step in disavowing the Debtor's fraud would be to

reject, not rely on, the fraudulent statements generated and provided to Claimants by BLMIS.

Instead of taking that step, Claimants expressly rely on those fraudulent statements to enhance

their claims in this proceeding, at the necessary and inevitable expense of other customers,

creditors, and SIPC, but then insist that they cannot be held responsible in any way for that fraud.

That position is inherently contradictory and is untenable under the law.  It has been expressly

rejected by the courts in this jurisdiction in the context of SIPA.  See Ensminger, 263 B.R. at

435.

Claimants' remaining argument - that the Trustee is barred by the doctrine of unclean

hands from asserting fraud claims against them - reflects a fundamental confusion.  The Trustee

has brought no affirmative fraud claim against any of the Claimants, nor is any such claim the

subject of the instant litigation.  Instead, the Trustee merely determined, and partially disallowed,

Claimants' "net equity" claims against the Debtor because Claimants have relied upon BLMIS's

fraud and seek to benefit from it at the expense of other investors.  Citations to authority

purportedly limiting the Trustee's power to bring affirmative claims have no relevance to his

-25-

power to determine claims.

In any event, Claimants are wrong about the Trustee's power to bring "fraud" claims. Their unclean hands argument is based upon the premise that any state law fraud claim that the Trustee might bring against them would have to be based on Section 541 of the Bankruptcy Code. But that is not the provision on which the Trustee might rely. Under Section 548 of the Bankruptcy Code (11 U.S.C.), the Trustee is expressly empowered to recover certain fraudulent transfers. Further, Bankruptcy Code Section 544(b) empowers the Trustee to step into the shoes of an unsecured creditor to avoid any transfer of an interest in property, including any such transfer avoidable under state fraudulent transfer laws, inter alia. See 11 U.S.C. § 544(b)(1). See also, e.g., 5 Collier on Bankruptcy ¶ 544.07[2] (15th rev. ed. 2009) ("Under section 544(b), the trustee may exercise the rights of creditors under state fraudulent transfer laws or preferential transfer laws").

SIPA – which displaces the Bankruptcy Code to the extent that the statutes are in conflict -- makes the matter even more explicit. See SIPA § 78fff(b). In particular, under Section 78fff-2(c)(3) of SIPA, if a transfer is void or voidable under the Bankruptcy Code, then the Trustee "may recover any property transferred by the debtor which, except for the transfer, would have been customer property...." If such a transfer was made to a "customer," then the "customer" is expressly deemed to have been a creditor of the debtor for purposes of this recovery provision, thus helping to ensure the applicability of state fraudulent transfer laws, among others. See SIPA § 78fff-2(c)(3). It is noteworthy that under section 78fff-2(c)(3), the trustee may avoid any transfer voidable or void under Title 11, including not only fraudulent conveyances but preferences. See also SIPA §78fff-1(a).

-26-

Many of the Claimants received transfers of property from BLMIS - transfers many of the transferees may have believed were withdrawals from their BLMIS accounts, but which were actually fraudulent transfers made by BLMIS in furtherance of its Ponzi scheme.  If not transferred, much of the subject property unquestionably would have constituted, and been administered as, "customer property" in this proceeding.  Under the provisions of SIPA and the Bankruptcy Code reviewed above, those transfers are recoverable by the Trustee.

It bears emphasis, however, that the Trustee's power to avoid the transfers simply reinforces the fact that the investor's net equity cannot be based on the last fictitious account statement.  For all of the reasons discussed in SIPC's main brief, the backdated trades, fictitious prices, and false profits that are the basis for the claims are in and of themselves illegal, and therefore, cannot be given effect.  Under the law of the Second Circuit, there is no recovery by an investor of fictitious amounts in a SIPA case.  <u>New Times I</u>, 371 F.3d at 88.  The Trustee's ability to recapture transfers of funds through the avoidance provisions of Title 11 are not the basis for the rejection of the last statement approach.  That he ultimately could do so, if he chose to, reaffirms the correctness of his approach.

