Katharine B. Gresham (*pro hac vice*)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20548
Telephone: (202) 551-5148
Facsimile: (202) 772-9260

Hearing Date: February 2, 2010
Hearing Time: 10:00 a.m

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT NEW YORK**

_____

SECURITIES INVESTOR PROTECTION CORPORATION,

     Plaintiff,

  v.

BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

     Defendant.
_____

In re:

BERNARD L. MADOFF,

     Debtor.
_____

Adv. Pro. No. 08-1789 (BRL)
SIPA Liquidation
(Substantively Consolidated)

**SUPPLEMENTAL MEMORANDUM OF LAW OF THE SECURITIES AND EXCHANGE COMMISSION SUPPORTING TRUSTEE'S DETERMINATION THAT NET EQUITY SHOULD NOT BE BASED ON SECURITIES POSITIONS LISTED ON LAST STATEMENTS, AND SUPPORTING IN PART TRUSTEE'S DETERMINATION THAT NET EQUITY SHOULD BE BASED UPON AMOUNTS DEPOSITED LESS AMOUNTS WITHDRAWN**

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The "Net Equity" Definition Must Be Read in Conjunction With
            Section 8(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    SIPA's legislative history does not support calculating net equity based on
            account statements that reflect fictitious positions in real securities that the
            broker concocted after the fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    The *New Times* decisions do not support calculating net equity based
            on fictitious securities positions shown on the claimants' BLMIS account
            statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    D.    Payments from the SIPC Fund Cannot Be Separated from Payments from
            Customer Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

# TABLE OF AUTHORITIES

**CASES**                                                                                             **PAGE**

*In re A.R. Baron Co., Inc.*, 226 B.R. 790 (Bankr. S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Adler Coleman Clearing Corp.*, 198 B.R. 70 (Bankr. S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . 6

*In re John Dawson & Associates, Inc.*, 289 B.R. 654 (Bankr. N.D. IL 2003) . . . . . . . . . . . . . . . . 6

*In re MV Securities, Inc.*, 48 B.R. 156 (Bankr. S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . 7, 8

*SEC v. S.J. Salmon & Co.*, 375 F. Supp. 867 (S.D.N.Y. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Stafford v. Giddens (In re New Times Securities Services, Inc.)*,
    463 F.3d 125 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

**STATUTES AND RULES**

Section 17(a)(1) of the Exchange Act, 15 U.S.C. 78q(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Securities Investor Protection Act

    Section 2, 15 U.S.C. 78bbb . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 8(b), 15 U.S.C. 78fff-2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4, 5, 6
    Section 8(c)(1)(C), 15 U.S.C. 78fff-2(c)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 9(a), 15 U.S.C. 78fff-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 16(4), 15 U.S.C. 78lll(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 16(11), 15 U.S.C. 78lll(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Regulation 17a-3, 17 C.F.R. 240.17a-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**MISCELLANEOUS**

H.R. Rep. No. 95-746 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

S. Rep. No. 95-763 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Securities Investor Protection Act of 1977: Hearings before the
    Subcomm. on Consumer Protection and Finance of the H.
    Comm. on Interstate and Foreign Commerce*, 95th Cong. (1977) . . . . . . . . . . . . . . . . . . 5

# INTRODUCTION

The Securities and Exchange Commission submits this memorandum in response to arguments made in reply memoranda to the Memorandum of the Securities and Exchange Commission Supporting Trustee's Determination that Net Equity Should Not be Based on Securities Positions Listed on Last Statements, and Supporting in Part Trustee's Determination That Net Equity Should Be Based Upon Amounts Deposited Less Amounts Withdrawn ("SEC Memorandum").[1]

Those reply memoranda challenge the Commission's view that the claims for net equity of the claimants in this proceeding should not be based on the final account statements they received from Bernard L. Madoff Investment Securities (BLMIS). The claimants principally argue that the position taken in the SEC Memorandum: (1) rests on an erroneous interpretation of

