Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**REPLY BRIEF IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER
UPHOLDING TRUSTEE'S DETERMINATION DENYING "CUSTOMER" CLAIMS
FOR AMOUNTS LISTED ON LAST CUSTOMER STATEMENT, AFFIRMING
TRUSTEE'S DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE
OBJECTIONS WITH RESPECT TO THE DETERMINATIONS
RELATING TO NET EQUITY**

# TABLE OF CONTENTS

I.  INTRODUCTION. ........................................................................................ 2

II.  NOTHING IN THE LANGUAGE OF SIPA ALTERS THE GENERAL
     PRINCIPLE THAT PONZI-SCHEME DISTRIBUTIONS SHOULD BE
     BASED ON NET INVESTMENT. ................................................................ 4

     A.  SIPA Precludes The Calculation Of Net Equity Based Upon
         Fictitious Account Statements. ................................................................ 5

     B.  Claimants Have No Legitimate Expectation In The Proceeds Of A
         Fraud. ...................................................................................................... 6

     C.  Calculating Net Equity Based On Fraudulent Transactions Cannot
         Be Reconciled With The Trustee's Power Under SIPA To Avoid
         Fraudulent Transfers. ............................................................................ 11

         1.  Payments Of Fictitious "Profits" In Furtherance Of A Ponzi
             Scheme Are Made With The Intent To Defraud And Are
             Not For Reasonably Equivalent Value. ...................................... 12

         2.  Section 546(e) Of The Bankruptcy Code Does Not Prevent
             The Trustee From Avoiding Ponzi-Scheme Transfers. ............... 14

     D.  Equity Supports The Net investment Method As Well. ......................... 17

III. ENTITLEMENT TO A SIPC ADVANCE ARISES ONLY FROM A
     VALID NET EQUITY CLAIM. .................................................................. 19

IV.  THE IRS'S TAX TREATMENT OF MADOFF CLAIMANTS DOES
     NOT CONFLICT WITH THE NET INVESTMENT METHOD. ..................... 21

V.   CERTAIN ISSUES RAISED BY THE OPPOSITION CLAIMANTS
     AND THE SEC ARE BEYOND THE SCOPE OF THIS BRIEFING. ............. 22

VI.  CONCLUSION. ......................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. Eby* (*In re Young*)
  294 F. 1 (4th Cir. 1923) ................................................................................... 17

*Auburn Hous. Auth. v. Martinez*
  277 F.3d 138 (2d Cir. 2002) ................................................................ 5, 10, 11

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P.* (*In re Bayou Group, LLC*)
  362 B.R. 624 (Bankr. S.D.N.Y. 2007) ................................................ 12, 13, 16, 17

*Cunningham v. Brown*
  265 U.S. 1 (1924) ............................................................................................ 17

*Daly v. Deptula (In re Carrozzella & Richardson)*
  286 B.R. 480 (D. Conn. 2002) ......................................................................... 13

*Donell v. Kowell,*
  533 F.3d 762 (9th Cir. 2008) ........................................................................... 14

*Drenis v. Haligiannis*
  452 F. Supp. 2d 418 (S.D.N.Y. 2006) ......................................................... 12, 16

*Enron Corp. v. JP Morgan Secs., Inc.* (*In re Enron Corp.*)
  Nos. M-47 (GBD), 01-6034 (AJG), Adv. Nos. 03-92677 (AJG), 03-92682
  (AJG), 2008 WL 281972, at *5 (S.D.N.Y. Jan. 25, 2008) ................................ 16

*Focht v. Athens (In re Old Naples Sec., Inc.)*
  311 B.R. 607 (M.D. Fla. 2002) .......................................................................... 8

*Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund Ltd.)*
  310 B.R. 500 (Bankr. S.D.N.Y. 2002) ......................................................... 15, 16

*In re Grafton Partners, L.P.*
  321 B.R. 527 (B.A.P. 9th Cir. 2005) ................................................................ 16

*In re Integra Realty Res., Inc.*
  198 B.R. 352 (D. Colo. 1996) ........................................................................... 15

*In re Lake States Commodities, Inc.*
  253 B.R. 866 (Bankr. N.D. Ill. 2000) ............................................................... 11

*In re Taubman*
  160 B.R. 964 (Bankr. S.D. Ohio 1993) ............................................................. 13

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*
    263 B.R. 406 (S.D.N.Y. 2001)............................................................................. 15, 16

*Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital)*
    No. 01-MBK-6004L, 2002 WL 32500567, at *8 (W.D.N.Y. June 21, 2002)..................... 9, 13

*McKenny v. McGraw (In re Bell & Beckwith)*
    104 B.R. 842 (Bankr. N.D. Ohio 1989) ................................................................. 20

*Merrill v. Abbott (In re Indep. Clearing House Co.)*
    77 B.R. 843 (D. Utah 1987) ................................................................................ 13

*Pettus v. Morgenthau*
    554 F.3d 293 (2d Cir. 2009) ................................................................................. 6

*Scholes v. Lehmann*
    56 F.3d 750 (7th Cir. 1995) ............................................................................ 10, 12

*SEC v. Byers*
    637 F. Supp. 2d 166 (S.D.N.Y. 2009) .................................................................. 10

*SEC v. Credit Bancorp, Ltd.*
    No. 99 CIV. 11395, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000) ................................ 10

*Secs. Investor Prot. Corp. v. Morgan, Kennedy & Co., Inc.*
    533 F.2d 1314 (2d Cir. 1976) .............................................................................. 21

*Sender v. Buchanan (In re Hedged-Inv. Assoc., Inc.)*
    84 F.3d 1286 (10th Cir. 1996) ............................................................................. 13

*Sharp International Corp. v. State Street Bank and Trust Company (In re Sharp Int'l Corp.)*
    403 F.3d 43 (2d Cir. 2005) ............................................................................ 16, 17

*SIPC v. Morgan, Kennedy & Co.*
    533 F.2d 1314 (2d Cir. 1976) ............................................................................... 9

*Stafford v. Giddens (In re New Times Secs. Servs.)*
    463 F.3d 125 (2d Cir. 2006) ............................................................................. 8, 9

*Terry v. June*
    432 F. Supp. 2d 635 (W.D. Va. 2006) ................................................................... 13

*Troll Co. v. Uneeda Doll Co.*
    483 F.3d 150 (2d Cir. 2007) ................................................................................. 9

*Warfield v. Carnie*
    No. 04 CV 633, WL 1112591, at *13 (N.D. Tex. Apr. 13, 2007) ................................... 9

*Wider v. Wootton*
  907 F.2d 570 (5th Cir. 1990) ................................................................ 16

