**Response Deadline:  Extended to January 21, 2010 by Counsel for the Trustee**

SIDLEY AUSTIN LLP
Alex R. Rovira
Sophia P. Mullen
787 Seventh Avenue
New York, NY 10019
Tel: (212) 839-5300
Fax: (212) 839-5599

*Counsel for Winchester Global Trust Company Limited for, and on behalf of, the Master Trust Account and/or the underlying Fund Accounts and/or the underlying Investor Accounts*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-01789 (BRL) |
| v. | SIPA Liquidation |
| | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

------------------------------------------------------------X

In re:

BERNARD L. MADOFF,

Debtor.

------------------------------------------------------------X

# RESERVATION OF RIGHTS WITH RESPECT TO THE TRUSTEE'S DETERMINATION OF CLAIM

Winchester Global Trust Company Limited ("Winchester"), on behalf of the Master Trust

Account and/or its underlying Fund Accounts and/or their underlying Investor Accounts

(collectively, the "Claimants")[1], by its undersigned counsel, hereby submits this reservation of rights (the "Reservation of Rights") with respect to that certain Notice of Determination dated December 8, 2009 (the "Determination Notice") by Irving Picard as trustee (the "Trustee"), denying Winchester's customer claim number 015151 filed with the Trustee on June 30, 2009 (the "Customer Claim")[2], and respectfully represents as follows:

## BACKGROUND

1. The Claimants invested in Fairfield Sentry ("Fairfield Sentry"), which is a fund managed by Fairfield Greenwich Group ("Fairfield"). Fairfield was given discretionary authority, as the investment manager of Fairfield Sentry, to execute securities transactions with and through Bernard L. Madoff Investment Securities, LLC ("BLMIS"), the debtor in the above-captioned Securities Investor Protection Act ("SIPA") proceeding, for the benefit of the Claimants.

2. BLMIS maintained certain account(s) (the "Accounts") on behalf of Fairfield Sentry for the benefit of the Claimants pursuant to a customer relationship between Fairfield Sentry and BLMIS.

3. In the ordinary course of business, upon information and belief, BLMIS may have received, acquired and/or held cash and/or securities for the purpose of entering into securities transactions for or on behalf of Fairfield Sentry in the Accounts which were for the benefit of the Claimants. BLMIS acted as investment manager with respect to the Accounts and was solely responsible for investment decisions in connection therewith.

---

[1] Each of the Master Trust Account, Fund Accounts and Investor Accounts as used herein shall be defined as set forth in Schedule 1 of the Addendum to the Customer Claim.

[2] The Customer Claim was filed by Winchester on behalf of the Claimants, the identities of which are non-public and confidential, but may be disclosed to the Trustee and his counsel upon reasonable confidentiality measures. For the same reason, this Reservation of Rights is being filed by Winchester on behalf of the Claimants. A list of the Claimants' accounts is set forth in Schedule 1 of the Addendum to the Customer Claim.

4. On December 11, 2008, the above-captioned liquidation proceeding was commenced against BLMIS pursuant to SIPA, 15 U.S.C. § 78aaa et seq.

5. On December 15, 2008, jurisdiction of this matter was transferred to the United States Bankruptcy Court for the Southern District of New York, and Irving Picard was appointed as Trustee under SIPA. See Docket No. 4. Pursuant to SIPA, the Trustee was directed to oversee the liquidation of the assets of BLMIS and to process all claims against BLMIS. 15 U.S.C. § 78fff-1(a).

6. By order of this Court dated December 23, 2008 (the "Procedures Order"), the Trustee was directed to disseminate notice and claim forms to all former BLMIS customers setting forth claim-filing deadlines. See Docket No. 12. The Procedures Order, among other things, also directed the Trustee to "notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, and the reason therefore …."

7. Prior to the claims bar date, and pursuant to the direction of the Court's Procedures Order, Winchester timely filed the Customer Claim with the Trustee on behalf of the Claimants for the value of all cash and/or securities indirectly received, acquired and/or held for the benefit of the Claimants through Fairfield Sentry. As set forth in the Determination Notice, the Trustee designated the Customer Claim as Claim No. 015151.

8. In the Determination Notice, the Trustee formally notified Winchester that the Customer Claim had been disallowed, setting forth the basis for such denial as follows:

> Based on a review of available books and records of BLMIS by the Trustee's staff, you did not have an account with BLMIS. Because you did not have an account, you are not a customer of BLMIS under SIPA as that term is defined at 15 U.S.C. § 78*lll* (2). Accordingly, your Claim for securities and/or a credit balance is **DENIED**.

