**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Amy Vanderwal
Email: avanderwal@bakerlaw.com

**Hearing Date: February 18, 2010 at 10:00 a.m.**
**Objection Deadline: February 11, 2010**

*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L.*
*Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-1789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

## MOTION FOR ENTRY OF ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AN AGREEMENT BY AND AMONG THE TRUSTEE AND JEANNE LEVY-CHURCH AND FRANCIS N. LEVY

TO:   THE HONORABLE BURTON R. LIFLAND
      UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff," and together with BLMIS, collectively, the "Debtors"), by and through his undersigned counsel, submits this motion (the "Motion") seeking entry of an order, pursuant to section 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving an agreement (the "Agreement")[1] by and among the Trustee, on the one hand, and Jeanne Levy-Church and Francis N. Levy (the "Levys"), on the other hand, and, in support thereof, the Trustee respectfully represents as follows:

## BACKGROUND

1.     On December 11, 2008 (the "Filing Date"),[2] the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against the Debtors (Case No. 08 CV 10791). The complaint alleged that the Debtors engaged in fraud through investment advisor activities of BLMIS.

---

[1] The form of Agreement is annexed hereto as Exhibit "A."

[2] Section 78*lll*(7)(B) of the Securities investor Protection Act, 15 U.S.C. §§ 78aaa et seq. ("SIPA") states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

2.	On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

3.	On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part:

(i)	appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

(ii)	appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

(iii)	removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

4.	At a plea hearing (the "Plea Hearing") on March 12, 2009 in the criminal action filed against him by the United States Attorney's Office for the Southern District of New York, Madoff pled guilty to an 11-count criminal information, which counts included securities fraud, money laundering, theft and embezzlement. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (Plea Hr'g Tr. at 23:14-17.) On June 29, 2009, Madoff was sentenced to a term of imprisonment of 150 years.

5.	On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff. On June 9, 2009, this Court entered an order substantively consolidating the Chapter 7 estate of Madoff into the BLMIS SIPA proceeding.

## THE CLAIMS AGAINST THE LEVYS

6.	Norman F. Levy ("Mr. Levy") was a New York City commercial real

3

estate executive who began investing with BLMIS in the mid-1970's on behalf of himself, members of his family and certain trusts. Mr. Levy continued to invest over the years, until his death in September 2005. Prior to his death, Mr. Levy designated Madoff as an executor of his estate and upon Mr. Levy's death, Madoff was vested with power to make unilateral investment decisions regarding the estate's non-real estate assets. After Mr. Levy's death, Madoff, acting as executor, transferred more than $250 million to BLMIS from Mr. Levy's estate, essentially "stealing" this amount from Mr. Levy's heirs and beneficiaries.

7.     Prior to his death, Mr. Levy established a number of accounts at BLMIS in his name, the names of his children, and for family trusts and charitable trusts, including the Betty & Norman F. Levy Foundation (the "Foundation") (collectively, the "Levy BLMIS Account Holders"). During the six years prior to the Filing Date, the Levy BLMIS Account Holders withdrew an aggregate of approximately $305 million in excess of the amount of deposits made into such accounts (the "Six Year Transfers").[3] Of the $305 million, approximately $84 million (the "Foundation Transfers") was withdrawn by the Foundation, which maintained its own account at BLMIS that was separate and distinct from the accounts of the other Levy BLMIS Account Holders. The Levys have advised the

---

[3] At the time the Levys approached the Trustee and began discussions on a resolution of the Trustee's potential claims against the Levy BLMIS Account Holders, the Trustee had only identified account statements for the Levy BLMIS Account Holders dating back to 1995. The amount of the Six Year Transfers, and the other numbers set forth herein, represent amounts based on the data available to the Trustee at that time. The Trustee has since located and analyzed microfilm found at BLMIS's offices that provides additional account history for, among others, the Levy BLMIS Account Holders. Because the Trustee's settlement demand to the Levys was based on the older account data, and because the Trustee and the Levys were close to a settlement at the time that the additional account information became available, the Trustee determined that it would not be appropriate to make an additional demand of the Levys. The Trustee also understands that the Levys may be uncollectible for a judgment based upon the more complete account data. Accordingly, proceeding with litigation would not necessarily have yielded a higher return than the settlement contained in the Agreement.

