Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
Attorneys for Ronald J. Haber

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,

    Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

    Defendant.
-----------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

Ronald J. Haber hereby objects to the Notice of Trustee's Determination of Claim dated December 8, 2009 (the "Determination Letter") and states as follows:

**Background facts**

1. In order to deposit money with Bernard L. Madoff Investment Securities, LLC ("Madoff") for the purpose of purchasing securities, Haber was advised to, and did, open an account with Foredestine LLC ("Foredestine"). Foredestine invested 100% of Haber's funds in two different funds.

2. Some of Haber's funds were invested in Madoff through Foredestine Series Fund LLC Broad Market Prime Series which, in turn was 100% invested in Tremont's Rye Select Broad Market Prime Fund, LP, Madoff Account No. 1C1260-3-1 (the "Rye Prime Fund

Investment"). Haber's Rye Prime Fund Investment had a value of $3,486,896 as of October 31, 2008.

3. Some of Haber's funds were invested in Madoff through Foredestine Series Fund LLC-Broad Market XL Series which, in turn, was 100% invested in Rye Select Broad Market XL Fund LP (the "Rye XL Fund Investment"), Madoff Account No. 1T0027-3-0. Haber's Rye XL Fund Investment had a value of $2,649,475 as of October 31, 2008.

4. Bernard L. Madoff was fully aware that 100% of the funds invested in the Rye Prime Fund and in the Rye XL Fund were invested in Madoff because he directed customers to invest in Madoff through these funds.

5. On June 28, 2009, Haber filed a SIPC claim in the amount of $3,486,895.82 representing the October 31, 2008 balance of his Rye Prime Fund Investment.

6. On June 28, 2009, Haber filed a SIPC claim in the amount of $2,649,475.06 representing the October 31, 2008 balance of his Rye XL Fund Investment.

7. In the Determination Letter, Picard rejected Haber's claims on the ground that Haber did not have an account with Madoff in his own name. Picard ignored the fact that Haber is a "customer" under the Securities Investor Protection Act ("SIPA") because he transferred funds to Madoff, through the Rye XL Fund and through the Rye Prime Fund, for the purpose of purchasing securities and is, thus, entitled to SIPC insurance.

8. Picard extended Haber's time to object to the Determination Letter through February 6, 2010.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

1104985.1

9. Picard has failed to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that the customer did not have a "legitimate expectation" that the balance on the Account statement represented his property.

10. Picard has failed to state a legitimate basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at * (B.S.D.N.Y. Jan. 13, 2003).

**B. Picard has violated the requirement that
he honor a customer's "legitimate expectations"**

11. The legislative history of SIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.

> \*     \*     \*

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

3

1104985.1

H.R. Rep. 95-746 at 21.

12. On December 30, 1970, when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms. . . . Just as the Federal Deposit Insurance Corporation protects the user of banking services from the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid=2870

13. SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

14. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of customers, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

15. Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

16. As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.

5

>     COURT: Okay.
>
>     HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

## C. Without legal authority, Picard has invented his own definition of "net equity"

17.   SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

18.   SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

19.   The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

1104985.1

20. In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize customers' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff customers who have depended upon their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

21. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

22. Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent customers who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

23. After 14 months of his tenure, Picard has identified only two Madoff customers who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. Picard has sued two Madoff customers, Stanley Chais and Jeffry Picower who, Picard has alleged, took out of Madoff $7.2 billion more than they invested. Picard has further alleged that these two customers received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

24. However, the fact that a few out of more than 8,000 Madoff customers may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent customers of their statutory maximum payment of $500,000 in SIPC insurance.

25. The Rye XL Fund and the Rye Prime Fund (the "Rye Funds"), like thousands of other customers, received monthly statements from Madoff indicating returns on their Madoff investment in the past few years in the range of 9 – 11% per year, subject to short term capital gains tax rates. The Rye Funds had entered into standard brokerage agreements with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Rye Funds had specified, numbered accounts for the purchase and sale of securities; it received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. Haber paid federal and State taxes on the annual growth of the investments with Madoff. There is no basis to claim that Haber did not have a "legitimate expectation" that the assets reflected on the Rye Funds' statements sent by Madoff.

