UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | ) ) | |
| | ) | Adv. Pro. No. 08-01789-BRL |
| Plaintiff-Applicant | ) ) | |
| v. | ) ) | SIPA Application |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | ) ) ) | |
| Defendant | ) ) | |

_____)

### OPPOSITION OF CLAIMANT THE KESSLER NOMINEE PARTNERSHIP TO TRUSTEE'S DETERMINATION OF CLAIM

Claimant The Kessler Nominee Partnership ("Nominee") hereby files this written opposition to the determination by Irving H. Picard, Trustee under the Securities Investor Protection Act, dated January 25, 2010, as more particularly set forth on the Trustee's Notice of Determination annexed as <u>Exhibit A</u> ("Notice of Determination").

### BACKGROUND AND PROCEDURAL POSTURE

1.      The Nominee filed a "customer claim" in the form annexed as <u>Exhibit B</u>.  As is set forth on Rider A to such claim, the Nominee made such filing on a stand-by basis, "in the alternative to . . . five separate claims [on behalf of the five so-called "partners" in the Nominee Partnership] and only on the condition that such five separate claims are denied; it is the position of The Kessler Nominee Partnership that it was agent for the five investors and not the actual account holder."  The five principals for whom the Nominee acted as agent with respect to Bernard L. Madoff Investment Securities LLC ("BLMIS") are herein designated "the customers."

2.      The Nominee objects to the Trustee's determination to the extent it is a denial of the claim of the five customers.

3.      The Nominee requests a hearing before Bankruptcy Judge Burton R. Lifland to reduce the amount of Nominee's allowed claim to zero and grant the claims of such five customers, or alternatively to clarify that the payment of the Nominee's claim is not a rejection of the pending claims of the five customers and that it may be paid immediately, the proceeds of such payment to be credited against the claims of the five customers if allowed.

4.      The five customers, and the amounts of their allocated accounts based upon the books and records of BLMIS at November 30, 2008, are as follows:

| Customer Name | Market Value of Securities on Books and Records of BLMIS at November 30, 2008 |
|---|---|
| Kessler Family Trust  f/b/o Brian Kessler | $ 5,689,409.70 |
| Kessler Family Trust  f/b/o David Kessler | $ 6,348,850.69 |
| Kessler Family Foundation | $ 8,636,120.17 |
| Kessler Donor Advised Fund | $16,512,125.42 |
| Howard J. Kessler Revocable Trust | $16,080,132.96 |

5.      The Nominee, as agent for such five customers, possesses authority as agent to file and pursue the within Opposition.  By doing so, the Nominee as agent does not hereby waive any rights or entitlements which the Nominee or the five customers may possess.

6.      Set forth below is a brief summary of the bases of this Opposition, all of which are more particularly discussed below:

- The five customers are "customers" of BLMIS as that term is set forth in the Securities Investor Protection Act of 1970 (15 U.S.C. §§ 78aaa – 78lll) (the "Act" or "SIPA") and the "Rules" adopted thereunder.

- The legislative history of the Act is consistent with such classification.

- The remedial nature of the Act compels such a conclusion.

2

- The specific terms and legal effect of the instrument creating the Nominee, and the fact that the so-called "managing partner" is not an economic partner at all, confirms that the five customers are customers under the Act, and only creates an agency relationship. Moreover the facts with respect to this Nominee present a stronger factual case than those presented by other claimants who have filed oppositions seemingly analogous to the within, as the Nominee is established as an agent only, further lending support to this Opposition under the Rules.

- The Release that the Trustee has tendered to the Nominee does not comply with applicable law.

- Any delay in immediate payment to the customers violates the requirement that the Trustee make payment to customers with "promptness."

- The Trustee's determination fails to provide the required basis for the denial of the claims.

- The requirement that the Nominee be created for the "bundling" of the several customers was part and parcel of the fraud perpetrated by BLMIS, and it would be anomalous to cause the five customers to be classified as other than separate "customers" under the Act based upon a requirement imbedded in the very fraud itself.

## STATEMENT OF RELEVANT FACTS

7. The initial determination of the five customers to make investments with BLMIS was reached in or about December, 2006. As set forth more fully below, when a decision was reached, based upon fraudulent information provided to and relied upon by the five customers, the initial investments were made by the customers in the following amounts:

| Customer Name | Initial Cash Investment Made on January 1, 2007 |
|---|---|
| Kessler Family Trust  f/b/o Brian Kessler | $4,500,000 |
| Kessler Family Trust  f/b/o David Kessler | $5,000,000 |
| Kessler Family Foundation | $1,000,000 |
| Kessler Donor Advised Fund | $3,000,000 |
| Howard J. Kessler Revocable Trust | $2,100,000 |

8.    Following such initial investments, additional investments were made by the customers in the following amounts:

| Customer Name | Additional Cash Investment Made on January 2, 2008 | Additional Cash Investment Made on August 8, 2008 |
|---|---|---|
| Kessler Family Trust f/b/o Brian Kessler | $  225,000 | 0 |
| Kessler Family Trust f/b/o David Kessler | $  275,000 | 0 |
| Kessler Family Foundation | $4,000,000 | $3,000,000 |
| Kessler Donor Advised Fund | $  500,000 | $12,000,000 |
| Howard J. Kessler Revocable Trust | $3,000,000 | $10,000,000 |

9.    Specifically, the decision to establish the Nominee was not volitional, but was imposed on the customers by the express requirements of BLMIS.  The BLMIS investors each sought to deposit monies in individual accounts established at BLMIS.  However, BLMIS refused to let them do so.  When the customers reached a decision to invest in BLMIS, their counsel (Gordon Ehrlich, Esq.) reached out to BLMIS to facilitate the mechanics of the investment.  In December, 2006, such counsel contacted Mr. Robert Jaffee, known in the community as the BLMIS "gatekeeper" (due to his close historical association with BLMIS in facilitating investments in BLMIS as BLMIS's agent in exchange for a fee), to determine requisite mechanics.

(a)    Jaffee specifically advised counsel in a telephone conversation relating to the Kessler customers, that a single account would be required.  Counsel had prior experience in opening accounts with BLMIS for other clients, and was acquainted with the BLMIS insistence on a single account for multiple customers.

(b)    A representative of BLMIS, knowing that there were multiple customers, placed a telephone call to counsel, seeking a signed copy of an agreement and seeking the name of the contact person or agent for the customers; such caller stated that BLMIS was, in the words of counsel recorded contemporaneously, "anxious and willing" to process the paperwork.

