SONNENSCHEIN NATH & ROSENTHAL LLP
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
cneville@sonnenschein.com

*Attorneys for MAR Partners c/o Weiser LLP*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br>       Plaintiff,<br><br>       v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>       Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation |

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

MAR Partners c/o Weiser LLP ("MAR Partners"), hereby objects to the Notice of Trustee's Determination of Claim dated February 16, 2010 ("Determination Letter"), attached hereto as Exhibit A, as described herein.

**BACKGROUND**

1.  On or about November 12, 1999, MAR Partners opened an account (Account No. 1-M0154-3 and 1-M0154-4) with Bernard L. Madoff Investment Securities LLC ("Madoff") in the name of MAR Partners (the "MAR Partners Customer Account").[1] MAR Partners is a "customer" of Madoff, as defined by the Securities Investor Protection Act ("SIPA").

---

[1] All personal information relating to the MAR Partners Customer Account has been redacted for security reasons.

2.      From the creation of the MAR Partners Customer Account, MAR Partners received regular communications from Madoff, including monthly statements, trade confirmations, and quarterly portfolio management reports.

3.      The final Madoff statement dated November 30, 2008 (the "Final Madoff Statement") for the MAR Partners Customer Account shows that MAR Partners owned securities with a market value of $1,218,933.79 in the MAR Partners Customer Account. A copy of the Final Madoff Statement is annexed to the MAR Partners Customer Claim (defined below).

4.      On December 11, 2008, an action was commenced against Madoff by the Securities & Exchange Commission in the United States District Court for the Southern District of New York. On December 15, 2008, this liquidation proceeding was commenced pursuant to the SIPA. *See* Order, Securities and Exchange Commission v. Madoff, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Dkt. No. 4]. Irving Picard was appointed Trustee ("Trustee"), charged, *inter alia*, with overseeing the liquidation of Madoff and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. § 78fff-1(a).

5.      On December 23, 2008, the Court issued an Order directing the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines. *See* Order [Dkt. No. 12].

6.      The December 23, 2008 Order further provided that, to the extent the Madoff Trustee disagrees with the amount set forth on a customer claim form, the Madoff Trustee "shall notify such claimant by mail of their determination that the claim is disallowed, in whole or in part, **and the reason therefor** . . . " *See* Order at 6 (emphasis added) [Dkt. No. 12].

2

7. On or about June 25, 2009, MAR Partners timely filed a claim for the MAR Partners Customer Account for securities (the "MAR Partners Customer Claim") based on the November 30, 2008 Final Madoff Statement in the amount of $1,218,933.79. A copy of the MAR Partners Customer Claim with the Final Madoff Statement is attached hereto as Exhibit B.

8. On February 16, 2010, the Trustee sent MAR Partners the Determination Letter rejecting the MAR Partners Customer Claim and stating that MAR Partners is not entitled to a payment because (a) no securities were purchased for the MAR Partners Customer Account and (b) the MAR Partners Customer Account does not have a positive net equity because more funds had been withdrawn than deposited into the account.

## GROUNDS FOR OBJECTION

### I. The Determination Letter Fails To Comply With The Court's Order.

9. The Determination Letter fails to comply with this Court's December 23, 2008 Order, which directs the Trustee to satisfy customer claims in accordance "with the Debtor's books and records." Dec. 23, 2008 Order at 5 [Dkt. No. 12]. The MAR Partners Customer Claim was evidenced by the Final Madoff Statement showing a value of $1,218,933.79 and listing the securities purportedly purchased for the account, which reflects the "Debtor's books and records" and by which the Trustee is bound absent proof that the owner of the MAR Partners Customer Account did not have a "legitimate expectation" that the balance on the Final Madoff Statement, confirmations, credit advices and portfolio management report represented its property.

### II. The Trustee Does Not Set Forth the Legal Basis for Disallowing the Claim in Full.

10. The Trustee failed to set forth a legal basis for the position he has taken for the calculation of the claim. *See* Determination Letter. The Determination Letter:

3

   (a)  does not clearly provide "the reason" for the disallowance, as required by the Court's December 23, 2008 Order, *see* Order [Dkt. No. 12];

   (b)  is insufficient to rebut the prima facie validity of the MAR Partners Customer Claim as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f);

   (c)  violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based, *see, e.g.,* Collier on Bankruptcy ¶ 3007.01(3) (15th ed.) ("an objection to a claim should . . . meet the [pleading] standards of an answer"); *In re Enron Corp.*, No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (Bankr. S.D.N.Y. Jan. 13, 2003) (same); and

   (d)  includes an exhibit, which purportedly calculates the money deposited less subsequent withdrawals without any supporting documentation, that is completely unsubstantiated and incorrect; and to the extent that the Trustee's "reconciliation" differs from the MAR Partners Customer Claim, the Trustee should produce evidence supporting his "reconciliation."

