STONE & MAGNANINI LLP
150 JFK Parkway, 4th floor
Short Hills, New Jersey 07078
Telephone (973) 218-1111
Fax (973) 218-1160

*Attorneys for Ethel S. Wyner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | : SIPA Liquidation |
| v. | : |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : |
| Defendant. | : |

---

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIMS**

INTRODUCTION

1. Ethel S. Wyner ("*Claimant*"), by and through her undersigned counsel, hereby files this Objection to Trustee's Determination of Claim issued on October 19, 2009 by Irving Picard ( the *"Trustee"*), and respectfully represents as follows:

2. This Objection stems from investments made by Claimant with Bernard L. Madoff Investment Securities ("*BLMIS*") under BLMIS Account No. 1ZA048 (the "*Claimant Account*").

3. Without waiving any rights Claimant may have as a result of the Court's possible modification of the Trustee's method of accounting, Claimant objects to the disallowance of her claim based upon the fact that $548,000 was charged to the Claimant Account by the Trustee

which was improperly paid out of the Claimant Account by BLMIS without Claimant's approval, and which was never disbursed to Claimant.

4.     The $548,000 charged to the Claimant Account should have been paid out of a different account which was part of the estate of Claimant's husband, Jay S. Wyner.

5.     As a result, Claimant respectfully submits that she is entitled to claim the $204,534.11 positive cash balance which her account should have properly shown, using the Trustee's method of calculation, if not for the improper payout by BLMIS.

6.     Claimant has produced all Exhibits referenced in this Objection to the Trustee pursuant to the Protective Order issued in this case. The Exhibits are not being filed with the Court at this time.

## BACKGROUND

7.     In respect of the Claimant Account, BLMIS owes Claimant securities having an aggregate value of $10,085,542.43 as of November 30, 2008 (the "**Customer Claim**"). A complete breakdown of this amount is provided in the timely-filed Customer Claim, a copy of which Customer Claim is attached hereto as Exhibit A.

8.     On December 11, 2008, the Securities and Exchange Commission commenced an action against BLMIS in the United States District Court for the Southern District of New York. On December 15, 2008, a liquidation of BLMIS was commenced pursuant to the Securities Investor Protection Act of 1970 ("*SIPA*"), with Irving Piccard designated as the Trustee in charge of the liquidation and processing of claims. *See* Order, *Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) [Dkt. No. 4], 15 U.S.C. § 78fff-1(a).

2

9. On December 23, 2008, this Court issued an Order setting certain claims filing deadlines and directing the Trustee to distribute notice and claim forms to BLMIS customers. *See* Order [Dkt. No. 12]. The December 23, 2008 Order further mandated that the Trustee "shall notify such claimant by mail of their determination that the claim is disallowed, in whole or in part, and the reason therefor . . . ." *See* Order at 6 [Dkt. No. 12].

10. On October 19, 2009, the Trustee sent Claimant a letter containing notice of the Trustee's determination of the Customer Claim (the "***Determination Letter***"), a copy of which Determination Letter is attached hereto as Exhibit B. The Determination Letter stated that the Customer Claim was denied. The Trustee explained this determination, in part, as follows:

> Your claim for securities is DENIED. No securities were ever purchased for your account.
>
> Further, based upon the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $2,081,842.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $1,806,002.11).

*See* Exhibit B at 1.

11. Claimant was married to Jay S. Wyner ("***Jay Wyner***") for more than 40 years. Claimant and Jay Wyner were both professionals separately employed during the term of their marriage, maintained separate bank and investment accounts throughout the marriage, including separate accounts with BLMIS, and rarely commingled their separate funds.

12. Ethel S. Wyner established an account with BLMIS on November 30, 1992, with a deposit of $300,000 into BLMIS Account No. 1ZA048. *See* Account Information Table, Exhibit B.

13. Jay Wyner also established an account with BLMIS on November 30, 1992, with a deposit of $300,000 into BLMIS Account No. 1ZA044 (the "***JW Account***"). *See* Account

Information Table Re: BLMIS Account No. 1ZA044 prepared by the Trustee, a copy of which is attached hereto as Exhibit C (the "*JW Table*").

