**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - x
                                                   :
SECURITIES INVESTOR PROTECTION                     :
CORPORATION,                                        :
                                                   :
                   Plaintiff-Appellant,            :   SIPA LIQUIDATION
                                                   :   (Substantively Consolidated)
           v.                                      :   Adv. Pro. No. 08-01789 (BRL)
                                                   :
BERNARD L. MADOFF INVESTMENT                       :
SECURITIES LLC,                                    :
                                                   :
                   Defendant.                      :
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - x
                                                   :
In re:                                             :
                                                   :
BERNARD L. MADOFF,                                 :
                                                   :
                                                   :
                   Debtor.                         :
                                                   :
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - x

RECEIVED
MAR 1 8 2010
U.S. BANKRUPTCY COURT
SO. DIST. OF NEW YORK

## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

Marsy Mittlemann (the "Customer") hereby objects to the Notice of Trustee's

Determination of Claim ("Determination") dated February 19, 2010, attached hereto as

Exhibit A for the Claim designated by Trustee with four Claim Numbers: 003353,

100255, 100358 and 100419, for which Trustee has further stated "all of which are

duplicative of Claim Number 003353) and are combined ("Combined Claim") for

purposes of this determination."

## BACKGROUND

1.     The Customer is a "customer," as defined by the Securities Investor
Protection Act of 1970 ("SIPA"), of Bernard L. Madoff Investment Securities LLC
("BLMIS"). Accounts were opened by the Customer on or about December 18, 2001
under its own Social Security number for Federal and State Tax purposes. BLMIS
account numbers 1-KW350-3-0 and 1-KW350-4-0 were given to the Customer on or
about December 18, 2001. Any reference to the Customer's "Claim" includes the two
above referenced BLMIS account numbers and any Claim number(s) given by the
Trustee.

2.     On February 11, 2009, the Customer filed a customer claim in this
proceeding. See Exhibit B (the "Claim"). The Claim, including its reservation of rights,
is incorporated herein. The Claim seeks recovery of $632,795.27 the value of the
securities reflected in the Customer's final BLMIS account statements, dated November
30, 2008. This sum constitutes the Customer's "net equity" as defined in SIPA. See 15
U.S.C. § 78lll(11). Customer was not given a claim number in any prior correspondence
from Trustee. In this notice, customer Claim is designated by Trustee with four Claim
Numbers: 003353, 100255, 100358 and 100419, for which Trustee has further stated "(all
of which are duplicative of Claim Number 003353) and are combined ("Combined
Claim") for purposes of this determination."

2

3.     On December 23, 2008, this Court issued, on an ex parte basis, an order

directing the Trustee to disseminate notice and claim forms to BLMIS customers and

setting forth claim-filing deadlines, as well as processes by which claims were to be

submitted.  See Order on Application for an Entry of an Order Approving Form and

Manner of Publication and Mailing of Notices, Specifying Procedures for Filing,

Determination, and Adjudication of Claims; and Providing Other Relief, Docket No. 12,

SIPC v. Bernard L. Madoff Inv. Sec. LLC, No. 08-01789 (Bankr. S.D.N.Y. Dec. 23,

2008) (the "Claims Procedures Order").  The Claims Procedures Order authorizes the

Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's

books and records."  Id. at 5.  The Claims Procedures Order sets forth the procedure to be

followed by the Trustee when a customer's claim "disagree[s] with the Debtor's books

and records."  Id. at 6.  The Claims Procedures Order does not address the process by

which other objections are to be made.

4.     On Feb 19, 2010, the Trustee sent the Customer the Determination, which

states that "Your Combined Claim for securities is "DENIED."  Determination at 1, Ex.

A.  The Determination further states that "no securities were ever purchased for your

account" and that "since there were no profits" ... because you have withdrawn more

than was deposited into your account, "you do not have a positive "net equity" in your

account and you are not entitled to an allowed claim in the BLMIS liquidation

proceeding. Therefore your claim is DENIED in its entirety" Id., Ex. A.

5.     The Customer hereby objects to the Determination.

3

## **GROUNDS FOR OBJECTION**

**The Determination Violates SIPA.**

6.      SIPA requires that customer "net equity" claims be allowed and paid

promptly.  <u>See</u> 15 U.S.C. § 78fff-2(b).  "Net equity" is defined as the amount the debtor

owes the customer, less any indebtedness of the customer to the debtor.  <u>Id.</u> § 78lll(11).

The definition of "net equity" binds the Trustee.  <u>See id.</u> § 78ccc(b)(4)(A). As Customer

has no indebtedness to the debtor, Customer's November 30, 2008 statement reflects

Customer's "net equity."

