DUANE MORRIS LLP
COUNSEL TO KERRY A. UNFLAT, AS ADMINSTRATRIX
OF THE ESTATE OF M. MICHAEL UNFLAT
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1022
Patricia H. Heer, Esq.
         - and -
470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857.488.4200
Stephen M. Honig, Esq.
Kara M. Zaleskas, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-1789 (BRL) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**JOINDER TO ARGUMENTS PRESENTED IN CONNECTION WITH TRUSTEE'S OTHER OBJECTIONS TO CUSTOMERS' CLAIMS AND OBJECTION TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM**

Kerry A. Unflat, as Administratrix of the Estate of M. Michael Unflat (the "Claimant"),

hereby objects to the *Notice of Trustee's Determination of Claim* pursuant to which Irving H. Picard

(the "Trustee"), trustee appointed pursuant to the Securities Investor Protection Act, 15 U.S.C. §

78aaa *et seq*. ("SIPA"), denied in its entirety the claim asserted on account of BLMIS Account No. 1U0016, designated as Claim Number 005099 (the "Claim"). As grounds for his denial of the Claim, the Trustee employs his "Net Equity" approach and makes adjustments to accounts without taking into consideration the facts and circumstances relating to, among other things, the Claimant's reasonable expectations, any legitimate profits or earnings generated prior to the implementation of the Ponzi scheme, and the reasons which triggered the withdrawals. The Claimant submits that these considerations, which the Trustee ignores, warrant this Court's denial of the Determination Letter to the Claimant dated February 19, 2010 (the "Determination Letter")[1] and the allowance of the Claimant in the amount submitted or in such other amount which accurately reflects the Claimant's rights under, among other laws, Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, N.Y. C.P.L.R. § 5001, 5004; N.Y. Gen. Obl. § 5-501, *et seq.*, N.Y. C.P.L.R. § 5205(c), and laws in similar states. Accordingly, Claimant hereby joins the objections and briefs submitted in opposition to the Trustee's determination letters of similarly situated creditors and objects for the reasons stated herein to the Determination Letter.

As grounds for this joinder and objection, the Claimant respectfully states as follows:

**JOINDER TO PLEADINGS OF OTHER SIMILARLY SITUATED CUSTOMERS**

1. As an initial matter, Claimant hereby joins, and fully incorporates by reference as if fully restated herein, the arguments and authority cited in the objections and briefs filed on behalf of similarly situated customers. Without limiting the generality of the foregoing, Claimant held an IRA account with BLMIS and accordingly joins in the numerous objections filed by such other IRA account holders whose claims likewise have been challenged by the Trustee. To the extent that customers raise new arguments in connection with subsequent determinations rendered by the Trustee, Claimant reserves the right to join in such other arguments, as appropriate.

---

[1] A copy of the Determination Letter is attached hereto as **Exhibit A**.

**BACKGROUND**

2. In or about July, 1997,[2] First Trust & Co., FBO M. Michael Unflat, FTC Account Number V 970868 (the "Unflat IRA Account") administered for the benefit of M. Michael Unflat an account (Account No. 1-U0016) with Bernard L. Madoff Investment Securities LLC ("Madoff").[3] Mr. Unflat established the Unflat IRA Account as a self-directed Individual Retirement Account. On information and belief, the Unflat IRA Account was initially funded by a withdrawal of $463,801.29 from another account maintained by Madoff, Account No. 1U000710, that had been established in 1975 (the "Funding Account").

3. In or around August, 2000, Mr. Unflat was ordered, pursuant to a Domestic Relations Order issued by the Supreme Court of the State of New York (the "State Court"), to turn over to his ex-wife, Ms. Patricia F. Slattery, $200,000 plus interest and earnings accruing since May 11, 2000. A true and correct copy of the Domestic Relations Order is attached hereto as **Exhibit B**. This figure was determined based on the State Court's conclusion that"[t]he benefits allocable to [Mr. Unflat] by reason of his participation in the [Unflat IRA Account] are, *to the extent that they have accrued during the parties' marriage*, marital property within the meaning of Domestic Relations Law Section 236(B)(1)(c)." Domestic Relations Order, at 2 (emphasis added). On or around May 15, 2001, the total sum of $229,212.01 was withdrawn from the Unflat IRA Account and deposited in Account No. 1ZR30330. *See* Determination Letter, at 4.

