BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee
for the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and Bernard L. Madoff*

Hearing Date and Time: April 13, 2010 at 10:00 a.m.
Objection Deadline: April 6, 2010 at 5:00 p.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>   Plaintiff-Applicant,<br><br>   v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>   Defendant.<br>In re:<br>BERNARD L. MADOFF,<br><br>   Debtor. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |

**MOTION TO AUTHORIZE TRUSTEE'S ENTRY INTO THIRD AMENDED & RESTATED ASSET PURCHASE AGREEMENT WITH SURGE TRADING INC. F/K/A <u>CASTOR POLLUX SECURITIES, INC.</u>**

Irving H. Picard, (the "Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), by and through his undersigned counsel,

300078995.5

for his motion (the "Motion") seeking entry of an order, pursuant to sections 105 and 363 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), authorizing the Trustee's entry into a Third Amended and Restated Asset Purchase Agreement (the "Amended Agreement")[1] with Surge Trading Inc., formerly known as Castor Pollux Securities, Inc. (the "Purchaser"), and respectfully represents:

**JURISDICTION AND VENUE**

1.    This Court has jurisdiction over the Motion pursuant to Section 78eee(b)(4) of the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[2] and the order (the "Protective Decree") entered on December 15, 2008 [Docket No. 1] by the Honorable Louis L. Stanton, United States District Judge, United States District Court for the Southern District of New York in Case No. 08 CV 10791, and 28 U.S.C. §§ 157 and 1334. Pursuant to the Approval Order (as defined below), the Court retained exclusive jurisdiction to consider matters arising in connection with the Prior Agreement (as defined below). Venue of this case is proper in this district pursuant to Section 78eee(b)(4) of SIPA and 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 78fff(a) of SIPA, sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure.

---

[1] The Amended Agreement is being negotiated and will conform substantially to the terms as set forth in the term sheet (the "Term Sheet"), a copy of which is annexed hereto as Exhibit A. The Amended Agreement will be filed with the Court prior to the hearing on the Motion.

[2] Hereinafter, reference to SIPA shall omit "15 U.S.C."

**BACKGROUND**

2. On December 11, 2008 (the "Filing Date"),[3] the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against defendants Bernard L. Madoff and the Debtor (together, the "Defendants") (Case No. 08 CV 10791). The complaint alleged that the Defendants engaged in fraud through investment advisor activities of the Debtor.

3. On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

4. On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part:

   a) appointed the Trustee for the liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA;

   b) appointed Baker & Hostetler, LLP ("B&H") as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

   c) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

---

[3] Section 78*lll(7)(B)* of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll(7)(B)*. Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this case is on December 11, 2008.

**TRANSACTION HISTORY & SALE PROCESS**

5.      Since his appointment, the Trustee has been working diligently to investigate, identify, examine and evaluate the Debtor's activities, assets, rights, liabilities, customers and other creditors. As a result of his investigation, the Trustee determined that BLMIS's market making operations were potentially productive units of BLMIS. The Trustee concluded that it was in the best interests of BLMIS's estate, customers and creditors and also his duty, pursuant to section 78fff of SIPA, to sell certain assets, properties and rights (the "Acquired Assets") used by BLMIS in connection with the former market making operations (the "Business").

6.      After a reasonable period of marketing under the circumstances and negotiations with other parties, the Trustee selected the Purchaser, to serve as the "stalking horse" bidder in the proposed auction (the "Auction").

7.      At the Auction, the Purchaser submitted the highest and best offer for the Acquired Assets on terms and conditions set forth in the Second Amended and Restated Asset Purchase Agreement dated April 29, 2009 (the "Prior Agreement"), a copy of which is annexed hereto as Exhibit "B," pursuant to which the Trustee sold the Business.

8.      Pursuant to, and as set forth more fully in the Prior Agreement, as consideration for the Acquired Assets, the Purchaser agreed to pay a Purchase Price which included a $1,000,000 Closing Payment and $24,500,000 in Earn-Out Payments (the "Earn Out"), through December 31, 2013.

