Helen Davis Chaitman (4266)
BECKER & POLIAKOFF LLP
45 Broadway
New York, NY 10006
(212) 599-3322
Attorneys for the Winco Real Estate
Services Defined Benefit Pension Plan,
Richard Shapiro, Colleen Shapiro
and Andrea Blaine

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-     Adv. Pro. No. 08-01789 (BRL)

SECURITIES INVESTOR PROTECTION
CORPORATION,

               Plaintiffs                            SIPA Liquidation

vs.                                        **OBJECTION TO TRUSTEE'S**
                                       **DETERMINATION OF**

BERNARD L. MADOFF INVESTMENT          **CLAIM**
SECURITIES LLC,

               Defendant.
\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

      Winco Real Estate Services Defined Benefit Pension Plan (the "Plan"), and its three

beneficiaries, Richard Shapiro, Colleen Shapiro and Andrea Blaine (the "Beneficiaries"), hereby

object to the Notice of Trustee's Determination of Claim dated March 15, 2010 sent by Irving H.

Picard (the "Determination Letter") and state as follows:

**Background facts**

      1.       The Plan was formed pursuant to a written agreement on September 25, 2002.

      2.       On April 27, 2006, the Plan opened an account with Bernard L. Madoff

Investment Securities LLC ("Madoff"): Account No. 1W0129 (the "Account").

      3.       The Plan invested the funds in the Account for the sole benefit of the

Beneficiaries.

4.      The Plan deposited the funds into the Account for the purpose of purchasing securities and the Plan had the power to direct the investments in the Account. The Shapiros, as the Plan's Trustees, had the power to direct the investments in the Account. Each of the Beneficiaries had the power to direct his/her investment.

5.      During the period from April 27, 2006 through December 11, 2008, according to the Trustee, the Plan deposited a total of $1,995,903.01 into the Account for the Beneficiaries' benefit and the Beneficiaries withdrew a total of $305,000 from the Account. See Exh. A at 2. The Plan and the Beneficiaries dispute the Trustee's calculations.

6.      Throughout the period that the Beneficiaries withdrew funds from the Account, they paid taxes annually on the withdrawn funds.

7.      The November 30, 2008 market value of securities in the Account was $2,185,430.38.   Of that amount, $1,936,290.98 (88.6%) represented funds belonging to Richard Shapiro; $218,543.40 represented funds belonging to Colleen Shapiro and $30,596 (1.4%) represented funds belonging to Andrea Blaine.

8.      The Plan, as well as each of the Shapiros, sent timely SIPC claims to Picard, each asserting a claim for securities in the amount of $2,185,430.38 based upon the November 30, 2008 Madoff statement.

9.      In the Determination Letter, Picard allowed the claim of the Plan and the Beneficiaries for only $1,690,755.01, rejecting the claim for securities based upon the November 30, 2008 balance and ignoring the fact that each of the Beneficiaries is a "customer" under the Securities Investor Protection Act ("SIPA"), entitled to $500,000 in SIPC insurance.   See Exh. A at 1-2.

**Grounds for objection**

**A.  Picard has failed to comply with the Court's December 23, 2008 Order**

10.    The Determination Letter fails to comply with the Court order dated December

23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance

with "the Debtor's books and records."  December 23, 2008 Order at 5 (Docket No. 12).  The

November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books

and records" by which Picard is bound, absent proof that the Plan did not have a "legitimate

expectation" that the balance on the Account statements represented its property.  In fact, in each

year that the Beneficiaries withdrew funds from the Account, they paid ordinary income taxes on

the withdrawals from the Account, which were duly accepted by the federal and state taxing

authorities.  They would not have paid those sums if they did not believe that the assets in the

Account belonged to them.

11.    Picard has failed to state a basis in the Determination Letter for the position he

has taken.  Thus, he has not complied with the requirement that an "objection to a claim should .

