DUANE MORRIS LLP
COUNSEL TO THE RYAN EYGES TRUST DATED DECEMBER 26, 1996
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1022
William C. Heuer, Esq.
Patricia H. Heer, Esq.

        - and -

470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857.488.4200
Martin B. Shulkin, Esq.
Kara M. Zaleskas, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-1789 (BRL) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**JOINDER TO ARGUMENTS PRESENTED IN CONNECTION WITH TRUSTEE'S**
**OTHER OBJECTIONS TO CUSTOMERS' CLAIMS AND OBJECTION TO NOTICE**
**OF TRUSTEE'S DETERMINATION OF CLAIM**

Marilyn Chernis, in her capacity as the trustee of the Ryan Eyges Trust Dated December

26, 1996, (the "Claimant"), hereby objects to the *Notice of Trustee's Determination of Claim*

pursuant to which Irving H. Picard (the "Trustee"), the trustee appointed pursuant to the

Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq*. ("SIPA"), denied in its entirety the

claim asserted on account of BLMIS Account No. 1-EM369-3-0 (the "Account"), designated as

Claim Number 5889 (the "Claim").

In support of this joinder and objection (the "Objection"), the Claimant respectfully states

as follows:

## PRELIMINARY STATEMENT

The Trustee's determination letter to Claimant dated March 8, 2010 (the "Determination

Letter") [1] is objectionable on a number of grounds. First, through the claims determination

process, the Trustee inequitably discriminates against certain customers, including the Claimant,

whose deposits were funded by transfers from another account maintained with Bernard L.

Madoff Investment Securities LLC ("Madoff"). Specifically, without any support or

explanation, the Trustee makes an "adjustment" to the Account which effectively avoids and

recovers a substantial transfer which otherwise could not be avoided because it occurred more

than six years prior to the date of the statute of limitations for recovering so-called fraudulent

transfers under the laws of the State of New York. As the Trustee otherwise would be powerless

to avoid and recover that transfer were he to institute an adversary proceeding – as he is required

to do pursuant to the Federal Rules of Bankruptcy Procedures – he cannot recover it by

unilaterally reducing the balance of the Account for amounts transferred into the Account prior

to December 10, 2002 from another Madoff account. To hold otherwise would impermissibly

expand the Trustee's avoidance powers beyond the limitations set by title 11 of the United States

---

[1] A copy of the Determination Letter is attached hereto as **Exhibit A**.

Code, 11 U.S.C. §§ 101 *et seq*. (as amended, the "Bankruptcy Code") and applicable state law, and would work an unfair hardship against customers who reinvested their earnings in Madoff.

Secondly, the Trustee's "adjustment" process is inequitable for two additional reasons. In the first instance, the Trustee applies the Net Investment Method in a manner that inappropriately penalizes and discriminates against those customers who maintained account balances with Madoff on or before December 10, 2002 and thereafter continued to invest with Madoff, as compared to customers who withdrew their earnings, or a substantial portion thereof, on or prior to December 10, 2002, and whose withdrawals are free from restriction or avoidance.

As this Court already has concluded that the Trustee's power to determine customer claims should be exercised in concert with his other powers, including his avoidance powers, the proper application of the "Net Investment Method" must take into account that transfers to/from a Madoff account arising prior to December 10, 2002 are not avoidable by the Trustee.  To insure equal treatment to ***all*** customers of Madoff, the Trustee should, with respect to those customers who had accounts in existence with Madoff on or before December 10, 2002, be limited in his application of the Net Investment Method by considering only the following: (a) the statement balance in the Account as of November 30, 2002; less (b) withdrawals made from December 11, 2002 through December 10, 2008 (the "Avoidance Period") plus (c) deposits made during the Avoidance Period.  By treating the statement balance in existence on November 30, 2002 as the beginning amount of "cash in" for purposes of applying the Net Investment Method, this methodology: (i) works in concert with the avoidance provisions of the Bankruptcy Code; (ii) insures that customers holding "older accounts" do not bear an inordinate burden of

alleged fraudulent transfer liability; and (iii) comports with the "equality is equity" maxim on which the Bankruptcy Code is premised.[2]

