DUANE MORRIS LLP
COUNSEL TO PGC LIMITED PARTNERSHIP
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1022
William C. Heuer, Esq.
Patricia H. Heer, Esq.

    - and -

470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857.488.4200
Martin B. Shulkin, Esq.
Kara M. Zaleskas, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT NEW YORK**

|  |  |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-1789 (BRL) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**JOINDER TO ARGUMENTS PRESENTED IN CONNECTION WITH TRUSTEE'S
OTHER OBJECTIONS TO CUSTOMERS' CLAIMS AND OBJECTION TO NOTICE
OF TRUSTEE'S DETERMINATION OF CLAIM**

The PGC Limited Partnership (the "Claimant"), hereby objects to the *Notice of Trustee's*

*Determination of Claim* pursuant to which Irving H. Picard (the "Trustee"), the trustee appointed

pursuant to the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq*. ("SIPA"), denied in

its entirety the claim asserted on account of BLMIS Account No. 1-EM452-3-0 (the "Account"),

designated as Claim Number 13739 (the "Claim").

In support of this joinder and objection (the "Objection"), the Claimant respectfully states

as follows:

## PRELIMINARY STATEMENT

The Trustee's determination letter to Claimant dated March 8, 2010 (the "Determination

Letter")[1] is objectionable on a number of grounds.  First, through the claims determination

process, the Trustee inequitably discriminates against certain customers, including the Claimant,

whose deposits were funded by transfers from another account maintained with Bernard L.

Madoff Investment Securities LLC ("Madoff").  Specifically, without any support or

explanation, the Trustee makes an "adjustment" to the Account and the "predecessor account"

from which the deposit was made (hereinafter referred to as the "Funding Account") which

effectively avoids and recovers a substantial transfer (or that portion thereof as reflected on the

November 30, 2002 statement of the Funding Account) which otherwise could not be avoided

because it occurred more than six years prior to the date of the statute of limitations for avoiding

so-called fraudulent transfers under the laws of the State of New York.  As the Trustee otherwise

would be powerless to avoid and recover any amounts that could have been transferred from the

Funding Account on or prior to December 10, 2002 were he to initiate an adversary proceeding –

as he is required to do pursuant to the Federal Rules of Bankruptcy Procedures – he cannot

recover them by unilaterally "adjusting" the balance of the Account to ignore the balance on the

November 30, 2002 statement of the Funding Account.  To hold otherwise would impermissibly

---

[1]    A copy of the Determination Letter is attached hereto as **Exhibit A**.

expand the Trustee's avoidance powers beyond the limitations set by title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "<u>Bankruptcy Code</u>") and applicable state law, and would work an unfair hardship against customers who reinvested their earnings in Madoff.

Secondly, the Trustee's "adjustment" process is inequitable for two additional reasons. In the first instance, the Trustee applies the Net Investment Method in a manner that inappropriately penalizes and discriminates against those customers who maintained account balances with Madoff on or before December 10, 2002[2] and thereafter continued to invest with Madoff, as compared to customers who withdrew their earnings, or a substantial portion thereof, on or prior to December 10, 2002, and whose withdrawals are free from restriction or avoidance. As this Court already has concluded that the Trustee's power to determine customer claims should be exercised in concert with his other powers, including his avoidance powers, the proper application of the "Net Investment Method" must take into account that transfers to/from a Madoff account arising prior to December 10, 2002 are not avoidable by the Trustee. To insure equal treatment to <u>***all***</u> customers of Madoff, the Trustee should, with respect to those customers who had accounts (or funding accounts) in existence with Madoff on or before December 10, 2002, be limited in his application of the Net Investment Method by considering only the following: (a) the statement balance in the Account, or, as the case may be, in the Funding Account,[3] as of November 30, 2002; less (b) withdrawals from the Account, or, as the case may

---

[2]    This would have been the date prior to the commencement of the six year statute of limitations, assuming that the Trustee had commenced adversary proceedings against all customers on the Commencement Date (hereinafter defined). Claimant submits that, with respect to avoiding and recovering a particular transfer made from a Madoff account, the Trustee is still limited by the date of the commencement of such adversary proceeding in determining whether the action is timely and within the state statute of limitations period.

