**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Alissa M. Nann
Email: anann@bakerlaw.com

*Attorneys for Irving H. Picard, Esq. Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*And Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**TRUSTEE'S THIRD INTERIM REPORT**
**FOR THE PERIOD ENDING MARCH 31, 2010**

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................3

II.     BACKGROUND ..................................................................................5

        A. PROCEDURAL HISTORY.................................................................5
        B. MADOFF CHAPTER 7 LIQUIDATION .........................................7
        C. MSIL AND JOINT PROVISIONAL LIQUIDATORS.....................8
        D. CRIMINAL AND CIVIL CASES .....................................................9

III.    LIQUIDATION PROCEEDING ........................................................16

IV.     ADMINISTRATION OF THE ESTATE ...........................................17

        A. RETENTION OF PROFESSIONALS .............................................18
        B. MARSHALLING AND LIQUIDATION OF ESTATE ASSETS .................18
        C. WIND-DOWN OF ESTATE OPERATIONS ..................................20

V.      FINANCIAL CONDITION OF ESTATE...........................................23

VI.     GOVERNMENT FORFEITURE ......................................................24

VII.    CLAIMS ADMINISTRATION..........................................................25

        A. CUSTOMER CLAIMS....................................................................25
        B. CLAIMS OF GENERAL CREDITORS .........................................33

VIII.   TRUSTEE INVESTIGATION ..........................................................34

        A. INTERNATIONAL PROCEEDINGS.............................................35
        B. DOMESTIC PROCEEDINGS.........................................................41
        C. BANKS & OTHER FINANCIAL INSTITUTIONS.......................45
        D. POTENTIAL INSIDERS AND CORPORATE ASSETS..............46
        E. EVIDENCE GATHERING .............................................................47

IX.     INITIAL ALLOCATION OF FUNDS AND DISTRIBUTION TO CUSTOMERS.
        49

X.      BANKRUPTCY COURT PROCEEDINGS .......................................50

        A. NET EQUITY DISPUTE .................................................................50
        B. OBJECTIONS TO CLAIMS DETERMINATIONS.......................51
        C. CLAIMANTS WITHOUT ACCOUNTS ........................................53
        D. THIRD-PARTY ACTIONS AGAINST THE TRUSTEE..................54
        E. OBJECTIONS TO FEE APPLICATIONS.......................................57
        F. COMMENCEMENT OF BLM AIR CHARTER LLC CHAPTER 11 CASE59
        G. AVOIDANCE ACTIONS BY THE TRUSTEE................................61
        H. SETTLEMENTS..............................................................................76
        I. TRUSTEE'S  INJUNCTIONS .........................................................78
        J. MOTIONS TO INTERVENE...........................................................81

XI.     CONCLUSION...................................................................................83

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, Esq. (the "Trustee"), trustee for the substantively consolidated

liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard

L. Madoff ("Madoff" and together with BLMIS, each a "Debtor" and collectively, the

"Debtors"), respectfully submits his Third Interim Report (this "Report") pursuant to section

78fff-1(c) of the Securities Investor Protection Act[1] and in accordance with the terms of the

Order on Application for an Entry of an Order Approving Form and Manner of Publication and

Mailing of Notices, Specifying Procedures For Filing, Determination, and Adjudication of

Claims; and Providing Other Relief entered on December 23, 2008 (the "Housekeeping Order"

or "Claims Procedures Order") [Dkt. No. 12].  Pursuant to the Housekeeping Order, the Trustee

shall file additional interim reports at least every six (6) months hereafter. This Report covers the

period ending March 31, 2010, or as otherwise indicated (the "Report Period").

## I.    **INTRODUCTION**

1.    The Trustee and his counsel (including, but not limited to, B&H, various

international special counsel retained by the Trustee as described in ¶ 110 below ("International

Counsel"), Windels Marx Lane & Mittendorf, LLP ("Windels Marx"), special counsel to the

Trustee, and together with International Counsel and B&H, collectively referred to herein as

"Counsel"), have made significant headway into the investigation of Madoff's fraud.  To date,

the Trustee has filed fourteen (14) avoidance actions seeking to recover more than $14.8 billion

in funds from various feeder funds, Madoff friends and family members and related parties. The

Trustee anticipates filing extensive additional litigation based on investigation conducted by the

Trustee's counsel and consultants.  Because of efforts made by the Trustee and his counsel, as of

March 31, 2010, approximately $1.5 billion has been recovered for the benefit of customers. The Trustee hopes to make an initial *pro rata* distribution of the fund of customer property (the "Customer Fund"), which consists of funds already recovered and to be recovered by the Trustee, sometime before the end of 2010 to customers whose claims were allowed for amounts that exceed the $500,000 maximum that has been paid from advances made by the Securities Investor Protection Corporation ("SIPC"). The Trustee anticipates making subsequent *pro rata* distributions from the Customer Fund, the timing and amount of which will depend on future recoveries and the final and nonappealable determination of net equity. This proposed initial distribution is discussed in further detail in section IX *infra*.

2.      During the Report Period, the Trustee and B&H also made substantial progress in processing and determining the claims of customers of BLMIS. As further described in section VII.A *infra*, as of March 31, 2010, the Trustee had determined 12,249 claims, allowed 2,011 customers claims in the total amount of $5.3 billion, and had committed to pay approximately $668 million in SIPC advances, leaving approximately $4.6 billion in over-the-limits claims.

3.      Given the task of liquidating BLMIS, and in doing so, cooperating with those federal and state authorities investigating the criminal, civil and regulatory matters, the Trustee and his counsel have also dealt with issues spanning a broad spectrum of legal and administrative specialties and disciplines. The Trustee's ability to call on the resources of B&H in such areas as corporate, real estate, bankruptcy, securities, employment, tax, banking, litigation (and others) has been of material assistance in pursuing the Trustee's statutorily-mandated investigations, achieving results, establishing protocols, and directing the efforts of the Trustee's financial professionals.

---

[1] The Securities Investor Protection Act ("SIPA") is found at 15 U.S.C. 78aaa et seq. For convenience, subsequent references to SIPA will omit "15 U.S.C."

4.     During the Report Period, the Trustee and his counsel and staff have met extraordinary challenges, in a manner beneficial to the customers, creditors, and other investors of BLMIS.  This Report is meant to provide an overview of all the efforts engaged in by the Trustee and his team of professionals and to summarize all of the results achieved, as well as challenges faced by the Trustee during the Report Period.

## II.     **BACKGROUND**

5.     BLMIS was founded by Madoff in 1960 and was a sole proprietorship until it became a limited liability company, of which Madoff was the sole member.  BLMIS engaged in three primary types of business: market making, proprietary trading and investment advisory services.  BLMIS was registered with the SEC as a broker-dealer and beginning in 2006 as an investment advisor.  Pursuant to such registration as a broker-dealer, BLMIS was a member of SIPC.  BLMIS was also a member of the Financial Industry Regulatory Authority ("FINRA"), formerly known as the National Association of Securities Dealers, Inc. ("NASD").

## A.     **PROCEDURAL HISTORY**

6.     On December 11, 2008, Madoff was arrested by the FBI in his Manhattan home and was criminally charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. 240.10b-5 in the United States District Court for the Southern District of New York ("District Court"), captioned USA v. Madoff (No. 08-2735). That case number was terminated on March 10, 2009, and a new case number, USA v. Madoff (No. 09 CR 213) was opened and assigned to District Court Judge Denny Chin (the "Criminal Case").

7.     Also on December 11, 2008 (the "Filing Date" for the SIPA liquidation proceeding), the SEC filed a complaint in the District Court against defendants Madoff and BLMIS, captioned Securities and Exchange Commission v. Madoff, et al. (No. 08 CV 10791)

(the "Civil Case").  The complaint alleged that the defendants engaged in fraud through the investment advisor (or "IA") activities of BLMIS.

8.      Based on allegations brought by the SEC against Madoff and BLMIS in the Civil Case, on December 12, 2008, the Honorable Louis L. Stanton of the District Court entered an order which appointed Lee S. Richards, Esq. as receiver for BLMIS (the "Receiver").

9.      On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of the Civil Case with an application filed by SIPC.  Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that the Debtor was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

10.     On that date, the District Court entered the Protective Decree (Civil Case Dkt. No. 4), to which BLMIS consented, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA, therefore, effectively replacing the Receiver as to BLMIS;

(b)     appointed Baker & Hostetler LLP ("B&H") as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

(c)     removed the case to the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court" or "Court") pursuant to section 78eee(b)(4) of SIPA.[2]

11.     On December 18, 2008, the District Court entered the Order on Consent Imposing Preliminary Injunction, Freezing Assets and Granting Other Relief Against Defendants (the "Preliminary Injunction Order").  Among other things, the Preliminary Injunction Order clarified that the Receiver's authority was limited to assets of Madoff's U.K. entity, Madoff Securities International Ltd. ("MSIL").

6

12.     On February 26, 2009, the Receiver submitted a report and application to Terminate the Receivership to the District Court.  After receipt of submissions by the Trustee, the SEC, and the Department of Justice, and after a hearing on March 23, 2009, the District Court issued an order discharging the Receiver and terminating the receivership.

## B.    **MADOFF CHAPTER 7 LIQUIDATION**

13.     On April 10, 2009, at the request of certain creditors of Madoff, the District Court entered an order in the Civil Case modifying Article V of the Preliminary Injunction Order to allow them (as defined below, the "Petitioning Creditors") to file an involuntary bankruptcy petition against Madoff [Civil Case Dkt. No. 46].  The District Court in its Order noted that:

> A Bankruptcy Trustee has direct rights to Mr. Madoff's individual property, with the ability to maximize the size of the estate available to Mr. Madoff's creditors through his statutory authority to locate assets, avoid fraudulent transfers, and preserve or increase the value of assets through investment or sale, as well as provide notice to creditors, process claims, and make distributions in a transparent manner under the procedures and preferences established by Congress, all under the supervision of the Bankruptcy Court.

14.     On April 13, 2009, Blumenthal & Associates Florida General Partnership, Martin Rappaport Charitable Remainder Unitrust, Martin Rappaport, Marc Cherno and Steven Morganstern (collectively, the "Petitioning Creditors"), filed an involuntary chapter 7 bankruptcy petition against Madoff individually in the Bankruptcy Court (Case No. 09-11893 (BRL)) (the "Chapter 7 Case").

15.     On April 21, 2009, pursuant to an Order of the Bankruptcy Court signed on April 20, 2009 directing the appointment of an interim chapter 7 trustee in the Chapter 7 Case, the

---

[2] Pursuant to section 78fff(b) of SIPA, "[t]o the extent consistent with [SIPA], [this] liquidation proceeding [is] be[ing] conducted in accordance with, and as though it [is] being conducted under chapter 1, 3, 5 and subchapters I and II of chapter 7 of [the Bankruptcy Code]."

United States Trustee's Office for the Southern District of New York appointed Alan Nisselson, Esq. as interim trustee for the Chapter 7 Case (the "Chapter 7 Trustee").

16.     On May 5, 2009, the Trustee and SIPC filed a joint motion for entry of an order pursuant to section 105(a) of 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") substantively consolidating the Madoff chapter 7 estate into the BLMIS SIPA Liquidation (the "Substantive Consolidation Motion").

17.     On June 9, 2009, this Court approved and entered a Consent Order [Dkt. No. 252] which, among other things, approved the Substantive Consolidation Motion *nunc pro tunc* to December 11, 2008.

18.     Windels Marx, which had previously been counsel to the Chapter 7 Trustee, was subsequently retained on behalf of the consolidated estate as special counsel to the Trustee and the Chapter 7 Trustee by order dated July 16, 2009, *nunc pro tunc* as of June 9, 2009 [Dkt. No. 327].

C.     **MSIL AND JOINT PROVISIONAL LIQUIDATORS**

19.     On June 9, 2009, the Bankruptcy Court approved two protocols between the Trustee and the Joint Provisional Liquidators ("JPLs") of MSIL.  The protocols provide for cooperation between the Trustee and the JPLs.  Specifically, the Trustee and the JPLs entered into the Cross-Border Insolvency Protocol for the Bernard Madoff Group of Companies (the "Cross Border Protocol") and an Information Sharing Protocol (the "Information Protocol").

20.     The Cross Border Protocol provides that the Trustee and the JPLs will keep each other updated with respect to their activities, including any court proceedings and will work together regarding any assets that the representatives locate.  The Information Protocol covers sharing of information regarding the affairs of BLMIS and MSIL, including by their respective agents.

21.     On June 9, 2009, the MSIL proceeding also was recognized by the Bankruptcy Court as a foreign main proceeding pursuant to Chapter 15 of the Bankruptcy Code.

22.     A winding up order was made by the English High Court in relation to MSIL on December 15, 2009.  The JPLs were subsequently appointed as the Joint Liquidators ("JLs") of MSIL.  The Trustee and his Counsel periodically communicate with the JLs and their counsel or consultants.  The Cross Border Protocol and Information Protocol continue to apply.

D.     **CRIMINAL AND CIVIL CASES**

USA v. Madoff, 09-cr-213, SDNY.

23.     At a plea hearing (the "Plea Hearing") on March 12, 2009 in the Criminal Case, Madoff pled guilty to an 11-count criminal information, which counts included securities fraud, money laundering and theft and embezzlement, filed against him by the United States Attorney's Office for the Southern District of New York ("USAO").  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23:14-17.)  Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."  (Id. at 23:20-21.)  Madoff filed a plea allocution describing some of the details of his fraud (the "Allocution") [Criminal Case Dkt. No. 50].

24.     While operating BLMIS, Madoff represented to clients and prospective clients that he would invest their money in shares of common stock, options and other securities and would, at their request, return profit and principal.  (See Allocution at pg. 1).  As the world is now aware, no such securities were purchased by Madoff.

25.     In pleading guilty to the crimes he committed, Madoff admitted that since at least the early 1990's the IA business of BLMIS was used to operate a Ponzi scheme.  (See Allocution at p. 2).  Madoff solicited billions of dollars under false pretenses and failed to invest investors' funds as promised.  Instead, he deposited investors funds in a bank account at Chase Manhattan

Bank.  (*See* Allocution at pg. 1).  In his Allocution, Madoff also described how he moved funds between this account and other BLMIS accounts in an attempt to conceal the fraud.  (*See* Allocution at pg. 4).

26.     On June 29, 2009, Madoff was sentenced by the District Court to serve, in consecutive terms, the maximum term of incarceration recommended under the U.S. Federal Sentencing Guidelines on each count to which Madoff pled guilty.  The sentence totals 150 years in prison.  Madoff is currently serving his sentence at a federal correctional facility in North Carolina.

SEC v. Madoff, No. 08-cv-10791, SDNY.

27.     As described above in ¶ 7, on December 11, 2008, the SEC filed the Civil Case against Madoff and BLMIS.  The complaint alleged that the defendants engaged in fraud through investment advisor activities of BLMIS.

USA vs. DiPascali, 09-cr-764, SDNY.

28.     In 1975, Frank DiPascali, Jr. ("DiPascali"), who was eighteen (18) years old at the time, began working at BLMIS as a stock researcher and as Peter Madoff's assistant. DiPascali quickly rose within the company ranks to became Director of Options Trading in 1986, and Chief Financial Officer in 1996.  DiPascali eventually became a key lieutenant in Madoff's operation and oversaw the day-to-day operations of Madoff's investment-advisory business. DiPascali frequently interacted with investors as they were told that he was the one who executed their trades.

29.     In August 2009, DiPascali plead guilty in the District Court to ten criminal counts, including: conspiracy, securities fraud, mail fraud, wire fraud, investment fraud, two counts of falsifying the books of a broker dealer, international money laundering, perjury and federal income tax evasion.  He faces a maximum of 125 years in prison.  In his statement to the

court, DiPascali said that he helped Madoff defraud investors from as early as the late 1980's

until December 2008. DiPascali admitted that, during this time period, BLMIS did not buy or

sell securities through its investment advisory business, and that he had fabricated account

statements, knowingly lied to investors and committed perjury before the SEC. Said DiPascali:

> From at least the early 1990s through December of 2008, there was
> one simple fact that Bernie Madoff knew, that I knew, and that
> other people knew but that we never told the clients nor did we tell
> the regulators like the SEC. No purchases of sales of securities
> were actually taking place in their accounts. It was all fake. It was
> all fictitious. It was wrong and I knew it was wrong at the time, sir.

Plea Hr'g Tr. at 46:9-15.

30.     According to media reports, DiPascali has been cooperating with federal

investigators looking into the Madoff fraud since February. Upon DiPascali's guilty plea, U.S.

District Judge Richard Sullivan denied the federal prosecutor's request that DiPascali be released

on $2.5M bail. On February 23, 2010 an order was entered by Judge Sullivan setting forth the

conditions for release on bail pending sentencing; conditions include a $10 million personal

recognizance bond to be secured by at least $2 million in cash or property. DiPascali will remain

on house arrest prior to his sentencing.

31.     On February 1 and 2, 2010, stipulations were entered with respect to the surrender

of certain DiPascali property to the U.S. Marshal Service in partial satisfaction of the criminal

forfeiture money judgment in the amount of $170.25 billion entered against DiPascali. Personal

items to be seized and sold include DiPascali's residence in Bridgewater, New Jersey, a speed

boat and a jetski.

