# EXHIBIT A

FORM OF

THIRD AMENDED AND RESTATED

ASSET PURCHASE AGREEMENT

FOR THE PURCHASE OF CERTAIN ASSETS

OF

BERNARD L. MADOFF INVESTMENT SECURITIES LLC

BY

SURGE TRADING INC.

April __, 2010

# TABLE OF CONTENTS

**Page**

ARTICLE I       DEFINITIONS.................................................................... 2

    Section 1.1       Certain Definitions........................................ 2

ARTICLE II      PURCHASE AND SALE OF ASSETS ....................... 8

    Section 2.1       Purchase and Sale of Acquired Assets................................ 8
    Section 2.2       Excluded Assets ................................................................. 8
    Section 2.3       Transaction Data License................................................... 9

ARTICLE III     ASSUMED LIABILITIES.......................................... 9

    Section 3.1       Assumed Liabilities; Post-Closing Liabilities .................. 9
    Section 3.2       Other Liabilities ................................................................. 9
    Section 3.3       Non-Assignment of Contracts........................................... 10

ARTICLE IV      PAYMENT; CLOSING; POST-CLOSING ................. 10

    Section 4.1       Purchase Price .................................................................. 10
    Section 4.2       Acknowledgement and Allocation of Purchase Price....... 12
    Section 4.3       Date, Time and Place of Closing ...................................... 12
    Section 4.4       Prepayment ....................................................................... 13
    Section 4.5       Right of Rescission ........................................................... 13
    Section 4.6       Termination of Obligations............................................... 13
    Section 4.7       Monitoring Fee.................................................................. 13
    Section 4.8       Collateral Security ............................................................ 13
    Section 4.9       Enforcement ...................................................................... 14

ARTICLE V       REPRESENTATIONS AND WARRANTIES OF TRUSTEE .... 14

    Section 5.1       Authorization and Validity ............................................... 14
    Section 5.2       Title and Ownership.......................................................... 15
    Section 5.3       Intellectual Property.......................................................... 15
    Section 5.4       Brokers .............................................................................. 15
    Section 5.5       SALE ON AN OTHERWISE "AS IS" AND "WHERE IS"
                              BASIS ................................................................................ 15
    Section 5.6       NO OTHER REPRESENTATIONS OR WARRANTIES ............... 15

ARTICLE VI      REPRESENTATIONS AND WARRANTIES OF PURCHASER............. 15

    Section 6.1       Status................................................................................. 16
    Section 6.2       Authority; Effective Agreement ....................................... 16
    Section 6.3       Brokers or Finders............................................................. 16
    Section 6.4       Litigation or Proceedings.................................................. 16
    Section 6.5       Financial Capability .......................................................... 16
    Section 6.6       NO OTHER REPRESENTATIONS OR WARRANTIES ............... 16

ARTICLE VII     FURTHER COVENANTS AND AGREEMENTS ................. 16

    Section 7.1       Cooperation....................................................................... 16

# TABLE OF CONTENTS
(continued)

Section 7.2       [INTENTIONALLY OMITTED]...................................................... 17
Section 7.3       [INTENTIONALLY OMITTED]...................................................... 17
Section 7.4       Post Closing Cooperation and Preservation of Records ................... 17
Section 7.5       Notice to Third Parties ............................................................. 17
Section 7.6       Purchaser's Due Diligence Investigation; Certain
                  Acknowledgements ................................................................. 17
Section 7.7       Tax Covenants ....................................................................... 18
Section 7.8       [INTENTIONALLY OMITTED.].................................................. 19
Section 7.9       [INTENTIONALLY OMITTED.].................................................. 19
Section 7.10      [INTENTIONALLY OMITTED.].................................................. 19
Section 7.11      Residual Information ............................................................... 19
Section 7.12      Patent License ........................................................................ 19
Section 7.13      FINRA Filings; Access ............................................................ 19
Section 7.14      Additional Representations and Warranties as of the Effective
                  Date ..................................................................................... 19
Section 7.15      Additional Covenants of Purchaser as of the Effective Date............. 21
Section 7.16      Trustee's Rights in Respect of Reorganization................................ 21
Section 7.17      Trustee as Third Party Beneficiary Under License Agreement ........... 22
Section 7.18      Purchaser Obligations in Respect of Controlled Account ................. 22
Section 7.19      The Reorganization ................................................................. 23
Section 7.20      Right of Rescission; Reservation of Rights ................................. 23

ARTICLE VIII    CONDITIONS TO OBLIGATIONS OF PURCHASER ............................ 24

Section 8.1       Representations and Warranties................................................ 24
Section 8.2       Covenants and Agreements...................................................... 24
Section 8.3       Bankruptcy Matters................................................................ 24
Section 8.4       No Injunctions....................................................................... 24
Section 8.5       FINRA Approval .................................................................... 24
Section 8.6       Deliveries ............................................................................. 24

ARTICLE IX      CONDITIONS TO OBLIGATIONS OF TRUSTEE ................................ 24

Section 9.1       Representations and Warranties................................................ 24
Section 9.2       Covenants and Agreements...................................................... 25
Section 9.3       Bankruptcy Matters................................................................ 25
Section 9.4       No Injunctions....................................................................... 25
Section 9.5       Governmental and Regulatory Approvals ........................................ 25
Section 9.6       Deliveries ............................................................................. 25

ARTICLE X       BANKRUPTCY/SIPA CONDITIONS ............................................. 25

Section 10.1      Sale Order and SIPC Approval ................................................ 25
Section 10.2      Final Order ........................................................................... 26

ARTICLE XI      DELIVERIES ...................................................................... 26

Section 11.1      Trustee's Closing Deliveries.................................................... 26

# TABLE OF CONTENTS
(continued)

**Page**

|  |  |  |
|---|---|---|
| Section 11.2 | Purchaser's Closing Deliveries | 26 |
| Section 11.3 | Trustee's Effective Date Deliveries | 27 |
| Section 11.4 | Purchaser's Effective Date Deliveries | 27 |
| ARTICLE XII | TERMINATION | 28 |
| Section 12.1 | Termination of Initial Agreement | 28 |
| Section 12.2 | Effect of Termination of Initial Agreement | 28 |
| ARTICLE XIII | SURVIVAL OF REPRESENTATIONS AND WARRANTIES; SURVIVAL OF COVENANTS | 29 |
| Section 13.1 | Survival of Representations and Warranties | 29 |
| Section 13.2 | Survival of Covenants | 29 |
| ARTICLE XIV | GENERAL | 29 |
| Section 14.1 | Notices | 29 |
| Section 14.2 | Entire Agreement | 29 |
| Section 14.3 | Severability | 29 |
| Section 14.4 | Governing Law | 30 |
| Section 14.5 | JURISDICTION; WAIVER OF JURY TRIAL | 30 |
| Section 14.6 | Waiver | 30 |
| Section 14.7 | Expenses | 30 |
| Section 14.8 | Assignability; Binding Effect; No Beneficiaries | 31 |
| Section 14.9 | Counterpart Execution | 31 |

**THIS THIRD AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**
(this "Agreement") is entered into as of April __, 2010 (the "Effective Date") by and between the Trustee ("Trustee") for the Substantively Consolidated Liquidation Proceedings of Bernard L. Madoff Investment Securities LLC, a New York limited liability company, and Bernard L. Madoff and Surge Trading Inc., a Delaware corporation formerly known as Castor Pollux Securities, Inc. ("Purchaser").

## W I T N E S E T H:

WHEREAS, on December 11, 2008 (the "Filing Date"), the SEC filed a complaint (the "Complaint") in the United States District Court for the Southern District of New York against defendants Bernard L. Madoff Investment Securities LLC ("Debtor") and Mr. Bernard L. Madoff, individually (No. 08 CV 10791). On December 15, 2008, Judge Stanton entered an order pursuant to SIPA (as defined below), which, in pertinent part, appointed Trustee, pursuant to Section 78eee(b)(3) of SIPA, and removed the case, pursuant to Section 78eee(b)(4) of SIPA, to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Adv. Pro. No. 08-01789 (BRL), SIPA Liquidation (the "Bankruptcy Case"), pursuant to Section 78fff(b) of SIPA, chapters 1, 3 and 5 and subchapters I and II of Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, Trustee is liquidating the market making operations business previously operated by Debtor (as previously operated, the "Business");

WHEREAS, Purchaser desired to purchase the Acquired Assets (as defined in Section 2.1 below), and Trustee desired to sell the Acquired Assets to Purchaser, on the terms and conditions set forth in this Agreement, in accordance with Sections 78fff(a)(2) and (b) of SIPA and Sections 105, 363 and 365 of the Bankruptcy Code and in accordance with other applicable provisions of the Bankruptcy Code;

WHEREAS, Trustee and Purchaser entered into an agreement dated March 27, 2009 (as amended and restated on April 21, 2009, the "Original Agreement"), where upon the execution thereof Purchaser delivered to Trustee, in the form of a cashier's check payable to Trustee, a non-refundable deposit in the amount of Fifty Thousand Dollars ($50,000) (the "Initial Deposit");

WHEREAS, in connection herewith, on March 30, 2009, Trustee filed with the Bankruptcy Court a motion seeking approval of (i) procedures to be employed in connection with a proposed auction sale of the Business and excluding all other assets as detailed more particularly below, including, without limitation, notice and bidding procedures to be employed therewith and approval of a Fifteen Thousand Dollar Break-Up Fee (the "Break-Up Fee") and (ii) the proposed sale of the Acquired Assets to Purchaser, subject to a higher and better offer. On April 7, 2009, the Bankruptcy Court entered an order approving the auction procedures and the Break-Up Fee, a copy of which is attached hereto as Exhibit A (the "Procedures Order");

WHEREAS, following the conduct of an auction of the Business, Purchaser was deemed the highest and best offer and the Original Agreement was amended and restated on April 29,

2009 to reflect the terms agreed upon at the auction (such amended and restated Original Agreement, the "<u>Initial Agreement</u>");

**WHEREAS**, Purchaser purchased the Acquired Assets in connection with the consummation (the "<u>Closing</u>") of the transactions contemplated by the Initial Agreement occurred on June 17, 2009 (the "<u>Closing Date</u>") and following receipt of approval from FINRA, Purchaser resumed operation of the Business;

**WHEREAS**, Purchaser wishes to transfer (the "<u>Transfer</u>") substantially all of its assets and liabilities (including the Acquired Assets and associated obligations) to Surge Trading BD Inc., a wholly-owned subsidiary of Purchaser ("<u>Subsidiary</u>") in connection with a reorganization whereby Subsidiary will become the successor broker-dealer to Purchaser (the "<u>Reorganization</u>") and Purchaser intends to conduct the Business through Subsidiary; and

**WHEREAS**, Trustee and Purchaser now wish to amend and restate the terms of the Initial Agreement to include new terms and intend that this Agreement supersede the Initial Agreement in all respects.

