1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------x

       In the Matter

          of

                      Case No. 08-01789

SECURITIES INVESTOR PROTECTION CORPORATION

         V.

BERNARD L. MADOFF INVESTMENT SECURITIES, et al.,

              Debtors.

----------------------------------------x

                   April 13, 2010

                   United States Custom House
                   One Bowling Green
                   New York, New York 10004

      In Re:  Hearing in Trustee's entry into third amended and restated asset purchase agreement with Surge Trading Inc. f/k/a Castor Pollux Securities, Inc.
      Trustee's application for preliminary injunction, enforcement of stop declaration that Canavan, Goldsmith and Kalman action is void ab initio and a Temporary Restraining Order.

B E F O R E:

              HON. BURTON R. LIFLAND,

                   U.S. Bankruptcy Judge

2

```
 1    A P P E A R A N C E S (Continued):

 2

 3           BAKER HOSTETLER, LLP

 4           Attorneys for Irving H. Picard, Trustee

 5                45 Rockefeller Plaza

 6                New York, New York 10017

 7           BY:   BIK CHEEMA, ESQ.

 8                   -and-

 9                DAVID J. SHEEHAN, ESQ.

10                   -and-

11                MARC E. HIRSCHFIELD, ESQ.

12                   -and-

13                KEITH R. MURPHY, ESQ.

14           SECURITIES INVESTOR PROTECTION CORPORATION

15                805 15th Street, Suite 800

16                Washington,  D.C.  20005

17           BY:   KEVIN H. BELL, ESQ.

18

19

20

21           PROSKAUER ROSE, LLP

22                Attorneys for Surge Trading

23                One International Place

24                Boston, Massachusetts  02110

25           BY:   PETER J. ANTOSZYK, ESQ.
```

3

1

2     A P P E A R A N C E S:     (Continued)

3

4

5          BECKER & POLIAKOFF, LLP

6                Attorneys for Maureen Ebbel

7                45 Broadway

8                New York, New York 10006

9          BY:  HELEN CHAITMAN, ESQ.

10                    -and-

11               PETER W. SMITH, ESQ.

12

13

14          UNITED STATES DEPARTMENT OF JUSTICE

15          CIVIL DIVISION, TORTS BRANCH

16                Ben Franklin Station

17                Washington, DC  20044

18          BY:   JEFFREY P. EHRLICH, ESQ.

19

20

21

22                *    *    *

23

24

25

4

1            PROCEEDINGS.

2            THE COURT:  SIPC versus Bernard L. Madoff

3    Investment Securities.

4            MR. SHEEHAN:   Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MR. SHEEHAN:  David Sheehan, from the law

7    offices of Baker & Hostetler, on behalf of the Trustee.

8            We have several matters on the record.   The

9    first involves Surge Trading and I would ask my colleague,

10   Mr. Cheema, to address the Court with regard to that

11   matter.

12           THE COURT: Sure.

13           MR. SHEEHAN:   Thank you.

14           MR. CHEEMA:  Good morning, Your Honor.

15           THE COURT:  Good morning.

16           MR. CHEEMA: Good morning, Your Honor.  My

17   name is Bik Cheema.  I am an attorney at Baker & Hostetler

18   and I am appearing here today on behalf of the Trustee,

19   Irving Picard, on his motion to authorize the Trustee's

20   entry into a third amended and restated asset purchase

21   agreement with Surge Trading Inc., formerly known as Castor

22   Pollus Securities, Inc.

23           By way of brief background, this Court

24   approved the sale of BLMIS's market making operations last

25   year on April 30, 2009.  The winning bidder was the

5

1    stalking horse bidder, Surge Trading Inc., Surge, who

2    submitted the highest and best offer at auction.  The sale

3    closed on June 17, 2009 following the receipt of approval

4    from the Financial Industry Regulatory Authority, FINRA,

5    and Surge thereafter reopened the business.

6              Pursuant to the terms of the second amended

7    and restated asset purchase agreement, dated April 29,

8    2009, the prior agreement, Surge agreed to pay a purchase

9    price which included a $1 million closing payment and

10   $24,500,000 in earn-out payments through December 31, 2013.

11             In March 2010, having paid $3,385.73 of the

12   earn-out to the Trustee, Surge approached the Trustee

13   regarding the possibility of amending the prior agreement

14   because of the existence of certain regulatory issues that

15   may have compromised Surge's ability to continue as a going

16   concern.

