# EXHIBIT A

Helen Davis Chaitman (hdc-4266)
BECKER & POLIAKOFF, LLP
21 East Front Street – Suite 400
Redbank, New Jersey 07701
(908) 303-4568

and

45 Broadway
New York, New York 10006
(212) 599-3322
Attorneys for the Plaintiffs

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

---------------------------------------------------------

LISSA CANAVAN, LESLIE GOLDSMITH, and
JUDITH KALMAN on behalf of themselves
and all others similarly situated,

Plaintiffs

vs.

STEPHEN HARBECK, ARMANDO J. BUCELO,
JR., TODD S. FARHA, WILLIAM H. HEYMAN,
WILLIAM S. JASIEN, DAVID G. NASON, MARK
S. SHELTON, and DAVID J. STOCKTON,

Defendants.

---------------------------------------------------------

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Lissa Canavan, Judith Kalman, and Leslie Goldsmith, on behalf of themselves

and all other similarly-situated investors in Bernard L. Madoff Investment Securities LLC

("Madoff"), for their complaint against Defendants Stephen Harbeck, Armando J. Bucelo, Jr.,

Todd S. Farha, William H. Heyman, William S. Jasien, David G. Nason, Mark S. Shelton, and

David J. Stockton (other than Harbeck, the "Directors"), allege as follows:

**Summary of Action**

Case 2:10-cv-00243-FSH-PS    Document 1    Filed 02/24/10    Page 2 of 72

1.     This is a class action against the President of the Securities Investor Protection

Corporation ("SIPC"), and all of its Directors, to recover compensatory and punitive damages for

the defendants' perpetration of a fraudulent investment insurance scheme which has resulted in

billions of dollars of injury to class members.  The class members are Madoff customers who, as

a result of SIPC's deliberate misrepresentation of the nature and scope of insurance provided to

investors, have been denied their full SIPC insurance and have lost their entire investments (the

"Customers").  But for the promise of SIPC insurance, the Customers would not have invested

their funds with Madoff.

2.     The Customers are a protected class of creditors in the Madoff liquidation

proceeding instituted on December 15, 2008 under the Securities Investor Protection Act, 15

U.S.C. § 78aaa, *et seq.* ("SIPA").  Under SIPA, the Customers are entitled to the prompt

replacement of securities in their accounts, up to $500,000 in value, based upon their November

30, 2008 statements (their "Statutory Balances").

3.     Instead of replacing securities up to $500,000 based upon the Customers' Statutory

Balances, the defendants have devised a scheme to enrich SIPC and its members at the expense

of the Customers.

4.     In direct contradiction of their repeated representations to the Customers and in

violation of their statutory mandate, defendants have caused their designated trustee in the

Madoff case, Irving H. Picard (the "Trustee"), to refuse to pay SIPC insurance to any Customer

whose withdrawals exceeded his deposits, regardless of the amount of time the Customer

maintained the account.  In addition, as to those Customers who have received some payment

from SIPC, the payment is not equal to the Customers' Statutory Balances up to $500,000.

Rather, in breach of the representations the defendants made to the Customers and in defiance of

the plain language of SIPA, the payment is based upon the Customers' net investment over generations of account holders.

5.       Thus, in direct violation of their statutory obligations and for the first time in SIPC's history, defendants have taken the position that the Customers' accounts were not insured for their Statutory Balances but only for their net investment ("SIPC's Net Investment Policy").

6.       At a time when the United States is in an economic crisis due, in large part, to the unremitting greed of SIPC's members, the SEC-regulated broker/dealers (the "Financial Services Industry"), SIPC is taking a position which is fraudulent as to the Customers, as well as to all customers of the Financial Services Industry, and which is destructive of Congress' essential purpose in enacting SIPA, *i.e.,* to instill investor confidence in the capital markets.

7.       The defendants' conduct in the Madoff case is in direct violation of SIPA, its legislative history, the written representations made by SIPC on its own website and made by the Financial Services Industry to securities customers since 1970 and continuing today, as well as in direct contradiction to positions that Harbeck, and SIPC have taken in public statements and court proceedings of prior SIPA liquidations.

8.       SIPC was formed pursuant to SIPA in 1970 to provide insurance to customers of the Financial Services Industry against the dishonesty of an SEC-regulated broker/dealer, funded by the Industry which constitutes SIPC's members.  Thus, the statutory scheme required the Financial Services Industry to self-insure the honesty of its own broker/dealers.

9.       SIPA was enacted at the behest of the Financial Services Industry to relieve the industry of the significant expense of registering securities in the names of individual investors and to allow the industry to profit from holding securities in street name.  The inducement to investors to assume the risks of having their securities held in street name was the promise that

3

their accounts were insured against the brokers' dishonesty by an insurance fund managed by

SIPC and funded by the Financial Services Industry.

10.     In derogation of its obligation to assess its members appropriately, and in defiance

of governmental and other warnings that SIPC would be under-funded in the event of the

liquidation of a large broker/dealer, SIPC provided virtually free insurance to the Financial

Services Industry for the 19 years preceding Madoff's collapse.

11.     According to Harbeck's December 9, 2009 testimony before the House Financial

Services Committee's Subcommittee on Capital Markets, Insurance, and Government-Sponsored

Enterprises (the "Subcommittee"), for a period of 19 years ending in 2008, and in defiance of

specific warnings from Congress that SIPC was seriously under-funded, the defendants

deliberately provided hundreds of billions of dollars of SIPC insurance to SIPC's members for a

flat fee of $150 per year per firm, regardless of the number of customers of each member.

SIPC's decision to provide insurance for $150 per year per firm coincided with a significant

increase in market volume.  Thus, although SIPC's exposure was increased exponentially due to

increased market volume, SIPC allowed the fund balance to decrease drastically in relation to

SIPC's risk.  Moreover, SIPC deliberately allowed $500 million in lines of credit to expire in

March 2009, well after Madoff's fraud was exposed.  Thus, as predicted by Congress, on

December 31, 2008 SIPC, by deliberate design, lacked sufficient funds to satisfy SIPC's

obligations to the Customers.

12.     The Madoff case exposes SIPC to insurance obligations in the range of $2.5

billion.  SIPC had only $1.7 billion in assets as of December 31, 2008.  SIPC could have funded

this obligation by utilizing the $1 billion line of credit available to it under SIPA from the SEC,

or utilizing the $1 billion line of credit available to it from a consortium of banks. If it had done so, SIPC would have had to assess its members to repay these loans.

13. Instead, the defendants chose to have SIPC default on its obligations and they have orchestrated a scheme to cheat the Customers of their promised insurance and to enrich the Financial Services Industry at the expense of the Customers.

14. Defendants have not only adopted their Net Investment Policy in order to cheat the Customers. They have also announced a policy of "clawing back" withdrawals made by Customers from their accounts in excess of the deposits the Customers made, without giving the Customers any adjustment for the diminishing value of the dollar over time. In addition, they have rejected the position of the Securities and Exchange Commission ("SEC") that Customers' accounts should be adjusted for "constant dollars" so as to recognize that $1 invested in 1980 is probably equivalent to $10 withdrawn in 2008. (The policy to claw back withdrawals, with no adjustment for the value of the dollar, is hereafter called the "Unfair Clawback Policy.")

15. Pursuant to SIPA, the Directors have a statutory duty to determine the "policies which shall govern the operations of SIPC." 15 U.S.C. § 78ccc(c)(1). SIPC's Net Investment Policy was adopted by the Directors in bad faith and in direct contravention of their statutory duty, with the sole intention of saving SIPC billions of dollars by disqualifying thousands of Customers from receiving SIPC insurance. The Policy is in direct contravention of SIPA, its legislative history, SIPC's regulations, and SIPC's representations to investors and to the courts over the 38 years of its existence prior to the formulation of the Net Investment Policy.

16. By virtue of SIPC's Net Investment Policy, the defendants have perpetrated a fraud upon the Customers and are personally liable, jointly and severally, for the damages that SIPC's Net Investment Policy has caused to Customers in the full amount of their lost investments.

Case 2:10-cv-00663-FSH-PS   Document 1   Filed 02/24/10   Page 6 of 72

17.     Similarly, SIPC's Unfair Clawback Policy is a bad-faith policy in direct contravention of the purpose and intent of SIPA because it penalizes investors who placed their savings in the Financial Services Industry in order to save for their retirement.  It was adopted by the Directors solely to enrich SIPC at the expense of the Customers by increasing the fund of customer property so as to enhance SIPC's subrogation claims.

## Parties

18.     Plaintiff Canavan holds a twenty percent (20%) interest in Lapin Children LLC ("Lapin"), a New Jersey limited liability company formed on May 15, 2000.  She deposited funds with Lapin which were transferred to Madoff for the purpose of purchasing securities.  Thus, she is a "customer" under SIPA entitled to SIPC insurance.  Lapin's account with Madoff had a value of $1,959,600.93 as of November 30, 2008, and Lapin filed a claim in the SIPA liquidation for that amount.  Each member of Lapin is a customer of Madoff and is entitled to SIPC insurance in an amount determined by his or her proportionate interest in Lapin, up to the statutory maximum of $500,000.  Because Canavan holds a 20% interest in Lapin, she is entitled to 20% of that amount, or $391,920.18, as SIPC insurance.  To date, Canavan has received no SIPC insurance nor has she received a determination letter determining her claim.  She is domiciled in New Jersey and resides at 526 Alosio Drive, River Vale, New Jersey 07675.

19.     Plaintiff Goldsmith was a Madoff investor who filed a claim in the SIPA liquidation for $207,226.91, based on her November 30, 2008 statement.  Her claim was denied in its entirety by the Trustee in a determination letter dated October 19, 2009, because she purportedly withdrew $261,003.91 from her Madoff account and had deposited $200,000 in her account: $100,000 at the account's inception in 1992 and $100,000 in 2002.  Thus she received

Case 2:10-cv-00363-SHM-FPG    Document 1    Filed 02/24/10    Page 8 of 72

no SIPC insurance.  Goldsmith has filed an Objection to the Trustee's determination.  She is domiciled in New Jersey and resides at 30 Redcoat Drive, East Brunswick, New Jersey 08816.

20.     Plaintiff Kalman was a Madoff investor who filed a claim in the SIPA liquidation with Daniel Kalman for $817,006.60.  Her claim was allowed only in the amount of $133,675.00 by the Trustee in a determination letter dated September 10, 2009, because the Kalmans purportedly withdrew $31,000 from the account in 2006 and 2008, and had deposited $164,675.00 in the account during the period 1993 through 2002.  The Trustee refused to give any credit for a December 18, 2001 transfer from another Madoff account in the amount of $53,723.66.  Kalman is domiciled in New Jersey and resides at 78 Forest Park Terrace, Monroe Township, New Jersey 08831.

21.     Defendant Stephen Harbeck is the President of SIPC and its primary spokesperson. Upon information and belief, Harbeck is domiciled at 4106 Robertson Boulevard, Alexandria, VA 22309.

22.     Defendant Bucelo has been a member of SIPC's Board of Directors since 2002. He was acting Chairman of the Board in 2002, became Vice Chairman of the Board in 2003, and has been Chairman of the Board since 2005.  Upon information and belief, Bucelo is a principal of the Law Offices of Armando J. Bucelo, Jr. and is domiciled at 3310 Granada Blvd., Coral Gables, Florida 33134.

23.     Defendant Farha has been a member of SIPC's Board of Directors since 2006.  He is currently the Vice Chairman of the Board.  Upon information and belief, Farha is domiciled in 345 Bayshore Blvd., PH GP13, Tampa, Florida 33606.

24.     Defendant Heyman has been a member of SIPC's Board of Directors since 2007. Upon information and belief, he is the Vice Chairman and Chief Investment Officer of The

Travelers Companies, Inc. and is domiciled at 1111 Park Avenue, Unit 9C, New York, New

York 10128.

 25. Defendant Jasien has been a member of SIPC's Board of Directors since 2007.

Upon information and belief, he is a Senior Vice President of ING Financial Advisers LLC and

is domiciled at 7421 Dunquin Court, Clifton, Virginia 20124.

 26. Defendant Nason has been a member of SIPC's Board of Directors since 2007.

Upon information and belief, he was formerly an Assistant Secretary for Financial Institutions,

United States Department of the Treasury and is currently the Managing Director of Promontory

Financial Group LLC and is domiciled at 4455 33rd Street N., Arlington, Virginia 22207.

 27. Defendant Shelton has been a member of SIPC's Board of Directors since 2007.

Upon information and belief, he is the Managing Director and General Counsel Legal &

Compliance US UBS Financial Services, Inc. and is domiciled at 1150 5th Avenue, Apt. 3C, New

York, New York 10128.

 28. Defendant Stockton has been a member of SIPC's Board of Directors since 2000.

Upon information and belief, he is a Director of the Division of Research and Statistics, Board of

Governors of the Federal Reserve System and is domiciled at 7606 Mineral Springs Court,

Springfield, Virginia 22153.

**Jurisdiction and Venue**

 29. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2)(A) because:

(1) the matter in controversy between the class members and Defendants exceeds $5,000,000

exclusive of interest, attorneys' fees, and costs, and (2) many of the class members are citizens of

a State other than the States of citizenship of the Defendants.

30.    The Court has personal jurisdiction over the Defendants pursuant to New Jersey

Court Rule 4:4-4, which extends jurisdiction to the limits of due process.  The Defendants

committed tortious acts which caused injury to plaintiffs in New Jersey, including falsely

assuring plaintiffs that their accounts were insured up to $500,000 by SIPC.

31.    Venue is proper in this district pursuant to 28 U.S.C. § 1391.

### Class Action Allegations

32.    Plaintiffs bring this action as a class pursuant to Rule 23 of the Federal Rules of

Civil Procedure on behalf of themselves and all other customers of Madoff who are not entitled

to their full SIPC insurance under SIPC's Net Investment Policy (the "Class").

33.    Plaintiffs allege on information and belief that the Class consists of approximately

4,000 Customers.  The class is thus so numerous that joinder of all class members is impractical.

34.    Members of the Class may be identified from Madoff's records which have been in

the exclusive possession of the Trustee since December 15, 2008.  Members of the Class may be

notified of the pendency of this action by mail using a form of notice similar to that used in

securities class actions and similar to the notices that the Trustee has sent to Customers in the

Madoff case.

35.    The claims set forth in the complaint are common to each and every member of the

Class.

36.    Plaintiffs are proper representatives of the class because plaintiffs are members of

the Class and the claims asserted in this complaint are typical of the claims of all members of the

Class.  The claims of the plaintiffs are not subject to any unique defenses; nor do the interests of

any of the plaintiffs conflict with the interests of any other member of the Class.

37.     Plaintiffs contend that the claims set out herein are proper for certification as a class action under the provisions of Rule 23 (b)(3) of the Federal Rules of Civil Procedure.

