# EXHIBIT B

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-_____ (BRL) |
| v. | |
| LISSA CANAVAN, LESLIE GOLDSMITH and JUDITH KALMAN, themselves and to the extent they purport to represent a class of those similarly situated, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S APPLICATION FOR PRELIMINARY INJUNCTION, ENFORCEMENT OF STAY, DECLARATION THAT CANAVAN, GOLDSMITH AND KALMAN ACTION IS VOID *AB INITIO*, AND TEMPORARY  RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................. 6

A.    Commencement of the SIPA Proceeding .......................................... 6

B.    The SIPA Trustee's Authority ........................................................... 8

C.    SIPA and The Net Equity Dispute .................................................... 9

D.    The New Jersey Plaintiffs Have Participated in This Liquidation Proceeding
      Pursuant to the Claims Procedures Order and/or the Scheduling Order  Regarding
      Net Equity And Continue to Do So ................................................... 10

      1.    Lissa Canavan ........................................................................ 11

      2.    Leslie Goldsmith .................................................................... 12

      3.    Judith Kalman ........................................................................ 12

E.    This Court's Net Equity Decision .................................................... 13

F.    The New Jersey Plaintiffs' Allegations Are An Affront to This Court's
      Jurisdiction ...................................................................................... 16

      1.    The New Jersey Plaintiffs' Allegations Challenge the Net Equity Decision....... 17

      2.    The New Jersey Plaintiffs' Allegations Repeat the *Peskin* Adversary
            Proceeding............................................................................... 20

      3.    The New Jersey Plaintiffs' Allegations Mimic Objections to the Fee
            Applications............................................................................ 21

      4.    The New Jersey Plaintiffs' Allegations Raise the Same Issues as Customer
            Objections Filed by Ms. Chaitman ......................................... 23

      5.    Current Status of the New Jersey Action ................................ 24

ARGUMENT THE NEW JERSEY ACTION VIOLATES THE AUTOMATIC STAY
      AND MUST OTHERWISE BE PRELIMINARILY ENJOINED ................. 26

I.    The New Jersey Plaintiffs and Those Acting on Their Behalf Must Be Enjoined
      From Circumventing This Court's Jurisdiction and Relitigating the Net Equity
      Issue ................................................................................................ 26

      A.    This Court Has Jurisdiction to Enjoin the New Jersey Plaintiffs........................ 27

            1.    Subject Matter Jurisdiction ................................................ 27

            2.    Personal Jurisdiction ......................................................... 29

      B.    Standards for a Section 105(a) Injunction ......................................... 30

      C.    The New Jersey Action Threatens the Court's Jurisdiction and Seeks to
            Relitigate the Net Equity Decision ................................................... 31

**TABLE OF CONTENTS**
(cont'd)

**Page**

    1.    This Court Has Jurisdiction Regarding Net Equity ................................. 32

    2.    The New Jersey Plaintiffs Seek to Relitigate the Net Equity Decision and Must Be Enjoined ................................................. 32

D.    The SIPC Defendants Have Not Acted in Bad Faith as a Matter of Law and Are Statutorily Immune From Suit by the New Jersey Plaintiffs ................ 36

II.    The New Jersey Action Violates the Automatic Stay ..................................... 39

A.    The New Jersey Action Seeks to Subvert the Claims Administration Process ........................................................ 41

B.    The New Jersey Action Is Void *Ab Initio* ............................................. 45

III.    A Temporary Restraining Order Is Warranted ............................................. 46

CONCLUSION ................................................................................. 48

## TABLE OF AUTHORITIES

**Page**

### Cases

*Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281 (1970) ............................ 35

*BGW Assocs., Inc. v. Valley Broad. Co.*, 532 F. Supp. 1115 (S.D.N.Y. 1982) ........................ 36

*C & J Clark Am., Inc. v. Carol Ruth, Inc.* (*In re Wingspread Corp.*), 92 B.R. 87
(Bankr. S.D.N.Y. 1988) ............................................................................... 31

*Canavan, et al. v. Harbeck, et al.*, No. 2:10-cv-00954-FSH-PS........................................... passim

*E. Refractories Co. v. Forty Eight Insulations*, 157 F.3d 169 (2d Cir. 1998).............................. 45

*Evans v. Ottimo*, 469 F.3d 278 (2d Cir. 2006) ............................................................... 33

*Exch. Nat'l Bank of Chicago v. Wyatt*, 517 F.2d 453 (2d Cir. 1975) ......................................... 28

*Fed. Deposit Ins. Corp. v. Hirsch* (*In re Colonial Realty Co.*), 980 F.2d 125 (2d
Cir. 1992) ............................................................................................. 45

*Fid. Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47 (2d Cir. 1976)......................... 45

*First Fid. Bank N.A., N.J. v. Hooker Invs., Inc.* (*In re Hooker Invs., Inc.*), 937 F.2d
833 (2d Cir. 1991) ...................................................................................... 30

*Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998) ................................................... 31, 33

*Garrity v. Leffler* (*In re Neuman*), 71 B.R. 567 (S.D.N.Y. 1987)..................................... 31, 34

*Granfinanciera S.A. v. Nordberg*, 492 U.S. 33 (1989) .................................................... 30

*In re Adelphia Commc'ns Corp.*, 2006 WL 1529357 (Bankr. S.D.N.Y. June 5,
2006) .............................................................................................. passim

*In re Adelphia Commc'ns Corp.*, 298 B.R. 49 (S.D.N.Y. 2003) ............................................. 31

*In re Adelphia Commc'ns Corp.*, 307 B.R. 404 (Bankr. S.D.N.Y. 2004) ................................... 30

*In re AP Indus., Inc.*, 117 B.R. 789 (Bankr. S.D.N.Y. 1990) ........................................ passim

*In re Baldwin-United Corp.*, 57 B.R. 759 (S.D. Ohio 1985)................................................ 33

*In re Baldwin-United Corp.*, 770 F.2d 328 (2d Cir. 1985) ................................................ 35

*In re Burgess*, 234 B.R. 793 (D. Nev. 1999) ............................................................ 39

*In re Calpine Corp.*, 354 B.R. 45 (Bankr. S.D.N.Y 2006) ................................................ 31

*In re Chateaugay Corp.*, 109 B.R. 613 (S.D.N.Y 1990) ................................................... 35

**TABLE OF AUTHORITIES**
(cont'd)

**Page**

*In re Enivid*, 364 B.R. 139 (Bankr. D. Mass. 2007) ...................................................... 31

*In re Enron Corp.*, 314 B.R. 524 (Bankr. S.D.N.Y. 2004) ............................................ 45

*In re HSM Kennewick, L.P.*, 347 B.R. 569 (Bankr. N.D. Tex. 2006) ............................ 39

*In re Ionosphere Clubs, Inc.*, 111 B.R. 423 (Bankr. S.D.N.Y. 1990) ........................... 31

*In re Johns-Manville Corp.*, 91 B.R. 225 (Bankr. S.D.N.Y. 1988) ........................ 32, 33

*In re Johns-Manville Corp.*, 97 B.R. 174 (Bankr. S.D.N.Y. 1989) ....................... 34, 46

*In re Keene Corp.*, 162 B.R. 935 (Bankr. S.D.N.Y. 1994) ........................................... 31

*In re Keene Corp.*, 164 B.R. 844 (Bankr. S.D.N.Y. 1994) .................... 33, 34, 41, 45

*In re Lewellyn*, 26 B.R. 246 (Bankr. S.D. Iowa 1982) .................................................. 28

*In re Lyondell Chem. Co.*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009) .............................. 31

*In re MCEG Prods., Inc.*, 133 B.R. 232 (Bankr. C.D. Cal. 1991) ............................... 39

*In re New Times Sec. Servs., Inc.,* 463 F.3d 125 (2d Cir. 2006) .................................. 23

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355 (3d Cir. 2001) ................. 36

*In re Singer Co. N.V.*, 2000 WL 33716976 (Bankr. S.D.N.Y. Nov. 3, 2000) ........... 33, 34, 43, 45

*In re The 1031 Tax Group, LLC*, 397 B.R. 670 (Bankr. S.D.N.Y. 2008) ...................... 33

*Keller v. Blinder* (*In re Blinder Robinson & Co., Inc.*)*,* 135 B.R. 892 (D. Colo.
   1991) .......................................................................................................................... 30

*Kusch v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 1998 WL 551972
   (Bankr. S.D.N.Y. Aug. 24, 1998) ...................................................................... 37, 38

*Langenkamp v. Culp*, 498 U.S. 42 (1990) .................................................................... 30

*Liberty Mut. Ins. Co. v. Off. Unsecured Creditors' Comm.* (*In re Spaulding
   Composites Co., Inc.*), 207 B.R. 899 (9th Cir. BAP 1997) ..................................... 39

*LTV Corp. v. Back* (*In re Chateaugay Corp.*), 201 B.R. 48 (Bankr. S.D.N.Y.
   1996) .......................................................................................................................... 29

*LTV Steel Co., Inc. v. Bd. of Educ.* (*In re Chateaugay Corp.*), 93 B.R. 26
   (S.D.N.Y. 1988) ........................................................................................................ 31

# TABLE OF AUTHORITIES
### (cont'd)

**Page**

*MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988) ........................ 29

*Martin v. Graybar Elec. Co.*, 266 F.2d 202 (7th Cir. 1959) .................................... 36

*Nat'l Union Fire Ins. Co. v. Camp* (*In re Gov't Sec. Corp.*), 972 F.2d 328 (11th Cir. 1992) ........................................................................................................ 28

*Peskin v. Picard*, 09-01272 (BRL) (Bankr. S.D.N.Y.) ...................................... passim

*Peskin v. Picard*, No. 09 CV 8730 (S.D.N.Y.) (JGK) ............................................ 21

*Publicker Indus. Inc. v. United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110 (2d Cir. 1992) ...................................................................................... 28

*Rand v. Anaconda-Ericsson, Inc.*, 623 F. Supp. 176 (E.D.N.Y. 1985) ...................... 35

*Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494 (N.Y. 1984) ............................................... 33

*Samuel C. Ennis & Co. v. Woodmar Realty Co.*, 542 F.2d 45 (7th Cir. 1976) ............ 36

*Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2010 WL 694211 (Bankr. S.D.N.Y. Mar. 1, 2010) .......................................................... passim

*Statutory Comm. of Unsecured Creditors v. Motorola, Inc.* (*In re Iridium Operating LLC*), 285 B.R. 822 (S.D.N.Y. 2002) ............................................... 30

*Turner v. Davis* (*In re Inv. Bankers, Inc.*), 4 F.3d 1556 (10th Cir. 1993) .................. 28

*United States v. Int'l Bhd. of Teamsters*, 728 F. Supp. 1032 (S.D.N.Y. 1990) ...... 35, 36

*United States v. Madoff*, No. 08 MAG 2735 .......................................................... 6

*United States v. Madoff*, No. 09 CR 213 (DC) ....................................................... 7

*United States v. New York Tel.*, 434 U.S. 159 (1977) ............................................ 35

*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001) ...................................... 46

**Statutes**

11 U.S.C. § 105(a) ...................................................................................... passim

11 U.S.C. § 362 ....................................................................................... 34, 43

11 U.S.C. § 362(a) ......................................................................................... 1

## TABLE OF AUTHORITIES
(cont'd)

**Page**

11 U.S.C. § 362(a)(1) ........................................................................................... 41

11 U.S.C. § 362(a)(3) ...................................................................................... 39, 41

11 U.S.C. § 362(a)(6) ........................................................................................... 41

15 U.S.C. § 78aaa *et seq.* ...................................................................................... 1

15 U.S.C. § 78ccc(c)(2) ......................................................................................... 24

15 U.S.C. § 78eee(a)(3) .................................................................................... 7, 39

15 U.S.C. § 78eee(a)(4)(A) ..................................................................................... 7

15 U.S.C. § 78eee(b)(2) ......................................................................................... 40

15 U.S.C. § 78eee(b)(2)(A)(i) ................................................................................ 29

15 U.S.C. § 78eee(b)(2)(B) .................................................................................... 39

15 U.S.C. § 78eee(b)(2)(B)(i) ............................................................................ 1, 43

15 U.S.C. § 78eee(b)(3) ........................................................................................... 7

15 U.S.C. § 78eee(b)(4) ................................................................................ 7, 29, 40

15 U.S.C. § 78ff ...................................................................................................... 6

15 U.S.C. § 78fff(b) ...................................................................................... 8, 28, 30

15 U.S.C. § 78fff-1(a) .............................................................................................. 8

15 U.S.C. § 78fff-2(a)(2) .......................................................................................... 8

15 U.S.C. § 78fff-2(b) ...................................................................................... 38, 42

15 U.S.C. § 78fff-2(b)(1) ....................................................................................... 38

15 U.S.C. § 78fff-2(c)(3) ....................................................................................... 19

15 U.S.C. § 78fff-3(a) .................................................................................. 19, 38, 42

15 U.S.C. § 78j(b) .................................................................................................... 6

