MILBERG LLP
Jonathan M. Landers
Matthew Gluck
Brad N. Friedman
Sanford P. Dumain
Jennifer L. Young
One Pennsylvania Plaza, 48th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

SEEGER WEISS LLP
Stephen A. Weiss
Christopher M. Van DeKieft
Parvin Aminolroaya
One William Street
New York, NY 10004
Telephone: (212) 584-0700
Facsimile:  (212) 584-0799

*Attorneys for Michael Roth*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>           Plaintiff,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>          Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>          Debtor. | |

**<u>OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM</u>**

Michael Roth by and through his attorneys, hereby objects to the Notice of Trustee's Determination of Claim dated April 29, 2010 ("Determination Letter"), attached as Exhibit A, as described herein.

## BACKGROUND

1.      Michael Roth is a "customer," as defined by the Securities Investor Protection Act of 1970 ("SIPA"), of Bernard L. Madoff Investment Securities, LLC ("BMIS").

2.      Michael Roth's final BMIS statement for Account Number 1R0102, dated November 30, 2008, states that he owns securities valued at $6,779,696.00 ("Final BMIS Statement").

3.      On December 11, 2008, the above-captioned liquidation proceeding was commenced against BMIS, pursuant to SIPA. *See* Order, *Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Dkt. No. 4]. Irving Picard was appointed Trustee ("BMIS Trustee"), charged with overseeing the liquidation of BMIS and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. 78fff-1(a).

4.      On December 23, 2008, the Court issued an Order directing the Trustee to disseminate notice and claim forms to BMIS customers and setting forth claim-filing deadlines. *See* Order [Dkt. No. 12]. Upon information and belief, the BMIS Trustee disseminated notice and claim forms to BMIS's customers in accordance with the Court's Order.

5.      The December 23, 2008 Order further provided that, to the extent the BMIS Trustee disagrees with the amount set forth on a customer claim form, the BMIS Trustee "shall

notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, *and the reason therefor . . . .*" *See* Order at 6 (emphasis added) [Dkt. No. 12].

6.    On or about January 14, 2009, Michael Roth submitted a customer claim form to SIPC for Account Number 1R0102 (Exhibit B) ("Mr. Roth's Customer Claim").[1]    Michael Roth's Final BMIS Statement was submitted with his Customer Claim.    *See* Mr. Roth's Customer Claim (Exhibit B).

7.    On April 29, 2010, the BMIS Trustee sent Michael Roth the Determination Letter disallowing his claim in its entirety, rather than allowing the claim in the amount of $6,779,696.00, the total amount that he claimed. *See* Determination Letter (Exhibit A).

8.    Michael Roth hereby objects to the Determination Letter for the reasons described below.

## GROUNDS FOR OBJECTION

9.    First Objection.    The Determination Letter fails to comply with this Court's December 23, 2008 Order, which directs the BMIS Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's books and records." Dec. 23, 2008 Order at 5 [Dkt. No. 12].    Included with Michael Roth's Customer Claim was his final BMIS statement showing a final balance of $6,779,696.00.    *See* the Customer Claim (Exhibit B).    The Final BMIS statement is the best evidence of the amount owed based on the Debtor's books and records.    Accordingly, the claim should be allowed in the full amount of $6,779,696.00.

10.    Second Objection.    The Trustee has set forth no legal basis for disallowing Michael Roth's Customer Claim in full as filed.    The only explanations set forth in the Determination Letter are that (1) "[n]o securities were ever purchased for your account," and (2)

_____

[1] In accordance with the Court's Order dated October 20, 2009 [Dkt. No. 533], Claimant's personal identification data has been redacted from Exhibit B.

"the amount of money you withdrew from your account at BLMIS ... is greater than the amount

that was deposited with BLMIS for the purchase of securities (total of $382,438.87)."

