Joel Cohen, Esq.
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006
Email: jcohen@stroock.com

*Attorneys for Amy Roth*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br>Plaintiff,<br>v.<br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM** |

Amy Roth hereby objects to the Notice of Trustee's Determination of Claim dated April 26, 2010 (the "Determination Letter") and states as follows:

### BACKGROUND

1. On or about March 31, 1981, Amy Roth established an account with Bernard L. Madoff Investment Securities, LLC ("BLMIS"), bearing the Account Number 1-R0041 (the "Account").

2. Amy Roth is a "customer" of BLMIS, as defined by the Securities Investor Protection Act ("SIPA"). *See* 15 U.S.C. § 78*lll*(2).

3. From the creation of the Account until December of 2008, Amy Roth received regular updates on the status of the Account, including monthly statements, trade confirmations, and quarterly portfolio management reports from BLMIS.

4. The final update regarding the account that Amy Roth received from BLMIS was a monthly statement dated November 30, 2008 (the "Final Customer Statement"). *See* Exh. A.

5. The Final Customer Statement reflects that the Account contained securities with a market value of $9,028,346. *See* Exh. A.

6. On December 15, 2008, this SIPA liquidation proceeding was commenced and Irving H. Picard, Esq., was appointed as trustee (the "Trustee"). *See* Dec. 15, 2008 Order (Docket No. 1).

7. On December 23, 2008, this Court issued an Order (the "December 23, 2008 Order") setting a bar date for all claims against BLMIS, including all claims from BLMIS customers. *See* Dec. 23, 2008 Order (Docket No. 12).

8. On June 24, 2009, Amy Roth timely filed a claim in the amount of $9,028,346 for the securities in the Account that were reflected in the Final Customer Statement (the "Customer Claim"). *See* Exh. A.

9. The December 23, 2008 Order required that, if the Trustee disagreed with any claims filed by BLMIS customers, the Trustee must "notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, and the reason therefor[.]" *See* Dec. 23, 2008 Order (Docket No. 12).

10. On March 1, 2010, this Court issued a decision approving of the Trustee's method for calculating the "net equity" owed to each BLMIS customer by reference only to "the amount of cash deposited by the customer into his BLMIS customer account less any amounts already withdrawn by him (the 'Net Investment Method')." *See* Mar. 1, 2010 Mem. Decision at 5-6; *see also* 15 U.S.C. § 78*lll*(11) (definition of "net equity"). In so deciding, this Court rejected the

2

"Final Customer Statements" method of calculating "net equity" based on "the amounts reflected on customers' November 30th Statements[.]" *See* Mar. 1, 2010 Mem. Decision at 5-6.

11. On March 8, 2010, this Court issued an order adopting the "Net Investment Method" as "the proper interpretation and application of net equity" and expunging certain objections to the Trustee's determinations of customer claims "insofar as those objections are based upon the Final Customer Statements rather than the Net Investment Method to determine Net Equity[.]" Mar. 8, 2010 Order (Docket No. 2020) (the "Net Equity Order").

12. On March 8, 2010, this Court certified the Net Equity Order for immediate appeal to the United States Court of Appeals, "because this proceeding involves a matter of public importance, and an immediate appeal may materially advance the progress of this proceeding." Mar. 8, 2010 Order (Docket No. 2022).

13. A final resolution on the definition of "net equity" pursuant to 15 U.S.C. § 78*lll*(11) is pending.

14. On April 26, 2010, the Trustee issued a Notice of Trustee's Determination of Claim (the "Trustee's Determination"), rejecting the Customer Claim for two apparent reasons: (1) that no securities had been purchased by BLMIS on behalf of the Account (contrary to the monthly statements, trade confirmations, and quarterly portfolio management reports regularly sent by BLMIS); and (2) that Amy Roth had withdrawn more money from the Account than Amy Roth had deposited in it. *See* Exh. B.

**GROUNDS FOR OBJECTION**

**I. The Trustee's Determination Is Inadequate Under the December 23, 2008 Order and the Legal Standard for an Objection to a Claim.**

15. Because the Customer Claim was timely filed and executed, it is prima facie valid under Federal Rule of Bankruptcy Procedure 3001(f). *See also* 11 U.S.C. § 502(a).

3

16. While the Trustee's Determination includes an exhibit purporting to calculate the money deposited in the Account less the money withdrawn from the Account, this exhibit is entirely unsubstantiated: no supporting documentation is provided, and no explanation is provided for what documents (if any) were used to prepare the exhibits.

17. Amy Roth has not been shown any records relied upon by the Trustee in producing the Trustee's determination, and no specific details about such records have been provided to Amy Roth.

