Helen Davis Chaitman (4266)
BECKER & POLIAKOFF LLP
45 Broadway
New York, NY 10006
(212) 599-3322
hchaitman@becker-poliakoff.com
Attorneys for Lawrence Roth
and Jeannette Roth

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------          Adv. Pro. No. 08-01789 (BRL)

SECURITIES INVESTOR PROTECTION
CORPORATION,

              Plaintiffs                                                    SIPA Liquidation

vs.                                                                      **OBJECTION TO TRUSTEE'S
                                                                          DETERMINATION OF
BERNARD L. MADOFF INVESTMENT                                              CLAIM**
SECURITIES LLC,

              Defendant.
--------------------------------------------------------

       Lawrence Roth and Jeannette Roth (the "Roths") hereby object to the Notice of Trustee's

Determination of Claim dated May 11, 2010 (the "Determination Letter") sent by Irving H.

Picard, Trustee, and state as follows:

**Background facts**

       1.      In 1976 or 1977, the Roths opened an account with Bernard L. Madoff Investment

Securities LLC ("Madoff") in the name of Lawrence Roth and Jeannette Roth Tenants in

Common (the "Account").  In the later years, the Account was assigned No. 1R0159 by Madoff.

       2.      Each of the Roths had deposited money into the Account for the purpose of

purchasing securities and each of them had the power to direct the investments in the Account.

Each of the Roths communicated with Madoff concerning the Account and each of the Roths owned half of the assets in the Account.

3.      According to the Trustee, during the period from August 13, 1997 through December 11, 2008, the total deposits into the Account were $1,673,427.90 and the total withdrawals from the Account were $2,202,800.  However, the Account had a balance as of August 13, 1997 of $623,427.90 which the Trustee is crediting at $0.  In addition, the Roths transferred into the Account $450,000 of mandatory IRA withdrawals from Lawrence Roth's IRA account at Madoff, Account No. 1R019230, which the Trustee is also crediting at $0.  Thus, the Trustee is crediting the Account with deposits of only $600,000.  See Exh. A.

4.      The Roths dispute the Trustee's calculations and methodology.

5.      Throughout the period that the Roths had the Account, they paid taxes annually on the appreciation in the Account.

6.      The November 30, 2008 market value of securities in the Account was $226,752.56.

7.      The Roths sent a timely SIPC claim to the Trustee for the Account asserting a claim for securities in the amount of $226,752.56, based upon the November 30, 2008 Madoff statement.

8.      In the Determination Letter, the Trustee rejected the Roths' claim for securities based upon the November 30, 2008 balance and claimed that the Roths had withdrawn from the Account $1,582,800 more than they had deposited.  The Trustee ignored all appreciation in the Account and ignored the fact that each of the Roths is a "customer" under the Securities Investor Protection Act ("SIPA"), entitled to up to $500,000 in SIPC insurance.  See Exh. A at 1-2.

**Grounds for objection**

2

**A.  The Trustee has failed to comply with the Court's December 23, 2008 Order**

9.      The Determination Letter fails to comply with the Court order dated December

23, 2008 which directs the Trustee to satisfy customer claims and deliver securities in

accordance with "the Debtor's books and records."  December 23, 2008 Order at 5 (Docket No.

12).  The November 30, 2008 account statement generated by Madoff is reflective of "the

Debtor's books and records" by which the Trustee is bound, absent proof that the Roths did not

have a "legitimate expectation" that the balance on the Account statements represented their

property.  In fact, in each year that they had the Account, the Roths paid short term capital gains

tax on the appreciation in the Account, which were duly accepted by the taxing authorities.  They

would not have done so if they had any belief whatsoever that the assets in the Account did not

belong to them.

10.      The Trustee has failed to state a basis in the Determination Letter for the position

he has taken.  Thus, he has not complied with the requirement that an "objection to a claim

should . . . meet the [pleading] standards of an answer.  It should make clear which facts are

disputed; it should allege facts necessary to affirmative defenses; and it should describe the

theoretical bases of those defenses."  Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron*

*Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

**B.  The Trustee has violated the requirement that he honor a customer's "legitimate**
**expectations"**

11.      The legislative history of the Securities Investor Protection Act ("SIPA") makes

clear that Congress' intent was to protect a customer's "legitimate expectations."   For example,

Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be
> remedied by [the 1978 amendments] is the failure to meet legitimate customer

expectations of receiving what was in their account at the time of their broker's
insolvency.

