DUANE MORRIS LLP
COUNSEL TO DOUGLAS SHAPIRO
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1022
William C. Heuer, Esq.
Patricia H. Heer, Esq.

    - and -

470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857.488.4200
Martin B. Shulkin, Esq.
Kara M. Zaleskas, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-1789 (BRL) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**JOINDER TO ARGUMENTS PRESENTED IN CONNECTION WITH TRUSTEE'S OTHER OBJECTIONS TO CUSTOMERS' CLAIMS AND OBJECTION TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM**

Douglas Shapiro (the "<u>Claimant</u>"), by and through his undersigned counsel, hereby

objects to the *Notice of Trustee's Determination of Claim* pursuant to which Irving H. Picard (the

"Trustee"), the trustee appointed pursuant to the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq*. ("SIPA"), denied in its entirety the claim asserted on account of BLMIS Account No. 1-EM186 (the "Account"), designated as Claim Number 5811 (the "Claim").

In support of this joinder and objection (the "Objection"), the Claimant respectfully states as follows:

## PRELIMINARY STATEMENT

The Trustee's determination letter to Claimant dated May 12, 2010 (the "Determination Letter")[1] is objectionable on numerous grounds. First, through the claims determination process, the Trustee inequitably discriminates against certain customers, including the Claimant, whose deposits were funded by transfers from another account maintained with Bernard L. Madoff Investment Securities LLC ("Madoff"). Specifically, without any support or explanation, the Trustee makes an "adjustment" to the Account and the "predecessor account" from which the deposit was made (hereinafter referred to as the "Funding Account") which effectively avoids and recovers a substantial transfer (or that portion thereof as reflected on the November 30, 2002 statement of the Funding Account) which otherwise could not be avoided because it occurred more than six years prior to the date of the statute of limitations for avoiding so-called fraudulent transfers under the laws of the State of New York. As the Trustee otherwise would be powerless to avoid and recover any amounts that could have been transferred from the Funding Account on or prior to December 10, 2002 were he to initiate an adversary proceeding – as he is required to do pursuant to the Federal Rules of Bankruptcy Procedures – he cannot recover them by unilaterally "adjusting" the balance of the Account to ignore the balance on the November 30, 2002 statement of the Funding Account. To hold otherwise would impermissibly expand the

---

[1] A copy of the Determination Letter is attached hereto as **Exhibit A**.

2

Trustee's avoidance powers beyond the limitations set by title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and applicable state law, and would work an unfair hardship against customers who reinvested their earnings in Madoff.

As this Court already has concluded that the Trustee's power to determine customer claims should be exercised in concert with his other powers, including his avoidance powers, the proper application of the "Net Investment Method" must take into account that transfers to/from a Madoff account arising prior to December 11, 2002 are not avoidable by the Trustee. Although, in this case, the Account was funded with a substantial deposit after December 11, 2002, the same analysis must apply to the Funding Account, as the propriety of any "adjustment" to the Account rests exclusively on the proper calculation of the "net equity" in the Funding Account as of the date of the deposit to the Account (in this case, May 29, 2008). Thus, the Trustee's "adjustment" is proper only if the Funding Account did not have any "net equity" as of May 29, 2008. To determine the net equity of the Funding Account as of May 29, 2008, this Court must consider only the following: (a) the balance in the Funding Account according to the statement issued on November 30, 2002; less (b) withdrawals made from the Funding Account from December 11, 2002 through May 29, 2008; plus (c) deposits made to the Funding Account December 11, 2002 through May 29, 2008. If the "net equity" of the Funding Account as of May 29, 2008 is greater than the amount transferred from the Funding Account to the Account, then the deposit made on May 29, 2008 should be credited in full to the Account, and no adjustment is warranted. If the "net equity" of the Funding Account, based on the foregoing analysis, is less than the amount deposited, then adjustment is warranted to reflect a transfer of the "net equity" balance of the Funding Account to the Account. By treating the statement balance in existence on November 30, 2002 in the Funding Account as the beginning amount of

3

"cash in" for purposes of applying the Net Investment Method, this methodology: (i) works in concert with the avoidance provisions of the Bankruptcy Code; (ii) insures that customers holding "older accounts" do not bear an inordinate burden of alleged fraudulent transfer liability; and (iii) comports with the "equality is equity" maxim on which the Bankruptcy Code is premised.

