JOSEPHINE WANG
General Counsel
KEVIN H. BELL
Senior Associate General Counsel
  For Dispute Resolution
CHRISTOPHER H. LAROSA
Associate General Counsel
SECURITIES INVESTOR
  PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, D.C.  20005
Telephone:  (202) 371-8300
E-Mail: jwang@sipc.org
kbell@sipc.org
clarosa@sipc.org

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ———————————————————— ) | |
| SECURITIES INVESTOR PROTECTION ) | SIPA LIQUIDATION |
|   CORPORATION, ) | |
| ) | Case No. 08-01789 (BRL) |
|           Plaintiff ) | |
| ) | (Substantively Consolidated) |
|     v. ) | |
| ) | |
| BERNARD L. MADOFF INVESTMENT ) | |
|   SECURITIES, LLC ) | |
| ) | |
|           Defendant ) | |
| ———————————————————— ) | |

**MEMORANDUM OF LAW OF THE**
**SECURITIES INVESTOR PROTECTION CORPORATION**
**IN SUPPORT OF TRUSTEE'S MOTION TO AFFIRM TRUSTEE'S**
**DETERMINATIONS DENYING CLAIMS OF CLAIMANTS WITHOUT BLMIS**
**ACCOUNTS IN THEIR NAMES, NAMELY, INVESTORS IN FEEDER FUNDS**

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ..................................................................................................... ii

ISSUE ............................................................................................................................1

SUMMARY OF ARGUMENT ......................................................................................2

FACTS AND PROCEDURAL BACKGROUND.............................................................3

    A.    Hedge Funds in General.......................................................................................3

    B.    The Hedge Funds at Hand....................................................................................4

ARGUMENT .................................................................................................................7

    I.    AN OVERVIEW OF "CUSTOMER" STATUS.................................................7

        A.    The Historical Treatment of Customers.......................................................7

        B.    The Narrow Interpretation of "Customer"................................................10

            1.    In General.......................................................................................10

            2.    The Elements of Customer Status.....................................................11

            3.    <u>Morgan Kennedy</u> and Its Progeny ....................................................13

    II.    CLAIMANTS ARE NOT "CUSTOMERS" ......................................................19

CONCLUSION.............................................................................................................21

# TABLE OF AUTHORITIES

**CASES:**                                                                                           **PAGE**

In re Adler Coleman Clearing Corp., 204 B.R. 111 (Bankr. S.D.N.Y. 1997) .........................11

In re Adler Coleman Clearing Corp., 216 B.R. 719 (Bankr. S.D.N.Y. 1998) .......................12, 13

In re Adler, Coleman Clearing Corp., 218 B.R. 689 (Bankr. S.D.N.Y. 1998) .......................18

In re Adler, Coleman Clearing Corp., 277 B.R. 520 (Bankr. S.D.N.Y. 2002) .......................13

Appleton v. First Nat'l Bank of Ohio, 62 F.3d 791 (6th Cir. 1995) .........................................9, 12

In re A.R. Baron & Co., 226 B.R. 790 (Bankr. S.D.N.Y. 1998) .............................................10

Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,
     515 U.S. 687 (1995).........................................................................................................15

In re Bell & Beckwith, 937 F.2d 1104 (6th Cir. 1991)..............................................................10

In re Bernard L. Madoff Investment Secs., Inc.,
     424 B.R. 122 (Bankr. S.D.N.Y. 2010)...........................................................................10

In re Brentwood Secs. Inc., 925 F.2d 325 (9th Cir. 1991).......................................................11

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
     511 U.S. 164 (1994).....................................................................................................15, 17

In re First Ohio Secs. Co., 1994 WL 599433 (6th Cir. 1994)........................................... 15, 18-20

F.O. Baroff Co., Inc. v. Lubin, 497 F.2d 280 (2d Cir. 1974)....................................................8, 9, 12

In re Investors Center, Inc., 129 B.R. 339 (Bankr. E.D.N.Y. 1991).......................................18

Keene Corp v. United States, 508 U.S. 200 (1993) .................................................................15-16

In re Klein, Maus & Shire, Inc., 301 B.R. 408 (Bankr. S.D.N.Y. 2003) ................................11

In re Bernard L. Madoff Investment Secs., Inc., 424 B.R. 122
     (Bankr. S.D.N.Y. 2010) ................................................................................................10

Miles v. Apex Marine Corp., 498 U.S. 19 (1990) ...................................................................15

In re New Times Secs. Servs., Inc., 463 F.3d 125 (2d Cir. 2006) ...........................................9, 10

**CASES**: (cont.)                                                                 **PAGE**

Schultz v. Omni Mutual, Inc., [1993-94] Fed. Sec. L. Rep. (CCH)
    ¶98,095 (S.D.N.Y. 1993) ...............................................................................11

SEC v. Aberdeen Secs. Co., Inc., 480 F.2d 1121 (3d Cir. 1973).............................9

SEC v. First Secs. of Chicago, 507 F.2d 417 (7th Cir. 1974)...................................8

SEC v. Packer, Wilbur & Co., 498 F.2d 978 (2d Cir. 1974) .................................10, 13

SIPC v. Barbour, 421 U.S. 412 (1975) .....................................................................8

SIPC v. Exec. Secs. Corp., 423 F.Supp. 94 (S.D.N.Y. 1976),
    aff'd, 556 F.2d 98 (2d Cir. 1977)..............................................................9, 12

SIPC v. Morgan Kennedy & Co., 533 F.2d 1314 (2d Cir. 1976),
    cert. den., 426 U.S. 936 (1976) ............................................... 2, 8, 9, 11-20

SIPC v. Stratton Oakmont, 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999),
    aff'd sub nom., Arford v. Miller, 210 F.3d 420 (2d Cir. 2000) ...................11

In re Stalvey & Associates, Inc., 750 F.2d 464 (5th Cir. 1985).............................11

Matter of Weis Secs., Inc., 1977 WL 1043 (S.D.N.Y. 1977) ................................12-13

