DUANE MORRIS LLP
COUNSEL TO C.E.H. LIMITED PARTNERSHIP
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1022
William C. Heuer, Esq.
Patricia H. Heer, Esq.

    - and -

470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857.488.4200
Martin B. Shulkin, Esq.
Kara M. Zaleskas, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-1789 (BRL) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
|   BERNARD L. MADOFF, | |
| Debtor. | |

**JOINDER TO ARGUMENTS PRESENTED IN CONNECTION WITH TRUSTEE'S OTHER OBJECTIONS TO CUSTOMERS' CLAIMS AND OBJECTION TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM**

      The C.E.H. Limited Partnership, (the "Claimant"), by and through its attorneys, hereby

objects to the *Notice of Trustee's Determination of Claim* pursuant to which Irving H. Picard (the

"Trustee"), the trustee appointed pursuant to the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq*. ("SIPA"), denied in its entirety the claim asserted on account of BLMIS Account No. 1-EM313 (the "Account"), designated as Claim Number 15133 (the "Claim").

In support of this joinder and objection (the "Objection"), the Claimant respectfully states as follows:

## PRELIMINARY STATEMENT

The Trustee's determination letter to Claimant dated May 13, 2010 (the "Determination Letter")[1] is objectionable on a number of grounds. First, through the claims determination process, the Trustee inequitably discriminates against certain customers, including the Claimant, whose deposits were funded by transfers from other accounts maintained with Bernard L. Madoff Investment Securities LLC ("Madoff"). Specifically, without any support or explanation, the Trustee makes several "adjustments" to the Account which effectively avoids and recovers numerous portions of transfers which otherwise could not be avoided because they occurred more than six years prior to the date of the statute of limitations for recovering so-called fraudulent transfers under the laws of the State of New York. As the Trustee otherwise would be powerless to avoid and recover those transfers, or portions thereof, were he to institute an adversary proceeding – as he is required to do pursuant to the Federal Rules of Bankruptcy Procedures – he cannot recover them by unilaterally reducing the balance of the Account for amounts transferred into the Account on or prior to December 10, 2002 from another Madoff account. To hold otherwise would impermissibly expand the Trustee's avoidance powers beyond the limitations set by title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as

---

[1] A copy of the Determination Letter is attached hereto as **Exhibit A**.

2

amended, the "Bankruptcy Code") and applicable state law, and would work an unfair hardship against customers who reinvested their earnings in Madoff.

Secondly, the Trustee's "adjustment" process is inequitable for two additional reasons. In the first instance, the Trustee applies the Net Investment Method in a manner that inappropriately penalizes and discriminates against those customers who maintained account balances with Madoff on or before December 10, 2002 and thereafter continued to invest with Madoff, as compared to customers who withdrew their earnings, or a substantial portion thereof, on or prior to December 10, 2002, and whose withdrawals are free from restriction or avoidance.

As this Court already has concluded that the Trustee's power to determine customer claims should be exercised in concert with his other powers, including his avoidance powers, the proper application of the "Net Investment Method" must take into account that transfers to/from a Madoff account arising on or prior to December 10, 2002 are not avoidable by the Trustee. To insure equal treatment to *all* customers of Madoff, the Trustee should, with respect to those customers who had accounts in existence with Madoff on or before December 10, 2002, be limited in his application of the Net Investment Method by considering only the following: (a) the statement balance in the Account as of November 30, 2002; less (b) withdrawals made from December 11, 2002 through December 10, 2008, inclusive (the "Avoidance Period") plus (c) deposits made during the Avoidance Period. By treating the statement balance in existence on November 30, 2002 as the beginning amount of "cash in" for purposes of applying the Net Investment Method, this methodology: (i) works in concert with the avoidance provisions of the Bankruptcy Code; (ii) insures that customers holding "older accounts" do not bear an inordinate

3

burden of alleged fraudulent transfer liability; and (iii) comports with the "equality is equity" maxim on which the Bankruptcy Code is premised.[2]

