Richard J. McCord (RJM 3290)
Carol A. Glick (CAG 2675)
CERTILMAN BALIN ADLER & HYMAN, LLP
Attorneys for Clayre Hulsh Haft
90 Merrick Avenue
East Meadow, NY 11554
Telephone: (516) 296-7000
Facsimile: (516) 296-7111

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,
       Plaintiff,      Adv. Pro. No. 08-01789 (BRL

  v.              SIPC Liquidation

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
       Defendant.
------------------------------------------------------------X

## OBJECTION TO TRUSTEE'S DETERMINATION OF
## CLAIM OF CLAYRE HULSH HAFT

Clayre Hulsh Haft, by and through her attorneys, Certilman Balin Adler & Hyman, LLP, hereby objects to the Notice of Trustee's Determination of Claim dated April 22, 2010 ("Determination Letter"), attached as **Exhibit A**, as set forth herein.

### BACKGROUND

1. Clayre Hulsh Haft ("Ms. Haft") is a "customer," as defined by the Securities Investor Protection Act ("SIPA"), of Bernard L. Madoff Investment Securities, LLC ("BLMIS").

2. Ms. Haft's final BLMIS statement, dated November 30, 2008, states that she owns securities valued at $9,511,320.33 ("Final BLMIS Statement").

3. On December 11, 2008, the above-captioned liquidation proceeding was commenced against BLMIS pursuant to the Securities Investor Protection Act of 1970 ("SIPA"). See Order, *Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15,

2238788-1             1

2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Dkt. No. 4]. Irving Picard was appointed Trustee ("BLMIS Trustee"), charged with overseeing the liquidation of BMIS and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. 78fff-1(a).

5. On December 23, 2008, the Court issued an Order directing the BLMIS Trustee to disseminate notice and claim forms to BLMIS customers and setting forth claim-filing deadlines. *See* Order [Dkt. No. 12]. Upon information and belief, the BLMIS Trustee disseminated notice and claim forms to BLMIS's customers in accordance with the Court's Order.

6. The December 3, 2008 Order further provided that, to the extent the BLMIS Trustee disagrees with the amount set forth on a customer claim form, the BLMIS Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, and *the reason therefor*. . . ." *See* Order at 6 (emphasis supplied) [Dkt. No. 12].

7. Ms. Haft timely submitted a customer claim form to SIPC, setting forth her claim for a credit balance of $9,511,320.33 and for securities. Ms. Haft's Final BLMIS Statement was submitted with her claim.

8. April 22, 2010, the BLMIS Trustee sent Ms. Haft the Determination Letter denying her claim in its entirety. *See* **Exhibit A**.

9. Ms. Haft hereby objects to the Determination Letter for the reasons described below.

## GROUNDS FOR OBJECTION

### A. The Determination Letter Fails to Comply with December 23, 2008 Order

10. The Determination Letter fails to comply with this Court's December 23, 2008 Order, which directs the BLMIS Trustee to satisfy customer claims and deliver securities in

accordance "with the Debtor's books and records." Dec. 23, 2008 Order at 5 [Dkt. No. 12]. Ms. Haft's Customer Claim was accompanied by her Final BLMIS Statement showing a final balance of $9,511,320.33. The Final BLMIS Statement is the best evidence of the amount owed based on the Debtor's books and records. Accordingly, the claim should be allowed in the full amount of $9,511,320.33.

11. The Final BLMIS Statement generated by Madoff is reflective of "the Debtor's books and records" by which the BLMIS Trustee is bound, absent proof that Ms. Haft did not have a "legitimate expectation" that the balance in her account statement represented her property. In fact, in each year that she withdrew funds from the account, Ms. Haft paid income taxes on the withdrawals from the account, which were duly accepted by the taxing authorities. Ms. Haft would not have paid those sums if she did not believe that the assets in the account belonged to her.

12. The BLMIS has failed to state a basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3) (15th ed. 2008); *In re Enron Corp.* No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (S.D.N.Y. Jan. 13, 2003). In sum, the Determination Letter is inadequate to rebut the prima facie validity of the Haft Customer Claim as provided in Section 502(a) of the Bankruptcy Code and Rule 3001(f) of the Federal Rules of Bankruptcy Procedure.

