Lee J. Mondshein (LM 2241)
LEE J. MONDSHEIN, ESQ.
7600 Jericho Turnpike, Suite 200
Woodbury, NY  11797
Tel: (516) 364-8100
Fax: (516) 364-8518

*Attorney for Kathleen Giamo, Trustee of*
*Trust Number 6 U/A 12/23/88*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | **SIPA LIQUIDATION** |
| Plaintiff, | Adv. Pro. No. 08-01789(BRL) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

-------------------------------------------------------------------X

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

Kathleen Giamo, as Trustee of Trust Number 6 U/A 12/23/88, by and through her attorney, Lee J. Mondshein, Esq., hereby objects to the Notice of Trustee's Determination of Claim dated June 3, 2010 ("Determination Letter"), attached as Exhibit A.

**BACKGROUND**

1.	An account for Trust Number 6 U/A 12/23/88 was open with BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("Madoff") with account number 1-F0132-3-0.

2. The final statement of the Trust dated November 30, 2008 states that the Trust owns securities valued at approximately $549,912.69.

3. On or about December 11, 2008, the above-captioned liquidation proceeding was commenced against Madoff, pursuant to SIPA. *See* Order, *Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Docket No. 4]. Irving H. Picard was appointed Trustee ("Trustee"), charged with overseeing and administering the liquidation of Madoff and processing customer claims pursuant to SIPA. *Id.*; 15 U.S.C. 78fff-1(a) (2009).

4. On or about December 23, 2008, the Court issued an Order directing the Trustee to disseminate and make available notice and claim forms to Madoff customers and advise Madoff customers of claim-filing deadlines.

5. The Order of December 23, 2008 further provided that, to the extent the Trustee disagrees with the amount set forth on a customer claim for, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in the whole or in part, and the reason therefor…".

6. Kathleen Giamo, as Trustee, timely filed and submitted a customer claim form for The Kathleen Giamo Trust Number 6 account to SIPA, setting forth the basis of the claim in the amount of $549,912.69.

7. On June 3, 2010 the Trustee sent to Kathleen Giamo, Trustee a determination letter denying the claim in its entirety (Exhibit A).

8. Kathleen Giamo as Trustee hereby objects to the determination letter for the reasons described below.

2

## GROUNDS FOR OBJECTION

**I.  The Trustee's Determination of Claim Fails to Comply
with the Court's December 23, 2008 Order**

9.  The Trustee's Determination Letter fails to comply with this Court's December 23, 2008 Order, directing the Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's books and records." *See* December 23, 2008 Order at 5 [Docket No. 12]. Trust Number 6 U/A 12/23/88 claim included the statement dated the 30th day of November, 2008, showing a final balance of approximately $549,912.69 (Exhibit B). This statement constitutes the best evidence of the amount owed to the Trust based upon the Debtor's books and records. Consequently, Trust Number 6 U/A 12/23/88 should be allowed in the full amount of $549,912.69.

**II.  The Trustee Does Not Set Forth a Legal Basis for Disallowing
The Trust's Customer Claim in Full**

10.  The Trustee does not set forth a legal basis for disallowing the claim of Trust Number 6 U/A 12/23/88 as filed. The Determination Letter states only "your claim for securities is denied. No securities were ever purchased for your account." (Exhibit A). The Trustee's purported grounds for disallowance does not have any statutory or other legal basis. Furthermore, the Determination Letter:

(a)  Does not clearly provide "the reason" for such disallowance, as required by the Order of this Court dated December 23, 2008. [Docket Number 12];

(b)  Is inadequate to rebut the *prima facie* validity of Trust Number 6 U/A 12/23/88 as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f);

(c)  Violates general principals of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories

3

upon which the objection is based. *See, e.g.* Collier on Bankruptcy I-3007.01(3) (15th ed.) ("[A]n objection to a claim should…meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses."); *see also In re Enron Corp.*, No. 01-16034, 2003 Bankr. LEXIS 2261, at * (Bankr. S.D.N.Y. Jan. 13, 2003) (same); and

(d) Includes an exhibit which purportedly calculates the money deposited less subsequent withdrawals, but is inaccurate and completely unsubstantiated.

