AITKEN BERLIN LLP
Bernard V. Kleinman, Esq.
Alan Berlin, Esq.
Two Gannett Drive
Suite 418
White Plains, NY 10604
Tel. 914.644.6660
Fax: 914.694.1647
Email: bvkleinman@aitkenberlin.com
       adberlin@aitkenberlin.com

*Attorneys for:  Susan Saltz Charitable Lead Annuity Trust*
                   *Susan Saltz Descendants Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| =============================== : | | |
| SECURITIES INVESTOR PROTECTION | : | |
| CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | Adversary Proceeding |
| — *versus* — | : | |
| | : | No. 08-01789 (BRL) |
| | : | |
| BERNARD L. MADOFF INVESTMENT | : | |
| SECURITIES LLC, | : | SIPA Liquidation |
| | : | |
| Defendant. | : | (Consolidated Proceeding) |
| =============================== : | | |
| | : | |
| In re BERNARD L. MADOFF, | : | |
| | : | |
| Debtor. | : | |
| | : | |
| =============================== : | | |

## <u>MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION TO DENY CLAIMS OF CLAIMANTS HEREIN AS INVESTORS IN "FEEDER FUNDS" TO DEFENDANT-DEBTOR BERNARD L. MADOFF INVESTMENT SECURITIES, LLC</u>

_Introduction_

1. In the period from 2005 through 2007 the Claimant Susan Saltz Descendants Trust (hereinafter referred to as "SDT") invested a total of three million dollars ($3,000,000.00) with First Frontier, L.P.

2. On or about 28 February 2008 Claimant Susan Saltz Charitable Lead Annuity Trust (hereinafter referred to as "SCLAT") invested two million two hundred thousand dollars ($2,200,000.00) with First Frontier, L.P.

3. According to the offering statement for First Frontier, L.P. the named investment manager was Bernard L. Madoff Investment Securities, LLC (hereinafter referred to as "BLMIS"), the Defendant in the above-captioned adversary proceeding.

4. Pursuant to the offering plan, BLMIS was to be solely responsible for all investment decisions.

5. Upon information and belief all (100%) of the invested funds with FIRST FRONTIER LP were given over to and invested with BEACON ASSOCIATES LLC I for investment purposes, notwithstanding the fact that this was never revealed to investors at the time of any subscription payments made as investments, such as the named Claimants herein.[1]

---

[1] The Claimants herein have commenced suit against First Frontier and a number of other named parties regarding the losses sustained.  This case is denominated as _JACK SALTZ as Trustee of SUSAN SALTZ CHARITABLE LEAD ANNUITY TRUST, and SUSAN SALTZ DESCENDANTS TRUST, and SUSAN SALTZ, Plaintiffs v. FIRST FRONTIER, L.P., FRONTIER CAPITAL MANAGEMENT, LLC, FRONTIER ADVISORS CORP., MARK OSTROFF, "FNU" OSTROFF, BEACON ASSOCIATES, LLC I, BEACON ASSOCIATES MANAGEMENT CORP., IVY ASSET MANAGEMENT CORP., THE BANK OF NEW YORK MELLON CORP., JOEL DANZIGER, ESQ., HARRIS MARKHOFF, ESQ., ANCHIN, BLOCK & ANCHIN, LLP, PARENTEBEARD_

6. Upon information and belief a substantial portion of the assets of Beacon were directly invested with BLMIS.

7. According to the December 31, 2008 statement of account for the SCLAT, of the $2,200,000.00 in contributions, there was an allocated loss of $1,641,403.00.  A copy of said statement was annexed to Claimant's pleading filed with this Court on or about December 22, 2009.  See Docket Entry No. 1111.

8. According to the December 31, 2008 statement of account for the SDT, of the $3,000,000.00 in contributions, there was an allocated loss of $2,576,388.00.  A copy of said statement was annexed to Claimant's pleading filed with this Court on or about December 22, 2009.  See Docket Entry No. 1111.

9. Prior to the claims filing deadline, the SCLAT and the SDT did, respectively, file Notices of Claim with the Trustee pursuant to the direction of the Court in its December 23, 2008 Order, as referenced above.

