**Objection Deadline: July 12, 2010**
**Hearing Date: October 19, 2010**

MAYER BROWN LLP
Fred W. Reinke
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone: (202) 263-3000
Fax: (202) 263-3300
freinke@mayerbrown.com

Jeffrey G. Tougas
1675 Broadway
New York, New York 10019
Telephone: (212) 506-2500
Fax: (212) 262-1910
jtougas@mayerbrown.com

*Attorneys for AXA Private Management*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | : SIPA Liquidation |
| v. | : |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : |
| Defendant. | : |

_____

**OBJECTION/RESPONSE/MEMORANDUM OF LAW OF AXA PRIVATE
MANAGEMENT, ON BEHALF OF CERTAIN OF ITS CLIENTS, IN OPPOSITION
TO THE TRUSTEE'S MOTION TO AFFIRM DETERMINATIONS DENYING
THE CLAIMS OF INDIRECT INVESTORS**

17638458.5

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT ............................................................................................................................3

I. INDIRECT INVESTORS QUALIFY AS "CUSTOMERS" UNDER A PLAIN READING OF THE SIPA DEFINITION OF "CUSTOMER" ...................................................................3

    A. Nothing in the Language of SIPA Requires that a "Customer" Hold a Specifically-Titled Account Directly with the Debtor.................................................................................3

    B. SIPA Specifically Contemplates Protection for Indirect Claimants ...................................7

        1. Protection for Indirect Claimants is not Limited to Customers of Banks, Brokers, or Dealers ..................................................................................................................7

        2. SIPA Enumerates an Exclusive List of Entities that do not Qualify as Customers; the Claimants are not Included Among these Exceptions ....................................................8

II. THE CLAIMANTS, AS "CUSTOMERS," ARE ENTITLED TO A VALID NET EQUITY CLAIM; NOTHING IN THE DEFINITION OF "NET EQUITY" REQUIRES CLAIMANTS TO HOLD SPECIFICALLY-TITLED ACCOUNTS DIRECTLY WITH BLMIS ..................................................................................................................................9

III. THE CLAIMANTS ARE "CUSTOMERS" VIA CONVERSION ........................................11

IV. THE CLAIMANTS, AS "CUSTOMERS," EACH HOLD A DIRECT CLAIM AGAINST BLMIS ................................................................................................................................12

CONCLUSION.......................................................................................................................14

## TABLE OF AUTHORITIES

### Cases

Page

*In re Adler, Coleman Clearing Corp.*, 277 B.R. 520 (Bankr. S.D.N.Y. 2002) ..............................6

*In re A.R. Baron & Co.*, 226 B.R. 790 (Bankr. S.D.N.Y. 1998)......................................................3

*In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010) ..........................9

*In re First Interregional Equity Corp.*, 290 B.R. 265 (Bankr. D. N.J. 2003) ...............................6

*In re First State Sec. Corp.*, 34 B.R. 492 (Bankr. S.D. Fl. 1983) ...........................................11,12

*S.E.C. v. Ambassador Church Fin. Dev. Group, Inc.*, 679 F. 2d 608 (6th Cir. 1982).....................5

*In re Old Naples*, 223 F.3d 1296 (11th Cir. 2000).....................................................................11

*In re Primeline Sec. Corp.*, 295 F.3d 1100 (10th Cir. 2002) .....................................................7,11

*S.I.P.C. v. Barbour*, 421 U.S. 412 (1975) ....................................................................................7

*S.I.P.C. v. Executive Sec. Corp.*, 423 F. Supp. 94 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 98 (2d Cir. 1977) ...............................................................................................................................5,6

*S.I.P.C. v. Morgan Kennedy & Co., Inc.*, 533 F.2d 1314 (2d Cir. 1976).....................................12

*In re Stalvey and Assoc., Inc.*, 750 F.2d 464 (5th Cir. 1985)........................................................3

*In re Stratton Oakmont, Inc.*, 2003 WL 22698876 (S.D.N.Y. Nov. 14, 2003).............................12

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) .................................................................................12

### STATUTES AND RULES

15 U.S.C. § 78*aaa, et seq*...............................................................................................................1

15 U.S.C. § 78*fff*-2(b) ...................................................................................................................10

15 U.S.C. § 78*fff*-2(c)(1)(A) ...........................................................................................................2

15 U.S.C. § 78*fff*-2(d) .....................................................................................................................5

