**United States General Accounting Office**

# GAO

Report to the Ranking Minority
Member, Energy and Commerce
Committee, House of Representatives

May 2001

# SECURITIES INVESTOR PROTECTION

## Steps Needed to Better Disclose SIPC Policies to Investors





# Contents

| Letter | | 1 |
|---|---|---|

| Executive Summary | | 3 |
|---|---|---|

| Chapter 1 | **Introduction** | 14 |
|---|---|---|
| | SIPC's Mission, Organization, Funding, and Oversight | 15 |
| | SIPC Protection Versus Federal Deposit Insurance | 17 |
| | How SIPC Liquidates a Member Firm and Protects Its Customers | 18 |
| | SIPC Liquidation Proceedings Are Relatively Infrequent | 21 |
| | Objectives, Scope, and Methodology | 22 |

| Chapter 2 | **Opportunities Exist to Improve the Disclosure of SIPC's Policies in Liquidations Involving Unauthorized Trading** | 25 |
|---|---|---|
| | Unauthorized Trading Liquidations Accounted for Nearly Two-Thirds of Liquidations Initiated From 1996 Through 2000 | 25 |
| | The Establishment of an Evidentiary Standard Is Authorized Under SIPA | 28 |
| | Bankruptcy Court Rejected the Stratton Oakmont Trustee's Procedure for Satisfying Certain Approved Unauthorized Trading Claims | 31 |
| | SIPC and SEC Have Missed Opportunities to Disclose Information About the Evidentiary Standard to Investors | 32 |
| | Conclusions | 38 |
| | Recommendations | 39 |
| | Agency Comments and Our Evaluation | 40 |

| Chapter 3 | **Disclosure of SIPC Policies in Liquidations Involving Nonmember Affiliates Could Be Improved** | 43 |
|---|---|---|
| | SIPC and Trustees Denied Nonmember Affiliates Claims on Several Grounds | 43 |
| | The Trustee and SIPC Concluded in the Most Recent Liquidation That Customers of the Nonmember Affiliate Were Customers of the SIPC Member | 48 |
| | Information Available to Investors About Avoiding Risks That Can Be Associated With Nonmember Affiliates Is Limited | 49 |
| | Conclusions | 50 |

|  | Recommendations | 52 |
|  | Agency Comments and Our Evaluation | 52 |

| **Chapter 4** | **Despite Positive Initiatives, SEC's SIPC Oversight Program Faces Some Challenges** | **53** |
|  | SEC's SIPC Oversight Examination Program Has Some Limitations | 53 |
|  | SEC Has Not Implemented SEC IG Recommendation on Sharing Information About SIPC Issues | 57 |
|  | SEC OGC Has Established a Pilot Program to Monitor Ongoing SIPC Liquidations | 58 |
|  | Conclusions | 58 |
|  | Recommendations | 59 |
|  | Agency Comments and Our Evaluation | 59 |

| **Chapter 5** | **Investors May Confuse SIPC With Other Financial Guarantee Programs as U.S. Financial Industries Restructure** | **60** |
|  | Some Investors May Confuse SIPC and State Insurance Guarantee Associations With FDIC | 60 |
|  | Investor Confusion May Increase as Financial Services Industy Consolidate | 67 |
|  | Conclusions | 69 |
|  | Recommendation | 69 |
|  | Agency Comments and Our Evaluation | 69 |

| **Appendix I** | **Comments From the Securities Investor Protection Corporation** | **72** |

| **Appendix II** | **Comments From the Securities and Exchange Commission** | **83** |

| **Appendix III** | **GAO Contacts and Acknowledgments** | **89** |

## Tables

Table 1: Selected SIPC Liquidations Involving Nonmember Affiliates.     45

Table 2: Protections and Disclosure Rules of SIPC, FDIC, and State Life/Health Insurance Guarantee Associations     62

## Figures

Figure 1: Sample Back Page of Confirmation Statement     37
Figure 2: Official Symbols of SIPC and FDIC     65

## Abbreviations

| | |
|---|---|
| FDIC | Federal Deposit Insurance Corporation |
| GLBA | Gramm-Leach-Bliley Act of 1999 |
| IG | Inspector General |
| NERO | Northeast Regional Office |
| NYSE | New York Stock Exchange |
| OCIE | Office of Compliance Inspections and Examinations |
| OGC | Office of General Counsel |
| SEC | Securities and Exchange Commission |
| SIPA | Securities Investor Protection Act of 1970 |
| SIPC | Securities Investor Protection Corporation |
| SRO | Self-Regulatory Organization |



**G A O**
Accountability ∗ Integrity ∗ Reliability

**United States General Accounting Office**
**Washington, DC 20548**

May 25, 2001

The Honorable John D. Dingell
Ranking Minority Member
Committee on Energy and Commerce
House of Representatives

Dear Mr. Dingell:

This report responds to your November 16, 1999, and April 13, 2000,
requests that we assess the operations of the Securities Investor
Protection Corporation (SIPC), which was established by the Securities
Investor Protection Act of 1970. As you requested, this report discusses
(1) the basis for SIPC policies involving unauthorized trading and the
extent that these policies are disclosed to investors; (2) the basis for SIPC
policies involving the affiliates of SIPC member firms and the extent that
these policies are disclosed to investors; (3) the Securities and Exchange
Commission's (SEC) oversight of SIPC; and (4) the disclosure rules for
SIPC, the Federal Deposit Insurance Corporation, and state insurance
guarantee associations, as well as the related implications for consumers
as the financial services industry consolidates. This report includes
recommendations to the Chairman, SIPC, and the Chairman, SEC,
regarding disclosure of SIPC policies and SEC's SIPC oversight.

As we agreed with your office, we plan no further distribution of this
report until 30 days from its issuance date unless you publicly release its
contents sooner. We will then send copies of this report to Senator
Phil Gramm, Chairman, Senate Committee on Banking, Housing and
Urban Affairs; Senator Paul Sarbanes, Ranking Member, Senate
Committee on Banking, Housing and Urban Affairs; Representative
W.J. "Billy" Tauzin, Chairman, House Committee on Energy and
Commerce; Representative Michael G. Oxley, Chairman, House Committee
on Financial Services; Representative John J. LaFalce, Ranking Minority
Member, House Committee on Financial Services; Debbie Dudley Branson,
Acting Chairman, SIPC; Michael Don, President, SIPC; the Honorable
Laura Unger, Acting Chairman, SEC; Mr. Robert R. Glauber, President and
CEO, National Association of Securities Dealers; Richard Grasso,
Chairman and CEO, New York Stock Exchange; and other interested
committees and organizations. Copies will be made available to others
upon request.

GAO-01-653  Securities Investor Protection

Major contributors to this report are acknowledged in appendix III. If you
or your staff have any questions, please call me or Orice M. Williams at
(202) 512-8678.

Sincerely yours,

Richard J. Hillman
Director, Financial Markets
  and Community Investment

# Executive Summary

The Securities Investor Protection Act of 1970 (SIPA) created the Securities Investor Protection Corporation (SIPC) to provide certain protections against losses to customers from the failure of a securities firm. However, the large number of claims denied in several recent SIPC liquidation proceedings, has raised concerns that certain SIPC policies and practices may unduly limit the actual protection afforded customers. Critics assert that SIPC and court-appointed trustees, who carry out the liquidation proceedings, interpret SIPA so rigidly that they act inconsistently with, if not contrary to, the customer-protection purpose of the act. SIPC's handling of two types of claims has been most heavily criticized. The first type involves claims of unauthorized trading, which is the buying or selling of securities in an investor's account without the investor's prior approval. The second type involves claims from investors who were doing business with a nonmember affiliate but believed that they were dealing with a SIPC-member firm and, therefore, covered by SIPC.[1] These two types of claims were filed in 75 percent, or 28, of the 37 liquidation proceedings initiated by SIPC between 1996 and 2000.

The enactment of the Gramm-Leach-Bliley Act of 1999 (GLBA) eliminated many legal barriers to affiliation among banks, securities firms, and insurance companies, and other financial service providers. As the financial services industry consolidates to provide one-stop shopping mainly through affiliates, concerns have been raised about whether consumers are adequately informed about the respective coverage provided by SIPC, the Federal Deposit Insurance Corporation (FDIC), and state insurance guarantee funds for various financial products. In light of the concerns raised about SIPC's implementation of SIPA and the potential for increased investor confusion surrounding coverage, the specific objectives of this report are to

- review the basis for SIPC's policies and practices for validating and satisfying claims involving unauthorized trading and the extent that these policies were disclosed to investors;
- review the basis for SIPC's policies and practices for determining claims in liquidations of SIPC-member firms and their nonmember affiliates and the extent that these policies were disclosed to investors;
- evaluate the Securities and Exchange Commission's (SEC) oversight of SIPC's operations and compliance with SIPA; and

---

[1]Most registered securities firms automatically become members of SIPC. However, affiliates of securities firms are not required to become members of SIPC.

Executive Summary

- compare the coverage provided by and disclosure rules for SIPC, FDIC, and state insurance guarantee associations and the implications for consumers as some banks, securities firms, and insurance companies consolidate their operations.

GAO reviewed SIPA and its legislative history; reviewed legal briefs and court decisions; and interviewed SIPC and SEC officials, SIPA trustees and their attorneys, and claimants' attorneys. GAO focused its review on liquidations initiated between 1996 and 2000 involving introducing firms[2] engaged in unauthorized trading and SIPC members with affiliates. GAO also reviewed information relating to SEC's oversight of SIPC and the differences between SIPC and FDIC coverage and a summary of disclosure policies typical of state insurance guarantee programs. A complete discussion of GAO's scope and methodology can be found in chapter 1.

## Results in Brief

SIPC's policies and practices in liquidation proceedings involving certain unauthorized trading claims have generated controversy because many claims were denied or claimants received worthless securities instead of cash.[3] Two practices are central to the controversy. The first practice requires that claimants provide some form of objective evidence that they complained about an unauthorized trade within a reasonable time after the disputed trade. SIPC's practice of requiring objective evidence, usually a letter to the broker, is based on the authority that SIPA provides SIPC and the trustees to establish standards to determine the validity of customer claims. Although challenged by some claimants and critics as unreasonable, courts have upheld this policy. The second practice involves how SIPC and a trustee satisfied certain unauthorized trading claims. Approved claims for substantial amounts of cash were satisfied with worthless securities. Claimants have successfully challenged this practice in a bankruptcy court, but the appeals process is ongoing.

SIPC and SEC, which plays an important role in investor education, have not adequately disclosed to investors information about the policy on

---

[2]An introducing firm does not clear securities transactions or hold customer cash or securities.

[3]See "Many Holes Weaken Safety Net for Victims of Failed Brokerages," *The New York Times*, Sept. 25, 2000; "Group Assails Insurer of Investors," *The Washington Post*, July 21, 1999; and "Many Unhappy Returns: Ex-Stratton customers still fighting to recoup $130m," *Newsday*, Dec. 20, 1998.

providing objective evidence to prove unauthorized trading claims. For example, SIPC's informational brochure does not disclose information on this policy to investors. For the claims we reviewed, investors seemed unaware of the importance of documenting their complaints and were more than twice as likely to telephone their broker to complain about an unauthorized trade as to write a letter. GAO recommends that SIPC and SEC take actions to better inform investors about this policy and the steps investors can take to protect their interests.

SIPC's position in liquidation proceedings involving SIPC members with affiliates has also generated controversy because many claimants were determined not to be customers of the failed member firm. SIPA authorizes SIPC to liquidate only SIPC members. Therefore, only customers of the member in liquidation are entitled to protection under SIPA. In general, for a claim of a customer of the nonmember to be approved, SIPC requires that the cash or securities involved has been entrusted to the SIPC member firm.[4] Several claimants, whose claims were denied because SIPC and the trustee determined that they did not entrust funds with the SIPC member firm, appealed the determination in Federal Court. In 2000, a Federal Court of Appeals agreed, ruling that under the circumstances of that case, a claimant's reasonable belief that he or she was dealing with the member can serve as the basis for a claim. However, in other cases, courts have upheld SIPC's position that a claimant's belief does not constitute evidence that funds in fact were entrusted to the member. Although SIPC has been involved in several liquidation proceedings involving nonmember affiliates since 1996, there is limited information available to help investors avoid the potential risks associated with the nonmember affiliates. GAO recommends that SIPC and SEC take actions to increase the availability of this information.

