**Chapter 3: Disclosure of SIPC Policies in
Liquidations Involving Nonmember Affiliates
Could Be Improved**

The position taken by SIPC and the trustees regarding who is a customer
and whether they purchased securities depends largely on the facts of
each liquidation proceeding. In three of the four liquidations we reviewed
involving nonmember affiliates, SIPC and SIPA trustees denied SIPC
coverage to certain claimants, in part, on the grounds that they were not
customers as defined in SIPA. SIPC and the trustees generally determined
that to qualify for customer status, SIPC and the trustee must determine
that the SIPC member firm actually received cash or securities directly
from the claimant(s). In all three of these liquidations, SIPC also denied
claims on other grounds, including that the claimants did not purchase
financial products that qualify as securities under SIPA. In August 2000, a
federal appellate court rejected SIPC and the trustee's positions in one of
these three liquidations. The court concluded that (1) customer status
does not depend simply upon to whom the claimant writes a check to
purchase securities, (2) the SIPC member firm acquired control of
customer funds deposited with the nonmember affiliate, and (3) claimants
purchased products that qualify as securities under SIPA. Although SIPC
continues to believe that its positions were correct in this case, this court
decision establishes a precedent that other claimants can consider,
together with cases in which SIPC's positions have been upheld, in
deciding whether to file claims that involve dealings with affiliates.

In the fourth and most recent liquidation involving a nonmember affiliate,
SIPC supported the trustee's decision to consolidate the estates of the
member and nonmember, which would extend customer protection to
claimants, who purchased financial products from a nonmember affiliate.
Although the trustee may still deny certain claims on other grounds, these
claimants will not have their claims denied because they had accounts or
other dealings with the nonmember.

As with SIPC's evidentiary standard regarding unauthorized trading,
opportunities exist to improve disclosure to investors about the risks that
may be associated with certain SIPC member and their nonmember
affiliates. Although SIPC's informational brochure provides useful
information, such as writing checks to the SIPC member rather than
affiliates, there is no requirement that SIPC members distribute the
brochure to their customers. In addition, SEC's Web site does not
prominently warn investors about how SIPC members and their affiliates
may conduct schemes to defraud their customers. We recognize that
investor education, although beneficial, has its limitations and even with
improved investor education, many investors may continue to fall victim
to fraudulent schemes perpetrated by certain SIPC member firms and their
nonmember affiliates.

**Chapter 3: Disclosure of SIPC Policies in
Liquidations Involving Nonmember Affiliates
Could Be Improved**

## Recommendations

We recommend that the SEC Chairman, as discussed in chapter 2, require SIPC member firms to provide the SIPC brochure to their customers when they open an account and encourage firms to distribute it to its existing customers more widely. We also recommend that SEC update its Web site to inform investors about the frauds that may be associated with certain SIPC member firms and their affiliates as well as the steps that can be taken to avoid falling victim to such frauds.

## Agency Comments and Our Evaluation

SIPC and SEC officials generally agreed with our conclusions and recommendation pertaining to liquidations involving nonmember affiliates. In particular, SEC agreed to implement our recommendation by updating relevant on-line publications about the danger of sending funds to affiliates. SIPC officials commented that the draft report's recommendation that SEC require securities firms to provide the SIPC brochure, which includes useful cautionary information about dealing with nonmember affiliates, to new customers should also assist in the dissemination of this information to unsophisticated investors.

SIPC officials also provided additional explanatory remarks about their positions concerning liquidations involving nonmember affiliates. First, SIPC officials restated that several courts have upheld SIPC's positions in liquidations involving nonmember affiliates. We acknowledge this fact in the draft by discussing one of the federal appellate court cases and citing two others. Second, SIPC officials provided background information on the origin and significance of the rule SIPC and the trustees base their positions on in cases involving nonmember affiliates. SIPC officials stated that "SIPC protection is not simply about getting money from SIPC." They also stated that it is a question of whether it is equitable and fair to allow persons whom had not contributed to the assets of a firm in liquidation proceedings to share in the assets of such firms. Finally, SIPC officials wanted to clarify that the New Times liquidation proceeding was not the only case in which SIPC supported the consolidation of a SIPC member and its affiliates. SIPC stated that the New Times case is the fifth such circumstance where SIPC supported consolidation. As we stated throughout the draft report, the report addresses only four nonmember affiliate liquidations, which were initiated in 1996, 1997, 1999, and 2000.

# Chapter 4: Despite Positive Initiatives, SEC's SIPC Oversight Program Faces Some Challenges

As provided in SIPA, SEC has the responsibility to oversee SIPC's operations and to ensure compliance with the act. During 2000, SEC initiated several programs, which have the potential to strengthen its SIPC oversight as provided for under SIPA. In particular, SEC initiated an examination of SIPC, and OGC established a 1-year pilot program to monitor ongoing SIPC liquidations and to assist investors who disagree with SIPC trustee claim decisions. Our review found that SEC's oversight program faces challenges in meeting its potential goal of developing a comprehensive assessment of SIPC's operations. For example, to date the SIPC examination that SEC initiated in 2000 has focused on a limited sample of SIPC liquidations that involve unauthorized trading. Moreover, none of these proceedings involve the affiliate issue. However, SEC officials said that they would expand the sample to include more liquidations that involve unauthorized trading and the affiliate issue. In addition, SEC has not established a formal procedure to share information about SIPC issues as recommended by the IG report. According to SEC officials, the various groups plan to begin holding quarterly meetings to discuss SIPC.

## SEC's SIPC Oversight Examination Program Has Some Limitations

Market Regulation is the SEC division responsible for reviewing SIPC's day-to-day operations, including the review and approval of SIPC rules, and monitoring the size and adequacy of the SIPC customer protection fund. Although these efforts are important, in the 28-year period between 1971 and 1999, Market Regulation completed only two SIPC examinations, the most recent of which focused on four liquidations.

In May 2000, Market Regulation and OCIE initiated a joint SEC oversight examination. Although the ongoing SEC examination will likely provide important information about SIPC's operations, as of March 2001, the SEC examination sample included a limited sample of liquidations that involved unauthorized trading and none of the SIPC liquidations that involve nonmember affiliates, which were discussed in chapter 3. SEC staff said that they would include additional liquidations involving unauthorized trading and the affiliate issue as part of the ongoing inspection.

## Market Regulation's Ongoing Responsibility for SIPC Oversight

Market Regulation has implemented its oversight responsibility for SIPC in several ways. In particular, Market Regulation staff occasionally attend SIPC board meetings and routinely monitor the size and adequacy of the SIPC fund and discuss this issue with SIPC on an ongoing basis. In 1991, a Market Regulation official served on a SIPC task force formed to make recommendations regarding SIPC assessments on member firms. Market

Chapter 4: Despite Positive Initiatives, SEC's
SIPC Oversight Program Faces Some
Challenges

Regulation and SIPC officials also communicate frequently in person and via telephone over relevant issues and ongoing liquidations. As provided by SIPA, SIPC also submits any proposed rule changes to SEC for review and comment, and Market Regulation has lead responsibility for reviewing and approving the proposed rules. In addition, SIPC regularly submits its annual reports and audited financial statements to SEC.

However, Market Regulation's on-site SIPC examinations have been infrequent and limited in scope. In general, on-site examinations are a crucial component of an effective oversight program because they provide a comprehensive, independent, and in-depth look into the operations and practices of the regulated entity. To provide useful and meaningful information, examination guidelines must address relevant issues and examination staff must review a sufficient number of items to fully understand the regulated entity's operations. Although contacts between the regulator and regulated entity are important oversight tools, they cannot substitute for an effective on-site examination program.

Despite the need for a comprehensive examination program, our 1992 report[1] found that Market Regulation had only initiated one SIPC examination in the 21-year period between 1971 and 1992. Market Regulation's limited scope 1985 examination found that SIPC was doing a good job in selecting trustees and overseeing the liquidation process. However, our 1992 report also noted that the examination identified actions that could speed the payment of customer claims, such as the development of an automated liquidation system. Our report also found that SEC did not follow-up on the 1985 examination recommendations regarding SIPC's automated systems. Consequently, our report recommended that SEC periodically review SIPC's operations and its efforts to ensure timely and cost-effective liquidations. Market Regulation agreed to implement this recommendation and subsequently established a program to examine SIPC's operations every 4 to 5 years.

In 1994, Market Regulation completed a 2-year SIPC examination that focused on four liquidation proceedings. The examination assessed SIPC's efforts to maintain the size of the SIPC fund and reviewed the mechanics of the four liquidations. In general, the SEC examination found that SIPC and its trustees efficiently managed these four liquidations. However, the Market Regulation examination also made several technical

---

[1]GAO/GGD-92-109.

recommendations to SIPC to improve liquidation proceedings and to better serve individuals who file claims.

According to the SEC IG report on SEC's SIPC oversight,[2] the 1994 SIPC examination took 2 years to complete because Market Regulation assigned staff to the project on a part-time basis. The SEC IG report stated that the five staff assigned to the examination had other responsibilities, which contributed to the length of time necessary to complete the project. According to the IG report, SIPC staff said that, although the SEC examination was not disruptive, they would have preferred a more timely examination.

