UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | ) ) ) ) |
| Plaintiff-Applicant, | ) ) |
| v. | ) Adversary Proceeding ) No. 08-01789-BRL |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | ) ) ) |
| Defendant. | ) ) ) |

**CLAIMANTS' MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION TO AFFIRM HIS DENIAL OF THEIR CLAIMS BECAUSE THEY DID NOT HAVE ACCOUNTS ON THE BOOKS OF BLMIS**

NOW COMES Marshall G. Rowe on behalf of himself and the thirteen other investor-customers in Bernard L. Madoff Investment Securities LLC ("BLMIS") set forth in Exhibit 1 hereof (hereinafter the "Harvest Claimants"), and submits this memorandum of law in support of the Harvest Claimants' position that they are "customers" of BLMIS and entitled to have their claims fully paid by the Trustee.[1]

**Introduction**

"Throughout the [House] report '*investors*' is used synonymously with '*customers*' indicating that, in the eyes of Congress, the Act would protect capital markets by instilling confidence in securities traders." *Securities Investor Protection Corporation v. Morgan-Kennedy & Co., Inc.*, 533 F.2d 1314, 1317 (2nd Cir.

---

[1] Each Harvest Claimant has submitted a statement of claim and, thereafter, an objection to the Trustee's denial of the claim. As a matter of convenience, Marshall G. Rowe submits this memorandum in the name of the "Harvest Claimants" because all fourteen claimants use Harvest Capital Management, Inc. as their investment adviser and all share a common core of facts.

1

1976)(emphasis added), *cert. denied* 426 U.S. 936 (1976); *accord*, *Stafford v. Giddens* (*In re New Times Securities Service, Inc.*), 463. F.3d 125, 127 (2nd Cir. 2006)(noting that the "'principal purpose'" of the Act is "to protect *investors* against financial losses arising from the insolvency of their brokers'")(emphasis added); *Sec. Investor Prot. Corp. v. Exec. Sec. Corp.*, 556 F.2d 98, 99 (2nd Cir. 1977)("Congress intended to protect the public customer 'as *investor* and *trader* ….'")(emphasis original).

In his filing, the Trustee not only ignores Congress' intent of protecting *investors* in the securities market but all but ignores two provisions of the Securities Investor Protection Act, 15 U.S.C. §§78*aaa et seq.,* (the "Act") that undercut his position on who is a customer.[2]

The Trustee, first, fails to accord any significance to that part of the definition of "customer" that reads: "The term 'customer' includes … any person who has deposited cash with the debtor for the purpose of purchasing securities…." Nothing in the definition restricts "customer" status to only those investors for whom the debtor has set up an account.

The Trustee also ignores the significance of that part of section 78*fff*-2(b) that requires him to pay "all obligations of the debtor to a customer relating to … cash … insofar as such obligations are ascertainable from the books and records of the debtor *or are otherwise established to the satisfaction of the trustee*" (emphasis added).  If Congress intended to protect only those investors with accounts, as the Trustee contends, why would it have provided for an alternative way for investors to prove their claims?

---

[2] As this Court stated about the Act's definition of "net equity," the "[r]esolution of this issue 'begins where all such inquiries must begin: with the language of the statute itself.'" *In re Bernard L. Madoff Investment Securities LLC*, 424 B.R. 122, 134 (Bankr. S.D.N.Y. 2010)(citation omitted).

2

Succinctly put, the basic flaw in the Trustee's position is that it leaves investors at the whim and caprice of the insolvent debtor: only if the debtor has created an account for the investor would there be coverage. Surely that cannot be how Congress intended to promote investor confidence in the securities markets.

