# EXHIBIT C

<u>Testimony by Peter J. Leveton</u>
<u>Co-Chairman of the Agile Funds Investor Committee</u>
<u>Before the House Financial Services Subcommittee on Capital Markets, Insurance and</u>
<u>Government Sponsored Enterprises, December 9, 2009</u>

<u>"Additional Reforms to the Securities Investor Protection Act"</u>

**Introduction**

Chairman Kanjorski, Ranking Member Garrett and Members of the Committee.

My name is Peter J. Leveton. I live in Lakewood, Colorado, a Denver suburb in Congressman Ed Perlmutter's 7th District. I am a Co-Chairman of the Agile Group, LLC ("Agile") Investor Committee. Agile is a Boulder, CO based hedge fund manager that was forced to suspend redemptions and has been in liquidation since the fourth quarter of 2008. The Investor Committee is an ad hoc entity formed in December 2008 to maximize the recovery of Agile's investor assets. My fellow Investor Committee members and I serve as unpaid volunteers.

Thank you for giving me the opportunity to testify about and propose solutions for:

    1. The current inability of "indirect" investors to be recognized by the Securities Investor Protection Corporation ("SIPC") as "customers".

    2. The current inability of all Ponzi scheme victims to receive Federal income tax relief for the loss of their Individual Retirement Accounts ("IRAs"), 401(k)s, Charitable Remainder Trusts ("CRTs"), variable annuities and any other tax deferred retirement accounts (collectively "Tax-Deferred Retirement Accounts").

    3. The proposed Securities Investor Protection Act ("SIPA) amendment for investors in ERISA plans.

    4. The proposed SIPA amendment prohibiting clawbacks.

    5. A SIPA amendment or other action requiring SIPC to make advances based on a customer's statement balance within 60 days of a customer filing a claim.

I am testifying on behalf of Agile's 205 "indirect" investors; several hundred Ponzi Victims Coalition members from more than 20 states; and, by extension, Bernard L. Madoff Investment Securities, LLC ("BLMIS" or "Madoff"). Indirect investors who filed more than 11,000 SIPC claims on or before the bar date of July 2, 2009.

Please see Exhibit I for information about Agile's investment history, its investments with hedge funds that invested with BLMIS and personal letters from 55 Agile investors to the Senate Finance Committee immediately prior to that Committee's March 17, 2009 hearing titled "Tax Issues Related to Ponzi Schemes".

In addition to commenting on items 3, 4 and 5 above, as requested in the official invitation, my goal is to accomplish two significant objectives for the benefit of all Indirect investors:

1

1. Clarify SIPA's definition of Customer consistent with Congress's 1970 intent to provide a "safety net" for all investors who placed their money with US brokerage firms that later turned out to be engaged in fraudulent activities or otherwise failed.

As SIPA is currently interpreted by SIPC and BLMIS Trustee Irving H. Picard, "direct" investors stand to recoup up to $500,000 from SIPC for each of their BLMIS accounts, while Indirect investors will receive zero.

When SIPA was enacted in 1970 it was clearly Congress' intent to protect all investors from losing 100% of their investment in fraudulent investment schemes run by brokerages supervised by the Securities and Exchange Commission ("SEC"). It was clearly not Congress' intent to discriminate between Indirect and Direct investors.

We propose that Congress clarify SIPA's definition of Customer and require SIPC to provide equal financial relief for all Indirect and Direct investor victims whose funds were stolen by BLMIS and other Ponzi schemes operating under the regulatory authority of the SEC and exposed after December 31, 2007.

2. Provide Federal income tax relief for all Ponzi scheme investor victims whose Tax-Deferred Retirement Accounts were stolen by BLMIS and other Ponzi scheme operators exposed after December 31, 2007

**Indirect Investor Profile**

Indirect investors are not definable as a homogeneous group. Indirect investors are Americans from all walks of life, including farmers, doctors, lawyers, teachers, engineers, entrepreneurs, business owners, corporate executives, and others who have worked hard our entire lives. We have typically saved diligently, helped create jobs, played by the rules, contributed to charities and, we thought, invested wisely for our retirement and to provide some remainder for our children and charities, including medical research foundations, educational institutions and other not-for-profit organizations recognized under IRC S 501 (c) (3).

