CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
Telephone: (212) 504-6000
Fax: (212) 504-6666

*Counsel for Milton Fine Revocable Trust and*
*Milton Fine 1997 Charitable Remainder Unitrust*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

SECURITIES INVESTOR PROTECTION
CORPORATION,

                         Plaintiff-Applicant,

        v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                    Defendant.

------------------------------------------------------X

In re:

BERNARD L. MADOFF,

                  Debtor.

------------------------------------------------------X

Adv. Pro. No. 08-01789-BRL

SIPA Liquidation

(Substantively Consolidated)

**MILTON FINE REVOCABLE
TRUST AND MILTON FINE
1997 CHARITABLE
REMAINDER UNITRUST'S
OBJECTION TO THE
TRUSTEE'S MOTION TO
AFFIRM TRUSTEE'S
DETERMINATION DENYING
CLAIMS OF CLAIMANTS**

      Milton Fine Revocable Trust and Milton Fine 1997 Charitable Remainder Unitrust (collectively the "Claimants"), by and through their undersigned counsel, hereby submit their opposition to the Memorandum of Law in Support of Trustee's Motion to Affirm Trustee's

Determination Denying Claims of Claimants to the Trustee's Determination of Claims, dated June 11, 2010.

## PRELIMINARY STATEMENT

The motion of Irving H. Picard, Esq., as trustee (the "Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities ("BMIS" or the "Debtor") under the Securities Investment Protection Act of 1970, 15 U.S.C. §§ 78aaa-78lll ("SIPA"), to affirm the Trustee's denial of Claimants' claims for recovery with respect to moneys they invested with BMIS should be denied. The Trustee does not deny – indeed he admits – that Claimants invested millions of dollars with BMIS through Fairfield Sentry, L.P. ("Fairfield") and Greenwich Sentry, L.P. ("Greenwich" and together with Fairfield, the "Feeder Funds") whose sole purpose was to funnel investors' money to BMIS. The Feeder Funds acted as agents of BMIS and willing accomplices helping to prop up Madoff's Ponzi scheme. The Trustee does not deny that Claimants lost all of their money, nor that they lost it because it was held by BMIS when Bernard Madoff's Ponzi scheme was revealed and BMIS collapsed.

The Claimants here are customers of BMIS under SIPA and the Trustee's motion should be denied. First, the Trustee relies on an improperly narrow definition of "customer" under SIPA to assert that Claimants are not customers, merely because they initially provided the money to an agent of BMIS to be invested at BMIS on their behalf, rather than depositing their money at BMIS directly. The Trustee's cramped definition of "customer" would deprive Claimants of any recovery because the Trustee is simultaneously asserting "claw-back" claims against Fairfield and Greenwich to recover moneys withdrawn by other investors and the Feeder Funds' investment advisor based upon fictitious profits generated by the Madoff Ponzi scheme, even though Claimants never withdrew any money and lost their entire investment.

Neither the language nor purpose of SIPA compels this perverse result. To the contrary, SIPA broadly defines "customer" to include <u>any person</u> who, like Claimants, dealt with BMIS, either directly or through one of its agents – like the Feeder Funds – and deposited money or securities with BMIS. Even the Trustee acknowledges that the Feeder Funds acted as BMIS' agent funneling money from Claimants and other investors into BMIS in order to prop up Madoff's fraudulent Ponzi scheme. As such, Claimants are "customers" and entitled to protection under SIPA. (*See infra* Section A.)

Second, SIPA expressly permits recovery by indirect investors where, as here, they entrust their investment to a financial intermediary who merely passes it through to the failed brokerage. (*See infra* Section B.) Finally, the Trustee's efforts to deprive Claimants of any recovery by aggregating their claims with those of other Feeder Fund investors, and the Feeder Funds' investment advisors who knowingly facilitated Madoff's Ponzi scheme, flies in the face of the purpose of SIPA to protect investors from the losses arising from the collapse of BMIS. (*See infra* Section C.) Accordingly, the Court should deny the Trustee's motion and reinstate Claimants' claims.

