UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES INEVESTOR PROTECTION ) 
CORPORATION, )
          Plaintiff-Applicant )
) Adv. Pro. No. 08-01789 (BRL)
v. )
) SIPA Liquidation
BERNARD L. MADOFF INVESTMENT )
SECURITIES LLC, ) (Substantively Consolidated)
          Defendant )
In re: )
)
BERNARD L. MADOFF, )
)
          Debtor. )

---

**MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION TO AFFIRM TRUSTEE'S DETERMINATIONS DENYING CLAIMS OF CLAIMANTS WITHOUT BLMIS ACCOUNTS IN THEIR NAMES, NAMELY, INVESTORS IN FEEDER FUNDS**

Claimants NATIONAL BANK OF KUWAIT S.A.K, NBK BANQUE PRIVEE (SUISSE) SA, and LEMANIA SICAV-SIF (hereinafter collectively the "NBK Investors") object and oppose the Trustee's Motion in this Securities Investor Protection Corporation ("SIPC") Liquidation proceeding to Affirm the Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names. The Trustee's motion should be denied and his objections should be overruled as to the NBK Investors' claims.

## I. FACTS

The NBK Investors filed claims in this SIPC proceeding, which the Trustee duly acknowledged as timely and to which he assigned claim nos. 013751, 013899, 015259, 015260,

015262, and 015263.[1]

The Trustee's motion shows that, when this proceeding was commenced, the NBK Investors held net investment interests in the Fairfield Sentry Limited fund ("Fairfield Sentry"). Affirmation of David J. Sheehan, Ex. 2. The Trustee correctly describes Fairfield Sentry as a "feeder fund" because it was nothing more than a conduit for placing customers' investments under management by the debtor, Bernard L. Madoff Investment Securities LLC ("BLMIS"). Fairfield Sentry was required, and its offering materials undertook, to place 95% to 100% of the NBK Investors' money with BLMIS for BLMIS to manage it in accordance with its "split strike conversion" strategy. The NBK Investors as Fairfield Sentry investors made the deliberate decision to invest in BLMIS and have BLMIS manage their funds under its seemingly unique strategy. Their losses resulted from BLMIS' fraudulent conduct and its conversion of the funds that the NBK Investors entrusted to BLMIS for management.

## II. ARGUMENT

### A. SUMMARY OF ARGUMENT

The NBK Investors object to the Trustee's assertion and determination that they are not "customers" of BLMIS within the meaning of the Securities Investor Protection Act ("SIPA"). The Trustee's determination is contrary to the words of the SIPA statute and relevant precedents. The Trustee's insertion into the statute of a requirement that "customers" have a "direct"

---

[1]    Each NBK Investor submitted a single claim by UPS and FedEx to assure timely, receipted delivery by the claim deadline, noting in their covering letters that they did not intend claims to be processed twice. However, each received two claim numbers and two Notices of Trustee's Determination of Claim. National Bank of Kuwait S.A.K.'s claim is for $60,199,561 (nos. 013751/013899); NBK Banque Privee (Suisse) SA's claim is for $8,714,790 (nos. 015259/015262); and Lemania SICAV-SIF's claim is for $5,591,329 (nos. 015260/ 015263).

2

"account" with BLIMIS is contrary to the language of the statute, which is not ambiguous. Because Congress did not impose such a requirement in defining "customer," the Trustee and the courts may not rewrite the statute to add such a requirement. Accordingly, the NBK Investors are "customers" for the purposes of, and are entitled to recover in, this SIPC proceeding. The Trustee's objection should be overruled, his motion denied, and the NBK Investors' claims allowed.[2]

### B. THERE IS NO DIFFERENCE UNDER SIPA BETWEEN THE NBK INVESTORS AND DIRECT INVESTORS WITH BLMIS

The funds of the NBK Investors were required to be, were intended to be, and in fact were invested in BLMIS. The express purpose of the Fairfield Sentry investment was to direct funds in the ordinary course of business to BLMIS for BLMIS to manage in accordance with its "split strike conversion" strategy. As the Trustee points out and Fairfield Sentry's sales literature and practice made clear, Fairfield Sentry was merely a conduit for funds to be invested with and managed by BLMIS, which actively solicited money to manage for investors like the NBK Investors through Fairfield Sentry.

