THOMAS, ALEXANDER & FORRESTER LLP
Emily Alexander, Esq. (3054111)
14 27th Avenue
Venice, California 90291
Telephone: (310) 961-2536
Facsimile: (310) 526-6852
Email: emilyalexander@tafattorneys.com

*Counsel for FutureSelect Prime Advisor II, LLC,
Merriwell Fund, L.P., Telesis IIW, LLC, RCW Group,Inc.,
Ronald Ward and Dianne Ward*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION </br> Plaintiff, </br> v. </br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, </br> Defendant. | Adv. Pro. No. 08-01789 (BRL) </br> SIPA Liquidation |

**RESPONSE IN OPPPOSITION TO TRUSTEE'S MEMORANDUM**
**OF LAW TO AFFIRM DETERMINATION DENYING CLAIM**

FutureSelect Prime Advisor II, LLC, Merriwell Fund, L.P., Telesis IIW, LLC, RCW Group, Inc., Ronald Ward and Dianne Ward (collectively, "FutureSelect" or "Claimants"), by their undersigned counsel, hereby submits this Response in Opposition to the Trustee's "Memorandum of Law in Support of the Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants without BLMIS Accounts in their Names, Namely, Investors in Feeder Funds" ("Trustee's Memorandum").

**INTRODUCTION**

FutureSelect deliberately entrusted millions of dollars with Bernard L. Madoff Investment Securities LLC ("BLMIS"), all of which was lost when Bernard Madoff's fraud was uncovered and BLMIS was liquidated. Like many other investors, FutureSelect made its investment in BLMIS through "feeder funds." At the time it made its investments, FutureSelect understood that the feeder funds would deposit virtually all of FutureSelect's investment into BLMIS, and that BLMIS would manage its investment. Indeed, the only reason FutureSelect used the feeder funds was in order to deposit its investment with BLMIS.

Although FutureSelect is an investor that entrusted its funds to BLMIS for the purpose of purchasing securities, and despite the fact that FutureSelect lost all of its investment as a result of BLMIS' massive fraud, the Trustee administering BLMIS' liquidation ("Trustee") pursuant to the Securities Investor Protection Act ("SIPA" or the "Act") seeks to deny FutureSelect protection under the Act. The Trustee wrongly argues that FutureSelect is not a "customer" within the meaning of SIPA simply because it invested in BLMIS through a feeder fund. Contrary to the Trustee's assertions, FutureSelect's status as a "customer" within the meaning of SIPA is clearly established by the Act's language and by case law. FutureSelect "deposited cash with [BLMIS] for the purpose of purchasing securities," and BLMIS "received, acquired [and] held" FutureSelect's funds. *See* 15 U.S.C. 78lll(2). In sum, FutureSelect knowingly entrusted its funds to BLMIS for the purpose of purchasing securities, and that qualifies it for "customer" protection under SIPA. *See SIPC v. BLMIS*, 401 B.R. 629, 634-35 (Bankr. S.D.N.Y. 2009). The Trustee's Motion to Affirm his denial of FutureSelect's claims should be denied.

2

**BACKGROUND**

In December 2008, when Bernard L. Madoff's unprecedented Ponzi scheme was exposed and BLMIS went into liquidation, FutureSelect had millions invested with BLMIS. All of FutureSelect's funds with BLMIS were invested through "feeder funds", specifically, Tremont Rye Select Broad Market Fund, L.P., Tremont Rye Select Broad Market Prime Fund, L.P., Tremont Rye Select Broad Market XL Fund, L.P., and Greenwich Sentry Fund L.P., and the MAXAM Absolute Return Fund (collectively, the "Feeder Funds").

When it invested in each of the Feeder Funds, FutureSelect knew that substantially all of their assets were invested in BLMIS, and that the investment strategy of the Feeder Funds was determined and implemented by BLMIS. Indeed, FutureSelect deliberately purchased shares in the Feeder Funds in order to invest in BLMIS.

On December 11, 2008, the above-captioned liquidation proceeding was commenced against BLMIS pursuant to SIPA. In accordance with the Claims and Procedures Order issued by this Court in December 2008, FutureSelect timely filed claims for protection under SIPA with the Court-appointed Trustee. The claims were designated as Claims No. 015114-015130 (collectively, the "Claims").

