SONNENSCHEIN NATH & ROSENTHAL LLP
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
cneville@sonnenschein.com

*Attorneys for Laura E. Gugenheimer Cole*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

                    Plaintiff,

            v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                    Defendant.

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

Laura E. Gugenheimer Cole hereby objects to the Notice of Trustee's Determination of

Claim dated June 23, 2010 ("Determination Letter"), attached hereto as **Exhibit A**, as described

herein.

### BACKGROUND

1.    On or about July 8, 1997, Bernard Madoff opened an account (Account No.

1C1258) (the "Cole Customer Account") with Bernard L. Madoff Investment Securities LLC

("Madoff") for Laura Cole with a distribution from her account 1G007810.[1]

2.    On December 11, 2008, an action was commenced against Madoff by the Securities

& Exchange Commission in the United States District Court for the Southern District of New

---

[1]    All personal information relating to the Cole Account has been redacted for security reasons.

York.  On December 15, 2008, this liquidation proceeding was commenced pursuant to the

Securities Investment Protection Act ("SIPA").  *See* Order, Securities and Exchange

Commission v. Madoff, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA

and transferring proceeding to the United States Bankruptcy Court for the Southern District of

New York) [Dkt. No. 4].  Irving Picard was appointed Trustee ("Trustee"), charged, *inter alia*,

with overseeing the liquidation of Madoff and processing customer claims for money pursuant

to SIPA.  *Id.*; 15 U.S.C. § 78fff-1(a) (2009).

3.    On December 23, 2008, the Court issued an Order directing the Trustee to

disseminate notice and claim forms to Madoff customers and setting forth claim-filing

deadlines.  *See* Order [Dkt. No. 12].

4.    The December 23, 2008 Order further provided that, to the extent the Trustee

disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such

claimant by mail of his determination that the claim is disallowed, in whole or in part, **and the

reason therefor** . . . "  *See* Order at 6 (emphasis added) [Dkt. No. 12].

5.    Ms. Cole timely filed a claim for the Cole Account the ("Cole  Customer Claim"),

based on the November 30, 2008 statement from Madoff (the "Final Madoff Statement").

6.    On March 1, 2010, the Court issued a decision affirming the Trustee's net

investment method for determining customer claims.  That decision has been appealed, and a

final resolution on the issue is pending.

7.    On June 23, 2010, the Trustee sent Ms. Cole the Determination Letter rejecting her

claim, stating that (a) no securities were purchased for the Cole Account and (b) the account

does not have a positive net equity because she had withdrawn more funds than she had deposited into the account.[2]

## GROUNDS FOR OBJECTION

8.    **First Objection.**  The Determination Letter fails to comply with this Court's December 23, 2008 Order, which directs the Trustee to satisfy customer claims in accordance "with the Debtor's books and records."  Dec. 23, 2008 Order at 5 [Dkt. No. 12].  The  Cole Customer Claim was evidenced by the Final Madoff Statement showing a final positive balance and listing the securities purportedly purchased for the account, which reflects the "Debtor's books and records" and by which the Trustee is bound absent proof that the owner of the Cole Account did not have a "legitimate expectation" that the balance on the Final Madoff Statement represented her property.

9.    **Second Objection.**  The Trustee failed to set forth a legal basis for the position he has taken for the calculation of the claim  *See* Determination Letter.  The Determination Letter:

(a)    does not clearly provide "the reason" for the disallowance, as required by the Court's December 23, 2008 Order, *see* Order [Dkt. No. 12];

(b)    is insufficient to rebut the prima facie validity of the Cole Customer Claim as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f);

(c)    violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based, *see, e.g.*, Collier on Bankruptcy ¶ 3007.01(3) (15th ed.) ("[A]n objection to a claim should . . . meet the [pleading] standards of an answer); *In re Enron Corp.*, No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (Bankr. S.D.N.Y. Jan. 13, 2003) (same);

---

[2]   There is no dispute that the Cole Account is a customer account within the meaning of SIPA.

