UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br>　　　　　Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>　　　　　Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re<br><br>BERNARD L. MADOFF,<br>　　　　　Debtor. | |



## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

I, Lawrence Simonds, hereby object to the Notice of Trustee's Determination of Claim dated June 14, 2010 ("Determination Letter"), attached hereto as Exhibit A, as described herein.

### BACKGROUND

1. I established an individual retirement account ("IRA") with Bernard L. Madoff Investment Securities, LLC ("BMIS") in 1987. Over the years, BMIS periodically changed the number and title for my IRA. The final account number given by BMIS to my IRA was Account Number 1S0508. The final account statement, dated November 30, 2008, for my IRA (my "Final IRA Statement") states that securities valued at $3,545,190.79 were held in my IRA.

2. On December 11, 2008, the above-captioned liquidation proceeding was commenced against BMIS, pursuant to the Securities Investor Protection Act of 1970 ("SIPA"). *See* Order, *Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy

1

Court for the Southern District of New York) [Dkt. No. 4]. Irving Picard was appointed Trustee ("BMIS Trustee"), charged with overseeing the liquidation of BMIS and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. § 78fff-1(a).

3. On December 23, 2008, the Court issued an Order directing the BMIS Trustee to disseminate notice and claim forms to BMIS customers and setting forth claim-filing deadlines. *See* Order [Dkt. No. 12]. Upon information and belief, the BMIS Trustee disseminated notice and claim forms to BMIS's customers in accordance with the Court's Order.

4. The December 23, 2008 Order further provided that, to the extent the BMIS Trustee disagrees with the amount set forth on a customer claim form, the BMIS Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, *and the reason therefor* . . . ." *See* Order at 6 (emphasis added) [Dkt. No. 12].

5. On or about February 17, 2009, I submitted a customer claim form to the BMIS Trustee for Account Number 1S0508 (Exhibit B hereto), which claim was designated by the BMIS Trustee as Claim Number 002760 (my "IRA Customer Claim"). My Final IRA Statement was submitted with my IRA Customer Claim. *See* IRA Customer Claim (Exhibit B hereto).

6. On or about June 14, 2010, the BMIS Trustee sent the Determination Letter to me, allowing my IRA Customer Claim in the amount of $133,239.20, rather than allowing the claim in the amount of $3,545,190.79, the total amount that I claimed. *See* Determination Letter (Exhibit A).

7. I hereby object to the Determination Letter for the reasons described below.

### GROUNDS FOR OBJECTION

8. <u>First Objection</u>. The Determination Letter fails to comply with this Court's December 23, 2008 Order, which directs the BMIS Trustee to satisfy customer claims and

2

deliver securities in accordance "with the Debtor's books and records." Dec. 23, 2008 Order at 5 [Dkt. No. 12]. Included with my IRA Customer Claim was my Final IRA Statement showing a final balance of $3,545,190.79. *See* IRA Customer Claim (Exhibit B hereto). The Final IRA Statement is the best evidence of the amount owed based on the Debtor's books and records. Accordingly, the claim should be allowed in the full amount of $3,545,190.79.

9. <u>Second Objection</u>. The BMIS Trustee has set forth no legal basis for disallowing the IRA Customer Claim. The only explanation set forth in the Determination Letter is that "[n]o securities were ever purchased for your account" Determination Letter at 1 (Exhibit A hereto). This purported ground for disallowance does not have any statutory or other legal basis. Moreover, the Determination Letter:

(a) does not clearly provide "the reason" for the disallowance, as required by the Court's December 23, 2008 Order, *see* Order [Dkt. No. 12];

(b) is inadequate to rebut the prima facie validity of my IRA Customer Claim, as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f); and

(c) violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based. *See, e.g.*, Collier on Bankruptcy ¶ 3007.01(3) (15th ed.) ("[A]n objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses."); *In re Enron Corp.*, No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (Bankr. S.D.N.Y. Jan. 13, 2003) (same).

