Sao Paulo, July 6, 2010.

REFERENCE – Claim n. 005041

Bankruptcy Case n. 08-1789 (BRL)



**To**
Officer of the United States Bankruptcy Court for
The Southern District of New York
One Bowling Green
New York, NY – 10004

**COPY TO**

Irving H. Picard, Trustee
c/o Baker & Hostler LLP
Attn.: Claims Department
45 Rockefeller Plaza
New York, NY 10111

        **SUNYEI LTD.**, herein represented by its undersigned Director **Jaques Lamac**, not conforming with the position of the Trustee that DENIED the claim for securities and/or a credit balance pointing out that there is not an account at BLMIS on its name for which reason it should not be considered as a **customer** under SIPA, as defined at 15 U.S.C, paragraph 78 III, requests the judicial review of that understanding, according to the following rationale:

1) There is no basis to unqualify quota holders of the Feeder Funds as legitimate creditors in the liquidation of BLMIS.

2) In fact, in the process of money laundering, to which all financial institutions are subject, the research spans to the entire chain of the

financial system until it is established who is the ultimate beneficial owner of the monies. This one, even being a customer of other entity, is also considered a customer of the final entity which receives the monies for investment and is responsible for the money laundering. All institutions must check the source and origin of funds, examining necessarily all customers, even those that do not apply directly but through intermediating institutions. In this sense, the institutions which receive monies from customers of other institutions are duly concerned about the liabilities that they are bearing and this is why they request severe representations and indemnification provisions in their subscription documents. This means that a customer of a financial institution will inevitably be affected, even if the resources have gone through an intermediary institution, considering such customers as customers of both institutions, in regard of preventing money laundering.

3) By analogy, in the Madoff case the customers of the Feeder Funds had applied their resources in such Funds which, in turn, carried all values to BLMIS. Therefore, in fact, resources were allocated to BLMIS, even if passed first through the Feeder Funds. In fact, the assets left the individual patrimony and, just passing temporarily through the Feeder Funds, were allocated, in reality, directly in BLMIS.

4) Thus, the quota holders of the Feeder Funds should rather be considered BLMIS customers not only in relation to the duties imposed upon them related to compliance issues but also to the rights involved. This includes investigations to prevent money laundering and even bankruptcy refunds with withdrawals considered irregular. Moreover, the Trustee, abiding for this reasoning, has struggled to collect returns of values withdrawn, including those withdrawn by the Feeder Funds under its regular business

activities, considering them in the final analysis, the actual quota holders BLMIS, meaning its customers.

5) The enclosed letter, issued by the Liquidator Kingate Global Fund, demonstrates that an agreement was sealed with the Trustee in order to transfer to him fifty per cent (50%) of the values recovered by the Fund regarding the withdrawals over the past six years.

6) It is a perfect and clear demonstration that the Trustee intends to exclude only the rights of the Feeder Funds quota holders while requiring their obligations and particularly their moneis.

7) As already stated, I am a quota holder of Fairfield Centry and Kingate Global Funds what is shown on bank statements of CREDIT SUISSE BANK. The Bank certified it according to statements already presented and the enclosed letters.

8) The mentioned Funds, Fairfield Centry and Kingate Global, were liquidated because they invested their funds in the BLMIS scheme.

9) Therefore, I am, even indirectly, a BLMIS customer, although not maintaining a direct account or registered in BLMIS' records. But, as above stated, my assets were invested directly in BLMIS. Therefore, I am BLMIS customer, as well as all others related to this scheme and I have lost my life savings such as many other BLMIS direct customers.

10) Different from what the Trustee restrictively and unreasonably says, Customers are not only the ones who have a direct account before BLMIS but ones who have investments and good standing obligations and are involved directly in this activity and thus subject to its results, positive or negative. If bureaucratic schemes hide the unlawful reality with other names, this should be disregarded if justice is to be made. How fair and

reasonable is the liquidation process of BLMIS if the Trustee tries to recover monies from Feeder Funds but simply ignores that behind such Feeder Funds there are investors who suffered irreparable losses and now are not allowed to receive the same treatment as the others. Under the Trustee's point of view, the monies eventually recovered in the liquidation process are "welcome" but those who provided the monies – the investors – are repelled and deprived from any right to complain.

11) If Fairfield Centry and Kingate Global would not invest their funds in the BLMIS scheme, they would not be immediately blocked and cleared.

12) Since the Law makes no distinction establishing different kinds of customers, there cannot be a different treatment between direct and indirect customers, since both suffered the same consequences (losing all what they had). No matter directly or indirectly, all ultimate beneficial owners of the monies invested with BLMIS were under the same treatment of sharing profits and losses in the proportion of their investments.

