**BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

In Liquidation

**December 11, 2008**



**CLIENT'S REQUEST FOR A HEARING**

**July 21, 2010**

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

**ONE BOWLING GREEN**

**NEW YORK, NEW YORK 10004**

CC: Irving Picard, Trustee

    c/o Baker & Hostetler LLP

        45 Rockefeller Plaza

        New York, New York 10111

Bankruptcy Case No. 08-01789 (BRL)

Ruth Wilk or Elliot Wilk WROS

6224A Island Bend

Boca Raton, Fl 33496-3267

Re: Account No. 1W0040

   : Notice of Trustee's Determination of Claim,  June 21, 2010

   : Client's Claim of June 29, 2009

   The Trustee's Determination of Claim of June 21, 2010 **DENIED** any claim for a credit balance in my BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") account #1W0040.  It stated that if I

disagree and desire a hearing that I must file written opposition with the Court and the Trustee on or before THIRTY DAYS of the date of the Determination of Claim. This letter is my request for a hearing before the Honorable Bankruptcy Judge Burton R. Lifland wherein I can present my claim to reverse the Trustee's DENIAL.

CLIENT'S GROUNDS FOR DISAGREEMENT

1. In my initial claim of June 29, 2009 to the Trustee I stated "My claim with you is that that transfer to the Wilk Investment Club never happened and this is because we now know that NOTHING ever happened. All funds simply went into Bernard Madoff's wallet. All transactions were fraudulent and I'm claiming that the listing of the transfer to the 2nd account was fraudulent too! "
2. Nine months later, in this Court's ruling of March 1, 2010, the Court stated on page 22 of 52, in part, "The account statements are entirely fictitious....and therefore cannot be relied upon to determine Net Equity."
3. On page 5 of 53 in the Court's ruling it states "The Trustee defines Net Equity as the amount of cash deposited by the customer into his BLMIS customer account less any amounts already withdrawn by him (the "Net Investment Method")."
4. On page 10 of 53 in the Court's ruling it states "As such, the only verifiable transactions were the customer's cash deposits into, and cash withdrawals out of, their particular accounts."

It is the Client's continual claim that the listing of the transfer was fraudulent on a fraudulent account statement. If it is the Trustee's Claim that the Transfer was legitimate because the Client requested it, then all purchases/sales of stocks are legitimate, dividends too because the Client requested it and not because BLMIS perpetrated a fraud. That's nonsense and so is legitimizing the Transfer as a cash withdrawal/deposit.

If the Trustee's Claim that the Transfer was legitimate, I challenge the Trustee to present to the Court any legitimate document (i.e. a bank check) from me, a bank, an inter-change bank, a Court, and/or the Internal Revenue Service that shows that transfer happened. In advance I submit that the BLMIS statement, per the Court's words, is FRAUDELENT, in its ENTIRETY.

In George Orwell's 1945 book "Animal Farm" it stated "All Animals are Created Equal But Some Animals are More Equal than Others".    The Court has ruled "The account statements are entirely fictitious". Is there some part of the Court's ruling that is more equal than others?    Is there some part of BLMIS statements that are more fictitious than others?

It is this Client's claim that account #1W0040 has been dormant since 1993; that the total cash deposits, $261,500, as verified by the Trustee, are still in that account and should be covered in entirety by SIPC insurance. I request that the Court rule as such and direct the Trustee to issue $261,500 to Elliot Wilk, alone, as Ruth Wilk, my mother, passed away in 2006 (as submitted to the Trustee in my June, 2009 claim).

I add the following.   BLMIS wiped me out.   I am now living on Social Security and a pension from Motorola.  I can not afford an attorney and I haven't been able to find any attorney that would either represent me pro bono or on a contingency basis.  Therefore, I will be representing myself.  In hindsight I was a fool for trusting Bernard Madoff for 17 years.  I was a fool for trusting the SEC to do their due diligence.   I am no doubt foolish, as a novice, to go into the Federal Bankruptcy Court without counsel.  So be it.

I also add the following.   In UTMOST irony, the Internal Revenue Service has ruled that the income that both I and my daughter, Julie Wilk, reported for capital gains and dividends for 2005 and 2007 via BLMIS is now factual.  We had received tax refunds in 2009 for false BLMIS income for prior years and now the IRS has reinstated the income as real and they want the income taxes back.  As such we are currently on appeal and most probably will wind up in Federal Tax Court.   The odds of two dates from two Federal Courts being the same are infinitesimal but it's possible nevertheless. I would have no idea which Court would have precedence. I'll deal it with it if it happens. I'm just alerting the Court that it could happen.

