Helen Davis Chaitman (4266)
BECKER & POLIAKOFF LLP
45 Broadway
New York, NY 10006
(212) 599-3322
hchaitman@becker-poliakoff.com
Attorneys for Theresa R. Ryan, Trustee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,

       Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

       Defendant.
---------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

       Theresa R. Ryan, Trustee (the "Trustee") of the Theresa R. Ryan and Lawrence J. Ryan Trust dated November 20, 1991 (the "Trust"), hereby objects to the Notice of Trustee's Determination of Claim dated July 19, 2010 sent by Irving H. Picard, Trustee (the "Determination Letter") and states as follows:

**Background facts**

       1.     In 1987 or 1988, Theresa R. Ryan and her husband, Lawrence J. Ryan, established an account with Bernard L. Madoff Investment Securities LLC ("Madoff"), Account No. 1R007310 (the "Account")..

       2.     The Trust was formed in 1991 pursuant to a written agreement and, at that point, the name of the Account was changed to Theresa R. Ryan and Lawrence J. Ryan Trust.

3. In 1997, Madoff changed the number on the Account, for his own purposes, to 1R0133.

4. According to Picard, during the period from June 10, 1997 through December 11, 2008, $953,522.21 was deposited into the Account and $1,244,933.35 was withdrawn from the Account. However, the Account balance as of June 10, 1997 was $888,522.21. Picard has credited the Account with $0 of this amount. See Exh. A at 4. The Trust does not accept Picard's calculations.

5. Throughout the period of the Account's existence, taxes were paid annually on the appreciation in the Account.

6. The November 30, 2008 market value of securities in the Account was $448,150.11.

7. The Trust sent a timely SIPC claim to Picard asserting a claim for securities in the amount of $448,150.11, based upon the November 30, 2008 Madoff statements.

8. In the Determination Letter, Picard rejected the Trust's claim because, according to Picard, during the period from June 10, 1997 to December 11, 2008, the Trust withdrew $1,179,933.35 more than it deposited, ignoring all appreciation in the Account over a period of approximately 20 years. See Exh. A at 1-3.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

9. The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books

2

and records" by which Picard is bound, absent proof that the Trust did not have a "legitimate expectation" that the balance on the Account statements represented Trust property. In fact, in each year of the Account, ordinary income taxes were paid on the appreciation in the Account, which taxes were duly accepted by the taxing authorities. These taxes would not have been paid if the Trustee did not believe that the assets in the Account belonged to the Trust.

10. Picard has failed to state a basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

**B. Picard has violated the requirement that
he honor a customer's "legitimate expectations"**

11. The legislative history of the Securities Investor Protection Act ("SIPA") makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.

> \*   \*   \*

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

12. On December 30, 1970, when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms. . . . Just as the Federal Deposit Insurance Corporation protects the user of banking services from the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid=2870

13. SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

14. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

15. Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

16. As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.

5

>HARBECK:  **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00) (emphasis added).

**C.  Without legal authority, Picard has invented his own definition of "net equity"**

17. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

>The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
>(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
>(B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

18. SIPA specifically prohibits SIPC from changing the definition of "net equity."  15 U.S.C. § 78ccc(b)(4)(A).

19. The Second Circuit has recognized that:

>Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

20. In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize

6

investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who have depended upon their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

21. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

22. Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

23. After 20 months of his tenure, Picard has identified only two Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. For example, Picard has sued Madoff customers Stanley Chais and Jeffry Picower who, Picard has alleged, took out of Madoff $7.2 billion more than they invested. Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

24. However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

The Trustee, like thousands of other investors, received monthly statements from Madoff in the past several years indicating returns on their Madoff investment in the range of 9 – 14% per year. The Trust had entered into a standard brokerage agreement with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Account had specific numbers; the Trustee received on a monthly basis trade confirmations for every securities transaction in the Account which accurately set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis to claim that the Trustee did not have a "legitimate expectation" that the assets reflected on the Account statements sent to her by Madoff belonged to the Trust. Thus, the Trust is entitled to a claim for securities in the amount of $448,150.11, as reflected on the November 30, 2008 Madoff statement.

**D. The Trust is entitled to prejudgment interest on the investment and profits.**

25. Under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted the the Trust' funds, that fact also entitles them to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

26. Although it is not legally relevant, Picard cannot prove that Madoff earned no money on the Trust's investment. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to

8

family members, and for other purposes. Those funds may have yielded substantial profits to which the Trust and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

27.     In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Picard makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

### E. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit

28.     In derogation of his fiduciary duty to the Trust, Picard is, in effect, imposing upon the Trust a fraudulent conveyance judgment for sums that were withdrawn from the Account,

and from the transferor accounts, beyond the statute of limitations period applicable to fraudulent conveyances and without any evidence that Madoff acted fraudulently during this period. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Trust of the claim to which it is absolutely entitled.

**F. Picard has violated SIPA by delaying the payment of SIPC insurance**

29. Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace the Trust's securities up to a value of $448,150.11 as valued on the November 30, 2008 statement.

**Conclusion**

The Trust is entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of $448,150.11 as of November 30, 2008.

The Trust is entitled to have its claim recognized in the amount of $448,150.11, consistent with the November 30, 2008 statements.

The Trust is entitled to judgment against Picard and Baker & Hostetler LLP for the damages it has suffered as a result of the breach of fiduciary duty of Picard and his counsel.

August 3, 2010

BECKER & POLIAKOFF LLP

By  s/s Helen Davis Chaitman (4266)

45 Broadway
New York, NY 10006
(212) 599-3322
hchaitman@becker-poliakoff.com
Attorneys for Theresa R. Ryan, Trustee