Katharine B. Gresham
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
Telephone:  (202) 551-5148
Facsimile: (202) 772-9260
email: greshamk@sec.gov

Hearing Date: October 19, 2010
Hearing Time: 10:00 a.m.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK**

---

SECURITIES INVESTOR PROTECTION
CORPORATION,

               Plaintiff,

     v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

               Defendant.

---

In re:

BERNARD L. MADOFF,

               Debtor.

---

Adv. Pro. No. 08-1789 (BRL)
SIPA Liquidation
(Substantively Consolidated)

**MEMORANDUM OF LAW OF THE SECURITIES AND EXCHANGE COMMISSION
SUPPORTING TRUSTEE'S DETERMINATIONS DENYING THE CLAIMS OF
CERTAIN FEEDER FUND CLAIMANTS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................. ii

INTRODUCTION ......................................................... 1

FACTS ................................................................. 2

ANALYSIS .............................................................. 3

    1.    Securities Investor Protection Act and the "Customer" Definition ........... 3

    2.    Legislative History of "Customer" Definition ............................ 5

    3.    Cases Interpreting "Customer" Definition .............................. 7

    4.    The Claimants Are Not "Customers" Under the SIPA Definition ............ 9

# TABLE OF AUTHORITIES

**CASES**                                                                         **Page**

*Ahammed v. Sec. Investor Prot. Corp. (In re Primeline Sec. Corp.)*, 295 F.3d 1100 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9, 11, 12

*Focht v. Heebner (In re Old Naples Sec., Inc.)*, 223 F.3d 1296 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 10, 11, 12

*Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314 (2nd Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*In re Marriott Hotel Prop. II Ltd. P'ship Unitholders Litig.*, 2000 Del. Ch. LEXIS 17 (Jan. 24, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**STATUTES**

Securities Investor Protection Act, 15 U.S.C. 78aaa, *et seq*.

    Section 9(a)(5), 15 U.S.C. 78fff-3(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7
    Section 16(2), 15 U.S.C. 78*lll*(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9
    Section 16(4), 15 U.S.C. 78*lll*(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 16(11), 15 U.S.C. 78*lll*(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Securities Investor Protection Act of 1970, § 6(c)(2)(A), 84 Stat. 1636 . . . . . . . . . . . . . . . . . . . . 7

N.Y. Ltd. Liab. Co. Law § 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

6 Del. Code § 17-701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**LEGISLATIVE MATERIAL**

H.R. 18081, 91st Cong. (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

H.R. 18109, 91st Cong. (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

H.R. 18458, 91st Cong. (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

H. R. Rep. No. 91-1613 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

H.R. Rep. No. 95-746 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

**TABLE OF AUTHORITIES (Continued)**

**Page**

S. 2348, 91st Cong. (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

S. 2348, Amendment in the Nature of a Substitute, 91st Cong. (1970) . . . . . . . . . . . . . . . . . . . . . . 6

S. 3989, 91st Cong. (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Hearings before the Subcomm. on Securities of the S. Comm.
    on Banking and Currency, 91st Cong. (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**MISCELLANEOUS**

Restatement (Third) of Agency §1.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## INTRODUCTION

The Securities and Exchange Commission respectfully submits this Memorandum of Law pursuant to this Court's Order establishing a schedule for adjudicating whether a claimant who "did not have an account in his/her/its name" with Bernard L. Madoff Investment Securities LLC (BLMIS) is a "customer" under the Securities Investor Protection Act (SIPA). Order, dated April 13, 2010, Dkt. # 2205. The Commission supports the Trustee's motion seeking an order affirming his denial of claims filed by claimants who did not have accounts with BLMIS but had invested in entities, called "feeder funds," that had accounts with BLMIS. Trustee's Motion To Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds, dated June 11, 2010 ("Trustee's Motion"), Dkt. # 2416.

This memorandum addresses why the claimants who invested in the sixteen feeder funds named in the Trustee's Motion are not "customers" eligible to receive individual payments from the fund maintained by the Securities Investor Protection Corporation (SIPC). The Trustee has not sought affirmance of his denials of claims involving other feeder funds, or of claims involving other types of entities where the claimants did not have accounts with BLMIS. Memorandum of Law in Support of Trustee's Motion, dated June 11, 2010 ("Trustee's Memorandum"), Dkt. # 2416 , at 2 and n.2. Whether these other claimants are "customers" will depend upon an analysis of the factual circumstances of their claims and how SIPA applies under those circumstances.

