DUANE MORRIS LLP
COUNSEL TO THE MAGNUS A. UNFLAT IRA
1540 Broadway
New York, NY 10036-4086
Telephone: 212.692.1022
William C. Heuer, Esq.
Patricia H. Heer, Esq.

        - and -

470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857.488.4200
Stephen M. Honig, Esq.
Kara M. Zaleskas, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-1789 (BRL) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**JOINDER TO ARGUMENTS PRESENTED IN CONNECTION WITH**
**TRUSTEE'S OTHER OBJECTIONS TO CUSTOMERS' CLAIMS AND**
**OBJECTION TO NOTICE OF TRUSTEE'S DETERMINATION LETTERS**

Magnus A. Unflat (the "Claimant"), by and through undersigned counsel, hereby objects

to the two *Notice of Trustee's Determination of Claims* pursuant to which Irving H. Picard (the

"Trustee"), the trustee appointed pursuant to the Securities Investor Protection Act, 15 U.S.C. §

78aaa *et seq*. ("SIPA"), denied in its entirety the "combined claim" asserted on account of

BLMIS Account No. 1-U0015-3-0 (the "Account"), which was opened in 1997 with the balance

of funds in BLMIS Account No. 1-U0005-1-0, (the "Funding Account") designated as Claim

Numbers 005096, 010622 and 010621 (collectively, the "Claim").[1]

In support of this joinder and objection (the "Objection"), the Claimant respectfully states

as follows:

## PRELIMINARY STATEMENT

The Trustee's determination letters to Claimant dated July 13, 2010 (collectively, the

"Determination Letter")[2] is objectionable on a number of grounds.

First, the Trustee ignores the fact that the Account is an IRA account from which the

Claimant was compelled to make minimum annual distributions pursuant to § 401(a)(9) of title

26 of the United States Code, 26 U.S.C. §§ 101 *et seq*. (the "Internal Revenue Code" or the

"IRC").  When Claimant turned 70½, Claimant commenced taking annual distributions from the

Account, as he was required to do, in order to avoid substantial penalties.  The Claimant was

required to take annual minimum distributions based on the reported balance of his account, both

principal and "fictitious profits." By extension, Claimant submits that the Trustee likewise must

calculate "net equity" based on the required minimum distribution of "fictitious profits" that the

IRC commanded Claimant to withdraw.[3]  Said another way, if Claimant had not been required,

---

[1]    Claimant submitted only one claim relating to the Account.  Claimant did not submit a claim with
respect to the Funding Account because that account effectively was closed in or around July 8, 1997, and
Claimant had not received any statements with respect to the Funding Account since its closure.  The Claimant
opposes the Trustee's efforts to bifurcate his Claim, as it appears that the Trustee is seeking to avoid and
recover the transfer that closed the Funding Account and funded the Account outside the statute of limitations
period.

[2]    Copies of each of the Determination Letters are attached collectively hereto as **Exhibit A**.

[3]    By way of example, if the balance of Claimant's account in 2002 was reported at $3 million, of which
50% constituted "principal investment," and 50% constituted "fictitious profits," and under IRC § 401(a)(9),
Claimant was required to take a minimum distribution of 5%, then Claimant's withdrawal of $150,000 for that

2

by law, to take annual distributions  based on an overstated an account balance, Claimant would

not have taken distributions, or would have taken lower annual distributions, and currently would

have a "positive net equity balance."  Thus, in applying the "net investment" methodology to

IRA accounts, the Trustee must: (i) determine what portion of each distribution was compelled

under the IRC, (ii) calculate how much of the minimum distribution was required on account of

misreported profits, and (iii) discount the withdrawal to the extent of the proportion of fictitious

profits reported to the IRS.  This is the only methodology which gives equal weight to the policy

goals of SIPA and IRC.

Second, through the claims determination process, the Trustee inequitably discriminates

against certain customers, including the Claimant, whose deposits were funded by transfers from

other accounts maintained with Bernard L. Madoff Investment Securities LLC ("Madoff").

Specifically, without any support or explanation, the Trustee makes an "adjustment" to the

Account which effectively avoids and recovers – in its entirety – the only transfer credited to the

Account in July, 1997 (the "Transfer").  Because the Transfer otherwise could not be avoided

because it occurred more than six years prior to the date of the statute of limitations for

recovering so-called fraudulent transfers under the laws of the State of New York were the

Trustee to institute an adversary proceeding against the Claimant – as he is required to do

pursuant to the Federal Rules of Bankruptcy Procedures – he cannot recover it by unilaterally

eliminating the one deposit made to the Account.  To hold otherwise would impermissibly

expand the Trustee's avoidance powers beyond the limitations set by title 11 of the United States

---

year should reduce "principal investment" by only $75,000, and the other $75,000 should be treated as being
withdrawn from "fictitious profits."  To hold otherwise would undermine the policy rationale of the required
minimum distribution rules of the IRC and would punish IRA account holders who were complying with such
rules.

Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "<u>Bankruptcy Code</u>") and applicable state law, and would work an unfair hardship against customers who reinvested their earnings in Madoff.

