NORMAN A. KAPLAN, ESQ.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 487-4300
Facsimile: (516) 773-4516
Attorney for Jeffrey Neil Konigsberg

UNITED STATE BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------

SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiff

    vs

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC.,

        Defendant.
-----------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

Trustee Claim Number 14955

## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

Jeffrey Neil Konigsberg (hereinafter referred to as "Konigsberg" or the "Customer")

hereby objects to the Notice of Trustee's Determination of Claim (the "Determination Letter"),

attached as **Exhibit A**, as described herein.

### BACKGROUND

In or about **May 1997**, Konigsberg opened an account currently known as **Account No.**

**1-K0107** [1] **(the "Account")**   with Bernard L. Madoff Investment Securities LLC ("Madoff") in

the name of  Konigsberg. Konigsberg is a "customer" of Madoff, as defined by the Securities

Investor Protection Act ("SIPA").

---

[1] All personal information relating to the Account has been redacted for security reasons.

1. From the creation of the Account, Konigsberg received regular communications from Madoff, including monthly statements, trade confirmations, and quarterly portfolio management reports.

2. The Konigsberg final Madoff statement dated November 30, 2008 (the "Account Final Statement") shows that he owns securities with a market value of $350,533.78.

3. On December 11, 2008, an action was commenced against Madoff by the Securities & Exchange Commission in the United States District Court for the Southern District of New York. On December 15, 2008, this liquidation proceeding was commenced pursuant to the SIPA. See Order, Securities and Exchange Commission v. Madoff, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring the proceeding to the United States Bankruptcy Court for the Southern District of New York) [Dkt. No. 4]. Irving Picard was appointed Trustee ("Trustee"), charged, *inter alia*, with overseeing the liquidation of Madoff and processing customer claims for money pursuant to SIPA. *Id.;* 15 U.S.C. 78fff-1(a).

4. On December 23, 2008, the Court issued an Order (the "Dec. 23, 2008 Order") directing the Trustee to disseminate notice and claim forms to Madoff customers and setting forth claim-filing deadlines. See Dec. 23, 2008 Order [Dkt. No. 12].

5. The Dec. 23, 2008 Order further provided that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of their determination that the claim is disallowed, in whole or in part, and the reason therefore...." (emphasis added) See Dec. 23, 2008 Order at 6 [Dkt. No. 12].

6. Konigsberg timely filed a claim for the Account for securities (the "Customer Claim") based on the Account Final Statement in the amount of $350,533.78. A copy of the Account Final Statement is attached as **Exhibit B**. The Trustee assigned Claim Number **14955.**

7. On July 1, 2010, the Trustee sent Konigsberg the Determination Letter rejecting the Customer Claim and stating he was not entitled to a payment based on (a) the total in the Account (b) less withdrawals, and (c) less any appreciation. See **Exhibit A**.

**GROUNDS FOR OBJECTION**

**FIRST OBJECTION**

8. The Determination Letter fails to comply with the Dec. 23, 2008 Order, which directs the Trustee to satisfy customer claims in accordance "with the Debtor's books and records." Dec. 23, 2008 Order at 5 [Dkt. No. 12]. The Customer Claim was evidenced by the Account Final Statement showing a final balance of $350,533.78 and listing the securities purportedly purchased for the Account, which reflects the "Debtor's books and records" and by which the Trustee is bound absent proof that the owner of the Account did not have a "legitimate expectation" that the balance on the Account Final Statement, confirmations, credit advices and portfolio management reports represented their property.

**SECOND OBJECTION**

9. The Trustee failed to set forth a legal basis for the Trustee's position for the calculation of the Customer Claim. See **Exhibit A** Determination Letter. The Determination Letter:

a. does not clearly provide "the reason" for the disallowance, as required by the Dec. 23, 2008 Order. See Order [Dkt. No. 12];

b. is insufficient to rebut the *prima facie* validity of the Customer Claim as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f);

c. violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the

objection is based. *See, e.g.,* Collier on Bankruptcy ¶ 3007.01(3) (15th ed.) ("[A]n objection to a

claim should…meet the [pleading] standards of an answer; *In re Enron Corp.*, No. 01-16034,

2003 Bankr. LEXIS 2261, at *25 (Bankr. S.D.N.Y. Jan 13, 2003) (same); and

> d.    includes an exhibit which purportedly calculates the money deposited less

subsequent withdrawals but is completely unsubstantiated, unauthenticated and incorrect.

## THIRD OBJECTION

10.    The Trustee has failed to fulfill the requirement that he honor the "legitimate

expectations" of the Customer.

11. The legislative history of SIPA makes clear that Congress' intent in enacting the

legislation was to protect the "legitimate expectations" of customers.  Congressman Robert

Eckhardt, (D) Texas, sponsor of amendments to SIPA to increase the amount of advance

available to customers and expedite the process, commented on the purpose of the legislation as

follows:

> "Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to a customer that which they expect to receive, that is, securities which they maintained in their brokerage account…
> By seeking to make customer accounts whole and returning them to customers in the form they exited on the filing date, the amendments . . . would satisfy the customers' legitimate expectations…."

S. Rep. No. 95-763, at 2 (1978) (*emphasis added*).

> A customer generally expects to receive *what he believes* is in his Account at the time the stockbroker ceases business. But because   securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account.…By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments…would satisfy customers' legitimate expectations….

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

12. The Securities Investor Protection Corporation ("SIPC"), charged with administering SIPA, acknowledged in the brief it submitted to the Court of Appeals for the Second Circuit that it was bound by the statute and the rules to satisfy the reasonable expectations of customers even when the securities had never been purchased, as follows:

> Reasonable and legitimate expectations on the filing date are Controlling even where inconsistent with transaction reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits of SIPA) even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase...[T]his emphasis on the reasonable and legitimate customer expectations frequently yields much greater customer protection than would be the case if the transaction reality, not the claimants expectations, were controlling, as this court's earlier opinion in this liquidation well illustrates.

Brief of the Appellant SIPC at 23-24.

13. Based on regular statements, confirmation reports and other communications received from Madoff, Konigsberg at all times reasonably believed and expected that Madoff executed such transactions and that the Account actually held such securities.

14. The Trustee's position in the Madoff case is completely inconsistent with the purpose and goals of SIPA and the prior position that SIPC has taken unequivocally with respect to the treatment of customers in accordance with their reasonable expectations reflected in the communications from the broker-dealer.

## FOURTH OBJECTION

15. The Trustee failed to set forth a legal basis for the position he has taken that he can reduce the amount of the Customer Claim by appreciation in the Account or calculate the claim by counting only investment principal less withdrawals without regard to the securities reflected

in the Account Final Statement. No legal basis for the method exists. The Trustee's calculation violates SIPA.

