BERNFELD, DEMATTEO & BERNFELD, LLP
600 Third Avenue, 15th Floor
New York, New York 10016
(212) 661-1661
David B. Bernfeld
Jeffrey L. Bernfeld
*Attorneys for Murray Gold, Esq. Money*
*Purchase Pension Plan*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

Plaintiff,

v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

Defendant.

Adv. Pro. No. 08-01789 (BRL)
SIPA LIQUIDATION

## OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM

Murray Gold, Esq. Money Purchase Pension Plan ("Claimant"), by its attorneys,

Bernfeld, DeMatteo & Bernfeld, LLP, hereby objects to the Notice of Trustee's Determination of

Claim dated May 14, 2010 (the "Determination Letter"), as follows:

Background Facts

1.      The relevant background facts are not in dispute. Simply stated, for decades

Bernard L. Madoff ("Madoff") and his company Bernard L. Madoff Securities ("BLMIS")

perpetrated a massive fraud upon thousands of investors, causing a loss to investors in the

billions of dollars. The fraud came to light in December 2008, when Madoff confessed his

scheme and was arrested.

2.      The scheme involved the reported purchase and sale by BLMIS for the various

customer accounts of securities of existing, publicly-traded companies.  Each reported

transaction was confirmed in writing to each customer and the monthly customer statements

reiterated and reconfirmed the representations made by BLMIS in those specific transaction

confirmations.  The account statements were consistent with the market prices for the securities

listed so that any BLMIS customer could confirm the existence and the value of the securities

and the transactions reported as having been conducted for their BLMIS account.

3.      Following the public disclosure of the fraud, actions were commenced by the SEC

and SIPC against, *inter alia,* BLMIS.  On or about December 15, 2008, the Court directed the

liquidation of BLMIS pursuant to the provisions of the SIPA and Irving Picard was designated by

SIPC and appointed by the Court to act as the SIPC trustee (the "Trustee"). Mr. Picard then hired

his law firm, Baker & Hostetler, to act as counsel to the Trustee.

4.      Pursuant to order dated December 23, 2008, the Court empowered the Trustee:

a.      to disseminate and make available notice and claim forms to BLMIS
        customers for the filing of Customer Claims in the BLMIS Liquidation;

b.      to advise Customers of the relevant claim-filing cut off dates; and

c.      to determine in writing all filed customer claims, and to the extent that the
        Trustee disallowed any claim, whether in whole or in part, to provide the
        reason for such disallowance.

5.      By  in or about February 2009, the Trustee publicly announced that he would not

calculate customer net equity on the basis of the written confirmations and account statements

sent by BLMIS to the customers but, instead, would do so on the basis of what the Trustee

labeled as his "cash in/cash out" methodology.

6.     The last date for filing customer SIPA Claims was July 2, 2009 (the "Filing Deadline").

7.     In the months following the Filing Deadline, the Trustee issued various Determination Letters each of which applied the Trustee's cash in/cash out  "definition" of Net Equity.

8.     Various customers filed formal written objections to those Determination Letters and to the "cash in/cash out" method of calculating net equity.  In addition, several investor groups brought separate actions seeking to have the Court rule on the definitional dispute.

9.     The Trustee objected to those actions and moved for their dismissal.  In September 2009, however, the Trustee made an application to the Court seeking specific Court approval for his claim that a customer's net equity under SIPA should be determined solely on the "cash in/cash out" methodology and that the customers' account statements and the transaction confirmations the customers' received for each separate transaction should be disregarded.

10.     In accordance with the schedule fixed by the Court, various claimants filed papers in opposition to the Trustee's proposed net equity definition.  These claimants' Memoranda are incorporated by reference as if set forth at length in these objections.

11.     The Bankruptcy Court (Lifland, J.) granted the Trustee's motion and sustained the Trustee's "cash in/cash out" definition and methodology for determining each customer's Net Equity for SIPA purposes.

12.     The Bankruptcy Court certified its decision for direct appeal to the Second Circuit

3

Court of Appeals, on the joint application of the Trustee and counsel for various claimants and a

petition to the Second Circuit for permission to file a direct appeal is currently pending.

### THE CLAIM AND THE TRUSTEE'S DETERMINATION LETTER

13.    Claimant is a "customer"of Bernard L. Madoff Investment Securities, LLC

("BLMIS") as that term as defined under the Securities Investor Protection Act (hereinafter

"SIPA").

