Jason A. Nagi
POLSINELLI SHUGHART PC
7 Penn Plaza, Suite 600
New York, NY   10001
(212) 644-2092 (Telephone)
(212) 684-0197 (Facsimile)
E-Mail: jnagi@polsinelli.com

*Attorneys for Barbara and Mark Roth*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br><br>Plaintiff,<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | SIPA LIQUIDATION<br><br><br>Adv. Pro. No. 08-01789 (BRL) |

## <u>OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM</u>

Barbara Roth and Mark Roth (together, the "<u>Roths</u>"), by and through their attorneys, John J. Hebert and Polsinelli Shughart PC, hereby object to the Notice of Trustee's Determination of Claim dated May 10, 2010.[1]

---

[1] This Objection is timely as counsel for the Trustee extended, in writing, the Roths' time to answer until September 14, 2010.

## BACKGROUND

1.      A joint account for the Roths was opened at Bernard L. Madoff Investment Securities, LLC ("BLMIS") with account number 1-R0123 (the "Account").    The Roths are a "customer" of BLMIS, as defined by the Securities Investor Protection Act of 1970 ("SIPA").

2.      The Roths' final BLMIS statement dated November 30, 2008, states that they own securities valued at approximately $3,148,620.18 (the "November Statement").

3.      On December 11, 2008, the above-captioned proceeding was commenced against BLMIS pursuant to SIPA.   *See* Order, Securities and Exchange Commission v. Madoff, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Docket. No. 4]. Irving H. Picard was appointed Trustee (the "Trustee"), charged with overseeing and administering the liquidation of BLMIS and processing customer claims pursuant to SIPA.   *See id.*; 15 U.S.C. 78fff-1(a) (2009).

4.      On December 23, 2008, the Court issued an Order (the "December 23 Order") [Docket. No. 12] directing the Trustee to disseminate and make available notice and claim forms to BLMIS customers and advise BLMIS customers of claim-filing deadlines.   *See* December 23 Order.

5.      The December 23 Order further provided that, to the extent the Trustee disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, and the reason therefor . . . ." See December 23 Order, at 6 (emphasis added).

1886725.1

6.      On or about February 23, 2009, the Roths submitted a Customer Claim for account number 1-R0123[2] to SIPC setting forth their claim in the amount of $3,148,620.18 (the "Customer Claim").   A true and correct copy of the Roths' Customer Claim is attached hereto as **Exhibit A**.

7.      On May 10, 2010 the Trustee sent the Roths a Determination Letter (the "Determination Letter") denying the claim in its entirety.   A true and correct copy of the Determination Letter is attached hereto as **Exhibit B**.

8.      According to the Trustee, during the period from April 24, 1997 through September 13, 2006, the Roths deposited a total of $2,479,838.55 into the Account.   However, the Trustee adjusts the deposit amounts from $2,479.838.55 to $1,348,501.33 based on transfers from other BLMIS accounts (account numbers 1R004310 and 1R012430) to the Account.   The Roths do not agree with the Trustee's calculations.

9.      The Roths hereby object to the Determination Letter for the following reasons.

**GROUNDS FOR OBJECTION**

**I.      The Trustee's Determination Letter Fails to Comply with the Court's December 23 Order**

10.      The Trustee's Determination Letter fails to comply with the December 23 Order, which directs the Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's books and records." *See* December 23 Order, at 5.   The Roths' Customer Claim included the November Statement showing a final balance of approximately $3,148,620.18.   *See* Customer Claim, Ex. A.   The November Statement is the best

---

[2]  Account Number 1-R0123 appears to be two separate accounts (account no. 1-R0123-3 & account no. 1-R0123-4).

3

evidence of the amount owed to the customer based on BLMIS' books and records. Accordingly, the Customer Claim should be allowed in the full amount of $3,148,620.18.

## II.    The Trustee Does Not Set Forth a Legal Basis for Disallowing the Customer Claim in Full

11.    The Trustee does not set forth a legal basis for disallowing the Customer Claim in full as filed. The Determination Letter only states "[y]our claim for securities is **DENIED**. No securities were ever purchased for your account." *See* Determination Letter, Ex. B, at p. 1 Exhibit A.   The Trustee's purported grounds for disallowance do not have any statutory or other legal basis.   Furthermore, the Determination Letter:

(a)    does not clearly provide "the reason" for such disallowance, as required by the Court's December 23 Order.   *See* December 23 Order;

(b)    is inadequate to rebut the prima facie validity of the Customer Claim as provided in section 502(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3001(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

(c)    violates general principles of applicable law requiring that an objection to a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based.   *See, e.g.,* Collier on Bankruptcy I-3007.01(3) (15th ed.) ("[A]n objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses."); *see also In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at * (Bankr. S.D.N.Y. Jan. 13, 2003) (same); and

(d)    includes an exhibit which purportedly calculates the money deposited less subsequent withdrawals, but is inaccurate and completely unsubstantiated.

