JOSEPHINE WANG
General Counsel
KEVIN H. BELL
Senior Associate General Counsel
  For Dispute Resolution
CHRISTOPHER H. LAROSA
Associate General Counsel
SECURITIES INVESTOR
  PROTECTION CORPORATION
805 Fifteenth Street, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 371-8300
E-Mail: jwang@sipc.org
kbell@sipc.org
clarosa@sipc.org

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant | SIPA LIQUIDATION <br><br> Case No. 08-01789 (BRL) <br><br> (Substantively Consolidated) |

**REPLY OF THE
SECURITIES INVESTOR PROTECTION CORPORATION
IN SUPPORT OF TRUSTEE'S MOTION TO AFFIRM TRUSTEE'S
DETERMINATIONS DENYING CLAIMS OF CLAIMANTS WITHOUT BLMIS
ACCOUNTS IN THEIR NAMES, NAMELY, INVESTORS IN FEEDER FUNDS**

Pursuant to Section 5(d) of the Securities Investor Protection Act,[1] 15 U.S.C. §78eee(d), and to this Court's Order of April 13, 2010, the Securities Investor Protection Corporation ("SIPC") hereby submits this reply in support of the motion of Irving H. Picard ("Trustee"), as trustee for the consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff, for entry of an order upholding the Trustee's determinations denying the claims for "customer" relief of a group of claimants ("Claimants") who did not have accounts in their names at BLMIS, who had no other legally cognizable relationship with BLMIS, and who instead purchased ownership interests in one or more of sixteen feeder funds or hedge funds (together, referred to herein as "Hedge Funds" or "Funds") that, in turn, invested through BLMIS.

## I. SUMMARY OF THE ARGUMENT

As both SIPC and the Trustee demonstrated in their initial memoranda, and as the Securities and Exchange Commission ("Commission") explained again in its supporting memorandum, the nature of the interests purchased by Claimants forms the crux of this case. (See Dkt. Nos. 2414-2416, 2849.) Claimants purchased ownership interests – consisting of company shares, limited partnership interests, or limited liability company ("LLC") units - in the Hedge Funds. The private placement memoranda, prospectuses, and other explanatory material made available to Claimants prior to their investments in the Hedge Funds made perfectly clear that: (1) the Hedge Funds were entities separate and distinct from both BLMIS and from Claimants themselves; (2) each Claimant purchased an ownership interest in one of the Funds, not in the assets of the Fund; (3) Claimants had no right to manage the Hedge Funds, or to direct the disposition of the Funds' assets; and (4) the Hedge Funds were not required to, and did not,

---

[1] 15 U.S.C. §78aaa et seq. ("SIPA"). References hereinafter to provisions of SIPA shall be to the United States Code, but shall omit "15 U.S.C." for convenience.

consult Claimants concerning the disposition of Fund assets. (See Dkt. No. 2414 at 4-6.) As a consequence, as the Trustee, SIPC, and the Commission all pointed out, Claimants had no cognizable legal relationship with BLMIS and therefore are indistinguishable from the trust beneficiaries denied "customer" status in the Second Circuit's decision in SIPC v. Morgan Kennedy & Co., 533 F.2d 1314, 1317 (2d Cir.), cert. den. sub nom., Trustees of the Reading Body Works v. SIPC, 426 U.S. 936 (1976), and the Sixth Circuit and lower court decisions in In re First Ohio Secs., Inc., 1994 WL 599433 (6th Cir. Nov. 1, 1994), cert. den. sub nom., Plumbers & Steamfitters Local 490 Severance and Ret. Fund v. Appleton, 514 U.S. 1018 (1995).

