Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

Hearing Date:  October 19, 2010
Hearing Time: 10:00 AM (EST)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**TRUSTEE'S REPLY IN SUPPORT OF TRUSTEE'S MOTION TO AFFIRM
TRUSTEE'S DETERMINATIONS DENYING CLAIMS OF CLAIMANTS WITHOUT
BLMIS ACCOUNTS IN THEIR NAMES, NAMELY, INVESTORS IN FEEDER FUNDS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 2

ARGUMENT .............................................................................................................. 3

    A.    The Feeder Funds, Not The Objecting Claimants, Had Securities Accounts at BLMIS ................................................................................................ 3

    B.    The Feeder Funds, Not The Objecting Claimants, Deposited Cash With BLMIS For The Purpose Of Purchasing Securities ............................................... 5

        1.    The Feeder Funds, Not The Objecting Claimants, Owned The Property Invested In BLMIS ....................................................................... 5

        2.    The Objecting Claimants Cannot Be Customers As To Feeder Fund Property ........................................................................................... 6

        3.    The Objecting Claimants' Allegations Of An Agency Relationship Between The Feeder Funds And BLMIS Does Not Affect The Result ............................................................................................... 9

    C.    Any Claim For Conversion Belongs To The Feeder Funds ............................... 11

    D.    SIPA Section 78fff-3(a)(5)'s Limited Exceptions Do Not Include Hedge Funds ............................................................................................................... 12

    E.    Net Equity Claims Of The Objecting Claimants Could Not Be Ascertained From The Books And Records Of BLMIS ........................................................ 13

    F.    The SIPC Rules Are Irrelevant To Determining Customer Status ..................... 17

    G.    Any Tort Claims By The Objecting Claimants Would Be General Creditor Claims ............................................................................................................. 17

    H.    Only The Feeder Funds Can Pursue Customer Claims As To Their Accounts. ......................................................................................................... 18

    I.    The Court Should Defer To The Interpretation Of SIPA By The SEC And SIPC ............................................................................................................... 19

CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

Page

## Cases

In re Adler, Coleman Clearing Corp.,
195 B.R. 266 (Bankr. S.D.N.Y. 1996) ................................................................. 19

In re Adler, Coleman Clearing Corp.,
216 B.R. 719 (Bankr. S.D.N.Y. 1998) ................................................................. 17

Ahammed v. Sec. Investor Prot. Corp. (In re Primeline Secs. Corp.),
295 F.3d 1100 (10th Cir. 2002) .............................................................................. 7

In re Albert & Maguire Secs. Co.,
419 F. Supp. 1171 (E.D. Pa. 1976) ...................................................................... 12

APWU v. Potter,
343 F.3d 619 (2d Cir. 2003) ................................................................................... 5

Arford v. Miller (In re Stratton Oakmont, Inc.),
239 B.R. 698 (S.D.N.Y. 1999) ............................................................................. 17

Auburn Hous. Auth. v. Martinez,
277 F.3d 138 (2d Cir. 2002) ................................................................................. 14

Bank Leumi Trust Co. of New York v. D'Evori Int'l., Inc.,
163 A.D.2d 26, 558 N.Y.S.2d 909 (N.Y. App. Div. 1st Dept. 1990) .................... 18

In Re Bear Stearns High Grade Structured Credit Strategies Master Fund, Ltd.,
389 B.R. 325 (S.D.N.Y. 2008) ............................................................................. 11

Chevron U.S.A., Inc. v. NRDC,
467 U.S. 837 (1984) .............................................................................................. 20

Collazos v. United States,
368 F.3d 190 (2d Cir. 2004) ................................................................................. 13

Focht v. Heebner (In re Old Naples Secs., Inc.),
223 F.3d 1296 (11th Cir. 2000) ......................................................................... 6, 7

Gordon v. Fundamental Investors, Inc.,
362 F. Supp. 41 (S.D.N.Y. 1973) ........................................................................ 13

In re JNT Investors, Inc.,
1978 U.S. Dist. LEXIS 7021 (S.D.N.Y. Dec. 26, 1978) ...................................... 18

In re John Muir & Co.,
51 B.R. 150 (Bankr. S.D.N.Y. 1985) ..................................................................... 3

Johnson v. Gore Wood & Co., [2002] 2 A.C. 1, [2001] B.C.C. 820 (H.L.) .................. 6

In re Klein Maus & Shire, Inc.,
2002 Bankr. LEXIS 1784 (Bankr. S.D.N.Y. Oct. 2, 2002) .................................. 18

In re Marriott Hotel Prop. II Ltd. P'ship Unitholders Litig.,
2000 Del. Ch. LEXIS 17 (Del. Ch. Jan. 24, 2000) ............................................... 5

*In re MV Secs.*,
   48 B.R. 156 (Bankr. S.D.N.Y. 1985)..................................................................... 18

*In re New Times Sec. Servs., Inc.*,
   371 F.3d 68 (2d Cir. 2004) .................................................................................. 20

*Pettus v. Morgenthau*,
   554 F.3d 293 (2d Cir. 2009) ................................................................................ 14

*Regency Housing and Drilling Ltd. Partnership I v. Cohen*,
   1991 WL 190311 (Del. Super. Ct. Sep. 11, 1991).............................................. 10

*Robesco-Sage Capital L.P. v. Citigroup Alternative Invs. LLC*,
   Index No. 600121/2009 N.Y. Slip. Op. 31751U (N.Y. Sup. Ct. July 28, 2009) ..................... 11

*SEC v. S.J. Salmon & Co., Inc.*,
   375 F. Supp 867 (S.D.N.Y. 1974) ....................................................................... 18

