LOWENSTEIN SANDLER PC
Bruce S. Nathan, Esq.
David M. Banker, Esq.
1251 Avenue of the Americas
18th Floor
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Attorneys for Pulver Family Foundation, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff,<br><br>              v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES,<br><br>                    Defendant. | Adv. Pro. No. 08-01789 (BRL)<br>SIPA Liquidation |

**PULVER FAMILY FOUNDATION, INC.'S**
**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

Pulver Family Foundation, Inc. ("Pulver") hereby objects to the Trustee's Determination of Claim No. 013920 (the "Pulver Claim"), concerning Pulver Account No. 1P0050 (the "Pulver Account"), as set forth in the Trustee's determination letter dated September 29, 2010.

## BACKGROUND

1.       On December 11, 2008 (the "Liquidation Date"), this Securities Investors Protection Act ("SIPA") liquidation proceeding was commenced against Bernard L. Madoff Investment Securities ("BLMIS" or the "Debtor") in the United States Bankruptcy Court for the Southern District of New York.  Irving Picard was appointed as trustee (the "Trustee") to oversee the BLMIS SIPA liquidation.  [Dkt. No. 12].

2.       On December 23, 2008, the Court issued a Claims Procedure Order directing the Trustee to organize and disseminate claim forms to BLMIS customers who were defrauded by Bernard Madoff's massive Ponzi scheme.  *Id.* at 2.  The Order also directed the Trustee to establish a claims filing protocol and deadline for customers to file such claims.  *Id.* at 5-7.  The Trustee began mailing these claim forms and notices containing the protocol and deadlines to BLMIS customers in January 2009.

3.       On or about June 30, 2009, Pulver filed the Pulver Claim for securities that it was owed from BLMIS based on the last statement balance for the Pulver Account as of the Liquidation Date.  A copy of the Pulver Claim is attached hereto as Exhibit A.[1]

4.       The Pulver Account maintained a positive net equity and cash balance as of the Liquidation Date.  A copy of the last statement that Pulver received, dated November 30, 2008, is annexed to the Pulver Claim attached hereto as Exhibit A.

5.       On September 29, 2010, the Trustee issued a Determination of Claim denying the Pulver Claim under SIPA, and alleging that amounts received by Pulver in excess of its deposits were taken from other customers and given to Pulver.[2]  A copy of the Notice of the Trustee's Determination of Claim is attached hereto as Exhibit B.

6.       The Trustee does not assert that Pulver was in any way a participant in the

---

[1] In accordance with the Court's orders, sensitive information regarding Pulver, including social security and taxpayer identification numbers, addresses and account balances, has been redacted from the Pulver Claim for the purposes of filing.

[2] The Trustee's Determination of Claim did not specifically seek the return of alleged fraudulent transfers made to Pulver.

fraud perpetrated by Bernard Madoff, and it was not; rather, it is a victim. Accordingly, Pulver objects to the Trustee's Determination of Claim in its entirety. Pulver is entitled to recover from the BLMIS estate, as it was one of the thousands of defrauded customers swindled out of millions of dollars by BLMIS.

**OBJECTIONS**

**I.    The Trustee Has Failed To Comply With The Court's December 23, 2008 Order.**

7.    In the December 23, 2008 Order, the Court directed the Trustee to mail "[n]otice, explanatory letters, claims forms and instructions" to "all former customers, broker-dealers, and other creditors of the Debtor . . . ." [Dkt. No. 12, p. 2]. The Court also authorized the Trustee to "satisfy, within the limits provided by SIPA, those portions of any and all customer claims and accounts which agree with the Debtor's books and records . . . ." *Id.* at p. 5.

8.    The Court authorized the Trustee either (x) to deliver to customers the securities which are "ascertainable from the books and records of the Debtor" or (y) to satisfy customers' claims with cash from customer property or with advances to be paid from SIPC. *Id.* at 5-6.

9.    In the alternative, to the extent a customer's claim disagrees with the "books and records of the Debtor," the Trustee is to notify the claimant of his determination that the claim is disallowed and the reason therefore, and provide the claimant with instructions as to how to object to the Trustee's determination. *Id.* at 6-7.

10.    The Trustee has failed to abide by the Court's Order with respect to Pulver because the Trustee has failed to satisfy Pulver's claim concerning the Pulver Account based on the books and records of the Debtor. The books and records of the Debtor show that Pulver maintained a significant equity and cash balance as of the Liquidation Date. To date, the Trustee has not delivered securities to Pulver or otherwise satisfied the Pulver Claim from the customer property of the Debtor or from SIPC.

