**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jacqlyn R. Rovine
Email: jrovine@bakerlaw.com

*Attorneys for Irving H. Picard, Esq. Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*And Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

## TRUSTEE'S FOURTH INTERIM REPORT
## FOR THE PERIOD ENDING SEPTEMBER 30, 2010

# TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ........................................................................................1

II.     BACKGROUND ....................................................................................................3

III.    FINANCIAL CONDITION OF ESTATE................................................................3

IV.     ADMINISTRATION OF THE ESTATE ................................................................5

        A. MARSHALLING AND LIQUIDATING THE ESTATE ASSETS ............................ 5

        B. RETENTION OF PROFESSIONALS .......................................................... 6

        C. WIND-DOWN OF ESTATE OPERATIONS ............................................... 6

                i.      Termination and Liquidation of BLMIS-Sponsored Benefit Plans ............... 6

V.      PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA............................7

        A. NET EQUITY DISPUTE ........................................................................ 7

        B. "CUSTOMER" DEFINITION.................................................................... 8

        C. "CUSTOMER PROPERTY" DEFINITION ............................................... 10

VI.     CLAIMS ADMINISTRATION............................................................................10

        A. CLAIMS PROCESSING ....................................................................... 10

                i.      Customer Claims................................................................. 10

                ii.     General Creditor Claims ................................................... 12

                iii.    The Trustee Has Kept Customers Informed of the Status of the
                        Claims Process ..................................................................... 12

                iv.     The Hardship Program..................................................... 13

        B. OBJECTIONS TO CLAIMS DETERMINATIONS.................................... 14

        C. SETTLEMENTS OF CUSTOMER CLAIMS DISPUTES ......................... 15

VII.    INITIAL ALLOCATION OF FUNDS AND  DISTRIBUTION TO CUSTOMERS.......16

VIII.   CONTINGENCIES................................................................................................18

IX.     INVESTIGATION................................................................................................18

A. FEEDER FUND INVESTIGATION ...................................................................... 20

B. FAVORED INVESTORS INVESTIGATION ......................................................... 20

C. INTERNATIONAL INVESTIGATION ................................................................ 21

     i.   Austria & Italy ....................................................................................... 23

     ii.   BVI/Cayman Islands .............................................................................. 23

     iii.  England ................................................................................................... 24

     iv.  Gibraltar ................................................................................................. 24

     v.   Ireland .................................................................................................... 24

     vi.  Luxembourg ........................................................................................... 25

D. COLLABORATIVE INVESTIGATIONS .............................................................. 25

X.    LITIGATION ...........................................................................................................26

A. FEEDER FUND LITIGATION .............................................................................. 26

     i.   Picard v. Alpha Prime Fund Ltd., HSBC Bank PLC and HSBC  Securities Services (Luxembourg) S.A., Adv. Pro. No. 09-1364 (BRL). ...................................................................................................... 26

     ii.   Picard v. Fairfield Sentry Ltd., et al., Adv. Pro No 09-1239  (BRL). .......... 26

     iii.  Picard v. Harley International (Cayman) Ltd., Adv. Pro. No.  09-1187 (BRL). ...................................................................................................... 27

     iv.  Picard v. Herald Fund SPC, HSBC Bank PLC and HSBC  Securities Services (Luxembourg) S.A., Adv. Pro. No. 09-1359  (BRL). ................... 28

     v.   Picard v. Kingate Global Fund Ltd., Kingate Euro Fund Ltd.  and Bank of Bermuda Ltd., Adv. Pro No 09-1161 (BRL). ............................................. 28

     vi.  Picard v. J. Ezra Merkin, et al., Adv. Pro. No. 09-1182 (BRL). ................... 30

     vii.  Picard v. Primeo Fund, HSBC Bank PLC and HSBC Securities  Services (Luxembourg) S.A., Adv. Pro. No. 09-1366 (BRL). .................................... 31

     viii. Picard v. Thybo Asset Management Ltd., Thybo Global Fund  Ltd., Thybo Return Fund Ltd., Thybo Stable Fund Ltd., Adv.  Pro. No. 09-1365 (BRL). ...................................................................................................... 32

ix.   Picard v. Vizcaya Partners Ltd. and Bank Jacob Safra  (Gibraltar) Ltd.,
Adv. Pro. No 09-1154 (BRL). ................................................... 33

B.  MADOFF FAMILY LITIGATION ................................................................ 35

i.    Picard v. Peter B. Madoff, Mark D. Madoff, Andrew H.  Madoff and Shana
D. Madoff, Adv. Pro. No. 09-1503 (BRL). ................................. 35

ii.   Picard v. Ruth Madoff, Adv. Pro. No. 09-1391 (BRL). .............. 35

C.  MADOFF-RELATED ENTITIES .................................................................. 36

i.    Picard v. Madoff Technologies LLC et al., Adv. Pro. No. 10- 03483
(BRL). ....................................................................................... 36

ii.   Picard v. Madoff Family LLC et al., Adv. Pro. No. 10-03485  (BRL)......... 37

iii.  Picard v. Madoff Energy Holdings, LLC, Adv. Pro. No.  10- 03484
(BRL). ....................................................................................... 37

D.  OTHER LITIGATION ............................................................................... 37

i.    Picard v. Stanley Chais, et al., Adv. Pro No 09-1172 (BRL). .................... 37

ii.   Picard v. Cohmad Securities Corporation, et al., Adv. Pro. No.  09-1305
(BRL). ....................................................................................... 39

iii.  Picard v. Jeffry Picower, et al., Adv. Pro. No. 09-1179 (BRL). .................. 41

iv.   Picard, et al. v. Amy J. Luria, et al., Adv. Pro. No. 10-3222  (BRL) and
Picard et al. v. Robert A. Luria, et al., Adv. Pro. No.  10-3223 (BRL). ...... 42

E.  TRUSTEE'S INJUNCTIONS ....................................................................... 43

i.    Picard v. Fox, Adv. Pro. 10-3114 (BRL). ................................... 43

ii.   Picard v. Stahl, Adv. Pro. No. 10-03268 (BRL). ......................... 46

iii.  Picard v. Canavan, Adv. Pro. 10-3200 (BRL). ........................... 48

XI.   OTHER BANKRUPTCY COURT PROCEEDINGS ........................................49

A.  BLM AIR CHARTER LLC CHAPTER 11 CASE ................................... 49

B.  FEE APPLICATIONS AND RELATED APPEALS ................................ 49

C.  SUITS AGAINST TRUSTEE & RELATED APPEALS ........................... 52

i.    Rosenman Family LLC v. Picard, et al., Adv. Pro. No. 09-1000  (BRL)..... 52

ii.    Peskin, et al. v. Picard, Adv. Pro. No. 09-1272 (BRL)................................. 52

iii.    Albanese, et al. v. Picard, Adv. Pro No 09-1265 (BRL)............................. 53

D.  MOTION TO INTERVENE AND RELATED APPEALS........................................ 54

XII.    CONCLUSION.............................................................................................................55

**TO THE HONORABLE BURTON R. LIFLAND,**
**UNITED STATES BANKRUPTCY JUDGE:**

Irving H. Picard, Esq. (the "Trustee"), trustee for the substantively consolidated

liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the

Securities Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of

Bernard L. Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the

"Debtors"), respectfully submits his Fourth Interim Report (this "Report") pursuant to section

78fff-1(c) of SIPA, and in accordance with the terms of the Order on Application for an Entry of

an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying

Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief

entered on December 23, 2008 (the "Claims Procedures Order") (ECF No. 12). Pursuant to the

Claims Procedures Order, the Trustee shall file additional interim reports every six (6) months

hereafter. This Report covers the period between April 1, 2010 and September 30, 2010, or as

otherwise indicated (the "Report Period").

## I.   EXECUTIVE SUMMARY

1.      The Trustee and his counsel (including, but not limited to, Baker & Hostetler

LLP ("B&H"), various international special counsel retained by the Trustee as described in ¶ 110

of the Amended Third Interim Report and as further described herein ("International Counsel"),

Windels Marx Lane & Mittendorf, LLP ("Windels Marx"), special counsel to the Trustee, and

together with International Counsel and B&H, collectively referred to herein as "Counsel"), have

made significant headway in the investigation of Madoff's fraud (the "Ponzi Scheme"). To date,

---

[1] The Securities Investor Protection Act ("SIPA") is found at 15 U.S.C. §§ 78aaa *et seq.*  For convenience, subsequent references to SIPA will omit "15 U.S.C."

the Trustee has filed nineteen avoidance actions seeking to recover more than $15.5 billion in funds from various feeder funds, Madoff friends and family members, and related parties.  The Trustee anticipates filing extensive additional litigation based on investigations conducted by the Trustee's Counsel and professionals prior to the expiration of the statutory period during which the Trustee can commence avoidance actions.  Because of efforts made by the Trustee and his Counsel, approximately $1.5 billion has been recovered for the benefit of customers as of September 30, 2010.

2.       During the Report Period, the Trustee and B&H also made substantial progress in processing and determining the claims of customers of BLMIS.  As of September 30, 2010, the Trustee has determined 13,403 claims, allowed 2,232 customer claims which total amount of over $5.6 billion, and committed to pay approximately $728 million in SIPC advances, leaving approximately $4.9 billion in over-the-limits claims.[2]

3.       Given the task of liquidating BLMIS and, in doing so, cooperating with the federal and state authorities investigating the criminal, civil, and regulatory matters, the Trustee and his Counsel have dealt with issues spanning a broad spectrum of legal and administrative specialties and disciplines.  The Trustee's ability to call on the resources of B&H in such areas as corporate, real estate, bankruptcy, securities, employment, tax, banking, and litigation has been of material assistance in pursuing the Trustee's statutorily-mandated investigation, establishing protocols, and directing the efforts of the Trustee's financial professionals.

---

[2] As of October 22, 2010, the Trustee has determined 14,030 claims, allowed 2,280 customer claims in the total amount of over $5.6 billion, and committed to pay approximately $738 million in SIPC advances, leaving approximately $4.9 billion in over-the-limits claims.

4.          During the Report Period, the Trustee, his Counsel, and professional staff have met extraordinary challenges in a manner beneficial to the customers, creditors, and other investors of BLMIS.  This Report is meant to provide an overview of all the efforts engaged in by the Trustee and his team of professionals and summarize the results achieved, as well as the challenges faced by the Trustee during the Report Period.

## II.    BACKGROUND

5.          The Trustee's prior interim reports, each of which are fully incorporated herein,[3] have detailed the circumstances surrounding the filing of this case and events that took place during earlier phases of this proceeding.  The customer claims process is also detailed in prior interim reports.  See sections VII of the First, Second, and Amended Third Interim Reports.

## III.    FINANCIAL CONDITION OF ESTATE

6.          A summary of the financial condition of the estate as of September 30, 2010 is provided in Exhibit A attached hereto.   To date, the Trustee has incurred significant administrative expenses in maintaining the BLMIS office, including rent payments (although this has decreased substantially since the sale of the market making operation), monthly payment of Trustee fees, legal fees, and consultant fees (all approved by SIPC), and the digitizing of records and costs associated with determining customer claims.  All administrative costs (including payments to the Trustee, all counsel, and consultants) to date associated with the liquidation proceeding have been paid from SIPC administrative advances.  Payment of these costs has no impact on recoveries that the Trustee has obtained and will obtain because the costs are

---

[3] Prior reports covered the periods from December 11, 2008 to June 30, 2009 (the "First Interim Report") (ECF No. 314); July 1, 2009 to October 31, 2009 (the "Second Interim Report") (ECF No. 1011); and November 1, 2009 to March 31, 2010 (the "Amended Third Interim Report") (ECF No. 2207).

chargeable to the general estate. Recoveries will be fully allocated to the fund of Customer Property.[4]

7.        As detailed in <u>Exhibit A</u>, as of September 30, 2010, the Trustee has requested and SIPC has advanced over $968.9 million, of which $248.8 million was used for administrative expenses and approximately $720.2 million was used to pay allowed customer claims up to the maximum SIPA limit ($500,000 per account).[5]

8.        The Trustee maintains a regular operating account with Citibank, which is primarily funded by SIPC advances, and from which he pays administrative expenses and customer claims. As of September 30, 2010, the funds in this account totaled approximately $54.2 million.

