Lawrence R. Velvel
Massachusetts School of Law
500 Federal Street
Andover, MA 01810
Tel:  (978) 681-0800
Fax: (978) 681-6330
Email: velvel@mslaw.edu

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, )<br><br>Plaintiff-Applicant, )<br><br>v. )<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC, )<br><br>Defendant. ) | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |

## OBJECTION OF LAWRENCE R. VELVEL TO TRUSTEE'S PREMATURE MOTION TO ESTABLISH, *AT THIS TIME*, PROCEDURAL RULES GOVERNING AVOIDANCE ACTIONS.

1.    The Trustee previously requested this Court to authorize a direct appeal to the Second Circuit on the question whether net equity should be determined by the cash-in/cash-out method ("CICO") or the final statement method ("FSM").  The Court did authorize a direct appeal.  The Trustee's request for a direct appeal, and this Court's

authorization of one, were predicated on the view that crucial aspects of the remainder of this case will depend on the resolution of the question of how to determine net equity. One of these crucial aspects is the question of whether individuals are liable for clawbacks. If the FSM is used, innocent Madoff investors will not be liable for clawbacks. For they will be credited with the earnings appearing on their statements, and all monies they withdrew will therefore have been earnings or principal. If CICO is used, innocent investors may be liable for clawbacks because monies they withdrew might in part have been fictitious profits.

The Trustee having sought, and this Court having authorized, a direct appeal on this controlling question of the determination of net equity,[1] the Trustee now seeks to begin the clawback process *before* the Second Circuit rules on the question. He seeks to begin this process by the establishment of procedural rules to govern it, and by going forward with his efforts to file lawsuits against, to negotiate with, to mediate against and to litigate against innocent investors. *He concedes, moreover, that his motion directed towards beginning this process is predicated on the determination of net equity being governed by CICO[2] -- the very issue on which he sought an immediate direct appeal, the very issue on which the Second Circuit has not yet ruled, and the very issue on which the Second Circuit's ruling could obviate avoidance actions against innocent investors. The Trustee's motion is thus an effort to begin and move forward with the avoidance process while the appellate decision which could obviate that process is still pending.* Such an effort is improper.

---

[1] Objector was *not* one of the parties who joined the Trustee in the request for a direct appeal.

[2] Trustee's Motion, pp. 3-4; see pp. 5, 5 n. 5.

The Trustee's motion concomitantly is in derogation of the jurisdiction of the Second Circuit, and is subject to the All Writs Act,[3] because it will in significant ways nullify the effects of a potential Second Circuit decision holding that the FSM must be used.  It will nullify the effect of such a decision, it is possibly superfluous to add, by causing investors to have to spend extensive, unrecoverable sums to oppose procedures for cases that will not exist if the Second Circuit rules in favor of FSM; by forcing investors to spend large, unrecoverable sums for lawyers to represent them in negotiations, mediations and litigations if the avoidance actions move forward now but are subsequently wiped out by a Circuit decision against CICO (on which, to reiterate, the Trustee's motion is expressly predicated); and by causing persons who have been drastically reduced in circumstance to live in terror of further, near term efforts to obtain monies from them -- and to leverage settlements from them -- even if the second Circuit were ultimately to uphold their view that the FSM is proper.  With regard to possible

---

[3] 28 U.S.C. §1651.  In *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9-10 (1942), Justice Frankfurther held for the Court that "No court can make time stand still.  The circumstances surrounding a controversy may change irrevocably during the pendency of an appeal, despite anything a court can do.  But within these limits it is reasonable that an appellate court should be able to prevent irreparable injury to the parties or to the public resulting from the premature enforcement of a determination which may later be found to have been wrong.  It has always been held, therefore, that, as part of its traditional equipment for the administration of justice,* a federal court can stay the enforcement of a judgment pending the outcome of an appeal."  In *re Claasen*, 140 U.S. 200, 11 S.Ct. 735, 35 L.Ed. 409; in *re McKenzie*, 180 U.S. 536, 21 S.Ct. 468, 45 L.Ed.657.

> *Section 262 of the Judicial Code, 28 U.S.C. s 377, 28 U.S.C.A. s 377, empowers the federal courts 'to issue all writs not specifically provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the usages and principles of law.'  This provision appeared in the very first Judiciary Act, 1 Stat. 73, 81-82.  Compare District of Columbia Code (1940 ed.) s 11-208, authorizing the Court of Appeals for the District of Columbia 'to issue all necessary and proper remedial prerogative writs in aid of its appellate jurisdiction.' 31 Stat. 1189, 1227.

In *Eastern Greyhound Lines v. Fusco*, 310 F.2d 632, 634 (1962), the Sixth Circuit held: "Eastern's motion here asks us to maintain the status quo by ordering that the ballots remain impounded and enjoin their tabulation until its appeal is heard on the merits.  We have power to grant the relief requested to prevent irreparable harm to parties during the pendency of an appeal.  *Scripps-Howard Radio v. Federal Communications Comm.*, 316 U.S. 4, 9, 10, 62 S.Ct. 875, 880, 86 L.Ed. 1229, 1234.  Such authority is a necessary incident to our power to issue writs under Section 1651, Title 28 U.S.C.A., in aid of, or to protect, our appellate jurisdiction."

leveraging of settlements by the Trustee, it is the oldest litigating device in the book to tell one's opponent it would be wise to settle now, early-on, because the price of settlement will drastically increase if a decision is rendered in favor of the leverager. Terrified victims of Madoff would be prime targets for use of this common device by the Trustee.

2.      The number of persons who will be adversely affected by the Trustee's motion in derogation of the Second Circuit's jurisdiction is currently unknowable with any precision, but is certain to be very large.  It is unknowable with precision because the Trustee has not announced whom he will be seeking clawbacks from in avoidance actions.  It will be very large because, in September 7, 2010 answers that SIPC sent to a Congressional subcommittee which has jurisdiction over it and which sent it questions on August 20th,[4] SIPC said "the Trustee is reviewing the facts of approximately 1,000 possible avoidance actions" against persons who are in the category of innocent individuals "as to whom knowledge is not a factor." (SIPC Answers to Congress, p. 5; Ex. 1, p. 5.)  From these persons, the Trustee expects there could be a "recovery of approximately" 4.8 billion dollars (*id.,* p. 5). (SIPC Answers, p. 5; Ex. 1, p. 5.)

Plainly, there will be a *host* of avoidance actions since the expectancy is that *$4.8 billion dollars* will be clawed back from innocent people who had no knowledge of the fraud.  Most of these innocent people, moreover, are small investors:  SIPC's answers show that, under the CICO method, over half of them (1,204 of 2,319) have accounts of less than one million dollars (*id.*, p. 5), with an average account size for all already allowed claims of $376,671 (*id.*, p. 3), and an average size of the more than fifty percent

---

[4] The Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises of the House Financial Services Committee.

of accounts that are less than one million dollars being approximately $318,000.[5]

Because the Trustee expects to claw back *$4.8 billion dollars* from innocent people, and

most innocent people were small investors, there of necessity will have to be, as said

above, a large number of clawback actions.[6]

---

[5] Calculations showing this can be found at
http://velvelonnationalaffairs.blogspot.com/2010/09/information-provided-to-congress-by.html.

[6] The answers provided to Congress by SIPC did not diminish legislators' displeasure with SIPC or the Trustee. Thus, the following was said by members of the House subcommittee at a hearing on September 23, 2010, two weeks after receiving SIPC's answers. (Exhibit 2, *infra*.)

    1.    Subcommittee Chair Kanjorski (a Democrat) said SIPC has ignored the spirit of the law, it has created a major inconsistency with regard to statements from brokers, it has seriously eroded investor trust, and its tone must be changed and it must be refocused on maintaining investor confidence and protection. (Transcript of Hearing of the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises of the House Financial Services Committee, p. 2. (Ex. 2, *infra*, p. 2)

    2.    Ranking member Garrett (a Republican) said SIPC and the Trustee should stop acting as an "adversary against innocent investors" who are now being "hunted down and accused of . . . some sort of wrongdoing;" that SIPC is blaming the victims instead of meeting their reasonable expectations; that the Trustee is refusing to turn over records that are important for key aspects of the case and *would cause "the Trustee's net equity formulation [to] completely be called into question"* if not all transactions were fraudulent [we now know, as discussed *infra*, that there *were* nonfraudulent investments in Treasuries and short term instruments and that the net equity formulation of SIPC and the Trustee is therefore wrong beyond dispute]; that it is "critically important" for investors as well as SIPC to have those records; that SIPC is ignoring interest, earnings, and the time value of money; that the IRS' taking of tax payments was a government imprimatur on Madoff; that the Trustee may seize tax refunds; that SIPC is not considering advances from its fund separately from distribution of customer property; and that SIPC has "lost the trust of many investors, *as well as the trust of many members here of Congress as well*. (Ex. 2, *infra,*, pp. 2, 3, 19, 20 (emphases added).)

    3.    Congressman King (a Republican) said the investors are victims who are being treated by the Trustee "as if they were coconspirators of Madoff, rather than victims," and when "you listen to the tactics and methods being used against them by the trustee, it's similar to people under indictment or under investigation by a grand jury, by the United States Attorney, by the SEC;" that the Trustee is being allowed "to go after them when they are victims, as if they are guilty themselves; that the government and Trustee "are going out of its way to make them victims again;" that victims are being treated "as if they were criminal defendants rather than victims" and are "being subjected to the same type of treatment that defendants are put through in massive criminal conspiracies;" that "moral harm [is] being done here;" that the Trustee is acting towards victims in "a high handed arrogant" way, is putting victims through "incredible ravages and suffering," and is a "runaway trustee;" that there is "almost an inherent conflict of interest" when a Trustee recommended to the Bankruptcy Court by SIPC is now arguably "putting a tremendous effort into protecting SIPC's funds," and is "working to protect SIPC, rather than protecting investors;" and that investors who withdrew funds from Madoff in reliance on

5

So a very large number of persons will be the subject of avoidance actions, but few if any of them yet know whether the Trustee will *in fact* sue them. Yet the Trustee is seeking by his motion to establish the procedural ground rules that will govern their cases even before most of them know whether they will be sued, and when large numbers of them, who have *not* been represented by counsel here, may not even *know* that the Trustee has moved for the establishment of rules that will govern their cases. Those who do know of the Trustee's motion, but do not know whether they will be sued, must either (i) allow the Trustee to have his way because, being in greatly reduced circumstances, they cannot afford to hire counsel to contest the rules of cases which may never be brought against them, or (ii) spend money they can ill afford to hire counsel to contest rules to govern cases which may never be brought against them. Those who do *not* know of the Trustee's motion are simply out of luck.

It is thus clear that, even were the Trustee's motion not in violation of the basic reason why he sought and this Court granted a direct appeal (the reason being that a

---

their statements are now "suddenly confronted with a massive clawback which is going to destroy that person, destroy their business, and also destroy any hope of financial security for their children or grandchildren." (Ex. 2, *infra*, pp. 4, 5, 15, 16, 17, 23.)

