Richard J. McCord (RJM 3290)
Carol A. Glick (CAG 2675)
CERTILMAN BALIN ADLER & HYMAN, LLP
Attorneys for Morton Certilman and Joyce Certilman
90 Merrick Avenue
East Meadow, NY 11554
Telephone:  (516) 296-7000
Facsimile:  (516) 296-7111

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,
                                        Plaintiff,                          Adv. Pro. No. 08-01789 (BRL)

        v.                                                                  SIPC Liquidation

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
                                        Defendant.
------------------------------------------------------------X

## OBJECTION TO TRUSTEE'S DETERMINATION OF
## CLAIM OF MORTON L. CERTILMAN AND JOYCE CERTILMAN

Morton L. Certilman and Joyce Certilman, by and through their attorneys, Certilman

Balin Adler & Hyman, LLP, hereby object to the Notice of Trustee's Revised Determination of

Claim dated October 8, 2010 ("Determination Letter"), as set forth herein.

### BACKGROUND

1.        Morton L. Certilman and Joyce Certilman (sometimes, collectively, the

"Certilmans") is each a "customer," as defined by the Securities Investor Protection Act

("SIPA"), of Bernard L. Madoff Investment Securities, LLC ("BLMIS").

2.        In the 1970's, Morton L. Certilman and Joyce Certilman, opened a joint account

with BLMIS with a substantial deposit, to which they periodically added funds over the years.

The account maintained by Mr. and Mrs. Certilman bears BLMIS Account No. 1-C1013-3-0 (the

2283612-2

"Certilman Joint Account"). During the same time period, Joyce Certilman also opened an account with a substantial initial deposit, to which she periodically added funds over the years. The account maintained by Mrs. Certilman bears BLMIS Account No. 1-C1012-3-0 (the "Joyce Certilman Account") (the Certilman Joint Account and the Joyce Certilman Account, collectively, the "Certilman Accounts"). In other words, the Certilmans maintained two separate accounts with BLMIS at the time the above-captioned liquidation proceeding was commenced against BLMIS pursuant to the Securities Investor Protection Act of 1970. Consequently, separate account statements for the Certilman Joint Account and the Joyce Certilman Account were received by the Certilmans for each and every month through and including the account statements for the month ended November 30, 2008.

3.    Irving H. Picard, the Trustee for the Liquidation of BLMIS (the "Trustee") formerly sent a Notice of Trustee's Determination Letter dated April 28, 2010 ("Prior Determination Letter") to Morton L. Certilman and Joyce Certilman with respect to the Certilman Joint Account, but did not address the Joyce Certilman Account in the Prior Determination Letter.

4.    On or about June 25, 2010, the Certilmans filed an Objection to the Prior Determination Letter ("Prior Objection") and thereafter provided documents to the Trustee in support of the Prior Objection.

5.    The Trustee has now served upon the Certilmans a Revised Determination Letter with respect to BLMIS Account No. 1-C1013-3-0 only,[1] which purportedly contains corrected deposit and withdrawal totals in the Certilman Joint Account. Specifically, the Trustee has added securities deposits of $962,039.59 and added securities withdrawals of $236,936.52,

---

[1] The Revised Determination Letter makes no reference whatsoever to BLMIS Account No. 1-C1012-3-0 in the name of Joyce Certilman.

resulting in a decrease of the "overdrawn amount" by $925,103.07. Thus, the Trustee has "corrected" total deposits into the Certilman Joint Account to $2,597,104.22 and total withdrawals therefrom to $12,686,133.29. Accordingly, based on the Trustee's money in/money out analysis (as described hereafter), there was a negative balance in the Certilman Joint Account at the time the above-captioned liquidation proceeding was commenced against BLMIS.

6.    The final BLMIS statement for the Certilman Joint Account ("Final BLMIS Statement for Certilman Joint Account") indicates that the total value of the account was $3,051,102.31 (including cash and securities) as of November 30, 2008. A copy of the Final BLMIS Statement for Certilman Joint Account is annexed hereto as **Exhibit A**.

