Helen Davis Chaitman (4266)
Becker & Poliakoff LLP
45 Broadway
New York, NY 10006
(212) 599-3322
hchaitman@becker-poliakoff.com
Attorneys for the D Stone Industries
Inc. Profit Sharing Plan

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,

         Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

         Defendant.
-----------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

       The D Stone Industries Inc. Profit Sharing Plan (the "Plan") hereby objects to the Notice of Trustee's Determination of Claim dated October 8, 2010 and states as follows:

**Background facts**

       1.      On April 14, 1995, the Plan established a profit sharing account with Bernard L. Madoff Investment Securities, LLC ("Madoff"), Account No. 1S0201 (the "Account"). The Plan contained the funds of several people (the "Beneficiaries") in the following percentages: Susan Stone 50.4%; Daniel Stone 37.9%; Mike Stone 8.5%; and Scott Stone 2.9%.

       2.      Each of the Beneficiaries deposited funds into the Plan for the purpose of purchasing securities through Madoff.

       3.      According to the Trustee, during the period from April 14, 1995 through December 11, 2008, the Plan deposited a total of $11,974,357.48 into the Account and withdrew

a total of $16,304,569 from the Account. See Exh. A. The Plan does not agree with the Trustee's calculations.

4. The November 30, 2008 market value of securities in the Account was $9,098,000.

5. The Plan sent a timely SIPC claim to Picard for the Account asserting a claim for securities in the amount of $9,098,000 based upon the November 30, 2008 Madoff statement.

**6.** In the Determination Letter, Picard rejected the claim for securities based upon the November 30, 2008 balance and disallowed the Account's claim in its entirety on the theory that the Plan withdrew from the Account $4,330,211.52 more than it had invested. Exh. A hereto.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

7. The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that the Plan did not have a "legitimate expectation" that the balance on the Account statement represented its property. In fact, in each year that Beneficiaries withdrew funds from the Account, they paid ordinary income taxes on the withdrawals from the Account, which were duly accepted by the federal and state taxing authorities. They would not have paid those sums if they did not believe that the assets in the Account belonged to them.

8.     Picard has failed to state a basis in the Determination Letter for the position he has taken.  Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer.  It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

**B.  Picard has violated the requirement that he honor a customer's "legitimate expectations"**

9.     The legislative history of the Securities Investor Protection Act ("SIPA") makes clear that Congress' intent was to protect a customer's "legitimate expectations."  For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
>
> \*     \*     \*
>
> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. **But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen**, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21; emphasis added.

10.     On December 30, 1970, when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms.   . . . Just as the Federal Deposit Insurance Corporation protects the

3

user of banking services from the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid=2870

11.     SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

12.     Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality.  Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

13.     Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open

4

> market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

14. As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00) (emphasis added).

**C. Without legal authority, Picard has invented his own definition of "net equity"**

5

15. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

16. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

17. The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

18. In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who have depended upon their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus

6

enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

19. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

20. Harbeck's statement is a rationalization of SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

21. After 23 months of his tenure, Picard has identified only two Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. Picard has sued two Madoff customers, Stanley Chais and Jeffry Picower who, Picard has alleged, took out of Madoff $8.2 billion more than they invested. Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

22. However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

23. The Plan, like thousands of other investors, received monthly statements from Madoff indicating returns, in the past few years, on its Madoff investment in the range of 9 – 11% per year. The Plan had entered into a standard brokerage agreement with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Account had a specific number; it

7

received on a monthly basis trade confirmations for every securities transaction in the Account which accurately set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis to claim that the Plan did not have a "legitimate expectation" that the assets reflected on the Account statements sent to it by Madoff belonged to it. Thus, each of the Beneficiaries is entitled to replacement securities with a value, as of November 30, 2008 of $500,000 and the Plan is entitled to a claim for $9,098,000 as reflected on the November 30, 2008 Madoff statement.

**D.  The Plan is entitled to prejudgment interest on his investment and profits.**

24.     Under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted the Plan's funds, that fact also entitles it to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

25.     Although it is not legally relevant, Picard cannot prove that Madoff earned no money on the Plan's investment. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which the Plan and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

8

26. In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

### E. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit

27. In derogation of his fiduciary duty to the Plan, Picard is, in effect, imposing upon the Plan a fraudulent conveyance judgment for sums that the Beneficiaries withdrew from the Account beyond the statute of limitations period applicable to fraudulent conveyances and during a time when Picard has no evidence that Madoff operated a Ponzi scheme. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against

9

customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Plan of the claim to which it is absolutely entitled.

28.     Moreover, Picard has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for Picard to utilize the avoidance powers of a trustee to enrich SIPC at the Plan's expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g.,* 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

29.     Here, however, Picard is not acting to assure equal distribution among prepetition creditors. On the contrary, he is simply acting as SIPC's agent in depriving the Plan of the $500,000 in SIPC insurance to which it is statutorily entitled.

**F.  Picard has violated SIPA by delaying the payment of SIPC insurance**

30.     Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace each of the Beneficiaries' securities up to a value of $500,000 as valued on the November 30, 2008 statements.

10

**G. Picard has no power to claw back withdrawals from an IRA**

31.     The Account was established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, whose provisions preempt State fraudulent conveyance law, upon which Picard presumably relies pursuant to 11 U.S.C. § 544. 29 U.S.C. § 1144(a) (the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section [1003(a)]. . .")

32.     As evidence of Congressional intent to protect ERISA-qualified plans, the Bankruptcy Code was amended in 2005 to protect such plans from the claims of creditors. 11 U.S.C. § 541(b)(7)(a)(i)(I) (exempting from property of the estate "any amount withheld by an employer from the wages of employees for payment as contributions to an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 . . ."). *See also, Patterson v. Shumate,* 504 U.S. 753 (1992)(holding that debtor's interest in an ERISA-qualified pension plan may be excluded from the property of the bankruptcy estate pursuant to 11 U.S.C. § 541(c)(2)).

33.     In addition, the Plan is protected under Florida law.

**H. Each of the Beneficiaries is a "customer" under SIPA entitled to $500,000 in SIPC insurance each.**

34.     Each of the Beneficiaries is a "customer" under the plain definition of "customer" in SIPA.  Thus, each is entitled to receive up to $500,000 in SIPC insurance. 15 U.S.C. § 78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.").

35.     Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder."

Instead, Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the Trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor").

36. Moreover, it is clear that Congress intended for "customer" to be broadly interpreted. In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. Section 7(d)(June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (Aug.4, 1969). The final bill dropped this restriction. Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Partners because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

**Conclusion**

The Beneficiaries are each entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of $500,000 as of November 30, 2008 for each of them.

The Plan is entitled to have its claim recognized in the amount of $9,098,000, consistent with the November 30, 2008 statements.

The Plan is entitled to judgment against Picard and Baker & Hostetler LLP for the damages he has suffered as a result of the breach of fiduciary duty of Picard and his counsel.

November 3, 2010

BECKER & POLIAKOFF LLP

By /s/ Helen Davis Chaitman

45 Broadway
New York, NY 10006
(212) 599-3322
hchaitman@becker-poliakoff.com
Attorneys for the D Stone Industries
Inc. Profit Sharing Plan