Helen Davis Chaitman (4266)
BECKER & POLIAKOFF LLP
45 Broadway
New York, NY 10006
hchaitman@becker-poliakoff.com
Attorneys for the Peerstate Equity Fund L.P.
and each of its participants

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,                                          Adv. Pro. No. 08-01789 (BRL)

        Plaintiffs                                      SIPA Liquidation

vs.                                                   **OBJECTION TO TRUSTEE'S**
                                                      **DETERMINATION OF**
BERNARD L. MADOFF INVESTMENT                          **CLAIM**
SECURITIES LLC,

        Defendant.
------------------------------------------------------------

The Peerstate Equity Fund L.P. (the "Fund") and all of its 61 participants (the

"Participants") hereby object to the Notices of Trustee's Determination of Claim dated

November 5, 2010 and state as follows:

**Background facts**

1.    On October 29, 1996, the Fund opened an account with Bernard L. Madoff

Investment Securities LLC ("Madoff") bearing Account No. 1ZB295 (the "Account").

2.    The Fund was formed pursuant to a written agreement for the purpose of enabling

the Participants to invest in securities through Madoff.  Each of the Participants deposited money

with Madoff for the purpose of purchasing securities.

3.    According to the Trustee, during the period from October 29, 1996 through

December 11, 2008, the Participants deposited a total of $21,820,000 into the Account and

withdrew a total of $22,300,000 from the Account.  See Exh. A hereto at 4 - 6.  The Fund

disputes the Trustee's calculations.

4.    As of November 30, 2008, the Account held securities with a value of

$19,212,702.56.  The percentage interest and amount owned by each of the Participants is set

forth on Exhibit B hereto.

5.    The Fund filed a SIPC claim in the amount of $19,212,702.56, representing the

November 30, 2008 balance in the Account.  Each Participant also filed a timely SIPC claim.

**6.**    By letter dated October 29, 2009, Picard sent a determination letter to the Fund

objecting to the claim and stating that the Fund had withdrawn $480,000 more than it had

deposited into the Account.  Picard ignored all appreciation in the Account over 12 years and

ignored the fact that each of the Participants is a "customer" under the Securities Investor

Protection Act ("SIPA").  See Exh. A.

**7.**    By letter dated November 5, 2010, Picard rejected the claims filed by each of the

Participants on the theory that there was no Madoff account in the name of each Participant.

See, *e.g.*, Exh. C.

**Grounds for objection**

**A.   The Participants are each "customers"
under SIPA entitled to $500,000 in SIPC insurance.**

8.    Each of the Participants is a "customer" under the plain definition of "customer" in

SIPA.  Thus, each is entitled to receive $500,000 in SIPC insurance.  15 U.S.C. § 78lll(2)("The

term "customer" includes . . . any person who has deposited cash with the debtor for the purpose

of purchasing securities.").  *Rosenman Family, LLC v. Picard,* 401 B.R. 629, 635 (B.S.D.N.Y.

2009)("the mere act of entrusting . . . cash to the debtor for the purpose of effecting securities

transactions . . . triggers customer status. . .");  *SEC v. Ambassador Church Financial Devel. Group, Inc.,* 679 F. 2d 608, 614 (6th Cir. 1982); *In re Primeline Sec. Corp.,* 295 F. 3d 1100, 1107 (10th Cir. 2002)("SIPA does . . . protect claimants who try to attempt to invest through their brokerage firm but are defrauded by dishonest brokers . . . If a claimant intended to have the brokerage purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds"); *Miller v. DeQuine (In re Stratton Oakmont, Inc.),* 2003 WL 22698876 at *3 (S.D.N.Y. Nov. 14, 2003)("Stratton Oakmont's conversion of Claimants' property makes the customers within the meaning of SIPA.").

9.      Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words:  "A "customer" is an account holder." Instead, Congress' definition of "customer" is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor")(emphasis added).

10.      Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Participants because "SIPA is remedial legislation.  As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

11.    Moreover, it is clear that Congress intended for "customer" to be broadly interpreted.  In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer."  S. 2348, 91st Cong. Section 7(d)(June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (Aug.4, 1969).  The final bill dropped this restriction.

**B.  Picard has failed to comply with the Court's December 23, 2008 Order**

12.    The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records."  December 23, 2008 Order at 5 (Docket No. 12).  The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that the Fund did not have a "legitimate expectation" that the balance on the Account statement represented its property.  In fact, in each year of the investment, the Participants paid short term capital gains tax on the appreciation in the Account.   They would not have done so if they had any belief whatsoever that the assets in the Account did not belong to them.

