November 14, 2010

Re:  Claim Number 004243

To Whom It May Concern:

This is official notice that we disagree with your determination that as two of the Limited Partners with Peerstate Equity Fund LP we did not have an account with Bernard Madoff. We are formally requesting a hearing with Bankruptcy Judge Burton Lifland on this matter.

We are enclosing a copy of the paperwork we originally filed with our claim, including the General Partnership agreement which indicates on page 3, paragraph 4 the fund was invested with Bernard Madoff, the final statement I received from Peerstate, copies of a list obtained from the New York Times indicating Peerstate's account name found by the court-appointed trustee in the records of Bernard Madoff and copies of all checks I wrote to Peerstate for my sub account number 3140.

Sincerely,

Louis F. Prochilo

Dorothy Prochilo

43 West Street
Northport, NY 11768



http://projects.nytimes.com/madoff/page/494

# Searching the Madoff List

The list of customer account names found by the court-appointed trustee in the records of Bernard L. Madoff's wealth management firm, as well as names of people who contacted the trustee to say they believed they had been Madoff customers and wanted to file a claim. Some of the names on the list are those of lawyers, accountants, foundation trustees and agents who set up the accounts on behalf of the actual investors in the Madoff fund, which investigators are calling the biggest Ponzi scheme ever. Some people on the list have said publicly that they were included in error.

| Name | City | State | ZIP Code |
|---|---|---|---|
| Pauline Silverstein C/O M Medrano | Weston | FL | 33331 |
| Pauline Silverstein Rev Trust | Great Falls | VA | 22066 |
| Pauline Werbin | New York | NY | 10022 |
| Pearl Dudak | Boca Raton | FL | 33496 |
| Pearl Leifer Trust | Boca Raton | FL | 33434 |
| Pearl Liberman | Palm Beach Gardens | FL | 33418 |
| Pearl Liberman Trust 2 | Palm Beach Gardens | FL | 33418 |
| Pearson Family Partnership C/O Lynn Weiner | Palm Beach Gardens | FL | 33418 |
| Pearson Street Capital Llc | Chicago | IL | 60611 |
| Pec Israel Economic Corp | New York | NY | 10017 |
| Peck Partnership C/O Andrew Peck | New York | NY | 10021 |
| Pedro Garcia | Delray Beach | FL | 33446 |
| Peds Retirement Trust | Palm Beach Gardens | FL | 33418 |
| ~~Peerstate Equity Fund L P C/O Robert N Getz~~ | ~~Dix Hills~~ | ~~NY~~ | ~~11746~~ |
| Peggy Ann Gerhard Barone | Louisburg | NC | 27549 |
| Pejman Sabet | Los Angeles | CA | 90064 |
| Penney P Burnett | Stamford | CT | 06902 |
| Pennhill Urological Associates | Philadelphia | PA | 19118 |
| Penny Bank | Baltimore | MD | 21210 |
| Penny Marson | Encino | CA | 91316 |

# PEERSTATE EQUITY FUND, L.P.

NEW WORLD PLAZA
6 ARISTA COURT
DIX HILLS, NY 11746
631 424-0078



Dear Limited Partner: *Dear Dorothy + Lou,*

    The General Partner of Peerstate Equity Fund, L.P. (the "Fund") is proposing to amend the Limited Partnership Agreement for the Fund (the "Agreement") to make the following changes to this Agreement:

    1.    Reduce the Management Fee to be charged to Limited Partners depending upon the value of Partnership Interests;

    2.    Initiate a Performance Allocation pursuant to which the General Partner may receive a portion of the Partnership's Net Profits;

    3.    Incorporate into the Agreement the business practice of the Fund by which I, the Managing Member of the Fund's General Partner, may establish, in my name, various banking, brokerage and advisory relationships that are for the exclusive use and benefit of the Fund and its investors and, to assure the continued operation of the Fund in the event of my death or disability, consent to my appointment of Steven S. Getz as joint nominee as to such accounts;

    4.    Acknowledge and agree that the General Partner may establish a second investment partnership that will follow the Fund's investment principles and be marketed solely to qualified purchasers, as that term is defined in the Investment Company Act of 1940, and further acknowledge and agree that the General Partner may use those nominee accounts that are described above to hold the assets of both the Fund and this second investment partnership; and

    5.    Include various administrative changes to the Agreement.

    These proposed changes are discussed in greater detail below. A copy of the proposed amended Agreement is attached to this letter. The proposed amended Agreement has also been enclosed in a version that has been highlighted to show the specific changes that are being proposed.

