# ☐ DAY PITNEY LLP

BOSTON   CONNECTICUT   NEW JERSEY   NEW YORK   WASHINGTON, DC

JEFFREY PLOTKIN
Attorney At Law

One Canterbury Green
Stamford, CT 06901
T: (203) 977-7547  F: (212) 916-2940
jplotkin@daypitney.com

March 3, 2009

VIA UPS

Irving H. Picard, Esq., Trustee
Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

Re:   Orthopaedic Specialty Group PC Defined Contribution Pension Plan
      a/k/a Orthopaedic Specialty Group PC 401(k) Plan
      (BMIS Account No. 1O0004)

Dear Mr. Picard:

This law firm represents Orthopaedic Specialty Group PC ("OSG"), a medical practice located in Fairfield, Connecticut. Enclosed herein, under separate cover letter, is the Customer Claim for the OSG Defined Contribution Pension Plan (a/k/a OSG 401(k) Plan) (the "OSG Plan" or the "Plan") account at Bernard L. Madoff Investment Securities LLC ("BMIS") (Account No. 1O0004).[1]  We write this letter in support of our contention that you should treat each of the participants in the Plan as separate "customers" of BMIS for purposes of this liquidation proceeding, to the full extent of their vested interest (employee and employer contributions) in their individual 401(k) Plan accounts.

## EXECUTIVE SUMMARY

On January 27, 2009, Dr. Henry A. Backe, an orthopedic surgeon and partner of OSG, and a participant in the OSG Plan, appeared and testified before the Senate Banking Committee during its hearings on the Madoff scandal.  Dr. Backe expressed concern to the Committee that the Securities Investor Protection Corporation ("SIPC"), based on its position in prior liquidation proceedings, might take the position in the BMIS liquidation proceeding that the OSG Plan trust was the sole "customer" of BMIS entitled to SIPC protection, and that the more than 100

---

[1] Under separate cover, the law firm of Sandak, Hennessey & Greco, LLP is filing the individual Customer Claims on behalf of 117 participants of the Plan.

**DAY PITNEY** LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 2

participants in the OSG Plan (including nurses, medical assistants, x-ray technicians, and administrative staff) were not "customers" of BMIS and not entitled to SIPC protection. Dr. Backe spoke of the injustice and grave consequences that would result if the Plan participants, who had contributed millions of dollars of their hard-earned pay into the Plan towards their retirement, were relegated to sharing on a *pro rata* basis the Plan's $500,000 maximum recovery from SIPC.

At that same hearing, Stephen Harbeck, the President and CEO of SIPC, in response to a question by a Senator, stated that each of the participants in the OSG 401(k) Plan might be considered BMIS customers in the SIPC liquidation proceeding, but only if BMIS had "recognized" the individual participants and sent them individual account statements. In other words, Mr. Harbeck indicated that SIPC might recognize the OSG Plan participants as customers of BMIS if the OSG Plan was a "participant-directed" plan, rather than a "trustee-directed plan." (The OSG Plan is a trustee-directed plan).

Mr. Harbeck's distinction between participant-directed plans, and trustee-directed plans such as the OSG 401(k) Plan, apparently is based on logic contained in a 1976 decision by the Second Circuit in *SIPC v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314 (2d Cir. 1976) – a case that Mr. Harbeck himself testified was inapposite to 401(k) plans. But as noted by the United States Supreme Court in its recent decision of *La Rue v. DeWolff, Boberg & Associates, Inc.*, 128 S.Ct. 1020 (2008), there have been substantial developments in the law and substantial changes in the retirement plan landscape over the past thirty years. These developments and changes dictate that the individual participants in the trustee-directed OSG 401(k) Plan are entitled to individual coverage from SIPC to the maximum extent provided by law, just like individual owners of individual retirement accounts ("IRAs").

Nonetheless, should you feel constrained by *Morgan, Kennedy* with respect to its holding that participants of pension plans funded solely by employers are not entitled to individual SIPC coverage, OSG respectfully submits that you treat each of the participants as a customer of BMIS to the extent of their own financial contributions to their 401(k) accounts (*i.e.*, deferred income contributions and rollover contributions), and treat the Plan as a customer of BMIS to the extent of OSG's employer-fundings to the participants' accounts.

Finally, should you ultimately determine that you will not treat each of the participants of the Plan as individual customers of BMIS for purposes of this liquidation proceeding, we respectfully request that you treat the Plan as the BMIS customer. In that event, please remit the proceeds of the claim directly to OSG at its address listed on the Customer Claim form.

**DAY PITNEY** LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 3

## BACKGROUND

1.    SIPA's Definition of "Customer"

Congress enacted SIPA in 1970 to protect public investors "by providing financial relief to the customers of failing broker-dealers with whom they had left cash or securities on deposit." *SIPC v. Barbour*, 421 U.S. 412, 413 (1971).[2]

SIPA originally defined the term "customers" of a debtor to mean:

> . . . . persons (including persons with whom the debtor deals as principal or agent) who have claims on account of securities received, acquired, or held by the debtor from or for the account of such persons (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchases, or (V) as collateral security, or (VI) by way of loans of securities by such persons to the debtor, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, and shall include any person who has deposited cash with the debtor for the purposes of purchasing securities . . . .

15 U.S.C. § 78fff(c)(2)(A)(ii) (1970).

Most of this definition was taken from then-existing Section 60(e)(1) of the Bankruptcy Act, 11 U.S.C. § 96(e)(1), which had established special rules "where the bankrupt is a stockbroker." "The definition [of customer] in the Bankruptcy Act and SIPA sections is in identical language. Under each law, the preferential protection is accorded to a person <u>who can trace and identify the trust property or funds in the hands of the stockbroker</u>; other claimants must look to the general assets of the stockbroker for satisfaction." *SEC v. Kenneth Bove & Co., Inc.*, 378 F. Supp. 697, 700 (S.D.N.Y. 1974) (emphasis supplied).

SIPA's definition of customer, however, included one element that went beyond the Bankruptcy Code definition: it defined a "customer" to also include "any person who has deposited cash with the debtor for the purposes of purchasing securities." 15 U.S.C. § 78fff(c)(2)(A)(ii) (1970); *In re Investors Security Corp.*, 6 B.R. 420, 424 (Bkrtcy. W.D. Pa. 1980) ("While much of the definitional language of 'customer' in SIPA is taken nearly verbatim from Section 60(e)(1), the term also includes, *inter alia*, persons who have deposited cash with

---

[2] Throughout the House of Representatives' final report on the bill, the term "'investors' is used synonymously with 'customers,' indicating that, in the eyes of Congress, the Act would protect capital markets by instilling confidence in securities traders." *SEC v. F.O. Baroff Co., Inc.*, 497 F.2d 280, 283 (2d Cir. 1974).

DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 4

the debtor for the purpose of purchasing securities").

In plain terms, Congress defined "customer" for SIPA purposes as a person who:

(1) had a securities-related claim arising from the "account of such person[]" -- without explanation as to whether the account must be in the name of such person or held for such person's benefit,[3] OR

(2) someone who deposited cash with the broker-dealer for the purposes of purchasing securities – untethered to a requirement that an "account of such person" be opened or maintained at the broker-dealer.

In 1978, Congress amended the definition to its current form, as follows:

> The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor *in the ordinary course of its business as a broker or dealer* from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . .

15 U.S.C. § 78lll(2) (italics supplied).

Congress added the phrase italicized above - "in the ordinary course of its business as a broker or dealer" - to highlight its determination that SIPA protection should extend only to members of the investing public,[4] that is, those persons traditionally enjoying "the type of

---

[3] SIPA imposes no requirement that the broker-dealer "recognize" the name of a customer claimant in a SIPC liquidation. In the first draft of the SIPA legislation, SIPC would not have been required to recognize as a customer any person whose name or interest as the owner of any portion of an account was not disclosed on the records of the broker-dealer, "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. §7(d) (June 9, 1969); H.R. 13308, 91st Cong. §7(d) (Aug. 4, 1969). The final bill dropped this restriction.

