SNR Denton US LLP
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
cneville@sonnenschein.com

*Attorneys for Stein Roberts IRA*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | SIPA Liquidation |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

Elaine Stein Roberts hereby objects to the Notice of Trustee's Determination of Claim

dated October 22, 2010 ("Determination Letter"), attached hereto as **Exhibit A**, as described

herein.

**BACKGROUND**

1.     Elaine Stein Roberts invested funds in an IRA (the "Stein Roberts IRA") with

Bernard L. Madoff Investment Securities LLC ("Madoff") through the Stanley Lehrer and Stuart

Stein Joint Venture Account No. 1-L0013 (the "Stein Roberts IRA Account").

2.     On December 11, 2008, an action was commenced against Madoff by the Securities

& Exchange Commission in the United States District Court for the Southern District of New

York.  On December 15, 2008, this liquidation proceeding was commenced pursuant to the

Securities Investment Protection Act ("SIPA"). *See* Order, Securities and Exchange

Commission v. Madoff, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA

and transferring proceeding to the United States Bankruptcy Court for the Southern District of

New York) [Dkt. No. 4]. Irving Picard was appointed Trustee ("Trustee"), charged, *inter alia*,

with overseeing the liquidation of Madoff and processing customer claims for money pursuant

to SIPA. *Id.*; 15 U.S.C. § 78fff-1(a) (2009).

3.     On December 23, 2008, the Court issued an Order directing the Trustee to

disseminate notice and claim forms to Madoff customers and setting forth claim-filing

deadlines. *See* Order [Dkt. No. 12].

4.     The December 23, 2008 Order further provided that, to the extent the Trustee

disagrees with the amount set forth on a customer claim form, the Trustee "shall notify such

claimant by mail of his determination that the claim is disallowed, in whole or in part, **and the**

**reason therefor** . . . " *See* Order at 6 (emphasis added) [Dkt. No. 12].

5.     Mrs. Roberts timely filed a claim for the Stein Roberts IRA Account ( the "Stein

Roberts IRA Customer Claim"), based on the statement from the custodian of her IRA.

6.     On March 1, 2010, the Court issued a decision affirming the Trustee's net

investment method for determining customer claims. That decision has been appealed, and a

final resolution on the issue is pending.

7.     On October 22, 2010, the Trustee sent Mrs. Roberts the Determination Letter

rejecting the Stein Roberts IRA Account Claim, stating that Mrs. Roberts did not have a Madoff

account and she was not a customer of Madoff under SIPA.

### GROUNDS FOR OBJECTION

8.     **First Objection.** The Stein Roberts IRA Account fits within the plain definition of

"customer" in SIPA. The account was opened as a vehicle for investment in Madoff and all of

the investors put their money in for deposit in Madoff.  Thus, each investor in the vehicle should

be entitled to receive up to $500,000 in SIPC insurance. 15 U.S.C. §78111(2) ("the term

customer includes…any person who has deposited cash with the debtor for the purpose of

purchasing securities").  The statute makes it clear in an analogous situation that customers of a

bank or broker or dealer that invested in Madoff are all customers under SIPA ("no advance

shall be made by SIPC to the Trustee to pay or otherwise satisfy any net equity claim of any

customer who is a broker or dealer or bank, other than to the extent it is established …that the

net equity claim of such broker or dealer or bank against the debtor arose out of a transaction for

customers of such broker or dealer or bank…in which event such customer of such broker or

dealer or bank shall be deemed a separate customer of the debtor").

> 9.    Moreover, Congress intended for "customer" to be broadly construed,  In the first
draft of the bill, there was no entitlement to insurance for any customer whose name or interest
was no disclosed on the records of the broker/dealer "if such recognition would increase the
aggregate amount of the insured customer accounts in such closed broker or dealer." S.2348,
91st Cong.Section 7(d)(June 9,1969): H.R. 13308, 91st Cong. Section 7(d) (Aug. 4, 1969).  The
final bill dropped this restriction.  Any ambiguity in the term should be construed in favor of the
investors because SIPA is remedial legislation and as such, it should be construed liberally to
effect its purpose.

> 10.    **<u>Second Objection.</u>**  The Trustee failed to set forth a legal basis for the position he
has taken for the calculation of claims.  The Determination Letter:

> > (a)    does not clearly provide the basis for the disallowance as required by
applicable law;

(b)      is insufficient to rebut the prima facie validity of the Stein Roberts IRA

Customer Claim as provided in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P.

