BERNFELD, DEMATTEO & BERNFELD, LLP
600 Third Avenue, 15th Floor
New York, New York 10016
(212) 661-1661
David B. Bernfeld
Jeffrey L. Bernfeld
*Attorneys for Margrit Franitza (IRA)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

                         Plaintiff,

        v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                 Defendant.

Adv. Pro. No. 08-01789 (BRL)
SIPA LIQUIDATION

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

    Margrit Franitza (IRA) ("Claimant"), by its attorneys, Bernfeld, DeMatteo & Bernfeld,

LLP, hereby submits the following amended objections to the Notice of Trustee's Determination

of Claim dated October 19, 2009 (the "Determination Letter"), as follows:

**BACKGROUND FACTS**

    1.    The relevant background facts are not in material dispute. Simply stated, the

Trustee has alleged that for decades Bernard L. Madoff ("Madoff") and his company Bernard L.

Madoff Investment Securities, LLC (collectively "BLMIS") perpetrated a massive fraud upon

thousands of investors, causing a loss to investors in the billions of dollars. The fraud came to

light in December 2008, when Madoff confessed his scheme and was arrested.

    2.    The scheme involved the reported purchase and sale by BLMIS for the various

customer accounts of securities and options of existing, publicly-traded companies. Each

reported transaction was confirmed in writing to each customer and the monthly customer statements reiterated and reconfirmed the representations made by BLMIS in those specific transaction confirmations.  The account statements were consistent with the market prices for the Securities listed so that any BLMIS customer could confirm the existence and the value of the Securities and the transactions reported as having been conducted for the customer's BLMIS account.

3.      Following the public disclosure of the fraud, actions were commenced by the SEC and SIPC against, *inter alia,* BLMIS.  On or about December 15, 2008, the Court directed the liquidation of BLMIS pursuant to the provisions of the SIPA and Irving Picard was designated by SIPC and appointed by the Court to act as the SIPC trustee (the "Trustee").  Mr. Picard then hired his law firm, Baker & Hostetler, to act as counsel to the Trustee.

4.      Pursuant to order dated December 23, 2008, the Court empowered the Trustee:

a.      to disseminate and make available notice and claim forms to BLMIS customers for the filing of Customer Claims in the BLMIS Liquidation;

b.      to advise Customers of the relevant claim-filing cut off dates; and

c.      to determine in writing all filed customer claims, and to the extent that the Trustee disallowed any claim, whether in whole or in part, to provide the reason for such disallowance.

5.      By in or about February 2009, the Trustee publicly announced that he would not calculate customer net equity on the basis of the written confirmations and account statements sent by BLMIS to the customers but, instead, would do so on the basis of what the Trustee labeled as his "cash in/cash out" methodology.

6.      The last date for filing customer SIPA Claims was July 2, 2009 (the "Filing

2

Deadline").

7.      In the months following the Filing Deadline, the Trustee issued various

Determination Letters each of which purportedly applied the Trustee's "cash in/cash out"

("CICO") definition of Net Equity.

8.      Various customers filed formal written objections to those Determination Letters

and to the CICO method of calculating net equity.  In addition, several investor groups brought

separate actions seeking to have the Court rule on the definitional dispute.

9.      Initially, the Trustee objected to those actions and moved for their dismissal.  In

September 2009, however, the Trustee reversed himself and made an affirmative application to

the Court seeking specific Court approval for his claim that a customer's net equity under SIPA

should be determined solely on the CICO methodology and that the customers' account

statements and the transaction confirmations the customers' received for each separate

transaction should be disregarded.

10.     In accordance with the schedule fixed by the Court, various claimants filed papers

in opposition to the Trustee's proposed net equity definition.  These claimants' submissions,

including legal Memoranda are incorporated by reference as if set forth at length in these

objections.

11.     The Bankruptcy Court (Lifland, J.) granted the Trustee's motion and sustained the

Trustee's CICO definition and methodology for determining each customer's Net Equity for

SIPA purposes.

12.     The Bankruptcy Court certified its decision for direct appeal to the Second Circuit

Court of Appeals, based on the application of the Trustee and counsel for certain claimants and

the Second Circuit granted permission to file a such a direct appeal and the same is currently

pending before that court.

## THE CLAIM AND THE TRUSTEE'S DETERMINATION LETTER

13.     Claimant is a "customer"of BLMIS as that term as defined under the Securities

Investor Protection Act (hereinafter "SIPA").

14.     According to Claimant's final BLMIS customer statement dated November

30,2008 (the "November Statement"), Claimant had Securities and cash proceeds in its BLMIS

account valued at in excess of $5,072,428.53.

15.     Claimant submitted its claim on the form provided by the Trustee (the "Claim").

Included in the Claim was a copy of Claimant's November Statement. The Claim is incorporated

by reference herein.

