Richard J. McCord (RJM 3290)
Carol A. Glick (CAG 2675)
CERTILMAN BALIN ADLER & HYMAN, LLP
Attorneys for Morton Certilman and Joyce Certilman
90 Merrick Avenue
East Meadow, NY 11554
Telephone: (516) 296-7000
Facsimile: (516) 296-7111

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,

               Plaintiff,                   Adv. Pro. No. 08-01789 (BRL)

      v.                                SIPC Liquidation

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
               Defendant.
-----------------------------------------------------------X

## OBJECTION TO TRUSTEE'S DETERMINATION OF
## CLAIM OF JOYCE CERTILMAN

     Joyce Certilman, by and through her attorneys, Certilman Balin Adler & Hyman, LLP,

hereby object to the Notice of Trustee's Determination of Claim dated October 26, 2010

("Determination Letter"), as set forth herein.

### BACKGROUND

     1.     Joyce Certilman ("Mrs. Certilman") is a "customer," as defined by the Securities

Investor Protection Act ("SIPA"), of Bernard L. Madoff Investment Securities, LLC ("BLMIS").

     2.     In the 1970's, Morton L. Certilman and Joyce Certilman opened a joint account

with BLMIS with a substantial deposit, to which they periodically added funds over the years.

The account maintained by Mr. and Mrs. Certilman bears BLMIS Account No. 1-C1013-3-0 (the

"Certilman Joint Account"). Sometime thereafter, Mrs. Certilman opened an account with a

substantial initial deposit, to which she periodically added funds over the years. The account

1

maintained by Mrs. Certilman bears BLMIS Account No. 1-C1012-3-0 (the "Joyce Certilman Account"). Mrs. Certilman received an account statement for the Joyce Certilman Account for each and every month from inception through and including the account statement for the month ended November 30, 2008.

3.      Irving H. Picard, the Trustee for the Liquidation of BLMIS (the "Trustee or the "BLMIS Trustee") formerly sent a Notice of Trustee's Determination Letter dated April 28, 2010 ("Determination Letter") to Joyce Certilman with respect to the Certilman Joint Account, but did not address the Joyce Certilman Account in the Determination Letter.

4.      The Trustee has also served upon the Certilmans a Revised Determination Letter dated October 8, 2010 with respect to BLMIS Account No. 1-C1013-3-0 only,[1] which purportedly contains corrected deposit and withdrawal totals in the Certilman Joint Account. According to the Trustee's money in/money out analysis (as described hereafter), there was a negative balance in the Certilman Joint Account at the time the above-captioned liquidation proceeding was commenced against BLMIS.

5.      This Objection pertains solely to the Trustee's determination to deny the claim of Joyce Certilman with respect to the Joyce Certilman Account.

6.      The final BLMIS statement for the Joyce Certilman Account ("Final BLMIS Statement for Joyce Certilman Account") indicates that the total value of the account was $4,213,792.06 (including cash and securities) as of November 30, 2008. A copy of the Final BLMIS Statement for the Joyce Certilman Account is annexed hereto as **Exhibit A**.

7.      On December 11, 2008, the above-captioned liquidation proceeding was commenced against BLMIS pursuant to the Securities Investor Protection Act of 1970 ("SIPA").

---

[1] The Revised Determination Letter makes no reference whatsoever to BLMIS Account No. 1-C1012-3-0 in the name of Joyce Certilman.

2294798-1

See Order, *Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Dkt. No. 4]. Irving Picard was appointed BLMIS Trustee, charged with overseeing the liquidation of BMIS and processing customer claims for money pursuant to SIPA. *Id.*; 15 U.S.C. 78fff-1(a).

8.      On December 23, 2008, the Court issued an Order directing the BLMIS Trustee to disseminate notice and claim forms to BLMIS customers and setting forth claim-filing deadlines. *See* Order [Dkt. No. 12]. Upon information and belief, the BLMIS Trustee disseminated notice and claim forms to BLMIS's customers in accordance with the Court's Order.

9.      The December 23, 2008 Order further provided that, to the extent the BLMIS Trustee disagrees with the amount set forth on a customer claim form, the BLMIS Trustee "shall notify such claimant by mail of his determination that the claim is disallowed, in whole or in part, and *the reason therefor. . . .*" *See* Order at 6 (emphasis supplied) [Dkt. No. 12].

