179420

Jerome Reisman (JR-0933)
**REISMAN, PEIREZ & REISMAN, L.L.P.**
1305 Franklin Avenue
PO Box 119
Garden City, New York 11530
JReisman@reismanpeirez.com
Attorneys for NTC & Co. FBO Judith W. Bailey IRA Plan as a
Limited Partner of Peerstate Equity Fund LP

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
SECURITIES INVESTOR PROTECTION
CORPORATION,

                              Plaintiffs,

                                                    Adv. Pro. No. 08-01789 (BRL)

VS.

BERNARD L. MADOFF INVESTMENT                  **OBJECTION TO TRUSTEE'S**
SECURITIES LLC,                               **DETERMINATION OF**
                              Defendant.          **CLAIM**
--------------------------------------------------------X

        NTC & Co. FBO Judith W. Bailey IRA Plan ("NTC"), as a Limited Partner

of The Peerstate Equity Fund L.P. (the "Fund"), hereby objects to the Notice of Trustee's

Determination of Claim dated November 5, 2010 and states as follows:

                          **Background Facts**

        1.      The Fund was formed pursuant to a written agreement for the

purpose of enabling participants to invest in securities through Bernard L. Madoff

Investment Securities LLC ("Madoff").

179420

2.    On October 29, 1996, the Fund opened an account with Madoff bearing Account No. 1ZB295 (the "Account").

3.    NTC established and maintained account no. 3112 with the Fund and thereby became a limited partner of, and participant in, the Fund.

4.    NTC deposited money with the Fund for the express purpose of purchasing securities from Madoff.

5.    As of December 11, 2008, the Account held securities with a value of $329,084.59 on behalf of NTC.

6.    NTC filed a SIPC claim in the amount of $329,084.59, representing the December 11, 2008 balance in the Account.

7.    By letter dated November 5, 2010, Picard rejected NTC's claim on the theory that there was no Madoff account in its name. See, e.g., Exh. A.

### Grounds for Objection

**A.    NTC is a "Customer" under
SIPA Entitled to Receive up to $500,000 in SIPC Insurance**

8.    NTC is a "customer" under the plain definition of "customer" in SIPA. Thus, NTC is entitled to receive $329,084.59 in SIPC insurance based upon its statutory right to receive up to $500,000 in SIPC insurance. 15 U.S.C. § 78111(2) ("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities."). *Rosenman Family, LLC v. Picard*, 401 B.R. 629, 635 (B.S.D.N.Y. 2009)("the mere act of entrusting . . . cash to the debtor for the purpose of effecting securities transactions . . . triggers customer status. . ."); *SEC v. Ambassador*

- 2 -

179420

*Church Financial Devel. Group, Inc.*, 679 F. 2d 608, 614 (6th Cir. 1982); *In re Primeline*

*Sec. Corp.*, 295 F. 3d 1100, 1107 (10th Cir. 2002)("SIPA does . . . protect claimants who

try to attempt to invest through their brokerage firm but are defrauded by dishonest

brokers . . . If a claimant intended to have the brokerage purchase securities on the

claimant's behalf and reasonably followed the broker's instructions regarding payment,

the claimant is a 'customer' under SIPA even if the brokerage or its agents

misappropriate the funds"); *Miller v. DeQuine (In re Stratton Oakmont, Inc.)*, 2003 WL

22698876 at *3 (S.D.N.Y. Nov. 14, 2003)("Stratton Oakmont's conversion of Claimants'

property makes the customers within the meaning of SIPA.").

        9.     Clearly, if Congress had intended to limit customers to account

holders the definition of customer could have been six words: "A "customer" is an

account holder." Instead, Congress' definition of "customer" is 20 lines long and is

further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or

broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall

be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any

customer who is a broker or dealer or bank, other than to the extent that it shall be

established . . . that the net equity claim of such broker or dealer or bank against the

debtor arose out of transactions for customers of such broker or dealer or bank . . . , in

which event each such customer of such broker or dealer or bank shall be deemed a

separate customer of the debtor")(emphasis added).

179420

10.    Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of NTC because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight*, 389 U.S. 332 (1967).

11.    Moreover, it is clear that Congress intended for "customer" to be broadly interpreted. In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. Section 7(d)(June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (Aug.4, 1969). The final bill dropped this restriction.

