Brian J. Neville (BN 8251)
Barry R. Lax (BL 1302)
Brian Maddox (BM 6128)
Lax & Neville, LLP
1412 Broadway, Suite 1407
New York, New York 10018
Tel: (212) 696-1999
Fax: (212) 455-5361

*Attorneys for White Orchard Investments, Ltd c/o Swiss Fund Services*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

| | |
|---|---|
| SECURITIES INVESTOR PROTCTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-01789(BRL) |
| vs. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | **OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM** |
| Defendant. | |

---------------------------------------------------------------X

White Orchard Investments, Ltd c/o Swiss Fund Services ("White Orchard Investments"), by and through its attorneys, Lax & Neville, LLP, hereby objects to the Notice of Trustee's Determination of Claim dated November 5, 2010 ("Determination Letter"), attached as Exhibit A.

## BACKGROUND

1.  An account was opened for White Orchard Investments at Bernard L. Madoff Investment Securities LLC ("Madoff") account (the "Account") bearing the Account No. 1-FR088.

2.  According to the November 30, 2008 BLMIS Account statement received by White Orchard Investments, the value of the account was $12,919,024.24. On June 24, 2009,

1

White Orchard Investments filed a Securities Investor Protection Corporation Claim to the BLMIS Trustee based upon securities held in the account as stated on the November 30, 2008 BLMIS account statement. The White Orchard Customer Claim has been attached hereto as Exhibit B.

3.   On November 5, 2010 the Trustee denied the claim stating that, "Based on a review of available books and records of BLMIS by the Trustee's staff, [White Orchard Investments] did not have an account with BLMIS. Because [White Orchard Investments] did not have an account, [it is] not a customer of BLMIS under SIPA as that term is defined at 15 U.S.C. §78lll(2)."

**Grounds for Objection**

   **I.   White Orchard Investments is entitled to $500,000 in SIPC Insurance since it is Defined as a customer under SIPA**

4.   Pursuant to SIPA's definition of "customer," White Orchard Investments is a "customer" that is entitled to receive up to $500,000 in SIPC insurance. *See* 15 U.S.C. § 78lll(2) ("The term 'customer' [is] . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.")

5.   The Trustee's Determination attempts to limit SIPC's liability to White Orchard Investments by relying on SIPC Rules. SIPA, however, clearly prohibits the Trustee from altering the definition of "customer." 15 U.S.C. § 78ccc(b)(4)(A). Moreover, any ambiguity regarding whether or not White Orchard Investments constitute as a "customer" must be construed in favor of White Orchard Investments since "SIPA is a remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight*, 389 U.S. 332 (1967).

6.   Congress's lengthy definition of "customer," clearly evidences the intention of Congress to include customers of a bank or broker-dealer that invested in Madoff in the

2

definition of Customer under SIPA. 15 U.S.C. § 78fff-3(a) ("no advance shall be made by SIPC to the Trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . in which even each such customer of such broker or dealer or bank shall be deemed a separate customer of the debtor.").

7. In early drafts of SIPA, individuals whose names or interests were not disclosed on broker-dealer records were denied SIPC insurance. S. 2348, 91st Cong. Section 7(d) (June 9, 1969). Clearly, Congress intended for the "customer" definition to be broadly construed since the final version of SIPA did not include such a restriction.

## II. The Southern District of New York's December 23, 2008 Order Was Not Followed By the Trustee

8. The Trustee's Determinations do not comply with the Southern District of New York's Court Order, dated December 23, 2008, which mandates that the Trustee satisfy customer claims and deliver securities in compliance with Madoff's "books and records." According to the debtor's books and records, White Orchard Investments is due the amount reflected on the White Orchard Investment's November 30, 2010 BLMIS account statement, unless the Trustee can prove White Orchard Investments did not have a "legitimate expectation" that the balance referenced on the account statement represented White Orchard Investment's property. Clearly, the Trustee is unable to overcome this tremendous hurdle. White Orchard Investments did have a legitimate expectation that the value designating on each and every BLMIS account statement represented an amount of property owed to it.

9. Furthermore, the Trustee failed to comply with applicable Bankruptcy requirements since the Trustee's Determination does not denote the reasoning that supports the

3

Trustee's Determination. An "objection to a claim should . . . meet the standard of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.*, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

### III. The Trustee Has Formulated a New Definition for "Net Equity"

10. Under SIPA, net equity is:

> [T]he dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customers . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date.

