Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Jonathan B. New
Email: jnew@bakerlaw.com
Adam B. Oppenheim
Email: aoppenheim@bakerlaw.com
Mark A. Kornfeld
Email: mkornfeld@bakerlaw.com
Melissa L. Kosack
Email: mkosack@bakerlaw.com
Anthony M. Stark
Email: astark@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Esq., Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and Bernard L.
Madoff*

Hearing Date: January 6, 2011 at 10:00 a.m.
Objection Deadline: December 30, 2010

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiff-Applicant,

v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

        Defendant.

Adv. Pro. No. 08-1789 (BRL)

SIPA Liquidation
(Substantively Consolidated)

In re:

BERNARD L. MADOFF,

Debtor.

## MOTION FOR ENTRY OF ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AN AGREEMENT BY AND BETWEEN THE <u>TRUSTEE AND UNION BANCAIRE PRIVÉE AND M-INVEST LIMITED</u>

TO:   THE HONORABLE BURTON R. LIFLAND
      UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff," and together with BLMIS, collectively, the "Debtors"), by and through his undersigned counsel, submits this motion (the "Motion") seeking entry of an order (the "Approval Order"), pursuant to section 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving an agreement (the "Agreement")[1] by and between the Trustee on the one hand and Union Bancaire Privée, UBP S.A. ("UBP") and M-Invest Limited ("M-Invest"), on the other hand, and, in support thereof, the Trustee respectfully represents as follows:

### PRELIMINARY STATEMENT

The Trustee's settlement with UBP and M-Invest, a direct customer of BLMIS, is for no less than Four Hundred Seventy Million Dollars ($470,000,000) and no more than Five Hundred Million Dollars ($500,000,000) (collectively the "UBP Settlement"). This amount

---

[1] The form of Agreement is annexed hereto as Exhibit "A."

- 2 -

is the largest BLMIS Feeder Fund/bank settlement here to date in cash.[2] The Four Hundred Seventy Million Dollar ($470,000,000) minimum UBP Settlement Payment and the up to Five Hundred Million Dollars ($500,000,000) guaranteed UBP Settlement Payment represent a good faith, complete, and total compromise between the Parties as to any and all claims the Trustee would have asserted in a lawsuit for approximately One Billion Dollars against UBP and M-Invest including but not limited to claims the Trustee had against UBP and M-Invest for avoidable direct transfers by BLMIS during the 90 day, two year and six year periods prior to the Filing Date, fees and interest payments earned by UBP, and other claims the Trustee had against UBP and M-Invest. This Settlement Payment is not specifically or expressly allocated to any of the particular claims that would have been asserted by the Trustee. The UBP Settlement will greatly benefit the victims of the Madoff Ponzi scheme, and the Trustee respectfully requests that the Court approve it.

## **BACKGROUND**

1. On December 11, 2008 (the "Filing Date"),[3] the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against the Debtors (Case No. 08 CV 10791). The complaint alleged that the Debtors engaged in fraud through investment advisor activities of BLMIS.

2. On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC

---

[2] BLMIS Feeder Funds were investment vehicles, which invested assets through BLMIS via direct customer accounts with BLMIS's investment advisory business (the "IA Business").

[3] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm. *See* Section 78*lll*(7)(B) of SIPA.

3

consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

3. On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part:

   (i) appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

   (ii) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

   (iii) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

4. At a plea hearing (the "Plea Hearing") on March 12, 2009 in the criminal action filed against him by the United States Attorney's Office for the Southern District of New York, Madoff pled guilty to an 11-count criminal information, which counts included securities fraud, money laundering, theft and embezzlement. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (Plea Hr'g Tr. at 23:14-17.) On June 29, 2009, Madoff was sentenced to a term of imprisonment of 150 years.

5. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff. On June 9, 2009, this Court entered an order substantively consolidating the Chapter 7 estate of Madoff into the BLMIS SIPA proceeding.

## THE CLAIMS AGAINST UBP AND THE M-INVEST BLMIS ACCOUNT HOLDER

6. UBP, a private bank based in Geneva, Switzerland, invested through BLMIS

via M-Invest's direct account at BLMIS and via investments into other investment vehicles, i.e. BLMIS Feeder Funds, with direct accounts at BLMIS. In 2003, UBP created M-Invest for the sole purpose of investing assets into BLMIS. M-Invest's directors held management level positions at UBP. M-Invest was a customer of BLMIS and maintained a customer account (the "M-Invest BLMIS Account"), Account 1FR1094, with BLMIS, commencing in January 2003 (the "M-Invest BLMIS Account Holder").[4] The M-Invest BLMIS Account Holder is listed on Attachment A to the Agreement.

