Lawrence R. Velvel
Massachusetts School of Law
500 Federal Street
Andover, MA 01810
Tel: (978) 681-0800
Fax: (978) 681-6330
Email: velvel@mslaw.edu

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (BRL) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | SIPA LIQUIDATION (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities, LLC | |
| Plaintiff, | |
| v. | Adv. Pro. No. 10-05412 (BRL) |
| LAWRENCE R. VELVEL, | |
| Defendant. | |

## REPLY OF LAWRENCE R. VELVEL TO TRUSTEE'S MEMORANDUM OPPOSING LEAVE TO APPEAL

1

A. Lawrence R. Velvel has moved for leave to interlocutorily appeal the provisions of the Procedural Rules, ordered on November 10th, which *severely* limit discovery, prohibit deposing the Trustee without a special order of the Court, and order mandatory mediation even though the Trustee's counsel, Mister Hirschfield, stated in open court that the Trustee would not consider litigation risk.

In opposing Velvel's request for leave to appeal, the Trustee, per Messrs. Sheehan and Hirschfield, spends much time arguing that Velvel has no standing to appeal any of the Procedural Rules because those rules do not apply to him. The lack of applicability exists, they say, because the Trustee (unexpectedly) did not file a Notice of Applicability in Velvel's case.

Velvel has responded to this argument in his December 17th "Reply . . . To The Trustee's Objection To A Partial Stay Of The Orders Of November 10, 2010," which correctly characterizes this low litigation trick pulled by the Trustee and his counsel. Velvel's response need not be reiterated here, but only incorporated here by reference. All that need be added here is that on December 17th, only four days after learning of the Trustee's tactic in the Trustee's Objection to a partial stay, Velvel himself, as the Trustee concedes to be his right, filed a Notice of Applicability of the procedures ordered on November 10th. Thus, at this point the Procedures certainly do apply to him beyond any conceivable further argument to the contrary by the Trustee, and the Trustee's argument, per Messrs. Sheehan and Hirschfield, that Velvel has no standing because the Procedures do *not* apply to him can have no purchase.

B. In his Memorandum objecting to Velvel's motion to interlocutorily appeal certain provisions of the Orders of November 10th, the Trustee also spends considerable

2

time claiming that there can be no appeal here because Velvel's Notice of Appeal was filed on December 1st, whereas the time for filing ran out on November 24th, fourteen days after the Orders were signed on November 10th. This argument has no force, however, due to the Trustee's own actions.

The Trustee has extensively and repeatedly propounded, in not one but two briefs *so far*, that the Procedural Orders of November 10th did not apply in Velvel's case because the Trustee (unexpectedly) did not file a Notice of Applicability in Velvel's case even though that case is prototypical of the cases the orders were designed for -- cases against concededly innocent investors who were victimized by Madoff. Because the Procedural Orders of November 10th did not apply in Velvel's case, he could not appeal any of the orders. That would seem to go without saying, since one has never heard of a litigant being able to appeal an order that does not apply to him, and such is, indeed, the Trustee's exact argument. The Procedural Rules did not apply to Velvel's case until December 17th, when Velvel himself filed a Notice of Applicability. Thereafter, Velvel filed a new Notice of Appeal on December 20th, only three days after the Procedural Orders became applicable to him. The December 20th Notice of Appeal is the one that governs because it is the only one filed after the Procedural Rules became applicable to Velvel's case, and, being filed within three days of such applicability, is well within any possible time limit (not to mention that two of the three days were a Saturday and a Sunday).

Even were the question to revolve around the fact that the original Notice of Appeal, filed before the Procedures were applicable to Velvel, was filed on December 1st (a point the issues does *not* revolve around now, as discussed), still the Notice of Appeal

3

would suffice in the circumstances of this case even though it was filed seven days after November 24th. It is long established (though not mentioned by the Trustee) that an extension to file a notice of appeal can be granted if there was what is called "excusable neglect." Here, under the case law of both the Supreme Court and the Second Circuit, there *was* excusable neglect for not filing the initial Notice of Appeal until December 1st. *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380 (1993); *Bolarinwa v. Williams*, 593 F.3d 226 (2nd Cir. 2010); *Williams v. KFC National Management Co.*, 391 F.3d 411 (2nd Cir. 2004); *U.S. v. Hooper*, 9 F.3d 257 (2nd Cir. 1993); *U.S. v. Desdune*, 104 F.3d 354 (2nd Cir. 1996). The delay of seven days beyond November 24th caused no conceivable prejudice to the Trustee, and the Trustee claims none, nor did the seven day delay have any impact in the administration of justice in this Court, and again the Trustee claims none. For as with Velvel's own case, the vast preponderance of cases to which the Procedures are applicable, perhaps even all such cases, were not even filed by the Trustee until the period December 1 – December 11. Little wonder that the Trustee does not even claim prejudice to him or harm to the administration of justice from the fact that the initial Notice of Appeal was filed on December 1st rather than on or before November 24th.

