Elliot. G. Sagor
166 Brite Avenue
Scarsdale, New York 10583
Telephone (212) 918-3641
Facsimile (800) 865-6851

Attorney for Elliot G. Sagor (IRA)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                                            Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                                            Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM** |

       Elliot G. Sagor, pro se, objects to the Notice of Trustee's Determination of Claim dated September 22, 2010,[1] and states as follows:

**Overview**

       1.    I invested a total of $359,067.82 in cash in two successive accounts at Bernard L. Madoff Investment Securities LLC ("BLMIS") over an eighteen-year period.  **I never withdrew any money from BLMIS.**  I submitted a claim to the Trustee on June 23, 2010 for the amount of my cash-in investments of $359,067.82.  The Trustee allowed me a partial reimbursement of $184,067.82, which had been invested in my personal account, but allowed me nothing for the

---

[1] The Trustee has designated my claim as Number 148 on BLMIS Account No. 1S0437.  I filed my claim on January 6, 2009 and it is incorporated herein by reference.  On June 23, 2010 I augmented my January 6, 2009 claim with a letter of explanation.  Because the Trustee has all the documents in my January 6, 2009 claim and has my letter of June 23, 2010 with exhibits, I have not made my claim and the June 23 letter part of this filing, but they can be introduced into the record at the time of trial.  The Trustee has extended the time to file objections to his determination of my claim to December 22, 2010.

1

remaining amount of $175,000 (which had initially been invested in an omnibus account with my partners and thereafter was rolled over into my personal account). The Trustee has denied my right to obtain the remaining portion of my cash-in investment of $175,000 because the Trustee, under his "cash-in/cash-out" approach (hereinafter "cash-in") does not give any credit for the cash-in where an individual investor in an omnibus account which was collectively a Net Winner – although the **individual** personally never derived **any** benefit or profit whatsoever from that account – rolled over his own initial investment into an individual account.

2.   Where there are transfers between accounts, the Trustee follows an account-by-account analysis for cash-in which may work effectively in many cases, but is unnecessarily harsh and unfair in a small and out-of-the-mainstream subset of cases like mine where an overall analysis by investor or customer for cash-in is fairer and precisely achieves the Trustee's goals of not paying any amount for fictitious gains over and above cash-in but allows a credit for cash-in to the fullest extent possible.[2] Unlike many, I did not take out a penny in withdrawals from BLMIS. The Trustee's denial of the **full** extent of my original cash-in investments is not fair, equitable, or mandated by SIPA rules and objectives.

3.   My claim is based on my personal BLMIS account and seeks at least the full amount of my BLMIS cash-in of $359,067.82. Crediting me for all of my cash-in does not result in giving me "fictitious gains that were fabricated by BLMIS."[3] Avoiding payment for fictitious gains that were fabricated by BLMIS is a *sine qua non* of the Trustee's analysis, the

---

[2] "Only those customers that have not received the return in full of their principal are entitled to share in the fund of customer property ...." *See* Baker & Hostetler Memorandum of Law in Support of Net Equity dated October 16, 2009 at 50 ("Trustee's Memorandum").

[3] Trustee's Notice of Determination at 2, Exhibit A.

2

goal of which should be the return of cash-in to investors to the fullest extent possible.[4] Unfortunately, that has not been the result here. Application of a cash-in analysis to eliminate fictitious gains that were fabricated by BLMIS which cuts into and lops off the **full extent** of cash-in in a small subset of cases throws out the baby with the bath water. That should not be and need not be the result here. Approving my claim does not put any practical or precedential limitations on the Trustee's cash-in/cash-out analysis and in fact would only improve on it. Approving my claim would not open SIPC to a floodgate of claims. Furthermore, a SIPC advance to me of less than $500,000 as an "**under-the-limits Net Loser**"[5] is not based on fictitious profits, and most importantly takes no money away from any other over-the-limits claimant in what Judge Lifland has characterized as a "zero-sum game," because there is no further entitlement to share in customer property.[6] Finally, giving credit for all cash-in treats all Net Losers equally and thus fairly.

