# EXHIBIT J

# SIPC

**SECURITIES INVESTOR PROTECTION CORPORATION**
805 FIFTEENTH STREET, N.W., SUITE 800
WASHINGTON, D.C. 20005-2215
(202) 371-8300    FAX (202) 371-6728
WWW.SIPC.ORG

September 7, 2010

**BY MESSENGER**

| | |
|---|---|
| Honorable Paul E. Kanjorski | Honorable Scott Garrett |
| Chairman, Subcommittee on Capital | Ranking Member, Subcommittee on |
| Markets, Insurance and Government | Capital Markets, Insurance and |
| Sponsored Enterprises | Government Sponsored Enterprises |
| 2188 Rayburn House Office Building | 2188 Rayburn House Office Building |
| Washington, DC 20515-3811 | Washington, DC 20515-3811 |

Dear Chairman Kanjorski and Ranking Member Garrett:

Below is the information that you requested in your letter dated August 20, 2010. The information follows each request and, as per your request, is as of August 1, 2010.

1. A schedule that details the total balance of the SIPC Fund as defined by the Securities Investor Protection Act ("SIPA"). Of this balance, please identify how much is unallocated, reserved for the Madoff proceeding, and reserved for all other proceedings.

**Response:**
The SIPC Fund, as defined by SIPA, consists of cash on hand or on deposit and amounts invested in United States Government or agency securities.

As of August 1, 2010, rounded to the nearest $100,000, the SIPC Fund consisted of:

| | |
|---|---|
| US Government Securities maturing within 10 years at fair value (including accrued interest receivable) | $1,204,600,000 |
| Cash on hand or on deposit | $23,600,000 |
| Total | $1,228,200,000 |

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 2

The SIPC Fund does not have "reserves" established against it. All expenditures by SIPC are made out of the Fund as provided under SIPA. It is used to meet all SIPC obligations under SIPA as they occur.

2. An explanation of how SIPC Members are presently assessed annually and an estimate of the aggregate assessment that will be added to the SIPC Fund during the remainder of 2010 and in 2011.

**Response:**

Since April 1, 2009, the SIPC member assessment has been based on 0.25% of each member's net operating revenues as reflected on the members' financial reports filed with the Securities and Exchange Commission ("SEC" or "Commission") and the Financial Industry Regulatory Authority.

Members must complete a General Assessment Payment Form at their mid-year and a General Assessment Reconciliation Form at their year end. These filings and any assessment payments are due 45 and 75 days after the end of the period, respectively.

It is currently estimated that collection of member assessments will add an aggregate of approximately $500,000,000 to the SIPC Fund during the remainder of 2010 and in 2011.

3. A schedule that details all lines of credit available to SIPC, outstanding borrowings, and remaining credit available. Also, please disclose whether any lines of credit have been closed during 2009 and 2010 and explain why.

**Response:**

In the event the SIPC Fund is or may reasonably appear to be insufficient for the purposes of SIPA, the SEC is authorized to make loans to SIPC and, in that connection, the Commission is authorized to issue notes or other obligations to the Secretary of the Treasury in an aggregate amount not to exceed $2.5 billion. Currently SIPC has no other lines of credit available. There is currently no outstanding borrowing and to date there has not been. SIPC had a $500 million revolving line of credit with an international consortium of banks which expired effective March 1, 2009, and an additional $500 million revolving line of credit with that consortium of banks that expired effective March 1, 2010. Given the developing financial crisis, the consortium of lenders on SIPC's commercial credit lines was unwilling to renew the credit lines.

SIPC, by bylaw, increased the "target" for the SIPC Fund to $2.5 billion. Assessments based upon a percentage of net operating revenue will remain in place until that higher target is reached. Once the target is reached, together with the Government line of credit, SIPC will have access to $5 billion of funds.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 3

> I would note that SIPC, under current law, has demonstrated that it has sufficient resources for its statutory mission.

4. For claims related to the Madoff Ponzi scheme, please provide a schedule that details the number and aggregate value of allowed claims and the number and aggregate value of allowed claims at or below the statutory limits of SIPC protection. Also, include the average disbursement per claim.

