# EXHIBIT K

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises
July 14, 2009

**Mr. Ackerman: (At 8:55 on webcast)**

**Mr. Ackerman:** Thank you Mr. Chairman. Good morning. Mary Schapiro, there are an awful lot of people watching this hearing that aren't too interested in regulatory reform. They're not too concerned about resolution authority or the clearing of derivatives. And they aren't too worried about whether congress complies with your request to increase funding for the SEC Enforcement Division. Madam Chairman, there are thousands of now penniless victims of Bernard Madoff ponzi schemer who are interested in just one thing, making sure their government lives up to its word. As you know, the Securities Investor Protection Corporation. That's *investor protection.* Indicating that it has something to do with protecting the investors. SIPC provides insurance of up to $500,000 for securities investors in the event that a broker-dealer fails. It's been seven months now since the collapse of Mr. Madoff's fraud and, to date, of the 15,000,400 claims that have been submitted, only 450 victims have received even a portion of their SIPC insurance. Part of the delay stems from the confusion over the eligibility requirements for SIPC coverage. If you believe the law, as interpreted by SIPC general counsel Josephine Wang, SIPC is obligated to provide up to $500,000 per account for securities to any investor that believes that they own securities in Madoff's investment statements. But if you believe Irving Picard, the court appointed trustee in the Madoff case, based on the judicial precedence from the 1920s, SIPC is obligated to insure only the funds that Madoff victims initially invested, minus any withdrawals. According to Mr. Picard's interpretation, many Madoff victims are not entitled to their insurance payments. Madam Chairman, that Madoff was able to conduct his fraud unmolested by the SEC for decades and despite the red flags raised by Harry Markopolos is tragic. That the court appointed trustee in the Madoff case is seeking to delay and, ultimately, deny the insurance payments due Madoff's victims is absolutely shameful. Many of Madoff's victims are in complete financial ruin. Many have lost their homes and have moved in with their children or friends. The lucky ones don't know how to make their next mortgage payment. At a minimum, they deserve the insurance they believe, and to which the law says, they're entitled. I hope that you can put an end to the confusion today by clarifying specific eligibility requirements. And I yield back the balance of my time.

**Q&A between Mr. Ackerman and Ms. Schapiro (At 52:00 on webcast)**

**Q. Mr. Ackerman:** Madam Chairman, the issue that I addressed in my opening statement to refresh your memory as to the Madoff victims and the terrible situation that we're looking where we actually have classes of victims

1

1086559.1

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and
Government Sponsored Enterprises
July 14, 2009

       pitted against each other in addition to all the other confusion. Which Madoff investors are eligible for their SIPC insurance?

**A. Ms. Schapiro:** Congressman, let me just say that this is -- it shouldn't be such a difficult issue, but it is. And, of course, it's a very heartbreaking issue. Because the tragic truth is that there is not enough money available to pay off all of the customer claims. And, as you point out, there are --

**Q. Mr. Ackerman:** That leads us -- if I could just interject there -- a larger problem. Because that means that our citizens are not entitled to have confidence in the system.

**A. Ms. Schapiro:** Well, there is no doubt that what has happened with Madoff has shaken everybody's confidence in the integrity of the financial services industry and in the regulatory system to protect investors. With respect, specifically, to the SIPC question, as you know, the trustee has chosen a cash-in/cash-out view when determining net equity on which claims, and at what amount, to pay out. There are a group of investors who believe that net -- so that if you paid in $2 million, over time you took out a million dollars, your net equity would be $1 million. There's a group of investors --

**Q. Mr. Ackerman:** But these, unfortunately, are people that we have encouraged and assured by virtue of the fact that we provide the supervision and these people knew that there were questions raised about Madoff and the government, basically, gave him a clean bill of health year after year. People knew about Mr. Markopolos. People knew about other people, as well, that had raised questions that were dismissed and then felt the government is saying that this guy is okay. And the million dollars that I put in has grown over the years and I have this money to live on now.

