Helen Davis Chaitman
BECKER & POLIAKOFF LLP
45 Broadway
New York, NY 10006
(212) 599-3322
hchaitman@beckerny.com

Attorneys for the Schy Family Partnership,
Zipora Lazarus, Rose and Ira Schy, Abe
and Lisa Schy, Doron Schy and Family,
Steven Schy and Family, and Elan Schy

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,                                               Adv. Pro. No. 08-01789 (BRL)

       Plaintiffs                                            SIPA Liquidation

vs.                                                        **OBJECTION TO TRUSTEE'S**
                                                      **DETERMINATION OF**
BERNARD L. MADOFF INVESTMENT                               **CLAIM**
SECURITIES LLC,

       Defendant.
---------------------------------------------------------

       The Schy Family Partnership (the "Partnership"), and each of its Investors, Zipora Lazarus, Rose and Ira Schy, Abe and Lisa Schy, Doron Schy and Family, Steven Schy and Family, and Elan Schy (the "Investors"), hereby object to the Trustee's Determinations of Claim dated December 3, 2010 (the "Determination Letters") and state as follows:

**Background facts**

       1.    The Partnership was formed under Florida law pursuant to a written agreement.

       2.    On September 22, 2003, the Partnership opened an account with Bernard L. Madoff Investment Securities LLC ("Madoff") bearing Account No. 1ZB48130 (the "Account"). The Partnership and the Investors believe that the initial deposit into the Account was $878,492.42,

which came from Madoff Account No. 1ZB30030.   The Trustee has credited the Account with only $108,000 of this transfer.  The Partnership and the Investors dispute the Trustee's calculations and methodology.  In addition, the Partnership and the Investors dispute the trustee's calculations and methodology regarding the transfer of net equity, as defined by the Trustee, between Account No. 1ZB30030 and the Account.

3. The Partnership operated the Account for the purpose of each of the Investors investing in Madoff and each Investor of the Partnership deposited funds with Madoff for the purpose of purchasing securities on their behalf.

4. According to the Trustee, during the period from September 22, 2003 through December 11, 2008, the Investors deposited a total of $292,641 into the Account and withdrew a total of $561,000.  See Exh. A hereto at 5-6.  The Partnership disputes the Trustee's calculations and believes that the Investors deposited a total of $1,063,133.42.

5. The Partnership filed a SIPC claim in the amount of $1,011,770.09, representing the November 30, 2008 balance in the Account.  Each of the Investors also filed timely SIPC claims for their individual investments in the Partnership, based upon the November 30, 2008 balances.

**6.** On October 19, 2009, the Trustee sent a Determination Letter to the Partnership objecting to its claim and denying any SIPC insurance on the theory that the Partnership had withdrawn $268,359 more than it invested, ignoring all appreciation in the Account, as well as appreciation in Madoff account No. 1ZB30030, from which monies were transferred.  See Exh. A.

**7.** The Partnership objected to the October 19, 2009 Determination Letter.

**8.** In the December 3, 2010 Determination Letters, the Trustee rejected the SIPC claims filed by each of the Investors.  See Exh. B.

**Grounds for objection**

**A. The Investors are each "customers" under SIPA entitled to up to $500,000 in SIPC insurance.**

9. Each of the Investors is a "customer" under the plain definition of "customer" in the Securities Investor Protection Act ("SIPA"). Thus, each is entitled to receive up to $500,000 in SIPC insurance. 15 U.S.C. § 78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities."). *Rosenman Family, LLC v. Picard,* 401 B.R. 629, 635 (B.S.D.N.Y. 2009)("the mere act of entrusting . . . cash to the debtor for the purpose of effecting securities transactions . . . triggers customer status. . ."); *SEC v. Ambassador Church Financial Devel. Group, Inc.,* 679 F. 2d 608, 614 (6th Cir. 1982); *In re Primeline Sec. Corp.,* 295 F. 3d 1100, 1107 (10th Cir. 2002)("SIPA does . . . protect claimants who try to attempt to invest through their brokerage firm but are defrauded by dishonest brokers . . . If a claimant intended to have the brokerage purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds"); *Miller v. DeQuine (In re Stratton Oakmont, Inc.),* 2003 WL 22698876 at *3 (S.D.N.Y. Nov. 14, 2003) ("Stratton Oakmont's conversion of Claimants' property makes the customers within the meaning of SIPA.").

10. Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder." Instead, Congress' definition of "customer" is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the

3

extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor") (emphasis added).

11. Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Investors because "SIPA is remedial legislation. As such, it should be construed liberally to affect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

12. Moreover, it is clear that Congress intended for "customer" to be broadly interpreted. In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. Section 7(d)(June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (Aug.4, 1969). The final bill dropped this restriction.

13. The Trustee has erroneously relied upon SIPC Rule 103. SIPA does not permit SIPC, by the promulgation of Rules, to change the definition of "customer" under the statute. Hence, Rule 103 is invalid. 15 U.S.C. § 78ccc(b)(4)(A).

14. The share of each of the Investors in the Partnership, as of November 30, 2008, was less than $500,000 except for one Investor whose share was $529,719.

**B. The Trustee has failed to comply with the Court's December 23, 2008 Order**

15. The Determination Letters fail to comply with the Court order dated December 23, 2008 which directs the Trustee to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books

4

and records" by which the Trustee is bound, absent proof that the Partnership did not have a "legitimate expectation" that the balance on the Account statement represented its property. In fact, in each year of the investment, the Investors paid short term capital gains tax on the appreciation in the Account. They would not have done so if the Investors had any belief whatsoever that the assets in the Account did not belong to them.

16. The Trustee has failed to state a valid basis in the Determination Letters for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at * (B.S.D.N.Y. Jan. 13, 2003).

**C. The Trustee has violated the requirement that he honor a customer's "legitimate expectations"**

17. The legislative history of SIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
>
>                  \*     \*     \*
>
> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

5

18.     On December 30, 1970, when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms.   . . . Just as the Federal Deposit Insurance Corporation protects the user of banking services from the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid=2870

19.     The Securities Investor Protection Corporation's ("SIPC's") Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

20.     On December 17, 2010, New Jersey Congressman Scott Garrett, in-coming Chairman of the Subcommittee of Capital Markets, Insurance, and Government-Sponsored Enterprises (the "Committee") of the United States House of Representatives, introduced legislation to enforce the existing SIPA provisions which Picard has violated.   The Committee has jurisdiction over SIPC.  Congressman Garrett issued the following statement upon introduction of his legislation:

> When investors see the SIPC seal of approval, they should have confidence in the account statements they receive. These ordinary investors who knew nothing about the fraud should not be held to a higher standard than the federal government - which in the case of the Securities and Exchange Commission (SEC) missed the Madoff fraud in the first place, and in the case of the Internal Revenue Service (IRS) was happy to rely on these same statements to collect taxes from the reported profits.
>
> Customers of registered brokers regulated by the SEC are legally entitled to rely on their customer statements as evidence of what their broker owes them - this does not change when a broker engages in fraud. Indeed, it is there to protect customers in the event of fraud. Since customers dealing with brokers do not hold physical securities, there is no other way for customers to verify their holdings.

6

> I am concerned that the trustee in the Madoff case is ignoring this law and failing to provide prompt assistance to those who have been thrust into financial chaos. He is taking positions on a wide range of issues that are contrary to the Securities Investor Protection Act (SIPA), the Bankruptcy Code, and federal and state laws that are intended to protect investors against bad acts on the part of their brokers. This legislation is intended to clarify for the trustee and the Bankruptcy Court that Congress wants these laws to be followed.
>
> If the current law is not followed, no customer can ever have confidence in his or her dealings with a broker. That is contrary to the policy goal of encouraging investment, which is critical to the economic renewal our country needs.

21. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*) (emphasis added).

22. The Trustee's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities

7

> were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

23.  As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

**D.  Without legal authority, the Trustee has invented his own definition of "net equity"**

8

24. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

25. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

26. The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also ,In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999) ("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

27. In derogation of his obligations to carry out the provisions of SIPA, the Trustee has created his own definition of "net equity." He has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, the Trustee would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who have depended upon their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net

9

investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

28.     Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

29.     Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

30.     After 24 months of his tenure, the Trustee has identified only a handful of Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 per account in SIPC insurance.

31.     The Partnership, like thousands of other investors, received monthly statements from Madoff indicating returns on their Madoff investment in the range of 9 – 20% per year, subject to short term capital gains tax rates. The Partnership had entered into standard brokerage agreements with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Partnership had a specific, numbered account for the purchase and sale of securities; it received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. The Investors paid taxes on the annual growth of the investments with Madoff. There is no basis to claim that the Partnership,

or for that matter, each of its Investors, did not have a "legitimate expectation" that the assets reflected on the Partnership's statements sent by Madoff belonged to them.

32. Thus, the Partnership is entitled to a claim for $1,011,770.09, the November 30, 2008 balance on the Account as reflected on the Madoff statement and each of the Investors is entitled to a claim for his respective November 30, 2008 balance.

**E. The Investors are each entitled to prejudgment interest on its investment and profits.**

33. At a minimum, under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted the Investors' funds, they are also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

34. Although it is not legally relevant, the Trustee cannot prove that Madoff earned no money on the Investors's investments. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which the Investors and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

35. In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket

11

damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.) (district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

**F.  The Trustee has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit**

36.    In derogation of his fiduciary duty to the Investors, the Trustee is, in effect, imposing upon the Partnership a fraudulent conveyance judgment for sums that the Partnership withdrew from the Account, and sums that were transferred into the Account, beyond the statute of limitations period applicable to fraudulent conveyances. Thus, even if the Trustee were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Investors of SIPC insurance and the claim to which the Investorship is absolutely entitled.

37. Moreover, the Trustee has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for the Trustee to utilize the avoidance powers of a trustee to enrich SIPC at the Investorship's expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g.,* 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

38. Here, however, the Trustee is not acting to assure equal distribution among prepetition creditors. On the contrary, he is simply acting as SIPC's agent in depriving the Investors of the $ 1,011,770.09 in SIPC insurance to which the Investors are statutorily entitled.

**G. The Trustee has violated SIPA by delaying the payment of SIPC insurance**

39. The Trustee has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). The Trustee is obligated to replace the Investors' securities up to a value of $1,011,770.09 , as valued on the November 30, 2008 statements.

40. The share of each of the Investors in the Partnership, as of November 30, 2008, was less than $500,000 except for one Investor whose share was $529,719.

**Conclusion**

The Investors are entitled to an order compelling the Trustee and SIPC to immediately replace the securities in the Account to the extent of a valuation of $982,051.09 as of November 30, 2008, or up to $500,000 for each of the Investors. If it is determined that each Investor is not allowed up to $500.000, the Partnership should still be entitled to receive $500,000.

The Partnership is entitled to have its claim recognized in the amount of $ 1,011,770.09, consistent with the November 30, 2008 statement.

The Partnership, and/or the Investors are entitled to judgment against Picard and Baker & Hostetler LLP for the damages they have suffered as a result of the breach of fiduciary duty of the Trustee and his counsel.

December 28, 2010

BECKER & POLIAKOFF LLP

By: /s/ Helen Davis Chaitman

45 Broadway
New York, NY 10006
(212) 599-3322
hchaitman@beckerny.com

Attorneys for The Schy Family Partnership, Zipora Lazarus, Rose and Ira Schy, Abe and Lisa Schy, Doron Schy and Family, Steven Schy and Family, and Elan Schy