Helen Davis Chaitman (4266)
BECKER & POLIAKOFF LLP
45 Broadway
New York, NY 10006
(212) 599-3322
hchaitman@beckerny.com
Attorney for Helen Davis Chaitman

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,                                            Adv. Pro. No. 08-01789 (BRL)

        Plaintiffs                                              SIPA Liquidation

vs.                                                     **OBJECTION TO TRUSTEE'S**
                                       **DETERMINATION OF**
BERNARD L. MADOFF INVESTMENT                            **CLAIM**
SECURITIES LLC,

        Defendant.
----------------------------------------------------------

       Helen Davis Chaitman objects to the Notice of Trustee's Determination of Claim dated December 16, 2010 and states as follows:

**Background facts**

       1.     As one of two equal members of the Chaitman/Schwebel LLC (the "LLC"), Chaitman opened an account with Bernard L. Madoff Investment Securities LLC ("Madoff") in February 2005. The account bears Account No. 401 (the "Account").

       2.     Some of the account opening forms were signed by Chaitman in her individual capacity; some were signed in her capacity as managing member of the LLC.

       3.     The LLC was formed for the specific purpose of investing in Madoff and meeting Madoff's then stated minimum investment requirement. The only members of the LLC were Chaitman and Schwebel, each owning 50%.

1083409.1

4. In February 2005, Chaitman and Schwebel each wired funds to Madoff from their personal checking or brokerage accounts in the same amount. The funds were credited to the Account.

5. No funds were ever withdrawn from the Account by either Chaitman or Schwebel and no further investments were made by either Chaitman or Schwebel after the initial investments.

6. On January 12, 2009, Chaitman sent a SIPC claim to Picard on behalf of the LLC annexing all of the relevant documents. On January 30, 2009, Chaitman sent an amended SIPC claim to Picard on behalf of the LLC, again annexing all of the relevant documents. On May 12, 2009, Chaitman sent a SIPC claim to Picard on behalf of herself individually.[1]

7. On April 21, 2009, Picard sent Chaitman and Schwebel a determination letter (the "Determination Letter") with respect to the LLC's claim, rejecting the claim based upon the November 30, 2008 balance but agreeing to recognize the claim in the amount of the initial investment exclusive of any appreciation. Picard offered to send the LLC a check for $500,000 from SIPC upon execution by Chaitman and Schwebel of an Assignment and Release.

8. By letter dated April 30, 2009, Chaitman responded to the Determination Letter by asking Picard to explain his authority for two propositions:

a. Picard was utilizing a definition of "net equity" which was inconsistent with the definition of "net equity" in the Securities Investor Protection Act ("SIPA"), despite the fact that SIPA prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A); *In re New Times Securities Services, Inc*., 371 F.3d 68 (2d Cir. 2004)

---

[1] Because Picard has all of the relevant documents, to protect the privacy of her cousin, Chaitman has not made these documents part of this filing but they will be available to be introduced into the record at the time of trial.

b. Picard was not treating each of Chaitman and Schwebel as separate "customers" entitled to SIPC insurance, despite the fact that SIPA defines customer to include "any person who has deposited cash with the debtor for the purpose of purchasing securities." 15 U.S.C. § 78lll(2). Chaitman pointed out that she deposited funds with Madoff directly from her personal checking account for the purpose of purchasing securities while Schwebel deposited funds with Madoff directly from his brokerage account. No investment was made by the LLC as such. By letter dated May 11, 2009, Picard indicated that he was waiting for "guidance" from the Securities and Exchange Commission (the "SEC") with respect to the issues raised by Chaitman's letter and he voluntarily extended the time to object to his determination for 30 days, until June 21, 2009.

9. By letter dated May 28, 2009, Picard stated that, with respect to his definition of "net equity," he was "waiting for a response" from the SEC and would "defer responding to your request for clarification and legal authorities until such time as we receive a response from the SEC."

10. In the May 28, 2009 letter, Picard cited inapplicable authority in support of his position that Chaitman and Schwebel were each not "customers" entitled to $500,000 in SIPC insurance. Picard cited 17 CFR 300.105(b), a regulation promulgated by SIPC, despite the fact that SIPA expressly prohibits SIPC from promulgating regulations that change the definition of "customer." 15 U.S.C. § 78ccc(b)(4)(A). In any event, this regulation is irrelevant because it applies only to "qualifying joint accounts" and states that "qualifying joint accounts are accounts "owned jointly, whether by the owners thereof as joint tenants with the right of survivorship, as tenants by the entirety or as tenants in common, or by husband and wife as community property, but only if each co-owner possesses authority to act with respect to the entire account."

