# EXHIBIT 2

**The Special Trust & Investor-Claimants'
Objections to Trustee's Determination of Claim
(August 27, 2009)**

{00069121}

Hearing Date and Time: To be determined by Trustee
Objection Deadline: August 31, 2009

BRUNELLE & HADJIKOW, P.C.
George Brunelle (GB-3900)
Timothy Kebbe (TK-6300)
One Whitehall Street – 18th Floor
New York, New York 10004
Telephone: (212) 809-9100
Facsimile: (212) 809-3219
*Attorneys for James H. Cohen Special Trust*
*and other Investor-Claimants Captioned Below*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | : | |
| | : | SIPA Liquidation |
| v. | : | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| In Re: Objection to the Trustee's Determination of Claim with Respect to | : | **THE SPECIAL TRUST & INVESTOR-CLAIMANTS' OBJECTIONS TO TRUSTEE'S DETERMINATION OF CLAIM** |
| JAMES H. COHEN SPECIAL TRUST, | : | |
| MORRIE ABRAMSON, | | |
| BARRY E. KAUFMAN, | : | |
| JAMES H. COHEN, | | |
| ROBYN C. BERNIKER, | : | |
| ALAN D. GARFIELD, | | |
| MARION TALLERING-GARFIELD, | : | |
| ERIN M. HELBERG, | | |
| THE MARIAN COHEN 2001 | : | |
| RESIDENCE TRUST, and | | |
| BK INTEREST, LLC, | : | |
| | | |
| Investor-Claimants | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

00057711

## OBJECTIONS TO TRUSTEE'S DETERMINATION OF CLAIM

We represent a pass-through grantor trust, The James H. Cohen Special Trust (the "Special Trust") and its nine beneficiaries MORRIE ABRAMSON, BARRY E. KAUFMAN, JAMES H. COHEN, ROBYN C. BERNIKER, ALAN D. GARFIELD, MARION-TALLERING-GARFIELD, ERIN M. HELBERG, THE MARIAN COHEN 2001 RESIDENCE TRUST and BK INTEREST, LLC (collectively, the "Investor-Claimants"). The Special Trust and the investor-claimants, by and through their undersigned attorneys, hereby object to the Notice of Trustee's Determination of Claim dated July 30, 2009 ("Determination Letter"), attached as Exhibit A, as described herein.

### BACKGROUND

1. On December 11, 2008, the above-captioned liquidation proceeding was commenced against BLMIS, pursuant to the Securities Investor Protection Act of 1970 ("SIPA"). *See* Order, *Securities and Exchange Commission v. Madoff*, No. 08-10791 (S.D.N.Y. Dec. 15, 2008) (ordering relief under SIPA and transferring proceeding to the United States Bankruptcy Court for the Southern District of New York) [Dkt. No. 4]. Irving Picard was appointed Trustee ("BLMIS Trustee"), charged with overseeing the liquidation of BLMIS and processing customer claims for money pursuant to SIPA. *Id.*; *15 U.S.C. 78fff-1(a)*.

2. On December 23, 2008, the Court issued an Order directing the Trustee to disseminate notice and claim forms to BLMIS customers and setting forth claim-filing deadlines. *See* Order [Dkt. No. 12]. Upon information and belief, the BLMIS Trustee disseminated notice and claim forms to BLMIS's customers in accordance with the Court's Order.

3. The December 23, 2008 Order further provided that, to the extent the BLMIS Trustee disagreed with the amount set forth on a customer claim form, the BLMIS Trustee "shall notify such

claimant by mail of his determination that the claim is disallowed, in whole or in part, *and the reason therefor . . . .*" *See* Order at 6 (emphasis added) [Dkt. No. 12].

4.    On or about February 25, 2009, Mr. Cohen submitted SIPC customer claim forms for the Special Trust and the nine investor-claimants. The ten claim forms, of which copies are annexed as Exhibits B through K, claimed the following payments from SIPC:

| Claimant Name | SIPC Payment Claimed (Net Equity) |
|---|---|
| Morrie Abramson (Exhibit B) | $1,166,008.03 |
| Barry E. Kaufman (Exhibit C) | 1,183,295.01 |
| James H. Cohen (Exhibit D) | 1,166,008.03 |
| Robyn C. Berniker (Exhibit E) | 488,101.36 |
| Alan D. Garfield (Exhibit F) | 522,083.30 |
| Marion Tallering-Garfield (Exhibit G) | 368,070.45 |
| Erin M. Hellberg (Exhibit H) | 395,725.64 |
| Marian Cohen 2001 Residence Trust (Exhibit I) | 617,045.04 |
| BK Interest, LLC (Exhibit J) | 204,727.88 |
| James H. Cohen Special Trust (Exhibit K) | $6,111,093.74[1] |

5.    In addition, the Special Trust's final statement from BLMIS, dated November 30, 2008, stated that the value of the securities had reached an aggregate amount of $6,111,093.74 (the "Final

---

[1] The sums for the nine investor-claimants represent the pro rata market value of the securities attributable to each of them as of the final BLMIS account statement for the Special Trust, November 30, 2009. The separate claims of the investor-claimants are, in the aggregate, the same amount of the Special Trust. The Trustee allowed the Special Trust's Claim in the amount of $3,858,200 (Exhibit A) and made a partial satisfaction of the allowed Claim in the sum of $500,000 (id.). On Monday, August 17, 2009, Richard Holmes of Alix Partners, LLP, the Claims Administrator for the Trustee, informed us that the Trustee had determined to allow only those claims of individuals and entities that had accounts with BLMIS and that notices of the allowed claims were being mailed before the denied ones. As none of the investor-claimants had accounts directly with BLMIS, the Trustee has denied their separate claims in their entirety. Mr. Holmes informed us that the Trustee's letters denying their claims would be mailed at a later date. We have not received letters from the Trustee disallowing the investor-claimants' claims.

Statement") (Ex.2A)[2]. Had the SIPC claim of the nine investor-claimants here been allowed to the extent of the aggregate value of securities BLMIS claimed to have purchased, each of the nine would have received a SIPC payment in the amount of their net equity (if below $500,000) or $500,000 (if their net equity was above $500,000). The Determination Letter states, however, at p. 1, that "Your claim for securities is DENIED. No securities were ever purchased for your account."

6.    Each of these nine investor-claimants (other than the Special Trust) should be compensated as a "customer" of BLMIS under the SIPA. Through the fraud of BLMIS representatives, these nine customers were artificially and fraudulently aggregated into an *ad hoc* pseudo-entity called the "James H. Cohen Special Trust." BLMIS dictated the form of the "Special Trust," dictated that the "Trustee" would have no responsibilities for management of the "Special Trust's" assets, that the Cohen Trustee of the Special Trust would receive no compensation for his designation as "Trustee" or for any services on the "Special Trust's" behalf, and that the separate assets of the nine customers would be placed into a single account solely for the convenience of BLMIS. The nine investor-claimants were fraudulently induced to invest on the representation that BLMIS would "accept" their investments on no terms other than the aggregation of those investments into a single account, called a "Trust" account, so that their investments, collectively, would equal the minimum investment amount supposedly required to qualify for investment with BLMIS. This so-called "Special Trust" made no investments other than with BLMIS, made no decisions of any kind on matters of investment strategy, tax planning or others functions characteristic of a genuine trust, and was, in every meaningful respect, a fiction and a by-product of the Madoff fraud. For purposes of SIPA, therefore, this so-called "Special Trust" should be

---

[2] Numbered Exhibits are contained in the separate compendium submitted therewith.

disregarded, and the nine investor-claimants – all customers within the meaning of SIPA – should each receive the payments to which they are entitled under SIPA.

7.    Substantiating these facts and legal conclusions, the investor-claimants provided the BLMIS Trustee with, among other things, documentary exhibits, which are submitted herewith in a separate Compendium entitled Investor-Claimants' Exhibits in Support of Their Objections to the Trustee's Determination of Claim. Each of these Exhibits is hereby respectfully submitted for the Court's consideration, and is incorporated herein by reference.

8.    Rather than authorizing the payments sought by the nine investor-claimants, the Determination Letter stated that a single payment should be made by SPIC, to the "James H. Cohen Special Trust," in the total amount of $500,000. Although the Determination Letter does not state that the separate claims of the nine investor-claimants have been denied, the Determination Letter implies that conclusion, which implication was confirmed by the Trustee's Claims Administrator.

9.    Taking that implied and stated conclusion to be the BLMIS Trustee's actual determination, we file the present *Objections to Trustee's Determination of Claim.*

10.   The BLMIS Trustee seems to allow the nine customers to receive only a pro rata share of the aforementioned $500,000 payment. On the contrary, the nine customers, respectively, should receive payments under SIPA, as follows, even without the inclusion of securities from the Final Statement:

| Claimant Name | Initial Investment | Maximum SIPC Coverage | Presemt SIPA Payment Due * |
|---|---|---|---|
| Morrie Abramson | $650,000 | $500,000 | $500,000 |
| Barry E. Kaufman | 750,000 | 500,000 | 500,000 |
| James H. Cohen | 650,000 | 500,000 | 500,000 |
| Robyn C. Berniker | 325,000 | 500,000 | 325,000 ** |

| Alan D. Garfield | 375,000 | 500,000 | 375,000 ** |
| Marion Tallering-Garfield | 250,000 | 500,000 | 250,000 ** |
| Erin M. Hellberg | 275,000 | 500,000 | 275,000 ** |
| Marian Cohen 2001 Residence Trust | 425,000 | 500,000 | 425,000 ** |
| BK Interest, LLC | 158,200 | 500,000 | 158,200 ** |

\* These amounts are stated without prejudice to the nine investor-claimants' application for SIPC payments based not only the cash balance in their account, but also on the securities balance, as set forth under the "Fifth Objection" presented below.

\*\* If the Court allows the inclusion of the value of securities set forth in the Final Statement, the amount of this investor-claimants' claims will be as set forth in paragraphs 4 and 5, above.

## STATEMENT OF FACTS

11.    The Special Trust should be disregarded for purposes of "customer status" and customer protection under SIPA. The Special Trust is a direct product of fraud perpetrated on the claimants by BLMIS, Bernard L. Madoff ("Madoff") and the Firm's marketer, Alvin J. ("Sonny") Delaire, Jr., and nothing more.

12.    The Special Trust's initial investor-claimants wanted to individually invest with BLMIS. BLMIS and Madoff, however, refused to allow their individual investments and required the original investor-claimants to form a trust – binding upon themselves and future investors -- allegedly to meet BLMIS's and Madoff's "minimum investment" amount.

