**EXHIBIT H**

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com

Hearing Date: October 19, 2010
Hearing Time: 10:00 AM (EST)
Objection Deadline: July 12, 2010

*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION TO AFFIRM**
**TRUSTEE'S DETERMINATIONS DENYING CLAIMS OF CLAIMANTS WITHOUT**
**BLMIS ACCOUNTS IN THEIR NAMES, NAMELY, INVESTORS IN FEEDER FUNDS**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   THE "FEEDER FUND" CLAIMANTS AT ISSUE ................................. 2

III.  PROCEDURAL HISTORY.................................................................... 3

IV.   BACKGROUND .................................................................................. 5

    A.   The Madoff Scheme.................................................................... 5

    B.   The Feeder Funds ....................................................................... 7

V.    ARGUMENT ...................................................................................... 12

    A.   The Trustee Properly Denied The Claims Of The Objecting Claimants Because They Are Not "Customers" Under SIPA And Have No Cognizable Net Equity Claims.................................................................... 12

        1.   SIPA Provides Preferred Protection For "Customers" Only. .................. 12

        2.   The Objecting Claimants Are Not "Customers" Under SIPA Because, Unlike The Feeder Funds, They Did Not Have Securities Accounts With BLMIS. ............................................................... 14

        3.   Only Account Holders Who Entrusted The Debtor With Cash Or Securities For The Purpose Of Trading Or Investing In Securities Are "Customers" Under SIPA. ............................................................... 17

            a.   The Objecting Claimants Are Not "Customers" Because They Did Not Entrust BLMIS With Cash or Securities To Trade Or Invest. ........................................................... 18

        4.   The Objecting Claimants Have No Net Equity Upon Which A "Customer" Claim Could Be Allowed.................................................. 21

        5.   No Obligations To Investors in Feeder Funds Are Ascertainable From The Books And Records Of the Debtor. ......................................... 22

        6.   The Feeder Funds, Not The Objecting Claimants, Have Cognizable Claims Against BLMIS......................................................... 25

VI.   CONCLUSION .................................................................................. 28

# TABLE OF AUTHORITIES

Page

## Cases

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*,
    957 F. Supp. 1308 (S.D.N.Y. 1997)................................................................27

*In re A.R. Baron & Co.*,
    226 B.R. 790 (Bankr. S.D.N.Y. 1998)............................................................13

*In re Adler, Coleman Clearing Corp.*,
    204 B.R. 111 (Bankr. S.D.N.Y. 1997)............................................................21

*In re Adler, Coleman Clearing Corp.*,
    216 B.R. 719 (Bankr. S.D.N.Y. 1998)........................................................13, 17

*In re Adler, Coleman Clearing Corp.*,
    277 B.R. 520 (Bankr. S.D.N.Y. 2002)........................................................16, 18

*In re Albert & Maguire Sec. Co.*,
    419 F. Supp. 1171 (E.D. Pa. 1976) ................................................................15

*Anglo Am. Sec. Fund, L.P., v. S.R. Global Int'l Fund, L.P.*,
    829 A.2d 143 (Del. Ch. 2003)........................................................................26

*Bank Leumi Trust Co. of New York v. D'Evori Int'l., Inc.*,
    163 A.D.2d 26, 558 N.Y.S.2d 909 (N.Y. App. Div. 1st Dept. 1990)..........................26

*In re Bernard L. Madoff Inv. Sec. LLC*,
    424 B.R. 122 (Bankr. S.D.N.Y. 2010)............................................... passim

*Diana Allen Life Insurance Trust v. BP P.L.C.*,
    333 Fed. Appx. 636 (2d Cir. June 23, 2009)......................................................27

*Duel v. Hollins*,
    241 U.S. 523 (1916)......................................................................................12

*Ernst & Young Ltd. v. Quinn*, No. 09-C 2009 WL 3571573 (D. Conn. Oct. 26,
    2009) .........................................................................................................27

*In re First Interregional Equity Corp.*,
    290 B.R. 265 (Bankr. D.N.J. 2003) ...........................................................16, 18

*Gordon v. Fundamental Investors, Inc.*,
    362 F. Supp. 41 (S.D.N.Y. 1973)....................................................................26

*In re Hanover Square Sec.*,
    55 B.R. 235 (Bankr. S.D.N.Y. 1985)................................................................18

## TABLE OF AUTHORITIES
### (cont'd)

Page

*Johnson v. Gore Wood & Co.*,
   [2002] 2 A.C. 1, [2001] B.C.C. 820 (H.L.)...................................................25

*In re Klein, Maus & Shire, Inc.*,
   301 B.R. 408 (Bankr. S.D.N.Y. 2003).........................................................14

*Lakonia Mgmt Ltd. v. Meriwether*,
   106 F. Supp. 2d 540 (S.D.N.Y. 2000).........................................................27

*In re Omni Mutual, Inc.*,
   193 B.R. 678 (S.D.N.Y. 1996)....................................................................14

*Plumbers and Steamfitters Local 490 Severance and Retirement Fund v. Appleton
   (In re First Ohio Securities Co.)*,
   No. 93-133, 1994 WL 599433 (6th Cir. Nov. 1, 1994) ........................20, 21

*SEC v. F.O. Baroff Co.*,
   497 F.2d 280 (2d Cir. 1974)..................................................................14, 18

*SEC v. Packer, Wilbur & Co.*,
   498 F.2d 978 (2d Cir. 1974)........................................................................13

*SIPC v. Barbour*,
   421 U.S. 412 (1975)....................................................................................12

*SIPC v. Executive Sec. Corp.*,
   423 F. Supp. 94 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 98 (2d Cir. 1977)....................16, 18

*SIPC v. Morgan, Kennedy & Co.*,
   533 F.2d 1314 (2d Cir. 1976)............................................................. passim

*SIPC v. Pepperdine Univ. (In re Brentwood Sec., Inc.)*,
   925 F.2d 325 (9th Cir. 1991) ................................................................13, 14

*SIPC v. Stratton Oakmont, Inc.*,
   229 B.R. 273 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. Arford v. Miller*, 210
   F.3d 420 (2d Cir. 2000)...............................................................................14

*SIPC v. Wise (In re Stalvey & Assocs., Inc.)*,
   750 F.2d 464 (5th Cir. 1985) ...............................................................16, 18

*Stafford v. Giddens (In re New Times Sec. Servs., Inc.)*,
   463 F.3d 125 (2d Cir. 2006).............................................................17, 18, 22

## TABLE OF AUTHORITIES
### (cont'd)

Page

*Stephenson v. CITCO Group Ltd.,*
    2010 WL 1244007 (S.D.N.Y. Apr. 1, 2010).................................................27

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
    845 A.2d 1031 (Del. 2004) ........................................................................27

*United States v. Madoff,*
    No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) .........................................7

*In re Weis Sec., Inc.,*
    No. 73 Civ. 2332, 1977 WL 1043 (S.D.N.Y. Sept. 29, 1977)....................21

### Statutes

11 U.S.C. § 96e (repealed 1979) ........................................................... 12, 13

15 U.S.C. § 78aaa *et seq.* ......................................................................... 1, 15

    § 78bbb ............................................................................................... 15

    § 78ccc(a)(2) ......................................................................................... 8

    § 78ddd ................................................................................................. 8

    § 78eee(a)(3) ..................................................................................... 3, 8

    § 78eee(a)(4)(A) ................................................................................... 3

    § 78eee(b)(3) ........................................................................................ 3

    § 78eee(b)(4) ........................................................................................ 3

