Mark and Denise Hendler,
Claimants
1338 Sea Bass Cove
Charleston, South Carolina
29412

RECEIVED
JAN 18 2011
U.S. BANKRUPTCY COURT, SDNY

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Securities Investor Protection Corporation, Mark and Denise Hendler<br>      **Plaintiff,**<br>v.<br>Bernard L. Madoff Investment Securities, LLC,<br>      **Defendant.** | Adv. Proc. No. 08-01789 (BRL)<br><br>SIPA Liquidation |
| In re:<br>Bernard L. Madoff,<br>      **Debtor.** | |

## OBJECTION OF MARK AND DENISE HENDLER TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

Mark and Denise Hendler (the "Objector"), hereby submits this objection (the "Objection") to the Notice of Trustee's Determination of Claim (the "Claim Determination") provided by Irving H. Picard, the Trustee for the Liquidation of the Business of Bernard L. Madoff Investment Securities, LLC (the "Trustee") with respect to the Customer Claim submitted by the Objector (the "Objector's Customer Claim"). The Objector makes the following statements in support of this Objection:

### BACKGROUND

1. The Objector invested in Bernard L. Madoff Investment Securities LLC ("BMLIS") through Lucky Company which held a BMLIS Account No 1L0135 (the "Account").

Objector transferred funds to Lucky Company for the purpose of investing in BMLIS, directed Lucky Company to deposit funds in BMLIS for the purpose of purchasing securities and such funds were invested with BLMIS.*

2. Based upon the Account statement as of November 30, 2008, the Account held securities with a value of $9,787,632.15.

3. As of November 30, 2008, the value of Objector's interest in the Account was $94,515.00 Objector filed a timely SIPC claim which was assigned claim number 1L0135.

4. In the Determination Letter, the Trustee rejected the Objector's claim because BLMIS concluded that that the Objector was not a customer of BLMIS.

## GROUNDS FOR OBJECTION

4. Objector constitutes a "customer" as defined by the Securities Investor Protection Act ("SIPA") of BLMIS. Thus I am entitled to receive up to $500,000 in SIPC insurance. 15 U.S.C § 78111(2) ("The term "customer" includes ... any person who has deposited cash with the debtor for the purpose of purchasing securities.") *Rosenman Family, LLC v. Picard,* 401 B.R. 629, 635 (B.S.D.N.Y. 2009) ("the mere act of entrusting ... cash to the debtor for the purpose of effecting securities transactions... triggers customer status..."); *SEC v. Ambassador Church Financial Devel. Group, Inc.,* 679 F. 2d 608, 614 (6th Cir. 1982); *In re Primeline Sec. Corp.,* 295 F. 3d 1100, 1107 (10th Cir. 2002) ("SIPA does ... protect claimants who try to attempt to invest through their brokerage firm but are defrauded by dishonest brokers. ... If a claimant intended to have the brokerage firm purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds"); *Miller v. DeQuine (In*

---

* Lucky Company also held another account at BLMIS (Account No 1L0053). Upon information and belief, none of Objectors's funds were deposited into Account No 1L0053.

2

*re Stratton Oakmont, Inc.)*, 2003 WL 22698876 at *3 (S.D.N.Y. Nov. 14, 2003) ("Stratton Oakmont's conversion of Claimants' property makes the customers within the meaning of SIPA.")

5.  If Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder." Instead, Congress' definition of "customer" is 20 lines long and is further clarified in 15 U.S.C. §78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in BLMIS are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established… that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank…, **in which event such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor") (emphasis added).

6.  Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of Objector because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight*, 389 U.S. 332 (1967).

7.  Moreover, Congress intended for "customer" to be broadly interpreted. In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such recognition would increase the aggregate amount of the insured customer accounts or insured liability in such closed broker or dealer." S. 2348, 91st Cong. Section 7(d) (June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (Aug. 4, 1969). The final bill eliminated this restriction.

**B.    The Trustee has failed to comply with the December 23, 2008 Order**

8. The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs the Trustee to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by BMLIS is reflective of "the Debtor's books and records" by which the Trustee is bound, absent proof that Objector did not have a "legitimate expectation" that a portion of the balance on the Lucky Company BLMIS Account statements represented my property. In fact, in each year of the investment, Objector, as appropriate, paid capital gains tax on the appreciation in the Account attributable to my investment. Objector would not have done so if she had any belief whatsoever that she did not own a portion of the Account.

