## AMENDMENT NO.1 TO THE HILLEL FUND AGREEMENT

Reference is made to the "Agreement", which is the Hillel Fund Agreement, dated as of September 27, 2002, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles (the "Foundation") and the University of Southern California Hillel Foundation ("Hillel").  This document ("Amendment No.1") constitutes Amendment No.1 to the Hillel Fund Agreement.  Capitalized terms used in this Amendment No.1 and not otherwise defined are used as defined in the Agreement.

1. Effective as of March 1, 2006, the Agreement is hereby amended as follows:

    a. Section 3(a) of the Agreement is hereby amended by replacing the phrase "Allen & Ruth Ziegler Director" with the phrase "Executive Director", and by making the same change in the Form of Additional Assets Notice (Exhibit "A") and Form of Distribution Request (Exhibit "C").

    b. Each reference in the Agreement to "Hillel's Co-Chairman of the Board and Co-President" shall include each person holding that office and each person solely occupying the office of Chairman of the Board and President.

    c. Section 7(g) of the Agreement is hereby amended by adding at the end thereof the following: "If Hillel's Executive Director ceases to serve in that capacity, or if Hillel appoints a new Executive Director, then Hillel shall notify the Foundation of that fact in writing within five (5) business days after such change takes effect. That written notice shall name the departing or arriving Executive Director, specify the effective date of the reported change, be addressed and sent to the Foundation as specified in Section 9(b) below, and be signed by the incumbent holder of one of the offices listed in Hillel's then-effective Incumbency Certificate."

2. Hillel hereby expressly ratifies the following Distribution Requests and Additional Assets Notices and confirms that they shall for all purposes be considered to have been duly authorized, executed and delivered on Hillel's behalf in accordance with the Agreement:

    a. the Distribution Requests dated November 26, 2002, October 8, 2003 and January 8, 2004, each executed on Hillel's behalf by Jonathan Klein as Allen & Ruth Ziegler Director and by Jonathan Jaffrey as Co-Chairman of the Board and Co-President;

    b. the Distribution Requests dated November 11, 2002 and February 27, 2003, each executed on Hillel's behalf by Jonathan Klein as Allen & Ruth Ziegler Director and Jaime Gesundheit as Co-Chairman of the Board and Co-President;

    c. the Distribution Request dated August 19, 2004, executed on Hillel's behalf by Matt Davidson as Acting Director and Jonathan Jaffrey as Co-Chairman of the Board and Co-President;

    d. the Distribution Request dated February 14, 2005, executed on Hillel's behalf by Matt Davidson as Acting Director and Jonathan Jaffrey;

    e.   the Distribution Request dated August 23, 2005, executed on Hillel's behalf by Steven Mercer as Executive Director and Jonathan Jaffrey as Chairman of the Board;

    f.   the Distribution Request dated February 14, 2006, executed on Hillel's behalf by Steven Mercer as Executive Director and Robert Gach as Chairman of the Board and President (the "Pending Distribution Request");

    g.   the Additional Assets Notice dated October 29, 2002, executed on Hillel's behalf by  Jonathan Klein as Allen & Ruth Ziegler Director and Jonathan Jaffrey as Co-Chairman of the Board and Co-President; and

    h.   the Additional Assets Notice dated February 14, 2003, executed on Hillel's behalf by Jonathan Klein as Allen & Ruth Ziegler Director and Jaime Gesundheit as Co-Chairman of the Board and Co-President.

3.   Hillel hereby expressly acknowledges that the distribution of assets pursuant to the Pending Distribution Request shall be deemed timely if made within five (5) business days after the mutual execution and delivery of this Amendment No.1.

4.   Except as expressly set forth above, the Agreement remains in full force and effect in accordance with its terms.

IN WITNESS WHEREOF, Hillel and the Foundation have duly executed this Amendment No. 1 as of March 1, 2006.

| JEWISH COMMUNITY FOUNDATION<br>OF THE JEWISH FEDERATION -<br>COUNCIL OF GREATER LOS ANGELES | UNIVERSITY OF SOUTHERN<br>CALIFORNIA HILLEL FOUNDATION |
|---|---|
| By: _____ | By: _____ |
|    Name: |    Name: |
|    Title: |    Title: Chairman of the Board and<br>          President |

CERTIFICATE OF INCUMBENCY
OF OFFICERS OF UNIVERSITY OF SOUTHERN CALIFORNIA HILLEL FOUNDATION

The undersigned, Susan Gradman, does hereby certify that she is a duly elected, qualified and acting Secretary of University of Southern California Hillel Foundation ("Hillel"), a California nonprofit corporation; that the persons named below are and have been at all times since at least January 1, 2006, duly elected, qualified and acting officers of Hillel, holding the offices set forth opposite their respective names below; and that the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Robert Gach | Chairman of the Board and President | |
| Susan Gradman | Secretary | *Susan Gradman* |
| Robert Gach | Chief Financial Officer | |

IN WITNESS WHEREOF, I have hereunto set my hand as a duly authorized officer of Hillel this _5TH_ day of _MAY_, 2006.

_Susan Gradman_
Name: Susan Gradman
Secretary

The undersigned, Robert Gach, does hereby certify that he is a duly elected, qualified and acting Chairman of the Board and President of Hillel; that Susan Gradman is and has been at all times since at least June 11, 2001, a duly elected, qualified and acting Secretary of Hillel; and that the foregoing signature of Susan Gradman is genuine.

Date: _5/5/06_, 2006

Name: Robert Gach
Chairman of the Board and President

EXECUTION COPY

# HILLEL FUND AGREEMENT

This Hillel Fund Agreement (this "Agreement") is made as of September 27, 2002 (the "Effective Date") by and between the Jewish Community Foundation of the Jewish Federation - Council of Greater Los Angeles, a California corporation (the "Foundation"), and University of Southern California Hillel Foundation, a California corporation ("Hillel").

## BACKGROUND

The Foundation is a California non-profit public benefit corporation organized for public purposes including, among others, the receipt, acquisition, holding, administration and expenditure of property for charitable institutions, associations and undertakings. Pursuant to this purpose, the Foundation operates development and planned giving programs including the pooled investment and administration of designated endowment funds, donor advised funds, support foundations and its own unrestricted endowment funds for the benefit of the Jewish community. The size of the Foundation's endowment and planned giving program gives the Foundation access to certain investment advisers, money managers, custodians and other investment service providers generally unavailable to smaller investors and creates certain economies of scale in connection with the administration of investment activities.

Hillel is a California non-profit corporation operating within the Jewish community and has developed a general endowment and encouraged donor support for its programs, projects and long-range growth.   Hillel seeks to continue these activities in part by utilizing the Foundation's investment management and administration infrastructure and the Foundation's access to various investment industry professionals, and the Foundation seeks to aid Hillel's pursuit of its goals by these means, in each case, on the terms and in accordance with the conditions set forth in this Agreement.

In light of the foregoing background information, in consideration of the mutual promises set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which the parties hereby acknowledge, the Foundation and Hillel agree as follows:

1. ESTABLISHMENT OF FUND
   a. Fund Account. The Foundation shall establish on its books of account a fund called the Hillel Fund (the "Fund").   The assets of this Fund (the "Fund Assets") shall consist of all the cash assets transferred to the Foundation for investment, administration and management under this Agreement, adjusted to reflect net income, appreciation (if any) and disbursements.
   b. Transfer of Assets.  Hillel hereby transfers to the Foundation, for investment, administration and management purposes only, the "Initial Assets" listed on the attached Schedule I.   Hillel may transfer additional assets to the Foundation from time to time under this Agreement ("Additional Assets") by completing the "Additional Asset Notice" attached as Exhibit A and complying with the asset transfer procedures described in that notice.
   c. Standard of Care.  In performing its obligations under this Agreement, the Foundation shall exercise any discretion afforded to it hereunder with the same care as it exercises in the investment and management of its own permanent endowment assets.

1

EXECUTION COPY

2. <u>MANAGEMENT AND INVESTMENT OF FUND ASSETS</u>

    a.    <u>Common Investment Pool</u>.  The Foundation shall pool the Fund Assets with the other assets in its "Common Investment Pool" for purposes of investment, management and administration.  The "Common Investment Pool" (or "Pool") is the collective investment fund maintained by the Foundation exclusively for the collective investment and reinvestment of its general endowment fund assets and the general endowment fund assets of other charitable organizations.  Fund Assets transferred and delivered to the Foundation during a calendar quarter shall be invested in the Pool on the last business day of that calendar quarter, and until then shall be invested in the Foundation's "In-House Portfolio" (a portfolio of laddered United States Treasury securities, agency securities and money market instruments all of which will mature in fewer than five years).

    b.    [Intentionally Left Blank]

    c.    <u>Foundation's Authority</u>.  The Foundation shall hold the Fund Assets in its own name or in the name(s) of its custodian(s), designee(s) or nominee(s).  The Foundation shall have the sole right and power to  invest and manage the Fund Assets as part of the Pool and to take such other actions (including, for example, choosing and engaging "Advisors" (as defined below), delegating and assigning authority and responsibility to those Advisors,  incurring expenses and making payments in respect of those expenses) as the Foundation deems appropriate.   Hillel expressly acknowledges that the brokers, banks, trust companies, custodians, investment advisors, attorneys and other service providers that the Foundation engages or consults in the exercise of its authority under this Agreement (collectively, the "Advisors") may include some with which the Foundation's trustees or officers may be affiliated.

    d.    <u>*Pro Rata* Investment and Allocation</u>.  The Foundation shall invest the Fund Assets in the Pool in the same manner and in the same proportions as the other assets in the Pool. The Fund Assets in the Pool shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code, as defined herein) incurred in connection with the investment and administration of the Pool.  The Fund Assets in the In-House Portfolio shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code) incurred in connection with the investment and administration of the In-House Portfolio.  For purposes of this Agreement, the "Code" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time, and references to any particular provision of the Code mean that provision and the corresponding provision of any future United States Internal Revenue Code.

    e.    <u>Guidelines for Common Investment Pool Operations</u>.  The Foundation shall manage, administer and invest the Fund Assets in accordance with the investment guidelines adopted by the Investment Committee of the Foundation's Board of Trustees (the "Guidelines"). The Guidelines in effect on the date of this Agreement are attached as Exhibit B. The Foundation shall notify Hillel of any changes to the Guidelines within  thirty (30) days after their adoption.

EXECUTION COPY

    f.    <u>Valuation of Fund Assets</u>.  The value of the Fund Assets and the Fund's allocable share of costs, expenses, taxes and fees (other than the Foundation's fees hereunder) shall be determined by the Foundation using the same procedures as it applies to the Foundation's own assets in the Pool.

    g.    <u>*Pro Rata* Allocation of Third Party Payments</u>.  If the Foundation receives any indemnification, reimbursement, insurance proceeds, damages or other payment from any source or person that relates to a loss within or damage to assets in the Pool, the Foundation shall add Hillel's *pro rata* share of this payment to the Fund Assets (or, if the Fund is closed, shall pay that amount to Hillel) unless Hillel has already received its *pro rata* share directly from the source of such payment.

3.    <u>USE AND DISTRIBUTION OF FUND ASSETS</u>
    a.    <u>Distributions to Hillel</u>.  Hillel's requests for distributions from Fund Assets shall be made by submitting to the Foundation a "Distribution Request" substantially in the form of the attached Exhibit C.  Each Distribution Request shall be signed by persons so authorized by Hillel's Board of Trustees and previously designated for this purpose by written notice to the Foundation, one of whom shall be Hillel's Allen & Ruth Ziegler Director and the other of whom shall be one of the non-employees holding the office of Co-Chairman of the Board and Co-President.  The amount of prior notice required for Distribution Requests, the timing of distributions and limits on amounts available for distribution shall be governed by the "Distribution Procedures" set forth in Schedule III

4.    <u>ACCOUNTING AND REPORTING</u>
    a.    <u>Quarterly Written Reports</u>.  The Foundation shall provide Hillel with quarterly statements showing contributions, investment results and disbursements from the Fund; provided, however, that Hillel shall be solely responsible for reporting to individual donors and its Board of Trustees on the use of any amounts disbursed.  The Foundation shall also notify Hillel in the quarterly report if the size or composition of the Investment Committee of the Foundation's Board of Trustees (the "Investment Committee") changes by more than fifty percent (50%) during a calendar quarter, and shall notify Hillel within thirty (30) days after any chairman or co-chairman of the Investment Committee leaves that office for any reason other than the expiration of his term.

    b.    <u>Consultation with Investment Committee Representative</u>.  A member of the Foundation's Investment Committee shall be available to meet at least once during each calendar year with Hillel's Board of Trustees or that committee of its Board of Trustees that is responsible for overseeing the investment of Hillel's endowment assets.  This meeting shall occur at a mutually convenient time and location, to be agreed upon in good faith.

5.    <u>COSTS, TAXES AND FEES</u>
    a.    <u>Allocation of Costs, Taxes and Fees</u>.  As part of the Pool, the Fund Assets shall bear (and be reduced by) their *pro rata* share of the costs and fees incurred in connection with the management and investment of the Pool (including, without limitation, any taxes on unrelated business income as defined in §512 of the Code).

b.     <u>Foundation Fee</u>. In consideration of the administrative services provided by the Foundation hereunder, the Foundation shall charge against the Fund Assets a quarterly fee calculated in accordance with Schedule II. This quarterly fee shall be charged and paid from Fund Assets as of the last day of the calendar quarter to which the fee relates, and shall be reflected in the quarterly valuations of the Fund Assets reported to Hillel.

6. <u>REPRESENTATIONS AND WARRANTIES OF THE FOUNDATION</u>
<u>The Foundation hereby represents and warrants as follows:</u>

a.     <u>Organization, Existence and Charitable Status</u>. The Foundation is a duly organized and validly existing California non-profit, public benefit corporation, and is a "Qualified Charitable Organization" (that is, an organization described in §501(c)(3) of the Code which is not a private foundation under §509(a) of the Code).

b.     <u>Authorization, Legality and Enforceability</u>. The Foundation's execution, delivery and performance of this Agreement have been duly authorized in accordance with the Foundation's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c.     <u>Not Registered</u>. The Foundation is not registered as a broker-dealer, the Pool, the Fund and the In-House Portfolio are not registered as investment companies and none of Hillel's interests hereunder are registered securities, in each case, under any federal or state securities laws or under the rules and regulations promulgated under those laws. The Foundation does not intend to effect any such registrations and shall have no obligation to do so.

7. <u>REPRESENTATIONS AND WARRANTIES OF HILLEL</u>
Hillel hereby represents and warrants as follows:

a.     <u>Organization, Existence and Charitable Status</u>. Hillel is a duly organized and validly existing California non-profit corporation, and a Qualified Charitable Organization. Hillel shall remain a Qualified Charitable Organization during the term of this Agreement. If Hillel ceases to be a Qualified Charitable Organization, then it shall give the Foundation prompt notice of that fact.

b.     <u>Authorization, Legality and Enforceability</u>. Hillel's execution, delivery and performance of this Agreement have been duly authorized in accordance with Hillel's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c.     <u>No Encumbrances</u>. Hillel has unencumbered title to the Initial Assets, and warrants that it shall have unencumbered title to all Additional Assets and shall not grant any interest in any Fund Assets to any third party.

d.     <u>Review of Guidelines and Investment Procedures</u>. Hillel has received and read the copy of the Guidelines attached as Exhibit B; has conferred with one or more representatives of the Foundation regarding these Guidelines, has reviewed them with Hillel's legal and financial advisors, its Board of Trustees and any committees of that board responsible for overseeing Hillel's investment and asset management, and has concluded (by majority vote of its Board of Trustees and any constituent committees thereof required under Hillel's governing instruments) that these Guidelines accurately reflect Hillel's own investment and asset management principles.

e.     <u>Source of Funds</u>. The Initial Assets consist, and Hillel hereby covenants that any Additional Assets will consist, of one or more of the categories of assets described in Section 3(c)(10)(B)(i) through (vi) of the Investment Company

4

EXECUTION COPY

Act of 1940. For purposes of determining whether the limitation on compensation of Section 3(e)(2) of the Securities Exchange Act of 1934 has been met, no commission or other special compensation based on the number or value of donations collected by or on behalf of Hillel has been paid with respect to the Initial Assets and none will be paid with respect to any Additional Assets.

f.    <u>No Guarantees</u>. Hillel hereby acknowledges and agrees that the Foundation has not guaranteed or represented any specific investment results or returns. Hillel understands that investing is inherently risky and that investments may be volatile and subject to various risks over which the Foundation will have little or no control.

g.    <u>Incumbency</u>. The currently serving, duly elected officers of Hillel are the persons so identified on the "Incumbency Certificate" attached as Exhibit D. Hillel shall provide the Foundation with an updated Incumbency Certificate promptly upon the occurrence of any change to the information set forth therein.

8.    <u>LIMITATION OF LIABILITY</u>

a.    <u>Indemnification of Foundation Persons</u>.    The term "Foundation Person" means the Foundation, each member of the Investment Committee, each officer, employee, agent and Advisor of the Foundation and each member of the Foundation's Board of Trustees. Hillel shall indemnify, defend (at its expense) and hold harmless each "Foundation Person" from and against any claim or loss, together with all reasonable costs and expenses related thereto (including, for example, reasonable legal fees and expenses), which arises out of or in connection with the making, construction or performance of this Agreement or the investment or distribution of the Fund Assets (each, a "Claim" and together, "Claims").

b.    <u>Liability of Foundation and Foundation Persons</u>.

i.    No Foundation Person shall have any liability or responsibility to Hillel or any other person for any act or omission to act unless such action or omission resulted directly from that Foundation Person's fraud, willful misconduct, gross negligence or, only as to "Administrative Functions" (as defined below), negligence. In any event, no Foundation Person shall be liable to Hillel for any action or omission made in reliance upon advice of legal counsel (who may be a member of a law firm with which an Investment Committee member or Foundation officer or employee or Trustee is affiliated or associated) employed by or otherwise representing the Foundation or the Investment Committee. For purposes of this Agreement, "Administrative Functions" mean all actions and omissions, of Foundation Persons, directly relating to the receipt and distribution of moneys pursuant to this Agreement, but in any event excluding (i) all acts and omissions relating to the selection and execution of investments and investment strategies and (ii) the selection, engagement, employment, compensation and supervision of Advisors, officers, employees and agents of the Foundation.

ii.    No Foundation Person shall be liable for any failure or delay in performing any of its obligations under this Agreement if such failure or delay is occasioned by compliance with governmental regulations, requests or orders, or by circumstances beyond the Foundation's reasonable control (including, but not limited to, war, insurrection, fire,

EXECUTION COPY

flood, earthquake, accident, strike or other labor disturbance, disruptions of transportation or electrical power services or electronic communication systems, closure of financial markets, suspension in the trading of one or more securities, or acts of God).

iii.    In any event, no Foundation Person shall be liable for any consequential damages, and no Foundation Person shall have any responsibilities with respect to any assets of Hillel other than the Fund Assets.

