EXECUTION COPY

<u>EXHIBIT D</u>
<u>HILLEL INCUMBENCY CERTIFICATE</u>

[ATTACH COMPLETED INCUMBENCY CERTIFICATE HERE]

## CERTIFICATE OF INCUMBENCY
## OF OFFICERS OF LOS ANGELES HILLEL COUNCIL, INC.

The undersigned, Kenneth D, Simon, does hereby certify that (s)he is a duly elected, qualified and acting Secretary of Los Angeles Hillel Council, Inc. ("Hillel"), a California nonprofit corporation; that the persons named below are and have been at all times since at least September 11, 2002, duly elected, qualified and acting officers of Hillel, holding the offices set forth opposite their respective names below; and that the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| John D. Hanover | President | |
| Michael H. Diamond | First Vice President | |
| Janice Kamenir-Reznik | Second ~~First~~ Vice President | |
| Herbert S. Abrams | Treasurer | |
| Kenneth D. Simon | Secretary | |

IN WITNESS WHEREOF, I have hereunto set my hand as a duly authorized officer of Hillel this 27th day of September, 2002.

Name:  Kenneth D. Simon
Secretary

The undersigned, Michael H Diamond, does hereby certify that he is a duly elected, qualified and acting First Vice President of Hillel; that Kenneth D. Simon is and has been at all times since at least September 11, 2002, a duly elected, qualified and acting Secretary of Hillel; and that the foregoing signature of Kenneth D. Simon is genuine.

September 27, 2002

Name:  Michael H Diamond
First Vice President

## CERTIFICATE OF INCUMBENCY
## OF OFFICERS OF LOS ANGELES HILLEL COUNCIL, INC.

The undersigned, Kenneth D, Simon, does hereby certify that (s)he is a duly elected, qualified and acting Secretary of Los Angeles Hillel Council, Inc. ("Hillel"), a California nonprofit corporation; that the persons named below are and have been at all times since at least September 11, 2002, duly elected, qualified and acting officers of Hillel, holding the offices set forth opposite their respective names below; and that the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| John D. Hanover | President | |
| Michael H. Diamond | First Vice President | |
| Janice Kamenir-Reznik | Second ~~First~~ Vice President | |
| Herbert S. Abrams | Treasurer | |
| Kenneth D. Simon | Secretary | |

IN WITNESS WHEREOF, I have hereunto set my hand as a duly authorized officer of Hillel this 27th day of September, 2002.

Name: Kenneth D. Simon
Secretary

The undersigned, _Michael A Diamond_ , does hereby certify that he is a duly elected, qualified and acting First Vice President of Hillel; that Kenneth D. Simon is and has been at all times since at least September 11, 2002, a duly elected, qualified and acting Secretary of Hillel; and that the foregoing signature of Kenneth D. Simon is genuine.

September 27, 2002

Name: Michael A Diamond
First Vice President

CERTIFICATE OF INCUMBENCY
OF OFFICERS OF LOS ANGELES HILLEL COUNCIL, INC.

The undersigned, Kenneth D, Simon, does hereby certify that (s)he is a duly elected, qualified and acting Secretary of Los Angeles Hillel Council, Inc. ("Hillel"), a California nonprofit corporation; that the persons named below are and have been at all times since at least September 11, 2002, duly elected, qualified and acting officers of Hillel, holding the offices set forth opposite their respective names below; and that the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| John D. Hanover | President | |
| Michael H. Diamond | First Vice President | |
| Janice Kamenir-Reznik | ~~Second~~ ~~First~~ Vice President | |
| Herbert S. Abrams | Treasurer | |
| Kenneth D. Simon | Secretary | |

IN WITNESS WHEREOF, I have hereunto set my hand as a duly authorized officer of Hillel this 27th day of September, 2002.

Name:  Kenneth D. Simon
Secretary

The undersigned, Michael H. Diamond, does hereby certify that he is a duly elected, qualified and acting First Vice President of Hillel; that Kenneth D. Simon is and has been at all times since at least September 11, 2002, a duly elected, qualified and acting Secretary of Hillel; and that the foregoing signature of Kenneth D. Simon is genuine.

September 27, 2002

Name: Michael H. Diamond
First Vice President

CERTIFICATE OF INCUMBENCY
OF OFFICERS OF LOS ANGELES HILLEL COUNCIL, INC.

The undersigned, Kenneth D, Simon, does hereby certify that (s)he is a duly elected, qualified and acting Secretary of Los Angeles Hillel Council, Inc. ("Hillel"), a California nonprofit corporation; that the persons named below are and have been at all times since at least September 11, 2002, duly elected, qualified and acting officers of Hillel, holding the offices set forth opposite their respective names below; and that the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| John D. Hanover | President | |
| Michael H. Diamond | First Vice President | |
| Janice Kamenir-Reznik | Second First Vice President | |
| Herbert S. Abrams | Treasurer | |
| Kenneth D. Simon | Secretary | |

IN WITNESS WHEREOF, I have hereunto set my hand as a duly authorized officer of Hillel this 27th day of September, 2002.

Name:  Kenneth D. Simon
Secretary

The undersigned, _____, does hereby certify that he is a duly elected, qualified and acting First Vice President of Hillel; that Kenneth D. Simon is and has been at all times since at least September 11, 2002, a duly elected, qualified and acting Secretary of Hillel; and that the foregoing signature of Kenneth D. Simon is genuine.

September 27, 2002

Name: _____
First Vice President

EXECUTION COPY

# HILLEL FUND AGREEMENT

This Hillel Fund Agreement (this "Agreement") is made as of December 17, 2003 (the "Effective Date") by and between the Jewish Community Foundation of the Jewish Federation - Council of Greater Los Angeles, a California corporation (the "Foundation"), and Santa Barbara Hillel Support Foundation, a California corporation ("Hillel").

## BACKGROUND

The Foundation is a California non-profit public benefit corporation organized for public purposes including, among others, the receipt, acquisition, holding, administration and expenditure of property for charitable institutions, associations and undertakings. Pursuant to this purpose, the Foundation operates development and planned giving programs including the pooled investment and administration of designated endowment funds, donor advised funds, support foundations and its own unrestricted endowment funds for the benefit of the Jewish community. The size of the Foundation's endowment and planned giving program gives the Foundation access to certain investment advisers, money managers, custodians and other investment service providers generally unavailable to smaller investors and creates certain economies of scale in connection with the administration of investment activities.

Hillel is a California non-profit corporation operating within the Jewish community and has developed a general endowment and encouraged donor support for its programs, projects and long-range growth. Hillel seeks to continue these activities in part by utilizing the Foundation's investment management and administration infrastructure and the Foundation's access to various investment industry professionals, and the Foundation seeks to aid Hillel's pursuit of its goals by these means, in each case, on the terms and in accordance with the conditions set forth in this Agreement.

In light of the foregoing background information, in consideration of the mutual promises set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which the parties hereby acknowledge, the Foundation and Hillel agree as follows:

1. <u>ESTABLISHMENT OF FUND</u>
   a. <u>Fund Account</u>. The Foundation shall establish on its books of account a fund called the Santa Barbara Hillel Fund (the "Fund"). The assets of this Fund (the "Fund Assets") shall consist of all the cash assets transferred to the Foundation for investment, administration and management under this Agreement, adjusted to reflect net income, appreciation (if any) and disbursements.
   b. <u>Transfer of Assets</u>. Hillel hereby transfers to the Foundation, for investment, administration and management purposes only, the "Initial Assets" listed on the attached Schedule I. Hillel may transfer additional assets to the Foundation from time to time under this Agreement ("Additional Assets") by completing the "Additional Asset Notice" attached as Exhibit A (executed by any two of its President, Treasurer, and Secretary) and complying with the asset transfer procedures described in that notice.
   c. <u>Standard of Care</u>. In performing its obligations under this Agreement, the Foundation shall exercise any discretion afforded to it hereunder with the

EXECUTION COPY

same care as it exercises in the investment and management of its own permanent endowment assets.

2. <u>MANAGEMENT AND INVESTMENT OF FUND ASSETS</u>

a. <u>Common Investment Pool</u>. The Foundation shall pool the Fund Assets with the other assets in its "Common Investment Pool" for purposes of investment, management and administration. The "Common Investment Pool" (or "Pool") is the collective investment fund maintained by the Foundation exclusively for the collective investment and reinvestment of its general endowment fund assets and the general endowment fund assets of other charitable organizations. Fund Assets transferred and delivered to the Foundation during a calendar quarter shall be invested in the Pool on the last business day of that calendar quarter, and until then shall be invested in the Foundation's "Donor Funds Portfolio" (a portfolio of laddered United States Treasury securities, agency securities and money market instruments all of which will mature in fewer than five years) or a similar successor portfolio.

b. [<u>Intentionally Left Blank</u>]

c. <u>Foundation's Authority</u>. The Foundation shall hold the Fund Assets in its own name or in the name(s) of its custodian(s), designee(s) or nominee(s). The Foundation shall have the sole right and power to invest and manage the Fund Assets as part of the Pool and to take such other actions (including, for example, choosing and engaging "Advisors" (as defined below), delegating and assigning authority and responsibility to those Advisors, incurring expenses and making payments in respect of those expenses) as the Foundation deems appropriate. Hillel expressly acknowledges that the brokers, banks, trust companies, custodians, investment advisors, attorneys and other service providers that the Foundation engages or consults in the exercise of its authority under this Agreement (collectively, the "Advisors") may include some with which the Foundation's trustees or officers may be affiliated.

d. <u>*Pro Rata* Investment and Allocation</u>. The Foundation shall invest the Fund Assets in the Pool in the same manner and in the same proportions as the other assets in the Pool. The Fund Assets in the Pool shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code, as defined herein) incurred in connection with the investment and administration of the Pool. The Fund Assets in the Donor Funds Portfolio shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code) incurred in connection with the investment and administration of the Donor Funds Portfolio. For purposes of this Agreement, the "Code" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time, and references to any particular provision of the Code mean that provision and the corresponding provision of any future United States Internal Revenue Code.

e. <u>Guidelines for Common Investment Pool Operations</u>. The Foundation shall manage, administer and invest the Fund Assets in accordance with the investment guidelines adopted by the Investment Committee of the Foundation's Board of Trustees (the "Guidelines"). The Guidelines in effect


EXECUTION COPY

on the date of this Agreement are attached as Exhibit B. The Foundation shall notify Hillel of any changes to the Guidelines within thirty (30) days after their adoption.

f.  <u>Valuation of Fund Assets</u>.  The value of the Fund Assets and the Fund's allocable share of costs, expenses, taxes and fees (other than the Foundation's fees hereunder) shall be determined by the Foundation using the same procedures as it applies to the Foundation's own assets in the Pool.

g.  <u>*Pro Rata* Allocation of Third Party Payments</u>.  If the Foundation receives any indemnification, reimbursement, insurance proceeds, damages or other payment from any source or person that relates to a loss within or damage to assets in the Pool, the Foundation shall add Hillel's *pro rata* share of this payment to the Fund Assets (or, if the Fund is closed, shall pay that amount to Hillel) unless Hillel has already received its *pro rata* share directly from the source of such payment.

3.  <u>USE AND DISTRIBUTION OF FUND ASSETS</u>

a.  <u>Distributions to Hillel</u>.  Hillel's requests for distributions from Fund Assets shall be made by submitting to the Foundation a "Distribution Request" substantially in the form of the attached Exhibit C.  Each Distribution Request shall be signed by any two of Hillel's President, Treasurer or Secretary.  The amount of prior notice required for Distribution Requests, the timing of distributions and limits on amounts available for distribution shall be governed by the "Distribution Procedures" set forth in Schedule III

4.  <u>ACCOUNTING AND REPORTING</u>

a.  <u>Quarterly Written Reports</u>.  The Foundation shall provide Hillel with quarterly statements showing contributions, investment results and disbursements from the Fund; provided, however, that Hillel shall be solely responsible for reporting to individual donors and its Board of Trustees on the use of any amounts disbursed.  The Foundation shall also notify Hillel in the quarterly report if the size or composition of the Investment Committee of the Foundation's Board of Trustees (the "Investment Committee") changes by more than fifty percent (50%) during a calendar quarter, and shall notify Hillel within thirty (30) days after any chairman or co-chairman of the Investment Committee leaves that office for any reason other than the expiration of his term.

b.  <u>Consultation with Investment Committee Representative</u>.  A member of the Foundation's Investment Committee shall be available to meet at least once during each calendar year with Hillel's Board of Trustees or that committee of its Board of Trustees that is responsible for overseeing the investment of Hillel's endowment assets.  This meeting shall occur at a mutually convenient time and location, to be agreed upon in good faith.

5.  <u>COSTS, TAXES AND FEES</u>

a.  <u>Allocation of Costs, Taxes and Fees</u>.  As part of the Pool, the Fund Assets shall bear (and be reduced by) their *pro rata* share of the costs and fees incurred in connection with the management and investment of the Pool (including, without limitation, any taxes on unrelated business income as defined in §512 of the Code).

b.  <u>Foundation Fee</u>.  In consideration of the administrative services provided by the Foundation hereunder, the Foundation shall charge against the Fund

Assets a quarterly fee calculated in accordance with Schedule II. This quarterly fee shall be charged and paid from Fund Assets as of the last day of the calendar quarter to which the fee relates, and shall be reflected in the quarterly valuations of the Fund Assets reported to Hillel.

6. <u>REPRESENTATIONS AND WARRANTIES OF THE FOUNDATION</u>
The Foundation hereby represents and warrants as follows:

    a.    <u>Organization, Existence and Charitable Status</u>. The Foundation is a duly organized and validly existing California non-profit, public benefit corporation, and is a "Qualified Charitable Organization" (that is, an organization described in §501(c)(3) of the Code which is not a private foundation under §509(a) of the Code).

    b.    <u>Authorization, Legality and Enforceability</u>. The Foundation's execution, delivery and performance of this Agreement have been duly authorized in accordance with the Foundation's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

    c.    <u>Not Registered</u>. The Foundation is not registered as a broker-dealer, the Pool, the Fund and the Donor Funds Portfolio are not registered as investment companies and none of Hillel's interests hereunder are registered securities, in each case, under any federal or state securities laws or under the rules and regulations promulgated under those laws. The Foundation does not intend to effect any such registrations and shall have no obligation to do so.

