Michael S. Pollok (MP-9257)
Email: mpollok@marvinandmarvin.com
Marvin and Marvin, PLLC
6369 Mill Street-PO Box 151
Rhinebeck, New York 12572
(845) 876-3024
*Attorneys for Objectors Alan Hayes and Wendy Wolosoff-Hayes*

UNITED STATES BANRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

SECURITIES INVESTOR PROTECTION
CORPORATION,                                               Adv. Pro. No. 08-01789 (BRL)

Plaintiff-Appellant,                                       SIPA LIQUIDATION

-against-

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
                                                           OBJECTION TO TRUSTEE'S
Defendant.                                                 DETERMINATION

-----------------------------------------------------------------X

In re:

BERNARD L. MADOFF,

Debtor.

-----------------------------------------------------------------X

IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

Plaintiff,

-against-

LUCKY COMPANY, a New Jersey partnership,
BETH H. GERSTEN, (aka BETH HENDLER),
ROBIN EASTERN, MUNCHKINS, a partnership,
IRVING B. KAHN FOUNDATION, INC., a

Delaware corporation, MILTON HENDLER
RESIDUARY TRUST, a Florida trust, GLORIA
HENDLER, as trustee and as an individual,
ALAN HAYES, WENDY WOLOSOFF-HAYES,
BRIGID BUCHANAN, SANDRA RAMIREZM
BRIAN CLEARY, PETER J. CLEARY, STUART M.
TARSHIS, ROBERTA E. TARSHIS, PHYLLIS M.
ELDERIDGE, LESLIE READ, SCOTT H. READ,
CHARLES READ, MARK HENDLER, DENISE
HENDLER, JOSEPH S. EASTERN 2004
IRREVOCABLE TRUST, a New Jersey trust,
JOSEPH S. EASTERN, as trustee and as an
individual, SHIRLEY CHARMS, DAVID Z.
ROSENSWEIG, CARLY EASTERN, and ERIN
EASTERN,

Defendants.

-----------------------------------------------------------------X

# OBJECTION OF ALAN HAYES AND WENDY WOLOSOFF-HAYES TO NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM AND REQUEST FOR A HEARING

Alan Hayes and his wife Wendy Wolosoff-Hayes (the "Objectors") through their attorneys Marvin and Marvin, PLLC, hereby submit their objections to the Notice of Trustee's Determination of Claim (the "Claim Determination") provided by Irving H. Picard, the Trustee for the Liquidation of the Business of Bernard L. Madoff Investment Securities, LLC (the "Trustee") with respect to the Customer Claim submitted by the Objectors (the Objectors' Customer Claims). The Objectors assert, *inter alia*, that they were customers of Bernard L. Madoff Investment Securities, LLC ("BLMIS") as that term is defined by the applicable statutory and case law and therefore entitled to SIPA protection. The Objectors make the following statement of facts and conclusions of law in support of this objection:

I. **Statement of Facts**

1.    The Objectors were members of an investment club in defendant Lucky Company a company formed under the laws of the state of Florida. Lucky Company invested with BLMIS by opening a discretionary account (the "Account") and depositing funds into BLMIS through that Account. The Objectors caused funds to be placed in this Account and they were provided with regular IRS Form K1's from Lucky Company and paid taxes on any capital gains they earned on investments which they thought were being invested in stocks, bonds and options. Unfortunately for all involved, the funds deposited for the purpose of investing where converted by BLMIS as part of the Madoff scheme to defraud investors.

2.    As of November 30, 2008, the value of Objector Wendy Wolosoff-Hayes' interest in the Lucky Company Account was $1,745,121. Objector Wendy Wolosoff filed a timely SIPC claim which was assigned claim number 003178.

3.    As of November 30, 2008, the value of Objector Alan Hayes interest in the Lucky Company Account was approximately $52,286. Objector Alan Hayes filed a timely SIPC claim which was assigned claim number 003166.

4.    In the Determination Letter, the Trustee rejected the Objectors' claims concluding that the Objectors were not customers of BLMIS as defined by the Securities Investor Protection Act ("SIPA"). The Trustee further claims that Objector Wendy Wolosoff-Hayes had withdrawn $1,263,000 more than she had placed into Lucky Company. The Trustee did not take into consideration the contributions made by her father and step-mother. In reality, Wendy Wolosoff-Hayes only withdrew $304,077 more than she invested in the Lucky Company Account. The Trustee also ignored all legitimate expectation of appreciation in

the Lucky Company Account. The Objectors, as participants in Lucky Company, only invested with defendant Lucky Company which in turn invested with BLMIS. Neither of the Objectors had any knowledge of the fraudulent scheme perpetrated by BLMIS.

