# EXHIBIT C

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Jessie M. Gabriel
Email: jgabriel@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jennifer A. Vessells
Email: jvessells@bakerlaw.com
Lauren M. Hilsheimer
Email: lhilsheimer@bakerlaw.com
Lindsey D'Andrea
Email: ldandrea@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated)<br><br>**COMPLAINT**<br><br>**REDACTED** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>      Plaintiff,<br><br>      v.<br><br>JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, and J.P. MORGAN SECURITIES LTD.,<br><br>      Defendants. | Adv. Pro. No. 10-04932 (BRL) |

should have seen tens of billions of dollars—nearly all of the IA Business's assets under management—moved into T-bills, as that was part of BLMIS's purported investment strategy.

221. Instead, what JPMC saw was massive outflows of money that were in no way linked to customer accounts or stock and options trading. Money would come into the 703 Account as customers invested additional funds with BLMIS. An overwhelming majority of funds would then go directly back out to customers in the form of redemptions. Any balance that remained in the 703 Account was invested in short-term securities such as overnight sweeps, commercial paper, and certificates of deposit.

222. JPMC also faced regular account activity that would have been suspicious regardless of the type of business JPMC thought Madoff was running. The 2000 OCC BSA/AML Handbook identified numerous "red flags" that financial institutions needed to consider as part of their transaction monitoring procedures. These red flags included: (a) unexplained repetitive or unusual patterns of activity; (b) frequent large dollar transactions without corresponding explanations as to how those funds would be utilized; (c) spikes in customer activity with little or no explanation; and (d) wire activity with offshore banking centers or financial secrecy havens. The 703 Account exhibited all of these types of transactions, and exhibited them repeatedly.

223. In addition, much of this account activity occurred between BLMIS and other JPMC customers. Most notably, the party transacting with BLMIS most often and in the largest dollar amount, receiving almost $76 billion in payments from the 703 Account between December 1998 and September 2005, was JPMC's long-time Private Bank customer and IA Business customer, REDACTED [BLMIS/JPMC Customer 1].

**Account Activity Red Flags**

224.   *Repetitive Transactions:*  BLMIS frequently engaged in repeated transactions with the same parties, often on the same days, with no obvious purpose.  For example, during 2002, BLMIS initiated outgoing transactions to <sup>REDACTED</sup> [BLMIS/JPMC Customer 1] in the precise amount of $986,301 hundreds of times—318 separate times, to be exact.  These highly unusual transactions were often sent multiple times on a single day.

225.   As another example, from December 2001 to March 2003, the total monthly dollar amounts coming into the 703 Account from <sup>REDACTED</sup> [BLMIS/JPMC Customer 1] were almost always equal to the total monthly dollar amounts going out of the 703 Account to <sup>REDACTED</sup> [BLMIS/JPMC Customer 1].  There was no clear economic purpose for such repetitive transactions that had no net impact on <sup>REDACTED</sup> [BLMIS/JPMC Customer 1's] account at BLMIS.

226.   *Large Dollar Transactions:* The 703 Account reflected a pattern of large dollar transactions.  Between 1998 and 2008, BLMIS transferred $84 billion out of the 703 Account to just four customers.  These transactions represented over 75% of the wires and checks that flowed out of the 703 Account.  It also was typical for BLMIS, through the 703 Account, to enter into individual transactions with the BLMIS feeder funds for hundreds of millions of dollars.

227.   *Spikes in Activity:*  The 703 Account showed occasional spikes in overall activity, which should have prompted further investigation by JPMC.  Shortly before the beginning of the credit crisis, over the period beginning in the first quarter of 2006 and ending in the first quarter of 2007, there was a significant increase in the total dollar amount transacted in the 703 Account.  This increase in activity included a significant increase not only in third party wires but also in book transfer activity.  During this period, the average dollar amount of each transaction increased by over $60 million, from $17 million to $78 million.

228. There was also a downward spike in activity between the 703 Account and <sup>REDACTED</sup> [BLMIS/JPMC Customer 1's] account at the Private Bank after December 2001. In December 2001 alone, BLMIS engaged in approximately $6.8 billion worth of transactions with <sup>REDACTED</sup> [BLMIS/JPMC Customer 1]. Shortly thereafter, <sup>REDACTED</sup> [BLMIS/JPMC Customer 1's] activity with the 703 Account decreased dramatically.

229. *Wire Activity with Offshore Entities:* Incredible spikes in the 703 Account's overall activity were accompanied by incredible spikes in offshore activity as well. Between 2004 and 2008, the dollar amount and volume of the 703 Account's international wire transfers with high and medium risk jurisdictions increased 83% and 67%, respectively.

230. *Check Activity:* In addition, many transactions in the 703 Account involved hand-written checks totaling hundreds of millions of dollars in a single day. This is not only unusual on its face, but it is particularly unusual given that BLMIS would issue multiple checks on the same day to the same customer. At the very least, this activity should have prompted a check-kiting investigation, which undoubtedly would have revealed more suspicious behavior.

231. In addition, the majority of <sup>REDACTED</sup> [BLMIS/JPMC Customer 1's] transactions with the 703 Account were conducted by check. For example, in December 2001, the 703 Account received checks from <sup>REDACTED</sup> [BLMIS/JPMC Customer 1], each in the amount of $90 million, on a daily basis—a pattern of activity with no identifiable business purpose.

