**D&G** | DAVIS & GILBERT LLP
ATTORNEYS AT LAW

1740 Broadway          T: 212.468.4800          www.dglaw.com
New York, NY 10019     F: 212.468.4888

Direct Dial: 212.468.4875
Personal Fax: 212.974.6975
Email: jcioffi@dglaw.com

March 10, 2011

**By Hand**

The Honorable Burton R. Lifland
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

     Re:   *Picard v. Natixis et al.,* Case No. 1:10-ap-5353

Dear Judge Lifland:

     We write on behalf of defendants Natixis (in its own capacity and as successor in interest to Defendant IXIS Corporate & Investment Bank) and Natixis Financial Products LLC (as successor in interest to Natixis Financial Products Inc.) (collectively, the "Natixis Defendants" or "Natixis"). The complaint filed under seal on December 8, 2010 (the "Complaint") against the Natixis Defendants by Irving H. Picard, Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") was made public on March 8, 2011, with the exception of the names of three Natixis employees (the "Natixis employees"). Pursuant to Natixis' agreement with the Trustee, so-ordered by this Court on March 8, 2011, these names remain redacted. We submit this letter pursuant to the Order to Show Cause, issued by the Court on March 4, 2011. We believe the employee names included in the Complaint should remain redacted to protect their privacy interests and in fairness under the Court's equitable discretion. Because Exhibit 2 consists of excerpts from a confidential transcript of one of the Natixis employees, we respectfully request that this Exhibit be kept under seal.

## I. INTRODUCTION

     As an initial matter, we note that Natixis has already suffered losses in connection with BLMIS that far exceed what the Trustee seeks to recover by the Complaint. Natixis is a victim of BLMIS' fraudulent conduct, yet finds itself the subject of an action to recover $400 million as an alleged subsequent transferee of alleged avoidable transfers made by BLMIS to various Madoff feeder funds. Lacking any basis to allege that Natixis engaged in any fraud, the Trustee has resorted to the familiar set of "red flag" allegations found across nearly all his clawback actions, none of which have yet been found in any action to create inquiry notice on the part of any defendant, let alone Natixis. Notably, the only claims against Natixis are based on its alleged receipt of preferential and

D&G | DAVIS & GILBERT LLP
       ATTORNEYS AT LAW

The Honorable Burton R. Lifland
March 10, 2011
Page 2

fraudulent transfers by BLMIS to feeder funds but Natixis is not alleged to have known of Madoff's fraud; yet when playing to the court of public opinion, the Trustee through the press release that immediately followed the filing of the Complaint under seal proclaimed that Natixis was "[a]rmed with knowledge of many badges of fraud" but "nevertheless provided substantial momentum furthering Madoff's Ponzi scheme, especially in Europe." The Complaint, by means of misstatements and mischaracterizations of fact, some of which are addressed herein, urges that Natixis was aware of, turned a blind eye to, or played a role in furthering Madoff's fraud.   Natixis intends to vigorously defend itself against the Trustee's allegations in the course of this litigation.

       Given that we are at the initial stages of this proceeding, however, it is unfair to the Natixis employees identified in the Complaint for their names to be disclosed to the public.  The notoriety of Madoff will result in their names being unfairly linked to Madoff's fraud in the American and international press and the French press in particular. Furthermore, as part of the second largest banking group in France, Natixis is subject to considerable local media scrutiny there.  By virtue of differences between litigation in France and the U.S., the French public is even more likely to believe that the Natixis employees participated in fraudulent activity, as a result of the Complaint's references to "fraudulent transfer" claims under the Code and New York state law, and to fraudulent conduct by Madoff and/or the feeder funds.[1]   Serious reputational injury will result simply due to publication of the Complaint.  This matter will not reach trial until long after the reputational injury has occurred.

       Where, as here, publication of an unsworn complaint can cause real harm to a non-party individual, courts give significant weight to the individual's privacy rights when weighing the public right to access.  Furthermore, the public interest is in the alleged conduct, not the identity of the individuals.  The redactions are limited to the individuals' names, not the underlying conduct that is alleged.  Where the redactions are so narrowly-tailored, closure is permitted on a showing of "substantial reason," as opposed to the more stringent test requiring "overriding prejudice," which in any event is met here.

