**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jacqlyn R. Rovine
Email: jrovine@bakerlaw.com

Hearing Date: July 12, 2010
Hearing Time: 10:00 A.M. (EST)
Objection Deadline: May 31, 2010
Reply Deadline: June 21, 2010

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

## MOTION FOR AN ORDER APPROVING AN INITIAL ALLOCATION OF PROPERTY TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING AN INTERIM DISTRIBUTION TO CUSTOMERS

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ................................................................... 1

II.     PROCEDURAL HISTORY................................................................. 6

III.    THE LIQUIDATION PROCEEDING, CLAIMS PROCESSING & THE NET
        EQUITY DISPUTE ........................................................................ 8

IV.     ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA ......... 12

        A.    Allocation Of Property........................................................ 12

        B.    Distribution Under SIPA...................................................... 13

        C.    Allocation Of Assets To The Fund Of Customer Property And Related
              Reserves ........................................................................ 14

              i.    Assets In Trustee's Possession As Of The Fourth Interim Report &
                    Certain Related Reserves ......................................... 16

              ii.   Undisputed Recoveries To The BLMIS Estate Since The Fourth
                    Interim Report..................................................... 17

              iii.  Disputed Recovery—The Picower Settlement ...................... 19

              iv.   Summary Of Requested Allocation ................................ 23

        D.    Determination Of Allowable Net Equity Claims & Related Reserves ............... 23

V.      INTERIM CALCULATION OF PRO RATA SHARE DISTRIBUTION OF
        CUSTOMER FUND ...................................................................... 26

        A.    No Interim Distribution Of General Estate........................................ 32

VI.     DEPARTMENT OF JUSTICE FORFEITURE FUNDS................................. 33

VII.    MISCELLANEOUS .................................................................. 33

        A.    Notice.......................................................................... 33

        B.    Waiver Of Memorandum Of Law.......................................... 34

VIII.   CONCLUSION.......................................................................... 34

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. § 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff

("Madoff") (collectively, "Debtor"), respectfully submits this motion (the "Motion") pursuant to

SIPA §§ 78*lll*(4), 78fff(a)(1)(B), 78fff-2(b), and 78fff-2(c)(1), and Rule 9013 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking entry of an order (1)

approving an initial allocation of property to the fund of customer property ("Customer Fund");

and (2) authorizing an interim distribution to customers whose claims for customer protection

under SIPA have been allowed for amounts exceeding the statutory limits.  This Court has

jurisdiction over this Motion pursuant to SIPA §§ 78eee(b)(2), 78eee(b)(4), 28 U.S.C. §§ 157

and 1334, and Bankruptcy Rule 5005.  This Motion is based upon the law set forth below as well

as the facts set forth in the affidavit of Matthew Cohen ("Cohen Aff."), filed herewith.   In

support of this Motion, the Trustee alleges and represents as follows:

## I.    PRELIMINARY STATEMENT

1.    In order to protect customers of an insolvent broker-dealer such as BLMIS,

Congress established a statutory framework pursuant to which customers of a debtor in a SIPA

liquidation are entitled to preferential treatment in the distribution of assets from the debtor's

estate.  The mechanism by which customers receive preferred treatment is through the creation

of a fund of "customer property" as defined in SIPA § 78*lll*(4), which is distinct from a debtor's

general estate.  Customers holding allowable claims are entitled to share in the Customer Fund

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

based on each customer's "net equity" as of the filing date, to the exclusion of general creditors. SIPA § 78fff-2(c).

2.      To protect customers further, Congress authorized the Securities Investor Protection Corporation ("SIPC") to advance to the Trustee up to $500,000 for each customer with an allowed net equity claim if customer property is insufficient to satisfy the customer's claim.  SIPA § 78fff-3(a).  Because determining the total amount of customer property and the ratable share owed to each customer takes time, SIPA authorizes SIPC to advance funds to the Trustee, who in turn may promptly pay amounts up to the SIPA limits to customers with allowed claims.  SIPA §§ 78fff-2(b)(1), 78fff-3(a)(1).  Thus, even if ultimately there is enough customer property to make a customer whole without the use of SIPC funds, SIPA does not make the customer wait until the Trustee has collected customer property before partially or fully satisfying his or her claim.  With the exception of those claims in litigation or involved in settlement discussions, the Trustee has advanced or committed to advance SIPC funds to each customer with an allowed net equity claim.

3.      In order to make distributions from the Customer Fund, the Trustee must determine or be able to sufficiently estimate: (a) the total value of customer property available for distribution, or the "numerator" (including reserves for disputed recoveries), and (b) the total net equity of all allowed claims, or the "denominator" (including reserves for disputed claims). Each element of this equation—the customer property numerator and the net equity claims denominator—is inherently complex in a liquidation of this magnitude.  The Trustee has calculated reserve amounts on a "worst-case" basis, such that the ultimate resolution of disputed amounts will not adversely affect any customers' allowed or disputed net equity claims.

4.      There are many unresolved issues in this liquidation proceeding that will require the maintenance of substantial reserves with respect to both the customer property numerator and the net equity claims denominator.  Nonetheless, this liquidation proceeding has progressed to a stage at which it is now possible for the Trustee, on an interim basis, to determine: (a) the allocation of property to the Customer Fund, or the "numerator" (taking into account reserves); (b) the amount of allowable net equity claims, or the "denominator" (also taking into account reserves); and (c) the calculation of each customer's minimum ratable share of the Customer Fund.  Each of those determinations is set forth herein.

5.      In this Motion, the Trustee seeks permission to make an initial allocation to the Customer Fund and an interim distribution to customers whose claims have not been fully satisfied because their net equity claims as of the Filing Date[2] exceeded the statutory SIPA protection limit of $500,000.  The distribution will be made on claims allowed as of March 31, 2011, which relate to 1,224 BLMIS accounts.

6.      Over the course of the twenty-nine months since his appointment, the Trustee has recovered more than $7.6 billion.  Of the "net loser" customers (those BLMIS customers who did not receive their principal back prior to December 11, 2008) who filed claims with the Trustee, the amounts recovered thus far represent approximately 44% of the principal lost in this scheme, totaling approximately $17.3 billion.[3]  This means that the Trustee is almost halfway to the full recovery of principal lost by "net loser" claimants in this liquidation proceeding.  If and

---

[2] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* SIPA § 78*lll*(7)(B) and *infra* ¶ 6.

[3] The total amount of principal lost by all investors is approximately $19.5 billion.  Not every customer with a "net loser" account, however, filed a claim with the Trustee.  Thus, the amount that the Trustee would have to recover in order to return 100% of the principal lost by those who are eligible to receive a distribution in this proceeding is approximately $17.3 billion.

when the Trustee recovers all of the principal lost, it will represent the first time that the "net loser" customers will be caught up to "net winner" customers—"net winners" being those customers who received all of their principal back prior to December 11, 2008.[4]

7.    Despite having recovered over $7.6 billion, only approximately $2.3 billion is available to the Trustee for distribution at this time.  The reduced amount is the result of various appeals that have been filed, including, but not limited to, the appeal relating to the "net equity" dispute (the "Net Equity Dispute"), discussed *infra* ¶¶ 69-79, the appeals relating to the $5 billion Picower settlement, discussed *infra* ¶¶ 53-64, and the appeal relating to the settlement with the Levy family, discussed *infra* ¶ 45. The result of these appeals is that instead of a 44% distribution, the Trustee is only able to make a 4% distribution at this time.

