**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>            Plaintiff-Applicant,<br><br>            v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>            Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>            Debtor. | |

**AFFIDAVIT OF MATTHEW COHEN IN SUPPORT OF THE TRUSTEE'S MOTION FOR AN ORDER APPROVING AN INITIAL ALLOCATION OF PROPERTY TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING AN INTERIM <u>DISTRIBUTION TO CUSTOMERS</u>**

STATE OF NEW YORK    )
                                 ) ss:
COUNTY OF NEW YORK  )

      Matthew Cohen, being duly sworn, deposes and says:

      1.      I am a Managing Director of AlixPartners LLP. I make this affidavit to transmit to the Court information relevant to the motion by Irving H. Picard, trustee ("Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), for an Order Approving the Trustee's Initial Allocation of Property to the Fund of Customer Property and Authorizing an Interim Distribution to Customers (the "Motion").

2.     AlixPartners has served as the Trustee's Claims Agent and as the accountant for the BLMIS estate since December of 2008 pursuant to SIPA § 78fff-1(a)(1). As the Claims Agent, AlixPartners was responsible for both mailing the notice of the liquidation and claim forms to potential claimants and causing the notice of the liquidation to be published. AlixPartners has also been responsible for processing all claims submitted to the Trustee and assisting the Trustee in reviewing each customer claim filed to determine whether the asserted claim amount agrees with the "net equity" for that account, described herein more fully at ¶ 10. In addition, as the accountants for the BLMIS Estate, AlixPartners has assisted and continues to assist the Trustee in accounting for the assets of the BLMIS Estate, including the cash and cash equivalents available to the Trustee.

3.     I have been actively involved in the liquidation of BLMIS and the claims process since December 2008 and have personal knowledge of the matters set forth herein.

### The Claims Process

4.     In accordance with the Court's order of December 23, 2008 (ECF No. 8), on or about January 2, 2009, AlixPartners mailed more than 15,000 claim forms to purported customers of BLMIS, purported customer's alternate mailing addresses, broker-dealers, and general creditors of the Debtor advising potential claimants of the Court-approved and statutory time limits for filing claims. AlixPartners completed certain additional notice mailings by January 9, 2009. (ECF No. 76).

5.     In accordance with the Court's December 23, 2008 order, AlixPartners caused notice of the (i) SIPA liquidation proceeding; (ii) claims procedures; (iii) February 4, 2009 hearing on disinterestedness of the Trustee and his counsel; and (iv) February 20, 2009 meeting

of creditors to be published on January 2, 2009 in *The New York Times, The Wall Street Journal, The Financial Times, USA Today, Jerusalem Post,* and *Ye'diot Achronot*. (ECF No. 57).

6. As of March 31, 2011, the Trustee received 16,518 customer claims.

7. As of March 31, 2011, the Trustee determined 16,268 of those claims. The Trustee allowed 2,409 claims, and committed to pay approximately $793 million in funds advanced to him by SIPC. The allowed claims total over $6.8 billion.

8. Of the remaining determined customer claims, 13,438 claims had been denied, 12 had been determined as asserting no claim, 149 had been withdrawn, and 260 had been "deemed determined," which means that the Trustee has instituted avoidance litigation against those claimants. As of March 31, 2011, 250 customer claims remained to be determined, as they were still under review by the Trustee's staff; the value of these claims has been reserved in the proposed distribution.

9. As of March 31, 2011, the Trustee has received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. 101 of these 448 are general creditor claims and fifty are broker-dealer claims which together total approximately $266 million of the $1.7 billion.

10. The Trustee allowed or denied customer claims as described above depending on, first, whether the claimant was a customer of BLMIS (*i.e.*, had an account in his/her name) and, second, whether the claimant had positive "net equity," as that term is defined by SIPA. In calculating each customer's "net equity," the Trustee has credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn by him from his

3

BLMIS customer account (the "cash in, cash out method" or the "Trustee's Net Investment Method"). This methodology is in dispute and is the subject of a pending appeal (the "Net Equity Dispute").

11. As of March 31, 2011, 2,290 unique docketed objections to the Trustee's claims determinations have been filed relating to approximately 3,800 claims. These 2,290 objections relate to approximately 1,150 BLMIS accounts.

