# **EXHIBIT E**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**IN RE J.P. JEANNERET ASSOCIATES, INC.,** *et al.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -          Master File No. 09 Civ. 3907 (CM)

This Document Relates To:

All Securities Actions

## DECLARATION OF BRIAN E. WHITELEY

Brian E. Whiteley hereby declares as follows:

1.      I am partner with the law firm of Hiscock & Barclay, LLP, attorneys for defendants J.P. Jeanneret Associates, Inc., John P. Jeanneret, and Paul L. Perry (collectively, the "Jeanneret Defendants"). I have been admitted *pro hac vice* to practice law before the Court in this matter. I am fully familiar with the facts and circumstances of this action.

2.      This Declaration is submitted to the Court as a vehicle by which to bring before the Court certain documents necessary for the Court to determine the Jeanneret Defendants' Motion to Dismiss the Second Amended Class Action Complaint for Violations of Federal Securities Law and Common Law dated May 21, 2010 as asserted against the Jeanneret Defendants.

3.      Attached hereto as Exhibit A is a true and accurate copy of the Executive Summary and certain pages from the Securities and Exchange Commission, Rep. No. OIG-509, Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme (2009). The full (457 page) report is available at www.sec.gov/news/studies/2009/oig-509.pdf.

4.      Attached hereto as Exhibit B is a true and accurate copy of the Income-Plus Investment Fund ("Income-Plus") December 15, 1993 Confidential Offering Memorandum.

5.        Attached hereto as Exhibit C is a true and accurate copy of the Income-Plus November 1, 2003 Confidential Private Placement Memorandum.

6.        Attached hereto as Exhibit D is a true and accurate copy of the May 21, 1991 Agreement between J.P. Jeanneret Associates, Inc. and Ivy Asset Management Corp. ("Ivy"), with amendments thereto, and the December 1, 2007 Amended and Restated Agreement.

7.        Attached hereto as Exhibit E is a true and accurate copy of the Press Release (2008-293) issued by the U.S. Securities and Exchange Commission on December 11, 2008, entitled "SEC Charges Bernard L. Madoff for Multi-Billion Dollar Ponzi Scheme."

8.        Attached hereto as Exhibit F is a true and accurate copy of the Discretionary Investment Management Agreement between J.P. Jeanneret Associates, Inc. and the Plumbers & Steamfitters Local 267 Pension Fund dated July 1, 1996, with Amendments.

9.        Attached hereto as Exhibit G is a true and accurate copy of the Discretionary Investment Management Agreement between J.P. Jeanneret Associates, Inc. and the Local 73 Retirement Fund dated September 17, 1999, with Amendments.

10.       Attached hereto as Exhibit H is a true and accurate copy of the March 12, 2009 Plea Allocution of Bernard L. Madoff in the matter entitled USA v. Madoff, Docket No. 1:09-cr-0213-DC, in the United States District Court for the Southern District of New York, which was retrieved from the Public Access to Court Electronic Records ("PACER") system maintained by the United States District Court for the Southern District of New York (Dkt. No. 50).

11.       Attached hereto as Exhibit I are true and accurate copies of certain pages from the transcript of Proceedings as to Frank DiPascali held on August 11, 2009 in the matter entitled United States v. DiPascali, No. 09 Crim. 764 (S.D.N.Y.), and a copy of a December 15, 2009

print-out of the online docket retrieved from the PACER system maintained by the United States District Court for the Southern District of New York (Dkt. No. 11).

12.     Attached hereto as Exhibit J is a true and accurate copy of a news article published by *Barron's* on May 7, 2001, under the headline "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum."

13.     Attached hereto as Exhibit K is a true and accurate copy of a news article published by *MAR/Hedge* in May 2001, under the headline "Madoff tops charts; skeptics ask how."

14.     Attached hereto as Exhibit L is a true and accurate copy of a January 12, 1999 letter from Ivy addressed to Messrs. Burnside and Burns of the Engineers Joint Pension Fund.

15.     Attached hereto as Exhibit M is a true and accurate copy of the New York Attorney General's Complaint against Ivy Asset Management LLC, Larry Simon and Howard Wohl dated May 11, 2010.

16.     Attached hereto as Exhibit N is a true and accurate copy of the Income-Plus Investment Fund's Financial Statements for the year ended December 31, 2003.

17.     Attached hereto as Exhibit O is a true and accurate copy of the Second Amended Class Action Complaint for Violations of Federal Securities Law and Common Law in this matter.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 30, 2010                         _____
                                                    s/ Brian E. Whiteley
                                                    Brian E. Whiteley

## CERTIFICATE OF SERVICE

I, Brian E. Whiteley, as counsel for defendants J.P. Jeanneret Associates, Inc., John P. Jeanneret, and Paul L. Perry, hereby certify that, on this 30th day of June 2010, I caused the foregoing Declaration to be electronically filed with the Clerk of the District Court for the Southern District of New York using the CM/ECF system, which sent notification of such filing to all registered participants identified on the Notice of Electronic Filing.

                                        s/ Brian E. Whiteley
                                        Brian E. Whiteley

# **EXHIBIT B**

NAME OF OFFEREE _____     NO. _____

<u>CONFIDENTIAL PRIVATE OFFERING MEMORANDUM</u>

# INCOME-PLUS INVESTMENT FUND

(A Tax-Exempt Investment Fund Established
pursuant to The Master Income-Plus Group Trust)

December 15, 1993

**INVESTMENT MANAGER:**
**J.P. JEANNERET ASSOCIATES, INC.**

**TRUSTEE:**
**CUSTODIAL TRUST COMPANY**

THIS OFFERING IS NOT A PUBLIC OFFERING.  THE SECURITIES OFFERED
HEREBY HAVE NOT BEEN REGISTERED OR QUALIFIED WITH, NOR APPROVED BY,
THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE REGULATORY
AUTHORITY, NOR HAS SUCH COMMISSION OR ANY REGULATORY AUTHORITY
PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.   THIS
MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY
JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT LAWFUL, OR
IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT
QUALIFIED TO DO SO.

