**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jacqlyn R. Rovine
Email: jrovine@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*And Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (BRL) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

## TRUSTEE'S FIFTH INTERIM REPORT
## FOR THE PERIOD ENDING MARCH 31, 2011

# TABLE OF CONTENTS

**Page**

I.  EXECUTIVE SUMMARY ............................................................................................. 1

II.  BACKGROUND .......................................................................................................... 5

III.  FINANCIAL CONDITION OF ESTATE .......................................................................... 5

IV.  ADMINISTRATION OF THE ESTATE ........................................................................... 7

    A.  Marshalling And Liquidating The Estate Assets ................................................. 7

    B.  Retention Of Professionals ............................................................................... 8

    C.  Efficient Administration Of Litigations ............................................................. 8

V.  PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA ......................... 10

    A.  Net Equity Dispute ....................................................................................... 10

    B.  "Customer" Definition .................................................................................. 11

VI.  CLAIMS ADMINISTRATION ................................................................................... 11

    A.  Claims Processing ........................................................................................ 11

        i.  Customer Claims ................................................................................ 11

        ii.  General Creditor Claims .................................................................... 13

        iii.  The Trustee Has Kept Customers Informed Of The Status Of The Claims Process ................................................................................. 13

        iv.  The Hardship Program ....................................................................... 14

    B.  Objections To Claims Determinations .............................................................. 16

    C.  Settlements Of Customer Claims Disputes ........................................................ 17

VII.  RECOVERIES AND CONTINGENCIES ...................................................................... 17

    A.  Recoveries Accomplished During Prior Report Periods ...................................... 17

    B.  Recoveries Accomplished During This Report Period ......................................... 18

    C.  Appeals Of Settlements .................................................................................. 19

VIII.  INITIAL ALLOCATION OF FUNDS AND DISTRIBUTION TO CUSTOMERS ...... 21

    A.  The Fund Of Customer Property ..................................................................... 21

    B.  The General Estate ........................................................................................ 23

IX.  INVESTIGATION OF THE BLMIS FRAUD ................................................................ 24

    A.  Summary Of Litigation .................................................................................. 33

    B.  Avoidance Actions ........................................................................................ 33

    C.  "Bad Faith" Actions ...................................................................................... 35

# TABLE OF CONTENTS
### (continued)

**Page**

D.    Financial Services Industry Litigation: Banks, Feeder Funds, And Individuals .......................................................................................... 37

E.    International Investigation And Litigation .......................................... 40

    i.    Austria And Italy ..................................................................... 41

    ii.    Bermuda ................................................................................... 41

    iii.    BVI/Cayman Islands ............................................................... 41

    iv.    England .................................................................................... 42

    v.    Gibraltar .................................................................................. 42

    vi.    Ireland ..................................................................................... 43

    vii.    Switzerland/Luxembourg ........................................................ 43

F.    Trustee's Injunctions ......................................................................... 43

    i.    Picard v. Fox, Adv. Pro. 10-3114 (BRL) ................................ 43

    ii.    Picard v. Stahl, Adv. Pro. No. 10-03268 (BRL). .................... 45

X.    FEE APPLICATIONS AND RELATED APPEALS .................................... 46

XI.    CONCLUSION ............................................................................................ 49

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, Esq. (the "Trustee"), as trustee for the substantively consolidated liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the "Debtors"), respectfully submits his Fifth Interim Report (this "Report") pursuant SIPA § 78fff-1(c) of SIPA, and in accordance with the terms of the Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief entered on December 23, 2008 (the "Claims Procedures Order") (ECF No. 12).[2] Pursuant to the Claims Procedures Order, the Trustee shall file additional interim reports every six (6) months. This Report covers the period between October 1, 2010 and March 31, 2011 (the "Report Period").

## I.    <u>EXECUTIVE SUMMARY</u>

1.    During this Report Period, the Trustee's efforts since his appointment in December 2008 on behalf of the customers and creditors of the Debtors have been fully revealed to the public in the form of significant settlements and the filing of over one thousand lawsuits to recover avoidable transfers and other monies in claimed amounts totaling over $90 billion for the benefit of the BLMIS estate.

---

[1] The Securities Investor Protection Act ("SIPA") is found at 15 U.S.C. §§ 78aaa *et seq*.  For convenience, subsequent references to SIPA will omit "15 U.S.C."

[2] All ECF references refer to pleadings filed in the main adversary proceeding pending before the Bankruptcy Court, *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, 08-1789 (Bankr. S.D.N.Y.) (BRL), unless otherwise noted.

2.      The Trustee's first obligation under SIPA is to recover customer property[3] to satisfy the customer priority set forth in the SIPA statute.  Because a Ponzi scheme was perpetrated through BLMIS, the satisfaction of the customer priority in this particular case has a distinct result: those customers who deposited more than they withdrew over the course of the scheme ("net losers") will receive the return of their principal in the form of an allowed customer claim.  Those preferred customer claims are paid first.  Customers who withdrew more than they deposited over the course of the scheme ("net winners") are not entitled to a preferred customer claim since they already received their principal, as well as the funds of other customers.

3.      The Trustee's obligations, however, are not limited to recovering customer property to satisfy those preferred customer claims.  Rather, the Trustee's duties extend to the entire estate, consisting of both the preferred customer class as well as general creditors.  In this proceeding, both categories of customers are general creditors of the BLMIS estate, with claims against the estate for fraud, misrepresentation, and the like.  Thus, to the extent the Trustee recovers funds beyond those needed to satisfy the customer priority, such funds will be allocated to the general estate for distribution to creditors in accordance with section 726 of the Bankruptcy Code.  11 U.S.C. § 726; SIPA §§ 78fff-2(c)(1), 78fff(e).

4.      The Trustee's charge, therefore, is to recover all of the funds that are owed to the BLMIS estate.  By any standard, the Trustee has made tremendous strides in reaching that goal.  The Trustee's $5 billion settlement with the estate of Jeffry M. Picower (the "Picower Settlement") is historic, being the largest settlement in any SIPA case and staggering in terms of amounts recovered.  When combined with the other significant settlements entered into during

---

[3] SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

this Report Period, including $550 million settlement with Carl J. Shapiro and related parties, the

$470 million settlement with Union Bancaire Privée, and prior recoveries made by the Trustee,

the Trustee has recovered or entered into settlement agreements to recover over $7.6 billion,

representing over 44% of the principal lost in the scheme by those customers that filed claims

with the Trustee.[4]

5.      At this point, the Trustee has determined almost every customer claim filed.  As

of March 31, 2011, the Trustee had received 16,518 customer claims and determined 16,268.

2,409 claims have been allowed, totaling over $6.8 billion in claims against the BLMIS estate,

and the Trustee has committed to pay approximately $793 million in funds advanced to him by

SIPC.[5]

6.      During this Report Period, the Trustee and his counsel (including, but not limited

to, Baker & Hostetler LLP ("B&H"), Windels Marx Lane & Mittendorf, LLP ("Windels Marx"),

Young Conaway Stargatt & Taylor, LLP ("Young Conaway"), and various international special

counsel retained by the Trustee as described in ¶ 110 of the Amended Third Interim Report (ECF

No. 2207) and *infra* ¶ 116 ("International Counsel") (collectively, "Counsel")) filed over 1,000

adversary proceedings that seek to recover $76 billion of customer property and damages.  When

combined with adversary proceedings filed during prior Report Periods, the Trustee has brought

more than 1,050 actions seeking over $90 billion.  These proceedings, which are discussed

further herein, can be divided into three types:

---

[4] The total amount of principal lost by all investors is approximately $19.5 billion.  Not every customer with a "net loser" account, however, filed a claim with the Trustee.  Thus, the amount that the Trustee would have to recover in order to return 100% of the principal lost by those who are eligible to receive a distribution in this proceeding is approximately $17.3 billion.

[5] As of May 13, 2011 the Trustee had determined 16,513 customer claims, thus allowing approximately $6.9 billion in claims against the BLMIS estate.  The Trustee has committed to pay approximately $795 million in funds advanced to him by SIPC.

    (a)    Avoidance actions brought against BLMIS accountholders and other transferees who received fraudulent conveyances within ninety days, two years, and/or six years of the Filing Date[6] and from whom the Trustee seeks the return of fictitious profits ("Avoidance Actions");

    (b)    "Bad Faith" avoidance actions brought against BLMIS accountholders and/or other transferees who knew or should have known of fraudulent activity at BLMIS and from whom the Trustee seeks the return of fictitious profits and principal ("Bad Faith Avoidance Actions"); and

    (c)    Actions against banks, feeder funds, and certain entities and individuals in the financial services industry who knew or should have known of fraudulent activity at BLMIS and from whom the Trustee seeks the return of the fictitious profits, principal, fees, and, in certain cases, damages ("Bank/Feeder Fund Litigation").

7.    The Trustee's goal in pursuing this litigation is to effect a 100% distribution to customers and create a general estate for the benefit of all general creditors of BLMIS.

8.    While the Trustee's efforts to recover customer property and resolve disputed claims have materially advanced the administration of the estate, significant issues remain. Outstanding are motions and appeals relating to certain omnibus issues, such as the proper interpretation of "net equity" and "customer" under SIPA. There has been significant motion practice concerning the reference to the Bankruptcy Court of certain non-bankruptcy causes of action brought by the Trustee and the standing of the Trustee to pursue these claims; the resolution of these motions will determine the nature of a portion of the Trustee's causes of action set forth in certain Bank/Feeder Fund Litigations.

9.    This Report is meant to provide an overview of the efforts engaged in by the Trustee and his team of professionals in unwinding the largest Ponzi scheme in history. Billions of dollars and thousands of people and entities located across the world are relevant to this

---

[6] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm. *See* SIPA § 78*lll*(7)(B).

undertaking.  The Trustee has worked diligently to coordinate the administration, investigation, and litigation to maximize efficiencies and reduce costs.

10.    This Report also discusses certain significant developments that have occurred outside the Report Period, including the Trustee's recent motion for an initial allocation and interim distribution to customers.

11.    All Interim Reports, all filings by the Trustee in the main liquidation proceeding, and other pertinent information, can be located on the Trustee's website, www.madofftrustee.com.

## II.    <u>BACKGROUND</u>

12.    The Trustee's prior interim reports, each of which are fully incorporated herein,[7] have detailed the circumstances surrounding the filing of this case and events that took place during prior phases of this proceeding.

## III.    <u>FINANCIAL CONDITION OF ESTATE</u>

13.    No administration costs, including the compensation of the Trustee and his counsel, will be paid out of any recoveries obtained by the Trustee for the benefit of BLMIS customers.  Rather, the fees and expenses of the Trustee and of all counsel to the Trustee and consultants are paid from administrative advances from the Securities Investor Protection Corporation ("SIPC"), as are all administrative costs incurred by the Trustee.  Payment of these costs has no impact on recoveries that the Trustee has obtained and will obtain because the costs are chargeable to the general estate.  Recoveries from litigation, settlements, and other means will be available in their entirety for the satisfaction of customer claims.

---

[7] Prior reports covered the periods from December 11, 2008 to June 30, 2009 (the "First Interim Report") (ECF No. 314); July 1, 2009 to October 31, 2009 (the "Second Interim Report") (ECF No. 1011); November 1, 2009 to March 31, 2010 (the "Amended Third Interim Report") (ECF No. 2207); and April 1, 2010 to September 30, 2010 (the "Fourth Interim Report") (ECF No. 3038).

14.     A summary of the financial condition of the estate as of March 31, 2011 is provided in <u>Exhibit A</u> attached hereto.  The administrative expenses required for this liquidation include the maintenance of the BLMIS office, including rent payments (although this has decreased substantially since the sale of the market making operation), monthly payment of Trustee fees, legal fees, and consultant fees (all approved by SIPC), and the digitizing of records and costs associated with determining customer claims.

15.     As detailed in <u>Exhibit A</u>, as of March 31, 2011, the Trustee has requested and SIPC has advanced over $1.1 billion, of which approximately $779.3 million was used to pay allowed customer claims up to the maximum SIPA statutory limit of $500,000 per account[8] and $346.3 million was used for administrative expenses.

16.     The Trustee maintains a regular operating account with Citibank.  As of March 31, 2011, the funds in this account totaled over $104 million.

17.     The Trustee maintains an Insured Money Market account with Citibank.  As of March 31, 2011, the total value of this account was over $60 million.

18.     The Trustee maintains a preferred custody interest-bearing account with Citibank. As of March 31, 2011, the balance of the preferred custody account was over $1.1 billion, which consisted of $1 billion in short-term investments in United States Treasury Bills and mutual funds and $100 million in United States Treasury Notes.

19.     During this Report Period, the Trustee opened a second preferred interest-bearing account with Citibank.  As of March 31, 2011, the balance in the second preferred custody

---

[8] The Trustee must receive an executed assignment and release form from each customer before releasing an advance of funds from SIPC.  Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims that have been determined is less than the amount of SIPC advances committed by the Trustee.

account was over $1 billion, which consisted of short-term investments in United States Treasury Bills and mutual funds.

20.     The Trustee maintains a brokerage account with Morgan Joseph & Co., Inc., clearing through J.P. Morgan Clearing Corp.  As of March 31, 2011, the total value of the Trustee's Morgan Joseph account was approximately $306.8 million.

## IV.     ADMINISTRATION OF THE ESTATE

### A.          Marshalling And Liquidating The Estate Assets

21.     The Trustee and his Counsel have worked diligently to investigate, examine, and evaluate the Debtor's activities, assets, rights, liabilities, customers, and other creditors.  Thus far, the Trustee has been successful in recovering or entering into agreements to recover a significant amount of assets for the benefit of customers, totaling approximately $7.6 billion. For a more detailed discussion of prior recoveries, *see* Section V.B. of the First Interim Report, and Section IV of the Second, Amended Third, and Fourth Interim Reports.

