Helen Davis Chaitman (4266)
Becker & Poliakoff LLP
45 Broadway
New York, NY 10006
hchaitman@becker-poliakoff.com
*Attorneys for Marsha Peshkin and over*
*800 other Customers of Bernard L.*
*Madoff Investment Securities LLC as*
*Listed on Exhibit A*

**Hearing Date: June 1, 2011 at 10:00 a.m.**
**Objections Due: May 25, 2011 at 4:00 p.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**OBJECTION TO SIXTH APPLICATION OF TRUSTEE AND BAKER & HOSTETLER**
**LLP FOR ALLOWANCE OF INTERIM COMPENSATION FOR SERVICES**
**RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED FROM**
**OCTOBER 1, 2010 THROUGH JANUARY 31, 2011**

This objection is filed by over 800 investors in Bernard L. Madoff Investment Securities,

LLC ("Madoff")("Objectors")[1], through their attorneys, Becker & Poliakoff LLP, and

incorporates herein all of the grounds for objection asserted in previously-filed objections to the

five prior applications for interim compensation of the Trustee and B&H.  This objection

---

[1] A complete list of the Objectors is attached as Exhibit A to the accompanying Declaration of Helen Davis
Chaitman ("Chaitman Decl.").

constitutes the Objectors' offer of proof and Objectors request that the Court schedule an

evidentiary hearing at which they can submit evidence substantiating the facts set forth herein.

### Grounds for Objections

1.      The Trustee was appointed by this Court at the request of the Securities Investor

Protection Corporation ("SIPC") in the proceeding instituted in the United States District Court

for the Southern District of New York on December 15, 2008 for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. § 78aaa, *et seq.* ("SIPA").

2.      In the largest financial fraud in history, in a case which is closely watched by

people around the world, this Court has approved the payment of compensation to B&H in the

total amount of $132,329,517.73 and to the Trustee in the total amount of $3,552,286.50.

3.      In the Sixth Fee Application, the Trustee seeks court approval for allowance of

fees of $713,799.00 for the 123-day period from October 1, 2010 through January 31, 2011, and

B&H seeks allowance of fees of $43,177,049.10 (Sixth Fee App. ¶200.)  This works out to

$5,803.24 in daily compensation including weekends and holidays for the Trustee and

$351,032.92 in daily compensation for B&H, again including weekends and holidays.  Thus,

with the Sixth Fee Application, the totals are as follows:

| Interim Period | B&H's Compensation | Trustee's Compensation | Total Trustee & B&H Compensation |
|---|---|---|---|
| 12/15/08-4/30/09 | $14,662,319.83 | $759,228.75 | $15,421,548.58 |
| 5/1/09-9/30/09 | $21,279,101.85 | $835,605.00 | $22,114,706.85 |
| 10/1/09-1/31/10 | $23,884,085.25 | $671,591.25 | $24,555,676.50 |
| 2/1/10-5/31/10 | $33,981,534.45 | $601,202.25 | $34,582,736.70 |
| 6/1/10-9/30/10 | $38,522,476.35 | $684,659.25 | $39,207,135.60 |
| 10/1/10 – 1/31/11 | $43,177,049.10 | $713,799.00 | $43,890,848.10 |
| **TOTAL COMPENSATION** | **$175,506,566.83** | **$4,266,085.50** | **$179,772,652.33** |

4.      While the Trustee has affirmatively led the public to believe that he has not personally received as compensation even the Trustee's fees of $4,266,085.50 since his appointment,[2] we believe that the Trustee's contract with B&H entitles him to receive between 35% – 50% of the total amount of fees paid to B&H.  Thus, we believe that, since his appointment in December 2008, the Trustee (possibly together with Mr. Sheehan) has personally received compensation of between $60 million and $90 million.  If this is untrue, we invite the Trustee to file with the Court the contracts between B&H and the Trustee and between B&H and Mr. Sheehan.  In his March 30, 2011 report, the SEC Inspector General has stated that the administrative expenses in the Madoff case and in the Lehman case could bankrupt SIPC and cause it to draw on its $2.5 billion line of credit with the U.S. Treasury.[3]  Thus, there is an enormous public interest in knowing the compensation of Messrs. Picard and Sheehan.

5.      Despite being paid approximately $180 million in compensation and spending more than $130 million on forensic accounting experts, the Trustee and his counsel have violated federal law intended to protect investors through SEC-regulated broker/dealers.

6.      This is not just the opinion of Madoff investors.  This is the opinion of Congressman Scott Garrett, the Chairman of the Subcommittee on Capital Markets, Insurance, and Government-Sponsored Enterprises, of the House Financial Services Committee (the "Subcommittee").   The Subcommittee has direct supervision over SIPC.   Congressman Garrett

---

[2]  The Trustee stated at the hearing on his first fee application as follows:

> As noted at paragraph 33 of my application and contrary to the implication of certain objections that have been filed with the Court and before the press, the amounts that will be rewarded either today or at another time are going to be turned over to Baker Hostetler, the firm of which I am a partner. I want to emphasize I will not retain any portion of the award.

(8/6/09 Hrg. Trans. 14:15-21)  A copy of the 8/6/09 Hrg. Trans. is attached as Exhibit B to the Chaitman Decl.

[3] SEC's Office of Inspector General, Report No. 495, "SEC's Oversight of the Securities Investor Protection Corporation's Activities," dated March 30, 2011 (the "SEC's Oversight of SIPC Report"), at 22-23.  See Exhibit C to the Chaitman Decl.

made the following statement when he introduced legislation on December 17, 2010 intended to

enforce the SIPA against the Trustee:

> I am concerned that the trustee in the Madoff case is ignoring this law and failing
> to provide prompt assistance to those who have been thrust into financial chaos.
> He is taking positions on a wide range of issues that are contrary to the Securities
> Investor Protection Act, the Bankruptcy Code, and federal and state laws that are
> intended to protect investors against bad acts on the part of their brokers. This
> legislation is intended to clarify for the trustee and the Bankruptcy Court that
> Congress wants these laws to be followed.

