# EXHIBIT C



## U.S. Securities and Exchange Commission

# Office of Inspector General

### Office of Audits

# SEC's Oversight of the Securities Investor Protection Corporation's Activities



March 30, 2011
Report No. 495



OFFICE OF
INSPECTOR GENERAL

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# MEMORANDUM

March 30, 2011

| | |
|---|---|
| **To:** | Robert W. Cook, Director, Division of Trading and Markets |
| | Carlo V. di Florio, Director, Office of Compliance Inspections and Examinations |
| | Mark D. Cahn, General Counsel, Office of the General Counsel |
| **From:** | H. David Kotz, Inspector General, Office of Inspector General (OIG) |
| **Subject:** | *SEC's Oversight of the Securities Investor Protection Corporation's Activities,* Report No. 495 |

This memorandum transmits the U.S. Securities and Exchange Commission OIG's final report detailing the results on our audit of the SEC's oversight of the Securities Investor Protection Corporation's activities. This audit was conducted as part of our continuous effort to assess management of the Commission's programs and operations and as part of our annual audit plan.

The final report contains 12 recommendations which if fully implemented will enhance the SEC's monitoring of the Securities Investor Protection Corporation's activities. The respective offices concurred with all the report's recommendations. Your written responses to the draft report are included in Appendix V.

Within the next 45 days, please provide the OIG with a written corrective action plan that is designed to address the recommendations. The corrective action plan should include information such as the responsible official/point of contact, timeframes for completing required actions, and milestones identifying how you will address the recommendations.

Should you have any questions regarding this report, please do not hesitate to contact me.  We appreciate the courtesy and cooperation that you and your staff extended to our auditor during this audit.

Attachment

cc:    Kayla J. Gillan, Deputy Chief of Staff, Office of the Chairman
       Luis A. Aguilar, Commissioner
       Troy A. Paredes, Commissioner
       Elisse B. Walter, Commissioner
       Diego T. Ruiz, Executive Director, Office of the Executive Director
       Lori J. Schock, Director, Office of Investor Education and Advocacy
       Jacob H. Stillman, Solicitor, Office of the General Counsel
       John S. Polise, Associate Director, Office of Compliance Inspections and
         Examinations
       John H. Walsh, Associate Director and Chief Counsel, Office of
         Compliance Inspections and Examinations
       John M. Ramsay, Deputy Director, Division of Trading and Markets

---

# SEC's Oversight of the Securities Investor Protection Corporation's Activities

## Executive Summary

**Background.** As a result of the collapse or near collapse of several broker-dealers in the late 1960s,[1] Congress enacted the Securities Investor Protection Act (SIPA) in 1970 to provide investors protection against losses caused by the failure of broker-dealers. SIPA created the Securities Investor Protection Corporation (SIPC), which is a not-for-profit membership corporation.[2] SIPC or a SIPC employee either acts as trustee or works with an independent court-appointed trustee in liquidations of troubled brokerage firms to recover funds for investors with the assets of bankrupt or financially troubled brokerage firms.[3] All broker-dealers registered with the U.S. Securities and Exchange Commission (SEC or the Commission) under Section 15(b) of the Securities Exchange Act of 1934 are members of SIPC with certain limitations.[4] The Commission is responsible for monitoring the activities of SIPC. Pursuant to SIPA, the Commission also has delegated authority to conduct inspections of SIPC,[5] review SIPC annual reports,[6] and approve SIPC's bylaws,[7] rules,[8] and any amendments to the bylaws and rules.[9]

**Objectives.** The audit's objectives were to assess if SEC monitors SIPC's activities in accordance with governing legislation. In addition, our audit was performed to examine if the Commission performs periodic and systematic inspections of SIPC's activities. Our audit also focused on determining whether the Commission conducts meaningful reviews of SIPC's annual reports. The Office of Inspector General (OIG) also determined where improvements and best practices could be implemented for the SEC's oversight process of SIPC.

**Prior OIG Audit Report.** The OIG performed an audit of the SEC's oversight of SIPC in 2000[10] and made 11 recommendations in its report on that audit. The Division of Trading and Markets (TM),[11] the Office of Compliance Inspections and Examinations (OCIE), and the Office of Investor Education and Advocacy (OIEA)[12] implemented most of the prior OIG report's recommendations. However, TM has

---

[1] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 7.
[2] 15 U.S.C. §§ 78ccc(a)(1) and (2).
[3] http://www.sipc.org/media/release2.cfm. *See also* 15 U.S.C. § 78eee(b)(3).
[4] 15 U.S.C. § 78ccc(a)(2).
[5] 15 U.S.C. § 78ggg(c)(1).
[6] 15 U.S.C. § 78ggg(c)(2).
[7] 15 U.S.C. § 78ccc(e)(1).
[8] 15 U.S.C. § 78ccc(e)(2).
[9] 15 U.S.C. §§ 78ccc(e)(1) and (2).
[10] OIG Report No. 301, *Oversight of Securities Investor Protection Corporation* (Mar. 31, 2000).
[11] TM was known as the Division of Market Regulation in 2000.
[12] OIEA was known as the Office of Investor Education and Assistance in 2000.

not implemented the OIG's recommendation to inform SIPC that it should provide written documentation of its reasons for denying coverage in particular cases upon the request of TM and the Division of Enforcement.  TM stated that it provided a copy of the issued OIG audit report to SIPC.[13]  Additionally, TM and OCIE have not implemented the OIG's recommendation to decide on a review schedule and inspection scope for future inspections of SIPC as of this date.  See Finding 2 for further discussion.

Finally, TM, OCIE, and the SEC's New York Regional Office initially implemented the OIG's recommendation to conduct periodic briefings on SIPC-related issues.[14]  However, they currently communicate on an as-needed basis and no longer conduct periodic briefings because such briefings were deemed to be inefficient in years when there were no SIPC liquidations, such as 2007,[15] 2009,[16] and 2010.[17]

**Results.**  The OIG found that the SEC's oversight of SIPC is generally in compliance with SIPA.  However, our audit found that significant improvements could be made to enhance the process of the SEC's monitoring of SIPC.  We found that TM and the Office of the General Counsel (OGC) currently do not have adequate written procedures and policies for monitoring SIPC's activities.  The written procedures and policies in place for TM's oversight of SIPC are limited to a 1999 memorandum that merely lists the SEC's responsibilities for monitoring SIPC pursuant to SIPA.[18]  The 1999 memorandum does not provide detailed information about TM's internal procedures for oversight activities, such as how to process proposed bylaws or amendments that SIPC submitted or how reviews of SIPC's annual reports (including SIPC's financial statements) are to be performed.  In addition, we found that some of the limited information contained in the 1999 memorandum is outdated.

Our audit also found that there is inadequate documentation for the SEC's oversight role in OGC.  OGC provides legal guidance to TM related to SIPA liquidations and monitors SIPA proceedings that are handled by independent court-appointed trustees and SIPC.  Our audit revealed that internal policies or procedures regarding OGC's role relating to SIPC's oversight are not adequately documented.[19]  Moreover, during the timeframe in which we conducted our audit, there was a significant staff turnover in the OGC bankruptcy group, as the OGC

---

[13] SEC, memorandum to the OIG, *Information Request on Implementation of Prior OIG Recommendations*, Jan. 24, 2011.

[14] *Id.*

[15] According to SIPC's annual report for 2007. *See* http://www.sipc.org/pdf/SIPC_Annual_Report_2007_FINAL.pdf.

[16] According to SIPC's annual report for 2009. *See* http://www.sipc.org/pdf/2009%20Annual%20Report.pdf.

[17] According to the OIG's review of SIPC's website and inquiry with TM.

[18] TM memorandum, *The Commission's Oversight Role of the Securities Investor Protection Corporation ("SIPC")*, Jun. 24, 1999.

[19] OGC prepared a memorandum for the Commission related to entering notices of appearance in SIPA liquidations.  The memorandum briefly discusses OGC's monitoring of SIPA liquidations and reviewing fee applications.  However, the memorandum is limited to certain matters and does not list other responsibilities.

attorney who provided oversight of SIPC for a number of years retired and was replaced by another attorney. Due to the inadequate documentation of internal OGC procedures and policies, we found opposing opinions regarding how SIPC monitoring activities should be performed. For instance, the new OGC attorney questioned whether he should conduct certain monitoring efforts that the previous attorney believed were effective mechanisms for scrutinizing SIPA liquidations, stating his opinion that such efforts would be too time-consuming for large SIPA liquidations.

Our audit further found that the SEC does not inspect SIPC's activities in any systematic fashion. The SEC last performed a full inspection of SIPC in 2003 and a follow-up inspection in 2005. Despite having made six findings in its 2003 inspection, the SEC does not have any definite plans to inspect SIPC in the near future.

We found that the Government Accountability Office (GAO) performed an audit of SIPC in 1992, which included a review of the SEC's monitoring of SIPC.[20] In that audit, GAO found that since 1985 the SEC had evaluated SIPC's operations only one time and that the SEC had not followed up on the 1985 evaluation to determine if SIPC addressed its recommendations. GAO recommended that the SEC periodically review SIPC's operations and its efforts to ensure timely and cost-effective liquidations.[21] In response to this recommendation, TM agreed to inspect SIPC "every four to five years."[22] The OIG performed an audit of the SEC's oversight of SIPC's activities in March 2000. The OIG found that since SIPC's inception in 1970, the SEC had inspected SIPC only two times, once in 1985 and a second time in 1994. The OIG also identified several areas not addressed in past SIPC inspections that could improve oversight effectiveness and recommended that TM and OCIE decide on a review schedule and inspection scope for future SIPC inspections. In response to this recommendation, TM and OCIE agreed to prepare a review schedule and inspection scope for future SIPC inspections. Notwithstanding this agreement and this recommendation being closed, our inquiry with TM and OCIE regarding this matter revealed that TM and OCIE had never developed a review schedule or an inspection scope for future SIPC inspections.

In the SEC's 2003 inspection of SIPC, the SEC identified several deficiencies in SIPC's operations regarding its controls over fees, an improperly denied claim, internal policies and guidance, education initiatives, and funding options. Yet without additional inspections, the SEC is unable to ensure that these deficiencies have been appropriately addressed. The SEC has indicated that as a result of its involvement with the liquidations of Lehman Brothers, Inc. (Lehman) and Bernard L. Madoff Investment Securities, LLC (Madoff), it is not

---

[20] GAO, *Securities Investor Protection: The Regulatory Framework Has Minimized SIPC's Losses*, GAO/GGD-92-109 (Sept. 28, 1992).

[21] *Id.* at 62.

[22] OIG Report No. 301, *Oversight of Securities Investor Protection Corporation* (Mar. 31, 2000), p. 5.

necessary to conduct further inspections in the near future. Due to the lack of periodic and systematic inspections of SIPC by the SEC, 14 liquidations,[23] from 2003 to date, have not been subject to the scrutiny of an SEC inspection.[24]

The audit also found that the SEC does not perform a review of trustee fees on a systematic basis. We further found that such reviews are particularly necessary because of the statutory structure in place regarding trustee fees, which provides for few, if any, limits on the fees that may be awarded. First, although SIPA liquidations are similar to ordinary bankruptcy cases, it does not provide any limit on the amount of trustee fees in SIPA liquidations, unlike bankruptcy cases. Second, under SIPA, where payments are made out of the SIPC fund, courts have no discretion whatsoever to limit fees that SIPC has recommended for trustees or their counsel. Thus, even if a court finds the amount of fees awarded to the trustee to be excessive, it is required to approve such excessive fees if SIPC determines that the fees are reasonable. We found that in one case, a Southern District of New York bankruptcy judge deemed fees to be awarded to the trustee in a liquidation to be excessive, but found that he had no choice but to approve the fees.[25] In another instance, a 1974 case decided prior to the amendment of SIPA in 1978,[26] a court refused to allow SIPC to pay what it deemed excessive trustee fees. In this case, a Southern District of New York judge stated, "[We] simply cannot and will not blindly acquiesce—as SIPC apparently has done—in assessing the fees requested against the trust fund administered by SIPC. This case points up the probable need for legislative readjustment of the SIPA and the functions of its administrators."[27] The Southern District of New York judge further stated that, "To be sure, the Trustee and his counsel were additionally faced with somewhat unenviable task of uncovering Charisma's assets—which here totaled less than $15."[28] Third, even where SIPC advances the funds and there is reasonable expectation of recoupment, the statute provides the courts with only limited discretion.

In addition, we found that significant criticism and concern have been expressed about the amount of trustee fees awarded in the two largest liquidations in SIPC's history, Lehman and Madoff. According to the latest published report, the fees paid to the trustee and his counsels processing the Lehman claims for the period from September 2008 to September 2010 (24 months) totaled

---

[23] According to the OIG's comparison of the liquidations reviewed by the SEC based on OCIE's inspection records and the liquidations initiated in 2003 and 2004, as noted in SIPC's annual reports for 2003 and 2004. *See* http://www.sipc.org/who/annual.cfm for SIPC's 2003 and 2004 annual reports.

[24] OGC stated that the predecessor attorney monitored the 14 liquidations to ensure that they were processed timely. The OIG was unable to verify whether such monitoring occurred because there was no evidence of review.

[25] *See In re First State Securities Corp.*, 48 B.R. 45 (Bankr. S.D. Fla. 1985).

[26] TM stated that, "The Court had discretion to reject fees when this case was decided. Congress overruled this case when it amended the SIPA in 1978. This case was relied upon by Congress to mandate that recommendations by SIPC would be binding on the court in 'no-assets cases' unless it results in a controversy with the applicant."

[27] *Securities Investor Protection Corp. v. Charisma Sec. Corp.*, 371 F. Supp. 894, 899 (S.D.N.Y. 1974), *aff'd*, 506 F.2d 1191 (2d Cir. 1974).

[28] *Id.*

approximately $108 million.[29]  According to the fourth interim fee application, as of September 30, 2010, the entire administrative fees, including fees for accountants, consultants, etc., totaled approximately $420 million.[30]  We also found that the fees paid to the trustee and his counsels processing the Madoff claims for the period from December 2008 to September 2010 (21 months) totaled approximately $102 million.[31]  The OIG's review of the trustee fee chart that SIPC prepared revealed that the hourly rate for trustees assigned to the Madoff case ranged from $698 to $742.  For the Lehman liquidation, SIPC's trustee fee chart combined both the trustee's and the counsels' time, and the hourly rate ranged from $437 to $527.  Moreover, the fees paid to date for both the Lehman and Madoff liquidations are a mere fraction of the amounts that will eventually be sought because while there has been significant progress with respect to resolving certain customer claims, significant work relating to customer claims with pending litigation remains to be done.  Because the outcome of the Lehman liquidation is uncertain and SIPC is advancing its own funds to pay the administrative expenses for the Madoff liquidation, the possibility exists that SIPC could deplete its $2.5 billion fund.  If the SIPC fund is or reasonably appears to be insufficient, the SEC is authorized to make loans to SIPC by issuing the Secretary of the Treasury notes or other obligations in an aggregate amount not to exceed $2.5 billion.[32]

Finally, our audit disclosed that many investors are still confused about SIPA coverage.  As indicated by TM and evidenced by OIEA's log of complaints and questions regarding SIPC from investors, it is difficult for investors to understand protection against losses available under SIPA and which securities are covered under SIPA.  We found that certain public service campaigns by SIPC do not fully describe exceptions to SIPA coverage and are misleading.  Due to various factors that determine coverage under SIPA, it is difficult to explain limitations of SIPA and inform investors.  In addition, many investors do not know about SIPA until they become aware of the failure of their broker-dealer.