**V.  11 U.S.C. §546(e) DOES NOT**
**LIMIT THE TRUSTEE'S AVOIDANCE POWERS**
**<u>TO SUITS UNDER 11 U.S.C. §548(a)(1)(A)</u>**

As previously noted, the Trustee's ability to avoid transfers, while reinforcing the correctness of his calculation of "net equity," is not the basis for the calculation.  Nevertheless, much discussion is devoted by the Claimants to reasons why, in the Claimants' view, the Trustee's avoidance powers are limited.  In that regard, some Claimants assert that under section 546(e) of the Bankruptcy Code, any avoidance suit by the Trustee can only be brought under

-27-

section 548(a)(1)(A) of the Code, and that in any event, no such action may be brought here.

See, e.g., Sterling Br. at 14- 27.  The Claimants are mistaken because even assuming, arguendo,

that the instant matter were an avoidance action instead of one to determine the calculation of net

equity, section 546(e) would not apply.

## A.  Section 546(e)

Section 546(e) of the Code, the "stockbroker defense," provides a "safe harbor" by

exempting from avoidance certain types of payments commonly made in connection with

transactions in the securities markets.  The Claimants rely upon that portion of section 546(e) that

provides that notwithstanding specified provisions under the Code,

> the trustee may not avoid a transfer ... that is a transfer made by or
> to ... [a] stockbroker [or] financial institution, ... in connection with
> a securities contract, as defined in section 741(7), ... that is
> made before the commencement of the case, except under section
> 548(a)(1)(A) of this title.

Even though a suit by the Trustee to recapture transfers made by BLMIS is not now before the

Court, the Claimants assert that in any event, the sums withdrawn by Claimants (consisting of

other investors' money) are transfers that the Trustee could not seek to avoid.  Sterling Br. at 14.

In determining whether section 546(e) applies, a court must "look to the provisions of the

whole law, and to its object and policy," and not just its literal language.  Bevill, Bresler &

Schulman v. Spencer Sav. & Loan, 878 F.2d 742, 750 (3d Cir. 1989) ("Bevill Bresler") (citing

Massachusetts v. Morash, 490 U.S. 107, 115 (1989); Ensminger, 263 B.R. at 478-479; Official

Comm. of Unsecured Creditors of Norstan Apparel Shops Inc. v. Lattman (In re Norstan Apparel

Shops Inc.), 367 B.R. 68, 74-75 (Bankr. E.D.N.Y. 2007).  The legislative history of section

546(e) explains that the provision was intended "to minimize the displacement caused in the

-28-

commodities and securities markets in the event of a major bankruptcy affecting those industries." H. R. Rep. No. 97-420, at 1 (1982), reprinted in 1982 U.S.C.C.A.N. 583.  Thus, Congress sought to prevent the "ripple effect" created by "the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected industry." Bevill, Bresler, 878 F.2d at 747.  See Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.), 323 B.R. 857, 864 (Bankr. S.D.N.Y. 2005) ("the purpose of section 546 is to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions"), citing Kaiser Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp.), 913 F.2d 846, 848 (10th Cir.1990).

Five factors are significant to a consideration of whether section 546(e) applies.  These include whether:

"(1)    the transactions have long settled by means of actual transfers of consideration, so that subsequent reversal of the trade may result in disruption of the securities industry, creating a potential chain reaction that could threaten collapse of the affected market;

(2)    consideration was paid out in exchange for the securities or property interest as part of settlement of the transaction;

(3)    the transfer of cash or securities effected contemplates consummation of a securities transaction;

(4)    the transfers were made to financial intermediaries involved in the national clearance and settlement system;

(5)    the transaction implicated participants in the system of intermediaries and guarantees which characterize the clearing and settlement process of public markets and therefore would create the potential for adverse impacts on the functioning of the securities market if any of those guarantees in the chain were invoked."