---

[1] This Memorandum responds to the following pleadings: Reply Brief in Opposition to Arguments of the SEC and the Optimal Entities Supporting Trustee's Motion Relating to "Net Equity" Issue, filed December 18, 2009, Dkt. # 1095 ("Reply Memorandum of Milberg Claimants"); Memorandum of Law on "Net Equity" in Reply to Memoranda of the Securities and Exchange Commission and Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited, filed December 21, 2009, Dkt. #1096 ("Reply Memorandum of Phillips Nizer Claimants"); Reply Memorandum of Law of Sterling Equities Associates and Certain Affiliates Regarding Net Equity and Avoidance, filed December 21, 2009, Dkt. # 1098 ("Reply Memorandum of Sterling Equities Claimants"); Memorandum of Law Submitted by the SRZ Claimants in Response to the SEC's "Constant Dollar" Approach to "Net Equity," filed December 21, 2009, Dkt # 1104 ("Reply Memorandum of SRZ Claimants"); Reply Memorandum of Law in Opposition to Trustee's Motion for an Order Upholding Trustee's Determination Denying Claims' for Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity, and Expunging Those Objections with Respect to the Determinations Relating to Net Equity, filed December 21, 2009, Dkt. # 1105 ("Reply Memorandum of Lax & Neville Claimants"); and Reply Memorandum of Law in Further Opposition to Trustee's Motion Relating to the Determination of Net Equity, filed December 21, 2009, Dkt. # 1110 ("Reply Memorandum of Schur Claimants").

Securities Investor Protection Act (SIPA) Section 8(b); (2) is inconsistent with statements in the legislative history that SIPA is intended to protect customers' "legitimate expectations"; and (3) is contrary to the Second Circuit's *New Times* decisions. Having considered their arguments, the Commission disagrees with the claimants' view that net equity should be determined by the securities positions shown on the final account statements.

## ARGUMENT

A. <u>The "Net Equity" Definition Must Be Read in Conjunction With Section 8(b)</u>.

A number of the claimants reject the Commission's conclusion that net equity claims must satisfy the "books and records" requirement of SIPA Section 8(b), 15 U.S.C. 78fff-2(b). [2] Instead, they argue, the definition of net equity in SIPA Section 16(11), 15 U.S.C. 78lll(11), as applied to the account statements, governs how the claims should be valued.

These two statutory provisions must be read together, however. The definition of net equity in Section 16(11) provides the formula for calculating net equity—essentially netting out the broker-dealer's obligations to the customer and the customer's obligations to the broker-dealer. [3] Section 16(11) does not address how to determine a broker-dealer's obligations to its

---

[2] *See* Reply Memorandum of Reply Memorandum of Milberg LLP Claimants at 3-7; Reply Memorandum of Phillips Nizer Claimants at 5-6; Sterling Equities Associates at 2-3; Reply Memorandum of SRZ Claimants at 2-4; Reply Memorandum of Lax & Neville Claimants at 12-13; Reply Memorandum of Schur Claimants at 10.

[3] SIPA Section 16(11) provides, in pertinent part:

"The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
    (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . . , minus
    (B) any indebtedness of such customer to the debtor on the filing date . . . .

customers. That is supplied by Section 8(b), which provides that obligations be "ascertainable from the books and records of the debtor" or "otherwise established to the satisfaction of the trustee."[4] As explained in the SEC Memorandum (pp. 3-4), the account statements are contradicted by BLMIS's other books and records, which show that the securities positions shown on the statements were never purchased for the customers' accounts.[5] And because the claimants are unable to show that they paid for the securities positions on the final account statements, they are unable to satisfy Section 8(b)'s alternative condition that the debtor's obligations be "otherwise established to the satisfaction of the trustee." SEC Memorandum at 4.

---

[4] Section 8(b) provides, in pertinent part:

"After receipt of a written statement of claim . . . , the trustee shall promptly discharge . . . all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer . . . insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee."

The SRZ claimants note that the phrase "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction" applies only to "obligations of the debtor to a customer relating to . . . securities and cash," which is distinguished from "net equity claims" by the disjunctive "or." Reply Memorandum of SRZ Claimants at 3. While this may be grammatically correct, the drafters could not have meant that a "net equity claim" is not an obligation of the debtor with respect to securities and cash.

[5] Although there is no definition of "books and records" in SIPA itself, Section 2 of SIPA, 15 U.S.C. 78bbb, provides that "the provisions of the Securities Exchange Act of 1934 . . . apply as if [SIPA] constituted an amendment to, and was included as a section of [the Exchange Act]." Section 17(a)(1) of the Exchange Act, 15 U.S.C. 78q(a)(1), requires brokerage firms to keep certain records prescribed by the Commission. This requirement is implemented by Regulation 17a-3, 17 C.F.R. 240.17a-3, which specifies the records brokerage firms must "make and keep." These records include blotters containing an itemized daily record of all securities purchases and sales, ledger accounts itemizing securities purchases and sales for each customer account, and a memorandum of each brokerage order for the purchase or sale of securities. Regulation 17a-3(a)(1), (3), and (5), 17 C.F.R. 240.17a-3(a)(1), (3), and (5).