*Wyle v. C.H. Rider & Family (In re United Energy Corp.)*
  944 F.2d 589 (9th Cir. 1991) ................................................................ 13

**Statutes**

11 U.S.C. § 546(e) ................................................................ 14, 16

11 U.S.C. § 741(7)(A)(i)-(ix) ................................................................ 15

15 U.S.C. § 78aaa *et seq.* ................................................................ 1

17 C.F.R. § 300.502(a)(1) ................................................................ 7

17 C.F.R. § 300.503(a) ................................................................ 11

section 78ccc(b)(4)(A) ................................................................ 6

section 78fff-2(b) ................................................................ 6

Section 78fff-2(b) ................................................................ 5, 6

Section 78fff-2(c)(3) of SIPA ................................................................ 11

section 78*lll* ................................................................ 5, 6

**Rules**

17 C.F.R. § 300.502(a)(1) ................................................................ 6, 7

17 C.F.R. § 300.503(a) ................................................................ 11

**Legislative Materials**

H.R. Rep. No. 97-420, at 1 (1982) ................................................................ 15

**Other Authorities**

Br. of Appellant SIPC
  available at 2005 WL 5338148, at *13 (Dec. 27, 2005) ................................................................ 9

Collier on Bankruptcy ¶ 502.05[2][a], p. 502-58 ................................................................ 14

H.R. Rep. No. 97-420, at 1 (1982) ................................................................ 15

IRS Revenue Ruling 2009-20
   2004-14 I.R.B. 749 (March 17, 2009) ..................................................................... 22

IRS Revenue Ruling 2009-9
   2004-14 I.R.B. 735 (April 6, 2009) ....................................................................... 21

Mark A. McDermott, *Ponzi Schemes And The Law Of Fraudulent And
   Preferential Transfers*
   72 Am. Bankr. L.J. 157, 168 (1998) ...................................................................... 11

*Sterling Equities Reply Br.*
   [Dkt. No. 1098], at 2-3 ............................................................................................ 6

**Rules**

Rule 502(a)(1) ................................................................................................................. 6, 7

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and for Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this reply brief in further support of the Trustee's motion ("Motion") seeking an order (a) upholding the Trustee's determinations denying the claims in question for the securities and credit balances listed on the claimants last BLMIS customer statement, (b) affirming the Trustee's "cash in/cash out" determinations of net equity with respect to each customer claim, and (c) expunging the objections to the Trustee's determinations to the customer claims in question insofar as they relate to net equity, and the memorandum of law ("Trustee's Moving Brief") submitted in support of the same. Although the Trustee's Motion seeks an order with respect to certain customer claims determinations, the issue presented in this Motion and responsive briefing is a legal one that is intended to apply to all customer claims determinations in this liquidation proceeding.

In further support of the Trustee's Motion and this reply brief, the Trustee submits herewith the declaration of Seanna R. Brown, Esq. ("Brown Decl."), and the Exhibit "A" annexed thereto. For the convenience of the Court and all litigants, that Exhibit lists all of the briefs filed in response to the Trustee's Motion, and indicates the Trustee's response to each. This reply brief, however, does not attempt to respond to every collateral argument advanced in each of the oppositions or briefs filed in support of the Trustee's Motion. Rather, it focuses on the central, dispositive net equity issues raised therein. Moreover, to the extent that certain customers have asserted factual allegations or legal defenses particular to their individual accounts, *see, e.g., Declaration of Liane Willis in Support of Memorandum of Carl J. Shapiro*

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

*and Associated Entities in Opposition to Trustee's Net Equity Motion*, [Dkt. No. 767], those will not be addressed here, but rather will be dealt with by the Trustee and the customer claimant in the context of their claim determination or avoidance action, as the case may be. The fact that the Trustee does not respond to each argument or allegation should not be viewed as an admission or an agreement with those assertions.

## I.    Introduction.

While the arguments of the customer claimants that filed oppositions to the Trustee's Motion ("Opposition Claimants") vary, they share a common thread. Each of those arguments emanates from a desire to ignore the truth of this sordid mess: the BLMIS brokerage operation was a Ponzi scheme. That this is a liquidation under SIPA does not change that basic truth.

Starting from the premise that this was a Ponzi scheme, which no Opposition Claimant has contested, the propriety of the Trustee's position as a matter of law and equity becomes irrefutable. A customer's net equity defines her ability to share in the fund of customer property. Whether viewed through the particular lens of SIPA, or using general bankruptcy principles, the monies that infuse the fund of customer property to be redistributed to customer claimants are limited to two sources: those assets that remained with the Debtor on the Filing Date,[2] and those that the Trustee successfully recovers using his avoidance powers under SIPA and the Bankruptcy Code. As such, the issue can be reduced to a simple rhetorical question: should the Trustee distribute the limited funds available to pay those customers who already withdrew the

_____

[2] Some Opposition Claimants have argued that the market making and proprietary trading desks of BLMIS generated profits and that they should be entitled to "credit" for those profits. Any assets, including those generated by the market making and proprietary trading operations of BLMIS, that remained with the Debtor on the Filing Date are part of the fund of customer property and will be distributed to customers *pro rata* in accordance with SIPA.

entire amount of their investment, as well as other people's money, or pay those customers who have not yet been made whole.

Although each customer claimant would prefer to be viewed in isolation, the Trustee must maintain a broader perspective. The Trustee has fiduciary duties to the estate as a whole — and as such, he must view the competing claims of various customers in a holistic manner. The Trustee is endeavoring to distribute ratably the remaining assets among all of the defrauded investors. A defrauded customer may believe that she should be entitled to the "profits" made on her investment. While one could argue that is true as between her and BLMIS, its patently false as between her and other customers. A customer cannot be permitted to benefit from a fraud at another customer's expense merely because she was not to blame for the fraud. The "winners" in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to receive more than their investment when others have not been made whole. Nothing in SIPA changes this basic premise, or requires the Court to deviate from a century of precedent in dealing with Ponzi schemes.

In response to the weight of authority supporting the Trustee's position, many Opposition Claimants have muddied the concepts of a *pro rata* distribution from the fund of customer property and the payment of a SIPC advance. They view the SIPC advance as something separate and apart from the distribution to a customer from the fund of customer property. But this position is not supported by the plain language of SIPA. The two payment mechanisms are inextricably intertwined: entitlement to a SIPC advance only arises when a customer will receive a distribution from the fund of customer property – and participation in the fund requires a valid net equity claim. Thus, net equity must be determined first — and the plain language of SIPA,

case law interpreting SIPA, and case law dealing with Ponzi schemes mandate that net equity be calculated in this instance based upon a customer's net investment.