A copy of the Trustee's Determination Notice is attached hereto as Exhibit A.

9. Winchester disagrees with the Trustee's above Determination Notice for the reasons set forth herein and for such additional reasons as may be set forth by other respondents in similar circumstances to the Claimants, and hereby files this Reservation of Rights for the purposes of preserving any rights which may be recognized for persons who made indirect investments in BLMIS through feeder funds.

## RESERVATION OF RIGHTS

10. The Determination Notice relies on a flawed and nonexistent distinction between investors who had accounts directly with BLMIS and investors who invested by means of intermediaries through feeder funds. Indeed, a plain reading of SIPA, the courts' interpretation of the statute, as well as Congressional intent behind the statute, all clearly indicate that the absence of a direct investment relationship is not fatal to a claim as a "customer."

11. The statutory definition of "customer" is set forth in SIPA as:

> The term "customer" of a debtor means <u>any person</u> (including any person with whom the debtor deals as a principal or agent) <u>who has a claim on account of securities</u> received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such persons for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes <u>any person who has a claim against the debtor arising out of sales or conversions of such securities</u>, and any person who has deposited cash with the debtor for purposes of purchasing such securities ....[3]

15 U.S.C. § 78lll(2) (emphasis added).

12. Contrary to the Trustee's assertion, the foregoing language does not mandate that the funds or securities be received by the debtor or deposited by the claimant directly. Instead, SIPA only requires that the claimant's claim be "on account of securities," "arise out of" sales or conversions of securities, or result from depositing cash with the debtor for the purpose of purchasing securities. See <u>In re Primeline Sec. Corp.</u>, 295 F.3d 1100, 1107 (10th Cir. 2002)

---

[3] The statute provides two enumerated exclusions from the definition, neither of which apply to the Claimants.

("Whether a claimant deposited funds 'with the debtor' does not depend simply on to whom claimants made their checks payable. The relevant inquiry is whether the brokerage firm actually received, acquired or possessed Claimants' property.") (citing In re Old Naples, 223 F.3d 1296 (11th Cir. 2000)); S.E.C. v. Ambassador Church Fin. Dev. Group, Inc., 679 F.2d 608, 614 (6th Cir. 1982) ("[T]he mere act of entrusting … cash to the debtor for the purpose of effecting securities transactions … triggers customer status …."). See also Rosenman Family, LLC v. Picard, 401 B.R. 629, 635 (S.D.N.Y. 2009) (recognizing that the plain language of section 78lll(2) of SIPA defines "customer" as "any person who has deposited cash with the debtor for the purpose of purchasing securities," and that accordingly, "the mere act of entrusting … cash to the debtor for the purpose of effecting securities transactions … triggers customer status …") (citations omitted).

13.     The statute further provides that "any person who has a claim against the debtor arising out of sales or conversions" of securities is entitled to "customer" status. This broad language extends statutory protection beyond those claimants who dealt directly with the debtor, to any claimant with a claim generally "arising out of sales or conversions." See, e.g., In re Stratton Oakmont, Inc., 2003 WL 22698876, at *3 (S.D.N.Y. Nov. 14, 2003) (holding that the debtor's conversion of the claimant's property brings the claimant within the SIPA definition of "customer").

14.     As evidenced by the foregoing, the term "customer" under SIPA is a term of art, and does not have its ordinary and customary meaning. Arford v. Miller, 239 B.R. 698, 701 (S.D.N.Y. 1999), aff'd sub nom. In re Stratton Oakmont, 210 F.3d 420 (2d Cir. 2000). It is to be construed within the context of the definitional section of SIPA, and as interpreted by the courts,

both of which indicate that <u>each</u> investor – whether direct or indirect – constitutes a "customer" under SIPA.

15. Moreover, SIPA was enacted by Congress as remedial legislation. "As such it should be liberally construed to effect its purposes" of protecting the investments of customers of broker-dealers and investment advisors. In re First State Securities Corp., 34 B.R. 492, 496 (S.D. Fla. 1980). The fundamental purpose of SIPA was to protect the public in the event that the entities with whom they dealt went bankrupt, or were otherwise unable to satisfy their customer agreements. SEC v. S.J. Salmon & Co., Inc., 375 F. Supp. 867, 871 (S.D.N.Y. 1974) ("The principal purpose of the [Securities Investor Protection] Act was to protect investors against financial losses arising from the insolvency of their brokers."); SEC v. Schreiber Bosse & Co., Inc., 368 F. Supp. 24 (N.D. Ohio 1973).