Trustee that all of the money withdrawn by the Foundation was donated to charitable causes, that it has no significant remaining assets, and that it is now winding down its activities.

8. The Trustee believes that the Six Year Transfers are recoverable. The Trustee believes that, of the Six Year Transfers, certain transfers made within two years prior to the Filing Date are fraudulent conveyances, recoverable by the Trustee pursuant to sections 548 and 550 of the Bankruptcy Code. See section 78fff-2(c)(3) of SIPA. Pursuant to these sections, a trustee may avoid and recover, for the benefit of the estate, any transfer of an interest of the debtor in property made by the debtor (i) with actual intent to hinder, delay, or defraud an entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; and (ii) the debtor was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. 11 U.S.C. §§ 548 and 550.

9. Applying these sections of the Bankruptcy Code to the instant case, it is undisputed that Madoff intended to defraud the investors of BLMIS, as he admitted to doing so at the Plea Hearing. See Plea Hr'g Tr. 23:20-21. There is also ample evidence to show that BLMIS was insolvent at all times relevant hereto. In fact, the liabilities of BLMIS were billions of dollars greater than its assets.

10. The Trustee has also asserted that the Levys may be liable to the BLMIS estate under section 544(b) and 550 of the Bankruptcy Code and the New York Uniform Fraudulent Conveyance Law (New York Debtor and Creditor Law §§ 270 – 281). See section 78fff-2(c)(3) of SIPA. Section 544(b) of the Bankruptcy Code allows a trustee to avoid a transfer that is voidable under state law. The New York Uniform Fraudulent Conveyance Law provides a six year look-back period for fraudulent transfers.

## SETTLEMENT DISCUSSIONS WITH THE LEVYS

11.     In the Spring of 2009, the Levys, through their counsel, approached the Trustee to try to reach an agreement with the Trustee on the Levy BLMIS Account Holders' potential liability to the Trustee. While the Levys informed the Trustee that they dispute that they or the other Levy BLMIS Account Holders had any liability to the Trustee, the Levys nevertheless engaged in good faith negotiations with the Trustee that yielded the settlement set forth in the Agreement. Throughout the discussions, the Trustee found the Levys to be forthright and sincere in their desire to "do the right thing" to negotiate a return of the fictitious profits that the Trustee had calculated the Levy BLMIS Account Holders received from BLMIS. The Trustee had the opportunity to investigate the circumstances surrounding Mr. Levy's investment with BLMIS and whenever the Trustee made inquiry of the Levys, the Trustee received answers from them to his satisfaction. The Trustee appreciates the manner in which the Levys cooperated with him to obtain information he needed to arrive at the settlement set forth in the Agreement, and the Trustee hopes that other BLMIS customers will come forward, follow suit, and similarly engage in cooperative and candid settlement discussions with him.

12.     The Trustee believes that the Six Year Transfers made to each of the Levy BLMIS Account Holders are recoverable pursuant to Bankruptcy Code provisions and state law.[4] As part of the settlement discussions, the Levys informed the Trustee that prior

---

[4] The Levys have informed the Trustee that they dispute the legal and factual bases of liability for some of the withdrawals. In particular, the Levys contend: that they do not bear any liability for their good-faith withdrawals made prior to two years before the Filing Date; that withdrawals from their Levy BLMIS Accounts were comprised of invested principal and investment earnings to which they are legally entitled as opposed to fictitious profits; and that the account balances for the Levy BLMIS Accounts were real as of December 31, 1991. Nevertheless, the Levys