26. Thus, Haber is entitled to a claim for securities in the amount of $3,486,896 for the Rye Prime Fund Investment and $2,649,475 for the Rye XL Series Investment.

**D. Haber is entitled to prejudgment interest on its investment and profits.**

27. At a minimum, under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted Haber's funds, they are also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d

427, 428 (1ˢᵗ Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

28.    Although it is not legally relevant, Picard cannot prove that Madoff earned no money on Haber's money. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which Haber and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

29.    In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, an investor is not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation

9

approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

### E. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit

30. In derogation of his fiduciary duty to Haber, Picard is, in effect, imposing upon them a fraudulent conveyance judgment for sums that the Rye XL Series Fund and the Rye Prime Fund withdrew from the Accounts beyond the statute of limitations period applicable to fraudulent conveyances. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived Haber of SIPC insurance and the claim to which he is entitled.

31. Moreover, Picard has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for Picard to utilize the avoidance powers of a trustee to enrich SIPC at the Investment Group' expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g.*, 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among

creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

32.    Here, however, Picard is not acting to assure equal distribution among prepetition creditors. On the contrary, he is simply acting as SIPC's agent in depriving Haber of the SIPC insurance to which he is statutorily entitled.

**F.  Picard has violated SIPA by delaying the payment of SIPC insurance**

33.    Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace Haber's securities up to a value of $500,000 for each of the Rye Funds, as valued on the November 30, 2008 statements.

**G.  Haber is a "customer" under
SIPA entitled to up to $500,000 in SIPC insurance.**

34.    Haber is a "customers" under the plain definition of "customer" in SIPA. Thus, he is entitled to receive up to $500,000 in SIPC insurance. 15 U.S.C. § 78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities."). *Rosenman Family, LLC v. Picard,* 401 B.R. 629, 635 (B.S.D.N.Y. 2009)("the mere act of entrusting . . . cash to the debtor for the purpose of effecting securities transactions . . . triggers customer status. . ."); *SEC v. Ambassador Church Financial Devel. Group, Inc.,* 679 F. 2d 608, 614 (6th Cir. 1982); *In re Primeline Sec. Corp.,* 295 F. 3d 1100, 1107 (10th Cir. 2002)("SIPA does . . . protect claimants who try to attempt to invest through their brokerage firm but are defrauded by dishonest brokers . . . If a claimant intended to have the brokerage purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds"); *Miller v. DeQuine (In re Stratton Oakmont, Inc.),* 2003

1104985.1

WL 22698876 at *3 (S.D.N.Y. Nov. 14, 2003)("Stratton Oakmont's conversion of Claimants' property makes the customers within the meaning of SIPA.").

35. Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder." Instead, Congress' definition of "customer" is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor")(emphasis added).

36. Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Investment Group because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

37. Moreover, it is clear that Congress intended for "customer" to be broadly interpreted. In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. Section 7(d)(June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (Aug.4, 1969). The final bill dropped this restriction.

38.     The Trustee may erroneously rely upon SIPC Rule 103. SIPA does not permit SIPC, by the promulgation of Rules, to change the definition of "customer" under the statute. Hence, Rule 103 is invalid. 15 U.S.C. § 78ccc(b)(4)(A).

**Conclusion**

Haber is entitled to an order compelling Picard and SIPC to immediately replace the securities in the two Rye Funds' Accounts to the extent of a valuation of $500,000 for each Account, using the values as of November 30, 2008.

Haber is entitled to have his claims recognized in the amounts of $3,486,896 Prime Fund and $2,649,475 for the Rye XL Fund.

Haber is entitled to judgment against Picard and Baker & Hostetler LLP for the damages he has suffered as a result of the breach of fiduciary duty of Picard and his counsel.

February 6, 2010

                                PHILLIPS NIZER LLP

                                By <u>Helen Davis Chaitman</u>

                                666 Fifth Avenue
                                New York, NY 10103-0084
                                (212) 841-1320
                                Attorneys for Ronald J. Haber