4

Implicit in such conversation was the understanding that multiple customers were involved; if a single customer were involved, no need for any agreement would have arisen.

(c)    On December 26, 2006, counsel faxed to Jody Kupe at BLMIS a signed copy of the instrument establishing the Nominee, as BLMIS had expressly required.

(d)    In early January, 2007, counsel forwarded for execution by the Nominee the then-standard, mandatory and (to such counsel's stated understanding non-negotiable) instruments (Customer Agreement, Trading Authorization, Option Agreement) requisite to establish the BLMIS account in the name of the Nominee, although BLMIS explicitly knew that there were multiple customers.  Such aggregation of the customers was in furtherance of the fraud (and in order to maintain the illusion of exclusivity and privilege afforded by Madoff to the customers).

(e)    As more particularly described below, the instrument establishing the Nominee gave no power or discretion to the designated "managing partner," and the Trading Authorization required by BLMIS from the Nominee made it amply clear that the "managing partner" had no role in the management of the account, which was wholly discretionary with BLMIS.  The designation of Nominee was, as to BLMIS, both an element of the fraud and the establishment of an agency arrangement with the multiple customers as the principals.

10.    A copy of the instrument creating the Nominee is annexed as <u>Exhibit C</u>.  The instrument in fact is not a legal partnership but rather an establishment of an agency.  It groups the five customers, as required by BLMIS, but in fact is neither a limited partnership nor a limited liability partnership in legal form or substance.  Further, the instrument fails to create even a simple general partnership, and indeed could not do so given the nature of the parties: the individual designated as "managing partner," Mr. Francis R. Spellman, Jr., is an employee of Kessler Financial Services, LP, and is not a partner at all.  Mr. Spellman has no investment in the Nominee or BLMIS, has no direct interest or carried interest in the Nominee, is not shown in the schedules attached to the Nominee's formative instrument as providing any funds or possessing any ownership percentage in the Nominee, and has never made any investment therein or held any interest therein of any nature whatsoever.  As the Nominee was an agent as to BLMIS (see paragraph 9 above), so too was the Nominee a mere agent to the five customers thereunder.

11.    The Nominee never made any investment other than with BLMIS and never engaged in any other business enterprise.

12.    Annexed as <u>Exhibit D</u> is a description of the five several customers, each of which is a separately established entity, with separate assets separately accounted for, and with differing beneficiaries.

<u>EACH OF THE FIVE PRINCIPALS OF THE NOMINEE IS A SEPARATE "CUSTOMER"</u>

13.    "'Customer' as defined in section 78lll(2) of SIPA  is a term of art.  A creditor with customer protection under the Act is entitled to preferential treatment over other creditors in the distribution of assets of the debtor's estate marshaled by the Trustee."  *In re Klein, Maus & Shire, Inc.,* 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003).  The Act defines "customer" as follows:

> The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view of sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer.  The term *"customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . . .*

15 U.S.C. § 78lll(2) (emphasis added).

14.    As the document creating the Nominee establishes an agency only, each of the constituent principals is a customer within the language set forth in paragraph 13 above, namely "any person who has claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . . ."  *Id.*  The Nominee, having no economic stake in the account maintained by BLMIS, deposited no cash, owned no share of any securities actual or putative, and could not constitute a customer; rather, the Nominee was only an agent for the true customers.

15.    Substantial case law supports the status of each of the principals as a separate customer.  *Rosenman Family, LLC v. Picard,* 401 B.R. 629, 635 (B.S.N.Y. 2009) ("the mere act of *entrusting* . . . cash to the debtor for the purpose of effecting securities transactions . . .

triggers customer status . . . .") (emphasis in original) (citations omitted); *SEC v. Ambassador Church Financial Devel. Group, Inc.,* 679 F.2d 608, 613-14 (6th Cir. 1982) ("Entrustment was found to be a key factor in determining who qualified as a customer. . . .  The primary purpose of the Act is to assure the unsophisticated participant in securities transactions that there is protection when a bad choice of brokers is made."); *In re Old Naples Securities, Inc.*, 223 F.3d 1296, 1302 ("a claimant who delivered a note payable to a broker personally, rather than to the brokerage, could qualify as a 'customer' protected by SIPA") (citation and internal quotation omitted).  In this regard, a claimant who deposits cash or securities with a brokerage firm has entrusted those funds or securities with the broker-dealer within the meaning of SIPA.  *See Rosenman Family,* 401 B.R. at 635; *Lopez v. Zaremba,* 2009 WL 36617 at * 5 (N.D. Ohio Jan. 5, 2009) (a claimant entrusts cash or securities to a brokerage firm where the firm "'received, acquired or held cash or securities owned by [the claimant]'") (citation omitted); *In re Primeline Sec. Corp.,* 295 F.3d 1100, 1107 (10th Cir. 2002) ("SIPA does . . . protect claimants who attempt to invest through their brokerage firm but are defrauded by dishonest brokers. . . .  If a claimant intended to have the brokerage purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds.") (citation omitted); *Miller v. DeQuine (In re Stratton Oakmont, Inc.)*, 2003 WL 22698876 at *3 (S.D.N.Y. Nov. 14, 2003) ("Stratton Oakmont's conversion of Claimants' property makes them customers within the meaning of SIPA . . . .").[1]

---

[1] *Securities Investor Protection Corp. v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314, 1318 (2d Cir.), *cert. denied*, 426 U.S. 936 (1976), is distinguishable on its facts.  In *Morgan,* the Second Circuit was confronted with a trust created under a profit-sharing plan, funded entirely by yearly employer contributions, managed by three trustees who exercised sole control and discretion over investment decisions, and held in an account at the debtor, Morgan, Kennedy & Co., which eventually entered liquidation proceedings under the Act.  *Id.* at 1315.  The Court noted that the "decision to entrust [the trust's] funds to the debtor was the trustees'" and that the participation of the one hundred and eight employee-beneficiaries of the trust "amounted to a bookkeeping matter on the [employer's] books"  *Id.* at 1318.  Under such facts, the Second Circuit did not find the traits typical of a customer-debtor relationship.  *Id.*

Here, the decision to establish the Nominee was imposed on the five customers by BLMIS.  Moreover, unlike the trustees in *Morgan,*  the Nominee's "managing partner" had no role or discretion over investment decisions.  Finally, where the employee-beneficiaries contributed none of the funds to the trust at issue in *Morgan,* the five principals of the Nominee contributed all of the funds to which this opposition relates.  The five customers exhibit all the indicia of a customer-debtor relationship that the beneficiaries in *Morgan* lacked.