**III. The Trustee Has Failed to Honor Customer Expectation.**

11. The Trustee has failed to fulfill the requirement that he honor the legitimate expectations of a customer.

12. The legislative history of SIPA makes clear that Congress' intent in enacting the legislation was to protect the legitimate expectations of customers. Congressman Robert Eckhardt, (D) Texas, sponsor of amendments to SIPA to increase the amount of advance available to customers and expedite the process, commented on the purpose of the legislation as follows:

4

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations . . .

S. Rep. No. 95-763, at 2 (1978) (*emphasis added*).

> A customer generally expects to receive *what he believes* is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectations . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

13. The Securities Investor Protection Corporation ("SIPC"), charged with administering SIPA, acknowledged that it was bound by the statute and the rules to satisfy the reasonable expectations of customers even when the securities had never been purchased, in the brief it submitted to the Court of Appeals for the Second Circuit as follows:

> Reasonable and legitimate expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits of SIPA) even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase . . . [T]his emphasis on the reasonable and legitimate customer expectations frequently yields much greater customer protection than would be the case if the transaction reality, not the claimants expectations, were controlling, as this court's earlier opinion in this liquidation well illustrates.

5

Brief of the Appellant SIPC at 23-24.

14.  Based on regular statements, confirmation reports and other communications received from Madoff, MAR Partners, at all times reasonably believed and expected that Madoff executed such transactions and that the MAR Partners Customer Account actually held such securities.

15.  The Trustee's position in the Madoff case is completely inconsistent with the purpose and goals of SIPA and the position that SIPC has taken unequivocally with respect to the treatment of customers in accordance with their reasonable expectations reflected in the communications from the broker-dealer.

**IV.   The Trustee's Definition of "Net Equity" is Inconsistent With SIPA and SIPA Rules, Practice and Pronouncement and Case Law Interpreting the Statute and Rules.**

16.  The Trustee failed to set forth a legal basis for the position he has taken that he can reduce the amount of the claim by appreciation in the MAR Partners Customer Account or calculate the claim by counting only investment principal less withdrawals without regard to the securities reflected in the Final Madoff Statement. No legal basis for the method exists. The Trustee's calculation violates SIPA.

17.  15 U.S.C. § 78fff-2(b) provides that a customer's claim shall be allowed in the amount of the customer's "net equity." 15 U.S.C. § 78fff-2(b). The Trustee calculates "net equity" by reducing the principal contributed to the account less any withdrawals or appreciation, without regard to any gains reflected in the Final Madoff Statement and any prior statement delivered by Madoff to the customer.   This is incorrect for the following reasons:

(a)  The Trustee's method of calculating the customer claim is inconsistent with the language of the statute. SIPA defines a customer's net equity claim as the value of the

6

customer's "securities positions" in the customer's account, less any amount the customer owes the debtor, as of the date of the filing of the SIPA liquidation:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . . ; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .[2]

15 U.S.C. § 78lll(11). The Trustee's proposed formulation has no support in the language of the statute or interpreting case law and in fact, adds words and concepts to the statute which do not exist.

(b)     The Trustee's method is inconsistent with the Rules promulgated under SIPA. The Series 500 Rules promulgated under SIPA by SIPC provide for the classification of claims for cash or securities in accordance with the written transaction confirmations sent by the broker-dealer to the customer. 17 C.F.R. § 300.500. Pursuant to the Rule, a customer has a claim for securities if the customer has received written confirmation that the securities have been purchased or sold for the account.

(c)     The Trustee's method is inconsistent with the legislative history of the statute. SIPA's legislative history emphasizes Congress' intention that the statute protect customer expectations by ensuring that customers of retail brokerage firms can rely on their account statements. The Madoff statements and confirmations sent to MAR Partners indicated

---

[2] The "indebtedness" of the customer to the debtor refers to cash or securities owed to the debtor, which is most often in the context of a customer having borrowed from the debtor on margin. *See, e.g.*, H.R. Rep. No. 95-746 at 21 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (noting that, under the 1970 statutory regime, when there were shortages in available securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *In re First St. Sec. Corp.*, 34 B.R. 492, 497 (Bankr. S.D. Fla. 1983) (offsetting against claim amount of indebtedness customer owed to the debtor where unauthorized stock purchase was funded in part by borrowing on margin).

that it owned a list of blue chip securities. It makes no difference whether the securities were ever actually purchased.