14. Jay Wyner died on September 20, 2004, at the age of 83, a copy of which death certificate is attached hereto as Exhibit D.

15. The assets of the Estate of Jay Wyner (the "*Estate*") were distributed pursuant to the terms of the Last Will and Testament of Jay Wyner dated June 6, 1994 (the "*Will*"), a copy of which Will is attached hereto as Exhibit E.

16. According to Jay Wyner's IRS Form 706, United States Estate and Gift Tax Return filed with the Internal Revenue Service (the "*Form 706,*" a copy of the Form 706 is attached hereto as Exhibit F), Jay Wyner had a reported Gross Estate of $3,479,265 at the time of his death. (*See* Line 1, Form 706 (Exhibit F).) This amount included, among other things, the value of the JW Account.

17. At the time of Jay Wyner's death, the JW Account had a fair market value of $2,418,439. (*See* Item 2, Schedule B of the Form 706 (Exhibit F).)

18. The non-BLMIS assets included in the Estate totaled approximately $1,060,826, of which approximately $1,000,000 consisted of a joint interest in the marital residence (the "*Marital Residence*"). (*See* Item 1, Schedule E of the Form 706 (Exhibit F).)

19. The Will directed that the assets of the Estate would be used (a) to make non-spousal testamentary gifts of (i) $5,000 to Syracuse University and (ii) $200,000 to be divided equally between Jay Wyner's two daughters (collectively, the "*Testamentary Gifts*") (*see* Articles Fourth and Fifth of the Will (Exhibit E)) and (b) for the payment of all funeral expenses and other estate expenses (the "*Estate Expenses*") and estate taxes ("*Estate Taxes*") (*see* Articles First and Second of the Will (Exhibit E)).

20. The Estate paid $205,000 in Testamentary Gifts (*see* Line 4, Part 2 of the Form 706 (Exhibit F) and Item 1, Schedule O of the Form 706 (Exhibit F)), $13,169 in Estate Expenses (*see* Line 17, Part 5 of the Form 706 (Exhibit F)) and $345,800 in Estate Taxes (*see* Line 8 of the Form 706 (Exhibit F)) for a total of $563,969 in cash disbursements (the "***Cash Disbursements***") from the assets of Jay Wyner's Estate. *See* N.Y. EPTL §§ 3-2.1 and 3-3.1.

21. The assets in the Estate included very limited available cash to pay any required disbursements in so far as most of the assets were relatively non-liquid assets consisting of the decedent's interest in the Marital Residence (valued at $1,000,000), the JW Account (valued at $2,418,439) and certain patent rights (valued at $25,000) (*see* Item 1, Schedule F of the Form 706 (Exhibit F)). These relatively non-liquid assets had a total value of $3,443,439 at the date of Jay Wyner's death. This would mean that at the time of Jay Wyner's death, the Estate had available cash and cash equivalent assets (the "***Cash Assets***") of only approximately $35,826 (Gross Estate of $3,479,265 less non-liquid assets of $3,443,439). This amount was significantly less than the $563,969 that was needed to fund the Cash Disbursements.

22. Because the Cash Assets were insufficient to fund the Cash Disbursements, the Estate presumably would have had to withdraw funds from the JW Account (the only other significant asset of the Estate other than the Marital Residence) to pay such Cash Disbursements. However, the JW Table (*see* Exhibit C, Withdrawals Schedule) clearly shows that no such withdrawals were made during the relevant periods. The only post-date of death transactions occurring in the JW Account were (a) a transfer occurring on March 23, 2005 of the entire account balance of $1,500,000 to a new BLMIS account in the name of a Trust created under Article Seventh of the Will (*see* Table prepared by Trustee for BLMIS Account No. 1ZB526 named Trust Under Will of Jay S. Wyner attached hereto as <u>Exhibit G</u> (the "***Trust Table***")) and

(b) two transfers to the Claimant Account on March 23, 2005 and May 5, 2005 totaling $1,022,377.99 (*See* Exhibit B, Deposits Schedule and Exhibit C, Withdrawals Schedule.)