7.      The Determination is contrary to law for at least the following reasons:

        a.      The Determination violates SIPA's definition of "net equity."

        b.      The Determination is inconsistent with SIPA's legislative

history and intent, which requires the Trustee to meet the Customer's

"legitimate expectations."  Neither SIPA nor its legislative history excuses

the Trustee from this duty because no securities were purchased by the

debtor.  <u>See, e.g.</u>, S. Rep. No. 95-763, at 2 (1978); H.R. Rep. No. 95-746,

at 21. The Customer was given regular statements by BLMIS in its name

and under its unique Federal Tax ID number and paid taxes each year on

the earnings reported by BLMIS until 2008 when the fraud was

discovered.

4

   c.  The Determination is foreclosed by SIPC's position and the

Second Circuit's decision in *In re New Times Sec. Servs., Inc.,* 371 F.3d

68 (2d Cir. 2004).

   d.  The Determination is contrary to past SIPC policies and

practices.

**The Determination Violates the Claims Procedures Order.**

   8.  The Determination does not state that the Claim "disagree[s] with the

Debtor's books and records" and therefore is inconsistent with the Claims Procedures

Order. In addition, to the extent that the Trustee argues that the November 30, 2008

Statements are not part of the "books and records," the Trustee is placing upon the

Customer an unrealistic and impossible burden, to wit: the responsibility to verify that

every transaction that BLMIS was to have undertaken was done in accordance with

appropriate laws and regulations to be enforced by the SEC and by SIPC under SIPA.

The very nature of the SIPA act was to make the brokerage industry responsible for the

regulation of SIPC members once securities were to be held in "street name."

**The Determination Fails to Provide Notice**

   9.  The Determination is inadequate to rebut the <u>prima facie</u> validity of the

Claim, and fails to set forth facts and legal theories upon which it is based. <u>See, e.g.,</u> 11

U.S.C. § 502(a); <u>Collier on Bankruptcy</u> ¶ 3007.01(3) (15th ed.) ("[A]n objection to a

claim should . . . meet the [pleading] standards of an answer. It should make clear which

facts are disputed; it should allege facts necessary to affirmative defenses; and it should

describe the theoretical bases of those defenses.")  The Determination sets forth no valid

legal basis for disallowing the Claim in any respect.  Although the Determination states

that (1) "no securities were ever purchased for your account," and (2) includes a chart

setting forth deposits, withdrawals and transfers to other Madoff accounts, neither has

any basis in law for disallowing the Claim nor has Trustee referenced any basis in law for

the Determination.

**There is No Basis for Avoidance**

10.    To the extent the Determination is based upon any alternative valuation or

avoidance theory, there is no basis in law for the Determination. The Trustee states in the

Determination letter that his calculation of net equity is based on subtracting all

withdrawals from all deposits made during the life of the accounts as set forth in Table 1

annexed thereto (the "Account"). His calculations include inter-Madoff transfers from the

Account that pre-date the maximum statute of limitations period, based on a date which is

not six years before the commencement of an adversary proceeding against Customer if

New York State statute is determined to apply.[1]

11.    The Trustee, by attempting to process this Determination without a full

hearing to determine applicability of the statute of limitations set forth in the fraudulent

conveyance laws of the State of New York, if applicable and the Bankruptcy Code,

would be denying the Customer due process.

---

[1] There is some argument that on avoidance claims the New York Statute of Limitations runs
from the date an adversary proceeding is started.

12.    Furthermore, seeking to recover transfers outside the bankruptcy estate without a full and fair hearing denies the Customer due process.

13.    Since the time that the Trustee sent out this *Determination*, the Court ruled on the then-pending motion to determine the legally appropriate method of computing "net equity." The court ruled on his method on March 1, 2010. On March 8, 2010, the court certified that an appeal of the ruling would best serve all parties and referred the matter to the United States Court of Appeals for the Second Circuit. To the extent that other issues raised in this Objection, including but not limited to issues of due process and statute of limitations are not raised, Customer wishes to preserve its rights thereto. Customer further wishes to include by reference and preserve its rights as to arguments set forth by other customers in any of the proceedings which come before the bankruptcy court or any appellate court including the Second Circuit Court of Appeals as noted above.