4. On December 11, 2008 (the "Commencement Date"), an action was commenced against Madoff by the Securities & Exchange Commission in the United States District Court for the

---

[2] The exact date of the establishment of the account is unknown to Claimant, and Claimant reserves the right to correct the books and records of the Trustee, which indicate that the account was established in July, 1997, should additional information which disputes that assumption becomes available.

[3] As set forth in the Claim and supporting documentation submitted therewith, as of 2008, the account was being administered by FISERV Investment Support Services ("FISERV"). Claimant reserves all of its rights and remedies against FISERV, and any predecessors, successors, affiliates and assigns, which may be liable to Claimant under state and/or federal law.

3

Southern District of New York. On December 15, 2008, this liquidation proceeding was commenced pursuant to SIPA. *See Order, Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) [Dkt. No. 4]. The Trustee was appointed and charged with, *inter alia*, overseeing the liquidation of Madoff and processing customer claims for money pursuant to SIPA. *Id*.; 15 U.S.C. § 78fff-1(a) (2009).

5. On December 23, 2008, the Court issued an Order (the "<u>Claims Procedure Order</u>") directing the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines. *See* Claims Procedure Order [Dkt. No. 12]. The Claims Procedure Order further provides that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, **and the reason therefor** . . . " *Id.* at 6 (emphasis added).

6. On or about February 25, 2009, Mr. Unflat, by and through his counsel, filed a claim for the Unflat IRA Account in the amount of $1,528,045.28, based on the November 30, 2008 statement from Madoff (the "<u>Final Madoff Statement</u>").

7. On February 19, 2010, the Trustee sent the Claimant the Determination Letter pursuant to which he denied the entire Claim, stating, in relevant part, that (a) no securities were purchased for the Unflat IRA Account and (b) the account does not have a positive net equity because the amount of funds withdrawn from the Unflat IRA Account exceeded deposits.

**GROUNDS FOR OBJECTION**

A. *The Trustee's Determination Letter Does Not Comply With The Claims Procedure Order And Fails To Rebut The Prima Facie Validity Of The Claim.*

8. The Determination Letter fails to comply with the Claims Procedure Order, which directs the Trustee to satisfy customer claims in accordance "with the Debtor's books and records." Claims Procedure Order, at 5. The Claim was evidenced by the Final Madoff Statement showing a

4

final balance of $1,528,045.28 and listing the securities purportedly purchased for the account, which reflects the "Debtor's books and records" and by which the Trustee is bound.

9. Moreover, the Determination Letter: (a) does not clearly provide "the reason" for the disallowance, as required by the Claims Procedure Order; (b) is insufficient to rebut the *prima facie* validity of the Claim as provided in § 502(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended, the "<u>Bankruptcy Code</u>") and Fed. R. Bankr. P. 3001(f), made applicable herein pursuant to 15 U.S.C. § 78fff(b); (c) violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based, *see, e.g.*, 9-3007 COLLIER ON BANKRUPTCY § 3007.01[3] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) ("The body of the objection should identify the claim. It should also, at a minimum, allege those facts necessary to support the objection (ordinarily this must include allegations sufficient to overcome the *prima facie* validity of the filed proof of claim) and provide a description of the theories on which it is based. In short, proofs of claim have been held analogous to complaints initiating civil actions; an objection to a claim should therefore meet the standards of an answer."); and (d) includes an exhibit which purportedly calculates the money deposited less subsequent withdrawals without any supporting documentation. Among other things, because the Trustee seeks to adjust the value of the deposits that originated by withdrawals from other Madoff accounts, such adjustments should be substantiated with information and calculations relating to such other accounts.