9.      On April 30, 2009, the Court approved the sale of the Acquired Assets (the "Approval Order") pursuant to the Prior Agreement. On June 17, 2009, the sale closed and following receipt of approval from the Financial Industry Regulatory Authority, Inc. ("FINRA").

The Purchaser thereafter reopened the Business.

## PROPOSED AMENDMENT TO THE AGREEMENT

10. To date, the Purchaser has paid $3,385.73 of the Earn Out to the Trustee.

11. In March 2010, the Purchaser approached the Trustee to request a modification of the Prior Agreement. The Purchaser expressed a need to enter into an out of court reorganization of its business because of accounting issues which are inhibiting its ability to raise the necessary equity to ensure its survival as a going concern. Specifically, the Purchaser's auditor refused to certify the audit of the Purchaser for fiscal year 2009 because of concern that, due to the existence of the Purchaser's obligation under the Earn Out, the Purchaser may not be in compliance with FINRA Rule 4110(b)(1) which incorporates the net capital requirements set forth in SEC Regulation 15c3-1.[4] This concern arose since the Purchaser's obligations under the Earn Out may represent a contingent liability which must be offset against the value of the assets of the Purchaser and therefore might negatively impact the Purchaser's ability to comply with its net capital requirements.

12. The Purchaser informed the Trustee that without such additional capital and relief from the Earn Out at the broker dealer level, its auditors would not certify the audit, and as a result, potential equity investors in the Business would decline to invest the necessary capital which would in turn result in the Purchaser having to cease operations, thereby depriving the

---

[4] This incorporates the Statement of Financial Accounting Standard No. 141 which provides that the net present value of the contingent consideration for any transaction must be recognized as a liability of the purchasing entity. The Purchaser, its regulatory counsel and its auditors, have sought clarification from the SEC as to whether it should have recorded its liability for the Earn Out on its opening balance sheet and, therefore, as a result, whether it likely maintains a lower asset-liability ratio than is permitted by SEC Regulation 15c3-1, but have not received a substantive response to date. To prevent violation of SEC Regulation 15c3-1 and FINRA Rule 4110(b)(1), the Purchaser desires to consummate the Reorganization so that its auditor may certify the audit for fiscal year 2009 and so its potential investors may provide the necessary funds for the continued operation of the Business.

Trustee of the ability to earn any future Earn Out.[5]

13. Under its proposed reorganization, the Purchaser wishes to transfer substantially all of its assets and liabilities to Surge Trading BD Inc., a new wholly-owned subsidiary of Purchaser (the "Subsidiary") whereby the Subsidiary will become the successor broker dealer to the Purchaser and the Purchaser intends to thereafter conduct the Business through the Subsidiary (the "Reorganization"). By bifurcating the operations of the Business from the entity which owes the Earn Out to the Trustee, the Purchaser is able to comply with FINRA Rule 4110(b)(1) and the requirements as set forth in SEC Regulation 15c3-1. The Purchaser intends to cause the Subsidiary to, for accounting purposes, operate the Business as if it were a separate, standalone entity and account to the Trustee with separate financial statements of the Business as a stand-alone entity prepared in accordance with GAAP.

14. The Subsidiary, however, would not be liable to the Trustee for the Earn Out and consequentially, the Trustee could then be exposed to increased risk because the entity where the Business resides would not be the entity that owes the Trustee significant, ongoing obligations under the Earn Out.