. . meet the [pleading] standards of an answer.  It should make clear which facts are disputed; it

should allege facts necessary to affirmative defenses; and it should describe the theoretical bases

of those defenses."  Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-

16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

**B.  Picard has violated the requirement that he honor a customer's "legitimate
expectations"**

12.    The legislative history of the Securities Investor Protection Act ("SIPA") makes

clear that Congress' intent was to protect a customer's "legitimate expectations."   For example,

Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be
> remedied by [the 1978 amendments] is the failure to meet legitimate customer

3

> expectations of receiving what was in their account at the time of their broker's insolvency.

*    *    *

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

13.    On December 30, 1970, when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms.   . . . Just as the Federal Deposit Insurance Corporation protects the user of banking services from the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid=2870

14.    SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

15.    Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities.  SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality.  Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation**

4

**and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

16.    Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on  December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each.  So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

17.    As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements.  In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

HARBECK:  . . . if you file within sixty days, you'll get the securities, without question.  Whether – if they triple in value, you'll get the securities . . . Even if they're not there.

COURT:  Even if they're not there.

HARBECK:  Correct.

COURT:   In other words, if the money was diverted, converted –

HARBECK:  And the securities were never purchased.

COURT:  Okay.

HARBECK:  **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

## C.  Without legal authority, Picard has invented his own definition of "net equity"

18.    SIPA defines "net equity" as the value of the securities positions in the customer's

account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

19.    SIPA specifically prohibits SIPC from changing the definition of "net equity."  15

U.S.C. § 78ccc(b)(4)(A).

20.    The Second Circuit has recognized that:

Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

6

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re*

*Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is

calculated as the difference between what the debtor owes the customer and what the

customer owes the debtor on the date the SIPA proceeding is filed.").

21.    In derogation of his obligations to carry out the provisions of SIPA, Picard has

created his own definition of "net equity."  Picard has asserted that he has a right to recognize

investors' claims only for the amount of their net investment, disregarding all appreciation in

their accounts.  By this procedure, Picard would avoid paying SIPC insurance to the thousands of

elderly, long-term Madoff investors who have depended upon their Madoff investments for their

daily living expenses.  He also would be able to reduce all claims to the net investment, thus

enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to

customers.

22.    Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a
> claimant is owed perpetuates the Ponzi Scheme.  It allows the thief . . . Mr.
> Madoff . . . to determine who receives a larger proportion of the assets collected
> by the Trustee.

23.    Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to

save money for the brokerage community at the expense of innocent investors who relied upon

the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

24.    After 15 months of his tenure, Picard has identified only two Madoff investors

who **might not** have had a "legitimate expectation" that the trade confirmations and account

statements they received were accurate.  For example, Picard has sued two Madoff customers,

Stanley Chais and Jeffry Picower who, Picard has alleged, took out of Madoff $7.2 billion more

than they invested.  Picard has further alleged that these two investors received returns in their

accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts.

Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and

certainly could not have had a "legitimate expectation" that their accounts were genuine.

25.    However, the fact that a few out of more than 8,000 Madoff investors may have

been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining,

totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

26.    The Plan, like thousands of other investors, received monthly statements from

Madoff in 2006 – 2008 indicating returns on its Madoff investment in the range of 9.58% to

10.05% per year.  The Plan had entered into a standard brokerage agreement with Madoff, a

licensed SEC-regulated broker-dealer, pursuant to which the Account had specific numbers; the

Plan received on a monthly basis trade confirmations for every securities transaction in the

Account which accurately set forth the names and prices of securities indicating the purchase and

sale of Fortune 100 company stocks and the purchase of US Treasury securities.  There is no

basis to claim that the Plan and the Beneficiaries did not have a "legitimate expectation" that the

assets reflected on the Account statements sent to them by Madoff belonged to them.   Thus, the

Plan is entitled to a claim for securities in the amount of $2,185,430.38, as reflected on the

November 30, 2008 Madoff statement.

**D.  The Plan is entitled to prejudgment interest on their investment and profits.**

27.    Under New York law, which is applicable here, funds deposited with Madoff are

entitled to interest.  *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.*  Moreover,

since Madoff converted the Plan's funds, that fact also entitles it to prejudgment interest.  *See,*

*e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y.