Moreover, the Trustee, by arbitrarily "adjusting" the amounts in Madoff accounts (including predecessor funding accounts) existing on or before December 10, 2002, an act which exceeds the scope of the Trustee's powers, applies a different standard of review to the preexisting Madoff account-holders than he applies to "new" customers investing after December 10, 2002.  Although not expressly defined in the Trustee's Determination Letter, one surmises that the so-called adjustments made to the pre-December 2002 accounts are based on tracking of "cash in, cash out" for periods commencing with the inception of the investments. Yet, no such "tracking" of the source of funds is applied to any other class of Madoff customers. If hypothetically a "new" Madoff customer cashed out of a similar "ponzi" scheme prior to the State Look Back Period and invested those funds with Madoff, such investor receives full credit of "cash in" for the purposes of the Trustee's application of the Net Investment Method.  In contrast, preexisting Madoff account-holders are held to a totally different standard, as their deposits are being discounted, or even stricken altogether, simply because the deposits originated from another Madoff account.  It is inequitable for the Trustee, on the one hand, to discriminate against these customers solely on the basis that the Trustee has access to records that would otherwise be unavailable for use in an avoidance action, but, on the other hand, to give unfettered credit to a "new" customer without any ability to trace, or otherwise contest, the source of such funds.

Finally, notwithstanding the foregoing, the Trustee's claims determination process fails to properly account for any legitimate profits or earnings generated prior to the implementation of

---

[2]      *See infra*, note 4, for examples of how the timing of deposits and withdrawals in relation to the Avoidance Period cultivates inequitable treatment among customers.

the Ponzi scheme, and interest required to be credited pursuant to, among other provisions N.Y.

C.P.L.R. § 5001, 5004; N.Y. Gen. Oblig. § 5-501, *et seq.*, N.Y. C.P.L.R. § 5205(c). As set forth

in greater detail below, New York law, and cases interpreting the calculation of "value" in

presenting a defense of a fraudulent conveyance claim, command the Trustee to adjust

customers' claims to take into account the interest that they would have earned in connection

with a tort claim – for fraud, unjust enrichment, breach of fiduciary duty, or other similar claims

– against Madoff. The Trustee cannot ignore the mandates of state law to facilitate the claims

determination process.

### JOINDER TO PLEADINGS OF OTHER SIMILARLY SITUATED CUSTOMERS

1.     As an initial matter, Claimant hereby joins, and fully incorporates by reference as

if fully restated herein, the arguments and authority cited in the objections and briefs filed on

behalf of similarly situated customers including, without limitation, the arguments that the

Trustee is bound by the November 30, 2008 statement to determine a customer's claim. To the

extent that customers raise new arguments in connection with subsequent determinations

rendered by the Trustee, Claimant reserves the right to join in such other arguments, as

appropriate.

### BACKGROUND

2.     In or about September, 1997, the Claimant opened the Account with Madoff. On

information and belief, the Account was initially funded by a transfer in the amount of

$1,019,487.28 from Madoff Account No. 1-EM053-3-0 (the "Funding Account"). After these

initial deposits, the Claimant made several additional deposits totaling approximately $680,144

to the Account.

3.      On December 11, 2008 (the "Commencement Date"), an action was commenced against Madoff by the Securities & Exchange Commission in the United States District Court for the Southern District of New York.  On December 15, 2008, this liquidation proceeding was commenced pursuant to SIPA.  *See Order, Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) [Dkt. No. 4].  The Trustee was appointed and charged with, *inter alia*, overseeing the liquidation of Madoff and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. § 78fff-1(a) (2009).

4.      On December 23, 2008, the Court issued an Order (the "Claims Procedure Order") directing the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines. *See* Claims Procedure Order [Dkt. No. 12].  The Claims Procedure Order further provides that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, **and the reason therefor** . . . " *Id.* at 6 (emphasis added).