[3]    Because the Account was established after the November 30, 2002 statement date for determining what "cash" is not recoverable in an avoidance action, the balance of the Funding Account as of that date, plus any deposits and less withdrawals from December 11, 2002 through November 13, 2003 (the date that the Account was established), will determine whether the Funding Account had the full $5,726,673.28 available to fund the Account.

be, from the Funding Account, made from December 11, 2002 through December 10, 2008 (the

"Avoidance Period") plus (c) deposits made to the Account, or, as the case may be, to the

Funding Account, during the Avoidance Period. This is the only methodology which: (i) works

in concert with the avoidance provisions of the Bankruptcy Code; (ii) insures that customers

holding "older accounts" do not bear an inordinate burden of alleged fraudulent transfer liability;

and (iii) comports with the "equality is equity" maxim on which the Bankruptcy Code is

premised.[4]

Moreover, the Trustee, by arbitrarily "adjusting" the amounts in Madoff accounts

(including predecessor funding accounts) existing on or before December 10, 20002, an act

which exceeds the scope of the Trustee's powers, applies a different standard of review to the

preexisting Madoff account-holders than he applies to "new" customers investing after

December 10, 20002. Although not expressly defined in the Trustee's Determination Letter, one

surmises that the so-called adjustments made to the pre-December 2002 accounts are based on

tracking of "cash in, cash out" for periods commencing with the inception of the investments.

Yet, no such "tracking" of the source of funds is applied to any other class of Madoff customers.

If hypothetically a "new" Madoff customer cashed out of a similar "ponzi" scheme prior to the

State Look Back Period and invested those funds with Madoff, such investor receives full credit

of "cash in" for the purposes of the Trustee's application of the Net Investment Method. In

contrast, preexisting Madoff account-holders are held to a totally different standard, as their

deposits are being discounted, or even stricken altogether, simply because the deposits originated

from another Madoff account. It is inequitable for the Trustee, on the one hand, to discriminate

against these customers solely on the basis that the Trustee has access to records that would

---

[4] *See infra*, note 6, for examples of how the timing of deposits and withdrawals in relation to the Avoidance Period cultivates inequitable treatment among customers.

otherwise be unavailable for use in an avoidance action, but, on the other hand, to give unfettered credit to a "new" customer without any ability to trace, or otherwise contest, the source of such funds.

Finally, notwithstanding the foregoing, the Trustee's determination process fails to properly account for any legitimate profits or earnings generated prior to the implementation of the Ponzi scheme, and interest required to be credited pursuant to, among other provisions N.Y. C.P.L.R. § 5001, 5004; N.Y. Gen. Oblig. § 5-501, *et seq.*, N.Y. C.P.L.R. § 5205(c). As set forth in greater detail below, New York law, and cases interpreting the calculation of "value" in presenting a defense of a fraudulent conveyance claim, command the Trustee to adjust customers' claims to take into account the interest that they would have earned in connection with a tort claim – for fraud, unjust enrichment, breach of fiduciary duty, or other similar claims – against Madoff. The Trustee cannot ignore the mandates of state law to facilitate the claims determination process.

## JOINDER TO PLEADINGS OF OTHER SIMILARLY SITUATED CUSTOMERS

1.      As an initial matter, Claimant hereby joins, and fully incorporates by reference as if fully restated herein, the arguments and authority cited in the objections and briefs filed on behalf of similarly situated customers including, without limitation, the arguments that the Trustee is bound by the November 30, 2008 statement to determine a customer's claim. To the extent that customers raise new arguments in connection with subsequent determinations rendered by the Trustee, Claimant reserves the right to join in such other arguments, as appropriate.