SEC v. DiPascali, 09-cv-7085, SDNY.

32.     On August 11, the SEC filed civil charges against DiPascali, citing securities

fraud related to his overseeing of a fictitious investment strategy and the creation of millions of

fake documents and trading records.   The SEC charges indicate that DiPascali sustained the fraud from at least the 1980's all the way up to firm's December 2008 collapse.   The complaint also states that this level of fraud took great effort due to DiPascali's ability to hide thousands of BLMIS investor advisory accounts from SEC registration.   To continue the deception, DiPascali prepared a "cooked" set of books and records to provide regulators false information upon a review of the true scope and size of BLMIS.   Finally, the SEC complaint states that DiPascali misappropriated investor funds for his personal gain – from which he withdrew more than $5M between 2002 and 2008.

33.     The SEC complaint seeks financial penalties and a court order requiring DiPascali to return all ill-gotten gains.

USA v. Friehling, 09-cr-700, SDNY.

34.     Since the late 1970's, Friehling & Horowitz, a little-known accounting office in New York City's northern suburb of New City, New York, conducted the independent accounting and auditing work for BLMIS.   At the time it began working with BLMIS, the firm consisted of one partner, Jerome Horowitz, an accountant and a secretary.   In 1991, Jerome Horowitz began to work part-time and handed the majority of the firm's accounts to his son-in-law, David Friehling.   Friehling held his post until Madoff's 2008 arrest.   From 2004 to 2007, Friehling was paid about $13,500 per month by BLMIS - despite never verifying the firm's sources of revenue, assets, bank account statements or alleged stock purchases.

35.     On November 3, 2009, Friehling pled guilty in District Court for his role as independent BLMIS auditor.   Friehling told District Judge Alvin Hellerstein that he (a) did not conduct an independent investigation of BLMIS (b) did not follow the generally accepted accounting rules required of his profession and (c) accepted Madoff's claims about the firm's finances at "face value".   Friehling pled guilty to nine counts including securities fraud,

12

investment-advisor fraud and obstructing tax law administration. Friehling also admitted that he prepared false returns for Madoff and "others". It is possible that Friehling is cooperating with federal law enforcement authorities.

36.    Friehling was released on a $2.5 million bond. His sentencing was adjourned to September 3, 2010. He faces up to 114 years in prison.

SEC v. Friehling, 09-cv-2467, SDNY.

37.    On March 18, 2009, the SEC charged Friehling with committing securities fraud by falsely representing that he had conducted a legitimate audits of BLMIS, when, in fact, he had not. The SEC's complaint alleges that Friehling enabled the Ponzi scheme by falsely stating in annual audit reports that his accounting firm, Friehling and Horowitz, had conducted annual audit reports pursuant to the Generally Accepted Auditing Standards (GAAP) required by the profession. These statements were materially false as Friehling never performed a meaningful audit nor did he ever perform any auditing procedures to confirm that the securities being held on behalf of BLMIS investors even existed. Finally, in an effort to absolve himself from peer review, Friehling openly lied to the American Institute of Certified Public Accountants by denying that he conducted any audit work whatsoever.

38.    The SEC's complaint seeks permanent injunctions, civil penalties and a court ordering requiring Friehling to return all ill-gotten gains.

USA v. O'Hara and Perez, 10-cr-00228 SDNY.

39.    On November 13, 2009, Jerome O'Hara and George Perez, two BLMIS computer programmers, were arrested and appeared in District Court on federal charges for their role in helping Madoff cover up his fraudulent Ponzi scheme. The USAO complaint alleged that, for over a fifteen-year period, Madoff and DiPascali routinely asked O'Hara and Perez to, among other things, create records that combined the actual positions and activity from BLMIS' market-

13

making and proprietary trading business with the fictional balances on customer accounts.  The programmers used this data to manipulate and create false trading documents, DTC reports, trade blotters and stock records. Furthermore, O'Hara and Perez used an out-dated and technologically insufficient computer on the 17th floor (known internally as "House 17") to print millions of phony customer statements and trade records.

40.    The complaint further alleged that, in 2006, O'Hara and Perez had a crisis of conscience and attempted to delete 218 of the 225 special programs on the House 17 computer. The programmers allegedly decided afterward to cash out hundreds of thousands of dollars from their BLMIS accounts and promptly tell Madoff that they would refuse to create any more false records for BLMIS.  Madoff responded by offering them as much money necessary to keep them quiet on the matter and not expose the fraud.  Madoff ended up paying both Perez and O'Hara a 25% salary increase and a one-time bonus of more than $60,000 each.  In exchange, the programmers modified the House 17 computer so that the trading statements could be easily manipulated by DiPascali.

41.    On March 17, 2010, O'Hara and Perez were indicted by a federal grand jury on charges that they assisted in covering up the Ponzi scheme. The three-count indictment includes charges of falsifying the books and records of a broker-dealer and of an investment advisor, and conspiracy.  If convicted, they each face up to thirty (30) years in prison on conspiracy, twenty (20) years for falsifying books and records of a broker-dealer, and five (5) years for falsifying books and records of an investment adviser.  On March 25, 2010, both men pled not guilty to the charges.

SEC v. O'Hara and Perez, 09-cv-9425 SDNY.

42.    On November 13, 2009, the SEC filed civil charges against O'Hara and Perez for their role in helping Madoff cover up his fraudulent Ponzi scheme.  The SEC's complaint is

seeking financial penalties and a court order requiring the programmers return their ill-gotten

gains. The defendants currently have until May 14, 2010 to answer the SEC's complaint.

USA v. Bonventre, 10-mj-385 SDNY.

43.    On February 25, 2010, Daniel Bonventre, former operations director at BLMIS,

was arrested and appeared in District Court on federal charges for his role in the Madoff Ponzi

scheme. Bonventre joined BLMIS in 1968 and served as its director of operations, overseeing

the back-office record-keeping staff, since at least 1978.

44.    Bonventre was indicted by a federal grand jury on March 24, 2010 on nine (9)

counts of securities fraud, conspiracy, and other charges related to his role in Madoff's firm. If

convicted, Bonventre could face up to eighty-two (82) years in prison and a fine. The USAO

complaint alleged that Bonventre participated in doctoring records to conceal for at least a

decade that the firm was being propped up with money illegally siphoned from investor accounts

and had borrowed money to cover withdrawals from the Ponzi scheme during a cash shortage

that began in late 2005.

45.    According to the USAO complaint, Madoff preserved his fraud, in part, by using

funds from government agency bonds from an unidentified investor as collateral for $145 million

in loans to his brokerage firm, which he used to cover redemptions from his corrupt investment

advisory business. Bonventre allegedly arranged the loans and created the false paper trail that

concealed the bailout of the Ponzi scheme. According to the complaint, the scheme got so low

on cash during the crisis that Madoff also had to draw on his firm's operating accounts to meet

four separate investor redemption requests totaling nearly $262 million from January 30 to April

13, 2006. Prosecutors say that Bonventre created the fictional ledger entries that concealed the

illicit use of the funds and the repayment of the money from the Ponzi scheme's cash account

after the crisis was over.  Bonventre is also accused of personally pocketing nearly $2 million

from the scheme through fake transactions in his own Madoff accounts.

46.     On March 25, 2010, Bonventre pled not guilty to the charges brought against him.

SEC v. Bonventre, 10-cv-1576 SDNY.

47.     Also on February 25, 2010, the SEC separately brought civil securities and

accounting fraud charges against Bonventre, alleging he helped disguise Madoff's fraud and

financial losses at BLMIS by misusing and improperly recording investor money to create the

false appearance of legitimate income.

### III.     <u>LIQUIDATION PROCEEDING</u>

48.     On December 23, 2008, this Court approved the Trustee's Bond (Dkt. No. 11).

Pursuant to an application of the Trustee dated December 21, 2008 (Dkt. No. 8), this Court

entered the Housekeeping Order (Dkt. No. 12), which directed, among other things, that on or

before January 9, 2009 (a) a notice of the commencement of this SIPA proceeding be published

in all editions of *The New York Times, The Wall Street Journal, The Financial Times, USA

Today, Jerusalem Post* and *Ye'diot Achronot*; (b) notice of the liquidation proceeding and claims

procedure be given to persons who appear to have been customers of BLMIS by mailing to each

such person, at the last known address appearing on the books of BLMIS, a copy of the notice,

proof of claim form and instructional materials approved by the Court; (c) notice of the

liquidation proceeding and a claim form be mailed to all known general creditors of the Debtor;

and (d) notice be given of the hearing on disinterestedness of the Trustee and his counsel (see

section 78eee(b)(6) of SIPA) scheduled for February 4, 2009 and the meeting of creditors,

scheduled for February 20, 2009.

49.     As discussed in further detail in ¶ 74 below, the required notice was published on

January 2, 2009, in all required publications [Dkt. No. 57], and a mailing to customers and

general creditors of BLMIS was completed on January 9, 2009 [Dkt. No. 76].[3]    Potential
claimants were advised of the Court-approved and statutory time limits for filing claims.

50.    On February 4, 2009, this Court entered the Order Regarding Disinterestedness of
the Trustee and Counsel to the Trustee [Dkt. No. 69], finding that the Trustee and B&H are
disinterested pursuant to section 78eee(b)(6) of SIPA, section 327(a) of the Bankruptcy Code and
Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 2014(a) and therefore met the
disinterestedness standard required by section 78eee(b)(3) of SIPA, section 327(a) of the
Bankruptcy Code, and Bankruptcy Rule 2014(a).    Accordingly, the Trustee is duly qualified to
serve and act on behalf of the Debtor's estate.

51.    On February 20, 2009, a meeting of creditors under section 341(a) of the
Bankruptcy Code was held.    No representative of the Debtor appeared for examination at that
meeting.    The Trustee and his counsel, as well as the SIPC staff, attended the meeting of
creditors and reported on the then current state of affairs as well as the process for filing and
determining customer claims.    The Trustee and counsel then responded to inquiries made by over
150 customers and creditors who attended the meeting and to questions received via email prior
to the meeting.    In addition, the Trustee made over 1,000 phone lines available for those
customers and creditors who could not attend the 341 meeting to listen in live, and also posted a
video link to the 341 meeting on the Trustee website.

IV.    **ADMINISTRATION OF THE ESTATE**

52.    The Trustee has made every effort to keep customers and other interested parties
informed of his ongoing efforts to administer the BLMIS estate, including responding to

---

[3] In addition, materials were mailed in response to requests from customers or general creditors.    Furthermore, all claims
packages were made available for download on the Trustee's website, www.madofftrustee.com, and on SIPC's website,
www.sipc.org.

hundreds of phone calls, emails, and letters, establishing a telephone call center to respond to inquiries from claimants and their representatives (see discussion on customer claims process *infra* at Section VII.A), creating a website to serve as a clearinghouse for information (www.madofftrustee.com), and meeting with representatives of customers, creditors, regulatory authorities and other interested parties.

A.     **RETENTION OF PROFESSIONALS**

53.     In addition to the professionals already retained by the Trustee as described in ¶ 23 of the Trustee's First Interim Report, dated July 9, 2009 (the "First Interim Report") [Dkt. No. 314] and ¶ 49 of the Trustee's Second Interim Report, dated November 23, 2009 (the "Second Interim Report") [Dkt. No. 1011], the Trustee has retained the firm of Kugler Kandestin, L.L.P. as counsel in Quebec, Canada.  The Trustee has also retained, with the approval of SIPC, a number of consultants and expert witnesses.[4]

B.     **MARSHALLING AND LIQUIDATION OF ESTATE ASSETS**

54.     The Trustee and his counsel have worked diligently to investigate, examine and evaluate the Debtor's activities, assets, rights, liabilities, customers and other creditors.  Thus far, the Trustee has been successful in recovering a significant number of assets and in liquidating some of those assets for the benefit of customers, totaling approximately 1.5 billion.[5]  These asset recoveries include: the sale of the Debtor's market making operations; the settlement of BLMIS' trades and open positions; cash recoveries from banks and brokerage accounts that held BLMIS' funds; class action settlement recoveries; the sale of sports tickets; insurance refunds; refunds of political contributions; tax recoveries; the sale of BLMIS loan participations; the sale

---

[4] A SIPA trustee has authority, subject to approval from the Securities Investor Protection Corporation ("SIPC") but without need for Court approval, among other things, to "hire and fix the compensation of all personnel (including officers and directors of the debtor and of its examining authority) and other persons (including accountants) that are deemed necessary for all or any purposes of the liquidation proceeding." 15 U.S.C. §78fff-1(a)(1).  Each of the Trustee's hiring decisions to date has been reviewed and approved by SIPC.

[5] This number for recoveries was as of the end of the Report Period.

of BLMIS DTCC shares; pre-litigation settlements with various funds and entities for the return of customer property (see Section X.H *infra*); and various other miscellaneous recoveries. For a more detailed discussion of these recoveries, see Section V.B. of the First Interim Report and Section IV of the Second Interim Report. During the current Report Period, the Trustee has made recoveries from the following estate assets:

Trustee's Various Accounts and Recoveries From BLMIS Accounts.

55.    The Trustee maintains a regular operating account at Citibank, which is primarily funded by SIPC advances, and from which he pays administrative expenses and customer claims. As of March 31, 2010, the balance of this account was $58,023,064.43 (this amount does not include $6,356,872.78 in checks that were written but did not clear during the Report Period ). On December 21, 2009, the Trustee opened an Insured Money Market account maintained by Citibank. As of March 31, 2010, the balance of this account was $60,083,317.49.

56.    The Trustee maintains a preferred custody interest-bearing account at Citibank. As of March 31, 2010, the total balance of the preferred custody account was $1,029,603,320.06, which consisted of $929,488,946.43 in short term investments comprised of U.S. Treasury Bills with maturities between May 27, 2010 and December 16, 2010 and $100,114,373.63 in U.S. Treasury Notes dated November 30, 2009 and maturing November 30, 2011.

57.    The Trustee has a brokerage account with Morgan Joseph & Co., Inc., clearing through J.P. Morgan Clearing Corp. As of March 31, 2010, the total value of the Trustee's Morgan Joseph account was $304,868,129.00, consisting of a money market position of $22,141,538.60, equity securities of $10,417.81 and fixed income securities of $282,675,903.00. The fixed income securities include U.S. Treasury Bills of $179,801,940.00 with maturities between June 17, 2010 and December 16, 2010, and two U.S. Treasury Notes, which total $102,873,963.00 with maturities on April 30, 2010 and November 30, 2011, respectively.

58.    As described in the First Interim Report, the Trustee had recovered a significant amount of cash from financial institutions at which BLMIS maintained accounts (see First Interim Report, ¶¶ 35-37).  The Trustee has received an additional $1,452.39 from CIBC in the current Report Period.

Class Action Settlement Recoveries.

59.    The Trustee has identified claims that BLMIS had made before his appointment in at least six (6) class action suits.  The Trustee received distributions from five (5) of the six (6) class action settlements totaling $91,830.34.  The Trustee was notified that no distribution would be forthcoming from the sixth class action settlement as the claim filed by BLMIS pre-liquidation was missing required documentation.

60.    In addition, the Trustee has identified additional claims that BLMIS may have in forty-eight (48) other class action suits.  The Trustee has filed proofs of claim in thirty (30) of these cases, and, subject to the completion of a review of relevant records, intends to file claims in the other eighteen (18).  The Trustee has recovered $65,800.20 from one of those class action settlements.  The Trustee continues to review this area.

Miscellaneous Recoveries.

61.    In addition to the above, the Trustee has recovered $228,749.27 in miscellaneous recoveries from sources such as cancellation of various subscriptions and memberships.

C.    **WIND-DOWN OF ESTATE OPERATIONS**

Termination of BLMIS Employees.

62.    As was described in ¶ 52 of the First Interim Report and ¶ 68 of the Second Interim Report, as of December 12, 2008, 140 individuals were on the BLMIS payroll.  The two largest termination stages took place at the end of January and March 2009, which accounted for 80% of the individuals on payroll.  The remaining employees on the Trustee's payroll who were

needed to assist in winding down certain aspects of the business were terminated as of June 30, 2009.

Termination and Liquidation of BLMIS-Sponsored Benefit Plans.

63.     As part of the process of winding down the business operations of BLMIS and dismissing its many managers and employees in an orderly and equitable fashion, the Trustee (through counsel) reviewed the many employee benefit plans BLMIS sponsored and maintained for its employees and their dependents, incident to terminating those plans and providing for the orderly resolution and liquidation of all affected individuals' and vendors' plan-related rights and claims.  Initial efforts by the Trustee, B&H and AlixPartners LLP, the Trustee's consultant and claims agent ("AlixPartners"), consisted of identifying all such plans; investigating the extent to which those plans had been administered, funded, invested and maintained; identifying and rectifying any problems associated with the communication of terms, the payment or denial of benefits, and the arrangements made with plan fiduciaries and third party service providers; identifying any circumstances under which claims might be made, or actions could be taken by federal or state regulators, against the estate; and protecting the privacy rights of BLMIS' current and former employees and dependents.