**NOW, THEREFORE**, in consideration of the foregoing premises and of the mutual agreements and covenants hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms shall have the following meanings:

"**Acquired Assets**" has the meaning ascribed to it in <u>Section 2.1</u>.

"**Affiliate**" means, with respect to any Person, any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such Person.  For purposes of this Agreement, "control" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise (and the terms "controlled by" and "under common control with" shall have correlative meanings).

"**Agreement**" has the meaning ascribed to it in the preamble hereto.

"**Applicable Laws**" has the meaning ascribed to it in <u>Section 7.15(e)</u>.

"**Assumed Liabilities**" has the meaning ascribed to it in <u>Section 3.1</u>.

"**Assumption Agreement**" means the Assumption Agreement, in substantially the form attached hereto as <u>Exhibit B-2</u>.

"**Bankruptcy Case**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Rules**" has the meaning ascribed to it in Section 10.1.

"**Bill of Sale**" means the Bill of Sale, in substantially the form attached hereto as Exhibit B-1.

"**Block**" has the meaning ascribed to it in Section 7.18(c).

"**Break-up Fee**" has the meaning ascribed to it in the recitals hereto.

"**Business**" has the meaning ascribed to it in the recitals hereto.

"**Business Day**" means any day other than a Saturday or Sunday or any day that is a bank holiday in New York City.

"**Closing**" has the meaning ascribed to it in the recitals hereto.

"**Closing Date**" has the meaning ascribed to it in the recitals hereto.

"**Closing Payment**" has the meaning ascribed to it in Section 4.1(a).

"**Complaint**" has the meaning ascribed to it in the recitals hereto.

"**Contract**" means any contract, agreement, indenture, note, bond, loan, instrument, lease, sub-lease, deed of trust, conditional sales contract, mortgage, franchise, license, commitment or other binding arrangement, express or implied, currently in effect.

"**Controlled Account**" has the meaning ascribed to it in Section 4.8(a).

"**Cure Amount**" has the meaning ascribed to it in Section 7.18(c).

"**Debtor**" has the meaning ascribed to it in the recitals hereto.

"**Deposit Account Control Agreement**" means that certain Deposit Account Control Agreement, by and among Trustee, Purchaser, Subsidiary and JP Morgan Chase, in form and substance satisfactory to Trustee and substantially in the form attached hereto as Exhibit D-1.

"**Deposits**" has the meaning ascribed to it in Section 4.1(a)(i).

"**Designated Contracts**" has the meaning ascribed to it in Section 2.1(a).

"**Designated Funds**" has the meaning ascribed to it in Section 7.15(d).

"**Earn-Out Cap**" has the meaning ascribed to it in Section 4.1(b).

"**Earn-Out Payments**" has the meaning ascribed to it in Section 4.1(a).

"**Earn-Out Period**" means the period comprised of each full or partial consecutive calendar quarter ending March 31, June 30, September 30 and December 31 during such period, commencing with the calendar quarter ending June 30, 2009 and terminating upon the conclusion of the calendar quarter ending December 31, 2014.

"**Earn-Out Remainder**" has the meaning ascribed to it in Section 4.1(d)(i).

"**Earn-Out Report**" has the meaning ascribed to it in Section 4.1(c).

"**Earn-Out Termination Date**" means the earlier to occur of the date on which (a) Trustee has actually received Earn-Out Payments in an amount equal to the Earn-Out Cap; or (b) Purchaser has no further obligation to make any Earn-Out Payments in accordance with Section 4.1.

"**Effective Date**" has the meaning ascribed to in the preamble hereto.

"**Effective Date Funds**" has the meaning ascribed to it in Section 11.4(c).

"**Employee**" means any individual who is classified as either a full-time or part-time employee of Debtor on the payroll records maintained in connection with the Business or any individual who otherwise performs personal services exclusively for the Business on a substantially full-time basis.

"**Encumbrances**" has the meaning ascribed to it in Section 2.1.

"**Enhanced Deposit**" has the meaning ascribed to it in Section 4.1(a)(i).

"**Equity Collateral**" has the meaning ascribed to it in Section 4.8(b).

"**Equity Interests**" means all securities, shares, units, options, warrants, participations, or other equivalents of (regardless of how designated) or in any Person, whether voting or nonvoting, certificated or uncertificated, including general partner partnership interests, stock appreciation rights, limited partner partnership interests, common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended from time to time).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Event of Default**" means (a) the failure of Purchaser to pay to Trustee any Earn-Out Payment or Monitoring Fee when due in accordance with this Agreement (without giving effect to any Payment Cure Period); (b) the failure of Subsidiary to pay to Purchaser the License Fee, when due in accordance with the License Agreement (without giving effect to any Payment Cure Period); or (c) the failure of Purchaser to execute the Pledge Agreement, which failure in respect of clause (c) shall be deemed to have conclusively occurred upon receipt by Purchaser of written notice from Trustee in accordance with Section 4.8(b) of Trustee's belief that Purchaser has so failed.

"**Excluded Liabilities**" has the meaning ascribed to it in <u>Section 3.2</u>.

"**Filing Date**" has the meaning ascribed to it in the recitals hereto.

"**Final Order**" means an order or judgment of the Bankruptcy Court (a) which is not the subject of a pending appeal, petition for certiorari, or other proceeding for review, rehearing or reargument, (b) which has not been reversed, stayed, modified or amended and (c) respecting which the time to appeal from or petition for certiorari or to seek review, rehearing or reargument of such order shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules and other applicable Law, and there shall not be in effect any preliminary or permanent injunction, stay or order or decree or ruling by any Governmental Entity preventing consummation of the transactions contemplated by this Agreement.

"**Financial Collateral**" has the meaning ascribed to it in <u>Section 4.8(a)</u>.

"**FINRA**" means the Financial Industry Regulatory Authority, Inc.

"**GAAP**" means U.S. generally accepted accounting principles, consistently applied.

"**Governmental Entity**" means any federal, state, local, multi-national or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental, regulatory or administrative authority, body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

"**Initial Agreement**" has the meaning ascribed to it in the recitals hereto.

"**Initial Deposit**" has the meaning ascribed to it in the recitals hereto.

"**Intellectual Property Assignment**" means the Intellectual Property Assignment, in substantially the form attached hereto as <u>Exhibit C</u>.

"**JP Morgan Chase**" means JP Morgan Chase, National Association.

"**Law**" means any law in any jurisdiction (including common Law), statute, code, ordinance, rule, regulation, permit, order, judgment, writ, decree or other requirement or guideline of any Governmental Entity.

"**License Agreement**" has the meaning ascribed to it in <u>Section 7.17</u>.

"**License Fee**" has the meaning ascribed to it in <u>Section 7.17</u>.

"**Monitoring Fee**" has the meaning ascribed to it in <u>Section 4.7</u>.

"**Net Trading Revenue**" has the meaning ascribed to it in <u>Section 4.1(b)</u>.

"**Original Agreement**" has the meaning ascribed to it in the recitals hereto.

"**Order**" (or "**Orders**," where the context requires) means any order, judgment, injunction, writ or decree of any court or Governmental Entity.

"**Payment Cure Period**" shall mean the period commencing on the date on which an Event of Default resulting from (a) Purchaser's failure to pay when due, the Earn-Out Payment and/or the Monitoring Fee for the applicable calendar quarter or (b) Subsidiary's failure to pay to Purchaser, when due, the License Fee, in each case, shall have occurred and ending on the 45th Business Day thereafter.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or any other entity or organization.

"**Plan**" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) or any other bonus, deferred compensation, pension, profit-sharing, retirement, stock purchase, stock option, stock appreciation, other forms of incentive or equity compensation, excess benefit, supplemental pension insurance, disability, medical, dental, vision, supplemental unemployment, other paid time-off, vacation benefits, payroll practice, fringe benefit, scholarship, sickness, accident, severance, legal or post-retirement compensation or benefit, welfare or any other employee benefit plan, arrangement or practice, whether written or oral.

"**Pledge Agreement**" has the meaning ascribed to it in Section 4.8(b).

"**Pre-Closing Tax Period**" means, with respect to any Tax, any reporting period beginning on or before the Closing Date (in the case of a Straddle Period, including only the portion of such taxable period ending on and including the Closing Date).

"**Prepaid Earn-Out Payment**" has the meaning ascribed to in Section 4.4.

"**Procedures Order**" has the meaning ascribed to it in the recitals hereto.

"**Purchase Documents**" means the Initial Agreement, the Bill of Sale, the Assumption Agreement and the Intellectual Property Assignment.

"**Purchase Price**" has the meaning ascribed to it in Section 4.1(a).

"**Purchaser**" has the meaning ascribed to it in the preamble hereto.

"**Related Records**" has the meaning ascribed to it in Section 7.4.

"**Reorganization**" has the meaning ascribed to it in the recitals hereto.

"**Reorganization Documents**" means this Agreement, the Deposit Control Agreement and the License Agreement.

"**Residual Information**" has the meaning ascribed to it in Section 7.11.

"**Retained Amounts**" has the meaning ascribed to it in Section 7.18(a).

"**Sale of the Purchaser or Subsidiary**" means the sale of the Purchaser or Subsidiary, as the case may be, (whether by merger, consolidation, recapitalization, reorganization, sale of securities, sale of assets or otherwise) in one transaction or series of related transactions to a Person or group (within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) of Persons pursuant to which such Person or group of Persons (together with its Affiliates) acquires (a) securities representing at least a majority of the voting power of all securities of the Purchaser or Subsidiary, as the case may be, assuming the conversion, exchange or exercise of all securities convertible, exchangeable or exercisable for or into voting securities, or (b) all or substantially all of the assets of either Purchaser or Subsidiary, as the case may be.

"**Sale Order**" has the meaning ascribed to it in Section 10.1.

"**Sale Proceeds**" has the meaning ascribed to it in Section 4.1(d)(i).

"**SEC**" means the Securities and Exchange Commission.

"**SIPA**" means the Securities Investor Protection Act of 1970, 15 U.S.C. § 78 et seq.

"**SIPC**" means the Securities Investor Protection Corporation.

"**Straddle Period**" means any taxable period that begins on or before the Closing Date and ends after the Closing Date.

"**Subsidiary**" has the meaning ascribed to it in the recitals hereto.

"**Tax**" (or "**Taxes**" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, transfer, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or nonstatutory rules and whether or not measured in whole or in part by net income, and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto, and expenses associated with contesting any proposed adjustment related to any of the foregoing.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Transfer**" has the meaning ascribed to it in the recitals hereto.

"**Transfer Taxes**" has the meaning ascribed to it in Section 7.7(a).

"**Trustee**" has the meaning ascribed to it in the preamble hereto.