17             Surge proposed an out of court

18   reorganization whereby it would transfer substantially all

19   of its assets and liabilities to a new wholly-owned

20   subsidiary and the subsidiary would then become the

21   successor broker-dealer and Surge would thereafter conduct

22   the business through this subsidiary.

23             While this proposed reorganization would be

24   advantageous from a regulatory standpoint, the Trustee was

25   concerned that by bifurcating the operations of the

6

1    business from the entity which owes the earn-out to the

2    Trustee, the subsidiary would not be liable to the Trustee

3    for the earn-out and consequentially, the Trustee could

4    then be exposed to an increased risk because the entity

5    where the business resides would not be the entity that

6    owes the Trustee significant, ongoing obligations under the

7    earn-out.

8                    After considerable, lengthy and good-faith

9    negotiations, a mechanism was devised and agreed which

10   protects the Trustee by mitigating the risk to the Debtor's

11   estate, protecting the earn-out, increasing monies due to

12   the Trustee and the estate for the benefit of all

13   creditors, and ensuring the survival of Surge as a going

14   concern.

15                   Under the proposed reorganization,

16   substantially all of the assets and liabilities of Surge

17   will be pushed down in the newly-created subsidiary which

18   shall operate the business going forward.  Exercising his

19   sound business judgment, the Trustee was able to mitigate

20   the risk to the BLMIS estate by entering into several

21   amendments to the prior agreement.

22                   For example, the Trustee has agreed to

23   several economic enhancements that will compensate the

24   Trustee for any increased risk.  These included extending

25   the earn-out period by one year through and including the

7

1   conclusion of the calendar quarter ended December 31, 2014,

2   thereby increasing the likelihood that the full amount of

3   the earn-out will be paid.  Surge Trading also agreed to

4   the payment of a $50,000 monitoring fee to the Trustee on a

5   quarterly basis during the extended earn-out period in

6   consideration of monitoring and oversight services provided

7   by the Trustee.

8              Furthermore, the Trustee will be a

9   third-party beneficiary to a license agreement with Surge

10  whereby Surge will license to the subsidiary on an

11  exclusive and irrevocable basis the acquired assets in

12  exchange for a license fee paid by the subsidiary to Surge

13  equal to 15 percent of the net trading revenue.

14             The license fee, when paid, will be used by

15  Surge to pay the earn-out.  Additionally, as collateral

16  security for payment of the earn-out, the Trustee shall

17  have a security interest in all net trading revenue of the

18  subsidiary, which shall be deposited into an account

19  pursuant to the deposit account control agreement.  And,

20  the Trustee shall have the right to immediately obtain a

21  security interest in all issued and outstanding shares of

22  the subsidiary if a default event arises due to the failure

23  of Surge or the subsidiary to pay when due any earn-out and

24  such default is not cured within 30 days.

25             Lastly, before the third amended and

8

1    restated asset purchase agreement, the amended agreement,

2    shall become effective, the Trustee shall have received

3    evidence, in form and substance reasonably satisfactory to

4    the Trustee, that equity contributions in the amount of at

5    least $10,000,000 in the aggregate have been or will be

6    made to Surge or the subsidiary prior to or substantially

7    simultaneously with the consummation of the reorganization,

8    and within ten business days following receipt by Surge or

9    the subsidiary, of approval from FINRA of the change of

10    control of the business, Surge shall cause additional funds

11    of at least $5,000,000 to be contributed to Surge or to the

12    subsidiary.

13        On April 12, 2010, the Trustee and Surge

14    filed with the Court the form of the proposed amended

15    agreement, the APA, altering the prior agreement as

16    discussed herein and more fully set forth in the motion.

17        Not only does the prior agreement permit

18    amendment, but the Trustee has exercised sound business

19    judgment as he attested to in his declaration annexed to

20    the motion as Exhibit C, the "Picard Declaration", and as

21    is required under Second Circuit case law.

22        In the interests of ensuring protection of

23    the earn-out as argued here today and more fully in the

24    motion, as well as to enhance the value of the estate for

25    the benefit of the BLMIS estate and all of its creditors,

9

1    and thereby ensuring survival of the purchaser as a going

2    concern, we conclude, Your Honor, by respectfully

3    requesting that you enter an order, substantially in the

4    form annexed to the motion, granting the motion and such

5    other relief as may be just and proper.

6                    THE COURT:  Does anyone else want to be

7    heard?