38.     Plaintiffs are able to fairly and adequately protect the interests of the Class.

39.     Plaintiffs have retained counsel competent and experienced in class, SIPA and fraud litigation.

40.     The questions of law and fact common to the Class predominate over any questions affecting individual members because the issue of the proper determination of net equity is a central issue in determining all Class members' claims, and all Class members have suffered from the defendants' fraud and bad faith failure to pay insurance to Class members.

41.     The class action is superior to other methods of adjudication because there are over 4,000 members in the Class and repeated individual litigation of the common issues shared by all Class members would deplete their resources and reduce the amount of recovery available to each member, particularly since litigation to establish the defendants' fraud and the proper measure of damages will be relatively costly and time consuming when compared to the amount of each individual claim.

**Allegations Common to All Claims**

**The Directors Are Subject to Suit**

42.     The defendants' fraudulent assurance of SIPC insurance up to $500,000 based upon each Customer's last statement and the Director's promulgation of SIPC's Net Investment Policy are bad faith actions in direct violation of SIPA's definition of "net equity," of the SIPA prohibition against SIPC changing the definition of "net equity," of the legislative history of SIPA, of the defendants' fiduciary obligation to customers of the Financial Services Industry,

10

and of their obligations to fulfill Congress' statutory mandate to instill investor confidence in the capital markets.

43.    The sole justification for the Directors' Net Investment Policy is to enrich SIPC's members, the Financial Services Industry, at the expense of the Customers.

44.    SIPA, 15 U.S.C. § 78ccc(c)(1), provides that "SIPC shall have a Board of Directors which, subject to the provisions of this chapter, shall determine the policies which shall govern the operations of SIPC."  Pursuant to SIPC's 2008 Annual Report, a "board of seven directors determines policies and governs operations."

45.    The Directors are subject to suit for their bad faith promulgation of SIPC's Net Investment Policy and Unfair Clawback Policy pursuant to 15 U.S.C. § 78kkk(c) which provides that "Neither SIPC nor any of its Directors, officers or employees shall have any liability to any person for any action taken or omitted in good faith under or in connection with any matter contemplated by this chapter."  *See also, In re Adler, Coleman Clearing Corp.*, 1998 Bankr. LEXIS 1076 (B. S.D.N.Y. Aug. 25, 1998) (SIPA "contemplates that customers of a liquidating broker/dealer can sue SIPC when it has not acted in good faith in exercising its statutory rights and obligations.").

46.    The defendants are not entitled to be indemnified for their defense costs or any ultimate judgment in this case.  Under 15 U.S.C. § 78ccc(b)(3)(B), the defendants are only entitled to indemnification for actions they have taken in good faith:

> In addition to the powers granted to SIPC elsewhere in this chapter, SIPC shall have the power. . . to adopt, amend and repeal, by its Board of Directors, such bylaws as may be necessary or appropriate to carry out the purposes of this chapter, including bylaws relating to . . . the indemnity of its officers, directors and employees (including any person acting as a trustee or otherwise in a liquidation proceeding) for liabilities and expenses actually and reasonably incurred by any such person in connection with the

defense or settlement of an action or suit if such person acted in
good faith and in a manner reasonably believed to be consistent
with the purposes of this chapter.

47.    Article 5 of SIPC's Bylaws, entitled "Indemnification of Directors, Officers and

Employees" sets forth the criteria under which "former, present or future" directors, officers or

employees of SIPC shall be indemnified by SIPC for "any pending. . . civil, criminal,

administrative or arbitrative action, suit or proceeding . . . by reason of such person being or

having been such director, officer or employee."

48.    However, pursuant to SIPA, the defendants may not be indemnified in this case

because the statutory indemnification only applies to actions taken "in good faith and in a

manner reasonably believed to be consistent with the purposes of this chapter."

**The Directors Have Acted in Bad Faith**

49.    SIPA was established to protect investors who entrust their money to the Financial

Services Industry against the dishonesty of an SEC-regulated broker/dealer.  SIPC was created,

under SIPA, to carry out the policies of SIPA and to assess its members and administer the

insurance fund for the protection of investors.

50.    Under SIPA, SIPC is charged with the responsibility of assessing its members fees

sufficient to cover the insurance risk that a dishonest broker will steal a customer's money or

securities.  The defendants were warned in 2003 that they were seriously under-funded and

would not be able to handle a major liquidation.  Nevertheless, the defendants persisted in

charging firms like Goldman Sachs and Merrill Lynch a token $150 per year to insure millions of

customers.

51.    Under SIPA, SIPC is obligated to insure each customer's account up to $500,000

for securities that the customer had a legitimate expectation belonged to him.  The insurance was

intended by Congress to give investors confidence in the Financial Services Industry so that they would feel comfortable allowing their brokers to hold their securities in street name.

52.    In return for contributing to the insurance fund managed by SIPC, the Financial Services Industry gained access to hundreds of billions of dollars of street name securities which the Industry could use for its own profits while in the brokers' possession.

53.    In total derogation of their statutory responsibility, the defendants have managed SIPC so as to cheat investors out of the SIPC insurance to which they are indisputably entitled.

54.    At the same time, the defendants have favored the Financial Services Industry by charging each brokerage firm a mere $150 per year for the 19-year period ending in 2008 for the privilege of representing on every single trade confirmation issued by that firm that the customer's account was insured by SIPC up to $500,000.

55.    In order to minimize the insurance risk but in derogation of their statutory responsibilities, the defendants have continuously selected trustees in SIPA liquidations who act solely to enrich SIPC at the investors' expense.   In 2000, the media reported that lawyers for defrauded investors and some state securities regulators argued that

> SIPC, created by Congress in 1970, has defined its role so narrowly that it doesn't use enough of its resources to help victims of broker fraud.  Critics also say it too frequently doles out lucrative contracts to a handful of lawyers who keep the purse strings tight when overseeing the liquidation of failed brokerages.

August 7, 2000 article in The Street available at http://www.thestreet.com/story/1029090/1.html.

56.    The Trustee in the Madoff liquidation, Irving H. Picard, was quoted in the above article as being "personally offended" by any implication that he had been repeatedly hired by SIPC because he "kept payouts low."  But the article found that "the record seems to support at least some concerns of SIPC critics" since

13

> In 1990, the SIPC fund had $570 million and paid out $134 million, or almost 25% of its assets, to cover investor losses. That year it collected $65 million in fees from its members, based on a rate of 3/16 of 1% of each of their annual revenues
>
> By [1999], the SIPC fund had almost doubled to $1.1 billion, but with a similar caseload, the agency actually paid out less -- $122.7 million, or only about 11% of the value of its fund – to cover customer losses.

(*Id.*). In addition, SIPC appointed former SIPC president Theodore Focht, as a trustee in a liquidation in 1996, presumably because SIPC knew he would keep costs down by denying claims. (*Id.*). As reported in the article, critics viewed Focht's appointment as creating an "appearance of impropriety and inherent bias" since he, as a former SIPC president, would be expected to "rubber stamp" SIPC's decisions. (*Id.*).

57. Such cronyism and repeat utilization of lawyers, like Picard, who follow the defendants' mandate to deny valid customer claims violates SIPC's statutory purpose to protect investors. Picard, as SIPC Trustee, was chastised by one court for advancing a totally frivolous argument in his attempt to defeat a valid customer claim, after he had tried to threaten and intimidate the customer. In *In re Investors Center, Inc.,* 129 B.R. 339 (B.E.D.N.Y. 1991), Picard was faced with customer claims for cash where the customers had received confirmations from the broker that their securities had been sold. After the sale, the securities became worthless and SIPC wanted to simply replace the worthless securities rather than pay the cash that was reflected on the account statements. The court held that "Under [SIPC's] rules, each of the objecting *claimants*, because of the receipt of written confirmation of a sale prior to the filing of SIPC's application to liquidate Investors Center, has a claim for cash and not for securities and the Trustee's determination otherwise is incorrect." The court wrote:

> Except that the Trustee appears to urge this most seriously, the Court would deem the contention too frivolous to even consider.

14

58.    In rejecting Picard's argument, the court cited 17 C.F.R. 501(a)(1), (2) and stated "The Rules are as binding on the Trustee and on SIPC as they are on the public.  The Trustee is not free to ignore them or rewrite them." *Id.* at 348.

59.    Having proven his loyalty to SIPC, defendants chose Picard as the trustee in the Madoff case, at a compensation to his law firm of approximately $1 million per week.  In a repeat performance, Picard has fulfilled his mandate:  he has utterly ignored SIPA's definition of "net equity" as the balance in the customer's account as reflected in the customer's last statement and announced a totally new theory of SIPC's coverage.  Under Picard's theory, SIPC only insures the net investment of the customer.  By taking this position, SIPC has broken with 38 years of its history, with controlling Second Circuit authority, with the clear legislative history of SIPA, and with the repeated representations made by SIPC over the years to induce investors to entrust their life savings to the Financial Services Industry.  By their conduct, the defendants have caused the notices provided by all broker/dealers to their customers to be false and misleading.  Defendants have allowed Picard to cause havoc in the securities industry and devastation to the Customers.

60.    Thus, under the direction of the defendants, SIPC is a scam:  SIPC leads investors to believe that it protects them by "promptly" satisfying customer claims in a liquidation proceeding.  However, in fact, SIPC does everything in its power to defeat and delay payment on customer claims so as to enrich SIPC at the customers' expense.

**The false representations of insurance**

61.    Although SIPC has recently deleted from its website any reference to the word "insurance," it is well recognized that SIPC provides insurance.  Indeed, a Google search of "SIPC insurance" on September 4, 2009 brought up 2,790,000 items.  As one court put it:

> The SIPC Fund is raised from compulsory assessments on all
> securities business paid by all registered securities brokers and
> dealers. 15 U.S.C. § 78ddd(d). In effect, therefore, the Fund is
> nothing more or less than a compulsory insurance premium
> mandated by federal law, collected from brokers but charged to all
> securities investors.
>
> In return, the creditor/customer who has suffered a loss gets what
> appears to be an independent, impartial claims analysis by an
> officer of a federal court, but all he *really* gets is a decision by the
> insurance company's claims agent, its captive trustee. 15 U.S.C. §
> 78fff-2(b).

*In re First State Securities Corp.*, 39 B.R. 26 (B.S.D. Fla. 1984) (emphasis in original).

62.     The legislative history of SIPC clearly establishes that its purpose was to "maintain

and administer an insurance fund which would provide coverage against customer losses. . .

resulting from broker-dealer firms' insolvency." S.Rep. No. 91-1218, p. 1 (1970). The Senate

described SIPC as "an insurance plan for the industry," and one of several "federally sponsored

insurance programs." *Id.* at 4 - 5, 7 – 9.

63.     As the SEC's Office of the Inspector General ("OIG") has acknowledged, SIPA

"was created to protect customers from losses resulting from broker-dealer failure, thereby

promoting investor confidence in the securities markets." Oversight of Securities Investor

Protection Corporation, available at the OIG's website at http:www.sec-

oig.gov/Reports/AuditsInspections/2000/301fin.pdf.

64.     On December 30, 1970, when President Nixon signed SIPA into law, he made the

following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation
> establishes the Securities Investor Protection Corporation (SIPC), a private
> nonprofit corporation, which will insure the securities and cash left with
> brokerage firms by investors against loss from financial difficulties or failure of
> such firms.   . . . Just as the Federal Deposit Insurance Corporation protects the
> user of banking services from the danger of bank failure, so will the Securities
> Investor Protection Corporation protect the user of investment services.

16

http://www.presidency.ucsb.edu/ws/index.php?pid=2870.

65.    In its 1970 annual report, the SEC described SIPA's purpose as to "provide

insurance for customer accounts."   http://www.sec.gov/about/annual_report/1970.pdf (at 3).

66.    Numerous courts, including nine Court of Appeals decisions, have described SIPC

as managing an "insurance" fund.  [1]

---

[1] *In re New Times Sec. Servs.*, 371 F.3d 68, 84-85 (2d Cir. 2004); *Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 69 (2d Cir. 2000) *Redington v. Touche Ross & Co.*, 592 F.2d 617 (2d Cir. 1978), *rev'd and remanded on other grounds*, 442 U.S. 560 (1979); *Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1316 (2d Cir. 1976); *SEC v. Albert & Maguire Sec. Co.*, 560 F.2d 569, 574 (3d Cir. 1977); *Foster v. National Union Fire Ins. Co.*, 902 F.2d 1316, 1317, 1320 (8th Cir. 1990); *United States v. White*, 553 F.2d 1137, 1138 (8th Cir. 1977); *In re Brentwood Secur., Inc.*, 925 F.2d 325, 326 (9th Cir. 1991); *SEC v. Securities Northwest, Inc.*, 573 F.2d 622, 624 (9th Cir. 1978); *Ahammed v. Secs. Investor Prot. Corp. (In re Primeline Secs. Corp.)*, 295 F.3d 1100, 1103, 1106 (10th Cir. 2002); *Securities Investor Protection Corp. v. Oberweis Secur., Inc., (In re Oberweis Secur., Inc.)*, 135 B.R. 842, 846 (B. N.D. Ill. 1991); *Schwartz v. Oberweis*, 826 F. Supp. 280, 286 (N.D. Ind. 1993); *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 621 F. Supp. 2d 513, 533-34 (N.D. Ohio 2009); *Flego v. Philips, Appel & Walden, Inc.*, 514 F. Supp. 1178, 1181 (D.N.J. 1981); *Morsemere Sav. & Loan Asso. v. Marston*, 500 F. Supp. 1253, 1261 (D.N.J. 1980)("The decision here was in November, 1977; *Lamb v. Connecticut General Life Ins. Co.*, 509 F. Supp. 560, 574 (D.N.J. 1980); *In re Omni Mut.*, 193 B.R. 678, 680 (S.D.N.Y. 1996); *Rich v. Touche Ross & Co.*, 415 F. Supp. 99 (S.D.N.Y. 1976); *Securities Investor Protection Corp. v. Charisma Sec. Corp.*, 371 F. Supp. 894, 899 (S.D.N.Y. 1974); *Handelman v. Weiss*, 368 F. Supp. 258, 263 (S.D.N.Y. 1973); *In re MV Secs., Inc.*, 48 B.R. 156, 161 (B. S.D.N.Y. 1985); *Securities Investor Protection Corp. v. Oberweis Secur., Inc., (In re Oberweis Secur., Inc.)*, 135 B.R. 842 (B. N.D. Ill. 1991); *United States v. LaScola*, 2007 U.S. Dist. LEXIS 46054 at *6 (D.R.I. June 25, 2007).