15 U.S.C. § 78kkk(c) ....................................................................................... 36, 37

# TABLE OF AUTHORITIES
(cont'd)

**Page**

15 U.S.C. § 78*lll*(11) .................................................................................. 9

15 U.S.C. § 78*lll*(7)(B) ................................................................................ 6

28 U.S.C. § 1334 ....................................................................................... 29

28 U.S.C. § 1334(b) .............................................................................. 27, 28

28 U.S.C. § 157(a) .................................................................................... 27

28 U.S.C. § 157(b)(1) ................................................................................ 28

28 U.S.C. § 157(b)(2)(A) ........................................................................... 28

28 U.S.C. § 157(b)(2)(B) ........................................................................... 28

28 U.S.C. § 1651 ...................................................................................... 35

## Other Authorities

Jane Musgrave, *N.J. Lawyer and Madoff Victim Urges Palm Beach County
Victims to Flex Muscle in Payback Fight*, PALM BEACH POST, Jan. 9, 2010 .......................... 16

Leigh Kamping-Carder, *Madoff Cash In/Cash Out Ruling Heads to 2nd Cir.*, LAW
360, Mar. 9, 2010 .................................................................................................. 16

Noeleen G. Walder, *Bankruptcy Judge Backs Madoff Trustee's Payout
Calculations*, NEW YORK LAW JOURNAL, Mar. 2, 2010 ............................................. 16

Standing Order of Referral of Cases to Bankruptcy Judges of the United States
District Court for the Southern District of New York dated July 10, 1984 ............................ 27

## Rules

Federal Rule of Bankruptcy Procedure 7065 .......................................................... 1, 31

Federal Rule of Civil Procedure 12(b)(6) ............................................................. 21

Federal Rule of Civil Procedure 23 ..................................................................... 45

## Regulations

17 C.F.R. §§ 300.500–300.50 ........................................................................... 18

## TABLE OF AUTHORITIES
(cont'd)

**Page**

17 C.F.R. 240.10b-5 ................................................................................................................... 6

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq*. ("SIPA"), and Bernard L. Madoff ("Madoff"), individually (collectively, the "Debtor"), by and through his undersigned counsel, respectfully submits this Memorandum of Law in Support of his Application pursuant to § 362(a) and § 105(a) of the Bankruptcy Code, section 78eee(b)(2)(B)(i) of SIPA and Federal Rule of Bankruptcy Procedure 7065, to enjoin Lissa Canavan ("Canavan"), Leslie Goldsmith ("Goldsmith") and Judith Kalman ("Kalman" and collectively, the "New Jersey Plaintiffs"), those acting on their behalf or in concert or participation with them, and all defendants, from proceeding with their putative class action pending in the United States District Court for the District of New Jersey, captioned *Canavan, et al. v. Harbeck, et al*., No. 2:10-cv-00954-FSH-PS (the "New Jersey Action"), and for a declaration that the suit is void *ab initio*, having been brought in violation of the automatic stay. The New Jersey Action is a relitigation of this Court's March 1, 2010 Memorandum Decision (the "Net Equity Decision") and its March 8, 2010 Order adopting the Net Equity Decision (the "Net Equity Order") (Dkt. Nos. 1999 and 2022), usurps the exclusive jurisdiction of this Court's jurisdiction and interferes with the administration of the BLMIS estate. The Trustee further respectfully requests that this Court temporarily restrain the New Jersey Plaintiffs and those acting on their behalf or in concert or participation with them, and all defendants, from proceeding with the New Jersey Action until this Court determines the propriety of the relief sought.

## PRELIMINARY STATEMENT

On or about February 24, 2010, the New Jersey Plaintiffs, through their lead counsel, Helen Davis Chaitman of the law firm of Becker & Poliakoff, P.A., filed the New Jersey Action in the United States District Court for the District of New Jersey (the "*Canavan* Complaint")

against the past and present Directors of the Securities Investor Protection Corporation ("SIPC"), as well as its Chief Executive Officer/President (collectively, the "SIPC Defendants").[1]   The gravamen of the New Jersey Action is that the New Jersey Plaintiffs and the putative class—all of whom are claimants in the BLMIS liquidation proceedings—"as a result of SIPC's deliberate misrepresentation of the nature and scope of insurance provided to investors, have been denied their full SIPC insurance ..." in the BLMIS SIPA proceeding before this Court.[2]   The New Jersey Plaintiffs allege that it is "by virtue of" what the New Jersey Plaintiffs call "SIPC's Net Investment Policy" that "the defendants have perpetuated a fraud and are personally liable, jointly and severally, for the damages that SIPC's Net Investment Policy has caused to customers in the full amount of their lost investments."  (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 16.)

The New Jersey Plaintiffs disagree with the Trustee's definition of Net Equity, which was adopted by this Court in its Net Equity Decision and Net Equity Order.  This Court ruled that Net Equity must be evaluated on a cash-in/cash-out basis and cannot be based on a customer's last account statement because "[i]t would be simply absurd to credit the fraud and legitimize the phantom world created by Madoff when determining Net Equity."  *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (BRL), 2010 WL 694211, at *14 (Bankr. S.D.N.Y. Mar. 1, 2010) ("*SIPC v. BLMIS*").

While facially grounded in "fraud," the New Jersey Action is little more than a reargument of the "legitimate expectations" portion of the Net Equity briefing previously heard by this Court.  The "fraud" as alleged in the New Jersey Action is that SIPC allegedly made representations that every brokerage account was "insured" up to $500,000 and that the New

---

[1]   The New Jersey Plaintiffs did not name SIPC (the entity) as a defendant.

[2]   Affidavit of David J. Sheehan, sworn to on April 9, 2010 (the "April 9th Sheehan Aff."), Ex. A (*Canavan* Cmplt, ¶ 1).

Jersey Plaintiffs—and a putative class consisting entirely of BLMIS customers before this Court—relied on such representations to their detriment, and had legitimate expectations to recover up to $500,000, even if the money those customers are seeking to recover consists of fictitious profits.    Counsel for the New Jersey Plaintiffs strenuously made this exact same argument before this Court in connection with the litigation of, and the hearing on, the net equity issue.[3]  That argument was considered by this Court, and was soundly rejected:

> Because 'securities positions' are in fact nonexistent, the Trustee cannot discharge claims upon the false premise that customers' securities positions are what the account statements purport them to be.  Rather, the only verifiable amounts that are manifest from the books and records are the cash deposits and withdrawals. **Moreover, if customers' legitimate expectations are relevant to any determination other than whether customers hold 'claims for securities' or 'claims for cash,' they do not apply where they would give rise to an absurd result** . . . . The Trustee has properly satisfied expectations by providing all customers with 'claims for securities.'

*SIPC v. BLMIS*, 2010 WL 694211, at *10 (emphasis added) (citations omitted).  Accordingly, the New Jersey Plaintiffs and the putative class are not entitled to recover their fictitious profits and any "expectation" that they could keep those profits is nothing less than "absurd."

In the face of this Court's ruling, the New Jersey Plaintiffs now seek relief from a different federal court to attack the legal positions of the Trustee and SIPC taken before **this** Court—which is nothing more than a collateral attack on this Court's Net Equity Decision and Net Equity Order.  Significantly, the New Jersey Action is brought as a purported class action, and the New Jersey Plaintiffs thus seek to undo the holding and effect of the Net Equity Decision as to each and every customer before this Court who claims fictitious profits.  If the New Jersey

---

[3] Attached hereto as Appendix A is a chart which depicts the great degree of overlap among the *Canavan* Complaint and Ms. Chaitman's other pleadings and briefs before this Court.

Plaintiffs believe that this Court's Net Equity Decision and Order were incorrectly decided, the proper recourse is to appeal the decision, as counsel for the New Jersey Plaintiffs well knows, having filed a notice of appeal of the Court's Net Equity Decision on March 19, 2010. (Dkt. No. 2048.)  Under no circumstances should they be permitted to pursue an action in another federal court with no relationship to the BLMIS SIPA liquidation proceeding that is before this Court, the administration of which is at the core of their claims.

The New Jersey Plaintiffs no doubt will argue that whether "additional damages" are available to them as a result of SIPC's alleged misrepresentations is an issue separate and apart from the Net Equity Decision and Order.  However, the New Jersey Plaintiffs' allegations are inextricably intertwined with this Court's administration of the BLMIS SIPA proceeding.  The "damages" suffered by the New Jersey Plaintiffs only arise as a result of their status as "customers" of BLMIS under SIPA and the denial of their customer claims by the Trustee in accordance with the SIPA statute and this Court's Net Equity Decision.  While the New Jersey Plaintiffs attempt to cast their allegations as distinct from the BLMIS liquidation proceeding, they could not be more interconnected.  Indeed, their claims to "insurance," as well as their claims to recover fictitious profits, are entirely dependent on a reversal of the Net Equity Decision issued by this Court.

Moreover, as the New Jersey Plaintiffs themselves admit, the damages they seek could only be predicated on a finding that the SIPC Defendants acted in bad faith:  "[n]either SIPC nor any of its Directors, officers or employees shall have any liability to any person for any action taken or omitted in good faith . . . ." (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 45.)  In light of this Court's Net Equity Decision and Net Equity Order adopting the Trustee's position on Net

Equity, there is simply no factual or legal support for allegations of bad faith by SIPC, much less the individual members of the SIPC Board of Directors or its CEO/President.

The New Jersey Plaintiffs' disagreement with this Court's administration of the BLMIS SIPA proceeding cannot be allowed to form the basis of an action against the SIPC Defendants. The proper forum for the New Jersey Plaintiffs' claims, no matter how frivolous, is this Court. The New Jersey Plaintiffs should not be permitted to circumvent this Court's jurisdiction by filing a duplicative action in another forum with no connection to this liquidation proceeding. Such blatant forum shopping only invites similar suits in courts all over the country.  Moreover, as the New Jersey Action proceeds apace, with rapidly approaching deadlines for motions and return dates, the SIPC Defendants will be forced to litigate an action elsewhere which is inextricably connected to proceedings and decisions of this Court.[4]  The Trustee also may need to get involved in  the New Jersey Action, at a minimum to address all of the facts, history and proceedings that have taken place before this Court and their relevancy to the allegations and claims brought by the New Jersey Plaintiffs, and this will distract from the Trustee's work in the SIPA proceeding.

The New Jersey Plaintiffs' gripe with this Court's Net Equity Decision will be considered on appellate review.  In the interim, the New Jersey Plaintiffs should not be permitted to ask another court to second-guess this Court's determination.  Accordingly, the Trustee respectfully requests that the New Jersey Plaintiffs and those acting on their behalf or in concert with them, and all defendants, be enjoined from proceeding with the New Jersey Action.  Because, as discussed below, the New Jersey Action has been brought in violation of stays imposed in this

---

[4]    Additional detail concerning the timing and need for relief is discussed herein.  With respect to upcoming deadlines in the New Jersey Action, *see also* discussion page 24 ("Current Status of the New Jersey Action").

proceeding under the Bankruptcy Code and SIPA, the Trustee also requests that the Court

declare the suit to be in violation of the stays and void *ab initio*.

**STATEMENT OF FACTS**

From the inception of this liquidation proceeding, Ms. Chaitman, purporting to represent

numerous claimants, has been a vocal critic of the manner in which the Trustee and SIPC have

handled this matter.[5]   Through the press, adversary proceedings, hundreds of objections to

customer claims determinations, objections to the Trustee's and his counsel's fee applications,

and appeals, Ms. Chaitman has asserted her opposition to the Trustee's method of calculating net

equity, and has loudly voiced her view that the Trustee and SIPC have acted in bad faith in

denying Madoff's customers their fictitious profits.   Now taking a modified form in a different

forum, the New Jersey Action is a relitigation of prior Orders of this Court and the United States

District Court of the Southern District of New York ("District Court") dismissing her claims.

**A.      Commencement of the SIPA Proceeding**

On December 11, 2008, Madoff was arrested by the FBI in his Manhattan home and was

criminally charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C.

§§ 78j(b), 78ff, and 17 C.F.R. 240.10b-5 in the District Court, captioned *United States v. Madoff*,

No. 08 MAG 2735.[6]   Also on December 11, 2008 (the "Filing Date"),[7] the Securities and

---

[5] *See, e.g.*, (i) Customers' Memorandum of Law in Opposition to Trustee's Motion for An Order Approving the Trustee's Re-Definition of "Net Equity" Under the Securities Investor Protection Act (Dkt. No. 755); (ii) Objection to First Applications of Irving H. Picard, Trustee, and Baker & Hostetler LLP for Allowance of Interim Compensation for Services Rendered and Reimbursement of Expenses Incurred From December 5, 2008 through April 30, 2009 (Dkt. No. 351); (iii) Objection to Second Applications of Irving H. Picard, Trustee, and Baker & Hostetler LLP for Allowance of Interim Compensation for Services Rendered and Reimbursement of Expenses Incurred from May 1, 2009 through September 30, 2009 (Dkt. No. 1055); (iv) Amended Complaint (Dkt. No. 39), *Peskin v. Picard*, 09-01272 (BRL) (Bankr. S.D.N.Y.) ("*Peskin*"); *see also* note 13, *infra*.

[6] On March 10, 2009, the criminal case was transferred to Judge Denny Chin in the United States District Court for the Southern District of New York and was assigned a new docket number, No. 09 CR 213 (DC).

[7] In this case, the Filing Date is the date on which the SEC commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* section 78*lll*(7)(B) of SIPA.