Determination Letter at 1 (Exhibit A).  Neither of these purported grounds for disallowance have

any statutory or other legal basis.  Moreover, the Determination Letter:

       (a)     does not clearly provide "the reason" for the disallowance, as required by

the Court's December 23, 2008 Order, *see* Order [Dkt. No. 12];

       (b)     is inadequate to rebut the prima facie validity of the Customer Claim as

provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f); and

       (c)     violates general principles of applicable law requiring that an objection to

a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the

objection is based. *See, e.g.,* Collier on Bankruptcy ¶ 3007.01(3) (15th ed.) ("[A]n objection to a

claim should . . . meet the [pleading] standards of an answer.  It should make clear which facts

are disputed; it should allege facts necessary to affirmative defenses; and it should describe the

theoretical bases of those defenses."); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS

2261, at *25 (Bankr. S.D.N.Y. Jan. 13, 2003) (same).

     11.    <u>Third Objection</u>.  15 U.S.C. Section 78fff-2(b) provides that a customer's claim

shall be allowed in the amount of the customer's "net equity."  15 U.S.C. § 78fff-2(b).  Upon

information and belief, the Trustee objects to the Customer Claim on the ground that "net equity"

should be determined by principal contributed to the account less any withdrawals, without

regard to any gains reflected in the Final BMIS Statement or prior BMIS statements.  *See*

Determination Letter Table 1.  *See also* Memorandum Of Law In Support Of Trustee's Motion

For An Order Upholding Trustee's Determination Denying "Customer" Claims For Amounts

Listed On Last Customer Statement, Affirming Trustee's Determination Of Net Equity, And

Expunging Those Objections With Respect To The Determinations Relating To Net Equity, dated October 16, 2009 [Dkt. No. 525]. This is incorrect for the following reasons:

        (a)     The Trustee's construction of the statute ignores SIPA's express language which defines "net equity" as

> the dollar amount of the account or accounts of a customer, to be determined by --
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date;
>
> *********

15 U.S.C. § 78lll(11). The Trustee's proposed formulation has no support in the language of the statute or interpreting case law and in fact, adds words and concepts to the statute which do not exist.[2]

        (b)     SIPA's legislative history emphasizes Congress' intention that the statute protect customer expectations by ensuring that customers of retail brokerage firms can rely on their account statements. The BMIS statements received by Michael Roth stated that he owned a list of blue chip securities. It makes no difference whether the securities were purchased:

> A customer generally expects to receive *what he believes* is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive,

---

[2] Michael Roth is, of course, aware of the Court's Memorandum Decision dated March 1, 2010 [Dkt. No. 1999] regarding the Trustee's determination of "net equity." However, for the reasons set forth herein, Michael Roth respectfully believes that the Court's March 1, 2010 ruling is incorrect and will be overturned on appeal.

> that is, securities which they maintained in their brokerage
> account. . . . By seeking to make customer accounts whole and
> returning them to customers in the form they existed on the filing
> date, the amendments . . . would satisfy customers' legitimate
> expectations . . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).  While there may be a basis to disallow

customer claims for wholly fictitious securities of nonexisting entities, here the securities set

forth on Michael Roth's Final BMIS Statement and prior statements were those of actual

companies listed on the stock exchange.

      (c)    Michael Roth deposited funds in BMIS with the expectation the amount

would grow, his account statements showed such growth, and the balance on his Final BMIS

Statement reflects the benefit of this bargain.  The Trustee's formula is an improper and wholly

inadequate measure of loss.  In *Visconsi v. Lehman Brothers, Inc.*, 244 Fed. Appx. 708 (6th Cir.

2007), the Court declined to set aside an arbitration award that appeared to have applied an

expectancy measure of damages against a successor in a Ponzi scheme case, and rejected the

"money in/money out" formula as not reflecting the expectations of the parties.  The Court

explained:

> Lehman's out-of-pocket theory misapprehends the harm suffered
> by Plaintiffs and the facts of this case.  Plaintiffs gave $21 million
> to Gruttadauria [the dishonest broker], not to hide under a rock or
> lock in a safe, but for the express purpose of investment, with a
> hope -- indeed a reasonable expectation -- that it would grow.
> Thus, the out-of-pocket theory, which seeks to restore to Plaintiffs
> only the $21 million they originally invested less their subsequent
> withdrawals, is a wholly inadequate measure of damages.  Had
> Gruttadauria invested Plaintiffs' money as requested, their funds
> would like grown immensely, especially considering that Plaintiffs
> invested primarily throughout the mid-1990s, which, had they
> hired an honest broker . . . , would have placed their money in the
> stock market during one of the strongest markets in recent
> memory.  In fact, the fictitious statements issued by Lehman,
> which were designed to track Plaintiffs' funds as if they had been
> properly invested, indicate that Plaintiffs' accounts would have
> grown to more than $37.9 million (even accounting for the

withdrawal of more than $31.3 million).  Plaintiffs thus could have
reasonably believed that they were entitled to the full $37.9 million
balance shown, regardless of the amounts of their previous
deposits and withdrawals.