18. It is unreasonable to anticipate that Amy Roth would be able to compare the exhibit against her own records of withdrawals and deposits, given: (a) the number of years the account was open (27 years); (b) the apparent safety and solvency of BLMIS; and (c) the fact that complete and accurate historical financial records are usually available from broker-dealers such as BLMIS upon request.

19. Thus, the Trustee's Determination failed to explain with sufficient clarity "the reason" why the Trustee chose to disallow the Customer Claim, violating this Court's command in its December 23, 2008 Order. *See* Dec. 23, 2008 Order (Docket No. 12).

20. The unexplained basis for the Trustee's Determination also fails to meet the basic standard for an objection to a claim. *See In re Best Payphones*, No. 01-15472 (SMB), 2007 WL 203980, at *6 (Bankr. S.D.N.Y. Jan. 24, 2007) ("The proof of claim is analogous to a complaint, and the objection is analogous to and must meet the standards of an answer in a civil action.") (citations omitted); *see also* Fed. R. Civ. P. 8(b)(2) ("A denial must fairly respond to the substance of the allegation.").

21. For these reasons, absent specific proof of each withdrawal and deposit, the Trustee's Determination should be rejected by this Court.

4

**II.    The Trustee's Determination Fails to Comply with the Trustee's Obligations Under 15 U.S.C. § 78fff-4(c).**

22.    The Trustee is obligated pursuant to 15 U.S.C. § 78fff-4(c) to:

> promptly satisfy all obligations of the member to each of its customers relating to, or net equity claims based upon, securities or cash by the delivery of securities or the effecting of payments to such customer . . . insofar as such obligations are ascertainable from the books and records of the member or are otherwise established to the satisfaction of SIPC.

23.    The "books and records" of BLMIS include the Final Customer Statement and all other monthly statements, trade confirmations, and quarterly portfolio management reports regularly sent by BLMIS to Amy Roth.

24.    The "books and records" of BLMIS, as reflected in the Final Customer Statement, show that Amy Roth has a valid claim for $9,028,346. *See* Exh. A.

25.    The Customer Claim was valid, as the Customer Claim was premised upon "obligations" of BLMIS reflected in its "books and records," specifically the Final Customer Statement. *See* Exh. A.

26.    By not acting "promptly" to "satisfy" the valid Customer Claim, the Trustee violated 15 U.S.C. § 78fff-4(c).

**III.    The Trustee's Determination Failed to Honor Amy Roth's Legitimate Customer Expectations and Violated the Intent Behind and Meaning of SIPA.**

27.    In 1978, amendments were passed to SIPA in order to "make SIPA more responsive to the reasonable expectations of public investors and [to] provide investors with greater protection against the financial failure of stock-brokers, thereby enhancing investor confidence in the securities markets." H.R. Rep. 95-746, at 21 (1977).

28.    The 1978 Amendments were intentionally designed to ensure that each "customer" would receive compensation based on what that customer legitimately believed was in his or her account, *even if the securities at issue were never purchased*:

5

> *A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been* lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, *this is not always possible.* Accordingly, when the customer claims for a particular stock exceed the supply available to the trustee in the debtor's estate, then customers generally receive pro rata portions of the securities claims, and as to any remainder, they will receive cash based on the market value as of the filing date (normally the day the liquidation proceeding is initiated). . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, *the amendments* not only *would satisfy the customers' legitimate expectations*, but also would allow him to continue to exercise investment prerogatives and to avoid oftentimes adverse tax consequences.

H.R. Rep. 95-746, at 21 (emphasis added) (Report from the Committee on Interstate and Foreign Commerce);

> *Under present law, because securities belonging to customers may have been* lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, *it is not always possible to provide to customers that which they expect to receive, that is, securities which the maintained in their brokerage account.* . . .
>
> . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, *the amendments* not only *would satisfy the customers' legitimate expectations* but also would restore the customer to his position prior to the broker-dealer's financial difficulties.

S. Rep. 95-763 (1978) (emphasis added) (Report from the Committee on Banking, Housing, and Urban Affairs).

29.    Officials of and advocates for the Securities Investor Protection Corporation ("SIPC") have also stated on the record that the amended SIPA was intended to ensure that each customer would have a claim for all securities that he or she reasonably thought he or she owned, regardless of whether those securities ever existed in the customer's account. *E.g.*,

> The proposed amendments carry out the Task Force recommendations and are designed to make the act more responsive to the reasonable expectations of investors. Even though the overall purpose of the law is being met, that is to provide protect to customers of broker/dealers, some customers of failed members still believe that they are not receiving the protection they thought they were going to get in the way they believe they should get it. The proposed amendments will enhance investor confidence in our securities markets.