*        *        *

A customer generally expects to receive what he believes is in his account at the
time the stockbroker ceases business. But because securities may have been lost,
improperly hypothecated, misappropriated, never purchased, or even stolen, this
is not always possible. Accordingly, [when this is not possible, customers] will
receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

12.     On December 30, 1970, when President Nixon signed SIPA into law, he made the

following statement:

I am signing today the Securities Investor Protection Act of 1970. This legislation
establishes the Securities Investor Protection Corporation (SIPC), a private
nonprofit corporation, which will insure the securities and cash left with
brokerage firms by investors against loss from financial difficulties or failure of
such firms.   . . . Just as the Federal Deposit Insurance Corporation protects the
user of banking services from the danger of bank failure, so will the Securities
Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid=2870

13.     The Securities Investor Protection Corporation's ("SIPC's) Series 500 Rules, 17

C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance

with the "legitimate expectations" of a customer based upon the written transaction

confirmations sent by the broker-dealer to the customer.

14.     Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations."

This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein

SIPC assured the appeals court that its policy was to honor the legitimate expectations of

investors, even where the broker never purchased the securities.  SIPC wrote:

Reasonable and legitimate claimant expectations on the filing date are controlling
even where inconsistent with transaction reality.  Thus, for example, **where a
claimant orders a securities purchase and receives a written confirmation**

4

**statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

15.    The Trustee's  position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on  December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each.  So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

16.    As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements.  In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

HARBECK:  . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.

COURT:  Even if they're not there.

HARBECK:  Correct.

COURT:  In other words, if the money was diverted, converted –

HARBECK:  And the securities were never purchased.

COURT:  Okay.

HARBECK:  **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

## C.  Without legal authority, the Trustee has invented his own definition of "net equity"

17.    SIPA defines "net equity" as the value of the securities positions in the customer's

account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

18.    SIPA specifically prohibits SIPC from changing the definition of "net equity."  15

U.S.C. § 78ccc(b)(4)(A).

19.    The Second Circuit has recognized that:

Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed

6

by the debtor to such customer if the debtor had liquidated, by sale or purchase on
the filing date, all securities positions of such customer" [corrected for] any
indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re*

*Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is

calculated as the difference between what the debtor owes the customer and what the

customer owes the debtor on the date the SIPA proceeding is filed.").

20.    In derogation of his obligations to carry out the provisions of SIPA, the Trustee

has created his own definition of "net equity."  The Trustee has asserted that he has a right to

recognize investors' claims only for the amount of their net investment, disregarding all

appreciation in their accounts.  By this procedure, the Trustee would avoid paying SIPC

insurance to the thousands of elderly, long-term Madoff investors who, like the Roths, have

depended upon their Madoff investments for their daily living expenses.  He also would be able

to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for

reimbursement of the insurance it does pay to customers.

21.    Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

Using the final statements created by Mr. Madoff as the sole criteria for what a
claimant is owed perpetuates the Ponzi Scheme.  It allows the thief . . . Mr.
Madoff . . . to determine who receives a larger proportion of the assets collected
by the Trustee.

22.    Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to

save money for the brokerage community at the expense of innocent investors who relied upon

the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

23.    After 18 months of his tenure, the Trustee has identified only two Madoff

investors who **might not** have had a "legitimate expectation" that the trade confirmations and

account statements they received were accurate.  The Trustee has sued two Madoff customers,

7

Stanley Chais and Jeffry Picower who, Picard has alleged, took out of Madoff $7.2 billion more than they invested.  The Trustee  has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

24.    However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

25.    The Roths, like thousands of other investors, received monthly statements from Madoff over the past few years indicating returns on their Madoff investment in the range of 9% to 11% per year subject to short term capital gains tax rates.  The Roths had entered into a standard brokerage agreement with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Account had a specific, numbered account for the purchase and sale of securities; they received on a monthly basis trade confirmations for every securities transaction in the Account which accurately set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities.  The Roths paid taxes on the annual growth of the investments with Madoff. There is no basis to claim that the Roths did not have a "legitimate expectation" that the assets reflected on the Account statements sent to them by Madoff belonged to them.   Thus, the Roths are entitled to a claim for securities in the amount of $226,752.56, as reflected on the November 30, 2008 Madoff statement.