Moreover, the Trustee, by arbitrarily "adjusting" the amounts in Madoff accounts (including predecessor funding accounts) existing on or before December 10, 2002, an act which exceeds the scope of the Trustee's powers, applies a different standard of review to the preexisting Madoff account-holders than he applies to "new" customers investing after December 10, 2002. Although not expressly defined in the Trustee's Determination Letter, one surmises that the so-called adjustments made to the pre-December 2002 accounts are based on tracking of "cash in, cash out" for periods commencing with the inception of the investments. Yet, no such "tracking" of the source of funds is applied to any other class of Madoff customers. If hypothetically a "new" Madoff customer cashed out of a similar "ponzi" scheme and invested those funds with Madoff, such investor receives full credit of "cash in" for the purposes of the Trustee's application of the Net Investment Method. In contrast, preexisting Madoff accountholders are held to a totally different standard, as their deposits are being discounted, or even stricken altogether, simply because the deposits originated from another Madoff account. It is inequitable for the Trustee, on the one hand, to discriminate against these customers solely on the basis that the Trustee has access to records that would otherwise be unavailable for use in an avoidance action, but, on the other hand, to give unfettered credit to a "new" customer without any ability to trace, or otherwise contest, the source of such funds.

4

Finally, notwithstanding the foregoing, the Trustee's determination process fails to properly account for any legitimate profits or earnings generated prior to the implementation of the Ponzi scheme, and interest required to be credited pursuant to, among other provisions N.Y. C.P.L.R. § 5001, 5004; N.Y. Gen. Oblig. § 5-501, *et seq.*, N.Y. C.P.L.R. § 5205(c).  As set forth in greater detail below, New York law, and cases interpreting the calculation of "value" in presenting a defense of a fraudulent conveyance claim, command the Trustee to adjust customers' claims to take into account the interest that they would have earned in connection with a tort claim – for fraud, unjust enrichment, breach of fiduciary duty, or other similar claims – against Madoff.  The Trustee cannot ignore the mandates of state law to facilitate the claims determination process.

## JOINDER TO PLEADINGS OF OTHER SIMILARLY SITUATED CUSTOMERS

1. As an initial matter, Claimant hereby joins, and fully incorporates by reference as if fully restated herein, the arguments and authority cited in the objections and briefs filed on behalf of similarly situated customers including, without limitation, the arguments that the Trustee is bound by the November 30, 2008 statement to determine a customer's claim.  To the extent that customers raise new arguments in connection with subsequent determinations rendered by the Trustee, Claimant reserves the right to join in such other arguments, as appropriate.

## BACKGROUND

2. In or about January, 1993, the Claimant opened the Account with Madoff.  On information and belief, on or around May 29, 2008, the Claimant transferred $6,910,206.44 from the Funding Account, Madoff Account No. 1-EM185-3-0.  In total, inclusive of the funds

5

transferred from the Funding Account, the Claimant deposited approximately $10,100,829 in the Account. The Trustee alleges that the Claimant withdrew a total of $4,975,755.57.

3. On December 11, 2008 (the "Commencement Date"), an action was commenced against Madoff by the Securities & Exchange Commission in the United States District Court for the Southern District of New York. On December 15, 2008, this liquidation proceeding was commenced pursuant to SIPA. *See Order, Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) [Dkt. No. 4]. The Trustee was appointed and charged with, *inter alia*, overseeing the liquidation of Madoff and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. § 78fff-1(a) (2010).

4. On December 23, 2008, the Court issued an Order (the "Claims Procedure Order") directing the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines. *See* Claims Procedure Order [Dkt. No. 12]. The Claims Procedure Order further provides that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, **and the reason therefor** . . . " *Id.* at 6 (emphasis added).

5. On or about March 2, 2009, Claimant, by and through its counsel, filed a claim for the Account for all of the securities positions reflected on the November 30, 2008 statement from Madoff (the "Final Madoff Statement").

6. On March 1, 2010, this Court rendered a decision relating to the Trustee's so-called "Net Investment Method" for determining customers' claims. In endorsing the "Net Investment Method" for determining "net equity" under SIPA, this Court held that the "Net Investment Method allows the definition of Net Equity and the Trustee's powers to avoid and

6

recover property, contained in the same statutory framework, to be interpreted with preferred consonance." *See Memorandum Decision Granting Trustee's Motion for an Order (1) Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Customer Statement; (2) Affirming Trustee's Determination of Net Equity; and (3) Expunging Objections to Determinations Relating to Net Equity*, [Dkt. No. 1999] (the "Net Equity Decision"), at 24.