**STATUTES AND RULES:**

Securities Investor Protection Act, as amended, 15 U.S.C. §

78ddd......................................................................................................................10
78eee(d)....................................................................................................................1
78eee(a)(3) .............................................................................................................16
78eee(b)(1)..............................................................................................................16
78fff(b)....................................................................................................................18
78fff-2(a)(1) .............................................................................................................9
78fff-2(b)................................................................................................................10
78fff-2(c)(1) ...........................................................................................................10
78fff-2(c)(1)(B).........................................................................................................9
78fff-2(c)(2) .............................................................................................................9
78fff-3(a) ................................................................................................................10
78fff-3(a)(2) .............................................................................................................9
78fff-3(a)(5) ...........................................................................................................10
78*lll*(2).............................................................................................................9, 12

# TABLE OF AUTHORITIES

**STATUTES AND RULES: (cont.)**                                    **PAGE**

78*lll*(4)............................................................................................................9
78*lll*(11)..........................................................................................................9
78*lll*(14).................................................................................................6, 20

Securities Investor Protection Act Amendments of 1978,
    Pub. L. No. 95-283, 92 Stat. 249 (1978) ........................................17

Rules of the Securities Investor Corporation, 17 C.F.R. § 300.

100.................................................................................................................18
103.................................................................................................................18
104(a).............................................................................................................18
105.................................................................................................................18

Bankruptcy Act 1898 (repealed), 11 U.S.C. §

60(e) .........................................................................................................7, 8
60(e)(1) .....................................................................................................7, 8
96(e) ...............................................................................................................7
96(e)(1) ..........................................................................................................7

Bankruptcy Reform Act of 1978,
    Pub. L. No. 95-598, 92 Stat. 2549 (1978), as amended, 11 U.S.C. §

745   ..............................................................................................................18
745(c) .....................................................................................................16, 17

Chandler Act of 1938.............................................................................11

Securities Act of 1933, 15 U.S.C. §

77a et seq......................................................................................................20

Investment Company Act of 1940, 15 U.S.C. §

80a-3(c)(7) .....................................................................................................3
80a-3(c)(1) .....................................................................................................3

**LEGISLATIVE MATERIALS:**

Revision of the Bankruptcy Act: Hearing on H.R. 6439 and H.R. 8046
    Before the H. Comm. on the Judiciary, 75th Cong. 96 (1937) ........................7, 8

**LEGISLATIVE MATERIALS: (cont.)**                                                        **PAGE**

H. R. Rep. No. 91-1613 (1970)...............................................................................8

H. R. Rep. No. 95-595 (1977)...............................................................................17

H. R. Rep. No. 95-746 (1977)...............................................................................17

S. Rep. No. 91-1218 (1970).................................................................................8

S. Rep. No. 95-989 (1978)..................................................................................17

**PUBLICATIONS AND TREATISES:**

3 <u>Collier on Bankruptcy</u> (14th ed. 1976)

¶60.71.......................................................................................................7
¶60.72.......................................................................................................7
¶60.73.....................................................................................................7, 8

6 <u>Collier on Bankruptcy</u> (15th ed. 2010)

¶740.01....................................................................................................16

Harbeck, Stephen P.,  <u>Stockbroker Bankruptcy: The Role of the District Court and
    the Bankruptcy Court Under the Securities Investor Protection Act</u>,
    56 Am. Bankr. L. J. 277, 278 (1982) ...............................................................7

<u>Hedge Funds and Prime Brokers</u> (Mark Berman ed., 2d ed. 2009) .........................................3

Singer, Norman J., Singer, J.D. Shambie ,
    2B <u>Statutes and Statutory Construction</u>  (7th ed. 2008)................................................16

Pursuant to Section 78eee(d) of the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa et seq. ("SIPA"),[1] and to this Court's scheduling order of April 13, 2010, the Securities Investor Protection Corporation ("SIPC") hereby submits this memorandum of law in support of the motion of Irving H. Picard ("Trustee"), as trustee for the consolidated liquidation of Bernard L. Madoff Investment Securities, LLC ("BLMIS") and Bernard L. Madoff, for entry of an order upholding the Trustee's determinations denying the claims for "customer" relief filed with the Trustee by a group of claimants ("Claimants") who did not have accounts at BLMIS or any other relationship with it.

## ISSUE

In order to be protected under SIPA, a claimant must be a "customer" as defined in SIPA. To be a "customer" under SIPA, the claimant must be owed cash or securities received, acquired, or held by the broker for the account of the customer for specified market related purposes. The issue in this case is:

> Whether a claimant is a "customer" under SIPA if the claimant has no account at the broker, is not known to the broker, entrusts no cash or securities to the broker, receives no account statements or other communication from the broker, and seeks to be a "customer" only through its investment in a hedge fund which is itself a customer of the broker but which 1) invests for its own account at the broker, and 2) has no obligation to, and does not, consult with claimant concerning the investment or other disposition of the assets in its account, and notwithstanding that 3) claimant does not withdraw or otherwise dispose of any assets in the hedge fund's account at the broker, and has no authority to do so.

> SIPC submits that the claimant is not a "customer" under SIPA.

---

[1]  Section 78eee(d) of SIPA provides that SIPC shall be deemed to be a party in interest as to all matters arising in a liquidation proceeding under SIPA, with the right to be heard on all such matters. References herein to provisions of SIPA shall be to the United States Code, and for convenience, shall omit "15 U.S.C."

## SUMMARY OF ARGUMENT

The Trustee's motion arises out of objections to the Trustee's determination of claims filed by a group of Claimants who invested in one or more of sixteen hedge funds ("Hedge Funds" or "Funds"). Claimants themselves had no relationship with BLMIS and did not maintain accounts there. They did not entrust cash or securities to BLMIS, issued no transactional instructions regarding assets held there, and received no account statements or other communications from BLMIS concerning the status of any such assets.