Moreover, the Trustee, by arbitrarily "adjusting" the amounts in Madoff accounts (including predecessor funding accounts) existing on or before December 10, 2002, an act which exceeds the scope of the Trustee's powers, applies a different standard of review to the preexisting Madoff account-holders than he applies to "new" customers investing after December 10, 2002. Although not expressly defined in the Trustee's Determination Letter, one surmises that the so-called adjustments made to the pre-December 2002 accounts are based on tracking of "cash in, cash out" for periods commencing with the inception of the investments. Yet, no such "tracking" of the source of funds is applied to any other class of Madoff customers. If hypothetically a "new" Madoff customer cashed out of a similar "ponzi" scheme prior to the State Look Back Period and invested those funds with Madoff, such investor receives full credit of "cash in" for the purposes of the Trustee's application of the Net Investment Method. In contrast, preexisting Madoff account-holders are held to a totally different standard, as their deposits are being discounted, or even stricken altogether, simply because the deposits originated from another Madoff account. It is inequitable for the Trustee, on the one hand, to discriminate against these customers solely on the basis that the Trustee has access to records that would otherwise be unavailable for use in an avoidance action, but, on the other hand, to give unfettered credit to a "new" customer without any ability to trace, or otherwise contest, the source of such funds.

Finally, notwithstanding the foregoing, the Trustee's claims determination process fails to properly account for any legitimate profits or earnings generated prior to the implementation of

---

[2] *See infra*, note 5, for examples of how the timing of deposits and withdrawals in relation to the Avoidance Period cultivates inequitable treatment among customers.

4

the Ponzi scheme, and interest required to be credited pursuant to, among other provisions N.Y. C.P.L.R. § 5001, 5004; N.Y. Gen. Oblig. § 5-501, *et seq*., N.Y. C.P.L.R. § 5205(c). As set forth in greater detail below, New York law, and cases interpreting the calculation of "value" in presenting a defense of a fraudulent conveyance claim, command the Trustee to adjust customers' claims to take into account the interest that they would have earned in connection with a tort claim – for fraud, unjust enrichment, breach of fiduciary duty, or other similar claims – against Madoff. The Trustee cannot ignore the mandates of state law to facilitate the claims determination process.

### **JOINDER TO PLEADINGS OF OTHER SIMILARLY SITUATED CUSTOMERS**

1.  As an initial matter, Claimant hereby joins, and fully incorporates by reference as if fully restated herein, the arguments and authority cited in the objections and briefs filed on behalf of similarly situated customers including, without limitation, the arguments that the Trustee is bound by the November 30, 2008 statement to determine a customer's claim. To the extent that customers raise new arguments in connection with subsequent determinations rendered by the Trustee, Claimant reserves the right to join in such other arguments, as appropriate.

### **BACKGROUND**

2.  In or about October, 1994, the Claimant opened the Account with Madoff. According to the accounting attached and incorporated in the Determination Letter, the Account was funded by, among other things, transfers from other Madoff accounts (collectively, the "Funding Accounts"). Specifically, according to the accounting, the Claimant made eight transfers from Funding Accounts, as detailed below:

5

| Date | Account | Amount Transferred | Amount Credited By Trustee |
|---|---|---|---|
| 10/7/1994 | 1EM03430 | $3,420,526.20 | $1,899,300.00 |
| 10/17/1994 | 1EM03430 | $8.74 | $0.00 |
| 11/30/1994 | 1EM29030 | $3,934,549.68 | $1,840,000.00 |
| 12/30/1994 | 1EM03430 | $8,064.24 | $0.00 |
| 1/11/1995 | 1EM29030 | $18,397.71 | $0.00 |
| 2/16/2000 | 1EM03630 | $113,664.00 | $0.00 |
| 8/23/2000 | 1EM34030 | $111,148.85 | $14,697.48 |
| 10/11/2000 | 1EM34030 | $58.20 | $0.00 |

Thus, according to the Trustee's records,[3] the Account was credited as having received more than $7,606,417 on account of transfers from Funding Accounts. In addition to these transfers, the Claimant deposited an additional $8,733,737 in the Account.