13. Based on the foregoing, Ms. Haft's claim should be allowed in the full amount of $9,511,320.33.

## B. Trustee's Methodology Violates Legitimate Expectations of BLMIS Customers

14. The BLMIS Trustee has violated SIPA's requirement that he honor a customer's legitimate expectations of receiving what was in his or her account at the time of the broker-dealer's cessation of business.

15. On December 30, 1970, when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms.... Just as the Federal Deposit Insurance Corporation protects the user of banking services form the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid+2870.

16. The parties agree that BLMIS was a registered broker-dealer with the SEC under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b) as of January 1960.

17. On December 11, 2008, Bernard L. Madoff ("Madoff") was arrested by the FBI and charged with securities fraud. It is undisputed that Madoff pled guilty to fraud and was sentenced to imprisonment.

18. The BLMIS Trustee and SIPC concede that BLMIS prepared, and customers were sent, regular statements and confirmations based on the actual trading records of real (existing) securities purported in each customer's account. It is irrelevant from the perspective of SIPA, the rules promulgated thereunder and relevant agency interpretation and case law that the securities never existed.

2238788-1                                    4

19.     Nothing in the SIPA statutory framework supports the BLMIS Trustee's definition of net equity.

20.     SIPA established a not-for-profit corporation, the Securities Investor Protection Corporation ("SIPC"), the members of which are the domestic registered brokers or dealers, each of whom is assessed a fee to create a fund (the "SIPC Fund"). 15 U.S.C. §§ 78ccc(a)(2); 78ddd(a)(1) and (c). The SIPC Fund provides a certain amount of coverage (set by statute) for customer losses in the event that the property of a failed broker is inadequate or not readily available to satisfy customer claims. 15 U.S.C. § 78fff-3.

21.     The purpose of this liquidation proceeding, which was brought pursuant to SIPA, is to either (a) deliver to the customers either the securities held in their name, or (b) distribute customer property and (in advance thereof or concurrently therewith) otherwise satisfy net equity claims of customers. 15 U.S.C. § 78fff.

22.     SIPA defines a customer's net equity claim, without reference to fraud or financial failure of the broker, as the value of the customer's "securities positions" in the customer's account on the filing date, less any amount the customer owes the debtor, as of the date of the filing of the SIPA liquidation.[1] 15 U.S.C. § 78lll(11).

23.     Nothing in the statutory framework of SIPA authorizes the BLMIS Trustee to calculate net equity based on the aggregate amount of the customer's investment, less the

---

[1] The definition of "net equity" set forth in SIPA, and the methodology for calculating same, are as follows:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by—
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customers . . . ; minus
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

15 U.S.C. § 78lll(11).

2238788-1                                              5

aggregate amount of the customer's withdrawals. Furthermore, nothing in the statute limits its application, as the BLMIS Trustee and SIPC imply, to financially failed broker-dealers.

24. The Rules promulgated under SIPA base the determination of whether a customer claim is treated as one for cash or for securities, not on what is actually in the account, but rather on the written confirmations sent to the customer on whose behalf the securities were bought or sold. 17 C.F.R. § 300.502(a)(1).

25. Pursuant to section 78fff-2(b), the BLMIS Trustee is charged with promptly discharging "all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash," by delivering securities or making payments "to or for the account of a customer . . . insofar as such obligations are ascertainable from the books and records of the debtor or otherwise established to the satisfaction of the trustee." 15 U.S.C. § 78fff-2(b). Based on a tortured reading of this section of the statute, the BLMIS Trustee has determined to test the validity of every transaction in a customer's account rather than to stop his investigation at the point of the Final BLMIS Statement, which lists the securities and their market value purportedly in the account.

26. The Senate Committee report in respect of the 1978 amendments to SIPA clearly indicates that Congress's intent in enacting the legislation was to protect the legitimate expectations of customers even in cases, like the one here, where there has been significant fraud and the securities never existed.[2]

---

[2] The Senate Committee report commented upon the purposes of the legislation as follows:

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account . . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations. . . .