### III. The Trustee's Definition of "Net Equity" is Incorrect as a Matter of Law as a Customer's "Net Equity" Under SIPA is the Value of the Securities Reflected in the Customer's Madoff Account Statement dated

11. Upon information and belief, the Trustee denied Trust Number 6 U/A 12/23/88's customer claim based on his calculation of deposits minus withdrawals, without regard to the value of the securities reflected in Trust Number 6 U/A 12/23/88's account statements. The Trustee's "cash in/cash out" approach is incorrect for several reasons as explained below:

12. First, the Trustee's methodology contradicts the plain language of SIPA, which defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, minus any amount the customer owes the debtor. Specifically, the term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by:

(a) Calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer…; minus

4

(b) Any indebtedness of such customer to the debtor n the filing date…15 U.S.C. Section 78*lll*(11) (2009).

13. Consistent with this definition of "net equity", Ms. Giamo filed a claim for Trust Number 6 U/A 12/23/88 for approximately $549,912.69 which is the "sum which would have been owed" to the Trust if the securities positions reflected in her November 30, 2008 statement had been liquidated, minus any amounts owed to Madoff.  Despite the unambiguous and express language of SIPA, the Trustee has taken the position that Ms. Giamo's "net equity" for the Trust account is the total amount of her deposits in her Madoff account minus the total amount withdrawn.  The Trustee's proposed methodology is inconsistent with the language of SIPA and is unsupported by all relevant case law.  In fact, the Trustee's approach incorporates nonexistent words and concepts into the statute.

14. Second, the Trustee's approach is also inconsistent with the legislative history of the statute.  SIPA legislative history confirms Congress's intention that broker-dealer customers have valid "net equity" claims even when the securities reflected on their confirmation and account statements were never purchased.  Both the Senate and House reports on the 1978 amendments clearly reflect that a customer's net equity claim is not dependent on whether the securities were actually purchased by the broker-dealer:

> "Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account…By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendment… would satisfy the customers' legitimate expectations…"

S. Rep. No. 95-763, at 2 (1978) (*emphasis added*).

5

> "A customer generally expects to receive what he believes I his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date."

H.R. Rep. No. 95-746, at 21 (1978) (*emphasis added*).

Based on the regular monthly statements and trade confirmations, Ms. Giamo at all times believed and expected that Madoff executed such transactions and that her Trust Number 6 U/A 12/23/88 account actually held such securities. The fact that the securities listed in the confirmations and account statements were never actually purchased is irrelevant in determining the Trust's account net equity.

15.  Third, the Trustee's Determination Letter is contrary to SIPC's own policies and practices, as reflected in *New Times Securities Services, Inc.*, 371 F.3d 68 (E.D.N.Y. 2004). There the New Times Trustee's position on "net equity" was in full accord with SIPA, and thus directly contrary to the Trustee's and SIPC's position in this case. Specifically, with respect to any claims that were based on confirmations and account statements reflecting securities positions in "real" securities that could have been purchased (i.e. securities that actually existed on the public market and whose valuations were objectively and publicly verifiable by the customers), the *New Times* trustee allowed all such "net equity" claims to the full extent of the filing date valuations of those securities, even though none of the securities identified in those records had ever been purchased by the broker-dealer. Here, Ms. Giamo is in precisely the same position as the "real" securities claimants in *New Times* and should be treated no differently. Accordingly, her claim should be recognized as full as filed.

16. SIPC President Stephen Harbeck explained in the *New Times* case, that if broker-dealer customers have been led to believe that "real, existing" securities had been purchased for their accounts, then those customers are entitled to get the full value of their securities positions as of the filing date, even if that value represents a substantial increase from the purported purchase price of the securities, and even if the securities in question had never been purchased:

> "Harbeck: [I]f you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities…Even if they're not there.
>
> Court: Even if they're not there.
>
> Harbeck: Correct.
>
> Court: In other words, if the money was diverted, converted –
>
> Harbeck: And the securities were never purchased.
>
> Court: Okay.
>
> Harbeck: And if those positions triple, we will gladly give the people their securities positions."

Transcript at 37-39, *In re New Times Securities Services, Inc.*, No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000).

The Second Circuit further stated:

> "Meanwhile, investors who were misled…to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds – because Goren never executed the transactions – the information that these claimants received on their account statements mirrored what would have happened had the given transaction been executed. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. The Trustee indicates that this disparate treatment was justified because he could purchase

7