10. On or about December 8, 2009, the Trustee did formally notify both the SCLAT and the SDT that their respective claims had been disallowed.  The basis for the denial of both claims was as follows,

> Based on a review of available books and records of BLMIS by the Trustee's staff, you did not have an account with BLMIS.  Because you did not have an account, you are not a customer of BLMIS under SIPA, as that term is defined at 15 U.S.C. § 78*lll*(2).  Accordingly, your Claim for securities and/or a credit balance is **DENIED**.

---

*LLC, and JOHN DOES 1 through 100, Defendants.*  S.D.N.Y. 10-cv-964 (LBS).  All parties have been served and the Defendants have filed Rule 12 motions to dismiss.  Plaintiffs' responses thereto are due to be filed no later than July 23rd, 2010.  A copy of the Amended Complaint is annexed hereto as **Exhibit A**.

A copy of said statements of denial of claims was annexed to Claimant's pleading filed with this Court on or about December 22, 2009.  See Docket Entry No. 1111.

11. Among the bases set forth in Claimants' objections to Trustee's determinations was that the Claimants herein, notwithstanding the absence of "privity" of relationship with BLMIS, should be considered as "customers" of the aforementioned BLMIS, as that term is defined and interpreted under Section 78*lll*(2) of the Securities Investor Protection Act ("SIPA").

### The Issue Herein

12. The position of the Trustee's counsel, in seeking to deny the Claimants claims under the SIPA, is clearly set forth on page 1 of the *Memorandum of Law of the Securities Investor Protection Corporation in Support of Trustee's Motion to Affirm Trustee's Determination Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds* (Hereinafter referred to as "Trustee's Memorandum of Law").

13. The Trustee's position is that since one must be a "customer", as defined under the SIPA, to qualify for protection and benefits under the statute, since "the claimant [had] no account at the broker [*i.e.*, BLMIS], is not known to the broker, entrusts no cash or securities to the broker, receives no account statements or other communication from the broker, and seeks to be a "customer" only through its investment in a hedge fund which is itself a customer of the broker", said claimant is not a "customer under the statute."

4

14. The claims of Claimants SDT (Claim No. 14959) and SCLAT (Claim No.15429) are denominated under Movant's Exhibit 2, as "Feeder Fund Account Number 1B0118", the designated Account Number for claimants who had invested through Beacon Associates LLC.

15. It is the position of the Claimants, herein, that the Trustee has not only misinterpreted the applicable law, but made certain assumptions and conclusions that are supported neither by the facts nor the law in this case.

*Legal Argument*

16. Claimants, herein, incorporate by reference, the "Objection to Trustee Picard's Determination of Claims", as set forth in their filing dated December 22, 2009, as if fully set forth herein.

17. To the extent applicable, Claimants adopt and incorporate herein, the arguments and facts, of similarly situated claimants in the above-captioned proceeding, as if fully set forth herein.

18. Contrary to the Trustee's determination, Claimant is a "customer" of BLMIS under the plain meaning of SIPA. The Trustee's determination that Claimants must have had a specifically titled account recorded among BLMIS's "available books and records" has no statutory basis and is inconsistent with the purpose of SIPA.

19. The SIPA was designed to protect the assets of investors held by broker-dealers who become insolvent. As explained by the Supreme Court, Congress enacted the law to

protect and restore investor confidence in the financial markets.  *See SIPC v. Bourbor*,

421 U.S. 412, 415 (1975); *SIPC v. Bernard L. Madoff Investment Securities, LLC*, 401

B.R. 629, 633-34 (Bankr. Ct. S.D.N.Y. 2009).  In a liquidation proceeding, the SIPC fund

is availble to "customers" if the debtor's estate is deemed insufficient to pay "customer

claims".  If the "customer" is denied statutory status under the Act, then he or she

becomes a general unsecured creditor who may only seek recovery from the estate as

secured by the appointed Trustee.  *Madoff*, *supra*, 401 B.R. at 634.

20. To be protected under SIPA, an investor must come within the statutory definition

of "customer".  Section 78*lll*(2) of SIPA defines "customer" as:

> *any person* (including any person with whom the debtor deals as a
> principal or agent) who has a claim on account of securities received,
> acquired or held by the debtor in the ordinary course of its business as a
> broker or dealer from or for the securities accounts of such persons for
> safekeeping, with a view to sale, to cover consummated sales, pursuant to
> purchases, as collateral security, or for purposes of effecting transfer.  The
> terms "customer" includes any person who has a claim against the debtor
> arising out of sales or conversions of such securities, and any person who
> has deposited cash with the debtor for purposes of purchasing such
> securities.