15 U.S.C. § 78*fff*-3 .........................................................................................................................2

15 U.S.C. § 78*fff*-3(a)..............................................................................................1,7,8

15 U.S.C. § 78*kkk*(d)......................................................................................................5

15 U.S.C. § 78*lll*(2).............................................................................. *passim*

15 U.S.C. § 78*lll*(2)(A) ................................................................................................8

15 U.S.C. § 78*lll*(2)(B) ................................................................................................8

15 U.S.C. § 78*lll*(11)......................................................................................................9

17638458.5

## PRELIMINARY STATEMENT

Pursuant to this Court's April 13, 2010 order (the "**Scheduling Order**") [Dkt. No. 2205],

AXA Private Management ("**AXA**"), on behalf of certain of its clients, (collectively, the

"**Claimants**")[1] respectfully submits this objection/response/memorandum of law in support of its

objection to the motion of Irving H. Picard, Trustee ("**Trustee**") for the liquidation of Bernard L.

Madoff Investment Securities LLC ("**BLMIS**"), for an order approving the Trustee's motion (the

"**Customer Motion**")[2] to affirm the Trustee's denial of the claims of indirect investors of

BLMIS.

This case is governed by the plain language of the Securities Investor Protection Act of

1970, 15 U.S.C. § 78*aaa*, *et seq*. ("**SIPA**").  SIPA includes within it an express definition of

"customer."   15 U.S.C. § 78*lll*(2).   Contrary to the Trustee's determination, each of the

Claimants qualifies as a BLMIS "customer" and is entitled to have their claim accepted and

satisfied, to the extent thereof, by payment from the Securities Investor Protection Corporation

("**SIPC**") of up to $500,000.  15 U.S.C. § 78*fff*-3(a); 15 U.S.C. §78*lll*(2).

The Trustee has asserted a variety of arguments which all suffer from the same flaw: a

plain reading of SIPA *requires* the Trustee to classify indirect investors as "customers."  SIPA

does not require a claimant to hold a direct, specifically-titled account with the debtor.  To the

contrary, the SIPA definition of "customer" is broad, and specifically includes the flexibility to

include indirect investors within its scope.  Further, the structure of SIPA, as well as other

provisions within SIPA, shows that SIPA specifically contemplates and protects indirect

investors.  As such, the Claimants qualify as "customers," eligible to have their claims accepted

---

[1.]  As further detailed in AXA's Customer Claim, dated July 1, 2010, and attached as <u>Exhibit A</u> hereto.

[2.]  For ease of reference, subsequent citations to the Trustee's Customer Motion shall be denoted hereinafter as "TM at __."

1

17638458.5

by the Trustee, and ultimately satisfied from customer property and/or from SIPC's compensation fund.  15 U.S.C. § 78*fff*-2(c)(1)(A); 15 U.S.C. § 78*fff*-3.

*    *    *

## ARGUMENT

### I.   INDIRECT INVESTORS QUALIFY AS "CUSTOMERS" UNDER A PLAIN READING OF THE SIPA DEFINITION OF "CUSTOMER"

**A.   Nothing in the Language of SIPA Requires that a "Customer" Hold a Specifically-Titled Account Directly with the Debtor.**

Contrary to the Trustee's assertions, the Claimants each qualify as a BLMIS "customer" and are entitled to have their claims accepted and satisfied.  The Trustee's "determination" that the Claimants must have specifically-titled accounts recorded among BLMIS's "available books and records" is found nowhere within the statutory language of SIPA.  Clearly, to be protected under SIPA, an investor must come within the definition of "customer" as that term in defined in 15 U.S.C. § 78*lll*(2).  *See In re A.R. Baron & Co.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998) (noting that "customers" in a SIPA proceeding are entitled to "priority in the distribution of certain assets marshaled by the trustee as well as entitlement to advances from the SIPC fund"); *see also In re Stalvey and Assoc., Inc.*, 750 F.2d 464 (5th Cir. 1985).  15 U.S.C. § 78*lll*(2) sets forth the definition of "customer" as follows:

> **Customer.**  The term "customer" of a debtor means *any* person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes *any person* who has a claim against the debtor arising out of sales or conversions of such securities, *and any person who has deposited cash with the debtor for the purpose of purchasing securities*, but does not include--
>
> (A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or
>
> (B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring

3

17638458.5

> such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

15 U.S.C. § 78*lll*(2) (emphasis added).

SIPA's definition of "customer" is broad, requiring only that the "customer's" claim arises out of sales **or conversions** of securities "received, acquired, or held by the debtor in the ordinary course of business as a broker or dealer." *Id* (emphasis added). It is notable that this definition does not require that the debtor receive securities *directly* from the claimant. Similarly notable is the fact that the statute does not, by its terms, require that an ***account*** be created *directly* by the customer in his/her/its own name, or otherwise, with the debtor. *Id.* This is a Trustee-manufactured requirement.