SEC, which is responsible for oversight of SIPC, faces important challenges in its oversight of SIPC. Since 1971, SEC has initiated only three examinations. The first two examinations focused on the adequacy of the SIPC fund and administrative issues. The scope of the most recent examination initiated in May 2000 was expanded to include many of the more controversial issues raised in this report. To date, SEC examiners have focused on a limited number of liquidations involving unauthorized trading and none of the liquidation proceedings involving the affiliate

---

[4]Claimants must also meet other requirements such as the products purchased must be securities as defined by SIPA.

issue. SEC officials agreed and said that they would expand the number of liquidations reviewed. In addition, in March 2000, SEC's Inspector General (IG) issued a report[5] suggesting that SEC establish a formal mechanism to share information about SIPC proceedings, but SEC has not implemented the recommendation to date. A formal mechanism to share information could enhance SEC's ability to discuss staffs' varying opinions on issues relevant to SIPC and ensure a comprehensive oversight program. GAO recommends that SEC expand its oversight of SIPC operations to include a larger sample of proceedings involving unauthorized trading and nonmember affiliates and establish a formal coordination mechanism to share information about SIPC liquidation proceedings within SEC.

Consolidation in the financial services industry has raised concerns about whether consumers are adequately informed about the respective differences in coverage provided by SIPC; FDIC; and, to a lesser degree, state insurance guarantee funds as more companies offer banking, securities, and insurance products from a single location or through an affiliated entity. Differences in the coverage largely stem from the differences in the products offered and the nature of the relationship between the financial institution (bank, securities firm, or insurance company) and its customers. Many regulatory and securities industry officials that GAO contacted said that consumers already confuse SIPC with FDIC because of similarities in the amount of cash coverage and misunderstandings about what that coverage entails. Without improved investor education—especially that SIPC does not cover losses due to changes in market prices—investor confusion is likely to increase as the U.S. financial industry continues to consolidate and offer similar financial products under a single corporate umbrella. GAO recommends that SIPC improve the standard disclosure language it uses to describe its coverage.

## Background

By law, securities firms are to keep customer accounts separate from the firms' funds. For the firms that fail to do this and that are liquidated by SIPC, SIPC's statutory mission is to promptly replace missing cash and securities in an investor's account up to the statutory limits. Securities firms registered with SEC automatically become members of SIPC and must pay an annual assessment to the SIPC fund. The SIPC fund, valued at $1.2 billion as of February 9, 2001, is used to replace the missing securities

---

[5] *Oversight of Securities Investor Protection Corporation.* Securities and Exchange Commission Office of Inspector General. Audit Report No. 301. Mar. 31, 2000.

and cash and to pay administrative costs of the liquidation proceeding. However, SIPC does not protect against losses from declines in the market value of securities.

In typical proceedings under SIPA, SEC or the Self-Regulatory Organizations—such as the NASDR[6] and the New York Stock Exchange— notify SIPC when a SIPC member firm is in financial trouble. Upon receiving such information, SIPC may file a petition in a federal district court to liquidate the firm.[7] The district court appoints a trustee at SIPC's recommendation. SIPC serves as the trustee in some cases. The liquidation proceeding is then removed to a U.S. bankruptcy court. The trustee notifies the firm's customers of the liquidation proceeding. Typically, the trustee tries to sell or otherwise transfer customer accounts to another SIPC member. Customers must file claims to recover missing funds or securities from the member in liquidation. The trustee and SIPC staffs review submitted claims and related information and notify individuals whether their claims are approved or denied. To the extent that the SIPC member firm's assets are insufficient, SIPC advances funds for the payment of customer claims up to the statutory limits. Claimants may seek review of the trustee's decision on their claims by the bankruptcy court. If the trustee's fees and administrative expenses cannot be recovered from the members' assets, SIPC advances funds to cover them.

# Principal Findings

## SIPC's Policies and Practices Involving Unauthorized Trading Need Additional Disclosure

Pursuant to the authority provided under SIPA, SIPC and trustees generally require claimants to provide objective evidence that they complained within a reasonable time after the allegedly unauthorized trade or their claims will be denied. However, SIPC and the trustees may consider other forms of objective evidence, such as complaints to regulators. SIPC and the trustees assert that objective evidence, such as reliable and timely documentation showing a trade was unauthorized, is necessary to ensure claim accuracy and to protect against fraudulent claims. Although courts have upheld this policy, critics argue that the standard is unreasonable and places an undue burden on claimants. For

---

[6]NASDR, Inc., is the regulatory arm the National Association of Securities Dealers.

[7]In certain situations, SIPC may elect to use a direct payment procedure in lieu of instituting a liquidation proceeding to pay customer claims.

example, critics of the policy believe that it is unrealistic to expect
unsophisticated investors to complain about unauthorized trades in
writing within a specified period of time because securities orders and
related transactions routinely are conducted by telephone. Available
evidence lends support to the contention that investors are unaware of
SIPC's practice. For example, GAO reviewed a random and representative
sample of 152 unauthorized trading claims from 2 of the larger liquidation
proceedings and found that about 87 percent of the claimants indicated
that they telephoned to complain about unauthorized trades compared
with 38 percent of the claimants who provided letters.

The second controversial practice in SIPC liquidations involving
unauthorized trading occurred in a case in which the trustee satisfied
certain claims for cash by unwinding all trades determined to be
unauthorized, including those not specified in the claims. As a
consequence of this process, the trustee treated the claims as claims for
securities. This practice resulted in some claimants receiving worthless
securities, rather than substantial amounts of cash for which they had filed
claims. In this case, claimants filed claims for cash that had been used to
make unauthorized purchases of securities. However, the trustee
determined that the securities had been purchased with proceeds from
prior unauthorized sales of securities. Therefore, SIPC and the trustee
determined that the claimants were entitled to the securities that were in
the account before the unauthorized sales, rather than the cash that was
received from the sales and placed in the account before the unauthorized
purchase. Claimants challenged the trustee's practice, and a federal
bankruptcy court rejected the practice as not authorized by SIPA or any
other law. SIPC and the trustee maintained that SIPA requires the trustee's
approach. The court determined that the claims for cash should be paid
because the statute does not authorize the trustee to consider trades not
disputed in a claim form and, therefore, treat a claim as if it were a claim
for securities. According to SIPC officials, SIPC and the trustee have filed
notices of appeal.

SIPC and SEC, which has an important role in investor education, have not
adequately disclosed information about the importance of documenting
unauthorized trading complaints. Although SIPC and SEC—through an
informational brochure and Web sites—provide much useful information,
they do not fully and consistently explain the need to complain in writing
about unauthorized trades within a reasonable time period of the
unauthorized trade. SEC's Web site, for example, provided inconsistent
advice about when to telephone complaints and when to follow up in
writing. Limited disclosure may, in part, explain why many investors with

**Executive Summary**

unauthorized trading complaints appear to have been unaware of the importance of documenting their complaints about trades that were not authorized in a timely manner.

## Information Shared With Investors About SIPC's Policies Involving Nonmember Affiliates Is Not Adequate

Under SIPA, only customers of a SIPC member firm qualify for SIPA protection and only securities defined in the act and determined to be in the member's custody are covered. In three SIPC liquidations involving nonmember affiliates that GAO reviewed, trustees or SIPC denied claims they determined were not covered by SIPA because one or more of these requirements were not satisfied, as well as for other reasons. SIPC and the trustees denied certain claims in these proceedings, for example, on the grounds that persons who dealt with the affiliates were not customers of the SIPC member firms. They said that certain evidence, including checks made out to the affiliates or fund transfers to accounts with the affiliates, demonstrated that the claimants were not the customers of the SIPC members. In addition, SIPC and the trustees determined that the investments purchased were not securities as defined in the act.

In 2000, claimants in one liquidation involving a nonmember affiliate successfully challenged the trustee's and SIPC's denials of their claims. The claimants believed that they qualified as customers of the SIPC member because the SIPC member and its affiliates were presented to them and operated as a single enterprise and that the investments at issue were securities. Moreover, the common owner used the member and nonmember in a scheme to defraud customers. In August 2000, the Federal Court of Appeals for the Eleventh Circuit found that the claimants reasonably believed that they were dealing with the SIPC member and that the owner of both entities used funds raised through the nonmember affiliate as if they were the funds of the SIPC member. The court also found that the claimants deposited cash to purchase securities covered under the act. However, other courts have supported SIPC's and the trustee's position in similar cases.

Although disclosure alone would not resolve all of the issues surrounding these types of liquidations, greater disclosure could help investors better understand SIPC liquidation proceedings and what steps they could take to protect their interests. SIPC's informational brochure provides useful information that tells investors that they should avoid writing checks to anyone other than the firm, including affiliates. However, SEC does not require SIPC member firms to routinely distribute the SIPC brochure to investors. In addition, SEC's Web site provides some information on dealings with affiliates, but the information is generally limited.

## SEC's SIPC Oversight Has Improved but Faces Ongoing Challenges

SEC has taken steps to improve its oversight of SIPC. However, the oversight program faces ongoing challenges. SEC's Division of Market Regulation (Market Regulation) has primary responsibility for ensuring SIPC's compliance with SIPA. Market Regulation has engaged in several important oversight activities, such as monitoring the size of the SIPC customer-protection fund and maintaining regular communication with SIPC. However, Market Regulation initiated only two SIPC examinations between 1971 and 1999.

In 2000, SEC started a joint examination led by Market Regulation and the Office of Compliance Inspections and Examinations (OCIE). Consistent with observations made by SEC's IG, the scope of this examination was expanded. The examination guidelines include some of the issues raised by the more recent controversial liquidations discussed in this report. As of March 2001, the sample of liquidations reviewed by SEC included 4 of the 28 liquidations involving the controversial policies and practices and none of nonmember affiliate proceedings. In response to this observation, SEC staff stated that they plan to review additional liquidations involving unauthorized trading and the nonmember affiliate issue.

In September 2000, SEC also established a pilot program to monitor SIPC liquidation proceedings. Although this program is a positive development, it is too soon to determine its efficacy. The pilot program also highlights the need for more formal information sharing among SEC units. The IG report on SEC's SIPC oversight found that communication among SEC units could be improved and recommended that SEC units establish a formal method for sharing information. GAO's review found that SEC had not yet implemented the IG recommendation. Given that different offices and divisions receive different information about SIPC liquidations, more formal communication among the groups that are involved in reviewing these liquidations—such as Market Regulation, OCIE, and the Division of Enforcement (Enforcement)—is important. Without a formal means to share information across organizational lines, SEC's ability to establish a comprehensive SIPC oversight strategy could be hampered. SEC officials said that they plan to begin holding quarterly meetings to share information about SIPC.

## Potential Exists for Increased Investor Confusion

The type of financial protection that SIPC provides is similar to that provided by FDIC and, to some extent, state life and health insurance guarantee associations, but important differences exist. Consumers may confuse the coverage offered by these programs. When a member firm fails, if customer accounts are not transferred to another institution, both SIPC and FDIC return up to $100,000 of missing customer or depositor

cash; however, SIPC also replaces missing securities. The total amount of coverage under SIPA is up to $500,000, of which no more than $100,000 can be a claim for cash. Customer securities held by a securities firm are not assets of the firm, but are held in custody by the firm for its customers. SIPA protects the firm's obligation to return these assets. Because securities, unlike cash, are subject to price fluctuations, the securities returned to a customer can be worth less than their purchase price. In contrast, FDIC protects deposits, which are obligations of the accepting firm, which includes banks and thrifts. FDIC protects depositors against the risk that the institution that accepted the deposit will fail and not have assets sufficient to return a customer's deposit. Unlike securities accounts, cash deposits do not fluctuate in value. Therefore, in order to fulfill failed member depository obligations, FDIC returns the amount in the account up to the statutory limit. The state life/health insurance guarantee associations also serve to preserve an insurance company's obligation to those insured. The state insurance associations guarantee that owners of covered products will not lose their insurance coverage up to certain limits and step in to fulfill the obligations of the policy when an insured institution fails.

According to many regulatory and securities industry officials, some consumers likely confuse SIPC with FDIC, given the similarities in coverage amounts, misunderstandings between the nature of securities investing versus making deposits, and the similarity in the SIPC and FDIC logos. Yet, neither SIPC or SEC requires firms who are SIPC members to disclose in advertising to the investing public a key fact that might help consumers distinguish SIPC from FDIC: that SIPC does not protect against losses due to declines in their securities' market value.

GLBA allows banks, securities firms, and insurance companies, primarily through affiliates, to underwrite and sell each other's traditional financial products to a degree not previously allowed. To the extent that financial companies consolidate and begin to offer a full range of banking, securities, and insurance products to the public, individuals will be more likely to purchase financial products from the same corporate family that are covered by different guarantee organizations. Any public confusion that already exists between SIPC and FDIC or the state insurance guarantee associations may increase. Given the limitations of SIPC's disclosure requirements, unsophisticated investors who do not fully understand the difference between investing in securities and depositing funds in a bank may not realize that SIPC will not protect their securities investments from certain losses, such as declines in market value.