## SEC's 2000 Examination Is Ongoing

In May 2000, Market Regulation and OCIE initiated a joint examination of SIPC. SEC created OCIE in 1995 to consolidate SEC's inspection and examination program. At that time, SEC transferred most of the examination responsibilities of Market Regulation and the Division of Investment Management to OCIE. Despite the transfer of most SEC examination functions to OCIE in 1995, Market Regulation remained involved in SIPC examinations. The IG report stated that Market Regulation retained expertise in SIPC issues and has a constructive relationship with SIPC staff while OCIE has valuable examination expertise. The IG report commended Market Regulation and OCIE on agreeing to initiate a joint SIPC examination in 2000, and, upon completion of that examination, recommended that both SEC units continue to conduct joint examinations and to agree on a periodic examination schedule.

The SEC IG report identified several areas not addressed in the 1985 and 1994 inspections that could improve SEC's oversight effectiveness. These issues are as follows:

1. adequacy of SIPC policies, procedures, and/or standards used to determine whether a customer request to bring a liquidation proceeding has merit under SIPA;

2. sufficiency of SIPC guidance given to trustees regarding (a) evidence (such as type and amount) necessary to establish a valid customer

---

[2] *Oversight of Securities Investor Protection Corporation,* Audit Report No. 301.

claim and (b) recognition of legal precedents in liquidation
proceedings;

3.  propriety of SIPC decisions made regarding claims submitted to the
    trustee, during a proceeding, given SIPA's requirements;

4.  consistency of trustee actions in acting as a fiduciary to investors;

5.  comparison of the timeliness of each stage of claim processing during
    a liquidation compared with results from past inspections; and

6.  reasonableness of SIPC administrative expenses, including a
    comparison to amounts paid out in satisfaction of claims.

SEC Market Regulation and OCIE officials agreed that the 2000 inspection
would cover all the issues the IG report identified. The expanded scope
would allow SEC to address many of the controversies surrounding SIPC.
For example, item 2—SIPC guidance regarding evidence (type and
amount)—addresses the issues raised in SIPC's liquidations of introducing
firms engaged in unauthorized trading. In particular, the guidance that
SIPC provided to trustees who implemented the documentation standard
for unauthorized trading claims would likely be a relevant issue for SEC's
ongoing SIPC examination. In addition, item 6—cost of liquidation
administrative expenses—has primarily been a source of controversy in
some SIPC liquidations involving unauthorized trading claims. The
examination is to also include other areas, such as SIPC's appointment of
trustees in larger liquidations, the scope of SIPA's coverage, the public's
understanding of the type of coverage SIPA provides, and the adequacy of
the SIPC fund.

As of March 2001, SEC had included four SIPC liquidations involving
unauthorized trading in its examination sample but had not included any
liquidations involving nonmember affiliates. OCIE officials told us that as
of March 2001, SEC staff had reviewed 21 SIPC liquidation proceedings.[3] In
March 2001, the sample included 4 of the 24 liquidations that involved
unauthorized trading. However, Market Regulation and OCIE staff had not
included in the examination sample any of the four liquidations involving

---

[3] The SEC sample of 21 liquidations includes 5 liquidations SIPC initiated from 1996 through
1999. Four of these were introducing firms that engaged in unauthorized trading. Of the
remaining 16 liquidations in the SEC sample, SIPC initiated 2 in 1995, 2 in 1994, 1 in 1993, 7
in 1992, 1 in 1991, 1 in 1989, and 2 in 1988.

Chapter 4: Despite Positive Initiatives, SEC's
SIPC Oversight Program Faces Some
Challenges

nonmember affiliates. SEC officials told us that they were mindful of the issues concerning unauthorized trading and nonmember affiliate claims. They also said that the SIPC examination remained ongoing and that a final determination on the number of liquidations to include in the final sample had not yet been decided. However, they agreed that the sample should be expanded to include additional liquidations involving unauthorized trading and the nonmember affiliate issue. They said that they planned to expand the sample of liquidations accordingly.

Given the controversies involving SIPC's liquidations involving unauthorized trading and nonmember affiliates, including a large number of liquidations involving unauthorized trading and the affiliate issue, an expanded sample size is warranted. As discussed in chapters 2 and 3, liquidations involving unauthorized trading and affiliates comprise 75 percent of the SIPC proceedings initiated since 1996. In three of the four SIPC liquidations involving nonmember affiliates, SIPC or trustees denied large numbers of claims where customers purchased financial products from the affiliates. In the Old Naples Securities liquidation proceeding, a federal appellate court rejected SIPC and the trustee's basis for denying some of these customer claims. SIPC officials and trustees also determined that consolidating the estates of the SIPC member firms and their nonmember affiliates was not warranted in these three cases because the members generally operated independently from their affiliates. By contrast, SIPC and the trustee concluded in the New Times/New Age proceeding that consolidation of the estates was warranted. Without a review of the issues involved in these controversial SIPC liquidation proceedings, SEC's ongoing examination will not provide a complete basis for understanding SIPC's operations.

## SEC Has Not Implemented SEC IG Recommendation on Sharing Information About SIPC Issues

In 2000, the SEC IG found that communication among SEC's internal units regarding SIPC could be improved. To achieve this objective, the IG recommended that Market Regulation, Enforcement, NERO, and OCIE conduct periodic briefings to share information related to SIPC. Although the SEC IG report found that SEC officials tried to keep each other informed about relevant SIPC issues, there was no formal procedure for doing so. According to SEC officials that we contacted, they have not yet established a regular procedure to ensure the dissemination of information about SIPC. Subsequently, SEC officials stated that they will begin holding quarterly meetings to discuss SIPC.

As the IG report found, periodic briefings among SEC units would help ensure that information about issues such as investor complaints, the

status of current liquidations, and securities firms that may be candidates for SIPC liquidations are discussed in a timely manner. Moreover, the SEC IG report also found that SEC staff in offices responsible for SIPC oversight have expressed differing opinions on issues relevant to SIPC. By establishing periodic briefings, SEC staff would have the opportunity to discuss such differing opinions over SIPC and ensure a comprehensive oversight program. SEC officials stated that they plan to begin holding quarterly meetings.

## SEC OGC Has Established a Pilot Program to Monitor Ongoing SIPC Liquidations

In September 2000, SEC, at the request of OGC, Market Regulation, and Enforcement, authorized a 1-year pilot program to monitor ongoing SIPC liquidations. OGC requested authorization of the program after SEC received numerous inquiries from investors and their attorneys regarding SIPC liquidations. Under the pilot program, SEC will enter notices of appearance in all SIPC liquidation proceedings. This will enable staff in OGC and in SEC regional offices, which include about a dozen attorneys specializing in bankruptcy, to monitor ongoing SIPC liquidations. The bankruptcy staff already monitors corporate bankruptcy reorganizations affecting public investors, pursuant to authority in the Bankruptcy Code to take positions in reorganization proceedings. SIPA likewise authorizes SEC to file notices of appearance and to participate as a party in liquidations initiated under the act.

OGC staff said that the primary objective of the pilot program is to provide oversight of claims determinations in SIPC liquidation proceedings in order to make certain that the determinations are consistent with SIPA. OGC staff will not be involved in evaluating investor claims until after the trustee has made the initial determination because SEC does not want to circumvent the claims determination process as established by SIPA. By entering notices of appearances, SEC will receive investor objections to adverse claims determinations and can seek authorization from SEC to take positions in court if the staff disagrees with the determinations.

## Conclusions

Despite SEC's initiatives to strengthen its SIPC oversight efforts such as the OGC pilot program, SEC faces several important challenges. The joint Market Regulation and OCIE examination initiated in 2000 will likely provide important information about SIPC's operations and was expanded to include a much larger sample of cases than the 1994 examination. However, the sample of liquidations selected as of March 2001 included a limited number of liquidations involving unauthorized trading claims and did not include any SIPC liquidations that involved nonmember affiliates. These liquidations are among the most controversial that SIPC has

initiated over the past 5 years. SEC's plan to expand the sample of liquidations involving unauthorized trading and nonmember affiliates should strengthen its ongoing review.

Given the number of units involved in SIPC's oversight, it is essential that these units communicate across organizational lines, share information, and take coordinated steps to resolve any critical issues that are identified. Although SEC units share information on an informal basis, the lack of a formal means of communication could hinder SEC's overall SIPC oversight efforts. In addition, the pilot program implemented in September 2000 could enhance SEC's oversight of SIPC and provide useful timely information about ongoing proceedings, but it is too soon to assess its efficacy.

## Recommendations

To improve SEC's oversight of SIPC operations, we recommend that the Chairman, SEC

- ensure that OCIE and Market Regulation include in their ongoing SIPC examination a larger sample of liquidations involving unauthorized trading and nonmember affiliate claims and
- require that Market Regulation, OCIE, OGC, and Enforcement establish a formal procedure to share information about SIPC issues.