## Facts common to the Claimants[3]

The Harvest Claimants specifically intended to invest with BLMIS. In October and November 2008, they purchased limited partnership interests in Spectrum Select, L.P. and Spectrum Select II, L.P ("Spectrum") for either $150,000 or $250,000. Spectrum was organized solely for the purpose of enabling the Harvest Claimants and the other Spectrum limited partners to invest with BLMIS. By purchasing a Spectrum limited partnership interest, the Harvest Claimants intended that their cash payments would be deposited by Spectrum in one of three Rye Investment Management funds – Rye Select Broad Market Fund LP, Rye Select Broad Market Prime Fund LP, or Rye Select Broad Market XL Funds LP – each of which was, in turn, to be deposited with BLMIS for the purchase of securities.[4]

The Harvest Claimants are investors in the securities markets. To acquire their limited partnership interests in Spectrum, they had to meet the definition of an "Accredited Investor" within the meaning of the Securities Act of 1933. That qualification was part of the subscription agreement the Harvest Claimants completed to acquire their limited partnership interests.

---

[3] The facts set forth in this section are drawn from the objection each Harvest claimant filed in January 2010. The Harvest Claimants rely upon the facts and supporting documentation filed as a part of their objections and incorporate them herein by reference.

[4] The Trustee acknowledges at page 5 of his memorandum that the feeder funds that had accounts with BLMIS, as the Rye Investment Management funds did, "ceded control to Madoff personally to make investments on their behalf with the money placed with BLMIS."

3

The cash the Harvest Claimants deposited with BLMIS came from their accounts at Charles Schwab. The cash was first wired to Spectrum, then wired to one of the three Rye Investment Management funds and thereafter deposited with BLMIS.

**Argument**

*Elements of a cash claim*

The Harvest Claimants have made "claims for cash." *In re Bernard L. Madoff Investment Securities LLC*, 424 B.R. 122, 133 n. 26 (Bankr. S.D.N.Y. 2010); 15 U.S.C. §78*fff*-3(a)(1). As such, they must prove the "two elements" the court discussed in *In re Omni Mutual, Inc.*, 193 B.R. 678, 681 (S.D.N.Y. 1996). First, their "cash must be on deposit with a broker-dealer;" second, the cash "must have been paid for the purpose of purchasing securities." The Harvest Claimants meet each element: their cash was "on deposit" with BLMIS, and their specific intent was that the cash would be used to purchase securities. See *supra* at 3 and footnote 3.

*"Customer" status*

An investor who "has deposited cash with a debtor for the purpose of purchasing securities" meets the definition of "customer" under 15 U.S.C. §78*lll*(2). *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, 401 B.R. 629, 635 (Bankr. S.D.N.Y. 2009); aff'd, *Rosenman Family, LLC v. Picard*, 420 B.R. 108 (S.D.N.Y. 2009). Neither the definition of "customer" nor the Act prescribes the method by which the cash is to be deposited with the debtor. As this Court has said, "the mere 'act of *entrusting* … cash to the debtor for the purpose of effecting securities transactions … triggers customer status ….'" *Bernard L. Madoff Investment Securities LLC*, 401 B.R. at 635 (emphasis original)(citation omitted); *Brentwood Securities, Inc. v.*

4

*Pepperdine University*, 925 F.2d 325, 327 (9th Cir. 1991)("This definition embodies a common-sense concept: An investor is entitled to compensation from SIPC only if he has entrusted cash or securities to a broker-dealer who has become insolvent").

Although the Act does not prescribe the method of deposit, it does require that the cash be "received, acquired, or held by or for the account of the debtor." *See* 15 U.S. C. § *78lll*(4)(defining "customer property").

Courts have recognized that the determinative issue for a cash claim is whether the debtor, in fact, received the cash. For example, in *In re Primeline Securities Corporation*, 295 F.3d 1100 (10th Cir. 2002), the trustee denied customer status to claimants who reasonably believed their broker was acting as the debtor's agent when he directed them to make their checks payable to one of his companies. The Tenth Circuit reversed the trustee's determination. It stated: "Whether a claimant deposited funds 'with the debtor' does not depend simply on *to whom claimants made their checks payable … The relevant inquiry is whether the brokerage firm actually received, acquired or possessed Claimants' property*" (emphasis added). 295 F. 3d at 1107. The court cited *In re Old Naples*, 223 F.3d 1296 (11th Cir. 2000), where the Eleventh Circuit focused on whether the debtor had received the claimant's cash: "Whether a claimant 'deposited cash with a debtor,' however, does not … depend simply on *to whom the claimant handed his cash or made his check payable, or even where the funds initially [were] deposited*. Instead the question is whether there was '*actual receipt*, acquisition or possession of the property of a claimant by the brokerage firm under liquidation.'" *Id*. at 1302 (emphasis added).