Many of us are your constituents. Many of us had no disposable income, financial investments or savings, except what we accumulated over the course of our working lives and invested in Tax-Deferred Retirement Accounts, hedge funds and feeder funds, much of which then found its way from our "trusted" fund managers to BLMIS.

Many of us are now devastated, financially and psychologically. Many of us have sold or are trying to sell our homes just to obtain money to live on without becoming wards of the state. Many of us in our 60s, 70s and 80s, are attempting to reenter the work force, sometimes in menial jobs, to obtain money for food and shelter, and some of us have had to beg for support from our siblings and children.

It is fundamentally unfair, and was categorically not Congress' intent in passing SIPA, that Indirect investors would go overnight from a well planned retirement to financial ruin; while the Direct investors, who knowingly invested with Bernard L. Madoff and BLMIS, would receive up to $500,000 for each of their accounts.

There is only one significant distinction between Direct and Indirect investor victims:

2

- Direct investors intentionally placed their money with BLMIS without going through an intermediary, knew they were investing with Bernard L Madoff, and they or their financial advisors had ample opportunity to carry out extensive due diligence.

- Indirect investors invested via trusted advisors in hedge funds, pension funds, and feeder funds, which subsequently invested with BLMIS. A majority of Indirect investors had never heard of Bernard L. Madoff before learning that he had stolen our money.

In addition to hedge and feeder fund investors, Madoff and other Indirect Ponzi scheme victims' money came from family partnerships, corporate pension plans, physician pension and profit sharing plans, community/township plans, and similar investment vehicles, and the many charitable organizations that are recipients of CRTs. Because the contributors to these investment vehicles are also Indirect investors, they, like the victims who invested in hedge funds and feeder funds, are precluded from SIPC relief because they are not currently defined as Customers.

All Indirect investors lost their money to the same fraud and suffered the same devastating effects as the Direct investors. All Indirect investors should be entitled to the same financial relief as the Direct investors.

**Eliminate Discrimination Against Indirect Investors**

Until recently Congress seems to have focused primarily on the approximately 4,900 Direct investor Madoff victims who submitted SIPC claims on or before the Trustee's bar date of July 2, 2009. Substantially overlooked have been the Indirect investors who submitted more than 11,000 SIPC claims on or before July 2, 2009.

Per the Trustee's web site, as of December 3, 2009, SIPC had processed 3,062 Direct investor claims, allowed 1,641 of them and advanced approximately $559 million to the Direct investors (an average of about $341,000 per claim). Over the same period, to our knowledge, not one Indirect claim has even been processed. Without a change in the definition of Customer, these Indirect claims will never be processed and certainly not paid.

If Congress does not act to correct this inequity, Direct investors will continue to receive up to $500,000 SIPC advances for each of their allowed BLMIS claims, plus perhaps additional monies from the sale of Madoff's material assets, and Indirect investors, who lost their money to the same fraud and suffered the same financial devastation, will receive nothing.

It defies logic and basic fundamental American fairness to somehow believe that when passing SIPA and creating SIPC Congress' intent was to put Indirect investors at a decided disadvantage to Direct investors. But that is exactly the result of the current interpretation.

SIPA was passed and implemented in 1970 as an amendment to the Securities Exchange Act of 1934. In urging its prompt passage, Senator Edward S. Muskie proclaimed on the Senate floor: "…after this bill is enacted, no American will lose his savings through a brokerage firm bankruptcy."

It is apparent that Senator Muskie's and Congress' intent was for SIPA to protect all Americans from losing their savings through the failure or fraud of their brokerage firm.

3

He did not say that only those investors who invested directly with an apparently-successful money manager would receive SIPC relief if things went wrong, but, instead, that **all Americans** would receive such relief.

In 1970, hedge funds and feeder funds, to the extent they existed at all, were unavailable to most individual investors. Since then, even though these investment products are now available to the majority of investors, SIPA's language has not been clarified to clearly extend coverage to individual investors whose money was entrusted to fund managers. As a result, SIPC and BLMIS Trustee Irving H. Picard have felt free to construct their own definition and, contrary to congressional intent, have concluded that Indirect investors are not Customers and are, therefore, not eligible to receive SIPC advances.