## BACKGROUND

Claimants invested more than $4.2 million through the Greenwich and Fairfield Feeder Funds, whose sole purpose was to solicit funds for the BMIS "Ponzi" scheme and funnel moneys into the hands of BMIS. The Feeder Funds were nothing more than a pass-through to BMIS and, indeed, their offering documents expressly stated that substantially all of the Feeder Funds' assets (less fees to the Feeder Funds' investment manager) would simply be invested for each investor in BMIS. Moneys invested were deposited directly with BMIS and withdrawals, if any, came from BMIS. Under the circumstances, there is no doubt that Claimants' were in every meaningful sense "customers" of BMIS, having entrusted their money to BMIS' agents.

On December 11, 2008, Bernard L. Madoff was arrested and criminally charged with multiple violations in connection with perpetrating the biggest fraudulent Ponzi scheme in U.S. history through BMIS. That same day, a proceeding was commenced under SIPA with respect to BMIS. The Trustee was appointed under SIPA to liquidate the Debtor.

As set forth more fully in the Customer Claim filed by Claimant Milton Fine Revocable Trust with this Court on January 8, 2010, Claimant deposited cash in the amount of $1,000,000.00 with Greenwich Sentry, L.P. (*See* Docket no. 1613.) Claimant's cash was then deposited by Greenwich with BMIS, causing Claimant to bear the ultimate loss resulting from the fraudulent scheme perpetrated by Bernard L. Madoff and BMIS.

As set forth more fully in the Customer Claim filed by Claimant Milton Fine 1997 Charitable Remainder Unitrust with this Court on January 8, 2010, Claimant deposited cash in the amount of $3,000,000.00 with Fairfield Sentry, L.P. (*See* Docket no. 1613.) Claimant's cash was then deposited by Fairfield with BMIS, causing Claimant to bear the ultimate loss resulting from the fraudulent scheme perpetrated by Bernard L. Madoff and BMIS. On December 8, 2009, the Trustee issued a "Notice of Trustee's Determination of Claim," denying the Claimants' "customer claim" under 15 U.S.C. § 78*lll*(2) because "[b]ased on a review of available books and records of BMIS by the Trustee's staff, [Claimants] did not have an account with BMIS," and were therefore not "customers." Claimants timely filed an objection to these determinations on January 8, 2010. On March 19, 2010, the Trustee filed a motion requesting that the Court set a briefing schedule and hearing date regarding the objections raised by Claimants. On April 13, 2010, the Court granted the motion and ordered the Trustee to file by June 11, 2010, a motion to affirm the Claimants' claim determinations, and an accompanying memorandum of law and supporting papers setting forth the factual and legal bases for the Trustee's denial of the Claimants' claims. On May 18, 2009, the Trustee filed a complaint in the Bankruptcy Court for

the Southern District of New York against Fairfield and Greenwich, asserting that the Trustee is entitled to "claw back" claims against the Funds based on the amount of <u>gross</u> withdrawals by the Funds. *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-1239 (Bankr. S.D.N.Y. filed May 18, 2009) ("Picard Compl."). Thus, the Trustee seeks to deny Claimants their individual claim even though they are "net losers" under the parlance of this case and simultaneously deny them any recovery through the Feeder Funds by improperly aggregating their losses with the net withdrawals made by other Feeder Fund investors and the Feeder Funds' investment advisors.

## LEGAL ARGUMENT

A.  ### Each Of The Claimants Is A "Customer" Under The Plain Language Of SIPA.

   1.  **SIPA Does Not Require That a "Customer" Have A Direct Account With The Debtor**

   Contrary to the position of the Trustee, the Claimants are "customers" of BMIS under the plain meaning of SIPA. The Trustee's assertion that the Claimants must have had a specifically identifiable account recorded in BMIS's "available books and records" has no statutory basis under § 78*lll*(2) of SIPA (defining "customer") and creates an arbitrary distinction between investors who had accounts directly with Madoff and investors who invested through feeder funds that merely collected and passed moneys to BMIS for investment by BMIS. SIPA's text does not support the Trustee's efforts to exclude investors simply because they were induced to invest with BMIS by a feeder fund acting as BMIS' agent, funneling investor money directly to Madoff and where Madoff controlled the funds. To the contrary, Claimants are plainly "customers" under SIPA. In this regard, SIPA defines a "customer" as:

> *any person* (including any person with whom the debtor deals as principal or agent) *who has a claim on account of securities* received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts

of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor *arising out of sales or conversions of such securities,* and any person who has deposited cash with the debtor for the purpose of purchasing securities . . . .