Unlike investments in hedge funds, trusts, mutual funds, and other associations where the investors relinquish the management of their investment decision to the hedge fund, mutual fund, or another manager, Fairfield Sentry did not purport to manage the NBK Investors' money. Its offering literature required and promised that the money paid for shares of Fairfield Sentry were specifically to be turned over to BLMIS for management in accordance with BLMIS'

---

[2] To the extent applicable, NBK Investors adopt and incorporate herein, correct arguments and facts raised by similarly situated claimants in the above-captioned proceeding, as if fully set forth herein.

specifically identified and seemingly unique money management strategy. Therefore, a purchase of Fairfield Sentry shares was a designation that the money be invested with BLMIS. There is no substantive or meaningful difference between the NBK Investors and investors who invested funds directly in BLMIS.

### C. THE STATUTORY DEFINITION OF "CUSTOMER" MAKES THE NBK INVESTORS "CUSTOMERS" UNDER SIPA

The statutory definition of the word "customer" in SIPA controls whether an investor is entitled to a claim under the SIPA statute. Under the governing rules of statutory construction and interpretation, the bedrock principle is that the words of a statute are dispositive unless they are ambiguous. *Kmart Corp. v. Cartier, Inc.*, 486 U.S. 281, 281, 108 S.Ct. 1811, 1813 (1988) ("[i]f the statute is clear and unambiguous, courts must give effect to Congress' unambiguously expressed intent"); *Tyler v. Douglas*, 280 F.3d 116, 122 (2d Cir. 2001) ("[t]his court will look first to the plain language of a statute and interpret it by its ordinary, common meaning. If the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words") (internal citations omitted).

The statutory definition of "customer" supplied by Congress reads:

> The term 'customer' of a debtor means any person who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . . .[3] (15 U.S.C.A.

---

[3] The definition continues by setting out two exclusions from the term "customer," neither of which is

§ 78lll(2)).

The text of the statute sets out the requirements for being a claimant in a SIPC proceeding, but it does not contain any requirement that a "customer" must have had its own direct account with the debtor. The Trustee, in arguing that the law imposes such a requirement, barely addresses the statutory language, relegating it to a footnote and relying on misleading snippets of its text. Trustee's Memorandum 14-15.

It would have been a simple matter for Congress to define a "customer" as "any person who has an account with the insolvent broker dealer." But that is not what Congress said in choosing the words of the statute. In fact, what the text says that a customer is "<u>any person who has a claim</u>" or "any person who has deposited cash" when certain specified conditions are present. <u>None of those conditions requires a customer to have a "direct account" with the debtor</u>:

> [1] any person who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer [a] from or [b] for the securities accounts of such person for safekeeping, [c] with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. . . .
>
> [2] any person who has a claim against the debtor arising out of sales or conversions of such securities, or
>
> [3] any person who has deposited cash with the debtor for the purpose of purchasing securities. (15 U.S.C.A. § 78lll(2) (numbering and lettering added))

As to first definition, the NBK Investors are "person[s]" who "ha[ve] a claim," and their claim is "on account of securities" that were "received, acquired, or held" "from or for the securities accounts" of the NBK Investors "with a view to [their] sale, . . . [or] pursuant to purchases, . . . or for purposes of effecting transfer." The statutory words do not restrict

---

applicable to the NBK Investors.

5

"securities accounts" to accounts held at the insolvent broker/dealer. Congress need not explain why it chose to impose, or not impose, conditions or limitations in a statutory definition, but it is plain that Congress could rationally decide not to impose a direct account limitation for reasons easy to imagine in an investment world where investor/customers deal in a wide variety of ways with broker/dealers whose wrongdoing or insolvency can injure them.

As to the second definition, the NBK Investors are also a "person[s] who [have] a claim against [BLMIS] arising out of sales or conversions" of securities "received, acquired, or held" "from or for the securities accounts" of the NBK Investors "with a view to [their] sale, . . . pursuant to purchases, . . . or for purposes of effecting transfer." Again, Congress placed no restriction limiting customers to those with securities accounts held at the debtor.

As to the third definition, the NBK Investors concededly did not directly "deposit[] cash with [BLMIS] for the purpose of purchasing securities." However, under contract and agency law principles, Fairfield Sentry was obligated to forward the NBK Investors' money to BLMIS. The deposit requirement is satisfied by the fact that the transmission of the money from the NBK Investors to BLMIS was intended, automatic, inevitable, and in accord with Fairfield Sentry's legal obligations. Therefore, under the words of the statute, the NBK Investors are "customers" entitled to maintain a claim in this proceeding.