By "Notice of Trustee's Determination of Claim," dated December 8, 2009, ("Notice of Determination"), the Trustee denied FutureSelect's claim, stating:

> Based on a review of available books and records of BLMIS by the Trustee's staff, you did not have an account with BLMIS. Because you did not have an account, you are not a customer of BLMIS and SIPA as that term is defined at 15 U.S.C. § 78lll(2). Accordingly, your Claim for securities and/or a credit balance is **DENIED.**

On February 9, 2010, FutureSelect filed an Objection to the Trustee's Notice of Determination. This Court directed the Trustee to file a motion to affirm its claims

determinations, and an accompanying memorandum of law in support of its motion. On June 11, 2010, the Trustee filed the instant Motion to Affirm and accompanying Memorandum. FutureSelect now files this Response in Opposition.

## ARGUMENT

**I.     FutureSelect Is a "Customer" within the meaning of SIPA.**

"Congress' primary purpose in enacting the SIPA and creating the [Securities Investor Protection Corporation] was, of course, the protection of investors." *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 421 (U.S. 1975). SIPA establishes procedures for liquidating insolvent broker-dealers, and entitles the debtor's "customers" to a pro rata share of the debtor's "customer property." *In re New Times Secs. Services, Inc.,* 463 F.3d 125, 127 (2d Cir. 2006) (*"New Times II"*). In order to be protected under SIPA, an investor must qualify as a "customer" as that term is defined by the Act. 15 U.S.C. § 78lll(2). If a claimant does not qualify as a "customer," it is not protected by SIPA and is relegated to the status of a general unsecured creditor. *SIPC v. BLMIS*, 401 B.R. at 634 n. 8 (Bankr. S.D.N.Y. 2009) (quoting *SIPC v. Stratton Oakmont, Inc*., 229 B.R. 273, 277 (Bankr. S.D.N.Y. 1999)).

SIPA defines a "customer" as:

> any person ... who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with ... collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities....

15 U.S.C. § 78lll(2).

Whether a claimant qualifies as a "customer" under the Act "turns on the transactional relationship" between the claimant and the debtor. *In re New Times II,* 463 F.3d at 128. If the

4

claimant entrusted cash or securities to the debtor for purposes of trading securities, he or she is a "customer" under SIPA. *See id.*

SIPA's definition of "customer" "embodies a common-sense concept: An investor is entitled to compensation from the SIPC only if he has entrusted cash or securities to a broker-dealer who becomes insolvent; if an investor has not so entrusted cash or securities, he is not a customer and therefore not entitled to recover from the SIPC trust fund." *In re Brentwood Secs., Inc.*, 925 F.2d 325, 327 (9th Cir. 1991). "Accordingly, the mere 'act of *entrusting*...cash to the debtor for the purpose of effecting securities transactions...triggers customer status.'" *SIPC v. BLMIS*, 401 B.R. at 635 (quoting *In re ESM Gov. Secs., Inc.*, 812 F.2d 1374, 1376 (11th Cir. 1987)) (emphasis in original).

### A. The Statutory Language of SIPA Establishes FutureSelect as a "Customer" Entitled to Protection under SIPA.

A plain reading of SIPA demonstrates that FutureSelect fits within the definition of "customer." At the time of its insolvency, BLMIS had "received, acquired [and] held" securities from FutureSelect via the Feeder Funds. Furthermore, FutureSelect had "deposited cash" with BLMIS, through the Feeder Funds, "for the purpose of purchasing securities."

SIPA's definition of "customer" does not exclude investors such as FutureSelect, which invested in the broker through a feeder fund. Nothing in the statutory language requires that the debtor have "received [or] acquired" the customer's securities directly. Similarly, nothing requires that a "customer" have "deposited cash with the debtor" directly.

Although Congress did enumerate two specific categories of persons who do not qualify as "customers" under SIPA, Congress did not include indirect investors such as FutureSelect in either category. Section 78lll(2)(A)-(B) provides that a "customer" does not include—

(A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or

5

>    (B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

15 U.S.C. § 78lll(2).

These exclusions, which Congress added in 1978, make clear that "customer" status "turns on the transactional relationship" between the claimant and debtor. *In re New Times II*, 463 F.3d at 128. While a claimant with a creditor-debtor relationship with the broker would not qualify as a "customer" under SIPA, a claimant with a public customer-broker relationship would so qualify. *Id*. (citing *SEC v. F.O. Baroff Co*., 497 F.2d 280, 284 (2d Cir. 1974)).

In contrast to Congress' clear delineation of the transactional requirements for "customer" status, there is nothing to indicate Congressional intent to distinguish between direct and indirect public customers for purposes of SIPA. Had Congress intended SIPA to cover only those who invested directly in the SIPA debtor, and exclude investors who knowingly entrusted their funds with the debtor through an intermediary, surely it would have so stated.