(d)      includes an exhibit which purportedly calculates the money deposited less subsequent withdrawals without any supporting documentation and is completely unsubstantiated; and to the extent the Trustee's "reconciliation" differs from the Cole Customer Claim, particularly with respect to the amount of the distribution from one account to another, the Trustee should produce evidence supporting his "reconciliation;"

(e)      Includes an reduction of a transfer into the account with no documentation or support; and

(f)      the Trustee has not established that the Cole Customer Account did not hold actual securities.

10.    **<u>Third Objection</u>.**  The Trustee has failed to fulfill the requirement that he honor the legitimate expectations of a customer.

11.    The legislative history of SIPA makes clear that Congress' intent in enacting the legislation was to protect the legitimate expectations of customers.  Congressman Robert Eckhardt, (D) Texas, sponsor of amendments to SIPA to increase the amount of advance available to customers and expedite the process, commented on the purpose of the legislation as follows:

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments  .  .  .  would  satisfy  the  customers'  legitimate expectations . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

> A customer generally expects to receive *what he believes* is in his account at the time the stockbroker ceases business. But because securities  may  have  been  lost,  improperly  hypothecated,

> misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectations . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

12.    The Securities Investor Protection Corporation ("SIPC") acknowledged that it was bound by the statute and the rules to satisfy the reasonable expectations of customers even when the securities had never been purchased, in the brief it submitted to the Court of Appeals for the Second Circuit as follows:

> Reasonable and legitimate expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits of SIPA) even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase . . . [T]his emphasis on the reasonable and legitimate customer expectations frequently yields much greater customer protection than would be the case if the transaction reality, not the claimants expectations, were controlling, as this court's earlier opinion in this liquidation well illustrates.

Brief of the Appellant SIPC at 23-24.

13.    Based on regular statements and other communications received from Madoff, Ms. Cole at all times reasonably believed and expected that Madoff executed such transactions and that the Cole Customer Account actually held such securities.

14.    The Trustee's position in the Madoff case is completely inconsistent with the purpose and goals of SIPA and the position that SIPC, the corporation charged with administering the Act, has taken unequivocally with respect to the treatment of customers in

5

accordance with their reasonable expectations reflected in the communications from the broker-dealer.

15.   **Fourth Objection.**   The Trustee failed to set forth a legal basis for the position he has taken that he can reduce the amount of the claim by appreciation in the Cole Customer Account or calculate the claim by counting only investment principal less withdrawals.   The Court's decision affirming the Trustee's net investment method has been appealed and a final resolution on the issue is pending, and thus, no legal basis for the method exists.   The Trustee's calculation violates SIPA.

16.   15 U.S.C. § 78fff-2(b) provides that a customer's claim shall be allowed in the amount of the customer's "net equity."   15 U.S.C. § 78fff-2(b).   The Trustee calculates "net equity" by reducing the principal contributed to the account less any withdrawals or appreciation, without regard to any gains reflected in the Final Madoff Statement and any prior statement delivered by Madoff to the customer.   This is incorrect for the following reasons:

(a)       Notwithstanding the Court's determination, the Trustee's method of calculating the customer claim is inconsistent with the language of the statute.   SIPA defines a customer's net equity claim as the value of the customer's "securities positions" in the customer's account, less any amount the customer owes the debtor, as of the date of the filing of the SIPA liquidation:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . . ; minus

(B) any indebtedness of such customer to the debtor on the filing
date . . .[3]

15 U.S.C. § 78lll(11).  The Trustee's proposed formulation has no support in the language of the

statute or interpreting case law and in fact, adds words and concepts to the statute which do not

exist.

(b)     Notwithstanding the Court's determination, the Trustee's method is

inconsistent with the Rules promulgated under SIPA.  The Series 500 Rules promulgated under

SIPA by SIPC provide for the classification of claims for cash or securities in accordance with

the written transaction confirmations sent by the broker-dealer to the customer. 17 C.F.R. §

300.500.  Pursuant to the Rule, a customer has a claim for securities if the customer has received

written confirmation that the securities have been purchased or sold for the account.