10. <u>Third Objection</u>. 15 U.S.C. Section 78fff-2(b) provides that a customer's claim shall be allowed in the amount of the customer's "net equity." 15 U.S.C. § 78fff-2(b). Upon

information and belief, the BMIS Trustee objects to my IRA Customer Claim on the ground that "net equity" should be determined by principal contributed to the account less any withdrawals, without regard to any gains reflected in the Final IRA Statement or prior BMIS statements. *See* Determination Letter. *See also* "Another View: Unwinding Madoff Fraud Fairly," Deal Blog. NY times.com (May 6, 2009). This is incorrect for the following reasons:

(a) The BMIS Trustee's construction of the statute ignores SIPA's express language which defines "net equity" as

> the dollar amount of the account or accounts of a customer, to be determined by --
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus
>
> (B) any indebtedness of such customer to the debtor on the filing date;
>
> ✱✱✱✱✱✱✱✱

15 U.S.C. § 78lll(11). The BMIS Trustee's proposed formulation has no support in the language of the statute or interpreting case law and in fact, adds words and concepts to the statute which do not exist.

(b) SIPA's legislative history emphasizes Congress' intention that the statute protect customer expectations by ensuring that customers of retail brokerage firms can rely on their account statements. The BMIS statements that I received stated that I owned a list of blue chip securities. It makes no difference whether the securities were purchased:

> A customer generally expects to receive *what he believes* is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive,

4

> that is, securities which they maintained in their brokerage account. . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectations . . . .

S. Rep. No. 95-763, at *2 (1978) (emphasis added). While there may be a basis to disallow customer claims for wholly fictitious securities of nonexisting entities, here the securities set forth on my Final IRA Statement and prior statements were those of actual companies listed on the stock exchange. SIPC (Securities INVESTOR PROTECTION Corporation) was established by Congress, as the name indicates, to <u>protect investors</u>. The BMIS Trustee is defying Congressional intent.[1]

  (c) I deposited actual funds with BMIS with the expectation that I would accumulate profits earned from actual securities purchase and sale transactions conducted with such funds. The $3,545,190.79 balance on my Final IRA Statement reflects the aggregate amount of deposits that I made into my account plus all profits earned in that account. I have suffered a loss of $3,545,190.79 as a result of BMIS's failure to return such amount to me. The BMIS Trustee's formula is an improper and wholly inadequate measure of loss. In *Visconsi v. Lehman Brothers, Inc.*, 244 Fed. Appx. 708 (6th Cir. 2007), the Court declined to set aside an arbitration award that appeared to have applied an expectancy measure of damages against a successor in a Ponzi scheme case, and rejected the "money in/money out" formula as not reflecting the expectations of the parties. The Court explained:

> Lehman's out-of-pocket theory misapprehends the harm suffered by Plaintiffs and the facts of this case. Plaintiffs gave $21 million to Gruttadauria [the dishonest broker], not to hide under a rock or

---

[1] I object to the BMIS Trustee's (and SIPC's) position based upon, among other things, my reliance upon the pamphlet published by SIPC in 1984 entitled "How SIPC Protects You" (attached as Exhibit D hereto). That pamphlet (in Paragraph 16) provides the plain English meaning of "net equity" that I understood and always counted upon.

>lock in a safe, but for the express purpose of investment, with a hope -- indeed a reasonable expectation -- that it would grow. <u>Thus, the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages.</u> Had Gruttadauria invested Plaintiffs' money as requested, their funds would like grown immensely, especially considering that Plaintiffs invested primarily throughout the mid-1990s, which, had they hired an honest broker . . . , would have placed their money in the stock market during one of the strongest markets in recent memory. In fact, the fictitious statements issued by Lehman, which were designed to track Plaintiffs' funds as if they had been properly invested, indicate that Plaintiffs' accounts would have grown to more than $37.9 million (even accounting for the withdrawal of more than $31.3 million). Plaintiffs thus could have reasonably believed that they were entitled to the full $37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals.

*Visconsi*, 244 Fed. Appx. at 713-14 (emphasis added). This applies precisely to my IRA Customer Claim.

        (d)     The BMIS Trustee's Determination Letter is contrary to SIPC's own policies and practices, as reflected in the sworn testimony of Stephen Harbeck, SIPC's president and CEO, and its actions in similar liquidation proceedings. For example, in the *New Times* SIPA liquidation, in the context of discussing claims filing deadlines, Harbeck acknowledged that SIPC would replace securities listed on customer account statements, even if the securities had never been purchased:

>Harbeck: [I]f you file within sixty days, you'll get the securities, without question. Whether -- if they triple in value, you'll get the securities. . . . Even if they're not there.
>
>Court: Even if they're not there.
>
>Harbeck: Correct.
>
>Court: In other words, if the money was diverted, converted --
>
>Harbeck: And the securities were never purchased.