13) It is not true that the Feeder Funds were more "risky" than BLMIS or their investors had given up from the normal standards of liabilities which are ensured to BLMIS, as pointed out by the Trustee. Clearly, the portfolio of BLMIS was the same for all investors and there was no distinction or segregation among them.

14) Therefore, the unfair and unequal treatment among investors which the Trustee proposed, only because some carried out their investment directly and other, due to their own reasons, carried out their investment using a Feeder Fund, is unsustainable. The issue which should be the heart of the discussion and the main concern of the Trustee would be how to treat all ultimate beneficial owners, who in good faith made their investments and lost their savings to this fraudulent scheme, equably and with isonomy.

15) Once again is to be said that since the Law doesn't make any differentiation between kinds of customers, the Trustee is not allowed to do this differentiation. An equitable relief shall take into consideration all ultimate beneficial owners who lost their savings the same way.

16) Please, don't hesitate to contact me if you need further evidences or any other details and explanations.

Sincerely Yours.

Sunvei Ltd.
Jaques Lamac

Address: -

Jaques Lamac - Alameda Ribeirao Preto, 506 – ap. 13

Sao Paulo – SP  01331 - 000

BRAZIL

Phone – 55 11 – 7672-8081

5511 – 9711-8522

e-mail – jaqueslamac@superig.com.br    or

jlamac@sp.gov.br



# CREDIT SUISSE

**CREDIT SUISSE AG**

Phone  +41 44 3332084
Fax     +41 44 3338201
www.credit-suisse.com

P.O. Box
CH-8070 Zürich

Sunyei Limited
Mr. Jaques Lamac
Alameda Ribeirao Preto, 506, ap. 13
Sao Paulo - SP - Brasil 01331-000

June 15, 2010

## Sunyei Limited - Confirmation of Holdings in Fairfield Sentry Ltd.

Dear Sir

We hereby confirm that, based on the respective statements of investments, Sunyei Limited ("Sunyei") held as of June 15, 2010 in its safekeeping account no. 0835-608493-55 with Credit Suisse AG and still holds today in this account:

### 137 shares in Fairfield Sentry Ltd. (ISIN VGG3299L1004) ("Shares")

The Shares were subscribed as per request and for the account of Sunyei by Credit Suisse London Nominees Ltd. who acts as registered shareholder and is appointed for that purpose by Credit Suisse AG. Sunyei is the beneficial owner of the Shares and would bear any loss of value of these Shares, particularly in connection with the insolvency of Sunyei Ltd.

As beneficial owner of the Shares, Sunyei is free to use the present confirmation as it deems fit. In particular, it may use the present confirmation, in its endeavours to recover any loss of value of the Shares and to charge third parties with its representation in such endeavours.

Credit Suisse AG and Credit Suisse London Nominees Ltd. do not have any own interests in the Shares, other than rights of lien, rights of retention, and other withholding rights to secure the payment of fees.

Yours sincerely,

CREDIT SUISSE AG

René Kobel
Vice President

Ingrid Schmid
Vice President

**CREDIT SUISSE AG**

Phone  +41
Fax    +41
www.credit-suisse.com

P.O. Box
CH-8070 Zürich

Sunyei Limited
Mr. Jaques Lamac
Alameda Ribeirao Preto, 506, ap, 13
São Paulo - SP - Brasil 01331-000

May 19, 2010

## Sunyei Limited - Confirmation of Holdings in Kingate Global Fund Ltd.

Dear Sir

We hereby confirm that, based on the respective statements of investments, Sunyei Limited ("Sunyei") held as of [Date] in its safekeeping account no. 0835-608493-55 with Credit Suisse AG and still holds today in this account:

**569 shares in Kingate Global Fund Ltd. (ISIN VGG5255Z1146) ("Shares")**

The Shares were subscribed as per request and for the account of Sunyei by Credit Suisse London Nominees Ltd. who acts as registered shareholder and is appointed for that purpose by Credit Suisse AG. Sunyei is the beneficial owner of the Shares and would bear any loss of value of these Shares, particularly in connection with the insolvency of Sunyei Ltd.

As beneficial owner of the Shares, Sunyei is free to use the present confirmation as it deems fit. In particular, it may use the present confirmation, in its endeavours to recover any loss of value of the Shares and to charge third parties with its representation in such endeavours.

Credit Suisse AG and Credit Suisse London Nominees Ltd. do not have any own interests in the Shares, other than rights of lien, rights of retention, and other withholding rights to secure the payment of fees.