_Elliot Wilk_    _July 8, 2010_
Elliot Wilk              Date

Irving H. Picard, Esq  June 29, 2009

Trustee for Bernard L. Madoff Investment Securities LLC (BMIS)

Claims Processing Center 2100 McKinney Ave., Suite 800

Dallas, TX 75201

Re: Customer Claim for Account Ruth Wilk or Elliot Wilk WROS (Joint Account)

    Claim Form mailed to Elliot Wilk Jan 6, 2009

Dear Mr. Picard,

  This is a very difficult claim for losses I have with BMIS.  I have been financially devastated.  I am 63 years old and have been retired for almost 8 years.  In this memo I will delineate the flow of events to lead to this complicated mess.

In 1991, I and my mother, Ruth Wilk, opened the above referenced account with BMIS.  The joint account was opened as a 'courtesy' to us as my mother's significant other was Morris Denerstein. Morris had an account with BMIS.  Morris was the uncle of Jerry Horowitz, the former accountant of BMIS, who passed away in March, 2009.  So, we were friends of friends and we were ensnared.

Now, I have read that as Trustee, you have stated that all account transactions on customer statements are null and void. You are simply interested in deposits and withdrawals to accounts. Everything else is simply fraudulent.  I accept that.  Any transfers to purchase/sell stocks, purchase/sell Treasury Bills, dividends, interest, etc. are all apart of the fraud.

In 1993 BMIS allowed my mother and I to open another account called the 'Wilk Investment Club' (a family partnership account, line 80 on page 161 of the published list of BMIS victims) and they "closed out" the joint account I had with my mother.  Now, I realize they did this by supposedly 'transferring' the funds from the joint account to the partnership account.

No money, no funds were ever withdrawn from the joint account and sent to my mother or me.  There was an initial deposit and then further deposits.  My claim with you is that that transfer to the Wilk Investment Club never happened and that is because we now know that NOTHING ever happened.  All funds simply went into Bernard Madoff's wallet. All transactions were fraudulent and I'm claiming that the listing of the transfer to the 2nd account was fraudulent too!

Now, I have a problem and I need your help. I don't have any papers from the joint account that existed from 1991 to 1993.  I don't even have the account number!  But I have read you have all the information on microfilm.  So, some work has to be done.  I'm also stating that the first deposit to the Wilk Investment Club was NOT the supposed transfer but in fact, the first mailed in deposit to the account in 1993.  This can all be verified from the microfilm.

My mother, Ruth Wilk, passed away in June, 2006 at my residence which is the listed address of the Wilk Investment Club. A copy of her death certificate is attached. The listed address of the joint account on line 40 of page 131 of the published list of BMIS victims, 4130 Tivoli Court, #204, Lake Worth, FL 33467, is my mother's former address.

Overtime my mother had in the Wilk Investment Club partnership account along with herself, her surviving 4 children, 7 grandchildren and 4 great-grandchildren. As a family we have been extremely financially hurt. I'm glad my mother didn't see this financial destruction to her family while she was alive.

The amount of $500,000 that I have listed on the claim form is probably wrong. You can verify the total of all deposits to the joint account. I listed $500,000 to make sure I at least claim the maximum of SIPC insurance reimbursement.

If you deny my claim by legitimizing the transfer to the partnership account, I would counter that you would be picking and choosing what was legitimate and what is not as opposed to all or nothing. I do not have an attorney, I can not afford an attorney. I do not even want an attorney! I believe my claim has merit. I also know it will take time for you to verify, review, and resolve my claim. I simply ask that you maintain appropriate communication with me. I am most open to any questions that you may have to help move this claim along.

                                                              Most Sincerely,

                                                              Elliot Wilk

6224A Island Bend

Boca Raton, Fl 3349

561-893-9966

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
In re:

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

              Debtor.
------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,
              Plaintiff,
     v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
              Defendant.
------------------------------------------------------------X

SIPA LIQUIDATION
No. 08-01789 (BRL)

(Substantively Consolidated)

**FOR PUBLICATION**

**ARGUING ON THE MOTION:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
By:    David Sheehan
        Marc E. Hirschfield
        Oren J. Warshavsky
        Seanna R. Brown

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

SECURITIES INVESTOR PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, DC 20005
Telephone: (202) 371-8300
Facsimile: (202) 371-6728
By:    Josephine Wang
        Kevin H. Bell

*Attorneys for the Securities Investor Protection Corporation*

1

The Madoff proceeding and its accompanying SIPA liquidation involve staggering numbers, with more than 15,000 claims filed and billions of dollars at stake. As of December 11, 2008 (the "Filing Date"),[3] customers' November 30th Statements reflected $73.1 billion in fictional net investments and related gains. Net of "negative" accounts approximating $8.3 billion, customers are purportedly owed a total of $64.8 billion. The critical issue before the Court is how to define a claimant's "net equity" under SIPA for purposes of distributing against these astounding sums.