# FACTS

The claims at issue were filed by 1,771 investors in sixteen investment funds that had accounts with BLMIS. Trustee's Memorandum at 2, 10. The funds were legal entities – limited partnerships and limited liability companies organized under the laws of New York and Delaware, and companies organized under the laws of the Cayman Islands and British Virgin Islands. *Id.* at 8, n.4. Investors purchased ownership interests in the fund entities – shares and limited partnership interests. *E.g.,* Exhibits 61 (offering of common shares) and 65 (offering of limited partnership interests), attached to Declaration of David J. Sheehan in Support of Trustee's Motion, dated June 11, 2010 ("Sheehan Declaration"), Dkt. 2413.

The funds had accounts with BLMIS in which the funds' assets were invested using Bernard Madoff's "split strike conversion strategy." Typically, the prospectuses and private placement memoranda received by persons who purchased interests in the funds state that management of the funds' business is the responsibility of general partners or managing members, who delegate responsibility for investing part or all of the funds' assets to an investment advisor, which is either expressly identified as BLMIS, described in a way that refers to BLMIS, or not identified. *E.g.*, Exhibit 4, attached to Sheehan Declaration, Kingate Global Fund Amended and Restated Information Memorandum, at 4 ("All decisions with respect to the general management of the Fund are made by the Manager, who has complete authority and discretion in the management and control of the business of the Fund, including the authority to delegate all investment management activities to the selected Investment Advisor."); *id*. at ii ("The Fund's assets are managed by a New York based NASD registered broker-dealer ... [that] utilizes a 'split strike conversion' options strategy ... ").

-2-

**ANALYSIS**

1.   <u>Securities Investor Protection Act and the "Customer" Definition</u>

The purpose of the Securities Investor Protection Act is to assure that customers of failed brokerage firms receive the securities and cash that should be held for them by those firms. H. R. Rep. No. 91-1613, at 1 (1970) ("The primary purpose of the reported bill is to provide protection for investors if the broker-dealer with whom they are doing business encounters financial troubles. In these circumstances public customers sometimes encounter difficulty in obtaining their cash balances or securities from the broker-dealers."); H. R. Rep. No. 95-746, at 21 (1977) ("A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business.").

Section 16(2) of SIPA defines "customer" as a person who has a claim based upon securities and cash held for that person by the brokerage firm. It provides, in pertinent part:

> The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities ... ."

l5 U.S.C. 78*lll*(2). The "customer" definition encompasses three situations: (1) claims for securities held for the customer's account; (2) claims for securities that were being held for the customer's account, but have been sold or converted; and (3) claims for cash deposited with the brokerage firm to purchase securities.

The first two situations are expressly tied to a person's "securities accounts." The first sentence of the definition states that a "customer" is a "<u>person</u>" with a claim for "securities" that are "received, acquired, or held" by the brokerage firm "from or <u>for the securities accounts of such person</u>." The portion of the second sentence applicable to a claim for "sales or conversions" refers to "<u>such securities</u>" – *i.e.*, the securities described in the first sentence that would otherwise be held "for the securities accounts" of the person but are not because they have been sold or converted by the broker. The provision of the second sentence applicable to a claim for cash deposited for the purpose of purchasing securities does not expressly refer to a "securities account." However, the act of depositing cash with a brokerage firm for the purpose of purchasing securities creates an obligation that must be entered on the firm's books and records as cash held for the account of the person who deposited the money. Thus, SIPA's "customer" definition, which expressly refers to securities held for the account of a person, also encompasses cash held for the account of a person.

The focus on accounts is evident in other provisions of SIPA. For example, Section 16(4) defines "customer property" as "cash and securities ... at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer." l5 U.S.C. 78*lll*(4). Customers in SIPA proceedings file claims for "net equity," which is defined in Section 16(11) as "the dollar amount of the account or accounts of a customer." l5 U.S.C. 78*lll*(11).