<u>Third</u>, the Trustee's "adjustment" process is inequitable because the Trustee applies the Net Investment Method in a manner that inappropriately penalizes and discriminates against those customers who maintained account balances with Madoff on or before December 10, 2002 and thereafter continued to invest with Madoff, as compared to customers who withdrew their earnings, or a substantial portion thereof, on or prior to December 10, 2002, and whose withdrawals are free from restriction or avoidance.

As this Court already has concluded that the Trustee's power to determine customer claims should be exercised in concert with his other powers, including his avoidance powers, the proper application of the "Net Investment Method" must take into account that transfers to/from a Madoff account arising on or prior to December 10, 2002 are not avoidable by the Trustee. To insure equal treatment to **_all_** customers of Madoff, the Trustee should, with respect to those customers who had accounts in existence with Madoff on or before December 10, 2002, be limited in his application of the Net Investment Method by considering only the following: (a) the statement balance in the Account as of November 30, 2002; less (b) withdrawals made from December 11, 2002 through December 10, 2008 (the "<u>Avoidance Period</u>") plus (c) deposits made during the Avoidance Period. By treating the statement balance in existence on November 30, 2002 as the beginning amount of "cash in" for purposes of applying the Net Investment Method, this methodology: (i) works in concert with the avoidance provisions of the Bankruptcy Code; (ii) insures that customers holding "older accounts" do not bear an inordinate burden of

4

alleged fraudulent transfer liability; and (iii) comports with the "equality is equity" maxim on which the Bankruptcy Code is premised.[4]

      <u>Fourth</u>, the Trustee, by arbitrarily "adjusting" the amounts in Madoff accounts (including the Funding Account) existing on or before December 10, 2002, an act which exceeds the scope of the Trustee's powers, applies a different standard of review to the preexisting Madoff account-holders than he applies to "new" customers investing after December 10, 2002.  Although not expressly defined in the Trustee's Determination Letter, one surmises that the so-called adjustments made to the pre-December 2002 accounts are based on tracking of "cash in, cash out" for periods commencing with the inception of the investments.  Yet, no such "tracking" of the source of funds is applied to any other class of Madoff customers.  If hypothetically a "new" Madoff customer cashed out of a similar "ponzi" scheme prior to the State Look Back Period and invested those funds with Madoff, such investor receives full credit of "cash in" for the purposes of the Trustee's application of the Net Investment Method.  In contrast, preexisting Madoff account-holders are held to a totally different standard, as their deposits are being discounted, or even stricken altogether, simply because the deposits originated from another Madoff account.  It is inequitable for the Trustee, on the one hand, to discriminate against these customers solely on the basis that the Trustee has access to records that would otherwise be unavailable for use in an avoidance action, but, on the other hand, to give unfettered credit to a "new" customer without any ability to trace, or otherwise contest, the source of such funds.

      <u>Finally</u>, notwithstanding the foregoing, the Trustee's claims determination process fails to properly account for any legitimate profits or earnings generated prior to the implementation of the Ponzi scheme, and interest required to be credited pursuant to, among other provisions N.Y.

---

[4]    *See infra*, note 8, for examples of how the timing of deposits and withdrawals in relation to the Avoidance Period cultivates inequitable treatment among customers.

DM1\2277644.5

C.P.L.R. § 5001, 5004; N.Y. Gen. Oblig. § 5-501, *et seq.*, N.Y. C.P.L.R. § 5205(c).  As set forth in greater detail below, New York law, and cases interpreting the calculation of "value" in presenting a defense of a fraudulent conveyance claim, command the Trustee to adjust customers' claims to take into account the interest that they would have earned in connection with a tort claim – for fraud, unjust enrichment, breach of fiduciary duty, or other similar claims – against Madoff.  The Trustee cannot ignore the mandates of state law to facilitate the claims determination process.

## JOINDER TO PLEADINGS OF OTHER SIMILARLY SITUATED CUSTOMERS

1.      As an initial matter, Claimant hereby joins, and fully incorporates by reference as if fully restated herein, the arguments and authority cited in the objections and briefs filed on behalf of similarly situated customers including, without limitation, the arguments that the Trustee is bound by the November 30, 2008 statement to determine a customer's claim.  To the extent that customers raise new arguments in connection with subsequent determinations rendered by the Trustee, Claimant reserves the right to join in such other arguments, as appropriate.

## BACKGROUND

2.      The Funding Account was established from a roll-over of proceeds accumulated over time in a profit-sharing plan at UM Energy and its predecessor, which plan complied with the provisions of the IRC.

3.      The Funding Account was established in 1991 by the cash payment of $947,732.[5]

---

[5]      With respect to the Funding Account, Claimant points out, to the extent germane in law or equity, that the Trustee attempts to wipe out, in its entirety, the initial deposit from the account of the U.M. Energy Profit Sharing Plan (the "<u>Plan Account</u>") to the Funding Account by "adjusting" that deposit to $0.  Claimant demands an accounting of the referenced "Personal Account" which the Trustee has designated as the source of Claimant's initial deposit.