16. 15 U.S.C. Section 78fff-2(b) provides that a customer's claim shall be allowed in the amount of the customer's "net equity." 15 U.S.C. § 78fff-2(b). The Trustee calculates "net equity" by reducing the principal contributed to the account less any withdrawals or appreciation without regard to any gains reflected in the Account Final Statement and any prior statement delivered by Madoff to the customer. This is incorrect and improper for the following reasons:

a.       the Trustee's method of calculating the Customer Claim is inconsistent with the language of the statute. SIPA defines a customer's net equity claim as the value of the customer's "securities positions" in the customer's account less any amount the customer owes the debtor, as of the date of the filing of the SIPA liquidation:

> "The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer...; minus
>
> any indebtedness of such customer to the debtor on the filing date..."[2]

15 U.S.C. § 78LLL(11). The Trustee's proposed formulation has no support in the language of the statute or interpreting case law and, in fact, adds words and concepts to the statute which do not exist.

---

[2] The "indebtedness" of the customer to the debtor refers to cash or securities owed to the debtor, which is most often in the context of a customer having borrowed from the debtor on margin. *See, e.g.*, H.R. Rep. No. 95-746 at 21 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (noting that, under the 1970 statutory regime, when there were shortages in available securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *In re First Street Sec. Corp.*, 34 B.R. 492, 497 (Bankr. S.D. Fla. 1983) (offsetting against claim amount of indebtedness customer owed to the debtor where unauthorized stock purchase was funded in part by borrowing on margin).

   b.    The Trustee's method is inconsistent with the Rules promulgated under SIPA. The Series 500 Rules promulgated under SIPA by SIPC provide for the classification of claims for cash or securities in accordance with the written transaction confirmations sent by the broker-dealer to the customer. 17 C.F.R. 300.500. Pursuant to the Rules, a customer has a claim for securities if the customer has received written confirmation that the securities have been purchased or sold for the account.

   c.    The Trustee's method is inconsistent with the legislative history of the statute. SIPA's legislative history emphasizes Congress' intention that the statute protects customer expectations by ensuring that customers of retail brokerage firms can rely on their account statements. The Madoff statements and confirmations sent to Konigsberg on his Account indicated that the Account owned a list of "blue chip" securities. It makes no difference whether the securities were ever actually purchased.

   d.    The Trustee's formula is an improper and wholly inadequate measure of loss for SIPC purposes. Konigsberg deposited funds with Madoff with the expectation the amount would grow. The Account statements showed such growth and the balance on the Account Final Statement reflects the benefit of this bargain. In *Visconsi v. Lehman Brothers, Inc.*, No. 06-3304, 244 Fed. Appx. 708, 713-14 (6th Cir. 2007) the Court declined to set aside an arbitration award that appeared to apply an expectancy measure of damages against a successor in a Ponzi scheme case and rejected the money in/money out formula as not reflecting the expectations of the parties. *Id.* The Court explained:

> Lehman's out-of-pocket theory misapprehends the harm suffered by Plaintiffs and the facts of this case. Plaintiffs gave $21 million to Gruttadauria, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope – indeed a reasonable expectation – that it would grow. Thus, the out-of-pocket theory,which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly

7

inadequate measure of damages. Had Gruttadauria invested Plaintiff's money as requested, their funds would have likely grown immensely, especially considering that Plaintiffs invested primarily throughout the mid-1990s, which, had they hired an honest broker…, would have placed their money in the stock market during one of the strongest bull markets in recent memory.  In fact, the fictitious statements issued by Lehman, which were designed to track Plaintiff's funds as if they had been properly invested, indicate that Plaintiffs' accounts would have grown to more than $37.9 million (even accounting for the withdrawal of more than $31.3 million).  Plaintiffs thus could have reasonably believed that they were entitled to the full $37.9 million balance shown, regardless of the amounts of their previous deposits and withdrawals.

*Id.* This applies precisely to the Customer Claim.

         e.      The Trustee's Determination Letter is contrary to SIPC's own policies and practices, as reflected in the sworn testimony of Stephen Harbeck, SIPC's president and CEO, and its actions in similar liquidation proceedings.  For example, in the *New Times* SIPA liquidation, in the context of discussing claims filing deadlines, Harbeck acknowledged that if broker-dealer customers have been led to believe that "real existing" securities had been purchased for their accounts, then those customers are entitled to the full value of their securities positions as of the filing date, even if that value represents a substantial increase from the purported purchase price of the securities and even if the securities had never been purchased. Harbeck testified as follows:

> *Harbeck: [I]f you file within sixty days, you'll get the securities, without question.  Whether – if they triple in value, you'll get the securities….Even if they're not there.*
>
> *Court:  Even if they're not there.*
>
> *Harbeck:  Correct*
>
> *Court:  In other words, if the money was diverted, converted –*
>
> *Harbeck:  And the securities were never purchased.*
>
> *Court:  Okay.*

> *Harbeck:  And if those positions triple, we will gladly give the people their securities positions.*

See *In re New Times Securities Services, Inc.,* No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000) (**Exhibit C** Transcript at 37-39).

Moreover, SIPC faced very similar circumstances in the New Times Securities Services, Inc. ("New Times") liquidation and took a very different position than it is taking in the Madoff case in support of the Trustee.  There, the New Times Trustee's position on "net equity" was in full accord with SIPA, and thus directly contrary to the Trustee's position in this case. Specifically, with respect to any claims that were based on confirmations and account statements reflecting securities positions in "real" securities that could have been purchased (i.e., securities that actually existed on the public market and whose valuations were objectively and publicly verifiable by the customers), the New Times Trustee allowed all such net equity claims to the full extent of the filing date valuations of those securities, even though none of the securities identified in those records had ever, in fact, been purchased by the broker-dealer.[3]

      f.    The Trustee's determination is inconsistent with the case law.  The Second Circuit's discussion of SIPC's claims processing in *New Times*, the only case in this jurisdiction dealing with the "net equity" issue in the Madoff case, further indicates that, with respect to

---

[3] As with Madoff Securities and Bernard Madoff, New Times Securities and its principal, William Goren, defrauded scores of investors by providing them with confirmations and account statements reflecting purported securities investments made on their behalf when, in fact, no such investments had been made and their money had, instead, been misappropriated for other purposes.  Two of the investment opportunities Goren purported to offer were: (1) money-market funds that were entirely fictitious (the "Fictitious New Age Funds"), and (2) mutual funds that were entirely real, such as those offered by The Vanguard Group and Putnam Investments (the "Real Securities"). *See In re New Times Sec. Services, Inc.,* 371 F.3d 68, 71-72 (2d Cir. 2004) ("*New Times I*").  Goren's was "a classic Ponzi scheme," *Id.* at 72 n.2, wherein new investors' money was used to pay earlier investors.