14.    According to Claimant's final customer statement for Claimant's account at

BLMIS dated November 30,2008 (the "November Statement"), Claimant had securities in its

BLMIS account valued at in excess of the maximum SIPC customer payout of $500,000.

15.    Claimant submitted its claim on the form provided by the Trustee (the "Claim").

Included in the Claim was a copy of Claimant's November Statement.

16.    On or about May 14, 2010, the Trustee sent Claimant a letter (the "Determination

Letter") which, *inter alia*: (a) disallowed the claim for physical delivery of the securities set forth

as being in Claimant's BLMIS account as of the November Statement; (b) disallowed Claimant's

Net Equity claim in its entirety; and (c) rejected in its entirety Claimant's application for a SIPC

advance payment.

17.    According to the Determination Letter, there were total deposits to Claimants

Account of $112,823.45 (exclusive of the reported appreciation or any other substitute return on

the investment) and alleged total withdrawals of $672,284.30.

18.    In disallowing Claimant's entire Net Equity claim, the Trustee completely

disregarded  the transaction confirmations and Account Statements received by Claimant from

BLMIS which, as noted, reflected a substantial positive Net Equity in the account.

4

19.     Instead, using his "cash in/cash out" method and the Trustee "determined" that

Claimant had a negative Net Equity of $559,460.85.

20.     According to the Determination Letter, Claimant opened its account with BLMIS

in or about 1984 and  has maintained the account continuously to date (the "Account Period").

During the Account Period, Claimant received trade confirmations for each transaction and

monthly statements from BLMIS representing that the confirmed transactions in specific real

securities had taken place for the account.

21.     At all times during the Account Period, Claimant reasonably believed that the

Account Statement balances were accurate and reflected the securities and account values that

Claimant owned and had on deposit with BLMIS.

22.     At all times during the Account Period, Claimant believed Claimant was entitled

to make withdrawals from Claimant's BLMIS account and that when doing so, Claimant was

withdrawing its own money.

23.     Each year during the Account Period, Claimant received official tax reporting

forms from BLMIS advising and representing to Claimant's the amount of Claimant's reportable

BLMIS taxable income for that year based on the transactions reflected in the trade confirmations

and account statements received by Claimant.

24.     During the Account Period, Claimant's tax returns included that BLMIS income

and substantial taxes were paid thereon over that period.

## SUMMARY OF OBJECTIONS

25.     Claimant objects to the Trustee's Determination Letter and all claim

determinations made in its entirety except for the Trustee's acknowledgment that Claimant is a

5

BLMIS customer.

26.     Claimant's Objections are predicated, *inter alia,* on the SIPA statute and

regulations and on the cases interpreting SIPA.

27.     The Determination Letter is erroneous and the determinations contained therein

are objectionable for a variety of reasons including, *inter alia,* the following:

    a.    The Determination Letter fails to provide "legal reasons" for the determinations made, in violation of this Court's order dated December 23, 2008 mandating that specific reasons be provided for each claim disallowed;

    b.    The Trustee has ignored the definition of Net Equity contained in the SIPA statute which requires that Net Equity be determined based upon the customer's last account statement from the Debtor.  Instead, without any lawful basis, he has created his own definition-cash in/cash out - which deprives Claimant and thousands of other BLMIS investor claimants of their proper SIPA statutory advance and improperly reduces the proper Net Equity/allowable claim of those claimants.

    c.    SIPA is designed to give effect to the reasonable expectations of the customer of a failed SIPC member brokerage firm.  When a customer receives trade confirmations and monthly account statements reflecting transactions in real securities available for purchase in the marketplace, that customer's Net Equity under SIPA is the amount of the customer's last account statement, thereby giving effect to the customer's reasonable expectations.  Therefore, the Trustee was required to determine Claimant's Net Equity on the basis of, and in the amount of, the Claimant's last account statement, not on the basis of his cash in/cash out construct.

    d.    The Trustee should have allowed and paid Claimant a full SIPC advance of $500,000 since, under the proper definition of Net Equity, Claimant has a positive Net Equity substantially in excess of $500,000.

    e.    The Trustee owes a fiduciary duty to the BLMIS customers and pursuant to that duty is obliged to assert on behalf of those customers, interpretations of SIPA which, in good faith, maximize the statutory benefits to the customers.  In violation of that duty, the Trustee has adopted a definition of Net Equity which is antithetical to the customers best interests and to their entitlement to SIPC advances and payments.