4

III.    **The Trustee's Definition of "Net Equity" Is Incorrect as a Matter of Law as a Customer's "Net Equity" under SIPA is the Value of the Securities Reflected in the Customer's November Statement**

12.    Upon information and belief, the Trustee denied the Roths' Customer Claim based on his calculation of deposits minus withdrawals, without regard to the value of the securities reflected in the Roths' account statements. The Trustee's "cash in/cash out" approach is incorrect for several reasons as explained below.

13.    First, the Trustee's methodology contradicts the plain language of SIPA, which defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, minus any amount the customer owes the debtor. Specifically:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A)    calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B)    any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11) (2009).

14.    Consistent with this definition of "net equity," the Roths filed a customer claim for approximately $3,148,620.18, which is the "sum which would have been owed" to them if the securities positions reflected in their November Statement had been liquidated, minus any amounts owed to BLMIS. Despite the unambiguous and express language of SIPA, the Trustee has taken the position that the Roths' "net equity" is the total amount of the deposits in the BLMIS account minus the total amount withdrawn. The Trustee's proposed methodology is inconsistent with the language of SIPA and is unsupported by all relevant case

1886725.1

law.    In fact, the Trustee's approach incorporates nonexistent words and concepts into the statute.

15.    Second, the Trustee's approach is also inconsistent with the legislative history of the statute. SIPA legislative history confirms Congress's intention that broker-dealer customers have valid "net equity" claims even when the securities reflected on their confirmations and account statements were never purchased.    Both the Senate and House reports on the 1978 amendments clearly reflect that a customer's net equity claim is not dependent on whether the securities were actually purchased by the broker-dealer:

> "Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations . . . ."

S. Rep. No. 95-763, at 2 (1978) (*emphasis added*).

> "A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased,* or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date."

H.R. Rep. No. 95-746, at 21 (1978) (*emphasis added*).    Based on the regular monthly statements and trade confirmations, the Roths at all times believed and expected that BLMIS executed such transactions and that the account actually held such securities. The fact that the securities listed in the confirmations and account statements were never actually purchased is irrelevant in determining the Roths' account net equity.

6

16.     Third, the Trustee's Determination Letter is contrary to SIPC's own policies and
practices, as reflected in *New Times Securities Services, Inc.,* 371 F.3d 68 (E.D.N .Y. 2004).
There, the *New Times* trustee's position on "net equity" was in full accord with SIPA, and thus
directly contrary to the Trustee's and SIPC's position in this case.   Specifically, with respect
to any claims that were based on confirmations and account statements reflecting securities
positions in "real" securities that could have been purchased (i.e., securities that actually
existed on the public market and whose valuations were objectively and publicly verifiable by
the customers), the *New Times* trustee allowed all such "net equity" claims to the full extent of
the filing date valuations of those securities, even though none of the securities identified in
those records had ever been purchased by the broker-dealer.   Here, the Roths are in precisely the
same position as the "real" securities claimants in *New Times* and should be treated no
differently. Accordingly, their claim should be recognized in full as filed.

17.     SIPC President Stephen Harbeck explained in the *New Times* case, that if
broker-dealer customers have been led to believe that "real, existing" securities had been
purchased for their accounts, then those customers are entitled to get the full value of their
securities positions as of the filing date, even if that value represents a substantial increase from
the purported purchase price of the securities, and even if the securities in question had never
been purchased:

> Harbeck: [I]f you file within sixty days, you'll get the securities,
> without question. Whether -- if they triple in value, you'll get the
> securities. . . . Even if they're not there.
>
> Court: Even if they're not there.
>
> Harbeck: Correct.

7

> Court: In other words, if the money was diverted, converted --
>
> Harbeck: And the securities were never purchased.
>
> Court: Okay.
>
> Harbeck: And if those positions triple, we will gladly give the people their securities positions.

Transcript at 37-39, *In re New Times Securities Services, Inc.,* No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000).

The Second Circuit further stated:

> Meanwhile, investors who were misled . . . to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds -- because Goren never executed the transactions -- the information that these claimants received on their account statements mirrored what would have happened had the given transaction been executed. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. Furthermore, the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," . . . could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements.

*In re New Times Secs. Servs.,* 371 F.3d 68, 74 (2d Cir. 2004).

18.    Two years later, a different Second Circuit panel considered related issues in the *New Times* liquidation and expressed the very same views regarding the importance under SIPA of meeting a customer's legitimate expectations: "It is a customer's legitimate expectations on the filing date . . . that determines the availability, nature, and extent of customer relief under SIPA." *In re New Times Sec. Servs., Inc.,* 463 F.3d 125, 128 (2d Cir. 2006) ("*New Times II*"). Of particular relevance is SIPC's repeated statement that customers' legitimate expectations control, even when no securities were ever purchased:

1886725.1

> [R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), <u>even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase.</u> . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater "customer protection" than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times I*) *(emphasis added), New Times II,*

(No. 05-5527).