Nevertheless, in their responses to the Trustee's Motion, Claimants attempt to compensate in a number of ways for their lack of relationship with BLMIS. Several of the Claimants repeatedly assert that a claimant need not have an account in his or her own name in order to qualify as a "customer." They further assert, without citation to any relevant supporting evidence, that the Hedge Funds operated either as the agents of BLMIS or of the Claimants, ignoring the fact that, by purchasing Hedge Fund shares and/or partnership interests, they invested *in*, not *through*, the Hedge Funds. (See, e.g., Dkt. Nos. 2543-2554, 2577, 2581, 2593, 2651.) Other Claimants simply ignore the separate legal existences of the Hedge Funds – apparently assuming, again with no evidentiary support, that those Hedge Funds were the agents of either BLMIS or Claimants – and assert that they made cash deposits with BLMIS. (See, e.g., Dkt. Nos. 2643, 2649.) In a related argument, several Claimants assert entitlement to "customer" status on the ground that BLMIS converted their cash, again overlooking the fact that, when they purchased ownership interests in the Hedge Funds, they lost any property interest in the cash that they used to make those purchases. (See, e.g., Dkt. No. 2538, 2564.)

A number of Claimants mistakenly rely on Section 745(c) of the Bankruptcy Code ("Code") which provides that, in a stockbroker liquidation under the Code, trust account beneficiaries are treated as separate customers. These Claimants cannot overcome the fact that, under SIPA's express terms, Section 745(c) is inapplicable in SIPA, and that the inapplicability of the section under SIPA section 78fff(b) reflects Congressional policy and intent. (See, e.g., Dkt. No. 2564.) In a similar vein, some Claimants rely on Section 78fff-3(a)(5) of SIPA which confers "customer" status upon the customer of a bank or broker-dealer that maintained an account at the liquidating broker-dealer for the benefit of its customers. These Claimants ignore the fact that they are investors and not customers of the Hedge Funds in question, and that the property in the Hedge Fund accounts was not held for the benefit of the Claimants. (See Dkt. No. 2538.)

In the final analysis, Claimants invoke equity, pointing to the fact that SIPA is a remedial statute. Their argument actually cuts against their position. SIPA's "customer" provisions have been narrowly construed for a reason. Because under SIPA, "customer property" is distributed ratably to "customers" on the basis, and to the extent, of customers' respective "net equities," every claim accorded "customer" status reduces the share of "customer property" to which every other "customer" is entitled. See SIPA § 78fff-2(c)(1). A narrow construction of the term "customer" ensures that only genuine customers of the debtor share in the fund of "customer property," thus maximizing the recovery of such "customers" and furthering, not undercutting, SIPA's remedial purpose.

## II. ARGUMENT

### A. Agency and Conversion

#### 1. The Hedge Funds Were Not Claimants' Agents

As noted, Claimants contend that the Hedge Funds were their agents or, alternatively, that the Hedge Funds were agents of BLMIS. As a matter of law, the Hedge Funds could not have been Claimants' agents. Claimants purchased ownership interests in the Hedge Funds, which are all either limited partnerships organized in Delaware or New York, or corporations organized in the Cayman Islands or the British Virgin Islands. These jurisdictions uniformly provide that the managers of entities like the Hedge Funds are not the agents of owners like Claimants.

In both Delaware and New York, for instance, the general partner of a limited partnership is not the agent of a limited partner. See, e.g., Regency Housing and Drilling Ltd. Partnership I v. Cohen, 1991 WL 190311, at **1-3 (Del. Super. Ct. Sept. 11, 1991) (general partners in Delaware limited partnership were not agents of limited partner); JN Realty LLC v. Estate of Marvin, 268 F.Supp.2d 231, 236 (E.D.N.Y. 2003) ("[t]he principal-agent relationship which exists between the partners of an ordinary partnership is not present between the limited and general partners of a limited partnership" (quoting Friedson v. Lesnick, 1992 WL 51543, at * 3 (S.D.N.Y. Mar. 9, 1992)). In the same vein, under New York law, in an LLC which precludes active management by LLC members, and which instead assigns exclusive management responsibility to professional managers, those managers act as agents of the LLC, not its members. Cf., Caplash v. Rochester Oral & Maxillofacial Surgery Associates, LLC, 2008 WL 2199498, at * 4 (N.Y. Sup. Ct. May 12, 2008) ("[i]n a manager-managed LLC, members do not have agency authority and managers do") (quoting Larry E. Ribstein and Robert E. Keatinge, 3 Ribstein & Keatinge on Limited Liability Companies, Appendix B-8, n. 1 (2009)).