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec.*
   *LLC)*,
   424 B.R. 122 (Bankr. S.D.N.Y. 2010)................................................................. 14

*Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*,
   533 F.2d 1314 (2d Cir. 1976) ....................................................................... 7, 8, 9, 17

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)............................................................................................. 20

## Statutes

15 U.S.C. § 78aaa *et seq.* ............................................................................................ 1

   § 78ccc(2)(A) ........................................................................................................ 12

   § 78fff-2(b)........................................................................................................... 14

   § 78fff-3(a)........................................................................................................... 19

   § 78fff-3(a)(5) ................................................................................................. 12, 13

   § 78*lll* ................................................................................................................ 3, 10

   § 78*lll*(11) ............................................................................................................. 3

   § 78*lll*(2)......................................................................................................... 3, 11

   § 78*lll*(4).............................................................................................................. 4

6 Del. Code § 17-701 .................................................................................................. 5

N.Y. Ltd. Liab. Co. Law § 601 .................................................................................. 5

## Rules

17 C.F.R. § 300.100 *et seq.*...................................................................................... 17

**Other Authorities**

William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 31 (2010) ........ 5, 10

Pursuant to this Court's April 13, 2010 order (the "Scheduling Order") (Dkt. No. 2205), Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and for Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this reply ("Reply") in further support of his motion ("Motion")[2] (Dkt. No. 2416), and supporting memorandum of law[3] ("Trustee's Opening Brief") (Dkt No. 2414), to affirm the denial of the claims of certain claimants ("Objecting Claimants") who did not have accounts with BLMIS but instead invested, directly or indirectly, in "feeder funds" that had accounts and invested with BLMIS and objected to the Trustee's determination of their claims. A list of the sixteen (16) feeder funds ("Feeder Funds") whose investors are the subject of the Trustee's Motion is annexed to the declaration of David J. Sheehan, Esq. ("Sheehan Declaration") (Dkt. No. 2413) submitted in support of the Trustee's Motion, as Exhibit 1.

One hundred and seventy-nine oppositions ("Oppositions") and responses were filed in response to the Trustee's Motion by various claimants and the United States Securities & Exchange Commission ("SEC").[4] A list of those filings is annexed to the declaration of Seanna R. Brown, Esq. ("Brown Decl.") as Exhibit 1, submitted in further support of the Trustee's Motion and this Reply. Of the 179 filings, 149 were filed by Objecting Claimants, as that term is defined in the Scheduling Motion and the Motion, and are listed on Exhibit 2 to the Brown Declaration. Of the 179 filings, 4 were filed by or on behalf of claimants who had not objected

---

[1] For convenience, subsequent references to sections of the act shall be denoted simply as "SIPA § __."

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[3] Memorandum of Law in Support of Trustee's Motion to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds.

[4] This number is exclusive of two motions for leave to join the Motion (Dkt. Nos. 2410, 2481) that were denied by the Court. (Dkt. Nos. 2661, 2662). These filings are included on Exhibit 4 to the Brown Decl., as discussed *infra*.

previously to the Notice of Trustee's Determination of their claims, and 2 Oppositions were filed by or on behalf of parties that never filed claims with the Trustee in the first instance. An additional 23 were filed on behalf of parties who may have invested in entities other than the Feeder Funds that are the subject of the Motion. Those 29 Oppositions, identified in <u>Exhibit 3</u> to the Brown Declaration, were filed in violation of the Scheduling Order and the Motion (collectively, the "Non-Compliant Responses").[5] 4 motions were filed for leave to join the Motion, as provided for in the Scheduling Order, which are identified in <u>Exhibit 4</u> to the Brown Declaration. As indicated above, the SEC submitted a brief in support of the Trustee's Motion, and one supplemental brief was submitted in response to the same.

Through this reply brief, the Trustee does not attempt to respond to every argument advanced in each of the oppositions or briefs filed in support of the Trustee's Motion. Rather, it focuses on the central, dispositive issues raised therein. The fact that the Trustee does not respond to each argument or allegation should not be viewed as an admission or an agreement with those assertions.

## **INTRODUCTION**

The Objecting Claimants raise a variety of arguments in opposition to the Trustee's Motion, but the fact remains that the Feeder Funds, not those who invested in the Feeder Funds, were the "customers" of BLMIS. The Objecting Claimants did not deposit cash with BLMIS for the purpose of purchasing securities; it was the Feeder Funds that did so. What the Objecting Claimants did was purchase ownership interests in the Feeder Funds, and the Feeder Funds

---

[5] As between the 149 filings by Objecting Claimants and the 29 Non-Compliant Responses, it should be noted that there were 2 filings that were filed on behalf of Objecting Claimant(s) and a party that was not properly part of the Motion. As such, each of those filings are counted in both the Objecting Claimant tally (149) and the Non-Compliant Response tally (29). They were not, however, double counted for purposes of the total number of filings in response to the Trustee's Motion (179).

invested in BLMIS with fund-owned assets over which the Feeder Funds retained investment discretion. Securities accounts were set up for the Feeder Funds, not the Objecting Claimants. The Feeder Funds, not the Objecting Claimants, received customer statements from BLMIS. And the Feeder Funds, not the Objecting Claimants, were reflected in the books and records of BLMIS. As a result, it is the Feeder Funds that fall within the definition of "customer" under SIPA and have cognizable net equity claims, not the Objecting Claimants.