11.    Because the Trustee has failed in his duties under SIPA and has failed to

abide by the Court's Order, Pulver objects to the Trustee's Determination of Claim.

## II.    The Trustee Misconstrues the Meaning of "Net Equity" in SIPA.

12.    Pursuant to 15 U.S.C. § 78fff-2(b), the Trustee should allow a customer's claim to the extent of that customer's net equity.  Net equity is defined in § 78lll(11) as the amount that is owed by the debtor to the customer based on the securities on the customer's statement as of the filing date, less any amounts the customer owes to the debtor as of the filing date.  In other words, the net equity is simply the difference between the customer's equity balance plus cash position, less any amounts that the customer owes to the debtor broker.  *See In re New Times Sec. Servs., Inc.,* 371 F.3d 68, 72 (2d Cir. 2004).

13.    Based on the plain meaning of net equity in the statutory and case law, a customer who maintains a positive securities balance compared to any amounts the customer owes the broker as of the filing date is owed the net value of his securities, less the amount owed. In this case, the Trustee has taken a different approach to net equity, choosing instead to qualify a customer's claim based on "net-in/net-out" -- the net of the money deposited into an account against the money withdrawn from that account.[3]

14.    The Trustee's misinterpretation of net equity not only violates the plain meaning of net equity in the statutory and case law, but it is also antithetical to Congress' plain intention that SIPA should protect a customer's legitimate expectations with respect to the customer's brokerage account statements.  S. Rep. No. 95-763 at 2 (Apr. 25, 1978).  Congress intended that SIPA fall in line with what customers legitimately expect to receive from their brokerage accounts, and that any payments under SIPA should "restore the customer to his position prior to the broker-dealer's financial difficulties."  *Id.*

15.    The Trustee's failure to adhere to the SIPA definition of net-equity

---

[3] On or about March 1, 2010, the Bankruptcy Court issued a decision regarding, among other things, the Trustee's interpretation of "net equity."  The order with respect to the decision was appealed and that appeal is presently pending.  Pulver respectfully submits that the March 1, 2010 decision and any decision on appeal is not binding on the resolution of its claim before the Court.  Pulver further reserves all of its rights, procedural and substantive, to the extent that its claim is resolved in accordance with the March 1, 2010 decision and any appeal therefrom.

frustrates the customer's legitimate expectations -- the benefit of its investments and the reported appreciation over time.  Indeed, in *Visconsi v. Lehman Bros., Inc.,* 244 Fed. Appx. 708 (6th Cir. 2007), the Court rejected a "money-in/money-out" approach to settling customer's claims, noting that such a formulation would not account for the customers' legitimate expectations of appreciation over the lives of their accounts.  The court explained that:

> Lehman's out-of-pocket theory misapprehends the harm suffered by Plaintiffs and the facts of this case.  Plaintiffs gave $21 million to Gruttaduria, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope-indeed a reasonable expectation-that it would grow.  Thus, the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages.  Had Gruttaduria invested Plaintiffs' money as requested, their funds would have likely grown immensely, especially considering that Plaintiffs invested primarily throughout the mid-1990s, which, had they hired an honest broker or a watchful company that reasonably supervised its employees, would have placed their money in the stock market during one of the strongest bull markets in recent memory.

*Id*. at *5.

16.    In much the same way, the Trustee's determination ignores Pulver's legitimate expectations with respect to its account with BLMIS.  Nowhere in SIPA is the Trustee given power to reshape SIPA's statutory definitions, as interpreted in such cases as *New Times* and *Visconsi*.  To honor the Trustee's net investment approach would be to ignore Pulver's earnings and account balance appreciation over the life of its investments.  It renders useless the last statement balance as of the date of the filing that SIPA states is the pertinent benchmark by which to judge the customer's net equity position.

17.    The Trustee's definition is inconsistent with the clear language of SIPA, and cases interpreting the definition of net-equity.  Pulver therefore objects to the Trustee's net equity definition and the Trustee's claim, which claim relies upon this incorrect definition.

**III.   The Trustee Has Violated SIPA By Failing To Promptly Pay A SIPA Advance Of $500,000 To Pulver.**

18.    The Trustee has breached his duty under SIPA to "promptly" pay SIPC advances of up to $500,000 to customers who qualify for relief as victims of the Madoff fraud.