9.        The Trustee maintains an Insured Money Market account with Citibank. As of September 30, 2010, the total value of this account was over $60 million.

10.        The Trustee maintains a preferred custody interest-bearing account with Citibank. As of September 30, 2010, the total balance of the preferred custody account was over $1 billion, which consisted of $931 million in short-term investments in United States Treasury Bills and mutual funds and $101 million in United States Treasury Notes.

---

[4] SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

[5] As of the end of the Report Period, the Trustee had determined and allowed 2,232 claims, which amounted to a SIPC commitment of approximately $728 million. *See* ¶¶ 2, 31. The Trustee must receive an executed assignment and release form from each customer before obtaining an advance of funds from SIPC. Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims that have been determined is less than the amount of SIPC advances committed by the Trustee.

11.      The Trustee maintains a brokerage account with Morgan Joseph & Co., Inc., clearing through J.P. Morgan Clearing Corp.  As of September 30, 2010, the total value of the Trustee's Morgan Joseph account was approximately $306.5 million.

## IV.    ADMINISTRATION OF THE ESTATE

### A.    MARSHALLING AND LIQUIDATING THE ESTATE ASSETS

12.      The Trustee and his Counsel have worked diligently to investigate, examine, and evaluate the Debtor's activities, assets, rights, liabilities, customers, and other creditors. Thus far, the Trustee has been successful in recovering a significant amount of assets for the benefit of customers, totaling approximately $1.5 billion.  These asset recoveries encompass: the sale of the Debtor's market making operations, including quarterly payments under the Third Amended and Restated Asset Purchase Agreement with Surge Trading Inc. (ECF No. 2204); the settlement of BLMIS' trades and open positions; cash recoveries from banks and brokerage accounts that held BLMIS' funds; class action settlement recoveries; the sale of sports tickets; insurance refunds; refunds of political contributions; tax recoveries; the sale of BLMIS loan participations; the sale of BLMIS DTCC shares; pre-litigation settlements with various funds and entities for the return of Customer Property, described below; and various other miscellaneous recoveries.  For a more detailed discussion of these recoveries, see Section V.B. of the First Interim Report, Section IV of the Second Interim Report, and Section IV of the Amended Third Interim Report.

13.      The Trustee has identified claims in at least eight class action suits that BLMIS made before the Trustee's appointment arising out its proprietary and market making activities.  The Trustee received distributions from seven class action settlements totaling over $91 thousand.  No distribution will be forthcoming from the eighth class action settlement.  In

addition, the Trustee has identified claims that BLMIS may have in seventy other class action suits also arising out of its proprietary and market making activities. The Trustee has filed proofs of claim in fifty of these cases and, subject to the completion of a review of relevant records, intends to file claims in the remaining twenty cases. As of September 30, 2010, the Trustee has recovered approximately $91 thousand from four of these class action settlements. The Trustee continues to review this area.

**B.**          **RETENTION OF PROFESSIONALS**

14.          In addition to the professionals already retained by the Trustee, during this Report Period and pursuant to orders of this Court the Trustee retained Mishcon de Reya to represent him in England and the British Commonwealth, and Werder Vigano to represent him in Switzerland.

**C.**          **WIND-DOWN OF ESTATE OPERATIONS**

          **i.**          **Termination and Liquidation of BLMIS-Sponsored Benefit Plans**

15.          On November 24, 2009, the Court approved the Trustee's motion to terminate the BLMIS 401(k) plan as of December 15, 2009. The Trustee then entered into an agreement with Millennium Trust Company to serve as an individual retirement account ("IRA") custodian for any account balances remaining after December 15, 2009. The Trustee filed a final annual report with the United States Department of Labor during the Report Period. The Trustee anticipates filing an application terminating the plan during the next report period.

## V.    PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA

### A.    NET EQUITY DISPUTE

16.    For purposes of determining each customer's "net equity," as that term is defined under SIPA, the Trustee has credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn by him from his BLMIS customer account (the "cash in, cash out method" or the "Trustee's Net Investment Method"). Some claimants have argued that the Trustee is required to allow customer claims in the amounts shown on the November 30, 2008 BLMIS customer statements (the "Net Equity Dispute").[6]

17.    The Net Equity Dispute is an issue of comprehensive application in the SIPA liquidation. On September 16, 2009, the Bankruptcy Court issued an order scheduling adjudication of the "net equity" issue (the "Scheduling Order") that set forth a briefing schedule and hearing date permitting customers and other interested parties to participate in the adjudication of this issue (ECF No. 437). In accordance with the Scheduling Order and the Claims Procedures Order, the Trustee filed a motion with the Court on October 16, 2010 (the "Net Equity Motion") (ECF No. 525). The Trustee argued that the Trustee's Net Investment Method is the only interpretation of net equity consistent with SIPA, bankruptcy law, principles of equity, and common sense.

18.    Over thirty briefs and twenty *pro se* submissions were filed in response to the Trustee's Net Equity Motion. Two customers and SIPC filed papers in support of the Trustee's Net Equity Motion, and the SEC filed a brief substantially in support of the Trustee's Net Equity

---

[6] It should be noted that these claimants are greatly outnumbered by those claimants who are seeking the return of principal, whether they invested directly with BLMIS or indirectly with BLMIS through feeder funds and the like.

Motion.  Briefing was concluded on January 15, 2010 and a hearing was held on February 2, 2010.

19.      On March 1, 2010, the Court issued a decision upholding the Trustee's Net Investment Method as the only interpretation consistent with the plain meaning and legislative history of the statute, controlling Second Circuit precedent, and considerations of equity and practicality (ECF No. 2020), reported at *SIPC v. BLMIS*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010). On March 8, 2010, the Court issued its order with respect to the Trustee's Net Equity Motion.

20.      On March 8, 2010, the Court certified an immediate appeal to the United States Court of Appeals for the Second Circuit of its order and decision under 28 U.S.C. § 158(d)(2)(A).  Various notices of appeal and petitions for permission were filed with the Second Circuit and, on June 16, 2010, the Second Circuit accepted jurisdiction of the direct appeal.

21.      Thirteen briefs were filed by appellants who sought to reverse the Bankruptcy Court's decision and order relating to "net equity," and one amicus brief was filed in support of appellants.  On September 20, 2010, the Trustee and SIPC filed their opposition briefs.  Several days later, the SEC filed its brief in support of the Trustee's position with respect to "net equity." Six reply briefs were filed by appellants on October 12, 2010, and one amicus reply brief was filed in further support of appellants.  The Second Circuit has yet to set a date for oral argument.

B.          **"CUSTOMER" DEFINITION**

22.      The Trustee has taken the position for purposes of determining customer claims that only those claimants who had an account at BLMIS constitute "customers" of BLMIS, as defined in section 78*lll*(2) of SIPA.  Where it appears that a claimant did not have an

account in his/her/its name at BLMIS ("Claimant Without An Account"), he/she/it is not a customer of BLMIS under SIPA and the Trustee has denied his/her/its claims for securities and/or a credit balance.

23. On or about December 8, 2009, the Trustee issued approximately 8,500 claims determinations in which the Trustee denied the claims of Claimants Without An Account who invested with intermediary entities, which in turn may have directly or indirectly invested with BLMIS. Approximately 722 objections relating to 1,895 claims determinations were filed in response. In those objections, Claimants Without An Account have asserted that they are customers of BLMIS and, as such, are entitled to receive up to $500,000.00 of SIPC protection.

24. On April 13, 2010, the Court entered an order scheduling briefing and a hearing on the issue of Claimants Without An Account and the "customer" definition under SIPA (ECF No. 2205).

25. On June 11, 2010, the Trustee filed a *Motion to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names, Namely, Investors in Feeder Funds* ("Customer Motion") (ECF No. 2416), an accompanying memorandum of law (ECF No. 2414), and supporting affidavits (ECF Nos. 2412, 2413). The Customer Motion sought to affirm the Trustee's determinations denying claims of Claimants Without An Account that had invested in one of sixteen feeder funds that held accounts in the names of the feeder funds at BLMIS.

26. Approximately 180 oppositions were filed to the Customer Motion. The SEC and SIPC filed briefs in support of the Trustee's Customer Motion (ECF Nos. 2414, 2849). On September 20, 2010, the Trustee and SIPC filed reply memorandums (ECF No. 2995 and ECF

No. 2993), and a hearing on the Customer Motion was held before this Court on October 19, 2010. The Court reserved decision.

C.          **"CUSTOMER PROPERTY" DEFINITION**

27.          After hearing oral argument on April 15, 2010 on motions to dismiss filed by the defendants in the *Picard v. Merkin* adversary proceeding described more fully below in ¶¶ 98-103, the Court requested additional briefing on the Trustee's claims for turnover and accounting pursuant to section 542 of the Bankruptcy Code. Specifically, the Court asked the parties to address whether SIPA's interplay with the Bankruptcy Code affected the analysis of what constitutes property of the estate for the purposes of turnover.

28.          The parties submitted supplemental briefs on May 7, 2010. The Trustee asserted that section 78fff-2(c)(3) of SIPA, which authorizes the Trustee to recover Customer Property wherever it lies and restore all cash, securities, and proceeds that would have been Customer Property but for the wrongful transfer, gives a SIPA trustee powers that are broader than the powers of a bankruptcy trustee. Section 78fff-2(c)(3) of SIPA creates a legal fiction that transferred assets are treated as estate property and recoverable by the Trustee if he can demonstrate that the property in question was Customer Property as defined by SIPA. The Court's decision is pending.

VI.     **CLAIMS ADMINISTRATION**

A.          **CLAIMS PROCESSING**

i.          **Customer Claims**

29.          The Trustee sought Court approval for and implemented a customer claims process in accordance with SIPA. In particular, the Court directed the Trustee to publish notice

of the commencement of the liquidation proceeding and specified the procedures for filing, determining, and adjudicating customer claims pursuant to the Claims Procedure Order. For a detailed overview of that process and the Trustee's reconciliation process, see sections VII of the First, Second, and Amended Third Interim Reports.

30.    The books and records of BLMIS reflect over 8,000 non-administrative customer accounts. As of December 11, 2008, approximately 4,900 accounts were active, meaning either a monthly customer statement was generated for the account for the period ending November 30, 2008 or the account was opened in December 2008. As of September 30, 2010, the Trustee has received 16,374 customer claims.

31.    Notwithstanding the monumental and unprecedented task faced by the Trustee, the Trustee has made substantial progress in reviewing and determining claims. As of September 30, 2010, the Trustee had determined 13,403 customer claims. Out of those determined, the Trustee allowed 2,232 claims and committed to pay approximately $728 million in cash advances from SIPC. This is the largest commitment of SIPC funds in any one SIPA liquidation proceeding and greatly exceeds the total aggregate payments made in all SIPA liquidations to date. As of September 30, 2010, the Trustee has allowed over $5.6 billion in customer claims. The total over-the-limits claim amount – the amount by which allowed customer claims exceed the committed SIPC advances – is $4.9 billion.