4.    Congressman Ackerman (a Democrat) said the victims are guilty of no crime and trusted a system and a government that respectively betrayed them and failed them; that at least a thousand people were "traumatized by Bernard Madoff *and are now being terrorized by the Trustee*; that the federal government bears moral responsibility for creating a climate that allowed these things to happen; that investor confidence has been damaged at a critical time in the country's efforts to recover economically and financially; that he "would be willing to bet that there are people who took nothing out of their account, who are much wealthier, much wealthier than some people who took a 150 percent out of their account because they had to live on it" [a statement which bears on a point stressed by appellant in prior briefs]; that people have beyond question been victimized, yet are now "being told they're accomplices spending stolen money. I mean, that's pretty adversarial."; that because people believed Madoff's statements, "therefore [they are] guilty of something, and therefore the crooks are in charge of the agenda;" and that the IRS was "delighted to rely on the bottom line" of Madoff's statements when collecting taxes and would go after people who "didn't pay based on that bottom line." (Ex. 2, *infra*, pp. 4, 12, 13, 17, 18 (emphases added).)

Second Circuit decision on CICO versus FSM will govern important aspects of the case, including whether there can even be clawbacks suits), and even were the motion not in derogation of the jurisdiction of the Second Circuit, the motion would still be improperly premature now. The proper, appropriate methodology (even in the absence of the appeal currently pending in the Second Circuit) would be for the Trustee to first say against whom he will bring avoidance actions, to then make a motion for the entry of the procedural rules to govern the avoidance actions, and for those who at that time will know they will be defendants in avoidance actions to then support or oppose the procedural rules which the Trustee requests.[7]

3.      There is absolutely no need to establish the procedural rules governing avoidance actions *at the present time*. For the Trustee has more than enough to do for a long time into the future in efforts to recover a total of $17 billion dollars from investors whom he believes (often correctly) are *not* innocent. In SIPC's answers to Congress, it points out that the Trustee has already "brought 19 avoidance actions . . . seeking to recover approximately $15,000,000,000.00" (fifteen *billion* dollars) and is considering "the commencement of about 100 avoidance actions seeking the recovery of at least $2,000,000,000.00" (two *billion* dollars) from persons "who had enough information to be on inquiry notice of the fraud." (*Id.*, p. 5.) Thus, the Trustee already has filed or has in contemplation almost 119 major lawsuits, against persons whom he thinks are *not* innocent investors, seeking a total of 17 billion dollars. 119 major suits seeking $17

---

[7] One of the devices used by the Trustee to try to persuade this Court is to claim that he has granted hardship exemptions to clawbacks. But he does not tell the Court how many such exemptions have been granted, nor did SIPC tell Congress this in its answers. All that SIPC said in its answers is that "Hundreds of customers filed hardship applications" and "many" were granted. *Id.*, p. 7. But how many is "many"? Twenty or thirty could conceivably be regarded as "many." Neither the Trustee nor SIPC has told this Court the specifics.

*billion* dollars from investors he considers not to be innocent should be sufficient to keep
the Trustee occupied while the Second Circuit decides the net equity question. Indeed,
the "mere" 19 suits seeking a "mere" fifteen billion dollars -- from persons whom the
Trustee believes to have been deeply complicit, as shown in the complaints he has filed --
would keep the Trustee busy, and in truth these 19 suits are the only ones which should
be pursued prior to a Second Circuit decision on net equity, except to the extent, if any,
that there are others among the 100 additional possible defendants whose possible
knowledge or complicity plainly equals those of the 19 who have already been sued.

In the circumstances, it is somewhat difficult to understand why the Trustee
would seek the entry of an important procedural motion that governs concededly innocent
people before he even announces which of them he will sue,[8] that violates the reason for
a direct appeal, that is in derogation of the jurisdiction of the Second Circuit, and that is
subject to the All Writs Act. Conceivably, the answer to this puzzlement is that the
Trustee, as he publicly announced on National Public Radio, expects to recover 50 cents
on the dollar from investors, or about nine to ten billion dollars; desires to obtain monies
to give to SIPC, as he told this Court in his Amended Third Interim Report For The
Period Ending Marching 31, 2010, p. 50; is eager to get on with all this even against
concededly innocent investors; and may be eager to use leverage against them regardless
of the possibility of a subsequent, leverage-destroying Second Circuit decision against
CICO. Or perhaps the Trustee understands that his attempt to obtain an order for all the
procedures he desires -- many of which are highly questionable -- will face greater
opposition after he announces whom he will sue in avoidance actions, because then

---

[8] It is this kind of "highhanded arrogant" action which has led Congressmen to explicitly state, as set forth
in footnote 3, *supra*, that the Trustee is treating innocent investors "as if they were coconspirators of
Madoff," "as if they were criminal defendants."

persons who do not now know whether they will be sued, but then *will* know they are being sued, will join in opposing rules he seeks that happen to be dubious, sometimes *very* dubious. The sequence of events here, and some of the sought after rules, indicate that this possibility cannot be eliminated out of hand. Thus:

On Thursday, October 21st, the Trustee filed his motion and supporting memorandum. The detail and length of the requested procedural rules cover *nine* single spaced pages, making clear on its face that the Trustee had been considering and developing his proposed rules for a long time, probably for months. But the Trustee gave opponents -- who sometimes did not see the papers for another three or four days (i.e., not until Monday, October 25th) -- only until October 28th to file objections: he gave opponents only one week after his filing, and only three days after some first saw the papers, to absorb, do research on, and write objections to nine single spaced pages of rules on which he self evidently had been working for months. (Later he "graciously" extended the deadline for objections by six days, until November 4th.) But many of the proposed rules, on which the Trustee self evidently lavished extensive time, require significant research and full scale briefing because a significant number of them are not only outcome-determinative but appear to transgress fair procedure and due process, and consequently go far beyond the power of bankruptcy courts to establish procedures for the resolution of cases. Thus:

- The proposed rules bar discovery on the amounts of money which, the Trustee has admitted in the Court of Appeals, Madoff earned on short term instruments.[9] This money should beyond debate have been credited to the

---

[9] In his brief, when explaining that the money from the fraud was kept in the 703 account at Chase (later JP Morgan Chase), the Trustee says, at page 15, that "Balances in the account at the end of each business day

victims, especially since the funds to buy the short term instruments came from the JP Morgan Chase 703 account, into which Madoff put the victims' money. But these sums were not credited to investors by the Trustee. Given the scores *of billions* of dollars that moved through the 703 account -- sometimes tens of billions of dollars in a single year -- (SIPC Answers, p. 9, Ex. 1, p. 9), the amounts of earnings from short term instruments which should have been but were not credited to victims under CICO could be in the billions of dollars, or the several billions of dollars, over the 20 or 30 years or more of the Ponzi scheme. But discovery of this is barred under the Trustee's proposed procedural rules.

- Madoff's business was a single corporation that performed three functions: market making, proprietary trading, and the hedge fund/Ponzi scheme. The Government and the Trustee have said that the 703 account was used as a slush fund from which money was withdrawn, among other reasons, to finance, as necessary, the two legitimate aspects of Madoff's operation, market making and proprietary trading. For this reason (and others) some percentage of revenues -- perhaps even 100 percent -- from

---

were transferred to affiliated overnight investment accounts at Chase to purchase Treasuries or other short-term paper until additional monies were needed to fund additional withdrawal requests by customers, capital needs of the broker-dealer operation of BLMIS, or Madoff's (and other insiders') personal needs." This disclosure made in the Trustee's brief *shows that there were legitimate earnings, from Treasuries and short term paper, that should have been credited to investors,* just as investors receive the earnings which accrue when honest mutual funds or hedge funds "park" their money in short-term instruments to await stock market opportunities. The recent disclosure thus shows that the calculation of CICO by the Trustee and SIPC *is ineluctably in error because they did not credit investors with the proceeds of the earnings on these Treasuries and short-term instruments, proceeds which ineluctably were part of investors' investment, ineluctably had to be credited to investors as a defacto part of their "cash-in," just as at mutual funds and hedge funds.* In other words, not only is their a dispute here over whether to use CICO or the FSM, but there *is even a dispute over the calculation of CICO by the Trustee and SIPC,* now that they have disclosed the existence of investments in Treasuries and short-term instruments with whose earnings they did *not* credit investors.

the market making and proprietary trading arms of the Madoff firm should have been credited to investors (which would increase their "cash-in" under CICO, increase their final statements under CICO, and thus affect their right to up to $500,000 from the SIPC fund and their nonsusceptibility to clawbacks. But it has not been credited to investors by the Trustee, and the amounts of revenues which *should* have been credited to investors is barred from discovery under the proposed rules.

- The proposed rules bar lawyers from showing to their clients confidential financial information the Trustee has amassed about the client. Lawyers are thus handicapped in defending their clients, since they cannot obtain the client's input about the Trustee's claimed information -- information about the client himself, no less.

  The Trustee's proposed rules of confidentially also appear to bar counsel for different parties from working together, which could greatly handicap counsel.

- Under the proposed rules, the Trustee need not provide lawyers with actual data bearing on the cases of the lawyers' clients, but only with summaries. This would be laughed out of court in civil cases in the Federal District Court and would be grounds for immediate reversal in criminal cases. (Little wonder that Congressmen have objected to the fact that, in their view, the Trustee is treating innocent victims as if they are criminals.)

- The proposed procedural rules bar depositions of the Trustee, in part on the claim that "any information that [he] does have is the result of privileged communications with his attorneys." (Trustee Motion, p. 11, n. 8.) The entire claim is a farce. Much of the Trustee's information about the case comes from SIPC and he has no privilege with regard to SIPC nor does SIPC have any privilege with regard to him. As well, the fact that the Trustee received information from lawyers is irrelevant to whether he can be deposed *at all*. For he can be deposed and asked about his knowledge of given matters, even though he cannot be required to say whether his lawyers told him what he knows. What the lawyers told him is privileged; what he knows he is required to say, though he cannot be required to say that his lawyers did or did not tell him what he knows and must therefore testify to.

All of this is not even to mention that the Trustee, like Stephen Harbeck, the lawyer who is head of SIPC, often acts in the capacity of a businessman, not a lawyer, and no privilege of any type attaches to his conduct and statements as a businessman.

The Trustee, of course, has *extensive* information on which he should be deposed, such as his knowledge of SIPC's finances, his discussions with Harbeck about how best to safeguard SIPC, the number of billions of dollars he hopes to recover in customer property in order to give money to SIPC and the amount he intends to give to SIPC, the reasons for denying requests for hardship treatment, and a host of other crucial matters.