7.    By this Objection, the Certilmans are responding to the Trustee's Revised Determination Letter in respect of the Certilman Joint Account. The Certilmans reiterate and affirm the position set forth in the Prior Objection as to the Joyce Certilman Account.

8.    On December 11, 2008, the above-captioned liquidation proceeding was commenced against BLMIS pursuant to the Securities Investor Protection Act of 1970 ("SIPA"). See Order, *Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Dkt. No. 4]. Irving Picard was appointed Trustee ("BLMIS Trustee"), charged with overseeing the liquidation of BMIS and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. 78fff-1(a).

9.    On December 23, 2008, the Court issued an Order directing the BLMIS Trustee to disseminate notice and claim forms to BLMIS customers and setting forth claim-filing deadlines. *See* Order [Dkt. No. 12]. Upon information and belief, the BLMIS Trustee disseminated notice and claim forms to BLMIS's customers in accordance with the Court's Order.

2283612-2

10.    The December 23, 2008 Order further provided that, to the extent the BLMIS Trustee disagrees with the amount set forth on a customer claim form, the BLMIS Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, and *the reason therefor.* . . ." *See* Order at 6 (emphasis supplied) [Dkt. No. 12].

11.    On or about June 8, 2009, the Certilmans timely submitted a Customer Claim and the Final BLMIS Statement with respect to the Certilman Joint Account, which, was designated by the BLMIS Trustee as Claim No. 009706.[2]  With respect to the Certilman Joint Account, the Certilmans asserted a total claim in the amount of $3,051,102.31, including $6,437.00[3] in money market funds and securities with a market value of $3,044,665.31, pursuant to the Final BLMIS Statement for Certilman Joint Account.  There was no cash balance or securities owed to BLMIS with respect to the Certilman Joint Account as of November 30, 2010.

12.    On or about June 22, 2009, the Certilmans resubmitted a duplicate of their Customer Claim No. 009706 with respect to the Joyce Certilman Account (Account No. 1-C1012-3-0) and the Certilman Joint Account (Account No. 1-C1013-3-0), in order to correct the account number of the Joyce Certilman Account.  The Trustee designated the duplicate Customer Claims, together, as Claim No. 013019. The Final BLMIS Statement for the Certilman Joint Account was resubmitted with Claim No. 013109. (Claim No. 009706 and Claim No. 013109 are referred to collectively herein as the "Combined Claim.[4]")

---

[2] A Customer Claim for the Joyce Certilman Account was submitted at the same time.  However, the account number for the Joyce Certilman Account was inadvertently misstated as Account No. 1-C1013-4-0 instead of Account No. 1-1012-3-0.

[3] This amount represents a *de minimus* position held in Fidelity Spartan U.S. Treasury Money Market Funds as of the date of the Final BLMIS Statement for Certilman Joint Account, and does not represent the Certilmans' entire Customer Claim.  The Certilmans' Customer Claim also includes the total amount of securities in the account as of November 30, 2008, as reflected on page 4 of the Final BLMIS Statement for Certilman Joint Account.

[4] The Certilmans reiterate and reassert that Claim No. 009706 and Claim No. 013109 actually reflect two separate Customer Accounts maintained by the Certilmans with BLMIS; i.e., the Certilman Joint Account and the Joyce

4

13.    On October 8, 2010, the BLMIS Trustee sent the Revised Determination Letter, addressed to Morton L. Certilman and Joyce Certilman, J/T WROS," denying the Combined Claims in their entirety.[5]  A copy of the Revised Determination Letter is annexed hereto as **Exhibit B**.  In addition to denying the Certilmans' Combined Claims, the Revised Determination Letter states that the Certilmans are not entitled to payments because no securities were ever purchased by BLMIS for their account and thus profits reported to them were fictitious, they "do not have a positive 'net equity' in [their] account" and they are therefore "not entitled to an allowed claim in the BLMIS liquidation proceeding."  *See* Revised Determination Letter, at 2. The Revised Determination Letter further states that written opposition to the BLMIS Trustee's determination is due within 30 days of October 8, 2010.