13.    Picard has failed to state a basis in the Determination Letter for the position he has taken.  Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer.  It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses."  Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at * (B.S.D.N.Y. Jan. 13, 2003(.

**C.  Picard has violated the requirement that**

4

**he honor a customer's "legitimate expectations"**

14.   The legislative history of SIPA makes clear that Congress' intent was to protect a

customer's "legitimate expectations."   For example, Congressman Robert Eckhardt commented

when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be
> remedied by [the 1978 amendments] is the failure to meet legitimate customer
> expectations of receiving what was in their account at the time of their broker's
> insolvency.

*          *          *

> A customer generally expects to receive what he believes is in his account at the
> time the stockbroker ceases business. But because securities may have been lost,
> improperly hypothecated, misappropriated, never purchased, or even stolen, this
> is not always possible. Accordingly, [when this is not possible, customers] will
> receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

15.   SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for

the classification of claims in accordance with the "legitimate expectations" of a customer based

upon the written transaction confirmations sent by the broker-dealer to the customer.

16.   Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations."

This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein

SIPC assured the appeals court that its policy was to honor the legitimate expectations of

investors, even where the broker never purchased the securities.  SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling
> even where inconsistent with transaction reality.  Thus, for example, **where a
> claimant orders a securities purchase and receives a written confirmation
> statement reflecting that purchase, the claimant generally has a reasonable
> expectation that he or she holds the securities identified in the confirmation
> and therefore generally is entitled to recover those securities (within the
> limits imposed by SIPA), even where the purchase never actually occurred
> and the debtor instead converted the cash deposited by the claimant to fund**

5

> **that purchase** . . . [T]his emphasis on reasonable and legitimate claimant
> expectations frequently yields much greater 'customer' protection than would be
> the case if transaction reality, not claimant expectations, were controlling, as this
> Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

17.    Picard's position in the Madoff case is contradicted, not only by SIPC's prior

treatment of customers in the *New Times* case, but also by a statement that SIPC's general

counsel, Josephine Wang, gave to the press on  December 16, 2008 wherein Ms. Wang

acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if
> clients were presented statements and had reason to believe that the securities
> were in fact owned, the SIPC will be required to buy these securities in the open
> market to make the customer whole up to $500K each.  So if Madoff client
> number 1234 was given a statement showing they owned 1000 GOOG shares,
> even if a transaction never took place, the SIPC has to buy and replace the 1000
> GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

18.    As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its

obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement,

inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi

scheme for a period of approximately 17 years and had never purchased the securities reflected

on the customers' monthly statements.  In fact, SIPC's president, Stephen Harbeck, assured the

*New Times* bankruptcy court that customers would receive securities up to $500,000 including

the appreciation in their accounts.

> HARBECK:  . . . if you file within sixty days, you'll get the securities, without
> question.  Whether – if they triple in value, you'll get the securities . . . Even if
> they're not there.
>
> COURT:  Even if they're not there.

HARBECK:   Correct.

COURT:   In other words, if the money was diverted, converted –

HARBECK:   And the securities were never purchased.

COURT:   Okay.

HARBECK:   **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

## D.  Without legal authority, Picard has invented his own definition of "net equity"

19.    SIPA defines "net equity" as the value of the securities positions in the customer's

account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

20.    SIPA specifically prohibits SIPC from changing the definition of "net equity."  15

U.S.C. § 78ccc(b)(4)(A).

21.    The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

7

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re*

*Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is

calculated as the difference between what the debtor owes the customer and what the

customer owes the debtor on the date the SIPA proceeding is filed.").

22.     In derogation of his obligations to carry out the provisions of SIPA, Picard has

created his own definition of "net equity."  Picard has asserted that he has a right to recognize

investors' claims only for the amount of their net investment, disregarding all appreciation in

their accounts.  By this procedure, Picard would avoid paying SIPC insurance to the thousands of

elderly, long-term Madoff investors who have depended upon their Madoff investments for their

daily living expenses.  He also would be able to reduce all claims to the net investment, thus

enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to

customers.

23.     Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a
> claimant is owed perpetuates the Ponzi Scheme.  It allows the thief . . . Mr.
> Madoff . . . to determine who receives a larger proportion of the assets collected
> by the Trustee.