    The consent to these changes by Limited Partners owning a majority of Partnership Units is required in order for these amendments to become effective. Please carefully review these changes as well as the description of them contained below. If you consent to the adoption of these changes, please sign this letter in the space provided at the conclusion of this letter. Please also sign the amended Agreement in the space block provided for your signature. Please keep a copy of each of these documents for your records. You should then return these signed documents (or, at minimum, the signature pages thereto) to the General Partner in the enclosed envelope. After these amendments have been adopted, the changes discussed herein will take effect and the General Partner will sign the amended Agreement and will provide each of you with copies of such executed agreements.

### *I. Changes to the Management Fee*

Presently, each Limited Partner pays a quarterly Management Fee of one half of one percent (.5%) of the assets of the Partnership attributable to the Units owned by such Limited Partner. The General Partner is proposing to change this fee so that this fee will be reduced based upon the account balances of the Limited Partner at the end of each quarterly period.

Under the new fee structure, a Limited Partner whose account balance at the end of a quarterly period is less than $200,000 will continue to pay the existing Management Fee. However, a Limited Partner whose account balance is at such time equal to or greater than $200,000, but less than $5,000,000 will pay a quarterly management fee of .375% of that Limited Partner's account balance. This is a 25% fee reduction from the current Management Fee. A Limited Partner whose account balance is $5,000,000 or more will pay a quarterly management fee of .25%, or 50% less than the existing fee.

### *II. The Performance Allocation*

Privately offered investment partnerships commonly provide that the General Partner will receive an allocation of the profits achieved on behalf of the Limited Partners of such fund. To date, the Fund has not provided that its General Partner receive such an allocation.

The Fund's Limited Partnership Interests have, since its inception, increased at an annual average rate of 12.3%, net after deducting all expenses. This compares favorably to an average annual increase of 10.61% before any associated expenses in the S&P 100 and 10.66% in the Dow Jones Industrial Average, before any associated expenses, during the same time period. Though past performance is not a guarantee of future results, in view of the Fund's performance history to date as well as the changes to the Management Fee discussed above, the General Partner believes that it is appropriate that it henceforth receive a performance allocation as described below. As you will see, this performance allocation will only be made to the extent that the Fund achieves above average investment returns in any calendar year. Furthermore, this Performance Allocation will only be made when the value of the interest of a Limited Partner exceeds that Partner's highest previous account balance at the conclusion of a Fiscal Period (the "High Water Mark"). The General Partner believes that this allocation will provide additional incentive for the General Partner to achieve above-average investment returns.

Where the value of the interests of a Limited Partner increases in any calendar year by more than 12% (the "Hurdle Rate"), the General Partner will receive an allocation of 20% of such profits in excess of this Hurdle Rate. The General Partner will not receive any performance allocation if such an interest increases by an amount equal to or less than the Hurdle Rate; if the value of such an interest increases by more than the Hurdle Rate, the General Partner will only receive a performance allocation to the extent that the value of this interest has exceeded the High Water Mark by more than the Hurdle Rate.

2

The following examples illustrate how this Performance Allocation will be applied to the interests of Limited Partners. If the value of a Limited Partner's interest in the Fund hypothetically appreciated by 8% in a calendar year, this hypothetical appreciation would be less than the 12% Hurdle Rate and thus there would be no Performance Allocation to the General Partner with respect to this Limited Partner. However, if the value of a Limited Partner's interest in the Fund hypothetically appreciated by 16% in a calendar year, this appreciation would exceed the Hurdle Rate by 4%; therefore, 20% of this 4% excess - - .8% of the value of this Limited Partner's interest - - would be reallocated to the General Partner as its Performance Allocation.