[4] This definition was meant to exclude those persons who had financial dealings with the brokerage house outside of the ordinary course of business; like the claimant in *SEC v. F.O. Baroff Co., Inc.*, 497 F.2d at 283, who was not a public customer of the broker-dealer, but a person who voluntarily lent securities to the broker-dealer solely to help it avoid insolvency.

**DAY PITNEY** LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 5

fiduciary relationship with the debtor that characterizes customers in general." Michael E. Don
& Josephine Wang, *Stockbroker Liquidations Under the Securities Investor Protection Act and
Their Impact on Securities Transfers*, 12 Cardozo L. Review 509, 537 n. 158 (December 1990).[5]

#### 2.    The *Morgan, Kennedy* Opinion

In *Morgan, Kennedy*, the employer, Reading Body Works, Inc. ("Reading"), established
a profit sharing plan,[6] pursuant to which a trust fund was created and maintained through yearly
employer contributions based upon the employer's net earnings. The Reading plan provided that
employees would earn "credits" or a percentage interest in the fund according to annual
compensation level and consecutive years of service. A participant's interest in the plan did not
vest until the participant earned a specified amount of service credit under the plan. The
participants became entitled to the proceeds of the plan only upon retirement. *See Morgan,
Kennedy*, 533 F.2d at 1315.

The trustees of the plan opened an account with Morgan, Kennedy in the trustee's names.
After Morgan, Kennedy was placed into SIPC liquidation in 1973, the trustees of the plan
submitted a customer claim for the plan. None of the individual participants of the plan filed
customer claims with SIPC. Nonetheless, the SIPC Trustee informed SIPC that he intended to
treat the one hundred and eight trust beneficiaries of the trust as separate customers of the debtor,
entitling each to maximum SIPC coverage per customer.[7] *See id.* at 1315-16.

---

[5] BMIS, which was both the OSG Plan's investment adviser and broker-dealer, stood in a traditional fiduciary
relationship with the Plan participan's. *See, e.g., Glaziers and Glassworkers Union Local No. 252 Annuity Fund v.
Newbridge*, 93 F.3d 1171, 1179 - 82 (3d Cir. 1996) (broker-dealer that provided investment advice to pension plan
was a plan fiduciary); *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 109 (N.D. Cal. 2008) (individual participants in
pension plan have standing to sue plan's investment adviser for breach of fiduciary duty).

[6] A profit sharing plan is a retirement plan established and maintained by an employer to provide for the employees'
participation in the employer's profits. The employer agrees to make "substantial and recurring" contributions to the
plan, usually pursuant to a formula or on a discretionary basis. The Employee Retirement Income Security Act of
1974 ("ERISA") categorized profit sharing plans as "defined contribution plans." Like all defined contribution
plans, each profit sharing plan participant has an individual account under the plan to which are allocated the
employer's contributions and any income, expenses, gains, losses, and any forfeitures of other participants'
accounts. For purposes of this memorandum, a "traditional profit sharing plan" refers to a profit sharing plan such
as the Reading plan in which only an employer makes contributions to participants' individual accounts under such
profit sharing plan. As discussed below, only 401(k) profit sharing plans, which were legislatively created many
years after the *Morgan, Kennedy* opinion, allow participants to make pre-tax or before-tax contributions to their
individual accounts under such a profit sharing plan.

[7] At the time of the *Morgan, Kennedy* opinion, the pre-1978 definition of "customer" was at issue. The 1978
amendment has no material impact on the analysis.

# DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 6

SIPC disagreed with and disputed the SIPC Trustee's interpretation of the term "customer." Judge Babitt of the bankruptcy court ruled in favor of the SIPC Trustee, and awarded individual SIPC coverage to each participant in the plan. SIPC appealed the ruling to the district court. *See id.* at 1315-16.

The district court upheld the bankruptcy court's ruling:

> . . . . While the statutory language on its face may favor SIPC, this must not be exaggerated. Even on this somewhat arid level, there is substantial room for debate. As SIPC stresses, the advances are provided for payments to "each customer. . . ." 15 U. S. C. § 78fff(f)(1). But "customers" in turn are "persons . . . who have claims on account of securities . . . and . . . persons who have claims against the debtor arising out of sales or conversions of such securities. . . ." § 78fff(c)(2)(A) (ii). It is scarcely an unbearable wrench to include employees for whom the Trust existed as such "persons." It is in this setting that the Bankruptcy Judge deemed significant SIPC's own Rule 101(b).[8] For the purpose embraced by that Rule SIPC found itself comfortably able to look beyond the formalities of "title" and account designations to protect the "persons" affected with the kind of substantial interest Congress cared about. The analogy, if not decisive, is sound and useful.
>
> . . . . Elsewhere in its own Rules SIPC has shown that there is no undeviating identity between an "account" and a "customer;" it has overridden the identity even where the result has been to diminish the protection for individual beneficiaries. SIPC's Rule 104(c) says that where more than one trust account is held for the same beneficiary "such accounts shall be combined so that the maximum protection afforded to such accounts in the aggregate shall be the maximum protection afforded to one 'separate customer' of the member." Piercing the formal designation of "accounts" in that situation, SIPC has looked at the individual human "beneficiary" as the measure of the protection. That approach should not be shunned when it is favorable to the real

---

[8] SIPC Rule 101(b) currently states "An account held with a member by an agent or nominee for another person as a principal or beneficial owner shall, except as otherwise provided in these rules, be deemed to be an individual account of such principal or beneficial owner." 17 C.F.R. § 300.101(b).

**DAY PITNEY** LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 7

> party in interest-the true investor with his small but vital stake-and
> adopted only when it hurts. The overriding purpose remains after
> all to effect the speedy return of most customer property.

*SEC v. Morgan, Kennedy & Co., Inc.*, 1975 WL 399 at *1 – 2 (S.D.N.Y. June 10, 1975)
(footnote, quotation marks, and citation omitted).

SIPC appealed the ruling to the Second Circuit. The Court reversed the district court's
ruling, holding that the plan beneficiaries did not fit under SIPA's definition of a "customer." *See*
533 F.2d at 1317. Significantly, the court noted that that the only claimant before the Court was
the plan trust, and that none of the participants had even filed a customer claim with the SIPC
Trustee in the SIPC proceedings. *See id.* at 1318 n.6.

In ruling that the plan participants were not "customers" under SIPA, the Court noted that
the term "customer" in SIPA was modeled on the definition of that same term in the Bankruptcy
Act, and was meant to be synonymous with the terms "investor" or "trader." *See id.* at 1317. The
Court ruled that the plan itself was the customer because its account at Morgan, Kennedy was
funded <u>solely by the employer</u>, Reading, and was in the name of the trustees only, "who had the
exclusive power to entrust the assets to the debtor, to invest and reinvest, and to purchase and
trade securities in the account as they saw fit." *Id.* at 1318.

In this connection, the Court noted that Morgan, Kennedy "<u>held no property belonging to
any individual employee, in which such employee could trade or invest</u>. Calculable amounts
were payable to . . . employees only in the event that, pursuant to the terms of the Plan, they
became entitled thereto. . . ." *Id.* (emphasis supplied). As such, the Court noted, the
participants possessed no claim which was "presently reducible to a specific monetary sum. At
most, the employees have an interest in the trust *res* which may be defeated under certain
circumstances and which in any event is impossible of valuation until actual distribution is
made." *Id.* at 1318 n.6.

The court also noted that Morgan, Kennedy had no direct dealings with the plan
participants, and did not even know their names. The Court therefore concluded that the plan
participants could not be regarded as "customers" of Morgan, Kennedy because their
"participation in the Plan . . . amounted only to a bookkeeping matter on the Reading books." *Id.*
at 1318.