3001(f);

(c)      violates general principles of applicable law requiring that an objection to

a proof of claim set forth, at a minimum, the relevant facts and legal theories upon which the

objection is based, *see, e.g.*, Collier on Bankruptcy ¶ 3007.01(3) (15th ed.) ("[A]n objection to a

claim should . . . meet the [pleading] standards of an answer); *In re Enron Corp.*, No. 01-16034,

2003 Bankr. LEXIS 2261, at *25 (Bankr. S.D.N.Y. Jan. 13, 2003) (same);

11.    **Third Objection.**  The Trustee has failed to fulfill the requirement that he honor the

legitimate expectations of a customer.

12.    The legislative history of SIPA makes clear that Congress' intent in enacting the

legislation was to protect the legitimate expectations of customers.  Congressman Robert

Eckhardt, (D) Texas, sponsor of amendments to SIPA to increase the amount of advance

available to customers and expedite the process, commented on the purpose of the legislation as

follows:

> Under present law, because securities belonging to customers
> may have been lost, improperly hypothecated, misappropriated,
> *never purchased* or even stolen, it is not always possible to
> provide to customers that which they expect to receive, that is,
> securities which they maintained in their brokerage account. . . .
> By seeking to make customer accounts whole and returning them
> to customers in the form they existed on the filing date, the
> amendments . . . would satisfy the customers' legitimate
> expectations . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

> A customer generally expects to receive *what he believes* is in his
> account at the time the stockbroker ceases business. But because
> securities may have been lost, improperly hypothecated,
> misappropriated, *never purchased*, or even stolen, it is not always
> possible to provide to customers that which they expect to

4

> receive, that is, securities which they maintained in their
> brokerage account . . . By seeking to make customer accounts
> whole and returning them to customers in the form they existed
> on the filing date, the amendments . . . would satisfy customers'
> legitimate expectations . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

13.    The Securities Investor Protection Corporation ("SIPC") acknowledged that it was

bound by the statute and the rules to satisfy the reasonable expectations of customers even when

the securities had never been purchased, in the brief it submitted to the Court of Appeals for the

Second Circuit as follows:

> Reasonable and legitimate expectations on the filing date are
> controlling even where inconsistent with transaction reality. Thus,
> for example, where a claimant orders a securities purchase and
> receives a written confirmation statement reflecting that purchase,
> the claimant generally has a reasonable expectation that he or she
> holds the securities identified in the confirmation and therefore
> generally is entitled to recover those securities (within the limits of
> SIPA) even where the purchase never actually occurred and the
> debtor instead converted the cash deposited by the claimant to
> fund that purchase . . . [T]his emphasis on the reasonable and
> legitimate customer expectations frequently yields much greater
> customer protection than would be the case if the transaction
> reality, not the claimants expectations, were controlling, as this
> court's earlier opinion in this liquidation well illustrates.

Brief of the Appellant SIPC at 23-24.

14.    Based on regular statements and other communications regarding the Stein Roberts

IRA Account, Mrs. Roberts at all times reasonably believed and expected that she was invested

in a Madoff account generating interest on her investment, Madoff executed transactions on her

behalf, and that the Stein Roberts IRA Account actually held such securities.

15.    The Trustee's position in the Madoff case with respect to all accounts is completely

inconsistent with the purpose and goals of SIPA and the position that SIPC, the corporation

charged with administering the Act, has taken unequivocally with respect to the treatment of

customers in accordance with their reasonable expectations reflected in the communications
from the broker-dealer.

16.    **Fourth Objection.**   The Trustee failed to set forth a legal basis for the position he
has taken on the amount of an allowed claim. .