16.     On or about October 19, 2009, the Trustee sent Claimant a letter (the

"Determination Letter") which, *inter alia*: (a) disallowed the claim for physical delivery of the

securities set forth as being in Claimant's BLMIS account as of the November Statement; (b)

disallowed Claimant's Net Equity claim in its entirety; and (c) rejected, in its entirety, Claimant's

application for a SIPC advance payment.

17.     According to the Determination Letter, there were total deposits to Claimants

Account of $4,064,658.36 (exclusive of the reported appreciation or any other substitute return

on the investment) and alleged total withdrawals of $1,050,000.

18.     However, the Determination Letter then "Adjusted" downward the deposit credits

to the accounts by refusing to recognize $3,645,889.53 of said deposits (the "Disputed Deposit

Adjustment").  In addition, the Determination Letter failed to credit Claimant with the credits and

4

appreciation reflected in the account which, upon information and belief was in excess of $5,702,759.30 (the "Rejected Account Credits").

19.    The Trustee's apparent rationale for this Disputed Deposit Adjustment disallowance was the erroneous assertion that Claimant had simply transferred funds from one account of Claimant into Claimant's current account and that the Trustee's net equity methodology allowed him to disallow any alleged appreciation that had previously been credited to a separate BMLIS customer account.

20.    As a threshold matter, even if the Trustee's factual assumption had been correct - which it is not - the Trustee would still have had no authority even then to reduce the amount of the account by the Disputed Deposit Adjustment.

21.    The transactions upon which the Trustee bases his disallowances with respect to the Disputed Deposits, in whole or in part, took place more than Six (6) Years prior to the disclosure of the BLMIS fraud in December 2008. As such, consideration of these transactions is barred by all applicable statutes of limitations.

22.    Moreover, the accounts from which the Disputed Deposits emanated was a different account and a different customer, as defined by the SIPA statute.

23.    Further, the Disputed Deposits were made in conjunction with bona fide, arms length transactions pursuant to which, and for valuable consideration, the Disputed Deposits were made to Claimant's BLMIS account.

24.    Beyond all of the foregoing, the Disputed Deposits occurred more than six years prior to the filing of the BLMIS liquidation proceedings - and the prior appreciation that the Trustee is now ascribing to Claimant, would have taken place over a period of years even earlier

5

than the Disputed Deposits.

25.    In disallowing Claimant's entire Net Equity claim, the Trustee completely

disregarded  the transaction confirmations and Account Statements received by Claimant from

BLMIS which, as noted, reflected a substantial positive Net Equity in Claimant's account of in

excess of $5,702,759.30.

26.    Instead, using his CICO method and the Trustee "determined" that Claimant had a

negative Net Equity of $630,330.77.

27.    According to the Determination Letter, Claimant opened its account with BLMIS

in or about 1992 and has maintained the account continuously to date (the "Account Period").

During the Account Period, Claimant received trade confirmations for each transaction and

monthly statements from BLMIS representing that the confirmed transactions in specific real

securities had taken place for the account.

28.    At all times during the Account Period, Claimant reasonably believed in good

faith that the Account Statement balances were accurate and reflected the Securities and account

values that Claimant owned and had on deposit with BLMIS.

29.    At all times during the Account Period, Claimant believed Claimant was entitled

to make withdrawals from Claimant's BLMIS account and that when doing so, Claimant was

withdrawing its own money.

30.    Each year during the Account Period, Claimant received official tax reporting

forms from BLMIS advising and representing to Claimant the amount of Claimant's reportable

BLMIS taxable income for that year based on the transactions reflected in the trade confirmations

and account statements received by Claimant.

31.     During the Account Period, Claimant's tax returns included that BLMIS income and substantial taxes were paid thereon over that period.

## SUMMARY OF OBJECTIONS

32.     Claimant objects to the Trustee's Determination Letter and all claim determinations made in its entirety except for the Trustee's acknowledgment that Claimant is a BLMIS customer.

33.     Claimant's Objections are predicated, *inter alia,* on the SIPA statute and regulations and on the cases interpreting SIPA.

34.     The Determination Letter is erroneous and the determinations contained therein are objectionable for a variety of reasons including, *inter alia,* the following:

a.      The Determination Letter fails to provide "legal reasons" for the determinations made, in violation of this Court's order dated December 23, 2008, mandating that specific reasons be provided for each claim disallowed;

b.      The Trustee has ignored the definition of Net Equity contained in the SIPA statute which requires that Net Equity be determined based upon the customer's last account statement from the Debtor.  Instead, without any lawful basis, he has created his own definition - CICO - which deprives Claimant and thousands of other BLMIS investor claimants of their proper SIPA statutory advance and improperly reduces the proper Net Equity/allowable claim of those claimants.

c.      SIPA is designed to give effect to the reasonable expectations of the customer of a failed SIPC member brokerage firm.  When a customer receives trade confirmations and monthly account statements reflecting transactions in real securities available for purchase in the marketplace, that customer's Net Equity under SIPA is the amount of the customer's last account statement, thereby giving effect to the customer's reasonable expectations.  The Trustee was required to determine Claimant's Net Equity on the basis of, and  in the amount of, the Claimant's last account statement, not on the basis of his CICO construct.