10.     On or about June 8, 2009, Mrs. Certilman timely submitted a Customer Claim and the Final BLMIS Statement with respect to the Joyce Certilman Account, which inadvertently misstated the account number as Account No. 1-C1013-4-0 instead of Account No. 1-1012-3-0. Said Customer Claim was designated by the BLMIS Trustee as Claim No. 009601.[2] With respect to the Joyce Certilman Account, Mrs. Certilman asserted a total claim in the amount of $4,213,792.06 06 (including 17,684.00[3] in money market funds and securities with a market value of $4,196,108.06), pursuant to the Final BLMIS Statement for Joyce Certilman Account.

---

[2] A Customer Claim for the Certilman Joint Account was submitted at the same time.

[3] This amount represents a *de minimus* position held in Fidelity Spartan U.S. Treasury Money Market Funds as of the date of the Final BLMIS Statement for Joyce Certilman Account, which is a securities account. It should be noted that these money market funds are listed as securities on page 4 of the Final BLMIS Statement for Joyce Certilman Account.

2294798-1

There was no cash balance or securities owed to BLMIS with respect to the Joyce Certilman Account as of November 30, 2010.

11.    On or about June 22, 2009, Mrs. Certilman resubmitted a duplicate Customer Claim with respect to the Joyce Certilman Account (Account No. 1-C1012-3-0), in order to correct the account number, together with another copy of the Final Statement for Joyce Certilman Account. The Trustee designated the new Customer Claim, together with Customer Claim No. 009601, as Claim No. 015646 (together, the "Combined Claim").

12.    On October 26, 2010, the BLMIS Trustee sent the Determination Letter, addressed to Joyce Certilman, denying the Combined Claims in its entirety. A copy of the Determination Letter is annexed hereto as **Exhibit B**.  In addition to denying the Combined Claim, the Determination Letter states that Mrs. Certilman is not entitled to payment because "no securities were ever purchased by BLMIS for your account"; "any and all profits reported to you by BLMIS on account statements were fictitious"; and "because you have withdrawn more than was deposited into your account, you do not have a positive 'net equity' in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding." *See* Determination Letter, at 2. The Determination Letter further states that written opposition to the BLMIS Trustee's determination is due within 30 days of October 26, 2010.

13.    Mrs. Certilman hereby objects to the Determination Letter for the reasons described below.

## GROUNDS FOR OBJECTION

### A. The Determination Letter is Factually Incorrect

14.    As stated above, Mr. and Mrs. Certilman had two separate accounts with BLMIS, for which separate claims were filed, each accompanied by its own Final BLMIS Statement. The

2294798-1

Determination Letter specifically states that the Trustee's determination of claim relates to Account No. 1C1012 only (Joyce Certilman Account). However, it appears that the BLMIS Trustee's determination is based on commingling deposits into, and withdrawals from, the Joyce Certilman Account and the Certilman Joint Account so that they appear to be being deposited into—and withdrawn from—only one account (the Joyce Certilman Account). The BLMIS Trustee's mistake indicates that he does not have complete records of all deposits into, and withdrawals from, the Joyce Certilman Account and the Certilman Joint Account.

15.    In addition, the BLMIS Trustee has not provided a complete list of all deposits made by Mrs. Certilman into the Joyce Certilman Account, as the schedule attached to the Determination Letter ("Trustee's Schedule") does not include any deposits made into the account during the 1970's, nor does it provide a complete list of deposits made into the account for the periods 1981-1986 and 1987-2008.

16.    Moreover, prior to 1988, the funds of Mr. and Mrs. Certilman were invested in regular BLMIS brokerage accounts that were part of BLMIS's legitimate brokerage business. Upon information and belief, prior to 1988, BLMIS (i) purchased real securities on behalf of the Certilmans, (ii) acted as custodian of their securities, and (iii) traded such securities for their accounts with institutional counterparties over live computer systems. The Certilmans also received confirmations of such trades from BLMIS and regular account statements. In connection with its legitimate brokerage business, BLMIS was regulated and held accountable by the clearing houses it used, the exchanges on which it traded, and the NASD and its successor, the Financial Industry Regulatory Authority. Any profits realized by Mrs. Certilman from trading in such accounts are not illusory and cannot be swept away by the BLMIS Trustee under the rubric of "fictitious" profits. *See* Revised Determination Letter, at 2. Instead, Mrs.