**B.    Picard Has Failed to Comply with the
Court's December 23, 2008 Order**

12.    The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff, from which the December 11, 2008 account statement issued by the Fund to NTC was directly derived, is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that NTC did not have a "legitimate expectation" that the balance on the Account statement represented its property. In fact, in each year of the investment, NTC

- 4 -

179420

paid short term capital gains tax on the appreciation in the Account. It would not have

done so if it had any belief whatsoever that the assets in the Account did not belong to it.

13.    Picard has failed to state a basis in the Determination Letter for the

position he has taken. Thus, he has not complied with the requirement that an "objection

to a claim should . . . meet the [pleading] standards of an answer. It should make clear

which facts are disputed; it should allege facts necessary to affirmative defenses; and it

should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶

3007.01(3)(15th ed.); *In re Enron Corp.*, No. 0116034, 2003 Bankr. LEXIS 2261, at *

(B.S.D.N.Y. Jan. 13, 2003).

### C.    Picard Has Violated the Requirement that He Honor a Customer's "Legitimate Expectations"

14.    The legislative history of SIPA makes clear that Congress' intent

was to protect a customer's "legitimate expectations." For example, Congressman Robert

Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure
> under the 1970 Act, to be remedied by [the 1978
> amendments] is the failure to meet legitimate customer
> expectations of receiving what was in their account at
> the time of their broker's insolvency.

> \*    \*    \*

> A customer generally expects to receive what he
> believes is in his account at the time the stockbroker
> ceases business. But because securities may have been
> lost, improperly hypothecated, misappropriated, never
> purchased, or even stolen, this is not always possible.
> Accordingly, [when this is not possible, customers]
> will receive cash based on the market value as of the
> filing date.

- 5 -

179420

H.R. Rep. 95-746 at 21.

15.    SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to

SIPA, provide for the classification of claims in accordance with the "legitimate

expectations" of a customer based upon the written transaction confirmations sent by the

broker-dealer to the customer.

16.    Thus, SIPC is statutorily bound to honor a customer's "legitimate

expectations." This was acknowledged by SIPC in a brief it submitted to the Second

Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the

legitimate expectations of investors, even where the broker never purchased the

securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on
> the filing date are controlling even where inconsistent
> with transaction reality. Thus, for example, **where a**
> **claimant orders a securities purchase and receives a**
> **written confirmation statement reflecting that**
> **purchase, the claimant generally has a reasonable**
> **expectation that he or she holds the securities**
> **identified in the confirmation and therefore**
> **generally is entitled to recover those securities**
> **(within the limits imposed by SIPA), even where the**
> **purchase never actually occurred and the debtor**
> **instead converted the cash deposited by the**
> **claimant to fund that purchase . . . [T]his emphasis**
> on reasonable and legitimate claimant expectations
> frequently yields much greater 'customer' protection
> than would be the case if transaction reality, not
> claimant expectations, were controlling, as this Court's
> earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing New Times)(emphasis added).

179420

17.    Picard's position in the Madoff case is contradicted, not only by

SIPC's prior treatment of customers in the New Times case, but also by a statement that

SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008

wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in

his account:

> Based on a conversation with the SIPC general
> counsel, Josephine Wang, if clients were presented
> statements and had reason to believe that the securities
> were in fact owned, the SIPC will be required to buy
> these securities in the open market to make the
> customer whole up to $500K each. So if Madoff client
> number 1234 was given a statement showing they
> owned 1000 GOOG shares, even if a transaction never
> took place, the SIPC has to buy and replace the 1000
> GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.govdtp/alert/2008-37.html.

18.    As indicated *infra*, in the New Times case, SIPC voluntarily

recognized its obligation under SIPA to pay customers up to $500,000 based on their

final brokerage statement, inclusive of appreciation in their accounts, despite the fact that

the broker had operated a Ponzi scheme for a period of approximately 17 years and had

never purchased the securities reflected on the customers' monthly statements. In fact,

SIPC's president, Stephen Harbeck, assured the New Times bankruptcy court that

customers would receive securities up to $500,000 including the appreciation in their

accounts.

> HARBECK: . . . if you file within sixty days, you'll
> get the securities, without question. Whether – if they
> triple in value, you'll get the securities . . . Even if
> they're not there.

179420

> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted,
> converted – HARBECK: And the securities were never
> purchased. COURT: Okay.
>
> HARBECK: And if those positions triple we will
> gladly give the people their securities positions.