15 U.S.C. § 78lll(11). As such, "net equity" is the value of securities positions in customer's account, as referenced on the customer's November 30, 2008 account states, less any amount the customer owes the debtor. This definition was corroborated by the Second Circuit in *New Times*:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

371 F.3d at 72; *see also, In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 62 (B.S.D.N.Y. 1999) (defining net equity as the "difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

4

11.     Contrary to SIPA's prohibition against SIPC altering the "net equity" definition, 15 U.S.C. § 78ccc(b)(4)(A), the Trustee, in an attempt to limit the amount of SIPC insurance given to Madoff victims, has created a new definition for "net equity" that limits customer claims to the amount of their net investment without consideration to any appreciation accumulated in the customer account.

12.     At the inception of its account, White Orchard Investments entered into a standard broker-dealer customer agreement with BLMIS.  After entering into the account opening agreement with BLMIS, White Orchard Investments received monthly account statements, as well as trade confirmations for every transaction that occurred in its account.  The account statements and trade confirmations accurately depicted White Orchard Investment's account number, names and prices of the securities referenced in each transaction.  These account statements and trade confirmations established that White Orchard Investments had a "legitimate expectation" that the assets and transactions referenced were property owned and owed to White Orchard Investments.  Therefore, White Orchard Investments is entitled to a claim for securities in the amount reflected on its November 30, 2008 account statement, $12,919,024.21.

13.     Consistent with this definition of "net equity," White Orchard Investments filed a customer claim for approximately $12,919,024.21, which is the "sum which would have been owed" to it if the securities positions reflected in its November 2008 statement had been liquidated, minus any amounts owed to Madoff.  Despite the unambiguous and express language of SIPA, the Trustee has taken the position that White Orchard Investments "net equity" is the total amount of the deposits in the Madoff account minus the total amount withdrawn.  The Trustee's proposed methodology is inconsistent with the language of SIPA and is unsupported

5

by all relevant case law. In fact, the Trustee's approach incorporates nonexistent words and concepts into the statute.

14. The Trustee's methodology for calculating "net equity" is an improper measure of loss. White Orchard Investments invested money in the account with the reasonable expectation that it would grow, and the balance on its November 30, 2008 account statement reflects the benefit of that bargain. Indeed, White Orchard Investments's account statements indicate such growth. In *Visconsi v. Lehman Brothers, Inc.,* 244 Fed. Appx. 708 (6th Cir. 2007), the Court in opining on a Ponzi scheme case rejected the very same "money in/money out" methodology being utilized by the Trustee. The Court stated, ". . . the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages." *Visconsi,* 244 Fed. Appx. at 713. Like the investors in *Visconsi,* White Orchard Investments is entitled to the full amount reflected in his November 30, 2008 account statement, regardless of its previous deposits and withdrawals.

15. White Orchard Investments' "securities positions" in its account are readily ascertainable from the November 30, 2008 statements. Moreover, White Orchard Investments did not have any "indebtedness" to Madoff. *See* H.R. Rep. No. 95-746, at 4754 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"); *see also Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (under the 1970 statutory regime, when there were shortages of securities to satisfy "net" equity claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *see also In re First Street Sec. Corp.,* 34 B.R. 492,497 (B.S.D. Fla. 1983) (offsetting indebtedness of customer to broker from claim amount where unauthorized stock purchased was partially funded by borrowing on margin). Because White Orchard Investments has no indebtedness to Madoff,

6

there is no need to perform any calculations whatsoever to determine the amount of his net equity. White Orchard Investment's net equity for the account is simply the "securities positions" set forth on its last statement.

16. In the event that the Court should determine that claimed gains on deposited funds should not be allowed, then in the alternative, White Orchard Investments is entitled to recover interest on such deposited amounts. Such interest is required as a matter of state law, and the United States Supreme Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are determined by state law. *See Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

(a) Under New York law, which is applicable here, funds deposited with the Debtors under these circumstances are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004 (2009); *see, e.g.* N.Y.Gen. Oblig. § 5-501, et seq. (2009). Accordingly, Customer Claims should be recalculated by adding interest to all funds deposited by customers such as White Orchard Investments.

(b) Under New York law, which is applicable here, customers are entitled to any returns the Debtors earned on the deposited funds under principles of unjust enrichment. Accordingly, Customer Claims should be recalculated by adding the amounts earned by the Debtors on White Orchard Investment's deposits. *See, e.g.*, *Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *see also Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding

prejudgment interest on claims for unjust enrichment and conversion).

### IV. The Trustee Did Not Adhere to the Customer's "Legitimate Expectation" Requirement

17. An inherent requirement of SIPA is to honor Congress's intent to protect customer's "legitimate expectations." Indeed, SIPC Rules, promulgated under SIPA, require that SIPC claims be classified according to the customer's "legitimate expectations" based upon written confirmations and account statements provided to the customer by the debtor. *See* SIPC's Series 500 Rules, 17 C.F.R. 300.500. SIPC clarified the requirement to honor customer's legitimate expectations in a brief it submitted to the Second Circuit and stated:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase . . . [T]he emphasis on reasonable and legitimate claimant expectations frequently yield much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

SIPC Appellant Brief at 23-24 (citing *In re New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004).