7. The Trustee's claims against UBP and M-Invest, including, but not limited to, the M-Invest BLMIS Account Holder, include, but are not limited to, claims under Sections 542, 544(b), 547, 548, 550 and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), and Sections 270 to 281 of the New York Debtor and Creditor Law for direct or indirect transfers (the "Transfers") within the applicable statutory period (collectively, the "Avoiding Power Claims").

8. Had the Trustee commenced an avoidance action against UBP and M-Invest, he would have sought to recover approximately $1 billion dollars in Transfers from BLMIS, including transfers over the life of M-Invest's BLMIS Account and UBP's indirect investments into BLMIS through other investment vehicles, as well as UBP's BLMIS-related fees.

9. The Trustee believes that all of the Transfers are avoidable. UBP, on behalf of itself, M-Invest, and the M-Invest BLMIS Account Holder, has informed the Trustee that it disputes the legal and factual basis of the Trustee's claims against it, including the

---

[4] The definition of M-Invest, for purposes of this Motion, includes the M-Invest BLMIS Account Holder.

Avoiding Power Claims and has asserted certain defenses to the Trustee's claims. UBP asserts that all withdrawals from BLMIS were made in good faith for value and are not avoidable.

10. Prior to July 2, 2009, the bar date for filing claims, the M-Invest BLMIS Account Holder filed a customer claim with the Trustee (the "M-Invest Customer Claim"). The M-Invest Customer Claim, including the relevant BLMIS Account Number (1FR094), is listed on Attachment B to the Agreement.

11. The agreed upon settlement, described below and set forth in the Agreement, resolves any and all claims the Trustee would have asserted in a lawsuit against UBP and M-Invest including but not limited to claims the Trustee had against UBP and M-Invest for avoidable direct and indirect transfers by BLMIS during the 90 day, two year and six year periods prior to the Filing Date, fees and interest payments earned by UBP, and other claims the Trustee had against UBP and M-Invest. The UBP Settlement will return no less than Four Hundred Seventy Million Dollars ($470,000,000) and no more than Five Hundred Million Dollars ($500,000,000) from UBP and M-Invest to the BLMIS consolidated estate for distribution to defrauded customers. This represents a most significant recovery for the victims of the Ponzi scheme and the largest BLMIS Feeder Fund/bank settlement here to date in cash, while at the same time it collects a substantial debt owed to the estate.

## SETTLEMENT DISCUSSIONS AND TRUSTEE'S INVESTIGATION

12. During 2009 and 2010, UBP, through its counsel, engaged in good faith discussions with the Trustee aimed at resolving the Trustee's claims. While UBP informed the Trustee that it disputed it had any liability to the Trustee, UBP nevertheless engaged in good faith negotiations with the Trustee that yielded the settlement set forth in the

Agreement.

13. The Trustee has conducted a comprehensive investigation of UBP's direct and indirect investments through BLMIS, the M-Invest BLMIS Account, and the dealings between UBP, Madoff, BLMIS, and other BLMIS Feeder Funds, and BLMIS customers. UBP has cooperated with the Trustee and facilitated the investigation by providing information the Trustee has requested. This investigation includes, but is not limited to: the review and analysis of both UBP's and M-Invest's BLMIS-related transactional histories as reflected in the BLMIS account statements, correspondence and other records and documents available to the Trustee; interviews with third-party witnesses; Bankruptcy Rule 2004 examinations; meetings with counsel and principals from UBP; and a substantial review of third-party records and documents.

14. After a review of the relevant records and a thorough and deliberate consideration of the uncertainty and risks inherent in all litigation, the Trustee, in the exercise of his business judgment, has determined that it is appropriate to reach a business resolution in this matter rather than proceed to litigation.

**THE AGREEMENT**

15. The principal terms and conditions of the Agreement are generally as follows (as stated above, the form of Agreement is attached as Exhibit "A" and should be reviewed for a complete account of its terms):[5]

- UBP shall pay to the Trustee for the benefit of the Fund of Customer Property, the sum of Four Hundred Seventy Million Dollars ($470,000,000) ("the Settlement Payment") by wire transfer at the

---

[5] Terms not otherwise defined in this section shall have the meaning ascribed in the Agreement. In the event of any inconsistency between the summary of terms provided in this section and the terms of the Agreement, the Agreement shall prevail.

- Closing, plus potentially, an additional amount to be determined in accordance with the conditions set forth by the UBP Guarantee Payment (discussed below), in full and final settlement of all Avoiding Power Claims and other claims of the Trustee or the BLMIS estate against UBP and M-Invest.

- UBP agrees to pay to the Trustee the UBP Guarantee Payment as defined below, after the following condition is satisfied: (i) a final judgment, or a final order approving a settlement, or a negotiated resolution is entered in all actions brought by the Trustee against the Chester and Irongate Family of Funds. The "UBP Guarantee Payment" shall be the difference between (a) Thirty Million Dollars ($30,000,000), and (b) the sum of all amounts received by or awarded to, by way of settlement or judgment, the Trustee. As a result, the maximum amount UBP would eventually pay to the Trustee would be Five Hundred Million Dollars ($500,000,000).