Nor was there any *intent* to delay beyond the time when the period for filing the Notice of Appeal ran out. Velvel was under the mistaken impression that the period for filing was 30 days long, as with the filing of notices of appeal from District Courts to Courts of Appeal. He thought -- mistakenly but innocently and in good faith -- that he had just over another week after December 1st to file a Notice of Appeal.[1] And, when

---

[1] Conceivably Velvel's mistaken impression resulted from the fact that he has done a fair amount of work in Federal appellate tribunals, work in which one has 30 days to file a notice of appeal, and here the District

4

apprised of the fact that the Procedures unexpectedly had not been made applicable in his case by the Trustee, Velvel immediately filed a Notice of Applicability and immediately filed a new Notice of Appeal, which is the only Notice of Appeal which counts, as discussed above.

Finally, the delay in filing was short: the initial Notice of Appeal was filed only seven days after November 24th.

For these reasons, even if the filing of the initial Notice of Appeal were the question here (which it is not), an extension of the time to file until December 1, 2010 should be granted under the case law of the Supreme Court and the Second Circuit. But in fact, of course, the filing of December 1st was mooted by the Trustee's unexpected failure to file a Notice of Applicability in Velvel's case, and was superseded by Velvel's Notice of Appeal filed on December 20th, only a week after he learned what the Trustee had done and only four days after Velvel himself filed a Notice of Applicability (with two of the three days being Saturday and Sunday).

C.   The second sentence -- almost the very beginning -- of Velvel's Motion for an Interlocutory Appeal says the two aspects of the Procedures that he wishes to appeal "are highly material, of public interest and importance, and are nearly certain to be dispositive of results in the case." Ignoring this statement entirely, the Trustee, per Messrs. Sheehan and Hirschfield, pretends Velvel has ignored the standards courts use in

---

Court is *acting as an appellate court*. Relatedly, Velvel spent considerable time ruminating about the desirability of an appeal. Whatever the reason for Velvel's misimpression which led to delay, one notes that Federal courts often explicitly say that one has thirty days to appeal a lower Federal court decision, Thus, the Second Circuit said, in *Bolarinwa v. Taylor*, 593 F.3d 226, 230 (2nd Cir. 2010): "In general, a litigant must file a notice of appeal within thirty days of entry of judgment. Fed. R.App. P. 4(a)(1)(A). The district court may grant an extension of the filing deadline if one is requested within thirty days of the expiration of the filing period and so long as the movant "shows excusable neglect or good cause. *Id.* at 4(a)(5)(A)." The Circuit also said, in *Williams v. KFC National Management Co.*, 391 F.3d 411, 414 (2nd Cir. 2004): . "Judgment was entered on January 31, 2008, but Williams failed to appeal within the 30 days allowed by the Federal Rules of Appellate Procedure. *See* Fed. R.App. P. 4(a)(1)(A).

5

determining whether to grant an interlocutory appeal. The Trustee, per counsel, also either ignores entirely the reasons given in Velvel's Motion as to why the objectionable provisions are material, important and controlling, or simply dismisses their importance and impact without any explanation or reason as to *why* they allegedly are unimportant.

The Trustee's Memorandum, per Messrs. Sheehan and Hirschfield, pretends that the procedures' limitations on discovery can "have no substantive impact on the litigants' legal rights." (Memorandum, p. 10.) The Memorandum having made such a statement, one would think it was submitted by a tyro fresh out of law school rather than by two highly experienced Wall Street lawyers. But the comment is pretense. Two veteran lawyers like Messrs. Sheehan and Hirschfield know that discovery often makes all the difference in a case. Indeed, the limitations on discovery which they prevailed upon this Court to accept were designed to do exactly that.