4. Between 1990 and 1997, I invested $175,000 in cash in connection with my first BLMIS account, 1L001330 (the "joint account" or "account one"), which was a joint account with several of my then-law partners and others. My name was not on that account. In 2001 I transferred the balance that I had in the joint account into my own personal BLMIS account, 1S0437 ("account two"). In 2003 I invested an additional $184,067.82 in cash into account two. The Trustee has allowed my claim for that deposit, but has denied me any credit for my original

---

[4] See ¶¶ 17-20 *infra*. The Trustee says he has "endeavored to treat customers as fairly and as generously as the statute and relevant case law will allow." Trustee's Memorandum at 38 and footnote 2, *supra*.

[5] Trustee's Memorandum at 28.

[6] Memorandum Decision Affirming Trustee's Determination of Net Equity dated March 1, 2010 ("Memorandum Decision") at 31; see also ¶¶ 6, 18 *infra*.

3

cash-in of $175,000 (previously invested in the joint account (account one) from 1990 through 1997).

5. The Trustee has denied my right to reimbursement for my investment in the joint account because that joint account allegedly turned out to be a "Net Winner." In other words, when I transferred the balance attributed to me from the joint account to my personal account in 2001, allegedly more money had been withdrawn from that account **by others** than had been deposited in the account. Accordingly, under the Trustee's analysis, I **lost** my principal or cash-in in that account. But these withdrawals were unknown to me, were made by my law partners or others, and did not benefit me in any way. I never made **any** withdrawals from that account (account one) and gained **nothing** from any withdrawal made by anyone else. The Trustee does not dispute these facts. Under the Trustee's net equity methodology, if the omnibus account (account one) was a Net Loser at the time of this transfer to account two, the Trustee would credit me with my cash investment of $175,000.[7]

6. In analyzing my personal BLMIS account the Trustee should give me credit for my cash-in investment of $175,000 made from 1990 through 1997, because I never withdrew any money out of BLMIS from any account. Whether account one was a Net Winner or Net Loser, the fact remains that my cash-in was $175,000, and in equity and fairness I should be credited for it. There is an additional reason to return my $175,000 investment. Receiving full credit is warranted especially where, as here, an under-the-limits Net Loser will not receive a full $500,000 in SIPC protection and will not have any further claim. Thus, getting credit for my

---

[7] This assumes that account one was a Net Loser to the extent of $175,000 or more.

4

full cash-in to BLMIS does not take away in any way from the further recovery of any "over-the-limit Net Losers.[8]

**Background facts**

7. In 1990, when I made my first investment in BLMIS, I was a partner at Squadron Ellenoff Plesent & Lehrer ("Squadron"). I contributed payments through some of my Squadron partners in connection with an omnibus account at BLMIS, account1L001330 (account one). I invested through this joint account only because I understood that BLMIS would not manage a small individual investor account for me. A small investor such as myself had to invest as part of a larger omnibus account. By my letter of June 23, 2010 I documented these payments. My cash contributions, reflected on my K-1's issued to me by the Squadron firm, were as follows:[9]

| K-1 | 1990 | $50,000 | Howard M. Squadron & Stanley I. Lehrer Joint Venture (Exhibit D) |
| K-1 | 1993 | $20,000 | Stanley I. Lehrer & Stuart M. Stein Joint Venture (Exhibit E) |
| K-1 | 1995 | $65,000 | Stanley I. Lehrer & Stuart M. Stein, Joint Venture (Exhibit F) |
| K-1 | 1997 | $40,000 | Stanley I. Lehrer & Stuart M. Stein, Joint Venture (Exhibit G) |
|     | Total | $175,000 | |

8. In 2001 I became a partner in another law firm which required me to have my own self-directed IRA account. I could not have pension money in a joint omnibus account at BLMIS. Accordingly, I opened my own BLMIS account, 1S0437 (account two) on February 22, 2001. On February 22, 2001, instead of withdrawing my then purported accumulated investment of $640,682.00 from the joint account (account one, 1L001330) which was what was owing to me from the omnibus account at the end of 2000 according to my 2000 K-1, I

---

[8] See Trustee's Memorandum at 28.