**Response:**
This question and those that follow use the term "claims" with respect to the information being sought. However, SIPA provides protection per "customer," as defined in SIPA, and not per claim. Two claims submitted by the same customer could be aggregated for purposes of SIPA protection if that customer held more than one account in the same capacity at the brokerage. For example, if John Jones had two accounts at a brokerage, both of which were in his name and held by him in the same capacity, the accounts would be combined for purposes of the SIPC advance.

The answers that follow are predicated upon an analysis of the customer accounts that have been determined, or remain to be determined, by the Trustee and the relationship of those customer accounts to the claims that have been filed. Wherever possible, the Madoff Trustee and SIPC encouraged claimants to file claims to preserve any rights the claimants might have. Consequently, there are many more claims than there are customer accounts. It also should be noted that much of the information relating to claims analyzed under a last fictitious statement approach are rough approximations at best. The claims have not been reviewed or analyzed on that basis and some adjustments to the information could become necessary upon actual review. With this background in mind, the answer to question 4 is as follows:

The Trustee has allowed 2,175 claims related to 1,893 accounts, with a total allowed claims value of $5,556,299,243.18. The 2,175 allowed claims include 282 amended and/or duplicate claims. With respect to these allowed claims, SIPC has committed $713,037,947.41 in SIPC advances to these claimants. Of these allowed claims, 1,330 claims representing 1,149 accounts were allowed for more than $500,000.00. 845 claims representing 744 accounts were allowed for $500,000.00 or less. The average SIPC protection committed per account with an allowed claim is $376,671. The claims review and determination process continues.

5. Please estimate how many Madoff Ponzi scheme claimants would be eligible for advances of up to $500,000 under the final statement method of calculating "net equity" as that

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 4

    term was defined in the case considered by the U.S. Bankruptcy Court for the Southern District of New York (Case No. 08- 01789-brl). Also, please estimate the aggregate value of advances that would have been made under this method.

**Response:**
    The last fictitious statement approach assumes that claimants should be paid based on the last fictitious account statement issued to them by Bernard L. Madoff Investment Securities LLC ("BLMIS"). These statements reflect phony backdated securities positions chosen by Bernard Madoff to yield fake profits pre-determined by him. Under an approach that honors the final fictitious statement, there could be 4,459 accounts eligible to share in customer property and to the extent not fully satisfied, eligible for a SIPC advance. The holders of these 4,459 accounts could be entitled to a total of $2,010,467,854.23 in SIPC protection. The $2,010,467,854.23 includes the $713,037,947.41 which SIPC already has committed in customer advances and an estimated additional amount of approximately $175,000,000.00 that the Trustee expects to ask SIPC to advance, after August 1, 2010, for the satisfaction of customers under the Trustee's cash-in/cash-out methodology. Thus, if the Trustee were to use the final fictitious statement method of calculating "net equity," an additional $1,122,429,906.82 in SIPC advances could be made.

    It should be noted that allowance of claims on this basis necessarily would reduce the amount of customer property available to satisfy those claimants who have yet to recover their principal. The SIPC advance supplements the distribution of customer property that the Trustee collects for the benefit of customers. Such property is shared <u>pro rata</u> by customers. Distribution to claimants based on a last fictitious statement approach means that customer property and a SIPC advance will be used to pay not only customers who have yet to recover the amount deposited with BLMIS, but those customers who, while the firm was in business, took out more than they put in. Enlarging the pool of claimants sharing in customer property necessarily means less property for those who have yet to recover their principal and more property for those who, while the firm was in business, withdrew their principal and received other investors' money in the form of fake profits. In other words, the fake profits of the investors who already recovered their principal continue to grow when the firm is in liquidation to the continued detriment of those investors still owed their principal.