**A. Ms. Schapiro:** I understand that and there's a group of investors who feels very deeply that their net equity on which they would be paid to be determined by looking, as you point out, at their last account statement, so they may have paid in $2 million but that amount of money has grown to $10 million and they were relying on that $10 million to be there for them.

**Q. Mr. Ackerman:** Well, they weren't relying on the $2 million, which they were, of course. They were relying on the government's assurance that they had the $2 million. And they made life decisions based on that. So, where do you come down Madam Chairman?

**A. Ms. Schapiro:** Well, we've been with SIPC and with the lawyers for the investors who would like to calculate the net equity based on the last account

2

1086559.1

08-01789-cgm    Doc 3594-14    Filed 12/28/10    Entered 12/28/10 21:20:31    Exhibit K
to Chaitman Decl.    Pg 4 of 5

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and
Government Sponsored Enterprises
July 14, 2009

statement in hopes of trying to find a way to settle this matter and, between the two groups, to expedite getting these payments out to people who are very dependant upon them. These investors have challenged the trustee's cash-in/cash-out methodology in court and that is before --

**Q. Mr. Ackerman:** Well, we're going to have to make a decision and someone has to make a choice here.

**A. Ms. Schapiro:** I understand and --

**Q. Mr. Ackerman:** Here's a case. A woman who has a small business, a publishing business, she sells it for $3 million and that's everything she owns in the world, $3 million. It's in Madoff. She gets a check for $30,000 a month that she's taking out, which is the money she's making on it. She still has the equity in there. She buys a huge apartment in Manhattan. That's the only asset that she has. The asset is now under water. She spends the $30,000 a month to pay her taxes, pay her mortgage and her maintenance and her living expenses. She's done this for a couple of years. Suddenly, one month when Madoff turns himself in, she has no income. The unit she lives in upside down, as they say, she can't sell it for what it's worth, she owes $15,000 a month in carrying charges, she'll get nothing from it if she sells it, and has $1,500 in her bank and is waiting for her $30,000 return from Madoff. She's homeless. She has no assets. Her $3 million has been stolen. And then, on top of that, she's being told that the $30,000 a month that she's gotten, that she's paid taxes on with half, and half to her mortgage, she suddenly owes back, because of a claw-back thing that they're claiming, where is she going to get the $30,000 a month that she's collected to give back? I mean, these people are absolutely destitute. And they were reliant on the government's seal of approval that this guy is legit, that he's up and up. How can we turn our back on these people?

**A. Ms. Schapiro:** We cannot turn our back on them and we should not turn our back on them. And, I'm committed to working as aggressively as we possibly can with SIPC and take the most expansive possible view of how to repay these claims and to do it in as quick a fashion as we possibly can. That specific issue is before the bankruptcy judge right now. I don't have -- although I'd be happy get for you -- some indication of timing or when it might be resolved. But I agree that we need to push very hard to make people whole to the greatest extent possible.

**Q. Mr. Ackerman:** I thank you for your concern and your actions. Mrs. Chairman, if I could just have another couple of seconds to add -- some of our colleagues have raised an accountability question and I just want to compliment the Chairman. That rather bombastic initial hearing that we had with people

3

08-01789-cgm   Doc 3594-14   Filed 12/28/10   Entered 12/28/10 21:20:31   Exhibit K to Chaitman Decl.   Pg 5 of 5

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises
July 14, 2009

       from the agency before that got an awful lot of attention because it was the first one. The Chairman called me immediately after the hearing and said she aghast that some of the things that she had heard during the testimony --

**Unknown Speaker:** You mean she called you too?

**Q. Mr. Ackerman:** Yes, she did [laughter]. Even me. And, by the end of that week, two of those people were gone from the agency and I just want to say that that's accountability that I've never seen in my fourteen terms here and I want to thank the Chairman for swift action and dedication to our mission. I yield back the balance of my time.