3

11.     The only other authority Picard cited for the proposition that Chaitman is not a "customer" entitled to SIPC insurance is *SIPC v. Morgan, Kennedy & Co.,* 533 F. 2d 1314, 1317-18 (2d Cir. 1976). In that case, the Second Circuit rejected the argument that each of the 108 beneficiaries of a profit sharing plan was a "customer" under SIPA because the employees "were neither investors nor traders. The funds in the trust account came from [the employer corporation]; the decision to entrust those funds to the debtor was the Trustees'. Appellees' counsel conceded at oral argument that none of the one hundred and eight would have had any standing as a 'customer' of the then-solvent broker-dealer to give any buy or sell orders in the account." Here, on the other hand, Chaitman and Schwebel were investing their own funds into Madoff and each had authority to direct buy and sell orders in the account.

12.     On December 16, 2010, Picard sent Chaitman a determination letter rejecting her claim for securities on the theory that there was no Madoff account in her own name.

**Grounds for objection**

**E.    Chaitman is a "customer" under SIPA entitled to $500,000 in SIPC insurance**

13.     Chaitman is a "customer" under the plain definition of "customer" in SIPA. Thus, she is entitled to receive $500,000 in SIPC insurance. 15 U.S.C. § 78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.").

14.     Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder." Instead, Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise

4

satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor").

15. Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of Chaitman because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967)

**B. Picard has failed to comply with the Court's December 23, 2008 Order**

16. The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that Chaitman did not have a "legitimate expectation" that the balance on the Account statement represented the property of herself and Schwebel.

17. Picard has failed to state a basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at * (B.S.D.N.Y. Jan. 13, 2003(.

**C. Picard has violated the requirement that**

**he honor a customer's "legitimate expectations"**

18.  The legislative history of SIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
>
> \*   \*   \*
>
> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

19.  On December 30, 1970, when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms. . . . Just as the Federal Deposit Insurance Corporation protects the user of banking services from the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid=2870

20.  Consistent with SIPA, SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

6

21. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

22. Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

23. In the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation

in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

**D. Without legal authority, Picard has invented his own definition of "net equity"**

24. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus

8

(B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

25. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

26. The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

27. In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who have depended upon their Madoff investments for their daily living expenses. He also seeks to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

28. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

29. Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

30. After 24 months of his tenure, Picard has identified only a handful of Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

31. Chaitman, like thousands of other investors, purportedly received returns on their Madoff investment in the range of 9 – 11% per year, subject to short term capital gains tax rates. Chaitman had, through the medium of the LLC, entered into standard brokerage agreements with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the LLC had specified, numbered accounts for the purchase and sale of securities; she had separately and individually received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. She had paid Federal and State taxes on the annual growth of the partnership's account with Madoff. There is no basis to claim that she did not have a "legitimate expectation" that the assets reflected on the LLC's statements directly sent by Madoff to her belonged to her.

32. Thus, Chaitman is entitled to a claim for 50% of the November 30, 2008 balance on the Account as reflected on the Madoff statement.

**E.  Chaitman is entitled to prejudgment
interest on their investment and profits.**

33.     At a minimum, under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted Chaitman's funds, she is also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

34.     Picard cannot prove that Madoff earned no money on Chaitman's investments. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which Chaitman and other customers are entitled.

**G. Picard has violated SIPA by delaying in payment of SIPC insurance**

35.     Picard has breached his statutory obligation to "promptly" pay SIPC insurance or provide customers with replacement securities. 15 U.S.C. § 78fff-2(b)("... the Trustee shall promptly discharge . . . all obligations of the debtor to a customer . . . by the . . . making of payments to or for the account of such customer").

36.     Picard has no right to delay payment to Chaitman of the undisputed portion of her claim.

**Conclusion**

37.     Chaitman is entitled to an order compelling SIPC to immediately replace securities in the Account with a value of $500,000 as of November 30, 2008.

11

38.  Chaitman is entitled to have her claim recognized in the amount of 50% of the LLC's November 30, 2008 statement.

39.  Chaitman is entitled to compensatory damages against Picard and Baker & Hostetler LLP for their breach of fiduciary duty.

January 7, 2010

                BECKER & POLIAKOFF LLP

                By  s/s Helen Davis Chaitman

                45 Broadway
                New York, NY 10006
                (212) 599-3322
                hchaitman@beckerny.com

                Attorneys for Helen Davis Chaitman