13.    BLMIS, through its Trading Authorization Limited to Purchases and Sales of Securities and Options, dated April 28, 2003 (the "Trading Authorization"), dictated the terms of the Special Trust. Among other things, the Trading Authorization limited the Special Trust's functions to entrusting the investor-claimants' funds with BLMIS and allowed only BLMIS to make investment

decisions for the Special Trust. The Special Trust, in other words, was not a genuine trust, but a fraudulent extension of BLMIS's and Madoff's enormous Ponzi scheme. As set forth herein, the SIPC Trustee should have deemed the Special Trust a nullity, and classified each of its nine investor-claimants separately as a "customer," each being entitled to the full amount of customer protection under SIPA.

14.    The nine customers herein were each investors and beneficiaries in the Special Trust, which was merely a conduit for their monies. The Special Trust deposited all of the investor-claimants' funds with BLMIS for investment. Madoff required the founders of the Special Trust -- Messrs. Cohen, Abramson and Kaufman -- to establish two accounts with BLMIS (one for equities and related investments; the other for options) for investment of all of the investor-claimants' funds. BLMIS and Madoff required this structure to further their giant $50 billion Ponzi scheme. The transaction establishing the Special Trust was permeated with BLMIS's criminality and fraud; as a matter of law, BLMIS's criminality in respect of that transaction renders the Special Trust a legal nullity and void ab initio.

15.    The investor-claimants deposited a total of $3,858,200 with BLMIS, through the fiction of the Special Trust, for the purchase and sale of securities. BLMIS and Madoff absconded with the investor-claimants' investments. Under well recognized precedent, the Bankruptcy Court should find that each of the nine investor-claimants is entitled to separate customer status and separate protection under SIPA because the Special Trust was no more than a legal fiction -- created by BLMIS and Madoff -- designed to extract innocent investors' funds in furtherance of their criminal enterprise.

16.    More than that, each of the nine investor-claimants understood that their investments with BLMIS would be recognized as individual investments with that company, with the Special Trust as a conduct.  With this in mind, the investor-claimants followed BLMIS's payment instructions – using the Special Trust as a conduit for their investment in BLMIS – and reasonably believed that BLMIS would remit an individual investor-claimant's investment (and the profits or losses associated therewith) upon such investor's individual redemption request. (None of the investor-claimants redeemed any portion of their respective investments with BLMIS.)

17.    For these reasons, and as discussed in detail below, each of the nine investor-claimants is entitled to separate customer status under SIPA, and, at a minimum, remittance of their initial investments by the SIPC Trustee, in an amount up to $500,000 for each claimant.  In the event that the Trustee discovers additional BLMIS accounts or funds which enable the Trustee to distribute funds in excess of SIPA's statutory minimums, than such funds should be distributed to the nine investor-claimants, pro rata.

**Discussions Regarding Investments with BLMIS**

18.    In the summer of 2002, Mr. Cohen spoke with a long-time friend, Norman Leff, about investing with BLMIS.  Messrs. Cohen and Leff had known each other since they were Members on the Floor of the American Stock Exchange ("Amex") (n/k/a NYSE Alternext US, LLC) in the 1960's.  At the time of their conversation in 2002, both Mr. Leff and Mr. Cohen had retired from Amex and the securities industry.  Mr. Leff told Mr. Cohen that he had invested with BLMIS and offered to put Mr. Cohen in touch with a BLMIS representative to see about a possible investment with the Firm.

19. Mr. Cohen was aware of BLMIS's apparent investment successes. Approximately 10 or so years before Mr. Leff's invitation, Mr. Cohen was on the Investment Committee of the Hospital for Joint Diseases ("HJD") in New York City. HJD had invested with BLMIS since the 1960's, long before Mr. Cohen joined its Investment Committee. At the time Mr. Cohen was on HJD's Investment Committee (about 10 years ago), BLMIS's account statements reflected that HJD received between a fifteen (15%) percent and twenty (20%) percent return from the investments purportedly made on its behalf by the Firm. The President of HJD had been friendly with Madoff.

20. Mr. Cohen then discussed potentially investing with BLMIS with his friend, Barry Kaufman, a certified public accountant residing in Houston, Texas. Like Mr. Cohen, Mr. Kaufman knew of BLMIS's long record of investment success. Mr. Kaufman was interested in investing with BLMIS.

21. Since Messrs. Cohen and Kaufman could not, even jointly, meet BLMIS's supposed minium investment requirement, Mr. Kaufman contacted his friend of 60 years, Morrie Abramson (also a resident of Houston, Texas). He asked Mr. Abramson if he had any desire to invest with BLMIS. Mr. Abramson said he was interested in pursuing an investment with BLMIS based on his knowledge of its well- known investment performance.

22. Messrs. Kaufman and Abramson authorized Mr. Cohen to contact a BLMIS representative about investing with the Firm. Messrs. Cohen, Kaufman and Abramson -- like each investor-claimant herein -- wanted and intended to make separate, individual investments with BLMIS. Upon receiving instructions from his colleagues, Mr. Cohen contacted Mr. Leff and asked

for an introduction to a BLMIS representative. Mr. Leff introduced Mr. Cohen to "Sonny" Delaire, a marketer for BLMIS.[3]

23.    Mr. Cohen and Delaire met in late 2002 or early 2003. At the outset, Delaire made clear to Mr. Cohen that he had no authority to make any decisions regarding BLMIS, including the decision whether to admit Messrs. Cohen, Kaufman and Abramson as investors. Delaire represented to Mr. Cohen that Madoff made *all* decisions regarding the Firm, among them, whether particular individuals should become investors with BLMIS.

24.    During their first meeting, Mr. Cohen said that he and two other individuals were each willing to invest $500,000 with BLMIS, and inquired about the size of the minimum investment. Delaire replied that the minimum investment was $2 million or $2.5 million. Mr. Cohen asked if the Firm would accept $500,000 investments made by himself and two friends. Delaire said that he did not think so, but would check with Madoff.

25.    Some time later, Delaire contacted Mr. Cohen, saying that Madoff would not accept three $500,000 investments in individual accounts. Instead, Madoff insisted upon a $2 million investment through a single account. Having no alternative, Mr. Cohen proposed various types of investment vehicles (e.g., a joint account, a limited liability company or partnership, a corporation and a "members' account" which made investments on behalf of its sub-accounts) to function as a conduit for individual investments in BLMIS. Madoff, through Delaire, rejected each of Mr. Cohen's proposed investment vehicles.

---

[3]  Mr. Delaire had been an Amex specialist in the 1960's and had known Mr. Cohen while they were working on the Amex Floor. Mr. Cohen had not kept up with Delaire and did not know he was working as a BLMIS marketer.

26.    During this process, Madoff, through his marketer Delaire, made clear that: (a) any individual investments made by Messrs. Cohen, Kaufman and Abramson had to be made through a conduit in the form of an investment vehicle acceptable to Madoff; (b) the investment vehicle had to designate one individual as the sole contact for Madoff and BLMIS; and (c) BLMIS had to have unfettered discretion to manage and trade the investors-claimants' account without any input or recommendations from them.

27.    By process of elimination –  more particularly, Madoff's rejection of every other investment structure proposed by Mr. Cohen – BLMIS and Messrs. Cohen, Kaufman and Abramson arrived at a trust as an acceptable conduit through which the three individuals (and any future investor-claimants) would send their funds to BLMIS for investment.  Madoff approved of Mr. Cohen, Mr. Kaufman and Mr. Abramson investing through a trust on or about February 27, 2003 and lowered the Firm's alleged minimum investment threshold to $1.8 million.  Delaire told Mr. Cohen that the trustee of the Special Trust could not charge any fees in connection with investments in BLMIS.

28.    The Trust Agreement and Declaration of Trust dated April 11, 2003 (the "Trust Agreement"; Exs. 1 ¶¶ 2(a), 2(c), 2(d), 2(h)) mirrored the terms of BLMIS's Trading Authorization. (Ex. 2 at p.7.)  Indeed, as discussed below, the Trust Agreement embodied all of the terms that BLMIS's Trading Authorization required as a condition for accepting investments with the Firm.

29.    Before the Trust Agreement was finalized, Messrs. Abramson and Kaufman had a conference call with Madoff.  Mr. Abramson told Madoff that he was opening an account with BLMIS (i.e., the Special Trust's account) and might put in substantial additional funds for investment with BLMIS. Madoff replied that he did not want to handle such an investment by Mr.

Abramson at that time. This gave Messrs. Abramson and Kaufman comfort that Madoff knew what he was doing as investment manager.

30.    Mr. Kaufman also checked to see if the Firm had been subject to any disciplinary action on the Securities and Exchange Commission's (the "Commission") and NASD Regulation's (now FINRA) websites before the Special Trust account was opened with BLMIS. Mr. Kaufman's search revealed that in its 40 or so years of operation, BLMIS had been subject to a single, minor regulatory infraction resulting in a $1,000 fine. Relying upon that fact, Messrs. Cohen, Abramson and Kaufman invested in BLMIS through the conduit of the Special Trust.

31.    Mr. Abramson met with Delaire before committing funds for investment with the Firm. Mr. Abramson asked Delaire about BLMIS's investment strategy. Delaire was fairly vague in response and strongly implied that Mr. Abramson was not entitled to receive much information because Madoff was doing him a favor by accepting his modest investment with BLMIS.

32.    Delaire met again with Mr. Cohen before Messrs. Abramson, Kaufman and Cohen invested monies with BLMIS. Unlike his conversation with Mr. Abramson, Delaire explained BLMIS's "flex hedge" strategy (also known as a "split strike strategy") in detail and showed Mr. Cohen customer account statements and confirmations (with the customer names redacted) illustrating BLMIS's implementation of this strategy. Delaire's presentation to Mr. Cohen was impressive, and seemingly supported by its prior experience and a purportedly time-tested investment methodology.

33.    Messrs. Cohen, Kaufman and Abramson then finalized the Trust Agreement (Ex. 1) in April 2003. On April 28, 2003, they made three individual investments totaling $1,800,000 with BLMIS, using the Special Trust as a conduit, as required by Madoff. (Exs. 2(a); 3; 4(a); 5; 6; 7; 17.)

Mr. Cohen and Mr. Abramson each invested $650,000. Mr. Kaufman invested $500,000. (Id.) At

BLMIS's request, Mr. Cohen  sent the Trust Agreement to the Firm by letter dated May 16, 2003.

(Ex. 18.)

**The Special Trust**

34.    Mr. Cohen was the nominal trustee of the Special Trust with no right to manage or trade

the Special Trust's investments or to receive any compensation as a Trustee. (Ex. 1 [Trust

Agreement ¶ 1(b)].)  Messrs. Cohen, Kaufman and Abramson were the Special Trust's initial

investor-claimants. (Id. ¶ 1(a).)