    § 78fff-2 .............................................................................................. 21

    § 78fff-2(a)(2) ...................................................................................... 3

    § 78fff-2(b) ......................................................................... 10, 13, 22

    § 78fff-2(c)(1) .................................................................................... 13

    § 78fff-2(d) ................................................................................. 16, 17

    § 78fff-3 .............................................................................................. 21

    § 78fff-3(a) ..................................................................................... 8, 13

    § 78fff-3(a)(5) .................................................................................... 15

    § 78kkk(d) .......................................................................................... 17

    § 78*lll*(11) ................................................................................... 21, 22

    § 78*lll*(2) ..................................................................................... passim

## TABLE OF AUTHORITIES
### (cont'd)

Page

15 U.S.C. § 78j(b) ................................................................................................ 3

15 U.S.C. § 78o(b) ............................................................................................... 5

15 U.S.C. § 78ff ................................................................................................... 3

15 U.S.C. § 80a-2(a)(8) .................................................................................... 7, 15

6 Del. Code § 17-701 ......................................................................................... 25

N.Y. Ltd. Liab. Co. Law § 601 ......................................................................... 25

### Rules

17 C.F.R. § 240.10b-5 .......................................................................................... 3

17 C.F.R. § 300.104 .......................................................................................... 20

17 C.F.R. § 300.105 .......................................................................................... 20

### Legislative Materials

S. Rep. 95-763, *reprinted in* 1978 U.S.C.C.A.N. 764 ...................................... 23

### Treatises

19 Am. Jur. 2d Corporations § 1937 ................................................................. 26

### Other Authorities

*SEC Staff Report to the United States Securities and Exchange Commission, Implications of the Growth of Hedge Funds,* http://www.sec.gov/news/studies/hedgefunds0903.pdf .................... 8

William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations (2010) ..................... 25

Pursuant to this Court's April 13, 2010 order (the "Scheduling Order") (Dkt. No. 2205), Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and for Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this Memorandum of Law in Support of the Trustee's motion ("Customer Motion") to affirm the denial of the claims of certain claimants (the "Objecting Claimants" or "Claimants Without An Account") who did not have accounts with BLMIS but instead invested, directly or indirectly, in "feeder funds" that had accounts and invested with BLMIS. This memorandum is based upon the law set forth below as well as the facts set forth in the declarations of David J. Sheehan ("Sheehan Dec.") and Matthew B. Greenblatt (Greenblatt Dec.), filed herewith.

# I.
# INTRODUCTION

Many people who lost money in the Madoff fraud neither had accounts with BLMIS nor invested directly with BLMIS. Instead, they invested in various "feeder funds" that, in turn, invested with BLMIS, or they invested indirectly in those feeder funds through other entities. The Objecting Claimants, who invested in these feeder funds, filed with the Trustee customer claims against BLMIS. But SIPA allows such claims only by "customers," which SIPA narrowly defines as those investors who entrusted BLMIS with cash or securities for the purpose of trading or investing in securities, and who had accounts with BLMIS for that purpose. Under this definition, it is the feeder funds that invested with BLMIS (and in which the Objecting

---

[1] The Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* For convenience, subsequent references to sections of the act shall be denoted simply as "SIPA, § __."

Claimants directly or indirectly invested) that are "customers" under SIPA, not the Objecting

Claimants. The Trustee thus properly denied the Objecting Claimants' customer claims.

## II.
## THE "FEEDER FUND" CLAIMANTS AT ISSUE

The Customer Motion is limited to a certain group of claimants: those whose claims

emanate from their direct or indirect investments in so-called "feeder funds" that, in turn, had

accounts with and invested directly with BLMIS. The 16 feeder funds (the "Feeder Funds")

whose investors are the subject of this Motion share the following characteristics: (1) they are

legal entities (i.e., capable of owning property and of suing or being sued) that were created as

investment vehicles; (2) they obtained monies that they used for investment by selling (directly

or indirectly) ownership interests in themselves to the Objecting Claimants and other persons;

(3) the Feeder Funds' managers and administrators, not the Objecting Claimants, had

responsibility for managing and directing the Feeder Funds' investments; (4) they invested

directly with BLMIS and had BLMIS accounts, according to the books and records of the

Debtor; and (5) they do not include ERISA plans (and other entities whose property is treated as

ERISA plan property), trusts, or pass-through, self-directed, or custodial investment vehicles

such as banks, brokers or dealers. The 16 Feeder Funds whose investors are the subject of this

Motion are listed in Exhibit 1 to the Sheehan Declaration.[2]

---

[2] Other entities that invested with BLMIS that are not listed in Exhibit A may also meet these five criteria but are not included in this Motion. Similarly, objections have been filed by other indirect investors, including those who may have invested in other entities meeting the criteria specified above, that are not included within this Motion. The entities and objections that are not included in the instant motion involve factual situations that are still under investigation by the Trustee.

## III.
## PROCEDURAL HISTORY

On December 11, 2008, Madoff was arrested and criminally charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5 (the "Criminal Case") in the United States District Court for the Southern District of New York (the "District Court"). Also on that date, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court against Madoff and BLMIS, among others (Case No. 08-CV-10791) (the "SEC Action").

On December 15, 2008, under section 78eee(a)(4)(A) of SIPA, the SEC consented to combine the SEC Action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging that BLMIS was not able to meet its obligations to securities customers as they came due and that its customers needed the protection afforded by SIPA. The District Court entered a protective decree (the "Protective Decree"), to which BLMIS consented, which, in pertinent part, (a) appointed the Trustee for the liquidation of the business of the Debtor under section 78eee(b)(3) of SIPA, (b) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA, and (c) removed the case to this Court under section 78eee(b)(4) of SIPA.

On December 23, 2008, this Court entered an order specifying the procedures for filing, determining, and adjudicating customer claims (the "Claims Procedures Order") (Dkt. No. 12). The Claims Procedures Order provides, in pertinent part, that under section 78fff-2(a)(2) of SIPA, all claims against BLMIS must be filed with the Trustee. The Claims Procedures Order directs the Trustee to determine customer and creditor claims in writing and allows any claimant

who opposes the Trustee's determination to file an objection with this Court and the Trustee, after which the Court will hear the matter.

Since that time, each of the Feeder Funds has submitted a claim to the Trustee for each of their accounts. (Sheehan Dec., Exs. 4, 7, 10, 12, 15, 17, 19, 22, 25, 27, 29, 31, 33, 35, 37, 39, 41, 44, 47).    The Objecting Claimants also submitted claims in accordance with the Claims Procedures Order. (Sheehan Dec., Exs. 2, 3).    But as the claims of the Objecting Claimants are based not upon direct investments with BLMIS but upon their investments either in the Feeder Funds or in entities that invested in the Feeder Funds, the Objecting Claimants had no direct financial relationship with BLMIS.    They did not have accounts with BLMIS; they did not entrust cash or securities to BLMIS to trade or invest in securities; they did not dictate the timing or amount of investments with or redemptions from BLMIS; and the books and records of BLMIS have no record of their participation, if any, in the Feeder Funds' investments.    As a result, the Objecting Claimants are not "customers" under SIPA and have no cognizable net equity claim to the fund of customer property.    The Trustee thus denied their "customer" claims. The Objecting Claimants thereafter filed objections with the Court. (Sheehan Dec., Exs. 2, 3).