### C. Trustee has violated the requirement that he honor a customer's "legitimate expectations"

9. The legislative history of SIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
> 
> \*   \*   \*
> 
> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

4

10. On December 30, 1970 when President Nixon signed SIPA into law, he made the following statement:

> I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms. ...Just as the Federal Deposition Insurance Corporation protects the user of banking services from the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services.

http://www.presidency.ucsb.edu/ws/index.php?pid=2870

11. SIPC's series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

12. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities indentified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the case deposited by the claimant to fund that purchase**...[T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*) (emphasis added).

13. The Trustee's position is contradicted, not only by SIPC's prior treatment of customers in the *New Times,* but also by a statement that SIPC's general counsel, Josephine

5

Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a BLMIS customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

    14.    As indicated *infra*, in the *New Times* case, SIPC voluntarily recognized its obligations under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK:... if you file within sixty days, you'll get the securities, without question. Whether-if they triple in value, you'll get the securities...Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted-
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.*, No 00-8178 (B.E.D.N.Y. 7/28/00)

6

(emphasis added.)

### D. The Trustee has invented his own definition of "net equity"

15. SIPA defines "net equity" as the value of the securities positions in the customer's accounts as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by-
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer...; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date...

15 U.S.C. § 78*lll*(11).

16. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

17. The Second Circuit has recognized that:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.*, 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 62 N.2 (B.S.D.N.Y. 1999) ("Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

18. Nevertheless, the Trustee has created his own definition of "net equity." The Trustee has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, the Trustee

7

would avoid paying SIPC insurance to the thousands of BLMIS investors who have depended upon their investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

19. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the financial statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief… Mr. Madoff… to determine who receives a larger proportion of the assets collected by the Trustee.

20. Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.*, to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating BLMIS seven times over an 11-year period.

21. During his tenure, the Trustee has identified only a handful of BLMIS investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate.

22. However, the fact that a few out of more than 8,000 BLMIS investors may have been BLMIS co-conspirators does not justify SIPC's depriving the remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

23. Objector, like thousand of other investors, received monthly statements from BLMIS indicating returns on their investment in the range of 9-11% per year, subject to short term capital gains tax rates. Lucky Company had entered into a standard brokerage agreements with BLMIS, a licensed SEC-regulated broker-dealer, pursuant to which Lucky had specified, numbered accounts for the purchase and sale of securities; it received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. Objector paid federal and state taxes on the annual growth

of the investments with BLMIS. There is no basis to claim that I did not have a "legitimate expectation" that the assets reflected on the Lucky Company statements attributable to my investment belonged to me. Thus, Objector is entitled to a claim for securities in the amount of up to $500,000.

### E. Objector is entitled to prejudgment interest on my investment and profits.

24. Under New York law, which is applicable here, funds deposited with BLMIS are entitled to interest. *See, e.g.,* N.Y.C.P.L.R.§ 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since BLMIS' converted Objector's funds, I am also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as ...conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

25. In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g., Donell v. Kowell,* 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.,* No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visons*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 Million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 Million they originally invested, less their subsequent withdrawals, is a wholly inadequate measure of

9

damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.) (district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

### F. Trustee had no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit

26. The Trustee is, in effect, imposing upon Objector a fraudulent conveyance judgment for sums withdrawn from the Account beyond the statute of limitations period applicable to fraudulent conveyances. However, he has not right to do so in this manner. As such, the Trustee has deprived Objector of SIPC insurance and the claim to which I am entitled.

27. Moreover, the Trustee has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for the Trustee to utilize his avoidance powers to enrich SIPC at Objector's expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g., 5 Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorhold, Inc.,* 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.,* 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of

the debtor. Any creditor that received payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

28. Here, however, Trustee is not acting to assure equal distribution among prepetition creditors. On the contrary, he is acting as SIPC's agent in depriving Objector of SIPC insurance to whichI am statutorily entitled.

**G.    The Trustee has violated SIPA by delaying the payment of SIPC insurance**

29. Trustee has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Trustee is obligated to replace Objector's securities up to a value of $500,000 as valued on the November 30, 2008 statement sent to Lucky Company.

**Conclusion**

Objector is entitled to an order compelling the Trustee and SPIC to immediately replace my securities in the Account in the amount of $94,515.00 and to have my claim recognized in the amount of $94,515.00 plus interest and any additional funds determined by the Court to be reasonable.

Dated: January 17, 2011

_____

Mark Hendler

_____

Denise Hendler

11