9.    <u>NOTICES</u>

a.    <u>General</u>.  All communications relating to this Agreement shall be given in writing and sent (at the sender's pre-paid expense) by certified mail (return receipt requested), by hand delivery or by fax.  These communications shall be addressed as specified in this Section 9 (or as the intended recipient has otherwise specified by prior written notice to the sender). If properly addressed, such communications shall be deemed given on the date of hand delivery, on the third business day after deposit with the United States Postal Service (in the case of certified mail), or in the case of facsimile transmission, on the date on which receipt is confirmed.

b.    <u>To the Foundation</u>.    All communications to the Foundation shall be addressed as follows:

> Jewish Community Foundation
> 6505 Wilshire Blvd.
> Suite 1200
> Los Angeles, CA 90048
> Fax #323-761-8730
> Attention: Simone Savlov, Chief Operating Officer
> Copy to: Fay Althausen

c.    <u>To HILLEL</u>.  All communications to Hillel shall be addressed as follows:

> University of Southern California Hillel Foundation
> 3300 Hoover St.
> Los Angeles, CA 90007
> Fax #213-747-2671
> Attention: Rabbi Jonathan Klein, Director

> with a copy to:
> Jaime Gesundheit
> 3730 Meadville Drive
> Sherman Oaks, CA 91403
> Fax #_____

EXECUTION COPY

10. <u>WAIVERS AND AMENDMENTS</u>

    a.    This Agreement may be amended, modified, changed or waived (in whole or in part) only by written instrument signed by both parties hereto.  Any such instrument signed on behalf of Hillel shall be signed by one of the non-employees holding the office of Co-Chairman of the Board and Co-President, as authorized by Hillel's Board of Trustees and previously designated for this purpose by written notice to the Foundation.  Any purported amendment, modification, change or waiver of this Agreement by any means other than a written instrument signed as specified in this paragraph shall be deemed void *ab initio*.

    b.    Any waiver of a provision of this Agreement on any occasion shall not be deemed to be a continuing waiver of that provision, a waiver of the provision on  any other occasion or a waiver of any other provision on any occasion.

11. <u>TERM AND TERMINATION</u>

    a.    <u>Scheduled Term</u>.  This term of this Agreement (the "Term") shall begin on the Effective Date and shall end at 12:00 PM on the last day of the calendar quarter in which the anniversary of the Effective Date occurs, unless earlier terminated or extended in accordance with this Section 11.

    b.    <u>Automatic Extensions</u>.  The term shall be extended automatically for an additional year on each anniversary of the Effective Date unless either party gives the other at least one hundred twenty (120) days' prior written notice that the Agreement shall be allowed to expire at the end of the then-effective term.

    c.    <u>Early Termination</u>.  Either party may terminate this Agreement prior to its schedule expiration date (but in any event as of the end of a calendar quarter) upon at least one hundred twenty (120) days' prior written notice to the other.  Either party may terminate this Agreement immediately by written notice to the other if  the terminating party ceases to be a Qualified Charitable Organization.

    d.    <u>Early Termination by Foundation</u>.  If the Foundation determines in good faith that Hillel is no longer a Qualified Charitable Organization, then the Foundation may terminate this Agreement immediately by written notice to Hillel.

    e.    <u>Surviving Provisions</u>.  Upon expiration or termination of this Agreement, the provisions of Sections 7 and 8 shall remain in full force and effect, along with such definitions and provisions regarding construction, amendment, waiver and administration as may be needed to interpret and apply the surviving provisions.  In addition, such expiration or termination shall not affect the Foundation's right to collect its fees and its reimbursement of any costs, expenses and taxes incurred in respect of the Fund Assets under this Agreement.

    f.    <u>Final Distribution of Fund Assets</u>.  Upon termination or expiration of this Agreement, the Foundation shall distribute the Fund Assets to Hillel in the manner prescribed in Schedule III as if Hillel had submitted a Distribution Request for one hundred percent (100%) of the Fund Assets.

EXECUTION COPY

12. <u>MISCELLANEOUS</u>

    a.    <u>Counterparts and Facsimile Signatures</u>. This Agreement may be executed in counterparts, each of which shall be an original and all of which, together, shall constitute one and the same instrument. Signatures of this Agreement may be delivered by fax, and such faxed signatures shall be deemed a valid and binding form of execution.

    b.    <u>No Agency or Partnership</u>. Neither this Agreement nor the dealings between the parties hereunder shall be deemed to create an agency or partnership relationship between them. Neither party shall have the power to legally bind the other or to act on the other's behalf, except for those powers expressly granted to the Foundation hereunder.

    c.    <u>Assignment and Delegation</u>. Except as otherwise specified in this Agreement, neither Hillel nor the Foundation shall assign its rights or delegate its duties hereunder (by merger, sale or other transfer of assets, operation of law or otherwise) without the express prior written consent of the other. Any purported assignment or delegation without such consent shall be deemed void *ab initio*.

    d.    <u>Governing Law; Severability</u>. The making, execution, delivery and performance of this Agreement, and all disputes under or in connection with this Agreement, shall be governed by and construed under the internal substantive law of the State of California, as that law applies to contracts entirely made and performed within the State of California by parties which are California citizens, residents and domiciliaries. Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective only in that jurisdiction and only to the extent of such invalidity or unenforceability, without rendering the remaining terms and provisions hereof invalid or unenforceable and without affecting the validity of any provision of this Agreement in any other jurisdiction.

    e.    <u>Binding Effect; Entire Agreement</u>. This Agreement (including, without limitation, the attached Exhibits and Schedules, which are hereby incorporated as parts of this Agreement by reference) shall be binding on each of the parties, their successors and permitted assigns. This Agreement constitutes the entire agreement between the Foundation and Hillel as to the subject matter hereof, and supercedes all prior agreements (whether oral or written) as to such subject matter.

    f.    <u>Further Assurances</u>. Hillel shall execute, deliver and certify such documents and instruments, and take such other actions, as the Foundation reasonably may request in order to give full effect to the terms and conditions of the Agreement.

    g.    <u>Confidentiality</u>. Hillel shall not disclose the terms of this Agreement to any other person or entity, except for disclosures to its Board of Trustees, its shareholders (if any) and its "Confidential Advisors" or as otherwise required by law. The Foundation may, at its discretion, disclose the existence and terms of this Agreement. For purposes of this Agreement, "Confidential Advisors" means those attorneys, accountants and consultants who have been engaged in connection with the negotiation and administration of this Agreement and who have agreed in writing to maintain the confidentiality of this Agreement.

    h.    <u>Headings</u>. The section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation hereof.

EXECUTION COPY

IN WITNESS WHEREOF, Hillel and the Foundation have duly executed this Agreement
as of the Effective Date.

JEWISH COMMUNITY FOUNDATION
OF THE JEWISH FEDERATION -
COUNCIL OF GREATER LOS ANGELES

By: _____
    Name: Simone Savlov
    Title: Chief Operating Officer

UNIVERSITY OF SOUTHERN
CALIFORNIA HILLEL FOUNDATION

By: _____
    Name: Jaime Gesundheit
    Title: Co-Chairman of the Board
          and Co-President

EXECUTION COPY

SCHEDULE I
INITIAL ASSETS

Cash, in the form of a wire transfer in the amount of $1,593,613.30 sent to the Foundation in accordance with the following wire instructions:

> CITY NATIONAL BANK
> 400 N. ROXBURY DRIVE
> BEVERLY HILLS, CA 90210
> (213) 427-5050
> JEWISH COMMUNITY FOUNDATION
> ABA #122016066
> A/C #001-316-326

EXECUTION COPY

SCHEDULE II
FEE CALCULATION

| Per Annum Fee (%) | Charged On |
|---|---|
| 0.5% | Base Fund Assets |

For purposes of calculating the Foundation's fee in respect of a particular calendar quarter, "Base Fund Assets" means the end-of-quarter market value of all Fund Assets.

## SCHEDULE III
## DISTRIBUTION PROCEDURES

1. All Distribution Requests given during a calendar quarter shall be given before the last calendar month of that quarter.

2. The first one million dollars ($1,000,000) of Distribution Requests given during a calendar quarter shall be honored by the last day of the first calendar month of the next quarter.

3. All further Distribution Requests given during a calendar quarter (that is, for amounts in addition to the $1,000,000 in aggregate distributions contemplated by item (2) above) shall be honored not later than the last day of the first month of the second calendar quarter after such Distribution Request is given. (For example, if Hillel requests $1,000,000 during the calendar quarter ending December 31, then any requests for additional distributions must be given not later than November 30, and timely Distribution Requests for those excess amounts will be honored not later than April 30.)

4. Any Distribution Request given after the applicable deadline for a particular quarter will be deemed given on the first business day of the following quarter.

5. All Fund Assets distributed hereunder shall be distributed in cash or by wire transfer (in accordance with wire transfer instructions provided by Hillel in writing for that purpose).

6. Notwithstanding anything in this Schedule III or elsewhere in this Agreement to the contrary, the Foundation shall not distribute to Hillel any amount greater than the value of the Fund Assets as of the quarter end immediately preceding the date of payment. The value of the Fund Assets available for distribution shall be determined by the Foundation in accordance with its customary business practices, after giving effect to any liquidation of investments that the Foundation deems necessary or appropriate to make the requested amount available and after giving effect to any extraordinary expenses or penalties for early withdrawal that the Foundation may incur in connection with such liquidation. Hillel shall bear the risk of any decrease in the value of the Fund Assets during any period prior to their liquidation for distribution, including any such decrease between the giving of a Distribution Request and the distribution pursuant to that request.

EXECUTION COPY

EXHIBIT A
FORM OF ADDITIONAL ASSETS NOTICE

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Additional Assets Notice

Dear Ms. Savlov:

This is an Additional Assets Notice, being given as required under Section 1(b) of the Hillel Fund Agreement, dated as of September 27, 2002, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement").  The terms "Foundation", "Hillel", "Fund", "Additional Assets" and  "Fund Assets" are used in this notice as defined in the Agreement.

Hillel hereby transfers to the Foundation Additional Assets in the amount of $_____, to be added to the Fund Assets.  Hillel has elected to effect this asset transfer as follows (select one):

_____    Hillel has signed a check in the amount of the Additional Assets being transferred, made out to "Jewish Community Foundation", and sent the check and this signed Additional Asset Notice to the Foundation by hand delivery or  certified mail, return receipt requested; or

_____    Hillel has wired the Additional Assets to the Foundation in accordance with the Foundation's written wire transfer instructions, and has sent this signed Additional Asset Notice to the Foundation by hand delivery or certified mail, return receipt requested.

Upon the Foundation's receipt of these Additional Assets, they shall be  Fund Assets in accordance with the terms of the Agreement.  Hillel acknowledges that its cancelled check, duly and properly endorsed for deposit by the Foundation, or its wire transfer confirmation number, shall constitute its receipt for the Additional Assets being transferred hereby.

Very truly yours,

UNIVERSITY OF SOUTHERN CALIFORNIA HILLEL FOUNDATION

By: _____          By: _____
      Name:                                         Name:
      Title:  Allen & Ruth Ziegler Director       Title: Co-Chairman of the Board
                                                               and Co-President

A-1

EXECUTION COPY

<u>EXHIBIT B</u>

<u>INVESTMENT GUIDELINES</u>

SEE ATTACHED GUIDELINES

EXECUTION COPY

EXHIBIT C
FORM OF DISTRIBUTION REQUEST

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Distribution Request

Dear Ms. Savlov:

This is a Distribution Request, being given as required under Section 3(a) of the Hillel Fund Agreement, dated as of September 27, 2002, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation", "Hillel", "Fund" and "Fund Assets" are used in this notice as defined in the Agreement.

Hillel hereby requests that the Foundation transfer to Hillel, from Fund Assets, cash in the amount of $_____. Payment of this amount is requested in the following form (select one):

_____ a check in the amount of the requested disbursement, made out to Hillel and sent by hand delivery or certified mail, return receipt requested; or

_____ a wire transfer to Hillel in accordance with written wire instructions previously provided by Hillel in writing for this purpose.

Hillel shall confirm its receipt of the requested distribution in writing within three (3) business days after such receipt.

Very truly yours,

UNIVERSITY OF SOUTHERN CALIFORNIA HILLEL FOUNDATION

By: _____          By: _____
    Name:                              Name:
    Title:  Allen & Ruth Ziegler Director    Title: Co-Chairman of the Board
                                             and Co-President

C-1

<u>EXHIBIT D</u>
<u>HILLEL INCUMBENCY CERTIFICATE</u>

[ATTACH COMPLETED INCUMBENCY CERTIFICATE HERE]

CERTIFICATE OF INCUMBENCY
OF OFFICERS OF UNIVERSITY OF SOUTHERN CALIFORNIA HILLEL FOUNDATION

The undersigned, Susan Gradman, does hereby certify that (s)he is a duly elected, qualified and acting Secretary of University of Southern California Hillel Foundation ("Hillel"), a California nonprofit corporation; that the persons named below are and have been at all times since at least September 11, 2002, duly elected, qualified and acting officers of Hillel, holding the offices set forth opposite their respective names below; and that the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|---|---|---|
| Jaime Gesundheit | Co-Chairman of the Board and Co-President | |
| Jonathan Jaffrey | Co-Chairman of the Board and Co-President | |
| Susan Gradman | Secretary | |
| Scott A. Stone | Chief Financial Officer | |

IN WITNESS WHEREOF, I have hereunto set my hand as a duly authorized officer of Hillel this 27th day of September, 2002.

Name:  Susan Gradman
Secretary

The undersigned, JAIME GESUNDHEIT does hereby certify that he is a duly elected, qualified and acting Co-Chairman of the Board and Co-President of Hillel; that Susan Gradman is and has been at all times since at least September 11, 2002, a duly elected, qualified and acting Secretary of Hillel; and that the foregoing signature of Susan Gradman is genuine.

September 27, 2002

Name:
Co-Chairman of the Board and Co-President

AMENDMENT NO. 2

This Amendment No. 2 (this "Amendment") is made as of June 23, 2006 by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles (the "Foundation") and the Valley Beth Shalom Foundation ("VBSF"), and amends the Synagogue Fund Agreement, dated as of June 27, 2002, by and between those parties, as previously amended (the "Agreement"). All capitalized terms used in this Amendment and not otherwise defined are used as defined in the Agreement.

1.    Amendment to Section 1(a).    Section 1(a) of the Agreement is hereby amended in its entirety to read as follows:

> Fund Accounts.    The Foundation shall establish on its books of account a fund called the VBSF Fund (the "VBSF Fund") and a fund called the Rabbi Harold M. Schulweis Institute Fund (the "Schulweis Institute Fund"). For purposes of this Agreement, the VBSF Fund and the Schulweis Institute Fund are hereinafter collectively referred to as the "Fund". The assets of the Fund (the "Fund Assets") shall consist of all the cash assets transferred to the Foundation for investment, administration and management under this Agreement, adjusted to reflect net income, appreciation (if any) and disbursements.

2.    Amendment to Section 1(b).    Section 1(b) of the Agreement is hereby amended by adding at the end thereof the following sentence: "Unless otherwise specified in the applicable Additional Asset Notice, additional assets transferred to the Foundation hereunder shall be considered additions to the VBSF Fund."

3.    Amendment to Section 4(a).    Section 4(a) of the Agreement is hereby amended by replacing the first sentence of that section with the following: "The Foundation shall provide VBSF with quarterly statements for the VBSF Fund and the Schulweis Institute Fund, showing contributions, investment results and disbursements; provided, however, that VBSF shall be solely responsible for reporting to individual donors and its Board of Trustees on the use of any amounts disbursed."

4.    Incumbency.    When executing and delivering this Amendment, VBSF shall simultaneously execute and deliver to the Foundation a completed, signed, "Incumbency Certificate" (in the form attached as Exhibit "E" to this Amendment). VBSF shall provide the Foundation with an updated Incumbency Certificate promptly upon the occurrence of any change to the information set forth therein. In addition, if the Executive Director of VBSF ceases to hold that position for any reason, or a new Executive Director is hired, then VBSF shall so notify the Foundation in a writing signed by one of the incumbent officers identified on the then-current Incumbency Certificate.

1

5.   <u>Amendment to Exhibits A and D</u>. The form of Additional Assets Notice attached to the Agreement as Exhibit A and the form of Distribution Request attached to the Agreement as Exhibit D are hereby amended in their entirety to be in the forms attached as Exhibits A and D to this Amendment, respectively.

6.   <u>Other Provisions Unchanged</u>.   Except as expressly set forth in this Amendment No. 2, the Agreement remains in full force and effect in accordance with its preexisting terms.   This Amendment is hereby incorporated as a part of the Agreement by reference.   This Amendment may be executed in counterparts, each of which shall be an original document and all of which, together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, VBSF and the Foundation have duly executed this Amendment as of the Effective Date.

JEWISH COMMUNITY FOUNDATION
OF THE JEWISH FEDERATION -
COUNCIL OF GREATER LOS ANGELES

By: _____
Name: R Stevens Silkson
Title: C F o

VALLEY BETH SHALOM
FOUNDATION

By: _____
Name: VICTOR KOHN
Title: CHAIRMAN

EXHIBIT A
FORM OF ADDITIONAL ASSETS NOTICE

Date: 6/29/06

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Additional Assets Notice

Dear Ms. Savlov:

This is an Additional Assets Notice, being given as required under Section 1(b) of the Synagogue Fund Agreement, dated as of June 27, 2002, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned, as amended from time to time (the "Agreement"). The terms "Foundation", "VBSF", "Fund", "VBSF Fund", "Schulweis Institute Fund", "Additional Assets" and  "Fund Assets" are used in this notice as defined in the Agreement.

VBSF hereby transfers to the Foundation Additional Assets in the amount of $ 700, 000 , to be added as Fund Assets to the following fund (check ONLY one):

         ____   the VBSF Fund; or

          X     the Schulweis Institute Fund.

VBSF has elected to effect this asset transfer as follows (select one):

         ____   VBSF has signed a check in the amount of the Additional Assets being
                transferred, made out to "Jewish Community Foundation", and sent the
                check and this signed Additional Asset Notice to the Foundation by hand
                delivery or  certified mail, return receipt requested; or

          X     VBSF has wired the Additional Assets to the Foundation in accordance
                with the Foundation's written wire transfer instructions, and has sent this
                signed Additional Asset Notice to the Foundation by hand delivery or
                certified mail, return receipt requested.