7. <u>REPRESENTATIONS AND WARRANTIES OF HILLEL</u>
Hillel hereby represents and warrants as follows:

    a.    <u>Organization, Existence and Charitable Status</u>. Hillel is a duly organized and validly existing California non-profit corporation, and a Qualified Charitable Organization. Hillel shall remain a Qualified Charitable Organization during the term of this Agreement. If Hillel ceases to be a Qualified Charitable Organization, then it shall give the Foundation prompt notice of that fact.

    b.    <u>Authorization, Legality and Enforceability</u>. Hillel's execution, delivery and performance of this Agreement have been duly authorized in accordance with Hillel's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

    c.    <u>No Encumbrances</u>. Hillel has unencumbered title to the Initial Assets, and warrants that it shall have unencumbered title to all Additional Assets and shall not grant any interest in any Fund Assets to any third party.

    d.    <u>Review of Guidelines and Investment Procedures</u>. Hillel has received and read the copy of the Guidelines attached as Exhibit B; has conferred with one or more representatives of the Foundation regarding these Guidelines, has reviewed them with Hillel's legal and financial advisors, its Board of Trustees and any committees of that board responsible for overseeing Hillel's investment and asset management, and has concluded (by majority vote of its Board of Trustees and any constituent committees thereof required under Hillel's governing instruments) that these Guidelines accurately reflect Hillel's own investment and asset management principles.

    e.    <u>Source of Funds</u>. The Initial Assets consist, and Hillel hereby covenants that any Additional Assets will consist, of one or more of the categories of assets described in Section 3(c)(10)(B)(i) through (vi) of the Investment Company Act of 1940. For purposes of determining whether the limitation on

EXECUTION COPY

compensation of Section 3(e)(2) of the Securities Exchange Act of 1934 has been met, no commission or other special compensation based on the number or value of donations collected by or on behalf of Hillel has been paid with respect to the Initial Assets and none will be paid with respect to any Additional Assets.

f.   <u>No Guarantees</u>.  Hillel hereby acknowledges and agrees that the Foundation has not guaranteed or represented any specific investment results or returns. Hillel understands that investing is inherently risky and that investments may be volatile and subject to various risks over which the Foundation will have little or no control.

g.   <u>Incumbency</u>.  The currently serving, duly elected officers of Hillel are the persons so identified on the "Incumbency Certificate" attached as Exhibit D. Hillel shall provide the Foundation with an updated Incumbency Certificate promptly upon the occurrence of any change to the information set forth therein.

8.   <u>LIMITATION OF LIABILITY</u>

a.   <u>Indemnification of Foundation Persons</u>.  The term "Foundation Person" means the Foundation, each member of the Investment Committee, each officer, employee, agent and Advisor of the Foundation and each member of the Foundation's Board of Trustees.  Hillel shall indemnify, defend (at its expense) and hold harmless each "Foundation Person" from and against any claims or losses, together with all reasonable costs and expenses related thereto (including, for example, reasonable legal fees and expenses), which arise out of or in connection with the making, construction or performance of this Agreement or the investment or distribution of the Fund Assets (each, a "Claim" and together, "Claims").

b.   <u>Liability of Foundation and Foundation Persons</u>.

   i.   No Foundation Person shall have any liability or responsibility to Hillel or any other person for any act or omission to act unless such action or omission  resulted directly from that Foundation Person's fraud, willful misconduct, gross negligence or, only as to "Administrative Functions" (as defined below), negligence.  In any event, no Foundation Person shall be liable to Hillel for any action or omission made in reliance upon advice of legal counsel (who may be a member of a law firm with which an Investment Committee member or Foundation officer or employee or Trustee is affiliated or associated) employed by or otherwise representing the Foundation or the Investment Committee.  For purposes of this Agreement, "Administrative Functions" mean all actions and omissions, of Foundation Persons, directly relating to the receipt and distribution of moneys pursuant to this Agreement, but in any event excluding (i) all acts and omissions relating to the selection and execution of investments and investment strategies and (ii) the selection, engagement, employment, compensation and supervision of Advisors, officers, employees and agents of the Foundation.

   ii.   No Foundation Person shall be liable for any failure or delay in performing any of its obligations under this Agreement if such failure or delay is occasioned by compliance with governmental regulations, requests or orders, or by circumstances beyond the Foundation's reasonable control (including, but not limited to, war, insurrection, fire, flood, earthquake, accident, strike or other labor disturbance,

EXECUTION COPY

disruptions of transportation or electrical power services or electronic communication systems, closure of financial markets, suspension in the trading of one or more securities, or acts of God).

iii.    In any event, no Foundation Person shall be liable for any consequential damages, and no Foundation Person shall have any responsibilities with respect to any assets of Hillel other than the Fund Assets.

9.   NOTICES

   a.   General.  All communications relating to this Agreement shall be given in writing and sent (at the sender's pre-paid expense) by certified mail (return receipt requested), by hand delivery or by fax.  These communications shall be addressed as specified in this Section 9 (or as the intended recipient has otherwise specified by prior written notice to the sender).  If properly addressed, such communications shall be deemed given on the date of hand delivery, on the third business day after deposit with the United States Postal Service (in the case of certified mail), or in the case of facsimile transmission, on the date on which receipt is confirmed.

   b.   To the Foundation.    All communications to the Foundation shall be addressed as follows:

   Jewish Community Foundation
   6505 Wilshire Blvd.
   Suite 1200
   Los Angeles, CA 90048
   Fax #323-761-8730
   Attention: Simone Savlov, Chief Operating Officer
   Copy to: Fay Althausen

   c.   To HILLEL.  All communications to Hillel shall be addressed as follows:

   Santa Barbara Hillel Support Foundation
   781 Embarcadero Del Mar
   Goleta, CA 93117
   Fax #805- 968-3781_
   Attention: Rabbi Steve Cohen, Executive Director

   with a copy to:
   Joan Rothenberg
   735 State Street
   Suite 213
   Santa Barbara, CA 93101
   Fax #805-899-8666

EXECUTION COPY

10. <u>WAIVERS AND AMENDMENTS</u>

    a.    This Agreement may be amended, modified, changed or waived (in whole or in part) only by written instrument signed by both parties hereto. Any such instrument signed on behalf of Hillel shall be signed by Hillel's President and its Secretary, as authorized by Hillel's Board of Trustees and hereby designated for this purpose by written notice to the Foundation. Any purported amendment, modification, change or waiver of this Agreement by any means other than a written instrument signed as specified in this paragraph shall be deemed void *ab initio*.

    b.    Any waiver of a provision of this Agreement on any occasion shall not be deemed to be a continuing waiver of that provision, a waiver of the provision on any other occasion or a waiver of any other provision on any occasion.

11. <u>TERM AND TERMINATION</u>

    a.    <u>Scheduled Term</u>. This term of this Agreement (the "Term") shall begin on the Effective Date and shall end at 12:00 PM on the last day of the calendar quarter in which the anniversary of the Effective Date occurs, unless earlier terminated or extended in accordance with this Section 11.

    b.    <u>Automatic Extensions</u>. The term shall be extended automatically for an additional year on each anniversary of the Effective Date unless either party gives the other at least one hundred twenty (120) days' prior written notice that the Agreement shall be allowed to expire at the end of the then-effective term.

    c.    <u>Early Termination</u>. Either party may terminate this Agreement prior to its schedule expiration date (but in any event as of the end of a calendar quarter) upon at least one hundred twenty (120) days' prior written notice to the other. Either party may terminate this Agreement immediately by written notice to the other if the terminating party ceases to be a Qualified Charitable Organization.

    d.    <u>Early Termination by Foundation</u>. If the Foundation determines in good faith that Hillel is no longer a Qualified Charitable Organization, then the Foundation may terminate this Agreement immediately by written notice to Hillel.

    e.    <u>Surviving Provisions</u>. Upon expiration or termination of this Agreement, the provisions of Sections 7 and 8 shall remain in full force and effect, along with such definitions and provisions regarding construction, amendment, waiver and administration as may be needed to interpret and apply the surviving provisions. In addition, such expiration or termination shall not affect the Foundation's right to collect its fees and its reimbursement of any costs, expenses and taxes incurred in respect of the Fund Assets under this Agreement.

    f.    <u>Final Distribution of Fund Assets</u>. Upon termination or expiration of this Agreement, the Foundation shall distribute the Fund Assets to Hillel in the manner prescribed in Schedule III as if Hillel had submitted a Distribution Request for one hundred percent (100%) of the Fund Assets.

EXECUTION COPY

12. <u>MISCELLANEOUS</u>

a.    <u>Counterparts and Facsimile Signatures</u>.  This Agreement may be executed in counterparts, each of which shall be an original and all of which, together, shall constitute one and the same instrument.  Signatures of this Agreement may be delivered by fax, and such faxed signatures shall be deemed a valid and binding form of execution.

b.    <u>No Agency or Partnership</u>.  Neither this Agreement nor the dealings between the parties hereunder shall be deemed to create an agency or partnership relationship between them.  Neither party shall have the power to legally bind the other or to act on the other's behalf, except for those powers expressly granted to the Foundation hereunder.

c.    <u>Assignment and Delegation</u>.    Except as otherwise specified in this Agreement, neither Hillel nor the Foundation shall assign its rights or delegate its duties hereunder (by merger, sale or other transfer of assets, operation of law or otherwise) without the express prior written consent of the other.  Any purported assignment or delegation without such consent shall be deemed void *ab initio*.

d.    <u>Governing Law; Severability</u>.    The making, execution, delivery and performance of this Agreement, and all disputes under or in connection with this Agreement, shall be governed by and construed under the internal substantive law of the State of California, as that law applies to contracts entirely made and performed within the State of California by parties which are California citizens, residents and domiciliaries.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective only in that jurisdiction and only to the extent of such invalidity or unenforceability, without rendering the remaining terms and provisions hereof invalid or unenforceable and without affecting the validity of any provision of this Agreement in any other jurisdiction.

e.    <u>Binding Effect; Entire Agreement</u>.    This Agreement (including, without limitation, the attached Exhibits and Schedules, which are hereby incorporated as parts of this Agreement by reference) shall be binding on each of the parties, their successors and permitted assigns.  This Agreement constitutes the entire agreement between the Foundation and Hillel as to the subject matter hereof, and supercedes all prior agreements (whether oral or written) as to such subject matter.

f.    <u>Further Assurances</u>.  Hillel shall execute, deliver and certify such documents and instruments, and take such other actions, as the Foundation reasonably may request in order to give full effect to the terms and conditions of the Agreement.

g.    <u>Confidentiality</u>.  Hillel shall not disclose the terms of this Agreement to any other person or entity, except for disclosures to its Board of Trustees, its shareholders (if any) and its "Confidential Advisors" or as otherwise required by law.  The Foundation may, at its discretion, disclose the existence and terms of this Agreement.  For purposes of this Agreement, "Confidential Advisors" means those attorneys, accountants and consultants who have been engaged in connection with the negotiation and administration of this Agreement and who have agreed in writing to maintain the confidentiality of this Agreement.

h.    <u>Headings</u>.  The section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation hereof.

EXECUTION COPY

IN WITNESS WHEREOF, Hillel and the Foundation have duly executed this Agreement
as of the Effective Date.

JEWISH COMMUNITY FOUNDATION
OF THE JEWISH FEDERATION -
COUNCIL OF GREATER LOS ANGELES

By: _____
Name: Simone Savlov
Title: Chief Operating Officer

SANTA BARBARA HILLEL
SUPPORT FOUNDATION
(Tax I.D. #91-2054237)

By: _____
Name: Joan Rothenberg
Title: President

By: _____
Name: Steve Amerikaner
Title: Treasurer

EXECUTION COPY

## SCHEDULE I
## INITIAL ASSETS

Cash, in the form of a check or checks in the aggregate the amount of $400,000 sent to the Foundation in accordance with the notice provisions of Section 9, or in the form of one or more wire transfers sent to the Foundation in accordance with the following wire instructions:

CITY NATIONAL BANK
400 N. ROXBURY DRIVE
BEVERLY HILLS, CA 90210
(213) 427-5050
JEWISH COMMUNITY FOUNDATION
ABA #122016066
A/C #001-316-326

EXECUTION COPY

## SCHEDULE II
## FEE CALCULATION

| Per Annum Fee (%) | Charged On |
| --- | --- |
| 0.5% | Base Fund Assets |

For purposes of calculating the Foundation's fee in respect of a particular calendar quarter, "Base Fund Assets" means the end-of-quarter market value of total Fund Assets.

EXECUTION COPY

SCHEDULE III
DISTRIBUTION PROCEDURES

1. All Distribution Requests given during a calendar quarter shall be given before the last calendar month of that quarter.

2. The first one million dollars ($1,000,000) of Distribution Requests given during a calendar quarter shall be honored by the last day of the first calendar month of the next quarter.

3. All further Distribution Requests given during a calendar quarter (that is, for amounts in addition to the $1,000,000 in aggregate distributions contemplated by item (2) above) shall be honored not later than the last day of the first month of the second calendar quarter after such Distribution Request is given. (For example, if Hillel requests $1,000,000 during the calendar quarter ending December 31, then any requests for additional distributions must be given not later than November 30, and timely Distribution Requests for those excess amounts will be honored not later than April 30.)

4. Any Distribution Request given after the applicable deadline for a particular quarter will be deemed given on the first business day of the following quarter.

5. All Fund Assets distributed hereunder shall be distributed in cash or by wire transfer (in accordance with wire transfer instructions provided by Hillel in writing for that purpose).

6. Notwithstanding anything in this Schedule III or elsewhere in this Agreement to the contrary, the Foundation shall not distribute to Hillel any amount greater than the value of the Fund Assets as of the quarter end immediately preceding the date of payment. The value of the Fund Assets available for distribution shall be determined by the Foundation in accordance with its customary business practices, after giving effect to any liquidation of investments that the Foundation deems necessary or appropriate to make the requested amount available and after giving effect to any extraordinary expenses or penalties for early withdrawal that the Foundation may incur in connection with such liquidation. Hillel shall bear the risk of any decrease in the value of the Fund Assets during any period prior to their liquidation for distribution, including any such decrease between the giving of a Distribution Request and the distribution pursuant to that request.