5.      Annexed hereto as Exhibit "A" is a copy of the 1999 Lucky Company partnership agreements executed by objector Wendy Wolosoff-Hayes on June 8, 1999 who became a 1.09% partner. The original agreement was executed in 1986.

6.      Objector Alan Hayes was never a party to the Lucky Company partnership agreement and instead invested in the Lucky Company in 2005 when objector Wendy Wolosoff-Hayes transferred shares of Lucky Company to objector Alan Hayes as repayment of a $37,000 loan he made to her. To repay this loan, Wendy Wolosoff-Hayes transferred a number of her shares in Lucky Company valued at $20,000 to Alan Hayes in 2005. Additional shares valued at $17,000 were transferred to Alan Hayes in 2006. No funds were ever withdrawn from Lucky Company by Objector Alan Hayes.

7.      Lucky Company was created in 1986 to "engage in arbitrage as that term is generally understood in the financial community, and to purchase and sell stocks, bonds, and options only through a registered, licensed securities firm or broker who shall have discretionary authority in dealing with the assets of the partnership." *See* Exhibit "A" annexed hereto at ¶1.

8.      In a supplement dated May 15, 1997, the agreement further states that "the partners acknowledge that they understand that the nature of the investment that the partnership is undertaking is changing to the following. Funds will be used to purchase several (as many as 50) different listed

corporations and held for varying time periods. At the same time stock options in the form of Put & Calls of the S&P stock index will be bought and sold." *Id*

9. The K1 statements received from Lucky Company reflected the value of their shares in Lucky Company based upon investments made by BLMIS in the Lucky Company discretionary account. Annexed hereto as Exhibit "B" are sample K1 statements generated by the Lucky Company.

10. The source of the funds for Objector Wendy Wolosoff-Hayes included annual cash gifts of $10,000 from her father, annual cash gifts of $10,000 from her step-mother, an initial investment in Lucky Company of $50,000 in 1986, and a bequest of 1,500,000 from her father in 2001.

## II. Grounds for Objection

11. *A. The Trustee erroneously determined that the Objectors were not Customers of BLMIS and thus not eligible claimants.* The purpose of the Lucky Partnership was to invest in stocks, bonds and other securities. The authority to trade and invest in these securities was discretionary. There is no evidence that the Objectors' were aware of the various investments made at any given time or had knowledge of any fraud being perpetrated by BLMIS. *See SEC v. Ambassador Church Financial Development Group, Inc.*, 679 F.2d 608 (6th Cir. 1982) (one of the purposes of SIPA is to protect investors who attempt to invest in securities but are defrauded by dishonest brokers). "If a claimant intended to have the brokerage firm purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds." *Id*. at 614. *In re Stratton Oakmont, Inc.*, (unreported decision) 2003 WL 22698876 at *5 (S.D.N.Y., Nov. 14. 2003) ("SIPA brings those whose property was

unlawfully taken within the preferred status of "customer," and the property unlawfully taken within the definition of "customer property," but those are the only inclusion of conversion, fraud, or other broker wrongdoing in the legislation. *See id*. §§ 78lll-2, 78lll-4. Nothing in the statute's language or legislative history suggests that converted property is to be treated any differently than property merely lost due to the broker's bankruptcy.") *citing SEC v. Goren*, 206 F.Supp.2d 344, 351 (E.D.N.Y.2002) (the trustee opined that the claimants were entitled to cash rather than securities because the broker "embezzled Claimants' assets instead of investing them in an existing money market fund.").

12.  The Trustee's findings have been inconsistent because on the one hand, the Trustee has determined that the Objectors were not customers of BLMIS and they are not entitled to SIPA protection. On the other hand, the Trustee also finds that the funds they invested with Lucky Company are forfeit because they indirectly invested with BLMIS.

13.  However, the facts of this case and law demonstrate that the Objectors were customers of BLMIS even though the funds were received by Lucky Company. The funds placed with Lucky Company and BLMIS were intended to be used *for the purpose of investing in securities by the debtor* which makes the Objectors customers. *See In re Waddell Jenmar Securities, Inc.*, 126 B.R. 935 (Bkrtcy., E.D.N.C., 1991) (Investors were "customers" of broker-dealer, entitled to coverage under Securities Investor Protection Act, even though investment funds were made payable to entity other than broker-dealer); *see Rosenman Family, LLC v. Picard*, 420 B.R. 108 (Bkrtcy., S.D.N.Y., 2009). Nothing in the statute differentiates between a direct or indirect investor. The original draft

of the bill made a distinction between direct and indirect investors and required the investor's name or interest to appear in the broker's records to be classified as a "customer." This requirement was removed in the final version. *See* S.2348, 91st Cong. Section 7(d) (June 9, 1969); H.R. 13308, 91st Cong. Section 7(d) (August 4, 1969).