232. *Private Banking:* JPMC should have also been monitoring transactions from the perspective of certain JPMC customers that were also BLMIS customers. A number of BLMIS customers held accounts at JPMC's Private Bank, including <sup>REDACTED</sup> [BLMIS/JPMC Customer 1]. Private banking has long been considered a high risk activity. That is because private bank accounts generate lucrative fees, which provide an incentive for private bankers to ignore client

64

activity that is illegal or violates internal bank policy. Private banking has frequently served as a vehicle for money laundering, and particularly money laundering involving cross-border wire transfers.

233. Thus, when JPMC saw billions of dollars of transfers between the 703 Account and accounts held at JPMC's Private Bank, it should have been highly suspicious. Given that those accounts were held by JPMC, the bank was in a perfect position to investigate. It had only to review its internal account records to determine whether there was a legitimate explanation for the transaction history.

234. *Automated Account Monitoring:* The 703 Account's unusual activity should have triggered JPMC's automated account monitoring system as well.     REDACTED

235. JPMC's transaction monitoring system appears to have been critically flawed in that the formula JPMC programmed into the system failed to issue alerts even when analyzing highly suspicious activities.     REDACTED

However, even though the formula identified many instances of suspicious activity in the 703 Account, the system almost never issued alerts. This prompted compliance personnel at JPMC to ask, after Madoff's arrest, "Why didn't the DDA Account (xxxxx1703) alert . . . ?"

65

236.  Between June 2005 and September 2008, REDACTED

Yet, during that period, only one account alert was generated.

237.  Taking March 2008 as an example, during that month there were approximately $1.1 billion in transactions in the 703 Account. This value was so high REDACTED

Remarkably, JPMC's transaction monitoring system noted the unusual activity but did not consider it unusual enough to warrant an alert. No alert was generated in March 2008.

**JPMC Had a Duty to Investigate Suspicious Activity in BLMIS's Account**

238.  Once suspicious activity is identified, a bank must further investigate to determine whether there could be a legitimate explanation for the activity or, rather, if it is indicative of illegal activity. REDACTED

Upon information and belief, in the face of repeated indications of suspicious transaction activity in the 703 Account, as well as comments from individuals within JPMC regarding the legitimacy of BLMIS's operations, JPMC never conducted any serious investigation of the activity in the 703 Account or filed a SAR with the United States government.

239.  Despite the frequency with which transactions in the 703 Account were far outside the normal levels, the system issued only **a single account alert**. REDACTED

66

REDACTED

240.   REDACTED

241.   Finally, the reviewer noted that he could not locate a KYC file for BLMIS and, regardless, concluded the investigation.   REDACTED

242.   Even when [REDACTED] [JPMC Employee 1] raised the issue in 2007 that Madoff was operating a Ponzi scheme, no one at JPMC appears to have looked at the transactions in the 703 Account, even though it was a JPMC account. BLMIS's Client Relationship Manager and account sponsor, [REDACTED] [JPMC Employee 9], learned of [REDACTED] [JPMC Employee 1's] claim, but took no action whatsoever.

243.   Not only did JPMC have access to BLMIS's account history, but JPMC also had access to the bank accounts of a number of BLMIS customers, and was thus provided with even more information indicating fraud. In fact, JPMC had an extremely close relationship with one of BLMIS's largest and most active customers, [REDACTED] [BLMIS/JPMC Customer 1].

244.   [REDACTED] [BLMIS/JPMC Customer 1] was a client of JPMC's Private Bank for over [REDACTED] years. [REDACTED] [BLMIS/JPMC Customer 1] had close business relationships with senior executives at JPMC's predecessor banks, as well as at JPMC. These individuals included

REDACTED

67

REDACTED

245. [REDACTED] [BLMIS/JPMC Customer 1] had two Premier Checking accounts with JPMC's Private Bank: account XXX-XXXX[REDAC] and account XXX-XXXX[REDAC].

246. JPMC was acutely aware of[REDACTED] [BLMIS/JPMC Customer 1's] close relationship with Madoff, identifying Madoff as "[REDACTED] [BLMIS/JPMC Customer 1's][REDACTED] trader," who had helped increase[REDACTED] [BLMIS/JPMC Customer 1's] wealth from $180 million in 1986 to $1.5 billion in 1998.

247. Upon information and belief, JPMC never meaningfully investigated the connection between Madoff and[REDACTED] [BLMIS/JPMC Customer 1]. The activity in[REDACTED] [BLMIS/JPMC Customer 1's] account confirmed that there was no legitimate explanation for the suspicious transactions in the 703 Account.

248. Instead of investigating these transactions, JPMC was primarily concerned about maintaining a relationship with[REDACTED] [BLMIS/JPMC Customer 1] and Madoff and maintaining a role in REDACTED finances REDACTED upon information and belief, JPMC prioritized its relationships with[REDACTED] [BLMIS/JPMC Customer 1] and Madoff over its compliance with regulations that required banks to monitor customer accounts.

**JPMC Had a Duty to Take Action**

249. Suspecting that illegal activity was occurring, JPMC had a duty to take action. JPMC should have notified Madoff and then closed the account.