       Thus, for the reasons set forth herein, the Natixis employees' privacy rights should be protected, and, in the interest of fairness and equity, the Trustee's Complaint against Natixis should only be available to the public in its current form, with the names of employees redacted – a narrowly-tailored solution that leaves virtually the entire pleading open to public access.

---

[1] To aid the Court in understanding the differences between France and the U.S. described herein, the Natixis Defendants are attaching as Exhibit 1 the Declaration of Paris attorney Bruno Quentin.

**D&G** | DAVIS & GILBERT LLP
ATTORNEYS AT LAW

The Honorable Burton R. Lifland
March 10, 2011
Page 3

## II. THE NATIXIS EMPLOYEES ARE NOT PARTIES TO THIS ACTION AND THEIR PRIVACY INTERESTS MUST BE PROTECTED.

The Complaint identifies three Natixis employees, referred to herein in the order in which their names appear in the Complaint as Employee A (in New York), and Employees B and C (both in Paris). None of them are parties to the Complaint or to any other Madoff-related action. Interspersed with allegations identifying the Natixis employees by name (or alternatively, by title after having identified them by name and title) are allegations directed at "Natixis"[2] generally or at one or more unidentified Natixis employees, which the general public would likely understand to mean Employee A, B and/or C. Natixis and the Trustee already agreed to unsealing of the Complaint against Natixis with the most narrowly-tailored redactions and only means possible to protect the Natixis employees, while allowing public access to the Trustee's allegations and claims against Natixis, i.e., redaction of the individual employee names. The public has no need to know the names of the employees mentioned in the Complaint – indeed, any person's understanding of the claims against the Natixis Defendants would be unchanged by the revelation of these small pieces of information.

### A. Limitations to Public Right of Access

While it has been held that the public and the press have a "qualified First Amendment right to attend judicial proceedings and to access certain judicial documents," *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir.2004), such right of access is not absolute. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982). The public's right of access is codified in the Bankruptcy Code (the "Code"), subject to exceptions as provided therein. *See*, 11 U.S.C. §107.

"[D]ocuments may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values [or a compelling interest] and is narrowly tailored to serve that interest." *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987) (internal quotation marks omitted). The right of privacy has been considered a higher value. *See United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).

Courts have determined that "[w]hen limited closure... is at issue, the prejudice asserted need only supply a 'substantial reason' for closure. Only when the closure sought is total or nearly so must the district court find the prejudice to be 'overriding.'" *United States v. Doe*, 63 F.3d 121, 129 (2d Cir. 1995).

---

[2] The Complaint defines "Natixis" to include all but one defendant – *i.e.*, "Natixis, Natixis Corporate & Investment Bank (f/n/a [sic] IXIS Corporate & Investment Bank), Natixis Financial Products, Inc. and Bloom Asset Holdings Fund."

**D&G** | DAVIS & GILBERT LLP
ATTORNEYS AT LAW

The Honorable Burton R. Lifland
March 10, 2011
Page 4

The Second Circuit has held that "[t]he privacy interests of innocent third parties ... should weigh heavily in a court's balancing equation." *United States v. Biaggi* (In re New York Times Co.), 828 F.2d 110, 116 (2d Cir. 1987), cert. denied, 485 U.S. 977 (1988). "Such interests, while not always fitting comfortably under the rubric of 'privacy,' are a venerable common law exception to the presumption of access. Courts have long declined to allow public access simply to cater to a morbid craving for that which is sensational and impure." *Amodeo*, 71 F.3d at 1051 (internal quotation marks omitted). The *Amodeo* Court furthered noted that privacy interests at issue should not be narrowly defined to include only "privacy rights to 'intimate relations' as bedroom or other intimate conversations." *Id.* at 1051, n. 1.