8.    Pursuant to the decision and order of this Court on March 1, 2010 and March 8, 2010, respectively (collectively, the "Net Equity Decision"), only "net loser" customers have a positive net equity under SIPA such that they are eligible for a distribution from the Customer Fund.  Were the Net Equity Decision to be reversed, those claims of "net winner" customers that have been denied to date may become allowable and eligible for a distribution from the Customer Fund.  In order to ensure that there are funds sufficient to make a *pro rata* distribution in that eventuality, the Trustee is maintaining significant reserves,[5] which decrease the amount available for distribution from approximately 44% to approximately 13%.

9.    While not nearly as significant as a 44% distribution, a 13% distribution at this stage of the proceeding would be a welcome result for many BLMIS victims.  Unfortunately, the

---

[4] Net losers and net winners will not be equal, however, until net winners repay the fictitious profits they received.

[5] For this reason alone, no objections to this Motion need be filed by "net winner" claimants to protect any rights to payment in the event the Net Equity Decision is reversed because the distribution model and related reserves build in such protection.

appeal relating to the Net Equity Dispute is not the only appeal pending that reduces the amounts the Trustee can distribute to victims. As noted above, certain claimants have appealed the $220 million settlement with the Levy family, requiring the Trustee to hold those funds in reserve pending the outcome of that appeal. Moreover, two claimants (on behalf of themselves and uncertified, putative classes, whose class actions have been enjoined) separately appealed the most significant settlement obtained by the Trustee to date—that with the estate of Jeffry Picower for $5 billion—singlehandedly reducing the amounts available from $7.3 billion to $2.3 billion. Because of these appeals, distributions on claims relating to 1,224 accounts must be reduced from approximately 13% percent to just over 4%.

10.    While a 4% recovery may appear to be so *de minimus* such that it is inadvisable to make a distribution at this time, there are several factors that tip the balance in favor of a distribution, even with the pending appeals relating to the Net Equity Dispute, the Levy settlement, and the Picower settlement.

11.    By way of this Motion, the Trustee seeks to distribute more than $272 million (with an additional $424 million available for distribution to certain net loser accounts, if the claims relating to their accounts become allowed prior to the time at which the distribution is made).[6]    These distributions will be paid on claims relating to 1,224 BLMIS accounts. The average payment amount to those 1,224 BLMIS accounts is $222,551.12. Thirty-nine payments will go to claimants who qualified for hardship status under the Trustee's hardship program.

12.    Moreover, a significant number of claimants did not have accounts at BLMIS but instead invested in an entity that was a BLMIS customer. Investors in feeder funds are an

---

[6] If all of the net loser accounts were allowed prior to the distribution, the total distribution would be approximately $696 million. SIPC's subrogation claim is approximately $8 million, which as discussed herein, is being currently deferred pending further developments in this proceeding.

example of the foregoing.  A distribution to a feeder fund would likely benefit those persons who had invested in the fund.

13.    Given these numbers and factors, the Trustee submits that the liquidation proceeding is at an appropriate juncture to make a distribution.  Further, he does not believe it is equitable to delay payments however small to thousands of injured customers on account of the actions of two claimants or a potentially lengthy appellate process over which he has no control.

14.    The proposed allocation and distribution are initial and interim in nature.  The Trustee anticipates recovering additional assets through litigation and settlements.  Final resolution of certain disputes will permit the Trustee to reduce the reserves he is required to maintain, which would allow him to make additional distributions to customers in the future. The Trustee will seek authorization for these further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.

## II.    <u>PROCEDURAL HISTORY</u>

15.    On December 11, 2008, Madoff was arrested and criminally charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 in the United States District Court for the Southern District of New York.  *See United States v. Madoff*, 08-MJ-2735.  Also on December 11, 2008, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court against Madoff and BLMIS, among others, titled *SEC v. Madoff*, No. 08-CV-10791 (LLS) (the "SEC Action").

16.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combine the SEC Action with an application of SIPC.  Thereafter, under SIPA § 78eee(a)(3), SIPC filed the application in the District Court alleging that BLMIS was not able to meet its obligations to securities customers as the obligations came due and that its customers needed the protection afforded by SIPA.  The District Court entered a protective decree, to which BLMIS

consented, which, in pertinent part, (a) appointed the Trustee for the liquidation of the business

of the Debtor under SIPA § 78eee(b)(3), (b) appointed Baker & Hostetler LLP as counsel to the

Trustee pursuant to SIPA § 78eee(b)(3), and (c) removed the case to this Court under SIPA

§ 78eee(b)(4).

17.    By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  (ECF Nos. 11, 69).[7]  Accordingly, the Trustee is duly qualified to serve and act on

behalf of the estate of BLMIS.

18.    At a plea hearing on March 12, 2009 in the criminal action filed against him by

the United States Attorney's Office for the Southern District of New York, Madoff pled guilty to

an 11-count criminal information, which included charges of securities fraud, money laundering,

theft, and embezzlement.   Madoff admitted that he "operated a Ponzi scheme through the

investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23:14-17).  On June 29, 2009, Madoff

was sentenced to a term of imprisonment of 150 years.

19.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to

participating in and conspiring to perpetuate the Ponzi scheme.  At a plea hearing on August 11,

2009, DiPascali pled guilty to a ten-count criminal information.   DiPascali admitted, among

other things, that Madoff had been operating a Ponzi scheme since at least the late-1980s or early

1990s.  (Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764

(RJS) (S.D.N.Y. Aug. 11, 2009) (ECF No. 11)).  Mr. DiPascali has yet to be sentenced.

---

[7] All ECF references refer to pleadings filed in the main adversary proceeding pending before the Bankruptcy Court, *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, Adv. Pro. No. 08-1789 (Bankr. S.D.N.Y.) (BRL), unless otherwise noted.

20.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff. On June 9, 2009, this Court entered an order substantively consolidating the Chapter 7 estate of Madoff into the BLMIS SIPA proceeding.

### III.     THE LIQUIDATION PROCEEDING, CLAIMS PROCESSING & THE NET EQUITY DISPUTE

21.     Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11" to the extent that these provisions are consistent with SIPA.

22.     SIPA affords special protection to "customers," as defined in SIPA § 78*lll*(2), who receive preferential treatment by having their claims satisfied ahead of general creditors. *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (recognizing that a "person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment"). The amounts owed to each customer are determined by valuing his or her "net equity," defined in SIPA § 78*lll*(11), as of the Filing Date.

23.     While customer protection is a paramount objective of SIPA, the Trustee has duties under SIPA to the entire bankruptcy estate. Accordingly, both customers and general creditors may file claims against the estate in a SIPA liquidation.

24.     In order to establish an orderly liquidation and determination of claims consistent with SIPA and the Bankruptcy Code, upon application of the Trustee dated December 21, 2008, this Court entered the Claims Procedures Order, which directed, among other things, that the Trustee: (a) on or before January 9, 2009, provide notice of the liquidation proceeding and

claims procedures to all former customers, broker-dealers, and other creditors of the Debtor; (b) on or before January 9, 2009, publish notice of the commencement of this SIPA proceeding in *The New York Times, The Wall Street Journal, The Financial Times, USA Today, Jerusalem Post,* and *Ye'diot Achronot*; and (c) give notice of the February 4, 2009 hearing on disinterestedness of the Trustee and his counsel and the meeting of creditors to be held on February 20, 2009.  Ex Parte Application for Order Approving Form and Manner of Publication and Mailing of Notices (ECF No. 8); Order Signed on Dec. 23, 2008 Approving Form and Manner of Publication and Mailing of Notices (the "Claims Procedure Order") (ECF No. 12).