### Recoveries by the Trustee

12. As of September 30, 2010, the effective date of the Trustee's Fourth Interim Report, the Trustee had recovered approximately $1.5 billion. These funds were primarily derived from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS Estate, (b) pre-litigation settlements, (c) customer preference recoveries, (d) the sale of assets, and (e) refunds. (ECF No. 3083).

13. The $1.5 billion recovered by the Trustee as of September 30, 2010 includes $220 million from a pre-litigation settlement entered into by the Trustee with the estate of Norman F. Levy, which was approved by this Court on February 18, 2010. (ECF No. 1964). Certain customers have moved to set aside the Court's Order approving the Levy settlement. The Court denied the motion (ECF No. 3984), and the claimants filed an appeal on April 11, 2011 (ECF No. 4005) (the "Levy Appeal"). Therefore, while these funds are being allocated to the Customer Fund, they are not available for distribution at this time and must be held in reserve pending the outcome of the Levy Appeal.

14. The $1.5 billion recovered by the Trustee as of September 30, 2010 also includes $11,500,158.34 in preference and other monies returned by claimants to the BLMIS estate pursuant to agreements that contain clauses relating to the outcome of the Net Equity Dispute.

4

These agreements provide that if a final, nonappealable order is entered overruling the Net Equity Decision[1] (such that each customer's "net equity" in this proceeding shall be calculated as the Fictitious Statement Amount), the funds returned to the BLMIS estate shall revert to the claimants. Therefore, while these funds are being allocated to the Customer Fund, they cannot be distributed at this time and must be held in reserve pending the outcome of the Net Equity Dispute.

15. Since September 30, 2010, the proceeds of three undisputed settlements have entered the BLMIS estate and are available for distribution. The Court approved settlements between the Trustee and: (i) Carl Shapiro, Robert Jaffe, and related entities (the "Shapiros"), in the amount of $550 million on December 21, 2010 (ECF No. 3551); (ii) Union Bancaire Privée ("UBP"), in the amount of $470 million on January 6, 2011 (ECF No. 3632); and (iii) Hadassah, in the amount of $45 million on March 10, 2011 (ECF No. 3912). These settlements total $1,065,000,000 and are available for distribution at this time.

16. In addition to the above settlements, the Trustee has recovered $89,071,011.28 since September, 30 2010 as a result of preference and other settlements. Of the $89,071,011.28, $45,981,625.41 is subject to the Net Equity Decision and must be held in reserve pending the outcome of the Net Equity Dispute. Therefore, only $43,089,385.87 of the $89,071,011.28 is available for distribution at this time.

17. The fourth significant settlement entered into by the Trustee since September 30, 2010 was with the estate of Jeffry Picower (the "Picower Settlement Funds") in the amount of $5 billion. *Picard v. Picower*, Adv. Pro. No. 09-1197 (BRL) (ECF No. 43). However, because the Picower Settlement Funds remain in escrow until the earlier of an entry of a final, nonappealable

---

[1] All capitalized terms that are not otherwise defined herein shall have the meaning ascribed to them in the Motion.

5

order approving the Trustee's settlement or a final, nonappealable order of forfeiture, these funds are not available for allocation and distribution at this time.

18. Thus, $2,617,974,430.26 is available to be allocated to the Customer Fund, with $220 million and $57,481,783.75 (a total of $277,481,783.75) of the $ 2,617,974,430.26 held in reserve pending the outcome of the Levy Appeal and the Net Equity Dispute, respectively. That leaves $2,340,492,646.51 available for distribution at this time.

## The Net Investment Method Denominator

19. The Trustee's Net Investment Method Denominator is the allowed amount of all accounts that have an allowed claim plus the net cash balance for all accounts into which more funds were deposited than withdrawn for which a claim has been filed, but not yet allowed. As of March 31, 2011, the Trustee's Net Investment Method denominator is $17,265,885,837.54. This number is subject to change as additional accounts are determined.

## The Net Equity Reserve Denominator

20. The total amount of fictitious equity shown on the customer statements issued by BLMIS on November 30, 2008 was $64,884,303,872.14. However, this $64,884,303,872.14 includes $8,597,048,281.54 in negative equity from twenty-two accounts. When this negative equity is added to the $64,884,303,872.14 fictitious equity of those customer accounts that had a positive balance, the total fictitious equity for all BLMIS customer accounts as of November 30, 2008 increases to $73,481,352,153.68.