**Ex. B-1**

## TABLE OF CONTENTS

CAPTION                                                                PAGE

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . (v)

INTRODUCTION    . . . . . . . . . . . . . . . . . . . . . . . . . 1

BUSINESS OF THE INVESTMENT FUND . . . . . . . . . . . . . . . 4

ILLUSTRATIONS OF HEDGING AND ARBITRAGE STRATEGIES . . . . . . 6

MANAGEMENT OF THE INVESTMENT FUND . . . . . . . . . . . . . . 8

ENGAGEMENT OF ADVISOR . . . . . . . . . . . . . . . . . . . . 9

RISK FACTORS    . . . . . . . . . . . . . . . . . . . . . . . . 11

CONFLICTS OF INTEREST . . . . . . . . . . . . . . . . . . . . 14

FINANCIAL SUMMARY OF THE OFFERING . . . . . . . . . . . . . . 15

INCOME TAX ASPECTS    . . . . . . . . . . . . . . . . . . . . . 19

ERISA CONSIDERATIONS    . . . . . . . . . . . . . . . . . . . . 21

ELIGIBILITY REQUIREMENTS    . . . . . . . . . . . . . . . . . . 22

SUBSCRIPTION PROCEDURES . . . . . . . . . . . . . . . . . . . 25

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . 25

### EXHIBITS

"A" Agreement of Trust Establishing Group Trust

"B" Adoption Agreement

"C" Declaration Establishing Income-Plus Investment Fund
    Under the Group Trust

Ex. B-5

## INTRODUCTION

Income-Plus Investment Fund, a tax-exempt group trust ("Investment Fund"), has been formed by the Investment Manager (as defined below) to pool and commingle certain of the assets of certain qualifying employee pension and profit sharing plans or certain other entities, including exempt individual retirement accounts, all of which are either Accredited Investors and Sophisticated Investors (collectively "Participating Entities") for investment purposes only. The Investment Fund was established on December 15, 1993 pursuant to The Master Income-Plus Group Trust ("Group Trust"). The Group Trust was formed on February 23, 1993 pursuant to an Agreement of Trust Establishing The Master Income-Plus Group Trust ("Trust Agreement") between the Trustee and the Investment Manager. The Trust Agreement provides that the Investment Manager may from time to time establish group trust funds by executing and delivering to the Trustee a Declaration Establishing Investment Fund under the Group Trust ("Declaration"). The Investment Fund is a group trust fund established by the Investment Manager pursuant to such a Declaration.

The Investment Manager, together with its Advisor (as defined below), have identified a number of hedging and arbitrage strategies utilized by Designated Managers with whom the Investment Manager intends to invest substantially all of the assets of the Investment Fund. These Designated Managers, either through directly-managed accounts or through their own partnership within which the Investment Fund would participate, employ varying investment styles and strategies. These include convertible hedging, basis and spread trading, conversions and reversals and relative value trading. Future investments may also be made with Designated Managers employing other hedging and arbitrage strategies involving stocks, bonds, options on stocks and other financial instruments. While it is anticipated that a substantial portion of the assets of the Investment Fund will be invested with Designated Managers recommended to the Investment Manager by the Advisor, all decisions regarding the investment, maintenance and withdrawal of Investment Fund assets will be made by the Investment Manager in its sole and absolute discretion. The Investment Manager may directly manage up to ten (10%) percent of the assets of the Investment Fund.

The Investment Fund's prime objective is to provide returns substantially higher than the risk-free rate of return (i.e., Treasury Bills), while attempting to minimize risk. It is the intention of the Investment Manager to diversify the assets of the Group Trust among numerous Designated Managers, and to allocate assets within the Investment Fund such that they are reasonably diversified among different Designated Managers and investment strategies, in order to minimize the risk of one strategy adversely effecting the investment return. Hedging and arbitrage strategies are not intended to profit by taking "market risk". The Investment

-1-

Ex. B-11

Manager believes that the objective of consistent capital growth can be achieved with diversified asset management utilizing hedging and arbitrage strategies and employing managers utilizing the same or varied strategies that seek to profit from pricing inefficiencies. However, no assurance can be given that these objectives will be achieved.

The Investment Manager has determined that there are various hedging and arbitrage managers available to clients with high net worth, or managers which require large minimum accounts under management or large investments in partnerships they control, which are not available to some pension and profit sharing plans and individual retirement accounts. Also, the Investment Manager recognizes the benefits of diversification of assets of such entities among several hedging managers, and the economies that can be realized from management of a large pool of assets in the Group Trust. The Investment Manager believes that satisfactory rates of return can be achieved on a consistent basis through various hedging and arbitrage strategies, which have been thoroughly researched by the Investment Manager and its Advisor, Ivy Asset Management Corp. As such, the Income Plus Investment Fund represents a vehicle for achievement of relatively consistent higher rates of return on pension and profit sharing plans and individual retirement accounts from year to year than the risk-free rate of return (i.e. Treasury Bills).

J.P. Jeanneret Associates, Inc., with an address at 100 East Washington Street, Syracuse, New York 13202, is the investment manager ("Investment Manager"). The Investment Manager (and its predecessor) has been registered as an investment advisor under the Investment Advisers Act of 1940, as amended ("Adviser's Act") since 1974 and is the "investment manager" for the Group Trust and Investment Fund within the meaning of Section 3(38) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Investment Manager is also a Qualified Professional Asset Manager ("QPAM"). Investment Manager provides investment advice with respect to over $200 million in assets. Dr. John P. Jeanneret is the sole shareholder of the Investment Manager. He is its chief executive officer, and he serves with Matthew C. McCabe and Paul L. Perry as directors of the Investment Manager.

The Investment Fund will initially pay (a) the Investment Manager a quarter-annual fee equal to .09375% and, (b) on behalf of the Investment Manager, the Advisor a quarter-annual advisory fee equal to .09375%, of the value of the Investment Fund (as adjusted for additions and withdrawals of funds) at the end of each fiscal quarter (collectively, "Base Fee"). The Investment Fund will also pay an additional annual fee ("Additional Fee") equal to twenty (20%) percent of the amount by which the percentage increase in value of the Investment Fund (as adjusted for additions and withdrawals of funds) during each calendar year, before deduction of the Additional Fee, exceeds the sum of (a) 10% less (b) the Base

-2-

Fee.   The Additional Fee will be paid one-half (1/2) to the
Investment Manager and, on behalf of the Investment Manager, one-
half (1/2) to the Advisor.  The payment of the fees to the Advisor
is the sole obligation of the Investment Manager and the Investment
Manager has given standing instructions to the Investment Fund to
pay one-half (1/2) of all fees earned by the Investment Manager
directly to the Advisor. The Advisor has agreed to look solely and
exclusively to the Investment Manager for payment of its fees.
SEE "FINANCIAL SUMMARY OF THE OFFERING - Fees and Expenses of
Investment Fund", P. 16 to P. 18.   The fees and expenses of the
Trustee, Designated Managers, brokerage commissions, legal, audit,
accounting and other administration expenses of the Investment Fund
will be paid out of the assets of the Investment Fund.   The
Investment Manager will not receive any additional fees or other
compensation with respect to the assets of the Investment Fund that
it directly manages (limited to up to ten (10%) percent) except the
Base Fee and Additional Fee that the Investment Fund will pay it.

     The Trustee is an FDIC insured New Jersey bank located in
Princeton, New Jersey, and is wholly-owned by The Bear Stearns
Companies Inc.  The Trustee commenced operations in September 1985
and is currently in its ninth year of operation.   The Trustee
holds, as custodian or trustee, over $16 billion in unaffiliated
customer assets.    The Trustee's customers include public and
private pension funds, mutual funds, endowments and insurance
companies.  The Trustee also holds over $18 billion of assets from
affiliated entities.  The Trustee has over $100 million of capital
which is invested principally in short-term securities.    The
Trustee is the largest securities clearance customer of the
Philadelphia Federal Reserve Bank district (accounting for 70% of
the total volume cleared) and is one of the largest trust and
custody banks in New Jersey.