22.     The Trustee has identified claims in at least eight derivative shareholder class action suits that BLMIS filed before the Trustee's appointment arising out of its proprietary and market making desk's ownership of securities.  As of the Fourth Interim Report, the Trustee had received distributions from seven of these class action settlements totaling over $91,000.  The Trustee has not and will not receive any distributions from the eighth class action settlement.  In addition, the Trustee has identified claims that BLMIS may have in eighty-four other class action suits also arising out of its proprietary and market making activities.  The Trustee has filed proofs of claim in sixty-one of these cases and, based on a review of relevant records, declined to pursue claims in nine additional cases.  Subject to the completion of a review of relevant records, the Trustee intends to file claims in the remaining fourteen cases.  As of March 31, 2011, the Trustee has recovered approximately $222,000 from settlements relating to seven of the sixty-

one claims filed directly by the Trustee, of which over $131,000 was recovered during this Report Period. The Trustee continues to review this area.

23.    In the First and Second Interim Reports, the Trustee explained his determination that BLMIS's market making operation might be a potentially productive unit, and announced the subsequent sale of the market making unit to Surge Trading Inc. (f/k/a Castor Pollux Inc.) ("Surge").  (First Interim Report ¶¶ 25-29; Second Interim Report ¶¶ 51-52).  During this Report Period, the Trustee received an over $145,000 from Surge, which includes guaranteed payments for the third and fourth quarters of 2010 and a percentage of Surge's earnings, for a total received from Surge of more than $1.2 million.

24.    During this Report Period, the Court authorized the Trustee to: (i) complete future sales of financial assets; (ii) participate in tender offers, exchanges offers, or other restructurings; and (iii) execute any necessary documents to implement the foregoing.   (ECF No. 3055). Thereafter, McKechnie Aerospace De, Inc. exchanged more than $499,000 in cash for BLMIS's second lien interest position in McKechnie Aerospace De, Inc.

**B.         Retention Of Professionals**

25.    In addition to the professionals already retained by the Trustee, during this Report Period and pursuant to orders of this Court the Trustee retained Taylor Wessing LLP to represent him in England and the British Commonwealth (ECF No. 3305), Young Conaway as special counsel (ECF No. 3554), Graf & Pitkowitz Rechtsanwälte GMBH to represent him in Austria (ECF No. 3930), Osborne & Osborne, P.A. as special probate counsel in Florida (ECF No. 4018), and UGGC & Associés to represent him in France (ECF No. 4038).

**C.         Efficient Administration Of Litigations**

26.    During this Report Period, the Trustee filed several motions before this Court that will govern the treatment of and procedures related to the efficient administration of over one

thousand litigations against more than four thousand defendants located in at least thirty countries. These procedures will ensure compliance with the Bankruptcy Code and SIPA, consistency, and transparency.

27.    On October 21, 2010, the Trustee filed a Motion for an Order Establishing Procedures for the Assignment of Allowed Claims in order to govern how a BLMIS claimant may assign his or her allowed claim. (ECF No. 3057). The Court entered the Order on November 10, 2010. (ECF No. 3138).

28.    On October 21, 2010, the Trustee filed a Motion for an Order (1) Establishing Litigation Case Management Procedures for Avoidance Actions, and (2) Amending the February 16, 2010 Protective Order in order to (a) extend defendants' time to answer or otherwise respond to the complaints, (b) establish guidelines for the filing and service of pleadings, (c) establish the permissible scope of discovery and set deadlines for same, (d) establish omnibus status conferences and hearings, (e) institute the grounds and procedures for the filing of motions and trial of the Avoidance Actions, and (f) maximize the potential for settlement before trial either through negotiation or through mandatory mediation under the Bankruptcy Court's mediation program. (ECF No. 3058). The Court entered the Order on November 11, 2010. (ECF No. 3141).

29.    On October 21, 2010, the Trustee filed a Motion for an Order Granting Authority to the Trustee and Establishing Procedures for Settlement Agreements in Connection with Avoidance Actions Filed by the Trustee to allow the Trustee to enter into settlement agreements by and between the Trustee and BLMIS accountholders without further order of the Court when a settlement is $7.5 million or less, and allow the Trustee to file periodic notices of settlements

between $7.5 million and $20 million. (ECF No. 3059). The Court entered the Order on November 12, 2010. (ECF No. 3181).

30.     On January 11, 2011, the Trustee filed a Motion for an Order Establishing Procedures for Serving Complaints and Exhibits Under Seal in order to allow the Trustee to serve unredacted versions of complaints on defendants named in adversary proceedings, and to have such recipients bound by the Global Protective Order. (ECF No. 3670). The Court entered the Order on February 17, 2011. (ECF No. 3858).

31.     On February 24, 2011, the Trustee and B&H filed a Motion for an Order Establishing Procedures for an Electronic Data Room in order to allow discovery for all adversary proceedings of certain documents supporting some of the key elements of the Trustee's claims while balancing the privacy interests of BLMIS customers and others. (ECF No. 3869). A hearing on this Motion will be scheduled once the Court rules on the Motion described in paragraph 32, *infra*.

32.     On March 14, 2011, the Trustee and B&H filed a Motion for Entry of Litigation Protective Order in order to use materials produced by any party in the lawsuits initiated by the Trustee that have been or are deemed to comprise or contain confidential material while balancing the privacy interests of any producing party. (ECF No. 3928). A hearing on the Motion is scheduled to be heard by the Court on May 24, 2011.

## V.     PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA

### A.          Net Equity Dispute

33.     For purposes of determining each customer's "net equity," as that term is defined under SIPA, the Trustee has credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn from that BLMIS customer account (the "cash in, cash out method" or the "Trustee's Net Investment Method"). Some claimants argued

-10-

that the Trustee is required to allow customer claims in the amounts shown on the November 30,

2008 customer statements (the "Net Equity Dispute"). This Court issued a decision on March 1,

2010 upholding the Trustee's Net Investment Method as the only interpretation consistent with

the plain meaning and legislative history of the statute, controlling Second Circuit precedent, and

considerations of equity and practicality (ECF No. 2020), reported at *SIPC v. BLMIS*, 424 B.R.

122 (Bankr. S.D.N.Y. 2010). The Court certified an immediate appeal to the United States Court

of Appeals for the Second Circuit (ECF No. 2467), which heard oral argument on March 3,

2011. The Trustee, SIPC, and appellants await the panel's ruling.

B.          **"Customer" Definition**

34.     The Trustee's position is that only those claimants who maintained an account at

BLMIS constitute "customers" of BLMIS, as defined in section 78*lll*(2) of SIPA. Where it

appears that a claimant did not have an account in his/her/its name at BLMIS ("Claimant

Without An Account"), he/she/it is not a customer of BLMIS under SIPA and the Trustee has

denied his/her/its claims for securities and/or a credit balance. The Trustee filed a motion,

pertaining to claimants that had invested in certain BLMIS feeder funds, to confirm this

methodology. (ECF Nos. 2412-2416). The Court held a hearing on October 19, 2010, and the

Trustee, SIPC, and Claimants Without an Account await the Court's ruling.

## VI.    CLAIMS ADMINISTRATION

A.          **Claims Processing**

### i.          **Customer Claims**

35.     In December 2008, the Trustee sought the Court's approval for the

implementation of customer claims process that would accord with SIPA. In particular, the

Court directed the Trustee to publish notice of the commencement of the liquidation proceeding

and specified the procedures for filing, determining, and adjudicating customer claims pursuant

to the Claims Procedure Order.  (ECF No. 12).  For a detailed overview of that process and the Trustee's reconciliation process, see sections VII of the First, Second, and Amended Third Interim Reports and section VI of the Fourth Interim Report.

36.     The books and records of BLMIS reflect over 8,000 non-administrative customer accounts.  As of December 11, 2008, approximately 4,900 accounts were active, meaning either a monthly customer statement was generated for the account for the period ending November 30, 2008 or the account was opened in December 2008.

37.     As of March 31, 2010, the Trustee had received 16,518 customer claims and determined 16,268 of them.  Of those determined, the Trustee allowed 2,409 claims and committed to pay approximately $793 million in cash advances from SIPC.  This is the largest commitment of SIPC funds of any SIPA liquidation proceeding and greatly exceeds the total aggregate payments made in all SIPA liquidations to date.  As of March 31, 2011, the Trustee had allowed over $6.8 billion in customer claims.[9]

38.     Of the remaining determined customer claims, 13,438 were denied, 12 were determined as asserting no claim, and 149 were withdrawn.  260 claims have been "deemed determined," meaning that the Trustee has instituted litigation against those claimants.  The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under section 502(d) of the Bankruptcy Code.  Accordingly, such claims will not be allowed until the avoidance action is resolved by settlement or otherwise and any judgment rendered against the claimant in the avoidance action is satisfied.  250 customer claims remained to be determined as of March 31, 2011, as they were under review by the Trustee and Counsel.  245 of these 250 claims have since been determined, with 243 claims being denied,

one claim being allowed, and one claim being withdrawn. Five claims remain to be determined as of the date of this Report.

### ii.     General Creditor Claims

39.     As of March 31, 2011, the Trustee has received 427 timely and 21 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. Of these 427 claims and $1.7 billion, the Trustee has received 101 general creditor claims and fifty broker-dealer claims totaling approximately $265.7 million. At this time, the Debtor's estate has no funds from which to make distributions to priority/non-priority general creditors and/or broker dealers.

### iii.    The Trustee Has Kept Customers Informed Of The Status Of The Claims Process

40.     Throughout the liquidation proceeding, the Trustee has kept customers, interested parties, and the public informed of his efforts by maintaining the Trustee Website, www.madofftrustee.com, a toll-free customer hotline, conducting a Bankruptcy Code § 341(a) meeting of creditors on February 20, 2009, holding various press conferences regarding the status of customer claims, and responding to the multitude of phone calls, e-mails, and letters received on a daily basis, both from claimants, their representatives, and the press.

41.     The Trustee Website allows claimants to e-mail their questions directly to the Trustee's professionals, who follow up with a return e-mail or telephone call to the claimants. As of March 31, 2011, the Trustee and his professionals had received and responded to more than 5,200 e-mails via the Trustee Website from BLMIS customers and their representatives.

---

[9] As of May 13, 2011 the Trustee had determined 16,513 customer claims, thus allowing approximately $6.9 billion in claims against the BLMIS estate. The Trustee has committed to pay approximately $795 million in funds advanced to him by SIPC.

42.     The toll-free customer hotline provides status updates on claims, addresses claimants' questions or concerns, and offers confirmation to claimants that their claims were received.  As of March 31, 2011, the Trustee, B&H, and the trustee's professionals had fielded more than 7,100 hotline calls from claimants and their representatives.

43.     In sum, the Trustee and his team have endeavored to respond in a timely manner to every customer inquiry and ensure that the customers are as informed as possible about various aspects of the BLMIS proceeding.

### iv.     The Hardship Program

44.     Simultaneously with the commencement of claims administration, the Trustee established the Hardship Program, which was originally established to accelerate the determination of claims and the receipt of SIPC protection up to $500,000 for individual account holders who suffer hardship.  An individual may qualify for the Hardship Program if he or she has filed a claim and is: (i) unable to pay for necessary living or medical expenses, (ii) over 65 years old and forced to reenter the work force after retirement, (iii) declaring personal bankruptcy, (iv) unable to pay for the care of dependents, or (v) suffering from extreme financial hardship beyond the identified circumstances.

45.     As of December 11, 2010, the Trustee had received 394 Hardship Program applications.  The Trustee obtained advances from SIPC and issued 116 checks to hardship applicants.  The Trustee also worked in good faith with approved applicants to reconcile any disputed portions of their claims.  Of the 394 Hardship Program applications received prior to December 11, 2010, the Trustee assessed the information provided and, in exercise of his discretion, decided to forego potential avoidance actions against 249 applicants who submitted applications to the Hardship Program.

-14-

46.    The Trustee expanded the Hardship Program with a second phase as he prepared to institute avoidance actions, discussed *infra* Section IX.B.   The Trustee has consistently expressed that while the law requires the Trustee to pursue avoidance actions to recover customer property, he will not pursue avoidance actions against BLMIS accountholders suffering proven hardship.   Realizing that he could forego an avoidance action only if the accountholder shared their financial information with him, the Trustee announced in November 2010 that the Hardship Program would focus on avoidance actions and requested that accountholders come forward to share information regarding their hardship.   Through applications voluntarily submitted to the Hardship Program, the Trustee has worked with a substantial number of accountholders who were subject to avoidance actions to confirm their hardship status and forego the pursuit of an avoidance action.

47.    In the second phase of the Hardship Program, as of March 31, 2011, the Trustee had received 128 Hardship Program applications from avoidance action defendants relating to 92 adversary proceedings.    After reviewing the facts and circumstances presented in these applications and, in many cases, requesting additional verifying information, the Trustee has or is in the process of dismissing 35 avoidance actions against the related defendants.  The Trustee has also extended the time for applicants to answer or otherwise respond to avoidance action complaints while their hardship applications are pending.

48.    The Trustee established a Hardship Program Hotline with a telephone number and electronic mail address.  A large number of potential applicants have been assisted by the Trustee through the use of the Hotline, and the Trustee urges customers to continue using this resource and the Hardship Program if they believe they qualify.

**B.**         **Objections To Claims Determinations**

49.    As required by the Claims Procedures Order and described in each Determination

Letter sent by the Trustee, claimants of BLMIS have thirty days from the mailing of a

Determination Letter to object to the Trustee's determination of their claim.  Claimants that

disagree with the Trustee's determination of their claim must file with the Court a written

opposition setting forth the grounds of disagreement and provide the Trustee with the same.  A

hearing date will be obtained by the Trustee, and claimants will be notified of that date.  As of

March 31, 2011, 2,290 objections (which includes duplicates, amendments, and supplements)

had been filed with the Court.  These objections relate to approximately 3,800 unique claims and

approximately 1,150 BLMIS accounts.