States News Service (12/17/10). A copy of the statement is attached as Exhibit J to the
Chaitman Decl.

7.    The fees of the Trustee and B&H have consistently escaped scrutiny because of

the representation of the Trustee and SIPC, pursuant to SIPA section 78eee(b)(5)(C), that SIPC

has no reasonable expectation of recoupment of its advances for administrative expenses.

8.    In the Sixth Fee Application, Trustee – once again – tries to strip this Court of its

ability to review and analyze his and his firm's compensation by invoking the claim that SIPC

will not be reimbursed. The following statement is contained in the Sixth Fee Application:

> The Trustee has determined, at this time, that he has no reasonable
> expectation that the general estate will be sufficient to make a
> distribution to creditors or pay any administrative expenses. The
> Trustee has been advised by SIPC that it concurs in this belief of
> the Trustee. Therefore, . . . the Trustee and B&H request that . . .
> the Court 'shall award the amounts recommended by SIPC.'
> (citation omitted).

(Sixth Fee App. ¶197-198.)

9.    The Trustee's representation that there is no reasonable expectation that SIPC will

be reimbursed its administrative expenses is patently false. *See* ¶¶14-16 *infra*. It is another

attempt to obtain a blank check from SIPC without the Court's scrutiny.

## 1.    The Trustee Has Violated Federal Law By Suing Innocent Investors

10.    The Trustee has violated SIPA – and caused untold devastation to thousands of

people -- by utilizing the avoidance provisions of the Bankruptcy Code to sue approximately

6,000 innocent investors despite the fact that he is holding sufficient money in the fund of customer property to pay all allowed customer claims, inclusive of the SIPC advances.  Under § 78fff-2(c)(3), a SIPA trustee has the power to use the avoidance provisions of the Bankruptcy Code to recover property **only** when there are insufficient funds in the estate to pay allowed customer claims and reimburse SIPC for the amounts paid in SIPC insurance:

> **Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1)**, the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11.  (emphasis added.)

SIPA § 78fff-2(c)(3).

11.     In the 1,000 clawback suits the Trustee has filed against innocent investors, he relies on § 78fff-2(c)(3) for statutory authority to bring these actions:

> However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. **Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).**

See e.g., *Picard v. Shapiro Nominee, et. al.*, Doc. #1, Adv. Pro. No. 10-4328 (the "Shapiro Nominee Clawback Complaint"), at ¶17 (emphasis added).

12.     Section 78fff-2(c)(1)(A) – (D) sets forth the claims that must be satisfied from the fund of customer property.  If the fund of customer property is sufficient to satisfy the following claims, then the Trustee has no power to institute avoidance actions:

> **(A)** first, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(1) of this title, to the extent such advances recovered securities which were apportioned to customer property pursuant to section 78fff(d) of this title;

**(B)** second, to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities;

**(C)** third, to SIPC as subrogee for the claims of customers;

**(D)** fourth, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(2) of this title.

13.     The Trustee has acknowledged that only the second and third priorities of distribution are applicable in this case, *i.e.*, categories "B" and "C."  *See* Motion for an Order Approving Initial Allocation of Property to the Fund of Customer Property and Authorizing an Interim Distribution to Customers (the "Interim Distribution Motion"), Doc. # 4048, Case No. 08-01789, at ¶38.

14.     As of May 23, 2011, the Trustee had determined 99.97% of all customer claims. He has allowed claims totaling $6,883,791,021 on which SIPC has advanced a total of $794,890,347. <http://www.madofftrustee. com/Status.aspx>; *see also* Cohen Aff., Ex. A, Interim Distribution Motion ¶7.  Thus, if the Trustee had $6,883,791,021 in the fund of customer property, he could not use the avoidance provisions of the Bankruptcy Code.

15.     The fund of customer property now consists of more than $9.8 billion. The Trustee states that the fund of customer property totals $7.6 billion.  *See* Interim Distribution Motion ¶6.  In his calculation, however, the Trustee does not include $2.2 billion forfeited to the governed by the Picowers, even though he previously represented that "every penny" of the $7.2 billion settlement will be distributed to customers.  *See* Press Release of Irving H. Picard, "$7.2 BILLION RECOVERY AGREEMENT WITH ESTATE OF JEFFRY PICOWER AND PICOWER-RELATED INVESTORS," dated December 17, 2010, available at http://madofftrustee.com/News.aspx. (the "Picower Press Release"), at 1.  A copy of the Picower Press Release is attached as Exhibit D to the Chaitman Decl.

16.     Thus, the Trustee has $9.8 billion in the fund of customer property and he has allowed claims of less than $6.9 billion, leaving an excess of $2.9 billion.  To summarize:

| Fund of Customer property | | Allowed Customer Claims | |
| --- | --- | --- | --- |
| Description | Amount | Payee | Amount |
| Recoveries as of 9/30/2010 | $1,500,000,000 | BLMIS Customers' Net Equity Claims | $6,088,900,674 |
| Picower Family Settlement | $5,000,000,000 | SIPC's Subrogee Claim | $794,890,347 |
| Picower forfeiture to US | $2,200,000,000 | | |
| Shapiro Family Settlement | $550,000,000 | | |
| Union Bancaire Prive Settlement | $470,000,000 | | |
| Hadassah Settlement | $45,000,000 | | |
| Other Preference Settlements | $89,071,011 | | |
| **Fund of Customer Property:** | **$9,854,071,011** | **Customer Claims:** | **$6,883,791,021** |

17.     Since SIPA § 78fff-2(c)(3) only authorizes a trustee to utilize the avoidance provisions of the Bankruptcy Code when the fund of customer property is insufficient to pay the allowed customer claims, the Trustee is acting in direct contravention of SIPA by proceeding with the clawback suits.  *See Trefny v. Bear Stearns Securities Corp*., 243 B.R. 300, 321 (S.D. Tex. 1999) ("Section 78fff-2(c)(3) comes into effect when the customer's property held by the debtor is not sufficient to pay customers' claims in full."); *Matter of Bevill, Breslet & Schulman, Inc.*, 94 B.R. 817, 824 (D.N.J 1989) (citing 15 U.S.C. § 78fff-2(c)(3)) ("[A] trustee's avoidance power under section 78fff-2(c)(3) of SIPA only comes into effect '[w]henever customer property is not sufficient to pay in full [certain creditor's claims].")  And, of course, he is causing absolute devastation among clawback defendants by doing so.[4]

18.     The Trustee's self-serving explanation that he **may** in the future allow additional claims does not change the fact that his prosecution of 1,000 clawback suits against innocent investors is *ultra vires* and unlawful.