**Summary of Recommendations**.  Our audit determined that several improvements in the SEC's monitoring of SIPC's processes are needed to ensure proper oversight of SIPC by the SEC pursuant to SIPA.

Specifically, we recommend the following:

(1) TM should document its procedures and processes for its oversight and monitoring of SIPC pursuant to SIPA.

---

[29] "Trustee's Fourth Interim Report for the Period May 11, 2010 Through October 26, 2010," Exhibit 2, last accessed Mar. 26, 2011, http://dm.epiq11.com/LBI/Project/default.aspx#.  *Go to* Public Reports/Trustee's Interim Reports to the Court/Trustee's Fourth Interim Report: October 26, 2010.

[30] *Id.*

[31] "Trustee's Fourth Interim Report for the Period Ending September 30, 2010," last accessed Mar. 1, 2011, http://www.madofftrustee.com/documents/FourthInterimReport.pdf. *See* "Cash Disbursement" chart located in the back of the Madoff trustee's Fourth Interim Report.

[32] 15 U.S.C. §§ 78ddd(g) and (h).

(2) TM should complete its efforts to update its internal memorandum which describes its oversight responsibilities under SIPA and include its current practices and, where appropriate, the legislative amendments that were made to SIPA in July 2010 by the Dodd-Frank Wall Street Reform and Consumer Protection Act.

(3) OGC should consult with TM to clarify its role in monitoring SIPC and document the responsibilities and procedures it follows in regard to the Commission's oversight of SIPC.

(4) OGC should consider the costs and benefits related to certain activities that the retired attorney performed and determine what, if any, other activities are appropriate to adequately monitor SIPC.

(5) TM and OCIE should conduct meetings, on at least an annual basis, to determine when an inspection of SIPC should occur, based on the ongoing liquidations, to ensure systematic and risk based monitoring of SIPC's operations.  In these meetings, TM and OCIE should develop a schedule for future inspections based upon objective criteria or defined risk-factors, such as conducting inspections based upon the number of SIPC liquidations.

(6) TM and OCIE should perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to the next inspection of SIPC, as they did prior to the commencement of the 2003 inspection of SIPC.  The scope of each future inspection should take into consideration the risk assessment conducted prior to the inspection.

(7) TM, in coordination with OGC, should conduct additional oversight of SIPC's assessments of the reasonableness of trustee fees and encourage SIPC to negotiate with outside court-appointed trustees more vigorously to obtain a reduction in fees greater than 10 percent.

(8) The bankruptcy group in OGC and TM should decide on the scope and frequency of the Commission staff's monitoring of SIPC's assessments of the reasonableness of trustee fees paid by SIPC, rather than relying only on inspections of SIPC, which do not occur on a systematic basis.

(9) TM, in consultation with the Commission, shall determine whether to request that Congress modify SIPA to allow bankruptcy judges who preside over SIPA liquidations to assess the reasonableness of administrative fees in all cases where administrative fees are paid by SIPC.

(10)  TM, in coordination with OIEA, should encourage SIPC to designate an employee whose responsibilities include improving investor education and preventing further confusion among investors about coverage available under SIPA.

(11)  TM should support SIPC's efforts to improve investor education, including encouraging SIPC to strongly consider and, as appropriate, implement OIEA's suggestions to improve investor awareness.

(12)  TM, in coordination with OIEA and in consultation with the Commission, should utilize more effective methods to communicate with investors in case of the failure of broker-dealers, such as notifying investors of the status of the Commission's efforts throughout the liquidation process or designating an employee, as appropriate, who can communicate directly with investors on matters unique to each liquidation case.

A detailed list of our recommendations can be found in Appendix IV.

# TABLE OF CONTENTS

Executive Summary ............................................................................................... iv

Table of Contents ................................................................................................ xi

**Background and Objectives** ............................................................................. 1
   Background ...................................................................................................... 1
   Objectives ........................................................................................................ 6

**Findings and Recommendations** ...................................................................... 7
   Finding 1:  TM and OGC Do Not Maintain Adequate Written Procedures
   and Policies for Oversight of SIPC ..................................................................... 7
                    Recommendation 1 .................................................................... 9
                    Recommendation 2 .................................................................... 9
                    Recommendation 3 .................................................................... 9
                    Recommendation 4 .................................................................. 10

   Finding 2: TM and OCIE Do Not Inspect SIPC's Activities in a Systematic
   Fashion ........................................................................................................... 10
                    Recommendation 5 .................................................................. 16
                    Recommendation 6 .................................................................. 16

   Finding 3: The SEC Does Not Review Fees SIPC Pays to Court-
   Appointed Trustees on a Periodic or Systematic Basis .................................... 17
                    Recommendation 7 .................................................................. 26
                    Recommendation 8 .................................................................. 27
                    Recommendation 9 .................................................................. 27

   Finding 4: SIPA Investor Education Coverage Still Needs Improvement ......... 28
                    Recommendation 10 ................................................................ 31
                    Recommendation 11 ................................................................ 31
                    Recommendation 12 ................................................................ 32

**Appendices**
   Appendix I:  Acronyms/Abbreviations ............................................................... 33
   Appendix II: Scope and Methodology ................................................................ 34
   Appendix III: Criteria ....................................................................................... 36
   Appendix IV: List of Recommendations ............................................................ 37
   Appendix V: Management's Comments ............................................................. 40
   Appendix VI: OIG Response to Management's Comments ................................. 48

# Background and Objectives

## Background

In 1970, several prominent broker-dealers, including Walston & Co., Bache & Co., McDonnell & Co., and F.I. duPont, Glore Forgan & Co.,[33] became insolvent or experienced near collapse.  From August 1970 to December 1970, three members or former members of the New York Stock Exchange were forced to go into bankruptcy or to commence liquidation proceedings.[34]  On December 30, 1970, Congress created the Securities Investor Protection Corporation (SIPC) to provide protection against losses to customers from the failure of a securities firm under the Securities Investor Protection Act (SIPA).[35]  SIPA was created to establish a substantial reserve fund that would provide protection to customers of broker-dealers and to reinforce investors' confidence in the securities industry.[36]

**Organizational Structure of SIPC.** SIPC is a not-for-profit membership organization[37] that does not regulate its members or examine their financial condition.[38]  All broker-dealers registered with the U.S. Securities and Exchange Commission (SEC or the Commission) under Section 15(b) of the Securities Exchange Act of 1934, are members of SIPC, with the following exceptions:

(i) Persons whose principal business, in the determination of SIPC, taking into account business of affiliated entities, is conducted outside the United States and its territories and possessions;

(ii) Persons whose business as a broker or dealer consists exclusively of (I) the distribution of shares of registered open end investment companies or unit investment trusts, (II) the sale of variable annuities, (III) the business of insurance, or (IV) the business of rendering investment advisory services to one or more registered investment companies or insurance company separate accounts; and

(iii) Persons who are registered as a broker or dealer pursuant to section 78o(b)(11)(A) of this title.[39]

SIPC has a board consisting of seven directors who determine policies that govern its operations.[40]  SIPC's board of directors is made up of five directors who are appointed by the President of the United States and subject to the U.S.

---

[33] SEC, *Unsafe and Unsound Practices of Brokers and Dealers* (Dec. 1971), pp. 63-65.
[34] H.R. Rep. No. 91-1613 (1970).
[35] *Id.*
[36] *Id.*
[37] 15 U.S.C. §§ 78ccc(a)(1) and (2).
[38] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 7.
[39] 15 U.S.C. § 78ccc(a)(2)(A).
[40] 15 U.S.C. § 78ccc(c)(1).

Senate's approval.[41]  Three of the five directors represent the securities industry and two are from the general public.[42]  One of the five directors is appointed by the Secretary of the Treasury and another director is appointed by the Federal Reserve Board.[43]  The Chairman and the Vice Chairman of SIPC's board of directors are appointed by the President from the public directors.[44]

**SIPC's Role.**  Pursuant to SIPA, SIPC or a SIPC employee either acts as a trustee or works with an independent court-appointed trustee in liquidations of troubled brokerage firms to recover funds for investors with assets held by bankrupt or financially troubled brokerage firms.[45]  The customers of a failed brokerage firm may receive all non-negotiable securities that are already registered in their name or negotiable securities that are in the process of being registered in their name.[46]  SIPA protects the custody function that brokerage firms perform for customers; however, it does not provide protection against a decline in value of any investment, even if the SIPC member defrauded the customer into purchasing the investment.[47]

**SIPC Fund.**  SIPC maintains a fund that consists of assessments paid by SIPC members[48] and interest income earned on SIPC investments.  Upon consultation with self-regulatory organizations, SIPC determines assessments based on the amount necessary to maintain the fund and repay any borrowings by SIPC.[49]  If the SIPC fund is insufficient for payments to customers who have valid SIPA claims, SIPA allows SIPC to borrow from the Commission, which in turn may borrow up to $2.5 billion from the Department of the Treasury.[50]  The SIPC fund may be used to cover valid customer claims against a failed broker-dealer, to pay the costs of administering the liquidation of an estate of a failed broker-dealer, and for other purposes.[51]  Advances from the SIPC fund are limited to $500,000 per customer for claims,[52] and up to $250,000 of the $500,000 can be used to satisfy claims for cash.[53]

**SIPA Coverage.**  SIPA defines "customer" as "any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person

---

[41] 15 U.S.C. § 78ccc(2).
[42] *Id.*
[43] *Id.*
[44] 15 U.S.C. § 78ccc(c)(3).
[45] http://www.sipc.org/media/release2.cfm. *See also* 15 U.S.C. § 78eee(b)(3).
[46] *Id.*
[47] Letter from Stephen Harbeck, President of SIPC, to Ralph Janvey, Receiver of Stanford, August 14, 2009.
[48] 15 U.S.C. § 78ddd(c)(1).
[49] 15 U.S.C. § 78ddd(c)(2).
[50] 15 U.S.C. § 78ddd(g) and (h).
[51] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 8.
[52] 15 U.S.C. § 78fff-3(a).
[53] 15 U.S.C. § 78fff-3(d).

for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer."[54]

Under SIPA, the term "security" means:

> "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, any collateral trust certificate, preorganization certificate or subscription, transferable share, voting trust certificate, certificate of deposit, certificate of deposit for a security, or any security future as that term is defined in section 78c(a)(55)(A) of this title, any investment contract or certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or mineral royalty or lease (if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933 [15 U.S.C. 77a et seq.]), any put, call, straddle, option, or privilege on any security, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase or sell any of the foregoing, and any other instrument commonly known as a security."[55]

SIPA coverage extends to those persons who meet the definition of customer and to property that meets the definition of security.[56]

SIPA liquidations are conducted in U.S. Bankruptcy Courts,[57] with the exception of certain cases where SIPC can institute a direct payment proceeding if certain criteria are met.[58]

**SEC's Oversight.**  The Commission monitors the activities of SIPC.  Pursuant to SIPA, the Commission also has the authority to conduct inspections of SIPC,[59] review SIPC annual reports,[60] and approve SIPC's bylaws,[61] rules,[62] and amendments to the bylaws and rules.[63]  The Office of Broker-Dealer Finances in

---

[54] 15 U.S.C. § 78lll(2).

[55] 15 U.S.C. § 78lll(14).

[56] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 9.

[57] 15 U.S.C. § 78eee(b)(2) and (4).

[58] 15 U.S.C. § 78fff-4.  According to SIPC, Task Force Materials, Tab 3. *Topics and Issues*, E. *Direct Payment Procedure, Direct Payments* (single-page, no date), "in certain situations, SIPC may choose to use an out-of-court Direct Payment Procedure instead of initiating a liquidation proceeding.  The Direct Payment Procedure allows SIPC to act quickly and inexpensively to return property to customers."

[59] 15 U.S.C. § 78ggg(c)(1).

[60] 15 U.S.C. § 78ggg(c)(2).

[61] 15 U.S.C. § 78ccc(e)(1).

[62] 15 U.S.C. § 78ccc(e)(2).

[63] 15 U.S.C. §§ 78ccc(e)(1) and (2).

the SEC's Division of Trading and Markets (TM) has primary responsibility for monitoring SIPC.  If the Commission is aware of facts that lead it to believe that any broker-dealer is approaching financial difficulty, the Commission must immediately notify SIPC.[64]  The Office of the General Counsel (OGC) monitors SIPA liquidations and provides legal guidance.  On September 18, 2000, the Commission authorized OGC to enter notices of appearance in SIPA proceedings pursuant to a one-year pilot program, which became permanent on May 20, 2002.  The Office of Compliance Inspections and Examinations (OCIE) performs inspections of SIPC jointly with TM.  SIPC is required to submit its annual report to the Commission for review, and the Commission must transmit the annual report to the President and Congress.[65]

If SIPC refuses or fails to commit its funds for the protection of customers of any member of SIPC, the Commission may apply to the U.S. district court in which the principal office of SIPC is located for an order requiring SIPC to discharge its obligations under SIPA.[66]

According to interviews we conducted, we learned that SIPC personnel and SEC personnel communicate frequently.  The Associate Director from the Office of Broker-Dealer Finances in TM, which has the primary responsibility for monitoring SIPC, attends SIPC's quarterly board of directors meetings.  The Chairman of SIPC's board of directors and the SEC's Chairman meet periodically to discuss, among other things, ongoing liquidations and current matters that may impact SIPC's operations and the broker-dealer industry.  In particular, the SEC and SIPC have been meeting to discuss matters related to two of the largest liquidations in SIPC's history, Lehman Brothers, Inc. (Lehman) and Bernard L. Madoff Investment Securities, LLC. (Madoff).  TM also had numerous phone conversations with SIPC about matters related to the failure of Stanford Group Company (Stanford).

Lehman's liquidation under SIPA commenced in September 2008.[67]  The trustee overseeing the $110 billion customer estate[68] Lehman liquidation reported that the liquidation process is complicated because of the size and complexity of the firm and the trustee's limited access to Lehman's books and records.  The trustee further stated that the liquidation process is difficult because Lehman did not prepare a preliquidation disaster plan.[69]  Hence, concrete provisions for the mechanics of asset transfers were lacking, which contributed to difficulties in the Lehman bankruptcy.[70]  As of October 28, 2010, there were approximately 3

---

[64] 15 U.S.C. § 78eee(a)(1).
[65] 15 U.S.C. § 78ggg(c)(2).
[66] 15 U.S.C. § 78ggg(b).
[67] http://dm.epiq11.com/LBI/Project/default.aspx#.
[68] "SIPA Trustee for Lehman Brothers, Inc. Files Preliminary Investigation Report: Lessons Learned and Recommendations to Protect Broker-Dealer Customers," accessed Mar. 25, 2011, *See* http://dm.epiq11.com/LBI/Project/default.aspx. *Go to* Trustee's Investigation/Preliminary Report.
[69] *Id.*
[70] *Id.*

percent of unresolved customer claims in the Lehman case.[71]  The SEC has played a role in the Lehman liquidation from its inception and has met with the trustee assigned to the Lehman case and SIPC throughout the liquidation process to discuss pertinent matters related to the case.