In re Enron Creditors Recovery Corp., ___ F.Supp.2d ___, 2009 WL 5174119 at *16 (S.D.N.Y.

2009), <u>citing</u> <u>Ensminger</u>, 263 B.R. at 479-80.  <u>See</u> <u>American Tissue, Inc. v. Donaldson, Lufkin &</u>

<u>Jenrette Sec. Corp.</u>, 351 F.Supp.2d 79, 107 (S.D.N.Y. 2004).[12]

A review of the factors in the context of this case makes clear that section 546(e) cannot

apply.  The Claimants contend that the transfers in question are the withdrawals by the investors

as shown in their fictitious accounts statements.  Sterling Br. at 14.  As an initial matter, section

546(e) is inapplicable because customer withdrawals are not the type of transactions within the

ambit of the section.  The section was intended to enable <u>brokers</u> to protect themselves in the

event of the insolvency of one of their customers or a financial counterparty.  <u>See</u>, <u>e.g.</u>, 6 <u>Collier</u>

<u>on Bankruptcy</u> ¶ 741.07 (15th rev. ed. 2009).    It has no application to customer account

withdrawals.   Moreover, section 546(e) obviously can apply only to payments made in

connection with real "securities contracts."  Phantom trades that have never occurred cannot have

the kind of ripple effect threatening the liquidity of the markets or the operation of the national

securities clearance and settlement system targeted by Congress under section 546(e).   Indeed,

the application of section 546(e) to shield the withdrawals would have the effect of sanctioning

backdated trades at fabricated prices which would undermine, and not strengthen, the financial

markets.  Not only are the kinds of market participants and transactions at which section 546(e) is

directed not present here, but there also was no consideration paid for the fake securities trades.

Thus, bogus trades consistently were "paid for" out of fictitious profits and transfers were

payments of false profit.  Payments made by the broker to "settle" phony transactions cannot be

---

[12] Although section 546(e) was amended in 2006 to include transfers pursuant to securities contracts, Pub. L. No. 109-390, 120 Stat. 2692, 2697-2698 (2006), the factors still apply in evaluating the applicability of the section.  <u>See</u>  <u>In re Enron Creditors Recovery Corp.</u>, ___ F.Supp.2d ___, 2009 WL 5174119 at *16 (S.D.N.Y. 2009).

regarded as part of the normal settlement process, which section 546(e) seeks to protect.  See

Ensminger, 263 B.R. at 481 (phantom transactions "could not be considered as contemplating a

normal completion of a securities transaction as commonly understood in the securities

industry").    Thus, there would be no basis under section 546(e) to limit any avoidance action

brought by the Trustee in this case.

## B.  Section 548(a)(1)(A)

As this is not an avoidance suit, extensive discussion of the Trustee's authority to bring

such suits is not warranted and, given the absence of concrete facts, inappropriate.  Nevertheless,

a brief reply is made below to the Claimants' assertions.

Essentially, the Claimants argue that the Trustee would not be able to avoid transfers

under section 548(a)(1)(A) of the Bankruptcy Code because the withdrawals by the claimants

were payments of antecedent debts.  Relying mainly upon In re Sharp International Corp., 403

F.3d 43 (2d Cir. 2005) ("Sharp"), they contend that "[n]o intentional fraud claim may be stated"

in such circumstances.   Sterling Br. at 21.  Claimants go on, however, correctly to note that in

the case of a Ponzi scheme, actual fraud is presumed.  Sterling Br. at 25.  Where a debtor was

engaged in a Ponzi scheme, consideration of the "badges of fraud," that is, circumstances

commonly associated with fraud such that their existence gives rise to an inference of fraudulent

intent, is unnecessary.  In re Manhattan Inv. Fund Ltd., 397 B.R. 1, 10 n. 13 (S.D.N.Y. 2007),

citing Securities Investor Protection Corp. v. Old Naples Sec., Inc. (In re Old Naples Sec., Inc.),

343 B.R. 310, 319 (Bankr. M.D. Fla. 2006).  Actual intent to hinder, delay or defraud creditors is

established as a matter of law in cases involving a Ponzi scheme because transfers made in the

course of such an operation can only be made to hinder, delay or defraud.  In re Manhattan Inv.