*In re A.R. Baron Co., Inc.*, 226 B.R. 790 (Bankr. S.D.N.Y. 1998), does not, as several claimants suggest, limit Section 8(b)'s function to establishing whether claimants are entitled to the preferred status of customers. [6] The court was simply citing Section 8(b) to show that a claimant has the burden of establishing entitlement to a customer claim—the matter at issue in the case. 226 B.R. at 795 ("Provisions of SIPA make clear a claimant's burden by requiring that a debtor's obligations to its customers be 'ascertainable from the books and records of the debtor' or 'otherwise established to the satisfaction of the trustee.' See SIPA § 78fff-2(b)."). The court was not addressing the function of Section 8(b) in establishing the facts pertaining to the debtor's obligations to its customers.

    B.    <u>SIPA's legislative history does not support calculating net equity based on account statements that reflect fictitious positions in real securities that the broker concocted after the fact</u>.

A number of the claimants contend that views expressed in the SEC Memorandum are inconsistent with statements in the legislative history of the 1978 amendments to SIPA that the statute is intended to protect a customer's "legitimate expectations" of "receiv[ing] what he believes is in his account at the time the stockbroker ceases business." H.R. Rep. No. 95-746 at 21 (1977); *see also* S. Rep. No. 95-763 at 2 (1978). Those statements about legitimate expectations, the claimants argue, support calculating net equity based on the securities positions shown on the account statements and the confirmations of securities transactions that they received from BLMIS. [7]

---

[6] *See* Reply Memorandum of Sterling Equities Associates at 2-3; Reply Memorandum of Lax & Neville Claimants at 12.

[7] *See* Reply Memorandum of Milberg LLP Claimants at 4; Reply Memorandum of Phillips Nizer Claimants at 5-6; Reply Memorandum of Sterling Equities Associates at 5; Reply

We disagree for two reasons. First, read in context, the excerpts from the legislative history concerning "legitimate expectations" address a distinct issue unrelated to the issue confronted in this case, and there is nothing to support the broader reading of those excerpts that the claimants urge. Second, when placed in context, the statements concerning "legitimate expectations" are fully consistent with the requirements of Section 8(b).

The portions of the 1978 legislative history that the claimants cite address customers' "legitimate expectations" of receiving actual securities to replace securities missing from their accounts, rather than the cash value of those securities, as SIPA then provided. *See* H.R. Rep. 95-746 at 21; S. Rep. 95-763 at 2; *see also Securities Investor Protection Act of 1977: Hearings before the Subcomm. on Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce*, 95th Cong. at 69 (1977) (hereinafter "Hearings") (Testimony of SIPC Chairman Hugh F. Owens). [8] The legislative history indicates that the 1978 amendments were intended to honor those expectations in situations where customer securities are missing from customer accounts because they "have been lost, improperly hypothecated, misappropriated,

---

Memorandum of Lax & Neville Claimants at 7-8; Reply Memorandum of Schur Claimants at 10.

[8] Owens explained in his testimony that, as originally enacted, SIPA provided that when there was not enough stock available in the brokerage firm's accounts to satisfy customers' claims, customers would receive only a *pro rata* portion of the available securities. Hearings at 69. For the balance of the securities that should have been in their accounts, customers were limited to receiving the cash value of the missing securities based their market price as of the filing date of the SIPA proceeding. *Id.* In that situation, he noted, customers could lose the benefit of any appreciation after the filing date, and could suffer the "tax consequences of what is, in effect, a forced sale of their stock." *Id.* The amendments proposed by SIPC addressed this problem by requiring trustees to go into the market to purchase securities to make up the deficit, thus enabling trustees "to render accounts to customers in the same form as they stood when the member went out of business." *Id.* at 86. The Committee Reports that accompanied the 1978 amendments paraphrased Owens's testimony. *See* H.R. Rep. 95-746, at 21; S. Rep. 95-763, at 2.

never purchased or even stolen." H.R. Rep. 95-746 at 21; S. Rep. 95-763 at 2; Hearings at 69. These are circumstances in which securities either were purchased and then improperly disposed of, or in which securities could have been purchased in the market but were not. Critically, in each of those situations, the books and records of the broker-dealer or other evidence *could* be used to establish the broker's obligations to its customer as required by Section 8(b).