Moreover, to use fictitious customer statements as a basis for the net equity calculation would create a host of problems. It would improperly legitimatize fraudulent transactions. It would irreconcilably conflict with the Trustee's avoidance powers under SIPA. It would perpetuate Madoff's fraud, forcing scarce recovered assets into the hands of those who have already recovered all of their principal at the expense of those who have not. The tragedy of Madoff's scheme should not be compounded by continuing to divert limited customer funds to the more fortunate at the expense of the less fortunate, based on a broker's fraudulently invented "profits." The Trustee recognizes that *all* customers — whether "net winners" or "net losers" — have been harmed by Madoff's fraud.[3] But nothing in SIPA, bankruptcy law, or equity permits the Trustee to calculate net equity on a fraud, as the Opposition Claimants would have it.

## II.     Nothing In The Language Of SIPA Alters The General Principle That Ponzi-Scheme Distributions Should Be Based On Net Investment.

The objections to the net investment method of calculating net equity, while wide-ranging, coalesce around two central and interrelated points. First, the Opposition Claimants contend that the language and legislative history of SIPA require the Trustee to base net equity upon the final BLMIS customer statements, and that the numerous non-SIPA cases which advocate the net investment method are irrelevant. Second, they contend that SIPA and the decision of *In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) ("*New Times I*"), require vindication of a customer's "legitimate expectations," and that "legitimate

---

[3] Contrary to the rhetoric employed by some Opposition Claimants, the Trustee views each innocent investor in this case with sincere sympathy, regardless of whether they are "net winners" or "net losers." The use of these terms is not intended to be pejorative in any sense. Rather, they are used solely to differentiate those customers that have received all of their principal investment back from those who have not.

expectations" extend to the fraudulent profits of a Ponzi scheme. Neither of these contentions withstands scrutiny.

### A. SIPA Precludes The Calculation Of Net Equity Based Upon Fictitious Account Statements.

Contrary to the position advanced by certain Opposition Claimants, "net equity" is not defined in SIPA as the customer's final account statement, and the Trustee does not seek to redefine the term. Rather, section 78*lll* (11)(A) of SIPA provides that net equity be calculated based upon the sum owed to the customer if the debtor "had liquidated, by sale or purchase on the filing date, all securities positions of the customer." If a customer's final account statement reflects actual securities positions — *i.e.*, securities that the customer ordered and paid for — that account statement may well reflect his net equity. But if his account statement is entirely fictitious, as is the case here, that statement does not reflect actual securities positions that could be liquidated. Thus, net equity cannot be based upon fictitious account statements.

As a result, a customer's "securities positions" must be determined elsewhere in SIPA. "The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another." *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002). Section 78fff-2(b) of SIPA gives guidance, as it directs a SIPA trustee to make net equity distributions only insofar as they "are ascertainable from the books and records of the debtor or are otherwise established to the

satisfaction of the trustee."[4]  BLMIS's books and records, in turn, reveal a Ponzi scheme, in which no securities were ever ordered, paid for, or purchased; the only actual customer positions that can be gleaned from the books and records are their net cash investments.  Thus, the plain language of SIPA supports use of the net investment method in distributing customer property in this case.

### B.    Claimants Have No Legitimate Expectation In The Proceeds Of A Fraud.

The Opposition Claimants also contend that they have a "legitimate expectation" in the amounts shown on their final account statements, and that SIPA requires that expectation to be vindicated. The definition of "net equity" in SIPA, however, does not include a concept of "legitimate expectations."  Rather, it speaks of "securities positions" that can be ascertained from the books and records of the debtor or otherwise to the satisfaction of the trustee.  Section 78fff-2(b) of SIPA.

Neither the Series 500 Rules nor Second Circuit's decision in *New Times I* change this fact.  The Series 500 Rules do not speak to the meaning of net equity, and the Opposition Claimants concede that these Rules could not alter the statutory definition of net equity in any event.  Rather, Rule 502(a)(1) speaks solely to whether a customer's claim will be for cash or securities.  It holds that when a customer receives written confirmation of a securities purchase,

---

[4] Certain Opposition Claimants maintain that the Trustee and the SEC cannot look to section 78fff-2(b) to inform the meaning of net equity, as to do so would "contravene[] SIPA's prohibition on altering the statutory definition of 'net equity.'"  *See, e.g., Sterling Equities Reply Br.* [Dkt. No. 1098], at 2-3, citing section 78ccc(b)(4)(A) of SIPA.  This argument misconstrues both SIPA and the rules of statutory construction.   Section 78ccc(b)(4)(A) of SIPA provides that the Securities Investor Protection Corporation ("SIPC") cannot adopt *rules* that change the definition of net equity; it does not state that net equity cannot be informed by other parts of the SIPA *statute*.  Statutory provisions are not to be viewed in a vacuum.  "[W]hen construing the plain text of a statutory enactment, we do not construe each phrase literally or in isolation.  Rather, we attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole."  *Pettus v. Morgenthau*, 554 F.3d 293, 297 (2d Cir. 2009).  Although section 78*lll* of SIPA defines "net equity" as an investor's "securities position," it does not explain how that "securities position" is to be determined.  Section 78fff-2(b) of SIPA sheds light on that determination.

she has a claim for securities even if the securities were never purchased. 17 C.F.R. § 300.502(a)(1). As set forth in the Trustee's Moving Brief, the Trustee is treating all valid customer claims in this liquidation as claims for securities, consistent with Rule 502(a)(1). *See New Times I*, 371 F.3d at 87.

*New Times I* does not assist the Opposition Claimants either. In that case, the Second Circuit embraced the notion that Rule 502(a)(1) applied only to the question of whether a customer had a claim for cash or securities. And while it agreed with the United States Securities & Exchange Commission ("SEC") that Rule 502(a)(1) served to protect the "legitimate expectations" of customers that they possessed securities when they received a written confirmation to that effect, the court rejected the notion that the concept of legitimate expectations could be extended to fictitious profits engineered by a fraudster. As the Second Circuit held, and consistent with what the Trustee is doing in this liquidation, "basing customer recoveries on 'fictitious amounts in the firm's books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality.'" *In re New Times I*, 371 F.3d at 88.