16. Congressional intent is further clarified by the language of SIPA, which expressly contemplates indirect investors as "customers" protected by the statute. Specifically, section 78fff-3(a)(5) provides that:

> no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, <u>other than to the extent that it shall be established to the satisfaction of the trustee</u>, from the books and records of the debtor or from the books and records of a broker of dealer or bank, or otherwise, <u>that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker of dealer or bank</u> …, <u>in which event each such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor</u>.

15 U.S.C. § 78fff-3(a)(5) (emphasis added).

17. Under this provision, Congress provided that brokers, dealers and banks are not themselves entitled to SIPC advances under SIPA with respect to claims relating to their proprietary dealings with an insolvent debtor-broker. However, recognizing the necessity to protect the customers of such other brokers, dealers and banks, Congress sought to protect these

indirect customers by expressly including the customer protection of SIPC advances for customers of brokers, dealers or banks who dealt with the debtor-broker not for their own proprietary accounts, but instead, for the accounts of their customers. Had Congress intended for only a customer with a direct relationship with the debtor-broker to be protected under SIPA, Congress would not have made an express provision for indirect customers of other brokers, dealers and banks. Thus, Congress clearly intended for indirect investors to fall within the scope of "customers" under SIPA. The Claimants are no different than this type of customer contemplated by Congress – they are each a customer of a feeder fund (just like a customer of another broker, dealer or bank) which invested in BLMIS not for its own proprietary account, but for its customer's account – and is entitled to protection accordingly.

18. In addition, the primary purpose of SIPA has been and continues to be the restoration of investor confidence. Enacted in 1970 as an amendment to the Securities and Exchange Act of 1934, SIPA was passed in order to provide a safety net for all investors who placed their money with U.S. brokerage firms that later turned out to be engaged in fraudulent activities or otherwise failed. This intent is violated by denying relief to those investors who indirectly invested with BLMIS. Such indirect investors trusted the market and the Defendant, just as direct investors did, and their losses are no less real merely because they invested in BLMIS through feeder funds – the operative fact remains that their property was held and controlled by BLMIS just the same.

19. Numerous responses have been filed on the same issue set forth herein. To the extent applicable, the Claimants adopt by reference the arguments of other claimants as if set forth in full herein.

## **CONCLUSION**

20.     For all the reasons set forth herein, and for the reasons set forth by other similarly situated customers (whose arguments are incorporated herein by reference), the Claimants file this Reservation of Rights to preserve all of their rights and remedies to the extent it is determined that indirect customers such as the Claimants shall receive the rights and benefits of a "customer" under SIPA, and to the extent the Court finds that indirect customers are treated as a "customer" under SIPA, the Customer Claim shall be preserved and the Claimants shall receive treatment of their claim as a "customer" under SIPA.

21.     The Claimants hereby reserve all of their rights, privileges and remedies, under applicable law, whether at law or in equity, including as incorporated herein by reference the reservation of rights asserted in their Customer Claim, and nothing herein shall be deemed or otherwise relied upon as a waiver of any of the Claimants' rights, privileges and remedies under applicable law.  Further, the Claimants hereby reserve the right to amend, alter, revise or supplement this Reservation of Rights.  Any failure to object on a particular procedural or substantive ground shall not be deemed a waiver of any such rights, all of which are hereby reserved.

WHEREFORE, the Claimants respectfully request that to the extent this Court determines that indirect customers shall be treated as "customers" under SIPA, that this Court deem the Customer Claim filed by Winchester on behalf of the Claimants allowed in full as a "customer" claim and thereby entitled to the rights and remedies as such under SIPA and grant such other and further relief as is just and proper.

Respectfully submitted,

Dated: January 21, 2010
      New York, New York

SIDLEY AUSTIN LLP

/s/ Alex R. Rovira
Alex R. Rovira
Sophia P. Mullen
787 Seventh Avenue
New York, NY 10019
Tel: (212) 839-5300
Fax: (212) 839-5959

*Counsel for Winchester Global Trust Company Limited for, and on behalf of, the Master Trust Account and/or the underlying Fund Accounts and/or the underlying Investor Accounts*

NY1 7206301v.4