*continued on the following page…*

6

to the Filing Date, the Foundation had contributed the funds it received from BLMIS to various charitable causes and that the Foundation has no remaining significant assets. Accordingly, given the inability to pay any judgment against it, the Trustee has determined not to pursue recovery in respect of amounts withdrawn by the Foundation.[5] Upon making this determination, the Trustee demanded that the Levys return to BLMIS all other net amounts withdrawn by the Levy BLMIS Account Holders within the six years of the Filing Date, i.e., $220 million. The Levys have agreed to pay the amount of $220 million in full and final settlement of all claims under sections 544(b), 547, 548 and 550 of the Bankruptcy Code, and any other claims of the Trustee or the BLMIS estate against the Levys.

## THE AGREEMENT

13.    The principal terms and conditions of the Agreement are generally as follows (as stated, the form of Agreement is attached as Exhibit "A" and should be reviewed for a complete account of its terms):[6]

- At Closing, the Levys shall pay to the Trustee for the benefit of the fund of customer property, the sum of $220,000,000.00, which is nearly one hundred percent of the amount demanded from the Levys by the Trustee, and which amount the Trustee believes equals the amounts transferred to or for the benefit of the Levys and their family members in the six years prior to the Filing Date (minus the charitable contributions discussed above).

---

*...continued from the preceding page*

wish to settle all disputes with the Trustee, and under the Agreement, they do so without admitting liability.

[5] The Trustee reserves the right to engage in discussions with the charities that received money from the Foundation about returning to the Trustee amounts they received that constitute customer property.

[6] Terms not otherwise defined in this section shall have the meaning ascribed in the Agreement. In the event of any inconsistency between the summary of terms provided in this section and the terms of the Agreement, the Agreement shall prevail.

- Upon payment of the above-referenced amount at Closing, the Trustee (a) will release the Levy Releasees (listed in Attachment B to the Agreement) from any and all past, present or future claims or causes of action that are, have been, could have been or might in the future be asserted by the Trustee against any of the Levy Releasees and that are based on, arise out of or relate in any way to the affairs of BLMIS or the Levy BLMIS Accounts; and (b) grant a covenant not to sue to (i) any person related by blood or marriage as of the Closing to any of the Levy Releasees (other than Mr. Levy's former son-in-law) and (ii) any entity in which any of the Levy Releasees held or hold, as of or prior to the Closing, a financial interest, in the case of (i) and (ii) for Avoiding Powers Claims but only to the extent that such person or entity is an immediate or mediate transferee of any of the Levy Releasees under section 550(b) of the Bankruptcy Code.

- Each of the Levy Releasees, through the execution by an authorized representative of a Release Subscription (the form of which is annexed to the Agreement), will release, acquit and absolutely discharge the Trustee and all his agents and BLMIS and its estate from any and all actions or causes of action asserted or unasserted, known or unknown, now existing or arising in the future in any way related to BLMIS.

- The Levys will submit to the Bankruptcy Court's jurisdiction with respect to the SIPA Proceeding and any Avoiding Power Claims.

- The Levys agree to reasonably cooperate with the Trustee in his efforts to recover funds for the BLMIS estate.

- The claims filed by Zeno F. Levy and Titus R. Levy, children of Francis N. Levy and his wife Hallie D. Cohen, will be deemed withdrawn by them.

## RELIEF REQUESTED

14.     By this Motion, the Trustee respectfully requests that the Court enter an order substantially in the form of the proposed Order annexed hereto as Exhibit "B" approving the Agreement.

## LEGAL BASIS

15.     Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Courts have held that in order to approve a settlement or compromise under

Bankruptcy Rule 9019(a), a bankruptcy court should find that the compromise proposed is fair and equitable, reasonable, and in the best interests of a debtor's estate. In re Ionosphere Clubs, Inc., 156 BR 414, 426 (S.D.N.Y. 1993), accord, 17 F.3d 600 (2d Cir. 1994) (citing Protective Comm. for Index. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).