16.      The legislative history of the Act makes clear that Congress intended to afford customer status to each of the five principals of the Nominee.  If Congress had intended to limit customers to account holders, the definition of customer could have been six words: "A 'customer' is an account holder."  Instead, Congress's definition of "customer" is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that these customers are all customers under the Act ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , *in which event each such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor.*") (emphasis added).

17.      Moreover, it is clear that Congress intended for "customer" to be broadly interpreted.  In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer."  S. 2348, 91st Cong. § 7(d) (Aug. 4, 1969).  The final bill dropped this restriction.

18.      Any ambiguity in the definition of "customer" as used in the Act, although seemingly there is none here, should be construed in favor of the five customers.  The Act was designed to establish "a substantial reserve fund . . . [to] provide protection to customers of broker-dealers . . .  to reinforce the confidence that investors have in the U.S. securities markets." *In re New Times Sec. Services, Inc.*, 371 F.3d 68, 84 (2d Cir. 2004) (citations omitted).  Further, the Act recites that "the provisions of the Securities Exchange Act of 1934 . . . apply as if this chapter [15 U.S.C. §§ 78aaa – 78lll] constituted an amendment to, and was included as a section of, such [1934] Act." 15 U.S.C. § 78bbb.  In addition, "[t]he Securities Exchange Act quite clearly falls into the category of remedial legislation."  *Tcherepnin v. Knight,* 389 U.S. 332, 336

(1967). The Act, therefore, is remedial legislation. "[R]emedial legislation should be construed broadly to effectuate its purposes. . . ." *Id.*[2]

19.     Pursuant to Rule 101(b), promulgated by SIPC for purposes of identifying accounts of "Separate Customers", "an account held with a member by an agent or nominee for another person as a principal or beneficial owner shall, except as otherwise provided in these rules, *be deemed to be an individual account of such principal or beneficial owner*." 17 C.F.R. §§ 300.101(b) (emphasis added).

20.     The Nominee is defective as a partnership in any regard, but by its very title and contents establishes an agency relationship. As there are five principals designating the Nominee as agent, there are five customers pursuant to the provisions of the Rules.

21.     The nature of the instrument creating the Nominee differentiates the instant case from many other oppositions filed in the within proceeding. As stated above, the purported "general partner" is not a partner at all, having no investment in or economic stake either in the purported "partnership" or the account established with BLMIS. The only legal analysis to which the instrument creating the Nominee logically can submit is the creation of an agency which would in turn establish accounts and a customer relationship on behalf of the "principal or beneficial owner" pursuant to Rule 101(b).

22.     To the extent the Rules can be construed in any regard to deny the status of "customer" to each of the five principals of the Nominee, such provision of the Rules, or such reading of the Rules, must be disregarded as being in derogation of the plain language and clear intent of the statute as set forth in paragraphs 13, 16, 17 and 18 above.

---

[2] Readily distinguishable is a line of cases in the Second Circuit where the term "customer," as used in the Act, was construed narrowly. *See, e.g., Securities and Exch. Comm'n, v. F.O. Baroff Co.*, 497 F.2d 280 (2d Cir. 1974) (construing "customer" to exclude a voluntary lender of securities, where the loan of securities was made solely for the purpose of helping a failing brokerage house and not for purposes of becoming an investor in the securities markets); *In re Omni Mutual, Inc.*, 193 B.R. 678 (Bankr. S.D.N.Y. 1996) (while denying "customer" status to an investor in a limited partnership interest, the decision turns on the fact that the transaction had been completed as intended and the investor, once he received the targeted limited partnership interest, could no longer be considered a depositor of cash with a broker-dealer for the purpose of purchasing securities).

23.    The separateness of each principal as a customer is demonstrated by the lack of powers of the Nominee and the total individual control of each of the principals over the investment of each such principal:

- Each of the principals had the absolute right to add to withdraw from or completely terminate its individual account in its own discretion, without regard to the rights, interests or consent of any of the other principals or of the Nominee.

- The Nominee as an individual had no power or authority to affect, alter or vary the investments made with BLMIS, as all such investments were to be managed on a wholly discretionary basis without input or impact by the Nominee.

- Unlike a true partnership, additions and withdrawals by the principals were wholly discretionary with such principals and could not be impacted, blocked or managed in any way by Mr. Spellman, the "managing partner." *See* <u>Exhibit C</u>, paragraphs 7 (last sentence) and 12.

24.    The Trustee has sought to condition the receipt of any SIPC funds (including undisputed amounts) on the execution of a Partial Assignment and Release that would "release and forever discharge the SIPA Trustee and SIPC . . . from any and all claims arising out of or relating to [Nominee]'s BLMIS Account, the Customer Claim filed with the SIPA Trustee . . . , and any and all circumstances giving rise to said Customer Claim . . . ."  Notice of Determination and Partial Assignment and Release attached thereto at 2 (<u>Exhibit A</u>).  There is no legal basis for requiring such a Partial Assignment and Release, and the Trustee's actions attempt to compel the Nominee and the customers to give up substantial rights which are disputed as a condition to receiving amounts that are undisputed.  Indeed, conditioning the payment of funds to which customers are statutorily entitled on the execution of a release is contrary to the provisions of the Act which direct that customer claims be paid "promptly."  *See* 15 U.S.C. § 78fff(a)(1)(B) (noting that one of the purposes of a SIPA liquidation proceeding is "*as promptly as possible* after the appointment of a trustee . . . to distribute customer property and . . . otherwise satisfy net equity claims of customers . . .") (emphasis added); 15 U.S.C. § 78fff-2(b) ("[T]he trustee shall *promptly* discharge . . . all obligations of the debtor to a customer . . . by the . . . making of payments to or for the account of such customer.")  Moreover, the demand for a release and assignment violates specific provisions of SIPA providing limited subrogation rights to the BLMIS Trustee, which do not include the

10

assignment and release sought by the BLMIS Trustee.  *See, e.g.,* 15 U.S.C. § 78fff-4(c) (providing that Trustee's rights as subrogee are subordinated to rights of customers to customer property).  In addition, the Trustee's demand is both unconscionable and contrary to public policy and should be stricken.

## THE TRUSTEE HAS FAILED TO EXPLAIN THE BASIS OF HIS DETERMINATION

25.      The Trustee has failed to state a basis in the Notice of Determination (Exhibit A) for the position he has taken.  Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer."  *Collier on Bankruptcy* ¶ 3007.01(3) (15th ed. rev.).