(d) The Trustee's formula is an improper and wholly inadequate measure of loss. MAR Partners deposited funds with Madoff with the expectation the amount would grow—the MAR Partners Customer Account statements showed such growth, and the balance on the Final Madoff Statement reflects the benefit of this bargain. In *Visconsi v. Lehman Brothers, Inc.*, No. 06-3304, 244 Fed. Appx. 708, 713-14 (6th Cir. 2007), the Court declined to set aside an arbitration award that appeared to apply an expectancy measure of damages against a successor in a Ponzi scheme case and rejected the money in / money out formula as not reflecting the expectations of the parties. *Id*. The Court explained:

> Lehman's out-of-pocket theory misapprehends the harm suffered by Plaintiffs and the facts of this case. Plaintiffs gave $21 million to Gruttadauria, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope – indeed a reasonable expectation – that it would grow. Thus, the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. Had Gruttadauria invested Plaintiffs' money as requested, their funds would have likely grown immensely, especially considering that Plaintiffs invested primarily throughout the mid-1990s, which, had they hired an honest broker . . . , would have placed their money in the stock market during one of the strongest bull markets in recent memory. In fact, the fictitious statements issued by Lehman, which were designed to track Plaintiffs' funds as if they had been properly invested, indicate that Plaintiffs' accounts would have grown to more than $37.9 million (even accounting for the withdrawal of more than $31.3 million). Plaintiffs thus could have reasonably believed that they were entitled to the full $37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals.

*Id*. This applies precisely to the MAR Partners Customer Claim.

(e) The Trustee's Determination Letter is contrary to SIPC's own policies and practices, as reflected in the sworn testimony of Stephen Harbeck, SIPC's president and

8

CEO, and its actions in similar liquidation proceedings. For example, in the New Times Securities Services, Inc. ("New Times") SIPA liquidation, in the context of discussing claims filing deadlines, Harbeck acknowledged that if broker-dealer customers have been led to believe that "real existing" securities had been purchased for their accounts, then those customers are entitled to the full value of their securities positions as of the filing date, even if that value represents a substantial increase from the purported purchase price of the securities and even if the securities had never been purchased. Harbeck testified as follows:

> Harbeck: [I]f you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> Court: Even if they're not there.
>
> Harbeck: Correct.
>
> Court: In other words, if the money was diverted, converted –
>
> Harbeck: And the securities were never purchased.
>
> Court. Okay.
>
> Harbeck: And if those positions triple, we will gladly give the people their securities positions.

Transcript at 37-39, *In re New Times Sec. Servs., Inc.*, No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000).

Moreover, SIPC faced very similar circumstances in the New Times liquidation and took a very different position than it is taking in the Madoff case in support of the Trustee. There, the New Times Trustee's position on "net equity" was in full accord with SIPA, and thus directly contrary to the Trustee's position in this case. Specifically, with respect to any claims that were based on confirmations and account statements reflecting securities positions in "real" securities that could have been purchased (i.e., securities that actually existed on the public market and whose valuations were objectively and publicly verifiable by the customers), the New Times

9

Trustee allowed all such net equity claims to the full extent of the filing date valuations of those securities, even though none of the securities identified in those records had ever, in fact, been purchased by the broker-dealer.[3]

(f)     The Trustee's determination is inconsistent with the case law. The Second Circuit's discussion of SIPC's claims processing in *New Times,* the only case in this jurisdiction dealing with the issue in the Madoff case, further indicates that, with respect to customers who thought they were invested in listed securities, SIPC properly paid customer claims based on the customers' final account statements, even where the securities had never been purchased:

> Meanwhile, investors who were misled . . . to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds – because Goren never executed the transactions – the information that these claimants received on their account statements mirrored what would have happened had the given transaction been executed. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. Furthermore, the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," . . . could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements.