23. The Trust Table also shows no withdrawals during the relevant periods of time to fund the Cash Disbursements. (*See* Exhibit C, Withdrawals Schedule.) Commencing, in substance, in July 7, 2005, the Trust made regular quarterly distributions of income to Claimant as required by the Trust. (*See* Article Seventh of the Will (Exhibit E).) The Trust required that no other distributions be made during the life of the Claimant.

24. A review of the Claimant Account does, however, show withdrawals of $448,000 on March 29, 2005 and $100,000 on June 8, 2005 (the "***Suspect Withdrawals***") (*See* Exhibit B, Withdrawal Table.) In that the Suspect Withdrawals coincided with the time periods when the Cash Disbursements were to be made pursuant to the Will, the Suspect Withdrawals were presumably made to fund the Cash Disbursements required by the Will.

## OBJECTIONS

25. The Suspect Withdrawals should not have been, and were wrongly, made from the Claimant Account because the Cash Disbursements were not obligations of Claimant but rather were obligations of the Estate.

26. Claimant did not approve the withdrawal of $548,000 from her BLMIS account to pay for the Cash Disbursements, which were direct obligations of the Estate.

27. Upon information and belief, BLMIS improperly commingled the accounts of the Estate and Claimant, without Claimant's authorization, on or after the time of Jay Wyner's death. The accounts should have remained independent, however, as the Claimant Account was not part of the Estate.

6

28. Since the Cash Disbursements were obligations of the Estate, the withdrawals to pay such Cash Disbursements should have come directly from the JW Account and not the Claimant Account.

29. If the Cash Disbursements were properly handled by BLMIS, the withdrawals from the Claimant Account would have been $548,000 less for total withdrawals of $1,533,842 ($2,081,842 less $548,000) and not the $2,081,842 stated by the Trustee in the Determination Letter. (*see* Exhibit B, Withdrawal Table) The Determination Letter also noted total cash deposits into the Claimant Account of $1,806,002.11. This amount should be reduced by $67,626 because if the Suspect Withdrawals were properly accounted for and had reduced the balance of the JW Account there would have been no net cash amounts available to transfer to the Claimants Account under the Trustee's method of calculating account balances. This downward adjustment to the cash deposits made to Claimant as noted in the Determination Letter would reduce such total cash deposits to $1,738,376.11 ($1,806,002.11 less $67,626).

30. If the Cash Disbursements were properly paid for from the JW Account and the adjustments were made to the Claimant Account as explained in the preceding paragraph, the Claimant Account would have shown a positive cash balance of $204,534.11 ($1,738,376 less $1,533,842) when initially reviewed by the Trustee. This would then entitle Claimant to an approved claim in such amount based upon the Trustee's current claim determination methodology and to a SIPC payment in such amount.

## CONCLUSION

31. In conclusion, BLMIS improperly charged $548,000 in expenses to the Claimant Account which were neither approved nor received by Claimant, resulting in a loss of

7

$204,534.11 in positive cash balance to the Claimant Account to which Claimant should have been entitled under the Court mandated claim rewards process.

## RELIEF REQUESTED

32.     For the reasons stated herein, the Trustee's Determination Letter should be stricken.

33.     The Claimant requests that her Customer Claim be approved for an amount equal to $204,534.11 based upon the Trustee's current methodology for determining claim value.

34.     The Claimant requests such other relief as may be just and equitable.

35.     The Claimant reserves the right at any time to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of the Claimants' right to object on any other grounds.

36.     The Claimant reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

37.     To the extent applicable, the Claimant joins in the objections of other claimants in these proceedings that are in the same or a similar position.

Dated: March 3, 2010

                                        STONE & MAGNANINI LLP


                                        By:_____s/_____
                                            David S. Stone
                                            150 JFK Parkway, 4th floor
                                            Short Hills, New Jersey 07078
                                            Telephone (973) 218-1111
                                            Fax (973) 218-1160

                                        *Attorney for Ethel S. Wyner*

8