**All customers past and present should be considered in determining a fair approach to settling the estate and payments under SIPA**

14.    To the extent the Determination is based on the Trustee's definition of "net equity" or "cash in less cash out" method and not based on the balances in the Customer's statement as of November 30, 2008, said Determination and such methodology denies the Customer fair and equitable considerations to his prejudice and detriment for

7

the following reasons: first, the Customer reasonably relied on the account statements as

the "quid pro quo" reasoning behind any withdrawals from the "Account" to a party

outside of BLMIS; second, the Customer reasonably relied on the account statements as

the "quid pro quo" reasoning behind any intra Madoff account transfers from within the

"Account" to another Madoff account; third, the customer was never on notice that SIPC

or FINRA's rules were such that they could override the Customer's good faith reliance

on such statements and that subsequent withdrawals would potentially estop the

Customer from receipt of SIPC coverage or subject the Customer to possible "clawbacks"

of withdrawals;  fourth, that absent such notice to the Customer by SIPC or FINRA that

ipso facto they could reinterpret, create and apply rules retroactively to such accounts

irrespective of the Customer's good faith reliance on such statements is tantamount to a

"taking" of the Customer's property without fair and equitable compensation and fifth, the

Customer reasonably relied on the account statements prior to that of November 30, 2008

in making certain withdrawals for reinvestment and some of those reinvestments, some of

which were deposited into "fund of fund" investment managers who in turn reinvested

such Madoff withdrawals,  back into Madoff through investment by their own managers.


15.    Madoff has testified that the Ponzi scheme existed from the early 1990's

but the Trustee has alleged a period even earlier than that expanding over a period of

almost 30 years. The Trustee has noted that he has so far secured records going back

more than 13 years and expects to go back further. Untold numbers of customers have

opened accounts and closed them prior to December 11, 2002 withdrawing untold sums

8

of money. Recovery of these pre December 11, 2002 transfers or account closings are theoretically precluded by New York State law[2] (statute of limitations), but furthermore would be both impractical of recovery, expensive, time consuming and in some instances cruel. Yet failure by the Trustee to include them in his construction of a fair and equitable distribution process weighs heavily against those investors who remained yet who took necessary distributions in reasonable reliance on their account balances.

16.    The Trustee has stated publicly and in filings with this court that his determination of "net equity" is based upon use of his "cash in" less "cash out" method recently approved by the Bankruptcy Court as noted above. He has further stated that such a method is the only "fair" method under which this court can create an equitable and fair distribution process. The Trustee refers to only a two-tiered process in the Determination. A Claimant is designated as either having a **"positive net equity"** or **"negative net equity,"** and upon information and belief there are no claimants whose accounts terminated prior to December 12, 2002 nor will the Trustee seek avoidance of transfers/distributions to such former customers. Yet by including transfers earlier than December 11, 2002 current customers have a potential liability not extended to former customers even though they may have benefitted from withdrawals **during the very same period of time.** In its Memorandum Decision and Order dated September 10, 2009,

---

[2] As noted in the footnote to paragraph 10 hereof, there is some argument and the Customer contends that on avoidance claims the New York Statute of Limitations runs from the date an adversary proceeding is started. In that case, the date of December 11, 2002 would be moved later as would the application of any applicable limitations. In addition, Customer is and has been a resident of the State of Rhode Island and no determination has been made that Customer is subject to New York State Statute of Limitations.

9

this Court made reference to, the case of *S.E.C. v Byers*, **2009 WL 2185491 (S.D.N.Y.)**
as recent evidence of a District Court (Judge Chin) adopting an approach in a
receivership plan of distribution that addressed all customers as noted below[3].

Judge Chin took special recognition of those investors who chose not to take their
unbeknownst fictitious investment distributions in cash, but chose instead to roll them
over and increase their investment. Even though Judge Chin recognized that such
"rollovers" were clearly false profits under a "Ponzi" scheme as in the BLMIS matter, his
acknowledgment that the Customer had the ability to withdraw those funds led to the
Court **including these "rolled-over distributions,"** as part of the customer statement
balance. The court stated that failing to do so would result in an inequity. This logic can
rightfully be applied to the BLMIS matter. The Statute of Limitations Date can be used as
a guideline of both equity and practicality. Since all funds in this Customer's and other
customers' BMLIS accounts existing prior to six years from the start of an adversary
proceeding against the Customer[4] could have been withdrawn, it is equitable for the
Trustee and Court to treat such fictitious "profits" as "rolled-over" funds or new "cash"
"reinvestment" funds. Federal taxes and state and city taxes (where applicable) were paid
on these funds. The Trustee could then apply his "cash in / cash out" approach with

---

[3] Judge Chin was dealing with a federal equity receivership where a more liberal claims process is allowed versus a SIPA liquidation where the claims process is very clearly defined.