B. ***Until A Final, Non-Appealable Order Regarding The Trustee's "Net Equity" Methodology Has Been Entered, Which Currently Is Pending Appeal, Claimant Reserves All Of The Arguments Raised That The Claim Should Be Allowed In The Amount Of The Final Madoff Statement.***

10. As set forth above, Claimant joins in the numerous objections and pleadings filed by similarly situated customers challenging the Trustee's "Net Equity" methodology as if fully restated herein.

5

11.     Further, Claimant submits that if the Trustee's "Net Equity" methodology is applied, the Trustee must not be permitted to ignore actual profits and earnings accruing prior to the inception of Madoff's Ponzi scheme, and the Trustee must credit each account with the earnings attributable to actual investments as if they constitute deposits of "principal." As set forth above, the Funding Account was established almost twenty years prior to the time period that Madoff was believed to have initiated his Ponzi scheme. *See*, *e.g.*, Hearing Tr. at 25:12 – 25:24, *United States v. Madoff*, Case No. 09 CR 213 (DC) (S.D.N.Y. 3/12/2009) (Madoff recalling that his fraudulent activities at BLMIS began in the early 1990s).[4] If Madoff established his Ponzi scheme in 1990, then the Funding Account would have appreciated on account of actual investments for a period of fifteen years. The investment earnings which were achieved and reinvested in the Funding Account prior to the institution of the Ponzi scheme constitute *bona fide* earnings which, for all intents and purposes, should be treated as deposits in determining the "net equity" of the account. *See infra*, ¶¶ 18-19. To determine the total amount of deposits to be credited to any accounts opened prior to the Madoff Ponzi scheme, like the Funding Account, the Trustee should be bound by Madoff's books and records, and should use the balance of the account as of the earliest statement date prior to Madoff's commencement of his Ponzi scheme. Such an interpretation is consistent with the "cash in/cash out" methodology, as Madoff used genuine earnings and profits of pre-scheme customers to fund his Ponzi scheme in the identical manner as he used deposits – to pay other customers.

C.      ***Assuming The Trustee's "Net Equity" Determination Is Upheld, The Trustee Wrongly Attributed A Transfer Made From The Unflat IRA Account As Consisting Of A Transfer Of Principal When, By Court Order, Such Transfer Was Wholly On Account Of Marital Share Of Reported Profits.***

12.     In reaching his determination that "the amount of money you withdrew from your account at BLMIS … is greater than the amount that was deposited with BLMIS for the purchase of

---

[4]     Although neither the Trustee nor any other investigative authority has pinpointed the time period during which Madoff operated his Ponzi scheme, Madoff's use of the AS/400 server to manipulate account statements, which occurred in the early 1990s, corroborates Madoff's statements during his plea hearing.

6

securities," the Trustee ignores the fact that the withdrawal in the amount of $229,212.01 was ordered by the State Court to provide Ms. Slattery, Mr. Unflat's ex-wife, her share of profits which accrued on the Unflat IRA Account during their marriage. *See* Domestic Relations Order, at 2. The entire withdrawal of $229,212.01[5] reflects the State Court's division of profits that had accrued during the marriage, and not a withdrawal of any deposits of "principal," as advocated by the Trustee. Accordingly, to comport with the division of assets ordered by the State Court, the Trustee must treat the entire withdrawal as a division of profits, and thus cannot apply the withdrawal as a reduction to Claimant's net equity.[6]

13. In adopting the "netting rule," many courts presume that payments made from a debtor to a Ponzi scheme customer are first on account of "principal" investment, and, once "principal" has been exhausted, all subsequent payments are on account of "fictitious profits." In this case, such a presumption runs contrary to the facts. The Domestic Relations Order, which compelled Mr. Unflat to withdraw and pay the "benefits allocable to [Mr. Unflat] by reason of his participation

---

[5] From May 11, 2000 to May 15, 2001 – approximately one year – the $200,000 award to Ms. Slatterty ordered by the State Court had earned a return of approximately 14.61%.