15. After considerable negotiation with Purchaser, the Trustee was able to mitigate such risk, protect the Earn Out, increase monies due to the Trustee and preserve the assets of the estate for the benefit of all creditors:

- The definition of Net Trading Revenue on which the Earn Out is calculated will be revised to provide that it shall be determined on a consolidated basis with respect to the

---

[5] It is the Trustee's view that if the Purchaser were to cease operations because of the accounting issues that the Purchaser now faces, the Trustee would be able to reclaim the assets sold to the Purchaser and remarket them to a new purchaser. Whether the Purchaser would cooperate with the Trustee's efforts to reclaim the assets is uncertain. Consequently, and as set forth below, the prospect of potential litigation with the Purchaser in connection with such efforts by the Trustee, in addition to uncertainty as to the potential for the remarketing and sale of such assets when compared to the concessions that the Trustee negotiated with the Purchaser in connection with its reorganization (as detailed below) led the Trustee to conclude that consenting to the reorganization was in the best interests of BLMIS. The Trustee reserves all of his rights as against the Purchaser in the event that the Court does not authorize the Trustee's entry into the Amended Agreement.

Purchaser and the Subsidiary.

- The Purchaser and the Subsidiary will enter into a license agreement in form and substance satisfactory to Trustee (the "License") whereby the Purchaser will license to the Subsidiary the Acquired Assets in exchange for a license fee (the "License Fee") paid by the Subsidiary to the Purchaser equal to 15% of Net Trading Revenue. The License Fee, when paid, will be used by Purchaser to pay the Earn Out.
- The Purchaser will pay the Trustee a quarterly monitoring fee until the conclusion of the Earn-Out Period (as defined in the Prior Agreement) in the amount of Fifty Thousand Dollars ($50,000) in consideration of monitoring and oversight services provided by Trustee in respect of the Reorganization and Purchaser's compliance with the Amended Agreement.
- As collateral security for payment of the Earn Out and the Monitoring Fee, the Trustee will have a security interest in all Net Trading Revenue which shall be deposited daily into an account maintained at JPMorgan Chase (the "Deposit Account") pursuant to a deposit account control agreement in form and substance satisfactory to Trustee (the "Deposit Account Control Agreement").
- The definition of a "Sale of the Purchaser" (as defined in the Prior Agreement) shall be revised to include a sale of all or substantially all of the assets or equity interests of either the Purchaser and/or the Subsidiary, as applicable.
- As a condition to the effectiveness of the Amended Agreement, the Trustee shall have received evidence, in form and substance reasonably satisfactory to the Trustee, that equity contributions in the amount of at least $10,000,000 in the aggregate have been or will be made to the Purchaser or the Subsidiary prior to or substantially simultaneously with consummation of the Reorganization contemplated by the Term Sheet and the Amended Agreement (such funds, the "Effective Date Funds"). Additionally, within ten (10) Business Days following receipt by the Purchaser or the Subsidiary, as applicable, of approval from FINRA of the change of control of the Business, the Purchaser shall cause additional funds of at least $5,000,000 to be contributed to the Purchaser or the Subsidiary (such funds, collectively with the Effective Date Funds, the "Designated Funds").
- Further assurances - If at any time prior to the Earn-Out Termination Date (as defined below), a Default Event (as defined in the Term Sheet) occurs and is not cured within the applicable Cure Period (as defined in the Term Sheet), the Trustee may, at his sole discretion, require that the Purchaser, as promptly as practicable, take those steps reasonably requested by the Trustee to ensure that the Trustee's interests in and/or rights regarding the Earn Out under the terms of the Amended Agreement are protected; provided, that such steps will not be reasonably requested if they require the Purchaser or the Subsidiary to violate Applicable Laws (as defined in the Term Sheet).

16. In addition, the Trustee negotiated several economic enhancements that will compensate the Trustee for any increased risk:

- The Earn-Out Period (as defined in the Prior Agreement) shall be extended by one year through and including the conclusion of the calendar quarter ending December 31, 2014, thereby increasing the likelihood that the full amount of the Earn Out will be paid.

300078995.5                                                    7

- Prior to the Earn-Out Termination Date (as defined below), the Purchaser will pay the Trustee a quarterly monitoring fee (as defined in the Prior Agreement) in the amount of Fifty Thousand Dollars ($50,000) in consideration of monitoring and oversight services provided by Trustee in respect of the Reorganization and Purchaser's compliance with the Amended Agreement.