May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the

8

recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428

(1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

28.    Although it is not legally relevant, Picard cannot prove that Madoff earned no

money on the Plan's investment.  To the extent the funds were deposited into a bank, they earned

interest while on deposit.   Madoff disbursed customer funds to favored customers, to family

members, and for other purposes.  Those funds may have yielded substantial profits to which the

Plan and other customers are entitled once the ultimate recipients of Madoff's thievery are

known.

29.    In a Ponzi scheme, out of pocket damages are an improper and inadequate

remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008).   Where a Ponzi scheme

is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket

damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir.

Aug. 8, 2007).  In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes

here, that the plaintiffs were not entitled to any recovery because they already had withdrawn

more than they had invested.  The Sixth Circuit rejected that argument because, as the court

explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe,

but for the express purpose of investment, with a reasonable expectation that it would grow.

Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they

originally invested less their subsequent withdrawals, is a wholly inadequate measure of

damages. *Id.*  Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an

expectancy measure of damages, which seeks to put Plaintiffs in the position they would have

held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v.

Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation

9

approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

**E. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit**

30.    In derogation of his fiduciary duty to the Plan, Picard has applied his net investment calculation to determine the amount of its claim.  However, he has no right to reduce the claim in this manner.  Without any legal authority, Picard is, in effect, imposing upon the Plan a fraudulent conveyance judgment for sums that the Beneficiaries withdrew from the Accounts without establishing the elements of a fraudulent conveyance claim against them.

**H.  Picard has violated SIPA by delaying the payment of SIPC insurance**

31.    Picard has breached his statutory obligation to "promptly" replace a customer's securities.  15 U.S.C. § 78fff-2(b).  Picard is obligated to replace the Beneficiaries' securities up to the amount of $500,000 each as of November 30, 2008.

**I.  Picard has no power to claw back withdrawals from the Plan**

32.    The Plan was established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., whose provisions preempt State fraudulent conveyance law, upon which Picard presumably relies pursuant to 11 U.S.C. § 544.  29 U.S.C. § 1144(a) (the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section [1003(a)]. . . ")

33.    As evidence of Congressional intent to protect ERISA-qualified plans, the Bankruptcy Code was amended in 2005 to protect such plans from the claims of creditors. 11 U.S.C. § 541(b)(7)(a)(i)(I) (exempting from property of the estate "any amount withheld by an employer from the wages of employees for payment as contributions to an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 . . .").  *See*

10

also, *Patterson v. Shumate*, 504 U.S. 753 (1992)(holding that debtor's interest in an ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2)).

34.     Similarly, applicable state law protects the Plan from clawback suits.

**J.  The Beneficiaries are each a "customer" under SIPA and are entitled to $500,000 in SIPC insurance each.**

35.     Each of the Beneficiaries is a "customer" under the plain definition of "customer" in SIPA.  Thus, each is entitled to receive up to $500,000 in SIPC insurance.  15 U.S.C. § 78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.").

36.     Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words:  "A "customer" is an account holder." Instead, Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor").

37.     Moreover, it is clear that Congress intended for "customer" to be broadly interpreted.  In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured

11

liability in such closed broker or dealer." S. 2348, 91st Cong. Section 7(d)(June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (Aug.4, 1969). The final bill dropped this restriction.

38.    Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Beneficiaries because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

39.    The Trustee erroneously relies upon SIPC Rule 105. SIPA does not permit SIPC, by the promulgation of Rules, to change the definition of "customer" under the statute. Hence, Rule 105 is invalid. 15 U.S.C. § 78ccc(b)(4)(A).

**Conclusion**

The Beneficiaries are entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of up to $500,000 each as of November 30, 2008.

The Plan is entitled to have a claim recognized in the amount of $2,185,430.38, consistent with the November 30, 2008 statements.

The Plan is entitled to judgment against Picard and Baker & Hostetler LLP for the damages they have suffered as a result of the breach of fiduciary duty of Picard and his counsel.

April 6, 2010

BECKER & POLIAKOFF LLP

By <u>s/s Helen Davis Chaitman (4266)</u>
45 Broadway
New York, NY 10006
(212) 599-3322
Attorneys for the Winco Real Estate
Services Defined Benefit Pension
Plan, Richard Shapiro, Colleen
Shapiro and Andrea Blaine

12