5.      On or about February 26, 2009, Claimant filed a claim for the Account for all of the securities positions reflected on the November 30, 2008 statement from Madoff (the "Final Madoff Statement").  According to the Final Madoff Statement, the value of those positions was approximately $2,899,174.

6.      On March 1, 2010, this Court rendered a decision relating to the Trustee's so-called "Net Investment Method" for determining customers' claims.  In endorsing the "Net Investment Method" for determining "net equity" under SIPA, this Court held that the "Net Investment Method allows the definition of Net Equity and the Trustee's powers to avoid and recover property, contained in the same statutory framework, to be interpreted with preferred

consonance." *See Memorandum Decision Granting Trustee's Motion for an Order (1) Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Customer Statement; (2) Affirming Trustee's Determination of Net Equity; and (3) Expunging Objections to Determinations Relating to Net Equity*, [Dkt. No. 1999] (the "Net Equity Decision"), at 24.

7.      On March 8, 2010, the Trustee sent the Claimant the Determination Letter pursuant to which he denied the entire Claim, stating, in relevant part, that (a) no securities were purchased for the Account and (b) the Account does not have a positive net equity because the amount of funds withdrawn from the Account exceeded deposits.

## GROUNDS FOR OBJECTION

I.      **The Trustee's Adjustment Of The Claim Is Substantively And Procedurally Improper.**

    A.      *The Trustee's "Adjustments" Prejudice Claimants Who Funded Their Accounts With Gains From Madoff, And Effectively Operate To Avoid And To Recover Transfers Outside Of The Statute Of Limitations Period.*

8.      According to the Determination Letter, the Account initially was funded by a withdrawal from the Funding Account.  *See* Determination Letter, at 4.  According to the Trustee's analysis, the Funding Account had a "principal" balance of only $234,954.  *See id.* The "adjustment" to the Account under the "net investment" approach – **which reduces the "principal" balance by more than $784,533** – must be disallowed, as it essentially seeks to avoid and recover a transfer that was made outside of the statute of limitations period (the "State Law Look-Back Period").[3]  Because the Trustee could not recover the $784,533 in alleged

---

[3]      Claimant expressly reserves the right to assert that the state law "look-back period" of six-years runs from the date that an adversary proceeding is commenced, and not the Commencement Date.  *See, e.g., Floyd v. Option Mortg. Corp. (In re Supplement Spot, LLC)*, 409 B.R. 187, 201-202 and n.6 (Bankr. S.D. Tex. 2009) (noting that "this Court looks back four years from … the date the complaint alleging fraudulent transfers was filed.")

fictitious profits withdrawn from the Funding Account in September, 1997, the Trustee should not be permitted to "recover" that amount through his "adjustment" procedure.

9.      According to this Court's Net Equity Decision, the Trustee's "Net Investment Method" better reflects the Trustee's powers to avoid and recover property. *See Net Equity Decision*, at 24.  However, by making adjustments to Madoff accounts funded by alleged fictitious profits of other Madoff accounts, which the Trustee maintains has occurred with respect to the Account, the Trustee has expanded – indeed, eviscerated – the statute of limitations that restrains his avoidance powers.  Since the Trustee's power to avoid and recover transfers is temporally limited, so too must the Trustee's powers to adjust claims be temporally limited.  Accordingly, any transfers from a "funding" Madoff account to a "receiving" Madoff account occurring prior to the State Look-Back Period must be deemed deposits of "principal" to the "receiving" Madoff account.  To hold otherwise would improperly expand the powers of the Trustee, permitting the Trustee effectively to avoid and recover the "fictitious profits" portion of such transfers by "adjusting" (*i.e.*, offsetting) the balance available in such accounts.