## BACKGROUND

2.      In or about November, 2003, the Claimant opened an account, subsequently designated Account No. 1-EM452-3-0 (the "Account"), with Bernard L. Madoff Investment Securities LLC ("Madoff").  On information and belief, the Account was initially funded by two transfers, collectively in the amount of $5,726,673.28, from Madoff Account No. 1-EM036-3-0 (the "Funding Account").  After these initial deposits, the Claimant made three additional deposits totaling $3,106,333.58 to the Account.

3.      On December 11, 2008 (the "Commencement Date"), an action was commenced against Madoff by the Securities & Exchange Commission in the United States District Court for the Southern District of New York.  On December 15, 2008, this liquidation proceeding was commenced pursuant to SIPA.  *See Order, Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) [Dkt. No. 4].  The Trustee was appointed and charged with, *inter alia*, overseeing the liquidation of Madoff and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. § 78fff-1(a) (2009).

4.      On December 23, 2008, the Court issued an Order (the "Claims Procedure Order") directing the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines. *See* Claims Procedure Order [Dkt. No. 12].  The Claims Procedure Order further provides that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, **and the reason therefor** . . . " *Id.* at 6 (emphasis added).

5.      In February, 2009, Claimant, by and through its counsel, filed a claim for the Account for all of the securities positions reflected on the November 30, 2008 statement from

Madoff (the "Final Madoff Statement").  According to the Final Madoff Statement, the value of

those positions was approximately $5,687,784.00.

6.    On March 1, 2010, this Court rendered a decision relating to the Trustee's so-

called "Net Investment Method" for determining customers' claims.  In endorsing the "Net

Investment Method" for determining "net equity" under SIPA, this Court held that the "Net

Investment Method allows the definition of Net Equity and the Trustee's powers to avoid and

recover property, contained in the same statutory framework, to be interpreted with preferred

consonance." *See Memorandum Decision Granting Trustee's Motion for an Order (1) Upholding*

*Trustee's Determination Denying Customer Claims for Amounts Listed on Last Customer*

*Statement; (2) Affirming Trustee's Determination of Net Equity; and (3) Expunging Objections*

*to Determinations Relating to Net Equity*, [Dkt. No. 1999] (the "Net Equity Decision"), at 24.

7.    On March 8, 2010, the Trustee sent the Claimant the Determination Letter

pursuant to which he denied the entire Claim, stating, in relevant part, that (a) no securities were

purchased for the Account and (b) the Account does not have a positive net equity because the

amount of funds withdrawn from the Account exceeded deposits.

## GROUNDS FOR OBJECTION

### I.    The Trustee's Adjustment Of The Claim Is Substantively And Procedurally Improper.

A.    *The Trustee's "Adjustments" Prejudice Claimants Who Funded Their Accounts With Gains From Madoff, And Effectively Operate To Avoid And To Recover Transfers Outside Of The Statute Of Limitations Period.*

8.    According to the Determination Letter, the Account initially was funded by a

withdrawal from the Funding Account.  *See* Determination Letter, at 4.  According to the

Trustee's analysis, the Funding Account had no "principal" to transfer to the Account on

November 13, 2003.  *See id.*  The "adjustment" to the Account under the "net investment"

7

approach – **which reduces the "principal" balance by more than $5,726,673** – must be disallowed, as it essentially seeks to avoid and recover a transfer, at least of such amounts as reflected in the Funding Account as of November 30, 2002 statement, that was made outside of the statute of limitations period (the "State Law Look-Back Period").  Because the Trustee could not recover the $5,726,673 in alleged fictitious profits, or at least those amounts as reflected in the November 30, 2002 statement of the Funding Account, withdrawn from the Funding Account in November, 2003,[5] the Trustee should not be permitted to "recover" that amount through his "adjustment" procedure.