64.     As a result of the initial efforts of B&H and AlixPartners, BLMIS was found to have provided health, accident and sickness benefits, retirement-related benefits, and life insurance, disability income and accidental death and dismemberment benefits under as many as six (6) identifiable employee benefit plans; some of those benefits were provided through group insurance contracts and policies, while others were provided on a self-insured basis (including a group health plan which covered substantially all of BLMIS' former employees and their respective dependents) or were provided through a separately-established trust fund (such as the BLMIS-sponsored 401(k) plan).  Substantially all of the benefit plans needed to be brought into

compliance with relevant law, including the Employee Retirement Income Security Act ("ERISA") prior to termination, and several of the contractual arrangements made with third parties, including third party administrators, trustees and insurance companies, needed to be modified or replaced.

65.    On May 27, 2009, the Bankruptcy Court entered an order confirming the Trustee's authority to modify, then terminate effective May 31, 2009, and finally liquidate and wind down, all of the BLMIS-sponsored health and welfare plans by collecting and adjudicating all plan-related claims made by employees, covered dependents and third parties; negotiating agreements with vendors to provide for the handling, storage and disposal of plan records (including medical records subject to federal and state privacy laws); notifying all affected individuals and third parties of their plan-held or plan-related rights; and providing for the payment of meritorious claims and the denial and discharge of  ineligible or untimely claims. The liquidation and wind-down process was completed during the Report Period. No claims for plan benefits were received after the published August 2009 cut-off date, and all claims received on or prior to the cutoff date were completely processed and adjudicated.  The submission of final reports prepared by the Trustee and tax reports to the federal authorities responsible for plan oversight, including the Internal Revenue Service and the United States Department of Labor ("DOL")  were timely filed (taking into account a permitted extension), on March 15, 2010.

66.    The Trustee also completed a number of steps to terminate the BLMIS-sponsored 401(k) plan and liquidate and distribute its assets.  On November 3, 2009, the Trustee notified the remaining 401(k) plan participants of the upcoming termination of the plan.  On November 24, 2009, the Court approved the Trustee's motion to terminate the 401(k) plan as of December 15, 2009.  The Trustee then entered into an agreement with Millennium Trust Company to serve as an individual retirement account ("IRA") custodian for any account balances remaining after

December 15, 2009. Winding down the 401(k) plan was completed during the Report Period; however, the time required to compile and submit final reports and returns to the federal authorities responsible for plan oversight is expected to be completed after the date of this report.

## V.    FINANCIAL CONDITION OF ESTATE

67.    A summary of the financial condition of the estate as of February 28, 2010 is provided on Exhibit A attached hereto.[6]    To date, the Trustee has incurred significant administrative expenses in maintaining the BLMIS office, including rent payments (although since the sale of the market making operation, this has decreased substantially), monthly payment of legal fees and consultant fees (all approved by SIPC), the digitizing of records and costs associated with determining customer claims.    All administrative costs to date associated with the liquidation proceeding have been paid from SIPC administrative advances.    Since they are chargeable to the general estate, payment has no impact on recoveries that the Trustee has obtained and will obtain, and that will be allocated to the fund of customer property.

68.    As detailed on Exhibit A, as of February 28, 2010, the Trustee had requested and SIPC had advanced a total of $744,260,386.34, of which $141,819,540.89 was for administrative expenses and the balance of $602,440,845.45 was to pay allowed customer claims up to the maximum SIPA limit ($500,000 per account).    During March 2010, the Trustee requested additional SIPC advances totaling $809,320,017.07, of which $152,894,602.58 was for administrative expenses and $656,425,414.49 was to pay allowed customer claims.[7]

---

[6]    A report of the financial condition of the estate ending March 31, 2010, was not available in time for the filing of this Report. As stated in ¶ 55 above, as of March 31, 2010, the Trustee had $58,023,064.43 in his regular operating account at Citibank.

[7]    As of the end of the Report Period, the Trustee had determined and allowed 2,011 claims, which amounts to $668,102,200.32 in SIPC advances (see ¶ 85 below).    As described below in ¶ 84, the Trustee must receive an executed assignment and release form before he obtains an advance of funds from SIPC.    Thus, the amount of SIPC advances requested by the Trustee to pay allowed customer claims that have been determined during the Report Period is less than the amount of SIPC advances received by the Trustee during the Report Period for such purpose.

## VI.    **GOVERNMENT FORFEITURE**

69.    On April 20, upon an ex parte application by the USAO, Judge Chin issued a post-indictment restraining order in the Criminal Action (the "Restraining Order").  In pertinent part, the Restraining Order restrained Madoff and Ruth Madoff from the transfer or dissipation of assets subject to forfeiture.  The Restraining Order exempts the USAO from the restraining provisions, and further states that the USAO may provide specific written authorization to third parties to take actions otherwise prohibited by the Restraining Order.

70.    In connection with its criminal investigation of Madoff's fraudulent scheme and the resulting guilty pleas of several co-conspirators, the USAO has criminally forfeited proceeds pursuant to consent orders from Bernard and Ruth Madoff, Frank DiPascali, and David Friehling.

71.    On September 21, 2009, the USAO filed a motion in the District Court pursuant to Title 18, United States Code, Section 3663A(c)(3) for a finding that restitution would be impracticable in light of the large number of identifiable victims and the complex factual analysis required to assess the victims' losses.  Accordingly, the USAO requested that it be able to proceed through the process of remission as authorized under the forfeiture statutes at Title 21, United States Code, Section 853(9) and the regulations promulgated thereunder.  Among other options to maximize the efficiencies of the remission process and return the most value to the victims, the USAO stated in its motion papers that it would consider the possibility of appointing the SIPA Trustee, Irving Picard, as a special master to assess victim claims and distribute the forfeited proceeds in accordance with provisions of 28 CFR Part 9.  [Criminal Case Dkt. No. 105]

72.    By order dated September 24, 2009, Judge Chin granted the USAO's motion, finding that restitution is impracticable and the government would be permitted to proceed by

remission [Criminal Case Dkt. No. 106]. Upon a motion dated September 29, 2009, certain victims of Madoff requested that Judge Chin reconsider his order and condition any order of remission on a net equity calculation based on the November 30, 2008 customer statements [Criminal Case Dkt. No. 110]. The victims also objected to the appointment of Mr. Picard to assist in the remission process. In an order dated October 27, 2009, Judge Chin denied the motion for reconsideration and ruled that any objections to the resolution of customer claims or appointment and retention of the Trustee should be filed with the Bankruptcy Court [Criminal Case Dkt. No. 119].

VII.    **CLAIMS ADMINISTRATION**

A.    **CUSTOMER CLAIMS**

The Claims Processing Order and Notices of the Bar Date.

73.    The Trustee sought Court approval for and implemented a customer claims process in accordance with SIPA. As discussed in ¶ 48 above, the Claims Procedures Order approved (i) the form and manner of publication of the notice of the commencement of the liquidation proceeding (the "Notice") and (ii) specified the procedures for filing, determining and adjudicating customer claims.

74.    On January 2, 2009, the Trustee mailed a copy of the Notice and claims filing information to (i) all persons and entities that are or appear from available records to have been a customer of BLMIS at any time, (ii) creditors other than customers or broker-dealers and (iii) broker-dealers who were identified as BLMIS customers based on a review of BLMIS' books and records. More than 16,000 potential customer, general creditor and broker-dealer claimants were included in the mailing of the Notice. The Trustee published the Notice in all editions of The New York Times, The Wall Street Journal, The Financial Times, USA Today, Jerusalem Post and Ye-diot Achronot by January, 2009. The Trustee also posted claim forms and claims

filing information on the Trustee's website (www.madofftrustee.com) ("Trustee Website"), and SIPC's website (www.sipc.org) ("SIPC Website").

75.     Under the Claims Procedures Order, claimants were to mail their claims to the Trustee at the following address: Irving H. Picard, Esq., Trustee for Bernard L. Madoff Investment Securities LLC, Claims Processing Center, 2100 McKinney Avenue, Suite 800, Dallas, Texas 75201.  All customers and creditors were notified of the mandatory statutory bar date for filing of claims under section 78fff-2(a)(3) of SIPA, which was July 2, 2009 (the "Bar Date").  Any claims received after July 2, 2009 are deemed untimely and will not be allowed. The Notice published in the newspapers, mailed to claimants and posted on the Trustee's and SIPC's websites, stated in boldface that "[n]o claim of any kind will be allowed unless received by the trustee within six (6) months after the date of this Notice."  The Instructions for completing the Customer Claim and general creditor claim forms also included that information.

76.     On May 21, 2009, the Trustee mailed a reminder notice to customers who had not yet filed a claim that the statutory bar date was July 2, 2009.

77.     On June 22, 2009, the Trustee mailed over 7,700 final bar date reminder notices (the "Final Reminder Notice") relating to over 4,200 past and present customer account holders of BLMIS from whom a claim had not yet been received.  In addition, the Trustee posted the Final Reminder Notice on the Trustee Website.  In the Final Reminder Notice, the Trustee acknowledged that certain litigation had been filed regarding the Trustee's definition of "net equity" under SIPA and that this Court's decision on this issue may affect whether or not certain customers have an allowed claim in this proceeding (such litigation is discussed in Section X.A, *infra*).  The Trustee urged all customers to file a claim by the July 2, 2009 in order to ensure that the Trustee considers their claim.  The mailing of the Final Reminder Notice was unprecedented in SIPA proceedings and represented an extraordinary effort by the Trustee.

78.     As noted above, the Bar Date for the filing of claims under section 78fff-2(a)(3) of SIPA was July 2, 2009.  As of March 31, 2010, the Trustee had received 16,314 customer claims, including those filed both timely and untimely, and duplicate and supplemental claims. The books and records of BLMIS reflect that there were 8,095 non-administrative IA accounts. As of December 11, 2008, 4,903 accounts were active, i.e, either a monthly customer statement was generated for the account for the period ending November 30, 2008 or the account was opened in December 2008.  The Trustee has received multiple claims for many accounts.

Claims Processing.

79.     In compliance with the Claims Procedures Order, the Trustee has developed a comprehensive claims administration process for the intake, reconciliation, and resolution of customer claims.  The Trustee's dedicated team of professionals including business consultants, forensic accountants, and attorneys work together through the various levels of review a claim must undergo before it can be determined and allowed.

80.     At the initial intake stage, AlixPartners, the Trustee's claims agent receives and reviews each filed claim to insure they are filled out properly and all relevant information is included.  If any information is missing, the claims agent sends a request for supplemental information.  As of March 31, 2010, AlixPartners had mailed over 670 requests for supplemental information.

81.     In the next stage - the research stage - FTI, the Trustee's forensic accountants, review each claim, information gathered from BLMIS' books and records regarding the account at issue and information submitted directly by the claimant.  The results of this review are noted on each account and are ultimately used by the Trustee in assessing his determination of the claim.

82.     At the third review stage, the claims are moved to SIPC where a SIPC claims review specialist provides a recommendation to the Trustee regarding how each claim should be determined.  Once a recommendation has been made by a SIPC reviewer, the Trustee and his counsel then review the recommendation and legal or other issues that have been raised in prior review stages.  Once the Trustee has decided upon a resolution of a claim, the Trustee issues a determination letter to the claimant.

83.     The Trustee has or will mail a determination letter to every claimant when that claimant's claim is determined.  The determination letter explains how the customer's claim has been determined by the Trustee, states the amount of the allowed or denied claim, based on the net equity of the customer's account on a cash in/cash out basis, and sets forth the amount of SIPC protection available to the customer, if such claim is allowed.  Pursuant to the Claims Procedures Order, if the claimant does not object to the Trustee's determination within 30 days of the date on which the Trustee mailed the determination letter, the Trustee's determination will be deemed confirmed by the Court and binding on the claimant.

84.     Together with the determination letter, the Trustee mails either a full or partial assignment and release to customers with allowed claims.  This agreement states that the claimant agrees with the Trustee's determination and treatment of the claim as set forth in the determination letter.  This agreement must be executed and notarized by the claimant and received by the Trustee before the Trustee seeks a SIPC advance to fully or partially satisfy the claim within SIPA limits.

Interim Results of the Claims Process During the Report Period.

85.     Notwithstanding the monumental and unprecedented task faced by the Trustee, the Trustee has made substantial progress in reviewing and determining customer claims.  As of March 31, 2010, the Trustee had determined 12,249 claims.  Out of those determined, the

Trustee allowed 2,011 claims and committed to pay approximately $668 million in cash advances from SIPC. This is the largest commitment of SIPC funds in any one SIPA liquidation proceeding and exceeds the total aggregate payments made in all SIPA liquidations to date. As of March 31, 2010, the total amount of customer claims allowed was $5,310,849,986.29. The total over-the-limits claim amount on these claims – the amount by which allowed customer claims exceed the committed SIPC advances – was $4,642,747,785.97.

86.     As of March 31, 2010, the Trustee had also determined and denied 10,238 claims on the basis that (i) those accounts had withdrawn more money out of the accounts than was deposited to the accounts, applying the net equity investment method (cash in/cash out) to all account transactions over the life of the account or (ii) the claims were filed by claimants who did not have accounts at BLMIS and/or were indirect investors through feeder funds or other financial institutions. On March 19, 2010, the Trustee filed a motion to approve and set a briefing schedule for issues relating to the denial of claims of indirect investors, as further discussed in section X.C *infra*.

The Hardship Program.

87.     In an effort to speed relief to those BLMIS customers who had been hardest hit by the BLMIS Ponzi scheme, the Trustee implemented a Hardship Program in early May 2009 to expedite the determination of eligible customer claims and, therefore, payment of SIPC protection to those individuals facing severe hardship. The types of hardship considered includes, among others, the inability to pay for necessary living expenses (food, housing, utilities and transportation); inability to pay for necessary medical expenses; necessity to return to work, at the age of 65 or older, after having previously retired from former employment; declaring personal bankruptcy; and inability to pay for the care of dependents.

88.    The Trustee's counsel has evaluated each hardship application to determine whether or not the application should be approved for inclusion in the Hardship Program and provided written notification of the decision within 20 days of receipt of the application.   In some instances, rather than deny the application, the Trustee requested further information from the applicants in an effort to make sure the applicants receive full consideration of their hardship status.

89.    Once the Trustee accepts an applicant into the Hardship Program, the Trustee endeavors to determine the claim within 20 days of the customer's entry for the Hardship Program if the claimant's account was opened at BLMIS after January 1, 1996.  For claims on accounts that were opened at BLMIS prior to 1996, the Trustee is currently working to reconstruct the records for these years (most of which have been completed).  The Trustee is committed to determining these accounts as soon as the records are available.  As of March 31, 2010, the Trustee had received 317 Hardship Program applications and approved 212 applications.  Most of the remaining Hardship applications were ineligible for the program, either because the account had a negative net equity (meaning the investor had withdrawn more than they had deposited) or the application was from a third-party investor.  As of March 31, 2010, 232 of the claims relating to the Hardship Applications have been determined, 2 have been partially determined and 83 claims have not been determined.  The accounts that have not yet been determined are under various stages of review.

90.    The Trustee has departed from the practice in past SIPC proceedings and has committed to paying the undisputed portion of any disputed or objected-to claims, including Hardship Claims, even if there is a dispute over the full amount of the claim.  The purpose of this procedure is to expedite payment of SIPC protection to claimants while preserving their rights to dispute the total amount of their claim.

Settlement of Preferences.

91.     The Trustee has engaged in settlement negotiations with customers who withdrew funds from their BLMIS Accounts within ninety (90) days of the Filing Date.  Such withdrawals are preferential transfers recoverable by the Trustee under sections 547(b) and 550(a) of the Bankruptcy Code, which sections are applicable in this proceeding pursuant to sections 78fff(b) and 78fff-2(c)(3) of SIPA.  To settle potential preference actions against these customers, the Trustee has proposed that the customers agree to authorize the Trustee to deduct the preferential amount from the initial payment advanced by SIPC pursuant to section 78fff-3(a)(1) of SIPA. The allowed claim is thus calculated based on the amount of money the customer deposited with BLMIS for the purchase of securities, less subsequent withdrawals, plus the preferential amount. The customer will be entitled to receive an additional distribution from the fund of customer property based on the total amount of the allowed claim.

92.     The Trustee has been working to reach settlements in connection with claims resolution in accordance with the provisions of the Claims Procedures Order.   As of March 31, 2010, the preference team has reached agreements with 83 customers to settle the Trustee's claims against them in connection with preferential transfers.  These account-holders agreed to return to the Trustee a combined total of $31,367,888.29 to be added to the fund of customer property and be available for future distribution.  These settlements allow the Trustee to avoid the costly litigation that would be necessary to obtain and collect judgments from each of these individual customers.

The Trustee Has Worked to Keep Customers Informed of the Status of the Claims Process.

93.     Throughout the liquidation proceeding, the Trustee has kept customers, other interested parties and the public informed of his efforts by maintaining the Trustee Website, a customer hotline, holding a Section 341(a) meeting of creditors on February 20, 2009, holding

various press conferences regarding the status of customer claims and he and his counsel responding to the multitude of phone calls, e-mails and letters he receives on a daily basis.