"**Trustee's Knowledge**" means the actual knowledge of Trustee after due inquiry of Deborah Koster.

"**Weekly Certificate**" has the meaning ascribed to it in Section 7.18(b).

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

Section 2.1    Purchase and Sale of Acquired Assets.  Upon and subject to the terms and conditions set forth in the Procedures Order, this Agreement and the Sale Order, on the Closing Date Trustee sold, assigned, conveyed, transferred and delivered to Purchaser pursuant to Sections 78fff(a)(2) and (b) of SIPA and Sections 363(f) and 365 of the Bankruptcy Code, free and clear of all liens, claims, charges or encumbrances of any kind (collectively, "Encumbrances"), and Purchaser purchased and acquired from Trustee, all of Trustee's right, title and interest in, to and under the following assets, properties and rights used by Debtor in the Business (collectively, the "Acquired Assets"):

(a)    all rights of Trustee under and in connection with all Contracts set forth on Schedule 2.1(a) hereto (the "Designated Contracts");

(b)    all rights of Trustee to the information technology assets, including tangible personal property, in each case, as set forth on Schedule 2.1(b) hereto, in perpetuity, but specifically excluding any customer or other transaction data;

(c)    all rights of Trustee to the intellectual property (including software and algorithms) set forth on Schedule 2.1(c) hereto, in perpetuity, together with all associated goodwill;

(d)    to the extent transferrable under applicable Law, all rights of Trustee to all those permits, authorizations and licenses issued by any Governmental Entity to Debtor primarily related to the Business and set forth on Schedule 2.1(d), along with any pending applications related thereto;

(e)    all rights of Trustee to copies (in each case) of all lists and information containing contact information for customers and suppliers of Debtor primarily related to the Business, trade correspondence, accounts receivable ledgers, documents related to invoices and all shipping records, in each case primarily related to the Business, whether in hard copy or electronic form; and

(f)    all rights of Trustee to all other assets primarily relating to, required for the conduct of, or primarily used in or held for use in connection with the Business, other than, for the avoidance of doubt, cash, securities or other investments.

In confirmation of the foregoing sale, assignment and transfer, Purchaser and Trustee executed and delivered at the Closing the Bill of Sale.

Section 2.2    Excluded Assets.  Except for the Acquired Assets, Trustee is not selling, assigning or conveying hereunder to Purchaser, and Purchaser shall have no right to, any other asset of Trustee, Debtor or the Business whatsoever.  In no event shall Trustee be deemed to be selling or transferring any other assets not expressly delineated above in Section 2.1, including, but not limited to, all rights and causes of action under Chapter 5 of the Bankruptcy Code, or as otherwise arising under SIPA or applicable state and federal Law, all of which assets shall be and are retained by Trustee.

Section 2.3    <u>Transaction Data License</u>.  Upon the terms and subject to the conditions hereof, Trustee has granted to Purchaser, under the Initial Agreement, a non-exclusive, royalty-free, fully paid-up, non-transferable license to use any transaction data owned by Trustee under the Initial Agreement and created in the Business prior to December 1, 2008, which grant is hereby reaffirmed and remains in full force and effect.

## ARTICLE III
## ASSUMED LIABILITIES

Section 3.1    <u>Assumed Liabilities; Post-Closing Liabilities</u>.  Purchaser has assumed and agrees to perform, or cause Subsidiary to perform, in accordance with their terms, the Designated Contracts, but only to the extent the obligations to be performed are attributable to the period subsequent to the Closing Date.  The liabilities and obligations assumed by Purchaser pursuant to this <u>Section 3.1</u> shall be referred to as the "<u>Assumed Liabilities</u>."

Section 3.2    <u>Other Liabilities</u>.  Except as otherwise provided in <u>Section 3.1</u>, as between the parties, Purchaser expressly has not assumed under the Initial Agreement or this Agreement, and Trustee agrees that, without affecting the applicability of the Bankruptcy Code to his rights and obligations with respect to third parties, Trustee, subject to all of Trustee's rights under the Bankruptcy Code, SIPA and other applicable Law (including, without limitation, the right to reject any Contract or Plan), is responsible for:

(a)    any other direct or indirect liability, known or unknown, fixed or unfixed, choate or inchoate, accrued, absolute, contingent or otherwise, whether arising out of any Contract, Plan, tort, statute or otherwise, of Debtor including, without limitation, any severance-related liability pertaining to Employees of Debtor or any of its Affiliates;

(b)    the ongoing sponsorship, administration, funding and maintenance of any and all Plans sponsored or maintained as of the Closing Date for the benefit of employees and former employees of the Business (including specifically and without limitation, the Bernard L. Madoff Investment Securities LLC Employee Benefit Plan (Medical, Prescription Drug, Vision and Dental), and the Bernard L. Madoff Investment Securities LLC Cafeteria Plan);

(c)    all liabilities and obligations of Debtor relating to any environmental, health or safety matter, including, without limitation, any liability or obligation arising under any state or federal environmental Law;

(d)    all accounts payable of the Business incurred prior to the Closing Date and all claims related to the foregoing;

(e)    all amounts owed by Debtor to any Affiliate of Debtor;

(f)    all Taxes with respect to the Business or the Acquired Assets that are attributable to or allocable to any Pre-Closing Tax Period; and

(g)    all liabilities and obligations of Debtor of whatever nature, whether presently in existence of hereafter arising, other than the Assumed Liabilities.

The liabilities and obligations retained by Debtor pursuant to this <u>Section 3.2</u> shall be referred to as the "<u>Excluded Liabilities</u>."

To effectuate the assumption by Purchaser of the Assumed Liabilities, Purchaser and Trustee executed at the Closing the Assumption Agreement.

      Section 3.3    <u>Non-Assignment of Contracts</u>.  The Initial Agreement did not constitute an agreement to assign any Designated Contract, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of the third party thereto, would be unenforceable.  Any assignment to Purchaser of any Designated Contract that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent of any third party for such assignment as aforesaid shall be made subject to such consent being obtained.  Nothing in this <u>Section 3.3</u> shall be deemed to limit anything in <u>Section 8.2</u> or <u>Section 9.3</u>.

**ARTICLE IV**
**PAYMENT; CLOSING; POST-CLOSING**

      Section 4.1    <u>Purchase Price</u>.

      (a)    The total consideration for the Acquired Assets and the covenants of Trustee herein (the "<u>Purchase Price</u>") shall be (i) One Million Dollars ($1,000,000) (the "<u>Closing Payment</u>"), plus (ii) certain additional payments (the "<u>Earn-Out Payments</u>") in an amount determined in accordance with, and pursuant to the terms and conditions of <u>Sections 4.l(b)</u>, <u>4.1(c)</u> and <u>4.1(d)</u>.  The Purchase Price shall be paid as follows:

      (i)    Upon the execution of the Initial Agreement, Purchaser paid to Trustee, in the form of a cashiers check payable to Trustee, a non-refundable (except as provided in <u>Section 12.2</u>) deposit in the amount of Four Hundred Eighty-Five Thousand Dollars ($485,000) (the "<u>Enhanced Deposit</u>" and, collectively with the Initial Deposit, the "<u>Deposits</u>") that was applied against the full Closing Payment, as more fully described in the Procedures Order;

      (ii)    On the Closing Date, Purchaser paid in cash the Closing Payment <u>less</u> the Deposits directly to Trustee pursuant to a wire transfer of immediately available funds to an account specified in writing by Trustee at least two (2) Business Days prior to the Closing Date; and

      (iii)    Purchaser shall pay in cash, as and when due pursuant to <u>Section 4.1(d)</u>, the Earn-Out Payments directly to Trustee pursuant to wire transfers of immediately available funds to an account specified in writing by Trustee (or to such other accounts as Trustee may direct in writing at least two (2) days prior to the date any relevant payment is due). All payments made by Purchaser to Trustee hereunder shall be on a first priority basis in respect of the operating expenses of Purchaser or Subsidiary and without any set-off, counterclaims, deductions or any other offset of any kind with respect to Trustee.

      (b)    For each calendar quarter after the Closing Date during the Earn-Out Period, Purchaser shall pay to Trustee as part of the Purchase Price hereunder an Earn-Out

Payment that shall be equal to fifteen percent (15%) of the Net Trading Revenue earned by Purchaser and Subsidiary on a consolidated basis during such calendar quarter, provided, however, that Purchaser's obligation to make Earn-Out Payments shall cease upon Trustee receiving from Purchaser Twenty Four Million Five Hundred Thousand Dollars ($24,500,000) in the aggregate solely in respect of the Earn-Out Payments (the "Earn-Out Cap"). The term "Net Trading Revenue" means, for any applicable calendar quarter, gross trading revenue of Purchaser and Subsidiary on a consolidated basis, plus net rebate, net commission, net market access fees paid by or to Purchaser or Subsidiary (including DOT gross-up and ECN expenses) and income from market data provision, stock borrow loans, dividends, tape revenue and class action lawsuits of Parent and/or Subsidiary, less service bureau transaction fees and per share or per trade clearing and regulatory fees of Subsidiary only (including SRO execution fees). Net Trading Revenue shall not include all profits, losses or expenses arising from any proprietary trading activities.

(c)     No later than ten (10) Business Days following the conclusion of each calendar quarter during the Earn-Out Period, Purchaser shall pay by wire transfer to Trustee the Earn-Out Payment for such calendar quarter and shall deliver to Trustee simultaneously with such Earn-Out Payments an earn-out report (each, an "Earn-Out Report"), setting forth in reasonable detail the basis for Purchaser's determination of the applicable Earn-Out Payment and Net Trading Revenue for the relevant calendar quarter. Purchaser shall provide any additional supporting information not set forth in the Earn-Out Report that Trustee reasonably requests in order to verify the accuracy of the determination of any applicable Earn-Out Payment or Net Trading Revenue set forth in such Earn-Out Report.

(i)     Purchaser shall, upon request by Trustee made within ninety (90) days of receipt by Trustee of the respective Earn-Out Report, make available for review the books and records of Purchaser and Subsidiary related to Purchaser, Subsidiary and the Business in order for Trustee to verify the accuracy of the determination of the Earn-Out Payment and Net Trading Revenue as set forth in the Earn-Out Report. Trustee may request, by notice to Purchaser within such ninety (90)-day period, that such determination(s) be audited by an independent certified public accountant selected by Trustee, and the auditor shall be provided access to books and records relating to the Business, Purchaser and Subsidiary as requested by the auditor. The auditor's decision shall, subject to Purchaser providing prompt access to the books and records as requested by the auditor, be made within ninety (90) days of his/its appointment and shall be binding upon the parties and non-appealable. Purchaser shall pay to Trustee any adjustment payment to any previous Earn-Out Payments within ten (10) Business Days of the auditor's decision thereof. Trustee shall bear all costs of any such audit, except that if the amount of any adjustment payment required by Purchaser based on the auditor's decision represents more than five percent (5%) of the amount that was the subject of the disagreement, then Purchaser shall pay all costs of such audit.