8                    MR. BELL:  SIPC is in support of the

9    Trustee's motion.

10                    THE COURT:  As the presentation was being

11   made it came to mind for me to ask one question.   During

12   the course of the discussion the answer to that was

13   forthcoming.   I was concerned that earn-out be

14   collateralized and be collateralized in a better posture

15   than the previous agreement.   From this representation it

16   appears that that is correct and, therefore, the Trustee's

17   argument, that sound best judgment does not seem to be

18   undermined.   I will approve the arrangement.

19                    MR. CHEEMA:  Thank you Your Honor.

20                    THE COURT:  Do you have an order?

21                    MR. SHEEHAN:   I do.

22                    THE COURT: I will entertain it.

23                    MR. SHEEHAN:  Sure.   Thank you.

24                    THE COURT:  I have a record of the order.

25                    MR. SHEEHAN:   Your Honor, the other matter

10

1    on for this morning is the Trustee's request for the entry

2    of a scheduling order with regard to the confirmation of

3    certain determinations made by the Trustee with regard to

4    claims that have been filed with him in the proceeding.

5    Specifically, Your Honor, as the papers revealed there are

6    a body of customers out there that are feeder funds.  They

7    are customers in the sense they have accounts with the

8    Trustee.

9              Investors in those feeder funds, Your

10   Honor, approximately 8,500 of them who did not have

11   accounts with the broker-dealer but did have an investment

12   with the feeder fund that did have filed claims with the

13   Trustee suggesting they are entitled to SIPC protection and

14   to be afforded the rights of a customer.

15             The Trustee has determined to deny those

16   claims in the sense they are not a customer and, therefore,

17   have no accounts and, therefore, are not entitled to

18   protection.

19             Needless to say, there were a number of

20   objections, approximately 2,000 to the Trustee's

21   determination.

22             What we are seeking to do by virtue of our

23   application today, Your Honor, is to have those 2,000 or

24   approximately 2,000 objections heard by Your Honor in one

25   forum.

11

1          We believe, Your Honor, they are virtually

2   identical factually in this sense, that in each of them we

3   have 18 investors who went into a feeder fund, and in some

4   cases feeder firms but they do vary some but all were

5   involved in the feeder fund that invested in Madoff either

6   exclusively or partially.

7          As a result of that they had a niche in

8   that feeder fund that is different than the other

9   individual claimants who have also filed suggesting that

10  they are customers but are in a different multiple

11  capacity, and let me explain by what I mean in that.

12         They are obviously out there, investor

13  clubs, there are pension plans, there are profit sharing

14  plans, there are LLCs.  All of those factually are

15  markedly different than those that are associated with the

16  feeder fund.

17         The only people, the only claims we are

18  bringing before Your Honor are those that are currently

19  associated or are associated with a feeder fund, not any of

20  the claimants who have been associated with other multiple

21  investors.

22         The reason for that, Your Honor, is that we

23  believe the facts are very straightforward and we could

24  establish that and will through our briefing and

25  submissions to your Honor with regard to the feeder fund,

12

1    that will achieve clarity there with regard to at least the

2    2,000 objections that have been filed, so that we don't

3    have to deal with them essentially as individual

4    objections.

5         The other multiple claimants from our

6    review of the records indicates to us that there will be a

7    good deal of individual inquiries with regard to each of

8    them.

9         Without getting into the law with regard to

10   the subject in any great detail here this morning, Your

11   Honor, one of the touchstones for a determination of the

12   customer status other than having a statement is what was

13   your relationship to the broker-dealer, did you, in fact,

14   have a relationship, could you direct trades, could you do

15   things that the normal customers would be able to do.

16        Those factual barriers with respect to the

17   other multiple claimants we are confident in regard to the

18   feeder fund that is not the case.  As a matter of fact,

19   all the records that we have seen to date support the fact

20   that each of these feeder fund investors was involved in

21   dealing with the feeder fund and not with Madoff, and, in

22   fact, in some instances or many you would suggest that the

23   feeder fund is investing in Madoff.  So their only

24   relationship is with the feeder fund.

25        Needless to say, I am not advocating any

13

1    determination by Your Honor or anyone else with regard to

2    the Trustee's determination.    I am simply suggesting on

3    the record that we now support the fact we should have a

4    scheduling order not dissimilar, if you would, from the net

5    equity scheduling order wherein those 2,000 individual

6    objections will be dealt with as a group and in a group we

7    will identify for Your Honor, the following.