67.    Consistent with its statutory purpose, SIPC actively promoted itself as an insurance fund to insure investors against the fraud of their brokers.  For example, in 2003, Harbeck represented that SIPC is a "safety net," available to promptly pay customer claims so that "their assets [are not] tied up for months."  As quoted in a February 26, 2003 News Release available on SIPC's website,  Harbeck said:

> The Park South case is a textbook illustration of why Congress created SIPC to protect investors at troubled brokerage firms. While misuse of customer cash and securities is uncommon, it is important for investors to know that **SIPC is here as a safety net when they need us in those situations.  SIPC's mission also was met here in terms of making sure that more than 2,000 Park South investors were not further victimized by having their assets tied up for months or longer in a bankrupt brokerage firm.**

http://www.sipc.org/media/release26feb03.cfm; emphasis added.  In fact, Harbeck has repeatedly acted to delay and frustrate payment of customer claims.

68.    According to SIPC's bylaws, the Official Explanatory Statement that members of SIPC are authorized to use is either

> Member of SIPC, which protects securities customers of its members up to $500,000 (including $100,000 for claims for cash).  Explanatory brochure available upon request or at www.sipc.org; or


> Member of SIPC.  Securities in your account protected up to $500,000.  For details, please see www.sipc.org.

Case 2:10-cv-00934-SH    Document 1    Filed 02/28/10    Page 59 of 72

69.    Neither statement puts a customer on notice of SIPC's Net Investment Policy.
Rather, SIPC's approved disclosures were intended to mislead investors into believing that their
accounts were insured by SIPC up to $500,000 based upon their Statutory Balances. Each
statement is authorized in SIPC's bylaws, which are prepared and amended by the Directors.
Yet, each is an affirmative misrepresentation because SIPC does not, in fact, protect customers
but, instead, deceives customers by reneging on its insurance obligations.

70.    Even today, SIPC's members misrepresent the nature and extent of SIPC insurance
in order to lure trusting investors to entrust their life savings to the Financial Services Industry.
Citigroup, one of SIPC's members, sent the following notification to its customers after the
Madoff loss:

> In the unlikely event of insolvency, if a shortfall exists between
> what was required to be segregated and what actually was, Citi
> Personal Wealth Management clients are further protected by the
> following types of insurance:

> •    SIPC Protection. CGMI is a member of the Securities Investor
>       Protection Corporation (SIPC), a federally mandated U.S. nonprofit
>       corporation that protects investors if a broker-dealer becomes
>       insolvent. When a brokerage firm that is a member of SIPC fails,
>       SIPC's role is to ensure that investors get back what belongs to
>       them. If, when SIPC and the trustee examine the client accounts at
>       a failed broker-dealer, there is a shortfall in the amount of securities
>       or cash owed clients due to record-keeping errors or fraud, the
>       affected clients are protected by SIPC coverage.

> Each client with missing securities or cash will be reimbursed by
> SIPC up to a maximum of $500,000, of which $100,000 may be
> cash. SIPC does not cover market losses, and it does not cover
> certain types of investments such as commodity futures contracts
> and fixed-annuity contracts.

71.    Vanguard, one of SIPC's members, assures its customers as follows:

> SIPC Insurance provides protection for assets held by you in Vanguard Brokerage
> accounts." (Vanguard Brokerage Services is a division of Vanguard Marketing
> Corporation, which is a member of SIPC.

72.    FINRA, in 2010, described SIPC as providing insurance to investors:

SIPC is a non-profit organization created in 1970 under the Securities Investor
Protection Act (SIPA) that provides limited insurance to investors on their
brokerage accounts if their brokerage firm becomes insolvent. All brokerage firms
that do business with the investing public are required to be members of SIPC.

73.    The SEC continues to publish descriptions of SIPC as an insurer:

SIPC is a private, not-for-profit corporation that insures the securities and cash in
customer accounts of member brokerage firms against failure of those firms.

http://www.sec-oig.gov/Reports/AuditsInspections/2003/355fin.htm

74.    The defendants are fully cognizant of the representations that are made to the

public by its members and they have actively encouraged their members to make such

representations.  Yet, on February 2, 2010, Picard's lawyer, David Sheehan, argued to

Bankruptcy Judge Burton Lifland that, in the legislative history, some Senators made an

"unfortunate" choice of words when they described SIPC as insurance.  He told Judge Lifland:

There's no insurance. There's no $500,000 that everyone gets a check for. I don't
understand why people don't get that.

75.    Over the course of many years, defendants have deliberately misled the public into

believing that SIPC insured their accounts up to $500,000 against the dishonesty of a broker.

They did this because it was in the financial interests of their members for trusting investors to

pour their life savings into the Financial Services Industry to be held in street name.

76.    However, defendants also maintained a deliberate policy, if a broker turned out to

be dishonest, to do everything possible to deny insurance to the victims.  In fact, the defendants

perpetuated a policy of blaming the victims for the dishonesty of their brokers.  In addition to

arguing that Madoff's fraud should be imputed to the Customers, Sheehan argued to Judge

Lifland on February 2, 2010:

Case 2:10-cv-00934-SH    Filed Document 1    Filed 02/28/10    Page 21 of 72

the last customer statement, being a concoction of a fraudster, cannot be something upon which you rely. No one in their right mind would suggest you should use the last statement.

77.    Even though SIPC knew that it was grossly-underfunded, it continued to provide its members with essentially free SIPC insurance.  The $150 annual fund contribution was criticized in 2000 by Joe Borg, then Alabama's chief securities regulator, as "nothing."  August 7, 2000 article in The Street available at http://www.thestreet.com/story/1029090/1.html.  Yet, SIPC refused to raise the contribution until April 1, 2009, after the Madoff fraud was uncovered. As of April 1, 2009, member assessments were raised to ¼ of 1% of a member's net operating revenues ($150 minimum).  However, such small assessments can never make up for SIPC's failure to meaningfully assess contributions to the SIPC Fund from its members for the past 19 years.

78.    The following chart, compiled from information available in SIPC's annual reports for the years ending 1998 to 2008, shows that SIPC's annual revenues from member assessments and contributions have declined sharply after SIPC instituted a *de minimus* $150 annual assessment, while expenses, including salaries, employee benefits and directors' fees and expenses, have risen steeply during the same period.

| Year ended | Annual Revenues | Revenues from Interest on US Government Securities | Revenues from Member Assessments and Contributions and Interest on Assessments | Balance of Fund[2] | Salaries and Employee Benefits | Directors' Fees and Expenses |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

---

[2] Information on the Balance of the Fund from 1994-1997 is not readily available on SIPC's website because it only contains Annual Reports from 1998 to 2008, and the 1998 Annual Report does not contain information on the Balance of the Fund in previous years.

21

| 1994 | 87,967,964  | 50,829,178 | 37,138,786 |               | 2,654,204 | 16,183  |
| 1995 | 114,597,996 | 56,715,607 | 57,882,389 |               | 2,511,153 | 15,171  |
| 1996 | 63,942,360  | 61,280,052 | 2,662,308  |               | 2,611,595 | 16,913  |
| 1997 | 68,002,339  | 66,656,807 | 1,345,532  |               | 2,629,970 | 15,754  |
| 1998 | 71,030,692  | 69,839,676 | 1,191,016  | 1,196,695,240 | 2,890,318 | 31,414  |
| 1999 | 72,563,507  | 71,424,040 | 1,139,467  | 1,129,653,262 | 3,119,030 | 20,997  |
| 2000 | 73,484,696  | 72,373,421 | 1,111,275  | 1,220,284,553 | 3,516,593 | 35,773  |
| 2001 | 72,398,309  | 71,308,629 | 1,089,680  | 1,184,157,015 | 4,234,246 | 20,436  |
| 2002 | 67,581,578  | 66,526,852 | 1,054,726  | 1,260,200,497 | 4,495,570 | 19,112  |
| 2003 | 64,857,513  | 63,770,520 | 1,086,993  | 1,249,116,852 | 5,329,547 | 42,114  |
| 2004 | 64,063,393  | 63,085,146 | 978,247    | 1,287,554,216 | 5,118,345 | 55,835  |
| 2005 | 63,685,901  | 62,754,357 | 931,544    | 1,286,092,231 | 5,244,719 | 31,124  |
| 2006 | 66,385,148  | 65,487,278 | 897,870    | 1,403,558,035 | 5,439,474 | 67,492  |
| 2007 | 68,525,925  | 67,670,369 | 855,556    | 1,522,257,439 | 5,818,841 | 71,107  |
| 2008 | 68,417,453  | 67,597,794 | 819,659    | 1,699,039,958 | 6,461,396 | 101,207 |

79.   According to SIPC's 2007 Annual Report, the distributions to customers during the 37 years of SIPC's existence totaled $15,731,156,000, of which virtually all ($15,408,636,000) came from the assets of liquidated firms and a mere $322,520,000 (net) came from SIPC.

80.   According to SIPC's 2008 Annual Report, the distributions to customers during the 38 years of SIPC's existence totaled $159,997,487,000, of which virtually all ($159,673,694,000) came from the assets of liquidated firms and a mere $323,793,000 (net) came from SIPC.

Case 2:10-cv-00934-SH   Document 1   Filed 02/28/10   Page 23 of 72

81.     In 2008, SIPC's expenditures were approximately ten times greater than they had

been in the preceding 37 years, but such increases came almost exclusively from the debtors'

estates.  There was plainly not enough money to fund a liquidation where, as here, the debtor's

estate is inadequate.

82.     SIPC has spent more on administrative expenses than payments to investors during

its entire existence.  During the period 1971 to 2000, SIPC paid investors $233 million and paid

attorneys like Picard $320 million.  *See* Gretchen Morgenson, Investors Beware:  Many Holes

Weaken Safety Net for Victims of Failed Brokerages, N.Y. Times, September 25, 2000.    The

chart below shows payments to investors and administrative expenses for the years 2000 to 2008.

| Year Ended | Administration Expenses | Net SIPC Distributions to Customers |
|---|---|---|
| 2000 | $39,595,920 | $22,917,00 |
| 2001 | $22,177,869 | $113,429,000 |
| 2002 | $30,479,523 | $34,973,000 |
| 2003 | $23,179,660 | $18,304,000 |
| 2004 | $27,707,446 | ($49,362,000) |
| 2005 | $25,244,278 | ($3,167,000) |
| 2006 | $1,046,836 | ($49,289,000) |
| 2007 | $8,560,191 | $430,000 |
| 2008 | $18,479,409 | $1,273,000 |

83.     Under SIPA, SIPC has a $1 billion line of credit with the Securities and Exchange

Commission ("SEC").  *See* 15 U.S.C. § 78ddd(a)(c), (d), (e), (f), (g), and (h).

Case 2:10-cv-00934-JSH  Filed Document  Entered 02/28/10  Page 24 of 72

84.    In addition, SIPC had maintained lines of credit totaling $1 billion with a consortium of banks until March 1, 2009, when it allowed $500 million of these lines of credit to expire.  SIPC's decision to allow $500 million in lines of credit to expire, thus substantially limiting the amounts it had available to pay investors, *after* it knew the dimensions of the Madoff fraud, constituted an obvious bad faith action intended to cheat investors of their promised insurance.

85.    Because there are at least 4,000 members of the Class, each of whom is likely entitled to $500,000 in SIPC insurance if the Directors comply with SIPA, SIPC would need approximately $1.5 billion, possibly as much as $2 billion, to pay all the Class claims in accordance with SIPA.

86.    With the $1.7 billion in the SIPC Fund as of December 31, 2008, and the lines of credit available to it, the defendants could easily have caused SIPC to fulfill its statutory obligation to the Customers and avoid the financial devastation caused to the Customers as a result of SIPC's breach of its statutory obligations if it had simply borrowed on its lines of credit in order to "promptly" replace securities in Customers' accounts up to $500,000 each.

87.    Instead, with the complicity of the SEC, SIPC chose to abrogate its statutory obligations.  Thus, ignoring SIPC's lines of credit, SEC Commissioner Mary Schapiro testified before Congress on July 14, 2009:

> The tragic truth is there is not enough money available to pay off
> all the customer claims.

88.    The inadequacy of the SIPC fund was foreseen by the SEC.  In April 2003, the SEC observed that

> the SIPC fund was at risk in the case of failure of one or more of
> the large securities firms.  **SEC found that even if SIPC were to
> triple the fund in size, a very large liquidation could deplete the**

24

> **fund.  Therefore, SEC suggested that SIPC examine alternative
> strategies for dealing with the costs of such a large liquidation.
> SIPC management agreed to bring this issue to the attention of
> the Board of Directors, who evaluates the adequacy of the fund
> on a regular basis.**

July 2003 United States Accounting Office Report to Congressional Requesters, "Securities

Investor Protection:  Update on Matters Related to the Securities Investor Protection

Corporation."  Yet, the SIPC fund was not "tripled in size" after 2003.  Nor is there any

indication that the defendants, who were responsible for evaluating the adequacy of the fund,

took any action pursuant to the SEC's suggestion.

89.    Now that the "very large liquidation" foreseen by the SEC has come to pass, it is

plain that the Defendants have no "alternative strategies" to deal with the Customers' claims

other than to cheat them of the insurance to which they are statutorily entitled.

90.    In an effort to conceal their disastrous financial condition, the defendants

published, in the Notes to the 2008 Financial Statements attached to the 2008 Annual Report, a

patent misrepresentation of the Customer claims:

> In the Bernard L. Madoff Investment Securities LLC proceeding,
> the trustee, utilizing the customer records available from the
> computer files of the firm identified those accounts believed to be
> valid customers. In accordance with section 78lll (2) of SIPA, the
> definition of a "customer" includes a "person who has deposited
> cash with the debtor for the purpose of purchasing securities." The
> customer can be an individual, a corporation, a partnership, a
> pension plan or a "feeder fund." **The trustee then calculated the
> "net cash" positions (cash deposited less cash withdrawn) for
> each customers' account and where available, this information
> was compared to other source documentation including
> banking records and customer portfolio files. Based on that
> valuation, the trustee determined the customer's net equity
> and maximum claim allowed under SIPA. Including
> administrative costs, management estimates that the total
> charges to SIPC for this case to be approximately $1.4 billion.**
> As actual claims are processed, the trustee will determine the
> ultimate amount of payment for each claim.  Claims can be
> disputed, which among other factors, could cause the ultimate

amount of the claims to differ from the current estimate. Any
changes in the estimate will be accounted for prospectively.

91.     The estimate that the Madoff case can be resolved for total charges of
"approximately $1.4 billion" is a deliberate misrepresentation of fact.  There were 4,093 active
Madoff accounts as of December 11, 2008.  In many instances, an account held the funds of
more than one Customer -- indeed, there have been more than 15,400 customer claims filed in
the Madoff case.  It is believed the Class encompasses at least 4,000 Customers.  Thus, even if
every penny of the $1.4 billion projected went to Customers whose funds were in active
accounts, that would mean that only 2,800 Customers' claims would be paid, leaving at least
1,200 Customers without payment.