6

Exchange Commission ("SEC") filed a complaint in the District Court against defendants Bernard L. Madoff and BLMIS, Case No. 08-CV-10791 (the "SEC Action").

Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA. On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of the SEC Action with the application of SIPC.

On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part: (1) appointed the Trustee for the liquidation of the business of the Debtor pursuant to section 78eee(b)(3) of SIPA; (2) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and (3) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

On March 12, 2009, Madoff pled guilty to an 11-count criminal information. At the March 12 Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (*See United States v. Madoff*, No. 09 CR 213 (DC), Dkt. No. 57, Plea Hr'g Tr. at 23:14-17.) In pleading guilty to the crimes he committed, Madoff admitted that, since at least the early 1990s, the investment advisory business of BLMIS was used to operate a Ponzi scheme. (*See* Allocution of Bernard L. Madoff, *United States v. Madoff*, No. 09 CR 213 (DC), (Dkt. No. 50) (the "Madoff Allocution"), at p. 2.) The criminal information to which Frank DiPascali, Jr., one of Madoff's co-conspirators, pled guilty on August 11, 2009 (the "DiPascali Information"), stated that the Ponzi scheme commenced at least as early as the 1980's. (*See* DiPascali Information at 3.) On June 29, 2009, Madoff was

sentenced to imprisonment of 150 years for his crimes and was ordered to make restitution to his victims.

## B.    The SIPA Trustee's Authority[8]

As a trustee appointed under SIPA, the Trustee is charged with recovering and distributing customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee in addition to the powers granted by SIPA. Pursuant to section 78fff(b) of SIPA, chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case, to the extent consistent with SIPA.

In aid of the execution of his duties under SIPA, this Court entered an Order on December 23, 2008, which, *inter alia*, specified the procedures for the filing, determination, and adjudication of claims against BLMIS in this proceeding ("Claims Procedures Order."). (Dkt. No. 12.) The Claims Procedures Order provides that, pursuant to section 78fff-2(a)(2) of SIPA, all claims against BLMIS are to be filed with the Trustee. The Claims Procedures Order provides for the written determination by the Trustee of customer and creditor claims, and allows any claimant who opposes the Trustee's determination to file an objection with the Bankruptcy Court. Thereafter, the Trustee is to obtain a date and time for a hearing before the Bankruptcy Court.

Consistent with his duties, the Trustee is marshalling BLMIS's assets, and is well underway in that process. The Trustee has recovered more than $1.4 billion dollars in assets to

---

[8] The facts in this section regarding the Court-ordered claims administration process are drawn from the Trustee's Second Interim Report for the Period Ending October 31, 2009. (Dkt. No. 1011.)

date    and    has    determined    more    than    12,250    customer    claims.
(*See* http://www.madofftrustee.com/ (*follow* "Claims Processing Status;" *follow* "News/Press Releases" hyperlink, *then follow* 01/27/2010 "Madoff Trustee Announces Settlement of $220 Million" hyperlink).)

## C.    SIPA and The Net Equity Dispute

SIPA provides a statutory framework for the satisfaction of customer claims in a liquidation proceeding under SIPA.  SIPA provides that customers share *pro rata* in customer property to the extent of their net equity, as defined in section 78*lll*(11) of SIPA ("Net Equity"). Within limits, SIPC advances funds to the trustee for the satisfaction of customers with valid Net Equity claims, up to the amount of their Net Equity, if their ratable share of customer property is insufficient to make them whole.

The Trustee has determined each customer's Net Equity by crediting the amount of cash deposited by the customer into her BLMIS account, less any amounts withdrawn from her BLMIS customer account, otherwise characterized by the New Jersey Plaintiffs as the "Net Investment Method."  In a variety of different fora and pleadings, certain BLMIS investors have argued that the Trustee's interpretation of Net Equity is incorrect and contrary to SIPA (the "Net Equity Dispute").  They argue that the Trustee must allow their customer claims in the amount shown on their last customer statements issued by BLMIS.

Because those customer statements issued by BLMIS were based on fictitious profits and were entirely fraudulent, however, the Trustee has disregarded the statements for purposes of claims determinations.  Instead, as required under SIPA and consistent with the treatment of claims in prior SIPA proceedings and other Ponzi-scheme liquidations, the Trustee is allowing claims in the amounts that a customer actually deposited with BLMIS, less the amounts that the customer withdrew from the account.  Because the Net Equity Dispute is an issue of

comprehensive application in this liquidation proceeding, the Trustee moved for a briefing schedule and hearing to resolve the Net Equity Dispute, and an Order followed (the "Scheduling Order"). (Dkt. No. 437.) Thereafter, the Trustee filed his *Motion for an Order Upholding Trustee's Determination Denying Customer Claims' For Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity and Expunging Those Objections With Respect to The Determinations Relating to Net Equity* (the "Net Equity Motion"). (Dkt. No. 530.)

**D.    The New Jersey Plaintiffs Have Participated in This Liquidation Proceeding Pursuant to the Claims Procedures Order and/or the Scheduling Order Regarding Net Equity And Continue to Do So**

The New Jersey Plaintiffs are active litigants in the BLMIS SIPA proceeding pending before this Court.  In accord with the Claims Procedures Order, claims were filed for each of the BLMIS accounts held by the New Jersey Plaintiffs, as further detailed herein.  Moreover, briefs opposing the Trustee's Net Equity Motion were filed on behalf of both Goldsmith and Lapin Children LLC.[9]  (*See Sonnenschein Investors' Opposition to the Trustee's Motion for an Order Upholding Trustee's Determination Denying "Customer" Claims for Amounts Listed on Last Statement, Affirming Trustee's Determination of Net Equity and Expunging Those Objections With Respect to the Determinations Relating to Net Equity* (Dkt. No. 784) ("Sonnenschein Opposition") (filed on behalf of, *inter alia,* Lapin Children LLC)); *Customers' Memorandum of Law in Opposition to Trustee's Motion for an Order Approving the Trustee's Re-Definition of "Net Equity" Under the Securities Investor Protection Act,* (Dkt. No. 755) (filed on behalf of, *inter alia,* Goldsmith).)  Additionally, all of the New Jersey Plaintiffs have filed objections to the Trustee's determination of their claims.[10] (Dkt. Nos. 506, 569, and 2119.)  Finally, Kalman's

---

[9] New Jersey Plaintiff Canavan holds an interest in Lapin Children LLC, discussed herein.

[10] New Jersey Plaintiff Canavan filed an objection to the Trustee's determination of the Lapin Children LLC's claim, discussed more fully, *infra.*

BLMIS account was one of the accounts specifically included within the Trustee's Motion on Net Equity. (*See* Exhibit A to the Net Equity Motion) (Dkt. No. 530.) By these actions, the New Jersey Plaintiffs have voluntarily submitted themselves to the Bankruptcy Court's jurisdiction. Each of the New Jersey Plaintiff's involvement in the BLMIS SIPA proceeding is discussed in turn.

### 1.    Lissa Canavan

Lissa Canavan holds a 20% interest in Lapin Children LLC ("Lapin Children"), a New Jersey limited liability company formed on May 15, 2000. (April 9th Sheehan Aff, Ex. A, Cmplt, ¶ 18.) Eric Ginsburg, a manager of Lapin Children, filed a claim for the Lapin Children account, BLMIS Account No. 1CM624, on March 10, 2009. (April 9th Sheehan Aff., Ex. B.) At that time, Lapin Children appears to have been represented by Carole Neville of Sonnenschein, Nath & Rosenthal LLP. (*Id.*) No claim was filed by Canavan directly, though Canavan asserts that she is entitled to share in any distribution that may be paid on account of the Lapin Children claim. (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 18.) The Trustee denied the Lapin Children claim on March 23, 2010 because more money was withdrawn than deposited over the life of the account, resulting in a negative Net Equity. (April 9th Sheehan Aff., Ex. C.) In addition, on March 31, 2010, Ms. Chaitman, on behalf of Canavan, filed an objection to the Trustee's determination of the Lapin Children claim. (Dkt. No. 2119.)

The Scheduling Order required all counsel who participated in the Net Equity briefing to identify the BLMIS customers that they represented. Lapin Children was listed on Schedule A to the brief filed by Sonnenschein, Nath & Rosenthal LLP opposing the Trustee's Net Equity Motion. (*See* Sonnenschein Opposition) (Dkt. No. 784.) As a member of Lapin Children which, by and through its counsel, participated in and actively litigated the Net Equity dispute before this Court, Canavan has participated.

### 2.    Leslie Goldsmith

Goldsmith has a BLMIS account in her own name, BLMIS Account No. 1ZA328. Goldsmith filed a claim for that account on January 8, 2009.  (April 9th Sheehan Aff., Ex. D.) The Trustee denied her claim on October 19, 2009 because Goldsmith withdrew more funds than she deposited over the life of the account, leaving her with negative Net Equity.  (*Id.*, Ex. E.)  In other words, she was a "net winner" in Madoff's Ponzi scheme.  Ms. Chaitman filed an objection to the Trustee's determination of Ms. Goldsmith's claim on November 11, 2009.  (Dkt. No. 569.)

Goldsmith was listed on Exhibit A to the declaration filed in connection with the brief opposing the Trustee's Net Equity Motion by Ms. Chaitman.  (*See Declaration of Helen Davis Chaitman in Opposition to Trustee's Motion for an Order Approving the Trustee's Re-Definition of "Net Equity" Under the Securities Investor Protection Act*, (Dkt. No. 761).)  In addition, Ms. Chaitman filed a reply brief.  (*See Memorandum of Law on "Net Equity" in Reply to Memoranda of The Securities and Exchange Commission and Optimal Strategic U.S. Equity Limited and Optimal Arbitrage Limited filed on behalf of Maureen Ebel, Diane Peskin, Roger Peskin*, (Dkt. No. 1096).)  Thus, through her counsel, Ms. Chaitman, Goldsmith directly participated in and actively litigated the Net Equity dispute before this Court.

### 3.    Judith Kalman

Kalman has a BLMIS account in the name of *Judith Kalman and Daniel Kalman, TIC*, BLMIS Account No. 1ZG032.  (April 9th Sheehan Aff., Ex. F.)  Judith Kalman and Daniel Kalman (collectively, the "Kalmans") filed two claims regarding their one account on February 17, 2009.[11]  (*Id.*)  On September 10, 2009, the Kalmans' claim was allowed in the amount of

---

[11] The Kalmans filed two claims for the same BLMIS account:  Claim No. 002462 and Claim No. 002503, the latter of which is duplicative of Claim No. 002462.  Thus, the two claims were combined for purposes of the Trustee's determination.

$133,675.00.  (*Id.*, Ex. G.)  The Kalmans filed an objection to the Trustee's determination on October 8, 2009.  (Dkt. No. 506.)  Thereafter, on October 21, 2009, the Trustee mailed a check to the Kalmans in that amount in full satisfaction of their claim after they executed an assignment and release. (April 9th Sheehan Aff., Exs. H and I.)

In connection with the Trustee's Net Equity Motion, the Trustee included 78 customer claim objections that specifically raised the Net Equity Dispute in their objections.  (*See* Exhibit A to the Trustee's Net Equity Motion) (Dkt. No. 530).  The Kalman objection was one of the 78 customer objections specifically included within the Net Equity Motion and on which the Trustee sought a ruling.  On October 16, 2009, the Net Equity Motion papers were served upon the Kalmans at their last known address, via first-class United States mail.  The Certificate of Service dated October 16, 2009 evidencing service of the Motion on the Kalmans was electronically filed with the Court on October 16, 2009.  (Dkt. No. 526.)  As relates to Net Equity, the Kalmans' objection to their claim determination has been specifically ruled on by this Court as set forth in the Net Equity Order and Decision.  Thus, the Kalmans have had a full and fair opportunity to litigate the Net Equity Dispute.

E.    **This Court's Net Equity Decision**

In accordance with the Claims Procedures Order and the Scheduling Order, on October 16, 2009, the Trustee submitted his memoranda of law and other papers in support of his motion for an order (a) upholding the Trustee's determinations denying 78 customer claims for the amounts listed on the last customer statement, (b) affirming the Trustee's determination of "net equity," and (c) expunging those objections with respect to the determinations relating to "net equity" (as defined earlier, the "Net Equity Motion").  (Dkt. No. 525.)  The Trustee argued that the Net Investment Method of calculating Net Equity is the only one consistent with SIPA,

bankruptcy law, principles of equity, and common sense.  Over thirty briefs and twenty *pro se*

submissions were filed in response to the Trustee's Net Equity Motion.  Two customers, SIPC,

and the SEC filed papers in support of the Trustee's Net Equity Motion.  Briefing concluded on

January 15, 2010 and a hearing was held before this Court on February 2, 2010.