*Visconsi*, 244 Fed. Appx. at 713-14 (emphasis added).  This applies precisely to the Trust's

claim.

      (d)     The Trustee's Determination Letter is contrary to SIPC's own policies and

practices, as reflected in the sworn testimony of Stephen Harbeck, SIPC's president and CEO,

and its actions in similar liquidation proceedings.  For example, in the *New Times* SIPA

liquidation, in the context of discussing claims filing deadlines, Harbeck acknowledged that

SIPC would replace securities listed on customer account statements, even if the securities had

never been purchased:

> Harbeck:  [I]f you file within sixty days, you'll get the securities,
> without question.  Whether -- if they triple in value, you'll get the
> securities. . . . Even if they're not there.
>
> Court:  Even if they're not there.
>
> Harbeck:  Correct.
>
> Court:  In other words, if the money was diverted, converted --
>
> Harbeck:  And the securities were never purchased.
>
> Court.  Okay.
>
> Harbeck:  And if those positions triple, we will gladly give the
> people their securities positions.

Transcript at 37-38, *In re New Times Securities Services, Inc.*, No. 00-8178 (Bankr. E.D.N.Y.

July 28, 2000) (Exhibit C).  The Second Circuit's discussion of SIPC's claims processing in *New

Times* further indicates that, with respect to customers who thought they were invested in listed

securities, SIPC paid customer claims based on the customers' final account statements, even

where the securities had never been purchased:

> Meanwhile, investors who were misled . . . to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds -- because Goren never executed the transactions -- the information that these claimants received on their account statements mirrored what would have happened had the given transaction been executed. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. Furthermore, the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," . . . could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements.

*In re New Times Secs. Servs.*, 371 F.3d 68, 74 (2d Cir. 2004); *see also* Brief of Appellant SIPC at 23-24, *In re New Times Sec. Servs., Inc.*, No. 05-5527 (Dec. 30, 2005) (arguing that under SIPA "reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality" such as when the customer receives a confirmation reflecting a purchase, "even where the purchase never actually incurred and the debtor instead converted the cash deposited by the claimant to fund that purchase").[3] Michael Roth is situated no differently from the "securities claimants" discussed by the Second Circuit. Accordingly, his claim should be recognized in full.

12.    In the event that the Court should determine that claimed gains on deposited funds should not be allowed, then in the alternative, Michael Roth is entitled to recover interest on such deposited amounts. Such interest is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law. *See Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S.

---

[3] There are similar statements in S. Rep. No. 95-763, at 2 (1978) (SIPA seeks to make customers whole even if securities of customers are "lost ... misappropriated, never purchased or even stolen"); H.R. Rep. No. 95-746, at 21 (1977) (customer expects to receive what he believes is in his account even if securities were "never purchased").

443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

      (a)    Under New York law, which is applicable here, funds deposited with the Debtors under these circumstances are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Accordingly, Customer claims should be recalculated by adding interest to all funds deposited by customers such as Michael Roth.

      (b)    Under New York law, which is applicable here, customers are entitled to prejudgment interest and any returns the Debtors earned on the deposited funds under principles of unjust enrichment. Accordingly, Customer claims should be recalculated by adding the amounts earned by the Debtors on Michael Roth's deposits. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

      13.    <u>Fourth Objection.</u> The BMIS Trustee's action in reducing the amount shown on the Customer Claim by any prior gains reflected on his final BMIS statement or prior BMIS statements is an attempt to avoid such gains without alleging any grounds for avoidance or proving that such gains are avoidable under the Bankruptcy Code's avoidance provisions. As such, any such disallowance is improper and unjustified, and the Determination Letter should be stricken. *See* Fed. R. Bankr. P. 7001(1); 7008.