6

> . . .
>
> *[C]ustomers generally expect to receive what is in their accounts when the member stops doing business.* If John Q. Investor has 100 fully-paid shares of IBM and a credit balance of $200 in his account, he expects to receive from the trustee a stock certificate for 100 shares of IBM and a check for $200.
>
> *But in many instances that has not always been possible because securities have been* lost, improperly hypothecated, *never purchased,* or even stolen.
>
> . . .
>
> *The proposed amendments are designed to meet [this and other] shortcomings in the law* . . . . The amendments will, we believe, serve to maximize consumer protection[.]

H.R. Rep. 95-746, at 39 (emphasis added) (Statement by SIPC Chairman Hugh F. Owens);

> Of vital importance here, reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality. Thus, for example, *where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund the purchase.* . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater "customer" protection than would be the case if transactional reality, not claimant expectations, were controlling, as this court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC, Dec. 27, 2005, *Stafford v. Giddens (In re New Times Secs. Servs., Inc.)*, No. 05-5527-bk, 2005 WL 5338148, at *23-*24 (2d Cir.) (footnote and citations omitted; emphasis added);

> MR. HARBECK: Now, what Congress did is it said it wants to give the Trustee and SIPC a very good idea of what securities have to -- that the Trustee is going to have to go out into the marketplace and buy. So, if you file within sixty days, you'll get the securities, without question. Whether -- if they triple in value, you'll get the securities.
>
> But, if --
>
> THE COURT: Even -- if --
>
> MR. HARBECK: Even if they're not there.

7

> THE COURT: Even if they're not there.
>
> MR. HARBECK: Correct.
>
> THE COURT: In other words, if the money was diverted, converted --
>
> MR. HARBECK: And the securities were never purchased.
>
> THE COURT: Okay.
>
> MR. HARBECK: And, if those positions triple, we will gladly give the people their securities positions.

Tr. 37:17-38:10, July 28, 2000, In re New Times Secs. Servs., Inc., No. 00-8178 (Bankr. E.D.N.Y.) (dialogue between Bankruptcy Court and Stephen P. Harbeck, President and Chief Executive Officer of SIPC).

30.   Josephine Wang, SIPC's General Counsel, was cited by the "Insiders' Blog" at StreetInsider.com as having applied the logic of legitimate expectations as follows:

> Based on a conversations [sic] with the SIPC general counsel Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500k each. So if Maddof [sic] client number 1234 was given a statement showing that they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

Insiders' Blog, *SIPC's Role In Madoff-Of-All-Scams Could Save The Stock Market*, StreetInsider.com, Dec. 16, 2008, http://www.streetinsider.com/Insiders+Blog/SIPC's+Role+In+Madoff-Of-All-Scams+Could+Save+The+Stock+Market/4243249.html.

31.   Indeed, consistent with these statements, the language of the Series 500 Rules governing SIPC shows that a customer is allowed to pursue a claim for securities if the customer receives written notice of the purchase of the securities, *whether or not the securities were actually purchased*:

8

> Where the Debtor held cash in an account for a customer, the customer has a "claim for securities" with respect to any authorized securities purchase:
>
> (1) if the Debtor has sent written confirmation to the customer that the securities in question have been purchased for or sold to the customer's account; or
>
> (2) whether or not such a written confirmation has been sent, if the securities in question have become the subject of a completed or executory contract for purchase for or sale to the account.

17 C.F.R. § 300.502(a); *see also In re New Times Secs. Servs., Inc.*, 371 F.3d 68, 86 (2d Cir. 2004) ("Under the Series 500 Rules, whether a claim is treated for securities or cash depends not on what is *actually* in the customer's account but on what the customer has been told by the debtor in written confirmations.").

32.  Due to the monthly statements, trade confirmations, and quarterly portfolio management reports regularly sent by BLMIS, Amy Roth reasonably believed and legitimately expected, throughout the existence of the Account, that BLMIS had executed the transactions claimed in the records sent and that the Account contained all securities mentioned and all proceeds therefrom.

33.  Indeed, in each year that Amy Roth withdrew funds from the Account, Amy Roth paid income taxes on the withdrawals. Amy Roth would not have paid such taxes, and the Internal Revenue Service would not have billed them, if Amy Roth did not reasonably believe and legitimately expect that the assets in the account existed.

34.  By ignoring Amy Roth's reasonable beliefs and legitimate expectations in the Trustee's Determination, the Trustee violated both the intent behind and the meaning of the amended SIPA.