**D.  The Roths are each a "customer" for each Account under SIPA and are entitled to $500,000 in SIPC insurance for each Account.**

26.    Each of the Roths is a "customer" under the plain definition of "customer" in SIPA.  Thus, each is entitled to receive up to $500,000 in SIPC insurance.  15 U.S.C. §

8

78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.").

27.    Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words:  "A "customer" is an account holder." Instead, Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor").

28.    Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Roths because "SIPA is remedial legislation.  As such, it should be construed liberally to effect its purpose."  *Tcherepin v. Knight,* 389 U.S. 332 (1967).

29.    The Trustee erroneously relies upon SIPC Rule 105.  SIPA does not permit SIPC, by the promulgation of Rules, to change the definition of "customer" under the statute.  Hence, Rule 105 is invalid.  15 U.S.C. § 78ccc(b)(4)(A).

**E.  The Roths are entitled to prejudgment interest on their investment and profits.**

30.    Under New York law, which is applicable here, funds deposited with Madoff are entitled to interest.  *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.*  Moreover, since Madoff converted the Roths' funds, that fact also entitles them to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15

9

(S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

31.     Although it is not legally relevant, the Trustee cannot prove that Madoff earned no money on the Roths' investment.  To the extent the funds were deposited into a bank, they earned interest while on deposit.   Madoff disbursed customer funds to favored customers, to family members, and for other purposes.  Those funds may have yielded substantial profits to which the Roths and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

32.     In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008).   Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007).  In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested.  The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.*  Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have

10

held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

**F. The Trustee has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit**

33.    In derogation of his fiduciary duty to the Roths and without any legal authority, the Trustee is, in effect, imposing upon the Roths a fraudulent conveyance judgment for sums they withdrew from the Account, and for sums that were transferred into the Account, beyond the two-year statute of limitations period applicable to fraudulent conveyances and during a period when the Trustee has no evidence that Madoff was operating a Ponzi scheme. Thus, even if the Trustee were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Roths of the claim to which they are absolutely entitled.

34.    Moreover, the Trustee cannot recover fraudulent transfers from an investor, within the two-year period, absent proof that the investor had an intent to defraud. The Roths had no such intent; they withdrew funds that were in the Account that belonged to them and, by so doing, they reduced Madoff's indebtedness to them by the amount withdrawn. Thus, the Trustee has no right to recover any of the Roths' funds.

35.    The Trustee has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for the Trustee to utilize the avoidance powers of a trustee to enrich SIPC at Lazarus's expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a

trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g.,* 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

36.     Here, however, the Trustee is not acting to assure equal distribution among prepetition creditors. On the contrary, he is simply acting as SIPC's agent in depriving the Roths of the SIPC insurance to which they are statutorily entitled.

**G.  The Trustee has violated SIPA by delaying the payment of SIPC insurance**

37.     The Trustee has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace the Roths's securities up to a value of $460,356.10 as of November 30, 2008.

**Conclusion**

The Roths are entitled to an order compelling the Trustee and SIPC to immediately replace the securities in their Account to the extent of a valuation of $226,752.56 as of November 30, 2008.

The Roths are entitled to have their claim recognized in the amount of $226,752.56, consistent with the November 30, 2008 statements.

The Roths are entitled to judgment against the Trustee and Baker & Hostetler LLP for the

damages they have suffered as a result of the breach of fiduciary duty of Picard and his counsel.

June 8, 2010

BECKER & POLIAKOFF LLP

By  s/s Helen Davis Chaitman

45 Broadway
New York, NY 10006
(212) 599-3322
hchaitman@becker-poliakoff.com
Attorneys for
Lawrence Roth and Jeannette Roth