7.  On May 12, 2010, the Trustee sent the Claimant the Determination Letter pursuant to which he denied the entire Claim, stating, in relevant part, that (a) no securities were purchased for the Account and (b) the Account does not have a positive net equity because the amount of funds withdrawn from the Account exceeded deposits. Specifically, by discounting in its entirety the transfer from the Funding Account in the amount of $6,910,206.44 made on or around May 29, 2008 (the "Transfer"), the Trustee, through the "adjustment process," has effectively converted a positive "net investment" claim of $5,125,073.78 into a negative "net investment" claim of $1,813,801.69.

## GROUNDS FOR OBJECTION

**I.   The Net Investment Approach Should Be Limited To The Period Between December 11, 2002 and December 10, 2008, And The "Adjustment" To The Account, If Any, Should Be Determined Based On The Statement Balance Of The Funding Account As Of Six Years Prior To The Commencement Date.**

8.  The Trustee's application of the "Net Investment Method" unfairly penalizes and discriminates between those customers (or related customers) who maintained accounts with Madoff on or before December 10, 2002 and continued to maintain such investments thereafter and customers who withdrew all, or substantially all, of their earnings and principal prior to December 10, 2002. To insure equal treatment to all customers of Madoff, the Trustee should be limited in his application of the Net Investment Method, and determining whether any "adjustments" are appropriate, by considering only the following: (a) the statement balance of

7

the Account and the Funding Account, as of November 30, 2002;[2] less (b) withdrawals made during the six-year period prior to the Commencement Date,[3] plus (c) deposits made during the six-year period prior to the Commencement Date. This is the only methodology which insures equal treatment to all of Madoff's customers.

9.  By way of illustration, consider a case in which a Madoff customer, who opened an account in 1990, withdraws the entire balance of his account on December 10, 2002, and buys Treasury Bills. One week later, that customer decides to reinvest with Madoff. He sells the Treasury Bills, incorporates as a new entity, and opens up a new account with Madoff, depositing the same amount that he withdrew the previous week. If the "original customer" had not withdrawn his funds, the Trustee would be free to adjust the amounts deemed to remain in his original account and deny his claim. The "new customer", however, will have a claim against Madoff for the entire amount of the deposit – which will have been treated as a deposit of principal – less any subsequent withdrawals. Only if the aggregate value of the withdrawals during the "avoidance period" exceeds the initial deposit (as of December 10, 2002) will the "new customer" be stripped of any claim against Madoff.

10. In order to insure equitable treatment to all customers, therefore, all customers of Madoff should be afforded the same treatment as the "hypothetical new customer" discussed above, and accordingly, the statement balance of November 30, 2002 should control as the "initial balance" in determining net equity. This methodology for determining net equity

---

[2] This would have been the last statement balance received prior to the commencement of the six year statute of limitations, assuming that the Trustee had commenced adversary proceedings against all customers on the Commencement Date.

[3] Claimant expressly reserves the right to assert that the state law "look-back period" of six-years runs from the date that an adversary proceeding is commenced, and not the Commencement Date. *See, e.g., Floyd v. Option Mortg. Corp. (In re Supplement Spot, LLC)*, 409 B.R. 187, 201-202 and n.6 (Bankr. S.D. Tex. 2009) (noting that "this Court looks back four years from … the date the complaint alleging fraudulent transfers was filed.")

8

operates to treat all customers equally, and is consistent with the statute of limitations in the State of New York that protects amounts existing in a Madoff account as of November 30, 2002 would not be subject to avoidance or recovery. A customer, had he chosen to invest such funds in a non-Madoff vehicle as of that date, would have had free and unrestricted use of such funds. The mere act of withdrawing such funds for a week, or even a day, and then reinvesting them in a "new" Madoff account should not be a basis for treating the funds differently than those of a customer who maintained accounts continuously. This methodology will insure that all customers are treated in a manner consistent with the Trustee's avoidance powers, and will operate to insure that Madoff's "older accounts" are credited, in part, for the time value of money.

11.     For the same reasons that this Court must adopt the November 30, 2002 balance as the starting point in determining a customer's "net equity" claim, so too must it consider whether the Funding Account had sufficient "net equity," as of the date of the Transfer, to determine whether the Trustee's "adjustment" is warranted. In this case, the adjustment is only warranted if all funds in the Funding Account reflected on the November 30, 2002 statement, plus any deposits made between November 30, 2002 and May 29, 2008, had been withdrawn from the Funding Account prior to May 29, 2008. As the Trustee has failed to substantiate his downward "adjustment" of over $6.9 million, Claimant submits that no such adjustment is warranted, and that the Account should be credited the full amount of the initial deposit.