Nevertheless, Claimants attempt to overcome the lack of any relationship between them and BLMIS by relying upon their investments in the Hedge Funds which themselves had accounts at BLMIS and were customers of BLMIS. Under the governing terms of Claimants' investments in the Hedge Funds, however, Claimants held ownership interests in the Hedge Funds, not in the Hedge Funds' assets. The Claimants had no right to manage the Hedge Funds or to in any way direct the disposition of Hedge Fund assets, and did not do so. The Hedge Funds were not required to, and did not, consult Claimants concerning the investment and disposition of Hedge Fund assets. Moreover, as the Hedge Funds were legal entities separate and distinct from Claimants, Hedge Fund assets were owned by the Hedge Funds and not by the Claimants, who had no property rights in those assets.

In fact, Claimants are indistinguishable from a group of employee-benefit plan beneficiaries denied "customer" status in the Second Circuit's decision in <u>SIPC v. Morgan Kennedy & Co.</u>, 533 F.2d 1314, 1317 (2d Cir.), <u>cert. den.</u>, 426 U.S. 936 (1976). In that case – which was effectively ratified by Congress through the subsequent adoption of amendments to SIPA that did nothing to alter the rule announced in the case – a trust created pursuant to an employer-sponsored profit-sharing plan, not the employee-beneficiaries of the plan, had an account at the liquidating broker-dealer. Like the Claimants here, the <u>Morgan Kennedy</u>

beneficiaries did not entrust the assets held in the account to the broker-dealer, had no property rights in those assets, and had no power to direct the disposition of the assets. The Second Circuit concluded that the beneficiaries lacked any of the necessary indicia of "customer" status under SIPA and therefore denied their claims for "customer" relief. Claimants are identically situated, and their "customer" claims should be denied for the same reasons.

## FACTS AND PROCEDURAL BACKGROUND

### A.     Hedge Funds In General

The "customer" claims at issue rest exclusively on the ownership interest that each Claimant purchased in one or more of sixteen Hedge Funds. (See Declaration of David J. Sheehan in Support of the Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts, Namely, Investors in Feeder Funds ("Sheehan Decl.") ¶¶ 3-13.) A hedge fund pools assets of investors and invests the assets in financial instruments in order to generate a positive return. By investing in different kinds of vehicles, hedge funds pursue "leveraging and other speculative investment practices that may increase the risk of investment loss."[2] Hedge funds are not required to register with the Securities and Exchange Commission ("SEC") under the Securities Act of 1933, are not required to report periodically to the SEC, and typically, issue securities in private offerings that are not registered with the SEC. Id. See also 15 U.S.C. §80a-3(c)(1) and 3(c)(7). Hedge funds have a net asset value per share for each class of shares, and generally redeem shares on a monthly or quarterly cycle. Hedge Funds and Prime Brokers (Mark Berman ed., 2d ed. 2009) at 3, 4. Hedge funds are often incorporated offshore, although they also may be onshore limited liability companies or limited liability partnerships, and typically, they do not pay tax under the tax law of the country of incorporation. Id. at 3.

---

[2]     Hedging Your Bets: A Heads Up on Hedge Funds and Funds of Hedge Funds (U. S. Securities and Exchange Commission), at  http://www.sec.gov/answers/hedge.htm

Favorable tax treatment for the hedge fund investor also may be available if the investor invests in a hedge fund which is a feeder fund that in turn invests its assets in a "master fund" holding the portfolio. Offshore feeder funds may be incorporated or organized in such offshore jurisdictions as the Cayman Islands, the British Virgin Islands, or Bermuda. Id. at 10. If the hedge fund is organized as a limited partnership, then the activities of the partnership are managed by a general partner and the investors in the hedge fund are limited partners who have no other role in the partnership. The general partner is the administrator and investment manager of the hedge fund. While the general partner has unlimited liability for the debts of the partnership, the limited partners are liable only to the extent of their contributions. Id. at 15-16.

**B.    The Hedge Funds At Hand**

In the case at hand, the exact nature of the Hedge Fund ownership interest purchased by each Claimant depends upon the organizational form and structure of the entity in which the Claimant invested. (See Sheehan Decl. ¶¶ 3-13.)[3] While some were hedge funds and others were feeder funds or master funds, all will be referred to herein, for the sake of convenience, as hedge funds. As a practical matter, a key difference among the designations is the remoteness of the investor to the account at BLMIS. An investor who invests in a feeder fund which in turn puts its assets into a master fund which in turn has the account at BLMIS is more remotely situated to the brokerage relationship with BLMIS than the investor who invests in the hedge fund that has an account with BLMIS. For purposes of the analysis here, however, since the investor in all instances is not a customer under SIPA, the distinction is irrelevant.

---

[3] Citations to the Sheehan Declaration refer to the paragraph cited, along with all documents cited therein and attached as exhibits to the declaration.

The Hedge Funds in this case consist of limited partnerships organized in either Delaware or New York, a limited liability company organized in New York, and "companies" (i.e., corporations) organized in either the Cayman Islands or the British Virgin Islands. Each Claimant therefore received as his or her ownership interest a limited partnership interest, an interest in a limited liability company ("LLC"), or common shares in an offshore company.[4] (See Sheehan Decl. 14, 16, 17, 22, 24-35, 37, 39, 41, 43, 45, 47, 49, 51, 53, 54, 56, 57, 59-92.)

The terms of Claimants' ownership interests reserved to managers of the Hedge Funds the exclusive right to make all decisions concerning the investment and other disposition of Hedge Fund assets. (See id.) In this regard, none of the Claimants had any power to make any decision concerning where or how to invest Hedge Fund assets, whether to use any particular investment vehicle, whether to open or close any Hedge Fund account at any financial institution, and whether to afford investment discretion to any third-party investment professional. (See id.) In like manner, none of the Claimants had any power to issue transactional instructions, or to make deposits into or withdrawals from, any account held in the name of the Hedge Fund, including the Hedge Fund accounts at BLMIS, and none did so. (See id.; Declaration of Matthew B. Greenblatt in Support of Trustee's Motion to Affirm Trustee's

---

[4] The Trustee has provided further details in his memorandum regarding the Hedge Funds. (See Memorandum of Law in Support of Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts, Namely, Investors in Feeder Funds ("Trustee's Memo.").) Briefly, among others, the Hedge Funds consisted of: (1) seven limited partnerships organized under the law of the State of Delaware; (2) one limited partnership organized under the laws of the State of New York; (3) one LLC organized under the laws of the State of New York; (4) three "exempted companies" organized under the laws of the Cayman Islands; (5) one "segregated portfolio company" organized under the laws of the Cayman Islands; and (6) three "international business companies" organized under the laws of the British Virgin Islands. (See infra.) The Hedge Funds in question do not include any employee benefit plans, trusts, or pass-through, self-directed investment vehicles such as beneficial accounts held at banks or broker-dealers.

Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names ¶¶ 5-18.)  Further, Hedge Fund managers were not required to consult with any of the Claimants prior to issuing transactional instructions regarding Hedge Fund assets held in the Hedge Funds' BLMIS accounts.  (<u>See</u> Sheehan Decl. 14, 16, 17, 22, 24-35, 37, 39, 41, 43, 45, 47, 49, 51, 53, 54, 56, 57, 59-92.)

Finally, many of the Hedge Funds were not required to invest Hedge Fund assets in "securities," in either the general sense of that term, or the narrower definition provided in SIPA. (<u>See</u>, <u>e.g.</u>, Sheehan Decl. ¶¶ 17, 19, 35.)  <u>Cf.</u>, SIPA § 78<u>lll</u>(14).  Instead, under the terms of the documents governing the operations of each of these Hedge Funds, the Hedge Funds were permitted to invest Hedge Fund assets in a wide variety of investments not limited to securities (<u>e.g.</u>, "[r]eceivership certificates, certificates of beneficial interest…commodities contracts, futures contracts, forward contracts, and any other instruments which are traded in normal channels of trading for securities and commodities").  (<u>See</u> Sheehan Decl. ¶ 17, 19, 35.) Thus, Claimants in these Hedge Funds had no assurance that the cash of the Hedge Funds in which they purchased ownership interests would be deployed in the securities markets.

Despite the absence of any relationship between Claimants and BLMIS, Claimants all filed claims for "customer" relief in this proceeding on the basis of their ownership interest in the Hedge Funds.  (<u>See</u> Sheehan Decl. ¶¶ 3-13.)  Because they were not customers under SIPA, the Trustee denied their claims.  (<u>See</u> Sheehan Decl. ¶¶ 9, 10.)  Claimants then objected to the Trustee's determinations, prompting the Trustee to file the instant motion.

**ARGUMENT**

**I.       AN OVERVIEW OF "CUSTOMER" STATUS**

Because the issue in this case is whether the Claimants are "customers" under SIPA, the meaning of "customer" historically and under SIPA is examined below.

**A.       The Historical Treatment of Customers**

Prior to 1938, customers of a bankrupt stockbroker were treated as general creditors unless they could reclaim cash and securities traceable into the stockbroker's possession.  See, e.g., 3 Collier on Bankruptcy ¶¶ 60.71, 60.72 (14th ed. 1976) ("Collier"); Stephen P. Harbeck, Stockbroker Bankruptcy: The Role of the District Court and the Bankruptcy Court Under the Securities Investor Protection Act, 56 Am. Bankr. L. J. 277, 278 (1982) ("Harbeck").  As part of the Chandler Act of 1938, Congress enacted Section 60e to the Bankruptcy Act of 1898 (11 U.S.C. § 96(e) (repealed 1978)), the predecessor to the modern-day Bankruptcy Code, in order to impose uniform rules on, and to ensure greater equity in, the distribution of the assets of a bankrupt stockbroker.  See, e.g., Revision of the Bankruptcy Act: Hearing on H.R. 6439 and H.R. 8046 Before the H. Comm. on the Judiciary, 75th Cong. 96 (1937) ("1937 Hearing").  In Section 60e(1), Congress carefully defined the terms "customers" and "cash customers," and permitted the latter to reclaim cash or securities which could be specifically identified as their property.  See 11 U.S.C. § 96(e)(1) (repealed 1978); 3 Collier ¶ 60.73[1.2]; Harbeck at 278.  In contrast, Congress limited the recovery of "customers" to their ratable shares of the "single and separate fund" consisting of cash and securities held by the broker-dealer for the accounts of customers, but not specifically identified to a particular "cash customer."  A customer's ratable share of the "single and separate fund" was based upon the "net equity" associated with the

7

customer's account at the broker-dealer.  <u>See</u>, <u>e.g.</u>, 3 <u>Collier</u> ¶ 60.73[1.2]; Harbeck at 278.  In

discussing the purpose of Section 60e, the Second Circuit explained that:

> Both the legislative history of that provision (Section 60(e)) and its use since
> enactment have stressed protection to, and equality of treatment of, the public
> customer who <u>has entrusted securities to a broker for some purpose connected</u>
> <u>with participation in the securities markets</u>.    [emphasis added]

<u>See</u> <u>Morgan Kennedy</u>, 533 F.2d at 1317.  <u>See also</u> 1937 Hearing at 96; <u>SEC v. First Secs. of</u>

<u>Chicago</u>, 507 F.2d 417, 420 (7th Cir. 1974); <u>F.O. Baroff Co. v. Lubin</u>, 497 F.2d 280, 283 (2d Cir.

1974).

The "single and separate fund" frequently proved to contain insufficient assets to return

to customers all of the cash and securities to them by the liquidating broker-dealer, thus

weakening customer confidence in the securities markets.  This problem became acute by the

late 1960s, as the rate of broker-dealer failures increased rapidly.  <u>See</u>, <u>e.g.</u>, <u>SIPC v. Barbour</u>, 421

U.S. 412, 415 (1975).  Accordingly, Congress enacted SIPA in 1970, creating SIPC and

providing for the creation of the SIPC Fund, to enhance customer recovery in broker-dealer

liquidations and thereby increase public confidence in the safety and soundness of the securities

markets.  <u>See</u>, <u>e.g.</u>, S. Rep. No. 91-1218, at 2-4 (1970) ("Senate Report"); H. R. Rep. No. 91-

1613, at 2-4 (1970) ("House Report").  As its name indicates, and its legislative history confirms,

the *Securities Investor* Protection Act, was designed to promote confidence in those persons

engaged directly in securities investing and trading, or considering whether to do so.  <u>See</u>, <u>e.g.</u>,

Senate Report at 2-4; House Report at 2-4; <u>Barbour</u>, 421 U.S. at 415 ("Congress enacted SIPA

to…restore confidence in the capital markets…").