3.  On December 11, 2008 (the "Commencement Date"), an action was commenced against Madoff by the Securities & Exchange Commission in the United States District Court for the Southern District of New York. On December 15, 2008, this liquidation proceeding was commenced pursuant to SIPA. *See Order, Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) [Dkt. No. 4]. The Trustee was appointed and charged with, *inter alia*, overseeing the liquidation of Madoff and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. § 78fff-1(a) (2009).

4.  On December 23, 2008, the Court issued an Order (the "Claims Procedure Order") directing the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines. *See* Claims Procedure Order [Dkt. No. 12]. The Claims Procedure Order further provides that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, **and the reason therefor** . . . " *Id.* at 6 (emphasis added).

---

[3]    The Claimant expressly reserves the right to challenge the accuracy of the Trustee's records.

6

5. On or about February 26, 2009, Claimant, by and through its counsel, filed a claim for the Account for all of the securities positions reflected on the November 30, 2008 statement from Madoff (the "Final Madoff Statement"). According to the Final Madoff Statement, the value of those positions was approximately $9,679,375.

6. On March 1, 2010, this Court rendered a decision relating to the Trustee's so-called "Net Investment Method" for determining customers' claims. In endorsing the "Net Investment Method" for determining "net equity" under SIPA, this Court held that the "Net Investment Method allows the definition of Net Equity and the Trustee's powers to avoid and recover property, contained in the same statutory framework, to be interpreted with preferred consonance." *See Memorandum Decision Granting Trustee's Motion for an Order (1) Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Customer Statement; (2) Affirming Trustee's Determination of Net Equity; and (3) Expunging Objections to Determinations Relating to Net Equity*, [Dkt. No. 1999] (the "Net Equity Decision"), at 24.

7. On May 13, 2010, the Trustee sent the Claimant the Determination Letter pursuant to which he denied the entire Claim, stating, in relevant part, that (a) no securities were purchased for the Account and (b) the Account does not have a positive net equity because the amount of funds withdrawn from the Account exceeded deposits.

## GROUNDS FOR OBJECTION

### I. The Trustee's Adjustment Of The Claim Is Substantively And Procedurally Improper.

    A. *The Trustee's "Adjustments" Prejudice Claimants Who Funded Their Accounts With Gains From Madoff, And Effectively Operate To Avoid And To Recover Transfers Outside Of The Statute Of Limitations Period.*

8. According to the Determination Letter, the Account periodically was funded by transfers from various Funding Accounts. *See* Determination Letter, at 4. According to the

7

Trustee's analysis, although the transfers from the Funding Accounts were credited, at the time, as deposits in the aggregate amount of $7,606,417, the Funding Accounts only had "principal" balances in the aggregate amount of only $3,753,997. *See id.* The "adjustments" to the Account under the "net investment" approach – **which reduces the "cash in" balance by more than $3,852,420** – must be disallowed, as they essentially seek to avoid and recover transfers, or portions thereof, that were made outside of the statute of limitations period (the "State Law Look-Back Period").[4] Because the Trustee could not recover the $3,852,420 in funds withdrawn from the Funding Accounts prior to December 11, 2002 – which is the case for all eight transfers – the Trustee should not be permitted to "recover" those amounts through his "adjustment" procedure.