2238788-1                                    6

27. Similarly, the House Report issued in connection with the amendment of SIPA acknowledges that the purpose of the amended legislation was to make SIPA "more responsible to the reasonable expectations of public investors. . . ."[3]

28. In addition, the SIPC's own policy and practices, as reflected in the *New Times Securities, Inc. ("New Times")* SIPA liquidation, is that if broker-dealer customers have been led to believe that "real existing" securities had been purchased for their accounts, then those customers are entitled to the full value of their securities positions as of the filing date, even if that value represents a substantial increase from the purported purchase price of the securities and even if the securities have never been purchased. *See In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2006).

29. The position taken by the BLMIS Trustee is contradicted not only by SIPC's prior treatment of customers in the New Times case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press in connection with the BJMIS liquidation on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his/her account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to

---

S. Rep. No. 95-763, at 2, 95th Cong. 1st Sess. (1978) (emphasis supplied).

[3] The House Report states:

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account.... By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectations. . . .

H.R. Report No. 95-746 at 23; 95th Cong. 1st Sess. (1978) (emphasis supplied).

2238788-1                                                    7

> believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html

30. Notwithstanding all of the foregoing, the BLMIS Trustee and SIPC have reconstructed the SIPA statutory scheme to support a calculation of net equity based on the "cash in-cash out" transactions of each customer.

31. The BLMIS Trustee's methodology for determining net equity was adopted by this Court in its decision dated March 1, 2010 ("Net Equity Decision"), and the Court memorialized the Net Equity Decision by Order dated March 8, 2010 ("Net Equity Order").

32. On March 8, 2010, pursuant to 28 U.S.C. § 158(d)(2), this Court certified the Net Equity Order for immediate appeal to the Second Circuit Court of Appeal. The Second Circuit has not yet made any determination as to whether the Trustee is correct in his interpretation of "net equity" and its corresponding application to the determination of customer claims.

33. This Court's December 23, 2008 Order directs the BLMIS Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's books and records," thus satisfying the legitimate expectations of Ms. Haft pursuant to the express provisions of SIPA, the Second Circuit case law interpreting SIPA, the legislative history of the statute, and the pronouncements of SIPC's general counsel in December 2008 regarding SIPC's mandate to make distributions to customers based on their account statements. Nonetheless, the BLMIS Trustee has denied Ms. Haft's claim. In view of the foregoing, Ms. Haft submits this Objection to the Determination Letter so as to preserve all her rights in respect of her claim in the amount

2238788-1                                                              8

of $9,511,320.33, pending a determination of the appeal by the Second Circuit or any higher and/or subsequent appellate tribunal.

### C. Trustee's Definition of "Net Equity" Has No Basis Under SIPA or Relevant Case Law

34. The definition of "net equity" set forth in SIPA, and the methodology for calculating same, are as follows:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by—
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customers . . . ; minus
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

15 U.S.C. § 78lll(11).

35. SIPC was created pursuant to 15 U.S.C. § 78ccc, which also sets forth its powers.

36. Section 78ccc(b)(4)(A) expressly prohibits SIPC from changing the definition of "net equity" set forth in Section 78lll(11).[4]

37. The Second Circuit has recognized that:

> Each customer's 'net equity' is the 'dollar amount of the account or accounts of a customer, to be determined by calculating the sum

---

[4] SIPA Section 78ccc(b)(4)(A) states as follows:

> (b) Powers
>
> In addition to the powers granted to SIPC elsewhere in this chapter, SIPC shall have the power--
>
> (4) to adopt, amend, and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to--
>
> (A) the definition of terms used in this chapter, other than those terms for which a definition is provided in section 78*lll* of this title . . . .

15 U.S.C. § 78ccc(b)(4)(A).

> which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer' [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities, Inc.*, 371 F.3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 62 n.2 (Bankr. S.D.N.Y. 1999) ("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed").

38. Notwithstanding his duty to carry out the provisions of SIPA, the BLMIS Trustee has created his own definition of "net equity." He has asserted that he can recognize customers' claims on a "cash in-cash out" basis, without recognizing any interest that may be due to BLMIS's customers. By this procedure, the BLMIS Trustee would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who have depended on their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thereby increasing SIPC's subrogation claim for reimbursement of the insurance that it pays to customers.