15 U.S.C. § 78*lll*(2) (emphasis added).

21. The broad statutory definition of customer in no way mandates that a claimant

<u>directly</u> deal with, or deposit cash or funds <u>directly</u> with, the debtor.  Indeed, there is no

requirement that an investor have an account <u>directly</u> with the debtor.  See *In re First

State Securities Corp*., 34 B.R. 492, 495-96 (Bankr. Ct. S.D. Fla. 1980) (finding

claimants were "customers" of debtor where claimants' accounts were with a third-party

broker and not the debtor itself).

22. The term "customer" is a term of art. The courts have made clear that the

ordinary definition of the word is not to be applied (*see In re Adler Coleman Clearing*

*Corp.*, 204 B.R. 111, 115 (Bankr. Ct. S.D.N.Y. 1997)), and that the word is to be applied

as best suits the circumstances of each case. *Arford v. Miller*, 239 B.R. 698, 701 (Bankr.

Ct. S.D.N.Y. 1999), *aff'd sub nom. In re Stratton Oakmont*, 210 F.3d 420 (2d Cir. 2000)

(*per curiam*). As one court has put it,

> SIPA does not protect all creditors of a brokerage firm against all
> losses in the event of the demise of the firm. . . . Instead, SIPA protection
> extends to each "customer," a statutorily defined term of art.
> * * *
> The cases in this Circuit are uniform in recognizing that in defining the
> term "customer," Congress intended to protect those who had entrusted
> cash or securities to their broker/dealers for the purpose of trading and
> investing.
> * * *
> Because *appellant's loan* to the broker-debtor *had no connection with
> his trading activity in the securities market,* he cannot qualify by virtue
> thereof as a "customer" entitled to the benefits of the Securities Investor
> Protection Act.

*In re Hanover Square Securities*, 55 B.R. 235, 238, 239 (Bankr. Ct. S.D.N.Y. 1985).

Citations omitted. Emphasis in original.

23. Furthermore, the Trustee is obligated to use his discretion in applying the term,

and not adopt some strict analysis that ignores the circumstances of each case. As this

court put it in *In re A.R. Baron Co., Inc.*, 226 790, 795 (Bankr. Ct. S.D.N.Y. 1998):

"Provisions of SIPA make clear a claimant's burden by requiring that a debtor's

obligations to its customers be 'ascertainable from the books and records of the debtor' or

'otherwise established to the satisfaction of the trustee.'"

7

24. The SIPA is remedial legislation intended to protect investors of insolvent brokers and, as such, should be liberally construed to effect its purpose. *Id.*, citing, *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).  See also *Lowe v. SEC*, 472 U.S. 181 (1985), where Justice White, in his concurring opinion (joined by Chief Justice Burger and Associate Justice Rehnquist), stated the following in a case regarding the interpretation of Section 202 of the Investment Advisors Act of 1940, "the Court's zeal to avoid the narrow constitutional issue presented by the case leads it to adopt a construction of the Act that, wholly unnecessarily, prevents what would seem to be desirable and constitutional applications of the Act — a result at odds with our longstanding policy of construing securities regulation enactments broadly and their exemptions narrowly in order to effectuate their remedial purposes." *Id.* at 225.  Emphasis added.)[2]  The Trustee's unduly narrow and strict construction of the term "customer" to exclude indirect investors is inconsistent with that purpose and reads into SIPA a requirement that does not exist. Each investor who invested in BLMIS, whether directly or indirectly, qualifies as a "customer' under SIPA.[3]  Whether a claimant, under the SIPA, is a "customer" under the Act to qualify for government protection should not depend upon such an arcane standard

---

[2] See also language in *Pinter v. Dahl*, 468 U.S. 622 (1988), where, in a case involving Section 12 of the Securities Act of 1933, 15 U.S.C. § 77*l*, the Court discussed, in general terms, the manner in which courts should interpret, analyze, and apply the federal securities laws, *viz.*,

> The Court has acknowledged that "it is proper for a court to consider . . . policy considerations in construing terms in [the federal securities] Acts." . . . And the Court has recognized that Congress had "broad remedial goals" in enacting the securities laws and providing civil remedies. . . . Accordingly, the Court itself has construed securities law provisions "not technically and restrictively, but flexibly to effectuate [their] remedial purposes." . . . But the Court never has conducted its analysis entirely apart from the statutory language.  "The ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law." . . .