Despite this broad language, the Trustee attempts to require that "customers" hold a direct, specifically-titled account. The Trustee injects this requirement into the "customer" definition apparently by improperly fusing separate and distinct portions of the "customer" definition, arguing that "under SIPA a 'customer' is an investor who 'has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person,' **including** 'any person who has deposited cash with the debtor for the purpose of purchasing securities.'" TM at 14 (emphasis added).

The Trustee fails to note, initially, that nothing in this language requires a claim to arise from a securities account which is *directly* held by a claimant. Moreover, the Trustee's comingling of distinct requirements (*i.e.*, a claim arising from securities held for the claimant, and a claim arising on behalf of cash entrusted with the debtor) clouds the broad scope of this definition, and gives the false impression that a claimant must have placed cash into a specifically-titled account in order to qualify as a "customer." In fact, Congress chose, in a

separate and distinct sentence, to grant simple, broad "customer" protection to ***any person*** who has entrusted cash with the debtor for the purpose of purchasing securities.  15 U.S.C. § 78*lll*(2). ("The term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities, ***and any person who has deposited cash with the debtor for the purpose of purchasing securities*** . . . .") (emphasis added).  Thus, not only is there no requirement that a claimant hold a direct, specifically-titled account, there is no requirement that a claimant hold an account at all, provided that a claimant has entrusted cash with the debtor for the purpose of purchasing securities.  *See, e.g., S.E.C. v. Ambassador Church Fin. Dev. Group, Inc.*, 679 F. 2d 608, 614 (6th Cir. 1982) ("the mere act of entrusting . . . cash to the debtor for the purpose of effecting securities transactions . . . triggers customer status . . . .").

The Trustee further attempts to support his requirement that investors must have specifically-titled accounts in order to be granted "customer" status by relying on SIPA sections 78*fff*-2(d) and 78*kkk*(d), which both give passing reference to the "accounts" of customers.  *See* TM at 16-17.  As with all of the Trustee's arguments on this point, neither of these sections addresses whether a claimant must hold an account *directly* with the debtor, and whether, in the case of a claimant who has entrusted cash with the debtor, such an account need exist *at all*.  The silence on this point, together with the grant of customer status to *any person* who has entrusted cash with the debtor for the purpose of purchasing securities, shows that "customer" status should be granted to the Claimants.

The Trustee's memorandum of law advances several cases which purportedly support the imposition of this new requirement, each of which falls short of holding that an investor must hold a direct, specifically-titled account.  In *S.I.P.C. v. Executive Securities Corporation* – cited by the Trustee for the proposition that "objecting claimants were not customers because they

lacked an account with the debtor" – the court considered the effect of a "security loan agreement" (where the claimant lent securities to the broker in return for cash collateral) and concluded that the claimant was not a customer because his securities loan had no connection with his trading activity. *SIPC v. Executive Sec. Corp.*, 423 F. Supp. 94, 98 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 98 (2d Cir. 1977). Because the Claimants indirectly entrusted their funds with BLMIS *expressly* for the purpose of investing, they have an undeniable connection with the trading activity BLMIS was purportedly carrying out, unlike the "securities lending" claimant in *S.I.P.C. v. Executive Securities Corporation*. *Id.* Accordingly, the *dicta* the Trustee relies upon in *S.I.P.C. v. Executive Securities Corporation* simply does not address whether an indirect investor must hold an account *directly* with the debtor. Indeed, the case relates to a completely different activity: the Wall Street business of short term securities lending.

The Trustee's reliance upon the cases of *In re Adler, Coleman Clearing Corp.* and *In re First Interregional Equity Corp.* is similarly misplaced. In each case, the court either makes passing reference to a customer account, or simply paraphrases the SIPA definition of "customer." *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 557 (Bankr. S.D.N.Y. 2002); *In re First Interregional Equity Corp.*, 290 B.R. 265, 273-74 (Bankr. D. N.J. 2003). Neither case addresses, as the Trustee suggests, whether such an account, if necessary at all, must be *directly* held by an investor.