Executive Summary

## Recommendations

To improve investor awareness of SIPC's policies, practices, and coverage, GAO recommends that the Chairman, SIPC,

- as part of SIPC's ongoing effort to revise the informational brochure and Web site, include a full explanation of the steps necessary to document an unauthorized trading claim and
- amend SIPC advertising bylaws to require that the official explanatory statement about a firm's membership in SIPC include a statement that SIPC coverage does not protect investors against losses caused by changes in the market value of their securities.

In addition, SEC can take steps to improve the information it provides to investors and that investors receive about SIPC and about how to protect investor interests. GAO recommends that the Chairman, SEC

- require SIPC member firms to provide the SIPC brochure to their customers when they open an account and encourage firms to distribute the brochure to its existing customers more widely and
- review the sections of SEC's Web site and, where appropriate, advise customers to complain promptly in writing when they believe trades in their account were not authorized and update the SEC Web site to include a full explanation of SIPC's policies and practices in liquidations involving nonmember affiliates.

In chapter 2 of this report, GAO makes additional recommendations to the SEC Chairman to improve disclosure.

Finally, to improve oversight of SIPC operations, GAO recommends that the Chairman, SEC

- ensure that OCIE and Market Regulation include in their ongoing SIPC examination a larger sample of liquidations involving unauthorized trading and nonmember affiliates claims and
- require Market Regulation, OCIE, General Counsel, and Enforcement to establish a formal procedure to share information about SIPC issues.

## Agency Comments and Our Evaluation

GAO received written comments on a draft of this report from SIPC and SEC. These comments are discussed in greater detail at the end of chapters 2 through 5. In addition, SIPC's and SEC's comments are printed in appendixes I and II, respectively. SIPC and SEC also provided technical comments, which have been incorporated into the report where appropriate. Officials from SIPC and SEC agreed with most of the

**Executive Summary**

conclusions and recommendations in the draft report and both have begun to take steps to implement several of GAO's recommendations.

For example, SIPC officials said that they have begun to implement GAO's recommendation concerning improving disclosure of SIPC's unauthorized trading policies and practices. Specifically, SIPC officials said that changes they are making to the informational brochure would urge investors to complain about unauthorized trading in writing. In addition, SEC officials said that they would consider the appropriateness of requiring firms to distribute the SIPC brochure to new customers and existing customers more widely. In addition, SEC officials said that they had already reviewed SEC's Web site and made changes in response to GAO's recommendations where appropriate. SEC officials also agreed with GAO's recommendations concerning its oversight effort. Specifically, SEC officials agreed to review additional liquidation proceedings during its ongoing examination, and SEC officials stated that they would hold quarterly meetings to discuss various issues related to SIPC.

SIPC disagreed with GAO's recommendation that it amend its bylaws to require that any statement about a firm's membership include a statement that SIPC coverage does not protect investors against losses caused by changes in the market value of their securities. First, SIPC officials believe SIPC lacks the authority to implement such a change in SIPC's bylaws. Second, they believe such a statement would be misleading. GAO has revised the recommendation to make clear that it applies to only SIPC's "official explanatory statement." On the basis of GAO's conversation with SEC officials concerning SIPC's authority to amend its bylaws and GAO's review of the statute and legislative histories, GAO continues to believe that SIPC has authority, with SEC approval, to determine what should be disclosed in its official explanatory statement. GAO also does not share SIPC's concern that simply stating that SIPC does not protect against losses caused by changes in the market value of securities would be misleading. Such disclosure would be similar to information disclosed in SIPC's informational brochure, as well as information contained on the Web sites of SEC and NASDR describing SIPC coverage.

# Chapter 1: Introduction

The Securities Investor Protection Act of 1970 (SIPA) established the Securities Investor Protection Corporation (SIPC) to provide certain financial protections to the customers of insolvent securities firms. As required by SIPA, SIPC either liquidates a failed firm itself (in cases where the liabilities are limited and there are less than 500 customers) or a trustee selected by SIPC and appointed by the court liquidates the firm.[1] In either situation, SIPC is authorized to make advances from its customer protection fund to promptly satisfy customer claims for missing cash and securities up to amounts specified in SIPA. Between 1971 and 2000, SIPC initiated a total of 287 liquidation proceedings and paid about $234 million to satisfy such customer claims.

In the past 5 years, some SIPC liquidation proceedings have involved controversial policies and practices because trustees denied large numbers of investor claims.[2] One controversial practice involved the trustees' denials of many claims because claimants did not satisfy the trustee's requirement that the claimants reliably demonstrate that trading in their accounts was unauthorized (i.e., the firm had bought or sold securities for a customer's account without approval). Another controversial practice involved denials of claims of individuals who said they believed that they were customers of a firm covered under SIPA but actually had been dealing with an affiliated entity not covered by SIPA. In these liquidations, critics argue that SIPC's main goal has been to protect its industry-supplied fund rather than to protect customers as contemplated by SIPA. SIPC maintains that its policies are consistent with SIPA. An additional issue related to SIPC coverage has emerged from another source: consolidation in the financial services industry. As securities firms, banks, and insurance companies begin to merge and sell each others' traditional products through affiliates, it raises important implications about the extent of disclosure that SIPC should require its member firms to make concerning the program's coverage. In response to a request from the Ranking Member of the House Energy and Commerce Committee, we reviewed SIPC's policies and practices in liquidations involving unauthorized trading and affiliate issues, Securities and

---

[1]SIPA authorizes an alternative to liquidation under certain circumstances when all customer claims aggregate to less than $250,000.

[2]See "Many Holes Weaken Safety Net for Victims of Failed Brokerages," *The New York Times*, Sept. 25, 2000; "Group Assails Insurer of Investors," *The Washington Post*, July 21, 1999; and "Many Unhappy Returns: Ex-Stratton customers still fighting to recoup $130m," *Newsday*, Dec. 20, 1998.

Chapter 1: Introduction

Exchange Commission (SEC) oversight of SIPC, and the potential for greater investor confusion as banks, securities firms, and insurance companies offer financial products from the same corporate family that are covered by different guarantee organizations.

## SIPC's Mission, Organization, Funding, and Oversight

SIPC was established in response to a specific problem facing the securities industry in the late 1960s: how to ensure that customers recover their cash and securities from securities firms that fail or cease operations and cannot meet their custodial obligations to customers. The problem peaked in the late 1960s, when outdated methods of processing securities trades, coupled with the lack of a centralized clearing system able to handle a large surge in trading volume, led to widespread accounting and reporting mistakes and abuses at securities firms. Before many firms could modernize their trade processing operations, stock prices declined sharply, which resulted in hundreds of securities firms merging, failing, or going out of business. During that period, some firms used customer property for proprietary activities, and procedures broke down for proper customer account management, making it difficult to locate and deliver securities belonging to customers. The breakdown resulted in customer losses exceeding $100 million because failed firms did not have their customers' property on hand. Congress became concerned that a repetition of these events could undermine public confidence in the securities markets.

SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash and/or securities held at a failed firm. SIPC fulfills its mission by initiating liquidation proceedings where appropriate and transferring customer accounts to another securities firm or returning the cash or securities to the customer by restoring to customer accounts the customer's "net equity." SIPA defines net equity as the value of cash or securities in a customer's account as of the filing date, less any money owed to the firm by the customer, plus any indebtedness the customer has paid back with the trustee's approval within 60 days after notice of the liquidation proceeding was published. The filing date typically is the date that SIPC applies to a federal district court for an order initiating proceedings.[3] SIPA sets

---

[3]Under SIPA, the filing date is the date on which SIPC files an application for a protective decree with a federal district court, except that the filing date can be an earlier date under certain circumstances, such as the date on which a Title 11 bankruptcy petition was filed.

coverage at a maximum of $500,000 per customer, of which no more than $100,000 may be a claim for cash. SIPC is not intended to keep firms from failing or to shield investors from losses caused by changes in the market value of securities.

SIPC is a nonprofit corporation governed by a seven-member Board of Directors that includes two U.S. government, three industry, and two public representatives. SIPC has 29 staff located in a Washington, D.C., office. Most securities firms that are registered as broker-dealers under Section 15(b) of the Securities Exchange Act of 1934 automatically become SIPC members regardless of whether they hold customer property. As of December 31, 2000, SIPC had 7,033 members. SIPA excludes from membership securities firms whose principal business, as determined by SIPC subject to SEC review, is conducted outside of the United States, its territories, and possessions. Also, a securities firm is not required to be a SIPC member if its business consists solely of (1) distributing shares of mutual funds or unit investment trusts,[4] (2) selling variable annuities,[5] (3) providing insurance, or (4) rendering investment advisory services to one or more registered investment companies or insurance company separate accounts. SIPA, as recently amended, also exempts a certain class of firms that are registered with SEC solely because they may affect transactions in single stock futures.

SIPA covers most types of securities such as notes, stocks, bonds, and certificates of deposit.[6] However, some investments are not covered. SIPA does not cover any interest in gold, silver, or other commodity; commodity contract; or commodity option. Also, SIPA does not cover investment contracts that are not registered as securities with SEC under the Securities Act of 1933. Shares of mutual funds are protected securities, but securities firms that deal only in mutual funds are not SIPC members and thus their customers are not protected by SIPC. In addition, SIPA does not

---

[4]A unit investment trust is an SEC-registered investment company, which purchases a fixed, unmanaged portfolio of income-producing securities and then sells shares in the trust to investors.

[5]An annuity is a contract that offers tax-deferred accumulation of earnings and various distribution options. A variable annuity has a variety of investment options available to the owner of the annuity, and the rate of return the annuity earns depends on the performance of the investments chosen.

[6]Typically, bank certificates of deposit are not securities under the Securities Exchange Act of 1934, however, they are defined as securities in SIPA.

Chapter 1: Introduction

cover situations where an individual has a debtor-creditor relationship—such as a lending arrangement—with a SIPC member firm.

SIPC has a fund valued at $1.2 billion as of February 9, 2001, that it uses to make advances to trustees for customer claims and to cover the administrative expenses of a liquidation proceeding.[7] Administrative expenses in a SIPC liquidation include the expenses incurred by a trustee and the trustee's staff, legal counsel, and other advisors. The SIPC fund is financed by annual assessments on all member firms—periodically set by SIPC—and interest generated from its investments in U.S. Treasury notes.[8] If the SIPC fund becomes or appears to be insufficient to carry out the purposes of SIPA, SIPC may borrow up to $1 billion from the U.S. Treasury through SEC (i.e., SEC would borrow the funds from the U.S. Treasury and then re-lend them to SIPC). In addition, SIPC has a $1 billion line of credit with a consortium of banks.

SIPA gives SEC oversight responsibility over SIPC. SEC may sue SIPC to compel it to act to protect investors. SIPC must submit all proposed changes to rules or bylaws to SEC for approval, and may require SIPC to adopt, amend, or repeal any bylaw or rule.[9] In addition, SIPA authorizes SEC to conduct inspections and examinations of SIPC and requires SIPC to furnish SEC with reports and records that it believes are necessary or appropriate in the public interest or to fulfill the purposes of SIPA.

## SIPC Protection Versus Federal Deposit Insurance

SIPC and the Federal Deposit Insurance Corporation (FDIC) transfer or return customer property in the event that a member fails; however, there are important differences in the protection provided to investors. First, while both protect cash left with the banks or securities firms, only SIPC protects securities. Second, securities firms act as custodians for customers' securities; this property does not become an asset of the firm. SEC rules prohibit securities firms from using customer securities or cash

---

[7] The SIPC board decided the fund balance should be raised to $1 billion to meet the long-term financial demands of a very large liquidation. The SIPC balance reached $1 billion in 1996.

[8] As of February 2001, the annual assessment for SIPC members was $150.

[9] A proposed rule change becomes effective 30 days after it is filed with SEC, unless the period is extended by SIPC or SEC takes certain actions. A proposed rule change may take effect immediately if it is of a type that SEC determines by rule does not require SEC approval.

to finance their own operations, and require firms to maintain minimum levels of liquid assets to meet obligations to customers and other market participants. However, if a firm fails and is unable to return all customer securities or cash, SIPA provides limited protection, namely, the return of the securities or cash in a given customer's account up to the statutory limits. SIPC generally returns the securities or cash that should have been in the investor's account on the liquidation filing date. Therefore, if the price of the securities declines, SIPC does not protect investors from that loss. However, investors benefit from continuing to hold the securities if the price increases. Deposits held by a bank or thrift are different from investments held by securities firms. Unlike securities, cash deposits do not fluctuate in value. In addition, deposits are obligations of the institution that accepts them. Banks are free to use these customer deposits to finance their own operations (e.g., make loans or other investments). If a bank makes bad investment decisions and fails with insufficient assets to meet its liabilities to depositors, FDIC will provide coverage up to the $100,000 limit.