## Agency Comments and Our Evaluation

In general, SEC officials agreed with our conclusions and recommendations dealing with its SIPC oversight program. Specifically, regarding our recommendation that SEC sample a larger number of liquidations in its ongoing SIPC inspection, SEC officials stated that they will include additional liquidations involving unauthorized trading and nonmember affiliates as we recommended. Regarding our second recommendation on the need for a formal mechanism to share information about SIPC issues, SEC officials stated that they plan to hold quarterly meetings to discuss issues regarding SIPC. SEC said that the primary purpose of the formal meetings will be to ensure that factual information about investor complaints, the status of current liquidations, and other similar matters are shared with all interested persons.

# Chapter 5: Investors May Confuse SIPC With Other Financial Guarantee Programs as U.S. Financial Industries Restructure

Investors that do not fully appreciate the differences in how banks and securities firms operate may confuse SIPC with FDIC and, to a lessor extent, state insurance guarantee associations. Although SIPC and FDIC offer similar coverage for cash, only SIPC protects securities, whose market value fluctuates. The market losses generated from such fluctuations in the price of securities are not covered by SIPC. However, securities firms are not required to disclose this information when referring to SIPC in advertising statements. Conversely, FDIC insures deposits, which do not fluctuate in value, and state guarantee associations guarantee that owners of covered policies and contracts will not lose their coverage if their insurer fails. According to industry officials, investor confusion may increase as banking, securities, and insurance industries consolidate.

## Some Investors May Confuse SIPC and State Insurance Guarantee Associations With FDIC

Like FDIC, SIPC and state government life and health[1] insurance guarantee associations protect owners of financial products when, respectively, their securities firm or insurer fails. However, there are important differences that customers may not fully understand and SIPC rules do not require its members to disclose in advertising an important detail of coverage that might help investors distinguish SIPC from the other programs.

## SIPC's Protection Is Similar to FDIC and State Life/Health Association Guarantees, but Also Differs in Some Important Respects

SIPC, FDIC, and the life/health state insurance guarantee associations are broadly similar in the main functions they perform but with important differences. Each organization protects the owners of certain financial products when their securities firm, bank, thrift, or insurer becomes insolvent, subject to various statutory limitations. In a SIPC liquidation, SIPC pays customer claims against the failed firm to the extent they cannot be satisfied by customer cash and securities still in the firm's possession, and also pays the administrative expenses of a court-appointed trustee. FDIC liquidates failed members itself, as does SIPC in

---

[1] According to the National Organization of Life and Health Guarantee Associations, each state has at least two guarantee associations to protect policyholders of financially troubled insurers: one for life and health insurance and another for property and casualty insurance. We focused on the 52 state life/health guarantee associations because the policies their member firms sell, such as annuities, more closely resemble investments than do many of the types of insurance sold by property/casualty insurers. The life/health associations exist in every state, the District of Columbia, and Puerto Rico.

some cases, and FDIC pays depositors if the firm cannot do so and pays administrative expenses. State life/health insurance guarantee associations assist the state insurance commissioners in liquidating failed insurers and assume responsibility for covered policies that cannot be transferred to another insurer. Each organization covers a broad range of their members' traditional business. SIPC protects most types of securities and cash deposited at the firm. FDIC insures all deposits made in the normal course of an insured bank's business. A state association typically covers most types of life and health insurance sold in the state.

Despite these basic similarities, public confusion over the programs—particularly between SIPC and FDIC—may lead to misconceptions about coverage. Table 2 shows the different products the organizations cover and the types of protection they offer. One key distinction is that FDIC insures only cash deposits and SIPC protects cash and securities. Banks can use deposits to make loans or other investments. FDIC protects depositors against the possibility that their bank will not be able to repay the deposit amount because it has insufficient assets. When an FDIC-insured institution fails, depositors receive back all of the funds that they deposited in (and had not withdrawn from) the institution, plus interest that accrued prior to the insolvency, up to a statutory limit of $100,000 per depositor.[2] Unlike deposits at a bank, securities left with a securities firm do not become assets of the firm. Instead, the firm holds this property as a custodian. In the event of a failure, SIPC returns missing customer property: securities, the value of which is based on market pricing and not the firm's financial health, and cash held in customer accounts for the purpose of buying securities. SIPC's per-customer limit is $500,000, of which no more than $100,000 may be for cash. SIPC's statute requires it to value securities as of the filing date. This requirement protects the filing date value of securities in that, if the securities claimed by customers cannot be purchased by the SIPC trustee in a fair and orderly market, the claimant would receive their value as of the filing date. Losses caused by a decline in the price of the securities due to market fluctuations between the filing date and the date the investor originally purchased them would not be covered.

---

[2] Multiple accounts held in different capacities (such as an individual and a corporate account) are covered separately by both FDIC and SIPC.

**Table 2: Protections and Disclosure Rules of SIPC, FDIC, and State Life/Health
Insurance Guarantee Associations**

| Guarantee organization | Nature of guarantee | Disclosure rules |
|---|---|---|
| SIPC | Returns missing securities valued as of the filing date and investment cash. The securities' filing date value may be more or less than their original purchase price, and the cash must have been intended to purchase securities or result from the sale of securities.<br><br>$500,000 per customer[b] limit, of which no more than $100,000 may be a claim for cash. | Official symbol must be displayed in member firms' offices. Providing more information in advertising through use of SIPC official advertising statement, or an official explanatory statement, is optional.[b] |
| FDIC | Returns deposits unconditionally credited to deposit accounts as of the date of default, plus interest accrued as if the deposit had matured on that date.<br><br>$100,000 per depositor[a] limit. | Display and advertising rules are similar to SIPC's rules.<br><br>Insured institutions must disclose that uninsured products are neither FDIC-insured nor obligations of the bank, and carry market risk (if appropriate). |
| State Life and Health Insurance Guarantee Associations | Continuous coverage is guaranteed if the association covers the product. Another insurer or the association takes over all policies of the failed insurer.<br><br>$300,000 per policy limit in most states.[c] | Twenty-four states and Washington, D.C., require insurers to explain the association's coverage and limits to new policyholders. However, 48 states, Washington, D.C., and Puerto Rico prohibit insurers from advertising membership in the association to induce the sale of insurance. |

[a]Multiple accounts held in different capacities (such as an individual and a corporate account) are covered separately by both SIPC and FDIC.

[b]The SIPC official advertising statement is "Member of the Securities Investor Protection Corporation" or an abbreviated variant, such as "Member SIPC." The official explanatory statement may either be (1) "Member of SIPC. Securities in your account protected up to $500,000;" or (2) "Member of SIPC, which protects customers of its members up to $500,000 (including up to $100,000 for claims for cash). Explanatory brochure available on request."

[c]The state associations also have sub-limits on certain types of insurance, such as a typical $100,000 limit on health insurance benefits.

Sources: SIPA and SIPC rules, FDIC regulations, and National Organization of Life and Health Guaranty Association documents.

Some investors in securities who erroneously believe that SIPC protects against market losses may not fully understand the difference between SIPC and FDIC coverage. The data on the extent that investors already confuse SIPC with FDIC or any other organization are anecdotal. We are

Chapter 5: Investors May Confuse SIPC With
Other Financial Guarantee Programs as U.S.
Financial Industries Restructure

not aware of any recent nationwide survey of investors that explored their
understanding of FDIC, SIPC, and the state insurance guarantee
associations or the differences between them. Bank regulator guidance on
investment products emphasizes the differences between the two
programs.[3] However, a recent SEC IG report[4] and many securities industry
and regulatory officials we spoke with said that some customers probably
confuse SIPC and FDIC coverage. For example, FDIC officials said that
some investors do not understand the differences between FDIC and SIPC.
The main reason they cited was that both organizations have similar logos.
Another reason might be that both SIPC and FDIC protect cash up to
$100,000 per customer (SIPC) or per depositor (FDIC). The officials also
cited similarities in coverage and advertising as reasons for any confusion.
Our review of claim files in one recent SIPC liquidation suggested that
many claimants did not understand that SIPC returns securities that
should have been in the account or their value as of the date the
liquidation began, rather than the securities' value at the time they were
purchased. The trustee in the Stratton Oakmont liquidation denied almost
450 claims for redemption of market losses.

The coverage provided by the state life/health insurance guarantee
associations resembles that of FDIC and SIPC in some ways, but they offer
another degree of protection that neither of the other two organizations
provide. Like SIPC and FDIC, the state associations may transfer customer
policies to another, healthy firm. However, the state associations
guarantee that holders of covered policies or contracts will not lose all of
their policy coverage if the company fails. An association directly takes
over policies that cannot be transferred to another insurer, as long as the
policyholders continue to pay their premiums and the policies do not
terminate on their own terms. SIPC and FDIC both may transfer customer
accounts to other firms, but when that does not occur, positions in
customer accounts are distributed subject to statutory coverage
limitations. The protection that state life/health insurance guarantee
associations provide differ from that of SIPC and FDIC in other ways, as
well. For example, most of the associations limit protection to $300,000
per policy, unlike FDIC's $100,000 cap or SIPC's $500,000 limit.