5

Here, there can be no dispute that the Harvest Claimants' cash was "on deposit" with BLMIS. *Primeline Securities* and *Old Naples* provide direct authority that they are entitled to "customer" status because BLMIS received their cash, even though indirectly through Spectrum and the Rye Investment Management funds.

"Customer" status under 15 U.S.C. §78*lll*(2) requires the Harvest Claimants to prove that they deposited their cash with BLMIS "for the purpose of purchasing securities." As discussed *supra* at 3, that was their specific intent.

The Harvest Claimants, as investors with BLMIS, have customer claims. The Court has stated: "If the debtor-broker owes … the deposited cash to the investor on the SIPA filing date, the investor has a "customer" claim." *In re Klein, Maus & Shier, Inc.*, 301 B.R. 408, 419 (Bankr. S.D.N.Y. 2003)

***The claim must be "ascertainable" or "otherwise established"***

In support of his position that only claimants who had accounts with BLMIS are to be considered "customers" under the Act, the Trustee relies on the provision in 15 U.S.C. §78*fff*(2) that requires him to discharge "all obligations of the debtor … insofar as such obligations are ascertainable from the books and records of the debtor." Trustee's Memorandum at 22-23. While the Trustee's quotation of section 78*fff*-2(b) includes the phrase, "or are otherwise established to the satisfaction of the trustee," he never considers why Congress included that alternative. And for good reason: it cannot be squared with his position that "customer" status depends on the debtor having set up an account for the investor.

The Trustee cannot ignore his obligation to pay those claims that "are otherwise established to the satisfaction of the trustee." In *In re MV Securities, Inc.*, 48 B.R. 156,

6

159 (Bankr. S.D.N.Y. 1985), the Court stated that "[t]he Trustee discharges customer obligations of the debtor from the debtor's books and records insofar as the debtor's obligations are ascertainable from them *or from such other evidence as otherwise establishes the claim to the satisfaction of the trustee*" (emphasis added). Further, this Court's December 15, 2008 order at page 5 reads: "ORDERED, that the Trustee be, and hereby is, authorized to satisfy, within the limits provided by SIPA, those portions of any customer claims and accounts which … are otherwise established to the satisfaction of the Trustee pursuant to 15 U.S.C. §78fff-2(b)."[5]

If Congress intended to limit "customer" status to only those investors for whom a debtor maintained an account, why did it impose on the trustee the obligation to look beyond the books and records of the debtor? One reason it did, as the Court recognized in *In re MV Securities*, is that Congress acted to protect investors at a time of "severe back office problems in the securities industry" and "did not intend to base SIPC coverage solely on what the debtor's books stated." 48 B.R. at 159 n.5.

Moreover, such a limitation would defy common sense. The Act was intended to "protect capital markets by instilling confidence in securities traders." *Securities Investor Protection Corporation v. Morgan-Kennedy & Co., Inc.*, 533 F.2d at 1317. What measure of confidence would securities traders have if the Act's protection were dependent on the debtor's record-keeping practices? Congress acted knowing that broker-dealers will "encounter financial troubles," H. Rep. No. 91-1613, 91st Congress,

---

[5] At a minimum, the Trustee must make a good faith determination whether a claim can be "otherwise established." Under 15 U.S.C. §*78fff*-1(b), he is subject to the same duties as a trustee in a case under chapter 7 of title 11." *See* 11 U.S.C. §704.