To exclude Indirect investors would be, we believe, contrary to congressional intent.

### Why should Congress pass legislation requiring SIPC to treat all BLMIS investors equally?

- The distinction between Indirect and Direct investors is form over substance, contrary to congressional intent, and clear discrimination against Indirect investors. Unless Congress intervenes to correct this inequity, Indirect investors will not benefit from the SIPC safety net and receive no relief for their losses to the Madoff and other Ponzi schemes in firms regulated by the SEC. We believe it is time to correct this injustice and only Congress can do so.

- A major reason for the magnitude of the Madoff Ponzi is the collective failure, negligence, ineptitude and incompetence of the Securities and Exchange Commission ("SEC"), the Financial Industry Regulator Authority ("FINRA"), the IRS, and SIPC.

    The SEC's failures are clearly documented in the August 31, 2009 Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme report prepared by SEC Inspector General David Kotz. According to press reports the failures have also been confirmed by Bernard L. Madoff's own comments of recent months. This Subcommittee and the full House Financial Services Committee have received extensive testimony and discussed these failures at great length so I don't feel the need to go over them again.

    However, had the SEC and other regulatory agencies, adequately carried out their responsibilities, not been satisfied with the incomplete results of multiple superficial investigations, and not provided BLMIS and Bernard L. Madoff himself with one clean bill of health after another, the gigantic Madoff Ponzi scheme would have been stopped years ago; and the amount of money stolen and lives ruined would have been substantially less than the carnage that has taken place this past year.

- The IRS approved BLMIS as one of only about 250 non-bank custodians for IRAs and pension funds, and did so in the midst of Harry Markopolos' repeated warnings to the SEC that Madoff was running a Ponzi scheme. This approval was another vote of confidence in Bernard L. Madoff and BLMIS.

- If Congress and the SEC do not accept at least partial responsibility for these travesties, do not act to restore parity between Indirect and Direct investors, and do not carry out the provisions of

4

SIPA as intended by Congress (thereby allowing the BLMIS Trustee and SIPC to "make up the rules" as they go along), it is entirely possible that both domestic and foreign investors will lose significant confidence in the US securities markets and will look elsewhere to invest.

### Why should Congress provide tax relief to investors for Ponzi scheme losses in their Tax-Deferred Accounts?

- Congress created tax-deferred retirement vehicles to encourage all Americans to put their money in safe, growing investments for their retirement. This long term strategy was extremely successful in attracting investment capital. Unfortunately such accounts constituted a significant portion of monies stolen by Madoff and the other Ponzi operators and because this type of loss was not anticipated, the tax laws did not provide for relief in such circumstances.

- Market losses exceeding an investor's tax basis in Tax-Deferred Retirement Accounts are clearly not deductible under current Federal income tax regulations and we are not proposing that they be deductible. However, losses attributable to Ponzi schemes are not market losses and are brought about by the unusual circumstances discussed elsewhere in this testimony.

    We believe that Congress should act to provide tax relief for such losses. This is particularly true in the case of BLMIS where the SEC and IRS essentially issued "official seals of approval".
    - The SEC, in December 1992 when the Wall Street Journal quoted one of the Commissions' senior officials as saying that a recent Madoff investigation found "nothing to indicate fraud". Although this statement was made years ago, it has been extensively referenced and relied upon by investors and fund managers as an indication that Madoff had been vetted.

    - The IRS, in July 2004 when it named BLMIS as a non-bank custodian of IRA and pension plan accounts.

    CRT Ponzi losses are particularly damaging because they adversely affect both the donors and recipients. Such losses deprive the donors of a regular source of retirement income and deprive the recipient charities, such as educational institutions, hospitals, churches, foundations and other charitable organizations, and not-for-profit entities of money they counted on to fund their respective missions.

### Other Important Considerations

- It has been suggested that Indirect investors may actually be better off than Direct investors because we can sue our hedge and feeder funds. This suggestion is simplistic, misleading and not practical. Many of the hedge and feeder funds are bankrupt, and have retained expensive, high-powered attorneys to defend whatever might be left. Most Indirect investors, on the other hand, cannot afford expensive, high-powered attorneys, and we have nothing left. Even if this course of action were feasible and ultimately successful, such litigation would likely take many years and investor assets would be substantially depleted during the interim.