15 U.S.C. §78*lll*(2) (emphasis added).

The broad language of the statute does not limit the protected claimants to those who dealt directly with the debtor. Rather, SIPA only requires that a claimant's claim be "on account of securities" held on its behalf by the claimant's broker, or "arise out of" sales or conversions of securities, or result from depositing cash with the debtor for the purpose of purchasing securities.

The Trustee improperly disregards the plain words of the statute, quoting only excerpted portions of the statute in a footnote and truncated, misleading sections of the text to argue that Claimants must have had an account directly with BMIS. (Trustee's Br. 14 – 15.) The statute, however, simply does not mandate that the claimant deal directly, or deposit cash directly, with the debtor.[1] Nor does the statute require (as the Trustee contends) that the broker or dealer establish an account for the claimant. *See e.g. Focht v. Heeloner (In re Old Namples Sec. Inc.),* 223 F.3d 1296, 1302-03 (11th Cir. 2000) ("Whether a claimant "deposited cash with

---

[1] The fundamental principle underlying the rules of statutory interpretation is that the words of a statute are determinative unless they are ambiguous. *Kmart Corp. v. Cartier, Inc.,* 486 U.S. 281, 281, 108 S.Ct. 1811, 1813 (1988) ("[i]f the statute is clear and unambiguous, courts must give effect to Congress' unambiguously expressed intent"); *Tyler v. Douglas,* 280 F.3d 116 (2d Cir. 2001) ("[t]his court will look first to the plain language of a statute and interpret it by its ordinary, common meaning. If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words") (internal citations omitted). Here, the text of the statute is unequivocal and without any limitation; no language limiting, qualifying or otherwise modifying the phrase "deposit cash with the debtor" is provided. Thus, the words must be given their plain meaning free from extraneous sources of interpretation or considerations. *Kmart,* 486 U.S. at 281; *see, e.g., Bedroc Ltd., LLC v. U.S.,* 541 U.S. 176, 183 (2004) ("our inquiry begins with the statutory text, and ends there as well if the text is unambiguous").

the debtor," however, does not depend simply on to *whom the claimant handed her cash or made her check payable, or even where the funds were initially deposited.*") (emphasis added); *see also Ahammed v. Sec. Investor Corp. (In re Primeline Sec. Corp.)*, 295 F.3d 1100, 1107 (10th Cir. 2002) (accord). Instead, customer status under the statute depends on whether there was, as here, "actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation" like BMIS, such that the brokerage firm "acquired control over all of the claimants' funds" as BMIS did here. *Focht,* 223 F.3d at 1302-04.

Here, Claimants' funds were invested at BMIS on their behalf by Fairfield and Greenwich. The Trustee has acknowledged that the Feeder Funds "worked closely" with BMIS to, *inter alia,* "obtain[] new money used by BLMIS to perpetuate [Madoff's] Ponzi scheme." Picard Compl. ¶ 2. Thus, the Trustee has recognized that Fairfield and Greenwich were merely agents of BMIS, collecting money from investors like Claimants and passing it through to BMIS to support Madoff's fraudulent Ponzi scheme. *See* Restatement (Third) of Agency § 1.01 (2006) (an agency relationship arises "when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control"); *see, e.g., Forest Oil Corp. v. Tenneco,* 626 F. Supp. 917, 922 (S.D. Miss. 1986) (agency relationship existed where the agent and principal's course of performance over several years indicated that agent was authorized to act for the principal in marketing gas contracts); *Burch v. Goodyear Tire and Rubber Co.,* 420 F. Supp. 82, 91-92 (D. Md. 1976) (de facto agency relationship found where agent received a payment from principal for obtaining sales using anti-competitive methods and furthered the principal's anti-competitive scheme); *Ahammed,* 295 F.3d at 1107.

It cannot be disputed that BMIS converted the Claimants' property (their cash investments), which was funneled directly to BMIS through its agents Fairfield and Greenwich.