The Trustee does not grapple with the words of the statute but instead glosses over them. Yet, the Supreme Court could not be clearer that that the words of a statute must be given their plain meaning and, if they are not ambiguous, those words may not be supplemented by judicial, practical, or policy considerations to add elements that Congress did not include. *E.g., Bedroc Ltd., LLC v. U.S.*, 541 U.S. 176, 183, 124 S.Ct. 1587, 1593 (2004) ("our inquiry begins with the

6

statutory text, and ends there as well if the text is unambiguous"). The Court has held repeatedly that it is not permissible to look beyond the words of the statute without first finding them ambiguous, and that unambiguous words may not be interpreted by reference to other resources, such as legislative history or judicial or learned commentary. *E.g., Garcia v. U.S.*, 469 U.S. 70, 75, 105 S.Ct. 479, 482 (1984) (holding legislative history may be used as an "additional tool of analysis" but "only the most extraordinary showing of contrary intentions from those data would justify a limitation on the 'plain meaning' of the statutory language").

Interpretations of a statute by other courts can be important tools, but only if they are correct interpretations. If they fail to follow the proper steps of statutory analysis outlined by the Supreme Court, they have little precedential value, if any. *E.g., Morrison v. Nat'l Australia Bank Ltd., et al.*, No. 08-1191, 2010 WL 2518523 at *9-11 (U.S. June 24, 2010) (declining to apply Second Circuit precedent regarding determination of availability of federal securities fraud actions to foreign investors where contrary to plain meaning of statutory language); *Bedroc*, 541 U.S. at 186, 124 S.Ct. at 1596 (declining to extend Ninth Circuit precedent where court's interpretation of statute was counter to the plain meaning of the statutory language).

Further, the meaning of plain statutory language may not be altered "in order to satisfy the policy preferences" of an administrative agency like SIPC or the Trustee. *E.g., Barnhart v. Sigmon Coal Co., Inc., et al.*, 534 U.S. 438, 461, 122 S.Ct. 941, 956 (2002).

The plain, unambiguous language of the SPIA definition of "customer" does not limit "customers" to those with "direct accounts." Such a limitation, not having been imposed by Congress, may not be imposed by "construction" or "interpretation." Therefore, applying the plain language of the statute to the facts, the NBK Investors fit squarely within the definition of

7

08-01789-cgm    Doc 2641    Filed 07/12/10    Entered 07/12/10 21:49:37    Main Document
Pg 8 of 11

"customer."

### D. FAIRFIELD SENTRY INVESTORS ARE SIPA "CUSTOMERS" UNDER THE RELEVANT JUDICIAL PRECEDENTS

The Trustee focuses heavily on the decision in *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314 (2d Cir. 1976). Trustee's Memorandum 19-21. However, on the facts presented by Fairfield Sentry investors like the NBK Investors, the Trustee misreads the case. *Morgan, Kennedy* supports, rather than undercuts, the conclusion that Fairfield Sentry investors are "customers" with claims entitled to protection under the SIPA. *Morgan, Kennedy* was correctly decided on its facts, and the distinctions between this case and *Morgan, Kennedy* underline why the Trustee's view of the definition of "customer" is wrong.

In *Morgan, Kennedy*, a company created an employee profit sharing plan in the form of a trust with three trustees, allowing all company employees a contingent right to share in the trust corpus at the time of their retirement. *Morgan, Kennedy* 533 F.2d at 1315. Only the trustees, acting collectively, could decide how to invest the trust corpus, and the identities of the trust beneficiaries and their respective shares were inherently speculative because each employee's interest in the trust was unvested and payable only when the employee retired. *Id.* The three trustees sent money to Morgan Kennedy to invest in securities, and Morgan Kennedy became insolvent. *Id.* at 1315-16. The Second Circuit held that the trust, not the individual beneficiaries, was a "customer" under SIPA because

> [t]he trust account itself was in the name of the Trustees who had the <u>exclusive power to entrust the assets to the debtor</u>, to <u>invest and reinvest</u>, and to <u>purchase and trade securities in the account as they saw fit</u>. In short, the single trust account, represented by the Trustees collectively, possessed the required attributes

8

for customer status under SIPA; the Reading employees possessed none of those attributes.