In fact, an examination of SIPA's legislative history indicates that Congress intended the Act to protect investors such as FutureSelect who gave funds to the debtor for the purpose of trading securities. *See SIPC v. Morgan, Kennedy & Co., Inc*., 533 F.2d 1314, 1317 (2d Cir. 1976) (noting that in the House of Representatives Report accompanying SIPA, "'investors' is used synonymously with 'customers,' indicating that, in the eyes of Congress, the Act would protect capital markets by instilling confidence in securities traders.") (citation omitted).

6

  **B. FutureSelect's Entrustment of Cash to BLMIS Establishes FutureSelect as a "Customer" Entitled to Protection under SIPA.**

 Consistent with the language of SIPA, FutureSelect's qualifies as a "customer" within the meaning of SIPA because it knowingly entrusted its property to BLMIS, and BLMIS actually "received, acquired [and] held" FutureSelect's property. As this Court has recognized, "the mere 'act of *entrusting*...cash to the debtor for the purpose of effecting securities transactions...triggers customer status'" under SIPA. *SIPC v. BLMIS*, 401 B.R. at 635 (quoting *In re ESM Gov. Secs., Inc.,* 812 F.2d 1374, 1376 (11th Cir. 1987)). *See In re Brentwood Secs.*, 925 F.2d at 327 (investor entitled to compensation under SIPA "only if he has entrusted cash or securities to a broker-dealer who becomes insolvent"). *See, also, S.E.C. v. Ambassador Church Fin/Dev. Group, Inc*., 679 F.2d 608, 613-14 (6th Cir. 1982) (entrustment of funds is "key factor" in determining who is a "customer" under SIPA).

 Here, FutureSelect knowingly entrusted its property to BLMIS through the Feeder Funds. FutureSelect sent its money to Feeder Funds solely in order to invest in BLMIS for the purpose of trading securities. Its act of entrusting funds to BLMIS for the purpose of effecting securities transactions triggers "customer" status under SIPA.

 The Trustee's argument that a claimant cannot "entrust" property unless it invests directly with the debtor is not supported by case law. "Whether a claimant 'deposited cash with the debtor'…does not…depend simply on to whom the claimant handed her cash or made her check payable, or even where the funds were initially deposited." *In re Old Naples Secs., Inc*., 223 F.3d 1296, 1302 (11th Cir. 2000). "Instead, the question is whether there was actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation." *Id.* (quotations omitted). Courts have found entrustment in instances where the claimant did not directly deposit the funds with the debtor, provided the investor intended to

7

have the brokerage purchase securities on claimant's behalf. *See, e.g., In re Primeline Secs.*, 295 F.3d 1100, 1107 (10th Cir. 2002) (claimant was "customer" under SIPA even though checks were made out to debtor's agent who never deposited the cash with debtor); *In re Old Naples Secs.*, 223 F.3d at 1303 (claimants were "customers" under SIPA even though their funds were not deposited in debtor's account because their funds were "used by, or at least for," the debtor).

FutureSelect's deliberate entrustment of funds to BLMIS through the Feeder Funds distinguishes the instant case from *SIPC v. Morgan Kennedy & Co.,* 533 F.2d 1314 (2d Cir. 1976), upon which the Trustee so heavily relies. In *Morgan Kennedy*, the Second Circuit found that employee beneficiaries of an employer-established trust account with a debtor broker were not "customers" within the meaning of SIPA. *Id.* at 1318. The Second Circuit found that the employee beneficiaries—who did not choose to participate in the trust, could not increase or decrease their interest in the trust, and could not withdraw their stake in the trust until their employment was terminated—were not investors or traders and were not "customers" of the debtor broker. *Id.* at 1317-18. The Second Circuit noted that the funds in the employer-created trust account came from the employer, based on the amount of the employer's net earnings, and the decision to entrust those funds to the broker came solely from the trustees, not the employee beneficiaries. *Id.* at 1315, 1318. The Second Circuit emphasized that the employees' participation in the trust "amounted only to a bookkeeping matter on the [employer's] books," did not affect the amount of assets in the trust account, and was therefore of "no concern" to the debtor broker. *Id.* at 1318. The trustees "had the exclusive power to entrust the assets to the debtor, to invest and reinvest, and to purchase and trade securities in the account as they saw fit." *Id.*