(c)     Notwithstanding the Court's determination, the Trustee's method is

inconsistent with the legislative history of the statute.  SIPA's legislative history emphasizes

Congress' intention that the statute protect customer expectations by ensuring that customers of

retail brokerage firms can rely on their account statements.  The Madoff statements and

confirmations sent to Ms. Cole indicated that the Cole Customer Account owned a list of blue

chip securities.  It makes no difference whether the securities were ever actually purchased.

(d)     The Trustee's formula is an improper and wholly inadequate measure of

loss.  Ms. Cole deposited funds with Madoff in the expectation the amount would grow, the

statements for the Cole Customer Account showed such growth, and the balance on the Final

---

[3]   The "indebtedness" of the customer to the debtor refers to cash or securities owed to the debtor, which is most often in the context of a customer having borrowed from the debtor on margin.  *See, e.g.*, H.R. Rep. No. 95-746 at 21 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (noting that, under the 1970 statutory regime, when there were shortages in available securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *In re First St. Sec. Corp.*, 34 B.R. 492, 497 (Bankr. S.D. Fla. 1983) (offsetting against claim amount of indebtedness customer owed to the debtor where unauthorized stock purchase was funded in part by borrowing on margin).

Madoff Statement reflects the benefit of this bargain.  In *Visconsi v. Lehman Brothers, Inc.*, No.

06-3304, 244 Fed. Appx. 708, 713-14 (6th Cir. 2007), the Court declined to set aside an

arbitration award that appeared to apply an expectancy measure of damages against a successor

in a Ponzi scheme case and rejected the money in / money out formula as not reflecting the

expectations of the parties.  *Id.*  The Court explained:

> Lehman's out-of-pocket theory misapprehends the harm suffered
> by Plaintiffs and the facts of this case. Plaintiffs gave $21 million
> to Gruttadauria, not to hide under a rock or lock in a safe, but for
> the express purpose of investment, with a hope – indeed a
> reasonable expectation – that it would grow. Thus, the out-of-
> pocket theory, which seeks to restore to Plaintiffs only the $21
> million they originally invested less their subsequent withdrawals,
> is a wholly inadequate measure of damages. Had Gruttadauria
> invested Plaintiffs' money as requested, their funds would have
> likely grown immensely, especially considering that Plaintiffs
> invested primarily throughout the mid-1990s, which, had they
> hired an honest broker . . . , would have placed their money in the
> stock market during one of the strongest bull markets in recent
> memory. In fact, the fictitious statements issued by Lehman,
> which were designed to track Plaintiffs' funds as if they had been
> properly invested, indicate that Plaintiffs' accounts would have
> grown to more than $37.9 million (even accounting for the
> withdrawal of more than $31.3 million). Plaintiffs thus could have
> reasonably believed that they were entitled to the full $37.9
> million balance shown, regardless of the amounts of their previous
> deposits and withdrawals.

*Id.*  This applies precisely to Ms. Cole's claim.

(e)    Notwithstanding the Court's determination, the Trustee's Determination

Letter is contrary to SIPC's own policies and practices, as reflected in the sworn testimony of

Stephen Harbeck, SIPC's president and CEO, and its actions in similar liquidation proceedings.

For example, in the New Times Securities Services Inc. ("New Times") SIPA liquidation, in the

context of discussing claims filing deadlines, Harbeck acknowledged that if broker-dealer

customers have been led to believe that "real existing" securities had been purchased for their

accounts, then those customers are entitled to the full value of their securities positions as of the

filing date, even if that value represents a substantial increase from the purported purchase price

of the securities and even if the securities had never been purchased.  Harbeck testified as

follows:

> Harbeck: [I]f you file within sixty days, you'll get the securities,
> without question. Whether – if they triple in value, you'll get the
> securities. . . . Even if they're not there.
>
> Court: Even if they're not there.
>
> Harbeck: Correct.
>
> Court: In other words, if the money was diverted, converted –
>
> Harbeck: And the securities were never purchased.
>
> Court. Okay.
>
> Harbeck: And if those positions triple, we will gladly give the
> people their securities positions.