6

>   Court. Okay.
>
>   Harbeck: And if those positions triple, we will gladly give the people their securities positions.

Transcript at 37-39, *In re New Times Securities Services, Inc.*, No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000) (Exhibit C hereto) (excerpt). The Second Circuit's discussion of SIPC's claims processing in *New Times* further indicates that, with respect to customers who thought they were invested in listed securities, SIPC paid customer claims based on the customers' final account statements, even where the securities had never been purchased:

> Meanwhile, investors who were misled . . . to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds -- because Goren never executed the transactions -- the information that these claimants received on their account statements mirrored what would have happened had the given transaction been executed. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. Furthermore, the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," . . . could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements.

*In re New Times Secs. Servs.*, 371 F.3d 68, 74 (2d Cir. 2004); *see also* Brief of Appellant SIPC at 23-24, *In re New Times Sec. Servs., Inc.*, No. 05-5527 (Dec. 30, 2005) (arguing that under SIPA "reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality" such as when the customer receives a confirmation reflecting a purchase, "even where the purchase never actually incurred and the debtor instead converted the cash deposited by the claimant to fund that purchase").[2] I am situated no

---

[2] There are similar statements in S. Rep. No. 95-763, at 2 (1978) (SIPA seeks to make customers whole even if securities of customers are "lost . . . misappropriated, never purchased or even

differently from the "securities claimants" in *New Times* who thought they purchased bona fide securities. Accordingly, my IRA Customer Claim should be recognized in full.

11. In the event that the Court should determine that claimed gains on deposited funds should not be allowed, then in the alternative, I am entitled to recover interest on such deposited amounts. Such interest is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law. *See Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

(a) Under New York law, which is applicable here, funds deposited with the Debtors under these circumstances are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Accordingly, Customer claims should be recalculated by adding interest to all funds deposited by customers such as me.

(b) Under New York law, which is applicable here, customers are entitled to prejudgment interest and any returns the Debtors earned on the deposited funds under principles of unjust enrichment. Accordingly, Customer claims should be recalculated by adding the amounts earned by the debtors on my deposits. *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

---

stolen"); H.R. Rep. No. 95-746, at 21 (1977) (customer expects to receive what he believes is in

12.  **Fourth Objection.** The BMIS Trustee's action in reducing the amount shown on my IRA Customer Claim by any prior gains reflected on my Final IRA Statement or prior BMIS statements is an attempt to avoid such gains without alleging any grounds for avoidance or proving that such gains are avoidable under the Bankruptcy Code's avoidance provisions. As such, any such disallowance is improper and unjustified, and the Determination Letter should be stricken. *See* Fed. R. Bankr. P. 7001(1); 7008.

13.  **Fifth Objection.** The BMIS Trustee's determination assumes that BMIS never earned funds and therefore all gains reported to customers were "fictitious." This assumption is contrary to fact. There is significant evidence that, at some time, BMIS was at least in part a legitimate business and therefore all or a portion of the gains were not fictitious. The burden is on the BMIS Trustee to show that BMIS never earned any amounts to support customer gains and, if at some point it did earn funds, the dates when it ceased to do so. The BMIS Trustee is required to state and prove when the Ponzi scheme began.

14.  In fact, according to account statements that I received from BMIS prior to 1997, BMIS utilized a trading strategy involving convertible preferred stocks, which is different from the split strike conversion approach that the BMIS Trustee has attempted to discredit. In addition to the fact that the BMIS Trustee has failed to offer evidence demonstrating that BMIS's split strike trading strategy was falsified and, if so, for how long, the BMIS Trustee has neither discussed nor offered any explanation regarding the validity of the former trading strategy.

15.  The BMIS Trustee also states in the Determination Letter that "no securities were ever purchased by BLMIS" for my Customer Account. The BMIS Trustee, however, has not submitted evidence proving that this assertion is true.

---

his account even if securities were "never purchased").

9

16. <u>Sixth Objection</u>. The Determination Letter purports to calculate the "net equity" for my IRA on the basis of certain transactions for which I have no or incomplete records. It is unreasonable to anticipate that customers would maintain records of accounts for long periods of time given: (a) general limitations on record retention requirements under tax law and other applicable rules governing record retention; (b) the apparent safety and solvency of BMIS; and (c) the fact that historical records such as those in question are usually available from financial institutions, including broker-dealers, upon request. Under these circumstances, the BMIS Trustee should be required to prove that the alleged transactions occurred by furnishing the appropriate records to me and, absent such records, such transactions should be disregarded in the calculation of my "net equity."