Yours sincerely,

CREDIT SUISSE AG

René Kobel
Vice President

Ingrid Schmid
Vice President

**ZC ZOLFO COOPER**

9 June 2010

P.O. Box 4571
2nd Floor, Palm Grove House
Wickhams Cay, Road Town
Tortola
British Virgin Islands VG1110
t: +1 284 494 9600
f: +1 284 494 9601
www.zolfocooper.com

## TO THE CREDITORS & INVESTORS

Dear Creditors and Investors,

### Kingate Global Fund Ltd. – In Liquidation (the "Fund")

#### Settlement Agreement with the Trustee

As you are aware, the BVI Court ("Court") gave the Liquidators permission to enter into the Settlement Agreement ("Settlement") with the Trustee of the business of Bernard L. Madoff Investment Securities LLC and any modification thereof which, in their opinion, is consistent with the substance of the draft agreement and that extensive discussion have been ongoing with the Trustee to finalise the Settlement. Such permission of the Court was required under the terms of our appointment.

There are still a small number of important matters, one of which as noted below is highly significant, which need to be finalised before the Settlement can be entered into. I am therefore, in conjunction with my BVI and US legal advisers, continuing my negotiations with the Trustee in an attempt to resolve these outstanding issues.

The main outstanding matter relates to the pursuit of claims against third parties. Third parties in this context means any person other than the Fund, the Liquidators, and the Trustee. As you are aware, the Settlement will (subject to certain capped amounts (the "Total Capped Amount")) require the Fund to pay to the Trustee 50% of any monies it recovers from any third party source, and any such payments made by the Fund will be set against the Fund's Total Capped Amount. You will recall from my previous correspondence that the Total Capped Amount equals 85% of the Trustee's ninety day preference claim plus 35% of the Trustee's the six year fraudulent transfer claim against the Fund. The Settlement provided that if the parties determine that the Trustee has a stronger claim against a party than the Fund does, then the Liquidators may assign the claim(s) to the Trustee and he may then pursue the claim(s) and the Fund will receive the benefit of 50% of the net recovery. This was known to be a matter that would require further clarification as the liquidation progressed and better information became available.

I have become aware that the Trustee is now actively taking steps, outside the terms of the Settlement, to pursue third parties, such as KML, its beneficial owners and also investors who redeemed their shares in the six years prior to the onset of liquidation. These steps are occurring even though the Trustee has no contractual relationship with any such parties. The Trustee is not currently prepared to give the Fund any benefit from any recoveries he may make from third parties under claims he believes he can bring against them in his own right. I believe the benefit of any third party claims could be significant and should be brought into the settlement as had been anticipated.

It is my hope that this discussion will be concluded in due course and that the Settlement can finally be agreed on terms which reflect the wishes expressed by the Creditors and Investors at the meetings in June and September last year. If it is apparent that the Settlement can not be agreed on such terms, I



Page 2
9 June 2010
Creditors & Investors

may need to seek the views of the Creditors and Investors on any revision to the proposed terms of the settlement with the Trustee.

## Other potential recovery actions against third parties

The Liquidators are continuing to review and consider whether there are any causes of action available to the Fund which might result in recoveries for the benefit of the stakeholders in the Fund and we have taken further specific advice from Senior Counsel in the UK in relation to specific claims.

During April, I, with my BVI legal adviser, met with two of FIM Advisers LLP's executives, Mr. Carlo Grosso and Mr. Federico Ceretti and at this meeting I was provided with information and documentation relating to the Fund's operations and the roles of various parties in relation to the Fund. I am currently reviewing the documentation provided to me to determine whether there is any information which will assist me in pursuing any causes of action.

I have also made arrangements again to meet with Kingate Management Limited's principal, Mr. Chris Wetherhill later this month to obtain further information on the operational aspects of the Fund and its management.

The Fund may have causes of action against PricewaterhouseCoopers Bermuda ("PwC Bermuda") in relation to the audit work it performed for the Fund. Under Bermuda law, the limitation period for relevant claims is six years. Given the lack of information provided by PwC Bermuda, it was necessary for me to issue a writ against PwC Bermuda in relation to the 2003 audit in order to preserve any claims arising in that period. The writ is purely protective and the Liquidators will need to obtain and consider additional information from PwC Bermuda before deciding whether it is appropriate to pursue any claims.

## December Subscribers

I have now determined that the December Subscribers subscribed on the same basis as the Interveners and I have therefore instructed Bank of Bermuda to refund the remaining December subscription moneys. The amounts to be repaid to the December Subscribers, not including amounts already repaid to the Intervenes, total US$3,150,000.

A further update will be posted to the liquidation website in due course.

Yours faithfully

W R Tacon
Joint Liquidator