The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that customers share *pro rata* in customer property[4] to the extent of their net equities, as defined in SIPA section 78*lll*(11) ("Net Equity").[5] *See* SIPA § 78fff-2(c)(1)(b). If the fund of customer property is insufficient to make customers whole, the trustee is entitled to an advance[6] from the Securities Investor Protection Corporation ("SIPC") to pay each customer the amount by which his Net Equity exceeds his ratable share of customer property, subject to a cap of $500,000 for securities claims. *See* SIPA § 78fff-3(a).

The Trustee defines Net Equity as the amount of cash deposited by the customer into his BLMIS customer account less any amounts already withdrawn by him (the "Net Investment Method"). In contrast, the Objecting Claimants define Net Equity as the amounts reflected on

---

[3] Here, the Filing Date is the date on which the SEC brought suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the entity. *See* SIPA § 78*lll*(7)(B).

[4] A fund of "customer property" consists of assets garnered by the SIPA trustee on account of customers. These assets are not ascribable to individual customers, but rather are distributed *pro rata* to the extent of a customer's Net Equity. *See* SIPA § 78*lll*(4) (defining "customer property"); *see infra* at Discussion, section I.

[5] SIPA section 78*lll*(11) defines Net Equity as "the dollar amount of the account or accounts of a customer, to be determined by –
    (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . . ; minus
    (B) any indebtedness of such customer to the debtor on the filing date . . . ."

[6] Some Objecting Claimants refer to this advance as "insurance," a designation strenuously controverted by the Securities and Exchange Commission (the "SEC"), SIPC and the Trustee, and a designation that is not supported by the controlling SIPA statute. *See* SIPA § 78fff-3(a) (titled, "*Advances* for Customers' Claims") (emphasis added).

The IA Business, on the other hand, perpetuated Madoff's fraudulent activity. Physically isolated on the 17th floor from the MM and PT Businesses, the IA Business was accessible only to select employees and insiders.[14] Unlike the SEC registration of the MM and PT Businesses, registration of the IA Business was fabricated; only 23 of its thousands of customers were reported. In contrast to the MM and PT Businesses' live computer trading system interfacing with outside feeds, the IA Business had no contact with opposite brokers or counterparties and used only one unsophisticated and archaic computer that was not programmed to execute trading of any kind. The legitimate MM and PT Businesses limited scrutiny of the IA Business. In turn, the proceeds generated by the IA Business enabled the MM and PT Businesses to remain viable, at least from 2007 forward.

## II. MECHANICS OF THE PONZI SCHEME

Rather than engage in legitimate trading activity, Madoff used customer funds to support operations and fulfill other investors' requests for distributions of profits to perpetuate his Ponzi scheme. Thus, any payment of "profit" to a BLMIS customer came from another BLMIS customer's initial investment. Even if a BLMIS customer could afford the initial fake purchase of securities reported on his customer statement,[15] without additional customer deposits, any later "purchases" could be afforded only by virtue of recorded fictional profits. Given that in Madoff's fictional world no trades were actually executed, customer funds were never exposed to the uncertainties of price fluctuation, and account statements bore no relation to the United States securities market at any time. As such, the only verifiable transactions were the

---

[14] The IA Business was staffed by more than 25 employees, including Madoff and DiPascali, who directed its day-to-day affairs.

[15] The Trustee notes that, in most instances, the customer likely did not invest enough capital to buy even those securities listed on his first BLMIS customer statement, given that prices selected for the purchase of securities for customer accounts were backdated and orchestrated.

customers' cash deposits into, and cash withdrawals out of, their particular accounts. Ultimately, customer requests for payments exceeded the inflow of new investments, resulting in the Ponzi scheme's inevitable collapse.

### A. Solicitation of Customers and Opening of Accounts

Madoff solicited billions of dollars from investors through his fraudulent IA Business. Entry into the IA Business was coveted and selective, akin to membership in an elite club. This aura of exclusivity, combined with the secrecy and reported success of Madoff's investment strategies, limited the transparency of the IA Business to prospective investors, particularly non-institutional clients.

Once a customer was granted entry into the IA Business, standard account opening procedures followed. Under standardized written agreements, customers relinquished all investment authority to Madoff, agreeing that

> [i]n all such purchases, sales or trades . . . [Madoff] is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades. All purchases, sales or trades shall be executed strictly in accordance with the established trading authorization directive.