In sum, SIPA protection is extended to "customers," who are persons who have accounts with the brokerage firm undergoing liquidation. The only exception is provided in Section 9(a)(5), which applies to payments from the SIPC Fund with respect to accounts held by banks and other broker-dealers. They are entitled to receive payments only to the extent that their

-4-

claims arise from transactions for customers, and those customers are each deemed to be a separate "customer" for purposes of SIPA:

> " ... no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established to the satisfaction of the trustee ... that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank ... in which event each such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor."

Section 9(a)(5), 15 U.S.C. 78fff-3(a)(5).

    2.    <u>Legislative History of "Customer" Definition</u>

During its deliberations on the legislation that became the Securities Investor Protection Act of 1970, Congress had before it several proposals that would have provided coverage beyond the person who has the account with a brokerage firm to include third parties who have interests in the account. These proposals were not part of the legislation as enacted.

The initial bill proposed by Senator Muskie, the principal sponsor of the legislation in the Senate, defined "insured customer account" as "the net amount due any customer from his account maintained with an insured broker or insured dealer ... less any part thereof which is in excess of $50,000." S. 2348, 91st Cong. § 2(7) (1969). Thereafter, just before the hearings on the legislation, Senator Muskie introduced an amendment that expanded the definition to add additional coverage for accounts with beneficial interests. The revised definition stated:

> "The term 'insured customer account' means (a) the net amount due any customer from his account maintained with an insured broker or insured dealer, less any part thereof which is in excess of $50,000 ... ; or (b) the net amount due any institution or <u>entity which represents the beneficial interest of five or more natural persons</u>, less any part thereof which is in excess of $250,000 ... ."

-5-

S. 2348, Amendment in the Nature of a Substitute, 91st Cong. § 2(5) (1970) (emphasis added).

During the hearings, the Securities and Exchange Commission and a securities industry task force both made legislative proposals that were introduced as bills in Congress. The Commission's proposal included a section that provided greater coverage for accounts in which third parties have interests:

> "in the case of a person acting as agent who transacts business for third parties through an account or accounts with a broker, dealer, or member of a national securities exchange, for purposes of the $50,000 limitation, <u>the term customer shall not be limited by the number of such accounts but shall include each such third party</u> insofar as the claims of such third parties are ascertainable from the books and records of either the debtor or the person acting as agent made available to the trustee or are otherwise determined to the satisfaction of the trustee."

S. 3989, 91st Cong. § (35)(j)(8) (1970) (emphasis added); H.R. 18081, 91st Cong. § 35(j)(8) (1970) (same). The legislation proposed by the securities industry task force had no such provision, providing only a single payment not to exceed $50,000 for each customer with an account. H.R. 18109, 91st Cong. § 36(g) (1970).

The Commission and the securities industry task force were able to reach agreement on a single bill, which formed the basis for the legislation that was enacted. *Hearings before the Subcomm. on Securities of the S. Comm. on Banking and Currency*, 91st Cong. 257, 296 (1970). The combined proposal did not include the Commission's provision addressing third-party interests. It included a new provision applicable to customers of banks and broker-dealers that have accounts with broker-dealers, which provided that "each such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor." H.R. 18458, 91st Cong.,

§ 35(m)(13)(C) (1970). This provision is identical to the language in current SIPA Section 9(a)(5). *Compare id. with* SIPA Section 9(a)(5).

The combined proposal also for the first time included a definition of "customer." The proposal was, with modifications, adopted as the definition of customer in the final legislation enacted as the Securities Investor Protection Act of 1970. The parts of the definition at issue in this case are not significantly changed from the 1970 definition. [1]

3. Cases Interpreting "Customer" Definition

There are two court of appeals decisions that analyze SIPA's "customer" definition in the context of a Ponzi scheme: *Focht v. Heebner (In re Old Naples Sec., Inc.)*, 223 F.3d 1296 (11th Cir. 2000), and *Ahammed v. Sec. Investor Prot. Corp. (In re Primeline Sec. Corp.)*, 295 F.3d

---

[1] The 1970 definition provided:

> "'customers' of a debtor means persons (including persons with whom the debtor deals as principal or agent) who have claims on account of securities received, acquired, or held by the debtor from or for the account of such persons (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchases, or (V) as collateral security, or (VI) by way of loans of securities by such persons to the debtor, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, and shall include any person who has deposited cash with the debtor for the purpose of purchasing securities ... "