DM1\2277644.5

4.      On December 11, 2008 (the "Commencement Date"), an action was commenced against Madoff by the Securities & Exchange Commission in the United States District Court for the Southern District of New York.  On December 15, 2008, this liquidation proceeding was commenced pursuant to SIPA.  *See Order, Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) [Dkt. No. 4].  The Trustee was appointed and charged with, *inter alia*, overseeing the liquidation of Madoff and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. § 78fff-1(a) (2009).

5.      On December 23, 2008, the Court issued an Order (the "Claims Procedure Order") directing the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines. *See* Claims Procedure Order [Dkt. No. 12].  The Claims Procedure Order further provides that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, **and the reason therefor** . . . " *Id.* at 6 (emphasis added).

---

Even if the Trustee can provide sufficient documentation evidencing that, as of July, 1991, the aggregate of withdrawals from the Plan Account exceeded the aggregate of deposits, Claimant submits that the Trustee's proposed "adjustment" is improper for no less than three reasons.  First, the Plan Account was established with and maintained by Madoff well prior to 1991, when the Ponzi scheme was alleged to have commenced.  Thus, all earnings and profits earned in that Plan Account were legitimate earnings, and cannot be subject to a simple "cash in/cash out" calculation.  *See infra* ¶27.  Second, *assuming arguendo* that the Trustee can apply the "cash in/cash out" method to accounts existing prior to the inception of the Ponzi scheme – which Claimant disputes – the Trustee is barred by, among other things, the application of the statute of limitations, from effectively avoiding and recovering the 1991 transfer through his "adjustment" procedures. *See infra*, ¶¶ 18-20, 22.  Finally, in the event that this Court does not agree with the foregoing, and again assuming that the Plan Account was, in fact, "zeroed out" before Claimant received the 1991 transfer, because the Plan Account had several beneficiaries, the Trustee must marshal the deposits and withdrawals ratably among all of the beneficiaries, and cannot discriminate among the beneficiaries by crediting certain of the beneficiaries' withdrawals as comprised entirely of principal, while deeming other withdrawals (like the Claimant's) as transfers of "fictitious profits."

6.      On or about February 26, 2009, Claimant, by and through its counsel, filed a claim for the Account for all of the securities positions reflected on the November 30, 2008 statement from Madoff (the "Final Madoff Statement").

7.      On March 1, 2010, this Court rendered a decision relating to the Trustee's so-called "Net Investment Method" for determining customers' claims.  In endorsing the "Net Investment Method" for determining "net equity" under SIPA, this Court held that the "Net Investment Method allows the definition of Net Equity and the Trustee's powers to avoid and recover property, contained in the same statutory framework, to be interpreted with preferred consonance." *See Memorandum Decision Granting Trustee's Motion for an Order (1) Upholding Trustee's Determination Denying Customer Claims for Amounts Listed on Last Customer Statement; (2) Affirming Trustee's Determination of Net Equity; and (3) Expunging Objections to Determinations Relating to Net Equity*, [Dkt. No. 1999] (the "Net Equity Decision"), at 24.

8.      On July 13, 2010, the Trustee sent the Claimant the Determination Letters pursuant to which he denied the entire Claim, stating, in relevant part, that (a) no securities were purchased for either the Funding Account or the Account and (b) neither the Funding Account nor the Account is deemed to have positive net equity because the amount of funds withdrawn from the Funding Account and the Account exceeded deposits.

## GROUNDS FOR OBJECTION

**I.      The "Net Investment" Approach Should Not Apply In This Case Because The Claimant Was Required To Take Minimum Distributions Which Were Calculated, In Part, By The Amount Of "Fictitious Profits" Reported In The Account.**

   A.      *The Trustee Should Not Be Allowed To Discount As Deductions To "Principal" Amounts Which Claimant Was Compelled To Take Based On Overstated "Fictitious Profits."*

9.      In reaching his determination that "the amount of money you withdrew from your account at BLMIS … is greater than the amount that was deposited with BLMIS for the purchase

of securities," the Trustee ignores the fact that the Claimant was required, pursuant to IRC

§401(a)(9), to take minimum distributions based on, among other things, the "fictitious profits"

of the Account.[6]  Because the Account was significantly overstated by Madoff, Claimant was

required to take substantial distributions or otherwise face fees and penalties assessed by the IRS.

Certainly, if the Account had been reported as holding Claimant's initial investment, Claimant

could have, and would have, withdrawn a substantially lower amount for each quarterly

distribution.  Claimant should not be punished for his compliance with the Internal Revenue

Code in calculating his "net equity" claim under SIPA.

10.    In adopting the "netting rule," many courts presume that payments made from a

debtor to a Ponzi scheme customer are first on account of "principal" investment, and, once

"principal" has been exhausted, all subsequent payments are on account of "fictitious profits."  In

this case, such a presumption runs contrary to the facts, as Claimant's withdrawals were based, in

part, on the amount of "profits" being reported as being held in the Account.  Thus, a "simple

netting rule" in calculating the "net equity" of IRA accounts would unfairly punish claimants

who were complying with the minimum distribution requirements of the IRC.