Approximately 900 customers filed claims in the New Times liquidation: 726 for whom the Real Securities" were purportedly purchased; 174 for whom the "Fictitious New Age Funds" were purportedly purchased.  Consistent with SIPA and its legislative history, the New Times Trustee appropriately applied SIPA's net equity definition to the "Real Securities" customers' claims – meaning he paid them according to the full value of those securities positions as of the date of the liquidation filing.  When challenged by "Fictitious New Age Funds" customers who had objected that they had not received the same treatment, SIPC and the New Times Trustee (with the apparent concurrence of the SEC) vigorously defended their approach in court.

customers who thought they were invested in listed securities, SIPC properly paid customer
claims based on the customers' final account statements, even where the securities had never
been purchased:

> Meanwhile, investors who were misled...to believe that they were
> investing in mutual funds that in reality existed were treated much more
> favorably. Although they were not actually invested in those real funds – because
> Goren never executed the transactions – the information that these claimants
> received on their account statements mirrored what would have happened had the
> given transaction been executed.  As a result, the Trustee deemed those
> customers' claims to be "securities claims" eligible to receive up to $500,000 in
> SIPC advances. The Trustee indicates that this disparate treatment was justified
> because he could purchase real, existing securities to satisfy such securities
> claims. Furthermore, the Trustee notes that, if they were checking on their mutual
> funds, the "securities claimants,"...could have confirmed the existence of those
> funds and tracked the funds' performance against Goren's account statements.

*In re New Times Secs. Servs.*, 371 F.3d 68, 74 (2d Cir. 2004); *see also* Brief of Appellant SIPC at

23-24, *In re New Times Sec. Servs., Inc.*, No. 05-5527 (Dec. 30, 2005):

> [R]easonable and legitimate claimant expectations on the filing date are
> controlling even where inconsistent with transactional reality. Thus, for example,
> where a claimant orders a securities purchase and receives a written confirmation
> statement reflecting that purchase, the claimant generally has a reasonable
> expectation that he or she holds the securities identified in the confirmation and
> therefore generally is entitled to recover those securities (within the limits
> imposed by SIPA), even where the purchase never actually occurred and the
> debtor instead converted the cash deposited by the claimant to fund that
> purchase....[T]his emphasis on reasonable and legitimate claimant expectations
> frequently yields much greater 'customer' protection that would be the case if
> transactional reality, not claimant expectations, ere controlling, as this Court's
> earlier opinion in this liquidations well illustrates.

Konigsberg is in the same position as those investors in the *New Times* case who received

confirmations and statements reflecting real securities.

        g.    The Trustee's position in the Madoff case is contradicted not only by

SIPC's prior treatment of customers in the *New Times* case but also by a statement that SIPC's

general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang

acknowledged that Madoff customers are entitled to the securities in their account:

> Based on a conversation with the SIPC general counsel, Josephine Wang,
> if clients were presented statements and had reason to believe that the securities
> were in fact owned, the SIPC will be required to buy these securities in the open
> market to make the customer whole up to $500K each.  So if Madoff client
> number 1234 was given a statement showing they owned 1000 GOOG shares,
> even if a transaction never took place, the SIPC has to buy and replace the 1000
> GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

In sum, the Trustee has created his own definition of "net equity" that is not based on

statutes, case law or prior practice. The Trustee's procedure is designed not for the benefit of

Madoff victims but rather so that the Trustee can avoid paying SIPC insurance to the thousands

of Madoff investors who, like Konigsberg, have depended upon their Madoff investments for

their current and future living expenses.

**FIFTH OBJECTION**

17. The Trustee's action in reducing the amount shown on the Customer Claim by any

prior gains or withdrawals reflected on the Account Final Statement or prior statements is an

attempt to avoid such gains without alleging any grounds for avoidance provisions.  Any such

disallowance is improper and unjustified, and the Determination Letter should be stricken on that

ground alone. See Fed. R. Bankr. P. 7001(1);7008.

**SIXTH OBJECTION**

18. The Trustee's action in reducing the amount shown on the Customer Claim by gains

or withdrawals from the account is an attempt to avoid such gains and withdrawals without

alleging any grounds for avoidance or proving that such gains are avoidable under the state law

avoidance provisions or other theories of law.  The avoidance of those gains and withdrawals

11

have been taken well beyond any limitations period for avoidance of a claim under either state or federal law.

## SEVENTH OBJECTION

19. SIPA provides that (a) SIPC shall pay for the first $500,000 of each customer claim, and (b) customers have an unsecured claim against customer property for the balance of their claims which is paid *pro rata* with other customers. See 15 U.S.C. § 78fff-3(a) ("In order to provide for prompt payment and satisfaction of net equity claims of customers of debtor, SIPC shall advance to the trustee [up to] $500,000 for each customer, as may be required to pay...claims."); 15 U.S.C. § 78fff-2(c)(1)(B) (providing that customers of the debtor "shall share ratably in...customer property on the basis and to the extent of their net equities"). Konigsberg is entitled to an advance of $350,533.78 and a claim against customer property for the remainder.

## EIGHTH OBJECTION

20. In the event that the Court should determine that customer claims should not be allowed in the amount of the Account Final Statement, then in that alternative, Konigsberg is entitled to recover interest or appreciation on the investments based upon the following:

a.    Under New York law, which is applicable here, funds deposited with the Debtor under these circumstances are entitled to interest. See, e.g., N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, et seq. Accordingly, the Customer Claim should be recalculated by adding interest to all funds deposited.

b.    Under New York law, which is applicable here, customers are entitled to any returns Madoff earned on the deposited funds under principles of unjust enrichment. Accordingly, the Customer Claim should be recalculated by adding the amounts earned by Madoff on the Customer's deposits. *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S.

Dist. LEXIS 35786, at \*14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as…conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding interest on claims for unjust enrichment and conversion.)

21.     Konigsberg is entitled to interest on his investment under federal securities laws. In *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), the Supreme Court analyzed the different measures of recovery of "actual damages" for fraud, primarily including rescission and restitution. The *Randall* court concluded that Congress intended to deter wrongdoers, and hence, that wide latitude in choosing the measure of damages was warranted. *See id.* at 664 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). The *Randall* court continued by holding that:

> This deterrent purpose is ill-served by a too rigid insistence on limiting plaintiffs to recovery of their "net economic loss."

*Id.* at 664 (citing *Salcer v. Envicon Konigsberg Corp.*, 744 F.2d 935, 940 (2d Cir. 1984)).