6

The Trustee's proposed definition deprives BLMIS customers of millions of dollars of SIPC payments which, according to their respective account statements, they were entitled to receive. The sole beneficiary of this deprivation is SIPC which (i) avoids having to pay those millions in SIPC claims, and (ii) will be able to recoup, through subrogation, even those limited  SIPC advances it actually makes (because the Net Equity claims of BLMIS investors will have been artificially and improperly reduced or eliminated).

f.    SIPC has previously represented to the Courts of this district see, e.g.,(in the *New Times Securities* case) that if a customer receives trade confirmations and monthly account statements reflecting transactions in real securities available for purchase in the marketplace, that customer's Net Equity under SIPA equals the amount of the customer's last account statement. Under well settled principles of estoppel, neither SIPC nor the Trustee is now free to propose a wholly different and contrary definition of Net Equity which effectively seeks to disavow this prior judicial representation.

## SPECIFIC OBJECTIONS

## FIRST OBJECTION

## FAILURE TO PROVIDE REASONS
## FOR CLAIM DISALLOWANCES

28.    The Order of December 23, 2008 requires the Trustee to provide "the reasons" , in writing, for any claim disallowance.

29.     Although the Trustee's Determination Letter disallows Claimant's claim in its entirety, the Determination Letter fails to provide any legal basis or reasons for that disallowance.

30.    The most that can be said is that the Determination Letter makes certain factual statements which, however, does not provide "legal reasons" for the disallowance as specifically directed by the Court.

31.    Accordingly, the Determination Letter is deficient, fails to comply with the

7

Court's specific mandate and the claim disallowances made by the Trustee must be vacated.

## SECOND OBJECTION

### THE TRUSTEE'S WRONGFUL REFUSAL
### TO DELIVER *IN KIND* SECURITIES

32.     The Determination Letter disallows Claimant's demand for delivery of the

Securities listed in Claimant's Account Statement.

33.     The Determination Letter says that "No securities were ever purchased for your

account". While that may - or may not - be an accurate factual statement, it provides no legal

reason for the Trustee's refusal to purchase *in kind* securities in the market place for delivery to

the BLMIS customers, including Claimant.

34.     Under SIPA, the Trustee and SIPC are required to purchase and deliver *in kind*

securities when, as here, the confirmations and account statement reflect ownership of real

securities which are capable of being purchased in the marketplace (subject only to the dollar

limitations of SIPA).[1]

35.     The Determination Letter's disallowance of Claimant's demand for delivery of *in

kind* securities violates the clear mandate of SIPA and must be overruled.

36.     Moreover, the Trustee's claim that no investment transactions occurred with

---

[1]     Thus, SIPA provides as follows:

> The trustee *shall*, to the extent that securities can be purchased in a
> fair and orderly market, purchase securities as necessary for the
> delivery of securities to customers in satisfaction of their claims for
> net equities ...

15 U.S.C. §78fff-2(d)

8

respect to investor funds and that no profits were ever generated therefrom is factually erroneous and in direct conflict with allegations contained in Federal Grand Jury Indictments and SEC complaints brought against former Madoff employees.

## THIRD OBJECTION

### THE TRUSTEE IS USING AN IMPROPER
### AND UNAUTHORIZED DEFINITION OF NET EQUITY

37.     Under SIPA, when a customer has received confirmations of transactions in real securities and when the customer's account statement reflects ownership of real securities, the customer's net equity is to be determined by, and is equal to, the customer's last account statement value.

38.     Claimant's last BLMIS Account Statement account reflects a positive balance.

39.     The Determination Letter states that the Trustee has used a "cash in/cash out" method of determining customer Net Equity which violates the clear statutory definition of Net Equity.

40.     In the Trustee's Determination Letter, he admits that Claimant's Net Equity was determined based on the "cash in/cash out" methodology, rather than on the basis of the customer's last account statement as SIPA requires.[2]

41.     The SIPA statute (15 U.S.C. §78lll(11)) defines Net Equity in clear and straightforward terms, as follows:

---

[2]     The Determination Letter simply recites that the Trustee has determined Net Equity on the "cash in/cash out method" but that is simply a statement of fact and provides no legally cognizable reason for the Trustee to ignore the SIPA statutory definition of Net Equity, the controlling cases or SIPC's prior acknowledgments (judicial and otherwise) that in these circumstances, a customer's Net equity is equal to the customer's last account statement.