19.    As the court in *New Times II* explained, it is only in the context of "fictitious"

securities claims that the "cash in, cash out" valuation methodology makes sense:

> <u>Because there were no such securities,</u> and it was therefore impossible to reimburse customers with the actual securities or their market value on the filing date (the usual remedies when customers hold specific securities), the [*New Times I* Court] determined that the securities should be valued according to the amount of the initial investment. The court declined to base the recovery on the rosy account statements telling customers how well the <u>imaginary</u> securities were doing, because treating the fictitious paper profits as within the ambit of the customers' "legitimate expectations" would lead to the absurdity of 'duped' investors reaping windfalls as a result of fraudulent promises made on fake securities. . . . The court looked to the initial investment as the measure for reimbursement because the initial investment amount was the best proxy for the customers' legitimate expectations.

*New Times II,* 463 F.3d at 129-30 (citations omitted) *(emphasis added).*

20.    The "cash in, cash out" valuation methodology employed in *New Times* with

respect to "fictitious" securities claimants has no place here, where the Roths' confirmations

1886725.1

and account statements reflected "real," well-known and publicly verifiable securities. Because the prices and values ascribed to the "securities positions" on those records "mirrored what would have happened had the given transaction been executed," Br. for *New Times* trustee and SIPC at 7 n.6, the liquidation filing date value of those "securities positions" is the "best proxy for the customers' legitimate expectations." *New Times II,* 463 F.3d at 130.

21.     Fourth, the Trustee's methodology for calculating "net equity" is an improper measure of loss.   The Roths invested money in their BLMIS account with the reasonable expectation that it would grow, and the balance on their November Statement reflects the benefit of that bargain.   Indeed, the Roths' BLMIS account statements indicate such growth. In *Visconsi v. Lehman Brothers, Inc.*, 2007 U.S. App. LEXIS 19088 (6th Cir. Aug. 8, 2007), the Court in opining on a Ponzi scheme case rejected the very same "money in/money out" methodology being utilized by the Trustee.   The Court stated, ". . . the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages." *Visconsi*, 2007 U.S. App. LEXIS 19088, at *15.   Like the investors in *Visconsi*, the Roths are entitled to the full amount reflected in their November Statement, regardless of their previous deposits and withdrawals.

22.     Fifth, the Trustee's position conflicts with federal statutes, including, but not limited to, the Internal Revenue Code.   For example:

(a)     Rev. Proc. 2009-20, issued by Commissioner Shulman on March 17, 2009, expressly recognizes the income earned by customers, on which they paid taxes annually. Yet, the Trustee has taken the position that the income earned by customers is not their money.

1886725.1

(b)    Rev. Proc. 2009-20 provides for a five-year carry-back of the theft loss. Yet, the Trustee has indicated that he intends to "claw back" income withdrawn by customers over the last six years.

(c)    Customers were required by law to take mandatory withdrawals from IRA accounts. Yet, the Trustee is deducting from SIPC insurance the mandatory withdrawals that customers took and paid taxes on.

(d)    Summarily disallows or discounts transfers and deposits from other BLMIS accounts, some of which occurred prior to the applicable statute of limitations on the Trustee's authority to recover property under SIPA and/or the Bankruptcy Code.

(e)    In the event that the Trustee's "money in/money out" methodology survives a final, non-appealable order, such methodology should only apply to deposits and withdrawals made within the applicable statute of limitations period, and the **last account statement** for a given account prior to the applicable statute of limitations establishes the account value for said account at that point in time without regard to the "money in/money out" methodology.

23.    Because of his refusal to comply with SIPA's mandate that he "promptly" satisfy customer claims based on their last statements (their "<u>Statutory Balances</u>"), 15 U.S.C. § 78fff3(a) and 4(c), the Trustee has decided that he needs a vast team of forensic accountants to pour through decades of records to determine each customer's net investment before SIPC pays any amount to a customer.   Plainly, this is inconsistent with the statutory scheme and the legislative intent.

24.    The Roths' "securities positions" in their account are readily ascertainable from the November Statement.   Moreover, the Roths did not have any "indebtedness" to BLMIS.

11

They did not owe BLMIS any cash or securities since they did not borrow from BLMIS on margin. *See* H.R. Rep. No. 95-746, at 4754 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *see also Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (under the 1970 statutory regime, when there were shortages of securities to satisfy "net" equity claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *see also In re First Street Sec. Corp.*, 34 B.R. 492, 497 (Bankr. S.D. Fla. 1983) (offsetting indebtedness of customer to broker from claim amount where unauthorized stock purchased was partially funded by borrowing on margin).   Because the Roths have no indebtedness to BLMIS, there is no need to perform any calculations whatsoever to determine the amount of their net equity.   The Roths' net equity is simply the "securities positions" set forth on the November Statement.