The same rule governs the relationship between the directors and shareholders of companies organized in the British Virgin Islands or Cayman Islands. Again, that relationship is not one of agency. See Christopher Bickley, Bermuda, British Virgin Islands, and Cayman Islands Company Law ("Bickley") § 7.003 (3d ed. 2009) ("Directors are responsible to the company, not to individual shareholders").[2] Cf., William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 30 ("Ordinarily, the corporation is not the agent of the shareholders and does not act or hold property as agent for them"); Restatement (Third) of Agency, intro. (2006) ("[T]he defining characteristics of 'true agency' are not present between a corporation's shareholders and its directors...").

### 2. **Claimants Are Not "Customers" Regardless Of The Hedge Funds' Relationship With BLMIS**

Claimants' alternative contention, that the Hedge Funds were agents of BLMIS, is insufficient to make them "customers" under SIPA, even assuming solely for argument's sake that such were the case. Limited partnerships and corporations like the Hedge Funds constitute legal personalities separate and distinct from their owners, and the owners therefore have no property rights in the assets of such entities. See, e.g., The City of Wilmington v. Bassett Partners, L.P., 2000 WL 1211513, at * 3 (Del. Super. Ct. June 30, 2000) ("Regardless of the type of property (real, personal, or mixed) that a partnership owns, the general partners and limited partners of the partnership have no interest in specific partnership property"); Del. Code § 17-701; Newburger, Loeb & Co. v. Gross, 563 F.2d 1057, 1076 n. 22 (2d Cir. 1977), cert. den., 434 U.S. 1035 (1978) ("[a]s a general proposition limited partners have no property right in the partnership assets..."); Alley v. Clark, 71 F.Supp. 521, 526-28 (E.D.N.Y. 1947) (same); N.Y.

---

[2] Companies organized in the British Virgin Islands or the Cayman Islands are governed by the common law of the United Kingdom to the extent that such law is consistent with the statutory law of the jurisdiction in question. See, e.g., Bickley at §§ 2.002, 3.001, 7.001.

5

Ltd. Liab. Co. Law § 601 (in a limited liability company organized under New York law, "a member has no interest in specific property of the limited liability company"); Johnson v. Gore Wood & Co., [2002] 2 A.C. 1, [2001] B.C.C. 820, 858 (H.L.) (appeal taken from Ct. App.) (under the common law of the United Kingdom, "[a] company is a legal entity separate and distinct from its shareholders. It has its own assets and liabilities and its own creditors. The company's property belongs to the company and not to its shareholders"). Cf., Fletcher § 31 ("[T]he capital or assets of the corporation are its property, and the shares evidenced by the stock certificates are the property of the shareholders, which do not carry the capital property or any profits until they have been declared and vested as dividends..."). In fact, an owner's interest in such an entity is limited to his or her ownership share, which constitutes personal property separate and distinct from the assets of the entity, and the owner has no rights regarding, and no power over, entity assets. See, e.g., City of Wilmington, 2000 WL 1211513, at * 2; Alley, 71 F.Supp. at 526-28; N.Y. Ltd. Liab. Law § 601; Johnson, [2002] 2 A.C. 1, [2001] B.C.C. 820 at 858.