In the end, the Objecting Claimants do not dispute that the Feeder Funds are "customers" under SIPA. As shareholders or limited partners in the Feeder Funds, the Objecting Claimants will still participate in any distributions of customer property that are based upon the Feeder Funds' net equity claims. What the Objecting Claimants cannot do under SIPA is to hold themselves out as a second set of customers entitled to net equity claims based upon the same losses in those accounts. That result would violate the plain language of SIPA and ignore the nature of the Objecting Claimants' investments.

## ARGUMENT

### A. The Feeder Funds, Not The Objecting Claimants, Had Securities Accounts at BLMIS.

The Objecting Claimants do not dispute that they did not have securities accounts at BLMIS. They argue instead that the definition of "customer" under SIPA does not require that they have such an account. Not so. SIPA defines "customer" as an investor who "has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer *from or for the securities accounts of such person*[.]" SIPA § 78*lll*(2) (emphasis added); *see also In re John Muir & Co.*, 51 B.R. 150, 152-53 (Bankr. S.D.N.Y. 1985) ("customer" under SIPA "is clearly limited to persons who maintain accounts with broker-dealers and who trade or invest *through them*") (emphasis in original) (internal

citation omitted). Other provisions of SIPA, including the definition of net equity, similarly presume the existence of securities accounts. *See, e.g.,* SIPA § 78*lll*(4) (defining "customer property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer"); SIPA § 78*lll*(11) (net equity defined as "the dollar amount of the account or accounts of a customer"). SIPA should not be read to render its references to securities accounts superfluous. *See APWU v. Potter*, 343 F.3d 619, 626 (2d Cir. 2003) (courts decline to read statutes in such a way as to render some of its terms superfluous).

It is true, as the Objecting Claimants argue, that the definition of "customer" includes "any person who has deposited cash with the debtor for the purpose of purchasing securities." Thus, if someone deposits their cash with the debtor, and their account is not (or is not yet) set up when the liquidation proceeding commences, they are still a customer. But in those circumstances, but for the fraud of the broker (or the timing of the transaction), a customer account would, in the normal course of events, have been established.[6] Here, in contrast, even had BLMIS not acted fraudulently, customer accounts would never have been set up for the Objecting Claimants. Instead, securities accounts were set up for the *Feeder Funds* because it was they, not the Objecting Claimants, who invested their corporate assets in BLMIS to purchase securities.

---

[6] In his Opening Brief, the Trustee characterized this as a "reasonable expectation" that an account would be set up—meaning that an account would be reasonably expected to be set up in the normal course of events. (Trustee's Opening Brief, at 15).

**B.** **The Feeder Funds, Not The Objecting Claimants, Deposited Cash With BLMIS For The Purpose Of Purchasing Securities.**

        **1.** **The Feeder Funds, Not The Objecting Claimants, Owned The Property Invested In BLMIS.**

The Objecting Claimants argue that they entrusted BLMIS with cash for the purpose of trading in securities. But it was the Feeder Funds, not the Objecting Claimants, which owned the property and entrusted it to BLMIS on their own behalf. The Objecting Claimants, rather than entrusting BLMIS with their funds, purchased ownership interests—shares or limited partnership interests—in the Feeder Funds. As a result, the Objecting Claimants are not "customers" under SIPA.

The Objecting Claimants argue, in various guises, that the Feeder Funds were mere pass-through entities for their investments. But the various offering memoranda for the Feeder Funds say otherwise. They reveal that Objecting Claimants purchased ownership stakes in the Feeder Funds, which then made investments with fund property. *See, e.g.*, Sheehan Declaration, Ex. 69, American Masters Broad Market Fund, L.P. Amended Limited Partnership Agreement, dated May 31, 1994, at p. 6; Sheehan Declaration, Ex. 64, Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, dated October 6, 2008 at pp. 4-5. The Objecting Claimants do not dispute this central fact.

Once the Objecting Claimants gave money to the Feeder Funds in consideration for ownership interests the funds, that money became the assets of the Feeder Funds. *See, e.g.*, William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 31 (2010) ("the capital or assets of the corporation are its property"); N.Y. Ltd. Liab. Co. Law § 601 ("a member has no interest in specific property of the limited liability company"); 6 Del. Code § 17-701 ("A partner has no interest in specific limited partnership property."); *In re Marriott Hotel Prop. II Ltd. P'ship Unitholders Litig.*, 2000 Del. Ch. LEXIS 17, at *51-52 (Del. Ch. Jan. 24, 2000)

(Section 17-701 "has been interpreted to preclude the attempt to equate ownership interests in a partnership with ownership of partnership property"); *Johnson v. Gore Wood & Co.*, [2002] 2 A.C. 1, [2001] B.C.C. 820, 858 (H.L.) (appeal taken from Ct. App.) (Under UK common law, "[a] company is a legal entity separate and distinct from its shareholders. It has its own assets and liabilities and its own creditors. The company's property belongs to the company and not to its shareholders").

The various offering memoranda also make clear that the Feeder Funds reserved control over their investments, whether the investments were placed with BLMIS or not. *See, e.g.,* Sheehan Declaration, Ex. 50, Greenwich Sentry L.P. Amended and Restated Partnership Agreement, dated April 30, 2006, at p. 4 ("the General Partner shall have full, exclusive, and complete discretion in the management of the Partnership and the power on behalf of and in the name of the Partnership to take any action on behalf of the Partnership hereunder, to carry out any and all of the purposes of the Partnership"); Sheehan Declaration, Ex. 64, Kingate Global Fund, Ltd. Amended and Restated Information Memorandum, dated October 6, 2008 at pp. 4-5 ("All decisions with respect to the general management of the Fund are made by the Manager, who has complete authority and discretion in the management and control of the business of the Fund . . . . [N]o person should invest in the Fund unless willing to entrust all aspects of the management of the Fund to the Manager, having evaluated its capacity to perform such functions."). Thus, it is clear that it is the Feeder Funds, not the Objecting Claimants, that owned and controlled its property, and entrusted it to BLMIS.