19.    SIPA, 15 U.S.C. § 78fff-3 provides:

> In order to provide for prompt payment and satisfaction of net equity claims of customers of the debtor, SIPC shall advance to the trustee such moneys, not to exceed $500,000 for each customer, as may be required to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property.

Thus, the statute calls for the prompt payment and satisfaction of customer claims.

20.    The Trustee's actions with respect to Pulver have been anything but prompt. Pulver's SIPA claim was filed in July 2009. Yet, Pulver are still awaits the payment to which it is entitled. The Trustee has not advanced the $500,000 payment to it, despite the fact that the books and records of the Debtor clearly establish that Pulver maintained an account with BLMIS, had a positive equity balance as of the Liquidation Date and was not indebted to BLMIS for any amounts.

21.    Because the Trustee has failed to discharge his duties to pay to Pulver the $500,000 advance owing to it under SIPA, the Trustee is in breach of his duties. Pulver objects to the Trustee's continued refusal to comply with his obligation to pay it the SIPA advance.

**IV.   The Trustee Has No Power To Avoid A Settled Transaction Between A Customer And A Stockbroker Pursuant To Bankruptcy Code Section 546(e).**

22.    Pursuant to Section 546(e) of the Bankruptcy Code, a trustee may not avoid a settled transaction made pursuant to a securities contract between a customer and a stockbroker or securities clearing agency, except in the case of an intentionally fraudulent transfer. *See* 11 U.S.C. § 546(e). Section 546(e) is a "safe harbor" for settled transactions, and

was enacted to "protect the nation's financial markets from the instability caused by the reversal of settled securities transactions." *In re Enron Corp.,* 328 B.R. 58, 66 (Bankr. S.D.N.Y. 2005).

23.    Section 546(e) also was enacted to "ensure that the avoiding powers of a trustee are not construed to permit margin or settlement payments to be set aside except in cases of fraud [by the purchaser]." *QSI Holdings Inc. v. Alford,* 382 B.R. 731, 738 (W.D. Mich. 2007) (brackets in original) (quoting *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 878 F.2d 742, 751 (3d Cir. 1989) (quoting H.R. REP. NO. 97-420 (1982) ("1982 House Report"), reprinted in 1982 U.S. Code Cong. & Admin. News 583, 583)).

24.    In fact, the 1982 House Report, which accompanied the bill when it was considered and passed by both the House and the Senate, provides as follows:

> The thrust of several of the amendments contained in H.R. 4935 is to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market. The amendments will ensure that the avoiding powers of a trustee are not construed to permit margin or settlement payments to be set aside except in the cases of fraud . . .

In addition, the 1982 House Report further elaborates on the type of fraud that is to be excepted from the protections of Section 546(e):

> Section 4 creates a new Section 546(d) [now designated as 546(e)]. This amendment is made simultaneously with the repeal of Section 764(c) of Title 11 [the predecessor version of 546(e)]. Section 546[e], together with provisions of section 548, prohibits a trustee from avoiding a transfer that is a margin payment . . . or is a settlement payment . . . , except where the transfer was made with intent to hinder, delay, or defraud other creditors and was not taken in good faith.

25.    Further, Senator Dole's remarks on the passage of the bill's Section 4, creating Section 546(d) [now 546(e)], emphasize the same limitation:

> Simultaneously with the repeal of section 764(c) of title 11, section 4 of H.R. 4935 would create a new section 546(d). Section 764(c), together with the provisions of section 548, generally prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment, except where the transfer, first, was made with

-7-

an actual intent to hinder, delay, or defraud other creditors and second, was not taken in good faith by the recipient. These provisions apply to margin or settlement payments made by a debtor, whether or not such debtor is a commodity broker. The new section 546(d) reiterates and clarifies the provisions of current section 764(c).

26.    Accordingly, Congress clearly intended that the actual fraud exception to Section 546(e) be interpreted narrowly to encompass only those situations where the settlement or margin payment was not taken in good faith.

27.    Based upon the clear legislative history, Section 546(e) protects settled transactions in which customers like Pulver acted in good faith. Pulver finalized numerous settlement payments with BLMIS over the life of its account, and BLMIS acted as its stockbroker/securities clearing agent pursuant to a valid securities contract. Pulver did not act with bad faith with respect to its transactions with BLMIS, and of course had no knowledge of, much less did it participate in, Bernard Madoff's criminal acts. Accordingly, the safe harbor protection of Section 546(e) disallows any attempt by the Trustee to avoid settled transactions completed with regard to the Pulver Account.