32.    As of September 30, 2010, the Trustee has also determined and denied 11,171 claims for various reasons, including that (i) the claimants withdrew more money from their accounts than was deposited, applying the "cash in, cash out" net equity investment method to all account transactions over the life of the account or (ii) the claimants did not have accounts

directly with BLMIS and/or were indirect investors through feeder funds or other financial institutions.

### ii.    General Creditor Claims

33.    As of September 30, 2010, the Trustee has received 427 timely and 16 untimely filed secured priority and unsecured non-priority general claims totaling approximately $1.7 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 443 claims and $1.7 billion, the Trustee has received 100 general creditor claims and fifty broker-dealer claims totaling approximately $266 million.

34.    The Trustee does not currently believe there will be sufficient funds in the Debtor's estate from which to make distributions to priority/non-priority general creditors and/or broker dealers.  Accordingly, the Trustee believes that "[no] purpose would be served, [to] examine [such] proofs of claim and to object to the allowance of any [such] claim that is improper."  *See* Bankruptcy Code § 704(5).  Further, the Trustee does not expect that there will be sufficient funds in the general estate for SIPC to recoup its advances for administrative expenses.

### iii.    The Trustee Has Kept Customers Informed of the Status of the Claims Process

35.    Throughout the liquidation proceeding, the Trustee has kept customers, interested parties, and the public informed of his efforts by maintaining the Trustee Website, www.madofftrustee.com, a toll-free customer hotline, conducting a Section 341(a) meeting of creditors on February 20, 2009, holding various press conferences regarding the status of

customer claims, and responding to the multitude of phone calls, e-mails, and letters received on a daily basis, both from claimants, their representatives, and the press.

36.     The Trustee Website allows claimants to e-mail their questions directly to the Trustee's professionals, who follow up with a return e-mail or telephone call to the claimants. As of September 30, 2010, the Trustee and his professionals have received and responded to more than 4,528 e-mails via the Trustee Website from BLMIS customers and their representatives.

37.     The toll-free customer hotline provides status updates on claims, addresses claimants' questions or concerns, and offers confirmation to claimants that their claims were received. As of September 30, 2010, the Trustee, B&H, and the trustee's professionals have fielded more than 6,751 hotline calls from claimants and their representatives.

38.     In sum, the Trustee and his team have endeavored to respond in a timely manner to every customer inquiry and ensure that the customers are as informed as possible about various aspects of the BLMIS proceeding.

### iv.     The Hardship Program

39.     The Trustee has established a Hardship Program to accelerate the determination of a claim and receipt of SIPC protection up to $500,000 for individual account holders of BLMIS who are suffering hardship. An individual can qualify for the Hardship Program if he or she has filed a claim and is unable to pay for necessary living or medical expenses, over 65 years old and forced to reenter the work force after retirement, declaring personal bankruptcy, unable to pay for the care of dependents, or otherwise suffers from extreme financial hardship beyond the identified circumstances.

40.        As of September 30, 2010, the Trustee has received 317 Hardship Program applications and approved 196 applications. The Trustee has received SIPC advances and issued 112 checks to qualifying individuals. The remaining applications were ineligible because the claimants (i) withdrew more money from their accounts than was deposited, applying the "cash in, cash out" net equity investment method to all account transactions over the life of the account, (ii) were third party investors who submitted the applications, or (iii) could not be tied to customer accounts.

41.        The Trustee has worked in good faith with recipients of the Hardship Program to reconcile any disputed portions of their claims.

42.        Based in part on the benefit of the information gained from the Hardship Program, there are a number of potential avoidance actions that will not be commenced by the Trustee.

**B.**        **OBJECTIONS TO CLAIMS DETERMINATIONS**

43.        As required by the Claims Procedures Order and described in each Determination Letter sent by the Trustee, claimants of BLMIS have thirty days from the mailing of the Determination Letter to object to the Trustee's determination of their claim. Notice of and reasons for such objection must be provided to the Trustee and to the Court. As of September 30, 2010, 1,776 objections have been filed with the Court and the Trustee on behalf of 2,934 claimants.

44.        The following objections have been asserted: (i) Congress intended a broad interpretation of the term "customer" and the statute does not limit the definition to those who have a direct account with the Debtor; (ii) the Trustee should determine claims based upon the

14

BLMIS November 30, 2008 statement as opposed to the "cash in, cash out" method; (iii) claimants should receive interest on deposited amounts; (iv) the Trustee must commence an adversary proceeding against each claimant in order to avoid paying gains on claimants' investments; (v) claimants are entitled to immediate payment of the $500,000 SIPC advance; (vi) each named account holder should be entitled to the SIPC advance as a result of their joint account status; and (vii) there is no legal basis for requiring the execution of a Partial Assignment and Release prior to the payment of a SIPC advance.

45.    The Trustee has departed from past practice in SIPA proceedings and committed to pay the undisputed portion of any disputed or objected-to claim, even if there is a dispute over the full amount of the claim.  The purpose of this procedure is to expedite payment of SIPC protection to claimants while preserving their rights to dispute the total amount of their claim.

## C.    SETTLEMENTS OF CUSTOMER CLAIMS DISPUTES

46.    The Trustee has continued settlement negotiations with customers who withdrew funds from their BLMIS Accounts within ninety days of the Filing Date.  Such withdrawals are preferential transfers recoverable by the Trustee under sections 547(b) and 550(a) of the Bankruptcy Code, which are applicable in this proceeding pursuant to sections 78fff(b) and 78fff-2(c)(3) of SIPA.  To settle potential preference actions against these customers, the Trustee has proposed that the customers agree to authorize the Trustee to deduct the preferential amount from the initial payment advanced by SIPC pursuant to section 78fff-3(a)(1) of SIPA.  The allowed claim is thus calculated based on the amount of money the customer deposited with BLMIS for the purchase of securities, less subsequent withdrawals, plus

the preferential amount. The customer will be entitled to receive an additional distribution from the fund of Customer Property based on the total amount of the allowed claim.

47.    As of September 30, 2010, the Trustee reached agreements with approximately 300 customers who received preferential transfers totaling more than $43.9 million, which has been added to the fund of Customer Property and is available for future distribution. These settlements allow the Trustee to avoid the costly litigation that would be necessary to obtain and collect judgments from each of these customers.

48.    Moreover, as reported in the Trustee's Amended Third Interim Report, the Trustee entered into settlement agreements with (i) Optimal Strategic U.S. Equity Ltd. and Optimal Arbitrage Ltd. ("Optimal") and (ii) with Jeanne Levy-Church and Francis N. Levy (collectively, the "Levys") that were approved by the Bankruptcy Court on June 16, 2009 and February 18, 2010, respectively. The settlements with Optimal and the Levys returned more than $455 million to the estate for future distribution.

49.    During the Report Period, the Trustee has continued to engage in settlement discussions with a number of individuals and entities that has yielded over $3.3 million to the estate for future distribution, and expects to have further, substantial developments to disclose in the Trustee's next interim report.[7]

## VII.    INITIAL ALLOCATION OF FUNDS AND DISTRIBUTION TO CUSTOMERS

50.    To assure a *pro rata* distribution to all claimants that are entitled to one and that a distribution to one claimant will not prejudice another, the Trustee must proceed with

---

[7] Since the conclusion of the Report Period, the Trustee has reached additional settlements, bringing the total amount to $6,057,477.76.

distributions on allowed customer claims cautiously. Distributions will likely proceed in stages depending on the value of allowed claims, assets recovered, and the likelihood of success on certain contingencies. Currently, the Trustee is distributing funds provided by SIPC as advances against allowed claims from the fund of Customer Property.

51.     At the appropriate juncture, the Trustee will file a motion with the Bankruptcy Court seeking the Court's approval of (i) the Trustee's allocation of recovered property to the Customer Fund and (ii) the Trustee's proposed interim *pro rata* distribution of the Customer Fund to unsatisfied customers.

52.     In view of the fact that "customer property is not sufficient to pay in full the claims [of customers entitled to SIPA protection and SIPC, as subrogee]," in reliance on section 78fff-2(c)(3) of SIPA and other statutory authority and common law, the Trustee commenced the adversary proceedings described in section X, *infra*, as well as engaged in various investigations described in section IX, *infra*, that are aimed at gathering assets for liquidation and eventual distribution. The Trustee plans to commence, in the near future, additional avoidance actions to recover significant sums to further supplement the fund of customer property for distribution to customers with allowed claims.

53.     Any other recoveries from the defendants referred to in the below-referenced adversary proceedings, as well as additional recoveries from any other sources, will, with the Court's approval, be allocated to the Customer Fund and subject to a supplemental *pro rata* distribution to the remaining over-the-limits customer-claimants and SIPC, as subrogee for its cash advances to the Trustee to satisfy the allowed customer claims.

### VIII.    CONTINGENCIES

54.        While much progress has been made in analyzing customer accounts and determining customer claims, substantial contingencies remain for which the Trustee must reserve.  These contingencies may impact the timing and extent of distributions for allowed customer claims, as they amount to billions of dollars, are already subject to litigation, and may take several years to resolve.

55.        Chief among the contingencies is the Net Equity Dispute, which is currently on appeal before the Second Circuit and discussed more fully, *supra*, in section V.A.  As between the Trustee and those claimants disputing "net equity," there is a difference of approximately $45 billion for which the Trustee must reserve.

56.        To the extent that the Net Equity Dispute is resolved by a final non-appealable order, the Trustee must also reserve for disputed claims, as over 1,776 objections have been filed to date, with a substantial amount of money in dispute.  Where the resolution of an objection turns on factual questions, the Trustee's staff is analyzing the calculation and reconciliation of each claim.

57.        The Trustee is endeavoring to reduce these contingencies in a quick and efficient manner.

### IX.    INVESTIGATION

58.        As required by SIPA, the Trustee is obligated to, among other things, (i) investigate the acts, conduct, property, liabilities, and financial condition of the debtor, the operation of its business, and any other matter, to the extent relevant to the liquidation proceeding, and report thereon to the court and (ii) report to the court any facts ascertained by the

trustee with respect to fraud, misconduct, mismanagement, and irregularities, and to any causes of action available to the estate. *See* Section 78fff(1)(d) of SIPA.

59.     Pursuant to these obligations, the Trustee and his professionals have extensively investigated the Debtor's financial affairs both within the United States and abroad. The Trustee has issued more than 1,110 subpoenas pursuant to Bankruptcy Rule 2004 seeking documents from individuals, funds, and banks. Additionally, the Trustee has sent hundreds of letters to these and similar entities, informing them that they may be in possession of BLMIS Customer Property and demanding its return. Finally, the Trustee has conducted hundreds of interviews and depositions pursuant to Bankruptcy Rule 2004.

60.     As a result of the Trustee's investigation, the Trustee has filed nineteen avoidance actions against individuals and entities who withdrew funds from their BLMIS accounts during the relevant time periods (as further described in section X, *infra*). Collectively, these nineteen actions seek to recover more than $15.5 billion in principal and fictitious profits.

61.     Since the Filing Date, the Trustee has been monitoring legal proceedings filed by various third parties who allege that they suffered losses and incurred damages as a consequence of Madoff's fraud and their direct or indirect investments with BLMIS ("Third Party Actions"). At present, there at least 195 Third Party Actions filed in state and federal courts across the country. The plaintiffs in the Third Party Actions generally consist of: (i) investors whose funds were invested with BLMIS indirectly through feeder funds and other investment vehicles; (ii) investors who were direct customers of BLMIS who invested with BLMIS through Madoff, Madoff family members, and other BLMIS favored investors; and (iii) state governmental bodies seeking to redress for violations of securities and other laws. The

Trustee has moved to enjoin certain Third Party Actions because those actions interfere with the Trustee's pursuit of Customer Property.  *See* section X.F., *infra*.