The foregoing does not exhaust the list of questionable procedures requested by the Trustee. But it does suffice to show that the requested procedures deprive investors of rights normally taken for granted under the Rules of Civil Procedure and as matters of fairness and due process, and that could very well be outcome-determinative.[10] In such circumstances, the procedural rules requested by the Trustee should not be rammed through in a week or two or three, without victims having a full chance to absorb, do research on and write significant briefs, with subsequent oral argument, on the requested rules. This is true wholly aside from the fact that the Trustee's effort to obtain an order providing for altered rules, an effort predicated on CICO, is completely improper in view of the reason for a direct appeal in the Second Circuit and is in derogation of the jurisdiction of the Court of Appeals under the All Writs Act.

## CONCLUSION

For the foregoing reasons, the Trustee's motion for entry of an order *at the present time* approving his suggested procedural rules should be denied, with the Trustee remaining free to seek the requested rules after he has sued those against whom he intends to bring avoidance actions and after the Second Circuit has decided the net equity issue.

Respectfully submitted,

/s/ Lawrence R. Velvel
Lawrence R. Velvel, Esq.
Massachusetts School of Law

---

[10] To take just two examples of how the proposed rules are outcome-determinative, they preclude discovery, as said, about earnings from short term instruments, which investors have an absolute right to be credited with, and about earnings from other branches of Madoff's business, which investors may well have a right to be credited with. Without the right to obtain discovery on these matters, victims will find it impossible to fully and successfully assert their rights. The discovery bar is thus outcome-determinative (and violates 28 U.S.C. §2075, which provides that rules of "process, writs, pleadings, and motions, and the practice and procedure in cases under Title 11. . . shall not abridge, enlarge, or modify any substantive rights."

500 Federal Street
Andover, MA 01810
Tel:  (978) 681-0800
Fax:  (978) 681-6330
Email: Velvel@mslaw.edu

Dated:  November 2, 2010

R:\My Files\Madoff\Objection2TrusteeProcedureRules.doc

# EXHIBIT 1

# SIPC

SECURITIES INVESTOR PROTECTION CORPORATION
805 FIFTEENTH STREET, N. W., SUITE 800
WASHINGTON, D. C. 20005-2215
(202) 371-8300    FAX (202) 371-6728
WWW.SIPC.ORG

September 7, 2010

**BY MESSENGER**

Honorable Paul E. Kanjorski
Chairman, Subcommittee on Capital
 Markets, Insurance and Government
 Sponsored Enterprises
2188 Rayburn House Office Building
Washington, DC 20515-3811

Honorable Scott Garrett
Ranking Member, Subcommittee on
 Capital Markets, Insurance and
 Government Sponsored Enterprises
2188 Rayburn House Office Building
Washington, DC 20515-3811

Dear Chairman Kanjorski and Ranking Member Garrett:

Below is the information that you requested in your letter dated August 20, 2010. The information follows each request and, as per your request, is as of August 1, 2010.

1.  A schedule that details the total balance of the SIPC Fund as defined by the Securities Investor Protection Act ("SIPA"). Of this balance, please identify how much is unallocated, reserved for the Madoff proceeding, and reserved for all other proceedings.

**Response:**

The SIPC Fund, as defined by SIPA, consists of cash on hand or on deposit and amounts invested in United States Government or agency securities.

As of August 1, 2010, rounded to the nearest $100,000, the SIPC Fund consisted of:

| | |
|---|---|
| US Government Securities maturing within 10 years at fair value (including accrued interest receivable) | $1,204,600,000 |
| Cash on hand or on deposit | $23,600,000 |
| Total | $1,228,200,000 |

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 2

The SIPC Fund does not have "reserves" established against it. All expenditures by SIPC are made out of the Fund as provided under SIPA. It is used to meet all SIPC obligations under SIPA as they occur.

2. An explanation of how SIPC Members are presently assessed annually and an estimate of the aggregate assessment that will be added to the SIPC Fund during the remainder of 2010 and in 2011.

**Response:**

Since April 1, 2009, the SIPC member assessment has been based on 0.25% of each member's net operating revenues as reflected on the members' financial reports filed with the Securities and Exchange Commission ("SEC" or "Commission") and the Financial Industry Regulatory Authority.

Members must complete a General Assessment Payment Form at their mid-year and a General Assessment Reconciliation Form at their year end. These filings and any assessment payments are due 45 and 75 days after the end of the period, respectively.

It is currently estimated that collection of member assessments will add an aggregate of approximately $500,000,000 to the SIPC Fund during the remainder of 2010 and in 2011.

3. A schedule that details all lines of credit available to SIPC, outstanding borrowings, and remaining credit available. Also, please disclose whether any lines of credit have been closed during 2009 and 2010 and explain why.

**Response:**

In the event the SIPC Fund is or may reasonably appear to be insufficient for the purposes of SIPA, the SEC is authorized to make loans to SIPC and, in that connection, the Commission is authorized to issue notes or other obligations to the Secretary of the Treasury in an aggregate amount not to exceed $2.5 billion. Currently SIPC has no other lines of credit available. There is currently no outstanding borrowing and to date there has not been. SIPC had a $500 million revolving line of credit with an international consortium of banks which expired effective March 1, 2009, and an additional $500 million revolving line of credit with that consortium of banks that expired effective March 1, 2010. Given the developing financial crisis, the consortium of lenders on SIPC's commercial credit lines was unwilling to renew the credit lines.

SIPC, by bylaw, increased the "target" for the SIPC Fund to $2.5 billion. Assessments based upon a percentage of net operating revenue will remain in place until that higher target is reached. Once the target is reached, together with the Government line of credit, SIPC will have access to $5 billion of funds.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 3

I would note that SIPC, under current law, has demonstrated that it has sufficient resources for its statutory mission.

4. For claims related to the Madoff Ponzi scheme, please provide a schedule that details the number and aggregate value of allowed claims and the number and aggregate value of allowed claims at or below the statutory limits of SIPC protection, Also, include the average disbursement per claim.

**Response:**
This question and those that follow use the term "claims" with respect to the information being sought. However, SIPA provides protection per "customer," as defined in SIPA, and not per claim. Two claims submitted by the same customer could be aggregated for purposes of SIPA protection if that customer held more than one account in the same capacity at the brokerage. For example, if John Jones had two accounts at a brokerage, both of which were in his name and held by him in the same capacity, the accounts would be combined for purposes of the SIPC advance.

The answers that follow are predicated upon an analysis of the customer accounts that have been determined, or remain to be determined, by the Trustee and the relationship of those customer accounts to the claims that have been filed. Wherever possible, the Madoff Trustee and SIPC encouraged claimants to file claims to preserve any rights the claimants might have. Consequently, there are many more claims than there are customer accounts. It also should be noted that much of the information relating to claims analyzed under a last fictitious statement approach are rough approximations at best. The claims have not been reviewed or analyzed on that basis and some adjustments to the information could become necessary upon actual review. With this background in mind, the answer to question 4 is as follows:

The Trustee has allowed 2,175 claims related to 1,893 accounts, with a total allowed claims value of $5,556,299,243.18. The 2,175 allowed claims include 282 amended and/or duplicate claims. With respect to these allowed claims, SIPC has committed $713,037,947.41 in SIPC advances to these claimants. Of these allowed claims, 1,330 claims representing 1,149 accounts were allowed for more than $500,000.00. 845 claims representing 744 accounts were allowed for $500,000.00 or less. The average SIPC protection committed per account with an allowed claim is $376,671. The claims review and determination process continues.

5. Please estimate how many Madoff Ponzi scheme claimants would be eligible for advances of up to $500,000 under the final statement method of calculating "net equity" as that

Honorable Scott Garrett
September 7, 2010
Page 4

term was defined in the case considered by the U.S. Bankruptcy Court for the Southern
District of New York (Case No. 08- 01789-brf). Also, please estimate the aggregate value
of advances that would have been made under this method.

## Response:

The last fictitious statement approach assumes that claimants should be paid based on the
last fictitious account statement issued to them by Bernard L. Madoff Investment
Securities LLC ("BLMIS").   These statements reflect phony backdated securities
positions chosen by Bernard Madoff to yield fake profits pre-determined by him.  Under
an approach that honors the final fictitious statement, there could be 4,459 accounts
eligible to share in customer property and to the extent not fully satisfied, eligible for a
SIPC advance.  The holders of these 4,459 accounts could be entitled to a total of
$2,010,467,854.23  in  SIPC  protection.   The  $2,010,467,854.23  includes  the
$713,037,947.41 which SIPC already has committed in customer advances and an
estimated additional amount of approximately $175,000,000.00 that the Trustee expects
to ask SIPC to advance, after August 1, 2010, for the satisfaction of customers under the
Trustee's cash-in/cash-out methodology.  Thus, if the Trustee were to use the final
fictitious statement method of calculating "net equity," an additional $1,122,429,906.82
in SIPC advances could be made.

It should be noted that allowance of claims on this basis necessarily would reduce the
amount of customer property available to satisfy those claimants who have yet to recover
their principal.  The SIPC advance supplements the distribution of customer property that
the Trustee collects for the benefit of customers.  Such property is shared pro rata by
customers.  Distribution to claimants based on a last fictitious statement approach means
that customer property and a SIPC advance will be used to pay not only customers who
have yet to recover the amount deposited with BLMIS, but those customers who, while
the firm was in business, took out more than they put in.  Enlarging the pool of claimants
sharing in customer property necessarily means less property for those who have yet to
recover their principal and more property for those who, while the firm was in business,
withdrew their principal and received other investors' money in the form of fake profits.
In other words, the fake profits of the investors who already recovered their principal
continue to grow when the firm is in liquidation to the continued detriment of those
investors still owed their principal.

6. Please estimate the total number and value of distributions made to Madoff investors in
   excess of their investments. Of these distributions, please estimate how many
   avoidance actions that the trustee has brought or expects to bring and the amount the
   trustee has recovered and expects to recover in the future. Further, please break out
   the number of and expected recoveries from avoidance actions between investors
   who may have known about or participated in the Ponzi scheme and those who were
   likely to be unaware of the Ponzi scheme.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 5

**Response:**

There were approximately 90,000 disbursements totaling $18.5 billion made to Madoff investors in excess of their investments.

The Trustee has brought 19 avoidance actions under the Bankruptcy Code seeking to recover approximately $15,000,000,000.00.

The Trustee advises that he anticipates bringing avoidance actions in two categories. One category would involve customers who received other customers' money, withdrew more than they deposited with Madoff, and as to whom knowledge is not a factor. At this time, the Trustee is reviewing the facts of approximately 1,000 possible avoidance actions that could result in the recovery of approximately $4,800,000,000.00 for the benefit of customers who have yet to be repaid their principal.

The other category consists of avoidance actions in which the Trustee alleges that the customer had enough information to be on inquiry notice of the fraud. At this time, the Trustee is considering the commencement of about 100 avoidance actions seeking the recovery of at least $2,000,000,000.00 for the benefit of customers who have yet to recover their principal.