14.    The Certilmans hereby object to the Revised Determination Letter for the reasons described below.

## GROUNDS FOR OBJECTION

### A.  The Determination Letter is Factually Incorrect

15.    As stated above, the Certilmans had two separate accounts with BLMIS, for which separate claims were filed, each accompanied by its own Final BLMIS Statement.  The Determination Letter specifically states that the Trustee's determination of claim relates to Account No. 1C1013 only (the Certilman Joint Account).  No determination has been made

---

Certilman Account.  Notwithstanding the foregoing, for purposes of brevity, Claim Nos. 009706 and 013109 are referred to herein as the "Combined Claim."

[5] Notwithstanding the fact that Joyce Certilman, individually, also maintained an account with BLMIS, the Revised Determination Letter states in pertinent part as follows:  "This Notice of Trustee's Revised Determination of Claim supersedes the Prior Notice and serves as the Trustee's revised determination with respect to BLMIS Account No. 1C1013 designated as Claim No. 009706 and Claim No. 013019 (the latter of which is duplicative of Claim No. 009706) and combined ('Combined Claim') for purposes of this determination.  This letter shall serve as the Trustee's revised determination with respect to the Combined Claim.  Your Combined Claim for a credit balance of $6,437.00 and for securities is **DENIED**."  *See* Revised Determination Letter, at 2. The BLMIS Trustee's assumption that the Certilmans maintained only one account is incorrect.

2283612-2

regarding the Joyce Certilman Account.    Apparently, the BLMIS Trustee's determination is based on commingling deposits into, and withdrawals from, each of the accounts so that they appear to be being deposited and withdrawn from only one account (the Certilman Joint Account).    The BLMIS Trustee's mistake indicates that he does not have complete records of all deposits into, and withdrawals from, the Certilman Joint Account and the Joyce Certilman Account.    At the very least, the BLMIS Trustee is required to make a separate determination of net equity with respect to the Joyce Certilman Account.

16.    In addition, the BLMIS Trustee has not provided a complete list of all deposits made by the Certilmans into the two accounts, as the schedule attached to the Revised Determination Letter ("Trustee's Schedule") does not include any deposits made into either of the accounts during the 1970's, nor does it provide a complete list of deposits made into such accounts for the periods 1981-1986 and 1987-2008.

17.    Moreover, prior to 1988, the Certilmans' funds were invested in regular BLMIS brokerage accounts that were part of BLMIS's legitimate brokerage business.    Upon information and belief, prior to 1988, BLMIS (i) purchased real securities on behalf of the Certilmans, (ii) acted as custodian of their securities, and (iii) traded such securities for their accounts with institutional counterparties over live computer systems.    The Certilmans also received confirmations of such trades from BLMIS and regular account statements.    In connection with its legitimate brokerage business, BLMIS was regulated and held accountable by the clearing houses it used, the exchanges on which it traded, and the NASD and its successor, the Financial Industry Regulatory Authority.    Any profits realized by the Certilmans from trading in such accounts are not illusory and cannot be swept away by the BLMIS Trustee under the rubric of

2283612-2

"fictitious" profits. *See* Revised Determination Letter, at 2. Instead, the Certilmans maintain that actual profits were available to fund securities purchases for their accounts.

18.    The BLMIS Trustee does not explain what happened to the real securities positions held in the Certilmans' respective accounts prior to 1988. The BLMIS Trustee glosses over this matter by incorrectly stating in the Revised Determination Letter: "No securities were ever purchased for your account." *See* Revised Determination Letter, at 1.

19.    The BLMIS Trustee arbitrarily determines that no securities were ever purchased for the accounts as far back as 1981, without providing any factual or evidentiary basis for this conclusion.

20.    Based on the foregoing, each of the Certilman accounts is entitled to receive the statutory minimum payment of $500,000 of SIPC insurance in respect of the securities in such accounts as set forth in the Final BLMIS Statements.