24.     Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to

save money for the brokerage community at the expense of innocent investors who relied upon

the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

25.     After 23 months of his tenure, Picard has identified only two Madoff investors who

**might not** have had a "legitimate expectation" that the trade confirmations and account

statements they received were accurate.  Picard has sued two Madoff customers, Stanley Chais

and Jeffry Picower who, Picard has alleged, took out of Madoff $8.2 billion more than they

invested.  Picard has further alleged that these two investors received returns in their accounts of

100 – 400% and that Madoff back-dated $100 million losses in their accounts.  Assuming these

allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not

have had a "legitimate expectation" that their accounts were genuine.

26.     However, the fact that a few out of more than 8,000 Madoff investors may have

been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining,

totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

27.     The Fund, like thousands of other investors, received monthly statements from

Madoff indicating returns on their Madoff investment in the range of 9 – 20% per year, subject to

short term capital gains tax rates.  The Fund had entered into standard brokerage agreements with

Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Fund had a specified,

numbered account for the purchase and sale of securities; it received regular monthly statements

and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the

purchase of US Treasury securities.  The Participants paid Federal and State taxes on the annual

growth of the investments with Madoff.   There is no basis to claim that each of the Participants

did not have a "legitimate expectation" that the assets reflected on the Fund's statements sent by

Madoff belonged to them.

28.     Thus, the Fund is entitled to a claim for $19,212,702.56, the November 30, 2008

balance on the Account as reflected on the Madoff statement.

**E.  The Fund is entitled to prejudgment
interest on its investment and profits.**

29.     At a minimum, under New York law, which is applicable here, funds deposited

with Madoff are entitled to interest.  *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et*

*seq.* Moreover, since Madoff converted the Fund's money, it is also entitled to prejudgment

interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at \*14-15

(S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify

for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d

427, 428 (1ˢᵗ Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and

conversion).

30.     Although it is not legally relevant, Picard cannot prove that Madoff earned no

money on the Fund's investments.  To the extent the funds were deposited into a bank, they

earned interest while on deposit.   Madoff disbursed customer funds to favored customers, to

family members, and for other purposes.  Those funds may have yielded substantial profits to

which the Participants and other customers are entitled once the ultimate recipients of Madoff's

thievery are known.

31.    In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy.

*See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008).   Where a Ponzi scheme is

operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket

damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at \*5 (6th Cir.

Aug. 8, 2007).  In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes

here, that the plaintiffs were not entitled to any recovery because they already had withdrawn

more than they had invested.  The Sixth Circuit rejected that argument because, as the court

explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe,

but for the express purpose of investment, with a reasonable expectation that it would grow.

Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

**F.    Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit**

32.    In derogation of his fiduciary duty to the Participants, Picard is, in effect, imposing upon the Fund a fraudulent conveyance judgment for sums that the Fund withdrew from the Account beyond the statute of limitations period applicable to fraudulent conveyances. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Participants of SIPC insurance and the claim to which the Fund is absolutely entitled.

33.    Moreover, Picard has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit.   There is no authority in SIPA or the Bankruptcy Code for Picard to utilize the avoidance powers of a trustee to enrich SIPC at the Participants' expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g., 5 Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re*

*Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.  Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

34.   Here, however, Picard is not acting to assure equal distribution among prepetition creditors.  On the contrary, he is simply acting as SIPC's agent in depriving the Participants of the SIPC insurance to which each of the Participants is statutorily entitled.

**G.  Picard has violated SIPA by delaying the payment of SIPC insurance**

35.   Picard has breached his statutory obligation to "promptly" replace a customer's securities.  15 U.S.C. § 78fff-2(b).  Picard is obligated to replace the Participants' securities up to a value of $500,000 each, for a total of $19,212,702.56, as valued on the November 30, 2008 statements.

**Conclusion**

The Participants are entitled to an order compelling Picard and SIPC to immediately replace the securities in the Account to the extent of a valuation of $19,212,702.56 as of November 30, 2008, up to $500,000 for each of the Participants.

The Fund is entitled to have its claim recognized in the amount of $19,212,702.56, consistent with the November 30, 2008 statement.

The Participants are entitled to judgment against Picard and Baker & Hostetler LLP for

the damages they have suffered as a result of the breach of fiduciary duty of Picard and his

counsel.

November 16, 2010

BECKER & POLIAKOFF LLP

By  /s/ Helen Davis Chaitman

45 Broadway
New York, NY 10006
(212) 599-3322

Attorneys for the
Peerstate Equity Fund L.P.
and each of its Participants