### III.    Nominee Accounts

Throughout the Fund's history I, as the managing member of the General Partner, have established, in my name, various banking and brokerage and advisory relationships that are for the exclusive use and benefit of the Fund and its investors. The proposed amendments to the Agreement memorialize this business practice and permit its continuance in the discretion of the General Partner.

The nominee bank account that I have established permits me to promptly deposit the capital contributions of Limited Partners into such an account and thereafter transfer these funds, as I deem appropriate in the interests of the Fund, to investment accounts maintained on behalf of the Fund, which include the nominee account that is described below. I have typically maintained a balance in this bank account that I believe will best enable the General Partner to perform many of its administrative responsibilities on behalf of the Fund. These responsibilities include, but are not limited to, the following: the prompt execution, in accordance with the terms of the Agreement, of an instruction from a Limited Partner to withdraw all or part of their respective interests in the Fund; and the payment of expenses of the Fund, including fees or allocations to the General Partner, as well as auditing fees and legal fees payable by the Fund.

I have also established a nominee account with Bernard L. Madoff Investment Securities LLC ("BLM"). This BLM account has and will continue to serve as the Fund's principal investment account. In my many years of prior investment experience with BLM, I have received excellent brokerage services from them. When the Fund was organized, I wished to make BLM's brokerage services available to the Fund. In addition, to the extent that I have given BLM investment discretion as to my personal accounts, BLM has been able to achieve investment returns that have consistently outperformed recognized stock market indexes. Though BLM's past performance on my behalf is not a guarantee of the results that it would achieve on behalf of the Fund, I also wished to make BLM's discretionary investment services available to the Fund.

When the Fund was first established, BLM was not accepting any private offered investment partnerships, such as the Fund, as its new clients. However, since I had been a BLM client, BLM agreed it would establish an additional account, separate from my personal accounts. Accordingly, I established a separate BLM account in my name as the nominee for the Fund and I have acted solely as nominee for the Fund with respect thereto. In this account, BLM has provided brokerage services for the benefit of the Fund, and, through trading authorizations that I have given to this Firm, BLM has directed the investment of the assets of the nominee account. This nominee relationship with BLM has provided the Fund with a broad range of

3

services that have been performed in an exemplary manner. These services have been an essential component of the investment performance of the Fund.

To date, I have acted as the sole nominee for the Fund. In order to assure the Fund's continued operation in the event of my death or disability or when I am otherwise unavailable or unable to perform these duties, I have recently arranged for Steven S. Getz to become the joint holder of this nominee status. In the event of my death or disability, Steven will become the sole nominee for these accounts. As we will discuss below, Steven will under such circumstances become the managing member of the Fund's General Partner and, in this capacity, will administer the Fund's business and affairs.

Steven and I each intend to execute a Constructive Trust Agreement which clearly states that the assets in the nominee accounts are owned solely by Fund investors and are not owned by either Steven or myself. The agreement will further provide that such assets are to be managed for the sole use and benefit of the Fund. This trust agreement will further memorialize our nominee status with respect to the accounts and provide evidence for our position that the assets in such accounts should not be subject to the claims of either Steven's or my creditors, nor should such assets be deemed part of either of our respective estates.

### IV.   Consent to the Creation of Another Fund

The Fund is exempt from registration under the Investment Company Act because it will have no more than one hundred (100) investors. Presently, the Fund has ninety-seven investors and is thus approaching the maximum number permitted by the registration exemption at issue. As a result, the General Partner has ceased accepting new investors into the Fund.