3.    <u>ERISA and the Advent of Defined Contribution Plans</u>

In 1974, after almost a decade of studying the nation's Private Pension Plans and other
employee benefit plans, Congress enacted ERISA. *See Central States, Southeast & Southwest
Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 569 (1985). Through ERISA,
Congress wanted to ensure that if employees were promised a benefit, they would receive it.

**DAY PITNEY** LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 8

*See Lockheed Corp. v. Spink,* 517 U.S. 882, 887 (1996). ERISA "protect[s] . . . the interest of participants in employee benefit plans and their beneficiaries . . ., by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and access to the federal courts." *Id. (citing* 29 U.S.C. § 1001(b)). ERISA accomplishes this goal by mandating that private pension plan assets are to be held in trust for the exclusive benefit of plan participants and beneficiaries. *Id. (citing* 29 U.S.C. § 1103(a)). ERISA requires such plans to name fiduciaries who shall have the authority to control and manage the operation and administration of the plan. *Id. (citing* 29 U.S.C. § 1102(a)(2)). These fiduciaries need not be independent parties; the employer or plan sponsor may appoint its own "officer, employee, agent, or other representative" to serve in a fiduciary capacity. *Id. (citing* 29 U.S.C. § 1108(c)(3)).

"Defined benefit plans"[9] were the norm of American pension practice until the establishment of ERISA, at which time "defined contribution plans" came to dominate the retirement plan scene. *See LaRue,* 128 S. Ct. at 1025 (2008).[10]

ERISA categorized and divided all employee retirement plans into two newly established categories: defined benefit plans[11] and defined contribution plans. Under ERISA, "defined contribution plan" was defined, in pertinent part, as follows:

> The term "individual account plan" or "defined contribution plan" means a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains, and losses, and any forfeitures of account of other participants' which may be allocated to such participant's account.

29 U.S.C. § 1002(34).

"As its names imply, a 'defined contribution plan' or 'individual account plan' promises

---

[9] "A 'defined benefit plan' generally promises the participant a fixed level of retirement income, which is typically based on the employee's years of service and compensation." *LaRue,* 128 S. Ct. at 1022 n.1.

[10] The traditional profit sharing plan reviewed in *Morgan, Kennedy* was the typical defined contribution plan in existence prior to ERISA. As discussed below, after ERISA, traditional profit sharing plans were supplanted in popularity by 401(K) profit sharing plans, which contain an employee contribution component that was absent from traditional profit sharing plans.

[11] A defined benefit plan provides the employee with a specified benefit (usually derived by applying a formula contained in the plan document to the employee's compensation) at retirement. The employer (although, in some instances, the employer and the employee) annually contributes the amount that is actuarially estimated to be necessary to fund that benefit at retirement.

DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 9

the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions." *LaRue*, 128 S. Ct. at 1022 n.1.

"The principal advantage of a defined contribution plan over a defined benefit plan is that the employee has ownership rights over the assets in the plan. Thus, with a [Defined Contribution] plan the assets are portable and benefits from these assets do not depend upon the viability of the employer." Statement of the Financial Economists Roundtable on Best Practices for the Design of Defined Contribution Pension Plans, November 2006 (emphasis supplied), *http://www.luc.edu/orgs/finroundtable/FER_Statement_on_Defined_Contribution_Pension_Plans.pdf*.

"The shift from defined benefit to defined contribution plans has meant the shift of investment risk from employers to employees." John Turner, *Designing 401(k) Plans that Encourage Retirement Savings: Lessons from Behavioral Finance*, AARP Public Policy Institute Issue Brief, IB Number 80 (March 2006) (emphasis supplied), available at *http://assets.aarp.org/rgcenter/econ/ib80_pension.pdf*.

    4.    Section 401(k) of the Internal Revenue Code
            Revolutionized the Design of Profit Sharing Plans

In 1978, Congress added Section 401(k) to the Internal Revenue Code (the "IRC" or "Code"). The law went into effect on January 1, 1980.[12] Pursuant to Section 401(k), employers could add a cash or deferred arrangement to their traditional profit sharing plans. This meant that for the first time, employee-participants were allowed to elect to contribute or invest, on a pre-tax or before-tax basis, a portion of their own salary to the 401(k) profit sharing plan, or receive such funds in their paycheck. The pre-tax contributions as well as earnings on an account are taxed only when withdrawn (*e.g.*, upon retirement). This revolutionized the design and, in particular, the funding of profit sharing, defined contribution plans.

Employers have the discretion whether or not to make matching contributions to their workers' 401(k) accounts. Many companies match employee contributions to some extent, paying extra money into the employee's 401(k) account as an incentive for the employee to save more money for retirement. Alternatively, the employer may make profit sharing contributions into the 401(k) plan, or just contribute a fixed percentage of the employee's wages. These contributions may vest over several years as an inducement to the employee to stay with the employer.

---

[12] *Revenue Procedure Act of 1978, P.L. 95-600, 92 Stat. 2826 (Nov. 6, 1978).* The Internal Revenue Service ("IRS") did not publish regulations for Section 401(k) of the Code until 1981.

DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 10

As a result, because of the significant tax savings enjoyed by employees who make pre-tax or before-tax contributions to 401(k) profit sharing plans, over the last 30 years, 401(k) profit sharing plans have steadily increased in popularity and overtaken defined benefit pension plans as the country's dominant employer-sponsored retirement program.   While there were approximately 148,000 private-sector, employer-sponsored defined benefit pension plans in the early 1980s, that number had dwindled to 47,000 by 2004.  *See* Employee Benefit Research Institute, *Facts from EBRI: Retirement Trends in the United States Over the Past Quarter-Century* (June 2007), available at  *http://ebri.org/pdf/publications/facts/0607fact.pdf.*    By contrast, there were approximately 341,000 private-sector, employer-sponsored 401(k), defined contribution plans in 1980 and approximately 653,000 in 2004.  *See id.*

Clearly, the intent of Congress, with respect to its original enactment of 401(k), and its numerous revisions to 401(k) over the years, was to encourage employee participation in employer sponsored retirement plans, and maximize the amount of capital set aside for employees' retirement.  *See Laniok v. Advisory Committee of the Brainerd Manufacturing Company Pension Plan*, 935 F.2d 1360, 1365 (2d Cir. 1991) ("the Congress that enacted ERISA sought to improve the equitable character of private retirement plans and to encourage increased participation in them. . . .").   In its original form, and through revisions, Congress incentivized such employee participation by, *inter alia*:

- allowing employees to defer wages on a pre-tax basis for investment purposes, and such wages and investment gains thereon were not taxed until withdrawal upon retirement;
- repeatedly increasing the elective annual deferral limits for 401(k) accounts;
- increasing the maximum compensation limit as a percentage of salary;
- allowing employees to roll over assets from other qualified retirement plans into their current employer's 401(k) plan;
- allowing additional "catch-up" contributions to 401(k) plans by participants age 50 and older;
- allowing employers to make "negative elections" (*i.e.*, automatic enrollment) into 401(k) plans for newly eligible employees;
- requiring faster vesting requirements of employer matching contributions made for plan years (the chosen schedule must vest at least as rapidly as three-year cliff vesting, or two- to six-year graded vesting);
- allowing rollovers of contributory IRA[13] amounts into 401(k),
- allowing 401(k) plans to "facilitate" IRA contributions in addition to 401(k) contributions for eligible employees; and

---

[13] Similar to individual accounts maintained for employee-participants under 401(k) profit sharing plans, an IRA is an account which allows members of the public to save for retirement.