17.    15 U.S.C. § 78fff-2(b) provides that a customer's claim shall be allowed in the
amount of the customer's "net equity."  15 U.S.C. § 78fff-2(b).  The Trustee calculates "net
equity" by reducing the principal contributed to the account less any withdrawals or
appreciation, without regard to any gains reflected in the statements of account and any prior
statement delivered by Madoff to the customer.   This is incorrect for the following reasons:

(a)    Notwithstanding the Court's determination, the Trustee's method of
calculating the customer claim is inconsistent with the language of the statute.  SIPA defines a
customer's net equity claim as the value of the customer's "securities positions" in the
customer's account, less any amount the customer owes the debtor, as of the date of the filing of
the SIPA liquidation:

> The term 'net equity' means the dollar amount of the account or
> accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the
> debtor to such customer if the debtor had liquidated, by sale or
> purchase on the filing date, all securities positions of such
> customer . . . ; minus
>
> (B) any indebtedness of such customer to the debtor on the filing
> date . . .[1]

---

[1]   The "indebtedness" of the customer to the debtor refers to cash or securities owed to the debtor, which is most
often in the context of a customer having borrowed from the debtor on margin.  *See, e.g.*, H.R. Rep. No. 95-746 at
21 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *Rich v. NYSE*,
522 F.2d 153, 156 (2d Cir. 1975) (noting that, under the 1970 statutory regime, when there were shortages in
available securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of
holders of margin accounts, amounts owed" to the broker); *In re First St. Sec. Corp.*, 34 B.R. 492, 497 (Bankr. S.D.
Fla. 1983) (offsetting against claim amount of indebtedness customer owed to the debtor where unauthorized stock
purchase was funded in part by borrowing on margin).

15 U.S.C. § 78lll(11).  The Trustee's proposed formulation has no support in the language of the statute or interpreting case law and in fact, adds words and concepts to the statute which do not exist.

(b)    Notwithstanding the Court's determination, the Trustee's method is inconsistent with the Rules promulgated under SIPA.  The Series 500 Rules promulgated under SIPA by SIPC provide for the classification of claims for cash or securities in accordance with the written transaction confirmations sent by the broker-dealer to the customer. 17 C.F.R. § 300.500.  Pursuant to the Rule, a customer has a claim for securities if the customer has received written confirmation that the securities have been purchased or sold for the account.

(c)    Notwithstanding the Court's determination, the Trustee's method is inconsistent with the legislative history of the statute.  SIPA's legislative history emphasizes Congress' intention that the statute protect customer expectations by ensuring that customers of retail brokerage firms can rely on their account statements.  The statements and confirmations transmitted to Mrs. Roberts indicated that the Stein Roberts IRA Account owned a list of blue chip securities.  It makes no difference whether the securities were ever actually purchased.

(d)    The Trustee's formula is an improper and wholly inadequate measure of loss.  Mrs. Roberts deposited funds with Madoff in the expectation the amount would grow, the statements for the Stein Roberts IRA Account showed such growth reflecting the benefit of this bargain.  In *Visconsi v. Lehman Brothers, Inc.*, No. 06-3304, 244 Fed. Appx. 708, 713-14 (6th Cir. 2007), the Court declined to set aside an arbitration award that appeared to apply an expectancy measure of damages against a successor in a Ponzi scheme case and rejected the money in / money out formula as not reflecting the expectations of the parties.  *Id*.  The Court explained:

7

> Lehman's out-of-pocket theory misapprehends the harm suffered
> by Plaintiffs and the facts of this case. Plaintiffs gave $21 million
> to Gruttadauria, not to hide under a rock or lock in a safe, but for
> the express purpose of investment, with a hope – indeed a
> reasonable expectation – that it would grow. Thus, the out-of-
> pocket theory, which seeks to restore to Plaintiffs only the $21
> million they originally invested less their subsequent withdrawals,
> is a wholly inadequate measure of damages. Had Gruttadauria
> invested Plaintiffs' money as requested, their funds would have
> likely grown immensely, especially considering that Plaintiffs
> invested primarily throughout the mid-1990s, which, had they
> hired an honest broker . . . , would have placed their money in the
> stock market during one of the strongest bull markets in recent
> memory. In fact, the fictitious statements issued by Lehman,
> which were designed to track Plaintiffs' funds as if they had been
> properly invested, indicate that Plaintiffs' accounts would have
> grown to more than $37.9 million (even accounting for the
> withdrawal of more than $31.3 million). Plaintiffs thus could have
> reasonably believed that they were entitled to the full $37.9
> million balance shown, regardless of the amounts of their previous
> deposits and withdrawals.

*Id*. This applies precisely to Mrs. Roberts's claim.