7

d.     The Trustee should have allowed and paid Claimant a full SIPC advance of $500,000 since, under the proper definition of Net Equity, Claimant has a positive Net Equity substantially in excess of $500,000.

e.     Even under the Trustee's flawed definition, the Determination Letter improperly reduces the amount of deposits credited to Claimant's account by the Disallowed Deposit Adjustment, e.g., approximately $370,118.07.

f.     The Disallowed Deposit Adjustment reflect actual deposits to Claimants account which the Trustee (and the Determination Letter) had no legal or factual right to treat as nullities.

g.     Moreover, the Disallowed Deposit Adjustment: (i) relates to bona fide deposits; (ii) made and received in good faith; and (iii) involved transactions which took place before the last applicable statute of limitations to challenge their validity.  As a result, in treating such Disallowed Deposit Adjustment as nullities, the Trustee has, without any judicial determination ,unilaterally effected and  imposed a judgment against Claimant in the amount of the Disallowed Deposits, as if the Trustee had brought and succeeded in a fraudulent conveyance action - a result that the Trustee could not lawfully accomplish in court .

h.     The Trustee owes a fiduciary duty to the BLMIS customers and pursuant to that duty is obliged to assert on behalf of those customers, interpretations of SIPA which, in good faith, maximize the statutory benefits to the customers.  In violation of that duty, the Trustee has adopted a definition of Net Equity which is antithetical to the customers best interests and to their entitlement to SIPC advances and payments. The Trustee's proposed definition deprives BLMIS customers of in excess of one billion dollars of SIPC payments which, according to their respective account statements, they were entitled to receive.  The sole beneficiary of this deprivation is SIPC which (i) avoids having to pay that amount in SIPC advances, and (ii) will be able to recoup, through assignment and subrogation, even those limited  SIPC advances it actually makes (because the Net Equity claims of BLMIS investors will have been artificially and improperly reduced or eliminated).

i.     SIPC has previously represented to the Courts of this district see, e.g., (in the *New Times Securities* case) that if a customer receives trade confirmations and monthly account statements reflecting transactions in real securities available for purchase in the marketplace, that customer's Net Equity under SIPA equals the amount of the customer's last account statement. Under well settled principles of estoppel, neither SIPC nor the

8

Trustee is now free to adopt a contrary definition of Net Equity which effectively seeks to disavow this prior judicial representation.

## SPECIFIC OBJECTIONS

## FIRST OBJECTION

## FAILURE TO PROVIDE REASONS
## FOR CLAIM DISALLOWANCES

35.     The Order of December 23, 2008, requires the Trustee to provide "the reasons," in writing, for any claim disallowance.

36.      Although the Trustee's Determination Letter disallows Claimant's claim in its entirety, the Determination Letter fails to provide any legal basis or reasons for that disallowance.

37.     The most that can be said is that the Determination Letter makes certain factual statements which, however, do not provide "legal reasons" for the disallowance as specifically directed by the Court.

38.     Accordingly, the Determination Letter is deficient, fails to comply with the Court's specific mandate  and the claim disallowances made by the Trustee must be vacated.

## SECOND OBJECTION

## THE TRUSTEE'S WRONGFUL REFUSAL
## TO DELIVER *IN KIND* SECURITIES

39.     The Determination Letter disallows Claimant's demand for delivery of the Securities listed in Claimant's Account Statement.

40.     The Determination Letter says that, "No securities were ever purchased for your account."  While that may - or may not - be an accurate factual statement, it provides no legal reason for the Trustee's refusal to purchase *in kind* securities in the market place for delivery to

the BLMIS customers, including Claimant.

41.     Under SIPA, the Trustee and SIPC are required to purchase and deliver *in kind* securities when, as here, the confirmations and account statement reflect ownership of real securities in a customer's account which are capable of being purchased in the marketplace (subject only to the dollar limitations of SIPA).[1]

42.     The Determination Letter's disallowance of Claimant's demand for delivery of *in kind* securities violates the clear mandate of SIPA and must be overruled.

43.     Moreover, the Trustee's claim that no investment transactions occurred with respect to investor funds and that no profits were ever generated therefrom is factually erroneous and in direct conflict with allegations contained in Federal Grand Jury Indictments and SEC complaints brought against former Madoff employees.[2]

## THIRD OBJECTION

## THE TRUSTEE IS USING AN IMPROPER AND UNAUTHORIZED DEFINITION OF NET EQUITY

44.     Under SIPA, when a customer has received confirmations of transactions in real

---

[1]     Thus, SIPA provides as follows:

> The trustee *shall*, to the extent that securities can be purchased in a fair and orderly market, purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities ...