2294798-1

Certilman maintains that actual profits were available to fund securities purchases for her account.

17.     The BLMIS Trustee does not explain what happened to the real securities positions held in Mrs. Certilman's account prior to 1988. The BLMIS Trustee glosses over this matter by incorrectly stating in the Determination Letter: "No securities were ever purchased for your account." *See* Revised Determination Letter, at 1.

18.     The BLMIS Trustee arbitrarily determines that no securities were ever purchased for the account as far back as 1981, without providing any factual or evidentiary basis for this conclusion.

19.     Based on the foregoing, Mrs. Certilman is entitled to receive the statutory minimum payment of $500,000 of SIPC insurance in respect of the securities in the Joyce Certilman Account as set forth in the Final BLMIS Statement.

## B. The Determination Letter Fails to Comply with December 23, 2008 Order

20.     The Determination Letter fails to comply with this Court's December 23, 2008 Order, which directs the BLMIS Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's books and records" and authorizes the Trustee to satisfy "net equity" claims "out of funds made available to the Trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the Debtor available to satisfy such claims." Dec. 23, 2008 Order, at 5-6 [Dkt. No. 12]. The Combined Claim was accompanied by the Final BLMIS Statement showing money market funds and securities valued at $4,213,792.06 in the Joyce Certilman Account. The Final BLMIS Statement in respect of the Joyce Certilman Account is the best evidence of the amount owed based on the Debtor's books and records.

6

21.    The Final BLMIS Statement generated by Madoff is reflective of "the Debtor's books and records" by which the BLMIS Trustee is bound, absent proof that Mrs. Certilman did not have a "legitimate expectation" that the balance in her account statement represented her property.

22.    Based on periodic statements, credit advices, portfolio management reports, confirmations and other documents received from BLMIS over the years, Mrs. Certilman reasonably believed and had "legitimate expectations" that BLMIS executed the transactions reflected therein and that her account in fact held such securities.

23.    Throughout the period of existence of the accounts, Mrs. Certilman paid taxes annually and reported capital gains, dividends and interest income from the accounts, based on statements she received from BLMIS. Mrs. Certilman would not have paid those sums if she did not believe that the assets in the account belonged to her.

24.    The BLMIS Trustee has failed to state a basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3) (15th ed. 2008); *In re Enron Corp.* No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (S.D.N.Y. Jan. 13, 2003). In sum, the Determination Letter is inadequate to rebut the prima facie validity of the Combined Claim as provided in Section 502(a) of the Bankruptcy Code and Rule 3001(f) of the Federal Rules of Bankruptcy Procedure.

25.    The Determination Letter also fails to supply all supporting documentation for reaching the conclusions about the activity in the account, some of which is disputed. For

2294798-1

instance, the Trustee's Schedule lists a large number of purported dividend checks some of which Mrs. Certilman did not receive and withdrawals she may not have made. In other words, while the BLMIS Trustee has concluded that the Final BLMIS Statement reflects fictitious profits, he offers no support for what are likely fictitious disbursements. This calls into question the integrity of the records upon which the Trustee relied in making his determination.

26.    Based on the foregoing, the Combined Claim should be allowed in full as reflected in the Final BLMIS Statement.

## C. Trustee's Methodology Violates Legitimate Expectations of BLMIS Customers

27.    The BLMIS Trustee has violated SIPA's requirement that he honor a customer's legitimate expectations of receiving what was in his or her account at the time of the broker-dealer's cessation of business.

28.    On December 30, 1970, when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms…. Just as the Federal Deposit Insurance Corporation protects the user of banking services form the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid+2870.

29.    The parties agree that BLMIS was a registered broker-dealer with the SEC under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 780(b) as of January 1960. By virtue of its registration as a broker-dealer, BLMIS is a member of SIPC.

2294798-1

30.     On December 11, 2008, Bernard L. Madoff ("Madoff") was arrested by the FBI and charged with securities fraud.  It is undisputed that Madoff pled guilty to fraud and was sentenced to imprisonment.

31.     The BLMIS Trustee and SIPC concede that BLMIS prepared, and customers were sent, regular statements and confirmations based on the actual trading records of real (existing) securities purported in each customer's account.  It is irrelevant from the perspective of SIPA, the rules promulgated thereunder and relevant agency interpretation and case law that the securities never existed.