Tr. at 37-39, *In re New Times Securities Services, Inc.*, No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

### D.   Without Legal Authority, Picard Has Invented His Own Definition of "Net Equity"

19.   SIPA defines "net equity" as the value of the securities positions in

the customer's account as of the SIPA filing date, less any amount the customer owes the

debtor.

> The term 'net equity' means the dollar amount of the
> account or accounts of a customer, to be determined by
> –
>
> (A) calculating the sum which would have been owed
> by the debtor to such customer if the debtor had
> liquidated, by sale or purchase on the filing date, all
> securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on
> the filing date . . . 15 U.S.C. § 78111(11).

20.   SIPA specifically prohibits SIPC from changing the definition of

"net equity." 15 U.S.C. § 78ccc(b)(4)(A).

- 8 -

179420

21.    The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of
> the account or accounts of a customer, to be
> determined by calculating the sum which would have
> been owed by the debtor to such customer if the debtor
> had liquidated, by sale or purchase on the filing date,
> all securities positions of such customer" [corrected
> for] any indebtedness of such customer to the debtor
> on the filing date.

*In re New Times Securities Services, Inc.*, 371 F. 3d 68, 72 (2d Cir. 2004); *see also In re*

*Adler Coleman Clearing Corp.*, 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is

calculated as the difference between what the debtor owes the customer and what the

customer owes the debtor on the date the SIPA proceeding is filed.").

22.    In derogation of his obligations to carry out the provisions of SIPA,

Picard has created his own definition of "net equity." Picard has asserted that he has a

right to recognize investors' claims only for the amount of their net investment,

disregarding all appreciation in their accounts. By this procedure, Picard would avoid

paying SIPC insurance to the thousands of elderly, long-term Madoff investors who have

depended upon their Madoff investments for their daily living expenses. He also would

be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation

claim for reimbursement of the insurance it does pay to customers.

23.    Stephen Harbeck, the President of SIPC, justifies this conduct by

claiming that:

> Using the final statements created by Mr. Madoff as
> the sole criteria for what a claimant is owed
> perpetuates the Ponzi Scheme. It allows the thief . . .

- 9 -

179420

> Mr. Madoff . . . to determine who receives a larger
> proportion of the assets collected by the Trustee.

24.    Harbeck's statement is a rationalization of what appears to be
SIPC's goal, i.e., to save money for the brokerage community at the expense of innocent
investors who relied upon the SEC's competence and integrity in investigating Madoff
seven times over an 11-year period.

25.    After 23 months of his tenure, Picard has identified only two Madoff
investors who might not have had a "legitimate expectation" that the trade confirmations
and account statements they received were accurate. Picard has sued two Madoff
customers, Stanley Chais and Jeffry Picower who, Picard has alleged, took out of Madoff
$8.2 billion more than they invested. Picard has further alleged that these two investors
received returns in their accounts of 100 – 400% and that Madoff back-dated $100
million losses in their accounts. Assuming these allegations are true, Chais and Picower
were Madoff's co-conspirators and certainly could not have had a "legitimate
expectation" that their accounts were genuine.

26.    However, the fact that a few out of more than 8,000 Madoff
investors may have been Madoff's co-conspirators does not justify SIPC's depriving the
more than 8,000 remaining, totally innocent investors of their statutory maximum
payment of $500,000 in SIPC insurance.

27.    NTC, like thousands of other investors, received monthly statements
from Madoff, through the Fund, indicating returns on its Madoff investment in the range
of 9 – 20% per year, subject to short term capital gains tax rates. The Fund had entered

into standard brokerage agreements with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Fund had a specified, numbered account for the purchase and sale of securities; it received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. Based directly upon such monthly statements and trade confirmations, the Fund generated and distributed to NTC monthly statements reflecting the trade activity and account balance of its Madoff investments. NTC paid Federal and State taxes on the annual growth of the investments with Madoff. There is no basis to claim that NTC did not have a "legitimate expectation" that the assets reflected on the Fund's statements, which were derived directly from the Madoff statements, belonged to it.

28.     Thus, NTC is entitled to a claim for $329,084.59, the December 11, 2008 balance on the Account as dictated by the Madoff statement.