18. SIPC's general counsel, Josephine Wang, exemplified the concept of customer's "legitimate expectations" to the press on December 18, 2008. The resulting article stated:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG

8

> shares, even if a transaction never took place, the SIPA has to buy and replace the 1000 GOOG shares.

Insiders' Blog (Dec. 18, 2008) *available at www.occ.treas.gov/ftp/alert/2008-37.html.*

19. Second, the Trustee's approach is also inconsistent with the legislative history of the statute. SIPA legislative history confirms Congress's intention that broker-dealer customers have valid "net equity" claims even when the securities reflected on their confirmations and account statements were never purchased. Both the Senate and House reports on the 1978 amendments clearly reflect that a customer's net equity claim is not dependent on whether the securities were actually purchased by the broker-dealer:

> "Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, *never purchased* or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments . . . would satisfy the customers' legitimate expectations . . . ."

S. Rep. No. 95-763, at 2 (1978) (*emphasis added*).

> "A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, *never purchased*, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date."

H.R. Rep. No. 95-746, at 21 (1978) (*emphasis added*). Based on the regular monthly statements and trade confirmations, White Orchard Investments at all times believed and expected that Madoff executed such transactions and that its account actually held such securities. The fact that the securities listed in the confirmations and account statements were never actually purchased is irrelevant in determining the White Orchard Investment's account's net equity.

9

20. The Trustee's Determination Letters are contrary to SIPC's own policies and practices, as reflected in *New Times Securities Services, Inc.*, 371 F.3d 68 (E.D.N.Y. 2004). There, the New Times Trustee's position on "net equity" was in full accord with SIPA, and thus directly contrary to the Trustee's and SIPC's position in this case. Specifically, with respect to any claims that were based on confirmations and account statements reflecting securities positions in "real" securities that could have been purchased (i.e. securities that actually existed on the public market and whose valuations were objectively and publicly verifiable by the customers), the *New Times* trustee allowed all such "net equity" claims to the full extent of the filing date valuations of those securities, even though none of the securities identified in those records had ever been purchased by the broker-dealer. Here, White Orchard Investments is in precisely the same position as the "real" securities claimants in *New Times* and should be treated no differently. Accordingly, White Orchard Investment's claim should be recognized in full as filed.

21. SIPC President Stephen Harbeck explained in the *New Times* case, that if broker-dealer customers have been led to believe that "real, existing" securities had been purchased for their accounts, then those customers are entitled to get the full value of their securities positions as of the filing date, even if that value represents a substantial increase from the purported purchase price of the securities, and even if the securities in question had never been purchased:

> Harbeck: [I]f you file within sixty days, you'll get the securities, without question. Whether -- if they triple in value, you'll get the securities. . . . Even if they're not there.
>
> Court: Even if they're not there.
>
> Harbeck: Correct.
>
> Court: In other words, if the money was diverted, converted --
>
> Harbeck: And the securities were never purchased.

10

> Court: Okay.
>
> Harbeck: And if those positions triple, we will gladly give the people their securities positions.

Transcript at 37-39, *In re New Times Securities Services, Inc.*, No. 00-8178 (Bankr. E.D.N.Y. July 28, 2000).

The Second Circuit further stated:

> Meanwhile, investors who were misled . . . to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds -- because Goren never executed the transactions -- the information that these claimants received on their account statements mirrored what would have happened had the given transaction been executed. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. Furthermore, the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," . . . could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements.

*In re New Times Secs. Servs.*, 371 F.3d 68, 74 (2d Cir. 2004).

22. Two years later, a different Second Circuit panel considered related issues in the *New Times* liquidation and expressed the very same views regarding the importance under SIPA of meeting a customer's legitimate expectations: "It is a customer's legitimate expectations on the filing date . . . that determines the availability, nature, and extent of customer relief under SIPA." *In re New Times Sec. Servs., Inc.*, 463 F.3d 125, 128 (2d Cir. 2006) ("*New Times II*"). Of particular relevance is SIPC's repeated statement that customers' legitimate expectations control, even when no securities were ever purchased:

> "[R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and

11

therefore generally is entitled to recover those securities (within the limits imposed by SIPA), <u>even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase</u>. . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates."

Br. of Appellant SIPC at 23-24 (citing *New Times I*) (*emphasis added*), *New Times II*, (No. 05-5527).