- The M-Invest Customer Claim will upon receipt of the Settlement Payment be allowed in the amount of Seven Hundred Forty Million Seven Hundred Ninety Thousand Dollars ($740,790,000). In the event that UBP pays to the Trustee all or part of the UBP Guarantee Payment, the allowed M-Invest Customer Claim will include an additional "springing claim" in the amount of fifty percent (50%) of the UBP Guarantee Payment sum UBP pays to the Trustee (e.g. if UBP pays the full UBP Guarantee Payment of Thirty Million Dollars ($300,000,000) M-Invest's allowed claim increases by Fifteen Million Dollars ($15,000,000) to Seven Hundred Fifty-Five Million Seven Hundred Ninety Thousand Dollars ($755,790,000); if UBP pays zero ($0) on the UBP Guarantee Payment M-Invest's allowed claim remains at Seven Hundred Forty Million Seven Hundred Ninety Thousand Dollars ($740,790,000)).

- The Trustee will release, acquit, and absolutely discharge the UBP Releasees defined in the Agreement on the specific terms set forth therein. The release becomes effective upon Trustee's actual receipt of the Settlement Payment at the Closing as defined in the Agreement without any further action by any of the Parties.

- The Releasees will release, acquit, and absolutely discharge the Trustee and all his agents and BLMIS and its consolidated estate on the specific terms set forth in the Agreement. The release becomes effective upon the Trustee's actual receipt of the Settlement Payment at the Closing as defined in the Agreement without any further action by any of the Parties.

- Contemporaneous with the execution of the Agreement, the Fairfield Sentry Limited and Fairfield Sigma Limited Liquidator, et al.

(collectively the "Fairfield Liquidators") have agreed to release UBP, including, but not limited to, Fidulex Management, Inc., a wholly owned subsidiary of UBP, from liability and has dismissed with prejudice the actions referenced in the Agreement. (A copy of the Release and Settlement Agreement between UBP and the Fairfield Liquidators is attached to the Agreement as Attachment F).

- For the purposes of the Agreement only, UBP and M-Invest, on behalf of themselves and the M-Invest BLMIS Account Holder, agree that they are subject to the jurisdiction of the Bankruptcy Court for the purpose of the SIPA Proceeding and any Avoiding Power Claims that the Trustee may bring against them.

- All agreements between M-Invest and BLMIS will be terminated as of the date of the Settlement Payment.

- If the Bankruptcy Court has not entered the order approving the Agreement by January 20, 2010, then, at the option of either the Trustee or UBP or M-Invest and upon written notice to the other parties to the Agreement, the Agreement will terminate and be null and void.

## RELIEF REQUESTED

16. By this Motion, the Trustee respectfully requests that the Court enter an order substantially in the form of the proposed Order annexed hereto as Exhibit "B" approving the Agreement.

## LEGAL BASIS

17. Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Courts have held that in order to approve a settlement or compromise under Bankruptcy Rule 9019(a), a bankruptcy court should find that the compromise proposed is fair and equitable, reasonable, and in the best interests of a debtor's estate. *In re Ionosphere Clubs, Inc.*, 156 BR 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (citing *Protective Comm. for Index. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

18. The Second Circuit has stated that a bankruptcy court, in determining whether to approve a compromise, should not decide the numerous questions of law and fact raised by the compromise, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Liu v. Silverman (In re Liu)*, 1998 U.S. App. LEXIS 31698, at *3 (2d Cir. Dec. 18, 1998) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also Masonic Hall & Asylum Fund v. Official Comm. Of Unsecured Creditors (In re Refco, Inc.)*, 2006 U.S. Dist. LEXIS 85691, at *21-22 (S.D.N.Y. Nov. 16, 2006); *In re Ionosphere Clubs*, 156 B.R. at 426; *In re Purified Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying litigation"); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

19. In deciding whether a particular compromise falls within the "range of reasonableness," courts consider the following factors:

    (i)    the probability of success in the litigation;

    (ii)    the difficulties associated with collection;

    (iii)    the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

    (iv)    the paramount interests of the creditors (or in this case, customers).

*In re Refco, Inc.*, 2006 U.S. Dist. LEXIS 85691 at *22; *Nellis v. Shugrue*, 165 B.R. 115, 122 (S.D.N.Y. 1994) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992), *cert. denied*, 506 U.S. 1088 (1993)).