The limitations on discovery are designed to preclude discovery on *many* of the crucial relevant issues of the case, and to prevent discovery of material that could lead to other highly relevant facts and issues. Such limitations are illegal. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351-52 (1978); *Compudyne Corp. v. Shane*, 244 F.R.D. 282, 283 (S.D.N.Y. 2007). The list of issues which are *already* known to be critical (even before discovery), or which discovery could *show* to be relevant and crucial, but on all of which discovery is barred, is impressive -- and is not even denied by the Trustee.

For example, contrary to the uniform financial practice of every hedge fund, mutual fund, and bank with interest bearing accounts in the country -- *contrary to every one of them* -- SIPC and the Trustee have not credited victims with the interest earned for

6

them by Madoff's admitted nightly sweep *for decades* of every dollar in the 703 account into short term, interest bearing Treasury and money market instruments.

Why did the Trustee and SIPC refuse to credit victims' accounts, under their CICO method, with earnings that the accounts *should* have been credited with, and that accounts *are* credited with by every financial institution in the country? Was this done (as might seem self evident but nonetheless should be the subject of proof obtained by discovery), because even under CICO there might be few people who would have negative net equities, and who would *not* receive SIPC advances, if victims' accounts were credited with the earnings that the accounts *should* have been credited with? Similarly, there might be many fewer innocent victims subject to clawbacks if victims were properly credited with interest on short term instruments. For such interest is defacto cash-in by these victims, and could cause the amount they took out *not* to be greater than the amount they put in under the CICO method used by the Trustee and SIPC. And, in these respects, just how much *would* the accounts collectively have been credited with, and just how much *would* individual accounts have been credited with, if CICO -- which takes account of cash-in -- had been properly calculated to include the cash-in derived from the short term instruments? These are issues which are crucial, which can control the outcome of this case because of their impact on net equity and clawbacks, and which cry out for discovery instead of being hidden under the veil of secrecy imposed to the maximum extent possible by SIPC and the Trustee.[2]

---

[2] The only thing SIPC or the Trustee has publicly said about all of this to date is that Mr. Harbeck told NIAP that the short term earnings were not credited to victims because they are customer property. This is a transparently disingenuous answer which seeks to avoid the issue. The question is *not* whether such earnings, under SIPA, are customer property after the Madoff bankruptcy. For *all* Madoff property became customer property under SIPA after the bankruptcy, and under Harbeck's transparently disingenuous, so-called logic, customer accounts should have been credited with *nothing* for SIPA purposes after the

7

Another very important question for discovery is why did SIPC, as a financial matter, not a *potentially* privileged legal matter, choose to use CICO and, relatedly, why did SIPC choose Irving Picard as Trustee rather than, let us say, the prominent James Giddens, who was the Trustee in *New Times* and subsequently became a member of a special committee to reexamine SIPA and SIPC. The question here is did SIPC demand or desire the use of CICO, for the first time ever in a case involving securities that actually existed in the marketplace, because it knew that it did not have enough money to cover the situation if it used the final statement method in order to do as Congress desired and protect investors, especially small ones? Thwarting the Congressional intent to protect investors, through the use of CICO, in the knowledge that this would leave thousands of small investors out in the cold, is plainly unlawful unless SIPC's will outranks Congress', which it does not. But SIPC and the Trustee have refused to talk

---

bankruptcy. The question, is not what is or is not customer property, but is, rather, how much should victims' accounts have *been credited with* under SIPA after the bankruptcy.

This question leads in turn to the question of why did SIPC and the Trustee *not* credit the victims' accounts with the "cash-in" accruing from interest on short term instruments -- interest which is credited to customers who hold earnings-bearing accounts by every financial institution in the country. Is the answer to the last question that SIPC and the Trustee did not credit interest to the victims because they knew that SIPC did not have the money to pay all the advances which would be required even under CICO if the interest *was* credited to victims and thereby gave many or most victims a positive net equity? (The interest, whose total amount neither SIPC nor the Trustee has disclosed, could amount to many hundreds of millions or even billions of dollars over the twenty or so years during which the fraud is known to have been ongoing, and thus could easily have made the difference between a positive and a negative net equity under CICO for hundreds or thousands of people.) Is part of the answer to the question that SIPC and the Trustee knew the failure to credit victims with the interest, thereby causing them to have a negative net equity under CICO, would fly in the face of Congressional intent to protect victims, especially small ones, but SIPC and the Trustee decided to do this anyway because otherwise SIPC did not have enough money to pay advances to victims? Is the answer that SIPC and the Trustee simply made a mistake and then refused to own up to it when victims learned and pointed out that there had been short term interest earnings which should have been credited to them?