[9] Exhibit letters correspond to exhibits submitted to the Trustee which were attached to the letter of June 23, 2010. See footnote 1, *supra*.

5

transferred it from account one to BLMIS account two as reflected on the BLMIS credit notice which I received. I further transferred another $15,747.00 on June 26, 2001 which represented the rest of my purported IRA earnings in account one to account two as documented in the BLMIS credit notice which I received. *See* Exhibit B, credit notice of BLMIS of $15,747.00 dated June 26, 2001, attached to the letter of June 23, 2010. Therefore, the starting balance in account two as documented by BLMIS credit notices and account statements was $656,429 *(i.e.,* $640,682 plus $15,747). At the very least, as I document in the June 23, 2010 letter, my cash-in as of June 26, 2001 for which I should have been credited by the Trustee was the $175,000 reflected on my K-1's for my IRA account from 1990 through 1997.

9. Thereafter, as previously documented in my January 6, 2009 application, I contributed another $184,067.82 to my BLMIS account as follows (Exhibits H-M):

| 10/07/03 | $149,525.22 | Squadron Ellenoff Profit Sharing Plan, Merrill Lynch Trust Company (Exhibit I) | Squadron Ellenoff Profit Sharing Plan, Merrill Lynch Trust Company (Exhibit I) |
|---|---|---|---|
| 10/07/03 | $34,542.60 | Squadron Ellenoff Plesent & Sheinfeld, LLP 401(k) Plan Merrill Lynch Trust Company (Exhibit K) | Check paid to Madoff Investment Securities on 10/20/03 for account 1-SO437-3 (Exhibit J) |
| Total | $184,067.82 | | See First Trust Corp and Portfolio Management Report of 12/31/03 acknowledging credit of $184,067.82 (Exhibits L-M) |

10. By Notice dated September 22, 2010 the Trustee denied me **any** credit – **even** the amount of my cash-in of $175,000 for my February 22, 2001 transfer from BLMIS account one to BLMIS account two (my personal account). A copy of the Trustee's Determination is attached hereto as Exhibit A. According to the table in the Trustee's Determination, the Trustee made the following decisions:

6

– TABLE 1 –

| DEPOSITS | | | |
|---|---|---|---|
| Date | Transaction Description | Amount | Adjusted Amount |
| 2/22/2001 | TRANS FROM 1L001330 | $640,682.00 | $0.00 |
| 6/26/2001 | TRANS FROM 1L001330 | $15,747.00 | $0.00 |
| 10/17/2003 | Check | $149,525.22 | $ 149,525.22 |
| 10/20/2003 | Check | $34,542.60 | $34,542.60 |
| **Total Deposits** | | $840,496.82 | $184,067.82 |
| **WITHDRAWALS** | | | |
| Total Withdrawals | | $0.00 | $0.00 |
| | | | |
| Total Deposits Less Withdrawals | | $840,496.82 | $184,067.82 |

11. The Trustee shows that I made a transfer from 1L001330 on 2/22/2001 in the amount of $640,682.00, but the Trustee gave me zero credit for that transfer as shown immediately below:[10]

| Date | Transaction Description | Amount | Adjusted Amount |
|---|---|---|---|
| 2/22/2001 | TRANS FROM 1L001330 | $640,682.00 | $0.00 |

12. The Trustee explained that his adjustments were designed to eliminate "fictitious gains that were fabricated by BLMIS." "Under the money in/money out analysis, the Trustee

---

[10] I could have received a check from BLMIS in the amount of $640,682 made payable to Elliot G. Sagor. If I had received that check in February 2001 and then deposited it in my personal checking account and written a check in the same amount to BLMIS to open up account two (account number 1S0437) would that have made any difference? Should that make any difference? Allegedly, receiving $640,682 on February 22, 2001 would be beyond any clawback period and my cash-in might have been considered $640,682 instead of $175,000. But in any event my cash-in for this transfer should certainly not be zero; it should be at least $175,000  For purposes of this objection, my cash-in for the transfer on February 22, 2001 should be considered to be at least $175,000-$640,682.