6. Please estimate the total number and value of distributions made to Madoff investors in excess of their investments. Of these distributions, please estimate how many avoidance actions that the trustee has brought or expects to bring and the amount the trustee has recovered and expects to recover in the future. Further, please break out the number of and expected recoveries from avoidance actions between investors who may have known about or participated in the Ponzi scheme and those who were likely to be unaware of the Ponzi scheme.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 5

**Response:**
There were approximately 90,000 disbursements totaling $18.5 billion made to Madoff investors in excess of their investments.

The Trustee has brought 19 avoidance actions under the Bankruptcy Code seeking to recover approximately $15,000,000,000.00.

The Trustee advises that he anticipates bringing avoidance actions in two categories. One category would involve customers who received other customers' money, withdrew more than they deposited with Madoff, and as to whom knowledge is not a factor. At this time, the Trustee is reviewing the facts of approximately 1,000 possible avoidance actions that could result in the recovery of approximately $4,800,000,000.00 for the benefit of customers who have yet to be repaid their principal.

The other category consists of avoidance actions in which the Trustee alleges that the customer had enough information to be on inquiry notice of the fraud. At this time, the Trustee is considering the commencement of about 100 avoidance actions seeking the recovery of at least $2,000,000,000.00 for the benefit of customers who have yet to recover their principal.

7. For all Madoff-related SIPC claims, please provide a schedule stratified by claims of less than a million dollars, between one and three million dollars, between three and five million dollars, between five and ten million dollars and in excess of ten million dollars that details how many claims would be eligible under both the final statement method and the cash-in/cash-out method of calculating not equity. Further, please provide the aggregate amount that could be clawed backed from claimants under each method.

**Response:**
Under the Cash In/Cash Out Methodology, below is a stratified schedule of accounts potentially eligible for SIPC protection:

| Category | Accounts | Total Combined Amount |
|---|---|---|
| Less Than $1,000,000 | 1,204 | $381,921,324.59 |
| $1,000,000 to $2,999,999 | 626 | $1,096,526,388.57 |
| $3,000,000 to $5,000,000 | 198 | $754,646,856.41 |
| $5,000,000 to $9,999,999 | 153 | $1,027,403,169.73 |
| Greater Than $10,000,000 | 138 | $14,026,555,101.15 |
|  | 2,319 | $17,287,052,840.45 |

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 6

The following is a stratified schedule of accounts that potentially would be allowed under a last fictitious statement approach:[1]

| Category | Accounts | Total Combined Amount |
|---|---|---|
| Less Than $1,000,000 | 1,485 | $670,889,986.09 |
| $1,000,000 to $2,999,999 | 1,372 | $2,522,097,200.08 |
| $3,000,000 to $5,000,000 | 569 | $2,172,486,413.62 |
| $5,000,000 to $9,999,999 | 529 | $3,690,585,075.03 |
| Greater Than $10,000,000 | 499 | $48,055,627,602.00 |
| Dec 2008 Accts[2] | 5 | $76,905,772.00 |
|  | 4,459 | $57,188,592,048.82 |

For the answer to the final part of question 7 as to the transfers that the Trustee might seek to avoid under the Bankruptcy Code, please see the answer to question 6 above.

8. Please estimate the number of Madoff- related claims not yet determined and estimate the timeframe for when those claims will likely be determined. Also for all claims filed since the liquidation proceedings started, please calculate the average time period expressed in months between the filing of the claim and the trustee's determination of the claim.

**Response:**
Of the 16,374 filed claims, 13,189 have been determined and 3,185 claims remain to be determined. The Trustee has advised that he expects to have all claims determined before the end of this year. For the 13,189 determined claims, the average time period between the filing of the claim and determination is 7.55 months.

In analyzing the foregoing information, there are certain facts that are very important for a complete understanding of these statistics. First, this is not a typical SIPC proceeding in which securities or cash were on hand at the time of the failure of the brokerage house. As is well known, this was a Ponzi scheme in which the only assets were other people's money or assets derived from such funds.

Furthermore, this was a Ponzi scheme of long standing, going back over at least 30 years. Since the traditional approach in all Ponzi scheme matters and the one consistent with SIPA is to return to the investor what the investor put into the scheme, the Trustee was

---

[1] This analysis excludes the potential results of settlements negotiated by the Trustee.