35.    The Trust Agreement provided for responsibilities and obligations on behalf of the

Trustee, the investor-claimants and BLMIS. In this regard, the Trust Agreement stated:

> The Trustee, Cohen, will open with the New York broker-dealer
> organization of Bernard L. Madoff Investment Securities LLC ("Madoff")
> one or more retail brokerage accounts in the name of the Trust (the "Madoff
> Account"). In addition, the Trust will open a money market account with
> Fidelity Investments (the "Fidelity Account"). The Madoff Account and
> the Fidelity Account are collectively referred to in this Agreement as the
> "Accounts."
>
> All Beneficiaries of the Trust will share equally and proportionally in all
> profits, losses, income and expenses incurred in, or in connection with, the
> Accounts, to the same extent as if each Beneficiary had an individual
> account.
>
> The Madoff Account will be managed by Madoff on a "discretionary"
> basis, meaning that Madoff may enter orders for the Madoff Account  to
> purchase or sell securities (including options) in the exercise of Madoff's
> brokerage judgment.
>
> In all other respects, the Trustee shall have sole authority to act on the
> Trust's behalf with respect to the Accounts.
>
> The Beneficiaries agree to provide and/or execute promptly any agreements
> or disclosures which may be required by Madoff or Fidelity with respect to

> the Accounts, and to meet any minimum balance and fee requirements in
> the Accounts.

(Id. ¶¶ 2(a) – 2(e).)

*    *    *    *

> The Trustee and the Beneficiaries agree that Trustee may, and they
> anticipate that he will open one or more Accounts with Madoff on a
> "discretionary" basis, that Trustee will authorize Madoff to effect
> transactions on behalf of the Trust's Account with Madoff, in the exercise
> of Madoff's business judgment, that Madoff will have no obligation to
> discuss such transactions with the Trustee before effecting them, and that
> Madoff may effect such transactions without obtaining the Trustee's, or the
> Beneficiaries', permission for, or approval of, any such transaction, either
> before the transaction(s) or after the transaction(s).

(Id. ¶ 2(h).)

*    *    *    *

36.     By its terms, and with full knowledge and agreement of BLMIS and Madoff, the Trust

Agreement gave BLMIS sole and exclusive authority to manage, trade and invest the investor-

claimants' funds deposited in the "Madoff Account." Neither the Trustee, nor any investor-claimant,

had any say in the management, trading or investment of the investor-claimants' deposits with

BLMIS.

37.     It is now self-evident that Madoff required complete control of the monies deposited

through the Special Trust in order to hide the Ponzi scheme he was running through BLMIS.

Similarly, Madoff required Messrs. Cohen, Kaufman and Abramson to form the Special Trust – with

the nominal Trustee being the sole point of contact with BLMIS – to limit the number of persons

who could be in contact with the Firm, particularly contact involving additional due diligence.

Madoff, we now know, was concerned that increased scrutiny would enable someone to discern that there was some sort of wrongdoing occurring at BLMIS.

38.   The Special Trust is a revocable grantor trust. (Id. Ex. E.) The Special Trust paid no Federal, state or local taxes. The taxing authorities disregarded the Special Trust as an entity, and each investor-beneficiary treated gains, losses, dividends, interest and the like as gains and losses on their respective individual tax returns.

**Flow of Monies from the
Investor-Claimants' into BLMIS**

39.   After executing the Trust Agreement, Mr. Cohen filled out and executed account opening documents for the Special Trust sent to him by BLMIS. (Ex. 2.) Mr. Cohen also opened an account on behalf of the Special Trust with Fidelity to comply with BLMIS requirement that the funds come from a single account in order to meet BLMIS's supposed minimum investment amount. (Ex. 4.) The Fidelity account was used to collect the investor-claimants' monies and as a conduit by transmitting those funds to BLMIS for investment. (Exs. 3; 4(a); 4(b).)

**Messrs. Cohen's, Kaufman's and
Abramson's Investments with BLMIS**

40.   Mr. Cohen made his initial and only investment with BLMIS by check dated April 28, 2003. The $650,000 check, drawn on his account at the United Missouri Bank, was payable to the Special Trust. (Ex. 7.) Mr. Cohen's $650,000 investment was transmitted from the Special Trust's Fidelity account and received by BLMIS on or about May 13 or 14, 2003. (Id.; Exs. 2(a); 3; 4(a); 7.)

41.   Mr. Abramson made his initial and only investment with BLMIS by check dated April 24, 2003. The $650,000 check, drawn from his account at JP Morgan Chase Bank ("Chase"), was

00057711                                -15-

payable to the Special Trust. (Ex. 5.) Mr. Abramson's $650,000 investment was transmitted from the Special Trust's Fidelity account and received by BLMIS on or about May 13 or 14, 2003. (Id.; 2(a); 3; 4(a); 5.)

42.   Mr. Kaufman made his first investment with BLMIS by check dated April 22, 2003. The $500,000 check, drawn from his account at Bank of America ("BOA"), was made payable to the Special Trust. (Ex. 6.) Mr. Kaufman's $500,000 investment was transmitted from the Special Trust's Fidelity account  and received by BLMIS on or about May 13 or 14, 2003. (Id.; Exs. 2(a); 3; 4(a); 6.)

43.   Mr. Kaufman made another investment with BLMIS by wire transfer on June 28, 2007. The $150,000 wire transfer was sent to the Special Trust. (Exs. 3; 6.) The Special Trust deposited Mr. Kaufman's investment in its Fidelity account and transmitted that amount to BLMIS between June 29 and July 2, 2007.  (Id.)

44.   Mr. Kaufman's third and final personal investment with BLMIS was made by wire transfer on December 31, 2007. The $150,000 wire transfer was sent to the Special Trust.  The Special Trust deposited Mr. Kaufman's investment in its Fidelity account and transmitted that amount to BLMIS between December 31, 2007 and January 2, 2008.  (Id.)

45.   Messrs. Cohen, Abramson and Kaufman did not redeem or otherwise withdraw any portion of their respective investments with BLMIS.

**BK Interest, LLC's Investments with BLMIS**

46.   Mr. Kaufman formed a Texas limited liability company by the name of BK Interest, LLC ("BKI") on September 15, 2004. (Ex. 14 [Certificate of Interest of BK Interest, LLC; Articles of Organization of BK Interest, LLC; and Ratification and Consent in Lieu of Organizational Meeting

of the Sole Member of BK Interest, LLC, all dated September 15, 2004].) Mr. Kaufman was BKI's sole member and officeholder. Mr. Kaufman had a Qualified SEP/IRA Plan through BKI in order to make investments for his retirement.

47.   BKI's first investment with BLMIS was made by check in the amount of $55,000 dated December 23, 2005. The check reflects an investment by BKI through FISERV Investment Support Services ("FISERV"). (Exs. 12; 3; 4(a); 17.) The funds for the $55,000 check originated from BKI's Qualified SEP/IRA Plan account with FISERV. (Id.) The BKI Qualified SEP/IRA Plan's investment was transmitted to and received by BLMIS on or about December 29 or 30, 2005.

48.   BKI's second and last investment with BLMIS was made by check, dated December 21, 2006, in the amount of $103,200. The check reflects an investment by BKI, through FISERV, on behalf of BKI's Qualified SEP/IRA Plan. The funds for this investment originated from BKI's Qualified SEP Plan/IRA account with FISERV. (Id.) The BKI Qualified SEP/IRA Plan's investment of $103,200 was transmitted to and received by BLMIS on or about January 2 or 3, 2007. (Id.)

49.   The Trust Agreement was not formally amended to add the BKI Qualified SEP/IRA Plan as an investor-beneficiary in the Special Trust. Nevertheless, both of the Qualified SEP/IRA Plan's investments with BLMIS were made through the Special Trust's Fidelity account. (Exs. 4(a); 12.) BKI did not redeem or otherwise withdraw any portion of its investment with BLMIS.

**The Marian Cohen 2001 Residence Trust's Investment with BLMIS**

50.   Marian Cohen established the Marian Cohen 2001 Residence Trust (the "Residence Trust") by a trust document dated September 20, 2001. (Ex. 13 [Marian Cohen 2001 Residence Trust

00057711                                   -17-

(with Exhibits) dated September 20, 2001].) Mrs. Cohen is the grantor of the Residence Trust. Mr. Cohen, her husband, is the trustee of the Residence Trust. (See id. at p. 13).

51.   The Residence Trust's first investment with BLMIS was by check in the amount of $300,000 dated April 20, 2005. (Exs. 21; 3; 4(a); 17.) The check, drawn on the Residence Trust's account at the United Missouri Bank, was payable to the Special Trust. (Id.) The Residence Trust's investment was transmitted to and received by BLMIS on April 27 or 28, 2005. (Id.)

52.   The Residence Trust's second and last investment with BLMIS was by check in the amount of $125,000 dated June 27, 2006. The check was drawn on the Residence Trust's United Missouri Bank account and payable to the Special Trust. (Id.) This investment was transmitted to and received by BLMIS between June 29 and July 5, 2006. (Id.)

53.   The Trust Agreement was not formally amended to add the Residence Trust as an investor-beneficiary in the Special Trust. In spite of that, both of the Residence Trust's investments with BLMIS were made through the Special Trust's Fidelity account. The Residence Trust did not redeem or otherwise withdraw any part of its investment with BLMIS.

**Mr. Garfield's, Ms. Tallering-Garfield's,**
**Ms. Berniker's and Ms. Hellberg's Investments with BLMIS**

54.   During 2004, BLMIS account statements indicated that the Firm's investments were returning an average of nine (9%) percent on an annual basis. Mr. Abramson studied these account statements and compared BLMIS's returns with those he was receiving from other investments not made with BLMIS. These other investments were returning an average of fifteen (15%) percent on an annualized basis. Mr. Abramson then informed Messrs. Cohen and Kaufman that he was

considering redeeming his investment with BLMIS because he thought that his investments could

achieve a better rate of return if they were invested outside of the Firm.

55.    Messrs. Cohen and Kaufman were concerned that Madoff would require them to redeem

their own investments in the event that Mr. Abramson redeemed his, because they would no longer

meet the supposed minimum investment amount required by BLMIS. As a matter of prudence,

Messrs. Cohen and Kaufman thought they should invite others to join them in investing with

BLMIS.[4]

56.    Mr. Cohen decided to invite a friend, Alan Garfield, to become an investor in BLMIS,

through the Special Trust. Mr. Garfield – who was an acquaintance of Madoff's and familiar with

BLMIS's steady return on investments – discussed Mr. Cohen's invitation with his wife, Ms.

Tallering-Garfield. Both Mr. Garfield and Ms. Tallering-Garfield decided to separately invest in

BLMIS using the Special Trust as a conduit. Mrs. Tallering-Garfield also invited her married

daughters, Erin Hellberg and Robyn Berniker, to make their own investments with BLMIS. Ms.