The Trustee filed a motion requesting that the Court set a briefing schedule and hearing date regarding the Objecting Claimants. (Dkt. No. 2052).    On April 13, 2010, the Court granted the motion and ordered that the Trustee file a motion to affirm these claims determinations, and an accompanying memorandum of law and supporting papers setting forth the factual and legal bases for the Trustee's denial of the Objecting Claimants' claims on or before June 11, 2010. (Dkt. No. 2205).    The Customer Motion and this supporting memorandum follow.

# IV.
# BACKGROUND

**A.**    **The Madoff Scheme**

Founded in 1960, BLMIS began as a sole proprietorship of Madoff, and effective January

2001, formed as a New York limited liability company wholly owned by Madoff.  Since in or

about 1986, BLMIS operated from its principal place of business at 885 Third Avenue, New

York, New York.  Madoff ran BLMIS together with several family members and a number of

additional employees.  BLMIS was registered with the SEC as a securities broker-dealer under

section 15(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78*o*(b).  By that

registration, BLMIS is a member of SIPC.  BLMIS had three business units: investment advisory

(the "IA Business"), market making and proprietary trading.  *See generally In re Bernard L.*

*Madoff Inv. Sec. LLC*, 424 B.R. 122, 126-29 (Bankr. S.D.N.Y. 2010).

The IA Business was conducted under a carefully maintained aura of both secrecy and

exclusivity.  Over the years, however, an increasing number of feeder funds opened investment

accounts with BLMIS.  Feeder funds that opened accounts at BLMIS ceded control to Madoff

personally to make investments on their behalf with the money placed with BLMIS.  (*See, e.g.,*

"Trading Authorization Limited to Purchases and Sales of Securities and Options," for Rye

Select Broad Market Portfolio Limited, BLMIS Account No. 1FR080, AMF0007633, annexed to

the Sheehan Dec. as Ex. 46).

According to the information in the claims and objections filed by the Objecting

Claimants, some of the persons who were refused direct investment in BLMIS chose instead to

purchase interests in feeder funds that they knew held Madoff-directed accounts at BLMIS.  *See*

Objection of Howard Siegel IRA (Dkt. No. 1844, at ¶ 12).  Others allege that they invested with

such feeder funds in the first instance, knowing of the Madoff connection because BLMIS's

involvement was mentioned in documents provided to investors such as offering memoranda. *See* Objection of National Bank of Kuwait S.A.K. (Dkt. No. 1287, at ¶ 6). Still other people assert that they were unaware that the feeder funds in which they invested were in turn investing with BLMIS, as it often was not mentioned by name in investor promotional materials. *See* Objection of James J. Trainor (Dkt. No. 1605, at ¶ 1).

For most investors in the IA Business, including the Feeder Funds, Madoff purported to use an investment scheme he called the "split-strike conversion" strategy to attain consistent reported annual returns of between 10% and 17%. The purported strategy consisted of investing in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest publicly traded companies. The basket of stocks would mimic the movement of the S&P 100 Index. Madoff asserted that he carefully timed purchases and sales to maximize value, resulting in periods in which clients' funds would intermittently be out of the market and invested in United States-issued Treasuries. The second part of the purported split-strike conversion strategy was the hedge of the equities purchases with option contracts. Madoff claimed to purchase and sell option contracts corresponding to the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks. *See In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 129-30.

Although BLMIS account holders received monthly or quarterly statements purportedly showing the securities that were held in—or had been traded for—their BLMIS accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a fiction. The purchases and sales of securities depicted in the account statements virtually never occurred and the profits reported were fictitious. At his plea hearing in the Criminal Case, Madoff admitted that he never in fact purchased any of the securities he claimed to have

purchased for customer accounts. *See* Plea Allocation of Bernard L. Madoff at 3, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (Dkt. No. 50).

For all relevant periods, the IA Business was operated as a Ponzi scheme and Madoff and his co-conspirators continued to bring in new money from investors to pay those withdrawing funds. The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make distributions to, or payments on behalf of, other investors. In short, the money sent to BLMIS for investment was used to keep the Ponzi scheme going and to enrich Madoff, his associates, and others, until the scheme collapsed in December 2008 when requests for redemptions overwhelmed the flow of new investments. *See generally In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 128.

**B.    The Feeder Funds**

Most, if not all, of the U.S. feeder funds that invested with BLMIS, and those foreign feeder funds operating in the United States that invested with BLMIS, would be categorized as hedge funds. These investment vehicles are structured to be exempt from registration under United States securities laws, both as to issuance of their own securities (i.e., the ownership interests in themselves that they sell to their investors), and as to their operations in making outside investments using the money that has been invested in them. They are not categorized as brokers or dealers under United States securities laws. They have traditionally avoided registration under the Investment Company Act of 1940 by limiting the numbers of owner-investors and/or by accepting only entities or individuals with high net worth or income as owners-investors (also known in the industry as "Accredited Investors") to stay outside of U.S. securities protections for financially unsophisticated investors. 15 U.S.C. § 80a-2(a)(8). Those who invest in them accept the tradeoff of lesser protections under U.S. securities laws, for the greater freedom of the funds to take risks, avoid regulation, and potentially obtain greater profits

through use of methods that would otherwise be forbidden. Investors invest in hedge funds by purchasing a limited ownership interest in them. They usually withdraw money out of the hedge fund by redeeming a portion of their ownership interest in the hedge fund corresponding to the amount of money they seek to remove. Hedge funds often have limitations on when or to what extent redemptions may occur.[3]

Since these hedge funds are not brokers or dealers registered with the SEC under section 15(b) of the 1934 Act, they are not members of SIPC. SIPA § 78ccc(a)(2). They pay no assessments to the SIPC Fund, SIPA § 78ddd, and their investors are not protected by SIPC with one exception: a hedge fund with a customer account at a SIPC member broker-dealer such as BLMIS may be entitled to treatment as a "customer" of that broker-dealer, making it potentially eligible for a SIPC advance and a distribution of customer property, if the broker-dealer with which it invested is put into liquidation by SIPC. SIPA §§ 78eee(a)(3), 78fff-3(a), 78*lll*(2).

The Feeder Funds listed in Exhibit 1 to the Sheehan Declaration are a subset of funds that invested with BLMIS.[4] The Feeder Funds each appear to meet the criteria set forth above: (1) they are legal entities (i.e., capable of owning property and of suing or being sued) that were created as investment vehicles; (2) they obtained funds that they used for investment by selling ownership interests in themselves to, among others, the Objecting Claimants; (3) Feeder Fund managers and administrators, not the Objecting Claimants, had responsibility for managing and directing the funds' investments; (4) the Feeder Funds invested directly with BLMIS and had

---

[3] See generally SEC Staff Report to the United States Securities and Exchange Commission, Implications of the Growth of Hedge Funds, at http://www.sec.gov/news/studies/hedgefunds0903.pdf.

[4] The Feeder Funds include (1) seven limited partnerships organized under the law of the State of Delaware; (2) one limited partnership organized under the laws of the State of New York; (3) one LLC organized under the laws of the State of New York; (4) three "exempted companies" organized under the laws of the Cayman Islands; (5) one "segregated portfolio company" organized under the laws of the Cayman Islands; and (6) three "international business companies" organized under the laws of the British Virgin Islands. (See, e.g., Sheehan Dec., Exs. 4, 6, 12, 14, 15, 17, 19, 21, 22, 41, 50-77, 80-82).

BLMIS accounts, according to the books and records of the Debtor; and (5) the Feeder Funds are not ERISA plans (nor are they other entities whose property is treated as ERISA plan property), trusts, or pass-through, self-directed, or custodial investment vehicles such as banks, brokers or dealers.