Upon the Foundation's receipt of these Additional Assets, they shall be  Fund Assets in accordance with the terms of the Agreement. VBSF acknowledges that its cancelled check, duly and properly endorsed for deposit by the Foundation, or its wire transfer confirmation number, shall constitute its receipt for the Additional Assets being transferred hereby.

Very truly yours,

VALLEY BETH SHALOM FOUNDATION


By: _____          By: _____
    Name:                                   Name: victor Rohn
    Title: Executive Director               Title:  [Chairman   or   Designee]

## CERTIFICATE OF INCUMBENCY
## OF OFFICERS OF VALLEY BETH SHALOM FOUNDATION

The undersigned, Herb Reznikoff, does hereby certify that he is the duly elected, qualified and acting Secretary of Valley Beth Shalom Foundation ("VBSF"), a California nonprofit corporation; that the persons named below are and at all times since at least August 17, 2004 have been duly elected, qualified, and acting officers of VBSF, holding the offices set forth opposite their respective names below; and that the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Victor Kohn | Chairman | |
| Lisa Kabaker Hess | Chief Financial Officer | |
| Herb Reznikoff | Secretary | |

IN WITNESS WHEREOF, I have hereunto set my hand as a duly authorized officer of VBSF this 30 day of September, 2004.

Herb Reznikoff
Title: Secretary

The undersigned, Jeffrey Levine, does hereby certify that he is the duly elected, qualified and acting President of Valley Beth Shalom, the sole stockholder of Valley Beth Shalom Foundation ("VBSF"); that the person whose name is subscribed above as "Secretary" is and at all times since at least August 17, 2004 has been the duly elected, qualified and acting Secretary of VBSF; and that the foregoing signature of said Secretary is genuine.

September 30, 2004

Jeffrey Levine
Title: President

AMENDMENT NO. 1

This Amendment No. 1 (this "Amendment") is made as of July 15, 2002 by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles (the "Foundation") and the Valley Beth Shalom Foundation ("VBSF"), and amends the Synagogue Fund Agreement, dated as of June 27, 2002, by and between those parties (the "Agreement"). All capitalized terms used in this Amendment and not otherwise defined are used as defined in the Agreement.

1. <u>Amendment to Section 9</u>. The Foundation's address for purposes of communications under Section 9 of the Agreement is hereby amended to read as follows:

> Jewish Community Foundation
> 6505 Wilshire Blvd., Suite 1200
> Los Angeles, CA 90048
> Attention: Simone Savlov, Chief Operating Officer
> Copy to: Fay Althausen
> Fax #323-761-8730

2. <u>Amendment to Section 2(b)</u>. The fifth sentence of Section 2(b) of the Agreement is hereby amended to read as follows: "VBSF may prospectively change the percentage of Fund Assets to be invested in Israel Bonds by giving the Foundation an Israel Bonds Notice to that effect."

3. <u>Amendment to Schedule 1</u>. The amount of the Initial Assets set forth in Schedule I to the Agreement is hereby corrected to read "$3,564,946.97".

4. <u>Amendment to Exhibit B</u>. The text of Exhibit B to the Agreement ("Form of Israel Bonds Notice") is hereby deleted and replaced in its entirety by the text of the attached Exhibit B.

Except as expressly set forth in this letter, the Agreement remains in full force and effect in accordance with its preexisting terms. This Amendment is hereby incorporated as a part of the Agreement by reference. This Amendment may be executed in counterparts, each of which shall be an original document and all of which, together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, VBSF and the Foundation have duly executed this Amendment as of the Effective Date.

JEWISH COMMUNITY FOUNDATICN
OF THE JEWISH FEDERATION -
COUNCIL OF GREATER LOS ANGELES

By: _____

Name:

Title:

VALLEY BETH SHALOM FOUNDATION

By: _____

Name: Irving J. Weintraub

Title: Chairman

EXECUTION COPY

# SYNAGOGUE FUND AGREEMENT

This Synagogue Fund Agreement (this "Agreement") is made as of June 27, 2002 (the "Effective Date") by and between the Jewish Community Foundation of the Jewish Federation - Council of Greater Los Angeles, a California corporation (the "Foundation"), and Valley Beth Shalom Foundation, a California corporation ("VBSF").

## BACKGROUND

The Foundation is a California non-profit public benefit corporation organized for public purposes including, among others, the receipt, acquisition, holding, administration and expenditure of property for charitable institutions, associations and undertakings. Pursuant to this purpose, the Foundation operates development and planned giving programs including the pooled investment and administration of designated endowment funds, donor advised funds, support foundations and its own unrestricted endowment funds for the benefit of the Jewish community. The size of the Foundation's endowment and planned giving program gives the Foundation access to certain investment advisers, money managers, custodians and other investment service providers generally unavailable to smaller investors and creates certain economies of scale in connection with the administration of investment activities.

VBSF is a California non-profit corporation operating within the Jewish community and has developed a general endowment and has encouraged donor support for its programs, projects and long-range growth. VBSF seeks to pursue these goals in part by utilizing the Foundation's investment management and administration infrastructure and the Foundation's access to various investment industry professionals, and the Foundation seeks to aid VBSF's pursuit of its goals by these means, in each case, on the terms and in accordance with the conditions set forth in this Agreement.

In light of the foregoing background information, in consideration of the mutual promises set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which the parties hereby acknowledge, the Foundation and VBSF agree as follows:

1. ESTABLISHMENT OF FUND
   a. Fund Account. The Foundation shall establish on its books of account a fund called the VBSF Fund (the "Fund"). The assets of this Fund (the "Fund Assets") shall consist of all the cash assets transferred to the Foundation for investment, administration and management under this Agreement, adjusted to reflect net income, appreciation (if any) and disbursements.
   b. Transfer of Assets. VBSF hereby transfers to the Foundation, for investment, administration and management purposes only, the "Initial Assets" listed on the attached Schedule I. VBSF may transfer additional assets to the Foundation from time to time under this Agreement ("Additional Assets") by completing the "Additional Asset Notice" attached as Exhibit A and complying with the asset transfer procedures described in that notice.
   c. Standard of Care. In performing its obligations under this Agreement, the Foundation shall exercise any discretion afforded to it hereunder with the same care as it exercises in the investment and management of its own permanent endowment assets.

1

EXECUTION COPY

2. <u>MANAGEMENT AND INVESTMENT OF FUND ASSETS</u>

    a.    <u>Common Investment Pool</u>. Except as otherwise specified in Section 2(b) below, the Foundation shall pool the Fund Assets with the other assets in its "Common Investment Pool" for purposes of investment, management and administration. The "Common Investment Pool" (or "Pool") is the collective investment fund maintained by the Foundation exclusively for the collective investment and reinvestment of its general endowment fund assets and the general endowment fund assets of other charitable organizations. Fund Assets transferred and delivered to the Foundation during a calendar quarter shall be invested in the Pool on the last business day of that calendar quarter, and until then shall be invested in the Foundation's "In-House Portfolio" (a portfolio of laddered United States Treasury securities, agency securities and money market instruments all of which will mature in fewer than five years).

    b.    <u>Allocation of Fund Assets to Israel Bonds</u>. The Foundation shall invest ten percent (10%) of all Fund Assets in bonds issued by the State of Israel ("Israel Bonds"). Within a reasonable period of time (and in any event within ten business days) after the effective date of this Agreement, VBSF shall give the Foundation written notice of the series and denominations of Israel Bonds to be purchased. Such written notice shall be in the form of the "Israel Bonds Notice" attached hereto as Exhibit B. The Foundation shall purchase those Israel Bonds when the Fund Assets allocated to that purpose are sufficient to do so and such Israel Bonds are available for purchase in the ordinary course of the Foundation's business. VBSF may prospectively change the percentage of Fund Assets to be invested in Israel Bonds, and may change the series and denominations of Israel Bonds to be purchased hereunder, by giving the Foundation an Israel Bonds Notice to that effect. All Fund Assets allocated to the purchase of Israel Bonds but not yet used for that purpose shall be invested in the In-House Portfolio until a sufficient amount has accumulated and the specified Israel Bonds are purchased, and shall also be invested in the In-House Portfolio if the Israel Bonds specified by VBSF for purchase are no longer (or not yet) being offered for sale. If Fund Assets have been allocated to the purchase of Israel Bonds that are no longer available for purchase, then the Foundation shall request and VBSF shall provide an Israel Bond Notice specifying an available series and denomination. Fund Assets allocated to the purchase of Israel Bonds and then re-allocated to investment in the Pool prior to such use shall be held in the In-House Portfolio until invested in the Pool on the last business day of the calendar quarter in which they are so re-allocated.

    c.    <u>Foundation's Authority</u>. The Foundation shall hold the Fund Assets in its own name or in the name(s) of its custodian(s), designee(s) or nominee(s). The Foundation shall have the sole right and power to invest and manage the Fund Assets as part of the Pool and to take such other actions (including, for example, choosing and engaging "Advisors" (as defined below), delegating and assigning authority and responsibility to those Advisors, incurring expenses and making payments in respect of those expenses) as the Foundation deems appropriate. VBSF expressly acknowledges that the brokers, banks, trust companies, custodians, investment advisors, attorneys and other service providers that the Foundation engages or consults in the exercise of its authority under this Agreement (collectively, the "Advisors")

may include some with which the Foundation's trustees or officers may be affiliated.

d.    *Pro Rata Investment and Allocation.*  The Foundation shall invest the Fund Assets in the Pool in the same manner and in the same proportions as the other assets in the Pool. The Fund Assets in the Pool shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code, as defined herein) incurred in connection with the investment and administration of the Pool. The Fund Assets in the In-House Portfolio shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code) incurred in connection with the investment and administration of the In-House Portfolio.  For purposes of this Agreement, the "Code" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time, and references to any particular provision of the Code mean that provision and the corresponding provision of any future United States Internal Revenue Code.

e.    Guidelines for Common Investment Pool Operations.  The Foundation shall manage, administer and invest the Fund Assets in accordance with the investment guidelines adopted by the Investment Committee of the Foundation's Board of Trustees (the "Guidelines"). The Guidelines in effect on the date of this Agreement are attached as Exhibit C. The Foundation shall notify VBSF of any changes to the Guidelines within  thirty (30) days after their adoption.

f.    Valuation of Fund Assets.  The value of the Fund Assets and the Fund's allocable share of costs, expenses, taxes and fees (other than the Foundation's fees hereunder) shall be determined by the Foundation using the same procedures as it applies to the Foundation's own assets in the Pool.

g.    *Pro Rata Allocation of Third Party Payments.*  If the Foundation receives any indemnification, reimbursement, insurance proceeds, damages or other payment from any source or person that relates to a loss within or damage to assets in the Pool, the Foundation shall add VBSF's *pro rata* share of this payment to the Fund Assets (or, if the Fund is closed, shall pay that amount to VBSF) unless VBSF has already received its *pro rata* share directly from the source of such payment.

3.  USE AND DISTRIBUTION OF FUND ASSETS

a.    Distributions to VBSF.  VBSF's requests for distributions from Fund Assets shall be made by submitting to the Foundation a "Distribution Request" substantially in the form of the attached Exhibit D. Each Distribution Request shall be signed by the Chairman of VBSF's Board of Trustees (or one of his or her designee(s) from the VBSF Board of Directors) and a second officer of VBSF previously designated for this purpose by written notice to the Foundation.  The amount of prior notice required for Distribution Requests, the timing of distributions and limits on amounts available for distribution shall be governed by the "Distribution Procedures" set forth in Schedule III

4.  ACCOUNTING AND REPORTING

a.    Quarterly Written Reports.  The Foundation shall provide VBSF with quarterly statements showing contributions, investment results and disbursements

3

from the Fund; provided, however, that VBSF shall be solely responsible for reporting to individual donors and its Board of Trustees on the use of any amounts disbursed. The Foundation shall also notify VBSF in the quarterly report if the size or composition of the Investment Committee of the Foundation's Board of Trustees (the "Investment Committee") changes by more than fifty percent (50%) during a calendar quarter.

b.    <u>Consultation with Investment Committee Representative</u>. A member of the Foundation's Investment Committee shall be available to meet at least once during each calendar year with VBSF's Board of Trustees or that committee of its Board of Trustees that is responsible for overseeing the investment of VBSF's endowment assets. This meeting shall occur at a mutually convenient time and location, to be agreed upon in good faith.

5.    <u>COSTS, TAXES AND FEES</u>

a.    <u>Allocation of Costs, Taxes and Fees</u>. As part of the Pool, the Fund Assets shall bear (and be reduced by) their *pro rata* share of the costs and fees incurred in connection with the management and investment of the Pool (including, without limitation, any taxes on unrelated business income as defined in §512 of the Code).

b.    <u>Foundation Fee</u>. In consideration of the administrative services provided by the Foundation hereunder, the Foundation shall charge against the Fund Assets a quarterly fee calculated in accordance with Schedule II. This quarterly fee shall be charged and paid from Fund Assets as of the last day of the calendar quarter to which the fee relates, and shall be reflected in the quarterly valuations of the Fund Assets reported to VBSF.

6.    <u>REPRESENTATIONS AND WARRANTIES OF THE FOUNDATION</u>
<u>The Foundation hereby represents and warrants as follows:</u>

a.    <u>Organization, Existence and Charitable Status</u>. The Foundation is a duly organized and validly existing California non-profit, public benefit corporation, and is a "Qualified Charitable Organization" (that is, an organization described in §501(c)(3) of the Code which is not a private foundation under §509(a) of the Code).

b.    <u>Authorization, Legality and Enforceability</u>. The Foundation's execution, delivery and performance of this Agreement have been duly authorized in accordance with the Foundation's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c.    <u>Not Registered</u>. The Foundation is not registered as a broker-dealer, the Pool, the Fund and the In-House Portfolio are not registered as investment companies and none of VBSF'S interests hereunder are registered securities, in each case, under any federal or state securities laws or under the rules and regulations promulgated under those laws. The Foundation does not intend to effect any such registrations and shall have no obligation to do so.

7.    <u>REPRESENTATIONS AND WARRANTIES OF VBSF</u>
<u>VBSF hereby represents and warrants as follows:</u>

a.    <u>Organization, Existence and Charitable Status</u>. VBSF is a duly organized and validly existing California non-profit corporation, and a Qualified Charitable Organization. VBSF shall remain a Qualified Charitable Organization during the term of this Agreement. If VBSF ceases to be a

4

Qualified Charitable Organization, then it shall give the Foundation prompt notice of that fact.

b. <u>Authorization, Legality and Enforceability</u>. VBSF's execution, delivery and performance of this Agreement have been duly authorized in accordance with VBSF's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c. <u>No Encumbrances</u>. VBSF has unencumbered title to the Initial Assets, and warrants that it shall have unencumbered title to all Additional Assets and shall not grant any interest in any Fund Assets to any third party.

d. <u>Review of Guidelines and Investment Procedures</u>. VBSF has received and read the copy of the Guidelines attached as Exhibit C; has conferred with one or more representatives of the Foundation regarding these Guidelines, has reviewed them with VBSF's legal and financial advisors, its Board of Trustees and any committees of that board responsible for overseeing VBSF's investment and asset management, and has concluded (by majority vote of its Board of Trustees and any constituent committees thereof required under VBSF's governing instruments) that these Guidelines accurately reflect VBSF's own investment and asset management principles.

e. <u>Source of Funds</u>. The Initial Assets consist, and any Additional Assets will consist, of one or more of the categories of assets described in Section 3(c)(10)(B)(i) through (vi) of the Investment Company Act of 1940. For purposes of determining whether the limitation on compensation of Section 3(e)(2) of the Securities Exchange Act of 1934 has been met, no commission or other special compensation based on the number or value of donations collected by or on behalf of VBSF has been paid with respect to the Initial Assets and none will be paid with respect to any Additional Assets.

f. <u>No Guarantees</u>. VBSF hereby acknowledges and agrees that the Foundation has not guaranteed or represented any specific investment results or returns. VBSF understands that investing is inherently risky and that investments may be volatile and subject to various risks over which the Foundation will have little or no control.

8. <u>LIMITATION OF LIABILITY</u>

a. <u>Indemnification of Foundation Persons</u>. The term "Foundation Person" means the Foundation, each member of the Investment Committee, each officer, employee, agent and Advisor of the Foundation and each member of the Foundation's Board of Trustees. VBSF shall indemnify, defend (at its expense) and hold harmless each "Foundation Person" from and against any claim or loss, together with all reasonable costs and expenses related thereto (including, for example, reasonable legal fees and expenses), which arises out of or in connection with the making, construction or performance of this Agreement or the investment or distribution of the Fund Assets (each, a "Claim" and together, "Claims").

b. <u>Liability of Foundation and Foundation Persons</u>.

   i. NoFoundation Person shall have any liability or responsibility to VBSF or any other person for any act or omission to act unless such action or omission resulted directly from that Foundation Person's fraud, willful misconduct, gross negligence or, only as to "Administrative Functions" (as defined below), negligence. In any event, no Foundation Person shall be liable to VBSF for any action or omission made in reliance upon advice of legal counsel (who may be a member of a law firm with

EXECUTION COPY

which an Investment Committee member or Foundation officer or employee or Trustee is affiliated or associated) employed by or otherwise representing the Foundation or the Investment Committee. For purposes of this Agreement, "Administrative Functions" mean all actions and omissions, of Foundation Persons, directly relating to the receipt and distribution of moneys pursuant to this Agreement, but in any event excluding (i) all acts and omissions relating to the selection and execution of investments and investment strategies and (ii) the selection, engagement, employment, compensation and supervision of Advisors, officers, employees and agents of the Foundation.

ii.    No Foundation Person shall be liable for any failure or delay in performing any of its obligations under this Agreement if such failure or delay is occasioned by compliance with governmental regulations, requests or orders, or by circumstances beyond the Foundation's reasonable control (including, but not limited to, war, insurrection, fire, flood, earthquake, accident, strike or other labor disturbance, disruptions of transportation or electrical power services or electronic communication systems, closure of financial markets, suspension in the trading of one or more securities, or acts of God).

iii.    In any event, no Foundation Person shall be liable for any consequential damages, and no Foundation Person shall have any responsibilities with respect to any assets of VBSF other than the Fund Assets.