EXECUTION COPY

<u>EXHIBIT A</u>
<u>FORM OF ADDITIONAL ASSETS NOTICE</u>

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Additional Assets Notice

Dear Ms. Savlov:

This is an Additional Assets Notice, being given as required under Section 1(b) of the Hillel Fund Agreement, dated as of December 17, 2003, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement").  The terms "Foundation", "Hillel", "Fund", "Additional Assets" and  "Fund Assets" are used in this notice as defined in the Agreement.

Hillel hereby transfers to the Foundation Additional Assets in the amount of $_____, to be added to the Fund Assets.  Hillel has elected to effect this asset transfer as follows (select one):

_____  Hillel has signed a check in the amount of the Additional Assets being transferred, made out to "Jewish Community Foundation", and sent the check and this signed Additional Asset Notice to the Foundation by hand delivery or  certified mail, return receipt requested; or

_____   Hillel has wired the Additional Assets to the Foundation in accordance with the Foundation's written wire transfer instructions, and has sent this signed Additional Asset Notice to the Foundation by hand delivery or certified mail, return receipt requested.

Upon the Foundation's receipt of these Additional Assets, they shall be  Fund Assets in accordance with the terms of the Agreement.  Hillel acknowledges that its cancelled check, duly and properly endorsed for deposit by the Foundation, or its wire transfer confirmation number, shall constitute its receipt for the Additional Assets being transferred hereby.

Very truly yours,

SANTA BARBARA HILLEL SUPPORT  FOUNDATION

By: _____            By: _____
    Name:                               Name:
    Title:                              Title:

## EXHIBIT B

## INVESTMENT GUIDELINES

SEE ATTACHED GUIDELINES

# Jewish Community Foundation
## Statement of Investment Policies and Guidelines

### INTRODUCTION AND PURPOSE

This Statement of Investment Policy is set forth in order that:

1. There is a clear understanding on the part of Board of Trustees ("Board") of the Jewish Community Foundation (" Foundation") as to the investment policies and objectives of the Foundation.

2. The designated Investment Managers are given guidance and limitations, helping them to understand what is expected of them.

3. The Investment Committee ("Committee") of the Board has a basis for evaluation of the investment performance of the investment program.

The intent of this statement is to design an investment environment with specific parameters that reflects the philosophy of the Foundation and which allows the Investment Managers to focus on defined policies and objectives which should enhance the opportunities to obtain desired performance goals. The objectives are intended to be sufficiently flexible to be practicable.

# DELEGATION OF RESPONSIBILITIES

## Board

Responsibilities of the Board of Trustees:

The Board has responsibility to ensure that the assets of the Foundation's various funds are managed in a manner which is consistent with the mission, goals, and objectives of the Foundation. In this regard, the Board also has oversight responsibility for full compliance with all applicable laws.

The Board, has delegated supervisory and operating responsibility to the Committee. All major decisions are reported to the Board or the Executive Committee thereof, and regularly scheduled performance evaluations are presented to the Board on a quarterly basis.

## Investment Committee

The Committee Members are charged with the responsibility of overseeing the management of Foundation assets available for investment. The Committee Members shall discharge their duties solely in the interest of the Foundation and for the exclusive purpose of meeting the financial needs of the Foundation. The Committee Members are authorized and permitted to engage the services of registered investment managers who possess the necessary specialized research facilities and skill to meet the investment objectives and guidelines of the Foundation. Accordingly, the Committee Members require the Investment Managers to adhere to the policies adopted by the Committee.

1. Setting policy guidelines which the Board approves and may modify from time to time.

2. Developing investment objectives and performance guidelines which are consistent with the financial goals of the Foundation.

3. Determining asset allocation strategy and investment managers' structure specifically designed to meet the Foundation's objective.

4. Selecting Investment Managers, Consultants and Custodians.

5. Reviewing and evaluating investment results in the context of predetermined performance standards and implementing corrective action as needed.

\pub_wpl\invpola2.jef
revised 1-24-02

2

## Chief Operating Officer

The Chief Operating Officer ("COO") is charged with the implementation and administration of the policies and procedures adopted and enacted by the Committee. The Chief Operating Officer also serves as the primary conduit for communication with all other parties involved in the investment function of the Foundation.

## Consultants

The Committee Members may recommend the engagement of independent investment consulting firms to report to the Committee on an on-going basis.

In addition to providing performance evaluation results on an absolute and relative basis, the Consultant's report will provide data pertaining to the Foundations' portfolio(s) asset allocation and the risk associated with their asset classes.

The Consultant's responsibilities are:

1. Providing data pertaining to the Portfolio(s) asset allocation structure and its associated risks.

2. Assisting in the development of investment goals and objectives.

3. Reviewing Investment Managers, including search and selection processes.

4. Preparing and presenting performance evaluation reports in accordance with Association of Investment Management and Research promulgated standards.

5. Reviewing contracts and fees for both current and proposed Investment Managers.

6. Reviewing and developing special investment strategies that complement existing asset classes or strategies to be considered by the Committee.

7. Communicating investment policy to the managers and their adherence to such policies.

8. Notifying the Committee of any changes in personnel or ownership of the consulting firm.

9. Advising the Chief Operating Officer of any circumstances for which a special Committee meeting would be advisable.

\pub_wp1\invpola2.jcf
revised 1-24-02

3

## Investment Managers

Each Investment Manager is expected to operate within its specific asset allocation constraints. Subject to individually prepared guidelines, each manager will pursue its own strategy. Coordination of the guidelines for the individual managers assures the combined efforts of our managers will be consistent with the overall investment objectives of the Foundation and will result in the following benefits:

1. Through definition of a preferred asset mix, each manager will be able to concentrate efforts in its area(s) of expertise.

2. Within the constraints of the asset mix, the manager can enhance opportunities to add value by aggressively exploiting his/her strategy.

The Investment Managers' responsibilities are as follows:

1. Investing assets under their management in accordance with the guidelines and restrictions formulated by the Committee.

2. Exercising discretionary authority over the assets entrusted to them, subject to these guidelines and restrictions.

3. Providing written documentation of portfolio activity and valuations, performance data, and other information as requested by the Chief Operating Officer of the Foundation.

4. Attending meetings with representatives of the Committee as requested.

5. In the event there is a proxy contest, the manager will notify and consult with the Chief Operating Officer making any decisions regarding the Foundation's portfolios.

6. Annually providing a copy of the ADV Part II.

7. Notifying the Chief Operating Officer immediately of any litigation or violation of securities regulations in which the Investment Manager is involved that may adversely affect the Foundation.

8. Notifying the committee of any changes in personnel or ownership of the investment management firm that may impact the Foundation.

# INVESTMENT GOALS AND OBJECTIVES

## COMMON INVESTMENT POOL

### General Investment Philosophy

- The investment program is designed to provide total real return to meet the Foundation's stated investment goals.

- Preservation of capital is of primary importance while at the same time long-term growth is desirable.

- The investment policies and objectives are designed to support the spending rate policy of the Foundation.

### General Performance Goals

The investment objectives of the Foundation are based upon a long-term investment horizon so that interim fluctuations can be viewed in an appropriate perspective. While there cannot be assurance that the defined objectives will be realized, it is believed that the likelihood of their realization is enhanced by the Investment Policy Statement of the Foundation.

1. Total real return on assets should at least be equal to the spending rate, which is established periodically by the Board of Trustees.

2. The S&P 500 index, or other appropriate indices, will be the standards by which we measure equity performance.

3. The Lehman Brothers Government/Corporate Bond Index, or other appropriate indices will be the standards by which we measure fixed income performance.

# COMMON INVESTMENT POOL
## ASSET ALLOCATION

## Purpose

It is the responsibility of the Investment Committee of the Foundation to determine the asset allocation that offers the highest probability of achieving the investment goals as set by the Board of Trustees from time to time.  The Committee will review the asset mix on an ongoing basis and make revisions as necessary.

The target asset allocation of the Portfolio is designed to give balance to the overall structure of the Portfolio's investment program over a long time horizon.  The following factors will affect implementation of the asset allocation structure:

1. The Committee's assessment of the intermediate term outlook for different types of securities.

2. Divergence in the performance of various asset classes.

3. Divergence in the performance of the different Investment Managers.

4. Investment Managers' decisions to raise or lower cash positions.

## Non-Permissible Investments

- Non Marketable Securities
- Naked Options
- Uncovered Short Positions

## Procedure for Revising Guidelines

All investment guidelines will be reviewed annually or as deemed necessary by the Committee. Any revisions of the guidelines must be approved by the Board.

## Policies Regarding Non-Endowment Funds

Goals & guidelines for the following will be developed at a future date:

- Portfolio II (currently holds philanthropic and charitable directed fund investments).

- Charitable Remainder Trusts.

\pub_wp1\invpola2.jef
revised 1-24-02

## Policies Regarding Other Donated Assets

The following assets will be evaluated on an ad hoc basis:

Closely held securities
Non-marketable securities
Notes receivable (accrued and unaccrued)
State of Israel bonds

## Reporting Requirement and Process of Evaluation

The Consultants will be responsible for the preparation of reports concerning performance evaluation and compliance with investment objectives and spending rate policies. Such reports will be submitted, at least quarterly, to the Investment Committee.

While the assets will be monitored on a continuous basis, the Committee will focus primarily on the achievement of its objectives over a rolling three and five year time horizon. However, if any manager significantly changes management philosophy, personnel or ownership, a review will be conducted to determine if the investment manager remains appropriate for the Portfolio's purpose.

EXECUTION COPY

EXHIBIT C
FORM OF DISTRIBUTION REQUEST

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Distribution Request

Dear Ms. Savlov:

This is a Distribution Request, being given as required under Section 3(a) of the Hillel Fund Agreement, dated as of December 17, 2003, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement").  The terms "Foundation", "Hillel", "Fund" and "Fund Assets" are used in this notice as defined in the Agreement.

Hillel hereby requests that the Foundation transfer to Hillel, from Fund Assets, cash in the amount of $_____.  Payment of this amount is requested in the following form (select one):

_____ a check in the amount of the requested disbursement, made out to Hillel and sent by hand delivery or  certified mail, return receipt requested; or

_____ a wire transfer to Hillel in accordance with written wire instructions previously provided by Hillel in writing for this purpose.

Hillel shall confirm its receipt of the requested distribution in writing within three (3) business days after such receipt.

Very truly yours,

SANTA BARBARA HILLEL SUPPORT FOUNDATION

By: _____          By: _____
    Name:                              Name:
    Title:                             Title:

EXHIBIT D
HILLEL INCUMBENCY CERTIFICATE

[ATTACH COMPLETED INCUMBENCY CERTIFICATE HERE]

## CERTIFICATE OF INCUMBENCY
## OF OFFICERS OF SANTA BARBARA HILLEL SUPPORT FOUNDATION

The undersigned, Julie Friedman, does hereby certify that she is the duly elected, qualified and acting Secretary of Santa Barbara Hillel Support Foundation (the "Organization"), a California nonprofit corporation; that the persons named below are and at all times since at least _November 1_____, 2003 have been duly elected, qualified, and acting officers of the Organization, holding the offices set forth opposite their respective names below; and that the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Joan Rothenberg | President | |
| Steve Amerikaner | Treasurer | |

IN WITNESS WHEREOF, I have hereunto set my hand as a duly authorized officer of the Organization this _17th_ day of _December_____, 2003.

Name: Julie Friedman
Title: Secretary

The undersigned, Joan Rothenberg, does hereby certify that she is the duly elected, qualified and acting President of the Organization; that Julie Friedman is and at all times since at least _November 1_____, 2003 has been the duly elected, qualified and acting Secretary of the Organization; and that the foregoing signature of Julie Friedman is genuine.

December _17_, 2003

Name: Joan Rothenberg
President

EXECUTION COPY

# SYNAGOGUE FUND AGREEMENT

This Synagogue Fund Agreement (this "Agreement") is made as of December 10, 2003 (the "Effective Date") by and between the Jewish Community Foundation of the Jewish Federation - Council of Greater Los Angeles, a California corporation (the "Foundation"), and Temple Judea of the West San Fernando Valley, a California corporation ("Synagogue").

## BACKGROUND

The Foundation is a California non-profit public benefit corporation organized for public purposes including, among others, the receipt, acquisition, holding, administration and expenditure of property for charitable institutions, associations and undertakings. Pursuant to this purpose, the Foundation operates development and planned giving programs including the pooled investment and administration of designated endowment funds, donor advised funds, support foundations and its own unrestricted endowment funds for the benefit of the Jewish community. The size of the Foundation's endowment and planned giving program gives the Foundation access to certain investment advisers, money managers, custodians and other investment service providers generally unavailable to smaller investors and creates certain economies of scale in connection with the administration of investment activities.

Synagogue is a California non-profit corporation operating within the Jewish community and has developed a general endowment and encouraged donor support for its programs, projects and long-range growth. Synagogue seeks to continue these activities in part by utilizing the Foundation's investment management and administration infrastructure and the Foundation's access to various investment industry professionals, and the Foundation seeks to aid Synagogue's pursuit of its goals by these means, in each case, on the terms and in accordance with the conditions set forth in this Agreement.

In light of the foregoing background information, in consideration of the mutual promises set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which the parties hereby acknowledge, the Foundation and Synagogue agree as follows:

1. <u>ESTABLISHMENT OF FUND</u>
    a.  <u>Fund Account</u>. The Foundation shall establish on its books of account a fund called the Temple Judea of the West San Fernando Valley Fund (the "Fund"). The assets of this Fund (the "Fund Assets") shall consist of all the cash assets transferred to the Foundation for investment, administration and management under this Agreement, adjusted to reflect net income, appreciation (if any) and disbursements.
    b.  <u>Transfer of Assets</u>. Synagogue hereby transfers to the Foundation, for investment, administration and management purposes only, the "Initial Assets" listed on the attached Schedule I. Synagogue may transfer additional assets to the Foundation from time to time under this Agreement ("Additional Assets") by completing the "Additional Asset Notice" attached as Exhibit A (executed by any two of its President, Treasurer, and Secretary) and complying with the asset transfer procedures described in that notice.

1

EXECUTION COPY

c.   <u>Standard of Care</u>.  In performing its obligations under this Agreement, the Foundation shall exercise any discretion afforded to it hereunder with the same care as it exercises in the investment and management of its own permanent endowment assets.