14.    All that is required is an investment, directly or indirectly, with a registered broker-dealer. 15 U.S.C. § 78111(2) defines a customer as "any person who has deposited cash with the debtor *for the purpose* of purchasing securities." Whether BLMIS used the cash derived from the Lucky Company shares to ultimately purchase securities is irrelevant if the purpose was to purchase securities. *See* I*n re Old Naples Securities, Inc.*, 218 B.R. 981 (Bkrtcy.M.D.Fla.,1998) (claimants funds to broker for investment in certain unidentified bonds upon promise that they would receive a set return on their investment, had indicia of fiduciary relationship, as opposed to merely the characteristics of debtor-creditor relationship, as required for claimants to qualify as "customers"); *In re Gibralco, Inc.*, 53 B.R. 324 (Bkrtcy.Cal.,1985). Here, cash deposits were made over many years by Objector Wendy Wolosoff-Hayes and the account's value was increased by the transfer of shares with cash value.

15.    Moreover, even if the funds that were used to purchase shares in Lucky Company and deposited with BLMIS for the purpose of purchasing securities are not deemed to be "cash", the shares are "customer property" that were used for the purpose of purchasing securities by the debtor. "The term 'customer property' means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the

proceeds of any such property transferred by the debtor, including property unlawfully converted." 15 U.S.C. § 78111(4). Customer property includes "any other property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property." 15 U.S.C. § 78111(4)(E). *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70 (Bkrtcy., S.D.N.Y.1996) (customer property includes the proceeds of any such property transferred by the debtor, including property unlawfully converted).

  *16.*   "The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, any collateral trust certificate, preorganization certificate or subscription, transferable share, voting trust certificate, certificate of deposit, certificate of deposit for a security, or any security future as that term is defined in section 78c(a)(55)(A) of this title." Thus, under an alternative theory to cash, the "transferrable shares" of Lucky Company were customer property held by Lucky Company the proceeds of which were invested by BLMIS on behalf of the Objectors for the purpose of trading in securities. *See In re C.J. Wright & Co. Inc.,* 162 B.R. 597 (Bkrtcy., M.D.Fla.,1993) (deposit account document received by claimants as result of transaction with debtor stockbroker was "security," for purpose of determining if claimants were entitled to protection under the Securities Investor Protection Act); *Matter of Atkeison*, 446 F. Supp. 844 (D.C.Tenn.,1977) (Investment certificates which were purchased for $6,000 each from corporation that was alter ego of insolvent securities broker-dealer, which were purchased as an investment whereby buyer of certificates intended to earn profits solely from efforts made by others and

which were in possession of buyer were "investment contracts" and thus "securities" and not cash deposited with broker-dealer so as to entitle buyer to protection under SIPA).

17.     Furthermore, both Objectors were customers and entitled to SIPC insurance because the transactions underlying their claims (1) relate to investment, trading or participation in the securities markets, and (2) arise out of the type of fiduciary relationship that generally exists between a broker-dealer and his customer. *In re Mason Hill & Co., Inc., Debtor,* 2003 WL 23509197 (Bkrtcy. S.D.N.Y. 2003), 51 Collier Bankr.Cas.2d 1578. The relationship between Lucky Company and its investors and BLMIS was not a debtor-creditor relationship and was strictly for the purpose of trading securities. *See SIPC v. Executive Sec. Corp.*, 556 F.2d 98, 99 (2d Cir. 1977) (one involved in an ordinary debtor-creditor relationship with the broker is not a customer); *SEC v. F.O. Baroff Co.*, 497 F.2d at 284; *In re Hanover Square Sec.*, 55 B.R. 235, 239-40 (Bkrtcy., S.D.N.Y. 1985). In the end, like virtually all BLMIS investors, the Objectors were defrauded by the debtor and should be provided SIPA protection. *See* 15 U.S.C. § 78fff-3(a); *S.E.C. v. Goren*, 206 F.Supp.2d 344 (E.D.N.Y. 2002) *affirmed in part, vacated in part sub nom and remanded*, 371 F.3d 68 (2d Cir. 2004) (purchasers of shares in non-existent money market fund (MMF) held securities claims, not cash claims, and thus were entitled under Securities Investor Protection Act (SIPA) to recover up to $500,000 in registered broker-dealer's liquidation proceedings, even though broker-dealer had in fact embezzled purchasers' assets instead of investing them in existing money market fund, where purchasers received MMF share purchase confirmations and monthly account statements that gave them legitimate expectations that they held securities in their accounts).