Privacy interests are a strong factor weighing against disclosure of the identity of individuals who, like the current and former Natixis employees whose names are in the Complaint, are not named parties. *In re Savitt/Adler Litigation*, 1997 WL 797511 (N.D.N.Y. Dec. 23 1997). In conducting this test, courts give significant weight to two factors present in this case: whether any "of the information is potentially quite damaging to non-party ... and is unsworn." 1997 WL 797511, *3; *see Amodeo*, 71 F.3d at 1051. In such circumstances, the individual's privacy interests can constitute a "higher interest" than the public right to access, best served by narrowly tailored redactions such as those made to the Complaint in this case. *Savitt* , 1997 WL 797511, *4 ("Because the redaction sought is minimal and largely unrelated to the public interest, [ ] defendants have demonstrated both that a higher value will be served by redaction and that their proposed redactions are narrowly tailored to serve that interest.").

### B. Redaction is Essential and Narrowly Tailored to Preserve their Privacy Interests

Employees A, B, and C are not defendants in this or any other Madoff-related action, and are not the subjects of any Madoff-related inquiry or investigation into their conduct. Notwithstanding the fact that no claims have been stated against Employees A, B or C personally, and no facts are alleged to show that any were complicit in fraud, through disclosure of their names in the Complaint, they will be unjustifiably associated with BLMIS' fraudulent conduct. This false connection is occurring at a time when bankers and other financial sector employees are the subject of often arbitrarily directed anger. One need only look to the case of AIG executives who received threats upon disclosure of their names in the press to recognize that the privacy interests of the Natixis employees is a higher value.[3] On the other hand, the redactions sought hereunder are so "minimal and largely unrelated to the public interest" because identity of the Natixis employees is not relevant to the allegations. *Savitt*, 1997 WL 797511, *4. Moreover, other

---

[3] *See, e.g.*, Tom Baldwin and Christine Seib, "Armed guards at AIG offices after death threats over bonuses", The Sunday Times, March 18, 2009,
http://business.timesonline.co.uk/tol/business/industry_sectors/banking_and_finance/article5927610.ece;
*see also* Andrew Pergam, "Threats to AIG: 'We Will Get Your Children'", March 26, 2009,
http://www.nbcconnecticut.com/news/local/AIG-Threats-We-will-get-your-children.html

**D&G** | Davis & Gilbert llp
ATTORNEYS AT LAW

The Honorable Burton R. Lifland
March 10, 2011
Page 5

than redaction of their names, there is no other means of protecting the Natixis employees' privacy interests.

## III. REDACTION IS NECESSARY BECAUSE THE ALLEGATIONS ARE DEFAMATORY

### A. Standard For Defamation

Even if the Natixis employees' right of privacy does not prevent disclosure of their identities, Section 107(b)(2) of the Code provides that, on the request of a party in interest, the bankruptcy court shall "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title." In determining whether a statement in a legal pleading is "defamatory matter" for purposes of section 107(b)(2), courts have determined that the interested person must show that the material at issue is untrue and that it would alter his or her reputation in the eyes of a reasonable person. The determination as to whether such a person would alter his view of the interested party is based upon a fair (i.e., reasonable) reading of the document by a non-lawyer taking into account the context in which the allegations appear. *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir.1985) ("The words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed.") (internal quotation marks and citations omitted). Defamation with respect to a person's professional skills or complicity in unlawful conduct is considered egregious and damages are presumed. *Id.* at 82; *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001).

### B. The Factual Allegations Concerning Natixis Employees Are Untrue

Natixis has not yet even answered the Complaint. This proceeding is in its infancy. The loosely framed allegations of supposed red flags, and that either Natixis was aware that BLMIS was a fraudulent operation, or Natixis disregarded information that put it on inquiry notice, are unsworn and unproven. Natixis vigorously denies such allegations. As this litigation has only just commenced, the fact that the complaint contains untrue and damaging allegations about specific employees is enough to warrant redaction of their names in the publicly-available copy of the Complaint. The following examples of false or misleading statements in the Complaint illustrate the potential for the public to be misled to believe that Employees A, B and C engaged in professional misconduct.