25.    As required by the Claims Procedures Order, notice was published on January 2, 2009 in all publications.  Affidavit of Publication of John Franks at AlixPartners LLP (ECF No. 57); (Cohen Aff. ¶ 4).  Also on January 2, 2009,[8] more than 15,000 claim forms were mailed to purported customers, purported customers' alternate addresses, broker-dealers, and general creditors of the Debtor advising potential claimants of the Court-approved and statutory time limits for filing claims.  (Cohen Aff. Aff. ¶ 4).  In this case, all claims—whether customer, general creditor, or other claims—must have been filed by July 2, 2009 or were barred as untimely.  *See* SIPA § 78fff-2(a)(3).

26.    In the Claims Procedures Order, the Court set forth the following procedure for determining claims for customer protection under SIPA.  First, the Trustee must review each customer claim filed and determine whether the asserted claim amount agrees with the "net equity" for that account, as reflected on the books and records of BLMIS or otherwise established to the satisfaction of the Trustee.  Second, the Trustee must send the claimant a letter setting forth this determination.  Third, if the claimant agrees with the Trustee's written

---

[8] Certain additional notice mailings were completed by January 9, 2009.  (ECF No. 76).

determination, or if the claimant does not object to the Trustee's determination as required within 30 days of its mailing, then the determined amount becomes the customer's "net equity" claim. Fourth, if the claimant disagrees with the Trustee's determination, then the claimant is required to file a written statement with the Court setting forth the basis for the objection, together with copies of any documents in support of its objection, and serve it on the Trustee within 30 days of the mailing of the Trustee's determination letter. Upon the claimant's objection, the Trustee shall obtain a hearing date from the Court to hear the dispute.

27.     As of March 31, 2011, the Trustee had received 16,518 customer claims. (Cohen Aff. ¶ 6). As of March 31, 2011, the Trustee had determined 16,268 of those claims. (*Id.* ¶ 7). The Trustee allowed 2,409 claims and committed to pay approximately $793 million in funds advanced to him by SIPC. (*Id.*). The allowed claims total over $6.8 billion. (*Id.*).

28.     Of the remaining determined customer claims, 13,438 were denied, 12 were determined as asserting no claim, and 149 were withdrawn. (*Id.* ¶ 8). Two hundred and sixty claims relating to 205 accounts have been "deemed determined," meaning that the Trustee has instituted litigation against those claimants. (*Id.*). The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under section 502(d) of the Bankruptcy Code. Accordingly, such claims will not be allowed until the avoidance action is resolved by settlement or otherwise and any judgment rendered against the claimant in the avoidance action is satisfied. Two hundred and fifty customer claims remain to be determined, as they are still under review by the Trustee's staff; the value of these claims has been reserved in the proposed distribution. (*Id.*).

29.     As of March 31, 2011, the Trustee received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7

billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 448 claims, 101 are general creditor claims and fifty are broker-dealer claims, which together total approximately $266 million of the $1.7 billion.[9]  (*Id.* ¶ 9).

30.    Two thousand, two hundred and ninety (2,290) unique docketed objections to the Trustee's claims determinations have been filed relating to approximately 3,800 claims, which will be noticed for hearing if necessary.  (*Id.* ¶ 11).  These 2,290 objections relate to approximately 1,150 BLMIS accounts.  (*Id.*).  The objections raise various issues, including the proper interpretation of "net equity," the right to interest or time value of money, and whether the Trustee's calculation of allowed claims amounts are correct, which are among the matters for which the Trustee is reserving.

31.    The Trustee allowed or denied customer claims as described above depending on, first, whether the claimant was a customer of BLMIS (*i.e.*, had an account in his/her name) and second, whether the claimant had positive "net equity," as that term is defined by SIPA.  In calculating each customer's "net equity," the Trustee has credited the amount of cash deposited by the customer into his BLMIS account, less any amounts withdrawn by him from his BLMIS customer account (the "cash in, cash out method" or the "Trustee's Net Investment Method").  Some claimants have argued that the Trustee is required to allow customer claims in the amounts shown ("Fictitious Statement Amount") on the November 30, 2008 BLMIS customer statements (the "Net Equity Dispute").  Nonetheless, this Court upheld the Trustee's Net Investment

---

[9] The 151 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor and service claims.  (Cohen Aff. ¶ 9).  They do not include "customer" claims, even though each "customer" claim—both those allowed and denied—has a "general creditor" component.  All BLMIS creditors, including customers whose claims were allowed, customers whose claims were denied, and general creditors, may have claims as general creditors against BLMIS for misrepresentation, fraud, and breach of contract (assuming they filed claims).  Customers who filed customer claims need not have specifically filed claims as general creditors to protect such rights.

Method as the only interpretation consistent with the plain meaning and legislative history of the statute, controlling Second Circuit precedent, and considerations of equity and practicality (ECF No. 2020), reported at *SIPC v. BLMIS*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010) (the "Net Equity Decision"). The Net Equity Decision is currently on appeal before the Second Circuit.

IV.    **ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA**

A.    **Allocation Of Property**

32.    In order to protect customers of an insolvent securities broker-dealer such as BLMIS, Congress enacted a bipartite statutory framework that gives customers priority over general creditors of the broker-dealer. Pursuant to SIPA § 78fff-2(c)(1)(B), all customers will share ratably in the fund of customer property. Pursuant to SIPA § 78fff-2(c), general creditors and customers, to the extent of their respective unsatisfied net equities, will share in any general estate. Estate property not allocable to the fund of customer property is distributed in the order of priority established in section 726 of the Bankruptcy Code. SIPA § 78fff(e). Any property allocated to the fund of customer property that is not necessary to satisfy customer and other priority claims will become part of the general estate. SIPA § 78fff-2(c).

33.    According to SIPA § 78*lll*(4), "customer property" consists of "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

34.    Among the assets that comprise "customer property" are "any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers . . ." SIPA § 78*lll*(4)(D). Under SIPA § 78*lll*(4)(D), a trustee is permitted to look to the property of the debtor to rectify the actions taken by the debtor that resulted in a shortfall in customer property. *See Ferris, Baker, Watts v.*

*Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 131-32 (Bankr. D. Minn. 2002) ("Application of the plain meaning of 15 U.S.C. § 78*lll*(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall. . . . Thus, if the debtor failed to set aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78*lll*(4)(D) would require the trustee to correct the debtor's error.").

35.    Thus, if the trustee determines that there is a shortfall in assets such that customer property is insufficient to satisfy net equity claims, then he may look to other assets of the debtor and allocate property to the fund of customer property.

36.    SIPA liquidations generally take a broad and inclusive customer-related approach to the allocation of property. For example, in *In re Park South Securities, LLC*, 99% of the debtor's estate was allocated to customer property. *See* Order, No. 03-08024A (Bankr. S.D.N.Y. Oct. 30, 2008).[10] Consistent with prior liquidations, the Trustee expects to allocate most of the BLMIS estate to the Customer Fund, inasmuch as here, recovered property either belonged to customers or was derived from the misuse of customer property.