21. Customer claims relating to accounts with $16,034,388,246.88 in November 30, 2008 fictitious equity related to the Levy, Picower, and Shapiro accounts have been irrevocably withdrawn from this liquidation proceeding and, therefore, $16,034,388,246.88 must be deducted from the $73,481,352,153.68.

6

22.     During December 2008, 250 accounts that are included in the Net Equity Denominator had cash activity that resulted in a net withdrawal of $225,604,087.19. This activity is not reflected in the November 30, 2008 statements and, therefore, must be deducted from the $73,481,352,153.68.

23.     One hundred sixteen accounts remitted $48,948,698.04 to the BLMIS estate as a result of preference settlements or settlement agreements that are not contingent on the Net Equity Dispute must be added to the $73,481,352,153.68 because the claims related to these settlements have been increased by the amount of the settlements paid by the claimants.

24.     During December 2008, seven new accounts opened with cash activity that resulted in a net deposit of $84,555,432.72. This activity is not reflected in the November 30, 2008 statements and, therefore, must be added to the $73,481,352,153.68.

25.     After making the adjustments discussed above, the "denominator" for the Net Equity Reserve (the "Net Equity Reserve Denominator") is $57,354,863,950.37. The table below summarizes this calculation.

| Category | Amount |
| --- | --- |
| **Total November 30, 2008 Fictitious Equity** | **64,884,303,872.14** |
| Negative Equity Accounts | (8,597,048,281.54) |
| **Sub-Total** | **73,481,352,153.68** |
| Settlement Exclusions | (16,034,388,246.88) |
| December 2008 Cash Activity | (225,604,087.19) |
| Preference Agreements & Settlement Agreements Not Contingent Upon Net Equity Decision | 48,948,698.04 |
| Accounts Opened in December 2008 | 84,555,432.72 |
| **Net Equity Reserve Denominator** | **57,354,863,950.37** |

26.     Approximately $7.2 billion of the $57,354,863,950.37 is attributable to customer accounts against which no claims were filed or for which any filed claims were withdrawn due to settlement agreements. However, the $7.2 billion cannot be removed from the $57,354,863,950.37 because of certain litigation and pending appeals.

7

27.     $57,354,863,950.37 is the highest amount for which the Trustee will have to reserve because no customer's net equity could be greater than the amount on their November 30, 2008 statement once the adjustments described above have been made.

### Interim Calculation of *Pro Rata* Share
### Distribution of Customer Fund

28.     As of March 31, 2011, 2,092 accounts for which a claim had been filed were allowed.  In addition, there are 205 accounts that have a positive net equity that have been "deemed determined."  Thus, there are 2,297 accounts that are eligible for a distribution.  Of these 2,297 accounts, 947 accounts have been or could be fully satisfied by the SIPC advance, leaving 1,350 accounts that have not been fully satisfied.  Of these 1,350 accounts, 1,224 were allowed as of March 31, 2011 and will receive a payment if the Court approves the Trustee's Motion.  The 205 "deemed determined" accounts will receive payment of either the SIPC advance, or the SIPC advance and a distribution, if the status of their claims move from "deemed determined" to allowed.  If and when that occurs, 79 of the 205 accounts will be fully satisfied by the SIPC advance.  The remaining 126 accounts will receive both a SIPC advance and a distribution in accordance with the Trustee's Motion if the status of their claims move from "deemed determined" to allowed.

29.     As set forth above, the Trustee proposes allocating $2,617,974,430.26 to the Customer Fund at this time, of which $277,481,783.75 must be held in reserve due to the Levy Appeal and the Net Equity Dispute.  Thus, $2,340,492,646.51 is available for distribution (the "Net Customer Fund").  The Net Equity Reserve Denominator is $57,354,863,950.37.  To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the Net Equity Reserve Denominator, resulting in the following percentage:

8

$$\frac{\$2,340,492,646.51 \ (\text{Net Customer Fund})}{\$57,354,863,950.37 \ (\text{Net Equity Reserve Denominator})} = 4.081\%$$

30. Accordingly, each customer's ratable share of the Net Customer Fund shall be no less than 4.08% of the customer's net equity claim.