     On May 15, 1991, Investment Manager entered into an advisory
agreement with Ivy Asset Management Corp., a Delaware corporation
("Advisor"), with an address at 591 Stewart Avenue, Suite 550,
Garden City, New York 11530. The advisory agreement was amended as
of December 1, 1992 to take into account the organization of the
Group Trust and Investment Fund by the Investment Manager and to
provide that the Advisor initially will receive 50% of the fees
received by Investment Manager from the Group Trust and Investment
Fund.  The advisory agreement, as amended, provides that Advisor
will make recommendations to Investment Manager as to potential
Designated Managers that Investment Manager may invest its clients'
fund with.  Advisor is also required to monitor and periodically
evaluate all investments made by Investment Manager of its clients'
funds with investment managers it recommends.   Advisor is not
registered as an investment advisor under the Adviser's Act in
reliance upon an exemption set forth therein.  Lawrence J. Simon
and Howard Wohl are the President and Vice President, respectively,
of Advisor, and its sole directors, and they and their respective
immediate families are the sole shareholders of Advisor.

-3-

Ex. B-13

are taxed as ordinary income, the classification of such excess distributions for unrelated business taxable income purposes is uncertain. While the Internal Revenue Service has indicated in a recent private letter ruling that income from a PFIC that is the subject of a qualifying election would not be classified as unrelated business taxable income, such a ruling is applicable only to the taxpayer to whom it was issued, and the Group Trust in any event may not be able to make a qualifying election with respect to a particular PFIC. Furthermore, even if a Group Trust were to make a qualifying election in respect of a PFIC in which the Group Trust had invested, it is uncertain whether the amount includible in the Group Trust's gross income by reason of such election would constitute income from "debt-financed property" if and to the extent that the PFIC incurred indebtedness for the purpose of acquiring the investment giving rise to such income.

From time to time legislation has been introduced in Congress that would have the effect of treating any income attributable to certain PFICs as unrelated business taxable income. While such legislation has not been adopted, there can be no assurances that such measures will not be enacted in the future.

### ERISA CONSIDERATIONS

The Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the regulations promulgated thereunder by the United States Department of Labor (the "DOL") provide as a general rule that a fiduciary with respect to employee benefit plans ("Plans") subject to ERISA must discharge its responsibilities with respect to a Plan in a prudent manner and must consider several factors in determining whether to enter into an investment or engage in an investment course of action. If a fiduciary with respect to any such Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such Plan, the fiduciary may be held personally liable for losses incurred by the Plan as a result of such breach. Among the factors that should be considered are the diversification and liquidity of the Plan's portfolio, the potential return on the proposed investment and the place the proposed investment would occupy in the Plan's portfolio taken as a whole.

ERISA imposes certain duties and responsibilities on persons (including investment managers) who are deemed to be fiduciaries (within the meaning of Section 3(21) of ERISA) and prohibits them from entering into transactions involving plan assets with various parties in interest (within the meaning of Section 3(14) of ERISA) with respect to the Plan. Generally, under ERISA, the Plan trustees, named fiduciaries or duly appointed investment managers (within the meaning of Section 3(38) of ERISA) have exclusive authority and discretion to manage and control assets of the Plan. If any such "prohibited transaction" is entered into, certain excise taxes may be payable by the party in interest, and the Plan

-21-

**Ex. B-31**

fiduciaries may be liable to the Plan for any losses incurred.

The assets of the Group Trust will constitute "plan assets" under regulations promulgated by the DOL. The Investment Manager will therefore be deemed a fiduciary with respect to each investing Plan and the general prudence and fiduciary responsibility provisions of ERISA will be applicable to it and to the operations of the Group Trust. The Investment Manager does not expect that the applicability of these ERISA provisions to the Group Trust will interfere with the operations or the results of the Group Trust in any material way.

Certain prospective Participating Entities may currently maintain relationships with the Investment Manager under which the Investment Manager provides investment advisory and/or management services to the Plan. These relationships may cause the Investment Manager or such affiliates to be deemed to be fiduciaries of those Plans. The DOL has issued regulations defining the term "fiduciary" which provide that an investment advisor who renders investment advice to a Plan for a fee and who either has discretionary control over plan assets or renders advice pursuant to an understanding that such advice will serve as a primary basis for the Plan's investment decisions will be deemed a fiduciary but only with respect to that portion of the Plan's assets with respect to which the investment advisor renders such advice or has such discretion. The prior written authorization of an independent fiduciary of any Plan for which the Investment Manager or one of its affiliates acts as investment advisor or has a preexisting fiduciary relationship shall be obtained before assets of such Plan will be invested in the Group Trust. Further, if the Investment Manager acts as investment advisor to a Plan, it will eliminate its advisory fee charged to the Plan with respect to the amount of such Plan's investment in the Group Trust.

## ELIGIBILITY REQUIREMENTS

The acquisition of Units in the Investment Fund involves a degree of risk. See "RISK FACTORS" P. 11 to P. 14. Further, transfer of the Units is not permitted. Consequently, the Investment Manager has adopted as a general investor suitability standard that each prospective Participating Entity represent in writing that it is an Accredited Investor (as defined below) or a Sophisticated Investor (as defined below). The suitability standards referred to above and itemized below represent minimum suitability requirements for prospective Participating Entities and the satisfaction of such standards by a prospective Participating Entity does not necessarily mean that Units are a suitable investment for such Participating Entity.

This offering is made for purchase of Units only by (i) "Accredited Investors" as defined by Regulation D of the Act, and (ii) up to 35 "Sophisticated Investors", pursuant to an exemption

-22-

EXHIBIT "A"

AGREEMENT OF TRUST ESTABLISHING GROUP TRUST

AGREEMENT OF TRUST

ESTABLISHING

THE MASTER INCOME-PLUS GROUP TRUST

Dated this ⅔ day of February, 1993

Ex. B-38

# TABLE OF CONTENTS

## ARTICLE I
## NAME AND DEFINITIONS . . . . . . . . . 2

Section 1.01   Name. . . . . . . . . . . . . . . . . . 2
Section 1.02   Definitions. . . . . . . . . . . . . . 2

## ARTICLE II
## PARTICIPATING ENTITIES . . . . . . . . 6

Section 2.01   Purpose. . . . . . . . . . . . . . . . . 6
Section 2.02   Eligibility for Participation. . . . . . 6
Section 2.03   Commencement of Participation. . . . . . 7
Section 2.04   Ownership. . . . . . . . . . . . . . . . 8
Section 2.05   Termination of Participation. . . . . . 8
Section 2.06   Terms and Conditions. . . . . . . . . . 9