50.    The following objections, among others, have been asserted: (i) Congress

intended a broad interpretation of the term "customer" and the statute does not limit the

definition to those who had a direct account with the Debtor; (ii) the Trustee should determine

claims based upon the BLMIS November 30, 2008 statement as opposed to the Trustee's Net

Investment Method; (iii) claimants should receive interest on deposited amounts; (iv) the Trustee

must commence an adversary proceeding against each claimant in order to avoid paying gains on

claimants' investments; (v) claimants paid income taxes on distributions and their claims should

be adjusted by adding all amounts they paid as income taxes on fictitious profits; (vi) each

person with an interest in an account should be entitled to the SIPC advance despite sharing a

single BLMIS account; and (vii) there is no legal basis for requiring the execution of a Partial

Assignment and Release prior to prompt payment of a SIPC advance.

51.    The Trustee has departed from past practice in SIPA proceedings and paid or

committed to pay the undisputed portion of any disputed claim in order to expedite payment of

SIPC protection to customers, while preserving their rights to dispute the total amount of their claim.

**C.**          **Settlements Of Customer Claims Disputes**

52.     The Trustee has continued settlement negotiations with customers who withdrew funds from their BLMIS Accounts within ninety days of the Filing Date.  Such withdrawals are preferential transfers recoverable by the Trustee under sections 547(b) and 550(a) of the Bankruptcy Code, which are applicable in this proceeding pursuant to sections 78fff(b) and 78fff-2(c)(3) of SIPA.  To settle potential preference actions against these customers, the Trustee has proposed that the customers agree to authorize the Trustee to deduct the preferential amount from the initial payment advanced by SIPC pursuant to section 78fff-3(a)(1) of SIPA.  The allowed claim is thus calculated based on the amount of money the customer deposited with BLMIS for the purchase of securities, _less_ subsequent withdrawals, _plus_ the preferential amount. The customer will be entitled to receive an additional distribution from the fund of Customer Property based on the total amount of the allowed claim.

53.     As of March 31, 2011, the Trustee reached agreements with approximately 400 customers, recovering over $1.65 billion in pre-litigation and avoidance action settlements. These pre-litigation and avoidance action settlements have allowed the Trustee to avoid the litigation costs that would have been necessary to obtain and collect judgments from each of these customers.

**VII.     RECOVERIES AND CONTINGENCIES**

**A.**          **Recoveries Accomplished During Prior Report Periods**

54.     In the Fourth Interim Report, the Trustee reported that he possessed approximately $1.5 billion and a _de minimis_ amount of unliquidated assets.  (ECF No. 3038). These funds were primarily derived from the following sources: (a) the transfer of BLMIS bank

accounts to the BLMIS estate; (b) pre-litigation settlements; (c) customer preference recoveries; (d) the sale of assets; and (e) refunds.

55.    On June 16, 2009, this Court approved a pre-litigation settlement between Trustee and Optimal Strategic U.S. Equity Ltd. and Optimal Arbitrage Ltd.  (ECF No. 270).  This settlement resulted in the return of over $235 million.

56.    On February 18, 2010, this Court approved a pre-litigation settlement between the Trustee and the estate of Norman F. Levy.  (ECF No. 1964).  This settlement resulted in the return of $220 million (the "Levy Settlement").  Certain customers have moved to set aside the Court's Order approving the Levy settlement.  The Court denied the motion (ECF No. 3984), and the claimants filed an appeal on April 11, 2011 (ECF No. 4005).  *See* ¶ 68, *infra.*

57.    In addition the above settlements, the Trustee recovered more than $43.9 million in preference and other settlements.  *See* ¶ 66, *infra*.

**B.**        **Recoveries Accomplished During This Report Period**

58.    Since the Fourth Interim Report, this Court has approved several significant settlements between the Trustee and certain parties that greatly increase the amount of funds recovered.

59.    On October 7, 2010, the Court approved an agreement among the Trustee, HSBC Bank plc, and the Liquidators of the Primeo Fund for the release of approximately $5 million being held by HSBC Bank plc for Primeo Fund.  (ECF No. 3023).  The agreement explicitly left unresolved the Trustee's claims against Primeo Fund pursuant to the various provisions of the Bankruptcy Code, SIPA, and state law.  (ECF No. 2914).  On or about December 9, 2010, HSBC Bank plc transferred $224,000 to the Trustee.

60.    On December 21, 2010, this Court approved a pre-litigation settlement between the Trustee and Carl Shapiro, Robert Jaffe, and related entities (the "Shapiros") in the amount of

$550 million.  (ECF No. 3551).  On or about December 23, 2010, the Shapiros transferred $550 million to the Trustee.

61.    On January 6, 2011, this Court approved a pre-litigation settlement between the Trustee and Swiss bank Union Bancaire Privée ("UBP") that resulted in the recovery of $470 million to the estate.[10]  (ECF No. 3632).  On or about January 24, 2011, UBP transferred $470 million to the Trustee.

62.    On January 13, 2011, this Court approved a settlement between the Trustee and the estate of Jeffry M. Picower in the amount of $5 billion.  *Picard v. Picower*, Adv. Pro. No. 09-1197 (Bankr. S.D.N.Y.) (BRL) (ECF No. 43).  Certain customers have moved to set aside the Court's Order approving the Picower settlement.  (*Picower*, ECF Nos. 45, 49).  *See* ¶¶ 67-69, *infra.*

63.    On March 10, 2011, this Court approved a settlement between the Trustee and Hadassah in the amount of $45 million.  (ECF No. 3912).  On or about March 28, 2011, Hadassah transferred $45 million to the Trustee.

64.    In addition to the above settlements, during the Report Period, the Trustee recovered approximately $89 million as a result of preference and other settlements.  *See* ¶ 66, *infra*.

## C.    <u>Appeals Of Settlements</u>

65.    Certain claimants filed a Motion to Set Aside the Order Approving the Trustee's Settlement with the Levy Heirs for Failure to Disclose Material Information (the "Levy

---

[10] Per the settlement agreement executed on December 6, 2010, UBP agreed to pay the Trustee an additional amount (the "UBP Guarantee Payment") upon the resolution of actions brought by the Trustee against the Chester and Irongate family of funds.  The UBP Guarantee Payment shall be the difference between $30 million and the sum of all settlement and judgment amounts received by the Trustee from the Chester and Irongate family of funds.  As a result, the maximum UBP Guarantee Payment will be $500 million.

Motion"). (ECF No. 3861). By order dated March 30, 2011, the Court denied the Levy Motion. (ECF No. 3984). Shortly after the close of the Report Period, the claimants filed a notice of appeal of the Order. (ECF No. 4005). Because of this appeal, the Trustee has maintained in reserve the $220 million returned to the BLMIS estate by the Levy Heirs.

66.    As referenced above in ¶ 57, the Trustee recovered over $43.9 million prior to the Fourth Interim Report as a result of preference and other settlements, more than $11.5 million of which was made pursuant to agreements that are subject to the Net Equity Dispute. As referenced above in ¶ 64, the Trustee has recovered approximately $89 million since the Fourth Interim Report as a result of preference and other settlements, more than $45.9 million of which was made pursuant to agreements that are subject to the Net Equity Dispute.

67.    As referenced above in ¶ 62, this Court entered an Order approving the Picower Settlement ("Picower Settlement Order") on January 13, 2011. Had fourteen days expired with no appeals taken, the Picower Settlement Order entered would have become final and nonappealable on January 27, 2011. Pursuant to an escrow agreement incorporated by reference into the Picower Settlement Order, the Trustee would have then sought the release of the $5 billion and received such funds within five business days for distribution to BLMIS customers. However, that is not what transpired. Instead, BLMIS claimants Adele Fox ("Fox") and Susan Marshall (the "Florida Plaintiffs") appealed the Picower Settlement Order to the District Court, meaning that a final, nonappealable order regarding the Trustee's Picower settlement can be entered only upon the resolution of those appeals. (*Picower*, ECF Nos. 45, 49).

68.    The Government forfeiture action relating to the Picower Estate (the "Picower Forfeiture"), which resulted in the recovery of an additional $2,206,157,717 and is intertwined with the Trustee's Picower Settlement, is pending before the District Court. Fox filed both a

motion to intervene in that action and a claim against the Picower Forfeiture funds. *$7,206,157,717 On Deposit at JPMorgan Chase, NA in the Account Numbers Set Forth on Schedule A*, No. 10-CV-9398, Motion to Intervene (ECF Nos. 6-8), Notice of Claim (ECF No. 10). The Government opposed the motion to intervene and simultaneously filed a cross-motion to dismiss Fox's claim to the forfeited funds (the "Government Opposition"). *Id.* (ECF No. 12-14). In the Government Opposition, the Government requested that the District Court enter a final order of forfeiture. A hearing to determine the motion, claim, and cross-motion will be heard by the District Court on May 26, 2011.

69.     The only way for the Trustee to receive the Picower Settlement Funds is through entry of either a final, nonappealable order approving the Picower Settlement or a final, nonappealable order of forfeiture. Upon either event, the Trustee will seek the transfer of $5 billion to the BLMIS estate from the Escrow Account.

## VIII.    INITIAL ALLOCATION OF FUNDS AND DISTRIBUTION TO CUSTOMERS

### A.          The Fund Of Customer Property

70.     In order to protect customers of an insolvent broker-dealer such as BLMIS, Congress established a statutory framework pursuant to which customers of a debtor in a SIPA liquidation are entitled to preferential treatment in the distribution of assets from the debtor's estate. The mechanism by which customers receive preferred treatment is through the creation of a fund of customer property, as defined in SIPA § 78*lll*(4), which is distinct from a debtor's general estate. Customers holding allowable claims are entitled to share in the fund of customer property based on each customer's Net Equity as of the filing date, to the exclusion of general creditors. SIPA § 78fff-2(c).

71.     In order to make interim distributions from the fund of customer property, the Trustee must determine or be able to sufficiently estimate: (a) the total value of customer

property available for distribution (including reserves for disputed recoveries, such as the Levy Settlement and Net Equity Dispute), and (b) the total net equity of all allowed claims (including reserves for disputed claims). Each element of the equation—the customer property numerator and the net equity claims denominator—is inherently complex in a liquidation of this magnitude.

72.     There are many unresolved issues in this liquidation proceeding that will require the maintenance of substantial reserves with respect to both the customer property numerator and the net equity claims denominator, as discussed in Section VII.C. Nonetheless, this liquidation proceeding progressed to a stage at which it was possible for the Trustee, on an interim basis, to determine: (a) the allocation of property to the customer fund, or the "numerator" (taking reserves into account); (b) the amount of allowable net equity claims, or the "denominator" (also taking reserves into account); and (c) the calculation of each customer's minimum ratable share of the Customer Fund.

73.     On May 4, 2011, the Trustee filed a Motion seeking entry of an order approving an initial allocation of property to the Customer Fund, and authorizing an interim distribution to customers whose claims have not been fully satisfied because their net equity claims as of the filing date exceeded the statutory SIPA protection limit of $500,000. (ECF No. 4048). If an order is entered by this Court approving the Trustee's motion, the Trustee will distribute to BLMIS customers approximately $272 million relating to 1,224 BLMIS accounts, in an average payment amount of over $222,000. Thirty-nine payments will go to claimants who qualified for hardship status under the Trustee's hardship program. Moreover, a significant number of claimants who did not have accounts at BLMIS but instead invested in an entity that was a BLMIS customer, such as a feeder fund, will likely benefit from the distribution.

74.     The proposed allocation and distribution is initial and interim in nature because the Trustee anticipates (i) recovering additional assets through litigation and settlements and (ii) resolving the issues on appeal that require reserves.  Indeed, despite having recovered or entered into settlement agreements to recover over $7.6 billion, only approximately $272 million is available to the Trustee for distribution at this time because of the net equity dispute, appeals of the Levy and Picower settlements, and net loser accounts that are in litigation.  Final resolution of these appeals and disputes may permit the Trustee to reduce the reserves he is required to maintain, which would allow for a greater distribution to customers in the future.  As the Trustee has recovered or entered settlement agreements to recover approximately 44% of the principal lost in Ponzi scheme by customers with net equity claims, a distribution to customers without any reserves would be significant.  The Trustee expects to seek authorization for further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.

**B.**          **The General Estate**

75.     If the Trustee were able to fully satisfy the net equity claims of the BLMIS customers, any funds remaining would be allocated to the general estate and distributed in the order of priority established in section 726 of the Bankruptcy Code.  SIPA § 78fff(e); *see also supra* ¶¶ 3, 7.

76.     All BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—are general creditors of the BLMIS estate.  The Trustee is working diligently on behalf of the entire BLMIS estate and seeks to satisfy all creditor claims in this proceeding.  *See supra* ¶¶ 3, 7.

## IX.   INVESTIGATION OF THE BLMIS FRAUD

77.     Prior to the filing of litigation, discussed more fully below, the Trustee engaged in a laborious and wide-ranging investigation of the activities of BLMIS and all of the entities and individuals who transacted with BLMIS, whether directly or indirectly, an investigation that continues.  Many of the details of the Trustee's investigation were set forth in the affidavit of Joseph Looby, filed in this Court on October 16, 2009 in connection with the Trustee's brief on net equity.  (ECF No. 524).

78.     The Trustee's investigation through December 2010 led to the filing of thousands of complaints.  As set forth in those complaints, the Trustee has identified numerous "red flags" indicating a lack of securities trading on behalf of BLMIS customers.  The details of these red flags, the evidence supporting those red flags, and how they relate to specific defendants, is more fully detailed in the litigations filed by the Trustee, all of which are a matter of public record. *See, e.g., Picard v. HSBC Bank plc*, Adv. Pro. No. 09-1364 (BRL); *Picard v. Kohn*, Adv. Pro. No. 10-5411 (BRL); *Picard v. JPMorgan Chase*, Adv. Pro. No. 10-4932 (BRL); *Picard v. UBS AG*, Adv. Pro. No. 10-4285 (BRL); *Picard v. Vizcaya*, Adv. Pro. No. 09-1154 (BRL); *Picard v. Kingate*, Adv. Pro. No. 09-1161 (BRL); *Picard v. Harley*, Adv. Pro. No. 09-1187 (BRL); *Picard v. Fairfield,* Adv. Pro. No. 09-1239 (BRL); *Picard v. Thybo*, Adv. Pro. No. 09-1365 (BRL).