---

[4] While the Trustee advertises on his website that he is a "compassionate" man, Objectors, to a man, would not say so.  On the contrary, his "hardship" program – through which, purportedly, his compassion is demonstrated, is an absolute sham as Objectors will be happy to prove if the Court schedules an evidentiary hearing on this Objection.

**2.      The Trustee Has Violated Federal Law By Failing to Report on BLMIS' Crimes**

19.      Under SIPA, a trustee has an obligation to make to the Court and SIPC "such

written reports as may be required of a trustee in a case under chapter 7 of title 11."  SIPA §

78fff-1(c).  Under SIPA § 78fff-1(d)(3), a trustee is required to "investigate the acts [and]

conduct . . . of the debtor, the operation of its business, and any other matter, to the extent

relevant to the liquidation proceeding, and report thereon to the court."  SIPA § 78fff-1(d)(1).

Having made such an investigation, a trustee is required to:

> report to the court any facts ascertained by the trustee with respect
> to fraud, misconduct, mismanagement, and irregularities, and to
> any causes of action available to the estate.

SIPA §78fff-1(d)(3).

20.      Similarly, under the Bankruptcy Code, a trustee is mandated to "investigate the

financial affairs of a debtor" and, unless otherwise ordered by the court, "furnish such information

concerning the estate and the estate's administration as is requested by a party in interest."  11

U.S.C. § 704(a)(4), (7).

21.      Moreover, a SIPA trustee is required to furnish to customers all information

provided to SIPC unless it is determined that disclosure is not in the public interest.  *See* SIPA

§ 78kkk(a).  The Trustee has treated SIPC as his client and has provided all kinds of information

about BLMIS to SIPC.  Yet, he has failed to provide any of this information to the customers, to

whom he owes a fiduciary duty.

22.      The Trustee has expended over $310 million in legal and forensic accounting fees

— fees that are projected to exceed $1 billion by 2014.[5]  SIPC has approved thus far over $135

---

[5] *See* January 24, 2011 letter from SIPC president Stephen Harbeck to Congressman Scott Garrett, (the "1/24/2011
Harbeck Letter"), at 14-15, attached as Exhibit E to the Chaitman Decl.; *see also* SEC's Oversight of SIPC Report at
22-28.

million in legal fees for the Trustee and B&H.  *See* ¶2 *supra.*  The Trustee's forensic accountants

have been paid in excess of $130 million.  1/24/2011 Harbeck Letter at 21.

23.    Yet, the Trustee has not provided a single report to the Court or the customers

laying out the precise details of how Madoff perpetrated the fraud; the actions of Madoff's co-

conspirators; the amount of investor money that was used to actually purchase securities and,

indeed, to purchase the very securities shown on customer statements; and the identity of the

BLMIS customers who benefited from the purchase of securities with customers' money.  Nor

has he provided disclosure to customers of the vast amounts of information he has provided to

SIPC.  Instead, he has pursued an adversarial course of conduct releasing only such information

as is consistent with his self-serving view of the facts.

24.    All of the customers are parties in interest.  *See Peskin v. Picard*, 413 B.R. 137,

145 (Bankr. S.D.N.Y. 2009) (all claimants in the BLMIS estate are "parties in interest"); *In re*

*Caldor*, 193 B.R. 182, 186 (Bankr. S.D.N.Y. 1996) (creditors of an estate are parties in interest);

1/24/2011 Harbeck Letter at 5 (noting that "customers and creditors who were not given priority"

will be "treated as general unsecured creditors" of the estate); *see also Miller v. Austin*, 72 B.R.

893, 898 (S.D.N.Y. 1987) (acknowledging a duty to provide information to SIPA customer as a

party in interest).

25.    The reports thus far issued by the Trustee discuss the nature of his investigation in

sweeping terms, with a bare minimum of detail and only conclusory statements about what has

actually been uncovered.  *See, e.g.*, Trustee's Amended Third Interim Report, Doc. #2207, Case

No. 08-01789, at ¶¶ 103-157 (concluding that "the Trustee has assembled in substantial detail

and for extensive periods of time BLMIS' financial history" but providing no such detail or

supporting data).  The Trustee has provided customers with none of the underlying data.  Clearly,

the customers cannot rely upon the Trustee's self-serving version of the facts, and his reports are insufficient given the statutory mandates and the Trustee's recognition that he is "obligated to . . . report to the court *any* facts ascertained . . . with respect to fraud . . . and to any causes of action available to the estate."  Trustee's Fourth Interim Report, Doc. # 3083, Case No. 08-01789, at ¶ 58.  Moreover, he has failed to produce a single report prepared by the forensic accountants who have already received in excess of $130 million for their work in this case.[6]

26.    As a result, over 1,200 BLMIS customers jointly filed a Motion to Compel the Trustee to Provide a Report of His Investigative Activities and the Financial Affairs of BLMIS (the "Motion to Compel), Doc. #4045, Case No. 08-01789.  That motion is to be argued on June 21, 2011.