Madoff's SIPA liquidation commenced in December 2008.[72]  Among other matters, the method of payment for customer claims has drawn much attention. Madoff investors have questioned the method used to pay claims, referred to as the "cash-in/cash out method," under which investors who withdrew more money from their Madoff accounts than they deposited would not be compensated, while investors who withdrew less than they put in would be compensated.[73]  On September 22, 2010, SIPC representatives testified before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, Committee on Financial Services, U.S. House of Representatives, to explain the method.[74] On March 1, 2010, Judge Burton Lifland of the U.S. Bankruptcy Court for the Southern District of New York upheld the Madoff trustee's method for adjudicating the Madoff investors' claims because securities positions are nonexistent as a result of a Ponzi scheme in which the securities positions shown on the customers' account statements had not been purchased and could not have been purchased in real market trading.[75]  This decision has been appealed and is now pending before the U.S. Court of Appeals for the Second Circuit.  The Commission filed briefs on the issue of the treatment of investors' claims in both the Bankruptcy Court and the Court of Appeals for the Second Circuit supporting the position of both the trustee and SIPC.  As of February 18, 2011, there were approximately 2 percent of unresolved customer claims.[76]

Investors who were adversely affected by the $8 billion[77] alleged Robert Allen Stanford Ponzi scheme have sought protection under SIPA.  On August 14, 2009, SIPC stated in a letter to the receiver in the Stanford case that it had determined that there was no basis for SIPC to initiate a SIPA liquidation proceeding against Stanford based on the information it had received at the time.[78]  SIPC also asserted, based upon the information it had received, that the certificates of deposit issued by Stanford International Bank Ltd. were formed under the laws of Antigua and Barbados, and Stanford International Bank Ltd. is

---

[71] "State of the Estate October 28, 2010," Progress To Date, Lehman trustee's law firm, last accessed Mar. 25, 2011, http://dm.epiq11.com/LBI/Project/default.aspx. *Go to* Public Reports/Trustee's Presentations/Presentations to the Bankruptcy Court.

[72] http://www.madofftrustee.com/Home.aspx.

[73] "Bankruptcy Judge Backs Madoff Trustee's Payout Calculations," Noeleen G. Walder, (Mar. 2, 2010), accessed Oct. 18, 2010, http://www.law.com/jsp/law/LawArticleFriendly/jsp?id=1202444971605 (site discontinued).

[74] "SIPC Chairman To Defend Method Used To Pay Claims For Madoff Victims," Sarah N. Lynch, (Sept. 22, 2010), accessed Nov. 8, 2010, http://online.wsj.com/article/BT-CO-20100922-711421.html (site discontinued).

[75] *Id.*

[76] http://www.madofftrustee.com/Status.aspx.

[77] http://www.sec.gov/news/press/2009/2009-26.htm.

[78] Letter from Stephen Harbeck, President of SIPC, to Ralph Janvey, Receiver of Stanford, Aug. 14, 2009, p. 3.

not a SIPC member.[79]  Our inquiry with the director and founder of the Stanford
Victims Coalition (SVC) indicated that Stanford investors are maintaining that
they were led to believe that the certificates of deposit were covered under
SIPA.[80]

# Objectives

As part of its annual audit plan, the OIG conducted an audit of the SEC's
oversight of SIPC.  The overall objective of this audit was to assess the
effectiveness of the SEC's oversight of SIPC.  The audit assessed if the
Commission monitors SIPC's activities in accordance with governing legislation.
In addition, our audit was performed to assess if the Commission performs
periodic and systematic inspections of SIPC's activities.  Our audit also focused
on determining whether the Commission conducts meaningful reviews of SIPC's
annual reports.  The OIG also determined where improvements and best
practices could be implemented for the SEC's oversight of the SIPC process.

---

[79] *Id.*
[80] Interview with Angie Kogutt, director and founder of the Stanford Victims Coalition, Nov. 22, 2010.

SEC's Oversight of the Securities Investor Protection Corporation's Activities          March 30, 2011
Report No. 495

# Findings and Recommendations

## Finding 1:  TM and OGC Do Not Maintain Adequate Written Procedures and Policies for Oversight of SIPC

TM and OGC currently do not have adequate written procedures and policies for monitoring SIPC's activities.

### Absence of TM's Written Procedures and Policies for Oversight of SIPC

The written procedures and policies in place for the SEC's oversight of SIPC are limited to a 1999 memorandum that merely lists the SEC's responsibilities for monitoring SIPC pursuant to SIPA.[81]  The 1999 memorandum describes in general terms how the Commission monitors SIPC and its operations, as required under SIPA.  Our audit found that TM has not documented the actual internal procedures it follows to provide oversight of SIPC's activities.  The 1999 memorandum does not provide detailed information about TM's internal procedures for oversight activities, such as how to process proposed bylaws or amendments that SIPC submitted or how reviews of SIPC's annual reports (including SIPC's financial statements) are to be performed.

Additionally, SIPA states that the independent public accountant or a firm of independent public accountants that audits SIPC's financial statements and is selected by SIPC must be deemed satisfactory by the Commission.[82]  Our inquiry of TM regarding its procedure for this review revealed that there is no written guidance that sets forth the procedures TM utilizes to determine the competency of an independent public accountant or a firm of independent public accountants hired to audit SIPC's financial statements.[83]

In addition, some of the limited information contained in the 1999 memorandum is outdated.  For instance, the memorandum provides that the amount of SIPC protection available for cash claims is $100,000, even though such coverage was increased in 2010 to $250,000 by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).[84]

---

[81] TM memorandum, *The Commission's Oversight Role of the Securities Investor Protection Corporation ("SIPC")*, June 24, 1999.
[82] 15 U.S.C. § 78ggg(c)(2).
[83] TM informed the OIG that when SIPC hired its independent auditor in 2002, a senior TM official attended the interviews SIPC staff conducted, and the senior TM official did not oppose SIPC's selection of its new auditing firm.
[84] H.R. 4173, Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 929H, *SIPC Reforms.*

TM acknowledges that having written policies is useful and that documenting its SIPC monitoring procedures would add transparency to its delegated authority and responsibilities under SIPA.  However, TM stated that it believes that the absence of documented procedures has not impacted its ability to perform its tasks related to the oversight of SIPC.  TM also asserted that most of its employees who are responsible for monitoring SIPC's activities are experienced staff members who have performed their assigned duties related to SIPC for many years.  However, staff changes at the SEC are common, and we believe that having documented procedures is critical to ensuring appropriate and effective monitoring and oversight.

TM informed us that it is in the process of preparing an updated version of the 1999 memorandum, which it intends to complete and circulate to relevant TM staff members by March 31, 2011.[85]

## OGC Lacks Adequate Documentation of Its Oversight Role Related to SIPC

Our audit also found that there is inadequate documentation for the SEC's oversight role in OGC.[86] OGC provides legal guidance to TM related to SIPA liquidations and monitors SIPA proceedings that are handled by independent court-appointed trustees and SIPC.  Our tests and interviews with OGC staff members revealed that internal policies or procedures regarding OGC's role relating to SIPC oversight are not adequately documented.  Moreover, during the timeframe in which we conducted our audit, there was a significant staff turnover in the OGC bankruptcy group, as the OGC attorney who provided oversight of SIPC for a number of years retired and was replaced by another attorney.  Due to the lack of adequately documented internal OGC policies and procedures, we found opposing opinions on how SIPC monitoring activities should be performed. For instance, the retired attorney monitored Public Access to Court Electronic Records (PACER)[87] and reviewed court documents for SIPA liquidations in order to monitor court proceedings to ensure that SIPA liquidations were processed timely and that trustees appointed to the SIPA liquidations and SIPC were properly handling SIPA proceedings.  The retired attorney reviewed, among other matters, disputes arising from customer claims for SIPA liquidations.  In one

---

[85] SEC, memorandum to the OIG, *Information Request on Implementation of Prior OIG Recommendations*, Jan. 24, 2011.
[86] In December 2001, OGC drafted a memorandum to the Commission explaining its procedures for monitoring claims determinations and reviewing fee applications. However, OGC prepared the memorandum to request that the Commission allow OGC to enter notices of appearance in SIPA liquidations permanently.  Additionally, the memorandum focuses on certain issues and does not discuss other monitoring activities OGC performs, such as identifying significant legal issues that could lead to filing briefs in court.
[87] According to its website (http://www.pacer.gov), PACER "is an electronic public access service that allows users to obtain case and docket information from federal appellate, district and bankruptcy courts, and the PACER Case Locator via the Internet.  PACER is provided by the federal Judiciary in keeping with its commitment to providing public access to court information via a centralized service."

instance during her review of filed dockets on PACER, she disagreed with SIPC's denial of a claim and consulted with a TM staff member who agreed with her. The retired attorney and the TM staff member notified SIPC about the disagreement.  On the contrary, the new successor OGC attorney has indicated that monitoring PACER could be time-consuming due to the large number of court documents that are filed in some cases, such as Lehman and Madoff. Hence, he questioned whether such a practice would be efficient.

This example illustrates the necessity that procedures be documented so that decisions on how to conduct oversight can be made in a careful and reasoned manner and do not depend solely on a particular staff member who is working at the SEC at a given time.

### Recommendation 1:

The Division of Trading and Markets should document its procedures and processes for its oversight and monitoring of the Securities Investor Protection Corporation pursuant to the Securities Investor Protection Act.

**Management's Comments.**  TM concurred with this recommendation.  See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that TM concurred with this recommendation

### Recommendation 2:

The Division of Trading and Markets should complete its efforts to update its internal memorandum which describes its oversight responsibilities under the Securities Investor Protection Act (SIPA) and include its current practices and, where appropriate, the legislative amendments that were made to SIPA in July 2010 by the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**Management's Comments.**  TM concurred with this recommendation.  See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that TM concurred with this recommendation.

### Recommendation 3:

The Office of the General Counsel should consult with the Division of Trading and Markets to clarify its role in monitoring the Securities Investor Protection Corporation (SIPC) and document the responsibilities and procedures it follows in regard to the Commission's oversight of SIPC.

**Management Comments.**  OGC concurred with this recommendation.  See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that OGC concurred with this recommendation.

**Recommendation 4:**

The Office of the General Counsel should consider the costs and benefits related to certain activities that the retired attorney performed and determine what, if any, other activities are appropriate to adequately monitor the Securities Investor Protection Corporation.

**Management's Comments.**  OGC concurred with this recommendation.  See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that OGC concurred with this recommendation.

# Finding 2:  TM and OCIE Do Not Inspect SIPC's Activities in a Systematic Fashion

> TM and OCIE performed a full inspection of SIPC in 2003 and a follow-up inspection in 2005 to assess whether SIPC implemented recommendations from the 2003 inspection. Notwithstanding the SEC's representation to the Government Accountability Office (GAO) that it would inspect SIPC "every four to five years,"[88] the SEC has not conducted a full inspection in nearly 8 years.  Currently, the SEC has no definitive plans to inspect SIPC in the near future.

## Findings From Previous Audits of SEC's Oversight of SIPC

GAO performed an audit of SIPC, which included a review of the SEC's monitoring of SIPC, in 1992.[89]  In that audit, GAO found that since 1985, the SEC had evaluated SIPC's operations one time and had not followed up on the 1985 evaluation to determine if SIPC addressed its recommendations, such as speeding up the payment of customer claims through an automated liquidation system.[90]  GAO recommended that the SEC periodically review SIPC's

---

[88] OIG Report No. 301, *Oversight of Securities Investor Protection Corporation* (Mar. 31, 2000), p. 5.
[89] Report No. GAO/GGD-92-109, GAO, *Securities Investor Protection: The Regulatory Framework Has Minimized SIPC's Losses*, GAO/GGD-92-109 (Sept. 28, 1992).
[90] *Id.* at 61.

operations and its efforts to ensure timely and cost-effective liquidations.[91]  In response to this recommendation, TM agreed to inspect SIPC "every four to five years."[92]

The OIG performed an audit of the SEC's oversight of SIPC's activities in March 2000.[93]  The OIG found that since SIPC's inception in 1970, the SEC had inspected SIPC only two times, once in 1985 and a second time in 1994.[94]  The OIG also identified several areas not addressed in past SIPC inspections that could improve oversight effectiveness[95] and recommended that TM and OCIE decide on a review schedule and inspection scope for future SIPC inspections. Based on this recommendation, TM and OCIE agreed to prepare a review schedule and inspection scope for future SIPC inspections.  Notwithstanding this agreement and this recommendation being closed, our inquiries of TM and OCIE regarding this matter revealed that TM and OCIE never developed a review schedule or an inspection scope for future SIPC inspections.

## The SEC's Inspection of SIPC in 2003 and Follow-up Inspection in 2005

As previously mentioned, TM and OCIE performed an extensive inspection of SIPC in 2003 and a follow-up inspection of SIPC in 2005; however, they have not since performed any inspections of SIPC.  The scope of the 2005 inspection included follow-up work on the recommendations from the 2003 inspection to ensure that SIPC had implemented TM's and OCIE's recommendations.  During the 2005 inspection, TM and OCIE staff also reviewed additional liquidations that were not reviewed in the 2003 inspection.  However, we learned that TM and OCIE reviewed the liquidations solely to follow up on the recommendations from the 2003 inspection.  For example, TM and OCIE staff reviewed the billing records of those additional liquidations to follow up on its 2003 recommendations regarding controls over trustee fees, but they did not review customer claims in those liquidations.

## Results of the SEC's Inspection of SIPC in 2003 and 2005

The six findings TM and OCIE made during their 2003[96] SIPC inspection support the need for the SEC to conduct systematic inspections of SIPC.  TM's and OCIE's SIPC inspection findings were as follows:[97]

---

[91] *Id.* at 63.

[92] OIG Report No. 301, *Oversight of Securities Investor Protection Corporation* (Mar. 31, 2000), p. 5.

[93] *Id.*

[94] *Id.* at 5.

[95] These areas included (1) adequacy of SIPC policies and procedures used to determine whether a customer request to bring a liquidation proceeding has merit under SIPA, (2) sufficiency of SIPC guidance given to trustees regarding evidence necessary to establish a valid customer claim and recognition of legal precedents in liquidation proceedings, and (3) propriety of SIPC decisions made regarding claims submitted to the trustee during a proceeding.  *Id.* at 5-6.

[96] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), pp. 1-2.

(1) SIPC should improve its controls over fees.

(2) SIPC should provide written guidance to SIPC personnel and individual trustees to use in assessing whether claimants have established valid unauthorized trading claims.