Fund Ltd., 359 B.R. 510, 517-518 (Bankr. S.D.N.Y. 2007), aff'd., in part, and rev'd, in part, on

other grounds, 397 B.R. 1 (S.D.N.Y. 2007) ("Manhattan Investment").    Courts have long

recognized that the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to

defraud. See in re Manhattan Inv. Fund Ltd., 397 B.R. at 10-11, and cases cited therein.

Significantly, with respect to the Sharp decision relied upon by the Claimants, the Court

in Manhattan Investment observed that Sharp did not involve a Ponzi scheme and that the

Second Circuit did not discuss in that case the Ponzi scheme presumption.  397 B.R. at 10.  In

noting also the factual differences between the two cases, the Court remarked:

> In Sharp, the transfer at issue was the repayment of a debt that was
> antecedent to the company's fraud. See [Sharp, 403 F.3d] at 55
> (finding that "no ground exists therefore to 'collapse' that loan
> with other (non-contemporaneous) bad-faith maneuvers").    In
> contrast, in a Ponzi scheme, the transfers sought to be avoided
> occur as part of the fraud.  They are not made to repay loans or
> services that preceded the fraud and were unrelated to it.  For this
> reason, the transfer in Sharp is factually distinguishable from the
> typical transfers in a Ponzi scheme case.

397 B.R. at 11.

In the case at hand, the withdrawals by the Claimants did not result in the extinguishment

of an underlying debt or, as in another case relied upon by the Claimants, the payment of a rate of

interest contracted for between the parties.   In re Carrozzella & Richardson, 286 B. R. 480, 484

(D. Conn. 2002). See Sterling Br. at 24.   Withdrawals far exceeding deposits of  principal were

not uncommon.  As examples of some deposits and withdrawals:

| Claimant | Deposit | Withdrawal |
|---|---|---|
| Mets Ltd. Partnership | $20 million | $44,550,000 |
| Mike Stein | $10,211,297.50 | $20,220,200 |
| Stephen R. Goldenberg | $5 million | $9 million |

| Stuart Perlen | $1,210,000 | $6,429,076.47 |

Exhibit A to Trustee's Motion.  Calculated as the amounts were based on predetermined returns and the "reinvestment" of false profits and comprised as they were of other investors' money, the transfers shown on the fictitious account statements were themselves inherently fraudulent and intrinsically a part of the Ponzi scheme.  Necessarily, their purpose was to hinder, delay or defraud other investors.   See In re Bayou Group, LLC, 362 B.R. 624, 636-38 (S.D.N.Y. 2007).

## VI.  SIPC IS NOT JUDICIALLY ESTOPPED

Certain of the Claimants contend that SIPC is judicially estopped from asserting that the account statements do not control because, in their view, the position contradicts SIPC's position in New Times I.  Schur Br. at 19-23.  Two elements must be present to invoke judicial estoppel: 1) an inconsistent position argued by a party in a prior proceeding; and 2) adoption by the Court of the inconsistent view.  Bates v. Long Island R. Co., 997 F.2d 1028, 1038 (2d Cir.), cert. den., 510 U. S. 992 (1993).  The Claimants are mistaken as there is no basis to apply judicial estoppel here.

Two groups of claimants were presented in New Times I.  All received fabricated account statements and none had trades actually placed for them.  Nevertheless, the statements received by one group of claimants contained information relating to investment in real mutual funds that "mirrored what would have happened had the given transaction been executed." New Times I, 371 F.3d at 74.  The statements received by the second group showed investment in Funds that never existed.  The issue in the case was whether the second group of claimants with investments in fictitious securities had claims for securities or cash.  SIPC and the trustee in the case took the position that contrary to the first group of claimants as to whom the account statements were to

-33-

be given effect, the statements as to the second group could not be honored as the "securities" did

not exist. Those claimants would have claims for cash.  The Second Circuit disagreed, holding

that because the claimants reasonably believed that securities had been bought for them, their

claims would be for securities.  However, the Court also held that the claimants' net equity

would be valued according to the amount of cash they provided to the debtors to purchase the

Funds and would not include any fictitious interest or dividend reinvestments.  371 F.3d at 87-88.