By contrast, there is nothing in the legislative history suggesting, as the claimants argue, that the "legitimate expectations" referred to in the House and Senate reports would extend to fabricated securities positions like those at issue in this case—based on hindsight and designed to facilitate a fraudulent scheme—just because those positions were shown on a customer's final account statement. And this extra-contextual reading of "legitimate expectations" cannot be reconciled with the express statutory requirement of Section 8(b), discussed above, that the obligations of a broker-dealer on which a customer's net equity is based must be ascertainable from the brokerage's books and records or otherwise established to the satisfaction of the trustee. Indeed, where, as in this case, customers' account statements reflect positions that were a product of a broker's after-the-fact concoction or otherwise could not have been achieved through actual market trading, neither the broker's books and records nor other evidence will be able to establish that those fictitious securities positions are obligations of the broker under Section 8(b).

Our reading of the legislative history is also consistent with case law holding that SIPA covers situations where assets are converted from customer accounts, and does not address fraudulent conduct by brokerage firms. [9] *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70,

---

[9] Although SIPA does not cover fraudulent conduct by brokerage firms, SIPA does cover certain situations that involve deception in connection with the purchase and sale of securities and thus could form the basis for an action under the antifraud provisions of the federal securities

76 (Bankr. S.D.N.Y. 1996) (SIPA does not protect customer claims based on fraud); *In re MV Securities, Inc.*. 48 B.R. 156, 160 (Bankr. S.D.N.Y. 1985) (same); *see also SEC v. S.J. Salmon & Co.*, 375 F. Supp. 867, 871 (S.D.N.Y. 1974) ("[T]his statutory scheme was designed to facilitate the return of the property of customers of insolvent brokerage firms or, where this cannot be done, to reimburse such customers if their property has been lost or misappropriated."). As the court noted in *MV Securities*: "It seems plain that SIPA's primary intent and policy are to protect customers who have cash and securities being held for them by a broker dealer, rather than to serve as a vehicle for the litigation of claims of fraud or violations of Rule 10b-5." 48 B.R. at 160.

   C. <u>The *New Times* decisions do not support calculating net equity based on fictitious securities positions shown on the claimants' BLMIS account statements</u>.

Several of the claimants contend that the Second Circuit's decision in *In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) (*New Times I*) to calculate net equity based on the amount of the customers' initial investment should be limited to situations where securities are non-existent—unlike the real securities listed on the claimants' BLMIS account statements. [10] Although the Court in *New Times I* addressed claims for net equity based on non-existent securities, the reasoning underlying that decision—as further explained in *Stafford v.*

---

laws – *e.g.*, where a brokerage firm never purchases securities as promised, or engages in unauthorized trading in a customer's account. Such situations give rise to a claim under SIPA, however, not because of the broker's fraud, but because customer assets were converted. *See In re John Dawson & Assocs., Inc.*, 289 B.R. 654, 662 (Bankr. N.D. IL 2003) (Unauthorized trading may give rise to a customer claim, since "customer property," as defined under SIPA Section 16(4), 15 U.S.C. 78lll(4), includes "the proceeds of any . . . property transferred by the debtor, including property unlawfully converted.").

[10] *See* Reply Memorandum of Sterling Equities Associates at 3-4; Reply Memorandum of SRZ Claimants at 6; Reply Memorandum of Schur Claimants at 11-12.

*Giddens (In re New Times Securities Services, Inc.)*, 463 F.3d 125 (2d Cir. 2006) (*New Times II*)—suggests that the Second Circuit would conclude that it is similarly inappropriate to calculate a customer's net equity based on the non-existent positions in real securities reflected on the claimants' BLMIS account statements.

The Second Circuit explained that it "declined to base the recovery on the rosy account statements telling customers how well the imaginary securities were doing, because treating the fictitious paper profits as within the ambit of the customers' 'legitimate expectations' would lead to the absurdity of 'duped' investors reaping windfalls as a result of fraudulent promises made on fake securities." *New Times II*, 463 F.3d at 130. In so holding, the court addressed one situation in which paper profits can be "fictitious" and thus an illegitimate basis for calculating net equity under SIPA—where the securities themselves do not exist and therefore the positions shown on the account statements of "'duped' investors" were disconnected from reality. *See New Times I*, 371 F.3d at 88. Crediting the fictitious securities positions at issue in *New Times I* would have resulted in "windfalls" to the investors *not* because the investors were in any way to blame for the fraud, but because those positions could not have been acquired in actual market trading.