That is the case here as well. Although the Opposition Claimants attempt to distinguish *New Times I* by arguing that the securities listed on their account statements were real, the profits reflected on the customer account statements in this case were equally as arbitrary, and as divorced from market reality, as the *New Times I* account statements containing fictitious securities. In both cases, the profits reflected on account statements — unbounded by the limitations of real-market trading — were entirely engineered by a fraudster. Thus, under *New*

*Times I*, "legitimate expectations" similarly cannot be read to subsume the fictitious profits in this case.[5]

The Opposition Claimants attempt to distinguish *Focht v. Athens (In re Old Naples Sec., Inc.)*, 311 B.R. 607 (M.D. Fla. 2002) — another SIPA Ponzi-scheme case in which the court refused to include fictitious profits in the calculation of net equity — on the grounds that the claims in that case were for cash, not securities. That, however, is a red herring. The court agreed with the trustee that the claimants were not entitled to "interest" on the "CDs" they believed they were investing in, because no such CDs were purchased, and the interest was fictitious: "No one disputes that the interest payments were not in fact interest at all, but were merely portions of other victims' capital investments." *Id.* at 617. The court deemed payment of "phony 'interest' payments" to be "illogical", "[e]specially where the payments to claimants will be made out of the quasi-public SIPA fund[.]" *Id.* at 616-17.

Indeed, to the extent that the concept of "legitimate expectations" has some relevance to the net equity inquiry — a debatable point, given that the phrase cannot be found anywhere in SIPA — the claimants cannot articulate a *legitimate* expectation in the proceeds of a fraud. As noted in the Trustee's Moving Brief, a critical difference between the "real" securities investors in *New Times I* and the claimants in this case is that in *New Times I*, the claimants sought to recover securities they had purchased, and would have had in their accounts, *but for* the broker's fraud. *See* Trustee's Moving Brief, at pp. 40-44. Here, the claimants' final account statements

---

[5] The Second Circuit has pointed out that the purpose of SIPA is to "expose the customer to the same risks and rewards that would be enjoyed had there been no liquidation." *Stafford v. Giddens (In re New Times Secs. Servs.)*, 463 F.3d 125, 128 (2d Cir. 2006) ("*New Times II*"). But to credit the final account statements — and the falsely engineered profits divorced from market realities contained therein — would be to allow customer recovery without exposure to the risks of the marketplace.

are devoid of market reality. By basing their net equity claims upon their fictitious securities positions, the claimants seek to benefit from the *results* of the fraudulent scheme.[6]

This distinction makes all the difference. While an investor may have an expectation that he will receive the profits of a fraudulent scheme, that expectation is not a legitimate one. An investor "could have no reasonable expectation of profiting from an illegal Ponzi scheme." *Warfield v. Carnie*, No. 04 CV 633, WL 1112591, at *13 (N.D. Tex. Apr. 13, 2007). *See also New Times II,* 463 F.3d at 130 ("fictitious paper profits" are not "within the ambit of the customers' 'legitimate expectations'").

That is particularly true for three reasons. First, the scheme has no real "profits," just money stolen from new participants. "If a person invests money with the understanding that he will share in the profits produced by his investment, and it turns out that there are no profits, it is difficult to see how that person can make a claim to receive any more than the return of his principal investment." *Lustig v. Weisz & Assocs., Inc.* (*In re Unified Commercial Capital*), No. 01-MBK-6004L, 2002 WL 32500567, at *8 (W.D.N.Y. June 21, 2002). "The false representation by the Ponzi schemer that he is paying the investor his share of the profits, which

---

[6] Certain claimants argue that the Trustee is judicially estopped from taking this position, on the ground that it differs from SIPC's position in *New Times I*. But judicial estoppel has no application to the Trustee, who is legally distinct from SIPC and who was not a party to *New Times*. While a trustee is specified by SIPC, once appointed by the Court, the trustee does not act under SIPC's control. *See, e.g., SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1316 (2d Cir. 1976) (SIPC and SIPA trustee were on opposite sides of Second Circuit appeal on proper construction of SIPA). Moreover, judicial estoppel applies to factual, not legal, positions. *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 155 n.7 (2d Cir. 2007). In any event, SIPC's positions in the two cases are consistent. The oft-quoted section of SIPC's brief in *New Times II* supported the recognition of gains earned in the marketplace by mutual funds that the *New Times* customers had actually ordered and paid for. "Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, . . . the claimant generally is entitled to recover those securities, . . . even where the purchase never actually occurred and the debtor converted the cash deposited by the claimant to fund the purchase." Br. of Appellant SIPC, available at 2005 WL 5338148, at *13 (Dec. 27, 2005). Where the *New Times* "gains" were the product of the imagination of the fraudster — which in *New Times* happened with fictitious securities and the "reinvestment" of the fictitious profits on them — SIPC did not support their recognition. Such is the case here as well.

are in fact nothing more than funds invested by other victims, cannot alter the fact that there are no profits to share." *Id.*

Second, it would be difficult to imagine that a party could have a legitimate expectation in distributions — or in account statements reflecting "profits" — that act to perpetuate a fraud. Payments of fictitious profits, and account statements showing additional fictitious profits, are used to lure new investors and continue the Ponzi scheme. These "profits" are funded by later investors who are left holding the bag when the scheme collapses. For that reason, courts in both SIPA and non-SIPA cases have refused to entertain claims of fictitious profits by investors in Ponzi schemes. *See, e.g., In re Old Naples Sec., Inc.*, 311 B.R. at 616 (SIPA); *SEC v. Credit Bancorp, Ltd.,* No. 99 CIV. 11395, 2000 WL 1752979, at *40 (S.D.N.Y. Nov. 29, 2000) (non-SIPA).[7]

Third, a claimant cannot have a legitimate expectation in transfers in excess of his net investment because such transfers lack reasonably equivalent value. Courts have held that investors have no legitimate claim on the "profits" of a Ponzi scheme where they transferred nothing in exchange for those ill-gotten gains. *See Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) (Ponzi-scheme investor "is entitled to his profit only if the payment of that profit to him, which reduced the net assets of the estate now administered by the receiver, was offset by an equivalent benefit to the estate. It was not . . . He should not be permitted to benefit from a

---

[7] Some Opposition Claimants contend that the distribution plan adopted by the court in *SEC v. Byers*, 637 F. Supp. 2d 166 (S.D.N.Y. 2009), a non-SIPA Ponzi-scheme case, rejected the net investment approach. It did not. *Id.* at 182-83. Indeed, the court expressly approved such an approach, and investors who took distributions had to deduct them from their initial investment, not from their last statement, to arrive at their claim. *Id.* at 171-72. But using that method, investors who had elected to take set "distributions" from the scheme still benefited disproportionately as compared to investors who elected to "roll over" those same distributions, because claims could not be paid in full. *Id.* at 169, 182-83. To minimize the inequity, the court approved an SEC proposal to allow the investors who had "rolled over" their foregone distributions to increase their claims by the amount of the foregone distributions. *Id.* at 172, 182-83. At no point did the court suggest that the investors had any legitimate expectation in the fictitious profits of the Ponzi scheme.

fraud at [another creditor's] expense merely because he was not himself to blame for the fraud."); *In re Lake States Commodities, Inc.*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) ("Payments in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity.") (citing cases). As one commentator put it:

> [T]he courts that have adjudicated the rights of trustees and Ponzi investors have appropriately refused to allow investors to retain *any* profit. The proper analysis is not whether the debtor received reasonably equivalent value or fair consideration for the *total* payments made to the investor, but whether the debtor received reasonably equivalent value or fair consideration in exchange for the *profit* transferred. To analyze the entire set of transfers to an investor, rather than focusing on the profit component, incorrectly assumes that there is something of value in a Ponzi scheme when in fact the whole series of transactions has been a sham.