16. The Second Circuit has stated that a bankruptcy court, in determining whether to approve a compromise, should not decide the numerous questions of law and fact raised by the compromise, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir.), cert. denied sub nom. Cosoff v. Roman, 464 U.S. 822 (1983) (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir.), cert. denied sub nom. Benson v. Newman, 409 U.S. 1039 (1972)); accord Nellie v. Shugrue, 165 B.R. 115, 121-22 (S.D.N.Y. 1994); In re Ionosphere Clubs, 156 B.R. at 426; In re Purified Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying litigation"); In re Drexel Burnham Lambert Group, Inc., 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

17. In deciding whether a particular compromise falls within the "range of reasonableness," courts consider the following factors:

(i) the probability of success in the litigation;

(ii) the difficulties associated with collection;

(iii) the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

(iv) the paramount interests of the creditors.

Nellis v. Shugrue, 165 B.R. at 122 (citing In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 292 (2d Cir. 1992), cert. denied, 506 U.S. 1088 (1993)).

18. The bankruptcy court may credit and consider the opinions of the trustee or debtor and their counsel in determining whether a settlement is fair and equitable. See In re Purified Down Prods., 150 B.R. at 522; In re Drexel Burnham Lambert Group, Inc., 134 B.R. at 505. The competency and experience of counsel supporting the settlement may also be considered. Nellis v. Shugrue, 165 B.R. at 122. Finally, the court should be mindful of the principle that "the law favors compromise." In re Drexel Burnham Lambert Group, Inc., 134 B.R. at 505 (quoting In re Blair, 538 F.2d 849, 851 (9th Cir. 1976)).

19. The Trustee believes that the terms of the Agreement fall well above the lowest point in the range of reasonableness and, accordingly, the Agreement should be approved by this Court. The Agreement resolves all issues regarding the Trustee's claims against the Levys (the "Claims") without the need for protracted, costly, and uncertain litigation. (Affidavit of the Trustee in Support of the Motion (the "Picard Affidavit") ¶ 2. A true and accurate copy of the Picard Affidavit is attached hereto as Exhibit "C.") Litigating the Claims would undoubtedly be expensive and would require a significant commitment of time by the various professionals involved in the matter.

20. Given the cost and complexities involved in proceeding with litigation, the Trustee has determined that the proposed settlement with the Levys represents a fair compromise of the Claims. As discussed above, the Trustee determined that proceeding against the Foundation was fruitless because of its lack of significant assets and inability to pay any judgment against it. Moreover, under the settlement, the Levys will return to the Trustee the amount that the Trustee demanded from them, $220,000,000. The Trustee believes that such amount represents nearly one-hundred percent of the amount that the Levy BLMIS Account Holders withdrew from BLMIS during the six-year period before

the filing (using the data available to the Trustee at the time he made the demand). The Agreement also furthers the interests of the customers of BLMIS by adding a substantial amount of money to the fund of customer property now. Id. ¶ 3.

21. In sum, the Trustee submits that the Agreement should be approved for two reasons: (a) to avoid burdensome and expensive litigation; and (b) and because it represents a reasonable compromise of the Claims that benefits the estate and the customers of BLMIS. Accordingly, since the Agreement is well within the "range of reasonableness" and confers a substantial benefit on the estate, the Trustee respectfully requests that the Court enter an Order approving the Agreement.

### Notice

22. In accordance with Bankruptcy Rules 2002 and 9019, notice of this Motion has been given to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) all known creditors of BLMIS. The Trustee shall also serve, by way of the ECF filing that will be made, each person or entity that has filed a notice of appearance in this case. The Trustee submits that no other or further notice need be given and respectfully requests that the Court find that such notice is proper and sufficient.

WHEREFORE, the Trustee respectfully requests entry of an Order substantially in the form of Exhibit "B" granting the relief requested in the Motion.

Dated: New York, New York
January 27, 2010

Respectfully submitted,

*s/Marc E. Hirschfield*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L.*
*Madoff*