26.      The Trustee's determination, aside from not clearly providing "the reason" for its action, (a) is inadequate to rebut the prima facie validity of the five customers' claims, as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f); and (b) violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based ("It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical basis of those defenses").  *See, e.g., Collier on Bankruptcy* ¶ 3007.01(3) (15th ed. rev.).

## THE NOMINEE, A CREATION OF THE VERY FRAUD TO BE REMEDIED, SHOULD NOT BE TREATED AS THE CUSTOMER

27.      The designation of the Nominee as agent on behalf of the five customers grows out of and is part and parcel of the BLMIS fraud itself.  See paragraph 9 above.  The alleged establishment of the Nominee as a "customer" must be ignored, or the very nature of the fraud would become the reason to deny the defrauded parties their full remedy.

28.      In fact, the instrument creating the Nominee could not and did not create a separate legal entity capable of being a customer, but rather merely created an agency (see paragraph 10 above).  Pursuant to Rule 101(b), such a Nominee is to be ignored (see paragraph 22 above).

29.    The aggregation of the customers into a single account, opened in the name of the Nominee, was a fundamental hallmark of BLMIS's Ponzi scheme.  BLMIS had an alleged long-term track-record of steady, positive returns on its customers' investments during both market upswings and downturns.  BLMIS's widely publicized success – covering a span of more than 40 years – was well known to all five customers before their deposits were made with BLMIS, and was a primary factor inducing their respective decisions to invest with BLMIS.

30.    The BLMIS investors each sought to deposit monies in individual accounts established at BLMIS.  However, BLMIS refused to let them do so.  As a result, in order to invest with BLMIS – and obtain the benefits of BLMIS's supposed positive returns in the securities markets – BLMIS required the five customers to use the Nominee as an agent for entrusting their respective funds with BLMIS.

31.    The Nominee thus became another vehicle for BLMIS to obtain investor monies, which BLMIS, Bernard Madoff and perhaps others misappropriated, in whole or in part, for their own purposes.  BLMIS designed the text of the Trading Authorization Limited to Purchases and Sales of Securities and Options (as annexed as Exhibit E, the "Trading Authorization") and thus required the Kessler Nominee Partnership to contain terms permitting BLMIS to possess exclusive authority over the customers' investments, and limiting the number of persons in contact with BLMIS.  Simply put, BLMIS and Madoff used the Nominee to steal the customers' funds.

32.    The Trading Authorization required by BLMIS and executed by the Nominee on behalf of the customers stripped the Nominee of any true function or role with respect to the investments.  Consequently, the Nominee not only had no economic interest and no true partnership status, but also no function whatsoever beyond a bookkeeping and administrative function.  Specifically, the Trading Authorization dictated the mandatory method of operation for the account (that is, Bernard Madoff's personal direction controlled all investment decisions), rendering irrelevant any lingering hint of powers left to the Nominee.  Among other things, the Trading Authorization limited the Nominee's functions to entrusting the customers funds with BLMIS and allowed only BLMIS to make investment decisions.  The Nominee, in other words, was not a genuine entity, but a fraudulent extension of BLMIS's enormous Ponzi scheme.  The

Trustee should deem the Nominee status a nullity and classify each of the five customers

separately, each being entitled to full customer protection under the Act.

33.     Accordingly, the Nominee was a product of BLMIS's fraud.  It was intended by

BLMIS to function as one cog in its massive, complex Ponzi scheme.  In other circumstances,

BLMIS's fraud with respect to inducing the establishment of the Nominee would enable the

customer to set aside and rescind the instrument designating Mr. Spellman as Nominee.  *See*

*Renzor v. J. Artist Mgm't, Inc.,* 365 F. Supp. 2d 565, 577 (S.D.N.Y. 2005) (agreements may be

rescinded "where plaintiff can prove fraud in the inducement"); *M&T Mortgage Corp. v. Miller,*

323 F. Supp. 2d 405, 411 (E.D.N.Y. 2004) (a fraud claim is sustainable and rescission is

available "where the decision by one party to enter into the contract itself was induced by

fraud").

34.     BLMIS's fraudulent conduct with respect to the establishment of the Nominee

voids the instrument creating the Nominee and renders that instrument a legal nullity.  *See, e.g.,*

*Bangkok Crafts Corp. v. Capitolo di San Pietro in Valicano,* 2007 WL 1687044 at * 9 (S.D.N.Y.

June 11, 2007) ("[i]f [plaintiff] succeeds in proving that it was fraudulently induced into entering

into the contract . . . and the contract is thereby rendered void, recovery under a theory of money

had and received may be proper.").

35.     Here, each of the five customers deposited their monies with BLMIS through the

BLMIS required Nominee on three occasions between 2007 and 2008.  BLMIS knew that they

were multiple customers who were making individual investments for themselves and were not

depositing monies through some sort of hedge fund or fund-of-funds.  In point of fact, BLMIS

required establishment of the Nominee, and counsel to the customers advised them that they

were executing an instrument creating the Nominee only because BLMIS insisted that they make

their individual investments through an agent.  *See In re Matter of Weiss Securities, Inc.,* 1977

WL 1043 at * 3 (Bankr. S.D.N.Y. Sept. 29, 1977) ("as Judge Learned Hand reminded us, 'there

is no surer way to misread any document than to read it literally'") (citation omitted).

<u>CONCLUSION AND RELIEF REQUESTED</u>

36.    By reason of the foregoing, the Trustee should be directed to award to each of the five customers the full amount of their separate claims.   In the event of such action, the award to the Nominee should be reduced to zero.

37.    In the alternative, if the relief prayed for in the immediately preceding paragraph is not granted, the Trustee should make immediate payment to the Nominee in the amount of $500,000, upon execution by the Nominee of such form of assignment and release as the Court may determine, and if  the claims of the five customers are subsequently allowed should credit such prior payment as (made to the Nominee) against payments to such five customers.

38.    All relief prayed for further is without prejudice to all other claims which may be asserted by the five customers, and by the Nominee, including without limitation, with respect to any other matters subject to uniform determination by the Court during the pendency of the within proceedings.

Respectfully submitted this 23rd day of February, 2010.

DUANE MORRIS LLP

By: */s/ Patricia H. Heer*
      Patricia H. Heer

1540 Broadway
New York, NY 10036-4086
Telephone: 212-471-1803
Facsimile:  212-214-0808
 and
Stephen M. Honig
470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857-488-4239
Facsimile:  857-401-3052

*Attorneys for Kessler Nominee Partnership, as agent
for the five customers hereinabove identified*

## Exhibit A



### BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]

### NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

January 25, 2010

The Kessler Nominee Partnership
c/o Calibre Advisory Services
Reservoir Woods
930 Winter Street, Suite 1500
Waltham, MA 02451

Dear The Kessler Nominee Partnership:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1K0205 designated as Claim Number 013339:

Your claim for a credit balance of $53,266,638.94 and for securities is **DENIED**. No securities were ever purchased for your account.