---

[3] As with Madoff Securities and Bernard Madoff, New Times and its principal, William Goren, defrauded scores of investors by providing them with confirmations and account statements reflecting purported securities investments made on their behalf when, in fact, no such investments had been made and their money had, instead, been misappropriated for other purposes. Two of the investment opportunities Goren purported to offer were: (1) money-market funds that were entirely fictitious (the "Fictitious New Age Funds"); and (2) mutual funds that were entirely real, such as those offered by The Vanguard Group and Putnam Investments (the "Real Securities"). *See In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 71-72 (2d Cir. 2004) ("*New Times I*"). Goren's was "a classic Ponzi scheme," *id.* at 72 n.2, wherein new investors' money was used to pay earlier investors.

Approximately 900 customers filed claims in the New Times liquidation: 726 for whom the "Real Securities" were purportedly purchased; 174 for whom the "Fictitious New Age Funds" were purportedly purchased. Consistent with SIPA and its legislative history, the New Times Trustee appropriately applied SIPA's net equity definition to the "Real Securities" customers' claims – meaning he paid them according to the full value of those securities positions as of the date of the liquidation filing. When challenged by "Fictitious New Age Funds" customers who had objected that they had not received the same treatment, SIPC and the New Times Trustee (with the apparent concurrence of the SEC) vigorously defended their approach in court.

*In re New Times Sec. Servs.*, 371 F.3d 68, 74 (2d Cir. 2004); *see also* Brief of Appellant SIPC at 23-24, *In re New Times Sec. Servs., Inc.*, No. 05-5527 (Dec. 30, 2005):

> [R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

MAR Partners is in the same position as those investors in the *New Times* case who received confirmations and statements reflecting real securities. MAR Partners' statement showed positions in securities just as the statements of investors in *New Times* showed positions in securities that were never purchased.

    (g)  The Trustee's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in their account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

11

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html. This is a statement that Ms. Wang was not disavowed.

(h) The Trustee's methodology also conflicts with other federal laws. For example, Rev. Proc.2009-20, issued by Commissioner Shulman on March 17, 2009, expressly recognizes the income earned by customers, on which they paid taxes annually. Yet the Trustee's position is that the income earned by customers on their investments is not their money. In addition, some customers were required to take distribution from their retirement accounts. Yet the Trustee is deducting from their customer claim the mandatory withdrawals that the customers were required by law to take.

18. In sum, the Trustee has created his own definition of "net equity" that is not based on statutes, prior practice or case law. The procedure is designed not for the benefit of Madoff victims but rather so that the Trustee can avoid paying SIPC insurance to the thousands of Madoff investors who, like MAR Partners, have depended upon their Madoff investments for their current and future living expenses.

19. Because of his refusal to comply with SIPA's mandate that he "promptly" satisfy customer claims based on their last statements, 15 U.S.C. § 78fff- 3(a) and 4(c), the Trustee employs a vast team of forensic accountants to pore through decades of records to determine each customer's net investment before SIPC pays any amount to a customer. Clearly, this is inconsistent with the statutory scheme and the legislative intent. MAR Partners' "securities position" is readily ascertainable from the Final Madoff Statement.

**V.     The Trustee Has No Legal Basis For Reducing The Claim.**

20. The Trustee's action in reducing the amount shown on the MAR Partners Customer Claim by any prior gains or withdrawals reflected on the Final Madoff Statement or prior statements is an attempt to avoid such gains without alleging any grounds for avoidance or

12

proving that such gains are avoidable under the Bankruptcy Code's avoidance provisions. Any such disallowance is improper and unjustified, and the Determination Letter should be stricken on that ground alone. *See* Fed. R. Bankr. P. 7001(1) & 7008.

## VI. The Trustee's Reductions Are Barred By The Statue Of Limitations.

21.     The Trustee's action in reducing the amount shown on the MAR Partners Customer Claim by gains or withdrawals from the account is an attempt to avoid such gains and withdrawals without alleging any grounds for avoidance or proving that such gains are avoidable under the state law avoidance provisions or other theories of law. The avoidance of those gains and withdrawals have been taken well beyond any limitations period for avoidance of a claim under either state or federal law.

## VII. The Trustee's Denial Is Inconsistent With SIPA.

22.     SIPA provides that (a) SIPC shall pay the first $500,000 of each customer claim, and (b) customers have an unsecured claim against customer property for the balance of their claims which is paid pro rata with other customers. *See* 15 U.S.C. § 78fff-3(a) ("In order to provide for prompt payment and satisfaction of net equity claims of customers of debtor, SIPC shall advance to the trustee [up to] $500,000 for each customer, as may be required to pay . . . claims."); 15 U.S.C. § 78fff-2(c)(1)(B) (providing that customers of the debtor "shall share ratably in . . . customer property on the basis and to the extent of their net equities"). As evidenced by the Final Madoff Statement, MAR Partners has a valid claim in the amount of $1,218,933.79. Therefore, MAR Partners is entitled to an advance of $500,000 and a claim against customer property for the remainder.