[4] As noted in the footnotes 1 and 2, there is some argument that on avoidance claims the New York Statute of Limitations runs from the date an adversary proceeding is started. In that case, the date of December 11, 2002 wherever referenced in this paragraph would be moved later as would the application of any applicable limitations. In addition, Customer is and has been a resident of the State of Rhode Island and no determination has been made that Customer is subject to New York State Statute of Limitations.

10

greater fairness and equity. Claimant thus challenges the Trustee's methodology on the basis noted.[5]

**The Customer is entitled to prejudgment interest.**

17.    Under New York law, if determined to be applicable here, funds deposited with Madoff are entitled to interest. See, e.g., N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, et seq. Moreover, since Madoff converted the Customer's funds, that fact also entitles the Customer to prejudgment interest. See, e.g., *Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at * 14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as ... conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y. S. 2d 427, 428 (151 Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

**The "net equity" definition of the Trustee causes an inadequate measure of damages to the Customer**

18.    The Sixth Circuit recently ruled on the propriety of using the "net equity" or cash in/cash out method. The Sixth Circuit ruling [*Visconsi v. Lehman Bros.*, **244 Fed.**

---

[5] Due to the fact that the *Byers* case was short-lived relative to this case and did not extend back in time more than 5 years, it bears noting that Judge Chin did not need to address whether or not pre-limitation transfers could be included. Accordingly, while a form of "net equity" was consented to by the Court in *Byers*, this court should not fully and solely rely on such a process in connection herewith as many of the transfers that occurred were prior to the applicable statute of limitations.

11

**App.708, 2007, WL 225887 (C.A. 6, 2007)** (Ex., *infra.*)] involved a securities fraud in

which the perpetrator paid victims with monies obtained from other victims. The Sixth

Circuit rejected the claim that one's harm, and damages, are limited to "the out-of-pocket

theory," or "net equity" theory, which would give the plaintiff "only the $21 million they

originally invested less their subsequent withdrawals." (Ex.,p. 5.) This artificial

imposition of an inadequate measure of harm and damages suffered by the victim of the

fraud is identical to the inadequacy of the "net equity" theory set forth by the Trustee in

the Determination. It was ruled to be "an improper-and wholly inadequate measure of

damages," because the plaintiffs had given the fraudster their money "not to hide under a

rock or lock in a safe, but for the express purpose of investment, with a hope -- indeed a

reasonable expectation -- that it would grow." (*Id.*)

19.    Basing the customers' ability to receive SIPC payments other than on

amounts in the account statements of November 30, 2008 would inequitably distort the

*pro rata* distribution of customer property held by the Trustee by favoring customers who

most recently invested as well as customers who had invested $500,000 or less. While on

the surface it might appear that there would be a substantial and inequitable reduction in

assets available for distribution to customers who have not recovered their principal if the

final account statement method were adopted, in point of fact those customers who

invested most recently have had the benefit of being able to invest their money

elsewhere, while those customers who invested their monies with BMLIS have been

precluded from the ability to receive back their investments with some fair and equitable

return. According to the SEC in their December 11, 2009 Memorandum of Law in this

matter, "the net equity claims of the BLMIS customers are not limited by the "return of

12

principal" analysis applied in cases involving ponzi schemes."[6] The SEC Commission

disagreed "with the Trustee's view that principles applicable in Ponzi scheme cases limit

the claims of BLMIS customers to the actual net cash they invested. The customers'

claims must be determined in accordance with the provisions of SIPA, not by principles

courts apply in resolving claims of Ponzi scheme victims. Morever, the Commission is

concerned that such principles could be interpreted to require calculation of claims in

current dollars as of the dates of investments and withdrawals. This could preclude

calculation of the claim in constant dollars." They further state that "claims for net equity

in a case under SIPA that involves a Ponzi scheme are not limited to a customer's actual

net investment...Brokerage firm customers caught in Ponzi schemes that result in SIPA

liquidations are treated differently than investors in Ponzi schemes that do not involve

SIPC-member brokerage firms. SIPA is a product of Congressional concern that

customers of failed brokerage firms receive the assets that should be in their accounts

when the firm is placed in liquidation. *See* **H.R. Rep. No. 91-1613 at 1-2 (1970).** While

customers in Ponzi schemes may be limited to a return of their initial principal, customers

in SIPA liquidations have claims for the net equity in their accounts. It is this remedy that

fulfills the statute's purpose of assuring that a customer "receive[s] what he believes is in

his account at the time the stockbroker ceases business." **H.R. Rep. No. 95-746 at 21**

---

[6] The following quotes are taken from the "SUPPLEMENTAL MEMORANDUM OF LAW OF THE
SECURITIES AND EXCHANGE COMMISSION SUPPORTING TRUSTEE'S DETERMINATION
THAT NET EQUITY SHOULD NOT BE BASED ON SECURITIES POSITIONS LISTED ON LAST
STATEMENTS, AND SUPPORTING IN PART TRUSTEE'S DETERMINATION THAT NET EQUITY
SHOULD BE BASED UPON AMOUNTS DEPOSITED LESS AMOUNTS WITHDRAWN" page 9-10.