[6] The Domestic Relations Order provides that the $200,000 plus earnings accruing on or after May 11, 2000 constitute the "benefits allocable to [Mr. Unflat] by reason of his participation in [Madoff]," and thus were divided based on "the extent that they accrued during the parties marriage." Domestic Relations Order, at 2. To the extent that this Court determines that the State Court intended for Mr. Unflat to transfer some portion of "principal" held in the Unflat IRA Account to Ms. Slattery, Claimant submits that this Court must proportionately allocate the transfer between "principal" and "fictitious profits." Indeed, to credit the account of Ms. Slattery with all, or substantially all, "principal," rather than the proportionate share of "principal" and "fictitious profits" that existed in the Unflat IRA Account at the time of the transfer would engender a windfall for one account holder at the expense of the other account holder.

By way of example, if, at the time the State Court entered the Domestics Relations Order, the balance of the Unflat IRA Account per the then-most recent Madoff statement was $1,000,000, then, based on the Trustee's figures, therefore, only 22.28% of that balance was "principal," and 77.72% of that balance was "fictitious profits." In this example, the transfer of $229,212.01 would be allocated as follows: (i) $29,212.01 would constitute "fictitious profits," as, by the terms of the Domestic Relations Order, amounts over and above $200,000 constitute "earnings" attributable to the $200,000 investment; (ii) $44,560 would constitute "principal," as this figure represents the proportion of "principal" to the outstanding balance of the Unflat IRA Account as of the effective date of the Domestic Relations Order multiplied by the $200,000 transfer; and (iii) $155,440 would constitute "fictitious profits," as this figure represents the proportion of "fictitious profits" to the outstanding balance of the account as of the effective date of the Domestic Relations Order multiplied by the $200,000 transfer. As this example illustrates, the transfer of $229,212.01 would see a reduction of $44,560 in "principal" from the Unflat IRA Account for the purpose of calculating "net equity" in that account, while the balance of the transfer - $184,652.01 – would be used to reduce the "adjusted amount" in the account of Patricia Slattery, to which the transfer had been made.

7

in [Madoff] … to the extent that they accrued during the parties' marriage," itself provides that the funds transferred constitute "profits." Because the payment of $229,212.01 was unequivocally on account of "profits," the Trustee cannot reduce the "net equity" of the Claim by the amount of those payments, as such treatment would serve as an end-run around the statute of limitations regarding fraudulent conveyances.[7]

14.    Accordingly, even applying the Trustee's "net equity" formula to the Claim, the "net equity" of the Claimant should be increased by $229,212.01, the amount improperly deducted from the account which were in payment of so-called "fictitious profits" pursuant to the Domestic Relations Oder. Adding back the Trustee's improper deduction to even the lower "adjusted amount" of the Claim,[8] the Claimant holds a positive claim of $104,146.89 under the Trustee's "net equity" methodology.

15.    Pursuant to SIPA and representations made by the Trustee before this Court, Claimant is entitled to an immediate payment of $104,146.89 in satisfaction of what should be Claimant's undisputed "net equity" claim. Should the Trustee's "net equity" methodology be deemed incorrect, and the Claim, as asserted, is allowed, Claimant shall be entitled to the balance of the advances required by SIPC – in this case, $395,853.11 – plus a distribution on account of his pro-rata share of customer property.

---

[7]    There is no dispute that the transfer was made outside of the statute of limitations for recovery of fraudulent conveyances under the Uniform Fraudulent Conveyance Act, as enacted in New York, made applicable to this proceeding pursuant to § 544 of the Bankruptcy Code.