17. After good faith negotiations, the parties agreed to certain amendments to the Prior Agreement which are set forth in the Term Sheet. The Trustee expects to negotiate definitive agreements (including; without limitation, the Amended Agreement, the License Agreement and the Deposit Control Agreement) implementing the transactions set forth in the Term Sheet prior to the hearing on this Motion and the Trustee will file such agreements with the Court prior to the hearing.

18. The Trustee now seeks this Court's authorization for entry into the transactions described in the Term Sheet, as described in greater detail below:[6]

    a)    <u>License Fee</u>. The Purchaser and the Subsidiary will enter into the License in form and substance satisfactory to the Trustee whereby the Purchaser will license the Acquired Assets to the Subsidiary that are necessary for the Subsidiary to operate its business, in exchange for a License Fee paid by the Subsidiary to the Purchaser equal to 15% of Net Trading Revenue. This License Fee, when paid, will be used by the Purchaser to pay the Earn Out. The Trustee shall be an express third-party beneficiary to the License, and the License will not be terminated, amended or otherwise modified without the Trustee's consent (not to be unreasonably withheld) until the date on which the Purchaser has paid all of the Earn Out due to the Trustee on or prior to such date and there exists under the Amended Agreement no further obligation of the Purchaser to meet its obligations under the Earn Out (the "Earn-Out Termination Date").

    b)    <u>Monitoring Fee</u>. The Purchaser will pay a fee of $50,000 per calendar quarter to the Trustee no later than 10 Business Days after the end of every quarter during the Earn-Out Period (as defined in the Prior Agreement) (each, a "Monitoring Fee"). The obligation to pay the Monitoring Fee shall terminate on the Earn-Out Termination Date provided that if the Monitoring Fee has not yet been paid for the calendar quarter during which the Earn-Out Termination Date occurs, such Monitoring Fee for such calendar quarter shall immediately come due and be paid to the Purchaser.

---

[6] The following summary of the Term Sheet is provided for the convenience of the Court and the parties in interest. To the extent that there are any discrepancies between this summary and the Term Sheet, the terms and language of the Term Sheet shall govern.

300078995.5    8

c) <u>Security for Earn-Out Payments</u>. As collateral security for payment of the Earn Out and the Monitoring Fees, the Trustee shall have a security interest in all Net Trading Revenue which shall be deposited into an account pursuant to the Deposit Account Control Agreement. At all times prior to the Earn-Out Termination Date, with respect to any Business Day, 100% of Net Trading Revenue for such Business Day will be deposited on a daily basis (as set forth below) into the Deposit Account pursuant to the Deposit Account Control Agreement. The Purchaser shall, and shall cause the Subsidiary to, take all actions and execute all documents necessary to perfect Trustee's security interest therein. So long as no Default Event (as defined in the Term Sheet) has occurred, the Subsidiary may withdraw from the Deposit Accounts all funds other than the Retained Amounts (as defined below), which shall only be used in accordance with the terms hereof. "Retained Amounts" on any given Business Day shall be equal to 20% of Net Trading Revenue for the portion of the then-current calendar quarter that has elapsed as of the Business Day prior to such Business Day. The Purchaser shall, and shall cause the Subsidiary to, take all actions and execute all documents necessary to perfect the Trustee's security interest therein.