10.      Moreover, by using this "adjustment" approach, the Trustee insures that disparate and prejudicial treatment is borne by claimants who transferred or received funds from other Madoff accounts to fund current Madoff accounts rather than taking their "cash" and placing it in a different investment vehicle altogether prior to the State Law Look-Back Period.[4]  Indeed,

---

[4]      A simple example illustrates the injustice that results by allowing the Trustee to "adjust" the balance of a new account based on the "net equity" of the funding account:

Claimant A opens an account with Madoff with an initial deposit of $100,000 on January 1, 1975.  On December 10, 2002, the balance of the account is $2 million.  On December 10, 2002, Claimant A withdraws the entire amount and places it in a bank account.  One month later, Claimant A establishes a trust for his children and opens a new account with Madoff and deposits $2 million in that account.  During the course of the next six years, the beneficiaries make withdrawals of $100,000 each year.  The Trustee, applying his "adjustment" and "net investment" methodologies, would grant the customer an allowed claim of $1.4 million.

Claimant B opens an account with Madoff with an initial deposit of $100,000 on January 1, 1975.  On December 10, 2002, the balance of the account is $2 million.  On December 10, 2002, Claimant B establishes a trust

claimants who withdrew their funds prior to the State Law Look-Back Period are allowed to hold those profits free and clear of any claims of the Trustee, while claimants who, prior to the State Law Look-Back Period, reinvested those profits in another Madoff account, are being stripped of those profits by operation of the Trustee's "adjustment" decision. Such treatment can hardly be characterized as equal or fair, and certainly, the Trustee should not be permitted to effectively recover alleged "fictitious profits" portions of transfers made prior to the State Law Look-Back Period.

11.     If the Trustee is prohibited from adjusting these deposits, the Claimant will be credited with deposits totaling $1.7 million, which amount is approximately $246,431 greater than the withdrawals made by the Claimant since the opening of the Account. If the Trustee is barred from exercising his avoidance powers through making adjustments to the Account based on the statement balance in effect on November 30, 2002, the Claimant would hold a positive net equity claim, using the Trustee's "Net Investment Method."

> B.     *The Claims Determination Process Is Procedurally Improper And Violates Claimant's Due Process Rights, As It Seeks To Avoid And Recover A Transfer Outside Of An Adversary Proceeding And Otherwise Does Not Comply With The Claims Procedure Order, As It Fails To Rebut The Prima Facie Validity Of The Claim.*

12.     By the claims determination process, the Trustee seeks to avoid and recover transfers which, pursuant to the Federal Rules of Bankruptcy Procedure, can only be accomplished through an adversary proceeding. The Trustee cannot circumvent Claimant's due

---

for his children, and transfers the entire $2 million into another Madoff account. During the course of the next six years, the beneficiaries make withdrawals of $100,000 each year. The Trustee, applying his "adjustment" and "net investment" methodologies, would disallow the claim of this account in full, and would argue that the customer's "net equity" in that account is negative $500,000 ($100,000 "adjusted principal" balance less six $100,000 withdrawals).

The prior two scenarios evidence how two claimants with practically identical fact patterns – save whether they made a direct transfer from one Madoff account to another – can be treated so disparately that one claimant's claim is totally rejected, while another claimant could hold a claim for $1.4 million.

process rights and defenses, including its defense based on the statute of limitations, simply by "adjusting" the claim and reducing it by unsubstantiated amounts.  For this reason alone the Determination Letter must be denied.

13.    Additionally, the Determination Letter: (a) does not clearly provide "the reason" for the disallowance, as required by the Claims Procedure Order; (b) is insufficient to rebut the *prima facie* validity of the Claim as provided in § 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f), made applicable herein pursuant to 15 U.S.C. § 78fff(b); (c) violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based, *see, e.g.*, 9-3007 COLLIER ON BANKRUPTCY § 3007.01[3] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) ("The body of the objection should identify the claim.  It should also, at a minimum, allege those facts necessary to support the objection (ordinarily this must include allegations sufficient to overcome the *prima facie* validity of the filed proof of claim) and provide a description of the theories on which it is based.  In short, proofs of claim have been held analogous to complaints initiating civil actions; an objection to a claim should therefore meet the standards of an answer."); and (d) includes an exhibit which purportedly calculates the money deposited less subsequent withdrawals without any supporting documentation.  These deficiencies similarly warrant this Court's denial of the Determination Letter.