9.    According to this Court's Net Equity Decision, the Trustee's "Net Investment Method" better reflects the Trustee's powers to avoid and recover property.  *See* Net Equity Decision, at 24.  However, by making adjustments to Madoff accounts funded by alleged fictitious profits of other Madoff accounts, which the Trustee maintains has occurred with respect to the Account, the Trustee has expanded – indeed, eviscerated – the statute of limitations that restrains his avoidance powers.  Since the Trustee's power to avoid and recover transfers is temporally limited, so too must the Trustee's powers to adjust claims be temporally limited.  Accordingly, any transfers from a "funding" Madoff account to a "receiving" Madoff account occurring prior to the State Look-Back Period must be deemed deposits of "principal" to the "receiving" Madoff account.  To hold otherwise would improperly expand the powers of the Trustee, permitting the Trustee effectively to avoid and recover the "fictitious profits" portion of such transfers by "adjusting" (*i.e.*, offsetting) the balance available in such accounts.

---

[5]    The Claimant submits that state law "look-back period" of six-years runs from the date that an adversary proceeding is commenced, and not the Commencement Date.  *See, e.g., Floyd v. Option Mortg. Corp. (In re Supplement Spot, LLC)*, 409 B.R. 187, 201-202 and n.6 (Bankr. S.D. Tex. 2009) (noting that "this Court looks back four years from … the date the complaint alleging fraudulent transfers was filed.")  As such, because the Trustee has not timely sought to recover the transfers in the aggregate amount of $5,726,673 from Claimant – which was required to be initiated prior to November 13, 2009 – the Trustee cannot "revive" the statute of limitations by "adjusting" those deposits in the Account.

10.    Moreover, by using this "adjustment" approach, the Trustee insures that disparate and prejudicial treatment is borne by claimants who transferred or received funds from other Madoff accounts in their accounts to fund current Madoff accounts rather than taking their "cash" and placing it in a different investment vehicle altogether prior to the State Look-Back Period.[6]  Indeed, claimants who withdrew their funds prior to the State Law Look-Back Period are allowed to hold those profits free and clear of any claims of the Trustee, while claimants who, prior to the State Law Look-Back Period, reinvested those profits in another Madoff account, are being stripped of those profits by operation of the Trustee's "adjustment" decision. Such treatment can hardly be characterized as equal or fair, and certainly, the Trustee should not be permitted to effectively recover alleged "fictitious profits" portions of transfers made prior to the State Law Look-Back Period.

11.    If the Trustee is prohibited from adjusting these deposits, the Claimant will be credited with deposits totaling $8,833,006.86 (adjusted to reflect net gains in the Funding Account from December 10, 2002 through November 13, 2003, the opening date of the

---

[6]    A simple example illustrates the injustice that results by allowing the Trustee to "adjust" the balance of a new account based on the "net equity" of the funding account:

Claimant A opens an account with Madoff with an initial deposit of $100,000 on January 1, 1975.  On December 10, 2002, the balance of the account is $2 million.  On December 10, 2002, Claimant A withdraws the entire amount and places it in a bank account.  One month later, Claimant A establishes a trust for his children and opens a new account with Madoff and deposits $2 million in that account.  During the course of the next six years, the beneficiaries make withdrawals of $100,000 each year.  The Trustee, applying his "adjustment" and "net investment" methodologies, would grant the customer an allowed claim of $1.4 million.

Claimant B opens an account with Madoff with an initial deposit of $100,000 on January 1, 1975.  On December 10, 2002, the balance of the account is $2 million.  On December 10, 2002, Claimant B establishes a trust for his children, and wires the entire $2 million and places it in another Madoff account.  During the course of the next six years, the beneficiaries make withdrawals of $100,000 each year.  The Trustee, applying his "adjustment" and "net investment" methodologies, would disallow the claim of this account in full, would argue that the customer's "net equity" in that account is negative $500,000 ($100,000 "adjusted principal" balance less six $100,000 withdrawals).

The prior two scenarios evidence how two claimants with practically identical fact patterns – save whether they made a direct transfer from one Madoff account to another  – can be treated so disparately that one claimant's claim is totally rejected, while another claimant could hold a claim for $1.4 million.