94.    The Trustee established the Trustee Website for centralized distribution of as much information as possible, including (i) regular press releases and statements on the status and progress of the proceedings; (ii) statistics on the number of claims determined, the dollar amount of the proposed allowed claims, the dollar amount of SIPC protection provided on such claims and the dollar amount by which the proposed allowed claims exceed the statutory limits of SIPC protection (which statistics are generally updated twice a week); (iii) copies of Bankruptcy Court filings; (iv) claims-related information and claim forms; (v) details regarding the Hardship Program, including Hardship Program application forms; and (vi) other news directly or indirectly related to the liquidation proceeding.

95.    The Trustee Website also allows claimants to e-mail their questions directly to the Trustee's representatives, who follow up with a return e-mail or telephone call to the claimants. As of March 31, 2010, the Trustee and his professionals have received and responded to more than 2,820 e-mails from BLMIS customers as well as their representatives.

96.    In addition, the Trustee established a toll-free hotline for BLMIS customers to call for information.  As of March 31, 2010, the Trustee's professionals have fielded more than 6,450 hotline calls from claimants as well as their representatives, and have provided status updates on claims, addressed claimants' questions or concerns and offered confirmation to claimants that their claims were received.  In addition, the Trustee and B&H have responded to hundreds of phone calls.

97.    In sum, the Trustee and his team have endeavored to respond timely to every customer inquiry and to ensure that the customers are as informed as possible about various aspects of the BLMIS proceeding.

Contingencies.

98.    As discussed above, the Trustee has made progress in determining claims. Nevertheless, substantial contingencies remain, and the Trustee must reserve for these contingencies in determining what distributions can be made immediately to customers with allowed net equity claims.  The total universe of allowed claims against customer property cannot be determined with precision until all claims have been fully analyzed, a process that will take time, given the complexity of many claims.

99.    In addition, as discussed below, as the analysis of the claims population has progressed, disputes have arisen with claimants over the Trustee's definition of "net equity" as being measured by money deposited, less money withdrawn.  As noted in section X.A *infra*, the Court issued an opinion on March 1, 2010 upholding the methodology being used by the Trustee. This issue is currently on appeal to the Second Circuit

100.    It is the Trustee's intent, at the earliest practicable time, to seek, pursuant to §78fff-2(c)(1) and related provisions of SIPA, Bankruptcy Court approval for the allocation of all recoveries already obtained and to be obtained to the "fund of customer property."  The Trustee anticipates making applications seeking approval for interim allocations and pro rata distributions.

B.    **CLAIMS OF GENERAL CREDITORS**

101.    As of March 31, 2010, the Trustee had received 389 secured and priority and non-priority general unsecured claims totaling approximately $1,708,165,815.01.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  As of March 31, 2010, the Trustee had received 50 general unsecured broker dealer claims totaling approximately $29,081,878.41.

102.    The Trustee does not currently believe that there will be sufficient funds in the

Debtor's estate from which to make distributions to priority, non-priority general creditors and/or

broker dealers.    Accordingly, the Trustee believes that "[no] purpose would be served, [to]

examine [such] proofs of claim and to object to the allowance of any [such] claim that is

improper" (*see* Bankruptcy Code § 704(5)).    Further, the Trustee does not expect that there will

be sufficient funds in the general estate for SIPC to recoup its advances for administrative

expenses.

## VIII.    **TRUSTEE INVESTIGATION**

103.    As required by SIPA, the Trustee is obligated to, among other things, (i)

investigate the acts, conduct, property, liabilities, and financial condition of the debtor, the

operation of its business, and any other matter, to the extent relevant to the liquidation

proceeding, and report thereon to the Court; and (ii) report to the court any facts ascertained by

the trustee with respect to fraud, misconduct, mismanagement, and irregularities, and to any

causes of action available to the estate.    Section 78fff(1)(d) of SIPA.

104.    Pursuant to these obligations, during the Report Period the Trustee and his

professionals have extensively investigated the Debtor's financial affairs both inside and outside

of the United States.    In furtherance of such investigation, the Trustee has sent more than 660

subpoenas pursuant to Bankruptcy Rule 2004 seeking documents from many individuals, funds

and banks.    Additionally, the Trustee has sent hundreds of letters to these and similar entities,

informing them that they may be in possession of BLMIS customer property and demanding the

return of such customer property.

105.    As a result of the Trustee's investigation, the Trustee has to date filed fourteen

(14) avoidance actions against funds and individuals who withdrew funds from their IA accounts

during the relevant time periods (as further described in Section X.G *infra*).  Collectively, these fourteen (14) actions seek to recover more than $14.8 billion in principal and fictitious profits.

106.    In addition, after extensive investigative efforts and due diligence, the Trustee settled preference claims involving the Optimal Funds, based in the Bahamas, for $235 million, which was an 85% recovery. The Trustee was also able to settle avoidance actions against the Levy Family for $220 million.  (*See* section X.H *infra* for further discussion regarding these settlements).  Several other parties are currently in settlement discussions with the Trustee and others are producing documents to the Trustee without the need to resort to formal process.

107.    The Trustee is also providing information to and coordinating efforts with the SEC, Federal Bureau of Investigation ("FBI"), USAO and other regulators on an on-going basis.

108.    In addition, as further described below, through B&H and International Counsel, the Trustee has been monitoring all domestic and international third-party actions filed outside of the Bankruptcy Court that may be related to Madoff, BLMIS, any insiders thereof, or any other related parties and/or assets of the estate.

A.    **INTERNATIONAL PROCEEDINGS**

109.    The Trustee's international investigation and recovery of BLMIS estate assets involves, among other things: (i) identifying the location and movement of estate assets and retaining international counsel where necessary; (ii) becoming involved where appropriate, whether by appearance in a foreign court or otherwise, to prevent dissipation of funds properly belonging to the estate; and (iii) bringing actions before U.S. and foreign courts and government agencies to recover customer property for the benefit of the customers and creditors of the BLMIS estate.  These investigations, which are assisted by voluntary requests for information and the use of subpoena power, both in the U.S. and abroad, have focused primarily on international feeder funds, banks, related financial services entities and certain individuals.

110.    Since the Filing Date, the Trustee has been actively investigating and seeking to recover assets for the BLMIS estate in no fewer than a dozen different jurisdictions including, but not limited to, England, Gibraltar, Bermuda, the British Virgin Islands ("BVI"), the Cayman Islands, the Bahamas, Ireland, France, Luxembourg, Switzerland, Canada, Austria and Spain. Accordingly, the Trustee has retained the following International Counsel to assist him in further investigations and to represent him and the BLMIS estate in any foreign proceedings that have arisen or may arise in connection with BLMIS: (i) Lovells - England, Wales and other European jurisdictions; (ii) Higgs Johnson Truman Bodden - Cayman Islands; (iii) Williams Barristers & Attorneys – Bermuda; (iv) Attias & Levy – Gibraltar; (v) E.F. Collins – Ireland; (vi) Schiltz & Schiltz – Luxembourg; (vii) Schifferli – Switzerland; (viii) SCA Creque – BVI; and (ix) Kugler Kandestin – Quebec, Canada.    The Trustee will continue to seek court approval to retain professionals to investigate and represent him wherever estate assets may be found across the globe.

111.    The Trustee's international investigations have to date revealed a complex web of tangled investment structures that fed money into the Ponzi Scheme, involving several billion dollars and myriad actors.  In connection with that investigation, the Trustee, through B&H and International Counsel are monitoring and/or participating in over 260 pending and 81 potential international third-party proceedings involving Madoff and/or BLMIS.  Furthermore, the Trustee has served more than 75 subpoenas against more than 65 entities in 20 jurisdictions.   The investigation is made even more challenging by the broad array of anti-discovery laws, bank secrecy statutes, and other foreign legislation designed to limit discovery by U.S. entities. However, the Trustee is working closely with International Counsel to use local laws to obtain necessary discovery.

112.    To date the Trustee has received significant documentation in response to the many subpoenas and other requests for information that have been filed and the Trustee is actively pursuing legal remedies against those entities and/or persons that have refused to timely respond to the Trustee's requests for information.   Where the Trustee has been able successfully to discover the location of customer property, the Trustee is taking steps to freeze or otherwise secure such assets.   Below is a brief summary by jurisdiction of the international efforts currently being undertaken by the Trustee.   For a further discussion of the actions commenced in the Bankruptcy Court by the Trustee against certain of the international entities mentioned below, *see* section X.G *infra*.

England.

113.    In England, the Trustee, who was granted recognition as a foreign representative for the purpose of gathering evidence, continues to investigate MSIL, a Madoff-affiliated entity and in so doing continues to work with MSIL's JLs.   The Trustee has filed at least one, and is preparing to file additional, disclosure order applications in England to further his investigations.

Gibraltar.

114.    As noted in the Trustee's prior Interim Reports, the Trustee's investigations into the business and operation of BLMIS revealed numerous Gibraltar-related funds and banks with accounts and affiliations with BLMIS including an account held by Vizcaya Partners Limited ("Vizcaya"), a BVI fund with approximately $75 million located in Gibraltar.   On April 9, 2009, the Trustee filed a complaint in the Bankruptcy Court against Vizcaya and Banque Jacob Safra (Gibraltar) Ltd. ("Safra"), seeking the return of $150,000,000 under SIPA and the Bankruptcy Code as a preferential transfer and also for turnover and accounting in connection with a transfer from BLMIS to Safra for the benefit of Vizcaya.   For a further discussion of the Vizcaya litigation in the Bankruptcy Court, *see* section X.G *infra*.

115.    On October 28, 2009, the Supreme Court of Gibraltar (the "Gibraltar Court")
ordered the payment into the Gibraltar Court of $63,244,490.06 previously held in various
accounts at Safra.  In addition, the Gibraltar Court also recognized the Trustee as the U.S. court-
appointed Trustee for the liquidation of the business of BLMIS "with such rights as such
recognition by the Supreme Court of Gibraltar affords him and entitles him to apply for" and
further ordered Bank Safra to produce documents to the Trustee, which documents have been
produced.

116.    On October 29, 2009, Vizcaya, Zeus and Asphalia filed a notice of appeal in
respect of the disclosure order.  On November 3, 2009 Vizcaya, Zeus and Asphalia made an
application for a stay of execution against the disclosure order pending appeal (the "Gibraltar
Appeal") to the Court of Appeal. This was granted by the Court on condition that security for
costs in a sum to be agreed or if in default set by the Court were paid by Vizcaya, Zeus and
Asphalia. The Trustee was also awarded his costs for the stay of execution application.

117.    On November 18, 2009, there was a further hearing given that it had been
impossible to reach an agreement on the sum of security for costs of the appeal. As a result of
that hearing the Court ordered that Vizcaya, Zeus and Asphalia deposit the sum of £30,000
($50,400.00) as security for the Trustee's costs of the appeal.  The hearing of the Appeal was
scheduled for February 9-10, 2010.  On February 18, 2010, the Gibraltar Appeal was dismissed,
and the Trustee was awarded his costs, in the amount of £30,000, associated with that appeal.

Bermuda.

118.    Following months of investigation, the Trustee on July 15, 2009 filed a complaint
in the Bankruptcy Court against Alpha Prime Fund Ltd. ("Alpha Prime") as well as HSBC Bank
plc and HSBC Securities Services (Luxembourg) S.A.   Alpha Prime is a Bermuda-based feeder
fund that received more than $49 million in preference payments.  Alpha Prime failed to file an

answer to the complaint and on August 19, 2009 the Trustee filed a request for an Entry of Default against Alpha Prime, which request was granted on September 1, 2009

119.    The Trustee has also been able to freeze approximately $111,000,000.00 of funds held at the Bank of Bermuda Limited in Bermuda over which the Trustee maintains a claim and which funds have been claimed by other entities and authorities.

British Virgin Islands.

120.    In BVI the Trustee has discovered and is actively investigating the involvement of no fewer than 20 feeder funds that funneled money into the Ponzi scheme.  The Trustee is currently engaged in settlement talks with a number of funds and has filed seven actions in the U.S. Bankruptcy Court against BVI funds, as further discussed in Section X.G *infra*.  In addition, the Trustee has served no fewer than 16 subpoenas against BVI-based funds.

121.    Kingate Euro Fund Ltd. and Kingate Global Fund Ltd. (collectively, "Kingate") are BVI-based feeder funds that received, collectively, more than $250 million in preference payments.  An action was commenced in the Bankruptcy Court against Kingate on April 14, 2009, with a second amended complaint being filed on July 21, 2009.   The parties have undertaken settlement negotiations which are on-going.

122.    Thybo Asset Management Ltd, Thybo Global Fund Ltd., Thybo Return Fund Ltd. and Thybo Stable Fund Ltd. (collectively, the "Thybo Funds"), are BVI-based funds that, considered collectively, have received approximately $6 million in preference payments.  A complaint was filed against the Thybo Funds on July 15, 2009 asserting preference and fraudulent transfer causes of action.  On or about August 25, 2009, an amended complaint was filed to include a count objecting to the SIPA claim filed by the Thybo Funds in the amount of $217,163,851.  Since filing the Amended Complaint, the parties have undertaken settlement negotiations, which are ongoing.

123.    For discussion of proceedings commenced against Vizcaya, *see* ¶ 114 *infra*.

Cayman Islands.

124.    In the Cayman Islands the Trustee has discovered and is actively investigating the involvement of no fewer than four feeder funds that fueled the Ponzi scheme. Complaints have been filed against three funds in the Bankruptcy Court and the Trustee was recently granted leave to file a Complaint in the Cayman Islands against another. *See* Section X.G *infra*.

125.    Harley International (Cayman) Ltd. ("Harley") is a Cayman Islands-based feeder fund. The Trustee's investigation has revealed that Harley has received no less than $425 million in 90-day preference payments. A complaint was filed on May 12, 2009 in the Bankruptcy Court asserting preference and fraudulent transfer causes of action. The clerk entered a default on July 8, 2009. On January 21, 2010, leave was granted by the Grand Court of the Cayman Islands, Financial Services Division to the Trustee to proceed with an action against Harley in the Cayman Islands.

126.    Herald USA Segregated Portfolio One is the sole fund of Herald Fund SPC ("Herald"), a Cayman Islands-based feeder fund. The Trustee's investigation has revealed that Herald received at least $537 million in preference payments. The Trustee filed a complaint against Herald initiating an adversary proceeding in the Bankruptcy Court. On October 13, 2009, the Trustee filed a second amended complaint. Herald filed a motion to dismiss the case, to which the Trustee has responded; an argument on the motion to dismiss is scheduled for May 25, 2010.

127.    Primeo Fund ("Primeo") is a Cayman Islands-based feeder fund that is currently in liquidation in the Cayman Islands. A complaint was filed against Primeo in the Bankruptcy Court on July 15, 2009. Primeo failed to respond to the suit papers, and the Clerk entered a Default against Primeo on Sept. 1, 2009.

Ireland.

128.    In Ireland, the Trustee has discovered two feeder funds, which collectively received more than $380 million in preference payments.    The Trustee is continuing to investigate these funds and related entities and has issued several subpoenas in connection with that investigation.

Luxembourg.

129.    In Luxembourg, the Trustee's investigation has revealed the existence of two feeder funds that collectively fed more than $1.5 billion into BLMIS.    One of these funds, Luxalpha SICAV, is currently in liquidation under Luxembourg law and the Trustee is in discussions with Luxalpha SICAV's liquidators concerning the disposition of its assets and access to information.

Other Jurisdictions.

130.    In addition to the jurisdictions and entities identified above, the Trustee is also actively investigating other feeder funds and related institutions connected to BLMIS in Panama, St. Lucia, Canada, Austria and Switzerland.

B.    **DOMESTIC PROCEEDINGS**

Related Civil Third Party Actions.

131.    Since the Filing Date, the Trustee has been monitoring legal proceedings filed by various third parties who allege to have suffered losses and incurred damages resulting from Madoff's Ponzi scheme and their direct or indirect investments with BLMIS (the "Third Party Actions").    At present, there at least 178 Third Party Actions filed in state and federal courts across the country.    The plaintiffs in the Third Party Actions generally consist of: (i) investors whose funds were invested with BLMIS indirectly through feeder funds and other investment vehicles; (ii) investors who were direct customers of BLMIS who invested with BLMIS through

Madoff, Madoff family members and other BLMIS insiders; and (iii) state governmental bodies which seek the return of investment losses by their respective state's residents.

132.    The plaintiffs in the Third Party Actions brought against feeder funds generally allege that these entities negligently – and even fraudulently, and in a breach of their fiduciary duty, convinced them to invest their money in a fund that was invested either fully or partially with BLMIS.  Many of these lawsuits, which generally are either private party actions, securities class actions or derivative actions, seek damages against feeder funds and management companies against which the Trustee has also asserted claims in this Court.  A majority of these Third Party Actions are pending in the Southern District of New York, although there are many cases pending nationwide.  To date, there have been a handful of decisions by both state and federal courts on motions to dismiss by defendants in these  actions.

Domestic Feeder Funds Investigations.

133.    The Trustee is also continuing his investigation of the domestic feeder funds that were customers of BLMIS, perhaps facilitated the fraud, or received preferences and fraudulent transfers.  Some of the domestic feeder funds investigations are discussed below.

Tremont Group.