(ii)     From the Closing Date and through the Earn-Out Termination Date, (w) Purchaser shall not, and shall not permit any of its Affiliates to, engage, directly or indirectly, in the operation of a market making business other than through Purchaser or Subsidiary; (x) in order to facilitate the determination of any Earn-Out Payments owed by Purchaser to Trustee, Purchaser shall, and shall cause Subsidiary to, for accounting purposes, operate the Business as if it were a separate, stand alone entity and account to Trustee with

separate financial statements of the Business as a stand-alone entity prepared in accordance with GAAP; (y) Purchaser shall provide all capital reasonably necessary for the operation of the Business by Purchaser or Subsidiary, as the case may be, following the Closing (but which in no event shall be less than a commercially reasonable amount, given the intended and customary use of the Business as a market maker); and (z) Purchaser shall ensure that the operation of the Business by Purchaser and/or Subsidiary shall be conducted in a commercially reasonable manner with the goal of maintaining the commercial viability of the Business.

(d)     If, following the Closing and prior to the Earn-Out Termination Date, a Sale of the Purchaser or Subsidiary occurs, then the provisions of Sections 4.l(b) shall terminate immediately in respect of the Purchaser and in lieu thereof Purchaser shall be obligated to take the following actions:

(i)     if the amount to be received by Purchaser or Subsidiary or the holders of their equity interests in such Sale of the Purchaser or Subsidiary (the "Sale Proceeds") exceeds the sum (the "Earn-Out Remainder") of the Earn-Out Cap minus all Earn-Out Payments actually received by Trustee pursuant to Section 4.1(b) as of such date, then Purchaser shall pay, or shall cause Subsidiary to pay, to Trustee at closing thereof an amount equal to such Sale Proceeds; and

(ii)     if the Sale Proceeds do not exceed the Earn-Out Remainder, then the amount of the Sale Proceeds shall be transferred to Trustee at closing thereof and the obligation to make any Earn-Out Payments constituting the Earn-Out Remainder up to the sum of the Earn-Out Cap minus the Sale Proceeds shall be assumed by the third-party purchaser in such Sale of the Purchaser or Subsidiary; provided, that the third-party purchaser shall have assumed the obligation in respect of such remaining Earn-Out Payments in writing and Trustee shall have been granted third-party beneficiary rights related thereto, in form and substance satisfactory to Trustee.

Where any such Sale of the Purchaser or Subsidiary is effected through a series of transactions, the parties acknowledge and agree that the obligations of Purchaser set forth in this Section 4.1(d) shall be interpreted, to the maximum extent permitted by Law, so as to be triggered as of the consummation of the first transaction comprising such series of transactions.

Section 4.2     Acknowledgement and Allocation of Purchase Price.  The parties hereby acknowledge and agree that the Closing Payment and any Earn-Out Payments constitute the Purchase Price hereunder.  The aggregate Purchase Price was allocated by Trustee and Purchaser among the Acquired Assets as set forth on Schedule 4.2 of the Initial Agreement.  Such agreed allocation is intended to comply with Section 1060 of the Tax Code and Purchaser and Trustee agreed to report the transactions contemplated by the Initial Agreement for federal income Tax purposes in accordance with such allocation.

Section 4.3     Date, Time and Place of Closing.  The transactions contemplated by the Initial Agreement to be consummated on the Closing Date were consummated at 10:00 a.m., local time, at the offices of Baker & Hostetler LLP, 45 Rockefeller Plaza, New York, NY 10111, on the first Business Day following the date on which all of the conditions to the parties obligations set forth in Articles VIII, IX and X therein were satisfied or waived in writing by the

appropriate party, or such other date or place as may have been agreed upon by the parties thereto.

Section 4.4    Prepayment.    At any time from the Closing Date through the date on which the Earn-Out Cap is paid in full, Purchaser shall have the option to accelerate its obligations in respect of the Earn-Out Payments and pay to Trustee at such time an amount equal to (a) the Earn-Out Cap minus (b) the aggregate amount of Earn-Out Payments actually received by Trustee as of such date (the "Prepaid Earn-Out Payment").

Section 4.5    Right of Rescission.    Following the Closing Date, in the event that FINRA provides a final determination that it has denied any approvals required for the Business as set forth in Section 7.13(a)(i) and (ii), Trustee shall have the sole and exclusive option in his sole discretion to promptly rescind the transactions contemplated hereby and all of the Acquired Assets will be returned by Purchaser to Trustee in exchange for the return of Four Hundred Sixty-Five Thousand Dollars ($465,000), it being expressly understood that the Deposits shall remain the sole and exclusive property of Trustee as liquidated damages.

Section 4.6    Termination of Obligations.    Notwithstanding anything to the contrary set forth herein, upon actual receipt by Trustee of Earn-Out Payments in an amount equal to the Earn-Out Cap, all rights and obligations of either party under this Agreement shall immediately terminate with no further force and effect, except that Purchaser shall pay any Monitoring Fee as may come due in accordance with Section 4.7.

Section 4.7    Monitoring Fee.    In consideration of monitoring and oversight services provided by Trustee in respect of the Reorganization and Purchaser's compliance with this Agreement and for other good and valuable consideration, Purchaser shall pay in cash, no later than ten (10) Business Days following the beginning of each subsequent full or partial calendar quarter during the Earn-Out Period with respect to the prior full or partial calendar quarter, a monitoring fee in the amount of Fifty Thousand Dollars ($50,000) (each, a "Monitoring Fee") pursuant to a wire transfer of immediately available funds to an account specified in writing by Trustee (or to such other accounts as Trustee may direct in writing at least two (2) days prior to the date payment of any such Monitoring Fee is due). In the event that the Earn-Out Termination Date occurs prior to the conclusion of the Earn-Out Period, Purchaser's obligation to pay the Monitoring Fee shall terminate on the Earn-Out Termination Date; provided, however, that the Monitoring Fee for the calendar quarter during which the Earn-Out Termination Date has occurred, if not yet paid to Trustee, shall then become immediately due and payable to Trustee for services hereunder.

Section 4.8    Collateral Security.

(a)    Financial Collateral.    As collateral security for the prompt and complete payment of the Earn-Out Payments, License Fees and the Monitoring Fees as and when due, Purchaser hereby grants to Trustee a first-ranking security interest in and to all Net Trading Revenue earned prior to the Earn-Out Termination Date (the "Financial Collateral"), which shall be deposited into that certain account number 874861107 held at JP Morgan Chase (the "Controlled Account") and governed by the Deposit Account Control Agreement and Section 7.18 of this Agreement at all times prior to the Earn-Out Termination Date. In the event that the

Earn-Out Payments, Monitoring Fees or License Fees are not paid in full as and when due in accordance with <u>Section 4.1</u> or the License Agreement, as applicable, Trustee may, to the fullest extent permitted by applicable Law, without notice, through demand or legal process of any kind, take possession of the Financial Collateral in accordance with the terms of <u>Section 7.18</u> and the Deposit Account Control Agreement.  Purchaser hereby irrevocably constitutes and appoints Trustee and any representative or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Purchaser or Subsidiary, as the case may be, or in Trustee's own name, for the sole purpose of perfecting and maintaining Trustee's first-ranking lien on the Financial Collateral and carrying out the terms of this <u>Section 4.8(a)</u> and <u>Section 7.18(c)</u>, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or useful to accomplish the purposes of this <u>Section 4.8(a)</u> and <u>Section 7.18(c)</u>.  The Trustee also reserves all other rights and remedies available to him under the Uniform Commercial Code or other applicable Law.

(b)    <u>Equity Collateral</u>.  If an Event of Default occurs due to the failure of Purchaser or Subsidiary (as applicable) to pay, when due, any Earn-Out Payment, Monitoring Fee or License Fee, and the Payment Cure Period has lapsed without payment of the Cure Amount, Purchaser shall, at Trustee's request, promptly grant to Trustee a first-ranking security interest in and to all Equity Interests of Subsidiary (the "<u>Equity Collateral</u>").  Purchaser hereby irrevocably constitutes and appoints Trustee and any representative or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Purchaser or Subsidiary, as the case may be, or in Trustee's own name, for the sole purpose of perfecting and maintaining Trustee's first-ranking lien on the Equity Collateral, which lien shall not in any event be effective prior to the expiration of the applicable Payment Cure Period.  Within two (2) Business Days of the expiration of the Payment Cure Period relating to such Event of Default, Purchaser shall, and shall cause Subsidiary to, take all actions and execute a pledge agreement in form and substance satisfactory to the Trustee (the "<u>Pledge Agreement</u>").  In the event that Purchaser fails to execute the Pledge Agreement and Trustee has notified Purchaser in writing of his belief that Purchaser has so failed, such failure shall be deemed an Event of Default and a Block shall immediately take effect.

Section 4.9    <u>Enforcement</u>.  Purchaser shall reimburse Trustee for any and all expenses, including without limitation, attorneys' fees, as and when incurred by Trustee in connection with his enforcement of his rights to the Earn-Out Payments and Monitoring Fees.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF TRUSTEE

Trustee represented and warranted to Purchaser on the Closing Date that:

Section 5.1    <u>Authorization and Validity</u>.  Subject to the Order Procedures and the Sale Order, Trustee has all requisite power and authority to enter into the Initial Agreement and the other Purchase Documents to which he is a party and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out his obligations hereunder and thereunder, including to effect the sale of the Acquired Assets to Purchaser.  The Initial Agreement and the other Purchase Documents have been duly executed by Trustee and, subject to the Bankruptcy Court's entry of the Sale

Order, constitute, or will when executed constitute, his valid and binding obligations, enforceable against him in accordance with their terms.

Section 5.2    Title and Ownership.  At the Closing, Trustee conveyed, and Purchaser obtained, good and valid title to the Acquired Assets free and clear of all Encumbrances, pursuant to Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code or SIPA, as set forth in the Sale Order.

Section 5.3    Intellectual Property.  To Trustee's Knowledge, Schedule 2.1(c) contains a complete and accurate list of all material intellectual property owned or licensed by Debtor which is used in connection with the conduct of the Business.

Section 5.4    Brokers.  Except for Lazard Frères & Co., LLC, Trustee has not dealt with any broker, finder or similar agent with respect to the transactions contemplated by the Initial Agreement, and Trustee is not under any obligation to pay any broker's fee, finder's fee or commission other than to Lazard Frères & Co., LLC in connection with the transactions contemplated by the Initial Agreement.