8              We will identify each of the feeder funds

9    with which we believe the investors are associated based

10   upon the records or documents provided by customers, FINRA,

11   I should say.    The claimant will then be notified, each of

12   the individual claimants be aware of that.

13             We could provide Your Honor with additional

14   information so Your Honor would know not only what the

15   feeder fund but also the individual claims, and certainty

16   with respect to these feeder funds, we would present Your

17   Honor with a factual record that would ratify that

18   information and we would provide Your Honor with

19   information with regard to the feeder fund, and to the

20   extent Your Honor requires additional financials, we could

21   provide that as well.

22             The idea is to provide Your Honor and the

23   claimant with as full a record as we could with regard to

24   the feeder fund itself, the claimant's relationship, if

25   any, to the broker-dealer, Mr. Madoff.

14

1          At the end of the day we believe we would

2     be able to present to your Honor a complete record, so that

3     Your Honor will have before you an adequate record upon

4     which to determine these 2,000 claims.

5          Needless to say, we have also provided in

6     our scheduling order for the fact there will be those who

7     would not agree with us, we understand that.  While we are

8     trying to do this in a way that will be expeditious, we

9     understand that we should not do it in a way that would

10    frustrate anyone's rights, and we are not seeking to do

11    that.  We are simply seeking to take what we believe to be

12    a discrete body of claimants and have them dealt with in an

13    orderly fashion before Your Honor pursuant to the terms of

14    the order.

15         With regard to the multiple claimants that

16    are out there and we have received some increased inquiries

17    with regard to this, they are in the process of determining

18    that now.  Some have already been determined and denied.

19         What will happen is while we are proceeding

20    with this, Your Honor, this scheduling order we are seeking

21    here today, we will be bringing those before Your Honor and

22    as a matter of fact, probably before we do that, we will

23    also seek another hearing with Your Honor as to how you

24    wish to approach that.

25         There will be hundreds of individuals that

15

1    we believe have to be addressed.

2              One that probably will overburden this

3    Court's docket and is something we would have to address

4    with Your Honor and with counsel before we embark on that.

5              But we don't anticipate, Your Honor, those

6    claims just sitting on the wayside.    We are seeing them

7    moving forward.

8              We understand each claimant's needs to have

9    an ultimate determination with regard to the claim, and

10   that they have the right to be here and have Your Honor

11   look at what the Trustee has done and either confirm or

12   deny that determination.    So we fully understand our

13   responsibilities and will fully engage with all claimants

14   with regard to this.

15             What we seek today is the first step

16   towards dealing with this type of issue, does the customer

17   actually have an account and this discrete body recommends

18   a good first start, Your Honor and we will continue to

19   bring the rest before you in an orderly fashion as they

20   arise.

21             We have received three written objections.

22   We have appended them to the papers.    We believe two of

23   them represent direct claimants.    You will see that based

24   upon a review of the record itself.    Individuals, perhaps

25   out of a misunderstanding of what they are trying to

16

1   achieve here are objecting to the order even though they

2   are not individuals who are those investors in a feeder

3   fund.   We think they are objecting because they didn't

4   understanding, quite frankly, what we are trying to do.

5           This order will not affect them.   They are

6   collective claimants and their objections will be heard

7   individually as we move forward.

8           Another would be Andover, Your Honor, a

9   classic investor to the feeder fund.   These are written

10  submissions and suggestions that we did not know that the

11  funds were in Madoff through Andover and he is objecting to

12  the fact this procedure will be followed.

13          However, I submit to Your Honor, I don't

14  think the claimant himself fully appreciates what we are

15  trying to do here and that we are trying to give him his

16  day in Court and give him his opportunity to be heard.

17          His claim has been denied.   That is true.

18  He is not suggesting an alternative.   He is just objecting

19  to the procedure.   But I submit to Your Honor this

20  procedure will satisfy his need.   He will get a hearing.

21  He will have an opportunity to be heard.   His individual

22  claim, along with all others, will be presented to your

23  Honor factually specific with regard to Andover.   I

24  believe we will meet his objections in the sense he will

25  get a hearing.   He just wouldn't get an individual hearing

17

1    as some of the other multiple claimants will.

2              Based upon that analysis of those

3    objections, Your Honor, I would respectfully submit these

4    objections should be overruled, and the order submitted to

5    your Honor should be entered with regard to this particular

6    objection.

7              I will answer any objections Your Honor may

8    have.