92.     Yet, every penny of the projected $1.4 billion is not going to be paid to Customers
because SIPC has been paying administrative expenses for the Trustee, his law firm and other
professionals such as accountants in the amount of approximately $2 million per week.  The
Trustee has stated that he anticipates no distributions of customer property will be made to
Customers for at least five years.  Thus, the legal fees alone in the Madoff case may well exceed
$250 million and could reach $500 million, if continued at their present pace.  This is money that
SIPC should be using to pay Customers the insurance to which they are entitled.

93.     Indeed, under the defendants' direction, as of February 2, 2010, 14 months after his
appointment, Picard had paid SIPC insurance to only one-third of the customers whose claims he
acknowledged as valid.  By this conduct, Picard is preserving the funds in the SIPC fund to pay
the exorbitant professional fees, rather than to replace securities in each Customer's account up
to $500,000.

94.     SIPC's note to the financial statements also makes its agenda of refusing to pay
customers patently obvious.  The note begins with a description of how the Trustee is paying

claims under SIPC's Net Investment Policy and then immediately states that costs will be kept to

$1.4 billion.  The cause and effect relationship is quite clear – because the Trustee is violating

SIPA and betraying the trust of the American people by using SIPC's Net Investment Policy, the

costs can be kept low enough to satisfy SIPC and its members.  Unfortunately, SIPC's desire to

keep its costs down is at the expense of the Customers whose interests Congress sought to

protect when it enacted SIPA.

**SIPC's Net Investment Policy Is A Violation of Federal Law**

95.    Under the aegis of SIPC's Net Investment Policy, the Directors have created a new

definition of "net equity," in direct contravention of SIPA, with the intention of depriving

approximately 2,568 Customers of SIPC insurance entirely and drastically reducing the SIPC

insurance paid to the 2,335 Customers whose claims SIPC recognizes as valid in some amount.

96.    Pursuant to this new definition, and in blatant disregard of SIPA, the defendants

have denied SIPC insurance to anyone who does not have a net investment over the life of his

investment with Madoff.  Under the defendants' policy, an investor who invested $100,000 in

1970, which appreciated to $1,600,000 in 2008, is not entitled to any SIPC insurance if, over the

course of 37 years, the investor took out $100,000 to pay taxes.   Similarly, according to the

defendants a Class member who had an IRA account from which the Class member took the

annual withdrawals mandated by federal law and paid taxes on the money is not entitled to SIPC

insurance if his mandatory withdrawals exceeded his investment.

97.    Pursuant to the defendants' Unfair Clawback Policy, an investor who invested

$100,000 in 1970, which appreciated to $1,600,000 in 2008, would be subject to clawback by the

Trustee if, during that 38-year period, the investor took out more than $100,000.  According to

Picard, that investor would have to disgorge to Picard all funds withdrawn in the six years

preceding the liquidation proceeding, in excess of $100,000.

98.    By ignoring SIPA, the defendants have necessitated the additional administrative

expense of having "forensic" accountants determine the net investment of each Class member, in

many cases encompassing 30 – 40 years of records.   The "forensic" accountants, of course, are

also being paid by SIPC with money which should be paid to Customers.  The defendants' self-

serving *legerdemain* is calculated to save SIPC billions of dollars and, at the same time,

necessitates the incurrence of hundreds of millions of dollars of unnecessary administrative

expenses that would be avoided if SIPC simply complied with the law.

99.    As a result of the defendants' bad faith failure to pay SIPC insurance, Customers

have suffered tragic additional losses.  Many Customers have been forced to sell their homes on

a fire-sale basis in an extraordinarily depressed market, simply because they did not have the

money to cover the monthly housing expenses for a sufficient period to sell their homes over a

more reasonable time period.   Customers have been forced to put loved ones into nursing homes

because they could not afford to continue to support them in their own homes.  The health of

many Customers has deteriorated significantly from the stress and they have not had the money

to be properly treated for their medical conditions.

100.   As a result of the defendants' Unfair Clawback Policy, Customers who were

devastated by the loss of their life savings are now tortured by the prospect of losing the only

money they have left in the world – the tax refunds they obtained from the Internal Revenue

Service as a result of their theft losses.

**The Benefits of SIPA to the Financial Services Industry**

101.   SIPA was enacted in 1970 at the behest of the Financial Services Industry which was seeking to relieve itself of the administrative expense of having to register customer securities with the issuing corporations every time a customer purchased new securities for his account.  *See* Joel Seligman, *The Transformation of Wall Street:  A History of the Securities Exchange Commission and Modern Corporate Finance,* 451 n.31 (1995) (Prior to enactment of SIPA, "Stock certificates and related documents were 'piled halfway to the ceiling' in some offices; clerical personnel were working overtime, six and seven days a week, with some firms using a second or even a third shift to process each day's transactions.").

102.   In addition to being relieved of the administrative expense of salaries for people whose sole function was to register securities, the Financial Services Industry wanted the flexibility and profits that would come with investors allowing the firms to hold securities in street name.  *See An Investor's Guide to the Alternatives of Holding Physical Certificates,* published by the Securities Industry and Financial Market Association, available at http://www.sifma.org/services/publications/pdf/PhysCertGuide2alternatives.pdf (stating that the Securities Industry and Financial Market Association "strongly supports and encourages [street name] type of ownership").

103.   Securities held in street name could be utilized by the brokerage firms to generate profits for themselves.  The securities could be loaned out, could be sold and repurchased, and could be borrowed against, while in the possession of the brokerage firms, whereas securities directly registered in the name of the customer could not be utilized for any purpose by the brokerage firms**.  *See, e.g.,* 17 C.F.R. 240.8c-1; 17 C.F.R. 15c-1.

104.   In order to induce investors to allow brokerage firms to hold securities in street name, the Financial Services Industry realized it would have to provide some insurance to

29

investors for the risk that a broker might be dishonest and steal the street name securities or not
purchase them in the first place.  Hence, the Industry developed the idea of SIPA to provide
SIPC insurance to investors and, thereby, to induce them to invest in securities held in street
name.  This would allow the Financial Services Industry to utilize the investors' securities for
their own enrichment while in the brokers' possession.  As a result of the enactment of SIPA,
tens of billions of dollars was invested in the Financial Services Industry in street name
securities.

105.   Yet, now SIPC, acting in bad faith through the defendants, is denying Customers
the insurance to which they are statutorily entitled, while having allowed its members, the
Financial Services Industry, to enjoy the billions of dollars of profits that they made by using
street name securities for the past 40 years.

**In Order To Enrich SIPC at the Customers' Expense, The Directors Have
Changed SIPA's Definition Of "Net Equity," Despite A Statutory Prohibition**

106.   Pursuant to SIPA, the Trustee is obligated to "satisfy net equity claims of
customers." 15 U.S.C. § 78fff(a)(1)(A)-(B).  SIPA defines "net equity" as the value of the
securities positions in the customer's account as of the SIPA filing date, less any amount the
customer owes the debtor.  This is the Statutory Balance of each customer's account.

> The term "net equity" means the dollar amount of the account or accounts of a
> customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such
> customer if the debtor had liquidated, by sale or purchase on the filing date, all
> securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date. . .

15 U.S.C. §78lll(11).

107.   Congress specifically prohibited SIPC from changing any definitions contained in
§ 78lll, which section includes the definition of "net equity."  As stated in SIPA:

> SIPC shall have the power. . . to adopt, amend and repeal, by its Board of
> Directors, such rules as may be necessary or appropriate to carry out the purposes
> of this chapter, including rules relating to . . .the definition of terms in this
> chapter, **other than those terms for which a definition is provided in section
> 78lll of this title. .**

15 U.S.C. § 78ccc(b)(4)(A) (emphasis added).  Because SIPC has no power to change the

statutory definition of "net equity," the defendants have no power to allow the Trustee to use

SIPC's Net Investment Policy.

108.   In a July 2003 and a May 2001 Report, the United States General Accounting

Office ("GAO"), wrote:

> SIPC's statutory mission is to promote confidence in securities markets by
> allowing for the prompt return of missing customer cash and/or securities held at
> a failed firm**.   SIPC fulfills its mission** by initiating liquidation proceedings
> where appropriate and transferring customer accounts to another securities firm or
> returning the cash or securities to the customer **by restoring to the customer
> accounts the customer's "net equity."  SIPA defines net equity as the value of
> cash or securities in a customer's account as of the filing date, less any money
> owed to the firm by the customer, plus any indebtedness the customer has
> paid back** with the trustee's approval within 60 days after notice of the
> liquidation proceeding was published.

GAO Report to the Ranking Minority Member, Energy and Commerce Committee, House of

Representatives entitled "Securities Investor Protection:  Steps Needed to Better Disclose SIPC

Policies to Investors" dated May 2001 at 15; emphasis added; GAO Report to Congressional

Requesters entitled "Securities Investor Protection: Update on Matters Related to the Securities

Investor Protection Corporation" dated July 2003 at 6; emphasis added.

109.   The Second Circuit has recognized the statutory definition of net equity:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a
> customer, to be determined by calculating the sum which would have been owed
> by the debtor to such customer if the debtor had liquidated, by sale or purchase on
> the filing date, all securities positions of such customer" corrected for "any
> indebtedness of such customer to the debtor on the filing date."

*In re New Times Securities Services, Inc.*, 371 F.3d 68, 72 (2d Cir. 2004); *see also Securities Investor Protection Corp. v. BDO Seidman, LLP,* 49 F. Supp. 2d 644, 649 (S.D.N.Y. 1999) ("As defined by SIPA, 'net equity' is the amount that the broker would have owed a customer had it liquidated all the customer's holdings on the date SIPC filed for a protective decree, less any outstanding debt the customer owed to the broker."); *In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 61 n. 2 (B. S.D.N.Y. 1999) ("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

110.    The Southern District of New York Bankruptcy Court also adopted the statutory definition of "net equity" when it wrote, in the December 23, 2008 Order in the Madoff liquidation that:

> **ORDERED, that the Trustee be, and he hereby is, authorized to satisfy such customer claims and accounts** (i) by delivering to a customer entitled thereto "customer name securities," as defined in 15 U.S.C. §78*lll*(3); (ii) **by satisfying a customer's "net equity" claim, as defined in 15 U.S.C. §78*lll*(11),** by distributing on a ratable basis securities of the same class or series of an issue on hand *as* "customer property," as defined in 15 U.S.C. §78*lll*(4), and, if necessary, by distributing cash from such customer property or cash advanced by SIPC, or purchasing securities for customers as set forth in 15 U.S.C. §78fff-2(d) within the limits set forth in 15 U.S.C. §78fff-3(a); and/or (iii) by completing contractual commitments where required pursuant to 15 U.S.C. §78fff-2(e) and SIPC's Series 300 Rules, 17 C.F.R. §300.300 et seq., promulgated pursuant thereto; and it is further

> **ORDERED, that with respect to claims for "net equity," as defined in 15 U.S.C. § 78*lll*(11), the Trustee be, and he hereby is, authorized to satisfy claims out of funds made available to the Trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the Debtor available to satisfy such claims;**

December 23, 2008 Order at 5; emphasis added.

111.    In the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation

in their accounts, despite the fact that the broker had operated a Ponzi scheme for a lengthy

period and had never purchased the securities reflected on the customers' monthly statements.

112.    In fact, Harbeck assured the *New Times* bankruptcy court that customers would

receive securities up to $500,000 **including the appreciation** in their accounts.  As Harbeck

explained, if customers are led to believe that "real, existing" securities had been purchased for

their accounts, then those customers are entitled to get the full value of their securities positions

as of the filing date even if the securities had never been purchased:

> MR. HARBECK:  **Even if they're not there.**
>
> THE COURT:  Even if they're not there.
>
> MR. HARBECK:  Correct.
>
> THE COURT:  In other words, **if the money was diverted, converted –**
>
> MR. HARBECK:  And the **securities were never purchased**.
>
> THE COURT:  Okay.
>
> MR. HARBECK:  **And, if those positions triple, we will gladly give the people their securities positions**.

Hearing Transcript at 37-38, *In re New Times Sec. Servs. Inc.*, 371 F.3d 68 (B. E.D.N.Y. 2000)

(emphasis added).

113.    In a brief SIPC submitted to the Second Circuit in 2005, SIPC represented that its

policy was to honor the legitimate expectations of investors, even where the broker never

purchased the securities.  SIPC wrote:

> [R]easonable and legitimate claimant expectations on the filing date are
> controlling even where inconsistent with transaction reality.  Thus, for example,
> **where a claimant orders a securities purchase and receives a written
> confirmation statement reflecting that purchase, the claimant generally has a
> reasonable expectation that he or she holds the securities identified in the
> confirmation and therefore generally is entitled to recover those securities
> (within the limits imposed by SIPA), even where the purchase never actually
> occurred and the debtor instead converted the cash deposited by the**

> **claimant to fund that purchase** . . . [T]his emphasis on reasonable and
> legitimate claimant expectations frequently yields much greater 'customer'
> protection than would be the case if transactional reality, not claimant
> expectations, were controlling, as this Court's earlier opinion in this liquidation
> well illustrates.

Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at 23-24 (citing

*New Times*)(emphasis added).

114.   The defendants' position in the Madoff case is directly contradicted, not only by

SIPC's treatment of customers in *New Times*, but also by a statement that SIPC's General

Counsel, Josephine Wang, gave to the press on December 16, 2008 – after Mr. Madoff's

confession --  wherein Ms. Wang acknowledged that a Customer is entitled to the securities in

his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if
> clients were presented statements and had reason to believe that the securities
> were in fact owned, the SIPC will be required to buy these securities in the open
> market to make the customer whole up to $500K each.  So if Madoff client
> number 1234 was given a statement showing they owned 1000 GOOG shares,
> even if a transaction never took place, the SIPC has to buy and replace the 1000
> GOOG shares.

December 16, 2008 Insiders' Blog,
http://www.streetinsider.com/Insiders+Blog/SIPCs+Role+In+Madoff-Of-All-
Scams+Could+Save+The+Stock+Market/4243249.html.

115.   The defendants' position conflicts with other federal statutes including the Internal

Revenue Code and ERISA.  For example,

(a)   IRS Form 4506 requires the IRS to destroy returns after seven years.  Yet,

the Trustee is refusing to pay SIPC insurance to Class members who cannot produce records of

deposits dating back 15 – 20 years.

(b)   Rev. Proc. 2009-09, issued by Commissioner Shulman on March 17,

2009, expressly recognizes the income earned by Class members, on which they paid taxes

annually.  Yet, the Trustee has taken the position that the income earned by Class members is not their money.

(c)    Rev. Proc. 2009-20 provides for a five-year carryback of the theft loss. Yet, the Trustee has indicated he intends to "claw back" income withdrawn by Class members over the last six years.

(d)    Plaintiffs were required by law to take mandatory withdrawals from their IRA accounts, their family limited partnerships, and other entities.  Yet, the Trustee is deducting from SIPC insurance the mandatory withdrawals that Class members took and paid taxes on.