On March 1, 2010, this Court issued its decision on the Net Equity issue, approving the

Trustee's method of determining Net Equity (as defined earlier, the "Net Equity Decision"),

rejecting the arguments now put forward by the New Jersey Plaintiffs as "allegations."  *SIPC v.*

*BLMIS*, 2010 WL 694211, at *2.  In that decision and the accompanying Net Equity Order of

March 8, 2010, this Court upheld the Trustee's Net Investment Method of calculating Net

Equity.  The Court upheld the denial of claims of those customers whose withdrawals exceeded

their initial investments and subsequent deposits, therefore rendering them ineligible to

participate in a distribution from the estate.  *See generally SIPC v. BLMIS*, 2010 WL 694211, at

*7, 15.  In support of that holding, this Court determined that the plain language and the

legislative history of SIPA supports the adoption of the Trustee's method of determining Net

Equity:

> Because 'securities positions' [the term used in SIPA's definition
> of net equity] are in fact nonexistent, the Trustee cannot discharge
> claims upon the false premise that customers' securities positions
> are what the account statements purport them to be.  Rather, the
> only verifiable amounts that are manifest from the books and
> records are the cash deposits and withdrawals.  **Moreover, if
> customers' legitimate expectations are relevant to any
> determination other than whether customers hold 'claims for
> securities' or 'claims for cash,' they do not apply where they
> would give rise to an absurd result…The Trustee has properly
> satisfied expectations by providing all customers with 'claims
> for securities.'**

*SIPC v. BLMIS*, 2010 WL 694211, at *10 (emphasis added) (citations omitted).

This Court also concluded that the Trustee's calculation of Net Equity is consistent with the avoidance powers available to him under SIPA and the Bankruptcy Code.  *See SIPC v. BLMIS*, 2010 WL 694211, at *10–11.  Further, the Court noted that both equity and practicality favor utilizing the method proposed by the Trustee:

> Customer property consists of a limited amount of funds that are available for distribution.  Any dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested.  If the Last Statement Method were adopted, Net Winners would receive more favorable treatment by profiting from the principal investments of Net Losers, yielding an inequitable result.
>
> ***
>
> Equality is achieved in this case by employing the Trustee's method, which looks solely to deposits and withdrawals that in reality occurred.

*Id.* at *14–15.

Finally, this Court further held that the notion that SIPA provided some form of guaranteed insurance for fictitious profits was equally wrong:  "SIPC payments . . . serve only to replace missing customer property and cannot be ascertained independently of the determination of a customer's *pro rata* share of customer property.  Accordingly, the SIPA statute does not allow bifurcation of the claims process, with customers recovering SIPC payments based on the Last Statement Method, and recovering customer property shares based on the Net Investment Method."  *Id.* at *9; *see also id.* at *1, n.6 (notion of SIPC advances as "insurance" was "strenuously controverted by the . . . [SEC], SIPC and the Trustee, and . . . is not supported by the controlling SIPA statute").

On March 8, 2010, this Court issued its order adopting the Trustee's Net Equity calculation and retained exclusive jurisdiction on "all matters relating to the interpretation or implementation of this [Net Equity] Order."  (Dkt. No. 2020; Order at 4.)  On that same date, the

Court also certified an appeal of the order directly to the United States Court of Appeals for the Second Circuit. (*Id.*; *see also* Dkt. No. 2022.) Notices of appeal of the Net Equity Order have been filed, including one by Ms. Chaitman.

**F.      The New Jersey Plaintiffs' Allegations Are An Affront to This Court's Jurisdiction**

Ms. Chaitman is both an indirect investor[12] in BLMIS and counsel to numerous customer claimants in this liquidation proceeding. Both prior to and in the wake of the argument on Net Equity, Ms. Chaitman has been a vocal critic of this Court, making frequent statements to the press that implied that she and her clients were unable to get a fair hearing on the Net Equity Dispute before this Court, which she has appealed.[13] Now, Ms. Chaitman seeks relief denied to her by this Court from the New Jersey District Court, feigning that the New Jersey Action has nothing to do with the BLMIS SIPA proceeding. The allegations made in the New Jersey Action are indisputably virtually identical to her arguments and allegations already heard and decided by this Court. *See, e.g.*, Appendix A attached hereto detailing overlap of arguments among multiple

---

[12] Ms. Chaitman and her cousin, Stephen Schwebel, shared BLMIS Account No. 1CM921, through an entity named *Chaitman/Schwebel LLC.* (April 9th Sheehan Aff., Ex. J.) The Trustee allowed the claim of Chaitman/Schwebel LLC in the amount of $2,000,000, and partially satisfied that claim by paying $500,000 to the LLC on August 13, 2009 after Ms. Chaitman and Mr. Schwebel executed an assignment and release. (April 9th Sheehan Aff., Exs. K, L and M.) On June 20, 2009, Ms. Chaitman filed an objection to the Trustee's determination of their claim on behalf of Chaitman/Schwebel LLC. (Dkt. No. 283.) In that objection, Ms. Chaitman raises many of the same arguments, including, *inter alia*, an objection to the Net Investment Method calculation of Net Equity. (*Id.*)

[13] For example, in an article from the Palm Beach Post—written before this Court issued its Net Equity Decision— the author noted that Ms. Chaitman anticipated an adverse ruling, saying that she was "convinced she and other investors w[ould] lose the first round of the legal battle." *See* Jane Musgrave, *N.J. Lawyer and Madoff Victim Urges Palm Beach County Victims to Flex Muscle in Payback Fight*, PALM BEACH POST, Jan. 9, 2010, *available at* http://www.palmbeachpost.com/news/n-j-lawyer-and-madoff-victim-urges-palm-171293.html. The article recognized that Ms. Chaitman was anxious to appeal, and mentioned her desire for victims *instead* to "lobby Congress to get Picard to change his approach . . . [and] force [SIPC] to live up to its name . . ." *Id.; see also* Leigh Kamping-Carder, *Madoff Cash In/Cash Out Ruling Heads to 2nd Cir.*, LAW 360, Mar. 9, 2010, *available at* http://www.law360.com/print_article/154320 (documenting Ms. Chaitman's impatience with the legal system's proper avenues for relief, quoting her as saying: "'It's in the public's interest that this issue be resolved as quickly as possible.'").

After Judge Lifland issued his decision, Ms. Chaitman expressed her disappointment with this Court's rulings, "call[ing] [its] ruling 'another example of Wall Street manipulating the law to enrich itself at the expense of Main Street, even though it is one of [SIPC's] own members who stole the investors' money.'" Noeleen G. Walder, *Bankruptcy Judge Backs Madoff Trustee's Payout Calculations*, NEW YORK LAW JOURNAL, Mar. 2, 2010, *available at* http://www.law.com/jsp/nylj/ PubArticleFriendlyNY.jsp?id=1202444916101.

pleadings in this Court and in the New Jersey Action. In defiance of those prior rulings, Ms. Chaitman has now proceeded to yet another federal court with the implicit purpose of undermining this Court's rulings and jurisdiction. Although the New Jersey Action is styled as an action against the SIPC Defendants, it is merely a reiteration of Ms. Chaitman's failed arguments before this Court, both on Net Equity and related issues.

### 1.    The New Jersey Plaintiffs' Allegations Challenge the Net Equity Decision

On February 24, 2010, the New Jersey Plaintiffs, represented by Ms. Chaitman, filed and are maintaining their suit in the New Jersey District Court, effectively challenging this Court's jurisdiction and the Net Equity Decision. The New Jersey Action, filed against the SIPC Defendants on behalf of Canavan, Goldsmith, and Kalman, as well as on behalf of a putative class, seeks a ruling that would allow the New Jersey Plaintiffs and the putative class to recover their fictitious profits from the Madoff Ponzi scheme. The New Jersey Plaintiffs attack this Court's administration of BLMIS with respect to the determination of Net Equity and the Trustee's use of his avoidance powers to recover fictitious profits from BLMIS customers. The New Jersey Plaintiffs bring causes of action sounding in: (1) bad faith failure to pay insurance claims; (2) fraud; (3) violation of the New Jersey Consumer Fraud Act; and (4) promissory estoppel. (April 9th Sheehan Aff., Ex. A, Cmplt, ¶¶ 204–36.)

The New Jersey Plaintiffs allege that the "Net Investment Policy"—*i.e.*, SIPC's view that BLMIS customers should not be entitled to keep fictitious profits in perpetuation of the Ponzi scheme—is nothing less than a fraud: "[B]y virtue of SIPC's Net Investment Policy, the defendants have perpetuated a fraud and are personally liable, jointly and severally, for the damages that SIPC's Net Investment Policy has caused to customers in the full amount of their lost investments." (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 1.) The New Jersey Plaintiffs thus seek to achieve in the New Jersey District Court what they could not achieve before this Court—

a ruling that they were entitled to legitimately expect the return of their fictitious profits and the concomitant advance of $500,000.

Significantly, the allegations before the New Jersey District Court consist of little more than a regurgitation of the briefing before this Court filed by Ms. Chaitman detailing SIPC's public statements and the legislative history of SIPA, in an effort to persuade the New Jersey District Court that SIPC's position with respect to the proper interpretation of Net Equity is a fraud because it is purportedly contrary to the SIPA statute and formulations in other SIPA cases. (*Compare* April 9th Sheehan Aff., Ex. A, Cmplt, ¶¶ 95, 137, 142, 149–50 *with* Net Equity Brief (Dkt. No. 755) at 22, 12, 18, 36.)  Articulated yet another way, in both the *Canavan* Complaint and in briefing before this Court on Net Equity, the New Jersey Plaintiffs allege or argue that they had a "legitimate expectation" to be compensated by SIPC for their fictitious profits. (*Compare* April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 121 *with* Net Equity Brief (Dkt. No. 755) at 17.)  The New Jersey Plaintiffs further allege that SIPC is a form of guaranteed insurance for $500,000 per customer, regardless of the nature of the loss or the legal implications stemming from the same, which argument also was made in the Net Equity briefing before this Court. (*Compare* April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 51 *with* Net Equity Brief (Dkt. No. 755) at 24.)

All of these allegations—presented to this Court in connection with the Net Equity issue—already have been rejected by this Court in its Net Equity Decision and Order.  *See, e.g.*, *SIPC v. BLMIS*, 2010 WL 694211, at *10, 14.  This Court essentially ruled those arguments "absurd."  *Id.*  The "legitimate expectations" of a customer, to the extent they are relevant to anything other than determining whether a customer has a claim for cash or a claim for securities, *see* 17 C.F.R. §§ 300.500–300.50, are inapplicable where it would lead to an absurd

result.  *See, e.g.*, *SIPC v. BLMIS*, 2010 WL 694211, at *10.  Moreover, the funds advanced by SIPC to the Trustee to satisfy allowed customer claims were deemed not to be guaranteed "insurance" pursuant to 15 U.S.C. § 78fff-3(a), as the New Jersey Plaintiffs suggest, but rather, are an advance against the "customer's *pro rata* share of customer property."  *See id.* at *9.  In other words, there are no "insurance" funds to distribute in this liquidation proceeding, but rather, SIPC funds are advanced to the Trustee to pay a customer against a valid Net Equity claim—which claim does not include fictitious profits.

In a similar vein, the New Jersey Plaintiffs allege that SIPC's "clawback policy" is fraudulent because they should be entitled to recover—at the expense of other customers who have not yet been made whole—their fictitious profits:  "SIPC's Unfair Clawback Policy is a bad-faith policy in direct contravention of the purpose and intent of SIPA. . . ."  (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 17.)  As an initial matter, the so-called "clawback policy" is not a policy of SIPC.  Rather, a SIPA trustee's right to avoid transfers is expressly provided by statute.  *See* 15 U.S.C. § 78fff-2(c)(3).  Furthermore, the New Jersey Plaintiffs' allegation directly contravenes this Court's ruling that customers are not entitled to fictitious profits.  Finally, the Trustee's use of his avoidance powers directly impacts the administration of the estate, which is within this Court's exclusive jurisdiction. Indeed, the Trustee has already instituted major avoidance litigation in this SIPA proceeding.

Significantly, the allegations in the Complaint are made against former and present individual members of the SIPC Board of Directors and SIPC's CEO/President, not SIPC or the Trustee.  While the SIPC Defendants may have a view as to the proper interpretation of net equity, the decisions to implement the Net Investment Method and institute avoidance actions were made by the Trustee in his capacity as a separate and independent fiduciary. Having already

sued the Trustee on virtually the same grounds and lost in the *Peskin* matter, Ms. Chaitman now

uses the guise of the New Jersey Action to sue the SIPC Defendants instead.  However, as the

New Jersey Plaintiffs themselves admit, there is a limitation to when the Board may be sued—

only when it has acted in bad faith.  (April 9th Sheehan Aff., Ex. A, Cmplt, ¶ 45.)  All of the

arguments as to the SIPC Defendants' purported bad faith in denying Madoff customers their

fictitious profits were presented to this Court in arguments on Net Equity, and not one of them

was accepted by this Court in its ruling.  (*See, e.g.*, Net Equity Brief at p. 3, 8–9, 12–13, 18, 25,

37.)

Nowhere is the New Jersey Plaintiffs' assault on this Court's rulings and jurisdiction

more glaring than in the fact that the New Jersey Action is brought as a putative class action.

Thus, the New Jersey Plaintiffs seek to recover on behalf of all customers—the majority of

whom are claimants before this Court in the BLMIS proceedings.  (April 9th Sheehan Aff., Ex.

A, Cmplt, ¶ 32.)