      14.    <u>Fifth Objection.</u> The Trustee's determination assumes that BMIS never earned funds and therefore all gains reported to customers were "fictitious." This assumption is

contrary to fact. There is significant evidence that, at some time, BMIS was at least in part a legitimate business and therefore all or a portion of the gains were not fictitious. The burden is on the Trustee to show that BMIS never earned any amounts to support customer gains and, if at some point it did earn funds, the dates when it ceased to do so. The Trustee is required to state and prove when the Ponzi scheme began.

15.    Sixth Objection. Michael Roth was required to pay significant income taxes on distributions which the Trustee has alleged are fictitious. The Trustee has justified his proposed method of calculating claims as fair and reasonable because fictitious gains should not compete dollar for dollar with claims for funds actually deposited by customers, and his proposed method equalizes the treatment of all customers. This justification is not correct insofar as customers did not have the use of reported but fictitious gains because of required income tax payments. Even assuming *arguendo* the Trustee's method is correct, Michael Roth's customer claims should be adjusted by adding all amounts he actually paid as income taxes on allegedly fictitious gains to equalize his treatment with that of other customers. See *SEC v. Byers*, No. 08-7104, 2009 U.S. Dist. LEXIS 63741, at *11-13 (S.D.N.Y. 2009) (in equitable distribution proceeding, allowing claims for reinvestment of fictitious profits to equitably treat reinvesting customers as compared with customers receiving distributions).

16.    Seventh Objection. The Determination Letter purports to calculate the "net equity" for Michael Roth's BMIS account on the basis of certain withdrawal and deposit transactions for which Michael Roth has no records. Many of the transactions in question allegedly occurred more than ten years ago. It is unreasonable to anticipate the customers would maintain records of accounts for long periods of time given (a) general limitations on record retention requirements under tax law and other applicable rules governing record retention; (b)

the apparent safety and solvency of BMIS as acknowledged by the United States Securities and

Exchange Commission and other securities agencies which had investigated the affairs of BMIS;

and (c) the fact that historical records such as those in question are usually available from

financial institutions, including broker-dealers, upon request.   Under these circumstances, the

Trustee should be required to prove that the alleged withdrawal transactions occurred by

furnishing the appropriate records to Michael Roth and, absent such records, such transactions

should be deleted from the calculation of Michael Roth's "net equity."   Likewise, the Trustee

should be required to prove that all deposit transactions are completely listed by furnishing the

appropriate records to Michael Roth.

### RELIEF REQUESTED

17.     For the reasons stated herein, Michael Roth's Customer Claim should be allowed

in its entirety.

18.     For the reasons stated herein, the Court should direct SIPC to issue immediate

payment to Michael Roth in the amount of $500,000.00 plus interest from the date of the

Determination Letter without imposing conditions to payment which are not authorized or

warranted.

19.     The BMIS Trustee's determination amounts to an improper disallowance of a

claim that has prima facie validity.   *See* Bankruptcy Code § 502(a).   The BMIS Trustee has

offered no factual or legal basis for his Determination.   The BMIS Trustee's Determination

Letter, and the objections contained therein, should be stricken, or alternatively, the BMIS

Trustee should describe his position in detail including all relevant facts, legal theories, and

authorities.   Upon the filing of such a statement, this matter will be a contested proceeding under

Rule 9014, and Michael Roth will file a response.

11

20.    Michael Roth requests such other relief as may be just and equitable.


## CONCLUSION

21.    Michael Roth reserves the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of Michael Roth's right to object on any additional grounds.

22.    Michael Roth reserves all rights set forth Rule 9014, including, without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014.

23.    Michael Roth reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

24.    Michael Roth incorporates by reference all reservations of rights set forth in the Customer Claim.

Dated: May 10, 2010

<div style="margin-left: 40%;">

s/ Jonathan M. Landers
MILBERG LLP
Jonathan M. Landers
Matthew Gluck
Brad N. Friedman
Sanford P. Dumain
Jennifer L. Young
One Pennsylvania Plaza, 48th Fl.
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229

</div>

SEEGER WEISS LLP
Stephen A. Weiss
Christopher M. Van DeKieft
Parvin Aminolroaya
One William Street
New York, NY 10004
Telephone: (212) 584-0700
Facsimile:  (212) 584-0799

*Attorneys for Plaintiff Michael Roth*