**IV.   The Trustee's Determination Functions as an Illegal Clawback Action in Violation the Applicable Statute of Limitations.**

35.   Pursuant to the Final Customer Statement, Amy Roth was owed $9,028,346 by BLMIS, due to the purported holdings of the Account.

36.   All withdrawals made by Amy Roth were without notice of any impropriety or fraud by BLMIS, and each withdrawal was made for value (*i.e.*, a corresponding reduction in the amount of money owed by BLMIS to Amy Roth due to the purported holdings of the Account).

37.   The Trustee, through the Trustee's Determination, is attempting to reduce BLMIS's obligation to Amy Roth down to nothing. This functional clawback action has been mounted without even the allegation of a single ground for avoidance under either federal or state law and without following any of the procedures required by Rules 7001(1) and 7008(a) of the Federal Rules of Bankruptcy Procedure.

38.   The Trustee is attempting to reduce Amy Roth's net equity on account of withdrawals as far back as April 1, 1981, well beyond any potentially applicable limitations period for an avoidance action.

39.   The Trustee's Determination is an illegal attempt to circumvent established and governing laws, and it should be rejected for that reason.

**V.   Amy Roth is Entitled to Interest on the Customer Claim.**

40.   Because "[t]he proof of a claim is analogous to a complaint," *Best Payphones*, 2007 WL 203980, at *6, upon the Customer Claim's acceptance, Amy Roth will be entitled to interest under New York law (which is applicable here). *See* N.Y. C.P.L.R. § 5004 (providing for a nine per cent fixed interest rate for judgments).

41.   Amy Roth is equally entitled to prejudgment interest, since the money invested with BLMIS was converted. *See Eighteen Holding Corp. v. Drizin*, 268 A.2d 371 (1st Dep't

10

2000) (awarding prejudgment interest on judgment for money had and received, unjust enrichment, and conversion because "defendants wrongly withheld plaintiff's money"); *see also Steinberg v. Sherman*, No. 07 Civ. 1001 (WHP), 2008 U.S. Dist. LEXIS 35786, at *15 (S.D.N.Y. May 2, 2008) (citing cases for the proposition that prejudgment interest is generally available for judgments of conversion and unjust enrichment, with interest calculated at the nine percent statutory rate for post-judgment interest).

42. Furthermore, victims of a Ponzi scheme are entitled to "an expectancy measure of damages, which seeks to put Plaintiffs in the position the would have held had [the broker-dealer] not breached [its] 'bargain' to invest Plaintiffs' money." *See Visconsi v. Lehman Bros., Inc.*, 244 Fed. App'x 708, 713 (6th Cir. 2007) (noting that defrauded investors are entitled to be compensated based on the fact that they gave their money "not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope-indeed a reasonable expectation-that it would grow[]").

43. As a victim of BLMIS's conversion of the Account, Amy Roth is entitled to prejudgment interest at the New York statutory rate of nine percent.

## VI. Amy Roth Is Entitled to an Advance from SIPC and a Share of Customer Property.

44. The Final Customer Statement, on which Amy Roth reasonably and legitimately relied, entitles Amy Roth to the entirety of the Customer Claim, *i.e.* $9,028,346. *See* Exh. A.

45. The Trustee, on behalf of SIPC, is obligated to advance to each customer with a valid and outstanding claim for securities the first $500,000 of his or her claim. *See* 15 U.S.C. § 78fff-3(a). Any such customer who has a claim for more than $500,000 is entitled to "share ratably in [any available] customer property on the basis of and to the extent of their respective net equities[,]" minus the amount advanced. *See* 15 U.S.C. § 78fff-2(c)(1).

11

46.   Thus, Amy Roth is entitled to an advance of $500,000 from SIPC and claims against customer property for the remainder of the Customer Claim, *i.e.* $8,528,346.

## RESERVATION OF RIGHTS

47.   Amy Roth reserves the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of Amy Roth's right to object on such additional ground or grounds.

48.   Amy Roth reserves all rights set forth in Rule 9014 of the Federal Rules of Bankruptcy Procedure, including, without limitation, rights to discovery.

## RELIEF REQUESTED

For the reasons stated herein, the Customer Claim should be allowed in its entirety in the amount of $9,028,346, which is the amount stated on the Final Customer Statement, plus interest from the date of the Trustee's Determination.

For the reasons stated herein, this Court should direct SIPC to advance Amy Roth $500,000 forthwith.

For the reasons stated herein, the Trustee's Determination should be rejected.

Amy Roth requests such other relief as may be just and equitable.

Dated: New York, New York
       May 21, 2010

STROOCK & STROOCK & LAVAN LLP

By: _____
Joel Cohen, Esq.
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006
Email: jcohen@stroock.com

*Attorneys for Amy Roth*