12.     If the Trustee is prohibited from adjusting the Transfer, the Claimant will be deemed to be holding a positive "net equity" claim of $5,125,073.78. *See* Determination Letter, at 5. Although Claimant submits that it is the Trustee's burden to show that the adjustment is proper, the Claimant expressly reserves the right to seek additional discovery from the Trustee

9

with respect to the Funding Account in order to substantiate the sufficiency of the deposit in question.

**II.     The Claims Determination Process Is Procedurally Improper And Violates Claimant's Due Process Rights, As It Seeks To Avoid And Recover A Transfer Outside Of An Adversary Proceeding And Otherwise Does Not Comply With The Claims Procedure Order, As It Fails To Rebut The Prima Facie Validity Of The Claim.**

13.     By the claims determination process, and, in particular, the "adjustment" process, the Trustee seeks to avoid and recover transfers which, pursuant to the Federal Rules of Bankruptcy Procedure, can only be accomplished through an adversary proceeding. The Trustee cannot circumvent Claimant's due process entitlements and defenses simply by "adjusting" the claim and reducing it by unsubstantiated amounts. Indeed, unless and until the balance of the Funding Account has been properly challenged and any objections thereto sustained, the Determination Letter is, at best, premature and, accordingly, the disallowance of the Claim is not ripe for adjudication. For this reason alone the Determination Letter must be denied.

14.     Additionally, the Determination Letter: (a) does not clearly provide "the reason" for the disallowance, as required by the Claims Procedure Order; (b) is insufficient to rebut the *prima facie* validity of the Claim as provided in § 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f), made applicable herein pursuant to 15 U.S.C. § 78fff(b); (c) violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based, *see, e.g.*, 9-3007 COLLIER ON BANKRUPTCY § 3007.01[3] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) ("The body of the objection should identify the claim. It should also, at a minimum, allege those facts necessary to support the objection (ordinarily this must include allegations sufficient to overcome the *prima facie* validity of the filed proof of claim) and provide a description of the theories on which it is based. In short, proofs of claim have been

10

held analogous to complaints initiating civil actions; an objection to a claim should therefore meet the standards of an answer."); and (d) includes an exhibit which purportedly calculates the money deposited less subsequent withdrawals without any supporting documentation. These deficiencies similarly warrant this Court's denial of the Determination Letter.

III.   **Even If The Trustee's "Net Investment Method" Is Upheld On Appeal, Such Methodology Cannot Be Applied To Wipe Out Actual Earnings And Profits Earned By Any Account That Accrued Prior To The Commencement Of Madoff's Ponzi Scheme, Nor Should It Ignore Claimant's Entitlement To Interest.**

15.   Claimant submits that even if the Trustee's "Net Investment Method" is applied, the Trustee must not be permitted to ignore actual profits and earnings accruing prior to the inception of Madoff's Ponzi scheme, and the Trustee must credit each account with the earnings attributable to actual investments as if they constitute deposits of "principal." To the extent, the Funding Account was established prior to the time period that Madoff was believed to have operated his Ponzi scheme, earnings prior to such time must be deemed to constitute "cash" deposits. *See*, *e.g.*, Hearing Tr. at 25:12 – 25:24, *United States v. Madoff*, Case No. 09 CR 213 (DC) (S.D.N.Y. 3/12/2009) (Madoff recalling that his fraudulent activities at BLMIS began in the early 1990s).[4] If Madoff initiated his Ponzi scheme in 1990, any investment earnings which were achieved and reinvested in the Funding Account prior to the institution of the Ponzi scheme constitute *bona fide* earnings which, for all intents and purposes, should be treated as deposits in determining the "net equity" of the account. Such an interpretation is consistent with the "cash in/cash out" methodology, as Madoff used genuine earnings and profits of pre-scheme customers to fund his Ponzi scheme in the identical manner as he used deposits – to pay other customers.

---

[4]   Although neither the Trustee nor any other investigative authority has pinpointed the time period during which Madoff operated his Ponzi scheme, Madoff's use of the AS/400 server to manipulate account statements, which occurred in the early 1990s, corroborates Madoff's statements during his plea hearing.

11

16.     In determining the amount of the Claim, the Trustee cannot ignore that Claimant (or the customer holding the Funding Account) would be entitled to interest on account of funds held by Madoff. As set forth in greater detail below, New York law, and cases interpreting the calculation of "value" in presenting a defense of a fraudulent conveyance claim, command the Trustee to adjust customers' claims to take into account the interest that they would have earned in connection with a tort against Madoff.