Consistent with this objective, Congress incorporated into SIPA the structure, and many

of the definitions, in Section 60e.  The definition of "customer" in SIPA is derived from the

"customer" definition in Section 60e(1), for example, and reflects the same focus as that earlier

definition.  See, e.g., Senate Report at 11; House Report at 10.  See also, Morgan Kennedy, 533 F.2d at 1317-18; Baroff, 497 F.2d at 282; SEC v. Aberdeen Secs. Co., 480 F.2d 1121 (3d Cir. 1973).  Again, that focus is limited to investors with a direct account or fiduciary relationship with a broker-dealer, who entrust cash or securities to the broker-dealer for the purpose of investing or trading in the securities markets.  See, e.g., In re New Times Secs. Servs., Inc., 463 F.3d 125, 128 (2d Cir. 2006); Appleton v. First Nat'l Bank of Ohio, 62 F.3d 791, 801 (6th Cir. 1995); Morgan Kennedy, 533 F.2d at 1317-18; SIPC v. Exec. Secs. Corp., 423 F.Supp. 94, 95-98 (S.D.N.Y. 1976), aff'd, 556 F.2d 98 (2d Cir. 1977).

The focus on the "customer" as one for whom the broker-dealer holds cash and/or securities is evident from a review of provisions of SIPA, as enacted, and today.  Thus, for example, the definition of "customer" includes a person with a claim for securities received, acquired, or held by the broker "from or for the securities accounts of such person...."  SIPA §78lll(2).  The definition also includes "any person who has deposited cash with the debtor ...."  Id.  "Customer property" is cash and securities received, acquired, or held from or for the securities accounts of a customer...."  Id. at § 78lll(4).  The net equity definition refers to the "indebtedness of such customer" and speaks of "accounts held by a customer."  Id. at § 78lll(11).

Similar observations can be made concerning the provision governing notice of the commencement of the proceeding which requires only that written notice be mailed "... to the address of such person as it appears from the books and records of the debtor."  Id. at § 78fff-2(a)(1).  The section governing advances from SIPC's funds refers, for example, to "a customer who holds accounts with the debtor."  Id. at § 78fff-3(a)(2).  The trustee in liquidation is obliged to distribute customer property and deliver securities only to customers of the debtor.  Id. at §§ 78fff-2(c)(1)(B) and (c)(2).  In short, the notion of a customer as a person with a direct account

or a fiduciary relationship with the broker for whom the broker holds cash and/or securities pervades SIPA. It should be noted that when Congress intended to extend protection to persons who are not customers of the debtor itself, it has done so in specific terms. Thus, although banks and broker/dealers are not protected by SIPC's funds, section 78fff-3(a)(5) of SIPA specifically authorizes protection for their public customers.

## B.     The Narrow Interpretation of "Customer"

### 1.     In General

In a SIPA liquidation, claimants who qualify as "customers" receive preferred treatment in several ways. "Customers" share ratably in the fund of "customer property" – consisting generally of the cash and securities held by the liquidating broker-dealer for customers – on the basis and to the extent of their respective "net equities," and to the exclusion of general creditors. See SIPA §78fff-2(b) and (c)(1). See also In re New Times Secs. Servs., Inc., 463 F.3d 125, 128-29 (2d Cir. 2006); In re Bell & Beckwith, 937 F.2d 1104, 1106-08 (6th Cir. 1991); In re Bernard L. Madoff Investment Secs., Inc., 424 B.R. 122, 133 (Bankr. S.D.N.Y. 2010), appeal pending ("BLMIS"). To the extent that the fund of customer property is insufficient to satisfy the claims of customers in full, SIPA permits SIPC to make advances to the trustee, within the statutory limits of protections, from the SIPC Fund – a "quasi-public" fund established and administered by SIPC. See SIPA § 78ddd. See also SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983-85 (2d Cir. 1974); BLMIS, 424 B.R. at 133. In this regard, SIPC may advance to the SIPA trustee not more than $500,000 per customer, of which not more than $100,000 may be used to satisfy that portion of a claim which is for cash, rather than securities. See SIPA § 78fff-3(a). See also BLMIS, 424 B.R. at 133; In re A.R. Baron & Co., 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998).

Consistent with the exclusivity of the relief available to SIPA "customers," the term "customer" is narrowly construed. See, e.g., In re Brentwood Secs. Inc., 925 F.2d 325, 327 (9th Cir. 1991) (SIPA was "carefully crafted, precisely delineating the categories of investors it protects…"); In re Stalvey & Associates, Inc., 750 F.2d 464, 472 (5th Cir. 1985) ("Judicial interpretations of 'customer' status support a narrow interpretation of SIPA's provisions"); Morgan Kennedy & Co., 533 F.2d at 1317; In re Klein, Maus & Shire, Inc., 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003) ("The courts have consistently taken a restrictive view of the definition of 'customer' under SIPA…"). The obligations of a liquidating broker-dealer to a claimant for "customer" relief must be ascertainable from the broker-dealer's books and records, or must be established "to the satisfaction of the trustee." See SIPA § 78fff-2(b). Accordingly, a claimant seeking "customer" status has a heavy burden to prove his or her entitlement to it. See In re Brentwood Securities, Inc., 925 F.2d at 328 (claimants have burden of proving that they are customers by establishing that they entrusted cash or securities to the broker); SIPC v. Stratton Oakmont, 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999), aff'd sub nom., Arford v. Miller, 210 F.3d 420 (2d Cir. 2000); In re Adler Coleman Clearing Corp., 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997); Schultz v. Omni Mutual, Inc., [1993-94] Fed. Sec. L. Rep. (CCH) ¶98,095 at p. 98,763 (S.D.N.Y. 1993).