9.  According to this Court's Net Equity Decision, the Trustee's "Net Investment Method" better reflects the Trustee's powers to avoid and recover property. *See* Net Equity Decision, at 24. However, by making adjustments to Madoff accounts funded by alleged fictitious profits of other Madoff accounts, which the Trustee maintains has occurred with respect to the Account, the Trustee has expanded – indeed, eviscerated – the statute of limitations that restrains his avoidance powers. Since the Trustee's power to avoid and recover transfers is temporally limited, so too must the Trustee's powers to adjust claims be temporally limited. Accordingly, any transfers from a "funding" Madoff account to a "receiving" Madoff account occurring prior to the State Look-Back Period must be deemed deposits of "principal" to the "receiving" Madoff account. To hold otherwise would improperly expand the powers of the

---

[4] Claimant expressly reserves the right to assert that the state law "look-back period" of six-years runs from the date that an adversary proceeding is commenced, and not the Commencement Date. *See, e.g., Floyd v. Option Mortg. Corp. (In re Supplement Spot, LLC)*, 409 B.R. 187, 201-202 and n.6 (Bankr. S.D. Tex. 2009) (noting that "this Court looks back four years from … the date the complaint alleging fraudulent transfers was filed.")

8

Trustee, permitting the Trustee effectively to avoid and recover the "fictitious profits" portion of such transfers by "adjusting" (*i.e.*, offsetting) the balance available in such accounts.

10. Moreover, by using this "adjustment" approach, the Trustee insures that disparate and prejudicial treatment is borne by claimants who transferred or received funds from other Madoff accounts to fund current Madoff accounts rather than taking their "cash" and placing it in a different investment vehicle altogether prior to the State Law Look-Back Period.[5] Indeed, claimants who withdrew their funds prior to the State Law Look-Back Period are allowed to hold those profits free and clear of any claims of the Trustee, while claimants who, prior to the State Law Look-Back Period, reinvested those profits in another Madoff account, are being stripped of those profits by operation of the Trustee's "adjustment" decision. Such treatment can hardly be characterized as equal or fair, and certainly, the Trustee should not be permitted to effectively recover alleged "fictitious profits" portions of transfers made prior to the State Law Look-Back Period.

---

[5] A simple example illustrates the injustice that results by allowing the Trustee to "adjust" the balance of a new account based on the "net equity" of the funding account:

Claimant A opens an account with Madoff with an initial deposit of $100,000 on January 1, 1975. On December 10, 2002, the balance of the account is $2 million. On December 10, 2002, Claimant A withdraws the entire amount and places it in a bank account. One month later, Claimant A establishes a trust for his children and opens a new account with Madoff and deposits $2 million in that account. During the course of the next six years, the beneficiaries make withdrawals of $100,000 each year. The Trustee, applying his "adjustment" and "net investment" methodologies, would grant the customer an allowed claim of $1.4 million.

Claimant B opens an account with Madoff with an initial deposit of $100,000 on January 1, 1975. On December 10, 2002, the balance of the account is $2 million. On December 10, 2002, Claimant B establishes a trust for his children, and transfers the entire $2 million into another Madoff account. During the course of the next six years, the beneficiaries make withdrawals of $100,000 each year. The Trustee, applying his "adjustment" and "net investment" methodologies, would disallow the claim of this account in full, and would argue that the customer's "net equity" in that account is negative $500,000 ($100,000 "adjusted principal" balance less six $100,000 withdrawals).

The prior two scenarios evidence how two claimants with practically identical fact patterns – save whether they made a direct transfer from one Madoff account to another – can be treated so disparately that one claimant's claim is totally rejected, while another claimant could hold a claim for $1.4 million.

9

11. This Court must limit the Trustee's "adjustment" powers to reflect his avoidance powers, and thus must prohibit the Trustee from adjusting transfers with respect to which Claimant holds an absolute defense, *i.e.*, each adjustment is barred by the statute of limitations. Accordingly, at a minimum, the Account must be credited with deposits totaling no less than $16,340,154, and as set forth below, should be entitled to interest, calculated at the prejudgment interest rate of 9% per year, on the balance of the Account during Madoff's operation of the Ponzi scheme.