39. In part, the Court justifies the adoption of the BLMIS Trustee's definition of "net equity" and his methodology for determining customer claims by stating:

> Compensating Madoff investors on the basis of fictional account statements leads to . . . inequality as it enables the thief to dictate who receives a larger proportion of the assets collected by the Trustee. Madoff should not be entitled to award, to equally deserving clients, higher and lower returns based solely on his whim.

Net Equity Decision, at 33, n. 38. Likewise, the BLMIS Trustee and SIPC should not be able to disregard on a whim SIPA's mandate to compensate investors based on their legitimate expectations of receiving the amounts set forth in their Final BLMIS Statements upon BLMIS's

cessation of business. The result is to deprive more than 8,000 totally innocent investors of their statutory minimum payment of $500,000 in SIPC insurance.

40. Ms Haft, like thousands of other investors, received monthly account statements from BLMIS over the past 21 years indicating returns on her BLMIS investment in the range of 9% - 11% per year. Ms. Haft had entered into a standard brokerage agreement with BLMIS, a licensed SEC-regulated broker-dealer, pursuant to which the account had specific numbers; Ms. Haft received on a monthly basis trade confirmations for every securities transaction in her account, which set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis to claim that Ms. Haft did not have a "legitimate expectation" that the assets reflected on the account statements sent to her by BLMIS belonged to her. Thus, Ms. Haft is entitled to a claim for securities in the amount of $9,511,320.33, as reflected in her Final BLMIS Statement.

### D. Ms. Haft is Entitled to Interest on Her Account Balance Under New York Law

41. Under New York law, which is applicable here, funds deposited with BLMIS are entitled to interest. *See, e.g.*, N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq*. Moreover, since BLMIS converted Ms. Haft's funds, that fact also entitles her to prejudgment interest. *See, e.g. Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest"); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

42. It is undisputed that between December 22, 1987 and November 12, 2008, Ms. Haft deposited $9,675.244.37 in her account at BLMIS. However, the BLMIS Trustee has not

given Ms. Haft credit for interest which would have accrued in the account during said 21 year period.

43. In the Net Equity Decision, the Court found that, "[a]lthough customer account statements reflected trading activity, funds were merely deposited into a bank account at J.P. Morgan Chase Manhattan Bank ('Chase Bank') . . . (the "703 Account"), and never invested." Net Equity Decision, at 12.

44. To the extent that the funds invested by Ms. Haft in BLMIS were deposited into the 703 Account, they earned interest while on deposit.

45. The BLMIS Trustee's decision to omit any credit for interest impacts on the "cash in-cash out" method of determining the amount of customer claims, especially in view of the BLMIS Trustee's intention to "claw back" the amount by which investor withdrawals exceeded investor deposits in their accounts.

46. It is unlawful and inequitable for the BLMIS Trustee to completely disregard the interest component in the calculation of Ms. Haft's claim.

47. As this Court has stated in the Net Equity Decision: "It would be simply absurd to credit the fraud and legitimize the phantom world created by Madoff when determining Net Equity." Net Equity Decision, at 30. However, if the BLMIS Trustee were permitted to rely "solely on unmanipulated withdrawals and deposits" without crediting customers for accrued interest on the funds actually deposited and withdrawn from the account, the BLMIS Trustee would be granting to Madoff the right "to arbitrarily decide who wins and who loses." *See* Net Equity Decision, at 30-31.

48. Clearly, the funds in Ms. Haft's account at BLMIS constituted legal tender which was utilized by BLMIS for its own purposes and for which use Ms. Haft is entitled to be compensated by the payment of interest.

49. Based on the foregoing, Ms. Haft objects to the BLMIS Trustee's position she received $6,845,164.63 more than she was entitled to, based on the "cash in-cash out" methodology employed by the BLMIS Trustee, and respectfully submits that the Determination Letter does not reflect any credit for interest that should have accrued on the funds in her BLMIS account during the 21 years said account was in existence.

E. **Trustee Has Used Bankruptcy Code's Avoidance Powers Solely For SIPC's Benefit**

50. The BLMIS Trustee has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for the BLMIS Trustee to utilize the avoidance powers of a trustee to enrich SIPC at the expense of investors. As the legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear, the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See* 5 Collier on Bankruptcy ¶ 547.01 (15th ed. 2008); *In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (Bankr. S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally").