*Id.* at 653.  Citations omitted.  Emphasis added.

[3] See ¶ 21 *supra*.

as to who the claimant handed his or her money over to, or even where the claimant's funds were initially deposited. *In re Old Naples Securities, Inc.*, 223 F.3d 1296, 1302-03 (11th Cir. 2000). The issue should depend, rather, upon whether the claimant actually received or acquired property in return for his or her investment. *Id.* To hold otherwise turns the intent of the Act on its head — rather than protecting investors, it protects the bankrupt brokerage's estate for perpetrating a fraud. And, that is the position of the Trustee here!

25. By its terms, the SIPA expressly intends to protect indirect investors, providing:

> no advance shall be made by SIPC to the trustee to payor otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank (which customers are not themselves a broker or dealer or bank or a person described in paragraph (4), **in which event such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor.**

15 U.S.C. § 78fff-3(a)(5) (emphasis added).

26. Under that provision, Congress made clear that SIPA affords protection to certain indirect investors, *i.e.*, investors participating in the securities markets through financial intermediaries. Participation through such financial intermediaries obviates any need for a direct account relationship between the investor and a debtor. See *First State Securities Corp.*, *supra*, 34 B.R. at 495- 96 ("There is nothing in SIPA which suggests that coverage should be denied merely because the debtor used the facilities of another innocent broker in converting its customer's property.''). Indeed, there is no substantive difference between direct and indirect investors; both ultimately tried to participate in the securities

markets through the same broker-dealer — BLMIS.  And, both suffered the precisely

same consequences — the victims of the worst Ponzi Scheme in American history!

27. In addition, under the SIPA, only two categories of persons are excluded from

customer status: (i) any person with a claim arising out of transactions with a foreign

subsidiary of a member of SIPC; and (ii) any person with a claim for cash or securities

which can be considered part of the capital of the debtor, or which is subordinated to the

claims of any or all creditors of the debtor.  15 U.S.C. § 78*lll*(2).  Indirect investors, like

Claimants SDT and SCLAT, are not included in either of those two exceptions.  Had

Congress intended to exclude indirect claimants from the definition of "customer", it

would have done so explicitly — either by specifying them within a third enumerated

exception, and/or by making the existence of a specifically tided account within the

debtor's "available books and records" an express condition for obtaining "customer"

status.  But Congress chose not to do so.  See generally *In re New Times Securities Serv.,
Inc.*, 463 F.3d 125, 128 (2d Cir. 2006) (noting that lenders are not protected under the

SIPA as they were "expressly excluded from the definition of customer upon the

enactment of the 1978 amendments to the SIPA.", quoting *In re Hanover Square Sec.*,

*supra*.)

28. Furthermore, the legislative history of the SIPA[4] makes clear that so-called

"indirect investors" should not be excluded from the protections afforded by the Act.

The legislative history of the Securities Investor Protection Act makes clear that

---

[4] See also N. 2, *supra*.

Congress' intent was to protect a customer's "legitimate expectations."  See *In re*

*Investors Center, Inc.*, 129 B.R. 339, 341, 350 (Bankr. Ct. E.D.N.Y. 1991).

29. When the SIPA was amended in 1978, Congressman Robert Eckhardt

commented:

> One of the greatest shortcomings of the procedure under the 1970 Act,
> to be remedied by [the 1978 amendments] is the failure to meet legitimate
> customer expectations of receiving what was in their account at the time of
> their broker's insolvency.
>                           * * *
> A customer generally expects to receive what he believes is in his
> account at the time the stockbroker ceases business.  **But because
> securities may have been lost, improperly hypothecated,
> misappropriated, never purchased, or even stolen**, this is not always
> possible.  Accordingly, [when this is not possible, customers] will receive
> cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21; emphasis added.

30. On December 30, 1970, when President Nixon signed the SIPA into law, he made

the following statement:

> I am signing today the Securities Investor Protection Act of 1970.
> This legislation establishes the Securities Investor Protection Corporation
> (SIPC), a private nonprofit corporation, which will insure the securities
> and cash left with brokerage firms by investors against loss from financial
> difficulties or failure of such firms. . . .  Just as the Federal Deposit
> Insurance Corporation protects the user of banking services from the
> danger of bank failure, so will the Securities Investor Protection
> Corporation protect the user of investment services.