Accordingly, because the Claimants were clearly attempting to engage in exactly the type of investing associated with trading activity which courts have sought to protect, they fit within the accepted realm of "customers" which SIPA was enacted to protect. This behavior, together with the undeniably broad language of 15 U.S.C. 78*lll*(2) entitles each of the Claimants to "customer" status and the corresponding protections Congress intended to confer upon them.

17638458.5                                                    6

**B.      SIPA Specifically Contemplates Customer Protection for Indirect Claimants.**

Section 78*fff*-3(a) of SIPA, which covers "Advances for Customers' Claims" specifically contemplates indirect claimants as "customers."  Section 78*fff*-3(a) states that:

> no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor**.

15 U.S.C. § 78*fff*-3(a) (emphasis added).    This language makes clear that SIPA affirmatively affords positive treatment to certain indirect customers, particularly when such indirect customers were attempting to participate in the securities markets through financial intermediaries who obviate the need for a direct account relationship between the indirect customer and a debtor.  Congress specifically intended to protect indirect customers – and other similarly situated "public investors" when it passed SIPA.  *See S.I.P.C. v. Barbour*, 421 U.S. 412, 415 (1975).  *See also In re Primeline Sec. Corp.*, 295 F.3d 1100, 1105-06 (10th Cir. 2002) ("Congress passed SIPA to protect *public investors* against financial losses arising from the insolvency of registered brokers and dealers.") (emphasis added).

**1.      Protection for Indirect Claimants is not Limited to Customers of Banks, Brokers, or Dealers.**

The Trustee notes, appropriately, that an investor should be granted "customer" status when a fiduciary opens an account on such investor's behalf.  *See* TM at 15, FN 9.  The Trustee attempts to artificially and arbitrarily limit SIPA's "customer" treatment of indirect investors to situations where the fiduciary in question is a "bank, broker, or dealer."  *Id.*  However, the Trustee, in the same breath, acknowledges that the touchstone of this exception is that such entities *are statutorily ineligible for SIPC advances*.    The Trustee further argues and

17638458.5                                        7

acknowledges that the feeder funds at issue should be considered "hedge funds," and should therefore be ineligible for SIPC advances.  TM at 8-9.

By the terms of the Trustee's own framework, the "hedge funds" at issue were acting as classic fiduciaries for the indirect investors, with responsibility for maintaining accounts on the customers' behalf.  As noted above, SIPA, in section 78*fff*-3(a), specifically contemplates protection of the individual customers of entities, such as this, which would otherwise be ineligible for SIPA advances.  Accordingly, the Claimants are entitled to the protective "customer" treatment SIPA affords to indirect investors, as evidenced by 15 U.S.C. 78*fff*-3(a).

> **2.    SIPA Enumerates an Exclusive List of Entities that do not Qualify as Customers; the Claimants are not Included Among these Exceptions.**

The SIPA definition of "customer" notably contains the following two enumerated exceptions, which specifically indicate that certain entities do not come within the "customer" definition: (i) any person with a claim arising out of transactions with a foreign subsidiary of a member of SIPC; or (ii) any person with a claim for cash or securities which can be considered part of the capital of the debtor, or which is subordinated to the claims of any or all creditors of the debtor.  15 U.S.C. § 78*lll*(2)(A); 15 U.S.C. § 78*lll*(2)(B).  These two enumerated exceptions indicate a desire by the drafters of SIPA specifically to indicate when an entity, which might otherwise meet the "customer" criteria, is nonetheless ineligible for "customer" status.  Indirect customers, such as the Claimants, are *not* listed among the enumerated exceptions.  Had Congress intended to exclude indirect claimants from the definition of "customer," they would have done so explicitly – either by specifying them within a third enumerated exception, and/or by making the existence of a specifically-titled account within the debtor's "available books and records" a *sine qua non* of "customer" status.

II.    THE CLAIMANTS, AS "CUSTOMERS," ARE ENTITLED TO A VALID NET
EQUITY CLAIM; NOTHING IN THE DEFINITION OF "NET EQUITY"
REQUIRES CLAIMANTS TO HOLD SPECIFICALLY-TITLED ACCOUNTS
<u>DIRECTLY WITH BLMIS.</u>

The Trustee argues that the Claimants have no "net equity" upon which a "customer"

claim can be allowed.  This argument, like the Trustee's previously discussed statute-based

arguments, is founded upon the notion, invented by Trustee, that a showing of "net equity"

depends upon the existence of a specifically-titled, directly held, account.  And, as is repeatedly

the case with such arguments, such a requirement *does not exist* within the language of SIPA.