## How SIPC Liquidates a Member Firm and Protects Its Customers

When SEC or a self regulatory organization (SRO), such as NASDR, Inc.,[10] informs SIPC that one of its member firms is in or is approaching financial difficulty, SEC, the SROs, and SIPC take steps to determine whether the firm might fail and whether and to what extent customers, as that term is defined in SIPA, may be exposed. SIPC initiates liquidation proceedings if it determines that the member firm has failed or is in danger of failing to meet its obligations to customers, among other factor(s).[11] SIPC initiates liquidation proceedings by applying for a protective order in a federal district court or initiating a direct payment procedure.[12] The firm has an opportunity to challenge the ruling. If the court issues the order, the court appoints a disinterested trustee selected by SIPC, or, in certain cases, SIPC

---

[10]NASDR, Inc., is the regulatory arm of the National Association of Securities Dealers, which was granted self-regulatory authority under the Securities Exchange Act of 1933.

[11]For SIPC to initiate a proceeding, at least one of the following other factors must exist (1) the firm must be insolvent under the Bankruptcy Code or unable to meet its obligations as they become due; (2) the firm is subject to a court or agency proceeding in which a receiver, liquidator, or trustee has been appointed for the member; (3) the firm is not compliant with applicable financial responsibility rules of the Commission or SROs; or (4) the firm is unable to show compliance with such rules.

[12]In the smallest proceedings (in which, among other factors, the claims of all customers are less than $250,000), SIPC directly pays customer claims without filing an application for a protective order with a court and without the appointment of a trustee.

itself, to liquidate the firm.[13] The district court orders removal of the entire liquidation proceeding to the federal bankruptcy court for that district. To the extent that it is consistent with SIPA, the proceeding is conducted pursuant to pertinent provisions of the Bankruptcy Code. SIPA requires that the trustee investigate facts and circumstances relating to the liquidation; report to the court facts indicating fraud, misconduct, mismanagement, or irregularities; and submit a final report to SIPC and others designated by the court. Also, the trustee is to periodically report to the court and SIPC on its progress in distributing cash and securities to customers.

Promptly after being appointed, the trustee is to publish a notice of the proceeding in one or more major newspapers, in a form and manner determined by the court. The trustee also is to mail a copy of the notice to existing and recent customers listed on the firm's books and records, and is to provide notice to creditors in the manner prescribed by the Bankruptcy Code. Customers must file written statements of claims. The notice typically informs customers how to file claims and explains the deadlines for filing claims. Two deadlines apply. One is set by the bankruptcy court supervising the proceeding and the other is set by SIPA. The deadline set by the bankruptcy court for filing customer claims applies to customer claims for net equity. Under SIPA, the deadline may not exceed 60 days after the date that notice of the proceeding is published. Failure to satisfy the deadline can affect what the customer may be able to recover. The second deadline occurs 6 months after the publication date. SIPA mandates that no customer or general creditor claim received after the 6-month deadline can be allowed by the trustee, except for claims filed by the United States, any state, infant, or certain incompetent persons.

The trustee and SIPC staffs review each claim that the trustee receives. In some cases, the trustee's staff, SIPC staff, or both may write a brief analysis of the claim, which recommends whether the claim should be allowed or denied. If the trustee and SIPC staff initially disagree over whether the claim is valid, they hold a discussion. Typically, if the claim lacks sufficient supporting evidence, the trustee will write to the claimant requesting additional information. Once a final decision is made, the

[13]SIPC may decide to serve as a trustee in any case where it determines that the firm's liabilities to unsecured general creditors and subordinated lenders appear to aggregate to less than $750,000 and it appears that there are less than 500 customers.

trustee sends a determination letter to each claimant that informs him or her of the decision and its basis. The letter also informs a claimant of his or her right to object to the determination and how to do so. The bankruptcy court judge overseeing the liquidation rules on customers' objections after holding a hearing on the matter. Decisions of the bankruptcy court may be appealed to the appropriate federal district court, and then upward through the federal appellate process.

Under the typical SIPA property distribution process, SIPC customers are to receive any securities that the firm holds that are registered in their name or that are in the process of being registered in their name, subject to the payment of any debt to the firm. Any other customer property in an account is part of a customer's net equity as calculated by the trustee. Net equity claims are satisfied first by allowing customers to share on a pro rata basis in the firm's remaining customer property. The trustee may use up to $500,000 advanced from the SIPC fund to satisfy a customer's claim remaining after the distribution; however, only $100,000 may be advanced to satisfy a claim for cash.[14] SIPA specifies that a customer claim for securities must be satisfied with securities whenever feasible. That is, if the firm being liquidated does not possess the securities, then the trustee must purchase them in the open market and return them to the customer if a fair and orderly market for the securities exists.

Investors who attain SIPC customer status are a preferred class of creditors compared with other individuals or companies that have claims against the failed firm and are much more likely to get a part or all of their claims satisfied. This is because SIPC customers share in any customer property that the bankrupt firm possesses before any other creditors may do so. Moreover, the trustee may use advances from the SIPC fund up to the $500,000/$100,000 limits to satisfy claims that cannot be fully satisfied by the estate of customer property. In fact, since many bankrupt securities firms have no assets left at all, SIPC customers may be the only parties with claims against the firm to have any of their claims satisfied.

SIPC liquidates clearing and introducing firms, which are distinct entities. Introducing firms do not clear securities transactions or hold customer cash or securities. Instead, introducing firms contract with clearing firms to clear their customers' transactions and hold their customers' cash and

---

[14]SIPC may advance funds to the trustee to satisfy claims prior to the distribution of customer property.

**Chapter 1: Introduction**

securities. Introducing firms introduce their customers to a clearing firm on a fully disclosed basis. This means that each introducing firm customer has a securities account at the clearing firm in the customer's name and in which the customer's securities transactions are cleared and securities and cash are held. Under this scenario, the customers know their accounts are at the clearing firm, and the clearing firm treats them as customers for purposes of securities regulations governing custody of customer assets and the financial responsibility of broker-dealers. In general, the clearing firm, not the introducing firm, prepares and mails trade confirmations and periodic account statements.[15] Some SIPC liquidations have involved introducing firms that stole or misplaced customer property intended to go to a clearing firm.

## SIPC Liquidation Proceedings Are Relatively Infrequent

SIPC has initiated a fairly small number of liquidations each year compared with the number of securities firms that go out of business annually. Between its inception in 1971 and the end of 2000, SIPC commenced 287 liquidations of member securities firms. From 1996 through 2000, SIPC initiated a total of 37 liquidations of member firms or about 7 per year. By contrast, SIPC data indicate that hundreds of SIPC member firms go out of business each year without ever becoming SIPC liquidations.[16] For example, our 1992 report found that between 1971 and 1991, 20,344 SIPC members went out of business, but only 228 (about 1 percent) became SIPC liquidations. Similarly, in 1999, a total of 865 SIPC members went out of business but SIPC initiated liquidation proceedings against a total of 9 firms.

Many of the thousands of SIPC members that have gone out of business without SIPC involvement were firms that traded solely for their own accounts, did not hold customer property, and did not introduce customer accounts to a clearing firm. Accordingly, there were no customers in need of SIPC protection. In addition, because introducing firms are not permitted to hold customer cash or securities, most go out of business without any customer securities or cash to return to customers. (These assets are at the clearing firm.) However, if an introducing firm improperly holds, loses, or embezzles customer securities or cash, there may be a need for a SIPA liquidation. Furthermore, SEC's financial responsibility

---

[15]According to SEC, in some cases, the introducing firm sends the confirmation or account statement rather than the clearing firm.

[16]Although some firms fail financially, others go out of business for nonfinancial reasons, such as mergers.

and customer protection rules establish controls that securities firms must follow, which promote firm solvency and the safekeeping of customer assets. Regulators monitor compliance with these rules and intervene when problems arise prior to a firm's failure. SEC and SROs—such as NASDR and the New York Stock Exchange (NYSE)—have primary responsibility for overseeing and regulating SIPC member firms. SIPC does not have any authority under SIPA to regulate or examine its membership. In some cases, securities regulators may oversee the transfer of customer accounts from a troubled firm to a healthy firm without the need for SIPC involvement.

## Objectives, Scope, and Methodology

Our objectives were to (1) review the basis for SIPC's policies and practices for validating and satisfying claims involving unauthorized trading and the extent that these policies were disclosed to investors; (2) review the basis for SIPC's policies and practices for determining claims in liquidations involving SIPC-member firms and their nonmember affiliates, and the extent that these policies were disclosed to investors; (3) evaluate SEC's oversight of SIPC's operations and compliance with SIPA; and (4) compare the coverage provided by and disclosure rules for SIPC, FDIC, and state insurance guarantee associations; and identify the implications for greater confusion among consumers as some banks, securities firms, and insurance companies consolidate their operations.

To meet the first two objectives, we reviewed SIPA and its legislative history, court decisions, legal briefs, and other documents that were relevant to understanding SIPC's or its critics' views concerning the legal aspects of SIPC positions. Consistent with our general policy, we have not taken a position on issues involving ongoing litigation. To review the implementation of SIPC's policies and to assess investor awareness of these policies, we also reviewed a total of 152 customer claim files from 2 recent liquidations in which many claimants alleged unauthorized trading. For each of the two liquidations, we randomly selected a sample of claim files and reviewed documents from the files. These documents included affidavits and other supporting evidence provided by the claimants, if any were supplied, and the determination letter sent by the trustee to the claimant that explained the reason for allowing or denying the claim. We interviewed officials from SIPC and SEC, individuals who are or who have served as SIPC trustees and their attorneys, and attorneys who have represented claimants who have disputed trustee claim decisions concerning both the unauthorized trading and affiliate issues. In addition, we reviewed SIPC and SEC informational sources—such as brochures and Web sites—to determine what SIPC disclosed to investors regarding its policies and practices.

**Chapter 1: Introduction**

To fulfill our third objective, to evaluate SEC oversight of SIPC, we reviewed past SEC inspections of SIPC, the work plan and other documents relating to SEC's ongoing inspection of SIPC, a recent report by the SEC's Office of the Inspector General that reviewed SEC's oversight of SIPC,[17] our 1992 report on SIPC,[18] and other SIPC and SEC documents. We also interviewed officials in different organizational units of SEC, including the divisions of Market Regulation (Market Regulation) and Enforcement (Enforcement); the Office of General Counsel (OGC); the Office of Compliance, Inspections, and Examinations (OCIE); and the Northeast Regional Office (NERO) located in New York City.

To accomplish our fourth objective, to identify differences between SIPC and other financial guarantee programs and the potential for increased investor confusion as the financial services industry, we first compared general characteristics of the coverage provided by SIPC, FDIC, and state insurance guarantee associations. Then, we reviewed disclosure requirements regarding firms' participation in these organizations' coverage. To compare SIPC to FDIC, we reviewed pertinent statutes, regulations, and bylaws; and we interviewed officials from both organizations. With respect to state insurance guarantee associations, we focused on the 52 state life/health guarantee associations because the policies they sell, such as annuities, more closely resemble investments than do many of the types of insurance covered by property/casualty insurance guarantee associations. For information on the life/health state associations, we relied solely on information provided by the National Organization of Life and Health Guarantee Associations, a group to which all of the state associations belong. We did not verify the information this organization gave us with individual state insurance laws.

---

[17] *Oversight of Securities Investor Protection Corporation.* Securities and Exchange Commission Office of Inspector General. Audit Report No. 301. Mar. 31, 2000.

[18] *Securities Investor Protection: The Regulatory Framework Has Minimized SIPC's Losses* (GAO/GGD-92-109, Sept. 22, 1992).

**Chapter 1: Introduction**

We obtained written comments on a draft of our report from SIPC and
SEC, which are provided in full in appendixes I and II. We did our work in
Jacksonville and Tampa, Florida; New York, New York; and Washington,
D.C., between March 2000 and April 2001 in accordance with generally
accepted government auditing standards.