---

[3]Interagency Statement on Sales of Nondeposit Investment Products, Fed. 15, 1994. See
e.g., FDIC Interpretive Letter FIL-9-94 at 13.

[4]*Oversight of Securities Investor Protection Corporation.* Securities and Exchange
Commission Office of Inspector General. Audit Report No. 301. Mar. 31, 2000.

## SIPC Does Not Require Members to Disclose Important Coverage Issues

Table 2 also compares the extent to which FDIC, SIPC, and life/health state insurance guarantee associations require their members to inform customers of the coverage provided by these organizations. The disclosure requirements, or the lack thereof, may contribute to any confusion between SIPC and FDIC, and perhaps with the state associations.

### SIPC and FDIC Disclosure

SIPC and FDIC disclosure requirements are minimal. SIPC only requires that members display the official SIPC symbol prominently in their offices. Advertisements, unless exempted, must include the SIPC symbol, the official advertising statement, or the official explanatory statement, which are discussed below. SIPC does not require that its members disclose that SIPC does not protect against losses from changes in market value. When asked about disclosing this information, SIPC expressed concern about their authority to require additional disclosure in advertisements. Specifically, officials stated that they thought the SIPA provision authorizing SIPC to establish advertising bylaws restricted their authority to require additional disclosure. The provision states as follows:

"SIPC shall by bylaw prescribe the manner in which a member of SIPC may display any sign or signs (or include in any advertisement a statement) relating to the protection to customers and their accounts, or any other protections, afforded under this chapter. No member may display any such sign, or include in any advertisement any such statement, except in accordance with such bylaws. SIPC may also by bylaw prescribe such minimal requirements as it considers necessary and appropriate to require a member of SIPC to provide public notice of its membership in SIPC."[5]

We spoke with SEC staff about SIPC's concern regarding its statutory authority and they do not appear to share this concern. From the face of the statute, we also believe that the SIPA provision does not bar SIPC from requiring the additional disclosure in the optional disclosure statement.

FDIC generally requires insured institutions to display the appropriate official seal (FDIC has two seals, one for thrifts and one for banks) at each station or window where deposits are normally taken. Advertisements must include either the appropriate seal or the advertising statement, which says only that an institution is an FDIC member. Certain advertisements may be exempt from this requirement.

As figure 2 shows, SIPC's official symbol resembles FDIC's official seal.

---

[5]15 U.S.C. § 78kkk(d).

**Figure 2: Official Symbols of SIPC and FDIC**





Both SIPC and FDIC allow but do not require member firms to disclose
more information than can be gleaned from these logos. SIPC's
*Advertising Bylaw* permits members to advertise their membership using a
"SIPC official explanatory statement."

The explanatory statement, which has two variants, discloses somewhat
more information about SIPC coverage. The statement may either be (1)
"Member of SIPC, which protects customers of its members up to $500,000
(including up to $100,000 for claims for cash). Explanatory brochure
available on request;" or (2) "Member of SIPC. Securities in your account
protected up to $500,000." As we discussed in chapter 3, SIPC's brochure
describes SIPA coverage in more detail. However, SIPC does not allow
member firms to use any other language to describe its coverage in
advertisements, out of concern that they might mischaracterize SIPC
protections. For example, some firms have described the coverage as
"insurance."

SIPC also allows members to use an official advertising statement. Yet,
this statement ("This firm is a member of the Securities Investor
Protection Corporation" or an abbreviated version such as "member
SIPC") provides no more information to investors than the official symbol
does. FDIC also requires insured institutions to use an official advertising

**Chapter 5: Investors May Confuse SIPC With
Other Financial Guarantee Programs as U.S.
Financial Industries Restructure**

statement in most advertising. The statement (Member of the Federal Deposit Insurance Corporation" or an abbreviated version), like SIPC's official advertising statement, discloses few details about the organization's coverage.

Although FDIC only mandates use of its official seals or the official advertisement statement in advertising, there may be no need for additional disclosure. Arguably, FDIC protection is easier for consumers to understand, because it generally guarantees deposits placed in a failed insured institution. Unlike securities prices, cash deposits do not fluctuate in value. As explained above, SIPC protects the filing date value of securities, but not their original purchase price. Also, FDIC-insured institutions must disclose to their retail customers which of their products are not FDIC insured. As table 2 shows, they must inform customers, in writing and orally at the time of sale, that the uninsured product they are selling is not FDIC insured nor an obligation of the bank, and that the product carries market risk if that is appropriate. Further, according to FDIC officials, FDIC encourages insured institutions to disclose as much information as possible about the organization's insurance. In contrast, SIPC member firms are not required to disclose which products they sell are not protected by SIPC (such as commodity-based investments), although they are prohibited from displaying or advertising SIPC membership if doing so would mislead the public into believing that products they sell that do not meet SIPA's definition of a security are protected.

**State Insurance Guarantee Association Disclosure**

SIPC's disclosure rules differ from many states' requirements that members of a life/health insurance guarantee association must prominently disclose the limitations to the association's protections. Most of the associations are based on a "model act" drafted by the National Association of Insurance Commissioners (NAIC). The NAIC model act reflects the consensus of state insurance commissioners on how states should write their insurance laws. The model act for life/health insurance guarantee associations recommends that states prohibit any insurer, agent, or affiliate of an insurer from publishing, disseminating, or advertising membership in a life/health state insurance guarantee association "for the purpose of sales, solicitation, or inducement to purchase any form of insurance covered by the guarantee association." The purpose of prohibiting advertising of membership is to help prevent people from making insurance decisions out of a belief that they are protected from financial loss.

**Chapter 5: Investors May Confuse SIPC With
Other Financial Guarantee Programs as U.S.
Financial Industries Restructure**

However, the advertising prohibition does not mean that policyholders do not know of the existence of their state's life/health insurance guarantee association. The model act also recommends that states require insurers to provide a document that summarizes the general purposes and current limitations of their state's life/health guarantee association whenever the insurer delivers a policy or contract to a policy or contract owner. The model act recommends that this document state clearly and conspicuously, among other things, (1) that the guarantee association may not cover the policy or, if it does, that coverage will be subject to substantial limitations and exclusions and (2) the types of policies for which the association will provide coverage. An example of a substantial limitation or exclusion is that most of the life/health associations do not cover nonindemnity policies, such as health maintenance organizations.

Table 2 also shows the number of states whose laws conform to the model act's recommendation on life/health insurance guarantee association disclosure and advertising. As the table indicates, 48 states, Washington, D.C., and Puerto Rico prohibit insurers from using the existence of their association to sell any insurance product; and 24 states and Washington, D.C., require insurers, insurance agents, and affiliates of insurers to provide a written explanation of their association's coverage and coverage limits to all new policyholders.

## Investor Confusion May Increase as Financial Services Industry Consolidates

As banks, securities firms, and insurance companies consolidate and offer similar products to the public, some people may increasingly confuse SIPC, FDIC, and state life/health insurance guarantee organizations.

## GLBA Eliminates Barriers to Affiliation Among Banks, Securities Firms and Insurance Companies

GLBA makes major changes to the laws that govern how the U.S. financial services industry is structured and regulated. Before GLBA passage, federal and state laws limited the extent to which banking, securities, and insurance companies could affiliate. For example, banking and insurance companies were not allowed to affiliate nor were securities companies permitted to own banks. National banks could underwrite and deal in only certain types of securities known as bank-eligible securities. These included U.S. government securities and general obligation bonds of states and municipalities. Also, banks could engage in any mutual fund activity, except for underwriting the mutual fund. Securities firms that were

affiliates of banks that were members of the Federal Reserve System were
allowed to underwrite and deal in securities to a limited extent.

GLBA repeals or overrides sections of federal and state laws that
restricted the affiliation of banks, securities firms, and insurance
companies and agents. It permits traditional bank holding companies and
foreign banks to expand into new insurance and securities activities and
insurance and securities firms to enter commercial banking. Under GLBA,
banking institutions can participate in the securities and insurance
businesses by becoming Financial Holding Companies (FHC), a new kind
of bank holding company authorized by the act. An FHC may directly
engage in, or affiliate with companies that engage in, a wide array of
financially related activities. These activities include securities
underwriting and dealing, insurance underwriting and agency activities,
and any other activity that the Federal Reserve Board (usually in
conjunction with the Secretary of the Treasury) determines to be financial
in nature or incidental or complementary to financial activities.

GLBA also expands the range of financial activities that banks that are not
FHCs may engage in. The act does this by allowing national banks to form
or purchase subsidiaries that may engage in some, but not all, of the
activities that FHCs may engage in. For example, the national bank
subsidiaries are prohibited from engaging as principle in underwriting
insurance (other than credit-related insurance) or providing or issuing
certain types of annuities.

Regarding insurance, GLBA reaffirms the traditional authority of the states
to regulate the insurance industry. However, the act uses broad
preemptive language intended to override any state law restricting the
establishment of bank-insurance affiliations or placing burdens on sales
and cross-marketing of insurance by banking institutions and their
affiliates. The preemption provisions apply to any type of affiliation
permitted by GLBA, not just to the FHCs that the law creates. GLBA does
maintain some restrictions on banks' insurance activities. Still, many state
laws that prohibit insurers from merging or affiliating with banks or
securities firms will be superseded.