7

Second Session (1970); it added the requirement that a trustee look beyond the books and records knowing that broker-dealers will also encounter back office problems.

The Harvest Claimants have the burden of proving their claims. If they can do so through records that establish they deposited cash with BLMIS, the Trustee is required to pay their claims.

### *Claimants do not make a "net equity" claim*

The Trustee argues that only "customers with a valid net equity claim are entitled to … in certain circumstances, receive a SIPC advance …." Trustee's Memorandum at 21. Pointing to the definition of "net equity" in 15 U.S.C. §78*lll*(11), which refers to the "account or accounts of a customer," the Trustee asserts that "[a]bsent accounts with BLMIS, the Objecting Claimants have no "net equity" that could entitle them to … a SIPC advance." Trustee's Memorandum at 22.

Yet here, too, the Trustee fails to look to "the language of the statute itself," *In re Bernard L. Madoff Investment Securities LLC*, 424 B.R. at 134, which makes clear that the Act provides for other than "net equity" recoveries. Under 15 U.S.C. §78*fff*-2(b), the Trustee, after receiving a statement for a cash claim, "shall promptly discharge … all obligations of the debtor to a customer *relating to*, or net equity claims based upon, securities or *cash*, *by* the delivery of securities or *the making of payments to* or for the account of *such customer* …." (emphasis added).[6] The Harvest Claimants deposited cash

---

[6] That section 78*fff*-2(b) provides for other than "net equity" claims also is supported by the language of subsection (1)("with respect to net equity claims") and subsection (2)("with respect to claims relating to, or net equities based upon").

8

with BLMIS, submitted statements of claims to recover their cash, and under section 78*fff*-2(b) are entitled to receive payment of their cash.

### *Morgan Kennedy is not apposite*

To support his position that the Harvest Claimants are not "customers," the Trustee argues they are "indirect investors" no different than the profit-sharing plan participants in *Morgan Kennedy*. Trustee's Memorandum at 22. But unlike the plan participants, who did not make "the decision to entrust those funds to the debtor," *Morgan Kennedy*, 553 F.2d at 1318, the Harvest Claimants did make the decision to entrust their cash with BLMIS. As discussed *supra* at 4-5, that decision, coupled with the receipt by BLMIS of their cash, is all that is required for "customer" status under 15 U.S.C. §78*lll*(2).

### *"Unrestricted right to receive on demand"*

Relying on a statement in the legislative history that the Act was intended "to protect only those customers 'with 'an unrestricted right to receive on demand the securities which belong to them,''" the Trustee asserts that only the feeder funds would have such right, not the objecting claimants. Trustee's Memorandum at 21 n. 10. But nothing in the language of the Act limits "customer" status to an unrestricted right to receive. No such restriction is included within the definition of "customer" under 15 U.S.C. §78*lll*(2); nor is it a condition to the Trustee's obligation to pay cash claims under 15 U.S.C. §*78fff*-2(b). Further, the two cases cited by the Trustee that quote from the legislative history involve claimants who had made agreements with the debtors that, in effect, subordinated their rights to the securities in their accounts to the rights of the debtors. *In re Adler, Coleman Clearing Corp.*, 204 B.R. 111, 119 (Bankr. S.D.N.Y.

9

1997)("[T]he permitted investment under the Clearing Agreements plainly was intended to maintain the Deposit Accounts so that they could be used to cover the debtor's losses …."); *In re Weis Sec., Inc*., 1977 WL 1043, *4 (S.D.N.Y. 1977)("Any benefit derived from trading was subordinated to the primary purpose of maintaining account levels to satisfy Winslow's creditors"). The Harvest Claimants entered into no similar agreement with BLMIS in this case.