- Much has been made of the sale of Madoff's material assets and the several million dollars raised by these sales. Some reporters have stated that the proceeds will go to "Madoff's victims." However, unless the definition of Customer clearly includes Indirect investors, any proceeds that

5

may be left after the lawyers deduct their fees, will only be divided among the Direct investors, and, once again, Indirects will be looking at zero.

- Recent media attention and Senator Charles E. Schumer's comments have underscored the Senate's amendment to HR 3548, the Unemployment Extension Act. The amendment allows Indirect investors to carry back Ponzi theft losses consistent with the provisions of IRS Rule 2009-9 and Procedure 2009-20 allowed for the Direct investors. While this amendment is appreciated and will indeed be beneficial to some Indirect Investors, it is of little or no assistance to many smaller and retired Indirect Investors and the fact it was needed at all underscores the degree to which Indirects have been overlooked.

**Proposed Congressional Intervention**

Because of the collective failure, negligence, ineffectiveness and ineptitude of the SEC, FINRA, SIPC and IRS, we propose that Congress enact legislation to:

1. Amend SIPA and require SIPC to treat Indirect and Direct investors equally for BLMIS and all other Ponzi schemes in brokerages under the regulatory authority of the SEC and exposed after December 31, 2007; and

2. Provide Federal income tax or other relief for Tax-Deferred Retirement Accounts lost to the BLMIS and all other Ponzi schemes exposed after December 31, 2007.

**To carry out these recommendations we propose that Congress do the following:**

**1. Amend SIPA to clearly provide that all Indirect investors receive parity and be treated equally with Direct investors in BLMIS and all other Ponzi schemes under the regulatory authority of the SEC after December 31, 2007.**

There are many precedents for amending Federal and state laws to clarify the intent of the legislative sponsors. In this instance, the SIPA amendment would simply provide that those who suffered indirectly, for example as customers of customers, are equally entitled to protection under the law as those who suffered directly. An analogy would be the many "indirect purchaser" statutes and amendments enacted under antitrust consumer laws.

An equitable approach to accomplish this objective would be to amend the definition of Customer, SIPA Section 15 U.S.C. 78lll (2), to read:

"…The term 'customer' of the debtor means any person investing directly or indirectly through one or more parties who has a claim against the debtor arising out of sales or conversions of such securities".

"The effective date of this subsection shall apply to claims made after December 31, 2007".

**2) Enact legislation that either modifies the Federal tax code or provides alternative means for all victims of Ponzi schemes exposed after December 31, 2007 to recover a reasonable portion of their Tax-Deferred Retirement Accounts.**

6

Tax law modification is an extremely complex issue and we are not proposing specific solutions at this time. However, unless there are modifications to the Federal income tax code or Congress creates other approaches to provide some relief for the loss of Tax-Deferred Retirement Accounts, the unprecedented magnitude of the 2008 Ponzi revelations will leave many honest investors with zero relief for their stolen Tax-Deferred Retirement Accounts.

To address this problem, we propose that the Capital Markets Subcommittee initiate discussions with the House Ways and Means Committee and the appropriate Senate Committee to study and analyze the issues and recommend fair and equitable solutions.

### Proposed SIPA amendment for investors in ERISA plans (Maffei/Ellison) Amendment.

The concepts promoted in this amendment are certainly commendable. However, it unfortunately and arbitrarily excludes many Indirect Madoff and other Ponzi scheme victims. The amendment only addresses relief for ERISA plan Indirect investors and once again discriminates against the many thousands of other Indirect investors, including those in self-funded retirement plans such as IRAs, 401ks, variable annuities and other Tax-Deferred Retirement Plans.

Why should Congress protect investors in ERISA pension plans while ignoring innocent investors in the other self-funded Tax Deferred Retirement Plans?

If this amendment is passed without including all Indirect investors, thousands of Indirect investors will still be left with no relief whatsoever, and will once again be victimized by the system: first by Madoff, then by SIPC, and then by Congress.

We Indirect investors are seeking an Act of Congress that will end the discrimination against certain classes of investors, not perpetuate it.

Please do not pass the Maffei/Ellison Amendment unless it is amended to include all Indirect investors as discussed elsewhere in this testimony.