The arrangement between the Feeder Funds and BMIS was similar to the "introducing broker" at issue in *Arford v. Miller*, 239 B.R. 698, *aff'd, In re Stratton Oakmont,* 210 F.3d 420 (2d Cir. 2000). The Bankruptcy Court in *Arford* found that claimants were "customers" for SIPA purposes not of their introducing broker but of the "clearing broker" that actually held their investment. *Arford,* 239 B.R. at 701 (finding that, were the broker holding the claimants' investments to "undergo a SIPA liquidation, these Claimants would more than likely be entitled to preferential 'customer' treatment under SIPA"). The Feeder Funds role was highly analogous to an "introducing broker's" role because they served merely as a pass-through conduit to place the Claimants' funds with BMIS. Thus, the Claimants' funds were deposited with their "actual receipt, acquisition or possession" at BMIS, and BMIS "acquired control" over their property. Accordingly, Claimants are entitled to protection as a customer under SIPA. *See* 15 U.S.C. § 78*fff*.

2.   **The Feeder Funds At Issue Here Were Pass-Through Investment Vehicles For BMIS And Operated As The Functional Equivalent Of Agents For BMIS**

Nothing meaningfully distinguishes Claimants from other investors who invested funds directly in BMIS. The Claimants were in virtual, if not actual, privity with BMIS and suffered the same harm as direct investors in BMIS.

The Fairfield and Greenwich Feeder Funds were nothing more than pass-through vehicles funneling Claimants' money directly to BMIS. The fact that the moneys passed from Claimants to BMIS through the Feeder Funds is a technicality that, in any event, does not run afoul of SIPA's unambiguous text that a "customer" is any person who has "deposited cash with the debtor for the purpose of purchasing securities." 15 U.S.C. § 78*lll*(2); *See Rosenman Family, LLC v. Picard*, 401 B.R. 629, 635 (Bankr. S.D.N.Y. 2009) ("the mere act of entrusting . . . cash to the debtor for the purpose of effecting securities transactions . . . triggers customer status")

(internal quotations omitted); *see also S.E.C. v. Ambassador Church Fin. Dev. Grp. Inc.*, 679 F.2d 608, 614 (6th Cir. 1982) (accord). In *Rosenman*, this Court rejected an overly circumscribed definition of "customer," and instead analyzed the "sole purpose" for entrusting funds to the Debtor in its determination of whether the claimant was a "customer" under SIPA. Because the "*sole purpose* of wiring funds to the [Debtor's] Account was to effectuate future securities transactions," the Court held that the "purchase/investment purpose *necessary to establish Customer status* was triggered at the moment the funds were deposited" with the debtor. *Rosenman*, 401 B.R. at 635 (second emphasis added). Here, Claimants had the same "purchase/investment" purpose for entrusting funds to the Debtor through the Feeder Funds as the claimants in *Rosenman* did – *i.e.* to effectuate securities transactions with BMIS – and thus should similarly be deemed "customers" under SIPA.

As with any master-feeder fund structure, the Greenwich and Fairfield Feeder Funds were agents of the BMIS master fund. The master fund determines the investment strategy and controls all investment decisions and the investors are considered investors in the master fund. *See Robesco-Sage Capital L.P. v. Citigroup Alternative Invs. LLC*, Index No. 600121, 2009 N.Y. Slip. Op. 31751U (N.Y. Sup. Ct. July 28, 2009) (permitting feeder fund investors to maintain fraud claims against master fund and its investment manager notwithstanding the fact that losses were suffered directly by the master fund, and holding that "[t]he master fund-feeder fund structure of the [] funds is not a bar to assertions of the claim."). Claimants here were solicited through the two "Feeder Funds," which greatly expanded the BMIS Ponzi scheme. Prior to revelation of Madoff's fraud, feeder funds attracted new investors solely to funnel new moneys to BMIS to support the Ponzi scheme. The Trustee concedes that the Fairfield and Greenwich Funds worked hand-in-hand with BMIS to "obtain[] new money used by BLMIS to perpetuate [Madoff's] Ponzi scheme." Picard Compl. ¶ 2. Indeed, it was the

sole purpose of the Greenwich and Fairfield investments to direct Claimants' funds to BMIS. The Funds' Offering Documents state explicitly that the "split-strike conversion" to which the Funds allocated all or predominantly all of their assets, will be implemented by BMIS through accounts maintained by the Fund at that firm. (*See* Fairfield Sentry Limited Private Placement Memorandum, at 9, attached hereto as Exhibit A; Greenwich Sentry, L.P. Confidential Offering Memorandum, at 8, attached hereto as Exhibit B.)  The Offering Documents also state: "[t]he services of BLM[IS] and its personnel are essential to the continued operation of the [Funds]." (Ex. A at 10; Ex. B at 8.).