*Id.* at 1318 (emphasis added).

By contrast, the NBK Investors had, if not the exclusive power, a direct and controlling power "to entrust the assets to" BLMIS, distinguishing them from the beneficiaries in *Morgan, Kennedy*. Fairfield Sentry, unlike the Trustees in *Morgan, Kennedy*, was a mere "conduit" or "feeder" of funds to BLMIS. It was the NBK Investors who had the poser "to invest and reinvest" by redeeming or adding to their investments committed to BLMIS' management. Unlike the Trustees in *Morgan, Kennedy*, Fairfield Sentry did not have the "power to . . . purchase and trade securities in the account as they saw fit;" only BLMIS and the NBK Investors (by redeeming or adding to their investments) had that power. Thus, the factors that led the Second Circuit to the result in *Morgan, Kennedy* support the conclusion that the NBK Investors are "customers" entitled to a claim under SIPA.[4]

The Trustee argues that the identities of Fairfield Sentry investors are not easily identifiable. That is both untrue and irrelevant. It is untrue because the Fairfield Sentry investors to which this motion is directed actually identified themselves by filing claim forms and supporting documents, and Fairfield Sentry's business records are available to the Trustee to provide any remaining information needed. It is irrelevant because Congress did not make the

---

[4] The *Morgan, Kennedy* decision pointed out that the terms "customer" and "investor" are used interchangeably in the SIPA context. *Id.* at 1317 (*citing* H.Rep. No. 91-1613, 91st Cong., 2d Sess., p. 5255 (1970) (House Report stating that "[t]he primary purpose of the [SIPA] is to provide protection for investors if the broker-dealer with whom they are doing business encounters financial troubles")). It is worth noting that the Second Circuit did not spend much time in *Morgan, Kennedy* discussing the words of the statutory definition of "customer" in SIPA, and the court's method of interpreting the statute, relying heavily on legislative history and practical and policy considerations, does not comport with what the Supreme Court has laid down as the rules for statutory construction and interpretation since *Morgan, Kennedy* was decided in 1976.

9

statutory definition of "customer" turn on the ease with which records can be recovered from a debtor or others.

The role of Fairfield Sentry in feeding money from investors to BLMIS is analogous to the role of an "introducing broker." In *Arford, et. al. v. Miller*, 239 B.R. 698 (Bankr. S.D.N.Y. 1999), *aff'd, In re Stratton Oakmont*, 210 F.3d 420 (2d Cir. 2000), this court held that the investors were not "customers," for SIPA purposes, of the introducing brokers but of the "clearing broker" that actually held their investment. *Arford*, 239 B.R. at 701 (holding that, if the broker holding the claimants' investments were to "undergo a SIPA liquidation, these Claimants would more than likely be entitled to preferential 'customer' treatment under SIPA"). As a conduit or feeder of the NBK Investors' funds to BLMIS, Fairfield Sentry acted like an "introducing broker." It certainly did not manage the NBK Investors' funds under the "split strike conversion" strategy but only directed them to BLMIS for that purpose.

Consistently with *Arford*, a claimant's status as a "customer" under SIPA has been held not to depend on the identity of the person or entity to whom a check for investment funds was handed directly or the entity with which the investment funds were placed initially. *In re Old Naples Secs., Inc.*, 223 F.3d 1296, 1302-03 (11th Cir. 2000). Rather, that status depends on whether there was "actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation" and whether that brokerage firm "acquired control over all of the claimants' funds." *Id.* at 1302-04. That is exactly the case with the NBK Investors funds and BLMIS.

## CONCLUSION

Under the plain and unambiguous words of the statute, the NBK Investors were "customers" and are entitled to their claim in this proceeding. Therefore, the court should overrule the Trustee's objection to their claims, deny the Trustee's motion, allow the NBK Investors' claims, and grant such other relief as is just, equitable and proper.

Dated: New York, NY
July 12, 2010

KING & SPALDING LLP

by _____/s/_____
Richard A. Cirillo
Lauren W. Mitchell
1185 Avenue of the Americas
New York, NY 10036-4003
Telephone: 212-556-2100
Telecopier: 212-556-2222
*Attorneys for the NBK Investors*