8

Here, in contrast to the employees in *Morgan Kennedy* who were not investors and did not decide to participate in the trust or invest with the debtor, FutureSelect was an investor that decided to entrust its funds to BLMIS as part of its trading activity. FutureSelect understood that the Feeder Funds, were a conduit to BLMIS and chose to invest in those funds in order to entrust its assets to BLMIS. Moreover, unlike the trustees in *Morgan Kennedy*, the BLMIS Feeder Funds could not "purchase and trade securities in the account as [they] saw fit." It was understood by FutureSelect that the Feeder Funds would invest all FutureSelect's investment with BLMIS, and that BLMIS, not the Feeder Funds, would determine and implement the investment strategy. In fact, this was the very reason why FutureSelect chose to invest in the Feeder Funds. Moreover, FutureSelect's investment did not "amount[] only to a bookkeeping matter" on the Feeder Funds' books that was of "no consequence" to BLMIS. FutureSelect's investment was of direct consequence to the Feeder Funds and BLMIS, as its investment increased the recorded assets in both entities.

### C. SIPA Does Not Include Any Requirement that One Must Have a Security Account with Debtor in Order to Qualify as a "Customer."

Although the Trustee asserts that SIPA's definition of "customer" includes a requirement that the claimant have a security account with the debtor, there is nothing in SIPA's language to support this assertion. SIPA states that a "customer" includes "any person who has deposited cash with the debtor for the purpose of purchasing securities." 15 U.S.C. 78lll(2). There is no additional requirement that the depositor have opened or maintained an account with the debtor.

Moreover, no court has held that an investor cannot qualify as a "customer" under SIPA because it did not maintain an account with the debtor. In all of the cases cited by the Trustee for this point, the courts actually determined "customer" status based on the transactional

9

relationship of the claimants to the debtors, not on whether the claimant maintained an account with the debtor. Thus, in *SIPC v. Executive Securities Corporation*, 423 F.Supp. 94, 96 (S.D.N.Y. 1976), *aff'd* 556 F.2d 98 (2d Cir. 1977), the court found that the claimants were not "customers" under SIPA because they made loans to the debtor not in connection with the debtor's investment or trading activity. The court in *In re First Interregional Equity Corp.,* 290 B.R. 265, 279 (Bankr. D. N.J. 2003), similarly held that the claimant did not qualify as a "customer" under SIPA because the nature of its relationship with the debtor was "analogous to the lender/broker relationship." In *In re Adler, Coleman Clearing Corp.,* 277 B.R. 520, 559-60 (Bankr. S.D.N.Y. 2002), the court held that the claimant did not merit "customer" status under SIPA because he was a knowing beneficiary of the unlawful conduct that led to debtor's liquidation.

Indeed, this Court's opinion in *SIPC v. BLMIS*, 401 B.R. 629 (Bankr. S.D.N.Y. 2009), makes clear that there is no requirement that a claimant have an account with the debtor in order to qualify as a "customer" under SIPA. In *SIPC v. BLMIS*, this Court found that Rosenman Family LLC ("Rosenman") became a BLMIS "customer" under SIPA when it wired $10 Million to a BLMIS bank account ten days before BLMIS' liquidation. At the time of liquidation, Rosenman did not have a securities account with BLMIS. Rosenman alleged that the funds it wired were to be held in BLMIS' account until BLMIS allowed additional investment and Rosenman made a final decision to invest in BLMIS. Nevertheless, this Court found that Rosenman was a "customer" within the meaning of SIPA because it had "deposited cash with the debtor for the purpose of purchasing securities." *Id.* 634-35.

Other courts have also found "customer" status for investors that did not hold accounts with the debtors. *See, e.g., Matter of Investors Sec. Corp.,* 6 B.R. 420, 426 (Bkrtcy. Pa. 1980)

10

("The trustee is clearly erroneous in his assertion that [debtor's] failure to open a formal [claimant] account precludes 'customer' treatment"); *In re Primeline Securities Corp.* 295 F.3d at 1107 (claimant was "customer" of debtor, even though debtor was an introducing broker that did not carry customer accounts, and even though claimant made checks out to debtor's agent who never deposited the cash with debtor; "claimant intended to have the brokerage purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment"); *In re Old Naples Securities, Inc.,* 223 F.3d at 1302-1303 ("Whether a claimant 'deposited cash with the debtor,' however, does not… depend simply on to whom the claimant handed her cash or made her check payable, or even where the funds were initially deposited. Instead, the question is whether there was 'actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation.'") (quoting *SIPC v. Wise (In re Stalvey & Assocs., Inc.),* 750 F.2d 464, 469 (5th Cir. 1985)).[1]

## II. The Trustee's Remaining Arguments Have no Bearing on Whether FutureSelect Is a "Customer" Entitled to Protection under SIPA.