Transcript at 37-39, *In re New Times Securities Services, Inc.*, No. 00-8178 (Bankr. E.D.N.Y.

July 28, 2000).

Moreover,  SIPC faced very similar circumstances in the New Times liquidation and

took a very different position than it is taking in the Madoff case in support of the Trustee.

There, the New Times Trustee's position on "net equity" was in full accord with SIPA, and thus

directly contrary to the Trustee's position in this case.  Specifically, with respect to any claims

that were based on confirmations and account statements reflecting securities positions in "real"

securities that could have been purchased (i.e., securities that actually existed on the public

market and whose valuations were objectively and publicly verifiable by the customers), the

New Times Trustee allowed all such net equity claims to the full extent of the filing date

valuations of those securities, even though none of the securities identified in those records had

ever, in fact, been purchased by the broker-dealer.[4]

(f)    The Trustee's determination and the Court's determination are

inconsistent with the case law.  The Second Circuit's discussion of SIPC's claims processing in

*New Times,* the only case in this jurisdiction dealing with the issue in the Madoff case, further

indicates that, with respect to customers who thought they were invested in listed securities,

SIPC properly paid customer claims based on the customers' final account statements, even

where the securities had never been purchased:

> Meanwhile, investors who were misled . . . to believe that they
> were investing in mutual funds that in reality existed were treated
> much more favorably. Although they were not actually invested in
> those real funds – because Goren never executed the transactions –
> the information that these claimants received on their account
> statements mirrored what would have happened had the given
> transaction been executed. As a result, the Trustee deemed those
> customers' claims to be "securities claims" eligible to receive up
> to $500,000 in SIPC advances. The Trustee indicates that this
> disparate treatment was justified because he could purchase real,
> existing securities to satisfy such securities claims. Furthermore,
> the Trustee notes that, if they were checking on their mutual
> funds, the "securities claimants," . . . could have confirmed the
> existence of those funds and tracked the funds' performance
> against Goren's account statements.

---

[4]    As with Madoff Securities and Bernard Madoff, New Times and its principal, William Goren, defrauded scores
of investors by providing them with confirmations and account statements reflecting purported securities
investments made on their behalf when, in fact, no such investments had been made and their money had, instead,
been misappropriated for other purposes.  Two of the investment opportunities Goren purported to offer were: (1)
money-market funds that were entirely fictitious (the "Fictitious New Age Funds"); and (2) mutual funds that were
entirely real, such as those offered by The Vanguard Group and Putnam Investments (the "Real Securities").  *See In
re New Times Sec. Servs., Inc.*, 371 F.3d 68, 71-72 (2d Cir. 2004) ("*New Times I*").  Goren's was "a classic Ponzi
scheme," *id.* at 72 n.2, wherein new investors' money was used to pay earlier investors.

Approximately 900 customers filed claims in the New Times liquidation: 726 for whom the "Real Securities" were
purportedly purchased; 174 for whom the "Fictitious New Age Funds" were purportedly purchased.  Consistent
with SIPA and its legislative history, the New Times Trustee appropriately applied SIPA's net equity definition to
the "Real Securities" customers' claims – meaning he paid them according to the full value of those securities
positions as of the date of the liquidation filing.  When challenged by "Fictitious New Age Funds" customers who
had objected that they had not received the same treatment, SIPC and the New Times Trustee (with the apparent
concurrence of the SEC) vigorously defended their approach in court.

*In re New Times Secs. Servs.*, 371 F.3d 68, 74 (2d Cir. 2004); *see also* Brief of Appellant SIPC

at 23-24, *In re New Times Sec. Servs., Inc.*, No. 05-5527 (Dec. 30, 2005):

> [R]easonable and legitimate claimant expectations on the filing
> date are controlling even where inconsistent with transactional
> reality. Thus, for example, where a claimant orders a securities
> purchase and receives a written confirmation statement reflecting
> that purchase, the claimant generally has a reasonable expectation
> that he or she holds the securities identified in the confirmation
> and therefore generally is entitled to recover those securities
> (within the limits imposed by SIPA), even where the purchase
> never actually occurred and the debtor instead converted the cash
> deposited by the claimant to fund that purchase. . . . [T]his
> emphasis on reasonable and legitimate claimant expectations
> frequently yields much greater 'customer' protection than would
> be the case if transactional reality, not claimant expectations, were
> controlling, as this Court's earlier opinion in this liquidation well
> illustrates.