17. <u>Seventh Objection</u>. My IRA is a transferee from another IRA that I maintained with BMIS (each, a "Transferor Account"). In calculating the "net equity" for my IRA, the BMIS Trustee's accounting does not reflect the actual amounts transferred from the Transferor Accounts to my account as reflected in my records, the contemporaneous documents furnished to me at the time of the transfer, and/or the records of BMIS which reflected the transfer. Instead, the BMIS Trustee has redetermined each transferred amount in accordance with his "money in/money out" formula (as described in the Third Objection) so that the transferred amount is limited by the amount of "money in/money out" (*i.e.*, deposits less withdrawals) in the Transferor Account at the time the transfer occurred. There is no basis in law or fact for such a result or redetermination. The BMIS Trustee has not alleged any factual basis for claiming that my IRA is not a bona fide transferee and purchaser, acting in good faith. The BMIS Trustee has not alleged any basis for reducing the balance in the Transferor Account at the time of the transfer under applicable state law, which is governing pursuant to the decision in *Travelers Cas.*

10

*& Sur. Co. of Am. v. PG&E*, 549 U.S. 443 (2007), and has not alleged any basis to avoid or reduce said balance pursuant to the avoidance powers of the Bankruptcy Code. Instead, the reduction (a) is an attempt to assert an avoidance power retroactively, to assert such a power as against the owner of the Transferor Account who is not a party to this Case; (b) has no basis in any statute or rule and no such statute of rule is stated by the BMIS Trustee; (c) makes no attempt to satisfy the requirements applicable to actions under such avoidance powers including applicable statutes of limitations, and indeed fails to identify any provision of the avoidance powers which is applicable; (d) is subject to the various defenses set forth in the avoidance powers; and (e) is an improper attempt to impose liability on a transferee of the initial transferee without alleging or satisfying the conditions of section 550(b) of the Bankruptcy Code. The BMIS Trustee should be required to redetermine my claim by recognizing the full amounts transferred from any Transferor Accounts.

18. <u>Eighth Objection</u>. The BMIS Trustee has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). The BMIS Trustee is obligated to replace my securities up to a value of $500,000 as valued on my November 30, 2008 customer statement.

19. <u>Ninth Objection</u>. The BMIS Trustee has no power to claw back withdrawals from an IRA. My IRA was established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., whose provisions preempt State fraudulent conveyance law, upon which Picard presumably relies pursuant to 11 U.S.C. § 544. 29 U.S.C. § 1144(a) (the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section [1003(a)] . . . .").

20. As evidence of Congressional intent to protect ERISA-qualified plans, the Bankruptcy Code was amended in 2005 to protect such plans from the claims of creditors. 11 U.S.C. § 541(b)(7)(a)(i)(I) (exempting from property of the estate "any amount withheld by an employer from the wages of employees for payment as contributions to an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 . . ."). See also Patterson v. Shumate, 504 U.S. 753 (1992) (holding that debtor's interest in an ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2)).

21. Similarly, applicable state law protects my IRA from clawback suits.

**RELIEF REQUESTED**

22. For the reasons stated herein, my IRA Customer Claim should be allowed in its entirety.

23. For the reasons stated herein, the Court should direct SIPC to issue immediate payment to me in the amount of $3,545,190.79 plus interest from the date of the Determination Letter without imposing conditions to payment which are not authorized or warranted.

24. The BMIS Trustee's determination amounts to an improper disallowance of a claim that has prima facie validity. See Bankruptcy Code § 502(a) Bankr. R. 3001(f). The BMIS Trustee has offered no factual or legal basis for his Determination. The BMIS Trustee's Determination Letter, and the objections contained therein, should be stricken, or alternatively, the BMIS Trustee should describe his position in detail including all relevant facts, legal theories, and authorities. Upon the filing of such a statement, this matter will be a contested proceeding under Rule 9014, and I will file a response.

25.  I request such other relief as may be just and equitable.

## CONCLUSION

26.  I reserve the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of my right to object on any additional grounds.

27.  I reserve all rights set forth Rule 9014, including, without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014.

28.  I reserve all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

29.  I incorporate by reference all reservations of rights set forth in the IRA Customer Claim. Nothing in this Objection is intended, or shall be construed, as a waiver of any rights that I possess.

Dated: July 9, 2010

_____
Lawrence Simonds