*See* Decl. of Joseph Looby in Supp. of Trustee's Motion ("Looby Decl.") at Ex. 3. Customers retained only the authority to deposit cash and request withdrawals; all other rights associated with their accounts, including the ability to make investment decisions, were ceded to Madoff. With few isolated exceptions,[16] customers did not direct the purchase or sale of any specific security.

---

[16] The Trustee's investigation indicates that one customer directed the purchase and sale of a few specific securities. This is exclusive of those holding "friends and family" accounts, such as Jeffry Picower and Stanley Chais, who also directed securities transactions for their accounts.

11

However, the Court agrees with the Trustee, joined by the SEC and SIPC, that the Objecting Claimants' "securities positions" can be ascertained only by reference to the books and records of BLMIS. The account statements are entirely fictitious, do not reflect actual securities positions that could be liquidated, and therefore cannot be relied upon to determine Net Equity. As a result, the definition of Net Equity under SIPA section 78*lll*(11) must be read in tandem with SIPA section 78fff-2(b), which requires the Trustee to discharge Net Equity claims only "insofar as such obligations are [1] ascertainable from the books and records of the debtor or [2] are otherwise established to the satisfaction of the trustee." SIPA § 78fff-2(b). The BLMIS books and records expose a Ponzi scheme where no securities were ever ordered, paid for or acquired. Because "securities positions" are in fact nonexistent, the Trustee cannot discharge claims upon the false premise that customers' securities positions are what the account statements purport them to be. Rather, the only verifiable amounts that are manifest from the books and records are the cash deposits and withdrawals. Moreover, if customers' legitimate expectations are relevant to any determination other than whether customers hold "claims for securities" or "claims for cash," they do not apply where they would give rise to an absurd result. *See New Times Secs. Servs.*, 371 F.3d 68, 87–88 (2d Cir. 2004) ("*New Times I*") (rejecting the District Court's Net Equity calculation, which was based on customers' "legitimate expectations"); *New Times Secs. Servs.*, 463 F.3d 125, 130 (2d Cir. 2006) ("*New Times II*") ("The [*New Times I*] court declined to base the recovery on the rosy account statements . . . because treating the fictitious paper profits as within the ambit of the customers' 'legitimate expectations' would lead to [] absurdity . . . ."). The Trustee has properly satisfied expectations by providing all customers with "claims for securities."[28] Accordingly, the plain

---

[28] In *New Times I*, the SEC stated that the SIPA trustee sought to treat claims as claims for cash, with a $100,000 limit on SIPC advances. *New Times I*, 371 F.3d at 74. Here, notwithstanding a cash component reflected on

# BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

## DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

June 21, 2010

Ruth Wilk or Elliot Wilk WROS
6224A Island Bend
Boca Raton, FL 33496-3267

Dear Ruth Wilk or Elliot Wilk WROS:

## PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1W0040 designated as Claim Number 013289:

Your claim for a credit balance of $500,000.00 and for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $261,500.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, was equal to the amount that was deposited with BLMIS for the purchase of securities

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

(total of $261,500.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, and because you have withdrawn funds equal to the funds deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

**On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued a decision which affirmed the Trustee's Net Investment Method for determining customer claims. The final resolution of this issue is expected to be determined on appeal.**

**Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.**

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and**

2

the Trustee within **THIRTY DAYS** after June 21, 2010, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

> Clerk of the United States Bankruptcy Court for
> the Southern District of New York
> One Bowling Green
> New York, New York 10004
>
> and
>
> Irving H. Picard, Trustee
> c/o Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York 10111

*/s/ Irving H. Picard*
───────────────────────────
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 8/17/1992 | CHECK | $104,000.00 | $104,000.00 |
| 8/17/1992 | CHECK | $29,000.00 | $29,000.00 |
| 8/17/1992 | CHECK | $14,000.00 | $14,000.00 |
| 8/17/1992 | CHECK | $5,600.00 | $5,600.00 |
| 8/17/1992 | CHECK | $5,000.00 | $5,000.00 |
| 8/17/1992 | CHECK | $2,400.00 | $2,400.00 |
| 11/10/1992 | CHECK | $47,000.00 | $47,000.00 |
| 1/25/1993 | CHECK | $54,500.00 | $54,500.00 |
| **Total Deposits:** | | $261,500.00 | $261,500.00 |

| DATE | TRANSACTION DESCRIPTION | AMOUNT | ADJUSTED AMOUNT |
|---|---|---|---|
| 3/9/1993 | TRANS TO 1W004810 | ($56,061.50) | ($56,061.50) |
| 3/30/1993 | TRANS TO 1W004810 | ($224,101.57) | ($205,438.50) |
| **Total Withdrawals:** | | ($280,163.07) | ($261,500.00) |
| **Total deposits less withdrawals:** | | ($18,663.07) | $0.00 |

4