SIPA of 1970, § 6(c)(2)(A), 84 Stat. 1636. The 1978 amendments to SIPA changed the definition somewhat. In addition to making stylistic changes, the phrase "from or for the accounts of such persons" in the 1970 definition became "from or for the <u>securities</u> accounts of such persons," and the phrase "(VI) by way of loans of securities by such persons to the debtor" was eliminated. The legislative history of the 1978 amendments explains that the purpose of the changes was to make clear that persons who lend securities to a broker-dealer and receive consideration for their loans are not deemed customers. H.R. Rep. No. 95-746, 95th Cong., at 33-34, 54 (1977).

1100 (10th Cir. 2002). Both cases address when persons whose money is not deposited directly with a brokerage firm are deemed customers.

In *Old Naples*, the investors, who were clients of a branch office of Old Naples Securities, Inc., were told by the branch manager to wire their investment funds to Old Naples Financial Services, the investment advisory affiliate of the brokerage firm, and not to the firm itself. The Trustee and SIPC argued that because the customer definition requires a person to have "deposited cash with the debtor," the investors were not covered. The court of appeals disagreed, stating:

> Whether a claimant "deposited cash with the debtor," however, does not (as Focht [the Trustee] and the SIPC suggest) depend simply on to whom the claimant handed her cash or made her check payable, or even where the funds were initially deposited. Instead, the question is whether there was "actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation."

223 F.3d at 1302 (citations omitted). The court explained that an investor who "intended to have the brokerage purchase securities on her behalf and reasonably followed the broker's instructions regarding payment" can be a "customer" under SIPA. *Id.* at 1303. Because the *Old Naples* claimants were dealing with an agent of the brokerage firm and reasonably believed that in following his instructions they were sending their money to the brokerage firm, and because the brokerage firm in fact acquired control over their money, the court concluded that they had "deposited cash with the debtor." *Id.* at 1303-04.

*Primeline* involved investors who had been instructed by a registered representative of the brokerage firm to make checks out to one of his own companies. 295 F.3d at 1104. The investors had met with the representative at Primeline's offices and were given business cards

-8-

showing his position as a Primeline registered representative. *Id.* at 1107. Under these circumstances, the court of appeals concluded that the bankruptcy court's finding that the "[c]laimants reasonably thought [the representative] was acting as an agent of Primeline when he directed them to make out their checks to one of his third-party companies" was not clearly erroneous. *Id.* Based on the analysis of *Old Naples*, the court ruled that the bankruptcy court did not err in ruling that the claimants had "deposited cash 'with the debtor'" and thus were "customers" under SIPA. *Id.* at 1108.

In addition to these cases addressing the provision of the "customer" definition applicable to cash deposited for the purpose of purchasing securities, the Second Circuit has held that the employee-beneficiaries of a profit-sharing plan whose assets were maintained in a trust account at a brokerage firm were not "customers" under SIPA. *Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314 (2nd Cir. 1976). The beneficiaries, the court found, "made no purchases, transacted no business, and had no dealings whatsoever with the broker-dealer in question respecting the trust account." *Id.* at 1318. The account "was in the name of the Trustees who had the exclusive power to entrust the assets to the debtor, to invest and reinvest, and to purchase and trade securities in the account as they saw fit." *Id.* Under these circumstances, "the single trust account, represented by the Trustees collectively, possessed the required attributes for customer status under SIPA," while the employee-beneficiaries "possessed none of those attributes." *Id.*

    4.  <u>The Claimants Are Not "Customers" Under the SIPA Definition</u>.

In memoranda filed with this Court, the claimants make numerous arguments based upon their interpretations of the "customer" definition in SIPA Section 16(2) and the *Old Naples* and

*Primeline* decisions. The Commission, based upon its analysis of the statute and cases as applied to the facts pertaining to the claimants' investments in the sixteen feeder funds, believes that the claimants are not "customers" under SIPA.

SIPA protects a person who has a claim for securities and cash that are being held <u>for the person's account</u> with a SIPC-member brokerage firm. The claimants, who did not have accounts with BLMIS, ask to be treated no differently than investors who had accounts. The account requirement, however, is integral to the definition of "customer" and reflects Congress's purpose of protecting assets that are held for customers by brokerage firms.