---

[6]    To the extent that Claimant received a transfer (or a portion of a transfer) required under the IRC, such transfer – even though it consisted in whole or in part of "fictitious profits" – must not give rise to fraudulent transfer liability.  Claimant submits that regulatory compliance cannot give rise to such liability if the transfer is accepted in good faith and without knowledge of the fraud.  Additionally, the "value" that the Claimant provided in exchange for such transfer includes the satisfaction of the debt arising from Claimant's multiple claims against Madoff.  Unlike the non-IRA account holder, the "value" that Claimant provided in exchange for the transfer of a required minimum distribution includes the satisfaction, in whole or in part, of Claimant's restitution claim (*i.e.*, return of principal) as well as damages arising from Madoff's misreporting of the balance of Claimant's account (*i.e.*, potential excise tax penalties and actual tax liability).  If Claimant instead had withdrawn the "actual" required minimum distribution – based on his "actual" balance – while Madoff was reporting the balance of Claimant's account as being significantly greater, Claimant would be liable under the IRC for an excise tax for his failure to take the required minimum distribution, which would trigger Claimant's damages claim against Madoff.  By taking the required minimum distribution based on Madoff's false, overstated reports, Claimant complies with the IRC, avoids excise penalties, and effectively reduces Madoff's liability to Claimant for such potential damages.

11.     In April, 2001, Claimant commenced taking quarterly distributions of $50,000, based on, on information and belief, a reported balance of the Account of $2.4 million.  When Claimant commenced these quarterly withdrawals, the "principal" balance of the Account, per the accounting attached to the Determination Letter, would have been $1,124,345.58.[7]  Thus, more than 50% of the Account was comprised of "fictitious profits," a percentage of which Claimant was compelled to take as a "required minimum distribution," and which must be taken into account in determining the "net equity" in the Account as of the Commencement Date.

12.     If the Trustee is required to recalculate the "net equity" in the Account based on required minimum distribution percentages and the proportions of the Account which reflect principal and "fictitious profits," Claimant would hold a positive net equity claim, as each distribution would only partially reduce the "principal" in the Account.

   B.     *The Trustee Should Not Be Permitted To Effectively Avoid Transfers Which Otherwise Would Be Unavoidable, Pursuant To ERISA Or N.Y. C.P.L.R. § 5205(c), By Applying The "Net Equity" Methodology.*

13.     The Account is a qualified IRA account subject to, and protected by, ERISA, N.Y. C.P.L.R. § 5205(c), and similar laws and policies favoring IRAs.  *See*, *e.g.*, 11 U.S.C. §522(d)(12) (providing exemption to debtors of funds held in qualified IRA accounts).  Although the Trustee currently is not seeking to affirmatively recover any withdrawals made from the Account, the effect of the application of the "net equity" methodology operates to deprive the Claimant of certain rights and benefits arising under ERISA, N.Y. C.P.L.R. §5205(c), and other similar laws.  Indeed, the "net equity" methodology effectively avoids any and all appreciation in the Account, and more shamefully, permits the Trustee to characterize any payments received by the Claimant as a reduction

---

[7]     Because the Transfer is not avoidable – as it was made outside of the statute of limitations – Claimant disregards Trustee's "adjusted amount" in determining the calculation of "principal investment" as of the date that the first quarterly distribution was taken.  Claimant expressly reserves the right to assert that, in calculating principal balance, the Trustee must credit the Account with interest that the Account otherwise would have earned.

in the funds which Claimant set aside for retirement.  In sum, the Trustee's characterization of the Claimant's withdrawals as deductions to "principal" operates as an end-run around the laws which prohibit third-parties from attaching such funds.

14.     Like the myriad other customers of Madoff, the Claimant made these withdrawals believing that more than $2.4 million in retirement savings would be available, and sufficient, to pay such expenses during his lifetime.  These withdrawals should not be designated as reductions in the "principal" balance of Claimant's IRA savings, as such treatment would pervert the overriding policy principles protecting the funds held in IRA accounts.

15.     One cannot understate the importance of the policy rationale behind ERISA and related tax laws enacted to encourage citizens to save for their own retirement.  Congress intended to protect the funds held in a qualified IRA from the reach of third parties by affording it special treatment under the Bankruptcy Code, by enacting § 522(d)(12) under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  Section 522(d)(12) expressly limits the reach of a trustee in bankruptcy to seize and use funds in a debtor's qualified IRA, subject to a certain cap provided under § 522(n).  *See* 11 U.S.C. § 522(d)(12).  "Congress intended with [§ 522(d)(12)] and other provisions in the 2005 Act to expand the protection of certain tax-exempt retirement plans that might not otherwise be protected as property excluded from the debtor's estate under section 541(c)(2)."  *See* 4 COLLIER ON BANKRUPTCY ¶ 522.09[12] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008).  While these laws were enacted to protect a debtor, and have limited direct application in a proceeding arising under SIPA, the policy rationales behind such laws should not be abandoned simply because a vast Ponzi scheme renders it impractical, but not impossible, to protect the funds held in IRA accounts.