## NINTH OBJECTION

22.     The Trustee's Determination Letter assumes that Madoff never earned income and therefore all gains reported to customers were "fictitious." This assumption is contrary to fact. There is significant evidence that, at some time, Madoff was at least in part a legitimate business and therefore all or a portion of the gains were not fictitious. The burden is on the Trustee to show that Madoff never earned any income to support customer gains and, if at some point it did not earn funds, the dates when it ceased to do so. The Trustee is required to state and prove when the Ponzi scheme began as to the Customer and this the Trustee has failed to do.

## TENTH OBJECTION

13

23.    Konigsberg was required to pay significant income taxes on distributions which the Trustee has alleged are fictitious.    The Trustee has justified his proposed method of calculating claims as fair and reasonable because fictitious gains should not compete dollar for dollar with claims for funds actually deposited by customers, and that his proposed method equalizes the treatment of all customers.    This justification is not correct insofar as customers did not have the use of reported but fictitious gains because of required income tax payments.    Even assuming, *arguendo*, the Trustee's method is correct, the Customer Claim should be adjusted by adding all amounts actually paid as income taxes on allegedly fictitious gains to equalize the treatment with that of other customers.    *See SEC v. Byers*, No. 08-7104, 2009 U.S. Dist. LEXIS 63741, at *11-13 (S.D.N.Y. 2009) (in equitable distribution proceeding, allowing claims for reinvestment of fictitious profits to equitably treat reinvesting customers as compared with customers receiving distributions).

## ELEVENTH OBJECTION

24.    To the extent the Determination Letter is based on the Trustee's definition of "net equity" or the "cash in less cash out" method and not based on the balances in the Account Final Statement, said Determination and such methodology deny the Customer fair and equitable considerations to the Customer's prejudice and detriment for the following reasons: first, the Customer reasonably relied on the Account statements as the *quid pro quo* reasoning behind any withdrawals from the Account to a party outside of Madoff; second, the Customer reasonably relied on the Account statements as the *quid pro quo* reasoning behind any intra-Madoff account transfers to or from another Madoff account; third, the Customer was never on notice that SIPC or FINRA's rules were such that they could override the Customer's good faith reliance on such Account statements and that subsequent withdrawals would potentially estop the Customer from

receipt of SIPC coverage or subject the Customer to possible "clawbacks" of withdrawals; fourth, absent such notice to the Customer by SIPC or FINRA that *ipso facto* they could reinterpret, create and apply rules retroactively to such accounts irrespective of the Customer's good faith reliance on such statements is tantamount to a "taking" of the Customer's property without fair and equitable compensation.

25. Bernard L. Madoff testified that the Ponzi scheme existed from the early 1990's but the Trustee has alleged a period even earlier than that expanding over a period of almost 30 years. The Trustee has noted that he has so far secured records going back more than 13 years and expects to go back further. Untold numbers of customers have opened accounts and closed them prior to December 11, 2002 withdrawing untold sums of money. Recovery of these pre-December 11, 2002 transfers or account closings are presumptively precluded by New York State law[4] (Statute of Limitations) but, furthermore, would be both impractical of recovery, expensive, time consuming and in some instances cruel. Yet failure by the Trustee to include them in his construction of a fair and equitable distribution process weighs heavily against those investors who remained yet who took necessary distributions in reasonable reliance on their account balances.

26.    The Trustee has stated publicly and in filings with this Court that his determination of "net equity" is based upon use of his "cash in" less "cash out" method recently approved by the Bankruptcy Court as noted above. He has further stated that such a method is the only "fair" method under which this Court can create an equitable and fair distribution process. The Trustee refers to only a two-tiered process in the Determination. A Claimant is designated as either having a "positive net equity" or a "negative net equity" and, upon

---

[4] As noted in the footnote to paragraph 27 hereof, there is some argument and the Customer contends that on avoidance claims the New York Statute of Limitations runs from the date an adversary proceeding is filed. In that case, the date of December 11, 2002 would be moved later as would the application of any applicable limitations.

information and belief, there are no claims against those accounts that terminated prior to December 12, 2002 nor will the Trustee seek avoidance of transfers/distributions to such former customers.  Yet by including transfers earlier than December 11, 2002, current customers have a potential liability not extended to former customers even though the former customers may have benefitted from withdrawals during the very same period of time. In its Memorandum Decision and Order dated September 10, 2009, this Court made reference to the case of *S.E.C. v Byers*, 2009 WL 2185491 (S.D.N.Y.), as recent evidence of a District Court (Judge Chin) adopting an approach in a receivership plan of distribution that addressed all customers as noted below[5].

27.     Judge Chin took special recognition of those investors who chose not to take their unbeknownst fictitious investment distributions in cash but chose instead to roll them over and increase their investment. Even though Judge Chin recognized that such "rollovers" were clearly false profits under a "Ponzi" scheme as in the Madoff matter, his acknowledgment that the Customer had the ability to withdraw those funds led to the Court including these "rolled-over distributions," as part of the customer statement balance. The court stated that failing to do so would result in an inequity. This logic can rightfully be applied to the Madoff matter. The Statute of Limitations date can be used as a guideline of both equity and practicality. Since all funds in this Customer's and other customers' Madoff accounts existing prior to six years from the start of an adversary proceeding against the Customer[6] could have been withdrawn, it is equitable for the Trustee and Court to treat such fictitious "profits" as "rolled-over" funds or new "cash" "reinvestment" funds. Federal taxes and state and city taxes (where applicable) were paid on

---

[5] Judge Chin was dealing with a federal equity receivership where a more liberal claims process is allowed versus a SIPA liquidation where the claims process is very clearly defined.

[6] There is some argument that on avoidance claims the New York Statute of Limitations runs from the date an adversary proceeding is started. In that case, the date of December 11, 2002 wherever referenced in this paragraph would be moved later as would the application of any applicable limitations. In addition, Customer is and has been a resident of the State of Rhode Island and no determination has been made that Customer is subject to New York State Statute of Limitations.

these funds. The Trustee could then apply his "cash in / cash out" approach with greater fairness and equity. Claimant thus challenges the Trustee's methodology on the basis noted.[7]

## TWELFTH OBJECTION

28.    Customers relied on the statements on SIPC's website and in their advertisements that customers entrusting their funds to broker dealers who exhibited and represented through their written communications and documents the SIPC and FINRA symbols had their accounts protected to the extent of $500,000. There were no disclaimers as to the current calculation of "net equity" by the Trustee. There were no disclaimers as to the possibility that customers who removed proceeds from their broker dealer would not be entitled to receive protection up to the sum of $500,000. There was no warning to customers that they would or could be subject to avoidance actions by a Trustee based on their good faith deposits and withdrawals of sums from their Madoff accounts. The Court has recognized it its March 1, 2010 Memorandum Decision[8] that "the application of the Net Equity definition to the complex and unique facts of Madoff's massive Ponzi scheme is not plainly ascertainable in law." It is therefore all the more reasonable and practical that the reliance of customers on the "replacement cost" insurance by SIPC be honored by the Trustee under considerations of "equity and practicality" that the Court endorses. The returns of 10-17%, as noted by the Court in its Decision, in point of fact place the account statements in direct relation to the securities markets whose 75 year history up to 2008 had been an average return of approximately 10.5% per annum compounded. The concept of SIPC

---

[7] Due to the fact that the *Byers* case was short-lived relative to this case and did not extend back in time more than 5 years, it bears noting that Judge Chin did not need to address whether or not pre-limitation transfers could be included. Accordingly, while a form of "net equity" was consented to by the Court in *Byers*, this court should not fully and solely rely on such a process in connection herewith as many of the transfers that occurred were prior to the applicable statute of limitations.