9

> The term 'net equity' means the dollar amount of the account or
> accounts of a customer, to be determined by -
> (A) calculating the sum which would have been owed by the debtor
> to such customer if the debtor had liquidated, by sale or purchase
> on the filing date, all securities positions of such customer...; minus
> (B) any indebtedness of such customer to the debtor on the filing
> date...[3]

42.     Congressional history confirms that SIPA is focused on the customer's reasonable

expectations, in order to foster investor confidence in the securities markets.  Thus, for example,

as the Senate Report on the 1978 SIPA amendment bill explains:

> By seeking to make customer accounts whole and returning them
> to customers in the form they existed on the filing date, the
> amendment not only would satisfy the customers' legitimate
> expectations, but would also restore the customer to his position
> prior to the broker-dealer's financial difficulties.

S.Rep No. 763, 95th Cong., 2d Sess. (1978 ) at 2 (See also, Claimant's Memorandum of Law)

43.     Thus, as a matter of logic, legislative history and controlling case law, it is clear

that a customer's reasonable expectation is to receive what he or she has been told is contained in

his or her accounts.  Accordingly, the Account Statement balance *is* the customer's SIPA net

equity.

## FOURTH OBJECTION

## SIPC HAS PREVIOUSLY REPRESENTED
## THAT NET EQUITY IS DETERMINED BY
## THE CUSTOMER'S LAST ACCOUNT
## STATEMENT BALANCE AND IS ESTOPPED
## FROM ASSERTING A CONTRARY DEFINITION NOW.

---

[3]     SIPA specifically prohibits SIPC from changing any defined term in 15 USC §
which is where the definition of net equity is set forth. Notwithstanding this prohibition, that is
precisely what the Trustee seeks to accomplish-change the statutory definition to one that better
serves SIPC's financial interests and those of the registered broker deal industry which makes up
SIPC's membership.

10

44.      In the *New Times Square* case, SIPC represented in its court submissions that a

customer's Net Equity is determined by the customers account statement when (as here): (i) the

securities at issue are real and could be purchased in the market place; and (ii) the customer has

received written confirmations and account statements reflecting what has allegedly been

purchased for the customer's account.

45.      The Second Circuit in *New Times Securities* quoted with approval the following

statement from the Trustee's and SIPC's appellate brief to the Court on the issue of customer

expectations and the proper definition of net equity:

> [I]nvestors that were misled by Goren to believe that they
> were investing in mutual funds that in reality existed  were
> treated much more favorably [than those who were led to
> invest in the fictitious funds]. Although they were not
> actually invested in those real funds-because Goren never
> executed the transactions-the information that these
> claimants received on their account statements 'mirrored
> what would have happened had the given transactions been
> executed' Br. For Appellants [SIPC Trustee and SIPC].  As
> a result, the Trustee deemed those customers claims to be
> 'securities claims' eligible to receive up to $ 500,000 in
> SIPC advances.  The Trustee indicates that this disparate
> treatment was justified because he could purchase real,
> existing securities to satisfy such securities claims.
> Furthermore, the Trustee notes that, if they were checking
> on their mutual funds, the 'securities claimants' in contrast
> to the 'cash claimants' bringing this appeal could have
> confirmed the existence of those funds and tracked the
> funds' performance against Goren's account statements.

46.      This  definition of Net Equity, utilized by SIPA and the SIPA trustee in the New

Times  *Securities* case, reflects the proper definition of Net Equity under SIPA, consistent with

the reasonable expectations of the customers.

47.      There has been no change in the definition of Net Equity under SIPA since the

*New Times Securities* case.  Nevertheless, the BLMIS Trustee in these proceedings is essentially

ignoring that controlling authority as well as repudiating SIPC's prior judicial representations and

admissions, all  in an effort to reduce SIPC's financial exposure and responsibilities to aggrieved

BLMIS customers, such as Claimant.