25.     In the event that the Court should determine that claimed gains on deposited funds should not be allowed, then in the alternative, the Roths are entitled to recover interest on such deposited amounts.   Such interest is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law.   *See Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

26.     Under New York law, which is applicable here, funds deposited with BLMIS under these circumstances are entitled to interest. *See, e.g.,* N.Y. C.P.L.R. § 5004 (2009); N.Y. Gen. Oblig. Law. § 5-501, et seq. (2009). Accordingly, customer claims should be recalculated by adding interest to all funds deposited by customers such as the Roths.   Further, under New

1886725.1

York law, which is applicable here, customers are entitled to any returns BLMIS earned on the deposited funds under principles of unjust enrichment.   Accordingly, customer claims should be recalculated by adding the amounts earned by the BLMIS on the Roths' deposits. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *see also Eighteen Holding Corp. v. Drizin,* 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

27.    Prior to the Trustee sending the Determination Letter, this Court ruled on a motion to determine the legally appropriate method for computing "net equity."   This Court adopted the Trustee's method by ruling dated March 1, 2010.   On March 8, 2010, the court certified that an appeal of this ruling would best serve all parties and referred the matter to the Second Circuit which has since agreed to take the case.   To the extend that other issues raised in this Objection, including, but not limited to issues of transfers, due process and statute of limitations are not raised, the Roths wish to preserve its rights thereto.   The Roths wish to include by reference and preserve their rights as to arguments set forth by other customers in any of the proceedings which come before this Court or any appellate court including the Second Circuit.

## IV.    Trustee's Determination Amounts to an Improper Disallowance
   under the Bankruptcy Code

28.    The Trustee's action in reducing the amount shown on the Roths' Customer Claim by any prior gains reflected on the November Statement or prior BLMIS statements is an attempt to avoid such gains without alleging any grounds for avoidance or proving that such gains are avoidable under the Bankruptcy Code's avoidance provisions. As such, any such

disallowance is improper and unjustified, and the Determination letter should be stricken. *See* Fed. R. Bankr. P. 7001(1), 7008 (2009).

## RELIEF REQUESTED

29.    For the reasons stated herein, the Roths' Customer Claim should be allowed in its entirety in the amount of $3,148,620.18.

30.    For the reasons stated herein, the Court should direct SIPC to issue immediate payment to the Roths in the amount of $500,000, plus interest from the date of the Determination Letter, and such equitable relief as the Court deems appropriate.

31.    The Trustee's determination amounts to an improper disallowance of a claim that has prima facie validity. *See* 11 U.S.C. § 502(a).    The Trustee has offered no factual or legal basis for the Determination Letter. The Determination Letter, and the objections contained therein, should be stricken, or alternatively, the Trustee should describe his position in detail including all relevant facts, legal theories, and authorities.    Upon the filing of such a statement, this matter will be a contested proceeding under Rule 9014 of the Bankruptcy Rules and the Roths will file a response.

32.    The Roths requests such other relief as may be just and equitable.

## CONCLUSION

33.    The Roths reserve the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of the Roths' right to object on any additional grounds.

34.    The Roths reserve all rights set forth under Rule 9014 of the Bankruptcy Rules, including, without limitation, rights of discovery.    *See* Fed. R. Bankr. P. 9014.

1886725.1

35.    The Roths reserve all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.    Further, the Roths incorporate by reference all reservations of rights set forth in the Customer Claim.

Dated: New York, New York
       September 13, 2010

POLSINELLI SHUGHART PC

_____/s/ Jason A. Nagi_____
Jason A. Nagi
7 Penn Plaza, Suite 600
New York, New York 10001
(212) 644-2092 (Telephone)
(212) 684-0197 (Facsimile)
jnagi@polsinelli.com

*Attorneys for Barbara and Mark Roth*

## CERTIFICATE OF SERVICE

I, Jason A. Nagi, hereby certify that on the 13th day of September, 2010, a true and correct copy of the *Objection to Trustee's Determination of Claim* was served electronically to all interested parties that are registered to receive ECF notification from the Court, and served by First Class United States Mail, postage prepaid, addressed to:

Irving H. Picard, Trustee            Courtni Thorpe, Esq.
Baker & Hostetler LLP                Baker & Hostetler LLP
45 Rockefeller Plaza                 PNC Center
New York, New York 10111             1900 East 9th Street, Suite 3200
                                     Cleveland, Ohio 44114-3482

_____/s/ Jason A. Nagi_____

1886725.1