Consistent with these principles, when Claimants purchased ownership interests in the Hedge Funds, they invested in the Hedge Funds, not in the assets of the Hedge Funds. In fact, they had no property interest in any of the Hedge Funds' assets, including the assets invested with BLMIS. The existence of an agency relationship between BLMIS and the Hedge Funds would neither confer such an interest on Claimants, nor eliminate the restrictions inherent in their status as Hedge Fund owners. If, for example, the Hedge Funds had been acting as BLMIS agents in soliciting Claimants' investment in Hedge Fund shares and partnership interests, and had defrauded Claimants in doing so, Claimants might have damages claims for securities fraud against the Hedge Funds. They would not, and do not, have claims against BLMIS for the

6

specific assets purportedly held by BLMIS for the Hedge Funds, or the cash that the Hedge Funds deposited with BLMIS to purchase those assets, and therefore cannot qualify as "customers" of BLMIS.[3]

In fact, Claimants cannot qualify as "customers" even if BLMIS and the Hedge Funds are treated, purely hypothetically, as a single entity. In that instance, Claimants' ownership interests in the Hedge Funds would simply be ownership interests in BLMIS. But SIPA expressly excludes from "customer" status any claimant whose claim is based upon an interest that forms part of the "capital of the debtor." See SIPA § 78lll(2)(A) ("The term customer...does not include...any person to the extent that such person has a claim for cash or securities which by contract, agreement or understanding, or by operation of law, is part of the capital of the debtor..."). Moreover, Claimants would not hold a "customer" claim even if their purchase of ownership interests in the Hedge Funds/BLMIS was induced by fraud, because "customer" protection under SIPA does not extend to claims for securities fraud.[4] See, e.g., In re Arford v.

---

[3] The reliance by several Claimants on Robeco-Sage Capital L.P., et al. v. Citigroup Alternative Invs. LLC, et al., Index No. 600121, 2009 N.Y. Slip Op. 31751(U) (N.Y. Sup. Ct. July 28, 2009), is entirely misplaced. (See Dkt. Nos. 2593, 2595.) In Robeco-Sage, New York's Supreme Court held that investors in several hedge funds were not barred from pursuing fraud claims against the master fund with which the hedge funds were associated even though the investors had not purchased direct interests in the master fund. Unlike Claimants in this case, the Robeco-Sage plaintiffs were not seeking to recover property entrusted by the hedge funds to the master fund, but rather to recover the losses sustained by the plaintiffs due to the decline in the value of their shares in the feeder funds. As the plaintiffs alleged that the master fund had made misrepresentations concerning the financial position of the hedge funds, the court declined to dismiss the plaintiffs' claim against the master fund. In this case, in contrast, Claimants do not seek damages for fraud. Instead, they seek to recover property of the Hedge Funds, in which they have no cognizable interest. Robeco-Sage thus has no application here.

[4] In fact, under Section 510(b) of the Bankruptcy Code, Claimants would have the same status as shareholders, not general creditors, of BLMIS. In this regard, Section 510(b) provides that a claimant who purchased a security issued by the debtor or its affiliate "shall be subordinated to all claims or interests that are senior or equal to the interest represented by such security," and that, where the security in question is common stock, "such claim has the same priority as common stock." 11 U.S.C. § 510(b).

Miller, 239 B.R. 698, 701 (S.D.N.Y. 1999), aff'd, 210 F.3d 420 (2d Cir. 2000); SEC v. S.J. Salmon & Co., 375 F.Supp. 867, 870-71 (S.D.N.Y. 1974); In re Adler, Coleman Clearing Corp., 198 B.R. 70, 75 (Bankr. S.D.N.Y. 1996).