### 2. The Objecting Claimants Cannot Be Customers As To Feeder Fund Property.

Some Objecting Claimants argue that nothing in the definition of "customer" requires the direct entrustment of assets. For this proposition, they cite to *Focht v. Heebner (In re Old Naples*

*Secs., Inc.)*, 223 F.3d 1296, 1302-03 (11th Cir. 2000) ("*Old Naples*"), arguing that it stands for the proposition that the route by which an investor's money gets to an insolvent broker is not dispositive of whether or not he is a customer.

But the relevant question is not whether the route by which money arrived at the broker was direct or indirect; the relevant question is which entity is entrusting its property and has the right to deal with the broker with respect to that property. *Old Naples* characterizes the relevant inquiry as whether there was "actual receipt, acquisition, or possession *of the property of a claimant* by the brokerage firm under liquidation." *Id.* at 1302 (emphasis added) (citation omitted). Here, by the terms of the offering memoranda, the Feeder Funds invested *fund* property in BLMIS, not property of the Objecting Claimants, and the Objecting Claimants had no right to control or designate its disposition by BLMIS. Indirect investors participated in those investments only indirectly, through their ownership shares or limited partnership interests in the various Feeder Funds. Thus, under *Old Naples*, it is the Feeder Funds, not indirect investors in those funds, which are customers of BLMIS.[7]

For these same reasons, this case is on all fours with *Morgan Kennedy. See Sec. Investor Prot. Corp. v. Morgan, Kennedy & Co.,* 533 F.2d 1314 (2d Cir. 1976). In that case, the Second Circuit refused to grant customer status to the employee-beneficiaries of a trust that had invested with a broker in liquidation. Many of the Objecting Claimants seek to distinguish *Morgan Kennedy*, arguing that the Feeder Funds did not act at arm's length from BLMIS, unlike the

---

[7] Some Objecting Claimants cite *Old Naples* as well as *Ahammed v. Sec. Investor Prot. Corp. (In re Primeline Secs. Corp.)*, 295 F.3d 1100 (10th Cir. 2002) for the proposition that investors who reasonably believe they are investing directly with the debtor may be customers even if their cash does not make it there. Since the property at issue here was the Feeder Funds', not the Objecting Claimants, the point is irrelevant. But even were the intentions of the Objecting Claimants at issue, they cannot maintain that they reasonably believed they were investing directly with BLMIS, because they purchased stakes in the Feeder Funds, not BLMIS, and the offering memoranda for their purchases made clear which entities the Objecting Claimants were investing in.

trustees in *Morgan Kennedy*, or that the Objecting Claimants invested in the Feeder Funds with the intent to invest ultimately with BLMIS, while the employees in *Morgan Kennedy* were unaware that they had invested with the debtor.[8]

But neither of these facts was dispositive of *Morgan Kennedy*. Rather, the Second Circuit held that the trust, not the employee-beneficiaries, were customers under SIPA because (1) the securities account with the debtor was in the name of the trustees, not the employee-beneficiaries; (2) title to the trust assets was held by the trustees, not the employee-beneficiaries; (3) the trustees had the exclusive power to entrust the assets to the debtor, invest and trade securities; (4) the employee-beneficiaries were unknown to the broker; and (5) the employee-beneficiaries had no legal capacity in which they could deal with the debtor. *See id.* at 1318.

Each of these rationales applies with equal force here. The securities accounts are in the name of the Feeder Funds, not the Objecting Claimants. Title to Feeder Fund assets was held by the funds, not by the Objecting Claimants. The Feeder Funds, not the Objecting Claimants, had the power to entrust assets to BLMIS. *See, e.g.,* Sheehan Declaration, Ex. 53, Greenwich Sentry Partners, L.P. Confidential Offering Memorandum, dated August 2006, at p. 4 ("[T]he management of the Partnership, unless otherwise specified, shall be vested exclusively in the General Partner. The Limited Partners will have no part in the management of the Partnership and will have no authority or right to act on behalf of the Partnership in connection with any

---

[8] Although some Feeder Funds identified BLMIS in their prospectuses or offering memoranda, others did not. *Compare* Sheehan Declaration, Ex. 53, Greenwich Sentry Partners, L.P. Confidential Offering Memorandum, dated August 2006, at pp. 8-9 ("The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ("BLM"), a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Partnership at that firm"); *with* Sheehan Declaration, Ex. 65, Amended and Restated Confidential Private Placement Memorandum of Maxam Absolute Return Fund, L.P., dated March 21, 2008, at p. 1. ("The Partnership's assets are held in custody in customer accounts at the selected Broker Dealers. The Broker Dealers are selected by the Investment Manager based upon the trading strategy, their ability to implement the trading strategy and efficiently trade the assets of the Partnership's assets on a discretionary basis"). Whether BLMIS was specifically identified in offering memoranda does not change, however, the nature of the Objecting Claimants' investments in the Feeder Funds.

matter"); Sheehan Declaration, Ex. 65, Amended and Restated Confidential Private Placement Memorandum of Maxam Absolute Return Fund, L.P., dated March 21, 2008, at p. 13 ("Investors will become Limited Partners of the Partnership. The Limited Partners cannot take part in the management or control of the Partnership's business, which is the sole responsibility of the General Partner"). The Objecting Claimants are anonymous to the Trustee in that no record of their investments is reflected in the BLMIS books and records. And the Objecting Claimants had no legal relationship with BLMIS. There is, accordingly, no meaningful difference between the Objecting Claimants and the employee-beneficiaries in *Morgan Kennedy*.