## V.    The Trustee Has No Avoidance Powers Outside The Statute Of Limitations.

28.    Pulver objects to any attempts by the Trustee to "claw back" any amounts distributed to it over the life of the Pulver Account with BLMIS, including outside the relevant statutory limitations periods.

29.    As described in IV. above, Section 546(e) of the Bankruptcy Code limits the Trustee's "claw back" claims to claims of intentional fraud by the transferor under Section 548(a)(1)(A). Pursuant to §548(a)(1)(A), the Trustee may not avoid any transfer or distribution as fraudulent beyond a two-year statute of limitations. The Trustee has the burden of establishing that the transfer or distribution was made with actual intent to defraud, hinder or delay creditors.

30.    The Trustee will be unable to meet this burden in the case of Pulver.

Pulver is an innocent victim of the BLMIS fraud.  Pulver is not alone in that it was a BLMIS customer with no knowledge of or participation in Bernard Madoff's fraud.  Indeed, the Trustee has not attempted to present facts or arguments to the contrary.  The Trustee therefore cannot recover any transfer or distribution as fraudulent, let alone a transfer outside of the two-year statute of limitations.

31.  The Trustee has no power to ignore the plain language of Sections 546(e) and 548(a)(1) of the Bankruptcy Code.  The Trustee would have the Court believe that there is an unwritten Ponzi scheme exception which creates enormous powers for the Trustee to reach back to the beginning of time to avoid legitimate transactions and distributions to which Pulver (and other BLMIS customers) was entitled.

32.  There is no Ponzi scheme exception within the Bankruptcy Code's avoidance provisions.  The Bankruptcy Code provisions have language that is clear, specific and controlling.  The treatment of a SIPC claim under SIPA is distinct from the Trustee's avoidance powers under the Bankruptcy Code.  A Trustee's avoidance powers under SIPC, if any, are limited to those set forth in Chapter 5 of the Bankruptcy Code.  Thus, a Trustee may avoid fraudulent conveyances only within the limitations established by the Bankruptcy Code.  In this case, those limitations dictate that only intentionally fraudulent conveyances can be avoided, and only within a two-year period from the date of the bankruptcy filing.

33.  Pulver established what it always understood to be a legitimate investment account with BLMIS over a decade ago, and committed no fraud at any time.  For the Trustee to stretch his two-year avoidance powers to somehow envelop a lifetime of legitimate account investments constitutes an abject disregard for the law of the land.

34.  Accordingly, Pulver objects to the Trustee's attempt to avoid any transactions prior to December 11, 2006, which represents a two-year period culminating with the SIPA liquidation filing against BLMIS.

## JOINDER

35.     Pulver hereby joins in all other objections to the Trustee's Determination of Claims filed by other SIPA claimants, and incorporates those objections by reference herein, including, without limitation, the Securities and Exchange Commission's argument that the Trustee must make its determinations of claims incorporating the time value of money (i.e., interest on payments to investors).  Pulver reserves the right to address any and all of the arguments raised in such other objections at any hearing or proceeding to take place in connection with this Objection.

## RESERVATION OF RIGHTS

36.     Pulver expressly reserves the right to revise, supplement or amend this Objection, and any failure to object on a particular ground shall not be deemed a waiver of its rights to object on any additional ground(s).

## RELIEF REQUESTED

37.     For the reasons stated herein, the Pulver Account claim should be allowed in its entirety.

38.     The Trustee should immediately pay to Pulver a SIPA advance of $500,000 towards its claims against BLMIS, as it maintained a net equity balance well over $500,000 as of the Liquidation Date.

39.     Pulver seeks a determination by the Court that the Trustee may not avoid any settled transactions on its BLMIS account, which transactions are protected by the safe harbor provisions of Section 546(e) of the Bankruptcy Code.

40.     The Trustee's determination of Pulver's indebtedness to the BLMIS estate

should be denied in its entirety.  Pulver seeks a determination by the Court that the Trustee may

not avoid any transfers which occurred outside the statute of limitations period, namely outside

the period from December 11, 2006 to the Liquidation Date.

41.     Pulver requests interest at the statutory rate on its account balances as of

the Liquidation Date, in addition to pre-judgment interest.

42.     Pulver requests such other and further relief as this Court may deem just

and proper under the circumstances.

Dated:  October 29, 2010

LOWENSTEIN SANDLER PC

*/s/ David M. Banker*             _
Bruce S. Nathan
David M. Banker
1251 Avenue of the Americas
18th Floor
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Attorneys for Pulver Family*
*Foundation, Inc.*