62.       The Trustee, through B&H and International Counsel, is monitoring all international third-party actions that may be related to Madoff, BLMIS, and feeder funds that had connections to BLMIS.

A.       **FEEDER FUND INVESTIGATION**

63.       During the Report Period, the Trustee has continued his investigation of the feeder funds that had BLMIS accounts through which they received preferences and fraudulent transfers.  To date, the Trustee has sent demand letters seeking the return of those monies and issued Rule 2004 subpoenas for documents and testimony.

64.       To date, the Trustee has commenced nine adversary proceedings against feeder funds and related defendants, as more fully discussed, *infra*, in section X.A.  As the statute of limitations approaches in December 2010, the Trustee is preparing complaints against additional feeder funds.

B.       **FAVORED INVESTORS INVESTIGATION**

65.       The Trustee and his professionals have continued their investigatory efforts into the favored investors of BLMIS and Madoff to ascertain whether they were the recipients of BLMIS Customer Property or corporate assets.

66.       The cumulative effect of the investigatory efforts has uncovered a number of inter-relationships among many of the favored investors.  In addition, the Trustee's professionals have also been able to detect a series of patterns of financial dealings and/or transactions

between BLMIS and at least some of Madoff's favored investors.  This has enabled the Trustee's professionals to identify additional targets for investigation, locate additional suspect transactions, and, in some instances, identify potential motives underlying particular suspect transactions.

67.    Upon the completion of this investigation, the Trustee intends to seek to recover through litigation any Customer Property or corporate assets that were improperly transferred to favored investors.

## C.    INTERNATIONAL INVESTIGATION

68.    The Trustee's international investigation and recovery of BLMIS estate assets involves, among other things: (i) identifying the location and movement of estate assets abroad and retaining international counsel where necessary; (ii) becoming involved where appropriate, whether by appearance in a foreign court or otherwise, to prevent the dissipation of funds properly belonging to the estate; and (iii) bringing actions before U.S. and foreign courts and government agencies to recover customer property for the benefit of the customers and creditors of the BLMIS estate.   These investigations, which are assisted by voluntary requests for information and the use of subpoena power, both in the U.S. and abroad, have focused primarily on international feeder funds, banks, related financial services entities, and certain individuals.

69.    The Trustee continues to investigate and seek the recovery of assets for the BLMIS estate in no fewer than a dozen jurisdictions including, but not limited to, Austria, the Bahamas, Bermuda, the British Virgin Islands ("BVI"), Canada, the Cayman Islands, England, France, Gibraltar, Ireland, Italy, Luxembourg, Panama, Spain, and Switzerland.

70.        The Trustee has retained the following International Counsel to assist him in investigations and represent him and the BLMIS estate in any foreign proceedings that have arisen or may arise in connection with BLMIS: (i) Mishcon de Reya – England and the British Commonwealth; (ii) Higgs Johnson Truman Bodden – Cayman Islands; (iii) Williams Barristers & Attorneys – Bermuda; (iv) Attias & Levy – Gibraltar; (v) E.F. Collins – Ireland; (vi) Schiltz & Schiltz – Luxembourg; (vii) SCA Creque – BVI; (viii) Kugler Kandestin – Quebec, Canada; and (ix) Werder Vigano – Switzerland.  The Trustee will continue to seek court approval to retain professionals to investigate and represent him wherever estate assets may be found around the globe.

71.        The Trustee's international investigation has to date revealed a complex web of tangled investment structures that fed money into the Ponzi Scheme, involving several billion dollars and myriad actors.  In connection with that investigation, the Trustee, through B&H and International Counsel, are monitoring and/or participating in over 271 pending and eighty-seven potential international third-party proceedings involving Madoff and/or BLMIS.  Furthermore, the Trustee has served more than eighty subpoenas against more than sixty-nine entities in twenty jurisdictions.  The investigation is made even more challenging by the broad array of anti-discovery laws, bank secrecy statutes, and other foreign legislation designed to limit discovery by U.S. entities.  However, the Trustee is working closely with International Counsel to use local laws to obtain the necessary discovery.

72.        To date, the Trustee has received significant documentation in response to the many subpoenas and other requests for information that have been filed and is actively pursuing legal remedies against those persons and/or entities that have refused to timely respond to the Trustee's requests for information.  Where the Trustee has been able to discover the location of

Customer Property successfully, the Trustee is taking steps to freeze or otherwise secure such assets.

### i.    Austria & Italy

73.    The Trustee has actively investigated certain banks, institutions, and individuals located in these jurisdictions and issued subpoenas against 100 individuals and entities related to the same.

### ii.    BVI/Cayman Islands

74.    The Trustee has discovered and is actively investigating the involvement of no fewer than twenty BVI-based feeder funds that funneled money into the Ponzi scheme. The Trustee has served at least sixteen subpoenas against BVI-based funds.

75.    In particular, the Trustee has investigated and filed complaints in the Bankruptcy Court against BVI-based Kingate Global Fund Ltd., Kingate Euro Fund Ltd., the Bank of Bermuda, Thybo Asset Management Ltd., Thybo Global Fund Ltd., Thybo Return Fund Ltd., and Thybo Stable Fund Ltd. The Trustee has also filed for leave to sue the two Kingate funds in England. *See* section X.A.v., *infra*.

76.    The Trustee has investigated and filed complaints in the Bankruptcy Court against Cayman Islands-based Harley International (Cayman) Ltd., Herald Fund SPC, and Primeo Fund. The Trustee was granted leave to file a complaint in the Cayman Islands against Harley International (Cayman) Ltd. *See* section X.A.iii., *infra*.

77.    The Trustee's investigation is ongoing and may result in further litigation against BVI-based funds.

### iii.    England

78.    The Trustee, who was granted recognition as a foreign representative for the purpose of gathering evidence, has continued to investigate Madoff Securities International Ltd. ("MSIL), a London-based entity, and work with MSIL's joint liquidators ("MSIL Liquidators"). The Trustee has filed one disclosure order application in England to further his investigation and is preparing to file additional disclosure orders. The Trustee has also conducted interviews of all the directors that have served at MSIL since its inception, as well as other former employees. In addition, the Trustee has analyzed the financial records of MSIL. In coordination with the MSIL Liquidators, the Trustee is determining the proper course of action with respect to claims against MSIL and related parties.

### iv.    Gibraltar

79.    After extensive investigation, the Trustee has brought both domestic and Gibraltar-based actions against Vizcaya Partners Ltd. ("Vizcaya"), Banque Jacob Safra (Gibraltar) Ltd. ("Bank Safra"), Asphalia Fund Ltd. ("Asphalia"), Zeus Partners Ltd. ("Zeus") and Siam Capital Management ("Siam"). *See* section X.A.ix., *infra*.

### v.    Ireland

80.    There are at least two feeder funds in Ireland that were involved with BLMIS, which collectively received more than $380 million in preference payments. The Trustee has continued to investigate these funds and related entities and issued subpoenas in connection with the investigation.

### vi.    Luxembourg

81.     The Trustee has continued to investigate two Luxembourg-based feeder funds involved BLMIS.   One of these funds, Luxalpha SICAV, is currently in liquidation under Luxembourg law and the Trustee is in discussions with Luxalpha SICAV's liquidators concerning the disposition of its assets and access to information.

82.     In addition, an action was brought in Luxembourg by Luxalpha SICAV's liquidators against Access Group, UBS and the directors of Luxalpha, a BLMIS feeder fund based in Luxembourg (the "Luxembourg Action").   On June 15, 2010, the Trustee was served with a Third Party Notice to Appear in the Luxembourg Action by the Access Group defendants. The Third Party Notice seeks to hold the Trustee responsible for any liability imposed on the Access Group defendants on the theory that the Trustee is responsible for the obligations of BLMIS, which itself is ultimately responsible for the damage to Luxalpha.   The Trustee is working with the Trustee's counsel in Luxembourg to formulate a strategy for responding to or otherwise dealing with the Luxembourg Action.

### D.        COLLABORATIVE INVESTIGATIONS

83.     The Trustee has provided information to and coordinated efforts with the Securities and Exchange Commission ("SEC"), Federal Bureau of Investigation ("FBI"), United States Attorney's Office for the Southern District of New York ("USAO"), the Serious Fraud Office and the Financial Services Authority in the United Kingdom, and other regulators on an ongoing basis.

# X.   LITIGATION

## A.   FEEDER FUND LITIGATION

### i.   Picard v. Alpha Prime Fund Ltd., HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A., Adv. Pro. No. 09-1364 (BRL).

84.     On July 15, 2009, the Trustee filed a complaint against Alpha Prime Fund Ltd. ("Alpha Prime") seeking the return of $86 million under SIPA §§ 78*lll*(4) and 78fff-2(c)(3), and Bankruptcy Code sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a), and 551, the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq.* (McKinney 2001)), and other applicable laws for turnover, accounting, preferences, fraudulent conveyances, and objection to claim in connection with certain transfers of property by BLMIS to or for the benefit of Alpha Prime.   The complaint also named HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A. (collectively, "HSBC") as defendants.   HSBC answered the complaint on August 28, 2009.

85.     Alpha Prime failed to answer the Trustee's complaint or otherwise respond and the Clerk of the Bankruptcy Court entered default on September 1, 2009.   On August 31, 2010, Alpha Prime moved the Court to vacate the entry of default.   The Court vacated the entry of default on September 27, 2010 and granted the Trustee leave to file an amended complaint.

### ii.   Picard v. Fairfield Sentry Ltd., et al., Adv. Pro No 09-1239 (BRL).

86.     On May 18, 2009, the Trustee filed a complaint against Fairfield Sentry Ltd., Greenwich Sentry LP, and Greenwich Sentry Partners LP (collectively, "defendants") seeking the return of approximately $3.5 billion pursuant to SIPA §§ 78fff(b) and 78fff(c)(3), sections 105(a), 542, 544, 547, 548(a), and 551 of the Bankruptcy Code and the New York Fraudulent

Conveyance Act for turnover of customer property, accounting, avoidance of preferences, fraudulent conveyances, and transfers of property by BLMIS to defendants.  In addition, the complaint sought denial of the individual claims submitted by the defendants in the BLMIS proceedings.

87.       On July 20, 2010, the Trustee filed an amended complaint which added as defendants numerous business entities and individuals active in the management of Fairfield Greenwich, as well as various hedge funds under the control of the Fairfield Greenwich Group. The amended complaint seeks additional damages under New York law.  The answer date for the amended complaint is January 25, 2011 and a pre-trial conference is scheduled to be held on February 8, 2011.

88.       The Trustee continues to monitor the Chapter 15 proceeding which has been filed in this Court by Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda.

### iii.       **Picard v. Harley International (Cayman) Ltd.,** Adv. Pro. No. 09-1187 (BRL).

89.       On May 12, 2009, the Trustee filed a complaint against Harley International (Cayman) Ltd. ("Harley") seeking the return of approximately $1.1 billion pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a), 550(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws for turnover, accounting, preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of Harley.  Harley failed to answer the Trustee's complaint or otherwise respond and the Clerk of the Bankruptcy Court entered default on July 8, 2009.