7. For all Madoff-related SIPC claims, please provide a schedule stratified by claims of less than a million dollars, between one and three million dollars, between three and five million dollars, between five and ten million dollars and in excess of ten million dollars that details how many claims would be eligible under both the final statement method and the cash-in/cash-out method of calculating not equity. Further, please provide the aggregate amount that could be clawed backed from claimants under each method.

**Response:**

Under the Cash In/Cash Out Methodology, below is a stratified schedule of accounts potentially eligible for SIPC protection:

| Category | Accounts | Total Combined Amount |
|---|---|---|
| Less Than $1,000,000 | 1,204 | $381,921,324.59 |
| $1,000,000 to $2,999,999 | 626 | $1,096,526,388.57 |
| $3,000,000 to $5,000,000 | 198 | $754,646,856.41 |
| $5,000,000 to $9,999,999 | 153 | $1,027,403,169.73 |
| Greater Than $10,000,000 | 138 | $14,026,555,101.15 |
| | 2,319 | $17,287,052,840.45 |

Honorable Scott Garrett
September 7, 2010
Page 6

The following is a stratified schedule of accounts that potentially would be allowed under a last fictitious statement approach:[1]

| Category | Accounts | Total Combined Amount |
|---|---|---|
| Less Than $1,000,000 | 1,485 | $670,889,986.09 |
| $1,000,000 to $2,999,999 | 1,372 | $2,522,097,200.08 |
| $3,000,000 to $5,000,000 | 569 | $2,172,486,413.62 |
| $5,000,000 to $9,999,999 | 529 | $3,690,585,075.03 |
| Greater Than $10,000,000 | 499 | $48,055,627,602.00 |
| Dec 2008 Accts[2] | 5 | $76,905,772.00 |
| | 4,459 | $57,188,592,048.82 |

For the answer to the final part of question 7 as to the transfers that the Trustee might seek to avoid under the Bankruptcy Code, please see the answer to question 6 above.

8. Please estimate the number of Madoff- related claims not yet determined and estimate the timeframe for when those claims will likely be determined. Also for all claims filed since the liquidation proceedings started, please calculate the average time period expressed in months between the filing of the claim and the trustee's determination of the claim.

**Response:**

Of the 16,374 filed claims, 13,189 have been determined and 3,185 claims remain to be determined. The Trustee has advised that he expects to have all claims determined before the end of this year. For the 13,189 determined claims, the average time period between the filing of the claim and determination is 7.55 months.

In analyzing the foregoing information, there are certain facts that are very important for a complete understanding of these statistics. First, this is not a typical SIPC proceeding in which securities or cash were on hand at the time of the failure of the brokerage house. As is well known, this was a Ponzi scheme in which the only assets were other people's money or assets derived from such funds.

Furthermore, this was a Ponzi scheme of long standing, going back over at least 30 years. Since the traditional approach in all Ponzi scheme matters and the one consistent with SIPA is to return to the investor what the investor put into the scheme, the Trustee was

[1] This analysis excludes the potential results of settlements negotiated by the Trustee.

[2] This category relates to accounts that were opened after November 30, 2008. These accounts did not receive a November 30, 2008 Customer Statement.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 7

required to do a full forensic analysis of all the books and records of the debtor, going back to at least the early 1980s in order to fully determine the amount of money which might be due to each customer based upon the customer's investment.

This forensic analysis included not only a complete review of the books and records of the failed brokerage house, but also documents received from third parties, such as banking institutions, clearing houses and other brokerage houses, as well as documents received from the customers themselves. There are literally millions of documents that have been reviewed by the Trustee and his staff in connection with the evaluation of each of the customer claims filed. Furthermore, access to books and records required coordination and sharing with law enforcement authorities which complicated and, in some instances, necessarily delayed the review.

Moreover, in order to reach out to customers who might be in financial distress, the Trustee instituted a Hardship Program early in the case which gave every customer the opportunity to advise the Trustee of his or her financial circumstances so that the claim could be processed as quickly as possible. Hundreds of customers filed hardship applications, and as a result of the Trustee's actions, many of these hardship applications were granted and the Trustee determined those claims as promptly as possible.

In addition, it should also be noted that due to the long term nature of this Ponzi scheme, many of the customer accounts presented multiple generational investments by customers with Mr. Madoff. Thus, it was not simply a matter of examining a single account for a short period of time, but in many instances, it required an analysis of multiple accounts going back several decades in order to fully determine the amount of money invested by the customer and whether the customer had invested more money than he or she had received from Mr. Madoff.

Notwithstanding these extreme difficulties, the Trustee has determined over 80% of the customer claims filed. The review and determination of customer claims is an ongoing process. The remaining claims include the most difficult ones, such as those of members of the Madoff family and extended family, insiders (former employees), feeder funds and others.

9. For all Madoff- related claims, please detail how many claims have been disallowed because the investors were not directly invested with Mr. Madoff's firm.

**Response:**
There are 8,489 determined claims submitted by claimants who had no account at Madoff that were disallowed. There are an additional 2,094 undetermined claims that tentatively are in this category but may be re-categorized upon further review.

Honorable Scott Garrett
September 7, 2010
Page 8

10. For each year, from 1992 until the liquidation of Bernard L. Madoff Investment Securities, please detail the aggregate funds that flowed into the firm and out to investors.

**Response:**

For each year from 1992 through 2008, the following represents the aggregate funds that flowed into and out of BLMIS:

| Year | Cash In | Cash Out |
|---|---|---|
| 1992 | ($2,097,318,423.98) | $2,077,513,621.46 |
| 1993 | ($2,018,244,086.41) | $2,127,095,135.34 |
| 1994 | ($2,784,953,707.68) | $2,784,003,353.00 |
| 1995 | ($4,346,500,359.97) | $4,407,047,285.35 |
| 1996 | ($6,669,384,242.44) | $6,549,481,308.31 |
| 1997 | ($9,046,919,591.00) | $8,636,920,182.65 |
| 1998 | ($12,826,039,594.36) | $11,697,071,675.76 |
| 1999 | ($17,917,907,439.09) | $17,094,507,049.12 |
| 2000 | ($25,629,825,795.12) | $25,702,346,740.45 |
| 2001 | ($37,404,909,113.36) | $37,580,315,488.37 |
| 2002 | ($3,315,517,149.06) | $3,564,299,618.83 |
| 2003 | ($3,162,410,682.31) | $3,667,760,430.70 |
| 2004 | ($4,045,509,142.92) | $3,528,053,488.39 |
| 2005 | ($3,616,828,561.93) | $4,803,025,580.01 |
| 2006 | ($5,951,217,967.82) | $4,403,608,692.87 |
| 2007 | ($7,284,216,531.24) | $4,488,987,554.54 |
| 2008 | ($6,308,482,583.89) | $10,556,145,532.54 |

Respectfully submitted,

Stephen P. Harbeck
President

SPH:ved

cc: Hon. Barney Frank
Hon. Spencer Bachus

# EXHIBIT 2



1 of 1 DOCUMENT

Copyright 2010 Federal News Service, Inc.
All Rights Reserved
Federal News Service

September 23, 2010 Thursday

**SECTION:** PRESS CONFERENCE OR SPEECH

**LENGTH:** 20646 words

**HEADLINE:** HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERN-MENT SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE;
SUBJECT: "ASSESSING THE LIMITATIONS OF THE SECURITIES INVESTOR PROTECTION ACT";
CHAIRED BY: REPRESENTATIVE PAUL E. KANJORSKI (D-PA) WITNESSES JOSEPH BORG, DIRECTOR, ALABAMA SECURITIES COMMISSION; ORLAN JOHNSON, CHAIRMAN OF THE BOARD, SECURITIES IN-VESTOR PROTECTION CORPORATION; JOHN COFFEE, ADOLF A. BERLE PROFESSOR OF LAW, COLUM-BIA LAW SCHOOL; IRA HAMMERMAN, SENIOR MANAGING DIRECTOR AND GENERAL COUNSEL, SE-CURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION; STEVEN CARUSO, PARTNER, MADDOX, HARGETT, & CARUSO;
LOCATION: 2128 RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C.

**BODY:**

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE SUBJECT: "ASSESSING THE LIMITATIONS OF THE SECURITIES INVESTOR PROTECTION ACT" CHAIRED BY: REPRESENTATIVE PAUL E. KANJORSKI (D-PA) WITNESSES JOSEPH BORG, DIRECTOR, ALABAMA SECURITIES COMMIS-SION; ORLAN JOHNSON, CHAIRMAN OF THE BOARD, SECURITIES INVESTOR PROTECTION CORPORA-TION; JOHN COFFEE, ADOLF A. BERLE PROFESSOR OF LAW, COLUMBIA LAW SCHOOL; IRA HAM-MERMAN, SENIOR MANAGING DIRECTOR AND GENERAL COUNSEL, SECURITIES INDUSTRY AND FI-NANCIAL MARKETS ASSOCIATION; STEVEN CARUSO, PARTNER, MADDOX, HARGETT, & CARUSO LO-CATION: 2128 RAYBURN HOUSE OFFICE BUILDING, WASHINGTON, D.C. TIME: 10:00 A.M. EDT DATE: SEPTEMBER 23, 2010

REP. KANJORSKI: (Sounds gavel.) This hearing of the Subcommittee on Capital Markets, Insurance, and Gov-ernment Sponsored Enterprises will come to order. Pursuant to committee rules and prior discussions with the ranking member, each side will have 10 minutes for opening statements. Without objection, all members' opening statements will be made part of the record. And I yield five minutes to myself.

Nearly two years have passed since the massive $65-billion Madoff Ponzi scheme came to light. Since then, we have enacted the Dodd- Frank Wall Street Reform and Consumer Protection Act. Among many other things, this law amended the Securities Investor Protection Act, the statute that works to return money in securities to customers of failed brokerages.

To better protect the customers of failed brokerages going forward, the Dodd-Frank Act increases cash protection limits, and bolsters the resources of the reserve fund used to replace customers' missing cash and securities. This new law also quintuples penalties for misrepresentations of membership in or protections offered by the Securities Investor Protection Corporation.

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS. INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

Moreover, the statute makes important changes to prevent, rather than simply replace the loss of customers' property, including new custody safeguards for customers' assets held by certain financial professionals. The Dodd-Frank Act additionally requires the auditors of broker dealers to register with the Public Company Accounting Oversight Board. And this body has the authority to regulate these market gatekeepers. This change ought to put incompetent and unscrupulous one-man auditor shops, like the one which blessed the books of the Madoff brokerage out of business before investors get harmed.

Much more, however, remains to be done to protect investors. The victims of the Madoff Ponzi scheme and the Stanford Financial fraud include many hardworking families and frugal retirees who invested their hard-earned money with now-imprisoned or indicted con artists. Numerous press stories have relayed accounts about how these victims who sought to play by the rules have now had to greatly modify the way they live. The victims of these frauds believe that SIPC has fallen short in meeting the responsibilities, and they want change. I do too.