**B.  The Determination Letter Fails to Comply with December 23, 2008 Order**

21.    The Revised Determination Letter fails to comply with this Court's December 23, 2008 Order, which directs the BLMIS Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's books and records" and authorizes the Trustee to satisfy "net equity" claims "out of funds made available to the Trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the Debtor available to satisfy such claims." Dec. 23, 2008 Order, at 5-6 [Dkt. No. 12]. The Combined Claim was accompanied by the Final BLMIS Statement showing money market funds and securities valued at $3,051,102.31 in the Certilman Joint Account. The Final BLMIS Statement in respect of the Certilman Joint Account is the best evidence of the amount owed based on the Debtor's books and records.

7

22.    The Final BLMIS Statement generated by Madoff is reflective of "the Debtor's books and records" by which the BLMIS Trustee is bound, absent proof that the Certilmans did not have a "legitimate expectation" that the balance in their account statements represented their property.

23.    Based on periodic statements, credit advices, portfolio management reports, confirmations and other documents received from BLMIS over the years, the Certilmans reasonably believed and had "legitimate expectations" that BLMIS executed the transactions reflected therein and that their accounts in fact held such securities.

24.    Throughout the period of existence of the accounts, the Certilmans paid taxes annually and reported capital gains, dividends and interest income from the accounts, based on statements they received from BLMIS.  The Certilmans would not have paid those sums if they did not believe that the assets in the account belonged to them.

25.    The BLMIS Trustee has failed to state a basis in the Revised Determination Letter for the position he has taken.  Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer.  It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses."  Collier on Bankruptcy ¶ 3007.01(3) (15th ed. 2008); *In re Enron Corp.* No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (S.D.N.Y. Jan. 13, 2003).  In sum, the Revised Determination Letter is inadequate to rebut the prima facie validity of the Certilmans' Customer Claims as provided in Section 502(a) of the Bankruptcy Code and Rule 3001(f) of the Federal Rules of Bankruptcy Procedure.

26.    The Revised Determination Letter also fails to supply all supporting documentation for reaching the conclusions about the activity in the accounts, some of which is

disputed. For instance, the Trustee's Schedule lists a large number of purported dividend checks some of which the Certilmans did not receive and withdrawals they may not have made. In other words, while the BLMIS Trustee has concluded that the Certilmans' statements reflect fictitious profits, he offers no support for what are likely fictitious disbursements. This calls into question the integrity of the records upon which the Trustee relied in making his determination.

27.    Based on the foregoing, the Combined Claim should be allowed in full as reflected in the Final BLMIS Statement.

## C.  Trustee's Methodology Violates Legitimate Expectations of BLMIS Customers

28.    The BLMIS Trustee has violated SIPA's requirement that he honor a customer's legitimate expectations of receiving what was in his or her account at the time of the broker-dealer's cessation of business.

29.    On December 30, 1970, when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms.... Just as the Federal Deposit Insurance Corporation protects the user of banking services form the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid+2870.

30.    The parties agree that BLMIS was a registered broker-dealer with the SEC under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b) as of January 1960. By virtue of its registration as a broker-dealer, BLMIS is a member of SIPC.

9

31.    On December 11, 2008, Bernard L. Madoff ("Madoff") was arrested by the FBI and charged with securities fraud.  It is undisputed that Madoff pled guilty to fraud and was sentenced to imprisonment.

32.    The BLMIS Trustee and SIPC concede that BLMIS prepared, and customers were sent, regular statements and confirmations based on the actual trading records of real (existing) securities purported in each customer's account.  It is irrelevant from the perspective of SIPA, the rules promulgated thereunder and relevant agency interpretation and case law that the securities never existed.

33.    Nothing in the SIPA statutory framework supports the BLMIS Trustee's definition of net equity.

34.    SIPA established a not-for-profit corporation, the Securities Investor Protection Corporation ("SIPC"), the members of which are the domestic registered brokers or dealers, each of whom is assessed a fee to create a fund (the "SIPC Fund").  15 U.S.C. §§ 78ccc(a)(2); 78ddd(a)(1) and (c).  The SIPC Fund provides a certain amount of coverage (set by statute) for customer losses in the event that the property of a failed broker is inadequate or not readily available to satisfy customer claims.  15 U.S.C. § 78fff-3.