Accordingly, the General Partner has determined to, within the next three to six months, establish a second investment vehicle, referred to herein as Peerstate II, which will follow the same administrative parameters and investment principles of the Fund. Peerstate II will be offered to investors who satisfy the definition of a qualified purchaser under the Investment Company Act of 1940, as amended. Generally, this standard requires that potential investors maintain an investment portfolio of $5 million in total assets, including those that may be invested in the Fund. This is a higher net worth standard then the $1 million net worth guideline that is applicable to investors in the Fund.

When Peerstate II becomes operational, the General Partner intends to offer those Limited Partners in the Fund who satisfy the higher net worth standard of a "qualified purchasers" the opportunity to exchange their Fund interests, tax-free, for interests in Peerstate II. To the extent that such interests are so exchanged, the Fund will be able to again accept additional investors.

The General Partner also intends to use the same nominee accounts that have been described in Section III of this Letter for the benefit of investors in Peerstate II. Thus, the assets of Peerstate II may be commingled with those of the Fund and the purchases and sales made by BLM on behalf of this nominee account will be allocated by the General Partner, pro rata, to the Fund and to Peerstate II.

4

The General Partner believes that the creation of Peerstate II will attract additional investors to the Fund as well as to the investment strategy that is offered through the facilities of the General Partner. The additional capital represented by new investors in the Fund or Peerstate II will enhance the opportunities available to the Fund's Limited Partners and should not adversely effect their interests in any manner.

### V. Various Administrative Changes

When you review the blacklined version of the proposed amended Partnership Agreement, you will note various proposed changes to this Agreement that are administrative in nature. These changes are summarized below:

1. The General Partner will separately calculate the value of each Limited Partner's ownership interest in the Fund and will no longer calculate a common Net Asset Value for all Limited Partners. This change will better enable the General Partner to calculate the Performance Allocation for each Limited Partner. Numerous changes to the Partnership Agreement are necessary to effect this change. I expect that the costs of calculating these individual account interests will be higher than the current cost of calculating a Net Asset Value for all units. I believe that Limited Partners should evaluate these higher costs in the context of the benefits that the Partnership will receive from implementing a Performance Allocation and lowering Management Fees for many Limited Partners.

2. the amendment of Section 1.02 to clarify that the General Partner may change the Partnership's name;

3. the amendment of Section 3.03 to clarify the identity of persons who are entitled to indemnification by the Partnership and clearly state that Limited Partners shall not be personally liable to indemnify any permissible indemnitee;

4. the addition in Article IV of representations and warranties by Limited Partners as to their legal capacity to purchase a Partnership investment, their review of all documents and information provided to them, their status as accredited investors and their cooperation with applicable customer identification rules;

5. the revision of existing Section 6.01 to provide that the Partnership will not automatically terminate in December 2046.

6. the revision of existing Section 6.02 to provide that in the event of the death or disability of Robert N. Getz, it is intended that Steven S. Getz will become the Managing Member of the General Partner and the economic interests of the General Partner shall be retained by members of the immediate family of Robert N. Getz.

5

       Thank you for taking the time to review this letter. If you consent to each of the amendments discussed herein, please sign and return this letter as well as the enclosed amended agreement in the stamped, self-addressed envelope that has been provided to you. Should you have any questions concerning the matters discussed herein, please contact me at (631) 424-0078.

                           Very truly yours,

                           Robert N. Getz
                           Managing Member,
                           Robert N. Getz, LLC
                           General Partner

By signing below, I consent to those changes to the partnership agreement of Peerstate Equity Fund, L.P. described in this letter and in the proposed amended agreement included herewith. I have thoroughly reviewed and understood these amendments. I have had the opportunity to ask any questions that I may have concerning these amendments and have received complete responses to my questions. I have also had the opportunity to fully consult with my professional advisors if I chose to do so. I acknowledge that such amendments include changes to the management fee, the initiation of a performance allocation, the memoralization of business practices that permit Robert N. Getz to establish nominee accounts on behalf of the partnership, the consent to Steven S. Getz acting as joint nominee as to such accounts and the establishment of another investment vehicle to be administered by the General Partner through the same nominee accounts

_____              5/20/04
Signature of Limited Partner                                  Date