**DAY PITNEY** LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 11

- permitting 401(k) plans to allow participants to designate a portion of their elective deferral to become after-tax "Roth contributions."[14]

5.    The OSG 401(k) Plan

The OSG Plan was established on January 1, 1984. It is a defined contribution, profit-sharing plan subject to Sections 401(a) and 401(k) of the Code. As discussed above, as a 401(k) Defined Contribution Plan, each employee-participant has his or her own individual account, consisting of contributions (together with earnings, gains, and losses) which determine the amount of a participant's retirement benefit. Four kinds of contributions can be made to the Plan:

(a)    <u>Profit sharing contributions</u>: Orthopaedic Specialty Group, P.C. ("OSG") has the discretion to make annual non-elective contributions, which are allocated among the 401(k) Plan participants in the proportion that the compensation of each participant bears to the aggregate compensation of all of the 401(k) Plan participants;

(b)    <u>401(k) contributions</u>: employee-participants can elect to have a certain amount or percentage of their salary, which would otherwise be paid to them in cash (in 2009, up to $16,500 for individuals under age 50; $22,000 for individuals ages 50 and over), contributed (usually on a pre-tax basis) to their individual account under the 401(k) Plan;

(c)    <u>Safe harbor contributions</u>: For purposes of satisfying certain non-discrimination requirements under Section 401(k) of the Code, OSG has decided to make a special non-elective contribution, of up to 3% of compensation, to the accounts of all employees eligible to participate in the 401(k) Plan, regardless of whether the

---

[14] As will be discussed more fully later, it is inconceivable that Congress would have done so much to encourage employees to maximize their investments in their 401(k) accounts while understanding at the same time that the employees' assets would have no protection in the event of a failure of the brokerage firm holding the accounts.

As of September 2008, the following statistics were available concerning 401(k) plans:

Total number: more than 450,000
Estimated participants: 50 million
Total assets in 401(k) system: $3 trillion
Average 401(k) balance: $61,346
Amount of 401(k) loans outstanding: $320 billion

*http://www.ajc.com/business/content/business/stories/2008/09/07/dippercharts_0907.html?cxntlid=inform_artr*.

## DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 12

employee-participants make salary reduction contributions to the Plan, and regardless of whether OSG makes any discretionary profit sharing contributions to the 401(k) Plan during the year; and

(d)    Rollover contributions: Employee-participants with funds held under other prior employers' qualified employee benefit plans and individual retirement accounts can generally transfer such funds to their individual accounts under the 401(k) Plan. (Likewise, upon termination of employment, employee-participants are generally permitted to transfer the vested portion of their individual accounts under the 401(k) plan to their new employer's qualified employee benefit plan or an individual retirement account.)

Employee-participants are immediately 100% vested in their 401(k) contributions, safe harbor contributions, and rollover contributions. They must, however, complete three years of service with OSG to have a non-forfeitable right to profit sharing contributions. Employee-participants only can withdraw the funds in their individual accounts under the 401(k) Plan (with the exception of rollover contributions) upon the occurrence of certain specified events, including the employee-participant's termination of employment, normal retirement date (i.e., age 65), attainment of age 59½, death, total and permanent disability, and certain financial hardships (in the event of a financial hardship, an employee-participant can elect a distribution from 401(k) contributions only). The 401(k) Plan trustees are responsible for investing and managing the 401(k) Plan's assets, but all investment gains and losses are allocated to participants' accounts. All participants in the Plan are given a Summary Plan Description ("SPD"), a plan booklet that describes the above.

Prior to 1993, the Plan maintained an account with a broker-dealer other than BMIS. In 1993, the Plan transferred its account to BMIS. Discretion over the management of the funds in the account was granted to BMIS. Thereafter, new funds invested in the Plan directly by the participants (though payroll deductions and rollover contributions) and by OSG on behalf of the participants were bunched and deposited with BMIS on a periodic basis, for investment in securities. BMIS generated credit advices for each deposit, and the deposits also were reflected on monthly statements and quarterly and annual portfolio management reports. BMIS created and mailed to the Plan thousands of trade confirmations showing purchases and sales of securities and options. These transactions also were detailed on monthly statements. BMIS portfolio management reports detailed the Plan's quarterly and annual investment gains. As a result of the above documentation, the plan's administrator, Pentec Pension Actuaries & Consultants ("Pentec"), created ledger accounts for each participant, and provided reports to each participant regarding their account balance (based on the contributions to their account, withdrawals from the account, and reported investment gains, minus administrative expenses).

Twenty current participants in the Plan, including doctors and support staff, have rolled over assets from other qualified plans and IRA accounts to the OSG Plan, in the total amount of

DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 13

$937,837.97.[15]  In fact, one of the surgeons in the practice rolled over $325,709.62 into the OSG Plan in 2007. Further, several current participants have taken out loans from their 401(k) accounts, in the amount of approximately $67,500.

### 6.    BMIS Liquidation

On December 15, 2008, SIPC filed an application with the United States District Court for the Southern District of New York for a declaration that the customers of BMIS are in need of the protections available under the SIPA. The United States District Court for the Southern District of New York granted the application and appointed you as trustee for the liquidation of the brokerage firm, and further appointed your law firm as your counsel.

### 7.    Recent Senate Banking Committee Hearing

On January 27, 2009, at the invitation of Senator Christopher J. Dodd of Connecticut, Dr. Henry Backe, an orthopedic surgeon and partner of OSG, and one of the participants in the Plan, appeared and testified before the Senate Banking Committee in Washington, D.C.  Stephen Harbeck, the President and CEO of SIPC, also appeared at the hearing as a witness. *See Madoff Investment Securities Fraud: Regulatory and Oversight Concerns and the Need for Reform*, Senate Banking Committee, January 27, 2009.[16]

At the hearing, Dr. Backe testified:

> . . . OSG, incorporated in 1971, has been in existence for over 75 years. We employ 130 people with annual incomes ranging from $28,000 to $130,000. We have some employees who have worked with us for over 30 years. OSG has had a retirement plan (the "Plan") for its employees since the 1970's. We currently have 140 participants of which 34 are now employed elsewhere or retired
> . . . .

---

[15] Many of the non-trustee participants in the OSG Plan, before they rolled over their assets from other retirement plans into the OSG Plan, were aware that the Plan made its investments through BMIS.  For instance, Dr. Henry Backe, when he joined OSG in 1999, requested and was granted a meeting with BMIS representatives at the offices of BMIS.  At that meeting, where Dr. Backe presented himself as a new customer of BMIS, BMIS representatives touted their "conservative" trading strategy and explained how they were able to maintain steady positive returns. Dr. Backe thereafter rolled over funds from another retirement plan to the OSG Plan for investment with BMIS.

[16]    The witness' written statements, and a full video of the hearing, are available at *http://banking.senate.gov/public/index.cfm?Fuseaction=Hearings.Detail&HearingID=5aafcc47-bd19-442b-8470-ad5ef160d348*.


DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 14

Sixteen years ago, in 1992, we engaged Bernard Madoff Investment Securities Co. ("Madoff") to be our investment advisor and have invested all the Plan's assets with Madoff. Participants in the Plan include 15 doctors and 125 staff members such as nurses, x-ray technicians, medical assistants and administrative personnel. The Plan was funded by employee contributions, individual rollovers, and employer contributions. As of November 30, 2008, the plan had a net capital investment with Madoff of $11,581,000[17] and a statement balance of approximately $33 million.

. . . .

The news in early December 2008, that all the investment activity in Madoff was a sham, and that Madoff was in fact the world's largest Ponzi scheme, was devastating to us. We have three senior employees close to retirement who now do not know when or whether they can stop working. This affected OSG's recruitment planning to hire new physicians. We had given two new physicians employment offers that we are now unsure we can honor because senior doctors with plans to retire soon have now decided they need to keep working full time for many more years. Our employees are scared, worried and angry. They express loss of confidence in the federal government and its agencies. Some have declined to have payroll deductions made for their Plan contributions going forward. Some have expressed concerns that they will have to sell their homes when they retire since all their savings have been stolen . . . .