(e)    Notwithstanding the Court's determination, the Trustee's methodology is

contrary to SIPC's own policies and practices, as reflected in the sworn testimony of Stephen

Harbeck, SIPC's president and CEO, and its actions in similar liquidation proceedings.  For

example, in the New Times Securities Services Inc. ("New Times") SIPA liquidation, in the

context of discussing claims filing deadlines, Harbeck acknowledged that if broker-dealer

customers have been led to believe that "real existing" securities had been purchased for their

accounts, then those customers are entitled to the full value of their securities positions as of the

filing date, even if that value represents a substantial increase from the purported purchase price

of the securities and even if the securities had never been purchased.  Harbeck testified as

follows:

> Harbeck: [I]f you file within sixty days, you'll get the securities,
> without question. Whether – if they triple in value, you'll get the
> securities. . . . Even if they're not there.

Court: Even if they're not there.

Harbeck: Correct.

Court: In other words, if the money was diverted, converted –

Harbeck: And the securities were never purchased.

Court. Okay.

Harbeck: And if those positions triple, we will gladly give the
people their securities positions.

Transcript at 37-39, *In re New Times Securities Services, Inc.*, No. 00-8178 (Bankr. E.D.N.Y.

July 28, 2000).

Moreover, SIPC faced very similar circumstances in the New Times liquidation and

took a very different position than it is taking in the Madoff case in support of the Trustee.

There, the New Times Trustee's position on "net equity" was in full accord with SIPA, and thus

directly contrary to the Trustee's position in this case. Specifically, with respect to any claims

that were based on confirmations and account statements reflecting securities positions in "real"

securities that could have been purchased (i.e., securities that actually existed on the public

market and whose valuations were objectively and publicly verifiable by the customers), the

New Times Trustee allowed all such net equity claims to the full extent of the filing date

valuations of those securities, even though none of the securities identified in those records had

ever, in fact, been purchased by the broker-dealer.[2]

---

[2]    As with Madoff Securities and Bernard Madoff, New Times and its principal, William Goren, defrauded scores
of investors by providing them with confirmations and account statements reflecting purported securities
investments made on their behalf when, in fact, no such investments had been made and their money had, instead,
been misappropriated for other purposes. Two of the investment opportunities Goren purported to offer were: (1)
money-market funds that were entirely fictitious (the "Fictitious New Age Funds"); and (2) mutual funds that were
entirely real, such as those offered by The Vanguard Group and Putnam Investments (the "Real Securities"). *See In
re New Times Sec. Servs., Inc.*, 371 F.3d 68, 71-72 (2d Cir. 2004) ("*New Times I*"). Goren's was "a classic Ponzi
scheme," *id.* at 72 n.2, wherein new investors' money was used to pay earlier investors.

Approximately 900 customers filed claims in the New Times liquidation: 726 for whom the "Real Securities" were
purportedly purchased; 174 for whom the "Fictitious New Age Funds" were purportedly purchased. Consistent
with SIPA and its legislative history, the New Times Trustee appropriately applied SIPA's net equity definition to

(f)    The Trustee's determination of claims and the Court's determination are

inconsistent with the case law.  The Second Circuit's discussion of SIPC's claims processing in

*New Times,* the only case in this jurisdiction dealing with the issue in the Madoff case, further

indicates that, with respect to customers who thought they were invested in listed securities,

SIPC properly paid customer claims based on the customers' final account statements, even

where the securities had never been purchased:

> Meanwhile, investors who were misled . . . to believe that they
> were investing in mutual funds that in reality existed were treated
> much more favorably. Although they were not actually invested in
> those real funds – because Goren never executed the transactions –
> the information that these claimants received on their account
> statements mirrored what would have happened had the given
> transaction been executed. As a result, the Trustee deemed those
> customers' claims to be "securities claims" eligible to receive up
> to $500,000 in SIPC advances. The Trustee indicates that this
> disparate treatment was justified because he could purchase real,
> existing securities to satisfy such securities claims. Furthermore,
> the Trustee notes that, if they were checking on their mutual
> funds, the "securities claimants," . . . could have confirmed the
> existence of those funds and tracked the funds' performance
> against Goren's account statements.