15 U.S.C. §78fff-2(d)

[2]     Since the Trustee presumably knew and certainly should have known that there were multiple significant transactions and profits, the Trustee's repeated assertions to the contrary are difficult to comprehend or condone.

securities and when the customer's account statement reflects ownership of real securities, the

customer's  net equity is to be determined by, and is equal to,  the customer's last account

statement value.

45.    Claimant's last BLMIS  Account Statement  account reflects a positive balance - a

SIPA Net Equity - of in excess of $5,072,428.53.

46.    The Determination Letter states that the Trustee has used a CICO method of

determining customer Net Equity which violates the clear statutory definition of Net Equity.

47.    In the Trustee's Determination Letter, he admits that Claimant's Net Equity was

determined based on the  CICO methodology, rather than on the basis of the customer's last

account statement as SIPA requires.[3]

48.    The SIPA statute (15 U.S.C. §78lll(11)) defines Net Equity in clear and

straightforward terms, as follows:

> The term 'net equity' means the dollar amount of the account or
> accounts of a customer, to be determined by -
> (A) calculating the sum which would have been owed by the debtor
> to such customer if the debtor had liquidated, by sale or purchase
> on the filing date, all securities positions of such customer...; minus
> (B) any indebtedness of such customer to the debtor on the filing
> date...[4]

---

[3]    The Determination Letter simply recites that the Trustee has determined Net
Equity on the "cash in/cash out method" but that is simply a statement of fact and provides no
legally cognizable reason  for the Trustee to ignore the SIPA statutory definition of Net Equity,
the controlling cases or SIPC's prior acknowledgments (judicial and otherwise)  that in these
circumstances, a customer's Net Equity is equal to the customer's last account statement.

[4]    SIPA specifically prohibits SIPC from changing any defined term in 15 USC §
 which is where the definition of net equity is set forth. Notwithstanding this prohibition, that is
precisely what the Trustee seeks to accomplish-change the statutory definition to one that better
serves SIPC's financial interests and those of the registered broker deal industry which makes up
SIPC's membership.

49.     Congressional history, and the express language of SIPA, confirm that SIPA is designed to effectuate the customer's reasonable expectations, in order to foster investor confidence in the securities markets.  Thus, for example, as the Senate Report on the 1978 SIPA amendment bill explains:

> By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendment not only would satisfy the customers' legitimate expectations, but would also restore the customer to his position prior to the broker-dealer's financial difficulties.

S.Rep No. 763, 95th Cong., 2d Sess. (1978) at 2 (See also, certain claimants' Memoranda of Law)

50.     A customer's reasonable expectation is to receive what he or she has been told is contained in his or her accounts.  Accordingly, the Account Statement balance *is* the customer's SIPA net equity and the Trustee's use of CICO to determine Net Equity violates the statute.

### FOURTH OBJECTION

### SIPC HAS PREVIOUSLY REPRESENTED THAT NET EQUITY IS DETERMINED BY THE CUSTOMER'S LAST ACCOUNT STATEMENT BALANCE AND IS ESTOPPED FROM ASSERTING A CONTRARY DEFINITION NOW.

51.     In the *New Times Square* case, SIPC represented in its court submissions that a customer's Net Equity is determined by the customers final account statement when (as here): (i) the securities at issue are real and could be purchased in the market place; and (ii) the customer has received written confirmations and account statements reflecting what has allegedly been executed for the customer's account.

52.     The Second Circuit in *New Times Securities* quoted with approval the following statement from the Trustee's and SIPC's appellate brief to the Court on the issue of customer

12

expectations and the proper definition of net equity:

> [I]nvestors that were misled by Goren to believe that they were investing in mutual funds that in reality existed were treated much more favorably [than those who were led to invest in the fictitious funds]. Although they were not actually invested in those real funds-because Goren never executed the transactions-the information that these claimants received on their account statements 'mirrored what would have happened had the given transactions been executed' Br. For Appellants [SIPC Trustee and SIPC]. As a result, the Trustee deemed those customers claims to be 'securities claims' eligible to receive up to $500,000 in SIPC advances. The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. Furthermore, the Trustee notes that, if they were checking on their mutual funds, the 'securities claimants' in contrast to the 'cash claimants' bringing this appeal could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements.

53.     This definition of Net Equity, utilized by SIPC and the SIPC trustee in the *New Times Securities* case, reflects the proper definition of Net Equity under SIPA, consistent with the reasonable expectations of the customers.

54.     There has been no change in the statutory definition of Net Equity under SIPA since the *New Times Securities* case. Nevertheless, the BLMIS Trustee in these proceedings is essentially ignoring that controlling authority as well as repudiating SIPC's prior judicial representations and admissions, all in an effort to reduce SIPC's financial exposure and responsibilities to aggrieved BLMIS customers, such as Claimant.

55.     In the lower court proceedings in the *New Times Securities* case, the following transcribed colloquy between SIPC President Stephen Harbeck and the Court occurred in open Court:

> Harbeck:        ...if you file [a timely SIPC claim] you'll get the securities without

13

> question.  Whether - if they triple in value, you'll get the
> securities... *Even if they're not there.*

Court:         *Even if they're not there.*

Harbeck:    Correct.