32.     Nothing in the SIPA statutory framework supports the BLMIS Trustee's definition of net equity.

33.     SIPA established a not-for-profit corporation, the Securities Investor Protection Corporation ("SIPC"), the members of which are the domestic registered brokers or dealers, each of whom is assessed a fee to create a fund (the "SIPC Fund").  15 U.S.C. §§ 78ccc(a)(2); 78ddd(a)(1) and (c).  The SIPC Fund provides a certain amount of coverage (set by statute) for customer losses in the event that the property of a failed broker is inadequate or not readily available to satisfy customer claims.  15 U.S.C. § 78fff-3.

34.     The purpose of this liquidation proceeding, which was brought pursuant to SIPA, is to either (a) deliver to the customers the securities held in their name, or (b) distribute customer property and (in advance thereof or concurrently therewith) otherwise satisfy net equity claims of customers.  15 U.S.C. § 78fff.

35.     SIPA defines a customer's net equity claim, without reference to fraud or financial failure of the broker, as the value of the customer's "securities positions" in the

2294798-1

customer's account on the filing date, less any amount the customer owes the debtor, as of the date of the filing of the SIPA liquidation.[4] 15 U.S.C. § 78lll(11).

36.    Nothing in the statutory framework of SIPA authorizes the BLMIS Trustee to calculate net equity based on the aggregate amount of the customer's investment, less the aggregate amount of the customer's withdrawals.  Furthermore, nothing in the statute limits its application, as the BLMIS Trustee and SIPC imply, to financially failed broker-dealers.

37.    The Rules promulgated under SIPA base the determination of whether a customer claim is treated as one for cash or for securities, not on what is actually in the account, but rather on the written confirmations sent to the customer on whose behalf the securities were bought or sold.  17 C.F.R. § 300.502(a)(1).

38.    Pursuant to section 78fff-2(b), the BLMIS Trustee is charged with promptly discharging "all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash," by delivering securities or making payments "to or for the account of a customer . . . insofar as such obligations are ascertainable from the books and records of the debtor or otherwise established to the satisfaction of the trustee."    15 U.S.C. § 78fff-2(b). Based on a tortured reading of this section of the statute, the BLMIS Trustee has determined to test the validity of every transaction in a customer's account rather than to stop his investigation

---

[4] The definition of "net equity" set forth in SIPA, and the methodology for calculating same, are as follows:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by—
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customers . . . ; minus
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

15 U.S.C. § 78lll(11).

2294798-1

at the point of the Final BLMIS Statement, which lists the securities and their market value purportedly in the account.

39.    The Senate Committee report in respect of the 1978 amendments to SIPA clearly indicates that Congress's intent in enacting the legislation was to protect the legitimate expectations of customers even in cases, like the one here, where there has been significant fraud and the securities never existed.[5]

40.    Similarly, the House Report issued in connection with the amendment of SIPA acknowledges that the purpose of the amended legislation was to make SIPA "more responsible to the reasonable expectations of public investors. . . ."[6]

41.    In addition, the SIPC's own policy and practices, as reflected in the *New Times Securities, Inc. ("New Times")* SIPA liquidation, is that if broker-dealer customers have been led to believe that "real existing" securities had been purchased for their accounts, then those customers are entitled to the full value of their securities positions as of the filing date, even if

---

[5] The Senate Committee report commented upon the purposes of the legislation as follows:

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account . . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations. . . .

S. Rep. No. 95-763, at 2, 95th Cong. 1st Sess. (1978) (emphasis supplied).

[6] The House Report states:

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account.... By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy customers' legitimate expectations. . . .

H.R. Report No. 95-746 at 23; 95th Cong. 1st Sess. (1978) (emphasis supplied).

2294798-1

that value represents a substantial increase from the purported purchase price of the securities and even if the securities have never been purchased. *See In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 74 (2d Cir. 2006) (holding that defrauded investors who mistakenly believed they held real existing securities were entitled to SIPC advances because the information that they received on their account statements mirrored what would have happened had the given transaction been executed).