### E.    NTC Is Entitled to Prejudgment Interest on its Investment and Profits

29.     At a minimum, under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.*, N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted NTC's money, it is also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest");

- 11 -

179420

*Eighteen Holding Corp. v. Drizin*, 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding

prejudgment interest on claims for unjust enrichment and conversion).

30.    Although it is not legally relevant, Picard cannot prove that Madoff

earned no money on NTC's investments. To the extent the funds were deposited into a

bank, they earned interest while on deposit. Madoff disbursed customer funds to favored

customers, to family members, and for other purposes. Those funds may have yielded

substantial profits to which NTC is entitled once the ultimate recipients of Madoff's

thievery are known.

31.    In a Ponzi scheme, out of pocket damages are an improper and

inadequate remedy. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where

a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited

to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL

2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same

argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery

because they already had withdrawn more than they had invested. The Sixth Circuit

rejected that argument because, as the court explained, the plaintiffs gave $21 million to

Lehman, not to hide under a rock or lock in a safe, but for the express purpose of

investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket

theory, which seeks to restore to plaintiffs only the $21 million they originally invested

less their subsequent withdrawals, is a wholly inadequate measure of damages. Id.

Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy

179420

measure of damages, which seeks to put Plaintiffs in the position they would have held

had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C.*

*v. Byers, 2009*, W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA

liquidation approved distribution to investors in Ponzi scheme whereby investors' claims

were allowed in the amount of their net investment plus their re-invested earnings).

F.   **Picard Has No Power to Claw Back Withdrawals**
**Beyond the Statute of Limitations Period and Solely for SIPC's Benefit**

32.   In derogation of his fiduciary duty to NTC, Picard is, in effect,

imposing upon NTC a fraudulent conveyance judgment for sums that NTC withdrew

from the Account beyond the statute of limitations period applicable to fraudulent

conveyances. Thus, even if Picard were entitled to utilize the fraudulent conveyance

provisions of the Bankruptcy Code against customers, he could not possibly do so beyond

the applicable statute of limitations. Yet, he has done so here and deprived NTC of SIPC

insurance and the claim to which NTC is absolutely entitled.

33.   Moreover, Picard has employed the avoidance powers of the

Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the

Bankruptcy Code for Picard to utilize the avoidance powers of a trustee to enrich SIPC at

NTC's expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy

Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal

distribution of a debtor's assets among its creditors. *See, e.g.*, 5 Collier on Bankruptcy ¶

547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000)

(preferential transfer rule "is intended to discourage creditors from racing to dismember a

179420

debtor sliding into bankruptcy and to promote equality of distribution to creditors in

bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996)

(The purpose of Section 547 is to discourage creditors from racing to the courthouse to

dismember the debtor and, "[s]econd, and more important, the preference provisions

facilitate the prime bankruptcy policy of equality of distribution among creditors of the

debtor. Any creditor that received a greater payment than others of his class is required to

disgorge so that all may share equally") (quotations omitted).

34.    Here, however, Picard is not acting to assure equal distribution

among prepetition creditors. On the contrary, he is simply acting as SIPC's agent in

depriving NTC of the SIPC insurance to which NTC is statutorily entitled.

G.    **Picard Has Violated SIPA by Delaying the Payment of SIPC Insurance**

35.    Picard has breached his statutory obligation to "promptly" replace a

customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace NTC's

securities for a value of $329,084.59, as valued on the December 11, 2008 statement.

### Conclusion

36.    NTC is entitled to an order compelling Picard and SIPC to

immediately replace the securities in the Account to the extent of a valuation of

$329,084.59 as of December 11, 2008.

37.    NTC is entitled to have its claim recognized in the amount of

$329,084.59, consistent with the December 11, 2008 statement.

179420

38.    NTC is entitled to judgment against Picard and Baker & Hostetler

LLP for the damages it has suffered as a result of the breach of fiduciary duty of Picard

and his counsel.

Dated:  Garden City, New York
        December 2, 2010

REISMAN, PEIREZ & REISMAN, L.L.P.

By: _____
        Jerome Reisman (JR-0933)
        A Member of the Firm
    Attorneys for NTC & Co. FBO Judith W.
    Bailey IRA Plan as a Limited Partner of
    Peerstate Equity Fund LP
    1305 Franklin Avenue
    PO Box 119
    Garden City, New York 11530
    Office:  516.746.7799
    Fax:  516.742.4946
    JReisman@ReismanPeirez.com