23. As the court in *New Times II* explained, it is only in the context of "fictitious" securities claims that the "cash in, cash out" valuation methodology makes sense:

"<u>Because there were no such securities</u>, and it was therefore impossible to reimburse customers with the actual securities or their market value on the filing date (the usual remedies when customers hold specific securities), the [*New Times I* Court] determined that the securities should be valued according to the amount of the initial investment. The court declined to base the recovery on the rosy account statements telling customers how well the <u>imaginary</u> securities were doing, because treating the fictitious paper profits as within the ambit of the customers' 'legitimate expectations' would lead to the absurdity of 'duped' investors reaping windfalls as a result of fraudulent promises made on <u>fake</u> securities. . . . The court looked to the initial investment as the measure for reimbursement because the initial investment amount was the best proxy for the customers' legitimate expectations."

*New Times II*, 463 F.3d at 129-30 (citations omitted)(*emphasis added*).

24. The "cash in, cash out" valuation methodology employed in *New Times I* with respect to "fictitious" securities claimants has no place here, where the White Orchard Investments' confirmations and account statements reflected "real," well-known and publicly verifiable securities. Because the prices and values ascribed to the "securities positions" on those records "mirrored what would have happened had the given transaction been executed," Br. for *New Times* trustee and SIPC at 7 n. 6, the liquidation filing date value of those "securities positions" is the "best proxy for the customers' legitimate expectations." *New Times II*, 463 F.3d at 130.

## V. The Trustee Has Violated SIPA By Failing to Promptly Remit SIPC Insurance

25. The Trustee is obligated to promptly replace customer's securities up to the amount of $500,000. 15 U.S.C. § 78fff-2(b). The Trustee breached this statutory requirement by failing to remit SIPC insurance up to $500,000 based upon the customer's legitimate expectation as referenced on the customer's November 30, 2008 account statement. As such, White Orchard Investments is entitled up to $500,000 in SIPC coverage.

## VI. The Trustee's Determination Amounts to an Improper Disallowance Under the Bankruptcy Code

26. The Trustee's action in reducing the amount shown the Customer Claim forms for White Orchard Investments by any prior gains reflected on its November 2008 statement or prior Madoff statements is an attempt to avoid such gains without alleging any grounds for avoidance or proving that such gains are avoidable under the Bankruptcy Code's avoidance provisions. As such, any such disallowance is improper and unjustified, and the Determination letter should be stricken. *See* Fed. R. Bankr. P. 7001(1); 7008 (2009).

## VII. White Orchard Investments is Entitled to Prejudgment Interest on their SIPC Claim

27. New York law allows customers to seek interest on any and all funds deposited with BLMIS. N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501. Additionally, since Madoff converted White Orchard Investments' funds, White Orchard Investments is also entitled to prejudgment interest. *See Steinberg v. Sherman*, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) (holding that claims for conversion and unjust enrichment allow for recovery of prejudgment interest); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (granting prejudgment interest for conversion and unjust enrichment claims).

**Relief Requested**

28.     For the reasons stated herein, White Orchard Investments' Customer Claim should be allowed in its entirety.

29.     For the reasons stated herein, White Orchard Investments is entitled to an Order compelling the Trustee and SIPC to advance $500,000.00.

30.     The Trustee's determination amounts to an improper disallowance of a claim that has prima facie validity.  *See* Bankruptcy Code § 502(a) (2009). The Trustee has offered no factual or legal basis for his Determination. The Trustees Determination Letter, and the objections contained therein, should be stricken, or alternatively, the Trustee should describe his position in detail including all relevant facts, legal theories, and authorities.  Upon the filing of such a statement, this matter will be a contested proceeding under Rule 9014, White Orchard Investments will file a response.

**CONCLUSION**

31.     White Orchard Investments reserve the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of its right to object on any additional grounds.

32.     White Orchard Investments reserves all rights set forth under Rule 9014, including, without limitation, rights of discovery.  *See* Fed. R. Bankr. P. 9014 (2009).

33.     White Orchard Investments reserves all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

34.  White Orchard Investments incorporates by reference all reservations of rights set forth in the White Orchard Investments Customer Claim and the Objection to the Trustee's Determination Letter.

Dated: New York, New York
December 6, 2010

                                           */s/ Brian J. Neville*
                                           LAX & NEVILLE, LLP
                                           Brian J. Neville (BN 8251)
                                           Barry R. Lax (BL 1302)
                                           Brian Maddox (BM 6128)
                                           1412 Broadway, Suite 1407
                                           New York, NY 10018
                                           Tel: (212) 696-1999
                                           Fax: (212) 566-4531
                                           *Attorneys for White Orchard Investments, Ltd*
                                           *c/o Swiss Fund Services*