20. The bankruptcy court may credit and consider the opinions of the trustee or debtor and their counsel in determining whether a settlement is fair and equitable. *See In re Purified Down Prods.*, 150 B.R. at 522; *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. at 505. The competency and experience of counsel supporting the settlement may also

be considered. *Nellis v. Shugrue*, 165 B.R. at 122. Finally, the court should be mindful of the principle that "the law favors compromise." *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. at 505 (quoting *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976)).

21. The Trustee believes that the terms of the Agreement fall well above the lowest point in the range of reasonableness and, accordingly, the Agreement should be approved by this Court. The Agreement is a global settlement that resolves all issues regarding the Trustee's claims against UBP and M-Invest, including, but not limited to, the M-Invest BLMIS Account Holder, without the need for protracted, costly, and uncertain litigation. As part of the UBP Settlement, the Trustee on the one hand, and UBP, and M-Invest, on the other hand, have reached a good faith, complete, and total compromise as to any and all claims the Trustee would have asserted in a lawsuit for approximately One Billion Dollars against UBP and M-Invest including but not limited to claims the Trustee had against UBP and M-Invest for avoidable direct and indirect transfers by BLMIS during the 90 day, two year and six year periods prior to the Filing Date, fees and interest payments earned by UBP, and other claims the Trustee had against UBP and M-Invest. This Settlement Payment is not specifically or expressly allocated to any of the particular claims that would have been asserted by the Trustee. (Affidavit of the Trustee in Support of the Motion (the "Picard Affidavit") ¶ 5. A true and accurate copy of the Picard Affidavit is attached hereto as Exhibit "C.")

22. While the Trustee believes that he would ultimately prevail in an action against UBP, he has determined, in an exercise of his business judgment, that litigation of the issues in a litigation against UBP would undoubtedly be extremely complex, create significant delay, and would involve both litigation risk and difficulties associated with

collection. *Id.* ¶ 4.

23. UBP has described a number of defenses and has contested the allegations that would have been made by the Trustee in a lawsuit against, among others, UBP and M-Invest, regarding, among other things, the direct and indirect transfers from BLMIS to UBP, including, but not limited to, the M-Invest BLMIS Account Holder. UBP would claim among other things that: all withdrawals were made in good faith for value and are not avoidable; the Trustee lacks jurisdiction; there exist "tracing" issues regarding the indirect transfer of funds redeemed from BLMIS; and, principles of extraterritoriality would defeat some if not all of the Avoiding Power Claims to be asserted by the Trustee. While the Trustee is confident of his factual and legal position, there is risk involved in complex litigation. The global and certain nature of the settlement also allows the Trustee to avoid the complications and defenses necessarily associated with attempting to collect a judgment from a variety of foreign entities and individuals both foreign and domestic.

24. The Agreement greatly furthers the interests of the customers of BLMIS by adding up to half a billion dollars to the Fund of Customer Property immediately. *Id.* ¶ 6.

25. Given the complexities involved in proceeding with litigation, including, but not limited to, collectability issues associated therewith and the time value of money, the Trustee has determined that the proposed settlement with UBP and M-Invest represents a fair compromise of the Avoiding Power Claims. The Agreement allows the Trustee to avoid protracted litigation and resolves all of the defenses UBP raised during good-faith negotiations with the Trustee. The ability to avoid the time and expense associated with continuing to litigate this matter, combined with the fact that the Agreement will result in a very substantial recovery, makes the settlement embodied by the Agreement extremely

beneficial to BLMIS customers.

## CONCLUSION

26. In sum, the Trustee submits that the Agreement should be approved: (a) to avoid lengthy, burdensome, and expensive litigation; and, (b) because it represents a fair and reasonable compromise of the Avoiding Power Claims that greatly benefits the estate and the customers of BLMIS. Since the Agreement is well within the "range of reasonableness" and confers a substantial benefit on the estate, the Trustee respectfully requests that the Court enter an Order approving the Agreement.

## NOTICE

27. In accordance with Bankruptcy Rules 2002 and 9019, notice of this Motion has been given to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (iv) Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York, 10019, Attn: Herbert Wachtell and Stephen DiPrima. The Trustee shall also serve, by way of the ECF filing that will be made, each person or entity that has filed a notice of appearance in this case. The Trustee submits that no other or further notice need be given and respectfully requests that the Court find that such notice is proper and sufficient.

WHEREFORE, the Trustee respectfully requests entry of an Order substantially in the form of Exhibit "B" granting the relief requested in the Motion.

Dated: New York, New York
December 6, 2010

Respectfully submitted,

/s/ Marc E. Hirschfield
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Jonathan B. New
Email: jnew@bakerlaw.com
Adam B. Oppenheim
Email: aoppenheim@bakerlaw.com
Mark A. Kornfeld
Email: mkornfeld@bakerlaw.com
Melissa L. Kosack
Email: mkosack@bakerlaw.com
Anthony M. Stark
Email: astark@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Esq. Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*