Whatever the answers to these questions, it is obvious -- *obvious* -- that the answers (i) can make all the difference in this case as to what customers' net equity should be even under CICO – can be material and controlling on that score, (ii) can make all the difference on whether victims are subject to clawbacks since properly crediting customers with the interest earned on their accounts -- interest which is defacto cash-in for customers -- may cause customers *not* to have taken out more than they put in, and (iii) should be subject to discovery, including discovery via deposition of the two people who likely best know the answers, Messrs. Picard and Harbeck.

8

about this. Relatedly, did SIPC fail to use Mr. Giddens -- or someone else other then Picard -- because in the *New Times* case Mr. Giddens had used the final statement method for victims who, as here, invested in securities which actually existed in the marketplace? Mr. Giddens is highly experienced, well thought of, and a member of a Wall Street firm with huge resources: however much this might be true of Mr. Picard as well, and however competent he may be, was he chosen by SIPC instead of Mr. Giddens because Mr. Picard did *not* have a history of providing such fair treatment to victims as was provided by Mr. Giddens in *New Times* (and in fact was rebuked once by a federal court for going far overboard in combating victims); and because Mr. Picard could be relied on to take a harder line against victims than Mr. Giddens, a line that would thwart Congressional intent? These questions are critical to a proper result in this case, and need to be the subject of discovery.

Also highly material, potentially dispositive, and needing discovery is why does it supposedly continue to be necessary to terrify, and exercise leverage against, small and concededly *innocent* people by proceeding with cases against them now that the Trustee has recovered nearly ten billion dollars after the $7.2 billion settlement with the Picower interests last Friday? The Trustee has told Congress that the total of recognizable claims that should be paid is about $5.8 billion. He has already recovered three or four billion dollars more than needed to pay those claims; he is suing parties he claims are *culpable*, *not* innocent, for about another $50 billion more or less; and he is rumored to be in negotiation with several or many more large institutions he considers culpable. Why does he need to go after small, innocent, often nearly-wiped-out people against whom he is plainly seeking to exercise leverage by virtue of their terror of clawbacks that will

9

finish them economically -- if they are not *already* finished economically? His action in going after such people, even if otherwise assumed lawful, is nonetheless an abuse of his discretion *not* to proceed when *not* proceeding is the proper thing to do.[3] There needs to be discovery on the material and controlling question of why the Trustee continues to proceed against small, concededly innocent investors, and does not exercise his discretion *not* to proceed against them, even though he has already recovered billions of dollars more than he needs to pay every dollar of the claims he recognizes as valid, has suits for about another eight or nine *times* the amount he needs to pay off every dollar of the claims he recognizes, and is at least rumored to be in negotiations with large institutions to recover still more by settlement without need of suit.[4] In the circumstances, the Trustee's decision *not* to forbear against the small innocent investors whom Congress desired to protect is a subject which demands discovery because it may very well be -- and probably is -- an abuse of discretion which should be struck down by courts.

As said, on the critical matters discussed here, and on others as well, discovery is barred by the Procedural Orders of November 10, 2010. The Trustee, per Messrs. Sheehan and Picard, says that no interlocutory appeal should obtain because such bar will

---

[3] Every governmental and quasi governmental official has discretion *not* to prosecute or bring civil cases when he/she thinks they should *not* be brought even though they *could* be brought. The Trustee's so-called hardship program is an example of the use of this discretion. (Unfortunately, many of the victims who have inquired into or been exposed to the hardship program consider it a farce, and dangerous to them and their relatives besides.)

[4] It is sometimes bruited, albeit by people who cannot know, that the amount of claims the Trustee recognizes as valid, and the amount he will need to satisfy such claims, would increase after such settlements. The idea behind this is that, as in the settlement with Union Bancaire Privée, in settlements with large institutions the Trustee may recognize more in allowances of claims than he recovers in settlements -- thus increasing the sums recovered by huge institutions while taking those monies in significant part from the nearly destitute and terrified small investors whom Congress wished to protect. The Trustee, however, in the exercise of the secrecy which has pervaded his actions to the maximum extent possible, has not spoken about this, at least not explicitly, insofar as Velvel knows, and Velvel cannot comment on the veracity or lack of veracity of the bruiting, but can only say the issue has been raised in the investor community.