7

does not give credit for fictitious gains in setting your allowed claim." More specifically, the Trustee's Notice, Exhibit A at 2 states:

> As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (*i.e.*, **has the investor deposited more or less than he or she withdrew from BLMIS**). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is **fictitious gains that were fabricated by BLMIS**. A customer's allowed claim is based on the amount of principal in the customer's account. (Emphasis added.)
>
> Whenever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits or withdrawals in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. **Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in setting your allowed claim.** (Emphasis added.)

13. The Trustee's explanations and methodology makes sense when an account has one investor. Under those circumstances, "the difference between the purported transfer amount and the **adjusted** transfer amount is the amount of the fictitious gain" if and to the extent that the purported transfer amount is greater than the principal or cash-in in the account. No individual transferee should get the benefit of any transfer where there was not principal in his or her individual account at least equal to what had been put in. But this rule breaks down and should not be applied where, as here, there are multiple investors in an omnibus account. In a multiple investor account if the transferring account were a Net Winner, then the effect of the Trustee's position is that one **loses** the cash-in because of the **actions of others** taking more out of an account than was put in. That is not equitable under the circumstances here.

8

14.    Based upon the Trustee's money in/money out analysis, the fundamental question is: **"has the investor deposited more or less than he or she withdrew from BLMIS."** Trustee Determination, Exhibit A at 2, ¶ 12, supra.   This investor has deposited $175,000 more than the Trustee will permit him to recoup.   The implementation of the money in/money out analysis to determine whether "the investor deposited more or less than he or she withdrew from BLMIS" in a small number of out-of-the-mainstream cases is subject to unexpected and unfair consequences.   The devil, of course, is in the details; the Trustee's counsel acknowledged that the "nuances" of the cash-in/cash-out method were not before the Bankruptcy Court at the time of its approval.[11]   In a BLMIS account where there is one investor it follows that if such investor or account is a Net Winner, then he took out more than his cash-in in connection with account transfers and should not be able to profit thereby.   And if he is a Net Loser, then he gets the benefit of his cash-in if the account is transferred within BLMIS, whether it was an individual account or an omnibus account if the account were a Net Loser at the time of the transfer.   But the Trustee's account-by-account methodology should not apply to **every** last situation across the board (as in a zero tolerance policy or a per se rule) where a customer would lose his or her

---

[11] The Trustee's counsel has acknowledged that all of the "nuances" of the cash-in/cash-out method were not before the Bankruptcy Court at the time of its approval vis-a-vis the "Last Statement Method." Trustee Memorandum at 53.

9

cash-in in an omnibus account where the investor himself has been a Net Loser even though the transferring account has been a Net Winner.[12]

15.    Having a rule which fairly compensates customers for their real cash deposited in omnibus accounts regardless of whether any account they were in was a Net Winner or not: (1) opens no flood gate of claims; and (2) does not reward anyone with ill gotten or Ponzi scheme gains.  Giving **full** credit for cash-in **in BLMIS** is simply fair ("**has the investor deposited more or less than he or she withdrew from BLMIS**"), and achieves the goals of SIPA, which is to provide all customers the greatest measure of protection for at least their cash-in up to the statutory maximum of $500,000, less any amounts actually taken out of BLMIS.  The Trustee must not pay out fictitious profits but the Trustee should give credit for cash-in even if that cash-in was first deposited in an omnibus account which was a Net Winner.