[2] This category relates to accounts that were opened after November 30, 2008. These accounts did not receive a November 30, 2008 Customer Statement.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 7

required to do a full forensic analysis of all the books and records of the debtor, going back to at least the early 1980s in order to fully determine the amount of money which might be due to each customer based upon the customer's investment.

This forensic analysis included not only a complete review of the books and records of the failed brokerage house, but also documents received from third parties, such as banking institutions, clearing houses and other brokerage houses, as well as documents received from the customers themselves. There are literally millions of documents that have been reviewed by the Trustee and his staff in connection with the evaluation of each of the customer claims filed. Furthermore, access to books and records required coordination and sharing with law enforcement authorities which complicated and, in some instances, necessarily delayed the review.

Moreover, in order to reach out to customers who might be in financial distress, the Trustee instituted a Hardship Program early in the case which gave every customer the opportunity to advise the Trustee of his or her financial circumstances so that the claim could be processed as quickly as possible. Hundreds of customers filed hardship applications, and as a result of the Trustee's actions, many of these hardship applications were granted and the Trustee determined those claims as promptly as possible.

In addition, it should also be noted that due to the long term nature of this Ponzi scheme, many of the customer accounts presented multiple generational investments by customers with Mr. Madoff. Thus, it was not simply a matter of examining a single account for a short period of time, but in many instances, it required an analysis of multiple accounts going back several decades in order to fully determine the amount of money invested by the customer and whether the customer had invested more money than he or she had received from Mr. Madoff.

Notwithstanding these extreme difficulties, the Trustee has determined over 80% of the customer claims filed. The review and determination of customer claims is an ongoing process. The remaining claims include the most difficult ones, such as those of members of the Madoff family and extended family, insiders (former employees), feeder funds and others.

9. For all Madoff- related claims, please detail how many claims have been disallowed because the investors were not directly invested with Mr. Madoff's firm.

**Response:**
There are 8,489 determined claims submitted by claimants who had no account at Madoff that were disallowed. There are an additional 2,094 undetermined claims that tentatively are in this category but may be re-categorized upon further review.

Honorable Paul E. Kanjorski
Honorable Scott Garrett
September 7, 2010
Page 8

10. For each year, from 1992 until the liquidation of Bernard L. Madoff Investment Securities, please detail the aggregate funds that flowed into the firm and out to investors.

**Response:**
For each year from 1992 through 2008, the following represents the aggregate funds that flowed into and out of BLMIS:

| Year | Cash In | Cash Out |
|------|---------|----------|
| 1992 | ($2,097,318,423.98) | $2,077,513,621.46 |
| 1993 | ($2,018,244,086.41) | $2,127,095,135.34 |
| 1994 | ($2,784,953,707.68) | $2,784,003,353.00 |
| 1995 | ($4,346,500,359.97) | $4,407,047,285.35 |
| 1996 | ($6,669,384,242.44) | $6,549,481,308.31 |
| 1997 | ($9,046,919,591.00) | $8,636,920,182.65 |
| 1998 | ($12,826,039,594.36) | $11,697,071,675.76 |
| 1999 | ($17,917,907,439.09) | $17,094,507,049.12 |
| 2000 | ($25,629,825,795.12) | $25,702,346,740.45 |
| 2001 | ($37,404,909,113.36) | $37,580,315,488.37 |
| 2002 | ($3,315,517,149.06) | $3,564,299,618.83 |
| 2003 | ($3,162,410,682.31) | $3,667,760,430.70 |
| 2004 | ($4,045,509,142.92) | $3,528,053,488.39 |
| 2005 | ($3,616,828,561.93) | $4,803,025,580.01 |
| 2006 | ($5,951,217,967.82) | $4,403,608,692.87 |
| 2007 | ($7,284,216,531.24) | $4,488,987,554.54 |
| 2008 | ($6,308,482,583.89) | $10,556,145,532.54 |

Respectfully submitted,

Stephen P. Harbeck
President

SPH:ved

cc: Hon. Barney Frank
Hon. Spencer Bachus