Hellberg and Ms. Berniker determined to do so.[5]

57.    Mr. Garfield and Ms. Tallering-Garfield would not have made separate investments with

BLMIS, or invited her daughters to do so, had BLMIS not had a lengthy track record of prudent

investing and steady returns without significant volatility. Mr. Garfield and Ms. Tallering-Garfield

relayed BLMIS's history to her daughters. Mr. Garfield, Ms. Tallering-Garfield, Ms. Berniker and

_____

[4]    Mr. Abramson concurred in this decision. Ultimately, he decided against redeeming his investment with the
Firm.

[5]    Mr. Garfield is Ms. Berniker's and Ms. Hellberg's stepfather. Mr. Garfield is Ms. Tallering-Garfield's
second husband. Ms. Tallering-Garfield used her own funds to invest with BLMIS. Also, Ms. Berniker and Ms. Hellberg
used their respective personal funds to invest with BLMIS. Mr. Garfield used his own monies to invest with BLMIS.

Ms. Hellberg determined to make investments with BLMIS because of its history of safety, prudence

in investing and lack of disciplinary history.  The lack of a disciplinary history by BLMIS was

particularly significant in their decision to invest with BLMIS.  Thus, Mr. Garfield, Ms. Tallering-

Garfield, Ms. Berniker and Ms. Hellberg were lulled into a false sense of security about investing

with BLMIS.  Had there been any publicly available hint of potential trouble, no member of this

family group would have invested with BLMIS.

      58.    Messrs. Cohen, Kaufman and Abramson, and Mr. Garfield, Ms. Tallering-Garfield, Ms.

Berniker and Ms. Hellberg executed a First Amendment to the Trust Agreement dated December 17,

2004 (the "First Amendment").  (Ex. 1(a) [First Amendment].)

      59.    In accordance with the First Amendment, Mr. Garfield, Ms. Tallering-Garfield, Ms.

Berniker and Ms. Hellberg each made separate $125,000 contributions to the Special Trust for

investment with BLMIS.  (Id. at p. 1.)  The First Amendment conditioned these individuals'

admission to the Special Trust upon BLMIS accepting their investments on or before December 31

2004.  (Id. ¶ 13(f).)  Mr. Garfield, Ms. Tallering-Garfield, Ms. Berniker and Ms. Hellberg each made

a separate $125,000 investment with BLMIS before December 31, 2004.  BLMIS accepted their

funds for investment.  (Exs. 8; 3; 4(a); 17.)

      60.    Mr. Garfield made a second investment with BLMIS in the amount of $100,000 by

check dated April 14, 2005.  (Exs. 9; 3; 4(a); 17.)  The check was drawn on Mr. Garfield's Chase

bank account and payable to the Special Trust.  (Id.)  Mr. Garfield's $100,000 investment was

transmitted to and received by BLMIS on April 27 or 28, 2005.  (Id.)

      61.    Ms. Berniker made an additional $200,00 investment with BLMIS on June 23, 2005.

(Exs. 10; 3; 4(a); 17.)  Ms. Berniker authorized the deposit of two $100,000 cashier checks, drawn

on her account at Chase, with the Special Trust's Fidelity account. (Id.)[6] Ms. Berniker's $200,000 investment was transmitted to and received by BLMIS on June 29 or 30, 2005.

62.   Ms. Tallering-Garfield made a $100,000 investment in BLMIS by a June 23, 2005 check issued on her behalf by Mr. Garfield. (Exs. 11; 3; 4(a); 17.)[7] Mr. Garfield's check was drawn on his account at HSBC Bank USA and payable to the Special Trust. (Id.) Ms. Tallering-Garfield's $100,000 investment was transmitted to and received by BLMIS on June 29 or 30, 2005. (Id.)

63.   Ms. Hellberg made an additional $100,000 investment in BLMIS by check dated June 24, 2005. (Exs. 20; 3; 4(a); 17.) The check was drawn on Ms. Hellberg's BOA account and payable to the Special Trust. (Id.) Ms. Hellberg's $100,000 investment was transmitted to and received by BLMIS on June 29 or 20, 2005. (Id.)

64.   Mr. Garfield made another $100,000 investment in BLMIS by check dated December 18, 2006. (Exs. 9; 3; 4(a); 17.) The check was drawn on Mr. Garfield's Chase account and payable to the Special Trust. (Id.) This investment was transmitted to and received by BLMIS between December 29, 2006 and January 2, 2007. (Id.)

65.   On December 26, 2007, Mr. Garfield, Ms. Tallering-Garfield and Ms. Hellberg made three separate investments with BLMIS. (Exs. 20; 20(a); 20(b); 3; 4(a); 17.) To begin with, Mr. Garfield invested $50,000 with BLMIS through a December 26, 2007 check issued by 864 W.E.

---

[6] One check was dated June 23, 2005. The other check was accidentally dated June 23, 2006. Nonetheless, Fidelity accepted both checks for deposit into the Special Trust's account. (Id.)

[7] Ms. Tallering-Garfield repaid Mr. Garfield with her own funds in July 2005. (Ex. 11 [$100,000 check issued by Marion Tallering-Garfield to Alan Garfield dated July 23, 2005].)

Corp. on his behalf. (Exs. 20; 3; 4(a); 17.)[8] The check was drawn on 864 W.E. Corp.'s account at Chase and payable to the Special Trust. (Id.) Mr. Garfield's investment was transmitted to and received by BLMIS between December 28 and December 31, 2007. (Id.)

66.   Ms. Tallering-Garfield invested $25,000 in BLMIS by a December 26, 2007 check issued on her behalf by Garfield Development Corp ("GDC"). (Exs. 20(a); 3; 4(a); 17.)[9] The check was drawn on GDC's Chase account and was payable to the Special Trust as a conduit to BLMIS. (Exs. 20(a); 3; 4(a); 17.) Ms. Tallering-Garfield's investment was transmitted to and received by BLMIS between December 28 and December 31, 2007. (Id.)

67.   Ms. Hellberg invested $50,000 in BLMIS by a December 26, 2007 check issued on her behalf by West End Equities, LLC ("West End").[10] The check was drawn on West End's Chase account and payable to the Special Trust. (Id.) Ms. Hellberg's investment was transmitted to and received by BLMIS between December 28 and December 31, 2007. (Exs. 20(b); 3; 4(a); 17.)

68.   Mr. Garfield, Ms. Tallering-Garfield, Ms. Berniker and Ms. Hellberg did not redeem or otherwise withdraw any portion of their investments with BLMIS.

---

[8]   Mr. Garfield is the majority owner and CEO of 864 W.E. Corp., which is an active New York corporation with its principal place of business located at 675 Third Avenue, Suite 1606, New York, New York 10017.

[9]   Ms. Tallering-Garfield reimbursed GDC for the $25,000 by wire transfer on December 27, 2007. (Ex. 21(a).) Mr. Garfield is the sole owner and CEO of GDC, which is an active New York Corporation with its principal place of business located at 675 Third Avenue, Suite 1606, New York, New York 10017.

[10]   Ms. Hellberg promptly reimbursed West End for the $50,000 advance by wire transfer from her COHMAD Securities account to Mr. Garfield's Chase account. (Ex. 20(b).) Mr. Garfield is West End's Managing Member. West End is an active New York limited liability company with its principal place of business located at 675 Third Avenue, Suite 1606, New York, New York 10017.

**Monthly Account Statement and Confirmations**

69.     As part of Madoff's and BLMIS's Ponzi scheme, BLMIS sent fictitious monthly account statements and transaction confirmations, supposedly showing bona fide trading in equities, options and other securities, on behalf of the Special Trust's investor-claimants.  (Exs. 2(a); 15.)  The account statements and confirmations were a fraud; apparently none of the purported trades ever occurred.

70.     BLMIS sent the account statements to Mr. Cohen and Mr. Kaufman.  (Exs. 15, 22.)[11] On at least one occasion, Mr. Cohen asked BLMIS to provide each of the investor-claimants with duplicate copies of BLMIS's account statements and confirmations.  BLMIS refused to do so. Instead, BLMIS provided account statements only, (a) to Mr. James H. Cohen, as representative of the Special Trust, and (b) to Mr. Barry Kaufman, an investor by way of the Special Trust who also prepared tax filings for the Special Trust.  The second set of statements was addressed:

> **DUPLICATE** FOR ACCOUNT JAMES H COHEN
> BARRY E KAUFMAN, CPA
> 9121 BRIAR FOREST
> HOUSTON, TX 77024

Upon receipt of the monthly account statements, Mr. Cohen sent a copy of each to Mr. Alan Garfield, who agreed to send copies to other claimant-investors who were members of his family. Similarly, Mr. Kaufman agreed to send a copy of each statement to his follow investor, Morrie Abramson.  At the same time, Mr. Kaufman prepared and sent to each of the separate investors (eight, not including himself) a monthly analysis of the status of each of the separate investments.

---

[11]  The trade confirmation were sent only to Mr. Cohen and not to Mr. Kaufman.  Mr. Cohen did not retain copies because all of the requisite information was contained in the monthly account statements.  Mr. Cohen also kept a check register for the Special Trust containing, among other things, deposits, checks, investments, income reinvestment and balances for each investor-claimant.  (Ex. 23.)

His analysis (Ex. 17) showed the amount that each of the nine had invested, the value of their
separate investments as of the end of the previous year, and the change in value over each of the
preceding months and in the year to date.

71.    Except for BLMIS's fraudulent insistence that the nine investor-claimants be
collectivized into a single entity in order to "qualify" for the "right" to invest with BMLIS, the nine
would have had separate accounts and would have received separate account statements. The
Trustee has relied upon BMLIS's artificial grouping of the nine investor-claimants into a single
"account" as grounds for denying the individual claims of these customers. For that reason and
others, the Special Trust and the investor-claimants object to the Trustee's Determination Letter.

## GROUNDS FOR OBJECTION

72.    Without limitation on, or waiver of, any of the foregoing, the nine investor-claimants
and the Special Trust hereby object to the Determination Letter for the following reasons:

### FIRST OBJECTION

**Each Investor in the Special Trust is a separate "Customer" under
SIPA and entitled as such to Customer protection under that statute.**

73.    The Trustee's Determination improperly allowed a claim only for the Special Trust –
an entity existed only through fraudulent inducement by Madoff and his co-conspirators and that had
no purpose and no function other than to further and facilitate BLMIS's fraud. Although the Trustee
neglected to say why, he failed to permit SIPC protection for the nine investor-claimants in the
Special Trust.