The 16 Feeder Funds maintained a total of 19 accounts with BLMIS.  (Sheehan Dec., Exs. 5, 8, 11, 13, 16, 18, 20, 23, 26, 28, 30, 32, 34, 36, 38, 40, 42, 45, 48).[5]  To open an account with BLMIS, account holders generally executed a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements").[6]  Many of the Feeder Funds executed the Account Agreements.  (Sheehan Dec., Exs. 6, 9, 14, 21, 24, 43, 46, 49).  In contrast, as the Objecting Claimants invested (directly or indirectly) in the Feeder Funds, the Objecting Claimants did not open individual securities accounts with BLMIS for their Feeder Fund investments.[7]  BLMIS accounts were held in the names of the Feeder Funds, not in the names of the Objecting Claimants, and BLMIS sent account statements and confirmations to the Feeder Funds, not the Objecting Claimants.  (Sheehan Dec., Exs. 5, 8, 11, 13, 16, 18, 20, 23, 26, 28, 30, 32, 34, 36, 38, 40, 42, 45, 48).

---

[5] Fairfield Sentry Limited has four separate but linked accounts at BLMIS.  The accounts are linked for use in the "split-strike conversion" strategy.  Typically, the split strike accounts were separated into the equities/long positions in the "dash-3" (-3) subaccount and the options in the "dash-4" (-4) subaccount.  Fairfield Sentry Limited was the exception to this rule.  Fairfield Sentry Limited had separate IA accounts set up for the options instead of using subaccounts.  They were paired together as follows:  BLMIS Account No. 1FN012 for equities and BLMIS Account No. 1FN069 for options; and BLMIS Account No. 1FN045 for equities and BLMIS Account No. 1FN070 for options. (Greenblatt Dec., ¶ 6).

[6] The Account Agreements for certain of the Feeder Funds have not, to date, been located within BLMIS's books and records.

[7] Some of the Objecting Claimants invested with BLMIS through one or more of the Feeder Funds, but also maintained their own direct accounts with BLMIS.  Thus, an Objecting Claimant may have executed Account Agreements for his or her direct account, but there is no evidence that any Objecting Claimant executed Account Agreements for the Feeder Fund accounts at issue in this Motion.

Because the Feeder Funds maintained accounts at BLMIS, and were responsible for making deposits into and withdrawals from those accounts, the books and records of BLMIS reflect the amounts owing and owed between the Feeder Fund and the estate for each of the 19 accounts. (Greenblatt Dec., ¶ 13); (*see infra*, at pp. 22-23 regarding Section 78fff-2(b) of SIPA). The books and records of BLMIS do not, in contrast, reflect deposits or withdrawals directly to or from BLMIS by the Objecting Claimants with regard to the Feeder Fund accounts. The amounts the Objecting Claimants allege are owed to them thus are not discernable from the books and records of BLMIS. (Greenblatt Dec., ¶ 17).

The Feeder Funds filed customer claims with the Trustee for each of the 19 accounts. (Sheehan Dec., Exs. 4, 7, 10, 12, 15, 17, 19, 22, 25, 27, 29, 31, 33, 35, 37, 39, 41, 44, 47). These claims are under review by the Trustee. In the parlance of this case, 17 of the 19 claims are "net losers." (*See infra*, at p. 21).

Approximately 2,330 objections have been filed to date by claimants without accounts who invested through feeder funds, including the Feeder Funds herein. This Motion addresses 1,771 of those objections, more than 75%. (Sheehan Dec., ¶ 11). The Objecting Claimants that are the subject of this Motion are set forth on Exhibits 2 and 3, and invested directly or indirectly in one or more of the Feeder Funds. (Sheehan Dec., Exs. 2 and 3). The Objecting Claimants made customer claims with the Trustee based upon their investments, directly or indirectly, in the Feeder Funds. (*Id.*). The Trustee denied those claims and filed their objections.

Take, for example, the Kingate Global Fund. This Feeder Fund is an "open-ended investment company" organized in the British Virgin Islands in 1994. (Sheehan Dec., Ex. 64, at KF3). It sold shares in itself, in minimum amounts of $250,000, to investors. (*Id.* at KF1). It

held itself out as a "single-advisor fund" that appears to have invested all of its assets with Madoff. (*Id.* at KF20). Kingate Global Fund's 2008 offering memorandum of "USD Shares" ("Kingate Memorandum") states that its investment advisor "has managed the assets of the Fund since its inception" and that he uses the "'split strike conversion' options strategy" (i.e., the strategy that Madoff claimed to be using in the IA Business). (*Id.* at KF29). The Kingate Memorandum further provides that the fund manager "has delegated all investment management duties with regard to USD Shares to the Investment Advisor" and that investors in Kingate Global Fund do not have "any control over the investment and trading decisions of the Investment Advisor[.]" (*Id.* at KF20).

The Kingate Global Fund filed a customer claim with the Trustee for $381 million in cash and $3.18 billion in securities (the market value of the fictional securities in the Kingate Global Fund's account with BLMIS on November 30, 2008). (Sheehan Dec., Ex. 42). The Trustee calculated Kingate Global Fund's net equity to be $540,158,887.54. (Greenblatt Dec., ¶ 18). Based upon their investments in Kingate Global Fund, approximately 330 investors also filed customer claims with the Trustee. (Sheehan Dec., ¶ 13). Each of those claims was denied by the Trustee. (Sheehan Dec., ¶ 13). Twelve of the Kingate Global Fund investors objected to the Trustee's denial of their claims, placing them among the Objecting Claimants in this motion. (Sheehan Dec., Exs. 2 and 3). For example, Remy Investment Corporation made a claim, in part, for $14,741,097.50 based upon its ownership of 32,941 shares of Kingate Global Fund USD Shares. (Sheehan Dec., Ex. 78). And MEL Enterprises made a claim for securities with a market value of $775,069.35, based upon its ownership of 1,711.650 Kingate Global Fund shares. MEL Enterprises acknowledged that it was making its claim because it had made an

investment with BLMIS "through the Kingate Global Fund[.]"  *See* Objection of MEL

Enterprises (Dkt. No. 1186).

Some of the Objecting Claimants' claims are not even based upon investments in the

Feeder Funds; they are based upon investments in other funds that, in turn, invested in the Feeder

Funds—what the Trustee has termed "indirect investors" in the Feeder Funds.  For example,

Objecting Claimant Peter J. Leveton invested in an entity called Agile Group, LLC, which in

turn invested in Rye Select Broad Market Prime Fund, L.P. (Sheehan Dec., Ex. 79).  He stated

in his claim form that the amount owed to him on his customer claim filed with the Trustee was

the "estimated pro-rata percentage of Agile's investment in [Rye Select Broad Market Prime

Fund, LP, one of the Feeder Funds]." (Sheehan Dec., Ex. 79).  Mr. Leveton conceded that he

was an indirect investor who did not have a BLMIS account. (Sheehan Dec., Ex. 79).