9.    NOTICES

a.    General.  All communications relating to this Agreement shall be given in writing and sent (at the sender's pre-paid expense) by certified mail (return receipt requested), by hand delivery or by fax.  These communications shall be addressed as specified in this Section 9 (or as the intended recipient has otherwise specified by prior written notice to the sender).  If properly addressed, such communications shall be deemed given on the date of hand delivery, on the third business day after deposit with the United States Postal service (in the case of certified mail), or in the case of facsimile transmission, on the date on which receipt is confirmed.

b.    To the Foundation.    All communications to the Foundation shall be addressed as follows:

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

c.    To VBSF.  All communications to VBSF shall be addressed as follows:

Valley Beth Shalom Foundation
15739 Ventura Boulevard
Encino, CA
91436
Attention: Malcolm Katz

with a copy to: Irving Weintraub
16106 Valley Meadow Place
Encino, CA 91436

## 10. WAIVERS AND AMENDMENTS

a.    This Agreement may be amended, modified, changed or waived (in whole or in part) only by written instrument signed by both parties hereto.  Any purported amendment, modification, change or waiver of this Agreement by any other means shall be deemed void *ab initio*.

b.    Any waiver of a provision of this Agreement on any occasion shall not be deemed to be a continuing waiver of that provision, a waiver of the provision on  any other occasion or a waiver of any other provision on any occasion.

## 11. TERM AND TERMINATION

a.    Scheduled Term.  This term of this Agreement (the "Term") shall begin on the Effective Date and shall end at 12:00 PM on the last day of the calendar quarter in which the anniversary of the Effective Date occurs, unless earlier terminated or extended in accordance with this Section 11.

b.    Automatic Extensions.   The term shall be extended automatically for an additional year on each anniversary of the Effective Date unless either party gives the other at least one hundred twenty (120) days' prior written notice that the Agreement shall be allowed to expire at the end of the then-effective term.

c.    Early Termination.  Either party may terminate this Agreement prior to its schedule expiration date (but in any event as of the end of a calendar quarter) upon at least one hundred twenty (120) days' prior written notice to the other.  Either party may terminate this Agreement immediately by written notice to the other if  the terminating party ceases to be a Qualified Charitable Organization.

d.    Early Termination by Foundation.  If the Foundation determines in good faith that VBSF is no longer a Qualified Charitable Organization, then the Foundation may terminate this Agreement immediately by written notice to VBSF.

e.    Surviving Provisions.  Upon expiration or termination of this Agreement, the provisions of Sections 7 and 8 shall remain in full force and effect, along with such definitions and provisions regarding construction, amendment, waiver and administration as may be needed to interpret and apply the surviving provisions.  In addition, such expiration or termination shall not affect the Foundation's right to collect its fees and its reimbursement of any costs, expenses and taxes incurred in respect of the Fund Assets under this Agreement.

f.    <u>Final Distribution of Fund Assets</u>.    Upon termination or expiration of this Agreement, the Foundation shall distribute the Fund Assets to VBSF in the manner prescribed in Schedule III as if VBSF had submitted a Distribution Request for one hundred percent (100%) of the Fund Assets.

12. <u>MISCELLANEOUS</u>

a.    <u>Counterparts and Facsimile Signatures</u>.    This Agreement may be executed in counterparts, each of which shall be an original and all of which, together, shall constitute one and the same instrument.    Signatures of this Agreement may be delivered by fax, and such faxed signatures shall be deemed a valid and binding form of execution.

b.    <u>No Agency or Partnership</u>.    Neither this Agreement nor the dealings between the parties hereunder shall be deemed to create an agency or partnership relationship between them.    Neither party shall have the power to legally bind the other or to act on the other's behalf, except for those powers expressly granted to the Foundation hereunder.

c.    <u>Assignment and Delegation</u>.    Except as otherwise specified in this Agreement, neither VBSF nor the Foundation shall assign its rights or delegate its duties hereunder (by merger, sale or other transfer of assets, operation of law or otherwise) without the express prior written consent of the other.    Any purported assignment or delegation without such consent shall be deemed void *ab initio*.

d.    <u>Governing Law; Severability</u>.    The making, execution, delivery and performance of this Agreement, and all disputes under or in connection with this Agreement, shall be governed by and construed under the internal substantive law of the State of California, as that law applies to contracts entirely made and performed within the State of California by parties which are California citizens, residents and domiciliaries.    Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective only in that jurisdiction and only to the extent of such invalidity or unenforceability, without rendering the remaining terms and provisions hereof invalid or unenforceable and without affecting the validity of any provision of this Agreement in any other jurisdiction.

e.    <u>Binding Effect; Entire Agreement</u>.    This Agreement (including, without limitation, the attached Exhibits and Schedules, which are hereby incorporated as parts of this Agreement by reference) shall be binding on each of the parties, their successors and permitted assigns.    This Agreement constitutes the entire agreement between the Foundation and VBSF as to the subject matter hereof, and supercedes all prior agreements (whether oral or written) as to such subject matter.

f.    <u>Further Assurances</u>.    VBSF shall execute, deliver and certify such documents and instruments, and take such other actions, as the Foundation reasonably may request in order to give full effect to the terms and conditions of the Agreement.

g.    <u>Confidentiality</u>.    VBSF shall not disclose the terms of this Agreement to any other person or entity, except for disclosures to its Board of Trustees, its sole shareholder (Valley Beth Shalom) and its "Confidential Advisors" or as otherwise required by law.    The Foundation may, at its discretion, disclose the existence and terms of this Agreement.  For purposes of this Agreement, "Confidential Advisors" means those attorneys, accountants and consultants who have been engaged in connection with the negotiation and

EXECUTION COPY

administration of this Agreement and who have agreed in writing to maintain the confidentiality of this Agreement.

h.   <u>Headings</u>.  The section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation hereof.

IN WITNESS WHEREOF, VBSF and the Foundation have duly executed this Agreement as of the Effective Date.

JEWISH COMMUNITY FOUNDATION
OF THE JEWISH FEDERATION -
COUNCIL OF GREATER LOS ANGELES

By: _____
Name: MARVIN I. SCHOTLAND
Title: President + CEO

VALLEY BETH SHALOM FOUNDATION

By: _____
Name: Jeffrey L. Levine
Title: Chairman

9

EXECUTION COPY

SCHEDULE I
INITIAL ASSETS

Cash, in the form of a wire transfer in the amount of $3,559,625.20 sent in accordance with the following wire instructions:

> CITY NATIONAL BANK
> 400 N. ROXBURY DRIVE
> BEVERLY HILLS, CA 90210
> (213) 427-5050
> JEWISH COMMUNITY FOUNDATION
> ABA #122016066
> A/C #001-316-326

## SCHEDULE II
## FEE CALCULATION

| Per Annum Fee (%) | Charged On |
|---|---|
| 0.5% | first $5,000,000 of Base Fund Assets |
| 0.4% | next $2,500,000 of Base Fund Assets |
| 0.3% | next $2,500,000 of Base Fund Assets |
| 0.25% | all Base Fund Assets in excess of $10,000,000 |

For purposes of calculating the Foundation's fee in respect of a particular calendar quarter, "Base Fund Assets" means the end-of-quarter market value of all Fund Assets, excluding Additional Assets transferred to the Foundation during that quarter, Israel Bonds and assets held in the In-House Portfolio pending investment in Israel Bonds.

EXECUTION COPY

SCHEDULE III
DISTRIBUTION PROCEDURES

1.  The first one million dollars ($1,000,000) of Distribution Requests given during a calendar quarter shall be honored within ten (10) days after they are given.

2.  The next two million dollars ($2,000,000) of Distribution Requests given during a calendar quarter must be given by VBSF not later than thirty (30) days before the end of the quarter, and shall be honored within ten (10) days after the commencement of the next quarter.

3.  All further Distribution Requests given during a calendar (that is, for amounts in addition to the $3,000,000 in aggregate distributions contemplated by items (1) and (2) above), shall be given not later than thirty (30) days before the end of the quarter, and shall be honored not later than the thirtieth day of the second calendar quarter after such Distribution Request is given.  (For example, if VBSF requests $3,000,000 during the calendar quarter ending December 31, then any requests for additional distributions must be given not later than December 1, and timely Distribution Requests for those excess amounts will be honored not later than April 30.)

4.  Any Distribution Request given after the applicable deadline for a particular quarter will be deemed given on the first business day of the following quarter.

5.  All Fund Assets distributed hereunder shall be distributed in cash or by wire transfer (in accordance with wire transfer instructions provided by VBSF in writing for that purpose).

6.  Notwithstanding anything in this Schedule III or elsewhere in this Agreement to the contrary, the Foundation shall not distribute to VBSF any amount greater than the value of the Fund Assets as of the quarter end immediately preceding the date of payment.  The value of the Fund Assets available for distribution shall be determined by the Foundation in accordance with its customary business practices, after giving effect to any liquidation of investments that the Foundation deems necessary or appropriate to make the requested amount available and after giving effect to any extraordinary expenses or penalties for early withdrawal that the Foundation may incur in connection with such liquidation.  VBSF shall bear the risk of any decrease in the value of the Fund Assets during any period prior to their liquidation for distribution, including any such decrease between the giving of a Distribution Request and the distribution pursuant to that request.

EXECUTION COPY

EXHIBIT A
FORM OF ADDITIONAL ASSETS NOTICE

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:     Additional Assets Notice

Dear Ms. Savlov:

This is an Additional Assets Notice, being given as required under Section 1(b) of the Synagogue Fund Agreement, dated as of _____, 200_, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement").  The terms "Foundation", "VBSF", "Fund", "Additional Assets" and  "Fund Assets" are used in this notice as defined in the Agreement.

VBSF hereby transfers to the Foundation Additional Assets in the amount of $_____, to be added to the Fund Assets.  VBSF has elected to effect this asset transfer as follows (select one):

_____ VBSF has signed a check in the amount of the Additional Assets being transferred, made out to "Jewish Community Foundation", and sent the check and this signed Additional Asset Notice to the Foundation by hand delivery or  certified mail, return receipt requested; or

_____ VBSF has wired the Additional Assets to the Foundation in accordance with the Foundation's written wire transfer instructions, and has sent this signed Additional Asset Notice to the Foundation by hand delivery or certified mail, return receipt requested.

Upon the Foundation's receipt of these Additional Assets, they shall be  Fund Assets in accordance with the terms of the Agreement.  VBSF acknowledges that its cancelled check, duly and properly endorsed for deposit by the Foundation, or its wire transfer confirmation number, shall constitute its receipt for the Additional Assets being transferred hereby.

Very truly yours,

VALLEY BETH SHALOM FOUNDATION

By: _____              By: _____
       Name:                                                            Name:
       Title: Executive Director                              Title: [Chairman  or  Designee]

EXECUTION COPY

EXHIBIT B
FORM OF ISRAEL BONDS NOTICE

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Israel Bonds Notice

Dear Ms. Savlov:

This is an Israel Bonds Notice, given pursuant to Section 2(b) of the Synagogue Fund Agreement, dated as of _____, 200_, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation", "VBSF", "Fund", "Additional Assets", "Fund Assets", "In-House Portfolio", "Pool" and "Israel Bonds" are used in this notice as defined in the Agreement.

VBSF hereby instructs the Foundation to allocate _____ percent (____%) of future Additional Assets to the purchase of Series _____ Israel Bonds in denominations of not less than _____ dollars ($_____).

Fund Assets previously allocated to the purchase of Israel Bonds and not yet used for that purpose shall be used as follows (select one):

_____    apply them to the purchase of the series and denomination of Israel Bonds identified above; or

_____    apply them to the purchase of the series and denominations of Israel Bonds last specified by VBSF prior to this Israel Bonds Notice, supplementing them (to the extent necessary to reach the minimum required amount) with additional moneys from the amounts allocated to Israel Bonds pursuant to this Israel Bonds Notice; or

_____    invest them as part of the Pool.

Very truly yours,

VALLEY BETH SHALOM FOUNDATION

By: _____
    Name:
    Title: Executive Director

By: _____
    Name:
    Title: [Chairman or Designee]

EXECUTION COPY

<u>EXHIBIT C</u>
<u>INVESTMENT GUIDELINES</u>

SEE ATTACHED GUIDELINES

# Jewish Community Foundation
## Statement of Investment Policies and Guidelines

### INTRODUCTION AND PURPOSE

This Statement of Investment Policy is set forth in order that:

1. There is a clear understanding on the part of Board of Trustees ("Board") of the Jewish Community Foundation (" Foundation") as to the investment policies and objectives of the Foundation.

2. The designated Investment Managers are given guidance and limitations, helping them to understand what is expected of them.

3. The Investment Committee ("Committee") of the Board has a basis for evaluation of the investment performance of the investment program.

The intent of this statement is to design an investment environment with specific parameters that reflects the philosophy of the Foundation and which allows the Investment Managers to focus on defined policies and objectives which should enhance the opportunities to obtain desired performance goals.  The objectives are intended to be sufficiently flexible to be practicable.

# DELEGATION OF RESPONSIBILITIES

## Board

Responsibilities of the Board of Trustees:

The Board has responsibility to ensure that the assets of the Foundation's various funds are managed in a manner which is consistent with the mission, goals, and objectives of the Foundation. In this regard, the Board also has oversight responsibility for full compliance with all applicable laws.

The Board, has delegated supervisory and operating responsibility to the Committee. All major decisions are reported to the Board or the Executive Committee thereof, and regularly scheduled performance evaluations are presented to the Board on a quarterly basis.

## Investment Committee

The Committee Members are charged with the responsibility of overseeing the management of Foundation assets available for investment. The Committee Members shall discharge their duties solely in the interest of the Foundation and for the exclusive purpose of meeting the financial needs of the Foundation. The Committee Members are authorized and permitted to engage the services of registered investment managers who possess the necessary specialized research facilities and skill to meet the investment objectives and guidelines of the Foundation. Accordingly, the Committee Members require the Investment Managers to adhere to the policies adopted by the Committee.

1. Setting policy guidelines which the Board approves and may modify from time to time.

2. Developing investment objectives and performance guidelines which are consistent with the financial goals of the Foundation.

3. Determining asset allocation strategy and investment managers' structure specifically designed to meet the Foundation's objective.

4. Selecting Investment Managers, Consultants and Custodians.

5. Reviewing and evaluating investment results in the context of predetermined performance standards and implementing corrective action as needed.

## Chief Operating Officer

The Chief Operating Officer ("COO") is charged with the implementation and administration of the policies and procedures adopted and enacted by the Committee. The Chief Operating Officer also serves as the primary conduit for communication with all other parties involved in the investment function of the Foundation.

## Consultants

The Committee Members may recommend the engagement of independent investment consulting firms to report to the Committee on an on-going basis.

In addition to providing performance evaluation results on an absolute and relative basis, the Consultant's report will provide data pertaining to the Foundations' portfolio(s) asset allocation and the risk associated with their asset classes.

The Consultant's responsibilities are:

1. Providing data pertaining to the Portfolio(s) asset allocation structure and its associated risks.

2. Assisting in the development of investment goals and objectives.

3. Reviewing Investment Managers, including search and selection processes.

4. Preparing and presenting performance evaluation reports in accordance with Association of Investment Management and Research promulgated standards.

5. Reviewing contracts and fees for both current and proposed Investment Managers.

6. Reviewing and developing special investment strategies that complement existing asset classes or strategies to be considered by the Committee.

7. Communicating investment policy to the managers and their adherence to such policies.

8. Notifying the Committee of any changes in personnel or ownership of the consulting firm.

9. Advising the Chief Operating Officer of any circumstances for which a special Committee meeting would be advisable.

C-4

## Investment Managers

Each Investment Manager is expected to operate within its specific asset allocation constraints. Subject to individually prepared guidelines, each manager will pursue its own strategy. Coordination of the guidelines for the individual managers assures the combined efforts of our managers will be consistent with the overall investment objectives of the Foundation and will result in the following benefits:

1. Through definition of a preferred asset mix, each manager will be able to concentrate efforts in its area(s) of expertise.

2. Within the constraints of the asset mix, the manager can enhance opportunities to add value by aggressively exploiting his/her strategy.

The Investment Managers' responsibilities are as follows:

1. Investing assets under their management in accordance with the guidelines and restrictions formulated by the Committee.

2. Exercising discretionary authority over the assets entrusted to them, subject to these guidelines and restrictions.

3. Providing written documentation of portfolio activity and valuations, performance data, and other information as requested by the Chief Operating Officer of the Foundation.

4. Attending meetings with representatives of the Committee as requested.

5. In the event there is a proxy contest, the manager will notify and consult with the Chief Operating Officer making any decisions regarding the Foundation's portfolios.

6. Annually providing a copy of the ADV Part II.

7. Notifying the Chief Operating Officer immediately of any litigation or violation of securities regulations in which the Investment Manager is involved that may adversely affect the Foundation.

8. Notifying the committee of any changes in personnel or ownership of the investment management firm that may impact the Foundation.

# INVESTMENT GOALS AND OBJECTIVES

## COMMON INVESTMENT POOL

### General Investment Philosophy

- The investment program is designed to provide total real return to meet the Foundation's stated investment goals.

- Preservation of capital is of primary importance while at the same time long-term growth is desirable.

- The investment policies and objectives are designed to support the spending rate policy of the Foundation.

### General Performance Goals

The investment objectives of the Foundation are based upon a long-term investment horizon so that interim fluctuations can be viewed in an appropriate perspective. While there cannot be assurance that the defined objectives will be realized, it is believed that the likelihood of their realization is enhanced by the Investment Policy Statement of the Foundation.

1. Total real return on assets should at least be equal to the spending rate, which is established periodically by the Board of Trustees.

2. The S&P 500 index, or other appropriate indices, will be the standards by which we measure equity performance.

3. The Lehman Brothers Government/Corporate Bond Index, or other appropriate indices will be the standards by which we measure fixed income performance.

# COMMON INVESTMENT POOL
## ASSET ALLOCATION

## Purpose

It is the responsibility of the Investment Committee of the Foundation to determine the asset allocation that offers the highest probability of achieving the investment goals as set by the Board of Trustees from time to time.  The Committee will review the asset mix on an ongoing basis and make revisions as necessary.

The target asset allocation of the Portfolio is designed to give balance to the overall structure of the Portfolio's investment program over a long time horizon.  The following factors will affect implementation of the asset allocation structure:

1. The Committee's assessment of the intermediate term outlook for different types of securities.

2. Divergence in the performance of various asset classes.

3. Divergence in the performance of the different Investment  Managers.

4. Investment Managers' decisions to raise or lower cash positions.

## Non-Permissible Investments

- Non Marketable Securities
- Naked Options
- Uncovered Short Positions

## Procedure for Revising Guidelines

All investment guidelines will be reviewed annually or as deemed necessary by the Committee. Any revisions of the guidelines must be approved by the Board.

## Policies Regarding Non-Endowment Funds

Goals & guidelines for the following will be developed at a future date:

- Portfolio II (currently holds philanthropic and charitable directed fund investments).

- Charitable Remainder Trusts.