2.   <u>MANAGEMENT AND INVESTMENT OF FUND ASSETS</u>
a.   <u>Common Investment Pool</u>.  The Foundation shall pool the Fund Assets with the other assets in its "Common Investment Pool" for purposes of investment, management and administration.  The "Common Investment Pool" (or "Pool") is the collective investment fund maintained by the Foundation exclusively for the collective investment and reinvestment of its general endowment fund assets and the general endowment fund assets of other charitable organizations.  Fund Assets transferred and delivered to the Foundation during a calendar quarter shall be invested in the Pool on the last business day of that calendar quarter, and until then shall be invested in the Foundation's "Donor Funds Portfolio" (a portfolio of laddered United States Treasury securities, agency securities and money market instruments all of which will mature in fewer than five years) or a similar successor portfolio.

b.   [Intentionally Left Blank]

c.   <u>Foundation's Authority</u>.  The Foundation shall hold the Fund Assets in its own name or in the name(s) of its custodian(s), designee(s) or nominee(s).  The Foundation shall have the sole right and power to  invest and manage the Fund Assets as part of the Pool and to take such other actions (including, for example, choosing and engaging "Advisors" (as defined below), delegating and assigning authority and responsibility to those Advisors,  incurring expenses and making payments in respect of those expenses) as the Foundation deems appropriate.  Synagogue expressly acknowledges that the brokers, banks, trust companies, custodians, investment advisors, attorneys and other service providers that the Foundation engages or consults in the exercise of its authority under this Agreement (collectively, the "Advisors") may include some with which the Foundation's trustees or officers may be affiliated.

d.   <u>*Pro Rata* Investment and Allocation</u>.  The Foundation shall invest the Fund Assets in the Pool in the same manner and in the same proportions as the other assets in the Pool. The Fund Assets in the Pool shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code, as defined herein) incurred in connection with the investment and administration of the Pool. The Fund Assets in the Donor Funds Portfolio shall share *pro rata* in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code) incurred in connection with the investment and administration of the Donor Funds Portfolio.   For purposes of this Agreement, the "Code" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time, and references to any particular provision of the Code mean that provision and the corresponding provision of any future United States Internal Revenue Code.

e.   <u>Guidelines for Common Investment Pool Operations</u>.  The Foundation shall manage, administer and invest the Fund Assets in accordance with the

EXECUTION COPY

investment guidelines adopted by the Investment Committee of the Foundation's Board of Trustees (the "Guidelines"). The Guidelines in effect on the date of this Agreement are attached as Exhibit B. The Foundation shall notify Synagogue of any changes to the Guidelines within thirty (30) days after their adoption.

f.    <u>Valuation of Fund Assets</u>.  The value of the Fund Assets and the Fund's allocable share of costs, expenses, taxes and fees (other than the Foundation's fees hereunder) shall be determined by the Foundation using the same procedures as it applies to the Foundation's own assets in the Pool.

g.    <u>*Pro Rata* Allocation of Third Party Payments</u>.  If the Foundation receives any indemnification, reimbursement, insurance proceeds, damages or other payment from any source or person that relates to a loss within or damage to assets in the Pool, the Foundation shall add Synagogue's *pro rata* share of this payment to the Fund Assets (or, if the Fund is closed, shall pay that amount to Synagogue) unless Synagogue has already received its *pro rata* share directly from the source of such payment.

3.  <u>USE AND DISTRIBUTION OF FUND ASSETS</u>

a.    <u>Distributions to Synagogue</u>.  Synagogue's requests for distributions from Fund Assets shall be made by submitting to the Foundation a "Distribution Request" substantially in the form of the attached Exhibit C.  Each Distribution Request shall be signed by Synagogue's President and Vice President Finance.  The amount of prior notice required for Distribution Requests, the timing of distributions and limits on amounts available for distribution shall be governed by the "Distribution Procedures" set forth in Schedule III

4.  <u>ACCOUNTING AND REPORTING</u>

a.    <u>Quarterly Written Reports</u>.  The Foundation shall provide Synagogue with quarterly statements showing contributions, investment results and disbursements from the Fund; provided, however, that Synagogue shall be solely responsible for reporting to individual donors and its Board of Trustees on the use of any amounts disbursed.  The Foundation shall also notify Synagogue in the quarterly report if the size or composition of the Investment Committee of the Foundation's Board of Trustees (the "Investment Committee") changes by more than fifty percent (50%) during a calendar quarter, and shall notify Synagogue within thirty (30) days after any chairman or co-chairman of the Investment Committee leaves that office for any reason other than the expiration of his term.

b.    <u>Consultation with Investment Committee Representative</u>.  A member of the Foundation's Investment Committee shall be available to meet at least once during each calendar year with Synagogue's Board of Trustees or that committee of its Board of Trustees that is responsible for overseeing the investment of Synagogue's endowment assets.  This meeting shall occur at a mutually convenient time and location, to be agreed upon in good faith.

5.  <u>COSTS, TAXES AND FEES</u>

a.    <u>Allocation of Costs, Taxes and Fees</u>.  As part of the Pool, the Fund Assets shall bear (and be reduced by) their *pro rata* share of the costs and fees incurred in connection with the management and investment of the Pool

EXECUTION COPY

(including, without limitation, any taxes on unrelated business income as defined in §512 of the Code).

b.  <u>Foundation Fee</u>.  In consideration of the administrative services provided by the Foundation hereunder, the Foundation shall charge against the Fund Assets a quarterly fee calculated in accordance with Schedule II.  This quarterly fee shall be charged and paid from Fund Assets as of the last day of the calendar quarter to which the fee relates, and shall be reflected in the quarterly valuations of the Fund Assets reported to Synagogue.

6.  <u>REPRESENTATIONS AND WARRANTIES OF THE FOUNDATION</u>
The Foundation hereby represents and warrants as follows:

a.  <u>Organization, Existence and Charitable Status</u>.  The Foundation is a duly organized and validly existing California non-profit, public benefit corporation, and is a "Qualified Charitable Organization" (that is, an organization described in §501(c)(3) of the Code which is not a private foundation under §509(a) of the Code).

b.  <u>Authorization, Legality and Enforceability</u>.  The Foundation's execution, delivery and performance of this Agreement have been duly authorized in accordance with the Foundation's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c.  <u>Not Registered</u>.  The Foundation is not registered as a broker-dealer, the Pool, the Fund and the Donor Funds Portfolio are not registered as investment companies and none of Synagogue's interests hereunder are registered securities, in each case, under any federal or state securities laws or under the rules and regulations promulgated under those laws.  The Foundation does not intend to effect any such registrations and shall have no obligation to do so.

7.  <u>REPRESENTATIONS AND WARRANTIES OF SYNAGOGUE</u>
Synagogue hereby represents and warrants as follows:

a.  <u>Organization, Existence and Charitable Status</u>.  Synagogue is a duly organized and validly existing California non-profit corporation, and a Qualified Charitable Organization.  Synagogue shall remain a Qualified Charitable Organization during the term of this Agreement.  If Synagogue ceases to be a Qualified Charitable Organization, then it shall give the Foundation prompt notice of that fact.

b.  <u>Authorization, Legality and Enforceability</u>.  Synagogue's execution, delivery and performance of this Agreement have been duly authorized in accordance with Synagogue's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c.  <u>No Encumbrances</u>.  Synagogue has unencumbered title to the Initial Assets, and warrants that it shall have unencumbered title to all Additional Assets and shall not grant any interest in any Fund Assets to any third party.

d.  <u>Review of Guidelines and Investment Procedures</u>.  Synagogue has received and read the copy of the Guidelines attached as Exhibit B; has conferred with one or more representatives of the Foundation regarding these Guidelines, has reviewed them with Synagogue's legal and financial advisors, its Board of Trustees and any committees of that board responsible for overseeing Synagogue's investment and asset management, and has concluded (by majority vote of its Board of Trustees and any constituent committees thereof required under Synagogue's governing instruments) that these Guidelines

accurately reflect Synagogue's own investment and asset management principles.

e. <u>Source of Funds</u>.    The Initial Assets consist, and Synagogue hereby covenants that any Additional Assets will consist, of one or more of the categories of assets described in Section 3(c)(10)(B)(i) through (vi) of the Investment Company Act of 1940. For purposes of determining whether the limitation on compensation of Section 3(e)(2) of the Securities Exchange Act of 1934 has been met, no commission or other special compensation based on the number or value of donations collected by or on behalf of Synagogue has been paid with respect to the Initial Assets and none will be paid with respect to any Additional Assets.

f. <u>No Guarantees</u>.    Synagogue hereby acknowledges and agrees that the Foundation has not guaranteed or represented any specific investment results or returns. Synagogue understands that investing is inherently risky and that investments may be volatile and subject to various risks over which the Foundation will have little or no control.

g. <u>Incumbency</u>. The currently serving, duly elected officers of Synagogue are the persons so identified on the "Incumbency Certificate" attached as Exhibit D. Synagogue shall provide the Foundation with an updated Incumbency Certificate promptly upon the occurrence of any change to the information set forth therein.

8. <u>LIMITATION OF LIABILITY</u>

a. <u>Indemnification of Foundation Persons</u>.    The term "Foundation Person" means the Foundation, each member of the Investment Committee, each officer, employee, agent and Advisor of the Foundation and each member of the Foundation's Board of Trustees.  Synagogue shall indemnify, defend (at its expense) and hold harmless each "Foundation Person" from and against any claims or losses, together with all reasonable costs and expenses related thereto (including, for example, reasonable legal fees and expenses), which arise out of or in connection with the making, construction or performance of this Agreement or the investment or distribution of the Fund Assets (each, a "Claim" and together, "Claims").  Notwithstanding the foregoing, no Foundation Person shall be entitled to indemnification hereunder for a Claim, asserted by Synagogue against that Foundation Person, to the extent that such Foundation Person has been found in a final adjudication to be liable to Synagogue in accordance with the liability standards set forth in Section 8(b) below.

b. <u>Liability of Foundation and Foundation Persons</u>.

i. No Foundation Person shall have any liability or responsibility to Synagogue or any other person for any act or omission to act unless such action or omission  resulted directly from that Foundation Person's fraud, willful misconduct, gross negligence or, only as to "Administrative Functions" (as defined below), negligence. In any event, no Foundation Person shall be liable to Synagogue for any action or omission made in reliance upon advice of legal counsel (who may be a member of a law firm with which an Investment Committee member or Foundation officer or employee or Trustee is affiliated or associated) employed by or otherwise representing the Foundation or the Investment Committee. For purposes of this Agreement, "Administrative Functions" mean all actions and omissions, of Foundation Persons, directly relating to the

receipt and distribution of moneys pursuant to this Agreement, but in any event excluding (i) all acts and omissions relating to the selection and execution of investments and investment strategies and (ii) the selection, engagement, employment, compensation and supervision of Advisors, officers, employees and agents of the Foundation.

ii. No Foundation Person shall be liable for any failure or delay in performing any of its obligations under this Agreement if such failure or delay is occasioned by compliance with governmental regulations, requests or orders, or by circumstances beyond the Foundation's reasonable control (including, but not limited to, war, insurrection, fire, flood, earthquake, accident, strike or other labor disturbance, disruptions of transportation or electrical power services or electronic communication systems, closure of financial markets, suspension in the trading of one or more securities, or acts of God).

iii. In any event, no Foundation Person shall be liable for any consequential damages, and no Foundation Person shall have any responsibilities with respect to any assets of Synagogue other than the Fund Assets.

9. NOTICES

a. General. All communications relating to this Agreement shall be given in writing and sent (at the sender's pre-paid expense) by certified mail (return receipt requested), by hand delivery or by fax. These communications shall be addressed as specified in this Section 9 (or as the intended recipient has otherwise specified by prior written notice to the sender). If properly addressed, such communications shall be deemed given on the date of hand delivery, on the third business day after deposit with the United States Postal Service (in the case of certified mail), or in the case of facsimile transmission, on the date on which receipt is confirmed.

b. To the Foundation. All communications to the Foundation shall be addressed as follows:

> Jewish Community Foundation
> 6505 Wilshire Blvd.
> Suite 1200
> Los Angeles, CA 90048
> Fax #323-761-8730
> Attention: Simone Savlov, Chief Operating Officer
> Copy to: Fay Althausen

c. To Synagogue. All communications to Synagogue shall be addressed as follows:

> Temple Judea of the West San Fernando Valley
> 5429 Lindley Avenue
> Tarzana, CA 91325
> Fax #818-758-3816
> Attention: Endowment Chair

> with a copy to:
> Amy Segal, Accounting

10. WAIVERS AND AMENDMENTS

a.  This Agreement may be amended, modified, changed or waived (in whole or in part) only by written instrument signed by both parties hereto. Any such instrument signed on behalf of Synagogue shall be signed by Synagogue's President and its Vice President Finance, as authorized by Synagogue's Endowment Committee and Board of Trustees and hereby designated for this purpose by written notice to the Foundation. Any purported amendment, modification, change or waiver of this Agreement by any means other than a written instrument signed as specified in this paragraph shall be deemed void *ab initio*.

b.  Any waiver of a provision of this Agreement on any occasion shall not be deemed to be a continuing waiver of that provision, a waiver of the provision on any other occasion or a waiver of any other provision on any occasion.

11. TERM AND TERMINATION

a.  Scheduled Term. This term of this Agreement (the "Term") shall begin on the Effective Date and shall end at 12:00 PM on the last day of the calendar quarter in which the anniversary of the Effective Date occurs, unless earlier terminated or extended in accordance with this Section 11.

b.  Automatic Extensions. The term shall be extended automatically for an additional year on each anniversary of the Effective Date unless either party gives the other at least one hundred twenty (120) days' prior written notice that the Agreement shall be allowed to expire at the end of the then-effective term.

c.  Early Termination. Either party may terminate this Agreement prior to its schedule expiration date (but in any event as of the end of a calendar quarter) upon at least one hundred twenty (120) days' prior written notice to the other. Either party may terminate this Agreement immediately by written notice to the other if the terminating party ceases to be a Qualified Charitable Organization.

d.  Early Termination by Foundation. If the Foundation determines in good faith that Synagogue is no longer a Qualified Charitable Organization, then the Foundation may terminate this Agreement immediately by written notice to Synagogue.

e.  Surviving Provisions. Upon expiration or termination of this Agreement, the provisions of Sections 7 and 8 shall remain in full force and effect, along with such definitions and provisions regarding construction, amendment, waiver and administration as may be needed to interpret and apply the surviving provisions. In addition, such expiration or termination shall not affect the Foundation's right to collect its fees and its reimbursement of any costs, expenses and taxes incurred in respect of the Fund Assets under this Agreement.

f.  Final Distribution of Fund Assets. Upon termination or expiration of this Agreement, the Foundation shall distribute the Fund Assets to Synagogue in the manner prescribed in Schedule III as if Synagogue had submitted a Distribution Request for one hundred percent (100%) of the Fund Assets.