18.     *B. The Trustee Failed To Comply With The December 23, 2008 Order.* The Determination Letter served on the Objectors failed to comply with the Court's order dated December 23, 2008 which directed the Trustee to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." *See* December 23, 2008 Order at 5 (Docket No. 12).

19.     The November 30, 2008 account statement generated by BMLIS is reflective of the Debtor's books and records by which the Trustee is bound, absent proof that Objectors did not have a "legitimate expectation" that a portion of the balance on the Lucky Company BLMIS Account statements represented their property. In fact, in each year of the investment, Objectors, as appropriate, paid capital gains tax on the appreciation in the Account attributable to their investments. The Objectors would not have done so if they had any belief whatsoever that they did not own a portion of the Lucky Company BLMIS Account.

20.     *C. The Trustee has violated the requirement that he honor a customer's "legitimate expectations".* The legislative history of SIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations" upon investing with a regulated securities broker or dealer. For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978: "One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.* * * A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this

is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date." H.R. Rep. 95-746 at 21.

21.     On December 30,1970 when President Nixon signed SIPA into law, he made the following statement: "I am signing today the Securities Investor Protection Act of 1970. This legislation establishes the Securities Investor Protection Corporation (SIPC), a private nonprofit corporation, which will insure the securities and cash left with brokerage firms by investors against loss from financial difficulties or failure of such firms . . . . Just as the Federal Deposition Insurance Corporation protects the user of banking services from the danger of bank failure, so will the Securities Investor Protection Corporation protect the user of investment services."
http://www.presidency.ucsb.edu/ws/index.php?pid=2870

22.     SIPC's series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

23.     Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, *even where the broker never purchased the securities*. SIPC wrote: "Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities indentified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the

purchase never actually occurred and the debtor instead converted the case deposited by the claimant to fund that purchase. . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates." Br. of Appellant SIPC at 23-24 *citing In re New Times Securities Services, Inc.*, 463 F.3d 125 (2d Cir. 2006).

24. The Trustee's position is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008. In that statement, Ms. Wang acknowledged that a BLMIS customer is entitled to the securities in his account, "if clients were presented statements and had reason to believe that the securities were in fact owned, SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares." December 16, 2008 Insiders' B1og, www.occ.treas.gov/ftp/alert/2008-37.html.

25. In the *New Times* case, SIPC voluntarily recognized its obligations under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities of up to $500,000 *including the appreciation in their accounts*:

> HARBECK:... if you file within sixty days, you'll get the securities, without question. Whether-if they triple in value, you'll get the securities...Even if they're not there.
>
> COURT: Even if they're not there.

HARBECK: Correct.

COURT: In other words, if the money was diverted, converted-

HARBECK: And the securities were never purchased.

COURT: Okay

HARBECK: And if those positions triple we will gladly give the people their securities positions.

Tr. at 37-39, *In re New Times Securities Services, Inc.*, No. 00-8178 (E.D.N.Y., July 28, 2000).

26. ***D. The Trustee has invented his own definition of "net equity".*** SIPA defines "net equity" as the value of the securities positions in the customer's accounts as of the SIPA filing date, less any amount the customer owes the debtor. "The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer. . . minus (B) any indebtedness of such customer to the debtor on the filing date. . ." 15 U.S.C. § 78111(1l).

27. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A). The Second Circuit has recognized that "[e]ach customer's 'net equity' is the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer [corrected for] any indebtedness of such customer to the debtor on the filing date." *In re New Times Securities Services, Inc.*, 371 F. 3d 68, 72 (2d Cir. 2004); *see also, In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 62 N.2 (B.S.D.N.Y. 1999) ("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

28. Nevertheless, the Trustee has created his own definition of "net equity" by asserting that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, the Trustee would avoid paying SIPC insurance to the thousands of BLMIS investors who have depended upon their investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

29. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that using the financial statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. In his view, it allows Mr. Madoff to determine who receives a larger proportion of the assets collected by the Trustee. Harbeck's assertion is a rationalization of what appears to be SIPC's goal, *i.e.*, to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating BLMIS seven times over an eleven year period. The "red flags" presented to the regulatory authorities and their utter failures to protect the public are well documented and need not be rehashed in this objection.