The Complaint categorically alleges as fact that Natixis "had already spotted an important red flag of possible fraud" before investing in the Fairfield Sentry fund, quoting a Fairfield employee's e-mail about a conversation with a Natexis – not Natixis – employee, who questioned Sentry's options trading in June, 2004. (Complaint, ¶ 67).[4] At

---

[4] The allegation is framed in such a way that any member of the general public would assume that "Natexis" merely contained a typographical error and the allegation referred to Natixis and its employees. It states: "As *Continued from previous page*

**D&G** | DAVIS & GILBERT LLP
ATTORNEYS AT LAW

The Honorable Burton R. Lifland
March 10, 2011
Page 6

Employee A's deposition, the Trustee's counsel presented this e-mail to him.  In 2004, Employee A was employed by IXIS in New York, not Natexis.  At that time, Natixis did not yet exist, and IXIS was not related to Natexis.  It was evident from Employee A's testimony that the "Natexis employee" in this e-mail did not refer to him or any discussion he ever had with Fairfield employees.  (Exhibit 2, 117:5 – 118:4).[5]  It was not until 2006 that Natexis and IXIS combined to form Natixis.  Furthermore, Employee A testified that he did not believe he had any communications with anyone working for Fairfield Sentry regarding the options trading purported to be undertaken by Madoff. (Exhibit 2, 117:4-8).

Nevertheless, immediately after this allegation concerning information allegedly known by an unidentified "Natexis" employee, the Complaint goes on to state that "Natixis" had actual knowledge of this so-called "red flag" before entering into any of its transactions involving Madoff feeder funds (including the various transactions that Employee A worked on for IXIS, long before IXIS combined with Natexis).  (Complaint, ¶ 68).  Given that three employees are repeatedly referred to in the Complaint, interspersed with references to unnamed Natixis employees or simply "Natixis," the public would incorrectly infer that Employee A had actual knowledge of this purported "red flag", and nevertheless continued transacting business related to BLMIS while disregarding this information, presumably in breach of professional standards of conduct.  The reader just as readily will infer that Employees B and C – also alleged to have been involved in creating or executing certain of the Madoff related investments – likewise were privy to but disregarded this alleged red flag.  This allegation, which is clearly intended to connote professional misconduct by Natixis employees, is patently untrue as to these three employees and, given the negative implications, it is defamatory as to them.

Paragraphs 150 through 177 of the Complaint contain repeated conclusory allegations that Natixis generally and Employees B and C in particular were aware of specific red flags and deliberately ignored them.  In paragraph 162, for example, which references Employee B, the Complaint states that "in the zealous quest for ratings approval for the Tensyr transaction [related to the Fairfield Sentry fund], Natixis, in fact, made many exaggerated and misleading statements in the Rating Memo, which were either false and/or demonstrated Natixis was on notice of possible fraud being perpetrated

---

early as 2004, Natixis had identified fundamental problems with Sentry and BLMIS, putting it on notice of possible fraudulent activities at BLMIS.  In a June 2004 e-mail between FGG employees, FGG's Kim Perry stated, 'I had another conversation with my friend at Natexis…'"

[5] Relevant excerpts from this deposition are attached as Exhibit 2.  As noted above, this deposition transcript is, as a whole, confidential under the terms of the currently applicable protective order.  By referring to the transcript in response to the Court's Order to Show Cause, the Natixis Defendants are not waiving confidentiality or any of the protection provided by the protective order.

D&G | DAVIS & GILBERT LLP
ATTORNEYS AT LAW

The Honorable Burton R. Lifland
March 10, 2011
Page 7

by BLMIS." These types of allegations against Natixis and its employees, which will be shown to be untrue, do not constitute proven fact.[6]

Furthermore, the Complaint employs a device of vacillating between direct references to Employees A, B, and C and general statements regarding "Natixis'" conduct and knowledge. Given the context in which they appear, a fair reading of the mix of such specific and general allegations would lead to the conclusion that when attributing knowledge and conduct to Natixis, the Complaint in fact is referring the Natixis employees' knowledge and conduct. This includes a general allegation ascribed to Natixis that it was "keenly aware" of red flags indicating fraud. These allegations strongly imply that Employees A, B and C intentionally disregarded this information in order to enrich their employer at the possible expense of their clients.