---

[10] *Accord SIPC v. Lehman Brothers, Inc.*, Adv. Pro. No. 08-01420, Motion for Order Approving Allocation of Property of the Estate at 27-28, n.33 (Bankr. S.D.N.Y. Oct. 5, 2009) (ECF No. 1866) (allocating "most" of debtor's assets to customer property); *In re Vision Inv. Grp., Inc.*, Adv. Pro. No. 97-1035B, Order Approving Third and Final Report and Final Accounting of the Securities Investor Protection Corporation (Bankr. W.D.N.Y. Dec. 13, 2005) (allocating 95% of debtor's estate to customer property); *In re Klein Maus & Shire, Inc.*, Adv. Pro. No. 00-8193A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property); *In re MJK Clearing*, 286 B.R. at 132 (allocating 100% the debtor's assets as customer property); *In re A.R. Baron & Co., Inc.*, Order Approving Final Report and Account and Related Relief, Adv. Pro. No. 96-8831A (Bankr. S.D.N.Y. Feb. 10, 2004) (allocating 99% of the debtor's assets to customer property); *In re Hanover, Sterling & Co.*, Adv. Pro. No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002) (allocating 75% of debtor's estate to customer property).

### B.   Distribution Under SIPA

37.   The SIPA distribution scheme, while complex, can be distilled to a simple equation.  Each customer is entitled to his or her *pro rata* share of customer property.  To determine the percentage that each allowed customer will receive from the fund of customer property in an interim distribution, the aggregate amount collected to date by the trustee and allocated to customer property is divided by the aggregate amount of net equity claims allowed by the trustee.  The percentage result is then to be applied to each net equity claim to determine a customer's *pro rata* share.  The equation is as follows:

$$\frac{\text{Fund of Customer Property (``Numerator'')}}{\text{Allowable Customer  Net Equity Claims (``Denominator'')}} = \text{Customer } Pro\ Rata \text{ Share}$$

38.   SIPA § 78fff-2(c)(1) establishes the order of distribution of customer property.  The second and third priorities of distribution are relevant here.  The second priority is to distribute customer property among customers based on their filing date net equities.  SIPA § 78fff-2(c)(1)(B).  The third priority is to distribute customer property to SIPC as subrogee.  SIPA § 78fff-2(c)(1)(C).  Thereafter, any customer property remaining becomes part of the general estate.

39.   The amount advanced by SIPC to the Trustee in full or partial satisfaction of a customer claim is based on the difference between the customer's net equity and his share of customer property, subject to the $500,000 limit of SIPA's statutory protection.  The SIPC advance does not reduce the customer's net equity or his claim against customer property.  If the sum of the amount of a customer's SIPC advance and any subsequent distribution of customer property exceeds the customer's net equity, SIPC has the right to recoup the excess.  In effect, SIPC becomes subrogated to the claims of customers to the extent it has supplied advances but

- 14 -

cannot seek recovery from customer property as to any individual customer until the customer has been fully satisfied.  SIPA §§ 78fff-3(a), 78fff-2(c)(1).

### C.    Allocation Of Assets To The Fund Of Customer Property And Related Reserves

40.    As this Court previously found in its Net Equity Decision, Madoff did not engage in securities trading on behalf of BLMIS customers.  Madoff used customer funds to support operations and fulfill requests for redemptions to perpetuate the Ponzi scheme.  Thus, payment of "profits" to any one customer in fact came from another customer's deposit of funds.  As BLMIS was a Ponzi scheme, all of the funds withdrawn by BLMIS customers were simply other people's money.

41.    BLMIS was organized as a single member limited liability company.  BLMIS operated a fraudulent investment advisory business (the "IA Business"), a proprietary trading desk, and a market making desk.  Although it had three distinct units, customer funds that were invested through the IA Business were used to fund not only the IA Business, but all of BLMIS's operations.

42.    BLMIS had an obligation to set aside sufficient assets to cover its statutory obligations to customers.  To the extent it did not, even assets that were not directly "proceeds" of Madoff's fraud are to be treated as "customer property" up to the amount of the deficiency.[11] However, even including such assets in the fund of customer property, all of the assets of BLMIS

---

[11] SIPA's definitional paragraphs were amended in 1978 to incorporate in the "customer property" definition any other property of the debtor's estate which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers.  Thus, to the extent that prior to the Filing Date BLMIS failed to maintain cash and securities in compliance with the Net Capital Rule issued by the SEC (Rule 15c3-3), as affected by the Customer Protection Rule (Rule 15c3-3) (both issued pursuant to the Exchange Act, 15 U.S.C. § 78o(c)(3)(A)), the Trustee is required to allocate property as necessary to remedy such non-compliance.  The Customer Protection Rule effectively requires that a broker-dealer maintain secure control of all property that would have to be delivered to customers in the event of a liquidation: either the securities themselves or their value in the form of cash (or equivalents), and cash sufficient to pay net cash obligations to customers.

and Madoff would nonetheless be insufficient to cover the obligations of BLMIS to its customers.

43.    For these reasons, and because it is not uncommon for almost all property available to a broker-dealer to be deemed "customer property," the Trustee seeks the Court's approval to allocate to the Customer Fund virtually all cash currently in his possession— $2,617,974,430.26—as well as those assets specifically identified herein as the Picower Settlement Funds.  (Cohen Aff. ¶ 18).  *See First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 362-66 (D.N.J. 1986) (describing and approving SIPA allocation and distribution scheme similar to that proposed by Trustee).

### i.    Assets In Trustee's Possession As Of The Fourth Interim Report & Certain Related Reserves

44.    In the Trustee's Interim Report for the period of April 2010 through September 2010 ("Fourth Interim Report"), the Trustee reported that he possessed approximately $1.5 billion.[12]   *See* Fourth Interim Report, at ¶ 1 (ECF. No. 3038).   These funds were primarily derived from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS estate; (b) pre-litigation settlements; (c) customer preference recoveries; (d) the sale of assets; and (e) refunds.

45.    One of the more significant pre-litigation settlements approved by this Court was entered into by the Trustee and the estate of Norman F. Levy.  Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement By and Among the Trustee and Jeanne Levy-Church and Francis N. Levy (ECF No. 1964).  This settlement resulted in the return of $220 million to the BLMIS

---

[12] In addition, the Trustee has in his possession a *de minimis* amount of unliquidated assets.

estate. (Cohen Aff. ¶ 13). Certain claimants, represented by the law firm of Becker & Poliakoff, LLP, moved to vacate this settlement, which was heard by this Court on March 30, 2011. Customers' Motion to Set Aside the Order Approving the Trustee's Settlement with the Levy Heirs for Failure to Disclose Material Information (ECF Nos. 3860-3862). The Court denied the motion (ECF No. 3984), and the claimants filed an appeal on April 11, 2011 (ECF No. 4005) (the "Levy Appeal"). Because the proceeds of the Levy settlement remain the source of dispute, the Trustee is prevented from distributing these funds to customers at this time. The Trustee seeks approval to allocate the full amount of this settlement to the Customer Fund, though the Trustee will hold the $220 million in reserve pending the appeal.

46.     Other claimants returned $11,500,158.34 in preference and other monies to the BLMIS estate pursuant to agreements that contained clauses relating to the outcome of the Net Equity Dispute. (Cohen Aff. ¶ 14). These agreements provide that if a final, nonappealable order overruling the Net Equity Decision is entered (such that each customer's "net equity" in this proceeding shall be calculated as the Fictitious Statement Amount), the funds returned to the BLMIS estate shall revert to the claimants. The Trustee seeks approval to allocate the full amount of these preference and other settlements to the Customer Fund, though the Trustee will hold the $11,500,158.34 in reserve pending the outcome of the Net Equity Dispute.