31. If the Court approves the proposed initial allocation and interim distribution with the current numbers, the allowed claims relating to 1,214 accounts will be partially satisfied and the allowed claims relating to 10 additional accounts will be fully satisfied. Eight hundred and sixty-eight accounts have already been fully satisfied or committed to be fully satisfied by the funds advanced to the Trustee by SIPC. An additional 205 accounts that have been "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Seventy-nine of those 205 accounts would be fully satisfied by the SIPC advance. The remaining 126 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion.

32. As noted above, the Trustee is only making an interim distribution of the property allocated to the Customer Fund at this time and he expects additional recoveries allocable to the Customer Fund. Three other scenarios are possible, should the contingencies discussed above resolve themselves:

33. <u>Scenario 2</u>: If the Picower Settlement Funds were to come into the BLMIS estate and be allocated to the Customer Fund, each customer's ratable share of the Customer Fund would accordingly increase. Each customer's share would be calculated as follows:

$$\frac{\$7,340,492,646.51 \ (\text{Net Customer Fund})}{\$57,354,863,950.37 \ (\text{Net Equity Reserve Denominator})} = 12.798\%$$

Under Scenario 2, when combined with amounts advanced to the Trustee by SIPC, claims relating to 1,177 accounts would be partially satisfied and the allowed claims relating to

9

47 additional accounts would be fully satisfied. Eight hundred and sixty-eight accounts have already been fully satisfied or committed to be fully satisfied by the funds advanced to the Trustee by SIPC. An additional 205 accounts that have been "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Seventy-nine of the 205 accounts would be fully satisfied by the SIPC advance. Three additional accounts would be fully satisfied with the SIPC advance plus their *pro rata* share of the Customer Fund. The remaining 123 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion.

      34.      <u>Scenario 3</u>: If this Court's Net Equity Decision were upheld by a final, nonappealable order holding that net equity under SIPA shall be calculated using the cash in, cash out method, and no reserves for the Levy Appeal were required, each customer's ratable share of the Customer Fund would accordingly increase. Each customer's share would be calculated as follows

$$\frac{\$2,617,974,430.26 \text{ (Customer Fund)}}{\$17,265,885,837.54 \text{ (Net Equity Reserve Denominator)}} = 15.163\%$$

Under Scenario 3, when combined with amounts advanced to the Trustee by SIPC, claims relating to 1,168 accounts would be partially satisfied and the allowed claims relating to 56 additional accounts would be fully satisfied. Eight hundred and sixty-eight accounts have already been fully satisfied or committed to be fully satisfied by the funds advanced to the Trustee by SIPC. An additional 205 accounts that have been "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Seventy-nine of the 205 accounts would be fully satisfied by the SIPC advance. Three additional accounts would be fully satisfied with the SIPC advance plus their *pro rata* share of the Customer Fund. The remaining 123 accounts would receive both a SIPC advance and a

distribution in accordance with the Trustee's Motion.

35. <u>Scenario 4</u>: If this Court's Net Equity Decision were upheld by a final, nonappealable order, the Picower Settlement Funds were to come into the BLMIS estate and be allocated to the Customer Fund, the Levy funds were available, and no other reserves were required, each customer's ratable share of the Customer Fund would accordingly increase. Each customer's share would be calculated as follows:

$$\frac{\$7,617,974,430.26 \text{ (Customer Fund)}}{\$17,265,885,837.54 \text{ (Net Equity Reserve Denominator)}} = 44.122\%$$

Under Scenario 4, when combined with amounts advanced to the Trustee by SIPC, claims relating to 1,994 accounts would be partially satisfied and the allowed claims relating to 230 additional accounts would be fully satisfied. Eight hundred and sixty-eight accounts have already been fully satisfied or committed to be fully satisfied by the funds advanced to the Trustee by SIPC. An additional 205 accounts that have been "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed. Seventy-nine of the 205 accounts would be fully satisfied by the SIPC advance. Fifteen additional accounts would be fully satisfied with the SIPC advance plus their *pro rata* share of the Customer Fund. The remaining 111 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion.

                                   By: */s/ Matthew Cohen*_____
                                         Matthew Cohen

Sworn and subscribed to before me this 4th
day of May, 2011

*/s/ Sharyn P. Doyle*_____
Sharyn P. Doyle
Notary Public, State of New York
No. 01DO5051953

11

Qualified in New York County
Commission Expires Nov. 13, 2013