## ARTICLE III
## MANAGEMENT . . . . . . . . . . . . . . 10

Section 3.01   General. . . . . . . . . . . . . . . . . 10
Section 3.02   Authority of the Investment Manager
               to Delegate Power to the Designated
               Managers and Powers of the
               Designated Managers. . . . . . . . . . 13
Section 3.03   Responsibility and Authority of Trustee . . . 17
Section 3.04   Directed Powers of the Trustee . . . . . . . 18
Section 3.05   Certain Additional Limitations on
               Duties of Trustee . . . . . . . . . . . . . 22
Section 3.06   Other Powers of the Trustee . . . . . . . . 23
Section 3.07   Investment Management. . . . . . . . . . . 25
Section 3.08   Delivery and Custody of Funds and
               Securities. . . . . . . . . . . . . . . . . 27
Section 3.09   Delivery of Securities . . . . . . . . . . 29
Section 3.10   Final Payment Defined . . . . . . . . . . . 29
Section 3.11   Designated Managers. . . . . . . . . . . . 29
Section 3.12   Separate Accounting for Assets. . . . . . . 30
Section 3.13   Situs. . . . . . . . . . . . . . . . . . . 31
Section 3.14   Role of Participating Entities. . . . . . . 31
Section 3.15   Dealings with Investment Funds. . . . . . . 31
Section 3.16   Dealings with Other Persons . . . . . . . . 32
Section 3.17   Legal Counsel . . . . . . . . . . . . . . . 32
Section 3.18   Receipt and Collection of Income . . . . . 33
Section 3.19   Proxies and Other Materials . . . . . . . . 33
Section 3.20   Information on Corporation Actions . . . . . 34

## ARTICLE IV
## INVESTMENTS . . . . . . . . . . . . . 35

Section 4.01   Establishment of Funds. . . . . . . . . . . 35

(i)

Ex. B-39

Section 4.02    Permissible Types of Investments. . . . . . .    36
Section 4.03    Cash and Cash Balances. . . . . . . . . . . .    37
Section 4.04    Suspense and Liquidating Accounts. . . . . . .    39

ARTICLE V
UNITS OF PARTICIPATION; VALUATION . . . . . .    39

Section 5.01    Units of Participation. . . . . . . . . . . .    39
Section 5.02    Valuation of Investment Funds. . . . . . . . .    40
Section 5.03    Valuation of Units. . . . . . . . . . . . . .    41
Section 5.04    Valuation Rules. . . . . . . . . . . . . . . .    42

ARTICLE VI
ADDITIONS AND WITHDRAWALS; NO TRANSFER    . . . .    47

Section 6.01    Additions and Withdrawals. . . . . . . . . . .    47
Section 6.02    Investment of Cash in Short-Term
                Investment Funds of the Trustee.   . . . . . .    50
Section 6.03    Prohibition of Transfer of Units.   . . . . .    51

ARTICLE VII
NONDIVERSION OF THE GROUP TRUST FUND . . . . .    51

Section 7.01    Prohibition Against Diversion. . . . . . . . .    51

ARTICLE VIII
ACCOUNTINGS, RETURNS, FILINGS, AND REPORTS    . . .    52

Section 8.01    Maintenance of Records and Accountings
                by Investment Manager and Trustee.   . . . . .    52
Section 8.02    Approval of Accounts.   . . . . . . . . . . . .    55
Section 8.03    Judicial Accountings.   . . . . . . . . . . . .    56
Section 8.04    Application for IRS Determination Letter.   . .    57
Section 8.05    Governmental Filings.   . . . . . . . . . . . .    58

ARTICLE IX
COMPENSATION, EXPENSES, AND LIABILITY . . . . .    58

Section 9.01    Compensation.   . . . . . . . . . . . . . . . .    58
Section 9.02    Expenses of Trustee. . . . . . . . . . . . . .    60
Section 9.03    Fiduciary Standards. . . . . . . . . . . . . .    61
Section 9.04    Limitation of Liability of Trustee . . . . . .    62
Section 9.05    Further Limitation of Liability of Trustee . .    63
Section 9.06    Indemnification of the Trustee by
                Group Trust . . . . . . . . . . . . . . . . . .    64
Section 9.07    Limitation on Indemnification Obligation . . .    66
Section 9.08    Indemnity of Trustee by Investment Manager
                for Securities Law Violations and
                Other Matters . . . . . . . . . . . . . . . . .    66
Section 9.09    Survival of Provisions . . . . . . . . . . . .    68
Section 9.10    Indemnity in Securities Transactions . . . . .    68

(ii)

Section 9.11    Estoppel Regarding Indemnification.  . . . . .  68

ARTICLE X
CONCERNING THE TRUSTEE AND THE INVESTMENT MANAGER . .  69

Section 10.01   Term of Office.  . . . . . . . . . . . . . .  69
Section 10.02   Resignation. . . . . . . . . . . . . . . . .  69
Section 10.03   Removal. . . . . . . . . . . . . . . . . . .  70
Section 10.04   Appointment of Successor Trustee.  . . . . .  70
Section 10.05   Successors and Assigns.  . . . . . . . . . .  71
Section 10.06   Registration Under the Investment
                Advisers Act of 1940. . . . . . . . . . . .  72
Section 10.07   Bonding. . . . . . . . . . . . . . . . . . .  72
Section 10.08   Directions of Investment Manager.  . . . . .  73
Section 10.09   Notices  . . . . . . . . . . . . . . . . . .  73
Section 10.10   Reliance on Communications Generally . . . .  74
Section 10.11   Securities Law Compliance. . . . . . . . . .  75

ARTICLE XI
AMENDMENT AND TERMINATION . . . . . . . .  75

Section 11.01   Amendment. . . . . . . . . . . . . . . . . .  75
Section 11.02   Termination. . . . . . . . . . . . . . . . .  75

ARTICLE XII
CONSTRUCTION  . . . . . . . . . . .  76

Section 12.01   Construction . . . . . . . . . . . . . . . .  76

ARTICLE XIII
GENERAL PROVISIONS . . . . . . . . . .  77

Section 13.01   Other Business.  . . . . . . . . . . . . . .  77
Section 13.02   Titles and Captions. . . . . . . . . . . . .  77
Section 13.03   Usage. . . . . . . . . . . . . . . . . . . .  77
Section 13.04   Integration. . . . . . . . . . . . . . . . .  78
Section 13.05   Counterparts. . . . . . . . . . . . . . . .  78
Section 13.06   No Waiver  . . . . . . . . . . . . . . . . .  78
Section 13.07   Severability . . . . . . . . . . . . . . . .  79

Ex. B-41

the assets of the Group Trust Fund and Investment Funds invested
with them.