79.     The Trustee has made very specific allegations, among others, that (i) the equity transactions listed on BLMIS customer statements comprised a significant percentage of (or exceeded) the total market volume in those equities; (ii) BLMIS reported trades that were inconsistent with the exchange trade prices; (iii) BLMIS reported options trading that exceeded worldwide options trading volume; (iv) BLMIS reported trades that occurred or were settled on weekends and holidays; and (v) BLMIS reported trades that were backdated and fraudulent.

80.    While the Trustee has exclusive standing to bring actions to recover property for the benefit of the defrauded customers and creditors of BLMIS, *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 443 B.R. 295, 311 (Bankr. S.D.N.Y. 2011), the Trustee is far from the only fiduciary or entity investigating and reporting on matters relating to the fraud perpetrated through BLMIS.

81.    Since December 2008, the United States Congress, the United States Department of Justice ("DOJ"), the United States Department of Labor ("DOL"), the United States Securities and Exchange Commission ("SEC"), the SEC's Office of the Inspector General ("OIG"), and various state agencies, among other governmental entities, have conducted hearings and investigations, published transcripts and reports of those hearings and investigations, and filed numerous actions detailing the manner in which BLMIS carried out the largest financial fraud in history and the identities of Madoff's co-conspirators, enablers, and primary beneficiaries. Through the panoply of litigation filed by the Trustee, the DOJ, the DOL, and the SEC, and the extensive investigations into the BLMIS fraud and matters related thereto, much information and detail regarding the fraud is a matter of public record.

82.    The DOJ brought criminal actions against, among others, Madoff, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y.), and Frank DiPascali, Jr., *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y.).   In those matters, the defendants, the DOJ, and the court described on the record the operation of the Ponzi scheme.

83.    For example, in pleading guilty to securities fraud, investment advisor fraud, wire and mail fraud, money laundering, making false statements, perjury, filing false statements with the SEC, and theft of employee benefit funds, Madoff explained:

> Your Honor, for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L.

Madoff Securities LLC, which was located here in Manhattan, New York, at 885
Third Avenue . . . The essence of my scheme was that I represented to clients and
prospective clients who wished to open investment advisory and individual
trading accounts with me that I would invest their money in shares of common
stock, options, and other securities of large well-known corporations, and upon
request, would return to them their profits and principal. Those representations
were false for many years. Up until I was arrested on December 11, 2008, I never
invested these funds in the securities, as I had promised. Instead, those funds
were deposited in a bank account at Chase Manhattan Bank. When clients wished
to receive the profits they believed they had earned with me or to redeem their
principal, I used the money in the Chase Manhattan bank account that belonged to
them or other clients to pay the requested funds. The victims of my scheme
included individuals, charitable organizations, trusts, pension funds, and hedge
funds. Among other means, I obtained their funds through interstate wire
transfers they sent from financial institutions located outside New York State to
the bank account of my investment advisory business, located in Manhattan, New
York, and through mailings delivered by the United States Postal Service and
private interstate carriers to my firm here in Manhattan . . . Through the split
strike conversion strategy I promised to clients and prospective clients that client
funds would be invested in a basket of common stocks within the Standard &
Poors 100 index, a collection of the 100 largest publicly-traded companies in
terms of their market capitalization. I promised that I would select a basket of
stocks that would closely mimic the price movements of the Standard & Poors
100 index. I promised that I would opportunistically time those purchases and
would be out of the market intermittently, investing client funds during these
periods in United States Government-issued securities, such as United States
Treasury bills. In addition, I promised that as part of the split strike conversion
strategy, I would hedge the investments I made in the basket of common stocks
by using client funds to buy and sell option contracts related to those stocks,
thereby limiting potential client losses caused by unpredictable changes in stock
prices. In fact, I never made those investments I promised clients, who believed
they were invested with me in the split strike conversion strategy. To conceal my
fraud, I misrepresented to clients, employees, and others that I purchased
securities for clients in overseas markets. Indeed, when the United States
Securities and Exchange Commission asked me to testify as part of an
investigation they were conducting about my investment advisory business, I
knowingly gave false testimony under oath to the staff of the SEC on May 19,
2006 that I executed trades of common stock on behalf of my investment advisory
clients and that I purchased and sold the equities that were part of my investment
strategy in European markets. In that session with the SEC, which took place
here in Manhattan, New York, I also knowingly gave false testimony under oath
that I had executed options contracts on behalf of my investment advisory clients
and that my firm had custody of the assets managed on behalf of my investment
advisory clients. To further cover up the fact that I had not executed trades on
behalf of my investment advisory clients, I knowingly caused false trading
confirmations and client account statements that reflected the bogus transactions

-26-

and positions to be created and sent to clients purportedly involved in the split
strike conversion strategy, as well as other individual clients I defrauded who
believed they had invested in securities through me.  The clients receiving trade
confirmations and account statements had no way of knowing by reviewing these
documents that I had never engaged in transactions represented on the statements
and confirmations.  I knew those false statements and account statements would
be and were sent to clients through the U.S. Mails from my office here in
Manhattan.  Another way that I concealed my fraud was through the filing of false
and misleading certified annual reports and financial statements -- excuse me.
Another way that I concealed my fraud was through the filing of false and
misleading certified audit reports and financial statements with the SEC.  I knew
that these audit reports and financial statements were false and that they would
also be sent to clients.  These reports, which were prepared here in the Southern
District of New York, among other things, falsely reflected my firm's liabilities as
a result of my intentional failure to purchase securities on behalf of my advisory
clients.  Similarly, when I recently caused my firm in 2006 to register as an
investment adviser with the SEC, I subsequently  filed with the SEC a document
called the form ADV uniform application for investment adviser registration.  On
this form I intentionally and falsely certified under penalty of perjury that Bernard
L. Madoff Investment Securities had custody of my advisory clients' securities.
That was not true, and I knew it when I completed and filed the form with the
SEC, which I did  from my office on the 17th floor of 885 Third Avenue, here in
Manhattan.  In more recent years, I used yet another method to conceal my fraud.
I wired money between the United States and the United Kingdom to make it
appear as though there were actual securities transactions executed on behalf of
my investment advisory clients.  Specifically, I had money transferred from the
U.S. bank account of my investment advisory business to the London bank
account of Madoff Securities International Limited, a United Kingdom
corporation that was an affiliate of my business in New York.  Madoff Securities
International Limited was principally engaged in proprietary trading and was a
legitimate, honestly run and operated business.  Nevertheless, to support my false
statement that I purchased and sold securities for my investment advisory clients
in European markets, I caused money from the bank account of my fraudulent
advisory business, located here in Manhattan, to be wire transferred to the London
bank account of Madoff Securities International Limited.  There were also times
in recent years when I had money, which had originated in the New York Chase
Manhattan bank account of my investment advisory business, transferred from the
London bank account of Madoff Securities International Limited to the Bank of
New York operating bank account of my firm's legitimate proprietary and market
making business.  That Bank of New York account was located in New York.  I
did this as a way of ensuring that the expenses associated with the operation of the
fraudulent investment advisory business would not be paid from the operations of
the legitimate proprietary trading and market making businesses.  In connection
with the purported trades, I caused the fraudulent investment advisory side of my
business to charge the investment advisory clients four cents per share as a
commission.  At times in the last few years, these commissions were transferred

from Chase Manhattan bank account of the fraudulent investment advisory side of my firm to the account at Bank of New York, which was the operating account for the legitimate side of Bernard L. Madoff Investment Securities, the proprietary trading and market making side of my firm. I did this to ensure that the expenses associated with the operation of my fraudulent investment advisory business would not be paid from the operations of the legitimate proprietary trading and market making business. It is my belief that the salaries and bonuses of the personnel involved in the operation of the legitimate side of Bernard L. Madoff Investment Securities were funded by the operations of the firm's successful proprietary trading and market making businesses. Your Honor, I hope I have conveyed with some particularity in my own words the crimes I committed and the means by which I committed them. Thank you, your Honor.

Madoff Plea Allocution Tr. 23-30, Mar. 13, 2009.

84.    If the DOJ had to prove the charges against Madoff at trial, the DOJ possessed the

evidence to do so, which it disclosed on the record:

Had this case proceeded to trial, the government would have proven through testimony and evidence beyond a reasonable doubt all of the facts set forth in the criminal information. In summary, the government would have proven the following: The defendant operated a massive Ponzi scheme through his company, Bernard L. Madoff Investment Securities, beginning at least as early as the 1980s. Over the decades working from his New York City office and elsewhere, Madoff solicited and caused others to solicit prospective clients to open accounts with his company. His clients included individuals, charitable organizations, trusts, pension funds, and hedge funds, among others, and those clients were also his victims. Madoff told those clients that he would invest their funds in publicly-traded securities, options, and treasury bills. In fact, over the life of his scheme Madoff did not buy stocks or options as he had promised. Instead, Madoff used client funds to pay other clients who sought to redeem their investments, and used so-called commission revenue generated by charging clients four cents per share for shares that he never, in fact, purchased to generate revenue for his firm. At times, his firm would have been unable to operate but for the cash generated from this Ponzi scheme. Madoff repeatedly lied to clients in person, on telephone calls, and through mailings, including account statements and confirmations of purchases and sales of securities that he mailed through the U.S. Postal Service. Some investors sent checks to Madoff through the mails, others wired money to Madoff, and many of those wires came from outside New York State into the Southern District of New York. Madoff also caused hundreds of millions of dollars of client funds to be wired overseas to accounts in London. Some of that money was sent back to his firm and used to pay its expenses. Other money was sent back and forth between New York and London to give the false impression that he was actually buying and selling securities in European markets when, in fact, he was not. Madoff also used some of the money funneled through London

-28-

to support his lavish lifestyle.  Madoff also used other means of deception to hide his scheme.  He lied when he told clients that he was purchasing securities on their behalf.  He also lied to regulators, including the SEC.  He filed false and fraudulent certified financial statements with the SEC that failed to disclose his fraud scheme, failed to disclose his liabilities to the victims of his Ponzi scheme, and contained false certifications that the audited statements had been prepared in accordance with generally-accepted auditing standards and principles.  Mr. Madoff lied in a form that he was required to file with the SEC as an investment adviser, claiming that his company had custody of client securities when, in fact, he had not purchased any securities for those clients.  He also lied at least seven separate times in an SEC deposition in 2006.  At the end, Madoff told his clients that he was holding nearly $65 billion in securities on behalf of those clients.  In fact, he had only a small fraction of that amount.

Madoff Plea Allocution Tr. 31-34, Mar. 12, 2009.

85.    The DOJ confirmed that its investigation would continue: "I think the only thing the government would say is that the government's investigation continues.  It is continuing.  A lot of resources and effort are being expended, both to find assets and to find anyone else who may be responsible for this fraud."  Madoff Plea Allocution Tr. 40-41, Mar. 12, 2009.

86.    At Madoff's sentencing, the court described further financial aspects of the fraud:

Objectively speaking, the fraud here was staggering.  It spanned more than 20 years.  Mr. Madoff argues in his reply letter that the fraud did not begin until the 1990s.  I guess it's more that the commingling did not begin until the 1990s, but it is clear that the fraud began earlier.  And even if it is true that it only started in the 1990s, the fraud exceeded ten years, still an extraordinarily long period of time.  The fraud reached thousands of victims.  As for the amount of the monetary loss, there appears to be some disagreement.  Mr. Madoff disputes that the loss amount is $65 billion or even $13 billion.  But Mr. Madoff has now acknowledged, however, that some $170 billion flowed into his business as a result of his fraudulent scheme . . . The breach of trust was massive.  Investors -- individuals, charities, pension funds, institutional clients -- were repeatedly lied to, as they were told their moneys would be invested in stocks when they were not.  Clients were sent these millions of pages of account statements that the government just alluded to confirming trades that were never made, attesting to balances that did not exist . . . But large sums were also taken by him, for his personal use and the use of his family, friends, and colleagues.  The PSR shows, for example, that Mr. Madoff reported adjusted gross income of more than $250 million on his tax returns for the ten year period from 1998 through 2007.  On numerous occasions, Mr. Madoff used his firm's bank accounts which contained customer funds to pay for his personal expenses and those of his family, including, for example, the

purchase of a Manhattan apartment for a relative, the acquisition of two yachts, and the acquisition of four country club memberships at a cost of $950,000. Billions of dollars more were paid to individuals who generated investments for Mr. Madoff through these feeder funds.

Madoff Sentencing Tr. 43-46, June 29, 2009.