### 3.    The Trustee Has Violated Federal Law by Reaching Sweetheart Deals with Madoff's Co-Conspirators

27.    The most inexplicable of the Trustee's conduct has been his persecution of innocent investors while making sweetheart deals with Madoff's criminal co-conspirators. Madoff has admitted during his interview with the Financial Times that there were four men who were complicit in his scheme:  Jeffry Picower, Norman Levy, Carl Shapiro, and Stanley Chais.[7]

---

[6]  The Customers are aware of the Declaration of Joseph Looby, which was filed with the Trustee's motion for an order affirming his determination of net equity.  *In re BLMIS*, doc. no. 524 (Oct. 16, 2009).  That document, however, does not satisfy the Customers' request or the Trustee's statutory obligations.  Indeed, it raises more questions than it answers because Looby concedes that customer funds were used to purchase securities.  See Looby Decl. ¶¶ 9, 17, 18, 19, 26, 27.   In addition to being a year and a half old and acknowledging that it is based on partial information, *see id.* ¶ 7 n.1 ("The books and records of BLMIS are, at best, incomplete.  The Trustee . . . is endeavoring to supplement the corporate books and records with third party records, including banks records, customer records, etc., where available."), it is also framed in conclusory fashion with respect to major elements of the fraud and does not include documentary support for its conclusions.  Moreover, the investigation discussed in the declaration was limited in scope.  *See id.* ¶¶ 81, 87 (noting that the investigation covered only "select" months and baskets of trades from 2002 to 2008).  The customers are entitled to see the documentation relating to the entirety of BLMIS' operations, from its inception to its collapse.

[7] *See* "From Behind bars, Madoff spins his story" by David Gelles and Gillian Tett, April 8 2011, available at <http://www.ft.com/intl/cms/s/2/a29d2b4a-60b7-11e0-a182-00144feab49a.html>.

While the litigation against Chais is still pending, the Trustee has settled with Madoff's three

other criminal co-conspirators for far less than he is demanding from innocent investors.

28.      It was the Trustee himself who alleged that Picower was Madoff's co-conspirator

and the primary beneficiary of the Madoff fraud.[8]  According to the Trustee's complaint,

Picower enjoyed earnings on some accounts of 700% and 900% per year (Picower Complaint at

¶3); received fraudulent back-dated statements showing phony million dollar losses in his

accounts (*Id.* at ¶¶ 4, 63); and withdrew more than $7.2 billion more than he put in (Picower

Dismissal Opp. at 2, 20).  Thus, putting aside the value to Picower of having use of $7.2 billion

over a 38 year period, without having paid taxes on a substantial portion of the earnings, Picower

withdrew $7.2 billion more than he put in.  And that is the precise amount that the Trustee agreed

to accept from Picower's widow:  the net amount in excess of investment withdrawn from

BLMIS, with no accounting for the profits made by Picower from the use of $7.2 billion over a

38-year period, with no return of his original investment that he withdrew, and with no penalty

for perpetrating, with Madoff, the largest financial crime in history.

29.      Yet, from innocent investors who were the victims of Picower's and Madoff's

crimes, the Trustee is demanding 9% prejudgment interest from the date of each withdrawal.  *See

e.g.*, Shapiro Nominee Clawback Complaint at ¶vii. Apparently, in the Trustee's view, the

victims deserve to be punished because they were victimized by Picower and Madoff.

30.      Similarly, with respect to Norman Levy, Picard has alleged that Madoff increased

Levy's wealth from $180 million in 1986 to $1.5 billion in 1998.[9]  During the period from 1992

---

[8] *See Picard v. Jeffry M. Picower, et. al.*, Doc. #1, Adv. Pro. No. 09-01197 (the "Picower Complaint") at ¶28; *see also* MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS UNDER FED. R. BANKR. P. 7012(b) AND 7009, Doc. # 11, Adv. Pro. No. 09-01197 ("Picower Dismissal Opp.") at 2.

[9] *See Picard v. JPMorgan Chase & Co.*, *et als.*, Doc. #18, Adv. Pro. No. 10-4932 (the "Second Redacted Chase Compl.") at ¶246.

through 2001, Levy financed Madoff's operation with more than $100 billion. *See* 1/24/2011

Harbeck Letter at 14-15. In addition, Madoff made a margin loan of more than $2 billion to

Levy's children which was outstanding as of December 11, 2008.[10] Yet, the Trustee praised

Levy's children when they came forward and offered to settle their $2 billion liability for a mere

$220 million![11]

31.    Furthermore, in the motion seeking approval of the settlement with the Levy

Heirs (the "Levy Settlement Motion"), the Trustee represented that the $220 million offer from

the Levy Heirs was "the entire amount" that the Trustee was entitled to recover.[12] So, contrary

to the Trustee's representation that he settled for virtually "the entire amount" due, the recovery

represented less than 10% of the Levy Heirs' total contract liability and 0% of the Levy Heirs'

civil liability for their father's crimes. And again, the Trustee was not seeking prejudgment

interest from the children of one of Madoff's criminal co-conspirators.

32.    In the Levy Settlement Motion, the Trustee, once again, commended the Levy

Heirs for being "forthright and sincere in their desire to do the right thing." The Trustee

"appreciate[d] the manner in which the Levys cooperated with him to obtain the information he

needed to arrive at the settlement." *See* Levy Settlement Motion at ¶11. Nowhere in the

Settlement Motion did the Trustee disclose to the Court or to investors Levy's $100 billion

---

[10] The Trustee failed to disclose to this Court approximately $8 billion of negative equity balances in accounts of Jeffry Picower and the Levy Heirs. *See* 1/24/2011Harbeck Letter at 10, fn. 3. Of that $8 billion, $2 billion was the liability of the Levy Heirs. In the Picower Complaint, the Trustee asserted that one of Picower's accounts reported a staggering margin balance of approximately $6 billion. *See* Picower Complaint at ¶63(d). Thus, the Levy Heirs had a $2 billion margin loan. The Trustee has recently acknowledged that the total $8 billion figure represents "amounts owed . . . to BLMIS." Motion for Interim Distribution ¶ 72.

[11] *See* Press Release of Irving H. Picard, "MADOFF TRUSTEE ANNOUNCES SETTLEMENT OF $220 MILLION," dated January 27, 2010, available at http://www.madofftrustee.com/News.aspx (the "Levy Family Press Release"), at 1. A copy of the Levy Family Press Release is attached as Exhibit F to the Chaitman Decl.