(3) One claim in a specified liquidation of a brokerage firm (the brokerage firm liquidation), out of approximately 300 customer claims reviewed by TM and OCIE in the liquidation, was improperly denied by the trustee as time barred.

(4) SIPC lacks a record retention policy for records generated in liquidations where SIPC appoints an outside trustee.

(5) While SIPC has recently undertaken initiatives to educate investors about SIPC, SIPC should review further its publicly disseminated information about SIPC coverage, including the official explanatory statement, website, and brochure, and determine whether revisions are necessary to avoid customer confusion.

(6) SIPC should consider funding options in the event of a catastrophically large broker-dealer liquidation.

TM's and OCIE's finding regarding the claim in the brokerage firm liquidation clearly demonstrates a need for the SEC's ongoing monitoring of customer claim determinations that are made by court-appointed trustees and SIPC, as the SEC's ability to challenge the trustee's determinations becomes nonexistent as time passes.[98]  The claim in the brokerage firm liquidation cited in the SEC's 2003 inspection report involved SIPC's denial of a customer claim that the trustee believed was not timely filed.[99]  Certain SEC staffers indicated that the claim was not time barred and disagreed with the trustee's "assertion that the customer did not meet the requirements that the claim contain a demand by the creditor on the debtor's estate and express an intent to hold the debtor liable for the debt. . . ."[100]  According to the 2003 inspection report, "SIPC stated that even if the claim was timely filed, it would have been denied on the merits."[101]  According to SIPC, the allegedly unauthorized trades that were the basis of the customer's claim involved purchases for which the customer never paid and, as a result, the customer did not suffer any loss.[102]  Claimants may appeal the trustee's denial, and the SEC has the right to file a brief with the court supporting

---

[97] *Id.*

[98] Neither the Commission nor SIPC has any power to overrule a decision made by a trustee even if it were to determine immediately that a denial was inappropriate. The Commission or SIPC could; however, challenge the determination in court.

[99] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 45.

[100] *Id.* at 12.

[101] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 44, note 144.

[102] *Id.*

the claimant's appeal and disagreeing with the denial.  In this case, the customer was not made aware of the SEC's position and did not appeal the denial. Because the claimant did not appeal the denial, the SEC could not take any further action.  This example illustrates the need for the SEC's periodic monitoring of SIPC's activities and SIPA liquidations, especially in customer claims determinations to ensure that court-appointed trustees and SIPC properly administer customer claims.

Furthermore, TM's and OCIE's 2003 inspection disclosed that SIPC lacked a record retention policy for records that are prepared in liquidations and processed by outside trustees.[103]  The SEC was not able to review the records of a completed liquidation, since the trustee had destroyed the records shortly after completion of the liquidation and the SEC had not conducted its inspection in a timely manner.[104]  As a result of the SEC's inspection, SIPC now has a written record retention policy to keep records for five years, which is provided to trustees in the SIPC Trustee Guide.

## The SEC Does Not Currently Have Definitive Plans to Inspect SIPC in the Near Future

As discussed previously, currently OCIE and TM do not have a review schedule or an inspection scope plan for future SIPC inspections.[105]  In early 2010, OCIE and TM stated that they had informally determined that an inspection of SIPC in 2010 would not be feasible due to the ongoing liquidations of Lehman and Madoff.  OCIE and TM indicated that as the SEC's inspection of SIPC involves reviewing liquidations in which customer claims have been satisfied, an inspection of ongoing cases would not be efficient and could possibly disrupt the process of the ongoing liquidations.

OCIE staff members indicated that they meet with TM staff members on an annual basis to discuss goals in preparation for issuing OCIE's Goals Memorandum[106] in September or October of each year.  Both TM and OCIE agreed that they could discuss the schedule and scope for future SIPC inspections at the annual meeting.

OCIE and TM staff members indicated that SIPC has proper controls and procedures in place to process customer claims.  Also, TM and OCIE believe that

---

[103] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 2.
[104] *Id.* at 2.
[105] OCIE is in the process of transitioning to a risk-based program for all inspections.
[106] OCIE stated that the purposes of the memorandum include identifying risks and areas for concentration for annual inspections and informing the Commissioners and the directors of divisions and offices about OCIE's goals.  The memorandum divides OCIE's goals and risks by program.  The risks and the areas for concentration are based on OCIE staff members' observations during past inspections and discussions with other divisions and offices.  The Director and the Deputy Director of OCIE meet with the Chairman and the Commissioners to discuss the memorandum, to obtain their feedback, and to ensure that they agree with OCIE's focus for the inspections.

the frequency of inspecting SIPC depends on the number of liquidations that are
in progress.  If there are no broker-dealer liquidations, then there are no cases
for SIPC to process and none for the SEC to inspect.

However, the OIG found that notwithstanding the SEC's assurances to GAO and
the OIG, and the need for continuous monitoring, there are no systematic
inspections of SIPC and to date the SEC has not established a scope or
schedule for future inspections of SIPC.  Additionally, there have been no formal
discussions between TM and OCIE to plan an inspection of SIPC since the 2005
follow-up inspection.

## SIPA Liquidations That Occurred From 2003 to Date Have Not Been Reviewed

In 2003, TM and OCIE reviewed 14 liquidations that were processed by an
outside trustee and 14 liquidations where the direct payment process was used
or where SIPC was the trustee.[107]  In 2005, the SEC reviewed an additional 11
liquidations solely to follow up on the recommendations from the 2003
inspection.[108]

During the 2003 and 2005 inspections, TM and OCIE did not review 8
liquidations that had been initiated in 2003 and 2004.[109]  Since the SEC's follow-
up inspection in 2005, there have been 9 additional SIPC liquidations to date.[110]
However, the SEC has not reviewed any of these liquidations.

OCIE informed the OIG that the 8 liquidations that were initiated in 2003 and
2004 were not reviewed in 2005 because they were ongoing cases.  TM and
OCIE further informed the OIG that they only review completed liquidations or
liquidations where the customer claims are satisfied with certain litigation matters
pending.  OCIE indicated that the SEC reviewed liquidations where the customer
claims process was complete, but there may still have been pending litigation
because litigation arising out of SIPC liquidations can continue for many years.

The SEC has been heavily involved with the Lehman and Madoff cases from the
inception of the liquidations of both entities.  For instance, a TM staff member
attended SIPC board of directors meetings where the trustees for both cases
presented the status of claims and discussed significant matters.  SIPC also
consulted with OGC and TM regarding a payout method to Madoff claimants.
TM also meets with the trustees assigned to the Lehman and Madoff cases on a
periodic basis.  Additionally, the Commission's Atlanta Regional Office reviewed
claim determinations related to the SIPA liquidation of Hanover Investment

---

[107] OCIE 2003 inspection records.

[108] *Id.*

[109] According to the OIG's comparison of the liquidations reviewed by the SEC and the liquidations initiated
in 2003 and 2004 as noted in SIPC's annual reports for 2003 and 2004.  *See*
http://www.sipc.org/who/annual.cfm for SIPC's 2003 and 2004 annual reports.

[110] SIPC's 2005, 2006, and 2008 annual reports. *See* http://www.sipc.org/who/annual.cfm.

Securities, Inc. (Hanover).  One Atlanta Regional Office employee stated that she disagreed with SIPC's denial of a claim in the Hanover case.  SIPC did not agree with her conclusion, but it eventually paid the claimant.

Despite TM's and OGC's ongoing involvement with the Lehman and Madoff cases and the Atlanta Regional Office's involvement with the Hanover case, there have been 14 additional liquidations[111] in the past 8 years that have completely escaped the SEC's scrutiny.[112]  Although 4[113] of the 14 liquidations are currently ongoing, the remaining 10 liquidation proceedings have either been closed or the customer claims have been satisfied and thus are ripe for the SEC to review.  The SEC has reviewed cases that have been closed and the customer claims that have been satisfied during previous inspections.[114]  None of these liquidations have been reviewed, since the SEC has not conducted a full inspection since 2003.

OCIE and TM staff members informed the OIG that they have no plans to schedule a future inspection of SIPC until after the Lehman and Madoff cases are resolved.  The liquidations of Lehman and Madoff commenced in September 2008 and December 2008, respectively.[115, 116]  While there has been significant progress with respect to determining certain customer claims, substantial work remains to be done relating to resolving the customer claims that are being litigated.  TM also indicated that once the claim determinations are completed, it is possible that additional lawsuits, if they have not already commenced, are expected for both the Lehman and Madoff liquidations.  The majority of claims in Madoff have been determined, but there will be substantial work to resolve these claims because of objections to these determinations and the resulting ongoing litigation.

As TM and OCIE readily acknowledge, the estimated date for the completion of claim determinations, especially for Lehman, is currently unknown.  Thus, there are no assurances or even indications that the SEC will exercise its oversight authority to inspect any other SIPC liquidations in a systematic manner in the foreseeable future.  We do not believe that this approach is consistent with the

---

[111] Out of the 14 liquidations, independent court-appointed trustees processed 6 liquidations, SIPC was the trustee for 6 liquidations, and 2 liquidations were direct payments.

[112] OGC stated that the predecessor attorney monitored the 14 liquidations to ensure that they were processed timely.  The OIG was unable to verify whether such monitoring occurred because there was no evidence of review.

[113] Continental Capital Investment Services, Inc., North American Clearing, Lehman and Madoff.

[114] According to the OIG's review of customer proceedings in process noted in SIPC's 2009 annual report and the OIG's inquiry with SIPC management. See http://www.sipc.org/pdf/2009%20Annual%20Report.pdf for 2009 SIPC annual report.

[115] On September 19, 2008, the United States Bankruptcy Court for the Southern District of New York entered an order granting the application of SIPC for issuance of a Protective Decree adjudicating that the customers of Lehman are in need of protection afforded by the SIPA. See http://dm.epiq11.com/LBI/Project/default.aspx#.

[116] Pursuant to the application of SIPC, on December 15, 2008, the Honorable Louis L. Stanton, a federal judge in the United States District Court for the Southern District of New York, appointed Irving H. Picard as trustee for the liquidation of Madoff. See http://www.madofftrustee.com/Home.aspx.

assurances provided in the SEC's response to GAO's 1992 SIPC report and its response to the OIG's 2000 SIPC report. Based on interviews we conducted and our analysis, the OIG has determined that more frequent SEC SIPC inspections will assist claimants and SIPC.

**Recommendation 5:**

The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should conduct meetings, on at least an annual basis, to determine when an inspection of the Securities Investor Protection Corporation (SIPC) should occur, based on the ongoing liquidations, to ensure systematic and risk based monitoring of SIPC's operations. In these meetings, TM and OCIE should develop a schedule for future inspections based upon objective criteria or defined risk-factors, such as conducting inspections based upon the number of SIPC liquidations.

**Management's Comments.** TM and OCIE concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that TM and OCIE concurred with this recommendation.

In response to TM's comment regarding TM's and OCIE's possible conclusion not to inspect SIPC in certain years, we acknowledge that based on their assessment, TM and OCIE may conclude that it is not appropriate to specify a date for the next SIPC inspection.

In response to OCIE's comment, "In early 2010, OCIE and TM jointly determined that an inspection of SIPC in 2010 would not be prudent due to SIPC's involvement in certain ongoing large liquidations," OIG asserts that our audit found no evidence that supports this statement.

**Recommendation 6:**

The Division of Trading and Markets and the Office of Compliance Inspections and Examinations should perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to the next inspection of the Securities Investor Protection Corporation (SIPC), as they did prior to the commencement of the 2003 inspection of SIPC. The scope of each future inspection should take into consideration the risk assessment conducted prior to the inspection.

**Management's Comments.** TM and OCIE concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that TM and OCIE concurred with this recommendation.

# Finding 3: The SEC Does Not Review Fees SIPC Pays to Court-Appointed Trustees on a Periodic or Systematic Basis

The Commission does not perform a review of the fees SIPC pays to independent court-appointed trustees on a periodic or systematic basis. TM reviewed trustee fees in 1994. TM and OCIE reviewed trustee fees during their extensive inspection of SIPC in 2003. TM's and OCIE's 2005 follow-up inspection was conducted to ensure that SIPC implemented the SEC's recommendations from its 2003 inspection. However, no reviews of fees paid to trustees have taken place since 2003.

## Background on Trustee Fees under SIPA

According to the SEC's 1994 SIPC inspection report,[117] customers' claims are paid to the maximum extent possible from the assets of the failed broker-dealer. Customers share on a pro rata basis in a fund of customer property and in the general estate, as explained below.[118] The term "customer property" means "cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."[119] With regard to the liquidation of a broker-dealer's general estate, all costs and administration expenses, including the costs and expenses for which SIPC has made advances, must be paid from the general estate before any other claims are satisfied.[120] The general estate is distributed to creditors in accordance with the priorities set forth in the Bankruptcy Code.[121] To the extent that customer property and SIPC advances are not sufficient to satisfy a customer's claim in

---

[117] SEC, *SIPC Examination Report* (Jun. 22, 1994), p. 4.

[118] Catherine McGuire, Memorandum Re: SIPA, Aug. 28, 2009, p. 14.

[119] 15 U.S.C. § 78lll(4).

[120] *Id.*, § 78eee(b)(5)(E).

[121] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 7. *See also* 11 U.S.C. §§ 503(b) and 507 (a)(1).

full, the customer is entitled to participate in the general estate and share pro rata with other unsecured creditors.[122]

**Limit on the Amount of Trustee Fees in a Bankruptcy Case.**  Although SIPA liquidations are similar to ordinary bankruptcy cases, there is no limit on the amount of trustee fees paid in SIPA liquidations, unlike bankruptcy cases. According to the U.S. Code,

> [I]n a case under Chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.[123]

However, with respect to SIPA liquidations, there is no equivalent provision capping fees and, thus, there is no statutory limit on the amount of fees a trustee can earn in a SIPA case.

**The Court's Discretion Under SIPA Is Limited.**  SIPA states that "[i]n any case in which such allowances[124] are to be paid by SIPC without reasonable expectation of recoupment thereof as provided in this chapter and there is no difference between the amounts requested and the amounts recommended by SIPC, the court shall award the amounts recommended by SIPC."[125]

Accordingly, under the statute, even if the court finds the amount of fees awarded to the trustee to be excessive, it is required to approve such excessive fees if SIPC determines that the fees are reasonable.  In a 1985 case, Judge Thomas Britton of the U.S. Bankruptcy Court for the Southern District of Florida deemed fees to be awarded to the trustee in a liquidation to be excessive but found he had no choice but to approve the fees, stating, "The approval or disapproval of this particular application lies exclusively within the discretion of SIPC under the express provisions of 15 U.S.C. § 78eee(b)(5)(C) . . . ."[126]

---

[122] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 7.

[123] 11 U.S.C. § 326, *Limitation on Compensation of Trustee.*

[124] Reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred. 15 U.S.C. §78eee(b)(5)(A).

[125] 15 U.S.C. § 78eee(b)(5)(C).

[126] *See also In re First State Securities Corp.*, 48 B.R. 45, 46 (Bankr. S. D. Fla. 1985).