     The position taken by SIPC in the case at hand is fully consistent with its position in New

Times I, and more importantly, follows the law in this jurisdiction.  Although no investments

were made for them,  Claimants, having received account statements creating a reasonable

expectation that securities had been bought, would have claims for securities and thereby receive

the maximum amount of SIPC protection.  However, because the "trades" were backdated,

profits were false, and the amounts shown on the fictitious statements necessarily bore no

relation to reality, the claimants would be entitled to the return of their net principal, with

artificial sums excluded.  The positions are fully consistent, and SIPC is not judicially estopped.

     In closing, it bears mention that certain Claimants assert that, in taking the position that it

does,  SIPC is vilifying the Claimants by implying that they knew or should have known of the

fraud and therefore, were willing participants in it.  That is by no means SIPC's objective or

position.  While most of the investors did not know and had no reason to know of the Madoff

wrongdoing, the fact is that they know now.  To the extent the Claimants in this matter press

their claims for false profits based upon their last fictitious statement, they are attempting to turn

fiction into fact to the detriment of others.  In that circumstance, innocence notwithstanding, the

law imputes the knowledge of the agent-broker to the principal-investor.  As the Court observed

-34-

in Ensminger:

> [C]ircumstances may prevail under which the law, in disregard of the innocent's protestations, and indeed at times even conceding whatever validity due them, may still impose liability, not on account of anything the person may have done or omitted to do, but, for reasons of equity or policy, by imputing to the apparent bystander the misconduct of a sufficiently related wrongdoer.  By these means, the law recognizes that even innocent association with  scoundrels has its limitations, and its costs.  Occasions arise when the villain chooses to exploit the relationship and betray the trust, and then the supposed "innocent" may be obligated to pay a price.

Ensminger, 263 B. R. at 416-417.

The Trustee's calculation of net equity carries out the intent of Congress by not allowing the wrongdoer to dictate the marketplace and by effecting a ratable distribution of property among investors so that some do not benefit at the expense of others.  It is the approach required under SIPA.[13]

---

[13]  In support of their fictitious statement argument, certain Claimants rely upon the decision in Visconsi v. Lehman Bros., Inc., 244 Fed. Appx. 708,  2007 WL 2258827 (6th Cir. 2007) ("Visconsi").  At issue in Visconsi was the appropriateness of damages under an arbitration award entered in favor of certain investors defrauded by their broker.  The broker had sent false account statements to the investors in order to conceal his fraud.  The decision is inapposite because it did not involve a SIPA case or the computation of net equity under SIPA.  The arbitrators issued no opinion supporting their award to the investors, and therefore, the basis for the award is unknown. Furthermore, the award was of "damages" which, under SIPA, would constitute a general creditor, and not a "customer," claim against the debtor's estate.  See SIPC Br. at  40-42.

## CONCLUSION

For all of the reasons stated in SIPC's main brief and herein, the Trustee's Motion should

be granted.

Respectfully submitted,


    /s/ Josephine Wang
JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior Associate General Counsel
  for Dispute Resolution

CHRISTOPHER H. LAROSA
Associate General Counsel

HEMANT SHARMA
Assistant General Counsel

SECURITIES INVESTOR
  PROTECTION CORPORATION
805 15th Street, N.W.
Suite 800
Washington, D.C.  20005-2215
Telephone: (202) 371-8300
Email: jwang@sipc.org
E-mail: kbell@sipc.org
Email: clarosa@sipc.org
Email: hsharma@sipc.org

Date:  January 15, 2010
Washington, D.C.