The fraudulent promises Madoff made to his customers, of course, did not involve fictitious securities, and, conceivably, it would be possible for the Trustee to purchase real securities to cover the securities positions shown on the account statements. To do so, however, would give effect to non-existent positions in real securities fabricated after the fact to support pre-determined fictional investment returns. Like the fake securities addressed in *New Times I*, these positions could not have been acquired in legitimate market trading—here, not because the securities are fictitious, but because Madoff achieved those results *only* by opting out of real

-8-

market trading in favor of imaginary, after-the-fact "transactions." Thus, we believe that the Second Circuit would conclude that, even if the Madoff customers reasonably expected the securities positions shown on their final statements to be in their accounts, the goal of honoring customers' "legitimate expectations" cannot justify calculating net equity based on positions in real securities that are fabricated through fictitious backdated trades based on hindsight.

      D.    <u>Payments from the SIPC Fund Cannot Be Separated from Payments from Customer Property</u>.

Many claimants argue that allowing a customer to recover up to $500,000 from the SIPC Fund based on final account statement balances would not affect the amount available to pay any other customer from the fund of customer property.[11] The SIPC Fund payment, however, is not an independent payment unrelated to the customer's *pro rata* share of customer property.

SIPA Section 9(a), 15 U.S.C. 78fff-3, provides (emphasis supplied):

> In order to provide for prompt payment and satisfaction of <u>net equity claims</u> of customers of the debtor, SIPC shall advance to the trustee such moneys, not to exceed $500,000 for each customer, <u>as may be required to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property</u> . . . .

In many SIPA liquidation proceedings, customer property is insufficient to cover customer net equity claims, and payments are made from the SIPC Fund. Because trustees are unable to determine at the outset of a proceeding how much customer property will be available for distribution to customers, advances from the SIPC Fund are made before distributions from customer property. These advances, however, cover only "the amount by which the net equity of

---

[11] *See* Reply Memorandum of Phillips Nizer Claimants at 8; Reply Memorandum of Sterling Equities Associates at 5; Reply Memorandum of Lax & Neville Claimants at 13-14; Reply Memorandum of Schur Claimants at 4.

each customer exceeds his ratable share of customer property." If the combined amount of the advance from the SIPC Fund and the subsequent distribution from customer property exceed the customer's net equity, the SIPC Fund recoups the excess. *See* SIPA Section 8(c)(1)(C), 15 U.S.C. 78fff-2(c)(1)(C) (in allocating customer property, SIPC is subrogated to claims of customers). Thus, payments from the SIPC Fund only replace missing customer property and cannot be finally determined independently of the determination of a customer's *pro rata* share of customer property.

The statute does not permit the claims process to be bifurcated, with customers recovering payments from the SIPC Fund (up to $500,000) based on their final account statements, while the cash-in/cash-out method is used to determine payments from the fund of customer property. Again, the mechanism established in SIPA for paying net equity claims does not work this way. The payments from the SIPC Fund replace missing customer property. Net equity cannot be determined in one way for customer property and another way for the SIPC Fund payments that replace missing customer property.

## CONCLUSION

Based upon our analysis of SIPA and the Second Circuit's *New Times* decisions, the Commission believes that net equity should be determined by the amounts customers deposited in their BLMIS accounts less any amounts withdrawn. [12]

Dated: Washington, D.C.
January 15, 2010

                                Respectfully submitted,

                                /s/ Katharine B. Gresham

                                Katharine B. Gresham (*pro hac vice*)
                                Assistant General Counsel
                                Securities and Exchange Commission
                                100 F Street, N.E.
                                Washington, D.C. 20549
                                Telephone: (202) 551-5148
                                Facsimile: (202) 772-9260

Of Counsel
Jacob H. Stillman                    Alistaire Bambach
Solicitor                                    Assistant Director
Michael A. Conley                Securities and Exchange Commission
Deputy Solicitor                   3 World Financial Center, Suite 400
                                New York, NY 10281-1022
                                Telephone: (212) 336-0027
                                Facsimile: (212) 336-1319

---

[12] As explained in the SEC Memorandum, the Commission argues that, in determining customer claims under the cash-in/cash-out method, the amount of the payment should be calculated in constant dollars by adjusting for the effects of inflation (or deflation).