Mark A. McDermott, *Ponzi Schemes And The Law Of Fraudulent And Preferential Transfers*, 72 Am. Bankr. L.J. 157, 168 (1998) (emphasis in original).

### C. Calculating Net Equity Based On Fraudulent Transactions Cannot Be Reconciled With The Trustee's Power Under SIPA To Avoid Fraudulent Transfers.

The final account statement approach is also improper because to read net equity to allow the distribution of customer funds based upon the "results" of a Ponzi scheme would irreconcilably conflict with the Trustee's power under SIPA to avoid fraudulent transfers. *See* Section 78fff-2(c)(3) of SIPA; 17 C.F.R. § 300.503(a) ("Nothing in these Series 500 Rules shall be construed as limiting the rights of a trustee in a liquidation proceeding under the Act to avoid any securities transaction as fraudulent, preferential, or otherwise voidable under applicable law."). "[T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute." *Auburn Hous. Auth.*, 277 F.3d at 144. The Opposition Claimants have no meaningful rejoinder to the inherent tension within SIPA that results from their reading of net equity.

1.  **Payments Of Fictitious "Profits" In Furtherance Of A Ponzi Scheme Are Made With The Intent To Defraud And Are Not For Reasonably Equivalent Value.**

Transfers made in furtherance of a Ponzi scheme in excess of a customer's net investment are fraudulent as a matter of law for two reasons. First, transfers in furtherance of a Ponzi scheme are, by definition, made with fraudulent intent to perpetuate the scheme. "There is a general rule — known as the 'Ponzi scheme presumption' — that such a scheme demonstrates 'actual intent' as matter of law because 'transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.'" *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (quoting 11 U.S.C. §548(a)(1)(A)); *see also Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P.* (*In re Bayou Group, LLC*), 362 B.R. 624, 634 (Bankr. S.D.N.Y. 2007) ("The presumption of "actual intent" to hinder, delay and defraud is both intuitive and inescapable on the facts which are alleged in the amended complaints — that redemption payments of wholly- or partially-non-existent investment account balances and wholly fictitious profits, as reflected on fraudulent financial statements, were made to earlier investors requesting redemption using funds invested by subsequent investors. Indeed, it is impossible to imagine any motive for such conduct other than actual intent to hinder, delay or defraud"); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429 (S.D.N.Y. 2006) (citing cases).

Second, courts have held that Ponzi-scheme transfers in excess of a customer's net investment are not for reasonably equivalent value. As Judge Richard Posner of the Seventh Circuit pointed out in *Scholes v. Lehmann,* a Ponzi-scheme investor pays nothing for any distribution in excess of his capital investment: "A profit is not offset by anything; it is the residuum of income that remains when costs are netted against revenues." 56 F.3d at 757.

As a result, "virtually every court to address the question has held unflinchingly that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers[.]" *In re Bayou Group, LLC,* 362 B.R. at 635 (internal quotations and citation omitted); *see also Sender v. Buchanan (In re Hedged-Inv. Assoc., Inc.),* 84 F.3d 1286, 1290 (10th Cir. 1996) (debtor operating Ponzi scheme does not receive reasonably equivalent value in exchange for any amounts it transfers to investor in excess of investor's principal investment); *Wyle v. C.H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 595 n.6 (9th Cir. 1991) (same); *Terry v. June,* 432 F. Supp. 2d 635, 642-43 (W.D. Va. 2006) ("where the existence of a Ponzi scheme is established, the transferee's proof that it made a 'capital' investment in the scheme does not constitute reasonably equivalent value for the receipt of fictitious profits"); *Merrill v. Abbott* (*In re Indep. Clearing House Co.*), 77 B.R. 843, 857 (D. Utah 1987) ("the debtors received a 'reasonably equivalent value' in exchange for all transfers to a defendant that did not exceed the defendant's principal undertaking but, to the extent a defendant received more than he gave the debtors, the debtors did not receive a reasonably equivalent value").[8]

---

[8] Some Opposition Claimants cite a line of cases that create a fraudulent-transfer exception for persons who receive Ponzi-scheme payments as a result of a loan contract with a specified interest rate. *See, e.g.*, *Unified Commercial Capital, Inc.*, 2002 WL 32500567; *Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480 (D. Conn. 2002). But no Opposition Claimants allege that there are loan contracts (*i.e.*, debt instruments with interest rates) involved here. And those decisions distinguish their holdings from Ponzi schemes in which persons are paid profits that do not actually exist, as is the case here. *See, e.g., Unified Commercial Capital*, 2002 WL 32500567, at *8; *see also In re Bayou Group, LLC*, 362 B.R. at 635-36 (distinguishing loan-contract cases and finding that "virtually every court" has held that if investors receive "profits" in excess of the amount invested in a Ponzi scheme, the payments are avoidable fraudulent transfers). Moreover, the rationale for an interest exception has been challenged by other decisions in any event. *See In re Hedged-Inv. Assocs.*, 84 F.3d 1286 (10th Cir. 1996), *In re Independent Clearing House Co.*, 77 B.R. 843 (D. Utah 1987), and *In re Taubman*, 160 B.R. 964, 985-86 (Bankr. S.D. Ohio 1993) (all holding that contractual-interest portion of Ponzi investment is recoverable as fraudulent transfer).

Certain Opposition Claimants contend that the Trustee's ability to avoid fraudulent transfers is circumscribed by statutes of limitations applicable to avoidance actions. Even if that were true, the fact that the Trustee lacks the power to avoid *certain* transfers does not change the fraudulent nature of those transfers. As the Ninth Circuit has pointed out, "*all* payments of fictitious profits are avoidable as fraudulent transfers;" the statute of limitations simply "restricts the payments the Ponzi scheme investor may be required to disgorge." *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008) (emphasis added).[9]

Certain other Opposition Claimants contend that particular transfers were for value. This may well be true, and the bona fides of these individual challenges will be determined at a later point in this proceeding. But in any event, even if certain transfers cannot be avoided, some can. Thus, the Opposition Claimants' positions do not eliminate the inherent inconsistency between a distribution scheme based upon fraud and the Trustee's ability to avoid fraudulent transfers.