Your claim is **ALLOWED** for $48,600,000.00, which was the balance in your BLMIS Account on the Filing Date based on the amount of money you deposited with BLMIS for the purchase of securities, less subsequent withdrawals, as outlined in Table 1.

---

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

095879, 000005, 300068925.1

15



| – Table 1 – | | |
|---|---|---|
| **DEPOSITS** | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 1/8/2007 | CHECK WIRE | $15,600,000.00 |
| 1/3/2008 | CHECK WIRE | $8,000,000.00 |
| 8/11/2008 | CHECK WIRE | $25,000,000.00 |
| 10/20/2008 | CHECK WIRE | $5,000,000.00 |
| **Total Deposits:** | | $53,600,000.00 |
| **WITHDRAWALS** | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 10/14/2008 | CHECK WIRE | ($5,000,000.00) |
| **Total Withdrawals:** | | ($5,000,000.00) |
| **Total deposits less withdrawals:** | | $48,600,000.00 |

Your **ALLOWED CLAIM** of $48,600,000.00 will be satisfied in the following manner:

The enclosed **PARTIAL ASSIGNMENT AND RELEASE** must be executed, notarized and returned in the envelope provided herewith. Upon receipt of the executed and notarized **PARTIAL ASSIGNMENT AND RELEASE**, the Trustee will make a partial satisfaction of your **ALLOWED CLAIM** by sending you a check in the amount of $500,000.00, with the funds being advanced by Securities Investor Protection Corporation pursuant to section 78fff-3(a)(1) of SIPA. In addition, you will be entitled to receive an additional distribution based upon your **ALLOWED CLAIM** from the fund of customer property, if any.

It is the Trustee's intent, pursuant to SIPA, to submit a Motion for an order of the Bankruptcy Court to allocate assets he has collected and will collect between the fund of customer property and the general estate and to distribute customer property *pro rata* among allowed claimants, such as you. In a decision in this case, Rosenman Family, LLC v. Picard, 401 B.R. 629, 634 (Bankr. S.D.N.Y. 2009), the Bankruptcy Court stated:

> The customer estate is a fund consisting of customer property and is limited exclusively to satisfying customer claims. In re Adler Coleman Clearing Corp. (Adler Coleman II), 216 B.R. 719, 722 (Bankr. S.D.N.Y. 1998) ("A SIPA trustee, distributes 'customer property' exclusively among the debtor's customers…."); see also 15 U.S.C. § 78*lll*(4). Accordingly, Customers, as defined by SIPA §



78*111*(2), enjoy a preferred status and are afforded special protections under SIPA.  See New Times Securities, 463 F.3d at 127; Adler Coleman, 195 B.R. at 269."

Id. at 634.

It is not known at this time when the Trustee will be filing such allocation and distribution motion.

**Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order.  Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.**

**PLEASE TAKE NOTICE:**  If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after January 25, 2010, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:**  If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:**  If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date.  Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

095879, 000005, 300068925.1                                3



**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc:    Stephen M. Honig
Duane Morris, LLP
470 Atlantic Avenue
Boston, MA 02210

095879, 000005, 300068925.1                4



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES INVESTOR PROTECTION
CORPORATION,

       Plaintiff-Applicant,

       v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

       Defendant.

Adv. Pro. No. 08-01789-BRL

SIPA Liquidation

## PARTIAL ASSIGNMENT AND RELEASE

**KNOW ALL MEN BY THESE PRESENTS,** that The Kessler Nominee Partnership, located at Reservoir Woods, 930 Winter Street, Suite 1500, Waltham, MA, 02451 (hereinafter referred to as the "Assignor") in consideration of the payment of $500,000.00 to satisfy in part its claim for customer protection (the "Customer Claim", having been designated Claim #013339) filed in the liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §78aaa et seq. ("SIPA") (see §§78fff-2(b), 78fff-2(d), and §78fff-3(a)(1) of SIPA), does for itself hereby assign, transfer and set over to Irving H. Picard as SIPA Trustee (the "SIPA Trustee") for the liquidation of BLMIS (see §78fff-2(b) of SIPA), and the Securities Investor Protection Corporation ("SIPC"), as subrogee to the extent of its cash advances to the SIPA Trustee for the satisfaction of the aforementioned Customer Claim (see §78fff-3(a)(1) of SIPA), any and all rights, including causes of action or claims, that Assignor now may have against BLMIS and/or any third party arising out of or relating to any fraudulent or illegal activity with respect to Assignor's BLMIS account (Account No. 1K0205, the "BLMIS Account"), which gave rise to the allowed Customer Claim for

095879, 000005, 300068930.1



securities filed by Assignor against BLMIS. Such assignment is only to the extent that Assignor has received satisfaction of the Customer Claim as set forth above.

Further, Assignor has not previously compromised or assigned any claim, cause of action or other right against BLMIS, its principals or agents or any third party arising out of or related to any fraudulent or illegal activity giving rise to the Customer Claim.

Upon reasonable request of the SIPA Trustee or SIPC, Assignor agrees to cooperate with the SIPA Trustee or SIPC in connection with any efforts of either to recover from the principals or agents of BLMIS or anyone else for amounts advanced by SIPC or paid by the SIPA Trustee to satisfy in part Assignor's Customer Claim in this SIPA liquidation proceeding. Such efforts to recover by the SIPA Trustee or SIPC, either to demand or pursue or to prosecute or settle any collection effort, action or proceeding therefore, shall be at the sole cost of the SIPA Trustee or SIPC.

Effective immediately and without further action, contingent only upon Assignor's receipt from the SIPA Trustee or his agent of a check in the amount of $500,000.00 as set forth in the SIPA Trustee's Notice of Determination of the Customer Claim dated January 25, 2010, (the "Trustee's Determination"), and upon receipt by the SIPA Trustee of this executed and notarized Partial Assignment and Release, the Assignor does for itself, and for its executors, administrators, heirs and assigns hereby remise, release and forever discharge the SIPA Trustee and SIPC, as subrogee to the extent of its cash advances for the satisfaction of the Customer Claim, and, as the case may be, their officers, directors, professionals, employees, agents, successors and assigns, of and from any and all claims arising out of or relating to the Assignor's BLMIS Account, the Customer Claim filed with the SIPA Trustee as protected by the provisions of SIPA, and any and all circumstances giving rise to said Customer Claim which the Assignor

095879, 000005, 300068930.1                    2



now has, or hereafter may have, for or by any reason, cause, matter or thing whatsoever from the beginning of the world to the date of the execution of this Partial Assignment and Release, only to the extent that the SIPA Trustee and/or SIPC has paid monies to the Assignor to satisfy Assignor's Customer Claim.