## VIII. The Trustee Has Not Met Its Burden of Proving the Net Equity Calculation.

23.     The Determination Letter purports to calculate MAR Partners' "net equity" on the basis of withdrawal transactions for which MAR Partners' have incomplete records. It is

13

unreasonable to anticipate that customers would have access to and/or maintain all account records given (a) general limitations on record retention requirements under tax law and other applicable rules governing record retention; (b) the apparent safety and solvency of BMIS; and (c) the fact that historical records such as those in question are usually available from financial institutions, including broker-dealers, upon request. Under these circumstances, the Trustee should be required to prove the alleged withdrawal transactions by furnishing the appropriate records to MAR Partners and, absent such records, such transactions should be deleted from the calculation of MAR Partners' "net equity." Likewise, the Trustee should be required to prove that the deposit transactions are completely listed by furnishing the appropriate records to MAR Partners.

**IX.    MAR Partners Is Entitled To Interest On Its Investments.**

24.    In the event that the Court should determine that customer claims should not be allowed in the amount of the Final Madoff Statement, then in the alternative, MAR Partners is entitled to recover interest or appreciation on its investments based upon the following.

(i)    Under New York law, which is applicable here, funds deposited with the Debtor under these circumstances are entitled to interest. *See, e.g.,* N.Y. C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Accordingly, the MAR Partners Customer Claim should be recalculated by adding interest to all funds deposited.

(ii)    Under New York law, which is applicable here, customers are entitled to any returns Madoff earned on the deposited funds under principles of unjust enrichment. Accordingly, customer claims should be recalculated by adding the amounts earned by Madoff on the customer's deposits. *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v.*

14

*Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

    (iii) MAR Partners is entitled to interest on its investment under federal securities laws. In *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), the Supreme Court analyzed the different measures of recovery of "actual damages" for fraud, primarily including rescission and restitution. The *Randall* Court concluded that Congress intended to deter wrongdoers, and hence, that wide latitude in choosing the measure of damages was warranted. *See id*. at 664 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). The *Randall* Court continued by holding that:

> This deterrent purpose is ill-served by a too rigid insistence on limiting plaintiffs to recovery of their "net economic loss."

*Id.* at 664 (citing *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 940 (2d Cir. 1984)).

    (iv) MAR Partners is entitled to an adjustment to its account from its inception to account for present day dollars.

### RESERVATION OF RIGHTS

  25. MAR Partners reserves the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of MAR Partners' right to object on any additional grounds.

  26. MAR Partners reserves all rights set forth in Rule 9014, including, without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014.

  27. MAR Partners reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

28.     MAR Partners incorporates by reference all reservations of rights set forth in the MAR Partners Customer Claim.

## RELIEF REQUESTED

For the reasons stated herein, the MAR Partners Customer Claim should be allowed in its entirety in the amount of $1,218,933.79, which is the amount stated on the Final Madoff Statement, plus interest from the date of the Determination Letter.

For the reasons stated herein, this Court should direct SIPC to immediately replace $500,000 of the securities in the MAR Partners Customer Account based upon the values reflected on the Final Madoff Statement, and/or advance MAR Partners $500,000 from the SIPC fund.

For the reasons stated herein, the Determination Letter should be stricken.

MAR Partners requests such other relief as may be just and equitable.

Dated: March 4, 2010                         SONNENSCHEIN NATH & ROSENTHAL LLP


                                             By:    /s/ Carole Neville
                                                 Carole Neville
                                                 1221 Avenue of the Americas
                                                 New York, New York 10020
                                                 Telephone:  (212) 768-6700
                                                 Facsimile:  (212) 768-6800

                                             *Attorneys for MAR Partners c/o Weiser LLP*

16

# CERTIFICATE OF SERVICE

I, Carole Neville, hereby certify that on March 4, 2010 I caused a true and correct copy of the foregoing **Objection to Trustee's Determination of Claim** on behalf of MAR Partners c/o Weiser LLP to be filed electronically with the Court and served upon the parties in this action who receive electronic service through CM/ECF, and served by hand upon:

> David J. Sheehan, Esq.
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, NY 10111

Dated: March 4, 2010

      /s/ Carole Neville
      Carole Neville