(1977)."[7] Thus all customers should be entitled to receive a return on their initial and

subsequent funds deposited with BLMIS at the current New York State statutory interest

rate of 9%[8].

**Failure to allow all customers to receive SIPC benefits is tantamount to "clawing
back" from Customers without due process.**

20.     Customers relied on the statements on SIPC's website and in their

advertisements that customers intrusting their funds to broker dealers who exhibited and

represented through their written communications and documents the SIPC and FINRA

symbols had their accounts protected to the extent of $500,000.00.  There were no

disclaimers as to the current calculation of "net equity" by the Trustee. There were no

disclaimers as to the possibility that customers who removed proceeds from their broker

dealer would not be entitled to receive protection up to the sum of $500,000.00. There

was no warning to customers that they would or could be subject to avoidance actions by

a Trustee based on their good faith deposits and withdrawals of sums from BLMIS. The

Court has recognized it its March 1, 2010 Memorandum Decision[9] that "the application

---

[7] ibid

[8] Under New York law, if determined to be applicable here, funds deposited with Madoff are
entitled to interest. See, e.g., N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, et seq. Moreover, since
Madoff converted the Customer's funds, that fact also entitles the Customer to prejudgment interest. See,
e.g., *Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at * 14-15 (S.D.N.Y. May 2,
2008)("Causes of action such as ... conversion and unjust enrichment qualify for the recovery of
prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y. S. 2d  427, 428 (151 Dept.
2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

[9] MEMORANDUM DECISION GRANTING TRUSTEE'S MOTION FOR AN ORDER (1) UPHOLDING
TRUSTEE'S DETERMINATION DENYING CUSTOMER CLAIMS FOR AMOUNTS LISTED ON LAST

of the Net Equity definition to the complex and unique facts of Madoff's massive Ponzi scheme is not plainly ascertainable in law[10]" It is therefore all the more reasonable and practical that the reliance of customers on the "replacement cost" insurance by SIPC be honored by the Trustee under considerations of "equity and practicality," that the court endorses. The returns of 10-17% as noted by the court in its decision in point of fact place the account statements in direct relation to the securities markets whose 75 year history up to 2008 had been an average return of approximately 10.5% per annum compounded. The concept of SIPC insurance just as with FDIC insurance is one of replacement cost. The idea that SIPC insures original deposits and no return on investments would be contrary to the concept of all investments. That would be as great a fiction as we have discovered BLMIS to be. What would be zero sum is the refusal of SIPC to honor its $ 500,000.00 representation of replacement cost. Later customers have the benefit of such "replacement cost" as their more contemporaneous investments were made after appreciation to the date of investment.

For these reasons, arguments of "net equity" as set forth by the Trustee without full determination of the representations made to customers would be to deprive them of due process and make them guarantors of SIPC's failure to uphold their mandate. Claimant thus challenges the Trustee's methodology on the basis noted.

21.     In addition, the Customer hereby incorporates by reference, to the extent applicable, the legal arguments made by other customers in this adversary proceeding

CUSTOMER STATEMENT; (2) AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY; AND (3) EXPUNGING OBJECTIONS TO DETERMINATIONS RELATING TO NET EQUITY

[10] ibid page 6

15

who opposed the Trustee's Motions, including but not limited to: Lawrence R. Velvel,

Davis Polk & Wardwell, LLP, Phillips Nizer, LLP; Lax and Neville, LLP; Goodwin

Proctor; Milberg LLP, Shearman and Sterling and Becker and Poliakoff, LLP.

## RELIEF REQUESTED

22.    For the reasons stated herein, the Claim of $ 632,795.27 should be allowed

in its entirety.

23.    For the reasons stated herein, the Court should direct SIPC to issue

immediate payment to the Customer in the amount of $500,000.00, plus interest from the

date of the Determination, and such equitable relief as the Court deems appropriate.

24.    The Customer reserves the right to revise, supplement or amend this

Objection and any failure to object on a particular ground or grounds shall not be

construed as a waiver of the Customer's right to object on any additional grounds.

16

Dated:   Providence, Rhode
         Island
         March 15, 2010

By:

*Marsy Mittlemann*

by Marsy Mittlemann,

107 Prospect Street
Providence, RI  02906

17