[8]    As set forth herein, Claimant disputes that the "adjusted amount" constitutes an accurate reflection of the "net equity" balance available in the Funding Account at the time of the transfer. Specifically, Claimant believes that the Trustee has ignored the fact that the Funding Account – which had been established with Madoff at least 20 years beforehand – generated legitimate and legal profits and earnings during the period from its inception through the date that the Ponzi scheme arose (*i.e.*, the early/mid-1990s). Accordingly, for the purpose of establishing the amount of "net equity" in the Funding Account, the Trustee must calculate "principal" based on deposits made plus any earnings generated from those real investments through the early/mid 1990s.

8

*D.*     *The Trustee Wrongly Adjusts Accounts Based On Source Of Funds, And Fails To Account For Actual Gains And/Or Interest.*

  *1.*     *The Trustee's "Adjustments" Prejudice Claimants Who Funded Their Accounts With Gains From Madoff, And Effectively Operate To Avoid And To Recover Transfers Outside Of The Statute Of Limitations.*

16.     According to the Determination Letter, the Unflat IRA Account initially was funded by a withdrawal from the Funding Account. *See* Determination Letter, at 4. According to the Trustee's analysis, the Funding Account only had a "principal" balance of $222,760.20 on the date that the Unflat IRA Account was opened. *See id.* Absent substantiation from the Trustee that the Funding Account held insufficient assets to fund the initial deposit in total, the "adjustment" to the Unflat IRA Account under the "net equity" approach – which reduces the "principal" balance by more than $240,000 – must be disallowed.

17.     Even if the Trustee could substantiate his adjustment to the initial opening balance of the Unflat IRA Account by providing documentation that the Funding Account, applying the "net equity" approach, did not hold sufficient assets to fund the entire $463,801.29, the Trustee should not be allowed essentially to avoid and recover a transfer that was made prior to the commencement of the statute of limitations period (the "<u>State Law Look-Back Period</u>").[9] Specifically, the Trustee seeks to avoid and recover the "fictitious profits" portion of the initial deposit transfer by "adjusting" (*i.e.*, offsetting) the balance available in the Unflat IRA Account. By using this "adjustment" approach, the Trustee insures that disparate and prejudicial treatment is borne by claimants who used the misstated earnings in their accounts to fund their other Madoff accounts rather than taking their profits and placing them in a different investment vehicle altogether.[10] Indeed, claimants who

---

[9]     Claimant expressly reserves the right to assert that the state law "look-back period" of six-years runs from the date that an adversary proceeding is commenced, and not the Commencement Date.

[10]    A simple example illustrates the injustice that results by allowing the Trustee to "adjust" the balance of a new account based on the "net equity" of the funding account:

A claimant opens an account with Madoff with an initial deposit of $100,000 on January 1, 1975. On December 10, 2002, the balance of the account is $2 million, and claimant withdraws $1 million and places it in a

9

withdrew their funds prior to the State Law Look-Back Period are allowed to hold those profits free and clear of any claims of the Trustee, while claimants who, prior to the State Law Look-Back Period, reinvested those profits in another Madoff account, are being stripped of those profits by operation of the Trustee's "adjustment" decision. Such treatment can hardly be characterized as equal or fair where, as here, the transfer to establish the Unflat IRA Account was made after over 15 years of earnings appreciation prior to Madoff's acknowledged commencement of the Ponzi scheme.

    2.    *In Calculating The "Adjusted Amount," The Trustee Must Account For Actual Gains/Interest In The Funding Account.*

18.    Assuming, *arguendo*, that the Trustee can substantiate his calculation of "net equity" in the Funding Account warrants a downward adjustment to the opening deposit of the Unflat IRA Account – which Claimant does not concede, *see supra,* n.8, – both the Funding Account and, by extension, the Unflat IRA Account, should be recalculated: (a) to account for any profits that were generated prior to the early 1990s (*i.e.*, the alleged date of the inception of the Ponzi scheme), in the Funding Account; and (b) to account for interest. As set forth in greater detail below, New York law, and cases interpreting the calculation of "value" in presenting a defense of a fraudulent conveyance