d) <u>Equity Collateral</u>. If a Default Event (as defined in the Term Sheet) arises due to the failure of the Purchaser or the Subsidiary to pay when due any Earn Out, Monitoring Fee or License Fee, as applicable, has occurred and the applicable Cure Period (as defined in the Term Sheet) has lapsed without payment of the Cure by the Purchaser to the Trustee (as described in the Term Sheet), the Trustee shall have the right to immediately obtain a security interest in all issued and outstanding shares of the Subsidiary. As promptly as practicable following the exercise of such right by the Trustee, the Purchaser shall, and shall cause the Subsidiary to, take all actions and execute all documents necessary to perfect the Trustee's security interest therein, including, without limitation, a pledge agreement in form and substance satisfactory to Trustee (the "Perfection Assistance"). In the event that the Purchaser fails to provide Perfection Assistance and the Trustee has notified the Purchaser in writing of his belief that the Purchaser has so failed, such failure shall be deemed a Default Event and a Block (as defined in the Term Sheet) shall immediately take effect.

e) <u>Bankruptcy Court Approval/Effectiveness</u>. The Amended Agreement shall not become effective until the first date (the "Effective Date") on which the following has occurred: (i) the Bankruptcy Court has approved Trustee's entry into the Amended Agreement, (ii) the other required Reorganization Documents (including, without limitation, the License Agreement and Deposit Account Agreement) have been delivered to Trustee in form and substance satisfactory to the Trustee and the Purchaser, and (iii) the Trustee shall have received evidence, in form and substance reasonably satisfactory to Trustee, that equity contributions in the amount of at least $10,000,000 in the aggregate have been or will be made to the Purchaser or the Subsidiary prior to or substantially simultaneously with consummation of the Reorganization contemplated by the Term Sheet and the Amended Agreement (such funds, the "Effective Date Funds").

f) <u>Representations of the Purchaser</u>. The Amended Agreement shall include customary representations and warranties of the Purchaser on behalf of itself and/or the Subsidiary. Representations will include, without limitation, statements that, as of the Effective Date, (i) both the Purchaser and the Subsidiary have authority to execute documents being executed in connection with the Amended Agreement, (ii) the Reorganization is being effected

300078995.5                                        9

solely for regulatory purposes, (iii) within seven (7) days of the Effective Date, the Subsidiary will become a registered broker-dealer, (iv) the Reorganization is being effected in accordance with applicable law, and (v) the Designated Funds are being, and will be, made available solely for use as working capital of the Purchaser and the Subsidiary in relation to the Business or in connection with the Subsidiary's or the Purchaser's obligations in respect of the Earn Out, Monitoring Fees or License Fees.

        g) <u>Covenants of the Purchaser</u>. The Amended Agreement will include covenants of the Purchaser setting forth that (i) all Net Trading Revenue constituting the Earn Out will (in the form of the License Fee) be promptly distributed to the Purchaser without offset of any kind and paid promptly to the Trustee, (ii) within seven (7) days following the Reorganization, all Acquired Assets will be assigned to the Purchaser from the Subsidiary, (iii) the Acquired Assets shall remain at all times prior to the Earn-Out Termination Date subject to the requirements of the Amended Agreement and the Purchaser will ensure that the Subsidiary does not take any action which would result in a breach of the Purchaser's rights under the Amended Agreement, (iv) the Purchaser shall, or shall cause the Subsidiary, to file the application with FINRA seeking approval of the change of control of the Business as promptly as practicable following the Effective Date, and (v) within ten (10) Business Days following receipt by the Purchaser or the Subsidiary, as applicable, of approval from FINRA of the change of control of the Business, the Purchaser shall cause additional funds of at least $5,000,000 to be contributed to the Purchaser or the Subsidiary (such funds, collectively with the Effective Date Funds, the "Designated Funds").

## BASIS FOR RELIEF REQUESTED

    A. <u>The Prior Agreement permits amendment</u>.

19. Section 14.2 of the Prior Agreement permits amendment of the Prior Agreement only in writing signed by the parties hereto.

    B. <u>The proposed amendment is within the Trustee's sound business judgment and should therefore be approved</u>.

20. The Trustee submits that authority exists to support the approval of the requested modifications of the Amended Agreement. Section 363(b) of the Bankruptcy Code permits a trustee to use, sell or lease assets outside the ordinary course of its business. That section provides in pertinent part, "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate..." 11 U.S.C. § 363(b). While Section 363(b) is devoid of any standards to be applied to a trustee's request to use, sell or lease assets, a wide body of case law has evolved containing the governing judicial standards which

are based upon the exercise of the trustee's sounds business judgment.