## II.    The Application Of The Net Investment Approach Should Be Limited To The State Look-Back Period, And The Claim Should Be Determined By Subtracting The Aggregate Withdrawals From The Statement Balance As Of Six Years Prior To The Commencement Date.

14.    The application of the "Net Investment Method" unfairly penalizes and discriminates between those customers who maintained accounts with Madoff on or before December 10, 2002 and continued to maintain such investments and customers who withdrew

all, or substantially all, of their earnings and principal on or prior to December 10, 2002. To insure equal treatment to all customers of Madoff, the Trustee should be limited in his application of the Net Investment Method by considering only the following: (a) the statement balance in the Account as of November 30, 2002;[5] less (b) withdrawals made during the Avoidance Period plus (c) deposits made during the Avoidance Period. This is the only methodology which insures equal treatment to all of Madoff's customers.

15.     By way of illustration, consider a case in which a Madoff customer, who opened an account in 1990, withdraws the entire balance of his account on December 10, 2002, and buys Treasury Bills . One week later, that customer decides to reinvest with Madoff. He sells the Treasury Bills, incorporates as a new entity, and opens up a new account with Madoff, depositing the same amount that he withdrew the previous week. If the "original customer" had not withdrawn his funds, the Trustee would be free to adjust the amounts deemed to remain in his original account and deny his claim. The "new customer", however, will have a claim against Madoff for the entire amount of the deposit – which will have been treated as a deposit of principal – less any subsequent withdrawals. Only if the aggregate value of the withdrawals during the Avoidance Period exceeds the initial deposit (as of December 10, 2002) will the "new customer" be stripped of any claim against Madoff.

16.     In order to insure equitable treatment to all customers, therefore, all customers of Madoff should be afforded the same treatment as the "hypothetical new customer" discussed above, and accordingly, the statement balance of November 30, 2002 should control as the "initial balance" in determining net equity. This methodology for determining net equity

---

[5]     This would have been the last statement balance received prior to the commencement of the six year statute of limitations, assuming that the Trustee had commenced adversary proceedings against all customers on the Commencement Date.

operates to treat all customers equally, and is consistent with the statute of limitations in the State

of New York that amounts existing in a Madoff account as of November 30, 2002 were not

subject to avoidance or recovery.  A customer, had he chosen to invest such funds in a non-

Madoff vehicle as of that date, would have had free and unrestricted use of such funds.  The

mere act of withdrawing such funds for a week, or even a day, and then reinvesting them in a

"new" Madoff account should not be a basis for treating the funds differently than those of a

customer who maintained accounts continuously.  This methodology will insure that all

customers are treated in a manner consistent with the Trustee's avoidance powers, and will

operate to insure that Madoff's "older accounts" are credited, in part, for the time value of

money.[5]

### III. Even If The Trustee's "Net Investment Method" Is Upheld On Appeal, Such Methodology Cannot Be Applied To Wipe Out Actual Earnings And Profits Earned By Any Account That Accrued Prior To The Commencement Of Madoff's Ponzi Scheme, Nor Should It Ignore Claimant's Entitlement To Interest.

17.    Claimant submits that even if the Trustee's "Net Investment Method" is applied,

the Trustee must not be permitted to ignore actual profits and earnings accruing prior to the

inception of Madoff's Ponzi scheme, and the Trustee must credit each account with the earnings

attributable to actual investments as if they constitute deposits of "principal."  To the extent that

the Funding Account was established prior to the time period that Madoff was believed to have

operated his Ponzi scheme, earnings prior to such time must be deemed to constitute "cash"

deposits.  *See*, *e.g.*, Hearing Tr. at 25:12 – 25:24, *United States v. Madoff*, Case No. 09 CR 213

---

[5]    The "Net Investment Method" unfairly discriminates against the customers holding older accounts or accounts which were funded by older accounts, as those customers are: (i) generally older, and thus more likely to have required withdrawals during the Avoidance Period to supplement retirement needs; and (ii) have not been awarded any value for the time value of money and inflation.  Indeed, $100,000 invested in Madoff back in January 1970 is equivalent to almost $500,000 investment in December, 2002 (assuming 5% interest rate, compounded annually, and not accounting for inflation).