Account), which amount is nearly $2.9 million greater than the withdrawals made by the

Claimant since the opening of the Account.  If the Trustee is barred from exercising his

avoidance powers through making adjustments to the Account, at least as to amounts reflected in

the November 30, 2002 statement of the Funding Account, the Claimant would hold a positive

net equity claim, using the Trustee's "Net Investment Method."

> B.    *The Claims Determination Process Is Procedurally Improper And Violates Claimant's Due Process Rights, As It Seeks To Avoid And Recover A Transfer Outside Of An Adversary Proceeding And Otherwise Does Not Comply With The Claims Procedure Order, As It Fails To Rebut The Prima Facie Validity Of The Claim.*

12.    By the claims determination process, the Trustee seeks to avoid and recover

transfers which, pursuant to the Federal Rules of Bankruptcy Procedure, can only be

accomplished through an adversary proceeding.  The Trustee cannot circumvent Claimant's due

process entitlements and defenses, including its defense based on the statute of limitations,

simply by "adjusting" the claim and reducing it by unsubstantiated amounts.  For this reason

alone the Determination Letter must be denied.

13.    Additionally, the Determination Letter: (a) does not clearly provide "the reason"

for the disallowance, as required by the Claims Procedure Order; (b) is insufficient to rebut the

*prima facie* validity of the Claim as provided in § 502(a) of the Bankruptcy Code and Fed. R.

Bankr. P. 3001(f), made applicable herein pursuant to 15 U.S.C. § 78fff(b); (c) violates general

principles of applicable law requiring that an objection to a proof of claim set forth, at a

minimum, the relevant facts and legal theories upon which the objection is based, *see, e.g.*, 9-

3007 COLLIER ON BANKRUPTCY § 3007.01[3] (Alan N. Resnick & Henry J. Sommer eds., 15th

ed. rev. 2008) ("The body of the objection should identify the claim.  It should also, at a

minimum, allege those facts necessary to support the objection (ordinarily this must include

allegations sufficient to overcome the *prima facie* validity of the filed proof of claim) and

provide a description of the theories on which it is based.  In short, proofs of claim have been

held analogous to complaints initiating civil actions; an objection to a claim should therefore

meet the standards of an answer."); and (d) includes an exhibit which purportedly calculates the

money deposited less subsequent withdrawals without any supporting documentation.  These

deficiencies similarly warrant this Court's denial of the Determination Letter.

II.     **The Application Of The Net Investment Approach Should Be Limited To
        The State Look-Back Period, And The Claim Should Be Determined By
        Subtracting The Aggregate Withdrawals From The Statement Balance As Of
        Six Years Prior To The Commencement Date.**

        14.     The application of the "Net Investment Method" unfairly penalizes and

discriminates between those customers who maintained accounts (or had funding accounts) with

Madoff on or before December 10, 2002 and continued to maintain such investments thereafter

and customers who withdrew all, or substantially all, of their earnings and principal prior to

December 10, 2002.  To insure equal treatment to all customers of Madoff, the Trustee should be

limited in his application of the Net Investment Method by considering only the following: (a)

the statement balance in the Account, or as the case may be the Funding Account, as of

November 30, 2002;[7] less (b) withdrawals made during the Avoidance Period plus (c) deposits

made during the Avoidance Period.  This is the only methodology which insures equal treatment

to all of Madoff's customers.

        15.     By way of illustration, consider a case in which a Madoff customer, who opened

an account in 1990, withdraws the entire balance of his account on December 10, 2002 and buys

Treasury Bills..  One week later, that customer decides to re-invest with Madoff.  He sells the

---

[7]     This would have been the last statement balance received prior to the commencement of the six year statute
of limitations, assuming that the Trustee had commenced adversary proceedings against all customers on the
Commencement Date.