134.    The Tremont Group Holdings companies, based in Rye, New York, comprised both multi manager proprietary funds under the Tremont name and single manager funds under the Rye Select brand name.  Five of the Rye Select funds were either entirely or significantly invested through BLMIS.

135.    After the Trustee sent a demand letter for the return of preferential transfers and fictitious profits, of Tremont, through its counsel, entered into a "standstill" agreement with the Trustee pursuant to which it agreed not to release or distribute any of the monies in the accounts of the Rye Select, and subsequently, Tremont, funds, until the Trustee had concluded its

investigation.  In this regard, the Trustee and his Counsel have interviewed several members of management and issued subpoenas to various third parties.

138.    There have been a series of meetings and negotiations with Tremont in an effort to resolve the Trustee's claims.  The Trustee is presently evaluating the latest settlement proposal received from Tremont.

Maxam Capital.

136.    The Trustee has issued demand letters seeking the return of preferential and fraudulent transfers, and Rule 2004 subpoenas for documentation to Maxam Capital.  Based upon restrictions placed upon Maxam's Bank of America bank account as to the use of funds which the Trustee deemed to be customer property, Maxam instituted a court action in May 2009 against Bank of America in Connecticut state court for relief and unrestricted use of the Bank of America accounts monies.  Shortly thereafter, Bank of America commenced an interpleader action in this Court against the Trustee and Maxam seeking, among other things, a declaration as to the right to the bank account monies and a stay of the Connecticut action.  The Trustee joined in seeking a stay of the Connecticut action, the state where Maxim conducted its business. Following oral argument, this Court issued an Order, dated June 17, 2009, staying the Connecticut action and ordering the deposition of Maxam's founder and the former co-founder of Tremont.  Such deposition occurred on July 7, 2009, at which time questions seeking the identities and financial information of foreign investors was objected to based on claims of statutory privacy obligations under Cayman Islands law.

137.    Maxam made an application in August 2009 to the court in the Cayman Islands for relief from the local privacy laws to comply with our subpoena and request for foreign investor information.  On September 14, 2009, the Cayman Islands court, after submission of a

supporting affidavit by the Trustee, granted the application and allowed the disclosure of the information to the Trustee.

138.    After review of the information obtained as a result of the Cayman court decision, the Trustee served an additional Rule 2004 subpoena upon Citco Global Custody NV in December 2009, seeking financial and other information about a number of the foreign investors. Citco cooperated in seeking to provide the information about several of the investors. However, two of them, located in Jersey, Maxima Alpha Bomaral and Maxima Alpha Strategy Funds, commenced an action in early February 2010 in the Netherlands seeking an injunction to prohibit Citco from complying with the Trustee's subpoena. In support of Citco's attempted compliance, the Trustee submitted a supporting affidavit to the Dutch court. On February 11, 2010, the Dutch court denied the application of the funds noting, among other things, that if they wanted to contest the subpoena, they could do so in the Bankruptcy Court in the SDNY. The Trustee is in the process of receiving and reviewing the information from Citco in its further investigation to trace the monies.

Beacon/Andover.

139.    Rule 2004 subpoenas were issued in the summer of 2009 to Beacon and Andover funds and their management companies. Based upon the Trustee's independent investigation and information received pursuant to bank subpoenas, it was determined that only a portion of these funds' investments were placed with BLMIS. The Trustee obtained a "standstill" agreement with the funds' management regarding segregating certain funds while an investigation as to potential liability for the fraudulent transfers predicated upon their lack of good faith was concluded.

140.    The investigation of the funds and its sub-advisers, including Ivy Asset Management (currently owned by Bank of New York) and JP Jeannerett, is continuing. In this

regard, the Trustee's Counsel has recently interviewed recently several of the members and principals of the management companies. The conclusion of the investigation should occur shortly.

P&S Partnership/S&P Partnership.

141. These two funds were formed shortly after the 1992 SEC enforcement action against Avellino and Bienes. In light of the amount of monies involved in these funds, it was determined no further investigation of these funds was necessary or cost effective. Settlement proposals are being considered.

C.    **BANKS & OTHER FINANCIAL INSTITUTIONS**

142. During the Report Period, and primarily as a result of international and domestic feeder fund investigations, the Trustee has identified and commenced investigations of numerous banks and other financial institutions involved with various feeder funds and BLMIS. The Trustee's investigation of these banks and financial institutions is continuing. As mentioned above and as further described in Section X.G *infra*, the Trustee has brought suit against various feeder funds to date.

143. Various banks and financial institutions were involved with the feeder funds in a number of different capacities. For example, some were custodians of the funds, others were administrative agents charged with calculating the net asset value of the funds, others were involved in transactions associated with the BLMIS account at J.P. Morgan Chase. Some banks and financial institutions wore multiple hats, assuming a number of roles. Third party actions have been brought in both the United States and abroad that charge the banks, for instance, with some degree of complicity, money laundering or negligence in connection with the Madoff fraud. The Trustee continues to monitor these actions as he investigates the roles of various banks and financial institutions.

D.    **POTENTIAL INSIDERS AND CORPORATE ASSETS**

144.    During the Report Period, the Trustee and his professionals have continued their investigatory efforts into potential insiders of BLMIS and Madoff to ascertain whether they were the unlawful recipients of BLMIS customer property or corporate assets.

145.    The work of the Trustee and his professionals has greatly expanded as the insider investigations have progressed.  Many more document requests and subpoenas have been drafted and issued, and there has been an exponential increase in the number of documents reviewed and business transactions analyzed.

146.    The knowledge gained to date has greatly progressed the investigations into particular insiders.  In addition, the Trustee's professionals have gained an advanced understanding of the transactions between BLMIS and select individuals with whom Madoff appears to have had a special relationship.

147.    The cumulative effect of the investigatory efforts to date has uncovered a number of inter-relationships among many of the potential insiders.  In addition, the Trustee's professionals have also been able to detect a series of patterns of financial dealings and/or transactions between BLMIS and at least some of Madoff's preferred investors.  This has enabled the Trustee's professionals to identify additional targets for investigation, to locate additional suspect transactions, and in some instances, to identify potential motives underlying particular suspect transactions.

148.    Upon completion of the insider investigation, the Trustee intends to seek through litigation recovery of any customer property or corporate assets that were improperly transferred to insiders.

E.    **EVIDENCE GATHERING**

149.    Within hours of the appointment of the Receiver, AlixPartners began certain efforts to identify and preserve BLMIS paper documents, microfilm, microfiche and electronic data (hereinafter referred to as "documents") at the three (3) facilities used by BLMIS – the main office at 885 Third Avenue in Manhattan, the disaster recovery site at the Bulova Building in Astoria, Queens and a warehouse in Long Island City, Queens.  Starting on December 15, 2008, at the direction of the Trustee, AlixPartners coordinated efforts with the FBI to identify and provide forensic images and server data for review and analysis  and conducted numerous forensic analysis of electronic data.

150.    In addition, AlixPartners engaged in the following activities to gather and preserve evidence: coordinated the recovery of data from hard drives and other media that were physically damaged or had failed during the normal course of use; conducted a site survey of the 885 3rd Avenue and Bulova facilities to identify and preserve loose media (i.e. floppy disks, DVD/CDs, etc.); previewed each collected computer hard drive to document all user profiles; and extracted for analysis and review data identified for particular custodians, including certain Madoff family members and employees.

151.    With the assistance of AlixPartners, the Trustee has identified and preserved various items of electronic media.  The preserved data have been forensically imaged allowing analysis and future use as evidence.  AlixPartners has identified and collected server data from BLMIS facilities and equipment and has coordinated the preservation of BLMIS data.  These data have been loaded into a secure web-based document review program to accommodate the B&H attorneys review.

152.    The Trustee has engaged AlixPartners to retain BLMIS documents which were obtained from the main BLMIS office at 885 Third Avenue in Manhattan, the BLMIS Disaster

Recovery site at the Bulova Building in Astoria, Queens and a warehouse in Long Island City, Queens.

153.    Through Counsel and Consultants, the Trustee has organized within a warehouse approximately seven thousand boxes of BLMIS' paper documents, reviewed those documents to develop an index of boxes containing paper documents at the folder level and to identify approximately 8.3 million pages of those documents to scan, a significant portion of which have been processed so as to enable full-text searching. In addition, through Counsel and Consultants, the Trustee has continued to inventory and selectively assess the contents of more than 4,000 reels of microfilm and 87 transfile boxes of microfiche.

154.    In addition, the Trustee has accumulated and stored in secure and forensically sound formats more than 1.4 million emails, and more than 1,500 types of electronically stored information which include but are not limited to desktop computers, laptop computers, AS/400 computers, back-up tapes, hard drives, network storage, PDAs, floppy disks, compact discs and memory cards.

155.    Beyond identifying and analyzing BLMIS documents, the Trustee has issued to more than 600 parties subpoenas and has received documents from more than 150 parties, consisting of approximately 6 million documents. The Trustee receives these documents in a variety of formats. Like the BLMIS documents, responses to subpoenas are processed and imported into a litigation support database to accommodate attorney and consultant review.

156.    Under the Trustee's direction, Counsel and Consultants have assessed many of these responses to subpoenas and have indexed them with respect to various investigations and current and prospective law suits. Consequently, the Trustee's understanding of BLMIS' relationships with BLMIS' investor, employees, vendors and others has grown substantially.

157.    As a result of this work and under the Trustee's direction, Counsel and Consultants have indexed, organized and extracted information pertaining to BLMIS' operations, communications, books and records.  This enabled B&H, AlixPartners and FTI to assess many of BLMIS' documents.  Consequently, the Trustee has assembled in substantial detail and for extensive periods of time BLMIS' financial history and relationships with BLMIS' investors, employees, vendors and others.

IX.    **INITIAL ALLOCATION OF FUNDS AND DISTRIBUTION TO CUSTOMERS.**

158.    As noted in ¶ 1 *supra*, the Trustee expects to file a motion with the Bankruptcy Court seeking the Court's approval of (i) the Trustee's allocation of recovered property to the Customer Fund and (ii) the Trustee's proposed interim *pro rata* distribution of the Customer Fund to over-the-limits customers.  The Trustee hopes to file such motion for an initial allocation and distribution of funds to customers during the summer of 2010 and to make an interim distribution before year end.

159.    In view of the fact that "customer property is not sufficient to pay in full the claims [of customers entitled to SIPA protection and SIPC, as subrogee]," in reliance on section 78fff-2(c)(3) of SIPA and other statutory authority and common law, the Trustee commenced the adversary proceedings described in section X.G *infra*, as well as engaging in various other investigations as described above in section VIII aimed at gathering assets for liquidation and eventual distribution.

160.    Any other recoveries from the defendants referred to in the below-referenced adversary proceedings, as well as additional recoveries from any other sources, will, with the Court's approval, be allocated to the Customer Fund and be subject to a supplemental pro rata distribution to the remaining over-the-limits customer-claimants and SIPC, as subrogee for its cash advances to the Trustee to satisfy allowed customer claims.

## X.    **BANKRUPTCY COURT PROCEEDINGS**

### A.    **NET EQUITY DISPUTE**

161.    As discussed in Section VII.A *supra*, as of March 31, 2010 the Trustee had issued 12,249 customer claim determinations in accordance with SIPA and the Claims Procedures Order.  For purposes of determining each customer's "net equity," as that term is defined under SIPA, the Trustee has credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn by him from his BLMIS customer account (the "cash in/cash out approach").

162.    Various customers have filed adversary proceedings, *see infra*, and objections to the Trustee's determination of their claims, in which they argue that the Trustee's cash in/cash out approach is contrary to the statutory definition of "net equity" (the "Net Equity Dispute"). These customers argue instead that the Trustee is required to allow customer claims in the amount shown on the November 30, 2008 BLMIS customer statements.

163.    Because the Net Equity Dispute is an issue of comprehensive application in this SIPA liquidation, the Trustee filed a motion for a scheduling order on the Net Equity Dispute. On September 16, 2009, the Court issued an order scheduling adjudication of the "net equity" issue (the "Scheduling Order"), setting forth a briefing schedule and hearing date that permitted customers and other interested parties to participate in the adjudication of this issue. [Dkt. No. 437]  In addition, the Court limited the briefing to be submitted pursuant to the Scheduling Order solely to the Net Equity Dispute.  Briefing of issues ancillary to that dispute have been deferred.

164.    In accordance with the Claims Procedures Order and the Scheduling Order, on October 16, 2009, the Trustee submitted his memoranda of law and other papers in support of his motion for an order (a) upholding the Trustee's determinations denying 78 customer claims for

the amounts listed on the last customer statement,[8] (b) affirming the Trustee's determination of "net equity," and (c) expunging those objections with respect to the determinations relating to "net equity." [Dkt. No. 525]  The Trustee argues that the cash in/cash out approach to calculating "net equity" is the only one consistent with SIPA, bankruptcy law, principles of equity, and common sense.

165.    Over thirty briefs and twenty *pro se* submissions were filed in response to the Trustee's Net Equity Motion.  Two customers and SIPC filed papers in support of the Trustee's Net Equity Motion.  Briefing was concluded on January 15, 2010 and a hearing was held on February 2, 2010.

166.    On March 1, 2010, the Court issued a decision upholding the Trustee's Net Investment Method as the only one consistent with the plain meaning and legislative history of the statute, controlling Second Circuit precedent, and considerations of equity and practicality. [Dkt. No. 2020].

167.    Numerous notices of appeal have been filed on behalf of claimants.  Counsel for the Trustee conferred with counsel for certain claimants, SIPC, and the SEC regarding the possibility of certifying the appeal directly to the Second Circuit.  All were in agreement that the speediest resolution of the Net Equity Dispute was in the best interests of the customers and the estate.  A joint application was made to the Court requesting that the Court certify the Net Equity Order for immediate appeal to the Second Circuit.  On March 8, 2010, the Court entered an order certifying the appeal [Dkt. No. 2022].

B.    **OBJECTIONS TO CLAIMS DETERMINATIONS**

168.    In connection with the determination of customer claims, as of March 31, 2010, 2,619 objections had been filed by claimants with the Bankruptcy Court to the Trustee's

---

[8] As of the date of the Trustee's Motion, 78 customer claimants had filed an objection to the Trustee's determination of their

determination of such claims.  As required by the Claims Procedures Order, and as described in each Determination Letter sent by the Trustee, claimants of BLMIS have thirty (30) days from the receipt of the Determination Letter to object to the Trustee's determination of their claim. Notice of and reasons for such objection must be provided to the Trustee and to the Bankruptcy Court.

169.    The objectors have cited, among others, the following reasons for objecting to the Trustee's determination of their claims: (i) the use of the "cash in, cash out" method for calculating the value of claims is inappropriate and claims should be valued based on the BLMIS November 30, 2008 statement; (ii) claimants should receive interest on deposited amounts; (iii) the Trustee is required to commence an adversary proceeding as the Trustee is attempting to avoid gains on claimants' investments; (iv) there is no legal basis for requiring execution of a Partial Assignment and Release prior to payment of SIPC advance; and (v) claimants are entitled to immediate payment of the $500,000 SIPC advance; (vi) claimants also argue that there is no statutory requirement that a "customer" must have an account directly with the debtor and that Congress intended for "customer" to be broadly interpreted; and/or (viii) other claimants argue that as a result of their joint account status, each named account holder should be entitled to payment of a SIPC advance.

170.    As described in ¶ 90 *supra*, the Trustee has departed from the practice in past SIPC proceedings and has committed to paying the undisputed portion of any disputed or objected-to claim, even if there is a dispute over the full amount of the claim.  The purpose of this procedure is to expedite payment of SIPC protection to claimants while preserving their rights to dispute the total amount of their claim.

---

claim on the basis of the Net Equity Dispute.

C.    **CLAIMANTS WITHOUT ACCOUNTS**

171.    The Trustee has taken the position for purposes of determining customer claims that only those claimants who had an account at BLMIS constitute "customers" of BLMIS (as defined in section 78*lll*(2) of SIPA).  Where it appears that a claimant did not have an account in his/her/its name at BLMIS ("Claimant Without An Account"), he/she/it is not a customer of BLMIS under SIPA and the Trustee has denied his/her/its claims for securities and/or a credit balance.

172.    On or about December 8, 2009, the Trustee issued approximately 8,500 claims determinations in which the Trustee denied the claims of Claimants Without An Account who invested with intermediary entities, which in turn may have directly or indirectly invested with BLMIS.  Approximately 2,000 objections have been filed in response to the Trustee's claims determinations and the construction of the term "Customer," and how that term should be applied to determine the validity of their claim.  Claimants Without An Account have asserted that they are customers of BLMIS, and as such, they are each entitled to receive up to $500,000.00 of SIPC protection.

173.    On March 19, 2010, the Trustee filed a motion for a scheduling order on the issue of deciding who constitutes a customer under SIPA and resolving the claims objections of the Claimants Without An Account [Dkt. No. 2052].  A hearing on the motion is scheduled for April 13, 2010.