Section 5.5    SALE ON AN OTHERWISE "AS IS" AND "WHERE IS" BASIS. EXCEPT AS EXPLICITLY SET FORTH IN THIS ARTICLE V AND SUBJECT TO THE OTHER TERMS HEREOF, THE ACQUIRED ASSETS WERE SOLD ON AN "AS IS" AND A "WHERE IS" BASIS.  EXCEPT AS EXPLICITLY SET FORTH IN THIS ARTICLE V AND SUBJECT TO THE OTHER TERMS OF THE INITIAL AGREEMENT, TRUSTEE DISCLAIMED AND CONTINUES TO DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO PURCHASER (INCLUDING ANY OPINION, INFORMATION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO PURCHASER OR ANY OF ITS AFFILIATES BY ANY MEMBER, PARTNER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL OR OTHER AGENT, CONSULTANT OR REPRESENTATIVE OF TRUSTEE).

Section 5.6    NO OTHER REPRESENTATIONS OR WARRANTIES.  EXCEPT AS EXPLICITLY SET FORTH IN SECTION 7.14(b) AND THIS ARTICLE V AND SUBJECT TO THE OTHER TERMS HEREOF, TRUSTEE MADE OR MAKES NO REPRESENTATIONS OR WARRANTIES TO PURCHASER, AND ANY AND ALL STATEMENTS MADE OR INFORMATION COMMUNICATED BY TRUSTEE OR ANY OF TRUSTEE'S REPRESENTATIVES OUTSIDE OF THIS AGREEMENT (INCLUDING BY WAY OF THE DOCUMENTS PROVIDED IN CONNECTION WITH ANY DUE DILIGENCE REVIEW OF THIS TRANSACTION), WHETHER VERBALLY OR IN WRITING, ARE DEEMED TO HAVE BEEN SUPERSEDED BY THIS AGREEMENT, IT BEING INTENDED THAT NO SUCH PRIOR STATEMENT OR COMMUNICATION SHALL SURVIVE THE EXECUTION AND DELIVERY OF THIS AGREEMENT.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represented and warranted to Trustee on the Closing Date that:

Section 6.1 <u>Status</u>. Purchaser is a registered broker-dealer and a corporation duly formed and subsisting under the Laws of the State of Delaware and has full power and authority to own its properties and to carry on the business presently conducted by it.

Section 6.2 <u>Authority; Effective Agreement</u>. Purchaser has the requisite power and authority to execute and deliver the Initial Agreement, to perform its obligations under the Initial Agreement and the Purchase Documents to which it is a party, and to consummate the transactions contemplated herein and therein. Purchaser has taken all actions required by Purchaser to authorize the execution, delivery and performance of the Purchase Documents and the consummation of the transactions contemplated thereby. The Initial Agreement has been duly and validly executed and delivered by Purchaser and, following the Bankruptcy Court's entry of the Sale Order, constitutes, or will when executed constitute, a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

Section 6.3 <u>Brokers or Finders</u>. No agent, broker, person or firm acting on behalf of Purchaser or any of its Affiliates is, or will be, entitled to any commission, broker's or finder's fees from any party, or from any Affiliate of any party, in connection with any of the transactions contemplated by the Initial Agreement.

Section 6.4 <u>Litigation or Proceedings</u>. There is no litigation or other proceeding pending, or, to the knowledge of Purchaser, threatened, against Purchaser that could reasonably be expected to affect adversely Purchaser's ability to consummate the transactions contemplated by the Initial Agreement.

Section 6.5 <u>Financial Capability</u>. Purchaser will have on the Closing Date the financing sufficient to enable it to perform all of its obligations hereunder, including, without limitation, payment of the Closing Payment.

Section 6.6 <u>NO OTHER REPRESENTATIONS OR WARRANTIES</u>. EXCEPT AS EXPLICITLY SET FORTH IN <u>SECTION 7.14(a)</u> AND THIS <u>ARTICLE VI</u> AND SUBJECT TO THE OTHER TERMS HEREOF, PURCHASER MADE AND MAKES NO REPRESENTATIONS OR WARRANTIES TO TRUSTEE, AND ANY AND ALL STATEMENTS MADE OR INFORMATION COMMUNICATED BY PURCHASER OR ANY OF PURCHASER'S PRINCIPALS, OFFICERS OR REPRESENTATIVES OUTSIDE OF THIS AGREEMENT (INCLUDING IN CONNECTION WITH PURCHASER'S DUE DILIGENCE REVIEW OF THIS TRANSACTION), WHETHER VERBALLY OR IN WRITING, ARE DEEMED TO HAVE BEEN SUPERSEDED BY THIS AGREEMENT, IT BEING INTENDED THAT NO SUCH PRIOR STATEMENT OR COMMUNICATION SHALL SURVIVE THE EXECUTION AND DELIVERY OF THIS AGREEMENT.

## ARTICLE VII
## FURTHER COVENANTS AND AGREEMENTS

Section 7.1 <u>Cooperation</u>.

(a) Purchaser and Trustee agree, and Purchaser shall cause Subsidiary, to execute and deliver all other instruments and take all such other actions that either party may reasonably request from time to time, before or after Closing and without payment of further

consideration, to effectuate the transactions provided in this Agreement or any of the Purchase Documents and to confer to the parties hereto the benefits intended by such transactions.

(b)    Trustee shall promptly forward any mail or other communications relating to the Business or the Acquired Assets that are received by Trustee after the Closing, subject to Section 7.4 below.  Purchaser agrees that Trustee may open any such mail prior to forwarding.

Section 7.2    [INTENTIONALLY OMITTED].

Section 7.3    [INTENTIONALLY OMITTED].

Section 7.4    Post Closing Cooperation and Preservation of Records.  To facilitate the orderly transition of ownership of the Acquired Assets and the continuing cooperation with Trustee and Governmental Entities in connection with their respective ongoing investigations in the pending court proceedings, each party shall assist the other party with operating and transitional issues by providing information reasonably requested by such other party regarding the business and operations of Debtor, including by providing reasonable access to Trustee and his agents and representatives at reasonable times during reasonable business hours to Debtor's books and records included in the Acquired Assets after the Closing.  Purchaser also agrees that Trustee and his agents and representatives shall have access at reasonable times during reasonable business hours following the Closing Date to all Employees (whether employed by Purchaser or Subsidiary) transferred to Purchaser hereunder to assist in the investigation of Debtor and that all records shall be preserved.  Debtor agrees to retain possession of all accounting, business, financial and Tax records and information relating to but not included in the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date (the "Related Records") for a period of at least six (6) years from the Closing Date, provided that if at any time during such six (6) year period, Trustee no longer desires to retain all or any portion of the Related Records, Trustee shall offer to the extent permitted by applicable Law to transfer such Related Records to Purchaser at Purchaser's expense, and, if not accepted by Purchaser, Trustee may dispose of such Related Records.

Section 7.5    Notice to Third Parties.  On the Closing Date, Trustee executed and delivered to Purchaser for use by Purchaser with respect to any Person, anywhere throughout the world, letters prepared jointly by, and mutually acceptable to, Purchaser and Trustee advising that (a) effective as at the Closing Date, Purchaser owns Trustee's interests in or to the Acquired Assets and (b) Purchaser is entitled to receive all moneys, payments, receipts, revenues or income derived therefrom in accordance with this Agreement; and requesting that thereafter they render all required statements and activity reports and make payments of one hundred percent (100%) of all sums thereafter otherwise due in respect of any period after Closing to Purchaser in accordance with this Agreement, and provide copies of all notices, claims or other correspondence, directly to Purchaser.

Section 7.6    Purchaser's Due Diligence Investigation; Certain Acknowledgements.

(a)    Purchaser acknowledges and agrees that, except as explicitly set forth in Article V and Section 7.14(b) and subject to the other terms hereof, Trustee has not made any representations or warranties regarding Trustee, Debtor, the Business, the assets or operations of

the Business or otherwise in connection with the transactions contemplated hereby. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that no projections, forecasts and predictions, other estimates, data, financial information, documents, reports, statements (oral or written), summaries, abstracts, descriptions, presentations (including any management presentation or facility tour), memoranda, or offering materials with respect to the Business, is or shall be deemed to be a representation or warranty by Trustee to Purchaser, whether under this Agreement or otherwise, and that Purchaser has not relied thereon in determining to execute this Agreement and proceed with the transactions contemplated hereby. Purchaser further acknowledges and agrees that materials it has received from Trustee or Debtor or any of their respective Affiliates, agents, consultants, investment bankers, attorneys, advisors and representatives include projections, forecasts and predictions relating to the Business; that there are uncertainties inherent in attempting to provide these materials and to make such projections, forecasts and predictions; that Purchaser is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all materials, projections, forecasts, predictions and information so furnished; that Purchaser shall not have any claims against Trustee or Debtor or any of their respective Affiliates, agents, consultants, investment bankers, attorneys, advisors or representatives with respect thereto, and that Purchaser has not relied thereon. Purchaser acknowledges that no Person has been authorized by Trustee to make any representation or warranty regarding Trustee, Debtor, the Business, the assets or operations of the Business or otherwise in connection with the transactions contemplated hereby and, if made, such representation or warranty may not be relied upon as having been authorized by Trustee.

(b)    Purchaser acknowledges and agrees that it (i) has made its own inquiry and investigation into, and has formed an independent judgment concerning Debtor, the Business and the assets or operations of the Business, and (ii) has conducted such investigations of Trustee, Debtor, the Business and the assets and operations of the Business as Purchaser deems necessary to satisfy itself as to the operations and conditions thereof, and will rely solely on such investigations and inquiries. Purchaser further acknowledges and agrees that it will not at any time assert any claim against Trustee or Debtor or any of their respective Affiliates, agents, consultants, investment bankers, attorneys, advisors or representatives, or attempt to hold any of such Persons liable, for any inaccuracies, misstatements or omissions with respect to the information furnished by such Persons concerning Trustee, Debtor, the Business and the assets or operations of the Business.

Section 7.7    Tax Covenants.

(a)    All federal, foreign, state and local sales, transfer, stamp, excise, value-added or other similar Taxes, recording and filing fees (collectively, "Transfer Taxes") that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and not exempt under Section 1146(c) of the Bankruptcy Code shall be paid by Purchaser.

(b)    Trustee and Purchaser agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest,

for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

Section 7.8     [INTENTIONALLY OMITTED.]

Section 7.9     [INTENTIONALLY OMITTED.]

Section 7.10    [INTENTIONALLY OMITTED.]

Section 7.11    Residual Information.  Purchaser hereby acknowledges that certain of the Acquired Assets may contain residual data or other information relating to Debtor and the prior business operations of Debtor which may not pertain in any way to the Business (the "Residual Information").  Purchaser hereby agrees, and shall cause its director, officers, employees, agents and advisors, to keep all such Residual Information confidential and to not disclose the existence or contents of such Residual Information to any Person in any manner whatsoever.