9              THE COURT:  Does anyone to be heard?

10             MS. CHAITMAN:  Yes, Your Honor, Helen

11   Chaitman from the law firm of Becker & Poliakoff for

12   Maureen Ebbel.  And with me here today is my colleague

13   Peter Smith.

14             I didn't file an objection.  I asked Mr.

15   Sheehan if he would be good enough to provide me with a

16   list of feeder funds that are the subject of this motion

17   and he has not done that.

18             I would ask that the Court direct him to do

19   that because I think there is some accountability and

20   concern amongst investors as to whether the vehicle in

21   which they invested is included within the contemplation of

22   this motion.  It is easy to say feeder fund but, in fact,

23   there are all kind of investment vehicles that Mr. Madoff

24   encouraged people to utilize and I am not really sure where

25   the cut off point is on the feeder fund.

18

1          Since many of these investors are foreign

2    it will take time for the organization of facts relevant to

3    their particular issues, and I would simply ask that a list

4    of the feeder fund be provided to us as quickly as

5    possible.

6               MR. SHEEHAN:   Your Honor, I have no

7    objection to that.   If I failed to communicate this to Ms.

8    Chaitman, I apologize.   We are submitting that list as

9    part of the application, the complete list of the feeder

10   fund and the customers associated with those feeder funds

11   that were contemplated as part of the motion will be filed

12   as part of the scheduling order I think within two weeks.

13               Everyone will have this.

14               MS. CHAITMAN:   Yes.

15               THE COURT:   Does anyone else want to be

16   heard?

17               MR. BELL:   Kevin Bell, on behalf of SIPC.

18   SIPC supports the application as proposed.

19               THE COURT:   I have no problem with that.

20   It isolates a group that has a similar issue.   The

21   definition of feeder fund is something that is a little bit

22   not clear to me.

23               As Ms. Chaitman points out there are many

24   types of vehicles that we use to put money into Madoff's

25   hands.

19

1           For example, there are institutions that

2   take money in and then directly put that money into Madoff.

3   Some of them are banks and some are financial institutions.

4           Is there or is there not a difference when

5   there is a specific understanding that an institution is

6   investing with Madoff, so that the investors with the

7   institutions are considered under either the statute or

8   case law to be a direct claimant?

9           MR. SHEEHAN:   Your Honor, you are

10   absolutely right.

11           THE COURT:  I am not always right, but I am

12   just curious.

13           MR. SHEEHAN:   On this you are absolutely

14   right.   We have been using that term quite honestly in a

15   very generic way.

16           And the feeder fund is used in a very broad

17   sense, and I understand Ms. Chaitman's concern as well,

18   Your Honor.   One of the things we want to clarify by this

19   motion, by identifying the body of feeder funds that we are

20   talking about here are the ones we are talking about, and

21   we will define this very specifically for the purpose of

22   this application as we move forward so everyone will know

23   to whom this is being addressed.

24           We are addressing those feeder funds such

25   as the Ascot asset.  Your Honor, no banks will be included.

20

1    No pension funds will be included.    No investment groups

2    will be included.

3                     THE COURT:  That was the thrust of my

4    inquiry.

5                     MR. SHEEHAN:    Pardon?

6                     THE COURT:  That was the thrust of my

7    inquiry.

8                     MR. SHEEHAN:    It will be very discrete.

9    Even though this will large, it will be a discrete body

10    legally as to what people commonly refer to as feeder fund,

11    and we have a very solid description of who they are.

12                     THE COURT:  Does anyone else want to be

13    heard?

14                     There is no response.

15                     MR. SHEEHAN:    Thank you, Your Honor.

16                     THE COURT:  The request for relief is so

17    ordered.

18                     MR. SHEEHAN:    Apparently, my order was

19    also handed up with the earlier order on Surge.

20                     THE COURT:  It got in the way of my

21    signature.

22                     MR. SHEEHAN:    Thank you, Your Honor.    I

23    appreciate it.

24                     THE COURT: Next on the calendar of SIPC

25    versus Bernard L. Madoff Investment Securities.

21

1              Please proceed, Mr. Sheehan.

2              MR. SHEEHAN:  Good morning, Your Honor.

3              This is a return date by an application by

4    way of an order to show cause before Your Honor concerning

5    the immediate relief in terms of scheduling of the first

6    preliminary injunction hearing with regard to a matter

7    instituted by the Federal District Court of New Jersey by

8    Ms. Chaitman on behalf of certain individuals who also

9    happen to be the claimant in this proceeding, which is the

10   Madoff liquidation proceeding.

11             I just want to make a few points because I

12   have submitted fairly extensive papers to your Honor, so I

13   don't want to repeat it all for this hearing.