116.    Because of SIPC's refusal to comply with SIPA's mandate that the Trustee "promptly" satisfy customer claims based on the Statutory Balances, 15 U.S.C. § 78fff-3(a) and 4(c), SIPC has decided that the Trustee needs a vast team of forensic accountants to pore through decades of records to determine each Class member's net investment before SIPC pays any amount to a Class member.  Clearly, this is inconsistent with the statutory scheme and the legislative intent.

117.    The Class members' "securities positions" are readily ascertainable from their November 30, 2008 statements.  Their net equity is simply the "securities positions" set forth on their last statements, less any amount due the broker/dealer.

**Defendants Are Destroying Investor Confidence In A Period of National Economic Crisis**

118.    The purpose of SIPA, as evidenced by its title, was to "protect" investors who allowed the Financial Services Industry to hold their life savings in street name securities.  *See, e.g.,* H.R. Rep. No. 91-1613, at 3-4 (1970)("[SIPA] will reinforce the confidence that investors have in the U.S. securities markets.").  *See also In re New Times*, 371 F.3d at 87 ("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities markets and protecting

broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 794 (6th Cir.

1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[ ] and

upgrade the financial responsibility requirements for registered brokers and dealers.")(citations

omitted).  SIPA attempted to do this initially by satisfying customers' "net equity" claims for

securities with actual securities only if the debtor held securities of the appropriate class and kind

to satisfy customers' claims, while otherwise customers would receive the cash equivalent of the

value of their securities on the filing date.  SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat.

1636, 1648-50 (1970); H.R. Rep. No. 95-746 (39-41)(statement of SIPC Chairman Hugh F.

Owens).

119.   When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest

shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments],

*[i.e.]*, . . . **the failure to meet legitimate customer expectations of receiving what was in their**

**account at the time of their broker's insolvency**."  D 922 Cong. Rec. H. 36326 (daily ed. Nov.

1, 1977)(statement of Rep. Robert C. Eckhardt)(emphasis added).  See also Hearing on H.R.

8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. On Interstate

and Foreign Commerce, 94th Cong. 63 (1975)("The basic framework of the 1970 Act in regard to

satisfaction of customers' claims should be modified to better meet the legitimate expectations of

customers.") (report to the SIPC Board of Directors by the Special Task Force to consider

possible amendments to SIPA); Hearing on H.R. 8331 before the Subcomm. on Consumer

Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81

(1977) ("The proposed [1978] amendments carry out the Task Force recommendations and are

designed to make the Act more responsive to the reasonable expectations of investors.")

(statement of SIPC Chairman Hugh F. Owens); Hearing on H.R. 8064 Before the Subcomm. on

Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th

Cong. 161-162 ("[T]he principal purpose of these amendments is to meet more nearly the

reasonable expectations of brokerage firm customers.")(statement of SEC Commissioner Philip

A. Loomis, Jr.).

120.    A customer's reasonable expectations were that their actual securities, as shown on

their statements, would be returned to them "in the form they existed on the filing date." H.R.

Rep. No. 95-746, at 21. Thus, SIPA was amended to state that "[t]he trustee shall, to the extent

that securities can be purchased in a fair and orderly market, purchase securities as necessary for

the delivery of securities to customers in satisfaction of their claims for net equities. . ." 15

U.S.C. § 78fff-2(d); SIPA § 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978).

121.    Here, the legitimate expectations of the Customers was contained in the account

statements and trade confirmations they received. They expected that their accounts held the

securities reflected therein. Thus, recognizing Customer claims in the amount of their Statutory

Balances will further the goals of SIPA, as memorialized in the legislative history.

122.    Nor does the statute contain an exception where a dishonest broker, like Madoff,

never purchased the securities. On the contrary, Congress specifically contemplated that

"securities positions" reflected in a customer's statements could include securities that were

never actually purchased. The Senate and House Reports on the 1978 amendments to SIPA

show that SIPA was intended to cover securities that the broker-dealer did not actually purchase:

> Under present law, because securities belonging to customers may have been lost,
> improperly hypothecated, misappropriated, **never purchased** or even stolen, it is
> not always possible to provide to customers that which they expect to receive, that
> is, securities which they maintained in their brokerage account. . . By seeking to
> make customer accounts whole and returning them to customers in the form they
> existed on the filing date, the amendments. . . would satisfy the customers'
> legitimate expectations. . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, **never purchased**, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. No. 95-746 at 21 (emphasis added).

123.   Thus, there is absolutely no support for the defendants' Net Investment Policy in either SIPA or its legislative history. Instead, the legislative history is in accordance with the statute: Customers are entitled to claims in the amount of their Statutory Balances, consistent with their legitimate expectations.

**SIPC And the SEC Consented to Controlling Second Circuit Authority
Entitling Customers to Claims In The Amount Of Their Statutory Balances**

124.   In *New Times*, the trustee and SIPC took precisely the position they are required to take here, *i.e.,* that the claims of customers who received trade confirmations and account statements reflecting the purchase of real securities should be allowed in the amount of their last statements, even though the securities were never purchased. Here, the Customers are in the exact same position as the *New Times* customers whose claims were satisfied – they all received statements showing securities positions in actual, existing securities.

125.   *New Times'* principal, William Goren, engaged in a "classic Ponzi scheme" where new investors' money was used to pay earlier investors. *In re New Times Sec. Servs. Inc.* ("*New Times I*"), 371 F.3d 68, 72 n.2 (2d Cir. 2004). However, while Madoff presented Customers with trade confirmations and statements showing securities positions in real securities, only some *New Times* customers were presented with statements showing investments in mutual funds that actually existed (the "Existent Securities"); the remaining *New Times* customers received statements showing that they were invested in money market funds that were totally fictitious (the "Non-Existent Securities"). 371 F.3d at 71-72.

126.    In *New Times,* SIPC treated the two categories of customers differently.  SIPC
applied the statutory net equity definition to the Existent Securities customers' claims by paying
the claims according to the full value of those securities positions as of the date of the liquidation
filing, and the Second Circuit endorsed that treatment.   However, with respect to customers
whose statements showed Non-Existent Securities, SIPC used the net investment methodology
that the Trustee and defendants are using in the Madoff liquidation.  The customers with Non-
Existent Securities appealed SIPC's treatment.  The Second Circuit took particular note of
SIPC's position:

> investors who were misled by Goren to believe that they were investing in mutual
> funds that in reality existed were treated much more favorably.  Although they
> were not actually invested in those real funds – because Goren never executed the
> transactions, the information that these claimants received on their account
> statements "mirrored what would have happened had the given transaction been
> executed."  [Br. for New Times Trustee and SIPC] at 7 n.6.  As a result, the
> Trustee deemed those customers' claims to be "securities claims" eligible to
> receive up to $500,000 in SIPC advances.  *Id*.  The Trustee indicates that this
> disparate treatment was justified because he could purchase real, existing
> securities to satisfy such securities claims.  *Id*.  Furthermore, the Trustee notes
> that, if they were checking on their mutual funds, the "securities claimants," in
> contrast to the "cash claimants" bringing this appeal, could have confirmed the
> existence of those funds and tracked the funds' performance against Goren's
> account statements. *Id*.

*New Times I*, 371 F.3d at 74.

127.    The Second Circuit found that the customer's legitimate expectations based on
written confirmations and account statements control how a "net equity" claim is determined,
citing SIPC's Series 500 Rules, 17 C.F.R. §§ 300.500-300.503, which confirm the importance of
written confirmations.  The Court explained that "the premise underlying the Series 500 Rules
[is] that a customer's 'legitimate expectations' based on written confirmations of transactions,
ought to be protected."  371 F.3d at 87.  It noted that "Under the Series 500 Rules, whether a
claim is treated as one for securities or cash depends not on what is *actually* in the customer's

39

account, but on what the customer has been told by the debtor in written confirmations." *Id* at 86 (emphasis in original). *See also In re Oberweis Sec., Inc*., 135 B.R. 842, 847 n. 1 (B. N.D. Ill. 1991) ("The court agrees with the trustee's argument that Congress did not intend to treat customers without confirmations the same as those with confirmations; that customers with confirmations have a legitimate expectation of receiving securities, but customers without confirmations do not have the same expectation.").

128.   In contrast to those *New Times* customers whose statements showed Existent Securities, the Second Circuit held that the net equity of *New Times* customers whose statements showed Non-Existent Securities should be determined as the amount of money invested minus any withdrawals. *New Times I*, 371 F.3d at 88.   The court held that customer recoveries based on "fictitious amounts in the firm's books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality." *Id.* Obviously, customers whose confirmations indicated the purchase of Non-Existent Securities could not have had a legitimate expectation that they owned those securities. Thus, only when securities positions "necessarily have no relation to reality," *i.e.*, are based on securities that *do not exist*, should a "cash in minus cash out" methodology be employed.

129.   Here, each Customer received trade confirmations and account statements showing investments in real securities.  Thus, each Customer had a legitimate expectation that he owned the assets shown on his last statement and is entitled to a claim in the amount of the balance on his November 30, 2008 statement.

130.   In 2006, a different Second Circuit panel considered related issues and found, once again, "[i]t is a customer's legitimate expectations on the filing date . . . that determines the availability, nature and extent of customer relief under SIPA." *In re New Times Sec. Servs., Inc*.

463 F.3d 125, 128 (2d Cir. 2006) (*New Times II*). The court added, in *New Times II,* that, in the case of customers who believed they held fictitious securities:

> Because there were no such securities, and it was therefore impossible to reimburse customers with the actual securities or their market value on the filing date (the usual remedies when customers hold specific securities), the [*New Times I* Court] determined that the securities should be valued according to the amount of the initial investment. The court declined to base the recovery on the rosy account statements telling customers how well the imaginary securities were doing, because treating the fictitious paper profits as within the ambit of the customers' "legitimate expectations" would lead to the absurdity of "duped" investors reaping windfalls as a result of fraudulent promises made on fake securities . . . The court looked to the initial investment as the measure for reimbursement because the initial investment amount was the best proxy for the customers' legitimate expectations.

*New Times II,* 463 F.3d at 129-30 (citations omitted).

131. SIPC and the *New* Times Trustee valued Existent Securities customers' claims in accordance with the statutory definition of net equity even when those claims included mutual fund shares that were purchased through "dividend reinvestments," despite the fact that since the initial securities had never been purchased, the customers **had received no dividends to reinvest**. Specifically:

> [I]nvestors who believed that their accounts held shares of mutual funds that actually existed (but were never purchased for their accounts) are having their claims (both as to shares of mutual funds never purchased by Goren and shares shown in customer statements as purchased through dividend reinvestment) satisfied by the Trustee up to the statutory maximum of $500,000.

Claimants' Joint Mem. of Law in Opposition to Joint Motion of Trustee and SIPC for Order Upholding Determinations at 3, *SEC v. Goren*, 206 F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-CV-970).

> [W]hereas the Trustee has disallowed that portion of the claim of [the Non-existent Securities] investors representing shares of [the Non-existent Securities] purchased through dividend reinvestment, the Trustee has allowed that portion of the mutual fund investors' claims [i.e., "Existent Securities" investors' claims] as represents shares of such mutual funds purchased by them through dividend reinvestment.

41

Limited Objection to Trustee's Determination of Claim at 6 n.4, *SEC v. Goren*, 206 F. Supp.2d

344 (E.D.N.Y. 2002) (No. 00-CV-970).

132.    SIPC and the Trustee described their method in the *New Times* liquidation:

In every case [of an 'Existent Security' customer], the Trustee has been able to
identify the actual mutual fund in question by cross-checking the information
supplied by Goren on the customer statements, including share price information,
with publicly available information and then been able to purchase that security.

Joint Mem. of Law in Support of Trustee's Motion for an Order Upholding the Trustee's

Determinations with Respect to Claims Filed for Investments in Non-Existent Money Market

Funds and Expunging Objections to Those Determinations, *SEC v. Goren*, F. Supp. 2d 344

(E.D.N.Y. 2002) (No. 00-CV-970).  They further stated that where customers' statements

reflected securities positions in closed mutual funds, "the Trustee properly gave the customers

cash equal to the filing date values of the closed mutual funds."  Reply Mem. in Further Support

of Trustee's Motion for Order Upholding Determinations at 20, *S.E.C. v. Goren*.

133.    Even when challenged regarding their position by customers of the "Non-existent

Securities," SIPC (and the SEC) stood by their approach with respect to the Existent Securities

customers.  In an *amicus curiae* brief, the SEC stated "[o]ur view [is] that when possible, SIPA

should be interpreted consistently with a customer's legitimate expectations based on

confirmations and account statements."  Br. of the SEC, Amicus Curiae, In Partial Support of the

Position of Appellants and In Partial Support of the Position of Appellees ("SEC Amicus Curiae

Brief") at 13, New Times I (No. 02-6166).

134.    The briefs filed by SIPC and the *New Times'* Trustee likewise stated that:

In those cases [concerning the payment of interest and dividends on bona fide
mutual funds] the claimants had an objectively legitimate expectation of receiving
interest/dividends because the security in question had actually earned them.
Here, the bogus mutual fund [the Ficitious New Age Fund] was never organized
as a mutual fund and had no assets or investments.

Br. for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc. and Securities Investor Protection Corporation, at 38, *New Times I* (No. 02-6166).

135.   SIPC stated in its brief in *New Times II* that:

> [R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality.  Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at 23-24 (citing *New Times*)(emphasis added).  Thus, SIPC recognized that it is "claimant expectation," rather than "transactional reality" that controls.

136.   There were no "imaginary securities" listed on the Madoff account statements. Thus, *New Times II* does not apply. Yet, in direct contravention of SIPC's position in *New Times*, in which SIPC "gladly" paid customers whose statement showed Existent Securities that were never purchased their full claims, even if the actual securities' value had "triple[d]," here, the Trustee has refused to recognize the Customers' Statutory Balances.

137.   The  Customers had the legitimate expectation that they owned real securities. Indeed, they could have had no other expectation, based upon the trade confirmations and account statements they received.  Thus, SIPC must employ the same method used in *New Times* and honor Customer claims in the amount of their Statutory Balances.

**The Directors' Justification for SIPC'S Net Investment Policy Is Specious**

138.    SIPC has justified the Trustee's rejection of SIPA's definition of "net equity" by

claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a
> claimant is owed perpetuates the Ponzi Scheme.  It allows the thief . . . Mr.
> Madoff . . . to determine who receives a larger proportion of the assets collected
> by the Trustee.

www.foxbusiness.com/.../madoff-victims-greater-transparency-questions-linger/.  This

justification is completely specious.  SIPA honors the legitimate expectation of the customer,

even if the customer is dealing with a thief.  For precisely this reason, SIPC persuaded the

Second Circuit to accept a thief's books and records in *New Times* as to all customers who had a

legitimate expectation that their statements were accurate.