## 2.    The New Jersey Plaintiffs' Allegations Repeat the *Peskin* Adversary Proceeding

The net equity briefing is only one of many instances in which Ms. Chaitman has raised

the issues alleged in the New Jersey Action.  On behalf of Diane and Roger Peskin, and Maureen

Ebel, all BLMIS customers, Ms. Chaitman filed a complaint in this Court seeking a declaration

that, *inter alia*, the Trustee's Net Equity interpretation is incorrect and that he is bound by SIPA

to allow a customer's claim at the balance shown on the customer's last BLMIS statement.

(*Peskin,* Am. Cmplt, ¶ 106.)  The Peskin complaint also alleges a claim for damages for an

alleged breach of fiduciary duty by the Trustee.  (*Id.*, Am. Cmplt. at ¶ 114.)  Much of the Peskin

complaint is devoted to describing the alleged bad acts of the Trustee, his alleged improper

interpretation and implementation of SIPA with regard to "net equity" and other issues, spurious

allegations regarding the purposes and history of SIPA and SIPC, as well as *ad hominem* attacks against the Trustee and SIPC. (*See, e.g., id.,* Am. Cmplt., ¶ 13 ("In furtherance of his goal to protect the brokerage industry from further assessments by SIPC at the investors' expense . . . Picard intends to avoid paying SIPC insurance to…thousands of elderly Madoff investors . . ."); Am. Cmplt, ¶ 15 ("Harbeck's statement is a specious, bad faith rationalization of SIPC's goal, which is to save money for the brokerage community at the expense of innocent investors . . .").)

On July 17, 2009, the Trustee moved to dismiss the Peskin complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, to strike certain portions thereof. (*Peskin*, Dkt. No. 11.) On August 17, 2009, Ms. Chaitman filed a sixty-two page memorandum of law, and supporting papers, in opposition to the Trustee's motion to dismiss the Peskin complaint. (*Peskin*, Dkt. No. 30.) A hearing was held before this Court on September 9, 2009, and an order and errata order dismissing the Peskin complaint followed on September 9 and 10, 2009, respectively (together, the "Peskin Order").

On September 18, 2009, Ms. Chaitman filed a notice of appeal of the Peskin Order, which has been fully briefed and is pending before the United States District Court for the Southern District of New York. *Peskin v. Picard*, No. 09 CV 8730 (S.D.N.Y.) (JGK).

### 3.   The New Jersey Plaintiffs' Allegations Mimic Objections to the Fee Applications

On August 3, 2009, Ms. Chaitman filed a fifty-one page objection to the Trustee's and counsel's first interim fee applications in this Court (the "Fee Application Objection"). (*BLMIS*, Dkt. No. 351.) Raising issues ancillary to the services and compensation of the Trustee and Baker Hostetler, the Fee Application Objection is essentially a reiteration of the Peskin complaint and the Net Equity Dispute. The Objection attempted to use Ms. Chaitman's prior arguments about the Net Equity Dispute as a basis for alleging that the Trustee and Baker

Hostetler have a conflict of interest and should be disqualified from serving. SIPC and the Trustee each filed a reply to the Fee Application Objection on August 3, 2009 and August 5, 2009, respectively. (*BLMIS*, Dkt. Nos. 357, 358.) A hearing was held before this Court on the Fee Applications on August 6, 2009.

At the hearing, the Trustee, counsel for the Trustee, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Fee Applications was reasonable. Ms. Chaitman was also heard and essentially asserted the same arguments set forth in her Fee Application Objection—that the Trustee's interpretation of "net equity" was contrary to SIPA. (*See, e.g.*, Transcript of Hearing on August 6, 2009 (Dkt. 381) ("8/6/09 Transcript") at 32 (Chaitman: "The statute mandates prompt payment of customer claims based upon their last statements. The statute even prohibits SIPC from changing the definition of net equity which is defined, in essence, as the last statement.").)

In response, this Court noted that Ms. Chaitman's dispute regarding Net Equity was raised in the context of the *Peskin* adversary proceeding, and thus was not properly before the Court regarding the Fee Application Objection. (8/6/09 Transcript at 32–33.) After due consideration, this Court found "no merit to the objections." (8/6/09 Transcript at 34.) This Court found that it had already held a disinterestedness hearing, at which there were no objections, and there were "no new facts that have come forward that would change the disinterestedness concept with respect to the fee application" before the Court. (8/6/09 Transcript at 34–35.) Thus, "despite the disagreement of methodology being applied here in this unique and unusual case," this Court held that the services rendered "have been reasonable, that they have been done responsibly and to this point have been with a salutary effect." (8/6/09 Transcript at 38.) The Court approved the Fee Applications. (*Id.*)

Ms. Chaitman filed an almost identical objection to the Trustee's second interim application for fees on December 14, 2009.  (Dkt. No. 1055.)  This Court similarly denied the second objection.  (Dkt. No. 1078.)  Ms. Chaitman filed motions in the Southern District of New York for leave to appeal each of the orders denying her objections to the fee applications.  The District Court for the Southern District of New York denied the first motion for leave to appeal on January 11, 2010 (Dkt. No. 1764.)  As the District Court noted in denying leave to appeal, "[a]lthough Objectants attempt to classify their objections as three distinct and separate issues, they all revolve around the methodology the Trustee used to compute net equity."  *See id.*, at 2.  The second motion for leave to appeal is pending before that court.  The *Peskin* adversary proceeding and objections regarding the Fee Applications demonstrate that, having had her allegations and arguments rejected by this Court, as well as the Southern District Court, Ms. Chaitman is merely using different plaintiffs in an effort to relitigate the same issues in a different forum.

4.    **The New Jersey Plaintiffs' Allegations Raise the Same Issues as Customer Objections Filed by Ms. Chaitman**

Pursuant to the Claims Procedures Order, Ms. Chaitman has filed over 419 objections to the Trustee's determinations of customer claims on behalf of her clients.  In those objections, she objects to the Trustee's Net Equity calculation and reiterates the "legitimate expectations" argument.  *See, e.g.*, Objection to Trustee's Determination of Claim, (Dkt. No. 576, at ¶ 12) ("SIPC is statutorily bound to honor a customer's 'legitimate expectations'"); Objection to Trustee's Determination of Claim (Dkt. No. 1682, at ¶ 9) (same).)  In addition, she references the statements made by Mr. Harbeck and Ms. Wang which are now part of the *Canavan* Complaint, and asserts that *In re New Times* mandates that Net Equity be calculated using the amounts shown on the last BLMIS customer statement.  (*See, e.g.*, Objection to

Trustee's Determination of Claim, (Dkt. No. 576, at ¶ 14); Objection to Trustee's Determination of Claim (Dkt. No. 1682, at ¶ 11).)

Under the Claims Procedures Order, after an objection is filed to a claim determination, the Trustee is to schedule a hearing to resolve the objection. The objections that Ms. Chaitman has filed on behalf of her clients remain pending, and hearings will be scheduled in due course. Thus, the issues in the *Canavan* Complaint are already before this Court.

### 5.    Current Status of the New Jersey Action

On March 16, 2010, counsel for the SIPC Defendants, Greenbaum, Rowe, Smith & Davis LLP ("Greenbaum Rowe"), filed a letter with United States Magistrate Judge Patty Shwartz requesting leave of court to file a motion to transfer venue of the New Jersey Action to this Court. (April 9th Sheehan Aff., Ex. Q.) Ms. Chaitman responded by letter opposing the Greenbaum Rowe request. (April 9th Sheehan Aff., Ex. R.)

Judge Shwartz conducted a telephonic conference with the parties on March 18, 2010. (April 9th Sheehan Aff., Ex. S.) On that same date, Judge Shwartz issued an order in which, *inter alia*, the New Jersey Plaintiffs were granted until April 6, 2010 to decide whether to dismiss the federal defendants.[14] (*Id.*) If the New Jersey Plaintiffs chose to proceed with their claims against the federal defendants, Judge Shwartz required that the New Jersey Plaintiffs request a telephone conference to discuss the motions that those defendants, or the United States as substituted for them, may seek to bring. (*Id.*) If the New Jersey Plaintiffs chose to dismiss the

---

[14] Pursuant to section 78ccc(c)(2) of SIPA, the United States Treasury and the Federal Reserve Board each appoint one SIPC Board Member from among the officers and employees of those two entities. David Nason is a former Treasury Director, and David Stockton is the current Federal Reserve Director. Because their service on the Board has been as federal employees, it is anticipated that the Department of Justice will enter an appearance on their behalves.

federal defendants, then the private defendants were permitted to file a motion for transfer of venue no later than April 23, 2010. (*Id.*)

By a letter dated March 31, 2010, Ms. Chaitman informed the New Jersey District Court that she did not intend to dismiss the New Jersey Action as to the federal defendants. (April 9th Sheehan Aff., Ex. T.) The court then held a conference on April 5, 2010 to discuss, among other things, the New Jersey Plaintiffs' decision not to dismiss the federal defendants from the case. (April 9th Sheehan Aff., Ex. U. (Apr. 5, 2010 Order) at 1.) The court set a briefing schedule on the issue, with a return date of May 3, 2010. (*Id.* at 2.) At the April 5 conference, the court reiterated that the presence of the federal defendants in the New Jersey Action may be significant to its decision on transfer:

> THE COURT: Okay. Let me ask if you know, the non-federal defendants have asked about transfer. Do the federal defendants or the United States if it's substituted, does it have a view on that subject?
>
> MR. EHRLICH: Yes Your Honor, if the United States becomes a defendant and it's a typical FTCA suit, then venue would lie where the plaintiffs reside or the tort occurred. So it would either be the District of New Jersey or the District of the District of Columbia. And venue would not be proper in another district. And I don't believe that a bankruptcy judge in New York would have jurisdiction over a FTCA case.
>
> *             *             *
>
> THE COURT: Let me just tell you what I would like to be sure is that whoever is going to decide – obviously if this gets delegated to me I'll know this information. But if Judge Hochberg in her normal course deals with this motion to transfer, somehow we need to ensure that in those briefs she's on notice that if the United States is substituted in, that there are limitations in terms of where venue would lie for the claims against them. I want to make sure that she's aware of that, because transfer is a discretionary act and I think she needs to have the full picture of the kind of big picture consequences on the case.

(April 9th Sheehan Aff., Ex. V at 14:4-14; 16:2-12.)   Importantly, the court engaged in no discussion of the other "big picture" issue relating to venue—that the New Jersey Plaintiffs' allegations were a relitigation of this Court's Net Equity Decision and Order, and that this Court has exclusive jurisdiction over the BLMIS SIPA proceedings, especially as it affects its orders and the administration of the estate.

The SIPC Defendants were given permission to file their transfer motion by April 23, 2010, with their answer or motion to dismiss due ten days after the resolution of that motion. (April 9th Sheehan Aff., Ex. U (Apr. 5, 2010 Order), at 2.)   Significantly though, the court denied the SIPC Defendants' request for a stay of discovery pending resolution of the motion to transfer:  "Judge Hochberg's case management approach and mine is to keep the case percolating along. . . discovery and moving the pretrial process along will advance the ball of the case regardless of the forum in which you are in."  (April 9th Sheehan Aff., Ex. V at 19:24-25; 20:3-5.)

Because the parties were waiting to hear Ms. Chaitman's position as to the federal defendants and a possible transfer, the Trustee deferred bringing this Application until now. However, given the deadlines set in the April 5, 2010 order and that discovery is not stayed, the Trustee believes he must act now.

## ARGUMENT

### THE NEW JERSEY ACTION VIOLATES THE AUTOMATIC STAY AND MUST OTHERWISE BE PRELIMINARILY ENJOINED

**I.     The New Jersey Plaintiffs and Those Acting on Their Behalf Must Be Enjoined From Circumventing This Court's Jurisdiction and Relitigating the Net Equity Issue**

As detailed above and in Appendix A annexed hereto, the claims and allegations by the New Jersey Plaintiffs are substantially identical to arguments raised in the context of the Net Equity Dispute, as well as other proceedings before this Court involving the New Jersey

Plaintiffs' counsel.  Having recycled their arguments made previously in this Court, the New

Jersey Plaintiffs now attempt to argue them in a different federal forum.  Although the New

Jersey Plaintiffs attempt to restyle their causes of action, the basis of their claims is inextricably

connected to the proceedings before this Court and the Net Equity Decision.  This Court retained

jurisdiction over these issues, and accordingly, should issue an injunction pursuant to section

105(a) of the Bankruptcy Code to protect its jurisdiction and the orderly administration of the

BLMIS proceedings, as well as to prevent relitigation of the Net Equity Decision in the New

Jersey District Court.

The New Jersey Plaintiffs submitted themselves to the jurisdiction of this Court for a

determination with respect to their claims, and had a full and fair opportunity to litigate the net

equity issues relating thereto.  They should not now be permitted to seek out a different forum to

relitigate the same issues decided by this Court.

### A.    This Court Has Jurisdiction to Enjoin the New Jersey Plaintiffs

#### 1.    Subject Matter Jurisdiction

This Court has subject matter jurisdiction to enjoin the New Jersey Plaintiffs, based on 28

U.S.C. §§ 1334(b) and 157(a) and the Standing Order of Referral of Cases to Bankruptcy Judges

of the United States District Court for the Southern District of New York dated July 10, 1984

(Ward, Acting C.J.).