17.     As impliedly endorsed by the Securities and Exchange Commission through its support of the "constant dollar approach," customers are entitled to recover interest on such deposited amounts. Such interest is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law. *See Travelers Cas. & Sur. Co. of Am. v. PG&E,* 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.")[5] There are at least two independent bases for awarding interest to the Claimant to compensate it for Madoff's improper use and misappropriation of the funds held in the Account.

---

[5]     New York law governs the Claimant's entitlement to interest in this case. In cases involving torts, New York courts apply an "'interest analysis' to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that 'related to the purpose of the particular law in conflict.'" *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) (citation omitted). When the law in conflict regulates conduct, "the law of the jurisdiction where the tort occurred will generally apply . . . ." *Id.* A tort generally "occurs" in "'the place where the injury was inflicted,' which is generally where the plaintiffs are located." *Id.* However, when the "injury has occurred in locations with only limited connection to the conduct at issue . . . the plaintiffs' location is not a dispositive factor . . . ." *Id.* In such a case, the applicable law will be that of "jurisdiction where the fraud originated and where substantial activities in furtherance of the fraud were committed." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001). Therefore, New York law is applicable to the calculation of the Claimant's Claim.

12

18. Pursuant to New York law, funds deposited with Madoff are entitled to interest. N.Y. Gen. Oblig. § 5-501(1). Accordingly, even applying the Trustee's "net equity" methodology to calculating the Claimant's claim, the Claim must be adjusted to include interest.

19. Additionally, pursuant to New York law, the Claimant is entitled to any returns Madoff earned on the deposited funds under principles of unjust enrichment.[6] *See, e.g., Steinberg v. Sherman,* Case No. 1:2007cv01001, 2008 WL 1968297 * 5-6 (S.D.N.Y. May 2, 2008); *Breeden v. Thomas (In re Bennett Funding Group, Inc.)*, Case No. 98-61376, 1999 Bankr. LEXIS 1843, at *25-34 (Bankr. N.D.N.Y. Apr. 29, 1999) (noting that N.Y. C.P.L.R. §§ 5001 and 5004 would have entitled the customer to recover the principal balance of its claim, plus prejudgment interest calculated at rate of 9% dating back to the moment when the debtors were entrusted with customer's money, such that withdrawals in excess of "principal" were not avoidable). "'Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest . . . .'" *Steinberg, supra* at *5 (citation omitted). Furthermore, "'[t]he rate of interest is nine percent per year, unless another rate is agreed to by the parties.'" *Id.* "'Interest shall be computed from the earliest ascertainable date the cause of action existed.'" *Id. See also Eighteen Holding Corp. v. Drizin,* 268 A.D. 2d 371, 701 N.Y.S. 2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion); N.Y. C.P.L.R. §§ 5001, 5004.

20. Accordingly, even under the Trustee's "Net Investment Method," adjustments to the Funding Account and to the Account should be made to account for interest that should have

---

[6] Although it is not legally relevant, the Trustee cannot prove that Madoff did not earn any "legitimate profit" or interest on the Claimant's investment. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to either Madoff, or the recipients of fraudulent transfers, which the Claimant and all other customers are entitled, once the ultimate recipients of Madoff's thievery are known.

13

accrued from and after the inception of the Ponzi scheme through and including December 10, 2008.[7]

## RESERVATION OF RIGHTS

21. The Claimant expressly reserves the right to revise, supplement, or amend this Objection, or to join in any other objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of Claimant's right to object on any additional grounds.

22. The Claimant reserves all rights set forth in Fed. R. Bankr. P. 9014, including, without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014.

23. The Claimant reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

---

[7] Claimant submits that the Trustee must credit, as "investments of principal," all earnings and profits credited to the Funding Account prior to the inception of Madoff's Ponzi scheme, and that the Trustee must credit the Funding Account and the Account for interest which would have accrued during the operation of Madoff's Ponzi scheme. Claimant reserves the right to seek interest accruing on or after December 11, 2008.

Respectfully submitted this 11th day of June, 2010.

DOUGLAS SHAPIRO

By its attorneys,

DUANE MORRIS LLP


_/s/    Patricia H. Heer_
William C. Heuer
Patricia H. Heer
1540 Broadway
New York, NY 10036-4086
Telephone: 212-471-1803
Facsimile:  212-214-0808

- and -

Martin B. Shulkin (BBO#460280)
Kara M. Zaleskas (BBO#651981)
470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857-488-4239
Facsimile:  857-401-3052

15