2. **The Elements of Customer Status**

Under SIPA, with exclusions not applicable here, the term "customer" means:

[A]ny person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any

person who has deposited cash with the debtor for the purpose of purchasing securities…

See SIPA § 78lll(2). As this definition reflects, "customer" status under SIPA is not a shorthand designation for anyone who does business through a broker-dealer. See Morgan Kennedy, 533 F.2d at 1316. On the contrary, the plain language of the "customer" definition, the legislative history to SIPA, and the cases decided under SIPA all confirm that, in order to qualify for "customer" status, a claimant at least must be able to satisfy the following criteria:

(1) Entrustment of Cash or Securities to the Debtor

The claimant entrusted cash or securities to the broker-dealer (see, e.g., SIPA § 78lll(2) (securities must be "received, acquired, or held" by debtor or cash deposited with debtor for "customer" status); Appleton v. First Nat'l Bank of Ohio, 62 F.3d 791, 801 (6th Cir. 1995); Morgan Kennedy, 533 F.2d at 1317; Baroff, 497 F.2d at 282 & n. 2.

(2) Direct Account or Fiduciary Relationship

The claimant did so pursuant to a direct account, or comparable fiduciary, relationship with the broker-dealer (see, e.g., 78lll(2) (securities must be received, acquired, or held by debtor "from or for the securities accounts" of claimant asserting "customer" status); Morgan Kennedy, 533 F.2d at 1318; SIPC v. Exec. Secs. Corp., 423 F.Supp. 94, 95 (S.D.N.Y. 1976), aff'd, 556 F.2d 98 (2d Cir. 1977) (denying "customer" status to securities lenders who did not have accounts at the debtor); In re Adler Coleman Clearing Corp., 216 B.R. 719, 724-25 (Bankr. S.D.N.Y. 1998)).

(3) Power to Direct Disposition of Account Assets

The claimant retained the power to direct the disposition of the assets entrusted to the broker-dealer (see, e.g., Morgan Kennedy, 533 F.2d at 1318; Matter of Weis Secs., Inc., 1977

WL 1043 * 10 (S.D.N.Y. 1977) (SIPA intended to protect claimants with "an unrestricted right to receive on demand those securities which belong to them").

(4) <u>Intention to Trade in the Securities Markets</u>

The claimant intended to use the cash or securities entrusted to the broker-dealer for the purpose of investing or trading in the securities markets (<u>see</u>, <u>e.g.</u>, <u>New Times</u>, 463 F.3d at 128-29; <u>Adler Coleman</u>, 216 B.R. at 724-25).[5]

SIPA's purposes, as evident in its legislative history, provide ample support for these criteria.

### 3.    **Morgan Kennedy And Its Progeny**

The Second Circuit's decision in <u>Morgan Kennedy</u> represents one of the first applications of these principles to claims by persons with no relationship to the liquidating broker-dealer.  In <u>Morgan Kennedy</u>, the employee-beneficiaries of a trust created pursuant to an employer's profit sharing plan sought "customer" status for their interests in an account held at the liquidating broker-dealer in the names of the trustees of the trust.  <u>See</u> <u>Morgan Kennedy</u>, 533 F.2d at 1315. Although the trustees maintained separate "accounts" at the trust itself reflecting each employee-beneficiary's "accumulated credits" in the plan, they maintained a single trust account at the debtor, who had no knowledge of, or relationship with, the trust beneficiaries.  <u>Id.</u>

The Second Circuit rejected the claims of the employee-beneficiaries for "customer" status on the grounds that: (1) the employer sponsoring the profit-sharing plan and related trust,

---

[5]   Satisfaction of these criteria is necessary, but not always sufficient, to establish "customer" status.  A claimant's knowledge, participation in, or willful ignorance of a broker-dealer's misconduct may disqualify a claimant from "customer" relief, even where the criteria described above have been met.  <u>See</u>, <u>e.g.</u>, <u>Packer Wilbur</u>, 498 F.2d at 984-85 (claimant who violates securities laws as part of transaction in question is disqualified from "customer" status); <u>In re Adler, Coleman Clearing Corp.</u>, 277 B.R. 520, 558-59 (Bankr. S.D.N.Y. 2002) (claimant who is willfully ignorant of wrongful nature of subject transaction may be denied "customer" status).

not the employee-beneficiaries, contributed the funds in the trust account; (2) the trustees of the trust, not the employee-beneficiaries, had the power to decide whether to entrust those funds to the debtor, and, in fact, made that decision; (3) the account was in the name of the trust, not the employee-beneficiaries, and the debtor had no relationship with the employee-beneficiaries; (4) the trustees had the exclusive authority to make all decisions concerning the disposition of assets in the trust account at the debtor; (5) unlimited additions of employee-beneficiaries to, and subtractions from, the profit-sharing plan could be made; (5) the employee-beneficiaries were eligible for benefits only upon termination of employment; and (6) none of the property held in the trust account was allocable to any particular employee-beneficiary. See Morgan Kennedy, 533 F.2d at 1318. In light of these facts, the Second Circuit emphasized that the employee-beneficiaries did not meet the criteria necessary to establish "customer" status, explaining that:

> Emphasis on the customer (under SIPA) as investor and purchaser/trader has been a consistent theme in cases in this Circuit…Against this background, it is impossible to classify the Reading employees as "customers" of the debtor. The one hundred and eight beneficiaries were neither investors nor traders. The funds in the trust account came from Reading; the decision to entrust those funds to the debtor was the Trustees'…[N]one of the one hundred and eight (beneficiaries) would have had any standing as a "customer" of the then-solvent broker-dealer to give any buy or sell order in the account. The financial relationship, insofar as the plan is concerned, was entirely between the beneficiaries and their employer, not the broker-dealer. Moreover, with respect to the employees' participation in the Plan, we note that it amounted only to a bookkeeping matter on the Reading books. There could be an unlimited number of employee additions to, and subtractions from, the company's Profit Sharing Plan of which the broker would have no knowledge and with which no concern. The trust account itself was in the name of the Trustees who had the exclusive power to entrust the assets to the debtor, to invest and reinvest, and to purchase and trade securities in the account as they saw fit. In short, the single trust account, represented by the Trustees collectively, possessed the required attributes for customer status under SIPA; the Reading employees possessed none of those attributes.