    B. *The Claims Determination Process Is Procedurally Improper And Violates Claimant's Due Process Rights, As It Seeks To Avoid And Recover A Transfer Outside Of An Adversary Proceeding, And Otherwise Does Not Comply With The Claims Procedure Order As It Fails To Rebut The Prima Facie Validity Of The Claim.*

12. By the claims determination process, the Trustee seeks to avoid and recover transfers which, pursuant to the Federal Rules of Bankruptcy Procedure, can only be accomplished through an adversary proceeding. The Trustee cannot circumvent Claimant's due process entitlements and defenses, including its defense based on the statute of limitations, simply by "adjusting" the claim and reducing it by unsubstantiated amounts. For this reason alone the Determination Letter must be denied.

13. Additionally, the Determination Letter: (a) does not clearly provide "the reason" for the disallowance, as required by the Claims Procedure Order; (b) is insufficient to rebut the *prima facie* validity of the Claim as provided in § 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f), made applicable herein pursuant to 15 U.S.C. § 78fff(b); (c) violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based, *see, e.g.*, 9-3007 COLLIER ON BANKRUPTCY § 3007.01[3] (Alan N. Resnick & Henry J. Sommer eds., 15th

10

ed. rev. 2008) ("The body of the objection should identify the claim. It should also, at a minimum, allege those facts necessary to support the objection (ordinarily this must include allegations sufficient to overcome the *prima facie* validity of the filed proof of claim) and provide a description of the theories on which it is based. In short, proofs of claim have been held analogous to complaints initiating civil actions; an objection to a claim should therefore meet the standards of an answer."); and (d) includes an exhibit which purportedly calculates the money deposited less subsequent withdrawals without any supporting documentation. These deficiencies similarly warrant this Court's denial of the Determination Letter.

**II.  The Application Of The Net Investment Approach Should Be Limited To The State Look-Back Period, And The Claim Should Be Determined By Adding The Aggregate Deposits, And Subtracting The Aggregate Withdrawals, From The Statement Balance As Of Six Years Prior To The Commencement Date.**

14. The application of the "Net Investment Method" unfairly penalizes and discriminates between those customers who maintained accounts with Madoff on or before December 10, 2002 and continued to maintain such investments and customers who withdrew all, or substantially all, of their earnings and principal on or prior to December 10, 2002. To insure equal treatment to all customers of Madoff, the Trustee should be limited in his application of the Net Investment Method by considering only the following: (a) the statement balance in the Account as of November 30, 2002;[5] less (b) withdrawals made during the Avoidance Period plus (c) deposits made during the Avoidance Period. This is the only methodology which insures equal treatment to all of Madoff's customers.

15. By way of illustration, consider a case in which a Madoff customer, who opened an account in 1990, withdraws the entire balance of his account on December 10, 2002, and buys

---

[5] This would have been the last statement balance received prior to the commencement of the six year statute of limitations, assuming that the Trustee had commenced adversary proceedings against all customers on the Commencement Date.

11

Treasury Bills. One week later, that customer decides to reinvest with Madoff. He sells the Treasury Bills, incorporates as a new entity, and opens up a new account with Madoff, depositing the same amount that he withdrew the previous week. If the "original customer" had not withdrawn his funds, the Trustee would be free to adjust the amounts deemed to remain in his original account and deny his claim. The "new customer", however, will have a claim against Madoff for the entire amount of the deposit – which will have been treated as a deposit of principal – less any subsequent withdrawals. Only if the aggregate value of the withdrawals during the Avoidance Period exceeds the initial deposit (as of December 10, 2002) will the "new customer" be stripped of any claim against Madoff.

16.     In order to insure equitable treatment to all customers, therefore, all customers of Madoff should be afforded the same treatment as the "hypothetical new customer" discussed above, and accordingly, the statement balance of November 30, 2002 should control as the "initial balance" in determining net equity. This methodology for determining net equity operates to treat all customers equally, and is consistent with the statute of limitations in the State of New York that amounts existing in a Madoff account as of November 30, 2002 were not subject to avoidance or recovery. A customer, had he chosen to invest such funds in a non-Madoff vehicle as of that date, would have had free and unrestricted use of such funds. The mere act of withdrawing such funds for a week, or even a day, and then reinvesting them in a "new" Madoff account should not be a basis for treating the funds differently than those of a customer who maintained accounts continuously. This methodology will insure that all customers are treated in a manner consistent with the Trustee's avoidance powers, and will

operate to insure that Madoff's "older accounts" are credited, in part, for the time value of money.[6]