2238788-1                                                                 13

51.     Payments made to Ms. Haft based on her Final BLMIS Statement will not deny payments to another customer, as initial payments of $500,000 come from SIPC's fund, not from customer property or the bankruptcy estate.

52.     SIPC is a third party insurer with an absolute obligation to replace securities in a customer's account if the broker-dealer has sent written confirmation of the securities transactions to the customer.[5]  That SIPC's obligation is completely separate from each customer's share of estate property, and the payment by SIPC of insurance to each customer in no way reduces estate property.

53.     The SIPC Fund, which is financed by member assessments, is meant to provide the means for SIPC to make prompt advances to cover up to $500,000 of customer losses in the event that the property of a failed broker (honest or dishonest) is inadequate to satisfy customer claims. SIPC has authority to obtain more financing from Congress.

54.     The BLMIS Trustee's actions here do not further the stated purposes of a trustee's avoidance powers, but, rather, enable SIPC to avoid its statutory mandate to promptly replace a customer's securities. Simply put, the Trustee's actions in support of SIPC have deprived Ms. Haft of the $500,000 in SIPC insurance to which she is statutorily entitled.

### F. Trustee's Calculation of "Net Equity" Has No Evidentiary Support

55.     The Determination Letter purports to calculate Ms. Haft's "net equity" on the basis of withdrawal transactions for which Ms. Haft has incomplete records.

56.     It is unreasonable to anticipate that customers would have access to and/or maintain all account records over a 21 year period given (a) general limitations on record

---

[5] "Where the Debtor held cash in an account for a customer, the customer has a 'claim for securities' with respect to any authorized securities purchase *[i]f the Debtor has sent written confirmation to the customer* that the securities in question have been purchased for or sold to the customer's account." 17 C.F.R. § 300.502(a) (emphasis supplied). Essentially, the customer's receipt of confirmation, not the debtor's performance, is controlling for the purpose of SIPC advances.

2238788-1                                             14

retention requirements under tax law and other applicable rules governing record retention; (b) the apparent safety and solvency of BLMIS; and (c) the fact that historical records such as those at issue are usually readily available from financial institutions, including broker-dealers, upon request.

57. Based on the facts and circumstances, the BLMIS Trustee should be required to prove the alleged withdrawal transactions by furnishing the appropriate records to Ms. Haft and, absent such records, such transactions should be deleted from the calculation of Ms. Haft's "net equity." By the same token, the BLMIS Trustee should be required to prove that all deposit transactions are accurately listed by furnishing the appropriate records to Ms. Haft.

### RELIEF REQUESTED

58. For the reasons stated herein, the Haft Customer Claim should be allowed in its entirety.

59. For the reasons stated herein, the Court should direct SIPC to issue immediate payment Ms. Haft in the amount of $500,000.

60. The BLMIS Trustee's determination amounts to an improper disallowance of a claim that has prima facie validity. *See* Bankruptcy Code Section 502(a). The MLMIS Trustee has offered no factual or legal basis for his determination. The BLMIS Trustee's Determination Letter, and the objections contained therein, should be stricken, or alternatively, the BLMIS Trustee should describe his position in detail, including all relevant facts and legal authorities. Upon the filing of such a statement, this matter will be a contested proceeding under Rule 9104 of the Federal Rules of Bankruptcy Procedure and Ms. Haft will file a response.

61. Ms. Haft requests copies of any and all documents relating to her customer account.

62. Ms. Haft requests such other, further and related relief as may be just, proper and equitable.

## CONCLUSION

63. Ms. Haft reserves the right to revise, supplement or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of her right to object on any additional grounds.

64. Ms. Haft reserves all rights set forth in Rule 9014 of the Federal Rules of Bankruptcy Procedure, including, without limitation, rights of discovery.

65. Ms. Haft reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

66. Ms. Haft incorporates by reference all reservations of rights set forth in the Haft Customer Claim and any supplements thereto.

Dated: East Meadow, New York
       June 18, 2010

                        CERTILMAN BALIN ADLER & HYMAN, LLP
                        Attorneys for Clayre Hulsh Haft

                By:   /s/ Richard J. McCord
                        Richard J. McCord, Esq. (RJM 3290)
                        90 Merrick Avenue
                        East Meadow, New York 11554
                        (516) 296-7801