*http://www.presidency.ucsb.edu/ws/index.php?pid=287*

31. The SIPC's Series 500 Rules, 17 C.F.R. part 300.500, enacted pursuant to the

SIPA, provide for the classification of claims in accordance with the "legitimate

11

expectations" of a customer based upon the written transaction confirmations sent by the

broker-dealer to the customer.

32. Thus, the SIPC is statutorily bound to honor a customer's "legitimate

expectations."  This was acknowledged by SIPC in a brief it submitted to the Second

Circuit in 2006, wherein the SIPC assured the appeals court that its policy was to honor

the legitimate expectations of investors, even where the broker never purchased the

securities. The SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are
> controlling even where inconsistent with transaction reality.  Thus, for
> example, **where a claimant orders a securities purchase and receives a
> written confirmation statement reflecting that purchase, the claimant
> generally has a reasonable expectation that he or she holds the
> securities identified in the confirmation and therefore generally is
> entitled to recover those securities (within the limits imposed by
> SIPA), even where the purchase never actually occurred and the
> debtor instead converted the cash deposited by the claimant to fund
> that purchase** . . .  [T]his emphasis on reasonable and legitimate claimant
> expectations frequently yields much greater 'customer' protection than
> would be the case if transaction reality, not claimant expectations, were
> controlling, as this Court's earlier opinion in this liquidation well
> illustrates.

Brief of Appellant SIPC at 23-24 (citing *New Times*) (emphasis added).

33. Picard's position in the *Madoff* case is contradicted, not only by SIPC's prior

treatment of customers in the *New Times* case, but also by a statement that SIPC's general

counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang

acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang,
> if clients were presented statements and had reason to believe that the
> securities were in fact owned, the SIPC will be required to buy these
> securities in the open market to make the customer whole up to $500K
> each.  So if Madoff client number 1234 was given a statement showing

they owned 1000 GOOG shares, even if a transaction never took place, the
SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, *www.occ.treas.gov/ftp/alert/2008-37.html*

34. As indicated *infra,* in the *New Times* case, the SIPC voluntarily recognized its
obligation under SIPA to pay customers up to $500,000 based on their final brokerage
statement, inclusive of appreciation in their accounts, despite the fact that the broker had
operated a Ponzi scheme for a period of approximately seventeen years and had never
purchased the securities reflected on the customers' monthly statements. See *In re New
Times Securities Services, Inc.,* 371 F. 3d 68 (2d Cir. 2004). In fact, SIPC's president,
Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive
securities up to $500,000 including the appreciation in their accounts, *viz*.,

> HARBECK: . . . if you file within sixty days, you'll get the securities,
>     without question. Whether – if they triple in value, you'll get the
>     securities . . . Even if they're not there.
> COURT: Even if they're not there[?]
> HARBECK: Correct.
> COURT: In other words, if the money was diverted, converted –
> HARBECK: And the securities were never purchased.
> COURT: Okay.
> HARBECK: **And if those positions triple we will gladly give the people
>     [back] their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No. 00-8178 (Bankr. Ct.
E.D.N.Y. 2000). Emphasis added.

35. Furthermore, what the Court cannot ignore is the fact that the Offering Plan for
the Claimant's investment (with First Frontier, *et al*.), specifically stated that the invest-
ment advisor and manager would be BLMIS. As set forth therein,

> Bernard L. Madoff Investment Securities, which commenced business in
> 1960. The Investment Manager is a registered broker/dealer under the

13

Securities Exchange Act of 1934, as amended (the "1934 Act").  The
General Partner has delegated to the Investment Manager sole and
complete authority to mange the assets of the Partnership.

See Summary of the Offering at p. A.[5]

36. These planned investments were to be left, by the General Partner (First Frontier),

to the sole and exclusive discretion of the Investment Manager, *i.e.*, BLMIS.  The stated

plan was to make a series of investments, and to hedge any losses by a clear strategy; a

strategy that minimized risk by spreading the investments over a "basket, which typically

consists of 30-35 positions".  Although certain risks were set forth, these were reduced

due to the Investment Manager's (*i.e*., BLMIS) use of a so-called "collar", which was

described as follows: "The collar consists of options on the Index and serves as a hedge

against the Partnership's long portfolio."  Finally, any additional funds were to be

invested in short-term "A" rated liquid assets, such as money market funds, or U.S.