*See* 15 U.S.C. § 78*lll*(11) (defining "net equity" as the "dollar amount of the account or accounts

of a customer," but making no mention of any requirement that such accounts be held *directly* by

a claimant).  The Trustee acknowledges (as do the Claimants) that the calculation of net equity

flowing from indirectly-held accounts will be a profoundly complicated task, involving many

currently unknown factors.  *See* TM at 25-26.  The Trustee apparently feels that the difficulties

involved in investigating these "unknown factors" justifies the denial of claims for thousands of

victims of this horrific fraud.  While it may be true that such net equity calculations will be

complicated, and may, on a case by case basis, involve detangling the rights of multiple parties

for a given set of funds, such administrative inconvenience does not justify the outright denial of

claims on a generic basis.  Consistent with the Court's prior ruling, the Claimants, like all other

"customers," are entitled to the "net equity" resulting from the funds they entrusted indirectly

with BLMIS.  *See, generally, In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, (Bankr.

S.D.N.Y. 2010).

The Trustee further argues that no obligations to indirect investors are ascertainable from

the books and records of BLMIS.  TM at 22-25.  This argument once again ignores the simple

and apparently inconvenient fact that *nothing* in SIPA requires a customer to show a separate,

individually-titled, directly held account among the books and records of the debtor. These "requirements" are of the Trustee's own creation.

Moreover, SIPA section 78*fff*-2(b), which the Trustee relies upon for the proposition that indirect investors do not have "ascertainable" claims among the books and records of BLMIS, goes on to state that customer claims may also be satisfied to the extent such claims are "established to the satisfaction of the trustee." 15 U.S.C. § 78*fff*-2(b). In other words, SIPA, by its terms, encourages the Trustee to look beyond the mere books and records of the debtor, should the circumstances warrant. *Id.* Congress was wise to include such leeway, given the highly-suspect nature of the books and records of debtors such as BLMIS. If this leeway were not included, brokers such as Madoff might be able to obliterate, with disinformation, *all* SIPA protections simply by keeping a blank set of books.

Accordingly, it cannot be said that it is "impossible" to ascertain obligations from the books and records of BLMIS. Rather, the Trustee has *chosen* not to undertake the admittedly difficult task of filtering out the SIPC's obligations to indirect claimants from among the accounts of the relevant feeder funds, and from the various customer statements provided to the Trustee by the indirect investors, or even to estimate such obligations. This is not an administratively-insolvent estate. In light of the massive victimization of these investors, the Trustee's choice to disregard the "net equity" and available records relating to these claims, while expedient, is inequitable, and this Court should force the Trustee's hand by deeming such indirect investors "customers."

17638458.5                                                      10

### III.    THE CLAIMANTS ARE CUSTOMERS VIA CONVERSION.

The SIPA definition of "customer" also includes, by its terms, investors who can show that their claim against the debtor arises out of sales or conversions of securities held on the investor's behalf.    In this regard, the definition states, in relevant part, that "[t]he term "customer" includes **any** person who has a claim against the debtor **arising out of** sales or **conversions** of such securities . . . ."    15 U.S.C. § 78*lll*(2) (emphasis added).    This broad language in no way limits the grant of "customer" status arising via conversion to only *direct* claimants having a specifically-titled account appearing among the debtor's "available books and records."    As with the rest of the "customer" definition, the grant of "customer" status to **any** person who has a claim against the debtor **arising out of a conversion** clearly contemplates a potentially very broad range of claimants.

BLMIS, via its multi-billion dollar Ponzi scheme, undeniably **converted** Claimant's property which had been funneled to BLMIS through feeder funds such as the Fairfield entities (which themselves may well ultimately be found to be agents of BLMIS, thereby triggering "customer" status under SIPA, whether arising via conversion or otherwise), bringing the Claimants squarely within the SIPA definition of "customer."  *See Primeline*, 295 F.3d, at 1107 ("[w]hether a claimant deposited funds "with the debtor" does not depend simply on to whom claimants made their checks payable . . . . The relevant inquiry is whether the brokerage firm actually received, acquired or possessed [c]laimants' property." (citing *In re Old Naples*, 223 F.3d 1296, 1302 (11th Cir. 2000)).  *See, e.g., In re First State Sec. Corp.*, 34 B.R. 492, 495-96 (Bankr. S.D. Fl. 1983) ("There is nothing in SIPA which suggests that coverage should be denied merely because the debtor used the facilities of another innocent broker in converting its customer's property"); *In re Stratton Oakmont, Inc.*, 2003 WL 22698876, *3 (S.D.N.Y. Nov. 14,

17638458.5                                        11

2003) (holding that the debtor-broker's conversion of the claimant's property brings the customers within the meaning of SIPA).