# Chapter 2: Opportunities Exist to Improve the Disclosure of SIPC's Policies in Liquidations Involving Unauthorized Trading

SIPC liquidations involving unauthorized trading accounted for nearly two-thirds of all liquidations initiated from 1996 through 2000. SIPC's policies and practices in these liquidation proceedings have generated controversy primarily because of the large numbers of claims that were denied and the methods used to satisfy certain approved claims. The first practice generally requires that investors with unauthorized trading claims provide some form of objective evidence that they complained within a reasonable time after the disputed trade. Although establishment of such a practice is authorized under SIPA and has been upheld in court, this practice has been criticized as unfair. The second controversial practice occurred in one proceeding. The practice, which was rejected by a bankruptcy court, resulted in SIPC and the trustee treating certain approved unauthorized trading claims for cash as claims for securities. Consequently, claims for cash were paid with worthless securities. Claimants successfully challenged this practice in a bankruptcy court, but SIPC and the trustee have filed notices of appeal. Another issue involving SIPC's practices is that they are often not transparent to investors. Specifically, SIPC and SEC, which has an important role in educating investors, have missed opportunities to disclose information about SIPC's practices for determining unauthorized trading claims and to educate investors about steps they can take to protect their interests.

## Unauthorized Trading Liquidations Accounted for Nearly Two-Thirds of Liquidations Initiated From 1996 Through 2000

From 1996 through 2000, 24 of the 37 proceedings initiated by SIPC, or 65 percent, involved introducing firms that, according to SIPC, engaged in unauthorized trading.[1] SIPA provides customer status and coverage to claimants who can demonstrate that the securities or cash in their accounts was unlawfully converted. Unauthorized trading is recognized as a form of unlawful conversion in which the firm or its representative take control of a customer's property and use it for the firm's purposes without the customer's permission. For example, a firm representative might buy or sell a customer's securities without authorization. In February 1996, SIPC, with SEC's concurrence, began initiating liquidation proceedings against failed introducing firms that had engaged in unauthorized trading

---

[1]SIPC officials listed an additional introducing firm—Old Naples Securities—as having engaged in unauthorized trading. Old Naples also raised issues that occur when SIPC liquidates member firms and their nonmember affiliates. This issue and the Old Naples liquidation are discussed in chapter 3.

Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading

of customer accounts carried at clearing firms.[2] According to SIPC
officials, SIPC initiated the policy to liquidate these firms and provide
protection to their customers because of the increase in the number of
customers who dealt with introducing firms and the apparent increase in
unauthorized trading activity by them.

According to SIPC officials, many of these firms marketed microcap
stocks[3] to their customers, which had become virtually worthless by the
initiation of liquidation proceedings. For example, a firm called Stratton
Oakmont, Inc. (Stratton Oakmont) committed the most serious violations
and manipulated the prices of numerous microcap stocks through various
sales practice abuses, including unauthorized trading. Of the
approximately 3,400 claimants in the Stratton Oakmont liquidation
proceeding, the trustee either directed approximately 2,600 claimants to
pick up their generally worthless microcap securities at the clearing firm
or denied their claims because SIPA does not protect against market
losses.[4]

The fact that these introducing firms engaged in unauthorized trading
presents significant challenges to SIPA trustees in determining the validity
of customer claims. These introducing firms contract with clearing firms
to hold customer accounts and maintain records and these account
holders are treated as customers of the clearing firm. However, in SIPC
liquidation proceedings involving introducing firms, claimants may argue
that the records of both the introducing firms and the clearing firms are
incorrect because they show positions that were the result of

---

[2]Prior to 1996, SIPC did not initiate liquidation proceedings against introducing firms that
traded customer accounts without authorization by transmitting unauthorized trade orders
to clearing firms. SIPC took the position that claimants were customers of the firms that
cleared for the introducing firms and that their securities and cash were generally available
at those firms. See *e.g.,* 17 C.F.R. § 300.200 (2000) (SIPC rule stating that persons having
accounts cleared by a clearing firm on a fully disclosed basis are customers of the clearing
firm). See also *Arford v. Miller,* 239 B. R. 698 (S.D. N.Y. 1999), *aff'd Arford v. Miller,* 210.
F3d 420 (2dCir. 2000).

[3]Microcap stocks are normally not listed on national stock exchanges, have limited
financial reporting requirements, and represent interests in companies with speculative
business prospects.

[4]The trustee determined these approximately 2,600 claims in a variety of ways. For
example, the trustee directed about 1,210 claimants to contact the clearing firm for their
securities. The trustee also denied 448 claims for market losses on securities and 342
claimed they were owed nothing. The remaining approximately 600 claims were rejected
for other reasons.

Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading

unauthorized trades ordered by the introducing firm representatives. In general, SIPC trustees do not have the ability to determine from the firms' records whether the claimants' assertions are true. As discussed later in this chapter, SIPC and its trustees require claimants to provide some form of objective evidence to substantiate their claims, although many claimants have been unable to provide such evidence. For example, the Stratton Oakmont trustee denied 656 of a total of 728 unauthorized trading claims, or about 90 percent, largely for failing to provide objective evidence.[5] For other unauthorized trading claims, the trustee approved the claims and returned the microcap securities that he determined should have been in the claimants' account.

SIPC's liquidations of introducing firms that engaged in unauthorized trading involve relatively higher administrative costs than other liquidations because determining the validity of unauthorized trading claims involves the acquisition and evaluation of information that is not usually contained in firm records. On average, SIPC's administrative expenses were 45 percent of the total funds advanced in liquidation proceedings involving unauthorized trading initiated from 1996 through 1999.[6] By contrast, administrative expenses averaged 10 percent of SIPC funds advanced for all other SIPC liquidations.[7] The Stratton Oakmont liquidation provides a clear example of the high administrative costs that may be associated with these liquidations. As of year-end 2000, SIPC had advanced about $5.9 million for administrative expenses of the Stratton Oakmont liquidation, as opposed to about $2.1 million to satisfy customer claims. SIPC officials said that administrative expenses in proceedings involving unauthorized trading tend to be higher than other proceedings because, among other things, the trustee's staff must engage in lengthy investigations to determine the merits of each unauthorized trading claim. In addition, many claimants whose unauthorized trading claims have been

---

[5]We reviewed a representative and random sample of about 98 approved and denied claims in the Stratton Oakmont liquidation proceeding. The SIPA trustee generally approved claims that met the standard and denied those that did not.

[6]The percentage is calculated based on financial information from introducing firm liquidation proceedings that were closed or had satisfied claims but had litigation pending as of December 31, 1999. Proceedings in which the claims process was ongoing were excluded.

[7]The percentage is calculated based on the liquidation proceedings that where closed or had satisfied claims but litigation was pending, excluding proceedings involving introducing brokers engaged in unauthorized trading. Proceedings in which the claims process was ongoing were excluded.

Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading

denied often file objections in bankruptcy court, which further increases litigation and related costs. About two-thirds of the Stratton Oakmont claimants whose unauthorized trading claims were denied have filed such objections.

## The Establishment of an Evidentiary Standard Is Authorized Under SIPA

Pursuant to the authority provided under SIPA, SIPC and trustees have established a standard that requires claimants to produce objective evidence to substantiate their unauthorized trading claims. To satisfy this standard, SIPC and trustees typically require claimants to provide some form of objective evidence that they complained, usually in writing, to the SIPC member firm or to regulators within a reasonable time after the disputed transactions. According to SIPC officials, the evidentiary standard is necessary to verify unauthorized trading claims and to protect against fraudulent claims. SIPC's critics have complained that the evidentiary standard is unfair and that most unsophisticated investors call rather than write their securities firm to allege unauthorized trades. However, the court decisions that we reviewed have supported the evidentiary standard.

## SIPA Authorizes SIPC and Trustees to Establish Standards to Verify Claims

SIPA authorizes SIPC and trustees to establish the standards by which to determine the failed firm's obligations to its customers. Specifically, SIPA directs the trustee to

"…discharge, in accordance with the provisions of this section, all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer…*insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee*…" (italics added).[8]

Claimants have a right to challenge the appropriateness of the trustees' standards for verifying claims in bankruptcy court.

Pursuant to this statutory authority, SIPC officials said that they and trustees generally require some form of objective evidence to determine the legitimacy of unauthorized trading claims. Typically, to satisfy this standard, claimants must provide reliable, objective evidence that they complained in writing to the failed firm or to a regulatory agency within a

---

[8]15 U.S.C. § 78fff-2(b).

**Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading**

reasonable period after allegedly unauthorized trades. In general, SIPC staff and trustees reject claims where the individual could not provide documentation of the complaint made to the firm or regulators within 90 days of the disputed transaction. However, we found that SIPC and the trustees would consider alternative evidence or extenuating circumstances. For example, one trustee used an NASDR investor complaint log as evidence that claimants complained about allegedly unauthorized trades within a reasonable time period. In another SIPC proceeding, a claimant proved that he had not received any account statements within the 90-day time period and the trustee approved his unauthorized trading claim.

According to SIPC officials, the evidentiary standard is necessary to determine the validity of unauthorized trading claims and to protect against fraudulent claims. The officials said that without such a standard, trustees would generally have no way of verifying these claims—other than the testimony of the claimants—because the failed firms' books and records would not show that the trades were unauthorized. SIPC officials said that one claimant in a SIPC liquidation proceeding had filed claims for 75 allegedly unauthorized trades totaling $10 million. The claimant did not provide any evidence that the trades were unauthorized other than an affidavit and trading records. After extensive investigation of the claimant's account history, SIPC officials said that staff determined that the claimant had only identified trades that lost money as "unauthorized" while ignoring trades that made money. Without the evidentiary standard, SIPC officials said that they would not be able to reasonably determine the credibility of such claims.

According to SIPC officials, the requirement that customers provide evidence of having complained in writing generally within 90 days is consistent with the notifications that firms send to account holders, such as trade confirmations and quarterly statements, showing the activities and positions in their accounts. Typically, clearing firms send trade confirmations within days of each security transaction. Clearing firms are also required to send quarterly statements to account holders holding accounts carried on a fully disclosed basis and often send monthly statements as well. These statements provide a record of the transactions in each customer's account. Provided investors review these statements, SIPC officials said the statements would give investors ample notice of any unauthorized trades within about 90 days of the trade.

**Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading**

## Critics Question the Fairness of SIPC's Evidentiary Standard but Courts Have Upheld It

Critics have questioned the fairness of SIPC's evidentiary standard, but courts have upheld its use in liquidation proceedings.[9] An attorney who represents Stratton Oakmont claimants said that the evidentiary standard can be unfair and is unsupported by law or SIPC regulations. He said that most unsophisticated investors simply call their securities firms when they identify a problem in their account, and that only sophisticated investors can be expected to complain in writing within a specified period. The attorney said that Stratton Oakmont claimants plan to contest in the bankruptcy court the evidentiary standard as the basis for rejecting unauthorized trading claims. Critics of the policy also said that the policy ignores that SEC had taken enforcement actions against Stratton Oakmont for pervasive unauthorized trading before the liquidation proceeding.

Our review identified information to support the contention that many investors may not be aware of SIPC's evidentiary standard for unauthorized trade claims. We reviewed a representative and random sample of 152 claim files from the Stratton Oakmont and Euro-Atlantic Securities, Inc., liquidation proceedings. We found that about 87 percent of the claimants stated that they complained over the telephone about allegedly unauthorized trades. By contrast, only about 38 percent complained in writing within the 90-day time period.

Although investors may generally not be aware of SIPC's evidentiary standard, recent court decisions have upheld its application in SIPC liquidation proceedings. We identified bankruptcy court orders in 2 of the 24 introducing firm liquidations—Hanover Sterling & Co., Ltd. and Euro-Atlantic Securities, Inc.—relating to the evidentiary standard for unauthorized trading claims in SIPC liquidations. In both cases, the bankruptcy judges upheld the trustees' determinations to deny unauthorized trading claims on the grounds that the claimants did not provide reliable, objective evidence that they complained of allegedly unauthorized trades within a reasonable period.

---

[9]Also see "Investor Protection – NOT: SIPC and the Securities Investor Protection Act of 1970." *Securities Arbitration 2000*, Practising Law Institute, August 2000.

Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading

## Bankruptcy Court Rejected the Stratton Oakmont Trustee's Procedure for Satisfying Certain Approved Unauthorized Trading Claims

In a January 2001 decision, the bankruptcy court overseeing the Stratton Oakmont liquidation concluded that the trustee's procedure for satisfying approved unauthorized trading claims was not authorized by SIPA or any other law. Under the procedure, the trustee sometimes returned worthless securities to claimants rather than the substantial amounts of cash that they had sought.[10] SIPC officials supported the trustee's procedure and said it was based on SIPA.

The Stratton Oakmont trustee sometimes satisfied approved unauthorized trading claims with securities rather than the cash for which customers had filed their claims. Typically, these customers (claimants) filed claims with the trustee for the cash that would have been in their accounts had Stratton Oakmont representatives not purchased microcap securities without their authorization. In deciding how to satisfy these claims, however, the trustee considered evidence that suggested earlier transactions in the claimants' accounts were also unauthorized.[11] These earlier transactions were typically unauthorized sales of securities, the proceeds of which were used to make the unauthorized purchases that were the basis for the claims for cash. To satisfy the claims, the trustee reversed all transactions that he determined to be unauthorized and returned the claimants to their positions prior to the unauthorized trades. For some claimants, this procedure resulted in the trustee returning securities that had become worthless, but which had value when they were sold without authorization. As a result, the trustee did not return the substantial amounts of cash that the claimants had initially sought by unwinding only the unauthorized securities purchases.