## Greater Disclosure May Help Address Investor Confusion

Ultimately, GLBA may lead to creation of financial conglomerates that
contain under one corporate umbrella underwriters and distributors of
banking, securities, insurance, and other financial and complementary
products and services. Such consolidation already has occurred in some
institutions. Whether or not financial one-stop shops become the norm in
this country, as the U.S. financial services industry consolidates to take

Chapter 5: Investors May Confuse SIPC With
Other Financial Guarantee Programs as U.S.
Financial Industries Restructure

advantage of GLBA's opportunities, it will be more common in the future for individuals to purchase financial products from the same institution that are covered by the three different financial guarantee organizations that we have been discussing. An individual who buys securities from a securities firm affiliate of an FHC may be protected by SIPC should the firm fail. That same insurance guarantee person may be covered by a state insurance guarantee fund if he or she buys certain types of insurance from the same or another affiliate. And, funds deposited with a banking affiliate of one of these entities may be insured by FDIC.

In chapters 2 and 3, we highlighted the need to improve disclosure of SIPC's policies and practices. SIPC has engaged a private firm to survey investors to discover how well they understand SIPC coverage. The firm is also charged with devising ways in which SIPC coverage could be better advertised.

## Conclusions

SIPC and FDIC perform similar functions: they return customer property when a member firm fails if the firm cannot do so. Moreover, SIPC and FDIC share similar logos and coverage amounts. As financial companies continue to consolidate, investor confusion concerning SIPC protections could grow more widespread. In a consolidated entity, it's possible for a single customer to have various accounts with various affiliates that are afforded different types of protection.

Although SIPC's mission is to return the securities or cash that should have been in a customer's account when liquidation proceedings start, we found some evidence that investors are unaware that SIPC does not protect against decreases in the price of their securities. This type of misperception has led some investors to file claims for market losses in SIPA liquidation proceedings that were denied. The official explanatory statement that SIPC members can opt to use does not state that SIPC does not protect against losses from changes in the market value of securities.

## Recommendation

We recommend that the Chairman, SIPC, amend SIPC advertising bylaws to require that the official explanatory statement about a firm's membership in SIPC include a statement that SIPC coverage does not protect investors against losses caused by changes in the market value of their securities.

## Agency Comments and Our Evaluation

SIPC agreed with our conclusion that there is ample anecdotal evidence that some investors believe that SIPC protection is akin to FDIC protection and that some investors believe that SIPC will protect them from market losses. Furthermore, they agreed that the industry has an

obligation to correct these misperceptions. However, they disagreed with our recommendation that SIPC require any statement about SIPC membership to include information about the fact that SIPC does not protect investors from market losses. According to SIPC officials, the statute does not give SIPC the power to adopt such a bylaw and such a statement, without elaboration, would be misleading.

Regarding SIPC's concern about its statutory authority, SIPC stated that in the early 1970s it proposed a bylaw that would have required members to give public notice of their SIPC membership. According to SIPC, SEC rejected the proposal "on the ground that SIPC did not have authority to require its members to identify themselves as such." Consequently, in 1978, Congress amended 15 U.S.C. § 78kkk(e) and added the following sentence: "SIPC may also by bylaw prescribe such minimum requirements as it considers necessary and appropriate to require a member of SIPC to provide public notice of its membership." Even though the sentence appears to grant SIPC discretion to determine what such "minimum requirements" should be, SIPC maintains that, on the basis of the legislative history, Congress strictly limited that discretion to allow only for a requirement that a SIPC member must identify its status as a member. Although we recognize SIPC's discretion to interpret its enabling legislation, we do not believe that the provision in question precludes SIPC from adding our recommended statement to an official explanatory statement already authorized in its bylaws. Further, SEC staff does not share SIPC's statutory concern. The legislative history cited by SIPC in its comments clearly shows that Congress intended SIPC to have discretion to impose "minimal notice" of SIPC membership. As shown below, SIPC's bylaw permitting use of an official explanatory statement allows a member's statement about its membership to include a statement about SIPC coverage. We believe that SIPC has discretion to require members to disclose in prescribed language the fundamental consequence of SIPC membership when a firm chooses to use SIPC's official explanatory statement.

We have reworded our recommendation to make it clear that it contemplates SIPC amending SIPC's bylaw allowing members to disclose more information than can be gleaned from the SIPC logo by using a SIPC "official explanatory statement." The statement has two variants (1) "Member of SIPC, which protects customers of its members up to $500,000 (including up to $100,000 for claims for cash). Explanatory brochure available upon request;" or (2) "Member of SIPC. Securities in your account protected up to $500,000." As SIPC states, "SIPC can, by bylaw, give its members the option of making a statement about SIPC coverage."

Chapter 5: Investors May Confuse SIPC With
Other Financial Guarantee Programs as U.S.
Financial Industries Restructure

Our recommendation involves amending SIPC's official explanatory statements to include information about losses from changes in market values not being protected.

SIPC also raised an additional concern that the recommended language that SIPC does not protect against market losses would be misleading. We do not share SIPC's concern that amending SIPC's official statement, without elaboration, would be misleading. In its comments, SIPC sets forth three reasons why it believes the statement would be incomplete and misleading. These reasons relate to steps SIPC might take in liquidating a member should certain circumstances exist, that is; (1) providing the actual securities, (2) purchasing replacement securities, and (3) providing the cash value of the securities as of the filing date. Regardless of what steps SIPC might take in a particular proceeding, SIPC's actions would not change the fundamental fact that a firm's SIPC membership does not protect investors against market losses.

Rather than being misleading, we believe that our recommended language about market losses not being covered is consistent with current disclosures about SIPC coverage that SIPC and securities regulators already make to investors. For example, the first page of SIPC's informational brochure contains the following statement:

"Of course, SIPC does not protect against changes in the market value of your investment. It does, however, provide important protections against certain losses if a SIPC member fails financially and is unable to meet obligations to its securities customers."

Moreover, our recommended language, which was based on SIPC's information brochure, is similar to language used by SEC and NASDR on their Web sites to discuss SIPC coverage. For example, the SEC Web site states that " SIPC does **not** protect you against losses caused by a decline in the market value of your securities."

# Appendix I: Comments From the Securities Investor Protection Corporation



**SECURITIES INVESTOR PROTECTION CORPORATION**
805 FIFTEENTH STREET, N. W., SUITE 800
WASHINGTON, D. C. 20005-2215
(202) 371-8300    FAX (202) 371-6728
WWW.SIPC.ORG

April 27, 2001

Mr. Richard Hillman
Director, Financial Markets and Community Investment
United States General Accounting Office
Washington, D.C. 20548

Dear Mr. Hillman:

We are pleased to have this opportunity to offer the comments of the Securities Investor Protection Corporation ("SIPC") on the GAO Draft Report entitled <u>SECURITIES INVESTOR PROTECTION: Steps Needed To Better Disclose SIPC Policies To Investors</u>. As the Executive Summary to the Draft Report notes, the specific objectives of the report are to:

(1) review the basis for SIPC's policies and practices for validating and satisfying claims involving unauthorized trading and the extent these policies were disclosed to investors;

(2) review the basis for SIPC's policies and practices for determining claims in liquidations involving SIPC-member firms and their nonmember affiliates, and the extent these policies were disclosed to investors;

(3) evaluate the Securities and Exchange Commission's (SEC) oversight of SIPC's operations and compliance with SIPA; and

(4) compare the coverage provided by and disclosure rules for SIPC, FDIC [Federal Deposit Insurance Corporation], and state insurance guarantee associations; and the implications that GLBA [Gramm-Leach-Bliley Act of 1999] may have for consumers as some banks, securities firms, and insurance companies consolidate their operations. Draft Report Executive Summary ("ES") at 2.

GAO-01-653  Securities Investor Protection

Appendix I: Comments From the Securities
Investor Protection Corporation

Mr. Richard Hillman
Page 2
April 27, 2001

We are pleased to note that in the first two areas, which deal specifically with SIPC, the GAO Draft Report ("DR") confirms that SIPC's policies and practices are supported by both the Securities Investor Protection Act and case law developed thereunder. Indeed, it seems clear from the report that SIPC has followed the mandate given to it by Congress in SIPA. We are also pleased to note that the report concludes that SIPC has made available to investors useful information concerning investors' dealings with the nonmember affiliates of SIPC members and the importance of such investors being sure they are dealing with a member of SIPC. We appreciate the useful suggestions that the report makes concerning disclosure to investors of SIPC's policies and practices concerning the satisfaction of claims involving unauthorized trading and we note, as does the report, that SIPC initiated, before your study began, an extensive program of investor education in regard to all of the matters discussed in the Draft Report.

Set forth below are our comments on the matters covered by the report, including our responses to some comments and recommendations with which we disagree. We have submitted a separate memorandum alerting GAO to a few technical problems we find in the Draft Report. In general SIPC will not in this letter offer comments on those parts of the report which deal with the SEC or the SEC's role in the SIPC program.