*The feeder fund argument is misplaced*

The Trustee's final point is that the feeder funds, which are distinct legal entities, and through which the objecting claimants invested with BLMIS, are the only parties that have claimant status. "Investors in the Feeder Funds … do not have property rights in the specific property of the entities in which they invested." Trustee's Memorandum at 25. This misplaced argument, drawing on corporate, partnership and law, ignores the Act, elevates form over substance and has resulted in the blanket denial of more than 1,700 claims of investors who used feeder funds to invest in BLMIS. The Trustee's contention cannot be reconciled with Congress' intent to protect individual investors and promote confidence in the securities markets, *Securities and Exchange Commission v. F.O. Baroff Company*, *Inc*., 497 F.2d at 283 ("… in the eyes of Congress, the Act would protect the capital markets by instilling confidence in securities traders") – confidence that has been shaken by the worst Ponzi scheme in history, which the SEC's own investigation reveals should have been uncovered. *See Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme* at 23 (noting that "at no time did the SEC ever verify Madoff's trading through an independent third-party, and in fact never actually conducted a Ponzi scheme examination or investigation of Madoff").

10

Under the Act, the substance is not how the Spectrum and Rye Investment Management funds were legally organized; rather, it is the fact that the Harvest Claimants, to gain entry into an "elite club," had to use those two funds as the means to deposit their cash with BLMIS. *See In re Bernard L. Madoff Investment Securities LLC*, 424 B.R. at 128 ("Entry into the [Madoff] IA Business was coveted and selective, akin to membership in an elite club"). The substance is that the Harvest Claimants, having cash on deposit with BLMIS, meet the definition of "customer" and are entitled to have their cash claims paid by the Trustee.

## Conclusion

This Court should reject the Trustee's position that only claimants with accounts at BLMIS are entitled to "customer" status. The Trustee gives meaning to selective parts of the Act rather than what the law and this Court require: reading and giving meaning to the language of the Act as a whole. Beyond that, the Court must reject the Trustee's position because it defies logic and commonsense, making illusory any protection of investors.

How could Congress' intent of protecting investors in the securities markets ever be realized if protection were dependent upon the recordkeeping practices of wayward broker-dealers? Nowhere would reading into the Act the requirement of an account be more paradoxical than this case, in which BLMIS' Ponzi scheme involved sending "account holders" monthly or quarterly statements reporting trades that "were a fiction." Trustee's Memorandum at 6.

The Harvest Claimants should be given the opportunity to prove that they deposited cash with BLMIS for the purpose of investment. *Rosenman Family, LLC v.*

11

*Picard*, 420 B.R. 108, 112 (S.D.N.Y. 2009)("… SIPA is clear that once a depositor has entrusted funds with the debtor, it is the depositor's purpose that controls a finding of 'customer' status"); *see* 15 U.S.C. §78*fff*-2(a)(4)(permitting a "any person … to establish by formal proof or otherwise as the court may provide such claims as such person may have against the debtor").

　　WHEREFORE the Harvest Capital Management Claimants respectfully request that the Court deny the Trustee's motion for an order upholding his denial of their claims.

　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　Marshall G. Rowe

　　　　　　　　　　　　　By his attorneys,

　　　　　　　　　　　　　ORR & RENO, P.A.


Date: July 12, 2010　　　By:　　/s/ William L. Chapman
　　　　　　　　　　　　　　　　William L. Chapman (NH Bar No. 397)
　　　　　　　　　　　　　　　　One Eagle Square
　　　　　　　　　　　　　　　　P.O. Box 3550
　　　　　　　　　　　　　　　　Concord, NH  03302-3550
　　　　　　　　　　　　　　　　(603) 224-2381
　　　　　　　　　　　　　　　　wchapman@orr-reno.com


　　　　　　　　　　　　CERTIFICATE OF SERVICE

　　A copy of Marshall G. Rowe's memorandum of law in opposition to Trustee's motion to affirm his denial of their claims has been sent on this 12th day of July to Irving H. Picard, Trustee, by ECF and First Class mail.

　　　　　　　　　　　　　　　/s/ William L. Chapman
　　　　　　　　　　　　　　　William L. Chapman

671486_1.DOC