### Proposed SIPA Amendment Prohibiting Clawbacks

We endorse an amendment which prohibits clawbacks from investors who withdrew their money in good faith and can substantiate their claim that they did not know and had no reason to believe that BLMIS, or other Ponzi Schemes were fraudulent operations.

### SIPA amendment or other action requiring SIPC to make advances based on a customer's statement balance within 60 days of a customer filing a claim.

Obviously advance of the statement balance is a very complex matter (including whether or not the investor knew or should have known they were investing in a Ponzi scheme) with likely unintended consequences whichever way it is decided. Primarily because of the regulator failures discussed elsewhere in this testimony, we would apply the same test as with clawbacks. That is, investors who withdrew their money in good faith and can substantiate their claim that they did not know and had no reason to believe that BLMIS, or other Ponzi Schemes, were fraudulent operations, we believe they should receive credit for their statement balance closest to the date the Ponzi scheme was exposed.

7

With regard to payment within 60 days of a claim being filed, we would need to know far more about the processing logistics before stating an opinion. However, regardless of what period is determined to be reasonable for payment, we suggest that processing parameters and guidelines be established and that SIPC be held accountable for meeting such parameters and guidelines

## Conclusion

In closing, I suggest that "this could have happened to you", as it did to the thousands of honest and innocent investors who have been living in fear and deprivation for the past year, and whose lives will be permanently ruined without your help.

It is clear that only "Acts of Congress" will rectify the injustices discussed in this testimony. If left unmitigated and not corrected by Congress, we believe these financial problems of epic proportion will erode future investor confidence in the entire US investment system.

**We look to you and your colleagues as our only hope to:**
  (1) carry out Congress' original intent to protect all investors when it enacted SIPA, and
  (2) allow us to recover a portion of our Tax-Deferred Retirement Account losses because of monies stolen by Bernard L. Madoff and other unscrupulous Ponzi operators.

Thank you again for the opportunity to testify about these matters which are so important to the thousands of investors who have been financially devastated by the BLMIS and other Ponzi schemes.

I would be pleased to answer any questions you may have.

Sincerely,

**Peter J. Leveton**
Co-Chairman
Agile Funds Investor Committee
303-981-8783
Pete3489@aol.com

**Attachments:**

**Exhibit I: Proposed SIPA curative amendment for equitable treatment of Indirect and Direct Investors**

**Exhibit II: Agile Background Information and Personal Letters**

**Exhibit III: Leveton resume**

8

<u>Exhibit I</u>

<u>Peter J. Leveton Testimony Before the House Financial Services Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, December 9, 2009</u>

"Additional Reforms to the Securities Investor Protection Act"

<u>Curative Legislation to Provide Equal Relief for All Investors by Amending the 1970 Securities Investor Protection Act ("SIPA") Definition of Customer</u>

This proposed amendment defines "customer" to clearly allow "indirect" investors to receive SIPC safety net protection on equal footing with "direct" investors. Indirect investors include those in hedge funds, feeder funds, pension plans, trusts, family partnerships and similar investment vehicles ("Indirect Investment Vehicles").

- Direct investors placed their money with a particular brokerage firm without going through an intermediary and knew they were investing with that firm.
- Indirect investors invested in Indirect Investment Vehicles which subsequently invested with a brokerage firm.

**Amendment Justification**

**Updating SIPA**

- SIPA was passed by Congress in 1970 as part of the Securities Exchange Act of 1934. Since its inception investment opportunities have expanded dramatically and become available to a much wider range of investor. The proposed amendment will clarify the definition of "customer" and clearly provide equality and parity for Indirect and Direct investors.

- In 1970, Senator Edmund S. Muskie proclaimed, in urging the prompt enactment of SIPA: "...after this bill is enacted, no American will lose his savings through a brokerage firm bankruptcy." (Federal Broker Dealer Ins. Corporation: Hearing on S2388, 3988 and 3989 before the Subcommittee on Securities of the Senate Com. on Banking and Currency, 95th Congress Cog. 10(1970) at 147.).

- If SIPA is not amended, thousands of Americans -- the indirect investors -- will have lost their savings and retirement accounts through a brokerage firm bankruptcy, with no safety net as was Congress' intent when SIPA was passed and SIPC created.