There can be no doubt that the Greenwich and Fairfield Feeder Funds, with whom Claimants' moneys were "initially deposited", acted as agents for BMIS, drawing in investors (like Claimants) and simply collecting fees for delivering victims to BMIS.  The agency relationship between the Feeder Funds and BMIS renders meaningless any distinction between direct and indirect investments. *Ahammed*, 295 F.3d at 1107 (holding that where a SIPA claimant's money is entrusted to a broker for the purchase of securities on the claimant's behalf, "the claimant is a 'customer' under SIPA even if the brokerage *or its agents* misappropriate the funds") (emphasis added).  Under SIPA's remedies, there is no substantive difference between the Feeder Funds' customers and other investors who invested funds directly with BMIS where it is shown (as it is here) that the debtor actually "received, acquired, or held" claimant's cash or securities. *Focht*, 223 F.3d at 1303.

Indeed, there is ample evidence that the Feeder Funds acted as agents collecting and channeling money directly to BMIS, evidence not denied by the Trustee. *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, No. 09 CV 118 (VM), (S.D.N.Y. filed September 30, 2009) (the "Anwar Second Consolidated Amended Complaint" or "Anwar SAC".)  Contrary to the Trustee's contention that "the Feeder Funds' managers and administrators . . . had responsibility

for managing and directing the Feeder Funds' investments" (Trustee's Br. at 2), in fact it was BMIS that exercised complete control and discretion over the Feeder Funds' investments. In fact, the Feeder Funds invested all or substantially all of the their assets with BMIS,[2] "acquiesced to the unusual arrangement" by which BMIS served as both the Funds' execution agent and custodian and abdicated all management responsibility, investment decisions and enforcement and monitoring of the investments, to BMIS.  (Anwar SAC ¶¶ 212, 169, 170, 172, 205.) Essentially, BMIS exercised total control over the monies invested on behalf of Claimants by the Feeder Funds without any oversight, advice or consent from them. (*Id.* ¶205.) Adherence to the fiction of separate identity between the Feeder Funds and BMIS is not warranted under the plain reading of SIPA and would subvert the equitable and remedial principles underlying the statute. Each investor who invested with BMIS, like the Claimants here, whether directly or indirectly, constitutes a "customer" under the plain reading of SIPA.  Accordingly, the Claimants are entitled to receive the entirety of their claims through the insurance protections provided by SIPA.

The Trustee relies principally on *SIPC v. Morgan, Kennedy & Co*, 533 F.2d 1314 (2d Cir. 1976). The *Morgan, Kennedy* case was decided a few years after SIPA was passed and the opinion lacks a rigorous statutory interpretation of the definition of "customer" under SIPA; it therefore has limited utility to the question presented here.  Additionally, the outcome was based on facts materially different from those here and is thus inapposite.  In *Morgan, Kennedy*, all company employees were permitted to invest in a company-sponsored profit sharing plan in the form of a trust, which granted the employees a contingent right to share in the trust corpus upon their retirements.  The investment fund's three trustees controlled the trust's investment

---

[2] Fairfield invested all of its $7.3 billion of assets with BMIS and Greenwich invested $220 million of its fund's assets with BMIS.

decisions and sent a portion of the trust funds to Morgan, Kennedy to invest in securities. Unlike

the present case, no other relationship existed between the retirement fund trustees and Morgan,

Kennedy, much less an agency relationship. Accordingly, the trustees were not – in contrast to

the Feeder Funds here – merely collecting and funneling moneys to Morgan, Kennedy. When

Morgan, Kennedy subsequently became insolvent, the bankruptcy and district court agreed with

the SIPC trustee and the three trustees of the profit sharing plan that each of the then 108 putative

trust beneficiaries was a separate customer under SIPA. The Second Circuit reversed the trial

court's determination and permitted only the profit sharing plan to recover proceeds from SIPC.