### A. Net Equity Is not a Requirement for "Customer" Status.

The Trustee's argument regarding "net equity" has no bearing on whether FutureSelect qualifies for protection under SIPA as a "customer." The definition of "customer," discussed above, does not refer to "net equity." In fact, SIPA's language makes clear that "net equity" only becomes relevant *after* a claimant is determined to be a "customer" subject to protection under the Act. For example, Section 78fff(a)(1) provides that the purpose of a liquidation proceeding under SIPA is:

---

[1] The Trustee attempts to reconcile these cases by asserting that SIPA's language requires that a "customer" either hold an account with the debtor or deposit cash "with the debtor with the reasonable expectation that such an account will be set up to trade securities." *See* Trustee's Memorandum at 15-16. This assertion is unsupported by the statutory language, and no court has recognized or articulated this "reasonable expectation" requirement.

11

> **(A)** to deliver customer name securities to or on behalf of the *customers of the debtor entitled thereto as provided in section 78fff-2(c)(2) of this title*; and
>
> **(B)** to distribute customer property and (in advance thereof or concurrently therewith) otherwise satisfy net equity claims of customers to the extent provided in this section;

15 U.S.C. § 78fff(a)(1) (emphasis added). Section 78fff-2 of SIPA, cited by the Trustee, discusses the process for paying net equity claims in the context of "payments to *customers*." 15 U.S.C. § 78fff-2(b) (emphasis added). Moreover, SIPA defines "net equity" as "the dollar amount of the account or accounts of a *customer*…" 15 U.S.C. § 78lll(11) (emphasis added).[2]

The Trustee does not identify any case where the court considered the calculation of "net equity" in determining whether a claimant qualifies as a "customer." Indeed, the case law is clear that the consideration of "net equity" comes after the determination of "customer" status. *See, e.g., In re New Times II,* 463 F.3d at 127 (noting that SIPA accords claimants "who qualify as 'customers'" to share in "customer property" ratably "to the extent of the customer's net equity"); *In re Adler Coleman Clearing Corp.*, 211 B.R. at 489 (first discussing how claimant qualifies as a "customer" under SIPA, then explaining that "[t]he value of a customer's account, or its 'net equity,' is the measure of its preferred SIPA customer claim.").

**B.    A Review of the Debtor's Books and Records Is Not a Precursor to "Customer" Status.**

Similarly, the Trustee's arguments regarding the use of BLIMIS' books and records to satisfy customer claims do not bear on whether FutureSelect qualifies as a "customer" under SIPA. SIPA section 78fff-2(b), relied on by the Trustee, discusses examining the debtor's books and records to make "[p]ayments to *customers*" only after a *customer* submits a written

---

[2] To the extent the Trustee argues that the definition of "net equity" sets forth a requirement that a claimant must have an account to qualify as a "customer" subject to SIPA protection, FutureSelect refers to Section I.C., *supra.*

12

statement of claim. 15 U.S.C. § 78fff-2(b) (emphasis added). Clearly, the use of the debtor's books and records to determine payments becomes relevant only *after* a claimant is established as a "customer" entitled to SIPA protection.

In any event, SIPA does not require the use of the debtor's books and records to ascertain the amount of payment owed to "customers." SIPA provides that a trustee shall satisfy the debtor's obligations to a customer "insofar as such obligations are ascertainable from the books and records of the debtor *or are otherwise established to the satisfaction of the trustee.*" 15 U.S.C. § 78fff-2(b) (emphasis added). The language makes clear that a trustee does not need to rely on the debtor's books and records to ascertain the amount owed to a "customer."

Indeed, given BLMIS' fraudulent conduct, the Trustee should not rely on its books and records to determine customer payment. The Second Circuit has held that in cases involving widespread fraud, "basing customer recoveries on fictitious amounts in the [debtor's] books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality and leaves the SIPC fund unacceptably exposed." *In re New Times Secs. Servs., Inc.*, 371 F.3d 68, 88 (2d Cir. 2004) ("*New Times I*"). In *New Times I*, the debtor broker had fraudulently induced customers to invest in non-existent funds. The Second Circuit held that the District Court had erred by relying on the debtor's falsified books and records to calculate customers' "net equity" as the recorded value of non-existent securities, including artificial interest and dividends. *Id.* Recognizing the "potential absurdities created by reliance on the artificial number contained in fictitious account statements," the Second Circuit held that the customers' net equity was properly calculated as the amount of money the customers paid to the debtor to purchase the bogus funds. *Id.* at 88.