(g)     The Trustee's position in the Madoff case is contradicted, not only by

SIPC's prior treatment of customers in the New Times case, but also by a statement that SIPC's

general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang

acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine
> Wang, if clients were presented statements and had reason to
> believe that the securities were in fact owned, the SIPC will be
> required to buy these securities in the open market to make the
> customer whole up to $500K each. So if Madoff client number
> 1234 was given a statement showing they owned 1000 GOOG
> shares, even if a transaction never took place, the SIPC has to buy
> and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

(h)     The Trustee's methodology also conflicts with other federal laws. For

example, Rev. Proc.2009-20, issued by Commissioner Shulman on March 17, 2009, expressly

recognizes the income earned by customers, on which they paid taxes annually. Yet the

Trustee's position is that the income earned by customers on their investments is not their

money.  In addition, some customers were required to take distribution from their retirement

accounts.  Yet the Trustee is deducting from their customer claim the mandatory withdrawals

that the customers were required by law to take.  Moreover, pension distributions are protected

under federal and state law, yet the Trustee reduces or disallows such distributions.

17.   In sum, the Trustee  has created his own definition of "net equity."  The  procedure

is designed not for the benefit of Madoff victims but rather so that the Trustee can avoid paying

SIPC insurance to the thousands of Madoff investors who, like Ms. Cole, have depended upon

their Madoff investments for their current and future living expenses.

18.   **Fifth Objection.**  The Trustee's action in reducing the amount shown on the Cole

Customer Claim by any prior gains reflected on the Final Madoff Statement or prior statements

is an attempt to avoid such gains without alleging any grounds for avoidance or proving that

such gains are avoidable under the Bankruptcy Code's avoidance provisions.  Any such

disallowance is improper and unjustified, and the Determination Letter should be stricken on

that ground alone.  *See* Fed. R. Bankr. P. 7001(1) & 7008.

19.   **Sixth Objection.**  SIPA provides that (a) SIPC shall pay the first $500,000 of each

customer claim, and (b) customers have an unsecured claim against customer property for the

balance of their claims which is paid pro rata with other customers.  *See* 15 U.S.C. § 78fff-3(a)

("In order to provide for prompt payment and satisfaction of net equity claims of customers of

debtor, SIPC shall advance to the trustee [up to] $500,000 for each customer, as may be required

to pay . . . claims."); 15 U.S.C. § 78fff-2(c)(1)(B) (providing that customers of the debtor "shall

share ratably in . . . customer property on the basis and to the extent of their net equities").  As

evidenced by the Cole Customer Claim, Ms. Cole has a valid claim in the amount of her Final

Madoff Statement.  Therefore, Ms. Cole is entitled to an advance of $500,000 and a claim

against customer property for the remainder.

20. **<u>Seventh Objection.</u>** The disallowance of the transfer from Ms..Cole's prior account to the Cole Customer Account and all withdrawals prior to December 2002 are barred by the statute of limitation since they occurred more than six years prior to the filing of the petition.

21. **<u>Eighth Objection</u>**. The disallowance of funds from the transfer from Ms. Cole's prior account to the Cole Customer Account is improper because Ms. Cole took the transfer for value and without any knowledge of Madoff's fraud.

22. **<u>Alternate Considerations.</u>** In the event that the Court should determine that customer claims should not be allowed in the amount of the Final Madoff Statement, then in the alternative, the customer is entitled to recover interest or appreciation on the investments based upon the following.

(a) Under New York law, which is applicable here, funds deposited with Madoff under these circumstances are entitled to interest. *See, e.g.,* N.Y. C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq*. Accordingly, the Cole Customer Claim should be recalculated by adding interest to all funds deposited.