The claimants did not entrust their money with BLMIS, but gave it to the feeder fund entities to pay for their purchases of limited partnership interests and shares in those entities. Investors in the feeder funds received memoranda explaining the nature of the investments. *E.g.*, Exhibits 53, 61, 64, 65, 71, 74, 76, attached to Sheehan Declaration. They were also required to sign detailed subscription documents in order to purchase their interests. *E.g.*, Exhibits 51, 54, 66, 72, 77, attached to Sheehan Declaration. Once they gave their money to the funds in consideration for their ownership interests, the money became the property of the funds. See N.Y. Ltd. Liab. Co. Law § 601 ("A member has no interest in specific property of the limited liability company"); 6 Del. Code § 17-701 ("A partner has no interest in specific limited partnership property."); *In re Marriott Hotel Prop. II Ltd. P'ship Unitholders Litig.,* 2000 Del. Ch. LEXIS 17, at * 51-*52 (Jan. 24, 2000) (§ 17-701 "has been interpreted to preclude the attempt to equate ownership interests in a partnership with ownership of partnership property"). It is the funds' assets that were deposited with BLMIS for the purpose of purchasing securities.

The investors had interests that entitled them to distributions from the funds based upon the earnings on the assets held in the funds' accounts.

The claimants are not like the investors in *Old Naples* and *Primeline*. The courts based their findings that those investors had deposited money with the brokerage firm, even though the money was directed elsewhere, on factual circumstances that are not present here. In both cases the investors were dealing with agents of the brokerage firm. *Old Naples*, 223 F.3d at 1303 (investors were dealing with person who "acted as the agent of Old Naples Securities"); *Primeline*, 295 F.3d at 1107 (investors were dealing with person whom claimants "reasonably thought ... was acting as an agent of Primeline"). Although many of the claimants' briefs argue that the funds should be viewed as agents of BLMIS, there was no agency relationship because the funds were not controlled by BLMIS. "Control" of the agent by the principal is necessary to establish an agency relationship. *See* Restatement (Third) of Agency § 1.01 ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."). The prospectuses and private placement memoranda for the funds make clear that control remained with general partners or managing members, who then delegated responsibility for investing part or all of the funds' assets to BLMIS. *See, e.g.*, Exhibits 53 (p. 8), 61 (p. 14), 64 (p. 13), 65 (p. 3), 71 (pp. 9, 16), 74 (pp. 2, 5), 76 (p. 2, 7), attached to Sheehan Declaration.

Moreover, in both *Old Naples* and *Primeline*, the investors believed that in following the instructions of the brokerage firms' agents, they would be depositing their money with the firm itself. *Old Naples*, 223 F.3d at 1303 (one investor "believed that he was sending money to the

brokerage" and the other investor was "assured" that "Old Naples Securities and Old Naples Financial Services were one and the same"); *Primeline*, 295 F.3d at 1105 ("Claimants testified they elieved they were investing with, through, or in Primeline"). The claimants here received documents explaining their investments in the feeder funds and were required to fill out detailed subscription forms to purchase their interests. Purchasing an interest in one of the sixteen feeder funds was not comparable to depositing money with the brokerage firm itself.

Finally, many of the factual circumstances that led the Second Circuit to conclude that the trust beneficiaries in *Morgan, Kennedy* were not entitled to "customer" status are also present with respect to the holders of interests in the feeder funds. It was the funds' money that was entrusted with BLMIS; the investors were not named as holders of the accounts; they had no control over investment decisions of the funds; and they had no power over the assets held in the accounts. See *Morgan, Kennedy*, 533 F.2d at 1318.

In sum, only the sixteen feeder funds that had accounts with BLMIS are "customers" under SIPA, not the owners of interests in those funds.

Respectfully submitted,

Dated: New York, NY
August 10, 2010

Of Counsel
Jacob H. Stillman
Solicitor

/s/ Katharine B. Gresham
Katharine B. Gresham
Assistant General Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Telephone: (202) 551-5148
Facsimile: (202) 772-9260
e-mail: greshamk@sec.gov

-12-