16.     Because qualified IRA accounts are subject to other policy considerations, the Trustee should not be permitted to strip the account holders, like the Claimant, of their "reasonable expectations" that these funds would be safe from divestiture by application of a "net equity"

11

calculus. Accordingly, the Trustee should not be permitted effectively to offset SIPC's liability to an IRA account holder that otherwise would arise if the Trustee did not apply his "net equity" formula.

17.     To the extent that the "net equity" methodology, or any subsequent action instituted by the Trustee, seeks to effect a judgment against the beneficiaries of the Account, in contravention of ERISA and N.Y. C.P.L.R. §5205(c), the Claimant and any and all beneficiaries of the Account expressly reserve all of their rights, claims and defenses thereunder.

## II.     The Trustee's Adjustment Of The Claim Is Substantively And Procedurally Improper.

### A.     *The Trustee's "Adjustments" Prejudice Claimants Who Funded Their Accounts With Gains From Madoff, And Effectively Operate To Avoid And To Recover Transfers Outside Of The Statute Of Limitations Period.*

18.     According to the Determination Letter, the Account was funded by the Transfer from the Funding Account. *See* Determination Letter, at 4. According to the Trustee's analysis, although the Transfer from the Funding Account was credited, at the time, as a deposit in the amount of $1,824,345.58, the Funding Account allegedly had no "principal" remaining at the time of the Transfer. *See id.* The "adjustment" to the Account under the "net investment" approach must be disallowed, as it essentially attempts to avoid and recover the Transfer which was made outside of the statute of limitations period (the "State Law Look-Back Period"). Because the Trustee could not otherwise recover the Transfer pursuant to a properly initiated adversary proceeding, the Trustee should not be permitted to "recover" the Transfer through his "adjustment" procedure.

19.     According to this Court's Net Equity Decision, the Trustee's "Net Investment Method" better reflects the Trustee's powers to avoid and recover property. *See* Net Equity Decision, at 24. However, by making adjustments to Madoff accounts funded by alleged fictitious profits of other Madoff accounts, which the Trustee maintains has occurred with

12

respect to the Account, the Trustee has expanded – indeed, eviscerated – the statute of limitations that restrains his avoidance powers.  Since the Trustee's power to avoid and recover transfers is temporally limited, so too must the Trustee's powers to adjust claims be temporally limited.  Accordingly, any transfers from a "funding" Madoff account to a "receiving" Madoff account occurring prior to the State Look-Back Period must be deemed deposits of "principal" to the "receiving" Madoff account.  To hold otherwise would improperly expand the powers of the Trustee, permitting the Trustee effectively to avoid and recover the "fictitious profits" portion of such transfers by "adjusting" (*i.e.*, offsetting) the balance available in such accounts.

20.     Moreover, by using this "adjustment" approach, the Trustee insures that disparate and prejudicial treatment is borne by claimants who transferred or received funds from other Madoff accounts to fund current Madoff accounts rather than taking their "cash" and placing it in a different investment vehicle altogether prior to the State Law Look-Back Period. [8]  Indeed, claimants who withdrew their funds prior to the State Law Look-Back Period are allowed to hold those profits free and clear of any claims of the Trustee, while claimants who, prior to the State

---

[8]     A simple example illustrates the injustice that results by allowing the Trustee to "adjust" the balance of a new account based on the "net equity" of the funding account:

Claimant A opens an account with Madoff with an initial deposit of $100,000 on January 1, 1975.  On December 10, 2002, the balance of the account is $2 million.  On December 10, 2002, Claimant A withdraws the entire amount and places it in a bank account.   One month later, Claimant A establishes a trust for his children and opens a new account with Madoff and deposits $2 million in that account.  During the course of the next six years, the beneficiaries make withdrawals of $100,000 each year.  The Trustee, applying his "adjustment" and "net investment" methodologies, would grant the customer an allowed claim of $1.4 million.

Claimant B opens an account with Madoff with an initial deposit of $100,000 on January 1, 1975.  On December 10, 2002, the balance of the account is $2 million.  On December 10, 2002, Claimant B establishes a trust for his children, and transfers the entire $2 million into another Madoff account.  During the course of the next six years, the beneficiaries make withdrawals of $100,000 each year.  The Trustee, applying his "adjustment" and "net investment" methodologies, would disallow the claim of this account in full, and would argue that the customer's "net equity" in that account is negative $500,000 ($100,000 "adjusted principal" balance less six $100,000 withdrawals).

The prior two scenarios evidence how two claimants with practically identical fact patterns – save whether they made a direct transfer from one Madoff account to another  – can be treated so disparately that one claimant's claim is totally rejected, while another claimant could hold a claim for $1.4 million.

13

Law Look-Back Period, reinvested those profits in another Madoff account, are being stripped of those profits by operation of the Trustee's "adjustment" decision.  Such treatment can hardly be characterized as equal or fair, and certainly, the Trustee should not be permitted to effectively recover alleged "fictitious profits" portions of transfers made prior to the State Law Look-Back Period.