[8] MEMORANDUM DECISION GRANTING TRUSTEE'S MOTION FOR AN ORDER (1) UPHOLDING TRUSTEE'S DETERMINATION DENYING CUSTOMER CLAIMS FOR AMOUNTS LISTED ON LAST CUSTOMER STATEMENT; (2) AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY; AND (3) EXPUNGING OBJECTIONS TO DETERMINATIONS RELATING TO NET EQUITY

insurance just as with FDIC insurance is one of replacement cost. The idea that SIPC insures original deposits and not return on investments would be contrary to the concept of all investments. That would be as great a fiction as we have discovered Madoff to be. What would be "zero sum" is the refusal of SIPC to honor its $500,000 representation of replacement cost. Later customers have the benefit of such "replacement cost" as their more contemporaneous investments were made after appreciation to the date of investment.

For these reasons, arguments of "net equity" as set forth by the Trustee without full determination of the representations made to customers would be to deprive them of due process and make them guarantors of SIPC's failure to uphold their mandate. Konigsberg thus challenges the Trustee's methodology on the basis noted.

## INCORPORATION BY REFERENCE

29.    In addition, the Customer hereby incorporates by reference, to the extent applicable, the legal arguments made by other customers in this proceeding who opposed the Trustee's Motions, including but not limited to: Lawrence R. Velvel, Davis Polk & Wardwell, LLP, Phillips Nizer, LLP; Lax and Neville, LLP; Goodwin Proctor; Milberg LLP, Shearman and Sterling and Becker and Poliakoff, LLP.

## RESERVATION OF RIGHTS

30.    Konigsberg reserves the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of the Konigsberg's right to object on any additional grounds.

31.    Konigsberg reserves all rights set forth in Rule 9014, including, without limitation, rights of discovery. See Fed. R. Bankr. P. 9014.

32.    Konigsberg reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action or proceeding for any purpose whatsoever.

33.    Konigsberg incorporates by reference all reservations of rights set forth in the Konigsberg Customer Claim.

### RELIEF REQUESTED

34.    For the reasons stated herein, the Customer Claim should be allowed in its entirety in the amount of $350,533.78, which is the amount stated on the Account Final Statement, plus interest from the date of the Account Final Statement.

35.    For the reasons stated herein, this Court should direct SIPC to immediately replace $350,533.78 of the securities in the Account based upon the values reflected on the Account Final Statement.

36.    For the reasons stated herein, the Determination Letter should be stricken.

37.    Konigsberg requests such other and further relief as this Court may deem just and equitable.

Dated: July 29, 2010

NORMAN A. KAPLAN, ESQ.

By _____
   Norman A. Kaplan
   111 Great Neck Road
   Great Neck, New York 11021
   Telephone: (516) 487-4300
   Facsimile: (516) 773-4516

*Attorney for Jeffrey Neil Konigsberg*

**Exhibits**

**Exhibit A**    Notice of Trustee's Determination of Claim  (the "Determination Letter")

**Exhibit B**    Account Final Statement

**Exhibit C**    *In re New Times Securities Services, Inc.,* No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000) Transcript at 37-39

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

## DECEMBER 11, 2008[1]

## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

July 1, 2010

Jeffrey Neil Konigsberg
c/o Paul J. Konigsberg
440 Park Avenue South
New York, NY 10016

Dear Jeffrey Neil Konigsberg:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim on BLMIS Account No. 1K0107 designated as Claim Number 14955:

Your claim for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $288,000.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

EXHIBIT A

securities (total of $0.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($288,000.00) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your claim is **DENIED** in its entirety.

**On March 1, 2010, the United States Bankruptcy Court for the Southern District of New York (Lifland, J.) issued a decision which affirmed the Trustee's Net Investment Method for determining customer claims. The final resolution of this issue is expected to be determined on appeal.**

**Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.**

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after July 1, 2010, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

| Table 1 | | | |
|---|---|---|---|
| **DEPOSITS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 5/5/1997 | TRANS FROM 1K005410 | $229,945.50 | $0.00 |
| **Total Deposits:** | | $229,945.50 | $0.00 |
| | | | |
| **WITHDRAWALS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 10/1/1997 | CHECK | ($3,000.00) | ($3,000.00) |
| 1/2/1998 | CHECK | ($3,000.00) | ($3,000.00) |
| 4/1/1998 | CHECK | ($4,000.00) | ($4,000.00) |
| 7/1/1998 | CHECK | ($4,000.00) | ($4,000.00) |
| 10/1/1998 | CHECK | ($4,000.00) | ($4,000.00) |
| 1/4/1999 | CHECK | ($4,000.00) | ($4,000.00) |
| 2/11/1999 | STOP PAYMENT | $4,000.00 | $4,000.00 |
| 2/12/1999 | CHECK | ($4,000.00) | ($4,000.00) |
| 3/1/1999 | STOP PAYMENT | $4,000.00 | $4,000.00 |
| 3/1/1999 | CHECK | ($4,000.00) | ($4,000.00) |
| 4/1/1999 | CHECK | ($4,000.00) | ($4,000.00) |
| 6/2/1999 | CHECK | ($50,000.00) | ($50,000.00) |
| 7/1/1999 | CHECK | ($4,000.00) | ($4,000.00) |
| 10/1/1999 | CHECK | ($4,000.00) | ($4,000.00) |
| 1/3/2000 | CHECK | ($5,000.00) | ($5,000.00) |
| 4/3/2000 | CHECK | ($5,000.00) | ($5,000.00) |
| 7/3/2000 | CHECK | ($5,000.00) | ($5,000.00) |
| 10/2/2000 | CHECK | ($5,000.00) | ($5,000.00) |
| 1/2/2001 | CHECK | ($5,000.00) | ($5,000.00) |
| 4/2/2001 | CHECK | ($5,000.00) | ($5,000.00) |
| 7/2/2001 | CHECK | ($5,000.00) | ($5,000.00) |
| 10/1/2001 | CHECK | ($5,000.00) | ($5,000.00) |
| 1/2/2002 | CHECK | ($5,000.00) | ($5,000.00) |
| 4/1/2002 | CHECK | ($5,000.00) | ($5,000.00) |
| 7/1/2002 | CHECK | ($5,000.00) | ($5,000.00) |
| 10/1/2002 | CHECK | ($5,000.00) | ($5,000.00) |
| 1/2/2003 | CHECK | ($6,000.00) | ($6,000.00) |
| 4/1/2003 | CHECK | ($6,000.00) | ($6,000.00) |
| 7/1/2003 | CHECK | ($6,000.00) | ($6,000.00) |
| 10/1/2003 | CHECK | ($6,000.00) | ($6,000.00) |
| 1/2/2004 | CHECK | ($6,000.00) | ($6,000.00) |
| 4/1/2004 | CHECK | ($6,000.00) | ($6,000.00) |
| 7/1/2004 | CHECK | ($6,000.00) | ($6,000.00) |
| 10/1/2004 | CHECK | ($6,000.00) | ($6,000.00) |
| 10/13/2004 | STOP PAYMENT | $6,000.00 | $6,000.00 |