48.    In the lower court proceedings in the case of  *In re New Times Securities*, the

following transcribed colloquy between SIPC President Stephen Harbeck  and the Court occurred

in open Court:

| | |
|---|---|
| Harbeck: | ...if you file [a timely SIPC claim] you'll get the securities without question.  Whether - if they triple in value, you'll get the securities... *Even if they're not there.* |
| Court: | *Even if they're not there.* |
| Harbeck: | Correct. |
| Court: | *In other words, if the money was diverted, converted-* |
| Harbeck: | *And the securities were never purchased.* |
| Court: | Okay. |
| Harbeck: | And if those positions triple we will gladly give the people their securities positions. |

Tr. at 37-39,  *In re New Times Securities Services, Inc*, OO-8178 (Bkrcty. E.D.N.Y. July28,

2000) (emphasis added).

49.    Moreover, shortly after the Madoff scandal became public, SIPC's general

counsel also acknowledged SIPC's obligation to replace securities as reflected ion the following

interview:

[I]f clients were presented statements and had reason to believe
that the securities were in fact owned, the SIPC will be required to

12

> buy these securities in the open market to make the customer
> whole up to $500k each.  So if a Madoff client ... was given a
> statement showing they owned 1000 GOOG shares, even if a
> transaction never took place, the SIPC has to buy and replace the
> 1000 GOOG shares.

Insiders' Blog December 16, 2008, www.occ.treas.gov/ftp/alert/2008-37.html.

50.     Under well settled principles of estoppel, a party is not permitted to ignore prior

judicial representations and admissions nor to assert contentions that are contrary to that party's

earlier judicial representations.

51.     The BLMIS Trustee's definition of net equity seeks to disavow SIPC's prior

judicial representations and public statements by SIPC.

52.     Under these circumstances, SIPA and the Trustee should be precluded from

repudiating their prior  judicial assertions  and should, instead,  be compelled to calculate BLMIS

customer Net Equity on the basis of the last BLMIS customer account statements.

53.     Accordingly, the Determination Letter's attempted disavowal of the net equity

definition represented as correct by SIPC in prior judicial proceedings is barred by judicial

estoppel and the Trustee's Claim disallowances must be overruled.

## FIFTH OBJECTION

**THE DETERMINATION LETTER CLAIM DISALLOWANCE IGNORES
THE FACT THAT EACH SECURITIES TRANSACTION WAS
CONFIRMED TO CLAIMANT BY BLMIS AND WAS REFLECTED
IN CLAIMANT'S ACCOUNT STATEMENTS. UNDER SIPA, THOSE
CONFIRMED TRANSACTIONS WILL BE GIVEN BINDING EFFECT
IN CALCULATING NET EQUITY EVEN IF, AS HERE, THE
BROKER LIED AND NO TRANSACTIONS ACTUALLY TOOK PLACE.**

54.     All of Claimant's securities transactions, as reflected in Claimant's account, were

confirmed to Claimant's by written trade confirmations from BLMIS as well as account

13

statements from BLMIS reflecting those transactions.

55.    In accordance with Claimant's customer agreement with BLMIS, the transactions

became binding unless written objection was made within thirty (30) days of receipt.

56.    Under clear industry regulations applicable to broker-dealers such as BLMIS,

trade confirmations and accounts statements rendered to a customer by a broker-dealer are

binding on the broker-dealer and may not subsequently be disavowed.

57.    SIPC's series 500 rules are to the same effect. Thus, Rule 502 provides as follows:

> Where the Debtor held cash in an account
> for a customer, the customer 'has a claim for
> securities" with respect to any authorized securities
> purchase: (1) if the Debtor has sent a written confirmation
> to the customer that the securities in question have been
> purchased for or sold to the customer's account

58.    The applicable cases also squarely hold that when addressing transactions

involving real securities, confirmations and account statements issued by the broker to the

customer are controlling and will be binding.

59.    All of the securities which were the subject of those written trade confirmations

and account statements  reflected transactions for Claimant's account in real securities which

were available to be purchased in the open market.

60.    In such circumstances,  Net Equity must be determined by the claimant's last

BLMIS Account Statement, even if the broker lied and no transactions in those securities actually

took place.

61.    The Determination Letter disallowances ignores the transaction confirmations and

Account statements received by Claimant and those disallowances must be overruled.

14

## SIXTH OBJECTION

### THE DETERMINATION LETTER CLAIM DISALLOWANCE
### VIOLATES THE TRUSTEE'S FIDUCIARY OBLIGATIONS TO
### CLAIMANT AND THE OTHER BLMIS CUSTOMERS

62.    Under SIPA, the person designated and appointed by the Court to act as Trustee in a SIPA liquidation owes the customers of the debtor firm a fiduciary duty to act in their best interest and to advocate for them to the maximum extent permitted by law.