### 3. The Hedge Funds Were Not BLMIS Agents

In any event, the Hedge Funds clearly were not BLMIS agents. Under New York law, "[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." In re Shulman Transp. Enters., Inc., 744 F.2d 293, 295 (2d Cir. 1984); Amusement Industry, Inc. v. Stern, 693 F.Supp.2d 327, 343-44 (S.D.N.Y. 2010). An agency relationship is created by "written or spoken words, or other conduct, *of the principal* which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Amusement Industry, 693 F.Supp.2d at 343-44 (quoting Nationwide Life Ins. Co. v. Hearst/ABC-Viacom Entertainment Servs., 1996 WL 263008, at * 7 (S.D.N.Y. May 17, 1996)) (emphasis added). Importantly, "[t]he alleged agent's authority…may be established *only by the words or conduct of the alleged principal,*" and a finding of agency cannot be based upon the words or acts of a purported agent. In re Parmalat Secs. Litig., 640 F.Supp.2d 243, 247 (S.D.N.Y. 2009) (applying Illinois law but noting that "Illinois and New York definitions of an agency relationship do not differ in any material respect"); Meisel v. Grunberg, 651 F.Supp.2d 98, 110 (S.D.N.Y. 2009).

An agent's authority may be actual or apparent. See, e.g., Meisel, 651 F.Supp.2d at 110. Actual authority is granted to an agent by a direct manifestation by the principal of consent to action by the agent on the principal's behalf. See, e.g., Peltz v. SHB Commodities, Inc., 115 F.3d 1082, 1088 (2d Cir. 1997); Amusement Industry, 693 F.Supp.2d at 344. An agency

8

relationship based upon actual authority is formed by the actual interaction between the putative principal and agent, "not on any perception a third party may have of the relationship." Amusement Industry, 693 F.Supp.2d at 344 (quoting Dinaco, Inc. v. Time Warner Inc., 2002 WL 31387265, at * 3 (S.D.N.Y. 2002), aff'd, 346 F. 3d 64 (2d Cir. 2003).

Apparent authority is created by a words or conduct of the putative principal which, when reasonably interpreted, cause a third person to believe that the principal consents to an action by the putative agent on the principal's behalf. See, e.g., Minskoff v. Am. Express Travel Related Servs. Co., 98 F.3d 703, 708 (2d Cir. 1996); Meisel, 651 F.Supp.2d at 110. Again, apparent authority "cannot be established by the actions or representations of the agent." See, e.g., Minskoff, 98 F.3d at 708; Meisel, 651 F.Supp.2d at 110.

In this case, Claimants have not satisfied any of these standards. There was no agency agreement between any of the Hedge Funds and BLMIS. BLMIS in no way manifested any intent to authorize the Hedge Funds to act on its behalf, and BLMIS did not exercise control over any of the Hedge Funds. Instead, Claimants' sole support for their position are alleged statements by certain Hedge Fund managers to them and general assertions to the effect that the Hedge Funds were formed for the purpose of channeling money to BLMIS and that the Hedge Funds ceded control over investment decisions to BLMIS. (See, e.g., Dkt. Nos. 2566 at 3, 4, 9, 10; 2595 at 2-5.) The asserted statements are irrelevant. As noted, the putative *principal*, not the putative agent, must manifest intent to confer authority upon the agent, and the conduct of the putative agent cannot create an agency. See supra. In any event, at best, the statements to which Claimants point – e.g., that the Hedge Funds were a "conduit" to BLMIS, that they intended to invest substantially all of their assets with BLMIS, etc. – establish only that some of

the Hedge Funds *elected* to invest through BLMIS, not that BLMIS exercised control over the funds or authorized them to act on its behalf.

Claimants' general assertions about the Hedge Funds are ineffective for the same reasons. Again, at best, they establish that the Hedge Funds elected to invest through BLMIS. The fact that the Hedge Funds worked closely with BLMIS and channeled funds to it, for example, does not establish that the Hedge Funds were acting as BLMIS's agent, in the same way that the fact a manufacturing firm cooperates with its suppliers does not, by itself, establish the existence of an agency relationship between the two firms.[5]