In the end, just as the employee-beneficiaries in *Morgan Kennedy* could not be customers' of the debtor as to assets owned by the trust, the Objecting Claimants cannot be customers of BLMIS as to property owned by the Feeder Funds. It is the Feeder Funds, like the trust in *Morgan Kennedy*, that are BLMIS's customers for SIPA purposes.

### 3. The Objecting Claimants' Allegations Of An Agency Relationship Between The Feeder Funds And BLMIS Does Not Affect The Result.

Certain Objecting Claimants allege that they should be considered customers under SIPA because the Feeder Funds "operated as the functional equivalent of agents for [BLMIS]," *Milton Fine Revocable Trust and Milton Fine 1997 Charitable Remainder Unitrust's Objection to the Trustee's Motion to Affirm Trustee's Determination Denying Claims of Claimants* ("*Milton Fine Objection*"), (Dkt. No. 2595), at p. 8. In fact, the prospectuses and private placement memoranda for these Feeder Funds make clear that (a) some Feeder Funds invested capital not only in BLMIS but in other places, (b) some Feeder Funds did not even mention BLMIS, (c) the Feeder Funds retained discretion to invest the proceeds of the funds, (d) the Feeder Funds retained the discretion to withdraw their investments from BLMIS and invest them elsewhere, and (e) all of the Feeder Funds required the Objecting Claimants to relinquish control over their

investments to the Feeder Fund managers. *See*, *e.g*., Sheehan Declaration, Ex. 53, at p. 8; Ex. 61 at p. 14; Ex. 64 at p. 13; Ex. 65 at p. 3; Ex. 71 at pp. 9, 16; Ex. 74 at pp. 2, 5; Ex. 76, at pp. 2,7.[9]

In any event, whether the Feeder Funds assisted Madoff in soliciting funds for BLMIS has no bearing on whether the investors in the Feeder Funds were "customers" under SIPA. That question revolves around the nature of the Objecting Claimants' investments in the Feeder Funds.[10] Regardless of how they viewed the Feeder Funds, it was readily apparent to the Objecting Claimants that they were not investing directly in BLMIS, but instead were investing in the Feeder Funds. Once they did, their investments became the property of the Feeder Funds, and the Feeder Funds retained control over the commingled fund assets. These facts were not hidden from the Objecting Claimants, but were spelled out in their offering memoranda and subscription agreements. Under these circumstances, the Objecting Claimants cannot be viewed as "customers" under SIPA.

Some Objecting Claimants suggest that the relationship between the Feeder Funds and BLMIS was a "master-feeder fund structure," and that that fact should somehow affect the SIPA customer analysis. As a preliminary matter, a master-feeder structure typically involves a company organized under foreign law that offers shares to one or more domestic feeder funds and one or more offshore corporate feeder funds, all of which share common investments

---

[9] Certain Objecting Claimants argue, in the same breath, that the Feeder Funds were *their* agents. But the Feeder Funds are not agents of their investors or shareholders. *See generally* William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 30 (2010) ("Ordinarily, the corporation is not the agent of the shareholders and does not act or hold property as agent for them"); *Regency Housing and Drilling Ltd. P'ship I v. Cohen*, 1991 WL 190311, at **1-3 (Del. Super. Ct. Sep. 11, 1991) (general partners in Delaware limited partnership are not agents of limited partner).

[10] The definition of "customer" under SIPA does refer to "agency," but only with respect to the *debtor* dealing as an agent. *See* SIPA § 78*lll* ("customer" includes "any person with whom the debtor deals as principal or agent . . . who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person"). Brokers can enter into transactions in their capacity as agent for a customer, or they can enter into transactions as the counterparty that is actually purchasing from or selling to the customer, the latter of which requires certain disclosures.

strategies and objectives. *See, e.g., In Re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 328 n.3 (S.D.N.Y. 2008) (discussing master-feeder structures). BLMIS was neither ostensibly nor actually structured as such.

In any event, the Objecting Claimants do not explain how the existence of a master-feeder structure would affect who is deemed a customer under SIPA. They suggest that the court should not "adhere[] to the fiction of separate identity between the Feeder Funds and [BLMIS]," but they do not offer any authority for that proposition. *Milton Fine Objection*, (Dkt. No. 2595), at p.. 11. The only case that they cite in support is *Robesco-Sage Capital L.P. v. Citigroup Alternative Invs. LLC,* Index No. 600121/2009 N.Y. Slip. Op. 31751U (N.Y. Sup. Ct. July 28, 2009), but the case does not advance their cause. In *Robesco-Sage*, the court permitted feeder-fund investors in master-feeder fund to maintain fraud claims directly against the master fund because its investment advisor had made fraudulent statements directly to the feeder-fund investors. The court did not hold that the existence of a "master-feeder fund structure" automatically equated to a finding of agency or that the corporate identities of the feeder funds and the master fund should be ignored as a result. To the contrary, the court refused to permit allegations of corporate mismanagement by the feeder-fund investors, as they were strictly derivative of fund claims. *See id.*, at p. 19-20. In so doing, the court was respecting the fund corporate identities, not ignoring them.

## C. Any Claim For Conversion Belongs To The Feeder Funds.

Some Objecting Claimants argue that they are customers of BLMIS by virtue of its conversion of their property. While "[t]he term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities," *see* SIPA § 78*lll*(2), "such securities" refers to "securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer *from or for the securities accounts of such person*[.]"