90.     On January 21, 2010, leave was granted to the Trustee by the Grand Court of the Cayman Islands, Financial Services Division, to proceed with an action against Harley in the Cayman Islands.  A complaint has been prepared for filing with the Cayman court.

### iv.     Picard v. Herald Fund SPC, HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A., Adv. Pro. No. 09-1359 (BRL).

91.     On July 14, 2009, the Trustee filed a complaint against Herald Fund SPC ("Herald") and HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A. ("HSBC") seeking the return of $578 million under SIPA §§ 78$lll$(4) and 78fff-2(c)(3), and Bankruptcy Code sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a), and 551, the New York Fraudulent Conveyance Act, and other applicable laws for turnover, accounting, preferences, actual fraudulent conveyances, and constructive fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of Herald.  On August 14, 2009, the Trustee filed an amended complaint to add an objection to Herald's SIPA claim.  On October 13, 2009, the Trustee filed a second amended complaint.  The parties filed a case management plan, which the Court entered on October 21, 2009.

92.     On October 26, 2009, HSBC answered the second amended complaint and Herald moved to dismiss the second amended complaint for failure to state a claim.  The Trustee's opposition to Herald's motion was filed on November 13, 2009.   A pre-trial conference is currently scheduled for November 4, 2010 but is likely to be adjourned.

### v.     Picard v. Kingate Global Fund Ltd., Kingate Euro Fund Ltd. and Bank of Bermuda Ltd., Adv. Pro. No 09-1161 (BRL).

93.     On April 17, 2009, the Trustee filed a complaint against Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Kingate Euro") seeking the return of $395

million under SIPA §§ 78*lll*(4) and 78fff-2(c)(3), and Bankruptcy Code sections 542, 547, 550(a)(1), and 551, and other applicable laws for turnover, accounting, preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the defendants.

94.    On July 21, 2009, the Trustee filed a second amended complaint naming the Bank of Bermuda as an additional defendant (collectively, "Kingate Defendants"), and seeking $874 million.  The Kingate Defendants' answers are currently due on November 12, 2010 and a pretrial conference has been scheduled to be held on November 17, 2010.

95.    Kingate Global and Kingate Euro are in liquidation in BVI.  The Trustee and the BVI Court-appointed liquidators have been engaged in negotiations regarding a settlement agreement.  Both the Bankruptcy Court and the BVI Court must approve any final settlement agreement.

96.    The Trustee moved the Bankruptcy Court for a Letter Requesting Judicial Assistance from the appropriate judicial authority in Bermuda for service of a subpoena on Kingate Management Ltd., the manager of the two Kingate Funds.  The Bankruptcy Court granted the motion and issued the request on June 18, 2010.

97.    On January 27, 2010, the Trustee's English counsel filed an application in English court seeking a disclosure order in connection with the two Kingate Funds.  On May 27, 2010, Judge Kitchen of the High Court of Justice, Chancery Division, United Kingdom, found in favor of the Trustee on most issues and awarded the Trustee £76,000 in costs.  The court put its seal on the formal disclosure order on June 28, 2010 and the Trustee has begun to receive responsive documents in accordance therewith.

vi.   **Picard v. J. Ezra Merkin, et al.**, Adv. Pro. No. 09-1182 (BRL).

98.     On May 7, 2009, the Trustee filed a complaint against Gabriel Capital, L.P. ("Gabriel"), Ariel Fund, Ltd. ("Ariel"), Ascot Partners, L.P. ("Ascot"), Gabriel Capital Corporation, and J. Ezra Merkin ("Merkin") (collectively, the "Merkin Funds") seeking the return of more than $557 million under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws for turnover, accounting, preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Merkin Funds.

99.     In late June 2009, pursuant to an action commenced by the New York State Attorney General in the Supreme Court of New York, New York County, receivers were appointed over each of the funds.  Bart Schwartz, Esq. was appointed Receiver of Ariel and Gabriel, and is utilizing his law firm of Reed Smith LLP.  David Pitosky, Esq. was appointed Receiver over Ascot and is utilizing his firm of Goodwin Procter LLP.

100.     On December 23, 2009, the Trustee filed his Second Amended Complaint, which  defendants Ariel, Gabriel, Gabriel Capital Corp., and Merkin moved to dismiss on January 25, 2010.  Oral argument on the motion was held on April 15, 2010.

101.     After the hearing, the Court requested further briefing on the interplay between SIPA and the Bankruptcy Code as to how they relate to "customer property" in the hands of third parties.  Specifically, the Court was interested in an analysis of section 78fff-2(c)(3) of SIPA, which deems "customer property" the property of the debtor's estate, and Bankruptcy Code sections 541 and 542, which require the successful avoidance of property

before it becomes property of the estate subject to turnover.  The supplemental briefing was submitted by the parties on May 7, 2010.  The Court reserved decision.

102.    On September 16, 2010, Mr. Schwartz, the Receiver of Ariel and Gabriel Capital, L.P. ("Receiver"), filed suit against Merkin and Gabriel Capital Corporation in the Supreme Court of the State of New York, County of New York, captioned *Schwartz v. Merkin et al.*, Sup. Ct. NY. Co., No. 651516/2010 (the "Schwartz Action").  The Schwartz Action seeks the recovery of losses due to their investments in BLMIS, as well as the management fees collected by Merkin and Gabriel Capital Corporation.  The Schwartz Action also seeks a constructive trust over all fees of Merkin and Gabriel Capital Corporation that are in the possession of Ariel and Gabriel Capital Corporation, including fees associated with Merkin's administration of Ascot. Justice Richard B. Lowe, III is presiding over the Receiver's action as well as the action brought by the New York State Attorney General.  The Trustee is evaluating what response, if any, should be made to the Schwartz Action.

103.    The Trustee has had ongoing negotiations with the Receiver for Ascot and has extended the time for Ascot to respond to the Amended Complaint while these negotiations continue.  B&H has also interviewed third party witnesses and monitored third party actions against Merkin and his funds.

### vii.    Picard v. Primeo Fund, HSBC Bank PLC and HSBC Securities Services (Luxembourg) S.A., Adv. Pro. No. 09-1366 (BRL).

104.    On July 15, 2009, the Trustee filed a complaint against Primeo Fund ("Primeo") seeking the return of $145 million under SIPA §§ 78*lll*(4) and 78fff-2(c)(3), and Bankruptcy Code sections 105(a), 542, 544, 548(a), 550(a), and 551, the New York Fraudulent Conveyance Act, and other applicable laws for turnover, accounting, and fraudulent conveyances

in connection with certain transfers of property by BLMIS to or for the benefit of Primeo. The complaint also named HSBC Bank plc and HSBC Securities Services (Luxembourg) S.A. (collectively, "HSBC") as defendants.

106. Primeo failed to answer the Trustee's complaint or otherwise respond and the Clerk of the Bankruptcy Court entered default on September 1, 2009. Primeo is in liquidation in the Cayman Islands. HSBC answered the complaint on August 28, 2009. The Trustee entered a partial settlement with HSBC Bank PLC and the Joint Liquidators of Primeo to resolve competing claims to approximately $5 million that had been frozen in Primeo's accounts with HSBC in England and which were the subject of a lawsuit in England. The Trustee filed a motion seeking the Court's approval of this partial settlement on August 30, 2010. Both the Bankruptcy Court and the Cayman Islands Court must approve any final settlement.

> **viii.** **Picard v. Thybo Asset Management Ltd., Thybo Global Fund Ltd., Thybo Return Fund Ltd., Thybo Stable Fund Ltd.,** Adv. Pro. No. 09-1365 (BRL).

106. On July 15, 2009, the Trustee filed a complaint against Thybo Asset Management Ltd., Thybo Global Fund Ltd., Thybo Return Fund Ltd., and Thybo Stable Fund Ltd. (collectively, the "Thybo Funds") seeking the return of approximately $63 million pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a), 550(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws for turnover, accounting, preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Thybo Funds.

107. Based on an ongoing investigation, the Trustee filed an amended complaint on August 25, 2009, objecting to Thybo Stable Fund's customer claim that seeks $217,163,851.

The Trustee agreed to an extension of time for the Thybo Funds to respond to the amended complaint up to and including November 4, 2010. The pretrial conference is scheduled to be held on November 17, 2010.

### ix. Picard v. Vizcaya Partners Ltd. and Bank Jacob Safra (Gibraltar) Ltd., Adv. Pro. No 09-1154 (BRL).

108.     On April 9, 2009, the Trustee filed a complaint against Vizcaya and Bank Safra seeking the return of $150 million under SIPA §§ 78*lll*(4) and 78fff-2(c)(3), and sections 542, 547, 550(a)(1), and 551 of the Bankruptcy Code as a preferential transfer, and also for turnover and accounting in connection with a transfer from BLMIS to Bank Safra for the benefit of Vizcaya. On October 5, 2009, the Trustee filed an amended complaint naming Siam, Asphalia, and Zeus as additional defendants ("collectively, the "Vizcaya Defendants"), and seeking the additional return of $30 million as a fraudulent transfer. The Trustee also seeks turnover and accounting in connection with the transfer.

109.     Approximately $75 million is being held in various accounts at Bank Safra or frozen by the Gibraltar authorities in a Gibraltar court. On February 18, 2009, Vizcaya brought a Judicial Action in Gibraltar Supreme Court, No. 2009-Misc-13, against the Gibraltar Attorney General and Bank Safra, and named Irving H. Picard as an interested party, in order to regain control over frozen funds held in its account at Bank Safra.

110.     On June 1, 2010, Chief Justice Dudley of the Court of Appeal of Gibraltar granted an order by which $1 million would be released from the monies paid into Court so that Vizcaya and Zeus could pay legal fees, expenses, and administrative costs, and have a balance in favor of future costs. Chief Justice Dudley granted leave to appeal his order but refused to stay

the release of the funds.  On June 2, 2010, the Trustee's Gibraltar counsel, Attias & Levy, filed a notice of appeal of the order.

111.    On June 28, 2009, Judge Lifland requested by letter that the Gibraltar court turn over to the Bankruptcy Court all funds under the Gibraltar court's control that were derived from the transfer from BLMIS to Bank Safra, for the benefit of Vizcaya.

112.    On July 9, 2009, the Trustee filed an action, No. 2009-P-193, in Gibraltar Supreme Court against Vizcaya, Bank Safra, and related parties Siam, Asphalia, and Zeus for an injunction or freezing order, disclosure, and other relief.

113.    The Trustee and Bank Safra are engaged in discovery.  Vizcaya, Siam, Asphalia, and Zeus failed to appear or answer the Trustee's amended complaint and, accordingly, B&H drafted and prepared a motion for default judgment against those defendants. The motion for default was granted by the Court on August 3, 2010.  Following the entry of default, Judge Lifland sent a second letter dated August 23, 2010 requesting the Gibraltar court's assistance in enforcing the default judgment and/or turning over the relevant funds held in Gibraltar.  These requests remain pending.

114.    After a hearing on September 7, 2010, the order of Justice Dudley of the Gibraltar court releasing the funds was vacated on September 17, 2010.  Counsel for certain of the Vizcaya Defendants are working with the Trustee to transfer the Gibraltar litigation to New York.

115.     Defendant Zeus approached the Trustee to vacate the default as to Zeus, and to proceed with the litigation in New York.  The parties are submitting a stipulation for Court approval.

**B.**          **MADOFF FAMILY LITIGATION**

> **i.**     **Picard v. Peter B. Madoff, Mark D. Madoff, Andrew H. Madoff and Shana D. Madoff**, Adv. Pro. No. 09-1503 (BRL).