We, therefore, have many questions to explore today. For example, although SIPA protections do not currently extend to customers of investment advisors, we must explore the issue of expanding SIPA's coverage, as investment advisors may also commit fraud. In any serious efforts to reform SIPA, we must also consider what responsibility SIPC has to honor the broker statements that customers receive.

SIPC has denied the claims of customers based on seemingly legitimate paperwork provided to them by the brokers. Yet SIPC expects customers to use those very same statements to report unauthorized trading in their accounts. This inconsistency is unacceptable and we must work to resolve it. Investor trust, for which SIPA was designed to preserve, has been seriously eroded by SIPC's narrow interpretations of its statutory mandate.

While SIPC's actions may follow the letter of the law, many would argue that SIPA has ignored the spirit of the law. We therefore must consider the best way to change the tone of SIPC, and refocus this body on maintaining confidence in the financial system, and promoting investor protection. In the extent -- to the extent possible, we ought to also explore how SIPC could learn from the success of the Federal Deposit Insurance Corporation in maintaining the public's trust.

To address these questions and many others, SIPC has focused on modernization taskforce, and several members of this panel will appear before us today in their personal capacities. I for one, expect this taskforce to complete its work with great transparency, considerable outreach, and much speed. Moreover, this taskforce must view its mission as broadly as possible, and work to provide Congress with a comprehensive plan or reform.

In closing, we can further improve SIPA by building on the reforms of the Dodd-Frank Act. The witnesses before us today are recognized securities experts. Their recommendations, along with those offered by the Madoff victims, at our hearing last December, will undoubtedly help us in our work to update SIPA and better protect investors.

The chair recognizes the gentleman from New Jersey for 10 minutes.

REP. SCOTT GARRETT (R-NJ): Thank you.

As mad as I am at Madoff, I'm even more upset at my own government, over the way I've been treated in the aftermath of this fraud. That is gist of a quote from one of my constituents who was defrauded by Bernie Madoff, and who feels failed by the SEC and FINRA in protecting him while the fraud was going on, and who now faces a SIPC trustee who is threatening to clawback funds he withdrew from his Madoff account over the course of the last 15 or 20 years.

In a sense, these are -- innocent investors are being held to a higher standard. And both the government that was supposed to protect them and that gladly took their tax payments, and the organization, SIPC, that was supposedly set up to protect them by installing -- instilling greater confidence in our securities market.

We are holding today's hearing to access the limitations of the Securities Investor Protection Act, SIPA, and the Securities Investors Protection Corporation, SIPC, and to identify whether there are potential reforms that would better protect the investors. It would seem to me that one major and fundamental reform would be for them, through the actions of the trustee that's been appointed, to see itself as an advocate for rather than an adversary against innocent defrauded investors, so that they feel as though they are being assisted by the SIPC process, rather than hunted down and accused somehow of them doing some sort of wrongdoing.

So, there's one piece of legislation that's out there that could go at least part of the way in making things right for once, and potentially twice victimizing the Madoff investors.

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS. INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

A colleague of mine, in New Jersey, Bill Pascrell, has introduced the bill, H.R. 5058. It's called the Ponzi Scheme Victims' Tax Relief Act, and what it would do is liberalize the ability of those who are victims of theft to receive their refund for taxes, that they paid on gains, that the SIPC trustee is now trying to take back from them. I'm a cosponsor of this bill, which I feel should perhaps go a little further than the 10-year look-back, since their trustee is going back further than the 10 years in calculating the so-called net winners and losers.

Another aspect of the trustee's handling this case are now in the process of working a way through the court system, which matters will be decided. I'm concerned though about a looming deadline that's coming up, and that's in December, when the trustee will decide whether to go forward, with potentially thousands of clawbacks from these innocent, defrauded investors.

SIPC leadership and the trustee have indicated that they will not be going after the so-called ordinary people, people who are not leading a lavish lifestyle, and who had no knowledge of the fraud. But if you hear from my office and staff, that's not what I'm hearing from my constituents and others, and the people that I talk to when I come back at home. I spoke with one gentleman who, years ago, withdrew money to pay for college, and who lives a very modest lifestyle now.

He contacted a trustee's firm to get clarification what he wouldn't be plowed back -- that he wouldn't be plowed back. But he was told that others, and for giving a small percentage of what the trustee had calculated that he owned, he otherwise looked like he would be on the hook for the rest. In addition, he was told that anything he might recover in the form of tax refund, that too might be subject to seizure by the trustee.

So, I'm also concerned that, while these court cases are underway, the SIPC trustee has denied access to Madoff's records for the victims and their attorney. So access to these records is important for several key aspects of the case, including whether or not, at all, transactions reported by Madoff, over the years, were actually fraudulent transactions. If some of them weren't, then the trustee's net equity formulation would completely be called into question.

Inequitable access to these records results in a fundamental imbalance of the scales of justice in this case, and also calls into question whether ultimately there will be fair trial at the end of the day in this case.

So all of this, when you think about it, should make all of us feel very uncomfortable. The SIPC decal was supposed to mean protection, the SEC was supposed to provide protection. The IRS taking the tax payments also serve as a government imprimatur. SIPC is supposed to provide up to $500,000 in protection based on quote "reasonable expectation of customers."

In fact SIPC was created at the behest of the securities industry to encourage confidence in a more efficient paperless process, where investors would no longer have the -- a piece of mind one gets from holding on to the actual stock certificate, like we used to do in the old days. In their place, customers grew accustomed to depending on trade confirmations and account statements, which were regulated of course by the SEC and FINRA to set their reasonable expectations that they should have.

So as I said earlier though, instead of SIPC's meeting investors reasonable expectations, now it seems as though that they're blaming their victims instead. Instead of customers being able to rely on their account statements to calculate their SIPC protection, they're basically at the mercy of the trustee's formulation of net equity that doesn't take into account or consideration interest, earning, or the time value of money. Nor does the so-called customer-friendly methodology take into account the receiving SIPC protection as separate and distinct from the distribution of assets recovered. One of the results, unfortunately, is that SIPC has clearly lost the trust of many investors, as well as the trust of many members here of Congress as well.

So this hearing, Mr. Chairman, is timely. SIPC clearly needs the SIPC modernization taskforce to assist in its refocusing on its proper role, going forward. So I do look forward to the testimony we'll hear and the questioning from this panel. And with that, I yield back.

REP. KANJORSKI: Thank you, Mr. Garrett.

We'll now hear from the gentleman from New York, Mr. Ackerman.

REP. GARY ACKERMAN (D-NY): Thank you very much, Chairman Kanjorski, for calling this very important hearing. It's been nearly two years since Bernard Madoff confessed to masterminding the largest and longest-running Ponzi scheme in history, and turned himself in. After that fateful day in December 2008, the Securities Investment Protection Corporation, which is tasked with ensuring victims of broker fraud or failure and recovering assets from the

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

fraud of those victims, received over 16,000 insurance claims from Madoff's innocent victims. Of them, to date, SIPC has granted only 2,200.

That means that right now, at this very minute, many, if not most of the over 13,000 innocent victims of Bernard Madoff, who for years reasonably thought that they were entitled for SIPC insurance on the balance in their accounts in the unlikely event that their investments were entangled in a broker-dealer fraud or failure, instead are destitutes and out of luck. And those are just the investors who filed actual claims.

What crime did these investors commit? These 13,000 people and their families like millions, and millions of people who invest in our markets, put their trust in our financial system, its regulators, and its safeguards. Two years after Madoff turned himself in, two years after these 13,000 people have been turned away, time and time again, from the protection to which they reasonably believed they were entitled. It has become very clear that Madoff robbed them, our system betrayed them, and our government failed them.

Who's responsible? Who caused this problem? Who do we turn to? Who do the victims turn to? Now, people have reasonable expectations of government, its agencies, and the organizations that are created by them.

Where I come from, if the police don't do their job and stand idly by when terrible things happen; if a doctor just stands around and doesn't do what he's supposed to do; if emergency responders show up in the ambulance they just sit and watch the accident, people wind up suing those agencies, and the city and the municipality and the government for negligence. Someone is liable, whether it's because of incompetence or misfeasance or malfeasance, somebody is responsible for not fulfilling the reasonable expectations that people have, and come to rely on.

And here, in the federal government, if there's not a legal responsibility, there certainly is a moral responsibility for creating the climate that people depended on. That we have failed these investors is heartbreaking enough in terms of human tragedy. But the damage that has been done to investor confidence at this critical time in our economic and financial recovery as a result of our failure to safeguard and protect these innocent Madoff victims, and our country's negligence in leading them to believe that they were insured is as frightening as it is self-defeating.

Today's hearing will focus on the Securities Investor's Protection Act, and the present and future role of SIPC in providing assurance to investors in our markets that they are protected, really protected -- not fake protected, against broker-dealer fraud or failure.

It is my strong hope that this hearing is a prelude to the subcommittee's consideration of the Ponzi Scheme Investor Protection Act, a bipartisan bill that I've introduced along with numerous members of this subcommittee in the House to provide some relief to many of those innocent victims of Ponzi schemes of all kinds, who have been burned by SIPC, and to proactively assure investors in our securities market that they are protected against fraud, regardless of its scope or longevity.

Mr. Chairman, thank you very much again for scheduling the hearing, and I too look forward to hearing from our witnesses. And I yield back the balance of my time.

REP. KANJORSKI: Thank you, Mr. Ackerman.

Now, we'll hear from the other gentleman from New York, for two minutes, Mr. King.

REP. PETER KING (R-NY): Thank you, Mr. Chairman. At outset let me thank you very much for holding this hearing.

And I know it's important to get on to the hearing, so I'll keep my remarks brief. I want to fully identify myself with the statement of Mr. Garrett, both in precise content, and also in spirit. The fact is that the investors of Madoff were let down, were failed by our government -- by SEC, by FINRA. Despite numerous reasons why this fraud should have been stopped, it wasn't.

So these investors made the mistake of, number one, relying on Madoff, but number two, and more importantly, relying on our federal government. And now that they are victims, they are being treated by the trustee as if they were coconspirators of Madoff, rather than victims. And I've done some practice of law over the years, and when you listen to the investors and realize it -- and you listen to the tactics and methods being used against them by the trustee, it's similar to people under indictment or under investigation by a grand jury, by United States Attorney, by the SEC.

08-01789-cgm    Doc 3087    Filed 11/02/10    Entered 11/02/10 12:09:59    Main Document
Pg 29 of 38

Page 5
HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

There are years of records that are being demanded, going back 10, 15, 20 years. Every excuse, every possibility has been looked up by trustees to try to suck people into this and bring them in, not giving them the benefit of doubt, but again, treating them as if they were criminal defendants rather then victims.