35.    The purpose of this liquidation proceeding, which was brought pursuant to SIPA, is to either (a) deliver to the customers the securities held in their name, or (b) distribute customer property and (in advance thereof or concurrently therewith) otherwise satisfy net equity claims of customers.  15 U.S.C. § 78fff.

36.    SIPA defines a customer's net equity claim, without reference to fraud or financial failure of the broker, as the value of the customer's "securities positions" in the

customer's account on the filing date, less any amount the customer owes the debtor, as of the

date of the filing of the SIPA liquidation.[6] 15 U.S.C. § 78lll(11).

37.    Nothing in the statutory framework of SIPA authorizes the BLMIS Trustee to

calculate net equity based on the aggregate amount of the customer's investment, less the

aggregate amount of the customer's withdrawals.    Furthermore, nothing in the statute limits its

application, as the BLMIS Trustee and SIPC imply, to financially failed broker-dealers.

38.    The Rules promulgated under SIPA base the determination of whether a customer

claim is treated as one for cash or for securities, not on what is actually in the account, but rather

on the written confirmations sent to the customer on whose behalf the securities were bought or

sold.    17 C.F.R. § 300.502(a)(1).

39.    Pursuant to section 78fff-2(b), the BLMIS Trustee is charged with promptly

discharging "all obligations of the debtor to a customer relating to, or net equity claims based

upon, securities or cash," by delivering securities or making payments "to or for the account of a

customer . . . insofar as such obligations are ascertainable from the books and records of the

debtor or otherwise established to the satisfaction of the trustee."    15 U.S.C. § 78fff-2(b).

Based on a tortured reading of this section of the statute, the BLMIS Trustee has determined to

test the validity of every transaction in a customer's account rather than to stop his investigation

---

[6] The definition of "net equity" set forth in SIPA, and the methodology for calculating same, are as follows:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by—
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customers . . . ; minus
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

15 U.S.C. § 78lll(11).

2283612-2

at the point of the Final BLMIS Statement, which lists the securities and their market value purportedly in the account.

40.   The Senate Committee report in respect of the 1978 amendments to SIPA clearly indicates that Congress's intent in enacting the legislation was to protect the legitimate expectations of customers even in cases, like the one here, where there has been significant fraud and the securities never existed.[7]

41.   Similarly, the House Report issued in connection with the amendment of SIPA acknowledges that the purpose of the amended legislation was to make SIPA "more responsible to the reasonable expectations of public investors. . . ."[8]

42.   In addition, the SIPC's own policy and practices, as reflected in the *New Times Securities, Inc. ("New Times")* SIPA liquidation, is that if broker-dealer customers have been led to believe that "real existing" securities had been purchased for their accounts, then those

---

[7] The Senate Committee report commented upon the purposes of the legislation as follows:

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account . . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations. . . .

S. Rep. No. 95-763, at 2, 95th Cong. 1st Sess. (1978) (emphasis supplied).

[8] The House Report states:

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business.  But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account…. By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectations. . . .

H.R. Report No. 95-746 at 23; 95th Cong. 1st Sess. (1978) (emphasis supplied).

2283612-2

customers are entitled to the full value of their securities positions as of the filing date, even if that value represents a substantial increase from the purported purchase price of the securities and even if the securities have never been purchased. *See In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 74 (2d Cir. 2006) (holding that defrauded investors who mistakenly believed they held real existing securities were entitled to SIPC advances because the information that they received on their account statements mirrored what would have happened had the given transaction been executed).

43.    The position taken by the BLMIS Trustee is contradicted not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press in connection with the BJMIS liquidation on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his/her account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html

44.    Notwithstanding all of the foregoing, the BLMIS Trustee and SIPC have reconstructed the SIPA statutory scheme to support a calculation of net equity based on the "cash in-cash out" transactions of each customer.

45.    The BLMIS Trustee's methodology for determining net equity was adopted by this Court in its decision dated March 1, 2010 ("Net Equity Decision"), and the Court memorialized the Net Equity Decision by Order dated March 8, 2010 ("Net Equity Order").