. . . . We [also] learned . . . that it was highly likely that the Securities Investor Protection Corporation ("SIPC"), which took over Madoff, may take the position that the OSG Plan participants were not individual customers of Madoff, and each not entitled to SIPC coverage. Instead, it was likely that SIPC was going to treat the plan itself as the only customer of Madoff. In other words, the 140 participants in the plan, who lost a total of $11,581,000 capital investment, would have to share in a maximum $500,000 recovery. This is not right or just. Our pension plan functioned as an

---

[17] This figure represented the approximate capital investment of employee and employer contributions in the plan during the life of the plan. The net total amount of money deposited by the Plan with BMIS was approximately $8 million. The remainder was maintained at various times in an OSG money market account to pay Plan expenses and make distributions to participants.



Irving H. Picard, Esq., Trustee
March 3, 2009
Page 15

individual retirement savings plan. Each participant received
individual statements; each was able to rollover moneys from
outside accounts to their own account within the Pension Plan.
Each participant was allowed to, and some did, take out loans
against their account. The intent was individual accounts and the
plan operated in that way. Madoff traded on behalf of the Plan as
one account. One of my Partners spoke with an attorney from SIPC
who advised him that the initial intent of SIPC was to cover the
individual investor.

Senators, the 140 participants in the OSG plan are not wealthy
hedge fund investors, nor are they beneficiaries of multimillion
dollar offshore trusts. They are regular working class Americans,
most of modest means who annually put aside a substantial
percentage of their wages to try to ensure that they could enjoy a
dignified retirement in the near or distant future. They were let
down by Madoff, the regulators, the SEC and FINRA. We hope
and request that SIPC, which was created to protect small investors
from harm, will help us as individuals.

Dr. Backe's testimony elicited a question from Senator Jeff Merkley of Oregon to Mr.
Harbeck regarding whether SIPC would treat the Plan, or each of the Plan's participants, as the
BMIS "customer" for purposes of SIPC insurance coverage:

Senator Merkley: . . . . Can you explain is there a possibility that
the individual investors in Dr. Backe's firm can be insured as
individual investors?

Mr. Harbeck:    In the ordinary run-of-the-mill situation with a
pension fund, where the pension fund manages the dollars and the
pension fund itself gives instructions to the brokerage firm with
respect to purchases and sales and redemptions, that fund is the
customer, that's been the law in the Second Circuit since the mid
90s [sic], the case of *SEC v Morgan, Kennedy*. It has been
litigated, and that precedent has never been overturned. 401(k)
plans may be different. Back in 1975 [sic] when that *Morgan,
Kennedy* case was decided, I don't believe if there were 401(k)
plans they were not widespread and widely used. The doctor
mentioned that some of his people attempted to use self-managed
plans. If the brokerage firm recognized the individual and sent
individual statements to the individual, that person might well be
considered a customer under a 401(k) plan, but not having seen the



Irving H. Picard, Esq., Trustee
March 3, 2009
Page 16

Orthopaedic Group's paperwork, I can't tell you as I sit here today whether it would fit under one category or the other.

## DISCUSSION

Mr. Harbeck is correct that the *Morgan, Kennedy* opinion, which turned on the unique characteristics of the traditional defined contribution plan at issue in that case, is inapposite to the 401(k) "defined contribution plan" at issue here (which type of plan did not even exist at the time of the opinion). However, as discussed below, Mr. Harbeck is mistaken in his belief that SIPC cannot categorize individual participants in a 401(k) plan as "customers" unless BMIS "recognized" those participants and sent them individual statements. Mr. Harbeck's attempted distinction between "trustee-directed" plans such as the OSG Plan, and "participant-directed" plans (where the participants have individual accounts with the broker-dealer), is a distinction without a difference for purposes of SIPC protection.

The bottom line is that the OSG Plan participants here deposited their own funds into their individual accounts within the 401(k) Plan, and the deposits were bundled by OSG and forwarded to BMIS on a periodic basis for investment in securities at BMIS. The fact that BMIS may not have "recognized" each of the individual participants' names or sent them individual account statements is irrelevant to their status as "customers" as defined under SIPA. This is because the participants' funds at BMIS are easily traceable to the participants, and those funds clearly were entrusted with BMIS for securities investment purposes. That is all that is required under the law to establish that the OSG Plan participants are entitled to individual SIPC protection.

1.    Second Circuit Precedent Does Not Apply to 401(k) Profit Sharing Plans

As discussed above, in 1976, two years before Section 401(k) was added to the Code, the Second Circuit held in *Morgan, Kennedy* that a traditional profit sharing plan, and not its individual employee-beneficiaries, constituted the sole "customer" for purposes of filing a claim with SIPC. In concluding that the traditional profit sharing plan's individual employee-participants were not entitled to individual SIPC coverage, the Second Circuit cited the following characteristics of the *Morgan, Kennedy* traditional profit sharing plan: (a) contributions to the plan were made solely by the employer; (b) none of the funds in the broker's hands belonged to the individual employee-participants; (c) the employees' participation in the plan amounted only to a bookkeeping entry in the employer's books; (d) the financial relationship, insofar as the traditional profit sharing plan was concerned, was solely between the employee-participants and their employer, and not the employee-participants and the broker-dealer; (e) the trustees of the traditional profit-sharing plan, and not the employee-participants, had the exclusive power to entrust assets to the broker-dealer for investment purposes; and (f) the profit sharing plan trust account was in the name of the plan's trustees and not the individual employee-beneficiaries. *See* 533 F.2d at 1318.


DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 17

The typical 401(k) profit sharing plan maintained by employers today, including the OSG Plan, is easily distinguished from the traditional profit sharing plan at issue in *Morgan, Kennedy*. In a typical 401(k) profit sharing plan: (a) contributions are made by <u>both</u> the employee and the employer; (b) the employee-participants have the exclusive discretion to determine the amount of employee money to be invested, contributed, or rolled-over to the 401(k) profit sharing plan,[18] *see* IRC §§ 402(c), 402(g), 408(d)(3), and 401(k);[19] (c) the employee-participants have, from their first day of participation in the 401(k) profit sharing plan, a 100%, non-forfeitable right to their pre-tax, after-tax, and rollover contributions made to a 401(k) profit sharing plan;[20] and (d) all assets of a 401(k) profit sharing plan are allocated to separate accounts, maintained in the name of each participant and beneficiary of the 401(k) profit sharing plan, and, as required by law, are held under a trust instrument which (i) segregates such assets from the employer's assets; and (ii) requires that all assets of the trust are held "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying the reasonable expenses of administering the plan." *See* ERISA Section 404(a)(1)(A), Dept. of Labor Reg. Section 2510.3-102; Code Sections 401(k)(2)(A), 401(k)(2)(C).[21]

Of all the above distinctions, the key distinction between the plan reviewed in *Morgan, Kennedy* and the OSG 401(k) Plan is the fact that the funds contributed to the OSG Plan included deferred income <u>from employees</u> and funds rolled over <u>by the employees</u> from other qualified retirement plans or their IRA accounts.[22]  As such, unlike the participants in the *Morgan, Kennedy* case, the OSG Plan participants <u>actually invested their own capital</u> in their OSG Plan accounts and into BMIS.  This personal investment of capital by the participants was the essential ingredient missing from the *Morgan, Kennedy* case, and the fundamental reason the *Morgan, Kennedy* court held that the plan participants were not "investors." *See* 533 F.2d at

---

[18] In *Morgan, Kennedy*, the employer had the exclusive discretion to determine the amount to be contributed or invested in the traditional profit sharing plan. *See* 533 F.2d at 1318; *see also, Oppenheimer & Co., Inc., v Neidhardt*, 56 F.3d 352, 357 (2d Cir. 1995) (distinguishing *Morgan, Kennedy*, and concluding that a trust beneficiary, as the beneficial owner of the assets held in trust, was a "customer" for purposes of arbitrating a claim before the National Association of Securities Dealers, even though a trustee was responsible for making investment decisions and managing the assets of a trust).

[19] In addition, in many 401(k) profit sharing plans, the employee-participants are responsible for directing the investment of the assets in their individual accounts.