*In re New Times Secs. Servs.*, 371 F.3d 68, 74 (2d Cir. 2004); *see also* Brief of Appellant SIPC

at 23-24, *In re New Times Sec. Servs., Inc.*, No. 05-5527 (Dec. 30, 2005):

> [R]easonable and legitimate claimant expectations on the filing
> date are controlling even where inconsistent with transactional
> reality.  Thus, for example, where a claimant orders a securities
> purchase and receives a written confirmation statement reflecting
> that purchase, the claimant generally has a reasonable expectation
> that he or she holds the securities identified in the confirmation
> and therefore generally is entitled to recover those securities
> (within the limits imposed by SIPA), even where the purchase
> never actually occurred and the debtor instead converted the cash
> deposited by the claimant to fund that purchase. . . . [T]his
> emphasis on reasonable and legitimate claimant expectations

---

the "Real Securities" customers' claims – meaning he paid them according to the full value of those securities
positions as of the date of the liquidation filing.  When challenged by "Fictitious New Age Funds" customers who
had objected that they had not received the same treatment, SIPC and the New Times Trustee (with the apparent
concurrence of the SEC) vigorously defended their approach in court.

frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

(g)    The Trustee's position in the Madoff case is contradicted, not only by

SIPC's prior treatment of customers in the New Times case, but also by a statement that SIPC's

general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang

acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each.  So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

(h)    The Trustee's methodology also conflicts with other federal laws.  For

example, Rev. Proc.2009-20, issued by Commissioner Shulman on March 17, 2009, expressly

recognizes the income earned by customers, on which they paid taxes annually.  Yet the

Trustee's position is that the income earned by customers on their investments is not their

money.  In addition, some customers were required to take distribution from their retirement

accounts.  Yet the Trustee is deducting from their customer claim the mandatory withdrawals

that the customers were required by law to take.  Moreover, pension distributions are protected

under federal and state law, yet the Trustee reduces or disallows such distributions.

18.  In sum, the Trustee  has created his own definition of "net equity."  The  procedure

is designed not for the benefit of Madoff victims but rather so that the Trustee can avoid paying

SIPC insurance to the thousands of Madoff investors who, like Mrs. Roberts, have depended

upon their Madoff investments for their current and future living expenses.

19. **Fifth Objection.** The Stein Roberts IRA Account was established pursuant to the Employee Retirement System Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 et seq., provisions of which preempt state fraudulent conveyance law, upon which Picard presumably relies pursuant to 11 U.S.C. §544. 29 U.S.C. §1144(a) (the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section [1003(a)]…."

20. As evidence of Congressional intent to protect ERISA-qualified plans, the Bankruptcy Code was amended in 2005 to protect pension plans and retirement accounts from the claims of creditors.

21. **Sixth Objection.** SIPA provides that (a) SIPC shall pay the first $500,000 of each customer claim, and (b) customers have an unsecured claim against customer property for the balance of their claims which is paid pro rata with other customers. *See* 15 U.S.C. § 78fff-3(a) ("In order to provide for prompt payment and satisfaction of net equity claims of customers of debtor, SIPC shall advance to the trustee [up to] $500,000 for each customer, as may be required to pay . . . claims."); 15 U.S.C. § 78fff-2(c)(1)(B) (providing that customers of the debtor "shall share ratably in . . . customer property on the basis and to the extent of their net equities"). As evidenced by the Stein Roberts IRA Claim, Mrs. Roberts has a valid claim in the amount of $9,024,952.. Therefore, Mrs. Roberts is entitled to an advance of $500,000 and a claim against customer property for the remainder.

22. **Seventh Objection.** The Stein Roberts IRA Account was established as an individual retirement account, which under state law where the account was established and administered, are exempt from judgment and the Trustee's efforts to reduce the amounts due in the account or recover any transfers from the account under any theory. These state laws protect the funds in the Stein Roberts IRA Account from recovery by a trustee or any claiming party.

The Trustee's reduction or disallowance of the amount deposited from the Stein Roberts IRA Account is also prohibited by applicable state law.

23.    **Alternate Considerations.**    In the event that the Court should determine that customer claims should not be allowed in the amount of the final account balance, then in the alternative, the customer is entitled to recover interest or appreciation on the investments based upon the following.

(a)    Under New York law, which is applicable here, funds deposited with Madoff under these circumstances are entitled to interest.  *See, e.g.,* N.Y. C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq*.  Accordingly, the Stein Roberts IRA Customer Claim should be allowed and calculated by adding interest to all funds deposited.