Court:         *In other words, if the money was diverted, converted-*

Harbeck:    *And the securities were never purchased.*

Court:         Okay.

Harbeck:    And if those positions triple we will gladly give the people their
                   securities positions.

Tr. at 37-39, *In re New Times Securities Services, Inc*, OO-8178 (Bkrcty. E.D.N.Y. July 28,

2000) (emphasis added).

56.    Moreover, shortly after the Madoff scandal became public, SIPC's general

counsel also acknowledged and reaffirmed SIPC's obligation to replace securities as reflected in

the following interview:

> [I]f clients were presented statements and had reason to believe
> that the securities were in fact owned, the SIPC will be required to
> buy these securities in the open market to make the customer
> whole up to $500k each.  So if a Madoff client ... was given a
> statement showing they owned 1000 GOOG shares, even if a
> transaction never took place, the SIPC has to buy and replace the
> 1000 GOOG shares.

Insiders' Blog December 16, 2008, www.occ.treas.gov/ftp/alert/2008-37.html.

57.    Under well-settled principles of estoppel, a party is not permitted to ignore prior

judicial representations and admissions nor to assert contentions that are contrary to that party's

earlier judicial representations.

58.    The BLMIS Trustee's definition of net equity seeks to disavow SIPC's prior

14

judicial representations and public statements by SIPC.

59.    Under these circumstances, SIPA and the Trustee should be precluded from
repudiating their prior  judicial assertions  and should, instead, be compelled to calculate BLMIS
customer Net Equity on the basis of the last BLMIS customer account statements.

60.    Accordingly, the Determination Letter's attempted disavowal of the net equity
definition represented as correct by SIPC in prior judicial proceedings is barred by judicial
estoppel and the Trustee's Claim disallowances must be overruled and vacated.

## FIFTH OBJECTION

**THE DETERMINATION LETTER CLAIM DISALLOWANCE IGNORES
THE FACT THAT EACH SECURITIES TRANSACTION WAS
CONFIRMED TO CLAIMANT BY BLMIS AND WAS REFLECTED
IN CLAIMANT'S ACCOUNT STATEMENTS. UNDER SIPA, THOSE
CONFIRMED TRANSACTIONS WILL BE GIVEN BINDING EFFECT
IN CALCULATING NET EQUITY EVEN IF, AS HERE, THE
BROKER LIED AND NO TRANSACTIONS ACTUALLY TOOK PLACE.**

61.    All of Claimant's securities transactions, as reflected in Claimant's account, were
confirmed to Claimant by written trade confirmations from BLMIS as well as account statements
from BLMIS reflecting those transactions.

62.    In accordance with Claimant's customer agreement with BLMIS, the transactions
became binding unless written objection was made within thirty (30) days of receipt.

63.    Under clear industry regulations applicable to broker-dealers such as BLMIS,
trade confirmations and accounts statements rendered to a customer by a broker-dealer are
binding on the broker-dealer and may not subsequently be disavowed.

64.    SIPC's series 500 rules are to the same effect. Thus, Rule 502 provides as follows:

Where the Debtor held cash in an account

15

> for a customer, the customer 'has a claim for
> securities' with respect to any authorized securities
> purchase: (1) if the Debtor has sent a written confirmation
> to the customer that the securities in question have been
> purchased for or sold to the customer's account

65.     The applicable cases also squarely hold that when addressing transactions involving real securities, confirmations and account statements issued by the broker to the customer are controlling and will be binding.  New York's law concerning the binding effect of written trade confirmations is to the same effect.

66.     All of the Securities which were the subject of those written trade confirmations and account statements  reflected transactions for Claimant's account in real securities which were available to be purchased in the open market.

67.     In such circumstances, Net Equity must be determined by Claimant's last BLMIS Account Statement, even if the broker lied and no transactions in those Securities actually took place.

68.     The Determination Letter disallowances ignores the transaction confirmations and Account statements received by Claimant and those disallowances must be overruled and vacated.

## SIXTH OBJECTION

### THE DETERMINATION LETTER CLAIM DISALLOWANCE VIOLATES THE TRUSTEE'S FIDUCIARY OBLIGATIONS TO CLAIMANT AND THE OTHER BLMIS CUSTOMERS

69.     Under SIPA, the person designated by SIPC and appointed by the Court to act as Trustee in a SIPA liquidation owes the customers of the debtor firm a fiduciary duty to act in their best interest and to advocate for them to the maximum extent permitted by law.

16

70.     The Trustee owes no such comparable duty to SIPC.

71.     The Determination Letter sent by the Trustee to Claimant demonstrates facially that the Trustee is acting in a manner inconsistent with the duties he owes to customers of BLMIS, including Claimant.