42.    The position taken by the BLMIS Trustee is contradicted not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press in connection with the BJMIS liquidation on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his/her account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html

43.    Notwithstanding all of the foregoing, the BLMIS Trustee and SIPC have reconstructed the SIPA statutory scheme to support a calculation of net equity based on the "cash in-cash out" transactions of each customer.

44.    The BLMIS Trustee's methodology for determining net equity was adopted by this Court in its decision dated March 1, 2010 ("Net Equity Decision"), and the Court memorialized the Net Equity Decision by Order dated March 8, 2010 ("Net Equity Order").

2294798-1

45.    On March 8, 2010, pursuant to 28 U.S.C. § 158(d)(2), this Court certified the Net Equity Order for immediate appeal to the Second Circuit Court of Appeal. The Second Circuit has not yet made any determination as to whether the Trustee is correct in his interpretation of "net equity" and its corresponding application to the determination of customer claims.

46     This Court's December 23, 2008 Order directs the BLMIS Trustee to satisfy customer claims and deliver securities in accordance "with the Debtor's books and records," thus satisfying the legitimate expectations of the Certilmans pursuant to the express provisions of SIPA, the Second Circuit case law interpreting SIPA, the legislative history of the statute, and the pronouncements of SIPC's general counsel in December 2008 regarding SIPC's mandate to make distributions to customers based on their account statements. Nonetheless, the BLMIS Trustee has denied the Combined Claim. In view of the foregoing, Mrs. Certilman submits this Objection to the Revised Determination Letter so as to preserve all her rights in respect of her claims, pending a determination of the appeal by the Second Circuit or any higher and/or subsequent appellate tribunal.

**D.  Trustee's Definition of "Net Equity" Has No Basis Under SIPA or Relevant Case Law**

47.    The definition of "net equity" set forth in SIPA, and the methodology for calculating same, are as follows:

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by—
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customers . . . ; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . . .

15 U.S.C. § 78lll(11).

48.    SIPC was created pursuant to 15 U.S.C. § 78ccc, which also sets forth its powers.

49.    Section 78ccc(b)(4)(A) expressly prohibits SIPC from changing the definition of

"net equity" set forth in Section 78lll(11).[7]

50.    The Second Circuit has recognized that:

> Each customer's 'net equity' is the 'dollar amount of the account
> or accounts of a customer, to be determined by calculating the sum
> which would have been owed by the debtor to such customer if the
> debtor had liquidated, by sale or purchase on the filing date, all
> securities positions of such customer' [corrected for] any
> indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities, Inc.*, 371 F.3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman*

*Clearing Corp.*, 247 B.R. 51, 62 n.2 (Bankr. S.D.N.Y. 1999) ("'Net equity' is calculated as the

difference between what the debtor owes the customer and what the customer owes the debtor on

the date the SIPA proceeding is filed").

51.    Notwithstanding his duty to carry out the provisions of SIPA, the BLMIS Trustee

has created his own definition of "net equity."  He has asserted that he can recognize customers'

claims on a "cash in-cash out" basis, without recognizing any interest that may be due to

BLMIS's customers.  By this procedure, the BLMIS Trustee would avoid paying SIPC insurance

---

[7]  SIPA Section 78ccc(b)(4)(A) states as follows:

> (b) Powers
>
> In addition to the powers granted to SIPC elsewhere in this chapter, SIPC shall
> have the power--
>
> (4) to adopt, amend, and repeal, by its Board of Directors, such rules as may be
> necessary or appropriate to carry out the purposes of this chapter, including rules
> relating to--
>
> (A) the definition of terms used in this chapter, other than those terms for which
> a definition is provided in section 78lll of this title . . . .

15 U.S.C. § 78ccc(b)(4)(A).

2294798-1

to the thousands of elderly, long-term Madoff investors who have depended on their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thereby increasing SIPC's subrogation claim for reimbursement of the insurance that it pays to customers.

52.    In part, the Court justifies the adoption of the BLMIS Trustee's definition of "net equity" and his methodology for determining customer claims by stating:

> Compensating Madoff investors on the basis of fictional account statements leads to . . . inequality as it enables the thief to dictate who receives a larger proportion of the assets collected by the Trustee. Madoff should not be entitled to award, to equally deserving clients, higher and lower returns based solely on his whim.