10

expedite the case, and anyway individuals can subsequently request this Court to allow the discovery. In fact, the case will not be expedited, but delayed, if there is no interlocutory appeal at this time, a time when there is more than enough work in suits against huge, powerful culpable parties to keep the Trustee and his law firm busy for years, there is more than enough work seeking around $50 billion from *non* innocent parties who will spare no expense to defend themselves via major Wall Street law firms (which are not famous for rolling over and playing dead). Delay will occur because innocent victims will appeal *after* proceedings against them are completed in the Bankruptcy Court, if they have been denied the discovery which would have made all the difference in their cases, some of which has been discussed above.

The Trustee and SIPC are also quite confident that discovery they say should be requested later *will* be denied, because it has *already* been denied to the extent it was previously requested (by Velvel), because such discovery apparently is not common in bankruptcy cases (though it is *very* common in other types of cases (e.g., antitrust, civil rights, corporate fraud), and because the Court has made clear on several occasions that it significantly shares the Trustee's desire that nothing be done that, at least in the Trustee's opinion, "could impede [his] efforts to reach settlements, conclude cases, and bring funds into the estate." (Trustee's Memorandum, p. 11.)

The Trustee says that allowing small innocent people to exercise rights basic to litigation in federal courts *would* "impede [his] efforts," and therefore should not be allowed -- should not be allowed even though he is litigating for $50 billion or so against huge, wealthy institutions that will spare no dollar on Wall Street lawyers who will see to

11

it that the institutions' own rights are preserved in every jot and tittle.[5] However the requested discovery is essential to small investors too, and the right of small innocent investors to the discovery should not have to await the exercise of terrifying leverage against them by the Trustee and to await the conclusion of cases in which the leverage may force them into settlements that are grossly unfair, the more unfair because they might be avoided by an appeal now, and a possible (perhaps even likely) decision favorable to them now, on the question of whether the investors have discovery rights *which could wholly alter the outcome of the case* -- and which SIPC and the Trustee desperately wish to avoid now so that they can exercise leverage now.

        D.     The Trustee argues that Velvel objects to mandatory mediation only because "the Trustee has commenced lawsuits that he believes are well founded." (Trustee's Memorandum, p. 11.) One would hope the Trustee believes his lawsuits are well founded. Otherwise, he would be in violation of the rules of ethics.

But the Trustee's argument is a distortion. As said in his motion to file an appeal, Velvel objects to mandatory mediation because the Trustee has announced in open court that he will not discount for litigation and risk. That makes the mandatory mediation a farce -- it cannot conceivably succeed unless victims surrender their litigation position in advance, e.g., surrender in advance their positions on net equity and clawbacks in the Second Circuit. In such circumstances, the requirement that a victim *mandatorily* mediate is only a method for enabling the Trustee's lawyers to apply pressure and leverage to victims, especially the many small ones who are terrified and often cannot afford lawyers. No victim should be forced to mandatorily go through a charade of

---

[5] One can rest assured that an attempt to deny their discovery rights to such institutions will be met with a storm of motions, objections, appeals, etc. because the institutions can afford to pay lawyers to protect their rights. Many small innocent victims cannot.

mediation whose result, and very possibly whose goal, is the outcome determinative one of terrifying the victims into a settlement because the victim has to give up his position.

It is perhaps ironic on this score -- and perhaps much worse than ironic -- that in settlements with huge wealthy institutions and gigantically rich individuals, the Trustee has announced that he received less than he sought, but litigation risk was a factor in causing him to settle for less than he sought. He takes account of litigation risk when confronted by rich institutions and extraordinarily wealthy people who can litigate against him endlessly, but will ignore it when facing small, often penurious people whom he can terrify into submission.

## CONCLUSION

For the foregoing reasons, and those stated in Velvel's Motion, leave to appeal on the requested issues should be granted.

Respectfully submitted,

*[signature]*

Lawrence R. Velvel, Esq.
Massachusetts School of Law
500 Federal Street
Andover, MA 01810
Tel: (978) 681-0800
Fax: (978) 681-6330
Email: Velvel@mslaw.edu

Dated: December 21, 2010

R:\My Files\Madoff\Reply2TrusteeOpposLRVMt2Appeal.doc