16.    Accordingly, I should have been given credit for my cash-in of $175,000.  In my view the Trustee's grid should have shown at least the following for the February 22, 2001 transfer:

| Date | Transaction Description | Amount | Adjusted Amount |
|---|---|---|---|
| 2/22/2001 | TRANS FROM 1L001330 | $640,682.00 | $175,000 |

---

[12] As discussed herein, there are four relevant scenarios.  My claim falls into scenario four:

1. Individual BLMIS account:   if Net Loser, transferee get reimbursement to extent of net cash-in up to $500,000.
2. Individual BLMIS account:   if Net Winner, transferee gets no advance.
3. Omnibus BLMIS account:   if Net Loser, Net Loser transferee gets credit for his cash-in to the extent of the account net loss and up to $500,000.
4. Omnibus BLMIS account:   if Net Winner, Trustee currently gives Net Loser transferee no credit for his cash-in on transfer even though (a) credit for such cash-in would in no way consist of any fictitious gains (but see ¶ 17 *infra*) and (b) if that Net Loser were also an under-the-limits loser he would not participate further in any recovery (thereby not taking any thing away *pro tanto* from any other Net Loser).

I should be treated no differently than in scenario one.

10

The Trustee's explanation on page 2, Exhibit A, ¶ 12, *supra* remains the same. My balance in account one did not get to be $640,682 without any cash investments. The cash investments certainly were not zero. The Trustee would have given me credit for my cash-in of $175,000 if account 1L001330 were a Net Loser as of February 22, 2001. But whether the omnibus account were a Net Winner or Net Loser, my cash-in of $175,000 was still the same for purposes of evaluating whether an account holder in BLMIS Account No.1S0437 who is entitled to full SIPA protection is profiting from fictitious gains. If that person has not so profited, he should not be deprived of his cash-in even though the Trustee may argue that there was no principal left in account one to transfer on February 22, 2001 to account two because account one was a Net Winner.

17. The Trustee might argue in rebuttal that to the extent that there was no principal left in the omnibus account to make the transfer any credit for cash-in of $175,000 is therefore the equivalent of crediting "fictitious gains that were fabricated by BLMIS." But that would be giving deference to form over substance. **The "fictitious gains" that the Trustee should be eliminating are amounts over and above the cash-in of $175,000, not an amount equivalent to cash-in itself of the remaining unrecouped $175,000.** The Trustee is crediting no part of the $640,682 of the transfer because it is all deemed by him to be fictitious gain. But cash-in in BLMIS of $175,000 should nonetheless be credited. The most important and highest goal to accomplish is to make investors as whole as possible: The Trustee states that "Only those customers that have not received the return in full of their principal are entitled to share in the fund of customer property...."[13] The Trustee has explained that "as a matter of fairness, the

---

[13] Trustee's Memorandum at 50.

11

persons who have not gotten back all the money that they paid into the Ponzi scheme, in my view, should get back as much as possible."[14]   Therefore, the $175,000 should be credited.[15]

18.    In sum, not giving the owner of account two credit for his cash-in is a mistake even though it conforms to the Trustee's current operating method.   That is a harsh result which should not apply to a customer who:

- has his own personal BLMIS account, 1S0437;
- does not seek amounts over and above his cash-in;
- does not seek "fictitious gains that were fabricated by BLMIS;"
- has done anything wrong to merit loss of that cash-in;
- has not taken a penny out of BLMIS for a 18 year period;
- has literally and in reality had cash-in to BLMIS of $175,000; and
- is an under-the-limits Net Loser who will not be entitled to a further distribution from SIPC and the full credit for cash-in that was in the omnibus account will not decrease *pro tanto* the recovery from over-the-limits Net Losers.

We hope the Trustee upon further reflection will reconsider his position.