74.    "'Customer' as defined in section 78lll(2) of SIPA is a term of art. A creditor with
customer protection under SIPA is entitled preferential treatment over other creditors in the

00057711                                    -24-

distribution of assets of the debtor's estate marshaled by the Trustee." *In re Klein, Maus & Shire,*

*Inc.*, 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003). SIPA defines customer as follows:

> The term "customer" of a debtor means any person (including any person with
> whom the debtor deals as principal or agent) who has a claim on account of
> securities received, acquired, or held by the debtor in the ordinary course of its
> business as a broker or dealer from or for the securities accounts of such person
> for safekeeping, with a view to sale, to cover consummated sales, pursuant to
> purchases, as collateral security, or for purposes of effecting transfer. The term
> "customer" includes any person who has a claim against the debtor arising out of
> sales or conversions of such securities, and any person who has deposited cash
> with the debtor for the purpose of purchasing securities. . .

*15 U.S.C. § 78lll(2).*

75. Courts have uniformly held that SIPA coverage applies to those individuals and entities

– that is, "customers" – who have entrusted funds or securities with a broker-dealer, have a fiduciary

relationship with that broker-dealer, and the broker-dealer converts, misappropriates or otherwise

acts dishonestly with respect to those funds or securities. *See, e.g., Rosenman Family, LLC v. Picard,*

401 B.R. 629, 635 (Bankr. S.D.N.Y. 2009) ("the mere act of *entrusting* . . . cash to the debtor for the

purpose of effecting securities transactions . . . triggers customer status . . . .") (emphasis original)

(citations omitted.); *SEC v. Ambassador Church Financial Devel. Group, Inc.*, 679 F.2d 608, 614

(6th Cir. 1982); *In re Primeline Sec. Corp.*, 295 F.3d 1100, 1107 (10th Cir. 2002) ("SIPA does. . .

protect claimants who try to attempt to invest through their brokerage firm but are defrauded by

dishonest brokers. . . If a claimant intended to have the brokerage purchase securities on the

claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant

is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds"); *Miller v.*

*DeQuine (In re Stratton Oakmont, Inc.*), 2003 WL 22698876 at *3 (S.D.N.Y. Nov. 14, 2003)

("Stratton Oakmont's conversion of Claimants' property makes them customers withing the meaning of SIPA").

A. **BLMIS Fraudulently Induced Claimants to Establish a Special Trust and Make Their Respective Investments with BLMIS through the Special Trust**

76. BLMIS's requirement that investor-claimants establish a trust and make their individual investments through the Special Trust's Fidelity account - as a conduit to BLMIS – was an integral part of its Ponzi scheme, at least as it pertained to investor-claimants. BLMIS had an alleged long-term track-record of steady, positive returns on its customers' investments during both market upswings and downturns. BLMIS's widely publicized success – covering a span of more than 40 years – was well known to all of the investor-claimants in the Special Trust before their deposits were made with BLMIS, and was a primary factor inducing their respective decisions to invest with BLMIS.

77. The initial BLMIS investors – Messrs. Cohen, Abramson and Kaufman – each asked to deposit monies in individual accounts established at BLMIS. However, BLMIS refused to let them do so, purportedly because their contemplated investments did not meet its minimum investment threshold. As a result, in order to invest with BLMIS – and obtain the benefits of BLMIS's supposed positive returns in the securities markets – BLMIS required Messrs. Cohen, Abramson and Kaufman (and the Special Trust's future investors) to use the Special Trust as a conduit for entrusting their respective funds with BLMIS.

78. The Special Trust became another vehicle for BLMIS to obtain investor monies, which BLMIS, Madoff and perhaps others misappropriated, in whole or in part, for their own purposes. Madoff designed the text of the Trading Authorization and, thus, required the Trust Agreement to

contain terms providing BLMIS with exclusive authority over the investor-claimants' investments and limiting the number of persons in contact with BLMIS. Simply put, BLMIS and Madoff used the Special Trust to steal the investor-claimants' funds.

79. Accordingly, the Special Trust was a product of BLMIS's fraud. It was intended by BLMIS to function as one cog in its massive, complex Ponzi scheme. In other circumstances, BLMIS's fraud with respect to inducing the establishment of the Special Trust would enable the investor-claimants to set aside and rescind the Trust Agreement and First Amendment thereto. *See Renzor v. J. Artist Mgm't, Inc.*, 365 F. Supp. 2d 565, 577 (S.D.N.Y.) (agreements may be rescinded "where plaintiff can prove fraud in the inducement"); *M&T Mortgage Corp. v. Miller*, 323 F. Supp. 2d 405, 411 (E.D.N.Y. 2004) (recession is available "where the decision by one party to enter into the contract itself was induced by fraud").

80. More importantly, BLMIS's fraudulent conduct with respect to the establishment of the Special Trust – among other things, its failure to disclose that the Special Trust was a part of its Ponzi scheme – voids the Trust Agreement and renders that Agreement and First Amendment legal nullities. *See, e.g., Creative Waste Mgm't, Inc. v. Capitol Environmental Serv., Inc.*, 429 F. Supp. 2d 582, 607 (S.D.N.Y.) ("the courts impose a duty on a party with 'superior knowledge of essential facts' to disclose those facts where non-disclosure would make the transaction inherently unfair"), supplemented, 458 F. Supp. 2d. 178 (S.D.N.Y. 2006); *Uni-Rty Corp. v. Guangdong Bld'g Inc. (In re Uni-Rty Corp.)*, 191 B.R. 595, 598 (Bankr. S.D.N.Y. 1996) ("[p]arole evidence is . . . admissible to prove that a seemingly valid written contract is in fact invalid because the consent of one of the parties was induced by fraud")(citation omitted); *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*, 2007 WL 1687044 at *9 (S.D.N.Y. June 11, 2007)("[i]f [plaintiff] succeeds in proving that

it was fraudulently induced into entering the contract . . . the contract is thereby rendered void");

*Gordon v. Bialystoker Center and Bikur Cholim, Inc.*, 45 N.Y.2d 692, 698 (1978)("'[i]t may be

stated as universally true that fraud vitiates all contracts'")(citations omitted), *Ajettix Inc. v. Raub*,

9 Misc. 3d 908, 804 N.Y.S.2d 580, 588 (Sup. Ct. Monroe Co. 2005)("where a fiduciary relationship

exists between the parties, there must be clear proof of the integrity of and fairness of the transaction

between them, or any instrument thus obtained will be set aside or held invalid")(citations and

internal quotations omitted). As a result, the SIPC Trustee should look behind the Special Trust's

veil and furnish the nine individual investor-claimants, not the Special Trust, with SIPA protection

afforded to separate customers.

81. Stated differently, BLMIS's fraud in requiring all claimants herein to channel their

monies through the Special Trust for investment with BLMIS enables the SIPC Trustee to look

behind the Trust Agreement and First Amendment and treat each of the nine claimants as separate

customers entitled to SIPC protection. *See, e.g.*, *In re Old Naples Sec., Inc.*, 223 F.3d 1296, 1303

("SIPA protects claimants who attempt to invest through their brokerage but are defrauded by

dishonest brokers"); *Ambassador Church*, 679 F.2d at 614 (SIPA does not penalize the "trusting

customer for choosing . . . [an] unethical or dishonest broker").

**B.    Each of the Nine Claimants Is Entitled to Separate Customer Status under SIPA**

82. Leaving aside BLMIS's fraud and the resulting vitiation of the Trust Agreement and

First Amendment, "[f]or a claimant to be a 'customer' [entitled to SIPA protection], the claimant

must actually have entrusted the funds in question to the debtor broker-dealer." *Lopez v. Zaremba*,

2009 WL 36617 at *5 (N.D. Ohio Jan. 5, 2009). "[T]he question is whether there was actual receipt,

acquisition or possession of the property of a claimant by the brokerage firm under liquidation." *Old*

*Naples*, 223 F.3d at 1302 (citation and internal quotation omitted). In this regard, a claimant who deposits cash or securities with a brokerage firm has entrusted those funds or securities with the broker-dealer within the meaning of SIPA. *See Rosenman Family,* 401 B.R. at 635; *Lopez*, 2009 WL 36617 at *5; *see id.* (a claimant entrusts cash or securities to a brokerage firm where the firm "'received, acquired or held cash or securities owned by [the claimant]'") (citation omitted).

83.    Here, each of the nine claimants deposited their monies with BLMIS through the fiction of the Special Trust on numerous occasions between 2003 and early 2008. BLMIS and Madoff knew that the investor-claimants of the Special Trust were making individual investments for themselves and were not depositing monies through some sort of hedge fund or fund-of-funds. In point of fact, when BLMIS required establishment of the Special Trust, Mr. Cohen told Delaire that he, Mr. Abramson and Mr. Kaufman were executing a Trust Agreement only because Madoff insisted that they make their individual investments through the conduit of the Special Trust. Mr. Cohen emphasized that the Special Trust was a conduit for investor-claimants' individual investments. *See Matter of Weiss Securities, Inc.*, 1977 WL 1043 at *3 (Bankr. S.D.N.Y. Sept 29, 1977) ("as Judge Learned Hand reminded us, 'there is no surer way to misread any document than to read it literally'") (citation omitted).

84.    All of the Special Trust's investor-claimants deposited their funds with BLMIS "for the purpose of trading and investing in the securities market." *In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 724 (Bankr. S.D.N.Y. 1998). In other words, "[t]he claimant[s] [were. . .] 'trading' or 'public' customer[s] who tender[ed] [their] [cash] for the purpose of [buying securities and] having them traded for [their] account by the broker." (Exs. 2(a); 3; 4(a); 5-12; 17; 19; 20-21.) *In re Hanover Square Secs.*, 55 B.R. 235, 240 (Bankr. S.D.N.Y. 1985).

85. BLMIS had control of the funds deposited by each claimant from 2003 through early
2008. *See Lopez*, 2009 WL 36617 at *7 ("[f]or a debtor to have received, acquired or possessed the
claimant's cash, the debtor must have had control over the funds in question"), *citing*, *Old Naples*,
223 F.3d at 1304. BLMIS's Trading Authorization required the Trust Agreement to provide BLMIS
with control of managing, investing and trading the investor-claimants' funds and securities and
excluded the nominal Trustee (Mr. Cohen) and the investor-claimants from these activities. (Ex. 1
[Trust Agreement ¶¶ 2(c), 2(d), 2(h)].) Accordingly, the investor-claimants entrusted their funds
with BLMIS.

86. To obtain customer status under 15 U.S.C. § 78lll(2), an individual or entity should also
"enjoy[] the type of fiduciary relationship with the debtor that characterizes customers in general."
*SIPC v. I.E.S. Management Group, Inc.*, 612 F. Supp. 1172, 1177 (D.N.J. 1985); *Ambassador
Church*, 679 F.2d at 614 (claimant established that it had SIPA customer status where "[t]here was
an entrustment of a customer's property to a broker and a fiduciary relationship existed").