## V.
## ARGUMENT

**A.    The Trustee Properly Denied The Claims Of The Objecting Claimants Because They Are Not "Customers" Under SIPA And Have No Cognizable Net Equity Claims.**

**1.    SIPA Provides Preferred Protection For "Customers" Only.**

Congress's goals in enacting SIPA were to protect customers by preventing the failure of

their brokerage houses, restore confidence in capital markets, and upgrade financial

responsibility requirements for registered broker-dealers.  *See SIPC v. Barbour*, 421 U.S. 412,

415 (1975).  Before the enactment of SIPA and its predecessor statute, Section 60e of the former

Bankruptcy Act, 11 U.S.C. §96e (repealed 1979), customers of a bankrupt stockbroker were

considered general creditors if they could not reclaim cash or securities that they could trace into

the broker's possession.  *Duel v. Hollins*, 241 U.S. 523, 527-29 (1916).  Because serious

inequities could and did result from these requirements, Congress enacted section 60e of the

Bankruptcy Act of 1937, which was expanded upon and tailored by Congress with the creation

of SIPA in 1970, to address the unique problems of stockbroker failures.

SIPA established a fund of customer property in which all "customers" share ratably and

to the exclusion of general creditors. *See In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 133

("Separate from the general SIPA estate, a fund of 'customer property' is established for priority

distribution exclusively among the debtor's customers."); *In re Adler, Coleman Clearing Corp.*,

216 B.R. 719, 722 (Bankr. S.D.N.Y. 1998) (same); SIPA §§ 78fff-2(b), 78fff-2(c)(1), 78*lll*(4).

In addition, only "customers" are entitled to receive an advance from the SIPC Fund. *See* SIPA

§ 78fff-3(a); *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1316 (2d Cir. 1976) ("The

decision to advance monies in satisfaction of outstanding claims against a bankrupt broker-dealer

turns on whether the claimant qualifies as a "customer" of the broker-dealer."); *SIPC v.

Pepperdine Univ. (In re Brentwood Sec., Inc.)*, 925 F.2d 325, 327 (9th Cir. 1991) ("only a

'customer' of a registered broker-dealer may recover from the fund"). Thus, those who fit the

definition of "customer" under SIPA are accorded preferential treatment in the form of a priority

over general creditors in both the distribution from the fund of customer property and the funds

advanced by SIPC. *See In re A.R. Baron & Co.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998)

("'Customer' status in a SIPA proceeding is a preferred status which gives customers priority in

the distribution of certain assets marshaled by the trustee as well as entitlement to advances from

the SIPC fund."); *In re Adler, Coleman*, 216 B.R. at 722 ("A person whose claim against the

debtor qualifies as a 'customer claim' receives preferential treatment in the distribution of assets

from the debtor's estate").

Not all victims of a brokerage collapse, however, are protected as "customers" under

SIPA. *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 983 (2d Cir. 1974). Congress intended the

scope of protection under SIPA to be limited to only those individuals or entities that fall within the statutory definition of "customer." *See, e.g., In re Omni Mutual, Inc.*, 193 B.R. 678, 680-81 (S.D.N.Y. 1996) (recovery under SIPA "is limited to a certain class of investors who are 'customers' within the terms of SIPA"); *Brentwood Sec.*, 925 F.2d at 327 (SIPA was "carefully crafted, precisely delineating the category of investors it protects"). Thus, "customer" status is a preferred one that is not to be conferred lightly.

The burden is on a claimant to establish that he is, in fact, a "customer" entitled to SIPA protection. *See, e.g., In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003). As courts have narrowly construed the definition of "customer," that burden of proof "is not easily met." *Id.* Not only is such a showing difficult, a claimant must make such a showing on a transaction-by-transaction basis. *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 n.2 (2d Cir. 1974) (under SIPA, "a person may be a 'customer' with respect to some of his claims for cash or shares, but not with respect to others"); *SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 277 (Bankr. S.D.N.Y. 1999), *aff'd sub nom. Arford v. Miller*, 210 F.3d 420 (2d Cir. 2000) ("an investor can be a customer vis-a-vis certain transactions but not others").

### 2. The Objecting Claimants Are Not "Customers" Under SIPA Because, Unlike The Feeder Funds, They Did Not Have Securities Accounts With BLMIS.

"Customer" status is not a shorthand designation for anyone who deals with a broker-dealer. Rather, under SIPA a "customer" is an investor who "has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer *from or for the securities accounts of such person*," including "any person who has deposited cash with the debtor for the purpose of purchasing securities." SIPA § 78*lll*(2)

(emphasis added).[8]    Thus, SIPA presumes that a "customer" either has a "securities account"

with the debtor or deposits cash or securities with the debtor with the reasonable expectation that

such an account will be set up to trade securities.[9]

The Feeder Funds opened securities accounts at BLMIS for the purpose of trading in

securities.    They typically executed Account Agreements prior to investing with BLMIS, the

accounts are in the names of the Feeder Funds (as the direct or beneficial owners of those

accounts), and the books and records reflect deposits and withdrawals by the Feeder Funds from

those accounts.  (Sheehan Dec., Exs. 6, 9, 14, 21, 24, 43, 46, 49); (Greenblatt Dec., ¶ 9).   In

contrast, the Objecting Claimants—who had invested directly or indirectly in the Feeder Funds,

---

[8] "The term 'customer' of a debtor means any person who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the  purpose of purchasing securities, but does not include—

(A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or

(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the  capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the  claimant and the debtor." SIPA § 78*lll*(2).

While "person" is not defined in SIPA, it is defined under the Securities Exchange Act of 1934, 15 U.S.C. 78a *et seq.*, of which SIPA is deemed an amendment.  *See* SIPA § 78bbb ("Except as otherwise provided in this chapter, the provisions of the Securities Exchange Act of 1934 . . . apply as if this chapter constituted an amendment to, and was included as a section of,  such Act."). Under the 1934 Act, "person" is defined in Section 3(a)(9) as follows: "The term ''person'' means a natural person, company, government, or political subdivision, agency, or instrumentality of a government." The 1934 Act also states at Section 3(a)(19) that the term "company" is governed by the definition in the Investment Company Act of 1940, which in turn broadly provides in relevant part at Section 2(a)(8):  "(8)''Company'' means a corporation, a partnership, an association, a joint-stock company, a trust, a fund, or any organized group of persons whether incorporated or not; . . ." 15 U.S.C. § 80a-2(a)(8).

[9] The only statutory exemption to this requirement is where a fiduciary opens an account on a customer's behalf.  SIPA provides that when banks, brokers, or dealers (entities that are statutorily ineligible for SIPC advances) place investments with  a failed broker-dealer, on behalf of their non-bank, non-broker or non-dealer clients, SIPA treats each such underlying client, not the bank, broker, or dealer acting as the client's fiduciary, as the customer of the debtor for SIPC advance purposes.  *See* SIPA § 78fff-3(a)(5); *In re Albert & Maguire Sec. Co.,* 419 F. Supp. 1171, 1177-78 (E.D. Pa. 1976) ("The sole exception to the proscription [of SIPC advances to a bank] is where the bank, as a customer of the broker, was acting for one of its own customers.  The required advance from SIPC in such situation would benefit the 'customer' principal and not the agent bank.").

not with BLMIS—neither executed Account Agreements nor maintained accounts with BLMIS in their own names. (Greenblatt Dec., ¶ 17). Thus, it is the Feeder Funds that had "securities accounts," and are thus "customers" under SIPA, not the Objecting Claimants.