## Policies Regarding Other Donated Assets

The following assets will be evaluated on an ad hoc basis:

Closely held securities
Non-marketable securities
Notes receivable (accrued and unaccrued)
State of Israel bonds

## Reporting Requirement and Process of Evaluation

The Consultants will be responsible for the preparation of reports concerning performance evaluation and compliance with investment objectives and spending rate policies. Such reports will be submitted, at least quarterly, to the Investment Committee.

While the assets will be monitored on a continuous basis, the Committee will focus primarily on the achievement of its objectives over a rolling three and five year time horizon. However, if any manager significantly changes management philosophy, personnel or ownership, a review will be conducted to determine if the investment manager remains appropriate for the Portfolio's purpose.

## APPENDIX

## INVESTMENT POLICIES & PERFORMANCE GOALS FOR TRADITIONAL INVESTMENT MANAGERS

The following are performance goals and constraint guidelines placed on individual managers within specific asset classes:

### Domestic Equity

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate equity index.

4. The maximum weighting (market value basis) in any one company of the manager's portfolio holding is 7.5% and in any one industry (defined as the 99 industry groups specified by the Frank Russell Co.) in the manager's portfolio holdings, the maximum weighting (market value basis) is 15%. This constraint does not apply to mutual or commingled funds.

5. Investment managers may raise or lower cash positions as deemed appropriate within their strategy.

6. All portfolio securities held by the Investment Managers(s) of the Foundation shall be marketable securities unless there is prior approval by the Investment Committee.

### Domestic Fixed Income

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate index.

4. All fixed income securities should be of investment grade according to Moody's or Standard & Poor's unless a specific strategy utilizing below investment grade securities is approved by the Investment Committee. The portfolio(s) may include up to 10% of fixed income securities of lesser grade.

5. No holdings in any one security of more than <u>10%</u> (at market) in the manager's portfolio. This does not apply to U.S. government and agency issues. Including quasi government securities (e.g. FMNA, GNMA)

## Global or International Equity and Fixed Income

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate index.

4. The use of currency futures to enhance performance and/or hedge currency exposure by international and/or global managers is at the discretion of the manager, provided this activity is part of the manager's stated strategy. A detailed description of a manager's currency strategy must be submitted to the Investment Committee.

## Short Term Investments (Separate Cash Account )

1. To meet or exceed the return of the 90 Day Treasury Bills

2. To see that all cash, dividends and coupon interest are invested promptly.

EXECUTION COPY

EXHIBIT D
FORM OF DISTRIBUTION REQUEST

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Distribution Request

Dear Ms. Savlov:

This is a Distribution Request, being given as required under Section 3(a) of the Synagogue Fund Agreement, dated as of _____, 200_, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation", "VBSF", "Fund" and "Fund Assets" are used in this notice as defined in the Agreement.

VBSF hereby requests that the Foundation transfer to VBSF, from Fund Assets, cash in the amount of $_____. Payment of this amount is requested in the following form (select one):

_____ a check in the amount of the requested disbursement, made out to VBSF and sent by hand delivery or certified mail, return receipt requested; or

_____ a wire transfer to VBSF in accordance with written wire instructions previously provided by VBSF in writing for this purpose.

VBSF shall confirm its receipt of the requested distribution in writing within three (3) business days after such receipt.

Very truly yours,

VALLEY BETH SHALOM FOUNDATION

By: _____         By: _____
    Name:                             Name:
    Title: Executive Director         Title: [Chairman or Designee]

EXECUTION COPY

## BEIT T'SHUVAH FUND AGREEMENT

This Beit T'Shuvah Fund Agreement (this "Agreement") is made as of November 21, 2002 (the "Effective Date") by and between the Jewish Community Foundation of the Jewish Federation - Council of Greater Los Angeles, a California corporation (the "Foundation"), and Beit T'Shuvah, a California corporation ("Beit T'Shuvah").

## BACKGROUND

The Foundation is a California non-profit public benefit corporation organized for public purposes including, among others, the receipt, acquisition, holding, administration and expenditure of property for charitable institutions, associations and undertakings. Pursuant to this purpose, the Foundation operates development and planned giving programs including the pooled investment and administration of designated endowment funds, donor advised funds, support foundations and its own unrestricted endowment funds for the benefit of the Jewish community. The size of the Foundation's endowment and planned giving program gives the Foundation access to certain investment advisers, money managers, custodians and other investment service providers generally unavailable to smaller investors and creates certain economies of scale in connection with the administration of investment activities.

Beit T'Shuvah is a California non-profit corporation operating within the Jewish community and has developed a general endowment and encouraged donor support for its programs, projects and long-range growth.   Beit T'Shuvah seeks to continue these activities in part by utilizing the Foundation's investment management and administration infrastructure and the Foundation's access to various investment industry professionals, and the Foundation seeks to aid Beit T'Shuvah's pursuit of its goals by these means, in each case, on the terms and in accordance with the conditions set forth in this Agreement.

In light of the foregoing background information,  in consideration of the mutual promises set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which the parties hereby acknowledge, the Foundation and Beit T'Shuvah agree as follows:

1. ESTABLISHMENT OF FUND
    a. <u>Fund Account</u>.  The Foundation shall establish on its books of account a fund called the Beit T'Shuvah Fund (the "Fund").  The assets of this Fund (the "Fund Assets") shall consist of all the cash assets transferred to the Foundation for investment, administration and management under this Agreement, adjusted to reflect net income, appreciation (if any) and disbursements.
    b. <u>Transfer of Assets</u>.  Beit T'Shuvah hereby transfers to the Foundation, for investment, administration and management purposes only, the "Initial Assets" listed on the attached Schedule I.  Beit T'Shuvah may transfer additional assets to the Foundation from time to time under this Agreement ("Additional Assets") by completing the "Additional Asset Notice" attached as Exhibit A and complying with the asset transfer procedures described in that notice.

EXECUTION COPY

c.  <u>Standard of Care</u>.  In performing its obligations under this Agreement, the Foundation shall exercise any discretion afforded to it hereunder with the same care as it exercises in the investment and management of its own permanent endowment assets.

2.  <u>MANAGEMENT AND INVESTMENT OF FUND ASSETS</u>

a.  <u>Common Investment Pool</u>.  The Foundation shall pool the Fund Assets with the other assets in its "Common Investment Pool" for purposes of investment, management and administration.  The "Common Investment Pool" (or "Pool") is the collective investment fund maintained by the Foundation exclusively for the collective investment and reinvestment of its general endowment fund assets and the general endowment fund assets of other charitable organizations.  Fund Assets transferred and delivered to the Foundation during a calendar quarter shall be invested in the Pool on the last business day of that calendar quarter, and until then shall be invested in the Foundation's "In-House Portfolio" (a portfolio of laddered United States Treasury securities, agency securities and money market instruments all of which will mature in fewer than five years).

b.  [Intentionally Left Blank]

c.  <u>Foundation's Authority</u>.  The Foundation shall hold the Fund Assets in its own name or in the name(s) of its custodian(s), designee(s) or nominee(s).  The Foundation shall have the sole right and power to invest and manage the Fund Assets as part of the Pool and to take such other actions (including, for example, choosing and engaging "Advisors" (as defined below), delegating and assigning authority and responsibility to those Advisors, incurring expenses and making payments in respect of those expenses) as the Foundation deems appropriate.  Beit T'Shuvah expressly acknowledges that the brokers, banks, trust companies, custodians, investment advisors, attorneys and other service providers that the Foundation engages or consults in the exercise of its authority under this Agreement (collectively, the "Advisors") may include some with which the Foundation's trustees or officers may be affiliated.

d.  <u>*Pro Rata* Investment and Allocation</u>.  The Foundation shall invest the Fund Assets in the Pool in the same manner and in the same proportions as the other assets in the Pool. The Fund Assets in the Pool shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code, as defined herein) incurred in connection with the investment and administration of the Pool. The Fund Assets in the In-House Portfolio shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code) incurred in connection with the investment and administration of the In-House Portfolio. For purposes of this Agreement, the "Code" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time, and references to any particular provision of the Code mean that provision and the corresponding provision of any future United States Internal Revenue Code.

e.    <u>Guidelines for Common Investment Pool Operations</u>.    The Foundation shall manage, administer and invest the Fund Assets in accordance with the investment guidelines adopted by the Investment Committee of the Foundation's Board of Trustees (the "Guidelines"). The Guidelines in effect on the date of this Agreement are attached as Exhibit B. The Foundation shall notify Beit T'Shuvah of any changes to the Guidelines within thirty (30) days after their adoption.

f.    <u>Valuation of Fund Assets</u>.    The value of the Fund Assets and the Fund's allocable share of costs, expenses, taxes and fees (other than the Foundation's fees hereunder) shall be determined by the Foundation using the same procedures as it applies to the Foundation's own assets in the Pool.

g.    <u>*Pro Rata* Allocation of Third Party Payments</u>.    If the Foundation receives any indemnification, reimbursement, insurance proceeds, damages or other payment from any source or person that relates to a loss within or damage to assets in the Pool, the Foundation shall add Beit T'Shuvah's *pro rata* share of this payment to the Fund Assets (or, if the Fund is closed, shall pay that amount to Beit T'Shuvah) unless Beit T'Shuvah has already received its *pro rata* share directly from the source of such payment.

3.    <u>USE AND DISTRIBUTION OF FUND ASSETS</u>

a.    <u>Distributions to Beit T'Shuvah</u>.    Beit T'Shuvah's requests for distributions from Fund Assets shall be made by submitting to the Foundation a "Distribution Request" substantially in the form of the attached Exhibit C. Each Distribution Request shall be signed by persons so authorized by Beit T'Shuvah's Board of Trustees and previously designated for this purpose by written notice to the Foundation, one of whom shall be Beit T'Shuvah's Chief Executive Officer and the other of whom shall be a non-employee holding the office of President or Treasurer.    The amount of prior notice required for Distribution Requests, the timing of distributions and limits on amounts available for distribution shall be governed by the "Distribution Procedures" set forth in Schedule III

4.    <u>ACCOUNTING AND REPORTING</u>

a.    <u>Quarterly Written Reports</u>.    The Foundation shall provide Beit T'Shuvah with quarterly statements showing contributions, investment results and disbursements from the Fund; provided, however, that Beit T'Shuvah shall be solely responsible for reporting to individual donors and its Board of Trustees on the use of any amounts disbursed.  The Foundation shall also notify Beit T'Shuvah in the quarterly report if the size or composition of the Investment Committee of the Foundation's Board of Trustees (the "Investment Committee") changes by more than fifty percent (50%) during a calendar quarter, and shall notify Beit T'Shuvah within thirty (30) days after any chairman or co-chairman of the Investment Committee leaves that office for any reason other than the expiration of his term.

b.    <u>Consultation with Investment Committee Representative</u>.    A member of the Foundation's Investment Committee shall be available to meet at least once during each calendar year with Beit T'Shuvah's Board of Trustees or that committee of its Board of Trustees that is responsible for overseeing the investment of Beit T'Shuvah's endowment assets.  This

3

EXECUTION COPY

meeting shall occur at a mutually convenient time and location, to be agreed upon in good faith.

5. <u>COSTS, TAXES AND FEES</u>
   a. <u>Allocation of Costs, Taxes and Fees</u>.  As part of the Pool, the Fund Assets shall bear (and be reduced by) their *pro rata* share of the costs and fees incurred in connection with the management and investment of the Pool (including, without limitation, any taxes on unrelated business income as defined in §512 of the Code).
   b. <u>Foundation Fee</u>.  In consideration of the administrative services provided by the Foundation hereunder, the Foundation shall charge against the Fund Assets a quarterly fee calculated in accordance with Schedule II. This quarterly fee shall be charged  and paid from Fund Assets as of the last  day of the calendar quarter to which the fee relates, and  shall be reflected in the quarterly valuations of the Fund Assets reported to Beit T'Shuvah.

6. <u>REPRESENTATIONS AND WARRANTIES OF THE FOUNDATION</u>
The Foundation hereby represents and warrants as follows:
   a. <u>Organization, Existence and Charitable Status</u>.  The Foundation is a duly organized and validly existing California non-profit, public benefit corporation, and is a "Qualified Charitable Organization" (that is, an organization described in §501(c)(3) of the Code which is not a private foundation under §509(a) of the Code).
   b. <u>Authorization, Legality and Enforceability</u>.  The Foundation's execution, delivery and performance of this Agreement have been duly authorized in accordance with the Foundation's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.
   c. <u>Not Registered</u>.  The Foundation is not registered as a broker-dealer, the Pool,  the Fund and the In-House Portfolio are not registered as investment companies and none of Beit T'Shuvah's interests hereunder are registered securities, in each case, under any federal or state securities laws or under the rules and regulations promulgated under those laws.  The Foundation does not intend to effect any such registrations and shall have no obligation to do so.

7. <u>REPRESENTATIONS AND WARRANTIES OF BEIT T'SHUVAH</u>
Beit T'Shuvah hereby represents and warrants as follows:
   a. <u>Organization, Existence and Charitable Status</u>.  Beit T'Shuvah is a  duly organized and validly existing California non-profit corporation, and a Qualified Charitable Organization.  Beit T'Shuvah shall remain a Qualified Charitable Organization during the term of this Agreement.   If Beit T'Shuvah ceases to be a Qualified Charitable Organization, then it shall give the Foundation prompt notice of that fact.
   b. <u>Authorization, Legality and Enforceability</u>.   Beit T'Shuvah's execution, delivery and performance of this Agreement have been duly authorized in accordance with Beit T'Shuvah's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c.  <u>No Encumbrances</u>.  Beit T'Shuvah has unencumbered title to the Initial Assets, and warrants that it shall have unencumbered title to all Additional Assets and shall not grant any interest in any Fund Assets to any third party.

d.  <u>Review of Guidelines and Investment Procedures</u>.  Beit T'Shuvah has received and read the copy of the Guidelines attached as Exhibit B; has conferred with one or more representatives of the Foundation regarding these Guidelines, has reviewed them with Beit T'Shuvah's legal and financial advisors, its Board of Trustees and any committees of that board responsible for overseeing Beit T'Shuvah's investment and asset management, and has concluded (by majority vote of its Board of Trustees and any constituent committees thereof required under Beit T'Shuvah's governing instruments) that these Guidelines accurately reflect Beit T'Shuvah's own investment and asset management principles.

e.  <u>Source of Funds</u>.  The Initial Assets consist, and Beit T'Shuvah hereby covenants that any Additional Assets will consist, of one or more of the categories of assets described in Section 3(c)(10)(B)(i) through (vi) of the Investment Company Act of 1940.  For purposes of determining whether the limitation on compensation of Section 3(e)(2) of the Securities Exchange Act of 1934 has been met, no commission or other special compensation based on the number or value of donations collected by or on behalf of Beit T'Shuvah has been paid with respect to the Initial Assets and none will be paid with respect to any Additional Assets.

f.  <u>No Guarantees</u>.  Beit T'Shuvah hereby acknowledges and agrees that the Foundation has not guaranteed or represented any specific investment results or returns.  Beit T'Shuvah understands that investing is inherently risky and that investments may be volatile and subject to various risks over which the Foundation will have little or no control.

g.  <u>Incumbency</u>. The currently serving, duly elected officers of Beit T'Shuvah are the persons so identified on the "Incumbency Certificate" attached as Exhibit D.  Beit T'Shuvah shall provide the Foundation with an updated Incumbency Certificate promptly upon the occurrence of any change to the information set forth therein.

8.  <u>LIMITATION OF LIABILITY</u>

a.  <u>Indemnification of Foundation Persons</u>.  The term "Foundation Person" means the Foundation, each member of the Investment Committee, each officer, employee, agent and Advisor of the Foundation and each member of the Foundation's Board of Trustees.  Beit T'Shuvah shall indemnify, defend (at its expense) and hold harmless each "Foundation Person" from and against any claim or loss, together with all reasonable costs and expenses related thereto (including, for example, reasonable legal fees and expenses), which arises out of or in connection with the making, construction or performance of this Agreement or the investment or distribution of the Fund Assets (each, a "Claim" and together, "Claims").

b.  <u>Liability of Foundation and Foundation Persons</u>.

i.  No Foundation Person shall have any liability or responsibility to Beit T'Shuvah or any other person for any act or omission to act unless such action or omission  resulted directly from that Foundation Person's fraud, willful misconduct, gross negligence or, only as to "Administrative Functions" (as defined below),

EXECUTION COPY

negligence.  In any event, no Foundation Person shall be liable to Beit T'Shuvah for any action or omission made in reliance upon advice of legal counsel (who may be a member of a law firm with which an Investment Committee member or Foundation officer or employee or Trustee is affiliated or associated) employed by or otherwise representing the Foundation or the Investment Committee.  For purposes of this Agreement, "Administrative Functions" mean all actions and omissions, of Foundation Persons, directly relating to the receipt and distribution of moneys pursuant to this Agreement, but in any event excluding (i) all acts and omissions relating to the selection and execution of investments and investment strategies and (ii) the selection, engagement, employment, compensation and supervision of Advisors, officers, employees and agents of the Foundation.

ii.    No Foundation Person shall be liable for any failure or delay in performing any of its obligations under this Agreement if such failure or delay is occasioned by compliance with governmental regulations, requests or orders, or by circumstances beyond the Foundation's reasonable control (including, but not limited to, war, insurrection, fire, flood, earthquake, accident, strike or other labor disturbance, disruptions of transportation or electrical power services or electronic communication systems, closure of financial markets, suspension in the trading of one or more securities, or acts of God).

iii.    In any event, no Foundation Person shall be liable for any consequential damages, and no Foundation Person shall have any responsibilities with respect to any assets of Beit T'Shuvah other than the Fund Assets.

9.  NOTICES

a.    General.  All communications relating to this Agreement shall be given in writing and sent (at the sender's pre-paid expense) by certified mail (return receipt requested), by hand delivery or by fax.    These communications shall be addressed as specified in this Section 9 (or as the intended recipient has otherwise specified by prior written notice to the sender). If properly addressed, such communications shall be deemed given on the date of hand delivery, on the third business day after deposit with the United States Postal Service (in the case of certified mail), or in the case of facsimile transmission, on the date on which receipt is confirmed.

b.    To the Foundation.    All communications to the Foundation shall be addressed as follows:

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Fax #323-761-8730
Attention: Simone Savlov, Chief Operating Officer
Copy to: Fay Althausen

EXECUTION COPY

c.    To BEIT T'SHUVAH.    All communications to Beit T'Shuvah shall be addressed as follows:

> Beit T'Shuvah
> 8831 Venice Blvd.
> Los Angeles, CA 90034
> Fax #310-204-8908
> Attention: Harriet Rossetto, Chief Executive Officer

> with a copy to:
> Warren Breslow
> Goldrich & Kest
> 5150 Overland Ave.
> Culver City, CA 90230-4996
> Fax #310-204-6393

> and with another copy to:
> David Ruderman
> Senior Vice President
> Smith Barney, Inc.
> 15260 Ventura Blvd., Suite 1900
> Sherman Oaks, CA 91403
> Fax #818-382-5768

## 10. WAIVERS AND AMENDMENTS

a.    This Agreement may be amended, modified, changed or waived (in whole or in part) only by written instrument signed by both parties hereto. Any such instrument signed on behalf of Beit T'Shuvah shall be signed by one of the non-employees holding the office of Co-Chairman of the Board and Co-President, as authorized by Beit T'Shuvah's Board of Trustees and previously designated for this purpose by written notice to the Foundation. Any purported amendment, modification, change or waiver of this Agreement by any means other than a written instrument signed as specified in this paragraph shall be deemed void *ab initio*.

b.    Any waiver of a provision of this Agreement on any occasion shall not be deemed to be a continuing waiver of that provision, a waiver of the provision on any other occasion or a waiver of any other provision on any occasion.