EXECUTION COPY

## 12. MISCELLANEOUS

a. <u>Counterparts and Facsimile Signatures</u>. This Agreement may be executed in counterparts, each of which shall be an original and all of which, together, shall constitute one and the same instrument. Signatures of this Agreement may be delivered by fax, and such faxed signatures shall be deemed a valid and binding form of execution.

b. <u>No Agency or Partnership</u>. Neither this Agreement nor the dealings between the parties hereunder shall be deemed to create an agency or partnership relationship between them. Neither party shall have the power to legally bind the other or to act on the other's behalf, except for those powers expressly granted to the Foundation hereunder.

c. <u>Assignment and Delegation</u>. Except as otherwise specified in this Agreement, neither Synagogue nor the Foundation shall assign its rights or delegate its duties hereunder (by merger, sale or other transfer of assets, operation of law or otherwise) without the express prior written consent of the other. Any purported assignment or delegation without such consent shall be deemed void *ab initio*.

d. <u>Governing Law; Severability</u>. The making, execution, delivery and performance of this Agreement, and all disputes under or in connection with this Agreement, shall be governed by and construed under the internal substantive law of the State of California, as that law applies to contracts entirely made and performed within the State of California by parties which are California citizens, residents and domiciliaries. Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective only in that jurisdiction and only to the extent of such invalidity or unenforceability, without rendering the remaining terms and provisions hereof invalid or unenforceable and without affecting the validity of any provision of this Agreement in any other jurisdiction.

e. <u>Binding Effect; Entire Agreement</u>. This Agreement (including, without limitation, the attached Exhibits and Schedules, which are hereby incorporated as parts of this Agreement by reference) shall be binding on each of the parties, their successors and permitted assigns. This Agreement constitutes the entire agreement between the Foundation and Synagogue as to the subject matter hereof, and supercedes all prior agreements (whether oral or written) as to such subject matter.

f. <u>Further Assurances</u>. Synagogue shall execute, deliver and certify such documents and instruments, and take such other actions, as the Foundation reasonably may request in order to give full effect to the terms and conditions of the Agreement.

g. <u>Confidentiality</u>. Synagogue shall not disclose the terms of this Agreement to any other person or entity, except for disclosures to its Board of Trustees, its shareholders (if any) and its "Confidential Advisors" or as otherwise required by law. The Foundation may, at its discretion, disclose the existence and terms of this Agreement. For purposes of this Agreement, "Confidential Advisors" means those attorneys, accountants and consultants who have been engaged in connection with the negotiation and administration of this Agreement and who have agreed in writing to maintain the confidentiality of this Agreement.

h. <u>Headings</u>. The section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation hereof.

EXECUTION COPY

IN WITNESS WHEREOF, Synagogue and the Foundation have duly executed this Agreement as of the Effective Date.

JEWISH COMMUNITY FOUNDATION
OF THE JEWISH FEDERATION -
COUNCIL OF GREATER LOS ANGELES

By: _____
    Name: Simone Savlov
    Title: Chief Operating Officer

TEMPLE JUDEA OF THE WEST
SAN FERNANDO VALLEY
(Tax I.D. #95-6052095)

By: _____
    Name: Bruce Vann
    Title: President



EXECUTION COPY

SCHEDULE I
INITIAL ASSETS

Cash, in the form of a check or checks in the aggregate the amount of $292,437.50 sent to the Foundation in accordance with the notice provisions of Section 9, or in the form of one or more wire transfers sent to the Foundation in accordance with the following wire instructions:

CITY NATIONAL BANK
400 N. ROXBURY DRIVE
BEVERLY HILLS, CA 90210
(213) 427-5050
JEWISH COMMUNITY FOUNDATION
ABA #122016066
A/C #001-316-326

EXECUTION COPY

## SCHEDULE II
## FEE CALCULATION

| Per Annum Fee (%) | Charged On |
| --- | --- |
| 0.5% | Base Fund Assets |

For purposes of calculating the Foundation's fee in respect of a particular calendar quarter, "Base Fund Assets" means the end-of-quarter market value of total Fund Assets.



EXECUTION COPY

SCHEDULE III
DISTRIBUTION PROCEDURES

1. All Distribution Requests given during a calendar quarter shall be given before the last calendar month of that quarter.

2. The first one million dollars ($1,000,000) of Distribution Requests given during a calendar quarter shall be honored by the last day of the first calendar month of the next quarter.

3. All further Distribution Requests given during a calendar quarter (that is, for amounts in addition to the $1,000,000 in aggregate distributions contemplated by item (2) above) shall be honored not later than the last day of the first month of the second calendar quarter after such Distribution Request is given. (For example, if Synagogue requests $1,000,000 during the calendar quarter ending December 31, then any requests for additional distributions must be given not later than November 30, and timely Distribution Requests for those excess amounts will be honored not later than April 30.)

4. Any Distribution Request given after the applicable deadline for a particular quarter will be deemed given on the first business day of the following quarter.

5. All Fund Assets distributed hereunder shall be distributed in cash or by wire transfer (in accordance with wire transfer instructions provided by Synagogue in writing for that purpose).

6. Notwithstanding anything in this Schedule III or elsewhere in this Agreement to the contrary, the Foundation shall not distribute to Synagogue any amount greater than the value of the Fund Assets as of the quarter end immediately preceding the date of payment. The value of the Fund Assets available for distribution shall be determined by the Foundation in accordance with its customary business practices, after giving effect to any liquidation of investments that the Foundation deems necessary or appropriate to make the requested amount available and after giving effect to any extraordinary expenses or penalties for early withdrawal that the Foundation may incur in connection with such liquidation. Synagogue shall bear the risk of any decrease in the value of the Fund Assets during any period prior to their liquidation for distribution, including any such decrease between the giving of a Distribution Request and the distribution pursuant to that request.



EXHIBIT A
FORM OF ADDITIONAL ASSETS NOTICE

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Additional Assets Notice

Dear Ms. Savlov:

This is an Additional Assets Notice, being given as required under Section 1(b) of the Synagogue Fund Agreement, dated as of December 10, 2003, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation", "Synagogue", "Fund", "Additional Assets" and  "Fund Assets" are used in this notice as defined in the Agreement.

Synagogue hereby transfers to the Foundation Additional Assets in the amount of $_____, to be added to the Fund Assets.  Synagogue has elected to effect this asset transfer as follows (select one):

_____    Synagogue has signed a check in the amount of the Additional Assets being transferred, made out to "Jewish Community Foundation", and sent the check and this signed Additional Asset Notice to the Foundation by hand delivery or  certified mail, return receipt requested; or

_____    Synagogue has wired the Additional Assets to the Foundation in accordance with the Foundation's written wire transfer instructions, and has sent this signed Additional Asset Notice to the Foundation by hand delivery or certified mail, return receipt requested.

Upon the Foundation's receipt of these Additional Assets, they shall be  Fund Assets in accordance with the terms of the Agreement.  Synagogue acknowledges that its cancelled check, duly and properly endorsed for deposit by the Foundation, or its wire transfer confirmation number, shall constitute its receipt for the Additional Assets being transferred hereby.

Very truly yours,

TEMPLE JUDEA OF THE WEST SAN FERNANDO VALLEY

By: _____          By: _____
   Name:                              Name:
   Title: President                   Title Vice President Finance

EXHIBIT B

INVESTMENT GUIDELINES

SEE ATTACHED GUIDELINES

# Jewish Community Foundation
# Statement of Investment Policies and Guidelines

## INTRODUCTION AND PURPOSE

This Statement of Investment Policy is set forth in order that:

1. There is a clear understanding on the part of Board of Trustees ("Board") of the Jewish Community Foundation (" Foundation") as to the investment policies and objectives of the Foundation.

2. The designated Investment Managers are given guidance and limitations, helping them to understand what is expected of them.

3. The Investment Committee ("Committee") of the Board has a basis for evaluation of the investment performance of the investment program.

The intent of this statement is to design an investment environment with specific parameters that reflects the philosophy of the Foundation and which allows the Investment Managers to focus on defined policies and objectives which should enhance the opportunities to obtain desired performance goals. The objectives are intended to be sufficiently flexible to be practicable.

# DELEGATION OF RESPONSIBILITIES

## Board

Responsibilities of the Board of Trustees:

The Board has responsibility to ensure that the assets of the Foundation's various funds are managed in a manner which is consistent with the mission, goals, and objectives of the Foundation. In this regard, the Board also has oversight responsibility for full compliance with all applicable laws.

The Board, has delegated supervisory and operating responsibility to the Committee. All major decisions are reported to the Board or the Executive Committee thereof, and regularly scheduled performance evaluations are presented to the Board on a quarterly basis.

## Investment Committee

The Committee Members are charged with the responsibility of overseeing the management of Foundation assets available for investment. The Committee Members shall discharge their duties solely in the interest of the Foundation and for the exclusive purpose of meeting the financial needs of the Foundation. The Committee Members are authorized and permitted to engage the services of registered investment managers who possess the necessary specialized research facilities and skill to meet the investment objectives and guidelines of the Foundation. Accordingly, the Committee Members require the Investment Managers to adhere to the policies adopted by the Committee.

1. Setting policy guidelines which the Board approves and may modify from time to time.

2. Developing investment objectives and performance guidelines which are consistent with the financial goals of the Foundation.

3. Determining asset allocation strategy and investment managers' structure specifically designed to meet the Foundation's objective.

4. Selecting Investment Managers, Consultants and Custodians.

5. Reviewing and evaluating investment results in the context of predetermined performance standards and implementing corrective action as needed.

## Chief Operating Officer

The Chief Operating Officer ("COO") is charged with the implementation and administration of the policies and procedures adopted and enacted by the Committee. The Chief Operating Officer also serves as the primary conduit for communication with all other parties involved in the investment function of the Foundation.

## Consultants

The Committee Members may recommend the engagement of independent investment consulting firms to report to the Committee on an on-going basis.

In addition to providing performance evaluation results on an absolute and relative basis, the Consultant's report will provide data pertaining to the Foundations' portfolio(s) asset allocation and the risk associated with their asset classes.

The Consultant's responsibilities are:

1. Providing data pertaining to the Portfolio(s) asset allocation structure and its associated risks.

2. Assisting in the development of investment goals and objectives.

3. Reviewing Investment Managers, including search and selection processes.

4. Preparing and presenting performance evaluation reports in accordance with Association of Investment Management and Research promulgated standards.

5. Reviewing contracts and fees for both current and proposed Investment Managers.

6. Reviewing and developing special investment strategies that complement existing asset classes or strategies to be considered by the Committee.

7. Communicating investment policy to the managers and their adherence to such policies.

8. Notifying the Committee of any changes in personnel or ownership of the consulting firm.

9. Advising the Chief Operating Officer of any circumstances for which a special Committee meeting would be advisable.

## Investment Managers

Each Investment Manager is expected to operate within its specific asset allocation constraints.  Subject to individually prepared guidelines, each manager will pursue its own strategy.  Coordination of the guidelines for the individual managers assures the combined efforts of our managers will be consistent with the overall investment objectives of the Foundation and will result in the following benefits:

1.  Through definition of a preferred asset mix, each manager will be able to concentrate efforts in its area(s) of expertise.

2.  Within the constraints of the asset mix, the manager can enhance opportunities to add value by aggressively exploiting his/her strategy.

The Investment Managers' responsibilities are as follows:

1.  Investing assets under their management in accordance with the guidelines and restrictions formulated by the Committee.

2.  Exercising discretionary authority over the assets entrusted to them, subject to these guidelines and restrictions.

3.  Providing written documentation of portfolio activity and valuations, performance data, and other information as requested by the Chief Operating Officer of the Foundation.

4.  Attending meetings with representatives of the Committee as requested.

5.  In the event there is a proxy contest, the manager will notify and consult with the Chief Operating Officer making any decisions regarding the Foundation's portfolios.

6.  Annually providing a copy of the ADV Part II.

7.  Notifying the Chief Operating Officer immediately of any litigation or violation of securities regulations in which the Investment Manager is involved that may adversely affect the Foundation.

8.  Notifying the committee of any changes in personnel or ownership of the investment management firm that may impact the Foundation.

# INVESTMENT GOALS AND OBJECTIVES

## COMMON INVESTMENT POOL

### General Investment Philosophy

- The investment program is designed to provide total real return to meet the Foundation's stated investment goals.

- Preservation of capital is of primary importance while at the same time long-term growth is desirable.

- The investment policies and objectives are designed to support the spending rate policy of the Foundation.

### General Performance Goals

The investment objectives of the Foundation are based upon a long-term investment horizon so that interim fluctuations can be viewed in an appropriate perspective. While there cannot be assurance that the defined objectives will be realized, it is believed that the likelihood of their realization is enhanced by the Investment Policy Statement of the Foundation.

1. Total real return on assets should at least be equal to the spending rate, which is established periodically by the Board of Trustees.

2. The S&P 500 index, or other appropriate indices, will be the standards by which we measure equity performance.

3. The Lehman Brothers Government/Corporate Bond Index, or other appropriate indices will be the standards by which we measure fixed income performance.

# COMMON INVESTMENT POOL
## ASSET ALLOCATION

### Purpose

It is the responsibility of the Investment Committee of the Foundation to determine the asset allocation that offers the highest probability of achieving the investment goals as set by the Board of Trustees from time to time. The Committee will review the asset mix on an ongoing basis and make revisions as necessary.

The target asset allocation of the Portfolio is designed to give balance to the overall structure of the Portfolio's investment program over a long time horizon. The following factors will affect implementation of the asset allocation structure:

1. The Committee's assessment of the intermediate term outlook for different types of securities.

2. Divergence in the performance of various asset classes.

3. Divergence in the performance of the different Investment Managers.

4. Investment Managers' decisions to raise or lower cash positions.

### Non-Permissible Investments

- Non Marketable Securities
- Naked Options
- Uncovered Short Positions

### Procedure for Revising Guidelines

All investment guidelines will be reviewed annually or as deemed necessary by the Committee. Any revisions of the guidelines must be approved by the Board.