30. During his tenure, the Trustee has identified only a handful of BLMIS investors who might not have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. However, the fact that a few out of more than 8,000 BLMIS investors may have been BLMIS co-conspirators does not justify SIPC's depriving the remaining totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

31. The Objectors received regular K1 statements from Lucky Company indicating returns on their investment in BLMIS the range of 9-11% per year, subject to short term capital gains tax rates. Lucky Company had entered into a standard brokerage agreements with BLMIS, a licensed SEC-regulated broker-dealer, pursuant to which Lucky Company had specified, numbered accounts for the purchase and sale of

securities; it received regular monthly statements <u>and trade confirmations</u> reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. The Objectors paid federal and state taxes on the annual growth of the investments with BLMIS. There is no basis to claim that the Objectors did not have a "legitimate expectation" that the assets reflected on the Lucky Company statements attributable to their investments belonged to them. Thus, the Objectors are entitled to a claim for value of securities in the amount of up to $500,000 each.

32.    ***E. The Objectors are entitled to prejudgment interest on investments and profits.*** Under New York law, which is applicable here, funds deposited with BLMIS are entitled to interest. *See, e.g.*, C.P.L.R. 5004; N.Y. Gen. Oblig. § 5-501, *et seq*. Moreover, since BLMIS' converted the Objectors' funds, they are also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman*, No. 07-1001, 2008 U.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008) ("Causes of action such as ... conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin*, 701 N.Y.S. 2d 427, 428 (1st Dept. 2000) (awarding prejudgment interest on claims for unjust enrichment and conversion).

33.    In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." S*ee Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 Million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. This is why the instant Objectors are customers entitled to protection. They deposited and maintained funds in an

account with the legitimate expectation, pursuant to the partnership agreement, that the funds would be invested by BLMIS in stocks, bonds and options. As the Court in Visconsi found, "the out-of-pocket theory of damages, which underlies Lehman's assertion that it did not harm Plaintiffs, is an improper means of determining damages under the circumstances, and thus Lehman's argument is wholly without merit. The out-of-pocket theory focuses on the direct cash flow to and from Plaintiffs; it is a reliance measure of damages, which seeks to return Plaintiffs to the position they held before investing their money with Gruttadauria, SG Cowen, and Lehman. . . Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 Million they originally invested, less their subsequent withdrawals, is a wholly inadequate measure of damages." *Id*. at *4-5. Ultimately, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id*.; *see SEC. v. Byers*, 2009 W.L. 2185491 (S.D.N.Y.) (district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

34.     ***F. The Trustee had no authority to "claw back" withdrawals beyond the statute of limitations period and solely for SIPC's benefit.*** The Trustee is, in effect, imposing upon the Objectors a fraudulent conveyance judgment for sums withdrawn from the Lucky Company Account beyond the statute of limitations period applicable to fraudulent conveyances. However, the Trustee has no right to do so in this manner. As such, the Trustee has deprived the Objectors of SIPC insurance and the claim to which they are entitled.

35.     Moreover, the Trustee has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for the Trustee to utilize his avoidance powers to enrich SIPC at the

Objectors' expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g.*, 5 Collier on Bankruptcy 11 547.01 (15th ed. 2008); *see also In re Dorhold, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, NA.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received payment than others of his class is required to disgorge so that all may share equally") (quotations omitted). Here, however, the Trustee is not acting to assure equal distribution among prepetition creditors. On the contrary, he is acting as SIPC's agent in depriving the Objectors of SIPC insurance to which they are statutorily entitled.

36. ***G. The Trustee has violated SIPA by delaying the payment of SIPC insurance.*** The Trustee has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). The Trustee is obligated to replace Objector's securities up to a value of $500,000 as valued on the November 30, 2008 statement sent to Lucky Company and he has failed to do so.

37. ***H. The Objectors join in and adopt, the alternative grounds of objection to the Trustee's determination raised by the other Objectors.***

III. Reservation of Rights

38. The Objectors reserve the right to file additional relevant submissions as the need may arise during the course of this litigation.

IV. Conclusion

39. The Objectors are entitled to an order compelling the Trustee and SPIC to immediately replace the value of their investments in the Lucky Company Account up to and including a sum of $500,000 each.

Dated: Rhinebeck, New York
      January 31, 2011

                Yours etc.,

                MARVIN AND MARVIN, PLLC
                *Attorneys for Alan Hayes and Wendy Wolosoff-Hayes*

                By:_____
                      Michael S. Pollok, Esq. (MP-9257)
                      6369 Mill Street-P.O. Box 151
                      Rhinebeck, New York 12572
                      Telephone: (845) 876-3024
                      Email: mpollok@marvinandmarvin.com