Such factual allegations are indisputably damaging to Employees A, B and C, but will be shown to be untrue. The allegations concerning Natixis' awareness of possible fraud by Madoff, particularly in the section detailing communications between Natixis and Fairfield employees concerning the Tensyr transaction, are undermined by the absence of any fraud claims against Natixis, in contrast to the complaint filed against the Fairfield Sentry fund, the Fairfield Greenwich Group ("FGG") and various related entities and individuals. The amended complaint in that case (Adv. Pro. 09-01239, Docket No. 23, referred to as the "Fairfield Complaint") is not limited to "clawback" claims based upon alleged transfers of funds from BLMIS, such as those asserted against Natixis. In fact, the very Fairfield employees with whom Natixis employees are alleged to have communicated are alleged to have had actual knowledge of Madoff's fraudulent behavior, and are consequently defending a claim of "aiding and abetting [Madoff's] fraud." (Fairfield Complaint, Count 30.) Notably, these Fairfield employees are not alleged to have shared their knowledge of Madoff's fraud with anyone at Natixis, and Natixis is not accused of actual fraud, or of aiding and abetting fraud. A fair reading of paragraph 480 of the Fairfield Complaint implies that, by hiding their knowledge of Madoff's fraud, the Fairfield defendants induced financial institutions, including Natixis, to enter into derivative transactions involving the Fairfield funds, knowing that these institutions would be "hedg[ing] exposure by investing directly in Feeder Funds" themselves. The clear implication by the Trustee in the Fairfield Complaint that Fairfield aided and abetted Madoff in defrauding investors – which included Natixis, to the tune of hundreds of millions of dollars – is at odds with this Complaint's allegations concerning what Employees A, B or C knew about so-called "red flags."

---

[6] In addition, this section of the Complaint misleads the reader to believe that Employee A, a New York employee referred to earlier in the Complaint, was involved somehow with the Tensyr transaction, although he testified that he was not. (*See* Exhibit 2, p. 121:19-20). Thus, for the same reasons stated above, these paragraphs are defamatory not only as to Employees B and C (in France) but Employee A as well.

**D&G** | DAVIS & GILBERT LLP
ATTORNEYS AT LAW

The Honorable Burton R. Lifland
March 10, 2011
Page 8

These are but several illustrations of the way in which the Complaint's loosely framed allegations and conclusions will result in the public being misled at this early stage of the litigation into assuming that the Natixis employees in fact possessed information alerting them to the fact that BLMIS was a fraud.

### C. The False Allegations Against Natixis Employees Will Damage Their Professional and Personal Reputations

It goes without saying that the allegations impugn Employees A, B and C in their professional conduct. The Complaint also is framed so as to create the impression that Natixis (i.e., its employees) somehow engaged in unlawful conduct. As stated above, such statements are presumed to result in reputational damage.

As set forth in the annexed Quentin Declaration, the same result will be felt in France. The French public will generally attribute similar weight to allegations made in a complaint brought by a trustee in bankruptcy to those made by an investigating magistrate in a criminal complaint. (Exhibit 1, ¶ 9-11). The public will assume the person to have committed the alleged conduct, and that the conduct is wrongful. Moreover, in this case because the allegations are related to fraudulent behavior of BLMIS, and the allegations are made against investment professionals who utterly depend on their professional reputation as trustworthy and discreet individuals, the prejudice to them is even more severe. In that regard, the very use of the words "fraud" and "fraudulent" throughout the Complaint in which these three employees are identified will be damaging, particularly as the public cannot be expected to know that allegations of "fraudulent transfers" under Section 548 of the Code do not mean that the transferee (i.e., Natixis) is accused of having "fraudulent" intent. Nor will the public understand that the Trustee has not pleaded any actual fraud on the part of the Natixis Defendants. Such allegations are defamatory under both U.S. and French law.