### ii.     Undisputed Recoveries To The BLMIS Estate Since The Fourth Interim Report

47.     Since the Fourth Interim Report, this Court has approved four significant settlements between the Trustee and certain parties that greatly increased the amount of funds recovered to the BLMIS estate. Three of these settlements are undisputed and the proceeds of which are in the BLMIS estate and available for allocation and distribution.

48.    On December 21, 2010, this Court approved a settlement between the Trustee and

Carl Shapiro, Robert Jaffe, and related entities (the "Shapiros") in the amount of $550 million.

Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the

Federal Rules of Bankruptcy Procedure Approving an Agreement By and Among the Trustee

and the Shapiro Family (ECF No. 3551).    On or about December 23, 2010, the Shapiros

transferred $550 million to the Trustee.    (Cohen Aff. ¶ 15).    The Trustee seeks approval to

allocate the full amount of this settlement to the Customer Fund for distribution in accordance

with this Motion.

49.    On January 6, 2011, this Court approved a settlement between the Trustee and

Swiss bank Union Bancaire Privée ("UBP") that resulted in the recovery of $470 million to the

estate.[13]    Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of

the Federal Rules of Bankruptcy Procedure Approving an Agreement By and Among the Trustee

and Union Bancaire Privée (ECF No. 3632).    On or about January 24, 2011, UBP transferred

$470 million to the Trustee.    (Cohen Aff. ¶ 15).    The Trustee seeks approval to allocate the full

amount of this settlement to the Customer Fund for distribution in accordance with this Motion.

50.    On March 10, 2011, this Court approved a settlement between the Trustee and

Hadassah in the amount of $45 million.    Order Pursuant to Section 105(a) of the Bankruptcy

Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an

Agreement By and Among the Trustee and Hadassah, the Women's Zionist Organization of

America, Inc. and Hadassah Medical Relief Association, Inc. (ECF No. 3912).    On or about

---

[13] Per the settlement agreement executed on December 6, 2010, UBP agreed to pay the Trustee an additional amount (the "UBP Guarantee Payment") upon the resolution of actions brought by the Trustee against the Chester and Irongate family of funds.  The UBP Guarantee Payment shall be the difference between $30 million and the sum of all settlement and judgment amounts received by the Trustee from the Chester and Irongate family of funds.  As a result, the maximum UBP Guarantee Payment will be $500 million.

March 28, 2011, Hadassah transferred $45 million to the Trustee. (Cohen Aff. ¶ 15). The Trustee seeks approval to allocate the full amount of this settlement to the Customer Fund for distribution in accordance with this Motion.

51.     In addition to the above settlements, the Trustee has recovered $89,071,011.28 since the Fourth Interim Report as a result of preference and other settlements, of which $45,981,625.41 is subject to the Net Equity Dispute.[14]  (Cohen Aff. ¶ 16). The Trustee will hold the $45,981,625.41 in reserve pending the outcome of the Net Equity Dispute. Therefore, the Trustee seeks approval to allocate the full amount of these preference and other settlements to the Customer Fund, but only $43,089,385.87 of these settlements will be available for distribution at this time.

52.     To the extent additional settlements are entered into and approved by this Court prior to the entry of an order on this Motion, the Trustee will seek to allocate those recoveries by way of a supplemental filing.

### iii.    Disputed Recovery—The Picower Settlement

53.     The fourth significant settlement entered into by the Trustee since the Fourth Interim Report—that with the estate of Jeffry Picower (the "Picower Settlement" or the "Picower Settlement Funds")—stands to have the greatest effect on customer recoveries in this liquidation proceeding. Because of actions taken by certain claimants, however, the Picower Settlement Funds have not yet been transferred to the Trustee. Some background regarding the Picower Settlement Funds will be provided for context and clarity.

---

[14] These agreements provide that if the court enters a final, nonappealable order overruling the Net Equity Decision (such that each customer's "net equity" in this proceeding shall be calculated as the Fictitious Statement Amount), the funds returned to the BLMIS estate shall revert to the claimants.

54.     On May 12, 2009, the Trustee commenced an adversary proceeding against Jeffry Picower and related entities (the "Picower Defendants"), captioned *Picard v. Picower*, Adv. Pro. No. 09-1197 (Bankr. S.D.N.Y.) (BRL) (ECF No. 1).  Thereafter, the Trustee and Mrs. Barbara Picower, the executor of the estate of Jeffry Picower (the "Picower Estate"), engaged in settlement negotiations that resulted in an agreement to settle the Trustee's claims in the amount of $5 billion.

55.     Mrs. Picower's agreement with the Trustee, however, was contingent on her reaching an agreement with the United States Government (the "Government") to resolve potential civil forfeiture liability of the Picower Estate pursuant to 18 U.S.C. § 981(a)(1)(C).  As a result of subsequent negotiations with the Government, Mrs. Picower, on behalf of the Picower Estate, agreed to forfeit to the Government the amount of $7,206,157,717 (the "Forfeited Funds"), of which $5 billion was credited and to be paid over to the Trustee.  The remainder represented Mrs. Picower's settlement with the Government.

56.     In February 2010, while the Picower settlement negotiations were ongoing, Adele Fox ("Fox") and Susanne Marshall ("Marshall"), each a BLMIS claimant (collectively, the "Florida Plaintiffs"), commenced putative class actions against the Picower Defendants in the United States District Court for the Southern District of Florida, West Palm Beach Division (collectively, the "Florida Actions") for damages relating to BLMIS.  Upon motion of the Trustee, this Court preliminarily enjoined the Florida Actions (the "Preliminary Injunction Order").  *Picard v. Fox*, Adv. Pro. No. 10-3114 (Bankr. S.D.N.Y.) (BRL), Memorandum Order and Decision Granting Trustee's Motion Pursuant to Bankruptcy Code Sections 362(a) and 105(a) and Bankruptcy Rule 7065 for Enforcement of the Automatic Stay and for a Preliminary

Injunction (ECF No. 22). The Florida Plaintiffs appealed the Preliminary Injunction Order to the District Court for the Southern District of New York. *Id.*, Notice of Appeal (ECF No. 25).

57.    In December 2010, the Trustee moved for an order approving the Picower Settlement. At the same time, the Government commenced a forfeiture action in the District Court. *United States of America v. $7,206,157,717 On Deposit at JPMorgan Chase, NA in the Account Numbers Set Forth on Schedule A*, No. 10-CV-9398 (S.D.N.Y.) (TPG) (ECF No. 1). The Government and Mrs. Picower entered into a Stipulation and Order of Settlement (the "Forfeiture Stipulation"), which was so ordered by the District Court. *Id.*, Stipulation and Order of Settlement (ECF No. 2). Thereafter, the Trustee's Picower Settlement was approved by this Court on January 13, 2011 (the "Picower Settlement Order"). *Picower*, Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving an Agreement by and Among the Trustee and the Picower BLMIS Account Holders and Issuing a Permanent Injunction (ECF No. 43).

58.    Under the terms of an escrow agreement incorporated by reference into both the Picower Settlement Order and the Forfeiture Stipulation (the "Escrow Agreement"), the Picower Estate transferred the full $7.2 billion to the escrow account at JPMorgan Chase Bank, NA (the "Picower Escrow Account"). *Id.* Shortly thereafter, approximately $2.2 billion was transferred to the Government pursuant to the Forfeiture Stipulation.