Section 3.02    Authority of the Investment Manager to
Delegate Power to the Designated Managers and Powers of the
Designated Managers.    The Investment Manager shall have the sole
power and authority, in its sole discretion, to delegate to one
or more Designated Managers, and, subject to such delegation,
such Designated Managers, severally, shall have the following
powers and authority (except where such powers and authority are
specifically limited by the Investment Manager) in the
administration of the Group Trust Fund (or any part thereof under
management) exercisable by such Designated Managers without
further direction or action by the Investment Manager:

    (a)    To purchase, receive, subscribe for, or otherwise
acquire any securities or other property and to retain in
trust such securities or other property.

    (b)    To sell for cash, to convert, redeem, or exchange
for other securities or other property, to tender securities
pursuant to tender offers, or otherwise to dispose of any
securities or other property at any time held by it.

    (c)    To exercise any conversion privilege and/or
subscription right available in connection with any

13

securities or other property at any time held by it; to
oppose or to consent to the reorganization, consolidation,
merger, or readjustment of the finances of any corporation,
company, or association or to the sale, mortgage, pledge, or
lease of the property of any corporation, company,
association or any other entity; to do any act with
reference to any of the securities which may at any time be
held by it, including the exercise of options, the making of
agreements or subscriptions and the payment of expenses,
assessments or subscriptions which may be deemed necessary
or advisable in connection therewith; to hold and retain any
securities or other property which it may so acquire; to
deposit any property in any voting trust or with any
protective, reorganization or similar committee or with
depositories designated thereby, to delegate power thereto;
and, to pay or agree to pay part of the expenses and
compensation of any such committee and any assessments
levied with respect to property so deposited.

(d)   To exercise, personally, by proxy, or by general
or limited power of attorney, any right, privilege, or other
option including the right to vote, appurtenant to any
securities or other property held by it at any time.

14

(e)  To invest and reinvest all or any part of the
assets of the Group Trust Fund held by it at any time, and
to hold any part of such assets uninvested.

(f)  To purchase, enter into, sell, hold, and generally
deal in any manner in and with contracts for the immediate
or future delivery of financial instruments of any issuer or
of any other property; to grant, purchase, sell, exercise,
permit to exercise, permit to be held in escrow, and
otherwise to acquire, dispose of, hold, and generally deal
in any manner with and in all forms of options in any
combination; and, in connection with its exercise of the
powers herein above granted, to deposit any securities or
other property as collateral with any broker-dealer or other
person, and to take all other appropriate action in
connection with such contracts.

(g)  To borrow money, with or without security, from
any legally permissible source, to encumber all or any part
of the assets of the Group Trust Fund or Investment Fund
held by it at any time to secure repayment of such
indebtedness.

(h)  Generally to exercise the same powers as an owner
of property and to do all acts, whether or not expressly
authorized, which may be considered necessary or desirable

15

by it, for the protection of the Group Trust Fund and the

assets of an Investment Fund being managed by it.

(i)   To register or cause to be registered any
securities held by it in its own name or in the name of a
nominee with or without the addition of words indicating
that such securities are held in a fiduciary capacity, to
permit securities or other property to be held by or in the
name of others, to hold any securities in bearer form and to
deposit any securities or other property in a depository,
clearing corporation, or similar corporation, either
domestic or foreign.

(j)   To make, execute, and deliver as Designated
Manager pursuant to a managed account agreement, limited
partnership agreement or other similar pooled investment
vehicle agreement, any and all instruments, agreements,
certificates, contracts and documents in writing of any kind
or nature necessary or proper for the accomplishment of any
of the powers referred to in this Section 3.02.

(k)   To take any action committed to the Designated
Managers' discretion by other provisions of this Agreement.

(l)   Generally to exercise such powers and to do such
acts (exclusive of powers and acts otherwise committed to

16

the discretion of the Investment Manager or any other party
hereunder) whether or not expressly authorized, which may be
considered necessary or desirable by the Designated Manager
for the protection of the Group Trust Fund (or part thereof
under management).

Section 3.03   Responsibility and Authority of Trustee.   The
rights, powers and authority and the duties and responsibility of
the Trustee shall be solely and exclusively as provided in this
Agreement, and no duties or obligations shall be imposed upon the
Trustee with respect to the Group Trust by any plan of which a
Participating Entity forms a part or by any other instrument to
which the Trustee is not a party unless such duties or
obligations have been specifically undertaken by the Trustee by
the express terms of this Agreement or are otherwise imposed upon
the Trustee by applicable law. As provided in this Agreement,
the Trustee shall be a "nondiscretionary" directed trustee,
subject to the proper directions of the Investment Manager.   The
Trustee is not and shall not act as or be deemed to be a
"fiduciary" under the Act.  The Trustee shall be responsible for
the custody and safekeeping of all assets of the Group Trust Fund
except those held by Designated Managers in managed accounts as
to which it shall have no responsibility except as provided
herein.  Except for such assets held by Designated Managers in
managed accounts and limited partnership interests in
partnerships and interests in other similar pooled investment

17

**Ex. B-58**

EXHIBIT "B"

ADOPTION AGREEMENT

Ex. B-124

Ex. B-125

# ADOPTION AGREEMENT

## INCOME-PLUS INVESTMENT FUND

**(A Tax-Exempt Investment Fund
Established pursuant to
The Master Income-Plus Group Trust)**

## INVESTMENT MANAGER:

**J.P. JEANNERET ASSOCIATES, INC.**

Ex. B-126

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

4.01 <u>Qualification of the Participating Entity</u>.    The purchase and ownership of Units of the Investment Fund under this Adoption Agreement and the Group Trust Agreement are conditioned upon the Participating Entity being a Qualified Entity.    The Participating Entity and the Participating Entity Signatory hereby represent that the Participating Entity is a Qualified Entity. Simultaneously with the execution of this Adoption Agreement, the Participating Entity Signatory for a Participating Entity other than an IRA shall furnish to the Investment Manager either or both of the following documents, as specified by the Investment Manager, (a) a copy of the most recent determination letter issued by the Internal Revenue Service regarding the status of the Participating Entity as a Qualified Entity, or (b) an opinion of counsel satisfactory to Investment Manager with respect to such status as a Qualified Entity. Within five (5) business days after receipt by the Participating Entity of a determination letter, ruling, court decision, written notice, or other pertinent information that the status of the Participating Entity as a Qualified Entity has been revoked, terminated, or otherwise modified, the Participating Entity Signatory shall deliver to the Investment Manager a copy of such determination letter, final court decree, or other evidence the Investment Manager may require.    Simultaneously with the execution of this Adoption Agreement, the Participating Entity Signatory for an IRA shall furnish to the Investment Manager a certificate executed by the IRA's trustee which acknowledges that the IRA is exempt under Section 408(e) of the Code and which includes an undertaking by such trustee to notify the Investment Manager within five (5) business days after such trustee has knowledge that the IRA is no longer exempt under Section 408(e) of the Code.    As soon as practicable after the Investment Manager receives notice that a Participating Entity is no longer a Qualified Entity, the Participating Entity's status as a Participating Entity under the Group Trust shall be terminated, redemption of the Units of the Investment Fund owned by the Participating Entity shall be effected, and the Participating Entity's interest in the Group Trust shall be distributed to the Participating Entity, in accordance with the provisions of the Group Trust Agreement.