87.    When Mr. DiPascali pled guilty to securities fraud, investment advisory fraud, falsifying the books and records of a broker/dealer, falsifying the books and records of an investment fund, mail fraud, wire fraud, and money laundering, he explained:

From at least the early 1990s through December of 2008, there was one simple fact that Bernie Madoff knew, that I knew, and that other people knew but that we never told the clients nor did we tell the regulators like the SEC. No purchases of sales of securities were actually taking place in their accounts. It was all fake. It was all fictitious. It was wrong and I knew it was wrong at the time, sir. [I realized it was wrong] [i]n the late '80s or early '90s. I would like to address some of the counts in the information. Regarding Count One, conspiracy; Count Two, securities fraud; and Count Three, investment adviser fraud. From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all . . . Both [through documents and through oral communications]. Most of the time the clients' money just simply went into a bank account in New York that Bernie Madoff controlled. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did follow things: On a regular basis I told clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis I used hindsight to file historical prices on stocks then I used those prices to post purchase of sales to customer accounts as if they had been executed in realtime. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client. Regarding Count Six, mail fraud, on a regular basis I caused the U.S. mail to be used to send fraudulent account statements to clients from our offices in Manhattan. The account statements listed security transactions that had supposedly taken place in the client accounts, although I knew that no such transactions had indeed taken place. For example, in December of 2008, I caused fake account statements to be mailed from the Madoff firm to a client in Manhattan. Regarding the wire fraud, or Count Seven, on a regular basis I caused money to be wired from bank accounts in that New York to bank accounts in London, and other places abroad. For example, in March of '07 I caused about

-30-

$14 million to be sent by wire from a bank account in London to a bank account in New York in furtherance of this fraudulent scheme. [This furthered the scheme because] Bernie Madoff was trying to present the scenario, Judge, to regulators and others that he was earning commission income on these fictitious trades in order to substantiate the ruse. He had me wire funds – excuse me. He had our London office wire funds to New York that represented the theoretical amount of those commissioned incomes, had the regulators come in and added up all the tickets, if you will, to see our customer commissions. And in the example I cited in that particular instance, we would have had we actually done those trades earned $14 million in commission income. So he had the London office wire to the New York office a figure of about $14 million . . . I calculated the theoretical commissions and advised the London office where to send the money. On Count Eight, sir, international money laundering, between 2002 and 2008, I caused money to be wired from a Madoff firm bank account in New York to a Madoff account in London, which again was used to continue this fraud. I participated in falsifying documents that were required to be made and kept accurately under the SEC rules and regulations, including ledgers, trade blotters, customer statements, and trade confirmations. On Count Four and five, falsifying broker/dealer books and records and falsifying investment adviser books and records, between 2004 and 2008 the firm was a registered broker/dealer. Between September '06 and December '08 when the firm was also a registered as an investment adviser, it was required to make accurate books and records under the SEC rules. In January of '06, together with others, I used data from the Internet to create fake trade blotters that were made and kept and produced for the SEC. In April of '08, together with others, I caused fake trade blotters, ledgers, and other books and records to be made and kept by the firm. In order to discuss Count Nine, which is perjury, on January 26, 2006, at Bernie Madoff's direction I lied to the SEC during testimony I gave under oath in Manhattan about the activities of the Madoff firm. My false testimony is set out in Paragraph 61 of the information. I did all of these fraudulent activities, your Honor, in Manhattan . . . It is indeed a transcript describing the Madoff trading operation, which I knew at time when I was describing it was entirely fraudulent. Yes, sir, [I knew at the time you made these statements that portions of the statements, in particular the underlying portions, were false]. Yes, sir, [I did this to mislead the SEC] . . . [t]o throw them off their tracks, sir . . . Judge, thousands of clients, institutions, individuals, funds, charities were all misled about the status of their accounts, what was being done with their money, and what their accounts were worth . . . I knew I was participating in a fraudulent scheme. I knew what was happening was criminal and I did it anyway.

DiPascali Plea Allocution Tr. 17, 44-52, Aug. 1, 2009.

88.    The SEC commenced parallel civil actions against, including but not limited to,

Madoff and various insiders, captioned *SEC v. Madoff*, No. 08-CV-10791 (S.D.N.Y., filed Dec.

11, 2008), *SEC v. Cohmad*, No. 09-CV-5680 (S.D.N.Y., filed June 22, 2009), *SEC v. Chais*, No. 09-CV-5681 (S.D.N.Y., filed June 22, 2009), *SEC v. DiPascali*, No. 09-CV-7085 (S.D.N.Y., filed Aug. 11, 2009), *SEC v. Friehling*, No. 09-CV-2467 (S.D.N.Y., filed Mar. 18, 2009), and *SEC v. Bonventre*, No. 10-CV-1576 (S.D.N.Y., filed Feb. 25, 2010).  These actions were based upon investigations conducted by the SEC and made public how trading was (or was not) conducted by BLMIS and the identities of Madoff's co-conspirators, enablers, and primary beneficiaries.

89.   The OIG also conducted an extensive investigation, specifically into the SEC's handling of Madoff and BLMIS, and made public a report entitled: *Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme*.  Report No. OIG-509 (Aug. 31, 2009).  In the report, OIG identified the "red flags" of Madoff's fraud that were apparent to many in the financial services industry, as well as detailed the relationship between the market-making, proprietary trading, and investment advisory operations of BLMIS.

90.   State agencies are also investigating BLMIS and related parties, which have resulted in actions being filed in New York, such as *New York v. Merkin*, Index No. 450879/09 (N.Y. Sup. Ct., filed Apr. 6, 2009), and in Massachusetts, such as *In the Matter of Cohmad Securities Corp.*, Docket No. 2009-0015, and *In the Matter of Fairfield Greenwich Advisors LLC*, Docket No. 2009-0028.

91.   The Trustee's investigation is consistent with the filings made and litigations brought by the various governmental entities described above in that it reveals that BLMIS did not engage in trading on behalf of its IA Business customers.  This entire body of information is a matter of public record.  Any information that has not been made public by the Trustee is the subject of litigation, the release of which is governed by the Federal Rules of Bankruptcy and

Civil Procedure, as well as numerous privileges. The parties to these actions will receive discovery at the appropriate juncture consistent with these Rules and in a manner that protects the BLMIS estate and the interests of its customers and creditors.

## A.      Summary Of Litigation

92.      As discussed above, the Trustee has three broad categories of litigation pending against thousands of defendants that received avoidable transfers and/or are otherwise liable to the BLMIS estate: Avoidance Actions, Bad Faith Avoidance Actions, and Bank/Feeder Fund Litigation.

93.      The actions listed above do not include all types of litigation in which the Trustee is involved, such as suits against the Trustee, injunction applications brought by the Trustee, and the various international litigations to which the Trustee is a party. Those will be discussed more fully herein at ¶¶ 115-132.

## B.      Avoidance Actions

94.      The books and records of BLMIS reveal that in the six year period prior to the Filing Date, certain BLMIS accountholders ("BLMIS Transferees") received billions of dollars in avoidable transfers. The fictitious profits received by the BLMIS Transferees are calculated as the difference between what the investors invested with BLMIS and what they withdrew from BLMIS. Because there was no trading activity on behalf of BLMIS customers to give rise to any "profits" withdrawn in the six year period prior to the Filing Date, investors who received such "profits"—so called "net winners"—actually received investments made by other customers. Therefore, to the extent any customer received more than the return of his or her investment, he or she received other people's money and this money must be returned to the estate. The

Trustee, to date, has not discovered evidence that the BLMIS Transferees lacked good faith; thus, the Trustee has, limited recoveries sought to fictitious profits and preferences.[11]

95.    Before and during this Report Period, the Trustee filed approximately 1,000 avoidance actions against BLMIS Transferees seeking to recover over $4.3 billion.

96.    The litigation procedures established by the Court and discussed *supra* ¶¶ 26-32, govern these actions.  Mediation is a central aspect of the Trustee's approach to recovering the fictitious profits at issue.  Accordingly, all avoidance actions will be referred to mandatory mediation upon the completion of discovery.  Mediations are conducted in accordance with the General Order General Order Amending M-390 (the "Mediation Order") which is available on the Bankruptcy Court's website: (http://www.nysb.uscourts.gov/).  A copy of such order is also available on the Trustee's website: www.madofftrustee.com.  Where the amount sought in the complaint is $20 million or less, the Trustee shall pay the fees and reasonable expenses of the mediator; otherwise, the mediation cost and expenses will be apportioned as set forth in the Mediation Order.

97.    As discussed *supra* ¶¶ 44-48, the Trustee and B&H attempted to contact certain BLMIS Transferees to seek financial and other information to assist the Trustee in determining whether to seek the return of the fictitious profits received by such person or entity, which allowed the Trustee to forego filing suits or dismiss suits filed against BLMIS Transferees.  As the Trustee has consistently maintained throughout these proceedings, he is cognizant of the strain that avoidance claims may have on BLMIS Transferees and has considered and will continue to consider any mitigating circumstances and hardships brought to his attention in

---

[11] The Trustee reserved the right to amend any complaint to seek recovery of transfers of principal if disclosure and/or discovery belies the presumption of good faith.

connection with contemplated or filed avoidance actions in an effort to balance fairly the interests of all affected parties.

**C.**            **"Bad Faith" Actions**[12]

98.       The fundamental difference between the BLMIS Transferees subject to avoidance actions and those subject to "bad faith" avoidance actions is that the Trustee has a basis to allege that these latter transferees lacked good faith when they received transfers from BLMIS.  In other words, the Trustee believes that these accountholders knew or should have known of fraudulent activity at BLMIS.  In these circumstances, SIPA, the Bankruptcy Code, and state law provide that the Trustee may recover the fictitious profits transferred within six years of the Filing Date, as well as the principal invested.

99.       The Trustee has filed more than thirty bad faith avoidance actions against a variety of defendants, many of whom had direct and close relationships with BLMIS and Madoff.

100.       The bad faith avoidance action that has received the most attention is that against Saul Katz, Fred Wilpon, Sterling Equities, and their various family members, trusts, and entities, (collectively, "Sterling").  Over a quarter century relationship, Sterling opened and administered 483 BLMIS accounts: approximately 300 for themselves, their families, their trusts and entities, and the rest for their friends, employees, and business associates.  The Trustee's investigation revealed that the Sterling Defendants received hundreds of millions of dollars in fictitious profits and leveraged their BLMIS investments to attain additional millions in loans and access to capital that otherwise may not have been available.

---

[12] Two bad faith actions filed during prior report periods – *Picard v. Chais*, Adv. Pro. No. 09-1172 (Bankr. S.D.N.Y.) (BRL) and *Picard v. Cohmad Sec. Corp.*, Adv. Pro. No. 09-1305 (Bankr. S.D.N.Y.) (BRL) – remain in various stages of litigation.  The Sixth Application of the Trustee and B&H for Allowance of Interim Compensation

101.    On December 7, 2010, the Trustee filed an action against Sterling in this Court seeking the return of approximately $300 million in fictitious profits, more than $14 million in preferences tied to 185 specific BLMIS accounts, and principal.  *Picard v. Saul B. Katz*, Adv. Pro. No. 10-5287 (BRL) (ECF No. 1).  The complaint also seeks an additional $12 million in fraudulent transfers of payments made by Madoff, his wife Ruth, and/or brother Peter, to certain Sterling entities using BLMIS customer property.

102.    The filing of the complaint came on the heels of months of good faith negotiations with Sterling's counsel.  (*Id.*, ECF No. 9).  The Trustee filed the complaint under seal at Sterling's behest, and did not oppose the motions of The New York Times, WNBC-TV, and Newsday LLC to intervene and unseal the complaint.  (*Id.*, ECF Nos. 9-13, 15).  The Court unsealed the complaint on February 4, 2011.  (*Id.*, ECF No. 17).  On February 10, 2011, the Court appointed former Governor Mario M. Cuomo to mediate the adversary proceeding, and this mediation effort is ongoing.  (*Id.*, ECF No. 19).

103.    On February 14, 2011, Sterling filed a Motion to Compel Turnover of Discovery (*Id.*, ECF Nos. 20, 28), and the Trustee opposed the Motion on the basis that the Motion departs from the Federal and Bankruptcy Rules of Procedure (*Id.*, ECF No. 24).  The Trustee filed an Amended Complaint on March 18, 2011, providing further evidence of Sterling's involvement with Madoff and BLMIS and identifying approximately $700 million in fraudulent transfers of principal received by Sterling within the six years prior to the Filing Date.  (*Id.*, ECF No. 34). On March 20, 2011 Sterling filed a motion dismiss the Amended Complaint or, in the alternative, a motion for summary judgment.  (*Id.*, ECF Nos. 35-43).  The Trustee intends to file his opposition within sixty days of March 20, 2011.  (*Id.*, ECF No. 27).

---

for Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred.(ECF No. 4022) provides a detailed synopsis of the significant services rendered by the Trustee and his Counsel during this Report Period.

104.    Thus, the action against Sterling moves forward on two parallel tracks: one before this Court, and the other before Governor Cuomo.

**D.**        **Financial Services Industry Litigation: Banks, Feeder Funds, And Individuals**

105.    Several of the avoidance actions filed during prior report periods were against banks, feeder funds, and individuals involved in the financial services industry.[13]  Investigation never ceased, however, and the Trustee filed more than twenty new actions against entities and individuals who facilitated and expanded the Ponzi scheme.  These actions revealed further evidence of the central role played in BLMIS's fraud by some of world's largest banks and financial institutions.

**Picard v. HSBC Bank Plc, Adv. Pro. No. 09-1364 (BRL)**

106.    On July 14 and 15, 2009, the Trustee filed three complaints against HSBC Bank plc and HSBC Securities Services (Luxembourg) S.A.  Each complaint named a different feeder fund—Alpha Prime Fund Ltd., Herald Fund SPC, and Primeo Fund—and sought the return of millions in preferences and fraudulent conveyances under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws.

107.    After diligent investigation, the Trustee and his Counsel learned that the three feeder funds were mere spokes on the wheel of a vast operation whose hub was thirteen HSBC-related entities, which included HSBC Bank plc, HSBC Securities Services (Luxembourg) S.A., and other HSBC entities (the "HSBC Defendants").

---

[13] Six actions filed against feeder funds during prior report periods – *Picard v. Vizcaya*, Adv. Pro. No. 09-1154 (BRL), *Picard v. Kingate*, Adv. Pro. No. 09-1161 (BRL), *Picard v. Merkin*, Adv. Pro. No. 09-1182 (BRL); *Picard v. Harley*, Adv. Pro. No. 09-1187 (BRL), *Picard v. Fairfield,* Adv. Pro. No. 09-1239 (BRL), and *Picard v. Thybo*, Adv. Pro. No. 09-1365 (BRL) – remain in various stages of litigation.  The Sixth Application of the Trustee and B&H for Allowance of Interim Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred.(ECF No. 4022) provides a detailed synopsis of the significant services rendered by the Trustee and his Counsel during the Report Period.