[12] Levy Settlement Motion, Doc. #1833, Case No. 08-01789, at ¶12-13; 2/18/2010 Hrg. Trans. on Levy Settlement Motion (the "2/18/2010 Hrg. Trans.") at 7-8. A copy of the 2/18/2010 Hrg. Trans. is attached as Exhibit G to the Chaitman Decl.

financing of Madoff's scheme or the Levy children's outstanding $2 billion margin loan with BLMIS.

33.    After this Court's approval of the Levy Settlement Motion, explosive information indicative of Norman Levy's active participation in Madoff's fraud was revealed as a result of a written question to Stephen Harbeck, the President of SIPC, from Congressman Scott Garrett.  In his written response, Mr. Harbeck disclosed two facts that the Trustee had concealed, *i.e.,* that Norman Levy financed Madoff's scheme during the period from 1992 through 2001 in an amount exceeding $100 billion and that the Levy children[13] had a $2 billion margin loan outstanding with BLMIS as of December 11, 2008.[14]

34.    While the $100 billion in financing was not sufficiently notable, in the Trustee's view, to be disclosed to the Court and the customers when the Trustee sought approval of the settlement with the Levy children, he did use that fact in order to establish liability of JP Morgan Chase for aiding and abetting Madoff's fraud.[15]  The Trustee has provided no explanation for his unconscionable breach of his statutory obligations to disclose material information[16] even though he admits that he knew of the $100 billion in financing and the $2 billion margin loan at the time he sought approval of the settlement with the Levy Heirs.[17]

---

[13] 1/24/2011 Harbeck Letter at 14-15.

[14] 1/24/2011 Harbeck Letter at 10, fn. 3; *see also* fn. 10 *infra.*

[15] *See* Second Redacted Chase Compl. at ¶¶223-249.

[16] *See* Movants' Reply Brief in Further Support of Motion to Set Aside the Order Approving the Trustee's Settlement with the Levy Heirs for Failure to Disclose Material Information (the "Vacate Motion Reply"), Doc. #3960, Case No. 08-01789, at 5-6.

[17] *See* Trustee's Opposition to Customers' Motion to Set Aside the Order Approving Trustee's Settlement with the Levy Heirs for Failure to Disclosure Material Information (the "Vacate Motion Opp."), Doc. # 3942, Case No. 08-01789, at 7.

35.    Finally, the Trustee settled with Carl Shapiro and his family, including Shapiro's

son-in-law, Robert Jaffee, who fed hundreds of investors to Madoff, for the relatively paltry sum

of $550 million[18] despite the receipt by Shapiro and his family of over $1 billion in fictitious

profits just during the six-year period preceding the liquidation.[19]

### 4.    The Trustee Has Violated Federal Law by Unreasonably Delaying Payments to Customers of SIPC Insurance and from the Fund of Customer Property

36.    After 2 ½ years and the payment of over $300 million in professional fees, the

Trustee is now making a paltry first distribution to customers in the total amount of $2.3 billion.

*See* Interim Distribution Motion at ¶7.  While the Trustee is a master of laying the blame for his

own pathetic performance on others, the fact is that, solely as a result of the Trustee's wrongful

conduct, he has unconscionably delayed payments to injured customers.

37.    Congress made absolutely clear its intent to minimize the devastation to

customers of an insolvent broker/dealer through prompt payments of SIPC insurance.  SIPA

requires that SIPC **promptly** pay SIPC insurance to investors of liquidated brokerage firm.  *See*

SIPA U.S.C. § 78fff(a)(1)(B) (recognizing that the purpose of the liquidation proceeding is to "as

promptly as possible satisfy net equity claims of customers"); *see also* SIPA §78fff-4(c) ("SIPC

shall **promptly** satisfy all obligations of the member to each of its customers relating to, or net

equity claims based upon, securities or cash by the delivery of securities or the effecting of

payments to such customer.") (emphasis added); SIPA § 78fff-3(a) ("In order to provide for

prompt payment and satisfaction of net equity claims of customers of the debtor, SIPC shall

advance to the trustee such moneys . . . as may be required to pay or otherwise satisfy claims");

---

[18] Motion For Entry Of Order Pursuant To Section 105(A) Of The Bankruptcy Code And Rules 2002 And 9019 Of The Federal Rules Of Bankruptcy Procedure Approving An Agreement By And Between The Trustee And The Shapiro Family, Doc. #3320, Case No. 08-01789, at 1.

[19] *Id.* at ¶8.

SIPA § 78fff-2(b) ("**[T]he trustee shall promptly discharge**" all obligations relating to net equity claims.") (emphasis added).

38.     Despite this clear statutory mandate, the Trustee unconscionably delayed in paying SIPC insurance even in the reduced amounts he allowed to the small number of claimants whose claims he recognized.  Many victims waited a full year or more before receiving any SIPC insurance.

39.     On January 9, 2009 – less than three weeks after the Trustee's appointment, Stephen Harbeck, the President of SIPC, met with SEC Commissioner Mary Shapiro, and obtained her consent to change the definition of "net equity" from what SIPA requires and from what SIPC enforced for 39 years.  http://www.youtube.com/watch?v=gyywi9zp0qc.

40.     Clearly, this decision was unprecedented in SIPC's history and required judicial approval because it saved SIPC approximately $1.5 billion and deprived Madoff's victims of that amount of money in SIPC insurance.  If the Trustee had been acting honestly and in good faith, he would have immediately sought court approval of SIPC's interpretation of "net equity." Instead, the Trustee did nothing.

41.     Two different law firms representing investors sought to put the issue before the court in the spring of 2009. Both attempts were vigorously opposed by the Trustee and the Court acceded to the Trustee's view.  *See, e.g.,* Letter of David Sheehan dated July 13, 2009, Doc. #10, Adv. Pro. No. 09-1272.