The Court expressed its displeasure with the statutory scheme, stating,

> This statute either intentionally or inadvertently permits someone connected with SIPC to authorize questionable payments to attorneys from SIPC trust funds under the pretext that these payments have been reviewed, approved, authorized and directed by a federal court.  Nothing could be more misleading.

> Reluctantly, therefore, but without a choice, this application for compensation is approved in the amount requested.[127]

The judge considered the interim allowance of $80,933 sought by the trustee to be excessive, but stated he had "no discretion nor any choice" but to approve the exorbitant amounts.[128]

In another instance, in a 1974 case decided prior to the amendment of SIPA in 1978,[129] a court refused to allow SIPC to pay what the court deemed excessive trustee fees.  In a SIPC action against Charisma Securities Corp.,[130] Judge Milton Pollack of the U.S. District Court for the Southern District of New York disagreed with SIPC's recommendation and ordered SIPC to pay only $3,500 to the trustee and $6,500 to the trustee's law firm, rather than the $5,000 for the trustee and $25,000 for the law firm that SIPC had recommended.[131]  The court found that the trustee hired accountants with extensive experience in financial and securities matters who undertook and performed most of the significant tasks in the liquidation and, therefore, the trustee's law firm's work should have been minimal.[132]  The court further noted,

> The liquidation before this Court is, by any and every standard, a small one involving small uncomplicated claims.  If the fees requested herein were to be allowed in full, the result would signal a radical departure from the words and intent of the Act created to protect customers' net equities in the hands of enterprises that have foundered.…This Court, therefore, simply cannot and will not blindly acquiesce—as SIPC apparently has done—in assessing the fees requested against the trust fund administered by SIPC.  This case points up the probable need for legislative readjustment of the SIPA and the functions of its administrators.  For one thing, all appointments of servicing personnel should be subject to court control, and *all* expenses should be submitted to the Court for

---

[127] *Id.*

[128] *Id.*

[129] TM stated that, "The Court had discretion to reject fees when this case was decided.  Congress overruled this case when it amended the SIPA in 1978.  This case was relied upon by Congress to mandate that recommendations by SIPC would be binding on the court in 'no-assets cases' unless it results in a controversy with the applicant."

[130] *Securities Investor Protection Corp. v. Charisma Sec. Corp.*, 371 F. Supp. 894, 899 (S.D.N.Y. 1974), *aff'd.*, 506 F.2d 1191 (2d Cir. 1974).

[131] *Id.* at 895 and 900.

[132] *Id.* at 895-96.

approval so that a balanced view of the totality thereof can be maintained.[133]

In another case, Judge Bill Parker of the U.S. Bankruptcy Court for the Eastern District of Texas, Tyler Division, found that a SIPC trustee's fee application in the liquidation proceeding for Sunpoint Securities, Inc. (Sunpoint), needed improvement and clarity.[134]  The court found the following significant concerns with the sixth interim fee application in the amount of $439,294 that was submitted by the trustee assigned to the Sunpoint liquidation:[135]

(1) the Application provides insufficient information regarding the background and experience of the employed professionals to justify the hourly rate requested;

(2) the Application references services which were so insufficiently described as to effectively preclude the Court from evaluating the reasonableness and necessity of such services and, therefore, the benefit of such services to the estate were unclear or undemonstrated;

(3) the Application requests compensation for services for which excessive time was billed for the work actually described;

(4) the Application fails to some extent to disclose the precise time increments dedicated to the performance of certain services which inhibits the Court's ability to ascertain the reasonableness of the charges assessed; and

(5) the Application at times batches or lumps various services together in a singular item entry which effectively precludes the Court from evaluating the reasonableness and necessity of each of the particular services contained in such entries.

In the Sunpoint case, notwithstanding the concerns expressed by the court, SIPC recommended the fee proposed by the trustee based on the fee application described above, and because of the statutory language, the court had no discretion to compel SIPC to reduce the fees.

While there is absolutely no discretion on the part of the court to limit fees recommended by SIPC in a no-asset case (i.e., a case where SIPC advances the fees from its fund and there is no reasonable expectation of recoupment) pursuant to the statute, even when there is reasonable expectation of recoupment, the statute only provides the courts with limited discretion.  Under 15 U.S.C. § 78eee(b)(5)(C), in determining the amount of allowances in all cases other than those in which there is no reasonable expectation of recoupment from the general estate and the amounts requested do not differ from SIPC's

[133] *Id.* at 899 (emphasis in original).
[134] *In re: Sunpoint Securities, Inc.,* Adversary No. 99-6073 (Bankr. E.D. Tex.), Order Granting Sixth Application for Allowance of Interim Compensation and Reimbursement of Expenses of Jackson Walker, LLP, (Apr.18, 2002).
[135] *Id.* at 3.

recommendation, "the court shall give due consideration to the nature, extent, and value of the services rendered, and shall place considerable reliance on the recommendation of SIPC."[136]

SIPC has stated that in cases where the Court is obligated to rely on its recommendation,

> "The Court forms its independent judgment on whether fees should be allowed, but takes into account SIPC's recommendation, bearing in mind that SIPC 'functions as the entity charged with the administration of SIPA, as an advisor to the court, as the party initiating a liquidation proceeding, and as the party which, to a large extent, is responsible for overseeing the funds available for use in a liquidation proceeding.' S. Rep. No. 763, 95th Cong., 2d Sess. at 11 (1978)."[137]

## SIPC's Review of Trustee Fees

SIPC informed the OIG that since the SEC's 2003 and 2005 inspections it has implemented a policy requiring trustees to file quarterly or monthly invoices, depending on the size and complexity of the liquidation. SIPC further informed the OIG that independent court-appointed trustees in complex cases send their timesheets and fee applications to SIPC on either a quarterly or monthly basis and these documents are reviewed by SIPC staff attorneys. SIPC personnel also indicated that the monthly invoices for large cases are generally received by the middle of the subsequent month after the trustee and counsel have reviewed their own bills. SIPC asserts that it reviews in detail every page of timesheets and invoices submitted by the trustees. SIPC staff attorneys then prepare a memorandum for the Assistant General Counsel's and the General Counsel's review. SIPC administrative assistants prepare a fee chart and a summary of ongoing fees that are approved by the Assistant General Counsel and the General Counsel on a quarterly basis.

After the Assistant General Counsel and the General Counsel review and approve the fee applications and the timesheets, SIPC staff attorneys then prepare a memorandum identifying SIPC's recommendations, which are submitted to the bankruptcy court for review.

SIPC stated that it usually asks for a 10 percent reduction in fees and negotiates fees with the trustees before the liquidation process begins. SIPC also has a holdback policy which allows it to hold off paying the final fee until the case has been completed.

---

[136] 15 U.S.C. § 78eee(b)(5)(C).
[137] Electronic mail from a SIPC staff member, Feb. 9, 2011, Subject: Questions on Discretion over Fees.

## Fees Paid to the Lehman and Madoff Trustees and Trustees' Counsels

According to the latest published report, the fees paid to the trustee's counsels and staff members processing the Lehman claims covering September 2008 to September 2010 (24 months) totaled approximately $108 million.[138]  According to the fourth interim fee application as of September 30, 2010, the entire administrative fees, including fees for accountants, consultants, etc., totaled approximately $420 million.[139]

The OIG found that the fees paid to the trustee's counsel and staff members processing the Madoff claims for the period from December 2008 to September 2010 (21 months) totaled approximately $102 million.[140]  SIPC noted that in the Madoff case it is advancing SIPC funds to pay all the Madoff case's administrative expenses and that it "is not using any customer money for expenses."[141]

The OIG's review of the trustee fee chart that SIPC prepared revealed that the hourly rate for the trustee assigned to the Madoff case ranged from $698 to $742.  For the Lehman liquidation, SIPC's trustee fee chart combined both the trustee's time and the time charged by the law firm the trustee hired.  The average hourly rate for the trustee and the law firm personnel involved in the Lehman liquidation ranged from $437 to $527.

The fees paid to date for the Madoff liquidation are a mere fraction of the amount that will eventually be sought because, while there has been significant progress with respect to resolving certain customer claims, significant work remains to be done relating to customer claims with pending litigation.

The trustee assigned to the Madoff case has stated that he currently does not believe there will be sufficient funds in the debtor's estate to make distributions to priority creditors, nonpriority general creditors, and/or broker-dealers.[142]  Also, the trustee "does not expect that there will be sufficient funds in the general estate for SIPC to recoup its advances for administrative expenses."[143]

---

[138] "Trustee's Fourth Interim Report for the Period May 11, 2010 Through October 26, 2010," Exhibit 2, last accessed Mar. 26, 2011, http://dm.epiq11.com/LBI/Project/default.aspx#.  *Go to* Public Reports/Trustee's Interim Reports to the Court/Trustee's Fourth Interim Report: October 26, 2010.

[139] *Id.*

[140] "Trustee's Fourth Interim Report for the Period Ending September 30, 2010," last accessed Mar. 1, 2011, http://www.madofftrustee.com/documents/FourthInterimReport.pdf. *See* "Cash Disbursement" chart located in the back of the Madoff trustee's Fourth Interim Report.

[141] *The Finance Professionals' Post*, Mar. 17, 2010, "Interview: Stephen Harbeck and Irving Picard on the Lehman and Madoff Cases.*"*

[142] "VII. Claims Administration," "B. Claims of General Creditors," Paragraph 108, p.36, accessed Feb. 1, 2011, http://www.madofftrustee.com/documents/Claims_Process.pdf.

[143] *Id.*

Because the outcome of Lehman liquidation is uncertain and SIPC is advancing its own funds to pay the administrative expenses for the Madoff liquidation, the possibility exists that SIPC could deplete its $2.5 billion fund. If the SIPC fund is or reasonably appears to be insufficient, the SEC is authorized to make loans to SIPC by issuing the Secretary of the Treasury notes or other obligations in an aggregate amount not to exceed $2.5 billion.[144]

## The SEC's Role in Monitoring Fees

The SEC does not periodically review the fees SIPC pays the court-appointed trustees. OGC monitors fee applications to ensure that they are timely filed and prepared in a manner that allows for effective review. TM reviewed trustee fees and other information related to fees in 1994.[145] TM and OCIE reviewed fee applications and related supporting documents such as timesheets and fee negotiation documents during the 2003 SIPC inspection. The 2003 inspection report found that SIPC should improve its controls over fees and stated that "[t]he SEC staff found indications of excessive trustee and counsel fees in some liquidations and is concerned about fees charged by certain trustees and their counsel for work related to the Staff's inspection of SIPC."[146] The inspection also found that the trustees' work descriptions were not detailed and were generic.[147]

In addition, the SEC's 2003 inspection[148] and 2005 follow-up inspection[149] found that some trustees and their counsels did not file quarterly invoices with SIPC and, in the case of large, active liquidations, monthly invoices were not filed. The SEC also found that certain trustees and their counsels did not provide detailed descriptions of the services they performed in the invoices, which prevented a proper and thorough review of the invoices by SIPC.[150]

## Investors' Concerns Over Fees

The SEC's 2003 inspection report acknowledged that the amount of fees SIPC paid to trustees and their counsel for administering liquidation proceedings pursuant to SIPA had been the subject of criticism from the investing public. The report noted that groups such as the Public Investors Arbitration Bar Association had questioned the amount of fees SIPC paid trustees and their counsel. It also noted that the past president of the Public Investors Arbitration Bar Association argued that SIPC spent too much money on administrative expenses (trustee and counsel fees) and not nearly enough on satisfying customer claims.[151]

---

[144] 15 U.S.C. §§ 78ddd(g) and (h).
[145] SEC, *SIPC Examination Report* (Jun. 22, 1994), pp. 25-26.
[146] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 1.
[147] *Id.* at 1.
[148] *Id.* at 2.
[149] Letter from the Director of OCIE to SIPC President, Re: SEC Inspection of the Securities Investor Protection Corporation ("SIPC"), Sept. 30, 2005, p. 2.
[150] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 1.
[151] *Id.* at 21.

The criticism and concern expressed with regard to the amount of trustee fees that have been awarded have reemerged with the two largest liquidations in SIPC's history, Lehman and Madoff.  According to a news article, on August 20, 2010, the trustee overseeing the Madoff bankruptcy requested that the U.S. Bankruptcy Court for the Southern District in New York, where the liquidation case is pending, approve a $96.7 million fee request for work that was conducted from February 2010 to May 2010.[152]  The former Madoff investors objected, stating that the trustee and his law firm should not receive any payment for the work because they were improperly trying to minimize SIPC payouts at the expense of Madoff's victims.[153]  However, the judge presiding over the case ruled in favor of SIPC and accepted SIPC's recommended trustee fees.[154]

## The OIG's Audit Testing of Trustee Fees

**The OIG's Review of Trustee Fees.**[155]  SIPC provided the OIG with a list of the fees it paid to 11 independent court-appointed trustees from January 2008 to November 2010, by liquidation.  We selected the Hanover, North American Clearing, Inc. (NAC), Lehman, and Madoff liquidations as part of our review of billing because the SEC referred these cases to SIPC.  The liquidation of these cases commenced in 2008.[156]  There were no SIPC liquidations commenced in 2009 or 2010.[157,158]

SIPC provided the first and second Lehman fee applications to the OIG for our review because this information is available to the public.  For the OIG's review of the Madoff liquidation, the trustee and SIPC provided us with redacted fee applications and timesheets covering our requested timeframe, February 2010 to May 2010.  While SIPC provided us with the fee applications and invoices for both the Lehman and Madoff liquidations, SIPC refused to provide us with documents containing fee negotiations with the trustees.  As recommended in the SEC's 2003 SIPC inspection report, SIPC adopted a policy to document all discussions with trustees and counsel relating to the review of fee applications and any differences between the amounts that were initially sought by the trustees and counsel and those that SIPC recommended for payment.[159]  Our inquiry of SIPC revealed that SIPC attorneys documented fee negotiations with

---

[152] "Madoff victims object to trustee's fees," Bloomberg News, (Sept. 2, 201), accessed Dec. 6, 2010, http://www.crainsnewyork.com/article/20100902/FREE/100909959.
[153] *Id.*
[154] "Bankruptcy Judge Backs Madoff Trustee's Payout Calculations," Noeleen G. Walder, (Mar. 2, 2010), accessed Oct. 18, 2010, http://www.law.com/jsp/law/LawArticleFriendly/jsp?id=1202444971605 (site discontinued).
[155] The OIG did not perform an audit of SIPC's activities and did not review any claim determinations.
[156] 2008 SIPC annual report, page 6. *See* http://www.sipc.org/pdf/SIPC%20Annual%20Report%202008%20FINAL.pdf.
[157] 2009 SIPC annual report, page 6. *See* http://www.sipc.org/pdf/2009%20Annual%20Report.pdf.
[158] According to the OIG's review of SIPC's website (http://www.sipc.org) and inquiry with TM.
[159] Letter from SIPC President to Director of OCIE, *Inspection of Securities Investor Protection Corporation,* June 5, 2003.

trustees in a memorandum or an e-mail, or made notations on the fee charts or invoices.  SIPC stated that providing such information to the OIG while the liquidations are in process would reveal the legal strategies used by the trustees and could jeopardize the liquidation process.