### 2. Section 546(e) Of The Bankruptcy Code Does Not Prevent The Trustee From Avoiding Ponzi-Scheme Transfers.

Certain Opposition Claimants have advanced the proposition that 11 U.S.C. § 546(e) provides a complete defense to all avoidance actions in this case. Section 546(e) provides that a trustee cannot avoid certain margin or settlement payments made in connection with "securities contracts." This section has no application to this case, because Madoff never actually traded in securities for customers, and thus never entered into securities contracts on his investors' behalf.

A "securities contract" is defined in section 741(7) of the Bankruptcy Code as "a contract for the purchase, sale, or loan of a security" — in other words, a specific agreement to buy, sell or loan a particular security. While the investors gave Madoff the authority to purchase and sell

---

[9] See also Collier on Bankruptcy ¶ 502.05[2][a], p. 502-58 (15th ed. rev. 2003) (avoidance action outside statute of limitations can serve as defense to payment of claim under section 502(d), as its nature as an unpaid preference or fraudulent transfer is not changed by passage of statutory period).

securities and options on their behalf,[10] no such trades occurred. If Madoff actually sold or purchased a security consistent with his authorization, the sale or purchase agreement for that security — which, like most sale and purchase agreements, oral or otherwise, would have a buyer, a seller, a price, and a specification of what is being sold — would be a securities contract. The BLMIS documentation is not.

Moreover, a more expansive interpretation of "securities contract," as some Opposition Claimants suggest, would be inconsistent with the purpose of section 546(e) — to avoid potential disruptions to the market occasioned by undoing settled purchases and sales. The rationale for section 546(e) was "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy involving those industries." H.R. Rep. No. 97-420, at 1 (1982), as reprinted in 1982 U.S.C.C.A.N. 583, 583. *See also Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 513 (Bankr. S.D.N.Y. 2002) (Lifland, J.); *In re Integra Realty Res., Inc.*, 198 B.R. 352, 356 (D. Colo. 1996), *aff'd*, 354 F.3d 1246 (10th Cir. 2004). If security sale and purchase transactions could be reversed, it would undermine confidence in the system of guarantees and could lead to the "ripple effect" of bankruptcy filings by other participants in the chain of guarantees. *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 477 (S.D.N.Y. 2001). Here, since no securities were actually

---

[10] The standard documentation consists of a generalized account opening document, a document authorizing BLMIS to rely on Madoff's instructions to purchase or sell for the account on behalf of the account holder, and a document in which the account holder authorized the purchase of options. *See, e.g.,* Declaration of Joseph Looby, Ex. 3, submitted in support of the Trustee's Motion. These documents do not fit into any of the enumerated categories of "securities contract" provided for in section 741(7). Nor, as some Opposition Claimants contend, are these documents "master agreements" as described in subsection 741(7)(A)(x). That subsection requires sub-agreements or transactions that themselves fit within one of the other categories of "securities contract" listed in section 741(7)(A). See 11 U.S.C. § 741(7)(A)(i)-(ix). And no such sub-agreements or transactions exist, because no trades occurred. The actual transactions in question — the transfers received from BLMIS — were proceeds of a Ponzi scheme, not proceeds from the sale of securities.

purchased or sold, none of the potential disruptions to the market occasioned by undoing settled purchases and sales would occur.[11]

In any event, even if the agreements between BLMIS and its victims were securities contracts, section 546(e) expressly excludes from its reach transactions that are actually fraudulent. *See* 11 U.S.C. § 546(e) (intentional fraud avoidance actions under section 548(a)(1)(A) are excluded). And as set forth above, transfers made in furtherance of Ponzi schemes are, by definition, made with the intent to defraud. *See In re Manhattan Inv. Fund*, 397 B.R. at 8; *Drenis*, 452 F. Supp. 2d at 429 (citing cases).[12] Thus, section 546(e) does not reach

---

[11] Courts have focused consistently on the fact that section 546(e) was designed to protect public markets. *See In re Adler, Coleman Clearing Corp.*, 263 B.R. at 478-80; *In re Grafton Partners, L.P.*, 321 B.R. 527, 539 (B.A.P. 9th Cir. 2005). As a result, the "few decisions that involve outright illegality or transparent manipulation reject [section] 546(e) protection." *In re Grafton*, 321 B.R. at 539; *Wider v. Wootton*, 907 F.2d 570, 572-73 (5th Cir. 1990); *In re Adler, Coleman Clearing Corp.*, 263 B.R. at 478-80; *see also Enron Corp. v. JP Morgan Secs., Inc.* (*In re Enron Corp.*), Nos. M-47 (GBD), 01-6034 (AJG), Adv. Nos. 03-92677 (AJG), 03-92682 (AJG), 2008 WL 281972, at *5 (S.D.N.Y. Jan. 25, 2008) ("Where transactions are not merely unorthodox, but rather are fundamentally tainted by misconduct or impropriety," safe harbor protection is contrary to the objectives of section 546(e) and undermines the spirit of the Bankruptcy Code "by allowing a few individuals to reap the preferential benefit of the transfers, thereby diminishing the available assets for equitable distribution"). In *Wider*, the court considered an earlier version of the provision at issue in the context of a Ponzi scheme. The court held that to allow the transfers in question to have the protection of the section "would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims." 907 F.2d at 573.

[12] At least one Opposition Claimant, Sterling Equities Associates, has cited *Sharp International Corp. v. State Street Bank and Trust Company* (*In re Sharp Int'l Corp.*), 403 F.3d 43 (2d Cir. 2005), for the proposition that the presumption of fraudulent intent — the so-called "Ponzi-scheme presumption" — is no longer the law of the Second Circuit. *See* Memorandum of Law of Sterling Equities Associates and Certain Affiliates Regarding Net Equity and Avoidance, at pp. 23-26 [Dkt. No. 716]. But *Sharp* did not involve a Ponzi scheme, and at least two judges in the Southern District of New York have rejected this precise proposition. In *In re Bayou Group, LLC* and *In re Manhattan Investment Fund*, courts reaffirmed the Ponzi-scheme presumption and rejected the notion that *Sharp*, which did not involve a Ponzi scheme, eliminated that presumption. *See In re Manhattan Inv. Fund*, 397 B.R. at 7 ("*Sharp* did not involve a Ponzi scheme and the court did not discuss the Ponzi scheme presumption. Therefore, there is no reason to ignore the long line of cases that support the presumption's continuing existence."); *In re Bayou Group, LLC*, 362 B.R. at 633-34, 637-38 (embracing the Ponzi-scheme presumption and distinguishing *Sharp* as involving lawful antecedent debt that predated fraud at issue).

transfers made to claimants in a Ponzi scheme, and the provision does not eliminate the irreconcilable conflict between the Opposition Claimants' interpretation of "net equity" and the Trustee's avoidance powers.