Should a final and unappealable Court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Partial Assignment and Release shall be construed as a waiver of any rights or claims held by Assignor in having its customer claim re-determined in accordance with any such Court order. The payment of the undisputed amount of the Assignor's Customer Claim (up to the limits of SIPA protection) will be without prejudice to the Trustee's and the Assignor's rights, claims, and defenses with respect to the disputed portion(s) of the Assignor's Customer Claim.

Assignor acknowledges the sufficiency of the consideration to be received in accordance with the SIPA Trustee's Determination and under this Partial Assignment and Release.

095879, 000005, 300068930.1                    3

COPY

IN WITNESS WHEREOF, the undersigned has on this day set forth below duly executed this Partial Assignment of Assignor's Customer Claim and Release, intending to be legally bound hereby.

By: _____
     FRANCIS R. SPELLMAN

Sworn and subscribed before me this
_____ day of _____, 2010.


_____
     Notary Public

095879, 000005, 300068930.1                4

## Exhibit B

I- 1

### CUSTOMER CLAIM

Claim Number_____

Date Received_____

### BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008

Irving H. Picard, Esq.
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

Provide your office and home telephone no.

OFFICE: The Kessler Nominee Partnership

c/o Calibre Advisory Services
Reservoir Woods
930 Winter Street, Suite 1500
Waltham, MA 02451
Attn: Wm. Speciale
Telephone: (781) 392-2800

Taxpayer I.D. Number: 20-8018649

1K0205

WILLIAM SPECIALE MST JD
CALIBRE ADVISORY SERVICES I
NC RESERVOIR WOODS
930 WINTER STREET SUITE 1500
WALTHAM, MA 02451

Claimant is identified at above right.
                          See Rider A

(If incorrect, please change)

**NOTE:** BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY THE ACCOMPANYING INSTRUCTION SHEET. A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009. CLAIMS RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

*****************************************************************************

1.  Claim for money balances as of **December 11, 2008** :
    a.   The Broker owes me a Credit (Cr.) Balance of        $ 53,266,638.94*
    b.   I owe the Broker a Debit (Dr.) Balance of           $    0

                                                            *See Rider B

502180406                          1

c.   If you wish to repay the Debit Balance,
     please insert the amount you wish to repay and
     attach a check payable to "Irving H. Picard, Esq.,
     Trustee for Bernard L. Madoff Investment Securities LLC."
     If you wish to make a payment, **it must be enclosed**
     with this claim form.                                    $ _N/A_____

d.   If balance is zero, insert "None."                          _None_____

2.   Claim for securities as of **December 11, 2008:**

**PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.**

|  |  | YES | NO |
|---|---|---|---|
| a. | The Broker owes me securities | X | |
| b. | I owe the Broker securities | | X |
| c. | If yes to either, please list below: | | |

| Date of Transaction (trade date) | Name of Security | The Broker Owes Me (Long) | I Owe the Broker (Short) |
|---|---|---|---|
| | | | |
| | We understood that the broker owes us all securities listed on the enclosed November 30, 2008 Statement. | | |
| | If these Securities exist, delivery to the Partnership would be in lieu of claim #1 above. | | |
| | | | |

*Number of Shares or Face Amount of Bonds*

**Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or**

502180406                              2

24

**information regarding any withdrawals you have ever made or payments received
from the Debtor.**

See Rider C.

Please explain any differences between the securities or cash claimed and the cash
balance and securities positions on your last account statement. If, at any time, you
complained in writing about the handling of your account to any person or entity or
regulatory authority, and the complaint relates to the cash and/or securities that you are
now seeking, please be sure to provide with your claim copies of the complaint and all
related correspondence, as well as copies of any replies that you received.

**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.**

**NOTE:    IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION
ON A SIGNED ATTACHMENT.    IF SUFFICIENT DETAILS ARE NOT
PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR
COMPLETION.**

|  | | YES | NO |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. | | X |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? | | X |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? | | X |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) | | X |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. | | X |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. | | X |

502180406                                        3

9.     Have you or any member of your family
       ever filed a claim under the Securities
       Investor Protection Act of 1970?  if
       so, give name of that broker.                                          X

       Please list the full name and address of anyone assisting you in the
       preparation of this claim form: Stephen M. Honig, Duane Morris LLP, 470
       Atlantic Avery Boston, MA 02210, 857-488-4239

If you cannot compute the amount of your claim, you may file an estimated claim.  In that
case, please indicate your claim is an estimated claim.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM.
CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR
IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY
INFORMATION AND BELIEF.**

                                        The Kessler Nominee Partnership

Date _____      Signature by _____
                                             Francis R. Spellman, Managing Partner
Date _____      Signature_____

(If ownership of the account is shared, all must sign above.  Give each owner's name,
address, phone number, and extent of ownership on a signed separate sheet.  If other
than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity
and authority.  Please supply the trust agreement or other proof of authority.)

**This customer claim form must be completed and mailed promptly,
together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

502180406                          4

<u>Riders to Claim of the Kessler Nominee Partnership</u>

A.    The Kessler Nominee Partnership was established on advice of outside counsel as agent for five separate investors to participate in Madoff investments.  The Partnership Agreement has kept these five investments separate and has separately accounted to each investor.  Each of these five investors is filing a separate claim for its <u>pro rata</u> share of the losses.  This claim on behalf of The Kessler Nominee Partnership is filed in the alternative to these five several claims and only on the condition that such five several claims are denied; it is the position of The Kessler Nominee Partnership that it was agent for the five investors and not the actual account holder.

Annexed is the front sheet of a second claim form bearing the number 1K0205.  We do not believe that the Madoff account is either in the record name or for the benefit of the addressee Kessler Financial Services, but any recovery which may accrue under such name or for the account of Kessler Financial Services shall be deemed included by the within Customer Claim.