---

new account with Madoff. During the next six years, claimant withdraws a total of $500,000 from the new account. Applying the Trustee's "adjustment" and "net equity" methodologies, the Trustee would disallow the claim of the new account in full, stating that the adjusted balance of the account when it was opened was only $100,000 (ignoring legitimate earnings and profits that were achieved during the nearly 20-year period prior to the inception of Madoff's Ponzi scheme), and alleging that the claimant received alleged fraudulent transfers of $400,000 during the six-year statute of limitations period. In this scenario, the Trustee denies the claimant's claims for each of the original and new account, and the claimant is at risk for $400,000 in clawback liability.

    Compare this outcome to the claimant who withdraws $1 million from the original account on December 10, 2002, and, instead of opening a new account with Madoff, places it in the bank and withdraws that money in the same manner during the State Law Look-Back Period. This claimant would not be liable for any alleged fraudulent transfer liability because no transfers were made from Madoff to claimant during the State Law Look-Back Period.

    Now consider the situation where the claimant again withdraws $1 million on December 10, 2002, puts it in the bank for a some span of time (*i.e.*, a day, a month, a year, etc.), and then decides to open a new account with Madoff with those same funds. Assume again that, during the State Law Look-Back Period, claimant withdraws $500,000. In this case, the Trustee would grant claimant a positive "net equity" claim of $500,000, as the initial deposit – $1 million – would not be subject to adjustment to reflect that it originated from another Madoff account.

    The following three scenarios evidence how three claimants with practically identical fact patterns – save where they deposited the funds upon withdrawal – can be treated so disparately that one claimant may be subject to substantial clawback liability, while another claimant could hold a claim for $500,000 which would be paid, in full, by SIPC.

10

claim, command the Trustee to adjust customers' claims to take into account the interest that they would have earned in connection with a tort claim – for fraud, unjust enrichment, breach of fiduciary duty, or other similar claims – against Madoff.

19.     Only after the Trustee has properly calculated the "net equity" balance in the Funding Account, taking into account actual pre-scheme profits and post-scheme interest, can the "net equity" balance of the Unflat IRA Account be properly determined. Said another way, if pre-scheme earnings is credited as deposits to the Funding Account, and interest is credited to the Funding Account at an annual rate of 9% from the date that the Ponzi scheme began, *see* § 5001 of the New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") (providing for prejudgment interest on damages arising out of "an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property"), then the Funding Account likely would have had a sufficient "principal plus interest" balance, under the "net equity" approach, to satisfy the initial deposit of $463,801.29 in the Unflat IRA Account. The adjustment advocated by the Trustee to the Unflat IRA Account, therefore, would be unwarranted.

>   *3.    In Calculating The "Principal" Amount Of The Unflat IRA Account, The Trustee Must Account For Actual Gains/Interest Earned Or To Which Claimant Is Otherwise Entitled.*

20.     As impliedly endorsed by the Securities and Exchange Commission through its support of the "constant dollar approach," customers are entitled to recover interest on such deposited amounts. Such interest is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law. *See Travelers Cas. & Sur. Co. of Am. v. PG&E,* 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a

bankrupt's estate to state law.")[11] There are at least two independent bases for awarding interest to the Claimant to compensate it for Madoff's improper use and misappropriation of the funds held in the Unflat IRA Account.

21. Pursuant to New York law, funds deposited with Madoff are entitled to interest. N.Y. Gen. Oblig. § 5-501(1). Accordingly, even applying the Trustee's "net equity" methodology to calculating the Claimant's claim, the Claim must be adjusted to include interest.