21. Approval of amendments to an agreement for the sale of assets outside the ordinary course of business presents the question of whether the Trustee exercised appropriate business judgment in seeking authority to execute the amendments. *See In re Metaldyne Corp.,* 409 B.R. 661, 668 (Bankr. S.D.N.Y. 2009) citing *Global Crossing* 295 B.R. at 729-730 (where Judge Gerber characterizes the amendment issue in *Global Crossing* as a "classic" issue under section 363(b) and bases approval thereof on an exercise of reasonable business judgment).

22. Both the Trustee and the Purchaser negotiated the Amended Agreement in good faith, at arms' length, and with a view towards maximizing the value of the BLMIS estate for the benefit of all customers, creditors and parties in interest.

23. By agreeing to the Reorganization and entering into the Amended Agreement, the Trustee has mitigated risk by ensuring that the Earn Out is protected, thereby enhancing the value of the estate and recovery by all of the Debtor's creditors. (*See* Picard Declaration, Ex. C, p. 2, paragraph 10). Specifically, without consenting to Purchaser's reorganization, the Trustee faced the prospect of Surge immediately ceasing operations thereby jeopardizing the payment of any future Earn Out. *Id. at 8*. The Trustee, in the exercise of his business judgment, believes that the measures taken to mitigate risk as well as the economic enhancements are appropriate and are in the best interests of BLMIS and its estate. *Id. at 11*. While the Trustee believes that he could have reclaimed the Purchaser's assets had the Purchaser ceased operations, the prospect of potential litigation surrounding such efforts as well as general uncertainty concerning the ability to resell such assets all favor the Trustee's decision to enter into the Amended Agreement with the Purchaser. *Id. at 9.*

24. Accordingly, the Trustee respectfully requests that the Court authorize the Trustee

to enter into the Amended Agreement.

      C. <u>The Court should waive or reduce the ten day stay periods required by Rules 6004(h) of the Federal Rules of Bankruptcy Procedure.</u>

25.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale or use of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after the entry of the order. Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

26.    Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14 day stay period, Collier suggested that the 14 day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., 600409 (L. King, 15th rev. ed. 2005). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

27.    Purchaser has informed the Trustee that it urgently needs to complete its reorganization in order to finalize its 2009 audit and close a new round of equity investment. Without this influx of capital, Purchaser may need to cease operations prior to 14 days from the date of the hearing on this Motion. Accordingly, the Trustee hereby requests that the Court waive the 14 day stay period under Bankruptcy Rules 6004(g), or in the alternative, if an objection is filed, reduce the stay period to the minimum amount of time

needed by the objecting party to file its appeal.

## NOTICE

28. Notice of this Motion has been provided by U.S. Mail, postage prepaid, or email to (i) all parties that have filed a notice of appearance in this case, (ii) SIPC; (iii) the SEC; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) those counter-parties to the Term Sheet as identified in Exhibit A attached hereto. The Trustee submits that no other or further notice need be given.

## NO PRIOR REQUEST

29. No previous application for the relief requested herein has been made to this or any other court.

WHEREFORE, the Trustee respectfully requests that this Court enter an order, substantially in the form annexed hereto, granting the Motion and such other relief as may be just and proper.

Dated: New York, New York  
       March 30, 2010

Respectfully submitted,

/s/ Marc Hirschfield  
Baker & Hostetler LLP  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Email:dsheehan@bakerlaw.com  
Marc Hirschfield  
Email:mhirschfield@bakerlaw.com  
Bik Cheema  
Email: bcheema@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*  
*Trustee for the SIPA Liquidation of*  
*Bernard L. Madoff Investment Securities LLC*  
*and Bernard L. Madoff*