(DC) (S.D.N.Y. 3/12/2009) (Madoff recalling that his fraudulent activities at BLMIS began in the early 1990s).[6] If Madoff initiated his Ponzi scheme in 1990, then any investment earnings which were achieved and reinvested in the Funding Account prior to the institution of the Ponzi scheme constitute *bona fide* earnings which, for all intents and purposes, should be treated as deposits in determining the "net equity" of that Funding Account. Such an interpretation is consistent with the "cash in/cash out" methodology, as Madoff used genuine earnings and profits of pre-scheme customers to fund his Ponzi scheme in the identical manner as he used deposits – to pay other customers.

18.    In determining the amount of the Claim, the Trustee cannot ignore that Claimant (or the customer holding the Funding Account) would be entitled to interest on account of funds held by Madoff. As set forth in greater detail below, New York law, and cases interpreting the calculation of "value" in presenting a defense of a fraudulent conveyance claim, command the Trustee to adjust customers' claims to take into account the interest that they would have earned in connection with a tort claim against Madoff.

19.    As impliedly endorsed by the Securities and Exchange Commission through its support of the "constant dollar approach," customers are entitled to recover interest on such deposited amounts. Such interest is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law. *See Travelers Cas. & Sur. Co. of Am. v. PG&E,* 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination

---

[6]    Although neither the Trustee nor any other investigative authority has pinpointed the time period during which Madoff operated his Ponzi scheme, Madoff's use of the AS/400 server to manipulate account statements, which occurred in the early 1990s, corroborates Madoff's statements during his plea hearing.

of property rights in the assets of a bankrupt's estate to state law.")[7]  There are at least two

independent bases for awarding interest to the Claimant to compensate it for Madoff's improper

use and misappropriation of the funds held in the Account.

20.    Pursuant to New York law, funds deposited with Madoff are entitled to interest.

N.Y. Gen. Oblig. § 5-501(1).  Accordingly, even applying the Trustee's "net equity"

methodology to calculating the Claimant's claim, the Claim must be adjusted to include interest.

21.    Additionally, pursuant to New York law, the Claimant is entitled to any returns

Madoff earned on the deposited funds under principles of unjust enrichment.[8]  *See, e.g.,*

*Steinberg v. Sherman,* Case No. 1:2007cv01001, 2008 WL 1968297 * 5-6 (S.D.N.Y. May 2,

2008); *Breeden v. Thomas (In re Bennett Funding Group, Inc.)*, Case No. 98-61376, 1999 Bankr.

LEXIS 1843, at *25-34 (Bankr. N.D.N.Y. Apr. 29, 1999) (noting that N.Y. C.P.L.R. §§ 5001 and

5004 would have entitled the customer to recover the principal balance of its claim, plus

prejudgment interest calculated at rate of 9% dating back to the moment when the debtors were

entrusted with customer's money, such that withdrawals in excess of "principal" were not

avoidable).  "'Causes of action such as . . .  conversion and unjust enrichment qualify for the

---

[7]      New York law governs the Claimant's entitlement to interest in this case.   In cases involving torts, New
York courts apply an "'interest analysis' to identify the jurisdiction that has the greatest interest in the litigation
based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that 'related to the
purpose of the particular law in conflict.'"  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am.
Sec., LLC*, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) (citation omitted).  When the law in conflict regulates conduct,
"the law of the jurisdiction where the tort occurred will generally apply . . . ."  *Id.*  A tort generally "occurs" in "'the
place where the injury was inflicted,' which is generally where the plaintiffs are located."  *Id.*  However, when the
"injury has occurred in locations with only limited connection to the conduct at issue . . . the plaintiffs' location is
not a dispositive factor . . . ."  *Id.*  In such a case, the applicable law will be that of "jurisdiction where the fraud
originated and where substantial activities in furtherance of the fraud were committed."  *Cromer Fin. Ltd. v. Berger*,
137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001).  Therefore, New York law is applicable to the calculation of the
Claimant's Claim.