Treasury Bills, incorporates as a new entity and, opens up a new account with Madoff, depositing the same amount that he withdrew the previous week. If the "original customer" had not withdrawn his funds, the Trustee would be free to adjust the amounts deemed to remain in his original account and deny his claim. The "new customer" will have a claim against Madoff for the entire amount of the deposit – which will have been treated as a deposit of principal – less any subsequent withdrawals. Only if the aggregate value of the withdrawals during the Avoidance Period exceeds the initial deposit (as of December 10, 2002) will the "new customer" be stripped of any claim against Madoff.

16.    In order to insure equitable treatment to all customers, therefore, all customers of Madoff should be afforded the same treatment as the "hypothetical new customer" discussed above, and accordingly, the statement balance of November 30, 2002 should control as the "initial balance" in determining net equity. This methodology for determining net equity operates to treat all customers equally, and is consistent with the statute of limitations in the State of New York that amounts existing in a Madoff account as of November 30, 2002 were not subject to avoidance or recovery. A customer, had he chosen to invest such funds in a non-Madoff vehicle as of that date, would have had free and unrestricted use of such funds. The mere act of withdrawing such funds for a week, or even a day, and then reinvesting them in a "new" Madoff account should not be a basis for treating the funds differently than those of a customer who maintained accounts continuously. This methodology will insure that all customers are treated in a manner consistent with the Trustee's avoidance powers, and will operate to insure that Madoff's "older accounts" are credited, in part, for the time value of money.[8]

---

[8]    The "Net Investment Method" unfairly discriminates against the customers holding older accounts or accounts which were funded by older accounts, as those customers are: (i) generally older, and thus more likely to

**III.    Even If The Trustee's "Net Investment Method" Is Upheld On Appeal, Such Methodology Cannot Be Applied To Wipe Out Actual Earnings And Profits Earned By Any Funding Account That Accrued Prior To The Commencement Of Madoff's Ponzi Scheme, Nor Should It Ignore Claimant's Entitlement To Interest.**

17.    Claimant submits that even if the Trustee's "Net Investment Method" is applied, the Trustee must not be permitted to ignore actual profits and earnings accruing prior to the inception of Madoff's Ponzi scheme, and the Trustee must credit each account with the earnings attributable to actual investments as if they constitute deposits of "principal."  To the extent, the Funding Account was established prior to the time period that Madoff was believed to have operated his Ponzi scheme, earnings prior to such time must be deemed to constitute "cash" deposits.  *See*, *e.g.*, Hearing Tr. at 25:12 – 25:24, *United States v. Madoff*, Case No. 09 CR 213 (DC) (S.D.N.Y. 3/12/2009) (Madoff recalling that his fraudulent activities at BLMIS began in the early 1990s).[9]  If Madoff initiated his Ponzi scheme in 1990, any investment earnings which were achieved and reinvested in the Funding Account prior to the institution of the Ponzi scheme constitute *bona fide* earnings which, for all intents and purposes, should be treated as deposits in determining the "net equity" of the account.  Such an interpretation is consistent with the "cash in/cash out" methodology, as Madoff used genuine earnings and profits of pre-scheme customers to fund his Ponzi scheme in the identical manner as he used deposits – to pay other customers.

18.    In determining the amount of the Claim, the Trustee cannot ignore that Claimant (or the customer holding the Funding Account) would be entitled to interest on account of funds held by Madoff.  As set forth in greater detail below, New York law, and cases interpreting the

---

have required withdrawals during the Avoidance Period to supplement retirement needs; and (ii) have not been awarded any value for the time value of money and inflation.  Indeed, $100,000 invested in Madoff back in January 1970 is equivalent to almost $500,000 investment in December, 2002 (assuming 5% interest rate, compounded annually, and not accounting for inflation).

[9]    Although neither the Trustee nor any other investigative authority has pinpointed the time period during which Madoff operated his Ponzi scheme, Madoff's use of the AS/400 server to manipulate account statements, which occurred in the early 1990s, corroborates Madoff's statements during his plea hearing.

calculation of "value" in presenting a defense of a fraudulent conveyance claim, command the Trustee to adjust customers' claims to take into account the interest that they would have earned in connection with a tort claim – for fraud, unjust enrichment, breach of fiduciary duty, or other similar claims – against Madoff.