174.    The motion proposes the following briefing schedule: (i) on or before June 11, 2010, the Trustee shall file a motion and supporting papers (the "Motion") to affirm certain claims determinations as to which objections have been filed, specifically with regard to the Trustee's determinations that the claimants did not have accounts at BLMIS and therefore were not customers of BLMIS; in accordance with the Claims Procedures Order, the Motion shall

identify those claimants who have filed objections to his determination of their claims for which

he intends to schedule a hearing (the "Objecting Claimants"); (ii) SIPC shall file any brief with

reference to the Motion on or before June 11, 2010; (iii) the Objecting Claimants shall file their

responses to the Motion on or before July 12, 2010; (iv) any Interested Parties (as further defined

below in paragraph) who wish to file a brief in opposition to the Trustee's Motion shall file their

briefs on or before July 12, 2010; (v) any Interested Parties who wish to file a brief in support of

the Trustee's Motion shall file their briefs on or before August 10, 2010; (vi) to the extent that

Interested Parties who filed briefs in accordance with clause (v) above raise issues, factual or

legal, that have not been previously raised, Interested Parties who filed a brief in opposition to

the Trustee's Motion in accordance with paragraph F above may file a reply brief addressing

such issues on or before August 20, 2010; (vi) the Trustee and SIPC shall file any reply papers

on or before September 20, 2010; and (vii) the Court shall hold a hearing on the Motion on

October 19, 2010, at 10:00 a.m., or such other time as the Court determines. The Court will only

consider the Trustee's construction of the term "Customer" as it relates to the Claimants Without

An Account. All other issues raised by the Objecting Claimants will be resolved in subsequently

scheduled hearings.

D.    **THIRD-PARTY ACTIONS AGAINST THE TRUSTEE**

Rosenman Family LLC v. Picard, et al., Adv. Pro. No. 09-1000 (BRL).

175.    On January 1, 2009, Rosenman Family LLC, a BLMIS customer, filed an

adversary proceeding seeking the return of $10 million dollars it deposited mere days before

BLMIS collapsed. The Trustee moved to dismiss the complaint under Federal Rule of Civil

Procedure 12(b)(6), arguing that Rosenman Family LLC was a "customer," as that term is

defined under SIPA, and could thus only recover through the customer claims process set forth in

that statute. This Court granted the Trustee's motion, and Rosenman Family LLC appealed the

decision to the United States District Court for the Southern District of New York. The appeal was assigned to the Honorable Naomi R. Buchwald. After full briefing, oral argument was held on October 26, 2009.

176.    On November 30, 2009, the District Court issued an opinion affirming the Bankruptcy Court's dismissal of the complaint. The District Court agreed that Rosenman Family LLC was a "customer" as that term is defined under SIPA, and that the funds he deposited with BLMIS were part of the fund of customer property such that they could not be returned to him outright. Rather, Rosenman Family LLC must participate in the claims process as set forth in SIPA.

177.    On December 23, 2009, Rosenman Family LLC filed a notice of appeal of the District Court's decision to the Second Circuit. Rosenman Family LLC's appellate brief is due on April 15, 2010.

<u>Hadleigh Holdings LLC v. Picard, et. al.</u>, Adv. Pro. No. 09-1005 (BRL).

178.    A similar complaint was filed on January 7, 2009 against the Trustee by Hadleigh Holdings LLC ("Hadleigh"), a BLMIS customer which deposited $1 million dollars just a few days before the collapse of BLMIS. The Trustee filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). While the motion was pending, Hadleigh Holdings LLC filed an amended complaint. After the Trustee filed a motion to dismiss the amended complaint, the case was voluntarily dismissed by Hadleigh. The customer claim of Hadleigh has been determined and partially satisfied by the Trustee.

<u>Albanese, et al. v. Picard</u>, Adv. Pro. No 09-1265 (BRL).

179.    On June 5, 2009, a class action ("Class Action") complaint was filed by several BLMIS customers on behalf of a prospective class against the Trustee regarding the Net Equity Dispute. Plaintiffs sought a declaratory judgment that the Trustee's cash in/cash out approach to

"net equity," as that term is defined under SIPA, is invalid. Instead, they allege that the Trustee should allow claims based on the November 30, 2008 BLMIS customer account statements. The Class Action seeks to certify a class of customers who "are adversely affected by the Trustee's definition of 'net equity' under SIPA."

180.    The Trustee answered the complaint on July 17, 2009. As discussed above, the Court issued a Scheduling Order on the Net Equity Dispute on September 16, 2009. Thereafter, the parties entered into a stipulation staying the pendency of the Class Action until a final, non-appealable order regarding the Net Equity Dispute is issued.

Peskin, et al. v. Picard, Adv. Pro. No. 09-1272 (BRL).

181.    On June 10, 2009, three BLMIS customers filed an adversary proceeding seeking declarations that the Trustee must allow their customer claims in the amounts shown on their November 30, 2008 customer statement and that the Trustee is not permitted to deduct preference monies from their SIPC advances. Plaintiffs also sought compensatory damages for breach of fiduciary duty, alleging that the Trustee breached his duties to them by failing to promptly determine their customer claims and by "inventing" a new definition of "net equity."

182.    On July 17, 2009, the Trustee moved to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, to strike certain portions thereof. The Trustee moved on several bases, including: (i) Plaintiffs failed to adhere to the Claims Procedures Order; (ii) Plaintiffs lacked standing because the harm they alleged – the Trustee's interpretation of "net equity" – would benefit them rather than harm them; and (iii) that, in the alternative, certain paragraphs should be stricken pursuant to Federal Rule of Civil Procedure 12(f). On August 17, 2009, Plaintiffs filed an opposition to the Trustee's motion to dismiss the Complaint. (Peskin, Dkt. No. 30). The Trustee filed a reply on August 28, 2009 and this Court heard oral argument on September 9, 2009.

183.    The following day, this Court issued a memorandum decision and order granting the Trustee's motion to dismiss the complaint.  This Court held that the Plaintiffs' action violated the Claims Procedures Order and that permitting Plaintiffs to litigate their case was fundamentally unfair to other customers.  In addition, the Court found that permitting such a course of action would lead to an unwieldy process of adjudicating claims.  In light of the Trustee's motion for a scheduling order regarding the Net Equity Dispute in which Plaintiffs and all other customers may participate, the Court dismissed the portion of the complaint concerning the Net Equity Dispute.

184.    The Court also dismissed the remaining causes of action in Plaintiffs' complaint.  With regard to the preference issue, the Court held that the dispute was not ripe because the Trustee did not deduct preference monies from Plaintiffs' SIPC advances.  As for the breach of fiduciary duty claim, the Court found that whether the Trustee breached a fiduciary duty cannot be decided until the appropriateness of the "net equity" methodology is resolved.  Thus, the Court dismissed that portion of the complaint without prejudice with leave to re-file pending the outcome of the Net Equity Dispute.

185.    On September 18, 2009, Plaintiffs filed a notice of appeal from the order dismissing their complaint.  The appeal was assigned to the Honorable John G. Koeltl in the Southern District of New York.  The parties completed briefing before the District Court on January 4, 2010, and are waiting for the District Court to schedule oral argument.

E.    **OBJECTIONS TO FEE APPLICATIONS**

186.    During the First Fee Period, the Peskin plaintiffs filed a fifty-one page objection (the "First Fee Objection") in the Bankruptcy Court to the first fee applications of B&H and the Trustee (the "Fee Applications").  Raising issues ancillary to the services and compensation of the Trustee and B&H, the Objection was essentially a reiteration of the Complaint the Peskin

plaintiffs filed.  In short, it raised the very same arguments and allegations previously raised by

the Peskin plaintiffs regarding the Net Equity Dispute and certain factual allegations relating to

their particular customer accounts.  The Objection attempted to use the Peskin plaintiffs' prior

arguments about the Net Equity Dispute as a basis for alleging that the Trustee and B&H have a

conflict of interest and should be disqualified from serving.

187.    SIPC and the Trustee filed replies to the First Fee Objection, and at a hearing

before the Bankruptcy Court on August 6, 2009, the Court stated that the Net Equity Dispute was

raised in the context of the adversary proceeding, and was not properly before the Court at that

time.  The Court further stated that it found "no merit to the objections," and approved the Fee

Applications.  On August 14, 2009, the Peskin plaintiffs moved for leave to appeal seeking

seeking interlocutory review of the Bankruptcy Court's order granting the Fee Applications.

188.    The Trustee filed a memorandum and supporting documents in opposition to the

motion for leave detailing multiple grounds as to why the motion was improper and should be

denied, including that the Peskin plaintiffs lack standing to appeal and that they failed to meet

the necessary requirements for leave to appeal an interlocutory order.  The matter thereafter was

submitted to the District Court and was assigned to the Honorable George B. Daniels.  On

January 11, 2010, Judge Daniels issued an order denying the Peskin plaintiffs' motion.

189.    On November 24, 2009, the Trustee and B&H filed their Second Fee

Applications.  Once again, the Peskin plaintiffs filed an objection (the "Second Fee Objection"),

raising virtually the identical issues as they did in their First Fee Objection, and the Trustee and

B&H filed responsive papers.  At a hearing on the Second Fee Applications held on December

17, 2009, the Court found that there was nothing in the objection that raised issues that the Court

had not previously dealt with.  The Court further found that the Peskin plaintiffs' Rule 2004

argument was "bordering on frivolous," and overruled the objection and entered an order approving the Second Fee Applications on December 17, 2009.

190.    On December 23, 2009, the Peskin plaintiffs filed another motion for leave ("Second Motion for Leave") seeking interlocutory review of the December 17, 2009 order. Once again, the Peskin plaintiffs' motion and supporting papers filed contained the same allegations - alleged bad acts of the Trustee, his alleged improper interpretation and implementation of SIPA with regard to "net equity," spurious allegations regarding the purposes and history of SIPA and SIPC, as well as ad hominem attacks against the Trustee and SIPC. On January 5, 2010, the Trustee and B&H filed a memorandum and supporting documents in opposition to the Second Motion for Leave. As of the date of this Report, no judge has yet been assigned to the matter.

F.    **COMMENCEMENT OF BLM AIR CHARTER LLC CHAPTER 11 CASE**

191.    During the Report Period, the Trustee and the Chapter 7 Trustee also caused an entity related to BLMIS, BLM Air Charter LLC ("BLM Air"), to file a chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York (*In re BLM Air Charter LLC*, Case No. 09-16757 (BRL)). The commencement of the BLM Air bankruptcy case was necessary to preserve, and ultimately to recover for the benefit of the BLMIS estate, a significant asset in the form of an ownership interest in a private aircraft worth millions of dollars.

192.    BLM Air was an entity formed by Madoff to own and manage his various interests in private aircraft. Madoff assigned 100% of BLM Air's economic interest to BLMIS, and he retained legal title and was its sole Manager. From 2001 through 2008, virtually all of the funds used by BLM Air to purchase and maintain its various aircraft assets were transferred from BLMIS to BLM Air.

193.    BLM Air's primary remaining asset is a 50% undivided tenant-in-common interest in an Embraer Legacy 600, Model EMB-135 BJ aircraft (the "Aircraft"), which was purchased in 2007 for $24 million.  The other co-owner of the Aircraft is BDG Aircharter, Inc. ("BDG").

194.    BLM Air and BDG are jointly and severally obligated to make payments due under two warranty and maintenance service agreements for the Aircraft and its engines with Embraer Aircraft Customer Services, Inc. ("EACS") and Rolls-Royce Corporation ("Rolls-Royce").  BDG has for an extended period of time failed to make its share of payments due to EACS or Rolls-Royce, and since the BLMIS and Madoff bankruptcy proceedings, BLM Air no longer had funds available to make its share of payments EACS and Rolls-Royce.

195.    As of October 2009, Rolls-Royce threatened to terminate the agreement in the event full payment of all amounts due was not received by November 13, 2009.  Because the continued existence of the Rolls-Royce agreement significantly enhances the value of the Aircraft, the Trustee and the Chapter 7 Trustee commenced on BLM Air's behalf a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 12, 2009.

196.    The Trustees believe that a sale of the entire Aircraft will yield a greater recovery than would a sale of only BLM Air's 50% interest in the Aircraft.  Accordingly, on December 3, 2009, BLM Air filed a complaint commencing an adversary proceeding against the Aircraft's co-owner BDG, and its lender, Valley Commercial Capital, LLC, seeking among other things, authority pursuant to Bankruptcy Code § 363(h) to sell the entire Aircraft free and clear of BDG's interest.   BDG and ValCom filed responsive pleadings in January 2010.  The parties have agreed to an expedited discovery schedule in the adversary proceeding, pursuant to which summary judgment motions are to be submitted to the Court by August 2, 2010.

197.    In the meanwhile, BLM Air has retained Guardian Jet, Inc. ("Guardian") as aircraft broker in order to maximize the value obtained for the estate through either a sale of the entire Aircraft or through a sale of BLM Air's 50% interest in the Aircraft.  BLM Air submitted an application to the court for approval of the retention on March 19, 2010, and BDG and ValCom filed limited objections in opposition to the application.  The parties have subsequently come to an agreement pursuant to which BDG and ValCom will withdraw their limited objections, and expect to submit an agreed-upon consent order to the Court for approval of Guardian's retention promptly.

G.    **AVOIDANCE ACTIONS BY THE TRUSTEE**

Picard v. Vizcaya Partners Limited and Banque Jacob Safra (Gibraltar) Ltd. Adv. Pro. No 09-1154 (BRL).

198.    On April 9, 2009, the Trustee filed a complaint in the Bankruptcy Court for the Southern District of New York against Vizcaya Partners Limited ("Vizcaya") and Banque Jacob Safra (Gibraltar) Ltd. ("Bank Safra"), seeking return of $150,000,000 under SIPA §§ 78*lll*(4) and 78fff-2(c)(3), and sections 542, 547, 550(a)(1), and 551 of the Bankruptcy Code as a preferential transfer and also for turnover and accounting in connection with a transfer from BLMIS to Safra for the benefit of Vizcaya.

199.    Of that $150 million, approximately $75 million was held in various accounts at Bank Safra or in a Gibraltar Court, which money was frozen by the Gibraltar authorities and which the Trustee is claiming for the benefit of the estate.  The Trustee was added as an interested party to a Gibraltar-based Judicial Review Action, which was filed by Vizcaya against the Gibraltar Attorney General and Bank Safra in order to regain control over frozen funds held in its account at Bank Safra.

200. There are several related matters pending before the Gibraltar Supreme Court. One of these is a Judicial Action, Claim No. 2009-Misc-13, that was filed by Vizcaya Partners, Limited on February 18, 2009 and includes interested parties Bank J. Safra (Gibraltar) Limited and Irving H. Picard. Another is a claim filed by the Trustee on July 9, 2009, Claim No. 2009-P-193, against Vizcaya, Bank Safra, and related parties Siam Capital Management ("Siam"), Asphalia Fund Limited ("Asphalia"), and Zeus Partners Limited ("Zeus") for an injunction or freezing order, disclosure, and other relief. The Gibraltar Supreme Court has ordered approximately $75 million at Bank Safra to be turned over to the Gibraltar court. Judge Lifland has requested that the Gibraltar court turn over all funds under its control that were derived from the transfer from BLMIS to Bank Safra, for the benefit of Vizcaya, to the Bankruptcy Court.

201. On September 30, 2009, the Trustee filed an amended complaint in the Bankruptcy Court that identifies as defendants Vizcaya, Bank Safra, Siam, Asphalia, and Zeus, and seeks the return of $180,000,000 transferred from BLMIS to Bank Safra for the benefit of Vizcaya. The Trustee seeks relief pursuant to SIPA §§ 78$lll$(4) and 78fff-2(c)(3), and sections 542, 547, 548, 550, and 551 of the Bankruptcy Code. $150,000,000 is sought as a preferential transfer and $30,000,000 is sought as a fraudulent transfer. The Trustee also seeks turnover and accounting in connection with the transfers.

202. Bank Safra and the Trustee are engaged in discovery. Vizcaya, Siam, Asphalia, and Zeus have failed to appear in the Bankruptcy Court.

Picard v. Kingate Global Fund Ltd., Kingate Euro Fund Ltd. and Bank of Bermuda Limited,
Adv. Pro. No 09-1161 (BRL).

203. On April 17, 2009, the Trustee filed a complaint against Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Kingate Euro"), seeking return of $395 million under SIPA §§ 78$lll$(4) and 78fff-2(c)(3), and Bankruptcy Code sections 542, 547,

550(a)(1), and 551 and other applicable law for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the defendants.

204.   On July 21, 2009, the Trustee filed a second amended complaint against Kingate Global and Kingate Euro, seeking return of $874 million under SIPA §§ 78*lll*(4) and 78fff-2(c)(3), and Bankruptcy Code sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a), and 551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq.* (McKinney 2001)) and other applicable law for turnover, accounting, preferences, fraudulent conveyances and objection to claim in connection with certain transfers of property by BLMIS to or for the benefit of Kingate Global and Kingate Euro.   The complaint also named Bank of Bermuda Limited as a defendant.   The defendants' answers are currently due on May 11, 2010 and a pretrial conference has been scheduled for May 25, 2010.

205.   Kingate Global and Kingate Euro are in liquidation in BVI.   The Trustee and the BVI Court-appointed liquidators have been diligently engaged in negotiations regarding a settlement agreement since July 2009.   Any final settlement agreement would have to be approved by the Bankruptcy Court and the BVI Court.