Section 7.12    Patent License.  Trustee shall grant to Purchaser and Subsidiary a non-exclusive, royalty-free, fully paid-up license to use the process protected by U.S. Patent No. 7,162,448 worldwide solely in connection with Purchaser's operation of the Business after Closing, in the event that Trustee obtains the applicable right, power and authority over Primex Holdings LLC necessary to grant such license.

Section 7.13    FINRA Filings; Access.

    (a)     Purchaser acknowledges that (i) within seven (7) Business Days after the Closing Date, it filed the application necessary to obtain FINRA approval for a change of control of Purchaser and (ii) within fourteen (14) Business Days after the Closing Date, it filed the application necessary to obtain FINRA approval (x) to amend Purchaser's scope of business (or similar terms) to include the operation of a market making business and (y) to approve the purchase of the Acquired Assets.

    (b)     Upon the reasonable request of Purchaser to access an identified document related to the Business, Trustee shall provide to Purchaser reasonable access to (i) such document in connection with the documents filed by Purchaser with FINRA in accordance with Section 7.13(a), to the extent that Trustee has the right and control over such documents and (ii) the virtual data room of the Business controlled by Trustee.

Section 7.14    Additional Representations and Warranties as of the Effective Date.

    (a)     Purchaser hereby represents and warrants to Trustee as of the Effective Date as follows:

        (i)     Power and Authority.  Purchaser has the requisite power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and the other Reorganization Documents to which it is a party, and to consummate the transactions contemplated herein and therein.  Purchaser has taken all actions required by Purchaser to authorize the execution, delivery and performance of the Reorganization Documents and the consummation of the transactions contemplated thereby.  This Agreement

has been duly and validly executed and delivered by Purchaser, and subject to approval by the Bankruptcy Court of this Agreement and assuming due and valid execution of this Agreement by the Trustee, constitutes, or will when executed constitute a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

(ii)      Subsidiary.  Subsidiary is a corporation duly formed and subsisting under the Laws of the State of Delaware and has full power and authority to own its properties and to carry on the business presently conducted by it.  Subsidiary has the requisite power and authority to perform its obligations under any Reorganization Document to which it is a party and to consummate the transactions contemplated therein.  Subsidiary has taken all actions required by Purchaser to authorize the execution, delivery and performance of the Reorganization Documents to which it is a party and the consummation of the transactions contemplated thereby.

(iii)      Transfer and Reorganization.  The Transfer and Reorganization are being effected solely for regulatory and/or accounting purposes, and neither the Transfer nor the Reorganization are intended to have any effect on the amount or timing of the Earn-Out Payments.  At no time shall this Agreement be interpreted by Purchaser to the contrary.  The Transfer and Reorganization contemplated hereunder are being, and shall be, executed in accordance with applicable Law.  All approvals or consents required by FINRA, the SEC or any other Governmental Entity to effect the Reorganization and consummation of the transaction contemplated hereby have been obtained by Purchaser and/or Subsidiary as necessary.

(iv)      The Designated Funds are being, and will be, made available solely for use as working capital of Purchaser and Subsidiary in relation to the Business or in connection with Purchaser's or Subsidiary's obligations in respect of Earn-Out Payments, Monitoring Fees or License Fees.  The Effective Date Funds are sufficient to fund the working capital of the Business for all purposes as of the Effective Date.

(b)      Trustee hereby represents and warrants to Purchaser as of the Effective Date as follows:

(i)      Power and Authority.  Trustee has all requisite power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and the other Reorganization Documents to which he is a party to consummate the transactions contemplated herein and therein.  Trustee has taken all actions required by Trustee to authorize the execution, delivery and performance of the Reorganization Documents and the consummation of the transactions contemplated thereby.  This Agreement and the other Reorganization Documents have been duly and validly executed and delivered by Trustee, and subject to approval by the Bankruptcy Court of this Agreement and assuming due and valid execution of this Agreement by the Purchaser, constitutes, or will when executed constitute a legal, valid and binding obligation of Trustee enforceable against Trustee in accordance with its terms.

Section 7.15    Additional Covenants of Purchaser as of the Effective Date.

(a)    Purchaser hereby covenants that all Net Trading Revenue constituting Earn-Out Payments shall be promptly distributed to Purchaser in the form of License Fees under the License Agreement without offset of any kind and paid promptly to Trustee in accordance with Section 4.1(c).

(b)    Promptly following the completion of the Reorganization (but in no event later than seven (7) days thereafter), all of the Acquired Assets (other than a de minimis amount of Acquired Assets consisting solely of office furniture and equipment and expired software which have previously been disposed of in the ordinary course of business) will be assigned to Purchaser by Subsidiary and Subsidiary will become a registered broker-dealer.

(c)    At all times following the Effective Date and prior to the Earn-Out Termination Date, the Acquired Assets shall remain subject to the requirements of this Agreement and Purchaser shall cause Subsidiary not to take any action which would be reasonably likely to result in a breach of Purchaser's obligations under this Agreement.

(d)    Purchaser has informed Trustee that it has filed an application with FINRA seeking approval of the Reorganization, a redacted copy of which shall be forwarded to Trustee as promptly as practicable and Purchaser shall keep Trustee reasonably informed of such process.

(e)    As promptly as practicable following the Effective Date, Purchaser shall, or shall cause Subsidiary to, file an application with FINRA seeking approval of the change of control of the Business, a copy of which shall be forwarded to Trustee and Purchaser shall keep Trustee reasonably informed of such process. Within ten (10) Business Days following receipt by Purchaser or Subsidiary, as applicable, of such approval, Purchaser shall cause additional funds of no less than an amount which when aggregated with the Effective Date Funds, shall equal at least Fifteen Million Dollars ($15,000,000), such funds to be contributed to the Purchaser or Subsidiary (such funds, collectively with the Effective Date Funds, the "Designated Funds"). In the event that FINRA denies such approval with respect to the change of control, Purchaser shall as promptly as practicable (but in no event later than ninety (90) days from receipt of notice of such denial) cause additional funds to be contributed such that the Designated Funds shall equal Fifteen Million Dollars ($15,000,000) in a manner acceptable to FINRA.

(f)    If, after the Effective Date, changes in applicable law or regulations (including, without limitation, FINRA and SEC regulations, and changes in applicable accounting treatment) (collectively, the "Applicable Laws") would cause the Purchaser or Subsidiary to violate Applicable Laws if such party complied with the terms and provisions of this Agreement or any other Reorganization Document, then the parties agree to negotiate in good faith to amend this Agreement or any other applicable Reorganization Document on terms to be mutually agreed upon by the Parties in order to bring the Purchaser and the Subsidiary into compliance with such Applicable Laws.

Section 7.16    Trustee's Rights in Respect of Reorganization. If at any time prior to the Earn-Out Termination Date an Event of Default occurs and is not cured within the Payment Cure

Period, Trustee may, at his sole discretion, require that Purchaser, as promptly as practicable, take those steps reasonably requested by Trustee to ensure that Trustee's interests in and/or rights regarding the Earn-Out Payments under the terms of the Initial Agreement are restored and protected; provided, that such steps will not be reasonably requested if they require Purchaser or Subsidiary to violate Applicable Laws.  In addition, Purchaser acknowledges and agrees that it remains subject to all provisions of this Agreement, including, without limitation, those restrictions set forth in <u>Section 14.8(b)</u> herein.

Section 7.17    <u>Trustee as Third Party Beneficiary Under License Agreement</u>.  Purchaser and Subsidiary shall execute a license agreement (the "<u>License Agreement</u>"), dated as of the Effective Date, in form and substance satisfactory to Trustee and substantially in the form attached hereto as Exhibit D-2, pursuant to which Purchaser shall license to Subsidiary on an exclusive basis the Acquired Assets in consideration for a license fee (each a "<u>License Fee</u>"), payable in accordance with the License Agreement, which shall be used by Purchaser to satisfy its Earn-Out Payment obligations as they become due.  Purchaser hereby acknowledges and agrees that Trustee is, and shall remain until the Earn-Out Termination Date, a third party beneficiary to the rights and obligations set forth in the License Agreement and shall have standing to enforce the terms thereof and to avail himself of all other equitable and legal remedies available by Law as if Trustee were a direct party thereto.  Until the Earn-Out Termination Date, Purchaser shall, and shall cause Subsidiary to, agree and ensure that the License Agreement is not terminated, amended, restated or otherwise modified without Trustee's prior written consent, such consent not to be unreasonably withheld.

Section 7.18    <u>Purchaser Obligations in Respect of Controlled Account</u>.

(a)    At all times prior to the Earn-Out Termination Date, with respect to any Business Day, one hundred percent (100%) of Net Trading Revenue for such Business Day will be deposited on a daily basis into the Deposit Account.  So long as no Event of Default has occurred, Subsidiary may withdraw from the Deposit Account all funds other than the Retained Amounts, which shall only be used in accordance with the terms of this <u>Section 7.18</u> and the Deposit Account Control Agreement.  "<u>Retained Amounts</u>" on any given Business Day shall be equal to 20% of Net Trading Revenue for the portion of the then-current calendar quarter that has elapsed as of the Business Day prior to such Business Day.  For the sake of clarity, for each applicable Business Day on which Net Trading Revenue is earned, the daily deposit in respect of Net Trading Revenue for such Business Day shall be made by Subsidiary on the next succeeding Business Day.  Such Retained Amounts may only be released and used by Subsidiary to pay to Purchaser (i) the License Fee and (ii) an amount sufficient to reimburse Purchaser for payment of the Monitoring Fee.  On the date which is two (2) Business Days after delivery to the Trustee by Purchaser of the Earn-Out Payment and Monitoring Fee in respect of any applicable calendar quarter during the Earn-Out Period, Subsidiary may withdraw all remaining amounts constituting Retained Amounts for such calendar quarter in excess of five percent (5%) of the Net Trading Revenue held for such just-ended calendar quarter in accordance with this <u>Section 7.18(a)</u> (calculated prior to giving effect to payment of the License Fee and the amount sufficient to reimburse Purchaser for payment of the Monitoring Fee).

(b)    No later than two (2) Business Days following the conclusion of each week or partial week prior to the Earn-Out Termination Date, Purchaser shall deliver, or cause to

be delivered, to Trustee a certificate from either the Chief Executive Officer or Chief Financial Officer of Subsidiary certifying Subsidiary's compliance with the terms of the Deposit Account Control Agreement during the previous week or partial week (the "Weekly Certificate").  In addition to the Weekly Certificate, at the request of Trustee, for any day prior to the Earn-Out Termination Date, Purchaser shall deliver or cause to be delivered, to Trustee a report setting forth in reasonable detail the Net Trading Revenue and the Retained Amount calculations for every Business Day having occurred, and not included in, the prior Net Trading Revenue Report, if any, was delivered to the Trustee, no later than five (5) Business Days following Trustee's request for such Net Trading Revenue Report.  Purchaser shall provide, or cause to be provided, any additional supporting information not set forth in the Net Trading Revenue Report that Trustee reasonably requests in order to verify the accuracy of the determination of any Net Trading Revenue or Retained Amount calculation set forth in such Net Trading Revenue Report.