14             I think it is very important to note that

15   even though this is different than our previous application

16   in which we raised the Picard matter, it is different in

17   the sense that what we have is separate and apart from the

18   net equity claim which is an allegation of fraud, fraud

19   against individual directors of the SIPC organizations

20   through its officers, that in a real sense, at least from

21   our perspective, and we submit this is accurate, is that we

22   have a common touchstone that flows through both cases.

23   That is the decision made by Your Honor with regard to the

24   net equity allocation dealt with one of the cornerstones of

25   the arguments that is being made by our adversaries with

22

1    regard to the 1130 statement.

2                    That, Your Honor, is what are the

3    legitimate expectations of customers.    That very

4    allegation is at the heart of what is the allegation of

5    fraud in the action currently pending in the District Court

6    of New Jersey, what were the legitimate expectations of the

7    customers over time, and what the allegation is that fraud

8    was being perpetuated, that people were being told they

9    could rely on the fact that there was $500,000 worth of

10   insurance, another critical element of advocacy that you

11   heard here on February 2, not just from Ms. Chaitman but an

12   argument was made that the foundation for their argument

13   was that the history of SIPC as well as an interpretation

14   of the statute related to a finding on their behalf on the

15   1130 statement.

16                   Now, they are here utilizing the exact same

17   allegations to suggest that fraud was being perpetrated by

18   virtue of the conduct of the individuals at SIPC by virtue

19   of the position of this case, the Madoff case.

20                   The problem is this, Your Honor, as I see

21   it, to reduce it to a number, what if the Federal District

22   Court Judge decided the net equity differently, decided

23   that the legitimate expectation had some foundation.

24   That, in fact, that the 1130 statements should, in fact, be

25   the one that is followed here.

23

1          That, yes, the SIPC Trustee was wrong, but

2     forget that, worse than that, these folks engaged in fraud.

3     I think there would be an appeal, Your Honor.   I think

4     that it would be in the Third Circuit.   But on what?   The

5     net equity calculation?

6          That fact alone dictates the outcome here

7     this morning.   How could that possibly happen?   There is

8     no more core issue in this entire case than the net equity

9     calculation.

10          Everything we do flows from it.   How can

11     we allow another courtroom, however revered, it does not

12     matter?  That is not the point.   It doesn't matter it is

13     their circuit.   We should have only one Court deciding

14     this matter, this Court.   This Court has jurisdiction over

15     that issue.

16          Yes, subject to a review by the Second

17     Circuit, but it is this Court who makes that decision.

18          THE COURT:   I certified that issue to the

19     Second Circuit.

20          MR. SHEEHAN:   Of course, you have.   And

21     there is a petition hoping that they will expedite it for

22     them to respond to us quickly and we will have that

23     quicker.   We should not be having dual circuits on that

24     issue.   That alone tells us this case should not move

25     forward.

24

1              Why are we seek a TRO.   The reason we are

2    seek a TRO, as the record reveals this case is moving in

3    New Jersey with some degree of alacrity.   There are motions

4    being contemplated by the government; there are motions

5    being contemplated by the SIPC board members.   And as Judge

6    Magistrate Judge Schwartz made clear, there will be no stay

7    of discovery.   This case is going to move forward.   We

8    like things, as they say in the transcript, we like to keep

9    things percolating at a hearing, Your Honor.

10             One thing we can't have happen is that case

11   percolating in New Jersey while we are moving forward in

12   this courthouse, and in the second circuit with regard to

13   the very issues which are the gravamen of what is being

14   amassed in New Jersey.   That simply cannot happen.   The

15   only way to preserve the integrity of this Court is to shut

16   that down, plain and simple.   It has to be shut down now

17   so we don't have any untoward activity taking place to

18   protect everyone who is a party to that proceeding.

19             Until Your Honor has a full record, to give

20   Ms. Chaitman an opportunity to be heard on the papers, we

21   will have a hearing on the preliminary injunction.   I am

22   very, very confident that we will succeed on that.

23             I think on all of the elements that are

24   associated with the imposition of temporary relief, we are

25   in accord with every one of them and that relief should be

25

1    granted here as well.

2                    Thank you, Your Honor.

3                    MS. CHAITMAN:   Mr. Peter Smith will be

4    handling this issue, Your Honor.