139.    In fact, SIPC's "thief" rationale was flatly rejected in *New Times I,* when the

district court held that the Trustee's determination that holders of Non-Existent securities were

not entitled to claims in the amount listed on their account statements erroneously 'hinged on the

unilateral actions of the fraud-feasor who embezzled his client's funds.'"  371 F.3d at 75.  The

Second Circuit did not take the fraud-feasor's role into account when vacating in part the district

court's decision.

140.    Under the SIPA statutory scheme, the dishonesty of the broker is irrelevant to the

allowance of customer claims.  The only issue in determining the amount of a customer's claim

is whether the customer had a "legitimate expectation" that the assets reflected on his last

statement belonged to him.

141.    After 14 months of investigation, the Trustee has identified only two Madoff

investors who might not have had a "legitimate expectation" that their November 30, 2008

statements were accurate.  The Trustee has sued Jeffry Picower and Stanley Chais alleging that

Case 2:10-cv-00934-SH    Filed Document 1    Filed 02/28/10    Page 45 of 72

they had extraordinary returns in their accounts and received restated account statements showing retroactive $100 million losses. Assuming these allegations are true, Picower and Chais could not have had a "legitimate expectation" that their account statements were accurate. However, the fact that the Trustee has identified one or two customers who may not have had a legitimate expectation that their statements were accurate does not justify rejecting the statutory definition of "net equity" and frustrating the legitimate expectations of 4,000 Customers.

**SIPC's Net Investment Policy Is Contrary To Its Practice For 38 Years**

142.   The Directors' defiance of SIPA's definition of net equity, despite the fact that Customers received account statements and written confirmations showing investments in real securities, is inconsistent with 38 years of SIPC's history. Harbeck admitted as much in January 2009 when he announced: "We've modified our usual claim form to ask investors a question that's unique to this case, which is how much money did you put in and how much money did you take out." (Jan. 6, 2009, CNBC). He also stated that "[O]ne of the first things that we did . . . was to modify our standard claim form to make sure that we asked the claimants themselves what evidence they had in terms of money in and money out, because that's going to be one of the critical factors." (Jan. 5, 2009, Stephen Harbeck, testimony before House Financial Services Committee). In fact, the Madoff Class member Claim form contains the unprecedented language:

> In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.

143. Thus, Harbeck recognized the unprecedented nature of SIPC's approach which, in fact, is inconsistent with the position it has taken in its 39 year history. Indeed, SIPC always led investors to believe that SIPC insurance was based upon their last brokerage statement:

> In the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you. This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement.

*See* SIPC/SIFMA brochure Understanding Your Brokerage Account Statements, at 5, SIPC Website 2009.

> How is the amount of a customer's claim determined? The amount of the customer's claim, excluding any securities registered in his name and returned to him, is called his "net equity." **The net equity of a customer's account is determined by adding the total value of cash and securities the firm owes the customer and subtracting the total value of cash and securities the customer owes the firm.**

*See* How SIPC Protects You at 14, 1994 (emphasis added), www.jprcapital.com/howsipc.pdf.

> A customer's "net equity" is, in general, what the broker owes the customer less what the customer owes the broker, exclusive of "specifically identifiable property." Essentially, Section 6(c)(2)(A)(iv) [codified at 15 U.S.C. § 78lll(11)] defines "net equity" as the dollar amount of a customer's account determined after giving effect to the completion of any open contractual commitments (discussed below), excluding therefrom any specifically identifiable property reclaimable by the customer, and subtracting the indebtedness (if any) of the customer to the debtor from the sum which would have been owing by the debtor to the customer had the debtor liquidated all other securities and contractual commitments to the customer on the filing date. In short, a customer's "net equity" claim is for a liquidated sum.

*See* SIPC Annual Report 1973, at 21.

144. Having induced investor reliance upon the promise of SIPC insurance based upon the investors' last statement, the defendants cannot now change the rules, simply because they did not sufficiently assess their members to fund SIPC's liabilities.

46

**The Directors Have Violated SIPA's Mandate To "Promptly" Pay Customer Claims**

145.   Congress made absolutely clear its intent to minimize the devastation to customers

of an insolvent broker/dealer through prompt payment of SIPC insurance.  SIPA requires that

SIPC "promptly" pay SIPC insurance to investors of a liquidated brokerage firm:

GENERAL PROVISIONS OF A LIQUIDATION PROCEEDING

**(a) PURPOSES**

The purposes of a liquidation proceeding under this chapter shall
be—

(1) **as promptly as possible** after the appointment of a trustee in
such liquidation proceeding, and in accordance with the provisions
of this chapter—

(A) to deliver customer name securities to or on behalf of the
customers of the debtor entitled thereto as provided in §78fff-
2(c)(2) of this title; and

(B) to distribute customer property and (in advance thereof or
concurrently therewith) otherwise satisfy net equity claims of
customers to the extent provided in this section.

**PAYMENT TO CUSTOMERS.-SIPC shall promptly satisfy all
obligations of the member to each of its customers relating to,
or net equity claims** based upon, securities or cash by the delivery
of securities or the effecting of payments to such customer (subject
to the provisions of section8 (d) and section **9** (a) ) insofar as such
obligations are ascertainable from the books and records of the
member or are otherwise established to the satisfaction of SIPC.

15 U.S.C. §78fff-2(c)(2); emphasis added.  *See also,* 15 U.S.C. § 78fff-3(a).

146.   Congress intended for the trustee to promptly pay customer claims based upon the

debtor's books and records, without the filing of proofs of claim:

**[SIPA] establishes procedures** for prompt orderly liquidation of
SIPC members when required and **for making prompt
distributions and payments on account of customers' claims
without need for formal proofs of claim.**

*       *       *

The committee also believes that **it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations.**

*       *       *

> **Because of the difficulties involved in filing proofs of claim . . ., the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.**

See S. Rep. 91-1218, at 10, 11, 12 (1970), *reprinted in* Federal Securities Laws Legislative History 1933-1982, Vol. IV, at 4642, 4643, 4644 (1983) (emphasis added)).

147.   The Southern District of New York Bankruptcy Court has recognized Congress' intent that SIPC proceedings be conducted quickly in order to minimize the devastation to customers:

> Congress itself has commanded **swift** action. For example, the SEC and self-regulatory organizations are required to "**immediately notify**" SIPC of concerns about the financial stability of a SIPC member. 15 U.S.C.A. § 78eee(a)(1). A Court determining that a protective decree is warranted must "**forthwith**" appoint a trustee, 15 U.S.C.A. § 78eee(b)(3), and remove the case to a Court with jurisdiction over bankruptcy cases. 15 U.S.C.A. § 78eee(b)(4). The trustee is required to investigate the operation of the debtor's business and report its results to SIPC "**as soon as practicable**." 15 U.S.C.A. § 78fff-1(d). Among the stated purposes of a liquidation proceeding is to make customers whole "**as promptly as possible after the appointment of a trustee," 15 U.S.C.A. § 78fff(a), who is required to "promptly discharge** . . all obligations of the debtor to a customer relating to securities." 15 U.S.C.A. § 78fff-2(b). **SIPC fund moneys must be advanced to the trustee up to certain limits "to provide for prompt payment and satisfaction of . . . claims of customers." 15 U.S.C.A. § 78fff-3(a). Congress has commanded customer damages to be repaired promptly.**

*In re Donald Sheldon & Co., Inc.*, 153 B.R. 661, 667 (B. S.D.N.Y. 1993); emphasis added.

Case 2:10-cv-00934-SH    Document 1    Filed 02/28/10    Page 49 of 72

148.   The December 23, 2008 order entered in the Madoff liquidation specifically

incorporates the time periods mandated by SIPA.  The Order states:

> ORDERED, that the Trustee be, and he hereby is, authorized to
> satisfy, **within the limits provided by SIPA**, those portions of any
> and all customer claims and accounts which agree with the
> Debtor's books and records, or are otherwise established to the
> satisfaction of the Trustee pursuant to 15 U.S.C. §78fff-2(b),
> provided that the Trustee believes that no reason exists for not
> satisfying such claims and accounts

December 23, 2008 Order at 5; emphasis added.

149.   Congress intended that SIPC would pay claims promptly so as to minimize the

impact on investors who were victimized by a dishonest broker/dealer.  The intent was that SIPC

would pay claims as quickly as the FDIC.  As stated in the legislative history of SIPA:

> The intention of SIPC, like the FDIC, is to minimize losses to and
> to maintain public confidence in the institutions the public deals
> with.

S. Rep. 91-1218, at 9, *reprinted in* Federal Securities Laws Legislative History 1933-

1982, Vol. IV, at 4641.

150.   According to the FDIC's website, "It is the FDIC's goal to make deposit insurance

payments within two business day[s] of the failure of the insured institution."

http://www.fdic.gov/consumers/banking/facts/payment.html.  Yet in the Madoff liquidation,

more than 14 months after the institution of the liquidation proceeding, the Trustee has paid

SIPC insurance to only one-third of the claimants who, he has determined, are entitled to SIPC

insurance.

151.   Yet Harbeck led investors to believe that SIPC would pay their claims within two –

three months.  As quoted in a November 15, 2007 article available on Kiplinger.com at

www.kiplinger.com/printstory.php?pid=12842, Harbeck stated:  "The fastest that an investor

Case 2:10-cv-00934-SH   Document 1   Filed 02/28/10   Page 50 of 72

could conceivably get back in control of one's account is one week" but he added that "In most

situations, it takes two to three months."  The article further stated that "the process can stretch

out even longer if the brokerage firm kept shoddy records."

152.   The brochure on SIPC's website, "How SIPC Protects You," also states that

"[m]ost customers can expect to receive their property in two to three months."  It notes that

delays of "several months" can take place where the broker's records are inaccurate and that

there might be delays in cases where the broker was involved in fraud, but does not state that

such delays will be substantial.

153.   Here, as part of the defendants' fraudulent scheme, they have mandated that SIPC

delay the payment of claims as much as possible.  In recognition of the unconscionable delay in

payment of SIPC insurance to destitute Customers, but without any statutory authority, the

Trustee established a "Hardship Program" pursuant to which Customers who, through the

disclosure of the most intimate personal information, are deemed in the Trustee's sole discretion

to be hardship cases, are entitled to receive "expedited" treatment.

154.   However, the Trustee has given himself more time to pay "hardship" cases than

SIPA contemplates a trustee will need to pay all customers.  The Trustee has given himself an

initial period of 20 days to decide whether or not an individual qualifies for the Hardship

Program.  If an individual does qualify, then his claim "will be expedited in the claims process"

but "the Trustee cannot guaranty the timing of determination of any claim."  (*Id.*). The best that

an individual can hope for is that, if his account was opened after January 1, 2006, "the Trustee

will endeavor to mail a determination of [the] claim within 20 days of [the] claim qualifying for

the Hardship Program."  (*Id.*). Thus, if an individual's account was opened after January 1, 2006,

the Trustee will "endeavor" (but does not promise) to mail a determination of claim within 40

Case 2:10-cv-00034-JSH   Filed Document 1   Filed 02/28/10   Page 51 of 72

days, but only if the Class member discloses absolutely everything about his finances first.  Of

course, the time between determination and payment can be another 60 days.

155.   There is no provision in SIPA that contemplates that a trustee will take 60 days to

determine a claim, no matter when the investment was made.  There is nothing in SIPA that

restricts prompt payment to those who can demonstrate to the Trustee's satisfaction that they are

suffering "hardship."  There is nothing in SIPA which allows a trustee to provide for prompt

payment to recent customers and delayed payment to long-standing customers.  That is precisely

why SIPA requires the Trustee to fix a customer's claim at his Statutory Balance.

156.   The conduct of the defendants and the Trustee has been particularly injurious to

elderly investors.  The Trustee has denied SIPC insurance to "hardship" Customers whose

investments in Madoff date back 15-40 years who did not retain their records of deposits.  The

Trustee has taken the position that it is the Customer's burden to prove his investments and, if

the Customer did not retain records from 15-40 years ago, the Customer loses and SIPC wins.  In

fact, the Trustee's counsel has informed Customers that the Trustee will not provide Customers

with Madoff's own records – as to which the Trustee has exclusive access.  Thus, even if the

Trustee has a record of Customer deposits, the Trustee will not make those records available to

the Customer.  In this way, of course, SIPC can deny coverage to Customers who had no reason

to, and did not, retain records of deposits going back 15-40 years.

157.   As to the remainder of the "hardship" cases, the Trustee has taken months to

resolve "hardship" cases, during which the Trustee has sought to exact compromises from

elderly, destitute Customers.  In several instances, the Trustee's counsel have affirmatively

misrepresented the law to "hardship" cases in order to induce them to accept from SIPC less than

the sums to which they are indisputably entitled.  In addition, the Trustee has regularly deducted

from Customers' SIPC insurance alleged "preferences," despite the fact that SIPA does not
authorize such offsets and despite the fact that there is a substantial question as to whether the
preference provision of the Bankruptcy Code applies to Customers who simply received
distributions from their accounts of their own money, in the ordinary course of business of
themselves and Madoff.

158.   Under the Unfair Clawback Policy, defendants, through Picard, are attempting to
claw back funds from Customers whom Picard has already acknowledged are "Hardship Cases."

**SIPC Has Always Delayed Payment of Customer Claims In Violation of SIPA**

159.   Although SIPA mandates that securities be replaced in customers' accounts
"promptly," SIPA's strategy of delay is not new.  Indeed, as early as 1980, SIPC began its
strategy of bad faith delay in payment.  In *In re Investors Security Corp.*, 6 B.R. 415 (B.W.D. Pa.
1980), SIPC and the trustee argued that two accounts, one held by an investor individually and
one held jointly by the investor and his wife, should be treated as belonging to one "customer,"
thus making the investor and his wife entitled only to the statutory minimum, rather than twice
the statutory minimum.  The court found that the two accounts were held by two separate
customers, and ordered a judgment against the trustee in the statutory minimum at that time.
However, SIPC had successfully delayed for nearly five years from the date the claims were
filed.

160.   In a later proceeding in the same case, *In re Investors Security Corp.*, 30 B.R. 214
(B. W.D.Pa. 1983), SIPC and the trustee filed a motion for reconsideration and to alter
judgments after the court entered a judgment finding that two investors were "customers" within
the meaning of SIPC.  After reviewing all of the "expanded record, counsel's motions and their
brief in support thereof," the  court remained "firmly convinced that the [investors] fall squarely

within the definition of 'customer' as set forth in the SIPA statute, and are therefore entitled to its protection." However, SIPC obtained a delay of nearly eight months between the court's first decision in favor of the investors and its second decision, reiterating its findings in favor of the investors.

161. In *SIPC v. Ambassador Church Finance/Development Group, In*c., 788 F.2d 1208 (6th Cir. 1986), SIPC litigated for over seven and one half years the question of whether investors were "customers" under SIPA, a question that the Sixth Circuit decided in favor of the investors.