Pursuant to 28 U.S.C. § 1334(b), district courts (and hence bankruptcy courts) have

original jurisdiction of civil proceedings "arising under" and "arising in" and "related to" cases

under title 11.  *See In re Adelphia Commc'ns Corp.*, 2006 WL 1529357, at *6 (Bankr. S.D.N.Y.

June 5, 2006); 28 U.S.C. § 1334(b).[15]  Furthermore, bankruptcy courts have jurisdiction to "hear

and determine . . . all core proceedings arising under title 11, or arising in a case under title 11, . .

. ."  28 U.S.C. § 157(b)(1).  Subsections 157(b)(2)(A) and (B) provide that core proceedings

include, but are not limited to, "matters concerning the administration of the estate," and the

"allowance or disallowance of claims against the estate."  In the Second Circuit the test for

determining whether "related to" jurisdiction exists is whether the outcome of a proceeding

"might have any 'conceivable effect' on the bankrupt estate," or if the proceeding has a

"significant connection" with the bankrupt estate.  *See Adelphia*, 2006 WL 1529357, at *6.;

*Publicker Indus. Inc. v. United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110, 114 (2d Cir.

1992).

    The New Jersey Action circumvents this Court's jurisdiction and seeks to undermine its

rulings dealing with the administration of the estate under the Net Equity Decision and the

claims determination and allowance process, and to satisfy claims against BLMIS through a

third-party action.  These activities fall within the "arising under," "arising in," and "related to"

jurisdiction to this Court.  *See, e.g.*, *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 91, 92

---

[15] A SIPA proceeding effectively is a bankruptcy proceeding and unless inconsistent with SIPA is to be treated as such.  Thus, SIPA § 78fff(b) specifies that to the extent consistent with SIPA, the proceeding is to "be conducted in accordance with and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7" of the Bankruptcy Code.  These are all the provisions that apply to a chapter 7 bankruptcy proceeding except for the special provisions of subchapters III through V of chapter 7 applying to stockbrokers, commodity brokers, and clearing banks.  Because the liquidation is conducted "as though" it were being conducted as a chapter 7 liquidation and "in accordance with" the provisions that apply to a chapter 7 case, all of the provisions, both procedural and substantive, that  apply to such a case apply to the SIPA proceeding, unless inconsistent with SIPA. *See Exch. Nat'l Bank of Chicago v. Wyatt*, 517 F.2d 453, 457–59 (2d Cir. 1975); *Nat'l Union Fire Ins. Co. v. Camp* (*In re Gov't Sec. Corp.*), 972 F.2d 328, 330, n.1 (11th Cir. 1992) (rejecting claim that §78fff(b) makes applicable only procedural and not substantive Bankruptcy Code provisions, as plain language of section "makes no such distinction, and explicitly incorporates ... the Bankruptcy Code."); *Turner v. Davis* (*In re Inv. Bankers, Inc.*), 4 F.3d 1556, 1564 (10th Cir. 1993) (§78fff(b) "indicates that Congress intended SIPA liquidation proceedings to be treated, in most important respects, identical to a traditional bankruptcy case under title 11."); *In re Lewellyn*, 26 B.R. 246, 253 (Bankr. S.D. Iowa 1982).

(2d Cir. 1988); *Adelphia*, 2006 WL 1529357, at \*6–7; *In re AP Indus., Inc.*, 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990).

In addition, pursuant to SIPA § 78eee(b)(2)(A)(i) and § 78eee(b)(4), this Court has exclusive jurisdiction over BLMIS and its property, such that the Court has exclusive jurisdiction to decide claims against such property. By seeking to have a different federal court decide the issue of net equity (*see, e.g.*, *Canavan* Complaint, at ¶ 208 ("Plaintiffs' and the Class members' claims were indisputable as a matter of law as they were based on their 'net equity' as defined by SIPA"); *id.* at ¶ 209 ("Defendants wrongfully and in bad faith failed to 'promptly' pay the claims under the illegal SIPC Net Investment Policy, and had no fairly debatable reason for their failure to pay such claims")), the New Jersey Plaintiffs are attempting to create and confer jurisdiction on another court, undermining SIPA.

Moreover, this Court has inherent ancillary jurisdiction concerning the New Jersey Actions beyond the statutory grant of authority, in order to interpret and enforce this Court's orders:

> Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant of jurisdiction under 28 U.S.C. § 1334. ("Bankruptcy Courts must have the ability to enforce prior orders and 'secure or preserve the fruits and advantages of a judgment or decree rendered therein' … The proceeding being ancillary and dependent, the jurisdiction of the Court follows that of the original cause…") (quoting Local Loan Co) (citations omitted).

*LTV Corp. v Back (In re Chateaugay Corp.)*, 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996) (Lifland, J.), *aff'd in part*, 213 B.R. 633 (S.D.N.Y. 1997).

2.      Personal Jurisdiction

When the New Jersey Plaintiffs filed their claims and/or objections to the Trustee's determinations, they submitted themselves to the equitable jurisdiction of this Court, which

includes a consent to personal jurisdiction and a waiver of any right to a jury trial in respect of

the claims allowance process and avoidance actions:

> Respondents filed claims against the bankruptcy estate, thereby
> bringing themselves within the equitable jurisdiction of the
> Bankruptcy Court. Consequently, they were not entitled to a jury
> trial on the trustee's preference action.

*Langenkamp v. Culp*, 498 U.S. 42, 45 (1990). By filing a proof of claim,[16] a creditor consents to

the bankruptcy court's equitable jurisdiction regarding the adjudication of matters related to that

claim, including avoidance actions. *See, e.g.*, *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 59

n.14 (1989); *Statutory Comm. of Unsecured Creditors v. Motorola, Inc.* (*In re Iridium Operating

LLC*), 285 B.R. 822, 830–31 (S.D.N.Y. 2002) (holding that courts in Second Circuit have

consistently held adversary proceedings to be core matters due to filing of proof of claim); *In re

Adelphia Commc'ns Corp.*, 307 B.R. 404, 418 (Bankr. S.D.N.Y. 2004) ("when the [creditors]

filed proofs of claim in the bankruptcy court, they submitted to the equitable jurisdiction of th[at]

[c]ourt.").[17]

### B.    Standards for a Section 105(a) Injunction

Section 105(a) of the Bankruptcy Code, applicable here pursuant to section 78fff(b) of

SIPA, bestows on bankruptcy courts broad discretion to "issue any order 'necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]'. . . ." *In re Enivid*, 364 B.R.

---

[16]   A customer claim filed in a SIPA action is the equivalent to a proof of claim for purposes of submission to jurisdiction. "Therefore, like other creditors of the estate, a party filing a customer claim subjects himself to the process of allowance and disallowance of claims referred to in *Langenkamp* and *Granfinanciera*." *Keller v. Blinder* (*In re Blinder Robinson & Co., Inc.*), 135 B.R. 892, 896–97 (D. Colo. 1991). A customer claim in a SIPA liquidation is a species of preferred creditor. *Id.* at 897 (citing *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 555 (S.D.N.Y. 1990)).

[17]   In addition, Canavan filed an objection on March 31, 2010 in this Court regarding the denial of the Lapin Children claim. *See e.g., First Fid. Bank N.A., N.J. v. Hooker Invs., Inc.* (*In re Hooker Invs., Inc.*), 937 F.2d 833, 838 (2d Cir. 1991) (stating that a creditor who invokes bankruptcy court's equitable jurisdiction to establish a claim against a debtor's estate is also subject to procedures of equity in the determination of actions brought on behalf of estate).

139, 149 (Bankr. D. Mass. 2007).  The standard for a Rule 7065 injunction is inapplicable, and

the Court may enjoin suits if (i) a third party suit would impair the court's jurisdiction with

respect to a case before it or (ii) the third party suits threaten to thwart or frustrate the debtor's

reorganization efforts and the stay is necessary to preserve or protect the debtor's estate.[18]  *See In*

*re Calpine Corp.*, 354 B.R. 45, 48 (Bankr. S.D.N.Y 2006) *aff'd*, 365 B.R. 401 (S.D.N.Y. 2007);

*In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003) (quoting *In re Granite*

*Partners, L.P.*, 194 B.R. 318, 337 (Bankr. S.D.N.Y. 1996));  *In re Lyondell Chem. Co.*, 402 B.R.

571, 588 n.37 (Bankr. S.D.N.Y. 2009); *In re Keene Corp.*, 162 B.R. 935, 944 (Bankr. S.D.N.Y.

1994); *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990) *aff'd in part*, 124

B.R. 635 (S.D.N.Y. 1991); *Garrity v. Leffler* (*In re Neuman*), 71 B.R. 567, 571 (S.D.N.Y. 1987);

*C & J Clark Am., Inc. v. Carol Ruth, Inc.* (*In re Wingspread Corp.*), 92 B.R. 87, 92 (Bankr.

S.D.N.Y. 1988); *LTV Steel Co., Inc. v. Bd. of Educ.* (*In re Chateaugay Corp.*), 93 B.R. 26, 29

(S.D.N.Y. 1988); *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998).

## C.    The New Jersey Action Threatens the Court's Jurisdiction and Seeks to Relitigate the Net Equity Decision

This Court specifically held that: (1) customers were not entitled to fictitious profits and

that the last customer statements are therefore an invalid way to determine a customer's loss;

(2) no one could ever have a legitimate expectation that he or she would get to keep fictitious

profits; and (3) SIPC advances are based on the recovery a customer is entitled to—it is not a

form of guaranteed insurance, covering even fictitious profits.  *See SIPC v. BLMIS*, 2010 WL

694211, at *9, 10, 14.  Desperate for their fictitious profits, however, the *Canavan* Complaint

---

[18]    Notwithstanding that the Rule 7065 standard need not be satisfied here, it is.  There is no question that an infringement on this Court's jurisdiction would constitute "irreparable harm."  *In re Adelphia Commc'ns Corp.*, 2006 WL 1529357, at *5.  Moreover, the Trustee is likely to succeed on the merits of his complaint that preliminary injunctive relief is warranted given the New Jersey Plaintiffs' attempt to relitigate the Net Equity determination.  *See id.* at *4–5.

seeks precisely to relitigate and challenge: (1) how net equity is calculated; (2) whether customers' legitimate expectations could ever be that they deserve fictitious profits; and (3) whether SIPC advances are a form of guaranteed insurance that insures the return of fictitious profits. The New Jersey Plaintiffs must be enjoined from having these issues heard again in another forum.

### 1.    This Court Has Jurisdiction Regarding Net Equity

In upholding the Trustee's determination of Net Equity, this Court specifically ordered that it "shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order." (Net Equity Order at 4.) The New Jersey Action is predicated entirely on this Court's determination of Net Equity, and this Court is authorized to enforce its jurisdiction by enjoining the New Jersey Plaintiffs from pursuing their Action. *See e.g.*, *Adelphia*, 2006 WL 1529357, at *5 ("it is manifestly proper, in my view, to invoke section 105(a) **'to enforce or implement' my earlier orders**, to prevent abuses of process, and to avoid such a blatant interference with the Debtors' reorganization in these chapter 11 cases.") (emphasis added); *In re Johns-Manville Corp.*, 91 B.R. 225, 228 (Bankr. S.D.N.Y. 1988) (The court's injunctive powers allow the court to "protect[] and enforce[e] its own decrees").

### 2.    The New Jersey Plaintiffs Seek to Relitigate the Net Equity Decision and Must Be Enjoined

The New Jersey Action threatens to undo the equitable distribution of customer property, as determined in the Net Equity Decision, by substituting the New Jersey Plaintiffs' concept of "legitimate expectations" and equitable distribution for that of the Court. (*See, e.g.*, April 9th Sheehan Aff., Ex. A.) Were the New Jersey Plaintiffs to have their way, anyone dissatisfied with the Net Equity Decision could bring their own actions against SIPC to get more than their fair share of damages—"damages" in this instance being fictitious profits to which this Court has

determined they are not entitled.  This conduct is just the sort of conduct prohibited time after time by the bankruptcy courts in numerous cases in this and other jurisdictions.[19]  *See, e.g.*, *In re Keene Corp.*, 164 B.R. 844, 849–54 (Bankr. S.D.N.Y. 1994); *In re AP Indus., Inc.,* 117 B.R. at 801–02; *In re Johns-Manville Corp.*, 91 B.R. at 228; *In re The 1031 Tax Group, LLC*, 397 B.R. 670, 684–85 (Bankr. S.D.N.Y. 2008); *In re Singer Co. N.V.*, 2000 WL 33716976, at \*2 (Bankr. S.D.N.Y. Nov. 3, 2000) (Lifland, J.), *aff'd in part*, 2002 WL 999273 (S.D.N.Y.), *adhered to on reconsideration*, 2002 WL 31040349 (S.D.N.Y.), *vacated*, 2002 WL 31251621 (S.D.N.Y. 2002); *Apostolou*, 155 F.3d at 876; *Baldwin-United Corp. v. Paine Webber Group, Inc.* (*In re Baldwin-United Corp.*), 57 B.R. 759 (S.D. Ohio 1985).