Id.

In <u>In re First Ohio Secs. Co.</u>, 1994 WL 599433 * 1 (6th Cir. 1994), the Sixth Circuit and the District and Bankruptcy Courts for the Northern District of Ohio, extended the <u>Morgan Kennedy</u> holding to employee benefit plans in which the beneficiaries, not the sponsoring employer, contributed the investment funds, but in which the plan trustees, or their designees, had the exclusive power to direct the disposition and investment of fund assets. Citing <u>Morgan Kennedy</u>, the Bankruptcy Court, whose decision was upheld by both the District Court and the Sixth Circuit, explained that:

> In this case, as in <u>Morgan Kennedy & Co.</u>, the individual participants in the Funds had no dealings with the broker-dealer and no direct input into the investment decisions…Therefore, this court concludes that the individual participants in the …Funds are not "customers" as defined by SIPA, and therefore these claims should be denied.

(<u>See</u> Declaration of Christopher H. LaRosa in Support of Memorandum of Law of the Securities Investor Protection Corporation in Support of Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds ("LaRosa Decl."), Ex. 1, Findings re: Objections to Trustee's Determination of Claims ("Findings") at 17.)

The continuing vitality of <u>Morgan Kennedy</u> and its progeny is perhaps best illustrated by the 1978 amendments to both SIPA and the Bankruptcy Code. It is a well settled axiom of statutory construction that, when Congress enacts a statute, it is presumed to do so with full knowledge of existing law. <u>See</u>, <u>e.g.</u>, <u>Miles v. Apex Marine Corp.</u>, 498 U.S. 13, 19 (1990). Moreover, when Congress reenacts statutory language that has been interpreted by the judiciary, that reenactment ratifies the judicial interpretation. <u>See</u>, <u>e.g.</u>, <u>Babbitt v. Sweet Home Chapter of Communities for a Great Oregon</u>, 515 U.S. 687, 730 (1995) (Scalia, J., dissenting); <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 185 (1994); <u>Keene Corp</u>

v. United States, 508 U.S. 200, 212-213 (1993).  One commentator has explained the effect of statutory reenactment following a judicial interpretation of the subject statute as follows:

> Where reenactment of a statute includes a contemporaneous and practical interpretation, the practical interpretation is accorded greater weight than it ordinarily receives, as it is regarded as presumptively the correct interpretation of the law.  The rule has special force where the construction is made by the judiciary.  *Thus where the legislature adopts an expression which has received judicial interpretation, (that) interpretation is prima facie evidence of legislative intent.*

Norman J. Singer, J.D. Shambie Singer, 2B Statutes and Statutory Construction § 49:9 (7th ed. 2008) (emphasis added).

Under these standards, Congress has ratified Morgan Kennedy, which is presumptively, the correct interpretation of the law.  Morgan Kennedy was decided in 1976, two years before the passage of the Bankruptcy Reform Act of 1978, which created the Bankruptcy Code.  See Morgan Kennedy, 533 F.2d at 1314; Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978).  As part of the Bankruptcy Reform Act, Congress enacted the stockbroker liquidation provisions of Subchapter III of Chapter 7 of the Bankruptcy Code, which govern the liquidation of broker-dealers when SIPA is not applicable (e.g., when the conditions specified in Sections 78eee(a)(3) and (b)(1) of SIPA have not been met).  See, e.g., 6 Collier ¶ 740.01 (15th ed. 2010) ("A primary reason for having subchapter III in the Bankruptcy Code appears to be the lack of uniformity of practices, rules and regulations governing intrastate stockbrokers, who are subject to the financial responsibility rules promulgated by the Securities and Exchange Commission…or rules and regulations of a self-regulatory organization or to SIPA").  In Section 745(c) of the Bankruptcy Code, Congress provided that "each trustee's account specified as such on the debtor's books…shall be treated as a separate customer account for each beneficiary under such trustee account," and thus rejected the application of Morgan Kennedy to stockbroker

liquidations under the Bankruptcy Code.  See 11 U.SC. § 745(c); H. R. Rep. No. 95-595, at 388 (1977) ("Subsection (c) (of section 745) effects the same result with respect to a trust so that each beneficiary is treated as a customer of the debtor rather than the trust itself"); S. Rep. No. 95-989, at 102 (1978) (same).

In sharp contrast, while Congress extensively revised SIPA in 1978, at the same time that it introduced the Bankruptcy Code, and modified SIPA's "customer" definition in several ways, it added nothing to that definition – or any other provision of SIPA - to reverse Morgan Kennedy.  See Securities Investor Protection Act Amendments of 1978, Pub. L. No. 95-283, 92 Stat. 249 (1978).  In amending the "customer" definition, Congress retained the express exclusion from "customer" status of claimants who were subordinated lenders to the debtor, but added language to clarify that such claimants remain excluded from "customer" status even if "some ground exists" for declaring the subordination agreement void or voidable.  See, e.g., H.R. Rep. No. 95-746, at 33-34 (1977).  Congress also added an exclusion disqualifying from "customer" status claimants whose claims arise out of transactions with a debtor's foreign subsidiary.  See id. at 76, 97.  In this light, Congress's decision not to modify the "customer" definition, or any other provision of SIPA, to reverse Morgan Kennedy represents a clear adoption of the substance of that decision.  This is particularly evident as Congress was simultaneously considering the applicability of the status of trust beneficiaries in the context of the stockbroker liquidation provisions of the Bankruptcy Code, a closely related statute, and specifically rejected the Morgan Kennedy rule as part of its enactment of that related statute.  Cf., Central Bank of Denver v. First Interstate Bank of Denver, N.A. , 511 U.S. 164, 185 (1994); Keene Corp. v. United States, 508 U.S. 200, 212-213 (1993).  See also H. R. Rep. No. 95-595, at 388 (1977); S. Rep. No. 95-989, at 102 (1978).  Had Congress wanted to reject application of the

same rule under SIPA, it would surely have amended SIPA to do so. It is noteworthy that Section 745 of the Bankruptcy Code is contained in Subchapter III of Chapter 7 of the Code, a subchapter that specifically does not apply to a SIPA case. See SIPA §78fff(b).