### III. Even If The Trustee's "Net Investment Method" Is Upheld On Appeal, Such Methodology Cannot Be Applied To Wipe Out Actual Earnings And Profits Earned By Any Account That Accrued Prior To The Commencement Of Madoff's Ponzi Scheme, Nor Should It Ignore Claimant's Entitlement To Interest.

17.     Claimant submits that even if the Trustee's "Net Investment Method" is applied, the Trustee must not be permitted to ignore actual profits and earnings accruing prior to the inception of Madoff's Ponzi scheme, and the Trustee must credit each account with the earnings attributable to actual investments as if they constitute deposits of "principal." To the extent that any of the Funding Accounts were established prior to the time period that Madoff was believed to have operated his Ponzi scheme, earnings prior to such time must be deemed to constitute "cash" deposits. *See*, *e.g.*, Hearing Tr. at 25:12 – 25:24, *United States v. Madoff*, Case No. 09 CR 213 (DC) (S.D.N.Y. 3/12/2009) (Madoff recalling that his fraudulent activities at BLMIS began in the early 1990s).[7] If Madoff initiated his Ponzi scheme in 1990, then any investment earnings which were achieved and reinvested in such Funding Accounts prior to the institution of the Ponzi scheme constitute *bona fide* earnings which, for all intents and purposes, should be treated as deposits in determining the "net equity" of such Funding Account. Such an interpretation is consistent with the "cash in/cash out" methodology, as Madoff used genuine

---

[6]     The "Net Investment Method" unfairly discriminates against the customers holding older accounts or accounts which were funded by older accounts, as those customers are: (i) generally older, and thus more likely to have required withdrawals during the Avoidance Period to supplement retirement needs; and (ii) have not been awarded any value for the time value of money and inflation. Indeed, $100,000 invested in Madoff back in January 1970 is equivalent to almost $500,000 investment in December, 2002 (assuming 5% interest rate, compounded annually, and not accounting for inflation).

[7]     Although neither the Trustee nor any other investigative authority has pinpointed the time period during which Madoff operated his Ponzi scheme, Madoff's use of the AS/400 server to manipulate account statements, which occurred in the early 1990s, corroborates Madoff's statements during his plea hearing.

13

earnings and profits of pre-scheme customers to fund his Ponzi scheme in the identical manner as he used deposits – to pay other customers.

18. In determining the amount of the Claim, the Trustee cannot ignore that Claimant (or the customer(s) holding such Funding Accounts) would be entitled to interest on account of funds held by Madoff. As set forth in greater detail below, New York law, and cases interpreting the calculation of "value" in presenting a defense of a fraudulent conveyance claim, command the Trustee to adjust customers' claims to take into account the interest that they would have earned in connection with a tort claim against Madoff.

19. As impliedly endorsed by the Securities and Exchange Commission through its support of the "constant dollar approach," customers are entitled to recover interest on such deposited amounts. Such interest is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law. *See Travelers Cas. & Sur. Co. of Am. v. PG&E,* 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.")[8] There are at least two

---

[8] New York law governs the Claimant's entitlement to interest in this case. In cases involving torts, New York courts apply an "'interest analysis' to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that 'related to the purpose of the particular law in conflict.'" *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) (citation omitted). When the law in conflict regulates conduct, "the law of the jurisdiction where the tort occurred will generally apply . . . ." *Id.* A tort generally "occurs" in "'the place where the injury was inflicted,' which is generally where the plaintiffs are located." *Id.* However, when the "injury has occurred in locations with only limited connection to the conduct at issue . . . the plaintiffs' location is not a dispositive factor . . . ." *Id.* In such a case, the applicable law will be that of "jurisdiction where the fraud originated and where substantial activities in furtherance of the fraud were committed." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001). Therefore, New York law is applicable to the calculation of the Claimant's Claim.