Treasury obligations.

37. More completely, as set forth in the Memorandum,

    A. Basket of Long S&P 100 (OEX) Index Securities Hedged by
Options on the Index.  This investment strategy involves the purchase of a
basket of common stocks included in the Index and the simultaneous sale
of an Index call option and purchase of an Index put option.  In each case,
the expiration date of the call option and the put option are identical.  All
such transactions are undertaken on a hedged basis such that the basket of
common stocks purchased correlates significantly with the Index.
    *This strategy of selling a call against a long position increases income
while allowing appreciation to the strike price of the short call.
Additional income is earned through the collection of dividends from the
equity investments.  Finally, the purchase of the put provides downside*

---

[5] Annexed hereto is **Exhibit A**, a copy of the Claimants' Amended Complaint in *Saltz v. First
Frontier, et al.,* 10-cv-964 (LSB).  See N. 1 *supra*.  Attached as Exhibit A to the Amended
Complaint is the "Offering Plan" from Defendant First Frontier.

*protection for the underlying securities and is substantially funded by the
call premium.*

Index options are commonly utilized in this trading methodology.
This strategy involves buying a group of equities which in the aggregate
highly correlates to the Index. Out-of-the-money Index call options are
sold, and out-of-the-money Index put options are purchased, against the
long basket of securities. The basket, which typically consists of 30-35
positions, is designed to closely track the performance of the Index
without having to purchase all one hundred (100) securities that comprise
the Index.

Among the risks involved in the strategy are tracking, market and
timing risks. The strategy to be employed by the Investment Manager
involves the establishment of a "collar". The collar consists of options on
the Index and serves as a hedge against the Partnership's long portfolio. It
is possible that the Partnership's portfolio of securities may not perfectly
track the performance of the Index. When the price of the Index is within
the collar (the difference between the strike prices of the long put and the
short call), the Partnership's portfolio is at the risk of the market, which
risk is limited to the size of the collar. The size of the collar is typically
around 5% to 10% of the value of the Index. A third risk is timing risk.
The Partnership's assets will not always be invested so the risk exists that
the timing of entry and exit into and out of the market may not be optimal.

B. Other. The General Partner may invest Partnership funds that are
not currently allocated to the Investment Manager in short-term U.S.
Government securities, money market accounts and/or other short-term
interest bearing instruments located at major financial institutions in the
United States. Any income earned from such investments will be
reinvested by the Partnership in accordance with the Partnership's
investment strategies.

See Investment Strategies at p. 2. Emphasis added. (See **Exhibit A** annexed hereto.)

38. The Memorandum, which was the key selling tool for First Frontier, relied upon

representations of the safety, security, and long-standing position of BLMIS as a safe,

reliable Investment Manager. In describing BLMIS, the Memorandum used the

following language,

Bernard L. Madoff Investment Securities is registered as a broker/dealer
under the 1934 Act. The General Partner has selected the Investment
Manager to trade, invest and deal in securities and financial instruments
for the Partnership. The Investment Manager is a market maker for
dealers, banks and institutions. The Investment Manager has locations in
New York and London, and makes markets in both listed and unlisted

securities.  The Investment Manager currently is a market maker for approximately 650 securities.  The Investment Manager also trades in convertible bonds, convertible preferred stocks, warrants and listed equity and index options.  The Investment Manager began operations in 1960 and has approximately 210 employees.

See Management at p. 4.  (See **Exhibit A** annexed hereto.)

39. What the Trustee's counsel has failed to recognize, in both his Declaration and Memorandum of Law, are the almost unique circumstances of this case.  It is estimated that the bulk of the funds that Madoff received was through the so-called "feeder funds".  As early as 2003, it was estimated that from $8 billion to $10 billion managed by BLMIS, was derived from funds such as those invested in by the Claimants herein.  See INVESTIGATION AND FAILURE OF THE SEC TO UNCOVER BERNARD MADOFF'S PONZI SCHEME at p. 78, n. 43 (Office of Investigations, SEC Aug. 31, 2009) (SEC Report No. OIG-509).  According to the Trustee's own calculations (relevant to the subject motion), of the 2,330 claims made through feeder funds, 75% (or 1,771) were denied by the Trustee on the basis raised herein.  See Sheehan Decl. at ¶¶ 10-11.  And, now many of these feeder-funds are either defunct, bankrupt, or can only pay a small fraction of the investor's losses.  For example, in the *Saltz* case, the two claimants (the Saltz Descendants Trust and the Saltz Charitable Annuity Trust) lost a total of more than four million dollars through its indirect investments made with BLMIS.  See ¶¶ 7 & 8 *supra*.  Recovery of any or all of these losses through the defendants named in the ongoing lawsuit (see N. 1 *supra*) is problematic, and a full recovery can only be hoped for.[6]  And,