There is no precedent in modern history for the massive *conversion* of property which was put in the hands of BLMIS by feeder funds such as the Fairfield entities. Unlike previous cases which have held that indirect claimants (such as, for example, trust beneficiaries) are not "customers" under SIPA, the case at hand involves thousands of investors who were attempting to participate in the securities market on a large scale. Our national securities market is now comprised, in great part, of investors who regularly entrust their funds to intermediaries such as the Fairfield entities. *C.f., S.I.P.C. v. Morgan Kennedy & Co., Inc.*, 533 F.2d 1314 (2d Cir. 1976) (holding that slightly more than one-hundred trust beneficiaries, ***who were not each individually active in the securities market***, were not "customers" under SIPA.) The Claimants in the case at hand were clearly individually attempting to participate in the securities markets.

The Supreme Court of the United States has held that SIPA is remedial legislation, intended for the protection of the insolvent broker's customers and, as such, should be construed ***liberally*** to effect its purpose. *Tcherepnin v. Knight*, 389 U.S. 332 (1967) (emphasis added). *See also First State Sec.*, 34 B.R. at 495. The Trustee's extreme construction of SIPA is plainly inconsistent with such purpose.

## IV.   THE CLAIMANTS, AS "CUSTOMERS," EACH HOLD A DIRECT CLAIM AGAINST BLMIS.

The Trustee also asserts that only feeder funds, and not indirect investors, hold claims against BLMIS. This argument, which puts the proverbial cart before the horse, brushes aside the language of SIPA in an attempt to reach a conclusion that indirect investors have no claim, before properly first considering whether such investors fall within the scope of SIPA's

17638458.5                                               12

"customer" definition.    The Trustee cites SIPA section 78*lll*(2) for the proposition that a

"'customer' is defined as a person 'who has a claim' against the debtor'" TM at 25.    As noted

above, the Trustee fails to mention that the full text of section 78*lll*(2) provides that "*any person*

*who has deposited cash with the debtor for the purpose of purchasing securities*" is also included

as a "customer," as well as *any person* who has his or her property converted by the debtor.

And, as before, nothing in SIPA, or in the case law cited by the Trustee, requires that a

"customer" hold an account *directly* with the debtor.

It follows that when this Court properly designates the indirect investors as "customers,"

they will each possess the requisite "customer" claim against BLMIS, or, alternatively, would be

"customers" simply by virtue of having entrusted cash to BLMIS for the purpose of purchasing

securities.    Accordingly, each Claimant is pressing their own "customer" claim, and not, as the

Trustee argues, a derivative, or beneficiary, claim which might otherwise belong to the relevant

feeder fund.

## CONCLUSION

For the reasons stated herein, this Court should deny the Trustee's Customer Motion and rule that the Claimants are each "customers," as per 15 U.S.C. § 78*lll*(2), entitled to a proper determination and allowance of a "customer" claim by the Trustee and payment of the amounts Congress intended them to receive.  The Claimants should, to the extent permitted by applicable law, have interest and costs added to their allowed claim amounts.  The Claimants also hereby join and incorporate by reference as if fully restated herein the arguments and authority cited in the objections and appositions filed on behalf of all similarly situated Objecting Claimants (as defined in the Scheduling Order) as to why the Trustee's determination on the customer issue is wrong.

Dated:  July 9, 2010.

/s/ Fred W. Reinke
Mayer Brown LLP
Fred W. Reinke
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone: (202) 263-3000
Fax: (202) 263-3300
freinke@mayerbrown.com


/s/ Jeffrey G. Tougas
Mayer Brown LLP
Jeffrey G. Tougas
1675 Broadway
New York, New York 10019
Telephone: (212) 506-2500
Fax: (212) 262-1910
jtougas@mayerbrown.com

*Attorneys for AXA Private Management*