SIPC officials support the trustee's procedure for satisfying approved unauthorized trading claims as mandated by SIPA. According to SIPC officials, in determining a claimant's net equity under SIPA, a trustee has the responsibility to determine what securities or cash should have been in each claimant's account as of the liquidation filing date in the absence of any unauthorized trading. SIPC officials added that a claim seeking to unwind only some of the unauthorized trades would not preclude the

---

[10]The Stratton Oakmont trustee approved 72 unauthorized trading claims. A total of 23 claimants filed objections to the trustees' determinations of their claims, largely because the trustee offered to return worthless microcap securities in satisfaction of their claims.

[11]For example, the claimants may have filed copies of complaint letters that they had sent to the securities firms, which identified particular securities sales and purchases as unauthorized.

Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading

trustee from determining whether other transactions in the account were also unauthorized. The trustee would return to the claimant the cash and/or securities that should have been in the account had the unauthorized trades not occurred.

In the January decision, the bankruptcy court in the Stratton Oakmont proceeding stated that the trustee's process, which in effect treated the claims for cash as claims for securities, was not authorized by SIPA or any other law. The court concluded that claims for the proceeds from the unauthorized purchases were claims for cash and not, as the trustee and SIPC argued, claims for securities. As stated by the court:

"[T]he real question herein is whether the Trustee was correct when he collapsed two distinct wrongs: in one wrong, Stratton Oakmont sold stock without authority and turned the stock into cash, thereby cashing the customer out; in the other wrong, the broker took the cash and invested it in a stock whose purchase the customer did not authorize, thus tying up the customer's funds in an involuntary investment…

"Nothing in the (SIPA) definition of 'net equities' bears on the question of whether the two wrongs here can be treated as if they were one…The statute does not specifically authorize a trustee to search through earlier records to satisfy a net equity claim for cash as if it were a net equity claim for securities…In short, there is nothing in either bankruptcy or non-bankruptcy law that would require that the two related but distinct wrongs can be merged into one or that would prevent the complaining party from recovering only in respect to the latter wrong."[12]

SIPC officials said that they disagreed with the bankruptcy court's decision and have filed a notice of appeal, as has the trustee.

## SIPC and SEC Have Missed Opportunities to Disclose Information About the Evidentiary Standard to Investors

Disclosure plays an important role in securities market regulation, and given SIPC's investor protection mission, we believe SIPC has a responsibility to inform investors of actions that they can take to protect their investments and help ensure that they are afforded the full protections allowable under SIPA. Similarly, SEC plays a vital role in ensuring that investors receive adequate disclosure about the securities markets and programs, such as SIPC, that potentially affect their interests. In our 1992 report on SIPC, we identified deficiencies in disclosure about SIPC and recommended steps that SIPC and SEC could take to better

---

[12]See *SIPC v. Stratton Oakmont*, No. 97-40501 (ALG), slip op. at 20, 23 (Bankr. S.D. N.Y. filed Jan. 24, 2001).

**Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading**

educate investors about the SIPC coverage. In 1994, SIPC revised its informational brochure to respond to our recommendations.

SIPC and SEC have missed opportunities to disclose information about the evidentiary standard to investors. In particular, SIPC and SEC have not updated informational resources, such as the SIPC brochure as well as the SIPC and SEC Web sites, to provide information about the evidentiary standard. We also identified additional and more proactive steps that could also better serve to notify investors about the importance of documenting unauthorized trading claims. These steps include (1) establishing uniform disclosure statements on trade confirmations and other account holder documents and (2) requiring firms that have engaged in pervasive unauthorized trading to notify their customers about documenting complaints.

## SEC and SIPC Information Resources Do Not Fully and Consistently Explain the Evidentiary Standard for Unauthorized Trading Claims

SIPC and SEC have established informational resources that provide a great deal of useful information to investors. SIPC has developed an informational brochure called *How SIPC Protects You* that provides useful information about SIPC and its coverage. For example, the SIPC brochure provides the coverage limits for securities and cash claims, defines the securities covered under SIPA, and explains the claims review process. However, SIPC bylaws and SEC rules do not require SIPC members to distribute the brochure to their customers. Although SIPC officials said that a wider distribution of the brochure would be beneficial, they do not believe SIPC has the authority to require member firms to provide the brochure to their customers. This authority resides directly with SEC or with the SROs. In addition, SIPC has established a Web site at *www.sipc.org* that also provides useful information to investors. SIPC's Web site explains the SIPC program and provides much of the information discussed in the informational brochure.

Although the SIPC brochure—which was last updated in October 1994—provides useful information, it does not advise investors that SIPA covers unauthorized trading and that they should promptly complain in writing about allegedly unauthorized trades. In March 2000, the SEC IG issued a report on SEC's SIPC oversight, which found that the SIPC brochure did not give information about notifying the securities firm in a timely manner about improper account activity, such as unauthorized trading, and

**Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading**

documenting the notice.[13] The SEC IG report further recommended that SEC review the current SIPC brochure for adequacy, and encourage SIPC to make appropriate changes. As of March 2001, SIPC officials said that they had hired an investor education firm to review the current brochure and to recommend appropriate changes. SIPC officials anticipate that they will revise the brochure in 2001.

In addition to the information that SIPC provides to investors, SEC has a Web site at *www.sec.gov*, which includes useful investor information, including information relevant to SIPC protection.[14] For example, the SEC Web site contains a section called *Microcap Stock: A Guide for Investors*. The section discusses the high risks associated with microcap stocks and the fact that the prices of microcap stocks may be manipulated through fraudulent schemes, as has been the case in some of the firms involved in SIPC liquidations since 1996. SEC's Web site also contains a section entitled *Cold Calling* that provides tips to investors on how to avoid high-pressure telephone sales practices and advises investors to closely review their statements for any unauthorized trading activity. Stratton Oakmont used cold calling to attract investors. SEC's Web site also includes a brief discussion of SIPC and provides a link to the SIPC Web site.

However, we found that SEC's Web site provides information to investors that could be viewed as contradictory to the evidentiary standard. Specifically, the SEC Web site section entitled *Microcap Stock: A Guide for Investors* recommends that investors should first call their broker if they have any problems in their accounts.[15] If the broker cannot resolve the problems, SEC's Web site recommends that investors talk to the branch manager. Finally, SEC recommends that the investors (1) write to the firm's compliance department if the branch manager cannot solve the problem, (2) ask that the compliance department respond to the problem within 30 days, and (3) write to the state securities regulators or SEC if the problem is not corrected.

---

[13]*Oversight of Securities Investor Protection Corporation.* U.S. Securities and Exchange Commission Office of Inspector General. Audit Report No. 301. Mar. 31, 2000.

[14]According to SEC, the Web site receives about 1 million visitors daily.

[15]An SEC-prescribed statement that it requires securities firms to send in connection with penny stock advises customers to telephone SEC or NASDR with concerns about the brokerage firm's activities. It states that as an alternative, customers can write to SEC. 17 C.F.R. § 240.15g-100.

GAO-01-653 Securities Investor Protection

Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading

Although the telephone-based complaint approach SEC recommends appears reasonable if the securities firm acts in good faith to resolve problem trades, fraudulently operated firms such as Stratton Oakmont may not promptly reverse unauthorized trades within a reasonable period. Moreover, SIPC officials and the trustees' staffs told us that Stratton Oakmont officials sometimes used high pressure and even fraudulent tactics to convince persons who called to complain about potentially unauthorized trades to "ratify" these trades. According to these officials, persons who agreed to ratify trades over the telephone—even due to high-pressure tactics and fraud—would generally not be able to sustain an unauthorized trading claim in a SIPA proceeding.[16] Therefore, SEC's recommendation that investors call their securities firm to complain without simultaneously writing a complaint letter potentially jeopardizes their ability to prove claims in SIPC liquidation proceedings.

In contrast, we note that other sections of SEC's Web site recommend that investors complain in writing immediately if they encounter problems with their broker. Specifically, the SEC Web site section entitled *Invest Wisely: Advice From Your Securities Industry Regulators* warns investors that "If you have a problem with the sales representative on your account, promptly talk to the sales representative's manager or the compliance department. Confirm your complaint to the firm in writing. Keep written records of all your conversations. Ask for written explanations." SEC's Web site also includes specific information on unauthorized trading in a section entitled *Fast Answers*, which advises customers to send complaints to SEC via its on line complaint system. SEC has since updated various areas on its Web site to address many of the issues we raised.

We also reviewed NASDR's Web site, which also plays an important role in investor education, to determine what information it provides regarding potentially illegal behavior by securities firms. NASDR's Web site section entitled *Filing a Customer Complaint* recommends that "If you believe you have been subject to unfair or improper business conduct by your broker, you should complain to the brokerage firm promptly in writing." The Web site further recommends that investors should write to NASDR if the firm does not resolve the problem. NASDR also provides an electronic form to file written complaints about brokerage firms.

---

[16]Stratton Oakmont installed a taping system in 1995 to monitor telephone calls between firm representatives and their customers. The trustee's staff listened to taped conversations between Stratton Oakmont representatives and the firm's customers to determine if trades were ratified.

**Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading**

## Clearing Firms Are Not Required to Notify Customers to Complain in Writing About Unauthorized Trades

SEC, NYSE, and NASDR have not established requirements that clearing firms notify customers that they should immediately complain in writing about allegedly unauthorized trades. We reviewed a judgmental sample of trade confirmations and account statements and found that while many firms voluntarily notify their customers to immediately complain if they experience any problems with their trades, instructions about the next course of action varied. Some firms notified their customers to "complain in writing within 10 days," while other firms inform customers to "notify your broker immediately." In the latter case, the firms did not inform investors to complain in writing, which could result in the customer telephoning rather than writing the securities firm.

Although standardizing the notices to investors about documenting unauthorized trading claims would likely have some benefits, these benefits may be limited. We note that questions can be raised about the extent of investor awareness of the disclosures currently provided on trade confirmations and other account statements. Clearing firms that provide disclosures that investors immediately complain in writing typically do so in small print on the back page of trade confirmations (see fig. 1). This information is typically included with a substantial amount of information in similar type that the clearing firms are required to provide to their customers. For example, SEC Rule 10b-10 requires firms to disclose, among other things, information identifying and describing a securities transaction and the capacity in which the firm acted (e.g., as an agent for the customer or as a principal for its own account). Some regulatory officials we contacted questioned whether investors take the time to read these small disclosures on their trade confirmations and other account statements. Nevertheless, SIPC officials said that standardizing the disclosures to investors on account statements would be useful.

Market Regulation officials also told us that it would take a new rule or possibly an amendment to Rule 10b-10 to require firms to make a standard disclosure on confirmations, which in turn would require SEC to consider both the benefits and costs of such a rule. Although there would be some costs associated with modifying the disclosure provided on the back of account statements, the changes could be implemented in such a way as to keep costs to a minimum. For example, in many cases the change would be as simple as adding "in writing" to their current statements warning people to notify the firms of any problems with the statements.

Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading

**Figure 1: Sample Back Page of Confirmation Statement**



Source: A securities firm.

## Opportunities Exist to Provide Disclosures to the Customers of Firms That Have Engaged in Pervasive Unauthorized Trading

SEC may identify and impose sanctions on firms that have engaged in pervasive unauthorized trading long before they ever become SIPC liquidations, but it does not routinely require such firms to notify their customers about documenting unauthorized trading claims. For example, between 1992 and 1997, Stratton Oakmont operated under intensive SEC and court supervision in connection with, among other violations, pervasive unauthorized trading and stock price manipulation. However, in

**Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading**

Stratton Oakmont, there was no requirement that the firm notify customers that they should document their complaints in writing. In similar future cases, requiring such firms to prominently notify their customers to complain in writing about potentially unauthorized trades and to exercise caution in "ratifying" such trades in discussions with firm officials could help investors protect their interests, including potential unauthorized trading claims in a SIPC liquidation. Further, such prominent disclosures could benefit unsophisticated investors who may not review the SIPC brochure or review the disclosures on the back pages of trade confirmations and other account statements.