**SIPC's Policies And Practices In
Regard To Unauthorized Trading**

For many years SIPC took the position that if an introducing broker ordered a transaction in a customer's account at a clearing broker, the customer involved would not be protected by SIPC in the liquidation of the introducing broker because that broker had not "received, acquired, or held" any cash or securities for the customers' securities account within the SIPA definition of "customer." The account was, after all, held at the clearing broker and the securities and cash therein never went to the introducing broker. In 1996, with fewer and fewer broker-dealers actually carrying customer accounts, and more and more customers dealing through introducing brokers, and with what appeared to be a substantial increase in the scope of unauthorized trading by introducing broker-dealers, SIPC reconsidered its position. It determined that, in the interest of protecting customers and increasing investor confidence in the securities markets, it would construe SIPA as broadly as possible. It therefore took the position that, since customers of introducing brokers generally have written contracts with both the introducing and clearing brokers, naming the introducing broker as the customer's agent, introducing brokers placing unauthorized trades in customers' accounts at clearing brokers had "received, acquired, or held" the contents of those accounts within the meaning of the "customer" definition. Since implementing this liberalized view of its statutory mandate, SIPC has, as the Draft Report notes (at 16 and elsewhere), been criticized as unfair for requiring claimants to provide some form of objective evidence that the trade was unauthorized. The Draft Report

Mr. Richard Hillman
Page 3
April 27, 2001

acknowledges that SIPC practices in this regard are authorized under SIPA and have been upheld in court, but fails to note that most of the criticism has come from lawyers who have been unable to substantiate their clients' wholly undocumented assertions of unauthorized trading.

Customers have always had the burden of proving their claims. This has been true at least since 1938 when Congress adopted section 60e of the former Bankruptcy Act to deal with the liquidation of insolvent stockbrokers. SIPA was adapted, sometimes nearly word for word, from section 60e which gave preferred status to customers as to certain property in stockbroker bankruptcy proceedings. In ordinary bankruptcy, claimants seeking a preferred status bear the burden of showing that they are in the class of eligible persons and that their transactions are protected under the Act. As stated in In re Chitwood, 3 B.C.D. 1033, 1034 (Bankr. S.D. Ala. 1977):

> When statutes involving priorities are in issue, a strict construction must be
> placed thereon; and the burden falls on those asserting a priority to
> establish that they were within the intended class.

Customer status in a SIPA proceeding is a preferred status which gives the customer priority over other creditors in the distribution of certain assets marshaled by the trustee. Accordingly, courts take a restrictive view of Congress' intended scope of investor protection under SIPA. There are many court decisions, at the bankruptcy court, district court, and court of appeals levels, that hold that the status of "customer" is a preferred status and that a person seeking that status bears the burden of proof. SIPA itself provides that claims must be ascertainable from the books and records of the broker-dealer or otherwise established "to the satisfaction of the trustee." 15 U.S.C. §78fff-2(b). Of course, if a trade is unauthorized, then the books and records are, by definition, incorrect. The Draft Report recognizes (at 18) that "unauthorized trading presents significant challenges to SIPA trustees in determining the validity of customer claims" and that, "[i]n general SIPC trustees do not have the ability to determine from the firms' records whether the claimants' assertions are true." The Draft Report concludes (at 20-22) that under these circumstances, SIPC and the trustee have a right to establish an evidentiary standard which provides more definitive proof than simply the customer's word that the books and records are wrong. The customer must have taken a timely and objective step, such as writing a letter of complaint to the firm or to a regulator, to demonstrate that a transaction was unauthorized.

In addition to the criticism SIPC has suffered for insisting on objective evidence of unauthorized trades, the Draft Report discusses what it refers to as "a second controversial practice in SIPC liquidations involving unauthorized trading . . . " (DR at 9). The Draft Report discusses a bankruptcy court case, now on appeal, where the court rejected the trustee's and SIPC's approach to satisfying claims on account of admittedly unauthorized transactions. In that

Mr. Richard Hillman
Page 4
April 27, 2001

case customers' securities had been sold at high prices without their authorization. The proceeds were nearly simultaneously used to purchase different securities, again without the customers' authorization. On the filing date of the liquidation proceeding both the securities that had been sold and the securities that had been purchased were worthless, or nearly so. This is a typical pattern where customers have been induced to purchase securities in the course of a market manipulation scheme.  The customers, whose initial purchases of securities were in fact authorized, filed claims for the cash proceeds of the unauthorized sales, asserting that the broker had no authority to use those cash proceeds to make the second purchase of securities. The trustee, looking at the entire course of events, including the admission by the customers that the sale of the securities initially in their accounts had been unauthorized, allowed the customers' claims but determined that those claims should be satisfied by returning to the customers the securities that had been in their accounts before any unauthorized transactions took place. The bankruptcy judge disagreed with this determination, stating that since the customers had only filed claims for the proceeds of sale, the trustee could not "unwind" the unauthorized sale. In other words, customers, by carefully crafting their claims, could pick and choose among admittedly unauthorized trades in their accounts, thereby benefitting at the expense of other customers from the market manipulation.  As noted, both SIPC and the trustee have appealed this odd result.

The Draft Report (at 38) recommends that "to improve investor awareness of SIPC's policies, practices and coverage, we recommend that SIPC Chairman, as part of SIPC's ongoing effort to revise the brochure and Web site, include a full explanation of the steps necessary to document an unauthorized trading claim." We agree wholeheartedly with the recommendation and have already taken steps to implement it. The Draft Report also recommends (at 38) "that SIPC revise the brochure to warn investors to exercise caution in 'ratifying' potentially unauthorized trades in discussions with firm officials." The changes we have already started to make to the brochure should substantially lessen this problem by urging customers to complain in writing, thus making oral ratification of unauthorized trades unlikely. We note that a customer who ratifies an unauthorized trade after pressure or misrepresentations by an account executive or other official of the brokerage firm is in no different position than a customer who initially authorizes a purchase under similar circumstances. We believe that such matters are best handled in those publications and web pages that warn investors about various securities frauds.[1] SIPC's revised brochure and web site will of course refer or link to such resources.

---

[1] For example, the SEC and the National Association of Securities Dealers Regulation, Inc. publish information concerning securities frauds. Information warning investors about such frauds can be found at their web sites (www.sec.gov and www.nasdr.com) as well as other web sites such as that maintained by the Alliance for Investor Education, www.investoreducation.org.

Mr. Richard Hillman
Page 5
April 27, 2001

As stated earlier, we will not generally comment about those portions of the Draft Report directed to the SEC. However, one recommendation to the SEC raises serious questions. That recommendation (DR at 39) is that the SEC Chairman:

> require firms that SEC determines to have engaged or are engaging in systematic or pervasive unauthorized trading to prominently notify their customers about the importance of documenting disputed transactions in writing.

We, of course, can have no objection to such a requirement, but it appears to us that it does not go anywhere near far enough. If a firm engages "in systematic or pervasive unauthorized trading" it should be shut down immediately. The Stratton Oakmont firm, discussed throughout the Draft Report, is such a case. That firm was able to continue its shoddy and illegal practices for years. The SEC should be given whatever financial and legal resources are necessary to enable it to deal effectively with such firms–not just to warn its customers to document disputed transactions.

**Nonmember Affiliates**

The Draft Report states (at 40) that "SIPC's policies and practices in liquidations of member firms that had nonmember affiliates have also been controversial because SIPC and trustees have denied many claims in such liquidation proceedings."[2] While the Draft Report acknowledges that "some courts had upheld the position by SIPC and trustees that a claimant who places funds with an affiliate does not qualify the claimant as a customer under SIPA" (DR at 40), the Draft Report focuses on a November, 2000, decision by the United States Court of Appeals for the Eleventh Circuit that rejected arguments by SIPC and the trustee. The Draft Report fails to specifically note that of those courts which have upheld the position taken by SIPC and trustees, two are also United States Courts of Appeals and one is a district court of high repute. The key to understanding SIPC's position concerning persons who deal with affiliates of SIPC firms, which affiliates are not themselves members of SIPC, is that SIPC protection is not simply about getting money from SIPC–it is about splitting up the assets held by a brokerage firm among that brokerage firm's customers and other creditors. The question that must always be kept in mind is where is the equity, where is the fairness, in allowing persons who have not contributed to the assets held by the broker-dealer for its customers, to share in those assets. The Draft Report refers to what the United States Court of Appeals for the Fifth Circuit in In re Stalvey & Associates, Inc., 750 F.2d 464, 469 (1985), referred to as the "bright line" rule that

---

[2] As with unauthorized trading, the "controversy" has been generated principally by a few lawyers who have litigated claims.