**Restoring Trust**

- The failure of the SEC to provide oversight to the industry it was created to regulate, in spite of many warnings and red flags, has received widespread media attention. The August 31, 2009 Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme report prepared by SEC Inspector General David Kotz admitted that the government was a major cause of Madoff's success and of the enormous harm which has befallen thousands of direct and indirect investors. Judge Chin, in his sentencing of Bernard Madoff on June 29th, cited the need to restore confidence and public trust in investments. In his own words he said, "...But more is at stake than money, as we have

9

heard. The victims put their trust in Mr. Madoff. That trust was broken in a way that has left many-victims as well as others-doubting our financial institutions, our financial system, our government's ability to regulate and protect, and sadly, even themselves."

- The loss of trust felt by those victimized by the Madoff fraud is not limited to Madoff victims. There has been a general outcry to the investing community that "This could happen to you." The proposed amendment will help to restore confidence for all investors that the SIPC symbol will protect them in the event of brokerage fraud or financial failure.

**PROPOSED CURATIVE LEGISLATION:**

The intent of the SIPA was clearly to protect all investors, not to exclude investors who placed their money with Indirect Investment Vehicles. The following amendment will effectuate this change:

> The definition of CUSTOMER – Section 16 (2) of the Securities Investor Protection Act (15 U.S.C. 78111) is amended by inserting "directly or indirectly through one or more parties," after "The term 'customer' of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim".

> "Effective Date – The provisions of this Subsection shall take effect with respect to claims made after December 31, 2007."

10

## EXHIBIT II

## Testimony by Peter J. Leveton Before the House Financial Services Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, December 9, 2009

### "Additional Reforms to the Securities Investor Protection Act"

### Agile Group, LLC Background Information

Agile and its predecessor companies have managed investor money since the 1980s and operated as a "fund of funds" hedge fund manager since 2002. On September 30, 2008, Agile funds under management totaled approximately $475 million ($175 million equity and $300 million debt) invested in about 50 underlying hedge funds.

Agile's Bernard L. Madoff Investment Securities, LLC investments were through Rye Select Broad Market Prime Fund, LP ("Rye"). Rye's General Partner is Tremont Partners, Inc. ("Tremont"). Tremont's parent is Tremont Group Holdings, Inc., a wholly owned subsidiary of Oppenheimer Acquisition Corporation, itself a wholly owned subsidiary of Mass Mutual Holding Company, which is a wholly-owned subsidiary of Massachusetts Mutual Life Insurance Company.

Agile suspended redemptions and has been in liquidation since the fourth quarter of 2008.

### Investor Letters

Attached are 55 letters sent from typical Agile investors to the Senate Finance Committee immediately prior to that Committee's March 17, 2009 hearing "Tax Issues Related to Ponzi Schemes".

<u>Exhibit III</u>

<u>Testimony by Peter J. Leveton Before the House Financial Services Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, December 9, 2009</u>

<u>"Additional Reforms to the Securities Investor Protection Act"</u>

**Experience and Affiliations**

Currently retired and serving as an unpaid Co-Chairman of the Boulder, CO, Agile Funds, LLC ("Agile") Investor Committee. Agile is a "fund of Funds" hedge fund that suspended redemptions and has been in liquidation since the fourth quarter of 2008. The Committee is an ad hoc committee organized in December 2008 to assist Agile investors to maximize recovery of their Agile investments.

No prior experience in the securities industry.

More than 29 years experience as the CEO and CFO of public (NYSE, NASDAQ and OTCBB) and private companies, and 4 years experience as the Managing Director and Partner of an investment banking firm. Industry experience includes healthcare/medical devices, chemical manufacturing/mining and real estate development with company revenues between $1 million and $350 million. Functional emphasis on business development, team building, raising and deploying capital, mergers and acquisitions, deal analysis, structuring and negotiating, developing and achieving strategic and operating plans, and transitioning undercapitalized and struggling companies into highly successful, profitable and sought after enterprises. More than 18 years experience as an executive director of two public and five private companies.

**Education**

Willamette University, Salem Oregon, BA 1959

New York University Graduate School of Business (the Stern School), MBA 1964

5653 W. Iliff Drive
Lakewood, CO 80227
303-981-8783
Pete3489@aol.com