*Morgan, Kennedy*, however, is distinguishable. There the trust was an arm's length brokerage

customer of Morgan, Kennedy and was not acting as a paid agent passing money through to

Morgan, Kennedy. *C.f. Arford*, 239 B.R. at 701. Here, in contrast, the Feeder Funds simply

acted as "front men" for the Madoff Ponzi scheme, receiving fees based upon the scheme's

fictitious profits. They collected (and were rewarded for collecting) money from Claimants and

others and simply funneled it into BMIS.[3]

## B.    SIPA Expressly Affords Protection To Indirect Investors

SIPA expressly contemplates indirect investors as customers protected by the

statute. Section 78*fff*-3(a)(5) provides that:

> no advance shall be made by SIPC to the trustee to pay or
> otherwise satisfy any net equity claim of any customer who is a
> broker or dealer or bank, ***other than*** to the extent that it shall be
> established . . . that the net equity claim of such broker or dealer or

---

[3]    The Trustee cites *Lakonia Mgmt., Ltd. v. Meriwether*, 106 F. Supp. 2d 540 (S.D.N.Y. 2000), in support of its argument that Claimants have no direct claims against BMIS and thus are not "customers." However, the issue in *Lakonia Mgmt. Ltd.* was the ability of hedge fund shareholders to directly assert RICO claims against defendant-managers in a fraudulent scheme to gain control of the fund and squeeze out investors for insufficient consideration. *Id.* at 553, 558. *Lakonia Mgmt. Ltd.* has no application to the present determination of whether Claimants' investment in an investment vehicle whose express purpose was to direct the funds in the ordinary course of the business to BMIS is a "customer" under SIPA.

> bank against the debtor arose out of transactions for customers of
> such broker or dealer or bank (which customers are not themselves
> a broker or dealer or bank or a person described in paragraph (4)),
> ***in which event each such customer of such broker or dealer or
> bank shall be deemed a separate customer of the debtor.***

15 U.S.C. § 78*fff*-3(a)(5) (emphasis added).  By this provision, Congress provided that brokers, dealers and banks are not themselves entitled to protection under SIPA, but that their customers will be.  Recognizing the existence of indirect customers, Congress closed a possible loop-hole that indirect customers would be left unprotected by SIPA by virtue of the express exclusion of brokers, dealers and banks.  *See In re First State Sec. Corp.*, 34 B.R. 492, 495-96 (Bankr. S.D. Fla. 1983) ("There is nothing in SIPA which suggests that coverage should be denied merely because the debtor used the facilities of another innocent broker in converting its customer's property.")  As such, implicit in this provision is that indirect investors are presumed to be customers under SIPA.

## C.    <u>SIPA Should Be Broadly Construed To Protect The Claimant</u>

Additionally, to the extent that the definition of "customer" may be considered ambiguous (which it is not), the statute should be broadly construed to protect the Claimants.  *In re First State Sec. Corp.*, 34 B.R. at 496 ("SIPA is remedial legislation.  As such, it should be construed liberally to effect its purpose.") (citing *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)); *SIPC v. Barbour*, 421 U.S. 412, 415 (1975).

The fact that Claimants' investments were indirectly, rather than directly, deposited with BMIS is of no significance under SIPA.  Claimants have suffered devastating financial losses by virtue of their investments in BMIS.  Such losses are no less real merely because Claimants did not directly send their investments to BMIS.

Lastly, at the same time that the Trustee seeks to (wrongly) exclude Claimants from the pool of SIPC insurance proceeds, it also demands that the Feeder Funds <u>return</u> amounts

transferred to BMIS, based on an aggregated calculation of the gross withdrawals of the Funds. Allowing the Trustee to aggregate Claimants' investments to include investors who, *unlike the instant Claimants,* withdrew funds from BMIS is inequitable to those investors who, like Claimants, never redeemed or withdrew any funds and is inconsistent with SIPA's requirement that the determination of "customer" must be shown on a "transaction-by-transaction basis." *See SEC v. F.O. Baroff Co.,* 497 F.2d 280, 282 n.2 (2d Cir. 1974).

## **CONCLUSION**

For the reasons stated above, Claimants respectfully request that the Court reject the Trustee's Motion to Affirm Trustee's Determination Denying Claimants' claims and find the Claimants to be "customers" within the meaning of 15 U.S.C. § 78*lll*(2).


Dated:    July 12, 2010
          New York, New York


CADWALADER, WICKERSHAM & TAFT LLP

By: _____
        Dennis J. Block
        Martin L. Seidel

One World Financial Center
New York, NY 102881
Telephone: (212) 504-6000
Fax: (212) 504-6666

Counsel for Milton Fine Revocable Trust and Milton Fine
1997 Charitable Remainder Unitrust