Here, BLMIS' books and records were fraudulent, reflecting non-existent investments and returns. As in *New Times I,* the calculation of a customer's net equity should be based on the amount it paid to the debtor. This amount should be readily ascertainable from more reliable sources, such as the customer's books and records.[3]

The Trustee's reliance on the Second Circuit's discussion of books and records in *Morgan Kennedy* is misplaced since that case did not involve falsified books and records and could be assumed reliable. Moreover, as noted above, the debtor broker in *Morgan Kennedy* had "no knowledge" and "no concern" with the employee participants in the trust because the amount of the trust was based on company earnings, and was not affected by the number of employee participants

### C. The Trustee's Argument that FutureSelect Does not have a "Claim" Based on Derivative Liability Misreads SIPA's definition of "Customer."

The Trustee's argument regarding derivative liability is based on a misreading of the word "claim" in SIPA's definition of "customer." The Trustee asserts that when SIPA defines a "customer" as including "any person who has a claim against the debtor arising out of sales or conversions of such securities," the statute is referring to a legally sufficient claim as opposed to a claim for payment under SIPA. 15 U.S.C. § 78lll(2).

The Trustee's argument is belied by SIPA's plain language. Throughout the Act, the word "claim" is used in order to describe a request for protection or payment under SIPA, not a legally sufficient claim. For example, section 78fff-2(a), setting forth the provisions of a SIPA liquidation proceeding, provides that a "customer shall file with the trustee a written statement

---

[3] Even assuming the amount was accurately recorded in BLMIS' books and records—an unsafe assumption given BLMIS' widespread fraud—the Trustee admits that those books and records are not complete with respect to the feeder funds. *See* Trustee's Mem at 9 n. 6 (noting that "Account Agreements for certain of the Feeder Funds have not, to date, been located within BLMIS' books and records"). *See, also*, Dec. of Matthew B. Greenblatt ¶ 14.

14

of *claim*," and provides that "[n]o *claim* of a customer or other creditor of the debtor which is received by the trustee after the expiration of the six-month period [for filing]….shall be allowed…" 15 U.S.C. § 78fff-2(a)(2)-(3) (emphasis added).  Clearly, the term "claim," as used in SIPA, refers to a request for payment or protection under the Act.

Indeed, courts have properly understood the term "claim" as a request for protection under SIPA, as distinct from a successful "customer claim."  *See, e.g., In re Adler Coleman Clearing Corp.*, 277 B.R. at 557 ("A person whose claim against the debtor qualifies as a 'customer claim' receives preferential treatment in the distribution of assets from the debtor's estate").

Accepting the Trustee's argument would lead to an absurdly circular result wherein one could only establish "customer" status by demonstrating that it had a successful claim, but could only have a successful claim if it qualified as a "customer."  In any event, even if the Court were to adopt the Trustee's strained argument that a "claim against the debtor arising out of sales or conversions" requires the establishment of a legally sufficient claim, it would not affect FutureSelect's qualification as a "customer."  SIPA expressly provides that a "customer" also includes "any person who has deposited cash with the debtor for the purpose of purchasing securities."  15 U.S.C. 78lll(2).  This provision of the Act's "customer" definition does not include any requirement of or reference to a "claim."  As discussed above in section I.B., *supra*, FutureSelect qualifies as a "customer" under this provision.

FutureSelect understands that other claimants have also had their claims denied by the Trustee on the grounds that they were not "customers" of BLMIS as required by SIPA.  To the extent they are relevant, FutureSelect hereby adopts and incorporates the arguments of similarly situated claimants who respond in opposition to the Trustee's Motion.

15

## CONCLUSION

For the foregoing reasons, the Court should deny the Trustee's Motion to Affirm the determination denying FutureSelect's claim.

Dated:  July 12, 2010

                                                THOMAS, ALEXANDER & FORRESTER LLP

/S/ Emily Alexander_____
Emily Alexander, Esq. (3054111)
14 27th Avenue
Venice, California 90291
Telephone:  (310) 961-2536
Facsimile:  (310) 526-6852
Email:  emilyalexander@tafattorneys.com

*Counsel for FutureSelect Prime Advisor II, LLC, Merriwell Fund, L.P., Telesis IIW, LLC, RCW Group,Inc., Ronald Ward and Dianne Ward*