(b) Under New York law, which is applicable here, customers are entitled to any returns Madoff earned on the deposited funds under principles of unjust enrichment. Accordingly, customer claims should be recalculated by adding the amounts earned by Madoff on the customer's deposits. *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

(c)    Ms. Cole is entitled to interest on her investment under federal securities laws. In *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), the Supreme Court analyzed the different measures of recovery of "actual damages" for fraud, primarily including rescission and restitution. The *Randall* Court concluded that Congress intended to deter wrongdoers, and hence, that wide latitude in choosing the measure of damages was warranted. *See id.* at 664 (citing *Affiliated Ute Citizens of Utah v. United State*s, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). The *Randall* Court continued by holding that:

> This deterrent purpose is ill-served by a too rigid insistence on limiting plaintiffs to recovery of their "net economic loss."

*Id.* at 664 (citing *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 940 (2d Cir. 1984)).

## RESERVATION OF RIGHTS

23.   The Cole Customer Account reserves the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of its right to object on any additional grounds.

24.   The Cole Customer Account  reserves all rights set forth in Rule 9014, including, without limitation, rights of discovery.  *See* Fed. R. Bankr. P. 9014.

25.   The Cole Customer Account  reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

## RELIEF REQUESTED

For the reasons stated herein, the Cole Claim should be allowed in its entirety in the amount reflected on the Final Madoff Statement, plus interest from the date of the Determination Letter.

14

For the reasons stated herein, the Court should direct SIPC to immediately replace $500,000 of the securities in the Cole Customer Account based upon the values reflected on the Final Madoff Statement and/or immediately forward the Cole Customer Account  a $500,000 advance from the SIPC Fund.

For the reasons stated herein, the Determination Letter should be stricken.

Ms Cole requests such other relief as may be just and equitable.

Dated: July 14, 2010                  SONNENSCHEIN NATH & ROSENTHAL LLP


By:    /s/ *Carole Neville*                                
       Carole Neville
       1221 Avenue of the Americas
       New York, New York 10020
       Telephone:  (212) 768-6700
       Facsimile:  (212) 768-6800

*Attorneys for Laura E. Guggenheimer Cole*

## <u>CERTIFICATE OF SERVICE</u>

I, Carole Neville, hereby certify that on March 24, 2010 I caused a true and correct copy

of the foregoing **Objection to Trustee's Determination of Claim** on behalf of Laura E.

Guggenheimer Cole to be filed electronically with the Court and served upon the parties in this

action who receive electronic service through CM/ECF, and served by hand upon:

> David J. Sheehan, Esq.
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, NY 10111

Dated: July 14, 2010

> */s/ Carole Neville*
> Carole Neville

## **Exhibit A**

**(Determination Letter)**

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

June 23, 2010

Laura E. Guggenheimer Cole

~~[redacted]~~

~~[redacted]~~

Dear Laura E. Guggenheimer Cole:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1C1258 designated as Claim Number 009721:

Your claim for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $1,213,350.74), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $317,441.08). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

---

[1] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78*lll*(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($895,909.66) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

**On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued a decision which affirmed the Trustee's Net Investment Method for determining customer claims. The final resolution of this issue is expected to be determined on appeal.**

**Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.**

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after June 23, 2010, the date on which the Trustee mailed this notice.