21.    If the Trustee is prohibited from adjusting these deposits, the Claimant will be credited with deposits totaling approximately $1,824,345.58.  Although the Trustee maintains that Claimant withdrew $2,250,000 prior to the Commencement Date, as set forth above, $1,550,000 in withdrawals were taken as required distributions under the IRC.  If a portion of those "IRC withdrawals" are treated as payments on account of "fictitious profits," then Claimant's "principal" balance, as of the Commencement Date, will result in a positive net equity balance.

B.    *The Claims Determination Process Is Procedurally Improper And Violates Claimant's Due Process Rights, As It Seeks To Avoid And Recover A Transfer Outside Of An Adversary Proceeding, And Otherwise Does Not Comply With The Claims Procedure Order As It Fails To Rebut The Prima Facie Validity Of The Claim.*

22.    By the claims determination process, the Trustee seeks to avoid and recover a transfer which, pursuant to the Federal Rules of Bankruptcy Procedure, can only be accomplished through an adversary proceeding.  The Trustee cannot circumvent Claimant's due process entitlements and defenses, including its defense based on the statute of limitations, simply by "adjusting" the claim and reducing it by unsubstantiated amounts.  For this reason alone the Determination Letter must be denied.

23.    Additionally, the Determination Letter: (a) does not clearly provide "the reason" for the disallowance, as required by the Claims Procedure Order; (b) is insufficient to rebut the *prima facie* validity of the Claim as provided in § 502(a) of the Bankruptcy Code and Fed. R.

14

Bankr. P. 3001(f), made applicable herein pursuant to 15 U.S.C. § 78fff(b); (c) violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based, *see, e.g.*, 9-3007 COLLIER ON BANKRUPTCY § 3007.01[3] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) ("The body of the objection should identify the claim.  It should also, at a minimum, allege those facts necessary to support the objection (ordinarily this must include allegations sufficient to overcome the *prima facie* validity of the filed proof of claim) and provide a description of the theories on which it is based.  In short, proofs of claim have been held analogous to complaints initiating civil actions; an objection to a claim should therefore meet the standards of an answer."); and (d) includes an exhibit which purportedly calculates the money deposited less subsequent withdrawals without any supporting documentation.  These deficiencies similarly warrant this Court's denial of the Determination Letter.

III.    **Alternatively, the Application Of The "Net Investment" Approach Should Be Limited To The State Look-Back Period, And The Claim Should Be Determined By Subtracting The Aggregate Withdrawals From The Statement Balance As Of Six Years Prior To The Commencement Date.**

24.    The application of the "Net Investment Method" unfairly penalizes and discriminates between those customers who maintained accounts with Madoff on or before December 10, 2002 and continued to maintain such investments and customers who withdrew all, or substantially all, of their earnings and principal on or prior to December 10, 2002.  To insure equal treatment to all customers of Madoff, the Trustee should be limited in his application of the Net Investment Method by considering only the following: (a) the statement balance in the Account as of November 30, 2002;[5] less (b) withdrawals made during the

---

[5]    This would have been the last statement balance received prior to the commencement of the six year statute of limitations, assuming that the Trustee had commenced adversary proceedings against all customers on the Commencement Date.

DM1\2277644.5

Avoidance Period plus (c) deposits made during the Avoidance Period. This is the only methodology which insures equal treatment to all of Madoff's customers.

25.     By way of illustration, consider a case in which a Madoff customer, who opened an account in 1990, withdraws the entire balance of his account on December 10, 2002, and buys Treasury Bills. One week later, that customer decides to reinvest with Madoff. He sells the Treasury Bills and opens up a new account with Madoff, depositing the same amount that he withdrew the previous week. If the "original customer" had not withdrawn his funds, the Trustee would be free to adjust the amounts deemed to remain in his original account and deny his claim. The "new customer," however, will have a claim against Madoff for the entire amount of the deposit – which will have been treated as a deposit of principal – less any subsequent withdrawals. Only if the aggregate value of the withdrawals during the Avoidance Period exceeds the initial deposit (as of December 10, 2002) will the "new customer" be stripped of any claim against Madoff.

26.     In order to insure equitable treatment to all customers, therefore, all customers of Madoff should be afforded the same treatment as the "hypothetical new customer" discussed above, and accordingly, the statement balance of November 30, 2002 should control as the "initial balance" in determining net equity. This methodology for determining net equity operates to treat all customers equally, and is consistent with the statute of limitations in the State of New York that amounts existing in a Madoff account as of November 30, 2002 were not subject to avoidance or recovery. A customer, had he chosen to invest such funds in a non-Madoff vehicle as of that date, would have had free and unrestricted use of such funds. The mere act of withdrawing such funds for a week, or even a day, and then reinvesting them in a "new" Madoff account should not be a basis for treating the funds differently than those of a customer who maintained accounts continuously. This methodology will insure that all

16

DM1\2277644.5

customers are treated in a manner consistent with the Trustee's avoidance powers, and will

operate to insure that Madoff's "older accounts" are credited, in part, for the time value of

money.[9]

**IV.     Even If The Trustee's "Net Investment Method" Is Upheld On Appeal, Such
         Methodology Cannot Be Applied To Wipe Out Actual Earnings And Profits Earned
         By Any Account That Accrued Prior To The Commencement Of Madoff's Ponzi
         Scheme, Nor Should It Ignore Claimant's Entitlement To Interest.**

        27.        Claimant submits that even if the Trustee's "Net Investment Method" is applied,

the Trustee must not be permitted to ignore actual profits and earnings accruing prior to the

inception of Madoff's Ponzi scheme, and the Trustee must credit each account with the earnings

attributable to actual investments as if they constitute deposits of "principal."  As set forth above,

on information and belief, the Funding Account may have been established prior to the time

period that Madoff was believed to have operated his Ponzi scheme.  As such, all earnings and

profits credited to the Funding Account, or any predecessor account, prior to such time must be

deemed to constitute "cash" deposits.  *See*, *e.g.*, Hearing Tr. at 25:12 – 25:24, *United States v.

Madoff*, Case No. 09 CR 213 (DC) (S.D.N.Y. 3/12/2009) (Madoff recalling that his fraudulent

activities at BLMIS began in the early 1990s).[10]  If Madoff initiated his Ponzi scheme after the

opening of the Funding Account, then any investment earnings which were achieved and

reinvested in the Funding Account prior to the institution of the Ponzi scheme constitute *bona

fide* earnings which, for all intents and purposes, should be treated as deposits in determining the

---

[9]        The "Net Investment Method" unfairly discriminates against the customers holding older accounts or
accounts which were funded by older accounts, as those customers are: (i) generally older, and thus more
likely to have required withdrawals during the Avoidance Period to supplement retirement needs; and (ii) have
not been awarded any value for the time value of money and inflation.  Indeed, $100,000 invested in Madoff
back in January 1970 is equivalent to almost $500,000 investment in December, 2002 (assuming 5% interest
rate, compounded annually, and not accounting for inflation).

[10]        Although neither the Trustee nor any other investigative authority has pinpointed the time period
during which Madoff operated his Ponzi scheme, Madoff's use of the AS/400 server to manipulate account
statements, which occurred in the early 1990s, corroborates Madoff's statements during his plea hearing.

17

"net equity" of the Funding Account.  Such an interpretation is consistent with the "cash in/cash out" methodology, as Madoff used genuine earnings and profits of pre-scheme customers to fund his Ponzi scheme in the identical manner as he used deposits – to pay other customers.

28.    In determining the amount of the Claim, the Trustee cannot ignore that Claimant (or the customer holding the Funding Account or any predecessor account) would be entitled to interest on account of funds held by Madoff.  As set forth in greater detail below, New York law, and cases interpreting the calculation of "value" in presenting a defense of a fraudulent conveyance claim, command the Trustee to adjust customers' claims to take into account the interest that they would have earned in connection with a tort claim against Madoff.

29.    Interest on account of deposits is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law.  *See Travelers Cas. & Sur. Co. of Am. v. PG&E,* 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.")[11]  There are at least two independent bases for awarding interest to the Claimant to compensate it for Madoff's improper use and misappropriation of the funds held in the Account (and the Funding Account).

---

[11]    New York law governs the Claimant's entitlement to interest in this case.  In cases involving torts, New York courts apply an "'interest analysis' to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that 'related to the purpose of the particular law in conflict.'"  *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) (citation omitted).  When the law in conflict regulates conduct, "the law of the jurisdiction where the tort occurred will generally apply . . . ." *Id.*  A tort generally "occurs" in "'the place where the injury was inflicted,' which is generally where the plaintiffs are located."  *Id.*  However, when the "injury has occurred in locations with only limited connection to the conduct at issue . . . the plaintiffs' location is not a dispositive factor . . . ."  *Id.*  In such a case, the applicable law will be that of "jurisdiction where the fraud originated and where substantial activities in furtherance of the fraud were committed."  *Cromer Fin. Ltd. v. Berger,* 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001).  Therefore, New York law is applicable to the calculation of the Claimant's Claim.

DM1\2277644.5

30.    Pursuant to New York law, funds deposited with Madoff are entitled to interest.

N.Y. Gen. Oblig. § 5-501(1).  Accordingly, even applying the Trustee's "net equity"

methodology to calculating the Claimant's claim, the Claim must be adjusted to include interest.

31.    Additionally, pursuant to New York law, the Claimant is entitled to any returns

Madoff earned on the deposited funds under principles of unjust enrichment.[12]  *See, e.g.,*

*Steinberg v. Sherman,* Case No. 1:2007cv01001, 2008 WL 1968297 * 5-6 (S.D.N.Y. May 2,

2008); *Breeden v. Thomas (In re Bennett Funding Group, Inc.)*, Case No. 98-61376, 1999 Bankr.

LEXIS 1843, at *25-34 (Bankr. N.D.N.Y. Apr. 29, 1999) (noting that N.Y. C.P.L.R. §§ 5001 and

5004 would have entitled the customer to recover the principal balance of its claim, plus

prejudgment interest calculated at rate of 9% dating back to the moment when the debtors were

entrusted with customer's money, such that withdrawals in excess of "principal" were not

avoidable).  "'Causes of action such as . . .  conversion and unjust enrichment qualify for the

recovery of prejudgment interest . . . .'"  *Steinberg, supra* at *5 (citation omitted).

Furthermore,"'[t]he rate of interest is nine percent per year, unless another rate is agreed to by

the parties.'"  *Id.*  "'Interest shall be computed from the earliest ascertainable date the cause of

action existed.'"  *Id.  See also Eighteen Holding Corp. v. Drizin,* 268 A.D. 2d 371, 701 N.Y.S.

2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and

conversion); N.Y. C.P.L.R. §§ 5001, 5004.

---

[12]    The Trustee cannot prove that Madoff did not earn any "legitimate profit" or interest on the
Claimant's investment.  To the extent the funds were deposited into a bank, they earned interest while on
deposit.  Madoff disbursed customer funds to favored customers, to family members, and for other purposes.
Those funds may have yielded substantial profits to either Madoff, or the recipients of fraudulent transfers,
which the Claimant and all other customers are entitled, once the ultimate recipients of Madoff's thievery are
known.

32.    Accordingly, even under the Trustee's "Net Investment Method," adjustments to the Account (and/or to the Funding Account) should be made to account for interest that should have accrued from and after their inception through and including December 10, 2008. [13]

## V.    The Enforcement Of The Trustee's Determination Works A Substantial Equitable Unfairness To The Claimant, In Contravention Of The Court's Equitable Mandate.

33.    With the Determination Letters, the Trustee has concluded that Claimant's retirement savings – which were expected to last him for his entire retirement – have been completely depleted through no fault of the Claimant.  Claimant is 80 years old.  Other than social security benefits, Claimant has no steady income and no prospect to establish a future source of income.

34.    Like other claimants whose accounts were established in accordance with ERISA and IRC, Claimant submits that, to the extent that the policy rationales of ERISA and IRC, on the one hand, conflict with the provisions of SIPA and the Bankruptcy Code, on the other hand, that the equitable powers of this Court must harmonize the competing policy goals.  As set forth herein, the "cash in/cash out" methodology for determining net equity and fraudulent transfer principles – which do not take into account that the Claimant's withdrawals, at least in part, are not the product of his "free will" – conflict with the required minimum distribution provisions of the IRC.

35.    Profit-sharing plans and IRA accounts are trust fund accounts established in accordance with the provisions of ERISA and the IRC; thus, in making his claim determinations,

---

[13]    Claimant submits that the Trustee must credit, as "investments of principal," all earnings and profits credited to the Funding Account prior to the inception of Madoff's Ponzi scheme, and that the Trustee must credit the Funding Account and the Account for interest which would have accrued during the operation of Madoff's Ponzi scheme.  Claimant reserves the right to seek interest accruing on or after December 11, 2008.

DM1\2277644.5

the Trustee cannot ignore the provisions and policy reasoning of these federal regulations.[14]  The

Trustee must establish a fair methodology for addressing the unique circumstances surrounding

Madoff's IRA account holders – both in determining "net equity" and alleged fraudulent transfer

liability – in order to properly balance the laws, regulations and policies encompassed in the

provisions of ERISA, IRC, SIPA and the Bankruptcy Code.

## **<u>RESERVATION OF RIGHTS</u>**

36.     The Claimant expressly reserves the right to revise, supplement, or amend this

Objection, or to join in any other objection, and any failure to object on a particular ground or

grounds shall not be construed as a waiver of Claimant's right to object on any additional

grounds.

37.     The Claimant reserves all rights set forth in Fed. R. Bankr. P. 9014, including,

without limitation, rights of discovery. *See* Fed. R. Bankr. P. 9014.

38.     The Claimant reserves all objections as to the competence, relevance, materiality,

privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other

action for any purpose whatsoever.

### **[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

---

[14]     Certainly, the Trustee has the records – and resources – to investigate claims against the IRA custodians (primarily FiServ and its affiliates) and, if appropriate, to pursue such claims on behalf of the Madoff IRA account holders.

DM1\2277644.5

Respectfully submitted this 10th day of August, 2010.

MAGNUS A. UNFLAT (IRA)

By his attorneys,

DUANE MORRIS LLP


 /s/  Patricia H. Heer
William C. Heuer
Patricia H. Heer
1540 Broadway
New York, NY 10036-4086
Telephone: 212-471-1803
Facsimile:  212-214-0808

- and -

Stephen M. Honig (BBO#239180)
Kara M. Zaleskas (BBO#651981)
470 Atlantic Avenue, Suite 500
Boston, MA 02210-2600
Telephone: 857-488-4239
Facsimile:  857-401-3052


## CERTIFICATE OF SERVICE

I, Patricia Heer, hereby certify that on the 10th day of August, 2010, I electronically transmitted a true and correct copy of the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing (NEF) to all attorneys of record who are ECF registrants. I also certify that on said date, I caused to be served a true and correct copy of the aforementioned document via hand delivery on: (i) Irving H. Picard, Trustee, c/o Baker & Hostetler, LLP, 45 Rockefeller Plaza, New York, NY 10111, and (ii) the Clerk of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004.

 /s/  Patricia H. Heer
Patricia H. Heer