| 10/14/2004 | CHECK | ($6,000.00) | ($6,000.00) |
|---|---|---|---|
| 1/3/2005 | CHECK | ($6,000.00) | ($6,000.00) |
| 4/1/2005 | CHECK | ($6,000.00) | ($6,000.00) |
| 7/1/2005 | CHECK | ($6,000.00) | ($6,000.00) |
| 10/3/2005 | CHECK | ($6,000.00) | ($6,000.00) |
| 1/3/2006 | CHECK | ($6,000.00) | ($6,000.00) |
| 4/3/2006 | CHECK | ($6,000.00) | ($6,000.00) |
| 7/3/2006 | CHECK | ($6,000.00) | ($6,000.00) |
| 10/2/2006 | CHECK | ($6,000.00) | ($6,000.00) |
| 1/2/2007 | CHECK | ($6,000.00) | ($6,000.00) |
| 4/2/2007 | CHECK | ($6,000.00) | ($6,000.00) |
| 4/10/2007 | STOP PAYMENT | $6,000.00 | $6,000.00 |
| 4/11/2007 | CHECK | ($6,000.00) | ($6,000.00) |
| 7/2/2007 | CHECK | ($6,000.00) | ($6,000.00) |
| 10/1/2007 | CHECK | ($6,000.00) | ($6,000.00) |
| 1/2/2008 | CHECK | ($6,000.00) | ($6,000.00) |
| 4/1/2008 | CHECK | ($6,000.00) | ($6,000.00) |
| 7/1/2008 | CHECK | ($6,000.00) | ($6,000.00) |
| 10/1/2008 | CHECK | ($6,000.00) | ($6,000.00) |
| **Total Withdrawals:** | | ($288,000.00) | ($288,000.00) |
| | | | |
| **Total deposits less withdrawals:** | | ($58,054.50) | ($288,000.00) |

JEFFREY NEIL KONIGSBERG

C/O PAUL J KONIGSBERG
440 PARK AVE SOUTH
NEW YORK         NY 10016

11/30/08         1   M

1-K0107-3-0      * * * * * * * *

BALANCE FORWARD                                              18,719.33

| Date | | | Security | Rate | Amount |
|---|---|---|---|---|---|
| 11/12 | 210 | 209 | HEWLETT PACKARD CO | 34.900 | 7,337.00 |
| 11/12 | 182 | 4033 | WAL-MART STORES INC | 55.830 | 10,168.06 |
| 11/12 | 119 | 4535 | INTERNATIONAL BUSINESS MACHS | 87.270 | 10,389.13 |
| 11/12 | 441 | 8359 | EXXON MOBIL CORP | 72.880 | 32,157.08 |
| 11/12 | 483 | 8861 | INTEL CORP | 14.510 | 7,027.33 |
| 11/12 | 231 | 13187 | JOHNSON & JOHNSON | 59.580 | 13,771.98 |
| 11/12 | 315 | 17512 | J.P. MORGAN CHASE & CO | 38.530 | 12,148.95 |
| 11/12 | 168 | 21838 | COCA COLA CO | 44.660 | 7,508.88 |
| 11/12 | 98 | 26164 | MCDONALDS CORP | 55.370 | 5,429.26 |
| 11/12 | 182 | 30490 | MERCK & CO | 28.550 | 5,203.10 |
| 11/12 | 665 | 34816 | MICROSOFT CORP | 21.810 | 14,529.65 |
| 11/12 | 336 | 39142 | ORACLE CORPORATION | 17.300 | 5,825.80 |
| 11/12 | 133 | 52120 | PEPSICO INC | 56.410 | 7,507.53 |
| 11/12 | 77 | 52622 | APPLE INC | 100.780 | 7,763.06 |
| 11/12 | 567 | 56446 | PFIZER INC | 16.940 | 9,626.98 |
| 11/12 | 133 | 56948 | ABBOTT LABORATORIES | 54.610 | 7,268.13 |
| 11/12 | 252 | 60772 | PROCTER & GAMBLE CO | 64.080 | 16,158.16 |
| 11/12 | 91 | 61274 | AMGEN INC | 59.160 | 5,386.56 |
| 11/12 | 175 | 65098 | PHILLIP MORRIS INTERNATIONAL | 43.600 | 7,637.00 |
| 11/12 | 420 | 65600 | BANK OF AMERICA | 21.590 | 9,083.80 |
| 11/12 | 140 | 69424 | QUALCOMM INC | 33.770 | 4,732.80 |
| 11/12 | 455 | 69926 | CITI GROUP INC | 12.510 | 5,710.05 |
| 11/12 | 105 | 73750 | SCHLUMBERGER LTD | 49.480 | 5,199.40 |

CONTINUED ON PAGE    2

MDPT.AD 00017362

EXHIBIT B

JEFFREY NEIL KONIGSBERG

C/O PAUL J KONIGSBERG
440 PARK AVE SOUTH
NEW YORK       NY 10016

11/30/08            2      M

1-K0107-3-0      ******

| Date | Quantity | Description | Symbol | Price | Amount | Amount |
|---|---|---|---|---|---|---|
| 11/12 | 252 | COMCAST CORP CL A | 74252 | 16.510 | 4,170.52 | |
| 11/12 | 497 | AT&T INC | 78076 | 27 | 13,438.00 | |
| 11/12 | 126 | CONOCOPHILIPS | 78578 | 52.510 | 6,621.26 | |
| 11/12 | 84 | UNITED PARCEL SVC INC CLASS B | 82402 | 52.040 | 4,374.36 | |
| 11/12 | 511 | CISCO SYSTEMS INC | 82904 | 16.730 | 8,569.03 | |
| 11/12 | 147 | U S BANCORP | 86728 | 29.530 | 4,345.91 | |
| 11/12 | 175 | CHEVRON CORP | 87230 | 73.430 | 12,857.25 | |
| 11/12 | 84 | UNITED TECHNOLOGIES CORP | 91054 | 53.160 | 4,468.44 | |
| 11/12 | 889 | GENERAL ELECTRIC CO | 91556 | 19.630 | 17,486.07 | |
| 11/12 | 238 | VERIZON COMMUNICATIONS | 95380 | 30.410 | 7,246.58 | |
| 11/12 | 21 | GOOGLE | 95882 | 337.400 | 7,085.40 | |
| 11/12 | 294 | WELLS FARGO & CO NEW | 99706 | 29.800 | 8,772.20 | |
| 11/12 | 275,000 | U S TREASURY BILL DUE 2/12/2009 2/12/2009 | 22317 | 99.936 | | 274,824.00 |
| 11/12 | | FIDELITY SPARTAN U S TREASURY MONEY MARKET DIV 11/12/08 | | DIV | | 42.66 |
| 11/12 | 64,692 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 17417 | 1 | | 64,692.00 |
| 11/12 | 21,140 | FIDELITY SPARTAN U S TREASURY MONEY MARKET DIV 11/19/08 | 26786 | 1 | 21,140.00 | |
| 11/19 | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | | DIV | | 2.59 |

CONTINUED ON PAGE 3

MDPT.AO 000173363

MDPT.Ao 0017366

JEFFREY NEIL KONIGSBERG

C/O PAUL J KONIGSBERG
440 PARK AVE SOUTH
NEW YORK        NY 10016

11/30/08        3    M
1-K0107-3-0     *******

| Date | | | | | | |
|---|---|---|---|---|---|---|
| 11/19 | 21,140 | 52202 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | 21,140.00 |
| 11/19 | 25,000 | 56768 | U S TREASURY BILL DUE 03/26/2009 | 99.926 | 24,981.50 | |
| 11/19 | 17,133 | 61241 | FIDELITY SPARTAN U S TREASURY MONEY MARKET 3/26/2009 | 1 | 17,133.00 | |

NEW BALANCE        38,277.29

| | SECURITY POSITIONS | MKT PRICE |
|---|---|---|
| 497 | AT&T INC | 28.560 |
| 133 | ABBOTT LABORATORIES | 52.390 |
| 91 | AMGEN INC | 55.540 |
| 77 | APPLE INC | 92.670 |
| 420 | BANK OF AMERICA | 16.250 |
| 175 | CHEVRON CORP | 79.010 |
| 511 | CISCO SYSTEMS INC | 16.540 |
| 455 | CITI GROUP INC | 8.290 |
| 168 | COCA COLA CO | 46.870 |
| 252 | COMCAST CORP CL A | 17.340 |
| 126 | CONOCOPHILLIPS | 52.520 |
| 441 | EXXON MOBIL CORP | 80.150 |
| 889 | GENERAL ELECTRIC CO | 17.170 |

CONTINUED ON PAGE 4

JEFFREY NEIL KONIGSBERG

C/O PAUL J KONIGSBERG
440 PARK AVE SOUTH
NEW YORK          NY 10016

11/30/08                    4    M

1-K0107-3-0      *******

| | | |
|---|---|---|
| 21 | GOOGLE | 292.960 |
| 210 | HEWLETT PACKARD CO | 35.280 |
| 483 | INTEL CORP | 13.800 |
| 119 | INTERNATIONAL BUSINESS MACHS | 81.600 |
| 315 | J.P. MORGAN CHASE & CO | 31.660 |
| 231 | JOHNSON & JOHNSON | 58.580 |
| 98 | MCDONALDS CORP | 58.750 |
| 182 | MERCK & CO | 26.720 |
| 665 | MICROSOFT CORP | 20.220 |
| 336 | ORACLE CORPORATION | 16.090 |
| 133 | PEPSICO INC | 56.700 |
| 567 | PFIZER INC | 16.430 |
| 175 | PHILLIP MORRIS INTERNATIONAL | 42.160 |
| 252 | PROCTER & GAMBLE CO | 64.350 |
| 140 | QUALCOMM INC | 33.570 |
| 105 | SCHLUMBERGER LTD | 50.740 |
| 17,133 | FIDELITY SPARTAN | 1 |
| | U S TREASURY MONEY MARKET | |
| 147 | U S BANCORP | 26.980 |
| 84 | UNITED PARCEL SVC INC | 57.600 |
| | CLASS B | |
| 25,000 | U S TREASURY BILL | 99.971 |
| | DUE 03/26/2009 | |
| | 3/26/2009 | |
| 84 | UNITED TECHNOLOGIES CORP | 48.530 |

CONTINUED ON PAGE    5

MDPT.AD 0001736S

MDPT. AO 00017366

JEFFREY NEIL KONIGSBERG

C/O PAUL J KONIGSBERG
440 PARK AVE SOUTH
NEW YORK              NY 10016

11/30/08

1-K0107-3-0        *******

5    M

| | | |
|---|---|---|
| 238 | VERIZON COMMUNICATIONS | 32.650 |
| 182 | WAL-MART STORES INC | 55.880 |
| 294 | WELLS FARGO & CO NEW | 28.890 |

MARKET VALUE OF SECURITIES
LONG                          SHORT
350,533.78

JEFFREY NEIL KONIGSBERG

C/O PAUL J KONIGSBERG
440 PARK AVE SOUTH
NEW YORK          NY 10016

1-K0107-3-0          *******          11/30/08          6          M

YEAR-TO-DATE SUMMARY

DIVIDENDS                              2,452.99
GROSS PROCEEDS FROM SALES          2,174,133.20

MDPT.AO 0007367

1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -
In the Matter of:                    )        $800-8178·28$
                                     )
NEW TIMES SECURITIES                 )
SERVICES, INC.                       )
                                     )
              Debtor                 )
                                     )
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

1) Application filed by proposed class claimants to
authorize and approve the filing of a class proof of claim
and for a certification of the putative class and to
shorten time for the hearing

Memorandum by proposed class claimants

Memorandum by Plaintiff Securities Investor Protection
Corporation

Memorandum of law by Trustee James W. Giddens

Affidavit of Derek J. T. Adler in opposition

                              United States Bankruptcy
                              Court
                              Westbury, New York

                              July 28, 2000
                              10:00 a.m.

B E F O R E:

        HONORABLE STAN BERNSTEIN
        United States Bankruptcy Judge

A P P E A R A N C E S:

        HUGHES HUBBARD & REED LLP
            Attorney for James W. Giddens, Trustee
        One Battery Park Plaza
        New York, New York  10004
            BY:  JAMES W. KOBAK, JR, ESQ.
                 DANIEL S. LUBELL, ESQ.


    (516) 741-5342   Tankoos Reporting Co.   (212) 349-9692

EXHIBIT   C

2

APPEARANCES (Contd.)


STEPHEN P. HARBECK, ESQ.
    General Counsel and Secretary
Securities Investor Protection Corporation
805 15th Street, N.W., Suite 800
Washington, D.C.  20005


FARRELL FRITZ
    Co-Counsel for Class Claimants and
    Putative Class Plaintiffs
EAB Plaza
Uniondale, New York  11556
    BY:  TED A. BERKOWITZ, ESQ.


HELLER HOROWITZ & FEIT, P.C.
    Co-Counsel for Class Claimants and
    Putative Class Plaintiffs
292 Madison Avenue
New York, New York  10017
    BY:  SIGMUND S. WISSNER-GROSS. ESQ.
         ALAN EISENBERG, ESQ.


RICHARD L. STONE, ESQ.
    Receiver for New Age Financial Services
830 Third Avenue
New York, New York  10022


SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
7 World Trade Center
New York, New York  10048  .
    BY:  ALISTAIRE BAMBACH, ESQ.

```
1                    THE COURT:  Okay, so, you're telling me that
2       this is very different from the open transaction.
3                    MR. HARBECK:  Correct.
4                    THE COURT:  Okay, so, now we're dealing with a
5       closed transaction, where the money is there, you have
6       interest in a --
7                    MR. HARBECK:  The securities are there.
8                    THE COURT:  -- real --
9                    MR. HARBECK:  Not the money is there.  The
10      securities are supposed to be there.
11                   THE COURT:  No, no -- yeah, you have -- you
12      have an ownership interest in the securities; namely,
13      shares of the mutual fund, of a mutual fund that is real,
14      existing as of the petition date.
15                   MR. HARBECK:  Dreyfus, Janus, you name it.
16                   THE COURT:  Okay.
17                   MR. HARBECK:  Now, what Congress did is it said
18      it wants to give the Trustee and SIPC a very good idea of
19      what securities have to -- that the Trustee is going to
20      have to go out into the marketplace and buy.  So, if you
21      file within sixty days, you'll get the securities, without
22      question.  Whether -- if they triple in value, you'll get
23      the securities.
24                   But, if --
25                   THE COURT:  Even -- even if --
```

(516) 741-5342   Tankoos Reporting Co.  (212) 349-9692

38

```
1                    MR. HARBECK:  Even if they're not there.
2                    THE COURT:  Even if they're not there.
3                    MR. HARBECK:  Correct.
4                    THE COURT:  In other words, if the money was
5       diverted, converted --
6                    MR. HARBECK:  And the securities were never
7       purchased.
8                    THE COURT:  Okay.
9                    MR. HARBECK:  And, if those positions triple,
10      we will gladly give the people their securities positions.
11                   THE COURT:  But, you've got to jump.
12                   MR. HARBECK:  But, you've got to act fast,
13      yeah.  And, Congress did that --
14                   THE COURT:  Because -- because --
15                   MR. HARBECK:  -- because of the fluctuations.
16                   THE COURT:  -- because there's a concern --
17      because there's a concern that the value of this mutual
18      fund might skyrocket and it's going to cost SIPC a lot
19      more money.
20                   MR. HARBECK:  Six months down the line, that's
21      right.
22                   THE COURT:  Okay, all right.  And, you don't
23      want people playing games with you.
24                   MR. HARBECK:  That's correct.
25                   THE COURT:  Deciding when they're going to --
```

39

```
1         it's like the -- do you know about price-laters?
2                   MR. HARBECK:  Sorry?
3                   THE COURT:  Price-laters?
4                   MR. HARBECK:  I can't say that I do.
5                   THE COURT:  Oh, gee, it's a great analogy.
6                   MR. HARBECK:  In any event --
7                   THE COURT:  Do you know what a price-later
8         agreement is, Mr. Berkowitz?
9                   MR. BERKOWITZ:  No, I'm going to play even with
10        Mr. Harbeck --
11                  MR. HARBECK:  Thank you, very much.
12                  MR. BERKOWITZ:  -- for insurance.
13                  THE COURT:  I deposit grain in the elevator.
14        This goes back to my days in the rural counties of
15        Michigan.  And, of course, the grain is all co-mingled.
16        And, I look to the board price and say, "Bingo.  That's
17        the price.  Pay me."
18                  So, I deposit the grain under a price-later
19        agreement, under an agreement in which the price is later
20        to be fixed.  And, of course, I'm going to speculate on
21        the market.  I'm going to wait until the price is high
22        enough to say "Pay me that."
23                  So, basically, I'm a commodities broker, but
24        it's not in futures.  It's grain in the elevator.  And,
25        God help you if the elevator goes into bankruptcy.  Then,
```

## CERTIFICATE OF SERVICE

I, Norman A. Kaplan, hereby certify that on July 29, 2010 I caused a true and correct

copy of the foregoing **Objection to Trustee's Determination of Claim** on behalf of Jeffrey Neil

Konigsberg to be served by U.S. mail overnight delivery upon:


Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111


Dated: July 29, 2010

Norman A. Kaplan

UNITED STATE BANKRUPTCY COURT                    Adv. Pro. No. 08-01789 (BRL)
SOUTHERN DISTRICT OF NEW YORK                    SIPA Liquidation

SECURITIES INVESTOR PROTECTION CORPORATION,

                                        Plaintiff,

        vs

BERNARD L. MADOFF INVESTMENT SECURITIES LLC.,

                                        Defendant.

---

## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

---

**NORMAN A. KAPLAN**
**Attorney for Jeffrey Neil Konigsberg**
**111 Great Neck Road**
**Great Neck, NY 11021**
**(516) 487-4300**

---

To:    Irving H. Picard, Trustee                Service of a copy of the within
       c/o Baker & Hostetler LLP                is hereby admitted.
       45 Rockefeller Plaza
       New York, NY 10111                       Dated:

---

PLEASE TAKE NOTICE:

☐    NOTICE OF ENTRY
     that the within is a (certified) true copy of an   duly entered in the office of the clerk of the within
     named Court on _____ ___, 2010.

☐    NOTICE OF SETTLEMENT
     that an Order                               of which the within is a true copy will be
     presented for settlement to the Hon.        one of the judges of the within
     named Court, at
     on _____ 2010 , at   .M.

---

Dated: July 29, 2010                        Yours, etc.

                                            NORMAN A. KAPLAN

n:\ws\clients\madoff\stmt-claim-det-obj\obj-07292010.jeff.doc