63.    The Trustee owes no such comparable duty to SIPC.

64.    The Determination Letter sent by the Trustee to Claimant demonstrates facially that the Trustee is acting in a manner inconsistent with the duties he owes to customers of BLMIS, including Claimant.

65.    The Trustee's definition of Net Equity, if allowed to stand, will substantially reduce the number of BLMIS customers who, like Claimant, should  qualify for a full SIPC advance, but will receive nothing from SIPC.[4]

66.     The only party that benefits from the Trustee's SIPC "definition" of Net Equity is SIPC itself which, as a result, will be relieved of its statutory obligations to thousands of BLMIS customers and save hundreds of millions of dollars. There will be no benefit to any other customer or the customer class generally.

67.    The Trustee should be asserting the most favorable application of SIPA for the benefit of the customers, not one that deprives the customer of significant SIPA rights and benefits. However, the Trustee has chosen a definition for the application of SIPC advances

---

[4]    Moreover, even if a customer qualifies for some SIPC payment, that payment will frequently be for an amount less than the customer should have received under a proper Net equity definition.

15

which is adverse to the customers to whom a fiduciary duty is owed.

68.     As a result of this breach , the Determination Letter improperly disallows

Claimant's SIPA net equity in its entirety.

69.     Under the proper statutory definition of net equity which the Trustee was

obligated to apply, Claimant's Claim should have been allowed in its entirety.

70.     In that regard, in violation of this fiduciary duty,  the Trustee's Determination

Letter improperly deprived Claimant of at least the following relief to which Claimant is entitled:

    a.     A $500,000 SIPA allowance in the form of securities *in kind* or, in the alternative, a cash payment in that amount;

    b.     A determination that Claimant has a positive Net Equity for SIPA purposes as reflected by the balance of Claimant's last account statement and an allowed claim in that amount;

    c.     A determination that Claimant is entitled to share *pro rata* in all BLMIS customer property based upon an allowed claim as reflected by the balance of Claimant's last account statement.

71.     In view of the Trustee's fiduciary obligations, the Determination Letter

disallowing the Claim constitutes a breach of  duty and requires that the disallowances contained

in the Determination Letter be overruled.

**SEVENTH OBJECTION**

**THE DETERMINATION LETTER ERRONEOUSLY
DISALLOWED THE APPRECIATION AND PROFITS
REFLECTED IN CLAIMANTS ACCOUNT.**

**A.  If the Disallowance of Appreciation Is Sustained,
Then Claimant's Net Equity must Be Credited
with Interest at the New York Judgement Rate.**

72.     New York law clearly provides for the payment of prejudgment interest in light of

16

the conversion of property that occurred and the fraud perpetrated by BLMIS on the BLMIS

customers, including Claimant.

73.    Accordingly, should it be determined, *arguendo,* that Claimant's Net Equity does

not include the cumulative appreciation in Claimant's account as reflected in the November

Statement, then Claimant's Net Equity must include, and be increased by, interest at the legal rate

applicable to New York Judgments.

74.    The Determination Letter disallows all appreciation in Claimant's account in the

net equity/allowed claim calculation and does not, as an alternative, include an interest

component as required by law.

75.    The Determination Letter must be overruled.

**B.  If the Disallowance of Appreciation Is Sustained,
Then Claimant's Net Equity must Be Credited
With Appreciation from Transactions Which Took Place
Prior To The Formation of BLMIS.**

76.    Upon information and belief, on or about December 4, 2000,BLMIS was formed

as a domestic  Limited Liability Company under the laws of the State of New York.

77.    In this proceeding, the Trustee has been appointed by the Court to conduct a

liquidation of BLMIS under and in accordance with the SIPA statute.

78.    Upon information and belief, in or about December 2000, Claimant's account at

BLMIS was credited with deposits of securities and cash, as the starting principal deposit in

Claimant's BLMIS account.

79.    The Trustee's Determination Letter purports to justify his denial of Claimant's

Net Equity and SIPC advance claim based upon alleged transactions and events which preceded

17

the formation of BLMIS.

80.    In doing so, the Trustee is acting beyond his lawful mandate which is limited to

the liquidation under SIPA of BLMIS.

81.    By reason of the foregoing, the Trustee's Determination Letter is invalid and

Claimant's Net Equity claim under SIPA should be allowed in full, as filed.

**C.  If the Disallowance of Appreciation Is Sustained,**
**Then Claimant's Net Equity must Be Credited**
**With Taxes That Claimant Was Induced To Pay.**

82.    Claimant has reported and paid taxes on the income reported to have been earned

in Claimant's Madoff and BLMIS accounts.

83.    According to the Trustee, however, there were no actual profits or income and no

taxes should have required to be paid by Claimant.

84.    Madoff and BLMIS caused and induced Claimant to report said income and

profits on Claimant's tax returns and to pay taxes thereon based on the written information

provided to Claimant and to the Taxing authorities by Madoff and BLMIS.

85.    Even under the Trustee's cash in/cash out methodology, if there were actual

profits and income generated for Claimant's account, that income and those profits should be

allowed as actual principal deposits to the account.

86.    If, arguendo, all such reported income and profits were fictitious, Claimant is

entitled to have the principal of Claimant's account credited with the taxes Claimant was

wrongfully induced to pay based on the reported Madoff and BLMIS income and profits as

damages proximately caused by the fraud of Madoff and BLMIS.

87.    By reason of the foregoing, even under the cash in/cash out method, Claimant's

18

Net Equity must be increased to reflect (i) actual profits and income for Claimant's account; and (ii) taxes paid by Claimant with respect to any reported profits and income found to have been fictitious or otherwise not now credited to Claimant's account.

### D.  To the Extent that There Were Any Profits or Actual Transactions Either Specifically for Claimant's Account or For BLMIS Generally, Claimant's Account Should be Credited Accordingly.

88.    Although the Trustee has asserted that there were no transactions in connection with BLMIS and no securities purchased for Claimant's account, it appears that this assertion is erroneous.

89.    First, during the entire duration of the so-called ponzi-scheme, it appears that BLMIS engaged in significant transactions involving treasury bills and other securities which generated profits.  Further, it is undisputed that during the relevant periods, BLMIS was engaged in proprietary trading and market making activities for its own account (in large part involving trades in the very securities that were reflected in Claimant's trade confirmations) which also generated significant profits.  In addition, during the period that the Trustee has included in the so-called ponzi scheme, Madoff - prior to the formation of BLMIS and prior to the advent of Madoff's claimed "split-strike" trading model - was engaged in arbitrage transactions for specific customers - including Claimant - which, upon information and belief were real transactions and not simply a fictitious part of the so-called ponzi-scheme.  Further, whether arbitrage, split strike or otherwise, upon information and belief, the so-called ponzi scheme was not all-encompassing at the outset and at least well into the 1990's there were actual trades for customer accounts.

90.    The Determination Letter has not given Claimant proper - or, indeed, any - credit

for the profits derived from these transactions.[5]

91.     Claimant is entitled to appropriate credit for these transactions and profits.

## EIGHTH  OBJECTION

**THE DETERMINATION LETTER DISALLOWANCES FAILS
TO GIVE EFFECT TO THE REASONABLE EXPECTATIONS OF
CUSTOMERS, AS SIPA REQUIRES, AND THE NET EQUITY
DEFINITION IT UTILIZES WOULD RESULT IN A DRASTIC
LOSS OF INVESTOR CONFIDENCE IN THE MARKETS, AGAIN
IN VIOLATION OF SIPA'S STATED GOALS AND PURPOSES**

92.     The  primary purposes of Congress in enacting SIPA was to (a) protect customers

and give effect to their reasonable expectations, and (b) to foster investor confidence in the

securities markets.

93.     Under SIPA, the customer's reasonable expectations is that they receive what they

have been told is in their accounts based on transaction confirmations and account statements.

94.     As noted above, Claimant received trade confirmations and monthly account

statements throughout the Account Period for the various transactions set forth in Claimant's

BLMIS account.

95.     Claimant reasonably believed that Claimant's  BLMIS account statement properly

reflected what Claimant had on deposit with BLMIS, that said property was Claimant's, and that

Claimant was entitled to withdraw and use that property as Claimant's own, without restrictions

or potential recapture.

96.     The Trustee's flawed Net Equity definition frustrates the customers reasonable

expectations and promotes distrust by investors in the public securities markets.

---

[5]     Further, the existence of these transactions and profits renders the very basis for
the Trustee's "cash in/cash out" definition of Net Equity invalid.

97.     Thus the Trustee's definition of Net Equity violates the clear and express public policy interests that SIPA was designed to promote.

98.     Accordingly, the Trustee's definition of Net Equity, and the Determination Letter implementing that definition,  should be rejected as erroneous and  in conflict with the SIPA statute.

## NINTH OBJECTION

### THE DEFINITION OF NET EQUITY USED IN THE DETERMINATION LETTER TO DISALLOW THE CLAIM VIOLATES SIPA'S STATED PURPOSE TO GIVE PREFERENCE TO THE BROKER'S CUSTOMERS OVER GENERAL NON-CUSTOMER CREDITORS

99.     The Trustee's Net Equity definition also results in a reduced Net Equity allowance for substantial numbers of BLMIS customers, thus reducing the aggregate net equity of the BLMIS customer class.

100.     SIPA specifically provides that the customers of a failed broker-dealer are entitled to a statutory preference over general non-customer creditors of the debtor and their allowed Net equity  must be paid in full before any payments are made to general non-customer creditors.

101.     By artificially reducing the aggregate net equity of the BLMIS customer class, the Trustee is violating that statutory preference thereby benefitting the general creditor class at the expense of the Customer class which SIPA was enacted to protect.

102.     The Determination Letter disallowing the Claim contributes to this improper failure to honor the statutory preference that the customers are to receive and, as a result, the disallowance of the Claim must be overruled.

## <u>TENTH OBJECTION</u>

## THE TRUSTEE OWES CLAIMANT AND OTHER BLMIS
## CUSTOMERS A FIDUCIARY DUTY WHICH IS VIOLATED
## <u>BY THE TRUSTEE'S NET EQUITY ARGUMENT</u>

103.    As a fiduciary for BLMIS customers, including Claimant, the Trustee should be asserting positions that favor those to whom he owes a fiduciary duty - which in this circumstance means arguing for a definition of Net Equity that benefits the Customer class, not one that favors SIPC at the expense of the customers.

104.    Given the Trustee's fiduciary obligations, if there is a conflict or dispute between the Customers and SIPC, the Trustee is duty bound to make bona fide arguments that support the customer's contentions.  Here, however, the Trustee has adopted a definition that supports and benefits SIPC at the expense of the customer.

105.    Under the circumstances, Claimant: (a) objects to the Trustee adopting and implementing a definition of Net Equity which favors a third party like SIPC, at the expense of the Trustee's lawful fiduciaries; and (b) seeks a direction from the Court to the Trustee to discharge his duties under SIPA consistent with the fiduciary duties imposed on him by SIPA and by other applicable law.

**ELEVENTH OBJECTION**

**THE TRUSTEE HAS DEPRIVED CLAIMANT OF
FACTUAL DISCOVERY NECESSARY TO ALLOW
CLAIMANT TO DEMONSTRATE THAT THE CLAIM
SHOULD NOT HAVE BEEN DENIED AND, INSTEAD,
SHOULD HAVE BEEN ALLOWED IN FULL. CLAIMANT
RESERVES THE RIGHT TO AMEND AND/OR SUPPLEMENT
THE OBJECTIONS TO THE DETERMINATION LETTER
FOLLOWING APPROPRIATE FACT DISCOVERY.**

104.    Although more than 1½ years have elapsed since the BLMIS SIPA liquidation

commenced, upon information and belief, the Trustee has failed and refused to provide

meaningful-or any-fact discovery.  This is particularly distressing and prejudicial to Claimants

and others similarly situated since the transaction which allegedly form the basis for the

Determination Letter concern transactions now more than a decade old.  Claimant requires

discovery of the facts to allow Claimant properly to prepare for and litigate why the

Determination letter should be vacated and Claimant's Net Equity be determined in full, in

accordance with Claimant's previously filed SIPA Net Equity claim.

## CONCLUSION

The Determination Letter and the rejection of Claimant's SIPC claims contained therein should be rejected and overruled in all respects.  Claimant's Net Equity should be allowed in the amount set forth in Claimant's November 2008 account statement.  Claimant should receive a full $500,000 SIPC advance.  Claimant should be granted such other and further relief in favor of Claimant as to the Court appears just and proper.

Dated: August 2, 2010.

Bernfeld, Dematteo & Bernfeld, LLP


By:_____/s/_____
    David Bernfeld (0177)
*Attorneys for Claimant*
Alan Winters & Janet Winters
Family Limited Partnership
600 Third Avenue
New York, New York 10016
(212) 661-1661