In the same vein, several Claimants attempt to make much of a number of allegations in the Trustee's Amended Complaint in Irving H. Picard v. Fairfield Sentry Limited, et al., Adv. Proc. No. 09-01239 (BRL) (Bankr. S.D.N.Y.) ("Fairfield Action"). They repeatedly cite the Trustee's allegations in that Amended Complaint that one of the Hedge Funds was a "conduit" to BLMIS and a "partner" and "coconspirator" with BLMIS, allegations that are irrelevant for the reasons discussed above and, in any event, are insufficient to establish an agency relationship for the reason just described. (See, e.g., Dkt. No. 2885 at 2-5.) They also misconstrue and mischaracterize the Trustee's allegations regarding "customer property" in the Fairfield Action, asserting specifically that:

---

[5] On the basis of citations to the Bankruptcy Code and Rules, several Claimants contend that the Trustee has the burden to prove that the Hedge Funds were not agents of BLMIS. (See, e.g., Dkt. Nos. 2603, 2617) But SIPA expressly displaces the claims procedure established by the Bankruptcy Code and Rules, which have no application in the filing, determination, or resolution of claims for "customer" relief in a SIPA liquidation. See SIPA §§ 78fff(b), 78fff-2(a)(2). In fact, under established law, Claimants have the burden to prove their claims, and that burden is a heavy one. See, e.g., SIPC v. Stratton Oakmont, 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999), aff'd sub nom., Arford v. Miller, 239 B.R. 698 (S.D.N.Y. 1999), aff'd, 210 F.3d 420 (2d Cir. 2000). Claimants have manifestly failed to carry that burden.

10

> The Trustee correctly characterizes Fairfield Sentry investors' money as "Customer Property" and "stolen money"…Thus, the "Customer Property" is the Fairfield Sentry investors' money that, according to the Amended Complaint, was "stolen" by the Fairfield Defendants…,whom the Amended Complaint says were BLMIS and Madoff's "partners"…, "conspirators"…, and "aiders and abettors" in fraud … in the admitted theft (sic).

(See Dkt. No. 2885 at 3.) In fact, in his Amended Complaint in the Fairfield Action, the Trustee never characterizes any of the property of the Fairfield Sentry investors as "customer property," instead asserting that the cash that Fairfield Sentry received *from BLMIS* consisted of stolen "customer property." (See, e.g., Fairfield Action, Amended Complaint at ¶ 2.) In any event, since the Hedge Funds themselves may have been BLMIS "customers," the cash that they invested in their BLMIS accounts likely does qualify as "customer property." But that cash was the property of the Hedge Funds, not of Claimants, who relinquished any interest in the cash that they used to purchase their ownership interests in the Hedge Funds when they made those purchases. See supra.

### 4. Claimants' Property Was Not Converted

Claimants' contention that they are "customers" because BLMIS converted their property fails for the same reason. BLMIS never held any of their property. It held property of the Hedge Funds, in which Claimants, as owners of the Hedge Funds, had no interest as a matter of law. See supra.

### 5. Claimants Did Not Entrust Their Property To BLMIS

Several Claimants devote large portions of their memoranda to attempting to prove that they did not need to have accounts in their own names in order to qualify as "customers" because they entrusted cash to BLMIS, albeit indirectly. (See, e.g., Dkt. No. 2634.) Again, however, as discussed in detail above, Claimants had neither a property interest in the cash entrusted by the

11

Hedge Funds to BLMIS, nor any interest in the Hedge Funds' accounts at BLMIS, as a matter of law. See supra. Thus, Claimants' reliance on Ahammed v. SIPC (In re Primeline Sec. Corp.), 295 F.3d 1100 (10th Cir. 2002), and Focht v. Heebner (In re Old Naples, Inc.), 223 F.3d 1296 (11th Cir. 2000) – cases in which the investors involved deployed cash to which they held undisputed title – have no application here.[6]

Moreover, Claimants are mistaken concerning the need for an account at BLMIS. In support of their position, Claimants repeatedly cite the portion of SIPA's "customer" definition dealing with cash customers. See SIPA § 78*lll*(2) ("The term 'customer' includes...any person who has deposited cash with the debtor for the purpose of purchasing securities..."). Through their claims, however, Claimants seek to recover securities, not cash. In express language, SIPA makes unequivocally clear that the claim of a securities claimant must relate to an account at the debtor in which the claimant holds a cognizable interest, providing specifically that:

> *The term "customer"* of a debtor *means any person* (including any person with whom the debtor deals as principal or agent) *who has a claim on account of securities received, acquired or held* by the debtor in the ordinary course of its business as a broker or dealer *from or for the securities accounts of such person...*

See SIPA § 78*lll*(2) (emphasis added). As investors *in*, not *through*, the Hedge Funds, Claimants have no legally cognizable relationship with the Hedge Fund accounts at BLMIS, and therefore cannot claim "customer" status through those accounts. See supra.

---

[6] The decisions in both Primeline and Old Naples were also based upon explicit findings that the person or entity to whom the investors in question entrusted their cash was acting as the agent of the liquidating broker-dealer. See Primeline, 295 F.3d at 1107-08; Old Naples, 223 F.3d at 1303. In this case, for the reasons stated, there is no evidence indicating that the Hedge Funds were acting as agents of BLMIS when they accepted Claimants' cash. See supra. Even if they had been acting as such, Claimants still would not be SIPA "customers" because they entrusted cash to the Hedge Funds in order to purchase ownership interests *in the Hedge Funds themselves*. See supra.

12

## B. Bankruptcy Code § 745(c) And SIPA § 78fff-3(a)(5)

Several Claimants suggest that either Section 745(c) of the Bankruptcy Code and/or Section 78fff-3(a)(5) of SIPA ensures that they qualify as SIPA "customers." Neither provision does anything of the kind, however. On the contrary, both provisions confirm that Claimants are not "customers."

### 1. Bankruptcy Code § 745(c)

Bankruptcy Code Section 745(c) essentially provides that, in a liquidation under the stockbroker liquidation provisions of Chapter 7 of the Code, the beneficiaries of a trust with a brokerage account at the liquidating broker-dealer will be treated as separate customers of the broker-dealer. For the reasons explained in detail in SIPC's initial memorandum, Bankruptcy Code Section 745(c) does not apply in SIPA liquidations, and its enactment in 1978 - without any comparable modification of SIPA and two years after the Second Circuit's decision in Morgan Kennedy - confirms that Congress intended the rule announced in Morgan Kennedy, not Section 745(c), to prevail in liquidations under SIPA. (See Dkt. No. 2414 at 15-18.)

Several Claimants suggest, however, that, because the liquidation of BLMIS was consolidated with the personal bankruptcy of Bernard L Madoff, and because "Madoff Securities International Ltd. was also recognized as a Chapter 15 proceeding," the Court is free to apply Section 745(c). (See Dkt. No. 2564 at 4.) In fact, however, the instant proceeding does not encompass Madoff Securities International Ltd., and is governed by SIPA, not the Bankruptcy Code. Again, Code Section 745(c) is not applicable under SIPA.

### 2. SIPA § 78fff-3(a)(5)

Claimants' reliance on Section 78fff-3(a)(5) of SIPA is even more curious. That section essentially provides that when a bank or broker-dealer holds an account at a liquidating SIPC-

13

member for the benefit of its customers, then each of those customers may be treated as a separate "customer" of the SIPC-member for purposes of SIPA.[7] See SIPA § 78fff-3(a)(5). The provision has no application to the present case, as none of the Hedge Funds was either a bank or a broker-dealer acting on behalf of any of Claimants in investing through BLMIS. Moreover, as discussed above, the Hedge Funds acted for themselves, not Claimants, who were merely investors in the Hedge Funds, with no property interest whatsoever in either the Hedge Funds' accounts at BLMIS or the property contained therein. See supra.

C. **Remedial Legislation**

Finally, in the rhetorical equivalent of a Hail Mary pass, many of the Claimants suggest that they should be accorded "customer" status because SIPA is a remedial statute, and to deny them a remedy for the wrong that they suffered therefore would undercut SIPA's remedial purpose. (See, e.g., Dkt. Nos. 2543-2554.) Their argument, however, proves far too much. SIPA's customer provisions are narrowly tailored to limit relief only to those claimants who entrusted cash or securities to the liquidating broker-dealer for the purpose of trading in the securities markets. See, e.g., In re Brentwood Secs., Inc., 925 F.2d 325, 327 (9th Cir. 1991); In re Stalvey & Associates, Inc., 750 F.2d 464, 472 (5th Cir. 1985); Morgan Kennedy, 533 F.2d at

---

[7] Section 78fff-3(a)(5) provides in full:

> [N]o advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established to the satisfaction of the trustee, from the books and records of the debtor or from the books and records of a broker or dealer or bank, or otherwise, that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank (which customers are not themselves a broker or dealer or bank or a person described in paragraph (4)), in which event each such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor.

14

1316-1317. Consequently, those provisions do not protect a host of claimants who suffered wrongdoing at the hands of the broker-dealer – including claimants with claims based upon, e.g., fraud and breach of contract. See, e.g., Stratton Oakmont, 239 B.R. at 701-702; SEC v. S.J. Salmon & Co., 375 F.Supp. 867, 870-71 (S.D.N.Y. 1974). Such claimants are treated as general creditors under SIPA, and, as such, are frequently left without an effective remedy in a SIPA liquidation, due to the insufficiency of the general estate to satisfy all claims against it. If Claimants were correct, every one of these claimants would be eligible for "customer" status. The fact that such claimants are not so eligible confirms that the lack of an effective remedy for a wrong committed by the liquidating broker-dealer is not sufficient to qualify a claimant as a "customer" under SIPA.

In fact, denying Claimants' "customer" status is essential to preserve SIPA's remedial character. See SIPA § 78fff-2(c)(1). As discussed above, "customers" generally share ratably in the fund of "customer property." Opening "customer" status to claimants who had no cognizable relationship with the broker-dealer, and no cognizable interest in property held there, would significantly dilute the recoveries of the claimants whom SIPA was enacted to protect – customers with cash or securities held in custody by the liquidating broker-dealer in order to facilitate trading in the securities markets – and thus would severely erode SIPA's remedial foundations.

Even assuming, arguendo, that denial of customer status did not further SIPA's remedial purpose, the fact that to Claimants, the approach may seem inequitable is not the deciding factor. As the Second Circuit stated in SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983(2d Cir. 1974):

> However, arguments based solely on the equities are not, standing alone, persuasive. If equity were the criterion, most customers and creditors of Packer Wilbur, the bankrupt, would be entitled to reimbursement for their losses.

Experience, on the other hand, counsels that they will have to settle for much less. SIPA was not designed to provide full protection to all victims of a brokerage collapse. Its purpose was to extend relief to certain classes of customers.

## CONCLUSION

For the reasons stated above and in SIPC's initial memorandum, the Court should enter an order granting the Trustee's motion and upholding his determinations denying Claimants' claims for "customer" relief under SIPA.

DATED: September 20, 2010

                                            Respectfully submitted,

                                            /s/ Josephine Wang
                                            JOSEPHINE WANG
                                            General Counsel

                                            KEVIN H. BELL
                                            Senior Associate General Counsel
                                              For Dispute Resolution

                                            CHRISTOPHER H. LAROSA
                                            Associate General Counsel

                                            SECURITIES INVESTOR
                                            PROTECTION CORPORATION
                                            805 Fifteenth Street, N.W., Suite 800
                                            Washington, D.C. 20005
                                            Telephone: (202) 371-8300
                                            Facsimile: (202) 371-6728
                                            E-mail: jwang@sipc.org
                                            E-mail: kbell@sipc.org
                                            E-mail: clarosa@sipc.org