*Id.* (emphasis added). This "conversion" provision thus does not create independent customer standing for those who did not entrust the debtor with cash to trade or invest in securities, and who lack securities accounts with SIPA as a result. As discussed above, it was solely the Feeder Funds, however, not the Objecting Claimants, that had the securities accounts and placed their property with BLMIS for their accounts, and thus would be able to assert a claim for any conversion.

## D. SIPA Section 78fff-3(a)(5)'s Limited Exceptions Do Not Include Hedge Funds.

The Objecting Claimants argue that section 78fff-3(a)(5) of SIPA contemplates the protection of indirect customers. That section provides that when a bank, broker, or dealer (entities that are statutorily ineligible for SIPC advances) places an investment with a failed broker-dealer on behalf of their non-bank, non-broker or non-dealer clients, SIPA treats the underlying client, not the bank, broker, or dealer acting as the client's fiduciary, as the customer of the debtor for SIPC advance purposes. *See* SIPA § 78fff-3(a)(5); *see also In re Albert & Maguire Secs. Co.,* 419 F. Supp. 1171, 1177-78 (E.D. Pa. 1976) ("The sole exception to the proscription [of SIPC advances to a bank] is where the bank, as a customer of the broker, was acting for one of its own customers. The required advance from SIPC in such situation would benefit the 'customer' principal and not the agent bank."). While it is true that Congress enacted this exception to the "no indirect customer" rule, it made no such exception for hedge funds like the Feeder Funds, which are not brokers, dealers or banks.[11]

---

[11] Some Objecting Claimants argue that the Feeder Funds acted like introducing brokers. But this section does not apply to those who "act like" brokers, only to brokers registered with the SEC pursuant to the Securities & Exchange Act of 1934 and section 78ccc(2)(A) of SIPA. Unlike brokers, hedge funds like the Feeder Funds are not subject to the registration requirements of the SEC, are not members of SIPC, and are not subject to the CFTC requirements or FINRA regulations. And unlike introducing brokers, which are merely conduits to another broker, the Feeder Funds are legal entities that accept money and securities from investors, make investment decisions, and hold securities of their own.

Certain Objecting Claimants argue that hedge funds did not exist when SIPA was enacted in 1970. Regardless of whether this is true, SIPA § 78fff-3(a)(5) also provides no exception for mutual funds, which similarly allow for indirect investment and were part of the investment landscape throughout the 1970's. *Cf. Gordon v. Fundamental Investors, Inc.*, 362 F. Supp. 41, 45-46 (S.D.N.Y. 1973) (shareholder of mutual fund had only derivative, not direct claim, against mutual fund investment advisor).[12]

In any event, whether hedge funds existed at the time SIPA was enacted is of no moment when interpreting the plain meaning of the statute. "Well-established principles of construction dictate that statutory analysis necessarily begins with the 'plain meaning' of a law's text and, absent ambiguity, will generally end there." *Collazos v. United States*, 368 F.3d 190, 196 (2d Cir. 2004). Had Congress wished to extend the terms of section 78fff-3(a)(5) of SIPA to hedge funds, it could have done so on one of the myriad of occasions that it has amended SIPA since its enactment. It has not.

Thus, section 78fff-3(a)(5) of SIPA does not assist the Objecting Claimants. To the contrary, by making explicit the exception for banks, brokers, and dealers, SIPA made clear that for hedge funds and other entities *not* excepted, SIPA does *not* recognize indirect investments as giving rise to customer claims. This is an example of the legal maxim *exceptio probat regulam*—the "exception proves the rule."

**E.      Net Equity Claims Of The Objecting Claimants Could Not Be Ascertained From The Books And Records Of BLMIS.**

SIPA provides for payments of net equity claims to "customers" only "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise

---

[12] This is significant given that mutual funds, unlike hedge funds, are generally open to the small investors that SIPA was primarily designed to protect.

established to the satisfaction of the trustee." SIPA § 78fff-2(b); *see also Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 424 B.R. 122, 135 (Bankr. S.D.N.Y. 2010) (holding that "securities positions" can be ascertained only by reference to BLMIS books and records).

In its comprehensive claims administration process for the reconciliation and resolution of customer claims, the Trustee has relied upon the books and records of BLMIS to determine each customer's net equity. But as the Objecting Claimants had no securities accounts with BLMIS and did not themselves entrust BLMIS with cash to trade or invest in securities, the books and records of BLMIS contain no mention of the Objecting Claimants and no method of calculating net equity for them.

Some Objecting Claimants argue that the books and records of BLMIS should not be trusted to calculate net equity. That would be true if net equity were calculated based upon fictitious account statements. But as this Court has held, net equity should be calculated based upon the net investment method—by calculating the amount of money deposited by a customer, less any amount withdrawn—which reflects the actual investments of customers in BLMIS.

Other Objecting Claimants argue that the determination of who is a customer is independent of the net equity calculation, so that the Trustee's inability to calculate net equity for the Objecting Claimants is irrelevant to whether they are customers. However, one can only be a customer (a status that can exist for some transactions and not others) to the extent of one's net equity claim. Moreover, the Court should read SIPA in a manner that harmonizes its positions. "The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another." *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002); *see also Pettus v.*

*Morgenthau*, 554 F.3d 293, 297 (2d Cir. 2009) ("when construing the plain text of a statutory enactment, we do not construe each phrase literally or in isolation. Rather, we attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole"). The court should not read the customer definition in a fashion that would create customers for whom net equity would not exist or be calculable.

The Objecting Claimants' rejoinder is that their net equity would be calculable, albeit difficult, through a tracing analysis. They contend that the Trustee should rely upon the amounts of their investments into the Feeder Funds to calculate net equity. But this would be both infeasible and inappropriate.

Calculating net equity based upon the Objecting Claimants' investments in the Feeder Fund would be infeasible because net equity would potentially depend on any number of factors not known to the Trustee. As noted in the Trustee's Opening Brief, hedge funds are typically structured so that management fees and other expenses are paid before individual investors see a return, so a Feeder Fund might well dispute what portion of the value supposedly represented by the Feeder Fund's BLMIS account could ultimately be paid to any particular owner/investor. *See, e.g.,* Sheehan Dec., Ex. 53, at pp. 3, 5; Ex. 50, at pp. 12, 16. Also, many of the Objecting Claimants did not invest in the Feeder Funds but in other funds or entities that invested in the Feeder Funds, which could render impossible any attempt to trace the Objecting Claimants' investments. Some Feeder Funds invested in each other, further complicating the analysis. *See, e.g.,* Sheehan Dec., Ex. 47. Some Feeder Funds may have leveraged their investments with BLMIS through loans from lending institutions that also might claim priority over investor "distributions" of net equity. And many of the Feeder Funds, their managers, and related entities, many of which have claimed indemnity, have been or may be sued by their investors,

with unpredictable effects on who will ultimately be entitled to their current or future assets. Thus, the amounts owed to the Objecting Claimants by the Feeder Funds in which they directly or indirectly invested may be affected by a wide variety of external factors unknown and unknowable to the Trustee.

Calculating net equity in this fashion would also be inappropriate, at it would usurp the role of the Feeder Funds to determine which fund investors are entitled to share in fund property. Any fund entity, as a legal person, is a network not just of rights but of obligations owed at various levels of entitlement to many different persons. Many of those persons are not before this Court and this Trustee. If a shareholder or limited partner of a Feeder Fund attempted to claim directly from BLMIS the amounts he perceives to be "his share" of money that is owed, on its face, to the Feeder Fund, the interests of many other people who interacted with that fund— whether it be its owners, contractors, employees, or creditors—would be impacted. Any resolution of those competing obligations must take place at fund entity level.

Indeed, some Feeder Funds already have liquidators or receivers appointed to do precisely that task, and equitably distribute the Feeder Funds' assets accordingly. *See, e.g.*, *In re Fairfield Sentry Limited, et al.*, Case No. 10-13164 (Bankr S.D.N.Y.) (BRL) (Dkt. No. 51) (wherein this Court recognized the foreign liquidation proceeding relating to certain Fairfield Greenwich entities as a foreign main proceeding under Section 1517(b)(1) of the Bankruptcy Code); *Id.*, (Dkt. No. 77) ("In their capacities as the foreign representatives and liquidators of the [Fairfield] Debtors, [the liquidators] are responsible for all aspects of the [Fairfield] Debtors' business and are empowered to, *inter alia*, perform any acts, compromise claims, commence litigation, dispose of property and execute any deeds, receipts or other documents in the name and on behalf of the [Fairfield] Debtors"); *New York v. Merkin*, Index No. 450879/2009 (N.Y.

Sup. 2009) (Dkt. No. 14) (appointing Bart M. Schwartz as receiver for Ariel Fund and Gabriel Capital, L.P.); *Id.* (Dkt. No. 38) (appointing David B. Pitofsky as receiver for Ascot Partners, L.P.). There is no legal basis for the Objecting Claimants to bypass this process by seeking a net equity distribution from BLMIS directly.

**F.      The SIPC Rules Are Irrelevant To Determining Customer Status.**

The Objecting Claimants cite to various provisions of the SIPC Series Rules, codified at 17 C.F.R. § 300.100 *et seq.* (the "SIPC Rules"), to support their claim of customer status. But these rules, promulgated by SIPC, do not bear on the definition of "customer" under SIPA, which is a question of statutory interpretation. *See Morgan Kennedy,* 533 F.2d at 1319 ("Customer status under SIPA is therefore a prerequisite to the application of the Rules, and not a substitute therefor"); *In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 730 (Bankr. S.D.N.Y. 1998) ("This section applies to claimants who already qualify as customers"). Moreover, none of the SIPC Rules provide that there can be more than one customer (and thus more than one net equity claim) for any particular account, which is the upshot of what the Objecting Claimants are seeking.

**G.      Any Tort Claims By The Objecting Claimants Would Be General Creditor Claims.**

Some Objecting Claimants argue that BLMIS is liable to them for fraud. To the extent that they have cognizable tort claims against BLMIS, at best, those would be general creditor claims. Whether they have valid tort claims, however, is a separate question from whether they are "customers" under SIPA.

The primary purpose of a SIPA liquidation is to distribute the fund of customer property to satisfy net equity claims of customers. SIPA does not provide damages for fraud, torts or other wrongs committed by the broker. *See Arford v. Miller* (*In re Stratton Oakmont, Inc.)*, 239 B.R. 698, 701-02 (S.D.N.Y. 1999) ("SIPA does not protect against all cases of dishonesty and

fraud"), *aff'd*, 210 F.3d 420 (2008); *In re MV Secs.*, 48 B.R. 156, 160 (Bankr. S.D.N.Y. 1985) ("SIPA's primary intent and policy are to protect customers who have cash and securities being held for them by a broker dealer, rather than to serve as a vehicle for the litigation of claims of fraud or violations of Rule 10b-5") (citation omitted).

Thus, claims based on allegations of fraud, misrepresentation, or torts are at best entitled to general creditor status and must be paid from the general estate, which is separate and apart from the fund of customer property. *See, e.g., In re Klein Maus & Shire, Inc.*, 2002 Bankr. LEXIS 1784 (Bankr. S.D.N.Y. Oct. 2, 2002); *see also In re JNT Investors, Inc.*, 1978 U.S. Dist. LEXIS 7021 (S.D.N.Y. Dec. 26, 1978) (breach of contract or possible tort suits, if successful, are general creditor claims); *SEC v. S.J. Salmon & Co.*, 375 F. Supp 867, 871 (S.D.N.Y. 1974) (finding claimant must pursue fraud claim as general creditor). Accordingly, whether or not the Objecting Claimants have cognizable tort claims against BLMIS, such claims do not transform the Objecting Claimants into "customers," nor are such claims "customer" claims under SIPA.

## H.  Only The Feeder Funds Can Pursue Customer Claims As To Their Accounts.

As set forth in the Trustee's opening brief, where investors in the Feeder Funds, whether structured as corporations, limited liability companies, limited partnerships, or other corporate-type entities, do not have property rights in specific property of the entities in which they invested, any "claims" by Objecting Claimants are merely derivative of the claims by the Feeder Funds themselves. Under general principles of corporate law, an individual with an interest in an entity typically has no direct claim when, as here, the injury is merely incidental to the entity's injury. "It is well settled that a shareholder, even though he loses the value of his investment, does not have an individual cause of action for a wrong committed against a corporation." *Bank Leumi Trust Co. of New York v. D'Evori Int'l., Inc.*, 163 A.D.2d 26, 34-35, 558 N.Y.S.2d 909, 916-17 (N.Y. App. Div. 1st Dept. 1990).

Just as a shareholder cannot assert direct claims when his injury is incidental to the corporation's injury, the Objecting Claimants have no direct claims against BLMIS for losses suffered by the Feeder Funds at Madoff's hands. Any net equity claim of an Objecting Claimant would be incidental to the net equity claim of the Feeder Fund in which they invested.

Moreover, a SIPC advance can only be paid against a customer's valid net equity claim. *See* SIPA § 78fff-3(a); *see also In re Adler, Coleman Clearing Corp.*, 195 B.R. 266, 273 (Bankr. S.D.N.Y. 1996) (SIPC may not advance funds for claims against the broker that do not fall within the narrow scope of a customer's net equity claim). The fact that an indirect investor may be primarily seeking a SIPC advance rather than a direct share of the money that their Feeder Fund will receive from the fund of customer property does not improve his or her position. Because the net equity claim belongs only to the Feeder Fund, it holds the only corresponding right to a SIPC advance.

It is true, as certain Opposition Claimants argue, that whether the Objecting Claimants possess legal claims is distinct from whether they possess net equity claims. But the ability of the Objecting Claimants to pursue these two types of claims emanates from the same facts: the Objecting Claimants became shareholders (or the equivalent) of the Feeder Funds, and the Feeder Funds own the property that was invested in BLMIS. As a result, the definition of customer and the law governing derivative claims lead to the same result: the Objecting Claimants have no cognizable claim for injury to the property of the entity in which they invested—only the entity does.

I.      **The Court Should Defer To The Interpretation Of SIPA By The SEC And SIPC.**

To the extent that the language of SIPA leaves any doubt as to whether the Objecting Claimants are "customers," the Court should defer to the interpretations of SIPA by the SEC and SIPC. For many of the reasons set forth above, and as set out in detail in their filings with this

Court, both SIPC and the SEC agree that the Feeder Funds, not the Objecting Claimants, are the customers of BLMIS.

In *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 75 (2d Cir. 2004), the Second Circuit—without expressly reaching the matter of what level of deference applied—deferred on at least two occasions to the jointly held interpretations of the SEC and SIPC. *See In re New Times Secs. Servs., Inc.*, at 88 ("SIPC and the SEC agree that such an approach is irrational and unworkable and we defer to their unanimous and persuasive analysis of the potential absurdities created by reliance on the entirely artificial numbers contained in fictitious account statements."); *id.* at 81 ("Even if we were to view the text of the Series 500 Rules as ambiguous, we would defer to the SEC's and SIPC's common interpretation."). Whether this Court applies strict *Chevron* deference, *see Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 844 (1984), or *Skidmore* deference, *see Skidmore v. Swift & Co.,* 323 U.S. 134, 139 (1944), the Court should embrace the shared conclusions regarding of SIPA of the entities charged with enforcing it.

## CONCLUSION

The Objecting Claimants argue that it is inequitable for them not to have customer claims because they invested in the Feeder Funds, not in BLMIS. But SIPA is clear: it is the Feeder Funds, not the Objecting Claimants, who are customers under SIPA. The Objecting Claimants may well lay claim to a portion of the Feeder Funds' net equity distributions at some point; but they may not assert their own claims. For all of the foregoing reasons, the Court should affirm the Trustee's determination denying the claims of the Objecting Claimants.

Dated: September 20, 2010

Respectfully submitted,

Of Counsel:

/s/ David J. Sheehan

**Baker & Hostetler LLP**
3200 National City Center
Cleveland, Ohio 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
Brian A. Bash
Email: bbash@bakerlaw.com
Thomas D. Warren
Email: twarren@bakerlaw.com
Wendy J. Gibson
Email: wgibson@bakerlaw.com

David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201

*Attorneys for Irving H. Picard, Esq., Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and Bernard L. Madoff*

300101172

- 21 -