116.     On October 2, 2009, the Trustee filed a complaint against Peter B. Madoff, Mark D. Madoff, Andrew H. Madoff, and Shana D. Madoff (the "Madoff Family Defendants") seeking the return of nearly $200 million under SIPA §§ 78fff(b), 78fff-2(c)(3), sections 105(a), 502(d), 541, 542, 544, 548(a), 550(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and common law.

117.     On February 5, 2010, the Court entered Consent Orders restricting the Madoff Family Defendants' ability to transfer or dispose of their assets and requiring them to provide the Trustee with financial disclosures listing their significant assets, which were subsequently provided to the Trustee.

118.     On March 15, 2010, the Madoff Family Defendants moved to dismiss the Trustee's complaint.  The Trustee filed his opposition on May 21, 2010 and a hearing on the motions to dismiss was heard on October 6, 2010.  The Court reserved decision.

> **ii.**     **Picard v. Ruth Madoff**, Adv. Pro. No. 09-1391 (BRL).

119.     On July 29, 2009, the Trustee filed a complaint against Ruth Madoff seeking the return of more than $44 million under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 502(d), 541, 542, 544, 548(a), 550(a), and 551 of the Bankruptcy Code, the New

York Fraudulent Conveyance Act, and New York common law.  The relief sought includes turnover of and accounting for BLMIS funds, property, and assets, the recovery of fraudulent transfers and subsequent transfers, disallowance of Mrs. Madoff's claims against the estate, as well as damages, and the imposition of a constructive trust.

120.        On July 31, 2009, the Court entered an Order restricting Mrs. Madoff's ability to transfer or dispose of any of her assets, and requiring her to provide monthly reports to the Trustee describing all income and expenditures.  Mrs. Madoff's answer is due on December 17, 2010 and a pretrial conference will be held on December 21, 2010.  The Trustee and B&H have been engaged in settlement discussions with counsel for Mrs. Madoff.

## C.        **MADOFF-RELATED ENTITIES.**

121.        During the Report Period, the Trustee's continued investigation led to the commencement of several litigations involving personal business ventures owned, controlled, and/or managed by various Madoff family members, but which were unlawfully acquired and/or capitalized with BLMIS customer funds.

### i.        **Picard v. Madoff Technologies LLC et al.,** Adv. Pro. No. 10-03483 (BRL).

122.        On July 29, 2010, the Trustee filed a complaint seeking to recover, among other things,  more than $22 million in fraudulent transfers from BLMIS to, or for the benefit of, Madoff Technologies LLC, Primex Holdings LLC and Madoff Brokerage & Trading Technology.  An amended complaint was filed on September 1, 2010, adding as additional defendants the entities' owners Peter Madoff, Andrew Madoff, Mark Madoff, Shana Madoff, Ruth Madoff, Jennifer Dickson, Alberto Casanova, as well as the Alberto Casanova Revocable Living Trust.

**ii.**      **Picard v. Madoff Family LLC et al.,** Adv. Pro. No. 10-03485 (BRL).

123.      On July 29, 2010, the Trustee filed a complaint seeking to recover, among other things, approximately $3 million in fraudulent transfers made by BLMIS to, or for the benefit of, Madoff Family LLC.  An amended complaint was filed on September 1, 2010 adding as additional defendants the entity's owners Peter Madoff, Mark Madoff, Andrew Madoff, Jennifer Dickson, and Shana Madoff.

**iii.**      **Picard v. Madoff Energy Holdings, LLC,** Adv. Pro. No. 10-03484 (BRL).

124.      On July 29, 2010, the Trustee filed a complaint seeking to recover $5.45 million in fraudulent transfers made to, or for the benefit of, Madoff Energy Holdings LLC, Madoff Energy LLC, Conglomerate Gas Resources LLC, Madoff Energy III LLC, and Madoff Energy IV LLC.  An amended complaint was filed on September 1, 2010 adding as additional defendants the entities' owners Andrew Madoff, Mark Madoff and Shana Madoff.

125.      In each of the three above proceedings, the defendants' answers are due on November 23, 2010 and a pre-trial conference is scheduled to be held on November 30, 2010.

**D.**      **OTHER LITIGATION**

**i.**      **Picard v. Stanley Chais, et al.,** Adv. Pro No 09-1172 (BRL).

126.      On May 1, 2009, the Trustee filed a complaint against Stanley Chais and Pamela Chais (the "Chais Defendants"), as well as a number of related entities (collectively, the "Chais-related entities") seeking the return of more then $1.1 billion under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws for turnover, accounting,

preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Chais Defendants.

127.    On September 29, 2009, the Chais Defendants filed a motion with the Court seeking a declaration that the Chais Defendants should be free to use certain funds held at Goldman Sachs.  The Trustee had previously requested that Goldman Sachs freeze such assets and not permit the Chais Defendants to withdraw any amount.  The Trustee responded by filing a motion seeking a temporary restraining order and preliminary injunction to formally freeze all assets of the Chais Defendants.  Following a Chambers conference on October 6, 2009, the Chais Defendants consented to the entry of a temporary restraining order that formally froze their assets, but made certain amounts available to them for living and other expenses.  After two extensions of the October 7, 2009 Order, the Trustee and Chais Defendants entered into a stipulation that extended the asset freeze indefinitely.

128.    Certain of the Chais-related entities filed motions to dismiss the Trustee's complaint.  Stanley and Pamela Chais, and certain entities they control, answered the Trustee's complaint and filed counterclaims against the Trustee in connection with a letter that the Trustee wrote to Goldman Sachs last year.  The Trustee moved to dismiss the counterclaims and opposed the motions to dismiss.  A hearing on all of these motions was held on May 5, 2010.  The Court reserved decision.  Stanley Chais passed away on September 26, 2010.

129.    In addition to this activity, the Trustee has reviewed and analyzed documents by the Chais Defendants in discovery and took depositions of related third parties.

ii.    **Picard v. Cohmad Securities Corporation, et al.,** Adv. Pro. No.
09-1305 (BRL).

130.    On June 22, 2009, the Trustee filed a complaint against Cohmad Securities

Corporation ("Cohmad"), Maurice "Sonny" J. Cohn, Marcia B. Cohn, Robert Jaffe, Alvin

"Sonny" Delaire, Jr., Milton S. Cohn, Stanley Berman, Jonathan Greenberg, Cyril Jalon, Morton

Kurzrok, Linda McCurdy, Richard Spring, Rosalie Buccellato, Marilyn Cohn, Jane M. Delaire

a/k/a Jane Delaire Hackett, Carole Delaire, Gloria Kurzrok, Joyce Berman, S & J Partnership,

Janet Jaffin Revocable Trust, The Spring Family Trust, Jeanne T. Spring Trust, The Estate of

Elena Jalon, The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger, The Joint

Tenancy of Robert Pinchou and Fabian Guenzburger, and Elizabeth M. Moody.

131.    Prior motion practice relating to the Trustee's initial complaint in this

adversary proceeding is detailed in the Amended Third Interim Report, ¶¶ 220-232.

132.    The Trustee filed an amended complaint on October 8, 2009.  The amended

complaint seeks to avoid, pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542,

544, 547, 548(a) and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act,

and other applicable laws, decades worth of transactions through which BLMIS paid more than

approximately $114 million to Cohmad, Sonny Cohn and other Cohmad related individuals in

exchange for Sonny Cohn, Marcia Cohn, Robert Jaffe, and other Cohmad employees

introducing victims to BLMIS and knowingly helping Madoff create, fund, and maintain his

massive Ponzi scheme.

133.    The following defendants filed motions to dismiss the amended complaint, or

portions thereof, pursuant to Fed. R. Civ. P. 12(b)(6): (1) Cohmad, Maurice "Sonny" J. Cohn,

Marcia B. Cohn, Milton Cohn, and Marilyn Cohn; (2) Robert Jaffe and M/A/S Capital, Inc.; (3)

Richard Spring, The Spring Family Trust, and the Jeanne T. Spring Trust (collectively, the "Spring Defendants"); (4) Alvin "Sonny" Delaire, Jr. and Carole Delaire; (5) Gloria Kurzrok; and (6) Jane M. Delaire a/k/a Jane Delaire Hackett. The following defendants joined in the motion filed by the Spring Defendants: (1) Cyril Jalon and the Estate of Elana Jalon; and (2) Stanley Berman, Joyce Berman, and S & J Partnership.

134.    The following defendants answered the amended complaint: Jonathan Greenberg, Linda McCurdy, Rosalie Buccellato, Morton Kurzrok, the Janet Jaffin Revocable Trust, and Elizabeth M. Moody.

135.    The following defendants moved to dismiss the amended complaint for lack of personal jurisdiction: The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger and The Joint Tenancy of Robert Pinchou and Fabian Guenzburger (collectively, the "Tenancy Defendants").

136.    The Trustee opposed all of these motions in an omnibus opposition filed on March 1, 2010. The Cohmad Defendants filed their reply briefs by April 8, 2010. A hearing on the motions to dismiss the amended complaint will be held in January 2011.

137.    Meanwhile, the Securities Division of the Commonwealth of Massachusetts (the "Division") initiated an investigation into BLMIS and Cohmad. The Division held an adversarial proceeding and found on August 16, 2010 that Cohmad willfully violated Massachusetts securities laws for, among several findings of "unethical and dishonest" conduct, failing to retain records by shredding communications related to BLMIS, properly supervise employees, comply with subpoenas to produce documents and information, and produce the principals of Cohmad to testify. The Division revoked the securities licenses of Cohmad and

40

Robert Jaffe and fined the company $200,000.  The Trustee, Cohmad, Marcia Cohn, Maurice Cohn and Robert Jaffe submitted memoranda to the Court on October 12, 2010 regarding the import of this Decision on the motions to dismiss.  The Trustee, Cohmad, Marcia Cohn, Maurice Cohn and Robert Jaffe all submitted supplemental memoranda to the Court on October 26, 2010 regarding the same.

### iii.    **Picard v. Jeffry Picower, et al.**, Adv. Pro. No. 09-1179 (BRL).

138.      On May 12, 2009, the Trustee filed a complaint against Jeffry M. Picower, individually and as trustee for the Picower Foundation, Barbara Picower, individually and trustee for the Trust FBO Gabrielle H. Picower and the Picower Foundation, Capital Growth Company, Favorite Funds, JA Primary Ltd. Partnership, JA Special Ltd. Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JFM Investment Company, JLN Partnership, JMP Ltd. Partnership, Jeffry M. Picower Special Co., Jeffry M. Picower, P.C., Decisions Incorporated, The Picower Foundation, The Picower Institute For Medical Research, The Trust FBO Gabrielle H. Picower, and Does 1-25 (collectively, the "Picower-related entities") seeking the return of more then $6.7 billion under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 542, 544, 547, 548(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws for turnover, accounting, preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Picower-related entities.

139.      The Picower-related entities filed a partial motion to dismiss certain claims and parties on July 31, 2009.  The Trustee filed his opposition to the defendants' motion on September 30, 2009.  The Trustee notified the defendants that, among other things, the Trustee's continuing investigation revealed that the fictitious profit withdrawn by the Picower-related

entities was in excess of $7.2 billion, which correspondingly increased the recovery sought by the Trustee in this matter.  The Trustee also confirmed that the Picower-related entities had withdrawn more of other investors' money than any other customer of BLMIS.

140.    On October 25, 2009, Mr. Picower passed away.  An estate representative was appointed on January 5, 2010 pursuant to the issuance of letters testamentary.  A hearing on defendants' motion to dismiss is scheduled to be held on November 10, 2010 but will likely be adjourned while settlement discussions continue.

          **iv.**      **Picard, et al. v. Amy J. Luria, et al., Adv. Pro. No. 10-3222 (BRL) and Picard et al. v. Robert A. Luria, et al., Adv. Pro. No. 10-3223 (BRL).**

141.    On April 20, 2010, the Trustee filed a complaint against Amy J. Luria and Amy Luria Partners LLC and a complaint against Robert A. Luria and Robert Luria Partners LLC (the "Lurias") seeking the return of more than $1.9 million under SIPA § 78fff-2(c)(3), sections 544(b), 548(a), 550(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws for turnover, accounting, preferences, fraudulent conveyances, and objection to claims in connection with certain transfers of property by BLMIS to or for the benefit of the Lurias.  Included in the more than $1.9 million was approximately $300,000 held in accounts at HSBC Bank USA, N.A. ("HSBC").  The Trustee's complaints also seek disallowance of the customer claims filed by Amy Luria Partners LLC and Robert Luria Partners, and general unsecured claims filed by Amy J. Luria and Robert A. Luria.

142.    On August 27, 2010, the Lurias answered the complaints and asserted counterclaims seeking allowance of the SIPA customer claims and general unsecured claims.  On

42

October 1, 2010, the Trustee moved to dismiss the counterclaims.  A pre-trial conference before the Court is scheduled to be held on November 17, 2010.

143.     Previously, on December 16, 2009, the Lurias commenced an action against HSBC in the Supreme Court of the State of New York, Nassau County, seeking an accounting and damages equal to the amount of the funds held at HSBC.  This action was removed to the United States District Court for the Eastern District of New York, before the Honorable Joanna Seybert.  On September 3, 2010, on HSBC's motion, Judge Seybert transferred the case to the Bankruptcy Court, noting that the Lurias' claims arise from the same operative facts as the complexities of Madoff's frauds, and concluding that transfer would promote the economic and efficient administration of the bankruptcy estate and serve the interests of judicial economy

E.          **TRUSTEE'S INJUNCTIONS**

i.          **Picard v. Fox, et al.**, Adv. Pro. 10-3114 (BRL).

144.     As detailed in the Amended Third Interim Report, Adele Fox ("Fox") and Susanne Marshall ("Marshall") (collectively, the "Florida Plaintiffs") commenced putative class actions against Estate of Jeffry M. Picower and related entities (the "Picower Defendants") in the United States District Court for the Southern District of Florida, West Palm Beach Division in February 2010 (collectively, the "Florida Actions").  On March 24, 2010, Fox moved for entry of an initial order regarding consolidation of the Marshall Action and of potential later-filed actions related to the Florida Actions.  On March 25, 2010, the Florida Plaintiffs filed Civil RICO case statements.

145.     On March 31, 2010, the Trustee moved by Order to Show Cause for a Temporary Restraining Order, Enforcement of the Automatic Stay, and Preliminary Injunction

(the "Fox Application"), seeking to enjoin and restrain the Florida Plaintiffs and any related parties from pursuing the Florida Actions and commencing or proceeding with any other actions or proceedings against the Picower Defendants because, among several reasons, the Florida Actions impinge on the Court's jurisdiction, the orderly administration of the BLMIS proceedings, and the Trustee's imminent settlement with the Picower Defendants.

146.    On April 27, 2010, the Court granted the Fox Application and issued an Order (the "Fox Order") and Memorandum Order and Decision (the "Fox Decision") on April 28, 2010 and May 3, 2010, respectively.  In the Fox Decision, the Court held that the Florida Actions violated the automatic stay and the District Court's December 15, 2008 Stay Order because the Florida Plaintiffs' claims sought to redress a harm common to all BLMIS customer claimants. The Court also held that to the extent § 362(a) of the Bankruptcy Code did not apply to stay the Florida Actions in its own right, an extension of that provision was warranted under § 105(a). The Court reasoned that the Florida Actions threatened to adversely impact the administration of the bankruptcy estate by, among other things, seeking to recover the same funds sought by the Trustee in his action against the Picower Defendants and interfering with the Trustee's potential settlement with those parties.

147.    On May 12, 2010, Fox and Marshall jointly filed a Notice of Appeal requesting that the District Court review the Fox Order and Fox Decision.  Two weeks later, on May 26, 2010, Fox and Marshall filed separate, but substantially similar Designations of Items to be Included in the Record and Statement of the Issues to be Presented on Appeal (the "Designations").  In their Designations, Fox and Marshall sought appellate review of, among several objections, whether the Bankruptcy Court erred in failing to find that the Trustee was

barred from asserting the same claims against the Picower Defendants as those asserted by Fox and Marshall in the Florida Actions by virtue of the doctrine of *in pari delicto*.

148.     On June 9, 2010, the Trustee filed his Counter-Designation as well as a Motion to Strike the issue pertaining to *in pari delicto* and related documents from the Designations, as the doctrine was irrelevant to the proceeding and had not been raised by the Florida Plaintiffs prior to their appeal.

149.     The Bankruptcy Court Clerk transmitted all documents to the District Court on June 15, 2010 and the Trustee requested through letters to the Honorable John G. Koeltl in the Southern District of New York on June 22, 2010 and June 25, 2010 that the District Court suspend appellate briefing until the Bankruptcy Court ruled on the Motion to Strike. On July 1, 2010, the Court scheduled a conference call for July 7, 2010 regarding the request for a suspended appellate briefing schedule. Fox and Marshall each filed their appellate briefs on July 6, 2010. On July 7, 2010, the Court considered and agreed to the Trustee's request to suspend appellate briefing until after the Bankruptcy Court's ruling on the Motion to Strike.

150.     On August 3, 2010, the Bankruptcy Court held a hearing on the Trustee's Motion to Strike and granted the Trustee's requested relief. The Court issued its Memorandum Decision and Order that same day, holding that the doctrine of *in pari delicto* had not been raised before appeal and, therefore, could not be considered by the Bankruptcy Court in making its decision to grant the Fox Application. The Bankruptcy Court considered the issue regardless and found the doctrine of *in pari delicto* irrelevant to the proceeding and without bearing on the Court's subject matter jurisdiction over the Fox Application. Fox and Marshall filed separate

45

Notices of Appeal on August 11, 2010, seeking review of the Bankruptcy Court's decision granting the Trustee's Motion to Strike.

151.    The appeal was assigned to Judge Koeltl.  On September 7, 2010, Judge Koeltl ordered that the two appeals—the first seeking review of the Bankruptcy Court's Order and Decision granting the Fox Application and the second seeking review of the Bankruptcy Court's Memorandum Decision and Order granting the Trustee's Motion to Strike—be consolidated and briefed together.

152.    Fox's and Marshall's appellate briefs were filed on October 5, 2010 and the Trustee's brief in opposition is due on November 19, 2010.  A pretrial conference before the Court is scheduled to be held on December 29, 2010.

## ii.    <u>Picard v. Stahl</u>, Adv. Pro. No. 10-03268 (BRL).

153.    On May 27, 2010, the Trustee commenced an adversary proceeding against Richard Stahl ("Stahl"), Reed Abend ("Abend"), and ten other groups of plaintiffs (together, the "Stahl Plaintiffs"), seeking to enjoin lawsuits commenced by these plaintiffs against Peter Madoff, Mark Madoff, Andrew Madoff, and Shana Madoff (the "Madoff Family Defendants"). In support, the Trustee has filed an Application for a Temporary Restraining Order, Enforcement of the Automatic Stay, and a Preliminary Injunction (the "Stahl Application").

154.    Each group of the Stahl Plaintiffs has filed, individually or on behalf of a class, a separate lawsuit in state or federal court against one or more of the Madoff Family Defendants seeking damages for losses the plaintiffs suffered in the Madoff scheme, through investments either in BLMIS or in Madoff feeder funds.  Separately, Plaintiffs Stahl and Abend, former BLMIS employees, seek deferred compensation.  Because the Trustee believes that the

Madoff Family Defendants have no assets independent of Customer Property, the Trustee believes that a judgment against the Madoff Family Defendants in these actions would enable the Stahl Plaintiffs to recover more than their fair share as estate creditors. The Trustee is seeking this injunction to collect estate assets into a single pool for *pro rata* distribution to all BLMIS customers and creditors.

155.     The cases the Trustee seeks to enjoin with respect to the Madoff Defendants are *Stahl v. Madoff*, Index No. 601862/2009 (Sup. Ct. N.Y. Cty.); *Abend v. Madoff*, Index No. 601861/2009 (Sup. Ct. N.Y. Cty.); *The Lautenberg Foundation v. Madoff*, Case No. 09-CV-00816 (D.N.J.); *Erausquin v. Notz, Stucki Management (Bermuda) Limited*, Case No. 09-CV-07846 (S.D.N.Y.); *In re Herald, Primeo and Thema Funds Securities Litigation*, Case Nos. 09-CV-0289/09-CV-2558 (S.D.N.Y.); *Chavez v. Picard*, Case No. 09-mc-00006 (N.D. Tex.); *Retirement Program for Employees of the Town of Fairfield v. Bernard L. Madoff*, Case No. cv 09-5011561-S (Conn. Super. Ct.); *FLB Foundation, Ltd. v. BLMIS* (Index No. 101615/2009 (N.Y. Sup. Ct.)); *Wexler v. KPMG, LLP*, Index No. 101615/2009 (Sup. Ct. N.Y. Cty.); *Ryan v. Friehling & Horowitz, P.C.*, Index No. 101616/2009 (Sup. Ct. N.Y. Cty.); *Greenberg v. Friehling & Horowitz, P.C.*, Index No. 650633/2009 (Sup. Ct. N.Y. Cty.); and *McBride v. KPMG International*, Index No. 650632/2009 (Sup. Ct. N.Y. Cty.).

156.     The Stahl Plaintiffs filed their responses on or before June 30, 2010 and the Trustee filed his reply on August 17, 2010. A pre-trial conference and hearing on the Stahl Application are scheduled for January 27, 2011.

### iii.    <u>Picard v. Canavan</u>, Adv. Pro. 10-3200 (BRL).

157.    On April 9, 2010, the Trustee commenced an adversary proceeding and filed an Application for a Temporary Restraining Order, Enforcement of the Automatic Stay and a Preliminary Injunction (the "Canavan Application"), seeking to enjoin a putative class action (the "New Jersey Action") filed by three BLMIS customers, individually and on behalf of a similarly situated prospective class of customers (the "New Jersey Plaintiffs"), in the United States District Court for the District of New Jersey ("New Jersey District Court") against SIPC's Board of Directors and CEO/President (the "SIPC Defendants").    The New Jersey Plaintiffs alleged damages based on bad faith failure to pay insurance claims, fraud, violation of the New Jersey Consumer Fraud Act, and promissory estoppel.

158.    The Trustee filed the Canavan Application in this Court, which the New Jersey Plaintiffs opposed.    On April 23, 2010, the SIPC Defendants moved to transfer the New Jersey Action from the New Jersey District Court to the District Court, for referral to this Court (the "Transfer Motion").    In an order dated July 6, 2010, the Transfer Motion was granted by the New Jersey District Court.    The District Court subsequently removed the New Jersey Action to this Court, pursuant to 28 U.S.C. § 157(a).

159.    On May 26, 2010, the New Jersey Plaintiffs filed a Cross-Motion to Dismiss the Canavan Application.    On June 16, 2010, the Trustee filed his Reply Memorandum in Further Support of the Canavan Application and In Opposition to Defendants' Cross-Motion to Dismiss. A hearing on the Canavan Application is scheduled to be held on December 29, 2010.

48

## XI.   OTHER BANKRUPTCY COURT PROCEEDINGS

### A.   BLM AIR CHARTER LLC CHAPTER 11 CASE

160.     The Trustee caused BLM Air Charter LLC ("BLM Air"), an entity related to BLMIS, to file a chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York (*In re BLM Air Charter LLC*, Case No. 09-16757 (BRL)).   The commencement of the BLM Air bankruptcy case was necessary to preserve and ultimately recover for the benefit of the BLMIS estate a significant asset in the form of an ownership interest in a private aircraft worth millions of dollars.

161.     BLM Air's primary remaining asset is a 50% undivided tenant-in-common interest in an Embraer Legacy 600, Model EMB-135 BJ aircraft (the "Aircraft"), which was purchased in 2007 for $24 million.   The other co-owner of the Aircraft is BDG Aircharter, Inc. ("BDG").

162.     Because the Trustees believes that a sale of the entire Aircraft will yield a greater recovery than would a sale of only BLM Air's 50% interest in the Aircraft, he caused BLM Air to commence litigation against the Aircraft's co-owner BDG, and its lender, Valley Commercial Capital, LLC, seeking among other things, authority pursuant to Bankruptcy Code § 363(h) to sell the entire Aircraft free and clear of BDG's interest.   The parties have agreed to temporarily suspend the discovery process for a brief period of time to pursue settlement negotiations.

### B.   FEE APPLICATIONS AND RELATED APPEALS

163.     Objections have been filed to each of the four fee applications filed by the Trustee and B&H.  Discussions of the objections to the first and second fee applications (the

"Prior Objections"), and related motions for leave to appeal the Court's orders granting the

Trustee and B&H's fee applications and overruling those objections, are discussed more fully in

the Trustee's Amended Third Interim Report, at ¶¶ 186-90.

164.     The Trustee and B&H filed their third applications for interim compensation

on April 9, 2010 (ECF Nos. 2188 & 2189).  Diane and Roger Peskin, and Maureen Ebel (the

"Peskin Objectors") objected, again alleging that the Trustee and B&H are operating under a

conflict of interest and should be removed as Trustee and Counsel (ECF No. 2233).[8]   During the

Third Interim Fee Hearing, the Court again found no basis for a finding of a conflict of interest.

The Court further found that the Peskin Objectors' objections to fees could be attributed in part

to their efforts to object to the net equity method employed by the Trustee in determining claims,

*see* section V.A., *supra*.  By order dated May 6, 2010, the Court overruled their objection and

granted the third application for compensation (ECF No. 2251).  The Peskin Objectors filed a

motion for leave to appeal the Bankruptcy Court order on May 19, 2010.  The Southern District

denied the request for leave on August 6, 2010.  *See* District Court Opinion and Order dated

August 6, 2010 (SAS), Misc. Matter M-47.[9]

165.     The Trustee and B&H filed their fourth applications for interim compensation

on August 19, 2010 (the "Fourth Fee Application") (ECF No. 2883).  Two objections were filed

to the Fourth Application.  The first was filed on behalf of Susanne Stone Marshall (the

"Marshall Objectors") (ECF No. 2967).  The Marshall Objectors alleged that the fees sought by

the Trustee and B&H were excessive and the amount of time and number of attorneys working

on the Madoff liquidation is not justified.  However, as the Court has previously noted, the scale

---

[8] The Peskin Objectors also objected to the first and second fee applications of the Trustee and B&H.

of this liquidation involves "staggering numbers, with more than 15,000 claims filed and billions of dollars at stake." *In re Bernard L. Madoff Inv. Securities LLC*, 424 B.R. 122 (S.D.N.Y. 2010). Additionally, the Court recognized that "the Trustee is charged with the mission of going out to hunt for assets and under (sic) in a case like this that hunt is not easily achieved." Second Interim Fee Hearing Transcript, at 33.  In order to determine claims and collect assets for the estate, an extensive amount of work must be done by the Trustee and B&H which requires the time, effort, and expertise of many attorneys and other employees.  This liquidation is a result of the largest Ponzi scheme to date and unwinding this massive fraud is a complex task.

166.    The second objection was filed on behalf of the Peskin Objectors (ECF No. 2943) which was essentially a reiteration of arguments previously presented and rejected by the Court in connection with objections filed by the Peskin Objectors to the first, second, and third interim fee applications of the Trustee and B&H.[10]  The Peskin Objectors raised, for the fourth time, the conflict of interest issue that had been previously raised in Prior Objections.  The Court again dismissed this argument, finding no grounds for removal of the Trustee and B&H.  On September 14, 2010, the Bankruptcy Court granted the fourth fee applications of the Trustee and B&H (ECF No. 2981).  No motion for leave to appeal this order was filed.

---

[9] The Peskin Objectors' motion for leave to appeal the second fee order remains pending before the District Court and is assigned to District Judge Deborah A. Batts.  Case No. Misc. Matter M-47 (DAB).

[10] Though counsel for the Peskin Objectors is not listed as counsel for the Marshall Objector in the Objection, counsel for the Peskin Objectors does in fact represent Marshall in other proceedings related to the BLMIS liquidation.  *See, e.g.*, *Marshall v. Picower Estate, et al.*, No. 10 CV 80254 (S.D. Fla.) (complaint signed by, *inter alia*, Helen Davis Chaitman of Becker & Poliakoff); *Picard v. Fox, et al.*, No. 10-03114 (Bankr. S.D.N.Y.) (BRL) (notice of appearance filed by Helen Davis Chaitman of Becker & Poliakoff on behalf of, *inter alia*, Susanne Stone Marshall).  Thus, while it appears to be an independent objection, in many respects, the Marshall Objection should be viewed as nothing more than duplicative of that filed by the Peskin Objectors.

C.          **SUITS AGAINST TRUSTEE & RELATED APPEALS**

> i.          **Rosenman Family LLC v. Picard, et al.**, Adv. Pro. No. 09-1000 (BRL).

167.          On January 1, 2009, Rosenman Family, LLC filed an adversary proceeding seeking the return of $10 million dollars it deposited mere days before BLMIS collapsed. The Trustee moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that Rosenman Family LLC was a "customer," as that term is defined under SIPA that could recover only through the customer claims process set forth in that statute. After the Bankruptcy Court dismissed the complaint and the District Court affirmed, Rosenman Family LLC filed a notice of appeal of the District Court's decision to the Second Circuit on December 23, 2009.

168.          The appeal was fully briefed on July 6, 2010. Oral argument before the Second Circuit was held on September 22, 2010. On October 7, 2010, the Second Circuit affirmed the dismissal of the complaint by summary order, finding that Rosenman's $10 million deposit was property of the estate covered by SIPA.

> ii.          **Peskin, et al. v. Picard**, Adv. Pro. No. 09-1272 (BRL).

169.          On June 10, 2009, three BLMIS customers (the "Peskin Plaintiffs") filed an adversary proceeding seeking declarations that the Trustee must determine their claims in the amounts shown on their November 30, 2008 customer statements and that the Trustee is not permitted to deduct preference monies from their SIPC advances. The Peskin Plaintiffs also sought compensatory damages for breach of fiduciary duty, alleging that the Trustee breached his duties to them by failing to promptly determine their customer claims and by "inventing" a new definition of net equity.

170.     On July 17, 2009, the Trustee moved to dismiss the complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, strike certain portions thereof, because the Peskin Plaintiffs: (i) failed to adhere to the Claims Procedures Order; and (ii) lack standing, as the harm alleged – the Trustee's interpretation of "net equity" – would benefit rather than harm them; or, in the alternative (iii) that certain paragraphs should be stricken pursuant to Federal Rule of Civil Procedure 12(f).  On August 17, 2009, the Peskin Plaintiffs filed an opposition to the Trustee's motion to dismiss the Complaint (ECF No. 30). The Trustee filed a reply on August 28, 2009 and the Court heard oral argument on September 9, 2009.  The following day, the Court issued a memorandum decision and order granting the Trustee's motion to dismiss the complaint (ECF No. 42).

171.     On September 18, 2009, the Peskin Plaintiffs filed a notice of appeal from the order dismissing their complaint.  The appeal was assigned to the Honorable John G. Koeltl in the Southern District of New York.  The parties completed briefing before the District Court on January 4, 2010 and Judge Koeltl held a hearing on the appeal on September 15, 2010.  A decision affirming dismissal of the complaint was issued on October 26, 2010.

### iii.     **Albanese, et al. v. Picard**, Adv. Pro. No 09-1265 (BRL).

172.     On June 5, 2009, a class action ("Class Action") complaint was filed by several BLMIS customers on behalf of a prospective class against the Trustee regarding the Net Equity Dispute.  Plaintiffs sought a declaratory judgment that the Trustee should allow claims based on the November 30, 2008 BLMIS customer account statements.  The Class Action seeks to certify a class of customers who "are adversely affected by the Trustee's definition of 'net equity' under SIPA."

173.     The Trustee answered the complaint on July 17, 2009.  Thereafter, the parties entered into a stipulation staying the pendency of the Class Action until a final, non-appealable order regarding the Net Equity Dispute is issued.

**D.          MOTION TO INTERVENE AND RELATED APPEALS**

174.     The Trustee and his Counsel successfully opposed an attempt by Ade Ogunjobi, Toks, Inc. and its related companies (collectively, "Toks") to intervene in the BLMIS proceedings.  Toks proposed to purchase BLMIS through what it described as a purported "global transaction all stock tax free $100,000,000,000 ($100 Trillion) or 400,000,000,000 shares of Class A Common shares that will be registered with the [SEC] during the closing of the proposed exchange tender offers," pursuant to which clients of BLMIS purportedly would receive $75 billion or more in stock, and it proposed to use the funds recovered by the Trustee to fund the plan.  The offer was unsolicited, and more importantly, completely unsupported.

175.     After a hearing on the matter held on June 2, 2009, the Bankruptcy Court found that Toks was not a party in interest and failed to demonstrate any ability to complete its proposed tender offer.  The Court denied Toks' motion to intervene (ECF No. 234), and Toks appealed to the District Court, No. 09-CV-5877 (the "District Court Appeal").

176.     Counsel for the Trustee filed a joint appellate brief with SIPC, which together with Toks' appellate brief, was submitted without oral argument.  By order dated October 30, 2009, the District Court dismissed the District Court Appeal based on Toks' failure to provide information required pursuant to a prior order issued by the District Court (ECF No. 12).  Toks appealed the District Court's decision to the United States Court of Appeals for the Second Circuit.  The Trustee filed a motion to dismiss on February 16, 2010 asserting that, among

multiple grounds, the appeal was frivolous.  By order dated June 18, 2010, the Second Circuit

dismissed the appeal.  Toks thereafter filed a Petition for Writ of Mandamus with the Supreme

Court of the United States on September 3, 2010.  In response, Counsel for the Trustee has

written to the Supreme Court concerning the frivolous nature of the Petition and the dismissals

below.  As of the date of this report, no determination on the Petition has been issued.

## XII.    CONCLUSION

177.    The foregoing report represents a summary of the status of this proceeding

and the material events that have occurred through September 30, 2010, unless otherwise

indicated.  This Report will be supplemented and updated with further interim reports.

Dated: New York, New York
        October 29, 2010

Respectfully submitted,

_____ *s/Irving H. Picard*_____
Irving H. Picard

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jacqlyn R. Rovine
Email: jrovine@bakerlaw.com

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Email: ipicard@bakerlaw.com

*Trustee for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and
Bernard L. Madoff*

*Attorneys for Irving H. Picard, Esq. Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC And Bernard L. Madoff*