And to me, as my good friend Mr. Ackerman said, at a time when we're trying to rebuild investor confidence, we are sending the worst possible message to the -- to investors that show that not only did the government let them down, but then in effect, the government allows the trustee to go after them when they are victims, as if they are guilty themselves.

And we're talking about people who have already lost millions of dollars because of this Ponzi scheme of Madoff, now having to spend millions and millions of dollars in legal fee to defend themselves. When our government should be working to help them, the government is going out of its way and the trustees are going out of its way to make them victims again. I find this entire process wrong.

I think sometimes we can get caught in our own universe, and we start debating how many angels can dance on the head of a pin, and not realizing that good, good people who've been hurt once are now being hurt even worse by the tactics of this trustee.

So I think it's important to keep that in mind as we go forward, and debate the technicalities and legalities, realize the moral harm that's being done here. And with that, I yield back the balance of my time.

REP. KANJORSKI: Thank you, Mr. King.

The gentleman from Colorado, Mr. Perlmutter, is recognized for one minute.

REP. ED PERLMUTTER (D-CO): Thank you, Mr. Chairman. I agree with one point raised by Mr. Garrett, Mr. King, and I disagree with another point. I'll start where we disagree. In terms of the timing of this; it was under an SEC and under administration of George Bush, and there was really not a lot of police on Wall Street, even though Mr. Markopolos or Markopolos raised the red flags a dozen times. So, got to take a look at who's in office to decide whether the system is working or not.

But it did not work well at that time. I agree with the gentleman that this is insult added to injury. And that really is what we're talking about here. And that seems to be the unfairness of the system that individuals, who through no real -- you know, they weren't active participants in a fraud. They were innocent victims of a fraud perpetrated by Mr. Madoff. There should be an opportunity for them to recover either through their taxes, through claims with SIPC, or to not have to face a clawback if they're not active participants.

And the law, I think, is a real problem in this arena, and needs to be changed. And I look forward to working with the gentlemen on these very subjects. Thank you.

REP. ACKERMAN: The chair will recognize Mr. Childers for three minutes.

REP. TRAVIS W. CHILDERS (D-MS): Thank you. I want to thank the Chairman first for holding this important, and very timely, I think, hearing to address the Securities Investor Protection Act. I will thank our witnesses for being here today. This subcommittee has looked at a number of issues related to SIPA during this Congress, focusing on the Madoff Ponzi scheme, as well as the Stanford Financial Ponzi scheme.

I'm here today as an advocate of the victims of the Stanford Financial scheme, while the victims of the Madoff scheme and the Stanford Financial scheme live throughout our country. I realize that, but too many of those Stanford Financial scheme victims live in the district that I serve, the Northern Portion of Mississippi. There are North Mississippi families who now live an uncertain future. They invested much of their life savings in certificates of deposit with the Stanford group company, a SIPC member and registered broker- dealer.

It is estimated that in Mississippi alone, our families lost $68 million, that is no small matter to me, and to the state of Mississippi. SIPC has denied coverage to the Stanford victims, when the SEC had the jurisdiction to file enforcement action against Stanford in 2009.

These investors purchased securities they didn't get. They purchased them from a SIPC member. SIPC's entire function is to return securities to customers of a broker-dealer when a firm becomes insolvent. There are several legalities to the case for extending SIPC coverage to Stanford victims, and I don't want to get into all of that.

that would provide any financial restitution to these people. And it's very convenient to make SIPC the whipping boy for what's happened.

But if we want to take care of those people, then I today call on Congress to introduce legislation in addition to the tax relief that would provide a means of restitution away from the SIPC process. That's the most equitable and the fairest thing to do.

I thank you for inviting me today. And I'd be pleased to answer any question.

REP. ACKERMAN: Thank you very much, Mr. Caruso.

And I thank the entire panel for your testimony. I know -- I think we all have some questions. And I'll begin with my own. And we'll take five minutes each. And we'll go as many rounds as anybody would like.

I'll go backwards and start with a statement that Mr. Caruso just made and that is, seeing the mission as looking forward. When I look forward, I see before me some of the wounded warriors of the past, the victims, at least a thousand of whom were traumatized by Bernard Madoff and are now being terrorized by the trustee.

That's what I see looking forward to some people. And I believe it was Professor Coffee who said, recalling the Hippocratic Oath of first do no harm, to look at the situation that we are doing tremendous harm with the issue of the clawback to many, many people.

I think one of the terrible things that we've done here is because of the way the zero-sum game equation works that we have created classes of victims. I don't understand really -- and I know the math, net winners and net losers.

Except for the few who have yet to be identified, should there be those who are complicit with Madoff, everybody else is a victim. People who might have taken more money out of money that they think is theirs have been victimized.

People who put their money in a bank -- and I know that's a different system when you're talking about the FDIC and not SIPC -- who are using their own money, and suddenly somebody says that wasn't really your money because you wasn't -- weren't entitled for that 7 percent interest or whatever it was, they're victims.

If you're telling people their whole lifestyle -- not just in the future, but in the past -- has to be reversed, that they can no longer live in their house or maintain their business or drive in their car or continue to pay for their children or grandchildren's education, they are victims. That's traumatic. And to create classes of people by saying some are rich, wealthy entities and some are not. A guy died, and the insurance company ain't doing so well; so you say to the widow, I know you had a policy, but you're okay, I'll give it to someone else.

If you think the money is yours and you've paid for the premium -- and I don't know what kind of premium. By the way, you think you get $500,000 worth of insurance for a $150 a year. And the system pretends that people had real insurance.

And the SEC agrees that that's real insurance after they're supposed to be supervising the agency and the U.S. Congress which is complicit in this thing as well because we're supposed to be overseeing -- everybody is just pretending.

You know, at least during the commercials, the guy says, I'm not a real doctor; I'm just playing one on TV. Well, this isn't real insurance -- we're just making believe to make you feel better.

My question is about clawback. If we're going to move forward, how do you move backward? That's question number one, clawback. Anybody? Everybody?

MR. CARUSO: I'll offer a suggestion. I think anytime you get into the issue of clawbacks, you not only implicate SIPC and SIPA, but you also do the Bankruptcy Code. Is it fair to go back to somebody who took out money to pay taxes? Is it fair to go after somebody who may have taken money to pay for a grandchild's education? I mean, I don't think anybody in this room would say it's necessarily fair.

And I think Congress has the power to step up and say, that's not fair, that is simply not fair, whether you should be able to go back a year or two years. Clearly for insiders, it would be different. But for other people, to go back five, six, seven years, in my personal opinion, I find that to be stretching the limit.

But I don't think SIPC or the taskforce has the power to change that. I think it rests with the Congress. And maybe I'm wrong on that, but if --

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

REP. ACKERMAN: And what would you suggest as a policy the Congress do? Do we have a responsibility to those people?

MR. CARUSO: I think you clearly have a responsibility to those people. And I heard earlier, a suggestion about distinction about how much of a clawback would you go after, you know, would there be a threshold limit. Clearly, if there is somebody like a feeder fund who benefited by millions or billions of dollars, there should be no limitation on the ability to get the money back.

REP. ACKERMAN: Isn't this a moral question and not a means- tested thing. I mean, I'm sure without knowing anything -- or maybe I shouldn't be so sure. But I'd be willing to bet that there are people who took nothing out of their account, who are much wealthier, much wealthier than some people who took a 150 percent out of their account because they had to live on it.

Do we means-test this thing or do we make a policy decision and try to do what's right? I mean, this is a real Solomonic question that's before us. And I think we need some policy guidance. And you all are looking at this thing prospectively how to protect people in the future. But you know, when you come up with a cure for a disease, it's our obligation not only to inoculate people yet who've not gotten the disease, but to treat the people who are suffering from it at the same time. How do we deal with these people?

MR. COFFEE: May I try to address that question -- (off mike) --

REP. ACKERMAN: Professor Coffee, please. And then I'm going to --

MR. COFFEE: I would --

REP. ACKERMAN: -- I'll yield to Mr. Garrett because my time is up.

MR. COFFEE: I would just suggest to you that we look at all the participants who fall into this heading of net winners, who took more cash out and put more -- than they put cash in. There is a continuum.

There may be people that Congress wants to protect. You could protect them with a de minimus test saying that only fictitious profits over dollar sign X could be recovered. You could protect them with what I call an imputed interest test, because if you put this money in 10 years ago, the fact that you've made 10 percent a year would entitle you to take out a 100 percent or more above the money you put in.

But you do not need to protect the feeder funds and the other people who look like they behave irresponsibly and probably corruptly. Those names are well known to the financial press whether it's Fairfield Greenwich, Mr. Merkin, Stanley Chais, Jeffrey Picower.

Those people are cheering you on right now because if you move the standard up, any time you make the recovery harder for the trustee, you'll reduce the settlement value of the trustee's claims against them and the trustee can get billions of dollars back from them for the net losers.

I don't think Congress should make it harder to recover by the trustee on behalf of the net losers, from the people who I think were very culpable. And they were number of those people.

Thus if you would protect the people you want to protect by instead using a de minimus test or an imputed interest test, I think you'll recover -- you'll achieve most of your objective without protecting those people who are culpable.

REP. ACKERMAN: I'll respond in a different round -- probe that a little bit in different round.

Mr. Garrett.

REP. GARRETT: Thanks.

So going forward, does anyone have a recommendation with regard to the SIPC logo? And some people have suggested that we put a little asterisk by saying that -- warning you that the statements that you're receiving may be interpreted in a different way, and that you'll be subject to clawbacks in the future or other interpretations.

Well, I say that facetiously, but maybe not because couple of your comments -- everyone's comments seem to imply that the investor had a misinterpretation of exactly what they were getting when they -- if they understood that SIPC was there and what they were relying upon.

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

The reason that is important is because you could have a situation -- let's take Madoff case, where you have some-one that tells you something that from the beginning was not true. But the final statement they tell you -- but guess what, you've nothing to worry about because whatever I got on that final statement is what you're going to be protected from. That would be the only true statement that would come out of their mouth.

And what we would do is be creating an environment where the wrongdoer now gets an opportunity to set the tone for how the government then will be responsible for responding.

And so, the primary issue that we're concerned with is making sure that whatever message that we use are going to ensure that we're not going to allow the wrongdoer to actually set the parameters of how we would go about making final decisions, and putting Congress in a position where they end up doing something that may be unintended as well.

REP. GARRETT: Okay. But you're sort of going down a slightly different road on that, but I understand what you're saying. But there is case law now that says the final statement can be used by you for the reimbursement pur-poses. So, going forward on that case law contrary to the position of SIPC then.

MR. JOHNSON: There is case law that has said that. There is also bankruptcy rulings that have mentioned the fact that you can look at things from a different standpoint as it relates also to not only whether or not you've got this fictitious statement, but also whether or not you're a net winner or a net loser. And part of that calculation takes into consideration whether or not this fictitious statement or the statement you have is one that's valid.

Now, whether or not it should be taken into consideration, it should be. But at the end of the process there has to be some analysis to determine whether or not that actual statement is what you should end up using as the basis of how you would go about making a payment on a claim.

REP. GARRETT: But you're going to continue to reject the use of that as a guide for your coverage in cases?

MR. JOHNSON: When we -- what we will do is we'll continue to look at the statements that come in, and then we will continue to look at what we would call the global aspects of what happened in a particular set of circumstances. And then if there is a conflict, we will take it to the court and allow a third party to help us to make a decision whether or not we should move it forward or not.

All we're trying to do is hopefully, vigorously pursue the law as we understand it and interpret it. And we under-stand that there can be reasonable minds that may differ in how you may interpret the law. But once we are told from a third party or anyplace else that we should be operating differently, then we intent to vigorously move forward in that vein as well.

REP. GARRETT: Mr. Caruso, I don't want to put you on the spot on that one and respond to that since -- consider-ing where you come from. If not, fine.

MR. CARUSO: Well, I think clearly, there are going to be difference of -- different opinions from different cir-cuits, from different courts. Part of the confusion that exists is that there is no well-defined standard that is universal throughout the country. And the only way that I know of that that finally could be resolved would be through the Con-gress of the United States, because you're going to have different court opinions on every issue.

MR. JOHNSON: I think one of the point that's worth mentioning regarding the second circuit case is, it also points out the fact that where the decision regarding what those amounts on the statement are arbitrary. And in this case we're looking at a situation where the numbers, for example, in the Madoff statements were arbitrary and that would be taken into consideration in terms of coming to a final analysis as well.

REP. ACKERMAN: Thank you.

Next my co-collaborator and cosponsor of the Ponzi Scheme Investor Protection Act, Mr. King.

REP. KING: Thank you, Mr. Ackerman.

You know, as I'm listening to this I don't think we're getting the full input or impact of the reality that was SIPC was set up to protect investors. In too many cases right now, the trustee is acting as a prosecutor of victims. And we can try to explain it anyway we want, but the fact is that these people were victims, and they are now being subjected to the same type of treatment that defendants are put through in massive criminal conspiracies.

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

And yet there's no evidence that any of these people are co- conspirators; they are victims. And you know, I look at the SIPC website and it says, although not every investor is protected by SIPC, no fewer than 99 percent of persons who are eligible get their investments back from SIPC.

So clearly, what -- the dawning reality is different from what people would -- had every reason to expect. They relied on the statements they received from Madoff. They relied on statements from SIPC that 99 percent of investors would be protected. And yet they -- in addition to all the money they've lost, because of Madoff, they are now running up an incredible legal fees.

They're being required to produce documents going back 25 and 30 years. And it's being done in, I believe, a very arbitrary and highhanded way, and a very heavy-handed way which is just perpetuating the turbulent justice which was inflicted upon them in the first place. Now, as far as going forward with SIPC, if I could just be clear in my mind. How is the trustee, how's Picard appointed?

MR. JOHNSON: Well, he is really appointed by the bankruptcy court. They have an opportunity to review who the potential trustees may be. There will be recommendations that'll be made. They will check to see if there are any conflicts of interest, and then they will go forward and go through that selection process. Mr. Picard is obviously someone who has been involved in this industry for --

REP. KING: Let me stop you because, you know, time will be running. Did SIPC make any recommendation on who the trustee would be?

MR. JOHNSON: Yes, we do make a recommendation regarding who we think would be a good trustee.

REP. KING: And who would you recommend?

MR. JOHNSON: Who did we recommend?

REP. KING: Yes.

MR. JOHNSON: I believe we recommended Mr. Picard.

REP. KING: Picard. So in effect, we have the court selecting a trustee that you recommended, and the argument could be made that he is now putting a tremendous effort into protecting SIPA's funds; that rather than protecting investors, he's actually working to protect SIPA. And to me, there's almost an inherent conflict of interest in that.

I know the court made the final decision, but the recommendation was made by SIPA. And it seems to me, if we're going forward with recommendation to the future, maybe trying to correct the investors of the present, we would find a way to have a much more independent person appointed as trustee in which SIPA would have no input whatsoever.

MR. JOHNSON: Well, let me make one thing clear. I don't think that we need a trustee to protect SIPC funds under any circumstances, because these funds from my standpoint don't belong to any of us. These are funds that should be utilized in order to protect the customers.

What we're trying to do is to make sure that whatever the role the trustee is going to be utilizing, it's going to be in compliance with the law. Now, we do have a certain responsibility as we manage this fund. But we're not in the business of trying to figure out how to get as few people helped as possible, but we are in the business of making sure that whatever policies and procedures that we use can be protected under the law.

REP. KING: But to me, looking at the record, what the trustee is doing is not trying to protect as many people as possible, but he is using this -- apart from the fact that he has already gotten, I believe, $36 million in fees authorized to himself, it's -- I just think, you know, I've seen runaway prosecutors, special prosecutors. And to me what I'm seeing in this is a runaway trustee who is putting innocent, wounded people through increased suffering. And I know that even the -- maybe as Professor Coffee made a statement; he said people who we might think are innocent -- well, don't we have to assume they're innocent?

I mean, is there any reason to think that any of the people in this room who lost millions of dollars are now being put out in a rack, is there any reason to assume they're not innocent? There's almost an inference here that the trustee is being hired because -- he's been appointed or his job is to find out those who may have been involved. And we think others are involved when there's no evidence that they were.

And to me, the presumption should be that these people are innocent. How do we help them and not put them through the incredible ravages and suffering as they're going through right now? Is something wrong about the system?

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

I think somehow we are standing back at, you know, 30,000 feet and we're saying, okay, well, we dropped the bomb, there may be collateral damage, but we're not really, you know -- that's what happens in a war.

Well, the fact is there is a lot of collateral damage right now, and it's from people who are already damaged are now being collaterally damaged again. And I don't know if we're really addressing that -- the inequity, the injustice, the horror there.

MR. JOHNSON: I think, Congressman King, the point is well taken. And one of the things that I've tried to do as chairman is to make sure that we start out with the proper tone as to how we're going to go forward dealing with any of the individuals who have been victimized.

I think the role of the trustee is one that is difficult and complex in that when you begin to start to go through the process, it's unclear who may be complicit, who may have engaged in wrongdoing, and who has not.

But the one thing we have made clear is that we wanted to make sure that everyone had an opportunity even if you've got, quote, unquote, "received a service of a document" that you had an opportunity to come in and speak with the trustee because our goal is to make sure that we are going after the correct individual.

We are not trying to simply just go after anybody for the sake of going after anybody. We understand that this is a very sensitive issue, and we sympathize with some of the horrors that individuals have gone through. And we want to make sure that at the end of the day that that process is taking place in a way that we will all be comfortable. And that's basically the commitment that I'd like to continue to make here today.

REP. KING: If -- Mr. Ackerman, just give me time for one more question or one more statement.

If that's the case, then I think someone should tell Mr. Picard -- because I've spoken to many of these people and they described to me what they're going through. They are not being treated as citizens. They are being treated as defendants. They are being treated as criminals.

And it's a highhanded arrogant attitude by the trustee towards these people. And I think something has to be done, if the message should come from you or from the court or someone, but telling them to knock it off and treat them like victims, not as criminals.

MR. JOHNSON: Point is noted, Congressman King.

REP. ACKERMAN: And I will also note for the record that there are compassionate conservatives.

(Laughter.)

REP. KING: I'll take exception to that.

(Laughter.)

REP. ACKERMAN: Well, you are exceptional.

Several things -- these letters that are going out aren't, "Hey, I'm from the government. I'm here and I want to help you." These letters set the tone of a very adversarial relationship and it's scaring a lot of people.

It's now us against you or you against us, and these are people -- not if they might have been victimized, they're victims. I mean what kind of attitude is it they might have been victimized? Is there any question that they've been victimized? People who directed their entire lives and the future of their families after working hard with their lives and doing the right things wind up with nothing in an account -- and being told they're accomplices spending stolen money. I mean, that's pretty adversarial.

And you got to give it back even if you don't have it, and you've got a problem with that, come and talk to me. You know, I mean I understand your argument, Chairman Johnson that you don't want to put the crooks in charge of setting the dialogue by having the Ponzi scheme operator send you a statement. And -- but you know, just because the guy lied and put that as a bottom line on the statement, you believed it and therefore you're guilty of something, and therefore the crooks are in charge of the agenda.

And it's your fault for believing the bottom line. Well, let me tell you something. Your government, my government, our government -- the Internal Revenue Service was very pleased, was happy, was delighted to rely on the bottom line in collecting taxes and going after them if people didn't pay based on that bottom line.

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

We empowered that bottom line as being gospel. And telling people they had to pay based on that bottom line because that bottom line was the bottom line. And why didn't the government investigate? Why didn't the government do? I mean this whole thing is bizarre, it's Kafkaesque.

I mean "first do no harm" should be the rule. I mean it was cited here and properly so. But instead of the Hippocratic Oath, we've taken the hypocritical. And we're saying first do no harm and then we're going after these people. The whole notion is weird. You know, my colleague, Mr. Garrett, you know, talked about the SIPC logo. This is the SIPC logo.

People look -- you know, people look in shorthand. They look for symbols, they look for things and they -- this is the way we conduct our lives fortunately or not. And we all get those little statements, you know, from our financial institutions 15 times a week with all that fine print and it's folded in 16 pieces, and we don't read it and we throw it out. And sometimes I say who made these people send this out, and I scratch my head and I say oh, my God, what have we done.

But we don't read those things. We do the shorthand. You know, and it says, you know, people go into the bank. It says protected by the FDIC and people believe they know what that is. It's the government standing behind and they got insurance up to a certain amount that we just increased in this last Congress.

And they know they got insurance and the government standing behind it. And then they go to their broker and they see this and it looks kind of like the same kind of deal. And you go to your guide and make an investment, and he hands you his business card and we just pull two out of the fish bowl that we got, and on it, it says he's a member of the NASD and he is a member of SIPC.

And everybody's business card, they're proud they are a member of SIPC. That's code for you're protected and Uncle Sam and the government is standing behind. And you go -- you go into the guy's shop, and you go to your broker-dealer and you got this on the door. And if you've looked him up like I used to do not too many years ago, and those of us who were technologically challenged, and you go to Yellow Pages. His ad has this in it; his stationery has this on it. His radio ad tells you. His TV ad tells you.

You go to the Internet and he's advertising he's a member of SIPC. And you see what it says right under the logo, security investor, that's me; protection, that's what I need; cooperation, that's what I got. And instead of a dot on the 'I,' guess what we got? We got the American eagle. Just like on my stationery and on the shield, the president of the United States and the Supreme Court. That's shorthand for your government is standing behind this, and we've allowed this to happen.

If I'm not a real doctor, but I'm playing one to fool you and your government is accepting it, and you got insurance for $500,000, except you ain't got nothing. And we got a moral responsibility to these people, do we not? Or am I missing something? Question mark.

MR. JOHNSON: I think we do have a responsibility to these people. And I think when we look at things, we have a responsibility to every victim that was part of the scheme. And one of the things that we have to figure out how we balanced and whether we do it the right way or do it the wrong way is, how do we ensure that we are not simply going to benefit those that by the luck of time got out at the right time. As opposed to those individuals may not have been that fortunate.

REP. ACKERMAN: Well, if you got a transfusion, first we should take out the blood to give it to somebody who is a pint short?

MR. JOHNSON: Well, I wouldn't take out the blood, Congressman, in order to have somebody take their life away, but we do give blood to others from time to time who are in need. And one of the things that we're simply trying --

REP. ACKERMAN: But shouldn't that be a collective decision that we do as a society, and not have a trustee decide to who to go after and take that blood back?

MR. JOHNSON: Well, and I think maybe the role that Congress will end up taking is to help us to get more specific guidelines as to how that needs to take place. And I think we'll be more than happy to vigorously follow that rule in whatever way Congress decides to move forward.

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

REP. ACKERMAN: Yeah, but we're looking to you. I mean, this is not you know King Solomon's court, and you know, none of us pretend to be that. And it's an awesome responsibility. And you, by virtue of the fact that the roles that you have looking forward, which I agree is your role, and sometimes we have to see how to fix the problem looking forward, what we'd do about the collateral damages Pete King said that we've left behind, the carnage here. We shouldn't be trampling on the bodies of those who are injured in order to help people in the future.

We have to try to help everybody. And you don't do that by further wounding those people who are suffering. You know, it's not taking away -- you know, we are where we are. It's a static situation right now. You go in and further probe the wounds of those people who may or may not have the wherewithal to do anything to give the people who are, quote, "net losers" who may be richer than the net winners.

I mean, I don't know how you figure this thing out. I mean, you know, we have some legislation on the people who went through broker- dealers and third parties and all that, you know, give them up to $100,000 insurances. And we have to -- you know, as a society, maybe we who are complicit in it which is society and us and you and everybody else for letting this happen. To say, okay, this is -- you know, this is the help we have to give people. And we all bore the responsibility and we have to pay for it.

It's not just voter education. You know, we all know you can't go over the speed limit, but we still put cops out there. And people rely on the cops to enforce the law and our cops haven't done that. Everybody thought they were doing what they were supposed to be doing and then find out that their whole world is topsy-turvy. And my time is up.

REP. GARRETT: Thank you.

REP. ACKERMAN: (Off mike.)

REP. GARRETT: So I wasn't sure where you were going with this King Solomon's reference. But you know in the case of King Solomon of course -- we all know the story from the Old Testament -- at the end of the day of course, he didn't slice the baby in half and the baby survived.

I thought he was going to go and suggest that in this case we are slicing the baby in half and making that wrong decision, and then the penalty is on both the mother and the dead child. So just to file along, and also where Peter -- the gentleman from New York, excuse me -- was saying with regard to the trustee, just two quick questions there.

One question that we get oftentimes is do we know -- do you know what the trustee has billed SIPC so far? And where do those funds come from actually?

MR. JOHNSON: Yeah. I think he's billed the court about $39 million.

REP. GARRETT: Thirty-nine million dollars. And where --

REP.     : Does he get paid on time and --

REP. GARRETT: Yeah, okay. The question is from the -- (off mike) -- from my colleague here is that does he get paid on time, and where do those funds come from?

MR. JOHNSON: They come from fees that are paid by SIPC members.

REP. GARRETT: Okay. So same -- in that sense it has to be right from the same pot of -- the same pot of money. And Peter was -- I'm sorry. The question was asked by the gentleman from New York with regard to the appointment of the trustee, and I understand your answer.

But over time, not just in this case, is it just a norm with regard that SIPC makes the recommendation for a trustee, and is it the norm that the judge would approve that --

MR. JOHNSON: It's the norm for SIPC to make the recommendation and it's simply up to the judge. I can't say that I know all the circumstances where the judge may not have accepted that recommendation, but at the end of day, it's completely in the judge's discretion.

REP. GARRETT: Because do we know in -- as in other cases, does the investor class or anyone else make recommendations to the court as to how they would --

MR. JOHNSON: Well, we make the designation basically by statute. So if the statute was different, then it would allow others to be able to make the call. But we're designated by statute to do so. So that's why we really don't have any other third parties that are involved.

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE. SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

REP. GARRETT: You haven't --

MR. JOHNSON: I don't believe investors would have the right to propose their own trustee at least initially.

REP. GARRETT: Okay. And just as an -- quick question, does anyone --

MR. CARUSO: Your statement was correct. It is SIPC who makes the recommendation of the trustee; the court simply decides if the proposed trustee is qualified. So there's a strong presumption in favor of the SIPC nominee.

REP. GARRETT: Does anybody here on the panel suggest that that is good, bad or should be changed?

MR. CARUSO: I think SIPC is very much overseen by the SEC in this regard, and it's the SEC who has asked SIPC to generate a list of potential trustees in advance. So I think this is a combination of the SEC and SIPC that has developed this approach of developing a list of potential trustees in advance.

REP. GARRETT: Okay. And does anybody suggest that that is not the appropriate -- yes, some of you said looking forward, so looking forward is something that we should be looking at.

MR. JOHNSON: Well, in terms of that whole process, I mean that's on the table in terms of what we're looking at during the taskforce. The way we're looking at the taskforce is we want to take a look at everything that we're doing from top to bottom.

We just went and had a complete full view of the operations of the staff, which was something that I wanted to have an opportunity to take a look at. So we've got everything on the table in terms of how we think we can best protect investors and customers when this is all said and done.

REP. GARRETT: Okay. Would -- one of those other things and anybody can answer this question is -- and this was in my opening statement, it was the question regarding how net equity should be calculated. And the question as far as access to the records to the investor class in order to help make those determinations I understand that -- well, obviously it will be critically important for the investor class to be able to make -- have those information as well as SIPC to have them. But right now, I guess, they're not done.

I understand that SIPC trustees -- SIPC's formulation, it could be called into question if you were to look at the -- have access to those records. And to look at those records and to say, you know, the examples that some of you are raising that, well, yes, some of these transactions over the last -- how many years -- couple of decades -- were actually legitimate transactions, right.

And so when I got my statement, they'd put in $0.5 million dollars on and said $3 million, maybe 750,000 of them were actually legitimate transactions, right. So when you all figure out the net evaluation on that, you want to know that, right. But if the investor folks don't have access into the information, they are not in a position to argue that. So what are we doing with those records?

MR. JOHNSON: Well, that point is well noted. And I think, from my standpoint, I don't really see a reason why they shouldn't have access to that documentation. And that's one of the issues that we'll be looking at and making recommendations potentially with the taskforce.

REP. GARRETT: And but where are we right now on that, I mean --

MR. JOHNSON: I'm sorry.

REP. GARRETT: It's in the court right now. I mean, is this something that can be changed for with regard to that's going on right now or is this just -- and I'm not talking about -- Mr. Caruso's fine comment of saying what do we do in the future on the next Madoff?

We're taking about the situation right now. I guess for some of the folks behind you, can we say that, you know, tomorrow these -- this information is available or where are we?

MR. JOHNSON: Well, in terms of where we are right now --

REP. GARRETT: Yeah.

MR. JOHNSON: -- I'm not sure if we've got the authorization to make that available, but that's something that we can take a look at, and if we have the authorization to do so, we will.

HEARING OF THE SUBCOMMITTEE ON CAPITAL MARKETS, INSURANCE AND GOVERNMENT
SPONSORED ENTERPRISES OF THE HOUSE FINANCIAL SERVICES COMMITTEE; SUBJECT: "ASSESSING
THE LIMITATIONS OF THE SECURITIES INV

have innocent people who took the money out relying on the statements, which they thought was guaranteed by the government.

And they then get clawed back, and then others who left their money and also and that -- they're in a terrible situation too. I mean, but are we -- is there anything that's coming out of this hearing or any of the review that would make it any -- the situation any better 10 years from now for innocent people in a Madoff-like scheme?

MR. JOHNSON: That would be the hope. The idea is, is that, you know, when you look back to when the first Ponzi scheme came into play, we would have hoped that we would have never had to see that happen again. And our primary goals is, hopefully trying to put in place some modernization that will make our statute flexible enough to be able to deal with those things that we can imagine.

The biggest issue that we have is the 1970, the current statute we had --

REP. KING: Right.

MR. JOHNSON: -- could not have anticipated this. And we're hoping we're going to put something in place that will be --

REP. KING: But now that we know, I guess what I'm saying is besides hope, is there any reasonable expectation?

MR. JOHNSON: Well --

REP. KING: -- for the hope that we would be able to protect a person who took his money out, or say, systematically relying on the statement, took the money out over the years, and now is suddenly confronted with a massive clawback which is going to destroy that person, destroy their family, destroy their business, and also destroy any hope of financial security for their children or grandchildren?

Is there any -- do you see anything coming out of the discussion so far which would protect those people in the future; in a large PL (ph) scheme such as this?

MR. BORG: I think -- and I listened to Professor Coffee's idea. I don't think -- I don't think that under the current system, if another Madoff happened in 10 years, you would be any different. I think where you would be different is if you do set the limitations on the clawback that Professor Coffee has suggested, because that -- from point of view, there is always a limited pool of money.

And historically, in the cases that we have -- again, the non- SIPC, because that's where most of our experience is, we always have, for example, $10 million. That's what I've got. That's every asset, we've taken the houses and the land and whatnot, and I've got $100 million for the claims.

The only fair way I've been able to do it without having any SIPC coverage is to say if you put in $100,000 and you took $50,000 out, yes, I know that you were expecting that was interest. But I've got somebody over here who put $100,000 in and never took anything out. Therefore your loss has got to be $50,000, and their loss is 100 (thousand dollars). And then when I do the mathematics pro rata, you're all going to get the same sort of share of the loss, as opposed to trying to make your whole.

If you have an unlimited fund or a fund of $500 billion or something like that, then of course you can do different. If you have that expectation and you can cover everybody's expectation, I don't think it's practical to cover everybody's expectation for the full amount without some limitation -- 10 years, 5 percent, 10 percent, whatever it is.

Well, I do think 10 percent is high in the current economy. I'd love to get 10 percent on a CD at a bank if I could. But whatever the number is, I think the important thing is that we have a finite number to start with, and that's a finite number that has to be divided.

If I've got five people in my family and there is a lemon pie, I can cut it into five pieces. But if somebody has already got a piece, I'm not sure they are entitled to a full piece the next time around. And --

REP. KING: Let me just follow-up with Professor Coffee on that. Have you done any of the math if that reasonable expectation was built in over the years, how that would --

MR. CARUSO: Let me take Mr. Borg's example and take it one step further.

REP. KING: Sure.