2283612-2

46.     On March 8, 2010, pursuant to 28 U.S.C. § 158(d)(2), this Court certified the Net Equity Order for immediate appeal to the Second Circuit Court of Appeal. The Second Circuit has not yet made any determination as to whether the Trustee is correct in his interpretation of "net equity" and its corresponding application to the determination of customer claims.

47.     This Court's December 23, 2008 Order directs the BLMIS Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's books and records," thus satisfying the legitimate expectations of the Certilmans pursuant to the express provisions of SIPA, the Second Circuit case law interpreting SIPA, the legislative history of the statute, and the pronouncements of SIPC's general counsel in December 2008 regarding SIPC's mandate to make distributions to customers based on their account statements. Nonetheless, the BLMIS Trustee has denied the Combined Claim. In view of the foregoing, the Certilmans submit this Objection to the Revised Determination Letter so as to preserve all their rights in respect of their claims, pending a determination of the appeal by the Second Circuit or any higher and/or subsequent appellate tribunal.

**D. Trustee's Definition of "Net Equity" Has No Basis Under SIPA or Relevant Case Law**

48.     The definition of "net equity" set forth in SIPA, and the methodology for calculating same, are as follows:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by—
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customers . . . ; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

15 U.S.C. § 78lll(11).

14

2283612-2

49.     SIPC was created pursuant to 15 U.S.C. § 78ccc, which also sets forth its powers.

50.     Section 78ccc(b)(4)(A) expressly prohibits SIPC from changing the definition of

"net equity" set forth in Section 78lll(11).[9]

51.     The Second Circuit has recognized that:

> Each customer's 'net equity' is the 'dollar amount of the account
> or accounts of a customer, to be determined by calculating the sum
> which would have been owed by the debtor to such customer if the
> debtor had liquidated, by sale or purchase on the filing date, all
> securities positions of such customer' [corrected for] any
> indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities, Inc.*, 371 F.3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman

Clearing Corp.*, 247 B.R. 51, 62 n.2 (Bankr. S.D.N.Y. 1999) ("'Net equity' is calculated as the

difference between what the debtor owes the customer and what the customer owes the debtor on

the date the SIPA proceeding is filed").

52.     Notwithstanding his duty to carry out the provisions of SIPA, the BLMIS Trustee

has created his own definition of "net equity."  He has asserted that he can recognize customers'

claims on a "cash in-cash out" basis, without recognizing any interest that may be due to

BLMIS's customers.  By this procedure, the BLMIS Trustee would avoid paying SIPC insurance

---

[9]  SIPA Section 78ccc(b)(4)(A) states as follows:

> (b) Powers
>
> In addition to the powers granted to SIPC elsewhere in this chapter, SIPC shall
> have the power--
>
> (4) to adopt, amend, and repeal, by its Board of Directors, such rules as may be
> necessary or appropriate to carry out the purposes of this chapter, including rules
> relating to--
>
> (A) the definition of terms used in this chapter, other than those terms for which
> a definition is provided in section 78*lll* of this title . . . .

15 U.S.C. § 78ccc(b)(4)(A).

2283612-2

to the thousands of elderly, long-term Madoff investors who have depended on their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thereby increasing SIPC's subrogation claim for reimbursement of the insurance that it pays to customers.

53.    In part, the Court justifies the adoption of the BLMIS Trustee's definition of "net equity" and his methodology for determining customer claims by stating:

> Compensating Madoff investors on the basis of fictional account statements leads to . . . inequality as it enables the thief to dictate who receives a larger proportion of the assets collected by the Trustee. Madoff should not be entitled to award, to equally deserving clients, higher and lower returns based solely on his whim.

Net Equity Decision, at 33, n. 38. Likewise, the BLMIS Trustee and SIPC should not be able to disregard on a whim SIPA's mandate to compensate investors based on their legitimate expectations of receiving the amounts set forth in their Final BLMIS Statements upon BLMIS's cessation of business. The result is to deprive more than 8,000 totally innocent investors of their statutory minimum payment of $500,000 in SIPC insurance.

54.    The Certilmans, like thousands of other investors, received monthly account statements from BLMIS for more than thirty years indicating returns on their BLMIS investment in the range of 9% - 11% per year. The Certilmans had entered into standard brokerage agreements with BLMIS, a licensed SEC-regulated broker-dealer, pursuant to which the accounts had specific numbers; they received on a monthly basis trade confirmations for every securities transaction in their accounts, which set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis to claim that the Certilmans did not have a "legitimate expectation" that the assets reflected on the account statements sent to them by BLMIS belonged

16

to them.  Thus, the Certilmans are entitled to a claim for securities as reflected in their Final BLMIS Statement.

### E.  The Certilmans Are  Entitled to Interest on Account Balances Under New York Law

55.    Under New York law, which is applicable here, funds deposited with BLMIS are entitled to interest. *See, e.g.*, N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq*. Moreover, since BLMIS converted the Certilmans' funds, that fact also entitles them to prejudgment interest. *See, e.g. Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest"); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

56.    The Trustee's Schedule reflects that between March 31, 1981 and December 14, 2006, the Certilmans deposited $2,618,254.22 (before adjustments) in the Certilman Joint Account at BLMIS.[10]  However, the BLMIS Trustee has not given the Certilmans credit for the not insubstantial amount of interest which would have accrued in the account during said thirty year period.

57.    In the Net Equity Decision, the Court found that, "[a]lthough customer account statements reflected trading activity, funds were merely deposited into a bank account at J.P. Morgan Chase Manhattan Bank ('Chase Bank') . . . (the "703 Account"), and never invested." Net Equity Decision, at 12.

58.    To the extent that the funds invested by the Certilmans in BLMIS were deposited into the 703 Account, they earned interest while on deposit.

---

[10] The BLMIS Trustee does not give the Certilmans credit for all deposits made in the Certilman Joint Account, as the Trustee's Schedule does not include any deposits made in the account in the 1970's and  the BLMIS Trustee has not included a complete list of deposits into said account for the periods 1981-1986 and 1987-2008.

17

59.    The BLMIS Trustee's decision to omit any credit for interest impacts on the "cash in-cash out" method of determining the amount of customer claims, especially in view of the BLMIS Trustee's intention to "claw back" the amount by which investor withdrawals exceeded investor deposits in their accounts.

60.    It is unlawful and inequitable for the BLMIS Trustee to completely disregard the interest component in the calculation of the Certilmans' claims.

61.    As this Court has stated in the Net Equity Decision:  "It would be simply absurd to credit the fraud and legitimize the phantom world created by Madoff when determining Net Equity."  Net Equity Decision, at 30.  However, if the BLMIS Trustee were permitted to rely "solely on unmanipulated withdrawals and deposits" without crediting customers for accrued interest on the funds actually deposited and withdrawn from the account, the BLMIS Trustee would be granting to Madoff the right "to arbitrarily decide who wins and who loses."  *See* Net Equity Decision, at 30-31.

62.    Clearly, the funds in the Certilman Joint Account constituted legal tender which was utilized by BLMIS for its own purposes and for which use the Certilmans are entitled to be compensated by the payment of interest.

63.    Based on the foregoing, the Certilmans object to the BLMIS Trustee's position that they received $10,089,029.07 more than they were entitled to, based on the "cash in-cash out" methodology employed by the BLMIS Trustee, and respectfully submit that the Revised Determination Letter does not reflect any credit for interest that should have accrued on the funds in the Certilman Joint Account during the years said account was in existence.

**F.    Trustee Has Used Bankruptcy Code's Avoidance Powers Solely For SIPC's Benefit**

2283612-2

64.    The BLMIS Trustee has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit.  There is no authority in SIPA or the Bankruptcy Code for the BLMIS Trustee to utilize the avoidance powers of a trustee to enrich SIPC at the expense of investors. As the legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear, the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors.  *See* 5 Collier on Bankruptcy ¶ 547.01 (15th ed. 2008); *In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (Bankr. S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.  Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally").

65.    Payments made to the Certilmans based on their Final BLMIS Statements will not deny payments to another customer, as initial payments of $500,000 come from the SIPC Fund, not from customer property or the bankruptcy estate.

66.    SIPC is a third party insurer with an absolute obligation to replace securities in a customer's account if the broker-dealer has sent written confirmation of the securities transactions to the customer.[11]    That SIPC obligation is completely separate from each

---

[11] "Where the Debtor held cash in an account for a customer, the customer has a 'claim for securities' with respect to any authorized securities purchase *[i]f the Debtor has sent written confirmation to the customer* that the securities in question have been purchased for or sold to the customer's account."  17 C.F.R. § 300.502(a) (emphasis supplied). Essentially, the customer's receipt of confirmation, not the debtor's performance, is controlling for the purpose of SIPC advances.

2283612-2

customer's share of estate property, and the payment by SIPC of insurance to each customer in no way reduces estate property.

67.    The SIPC Fund, which is financed by member assessments, is meant to provide the means for SIPC to make prompt advances to cover up to $500,000 of customer losses in the event that the property of a failed broker (honest or dishonest) is inadequate to satisfy customer claims.  SIPC has authority to obtain more financing from Congress.

68.    The BLMIS Trustee's actions here do not further the stated purposes of a trustee's avoidance powers, but, rather, enable SIPC to avoid its statutory mandate to promptly replace a customer's securities.  Simply put, an insurance advance of $500,000 is payable on account of the Certilman Joint Account.  The Trustee's actions in support of SIPC have deprived these BLMIS account holders of insurance advances to which they are statutorily entitled.

## G.  Trustee's Calculation of "Net Equity" Has No Evidentiary Support

69.    The Revised Determination Letter makes no determination whatsoever with respect to the Joyce Certilman Account and purports to calculate the "net equity" in the Certilman Joint Account on the basis of incomplete records.

70.    Based on the facts and circumstances set forth herein, the BLMIS Trustee should be required to prove all alleged withdrawal transactions by furnishing the appropriate records to the Certilmans and, absent such records, such transactions should be deleted from the calculation of "net equity."

71.    By the same token, the BLMIS Trustee should be required to prove that all deposit transactions in the Certilman Joint Account and the Joyce Certilman Account are accurately listed by furnishing complete records to the Certilmans.

2283612-2

## RELIEF REQUESTED

72.    For the reasons stated herein, the Combined Claim should be allowed in its entirety.

73.    For the reasons stated herein, the Court should direct SIPC to issue immediate payment on account of the Certilman Joint Account in the amount of $500,000.

74.    The BLMIS Trustee's determination amounts to an improper disallowance of a claims that has prima facie validity.  *See* Bankruptcy Code Section 502(a).  The BLMIS Trustee has offered no factual or legal basis for his determination.  The BLMIS Trustee's Revised Determination Letter, and the determinations contained therein, should be stricken, or alternatively, the BLMIS Trustee should describe his position in detail, including all relevant facts, legal theories and legal authorities.  Upon the filing of such a statement, this matter will be a contested proceeding under Rule 9104 of the Federal Rules of Bankruptcy Procedure and the Certilmans will file a response.

75.    The Certilmans request copies of any and all documents relating to their customer accounts.

76.    The Certilmans request such other, further and related relief as may be just, proper and equitable.

## CONCLUSION

77.    The Certilmans reserve the right to revise, supplement or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of their right to object on any additional grounds.

78.    The Certilmans reserve all rights set forth in Rule 9014 of the Federal Rules of Bankruptcy Procedure, including, without limitation, rights of discovery.

21

2283612-2

79.    The Certilmans reserve all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

80.    The Certilmans incorporate by reference all reservations of rights set forth in the Combined Claim and any supplements thereto.

Dated:  East Meadow, New York
        November 2, 2010

                        CERTILMAN BALIN ADLER & HYMAN, LLP
                        Attorneys for Morton L. Certilman and
                        Joyce Certilman


                By:     /s/ Richard J. McCord_____
                        Richard J. McCord, Esq. (RJM 3290)
                        Carol A. Glick, Esq. (CAG 2675)
                        90 Merrick Avenue
                        East Meadow, New York 11554
                        (516) 296-7000

2283612-2