[20] In contrast, the Second Circuit in *Morgan, Kennedy* no mention of such contributions or the participants' ownership thereof.

[21] In *Morgan, Kennedy*, the Second Circuit indicated that the employee-participants' participation in the traditional profit sharing plan "amounted only to a bookkeeping matter on the [employer's] books." 533 F.2d at 1318.

[22] The OSG employees also were incentivized to defer income into the Plan because of OSG's promise to provide matching and other contributions to the participants' individual accounts within the 401(k) Plan.

DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 18

1318.[23] When the OSG Plan participants elected to defer their income into the Plan, and rollover assets from other qualified plans or IRAs into the OSG Plan, they were making the decision to invest their capital in the Plan and thereby with BMIS.

In *Morgan, Kennedy*, the court also was troubled by the fact that the individual participants' claims could not be reducible to a specific monetary sum. This is because, at the time of the SIPC liquidation of *Morgan, Kennedy*, the account held no property belonging to individual employees. The participant's interest in the plan did not vest until the participant earned a specified amount of service credit under the plan, and the employees only became entitled to benefits upon retirement based on the participant's age, years of service and final compensation at the point of retirement.

The OSG 401(k) trust here, on the other hand, is comprised exclusively of individual, distinct and segregated participant accounts. The OSG Plan accordingly has a combined value equal to the value of each individual participant's account. At any given point in time, a participant's interest in this account is easily reducible to a specific monetary sum, based on the dollar amount of contributions made by or on behalf of the participant, the gain or loss on investments during the period examined, minus any administrative expenses. As such, with respect to claims for securities positions in the Plan's account (*e.g.*, 100 shares of Apple), the Trustee easily can determine the individual participants' interest in the securities positions (*e.g.*, a participant with a 1% interest in the overall Plan assets, is entitled to 1%, or 1 share, of Apple common stock held in the Plan account).

In addition, the OSG 401(k) Plan could have been converted to a participant-directed plan at any time, allowing the participants to have accounts in their own name at the brokerage firm with the same balances they had in their individual 401(k) account within the Plan when the Plan was trustee-directed.[24]

---

[23] In an unpublished opinion, the Sixth Circuit ruled that the Second Circuit's opinion in *Morgan, Kennedy* that pension plan participants are not "customers" under SIPA applied equally to a defined contribution plan which was a "multi-employer 'Taft-Hartley Trust Fund' established pursuant to 29 U.S.C. § 186(c)(5). *See In re First Ohio Securities Co.*, 39 F.3d 1181 (6th Cir. 1991)(table), 1994 WL 599433 at *1 (text). *First Ohio* is distinguishable from the current controversy because the pension plan at issue in that case, similar to the plan at issue in *Morgan, Kennedy*, was funded solely by employer contributions, based on each hour worked. *See* Brief of Appellant, *In re First Ohio Securities*, 6th Circuit, Case No. 93-3313 at 10 (July 20, 1993).

[24] Also, in *Morgan, Kennedy*, no individual participants filed customer claims with the SIPC trustee. Instead, the plan trustees filed the only customer claim at issue in that case on behalf of the plan. Here, most of the participants are filing individual cusomter claims with the SIPC trustee.

# DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 19

2.    The *Waddell* Opinion Recognized
      Defined Contribution Plan Participants as Customers

One court outside this Circuit has recognized that individual participants in a defined contribution plan attain customer status under SIPA as long as their assets actually are deposited with a broker-dealer. *See In re Waddell Jenmar Securities, Inc.*, 126 B.R. 935, 940 (Bkrtcy. E.D.N.C. 1991), *aff'd*, 991 F.2d 792 (4th Cir. 1993). That is precisely the situation with the OSG Plan participants.

In *Waddell*, Salisbury Animal Hospital ("SAH") created an employee pension and profit sharing plan. The plan was administered by Waddell Benefit Plans, Inc ("WBP"), a company that offered pension and profit sharing plan design, implementation and administration. Waddell was an affiliate of Waddle Jenmar Securities ("Jenmar"), a broker-dealer. Guilford Waddell was the President of both companies. SAH maintained its pension plan account at Jenmar; the individual participants apparently did not have individual accounts opened in their names at Jenmar or its clearing firm. *See* 126 B.R. at 939-40.

> As administrator for the SAH plan, WBP assisted the plan's trustees in establishing and maintaining separate ledger accounts in the name of each of the SAH claimants, which accounts were credited with the amounts of each annual contribution allocated to each participant, and their allocable shares of any prior year's contributions which had become forfeitures since the last plan year. . . . Following the close of each plan year, WBP assisted the plan's trustees in providing each of the SAH claimants with an individual account statement showing the account balance at the beginning of each year, any changes during the year, the amount of SAH's contributions, including forfeitures, for that year allocated to his or her account, and the account balance at the end of the year.

*Id.* at 939.

SAH made five annual employer contributions to the plan from 1981 to 1985 by checks payable to WBP. Waddell misappropriated a substantial portion of the plan funds and never deposited them with Jenmar's clearing firm, and never followed investment instructions to purchase securities with respect to those funds. When Jenmar was placed into SIPC liquidation, the plan participants filed SIPC claims as individual customers of Jenmar to recover the stolen money. *See id.* at 939-40.

The court denied the claims, not because pension plan participants cannot be considered customers, but because the funds underlying the participants' SIPC claims never made their way

 DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 20

to the brokerage house: "When Jenmar actually did receive plan funds from WBP to purchase securities, the SAH affected employee was a "customer of the broker-dealer for that transaction. The SAH claimants, however, were not 'customers' with respect to the transactions upon which their claims are based. Although they may have instructed Mr. Waddle as agent of Jenmar to purchase securities on behalf of their accounts, *none* of the plan's funds were delivered to Jenmar to effectuate the purchases. The funds were essentially stolen from the plan and never reached the broker-dealer, Jenmar. . . ." *Id.* at 940 (italics in original). In other words, if Waddell had waited to steal the money until it had been deposited at Jenmar, the plan participants would have been considered "customers" for purpose of a SIPC claim.

The *Waddell* case is directly on point here. The OSG Plan had a plan administrator, Pentec, who created ledger accounts for each participant, and provided reports to each participant regarding their account balance, just like WBP in the *Waddell* case. And, just like the *Waddell* case, the pension account here was set up in the name of the plan, not in the name the participants. But here, different from the *Waddle* case, the OSG Plan money actually <u>was delivered</u> to BMIS, where Bernie Madoff purported to purchase securities on the participants' behalf, and then stole the money as a part of his Ponzi scheme. As such, because BMIS actually did receive Plan funds from Pentec to purchase securities, the affected OSG Plan participants were "customers" of BMIS. *See id.* at 940.

> 3.   Recent Supreme Court Case Law Recognizes That Participants' Rights to Individual Benefits Under 401(k) Defined Contribution Profit Sharing Plans Should Be Safeguarded

Last year, the United States Supreme Court reviewed and reinterpreted a long-standing, fiduciary law decision that it had issued over twenty years ago. The Court's prior decision, *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985), was issued at a time when defined benefit plans were the most popular type of retirement plan.[25] In *Russell*, the Court analyzed § 409 of ERISA and concluded that if an ERISA-governed plan fiduciary engages in misconduct with respect to the plan, such plan fiduciary is personally liable to the plan, and not to individual plan participants with rights under such plan. *See* 473 U.S. at 140; *see also, Coan v. Kaufman*, 457 F.3d 250, 257 (2d Cir. 2006) (citing *Russell*, prior to *La Rue*, for the proposition that an employee-participant with an individual account under a 401(k) profit sharing plan, who was harmed by fiduciary misconduct, was not entitled to relief under § 409 of ERISA because that provision afforded a remedy only to the entire plan, and not to an individual account holder thereunder). Accordingly, the decision in *Russell*, like the 1976 decision in *Morgan, Kennedy*, denied substantial rights to individual employee benefit plan participants.

---

[25] *See* footnote 9 above for a description of a defined benefit plan.

**DAY PITNEY** LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 21

However, in *La Rue*, the Court indicated that *"Russell's* emphasis on protecting the 'entire plan' from fiduciary misconduct reflects the former [defined benefit] landscape of employee benefit plans," and that the retirement plan "landscape has changed." 128 S.Ct. at 1025. In *La Rue*, the Court analyzed the right of an individual 401(k) profit sharing plan participant to sue for losses to his individual account based upon the alleged improper actions of plan fiduciaries in administering his individual account. [26] *See id.* at 1022-1023. Recognizing that 401(k) profit sharing plans now dominate the current retirement plan scene in the United States, the *La Rue* Court noted that *Russell's* references to the "entire plan" were "beside the point" when dealing with a 401(k) profit sharing plan." *Id.* at 1025.

The *La Rue* Court noted that Congress' intent was to protect retirement plan participants and beneficiaries from the consequences of fiduciary mismanagement and breaches of duty, regardless of how a particular retirement plan was designed. Thus, the *La Rue* Court concluded, § 409 of ERISA should apply equally to all retirement plan participants – whether the harmed plan assets were held in one individual account under a 401(k) profit sharing plan or under a defined benefit plan. In other words, whether fiduciary misconduct affected the amount of funds in one individual account under a 401(k) profit sharing plan or threatened the solvency of an entire plan, the harmed participant(s) should be entitled to recoup the losses they would otherwise suffer from the responsible fiduciary. *Id.* at 1025-1026.

The Supreme Court's recognition of the change in the American retirement plan "landscape," and the resulting need to protect individual participants' rights to benefits under 401(k) profit sharing plans, as discussed in *La Rue*, now requires extension of SIPC coverage to all 401(k) profit sharing plan participant-investors.

Specifically, given this development in the law, there is no reason to believe that the Supreme Court would not take into account the change in the retirement landscape over the last thirty years when reviewing a claim for SIPC coverage by an individual 401(k) profit sharing plan participant who invested his or her own money in the 401(k) profit sharing plan. It is critically important to recognize that in *Morgan, Kennedy*, the Second Circuit focused on the fact that there was no employee money invested in the traditional profit sharing plan at issue. *See* 533 F.2d at 1318; *see also, In re First Ohio Securities Co.*, 39 F.3d at 1181 (relying on *Morgan, Kennedy*, the Sixth Circuit concluded that individual SIPC coverage was not available to employee-participants of a defined contribution plan to which employees did not contribute their own money).

In contrast to the defined contribution plans reviewed, respectively, by the Second Circuit in *Morgan, Kennedy* and the Sixth Circuit in *First Ohio Securities*, it is a lynchpin of 401(k) profit sharing plan design that each individual participant has the right to invest his or her own

---

[26] Under prior law, such a lawsuit was thought to be impermissible based upon the Court's decision in *Russell. See id.*

DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 22

salary in the 401(k) profit sharing plan's investment funds. And, as discussed earlier, Congress, for its part, has consistently developed legislation to encourage participants to invest their own money in such plans.[27] It is illogical that Congress would encourage investment in 401(k) profit sharing plans without offering the umbrella of SIPC protection to individual 401(k) profit sharing plan investors, as is offered to other members of the public who invest in securities, including those individuals who invest their IRAs in securities.[28]

Arguably, Congress would be setting a trap for Americans of every economic background if it encouraged individual 401(k) profit sharing plan participants' investment in equity securities without providing SIPC coverage to such individual investors. Such a result would be in complete contravention of the purpose and legislative history of SIPC, *see Morgan, Kennedy,* 533 F.2d at 1317 (noting that "both the legislative history of [SIPA] and its use since enactment have stressed protection to, and equality of treatment of, the public customer who entrusted securities to a broker for some purpose connected with participation in the securities markets"), which reflects a strong Congressional intent to protect the public from fraudulent activities of broker-dealers, and would be rejected by the Supreme Court based upon the reasoning set forth in *La Rue, see* 128 S.Ct. at 1025-1026 (recognizing that Congress enacted ERISA to protect the financial integrity of ERISA-governed plans, the Court held that §§ 409 and 502(a)(2) of ERISA authorized individual 401(k) profit sharing plan participants' recovery for plan fiduciaries' breaches that impaired the value of assets in their individual accounts under the 401(k) profit sharing plan).

In this regard, it is obvious that the 401(k) plan's individual participants are investing in the underlying investment funds maintained by the 401(k) plan. Generally, individual 401(k) plan participants are provided with a plan booklet, called the SPD, which describes the investment funds available under the Plan. Based upon the SPD and other information provided by a 401(k) plan's fiduciaries and investment advisors, each 401(k) plan participant makes an independent decision to invest a portion of his or her salary in the 401(k) plan. Thus, the connection lacking in *Morgan, Kennedy* – investment by participants of their own funds in the profit sharing plan and with the broker-dealer – is not absent in the typical 401(k) plan and was

---

[27] For instance, in 2006, Congress amended both the Code and ERISA to provide that an employer, without an employee's affirmative consent, could automatically deduct amounts from an employee's pay and contribute such amounts to an individual account established on the employee's behalf under the employer's 401(k) profit sharing plan. *See* Section 902 of the Pension Protection Act of 2006, P.L. 109-280 (Aug. 17, 2006). Here, it is important to keep in mind that even if an employer adds an "automatic enrollment" feature to its 401(k) profit sharing plan, an affected employee-participant retains the investment discretion to discontinue any deductions which would otherwise be made from his or her salary pursuant to such automatic enrollment feature.

[28] As noted below, there is no basis for providing SIPC protection to IRAs but denying it to individual accounts under a 401(k) profit sharing plan. Just as SIPC coverage is uniformly provided to IRAs (whether the IRA investor retains or delegates investment discretion with respect to the funds in its IRA to an investment manager, trustee, or custodian), it should apply to all 401(k) profit sharing plan participants (whether the participants self-direct the funds in their individual accounts or such responsibility is allocated to an investment manager).

DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 23

not absent under the OSG Plan. Likewise, new employees of OSG, who became eligible to participate in the OSG Plan, also made the individual investment decision, in several cases, to rollover additional retirement benefits, which they had earned while working for other employers.[29]

All OSG Plan participant-investors were given an SPD, as required under ERISA, which assured them that (i) they had the individual discretion to invest part of their salary (subject to applicable IRS limitations) in the OSG Plan; and (ii) any such contributions would be invested through a third party advisor. Many of the OSG Plan participants (including all the doctors) specifically knew that the investments were being maintained at BMIS. When OSG Plan participants elected to contribute a portion of their salaries to the OSG Plan, they did so with the knowledge that such contributions were being invested with BMIS because all investments under the OSG Plan were placed with BMIS. Given these facts, simple logic dictates that OSG Plan participants, at least with respect to their own contributions to the OSG Plan (before-tax, after-tax, or rollover contributions), viewed themselves as clients of BMIS.

Further, it is important to recognize that those OSG Plan participants who voluntarily elected to rollover and invest their previously-earned retirement benefits with BMIS through the OSG Plan, did so under circumstances very similar to those in which a 401(k) profit sharing plan investor, upon termination of employment with one employer, opts to rollover his or her retirement benefits under the former employer's 401(k) profit sharing plan to a rollover IRA maintained by a broker-dealer. (In fact, in nearly each instance in which an OSG Plan participant opted to rollover previously-earned retirement benefits to the OSG Plan, he or she chose to invest such funds in the OSG Plan in lieu of a rollover IRA.) As noted above, SIPC coverage is available to IRAs. However, there is no discernible reason why SIPC coverage is permitted (in the case of rollover IRAs) or denied (in the case of a rollover to a 401(k) profit sharing plan). Those OSG Plan participants who happened to rollover retirement benefits, previously-earned with other employers, to the OSG Plan, should be entitled to SIPC coverage with respect to such rollover amounts.

      4.      There is no Legal Distinction for SIPA Purposes Between Trustee-Directed and Participant-Directed 401(k) Plans

As shown above, employees who participate in 401(k) plans are customers for purposes of SIPA. There is no legal basis upon which to draw any distinction, as did Mr. Harbeck at the Senate hearing, between participant-directed 401(k) plans and trustee-directed 401(k) plans for purposes of SIPC protection. Any such distinction defeats the remedial purposes of ERISA. ERISA specifically provides plan trustees with a choice. Either the trustees can manage the participants' assets as a whole (or assign account management responsibilities to a third-party

---

[29] Neither the *Morgan, Kennedy* nor the *First Ohio Securities* decision discusses the relevance of individual participants' rollover contribution investments in 401(k) profit sharing plans.

DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 24

fiduciary such as an investment adviser), or the trustees can allow the individual participants to manage the assets in their individual accounts within the plan through individual brokerage accounts. *See, e.g.*, 29 U.S.C. §§ 1103, 1104. In no way did Congress envision that this choice would determine which plan participants would receive SIPC coverage and which would not.[30]

It also should be noted that the OSG Plan could have been converted into a participant-directed plan at any time, and it would not have affected the individual account balances of the participants in any manner. It would have been only a matter of serendipity if SIPC had placed BMIS into liquidation a day or a week or a month after such conversion of the Plan from trustee-directed to participant-directed.

Second, for purposes of the "customer" definition in SIPA, it is not essential that the OSG Plan participants deposited their funds in individually-named accounts at BMIS. An investor is entitled to compensation from SIPC "if he has entrusted cash or securities to a broker-dealer who becomes insolvent." *In re Brentwood Securities*, 925 F.2d 325, 327 (9th Cir. 1991) (emphasis supplied). Without question, each of the individual participants in the OSG Plan entrusted cash or securities with BMIS (unlike the pension plan participants in *Morgan, Kennedy* and *First Ohio* who contributed no funds to their plans). And without doubt, the OSG Plan participants are customers under SIPA because the participants "can trace and identify the trust property or funds in the hands of the stockbroker," *SEC v. Kenneth Bove & Co., Inc.*, 378 F. Supp. at 700, to the contributions to their individual accounts within the 401(k) Plan and the transfer of such funds to BMIS.

And while BMIS may not have known the names of all the participants, and sent individual account statements to each participant, it knew that the OSG Plan participants were making a decision to invest their tax-deferred income and their "rollover" contributions from other retirement accounts with BMIS through their individual accounts within the OSG Plan. The fact that it was the OSG Plan trustees, rather than the OSG Plan participants, who directly granted BMIS discretionary authority over the participants' money, does not change the fact that it was the participants' money that was taken in by BMIS for the purpose of investment in securities, and then stolen by Bernie Madoff.

---

[30] Trustee-directed plans serve important purposes, the foremost of which is to relieve plan participants of the burden of trying to figure out how to invest their 401(k) plan accounts. This is especially true where the participants are financially unsophisticated, and unable independently to navigate the stock and bond markets. The OSG Plan trustees made the determination that it was in the best interest of all the OSG employees – including x-ray technicians, registered nurses, receptionists, administrative staff, and the surgeons -- that the Plan assets be managed by the trustees rather than by the individual participants, and that day-to-day management of the assets be delegated to a highly regarded investment adviser and broker-dealer. This decision may be criticized for being paternalistic, but it cannot be criticized as unreasonable or cavalier. Under no circumstance should the trustees have been forewarned that this decision would jeopardize the participants' rights to be protected in the event of a broker-dealer failure.

 DAY PITNEY LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 25

Finally, as noted above, SIPA's definition of customer provides coverage to those with securities claims arising out of the "account for such persons," but also provides coverage to those who deposit cash with the broker-dealer – <u>untethered to any requirement that an account has been established for such person</u>. *See* 15 U.S.C. § 78lll(2); *In re Investors Security Corp.*, 6 B.R. at 420; *see also Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d at 357 (individuals were "customers" of NASD member broker-dealer entitling them to arbitrate with the broker-dealer under the NASD arbitration code, even though their funds were never deposited into an account opened in their name, but were deposited instead into an account in the name of a third party fraudster). Such was the result in the *Waddell* case, where individual 401(k) account holders would have been entitled to SIPC customer status if the money had made its way into the plan's account at the broker-dealer, instead of being stolen by an intermediary and never deposited at the broker dealer. *See Waddell*, 126 B.R. at 940. Similarly, the OSG Plan participants are customers of BMIS because they deposited cash with BMIS for the purpose of purchasing securities. The fact that their funds, as an administrative necessity, first ran through the OSG Plan's bank account, is irrelevant. The fact that BMIS did not know their specific identities, or did not send them individual account statements, also is irrelevant.[31]

5.    Alternative Theory of Recovery: SIPC Coverage Up to the Amount of the Participants' Individual Contributions to the Plan

As shown above, the Second Circuit in *Morgan. Kennedy*, and the Sixth Circuit in *First Ohio*, refused to recognize pension plan participants as customers under SIPA because the pension funds in those matters were solely employer-funded plans.    Both cases are distinguishable from this case, for the reasons set forth above. However, should you feel constrained by the rulings in these cases, we respectfully request that you treat the OSG Plan participants as customers of BMIS to the extent of the amounts of their individual capital contributions to the Plan -- insofar as there can be no doubt and disagreement that these deposits of their own capital were intended for investments in securities through BMIS. In other words, under all circumstances, you should treat the OSG Plan participants as customers of BMIS to the extent of their deferred income contributions and rollover contributions. In the event you opt for this alternative, please treat the Plan's separate Customer Claim as a claim in the amount of its employer contributions to the Plan.

---

[31] Because Madoff purported to purchase real securities with the participants' funds, the participants have securities claims under SIPA and are each entitled to the maximum SIPC insurance coverage of up to $500,000. *See generally In re New Times Securities Services, Inc.*, 371 F.3d 68, 86 (2d Cir. 2004).

 **DAY PITNEY** LLP

Irving H. Picard, Esq., Trustee
March 3, 2009
Page 26

## CONCLUSION

As previously discussed, the addition of Section 401(k) to the Code, which allows for pre-tax, employee contributions to profit sharing plans, established the American worker, through his or her employer-sponsored retirement program, as a public investor in the equity securities markets. As a result, the Supreme Court recognized in *La Rue*, and all available statistics and experts agree, that 401(k) profit sharing plans are now the dominant retirement program maintained by employers in the United States. Because SIPC was designed by Congress to protect individual investors from the insolvency of their stock brokers, and, most importantly, because each plan participant makes the individual investment decision to invest a portion of his or her own salary in funds maintained by a 401(k) profit sharing plan, SIPC coverage should be extended to each participant-investor under a 401(k) profit sharing plan, including the OSG Plan participants, to the full extent of their vested interest (employee and employer contributions) in their individual 401(k) Plan accounts.

For the reasons set forth above, OSG respectfully requests that you treat each individual participant in the OSG Plan as a "customer" of BMIS for purposes of this liquidation proceeding. In the alternative, if you should feel constrained by prior case law which holds that participants of pension plans funded solely by the employer are not entitled to individual SIPC coverage, OSG respectfully requests that you treat each of the participants as a "customer" of BMIS to the extent of their individual contributions to the plans (*i.e.*, income deferrals and rollover contributions), and the Plan as a customer of BMIS to the extent of its employer fundings to the participants' accounts.

If you should determine that the Plan participants are not customers of BMIS in any manner, then please treat the Plan as the customer of BMIS, and process the Plan's Customer Claim accordingly.

Thank you for your consideration.

Very truly yours,

Jeffrey Plotkin

Enclosures

cc: Marc J. Kurzman, Esq.
    Sandak, Hennessey & Greco, LLP