(b)    Under New York law, which is applicable here, customers are entitled to any returns Madoff earned on the deposited funds under principles of unjust enrichment. Accordingly, customer claims should be calculated by adding the amounts "earned" by Madoff on the customer's deposits.  *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

(c)    Mrs. Roberts is entitled to interest on her investment under federal securities laws.  In *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), the Supreme Court analyzed the different measures of recovery of "actual damages" for fraud, primarily including rescission and restitution.  The *Randall* Court concluded that Congress intended to deter wrongdoers, and hence, that wide latitude in choosing the measure of damages was warranted.  *See id*. at 664

(citing *Affiliated Ute Citizens of Utah v. United State*s, 406 U.S. 128, 151, 92 S.Ct. 1456, 31

L.Ed.2d 741 (1972)).  The *Randall* Court continued by holding that:

> This deterrent purpose is ill-served by a too rigid insistence on
> limiting plaintiffs to recovery of their "net economic loss."

*Id.* at 664 (citing *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 940 (2d Cir. 1984)).

## RESERVATION OF RIGHTS

24.    Mrs. Roberts reserves the right to revise, supplement, or amend this Objection, and

any failure to object on a particular ground or grounds shall not be construed as a waiver of its

right to object on any additional grounds.

25.    Mrs. Roberts reserves all rights set forth in Rule 9014, including, without limitation,

rights of discovery.  *See* Fed. R. Bankr. P. 9014.

26.    Mrs. Roberts reserves all objections as to the competence, relevance, materiality,

privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other

action for any purpose whatsoever.

27.    Mrs. Roberts filed this Objection as a protective measure and this Objection does

not constitute a waiver of any defense or an admission of any matter.

## RELIEF REQUESTED

For the reasons stated herein, the Stein Roberts IRA Claim should be allowed in its

entirety in the amount stated therein, plus interest from the date of the Determination Letter.

For the reasons stated herein, the Court should direct SIPC to immediately replace

$500,000 of the securities in the Stein Roberts IRA Account based upon the values reflected on

her statements and/or immediately forward the Stein Roberts IRA Account a $500,000 advance

from the SIPC Fund.

For the reasons stated herein, the Determination Letter should be stricken.

Mrs. Roberts requests such other relief as may be just and equitable.

Dated: November 22, 2010                    SNR Denton US LLP


                                            By:    /s/ *Carole Neville*
                                                Carole Neville
                                                1221 Avenue of the Americas
                                                New York, New York 10020
                                                Telephone:  (212) 768-6700
                                                Facsimile:  (212) 768-6800

                                            *Attorneys for Stein Roberts IRA*

## <u>CERTIFICATE OF SERVICE</u>

I, Carole Neville, hereby certify that on November 22, 2010 I caused a true and correct

copy of the foregoing **Objection to Trustee's Determination of Claim** on behalf of Stein

Roberts IRA to be filed electronically with the Court and served upon the parties in this action

who receive electronic service through CM/ECF, and served by hand upon:

> David J. Sheehan, Esq.
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, NY 10111

Dated: November 22, 2010

> *  /s/ Carole Neville  *
> Carole Neville

**<u>Exhibit A</u>**

**(Determination Letter)**

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

## DECEMBER 11, 2008[1]


## NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

October 22, 2010

ELAINE STEIN ROBERTS IRA

Dear ELAINE STEIN ROBERTS IRA:

### PLEASE READ THIS NOTICE CAREFULLY.

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claim designated as Claim No. 011552:

Based on a review of available books and records of BLMIS by the Trustee's staff, you did not have an account with BLMIS. Because you did not have an account, you are not a customer of BLMIS under SIPA as that term is defined at 15 U.S.C. § 78lll (2). Accordingly, your Claim for securities and/or a credit balance is **DENIED**.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after October 22, 2010, the date on which the Trustee mailed this notice.

------------------------------

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

> Clerk of the United States Bankruptcy Court for
> the Southern District of New York
> One Bowling Green
> New York, New York 10004

> and

> Irving H. Picard, Trustee
> c/o Baker & Hostetler LLP
> Attn: Claims Department
> 45 Rockefeller Plaza
> New York, New York 10111

**Irving H. Picard**

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc:  CAROL NEVILLE, SONNENSCHEIN NATH & ROSENTHAL LLP
     1221 AVENUE OF THE AMERICAS, 25TH FL.
     NEW YORK, NY    10020