72.     The Trustee's definition of Net Equity, if allowed to stand, will substantially reduce the number of BLMIS customers who, like Claimant, should  qualify for a full SIPC advance, but will receive nothing from SIPC.[5]

73.      The primary party that benefits from the Trustee's "definition" of Net Equity is SIPC itself which, as a result, will be relieved of its statutory obligations to thousands of BLMIS customers and save in excess of a billion dollars.

74.     The Trustee should be asserting the most favorable application of SIPA for the benefit of the customers, not one that deprives the customer of significant SIPA rights and benefits.  However, the Trustee has chosen a definition for the application of SIPC advances which is adverse to the customers to whom a fiduciary duty is owed and beneficial to the financial interests of SIPC.

75.     As a result of this breach , the Determination Letter improperly disallows Claimant's SIPA net equity in its entirety.

76.     Under the proper statutory definition of net equity which the Trustee was obligated to apply, Claimant's Claim should have been allowed in its entirety.

77.     In that regard, in violation of this fiduciary duty,  the Trustee's Determination

---

[5]     Moreover, even if a customer qualifies for some SIPC payment, that payment will frequently be for an amount less than the customer should have received under a proper Net equity definition.

Letter improperly deprived Claimant of at least the following relief to which Claimant is entitled:

    a.    A $500,000 SIPA allowance in the form of securities *in kind* or, in the alternative, a cash payment in that amount;

    b.    A determination that Claimant has a positive Net Equity for SIPA purposes of in excess of $5,072,428.53 and an allowed claim in that amount;

    c.    A determination that Claimant is entitled to share *pro rata* in all BLMIS customer property based upon an allowed claim of in excess of $5,072,428.53.

78.    In view of the Trustee's fiduciary obligations, the Determination Letter disallowing the Claim constitutes a breach of duty and requires that the disallowances contained in the Determination Letter be overruled.

## SEVENTH OBJECTION

### ASSUMING *ARGUENDO* THAT THE TRUSTEE'S NET EQUITY DEFINITION IS CORRECT, THE DETERMINATION LETTER ERRONEOUSLY DISALLOWS SIGNIFICANT DEPOSITS TO CLAIMANT'S BLMIS ACCOUNT

79.    Even under the Trustee's flawed definition of Net Equity, the Trustee has failed to give Claimant proper credit for deposits actually made to Claimant's BLMIS account.

80.    Although the Determination Letter acknowledges that the Disputed Deposits was made to Claimant's account, the Determination Letter disallows credit for approximately $5,948,856.58.

81.    The Determination Letter improperly reduces the amount of recognized deposits in Claimant's account by improperly treating as nullities transactions which were bona fide deposits entitled to full credit.

18

82.    Moreover, under the guise of calculating Claimant's net equity, the Determination

Letter actually imposes a fraudulent conveyance offset without any judicial determination and

with respect to transactions which occurred well beyond the applicable statute of limitations for

the Trustee to challenge.

83.    In doing so, the Trustee (and the Determination Letter) seek to avoid clear

statutory limits on his ability to challenge transactions which occurred beyond the stated

limitations statutes.

84.    Thus even under the Trustee's flawed net equity definition, the Determination

Letter improperly disallowed substantial deposits which should have been credited to Claimant's

net equity and allowed claim.

85.    The Determination Letter disallowance of said deposits in the calculation of

Claimant's net equity was improper and must be overruled.

## EIGHTH OBJECTION

### THE DETERMINATION LETTER ERRONEOUSLY
### DISALLOWED THE APPRECIATION AND PROFITS
### REFLECTED IN CLAIMANTS ACCOUNT.

**A.  If the Disallowance of Appreciation Is Sustained,
Then Claimant's Net Equity must Be Credited
with Interest at the New York Judgement Rate.**

86.    New York law clearly provides for the payment of prejudgment interest in light

of, *inter alia*, the conversion of property that occurred and the fraud perpetrated by BLMIS on the

BLMIS customers, including Claimant.

87.    Accordingly, should it be determined, *arguendo,* that Claimant's Net Equity does

not include the cumulative appreciation in Claimant's account as reflected in the November

Statement, then Claimant's Net Equity must include, and be increased by, interest at the legal rate applicable to New York Judgments.

88.    The Determination Letter disallows all appreciation in Claimant's account in the net equity/allowed claim calculation and does not, as an alternative, include an interest component as required by law.

89.    The Determination Letter must be overruled.

**B.  If the Disallowance of Appreciation Is Sustained, Then Claimant's Net Equity must Be Credited With Appreciation from Transactions Which Took Place Prior To The Formation of BLMIS.**

90.     Upon information and belief, on or about December 4, 2000, BLMIS was formed as a domestic Limited Liability Company under the the laws of the State of New York.

91.    In this proceeding, the Trustee has been appointed by the Court to conduct a liquidation of BLMIS under and in accordance with the SIPA statute.

92.    Upon information and belief, in or about December 2000, Claimant's account at BLMIS was credited with deposits of securities and cash, as the starting principal deposit in Claimant's BLMIS account.

93.    The Trustee's Determination Letter purports to justify his denial of Claimant's Net Equity and SIPC advance claim based upon alleged transactions and events which preceded the formation of BLMIS.

94.    In doing so, the Trustee is acting beyond his lawful mandate which is limited to the liquidation under SIPA of BLMIS.

95.    By reason of the foregoing, the Trustee's Determination Letter is invalid and

Claimant's Net Equity claim under SIPA should be allowed in full, as filed.

**C.  If the Disallowance of Appreciation Is Sustained,
Then Claimant's Net Equity must Be Credited
With Taxes That Claimant Was Induced To Pay.**

96.    Claimant has reported and paid taxes on the income reported to have been earned in Claimant's Madoff and BLMIS accounts.

97.    According to the Trustee, however, there were no actual profits or income and no taxes should have required to be paid by Claimant.

98.    Madoff and BLMIS caused and induced Claimant to report said income and profits on Claimant's tax returns and to pay taxes thereon based on the written information provided to Claimant and to the Taxing authorities by Madoff and BLMIS.

99.    Even under the Trustee's CICO methodology, if there were actual profits and income generated for Claimant's account, that income and those profits should be allowed as actual principal deposits to the account.

100.    If, arguendo, all such reported income and profits were fictitious, Claimant is entitled to have the principal of Claimant's account credited with the taxes Claimant was wrongfully induced to pay based on the reported Madoff and BLMIS income and profits as damages proximately caused by the fraud of Madoff and BLMIS.

101.    By reason of the foregoing, even under the CICO method, Claimant's Net Equity must be increased to reflect (i) actual profits and income for Claimant's account; and (ii) taxes paid by Claimant with respect to any reported profits and income found to have been fictitious or otherwise not now credited to Claimant's account.

**D.  There Were Actual Securities Transactions**

21

**Which Produced Actual Profits Which the Trustee's
Determination Letter Does Not Properly Credit to Claimant**

102.    Although the Determination Letter asserts that "no securities were ever purchased by BLMIS for [Claimat's] account," upon information and belief, BLMIS and Madoff's previous investment operations did, in fact, purchase securities and generate profits both as a general matter and specifically for the customer's accounts such as Claimant's.[6]

103.    Whether under the Trustee's improper CICO method or otherwise, Claimant is entitled to be credited for the profits generated for its account as well as a fair and equitable share of the profits generated by BLMIS and Madoff's previous investment operations generally.

104.    By reason of the foregoing, even under the CICO method, Claimant's Net Equity must be increased to reflect (i) actual profits and income directly for Claimant's account as well as a fair and equitable share of the other profits generated by BLMIS and Madoff's previous investment operations generally.

---

[6]    Given the fiduciary obligations owed by the Trustee to the Madoff customer/victims, the Trustee has a duty to make full and complete disclosure of relevant facts. To the extent that, as appears, there were securities transactions and profits, the Trustee's non-disclosures and misleading claims with respect thereto constitute a further breach of his fiduciary duties.

## NINTH OBJECTION

### THE DETERMINATION LETTER DISALLOWANCES FAIL TO GIVE EFFECT TO THE REASONABLE EXPECTATIONS OF CUSTOMERS, AS SIPA REQUIRES, AND THE NET EQUITY DEFINITION IT UTILIZES WOULD RESULT IN A DRASTIC LOSS OF INVESTOR CONFIDENCE IN THE MARKETS, AGAIN IN VIOLATION OF SIPA'S STATED GOALS AND PURPOSES

105.    The primary purposes of Congress in enacting SIPA was to (a) protect customers and give effect to their reasonable expectations, and (b) foster investor confidence in the securities markets.

106.    A customer's reasonable expectations is that the customer receive what the customer has been told is in the customer accounts based on transaction confirmations and account statements.

107.    As noted above, Claimant received trade confirmations and monthly account statements throughout the Account Period for the various transactions set forth in Claimant's BLMIS account.

108.    Claimant reasonably believed that Claimant's BLMIS account statement properly reflected what Claimant had on deposit in its account with BLMIS, that said property was Claimant's, and that Claimant was entitled to withdraw and use that property as Claimant's own, without restrictions or potential recapture.

109.    The Trustee's flawed Net Equity definition frustrates the customers reasonable expectations and promotes distrust by investors in the public securities markets.

110.    Thus the Trustee's definition of Net Equity violates the clear and express public policy interests that SIPA was designed to promote.

23

111.    Accordingly, the Trustee's definition of Net Equity, and the Determination Letter implementing that definition,  should be rejected as erroneous and  in conflict with the SIPA statute.

**TENTH OBJECTION**

**THE DEFINITION OF NET EQUITY USED IN
THE DETERMINATION LETTER TO DISALLOW THE
CLAIM VIOLATES SIPA'S STATED PURPOSE TO
GIVE PREFERENCE TO THE BROKER'S CUSTOMERS
OVER GENERAL NON-CUSTOMER CREDITORS**

112.    The Trustee's Net Equity definition also results in a reduced Net Equity allowance for substantial numbers of BLMIS customers, thus reducing the aggregate net equity of the BLMIS customer class.

113.    SIPA specifically provides that the customers of a failed broker-dealer are entitled to a statutory preference over general non-customer creditors of the debtor and their allowed Net equity  must be paid in full before any payments are made to general non-customer creditors.

114.    By artificially reducing the aggregate net equity of the BLMIS customer class, the Trustee is violating that statutory preference thereby benefitting the general creditor class at the expense of the Customer class which SIPA was enacted to protect.

115.    The Determination Letter disallowing the Claim contributes to this improper failure to honor the statutory preference that the customers are to receive and, as a result, the disallowance of the Claim must be overruled.

**ELEVENTH OBJECTION**

**THE TRUSTEE OWES CLAIMANT AND OTHER BLMIS
CUSTOMERS A FIDUCIARY DUTY WHICH IS VIOLATED
BY THE TRUSTEE'S NET EQUITY ARGUMENT**

24

116.    As a fiduciary for BLMIS customers, including Claimant, the Trustee should be asserting positions that favor those to whom he owes a fiduciary duty - which in this circumstance means arguing for a definition of Net Equity that benefits the Customer class, not one that favors SIPC at the expense of the customers.

117.    Given the Trustee's fiduciary obligations, if there is a conflict or dispute between the Customers and SIPC, the Trustee is duty bound to make bona fide arguments that support the customer's contentions.  Here, however, the Trustee has adopted a definition that supports and benefits SIPC at the expense of the customer.

118.    Under the circumstances, Claimant: (a) objects to the Trustee adopting and implementing a definition of Net Equity which favors a third party like SIPC, at the expense of the Trustee's lawful fiduciaries; and (b) seeks a direction from the Court to the Trustee to discharge his duties under SIPA consistent with the fiduciary duties imposed on him by SIPA and by other applicable law.

## TWELFTH OBJECTION

## THE DETERMINATION LETTER AMOUNTS
## TO AN IMPROPER DISALLOWANCE
## UNDER THE BANKRUPTCY CODE

119.    The Trustee's action in reducing the amount set forth on Claimant's Claim by the Disallowed Deposit Adjustment as well as any gains and other profits set forth on Claimant's November 2008 Account Statement or on prior statements is an improper attempt to avoid such amounts without alleging any grounds for avoidance or proving that such gains are avoidable under the Bankruptcy Code's avoidance provisions.  As such, all of the disallowances are improper and unjustified and the Determination Letter and any associated disallowances should

25

be stricken.

## THIRTEENTH OBJECTION

## THE TRUSTEE HAS DEPRIVED CLAIMANT OF FACTUAL DISCOVERY NECESSARY TO ALLOW CLAIMANT TO DEMONSTRATE THAT THE CLAIM SHOULD NOT HAVE BEEN DENIED AND, INSTEAD, SHOULD HAVE BEEN ALLOWED IN FULL. CLAIMANT RESERVES THE RIGHT TO AMEND AND/OR SUPPLEMENT THE OBJECTIONS TO THE DETERMINATION LETTER FOLLOWING APPROPRIATE FACT DISCOVERY.

120.     Although almost 2 years have elapsed since the BLMIS SIPA liquidation

commenced, upon information and belief, the Trustee has failed and refused to provide

meaningful-or any-fact discovery.  This is particularly distressing and prejudicial to Claimant and

others similarly situated since the various transactions which allegedly form the basis for the

Determination Letter concern transactions now more than a decade old.  Claimant requires

discovery of the facts to allow Claimant properly to prepare for and litigate why the

Determination letter should be vacated and Claimant's Net Equity be determined in full, in

accordance with Claimant's previously filed SIPA Net Equity claim.

## RESERVATION OF RIGHTS

121.     Claimant reserves the right to revise, supplement or amend these Objections and

any failure to object on a particular ground or grounds should not be construed as a waiver of

Claimant's right to object on any additional ground.

122.     Claimant reserves all rights and remedies set forth under the Bankruptcy Code, the

Federal Rules of Bankruptcy Procedure, including, without limitation, all rights to discovery as

well as any other procedural and substantive rights, claims, defenses and/or remedies provided

for by any applicable federal and/or state laws, rules, statutes, cases and/or other authorities.

## CONCLUSION

The Determination Letter and the rejection of Claimant's SIPC claims contained therein should be rejected and overruled in all respects.  Claimant's Net Equity should be allowed in the amount set forth in Claimant's November 2008 account statement.  Claimant should receive a full $500,000 SIPC advance.  Claimant should be granted such other and further relief in favor of Claimant as to the Court appears just and proper.

Dated: November 16, 2010.

Bernfeld, Dematteo & Bernfeld, LLP


By:_____/s/_____
     David Bernfeld (0177)
     *Attorneys for Claimant Margrit Franitza (IRA)*
     600 Third Avenue
     New York, New York 10016
     (212) 661-1661

28