Net Equity Decision, at 33, n. 38. Likewise, the BLMIS Trustee and SIPC should not be able to disregard on a whim SIPA's mandate to compensate investors based on their legitimate expectations of receiving the amounts set forth in their Final BLMIS Statements upon BLMIS's cessation of business. The result is to deprive more than 8,000 totally innocent investors of their statutory minimum payment of $500,000 in SIPC insurance.

53.    Mrs. Certilman, like thousands of other investors, received monthly account statements from BLMIS for more than thirty years indicating returns on her BLMIS investment in the range of 9% - 11% per year. She had entered into standard brokerage agreements with BLMIS, a licensed SEC-regulated broker-dealer, pursuant to which her account had a specific number; she received on a monthly basis trade confirmations for every securities transaction in her accounts, which set forth the names and prices of securities indicating the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis to claim that Mrs. Certilman did not have a "legitimate expectation" that the assets reflected on the

2294798-1

account statements sent to her BLMIS belonged to her.  Thus, Mrs. Certilman is entitled to a claim for securities as reflected in the Final BLMIS Statement.

### E.  Mrs. Certilman is Entitled to Interest on Account Balances Under New York Law

54.    Under New York law, which is applicable here, funds deposited with BLMIS are entitled to interest.  *See, e.g.*, N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq*. Moreover, since BLMIS converted Mrs. Certilman's funds, that fact also entitles her to prejudgment interest.  *See, e.g. Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest"); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

55.    The Trustee's Schedule reflects that between May 8, 1981 and September 8, 2008, Mrs. Certilman deposited $4,905,559.26 (before adjustments) in the Joyce Certilman Account at BLMIS.[8]  However, the BLMIS Trustee has not given Mrs. Certilman credit for the not insubstantial amount of interest which would have accrued in the account during said thirty year period.

56.    In the Net Equity Decision, the Court found that, "[a]lthough customer account statements reflected trading activity, funds were merely deposited into a bank account at J.P. Morgan Chase Manhattan Bank ('Chase Bank') . . . (the "703 Account"), and never invested." Net Equity Decision, at 12.

57.    To the extent that the funds invested by Mrs. Certilman in BLMIS were deposited into the 703 Account, they earned interest while on deposit.

---

[8] The BLMIS Trustee does not give Mrs. Certilman credit for all deposits made in the Joyce Certilman  Account, as the Trustee's Schedule does not include any deposits made in the account in the 1970's and  the BLMIS Trustee has not included a complete list of deposits into said account for the periods 1981-1986 and 1987-2008.

2294798-1

58.    The BLMIS Trustee's decision to omit any credit for interest impacts on the "cash in-cash out" method of determining the amount of customer claims, especially in view of the BLMIS Trustee's intention to "claw back" the amount by which investor withdrawals exceeded investor deposits in their accounts.

59.    It is unlawful and inequitable for the BLMIS Trustee to completely disregard the interest component in the calculation of Mrs. Certilman's claim.

60.    As this Court has stated in the Net Equity Decision: "It would be simply absurd to credit the fraud and legitimize the phantom world created by Madoff when determining Net Equity." Net Equity Decision, at 30. However, if the BLMIS Trustee were permitted to rely "solely on unmanipulated withdrawals and deposits" without crediting customers for accrued interest on the funds actually deposited and withdrawn from the account, the BLMIS Trustee would be granting to Madoff the right "to arbitrarily decide who wins and who loses." *See* Net Equity Decision, at 30-31.

61.    Clearly, the funds in the Joyce Certilman Account constituted legal tender which was utilized by BLMIS for its own purposes and for which use Mrs. Certilman is entitled to be compensated by the payment of interest.

62.    Based on the foregoing, Mrs. Certilman objects to the BLMIS Trustee's position that she received $14,055,138.01 more than she was entitled to, based on the "cash in-cash out" methodology employed by the BLMIS Trustee, and respectfully submits that the Determination Letter does not reflect any credit for interest that should have accrued on the funds in the Joyce Certilman Account during the years said account was in existence.

**F.    Trustee Has Used Bankruptcy Code's Avoidance Powers Solely For SIPC's Benefit**

2294798-1

63.    The BLMIS Trustee has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit.  There is no authority in SIPA or the Bankruptcy Code for the BLMIS Trustee to utilize the avoidance powers of a trustee to enrich SIPC at the expense of investors. As the legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear, the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors.  *See* 5 Collier on Bankruptcy ¶ 547.01 (15th ed. 2008); *In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (Bankr. S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.  Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally").

64.    A payment made to Mrs. Certilman based on the Final BLMIS Statement will not deny payments to another customer, as initial payments of $500,000 come from the SIPC Fund, not from customer property or the bankruptcy estate.

65.    SIPC is a third party insurer with an absolute obligation to replace securities in a customer's account if the broker-dealer has sent written confirmation of the securities transactions to the customer.[9]  That SIPC obligation is completely separate from each customer's

---

[9] "Where the Debtor held cash in an account for a customer, the customer has a 'claim for securities' with respect to any authorized securities purchase *[i]f the Debtor has sent written confirmation to the customer* that the securities in question have been purchased for or sold to the customer's account."  17 C.F.R. § 300.502(a) (emphasis supplied). Essentially, the customer's receipt of confirmation, not the debtor's performance, is controlling for the purpose of SIPC advances.

2294798-1

share of estate property, and the payment by SIPC of insurance to each customer in no way reduces estate property.

66.    The SIPC Fund, which is financed by member assessments, is meant to provide the means for SIPC to make prompt advances to cover up to $500,000 of customer losses in the event that the property of a failed broker (honest or dishonest) is inadequate to satisfy customer claims. SIPC has authority to obtain more financing from Congress.

67.    The BLMIS Trustee's actions here do not further the stated purposes of a trustee's avoidance powers, but, rather, enable SIPC to avoid its statutory mandate to promptly replace a customer's securities. Simply put, an insurance advance of $500,000 is payable on account of the Joyce Certilman Account. The Trustee's actions in support of SIPC have deprived Mrs. Certilman, a BLMIS account holder, of insurance advances to which she is statutorily entitled.

## G. Trustee's Calculation of "Net Equity" Has No Evidentiary Support

68.    The Determination Letter purports to calculate the "net equity" in the Joyce Certilman Account on the basis of incomplete records.

69.    Based on the facts and circumstances set forth herein, the BLMIS Trustee should be required to prove all alleged withdrawal transactions by furnishing the appropriate records to Mrs. Certilman and, absent such records, such transactions should be deleted from the calculation of "net equity."

70.    By the same token, the BLMIS Trustee should be required to prove that all deposit transactions in the Joyce Certilman Account are accurately listed by furnishing complete records to Mrs. Certilman.

### RELIEF REQUESTED

71.    For the reasons stated herein, the Combined Claim should be allowed in its entirety.

72.    For the reasons stated herein, the Court should direct SIPC to issue immediate payment on account of the Joyce Certilman Account in the amount of $500,000.

73.    The BLMIS Trustee's determination amounts to an improper disallowance of a claim that has prima facie validity. *See* Bankruptcy Code Section 502(a). The BLMIS Trustee has offered no factual or legal basis for his determination. The BLMIS Trustee's Determination Letter, and the determinations contained therein, should be stricken, or alternatively, the BLMIS Trustee should describe his position in detail, including all relevant facts, legal theories and legal authorities. Upon the filing of such a statement, this matter will be a contested proceeding under Rule 9104 of the Federal Rules of Bankruptcy Procedure and Mrs. Certilman will file a response.

74.    Mrs. Certilman requests copies of any and all documents relating to her customer account(s).

75.    Mrs. Certilman requests such other, further and related relief as may be just, proper and equitable.

## CONCLUSION

76.    Mrs. Certilman reserves the right to revise, supplement or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of her right to object on any additional grounds.

77.    Mrs. Certilman reserves all rights set forth in Rule 9014 of the Federal Rules of Bankruptcy Procedure, including, without limitation, rights of discovery.

2294798-1

78.    Mrs. Certilman reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

79.    Mrs. Certilman incorporates by reference all reservations of rights set forth in the Combined Claim and any supplements thereto.

Dated:  East Meadow, New York
        November 24, 2010

CERTILMAN BALIN ADLER & HYMAN, LLP
Attorneys for Joyce Certilman

By:    /s/ Richard J. McCord
       Richard J. McCord, Esq. (RJM 3290)
       Carol A. Glick, Esq. (CAG 2675)
       90 Merrick Avenue
       East Meadow, New York 11554
       (516) 296-7000

2294798-1