19.    The Trustee's counsel has recognized, "only the cash-in/cash-out method hews to the letter and spirit of SIPA, case law, public policy, and the equities of this case, as well as common sense."[16]   The Trustee said:

---

[14] See ¶ 19 and footnote 17, *infra*.

[15] Even though an investor in an omnibus account may have, unfortunately, a very limited remedy as compared to the omnibus account holder in terms of getting a SIPA advance, an actual account holder such as myself at least should have much greater remedies once one has one's own account.   The Trustee does not have his hands tied in offering greater help to a victim account holder who first invested in an omnibus account.   The SIPA Trustee should exercise his considerable ability and flexibility to provide assistance where, as Judge Lifland notes, "the application of the Net Equity definition to the complex and unique facts of Madoff's massive Ponzi scheme is not plainly ascertainable in law."   Memorandum Decision at 6.   The Trustee has acknowledged that his goal is to treat "customers" as "generously" as the statute and case law will allow.   See footnote 4, *supra*.

[16] Trustee's Memorandum at 53.

> The money in/money out methodology is the approach that has generally been used in resolving claims in Ponzi scheme cases, going back to the fraud perpetrated by Charles Ponzi. The people who already received more money than they deposited have received their payments from the funds put in by those who have not received some or all of their deposits. **Thus, as a matter of fairness, the persons who have not gotten back all the money that they paid into the Ponzi scheme, in my view, should get back as much as possible.** Those who have been fully paid or received more than they deposited should not get more at the expense of those who have not been fully paid.[17] (Emphasis added.)

It is consistent with enabling investors to get back "all the money that they paid into the Ponzi scheme ... as much as possible" to give customers back their cash-in. Similarly, Judge Lifland observed that "Net Winners and Net Losers, equally innocent in Madoff's Ponzi scheme, should not be treated disparately." And "[t]o the extent possible, principal will rightly be returned to Net Losers ...."[18] (Emphasis added.) Thus, in trying to reimburse customers for all the money they paid into the Ponzi scheme as much as possible or to the extent possible, Net Losers equally innocent in Madoff's Ponzi scheme should not be treated disparately – whether they had invested in a prior BLMIS account individually or as part of a group.

20.     Ironically, it is the smaller investor who, all other things being equal, was constrained to invest with others in one account, and it is the smaller investor who needs SIPA protections the most. Accordingly, artificial rules which needlessly hurt the smaller investors who put cash-in in omnibus accounts, are not in the spirit of SIPA; it is these very investors who should be helped equitably as much as possible. As much as possible the Trustee should give full credit for cash-in. "[T]he circumstances of this case 'call strongly for the principle that equality is equity,'" citing *Cunningham v. Brown*, 265 U.S. 1, 13 (1924).[19]

---

[17] Interview with Fraud Magazine July/August 2010, http://www.fraud-magazine.com/article.aspx?id=4294967939

[18] Memorandum Decision at 33.

[19] *Ibid.*

13

## JOINDER

21. I hereby join in all other objections to the Trustee's Determination of Claims filed by other SIPA claimants, and incorporate those objections by reference herein including without limitation all the arguments which support the full payment of my claim filed on January 6, 2009. I reserve the right to address any and all of the arguments raised in such other objections at any hearing or proceeding to take place in connection with this Objection.

## RESERVATION OF RIGHTS

22. I expressly reserve the right to revise, supplement or amend this Objection, and any failure to object on a particular ground shall not be deemed a waiver of my right to object on any additional ground(s) including without limitation my rights to the full amount of my claim as filed on January 6, 2009.

## RELIEF REQUESTED

23. For the reasons stated herein, my claim for the additional $175,000 that was invested in 1990, 1993, 1995, and 1997 should be allowed.

24. I request such other and further relief as this Court may deem just and proper under the circumstances.

Dated: December 21, 2010

/s/ Elliot G. Sagor
Elliot G. Sagor, *pro se*
166 Brite Avenue
Scarsdale, NY 10583
Telephone: (212) 918-3641
Facsimile: (800) 865-6851