87. In this proceeding, the claimants entrusted their funds to BLMIS, which had exclusive
discretionary authority to manage and invest those funds, and to purchase and sell securities without
input from the claimants. This is more than sufficient to create a fiduciary relationship between
BLMIS and the claimants. As stated by the Second Circuit in *United States v. Chestman*: "[A]t the
heart of the fiduciary relationship lies reliance, and de facto control and dominance . . . The
relationship exists when confidence is reposed on one side and there is resulting superiority and
influence on the other. . ." 947 F.2d 551, 568 (2d Cir. 1991) (citations and internal quotations
omitted), *cert. denied*, 503 U.S. 1004 (1992); *see United States v. Skelly*, 442 F.3d 94, 98 (2d Cir.
2006)("a relationship of trust and confidence does exist between a broker and a customer with

respect to these matters that have been entrusted to the broker . . . Most commonly, this relationship exists in situations where the broker has discretionary authority over the customer's account")(citations omitted).

88.  BLMIS also assumed a fiduciary duty with respect to each investor-claimant because Madoff required the investors to channel their monies to BLMIS through a bogus Trust Agreement which gave BLMIS sole discretion to manage and invest their money, and to trade securities purchased with that money. As a matter of New York law, an investment manager or advisor to a trustee regarding investment decisions becomes a co-trustee and assumes fiduciary duties to each of the beneficiaries with respect to the trust's investments. *See Matter of Rubin*, 143 Misc. 2d 303, 540 N.Y.S.2d 944, 947 (Surr. Ct. Nassau Co. 1989) ("[insofar as the status of an advisor is concerned, the courts have generally considered him as a *fiduciary*, somewhat in the nature of a co-trustee . . . Another term employed is that of a quasi-trustee or special trustee . . . Since the relationship between fiduciary and advisor is that of a co-trustee, with the advisor having the controlling power, the [trustee] is justified in complying with the [advisor's] directions and will not generally be held liable for any losses unless the instructions given him are improper or in violation of fiduciary duties owing the beneficiaries")(citations omitted)(emphasis original); *Restatement of Trusts § 185 comment c (1957)* ("[a] power given to some third person, who is expert in the making of investments, to control the trustee in disposing of or acquiring trust investments, would ordinarily be a power for the benefit of the beneficiaries of the trust generally").

89.  Because Federal common law looks to state common law for its development and guidance *(United States v. Desinor*, 525 F.3d 193, 199 (2d Cir.), *cert. denied sub nom. Major v. United States*, 129 S.Ct. 298 (2008)), and it is a well-settled state and Federal common law principle

that trustees and trust beneficiaries are in a fiduciary relationship (*Chestman*, 947 F.2d at 568-69),

the SIPC Trustee should find that BLMIS is a fiduciary of the investor-claimants under the purported

Trust Agreement and First Amendment and that, accordingly, each investor-claimant is entitled to

separate customer status under SIPA.

## C.    Each Claimant Intended BLMIS to Buy Securities on Their Behalf and Followed BLMIS's Instructions Regarding Payment

90.    Each of the claimants deposited funds with BLMIS in order for BLMIS to buy and sell

securities on their behalf. *See Old Naples*, 223 F.3d at 1303; *Primeline*, 295 F.3d at 1107. The

investor-claimants also reasonably followed BLMIS's instructions regarding payment: first, by

depositing their respective funds with the Special Trust's Fidelity account; and second, by having

the Special Trust act as a conduit by transmitting their funds from the Fidelity account to BLMIS for

the purchase and sale of securities. *See Old Naples*, 223 F.3d at 1303; *Primeline*, 295 F.3d at 1107.

91.    The Special Trust and its Fidelity account were an integral part of BLMIS's Ponzi

scheme as that scheme was applied to these claimants. The investor-claimants reasonably believed,

based on Madoff's and Delaire's fraudulent misrepresentations, that BLMIS required the

intermediate step of a trust account – through which their monies would be deposited with BLMIS

– because each of their respective individual investments was purportedly too small for BLMIS to

accept. In actuality, BLMIS required the fraudulent intermediary of the trust account to hide its

Ponzi scheme and to prevent additional due diligence from being conducted with respect to its

activities by limiting the number of persons in contact with it.

92.    BLMIS was the investor-claimants' agent and fiduciary by insisting that it manage the

investor-claimants' investments in its sole discretion and without input or contact with the nominal

00057711                                         -32-

trustee or beneficiaries. (Ex. 1 [Trust Agreement ¶ 2(h)].) *See, e.g., Chestman*, 947 F.2d at 568-69; *Skelly*, 442 F.3d at 94. The claimants followed BLMIS' instructions by transferring funds to the Special Trust (a Madoff concoction) for further, almost immediate, deposit in BLMIS's bank account. *See Primeline*, 295 F.3d at 1107-08 ("[e]ach of the Claimants followed Ameen's instructions in delivering funds for investment. In some cases, Ameen delivered fraudulent statements on Primeline letterhead confirming the investment or reflecting the promised return. Ameen had both actual and apparent authority to enter into securities transactions as an agent of Primeline, and the bankruptcy court did not err in ruling Claimants deposited cash 'with the debtor'"); *Old Naples*, 223 F.3d at 1303.

93. Nor does BLMIS's refusal to open accounts on behalf of each claimant warrant concluding that the claimants are not separate customers of BLMIS. BLMIS's refusal to open an account for each claimant was part of the mechanics of its Ponzi scheme. An investor-claimant should not be denied SIPA customer status where a dishonest broker – BLMIS in this proceeding – refused to establish separate accounts for each claimant in order to further its Ponzi scheme. *See Ambassador Church*, 679 F.2d at 613-14; *In re Gibralco*, 53 B.R. 324, 329 (Bankr. C.D.Cal. 1985) ("[c]ourts should endeavor to give statutory language that meaning that nurtures the policies underlying the legislation . . . . One of the objectives of SIPA was to 'restore investor confidence in the capital markets' . . . . [I]t would erode investor confidence in the capital markets and thus tend to undermine one of the objectives which Congress sought to achieve if Marturano were held not to be a customer as to the bonds he entrusted Grayson in this case")(citations omitted).[12]

---

[12] *Rosenman Family*, 401 B.R. at 633-34 ("Congress's primary purpose in enacting SIPA was 'to protect investors' financial losses arising from the insolvency of their brokers' . . . . and re-establish investor confidence in the capital markets") (citations omitted).

94. SIPC's present regulations regarding customer status for trust accounts provide:

(a) A trust account held with a member shall be deemed a "qualifying trust account" if it is held on behalf of a *valid and subsisting* express trust created by a written instrument. No account held on behalf of a trust that on the filing date existed primarily to obtain or increase protection under the Act shall be deemed to be a qualifying trust account.

(b) A qualifying trust account held with a member shall be deemed held by a separate customer of the member distinct from the trustee, the testator or his estate, the settlor, or any beneficiary of the trust.

(c) Any account held with a member on behalf of a trust which does not meet the requirements of paragraph (a) of this rule shall be deemed to be an individual account of the settlor of the trust on behalf of which the account is held.

17 C.F.R. § 300.104 (2008) (emphasis added).

95. These regulations, however, are not applicable to this proceeding because the Trust Agreement and First Amendment are invalid and void due to BLMIS's fraudulent insistence on the creation of a Special Trust in order to further and enhance its Ponzi scheme. See 17 C.F.R. § 300.104(a) (to be a "qualifying trust account," SIPC's regulations require a "valid and subsisting express trust"); *Creative Waste*, 429 F. Supp. 2d at 607; *Uni-Rty*, 191 B.R. at 598; *Bangkok Crafts*, 2007 WL 1687044 at *9; *Gordon*, 45 N.Y.2d at 698-99; *Ajettix*, 9 Misc. 3d 908, 804 N.Y.S.2d at 588.[13]

96. Nor does the Second Circuit's decision in *SIPC v. Morgan Kennedy & Co.*, 533 F.3d 1314 (2d Cir.), *cert. denied, Trustees of the Reading Body Works, Inc. v. SIPC,* 426 U.S. 936 (1976) affect the outcome of this proceeding. In that case, the Second Circuit was "asked to determine

---

[13] 17 C.F.R. § 300.104 (c) is inapplicable because, as a matter of law, the trust is a legal nullity and void *ab initio. See, e.g. Creative Waste*, 429 F. Supp. 2d at 607; *Bangkok Crafts*, 2007 WL 1687044 at *9; *Uni-Rty*, 191 B.R. at 598; *Gordon*, 45 N.Y.2d at 698-99; *Ajettix,* 9 Misc. 3d 908, 804 N.Y.S.2d at 588.

whether the one hundred and eight employee-beneficiaries [the "Beneficiaries"] of a trust created
under a profit-sharing plan [the "Plan"] qualif[ied] as 'customers' of a bankrupt broker-dealer for
the purpose of receiving compensation for losses available to such customers under [SIPA] . . ." *Id.*
at 1315 (citation omitted).  The Court held that the Plan Beneficiaries were not entitled to customer
status because "both the relevant case law and our own interpretation of the term [customer]
persuade us that the *trust beneficiaries before us* cannot come within the term 'customer,' no matter
how far that word is stretched in service to the equitable ends of SIPA."  *Id.* at 1317 (emphasis
added).[14]

97.  In reaching its holding, the Second Circuit took note of SIPA's legislative history as of
1970 and the legislative history of § 60(e) of the Bankruptcy Act of 1938, a legislative source for
SIPA.  *See id.*  The Court found that the legislative history of § 60(e), and that section's use
subsequent to its enactment, "have stressed *protection to, and equality of treatment of the public
customer, who has entrusted securities to a broker* for some purpose connected with participation
in the securities markets."  *Id.* (citation and internal quotation omitted; emphasis original).

98.  With respect to the 1970 version of SIPA, the Court stated:

> . . .The 1970 Act [SIPA] carries through the same theme.  The House
> Report states: "The primary purpose of the reported bill is to provide
> protection for *investors* (emphasis supplied) if the broker-dealer with whom
> they are doing business encounters financial troubles."  *H.Rep.No.91-1613,
> 91st Cong., 2d Sess. (1970), 3 U.S.Code Congressional and Administrative
> News, 91st Cong., 2d Sess., p. 5255 (1970).  Throughout the report
> "investors" is used synonymously with "customers," indicating that, in the
> eyes of Congress, the Act would protect capital markets by instilling
> confidence in securities traders.*

---

[14]  We note that the Second Circuit in *Morgan Kennedy* limited its holding to the particular trust beneficiaries
before the Court (*see id.* ["the trust beneficiaries before us"]), a circumstance to which diminishes its impact as precedent
in this proceeding.  *See United States v. Helmsley*, 941 F.2d 71, 95 (2d Cir. 1991), *cert. denied*, 502 U.S. 1091 (1992).

> *The emphasis throughout was on the customer as investor and trader. . . .*

*Id.* (citation and internal quotation omitted; emphasis original).

99.   The *Morgan Kennedy* decision is readily distinguishable on the law and facts.  The investor-claimants in this matter, unlike the Plan Beneficiaries, are investors and traders in the securities markets.  *See id.* at 1317.  The investor-claimants entrusted their own monies to BLMIS, through the fiction of the Special Trust, as mandated by BLMIS.  The decision to entrust their funds (and the amount of funds to be entrusted) to BLMIS for investment was made by each individual investor, not by the nominal Trustee of the Special Trust.  *See id.* at 1317.

100.   Unlike the Plan Beneficiaries in *Morgan Kennedy*, the investor-claimants here could redeem their personal investments at any time.  *See id.*  Unlike *Morgan Kennedy*, insofar as the Special Trust was concerned, the financial relationship was not between the Special Trust and BLMIS; instead, the relationship was between the investor-claimants and BLMIS.  *See id.*

101.   Unlike *Morgan Kennedy*, the investor-claimants were not simply a bookkeeping matter on the Special Trust's books.  In fact, just the opposite was true.  There could not be unlimited additions to investors in the Special Trust of which BLMIS would have no knowledge and for an obvious reason: Part of the bogus Trust Agreement's text required by Madoff provided:

> In order for additional contributions to be made to the Trust, or additional Beneficiaries admitted, written notice of the proposal must be provided to the Trustee and all existing Beneficiaries by Federal Express and fax, the written consent of all existing Beneficiaries must have been transmitted and received by the Trustee with the same 10-day period, *and Madoff must have accepted the newly contributed funds and credited them to the Madoff Account prior to the last business day of the Madoff Account's current monthly statement accounting period.*

(Ex. 1 [Trust Agreement ¶ 5(d) (emphasis added)].)

102.    In order for new investors to make investments in BLMIS, that firm was required to affirmatively accept the new funds and credit them to the Special Trust's accounts before the end of the month in which the investor-claimants' monies were furnished to BLMIS for investment. BLMIS thus had discretion to reject new investors and new investments. Indeed, Madoff exercised this power by informing Mr. Abramson that BLMIS would not accept an additional investment from Mr. Abramson at the time of his initial investment with BLMIS in April 2003.

103.    Unlike *Morgan Kennedy*, Mr. Cohen, the nominal Trustee for the Special Trust, did not have any "power . . . to invest and reinvest, to purchase and trade securities" in the Special Trust's BLMIS accounts. Id. BLMIS insisted on arrogating those powers for itself, even to the extent of requiring the investor-claimants and Mr. Cohen to agree (through the Trading Authorization and, thus, the Trust Agreement) that they had no right or ability "to discuss such transactions with the Trustee before effecting them, and that Madoff may effect such transactions without obtaining the Trustee's, or the Beneficiaries' permission for, or approval of any such transaction, either before the transaction(s) or after the transaction(s)." (Ex. 1 [Trust Agreement ¶ 2(h)].) This text – required by BLMIS's and Madoff's Trading Authorization – created a fiduciary, broker-customer relationship between BLMIS and the Special Trust investors notwithstanding that BLMIS fraudulently induced them to invest in BLMIS through the Special Trust. *See I.E.S. Management*, 612 F. Supp. at 1177; *Ambassador Church*, 679 F.2d at 613-614; *Chestman*, 947 F.2d at 568; *Skelly*, 442 F.3d at 98.

104.    *Most significantly, the Plan at issue in* <u>Morgan Kennedy</u> *was not the result of or an instrumentality of a fraud perpetrated by the defunct broker-dealer.* By contrast, the Trust Agreement and First Amendment thereto – as well as the Special Trust's accounts with Fidelity and

BLMIS – were a direct product of and instrumentality of BLMIS's fraud and Ponzi scheme. The Special Trust was a result of Madoff's and Delaire's fraudulent misrepresentations and omissions of material facts. Because the Trust Agreement and First Amendment resulted from BLMIS's fraud to further its Ponzi scheme, the Bankruptcy Court should disregard the formalities of the Special Trust and treat the investor-claimants as separate customers under SIPA. *See, e.g, Uni-Rty*, 191 B.R. at 598; *Bangkok Crafts*, 2007 WL 1687044 at *9; *Gordon*, 45 N.Y.2d at 698-99.

105.   The Second Circuit in *Morgan Kennedy* was not confronted with issues of fraud, particularly a trust agreement established by the fraudulent misrepresentations, omissions and insistence of a now defunct broker-dealer in order to further its scheme to fleece public investors and traders.   As a result, *Morgan Kennedy* has no relevance in determining whether the investor-claimants are "customers" separate from the Special Trust  for purposes of SIPA.

106.   Lastly, the Second Circuit noted, in <u>dicta</u>, that the versions of 17 C.F.R. §§ 300.104 (trust accounts) and 300.105 (joint accounts) then in existence supported its conclusion that the Beneficiaries were not entitled to "customer" status separate from the Plan. *See id.* at 1319-20 and n. 12-n.15. Neither SIPC regulation is applicable in this proceeding.

107.   To begin with, the Trust Agreement and First Amendment are nullities due to BLMIS's fraud, which permeated the establishment of the Special Trust and BLMIS's use of the Special Trust as an instrumentality of its Ponzi scheme.   Under the circumstances, neither SIPC regulation is applicable to this matter. *See, e.g.*, *Uni-Rty*, 191 B.R. at 598, *Bangkok Crafts*, 2007 WL 1687044, at *9; *Gordon*, 45 N.Y.2d at 698-99.

108.   SIPC Rule 105 provides:

(a) A joint account shall be deemed to be a "qualifying joint account" if it is owned jointly, whether by the owners thereof as joint tenants with the right of survivorship, as tenants by the entirety or as tenants in common, or by husband and wife as community property, but only if each co-owner possesses authority to act with respect to the entire account.

(b) Subject to paragraph (c) of this rule, each qualifying joint account with a member shall be deemed held by one separate customer of the member.

(c) All qualifying joint accounts with a member owned by the same persons shall be deemed held by the same customer so that the maximum protection afforded to such accounts in the aggregate shall be the protection afforded to one separate customer of the member.

(d) A joint account with a member which does not meet the requirements of paragraph (a) of this rule shall be deemed to be an individual or qualifying joint account of the co-owner or co-owners having the exclusive power to act with respect to it.

17 C.F.R. § 300.105 (2008).

109.    A plain reading of Rule 105(a) establishes that the Special Trust's accounts at BLMIS are not joint accounts within the meaning of this regulation. Those accounts are not owned jointly by the claimants, whether "as joint tenants . . ., as tenants by the entirety or as tenants in common, or by husband and wife as community property." *See 17 C.F.R. § 300.105(a)*. Nor do all investor-claimants and the nominal Trustee of the Special Trust "each . . . possess the authority to act with respect to the [Special Trust's] entire account[s]" at BLMIS. *See id.* Thus, by its terms, *17 C.F.R. § 300.105* has no application to this proceeding.

110.    Furthermore, as the Special Trust's accounts were created as a result of BLMIS's fraud and used in furtherance of that fraud, the Bankruptcy Court should not treat the accounts as resulting from a <u>bona fide</u> business transaction. *See, e.g., Uni-Rty*, 191 B.R. at 598; *Gordon*, 45 N.Y.2d at 698-99; *Ajettix*, 9 Misc. 3d 908, 804 N.Y.S.2d at 588. Consequently, the SIPC Trustee

should not use Rule 105 by analogy to deprive the investor-claimants of separate customer status

under SIPA. *See Ambassador Church*, 678 F.2d at 611 ("reliance on the literal language of a portion

of a statute is improper if it leads to . . . an absurd result"); *Gibralco*, 53 B.R. at 329.

111.    In addition, the Special Trust's investor-claimants had no intention or interest in

having their funds placed in one or two accounts. That was the result of the BLMIS's fraud. Under

these circumstances, the Court should not find that the investor-claimants' investments were

anything other than separate investments made for individual accounts. *See, e.g., Gordon*, 45 N.Y.2d

at 698-99 (where parties to a transaction "do not deal on terms of equality[,] but either on the one

side from superior knowledge of the matter derived from a fiduciary, or from an overmastering

influence, or on trust justifiably reposed, unfair advantage in a transaction is rendered probable...

[and] the transaction is presumed void"); *Ajettix*, 9 Misc. 3d 908, 804 N.Y.S.2d at 588; *Uni-Rty*, 191

B.R. at 598.

**SECOND OBJECTION**

**The Trustee failed to comply with the Court's December 23, 2008
Order to base its determination on the Debtor's books and records.**

112.    The Determination Letter fails to comply with this Court's December 23, 2008 Order,

which directs the BLMIS Trustee to satisfy customer claims and deliver securities in accordance

"with the Debtor's books and records." Dec. 23, 2008 Order at 5 [Dkt. No. 12]. The investor-

claimants are entitled to, at a minimum, the payments set forth in paragraph 10 above.

### THIRD OBJECTION

**The Trustee failed to comply with the Court's 23, 2008 Order by failing to set
forth the factual or legal basis for denying the investor-claimants' separate claims.**

.       113.    The Trustee has set forth no factual or legal basis for disallowing the nine investor-

claimants' claims in full and as filed.  The Determination Letter stated only that, ".    .    . [T]he

Trustee will make a partial satisfaction of your ALLOWED Claim [$3,858,200.00] by sending you

a check in the amount of $500,000, with the funds being advance by the Securities Investor

Protection Corporation pursuant to section 78fff-3(a)(1) of SIPA.  The remainder of your claim -

$3,358,200.00 - will remain as a claim against the fund of customer property."

114.    Moreover, the Determination Letter:

(a) does not clearly provide "the reason" for the disallowance, as required by the Court's

December 23, 2008 Order, *see* Order [Dkt. No. 12];

(b) is inadequate to rebut the prima facie validity of the nine customers' claims, as provided

in Section 502(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3001(f); and

(c) violates general principles of applicable law requiring that an objection to a proof of

claim set forth, at a minimum, the relevant facts and legal theories upon which the objection is based.

*See, e.g., Collier on Bankruptcy* ¶ 3007.01(3) (15th ed.) ("[A]n objection to a claim should . . . meet

the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege

facts necessary to affirmative defenses; and it should describe the theoretical bases of those

defenses.").

### FOURTH OBJECTION

### The Trustee has failed to allow the Special Trust's claims and the claims of the nine investor-claimants in the amount of their net equity.

115.    Under *15 U.S.C.§ 78fff-2(b)*, a customer's claim must be allowed in the amount of the customer's "net equity." *15 U.S.C. § 78fff-2(b)*. Upon information and belief, the Trustee objects to the Special Trust's claim and the claims of the nine investor-claimants on the ground that "net equity" should be determined by principal contributed to the account less any withdrawals, without regard to any gains reflected in the Final BLMIS Statement or prior BLMIS statements. *See* Determination Letter, pp. 1-2 & Table 1.    The Trustee states as follows:

> Your claim for securities is **DENIED.** No securities were ever purchased for your account.
>
> Your claim is **ALLOWED** for $3,858,200.00, which is the amount of money you deposited with BLMIS for the purchase of securities, <u>less</u> subsequent withdrawals, as outlined in Table 12.

### FIFTH OBJECTION

### The Trustee's determination that "No securities were ever purchased for your account" is premature and potentially erroneous.

116.    The Trustee has publicly stated on several recent occasions that the investigation into the whereabouts of most of the missing funds is ongoing. Tens of billions of dollars are still missing, and there is no way to determine, if the funds exist, whether they are in cash or in securities. This unique characteristic of the Madoff fraud distinguishes it from the Second Circuit's decisions in *In Re: New Times Securities Services, Inc.*, 371 F.3d 68 (2d Cir. 2004) (*"New Times I"*) (Ex. 16); *In Re: New Times Securities Services, Inc.*, 463 F. 3d 125 (2d Cir. 2006) (" *New Times II"*).    In both cases, the customers purchased imaginary securities, and "the Court declined to base recovery on the

rosy account statements telling customers how well the imaginary securities were doing, because treating the fictitious paper profits as within the ambit of the customers' 'legitimate expectation' would lead to the absurdity of duped investors reaping windfalls as a result of fraudulent promises made on fake securities." *New Times II,* 463 F.3d at 130.

117.    Here, after months of investigation, there is no conclusive evidence about whether all of the missing funds were not invested in securities or not. SIPA seeks to honor the "legitimate expectations" of investors, in terms of what their account statement showed, *New Times I*, 371 F.3d at 87, unless, beneath those statements, there is no actual property but only "imaginary securities." *New Times II,* 463 F.3d at 130. In this matter, that is not necessarily the case, and absent any credible evidence on the issue disqualification of the ten objectors' claim is at best premature.

**SIXTH OBJECTION**

**The Trustee's denial of the ten objectors' claims is inconsistent with SIPA
in light of Congressional intent and as applied to the unique facts of this case.**

118.    The Trustee's Determination Notice ignores SIPA's express language which defines "net equity" as the dollar amount of the account or accounts of a customer, to be determined by –

(A)  calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus

(B)  any indebtedness of such customer to the debtor on the filing date; * * *

15 U.S.C. § 78lll(11). The Trustee's proposed formulation has no support in the language of the statute, and in fact adds words and concepts to the statute which do not exist.

119.    SIPA's legislative history emphasizes Congress's intention that the statute protect

customer expectations by ensuring that customers of retail brokerage firms can rely on their account

statements. The BLMIS statements received by Mr. Cohen stated that he owned a list of blue chip

securities:

> A customer generally expects to receive *what he believes* is in his account at the
> time the stockbroker ceases business. But because securities may have been lost,
> improperly hypothecated, misappropriated, *never purchased*, or even stolen, it is
> not always possible to provide to customers that which they expect to receive, that
> is, securities which they maintained in their brokerage account. . . . By seeking to
> make customer accounts whole and returning them to customers in the form they
> existed on the filing date, the amendments . . . would satisfy customers' legitimate
> expectations . . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added). While there may be a basis to disallow customer

claims for wholly fictitious securities of nonexistent entities, here the securities set forth on the

claimants' Final BLMIS Statement and prior statements were those of actual companies listed on

the stock exchange. Whether, where, or if those securities were actually purchased is unknown at

this time.

120.    The Trustee's Determination Letter is contrary to SIPC's own policies and practices,

as reflected in the sworn testimony of Stephen Harbeck, SIPC's president and CEO, and its actions

in similar liquidation proceedings. For example, in the *New Times* SIPA liquidation, in the context

of discussing claims filing deadlines, Harbeck acknowledged that SIPC would replace securities

listed on customer account statements, even if the securities had never been purchased:

Harbeck:    [I]f you file within sixty days, you'll get the securities, without question.
            Whether -- if they triple in value, you'll get the securities. . . . Even if they're
            not there.

Court:    Even if they're not there?

| Harbeck: | Correct. |
| --- | --- |
| Court: | In other words, if the money was diverted, converted -- |
| Harbeck: | And the securities were never purchased. |
| Court. | Okay. |
| Harbeck: | And if those positions triple, we will gladly give the people their securities positions. |

Transcript at 37-39; *In re New Times Securities Services, Inc.*, No. 00-8178 (Bankr. E.D.N.Y.
July 28, 2000), *rev'd on other grounds,* 371 F.3d 68 (2d Cir. 2004).

**SEVENTH OBJECTION**

**The Objectors are entitled to statutory interest.**

121.    In the event that the Court should determine that claimed gains on deposited funds
should not be allowed, then in the alternative, the objectors are entitled to recover interest on such
deposited amounts. Such interest is required as a matter of state law, and the United States Supreme
Court has determined that in bankruptcy cases, creditor claims, including the right to interest, are
determined by state law. *See Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 450-51
(2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law
governs the substance of claims, Congress having generally left the determination of property rights
in the assets of a bankrupt's estate to state law.").

122.    Under New York law, which is applicable here, funds deposited with the Debtors
under these circumstances are entitled to interest. *See, e.g., N.Y. Civ. Prac. L & R § 5004*; *N.Y. Gen.
Oblig.* § 5-501, *et seq*. Accordingly, the objectors' claims should be recalculated by adding interest
to all funds deposited with BLMIS.

123.    Under New York law, which is applicable here, customers are entitled to any returns the Debtors earned on the deposited funds under principles of unjust enrichment. Accordingly, investor-claimants' claims and the claims of the Special Trust should be recalculated by adding the amounts earned by the Debtors on the objectors' deposits. *See, e.g., Steinberg v. Sherman,* 2008 WL 1968297 * 5 (S.D.N.Y. May 2, 2008) ("'Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest under N.Y.C.P.L.R. 5001(a) at *5'") (citations omitted); *Eighteen Holding Corp. v. Drizin,* 268 A.D. 2d 371, 701 N.Y.S.2d 427, 428 (1st Dep't 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

## EIGHTH OBJECTION

### The Trustee has improperly disallowed any prior gain of the Claimants

124.    The BLMIS Trustee's action in reducing the amounts claimed by the investor-claimants by any prior gains reflected on the Final BLMIS statement or prior BLMIS statements is an attempt to avoid such gains without alleging any grounds for avoidance or proving that such gains are avoidable under the Bankruptcy Code's avoidance provisions. As such, any such disallowance is improper and unjustified, and the Determination Letter should be stricken. *See Fed. R. Bankr. P. 7001(1), 7008*.

## NINTH OBJECTION

### The Trustee has imposed improper conditions on the receipt of SIPC payments

125.    The BLMIS Trustee has sought to condition the Special Trust's receipt of any SIPC funds (including undisputed amounts) on the execution of a Partial Assignment and Release that would "release and forever discharge the SIPA Trustee and SIPC . . . from any and all claims arising

out of or relating to [Mr. Cohen's] BLMIS Account, the Customer Claim filed with the SIPA Trustee . . ., and any and all circumstances giving rise to the Customer Claim . . . ." *See* Determination Letter and Partial Assignment and Release attached thereto at 2-3 (Exhibit A). There is no legal basis for requiring such a Partial Assignment and Release, and the Trustee's actions attempt to compel the Special Trust and the investor-claimants to give up substantial rights which are disputed as a condition to receiving amounts that are undisputed.    Indeed, conditioning the payment of funds to which customers are statutorily entitled on the execution of a release is contrary to the provisions of SIPA which direct that customer claims be paid "promptly." *See 15 U.S.C. § 78fff(a)(1)* (noting that one of the purposes of a SIPA liquidation proceeding is "to distribute customer property and . . . otherwise satisfy net equity claims of customers . . . as *promptly as possible* after the appointment of a trustee")(emphasis added); 15 U.S.C. § 78fff-2(b) ("[T]he trustee shall *promptly* discharge . . . all obligations of the debtor to a customer . . . by the . . . making of payments to or for the account of such customer."). Moreover, the demand for a release and assignment violates specific provisions of SIPA providing limited subrogation rights to the BLMIS Trustee, which do not include the assignment and release sought by the BLMIS Trustee. *See, e.g., 15 U.S.C. § 78fff(a)(3)* (providing that Trustee has "rights of subrogation as provided in this chapter"); *15 U.S.C. § 78fff-2(c)(3)* (providing that Trustee's rights as subrogee are subordinate to rights of customers to customer property). In addition, the Trustee's demand is both unconscionable and contrary to public policy and should be stricken.

126.    The BLMIS Trustee's determination amounts to an improper disallowance of claims.

**RELIEF REQUESTED**

127.   For the reasons stated herein, the BLMIS Trustee should be directed to award each of the nine investor-claimants – all customers of BLMIS – the full amount of their separate claims, together with lawful interest.

which have prima facie validity. *See Bankruptcy Code § 502(a)*. The BLMIS Trustee has offered no factual or legal basis for his Determination. The BLMIS Trustee's Determination Letter should be stricken, or alternatively, the BLMIS Trustee should describe his position in detail including all relevant facts, legal theories, and authorities. Upon the filing of such a statement, this matter will be a contested proceeding under Rule 9014, and the Special Trust and the nine investor-claimants will file a response.

128.   The Special Trust and the nine investor-claimants each request such other relief as may be just and equitable.

**CONCLUSION**

129.   The Special Trust and the nine investor-claimants reserve the right to revise, supplement, or amend this Objection, and any failure to object on a particular ground or grounds shall not be construed as a waiver of their right to object on any additional grounds.

130.   The ten objectors reserve all rights set forth Rule 9014, including, without limitation, rights of discovery. *See Fed. R. Bankr. P. 9014*.

131.   The ten objectors reserve all objections as to the competence, relevance, materiality, privilege, or admissibility of evidence in any subsequent proceeding or trial of this or any other action for any purpose whatsoever.

00057711                                         -48-

132.    The ten objectors incorporate by reference all reservations of rights set forth in their

customer claim submissions to the BLMIS Trustee.

DATED:    New York, New York
          August 27, 2009                    Respectfully submitted,

                                             BRUNELLE & HADJIKOW, P.C.

                                             By: *George Brunelle*
                                                 George Brunelle
                                                 Timothy Kebbe

                                             One Whitehall Street – 18th Floor
                                             New York, New York 10004
                                             Telephone: (212) 809-9100
                                             Facsimile:  (212) 809-3219

                                             *Attorneys for James H. Cohen Special Trust, Morrie
                                             Abramson, Barry E. Kaufman, James H. Cohen,
                                             Robyn C. Berniker, Alan D. Garfield, Marian
                                             Tallering-Garfield, Erin M. Helberg, The Marian
                                             Cohen 2001 Residence Trust and BK Interest, LLC*

00057711                                -49-