Case law reflects the fact that one must have an account with the debtor to be a "customer" or have deposited cash or securities with the debtor with the reasonable expectation that such an account will be set up. In *Securities Investor Protection Corporation v. Executive Securities Corporation*, the Southern District of New York held that the objecting claimants were not customers because they lacked an account with the debtor. *SIPC v. Executive Sec. Corp.*, 423 F. Supp. 94, 98 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 98 (2d Cir. 1977). The court held that "a 'customer' is clearly limited to persons who maintain accounts with broker-dealers and who trade or invest through them. Claimants had no account with [the debtor] and clearly do not come within SIPA's definition of the word 'customer.'" *Executive Sec. Corp.*, 423 F. Supp. at 98; *see also In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 557 (Bankr. S.D.N.Y. 2002) ("Claimants with valid 'customer claims' share in the fund of 'customer property,' separate from the general estate, to the extent of the 'net equity' *in that account*") (emphasis added); *In re First Interregional Equity Corp.*, 290 B.R. 265, 273-74 (Bankr. D.N.J. 2003) (to be a customer, "the securities or cash must have been received, acquired, or held '*from or for the securities account*' of the claimant") (emphasis added). Thus, "[c]ustomer status 'in the air' is insufficient to confer the SIPA's protection on a given transaction." *SIPC v. Wise (In re Stalvey & Assocs., Inc.)*, 750 F.2d 464, 471 (5th Cir. 1985).

Consonant with the above authorities, other SIPA provisions presume the existence of a customer account and highlight the inherent link between having an account with the debtor and "customer" status. For example, Section 78fff-2(d) of SIPA provides that a trustee "shall, to the

extent that securities can be purchased in a fair and orderly market, purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities . . . and for the transfer of customer accounts . . . , *in order to restore the accounts of such customers* as of the filing date." SIPA § 78fff-2(d) (emphasis added). Section 78kkk(d), which governs SIPC advertising, states that SIPC may prescribe the manner in which SIPC members "may display any sign or signs . . . *relating to the protection to customers and their accounts*[.]" SIPA § 78kkk(d) (emphasis added).

Thus, because the Feeder Funds, not the Objecting Claimants, had "securities accounts" with BLMIS, only the Feeder Funds can be "customers" under SIPA.

### 3. Only Account Holders Who Entrusted The Debtor With Cash Or Securities For The Purpose Of Trading Or Investing In Securities Are "Customers" Under SIPA.

To be a "customer" under SIPA, an investor must not only have a securities account with the debtor, he must also have "a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for" that securities account (including "any person who has deposited cash with the debtor for the purpose of purchasing securities"). SIPA § 78*lll*(2). Thus, to be a "customer" an account holder must have entrusted cash or securities with the debtor for the purpose of trading or investing in securities. *See Stafford v. Giddens (In re New Times Sec. Servs., Inc.*), 463 F.3d 125, 128 (2d Cir. 2006) ("[t]he critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities") (quoting *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995)); *In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 724-25 (Bankr. S.D.N.Y. 1998) ("The term [customer] refers to those who entrust cash or securities to broker-dealers for the purpose of trading and investing in the securities market. . . . Thus, in determining "customer" status, we look to whether a particular transaction giving rise to

a SIPA claim arose out of the type of fiduciary relationship generally characterizing the relationship between a broker-dealer and its customer."); *see also Executive Sec.*, 423 F. Supp. at 98 ("a 'customer' is clearly limited to persons" who "trade or invest through" their securities accounts).

Courts have construed the "customer" definition narrowly. *See In re New Times Sec. Servs.*, 463 F.3d at 127 ("Judicial interpretations of 'customer' status support a narrow interpretation of the SIPA's provisions.") (quoting *SIPC v. Wise (In re Stalvey & Associates, Inc.)*, 750 F.2d 464, 472 (5th Cir. 1985)). Indeed, even if a claimant literally "fit[s] within the four corners of that definition does not automatically entitle a claimant to customer status"—the relevant question is whether the claimant entrusted the debtor with cash or securities for purposes of trading or investing in securities. *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 558 (citing *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 (2d Cir. 1974) (rejecting investor's contention that he was a "customer" simply because "he falls within the literal definition of a 'customer' in the 1970 statute"). For example, courts have rejected "customer" status for claimants who lent securities to the debtor, because they did not entrust those securities to the debtor for the purposes of trading or investing in securities. *See In re First Interregional Equity Corp.*, 290 B.R. 265, 279-80 (Bankr. D.N.J. 2003); *In re Hanover Square Sec.*, 55 B.R. 235, 238-39 (Bankr. S.D.N.Y. 1985); *Executive Sec.*, 556 F.2d at 99.

### a. The Objecting Claimants Are Not "Customers" Because They Did Not Entrust BLMIS With Cash or Securities To Trade Or Invest.

In addition to lacking accounts with BLMIS, the Objecting Claimants did not invest directly with BLMIS. Instead, they invested in the Feeder Funds or in other entities that invested, directly or indirectly, in the Feeder Funds—and the Feeder Funds, in turn, invested with BLMIS. As a result, the Objecting Claimants are not "customers" of BLMIS because it was

the Feeder Funds that entrusted cash or securities with BLMIS for the purpose of investing or trading in securities, not the Objecting Claimants.

For similar reasons, in *Securities Investor Protection Corp. v. Morgan, Kennedy & Co.* ("*Morgan Kennedy*"), 533 F.2d 1314 (2d Cir. 1976), the Second Circuit held that indirect investors like the Objecting Claimants were not "customers" under SIPA.

*Morgan Kennedy* involved a profit-sharing plan. The profit-sharing plan money was held in a trust fund headed by three trustees. The money was paid in by Reading Body Works, Inc., based upon its net earnings, for the benefit of its employees. Employees had vested and non-forfeitable interests in the trust funds, payable upon the employee's termination of employment. The trust maintained separate accounts for each employee. The money was invested solely by the trustees, through an account in the name of the trustees. As with the Objecting Claimants, none of the employees' names appeared in the records of the debtor broker-dealer. *Id.* at 1315.

The Second Circuit rejected the argument, advanced by both the trust employees and the SIPA trustee, that each employee was a separate "customer" entitled to a SIPC advance. The Court noted that "[e]mphasis on the customer as investor and purchaser/trader has been a consistent theme in cases in this Circuit." *Id.* at 1317. "Against this background," the Court held, "it is impossible to classify the Reading employees as 'customers' of the debtor. The one hundred and eight beneficiaries were neither investors nor traders." *Id.* at 1318.

The Court noted that "none of the one hundred and eight [employees] would have had any standing as a 'customer' of the then-solvent broker-dealer to give any buy or sell order in the account." *Id.* Furthermore, "[t]he trust account itself was in the name of the Trustees who had the exclusive power to entrust the assets to the debtor, to invest and reinvest, and to purchase and trade securities in the account as they saw fit. In short, the single trust account, represented by

the Trustees collectively, possessed the required attributes for customer status under SIPA; the Reading employees possessed none of those attributes." *Id.*

The Court further observed that "[n]ot only the relevant case law, but common sense as well, mandates this result. We are hard pressed to discern any of the usual traits of a customer relationship between the employee-beneficiaries and the debtor." *Id.* As the Court noted, "[t]he employee-beneficiaries in the case before us made no purchases, transacted no business, and had no dealings whatsoever with the broker-dealer in question respecting the trust account. Indeed, they could not have any such dealings since the broker-dealer held no property belonging to any individual employee, in which such employee could trade or invest." *Id.* Thus, the Court concluded, "[t]he argument that, notwithstanding their complete anonymity and total incapacity to have dealings with the broker-debtor, the Reading employees were 'customers' of Morgan-Kennedy stretches that term wholly beyond its limits." *Id.*

Moreover, the *Morgan Kennedy* court analyzed the SIPC Series 100 Rules, which provide that co-owners of a qualifying joint account and co-beneficiaries of a qualifying trust account are treated as one customer for SIPA advance purposes. *See id.* at 1319-20 (citing 17 C.F.R. §§ 300.104, 300.105). The Second Circuit held that individual customer status "for each individual owning some portion of, or interest in, [a] particular account" was "explicitly forbidden" under the Rules. 533 F.2d at 1319-20. "If the available maximum of a SIPC advance depended upon the number of parties jointly holding an account," the Court noted, "individuals could arbitrarily expand that figure at will. Such a result is obviously repugnant to the plain meaning of the statute and to the intent of Congress in passing it." *Id.* at 1321.

In *Plumbers and Steamfitters Local 490 Severance and Retirement Fund v. Appleton (In re First Ohio Securities Co.)*, No. 93-133, 1994 WL 599433 (6th Cir. Nov. 1, 1994), the Sixth

Circuit, citing to *Morgan Kennedy*, similarly held that while a pension fund was a "customer" of a failed brokerage in a SIPA liquidation proceeding, the pension-fund participants were not.

The reasoning of *Morgan Kennedy* and *First Ohio Securities* applies with equal force here. It was the Feeder Funds, not the Objecting Claimants, that had accounts with BLMIS, that entrusted assets to BLMIS for the purpose of investing and trading in securities, and that had the right to direct deposits to and withdrawals from those accounts. Thus, just as with the trust beneficiaries in *Morgan Kennedy* and the pension-plan participants in *First Ohio Securities,* the definition of "customer" cannot be stretched to encompass the Objecting Claimants.[10]

### 4.    The Objecting Claimants Have No Net Equity Upon Which A "Customer" Claim Could Be Allowed.

Only those customers with a valid net equity claim are entitled to share in the fund of customer property and, in certain circumstances, receive a SIPC advance against that distribution. *See* SIPA §§ 78fff-2, 78fff-3. "Net equity" is measured under section 78*lll*(11) of SIPA by calculating, in the first instance, "the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer." SIPA § 78*lll*(11).[11]

---

[10] Moreover, by restricting the "customer" definition to a select group of account holders who actually entrusted funds to the debtor to trade or invest in securities, SIPA intended—as its legislative history reflects—to protect only those customers "with 'an unrestricted right to receive on demand the securities which belong to them.'" *In re Adler, Coleman Clearing Corp.*, 204 B.R. 111, 118 (Bankr. S.D.N.Y. 1997) (quoting H. R. Rep. No. 91-1613, 91st Cong.2d Sess. (1970), 1970 U.S.C.C.A.N. 5254)); *see also In re Weis Sec., Inc.*, No. 73 Civ. 2332, 1977 WL 1043, *4 (S.D.N.Y. Sept. 29, 1977) (same). Because the Objecting Claimants' relationship with BLMIS was an indirect one, the Objecting Claimants had no relationship, contractual or otherwise, with BLMIS that would have given them the right to demand securities from BLMIS. Any such right would have resided with the Feeder Funds that directly invested with BLMIS and had BLMIS customer accounts as a result.

[11] Net equity is calculated by crediting the amount of cash deposited by the customer into his BLMIS customer account, less any amounts already withdrawn by him from his BLMIS customer account. *See In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 135. If customers have positive net equity, meaning that they deposited more cash with BLMIS than they withdrew over the history of their accounts, their claims may be allowed in the amount of their net investment. If customers have withdrawn more cash than they deposited, they have no net equity, and are not entitled to share in the fund of customer property.

The definition of "net equity" demonstrates that it is the Feeder Funds, and not the Objecting Claimants, that may have allowable customer claims under SIPA, as the Feeder Funds opened and maintained the securities accounts at issue. "Net equity" is defined under SIPA as the "dollar amount of the *account or accounts* of a customer[.]" SIPA § 78*lll*(11) (emphasis added). Absent accounts with BLMIS, the Objecting Claimants have no "net equity" that could entitle them to either a SIPC advance or a distribution of customer property. *See In re New Times*, 463 F.3d at 127 & n.4 ("Each customer shares ratably in this fund of assets to the extent of the customer's net equity at the time of filing. . . . SIPA defines 'net equity' as 'the dollar amount of the *account or accounts* of a customer.'") (emphasis added).

Moreover, the "net equity" definition—"the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer,"—presumes that the liquidation value of those securities positions "would have been owed" to the customer by the debtor. SIPA § 78*lll*(11). But any such obligations would be owed to the BLMIS account holders, not to indirect investors and non-account holders such as the Objecting Claimants, who did not have accounts with BLMIS and who did not entrust cash or securities to BLMIS to invest or trade in securities.

### 5.    No Obligations To Investors in Feeder Funds Are Ascertainable From The Books And Records Of the Debtor.

In order to resolve the thousands of customer claims filed with him in accordance with SIPA, the Trustee has developed a comprehensive claims administration process for the intake, reconciliation, and resolution of customer claims. SIPA provides for payments of obligations to "customers" only "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." SIPA § 78fff-2(b). As

such, the starting point for the determination of a customer claim is the books and records of the debtor.[12]

Before issuing a determination letter regarding each customer claim, the Trustee, his counsel and his consultants engage in a comprehensive review of the books and records of BLMIS. The "books and records" of BLMIS comprise many sources, including bank records, annual reports, DTCC account information, BLMIS customer statements and confirmations received by customers, other corporate documents, and customer-related files such as account maintenance folders, in which the Account Agreements, communications between customers and BLMIS, and any other documents relating to the particular customer account were maintained.

For BLMIS customers with BLMIS accounts, the Trustee relies upon the books and records of BLMIS to determine each customer's "net equity," as he is required to do under SIPA. But the Trustee can discern no obligations to the Objecting Claimants from the books and records of BLMIS. (Greenblatt Dec., ¶¶ 11, 17). Lacking any direct financial relationship with BLMIS, the Objecting Claimants do not appear on the books and records of BLMIS vis-à-vis the 19 accounts that are included in the Trustee's Motion, which were all in the names of the Feeder Funds. (Greenblatt Dec., ¶ 17).

In denying the "customer" claims of the profit sharing plan participants in *Morgan Kennedy*, the Second Circuit noted that the broker had no knowledge of the employee additions to and subtractions from the profit sharing plan. *Morgan Kennedy*, 533 F.2d at 1318 ("There could be an unlimited number of employee additions to, and subtractions from, the company's

---

[12] The legislative history of SIPA's 1978 amendments to SIPA—in describing SIPA's "books and records provision," explains that "[t]his section reflects one of the essential features of the amendments, namely the delivery of securities to customers to the greatest extent practicable *in order to make customer accounts whole*." S. Rep. 95-763, 12 (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. 764, 775. Thus, the connection between "customer" status and having an account at the debtor is reinforced by the legislative history as well as SIPA itself.

Profit Sharing Plan of which the broker would have no knowledge and with which no concern"). Similarly here, BLMIS has no knowledge of the amounts that the Objecting Claimants invested in their particular Feeder Funds.

Moreover, the determination of the specific amounts owed to the Objecting Claimants is potentially dependent on any number of factors not known to the Trustee, such as governing provisions in the contractual agreements between the Objecting Claimants and the Feeder Funds in which they invested that mandate the amounts, if any, that an Objecting Claimant is owed from its Feeder Fund. Hedge funds are typically structured so that management fees and other expenses are paid before individual investors see a return, so a Feeder Fund might well dispute what portion of the value supposedly represented by the Feeder Fund's BLMIS account could ultimately be paid to a particular withdrawing owner/investor. (*See, e.g.,* Sheehan Dec., Ex. 53, at GSPAA0000031, GPSAA0000033; Ex. 50, at PWCSAA0006510, PWCSAA0006514). Many of the Objecting Claimants did not invest in the Feeder Funds but in other funds or entities that invested in the Feeder Funds, casting doubt upon the nature and extent of their investments in the Feeder Funds. Some Feeder Funds invested in each other, further complicating any tracing analysis that would be necessary to identify an individual investor's actual investment with BLMIS—to the extent it could ever be determined at all. (*See, e.g.,* Sheehan Dec., Ex. 47). Some Feeder Funds may have leveraged their investments with BLMIS through loans from lending institutions that also might claim priority over investor "distributions" of net equity. And many of the Feeder Funds, their managers, and related entities (many of which have claimed indemnity) have been or may be sued by their investors, with unpredictable effects on who will ultimately be entitled to their current or future assets. Thus, the amounts owed to the

Objecting Claimants by the Feeder Funds in which they directly or indirectly invested may be affected by a wide variety of external factors unknown to the Trustee.

Each of the 16 Feeder Funds has filed customer claims with the Trustee. With litigation pending against most of the Feeder Funds, the Trustee has not yet determined those claims. An initial review of the books and records relating to the accounts of the Feeder Funds, however, indicates that with the exception of two Feeder Fund accounts, the Feeder Funds are "net losers" in the parlance of this case. *See In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 132. Thus, upon resolution of the Feeder Fund lawsuits, their customer claims may be allowed by the Trustee. And depending upon the Objecting Claimants' agreements with the Feeder Funds in which they invested, the Objecting Claimants may well be entitled to share in any distribution of customer property from the BLMIS estate to the Feeder Funds in which they directly or indirectly invested. But the Objecting Claimants do not have their own individual "customer" claims against BLMIS.

### 6.    The Feeder Funds, Not The Objecting Claimants, Have Cognizable Claims Against BLMIS.

Under SIPA, "customer" is defined as a person "who has a claim" against the debtor. SIPA § 78*lll*(2). As between the Feeder Funds and the Objecting Claimants, only the Feeder Funds have "claims" against BLMIS.

Investors in the Feeder Funds—whether structured as corporations, limited liability companies, limited partnerships, or other corporate-type entities—do not have property rights in specific property of the entities in which they invested. *See, e.g.*, William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 31 (2010) ("the capital or assets of the corporation are its property"); N.Y. Ltd. Liab. Co. Law § 601 ("a member has no interest in specific property of the limited liability company"); 6 Del. Code § 17-701 ("A partner has no

interest in specific limited partnership property."); *Johnson v. Gore Wood & Co.*, [2002] 2 A.C. 1, [2001] B.C.C. 820, 858 (H.L.) (appeal taken from Ct. App.) (Under UK common law, "[a] company is a legal entity separate and distinct from its shareholders. It has its own assets and liabilities and its own creditors. The company's property belongs to the company and not to its shareholders").

As a result, any "claims" by Objecting Claimants are merely derivative of the claims by the Feeder Funds themselves. Under general principles of corporate law, an individual with an interest in an entity typically has no direct claim when, as here, the injury is merely incidental to the entity's injury. "It is well settled that a shareholder, even though he loses the value of his investment, does not have an individual cause of action for a wrong committed against a corporation." *Bank Leumi Trust Co. of New York v. D'Evori Int'l., Inc.*, 163 A.D.2d 26, 34, 558 N.Y.S.2d 909, 916-17 (N.Y. App. Div. 1st Dept. 1990); *see Gordon v. Fundamental Investors, Inc.*, 362 F. Supp. 41 (S.D.N.Y. 1973) (investors in mutual fund had no direct right to sue for loss in value of their shares).

Just as a shareholder cannot assert direct claims when his injury is incidental to the corporation's injury, *see generally* 19 Am. Jur. 2d Corporations § 1937, the Objecting Claimants have no direct claims against BLMIS for losses suffered by the Feeder Funds at Madoff's hands. Any net equity claim of an Objecting Claimant is incidental to the net equity claim of the Feeder Fund in which they invested. What the Objecting Claimants seek to assert is thus derivative of the claims of the Feeder Funds in which they invested, and the Objecting Claimants have no "claims" against BLMIS on their own behalf.

This principle applies outside the corporation-shareholder context as well. *See Anglo Am. Sec. Fund, L.P., v. S.R. Global Int'l Fund*, L.P., 829 A.2d 143, 149 (Del. Ch. 2003) ("The test for

distinguishing direct from derivative claims in the context of a limited partnership is substantially the same as that used when the underlying entity is a corporation."). For example, in *Stephenson v. CITCO Group Ltd.,* 2010 WL 1244007, *9 (S.D.N.Y. Apr. 1, 2010), the district court held that an investor in Greenwich Sentry L.P., a hedge fund organized as a partnership that invested in BLMIS, had no standing to assert claims against the fund's administrators and auditor to the extent that the causes of action were incidental to injury to the fund itself.

Similarly, in *Diana Allen Life Insurance Trust v. BP P.L.C.*, the Second Circuit cited the rule governing shareholder claims when holding that the beneficiaries of a trust had no standing to assert a claim that arose because of damages suffered to the value of their interest in the trust; that claim belonged to the trust directly. 333 Fed. Appx. 636, 638 (2d Cir. June 23, 2009) (citing *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)). *See also Ernst & Young Ltd. v. Quinn*, No. 09-CV-1164, 2009 WL 3571573, *3-7 & n.5 (D. Conn. Oct. 26, 2009) ("variation in corporate form does not alter the general standards for evaluating whether claims are derivative or direct"; applying standard to investment fund structured as Delaware LLC); *Lakonia Mgmt Ltd. v. Meriwether,* 106 F. Supp. 2d 540, 550-53 (S.D.N.Y. 2000) (applying standard to investor in limited-partnership hedge fund that was feeder fund to a master hedge fund in Long Term Capital Hedge Funds group); *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.* 957 F. Supp. 1308, 1331-34 (S.D.N.Y. 1997) (noting constitutional imperative behind the principle in applying it both to limited partners in Delaware hedge fund and to shareholders in related hedge funds incorporated in Cayman Islands).

Accordingly, not only are the Objecting Claimants not "customers" of BLMIS under SIPA, they have no "claims" against BLMIS either. Any such claims reside with the Feeder Funds.

## VI.
## CONCLUSION

The Trustee properly denied the claims of the Objecting Claimants. Unlike the Feeder Funds in which they directly or indirectly invested, the Objecting Claimants had no accounts with BLMIS, did not did not entrust BLMIS with cash or securities for the purpose of trading or investing in securities, and had no net equity. The books and records of BLMIS show that the Feeder Funds, not the Objecting Claimants, were the "customers" as to the relevant accounts; indeed, the books and records do not reflect the Objecting Claimants at all. And only the Feeder Funds could have cognizable claims to customer property in any event. For all of the foregoing reasons, the Court should affirm the Trustee's determination denying the claims of the Objecting Claimants.

Dated: June 11, 2010

Respectfully submitted,

Of Counsel:

**Baker & Hostetler LLP**
3200 National City Center
Cleveland, Ohio 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
Brian A. Bash
Email: bbash@bakerlaw.com
Thomas D. Warren
Email: twarren@bakerlaw.com
Wendy J. Gibson
Email: wgibson@bakerlaw.com

*/s/ David J. Sheehan*
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Bik Cheema
Email: bcheema@bakerlaw.com
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201

*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Bernard L. Madoff*