## 11. TERM AND TERMINATION

a.    Scheduled Term.  This term of this Agreement (the "Term") shall begin on the Effective Date and shall end at 12:00 PM on the last day of the calendar quarter in which the anniversary of the Effective Date occurs, unless earlier terminated or extended in accordance with this Section 11.

b.    Automatic Extensions.  The term shall be extended automatically for an additional year on each anniversary of the Effective Date unless either party gives the other at least one hundred twenty (120) days' prior written notice that the Agreement shall be allowed to expire at the end of the then-effective term.

EXECUTION COPY

    c.    <u>Early Termination</u>.  Either party may terminate this Agreement prior to its schedule expiration date (but in any event as of the end of a calendar quarter) upon at least one hundred twenty (120) days' prior written notice to the other.  Either party may terminate this Agreement immediately by written notice to the other if the terminating party ceases to be a Qualified Charitable Organization.

    d.    <u>Early Termination by Foundation</u>.  If the Foundation determines in good faith that Beit T'Shuvah is no longer a Qualified Charitable Organization, then the Foundation may terminate this Agreement immediately by written notice to Beit T'Shuvah.

    e.    <u>Surviving Provisions</u>.  Upon expiration or termination of this Agreement, the provisions of Sections 7 and 8 shall remain in full force and effect, along with such definitions and provisions regarding construction, amendment, waiver and administration as may be needed to interpret and apply the surviving provisions.  In addition, such expiration or termination shall not affect the Foundation's right to collect its fees and its reimbursement of any costs, expenses and taxes incurred in respect of the Fund Assets under this Agreement.

    f.    <u>Final Distribution of Fund Assets</u>.  Upon termination or expiration of this Agreement, the Foundation shall distribute the Fund Assets to Beit T'Shuvah in the manner prescribed in Schedule III as if Beit T'Shuvah had submitted a Distribution Request for one hundred percent (100%) of the Fund Assets.

12. <u>MISCELLANEOUS</u>

    a.    <u>Counterparts and Facsimile Signatures</u>.  This Agreement may be executed in counterparts, each of which shall be an original and all of which, together, shall constitute one and the same instrument. Signatures of this Agreement may be delivered by fax, and such faxed signatures shall be deemed a valid and binding form of execution.

    b.    <u>No Agency or Partnership</u>.  Neither this Agreement nor the dealings between the parties hereunder shall be deemed to create an agency or partnership relationship between them.  Neither party shall have the power to legally bind the other or to act on the other's behalf, except for those powers expressly granted to the Foundation hereunder.

    c.    <u>Assignment and Delegation</u>.  Except as otherwise specified in this Agreement, neither Beit T'Shuvah nor the Foundation shall assign its rights or delegate its duties hereunder (by merger, sale or other transfer of assets, operation of law or otherwise) without the express prior written consent of the other.  Any purported assignment or delegation without such consent shall be deemed void *ab initio*.

    d.    <u>Governing Law; Severability</u>.  The making, execution, delivery and performance of this Agreement, and all disputes under or in connection with this Agreement, shall be governed by and construed under the internal substantive law of the State of California, as that law applies to contracts entirely made and performed within the State of California by parties which are California citizens, residents and domiciliaries.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective only in that jurisdiction and only to the extent of such invalidity or unenforceability, without rendering the remaining terms and provisions hereof invalid or unenforceable and

EXECUTION COPY

without affecting the validity of any provision of this Agreement in any other jurisdiction.

e.    <u>Binding Effect; Entire Agreement</u>.  This Agreement (including, without limitation, the attached Exhibits and Schedules, which are hereby incorporated as parts of this Agreement by reference) shall be binding on each of the parties, their successors and permitted assigns.  This Agreement constitutes the entire agreement between the Foundation and Beit T'Shuvah as to the subject matter hereof, and supercedes all prior agreements (whether oral or written) as to such subject matter.

f.    <u>Further Assurances</u>.  Beit T'Shuvah shall execute, deliver and certify such documents and instruments, and take such other actions, as the Foundation reasonably may request in order to give full effect to the terms and conditions of the Agreement.

g.    <u>Confidentiality</u>.    Beit T'Shuvah shall not disclose the terms of this Agreement to any other person or entity, except for disclosures to its Board of Trustees, its shareholders (if any) and its "Confidential Advisors" or as otherwise required by law.  The Foundation may, at its discretion, disclose the existence and terms of this Agreement.  For purposes of this Agreement, "Confidential Advisors" means those attorneys, accountants and consultants who have been engaged in connection with the negotiation and administration of this Agreement and who have agreed in writing to maintain the confidentiality of this Agreement.

h.    <u>Headings</u>.  The section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.    SIGNATURE PAGE FOLLOWS.]

EXECUTION COPY

IN WITNESS WHEREOF, Beit T'Shuvah and the Foundation have duly executed this Agreement as of the Effective Date.

JEWISH COMMUNITY FOUNDATION
OF THE JEWISH FEDERATION -
COUNCIL OF GREATER LOS ANGELES

By: _____
    Name: Simone Savlov
    Title: Chief Operating Officer

BEIT T'SHUVAH

By: _____
    Name: Warren Breslow
    Title:  President

EXECUTION COPY

SCHEDULE I
INITIAL ASSETS

Cash, in the form of one or more checks or a wire transfer in the amount of Three
Hundred Thousand Dollars ($300,000.00) sent to the Foundation in accordance with the
following wire instructions:

> CITY NATIONAL BANK
> 400 N. ROXBURY DRIVE
> BEVERLY HILLS, CA 90210
> (213) 427-5050
> JEWISH COMMUNITY FOUNDATION
> ABA #122016066
> A/C #001-316-326

<u>SCHEDULE II</u>
<u>FEE CALCULATION</u>

| <u>Per Annum Fee (%)</u> | <u>Charged On</u> |
|---|---|
| 0.5% | Base Fund Assets |

For purposes of calculating the Foundation's fee in respect of a particular calendar quarter, "Base Fund Assets" means the end-of-quarter market value of all Fund Assets.

EXECUTION COPY

SCHEDULE III
DISTRIBUTION PROCEDURES

1. All Distribution Requests given during a calendar quarter shall be given before the last calendar month of that quarter.

2. The first one hundred thousand dollars ($100,000) of Distribution Requests given during a calendar quarter shall be honored by the last day of the first calendar month of the next quarter.

3. All further Distribution Requests given during a calendar quarter (that is, for amounts in addition to the $100,000 in aggregate distributions contemplated by item (2) above) shall be honored not later than the last day of the first month of the second calendar quarter after such Distribution Request is given. (For example, if Beit T'Shuvah requests $100,000 during the calendar quarter ending December 31, then any requests for additional distributions must be given not later than November 30, and timely Distribution Requests for those excess amounts will be honored not later than April 30.)

4. Any Distribution Request given after the applicable deadline for a particular quarter will be deemed given on the first business day of the following quarter.

5. All Fund Assets distributed hereunder shall be distributed in cash or by wire transfer (in accordance with wire transfer instructions provided by Beit T'Shuvah in writing for that purpose).

6. Notwithstanding anything in this Schedule III or elsewhere in this Agreement to the contrary, the Foundation shall not distribute to Beit T'Shuvah any amount greater than the value of the Fund Assets as of the quarter end immediately preceding the date of payment. The value of the Fund Assets available for distribution shall be determined by the Foundation in accordance with its customary business practices, after giving effect to any liquidation of investments that the Foundation deems necessary or appropriate to make the requested amount available and after giving effect to any extraordinary expenses or penalties for early withdrawal that the Foundation may incur in connection with such liquidation. Beit T'Shuvah shall bear the risk of any decrease in the value of the Fund Assets during any period prior to their liquidation for distribution, including any such decrease between the giving of a Distribution Request and the distribution pursuant to that request.

EXECUTION COPY

EXHIBIT A
FORM OF ADDITIONAL ASSETS NOTICE

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Additional Assets Notice

Dear Ms. Savlov:

This is an Additional Assets Notice, being given as required under Section 1(b) of the Beit T'Shuvah Fund Agreement, dated as of _____, 2002, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation", "Beit T'Shuvah", "Fund", "Additional Assets" and "Fund Assets" are used in this notice as defined in the Agreement.

Beit T'Shuvah hereby transfers to the Foundation Additional Assets in the amount of $_____, to be added to the Fund Assets. Beit T'Shuvah has elected to effect this asset transfer as follows (select one):

_____    Beit T'Shuvah has signed a check in the amount of the Additional Assets being transferred, made out to "Jewish Community Foundation", and sent the check and this signed Additional Asset Notice to the Foundation by hand delivery or certified mail, return receipt requested; or

_____    Beit T'Shuvah has wired the Additional Assets to the Foundation in accordance with the Foundation's written wire transfer instructions, and has sent this signed Additional Asset Notice to the Foundation by hand delivery or certified mail, return receipt requested.

Upon the Foundation's receipt of these Additional Assets, they shall be Fund Assets in accordance with the terms of the Agreement. Beit T'Shuvah acknowledges that its cancelled check, duly and properly endorsed for deposit by the Foundation, or its wire transfer confirmation number, shall constitute its receipt for the Additional Assets being transferred hereby.

Very truly yours,

BEIT T'SHUVAH

By: _____        By: _____
    Name:                           Name:
    Title: CEO                      Title: President

A-1

EXECUTION COPY

EXHIBIT B

INVESTMENT GUIDELINES

SEE ATTACHED GUIDELINES

# Jewish Community Foundation
## Statement of Investment Policies and Guidelines

### INTRODUCTION AND PURPOSE

This Statement of Investment Policy is set forth in order that:

1. There is a clear understanding on the part of Board of Trustees ("Board") of the Jewish Community Foundation (" Foundation") as to the investment policies and objectives of the Foundation.

2. The designated Investment Managers are given guidance and limitations, helping them to understand what is expected of them.

3. The Investment Committee ("Committee") of the Board has a basis for evaluation of the investment performance of the investment program.

The intent of this statement is to design an investment environment with specific parameters that reflects the philosophy of the Foundation and which allows the Investment Managers to focus on defined policies and objectives which should enhance the opportunities to obtain desired performance goals.  The objectives are intended to be sufficiently flexible to be practicable.

# DELEGATION OF RESPONSIBILITIES

## Board

Responsibilities of the Board of Trustees:

The Board has responsibility to ensure that the assets of the Foundation's various funds are managed in a manner which is consistent with the mission, goals, and objectives of the Foundation. In this regard, the Board also has oversight responsibility for full compliance with all applicable laws.

The Board, has delegated supervisory and operating responsibility to the Committee. All major decisions are reported to the Board or the Executive Committee thereof, and regularly scheduled performance evaluations are presented to the Board on a quarterly basis.

## Investment Committee

The Committee Members are charged with the responsibility of overseeing the management of Foundation assets available for investment. The Committee Members shall discharge their duties solely in the interest of the Foundation and for the exclusive purpose of meeting the financial needs of the Foundation. The Committee Members are authorized and permitted to engage the services of registered investment managers who possess the necessary specialized research facilities and skill to meet the investment objectives and guidelines of the Foundation. Accordingly, the Committee Members require the Investment Managers to adhere to the policies adopted by the Committee.

1. Setting policy guidelines which the Board approves and may modify from time to time.

2. Developing investment objectives and performance guidelines which are consistent with the financial goals of the Foundation.

3. Determining asset allocation strategy and investment managers' structure specifically designed to meet the Foundation's objective.

4. Selecting Investment Managers, Consultants and Custodians.

5. Reviewing and evaluating investment results in the context of predetermined performance standards and implementing corrective action as needed.

## Chief Operating Officer

The Chief Operating Officer ("COO") is charged with the implementation and administration of the policies and procedures adopted and enacted by the Committee. The Chief Operating Officer also serves as the primary conduit for communication with all other parties involved in the investment function of the Foundation.

## Consultants

The Committee Members may recommend the engagement of independent investment consulting firms to report to the Committee on an on-going basis.

In addition to providing performance evaluation results on an absolute and relative basis, the Consultant's report will provide data pertaining to the Foundations' portfolio(s) asset allocation and the risk associated with their asset classes.

The Consultant's responsibilities are:

1. Providing data pertaining to the Portfolio(s) asset allocation structure and its associated risks.

2. Assisting in the development of investment goals and objectives.

3. Reviewing Investment Managers, including search and selection processes.

4. Preparing and presenting performance evaluation reports in accordance with Association of Investment Management and Research promulgated standards.

5. Reviewing contracts and fees for both current and proposed Investment Managers.

6. Reviewing and developing special investment strategies that complement existing asset classes or strategies to be considered by the Committee.

7. Communicating investment policy to the managers and their adherence to such policies.

8. Notifying the Committee of any changes in personnel or ownership of the consulting firm.

9. Advising the Chief Operating Officer of any circumstances for which a special Committee meeting would be advisable.

## Investment Managers

Each Investment Manager is expected to operate within its specific asset allocation constraints. Subject to individually prepared guidelines, each manager will pursue its own strategy. Coordination of the guidelines for the individual managers assures the combined efforts of our managers will be consistent with the overall investment objectives of the Foundation and will result in the following benefits:

1. Through definition of a preferred asset mix, each manager will be able to concentrate efforts in its area(s) of expertise.

2. Within the constraints of the asset mix, the manager can enhance opportunities to add value by aggressively exploiting his/her strategy.

The Investment Managers' responsibilities are as follows:

1. Investing assets under their management in accordance with the guidelines and restrictions formulated by the Committee.

2. Exercising discretionary authority over the assets entrusted to them, subject to these guidelines and restrictions.

3. Providing written documentation of portfolio activity and valuations, performance data, and other information as requested by the Chief Operating Officer of the Foundation.

4. Attending meetings with representatives of the Committee as requested.

5. In the event there is a proxy contest, the manager will notify and consult with the Chief Operating Officer making any decisions regarding the Foundation's portfolios.

6. Annually providing a copy of the ADV Part II.

7. Notifying the Chief Operating Officer immediately of any litigation or violation of securities regulations in which the Investment Manager is involved that may adversely affect the Foundation.

8. Notifying the committee of any changes in personnel or ownership of the investment management firm that may impact the Foundation.

# INVESTMENT GOALS AND OBJECTIVES

## COMMON INVESTMENT POOL

### General Investment Philosophy

- The investment program is designed to provide total real return to meet the Foundation's stated investment goals.

- Preservation of capital is of primary importance while at the same time long-term growth is desirable.

- The investment policies and objectives are designed to support the spending rate policy of the Foundation.

### General Performance Goals

The investment objectives of the Foundation are based upon a long-term investment horizon so that interim fluctuations can be viewed in an appropriate perspective. While there cannot be assurance that the defined objectives will be realized, it is believed that the likelihood of their realization is enhanced by the Investment Policy Statement of the Foundation.

1. Total real return on assets should at least be equal to the spending rate, which is established periodically by the Board of Trustees.

2. The S&P 500 index, or other appropriate indices, will be the standards by which we measure equity performance.

3. The Lehman Brothers Government/Corporate Bond Index, or other appropriate indices will be the standards by which we measure fixed income performance.

# COMMON INVESTMENT POOL
## ASSET ALLOCATION

## Purpose

It is the responsibility of the Investment Committee of the Foundation to determine the asset allocation that offers the highest probability of achieving the investment goals as set by the Board of Trustees from time to time.  The Committee will review the asset mix on an ongoing basis and make revisions as necessary.

The target asset allocation of the Portfolio is designed to give balance to the overall structure of the Portfolio's investment program over a long time horizon.  The following factors will affect implementation of the asset allocation structure:

1.  The Committee's assessment of the intermediate term outlook for different types of securities.

2.  Divergence in the performance of various asset classes.

3.  Divergence in the performance of the different Investment  Managers.

4.  Investment Managers' decisions to raise or lower cash positions.

## Non-Permissible Investments

- Non Marketable Securities
- Naked Options
- Uncovered Short Positions

## Procedure for Revising Guidelines

All investment guidelines will be reviewed annually or as deemed necessary by the Committee. Any revisions of the guidelines must be approved by the Board.

## Policies Regarding Non-Endowment Funds

Goals & guidelines for the following will be developed at a future date:

- Portfolio II (currently holds philanthropic and charitable directed fund investments).

- Charitable Remainder Trusts.

## Policies Regarding Other Donated Assets

The following assets will be evaluated on an ad hoc basis:

Closely held securities
Non-marketable securities
Notes receivable (accrued and unaccrued)
State of Israel bonds

## Reporting Requirement and Process of Evaluation

The Consultants will be responsible for the preparation of reports concerning performance evaluation and compliance with investment objectives and spending rate policies. Such reports will be submitted, at least quarterly, to the Investment Committee.

While the assets will be monitored on a continuous basis, the Committee will focus primarily on the achievement of its objectives over a rolling three and five year time horizon. However, if any manager significantly changes management philosophy, personnel or ownership, a review will be conducted to determine if the investment manager remains appropriate for the Portfolio's purpose.

## APPENDIX

## INVESTMENT POLICIES & PERFORMANCE GOALS
## FOR TRADITIONAL INVESTMENT MANAGERS

The following are performance goals and constraint guidelines placed on individual managers within specific asset classes:

### Domestic Equity

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate equity index.

4. The maximum weighting (market value basis) in any one company of the manager's portfolio holding is _7.5%_ and in any one industry (defined as the 99 industry groups specified by the Frank Russell Co.) in the manager's portfolio holdings, the maximum weighting (market value basis) is _15%_. This constraint does not apply to mutual or commingled funds.

5. Investment managers may raise or lower cash positions as deemed appropriate within their strategy.

6. All portfolio securities held by the Investment Managers(s) of the Foundation shall be marketable securities unless there is prior approval by the Investment Committee.

### Domestic Fixed Income

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate index.

4. All fixed income securities should be of investment grade according to Moody's or Standard & Poor's unless a specific strategy utilizing below investment grade securities is approved by the Investment Committee. The portfolio(s) may include up to 10% of fixed income securities of lesser grade.

5. No holdings in any one security of more than <u>10%</u> (at market) in the manager's portfolio. This does not apply to U.S. government and agency issues. Including quasi government securities (e.g. FMNA, GNMA)

## Global or International Equity and Fixed Income

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate index.

4. The use of currency futures to enhance performance and/or hedge currency exposure by international and/or global managers is at the discretion of the manager, provided this activity is part of the manager's stated strategy. A detailed description of a manager's currency strategy must be submitted to the Investment Committee.

## Short Term Investments (Separate Cash Account )

1. To meet or exceed the return of the 90 Day Treasury Bills

2. To see that all cash, dividends and coupon interest are invested promptly.

EXECUTION COPY

EXHIBIT C
FORM OF DISTRIBUTION REQUEST

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Distribution Request

Dear Ms. Savlov:

This is a Distribution Request, being given as required under Section 3(a) of the Beit T'Shuvah Fund Agreement, dated as of _____, 2002, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation", "Beit T'Shuvah", "Fund" and "Fund Assets" are used in this notice as defined in the Agreement.

Beit T'Shuvah hereby requests that the Foundation transfer to Beit T'Shuvah, from Fund Assets, cash in the amount of $_____. Payment of this amount is requested in the following form (select one):

_____    a check in the amount of the requested disbursement, made out to Beit T'Shuvah and sent by hand delivery or certified mail, return receipt requested; or

_____    a wire transfer to Beit T'Shuvah in accordance with written wire instructions previously provided by Beit T'Shuvah in writing for this purpose.

Beit T'Shuvah shall confirm its receipt of the requested distribution in writing within three (3) business days after such receipt.

Very truly yours,

BEIT T'SHUVAH

By: _____          By: _____
     Name:                               Name:
     Title:  CEO                          Title: President

<u>EXHIBIT D</u>
<u>BEIT T'SHUVAH INCUMBENCY CERTIFICATE</u>

[ATTACH COMPLETED INCUMBENCY CERTIFICATE HERE]

EXECUTION COPY

# HILLEL FUND AGREEMENT

This Hillel Fund Agreement (this "Agreement") is made as of September 27, 2002 (the "Effective Date") by and between the Jewish Community Foundation of the Jewish Federation - Council of Greater Los Angeles, a California corporation (the "Foundation"), and Los Angeles Hillel Council, Inc., a California corporation ("Hillel").

## BACKGROUND

The Foundation is a California non-profit public benefit corporation organized for public purposes including, among others, the receipt, acquisition, holding, administration and expenditure of property for charitable institutions, associations and undertakings. Pursuant to this purpose, the Foundation operates development and planned giving programs including the pooled investment and administration of designated endowment funds, donor advised funds, support foundations and its own unrestricted endowment funds for the benefit of the Jewish community. The size of the Foundation's endowment and planned giving program gives the Foundation access to certain investment advisers, money managers, custodians and other investment service providers generally unavailable to smaller investors and creates certain economies of scale in connection with the administration of investment activities.

Hillel is a California non-profit corporation operating within the Jewish community and has developed a general endowment and encouraged donor support for its programs, projects and long-range growth.   Hillel seeks to continue these activities in part by utilizing the Foundation's investment management and administration infrastructure and the Foundation's access to various investment industry professionals, and the Foundation seeks to aid Hillel's pursuit of its goals by these means, in each case, on the terms and in accordance with the conditions set forth in this Agreement.

In light of the foregoing background information, in consideration of the mutual promises set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which the parties hereby acknowledge, the Foundation and Hillel agree as follows:

1. ESTABLISHMENT OF FUND
   a.   Fund Account.  The Foundation shall establish on its books of account a fund called the Hillel Fund (the "Fund").  The assets of this Fund (the "Fund Assets") shall consist of all the cash assets transferred to the Foundation for investment, administration and management under this Agreement, adjusted to reflect net income, appreciation (if any) and disbursements.
   b.   Transfer of Assets.  Hillel hereby transfers to the Foundation, for investment, administration and management purposes only, the "Initial Assets" listed on the attached Schedule I.  Hillel may transfer additional assets to the Foundation from time to time under this Agreement ("Additional Assets") by completing the "Additional Asset Notice" attached as Exhibit A and complying with the asset transfer procedures described in that notice.
   c.   Standard of Care.  In performing its obligations under this Agreement, the Foundation shall exercise any discretion afforded to it hereunder with the same care as it exercises in the investment and management of its own permanent endowment assets.

1

EXECUTION COPY

2.  <u>MANAGEMENT AND INVESTMENT OF FUND ASSETS</u>

   a.   <u>Common Investment Pool</u>.  The Foundation shall pool the Fund Assets with the other assets in its "Common Investment Pool" for purposes of investment, management and administration.  The "Common Investment Pool" (or "Pool") is the collective investment fund maintained by the Foundation exclusively for the collective investment and reinvestment of its general endowment fund assets and the general endowment fund assets of other charitable organizations.  Fund Assets transferred and delivered to the Foundation during a calendar quarter shall be invested in the Pool on the last business day of that calendar quarter, and until then shall be invested in the Foundation's "In-House Portfolio" (a portfolio of laddered United States Treasury securities, agency securities and money market instruments all of which will mature in fewer than five years).

   b.   [Intentionally Left Blank]

   c.   <u>Foundation's Authority</u>.  The Foundation shall hold the Fund Assets in its own name or in the name(s) of its custodian(s), designee(s) or nominee(s).  The Foundation shall have the sole right and power to invest and manage the Fund Assets as part of the Pool and to take such other actions (including, for example, choosing and engaging "Advisors" (as defined below), delegating and assigning authority and responsibility to those Advisors,  incurring expenses and making payments in respect of those expenses) as the Foundation deems appropriate.  Hillel expressly acknowledges that the brokers, banks, trust companies, custodians, investment advisors, attorneys and other service providers that the Foundation engages or consults in the exercise of its authority under this Agreement (collectively, the "Advisors") may include some with which the Foundation's trustees or officers may be affiliated.

   d.   <u>Pro Rata Investment and Allocation</u>.  The Foundation shall invest the Fund Assets in the Pool in the same manner and in the same proportions as the other assets in the Pool. The Fund Assets in the Pool shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code, as defined herein) incurred in connection with the investment and administration of the Pool. The Fund Assets in the In-House Portfolio shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code) incurred in connection with the investment and administration of the In-House Portfolio. For purposes of this Agreement, the "Code" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time, and references to any particular provision of the Code mean that provision and the corresponding provision of any future United States Internal Revenue Code.

   e.   <u>Guidelines for Common Investment Pool Operations</u>.  The Foundation shall manage, administer and invest the Fund Assets in accordance with the investment guidelines adopted by the Investment Committee of the Foundation's Board of Trustees (the "Guidelines"). The Guidelines in effect on the date of this Agreement are attached as Exhibit B. The Foundation shall notify Hillel of any changes to the Guidelines within  thirty (30) days after their adoption.

2

EXECUTION COPY

f.  <u>Valuation of Fund Assets</u>.  The value of the Fund Assets and the Fund's allocable share of costs, expenses, taxes and fees (other than the Foundation's fees hereunder) shall be determined by the Foundation using the same procedures as it applies to the Foundation's own assets in the Pool.

g.  <u>*Pro Rata* Allocation of Third Party Payments</u>.  If the Foundation receives any indemnification, reimbursement, insurance proceeds, damages or other payment from any source or person that relates to a loss within or damage to assets in the Pool, the Foundation shall add Hillel's *pro rata* share of this payment to the Fund Assets (or, if the Fund is closed, shall pay that amount to Hillel) unless Hillel has already received its *pro rata* share directly from the source of such payment.

3.  <u>USE AND DISTRIBUTION OF FUND ASSETS</u>

a.  <u>Distributions to Hillel</u>.  Hillel's requests for distributions from Fund Assets shall be made by submitting to the Foundation a "Distribution Request" substantially in the form of the attached Exhibit C.  Each Distribution Request shall be signed by persons so authorized by Hillel's Board of Trustees and previously designated for this purpose by written notice to the Foundation, one of whom shall be Hillel's Executive Director or Associate Executive Director and the other of whom shall be Hillel's non-employee President or Treasurer.  The amount of prior notice required for Distribution Requests, the timing of distributions and limits on amounts available for distribution shall be governed by the "Distribution Procedures" set forth in Schedule III

4.  <u>ACCOUNTING AND REPORTING</u>

a.  <u>Quarterly Written Reports</u>.  The Foundation shall provide Hillel with quarterly statements showing contributions, investment results and disbursements from the Fund; provided, however, that Hillel shall be solely responsible for reporting to individual donors and its Board of Trustees on the use of any amounts disbursed.  The Foundation shall also notify Hillel in the quarterly report if the size or composition of the Investment Committee of the Foundation's Board of Trustees (the "Investment Committee") changes by more than fifty percent (50%) during a calendar quarter, and shall notify Hillel within thirty (30) days after any chairman or co-chairman of the Investment Committee leaves that office for any reason other than the expiration of his term.

b.  <u>Consultation with Investment Committee Representative</u>.  A member of the Foundation's Investment Committee shall be available to meet at least once during each calendar year with Hillel's Board of Trustees or that committee of its Board of Trustees that is responsible for overseeing the investment of Hillel's endowment assets.  This meeting shall occur at a mutually convenient time and location, to be agreed upon in good faith.

5.  <u>COSTS, TAXES AND FEES</u>

a.  <u>Allocation of Costs, Taxes and Fees</u>.  As part of the Pool, the Fund Assets shall bear (and be reduced by) their *pro rata* share of the costs and fees incurred in connection with the management and investment of the Pool (including, without limitation, any taxes on unrelated business income as defined in §512 of the Code).

b.  <u>Foundation Fee</u>.  In consideration of the administrative services provided by the Foundation hereunder, the Foundation shall charge against the Fund

Assets a quarterly fee calculated in accordance with Schedule II. This quarterly fee shall be charged and paid from Fund Assets as of the last day of the calendar quarter to which the fee relates, and shall be reflected in the quarterly valuations of the Fund Assets reported to Hillel.

6. REPRESENTATIONS AND WARRANTIES OF THE FOUNDATION
The Foundation hereby represents and warrants as follows:

a. Organization, Existence and Charitable Status. The Foundation is a duly organized and validly existing California non-profit, public benefit corporation, and is a "Qualified Charitable Organization" (that is, an organization described in §501(c)(3) of the Code which is not a private foundation under §509(a) of the Code).

b. Authorization, Legality and Enforceability. The Foundation's execution, delivery and performance of this Agreement have been duly authorized in accordance with the Foundation's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c. Not Registered. The Foundation is not registered as a broker-dealer, the Pool, the Fund and the In-House Portfolio are not registered as investment companies and none of Hillel's interests hereunder are registered securities, in each case, under any federal or state securities laws or under the rules and regulations promulgated under those laws. The Foundation does not intend to effect any such registrations and shall have no obligation to do so.

7. REPRESENTATIONS AND WARRANTIES OF HILLEL
Hillel hereby represents and warrants as follows:

a. Organization, Existence and Charitable Status. Hillel is a duly organized and validly existing California non-profit corporation, and a Qualified Charitable Organization. Hillel shall remain a Qualified Charitable Organization during the term of this Agreement. If Hillel ceases to be a Qualified Charitable Organization, then it shall give the Foundation prompt notice of that fact.

b. Authorization, Legality and Enforceability. Hillel's execution, delivery and performance of this Agreement have been duly authorized in accordance with Hillel's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c. No Encumbrances. Hillel has unencumbered title to the Initial Assets, and warrants that it shall have unencumbered title to all Additional Assets and shall not grant any interest in any Fund Assets to any third party.

d. Review of Guidelines and Investment Procedures. Hillel has received and read the copy of the Guidelines attached as Exhibit B; has conferred with one or more representatives of the Foundation regarding these Guidelines, has reviewed them with Hillel's legal and financial advisors, its Board of Trustees and any committees of that board responsible for overseeing Hillel's investment and asset management, and has concluded (by majority vote of its Board of Trustees and any constituent committees thereof required under Hillel's governing instruments) that these Guidelines accurately reflect Hillel's own investment and asset management principles.

e. Source of Funds. The Initial Assets consist, and Hillel hereby covenants that any Additional Assets will consist, of one or more of the categories of assets described in Section 3(c)(10)(B)(i) through (vi) of the Investment Company Act of 1940. For purposes of determining whether the limitation on compensation of Section 3(e)(2) of the Securities Exchange Act of 1934 has



EXECUTION COPY

been met, no commission or other special compensation based on the number or value of donations collected by or on behalf of Hillel has been paid with respect to the Initial Assets and none will be paid with respect to any Additional Assets.

f.    <u>No Guarantees</u>.  Hillel hereby acknowledges and agrees that the Foundation has not guaranteed or represented any specific investment results or returns. Hillel understands that investing is inherently risky and that investments may be volatile and subject to various risks over which the Foundation will have little or no control.

g.    <u>Incumbency</u>.    The currently serving, duly elected officers of Hillel are the persons so identified on the "Incumbency Certificate" attached as Exhibit D. Hillel shall provide the Foundation with an updated Incumbency Certificate promptly upon the occurrence of any change to the information set forth therein.

8.    <u>LIMITATION OF LIABILITY</u>

a.    <u>Indemnification of Foundation Persons</u>.   The term "Foundation Person" means the Foundation, each member of the Investment Committee, each officer, employee, agent and Advisor of the Foundation and each member of the Foundation's Board of Trustees.   Hillel shall indemnify, defend (at its expense) and hold harmless each "Foundation Person" from and against any claim or loss, together with all reasonable costs and expenses related thereto (including, for example, reasonable legal fees and expenses), which arises out of or in connection with the making, construction or performance of this Agreement or the investment or distribution of the Fund Assets (each, a "Claim" and together, "Claims").

b.    <u>Liability of Foundation and Foundation Persons</u>.
    i.    No Foundation Person shall have any liability or responsibility to Hillel or any other person for any act or omission to act unless such action or omission  resulted directly from that Foundation Person's fraud, willful misconduct, gross negligence or, only as to "Administrative Functions" (as defined below), negligence.  In any event, no Foundation Person shall be liable to Hillel for any action or omission made in reliance upon advice of legal counsel (who may be a member of a law firm with which an Investment Committee member or Foundation officer or employee or Trustee is affiliated or associated) employed by or otherwise representing the Foundation or the Investment Committee.   For purposes of this Agreement, "Administrative Functions" mean all actions and omissions, of Foundation Persons, directly relating to the receipt and distribution of moneys pursuant to this Agreement, but in any event excluding (i) all acts and omissions relating to the selection and execution of investments and investment strategies and (ii) the selection, engagement, employment, compensation and supervision of Advisors, officers, employees and agents of the Foundation.
    ii.    No Foundation Person shall be liable for any failure or delay in performing any of its obligations under this Agreement if such failure or delay is occasioned by compliance with governmental regulations, requests or orders, or by circumstances beyond the Foundation's reasonable control (including, but not limited to, war, insurrection, fire, flood, earthquake, accident, strike or other labor disturbance, disruptions of transportation or electrical power services or electronic

EXECUTION COPY

communication systems, closure of financial markets, suspension in the trading of one or more securities, or acts of God).

iii.    In any event, no Foundation Person shall be liable for any consequential damages, and no Foundation Person shall have any responsibilities with respect to any assets of Hillel other than the Fund Assets.

9.    NOTICES

a.    General.  All communications relating to this Agreement shall be given in writing and sent (at the sender's pre-paid expense) by certified mail (return receipt requested), by hand delivery or by fax.  These communications shall be addressed as specified in this Section 9 (or as the intended recipient has otherwise specified by prior written notice to the sender).  If properly addressed, such communications shall be deemed given on the date of hand delivery, on the third business day after deposit with the United States Postal Service (in the case of certified mail), or in the case of facsimile transmission, on the date on which receipt is confirmed.

b.    To the Foundation.    All communications to the Foundation shall be addressed as follows:

> Jewish Community Foundation
> 6505 Wilshire Blvd.
> Suite 1200
> Los Angeles, CA 90048
> Fax #323-761-8730
> Attention: Simone Savlov, Chief Operating Officer
> Copy to: Fay Althausen

c.    To HILLEL.  All communications to Hillel shall be addressed as follows:

> Los Angeles Hillel Council, Inc.
> 6505 Wilshire Blvd.
> Suite 450
> Los Angeles, CA 90048
> Fax #323-761-8566
> Attention: Tobi Inlender, Executive Director
> Copy to: Eitan Ginsburg, Associate Executive Director

> with a copy to:
> John Hanover
> ~~Hamburg, Hanover, Edwards & Martin~~ Liner, Yankelovitz, Sunshine &
>      Regenstreif
> ~~1900 Avenue of the Stars #1800~~  3130 Wilshire Blvd., 2nd floor
> ~~Los Angeles, CA 90067~~  Santa Monica, CA 90403
> ~~Fax #310-552-9291~~  fax 310-453-5901

10.  WAIVERS AND AMENDMENTS

a.    This Agreement may be amended, modified, changed or waived (in whole or in part) only by written instrument signed by both parties hereto.  Any such instrument signed on behalf of Hillel shall be signed by its non-employee

EXECUTION COPY

President or Treasurer, as authorized by Hillel's Board of Trustees and previously designated for this purpose by written notice to the Foundation. Any purported amendment, modification, change or waiver of this Agreement by any means other than a written instrument signed as specified in this paragraph shall be deemed void *ab initio*.

b.   Any waiver of a provision of this Agreement on any occasion shall not be deemed to be a continuing waiver of that provision, a waiver of the provision on any other occasion or a waiver of any other provision on any occasion.

11. <u>TERM AND TERMINATION</u>

a.   <u>Scheduled Term</u>. This term of this Agreement (the "Term") shall begin on the Effective Date and shall end at 12:00 PM on the last day of the calendar quarter in which the anniversary of the Effective Date occurs, unless earlier terminated or extended in accordance with this Section 11.

b.   <u>Automatic Extensions</u>. The term shall be extended automatically for an additional year on each anniversary of the Effective Date unless either party gives the other at least one hundred twenty (120) days' prior written notice that the Agreement shall be allowed to expire at the end of the then-effective term.

c.   <u>Early Termination</u>. Either party may terminate this Agreement prior to its schedule expiration date (but in any event as of the end of a calendar quarter) upon at least one hundred twenty (120) days' prior written notice to the other. Either party may terminate this Agreement immediately by written notice to the other if the terminating party ceases to be a Qualified Charitable Organization.

d.   <u>Early Termination by Foundation</u>. If the Foundation determines in good faith that Hillel is no longer a Qualified Charitable Organization, then the Foundation may terminate this Agreement immediately by written notice to Hillel.

e.   <u>Surviving Provisions</u>. Upon expiration or termination of this Agreement, the provisions of Sections 7 and 8 shall remain in full force and effect, along with such definitions and provisions regarding construction, amendment, waiver and administration as may be needed to interpret and apply the surviving provisions. In addition, such expiration or termination shall not affect the Foundation's right to collect its fees and its reimbursement of any costs, expenses and taxes incurred in respect of the Fund Assets under this Agreement.

f.   <u>Final Distribution of Fund Assets</u>. Upon termination or expiration of this Agreement, the Foundation shall distribute the Fund Assets to Hillel in the manner prescribed in Schedule III as if Hillel had submitted a Distribution Request for one hundred percent (100%) of the Fund Assets.

EXECUTION COPY

## 12. MISCELLANEOUS

a.   Counterparts and Facsimile Signatures.  This Agreement may be executed in counterparts, each of which shall be an original and all of which, together, shall constitute one and the same instrument.  Signatures of this Agreement may be delivered by fax, and such faxed signatures shall be deemed a valid and binding form of execution.

b.   No Agency or Partnership.  Neither this Agreement nor the dealings between the parties hereunder shall be deemed to create an agency or partnership relationship between them.  Neither party shall have the power to legally bind the other or to act on the other's behalf, except for those powers expressly granted to the Foundation hereunder.

c.   Assignment and Delegation.   Except as otherwise specified in this Agreement, neither Hillel nor the Foundation shall assign its rights or delegate its duties hereunder (by merger, sale or other transfer of assets, operation of law  or otherwise) without the express prior written consent of the other.  Any purported assignment or delegation without such consent shall be deemed void *ab initio*.

d.   Governing Law; Severability.   The making, execution, delivery and performance of this Agreement, and all disputes under or in connection with this Agreement, shall be governed by and construed under the internal substantive law of the State of California, as that law applies to contracts entirely made and performed within the State of California by parties which are California citizens, residents and domiciliaries.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective only in that jurisdiction and only to the extent of such invalidity or unenforceability, without rendering the remaining terms and provisions hereof invalid or unenforceable and without affecting the validity of any provision of this Agreement in any other jurisdiction.

e.   Binding Effect; Entire Agreement.   This Agreement (including, without limitation, the attached Exhibits and Schedules, which are hereby incorporated as parts of this Agreement by reference) shall be binding on each of the parties, their successors and permitted assigns.  This Agreement constitutes the entire agreement between the Foundation and Hillel as to the subject matter hereof, and supercedes all prior agreements (whether oral or written) as to such subject matter.

f.   Further Assurances.  Hillel shall execute, deliver and certify such documents and instruments, and take such other actions, as the Foundation reasonably may request in order to give full effect to the terms and conditions of the Agreement.

g.   Confidentiality.  Hillel shall not disclose the terms of this Agreement to any other person or entity, except for disclosures to its Board of Trustees, its shareholders (if any) and its "Confidential Advisors" or as otherwise required by law.  The Foundation may, at its discretion, disclose the existence and terms of this Agreement.  For purposes of this Agreement, "Confidential Advisors" means those attorneys, accountants and consultants who have been engaged in connection with the negotiation and administration of this Agreement and who have agreed in writing to maintain the confidentiality of this Agreement.

h.   Headings.  The section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation hereof.

EXECUTION COPY

IN WITNESS WHEREOF, Hillel and the Foundation have duly executed this Agreement as of the Effective Date.

JEWISH COMMUNITY FOUNDATION
OF THE JEWISH FEDERATION -
COUNCIL OF GREATER LOS ANGELES

By: _____
    Name: Simone Savlov
    Title: Chief Operating Officer

LOS ANGELES HILLEL COUNCIL, INC.

By: _____
    Name: John D. Hanover
    Title: President

SCHEDULE I
INITIAL ASSETS

Cash, in the form of a wire transfer in the amount of $ 706,199.97  sent to the Foundation in accordance with the following wire instructions:

CITY NATIONAL BANK
400 N. ROXBURY DRIVE
BEVERLY HILLS, CA 90210
(213) 427-5050
JEWISH COMMUNITY FOUNDATION
ABA #122016066
A/C #001-316-326

## SCHEDULE II
## FEE CALCULATION

| Per Annum Fee (%) | Charged On |
|---|---|
| 0.5% | Base Fund Assets |

For purposes of calculating the Foundation's fee in respect of a particular calendar quarter, "Base Fund Assets" means the end-of-quarter market value of all Fund Assets.

EXECUTION COPY

## SCHEDULE III
### DISTRIBUTION PROCEDURES

1. The first $20,000 in aggregate Distribution Requests during a calendar quarter may be given at any time more than two weeks prior to the end of that quarter. All Distribution Requests given during a calendar quarter shall be given before the last calendar month of that quarter; provided, however, that additional Distribution Requests up to an aggregate amount of twenty thousand dollars ($20,000) (collectively, the "Additional Distribution Requests") shall be considered timely if given during the first fifteen (15) days of that last calendar month of the quarter..

2. The first one million dollars ($1,000,000) of Distribution Requests given during a calendar quarter, and all Additional Distribution given during the first fifteen (15) days of the last month of that calendar quarter, shall be honored by the last day of the first calendar month of the next quarter.

3. All further Distribution Requests given during a calendar quarter (that is, for amounts in addition to the $1,000,000 in aggregate distributions contemplated by item (2) above) shall be honored not later than the last day of the first month of the second calendar quarter after such Distribution Request is given. (For example, if Hillel requests $1,000,000 during the calendar quarter ending December 31, then any requests for additional distributions must be given not later than November 30, and timely Distribution Requests for those excess amounts will be honored not later than April 30.)

4. Any Distribution Request given after the applicable deadline for a particular quarter will be deemed given on the first business day of the following quarter.

5. All Fund Assets distributed hereunder shall be distributed in cash or by wire transfer (in accordance with wire transfer instructions provided by Hillel in writing for that purpose).

6. Notwithstanding anything in this Schedule III or elsewhere in this Agreement to the contrary, the Foundation shall not distribute to Hillel any amount greater than the value of the Fund Assets as of the quarter end immediately preceding the date of payment. The value of the Fund Assets available for distribution shall be determined by the Foundation in accordance with its customary business practices, after giving effect to any liquidation of investments that the Foundation deems necessary or appropriate to make the requested amount available and after giving effect to any extraordinary expenses or penalties for early withdrawal that the Foundation may incur in connection with such liquidation. Hillel shall bear the risk of any decrease in the value of the Fund Assets during any period prior to their liquidation for distribution, including any such decrease between the giving of a Distribution Request and the distribution pursuant to that request.

EXECUTION COPY

EXHIBIT A
FORM OF ADDITIONAL ASSETS NOTICE

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Additional Assets Notice

Dear Ms. Savlov:

This is an Additional Assets Notice, being given as required under Section 1(b) of the Hillel Fund Agreement, dated as of September 27, 2002, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation", "Hillel", "Fund", "Additional Assets" and "Fund Assets" are used in this notice as defined in the Agreement.

Hillel hereby transfers to the Foundation Additional Assets in the amount of $_____, to be added to the Fund Assets. Hillel has elected to effect this asset transfer as follows (select one):

_____ Hillel has signed a check in the amount of the Additional Assets being transferred, made out to "Jewish Community Foundation", and sent the check and this signed Additional Asset Notice to the Foundation by hand delivery or certified mail, return receipt requested; or

_____ Hillel has wired the Additional Assets to the Foundation in accordance with the Foundation's written wire transfer instructions, and has sent this signed Additional Asset Notice to the Foundation by hand delivery or certified mail, return receipt requested.

Upon the Foundation's receipt of these Additional Assets, they shall be Fund Assets in accordance with the terms of the Agreement. Hillel acknowledges that its cancelled check, duly and properly endorsed for deposit by the Foundation, or its wire transfer confirmation number, shall constitute its receipt for the Additional Assets being transferred hereby.

Very truly yours,

LOS ANGELES HILLEL COUNCIL, INC.

By: _____
Name:
Title: [Executive Director or CFO]

By: _____
Name:
Title: [President or Treasurer]

A-1

EXECUTION COPY

# EXHIBIT B

## INVESTMENT GUIDELINES

SEE ATTACHED GUIDELINES

# Jewish Community Foundation
# Statement of Investment Policies and Guidelines

## INTRODUCTION AND PURPOSE

This Statement of Investment Policy is set forth in order that:

1. There is a clear understanding on the part of Board of Trustees ("Board") of the Jewish Community Foundation (" Foundation") as to the investment policies and objectives of the Foundation.

2. The designated Investment Managers are given guidance and limitations, helping them to understand what is expected of them.

3. The Investment Committee ("Committee") of the Board has a basis for evaluation of the investment performance of the investment program.

The intent of this statement is to design an investment environment with specific parameters that reflects the philosophy of the Foundation and which allows the Investment Managers to focus on defined policies and objectives which should enhance the opportunities to obtain desired performance goals.  The objectives are intended to be sufficiently flexible to be practicable.

# DELEGATION OF RESPONSIBILITIES

## Board

Responsibilities of the Board of Trustees:

The Board has responsibility to ensure that the assets of the Foundation's various funds are managed in a manner which is consistent with the mission, goals, and objectives of the Foundation. In this regard, the Board also has oversight responsibility for full compliance with all applicable laws.

The Board, has delegated supervisory and operating responsibility to the Committee. All major decisions are reported to the Board or the Executive Committee thereof, and regularly scheduled performance evaluations are presented to the Board on a quarterly basis.

## Investment Committee

The Committee Members are charged with the responsibility of overseeing the management of Foundation assets available for investment. The Committee Members shall discharge their duties solely in the interest of the Foundation and for the exclusive purpose of meeting the financial needs of the Foundation. The Committee Members are authorized and permitted to engage the services of registered investment managers who possess the necessary specialized research facilities and skill to meet the investment objectives and guidelines of the Foundation. Accordingly, the Committee Members require the Investment Managers to adhere to the policies adopted by the Committee.

1. Setting policy guidelines which the Board approves and may modify from time to time.

2. Developing investment objectives and performance guidelines which are consistent with the financial goals of the Foundation.

3. Determining asset allocation strategy and investment managers' structure specifically designed to meet the Foundation's objective.

4. Selecting Investment Managers, Consultants and Custodians.

5. Reviewing and evaluating investment results in the context of predetermined performance standards and implementing corrective action as needed.

## Chief Operating Officer

The Chief Operating Officer ("COO") is charged with the implementation and administration of the policies and procedures adopted and enacted by the Committee. The Chief Operating Officer also serves as the primary conduit for communication with all other parties involved in the investment function of the Foundation.

## Consultants

The Committee Members may recommend the engagement of independent investment consulting firms to report to the Committee on an on-going basis.

In addition to providing performance evaluation results on an absolute and relative basis, the Consultant's report will provide data pertaining to the Foundations' portfolio(s) asset allocation and the risk associated with their asset classes.

The Consultant's responsibilities are:

1. Providing data pertaining to the Portfolio(s) asset allocation structure and its associated risks.

2. Assisting in the development of investment goals and objectives.

3. Reviewing Investment Managers, including search and selection processes.

4. Preparing and presenting performance evaluation reports in accordance with Association of Investment Management and Research promulgated standards.

5. Reviewing contracts and fees for both current and proposed Investment Managers.

6. Reviewing and developing special investment strategies that complement existing asset classes or strategies to be considered by the Committee.

7. Communicating investment policy to the managers and their adherence to such policies.

8. Notifying the Committee of any changes in personnel or ownership of the consulting firm.

9. Advising the Chief Operating Officer of any circumstances for which a special Committee meeting would be advisable.

## Investment Managers

Each Investment Manager is expected to operate within its specific asset allocation constraints. Subject to individually prepared guidelines, each manager will pursue its own strategy. Coordination of the guidelines for the individual managers assures the combined efforts of our managers will be consistent with the overall investment objectives of the Foundation and will result in the following benefits:

1. Through definition of a preferred asset mix, each manager will be able to concentrate efforts in its area(s) of expertise.

2. Within the constraints of the asset mix, the manager can enhance opportunities to add value by aggressively exploiting his/her strategy.

The Investment Managers' responsibilities are as follows:

1. Investing assets under their management in accordance with the guidelines and restrictions formulated by the Committee.

2. Exercising discretionary authority over the assets entrusted to them, subject to these guidelines and restrictions.

3. Providing written documentation of portfolio activity and valuations, performance data, and other information as requested by the Chief Operating Officer of the Foundation.

4. Attending meetings with representatives of the Committee as requested.

5. In the event there is a proxy contest, the manager will notify and consult with the Chief Operating Officer making any decisions regarding the Foundation's portfolios.

6. Annually providing a copy of the ADV Part II.

7. Notifying the Chief Operating Officer immediately of any litigation or violation of securities regulations in which the Investment Manager is involved that may adversely affect the Foundation.

8. Notifying the committee of any changes in personnel or ownership of the investment management firm that may impact the Foundation.

# INVESTMENT GOALS AND OBJECTIVES

## COMMON INVESTMENT POOL

### General Investment Philosophy

- The investment program is designed to provide total real return to meet the Foundation's stated investment goals.

- Preservation of capital is of primary importance while at the same time long-term growth is desirable.

- The investment policies and objectives are designed to support the spending rate policy of the Foundation.

### General Performance Goals

The investment objectives of the Foundation are based upon a long-term investment horizon so that interim fluctuations can be viewed in an appropriate perspective. While there cannot be assurance that the defined objectives will be realized, it is believed that the likelihood of their realization is enhanced by the Investment Policy Statement of the Foundation.

1. Total real return on assets should at least be equal to the spending rate, which is established periodically by the Board of Trustees.

2. The S&P 500 index, or other appropriate indices, will be the standards by which we measure equity performance.

3. The Lehman Brothers Government/Corporate Bond Index, or other appropriate indices will be the standards by which we measure fixed income performance.

# COMMON INVESTMENT POOL
# ASSET ALLOCATION

## Purpose

It is the responsibility of the Investment Committee of the Foundation to determine the asset allocation that offers the highest probability of achieving the investment goals as set by the Board of Trustees from time to time. The Committee will review the asset mix on an ongoing basis and make revisions as necessary.

The target asset allocation of the Portfolio is designed to give balance to the overall structure of the Portfolio's investment program over a long time horizon. The following factors will affect implementation of the asset allocation structure:

1. The Committee's assessment of the intermediate term outlook for different types of securities.

2. Divergence in the performance of various asset classes.

3. Divergence in the performance of the different Investment Managers.

4. Investment Managers' decisions to raise or lower cash positions.

## Non-Permissible Investments

- Non Marketable Securities
- Naked Options
- Uncovered Short Positions

## Procedure for Revising Guidelines

All investment guidelines will be reviewed annually or as deemed necessary by the Committee. Any revisions of the guidelines must be approved by the Board.

## Policies Regarding Non-Endowment Funds

Goals & guidelines for the following will be developed at a future date:

- Portfolio II (currently holds philanthropic and charitable directed fund investments).

- Charitable Remainder Trusts.

## Policies Regarding Other Donated Assets

The following assets will be evaluated on an ad hoc basis:

Closely held securities
Non-marketable securities
Notes receivable (accrued and unaccrued)
State of Israel bonds

## Reporting Requirement and Process of Evaluation

The Consultants will be responsible for the preparation of reports concerning performance evaluation and compliance with investment objectives and spending rate policies. Such reports will be submitted, at least quarterly, to the Investment Committee.

While the assets will be monitored on a continuous basis, the Committee will focus primarily on the achievement of its objectives over a rolling three and five year time horizon. However, if any manager significantly changes management philosophy, personnel or ownership, a review will be conducted to determine if the investment manager remains appropriate for the Portfolio's purpose.

## APPENDIX

## INVESTMENT POLICIES & PERFORMANCE GOALS
## FOR TRADITIONAL INVESTMENT MANAGERS

The following are performance goals and constraint guidelines placed on individual managers within specific asset classes:

Domestic Equity

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate equity index.

4. The maximum weighting (market value basis) in any one company of the manager's portfolio holding is 7.5% and in any one industry (defined as the 99 industry groups specified by the Frank Russell Co.) in the manager's portfolio holdings, the maximum weighting (market value basis) is 15%. This constraint does not apply to mutual or commingled funds.

5. Investment managers may raise or lower cash positions as deemed appropriate within their strategy.

6. All portfolio securities held by the Investment Managers(s) of the Foundation shall be marketable securities unless there is prior approval by the Investment Committee.

Domestic Fixed Income

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate index.

4. All fixed income securities should be of investment grade according to Moody's or Standard & Poor's unless a specific strategy utilizing below investment grade securities is approved by the Investment Committee. The portfolio(s) may include up to 10% of fixed income securities of lesser grade.



5. No holdings in any one security of more than <u>10%</u> (at market) in the manager's portfolio. This does not apply to U.S. government and agency issues. Including quasi government securities (e.g. FMNA, GNMA)

<u>Global or International Equity and Fixed Income</u>

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate index.

4. The use of currency futures to enhance performance and/or hedge currency exposure by international and/or global managers is at the discretion of the manager, provided this activity is part of the manager's stated strategy. A detailed description of a manager's currency strategy must be submitted to the Investment Committee.

<u>Short Term Investments (Separate Cash Account )</u>

1. To meet or exceed the return of the 90 Day Treasury Bills

2. To see that all cash, dividends and coupon interest are invested promptly.

EXECUTION COPY

EXHIBIT C
FORM OF DISTRIBUTION REQUEST

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Distribution Request

Dear Ms. Savlov:

This is a Distribution Request, being given as required under Section 3(a) of the Hillel Fund Agreement, dated as of September 27, 2002, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation", "Hillel", "Fund" and "Fund Assets" are used in this notice as defined in the Agreement.

Hillel hereby requests that the Foundation transfer to Hillel, from Fund Assets, cash in the amount of $_____. Payment of this amount is requested in the following form (select one):

_____ a check in the amount of the requested disbursement, made out to Hillel and sent by hand delivery or  certified mail, return receipt requested; or

_____ a wire transfer to Hillel in accordance with written wire instructions previously provided by Hillel in writing for this purpose.

Hillel shall confirm its receipt of the requested distribution in writing within three (3) business days after such receipt.

Very truly yours,

LOS ANGELES HILLEL COUNCIL, INC.

By: _____            By: _____
    Name:                                Name:
    Title: [Executive Director or CFO]    Title:  [President  or  Treasurer]