### Policies Regarding Non-Endowment Funds

Goals & guidelines for the following will be developed at a future date:

- Portfolio II (currently holds philanthropic and charitable directed fund investments).

- Charitable Remainder Trusts.

## Policies Regarding Other Donated Assets

The following assets will be evaluated on an ad hoc basis:

Closely held securities
Non-marketable securities
Notes receivable (accrued and unaccrued)
State of Israel bonds

## Reporting Requirement and Process of Evaluation

The Consultants will be responsible for the preparation of reports concerning performance evaluation and compliance with investment objectives and spending rate policies. Such reports will be submitted, at least quarterly, to the Investment Committee.

While the assets will be monitored on a continuous basis, the Committee will focus primarily on the achievement of its objectives over a rolling three and five year time horizon. However, if any manager significantly changes management philosophy, personnel or ownership, a review will be conducted to determine if the investment manager remains appropriate for the Portfolio's purpose.

# APPENDIX

## INVESTMENT POLICIES & PERFORMANCE GOALS
## FOR TRADITIONAL INVESTMENT MANAGERS

The following are performance goals and constraint guidelines placed on individual managers within specific asset classes:

### Domestic Equity

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate equity index.

4. The maximum weighting (market value basis) in any one company of the manager's portfolio holding is _7.5%_ and in any one industry (defined as the 99 industry groups specified by the Frank Russell Co.) in the manager's portfolio holdings, the maximum weighting (market value basis) is _15%._ This constraint does not apply to mutual or commingled funds.

5. Investment managers may raise or lower cash positions as deemed appropriate within their strategy.

6. All portfolio securities held by the Investment Managers(s) of the Foundation shall be marketable securities unless there is prior approval by the Investment Committee.

### Domestic Fixed Income

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate index.

4. All fixed income securities should be of investment grade according to Moody's or Standard & Poor's unless a specific strategy utilizing below investment grade securities is approved by the Investment Committee. The portfolio(s) may include up to 10% of fixed income securities of lesser grade.

5. No holdings in any one security of more than <u>10%</u> (at market) in the manager's portfolio. This does not apply to U.S. government and agency issues, including quasi government securities (e.g. FMNA, GNMA).

<u>Global or International Equity and Fixed Income</u>

1. To be in the top half of a universe of managers with a similar style and philosophy over rolling four (4) quarter periods.

2. To be in the top quartile of a universe of managers with a similar style and philosophy over rolling twelve (12) quarter periods.

3. To exceed the return (net of fees) of the appropriate index.

4. The use of currency futures to enhance performance and/or hedge currency exposure by international and/or global managers is at the discretion of the manager, provided this activity is part of the manager's stated strategy. A detailed description of a manager's currency strategy must be submitted to the Investment Committee.

<u>Short Term Investments (Separate Cash Account )</u>

1. To meet or exceed the return of the 90 Day Treasury Bills.

2. To see that all cash, dividends and coupon interest are invested promptly.

EXECUTION COPY

EXHIBIT C
FORM OF DISTRIBUTION REQUEST

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Distribution Request

Dear Ms. Savlov:

This is a Distribution Request, being given as required under Section 3(a) of the Synagogue Fund Agreement, dated as of December 10, 2003, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation", "Synagogue", "Fund" and "Fund Assets" are used in this notice as defined in the Agreement.

Synagogue hereby requests that the Foundation transfer to Synagogue, from Fund Assets, cash in the amount of $_____. Payment of this amount is requested in the following form (select one):

_____ a check in the amount of the requested disbursement, made out to Synagogue and sent by hand delivery or certified mail, return receipt requested; or

_____ a wire transfer to Synagogue in accordance with written wire instructions previously provided by Synagogue in writing for this purpose.

Synagogue shall confirm its receipt of the requested distribution in writing within three (3) business days after such receipt.

Very truly yours,

TEMPLE JUDEA OF THE WEST SAN FERNANDO VALLEY

By: _____          By: _____
    Name:                            Name:
    Title:  President                Title: Vice President Finance

EXHIBIT D
SYNAGOGUE INCUMBENCY CERTIFICATE

[ATTACH COMPLETED INCUMBENCY CERTIFICATE HERE]

## CERTIFICATE OF INCUMBENCY
## OF OFFICERS OF TEMPLE JUDEA OF THE WEST SAN FERNANDO VALLEY

The undersigned, ~~Gail Aspinwall~~ *Scott Shapiro*, does hereby certify that she is a duly elected, qualified and acting ~~Recording~~ *FINANCIAL* Secretary of Temple Judea of the West San Fernando Valley ("Temple Judea"), a California nonprofit corporation; that the persons named below are and at all times since at least July 1, 2003 have been duly elected, qualified, and acting officers of Temple Judea, holding the offices set forth opposite their respective names below; and that the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Bruce Vann | President | |
| Bob Morgenstern | Vice President Finance | |
| Arthur Rosenberg | Treasurer | |
| Gary Luboff | Endowment Committee Chair | |

IN WITNESS WHEREOF, I have hereunto set my hand as a duly authorized officer of Temple Judea this *10* day of *December*, 2003.

Name: ~~Gail Aspinwall~~ *Scott Shapiro*
Title: ~~Recording~~ *FINANCIAL* Secretary

The undersigned, Bruce Vann, does hereby certify that he is a duly elected, qualified and acting President of Temple Judea of the West San Fernando Valley; that Gail Aspinwall is and at all times since at least July 1, 2003 has been a duly elected, qualified and acting Recording Secretary of Temple Judea of the West San Fernando Valley; and that the foregoing signature of Gail Aspinwall is genuine.

Date: December *10*, 2003

Name: Bruce Vann
President

Date: *March 29, 2004*

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Amendment No. 1 to Federation Fund Agreement

Dear Ms. Savlov:

Reference is made to the Federation Fund Agreement, dated as of December 17, 2003, by and between The Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation" and "SBJF" are used herein as defined in the Agreement.

This is to inform you that, effective [insert date], and pursuant to certification by the State of California (a copy of which is attached hereto) SBJF has legally changed its name from "The Santa Barbara Jewish Federation" (the "Old Name") to "The Jewish Federation of Greater Santa Barbara" (the "New Name"). In accordance with Section 9(a) of the Agreement, please address all future correspondence to SBJF to it under the New Name. Please reflect our name change in your books and records.

By signing and returning the enclosed duplicate original of this notice, please confirm the Foundation's agreement (as of the date first written above) to amend the Agreement solely to replace the Old Name wherever it appears in the Agreement with the New Name, and to replace "SBJF" wherever it appears in the Agreement with "JFGSB".

This letter, when signed and returned by The Foundation, shall constitute Amendment No. 1 to the Agreement, and shall be deemed a part of the Agreement for all intents and purposes as of the effective date hereof. Except as expressly amended hereby to reflect SBJF's name change, the Agreement and SBJF's obligations thereunder remain in full force and effect in accordance with the original terms thereof.

Very truly yours,

THE SANTA BARBARA JEWISH FEDERATION

By: _____          By: _____
Name: Mike Nissenson                      Name: Lou Weider
Title: President                                  Title: Secretary

ACKNOWLEDGED AND AGREED BY THE FOUNDATION
AS OF THE DATE FIRST WRITTEN ABOVE

By: _____
Simone Savlov
Chief Operating Officer

 

EXECUTION COPY

# FEDERATION FUND AGREEMENT

This Federation Fund Agreement (this "Agreement") is made as of December 17, 2003 (the "Effective Date") by and between the Jewish Community Foundation of the Jewish Federation - Council of Greater Los Angeles, a California corporation (the "Foundation"), and The Santa Barbara Jewish Federation, a California corporation ("SBJF").

### BACKGROUND

The Foundation is a California non-profit public benefit corporation organized for public purposes including, among others, the receipt, acquisition, holding, administration and expenditure of property for charitable institutions, associations and undertakings. Pursuant to this purpose, the Foundation operates development and planned giving programs including the pooled investment and administration of designated endowment funds, donor advised funds, support foundations and its own unrestricted endowment funds for the benefit of the Jewish community. The size of the Foundation's endowment and planned giving program gives the Foundation access to certain investment advisers, money managers, custodians and other investment service providers generally unavailable to smaller investors and creates certain economies of scale in connection with the administration of investment activities.

SBJF is a California non-profit corporation operating within the Jewish community and has developed a general endowment and encouraged donor support for its programs, projects and long-range growth.    SBJF seeks to continue these activities in part by utilizing the Foundation's investment management and administration infrastructure and the Foundation's access to various investment industry professionals, and the Foundation seeks to aid SBJF's pursuit of its goals by these means, in each case, on the terms and in accordance with the conditions set forth in this Agreement.

In light of the foregoing background information, in consideration of the mutual promises set forth in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which the parties hereby acknowledge, the Foundation and SBJF agree as follows:

1. ESTABLISHMENT OF FUND
   a. <u>Fund Account</u>. The Foundation shall establish on its books of account a fund called the The Santa Barbara Jewish Federation Fund (the "Fund"). The assets of this Fund (the "Fund Assets") shall consist of all the cash assets transferred to the Foundation for investment, administration and management under this Agreement, adjusted to reflect net income, appreciation (if any) and disbursements.
   b. <u>Transfer of Assets</u>. SBJF hereby transfers to the Foundation, for investment, administration and management purposes only, the "Initial Assets" listed on the attached Schedule I. SBJF may transfer additional assets to the Foundation from time to time under this Agreement ("Additional Assets") by completing the "Additional Asset Notice" attached as Exhibit A (executed by any two of its President, Treasurer, and Secretary) and complying with the asset transfer procedures described in that notice.



c.      <u>Standard of Care</u>.  In performing its obligations under this Agreement, the Foundation shall exercise any discretion afforded to it hereunder with the same care as it exercises in the investment and management of its own permanent endowment assets.

2.  <u>MANAGEMENT AND INVESTMENT OF FUND ASSETS</u>

a.      <u>Common Investment Pool</u>.  The Foundation shall pool the Fund Assets with the other assets in its "Common Investment Pool" for purposes of investment, management and administration.  The "Common Investment Pool" (or "Pool") is the collective investment fund maintained by the Foundation exclusively for the collective investment and reinvestment of its general endowment fund assets and the general endowment fund assets of other charitable organizations.  Fund Assets transferred and delivered to the Foundation during a calendar quarter shall be invested in the Pool on the last business day of that calendar quarter, and until then shall be invested in the Foundation's "Donor Funds Portfolio" (a portfolio of laddered United States Treasury securities, agency securities and money market instruments all of which will mature in fewer than five years) or a similar successor portfolio.

b.      [Intentionally Left Blank]

c.      <u>Foundation's Authority</u>.  The Foundation shall hold the Fund Assets in its own name or in the name(s) of its custodian(s), designee(s) or nominee(s).  The Foundation shall have the sole right and power to  invest and manage the Fund Assets as part of the Pool and to take such other actions (including, for example, choosing and engaging "Advisors" (as defined below), delegating and assigning authority and responsibility to those Advisors,  incurring expenses and making payments in respect of those expenses) as the Foundation deems appropriate.   SBJF expressly acknowledges that the brokers, banks, trust companies, custodians, investment advisors, attorneys and other service providers that the Foundation engages or consults in the exercise of its authority under this Agreement (collectively, the "Advisors") may include some with which the Foundation's trustees or officers may be affiliated.

d.      <u>Pro Rata Investment and Allocation</u>.  The Foundation shall invest the Fund Assets in the Pool in the same manner and in the same proportions as the other assets in the Pool. The Fund Assets in the Pool shall share <i>pro rata</i> in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code, as defined herein) incurred in connection with the investment and administration of the Pool. The Fund Assets in the Donor Funds Portfolio shall share <i>pro rata</i> in the appreciation and depreciation of the combined investments and in the costs, expenses, fees and taxes (including, without limitation, taxes on unrelated business income as defined in §512 of the Code) incurred in connection with the investment and administration of the Donor Funds Portfolio.  For purposes of this Agreement, the "Code" means the United States Internal Revenue Code of 1986, as the same may be amended from time to time, and references to any particular provision of the Code mean that provision and the corresponding provision of any future United States Internal Revenue Code.



EXECUTION COPY

e.    <u>Guidelines for Common Investment Pool Operations</u>.  The Foundation shall manage, administer and invest the Fund Assets in accordance with the investment guidelines adopted by the Investment Committee of the Foundation's Board of Trustees (the "Guidelines"). The Guidelines in effect on the date of this Agreement are attached as Exhibit B. The Foundation shall notify SBJF of any changes to the Guidelines within  thirty (30) days after their adoption.

f.    <u>Valuation of Fund Assets</u>.  The value of the Fund Assets and the Fund's allocable share of costs, expenses, taxes and fees (other than the Foundation's fees hereunder) shall be determined by the Foundation using the same procedures as it applies to the Foundation's own assets in the Pool.

g.    <u>*Pro Rata* Allocation of Third Party Payments</u>.  If the Foundation receives any indemnification, reimbursement, insurance proceeds, damages or other payment from any source or person that relates to a loss within or damage to assets in the Pool, the Foundation shall add SBJF's *pro rata* share of this payment to the Fund Assets (or, if the Fund is closed, shall pay that amount to SBJF) unless SBJF has already received its *pro rata* share directly from the source of such payment.

3.    <u>USE AND DISTRIBUTION OF FUND ASSETS</u>

a.    <u>Distributions to SBJF</u>.  SBJF's requests for distributions from Fund Assets shall be made by submitting to the Foundation a "Distribution Request" substantially in the form of the attached Exhibit C. Each Distribution Request shall be signed by any two of SBJF's President, Treasurer or Secretary. The amount of prior notice required for Distribution Requests, the timing of distributions and limits on amounts available for distribution shall be governed by the "Distribution Procedures" set forth in Schedule III

4.    <u>ACCOUNTING AND REPORTING</u>

a.    <u>Quarterly Written Reports</u>.  The Foundation shall provide SBJF with quarterly statements showing contributions, investment results and disbursements from the Fund; provided, however, that SBJF shall be solely responsible for reporting to individual donors and its Board of Trustees on the use of any amounts disbursed.  The Foundation shall also notify SBJF in the quarterly report if the size or composition of the Investment Committee of the Foundation's Board of Trustees (the "Investment Committee") changes by more than fifty percent (50%) during a calendar quarter, and shall notify SBJF within thirty (30) days after any chairman or co-chairman of the Investment Committee leaves that office for any reason other than the expiration of his term.

b.    <u>Consultation with Investment Committee Representative</u>.  A member of the Foundation's Investment Committee shall be available to meet at least once during each calendar year with SBJF's Board of Trustees or that committee of its Board of Trustees that is responsible for overseeing the investment of SBJF's endowment assets.   This meeting shall occur at a mutually convenient time and location, to be agreed upon in good faith.

5.    <u>COSTS, TAXES AND FEES</u>

a.    <u>Allocation of Costs, Taxes and Fees</u>.  As part of the Pool, the Fund Assets shall bear (and be reduced by) their *pro rata* share of the costs and fees

  EXECUTION COPY

incurred in connection with the management and investment of the Pool (including, without limitation, any taxes on unrelated business income as defined in §512 of the Code).

b.  Foundation Fee.  In consideration of the administrative services provided by the Foundation hereunder, the Foundation shall charge against the Fund Assets a quarterly fee calculated in accordance with Schedule II.  This quarterly fee shall be charged  and paid from Fund Assets as of the last  day of the calendar quarter to which the fee relates, and  shall be reflected in the quarterly valuations of the Fund Assets reported to SBJF.

6.  REPRESENTATIONS AND WARRANTIES OF THE FOUNDATION
    The Foundation hereby represents and warrants as follows:

a.  Organization, Existence and Charitable Status.  The Foundation is a duly organized and validly existing California non-profit, public benefit corporation, and is a "Qualified Charitable Organization" (that is, an organization described in §501(c)(3) of the Code which is not a private foundation under §509(a) of the Code).

b.  Authorization, Legality and Enforceability.  The Foundation's execution, delivery and performance of this Agreement have been duly authorized in accordance with the Foundation's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c.  Not Registered.  The Foundation is not registered as a broker-dealer, the Pool,  the Fund and the Donor Funds Portfolio are not registered as investment companies and none of SBJF's interests hereunder are registered securities, in each case, under any federal or state securities laws or under the rules and regulations promulgated under those laws.  The Foundation does not intend to effect any such registrations and shall have no obligation to do so.

7.  REPRESENTATIONS AND WARRANTIES OF SBJF
    SBJF hereby represents and warrants as follows:

a.  Organization, Existence and Charitable Status.  SBJF is a  duly organized and validly existing California non-profit corporation, and a Qualified Charitable Organization.   SBJF shall remain a Qualified Charitable Organization during the term of this Agreement.  If SBJF ceases to be a Qualified Charitable Organization, then it shall give the Foundation prompt notice of that fact.

b.  Authorization, Legality and Enforceability.  SBJF's execution, delivery and performance of this Agreement have been duly authorized in accordance with SBJF's governing instruments and applicable law, and do not violate any applicable law, regulation, agreement, order or decree.

c.  No Encumbrances.  SBJF has unencumbered title to the Initial Assets, and warrants that it shall have unencumbered title to all Additional Assets and shall not grant any interest in any Fund Assets to any third party.

d.  Review of Guidelines and Investment Procedures.  SBJF has received and read the copy of the Guidelines attached as Exhibit B; has conferred with one or more representatives of the Foundation regarding these Guidelines, has reviewed them with SBJF's legal and financial advisors, its Board of Trustees and any committees of that board responsible for overseeing SBJF's investment and asset management, and has concluded (by majority vote of

4

        EXECUTION COPY

its Board of Trustees and any constituent committees thereof required under SBJF's governing instruments) that these Guidelines accurately reflect SBJF's own investment and asset management principles.

e.  <u>Source of Funds</u>.  The Initial Assets consist, and SBJF hereby covenants that any Additional Assets will consist, of one or more of the categories of assets described in Section 3(c)(10)(B)(i) through (vi) of the Investment Company Act of 1940.  For purposes of determining whether the limitation on compensation of Section 3(e)(2) of the Securities Exchange Act of 1934 has been met, no commission or other special compensation based on the number or value of donations collected by or on behalf of SBJF has been paid with respect to the Initial Assets and none will be paid with respect to any Additional Assets.

f.  <u>No Guarantees</u>.  SBJF hereby acknowledges and agrees that the Foundation has not guaranteed or represented any specific investment results or returns. SBJF understands that investing is inherently risky and that investments may be volatile and subject to various risks over which the Foundation will have little or no control.

g.  <u>Incumbency</u>.  The currently serving, duly elected officers of SBJF are the persons so identified on the "Incumbency Certificate" attached as Exhibit D. SBJF shall provide the Foundation with an updated Incumbency Certificate promptly upon the occurrence of any change to the information set forth therein.

8.  <u>LIMITATION OF LIABILITY</u>

a.  <u>Indemnification of Foundation Persons</u>.  The term "Foundation Person" means the Foundation, each member of the Investment Committee, each officer, employee, agent and Advisor of the Foundation and each member of the Foundation's Board of Trustees.  SBJF shall indemnify, defend (at its expense) and hold harmless each "Foundation Person" from and against any claims or losses, together with all reasonable costs and expenses related thereto (including, for example, reasonable legal fees and expenses), which arise out of or in connection with the making, construction or performance of this Agreement or the investment or distribution of the Fund Assets (each, a "Claim" and together, "Claims").

b.  <u>Liability of Foundation and Foundation Persons</u>.

i.  No Foundation Person shall have any liability or responsibility to SBJF or any other person for any act or omission to act unless such action or omission resulted directly from that Foundation Person's fraud, willful misconduct, gross negligence or, only as to "Administrative Functions" (as defined below), negligence.  In any event, no Foundation Person shall be liable to SBJF for any action or omission made in reliance upon advice of legal counsel (who may be a member of a law firm with which an Investment Committee member or Foundation officer or employee or Trustee is affiliated or associated) employed by or otherwise representing the Foundation or the Investment Committee.  For purposes of this Agreement, "Administrative Functions" mean all actions and omissions, of Foundation Persons, directly relating to the receipt and distribution of moneys pursuant to this Agreement, but in any event excluding (i) all acts and omissions relating to the selection and execution of investments and investment strategies and (ii) the

 EXECUTION COPY

selection, engagement, employment, compensation and supervision of Advisors, officers, employees and agents of the Foundation.

ii.   No Foundation Person shall be liable for any failure or delay in performing any of its obligations under this Agreement if such failure or delay is occasioned by compliance with governmental regulations, requests or orders, or by circumstances beyond the Foundation's reasonable control (including, but not limited to, war, insurrection, fire, flood, earthquake, accident, strike or other labor disturbance, disruptions of transportation or electrical power services or electronic communication systems, closure of financial markets, suspension in the trading of one or more securities, or acts of God).

iii.   In any event, no Foundation Person shall be liable for any consequential damages, and no Foundation Person shall have any responsibilities with respect to any assets of SBJF other than the Fund Assets.

9.   <u>NOTICES</u>

a.   <u>General</u>.   All communications relating to this Agreement shall be given in writing and sent (at the sender's pre-paid expense) by certified mail (return receipt requested), by hand delivery or by fax.   These communications shall be addressed as specified in this Section 9 (or as the intended recipient has otherwise specified by prior written notice to the sender).   If properly addressed, such communications shall be deemed given on the date of hand delivery, on the third business day after deposit with the United States Postal Service (in the case of certified mail), or in the case of facsimile transmission, on the date on which receipt is confirmed.

b.   <u>To the Foundation</u>.   All communications to the Foundation shall be addressed as follows:

> Jewish Community Foundation
> 6505 Wilshire Blvd.
> Suite 1200
> Los Angeles, CA 90048
> Fax #323-761-8730
> Attention: Simone Savlov, Chief Operating Officer
> Copy to: Fay Althausen

c.   <u>To SBJF</u>.   All communications to SBJF shall be addressed as follows:

> The Santa Barbara Jewish Federation
> 524 Chapala Street
> Santa Barbara, CA 93101
> Fax #805-957-9230_
> Attention: Shelly Katz, Executive Director

> with a copy to:
> Joan Rothenberg
> 735 State Street,  Suite 213
> Santa Barbara, CA 93101
> Fax #805-899-8666

  EXECUTION COPY

## 10. WAIVERS AND AMENDMENTS

a.   This Agreement may be amended, modified, changed or waived (in whole or in part) only by written instrument signed by both parties hereto. Any such instrument signed on behalf of SBJF shall be signed by SBJF's President and its Secretary, as authorized by SBJF's Board of Trustees and hereby designated for this purpose by written notice to the Foundation. Any purported amendment, modification, change or waiver of this Agreement by any means other than a written instrument signed as specified in this paragraph shall be deemed void *ab initio*.

b.   Any waiver of a provision of this Agreement on any occasion shall not be deemed to be a continuing waiver of that provision, a waiver of the provision on any other occasion or a waiver of any other provision on any occasion.

## 11. TERM AND TERMINATION

a.   <u>Scheduled Term</u>. This term of this Agreement (the "Term") shall begin on the Effective Date and shall end at 12:00 PM on the last day of the calendar quarter in which the anniversary of the Effective Date occurs, unless earlier terminated or extended in accordance with this Section 11.

b.   <u>Automatic Extensions</u>. The term shall be extended automatically for an additional year on each anniversary of the Effective Date unless either party gives the other at least one hundred twenty (120) days' prior written notice that the Agreement shall be allowed to expire at the end of the then-effective term.

c.   <u>Early Termination</u>. Either party may terminate this Agreement prior to its schedule expiration date (but in any event as of the end of a calendar quarter) upon at least one hundred twenty (120) days' prior written notice to the other. Either party may terminate this Agreement immediately by written notice to the other if the terminating party ceases to be a Qualified Charitable Organization.

d.   <u>Early Termination by Foundation</u>. If the Foundation determines in good faith that SBJF is no longer a Qualified Charitable Organization, then the Foundation may terminate this Agreement immediately by written notice to SBJF.

e.   <u>Surviving Provisions</u>. Upon expiration or termination of this Agreement, the provisions of Sections 7 and 8 shall remain in full force and effect, along with such definitions and provisions regarding construction, amendment, waiver and administration as may be needed to interpret and apply the surviving provisions. In addition, such expiration or termination shall not affect the Foundation's right to collect its fees and its reimbursement of any costs, expenses and taxes incurred in respect of the Fund Assets under this Agreement.

f.   <u>Final Distribution of Fund Assets</u>. Upon termination or expiration of this Agreement, the Foundation shall distribute the Fund Assets to SBJF in the manner prescribed in Schedule III as if SBJF had submitted a Distribution Request for one hundred percent (100%) of the Fund Assets.

  EXECUTION COPY

12. <u>MISCELLANEOUS</u>

a. <u>Counterparts and Facsimile Signatures</u>. This Agreement may be executed in counterparts, each of which shall be an original and all of which, together, shall constitute one and the same instrument. Signatures of this Agreement may be delivered by fax, and such faxed signatures shall be deemed a valid and binding form of execution.

b. <u>No Agency or Partnership</u>. Neither this Agreement nor the dealings between the parties hereunder shall be deemed to create an agency or partnership relationship between them. Neither party shall have the power to legally bind the other or to act on the other's behalf, except for those powers expressly granted to the Foundation hereunder.

c. <u>Assignment and Delegation</u>. Except as otherwise specified in this Agreement, neither SBJF nor the Foundation shall assign its rights or delegate its duties hereunder (by merger, sale or other transfer of assets, operation of law or otherwise) without the express prior written consent of the other. Any purported assignment or delegation without such consent shall be deemed void *ab initio*.

d. <u>Governing Law; Severability</u>. The making, execution, delivery and performance of this Agreement, and all disputes under or in connection with this Agreement, shall be governed by and construed under the internal substantive law of the State of California, as that law applies to contracts entirely made and performed within the State of California by parties which are California citizens, residents and domiciliaries. Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective only in that jurisdiction and only to the extent of such invalidity or unenforceability, without rendering the remaining terms and provisions hereof invalid or unenforceable and without affecting the validity of any provision of this Agreement in any other jurisdiction.

e. <u>Binding Effect; Entire Agreement</u>. This Agreement (including, without limitation, the attached Exhibits and Schedules, which are hereby incorporated as parts of this Agreement by reference) shall be binding on each of the parties, their successors and permitted assigns. This Agreement constitutes the entire agreement between the Foundation and SBJF as to the subject matter hereof, and supercedes all prior agreements (whether oral or written) as to such subject matter.

f. <u>Further Assurances</u>. SBJF shall execute, deliver and certify such documents and instruments, and take such other actions, as the Foundation reasonably may request in order to give full effect to the terms and conditions of the Agreement.

g. <u>Confidentiality</u>. SBJF shall not disclose the terms of this Agreement to any other person or entity, except for disclosures to its Board of Trustees, its shareholders (if any) and its "Confidential Advisors" or as otherwise required by law. The Foundation may, at its discretion, disclose the existence and terms of this Agreement. For purposes of this Agreement, "Confidential Advisors" means those attorneys, accountants and consultants who have been engaged in connection with the negotiation and administration of this Agreement and who have agreed in writing to maintain the confidentiality of this Agreement.

h.    <u>Headings</u>.    The section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation hereof.

IN WITNESS WHEREOF, SBJF and the Foundation have duly executed this Agreement as of the Effective Date.

JEWISH COMMUNITY FOUNDATION
OF THE JEWISH FEDERATION -
COUNCIL OF GREATER LOS ANGELES

By: _____
Name: Simone Savlov
Title: Chief Operating Officer

THE SANTA BARBARA
JEWISH FEDERATION
(Tax I.D. #23-7354759)

By: _____
Name: Ron Fox
Title: President

By: _____
Name: Mike Nissenson
Title: Vice President

9

  EXECUTION COPY

SCHEDULE I
INITIAL ASSETS

Cash, in the form of a check or checks in the aggregate the amount of $1,257,000 sent to the Foundation in accordance with the notice provisions of Section 9, or in the form of one or more wire transfers sent to the Foundation in accordance with the following wire instructions:

CITY NATIONAL BANK
400 N. ROXBURY DRIVE
BEVERLY HILLS, CA 90210
(213) 427-5050
JEWISH COMMUNITY FOUNDATION
ABA #122016066
A/C #001-316-326

 

EXECUTION COPY

## SCHEDULE II
## FEE CALCULATION

Per Annum Fee (%)                    Charged On

0.5%                                 Base Fund Assets

For purposes of calculating the Foundation's fee in respect of a particular calendar quarter, "Base Fund Assets" means the end-of-quarter market value of total Fund Assets.

  EXECUTION COPY

## SCHEDULE III
## DISTRIBUTION PROCEDURES

1. All Distribution Requests given during a calendar quarter shall be given before the last calendar month of that quarter.

2. The first one million dollars ($1,000,000) of Distribution Requests given during a calendar quarter shall be honored by the last day of the first calendar month of the next quarter.

3. All further Distribution Requests given during a calendar quarter (that is, for amounts in addition to the $1,000,000 in aggregate distributions contemplated by item (2) above) shall be honored not later than the last day of the first month of the second calendar quarter after such Distribution Request is given. (For example, if SBJF requests $1,000,000 during the calendar quarter ending December 31, then any requests for additional distributions must be given not later than November 30, and timely Distribution Requests for those excess amounts will be honored not later than April 30.)

4. Any Distribution Request given after the applicable deadline for a particular quarter will be deemed given on the first business day of the following quarter.

5. All Fund Assets distributed hereunder shall be distributed in cash or by wire transfer (in accordance with wire transfer instructions provided by SBJF in writing for that purpose).

6. Notwithstanding anything in this Schedule III or elsewhere in this Agreement to the contrary, the Foundation shall not distribute to SBJF any amount greater than the value of the Fund Assets as of the quarter end immediately preceding the date of payment. The value of the Fund Assets available for distribution shall be determined by the Foundation in accordance with its customary business practices, after giving effect to any liquidation of investments that the Foundation deems necessary or appropriate to make the requested amount available and after giving effect to any extraordinary expenses or penalties for early withdrawal that the Foundation may incur in connection with such liquidation. SBJF shall bear the risk of any decrease in the value of the Fund Assets during any period prior to their liquidation for distribution, including any such decrease between the giving of a Distribution Request and the distribution pursuant to that request.

     EXECUTION COPY

## EXHIBIT A
## FORM OF ADDITIONAL ASSETS NOTICE

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Additional Assets Notice

Dear Ms. Savlov:

This is an Additional Assets Notice, being given as required under Section 1(b) of the Federation Fund Agreement, dated as of December 17, 2003, by and between the Jewish Community Foundation of the Jewish Federation -- Council of Greater Los Angeles and the undersigned (the "Agreement").   The terms "Foundation", "SBJF", "Fund", "Additional Assets" and  "Fund Assets" are used in this notice as defined in the Agreement.

SBJF hereby transfers to the Foundation Additional Assets in the amount of $_____, to be added to the Fund Assets.  SBJF has elected to effect this asset transfer as follows (select one):

_____    SBJF has signed a check in the amount of the Additional Assets being transferred, made out to "Jewish Community Foundation", and sent the check and this signed Additional Asset Notice to the Foundation by hand delivery or  certified mail, return receipt requested; or

_____    SBJF has wired the Additional Assets to the Foundation in accordance with the Foundation's written wire transfer instructions, and has sent this signed Additional Asset Notice to the Foundation by hand delivery or certified mail, return receipt requested.

Upon the Foundation's receipt of these Additional Assets, they shall be  Fund Assets in accordance with the terms of the Agreement.  SBJF acknowledges that its cancelled check, duly and properly endorsed for deposit by the Foundation, or its wire transfer confirmation number, shall constitute its receipt for the Additional Assets being transferred hereby.

Very truly yours,

THE SANTA BARBARA JEWISH FEDERATION

By: _____          By: _____
    Name:                              Name:
    Title:                             Title:

EXECUTION COPY

EXHIBIT B

INVESTMENT GUIDELINES

SEE ATTACHED GUIDELINES

# Jewish Community Foundation
## Statement of Investment Policies and Guidelines

### INTRODUCTION AND PURPOSE

This Statement of Investment Policy is set forth in order that:

1. There is a clear understanding on the part of Board of Trustees ("Board") of the Jewish Community Foundation (" Foundation") as to the investment policies and objectives of the Foundation.

2. The designated Investment Managers are given guidance and limitations, helping them to understand what is expected of them.

3. The Investment Committee ("Committee") of the Board has a basis for evaluation of the investment performance of the investment program.

The intent of this statement is to design an investment environment with specific parameters that reflects the philosophy of the Foundation and which allows the Investment Managers to focus on defined policies and objectives which should enhance the opportunities to obtain desired performance goals. The objectives are intended to be sufficiently flexible to be practicable.

 

## DELEGATION OF RESPONSIBILITIES

### Board

Responsibilities of the Board of Trustees:

The Board has responsibility to ensure that the assets of the Foundation's various funds are managed in a manner which is consistent with the mission, goals, and objectives of the Foundation. In this regard, the Board also has oversight responsibility for full compliance with all applicable laws.

The Board, has delegated supervisory and operating responsibility to the Committee. All major decisions are reported to the Board or the Executive Committee thereof, and regularly scheduled performance evaluations are presented to the Board on a quarterly basis.

### Investment Committee

The Committee Members are charged with the responsibility of overseeing the management of Foundation assets available for investment. The Committee Members shall discharge their duties solely in the interest of the Foundation and for the exclusive purpose of meeting the financial needs of the Foundation. The Committee Members are authorized and permitted to engage the services of registered investment managers who possess the necessary specialized research facilities and skill to meet the investment objectives and guidelines of the Foundation. Accordingly, the Committee Members require the Investment Managers to adhere to the policies adopted by the Committee.

1. Setting policy guidelines which the Board approves and may modify from time to time.

2. Developing investment objectives and performance guidelines which are consistent with the financial goals of the Foundation.

3. Determining asset allocation strategy and investment managers' structure specifically designed to meet the Foundation's objective.

4. Selecting Investment Managers, Consultants and Custodians.

5. Reviewing and evaluating investment results in the context of predetermined performance standards and implementing corrective action as needed.

 

## Chief Operating Officer

The Chief Operating Officer ("COO") is charged with the implementation and administration of the policies and procedures adopted and enacted by the Committee. The Chief Operating Officer also serves as the primary conduit for communication with all other parties involved in the investment function of the Foundation.

## Consultants

The Committee Members may recommend the engagement of independent investment consulting firms to report to the Committee on an on-going basis.

In addition to providing performance evaluation results on an absolute and relative basis, the Consultant's report will provide data pertaining to the Foundations' portfolio(s) asset allocation and the risk associated with their asset classes.

The Consultant's responsibilities are:

1. Providing data pertaining to the Portfolio(s) asset allocation structure and its associated risks.

2. Assisting in the development of investment goals and objectives.

3. Reviewing Investment Managers, including search and selection processes.

4. Preparing and presenting performance evaluation reports in accordance with Association of Investment Management and Research promulgated standards.

5. Reviewing contracts and fees for both current and proposed Investment Managers.

6. Reviewing and developing special investment strategies that complement existing asset classes or strategies to be considered by the Committee.

7. Communicating investment policy to the managers and their adherence to such policies.

8. Notifying the Committee of any changes in personnel or ownership of the consulting firm.

9. Advising the Chief Operating Officer of any circumstances for which a special Committee meeting would be advisable.

## Investment Managers

Each Investment Manager is expected to operate within its specific asset allocation constraints. Subject to individually prepared guidelines, each manager will pursue its own strategy. Coordination of the guidelines for the individual managers assures the combined efforts of our managers will be consistent with the overall investment objectives of the Foundation and will result in the following benefits:

1. Through definition of a preferred asset mix, each manager will be able to concentrate efforts in its area(s) of expertise.

2. Within the constraints of the asset mix, the manager can enhance opportunities to add value by aggressively exploiting his/her strategy.

The Investment Managers' responsibilities are as follows:

1. Investing assets under their management in accordance with the guidelines and restrictions formulated by the Committee.

2. Exercising discretionary authority over the assets entrusted to them, subject to these guidelines and restrictions.

3. Providing written documentation of portfolio activity and valuations, performance data, and other information as requested by the Chief Operating Officer of the Foundation.

4. Attending meetings with representatives of the Committee as requested.

5. In the event there is a proxy contest, the manager will notify and consult with the Chief Operating Officer making any decisions regarding the Foundation's portfolios.

6. Annually providing a copy of the ADV Part II.

7. Notifying the Chief Operating Officer immediately of any litigation or violation of securities regulations in which the Investment Manager is involved that may adversely affect the Foundation.

8. Notifying the committee of any changes in personnel or ownership of the investment management firm that may impact the Foundation.

 

# INVESTMENT GOALS AND OBJECTIVES

## COMMON INVESTMENT POOL

### General Investment Philosophy

- The investment program is designed to provide total real return to meet the Foundation's stated investment goals.

- Preservation of capital is of primary importance while at the same time long-term growth is desirable.

- The investment policies and objectives are designed to support the spending rate policy of the Foundation.

### General Performance Goals

The investment objectives of the Foundation are based upon a long-term investment horizon so that interim fluctuations can be viewed in an appropriate perspective. While there cannot be assurance that the defined objectives will be realized, it is believed that the likelihood of their realization is enhanced by the Investment Policy Statement of the Foundation.

1. Total real return on assets should at least be equal to the spending rate, which is established periodically by the Board of Trustees.

2. The S&P 500 index, or other appropriate indices, will be the standards by which we measure equity performance.

3. The Lehman Brothers Government/Corporate Bond Index, or other appropriate indices will be the standards by which we measure fixed income performance.

 

## COMMON INVESTMENT POOL
## ASSET ALLOCATION

### Purpose

It is the responsibility of the Investment Committee of the Foundation to determine the asset allocation that offers the highest probability of achieving the investment goals as set by the Board of Trustees from time to time.  The Committee will review the asset mix on an ongoing basis and make revisions as necessary.

The target asset allocation of the Portfolio is designed to give balance to the overall structure of the Portfolio's investment program over a long time horizon.  The following factors will affect implementation of the asset allocation structure:

1.  The Committee's assessment of the intermediate term outlook for different types of securities.

2.  Divergence in the performance of various asset classes.

3.  Divergence in the performance of the different Investment Managers.

4.  Investment Managers' decisions to raise or lower cash positions.

### Non-Permissible Investments

- Non Marketable Securities
- Naked Options
- Uncovered Short Positions

### Procedure for Revising Guidelines

All investment guidelines will be reviewed annually or as deemed necessary by the Committee. Any revisions of the guidelines must be approved by the Board.

### Policies Regarding Non-Endowment Funds

Goals & guidelines for the following will be developed at a future date:

- Portfolio II (currently holds philanthropic and charitable directed fund investments).

- Charitable Remainder Trusts.

\pub_wp1\invpola2.jcf
revised 1-24-02

6

## Policies Regarding Other Donated Assets

The following assets will be evaluated on an ad hoc basis:

Closely held securities
Non-marketable securities
Notes receivable (accrued and unaccrued)
State of Israel bonds

## Reporting Requirement and Process of Evaluation

The Consultants will be responsible for the preparation of reports concerning performance evaluation and compliance with investment objectives and spending rate policies.  Such reports will be submitted, at least quarterly, to the Investment Committee.

While the assets will be monitored on a continuous basis, the Committee will focus primarily on the achievement of its objectives over a rolling three and five year time horizon.  However, if any manager significantly changes management philosophy, personnel or ownership, a review will be conducted to determine if the investment manager remains appropriate for the Portfolio's purpose.

 

EXECUTION COPY

EXHIBIT C
FORM OF DISTRIBUTION REQUEST

Date: _____

Jewish Community Foundation
6505 Wilshire Blvd.
Suite 1200
Los Angeles, CA 90048
Attention: Simone Savlov, Chief Operating Officer

Re:    Distribution Request

Dear Ms. Savlov:

This is a Distribution Request, being given as required under Section 3(a) of the Federation Fund Agreement, dated as of December 17, 2003, by and between the Jewish Community Foundation of the Jewish Federation – Council of Greater Los Angeles and the undersigned (the "Agreement"). The terms "Foundation", "SBJF", "Fund" and "Fund Assets" are used in this notice as defined in the Agreement.

SBJF hereby requests that the Foundation transfer to SBJF, from Fund Assets, cash in the amount of $_____. Payment of this amount is requested in the following form (select one):

_____ a check in the amount of the requested disbursement, made out to SBJF and sent by hand delivery or certified mail, return receipt requested; or

_____ a wire transfer to SBJF in accordance with written wire instructions previously provided by SBJF in writing for this purpose.

SBJF shall confirm its receipt of the requested distribution in writing within three (3) business days after such receipt.

Very truly yours,

THE SANTA BARBARA JEWISH FEDERATION

By: _____          By: _____
     Name:                               Name:
     Title:                              Title:

C-1

## EXHIBIT D
## FEDERATION INCUMBENCY CERTIFICATE

[ATTACH COMPLETED INCUMBENCY CERTIFICATE HERE]

 

## CERTIFICATE OF INCUMBENCY
## OF OFFICERS OF THE SANTA BARBARA JEWISH FEDERATION

The undersigned, Joan Rothenberg, does hereby certify that she is the duly elected, qualified and acting Secretary OF THE SANTA BARBARA JEWISH FEDERATION (the "Federation"), a California nonprofit corporation; that the persons named below are and at all times since at least January 1, 2003 have been duly elected, qualified, and acting officers of the Federation, holding the offices set forth opposite their respective names below; and that the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Ron Fox | President | |
| Mike Nissenson | Vice President | |
| Judi Kahan | Treasurer | |

IN WITNESS WHEREOF, I have hereunto set my hand as a duly authorized officer of the Federation this 17th day of December, 2003.

Name: Joan Rothenberg
Title: Secretary

The undersigned, Ron Fox, does hereby certify that she is the duly elected, qualified and acting President of the Federation; that Joan Rothenberg is and at all times since at least January 1, 2003 has been the duly elected, qualified and acting Secretary of the Federation; and that the foregoing signature of Joan Rothenberg is genuine.

December 17, 2003

Name: Ron Fox
President