The perception in France is of utmost importance to all three Natixis employees. Two of the three live and work in Paris and therefore are members of the financial community there. The other Natixis employee is currently employed in New York by a major European financial institution and will suffer the same prejudice due to his ties to the European business community. As described in the Quentin Declaration, given the effect of the allegations in Europe any damage suffered would be irreparable because no remedy is available to repair the person's reputation in the public eye.

## IV. REDACTION IS NECESSARY BECAUSE THE ALLEGATIONS ARE SCANDALOUS

In determining whether an allegation is "scandalous" for purposes of Section 107(b)(2) of the Code, courts look to whether the allegations are relevant and whether they have been made for an improper purpose. In this case, the identification of the Natixis employees is not relevant to the allegations concerning the Natixis Defendants. As noted

**D&G** | DAVIS & GILBERT LLP
ATTORNEYS AT LAW

The Honorable Burton R. Lifland
March 10, 2011
Page 9

above, these employees are not defendants in this action and they have been identified in the Complaint as individuals in positions of authority with regard to the transactions at issue and in a misleading manner that would lead a reasonable reader to conclude they engaged in alleged professional misconduct. The use of the employee names in such a manner serves no purpose but to "promote public scandal" and "serve as reservoirs of libelous statements for press consumption" *Nixon v. Warner Commc'n, Inc.*, 435 U.S. 589, 598 (1978).

## V.    REDACTION IS NECESSARY BECAUSE THE ALLEGATIONS CREATE AN UNDUE RISK OF UNLAWFUL INJURY

The identities of the Natixis employees are unrelated to the public interest and serve no purpose to further the Trustee's allegations against Natixis. As described above, the Natixis employees' interests in closure far outweighs the public's interest in disclosure of their identities. Given the large sums at issue, the high stakes for certain direct and indirect Madoff investors, and recent events involving other financial executives against whom threats reportedly were made, there is a risk of unlawful harm to the Natixis employees. (*See* page 4, n. 3). Because the names of the Natixis employees are immaterial to the Trustee's allegations, any risk of harm is necessarily undue.

## VI.    EQUITY AND FAIRNESS NECESSITATE THAT THE NATIXIS EMPLOYEES' IDENTITIES REMAIN REDACTED

In any event, in addition to the foregoing arguments, the Court should use its equitable discretion under Section 105 of the Code in furtherance of the protections contemplated under Section 107 to maintain the redactions protecting the Natixis employees' identities. As noted above, we are currently at the initial stages of this action. Natixis will vigorously defend the Trustee's allegations in due course. The identification of the Natixis employees is unfair to them because it unnecessarily, without benefit to the Trustee's case and long before any adjudication on the merits of the Trustee's claims, subjects them to severe reputational damage as well as the prospect of unlawful harm. The lack of interest to the public in the identities of the Natixis employees when weighed against the detrimental effects on them necessitates that their names remain redacted.

D&G | DAVIS & GILBERT LLP
ATTORNEYS AT LAW

The Honorable Burton R. Lifland
March 10, 2011
Page 10

       For all of the foregoing reasons, the names of the Natixis employees, which are redacted in the otherwise publicly available Complaint, should remain redacted and the unredacted Complaint which shows their names should remain under seal.

Respectfully submitted,

DAVIS & GILBERT LLP

Joseph Cioffi
Bruce M. Ginsberg
Cheryl M. Plambeck
James Serritella
1740 Broadway
New York, New York  10019
Telephone: (212) 468-4800
Facsimile: (212) 468-4888

*Attorneys for the Natixis Defendants*


cc:    David Sheehan, Esq. (via ECF and e-mail)
       Thomas Long, Esq. (via ECF and e-mail)
       Catherine Woltering, Esq. (via ECF and e-mail)
       George Freeman, Esq. (via e-mail)
       Daniel M. Kummer, Esq. (via e-mail)