59.    The Escrow Agreement provides that the $5 billion remaining in the Picower Escrow Account is to be transferred to the Trustee upon the entry of the earlier of either: (a) a final, nonappealable order approving the Trustee's settlement; or (b) a final, nonappealable order of forfeiture. *Id.*

- 21 -

60.    As referenced above, this Court entered the Picower Settlement Order on January 13, 2011.   Had fourteen days expired with no appeals taken, the Picower Settlement Order entered by this Court would have become final and nonappealable on January 27, 2011. Pursuant to the Escrow Agreement, the Trustee would have then sought the release of the $5 billion and received such funds within five business days.  However, that is not what transpired. Instead, the Florida Plaintiffs (certain of which are represented by the law firm of Becker & Poliakoff, LLP) appealed the Picower Settlement Order to the District Court, meaning that a final, nonappealable order regarding the Trustee's Picower settlement can be entered only upon the resolution of those appeals.   *Picower*, Amended Notice of Appeal (ECF No. 45); Notice of Appeal (ECF No. 49).   As a result, instead of the Trustee receiving the $5 billion in early February 2011 for distribution to customers, those funds remain in the Picower Escrow Account.

61.    The Government forfeiture action relating to the Picower Estate is pending before the District Court.  Fox filed both a motion to intervene in that action and a claim against the forfeited funds.   *$7,206,157,717 On Deposit at JPMorgan Chase, NA in the Account Numbers Set Forth on Schedule A*, Motion to Intervene (ECF Nos. 6-8), Notice of Claim (ECF No. 10). The Government opposed the motion to intervene and simultaneously filed a cross-motion to dismiss Fox's claim to the forfeited funds (the "Government Opposition").   *Id.*, Opposition to Adele Fox's Motion to Intervene, and Cross-Motion to Dismiss Adele Fox's Claim to the Defendant in Rem, and for a Final Order of Forfeiture (ECF Nos. 12-14).  In the Government Opposition, the Government requested that the District Court enter a final order of forfeiture. The District Court has scheduled a hearing on May 26, 2011.

62.    The only way for the Trustee to receive the Picower Settlement Funds for allocation to the Customer Fund and distribution under SIPA is through either entry of a final,

nonappealable order approving the Picower Settlement or a final, nonappealable order of forfeiture. Upon either event, the Trustee will seek the transfer of $5 billion to the BLMIS estate from the Escrow Account.

63.    It is not known at this time whether or when a final order of settlement or forfeiture will be entered and, thus, whether or when the Trustee will receive the $5 billion paid in settlement of the Trustee's claims against the Picower Estate. Should those funds come into the BLMIS estate, there is no question that the $5 billion should be allocated to the Customer Fund.

64.    The Trustee seeks approval to allocate the $5 billion Picower Settlement to the Customer Fund upon receipt of such funds. As discussed more fully below, upon receipt of those funds and allocation to the Customer Fund, each customer's distribution will increase markedly.

### iv.    Summary Of Requested Allocation

65.    The Trustee, in this Motion, seeks to allocate $2,617,974,430.26 to the Customer Fund, with $220 million and $57,481,783.75 (a total of $277,481,783.75) held in reserve pending the outcome of the Levy Appeal and the Net Equity Dispute, respectively, leaving $2,340,492,646.51 available for distribution at this time. (Cohen Aff. ¶ 18).

66.    The Trustee also seeks to allocate the $5 billion Picower Settlement Funds to the Customer Fund. Should the Picower Settlement Funds be transferred to the BLMIS estate before entry of an order by this Court regarding allocation of the estate, the Trustee will seek permission to distribute those funds.

67.    The Trustee does not seek to allocate any funds to the General Estate at this time.

### D.    Determination Of Allowable Net Equity Claims & Related Reserves

68.    For distribution purposes, the Customer Fund numerator is only one half of the equation.  In order to calculate each customer's *pro rata* share of customer property, the Trustee also needs to establish the denominator, or the amount of allowable net equity claims.

69.    If the Trustee had determined all customer claims and his determinations were final either through the passage of time or judicial determination, the denominator would simply equal the amount of allowed claims.  Because the Trustee is seeking to make an interim distribution prior to a final determination of all customer claims and while certain disputes such as the Net Equity Dispute are pending, the Trustee cannot use as the denominator the amount of allowed claims as of this date.  Doing so could result in an uneven distribution to customers, in violation of SIPA and the Bankruptcy Code, because there could be less funds to distribute to claimants whose claims are allowed in the future.  Instead, the Trustee must project as to the amount of all *allowable* net equity claims and establish sufficient reserves to ensure that he can make a *pro rata* distribution to all possibly-eligible claimants, should their claims be allowed.  In order to do so, he must maintain sufficient reserves.

70.    In its current posture, the Net Equity Dispute can be resolved in one of two ways: this Court's Net Equity Decision could be upheld by a final, nonappealable order holding that net equity under SIPA shall be calculated using the cash in, cash out method, or the Net Equity Decision could be overturned by a final, nonappealable order holding that each customer's claim must be valued in the Fictitious Statement Amount.

71.    The Trustee, in this Motion, seeks to set the Fictitious Statement Amount of $57,354,863,950.37 as the "denominator" for purposes of this distribution (the "Net Equity Reserve Denominator").  (Cohen Aff. ¶ 25).

72.     The Fictitious Statement Amount is the amount shown on the November 30, 2008

BLMIS customer statements.    The total amount of fictitious equity shown on the customer

statements issued by BLMIS on November 30, 2008 was $64,884,303,872.14.    (*Id.* ¶ 20).

However, this $64,884,303,872.14 includes $8,597,048,281.54 in negative equity (*i.e.*, amounts

owed by customers to BLMIS) from twenty-two accounts.    (*Id.*).    When this negative equity is

added to the $64,884,303,872.14 fictitious equity of those customer accounts that had a positive

balance, the total fictitious equity for all BLMIS customer accounts as of November 30, 2008

increases to $73,481,352,153.68.    (*Id.*).

73.     The Trustee has subtracted $16,034,388,246.88 in customer claims, including

those related to the Levy, Picower, and Shapiro accounts that were irrevocably withdrawn from

this liquidation proceeding as part of the settlements with those parties, from the Fictitious

Statement Amount.    (*Id.* ¶ 21).

74.     During December 2008, seven new accounts opened with cash activity that

resulted in a net deposit of $84,555,432.72.    (*Id.* ¶ 24).    This activity is not reflected in the

Fictitious Statement Amount but is included in the Net Equity Reserve Denominator.    Also

during December 2008, 250 accounts that are included in the Net Equity Reserve Denominator

had cash activity that resulted in a net withdrawal of $225,604,087.19.    (*Id.* ¶ 22).    This activity

is not reflected in the Fictitious Statement Amount.    One hundred sixteen accounts remitted

$48,948,698.04 to the Trustee based on preference settlements or settlement agreements not

contingent on the Net Equity Dispute, which is also included in the Net Equity Reserve

Denominator.    (*Id.* ¶ 22).

75.     Of the Fictitious Statement Amount, approximately $7.2 billion correlates to

customer accounts against which no claims were filed or the claims were withdrawn due to

settlement agreements. (*Id.* ¶ 26). Thus, even if the Second Circuit resolves the Net Equity Dispute against the Trustee such that net equity is valued in the Fictitious Statement Amount, the Trustee asserts that no distributions should be made on these accounts. However, the Trustee has still included the $7.2 billion in the Net Equity Reserve Denominator because of certain actions pending in this Court.

76. Those actions include a class action filed prior to the statutory bar date against the Trustee seeking, *inter alia*: (a) declaratory relief that "net equity" must be valued in the Fictitious Statement Amount, and (b) a determination that the class action be deemed a class proof of claim on behalf of all customers who failed to file a customer claim prior to the bar date. *See Less v. Picard*, Adv. Pro. No. 09-1265 (Bankr. S.D.N.Y.) (BRL).

77. Pursuant to a stipulation so ordered by this Court on September 18, 2009, the class action was stayed pending the entry of a final, nonappealable order regarding the Net Equity Dispute. *Less*, So Ordered Stipulation signed on Sept. 18, 2009 Between Plaintiffs and Defendant (ECF No. 34). As such, no rulings were made as to the declaratory relief sought in the class action, including the propriety of filing a class proof of claim in this liquidation proceeding. Thus, the Trustee has included in the Net Equity Reserve Denominator approximately $7.2 billion relating to the fictitious equity of accounts for which no claims were filed. (Cohen Aff. ¶ 25).

78. After making the discussed-above adjustments, the Net Equity Reserve Denominator is $57,354,863,950.37. (*Id.* ¶ 25). This amount is the highest amount for which the Trustee will have to reserve because no customer's net equity could be greater than the

amount on their November 30, 2008 statement once the adjustments described above have been made.[15]  (*Id.* ¶ 27).

79.     In contrast, if the Net Equity Dispute were not pending, and no other reserves were required, $17,265,885,837.54 would be the denominator under the Trustee's Net Investment Method.  (*Id.* ¶ 19).

## V.     INTERIM CALCULATION OF *PRO RATA* SHARE DISTRIBUTION OF CUSTOMER FUND

80.     SIPA § 78fff-2(c)(1) establishes, in pertinent part, that a customer is to receive his ratable share from the fund of customer property.  To the extent that the customer has already been fully satisfied through an advance of funds by SIPC by the time that customer property is distributed, SIPC steps into the shoes of the customer as subrogee and receives that customer's share of customer property.  In that manner, a customer does not receive a double recovery on his claim that was already fully satisfied by the SIPC advance.

81.     As set forth above and in the Cohen Affidavit, the Trustee proposes to allocate $2,617,974,430.26 to the Customer Fund at this time.  (*Id.* ¶ 29).  Of that amount, $2,340,492,646.51 is available for distribution (the "Net Customer Fund").  *See supra* ¶ 65.  The Net Equity Reserve Denominator is $57,354,863,950.37.  (Cohen Aff. ¶ 29).  To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the Net Equity Reserve Denominator, resulting in the following percentage ("Scenario 1"):

$$\frac{\$2,340,492,646.51 \text{ (Net Customer Fund)}}{\$57,354,863,950.37 \text{ (Net Equity Reserve Denominator)}} = 4.081\%$$

---

[15] There are no additional reserves required for any future avoidance recoveries by the Trustee because such recoveries will be added to both the numerator and the denominator by operation of Bankruptcy Code § 502(h). Any subsequent recovery coupled with a corresponding claim for the same amount cannot adversely affect the distribution because the addition of any amount to both the numerator and denominator can only result in an increase, not a decrease, of the *pro rata* distribution to any customer.

Under Scenario 1, the allowed claims relating to 1,214 BLMIS accounts will be partially satisfied and the allowed claims relating to 10 additional accounts will be fully satisfied. Eight hundred and sixty-eight accounts have already been fully satisfied or committed to be fully satisfied by the funds advanced to the Trustee by SIPC. An additional 205 accounts that have been "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Seventy-nine of the 205 accounts would be fully satisfied by the SIPC advance. The remaining 126 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion.

82.     If the $5 billion Picower Settlement Funds were to come into the BLMIS estate and be allocated to the Customer Fund, each customer's ratable share of the Customer Fund would accordingly increase ("Scenario 2"). (*Id.* ¶ 33). Rather than 4.08%, each customer's share would be calculated as follows:

$$\frac{\$7,340,492,646.51 \text{ (Net Customer Fund)}}{\$57,354,863,950.37 \text{ (Net Equity Reserve Denominator)}} = 12.798\%$$

Under Scenario 2, when combined with amounts advanced to the Trustee by SIPC, claims relating to 1,177 accounts would be partially satisfied and the allowed claims relating to 47 additional accounts would be fully satisfied. Eight hundred and sixty-eight accounts have already been fully satisfied or committed to be satisfied by the funds advanced to the Trustee by SIPC. An additional 205 accounts that have been "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Seventy-nine of the 205 accounts would be fully satisfied by the SIPC advance. Three additional accounts would be fully satisfied with the SIPC advance plus their *pro rata* share of the

Customer Fund. The remaining 123 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion.

83. If this Court's Net Equity Decision were upheld by a final, nonappealable order holding that net equity under SIPA shall be calculated using the cash in, cash out method, and no reserves for the Levy Appeal were required, each customer's ratable share of the Customer Fund would accordingly increase ("Scenario 3"). (*Id.* ¶ 34). Rather than 12.80%, each customer's share would be calculated as follows:

$$\frac{\$2,617,974,430.26 \text{ (Customer Fund)}}{\$17,265,885,837.54 \text{ (Net Equity Reserve Denominator)}} = 15.163\%$$

Under Scenario 3, when combined with amounts advanced to the Trustee by SIPC, claims relating to 1,168 accounts would be partially satisfied and the allowed claims relating to 56 additional accounts would be fully satisfied. Eight hundred and sixty-eight accounts have already been fully satisfied or committed to be fully satisfied by the funds advanced to the Trustee by SIPC. An additional 205 accounts that have been "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Seventy-nine of the 205 accounts would be fully satisfied by the SIPC advance. Three additional accounts would be fully satisfied with the SIPC advance plus their *pro rata* share of the Customer Fund. The remaining 123 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion.

84. If this Court's Net Equity Decision were upheld by a final, nonappealable order, the Picower Settlement Funds of $5 billion were to come into the BLMIS estate to be allocated to the Customer Fund, the Levy funds were available, and no other reserves were required, each customer's ratable share of the Customer Fund would accordingly increase ("Scenario 4"). (*Id.* ¶ 35). Rather than 4.08% or 15.16%, each customer's share would be calculated as follows:

$$\frac{\$7{,}617{,}974{,}430.26 \text{ (Customer Fund)}}{\$17{,}265{,}885{,}837.54 \text{ (Net Equity Reserve Denominator)}} = 44.122\%$$

This means that each customer would receive approximately 44.1 cents on the dollar. Under Scenario 4, when combined with amounts advanced to the Trustee by SIPC, claims relating to 994 accounts would be partially satisfied and the allowed claims relating to 230 additional accounts would be fully satisfied. Eight hundred and sixty-eight accounts have already been fully satisfied or committed to be fully satisfied by the funds advanced to the Trustee by SIPC. An additional 205 accounts that have been "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Seventy-nine of the 205 accounts would be fully satisfied by the SIPC advance. Fifteen additional accounts would be fully satisfied with the SIPC advance plus their *pro rata* share of the Customer Fund. The remaining 111 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion.

85.    The following chart provides an example of the four distribution scenarios for a customer with an allowed claim of $575,000:

| Category | Customer Pro Rata Share | Allowed Amount | SIPC Advance | Customer Pro Rata Amount | SIPC Subrogation | Amount of Interim Allocation to Customer | Total To Claimant (SIPC Advance + Amount of Allocation to Customer) |
|---|---|---|---|---|---|---|---|
| Scenario 1: Funds on Hand ("FOH") | $0.0408 | $575,000 | $500,000 | $23,464 | $0 | $23,464 | $523,464 |
| Scenario 2: (FOH + Picower) | $0.1280 | $575,000 | $500,000 | $73,591 | $0 | $73,591 | $573,591 |
| Scenario 3: (FOH + net equity upheld + Levy) | $0.1516 | $575,000 | $500,000 | $87,186 | $12,186 | $75,000 | $575,000 |
| Scenario 4: (FOH + Picower + net equity upheld + Levy) | $0.4412 | $575,000 | $500,000 | $253,699 | $178,699 | $75,000 | $575,000 |

86. While the Trustee would prefer to implement Scenario 4, pending the final resolution of the Net Equity Dispute, the Levy Appeal, and the Picower Settlement, he cannot do so. Thus, the Trustee at this time seeks to implement Scenario 1.

87. Accordingly, the Trustee has determined that each customer's ratable share of the Net Customer Fund shall be no less than 4.08% of the customer's net equity claim. (*Id.* ¶¶ 29-30). By this Motion, the Trustee seeks the authority to make a distribution of the Net Customer Fund equal to 4.08% of the customer net equity claims (the "Proposed Interim Distribution"). Under the Proposed Interim Distribution, actual distributions from the Customer Fund will only be made to those customers whose claims have not already been fully satisfied.

88. SIPC, as subrogee, is entitled to receive partial repayment of its cash advances to the Trustee pursuant to SIPA § 78fff-3(a)(1), which, in this case, total $793,149,690.14. (*Id.* ¶

7).  Further, SIPC is entitled to receive repayment as to any given customer to the extent the customer's claim was fully repaid by a combination of the SIPC advance and the Trustee's initial distribution.  *See In re Bell & Beckwith*, 104 B.R. 852 (Bankr. N. D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991).  However, in light of the Net Equity Dispute and other considerations, SIPC has agreed to defer receipt of any subrogation amounts from this initial distribution.  Instead, any monies that would otherwise be paid to SIPC will, at present, be retained by the Trustee pending further developments in the case.

89.    If the Court approves this Motion with current numbers, the allowed claims relating to 1,214 accounts will be partially satisfied and the allowed claims relating to 10 additional accounts will be fully satisfied.  Eight hundred and sixty-eight accounts have been fully satisfied by the funds advanced to the Trustee by SIPC.  An additional 205 accounts that have been "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed.  Seventy-nine of the 205 accounts would be fully satisfied by the SIPC advance.  The remaining 126 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion.  (Cohen Aff. ¶ 28).

90.    As noted above, the Trustee is only making an interim distribution of the undisputed property allocated to the Customer Fund and he expects additional recoveries allocable to the Customer Fund.

91.    The numbers contained herein are based on recoveries and claims allowed as of March 31, 2011.  To the extent that additional claims are allowed, or additional recoveries are made by the Trustee, those events will alter the allocation and/or the calculation of the distribution.  To the extent that additional claims are allowed, or additional recoveries are made,

the Trustee will supplement this filing accordingly with final calculations for the relief sought in this Motion.

### A.   No Interim Distribution Of General Estate

92.     Under SIPA § 78fff(e), funds from the general estate satisfy the administrative costs and expenses of a Debtor's estate and a liquidation proceeding.  To the extent that the general estate is insufficient, SIPC makes advances to the Trustee for the payment of such costs and expenses.  SIPA § 78fff-3(b)(2).  All administrative advances made by SIPC are recoverable from the general estate under section 507(a)(2) of the Bankruptcy Code.   SIPA §§ 78eee(b)(5)(E), 78fff(e).  The general estate is distributed in accordance with section 726 of the Bankruptcy Code, with section 507(a)(2) expenses receiving second priority.[16]   SIPA § 78fff(e).

93.     As noted previously, *see supra* ¶ 29, the Trustee has received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  One hundred and one of these 448 are general creditor claims and 50 are broker-dealer claims which together total approximately $266 million of the $1.7 billion.  Inasmuch as the Trustee proposes to allocate no assets to the General Estate, *see supra* ¶ 67, there are no funds in the General Estate from which to make a distribution to general creditors at this time.  Accordingly, "[no] purpose would be served" by the examination of or the institution of actions seeking to disallow such claims.  *See* ii U.S.C. § 704(5).

---

[16] There are no § 507(a)(1) expenses in this liquidation proceeding.

## VI.   DEPARTMENT OF JUSTICE FORFEITURE FUNDS

94.     The United States Attorney's Office for the Southern District of New York ("USAO") is in the process of forfeiting billions of dollars of assets relating to the fraud that occurred at BLMIS (the "Forfeiture Fund"). Victims are entitled to petition for mitigation or remission of forfeiture in accordance with the criteria set forth in 28 C.F.R. Part 9. The Government may contract with a special master to notify petitioners, process petitions, and make recommendations with regard to forfeited property. 28 C.F.R. § 9.9(c). Pursuant to this authority, the Department of Justice has announced that it would retain Mr. Picard to serve as special master to assist the USAO and the Department of Justice ("DOJ") in the petition process to be conducted in connection with BLMIS-related forfeitures, in accordance with applicable regulations. Thus, Mr. Picard would wear "two hats," one as SIPA Trustee and one as DOJ special master.

95.     It is anticipated that many of the customers to which the Trustee proposes to distribute pursuant to this Motion may also be eligible for distributions from the Forfeiture Fund. Any determination as to the amounts owed to a claimant—whether a "customer" under SIPA or a "victim" under the forfeiture regulations—will take into account monies received from either fund such that no claimant receives in this SIPA proceeding more than their net equity claim under SIPA.

## VII.   MISCELLANEOUS

### A.   Notice

96.     Pursuant to Bankruptcy Rules 2002(a)(6), 2002(f)(8), and 2002(h), the Trustee has given notice of the hearing on the Trustee's Motion by first class mail, postage prepaid, to all claimants that filed a claim in the liquidation proceeding, and all counsel that have appeared in the main liquidation proceeding. Copies of the Application have been transmitted to SIPC, the

SEC, and other parties in interest.  The Trustee believes that no further notice need be given of this or any further matter in the proceeding.

       **B.**      **<u>Waiver Of Memorandum Of Law</u>**

97.      The Trustee respectfully requests that this Court waive the requirement under Local Bankruptcy Rule 9013-1(b) for the submission of a separate memorandum of law or, alternatively, deem this Application as satisfying that requirement.

## VIII.  <u>CONCLUSION</u>

98.      This Motion and the relief requested by the Trustee are consistent with the policy and purposes underlying SIPA and are in the best interests of the customers of BLMIS, the Debtor estate, its creditors, and SIPC.

99.      No prior application for the relief sought herein has been made to this or any other Court.

100.      **WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a) approving (i) the proposed initial allocation of property to the Customer Fund and to the General Estate; (ii) the proposed interim distribution of the Customer Fund; and (b) granting such other and further relief as may be deemed just and proper.

Dated:  May 4, 2011

Respectfully submitted,


Of Counsel:

*/s/ David J. Sheehan*
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
**Baker & Hostetler LLP**
Email: sbrown@bakerlaw.com
3200 National City Center
Jacqlyn R. Rovine
Cleveland, Ohio 44114
Email: jrovine@bakerlaw.com
Telephone: (216) 621-0200
**Baker & Hostetler LLP**
Facsimile: (216) 696-0740
45 Rockefeller Plaza
Brian A. Bash
New York, New York  10111
Email: bbash@bakerlaw.com
Tel: (212) 589-4200
Thomas Wearsch
Fax: (212) 589-4201
Email: twearsch@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and Bernard L. Madoff*