4.02 <u>Adoption of Group Trust Agreement</u>.    The Participating Entity and the Participating Entity Signatory hereby represent and warrant that the governing documents of the Participating Entity contain a provision which incorporates by reference and adopts the terms and provisions of the Group Trust Agreement and that the adoption of the Group Trust Agreement by the Participating Entity will not conflict with any provisions of the Participating Entity (or the plan or any other contract or

-3-

agreement under which such Participating Entity is maintained).

4.03 <u>Information Concerning Participating Entity</u>. The Participating Entity and the Participating Entity Signatory hereby certify that the information set forth in Appendix A hereto with respect to the Participating Entity is true, correct, and complete in all respects.

4.04 <u>Authority of Participating Entity Signatory</u>. The Participating Entity and the Participating Entity Signatory hereby represent and warrant (a) the Participating Entity Signatory has authority under the governing documents of the Participating Entity to appoint the Investment Manager as an investment manager of the Participating Entity, and if the Participating Entity is not an IRA, the authority of the Participating Entity Signatory is pursuant to Section 402(c)(3) of ERISA, (b) the execution and delivery of this Adoption Agreement by the Participating Entity Signatory on behalf of the Participating Entity has been duly authorized, and (c) this Adoption Agreement constitutes the valid and binding agreement of the Participating Entity, enforceable against the Participating Entity in accordance with its terms.

4.05 <u>Duty to Report Changes</u>. The Participating Entity hereby agrees to notify the Investment Manager promptly of: (a) any changes with respect to the information set forth in Sections 4.01 through 4.04 and Section 4.06 of this Adoption Agreement or in Appendix A hereto; (b) any notifications or determinations by the Internal Revenue Service, the Department of Labor, or any other applicable Federal or state agency with respect to the participation by the Participating Entity in the Group Trust, including without limitation the material results of any government audit of the Participating Entity, whether or not such examination purports to affect the status of the Participating Entity as a Qualified Entity; (c) any contemplated termination or the termination of the Participating Entity; and (d) any merger, consolidation, or transfer of substantially all of the assets of the Participating Entity.

4.06 <u>Additional Representations and Warranties</u>. The Participating Entity and Participating Entity Signatory represent and warrant to and agree with the Investment Manager as follows:

(a) The Participating Entity acknowledges receipt, at least forty-eight (48) hours prior to entering into this Adoption Agreement, of a copy of Part II of the Investment Manager's current filing with the Securities and Exchange Commission on Form ADV.

(b) The Participating Entity understands and acknowledges that assets of the Group Trust and Investment Fund may be invested and the Investment Manager may direct the Trustee to engage in transactions in reliance upon the exemption from ERISA

-4-

under Prohibited Transaction Class Exemption 84-14 (the "Exemption"); that the reliance of the Investment Manager is predicated, in part on the representations and warranties made and to be made by the Participating Entity in and pursuant to this Adoption Agreement and in Appendix A hereto; and that the Exemption may not be available if any of those representations and warranties are not true and accurate.

(c)    The Participating Entity acknowledges that the Investment Manager provides investment advisory services to, and has investment advisory responsibilities for, other individuals and entities and that the Investment Manager may give advice or exercise investment responsibility and take other action with respect to accounts of such persons or entities which may differ from advice given or action taken for the Group Trust and Investment Fund. The Investment Manager shall have no obligation to acquire for the Group Trust or Investment Fund, or to sell for the Group Trust or Investment Fund, a position in any investment which any such account may acquire or sell.

(d)    The Participating Entity is acquiring its interest in the Group Trust for its own account for investment, and not for, with a view to, or in connection with the resale or distribution thereof. The Participating Entity acknowledges, understands and agrees that the Units are not registered under the Securities Act of 1933, as amended (the "1933 Act") nor under the securities laws of any state and may not be transferred, in whole or in part. The Investment Manager and the Trustee have granted the Participating Entity and the Participating Entity Signatory access to all information about the Group Trust, Investment Fund and their respective activities which either of them has requested and have offered the Participating Entity and Participating Entity Signatory access to all further information which either of them has deemed relevant to a decision to invest in the Group Trust and Investment Fund. A substantial part of the business of the Participating Entity consists of investing, purchasing, selling or trading in securities of others.

(e)    The Participating Entity acknowledges and agrees that the Investment Manager may delegate the authority to manage all or a portion of the assets of the Investment Fund to investment managers who are independent of the Investment Manager or its affiliates ("Sub-Managers") in order to take advantage of special portfolio management skills and areas of expertise of certain managers and to reduce the risks to the Investment Fund associated with reliance upon any one particular portfolio management strategy. The compensation of any such Sub-Manager shall be paid from the Investment Fund and shall be in addition to the compensation paid to the Investment Manager. The Participating Entity and Participating Entity Signatory agree that for purposes of appointing any Sub-Manager, the Investment Manager is a "named fiduciary" of the Participating Entity within the meaning of

-5-

Ex. B-131

Section 402(a)(2) of ERISA.

(f) The Participating Entity specifically represents that it is either: (i) an "accredited investor", within the meaning of Section 2(15) of the 1933 Act and Rule 501(a) under the 1933 Act; or (ii) a "Sophisticated Investor" as defined in the Offering Memorandum.

4.07 <u>Qualification of Group Trust</u>. The Investment Manager hereby represents and warrants that the Group Trust is qualified as a "Group Trust" under Internal Revenue Service Revenue Ruling 81-100, and agrees that it will notify the Participating Entity Signatory promptly in the event of any failure to qualify, or in the event of any notification or determination by the Internal Revenue Service or the Department of Labor with respect to the qualification of the Group Trust.

### ARTICLE V

### MANAGEMENT OF THE GROUP TRUST AND DISCLOSURE OF ADDITIONAL INFORMATION

5.01 <u>Administration of the Group Trust</u>. The Participating Entity Signatory agrees that the Group Trust shall be administered by the Trustee and the Investment Manager in accordance with the provisions of the Group Trust Agreement, this Adoption Agreement and the Offering Memorandum. The Participating Entity Signatory hereby appoints the Investment Manager as the "Investment Manager" (as that term is defined in Section 3(38) of the Act) of those assets of the Participating Entity invested in the Group Trust Fund, and the Investment Manager acknowledges that as an investment manager, it is a "fiduciary" (as that term is defined in Section 3(21) of the Act) of the plan(s) of which the Participating Entity is a part.

5.02 <u>Additional Disclosures Relating to Participating Entities</u>. Upon request by either the Trustee or the Investment Manager, the Participating Entity Signatory shall disclose to the Trustee or the Investment Manager, as the case may be, such information, including but not limited to financial statements, which would enable the Trustee or the Investment Manager to determine whether the Group Trust, the Trustee, the Investment Manager, or the Participating Entity will be treated as having entered into or participated in any transaction prohibited by applicable law (including Section 406 of the Act and Section 4975 of the Code).

-6-

# EXHIBIT C

NAME OF OFFEREE _____    NO. _____

_____

_____

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# INCOME-PLUS INVESTMENT FUND

(A Tax-Exempt Investment Fund Established
Pursuant to The Master Income-Plus Group Trust)

_____

November 1, 2003

_____

### INVESTMENT MANAGER:
### J.P. JEANNERET ASSOCIATES, INC.

### TRUSTEE:
### CUSTODIAL TRUST COMPANY

_____

_____

THIS OFFERING IS NOT A PUBLIC OFFERING.  THE SECURITIES OFFERED
HEREBY HAVE NOT BEEN REGISTERED OR QUALIFIED WITH, NOR APPROVED
BY, THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE
REGULATORY AUTHORITY, NOR HAS SUCH COMMISSION OR ANY
REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF
THIS MEMORANDUM.  THIS MEMORANDUM DOES NOT CONSTITUTE AN
OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OR
SOLICITATION IS NOT LAWFUL, OR IN WHICH THE PERSON MAKING SUCH
OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.

Ex. C-1

## TABLE OF CONTENTS

| CAPTION | PAGE |
|---|---|
| SUMMARY OF THE OFFERING | A |
| INTRODUCTION | 1 |
| INVESTMENT STRATEGIES | 4 |
| MANAGEMENT OF THE INVESTMENT FUND | 9 |
| RISK FACTORS | 11 |
| FINANCIAL SUMMARY OF THE OFFERING | 15 |
| CONFLICTS OF INTEREST | 17 |
| INCOME TAX ASPECTS | 18 |
| ERISA CONSIDERATIONS | 20 |
| SUITABILITY REQUIREMENTS | 21 |
| SUBSCRIPTION PROCEDURES | 23 |

### EXHIBITS

"A"    Agreement of Trust Establishing Group Trust, as amended

"B"    Adoption Agreement

Ex. C-5

## INTRODUCTION

Income-Plus Investment Fund, a tax-exempt fund ("Investment Fund"), has been formed by the Investment Manager (as defined in this Memorandum) to pool certain of the assets of certain qualifying employee pension and profit sharing plans or certain other entities, including exempt individual retirement accounts, all of which are either Accredited Investors or Sophisticated Investors (collectively "Participating Entities") for investment purposes only. The Investment Fund was established on December 15, 1993 pursuant to The Master Income-Plus Group Trust ("Group Trust"). The Group Trust was formed on February 23, 1993 pursuant to an Agreement of Trust-Establishing The Master Income Plus Group Trust, as amended by the First Amendment to Agreement of Trust Establishing the Master Income-Plus Group Trust dated as of November 1, 2003 ("Group Trust Agreement") between the Trustee and the Investment Manager. The Trust Agreement provides that the Investment Manager may establish additional investment funds by executing and delivering to the Trustee a Declaration Establishing Investment Fund under the Group Trust ("Declaration"). The Investment Fund is a group trust fund established by the Investment Manager pursuant to such a Declaration. The Investment Manager reserves the right, in its sole and absolute discretion, to convert, at any time, the Investment Fund into a "master-feeder" structure.

The Investment Manager, together with the Advisor (as defined in this Memorandum), have identified a number of hedging and arbitrage strategies utilized by Managers with whom the Investment Manager intends to invest substantially all of the assets of the Investment Fund. These Managers, either through directly-managed accounts or through their own investment limited partnership, limited liability company or corporation within which the Investment Fund would participate, employ varying investment styles and strategies. Such styles and strategies include absolute return/market neutral, long-short equity, event driven/special situations, and other multiple strategies. Future investments may also be made with Managers employing other hedging and arbitrage strategies involving stocks, bonds, options on stocks and other financial instruments. While it is anticipated that a substantial portion of the assets of the Investment Fund will be invested with Managers recommended to the Investment Manager by the Advisor, all decisions regarding the investment, maintenance and withdrawal of Investment Fund assets will be made by the Investment Manager in its sole and absolute discretion. In addition, the Investment Manager may directly manage up to ten (10%) percent of the assets of the Investment Fund.

The Investment Fund's objective is to seek consistent returns substantially higher than the risk-free rate of return (i.e., Treasury Bills) while attempting to minimize risk (i.e., return volatility). **There can be no assurance that the Investment Fund will achieve its objective.** It is the intention of the Investment Manager to allocate assets within the Investment Fund such that they are reasonably diversified among different Managers and investment strategies, in order to minimize the risk of one strategy adversely affecting the overall investment return. However, hedging and arbitrage strategies are generally not intended to profit by taking "market risk". The Investment Manager believes that the objective of consistent capital growth can be achieved with diversified asset management utilizing hedging and arbitrage strategies and employing managers utilizing the same or varied strategies that seek to profit from pricing inefficiencies.

The Investment Manager has determined that there are various hedging and arbitrage managers available to clients with high net worth, or managers which require large minimum accounts under management or large investments in the investment vehicles they control, which are not available to some pension and profit sharing plans and individual retirement accounts. Also, the Investment Manager recognizes the benefits of diversification of assets of such entities among several hedging managers, and the economies that can be realized from management of a large pool of assets in the Investment Fund. The Investment Manager believes that satisfactory rates of return can be achieved on a consistent basis through various hedging and arbitrage strategies, which have been thoroughly researched by the Investment Manager and its Advisor, Ivy Asset Management Corp. As such, the Investment Manager believes that the Investment Fund represents a vehicle for achievement of relatively consistent higher

Ex. C-10

rates of return on pension and profit sharing plans and individual retirement accounts from year to year than the risk-free rate of return (i.e. Treasury Bills).

J.P. Jeanneret Associates, Inc., with an address at 100 East Washington Street, Syracuse, New York 13202, is the investment manager ("Investment Manager"). The Investment Manager (and its predecessor) has been registered as an investment advisor under the Investment Advisers Act of 1940, as amended ("Advisers Act") since 1974 and is the "investment manager" for the Group Trust and Investment Fund within the meaning of Section 3(38) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Investment Manager is also a Qualified Professional Asset Manager ("QPAM"). The Investment Manager provides investment advice with respect to over $500 million in assets. Dr. John P. Jeanneret and Paul L. Perry are the sole shareholders of the Investment Manager. Dr. Jeanneret serves as its chief executive officer and, together with Paul L. Perry, is a director of the Investment Manager.

The Investment Fund is offering Units in a private placement pursuant to Section 4(2) of the 1933 Act and Rule 506 of Regulation D promulgated thereunder by the SEC. The Units will be sold by the Investment Manager and will be continuously offered in the sole discretion of the Investment Manager. No selling commission will be charged. The initial subscription by any Offeree is $1,000,000; however, the Investment Manager may, in its sole discretion, waive the foregoing minimum purchase requirement. There are no minimum or maximum amounts that may be invested by all of the Participating Entities in the Investment Fund, in the aggregate. Existing Participating Entities may subscribe for additional Units of any amount and prospective Participating Entities will be required to purchase at least $1,000,000 of Units; however, the acceptance of any additional or new subscription is at the sole discretion of the Investment Manager. Units may be purchased only by Offerees that are: (1) a pension or profit sharing trust which by qualifying under Code Section 401(a) is exempt from taxation under Code Section 501(a); (2) a plan or governmental unit described in Code Sections 401(a)(24) and 818(a)(6); or (3) an individual retirement account exempt under Code Section 408(e). In addition, Units may only be purchased by Participating Entities which qualify as either Accredited Investors or Sophisticated Investors; provided that Units have not been and will not be sold to more than 35 Sophisticated Investors (calculated as the aggregate number of Sophisticated Investors that have purchased Units as of the date the Investment Fund commenced operations). See "*SUITABILITY REQUIREMENTS*". The Investment Manager may, in its sole discretion, reject any subscription for any reason.

The Investment Fund's fiscal year ends December 31. After the end of each fiscal year, audited financial statements for the year ("Audited Financial Statements") will be prepared by the Investment Fund, audited by the Investment Fund's independent certified public accountants, and will be distributed to each Participating Entity. The Participating Entities will also receive unaudited quarterly financial statements ("Unaudited Quarterly Statements") from the Investment Fund after the end of each calendar quarter (other than the calendar quarter ending December 31) indicating the Investment Fund Net Asset Value

Neither the Investment Fund nor the Group Trust is registered as an investment company and neither is subject to the provisions of the Investment Company Act, in reliance upon an exemption for an entity which does not have more than one hundred (100) beneficial owners of its securities. Accordingly, the Investment Fund will limit the number of purchasers of Units.

The Investment Manager has engaged Ivy Asset Management Corp., a wholly-owned subsidiary of the Bank of New York Company, Inc. (the "Advisor"), to consult with the Investment Manager in selecting and monitoring the Managers and to provide certain administrative, back-office and other general support. The engagement agreement between the Investment Manager and the Advisor runs to December 31, 2005 on which date it is automatically renewable thereafter on a year to year basis unless

Ex. C-11

cancelled by either party on at least 90 days written notice, during 2005, the final year of the engagement, or during any subsequent calendar year, if applicable.

Under the engagement agreement, the Advisor has agreed, with respect to the Investment Manager's management of the assets of the Investment Fund, to (i) research, evaluate and meet with potential investment managers of the assets of the Investment Fund, (ii) make recommendations to the Investment Manager that it invest assets of the Investment Fund with certain investment managers by investing in investment vehicles operated by such investment managers and/or by opening up directly-managed accounts with such investment managers, and (iii) monitor, evaluate and assess performance of investment managers that are managing assets of the Investment Fund and to make periodic recommendations to Investment Manager with respect to such performance. All advice provided by the Advisor shall be made solely to Investment Manager and all decisions regarding assets of the Investment Fund are made by the Investment Manager in its sole and absolute discretion.

The Advisor is registered as an investment adviser under the Advisers Act. The Advisor is also registered as a commodity pool operator ("CPO") and as a commodity trading advisor ("CTA") pursuant to the Commodity Exchange Act. As of March 1, 2003 the Advisor managed in excess of $6.2 billion of investor capital.

The Bank of New York Company, Inc., a financial holding company ("BNYCo"), is the sole owner of the Advisor. The Bank of New York is the world's largest custodian bank with $7.8 trillion in assets under custody as of June 30, 2003.

The Trustee is an FDIC-insured commercial bank located in Princeton, New Jersey, and is wholly-owned by The Bear Stearns Companies Inc. The Trustee commenced operations in September 1985. The Trustee holds, as custodian or trustee, over $94 billion of assets for institutional clients and affiliated entities. The Trustee's customers include public and private pension funds, mutual funds, endowments and insurance companies. The Trustee has over $140 million of capital.

-3-

Ex. C-12

## ERISA CONSIDERATIONS

         The Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the regulations promulgated thereunder by the United States Department of Labor (the "DOL") provide as a general rule that a fiduciary with respect to employee benefit plans ("Plans") subject to ERISA must discharge its responsibilities with respect to a Plan in a prudent manner and must consider several factors in determining whether to enter into an investment or engage in an investment course of action. If a fiduciary with respect to any such Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such Plan, the fiduciary may be held personally liable for losses incurred by the Plan as a result of such breach. Among the factors that should be considered are the diversification and liquidity of the Plan's portfolio, the potential return on the proposed investment and the place the proposed investment would occupy in the Plan's portfolio taken as a whole.

         ERISA imposes certain duties and responsibilities on persons (including investment managers) who are deemed to be fiduciaries (within the meaning of Section 3(21) of ERISA) and prohibits them from entering into transactions involving plan assets with various parties in interest (within the meaning of Section 3(14) of ERISA) with respect to the Plan. Generally, under ERISA, the Plan trustees, named fiduciaries or duly appointed investment managers (within the meaning of Section 3(38) of ERISA) have exclusive authority and discretion to manage and control assets of the Plan. If any such "prohibited transaction" is entered into, certain excise taxes may be payable by the party in interest, and the Plan fiduciaries may be liable to the Plan for any losses incurred.

         The assets of the Group Trust will constitute "plan assets" under regulations promulgated by the DOL. The Investment Manager will therefore be deemed a fiduciary with respect to each investing Plan and the general prudence and fiduciary responsibility provisions of ERISA will be applicable to it and to the operations of the Group Trust. The Investment Manager does not expect that the applicability of these ERISA provisions to the Group Trust will interfere with the operations or the results of the Group Trust in any material way.

         Certain prospective Participating Entities may currently maintain relationships with the Investment Manager under which the Investment Manager provides investment advisory and/or management services to the Plan. These relationships may cause the Investment Manager or such affiliates to be deemed to be fiduciaries of those Plans. The DOL has issued regulations defining the term "fiduciary" which provide that an investment advisor who renders investment advice to a Plan for a fee and who either has discretionary control over plan assets or renders advice pursuant to an understanding that such advice will serve as a primary basis for the Plan's investment decisions will be deemed a fiduciary but only with respect to that portion of the Plan's assets with respect to which the investment advisor renders such advice or has such discretion. The prior written authorization of an independent fiduciary of any Plan for which the Investment Manager or one of its affiliates acts as investment advisor or has a preexisting fiduciary relationship shall be obtained before assets of such Plan will be invested in the Group Trust. Further, if the Investment Manager acts as investment advisor to a Plan, the Investment Manager will not charge its advisory fee to the Plan with respect to the amount of such Plan's investment in the Group Trust and the Investment Manager will only receive its Management Fee hereunder with respect to the Plan's investment in the Group Trust.

Ex. C-29