108.    On December 5, 2010, the Trustee and B&H filed an Amended Complaint in the Alpha Prime Fund Ltd. action that functionally consolidated the three complaints filed in 2009 and expanded upon the allegations, evidence, and culpable defendants.

109.    The Trustee alleges that the HSBC Defendants are liable for damages, in an amount to be proven at trial, which, upon information and belief, will be no less than $6.6 billion.  The Trustee also seeks to recover nearly $2 billion in fraudulent transfers from BLMIS and more than $400 million in fees.

110.    The HSBC Defendants, as well as UniCredit S.p.A. and Pioneer Alternative Investment Management Ltd., filed motions to withdraw the reference to the Bankruptcy Court. *Picard v. HSBC Bank plc, et al.*, Nos. 11 CV 763; 11 CV 836 (JSR) (S.D.N.Y.).  The Trustee and SIPC opposed these motions.  United States District Judge Jed S. Rakoff withdrew the reference with respect to certain issues of the Trustee's standing on April 14, 2011.  Consequently, the motions to dismiss the HSBC action will be fully briefed before the District Court on June 17, 2011, and a hearing on the motion is scheduled for June 23, 2011.  The pre-trial conference before this Court has been adjourned to August 23, 2011.

## **Picard v. JPMorgan Chase, Adv. Pro. No. 10-4932 (BRL).**

111.    As has been widely reported, the bank account at the center of the fraud (the "703 Account") through which all customer monies flowed was held at JPMorgan Chase Bank, N.A. On December 2, 2011, the Trustee filed a Complaint against JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Ltd. ("JPMC"), seeking to recover fraudulent transfers and damages.  The Trustee filed a second redacted Complaint on April 14, 2011.

112.    JPMC filed a motion to withdraw the reference to the Bankruptcy Court, which  was granted by United States District Judge Colleen McMahon on May 4, 2011. *Picard v. JPMorgan*

*Chase Bank, N.A., et al.*, No. 11 CV 913 (CM) (S.D.N.Y.).    The motion to dismiss the Trustee's complaint will be fully briefed on July 15, 2011, and a hearing on the motion will be held on July 28, 2011.  The pre-trial conference before this Court has been adjourned to May 25, 2011.

### **Picard v. Kohn, Adv. Pro. No. 10-5411 (BRL).**

113.    On December 10, 2010, the Trustee commenced an adversary proceeding against Sonja Kohn ("Kohn"), along with certain family members, Bank Medici, Bank Austria, UniCredit S.p.A, and dozens of trusts, nominee companies, and individuals, who, the Trustee alleges, masterminded a vast illegal scheme to feed over $9.1 billion of other people's money into Madoff's Ponzi scheme through, among others, Primeo Fund, Thema International Fund plc, Herald Fund SPC, Alpha Prime Fund Ltd., Senator Fund SPC, and Herald (Lux) SICAV.  In addition to claims brought pursuant to the Bankruptcy Code, SIPA, and state law, the Trustee filed a cause of action seeking $19.6 billion in damages pursuant to the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq., ("RICO"), specifically RICO §§ 1962(c) and (d), based upon a pattern of racketeering activity comprised of repeated and related predicate acts of: (i) money laundering in violation of 18 U.S.C. § 1956; (ii) engaging in monetary transactions in property derived from specific unlawful activity in violation of 18 U.S.C. § 1957; (iii) wire fraud in violation of 18 U.S.C. § 1343; (iv) financial institution fraud in violation of 18 U.S.C. § 1344; (v) mail fraud in violation of 18 U.S.C. § 1341; and/or (vi) interstate and international travel in violation of the Travel Act, 18 U.S.C. § 1952.  An Amended Complaint was filed on February 3, 2011.

114.    On February 22, 2011, UniCredit S.p.A. moved to withdraw the reference to the Bankruptcy Court.  *Picard v. Sonja Kohn, et al.*, No. 11 CV 1181 (JSR) (S.D.N.Y.).  United States District Judge Jed S. Rakoff will hold a hearing on the Motion to Withdraw the Reference on May 31, 2011.  The pre-trial conference before this Court has been adjourned to May 25, 2011.

E.                    **International Investigation And Litigation**

115.    The Trustee's international investigation and recovery of BLMIS estate assets involves, among other things: (i) identifying the location and movement of estate assets abroad; (ii) becoming involved in litigation brought by third parties in foreign courts, by appearance or otherwise, to prevent the dissipation of funds properly belonging to the estate; (iii) bringing actions before United States and foreign courts and government agencies to recover customer property for the benefit of the customers and creditors of the BLMIS estate; and (iv) retaining international counsel to assist the Trustee in these efforts, where necessary.  More than 70 of the actions filed in this Court involve international defendants, and the Trustee also has actions pending in the United Kingdom, Bermuda, the British Virgin Islands (BVI), Gibraltar, and the Cayman Islands.

116.    The Trustee has retained the following International Counsel to assist him in investigations and represent him and the BLMIS estate in any foreign proceedings that have arisen or may arise in connection with BLMIS: (i) Taylor Wessing – England and the British Commonwealth; (ii) Higgs & Johnson (formerly Higgs Johnson Truman Bodden & Co.) – Cayman Islands; (iii) Williams Barristers & Attorneys – Bermuda; (iv) Attias & Levy – Gibraltar; (v) Eugene F. Collins – Ireland; (vi) Schiltz & Schiltz – Luxembourg; (vii) SCA Creque – BVI; (viii) Kugler Kandestin – Quebec, Canada; (ix) Werder Vigano – Switzerland; (x) Graf & Pitkowitz – Austria, and (xi) UGGC & Associes – France.  The Trustee will continue to seek court approval to retain professionals to investigate and represent him wherever estate assets may be found around the globe.

117.    The following summarizes key litigation involving foreign defendants in the Bankruptcy Court and in foreign courts:

### i.        Austria And Italy

118.    The Trustee has actively investigated certain banks, institutions, and individuals located in these jurisdictions.  The Trustee's action against Sonja Kohn, et al., and the HSBC action, discussed above in ¶¶ 113-114 and ¶¶ 106-110, respectively, name several Austrian and Italian defendants, including Sonja Kohn, Bank Austria, and UniCredit S.p.A.

### ii.        Bermuda

119.    The Trustee is actively investigating various BLMIS-related entities, their officers and directors, and transfers of funds to and through Bermuda.  The Trustee is also monitoring proceedings in the Supreme Court of Bermuda involving several BLMIS-related entities.  In addition, in December 2010, the Trustee filed protective actions in Bermuda against several HSBC-related entities in order to preserve the Trustee's ability to bring causes of action in that jurisdiction, as well as an action in the Bankruptcy Court against Bermuda-based Whitechapel Management Limited.

### iii.        BVI/Cayman Islands

120.    The Trustee has discovered and is actively investigating the involvement of no fewer than twenty BVI-based feeder funds that funneled money into the Ponzi scheme.  In particular, the Trustee has investigated and filed complaints in the Bankruptcy Court against BVI-based Kingate Global Fund Ltd., Kingate Euro Fund Ltd., the Bank of Bermuda, Thybo Asset Management Ltd., Thybo Global Fund Ltd., Thybo Return Fund Ltd., Thybo Stable Fund Ltd., Hermes International Fund Limited, Lagoon Investment Limited, Thema Fund Ltd, Thema Wise Investments Ltd., Lagoon Investment Trust, Defender Limited, Equity Trading Portfolio, and Granadilla Holdings Limited.  In addition, the Trustee has filed numerous claim forms against several feeder funds in the BVI that preserve the Trustee's right to pursue claims in that jurisdiction.

121.    The Trustee has investigated and filed complaints in the Bankruptcy Court against Cayman Islands-based Harley International (Cayman) Ltd., Herald Fund SPC, and Primeo Fund, the latter two of which are defendants in the Trustee's action against the HSBC-related entities, discussed above in ¶¶ 106-110.  The Trustee has also filed a complaint in the Cayman Islands against Harley International (Cayman) Ltd.

### iv.    England

122.    The Trustee, who was granted recognition as a foreign representative for the purpose of gathering evidence, has continued to investigate Madoff Securities International Ltd. ("MSIL"), a London-based entity, and work with MSIL's joint liquidators ("MSIL Liquidators"). In December 2010, the Trustee filed suit in England, together with MSIL (in liquidation) against MSIL's former directors and Sonja Kohn.  In connection with that lawsuit, the Trustee is seeking freezing orders and document disclosure in several European jurisdictions.   In addition, the Trustee has filed protective claims in England against Kingate-related individuals and entities and against HSBC and related entities.

### v.    Gibraltar

123.    After extensive investigation, the Trustee has brought both domestic and Gibraltar-based actions against Vizcaya Partners Ltd. ("Vizcaya"), Banque Jacob Safra (Gibraltar) Ltd. ("Bank Safra"), Asphalia Fund Ltd. ("Asphalia"), Zeus Partners Ltd. ("Zeus") and Siam Capital Management ("Siam").  Vizcaya, Siam, Asphalia, and Zeus failed to appear or answer the Trustee's amended complaint in the Bankruptcy Court and, accordingly, B&H drafted and prepared a motion for default judgment against those defendants.  The Bankruptcy Court granted that motion on August 3, 2010.  Thereafter, Zeus and the Trustee entered into a stipulation pursuant to which the Trustee agreed to vacate the default judgment against Zeus and Zeus agreed not to oppose the Trustee's application to the Supreme Court of Gibraltar for the

transfer of approximately $60 million that had been held in Zeus's account at Bank Safra and was placed in the custody of the Gibraltar Supreme Court. The Bankruptcy Court approved the stipulation on November 23, 2010. The Trustee filed an application in the Gibraltar Supreme Court for the repatriation of those funds, which was recently granted.

### vi.   Ireland

124.   The Trustee has investigated and filed a complaint in the Bankruptcy Court against Ireland-based Thema International Fund plc.

### vii.   Switzerland/Luxembourg

125.   In 2010, the Trustee filed two lawsuits against Switzerland-based UBS AG and other UBS-related entities and various feeder funds, management companies, and individuals. First, in November 2010, the Trustee filed a lawsuit in the Bankruptcy Court against UBS AG, other Luxembourg-based UBS entities, Luxalpha SICAV ("Luxalpha"), and several other defendants. Second, in December 2010, the Trustee filed suit in the Bankruptcy Court against UBS AG, other UBS entities, Luxembourg Investment Fund, and other defendants. These actions collectively demand just under $3 billion.

### F.   Trustee's Injunctions

#### i.   Picard v. Fox, Adv. Pro. 10-3114 (BRL).

126.   As detailed in the Fourth Interim Report, Adele Fox ("Fox") and Susanne Marshall ("Marshall") (collectively, the "Florida Plaintiffs") commenced putative class actions against the Estate of Jeffry M. Picower and related entities (the "Picower Defendants") in the United States District Court for the Southern District of Florida, West Palm Beach Division in February 2010 (collectively, the "Florida Actions"). On March 24, 2010, Fox moved for entry of an initial order regarding consolidation of the Marshall Action and of potential later-filed actions

related to the Florida Actions.  On March 25, 2010, the Florida Plaintiffs filed Civil RICO case statements.

127.    On March 31, 2010, the Trustee moved by Order to Show Cause for a Temporary Restraining Order, Enforcement of the Automatic Stay, and Preliminary Injunction (the "Fox Application"), seeking to enjoin and restrain the Florida Plaintiffs and any related parties from pursuing the Florida Actions and commencing or proceeding with any other actions or proceedings against the Picower Defendants because, among several reasons, the Florida Actions impinge on the Court's jurisdiction, the orderly administration of the BLMIS proceedings, and the Trustee's imminent settlement with the Picower Defendants.  The Florida Plaintiffs opposed the Motion.

128.    This Court granted the Trustee's Fox Application following a hearing on April 27, 2010, finding that the Florida Actions violated the automatic stay provisions of section 362 of the Bankruptcy Code and, hence, are void *ab initio*, and preliminarily enjoined the Florida Plaintiffs and related parties from proceeding with the Florida Actions or commencing any other action against the Picower Defendants (the "Preliminary Injunction Order").

129.    The Florida Plaintiffs have filed no less than five appeals regarding the Picower Defendants.  First, two appeals were filed from the Preliminary Injunction Order.  During this Report Period, B&H attorneys drafted several letters to the Court, submitted an appellee brief and an amended Counter-Designation of the Bankruptcy Record on Appeal, and reviewed the Florida Plaintiffs' submissions to the Court.

130.    Second, after this Court approved the Picower Settlement and entered a permanent injunction precluding the prosecution of actions by third parties against the Picower Defendants that are duplicative or derivative of claims belonging to the Trustee (the "Permanent

Injunction Order"), the Florida Plaintiffs each appealed the Permanent Injunction Order to the District Court. B&H attorneys drafted a Counter-Designation of the Bankruptcy Record on Appeal and reviewed the Florida Plaintiffs' submissions to the Court. The appeal relating to the permanent injunction will be fully briefed on July 18, 2011.

131.    Third, Fox filed both a motion to intervene in the Government's forfeiture action and a claim against the forfeited funds. *United States of America v. $7,206,157,717 On Deposit at JPMorgan Chase, NA in the Account Numbers Set Forth on Schedule A*, No. 10-CV-9398.

### ii.    Picard v. Stahl, Adv. Pro. No. 10-03268 (BRL).

132.    On May 27, 2010, the Trustee commenced an adversary proceeding against Richard Stahl, Reed Abend, and ten other groups of plaintiffs (together, the "Stahl Plaintiffs") seeking to enjoin lawsuits commenced by these plaintiffs against Peter Madoff, Mark Madoff, Andrew Madoff, and Shana Madoff (the "Madoff Family Defendants"). In support, the Trustee filed an Application for a Temporary Restraining Order, Enforcement of the Automatic Stay, and a Preliminary Injunction (the "Stahl Application"). The Trustee filed the Stahl Application because he believed that a judgment against the Madoff Family Defendants in any of the ten actions (the "Madoff Actions") would enable the Stahl Plaintiffs to recover more than their fair share as estate creditors, and the Trustee is seeking to collect estate assets into a single pool for *pro rata* distribution to all BLMIS customers and creditors

133.    During this Report Period, B&H attorneys sought from the Stahl Plaintiffs a voluntary stay of the Madoff Actions, and obtained two such stipulated stays. On February 15, 2011, the Court granted the Stahl Application and entered an Order enforcing the automatic stay and enjoining the remaining Stahl Plaintiffs from continuing the four active Madoff Actions against the Madoff Defendants until the conclusion of Trustee's actions against the Madoff Defendants. Certain of the Stahl Plaintiffs (the "Stahl Appellants") filed appeals of the

Bankruptcy Court Order with the United States District Court for the Southern District of New York, No. 11-CV-2135 (AKH), No. 11-CV-2246 (AKH). The Stahl Appellants filed Statements of Issues To Be Presented on Appeal and Designations of the Items To Be Included in the Record on Appeal, and the Trustee filed Counter-Statements and Counter-Designations and Reservations of the Right to Strike Issues on Appeal. The appeal relating to the Stahl injunction will be fully briefed on July 20, 2011.

## X.    FEE APPLICATIONS AND RELATED APPEALS

134.    Objections have been filed to five fee applications submitted by the Trustee and B&H. Discussions of the objections to the first, second, third, and fourth fee applications, and related motions for leave to appeal the Court's orders granting the Trustee and B&H's fee applications and overruling those objections, are discussed more fully in the Trustee's Amended Third Interim Report ¶¶ 186-90 and the Trustee's Fourth Interim Report ¶¶ 163-166.

135.    On November 19, 2010, the Trustee and his counsel filed the Fifth Application for Interim Compensation for Services Rendered Reimbursement of Actual and Necessary Expenses Incurred with the Bankruptcy Court (ECF No. 3207) (the "Fifth Interim Fee Application"), which was approved by order dated December 14, 2010 (the "Fifth Interim Fee Order").

136.    On December 7, 2010, Diane and Roger Peskin and certain other customers represented by Helen Davis Chaitman, Esq., ("Movants") filed an objection to the Fifth Interim Fee Application in the Bankruptcy Court (the "Fifth Objection"). (ECF No. 3308). The Fifth Objection was substantially similar to the four prior Objections filed by the Movants in that the Movants raised the repeatedly-rejected argument that the Trustee and B&H are not disinterested. Movants further insisted, based on nothing but speculation, that there will be sufficient funds for the Trustee to "pay all claims in full and reimburse SIPC in full for its administrative expenses" based upon the Trustee's success in recovering substantial amounts to the estate. Movants base

-46-

this oversimplified assumption on the fact that the Trustee had, to that date, allowed approximately $6 billion in customer claims, while his recoveries, if certain settlements are finally approved, will total approximately $7.6 billion.

137.    At the fee hearing held on December 14, 2010 (the "Fifth Interim Fee Hearing"), the Trustee, his counsel, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Fifth Interim Fee Application was reasonable.  The Trustee, his counsel, and SIPC also provided the Court with detailed explanations as to why there was not, at that time, a reasonable expectation that SIPC would recoup its administrative expenses.

138.    The Trustee explained that while the current value of allowed customer claims was $6 billion, because there is significant litigation pending against entities and individuals who also have claims against the estate, the amount of allowed claims will only increase as parties pay back certain avoidable transfers to the estate and/or as claims objections and the Trustee's claims under section 502(d) of the Bankruptcy Code are resolved.  *See* Fifth App. Hr'g Tr. 15, Dec. 14, 2010.  Moreover, the Trustee and his counsel advised the Bankruptcy Court of the risks associated with the litigations he has commenced against numerous defendants, very few of which have been resolved to date.  *Id.* at 15-17.

139.    Similarly, counsel for SIPC stated that while there was a hope that at some point there would be a reasonable expectation of recoupment, none existed at this time.  *Id.* at 24-25. Counsel for SIPC referenced a letter from the President of SIPC to Congress, attached to the Fifth Objection as Exhibit K, indicating that the amount of principal lost in Madoff's fraud was approximately $17.3 billion.  *Id.* at 25.  Accordingly, SIPC's counsel stated that "at some point

in time when the Trustee is able to recover over twenty billion dollars maybe we would be at a point where there would be no [sic] reasonable expectation." *Id.* at 26.

140.    Ignoring the above explanations, counsel for Movants stated that "after two years, he has only allowed $5.8 billion dollars of the seventeen billion in possible claims.  And he hasn't told you today why that is." *Id.* at 28.  Counsel for Movants then further argued that it is possible that the Trustee never intends to allow remaining claims, speculating in accordance with her own hypothetical that "if we assume that's true for a second, then it's virtually inconceivable that there won't be enough money to pay all the allowed claims in full and to fully reimburse SIPC . . ." *Id.*

141.    In overruling the Fifth Objection, Judge Lifland stated, "I do not find that the objectors have made any strong point with respect to objecting to the fees that have been requested here today." *Id.* at 33.   The Bankruptcy Court found that, at this juncture, there was no reasonable expectation of recoupment by SIPC.  *Id.* at 32.  Moreover, "notwithstanding the statutory command that [the Bankruptcy] Court shall approve the fees," Judge Lifland noted that he was "very well aware of the Herculean effort being utilized in the litigation arena to recoup funds for the benefit of the victims." *Id.*  The Bankruptcy Court subsequently entered the Fifth Interim Fee Order approving the Fifth Interim Fee Application.

142.    On December 28, 2010, Movants filed a Motion for Leave to Appeal the Fifth Fee Order and supporting papers seeking interlocutory review of the Fifth Interim Fee Order.  (ECF No. 3594).  Movants argue that the Fifth Interim Fee Order should be reversed because the Bankruptcy Court purportedly failed to properly review the Fifth Fee Application and, once again, that the Trustee and his counsel have a conflict of interest that renders them not disinterested.  On January 11, 2011, the Trustee filed an Opposition to the Motion for Leave to

Appeal.  (ECF No. 3672).  On January 17, 2011, Movants filed a Reply.  (ECF No. 3710).  The

Motion remains *sub judice* at the District Court.

143.    On April 18, 2011, the Trustee and his counsel filed the Sixth Application for

Interim Compensation for Services Rendered Reimbursement of Actual and Necessary Expenses

Incurred with the Bankruptcy Court.  (ECF No. 4022).  Counsel and international special counsel

also filed applications for Interim Professional Compensation.  (ECF Nos. 4023-4034).  On May

4, 2011, amended fee applications were filed for Taylor Wessing, Windels Marx, and Williams

Barristers & Attorneys, and the Trustee filed an amended Notice of Hearing.  (ECF Nos. 4052-

4055).  A hearing is scheduled to be held before the Court on June 1, 2011.

## XI.   <u>CONCLUSION</u>

144.    The foregoing report represents a summary of the status of this proceeding and

the material events that have occurred through March 31, 2011, unless otherwise indicated.  This

Report will be supplemented and updated with further interim reports.

Dated:  New York, New York
        May 16, 2011

Respectfully submitted,

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Jacqlyn R. Rovine
Email: jrovine@bakerlaw.com

_____*s/Irving H. Picard*_____
Irving H. Picard

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Email: ipicard@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC And Bernard L. Madoff*

*Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**EXHIBIT A**

**SECURITIES INVESTOR PROTECTION CORPORATION**
Irving Picard, Trustee of Bernard L. Madoff Investment Securities, LLC

Report No. 28

Period Ended March 31, 2011
*CASH RECEIPTS:*

| General Cash Receipts | Net Change for Period | Prior Period Cumulative | Total Received | Customer Fund Cumulative Detail | General Estate | SIPC | Code |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | $99,625,160.60 | | | | | | 4010 |
| Transfer from Debtor's Estate - Securities | 0.00 | 291,203,371.40 | 291,203,371.40 | | | | 4014 |
| Transfer from Debtor's Estate - BNY account | 0.00 | 336,660,934.06 | 336,660,934.06 | | | | 4016 |
| Transfer from Debtor's Estate - Chase account | 0.00 | 235,156,309.36 | 235,156,309.36 | | | | 4018 |
| Transfer from Debtor's Estate - Other | 0.00 | 4,036,145.08 | 4,036,145.08 | | | | 4040 |
| Interest and Dividends | 44,755.40 | 1,480,047.84 | 1,524,803.24 | | | | 4060 |
| Sale of Securities | 0.00 | 0.00 | 0.00 | | | | 4030 |
| Closeout Proceeds - Broker Dealers | 0.00 | 37,273,877.23 | 37,273,877.23 | | | | 4031 |
| Closeout Proceeds - NSCC | 0.00 | 21,783,082.40 | 21,783,082.40 | | | | 4032 |
| Closeout Proceeds - DTCC | 0.00 | 17,368,079.91 | 17,368,079.91 | | | | 4070 |
| Closeout Proceeds - DTC | 0.00 | 0.00 | 0.00 | | | | 4071 |
| Sale of Debtor's Assets | 0.00 | 0.00 | 0.00 | | | | |
| - Sports Tickets | 0.00 | 89,690.80 | 89,690.80 | | | | 4072 |
| - Bank Debt Participations | -595.78 | 2,586,195.10 | 2,585,599.32 | | | | 4073 |
| - DTCC Shares | 0.00 | 204,170.51 | 204,170.51 | | | | 4075 |
| - Market Making Business | 0.00 | 1,230,886.80 | 1,230,886.80 | | | | 4111 |
| Administrative Subtenant Rent Revenue | 8,664.76 | 483,118.97 | 491,783.73 | | | | 4090 |
| Refunds - General | 0.00 | 0.00 | 0.00 | | | | 4074 |
| - BLM Air Charter | 0.00 | 752,963.00 | 752,963.00 | | | | 4091 |
| Refunds - Deposits | 0.00 | 9,841.45 | 9,841.45 | | | | 4092 |
| - Dues/Subscriptions | 0.00 | 177,247.15 | 177,247.15 | | | | 4093 |
| - Car Registrations | 0.00 | 157.00 | 157.00 | | | | 4094 |
| - Vendors | 0.00 | 61,567.20 | 61,567.20 | | | | 4095 |
| - Transit Cards | 0.00 | 793.61 | 793.61 | | | | 4096 |
| - Insurance/Workers Comp | 0.00 | 402,859.56 | 402,859.56 | | | | 4097 |
| - Ref. - Political Contributions | 0.00 | 144,500.00 | 144,500.00 | | | | 4099 |
| - Refunds Other | 0.00 | 50.84 | 50.84 | | | | 4100 |
| Recoveries - General | 0.00 | 0.00 | 0.00 | | | | 4101 |
| Recoveries - Litigation Related | 0.00 | 0.00 | 0.00 | | | | |
| - Customer Avoidances | 2,118,486.48 | 130,870,547.98 | 132,989,034.46 | | | | 4020 |
| - Pre-Litigation Settlements | 45,000,000.00 | 1,475,381,048.00 | 1,520,381,048.00 | | | | 4021 |
| - Litigation Settlements | 0.00 | 0.00 | 0.00 | | | | 4022 |
| - Donation Settlements | 0.00 | 225,000.00 | 225,000.00 | | | | 4023 |
| - Vendor Preferences | 152,000.00 | 380,850.39 | 532,850.39 | | | | 4024 |
| - Employees | 0.00 | 10,674.74 | 10,674.74 | | | | 4102 |
| - Taxing Authorities | 0.00 | 12,777.56 | 12,777.56 | | | | 4103 |
| - Class Actions | 0.00 | 314,134.72 | 314,134.72 | | | | 4104 |
| - NASDAQ | 0.00 | 308,948.49 | 308,948.49 | | | | 4105 |
| - NYSE | 0.00 | 183,683.79 | 183,683.79 | | | | 4106 |
| - Transaction Fees | 0.00 | 96,816.23 | 96,816.23 | | | | 4107 |
| - Sub-Tenants | 0.00 | 0.00 | 0.00 | | | | 4108 |
| - Other | 0.00 | 71,298.73 | 71,298.73 | | | | 4109 |
| Miscellaneous | 0.00 | 0.36 | 0.36 | | | | 4110 |
| **Sub-total General Cash Receipts** | **$47,323,310.86** | **$2,558,949,670.26** | **$2,606,272,981.12** | **$0.00** | **$0.00** | **$0.00** | |
| **Advances from SIPC** | | | | | | | |
| Administration - Advances | 11,370,060.75 | 334,922,613.53 | 346,292,674.28 | | | | 2901 |
| Securities - Paid Bank Loans | 0.00 | 0.00 | 0.00 | | | | 2931 |
| - Cash in Lieu | 4,439,192.91 | 774,878,032.69 | 779,317,225.60 | | | | 2922 |
| **Sub-total SIPC Advances** | **$15,809,253.66** | **$1,109,800,646.22** | **$1,125,609,899.88** | | | | |
| **Total Cash Receipts** | **$63,132,564.52** | **$3,668,750,316.48** | **$3,731,882,881.00** | **$0.00** | **$0.00** | **$0.00** | |

Report No. 28

***CASH DISBURSEMENTS:***

***Administrative Disbursements***

| General Administrative Disbursements | Net Change for Period | Prior Period Cumulative | Cumulative Total Paid | Code |
|---|---|---|---|---|
| Computer - Rental | 0.00 | 11,121.59 | $11,121.59 | 5011 |
| - Software Support | 0.00 | 55,159.20 | $55,159.20 | 5012 |
| - Equipment Leases | 0.00 | 204,159.01 | $204,159.01 | 5013 |
| Employee related - Salaries-Net | 0.00 | 4,361,844.80 | $4,361,844.80 | 5020 |
| - FICA-Employer | 0.00 | 318,550.60 | $318,550.60 | 5021 |
| - Fed. & St. Unemploy. | 117.76 | 3,000.72 | $3,118.48 | 5023 |
| - Temporary Help | 0.00 | 29,612.50 | $29,612.50 | 5024 |
| - Employee Medical Plan | 0.00 | 830,103.99 | $830,103.99 | 5025 |
| - Employee LTD | 0.00 | 6,887.03 | $6,887.03 | 5026 |
| - Employee Expense Reimbursement | 0.00 | 1,125.87 | $1,125.87 | 5027 |
| - Employee Life/AD&D | 0.00 | 9,006.83 | $9,006.83 | 5028 |
| - Other | 0.00 | 1,622.90 | $1,622.90 | 5029 |
| Insurance - Trustee Bond | 0.00 | 1,200.00 | $1,200.00 | 5030 |
| Insurance - Surety & Fidelity Bonds | 0.00 | 37,400.00 | $37,400.00 | 5031 |
| Insurance Workers Comp | 0.00 | 12,578.00 | $12,578.00 | 5032 |
| - Other | 0.00 | 8,496.00 | $8,496.00 | 5039 |
| Fees - Payroll Processing | 0.00 | 8,195.96 | $8,195.96 | 5045 |
| - Other | 40.00 | 9,874.50 | $9,914.50 | 5049 |
| Rent - Office | 114,761.77 | 3,518,416.66 | $3,633,178.43 | 5050 |
| - Equipment | 0.00 | 1,695.89 | $1,695.89 | 5051 |
| - Warehouse | 10,864.55 | 297,047.91 | $307,912.46 | 5052 |
| - Bulova | 0.00 | 310,130.75 | $310,130.75 | 5053 |
| - Other | 936.00 | 29,489.27 | $30,425.27 | 5059 |
| Telephone and Telegraph | 0.00 | 360,456.68 | $360,456.68 | 5060 |
| Communication Fees | 0.00 | 626,227.89 | $626,227.89 | 5061 |
| Utilities - Electricity | 203.19 | 7,584.82 | $7,788.01 | 5070 |
| Office Supplies & Expense - Maint. & Repairs | 479.15 | 75,026.51 | $75,505.66 | 5080 |
| - Moving&Storage | 2,170.30 | 149,744.64 | $151,914.94 | 5081 |
| - Postage/Handling/Prep | 0.00 | 40,538.56 | $40,538.56 | 5082 |
| - Reproduction | 1,199.44 | 171,543.91 | $172,743.35 | 5083 |
| - Locksmith | 0.00 | 2,770.83 | $2,770.83 | 5084 |
| - Security | 0.00 | 249,897.70 | $249,897.70 | 5085 |
| - Supplies | 0.00 | 3,342.03 | $3,342.03 | 5086 |
| - Temporary Help | 11,297.43 | 4,577,345.26 | $4,588,642.69 | 5087 |
| - Process Server - Complaints | 0.00 | 10,000.00 | $10,000.00 | 5088 |
| - Other | 0.00 | 33,798.47 | $33,798.47 | 5089 |
| Taxes | 0.00 | 77,671.94 | $77,671.94 | 5090 |
| NYC Commercial Rent Tax | 0.00 | 59,558.01 | $59,558.01 | 5091 |
| Claims Related Costs - Mailing Costs | 0.00 | 23,053.28 | $23,053.28 | 5101 |
| - Publication | 0.00 | 163,961.13 | $163,961.13 | 5102 |
| - Supplies | 0.00 | 16,244.58 | $16,244.58 | 5103 |
| - Printing | 0.00 | 2,207.42 | $2,207.42 | 5104 |
| Scanning - Investigation | 7,473.90 | 4,810,204.15 | $4,817,678.05 | 5110 |
| Foreign Research | 0.00 | 38,975.00 | $38,975.00 | 5112 |
| Hosting Expense | 485,127.77 | 5,407,724.59 | $5,892,852.36 | 5244 |
| **Sub-total General Admin. Disbursements** | **$634,671.26** | **$26,974,597.38** | **$27,609,268.64** | |
| **Professional Fees and Expenses** | | | | |
| Trustee Fees | 134,240.28 | 3,450,292.60 | $3,584,532.88 | 5200 |
| Trustee Expenses | 31.50 | 2,037.95 | $2,069.45 | 5201 |
| Trustee Counsel Fees (Baker) | 7,465,775.42 | 138,098,576.24 | $145,564,351.66 | 5210 |
| Trustee Counsel Expenses (Baker) | 299,792.48 | 3,073,468.96 | $3,373,261.44 | 5211 |
| Trustee Counsel Fees (Windels) | 0.00 | 5,912,432.72 | $5,912,432.72 | 5212 |
| Trustee Counsel Expenses (Windels) | 0.00 | 92,027.76 | $92,027.76 | 5213 |
| Special Counsel Fees | 0.00 | 4,328,858.22 | $4,328,858.22 | 5220 |
| Special Counsel Expenses | 0.00 | 409,019.17 | $409,019.17 | 5221 |
| Consultant Fees | 2,870,610.78 | 144,858,750.71 | $147,729,361.49 | 5240 |
| Consultant Expenses | 186,168.15 | 4,598,607.58 | $4,784,775.73 | 5241 |
| Investment Banker Fees | 0.00 | 1,050,000.00 | $1,050,000.00 | 5242 |
| Sales Tax | 11,915.51 | 808,320.58 | $820,236.09 | 5243 |
| Mediator Fees | 0.00 | 125,000.00 | $125,000.00 | 5245 |
| Receiver Counsel Fees | 0.00 | 300,000.00 | $300,000.00 | 5260 |
| Receiver Counsel Expenses | 0.00 | 6,449.08 | $6,449.08 | 5261 |
| Receiver's Consultants Fees | 0.00 | 316,000.00 | $316,000.00 | 5262 |
| Receiver's Consultants Expenses | 0.00 | 15,000.00 | $15,000.00 | 5263 |
| **Sub-total Professional Fees and Expenses** | **$10,968,534.12** | **$307,444,841.57** | **$318,413,375.69** | |
| **Total Administrative Disbursements** | **$11,603,205.38** | **$334,419,438.95** | **$346,022,644.33** | |

Report No. 28

Period Ended March 31, 2011

CASH DISBURSEMENTS:

| | Net Change for Period | Prior Period Cumulative | Total Paid | Customer Fund | Cumulative Totals General Estate | SIPC | Code |
|---|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ | |
| Claim Related Disbursements | | | | | | | |
| Customer - Paid Bank Loan | | | | | | | 6021 |
| - Securities - Cash in Lieu | | | | | | | 6022 |
| - Securities - Purchases | 2,082,641.25 | 776,386,015.63 | 778,468,656.88 | | | | 6023 |
| - Indemnification | | | | | | | 6031 |
| - Cash Balance | | | | | | | 6041 |
| Customer - | | | | | | | 6044 |
| Customer - Trustee Journal Entry | | | | | | | 6050 |
| per Allocation | | | | | | | 6060 |
| Other - Contractual Commitments | | | | | | | 6090 |
| - P/E Bank Loan | | | | | | | 6111 |
| - Indemnification | | | | | | | 6121 |
| Other - | | | | | | | 6131 |
| Other - | | | | | | | 6140 |
| Other - | | | | | | | 6150 |
| Other - Trustee Journal Entry | | | | | | | 6160 |
| per Allocation | | | | | | | |
| General Creditor | | | | | | | 6200 |
| Sub-total Claim Disbursements | $2,082,641.25 | $776,386,015.63 | $778,468,656.88 | $0.00 | $0.00 | | |
| Other Disbursements (except investments) | | | | | | | |
| SIPC - Refunds - Recoupment | | | | | | | 6301 |
| - Indemnification | | | | | | | 6310 |
| - Contr. Commitments | | | | | | | 6311 |
| - Paid Bank Loan | | | | | | | 6321 |
| - Subrogation | | | | | | | 6322 |
| Other - | | | | | | | 6400 |
| Other - | | | | | | | 6401 |
| Other - | | | | | | | 6402 |
| Other - | | | | | | | 6403 |
| Other - | | | | | | | 6404 |
| Sub-total Other Disbursements | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Investments by Trustee - Purchases *See Notes (1) and (2) | $45,000,000.00 | $2,458,319,701.30 | $2,503,319,701.30 | 0.00 | 0.00 | | 1900 |
| Sub-total Administrative Disb. - page 2 | $11,603,205.38 | $334,419,438.95 | $346,022,644.33 | 0.00 | 0.00 | | |
| Total Disbursements | $58,685,846.63 | $3,569,125,155.88 | $3,627,811,002.51 | $0.00 | $0.00 | | |
| Total Receipts less Disbursements | $4,446,717.89 | $99,625,160.60 | $104,071,878.49 | $0.00 | $0.00 | | |
| Ending Cash Balance | $104,071,878.49 | | | | | | |

Page 3

* Note (2) On August 27, 2009, a preferred custody account maintained by Citibank was established and $1,123,377,311 has been transferred into the account.
In addition, on December 21, 2009, an insured money market account maintained by Citibank was established and $60,000,000 was transferred into the account.
Then on December 22, 2010 a third Citibank account was established for settlements reached and $1,020,000,000 has been transferred into the account.
As of March 31, 2011 the total net equity value of these three accounts was $2,208,665,872.

(See page 6 for more details)

* Note (1) On January 30, 2009, Depository Trust & Clearing Corp. transferred to the Trustee's brokerage account 1601 securities positions with a market value of $291,203,372.
Subsequently, additional funds and securities totaling $8,739,019 were transferred into this account. The total net equity value of this account at March 31, 2011 is $306,847,062.

(See Page 5 for more details)

## SUMMARY INFORMATION ON STATUS OF LIQUIDATION

Period Ended March 31, 2011

| | Customer Claimants | Broker/Dealer Claimants | General Estate Claimants |
|---|---|---|---|
| Claims received | 16,518 | 50 | 101 |
| | | | |
| Claims satisfied by distribution of cash and/or securities: | | | |
| a. As part of the transfer in bulk | - | - | - |
| b. On an account by account basis-Fully Satisfied (1) | 907 | - | - |
| c. On an account by account basis-Partially Satisfied (1) | 1,372 | - | - |
| | 2,279 | - | - |
| | | | |
| Claims Determined - no claims | 12 | - | - |
| Claims Deemed Determined - pending litigation | 260 | - | - |
| Claims Determined - withdrawn | 149 | | |
| Claims Determined but not yet satisfied (1) | 130 | | |
| Claims under review | 250 | 50 | 101 |
| Claims Denied: | | | |
| a. No Claims | - | - | - |
| c. Assets at Another Broker | - | - | - |
| c. Other Denials for which no objections were filed (1) | 9,523 | - | - |
| d. Denials for which objections were filed: | | | |
| - Hearing not yet set | 3,271 | - | - |
| - Set for Hearing | 644 | - | - |
| - Adjudicated | - | - | - |
| | 14,239 | 50 | 101 |

Accounts with cash and/or securities which were transferred in bulk

**Filing Date Value**

Customer name securities distributed

Customer fund securities distributed    $

(1) To the extent satisfied, customer claims have been paid with up to
the maximum SIPC advance of $500,000.

_____
(Trustee's Signature)                   4-18-2011
                                        (Date)

_____
(Accountant's Signature)                4-15-2011
                                        (Date)

Page 4

Period Ended March 31, 2011

Report No. 28

**IRVING H. PICARD, TRUSTEE FOR BLMIS LLC**
Morgan Joseph Account

| | Fixed Income | Equities | Accrued Interest | Sweep Account (Proceeds from sale of securities and other investment transactions) | Account Balance |
|---|---|---|---|---|---|
| Balance on February 28, 2011 | 300,301,094 | 10,687 | 185,440 | 6,353,301 | 306,850,522 |
| Sale of Securities | (79,970,032) | | | 79,970,032 | - |
| Redemptions | (59,997,468) | | | 59,997,468 | - |
| Securities Purchased | 139,919,028 | | | (139,919,028) | 0 |
| Unrealized Gain or (Loss) | (103,404) | (56) | | | (103,460) |
| Interest and Dividends Earned | | | 82,827 | 17,175 | 100,002 |
| Other changes in Account Balance | | | | (2) | (2) |
| Balance on March 31, 2011 | 300,149,218 | 10,631 | 268,267 | 6,418,946 | 306,847,062 |

Fixed Income
Equities

Page 5

**IRVING H. PICARD, TRUSTEE FOR BMIS LLC**
**Citibank Investment Accounts**

Report No. 28

Period Ended March 31, 2011

| | Citibank Preferred Custody Accounts | | | | | Citibusiness | |
| | A/C 25D0705788768 | | | | A/C 25D0762157B8 | IMMA Account | |
| | Cash Assets/Mutual Funds | U.S. Treasury Bills | US Treasury Notes | Accrued Interest | Account Balance | Cash Assets/Mutual Funds | Account Balance | Total Citibank |
|---|---|---|---|---|---|---|---|---|
| Balance February 28, 2011 | 11,761,923 | 970,273,381 | 100,391,000 | 187,680 | 1,082,613,984 | 1,020,352,234 | 60,304,467 | 2,163,270,685 |
| Deposits-Transferred from Checking | 45,000,000 | | | | | | | 45,000,000 |
| Deposits-Settlements | | | | | 45,000,000 | | | |
| Sales of Securities | 99,991,000 | | (99,991,000) | | - | | | - |
| Purchase of Securities | (144,938,739) | 144,938,739 | | | - | | | - |
| Unrealized Gain or (Loss) | | 159,059 | (43,000) | | 116,059 | | | 116,059 |
| Interest and Dividends Earned | | | | | | | | |
| Interest | 9,000 | | | 63,874 | 72,874 | 190,639 | 15,367 | 278,880 |
| Dividends | 179 | | | 69 | 248 | | | 248 |
| Balance March 31, 2011 | 11,823,363 | 1,015,380,179 | 100,348,000 | 251,623 | 1,127,803,165 | 1,020,542,873 | 60,319,834 | 2,208,665,872 |