42.     Finally, in order to resolve one suit filed by three investors, in October 2009, the Trustee agreed to a briefing schedule for the "net equity" issue, pursuant to which the issue was

not argued until February 2, 2010.[20]   In fact, the Trustee opposed[21] all requests by customers'

counsel to shorten the briefing schedule proposed by the Trustee.[22]

43.     Although this Court issued its decision on the "net equity" issue promptly after

the oral argument and certified the appeal directly to the Second Circuit, the argument before the

Second Circuit did not take place until March 3, 2011 and no decision has yet been handed

down.

44.     Thus, the Trustee's unilateral refusal to promptly litigate the "net equity" issue

has caused a delay in determining the threshold issue in this case, *i.e.*, who is entitled to SIPC

insurance and to distributions from the fund of customer property.

## 5.     In Breach of His Fiduciary Duty to Customers, the Trustee Sought to Protect Picower's Family from the Consequences of Picower's Crimes, Thereby Forcing Another Delay in Distribution of the Fund of Customer Property

45.     On December 17, 2010, the Trustee announced that the Picower Defendants (the

"Picower Parties") had settled with him and with the United States by irrevocably forfeiting $7.2

billion of which $5.5 billion would be allocated to settlement of the Trustee's lawsuit (the

"Picower Settlement").   On the same day, the Trustee filed his motion for approval of the

Picower Settlement (the "Picower Settlement Motion," Doc. #25, Adv. Pro. No. 09-01197).   In

the Picower Settlement Motion, the Trustee sought an injunction that would expressly bar not

only claims that "belong to" the Trustee, but also claims that had been asserted by Madoff

victims whose claims the Trustee does not recognize.   In other words, even though it would not

---

[20] *See gen.*, Motion to Authorize /Motion For an Order to Schedule Hearing on "Net Equity" Issue, Doc. #395, Case No. 08-01789, at ¶13.

[21] Response to Motion /Trustee's Response to Objections to Motion of Trustee For an Order To Schedule Hearing on "Net Equity" Issue, Doc. #412, Case No. 08-01789, at ¶10.

[22] *See* e.g., Response to Motion for Order Scheduling Hearing on "Net Equity" Issue filed by Carole Neville on behalf of Sonnenschein Investors, Doc. #406, Case No. 08-01789, at ¶3.

take $1 away from the fund of customer property, the Trustee was seeking to shield the Picower

Parties from liability to other Madoff victims.

46.    The entry of the injunction was not a condition of the settlement.  Indeed,

approval of the Picower Settlement by the bankruptcy court was not even a condition of the

Picower Settlement.  The Picower Settlement Agreement provides that all of the provisions

therein, "including the [mutual releases] contained in paragraphs 3 and 4 , shall become binding

and remain effective and binding on the parties, and shall remain in full force and effect, **even if**

**no Final 9019 Order ever is entered."**  Picower Settlement Agreement, Ex. A, Picower

Settlement Motion, at ¶6 (emphasis added).  The Picower Settlement Agreement simply

obligated the Trustee to use his "best efforts to obtain the Permanent Injunction," not actually

obtain one.  *Id*. at ¶7.  Nevertheless, the Trustee sought, and the bankruptcy court granted, an

injunction against any lawsuits by Madoff victims against the Picower Parties.

47.    The Trustee knew that counsel for these other Madoff victims would vigorously

oppose any such order and he also knew that, if the order was entered by this Court, counsel for

these other Madoff victims would have no alternative but to appeal the order.  Yet, he agreed,

gratuitously with the Picower Parties, that none of the forfeited funds would be distributed until a

final, non-appealable order approving the Picower Settlement was entered.

48.    The Trustee could have dropped the demand for the injunction entirely.  Indeed, it

was unseemly for him to use his office to shield a criminal like Picower from liability to his

victims.  Or he could have asked the bankruptcy court to enter two orders:  one approving the

Picower Settlement and the other enjoining any litigation against the Picower Parties.  Instead, he

specifically asked that one order be entered.  Of course, counsel for the Madoff victims had to

appeal the injunction.

49.     This caused a delay – created solely by the Trustee – in the distribution of the

$7.2 billion of forfeited funds, as part of the fund of customer property.  This is a delay for which

the Trustee bears sole and absolute responsibility.  Yet he casts the blame on the Madoff victims

whose claims he does not recognize.

**6.      The Trustee and B&H Have Charged Excessive Fees and Expenses**

50.     The exhibits submitted in support of the Sixth Fee Application illustrate that there

is gross inefficiency by the Trustee and his counsel with respect to the services rendered and, at

times, that their services are a complete waste of time and resources.

### A.      THE FEES AND EXPENSES SUBSTANTIALLY EXCEED THOSE OF THE TRUSTEE IN THE LEHMAN BROTHERS INC. SIPA LIQUIDATION

51.     Lehman Brothers Inc. ("LBI") is in a SIPA liquidation in the Southern District of

New York.  It is "'by far the largest and most complex securities broker-dealer liquidation ever

attempted."[23]  James Giddens is Trustee and Hughes, Hubbard & Reed LLP ("HHR") is the

trustee's counsel. "[T]he SIPA [p]roceeding has involved the administration or transfer of well

over $110 billion of cash and securities."  *Id.* Within a year, the LBI Trustee has effectuated the

transfer of over 110,000 customer accounts involving customer property with a value in excess

of $92.3 billion.  *Id.*  Yet, remarkably, the Trustee and B&H have managed to run up fees and

expenses vastly exceeding the administrative expenses in the Lehman case:  B&H's

compensation for a **21-month period** exceeds the Lehman Trustee's fees and legal expenses of

HHR for a **24-month period** by $30,006,029.60:

---

[23] Trustee's Preliminary Investigation Report And Recommendations (the "LBI Investigative Report"), Doc. # 3604, Case No.08-01420, at ¶22 (citing Memorandum Decision Granting Motion of DCP Parties for Leave to Conduct 2004 Discovery, at 4 (LBI Docket No. 353)).

| LBI LIQUIDATION | | MADOFF LIQUIDATION | |
|---|---|---|---|
| Interim Period | HHR & trustee Awarded Compensation | Interim Period | B&H & Trustee Awarded Compensation |
| 9/13/08-1/31/09 | $14,255.186.91 | 12/15/08-4/30/09 | $15,421,548.58 |
| 2/1/09-5/31/09 | $15,185,697.98 | 5/1/09-9/30/09 | $22,114,706.85 |
| 6/1/09-9/30/09 | $24,754,288.10 | 10/1/09-1/31/10 | $24,555,676.50 |
| 10/1/09-1/31/10 | $23,948,533.80 | 2/1/10-5/31/10 | $34,582,736.70 |
| 2/1/10-5/31/10 | $22,782,301.85 | 6/1/10-9/30/10 | $39,207,135.60 |
| 6/1/10-9/30/10 | $19,204,952.90 | | |
| **Totals: 24 months** | **$105,875,774.63** | **21 months** | **$135,881,804.23** |

52.    Similarly, the expenses incurred by B&H exceed those incurred by HHR by

nearly a million dollars:

| LBI LIQUIDATION | | MADOFF LIQUIDATION | |
|---|---|---|---|
| Interim Period | HHR Awarded Expenses | Interim Period | B&H Awarded Expenses |
| 9/13/08-1/31/09 | $213,706.28 | 12/15/08-4/30/09 | $274,203.03 |
| 2/1/09-5/31/09 | $132,764.74 | 5/1/09-9/30/09 | $280,681.62 |
| 6/1/09-9/30/09 | $253,544.54 | 10/1/09-1/31/10 | $390,204.89 |
| 10/1/09-1/31/10 | $354,344.87 | 2/1/10-5/31/10 | $731,371.19 |
| 2/1/10-5/31/10 | $403,977.87 | 6/1/10-9/30/10 | $851,331.34 |
| 6/1/10-9/30/10 | $284,450.53 | | |
| **Totals: 24 months** | **$1,642,788.83** | **21 months** | **$2,527,792.07** |

B.    B&H'S SERVICES ARE GROSSLY INEFFICIENT AND, AT TIMES, ARE A
COMPLETE WASTE OF MONEY

53.     Becker & Poliakff LLP is directly adverse to the Trustee in two matters where the Trustee sought to enjoin lawsuits commenced in other jurisdictions by Becker & Poliakoff's clients.  As to those two matters (summarized below), the Trustee seeks total compensation of $314,822.00 for 750 hours billed by B&H during the relevant four-month time period.

| Task/Matter | Task/Matter Name | Hours | Amount |
|---|---|---|---|
| 22 | Fox & Marshall ("Fox") | 733.80 | $308,332.00 |
| 23 | Canavan, Goldsmith, and Kalman ("Canavan") | 16.20 | $6,490.00 |
|  | **TOTAL** |  | **$314,822.00** |

(Ex. E., Sixth Fee App.)

54.     In the Canavan matter, B&H is seeking $6,490.00 for 16.20 hours spent preparing and filing of a Notice of Adjournment of Pre-Trial Conference and an Affidavit of Service. These are tasks that can be performed by a paralegal using an established form and simply inserting a few pieces of new information.  It is inconceivable that it could take more than 60 minutes for a paralegal to prepare both of these documents.  For B&H to bill $6,490.00 for this work is incredible.  While this is a small sum in the context of the enormity of the sums sought in the Sixth Fee Application, it probably accurately reflects the gross over-billing of the Trustee's counsel generally.

55.     B&H bolsters its claim for $6,490 by indicating that additional tasks in ¶ 49 were performed.  However, the tasks outlined in ¶ 49 simply cannot apply to the Canavan matter during this interim period.  A copy of the ECF docket for the Canavan matter is attached as Exhibit H to Chaitman Decl.

56.     The Trustee is also adverse to Becker & Poliakoff and co-counsel's clients in the Fox matter for which it billed $308,332 for 733.8 hours spent allegedly drafting letters to the

Court, submitting a 57-page appellee brief, submitting counter-designations of the record on

appeal, and reviewing submissions from adverse parties. *See* Fifth Interim Rept. ¶129.

57.       It is evident from the ECF docket[24] in the Fox case that the only substantive

activity during this interim period that warranted more than several hours of work was the

appellee brief.   B&H submitted a 57-page brief that listed **seven** B&H attorneys who worked on

it. Even a 57-page brief, however, is not worth over $300,000, particularly when all of the issues

had previously been briefed.   These two examples[25], of which Objectors' counsel have personal

knowledge, indicate that there is, at best, gross inefficiency by the Trustee and his counsel with

respect to the services rendered in this case.   This Court should approve reasonable fees, not

exorbitant ones, especially when those fees raise significant risk that they will bankrupt SIPC.

58.       Aside from the evidence of gouging, the Trustee and his counsel have wasted

millions of dollars asserting claims that are frivolous.   As two different judges in the district

court have held, the Trustee lacks standing to assert claims for aiding and abetting as assignee of

the customers.   Yet B&H has billed the following amounts for preparing its aiding and abetting

claims, just in the four-month period covered by the Sixth Fee Application:

| Task/Matter | Task/Matter Name | Hours | Amount |
|---|---|---|---|
| 27 | JPMorgan Chase | 1,971.30 | $632,244.00 |
| 30 | HSBC | 6,232.80 | $2,632,456.00 |
| 32 | UBS | 1,415.40 | $658,027.50 |
| 34 | Citibank | 383.10 | $164,499.50 |
| 40 | Medici Enterprises | 573.90 | $265,327.50 |
| **TOTAL:** | | **10,576.50** | **$4,352,554.50** |

[24] A copy of the ECF docket in the Fox case is attached as Exhibit I to the Chaitman Decl.

[25]   Objectors also offered proof of B&H's gross over-billing in the Canavan and Fox matters in their objections to
the Trustee's and B&H's Fifth Fee Applications. *See* Objection to Trustee's & B&H's Fifth Fee Applications, Doc.
# 3308, Case No. 08-01789, at ¶¶11-18.

(Ex. E, Sixth Fee App.)

59.     In a recent decision, Judge Rakoff raised doubt about the Trustee's standing to bring various state law claims against third parties on behalf of BLMIS customers.  *See gen.*, *Picard v. HSBC Bank PLC*, 2011 WL 1544494.  As to the Trustee's first theory of standing as a successor of a joint tortfeasor, Judge Rakoff recognized that the Trustee's standing "may well be precluded by the so-called "Wagoner" doctrine . . . ." *Id.* at * 7.  He further doubted the Trustee's ability to rely on *Redington v. Touche Ross & Co.*, 592 F.2d 617 (2d Cir. 1978), in support of his alleged  standing to assert common law claims as a subrogee of SIPC's rights and as a bailee of customer property.  *Id.* at *7-11.  He noted that "there are reasons to believe that the precedential force of *Redington* has been weakened, *perhaps fatally* . . . ." *Id.* at *8 (emphasis added).  As to the Trustee's assignee status as the basis for standing, Judge Rakoff noted that "at least four courts have concluded that SIPA only permits assignments of customers' net equity claims and not claims against third parties. *Id.* at *11.

60.     Similarly, on May 23, 2011, Judge McMahon issued a decision in *Picard v. JPMorgan Chase & Co.*, *et. al.*, Doc. #30, Case No. 11-00913, questioning the Trustee's standing to bring aiding and abetting claims on behalf of BLMIS customers (the "McMahon Order").  Agreeing with Judge Rakoff, Judge McMahon acknowledged that recent United States Supreme Court decisions "cast doubt . . . on the Trustee's basis for standing, either as bailee of customer property or as a subrogee of SIPC's subrogation rights." *Id.* at 11-12 (citing *Picard v. HSBC Bank PLC*, 2011 WL 1544494, at **3-4 (S.D.N.Y. April 25, 2011)).  Judge McMahon cited cases holding that SIPA only permits assignments of customers' net equity claims and expressed doubt about the Trustee's ability to bring suits against "parties other than the liquidated estate as an assignee of the estate." *Id.* at 12.

61.     Therefore, B&H's request for $4,352,554.50 in fees for supposedly over 10,000 hours of work spent on claims that the Trustee almost certainly has no standing to pursue is wasteful and unconscionable.

**C.      B&H Appears to be Charging Excessively High Rates and Charging An Impermissible Mark-Up on Temporary Attorneys**

62.     B&H is charging a blended rate of $350.67 for 13 attorneys who are not admitted to practice law.  They are charging a blended rate of $308.49 for two attorneys who were admitted in 2011 and $307.98 for 22 attorneys admitted in 2010.  The following chart summarizes the blended rates of the attorneys and represents gross over-charging by any standard.

| Year Admitted (# of attorneys) | Blended Hourly Billing Rate |
|---|---|
| 1984 (1) | $496.86 |
| 1988 (1) | $300.00 |
| 1994 (2) | $312.87 |
| 1997 (1) | $300.04 |
| 1998 (2) | $383.47 |
| 2000 (2) | $389.18 |
| 2001 (3) | $509.03 |
| 2002 (2) | $486.10 |
| 2003 (6) | $481.34 |
| 2004 (14) | $353.14 |
| 2005 (18) | $338.73 |
| 2006 (17) | $350.89 |
| 2007 (26) | $347.34 |
| 2008 (28) | $321.66 |
| 2009 (27) | $309.46 |
| 2010 (22) | $307.98 |
| 2011 (2) | $308.49 |
| Not admitted (13) | $350.67 |

(Ex. D, Sixth Fee App.)

63.     In addition, B&H is passing onto SIPC the cost for clerks, library staff, and other

non-legal staff with a blended rate of $250 an hour! *See* Ex. D, Sixth Fee App.  It appears that

B&H has simply passed onto SIPC the entire overhead of the firm without any disclosure of

how much it pays someone like a library clerk, whose time is billed out at $250 an hour.

64.     If B&H has employed any temporary attorneys, it is required to disclose the actual

cost to the firm and any markups it is charging.  *See In re Worldwide Direct, Inc.*, 316 B.R. 637

(Bankr. D. Del. 2004) (disallowing any amounts billed to the estate for more than firm paid for

the services of temporary lawyers and paralegals).

65.     Forty-two of the approximately 278 B&H attorneys listed on the Sixth Fee

Application were not listed on the firm's website as of the second week in May, even though the

application period is through 1/31/11.   Therefore, it appears that B&H is employing temporary

attorneys without disclosing the actual cost to the firm of these attorneys.

66.     In light of strong evidence suggesting impropriety and lack of professionalism

with respect to B&H's billing, Objectors propose that Stuart Maue be appointed as a Fee

Auditor to assist the Court in analyzing all of the B&H fee applications to assure that they

comply with the high standards of this Circuit.  *See* the Affidavit of John L. Decker in Support

of Order Authorizing the Appointment and Employment of Stuart Maue as Fee Auditor filed

simultaneously herewith.

## **CONCLUSION**

The failure of the Trustee and B&H to comply with applicable federal and state law

compels the denial of any compensation to them and raises serious questions about their

disinterestedness.

For the foregoing reasons, the Sixth Fee Application should be denied in its entirety.  The

Court should order the Trustee and his counsel to file with the Court the detailed billing reports

from December 11, 2008 to date so that the Court, Mr. Maue, and all interested parties can

properly evaluate the reasonableness of compensation, and the disinterestedness of the Trustee

and B&H, consistent with the well-established authorities governing professionals in this Circuit.


May 25, 2011                                BECKER & POLIAKOFF LLP


                                           By: /s/ Helen Davis Chaitman
                                           45 Broadway
                                           New York, NY 10006
                                           (212) 599-3322
                                           *Attorneys for Marsha Peshkin and over 800
                                           other Customers of Bernard L. Madoff
                                           Investment Securities LLC as Listed on Exhibit
                                           A*