The OIG reviewed fee memoranda and timesheets that were prepared by the court-appointed trustees and interviewed SIPC officials.  We determined that SIPC's attorneys performed detailed reviews of the timesheets and focused on the number of hours and tasks employees performed to ensure the proper division of work, based on the employee's experience.  For complex and large cases such as Lehman and Madoff, the trustees prepare a memorandum that describes, among other things, (1) the nature of the work performed, (2) the overall expenses, and (3) each month's average hourly rate.  Additionally, we found that a SIPC attorney reviewed the legal staff's hours to ensure that the hours and the type of work assigned to each level of the legal staff appeared reasonable.

**Errors Found on Invoices Prepared by the Trustee and His Counsels.** The OIG's review of trustee fees disclosed that errors in Lehman invoices related to expenses for travel and copying invoices, which the trustee and SIPC agreed that SIPC would not be obligated to pay, were properly corrected before the trustee submitted the invoices to SIPC.

Based on the examples we have discussed in which courts have challenged the trustee fees SIPC recommended as being excessive, the limited ability of courts to question or reject SIPC's determination to recommend fees, and the SEC's concerns with SIPC's fee process in the 2003 SIPC inspection, the OIG concludes that a more effective review process and increased oversight of these determinations are needed.  We also believe that SIPC should consider additional steps it can adopt to reduce trustee fees by establishing higher discount rates.

## SIPC's Response to Criticism of Trustee Fees

In the Madoff case, the trustee recovered $7.2 billion in December 2010 from the widow of a longtime Madoff investor.[160]  SIPC did not agree to request more than the 10 percent discount on fees during its negotiations with trustees and stated that the fees were reasonable, considering the complexity and magnitude of the liquidations, especially for the Lehman and Madoff cases.  SIPC further stated that it did not want to sacrifice the quality of work that was required to properly administer SIPC liquidations by trustees and their counsels by seeking further fee reductions.

---

[160] http://money.cnn.com/2010/12/17/news/companies/madoff_picower/index.htm?hpt=T1.

## TM's View on Trustee Fees

TM told the OIG that because it has not reviewed the Lehman and Madoff trustee fees, it has no ability to judge whether these fees are reasonable.  However, TM acknowledged that it is fair to question whether the current 10 percent fee reduction is sufficient.  Additionally, TM stated that the Commission has no basis to judge whether the trustee fees in the Lehman and Madoff cases are reasonable and has not attempted to make such determinations.  A bankruptcy attorney in the SEC's New York Regional Office who is familiar with SIPC cases stated that certain trustees appointed to non-SIPC bankruptcy cases and receivers in SEC enforcement-related cases offer discounts on fees of more than 10 percent.  TM acknowledged that in the Lehman and Madoff cases, which are the largest liquidations in SIPC's history, it has been difficult to determine whether the hourly rates the trustees, their counsels, and other legal staff charge SIPC are reasonable.  TM added that the fees the trustees collect for the Lehman and Madoff cases are steady income for the trustees' law firms.

## The SEC's Study on Modernizing SIPA Supported Giving Bankruptcy Judges More Discretion Over Fees

In August 2009, a special counsel in TM conducted a study highlighting issues with SIPA and SIPC's rules and bylaws thereunder.  TM's study was intended to identify possible changes to SIPA to help modernize it.  The study also explored some policy issues that could lead to an expansion of SIPC's responsibilities under SIPA or an expansion of SIPA's protection beyond broker-dealer's customers.  One of the topics in the study covered reducing administrative expenses at the discretion of bankruptcy judges.

The study noted that "[w]hile in many cases administrative expenses are borne exclusively by SIPC, SIPC has precedence over general creditors, including certain defrauded investors, when seeking reimbursement for administrative expenses.  Thus, there may be public interest in considering whether the requirement under the Bankruptcy Code that bankruptcy judges determine the reasonableness of fees paid to trustees and attorneys should be extended to SIPC cases.  Bankruptcy judges could then make use of their experience in other cases to determine the reasonableness of fees."[161]

As previously discussed, there is a lack of discretion by court under SIPA on trustee fees in certain cases.  Although SIPA liquidations are similar to ordinary bankruptcy cases, there is no limit on the amount of trustee fees that may be paid in SIPA liquidations, unlike bankruptcy cases where a limit is imposed on trustee fees.  Additionally, the SEC does not review trustee fees on a periodic basis.  Hence, it would be advisable to have a second party periodically review the trustee fees that SIPC pays.

---

[161] Catherine McGuire, Memorandum Re: SIPA, Aug. 28, 2009.

**Recommendation 7:**

The Division of Trading and Markets, in coordination with the Office of the General Counsel, should conduct additional oversight of the Securities Investor Protection Corporation's (SIPC) assessments of the reasonableness of trustee fees and encourage SIPC to negotiate with outside court-appointed trustees more vigorously to obtain a reduction in fees greater than 10 percent.

**Management's Comments.** TM and OGC concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that TM and OGC concurred with this recommendation.

**Recommendation 8:**

The bankruptcy group in the Office of the General Counsel and the Division of Trading and Markets should decide on the scope and frequency of the Commission staff's monitoring of the Securities Investor Protection Corporation's (SIPC) assessments of the reasonableness of trustee fees paid by SIPC, rather than relying only on inspections of SIPC, which do not occur on a systematic basis.

**Management's Comments.** OGC and TM concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that OGC and TM concurred with this recommendation. We acknowledge that TM and OGC are not in a position to make an independent assessment of the reasonableness of trustee fees as they do not actively participate in the actual liquidation proceeding in a meaningful way.

**Recommendation 9:**

The Division of Trading and Markets, in consultation with the Commission, shall determine whether to request that Congress modify the Securities Investor Protection Act (SIPA) to allow bankruptcy judges who preside over SIPA liquidations to assess the reasonableness of administrative fees in all cases where administrative fees are paid by the Securities Investor Protection Corporation.

**Management's Comments.** TM concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that TM concurred with this recommendation. The administrative fees identified in our recommendation relate to the trustees and their counsel fees.  Further, the recommendation refers to SIPA provisions in Section 78eee(b)(5)(C).

# Finding 4:  SIPA Investor Education Coverage Still Needs Improvement

Despite the SEC's and SIPC's previous efforts to clarify confusion about SIPC's role and the coverage available under SIPA, many investors still do not sufficiently understand certain limitations on the coverage SIPA provides and the protection against losses resulting from broker-dealer failures.

## Investors Are Still Confused About SIPA's Coverage

As part of this audit, the OIG interviewed officials from OIEA and found that questions and complaints about SIPC that OIEA received from investors have dramatically increased in the past two years as a result of the Lehman and Madoff cases.  Further, our review of OIEA's log of complaints and questions related to SIPC and SIPA from the public covering January 2008 to November 2010 demonstrates that many investors (1) are still confused about the coverage available under SIPA, and (2) believe that as long as their broker-dealers are SIPC members they are covered under SIPA.

The director and founder of SVC, a group of approximately 7,400 Stanford victims,[162] stated that she believed that Stanford investors were misled about their coverage, as their account statements and many of the novelty items they received from Stanford contained the SIPC logo.  The director further stated that based on the materials Stanford provided to Stanford investors about SIPA coverage, Stanford investors had no reason to believe that SIPC would not cover their investments up to SIPA's $500,000 limit per customer[163] for claims of securities.  The director indicated that many Stanford investors invested only up to the $500,000 limit[164] because they thought they would be protected up to this amount under SIPA.

According to the director of SVC, Stanford investors also expressed concerns about the investor alerts and updates that the SEC posted on its website regarding its case against Robert Allen Stanford, and stated that the SEC's updates and notices provided information that Stanford investors already knew and were not helpful.  Additionally, the director of SVC stated that direct

---

[162] Interview of Angie Kogutt, director and founder of the Stanford Victims Coalition, Nov. 22, 2010.
[163] 15 U.S.C. § 78fff-3(a).
[164] *Id.*

communication with employees in TM who could articulate the status of the
SEC's efforts would have been helpful.[165]  She further stated that in dealing with
the Stanford matter, Stanford investors felt as though the SEC regarded them as
adversaries and it seemed at times, that they had to force the SEC to do its job.
We also found that many investors assume that SIPA's coverage is equivalent to
Federal Deposit Insurance Corporation (FDIC) coverage and believe they are
guaranteed to be compensated.  The amount of SIPA protection available for
claims of cash is now $250,000,[166] as amended by the Dodd-Frank Act, which is
the same amount as the FDIC's limit for deposit insurance.[167]

## Many Investors Do Not Become Aware of SIPA Until Failure of Their Broker-Dealer

The OIG learned that most investors are unaware of SIPC and SIPA until they
learn about their broker-dealer's liquidation or failure.  When an investor opens
an account with a broker-dealer, he or she is generally not contemplating the
possible liquidation of the broker-dealer.  If investors were better educated about
SIPA coverage, they could then question the financial condition of the broker-
dealer before they made an investment.

## Confusing Advertisements by SIPC

During our audit, we discussed with OIEA SIPC's efforts to publicize its existence
and we reviewed SIPC's 2002 and 2007 public service campaigns.  According to
the OIEA Director, the segment shots for SIPC's public service campaigns are
misleading because they do not fully describe the limitations of SIPA's coverage.
Additionally, the Director believes that the campaigns seem to overstate SIPC's
role.  For example, one of SIPC's campaigns stated that as an investor, a
person's personal safety net includes SIPC.  The campaign did not explain that
there are several significant exceptions to SIPA.  A second SIPC campaign
compared SIPC to a glove that catches a falling egg, symbolizing an investor's
nest egg.  The commercial further states that SIPC helps investors recover their
securities if the investor's broker fails.  However, the commercial fails to state
that certain securities are not covered under SIPA and that other limitations exist.
These campaigns seem to simplify SIPA's coverage and may lead investors to
believe that if they lose their securities in the hands of a broker-dealer that is a
SIPC member, they can always recover their losses through SIPC under SIPA.

## SIPC's Response to Advertisements

SIPC stated that in March 2008, the collapse of the Bear Stearns Companies,
Inc., led SIPC to revise and expand its investor education commitment to assure

---

[165] TM stated that TM staff members did communicate directly with Stanford investors.
[166] 15 U.S.C. § 78fff-3(d).
[167] 12 U.S.C. § 1821(a)(1)(E).

investors that a brokerage firm failure involves protection under SIPA.  SIPC's board of directors authorized an expanded and expedited public relations effort in that regard.

Additionally, SIPC disclosed that in late April 2009, after the failures of Lehman and Madoff, SIPC suspended these efforts because SIPC was constantly in the news and the role of SIPC was examined in great public detail.  Further, in light of the litigation arising from the Madoff case, SIPC believed that it would be the subject of criticism if it were to continue an expensive, high-profile public relations campaign at a time when some claimants were actively litigating with SIPC over the nature and the extent of protection under the statute.

SIPC also stated that it has budgeted for a renewed and revised investor education campaign for late 2011.

## Establishment of SIPC Task Force to Modernize SIPA and Improve Investor Education

According to the SIPC Modernization Task Force website,[168] SIPC created a SIPC Modernization Task Force (Task Force) on June 17, 2010, to perform a comprehensive review of SIPA and SIPC's operations and procedures and to propose reforms to modernize SIPA and SIPC.  The Task Force consists of investors, lawyers, and industry experts from different interests and groups.  The Task Force has been soliciting public comment on a number of issues.  One of the objectives of the Task Force is to assess how SIPC can improve investor education.

A senior official from TM is participating on the Task Force as an observer.  In addition, the OIEA Director provided the Task Force with suggestions for improving investor education.  Specifically, the Director provided ideas to improve investor awareness of SIPC, such as relaying a message (through advertising) to investors about what SIPC is and what SIPC is not, buying Google Ad Words, utilizing social network websites such as Facebook, and preparing advertisements and messages for certain target groups.  For instance, if a broker-dealer in Denver, Colorado, were being liquidated, SIPC could advertise SIPA coverage to Denver residents.  Conducting research through focus group testing could help determine how much the average investor knows about SIPA's coverage.  Focus group testing could also help verify the efficacy of SIPC's message in its public service campaign or identify the need to modify the message.  The OIEA Director also indicated that given today's technology, broker-dealers could identify the assets that are not covered by SIPC in the account statements that are sent to customers.

---

[168] http://www.sipcmodernization.org.

The President of SIPC stated that the Task Force plans to present its findings, conclusions, and recommendations to the SIPC board of directors by the first quarter of 2011.  The SIPC board of directors will then review the report and vote on the recommendations.  SIPC's President further stated that the plan will contain recommendations that could be implemented by amendments to the bylaws which the SEC has the authority to approve under SIPA.  There may also be some recommendations that would need to be implemented through legislative changes.  Our inquiry with the Chairman of the SIPC board of directors revealed that the Task Force has considered designating an employee at SIPC whose focus would be to improve investor education regarding the role of SIPC and the coverage that is available under SIPA.

## TM's Response

In regard to improving ways to communicate with investors, TM indicated that the updates and notices on the SEC's website and SIPC's website and the letters that were sent to Stanford investors who complained to OIEA were sufficient.  TM further stated that it does not have the resources to answer questions directly from investors and that its coordination with OIEA, which is mainly responsible for communicating with investors, is sufficient.  TM further stated that updating investors on matters related to ongoing investigations may jeopardize the SEC's efforts in litigation.  TM also stated that it is difficult to educate the public about SIPA coverage because of the many legal issues and different factual scenarios involved in an analysis of SIPA coverage, and that it has been struggling with this issue for the past 20 years.  However, in light of the issues raised in the Lehman, Madoff, and Stanford matters, it would be useful to consider ways in which the information provided by SIPC to the investing public could be improved and made clearer.

### Recommendation 10:

The Division of Trading and Markets, in coordination with the Office of Investor Education and Advocacy, should encourage the Securities Investor Protection Corporation to designate an employee whose responsibilities include improving investor education and preventing further confusion among investors about coverage available under the Securities Investor Protection Act.

**Management's Comments.**  TM concurred with this recommendation.  See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that TM concurred with this recommendation.

**Recommendation 11:**

The Division of Trading and Markets should support the Securities Investor Protection Corporation's (SIPC) efforts to improve investor education, including encouraging SIPC to strongly consider and, as appropriate, implement the Office of Investor Education and Advocacy's suggestions to improve investor awareness.

**Management's Comments.** TM concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that TM concurred with this recommendation.

**Recommendation 12:**

The Division of Trading and Markets, in coordination with the Office of Investor Education and Advocacy and in consultation with the Commission, should utilize more effective methods to communicate with investors in case of the failure of broker-dealers, such as notifying investors of the status of the Commission's efforts throughout the liquidation process or designating an employee, as appropriate, who can communicate directly with investors on matters unique to each liquidation case.

**Management's Comments.** TM concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that TM concurred with this recommendation.

**Appendix I**

# Acronyms/Abbreviations

| | |
|---|---|
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 |
| GAO | Government Accountability Office |
| Hanover | Hanover Investment Securities, LLC |
| NAC | North American Clearing, Inc. |
| OCIE | Office of Compliance Inspections and Examinations |
| OGC | Office of the General Counsel |
| OIEA | Office of Investor Education and Advocacy |
| OIG | Office of Inspector General |
| Lehman | Lehman Brothers, Inc. |
| Madoff | Bernard L. Madoff Investment Securities, LLC |
| SEC or Commission | Securities and Exchange Commission |
| SIPA | Securities Investor Protection Act of 1970 |
| SIPC | Securities Investor Protection Corporation |
| Stanford | Stanford Group Company |
| Sunpoint Securities, Inc. | Sunpoint |
| SVC | Stanford Victims Coalition |
| Task Force | Securities Investor Protection Corporation Modernization Task Force |
| TM | Division of Trading and Markets |

08-01789-cgm   Doc 4088-4   Filed 05/25/11   Entered 05/25/11 10:36:16   Exhibit C to
Chaitman Decl.   Pg 46 of 61

Appendix II

# Scope and Methodology

As part of its annual audit plan, the OIG conducted an audit of the SEC's oversight of SIPC. We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

**Scope.** We obtained TM's internal memorandum listing its responsibilities related to oversight of SIPC's activities. The OIG also obtained OCIE's inspection manual, which was utilized to conduct inspections of SIPC in 2003 and 2005. Additionally, we obtained planning memoranda listing areas of concentration, which were prepared by TM and OCIE for the SEC's inspection of SIPC. We obtained a memorandum from TM and OCIE describing the status of the implementation of prior OIG audit recommendations on this program (*Oversight of Securities Investor Protection Corporation,* Audit No. 301, March 31, 2000).

We conducted our fieldwork from late November 2010 to January 2011. We reviewed documentation on the SEC's monitoring of SIPC's activities covering calendar years 2008 and 2009 and from January to November 2010.

**Methodology.** To accomplish the audit objective of assessing if the SEC monitors SIPC's activities in accordance with governing legislation, we conducted interviews with TM and OGC staff members who are responsible for monitoring SIPC's activities. We further conducted inquires to gain an understanding of the SEC's process for monitoring SIPC. The OIG reviewed SIPA and its related legislative history. We also reviewed bylaw amendments SIPC submitted and correspondence between SIPC and the SEC regarding the bylaw amendments. We reviewed SIPC's fee charts that showed the trustee's fees for SIPA liquidations of Lehman, Madoff, Hanover, and NAC. Additionally, the OIG reviewed fee applications, which included timesheets and invoices prepared by independent court-appointed trustees for the aforementioned SIPA liquidations. We also interviewed OIEA management who coordinated with TM to respond to investors with questions and complaints regarding SIPC. The OIG also reviewed OIEA's log of investors' questions and complaints regarding SIPC, the liquidation of Madoff, and the Stanford case from investors. Further, we interviewed Atlanta Regional Office staff members who worked on the Hanover case.

To accomplish the audit objective of examining whether the Commission performs periodic and systematic inspections of SIPC's activities, we interviewed TM and OCIE staff members who conducted SIPC inspections. We also

08-01789-cgm   Doc 4088-4   Filed 05/25/11   Entered 05/25/11 10:36:16   Exhibit C to
Chaitman Decl.   Pg 47 of 61

Appendix II

reviewed the SEC's inspection reports of SIPC, memoranda prepared by OCIE and sent to the Commission regarding SIPC inspections, and responses from SIPC regarding the SEC's findings.

Further, to accomplish the audit objective of determining whether the SEC conducts meaningful reviews of SIPC's annual reports, we reviewed SIPC's annual reports for 2007, 2008, and 2009, and we observed evidence of the SEC's review of SIPC's annual reports. We conducted interviews of TM and OGC staff members who review SIPC's annual reports. To obtain an understanding on the status of certain SIPA liquidations, the OIG also conducted inquiries of SIPC attorneys who were assigned to the Lehman, Madoff, Hanover, and NAC liquidations. Finally, we inquired SIPC management and the Chairman of SIPC's board of directors to gain an understanding of SIPA liquidations and the role of SIPC and the SIPC Task Force, and to obtain an interpretation of the SIPA provision regarding the court's discretion over trustee fees that are paid by SIPC.

**Internal Controls.** During our audit, the OIG reviewed internal controls as they pertained to our audit objectives.

**Judgmental Sampling.** SIPC provided the OIG with 11 listings for the fees it paid to trustees from January 2008 to November 2010, for each liquidation. The OIG selected the Hanover, NAC, Lehman, and Madoff litigations for our review of billing records because the SEC referred these cases to SIPC and the liquidations commenced in 2008,[169] during the scope of our audit. According to SIPC's 2008 annual report, the Great Eastern Securities, Inc., liquidation began in 2008. However, since SIPC is the trustee for Great Eastern Securities, Inc., there were no fees paid to an outside trustee that could be reviewed. Further, there were no SIPC liquidations in 2009[170] or 2010.[171] For the OIG's review of fees for Lehman, SIPC provided the OIG with fee applications and related supporting documents for the first and second fee applications, which are public records. For the Madoff case, SIPC requested that the OIG select a sample of invoices for our review. The OIG selected the fee applications for the quarter ending May 31, 2010, because the trustee fees for that quarter were substantial.

**Prior Audit Coverage.** OIG report *Oversight of Securities Investor Protection Corporation,* Report No. 301, March 31, 2000.

---

[169] According to SIPC's 2008 annual report. *See* http://www.sipc.org/pdf/SIPC%20Annual%20Report%202008%20FINAL.pdf.
[170] According to SIPC's 2009 annual report. *See* http://www.sipc.org/pdf/2009%20Annual%20Report.pdf.
[171] According to the OIG's review of SIPC's website and inquiry with TM.

# Criteria

**Securities Investor Protection Act of 1970.**  Enacted to provide investors protection against losses caused by failure of broker-dealers.  Created SIPC, which either acts as trustee or works with an independent court-appointed trustee in liquidations of troubled brokerage firms to recover funds for investors with assets of bankrupt or financially troubled brokerage firms.  Adopted December 30, 1970, and last amended July 21, 2010.

**Report of the U.S. House of Representatives Committee on Interstate and Foreign Commerce, House Report No. 95-746, 95th Congress, 1st Session (October 27, 1977).**  Contains the legislative history for the Securities Investor Protection Act amendments of 1978.

**Report of the U.S. Senate Committee on Banking, Housing and Urban Affairs, Senate Report No. 95-763, 95th Congress, 2nd Session (April 25, 1978).**  Contains the legislative history for the Securities Investor Protection Act amendments of 1978.

**SEC Division of Trading and Markets Memorandum Regarding the Commission's Oversight Role of the Securities Investor Protection Corporation (June 24, 1999).**  TM's internal memorandum that describes how the Commission monitors SIPC and its operations, as required under the Securities Investor Protection Act of 1970, and other ways the Commission exercises its oversight responsibilities related to SIPC.

**11 U.S.C. § 326, Limitation on compensation of trustee, Pub. L. 95-598 (November 6, 1978).**  Sets limits on the amount of fees that trustees may be paid in bankruptcy cases under Chapter 7 or 11.

# List of Recommendations

**Recommendation 1:**

The Division of Trading and Markets should document its procedures and processes for its oversight and monitoring of the Securities Investor Protection Corporation pursuant to the Securities Investor Protection Act.

**Recommendation 2:**

The Division of Trading and Markets should complete its efforts to update its internal memorandum which describes its oversight responsibilities under the Securities Investor Protection Act (SIPA) and include its current practices and, where appropriate, the legislative amendments that were made to SIPA in July 2010 by the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**Recommendation 3:**

The Office of the General Counsel should consult with the Division of Trading and Markets to clarify its role in monitoring the Securities Investor Protection Corporation (SIPC) and document the responsibilities and procedures it follows in regard to the Commission's oversight of SIPC.

**Recommendation 4:**

The Office of the General Counsel should consider the costs and benefits related to certain activities that the retired attorney performed and determine what, if any, other activities are appropriate to adequately monitor the Securities Investor Protection Corporation.

**Recommendation 5:**

The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should conduct meetings, on at least an annual basis, to determine when an inspection of the Securities Investor Protection Corporation (SIPC) should occur, based on the ongoing liquidations, to ensure systematic and risk based monitoring of SIPC's operations.  In these meetings, TM and OCIE should develop a schedule for future inspections based upon objective criteria or defined risk-factors, such as conducting inspections based upon the number of SIPC liquidations.

**Appendix IV**

**Recommendation 6:**

The Division of Trading and Markets and the Office of Compliance Inspections
and Examinations should perform a risk assessment to determine problematic
areas or liquidations that are deemed to be complex prior to the next inspection
of the Securities Investor Protection Corporation (SIPC), as they did prior to the
commencement of the 2003 inspection of SIPC.  The scope of each future
inspection should take into consideration the risk assessment conducted prior to
the inspection.

**Recommendation 7:**

The Division of Trading and Markets, in coordination with the Office of the
General Counsel, should conduct additional oversight of the Securities Investor
Protection Corporation's (SIPC) assessments of the reasonableness of trustee
fees and encourage SIPC to negotiate with outside court-appointed trustees
more vigorously to obtain a reduction in fees greater than 10 percent.

**Recommendation 8:**

The bankruptcy group in the Office of the General Counsel and the Division of
Trading and Markets should decide on the scope and frequency of the
Commission staff's monitoring of the Securities Investor Protection Corporation's
(SIPC) assessments of the reasonableness of trustee fees paid by SIPC, rather
than relying only on inspections of SIPC, which do not occur on a systematic
basis.

**Recommendation 9:**

The Division of Trading and Markets, in consultation with the Commission, shall
determine whether to request that Congress modify the Securities Investor
Protection Act (SIPA) to allow bankruptcy judges who preside over SIPA
liquidations to assess the reasonableness of administrative fees in all cases
where administrative fees are paid by the Securities Investor Protection
Corporation.

**Recommendation 10:**

The Division of Trading and Markets, in coordination with the Office of Investor
Education and Advocacy, should encourage the Securities Investor Protection
Corporation to designate an employee whose responsibilities include improving
investor education and preventing further confusion among investors about
coverage available under the Securities Investor Protection Act.

08-01789-cgm    Doc 4088-4    Filed 05/25/11    Entered 05/25/11 10:36:16    Exhibit C to
Chaitman Decl.    Pg 51 of 61

**Appendix IV**

**Recommendation 11:**

The Division of Trading and Markets should support the Securities Investor
Protection Corporation's (SIPC) efforts to improve investor education, including
encouraging SIPC to strongly consider and, as appropriate, implement the Office
of Investor Education and Advocacy's suggestions to improve investor
awareness.

**Recommendation 12:**

The Division of Trading and Markets, in coordination with the Office of Investor
Education and Advocacy and in consultation with the Commission, should utilize
more effective methods to communicate with investors in case of the failure of
broker-dealers, such as notifying investors of the status of the Commission's
efforts throughout the liquidation process or designating an employee, as
appropriate, who can communicate directly with investors on matters unique to
each liquidation case.

08-01789-cgm    Doc 4088-4    Filed 05/25/11    Entered 05/25/11 10:36:16    Exhibit C to
Chaitman Decl.    Pg 52 of 61

Appendix V

# Management's Comments

---

<u>**MEMORANDUM**</u>

**TO:**    Office of Inspector General

**FROM:**    Division of Trading and Markets

**CC:**    Mark D. Cahn
General Counsel, Office of the General Counsel

Carlo V. di Florio
Director, Office of Compliance Inspections and Examinations

Lori J. Schock
Director, Office of Investor Education and Advocacy

**RE:**    The Division of Trading and Markets' Response to the Office of Inspector
General Report No. 495, <u>SEC's Oversight of the Securities Investor
Protection Corporation's Activities</u>

**DATE:**    March 23, 2011

---

## I.    Introduction

Thank you for the opportunity to respond to the recommendations in your March 9, 2011 draft report – <u>SEC's Oversight of the Securities Investor Protection Corporation's Activities</u> (the "Report"). At the outset, we want to extend our appreciation for the professionalism of your staff in conducting the audit. The responses to recommendations directed to the Division of Trading and Markets ("TM") are set forth below.[1] This includes responses to all recommendations in the Report except Recommendation 4.

## II.    Recommendations Directed to TM

*Recommendation 1: "[TM] should document its procedures and processes for its oversight and monitoring of Securities Investor Protection Corporation ["SIPC"] pursuant to the Securities Investor Protection Act ["SIPA"]."*

TM concurs with this recommendation. As is noted in the Report, there is an internal TM memorandum dated June 24, 1999 that describes in general terms the Commission's oversight responsibilities under SIPA. TM will update this memorandum and, based on the statutory and other responsibilities identified in the memorandum, create written procedures more specifically detailing TM's role in executing these responsibilities. The updated memorandum and procedures will be distributed to all relevant staff.

---

[1]    We have updated Recommendations 6, 7, 8, and 9 below to reflect revisions to those recommendations based on discussions between TM staff and staff in your office.

08-01789-cgm    Doc 4088-4    Filed 05/25/11    Entered 05/25/11 10:36:16    Exhibit C to
Chaitman Decl.    Pg 53 of 61

**Appendix V**

***Recommendation 2:*** *"[TM] should complete its efforts to update its internal memorandum which describes its oversight responsibilities under the SIPA and include its current practices and, where appropriate, the legislative amendments that were made to [SIPA] in July 2010, by the Dodd-Frank Wall Street Reform and Consumer Protection Act [the "Dodd-Frank Act"]."*

TM concurs with this recommendation. As is discussed in TM's Response to Recommendation 1, TM will update its internal memorandum relating to SIPC oversight, in order to reflect TM's current oversight practices and amendments to SIPA under the Dodd-Frank Act.

***Recommendation 3:*** *"The Office of General Counsel ["OGC"] should consult with [TM] to clarify its role in monitoring [SIPC] and document the responsibilities and procedures it follows in regards to the Commission's oversight of SIPC."*

TM concurs with this recommendation. TM will consult with OGC as suggested by Recommendation 3.

***Recommendation 5:*** *"[TM] and [OCIE] should conduct meetings, at least on an annual basis, to determine when an inspection of [SIPC] should occur based on the ongoing liquidations to ensure systematic and risk-based monitoring of SIPC's operations. In these meetings, TM and OCIE should develop a schedule for future inspections based upon objective criteria or defined risk-factors, such as conducting inspections based upon the number of SIPC liquidations."*

TM concurs with this recommendation, subject to our comments in the following paragraph. We have discussed this recommendation with OCIE and have agreed to meet at least annually to plan for future SIPC inspections. As part of this planning process, TM and OCIE will consider objective criteria and/or defined risk-based factors to be used when assessing whether to commence an inspection of SIPC.

We note that your recommendation that TM and OCIE "determine when an inspection of [SIPC] should occur based on ongoing liquidations" could be interpreted to suggest that each such annual meeting should result in a determination of a specific date for the next SIPC inspection. TM does not expect that its periodic meetings with OCIE will in all cases result in determinations of specific dates for SIPC inspections. In fact, TM and OCIE may conclude during a meeting that it is not yet appropriate to specify the date for the next SIPC inspection. TM and OCIE believe that the timing and scope of future SIPC inspections should continue to include a level of flexibility and prioritization that provides for the efficient and effective allocation of Commission resources. This flexibility also should continue to enable TM and OCIE to plan inspections in a manner that minimizes disruptions to SIPC and SIPA trustees in connection with ongoing liquidations and to focus inspections on current areas of interest and concern. We interpret your recommendation as providing this flexibility.

2

SEC's Oversight of the Securities Investor Protection Corporation's Activities                    March 30, 2011
Report No. 495

08-01789-cgm    Doc 4088-4    Filed 05/25/11    Entered 05/25/11 10:36:16    Exhibit C to Chaitman Decl.    Pg 54 of 61

**Appendix V**

*Recommendation 6: TM and OCIE should perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to the next inspection of SIPC as they did so prior to the commencement of the 2003 inspection of SIPC. The scope of each future inspection should take into consideration the risk assessment conducted prior to the inspection.*

TM concurs with this recommendation. TM agrees that prior to inspecting SIPC, TM and OCIE should perform a risk assessment designed to determine, with respect to SIPC and SIPA, problematic areas or liquidations deemed to be complex. TM and OCIE should then determine to what degree to focus their inspection efforts on these areas and/or liquidations. This risk-based approach is consistent with the inspection planning process employed in prior SIPC inspections and TM believes that this approach results in an efficient and effective allocation of Commission resources.

*Recommendation 7: TM, in coordination with OGC, should conduct additional oversight over SIPC's assessments of the reasonableness of trustee fees and encourage SIPC to negotiate with outside court-appointed trustees more vigorously to obtain greater than a 10 percent reduction in fees.*

Recommendation 7 is, in effect, two separate recommendations. First, Recommendation 7 states that TM, in coordination with OGC, should conduct additional oversight over SIPC's assessments of the reasonableness of trustee fees. TM concurs with this recommendation. TM and OGC have agreed to coordinate with each other to determine their respective roles relating to the additional oversight as is described in more detail in response to Recommendation 8 below.

The second part of Recommendation 7 states that TM, in coordination with OGC, should encourage SIPC to negotiate with outside court-appointed trustees more vigorously to obtain greater than a 10 percent reduction in fees. TM generally concurs with this recommendation. TM recognizes, however, that the size of a trustee's fee reduction in a SIPA liquidation will likely vary from case to case based on facts and circumstances relevant to a particular liquidation, and, in some cases, SIPC may decide to recommend a trustee that has not agreed to a fee reduction greater than 10 percent based on factors such as the size, complexity and/or location of a liquidation and the limited availability of qualified and experienced persons capable of effectively exercising the powers granted to a trustee under SIPA.

*Recommendation 8: The bankruptcy group in OGC and TM should decide on the scope and frequency of the SEC staff's monitoring of SIPC assessments of the reasonableness of trustee fees paid by SIPC, rather than relying only on inspections of SIPC which do not occur on a systematic basis.*

TM concurs with this recommendation and will consult with OGC to determine the scope and frequency of the SEC staff's monitoring of SIPC's assessments of the reasonableness of trustee fees and to determine the respective roles of TM and OGC in the monitoring. Between inspections, TM and OGC plan to review fee applications in

3

08-01789-cgm    Doc 4088-4    Filed 05/25/11    Entered 05/25/11 10:36:16    Exhibit C to
Chaitman Decl.    Pg 55 of 61

**Appendix V**

SIPA cases to make sure trustees follow the U.S. Trustee guidelines and that SIPC has conducted a thorough review of the reasonableness of trustee fees. TM and OGC are not in a position to make an independent assessment of the reasonableness of trustee fees, because TM and OGC would need to, but do not, actively participate in the actual liquidation proceeding in a way that would permit that assessment.

***Recommendation 9***: *TM, in consultation with the Commission, shall determine whether to request that Congress modify SIPA to allow bankruptcy judges who preside over SIPA liquidations, to assess the reasonableness of administrative fees in all cases where administrative fees are paid by SIPC.*

TM understands from the Report and this recommendation that, as a result of judicial commentary in case law since 1978, you would like TM, in consultation with the Commission, to determine whether to request that Congress modify SIPA to provide for judicial review of administrative fees in SIPC cases where judicial oversight does not currently exist. We assume that when you refer to "administrative fees," you mean the fees of trustees and their counsel, and that you are referring to the provisions of Section 78eee(b)(5)(C) of SIPA that Congress adopted in 1978 to limit the judicial scrutiny of fee awards to trustees and their counsel in "no-asset cases" (i.e., cases in which there is no reasonable expectation that SIPC will recoup from the estate of the debtor allowances awarded by the court). TM will consult with the Commission for purposes of determining whether to make the aforementioned request to Congress.

***Recommendation 10***: *"[TM], in coordination with [OIEA], should encourage [SIPC] to designate an employee whose responsibilities include improving investor education and preventing further confusion about coverage available under the Securities Investor Protection Act among investors."*

TM concurs with this recommendation and will coordinate with OIEA to encourage SIPC to designate an employee whose responsibilities include improving investor education about SIPC and SIPA coverage.

As noted in the Report, in 2010, SIPC created a Task Force with a mandate to undertake a comprehensive review of SIPA and SIPC's operations and policies, and to propose reforms to modernize SIPA and SIPC. Among other things, the Task Force is considering whether SIPC should employ an individual whose focus would be to improve investor education about SIPC and SIPA. We understand that the Task Force will present its findings, conclusions, and proposals to SIPC's Board of Directors in the near future and that SIPC's Board of Directors will vote on the recommendations.

TM, in coordination with OIEA, will encourage SIPC's Board of Directors to designate an employee whose responsibilities include improving investor education about SIPC and SIPA.

4

08-01789-cgm    Doc 4088-4    Filed 05/25/11    Entered 05/25/11 10:36:16    Exhibit C to
Chaitman Decl.    Pg 56 of 61

**Appendix V**

*Recommendation 11: "[TM] should support [SIPC's] efforts to improve investor
education, including encouraging SIPC to strongly consider and, as appropriate,
implement [OIEA's] suggestions to improve investor awareness."*

TM concurs with this recommendation.  TM has supported, and will continue to
support, the efforts of SIPC and OIEA to improve investor education and awareness
relating to SIPA and SIPC.  We will encourage SIPC to consider and, as appropriate,
implement OIEA's suggestions to improve investor awareness.

*Recommendation 12:  "[TM], in coordination with [OIEA] and in consultation with the
Commission, should utilize more effective methods to communicate with investors in case
of the failure of broker-dealers such as notifying investors of the status of the
Commission's efforts throughout the liquidation process or designating an employee, as
appropriate, who can directly communicate with investors on matters unique to each
liquidation case."*

TM concurs with this recommendation.  TM will coordinate with OIEA to
develop more effective methods to communicate with investors affected by broker-dealer
failures and will consult with the Commission as part of this process.

* * * * *

5

SEC's Oversight of the Securities Investor Protection Corporation's Activities                March 30, 2011
Report No. 495

**Appendix V**

## MEMORANDUM

To:      Office of Inspector General

From:  Office of the General Counsel   *JH Stillman*

Subj:   OIG's Draft Report – SEC's Oversight of the Securities Investor Protection
Corporation's Activities

Date:   March 23, 2011

### Introduction

On February 28, 2011, the Office of Inspector General circulated its Discussion
Draft – SEC's Oversight of the Securities Investor Protection Corporation's Activities.
On March 7, 2011 the Office of the General Counsel ("OGC") submitted a memorandum
offering both technical and substantive comments on this Discussion Draft.  On March 9,
2011, the Office of Inspector General circulated its Draft – SEC's Oversight of the
Securities Investor Protection Corporation's Activities.  The OIG has requested that OGC
concur or not concur with its recommendations and to provide comments on this Draft
report.

### OGC's Responses to Recommendations of Draft Report (as amended)

**Recommendation 3 –** OGC concurs.

**Recommendation 4 –** OGC concurs.

**Recommendation 7 –** OGC concurs to the extent that the recommendation affects OGC.

**Recommendation 8 –** Joint Comment with TM – TM and OGC generally concur with
this recommendation and will consult with each other to determine the scope and
frequency of the SEC staff's monitoring of SIPC's assessment of the reasonableness of
trustee fees and to determine the respective roles of TM and OGC in the monitoring.
Between examinations, TM and OGC will also review fee applications to make sure they
follow the U.S. Trustee guidelines and that SIPC has conducted a thorough review of the
reasonableness of trustee fees. TM and OGC are not in a position to make an independent
assessment of the reasonableness of trustee fees, because TM and OGC would need to,
but do not, actively participate in the actual liquidation proceeding in a meaningful way.

1

## MEMORANDUM

March 24, 2011

**TO:**  H. David Kotz, Inspector General
Office of Inspector General

**FROM:**  John H. Walsh, Associate Director-Chief Counsel (Designated Audit Liaison)
John S. Polise, Associate Director
Helene K. McGee, Assistant Director ___ on behalf of HKM
Office of Compliance Inspections and Examinations

**COPY:**  Carlo di Florio, Director
Office of Compliance Inspections and Examinations

Robert W. Cook, Director
Division of Trading and Markets

**RE:**  Office of Compliance Inspections and Examinations' Response to the Office of Inspector
General's Draft Report, *SEC's Oversight of the Securities Investor Protection
Corporation's Activities*

---

The Office of Compliance Inspections and Examinations ("OCIE") submits this Memorandum in response to the Office of Inspector General's ("OIG") draft report entitled *SEC's Oversight of the Securities Investor Protection Corporation's Activities*," dated March 9, 2011 ("Report"). This Memorandum responds to OIG's recommendations that OCIE and the Division of Trading and Markets ("TM") should (1) conduct meetings to determine when an inspection of the Securities Investor Protection Corporation ("SIPC") should occur; and (2) continue to perform risk assessments of problematic areas or liquidations prior to the next inspection of SIPC. You have requested that we indicate whether we "concur" or "non-concur" with each recommendation. We have consulted with TM and are in general agreement that we concur with these recommendations.

Set forth below are our responses to the recommendations directed to OCIE contained in the Report.

***Recommendation 5:*** *"[TM] and [OCIE] should conduct meetings, at least on an annual basis, to determine when an inspection of [SIPC] should occur based on the ongoing liquidations to ensure systematic and risk-based monitoring of SIPC's operation. In these meetings, TM and OCIE should develop a schedule for future inspections based upon objective criteria or defined risk-factors, such as conducting inspections based upon the number of SIPC liquidations."*

OCIE concurs that regular meetings with TM would be useful in helping us achieve our objective of systematic and risk-based monitoring of SIPC's operations. As noted in the Report, OCIE and TM last performed an inspection of SIPC in 2003 and a follow-up inspection in 2005 to assess SIPC's activities. In early 2010, OCIE and TM jointly determined that an inspection of SIPC in 2010 would not be prudent due to SIPC's involvement in certain ongoing large liquidations. The staff of TM has been

**Appendix V**

OCIE's Response to OIG Audit - Report No. 495
March 24, 2011

actively involved in these liquidations and a considerable amount of SIPC's resources have been directed towards these liquidations. Based on these factors, OCIE and TM determined that our resources would be better utilized by waiting for these liquidations to be substantially completed prior to our next inspection of SIPC. We also considered the possible disruption an inspection could cause to SIPC and its activities with respect to these highly complex liquidations and determined that investors would be better served if we waited to commence an inspection of SIPC. We note also that examiners do not review liquidations that are in progress because of the disruption it could cause to the liquidation proceedings.

To date, meetings between OCIE and TM regarding the inspection of SIPC have generally been informal in nature. For example, we consult with TM on an annual basis in preparation of OCIE's memorandum that sets forth the annual goals and objectives of the National Exam Program. The purpose of this memorandum includes identifying risk areas for concentration on inspections. The memorandum generally includes our goals and objectives with respect to SIPC.

We agree that OCIE and TM should conduct more formal periodic meetings regarding inspections of SIPC. We have discussed this recommendation with TM and have agreed to meet at least annually for the purpose of determining when an inspection of SIPC should occur. In these meetings, OCIE and TM will assess whether to commence an inspection of SIPC. OCIE and TM have also agreed to develop objective criteria or defined risk-factors that will be used to develop a schedule for future inspections. We concur with the Report's assessment that an approach that considers objective criteria or defined risk-based factors in determining when SIPC should be inspected is preferable to an approach that calls for a set inspection cycle (e.g., every four to five years) without due consideration to these other factors.

***Recommendation 6:*** *"[TM] and [OCIE] should perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to the next inspection of [SIPC] as they did so prior to the commencement of the 2003 inspection of SIPC. The scope of each future inspection should take into consideration the risk assessment conducted prior to the inspection."*

We are pleased that the Report agrees with the risk-based approach OCIE and TM took prior to the commencement of our 2003 and 2005 inspections of SIPC. OCIE continues to improve and enhance its risk-based approach to examination preparation and execution and draws on multiple sources of data to ensure our risk assessment process is strategic and efficient in identifying problematic areas. For SIPC inspections, this would include identifying high-risk or complex liquidations. We therefore concur with the recommendation that OCIE and TM should continue to perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to inspections of SIPC. We also concur that the scope of each future inspection of SIPC should take into consideration these risk assessments.

2

# OIG Response to Management's Comments

The OIG is pleased that TM, OCIE, and OGC concurred with all of the report's 12 recommendations.  We are also encouraged that TM, OGC, and OCIE have agreed to work together to implement our recommendations and to ensure the effectiveness of the SEC's oversight of SIPC's activities.

We wish to re-emphasize the importance of TM and OCIE developing schedules for regular inspections of SIPC and making determinations at their annual meetings of specific dates for SIPC inspections even if every meeting may not result in a determination of a specific date.  We also believe that it is critical for TM and the bankruptcy group in OGC to engage in significant additional oversight of SIPC's assessments of the reasonableness of trustee fees, including careful and comprehensive review of fee applications; to encourage SIPC to negotiate greater fee reductions; and to seriously consider requesting that Congress modify SIPA to allow bankruptcy judges to scrutinize fees of trustees and their counsel, particularly in no-asset cases.  We believe that the implementation of these recommendations will enhance the SEC's monitoring of SIPC and will further ensure that, consistent with the intent of Congress in enacting SIPA, the investing public is provided adequate protection against losses caused by the failure of broker-dealers.

# Audit Requests and Ideas

The Office of Inspector General welcomes your input.  If you would like to
request an audit in the future or have an audit idea, please contact us at

U.S. Securities and Exchange Commission
Office of Inspector General
Attn: Assistant Inspector General, Audits (Audit Request/Idea)
100 F Street, N.E.
Washington D.C.  20549-2736

Tel. #:  202-551-6061
Fax #:  202-772-9265
Email: oig@sec.gov

## Hotline

**To report fraud, waste, abuse, and mismanagement at the SEC,
contact the Office of Inspector General at:**

**Phone:  877.442.0854**

**Web-Based Hotline Complaint Form:**