For all of the above reasons, "net equity" cannot be read to require the Trustee to distribute funds based upon the fraudulently derived "profits" found on the final account statements, at least some of which the Trustee would simultaneously have the right to avoid as fraudulent transfers.

### D. Equity Supports The Net investment Method As Well.

The plain language of SIPA precludes use of the fictitious account statements to calculate net equity and it supports the calculation of net equity in this case based upon the claimants' net investment. Because nothing in SIPA dictates treatment of the Madoff victims differently from how victims are typically treated in other Ponzi-scheme cases, the claimants are wrong in suggesting that non-SIPA Ponzi-scheme cases are irrelevant. The Trustee's, SIPC's, and the SEC's determination of net equity based upon net investment not only hews to SIPA's statutory scheme, it appropriately reflects the principle in Ponzi-scheme cases that "equality is equity" and that early investors should not benefit at the expense of later ones. *See Cunningham v. Brown*, 265 U.S. 1 (1924); *Abrams v. Eby* (*In re Young*), 294 F. 1 (4th Cir. 1923); *see also* Trustee's Moving Brief, at pp. 31-33.

---

These courts distinguished *Sharp* — which upheld the payment of a valid loan that predated the fraud — from transfers in furtherance of a Ponzi scheme. "In contrast to the lawful and disclosed payment of a valid contractual antecedent debt in *Sharp*, the redemption payments at issue here of non-existent investor account balances as misrepresented in fraudulent financial statements were themselves inherently fraudulent and constituted an integral and essential component of the fraudulent Ponzi scheme alleged in the amended complaints. The payments alleged here of fictitious account balances and profits were inherently deceitful and unlawful and were necessarily made with intent to "hinder, delay or defraud" present and future creditors." *In re Bayou Group, LLC*, 362 B.R. at 638.

If net equity claims were based upon fictitious account statements rather than net investment, the impact upon recent investors in Madoff's scheme — who were duped into funding the fictitious profits of others and who had no opportunity to withdraw any money themselves — would be profound.

Consider the following hypothetical investors in a Ponzi scheme like Madoff's. The first invested $10 million years ago, withdrew $15 million in the final year of the collapse of the Ponzi scheme, and her final fictitious account statement shows a $20 million balance. The second invested $15 million in the final year of the collapse of the Ponzi scheme — effectively funding the first investor's withdrawal — and her final fictitious account statement shows that $15 million deposit. Consider also that $10 million in customer funds were recovered, and that the scheme involved 50 investors whose fictitious account statements showed "balances" totaling $100 million but whose net investments totaled only $50 million.

Under the fictitious account statement approach, net equity claims would be satisfied based upon a 10% recovery ($10 million recovered ÷ $100 million in fictitious account balances). The first investor would be entitled to 10% of her $20 million "account balance" (and a $500,000 SIPC advance), or $2.5 million — even though she had just withdrawn $15 million from the scheme. *See* Sections 78fff-2(c)(1)(B) and 78fff-2(b) of SIPA (customers share ratably in customer property on the basis and to the extent of their respective net equities). Her total recovery would be $17.5 million on an initial investment of $10 million — or $7.5 million in profit. The second investor would be entitled only to 10% of her $15 million "account balance" and a $500,000 SIPC advance — or $2 million of his $15 million investment, a $13 million loss. So even though the second investor invested more money than the first investor, and even though

her investment went directly into the pocket of the first investor, she stands to lose much more money. That is simply unfair.

In contrast, under the net investment method, because the first investor had already withdrawn more than she deposited, she would have no net equity claim (and no entitlement to a SIPC advance), and could be subject to an avoidance action. Meanwhile, the second investor would recover 20% ($10 million recovered ÷ $50 million in total net investment) of her $15 million net investment, along with a $500,000 SIPC advance, or $3.5 million. This result is much more equitable.

As this hypothetical shows, if the fictitious account statement method were used, "net winners" such as the first investor would continue to recover customer funds through the claims process, siphoning away millions of dollars from investors who previously had recovered little or nothing from Madoff and whose "investments," induced by fraud, had funded the very withdrawals that made the earlier investors "net winners." This method compounds the injury caused to later investors in the scheme. And it improperly allocates customer funds based on the fraudster's designs.

III.    **Entitlement To A SIPC Advance Arises Only From A Valid Net Equity Claim.**

Certain Opposition Claimants have sought to divorce the $500,000 SIPC advance from the net equity calculation, as though the advance can be paid in the absence of a valid net equity claim. As set forth in the Trustee's Moving Brief, at pp. 49-50, this result is contradicted by SIPA. A customer must have a valid net equity claim both to share in the fund of customer

property, and to receive a SIPC advance if that *pro rata* share is insufficient to fully satisfy the customer's net equity claim.[13]  *See* Sections 78fff-2(b), (c)(1) and 78fff-3(a)(1) of SIPA.

Certain Opposition Claimants contend that a SIPC advance is to be paid before the Trustee determines the *pro rata* distribution that particular customer will receive.  *See, e.g., Memorandum of Law in Opposition to Motion for an Order Upholding Trustee's Determination Denying Customer Claims For Amounts Listed on Last Statement Relating to Net Equity*, filed by Rose Less, *et al*. [Dkt. No. 803], at pp. 29-30.  While it is true that the amount of the *pro rata* distribution that a particular customer will receive may be determined *after* the SIPC advance is paid, the customer's net equity claim must *first* be allowed by the Trustee under SIPA.  There can be no payment to a customer, whether a SIPC advance or an allocation from the fund of customer property, without an allowed net equity claim in the first instance.

In a different vein, several of the Opposition Claimants correctly point out that because the $500,000 advance is funded by SIPC, the payment of a SIPC advance to one customer does not reduce another customer's payment, nor does it reduce any customer's distribution from the fund of customer property.  That the advance is funded by SIPC, however, does not mean that it can be separated from the fund of customer property.  To the contrary, an advance only arises from an entitlement to share in the fund of customer property in the first instance.  For all of the reasons set forth in the Trustee's Motion, this Reply Brief, and the briefing by SIPC, the SEC,

---

[13] SIPC funds on claims for securities are advanced for the amount by which the net equity of each customer exceeds his ratable share of customer property, up to a $500,000 cap.  Section 78fff-3(a)(1) of SIPA.  Contrary to at least one claimant's representations, *see Amended Reply to Motion in further opposition to Trustee's motion regarding determination of Net Equity and specifically addressing the arguments of the SEC and Optimal,* filed on behalf of Edith A. Schur, Michael Schur [Dkt. No. 1110], at pp.13-15, SIPC does not get reimbursed for any portion of an advance — even if a claimant recovers more than $500,000 — unless the claimant's recovery, including the SIPC advance, exceeds her total net equity claim, meaning her claim is fully satisfied.  *See, e.g., McKenny v. McGraw (In re Bell & Beckwith),* 104 B.R. 842, 856-57 (Bankr. N.D. Ohio 1989), *aff'd*, 937 F.2d 1104, 1109-10,  Bankr. L. Rep. (CCH) P74049, Fed. Sec. L. Rep. (CCH) P96202 (6th Cir. Ohio 1991).

and various customers in support of the Trustee's Motion, the only customers with a valid net equity claim — *i.e.*, those that are entitled to share in the fund of customer property — are those who have not received back all of their principal.

## IV. The IRS's Tax Treatment Of Madoff Claimants Does Not Conflict With the Net Investment Method.

Several Opposition Claimants have argued that the Internal Revenue Service ("IRS") has recognized the phony profits as real income, and that SIPA must be similarly construed for net equity purposes. *See, e.g.*, *Customers' Memorandum of Law in Opposition to Trustee's Motion for an Order Approving the Trustee's Re-Definition of "Net Equity" Under the Securities Investor Protection Act*, filed on behalf of Diane Peskin, *et al.* [Dkt. No. 755], at p. 31. Even if this characterization of the IRS's treatment of Madoff claimants were correct (and it is not), it would be beside the point, as the IRS and SIPC are governed by different statutory schemes with different purposes. *Compare Secs. Investor Prot. Corp. v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314, 1318-19 (2d Cir. 1976) (court would not glean interpretation of SIPA provisions from Federal Deposit Insurance Act because they were "independent statutory schemes" that were "enacted to serve the unique needs of the banking and securities industries").

In any event, the IRS's treatment of Madoff claimants is consistent with the cash-in/cash-out method. IRS Revenue Ruling 2009-9, 2004-14 I.R.B. 735 (April 6, 2009), issued after discovery of the Madoff fraud, sets forth the rules for taxpayers to take theft loss deductions on their tax returns for their investments in Ponzi schemes. The IRS provisions take as their starting position for calculation of loss the amount of a customer's net investment. The only exception to this is if an investor has previously *reported as income* "profits" from the scheme that she did not withdraw. "Where an amount is reported to the investor as income prior to the discovery of the arrangement and the investor includes that amount in gross income and reinvests this amount in

the arrangement, the amount of the theft loss is increased by the purportedly reinvested amount."
*Id.*

In other words, the taxpayer can only treat phony profits as a loss for IRS purposes if the taxpayer previously treated those profits as income, paid taxes on them, but never received them. This approach does not "recognize" these phantom profits as income. Rather, it allows an investor who had previously recognized such phantom profits as income to correct that error now, by allowing the investor an equivalent offset for tax-loss purposes. IRS Revenue Ruling 2009-20, 2004-14 I.R.B. 749 (March 17, 2009), which provides a safe harbor for taking Madoff-related losses, uses the same approach.

## V. Certain Issues Raised By The Opposition Claimants And The SEC Are Beyond The Scope Of This Briefing.

The SEC has taken the position that a claimant's net investment should be calculated in constant dollars, not current dollars, so as to adjust for the effects of inflation. The SEC concedes, however, that that issue is not directly before the Court at this time. At the appropriate time, the Trustee will weigh in on this and similar arguments raised by certain Opposition Claimants that an interest factor, or other valuation should be used in the net investment calculation.

Similarly, certain Opposition Claimants have questioned the date upon which BLMIS ceased being a legitimate brokerage operation, to the extent that it ever was one. *See, e.g.,* *Memorandum of Law in Opposition to the Trustee's Motion to Affirm Customer Claims Determinations With Regard to the Trustee's Net Equity Determinations,* filed by Magnify, Inc. [Dkt. No. 772]. They and other Opposition Claimants argue that BLMIS customers must be given credit for the total existing balance in their BLMIS account up to the date on which BLMIS became a Ponzi scheme, and that the cash in/cash out methodology cannot be applied

prior to that time. No one has disputed that Madoff was running a Ponzi scheme. Whether a particular customer's account was opened prior to the date upon which it can be shown that the Ponzi scheme began is a customer-specific inquiry that should be dealt with in the context of the claims determination process or an adversary proceeding, as the case may be. Because it has no bearing on the meaning of net equity, it is outside the scope of this briefing and is not addressed herein.

## VI.    Conclusion.

For the reasons set forth in this brief, the Trustee's Moving Brief, SIPC's Memorandum of Law, and SIPC's Reply Memorandum submitted in support of the Trustee's Motion, and as further set forth in the brief of the SEC, and those briefs filed in support of the Trustee's Motion, net equity cannot be determined based upon BLMIS customers' fictitious final account statements.  The net investment method is supported by the SIPA statutory scheme and follows nearly a century of precedent concerning the treatment of the claims of Ponzi-scheme victims. The Court should approve the Trustee's use of that method in determining net equity claims.


Dated:  New York, New York               Respectfully submitted,
        January 15, 2010


Of Counsel:                              /s/ David J. Sheehan
                                         Baker & Hostetler LLP
Baker & Hostetler LLP                    45 Rockefeller Plaza
3200 National City Center                New York, New York 10111
Cleveland, Ohio 44114                    Telephone: (212) 589-4200
Telephone: (216) 621-0200                Facsimile: (212) 589-4201
Facsimile: (216) 696-0740                David J. Sheehan
Thomas D. Warren                         Email: dsheehan@bakerlaw.com
Email: twarren@bakerlaw.com              Marc Hirschfield
Wendy J. Gibson                          Email: mhirschfield@bakerlaw.com
Email: wgibson@bakerlaw.com              Seanna R. Brown
                                         Email: sbrown@bakerlaw.com

                                         *Attorneys for Defendant Irving H. Picard,*
                                         *Trustee for the Substantively Consolidated*
                                         *SIPA Liquidation of Bernard L. Madoff*
                                         *Investment Securities LLC and Bernard L.*
                                         *Madoff*


095879, 300063567