B.    The most recent valuation information is contained on the enclosed November 30, 2008 Madoff Statement.  We valued the total account as follows:  we took the long securities position of $54,871,348.18, on the "3" statement, to which we added the long position from the "4" statement and deducted the "short" position from the "4" statement.  To the extent such calculation is inaccurate, this claim should be deemed amended to accurately reflect the actual account value.

Investments were made in cash on behalf of the five investors on the dates and in the amounts set forth below:

| Investor | 1/1/07 | 1/2/08 | 8/8/08 |
|---|---|---|---|
| Kessler Family Trust<br>f/b/o Brian Kessler U/A dtd. 9/15/93<br>120 Casa Bendita<br>Palm Beach, FL 33480<br>Tax I.D. #:  04-6749809 | 4,500,000 | 225,000 | 0 |
| Kessler Family Trust<br>f/b/o David Kessler U/A dtd. 9/15/93<br>120 Casa Bendita<br>Palm Beach, FL 33480<br>Tax I.D. #:  04-6749805 | 5,000,000 | 275,000 | 0 |
| Kessler Family Foundation<br>120 Casa Bendita<br>Palm Beach, FL 33480<br>Tax I.D. #: 04-3213614 | 1,000,000 | 4,000,000 | 3,000,000 |
| Kessler Schwab Donor Advised Fund<br>(Fidelity Gift Fund 11-0303001)<br>Tax I.D. #: 31-1640316 | 3,000,000 | 500,000 | 12,000,000 |

DM2\1707625.1 U0753-00004

| Investor | 1/1/07 | 1/2/08 | 8/8/08 |
|---|---|---|---|
| Howard J. Kessler Revocable Trust<br>U/A dtd. 12/1/05<br>120 Casa Bendita<br>Palm Beach, FL 33480<br>SS #: 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 | 2,100,000 | 3,000,000 | 10,000,000 |

C.    On October 10, 2008, The Kessler Nominee Partnership as agent for the Kessler Family Foundation, asked to withdraw the sum of $5,000,000.  The purpose of the withdrawal was to test the liquidity and performance of Madoff Securities.  The withdrawal was honored by transfer within four days of demand.  Thus reassured, The Kessler Nominee Partnership as agent for the Kessler Family Foundation immediately redeposited the sum of $5,000,000 on October 20, 2008, six days after its receipt of the withdrawal distribution.  Such transactions are described on the Madoff Statement for the month ending October 30, 2008, enclosed.

DM2\1707625.1 U0753-00004

2

**CUSTOMER CLAIM**

Claim Number_____

Date Received_____

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008

Irving H. Picard, Esq.
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

Provide your office and home telephone no.

OFFICE:_____

HOME:_____

Taxpayer I.D. Number (Social Security No.)

_____

1K0205
KESSLER FINANCIAL SERVICES
ATTN: HOWARD KESSLER
855 BOYLSTON STREET
BOSTON, MA 02116

(If incorrect, please change)

NOTE:    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY THE ACCOMPANYING INSTRUCTION SHEET.  A SEPARATE CLAIM FORM SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009.  CLAIMS RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

*********************************************************************

1.    Claim for money balances as of December 11, 2008 :
    a.    The Broker owes me a Credit (Cr.) Balance of        $_____
    b.    I owe the Broker a Debit (Dr.) Balance of            $_____

502180406

## Exhibit C

Original at Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110

### THE KESSLER NOMINEE PARTNERSHIP

AGREEMENT made as of January ___, 2007 among those persons who are signatories hereto.

The parties hereto agree as follows:

1.    <u>Name and Business</u>.   The parties do hereby form a partnership under the name of "The Kessler Nominee Partnership" for the purpose of investment and reinvestment, without any restriction as to the character or duration of the investment of partnership assets.

2.    <u>Term</u>.   The partnership shall begin as of January __, 2007,  and shall continue until terminated as hereinafter provided in paragraph 12.

3.    <u>Location</u>.   The partnership shall maintain its principal office at Kessler Financial Services c/o Frank Spellman, 855 Boylston Street, Boston, Massachusetts 02144.

4.    <u>Management</u>.   Unless otherwise agreed by all the partners, Frank Spellman shall be the managing partner.   The partners may replace the managing partner from time to time by unanimous vote.   The managing partner shall have and may exercise all the powers necessary or convenient to manage the partnership's affairs which might be exercised by the partners including the power to admit new partners, excepting only those powers reserved to the partners in the next sentence.   Except by an affirmative vote by all of the partners and delivered to the managing partner, no action shall be taken which would (i) change or waive any of the terms of this agreement; (ii) cause any partner to receive any compensation of any kind for services rendered to the partnership other than the reimbursement of out-of-pocket expenses of the managing partner incurred in the exercise of his office; (iii) terminate the partnership except in accordance with

PTTDOCS/371178.1

-2-

paragraph 12 hereof; or (iv) waive any of the restrictions on partners enumerated in paragraph 11 hereof. The managing partner hereunder, may certify as to any facts relative to the partnership and such certificate may always be relied upon and shall always be conclusive evidence in favor of any purchaser, lender, broker, transfer agent, bank, financial advisor or any other person dealing in good faith with the partnership in reliance upon the certificate.

5.    Accounting Period. The books of account of the partnership shall be kept on the cash receipts and disbursements basis, and the partnership year shall be the calendar year.

6.    Books and Records. Adequate accounting records shall be kept of all partnership business under the managing partner's direction and these shall be open for inspection by any of the partners or their duly authorized officers or agents at all reasonable time. Accountants acceptable to all the partners shall, within a reasonable period after the close of each calendar year, compile unaudited financial statements reflecting the financial condition of the partnership for such year.

7.    Capital Accounts. Simultaneously with the execution of this agreement each partner has contributed the cash shown opposite the partner's name on Schedule A attached, which amount represents the percentage interest in the total partnership capital shown opposite the partner's name. The capital account of each partner shall consist of its original contribution: (i) increased by additional contributions to capital made by such partner and by such partner's share of partnership profits

PTTDOCS/371176.1

31

-3-

transferred to capital; (ii) decreased by such partner's share of partnership losses and by distributions to such partner in reduction of capital; and (iii) increased or decreased (as the case may be) on each valuation date by such partner's share of any increase or decrease in the net value of partnership assets. Additions and withdrawals may only be made as of the last day of a calendar quarter upon at least 30 days prior written notice to the Managing Partner (unless such notice is waived), except with respect to pro rata distributions of income which can be made in the discretion of the managing partner.

8.    <u>Valuation</u>.    The net value of the partnership assets shall be determined as of the last day of each calendar year. Adjustment to the capital account of each partner shall be made on each valuation date on the basis of such partner's percentage interest as shown in Schedule A. In determining the net value of partnership assets, all listed or commonly traded assets shall be valued per the market at the close of such valuation date and, in the case of commonly traded but unlisted assets, the value shall be the bid price.

9.    <u>Profits and Loss</u>.    Income, gains, losses, deductions and credits of the partnership shall be allocated or charged to each partner as of each valuation date on the basis of such partner's percentage interest in the partnership capital as shown in Schedule A attached hereto as it may be amended from time to time so that allocations will be made in proportion to capital account balances at the time the allocation is to be made.

Notwithstanding the foregoing, in accordance with §704(c) of the Code and the Regulations thereunder, income, gain, loss and deductions with

PTTDOCS/371178.1

-4-

respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated between the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its fair market value on the date of such contribution.

10.   <u>Distribution</u>.   Unless the partners otherwise decide, all net profits and net gains realized during each calendar year shall be distributed to each of the partners on the basis of such partner's percentage interest in the partnership capital as shown in Schedule A as it may be amended.

11.   <u>Restriction of Partners</u>.   Except when waived by all partners in a particular case the following restrictions shall apply to each partner:   No partner shall --

(i)   sell, transfer, assign, mortgage or pledge his interest in the partnership;

(ii)   use the name, credit or property of the partnership for any purpose other than a proper partnership purpose; or

(iii)   engage in any business activity on his personal behalf which may be prejudicial to the best interest of the partnership.

12.   <u>Liquidation</u>.   Any partner may withdraw from the partnership by a written notice to the remaining partners pursuant to paragraph 7 hereof.   The Managing Partner should have the right to terminate the partnership by a written notice to the remaining partners.   Upon such dissolution and termination, the partners shall promptly liquidate the affairs of the partnership by discharging all debts and liabilities of the partnership and by distributing to each of the partners such partner's percentage share of all remaining assets, in cash or in kind or partly in cash and partly in kind.

PTTDOCS/371178.1

-5-

IN WITNESS WHEREOF, the parties have executed this instrument under seal as of the day, month and year first above written.

The Kessler Nominee Partnership

By _Frank Spellman, Managing Partner_
Frank Spellman, Managing Partner

PTTDOCS/371178.1

## Exhibit D

**Description of the Five Customers, Each a Principal of the Nominee**


1.      <u>Kessler Family Trust f/b/o David Kessler ("KFT f/b/o David")</u>:  David Kessler is the son of Howard Kessler, grantor/settlor of the KFT f/b/o David.  The beneficiaries of the KFT f/b/o David are said David Kessler and his heirs (family members).  The trustee has discretion to distribute to issue of the grandparents of Howard Kessler or Michele Kessler (Howard's wife), or to charities.  David has a power of appointment on death; if not exercised, the assets pass to his issue.

2.      <u>Kessler Family Trust f/b/o Brian Kessler ("KFT f/b/o Brian")</u>:  Brian Kessler is the son of Howard Kessler, grantor/settlor of the KFT f/b/o Brian.  The beneficiaries of the KFT f/b/o Brian are said Brian Kessler and his heirs (family members).  The trustee has discretion to distribute to issue of the grandparents of Howard Kessler or Michele Kessler, or to charities.  Brian has a power of appointment on death; if not exercised, the assets pass to his issue.

3.      <u>Howard J. Kessler Revocable Trust u/a dtd 12/01/05 ("HJK Rev Trust")</u>:  The beneficiaries of the HJK Rev Trust are Howard's brother Kenneth Kessler, and sister Susan Kessler Beck (both, as to fixed amounts), with the balance to the benefit of the wife of Howard Kessler, Michelle Kessler.  If Michele does not survive Howard, two-thirds goes to the below-identified Foundation or other charitable entities, and one-third to the Kessler Family Trusts.  If Michele does survive Howard, all assets go to the Marital Trust for the benefit of Michele for her life, and, upon Michele's death, two-thirds goes to said Foundation and one-third to Howard's descendents, or their spouses or widows to the extent so appointed by Michele; failing such appointment, such one-third goes to the Kessler Family Trusts.

4.      <u>Kessler Family Foundation</u>:  The Kessler Family Foundation is a charitable foundation and the beneficiaries are such charitable organizations as may be designated from time to time by the Trustees of such Foundation.

5.      <u>Kessler Donor Advised Fund</u>:  The Kessler Donor Advised Fund is a charitable giving account established through the Fund for Charitable Giving of an independent brokerage and does not benefit either anyone in the Kessler family or any other non-charitable individual or entity.

## Exhibit E



**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

### TRADING AUTHORIZATION LIMITED TO PURCHASES
### AND SALES OF SECURITIES AND OPTIONS

To Whom It May Concern:

The undersigned hereby authorizes Bernard L. Madoff (whose signature appears below) as his agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities in accordance with your terms and conditions for the undersigned's account and risk and in the undersigned's name, or number on your books. The undersigned hereby agrees to indemnify and hold you harmless from, and to pay you promptly on demand any and all losses arising therefrom or debit balance due thereon.

In all such purchases, sales or trades you are authorized to follow the instructions of Bernard L. Madoff in every respect concerning the undersigned's account with you; and he is authorized to act for the undersigned and in the undersigned's behalf in the same manner and  with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades.   All purchases, sales or trades shall be executed strictly in accordance with the established trading authorization directive.

The undersigned hereby ratifies and confirms any and all transactions with you heretofore or hereafter made by the aforesaid agent or for the undersigned's account.

This authorization and indemnity is in addition to (and in no way limits or restricts) any rights which you may have under any other agreement or agreements between the undersigned and your firm.

This authorization and indemnity is also a continuing one and shall remain in full force and effect until revoked by the undersigned by a written notice addressed to you and delivered to your office at 885 Third Avenue New York, NY.  Such revocation shall not affect any liability in any way resulting from transaction initiated prior to such revocation.  This authorization and indemnity shall enure to the benefit of your present firm and any successor firm or firms irrespective of any change or changes at any time in the  personnel thereof for any cause whatsoever, and of the assigns of your present firm or any successor firm.

Dated.  JANUARY  2, 2007

| BOSTON | MASSACHUSETTS |
|--------|---------------|
| (City) | (State) |

Very truly yours,     ✗ _Frank Spellman, Managing Partner_
(Client Signature)   The Kessler Nominee Partnership by
Frank Spellman, Managing Partner

Signature of Authorized Agent:

**Affiliated with:**
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1J 8DT. Tel 020-7493 6222

ACCOUNT. NO.  1K0205

37