22. Additionally, pursuant to New York law, the Claimant is entitled to any returns Madoff earned on the deposited funds under principles of unjust enrichment.[12] *See, e.g., Steinberg v. Sherman,* Case No. 1:2007cv01001, 2008 WL 1968297 * 5-6 (S.D.N.Y. May 2, 2008); *Breeden v. Thomas (In re Bennett Funding Group, Inc.)*, Case No. 98-61376, 1999 Bankr. LEXIS 1843, at *25-34 (Bankr. N.D.N.Y. Apr. 29, 1999) (noting that N.Y. C.P.L.R. §§ 5001 and 5004 would have entitled the customer to recover the principal balance of its claim, plus prejudgment interest calculated at rate of 9% dating back to the moment when the debtors were entrusted with customer's money, such that withdrawals in excess of "principal" were not avoidable). "'Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest . . . .'" *Steinberg, supra* at *5 (citation omitted). Furthermore,"'[t]he rate of interest is nine percent per year,

---

[11] New York law governs the Claimant's entitlement to interest in this case. In cases involving torts, New York courts apply an "'interest analysis' to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that 'related to the purpose of the particular law in conflict.'" *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) (citation omitted). When the law in conflict regulates conduct, "the law of the jurisdiction where the tort occurred will generally apply . . . ." *Id.* A tort generally "occurs" in "'the place where the injury was inflicted,' which is generally where the plaintiffs are located." *Id.* However, when the "injury has occurred in locations with only limited connection to the conduct at issue . . . the plaintiffs' location is not a dispositive factor . . . ." *Id.* In such a case, the applicable law will be that of "jurisdiction where the fraud originated and where substantial activities in furtherance of the fraud were committed." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001). Therefore, New York law is applicable to the calculation of the Claimant's Claim.

[12] Although it is not legally relevant, the Trustee cannot prove that Madoff did not earn any "legitimate profit" or interest on the Claimant's investment. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to either Madoff, or the recipients of fraudulent transfers, which the Claimant and all other customers are entitled, once the ultimate recipients of Madoff's thievery are known.

12

unless another rate is agreed to by the parties.'" *Id.* "'Interest shall be computed from the earliest ascertainable date the cause of action existed.'" *Id.* *See also Eighteen Holding Corp. v. Drizin,* 268 A.D. 2d 371, 701 N.Y.S. 2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion); N.Y. C.P.L.R. §§ 5001, 5004.

23.     Accordingly, even under the Trustee's "net equity" approach, adjustments should be made to account for interest that should have accrued from and after July, 1997 through and including December 11, 2008.[13]

### E. *The Trustee Should Not Be Permitted To Effectively Avoid Transfers Which Otherwise Would Be Unavoidable, Pursuant To ERISA Or N.Y. C.P.L.R. § 5205(c), By Applying The "Net Equity" Methodology.*

24.     The Unflat IRA Account is a qualified IRA account subject to, and protected by, ERISA, N.Y. C.P.L.R. § 5205(c), and similar laws and policies favoring IRAs. *See*, *e.g.*, 11 U.S.C. §522(d)(12) (providing exemption to debtors of funds held in qualified IRA accounts). Although the Trustee currently is not seeking to affirmatively recover any withdrawals made from the Unflat IRA Account, the effect of the application of the "net equity" methodology operates to deprive the Claimant of certain rights and benefits arising under ERISA, N.Y. C.P.L.R. §5205(c), and other similar laws. Indeed, the "net equity" methodology effectively avoids any and all appreciation in the Unflat IRA Account, and more shamefully, permits the Trustee to characterize any payments received by the Claimant as a reduction in the funds which Claimant set aside for retirement. In sum, the Trustee's characterization of the Claimant's withdrawals as deductions to "principal" operates as an end-run around the laws which prohibit third-parties from attaching such funds.[14]

---

[13]     Claimant reserves the right to seek interest accruing on or after December 11, 2008.

[14]     Many have argued in this case that a payment to one customer is made at the expense of another customer. However, in this case, that position is not true: if this Court prohibits the Trustee from effectively "avoiding and recovering," by applying the net equity formula, the IRA distributions from the Claimant, the $154,000 in IRA distributions would be payable to the Claimant by SIPC. Such treatment harmonizes the policies endorsed by Congress in affording funds in a qualified IRA special treatment that prohibits a third party from reaching, and divesting the account holder of, those funds.

13

25. Other than two withdrawals (one of which was compelled by court order, as described herein), the Claimant withdrew $12,000 at the beginning of each quarter. All of the withdrawals, with the exception of the withdrawal in the amount of $229,212.01, were payments for the benefit of his health, welfare, and daily living expenses. Like the myriad other customers of Madoff, the Claimant made these withdrawals believing that more than $1.5 million in retirement savings would be available, and sufficient, to pay such expenses during his lifetime. These withdrawals, which aggregate $154,000 – well under the limit reimbursable by SIPC - should not be designated as reductions in the "principal" balance of Claimant's IRA savings, as such treatment would pervert the overriding policy principles protecting the funds held in IRA accounts.

26. One cannot understate the importance of the policy rationale behind ERISA and related tax laws enacted to encourage citizens to save for their own retirement. Certainly, Congress intended to protect the funds held in a qualified IRA from the reach of third parties by affording it special treatment under the Bankruptcy Code, by enacting § 522(d)(12) under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Section 522(d)(12) expressly limits the reach of a trustee in bankruptcy to seize and use funds in a debtor's qualified IRA, subject to a certain cap provided under § 522(n). *See* 11 U.S.C. § 522(d)(12). "Congress intended with [§ 522(d)(12)] and other provisions in the 2005 Act to expand the protection of certain tax-exempt retirement plans that might not otherwise be protected as property excluded from the debtor's estate under section 541(c)(2)." *See* 4 COLLIER ON BANKRUPTCY ¶ 522.09[12] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008). Understandably, these laws were enacted to protect a debtor, and arguably have limited application in a proceeding arising under SIPA. However, the policy rationales behind such laws should not be abandoned simply because a vast Ponzi scheme renders it impractical, but not impossible, to protect the funds held in IRA accounts.

27. Because qualified IRA accounts are subject to other policy considerations, the Trustee should not be permitted to strip the account holders, like the Claimant, of their "reasonable

14

expectations" that these funds would be safe from divestiture by application of a "net equity" calculus. Accordingly, the Trustee should not be permitted effectively to offset SIPC's liability to an IRA account holder that otherwise would arise if the Trustee did not apply his "net equity" formula. In this case, the Trustee should not be permitted to take the $154,000 in withdrawals for which SIPC otherwise would be liable to Claimant to relieve it of its obligations under SIPA.

28. To the extent that the "net equity" methodology, or any subsequent action instituted by the Trustee, seeks to effect a judgment against the beneficiaries of the Unflat IRA Account, in contravention of ERISA and N.Y. C.P.L.R. §5205(c), the Claimant and any and all beneficiaries of the Unflat IRA Account expressly reserve all of their rights, claims and defenses thereunder.

## **RESERVATION OF RIGHTS**

29. The Claimant expressly reserves the right to revise, supplement, or amend this Objection, or to join in any other objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of Claimant's right to object on any additional grounds.

30. The Claimant reserves all rights set forth in Fed. R. Bankr. P. 9014, including, without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014.

31. The Claimant reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

Respectfully submitted this 18th day of March, 2010.

        KERRY A. UNFLAT, AS
ADMINISTRATRIX OF THE ESTATE OF
M. MICHAEL UNFLAT,

By her attorneys,

DUANE MORRIS LLP


_/s/    Patricia H. Heer_
Patricia H. Heer
1540 Broadway
New York, NY 10036-4086
Telephone: 212-471-1803
Facsimile: 212-214-0808

- and -

Stephen M. Honig (BBO#239180)
Kara M. Zaleskas (BBO#651981)
470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857-488-4239
Facsimile: 857-401-3052

16