[8]      Although it is not legally relevant, the Trustee cannot prove that Madoff did not earn any "legitimate
profit" or interest on the Claimant's investment.  To the extent the funds were deposited into a bank, they earned
interest while on deposit.  Madoff disbursed customer funds to favored customers, to family members, and for other
purposes.  Those funds may have yielded substantial profits to either Madoff, or the recipients of fraudulent
transfers, which the Claimant and all other customers are entitled, once the ultimate recipients of Madoff's thievery
are known.

recovery of prejudgment interest . . . .'" *Steinberg, supra* at *5 (citation omitted).

Furthermore,"'[t]he rate of interest is nine percent per year, unless another rate is agreed to by

the parties.'" *Id.* "'Interest shall be computed from the earliest ascertainable date the cause of

action existed.'" *Id. See also Eighteen Holding Corp. v. Drizin,* 268 A.D. 2d 371, 701 N.Y.S.

2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and

conversion); N.Y. C.P.L.R. §§ 5001, 5004.

22.    Accordingly, even under the Trustee's "Net Investment Method," adjustments to

the Account should be made to account for interest that should have accrued from and after

September, 1997 through and including December 11, 2008.[9]

### RESERVATION OF RIGHTS

23.    The Claimant expressly reserves the right to revise, supplement, or amend this

Objection, or to join in any other objection, and any failure to object on a particular ground or

grounds shall not be construed as a waiver of Claimant's right to object on any additional

grounds.

24.    The Claimant reserves all rights set forth in Fed. R. Bankr. P. 9014, including,

without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014.

25.    The Claimant reserves all objections as to the competence, relevance, materiality,

privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other

action for any purpose whatsoever.

---

[9]    Claimant reserves the right to seek interest accruing on or after December 11, 2008.

Respectfully submitted this 7th day of April, 2010.

RYAN EYGES TRUST DATED
DECEMBER 26, 1996

By its attorneys,

DUANE MORRIS LLP


__/s/    Patricia H. Heer_____
Patricia H. Heer (PP7068)
William C. Heuer
1540 Broadway
New York, NY 10036-4086
Telephone: 212-471-1803
Facsimile:  212-214-0808

- and -

Martin B. Shulkin (BBO#460280)
Kara M. Zaleskas (BBO#651981)
470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857-488-4239
Facsimile:  857-401-3052

# EXHIBIT A



**BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

In Liquidation

**DECEMBER 11, 2008**[1]

**NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM**

March 8, 2010

Ryan Eyges Trust Dtd 12/26/96
12133 Turnberry Drive
Rancho Mirage, California  92270

Dear Ryan Eyges Trust Dtd 12/26/96:

**PLEASE READ THIS NOTICE CAREFULLY.**

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1EM369 designated as Claim Number 5889:

Your claim for securities is **DENIED**.  No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $1,453,200.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $914,551.73).  As noted, no securities were ever purchased by BLMIS for your account.  Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted.  As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B).  Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

COPY

money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($538,648.27) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

**On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued a decision which affirmed the Trustee's Net Investment Method for determining customer claims. The final resolution of this issue is expected to be determined on appeal.**

**Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.**

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after March 8, 2010, the date on which the Trustee mailed this notice.

2



**PLEASE TAKE FURTHER NOTICE:**  If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:**  If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date.  Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:**  You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern  District of  New York
One Bowling Green
New York, New York  10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York  10111

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc:  Martin B. Shulkin, Esq.
     Duane Morris LLP
     470 Atlantic Avenue
     Boston, Massachusetts  02210

3

COPY

| – Table 1 – | | | |
|---|---|---|---|
| **DEPOSITS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 9/11/1997 | TRANS FROM 1EM05330 | $1,019,487.28 | $234,953.54 |
| 10/16/1997 | CHECK WIRE | $73,665.96 | $73,665.96 |
| 4/15/1998 | TRANS FROM 1EM05330 | $545.74 | $0.00 |
| 6/7/2001 | CHECK | $11,000.00 | $11,000.00 |
| 1/28/2003 | CHECK | $220,000.00 | $220,000.00 |
| 1/29/2003 | CHECK A/O 1/28/03 | $200,000.00 | $200,000.00 |
| 1/29/2003 | CANCEL CHECK | ($220,000.00) | ($220,000.00) |
| 4/24/2003 | CHECK | $19,000.00 | $19,000.00 |
| 1/13/2006 | CHECK WIRE | $354,315.23 | $354,315.23 |
| 3/27/2006 | CHECK | $21,617.00 | $21,617.00 |
| **Total Deposits:** | | $1,699,631.21 | $914,551.73 |

| **WITHDRAWALS** | | | |
|---|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 4/9/1998 | CHECK | ($30,000.00) | ($30,000.00) |
| 10/7/1998 | CHECK | ($5,000.00) | ($5,000.00) |
| 3/30/1999 | CHECK | ($100,000.00) | ($100,000.00) |
| 6/7/1999 | CHECK | ($21,000.00) | ($21,000.00) |
| 8/30/1999 | CHECK | ($22,000.00) | ($22,000.00) |
| 12/14/1999 | CHECK | ($24,000.00) | ($24,000.00) |
| 3/30/2000 | CHECK | ($30,000.00) | ($30,000.00) |
| 6/6/2000 | CHECK | ($18,000.00) | ($18,000.00) |
| 8/25/2000 | CHECK | ($26,000.00) | ($26,000.00) |
| 12/19/2000 | CHECK | ($27,000.00) | ($27,000.00) |
| 8/28/2001 | CHECK | ($9,000.00) | ($9,000.00) |
| 12/5/2001 | CHECK | ($31,000.00) | ($31,000.00) |
| 1/3/2002 | CHECK | ($127,000.00) | ($127,000.00) |
| 2/15/2002 | CHECK | ($6,000.00) | ($6,000.00) |
| 3/21/2002 | CHECK | ($10,000.00) | ($10,000.00) |
| 4/9/2002 | CHECK | ($30,000.00) | ($30,000.00) |
| 5/23/2002 | CHECK | ($17,000.00) | ($17,000.00) |
| 6/13/2002 | CHECK | ($9,000.00) | ($9,000.00) |
| 8/16/2002 | CHECK | ($36,000.00) | ($36,000.00) |
| 12/4/2002 | CHECK | ($30,000.00) | ($30,000.00) |
| 3/31/2003 | CHECK | ($39,000.00) | ($39,000.00) |
| 6/2/2003 | CHECK | ($22,000.00) | ($22,000.00) |
| 7/21/2003 | CHECK | ($23,000.00) | ($23,000.00) |
| 9/3/2003 | CHECK | ($30,000.00) | ($30,000.00) |
| 12/12/2003 | CHECK | ($72,700.00) | ($72,700.00) |

4



| 3/2/2004 | CHECK | ($43,000.00) | ($43,000.00) |
| 3/24/2004 | CHECK | ($83,000.00) | ($83,000.00) |
| 6/21/2004 | CHECK | ($50,000.00) | ($50,000.00) |
| 9/7/2004 | CHECK | ($50,000.00) | ($50,000.00) |
| 1/14/2005 | CHECK | ($18,000.00) | ($18,000.00) |
| 4/1/2005 | CHECK | ($30,000.00) | ($30,000.00) |
| 9/1/2005 | CHECK | ($61,000.00) | ($61,000.00) |
| 12/23/2005 | CHECK | ($39,500.00) | ($39,500.00) |
| 4/4/2007 | CHECK | ($50,000.00) | ($50,000.00) |
| 4/30/2007 | CHECK | ($70,000.00) | ($70,000.00) |
| 10/9/2007 | CHECK | ($40,000.00) | ($40,000.00) |
| 4/18/2008 | CHECK | ($84,000.00) | ($84,000.00) |
| 10/28/2008 | CHECK | ($40,000.00) | ($40,000.00) |
| **Total Withdrawals:** | | ($1,453,200.00) | ($1,453,200.00) |
| | | | |
| **Total deposits less withdrawals:** | | $246,431.21 | ($538,648.27) |