19.     As impliedly endorsed by the Securities and Exchange Commission through its support of the "constant dollar approach," customers are entitled to recover interest on such deposited amounts.  Such interest is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law.  *See Travelers Cas. & Sur. Co. of Am. v. PG&E,* 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.")[10]  There are at least two independent bases for awarding interest to the Claimant to compensate it for Madoff's improper use and misappropriation of the funds held in the Account.

20.     Pursuant to New York law, funds deposited with Madoff are entitled to interest. N.Y. Gen. Oblig. § 5-501(1).  Accordingly, even applying the Trustee's "net equity" methodology to calculating the Claimant's claim, the Claim must be adjusted to include interest.

---

[10]     New York law governs the Claimant's entitlement to interest in this case.   In cases involving torts, New York courts apply an "'interest analysis' to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that 'related to the purpose of the particular law in conflict.'"  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) (citation omitted).  When the law in conflict regulates conduct, "the law of the jurisdiction where the tort occurred will generally apply . . . ." *Id.*  A tort generally "occurs" in "'the place where the injury was inflicted,' which is generally where the plaintiffs are located." *Id.*  However, when the "injury has occurred in locations with only limited connection to the conduct at issue . . . the plaintiffs' location is not a dispositive factor . . . ." *Id.*  In such a case, the applicable law will be that of "jurisdiction where the fraud originated and where substantial activities in furtherance of the fraud were committed." *Cromer Fin. Ltd. v. Berger,* 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001).  Therefore, New York law is applicable to the calculation of the Claimant's Claim.

21.     Additionally, pursuant to New York law, the Claimant is entitled to any returns

Madoff earned on the deposited funds under principles of unjust enrichment.[11]  *See, e.g.,*

*Steinberg v. Sherman,* Case No. 1:2007cv01001, 2008 WL 1968297 * 5-6 (S.D.N.Y. May 2,

2008); *Breeden v. Thomas (In re Bennett Funding Group, Inc.)*, Case No. 98-61376, 1999 Bankr.

LEXIS 1843, at *25-34 (Bankr. N.D.N.Y. Apr. 29, 1999) (noting that N.Y. C.P.L.R. §§ 5001 and

5004 would have entitled the customer to recover the principal balance of its claim, plus

prejudgment interest calculated at rate of 9% dating back to the moment when the debtors were

entrusted with customer's money, such that withdrawals in excess of "principal" were not

avoidable).  "'Causes of action such as . . .  conversion and unjust enrichment qualify for the

recovery of prejudgment interest . . . .'"  *Steinberg, supra* at *5 (citation omitted).

Furthermore,"'[t]he rate of interest is nine percent per year, unless another rate is agreed to by

the parties.'"  *Id.*  "'Interest shall be computed from the earliest ascertainable date the cause of

action existed.'"  *Id.  See also Eighteen Holding Corp. v. Drizin,* 268 A.D. 2d 371, 701 N.Y.S.

2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and

conversion); N.Y. C.P.L.R. §§ 5001, 5004.

22.     Accordingly, even under the Trustee's "Net Investment Method," adjustments

should be made to the Claim to account for interest that should have accrued from and after

November, 2003 through and including December 11, 2008.[12]

---

[11]     Although it is not legally relevant, the Trustee cannot prove that Madoff did not earn any "legitimate profit" or interest on the Claimant's investment.  To the extent the funds were deposited into a bank, they earned interest while on deposit.  Madoff disbursed customer funds to favored customers, to family members, and for other purposes.  Those funds may have yielded substantial profits to either Madoff, or the recipients of fraudulent transfers, which the Claimant and all other customers are entitled, once the ultimate recipients of Madoff's thievery are known.

[12]     Claimant reserves the right to seek interest accruing on or after December 11, 2008.

## RESERVATION OF RIGHTS

23.      The Claimant expressly reserves the right to revise, supplement, or amend this

Objection, or to join in any other objection, and any failure to object on a particular ground or

grounds shall not be construed as a waiver of Claimant's right to object on any additional

grounds.

24.      The Claimant reserves all rights set forth in Fed. R. Bankr. P. 9014, including,

without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014.

25.      The Claimant reserves all objections as to the competence, relevance, materiality,

privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other

action for any purpose whatsoever.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

Respectfully submitted this 7th day of April, 2010.

PGC LIMITED PARTNERSHIP

By its attorneys,

DUANE MORRIS LLP


_/s/    Patricia H. Heer_____

Patricia H. Heer (PP7068)
William C. Heuer
1540 Broadway
New York, NY 10036-4086
Telephone: 212-471-1803
Facsimile:  212-214-0808

- and -

Martin B. Shulkin (BBO#460280)
Kara M. Zaleskas (BBO#651981)
470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857-488-4239
Facsimile:  857-401-3052

# EXHIBIT A



# BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

## DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

March 8, 2010

PGC Limited Partnership
2100 South Ocean Blvd., #208 North
Palm Beach, Florida 33480

Dear PGC Limited Partnership:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1EM452 designated as Claim Number 13739:

Your claim for a credit balance of $5,687,874.00 and for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $5,900,000.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $3,100,000.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

---

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.



As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($2,800,000.00) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

**On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued a decision which affirmed the Trustee's Net Investment Method for determining customer claims. The final resolution of this issue is expected to be determined on appeal.**

**Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.**

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching



copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after March 8, 2010, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

_____
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc:  Martin B. Shulkin, Esq.
     Duane Morris LLP
     470 Atlantic Avenue
     Boston, MA  02210

3



| - Table 1 - | | | |
|---|---|---|---|
| **DEPOSITS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 11/13/2003 | TRANS FROM 1EM03630 | $2,000,000.00 | $0.00 |
| 11/13/2003 | TRANS FROM 1EM03630 | $3,726,673.28 | $0.00 |
| 4/6/2004 | TRANS FROM 1EM03630 | $6,333.58 | $0.00 |
| 1/23/2006 | CHECK | $1,800,000.00 | $1,800,000.00 |
| 5/13/2008 | CHECK | $1,300,000.00 | $1,300,000.00 |
| **Total Deposits:** | | $8,833,006.86 | $3,100,000.00 |
| | | | |
| **WITHDRAWALS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 12/3/2003 | CHECK | ($500,000.00) | ($500,000.00) |
| 3/31/2004 | CHECK | ($500,000.00) | ($500,000.00) |
| 6/28/2004 | CHECK | ($400,000.00) | ($400,000.00) |
| 10/29/2004 | CHECK | ($500,000.00) | ($500,000.00) |
| 3/3/2005 | CHECK | ($400,000.00) | ($400,000.00) |
| 6/3/2005 | CHECK | ($200,000.00) | ($200,000.00) |
| 8/18/2005 | CHECK | ($350,000.00) | ($350,000.00) |
| 4/2/2007 | CHECK | ($700,000.00) | ($700,000.00) |
| 5/4/2007 | CHECK | ($300,000.00) | ($300,000.00) |
| 7/3/2007 | CHECK | ($400,000.00) | ($400,000.00) |
| 8/29/2007 | CHECK | ($300,000.00) | ($300,000.00) |
| 10/30/2007 | CHECK | ($400,000.00) | ($400,000.00) |
| 1/4/2008 | CHECK | ($300,000.00) | ($300,000.00) |
| 6/2/2008 | CHECK | ($50,000.00) | ($50,000.00) |
| 6/11/2008 | CHECK | ($100,000.00) | ($100,000.00) |
| 9/5/2008 | CHECK | ($500,000.00) | ($500,000.00) |
| **Total Withdrawals:** | | ($5,900,000.00) | ($5,900,000.00) |
| | | | |
| **Total deposits less withdrawals:** | | $2,933,006.86 | ($2,800,000.00) |