Picard v. Stanley Chais, et al., Adv. Pro. No 09-1172 (BRL).

206.   On May 1, 2009, the Trustee filed an adversary complaint against Stanley Chais, Pamela Chais (the "Chais Defendants") and a number of related entities (collectively, the "Chais-related entities") seeking return of more then $1.1 billion under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, N.Y. Debt & Cred. § 270 et seq. (the "New York Fraudulent Conveyance Act"), and other applicable law, for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the defendants.

207.    On September 29, 2009, the Chais Defendants filed a motion with the Bankruptcy Court seeking a declaration that the Chais Defendants should be free to use certain funds held at Goldman Sachs.  The Trustee had previously requested that Goldman Sachs freeze such assets and not permit the Chais Defendants to withdraw any such amounts.  In response to such motion, the Trustee filed a motion seeking a temporary restraining order and preliminary injunction formally freezing all assets of the Chais Defendants.  Following a Chambers conference on October 6, 2009, the Chais Defendants consented to the entry of a temporary restraining order that formally froze their assets but made certain amounts available to them for living and other expenses.  After two extensions of the October 7, 2009 order, the Chais Defendants and the Trustee entered into a stipulation which extends the asset freeze indefinitely.

208.    Certain of the Chais-related entities filed motions to dismiss the Trustee's complaint.  Stanley and Pamela Chais, and certain entities they control, answered the Trustee's complaint and filed counterclaims against the Trustee in connection with a letter that the Trustee wrote to Goldman Sachs last year.  The Trustee moved to dismiss the counterclaims and opposed the motions to dismiss.  A hearing on all of these motions is scheduled for May 5, 2010.

Picard v. J. Ezra Merkin, et al., Adv. Pro. No. 09-1182 (BRL).

209.    On May 7, 2009, the Trustee filed an adversary complaint against Gabriel Capital, L.P., Ariel Fund, Ltd., Ascot Partners, L.P., Gabriel Capital Corporation and J. Ezra Merkin (collectively, the "Merkin Funds") seeking return of more then $557 million under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the defendants.

210.    In late June 2009, pursuant to an action commenced by the New York State Attorney General in the Supreme Court of New York, New York County, Receivers were appointed over each of the funds.  Bart Schwartz, Esq., was appointed Receiver of Ariel Fund Ltd. and Gabriel Capital, L.P., and is utilizing his law firm of Reed Smith.  David Pitosky, Esq. was appointed Receiver over Ascot Partners, L.P. and is utilizing his firm of Goodwin Procter.

211.    On or about August 6, 2009, the Trustee filed an Amended Complaint.  On or about September 4, 2009, Defendants Ariel Fund Ltd. and Gabriel Capital, L.P., through their above-mentioned state court appointed Receiver, filed a Motion to Dismiss the Amended Complaint.  On that same date, J. Ezra Merkin and Gabriel Capital Corporation filed a Motion to Dismiss the Amended Complaint.  On November 2, 2009, the Trustee filed his Memoranda in Opposition to the foregoing motions to dismiss the Amended Complaint.  On December 1, 2009 the Trustee filed a motion for leave to file a Second Amended Complaint, seeking to add a count for general partner liability against Merkin personally.  On December 14, 2009, Merkin filed his opposition to that motion.  On December 16, 2009, the Trustee filed a reply in further support. On December 17, 2009, the Court held a hearing on the motions in which it granted the motion for leave and deferred a hearing on the motions to dismiss the Amended Complaint, indicating that the defendants should refile their motions after the Second Amended Complaint was filed. The Trustee has had ongoing negotiations with the court appointed Receiver for Ascot Partners, L.P., and has extended the time for Ascot Partners, L.P. to respond to the Amended Complaint while those negotiations continue.

212.    On December 23, 2009, the Trustee filed his Second Amended Complaint.  On January 25, 2010, defendants Ariel Fund, Ltd., Gabriel Capital, L.P., Gabriel Capital Corp. and J. Ezra Merkin all moved to dismiss the Second Amended Complaint.  On February 24, 2010, the

Trustee filed his oppositions to those motions.  Defendants' reply briefs were filed on March 17,

2010.  The motions are scheduled for hearing on April 15, 2010.

Picard v. Harley International (Cayman) Limited, Adv. Pro. No. 09-1187 (BRL).

213.    On May 12, 2009, the Trustee filed a complaint against Harley International

(Cayman) Limited ("Harley"), seeking return of approximately $1.1 billion pursuant to SIPA §§

78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a), 550(a) and 551 of the

Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for

turnover, accounting, preferences, fraudulent conveyances and damages in connection with

certain transfers of property by BLMIS to or for the benefit of Harley.  As Harley failed to

answer the Trustee's complaint, a default was entered against Harley on July 8, 2009 by the

Clerk of the Bankruptcy Court.  On January 21, 2010, leave was granted by the Grand Court of

the Cayman Islands, Financial Services Division to the Trustee to proceed with an action against

Harley in the Cayman Islands.

Picard v. Jeffry Picower, et al., Adv. Pro. No. 09-1179 (BRL).

214.    On May 12, 2009, the Trustee filed an adversary complaint against Jeffry M.

Picower, individually and as trustee for the Picower Foundation, Barbara Picower, individually

and trustee for the Trust FBO Gabrielle H. Picower and the Picower Foundation, Capital Growth

Company, Favorite Funds, JA Primary Limited Partnership, JA Special Limited Partnership,

JAB Partnership, JEMW Partnership, JF Partnership, JFM Investment Company, JLN

Partnership, JMP Limited Partnership, Jeffry M. Picower Special Co., Jeffry M. Picower, P.C.,

Decisions Incorporated, The Picower Foundation, The Picower Institute For Medical Research,

The Trust FBO Gabrielle H. Picower and Does 1-25 (collectively, the "Picower-related entities")

seeking return of more then $6.7 billion under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections

105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent

Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the defendants. The defendants filed a partial motion to dismiss certain claims and parties on July 31, 2009. The Trustee filed his opposition to the defendants' motion on September 30, 2009. In his opposition the Trustee, among other things, notified the defendants that the Trustee's continuing investigation has determined that the fictitious profit withdrawn by the Picower-related entities was in excess of $7.2 billion, which correspondingly increases the recovery sought by the Trustee in this matter. The Trustee also confirmed that the Picower-related entities had withdrawn more of other investors' money than any other customer of BLMIS.

215.    On October 25, 2009, Mr. Picower was found dead in the swimming pool of his home in Florida. An estate representative was appointed on January 5, 2010 pursuant to the issuance of letters testamentary. A hearing on defendants' motion to dismiss is scheduled to be heard on May 25, 2010. In the meantime, settlement discussions are on-going.

Picard v. Fairfield Sentry Limited, et al., Adv. Pro. No 09-1239 (BRL).

216.    On May 18, 2009, the Trustee filed a complaint against Fairfield Sentry Limited, Greenwich Sentry Limited, L.P., and Greenwich Sentry Partners, L.P., (collectively, "the Fairfield Funds") seeking return of approximately $3.5 billion pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent conveyances, damages and objection to claim in connection with certain transfers of property by BLMIS to or for the benefit of the Fairfield Funds.

217.    Since the commencement of this adversary proceeding, extensive additional investigation pursuant to 2004 subpoenas has focused on subsequent transferees, including certain financial institutions.

218.    No answers or motions have been filed in the adversary proceeding to date.  There have been a series of discussions with the liquidators, who are represented by both BVI counsel and counsel in New York, to seek to work cooperatively and most advantageously in the filing of claims against various responsible parties, the individual principals of the Fairfield Greenwich Group, and the management companies.

219.    The individual principals are represented by counsel, who have met with the Trustee also to discuss settlement.  Thus far, their proposed resolution is deemed inadequate as forming a realistic basis for a settlement at this juncture.  Accordingly, it is the Trustee's intention to vigorously investigate and litigate this matter.  He also intends to amend his complaint, or file a new complaint, as appropriate, as further investigative information develops.

Picard v. Cohmad Securities Corporation, et al., Adv. Pro. No. 09-1305 (BRL).

220.    On June 22, 2009, the Trustee filed a complaint in the Bankruptcy Court against Cohmad Securities Corporation ("Cohmad"), Maurice "Sonny" J. Cohn, Marcia B. Cohn, Robert Jaffe, Alvin "Sonny" Delaire, Jr., Milton S. Cohn, Stanley Berman, Jonathan Greenberg, Cyril Jalon, Morton Kurzrok, Linda McCurdy, Richard Spring, Rosalie Buccellato, Marilyn Cohn, Jane M. Delaire a/k/a Jane Delaire Hackett, Carole Delaire, Gloria Kurzrok, Joyce Berman, S & J Partnership, Janet Jaffin Revocable Trust, The Spring Family Trust, Jeanne T. Spring Trust, The Estate of Elena Jalon, The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger, The Joint Tenancy of Robert Pinchou and Fabian Guenzburger and Elizabeth M. Moody.

221.    The following defendants filed motions to dismiss the complaint, or portions thereof, pursuant to Fed. R. Civ. P. 12(b)(6): (1) Cohmad, Maurice "Sonny" J. Cohn, Marcia B.

Cohn, Milton Cohn and Marilyn Cohn; (2) Robert Jaffe; (3) Richard Spring, The Spring Family Trust, Jeanne T. Spring Trust (collectively, the "Spring Defendants"); and (4) Jane M. Delaire a/k/a Jane Delaire Hackett.  The following defendants joined in the motion filed by the Spring Defendants: (1)  Cyril Jalon and the Estate of Elana Jalon; (2) Alvin "Sonny" Delaire, Jr. and Carole Delaire; and (3) Stanley Berman, Joyce Berman, S & J Partnership.  These motions were all rendered moot by the Trustee's amended complaint, discussed in further detail below.

222.    The following defendants answered the complaint: Jonathan Greenberg, Linda McCurdy, Rosalie Buccellato, Moton Kurzrok, Gloria Kurzrok, the Janet Jaffin Revocable Trust, and Elizabeth M. Moody.  Gloria Kurzrock also filed a counterclaim seeking recognition of her SIPA claim.

223.    The following defendants moved to dismiss for lack of personal jurisdiction and improper service: The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger, The Joint Tenancy of Robert Pinchou and Fabian Guenzburger (collectively, the "Tenancy Defendants"). The Trustee opposed these motions, and indicated that it was in the process of serving the complaint on the Tenancy Defendants under the Hague Convention.  Oral argument was held on October 22, 2009, and the on October 26, 2009, the Court issued an order denying the motion filed by the Tenancy.

224.    The Trustee filed a motion to dismiss Gloria Kurzrok's counterclaim.  The counterclaim was dismissed without prejudice by stipulation of the parties on November 23, 2009.

225.    The following defendants also moved to have the reference to Bankruptcy Court withdrawn as to the Trustee's case against them: (1) Cohmad, Maurice Cohn and Marcia Cohn; and (2) Robert Jaffe.  The Trustee opposed these motions, and on December 9, 2009, Judge

Stanton of the United States District Court issued an opinion denying defendants' motions to withdraw the reference to Bankruptcy Court.

226.    The Trustee continued its investigation against the various defendants, and filed an amended complaint on October 8, 2009.  The amended complaint seeks to avoid, pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, decades worth of transactions through which BLMIS paid more than approximately $114 million to Cohmad, Sonny Cohn and other Cohmad related individuals in exchange for Sonny Cohn, Marcia Cohn, Robert Jaffe and other Cohmad employees introducing victims to BLMIS and knowingly helping Madoff create, fund and maintain his massive Ponzi scheme.  Over 90% or more of the income to Cohmad and others came from the referral of customers to Madoff.

227.    The amended complaint portrays the unique relationships between Madoff, Cohmad, Cohn, Jaffe and other Cohmad individuals, who, though ostensibly at different companies, acted as a single enterprise. According to the amended complaint, while Madoff shrouded himself with an unapproachable, Wizard of Oz-like aura eschewing unknown investors, the reality is that Cohn, Jaffe and others were actively recruiting more than 1,000 customer accounts and infusing the Ponzi scheme with billions of dollars.  The amended complaint also adds M/A/S Capital, Inc., a company owned by Robert Jaffe, as a defendant to the action.

228.    In addition, the amended complaint seeks to recover all of the fictitious profits that the Cohmad representatives, and their family members, received over the years from their investment advisory accounts at BLMIS, an amount greater than $100 million.

229.    The following defendants filed motions to dismiss the amended complaint, or portions thereof, pursuant to Fed. R. Civ. P. 12(b)(6): (1) Cohmad, Maurice "Sonny" J. Cohn,

Marcia B. Cohn, Milton Cohn and Marilyn Cohn; (2) Robert Jaffe and M/A/S Capital, Inc.; (3) Richard Spring, The Spring Family Trust, Jeanne T. Spring Trust (collectively, the "Spring Defendants"); (4) Alvin "Sonny" Delaire, Jr. and Carole Delaire; (5) Gloria Kurzrok; and (6) Jane M. Delaire a/k/a Jane Delaire Hackett.  The following defendants joined in the motion filed by the Spring Defendants: (1)  Cyril Jalon and the Estate of Elana Jalon; and(2) Stanley Berman, Joyce Berman, S & J Partnership.

230.    The following defendants answered the amended complaint: Jonathan Greenberg, Linda McCurdy, Rosalie Buccellato, Morton Kurzrok, the Janet Jaffin Revocable Trust, and Elizabeth M. Moody.

231.    The following defendants moved to dismiss the amended complaint for lack of personal jurisdiction: The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger, The Joint Tenancy of Robert Pinchou and Fabian Guenzburger (collectively, the "Tenancy Defendants").

232.    The Trustee opposed all of these motions in an omnibus opposition filed on March 1, 2010.  The Cohmad Defendants filed their reply briefs by April 8, 2010 (the return date was March 31, 2010; however, the Trustee stipulated to filing extensions for several of the Cohmad Defendants) and a hearing will be scheduled to consider the motions.

Picard v. Peter B. Madoff, Mark D. Madoff, Andrew H. Madoff and Shana D. Madoff,
Adv. Pro. No. 09-1503 (BRL).

233.    On October 2, 2009, the Trustee filed an adversary complaint against Peter B. Madoff, Mark D. Madoff, Andrew H. Madoff, and Shana D. Madoff (the "Family Defendants"). Through the complaint, the Trustee is seeking the return of nearly $200 million under SIPA §§ 78fff(b), 78fff-2(c)(3), sections 105(a), 502(d), 541, 542, 544, 548(a), 550(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 et seq.),

and common law.  The relief sought includes turnover of and accounting for BLMIS funds, property, and assets, the recovery of preferential and fraudulent transfers—both discovered and undiscovered—of BLMIS funds, property, and assets from BLMIS to the Family Defendants, the recovery of subsequent transfers of BLMIS funds, property, and assets from the Family Defendants to others, the disallowance, or, alternatively, the equitable subordination of the Family Defendants' claims against the estate, as well as seeking damages for breach of fiduciary duty, conversion, unjust enrichment, negligence, and the imposition of a constructive trust.

234.    Each of the Family Defendants held senior supervisory or compliance roles at BLMIS: Peter B. Madoff was the Company's Senior Managing Director and Chief Compliance Officer, Mark D. Madoff and Andrew H. Madoff were Co-Directors of Trading, and Shana D. Madoff was Compliance Counsel.  The Trustee alleges that the Family Defendants ignored their responsibilities to BLMIS and instead each improperly received tens of millions of dollars in customer funds to which they were not entitled.

235.    On February 5, 2010, the Court entered Consent Orders restricting each of Peter, Mark, Andrew, and Shana's ability to transfer or dispose of any of their assets, and requiring each of them to provided the Trustee with financial disclosures listing all of their significant assets.  Those financial disclosures were provided to the Trustee on March 8, 2010.

236.    On March 15, 2010, the Family Defendants moved to dismiss the Trustee's complaint.  The Trustee's reply papers to the motion to dismiss are due on May 21, 2010 and a hearing on the motion to dismiss is scheduled for July 22, 2010.

Picard v. Ruth Madoff, Adv. Pro. No. 09-1391 (BRL).

237.    On July 29, 2009, the Trustee filed an adversary complaint against Ruth Madoff. In this action the Trustee is seeking the return of more than $44 million under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 502(d), 541, 542, 544, 548(a), 550(a), and 551 of

the Bankruptcy Code, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 et seq.), and New York common law.  The relief sought includes turnover of and accounting for BLMIS funds, property, and assets, the recovery of fraudulent transfers and subsequent transfers, disallowance of Mrs. Madoff's claims against the estate, as well as damages and the imposition of a constructive trust.

238.    On July 31, 2009, the Court entered an Order restricting Mrs. Madoff's ability to transfer or dispose of any of her assets, and requiring her to provide monthly reports to the Trustee describing all income and expenditures.  Mrs. Madoff's answer currently is due on May 10, 2010.  A pre-trial conference is scheduled to take place before Judge Lifland on May 25, 2010.  The Trustee and B&H have been engaged in settlement discussions with counsel for Ms. Madoff.

Picard v. Alpha Prime Fund Limited, HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A., Adv. Pro. No. 09-1364 (BRL).

239.    On July 15, 2009, the Trustee filed a complaint against Alpha Prime Fund Limited ("Alpha Prime") seeking return of $86 million under SIPA §§ 78*lll*(4) and 78fff-2(c)(3), and Bankruptcy Code sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a), and 551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq.* (McKinney 2001)) and other applicable law for turnover, accounting, preferences, fraudulent conveyances and objection to claim in connection with certain transfers of property by BLMIS to or for the benefit of Alpha Prime.  The complaint also named HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A. (collectively "HSBC") as defendants.  HSBC answered the complaint on August 28, 2009.  Alpha Prime failed to answer or move to dismiss before its deadline and the Clerk of the Court entered a default against Alpha Prime on September 1, 2009.  A pretrial conference is scheduled for May 5, 2010.

Picard v. Herald Fund SPC, HSBC Bank PLC and HSBC Securities Services (Luxembourg)
S.A., Adv. Pro. No. 09-1359 (BRL).

240.    On July 14, 2009, the Trustee filed a complaint against Herald Fund SPC
("Herald") and HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A.
(collectively "HSBC") as defendants, seeking return of $578 million under SIPA §§ 78*lll*(4) and
78fff-2(c)(3), and Bankruptcy Code sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a), and
551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq.* (McKinney
2001)) and other applicable law for turnover, accounting, preferences, actual fraudulent
conveyances and constructive fraudulent conveyances in connection with certain transfers of
property by BLMIS to or for the benefit of Herald.  On August 14, 2009, the Trustee filed an
amended complaint to add an objection to Herald's SIPA claim.  On October 13, 2009, the
Trustee filed a second amended complaint.  The parties filed a case management plan, which the
Court entered on October 21, 2009.

241.    HSBC answered the second amended complaint on October 26, 2009.  Herald
moved to dismiss the second amended complaint for failure to state a claim on October 26, 2009.
The Trustee's opposition to that motion was filed on November 13, 2009.  A hearing on the
motion to dismiss is scheduled for May 25, 2010.

Picard v. Primeo Fund, HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A.,
Adv. Pro. No. 09-1366 (BRL).

242.    On July 15, 2009, the Trustee filed a complaint against Primeo Fund ("Primeo")
seeking return of $145 million under SIPA §§ 78*lll*(4) and 78fff-2(c)(3), and Bankruptcy Code
sections 105(a), 542, 544, 548(a), 550(a), and 551, the New York Fraudulent Conveyance Act
(N.Y. Debt. & Cred. §§ 270 et seq. (McKinney 2001)) and other applicable law for turnover,
accounting and fraudulent conveyances in connection with certain transfers of property by
BLMIS to or for the benefit of Primeo.  The complaint also named HSBC Bank PLC and HSBC

Securities Services (Luxembourg) S.A. (collectively "HSBC") as defendants. HSBC answered the complaint on August 28, 2009. Primeo failed to respond to the suit papers before its deadline and the Clerk of the Court entered a default against Primeo on September 1, 2009. A pretrial conference is scheduled for May 5, 2010. Primeo is in liquidation in the Cayman Islands. The Trustee and the Cayman Islands court-appointed liquidators (the "Liquidators") are in negotiations regarding a partial settlement. Any final settlement agreement would have to be approved by the Bankruptcy Court and the Cayman Islands Court.

<u>Picard v. Thybo Asset Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited, Thybo Stable Fund Ltd.</u>, Adv. Pro. No. 09-1365 (BRL).

243.    On July 15, 2009, the Trustee filed a complaint against Thybo Asset Management Limited; Thybo Global Fund Limited; Thybo Return Fund Limited; and Thybo Stable Fund Ltd. (collectively, the "Thybo Funds"), seeking return of approximately $63 million pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a), 550(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for turnover, accounting, preferences, fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Thybo Funds. The Trustee filed an amended complaint on August 25, 2009, adding a claim objecting to Thybo Stable Fund's SIPA claim. Since then, the parties have been engaged in settlement discussions, which are ongoing, and have agreed to an extension of time for the Thybo Funds to respond to the amended complaint. The Thybo Funds' answers are due on May 13, 2010 and a pretrial conference is scheduled for May 27, 2010.

H.    **SETTLEMENTS**

Optimal Companies.

244.    On May 22, 2009, the Trustee reached an agreement (the "Optimal Settlement Agreement") with Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited (collectively the "Optimal Companies") to settle the Trustee's claims against them in connection with the liquidation of BLMIS.    The Optimal Companies are indirectly owned by Banco Santander, S.A., a Spanish banking corporation ("Santander" and together with the Optimal Companies, collectively "Optimal").    On May 26, 2009, the Trustee filed a motion seeking approval of the Optimal Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code and Fed. R. Bankr. P. 2002 and 9019.    This Court approved the Optimal Settlement Agreement at a hearing held on June 16, 2009.

245.    Pursuant to the Optimal Settlement Agreement, Optimal agreed to pay $235 million to settle potential litigation claims by the Trustee.    This settlement is significant because it is the first instance where a "feeder fund" has agreed to settle with the Trustee.    The Optimal Companies withdrew about $275 million within 90 days before the collapse of BLMIS.    The $275 million in withdrawals were therefore considered preferences, recoverable by the Trustee pursuant to sections 547 and 550 of the Bankruptcy Code.    Optimal agreed to return approximately $235 million, which is 85% of what the Trustee would have sought from Optimal as a 90-day preference claim.    The settlement is considered to be a major success because it allows the Trustee to avoid (1) the anticipated legal battles over determining the judicial plausibility of a US court holding jurisdiction over a foreign bank in Spain and (2) the costly litigation that would be necessary to collect a judgment from the funds.

246.    The Trustee conducted a confirmatory investigation, including a review of documents made available to the Trustee by the Optimal Companies that related to, among other

things, due diligence conducted by the Optimal Companies and their affiliates on BLMIS.  On the basis of that review, the Trustee concluded that the Optimal Companies and their affiliates were not complicit in the fraud perpetrated by BLMIS and Bernard Madoff on BLMIS's customers and did not have actual knowledge of the fraud, and based on the review, the Trustee did not believe that the conduct, acts and omissions of the Optimal Companies and their affiliates provide grounds to assert any claim against the Optimal Companies or any affiliates (other than avoiding preference claims), or to disallow any claim that the Optimal Companies may have against BLMIS or its estate.  If the Trustee obtains new information relating to the BLMIS accounts of the Optimal Companies that materially affects the Trustee's decision to enter into the Settlement Agreement, the Trustee may declare the Optimal Settlement Agreement void and return the amounts paid by the Optimal Companies.

Levy Family.

247.    In January 2010, the Trustee reached an agreement (the "Levy Settlement Agreement") with Jeanne Levy-Church and Francis N. Levy (collectively, the "Levys") to settle the Trustee's claims against them regarding certain accounts held by the Levys and their family members in connection with the liquidation of BLMIS.  Prior to his death, Norman F. Levy, established a number of accounts at BLMIS in his name, the names of the Levys, and for family trusts and charitable trusts, including the Betty and Norman F. Levy Foundation (the "Foundation") (collectively, the "Levy BLMIS Account Holders").  In the spring of 2009, the Levys came forward and approached the Trustee regarding the possible negotiation of a settlement agreement.  On January 27, 2010, the Trustee filed a motion seeking approval of the Levy Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code and Fed. R. Bankr. P. 2002 and 9019.  This Court approved the Levy Settlement Agreement by order dated February 18, 2010.

248.    Pursuant to the Levy Settlement Agreement, the Levys agreed to pay $220 million to settle potential litigation claims by the Trustee, which represents nearly one hundred percent of the transfers of fictitious profits to the Levy BLMIS Account Holders during the six years prior to the Filing Date, less the transfers of fictitious profits to the Foundation.   The settlement funds were received by the Trustee on March 5, 2010, and represents the largest settlement to date with individual account holders at BLMIS.

249.    The Levys also agreed to reasonably cooperate with the Trustee in his efforts to recover funds for the BLMIS estate and also agreed to deem withdrawn the claims filed by Francis N. Levy's children.   This settlement is significant because the Levys were among the first group of former BLMIS customers to approach the Trustee to discuss settlement in the spring of 2009 and engaged in good faith negotiations, sharing information and documents about themselves and the Levy BLMIS accounts with the Trustee and his counsel.   The Levys' cooperation has sped resolution and minimized Trustee expenses.

I.    **TRUSTEE'S INJUNCTIONS**

Fox v. Picower, Adv. Pro. No. 10 CV 80252 (KLR) / Marshall v. Picower, Adv. Pro. No. 10 CV 80254 (KLR)

250.    On February 16, 2010,[9] Adele Fox ("Fox"), a BLMIS customer, commenced a putative class action against Estate of Jeffry M. Picower and related entities (the "Picower Defendants") in the United States District Court for the Southern District of Florida, West Palm Beach Division (the "Florida District Court") on her own behalf and on behalf of a similarly situated class of plaintiffs (the "Fox Action"). The complaint describes the class as "persons or entities who have maintained customer accounts with BLMIS who are not SIPA Payees and who

---

[9] The complaint was amended on March 15, 2010.

have not received the net account value scheduled in their BLMIS accounts as of the day before the commencement of the SIPA Liquidation."

251.    Similarly, on February 17, 2010,[10] Susanne Marshall ("Marshall," and together with Fox, the "Florida Plaintiffs"), a BLMIS customer, commenced a putative class action against the Picower Defendants in the Florida District Court, on her own behalf and on behalf of a similarly situated class of plaintiffs (the "Marshall Action," and together with the Fox Action, the "Florida Actions").  The complaint describes the class the plaintiff seeks to certify as "all SIPA Payees, but only with respect to claims, or portions thereof, not assigned to the Trustee."

252.    Apart from representing different putative classes, the Marshall complaint is identical to the Fox complaint and plaintiffs in both Florida Actions are represented by the same counsel.  Further, both complaints rely heavily on the allegations in the complaint filed by the Trustee in this Court on May 13, 2009 (*Picard v. Picower, et al.*, Adv. Pro. No. 09-1197 (BRL)). Plaintiffs in the Florida Actions allege damages based on conspiracy, conversion, unjust enrichment and violations of the Florida RICO statute.

253.    On March 24, 2010, Fox moved for entry of an initial order regarding consolidation of the Marshall Action and of potential later-filed actions related to the Florida Actions.  On March 25, 2010, both Florida Plaintiffs filed Civil Rico case statements.

254.    On April 1, 2010, the Trustee moved by way of Order to Show Cause for a Temporary Restraining Order, Enforcement of the Automatic Stay and Preliminary Injunction, enjoining and restraining the Florida Plaintiffs and any related parties from pursuing the Florida Actions and commencing or proceeding with any other actions or proceedings against the Picower Defendants, among other reasons, because the Florida Actions impinge on the Bankruptcy Court's jurisdiction and the orderly administration of the BLMIS proceedings and

interfere with the Trustee's imminent settlement with the Picower Defendants.  A conference was held before the Court on April 1, 2010, with counsel for the parties in the Florida Actions present, and a temporary retraining order was granted.  A hearing is scheduled for April 27, 2010, at which time the Court will determine whether the Florida Actions are in violation of the automatic stay provisions of § 362 of the Bankruptcy Code and hence, *void ab initio*, and whether to issue a preliminary injunction enjoining the Florida Plaintiffs and related parties from proceeding with the Florida Actions or commencing any other action against the Picower Defendants.  Meanwhile, the Florida Plaintiffs have until May 3, 2010 to answer the Trustee's complaint against them, made in connection with the injunctive relief sought, and a pre-trial conference with the Court is set for May 12, 2010.

Canavan v. Harbeck, Adv. Pro. No. 10-cv-00954 (FSH) (PS)

255.    On February 24, 2010, three BLMIS customers[11] (the "New Jersey Plaintiffs") filed an action in the United States District Court for the District of New Jersey ("New Jersey District Court") against SIPC's Board of Directors and CEO/President (the "SIPC Defendants"), on behalf of a similarly situated prospective class of customers (the "New Jersey Action").  The purported class action seeks to certify a class of "customers of Madoff who are not entitled to their full SIPC insurance under SIPC's Net Investment Policy." The New Jersey Plaintiffs' causes of action claim: (1) bad faith failure to pay insurance claims; (2) fraud; (3) violation of the New Jersey Consumer Fraud Act; and (4) promissory estoppel.

256.    On March 18, 2010, following a request by counsel for five of SIPC's Board members and its CEO/President for leave of court to file a motion to transfer venue of the New Jersey Action to the Bankruptcy Court and a related teleconference, New Jersey Magistrate

---

[10] The complaint was amended on March 15, 2010.

[11] One plaintiff holds a 20% interest in a limited liability company that had an account with BLMIS; one has a BLMIS account in her own name and one has a BLMIS account in the name of herself and another individual as tenants in common.

Judge Patty Shwartz issued an order under which, inter alia, the New Jersey Plaintiffs would have until April 6, 2010 to decide whether to dismiss certain federal employee defendants, in which case, she would allow the transfer motion to be made.  By a letter dated March 31, 2010, New Jersey Plaintiffs' counsel informed the New Jersey District Court that she did not intend to dismiss the New Jersey Action as to the federal defendants.  The court then held a conference on April 5, 2010 to discuss, among other things, the New Jersey Plaintiffs' decision not to dismiss the federal defendants from the case.  The court set a briefing schedule on the issue pursuant to an order dated April 5, 2010, with a return date of May 3, 2010, and the SIPC Defendants were given permission to file their transfer motion by April 23, 2010, with their answer or motion to dismiss due ten days after the resolution of that motion. The court denied the SIPC Defendants' request for a stay of discovery pending resolution of the motion to transfer.

J.    **MOTIONS TO INTERVENE**

257.    The Trustee and his counsel successfully opposed an attempt by Ade Ogunjobi, Toks, Inc. and its related companies (collectively, "Toks") to intervene in the BLMIS proceedings.  Toks proposed to purchase BLMIS through what it described as a purported "global transaction all stock tax free $100,000,000,000 ($100 Trillion) or 400,000,000,000 shares of Class A Common shares that will be registered with the [SEC] during the closing of the proposed exchange tender offers," pursuant to which clients of BLMIS purportedly would receive $75 billion or more in stock, and it proposed to use the funds recovered by the Trustee to fund the plan.  The offer was unsolicited, and more importantly, completely unsupported.

258.    Based on papers filed by the Trustee, and after a hearing on the matter held on June 2, 2009, the Bankruptcy Court found that Toks was not a party in interest, and that Toks failed to demonstrate any ability to complete its proposed tender offer.  The Bankruptcy Court

denied Toks' motion to intervene [Dkt. No. 234],[12] and Toks appealed to the District Court. The matter was assigned to Judge Chin (Civil Case No. 09 CV 5877) (the "District Court Appeal").

259.    Counsel for the Trustee filed a joint appellate brief with SIPC, which together with Toks' appellate brief, was submitted without oral argument. By order dated October 30, 2009, the District Court dismissed the appeal based on Toks' failure to provide information required pursuant to a prior order issued by the District Court. [District Court Appeal Dkt. No. 12].

260.    Toks appealed the District Court's decision to the United States Court of Appeals for the Second Circuit. In connection therewith, Toks filed an Emergency Motion seeking an expedited appeal, which was denied by the Second Circuit. Thereafter, Toks filed a brief in support of its appeal. Because the Trustee believes that the appeal should be dismissed for multiple reasons, including that the appeal is frivolous, the Trustee filed a motion to dismiss on February 16, 2010. The motion has been submitted to the Second Circuit, and no decision on the motion to dismiss has been issued as of this date.

---

[12] Mr. Ogunjobi's and Tok's emergency motion seeking a stay of the liquidation proceeding [Dkt. No. 304] was denied by the Bankruptcy Court on July 6, 2009 [Dkt. No. 306].

XI.    **CONCLUSION**

The foregoing report represents a summary of the status of this proceeding and the material events that have occurred through February 28, 2010 unless otherwise indicated.  This Report will be supplemented and updated with further interim reports.

Dated: New York, New York
       April 9, 2010

Respectfully submitted,

_/s/ Irving H. Picard_ _____
Irving H. Picard
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Trustee for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and
Bernard L. Madoff*

OF COUNSEL[13]

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc Hirschfield
Email: mhirschfield@bakerlaw.com
Alissa M. Nann
Email: anann@bakerlaw.com

*Attorneys to Trustee for the Substantively
Consolidated SIPA Liquidation of Bernard L.
Madoff Investment Securities LLC And
Bernard L. Madoff*

---

[13] The Trustee would like to recognize the following B&H attorneys and team members who contributed to this Report: Fritz Chockley, Elizabeth Scully, Lauren Resnick, Brian Bash, Gonzalo Zeballos, Mark Kornfeld, Ona Wang, Marc Powers, Lou Colombo, Timothy Pfeifer, Adam Oppenheim, Keith Murphy, Bik Cheema, Deborah Kaplan, Courtni Thorpe, Seanna Brown, Tatiana Markel and Bill Speros.  Denis O'Connor, William Kingsford, Meaghan Schmidt, Vineet Sehgal and Matt Layton of AlixPartners also contributed to this Report, as well as Regina Griffin of Windels Marx.