(c)    If an Event of Default occurs, then Subsidiary will be blocked (starting on the next Business Day following the date on which the Event of Default occurred) (a "Block") from accessing any funds in the Deposit Account other than a withdrawal to pay any unpaid portion of the Cure Amount (as defined below).  Purchaser and Subsidiary acknowledge that a Shifting Control Notice may be sent by the Trustee evidencing such blocking rights.  If a Block is in effect as a result of (x) Purchaser's failure to pay, when due, the Earn-Out Payment and the Monitoring Fee for the applicable calendar quarter or (y) Subsidiary's failure to pay to Purchaser, when due, the License Fee (such Payment or Fee referenced in (x) or (y), the "Cure Amount") and Purchaser pays such Cure Amount prior to the expiration of the Payment Cure Period, then such Block shall be removed by Trustee as soon as practicably possible, but in no event later than two (2) Business Days following such payment.  If a Block is in effect and the Cure Amount is not paid by the expiration of the Payment Cure Period, Trustee shall have the right (beginning on the first Business Day after the end of the Payment Cure Period) to withdraw any and all funds in the Deposit Account; provided, that any withdrawals will first be deemed Earn-Out Payments until fully satisfied and second Monitoring Fee payments, as applicable, from Purchaser to Trustee.  The Deposit Account Control Agreement shall evidence the terms of this Section 7.18 and the other terms of this Agreement.

(d)    Purchaser shall pay, and be solely responsible for, all fees, expenses and other amounts due and payable to JPMorgan Chase or its successor as security agent in accordance with the Deposit Account Control Agreement.

Section 7.19    The Reorganization.    Trustee hereby acknowledges that the Reorganization as contemplated hereunder does not constitute a "Sale of the Purchaser or Subsidiary" hereunder.

Section 7.20    Right of Rescission; Reservation of Rights.  Following the Effective Date, in the event that FINRA provides a final determination that it has denied the approval relating to the Reorganization referenced in Section 7.15(d), Trustee may in his sole discretion promptly rescind his approval of the Reorganization.  Without limiting the foregoing, nothing herein is deemed to be a waiver or limitation of any of Trustee's rights or remedies hereunder (including without limitation, under Section 4.5).

**ARTICLE VIII**
**CONDITIONS TO OBLIGATIONS OF PURCHASER**

The obligations of Purchaser to consummate the transactions contemplated by the Initial Agreement were subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions:

Section 8.1    Representations and Warranties.    Each of the representations and warranties of Trustee set forth in the Initial Agreement and any exhibit thereto were true and correct in all material respects on and as of the Closing Date (except for any representations and warranties that speak as of a specific date or time, which representations and warranties need only be true and correct as of such date or time).

Section 8.2    Covenants and Agreements.    Trustee shall have performed and complied, and shall have caused Debtor to perform and comply, in all material respects, with all of their respective covenants and agreements contained in the Initial Agreement that are required to be performed or complied with on or prior to the Closing Date.

Section 8.3    Bankruptcy Matters.    All authorizations, consents, Orders and approvals of the Bankruptcy Court necessary for the consummation of the transactions contemplated by the Initial Agreement shall have been obtained, including, but not limited to, those set forth in Article X; and Purchaser shall have received from the Bankruptcy Court all other Orders, approvals and consents required to transfer the Acquired Assets and to consummate the transactions contemplated by the Initial Agreement.

Section 8.4    No Injunctions.    No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other Order that is in effect on the Closing Date and prohibits the consummation of the transactions contemplated hereby but, for the avoidance of doubt, is not intended to include any approval from any Governmental Entity.

Section 8.5    FINRA Approval.    Purchaser shall have received approval from FINRA of the application to be filed by Purchaser pursuant to Section 7.13(a)(i).

Section 8.6    Deliveries.    All documents required to be delivered by Trustee at or prior to Closing shall have been delivered to Purchaser at Closing, including, without limitation, those contemplated by Section 11.1.

**ARTICLE IX**
**CONDITIONS TO OBLIGATIONS OF TRUSTEE**

The obligations of Trustee to consummate the transactions contemplated by the Initial Agreement were subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions:

Section 9.1    Representations and Warranties.    Each of the representations and warranties of Purchaser set forth in the Initial Agreement and any exhibit hereto shall be true and correct in all material respects on and as of the Closing Date (except for any representations and

warranties that speak as of a specific date or time, which representations and warranties need only be true and correct as of such date or time).

Section 9.2    <u>Covenants and Agreements</u>.    Purchaser shall have performed and complied in all material respects with all of its covenants and agreements contained in the Initial Agreement which are required to be performed or complied with on or prior to the Closing Date.

Section 9.3    <u>Bankruptcy Matters</u>.  All authorizations, consents, Orders and approvals of the Bankruptcy Court necessary for the consummation of the transactions contemplated by the Initial Agreement shall have been obtained, including, but not limited to, those set forth in <u>Article X</u>; and Trustee shall have received from the Bankruptcy Court all other Orders, approvals and consents required to consummate the transactions contemplated by the Initial Agreement.

Section 9.4    <u>No Injunctions</u>.    No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or Order that is in effect on the Closing Date and prohibits the consummation of the transactions contemplated hereby but, for the avoidance of doubt, is not intended to include any approval from any Governmental Entity.

Section 9.5    <u>Governmental and Regulatory Approvals</u>.    Purchaser shall have advised Trustee that Purchaser has received all required or necessary approvals or consents from all applicable Governmental Entities, including, without limitation, from FINRA, in connection with the transactions contemplated hereby.    Notwithstanding the foregoing, Purchaser shall not be required to obtain FINRA's approval of the application to be filed by Purchaser pursuant to <u>Section 7.13(a)(ii)</u> on or prior to the Closing Date.

Section 9.6    <u>Deliveries</u>.    All documents required to be delivered by Purchaser at or prior to Closing shall have been delivered to Trustee at Closing.

## ARTICLE X
## BANKRUPTCY/SIPA CONDITIONS

The obligations of each party to consummate the transactions contemplated by the Initial Agreement were subject to the fulfillment or waiver of each of the following conditions (any one or more of which was waivable in writing in whole or in part by the written consent of both parties thereto):

Section 10.1    <u>Sale Order and SIPC Approval</u>.    The Initial Agreement was subject to approval by SIPC and the entry by the Bankruptcy Court of an Order (the "<u>Sale Order</u>") on or before May 30, 2009 in form and substance reasonably satisfactory to Trustee and Purchaser, and approving the transactions contemplated by the Initial Agreement including, but not limited to the sale of all of the Acquired Assets free and clear of all Encumbrances and shall, without limitation, contain findings of fact and conclusions of Law that: (a) Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and the sale contemplated by this Agreement does not violate and is not subject to avoidance under Section 363(n) of the Bankruptcy Code; (b) all of the requirements of Sections 363 and 365 of the Bankruptcy Code, including, but not limited to, one or more of the requirements set forth in the subsections of Section 363(f), have been satisfied; (c) the Acquired Assets are being sold free and clear of all Encumbrances; (d) any Encumbrances on the Acquired Assets shall attach to the

proceeds received by Trustee pursuant to the Initial Agreement to the same extent, and with the same validity, priority, perfection and enforceability, as such Encumbrances had with respect to the Acquired Assets; (e) notice of the hearing on the transactions contemplated by the Initial Agreement (i) was given in accordance with the applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and (ii) constitutes such notice as is appropriate under the particular circumstances and in accordance with the Bankruptcy Code and applicable Law; (f) neither Purchaser nor its designees shall be considered successors of Debtor or any of Debtor's  Affiliates and none of Purchaser, any of Purchaser's Affiliates or any designee shall have any liability for any debts, liabilities or obligations of, or claims against Debtor or any of its Affiliates, except as expressly assumed in writing by Purchaser pursuant to the Initial Agreement; and (g) provisions for the Bankruptcy Court's retention of jurisdiction over matters arising out of or related to the Initial Agreement and the transactions contemplated hereby.

In addition to the above, the Sale Order was required to provide for the assumption by and assignment to Purchaser of the Designated Contracts.

Section 10.2    Final Order.  The Sale Order shall have become a Final Order; provided, however, that this condition may be waived in writing by the parties.  Trustee shall seek entry of an Order waiving any stay requirement under, inter alia, Federal Rules of Bankruptcy Procedures 6004 and 6006.

## ARTICLE XI
## DELIVERIES

Section 11.1    Trustee's Closing Deliveries.  At the Closing, Trustee delivered or caused to be delivered to Purchaser each of the following:

(a)    (i) the Bill of Sale, duly executed by Trustee, and (ii) the Assumption Agreement, duly executed by Trustee;

(b)    a certificate of Trustee to the effect that each of the conditions specified in Sections 8.1 and 8.2 of the Initial Agreement has been satisfied, in form and substance reasonably acceptable to Purchaser;

(c)    a certified copy of the Sale Order, in form acceptable to Purchaser, providing for the sale of the Acquired Assets and assumption and assignment of the Designated Contracts;

(d)    the Intellectual Property Assignment, duly executed by Trustee; and

(e)    such other documents and agreements as shall vest in Purchaser, Trustee's and Debtor's right, title and interest in and to the Acquired Assets or as Purchaser shall reasonably request to further evidence consummation of the transactions contemplated by the Initial Agreement.

Section 11.2    Purchaser's Closing Deliveries.  At the Closing, Purchaser delivered or caused to be delivered to Trustee or any other applicable party each of the following:

(a)    the Closing Payment;

(b)    the Bill of Sale, duly executed by Purchaser;

(c)    the Assumption Agreement, duly executed by Purchaser;

(d)    resolutions, certified by an officer of Purchaser, evidencing Purchaser's authority to (i) execute and deliver this Agreement and the other Purchase Documents and (ii) consummate the transactions contemplated herein and therein;

(e)    an incumbency certificate of Purchaser, certified by an officer of Purchaser, certifying the accuracy of the specimen signature of the authorized representative of Purchaser executing this Agreement and the Purchase Documents;

(f)    certificate of an officer of Purchaser to the effect that each of the conditions specified in Sections 9.1 and 9.2 of the Initial Agreement has been satisfied, in form and substance reasonably satisfactory to Trustee; and

(g)    such other documents or instruments as Trustee reasonably requested to further evidence consummation of the transactions contemplated by the Initial Agreement.

Section 11.3    Trustee's Effective Date Deliveries.    Prior to or simultaneously with execution and delivery by Purchaser of this Agreement on the Effective Date, Trustee shall deliver or cause to be delivered to Purchaser the following:

(a)    the Deposit Account Control Agreement, executed by Trustee; and

(b)    an Order of the Bankruptcy Court approving the transactions contemplated by this Agreement.

Section 11.4    Purchaser's Effective Date Deliveries.    Prior to or simultaneously with execution and delivery by Trustee of this Agreement on the Effective Date, Purchaser shall deliver or cause to be delivered to Trustee the following:

(a)    the Deposit Account Control Agreement, executed by Subsidiary and JP Morgan Chase;

(b)    the License Agreement, executed by Purchaser and Subsidiary; and

(c)    written evidence, in form and substance reasonably satisfactory to Trustee, that equity contributions in the amount of at least Ten Million Dollars ($10,000,000) in the aggregate have been made to Purchaser or Subsidiary (such funds, collectively the "Effective Date Funds").

# ARTICLE XII
# TERMINATION

Section 12.1    <u>Termination of Initial Agreement</u>.  The Initial Agreement was terminable by written notice promptly given to the other party hereto, at any time prior to the Closing Date:

(a)    by mutual consent of Purchaser and Trustee;

(b)    by either Purchaser or Trustee, if any permanent injunction or other Order of any Governmental Entity that prevents the consummation of the transactions contemplated thereby shall have become final and non-appealable;

(c)    by either Purchaser or Trustee, if either (i) the Sale Order is not entered by May 30, 2009 or (ii) the Sale Order was not a Final Order by June 11, 2009;

(d)    by either Purchaser or Trustee, if the Closing had not occurred by the date that is three (3) Business Days after the date on which Purchaser received notice of  FINRA's approval of Purchaser's application for a change of control of Purchaser as set forth in <u>Section 7.13(a)(i)</u> thereof;

(e)    by Purchaser, upon the voluntary or involuntary dismissal of the Bankruptcy Case;

(f)    by Purchaser, if there had been a material breach by Trustee of any of the representations, warranties, covenants or other agreements of Trustee set forth therein, which breach was not curable, or if curable, was not cured within five (5) days after written notice of such breach was given by Purchaser to Trustee, or if any of the conditions set forth in <u>Article VIII</u> thereof were incapable of being met; or

(g)    by Trustee, if there had been a material breach by Purchaser of any of its representations, warranties, covenants or other agreements set forth therein, which breach was not curable, or if curable, was not cured within five (5) days after written notice of such breach was given by Trustee to Purchaser, or if any of the conditions set forth in <u>Article IX</u> thereof were incapable of being met.

Section 12.2    <u>Effect of Termination of Initial Agreement</u>.  Upon any termination of the Initial Agreement pursuant to <u>Section 12.1</u> thereof, except as set forth in the second and third sentences of <u>Section 12.2</u> thereto, the Initial Agreement was voidable and had no effect, without any liability on the part of any party thereof or any equityholders thereof (including, without limitation, in the case of either Trustee or Purchaser, such party's respective agents, Affiliates, consultants, investment bankers, attorneys, advisors and other representatives).  In the event that the Initial Agreement was terminated either (a) pursuant to <u>Sections 12.1(a)</u>, <u>12.1(b)</u>, <u>12.1(c)</u> or <u>12.1(e)</u>, thereof the Initial Deposit would be immediately forfeited by Purchaser and retained exclusively for the account of Trustee and Purchaser would, to the extent permitted by applicable Law, be relieved of any further liability with respect to the Initial Agreement or the transactions contemplated thereby or (b) pursuant to <u>Sections 12.1(d)</u> or <u>12.1(g)</u> thereof, the Deposits would be immediately forfeited by Purchaser and retained exclusively for the account of Trustee and Purchaser would, to the extent permitted by applicable Law, be relieved of any further liability

with respect to the Initial Agreement or the transactions contemplated thereby.  In the event that the Initial Agreement was terminated pursuant to Section 12.1(f) thereof, Trustee would return the Deposits to Purchaser as promptly as reasonably practicable as liquidated damages and Trustee and his Affiliates (including, without limitation, Trustee's agents, Affiliates, consultants, investment bankers, attorneys, advisors and other representatives) and would, to the extent permitted by applicable Law, be relieved of any further liability with respect to the Initial Agreement or the transactions contemplated thereby.

## ARTICLE XIII
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES;
## SURVIVAL OF COVENANTS

Section 13.1  Survival of Representations and Warranties.  Except for those representations and warranties set forth in Section 7.14(a), which shall survive indefinitely, if so provided hereunder, or in any other Reorganization Document, which by their terms shall survive the Effective Date, and shall terminate in accordance with the terms thereof, none of the representations and warranties included in the Purchase Documents, the Reorganization Agreements or in any certificate delivered at Closing will survive the Effective Date and consummation of the transactions contemplated by the Initial Agreement or hereunder.

Section 13.2  Survival of Covenants.  The covenants and agreements herein, including, without limitation, those covenants and agreements set forth in Sections 7.15, 7.16, 7.17, 7.18 and 7.20, shall survive until performed in full.

## ARTICLE XIV
## GENERAL

Section 14.1  Notices.  All notices and other communications hereunder shall be in writing and shall be sent by certified mail, postage prepaid, return receipt requested; by an overnight express courier service that provides written confirmation of delivery; or by facsimile with confirmation, in each case addressed and copied as set forth on the signature pages hereto. Any party may change his or its address for receiving notice by giving notice of a new address in the manner provided herein.  Any notice so given, shall be deemed to be delivered on the second Business Day after the same is deposited in the United States mail, on the next Business Day if sent by overnight courier, or on the same Business Day if sent by facsimile before the close of business, or the next Business Day, if sent by facsimile after the close of business on such day.

Section 14.2  Entire Agreement.  This Agreement, the Purchase Documents (other than the Initial Agreement), and the Reorganization Documents, constitute the entire agreement between the parties pertaining to this subject matter and supersede all prior or contemporaneous agreements and understandings of the parties relating to the same including, without limitation, the Initial Agreement and the Original Agreement.  This Agreement may be amended only in writing signed by the parties hereto.

Section 14.3  Severability.  If any term or provision of this Agreement or any application thereof shall be invalid or unenforceable, the remainder of this Agreement and any other application of such term or provision shall not be affected thereby.

Section 14.4   Governing Law.   This Agreement and any claim related directly or indirectly to this Agreement (including any claim concerning advice provided pursuant to this Agreement) shall be governed by and construed in accordance with the laws of the State of New York (without regard to the principle of conflicts of law thereof), the Bankruptcy Code and the Securities Investor Protection Act.  No such claim shall be commenced, prosecuted or continued in any forum other than the Bankruptcy Court and, in the event that such Bankruptcy Court does not have jurisdiction, the Supreme Court of the State of New York in New York County and the United States District Court for the Southern District of New York and each of the parties hereby submits to the co-exclusive jurisdiction of such courts.  Notwithstanding the foregoing, nothing in this Section 14.4 is intended to limit any applicable appellate process.  Each of the parties hereby waives on behalf of himself or itself and his or its successors and assigns any and all right to argue that the choice of forum provision is or has become unreasonable in any legal proceeding.

Section 14.5   JURISDICTION; WAIVER OF JURY TRIAL.

(a)   THE BANKRUPTCY COURT (AS DEFINED HEREIN) WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY PURCHASE DOCUMENT, ANY REORGANIZATION DOCUMENT, OR ANY ORDER OF THE BANKRUPTCY COURT ISSUED OR ANY OTHER SECURITY AGREEMENT EXECUTED IN CONNECTION HEREWITH; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE SUPREME COURT OF THE STATE OF NEW YORK IN NEW YORK COUNTY AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK WILL HAVE SOLE AND CO-EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER PURCHASE DOCUMENT.   ANY PARTY MAKING AN INITIAL FILING IN THE SUPREME COURT OF THE STATE OF NEW YORK MUST DESIGNATE THE CASE OF ASSIGNMENT TO THE COMMERCIAL DIVISION OF THAT COURT.

(b)   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 14.6   Waiver.  Any of the terms or conditions of this Agreement may be waived at any time by the party entitled to the benefit thereof, but only by written notice signed by the party waiving such terms or conditions.

Section 14.7   Expenses.  Purchaser shall reimburse Trustee for all expenses, including attorney's fees, incurred by Trustee in connection with the negotiation and execution of this Agreement and the other Reorganization Documents and the consummation of the transactions contemplated hereby and thereby.  Purchaser shall be responsible for all expenses incurred by Purchaser or Subsidiary relating to or arising out of this Agreement or any other Reorganization

Document and the consummation of the transaction contemplated hereunder and Trustee shall have no obligation whatsoever in relation thereto.

Section 14.8    Assignability; Binding Effect; No Beneficiaries.

(a)    This Agreement may not be assigned by either party without the prior written consent of the other party.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement shall not confer any rights or remedies upon any Person, other than the parties hereto and their respective successors and permitted assigns.

(b)    Purchaser hereby acknowledges and agrees that (i) it shall not sell, assign or otherwise transfer any right, title or interest in, to and under any Acquired Asset to any Affiliate thereof without Trustee's prior written consent and (ii) any sale, assignment or transfer of any such Acquired Asset to any other Person shall be effected on a third-party, arm's length basis.

Section 14.9    Counterpart Execution.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Any counterpart signature page delivered by facsimile transmission shall be deemed to be and have the same force and effect as an originally executed signature page.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have duly executed and delivered this Agreement as of the date first set forth above.

<u>**TRUSTEE**</u>

Address:
Irving H. Picard, Esq.
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Facsimile No.: (212) 589-4201

With copies to:
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York  10111
Attention:  Steven H. Goldberg, Esq.
                    Marc Hirschfield, Esq.
Facsimile No.: (212) 589-4201

**The Trustee for the Liquidation of the Business of Bernard L. Madoff Investment Securities LLC**

By: Irving H. Picard, Esq., in his capacity as the Trustee for the Substantively Consolidated Liquidation Proceedings of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff

_____
Irving H. Picard, Esq.

**PURCHASER**

                                             **SURGE TRADING INC.**

Address:

885 Third Avenue – 18th Floor        By: _____

New York, NY 10022               Name: Frank Petrilli

Attention:  Chief Executive Officer    Title:   Chief Executive Officer

Facsimile No.:  (212) 486-7894

with copies to:

Proskauer Rose LLP

One International Place

Boston, MA 02110-2600

Attention:  Alexander B. Temel, Esq.

                  William H. Schwab, Esq.

Facsimile No.:  (617) 526-9899

[PURCHASER SIGNATURE PAGE TO THIRD AMENDED AND RESTATED
ASSET PURCHASE AGREEMENT]