5                    THE COURT: Sure.

6                    MR. SMITH:   Good morning.   Let's first

7    address the numbers that Mr. Sheehan mentioned.   I fail to

8    see how a District Court decision on what net equity

9    determines or if it were different would affect anything

10   that happens here.

11                   Throughout these papers it talks about

12   confusion, and it will affect the administration and

13   liquidation.   Who will be confused that Your Honor issued

14   the decision that he did?

15                   Certainly Your Honor will not.   Mr.

16   Sheehan will.   It will not affect how any customer

17   property is distributed here, even if that were to happen.

18                   But as to the TRO there is no immediate

19   harm that anyone is going to suffer between now and when

20   Your Honor hears this.

21                   I was on the call with Judge Schwartz about

22   the stay of discovery.   She said there will be no stay of

23   discovery.

24                   But no discovery will happen because Judge

25   Schwartz has not issued the order directing the initial

26

1    conference in the case.

2              Until that happens there wouldn't even be

3    mandatory disclosures under Rule 26.   Nothing will happen

4    between now and when Your Honor hears the preliminary

5    injunction motion that is part of this application.   There

6    is nothing immediate, no harm.

7              I suggest there is not even any harm that

8    they have identified.

9              They basically write the motion to dismiss

10   for the defendants in their papers, Your Honor.   They

11   argue that any decision of net equity that could be made in

12   the District Court would be foreclosed on by a

13   persuasiveness by Your Honor's decision, if not collateral

14   estoppel.   So where is the harm?   There is no harm that

15   would be suffered by anyone with this case proceeding.

16   Certainly not between now and when Your Honor hears the

17   preliminary injunction motion.

18              I further submit they have not established

19   a serious question in this case.

20              The brief they submitted regurgitates what

21   they said in the Picaeur agreement.   This is not a serious

22   question here because of the cases they cite talk about the

23   Court's staying the third-party actions that might

24   implicate every estate property.

25              There is no estate property implicated by

27

1    the New Jersey action, Your Honor.

2               The other cases they cite talk about

3    enjoining third-party actions where the alter ego of the

4    Debtor is somehow involved, but that is also not the case

5    here.

6               These are individuals who have been sued in

7    New Jersey.

8               There is no question, Your Honor, that you

9    will deny this preliminary injunction motion.   So,

10   therefore, there is no basis for issuing the TRO today.

11              THE COURT:  Thank you.   Does anyone else

12   want to be heard?

13              MR. EHRLICH:  Good morning, Your Honor.  My

14   name is Jeff Ehrlich, I am a trial attorney for the

15   Department Of Justice.   I don't want to get too much into

16   the middle of this, but I will note that the United States

17   Trustee is one of the percolators of the New Jersey case.

18              Two of the defendants in this case are SIPC

19   directors who are federal employees and under Federal tort

20   claims action, the United States Trustee is only the proper

21   defendant in a lawsuit that alleges a violation of state

22   law involving actions of federal employees.   So we filed a

23   motion to substitute the United States as a defendant in

24   the New Jersey action in lieu of two of the current

25   defendants and for our interests here, obviously, we would

28

1    support a restraining order and injunctive relief certainly

2    if it meant dismissal of the New Jersey case where the

3    United States is a defendant.    But today the main interest

4    that we have is that we would like to avoid a situation

5    where the New Jersey action is in some way stayed

6    indefinitely with the two individual federal employees

7    remaining as defendants.    We would like to have the

8    pending motion to substitute decided before any type of

9    permanent injunction is entered if the Court were inclined

10   to do that.

11                   THE COURT: Thank you.

12                   MR. EHRLICH:  Thank you, Your Honor.

13                   THE COURT:  I have read all of the papers

14   including the transcripts of hearings before the Magistrate

15   in New Jersey.

16                   I understand it is a matter of policy the

17   need to keep cases moving and to percolate by not staying

18   discovery.    However, I don't know that determination is a

19   matter of administrative policy is always well thought out

20   when the unintended consequences could cause severe

21   dislocation.

22                   Nevertheless, I tend to agree with the

23   opponent to the request for a Temporary Restraining Order

24   here that the request for that Temporary Restraining Order

25   is not as robust as it could be.    I see nothing in these

29

1   papers that shows that this discovery at this point in time

2   has a direct impact on the proceedings before me.

3                  The nature of the discovery is not clear.

4   I understand there is a motion practice that could be made

5   before the New Jersey Court and it may very well be when

6   everyone sits back and sees what all of the issues are that

7   a proper determination will be made.

8                  But as far as the request for a Temporary

9   Retraining Order today, I don't see the U.S. Trustee has

10  made a case for that.

11                 The defendants in the New Jersey action are

12  not the defendants here.

13                 The allegation that this is a collateral

14  attack on the determination of this Court, that the same

15  parties in New Jersey are already partisans to the

16  appellate practice here in the Second Circuit, and that

17  many of issues that are raised in the New Jersey proceeding

18  are already subject to appeals and briefing in the Southern

19  District of New York.

20                 Nevertheless I do not see that the nebulous

21  kind of discovery that is pointed out to me here in any way

22  deserves a stay from this Court where the issues of the

23  stay, it may have the potential of pitting Court against

24  Court, which I think is not an appropriate situation at

25  this point in time.

30

1          There are other avenues if one wants to

2     entertain another Court.   But when parties are put before

3     a Court with a compulsion to submit to discovery, if this

4     Court were to stay the party from cooperating with that

5     order, if does have the affect of pitting Court against

6     Court.

7          I agree with the opposition here that a

8     preliminary injunction hearing is the appropriate way to go

9     and pending that, there has been not enough shown to me to

10    require a Temporary Restraining Order.

11              MR. SHEEHAN:   Fine, Your Honor, thank you.

12              MS. CHAITMAN:   Your Honor, can we work out

13    a schedule for discovery before we have the preliminary

14    injunction hearing?

15              THE COURT:  Well, let me hear from the

16    United States Trustee because among other things there are

17    events here in New Jersey that may be preemptive to any of

18    your requests for discovery.

19              MS. CHAITMAN:   I am talking about a

20    discovery for a preliminary injunction hearing.

21              THE COURT:  I understand that.

22              MR. EHRLICH:   I don't know if you have a

23    question I could address for you.

24              THE COURT:  There is a question posed by

25    Ms. Chaitman as to the scheduling of discovery in

31

1    connection with the preliminary injunction.   Since I am

2    not fully aware of the kind of discovery that is

3    contemplated in New Jersey, we don't want to have a

4    discovery foray that has everyone scattered all over the

5    place.

6              MR. EHRLICH:  I don't mean to speak for Ms.

7    Chaitman.  I think she is talking about discovery in this

8    Court on the preliminary injunction.

9              THE COURT:  I understand.

10             MR. EHRLICH:  In the New Jersey action, the

11   scheduling or is not issued yet and there is no discovery.

12             What is pending now in the New Jersey

13   action is the motion to substitute the United States

14   Trustee for two of the defendants.

15             There are still other individual defendants

16   who at any moment a scheduling order could issue and we

17   would be subjected to discovery.   I think that is what

18   prompted the motion by the Trustee today.

19             THE COURT:  Very well.   Mr. Sheehan, do

20   you have an order on the preliminary injunction before me?

21             MR. SHEEHAN:   I don't understand what

22   discovery is being requested here.  Ms. Chaitman and I

23   could talk.   I don't see any need for discovery.   I think

24   we need a hearing.

25             THE COURT:  I think the appropriate thing

32

1    to do is to set down a hearing date.

2              MR. SHEEHAN:   All right.   We will work

3    out a hearing date.

4              THE COURT: I will adjust the request, if

5    you wish to it.

6              MR. SHEEHAN:   We will submit it to your

7    Honor.

8              THE COURT:  All right.

9              MR. SHEEHAN:   We will work out a schedule

10   and do it that way.

11             MR. SMITH:  Thank you Your Honor.

12             MR. SHEEHAN:  Thank you.

13

14                     *     *     *

15

16

17

18

19

20

21

22

23

24

25

33

1                        C E R T I F I C A T E

2

3       STATE OF NEW YORK          }

                                   }    ss.:

4       COUNTY OF NEW YORK         }

5                        I, MINDY CORCORAN, a Shorthand Reporter

6       and Notary Public within and for the State of New York, do

7       hereby certify:

8                        That I reported the proceedings in the

9       within entitled matter, and that the within transcript is a

10      true record of such proceedings.

11                       I further certify that I am not related, by

12      blood or marriage, to any of the parties in this matter and

13      that I am in no way interested in the outcome of this

14      matter.

15                       IN WITNESS WHEREOF, I have hereunto set my

16      hand this 14th day of April, 2010.

17

18                       _____

                                  MINDY CORCORAN

19

20

21

22

23

24

25