162. In *In re C.J. Wright & Co., Inc*., 162 B.R. 597 (B. M.D. Fla. 1993), claimants objected to the trustee's determination that they were not customers. The claimants had deposited money with the debtor in the belief that the debtor was purchasing CD's with such funds. The trustee argued that the funds were loans because CD's were never purchased with the funds. The court found that the claimants did not intend to loan funds to the debtor, but entrusted the monies with the debtor for the purposes of purchasing securities (the CD's). Thus, the court ruled claimants were customers within the meaning of SIPA and had claims for cash. Yet, through litigation, SIPC delayed paying such customers for over one year. Harbeck acted as counsel for SIPC in the matter.

163. In *Schultz v. Omni Mutual, Inc*., 1993 U.S. Dist. LEXIS 18464 (S.D.N.Y. 1993), the district court reversed the bankruptcy court's holding, which granted the trustee summary judgment. The bankruptcy court had held that it did not have to reach the issue of whether claimants were customers because their claim was grounded in fraud, negligence, breach of contract and overreaching. On appeal, the district court found that there was a material issue of fact as to whether the claimants had deposited money with the debtor and given the debtor's agent a direction to invest their money. The district court further held that whether the claimants

were "customers" had to be resolved before determining how their claims for fraud, breach of

contract, negligence or overreaching might affect their SIPC coverage.  SIPC delayed paying the

claims for over one year.

164.   In *In re Primeline Securities Corp*, 295 F.3d 1100 (10th Cir. 2002), SIPC delayed

payment of customer claims for four years.  The bankruptcy court had ruled that claimants (and

others) were entitled to payments, but the trustee and SIPC had filed an appeal.  The district

court found that the claimants were not entitled to payments and were not "customers." The

Court of Appeals reversed and remanded the district court order denying customer status to

claimants with respect to funds each claimant sought to invest in debentures. The protective

order was entered in 1998, but the 10th Circuit decision was not entered until 2002.  Harbeck was

on the brief for SIPC and the trustee.

165.   In *In re Investors Center*, 129 B.R. 339 (B. E.D.N.Y. 1991), Irving Picard, as SIPC

Trustee, advanced the argument that customers with unexecuted sales orders were entitled to

securities and not the cash they would have received if the sales were executed.  Picard even

threatened, in letters rejecting the claims, that "if the sales transactions had been completed and

your account credited with the proceeds, the Trustee would have had the right to seek to avoid

the transactions as involving a fraudulent transfer under the Bankruptcy Code."  He withdrew his

threat to seek to avoid the transactions, but insisted that the claims were only for the securities

the customers sought to sell.  The court stated:  "Except that the Trustee appears to urge this

most seriously, the Court would deem the contention too frivolous to even consider."  In

rejecting Picard's argument, the court cited 17 C.F.R. 501(a)(1), (2) which mandates that the

customers had claims for cash, and not securities, and stated "**The Rules are as binding on the**

Case 2:10-cv-00934-TSH Filed Document 1 Filed 02/28/10 Page 55 of 72

**Trustee and on SIPC as they are on the public.  The Trustee is not free to ignore them or rewrite them.**" (emphasis added).

166.   Yet, just as they tried to do in *Investors Center*, SIPC, acting through defendants, have rewritten SIPA to enrich the Financial Services Industry at the expense of the Customers.

**The Directors Have Ignored Serious Concerns Raised By The GAO and Congress**

167.   In 1999, Representative John D. Dingell raised concerns about SIPC's performance and asked the GAO to "examine how the corporation determines the legitimacy of investor claims and whether oversight of the corporation by the SEC is adequate."  June 22, 2001 New York Times article, "U.S. Report Faults Agency That Oversees Investor Claims."

168.   The GAO Report issued in 2001 found that there were "significant deficiencies" in SIPC, and Rep. Dingell told the New York Times that "SIPC's mission is to promote confidence in securities markets by facilitating the prompt return of missing customer cash and/or securities held at a failed firm.  However, the large number of claims denied in several recent high-profile SIPC liquidation proceedings has raised concern that SIPC policies may unduly limit the actual protection afforded consumers."  (*Id.*).

169.   Representative Paul E. Kanjorski was also quoted in the New York Times article as stating that "According to the GAO, both the SIPC and the SEC have fallen short in their duty to make sure that investors are informed on the actions they need to take to protect their interests.  Both Congress and the administration must address these concerns and deficiencies promptly, especially as more Americans than ever – roughly 50 percent – are invested in the stock market. (*Id.*).

170.   Representative Dingell was so agitated by SIPC's policies that he sent a letter to the Acting Chairmen of the SEC and SIPC on June 20, 2001 regarding SIPC's deficiencies in the

wake of the GAO report, and posted the letter to the Committee on Energy and Commerce's

website.  Specifically, Rep. Dingell stated that

> **the large number of claims denied in several recent high-
> profile SIPC liquidation proceedings have raised concerns that
> SIPC policies and practices may unduly limit the actual
> protection afforded customers**.  **Critics argue that SIPC's main
> goal has been to protect its industry-supplied fund rather than
> to protect customers as contemplated by SIPC**.  *See,* "Many
> Holes Weaken Safety Net for Victims of Failed Brokerages," <u>The
> New York Times</u>, Sept. 25, 2000; "Group Assails Insurer of
> Investors," <u>The Washington Post</u>, July 21, 1999; and "Many
> Unhappy Returns:  Ex-Stratton Customers still fighting to recoup
> $130m," <u>Newsday</u>, Dec. 20, 1998. (Emphasis added.)

171.   The 2001 GAO Report emphasized the importance of SIPC honestly explaining the

limits of its insurance protection to investors and indicated concerns with SIPC's performance.

172.   SIPC's then-president, Michael E. Don, issued a statement about the GAO report in

a June 22, 2001 press release on its website.  SIPC whitewashed the GAO report, stating that

"Contrary to some published reports, the GAO report does not find any significant deficiencies

on the part of SIPC and I encourage fair-minded individuals to read the report for themselves in

order to get an accurate grasp of what the GAO actually concluded."  SIPC further stated that it

prided itself on "the fact that the SEC has never found a significant problem of any kind in how

SIPC operates."  In the press release, SIPC also made some statements regarding its plans to

simplify and expand its brochure, "How SIPC Protects You," to make certain changes to its

website and to increase its investor education outreach activities, and represented that it had

taken such actions in response to the GAO report.

173.   Yet, despite its promises, SIPC ignored Rep. Dingell's concerns and certain of the

GAO recommendations.  In a July 2003 follow up report, GAO found that SIPC had not

remedied some of its deficiencies in educating the public.  July 2003 United States Accounting

Office Report to Congressional Requesters, "Securities Investor Protection:  Update on Matters

Related to the Securities Investor Protection Corporation" at 3-4.

174.   The July 2003 GAO Report also caused consternation in Congress.  On August 11,

2003, Rep. Barney Frank, then the Ranking Member of the Committee on Financial Services,

Rep. Paul E. Kanjorski, then the Ranking Member of the Subcommittee, and Rep. John D.

Dingell, then the Ranking Member on the Committee on Energy and Commerce, wrote to the

SEC, SIPC and the GAO regarding the GAO stating that the Congressmen "cannot overstate the

importance of the SIPC program in the ongoing effort to restore and maintain investor

confidence."

175.   In their August 11, 2003 letter, Reps. Frank, Kanjorski and Dingell declared that

they were "deeply troubled by th[e] state of affairs" at SIPC outlined the GAO Report.

Specifically, the SEC had found in an examination of SIPC that:

> (1) some statements in SIPC's brochure and Web site might
> overstate the extent of SIPC coverage and mislead investors; (2)
> there was insufficient guidance for SIPC personnel and trustees to
> follow when determining whether claimants have established valid
> unauthorized trading claims, one. . principle source of investor
> complaints; (3) SIPC had inadequate controls over the fees
> awarded to trustees and their counsel for services rendered and
> their expenses; (4) SIPC lacks a retention policy for records
> generated in liquidations where SIPC appoints an outside trustee;
> and (5) the SIPC fund was at risk in the case of failure of one or
> more of the large securities firms.

176.   Reps. Frank, Kanjorski and Dingell stated that this situation was "totally

unacceptable and [they] urge[d] SIPC to fix these shortcomings, which [they] consider[ed] to be

significant, with all deliberate speed before a major problem occurs."  Now, the "major

problem," foreseen by the SEC has come to pass in this case, and defendants' failure to remedy

SIPC's shortcomings has resulted in SIPC's fund being inadequate.

177.   The Congressmen "strongly agree[d]" with the statement in the GAO Report that:

> Disclosure has an important role in securities market regulation,
> and the Securities Investor Protection Corporation (SIPC) has a
> responsibility to inform investors of actions they can take to
> protect their investments and help ensure that investors are
> afforded the full protections allowable under the Securities
> Investor Protection Act of 1970 (SIPA).

*Id.*

178.   Reps Frank, Kanjorski and Dingell added that they agreed with the GAO recommendation that SIPC revise its brochure to provide more specific references to links to investor education information on the SEC web site and web sites of SROs such as NYSE and NASD.  *Id.*

179.   In conclusion, the Congressmen requested that the GAO submit a follow-up report by April 2004 on the SEC, SRO and SIPC progress in implementing GAO's recommendations and addressing the "myriad issues raised by this report and identified by [their] letter, the effectiveness of these reforms, and the need for any further actions."  *Id.*

180.   Despite the serious concerns raised by the Congressmen, SIPC once again issued a rosy press release regarding the GAO Report.  In a August 11, 2003 statement by Harbeck, then-General counsel, on SIPC's website, Harbeck stated that "[w]e are deeply gratified to see that the General Accounting Office (GAO) follow up review of SIPC acknowledges the many and major strides that we have made to address concerns originally outlined in the GAO report of June 2001."  He further stated that the Congressmen's concerns "already have been addressed," and that "all of the issues . . are being resolved."  Yet, SIPC provided no concrete information regarding the steps it was purportedly taking to address the concerns, other than increasing its investor education efforts.

181.   While a July 9, 2004 letter report by GAO entitled "Follow-Up on GAO Recommendations Concerning the Securities Investor Protection Corporation" stated that the

SEC's "preliminary findings indicated that SIPC has taken steps to improve its policies and operations," the SEC staff was still in the process of determining whether SIPC's responses to the SEC's recommendations were adequate at that time. Obviously, this case shows that SIPC did not adequately respond to the SEC's concerns despite Harbeck's promises in the August 11, 2003 press release.

**The Directors Have Ignored An Audit by the SEC Inspector General**

182. The OIG had conducted an audit of SIPC, available at http://www.sec-oig.gov/Reports/Auditsinspections/2000/301fin.pdf, from June 1999 to October 1999. The primary objective of the audit was "to evaluate the efficiency and effectiveness of the Commission's oversight of SIPC and to determine if oversight was in compliance with the Act."

183. OIG made several recommendations for improving SIPC and stated that "Commission officials generally agree that the Commission's oversight of SIPC would be enhanced if SIPC would articulate more specifically the standards it employs for initiating and acting on claims in SIPA proceedings" and that it had "several other recommendations . . . that may enhance Commission oversight of SIPC."

184. In the Audit, the OIG noted, by way of background, that SIPA was "created to protect customers from losses resulting from broker-dealer failure, thereby promoting investor confidence in the securities market." The OIG further stated that "As interpreted, the Act protects customers whose securities were misappropriated, **never purchased**, or stolen." (emphasis added). Thus, the OIG acknowledged that customers such as the Class members, whose securities were never purchased due to their broker's fraud, were entitled to SIPC insurance.

185.   The OIG made recommendations, listed as Recommendation A through K.

Recommendation A was that:

>   The Division of Market Regulation ["MR"] should obtain from
>   SIPC a statement setting forth the evidence necessary
>   and the standard of proof SIPC uses in initiating and acting on
>   claims in SIPC proceedings.  In addition, MR should inform SIPC
>   that it should provide written documentation of its reasons for
>   denying coverage in particular cases upon the request of MR and
>   Enforcement.  This will allow the staff to evaluate SIPC's
>   reasoning, taking into account other evidence available to the staff.

186.   Recommendation A was necessary because there had been disagreement between

MR, Enforcement and the Commission, on the one hand, and SIPC, on the other hand, regarding

whether the requirements of SIPA had been met, usually regarding whether there was a

"customer" under SIPA and whether the customer had purchased a "security" under SIPA.

While all disagreements had been resolved in the past, according to the audit, "[t]he staff

believes that the lack of specificity from SIPC as to the standards of proof it applies and the

evidence upon which it relies has made it more difficult for staff to resolve disagreements on

particular matters."  There is no indication that SIPC ever implemented Recommendation A.

187.   Recommendation B stated that "OCG, MR and Enforcement should request that

the Commission delegate authority to OGC to enter appearances in SIPC cases on a one-year

pilot basis."  The Commission had the authority under SIPA to enter an appearance and to take

positions on issues in a SIPC case which it had not exercised in the past, but in connection with

the audit, OGC, MR and Enforcement agreed that OGC staff should enter appearances in SIPC

cases on a one-year pilot basis.  There is no indication that SIPC ever implemented

Recommendation B.

188.   Recommendation C stated that "The Division of Market Regulation and OCIE

should conduct joint SIPC inspections and make joint recommendations" and Recommendation

D stated that "The Division of Market Regulation and OCIE should decide on a review schedule and inspection scope for future SIPC inspections."

189.   Recommendation C and D were necessary because at the time of the audit, SIPC had not been inspected since 1994, although in response to an earlier GAO recommendation, MR had agreed to inspect SIPC every 4-5 years.  The auditors identified "several areas not addressed on past SIPC inspections that could improve oversight effectiveness" including

- adequacy of SIPC policies, procedures, and/or standards used to determine whether a customer request to bring a liquidation proceeding (or claim submitted to the trustee during a proceeding) has merit under the Act;

- sufficiency of SIPC guidance given to trustees regarding (1) evidence (e.g., type and amount) necessary to establish a valid customer claim and (2) recognition of legal precedents in liquidation proceedings:

- propriety of SIPC decisions made regarding claims submitted to the trustee during a proceeding, given Act requirements;

- consistency of trustee actions in acting as a fiduciary to investors;

- comparison of the timeliness of each stage of claim processing during a liquidation compared to results from past inspections (e.g., 1994); and

- reasonableness of SIPC administrative expenses, including a comparison to amounts paid out in satisfaction of claims.

According to the audit, OCIE and MR planned a 2000 joint inspection and stated that the inspection would cover the above issues.  There is no indication that inspections were performed on a regular basis thereafter.

190.    Recommendation E stated that "The Division of Market Regulation, Enforcement, NERO and OCIE should conduct periodic briefings on SIPC related issues."  Recommendation E was necessitated by the fact that there was "no formal mechanism for sharing SIPC information" internally and "MR, Enforcement and NERO officials stated that internal communications regarding SIPC could be improved."  There is no indication that SIPC ever implemented Recommendation E.

191.    Recommendation F stated that "The Division of Market Regulation, in coordination with OIEA, should review the current SIPC brochure for adequacy, and encourage SIPC to make appropriate changes," and Recommendation H stated that "The Office of Investor Education and Assistance should work with SIPC officials to have the SIPC brochure (or similar disclosures) included in CIC's catalog of publications."

192.    Recommendation F and H were designed to increase investor awareness.  As the Audit stated, "All officials believe that many investors do not sufficiently understand SIPC."  It identified a specific shortcoming in the then-current SIPC brochure, that it was "silent about notifying the firm in a timely manner of improper account activity and documenting this notice. An unauthorized trade may be difficult to prove if the customer has not documented a timely complaint to the broker."

193.    Recommendation F and H appear to have been implemented, at least in part.  In the 2000 SIPC Annual Report, the Message from the Acting Chairman stated that SIPC was working toward a spring 2001 re-launch of its website and rewriting its brochures in "plain English" as part of an investor education initiative whose aim was "to let investors know as clearly as possible not only what they can and should expect from SIPC in terms of protection, but also what is *not* covered by SIPC."  (Emphasis in original).  In the 2001 Annual Report, the Message

from the Acting Chairman indicated that the website overhaul and rewriting of SIPC's basic

brochure had been completed.  In the 2003 Annual Report, the Message from the Chairman and

Vice Chairman stated that "Materials have also been made available to the public through the

General Services Administration Federal Citizen Information Center in Pueblo, Colorado."

Subsequent annual reports indicated that SIPC would continue its educational efforts.

194.   Recommendation J stated that "The Division of Market Regulation, in consultation

with OCIE, should consider a formal policy requiring an independent review of the SIPC fund

and assessment structure regularly (e.g., every five years)."  Recommendation J was necessary

because although an independent consultant had determined in 1998 that the SIPC fund was

sufficient for the foreseeable future, "the consultant's conclusion was based on the current

soundness of the securities markets (e.g., if the need arose to liquidate a large broker-dealer, or

multiple broker-dealers, the SIPC Fund may not be sufficient)."

195.   SIPC made some token efforts at implementing this Recommendation.  The

Message from the Acting Chairman in SIPC's 2002 Annual Report indicated that a "study

addressing the magnitude of the risks confronting SIPC in today's rapidly developing securities

markets" had "concluded that SIPC's present resources are adequate to fulfill its obligations."  In

2003, the Message from the Chairman and Vice Chairman in SIPC's 2003 Annual Report stated

that:

> In the past, the Board periodically engaged independent
> consultants to assure use that the SIPC Fund was adequate to meet
> any foreseeable contingency. In 2003, we determined that SIPC
> should also have an independent ability to assess risks that might
> give rise to concern.  Accordingly, SIPC has brought a Risk
> Manager on board to advise on any developments that could affect
> SIPC's financial capacity.

196.   Fitch Risk Management was engaged by SIPC to conduct a review of the failure of

MJK Clearing, Inc. and to evaluate SIPC's risk management practices, and it prepared a January

31, 2003 report, entitled "Review of SIPC's Risk Profile and Practices: The MJK Clearing Event, the Securities Lending Exposure, Risk Management Practices and Capital Requirements" The failure of MJK Clearing, Inc. was the largest loss in the history of SIPC to that date, with losses in excess of $80 million. The Fitch Risk Management Report noted that SIPC could not effectively control the risks, monitor the fund's exposure or charge premiums based on the risk assumed because of its limited mandate, and thus concluded that it was "crucial that SIPC leverage the risk management resources of the regulatory agencies that are better positioned to perform these functions, namely the [SEC] and the major Self Regulatory Organizations." Fitch Risk Management recommended that SIPC "petition the SEC to enforce improved disclosure requirements and to implement expanded examination requirements." Fitch Report at 37. Yet, there is no indication that SIPC ever did this.

197.   Moreover, the Report set forth specific recommendations that SIPC should take in order to manage risks that impacted the SIPC fund. The Report recommended that SIPC establish a Risk Monitoring Team, which would consist of 1-2 experienced financial analysts (or a third-party provider) that would raise specific concerns to the Board of Directors; that SIPC institute a comprehensive risk monitoring process that would involve collecting data and analyzing it to quantify the risks to the SIPC fund; that SIPC establish a review process that involved the SEC and would allow SIPC to present the concerns that arose in its risk monitoring process; and institute a formal process for the identification, control and review of risk factors. *Id.* at 38-40. The Report even contained a methodology that would quantify SIPC's risk exposure. *Id.* at 41). Yet, there is no evidence that SIPC ever did anything to implement these recommendations.

198.   Perhaps if SIPC had worked to manage its risks, it would have been able to raise concerns about Madoff to the SEC.  The Executive Summary of the Report of Investigation by the OIG, Case No. OIG-509 concluded that "despite numerous credible and detailed complaints, the SEC never properly examined or investigated Madoff's trading and never took the necessary, but basic, steps to determine if Madoff was operating a Ponzi scheme.  Had these efforts been made with appropriate follow-up at any time beginning in June of 1992 until December 2008, the SEC could have uncovered the Ponzi scheme well before Madoff confessed."

199.   FTI Consulting, in a September 29, 2009 Review and Analysis of OCIE Examinations of Bernard L. Madoff Investment Securities, LLC, agreed that "OCIE examiners made critical mistakes in nearly every aspect of their examinations of Madoff and BMIS and missed significant opportunities to uncover Madoff's Ponzi scheme." If the SEC and SIPC had been working together as recommended, this may not have occurred.  For example, the FTI report found that the SEC examiners "did not understand how BMIS executed, cleared and settled trades." *Id* at 22.  Perhaps if they were instructed by SIPC as to the mechanisms of trading practices, the SEC examiners would have realized that Madoff was a Ponzi scheme.

200.   In the 2007 Annual Report Message from the Chairman, Bucelo stated that "Notwithstanding the record level of our financial resources, the Board charted a new study of SIPC's capital adequacy by an outside consultant.  I am pleased to report that the size of the SIPC Fund is sufficient to meet SIPC's mission.  The probability that the Fund will be exhausted in a one year period is small."

201.   Yet, in the notes to SIPC's 2008 Financial Statements (annexed to SIPC's 2008 Annual Report), it states:

> In the event the SIPC Fund is or may reasonably appear to be
> insufficient for the purposes of SIPA, the Securities and Exchange

> Commission is authorized to make loans to SIPC and, in that
> connection, the Commission is authorized to issue notes or other
> obligations to the Secretary of the Treasury in an aggregate amount
> not to exceed $1 billion.  In addition, SIPC maintained $1 billion
> revolving lines of credit with a consortium of banks, $500 million
> of which *expired effective March 1, 2009*."  (emphasis added).

Allowing a significant line of credit to expire does not fulfill the intent behind Recommendation

J.  Moreover, as detailed above, the SIPC fund is not adequate for the Madoff liquidation (and

thus would not have been adequate for any large liquidation).

202.    The Directors' failure to ensure that these recommendations were implemented

further proves that they have performed their duties in bad faith.

203.    Under New Jersey law, the Directors are liable for their bad faith failure to pay,

and delay in paying, SIPC insurance claims in accordance with the mandates of SIPA and with

the representations of insurance that were made to Customers for the first 38 years of SIPC's

existence.  *See Pickett v. Lloyd's*, 131 N.J. 457, 621 A.2d 445 (N.J. 1993) (finding that cause of

action for an insurance company's bad-faith refusal or delay of payment of a claim existed under

New Jersey law); *Diebold, Inc. v. Continental Casualty Co.*, 2008 U.S. Dist. LEXIS 29308, at

*17 (D.N.J. Apr. 10, 2008) (stating that New Jersey recognized a cause of action for bad faith

denial of insurance claims).

### FIRST CLAIM FOR RELIEF
### BAD FAITH FAILURE TO PAY INSURANCE CLAIMS

204.    Plaintiffs, on behalf of themselves and the Class, repeat the allegations heretofore

stated.

205.    New Jersey law applies to the plaintiffs' claims because they are domiciled in New

Jersey.

206.    SIPC is an insurer that actively advertises directly and through its members that it

provides insurance coverage for investors up to $500,000.

207.   Plaintiffs and the Class members asserted claims in accordance with the mechanism provided for by SIPC.

208.   Plaintiffs' and the Class members' claims were indisputable as a matter of law as they were based on their "net equity" as defined by SIPA.

209.   Defendants wrongfully and in bad faith failed to "promptly" pay the claims under the illegal SIPC Net Investment Policy, and had no fairly debatable reason for their failure to pay such claims.

210.   Defendants wrongfully and in bad faith refused to pay the Customers' claims based upon their Unfair Clawback Policy, claiming that SIPC had a right to offset against the Customers' SIPC insurance any sum that the Customer withdrew in excess of the sums the Customer deposited.

211.   Defendants had no good faith basis under SIPA for the adoption of the SIPC Net Investment Policy and the Unfair Clawback Policy.

212.   Defendants knew or recklessly disregarded the lack of a reasonable basis for SIPC's Net Investment Policy and the Unfair Clawback Policy.

213.   Defendants acted in egregious bad faith, maliciously and with wanton recklessness, and in wanton and willful disregard of plaintiffs' and the Class members' rights.

214.   Due to Defendants' actions, plaintiffs and the Class members suffered damages and consequential damages in an amount to be determined at trial.

215.   Plaintiffs and the Class members are entitled to an award of compensatory and punitive damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**FRAUD**

67

216.    Plaintiffs, on behalf of themselves and the Class, repeat the allegations heretofore stated.

217.    As described more fully above, Defendants made numerous misrepresentations of material fact, including allowing members to state that investments were "protected" by SIPC, which statements were designed and intended to induce Customers to invest their money with Madoff in the belief that their accounts were insured up to $500,000 by SIPC.

218.    Defendants acted with knowledge of the falsity of their misrepresentations for the purpose of fraudulently inducing plaintiffs and the Class members to place trust in the Financial Services Industry and in SIPC.

219.    Plaintiffs and the Class members justifiably relied upon Defendants' misrepresentations, which directly and proximately caused plaintiffs to suffer substantial damages.

220.    Due to defendants' actions, plaintiffs and the Class members suffered damages in an amount to be determined at trial.

221.    Defendants acted egregiously, in bad faith, maliciously and with wanton recklessness, and wanton and willful disregard of plaintiffs' and the Class members' rights.

222.    Plaintiffs and the Class members are entitled to an award of compensatory and punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT

223.    Plaintiffs, on behalf of themselves and the Class, repeat the allegations heretofore stated.

224.    Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.,* which prohibits "any unconscionable commercial practice, deception, fraud, false pretense,

false promise, misrepresentation or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate."

225.   The actions defendants took in violation of the New Jersey Consumer Fraud Act include instituting and implementing business policies and practices intended to mislead plaintiffs and the Class as to the amount of SIPC insurance to which they were entitled and the ways in which SIPC insurance would protect them, including allowing members to state that investments were "protected" by SIPC.  These false policies and practices were designed and intended to induce plaintiffs and the Class to keep their investments in securities with Madoff in the belief that their accounts were insured up to $500,000 by SIPC.

226.   Defendants also violated the New Jersey Consumer Fraud Act by intentionally failing to disclose to plaintiffs and the Class that these misrepresentations were false for the purpose of fraudulently inducing plaintiffs and the Class to place trust in the Financial Services Industry and in SIPC.

227.   These affirmative misrepresentations and omissions in connection with the marketing of SIPC insurance constitutes a violation of the New Jersey Consumer Fraud Act because insurance is "merchandise," as defined under the New Jersey Consumer Fraud Act as "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."  N.J.S.A. § 56:8-1.

228.   This Court has found that "The [New Jersey Consumer Fraud Act] does not apply to a mere denial of benefits but does apply to alleged fraud in the sale, marketing or advertisement of insurance policies."  *McCartney v. Transamerica Ins. & Inv. Group*, 2008 U.S. Dist. LEXIS 61204, at *8 (D.N.J. Aug. 4, 2008) (*citing Lemelledo v. Beneficial Management*

*Corp. of America*, 150 N.J. 255, 696 A.2d 546, 551 (N.J. 1997) ("although several lower courts have held that the payment of insurance benefits is not subject to the [New Jersey Consumer Fraud Act]" the statute does cover "the sale of insurance policies as goods and services that are marketed to consumers"); *Yourman v. People's Sec. Life Ins. Co.*, 992 F. Supp. 696, 700 (D.N.J. 1998) (finding that the New Jersey Consumer Fraud Act does apply to the "sale and marketing of insurance policies")).

229.   Plaintiffs and the Class suffered an ascertainable loss as a direct result of Defendants' actions in violation of the New Jersey Consumer Fraud Act.

### FOURTH CLAIM FOR PROMISSORY ESTOPPEL

230.   Plaintiffs repeat the allegations heretofore stated.

231.   Defendants made a clear and definite promise to the Customers that each of their investments would be insured up to $500,000 in the event their broker stole their money or their securities.

232.   Defendants' promise was made directly to the Customers and indirectly through SIPC's members, in this case, Madoff.

233.   Defendants made the promise and caused their members to make the promise with the expectation that the Customers would rely upon it.

234.   The Customers reasonably relied upon the defendants' promises.

235.   The defendants' promises were deliberately false.

236.   The Customers suffered a definite and substantial detriment in reliance upon the defendants' promises.

WHEREFORE, plaintiffs demand judgment as follows:

Case 2:10-cv-00934-SH Filed Document 1 Filed 02/28/10 Page 51 of 72

1.      A determination that this action is a proper class action and certifying plaintiffs as Class Representatives under Federal Rule of Civil Procedure 23 and plaintiffs' counsel as lead counsel.

2.      On the first claim, judgment against each of the defendants, jointly and severally, for compensatory, consequential and punitive damages for plaintiffs and each member of the Class for defendants' bad faith failure to pay insurance claims.

3.      On the second claim, judgment against each of the defendants, jointly and severally, for compensatory and punitive damages for plaintiffs and each member of the Class for defendants' fraud.

4.      On the third claim, judgment against each of the defendants, jointly and severally, for treble damages, attorneys' fees and costs under the New Jersey Consumer Fraud Act for Plaintiffs and for each member of the Class.

5.      On the fourth claim, judgment against each of the defendants, jointly and severally, for promissory estoppel in the full amount of each Class member's loss as a result of defendants' breach of promise.

6.      For judgment for the costs of suit and an award of attorneys' fees and costs.

7.      For such other relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiffs hereby demand a trial by jury of all issues

triable by right to a jury.

February 24, 2010

BECKER & POLIAKOFF, LLP

By s/s Helen Davis Chaitman (hdc-4266)
21 East Front Street – Suite 400
Redbank, New Jersey 07701
(908) 303-4568

and

45 Broadway
New York, New York 10006
(212) 599-3322
Attorneys for the Plaintiffs