The New Jersey Plaintiffs have filed customer claims with the Trustee, or claims have been filed on behalf of the accounts in which they have an interest.  (*See* April 9th Sheehan Aff., Exs. B, D and F.)  Moreover, each of the New Jersey Plaintiffs has filed objections to those claims determinations that are pending before this Court.  (*See* Dkt. Nos. 506, 569 and 2119.)  Finally, each has been and continues to be an active litigant in the Net Equity Dispute before this Court.  While they are clearly participants in this liquidation proceeding, the New Jersey Plaintiffs may only be eligible to share in the fund of customer property as permitted by the terms of this Court's Net Equity Decision.  Dissatisfied with the impact the Net Equity Decision will have on their recoveries in the BLMIS liquidation, they seek to avoid, through the New

---

[19] If this action were to be litigated before the New Jersey District Court, the SIPC Defendants would undoubtedly assert collateral estoppel.  *See Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006) (noting that collateral estoppel bars relitigation under New York law when "(1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action"); *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 500 (N.Y. 1984) ("The doctrine of collateral estoppel...precludes a party of relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same.")

Jersey Action, this Court's jurisdiction and "disrupt the heart of the duties" of the bankruptcy court. *See In re Neuman*, 71 B.R. at 574.

This is exactly the situation in which a section 105(a) injunction is necessary to protect the court's jurisdiction and the administration of the liquidation. In *In re AP Industries, Inc.*, this Court noted that a bankruptcy court has "authority under § 105 broader than the automatic stay provisions of § 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re AP Indus., Inc.*, 117 B.R. at 801 (citations omitted). In that case, the debtor sought to stay or enjoin actions commenced by a creditor against the debtor's directors and other third parties that were brought because the creditor objected to a transaction entered into by the debtor. This Court found that it was appropriate to use section 105(a) to enjoin the creditor's action, stating:

> this Court finds that it is also appropriate to issue an injunction pursuant to § 105 of the Code to stay the [creditor's] Actions in order to preserve and protect the Debtor's estate and reorganization prospects. Not only may the outcome of the [creditor's] Actions affect the administration of this case, but the possibility of inconsistent judgments warrants the issuance of an injunction . . .

*In re AP Indus., Inc.*, 117 B.R. at 802; *see also In re Singer Co. N.V.*, 2000 WL 33716976, at*7.

Similarly, in enjoining approximately 1,600 lawsuits commenced by a debtor's creditors seeking to challenge certain asset transfers, the *Keene* court observed:

> [t]he Court cannot sanction a practice which permits creditors to assert general, indirect claims in order to achieve a greater distribution on a first come, first serve basis from assets which the trustee has standing to recover, and which, if recovered, will be available to satisfy the claims of all creditors.

*In re Keene Corp.*, 164 B.R. at 854.

Section 105(a) of the Bankruptcy Code is analogous to the All Writs Act. *See In re Johns-Manville Corp.*, 97 B.R. 174, 178 (Bankr. S.D.N.Y. 1989) (Lifland, J.); *In re Chateaugay*

34

*Corp.*, 109 B.R. 613, 612 (S.D.N.Y 1990).  The All Writs Act, 28 U.S.C. § 1651, provides that federal courts have the authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  Courts have consistently recognized that, under the All Writs Act, a federal court may issue an injunction to prevent interference with its determinations or jurisdiction.  *See, e.g.*, *United States v. New York Tel.*, 434 U.S. 159, 172 (1977) (finding that a court had the authority under the All Writs Act to compel a third-party private company to provide access to telephone lines to effectuate a wiretap order); *In re Baldwin-United Corp.*, 770 F.2d 328, 337 (2d Cir. 1985) (in the context of settlement negotiations, using the All Writs Act to enjoin non-parties from commencing actions in state court where the circumstances faced "threatened to frustrate proceedings in a federal action of substantial scope, which had already consumed vast amounts of judicial time…").

Significantly, the All Writs Act permits, *inter alia*, a court to enjoin actions if necessary to prevent relitigation, though "preservation of the federal court's jurisdiction or authority over an ongoing matter may justify an injunction," even before a federal judgment is reached.  *See, e.g.*, *In re Baldwin-United Corp.*, 770 F.2d at 335 (stating that "preservation of the federal court's jurisdiction or authority over an ongoing matter may justify an injunction"); *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 295 (1970) (stating that "federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case");  *United States v. Int'l Bhd. of Teamsters*, 728 F. Supp. 1032, 1042–1044 (S.D.N.Y. 1990) (enjoining competing federal action essentially seeking to relitigate consent order); *Rand v. Anaconda-Ericsson, Inc.*, 623 F. Supp. 176, 189 (E.D.N.Y. 1985) (enjoining successive suits by shareholders as relitigation of decided matter); *BGW Assocs., Inc.*

*v. Valley Broad. Co.*, 532 F. Supp. 1115, 1117 (S.D.N.Y. 1982) (barring relitigation of issues decided by federal court);  *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 367–68 (3d Cir. 2001) (a court has jurisdiction to enjoin action to protect the integrity of class settlement where the court explicitly retained jurisdiction);[20] *Samuel C. Ennis & Co. v. Woodmar Realty Co.*, 542 F.2d 45, 49–50 (7th Cir. 1976) (protecting both parties and non-parties from the relitigation of issues decided by federal court in order to "preserve the full 'fruits and advantages' of the [prior] federal judgment").

Further, "judicial economy demands that similar issues not be litigated multiple times in different districts," and therefore, an injunction is warranted.  *See Int'l Bhd.*, 728 F. Supp. at 1048.  The New Jersey Plaintiffs' action to bring the same issues before two federal courts is not only improper forum shopping and counter to the jurisdiction of this Court, but also is contrary to the orderly and efficient administration of justice.  *See, e.g.*, *Martin v. Graybar Elec. Co.*, 266 F.2d 202, 204 (7th Cir. 1959).

### D.    The SIPC Defendants Have Not Acted in Bad Faith as a Matter of Law and Are Statutorily Immune From Suit by the New Jersey Plaintiffs

The *Canavan* Complaint is replete with accusations of bad faith.  (*See e.g.*, April 9th Sheehan Aff., Ex. A, Cmplt, ¶¶ 209, 210.)  However, all of these allegations are baseless as a matter of law.  The New Jersey Plaintiffs concede, as they must, that SIPC is only subject to suit for actions taken in bad faith, and that under the express provisions of SIPA, they are immune from all other actions.  *See id.*, Cmplt ¶ 45; SIPA § 78kkk(c) ("Neither SIPC nor any of its Directors, officers, or employees shall have any liability to any person for any action taken or omitted in good faith under or in connection with any matter contemplated by this chapter.");

---

[20] The claims administration process may be viewed essentially as a settlement process over which this Court has exclusive jurisdiction, making an injunction all the more necessary.

*Kusch v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 1998 WL 551972, at *32 (Bankr. S.D.N.Y. Aug. 24, 1998) *aff'd sub nom.*, *Adler, Coleman Clearing Corp. v. Mishkin*, 208 F.3d 202 (2d Cir. 2000) (quoting SIPA § 78kkk(c) and referring to SIPC's immunity under the statute).

As discussed above, this Court has ruled that the net equity calculation determined by the Trustee and endorsed by SIPC is correct, and that the New Jersey Plaintiffs' "legitimate expectations" argument is "absurd." Under these circumstances, there could be no bad faith. *In re Adler* is instructive. In *Adler*, the plaintiff account-holder sued SIPC and the SIPA trustee to recover from them compensatory and punitive damages for certain actions taken with respect to the plaintiff's account, allegedly, in bad faith. *Id.* at *1. Originally, the plaintiff moved the Court for an order directing the trustee to move her brokerage account and release her securities to another broker. The trustee and SIPC opposed her motion and after a hearing was held, her motion was denied. *Id.* at *3. The plaintiff filed an action, alleging, *inter alia*, that "because defendants, acting in concert and in bad faith, refused to deliver the securities in Kusch's account, they prevented her from selling them to NSCC at the same price that the trustee was selling customer securities" causing plaintiff to lose $1,396,182.23, the amount which would have been realized from such sale. *Id.* at *5. The plaintiff further alleged that SIPC manifested its bad faith by opposing her motion for immediate release of her securities. *Id.* at *32. The court held that trustee's actions with respect to the plaintiff's account were completely within his discretion and lawful. *Id.* "As such, SIPC's support of and authorization for those lawful acts cannot evidence bad faith." *Id.* Furthermore, if the Court were to adopt the plaintiff's argument, SIPC would be "subject to claims of self-interest and bad faith whenever it takes a position opposing any claim in a SIPA case." *Id.*

Similarly, here, the Trustee's determination of customers' claims using the Net Investment Method was not only lawful, but was deemed correct by this Court. *SIPC v. BLMIS*, 2010 WL 694211, at *2, 16. Thus, as in *Adler*, the Trustee's actions were completely lawful, and "SIPC's support of and authorization for those lawful acts cannot evidence bad faith." *In re Adler,* 1998 WL 551972, at *32. The New Jersey Plaintiffs' claims are baseless.

Not only are the New Jersey Plaintiffs' allegations false, they could not be true under any circumstances. SIPA has bifurcated the duties and obligations of the Trustee and those of SIPC. Significantly, the Trustee is charged with the day-to-day administration of the estate, which includes determining and satisfying customer claims, while it is SIPC's obligation to advance the Trustee enough money for each customer claim which he, in his sole discretion, has allowed, up to $500,000 if the claim is for securities. *See, e.g.*, § 78fff-2(b), 2(b)(1), and 3(a). SIPC could not have exhibited bad faith with respect to actions that it did not undertake—determining the appropriate method for the net equity calculation. The New Jersey Plaintiffs' attempt to impute the Trustee's actions to the SIPC Defendants, who are removed from the Trustee's decisions, wreaks of an end-run around the automatic stay of proceedings against the Trustee. Indeed, the New Jersey Plaintiffs' counsel has made similar allegations against the Trustee before this Court—unsuccessfully. (*See Peskin*, Am. Cmplt., Dkt. No. 39 at ¶¶ 2, 11–13, 85-86, 114–16; Opp. to Motion to Dismiss, Dkt. No. 30 at p. 2, 18-19, 30-31, 48.).

In sum, the SIPC Defendants are immune from the New Jersey Plaintiffs' suit because they could not have acted in bad faith for views endorsed by this Court with a full record of SIPC's alleged "bad conduct" before it. The New Jersey Plaintiffs and their counsel must be

enjoined from proceeding with their baseless and insulting action, which amounts to nothing more than a collateral attack on the Net Equity Decision.[21]

## II.    The New Jersey Action Violates the Automatic Stay

The filing of an application for a customer protective decree under SIPA puts into effect certain stays under the Bankruptcy Code.  Notice of the stays was given by the District Court in its Order, dated December 15, 2008, placing BLMIS into liquidation.  (Dist. Ct. Dkt. No. 4.)

Section 362(a)(3) of the Bankruptcy Code provides that the filing of an application for the entry of a protective decree under Section 5(a)(3) of SIPA (15 U.S.C. § 78eee(a)(3)) operates as a stay, applicable to all persons and entities, *inter alia*, of any act to exercise control over property of the estate.  *See* 11 U.S.C. § 362(a)(3).  Section 362(a)(3) is designed to prevent the dismemberment of the bankruptcy estate through interference, either directly or indirectly, with the trustee's control over estate property.  *See, e.g.*, *Liberty Mut. Ins. Co. v. Off. Unsecured Creditors' Comm.* (*In re Spaulding Composites Co., Inc.*), 207 B.R. 899, 908 (9th Cir. BAP 1997); *In re Burgess*, 234 B.R. 793, 799 (D. Nev. 1999); *In re HSM Kennewick, L.P.*, 347 B.R. 569, 572 (Bankr. N.D. Tex. 2006).  In particular, as this Court has long recognized, "Code section 362(a)(3) protects the *in rem* jurisdiction of the Court, and prohibits interference with the disposition of the assets that are under the Court's wing, whether or not the Debtor is named as a defendant as part of that effort.  And that is so without distinction as to the form the interference takes."  *Adelphia*, 2006 WL 1529357, at * 3; *see also In re MCEG Prods., Inc.*, 133 B.R. 232, 235 (Bankr. C.D. Cal. 1991).[22]

---

[21] To the extent the Court determines that the New Jersey Action should be heard (which it should not), that case belongs only before this Court, which retained jurisdiction on all matters relating to net equity, and the New Jersey Plaintiffs and their counsel should be enjoined from proceeding in other fora.

[22]  Furthermore, SIPA § 78eee(b)(2)(B) also provides for stay protection as to, *inter alia*, any suit against the debtor's property.

Protection of the Court's *in rem* jurisdiction is particularly important in a SIPA case as "exclusive jurisdiction over the debtor and its property wherever located" is vested initially in the District Court where SIPC files its application for a protective decree, *see* SIPA § 78eee(b)(2), and upon removal, in the Bankruptcy Court. *See* SIPA § 78eee(b)(4) (in relevant part, upon removal, the bankruptcy court acquires all of the jurisdiction of the district court). The SIPA application as to BLMIS was filed in the District Court for the Southern District of New York, and upon removal, this Court acquired exclusive jurisdiction over BLMIS and its property, and the concomitant exclusive jurisdiction to decide claims against such property.

In the present case, there is simply no doubt that the principal objective of the New Jersey Plaintiffs is to relitigate in another forum this Court's decision concerning the propriety of the Trustee's Net Equity calculus. The New Jersey Plaintiffs expressly challenge the propriety of that calculus throughout their Complaint and, in so doing, challenge the correctness of this Court's March 1 Net Equity Decision in favor of the Trustee by implication. (*See*, *e.g.*, Complaint ¶¶ 15, 16, 208-211.)

As this Court is well aware, the net equity issue is of vital importance in the resolution of thousands of "customer" claims in the BLMIS liquidation, and its resolution will affect the allocation and disposition of potentially literally billions of dollars worth of "customer property" through the BLMIS estate. Any finding in the New Jersey Action inconsistent with this Court's March 1 opinion resolving the net equity issue therefore would create enormous confusion in the distribution of the assets of the BLMIS estate and would severely compromise the orderly administration of the BLMIS liquidation proceeding. Further, in all likelihood, such a ruling would ultimately set the net equity issue before two different appellate courts, wasting further judicial resources, creating continued risk of judicial inconsistency, and deepening the confusion

surrounding customer satisfaction in the BLMIS liquidation. This is exactly the kind of interference proscribed by Section 362(a)(3).

The New Jersey Action also is brought in violation of other sections of the Bankruptcy Code providing that the filing of the SIPA application operates as a stay, *inter alia*, against recovery against the debtor for claims arising prior to the commencement of the case. *See* 11 U.S.C. §§ 362(a)(1) and (6). The automatic stay provision is thus broad, and "prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding." *In re AP Indus., Inc.*, 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) (Lifland, J.) (citations omitted). Similarly, in the SIPA context, the automatic stay prevents third parties from interfering with customer property and ensures its distribution in accord with the Court's administration of the estate.

The automatic stay is intended precisely to prevent creditors from obtaining payment "in preference to and to the detriment of other creditors . . ." *Id.* at 799 (citations omitted); *see also In re Keene Corp.*, 164 B.R. at 849 ("equality . . . is the governing principle").

A.     **The New Jersey Action Seeks to Subvert the Claims Administration Process**

By relitigating the Net Equity issue, there can be no question that the New Jersey Action attempts an end-run around this Court's orderly administration of the BLMIS liquidation. Under these circumstances, the New Jersey Plaintiffs—all of whom are before this Court precisely on the issue of the administration of their claims—should have sought to lift the automatic stay prior to filing the New Jersey Action. That they failed to do so speaks volumes of their fear that this Court would not permit their efforts to relitigate its rulings. And rightfully so.

In an effort to subvert the SIPA statute and its distribution mechanism that hinges upon a valid net equity claim, the New Jersey Plaintiffs cling to the entirely unfounded notion of

SIPC's independent "insurance" obligation. SIPC's obligations to customers, however, are only those specifically delineated in the SIPA statute. The SIPA statute permits SIPC to advance funds to the Trustee to satisfy allowed net equity claims, but only if customer property is insufficient to satisfy those claims. *See* SIPA § 78fff-3(a). Only customers who are entitled to share in customer property —*i.e.*, those with a valid net equity claim as "ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the *trustee*" (SIPA § 78fff-2(b) (emphasis added))— are eligible to be paid with a SIPC advance.

There is no general right to SIPC "insurance." There also is no "entitlement" to obtain payment from a SIPC advance outside of a SIPA proceeding. Whether a customer is eligible to be paid with a SIPC advance is entirely dependent upon the allowance of a valid net equity claim. As such, it is elementally connected to the SIPA liquidation proceeding and the Trustee's determination of customer claims within that proceeding. In fact, the New Jersey Plaintiffs, who couch their claims for relief as seeking compensatory and punitive damages, cannot avoid asserting that the basis for their claims is premised upon their status as "customers" of BLMIS, and that the SIPC Defendants have caused the Trustee to deny payment of the SIPC "insurance" where a customer's withdrawals exceeded deposits. (*See, e.g.*, *Canavan* Complaint, at ¶ 2 ("Under SIPA, the Customers are entitled to the prompt replacement of securities in their accounts, up to $500,000 in value, based upon their November 30, 2008 statements (their 'Statutory Balances')"; *Canavan* Complaint, at ¶4 ("[D]efendants have caused their designated trustee in the Madoff case, Irving H. Picard (the 'Trustee'), to refuse to pay SIPC insurance to any Customer whose withdrawals exceeded his deposits, . . . .".).) Further analysis of the *Canavan* Complaint elucidates that but for the denial of the New Jersey Plaintiffs' SIPA claims, there would be no controversy. Had this Court ruled in favor of the last statement method of

calculating net equity, as advocated by the New Jersey Plaintiffs, there also would be no ability, or need, to seek compensatory damages. Thus, although not explicitly labeled as such, the New Jersey Action is an indirect attempt to recover on and satisfy their claims against BLMIS. The Court can pierce this veiled attempt and recognize the true nature of the proceeding.

The New Jersey Plaintiffs seek to undermine the claims process, the Court's Net Equity Decision, the exclusive jurisdiction of the Court, and the orderly administration of the BLMIS estate by initiating and maintaining a lawsuit that seeks indirectly what they have not been able to obtain from this Court—a decision that they are entitled to a net equity claim (and therefore a SIPC advance)—based upon their last statement received. It is difficult to imagine any greater attack on these proceedings—proceedings protected by the automatic stay—than suits filed in another jurisdiction that seek to undo the Court's administration of the BLMIS liquidation. As was the case in *In re AP Industries*, the New Jersey Plaintiffs are attempting to "end run" the automatic stay and avoid the jurisdiction of this Court and the processes this Court has put into place consistent with SIPA. *In re AP Indus., Inc.*, 117 B.R. at 799; *see also In re Singer Co. N.V.*, 2000 WL 33716976, at *2.[23]

The New Jersey Plaintiffs would no doubt have this Court believe that because they have brought their suit against the SIPC Defendants rather than against the Trustee, and because they are not seeking to recover their fictitious profits from the pot of customer property, that somehow they have steered clear of the automatic stay. They are wrong. Of further concern is that the New Jersey Action would directly impact the administration of the claims procedure before this

---

[23] Similarly, the New Jersey Action violates the SIPA stay. BLMIS was placed in liquidation under SIPA by order of the District Court on December 15, 2008. Among other things, the Court ordered that "pursuant to 15 U.S.C. sec 78eee(b)(2)(B)(i), . . .any other suit against any . . . trustee of the Defendant or its property, is stayed." (SEC Action, Dkt. No. 4 at 3, *see also id.* at 2.) As under section 362 of the Bankruptcy Code, the SIPA stay is intended to protect customers from receiving preferential treatment and maintain the integrity of the SIPA claims process.

Court.  Were they to prevail before the New Jersey District Court (even though unlikely at best), and that court were to determine that the New Jersey Plaintiffs and the BLMIS customers they purport to represent all had the legitimate expectation that they would be covered by SIPC "insurance" for their fictitious profits based on their last customer statements, that ruling would directly conflict with this Court's Net Equity Decision and Order.  If that were the case, the claims administration process established by this Court would be thrown into question, directly impacting the administration of the BLMIS liquidation.  Such an inconsistent ruling would thus wreak havoc on the orderly administration of the BLMIS liquidation.  The situation would be further exacerbated by conflicting decisions on appeal.  Given the litigiousness in the BLMIS case of the New Jersey Plaintiffs' counsel to date, an unfavorable ruling in New Jersey undoubtedly would give rise to an appeal by the New Jersey Plaintiffs to the Third Circuit. Thus, the *same issue* as to the proper interpretation of "net equity," pursued by the *same claimants* both in New York *and* in New Jersey, involving the *same debtor and arising out of the same facts*, would be reviewed not by one, but by two, Courts of Appeals at the same time. Inconsistent decisions by those Courts would create even more chaos in the administration of the BLMIS SIPA liquidation.

It is not just that the New Jersey Plaintiffs seek to circumvent this Court's jurisdiction and the orderly administration of the claims administration process, it is that they have not—and cannot—steer completely clear of this Court because, as discussed above, the allegations they seek to prove are inextricably intertwined with this Court's rulings.  The claims of the New Jersey Plaintiffs arise from the Madoff Ponzi scheme, and are being adjudicated by this Court in the claims administration process.  Indeed, each of the three New Jersey Plaintiffs has filed objections to claims determinations for accounts in which they have an interest, which are

pending before this Court.  Worse still, the New Jersey Plaintiffs seek to represent all of those

BLMIS customers who are already before this Court who have been denied their fictitious

profits.[24]  In other words, all of those customers would be before the New Jersey federal court in

an effort to get preferential treatment—which is forbidden by the automatic stay.  *See, e.g.*, *AP*

*Indus., Inc.*, 117 B.R. at 798–99; *In re Keene Corp.*, 164 B.R at 849.

### B.      The New Jersey Action Is Void *Ab Initio*

The New Jersey Plaintiffs have sought an end-run around this Court's jurisdiction to

compensate them in connection with claims which are properly before this Court.  The New

Jersey Action is an attempt to create confusion with respect to the definition of "net equity" and

thus, to dictate and to affect how property is to be distributed in the BLMIS SIPA proceeding.

As noted above, while pursuing their action in New Jersey, the New Jersey Plaintiffs are

simultaneously pursuing their claims in the BLMIS SIPA proceeding.  Thus, the New Jersey

Plaintiffs are utilizing the New Jersey Action to exercise control over estate property and to

recover on claims against BLMIS, thereby violating the automatic stay.  As such, their efforts

should be found to be void *ab initio*.  *See, e.g.*, *E. Refractories Co. v. Forty Eight Insulations*,

157 F.3d 169, 172 (2d Cir. 1998); *Fed. Deposit Ins. Corp. v. Hirsch* (*In re Colonial Realty Co.*),

980 F.2d 125, 137 (2d Cir. 1992); *In re Singer Co. N.V.*, 2000 WL 33716976, at *5; *In re Enron*

*Corp.*, 314 B.R. 524, 540–41 (Bankr. S.D.N.Y. 2004).[25]

---

[24] In any event, class treatment under Federal Rule of Civil Procedure 23 could never be appropriate for the fraud suit alleged by the New Jersey Plaintiffs, among other reasons, because of issues of individualized reliance.  The Trustee reserves the right to challenge the propriety of class certification if that becomes necessary.

[25] Violations of the automatic stay are not taken lightly by courts, and the continued actions of the New Jersey Plaintiffs to subvert this Court's jurisdiction are contrary to the law and admonitions of this Court.  The Trustee submits that such actions are sanctionable as against the New Jersey Plaintiffs and/or their counsel, as this Court deems appropriate, including attorneys' fees incurred by the Trustee and his professionals in responding to and addressing these violations.  *See, e.g.*, *Fid. Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976); *In re AP Indus., Inc.* 117 B.R. at 802.

## III.    A Temporary Restraining Order Is Warranted

A federal bankruptcy court has authority to issue a temporary restraining order ("TRO") against third-party actions commenced in other federal districts to prevent a party before it from suffering irreparable harm. *See, e.g., Adelphia*, 2006 WL 1529357, at *1. "The standards for a TRO and preliminary injunction in this Circuit, which are not materially different, are well established. To prevail, the moving party must show: (a) that it will suffer 'irreparable harm in the absence of an injunction' and '(b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *Id.* at *4. (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 172 (2d Cir. 2001)).

It is clear that the Trustee can satisfy these standards. The potential for irreparable harm exists for at least two reasons. First, "[t]he infringement on this Court's jurisdiction" alone constitutes irreparable harm. *Id.* at *5; *see also In re Johns-Manville Corp.*, 97 B.R. at 181 (finding irreparable harm and enjoining suits that threatened the bankruptcy court's jurisdiction to implement its order in chapter 11 proceeding).

Second, as discussed above, the New Jersey Action is now in discovery, as the court denied the SIPC Defendants' request for a stay pending resolution of its transfer motion. (April 9th Sheehan Aff., Ex. U at 2-3.) Under these circumstances, a TRO is necessary to avoid needless discovery which will divert SIPC's and the Trustee's attention from the proceedings before this Court.

Moreover, the Trustee is likely to succeed in his request for an injunction under section 105(a), and at the very least he presents "sufficiently serious questions going to the merits" which tip the "balance of hardships . . . in the [Trustee]'s favor." *See In re Adelphia Commc'ns*

46

*Corp.*, 2006 WL 1529357, at *4.[26] As more fully discussed above, it takes only a glance at the facts to realize that the New Jersey Action is an egregious attempt by Chaitman and the New Jersey Plaintiffs to relitigate issues already presented to, and decided by, this Court.

Thus, it is evident that the Trustee has raised "serious questions" as to the New Jersey Plaintiffs' ability to proceed with their New Jersey Action, and has met the standards for issuance of a TRO.

---

[26] As noted in *In re Adelphia Commc'ns Corp*, irreparable harm need not be shown when seeking an injunction under Bankruptcy Code § 105(a).  *See id*. at *5.

## CONCLUSION

The Trustee respectfully requests that the New Jersey Plaintiffs, anyone acting on their behalf or in concert or participation with them, and all defendants, be enjoined from proceeding with the New Jersey Action and that the Court declare the action to be in violation of stays under the Bankruptcy Code and SIPA and, accordingly, void *ab initio*. The Trustee further requests that the Court issue a TRO pending its determination of the propriety of the injunctive relief sought.

Dated:  New York, New York
          April 9, 2010

    *s/Keith R. Murphy*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

300081348