The symmetry between the Morgan Kennedy and First Ohio rule and SIPC's Series 100 Rules, which SIPC adopted following consultation with the SEC and which have the force of law, reinforces the inference that the rule is correct. See 17 C.F.R. §§ 300.100-300.105. See also In re Adler, Coleman Clearing Corp., 218 B.R. 689, 699 (Bankr. S.D.N.Y. 1998); In re Investors Center, Inc., 129 B.R. 339, 348 (Bankr. E.D.N.Y. 1991). Those rules, which were first adopted prior to Morgan Kennedy, set forth the circumstances under which multiple accounts held by the same person with a SIPC member broker-dealer will be deemed to be separate accounts for purposes of SIPA. See 17 C.F.R. §§ 300.100; Morgan Kennedy, 533 F.2d at 1319-20. Under Rule 103, an account held in the name of a corporation, partnership, or unincorporated association "shall be deemed to be a separate customer distinct from the person or persons owning such corporation or comprising such partnership or unincorporated association," unless the purpose of the entity in question was to obtain or increase protection under SIPA. See 17 C.F.R. § 300.103. In like fashion, under Rule 104(a), a trust account held on behalf of a valid and express trust created by a written instrument – a "qualifying trust account" – generally is deemed to be separate from an account in the name of the trust beneficiary. See 17 C.F.R. § 300.104(a). While the Series 100 Rules cannot confer "customer" status, and merely determine when accounts held by the same person will each be treated as a separate "customer" of a liquidating broker-dealer, the fact that, under most circumstances, the rules recognize the distinction between various kinds of entities and their owners or beneficiaries

reinforces the <u>Morgan Kennedy</u> holding that the same distinction must be respected when evaluating eligibility for "customer" status in the first instance.

## II.    CLAIMANTS ARE NOT "CUSTOMERS"

Claimants are not meaningfully distinguishable from the trust beneficiaries in <u>Morgan Kennedy</u> and <u>First Ohio</u> and, like those beneficiaries, have none of the indicia of a "customer" relationship with the liquidating broker-dealer.  None of the Claimants had an account at BLMIS and none received any account statement or other communication from BLMIS.  Instead, each of the Claimants purchased an ownership interest – typically common shares or a limited partnership interest – in a Hedge Fund.  The Hedge Funds, not the Claimants, were the customers of BLMIS.  Claimants did not entrust cash or securities to BLMIS, did not make the decision to do so, and had no power to make that decision or to prevent or reverse the decisions made by the Hedge Funds.  Claimants neither had, nor exercised, any power over the assets held in the Hedge Funds' accounts at BLMIS.   No Claimant ever withdrew assets from any of the Hedge Funds' accounts or placed any transactional order with respect to those assets, for instance, and no Claimant had any power to do so.  Claimants thus lacked any intent to invest or trade directly, through BLMIS, in the securities markets.

Likewise, Claimants had no assurance of any <u>indirect</u> investment in the securities markets.  As each of the Claimants bought an ownership interest in a Hedge Fund, a Claimant's only rational interest was in having the value of that interest rise, <u>i.e.</u>, in having the value of its interest in the *Hedge Fund* grow.  *How* its interest in the Hedge Fund was maximized  – and specifically, whether it did so through securities investments, or through some other investment vehicle such as commodity futures – was likely of little importance to Claimants.  Although the Hedge Funds chose to invest in securities through BLMIS, they were not obligated to do so, and

could have elected other investments among the other investment vehicles permitted by their governing documents. A Claimant thus had no assurance that the Hedge Fund in which the Claimant invested would itself invest in securities.[6]

The fact that the Hedge Funds may have elected to fund their accounts at BLMIS with some or all assets supplied by Claimants does not make Claimants SIPA "customers." Once Claimants purchased ownership interests in the Hedge Funds, the cash that Claimants used to make those purchases became property of the Hedge Funds, not Claimants.[7] Accordingly, each of the Claimants held an interest in a Hedge Fund, not in the Hedge Fund's securities investments. Claimants are thus no different from the employee-beneficiaries in Morgan Kennedy and First Ohio, and, like those employee-beneficiaries, do not qualify for "customer" status under SIPA.

_____

[6] SIPA defines the term "security" more narrowly than under other federal laws. See SIPA § 78_lll_(14). Under SIPA, for example, the term does not include most futures or over-the-counter derivatives contracts, for example, and specifically excludes any "investment contract" not registered with the Commission under the Securities Act of 1933, 15 U.S.C. §§ 77a et seq. Id.

[7] The trust beneficiaries in First Ohio also provided the funds used to purchase the assets held in the trust accounts and still did not qualify for "customer" status. (See LaRosa Decl., Ex. 1, Findings at 5-8.)

## CONCLUSION

For the reasons stated, the Court should enter an order granting the Trustee's motion and upholding his determinations denying Claimants' claims for "customer" relief under SIPA.

DATED:  June 11, 2010

Respectfully submitted,


/s/Josephine Wang
JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior Associate General Counsel
 For Dispute Resolution

CHRISTOPHER H. LAROSA
Associate General Counsel

SECURITIES INVESTOR
PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, D.C.  20005
Telephone: (202) 371-8300
Facsimile: (202) 371-6728
E-mail: jwang@sipc.org
E-mail: kbell@sipc.org
E-mail: clarosa@sipc.org