14

independent bases for awarding interest to the Claimant to compensate it for Madoff's improper use and misappropriation of the funds held in the Account (and the Funding Accounts).

20.     Pursuant to New York law, funds deposited with Madoff are entitled to interest. N.Y. Gen. Oblig. § 5-501(1).  Accordingly, even applying the Trustee's "net equity" methodology to calculating the Claimant's claim, the Claim must be adjusted to include interest.

21.     Additionally, pursuant to New York law, the Claimant is entitled to any returns Madoff earned on the deposited funds under principles of unjust enrichment.[9]  *See, e.g., Steinberg v. Sherman,* Case No. 1:2007cv01001, 2008 WL 1968297 * 5-6 (S.D.N.Y. May 2, 2008); *Breeden v. Thomas (In re Bennett Funding Group, Inc.)*, Case No. 98-61376, 1999 Bankr. LEXIS 1843, at *25-34 (Bankr. N.D.N.Y. Apr. 29, 1999) (noting that N.Y. C.P.L.R. §§ 5001 and 5004 would have entitled the customer to recover the principal balance of its claim, plus prejudgment interest calculated at rate of 9% dating back to the moment when the debtors were entrusted with customer's money, such that withdrawals in excess of "principal" were not avoidable).  "'Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest . . . .'"  *Steinberg, supra* at *5 (citation omitted). Furthermore,"'[t]he rate of interest is nine percent per year, unless another rate is agreed to by the parties.'"  *Id.*  "'Interest shall be computed from the earliest ascertainable date the cause of action existed.'"  *Id.  See also Eighteen Holding Corp. v. Drizin,* 268 A.D. 2d 371, 701 N.Y.S. 2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion); N.Y. C.P.L.R. §§ 5001, 5004.

---

[9]     Although it is not legally relevant, the Trustee cannot prove that Madoff did not earn any "legitimate profit" or interest on the Claimant's investment.  To the extent the funds were deposited into a bank, they earned interest while on deposit.  Madoff disbursed customer funds to favored customers, to family members, and for other purposes.  Those funds may have yielded substantial profits to either Madoff, or the recipients of fraudulent transfers, which the Claimant and all other customers are entitled, once the ultimate recipients of Madoff's thievery are known.

15

22. Accordingly, even under the Trustee's "Net Investment Method," adjustments to the Account (and/or to the Funding Accounts) should be made to account for interest that should have accrued from and after their inception through and including December 10, 2008.[10]

## RESERVATION OF RIGHTS

23. The Claimant expressly reserves the right to revise, supplement, or amend this Objection, or to join in any other objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of Claimant's right to object on any additional grounds.

24. The Claimant reserves all rights set forth in Fed. R. Bankr. P. 9014, including, without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014.

25. The Claimant reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

---

[10] Claimant submits that the Trustee must credit, as "investments of principal," all earnings and profits credited to any Funding Accounts prior to the inception of Madoff's Ponzi scheme, and that the Trustee must credit the Funding Accounts and the Account for interest which would have accrued during the operation of Madoff's Ponzi scheme. Claimant reserves the right to seek interest accruing on or after December 11, 2008.

Respectfully submitted this 14th day of June, 2010.

        C.E.H. LIMITED PARTNERSHIP

        By its attorneys,

        DUANE MORRIS LLP

        */s/   Patricia H. Heer*
        William C. Heuer
        Patricia H. Heer
        1540 Broadway
        New York, NY 10036-4086
        Telephone: 212-471-1803
        Facsimile:  212-214-0808

        - and -

        Martin B. Shulkin (BBO#460280)
        Kara M. Zaleskas (BBO#651981)
        470 Atlantic Avenue, Suite 500
        Boston, MA 02210-2600
        Telephone: 857-488-4239
        Facsimile:  857-401-3052