---

[6] Defendant First Frontier is, at best, moribund, and Defendant Beacon (the named feeder-fund in this action) has only limited funds which, even if successful, will pay out to the Claimants SDT and SCLAT, a fraction of their respective losses.  See Plaintiffs' Amended Complaint, N. 1 *supra*, at ¶¶ 89-95, **Exhibit A**, *infra*.

the situation of these Claimants is certainly not atypical.  Many, if not most, of the so-called indirect investors, have no real recourse, except through the efforts of timely, costly, and challenging litigation.  The simple remuneration sought here ($500,000 for each of the subject claimants — SDT and SCLAT) would at least demonstrate a recognition, on the federal government's part, of its responsibilities here, and its abject failures to police the securities industry.  See generally SEC Report No. OIG-509, *supra*. See discussion in Claimants' Amended Complaint, **<u>Exhibit A</u>**, herein, at ¶¶ 66-72, *infra*.

40. What the position of the Trustee fails to recognize is that, as this Circuit has stated, "[w]hether an individual enjoys 'customer' status thus turns on the transactional relationship." *In re New Times*, *supra*, 463 F.3d at 128.  The "transactional relationship" between SDT and SCLAT and BLMIS was made clear by the Offering Plan from First Frontier, and the role of BLMIS as the investment manager of the funds.

41. Simply put, it is the Claimants SDT and CLAT position that they qualify as "customers" under the applicable section of the SIPA.

*Conclusion*

42. For all of the aforesaid reasons, Claimants would respectfully pray that this Court deny the Trustee's Motion, and vacate his decision denying "customer" status, under the SIPA, to the Claimants herein.

Dated: July 9, 2010
        White Plains, NY

                                    Respectfully submitted,


                                    /s/ *Bernard V. Kleinman*
                                    AITKEN BERLIN LLP
                                    Bernard V. Kleinman, Esq.
                                    Alan Berlin, Esq.
                                    Two Gannett Drive
                                    Suite 418
                                    White Plains, NY 10604
                                    Tel. 914.644.6660
                                    Fax: 914.694.1647
                                    Email: bvkleinman@aitkenberlin.com
                                        adberlin@aitkenberlin.com
                                    *Attorneys for:  Susan Saltz Charit-*
                                        *able Lead Annuity Trust*
                                    *Susan Saltz Descendants Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
============================== :
SECURITIES INVESTOR PROTECTION      :
CORPORATION,                         :      U.S.D.C. No. 08-10791(LSL)
                                     :
          Plaintiff,                 :
                                     :
                                     :      Adversary Proceeding
          — *versus* —               :      No. 08-01789 (BRL)
                                     :
                                     :      (Substantively Consolidated)
                                     :
BERNARD L. MADOFF INVESTMENT         :
SECURITIES LLC,                      :
                                     :
          Defendant.                 :
============================== :

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK}
COUNTY OF WESTCHESTER}              *s.s.*:

    Bernard V. Kleinman, an attorney duly admitted to practice law before this Court,

does affirm, under the laws against perjury of the United States, that on the 9th day of July

2010, he did serve the within Memorandum of Law, and annexed exhibits, upon the

following parties by depositing in an official depository of the U.S. Postal Service, first

class postage pre-paid, at the addresses as set forth below, and did file same with this

Court by ECF filing,

Irving H. Picard                    Office of the United States Trustee
Trustee                             33 Whitehall Street
Attn: David Sheehan, Esq.           Suite 2100
Baker & Hostetler, LLP              New York, NY 10004
Attorneys for Trustee
45 Rockefeller Plaza
New York, NY 10111

Securities Investor Protection Corporation
805 Fifteenth Street, N.W.
Suite 800
Washington, D.C. 10004

                              /s/ *Bernard V. Kleinman*
                              Bernard V. Kleinman