We recognize that not all firms that engage in unauthorized trading become SIPC liquidations, and that requiring firms to disclose the procedures for documenting claims could result in a loss of customer confidence in those firms. However, as discussed earlier, SIPC liquidations involving unauthorized trading are increasing and represented nearly two-thirds of all SIPC liquidations from 1996 through 2000. Concerning customer confidence, an SEC official who was responsible for overseeing Stratton Oakmont said that requiring firms to notify their customers about documenting unauthorized trades would not necessarily result in the immediate failure of the firms and that it may be sensible to provide such disclosures.

## Conclusions

SIPC's evidentiary standard, although controversial, is based on authorities afforded SIPC and the trustees under SIPA. Claimants may use evidence to attempt to meet the burden of proof required to prove their claims, and it is up to the trustee and ultimately the courts to decide whether the evidence provided is sufficient. SIPC officials have concluded, and courts have agreed, that an objective evidence standard is necessary to protect the SIPC fund from fraudulent claims. However, some critics of SIPC's evidentiary standard believe the standard is unfair because many unsophisticated investors call rather than write their securities firm, and available evidence supports this argument. In the Stratton Oakmont liquidation proceeding, for example, the trustee denied 90 percent of the unauthorized trading claims, largely because claimants were not able to provide objective evidence to support their claim. In the two liquidation proceedings reviewed, we found that investors appeared unaware that failure to provide objective evidence could jeopardize their claims. Claimants in these liquidation proceedings were twice as likely to telephone complaints about unauthorized trading activity than to write a letter to their broker.

Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading

Disclosure has an important role in securities market regulation, and SIPC has a responsibility to inform investors of actions they can take to protect their investments and help ensure that they are afforded the full protections allowable under SIPA. SIPC and SEC, which plays a vital role in investor education, have missed opportunities to disclose the evidentiary standard to investors. Many investors appeared unaware of the steps they should take to protect their interests. SIPC's brochure provided no information on handling unauthorized trading complaints, and there is no requirement that securities firms provide customers with the SIPC brochure. In addition, SEC's Web site offers potentially contradictory guidance by, sometimes telling investors to call first and write if the problem is not resolved, and other times telling them to call and confirm the complaint in writing. SEC guidance, such as steps for dealing with microcap fraud, generally tells investors to first call their securities firms when they have problems with their accounts. In certain instances, such advice could result in unscrupulous brokers pressuring investors into increasing their investments or ratifying the trades, which would compromise their SIPC protection.

Moreover, we identified additional limitations in the information disclosed to investors about the evidentiary standard. First, SEC, NYSE, and NASDR have not required that clearing firms uniformly inform investors on the back of trade confirmations and other statements to complain in writing if they have complaints about trades that were not authorized. Second, SEC does not routinely require firms that are subject to enforcement actions for pervasive unauthorized trading to advise their customers that they should document complaints about unauthorized trades in a timely manner.

In contrast to judicial acceptance of SIPC's and the trustees' policy of requiring objective evidence to support unauthorized trading claims, which is based on SIPA, a bankruptcy court rejected the Stratton Oakmont trustee's procedure for satisfying approved unauthorized trading claims as not authorized by SIPA or any other law. However, SIPC and the trustee have filed notices of appeal.

## Recommendations

To improve investor awareness of SIPC's policies, practices, and coverage, we recommend that the SIPC Chairman, as part of SIPC's ongoing effort to revise the informational brochure and Web site, include a full explanation of the steps necessary to document an unauthorized trading claim. We also recommend that SIPC revise the brochure to warn investors to exercise

**Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading**

caution in "ratifying" potentially unauthorized trades in discussions with
firm officials.

In addition, SEC can take steps to improve the information it provides to
investors about SIPC and about how to protect investor interests.
Moreover, it can help ensure that more investors receive the SIPC
brochure. To improve investor awareness and education, we recommend
that the SEC Chairman

- require SIPC member firms to provide the SIPC brochure to their
  customers when they open an account and encourage firms to distribute it
  to its existing customers more widely;
- review the sections of SEC's Web site and, where appropriate, advise
  customers to promptly complain in writing when they believe trades in
  their account were not authorized, including an explanation of SIPC's
  policies and practices and warnings about how to avoid ratifying
  potentially unauthorized trades during telephone conversations;
- in conjunction with the SROs, establish a uniform disclosure rule to
  require that clearing firms disclose on trade confirmations and/or other
  account statements that investors should complain in writing about
  unauthorized trades in a timely manner; and
- require firms that SEC determines to have engaged or are engaging in
  systematic or pervasive unauthorized trading to prominently notify their
  customers about the importance of documenting disputed transactions in
  writing.

## Agency Comments and Our Evaluation

Overall, SIPC and SEC officials agreed with the report's conclusions and
recommendations regarding liquidations involving unauthorized trading.
However, SIPC's written response clarified their positions on expanding
SIPC coverage to include customers of introducing firms, the
establishment of an evidentiary standard, and the 2001 bankruptcy court
decision regarding certain Stratton Oakmont claimants.

In response to our recommendation that SIPC revise its informational
brochure and Web site to explain the steps for documenting an
unauthorized trading claim, SIPC officials agreed "wholeheartedly" with
the recommendation. SIPC officials stated that the planned changes will
urge customers to complain in writing and thus make oral ratification of
unauthorized trades less likely. SIPC officials stated that its revised Web
site and brochure would refer investors to other Web sites—such as those
maintained by SEC and NASDR—that warn investors against securities
fraud.

Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading

SEC officials agreed that investors can best ensure that SIPC trustees will
recognize their claims resulting from unauthorized trades if they send
written complaints to their brokerage firm soon after the trade occurs.
SEC officials also agree that SEC should help educate investors about the
need to send written complaints. SEC officials stated that Commission
staff have reviewed SEC's Web site and where appropriate added
information advising investors to complain promptly in writing when they
believe they are victims of unauthorized trading. However, SEC officials
said that it would not be appropriate to advise investors to put all
complaints in writing because most complaints can be resolved via
telephone calls, and some investors may abandon their complaints if
advised to put them in writing. We agree that all complaints do not have to
be in writing, but in instances of unauthorized trading SIPC and SEC
should advise investors to document their complaints in writing to ensure
that their interests are protected. In addition, we believe that SIPC and
SEC should advise investors to exercise caution in ratifying allegedly
unauthorized trades in conversations with firm representatives.

SEC officials stated that they supported improving disclosures to
customers. Moreover, they said that they would consider our
recommendations that SEC issue rules that would require (1) securities
firms to distribute the SIPC brochure to new customers and to encourage
the distribution of the brochure more widely to existing customers and (2)
clearing firms to provide uniform disclosures on account statements to
complain in writing about allegedly unauthorized trades. SEC staff
asserted, however, that most firms distribute the SIPC informational
brochure when customers open an account and that most statements have
language telling customers to write or notify the firm at an address if they
believe the statement is in error. SIPC officials supported the
recommendation that SEC require securities firms to provide the SIPC
brochure to new customers and stated that it would assist in the
dissemination of this information to unsophisticated investors. Relating to
the second issue raised by SEC, the intent of our recommendation
concerning information disclosures on the back of account statements is
to ensure that all clearing firms provide uniform disclosures. For the
account statements we reviewed, we did not find that firms routinely
provide an address when they instruct customers to write or notify the
firm.

SEC officials also said that they would consider our recommendation that
firms that have engaged in systematic unauthorized trading prominently
notify their customers to complain in writing about allegedly unauthorized
trades. Specifically, officials said that they would consider imposing the

**Chapter 2: Opportunities Exist to Improve the
Disclosure of SIPC's Policies in Liquidations
Involving Unauthorized Trading**

requirement on a case-by-case basis as part of settlement proceedings with firms found to have engaged in systematic unauthorized trading. However, SEC officials said that many issues arise in settling cases and that the requirement may not be the best way to address all unauthorized trading cases.

GAO-01-653  Securities Investor Protection

# Chapter 3: Disclosure of SIPC Policies in Liquidations Involving Nonmember Affiliates Could Be Improved

SIPC's policies and practices in liquidations of member firms that had nonmember affiliates have also been controversial because SIPC and trustees have denied many claims in such liquidation proceedings. In three such liquidations, SIPC and the trustees denied claims by individuals who had purchased financial products from the nonmember affiliates on several grounds, including the determination that they were not customers of the SIPC member firms. Although some courts had upheld the position taken by SIPC and trustees that a claimant who places funds with an affiliate does not qualify the claimant as a customer under SIPA, in August 2000, a federal appellate court rejected SIPC and the trustee's arguments on this point and others. In the fourth and most recent liquidation that we reviewed, the trustee requested, with SIPC's endorsement, that the bankruptcy court consolidate the estates of the SIPC member and its nonmember affiliate, which potentially extended SIPA coverage to claimants who dealt with the affiliate. SIPC maintains that the factual circumstances in the most recent proceeding warranted consolidation, while similar circumstances were not present to the same degree, if at all, in the other three proceedings.

SIPC and SEC have missed opportunities to educate investors about the potential risks associated with certain nonmember affiliates. Although SIPC's informational brochure provides useful information, there is no SEC requirement that SIPC members distribute the brochure to their customers. Moreover, SEC's Web site provides limited information about dealing with nonmember affiliates. Given the limited information that is available, investors may not be fully aware of the risks that can be associated with certain nonmember affiliates.

## SIPC and Trustees Denied Nonmember Affiliates Claims on Several Grounds

Among other things, claimants seeking SIPA protection must be customers of the SIPC member in liquidation, must purchase financial products that qualify as securities under the Act, and the property they seek to have returned must have been in the member's custody. In three of the four SIPC liquidations involving nonmember affiliates initiated from 1996

Chapter 3: Disclosure of SIPC Policies in
Liquidations Involving Nonmember Affiliates
Could Be Improved

through 2000 (see table 1),[1] SIPC or trustees denied claims on one or more
of these grounds.[2] In determining whether a claimant qualified as a
customer of the SIPC member firm, for example, SIPC and the trustees
followed what has been referred to as the "bright-line" rule.[3] Under the
bright-line rule, SIPC and the trustees deny claims unless the cash or
securities involved had been entrusted to the SIPC member firm because
entrustment creates the custodial relationship with the member that is
protected under SIPA. However, in an August 2000 decision regarding Old
Naples Securities, a federal appellate court rejected SIPC's and the
trustee's application of the rule in denying customer claims, as well as
their determination that the claimants had not purchased protected
securities.

---

[1]In this chapter, we discuss four SIPC liquidations that involved affiliate issues, including
the New Times Securities. However, a fifth SIPC liquidation, Primeline Securities, also
raised affiliate issues. In the four liquidation proceedings discussed in this chapter,
customers were directly or indirectly induced by the principal to deposit their funds with
the nonmember affiliates. The principal used the funds to operate a fraudulent scheme. In
Primeline, by contrast, a registered representative employed by the SIPC member
apparently acted on his own to defraud customers by directing them to place their funds
with bank accounts he maintained for fraudulent purposes. Because of these differences,
we decided to exclude the Primeline liquidation from the discussion in this chapter.

[2]SIPC and the trustees denied claims in the Old Naples and First Interregional liquidations
on one or more of the following grounds: (1) claimants must be customers of the SIPC
member in liquidation, (2) claimants must purchase financial products that qualify as
securities under the act, and (3) the property claimants seek to have returned must have
been in the member's custody. SIPC opposed initiating liquidation proceedings against
Churchill Securities, primarily on grounds that the investments at issue were not securities
under SIPA. However, SIPC did not concede its position that persons who dealt with
affiliates were not customers of the SIPC member. Subsequently, SIPC initiated liquidation
proceedings against Churchill and as of January 2001, the trustee was reviewing claims.

[3]*See*, for example, *In re Stalvey & Associates, Inc.,* 750 F.2d 464, 469 (5th Cir. 1985)
(referring to "the bright line rule that 'in the absence of actual receipt, acquisition, or
possession of the property of a claimant by the brokerage firm under liquidation,' a
claimant (is) not entitled to the protection of SIPA." (*citing SEC v. Bove & Co.,* 378 F. Supp.
697, 699-700 (S.D.N.Y. 1974)).

Chapter 3: Disclosure of SIPC Policies in
Liquidations Involving Nonmember Affiliates
Could Be Improved

**Table 1: Selected SIPC Liquidations Involving Nonmember Affiliates.**

| SIPC member | Nonmember affiliate(s) | Filing date |
|---|---|---|
| Old Naples Securities | Old Naples Financial Services | Aug. 28, 1996 |
| First Interregional Equity Corporation | First Interregional Advisors Corporation | Mar. 6, 1997 |
| Churchill Securities | CD Investment Group Churchill Mortgage Investment Corporation | Nov. 30, 1999 |

Sources: SIPC and SEC.

## SIPC's Basis for Denying Claims Associated With Nonmember Affiliates

In each of the three cases identified in table 1, the SIPC member firms and their nonmember affiliates were involved in schemes to defraud investors. Claimants, victimized by these schemes, asserted that in their dealings with the nonmember affiliate they reasonably believed that either they were dealing with the SIPC member, or that any distinctions between the firms were meaningless, and that both firms were treated as a single entity by their common owners. [4] For example, claimants maintained that representatives of the SIPC member firms solicited investments in products offered by the affiliate, directed or guided them toward dealing with the affiliate, or promoted the member and the affiliate in such a way that the claimants reasonably believed both enterprises were part of the same entity. In some cases, claimants also provided other evidence indicating a close relationship between the two entities, such as the use of similar names (e.g., First Interregional Equity Corporation and First Interregional Advisors Corporation) and locations of the SIPC member and its affiliate on the same premises. Claimants also pointed out that in each case one person owned or controlled the SIPC member and its affiliate and that funds and assets held by the nonmember were used in varying degrees to benefit either the member or the common owner. Finally, claimants argued that they purchased financial products—such as certificates of deposit—that qualified as securities under SIPA.

However, SIPC and trustees concluded that this evidence did not establish that the claimants were customers of the SIPC member firms. In applying the bright-line rule, SIPC and the trustees relied on checks or wire transfers the claimants paid directly to the nonmembers to show that the customers had not entrusted their investments to the member as required

[4]Typically, a trustee liquidates nonmember affiliates of SIPC members in liquidation proceedings separate from the SIPC members. Moreover, the affiliates typically have no assets to satisfy the claims of former customers.

Chapter 3: Disclosure of SIPC Policies in
Liquidations Involving Nonmember Affiliates
Could Be Improved

under SIPA. SIPC and the trustees concluded that this evidence spoke for
itself, that is, the property the claimants sought to recover was placed in
accounts somewhere else and had not been entrusted to the member. SIPC
and the trustees did not accept claims by persons who presented evidence
to show that they reasonably believed they were dealing with the SIPC
member. To the extent that claimants produced evidence to show that the
two entities actually were one or that they were used by their common
owners in such a way that they were legally indistinct, SIPC and the
trustees either considered the evidence unpersuasive or determined for
other reasons that treating the two entities as one would not be
appropriate.

In applying the bright-line rule, SIPC and the trustees focused exclusively
on whether the claimant's property had been placed with the member.
Consequently, even if the claimant believed that he or she was dealing
with the member when placing funds with the affiliate, this belief would
not establish that the claimant was a customer of the member.[5] An
example of this position is set forth in a brief SIPC and the trustee filed
with the Federal Court of Appeals for the Eleventh Circuit in *In re Old
Naples Securities, Inc. v. Heebner*.[6] There, SIPC and the trustee contended
that a claimant was not a customer under SIPA if he or she wrote checks
payable to an entity other than the member regardless of what the
claimant believed concerning the recipient's status as a registered broker-
dealer. [7]

SIPC and trustees also denied claims in these proceedings because, in
their view, the claimants did not purchase securities as defined under

---

[5]SIPC refers to a decision by the United States Court of Appeals for the Ninth Circuit, *In re
Brentwood Securities, Inc.*, 925 F.2d 325 (9th Cir. 1991), as authority for the proposition
that a claimant's reasonable belief that he or she was dealing with the member is not the
proper basis for determining whether the claimant is a customer. Stating that an investor is
entitled to compensation from SIPC only if he or she has "entrusted" cash or securities to
the member, the court in *Brentwood*, rejected claims where the claimants asserted that
they had assumed or believed they had been dealing with the member. The court observed
that nothing in the record established that the broker had any role in the disputed
transactions. The claimants effectively bypassed the broker to deal directly with the
entities issuing the securities; no brokerage service was performed by either Brentwood or
an affiliate in connection with making the investments.

[6]223 F.3d 1296 (11th Cir. 2000).

[7]Joint Appellate Brief of SIPA and Trustee at 20-22, *In re Old Naples Securities, Inc. v.
Heebner* 223 F.3d 1296 (11th Cir. 2000).

**Chapter 3: Disclosure of SIPC Policies in
Liquidations Involving Nonmember Affiliates
Could Be Improved**

SIPA.[8] For example, in Old Naples, SIPC and the trustee determined that claimants who allegedly purchased bonds from Old Naples Financial Services—the affiliate of Old Naples Securities—actually made loans to Old Naples Financial Services, which are not securities under SIPA. In a similar situation, Churchill Securities, SIPC officials said that individuals who allegedly purchased certificates of deposit from the nonmember affiliates actually made loans to the affiliates or invested in unregistered investment contracts, which also do not qualify for protection under SIPA. In addition, SIPC and the trustees argued in some situations that claimants already had their so-called securities in their possession, and therefore, SIPC had no obligation to the claimants. For example, SIPC and the trustee argued that claimants, who purchased "lease assignments" from First Interregional Equity Corporation, or its affiliate First Interregional Advisors Corporation, had possession of the instruments at issue because they held the paper that recorded the assignments.

## The Eleventh Circuit Court of Appeals Rejected SIPC's and the Trustee's Positions in the Old Naples Liquidation

In an August 2000 decision in the Old Naples litigation, the Eleventh Circuit rejected SIPC's application of the bright-line rule as well as the determination that the instruments at issue were not SIPA securities. On the issue of dealing with an affiliate, the court recognized that "[a] claimant is only a 'customer' protected by SIPA in regard to a claim for cash entrusted to a brokerage if he of she 'deposited [the] cash with the debtor [or SIPC member firm]." The court further observed, however, that determining customer status "does . . . not depend simply on to whom the claimant handed her cash or made her check payable, or even where the funds were initially deposited."[9] The court held that the claimants in that case were customers of the SIPC member because (1) they reasonably believed that they were dealing with the member through their dealings with the nonmember affiliate and (2) the owner of both firms had acquired control over customer funds held by the affiliate and used them as if they were funds of the member firm. In addition, the court concluded that the claimants had deposited cash that was intended to purchase bonds, which qualify as securities under SIPA.

In November 2000, the trustee settled claims in the First Interregional liquidation for $25 million out of a possible SIPC fund exposure of $100

---

[8]The issue as to whether financial products qualify as securities is not unique to cases involving nonmember affiliates.

[9]Old Naples Lexis at *11.

**Chapter 3: Disclosure of SIPC Policies in
Liquidations Involving Nonmember Affiliates
Could Be Improved**

million. As of January 2001, the trustee for the SIPC liquidation of
Churchill Securities continued to review claims.

## The Trustee and SIPC Concluded in the Most Recent Liquidation That Customers of the Nonmember Affiliate Were Customers of the SIPC Member

In May 2000, SIPC initiated liquidation proceedings against New Times
Securities Services (New Times), which had a nonmember affiliate called
New Age Securities (New Age). Similar to the previous three liquidations,
the New Times case involved an apparently fraudulent scheme by the
controlling principal of both New Times and New Age that involved both
firms. However, in November 2000, the trustee, with SIPC's approval,
requested that the bankruptcy court consolidate the New Times and New
Age estates for purposes of the liquidation. According to the trustee,
claimants who dealt with New Age should be considered as customers of
New Times and could qualify for SIPA protection.

Among the many reasons the trustee discussed in support of the request,
he pointed out that although New Times and New Age in many respects
operated separately, generally did not commingle their assets, and
distributed account statements under their respective names, their owner
had promoted them to investors as being indistinguishable. Because the
distinctions between New Times and New Age were unclear, claimants
either had believed that they were dealing with the member or that any
distinction between the firms was meaningless. Accordingly, the trustee
stated that the principal benefit of consolidating the firms is to

"...ease the burden upon ponzi scheme victims (the claimants) who are asserting claims for
customer status in this proceeding so that they may, in many cases, be eligible for SIPC
advances. Under the proposed consolidation order, those claims for "customer" status
(arising after the member became a SIPC member in 1995) will be determined as if New
Age and (New Times) were a single broker-dealer." [10]

As the New Times proceeding demonstrates, SIPC recognizes that under
certain circumstances a member firm and its nonmember affiliate can be
consolidated, which may benefit claimants who dealt with the affiliate.

---

[10]In a ponzi scheme, an individual raises investment funds under fraudulent promises of
above market and typically risk-free returns. The perpetrator uses funds raised through the
scheme to pay off the investments of early participants in the scheme or for personal
expenses. Such schemes depend upon attracting an ever-increasing number of investors to
continue paying promised returns. Ultimately, ponzi schemes collapse when the
perpetrator can no longer raise funds to pay off the promised returns. The bankruptcy
court granted the trustee's petition in November 2000.

Chapter 3: Disclosure of SIPC Policies in
Liquidations Involving Nonmember Affiliates
Could Be Improved

According to SIPC officials, the "facts and circumstances" of the New Times proceeding differed from the facts and circumstances in the three liquidation proceedings discussed earlier in this chapter. Because of the facts and circumstances analysis, SIPC officials said that standard criteria could not be developed to determine whether claimants who dealt with an affiliate qualified as customers of the member. SIPC officials explained SIPC's denials of claims in the first three proceedings as cases in which they did not believe that consolidating the estates of the SIPC members and their nonmember affiliates was warranted.

## Information Available to Investors About Avoiding Risks That Can Be Associated With Nonmember Affiliates Is Limited

As discussed in chapter 2, SIPC and SEC have a responsibility to disclose information about SIPC's policies and procedures to investors. However, the information that investors would need to avoid the type of problems that can be associated with fraudulent schemes conducted by certain SIPC member firms and their affiliates is limited. SIPC's brochure does provide very useful information, but as also discussed in chapter 2, the SIPC brochure is not routinely distributed to investors. In addition, SEC's Web site provides useful information about affiliates; however, opportunities exist to educate investors about the potential problems that can be associated with SIPC members that have nonmember affiliates.

SIPC's investor informational brochure advises investors to be sure that they are customers of a SIPC member firm and contains helpful information that could assist investors in avoiding fraud when dealing with certain nonmember affiliates. The SIPC brochure has a section entitled *How Can I Be Sure I am Dealing With a SIPC Member*, which explains that all SIPC members are required to display the SIPC logo. The section also advises investors that

"Some SIPC members have affiliated or related companies or persons who conduct investment business but who are not members of SIPC. Some of these affiliates may have names which are similar to the name of the SIPC member, or which operate from the same offices or with the same employees. Be sure that you receive written confirmation of each securities transaction in your account and that each confirmation statement and each statement of account is issued by the SIPC member and not by a SIPC member affiliate. Deposits for credit for your securities account, by check or otherwise, should not be made payable to your account executive, registered representative, or to any other individual, but generally only to your SIPC member broker-dealer or, if your account is carried at another SIPC member who provides clearing services for your SIPC member broker-dealer, then to that other SIPC member…"

**Chapter 3: Disclosure of SIPC Policies in
Liquidations Involving Nonmember Affiliates
Could Be Improved**

However, investor access to this information is uncertain because there is
no requirement that SIPC members distribute the informational brochure
and many unsophisticated investors may not access the SIPC Web site.[11]
While SEC officials agreed that wider distribution of the brochure would
be useful, they were concerned about the costs of distributing the
brochure to 82 million account holders. Costs could be mitigated through
a variety of methods, from distributing it to only new account holders to
creating hyperlinks between SIPC and the firms' Web sites, which
customers could access.

SEC's Web site contains sections that generally advise investors about
risks that can be involved with affiliated entities of broker-dealers. The
SEC Web site includes a section entitled *Invest Wisely: Advice From Your
Securities Industry Regulators.* The section warns investors to "Never
make a check out to a sales representative" and to "Never send checks to
an address different from the business address of the brokerage or a
designated address listed in the prospectus." SEC's Web site also contains
a link to the SIPC Web site, which advises customers on affiliate-related
issues.

However, there are other prominent sections of the SEC Web site that
investors may access for advice that do not include specific information
about avoiding the frauds that may be associated with certain SIPC
member affiliates. Specifically, the SEC Web site has a section entitled
*SEC: Protect Your Money* that includes a subsection called *Investor Alerts.*
The purpose of the subsection is to advise investors on how to avoid
frauds that could result in substantial losses. The subsection contains links
to other Web sites as well as other sections of the SEC Web site that
discuss common frauds. These frauds include pump and dump schemes,
promissory note fraud, fraudulent telemarketers, and Internet securities
fraud. However, the subsection does not include any information the
means by which broker-dealers may set-up affiliates to perpetrate
fraudulent schemes, and the steps that investors could take to avoid these
scams.

## Conclusions

Although SIPC's policies and practices in liquidation proceedings involving
SIPC members that had nonmember affiliates are based on SIPA and
relevant case law, it has had mixed success defending its position in court.

---

[11]SIPC's Web site contractor does not keep data on the number of "hits" that the Web site
receives.