Mr. Richard Hillman
Page 6
April 27, 2001

"'in the absence of actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation', a claimant [is] not entitled to the protections of SIPA" citing SEC v. Kenneth Bove & Co., 378 F. Supp. 697, 699, 700 (S.D.N.Y. 1974). But the report does not explain the origin or significance of the rule. Its origin is in section 60e of the former Bankruptcy Act, added to that Act in 1938 by the Chandler Act Amendments to the Bankruptcy Act of 1898. Section 60e was added for the specific purpose of dealing with the insolvency of a stockbroker and the conflicting claims of its customers and other creditors to property held by the insolvent stockbroker. Section 60e created what was called the "single and separate fund" of property held for customers and allowed customers to share pro rata in that property to the exclusion of other creditors of the stockbroker. The concept of that " single and separate fund" was picked up nearly word for word when SIPA was enacted in 1970 and was continued as the fund of "customer property" when SIPA was amended in 1978. This history is well described in SEC v. Kenneth Bove & Co. referred to above. There Judge Pollack stated that

To have a protected "net equity" claim under the Act as a "customer", the claimant must have *entrusted* his securities to the debtor in liquidation . . . . In order for claimants to fall within the class of "customers" of a Debtor entitled to benefits under [SIPA], it is necessary that the claim be "on account of securities received, acquired, or held by the debtor."

* * *

The circumscribed class of customers protected under the [SIPA], those persons who have entrusted property to the Debtor, was intentionally chosen by Congress to afford relief akin to the preference given to a reclamation claim which was well understood in bankruptcy proceedings. This type of claim was grounded on possession of identifiable securities by the broker.

* * *

Undoubtedly in framing the SIPA, Congress had in mind . . . one who had entrusted his securities to the debtor and who was claiming against the debtor "on account of securities received, acquired, or held by the debtor". The definition in the Bankruptcy Act and SIPA sections is in identical language. Under each law, the preferential protection is accorded to a person who can trace and identify the trust property or funds in the hands of the stockbroker . . . .

Mr. Richard Hillman
Page 7
April 27, 2001

\*   \*   \*

>Accordingly, the absence of actual receipt, acquisition or possession of
>property of a claimant by the brokerage firm under liquidation has been
>held to be dispositive against a claim to participation in the coverage under
>[SIPA] extended by SIPC. [Citing cases]

378 F. Supp. at 699.

As noted in footnote 37 to the Draft Report, the United States Court of Appeals for
the Fifth Circuit in the Stalvey & Associates case refers to the above discussion in the Kenneth
Bove case as "the bright-line rule." The United States Court of Appeals in In re Brentwood
Securities, Inc., 925 F.2d 325 (1991), stated that the "customer" definition in SIPA "embodies
a common sense concept: An investor is entitled to compensation from the SIPC only if he has
entrusted cash or securities to a broker-dealer who becomes insolvent; if an investor has not so
entrusted cash or securities, he is not entitled to recover from the SIPC trust fund." This is so
even if the claimant believed that her shares were in her account at the insolvent brokerage firm.
Id. at 329. The "bright-line rule" as applied by SIPC and trustees under SIPA is based on SIPA,
the cases discussed above, and the demonstrable fact that allowing persons who have entrusted
their cash and securities to a nonmember affiliate of a SIPC member unfairly diminishes every
other customers' pro rata share of the fund of customer property of the debtor firm.

Of course, there are cases where the difficulties in untangling the finances of the SIPC
member from those of the nonmember affiliate are so great that it would be unfair *not* to allow
persons who had dealt with the nonmember affiliate to share with other customers in the fund of
customer property and in SIPC's funds. In this regard the Draft Report discusses the New Times
Securities Services case where SIPC supported consolidation of the liquidation of that SIPC
member with the liquidation of the nonmember affiliate called New Age Securities (Draft Report
at 47). But the report leaves the impression that this is the first time SIPC has ever agreed to
such consolidation. In fact this is at least the fifth case in which SIPC has supported such
consolidation. The other cases include G. V. Lewellyn & Co., Inc., Blinder Robinson & Co.,
Inc., Perry, Adams & Lewis Securities, Inc., and Ambassador Church Finance/Development
Group, Inc.

The report notes (at 49-50) that SIPC's information brochure "does provide very
useful information" concerning dealing with SIPC member firms and their affiliates but also notes
that "investor access to this information is uncertain because there is no requirement that SIPC
members distribute the informational brochure and many unsophisticated investors may not have
access to the SIPC web site." Id. GAO's recommendations to the SEC deal with this problem.

Mr. Richard Hillman
Page 8
April 27, 2001

**Disclosures To Public**

The Draft Report (at 80) recommends that SIPC "amend SIPC bylaws to require that any statement about a firm's membership in SIPC include a statement that SIPC coverage does not protect investors against losses caused by changes in the market value of their securities." We disagree with this recommendation for two reasons:

1. We do not believe the statute gives us the power to adopt such a bylaw; and

2. We believe that such a statement, without elaboration, is misleading.

The Draft Report (71-72) notes that SIPC has expressed concern about its authority to require additional disclosure in advertisements, quotes the advertising provision of SIPC, and then states that neither the SEC nor the GAO shares SIPC's concerns about its authority. We believe that both the language of the statute and its legislative history deny SIPC the authority to *require* the statement you have recommended.

The advertising provision of SIPA, as originally adopted in 1970 (15 U.S.C. §78kkk(e)) provided in full as follows:

SIPC shall by bylaw or rule prescribe the manner in which a member of SIPC may display any sign or signs (or include in any advertisement a statement) relating to the protection to customers and their accounts, or any other protections, afforded under this Chapter. No member may display any such sign, or include in an advertisement any such statement, except in accordance with such bylaws and rules.

Pursuant to this provision, and at the suggestion of the Securities Industry Association, SIPC in the early 1970s proposed a bylaw that would have required members to give public notice of the fact of their membership in SIPC. That bylaw was rejected by the Securities and Exchange Commission on the ground that SIPC did not have authority to require its members to identify themselves as such. Hearings on H.R. 8331 Before the House Subcomm. On Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. 93-94 (August 1, 1977) (Statement of Hugh F. Owens, Chairman, SIPC); Hearings on H.R. 8064 Before the House Subcomm. On Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce, 94th Cong., 1st Sess. 164 (October 22, 1975) (Statement of Philip A. Loomis, Jr., Commissioner, SEC).

Mr. Richard Hillman
Page 9
April 27, 2001

In 1978 Congress amended the advertising provision of SIPA. It made no material change to the existing provision (it deleted the references to "rules") but it added the following sentence:

> SIPC may also by bylaw prescribe such minimum requirements as it considers necessary and appropriate to require a member of SIPC to provide public notice of its membership in SIPC.

Pub. L. 95-283, 92 Stat. 271 (1978). It goes without saying that if SIPC did not have the power under the 1970 version of the statute to require members to give public notice of their membership, then it could not have had the power to require members to make a statement about the nature of SIPC protection. The only statutory provision which could give SIPC that power would have to be contained in the sentence added in 1978. But that sentence, by its very terms, limits SIPC to requiring only public notice of membership in SIPC. And the legislative history is clear that this is exactly what Congress intended. The House committee considering the bill containing this amendment stated as follows:

> The Committee intends, under the authority which would be conferred by this amendment, SIPC would not impose an unreasonable burden upon its members. This section is designed to permit SIPC, in its discretion, to require its members to display in a reasonable fashion *only the bare minimal membership notice necessary of their membership in SIPC.*

H. R. Rep. No. 746, 95 Cong. 1st Sess. At 33 (1977) (Emphasis added). Likewise, the Senate Report provides:

> *The bill also authorizes [SIPC] to require minimal requirements for each member of [SIPC] to provide public notice of the fact of membership in [SIPC].* This provision is included because of the usefulness of encouraging public awareness of [SIPC] and the investor protections which it makes available. However, the Committee does not believe that it would be possible for SIPC to require more than a minimal notice requirement.

S. Rep. No. 763, 95th Cong. 2d Sess. 15 (1978), *reprinted in* 1978 U.S. Code Cong. & Adm. News 764, 768 (emphasis added).

Mr. Richard Hillman
Page 10
April 27, 2001

In sum, before the 1978 amendment, SIPC did not have the power to require its members to notify the public that they were members of SIPC. After the 1978 amendment, SIPC did have the power to require notice of the bare fact of SIPC membership. Nothing in the statute or its legislative history gives SIPC the power to require, as the GAO recommends, a statement concerning the nature of SIPC coverage. Of course, SIPC can, by bylaw, give its members the option of making a statement about SIPC coverage. But as discussed below, GAO's proposed statement is inappropriate.

**The Statement Recommended By**
**GAO Is Incomplete And Misleading**

GAO recommends that any statement about a firm's membership in SIPC "include a statement that SIPC coverage does not protect investors against losses caused by changes in the market value of their securities." This statement is incomplete and misleading because:

1. It fails to note that in most circumstances SIPC will, within the dollar limits of its mandate, return to customers the actual securities held for them in their securities account, whether those securities have decreased or increased in value;

2. It fails to note that in the event securities are missing from the brokerage firm being liquidated, SIPC must purchase replacement securities if it can do so in a fair and orderly market, and it will do so regardless of whether the cost of those securities has increased or decreased since the filing date; and

3. It fails to note that, in the unlikely event that securities are missing from the brokerage firm being liquidated and there is no fair and orderly market in which replacement securities can be purchased, customers will receive cash equal to the market value of those securities on the filing date.

In short, the nature of SIPC protection for securities is too complicated to be explained in one short sentence or even one short paragraph and any attempt to do so is bound to be misleading or incomplete in some way or other.

We fully agree with the Draft Report's conclusion that there is ample anecdotal evidence that some investors believe that SIPC protection is akin to FDIC protection and that some investors believe that, because of SIPC, they do not have to worry about market losses.

Mr. Richard Hillman
Page 11
April 27, 2001

We also fully agree that the industry and SIPC have an obligation to correct these misperceptions. Unfortunately, there is no simple, shortcut solution to this problem. The advertising slogan that the GAO would mandate creates other problems. We believe the solution is to intensify efforts at investor education. This SIPC has already begun to do. The Draft Report recommendation that the SEC require broker-dealers to distribute the SIPC brochure to customers is a good step in that direction. In this regard, SIPC would be pleased to cooperate with the industry and the SEC.

We appreciate the opportunity to comment on the Draft Report. We would be happy to meet with the GAO staff at your convenience to discuss our comments further. If you have any questions regarding this letter please feel free to contact us at 202/371-8300.

Sincerely,

Debbie Dudley Branson
Acting Chairman

Michael E. Don
President

MED:ved

# Appendix II: Comments From the Securities and Exchange Commission



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

April 27, 2001

Mr. Richard Hillman
Director, Financial Markets and
Community Investment
General Accounting Office
Washington, DC 20548

Dear Mr. Hillman:

Thank you for the opportunity to comment on the General Accounting Office's ("GAO") draft report entitled <u>Securities Investor Protection: Steps Needed to Better Disclose SIPC Policies to Investors</u> (the "Report").

The Report addresses four objectives and discusses, among other things, how disclosure and oversight by the Securities and Exchange Commission (the "Commission") can aid investors. The Commission shares the Report's conclusion that in overseeing SIPC, the Commission should inform investors of their rights and responsibilities relating to obtaining protection under the Securities Investor Protection Act of 1970 ("SIPA") when a broker-dealer is liquidated. The Commission also agrees that it must oversee the operations of the Securities Investor Protection Corporation ("SIPC") and of trustees appointed by SIPC by continuing its day-to-day involvement with issues relating to SIPC and by conducting regular, thorough examinations of SIPC. As discussed below, the Commission will rely on many of the Report's conclusions and recommendations to aid it in continuing to fulfill these responsibilities.

**Appendix II: Comments From the Securities
and Exchange Commission**

Mr. Richard Hillman
April 27, 2001
Page 2

<u>Objective 1:  Claims Involving Unauthorized Trading</u>

The Report correctly explains that investors can best assure that SIPC trustees will recognize their claims resulting from unauthorized trades if they send written complaints to their brokerage firms soon after the trade occurs.  The Report also correctly notes that the Commission should help to educate investors about the need to send written complaints, and the Commission staff has already reviewed the website and where appropriate added information advising investors to complain promptly in writing when they believe trades in their account were not authorized.

The Commission staff, however, does not think it is advisable to tell investors that complaints must always be in writing.  The vast majority of problems that motivate investors to seek assistance from the Commission staff can be resolved quickly with a telephone call to a broker, and investors often abandon their complaints when told they must complain to their broker in writing.  The updated website encourages telephone calls to brokerage firms and also warns investors that it will be difficult for them to prove that they complained about unauthorized transactions if they do not document in writing their complaints.

The Report also recommends that the Commission promulgate (or encourage SROs to promulgate) two rules to provide investors additional information about the need to complain in writing about unauthorized trades.  One rule would require SIPC member firms to provide the

Mr. Richard Hillman
April 27, 2001
Page 3

SIPC brochure to their customers when they open an account, and the other rule would require
that clearing firms disclose on confirmations or account statements that investors should
complain in writing in a timely manner when they believe trades are unauthorized. The
Commission staff supports improving disclosures to customers and will consider whether the
rules should be promulgated. The staff notes, however, that most brokerage firms already
routinely provide the SIPC brochure when customers open an account and that most account
statements have language telling customers to write or notify the firm at an address (rather than
phone number) if they believe the statement is in error.

The Report's final recommendation to the Commission relating to unauthorized trading is
that the Commission require firms that engage in pervasive unauthorized trading to prominently
notify their customers about the need to document disputed transactions in writing. The Report
appears to contemplate that the Commission impose such a requirement as part of the settlement
of an enforcement proceeding. The Commission will consider imposing such a requirement on a
case-by-case basis. However, in settling cases, many issues arise, and requiring firms to notify
their customers about the importance of written complaints may not be the best way to address
all unauthorized trading cases. Indeed, while the Report suggests that requiring Stratton
Oakmont to notify its customers about the need to document disputed transactions in writing may
have aided Stratton Oakmont customers, the Commission required that Stratton Oakmont tape all
conversations with customers – including calls to a toll-free number the firm was required to
obtain for customer complaints -- and that taping system has documented customer complaints.

Appendix II: Comments From the Securities
and Exchange Commission

Mr. Richard Hillman
April 27, 2001
Page 4

Objective 2:  Liquidations Involving Non-Member Affiliates

The Report properly recognizes that to be assured of SIPC protection, investors should never send their money to an affiliate of a brokerage firm if the affiliate is not a SIPC member itself.  The Report also recognizes that the instructions on the Commission's website that investors "**Never** make a check out to a sales representative" and "**Never** send checks to an address different from the business address of the brokerage or a designated address listed in the prospectus" give investors crucial information on this issue.  In response to the Report's conclusion that disclosure about the danger of sending funds to affiliates should be more prominent, we have updated relevant online publications.

Objective 3:  SEC Oversight of SIPC

The Report addresses four aspects of the Commission's oversight of SIPC:  the Division of Market Regulation's day-to-day involvement in monitoring all aspects of SIPC's operations, periodic inspections of SIPC by the Division of Market Regulation and the Office of Compliance Inspections and Examinations, procedures for sharing information within the Commission, and the Office of the General Counsel's pilot program to monitor ongoing SIPC liquidations.  These aspects of the Commission's oversight, along with the Division of Enforcement's role in monitoring liquidations related to Enforcement investigations and proceedings, currently allow

Mr. Richard Hillman
April 27, 2001
Page 5

the Commission staff to gain a thorough understanding of issues relating to SIPC and to assure

SIPC and its trustees comply with SIPA.

The Report contains two recommendations for improving Commission oversight of

SIPC. The first is to include more liquidations involving unauthorized trading and non-member

affiliate claims in the Commission's ongoing SIPC examination. The Commission staff

recognizes that these issues are important, and the staff will review additional liquidations

involving unauthorized trading and non-member affiliates.

The second recommendation is that the Commission establish formal procedures for

communications among all of the offices and divisions of the Commission that have information

regarding SIPC's operation. The Commission staff believes that such procedures could be

beneficial and has decided to hold quarterly meetings to discuss issues regarding SIPC. The

primary purpose of formal procedures will be to assure that factual information about investor

complaints, the status of current liquidations, and other similar matters are shared with all

interested persons. Even without formal procedures the offices and divisions of the Commission

regularly discuss difficult and controversial issues regarding SIPC.

**Appendix II: Comments From the Securities
and Exchange Commission**

Mr. Richard Hillman
April 27, 2001
Page 6

Thank you again for this opportunity to provide comments to the GAO as it prepares its
final draft of the Report.

Very truly yours,

David M. Becker
General Counsel

# Appendix III: GAO Contacts and Acknowledgments

| | |
|---|---|
| **GAO Contacts** | Richard J. Hillman (202) 512-8678<br>Orice M. Williams (202) 512-8678 |
| **Acknowledgments** | In addition to the persons named above, David Genser, Rosemary Healy, Wesley M. Phillips, and Paul G. Thompson made key contributions to this report. |

## Ordering Information

The first copy of each GAO report is free.  Additional copies of reports are $2 each. A check or money order should be made out to the Superintendent of Documents. VISA and MasterCard credit cards are also accepted.

Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

***Orders by mail:***
U.S. General Accounting Office
P.O. Box 37050
Washington, DC  20013

***Orders by visiting:***
Room 1100
700 4th St., NW (corner of 4th and G Sts. NW)
Washington, DC  20013

***Orders by phone:***
(202) 512-6000
fax: (202) 512-6061
TDD (202) 512-2537

Each day, GAO issues a list of newly available reports and testimony. To receive facsimile copies of the daily list or any list from the past 30 days, please call (202) 512-6000 using a touchtone phone. A recorded menu will provide information on how to obtain these lists.

***Orders by Internet***
For information on how to access GAO reports on the Internet, send an e-mail message with "info" in the body to:

Info@www.gao.gov

or visit GAO's World Wide Web home page at:

http://www.gao.gov

## To Report Fraud, Waste, and Abuse in Federal Programs

***Contact one:***

- Web site: http://www.gao.gov/fraudnet/fraudnet.htm
- E-mail: fraudnet@gao.gov
- 1-800-424-5454 (automated answering system)

 PRINTED ON RECYCLED PAPER