2

| | | | |
|---|---|---|---|
| 4/9/2003 | CHECK | ($19,937.18) | ($19,937.18) |
| 7/8/2003 | CHECK | ($25,605.59) | ($25,605.59) |
| 10/9/2003 | CHECK | ($32,399.70) | ($32,399.70) |
| 1/8/2004 | CHECK | ($13,030.19) | ($13,030.19) |
| 4/8/2004 | CHECK | ($19,187.31) | ($19,187.31) |
| 7/7/2004 | CHECK | ($30,026.08) | ($30,026.08) |
| 10/7/2004 | CHECK | ($24,757.16) | ($24,757.16) |
| 1/7/2005 | CHECK | ($19,036.84) | ($19,036.84) |
| 4/7/2005 | CHECK | ($19,210.98) | ($19,210.98) |
| 7/7/2005 | CHECK | ($20,341.48) | ($20,341.48) |
| 10/7/2005 | CHECK | ($18,535.35) | ($18,535.35) |
| 1/9/2006 | CHECK | ($28,787.52) | ($28,787.52) |
| 4/7/2006 | CHECK | ($22,960.76) | ($22,960.76) |
| 7/10/2006 | CHECK | ($25,422.99) | ($25,422.99) |
| 10/6/2006 | CHECK | ($44,011.17) | ($44,011.17) |
| 1/8/2007 | CHECK | ($24,277.44) | ($24,277.44) |
| 4/4/2007 | CHECK | ($21,369.21) | ($21,369.21) |
| 7/6/2007 | CHECK | ($27,246.41) | ($27,246.41) |
| 10/4/2007 | CHECK | ($28,675.57) | ($28,675.57) |
| 1/8/2008 | CHECK | ($22,584.67) | ($22,584.67) |
| 4/7/2008 | CHECK | ($11,371.52) | ($11,371.52) |
| 7/7/2008 | CHECK | ($51,662.16) | ($51,662.16) |
| 10/6/2008 | CHECK | ($13,734.20) | ($13,734.20) |
| **Total Withdrawals:** | | ($1,213,350.74) | ($1,213,350.74) |
| | | | |
| **Total deposits less withdrawals:** | | ($289,117.03) | ($895,909.66) |

5

| - Table 1 - | | | |
|---|---|---|---|
| **DEPOSITS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 7/8/1997 | TRANS FROM 1G007810 | $654,233.71 | $47,441.08 |
| 9/18/1997 | CHECK | $20,000.00 | $20,000.00 |
| 5/17/1999 | CHECK | $25,000.00 | $25,000.00 |
| 7/29/1999 | CHECK | $25,000.00 | $25,000.00 |
| 5/8/2000 | CHECK | $120,000.00 | $120,000.00 |
| 8/3/2001 | CHECK | $50,000.00 | $50,000.00 |
| 6/9/2003 | CHECK | $30,000.00 | $30,000.00 |
| **Total Deposits:** | | $924,233.71 | $317,441.08 |
| **WITHDRAWALS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 10/10/1997 | CHECK | ($26,713.35) | ($26,713.35) |
| 1/13/1998 | CHECK | ($25,069.31) | ($25,069.31) |
| 4/8/1998 | CHECK | ($34,743.77) | ($34,743.77) |
| 7/9/1998 | CHECK | ($34,104.09) | ($34,104.09) |
| 10/9/1998 | CHECK | ($18,326.12) | ($18,326.12) |
| 1/13/1999 | CHECK | ($35,719.03) | ($35,719.03) |
| 4/13/1999 | CHECK | ($32,012.27) | ($32,012.27) |
| 7/8/1999 | CHECK | ($48,112.41) | ($48,112.41) |
| 10/8/1999 | CHECK | ($23,340.29) | ($23,340.29) |
| 1/6/2000 | CHECK | ($28,950.40) | ($28,950.40) |
| 4/7/2000 | CHECK | ($40,542.48) | ($40,542.48) |
| 7/7/2000 | CHECK | ($27,242.94) | ($27,242.94) |
| 10/11/2000 | CHECK | ($18,921.69) | ($18,921.69) |
| 1/10/2001 | CHECK | ($17,166.56) | ($17,166.56) |
| 4/6/2001 | CHECK | ($41,069.74) | ($41,069.74) |
| 7/9/2001 | CHECK | ($27,410.06) | ($27,410.06) |
| 10/9/2001 | CHECK | ($20,271.72) | ($20,271.72) |
| 1/11/2002 | CHECK | ($31,674.65) | ($31,674.65) |
| 4/10/2002 | CHECK | ($10,991.25) | ($10,991.25) |
| 7/8/2002 | CHECK | ($39,764.43) | ($39,764.43) |
| 10/7/2002 | CHECK | ($49,039.77) | ($49,039.77) |
| 1/10/2003 | CHECK | ($17,992.93) | ($17,992.93) |

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York  10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York  10111

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC