# Exhibit 1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

ANWAR, *et al.*,

  Plaintiffs,

v.

FAIRFIELD GREENWICH LIMITED,
*et al.*,

  Defendants.

This Document Relates To:  All Actions

Master File No. 09-cv-118 (VM)

## SECOND CONSOLIDATED AMENDED COMPLAINT

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
(212) 759-4600

LOVELL STEWART HALEBIAN LLP
61 Broadway, Suite 501
New York, NY 10006
(212) 608-1900

*Interim Co-Lead Counsel for Plaintiffs*

RECEIVED
09 SEP 29 PM 12: 16
U.S. DISTRICT COURT
S.D.N.Y.

# TABLE OF CONTENTS

Page

GLOSSARY OF DEFINED TERMS.................................................................... viii

NATURE OF THE ACTION ...............................................................................1

JURISDICTION AND VENUE ...........................................................................3

PARTIES ..............................................................................................................3

    A.    Plaintiffs .................................................................................4

        1.    Fairfield Sentry Limited Investors.................................4

        2.    Fairfield Sigma Limited Investors.........................14

        3.    Greenwich Sentry, L.P. Investors...........................18

        4.    Greenwich Sentry Partners, L.P. Investors ............................19

    B.    Defendants ...........................................................................20

        1.    Fairfield Greenwich Defendants ...........................20

        2.    PricewaterhouseCoopers Defendants .........................38

        3.    Citco Defendants ...................................................39

        4.    GlobeOp Defendant .............................................42

ALLEGATIONS OF FACT ................................................................................43

    A.    Bernard Madoff's Massive Ponzi Scheme................................43

    B.    Fairfield Greenwich Group's Relationship with Madoff .................44

    C.    Nature and Structure of the Fairfield Greenwich Group ...................47

D.    Fairfield Defendants' False Representations and Omissions in
      Marketing the Funds and Their Breaches of Fiduciary Duties to
      Investors .................................................................................... 49

      1.    Defendants' False Representations and Omissions
            Regarding the Split-Strike Conversion Strategy ..................... 51

      2.    Defendants' False Representations and Omissions
            Regarding the Funds' Track Record of Profitability ............... 52

      3.    Defendants' False Representations and Omissions in Fund
            Reports to Investors .............................................................. 53

      4.    Defendants' False Representations and Omissions
            Concerning Due Diligence and Oversight of Madoff ............. 57

E.    The Fairfield Defendants Ignored Red Flags of Madoff's Fraud ....... 68

      1.    Madoff's Secretive Operations ............................................... 68

      2.    Key Positions Held by Madoff Family Members .................... 69

      3.    Madoff's Custody of Assets .................................................... 69

      4.    Madoff's Unknown Auditing Firm ......................................... 70

      5.    Madoff's Paper Trading Records ............................................. 70

      6.    Madoff's Consistent Investment Returns ................................ 71

F.    The Fairfield Defendants Falsely Reassured Investors Who Made
      Inquiries ...................................................................................... 72

G.    The Fairfield Defendants Assisted Madoff in Thwarting an SEC
      Investigation ................................................................................ 78

H.    The Fairfield Defendants Attempted to Raise Money to Keep
      Madoff Afloat in Late 2008 ......................................................... 79

I.   The Fairfield Defendants and Fairfield Fee Claim Defendants
     Earned Massive Fees from Funneling Plaintiffs' Assets into the
     Madoff Fraud.....................................................................................80

J.   Fairfield Defendants Agreed to Provide Full Restitution to
     Massachusetts Investors in the Funds...............................................87

K.   PricewaterhouseCoopers Failed to Audit the Funds According to
     U.S. and International Standards and Misrepresented the
     Financial Condition of the Funds. ....................................................89

     1.   PwC Issued Clean Audit Opinions for the Funds ...................90

     2.   PwC Operates As a Unitary International Professional
          Services Organization .........................................................92

     3.   PwC Owed Duties to Plaintiffs and Knew Investors in the
          Funds Would Rely on Clean Audit Opinions .........................96

     4.   PwC Recklessly Performed Its Audits and Made
          Misrepresentations Regarding the Funds................................99

          a)   PwC Was Required, at a Minimum, to Obtain
               Independent Verification that the Funds' Assets
               Existed ......................................................................99

          b)   PwC Failed to Verify the Existence of the Funds'
               Madoff Investments ...................................................111

          c)   PwC Violated Its Duties to Fund Investors .................115

     5.   PwC's Substantial Assistance to Fairfield Defendants' Fraud
          and Breaches of Fiduciary Duty ...........................................118

L.   Citco Violated Its Obligations to Provide Financial Services to
     Fund Investors ...............................................................................119

     1.   Citco Operates as a Single Global Financial Services
          Provider ..............................................................................119

2.      Citco Holds Itself Out as a Superior Financial Services
        Provider ......................................................................................121

3.      Citco Committed to Serve as the Funds' Administrator ........123

4.      Citco Committed to Serve as Custodian for Fairfield Sentry
        and Sigma ..................................................................................124

5.      Citco Owed Duties to Plaintiffs as Fund Investors ...............126

6.      Citco's Performance of Its Duties to Plaintiffs Was Grossly
        Deficient ....................................................................................128

7.      Citco Provided Substantial Assistance to the Fairfield
        Defendants' Fraud and Breaches of Fiduciary Duty..............130

8.      Citco Collected Unearned Fees .............................................131

M.      GlobeOp Violated Its Obligations to Greenwich Sentry Investors...131

N.      Defendants' Fraudulent Concealment of Their Breaches of Duty ....133

CLASS ACTION ALLEGATIONS ...................................................................134

CLAIMS FOR RELIEF ....................................................................................141

Count 1
Fraud against Fairfield Fraud Claim Defendants (Purchaser Claims) .................141

Count 2
Fraud against Fairfield Fraud Claim Defendants (Holder Claims)......................143

Count 3
Violation of Section 10(b) and Rule 10b-5 against Fairfield Fraud Claim
Defendants..........................................................................................................146

Count 4
Violation of Section 20(a) against Fairfield Fraud Claim Defendants and
Defendants Landsberger, Murphy, and Smith ....................................................148

Count 5
Negligent Misrepresentation against Fairfield Defendants (Purchaser Claims) ...149

Count 6
Negligent Misrepresentation against Fairfield Defendants (Holder Claims)........151

Count 7
Gross Negligence against Fairfield Defendants....................................................154

Count 8
Breach of Fiduciary Duty against Fairfield Defendants.......................................156

Count 9
Third-Party Beneficiary Breach of Contract against Fairfield Defendants and
Fairfield Fee Claim Defendants ..........................................................................159

Count 10
Constructive Trust against Fairfield Defendants and Fairfield Fee Claim
Defendants...........................................................................................................161

Count 11
Mutual Mistake against Fairfield Defendants and Fairfield Fee Claim
Defendants...........................................................................................................162

Count 12
Gross Negligence against PricewaterhouseCoopers ...........................................163

Count 13
Negligence against PricewaterhouseCoopers .....................................................164

Count 14
Negligent Misrepresentation against PricewaterhouseCoopers...........................165

Count 15
Third-Party Beneficiary Breach of Contract against PricewaterhouseCoopers ....167

Count 16
Aiding and Abetting Breach of Fiduciary Duty against
PricewaterhouseCoopers....................................................................................168

Count 17
Aiding and Abetting Fraud against PricewaterhouseCoopers .............................169

Count 18
Violation of Section 10(b) and Rule 10b-5 against PwC Canada and PwC
Netherlands...................................................................................................173

Count 19
Violation of Section 20(a) against PricewaterhouseCoopers International ..........176

Count 20
Third-Party Beneficiary Breach of Contract against Citco ..................................177

Count 21
Breach of Fiduciary Duty against Citco .............................................................182

Count 22
Gross Negligence against Citco .........................................................................186

Count 23
Negligence against Citco ...................................................................................186

Count 24
Aiding and Abetting Breach of Fiduciary Duty against Citco .............................187

Count 25
Aiding and Abetting Fraud against Citco ...........................................................188

Count 26
Violation of Section 10(b) and Rule 10b-5 against Citco Fund Services and
Citco Canada ....................................................................................................190

Count 27
Violation of Section 20(a) against Citco Group...................................................191

Count 28
Negligent Misrepresentation against Citco Fund Services, Citco Canada and
Citco Group ......................................................................................................192

Count 29
Breach of Fiduciary Duty against GlobeOp ..................................................194

Count 30
Gross Negligence against GlobeOp..............................................................196

Count 31
Negligence against GlobeOp..........................................................................197

Count 32
Breach of Fiduciary Duty against Francoeur, Pilgrim, and Citco ......................198

Count 33
Unjust Enrichment against All Defendants ....................................................199

PRAYER FOR RELIEF....................................................................................201

JURY TRIAL DEMANDED ..............................................................................202

# GLOSSARY OF DEFINED TERMS

| **Defined Term** | **Definition** |
| --- | --- |
| AICPA | American Institute of Certified Public Accountants |
| Barreneche | Defendant Lourdes Barreneche |
| BMIS | Bernard L. Madoff Investment Securities, Inc. |
| Blum | Defendant Robert Blum |
| Boele | Defendant Cornelis Boele |
| Bowes | Defendant Gregory Bowes |
| BVI | Territory of the British Virgin Islands |
| CFSB | Defendant Citco Fund Services (Bermuda) Limited |
| Citco Bank | Defendant Citco Bank Nederland, N.V., Dublin Branch |
| Citco Canada | Defendant Citco (Canada) Inc. |
| Citco | Defendants Citco Group, Citco Fund Services, Citco Canada, Citco Global, CFSB, and Citco Bank |
| Citco Fund Services | Defendant Citco Fund Services (Europe) B.V. |
| Citco Global | Defendant Citco Global Custody N.V. |
| Citco Group | Defendant Citco Group Limited |

| **Defined Term** | **Definition** |
| --- | --- |
| Class | All shareholders or partners of Fairfield Sentry, Fairfield Sigma, Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P., as of December 10, 2008 who suffered a net loss of principal invested in the Funds |
| COM | Confidential Offering Memoranda/Memorandum |
| Corina Piedrahita | Defendant Corina Noel Piedrahita |
| Della Schiava | Defendant Yanko Della Schiava |
| d'Hendecourt | Defendant Vianney d'Hendecourt |
| FΣ PPM-02/06 | Fairfield Sigma February 21, 2006 PPM |
| FΣ PPM-12/08 | Fairfield Sigma December 1, 2008 PPM |
| F&H | Friehling & Horowitz |
| Fairfield Defendants | FGG, FGL, FGBL, FGA, FRS, FHC, LFCM, Noel, Tucker, Piedrahita, Vijayvergiya, Lipton, McKeefry, Landsberger, Smith, and Murphy |
| Fairfield Fee Claim Defendants | Della Schiava, Toub, Barrenche, Boele, d'Hendencourt, Harary, Reyes, Pulido Mendoza, Luongo, Greisman, Horn, Blum, and Corina Piedrahita |
| Fairfield Fraud Claim Defendants | FGG, FGL, FGBL, FGA, FRS, Noel, Tucker, Piedrahita, Vijayvergiya, Lipton, and McKeefry |
| Fairfield Sentry | Fairfield Sentry Limited |

| **Defined Term** | **Definition** |
|---|---|
| Fairfield Sigma | Fairfield Sigma Limited |
| FGA | Defendant Fairfield Greenwich Advisors LLC |
| FGBL | Defendant Fairfield Greenwich (Bermuda) Ltd. |
| FGG | Defendant Fairfield Greenwich Group |
| FGG Partners | All FGG entities, including FGBL, FGL, and FGA, and partners in FGG including Defendants Noel, Tucker, and Piedrahita, the individual Fairfield Defendants and the Fairfield Fee Claim Defendants |
| FGL | Defendant Fairfield Greenwich Limited |
| FHC | Defendant Fairfield Heathcliff Capital LLC |
| Francoeur | Defendant Brian Francoeur (Director of FGBL) |
| FRS | Defendant Fairfield Risk Services Ltd. |
| FS PPM-10/03 | Fairfield Sentry July 1, 2003 Private Placement Memorandum |
| FS PPM-10/04 | Fairfield Sentry October 1, 2004 Private Placement Memorandum |
| FS PPM-8/06 | Fairfield Sentry August 14, 2006 Private Placement Memorandum |
| Funds or Fairfield Funds | Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P., and Greenwich Sentry Partners, L.P. |

x

| **Defined Term** | **Definition** |
| --- | --- |
| GlobeOp | Defendant GlobeOp Financial Services, LLC |
| Greenwich Sentry | Greenwich Sentry, L.P. |
| Greenwich Sentry Partners | Greenwich Sentry Partners, L.P. |
| Greisman | Defendant Harold Greisman |
| GS COM-1994 | Greenwich Sentry 1994 Confidential Offering Memorandum |
| GS COM-5/06 | Greenwich Sentry May 2006 Confidential Offering Memorandum |
| GS COM-8/06 | Greenwich Sentry August 2006 Confidential Offering Memorandum |
| GSP COM-8/06 | Greenwich Sentry Partners August 2006 Confidential Offering Memorandum |
| Harary | Defendant Jacqueline Harary |
| Horn | Defendant David Horn |
| Landsberger | Defendant Richard Landsberger |
| LFCM | Defendant Lion Fairfield Capital Management Ltd. |
| Lipton | Defendant Daniel E. Lipton |
| Luongo | Defendant Julia Luongo |
| Madoff | Bernard L. Madoff and BMIS |

| Defined Term | Definition |
|---|---|
| Massachusetts Proceeding....... | *In the Matter of Fairfield Greenwich Advisors LLC and Fairfield Greenwich (Bermuda) Ltd.*, Docket No. 2009-0028, (Commonwealth of Massachusetts, Securities Division), complaint filed Apr. 1, 2009 |
| McKeefry................................ | Defendant Mark McKeefry |
| Murphy .................................. | Defendant Charles Murphy |
| NASD .................................... | National Association of Securities Dealers |
| NAV ...................................... | Net Asset Value |
| NNI........................................ | Northern Navigation International Limited |
| Noel....................................... | Defendant Walter M. Noel, Jr. |
| Piedrahita.............................. | Defendant Andres Piedrahita |
| Pilgrim .................................. | Defendant Ian Pilgrim |
| Placement Memoranda........... | Private Placement Memoranda and Confidential Offering Memoranda for the Funds |
| PPM...................................... | Private Placement Memoranda/ Memorandum |
| Pulido Mendoza ..................... | Defendant Maria Teresa Pulido Mendoza |
| PwC ...................................... | Defendants PwC Canada, PwC Netherlands, and PwC International |
| PwC Canada .......................... | Defendant PricewaterhouseCoopers LLC |

| Defined Term | Definition |
|---|---|
| PwC Netherlands | Defendant PricewaterhouseCoopers Accountants Netherlands N.V. |
| PwC International | Defendant PricewaterhouseCoopers International Limited |
| Reyes | Defendant Santiago Reyes |
| Sentry Administrative Agreement | Administrative Agreement between Fairfield Sentry Limited and Citco Fund Services (Europe) B.V., dated February 20, 2003 |
| Sentry 2003 Custodian Agreement | Brokerage & Custody Agreement between Fairfield Sentry Limited, Citco Bank Nederland N.V. Dublin Branch, and Citco Global Custody N.V., dated July 17, 2003 |
| Sentry 2006 Custodian Agreement | Custodian Agreement between Fairfield Sentry Limited, Citco Bank Nederland N.V. Dublin Branch, and Citco Global Custody N.V., dated July 3, 2006 |
| Sigma Administration Agreement | Administration Agreement between Fairfield Sigma Limited and Citco Fund Services (Europe) B.V., dated February 20, 2003 |
| Sigma 2003 Custodian Agreement | Brokerage & Custody Agreement between Fairfield Sigma Limited, Citco Bank Nederland N.V. Dublin Branch, and Citco Global Custody N.V., dated August 12, 2003 |
| SIPC | Securities Investor Protection Corporation |
| Smith | Defendant Andrew Smith |

| **Defined Term** | **Definition** |
|---|---|
| SSC | Split-strike conversion/split-strike conversion strategy |
| Toub | Defendant Philip Toub |
| Tucker | Defendant Jeffrey H. Tucker |
| Vijayvergiya | Defendant Amit Vijayvergiya |

Plaintiffs, through undersigned Interim Co-Lead Counsel and Lead Counsel

for the PSLRA Plaintiffs, pursuant to the Court's January 30, 2009, and July 7,

2009 Orders, file their Second Consolidated Amended Complaint against

Defendants and allege, upon personal knowledge as to matters relating to

themselves and upon information and belief obtained during the course of their

counsel's investigation as to all other matters, as follows:

## NATURE OF THE ACTION

1.       This suit arises out of the largest and longest running "Ponzi scheme"

in history – a fraud orchestrated by Bernard Madoff, and facilitated by the reckless,

grossly negligent, and fraudulent conduct of others.  This class action seeks

recovery on behalf of investors who lost billions of dollars in the largest group of

so-called "feeder funds" into Madoff's fraudulent operations, the funds marketed

and operated by the Fairfield Greenwich Group ("FGG").

2.       Plaintiffs and the members of the class (collectively, "Plaintiffs") are

shareholders and/or equity holders of the four FGG/Madoff feeder funds –

Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P., and

Greenwich Sentry Partners, L.P. (collectively, the "Funds") – who suffered a net

loss of principal invested in the Funds.

3.       The Defendants in this action are all responsible for Plaintiffs'

massive losses.  Defendants solicited Plaintiffs' investments; they oversaw and

1

controlled the investments; they handed Plaintiffs' assets over to Madoff; they

reported fictitious account values to investors; and they purported to, but did not,

monitor Madoff or perform proper audits.  As detailed below, Defendants directly

owed duties to Plaintiffs, including fiduciary duties, to conduct due diligence on

Madoff; to verify Madoff's transactions; to monitor any third parties that

Defendants chose to carry out the Funds' investment strategy, including Madoff; to

provide accurate and complete information to Plaintiffs about their investments in

the Funds, both before and after the initial investment; and to audit the Funds to

assure their financial statements represented fairly in all material respects their

financial condition.  The loss of Plaintiffs' assets in the Madoff Ponzi scheme is a

direct and proximate result of Defendants' false representations and omissions and

failure to fulfill their duties to Plaintiffs.

       4.       Moreover, as detailed below, certain of the Defendants wrongfully

collected hundreds of millions of dollars in unearned fees based on the fictitious

assets supposedly managed by, and profits supposedly generated by, Madoff for

FGG's investors.  These fees were wrongly paid out of the Funds, as a result of

false representations and breaches of fiduciary duties owed by Defendants.  The

fees must be returned to Plaintiffs, or a constructive trust imposed for the benefit of

investors against those now holding such fees.

2

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this dispute pursuant to 28 U.S.C.

§ 1331 (federal question jurisdiction), Section 27 of the Securities Exchange Act of

1934 (the "Exchange Act"), 15 U.S.C. § 78a, and the Class Action Fairness Act of

2005, codified at 28 U.S.C. § 1332(d)(2)(B).  The amount in controversy exceeds

$5,000,000.  The Plaintiff class consists of more than 100 individuals; at least one

Plaintiff is a citizen of a foreign state and one Defendant is a citizen of New York.

6.    The Court also has supplemental jurisdiction pursuant to 28 U.S.C.

§ 1367(a).

7.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(3), as

one or more of the Defendants resides in this District and the principal place of

business of one or more Defendants is in this District.

## PARTIES

8.    Due to the wrongful conduct alleged herein, the Plaintiffs identified

below have lost all, or substantially all, of their investments in the Funds as of

December 11, 2008, and also have paid substantial investment, placement,

management, and performance fees that were wrongfully charged based on

fraudulent investment returns.

3

A.   **Plaintiffs**

1.   Fairfield Sentry Limited Investors

1.      Plaintiff **Inter-American Trust** is a Cayman Islands settlor-directed trust that invested assets in Fairfield Sentry on October 8, 2002.

2.      Plaintiff **Elvira 1950 Trust** is a Cayman Islands settlor-directed trust that invested assets in Fairfield Sentry beginning March 6, 2002, and made subsequent investments on January 4, 2001, March 30, 2001, June 30, 2002, December 27, 2007, and January 31, 2008.

3.      Plaintiff **Bonaire Limited** is a Cayman Islands private investment holdings company that invested assets in Fairfield Sentry on May 5, 2006.

4.      Plaintiff **Pacific West Health Medical Center Inc. Employees Retirement Trust**, located in Los Angeles, California, invested assets in Fairfield Sentry in approximately January 2008.

5.      Plaintiff **20/20 Investments** is a Panamanian company that invested assets in Fairfield Sentry beginning November 27, 2002, and made subsequent investments on December 1, 2003, February 1, 2004, October 1, 2004 and June 1, 2005 .

6.      Plaintiff **ABN AMRO LIFE S.A.** is a Luxembourg-based life insurance company that invested assets in Fairfield Sentry on September 23, 2003.

7.    Plaintiff **Aldeneik B.V.B.A.** is Belgian company that invested assets in Fairfield Sentry on March 13, 2003.

8.    Plaintiff **Alejandro Flores** is an individual residing in Mexico who invested assets in Fairfield Sentry on November 14, 2008.

9.    Plaintiff **Alejandro López de Haro** is an individual residing in Spain who invested assets in Fairfield Sentry on August 18, 2005.

10.    Plaintiff **Alexander Richardson** is an individual residing in Bahrain who invested assets in Fairfield Sentry in approximately September 2000.

11.    Plaintiff **Alfonso Villanova Torres** is an individual residing in Spain who invested assets in Fairfield Sentry on December 20, 2007.

12.    Plaintiffs **Arie Gruber** and **Dafna Gruber** are individuals residing in Israel who invested assets in Fairfield Sentry on January 2, 2007.

13.    Plaintiff **Bahraini Saudi Bank** is a Bahraini financial institution that invested assets in Fairfield Sentry beginning September 27, 2006, and made a subsequent investment on February 2, 2008.

14.    Plaintiff **Banca Arner, S.A.** is a Swiss corporation that invested assets in Fairfield Sentry beginning February 27, 1998, and made a subsequent investment on November 30, 2003.

15.    Plaintiff **Banco General S.A.** is a Panamanian institution that invested assets in Fairfield Sentry beginning September 26, 2002, and made

subsequent investments on October 1, 2002, October 1, 2004, October 19, 2004,
December 12, 2004, December 14, 2004, April 1, 2005, June 1, 2005, July 1,
2005, September 9, 2005, October 1, 2005, November 1, 2005, December 1, 2005,
May 1, 2006, August 1, 2006, October 1, 2006, February 1, 2007, March 1, 2007,
May 23, 2007, December 1, 2007, February 1, 2008, and May 1, 2008.

16. Plaintiff **Berndt M. Sommer** is an individual residing in Mexico who
invested assets in Fairfield Sentry on November 14, 2008.

17. Plaintiff **Blythel Associated Corp.** is a Panamanian corporation that
invested in Fairfield Sentry beginning October 1, 2004, and made subsequent
investments on October 30, 2004, and April 30, 2005.

18. Plaintiff **BPV Finance (International) Ltd.** is an Irish company that
invested assets in Fairfield Sentry beginning March 21, 2006, and made a
subsequent investment on January 1, 2007.

19. Plaintiff **Carling Investment Ltd.** is an Israeli company that invested
assets in Fairfield Sentry on March 1, 2008.

20. Plaintiff **Carlos Gauch** is an individual residing in Mexico who
invested assets in Fairfield Sentry on June 27, 2005.

21. Plaintiff **Carmel Ventures Ltd.** is a British Virgin Islands
corporation that invested assets in Fairfield Sentry beginning September 14, 2005,

and made subsequent investments on August 29, 2005, November 1, 2006, and
March 1, 2007.

22.     Plaintiff **Centro Inspection Agency** is a New Jersey Defined Benefit
Plan that invested assets in Fairfield Sentry beginning September 12, 2006, and
made subsequent investments on February 26, 2007 and September 9, 2008.

23.     Plaintiff **Diandra DeMorrell Douglas Foundation** is a California
charitable foundation that invested assets in Fairfield Sentry beginning in
approximately July 2007.

24.     Plaintiff **Diandra Douglas** is an individual residing in New York,
New York who invested her Investment Retirement Account ("IRA") in Fairfield
Sentry in approximately June 2007.

25.     Plaintiff **Elaine Meldahl** is an individual residing in Mexico who
invested assets in Fairfield Sentry beginning November 14, 2008.

26.     Plaintiff **Edurne Alonso** is an individual residing in Mexico who
invested assets in Fairfield Sentry beginning November 14, 2008.

27.     Plaintiff **Edgar Russo** is an individual residing in Argentina who
invested assets in Fairfield Sentry beginning August 23, 2007, and made a
subsequent investment on February 22, 2008.

28.     Plaintiff **El Prado Trading** is a British Virgin Islands company that
invested assets in Fairfield Sentry on August 28, 2006.

29.     Plaintiff **Emerson Sanchez** is an individual residing in Brazil who invested assets in Fairfield Sentry on February 26, 2007.

30.     Plaintiff **Enrique Descamps Sinibaldi** is an individual residing in Guatemala who invested assets in Fairfield Sentry on October 24, 2006.

31.     Plaintiff **Erling D. Speer** is an individual residing in Florida who invested his Investment Retirement Account ("IRA") in Fairfield Sentry on October 19, 2006.

32.     Plaintiff **Eugene James Brian Cooper** is an individual residing in Great Britain who invested assets in Fairfield Sentry on September 30, 1999.

33.     Plaintiff **EVG Bank Ltd.** is a company incorporated in Antigua that invested assets in Fairfield Sentry beginning March 29, 2006, and made subsequent investments on July 26, 2007, April 17, 2008, May 27, 2008, and June 25, 2008. EVG Bank Ltd. is the successor to Evergreen Bank Ltd.

34.     Plaintiff **Falcon One, Ltd.** is a Cayman Islands trust that invested assets in Fairfield Sentry on September 6, 2005.

35.     Plaintiff **Federico L. Pedreño Cleries** and Plaintiff **Mercedes Cleries Genovart** are individuals residing in Spain who invested assets in a joint account in Fairfield Sentry on October 1, 1999.

36.     Plaintiff **Francisco Vieta Pascual** is an individual residing in Spain who invested assets in Fairfield Sentry on August 3, 1998.

37.    Plaintiff **Fundación Rolur** is a Panamanian foundation that invested assets in Fairfield Sentry on July 25, 2008.

38.    Plaintiff **Guillermo Cordera** is an individual residing in Mexico who invested assets in Fairfield Sentry on November 14, 2008.

39.    Plaintiff **Harel Insurance Company, Ltd**. is an Israeli company that invested assets in Fairfield Sentry on September 22, 2003, and made subsequent investments on April 26, 2006, and June 28, 2007.

40.    Plaintiff **Harvest Dawn International Inc.** is a Panamanian corporation that invested assets in Fairfield Sentry in approximately 2007.

41.    Plaintiff **Hector Castro** is an individual residing in Argentina who invested assets in Fairfield Sentry in approximately July 2001.

42.    Plaintiff **Heidi Steiger Investment Retirement Account** is an IRA that invested assets in Fairfield Sentry on June 13, 2007.

43.    Plaintiff **Janine Lannelongue** is an individual residing in Mexico who invested assets in Fairfield Sentry on August 1, 1997.

44.    Plaintiff **Johanna L.M. Van Unnik-Borstlap** is an individual residing in Belgium who invested assets in Fairfield Sentry on January 20, 2003.

45.    Plaintiff **Juan Antonio Hentschel** is an individual residing in Mexico who invested assets in Fairfield Sentry on November 14, 2008.

46.     Plaintiff **Kalandar International** is a British Virgin Islands company that invested assets in Fairfield Sentry on August 26, 2008.

47.     Plaintiff **Kapital Geld Sicav, S.A.** is a Spanish investment fund that invested assets in Fairfield Sentry on July 1, 2007.

48.     Plaintiff **KAS BANK N.V.** is a company organized in The Netherlands that invested assets in Fairfield Sentry on April 1, 2002.

49.     Plaintiff **Kerry Piesch** is an individual residing in Australia who invested assets in Fairfield Sentry in approximately March 1999.

50.     Plaintiff **Kidman N.V.** is a company organized in the Netherlands Antilles that invested assets in Fairfield Sentry beginning September 1, 2003, and made a subsequent investment on March 24, 2005.

51.     Plaintiff **Landville Capital Management S.A.** is a Panamanian corporation that invested assets in Fairfield Sentry on October 27, 2006.

52.     Plaintiff **Loana Ltd.** is a Cayman Islands settlor-directed trust that invested assets in Fairfield Sentry on December 11, 2000.

53.     Plaintiff **Madanes Investment & Enterprise Ltd.** is an Israeli company that invested assets in Fairfield Sentry on June 28, 2007.

54.     Plaintiff **Margaretha Katherina Cooper** is an individual residing in Great Britain who invested assets in Fairfield Sentry on February 25, 2003.

55.    Plaintiff **Maria Elena Curzio** is an individual residing in Mexico who invested assets in Fairfield Sentry on November 14, 2008.

56.    Plaintiff **Maria Teresa Marquez** is an individual residing in Mexico who invested assets in Fairfield Sentry on November 14, 2008.

57.    Plaintiff **Marrakesh Resources** is a Panamanian company that invested assets in Fairfield Sentry on November 1, 2006.

58.    Plaintiff **Miguel Cornejo** is an individual residing in Mexico who invested assets in Fairfield Sentry on June 13, 2008.

59.    Plaintiff **Mira Securities N.V.** is a company organized in the Netherlands Antilles that invested assets in Fairfield Sentry beginning September 5, 2002, and made subsequent investments on December 23, 2003, April 18, 2005, and January 1, 2008.

60.    Plaintiff **Moises Lou Martinez** is an individual residing in Panama who invested assets in Fairfield Sentry in approximately September 2005.

61.    Plaintiffs **Nadav Zohar** and **Rohit Zohar** are individuals residing in the United Kingdom who purchased assets in Fairfield Sentry on February 27, 2008.

62.    Plaintiff **Omawa Investment Corporation** is a Panamanian company that invested assets in Fairfield Sentry beginning May 25, 2005, and made a subsequent investment on August 24, 2005.

11

63.    Plaintiff **Paolo Paoloni Remia** is an individual residing in Mexico who invested assets in Fairfield Sentry on January 27, 2005, and made a subsequent investment on September 25, 2006.

64.    Plaintiff **Peter Anthony Baines** is an individual residing in Brazil who invested assets in Fairfield Sentry on April 4, 2008.

65.    Plaintiff **Property & Equity Corp.** is a Panamanian company that invested assets in Fairfield Sentry beginning in approximately August 2007, and made a subsequent investment on February 27, 2008.

66.    Plaintiff **Ricardo Ballesteros** is an individual residing in Mexico who invested assets in Fairfield Sentry on November 14, 2008.

67.    Plaintiff **Securities & Investment Company (SICO) Bahrain** is a Bahraini institution that invested assets in Fairfield Sentry on June 27, 2002, and made subsequent investments on September 30, 2004, September 1, 2005, and October 1, 2008.

68.    Plaintiff **Shimon Laor** is an individual residing in Israel who invested assets in Fairfield Sentry on May 1, 2004.

69.    Plaintiff **South Barrow, S.A.** is a Panamanian company that invested assets in Fairfield Sentry on June 1, 2006.

70.    Plaintiff **Stienaklif B.V.** is a Netherland company that invested assets in Fairfield Sentry on October 31, 2006.

71.    Plaintiff **Sunglow Equities Inc.** is a Panamanian company that invested assets in Fairfield Sentry on December 8, 2008.

72.    Plaintiff **Tampa N.V.** is a company organized in the Netherlands Antilles that invested assets in Fairfield Sentry on July 17, 2003.

73.    Plaintiff **The Knight Services Holdings Limited** is a company organized in the British Virgin Islands that invested assets in Fairfield Sentry on March 15, 2007.

74.    Plaintiff **Traconcorp** is a Panamanian corporation that invested assets in Fairfield Sentry in approximately 2000.

75.    Plaintiff **Vicenza Life Ltd.** is an Irish company that invested assets in Fairfield Sentry beginning April 17, 2008, and made subsequent investments on August 1, 2008, September 1, 2008, and November 1, 2008.

76.    Plaintiff **Victor Milke** is an individual residing in Mexico who invested assets in Fairfield Sentry on August 15, 2008.

77.    Plaintiff **Wall Street Securities, S.A.** is a Panamanian corporation that invested assets in Fairfield Sentry beginning April 1, 2000, and made dozens of subsequent purchases in 2001, 2002, 2005, 2006, 2007, and 2008.

78.    Plaintiff **William De Warren** is an individual residing in Switzerland who invested assets in Fairfield Sentry beginning June 24, 2002, and made a subsequent investment on January 24, 2003.

2.   Fairfield Sigma Limited Investors

79.   Plaintiff **Akenaton Inversiones Sicav, S.A.** is a Spanish investment fund that invested assets in Fairfield Sigma beginning August 1, 2008.

80.   Plaintiff **ABN AMRO LIFE S.A**. is a Luxembourg-based life insurance company that invested assets in Fairfield Sigma beginning October 27, 2003, and made subsequent investments on December 23, 2003, March 24, 2005, and May 25, 2005.

81.   Plaintiffs **Arie Pieter van de Bovenkamp** and **Henk van Capelle** are individuals residing in Belgium who invested assets in Fairfield Sigma in approximately 2000.

82.   Plaintiff **AXA Private Management** is a Belgian institution that invested assets in Fairfield Sigma beginning July 1, 2005, and made dozens of subsequent investments through June 30, 2008.

83.   Plaintiff **Banca Sella Holding S.P.A.** is an Italian company that invested assets in Fairfield Sigma on November 23, 2006.

84.   Plaintiff **Beleggingsmaatschappij Josephine D. B.V.** is a company organized in The Netherlands that invested assets in Fairfield Sigma beginning March 24, 2005, and made subsequent investments on April 21, 2005, September 12, 2005, June 27, 2006, and November 23, 2007.

85.     Plaintiff **Berzosa de Inversiones, SICAV, S.A.** is a Spanish company
that invested assets in Fairfield Sigma on September 23, 2008.

86.     Plaintiff **Certimab Control SL** is a Spanish company that invested
assets in Fairfield Sigma on January 25, 2005.

87.     Plaintiff **Compass Inversiones Sicav, S.A.** is a Spanish investment
fund that invested assets in Fairfield Sigma on October 1, 2008.

88.     Plaintiff **Eric Simon Van Ruiten** is an individual residing in Belgium
who invested assets in Fairfield Sigma beginning October 24, 2003, and made a
subsequent investment on June 25, 2007.

89.     Plaintiff **Jacco F. Eltingh** is an individual residing in The Netherlands
who invested assets in Fairfield Sigma beginning May 31, 2005, and made a
subsequent investment on July 2, 2007.

90.     Plaintiff **Florijn S.A.** is a company organized in Luxembourg that
invested assets in Fairfield Sigma on May 26, 2003.

91.     Plaintiff **Gama Bursatil Sicav, S.A.** is a Spanish investment fund that
invested assets in Fairfield Sigma on April 2, 2007.

92.     Plaintiff **Income Inversiones Sicav, S.A.** is a Spanish investment
fund that invested assets in Fairfield Sigma on July 1, 2007.

93.     Plaintiff **Inversiones Mobiliarias Alicante, Simcav, S.A.** is a
Spanish investment fund that invested assets in Fairfield Sigma on August 1, 2007.

94.     Plaintiff **Jesús Domínguez Fernández** is an individual residing in
Spain who invested assets in Fairfield Sigma on September 30, 2008.

95.     Plaintiff **Johanna L.M. Van Unnik-Borstlap** is an individual
residing in Belgium who invested assets in Fairfield Sigma beginning October 24,
2003, and made a subsequent investment on December 23, 2003.

96.     Plaintiff **Mira Securities N.V.** is a company organized in the
Netherlands Antilles that invested assets in Fairfield Sigma beginning December
23, 2003, and made subsequent investments on April 18, 2005, and January 17,
2008.

97.     Plaintiff **Nmás1 Gestión Renta Fija Corto Plazo, Fl** (previously
known as Nmás1 Tesorería, Fl) is a Spanish mutual fund that invested assets in
Fairfield Sigma on June 30, 2008.  Nmás1 had previously purchased shares of
Fairfield Sentry on May 31, 2008, which were transferred to Fairfield Sigma shares
on June 30, 2008.

98.     Plaintiff **Paul V.N. Haarhuis** is an individual residing in The
Netherlands who invested assets in Fairfield Sigma in approximately December
2006.

99.     Plaintiff **South Barrow, S.A.** is a Panamanian company that invested
assets in Fairfield Sigma on May 1, 2007.

100. Plaintiff **SSMART S.A.** is a Greek corporation that invested assets in Fairfield Sigma on July 25, 2006.

101. Plaintiff **Stichting Guppie** is a company organized in the Netherlands Antilles that invested assets in Fairfield Sigma beginning November 20, 2003, and made subsequent investments on August 23, 2004, November 3, 2004, April 26, 2005, May 6, 2005, August 4, 2005, and June 22, 2008.

102. Plaintiff **St. Stephen's School** is a co-educational, non-denominational boarding and day school incorporated in Connecticut and located in Rome, Italy that invested assets from its endowment fund in Fairfield Sigma in approximately December 2005.

103. Plaintiff **Svetlana Kuznetsova** is an individual residing in Monaco who invested assets in Fairfield Sigma beginning June 27, 2006, and made subsequent investments on August 28, 2006, September 26, 2006, and April 22, 2008.

104. Plaintiff **Tampa N.V.** is a company organized in the Netherlands Antilles that invested assets in Fairfield Sigma beginning October 27, 2003, and made subsequent investments on December 23, 2003, October 26, 2006, and July 25, 2007.

105. Plaintiff **Theodorus H. Henkelman** is an individual residing in Belgium who invested assets in Fairfield Sigma on May 25, 2005.

106.    Plaintiff **Ubione di Banche Italiane S.c.P.A.** is an Italian financial
institution that invested assets in Fairfield Sigma on December 12, 2003.

107.    Plaintiff **William De Warren** is an individual residing in Switzerland
who invested assets in Fairfield Sigma beginning October 24, 2003, made a
subsequent investment on December 12, 2003, and made two further investments
on March 24, 2005.

108.    Plaintiff **Xavier L. Vuiton** is an individual residing in Belgium who
invested assets in Fairfield Sigma on March 1, 2004, and made subsequent
investments on April 1, 2005, May 30, 2005, July 5, 2005, August 1, 2005,
November 22, 2005, and June 21, 2007.

3.    <u>Greenwich Sentry, L.P. Investors</u>

109.    Plaintiffs **Pasha S. Anwar** and Julia Anwar are individuals residing in
Illinois who have an equity interest in Greenwich Sentry, purchased in
approximately May 2007.  Plaintiffs Pasha S. Anwar and Julia Anwar previously
owned an equity interest in Fairfield Sentry.

110.    Plaintiff **ABR Capital Fixed Option/Income Strategic Fund LP** is a
fund incorporated under the laws of Delaware that has an equity interest in
Greenwich Sentry, purchased on February 1, 2008, and that made subsequent
purchases throughout 2008.

111.   Plaintiff **Dawson Bypass Trust** is a Nevada trust that has an equity interest in Greenwich Sentry, purchased on February 27, 2008.

112.   Plaintiff **Diversified Investments Associates Class A Units** is a New York company that has an equity interest in Greenwich Sentry, purchased on March 15, 2000, and made a subsequent purchase on January 1, 2001.

113.   Plaintiff **Jeffrey S. Lieberman** is an individual residing in Florida who has an equity interest in Greenwich Sentry, purchased on April 26, 2007.

114.   Plaintiff **Larry Centro** is an individual residing in New Jersey who has an equity interest in Greenwich Sentry, purchased on August 1, 2006.

115.   Plaintiff **Martin and Shirley Bach Family Trust** is an Arizona family trust that has an equity interest in Greenwich Sentry, purchased on February 15, 2002, and made subsequent purchases on September 20, 2002, October 31, 2002, June 12, 2006, and December 28, 2007.

    **4.**   Greenwich Sentry Partners, L.P. Investors

116.   Plaintiff **Natalia Hatgis** is an individual residing in New York who has an equity interest in Greenwich Sentry Partners, purchased on December 1, 2006.

**B.**   **Defendants**

    1.   Fairfield Greenwich Defendants

117.   Defendant **Fairfield Greenwich Group** ("FGG") is a de facto
partnership or partnership by estoppel. FGG's partners include the other Fairfield
entities and individual persons, as set forth below. The FGG partners intended to
act as partners, held themselves out to Plaintiffs and other investors as partners,
and conducted business under the name Fairfield Greenwich Group without regard
to corporate structure and formalities.

118.   Defendant **Fairfield Greenwich Limited** ("FGL") is a company
incorporated under the laws of the Cayman Islands and registered to do business in
New York. FGL is a member of the National Futures Association, and is
registered with the Commodity Futures Trading Commission as a commodity pool
operator. FGL was held out and marketed as a member and partner of FGG. FGL
was the Placement Agent for Fairfield Sentry and Fairfield Sigma, and oversaw the
marketing of Fairfield Sentry's shares. Prior to 2003, FGL served as the
Investment Manager of Fairfield Sentry. FGL was the General Partner of
Greenwich Sentry from July 2003 to February 2006. It exercised broad discretion
and control over the Funds' assets.

119.   Defendant **Fairfield Greenwich (Bermuda) Ltd.** ("FGBL") is an
SEC-registered, exempted corporation organized under the laws of Bermuda on

June 13, 2003. FGBL is a wholly-owned subsidiary of FGL and was marketed as a member and partner of FGG. FGBL is registered with the SEC as an investment advisor under the Investment Advisers Act of 1940, effective April 20, 2006. FGBL was the Investment Manager for Fairfield Sentry and the Investment Manager and Investment Advisor for Fairfield Sigma. FGBL was also the General Partner of Greenwich Sentry beginning March 1, 2006, and the General Partner of Greenwich Sentry Partners since the Fund's organization on April 11, 2006. FGBL also is a member of FGG's Risk Management team. FGBL exercised broad discretion in the management of the Funds' investment activities, the selection and monitoring of the Funds' investments, and maintaining relationships between the Funds and their respective custodians, sub-custodians, administrators, registrars and transfer agents. FGBL was responsible for reviewing and approving the parameters and operating guidelines of Madoff's purported split-strike conversion strategy, conducting investment oversight, evaluating market risk, and monitoring investment compliance with the guidelines. In addition, the finance group of FGBL was responsible for reviewing and verifying the monthly NAV calculated by Defendant Citco.

120. Defendant **Fairfield Greenwich Advisors LLC** ("FGA") is a Delaware limited liability company, incorporated on December 12, 2001 that is registered to do business in New York. FGA was held out as a member and

21

partner of FGG.  FGA assisted FGBL with its fund manager selection and due

diligence process, and provided each of the Funds with administrative services and

back-office support.  FGA is registered with the SEC as an investment advisor

under the Investment Advisors Act of 1940, as amended, effective November 17,

2003.

121.    Defendant **Fairfield Risk Services Ltd.** ("FRS") is incorporated

under the laws of Bermuda.  It is a wholly owned subsidiary of FGL and shares

office space with FGBL in Hamilton, Bermuda.  FRS was held out and marketed

as a member and partner of FGG.  Along with FGBL, FRS served on FGG's Risk

Management team.  FRS was responsible for analyzing and monitoring FGG's

hedge fund managers, monitoring market risk, analyzing asset allocation decisions,

creating and disseminating fund-specific risk reports, and maintaining a risk

infrastructure to support these activities.

122.    Defendant **Fairfield Heathcliff Capital LLC** ("FHC") is

incorporated under the laws of Delaware, is registered as a foreign corporation to

do business in New York, is registered with the SEC as a broker-dealer, and is a

member of the Financial Industry Regulatory Authority, the National Association

of Securities Dealers ("NASD"), and the Securities Investor Protection

Corporation ("SIPC").  It is a wholly-owned subsidiary of FGL and an affiliate of

FGBL.  FHC was held out and marketed as a member and partner of FGG.  FHC

served as the placement agent for the Funds.  FHC maintains offices at 55 East

52nd Street, New York, New York and transacted business relating to the Funds in

New York.

123.   Defendant **Lion Fairfield Capital Management Ltd.** ("LFCM") is

incorporated under the laws of the Republic of Singapore.  LFCM is FGG's hedge

fund management and client-servicing platform in Asia, and marketed shares of

Fairfield Sentry to investors.  LFCM was created by a joint venture between FGG

and Lion Capital Management Limited (formerly, Straits Lion Asset Management

Limited) in 2004.  FGG owns 35% of LFCM, and Lion Capital Management

Limited owns the remaining 65%.  LFCM holds a capital markets services license

issued by the Monetary Authority of Singapore under the provisions of the

Securities and Futures Act.  Lion Capital Management is one of the largest asset

management companies in Southeast Asia, and maintains offices in Singapore.

LFCM was formerly known as Fairfield Straits Lion Asset Management Limited.

124.   Defendant **Walter M. Noel, Jr.** ("Noel") is an American citizen and

maintains residences in Connecticut and New York.  Noel is a Founding Partner of

FGG, which he established in 1983.  Since founding FGG, Noel has been a director

or general partner of a variety of its funds, including Fairfield Sentry and Fairfield

Sigma, and continues to oversee all of FGG's activities.  He had significant

discretion and control over assets of the Funds.  As a founding partner and senior

officer of FGG, Noel was compensated with placement, management, and

performance fees derived from the Funds' investments with Madoff. Mr. Noel

received a Bachelor of Arts from Vanderbilt University in 1952, a Master of Arts

in Economics from Harvard in 1953, and an LL.B. from Harvard Law School in

1959.

125. Defendant **Jeffrey H. Tucker** ("Tucker") is an American citizen and

is a resident of New York. Tucker is a Founding Partner of FGG. In 1989, Tucker

introduced the Madoff relationship to FGG. FGG's relationship with Madoff later

became the basis for Fairfield Sentry. At all relevant times, Tucker oversaw the

business and operational activities of several FGG management companies and

funds. He had significant discretion and control over assets of the Funds. As of

July 2006, Tucker was one of four individuals who could authorize movement of

cash into and out of the investment accounts the Funds maintained at Madoff's

investment firm, Bernard L. Madoff Investment Securities, Inc. ("BMIS"). As a

founding partner and senior officer of FGG, Tucker was compensated with

placement, management, and performance fees derived from the Funds'

investments with Madoff. Mr. Tucker received a B.A. from Syracuse University in

1966 and a J.D. from Brooklyn Law School in 1969.

126. Defendant **Andres Piedrahita** ("Piedrahita") is one of Defendant

Noel's sons-in-law. He is a Colombian citizen and a resident of New York,

London, and Madrid.  Piedrahita is a Founding Partner of FGG, and is Director and

President of FGBL, which in turn is the investment manager of Fairfield Sentry

and Fairfield Sigma, and the general partner of Greenwich Sentry and Greenwich

Sentry Partners.  Piedrahita has overall management responsibility over FGG and

is directly involved in its decision-making.  He had significant discretion and

control over assets of the Funds.  As of July 2006, Piedrahita was one of four

individuals who could authorize movement of cash into and out of the investment

accounts that the Funds maintained at BMIS.  As a founding partner and senior

officer of FGG, Piedrahita was compensated with placement, management, and

performance fees derived from the Funds' investments with Madoff.  Mr.

Piedrahita holds a Bachelor's degree from Boston University.

127.  Defendant **Amit Vijayvergiya** ("Vijayvergiya") was a partner in FGG

and served as the firm's Chief Risk Officer and President of FGBL. Vijayvergiya

resides in Bermuda and New York City, and worked primarily out of FGG's

Bermuda office, focusing on manager selection and risk management.

Vijayvergiya had direct responsibility for monitoring and assessing the past and

ongoing performance of the Funds' assets entrusted to Madoff.  He had significant

discretion and control over assets in the Funds.  As of July 2006, Vijayvergiya was

one of four individuals who could authorize movement of cash into and out of the

investment accounts that the Funds maintained at BMIS.  As a partner and senior

officer of FGG, Vijayvergiya was compensated with placement, management, and performance fees derived from the Funds' investments with Madoff. Mr. Vijayvergiya holds an M.B.A. from Schulich School of Business at York University, a B.S. in Statistics from the University of Manitoba, and a B.A. in Economics from the University of Western Ontario; he is a Chartered Financial Analyst and had a Financial Risk Manager certification.

128.  Defendant **Daniel E. Lipton** ("Lipton") is FGG's Chief Financial Officer, based in the New York office, and a partner in the Operations Group. He had significant discretion and control over assets in the Funds. As of July 2006, Lipton was one of four individuals who could authorize movement of cash into and out of the Funds' accounts that FGG maintained at BMIS. As a partner and senior officer of FGG, Lipton was compensated with placement, management and performance fees derived from the Funds' investments with Madoff. Lipton received a B.A. in Economics from Tufts University and an M.B.A. in dual degrees in Accounting and Finance from New York University's Stern School of Business; he is a Certified Public Accountant. Lipton spent nine years at Ernst & Young as a Senior Manager, with responsibility for auditing and consulting engagements, specializing in alternative assets, private equity, venture capital, and domestic and offshore funds. Lipton resides in New York City.

129.   Defendant **Mark McKeefry** ("McKeefry") is FGG's Chief Operating
Officer and General Counsel, based in New York, and a partner in the Operations
Group.  He had significant discretion and control over assets in the Funds.  He
holds FINRA Series 7, 24, 63, and 65 licenses and is admitted to the bars of
California and New York.  Prior to joining FGG's New York office in 2003,
McKeefry spent eight years in private law practice advising broker-dealers and
investment advisors on regulatory and compliance matters related to onshore and
offshore funds and authored several articles on hedge fund compliance issues and
investment advisor trading practices.  As a partner and senior officer of FGG,
McKeefry was paid placement, management and performance fees derived from
the Funds' investments with Madoff.  McKeefry holds a B.S. from Carnegie
Mellon University and a J.D. from Fordham University, where he was a member of
the Law Review.

130.   Defendant **Richard Landsberger** ("Landsberger") was a partner in
FGG's Client Group and a member of its Executive Committee, and a director of
LFCM.  Having joined FGG in 2001, Landsberger was responsible for business
development in Europe and Asia and directly marketed products to a global
institutional client base.  He had significant discretion and control over assets in
the Funds.  As a partner and senior officer of FGG, Landsberger was compensated
with placement, management, and performance fees derived from the Funds'

investments with Madoff. Landsberger is based in FGG's London office. With
over 20 years of experience in capital markets, Landsberger was Managing
Director of Fixed Income Sales at PaineWebber and Citicorp Securities.
Landsberger received a B.A. from Boston University and an M.B.A. from Cornell
University.

131. Defendant **Maria Teresa Pulido Mendoza** ("Pulido Mendoza") was
a partner in FGG. Pulido Mendoza was FGG's Head of Global Sales, with
responsibility for managing FGG's global sales force and developing new markets.
She had significant discretion and control over assets in the Funds. As a partner
and senior officer of FGG, Pulido Mendoza was compensated with placement,
management, and performance fees derived from the Funds' investments with
Madoff. FGG's marketing materials touted Pulido Mendoza's 17 years of
experience in private banking, investment banking and management consulting at
Citi Private Bank, Bankers Trust/Deutsche Bank, James D. Wolfensohn, Inc., and
McKinsey. Pulido Mendoza received a B.A. in economics, cum laude, from
Columbia, and an M.B.A., magna cum laude, from MIT Sloan School of
Management.

132. Defendant **David Horn** ("Horn") was a partner in FGG, based in the
New York office. Horn was held out to investors as a partner in FGG and received
compensation out of the profits derived by FGG from the Madoff relationship.

28

FGG's marketing materials described Horn as a Partner and Chief Global Strategist who served on the firm's Board of Directors. He had significant discretion and control over assets in the Funds. As a partner and senior officer of FGG, Horn was compensated with placement, management, and performance fees from the Funds' investments with Madoff. Horn holds a B.A. from Stanford University and a J.D. with honors from Kent College of Law, Chicago. He was founder CEO of Grey Home Partners, a $4.4 billion hedge fund that was acquired by Morgan Stanley in 1999; thereafter, Horn was a managing director who headed global private client marketing at Morgan Stanley. Horn holds FINRA Series 7, 63, and 65 licenses.

133. Defendant **Andrew Smith** ("Smith") was a partner in FGG's Investments Group and a member of its Executive Committee. Smith was FGG's Chief Risk Officer and President of FGB and is based in FGG's New York office. As a partner and senior officer of FGG, Smith was paid placement, management, and performance fees derived from the Funds' investments with Madoff. Mr. Smith is a graduate of Dartmouth College and holds FINRA Series 7 and 63 licenses.

134. Defendant **Charles Murphy** ("Murphy") was a partner in FGG's New York office, and a member of FGG's Executive Committee, responsible for strategy and capital markets business. He had significant discretion and control over assets in the Funds. As a partner and senior officer of FGG, Murphy was paid

placement, management, and performance fees derived from the Funds'

investments with Madoff.  Mr. Murphy holds a J.D. from Harvard Law School, an

M.B.A. from MIT's Sloan School, and a B.A. from Columbia College.

135.   Defendant **Yanko Della Schiava** ("Della Schiava") is one of

Defendant Noel's sons-in-law.  According to published reports, Della Schiava

marketed the Funds to investors in southern Europe from bases in Milan and

Lugano.  As a partner and senior officer of FGG, Della Schiava was compensated

with placement, management, and performance fees derived from the Funds'

investments with Madoff.

136.   Defendant **Philip Toub** ("Toub") is one of Defendant Noel's sons-in-

law.  Toub was identified in FGG's marketing brochures as a partner in the Client

Group at FGG.  Toub marketed FGG's funds in Brazil and the Middle East.  As a

partner and senior officer of FGG, Toub was compensated with placement,

management, and performance fees derived from the Funds' investments with

Madoff.  Toub was based in New York.  Toub holds a B.A. from Middlebury

College.

137.   Defendant **Lourdes Barreneche** ("Barreneche") is a partner in the

Client Group at FGG.  Barreneche was described in FGG's marketing materials as

an international sales specialist with more than 15 years of experience in the

investment management business.  Barreneche coordinated FGG's sales efforts and

30

played a leading role in developing FGG's practices for marketing and business

development of FGG funds to offshore clients in Latin America, Europe, and the

Far East. Barreneche also played an important role in supporting FGG's

relationships with non-profit organizations. Barreneche holds FINRA Series 7 and

63 licenses, and was based in FGG's New York office. As a partner and senior

officer of FGG, Barreneche was compensated with placement, management, and

performance fees derived from the Funds' investments with Madoff. Ms.

Barreneche received a Master's degree in Politics and Economics from New York

University.

138. Defendant **Cornelis Boele** ("Boele") is a partner of FGG and has

worked in its Client Group. Boele oversaw the marketing efforts of the offshore

funds of FGG in the Benelux region and markets them throughout Europe. FGG's

marketing materials describe Boele as having more than 15 years of marketing

experience in the investment management business. Boele holds a B.A. from

Clark University, as well as FINRA Series 7 and 63 licenses, and was based in

FGG's New York office. As a partner and senior officer of FGG, Boele was

compensated with placement, management, and performance fees derived from the

Funds' investments with Madoff.

139. Defendant **Vianney d'Hendecourt** ("d'Hendecourt") is a partner in

FGG. FGG's marketing materials describe d'Hendecourt as a partner who markets

31

FGG's offshore funds throughout Europe, including France, Belgium, and

Luxembourg. D'Hendecourt has more than 19 years experience in capital markets

and holds a Bachelor of Business Administration degree from European University

in Antwerp (Belgium). D'Hendecourt is based in FGG's London office. As a

partner and senior officer of FGG, d'Hendecourt was compensated with placement,

management, and performance fees derived from the Funds' investments with

Madoff.

140.    Defendant **Jacqueline Harary** ("Harary") is a partner in the Client

Group at FGG. Based in FGG's New York office, Harary marketed FGG funds

worldwide, with a focus on Latin America. Her role combined sales

responsibilities with manager selection/product development projects. Ms. Harary

holds a B.A. from Oglethorpe University, and FINRA Series 7 and 63 licenses. As

a partner in FGG, Harary was paid portions of the placement, management, and

performance fees derived from the Funds' investments with Madoff.

141.    Defendant **Santiago Reyes** ("Reyes") is a partner in FGG's Client

Group. Reyes headed FGG's Miami office and marketed FGG's offshore funds

worldwide. Reyes holds a B.A. from the University of Texas and a Master of

Economic History from the London School of Economics, as well as FINRA

Series 7 and 63 licenses. As a partner and senior officer of FGG, Reyes was paid

placement, management, and performance fees derived from the Funds'
investments with Madoff.

142.    Defendant **Julia Luongo** ("Luongo") is a partner in FGG's New York
office and serves as FGG's Assistant General Counsel – Tax Director.  Luongo
received a B.B.A. in Accounting from Loyola College, a J.D. from Seton Hall
University, magna cum laude, where she was a law review editor, and an LL.M. in
Taxation from New York University.  She is a Certified Public Accountant and is
admitted to the bars of New Jersey and New York.  Before joining FGG, Luongo
worked as a certified public accountant in charge of auditing, consulting, and tax
engagements.  As a partner and senior officer of FGG, Luongo was paid
placement, management and performance fees derived from the Funds'
investments with Madoff.  Luongo joined FGG in 2004 after five years at
PricewaterhouseCoopers, where she was Manager of the International and
Offshore Funds Team.

143.    Defendant **Harold Greisman** ("Greisman") is a partner in FGG, who
focuses on evaluating alternative asset investments and managers.  He is based in
FGG's New York and London offices.  Mr. Greisman received a B.A. from Tufts
University and an M.B.A. from NYU's Stern School of Business.  As a partner and
senior officer of FGG, Greisman was compensated with placement, management,
and performance fees derived from the Funds' investments with Madoff.

144.   Defendant **Corina Noel Piedrahita** ("Corina Piedrahita") served as a
partner in FGG's Client Group.  Together with her husband, Defendant Andres
Piedrahita, she was responsible for marketing FGG's Funds throughout Europe and
South America; she also oversaw trade confirmations for FGG's Funds.  Ms.
Piedrahita is a U.S. citizen, a graduate of Yale University.  She began working for
in 1985.  As a partner and senior officer of FGG, Corina Piedrahita was
compensated with placement, management, and performance fees derived from the
Funds' investments with Madoff.  Corina Piedrahita continued to share in FGG's
profits subsequent to leaving the firm.

145.   Defendant **Robert Blum** ("Blum") was a Managing Partner and Chief
Operating Officer of FGG from 2000 to 2005.  He was responsible for overseeing
or assisting in all aspects of FGG's activities, and co-led the build-out of FGG's
capabilities to a diversified hedge fund management firm and co-managed FGG's
hedge fund business.  Blum holds a B.A. from the University of Pennsylvania and
a J.D. from the University of Chicago Law School.  Blum continued to share in
FGG's profits subsequent to leaving the firm.  As a managing partner and senior
officer of FGG, Blum was compensated with placement, management, and
performance fees derived from the Funds' investments with Madoff.

146.   Defendant **Gregory Bowes** ("Bowes") was a partner of FGG.
According to a 2003 Fairfield Sentry PPM, Bowes focused on all aspects of new

34

business development, including manager selection, and had, as of that time, 18

years of experience in capital markets. Bowes was paid placement, management,

and performance fees derived from the Funds' investments with Madoff. Bowes

holds a bachelor's degree in economics and history from Bowdoin College. Bowes

continued to share in FGG's profits subsequent to leaving the firm. According to

information provided by FGG in the Massachusetts Proceeding, in 2007 alone,

Bowes was paid partnership distributions of $4.49 million. His principal place of

business is New York City.

147.   The persons identified above in paragraphs 124 through 146 are

referred to collectively as the "Individual Defendants."

148.   The following chart (derived from an exhibit in the Massachusetts

Proceeding) reflects percentage ownership interests of Individual Defendants in

FGG, as well as their 2007 and 2008 partnership compensation:

| FGG Partner Name | Partner Compensation | | | |
| | 2007 (Millions) | 2008 (Millions) | 2007-2008 Total (Millions) | Ownership (%) Interest |
| --- | --- | --- | --- | --- |
| A. Piedrahita | $45.60 | $28.25 | **$73.85** | 24.60% |
| Tucker | $30.67 | $18.79 | **$49.46** | 16.73% |
| Noel | $30.67 | $18.79 | **$49.46** | 16.73% |
| Landsberger | $9.76 | $5.85 | **$15.61** | 4.43% |
| Toub | $9.59 | $5.60 | **$15.19** | 4.43% |
| Murphy | $4.80 | $4.25 | **$9.05** | 1.97% |

| FGG Partner Name | Partner Compensation | | | |
|---|---|---|---|---|
| | 2007 (Millions) | 2008 (Millions) | 2007-2008 Total (Millions) | Ownership (%) Interest |
| McKeefry | $4.47 | $4.25 | **$8.72** | 2.07% |
| Smith | $5.15 | $3.20 | **$8.35** | 2.36% |
| Vijayvergiya | $3.22 | $2.50 | **$5.72** | 1.48% |
| Lipton | $2.75 | $1.68 | **$4.43** | 1.03% |
| Barreneche | $9.47 | $5.39 | **$14.86** | 4.92% |
| Gretsman | $4.46 | $2.66 | **$7.12** | 2.21% |
| Reyes | $3.27 | $2.01 | **$5.28** | 1.57% |
| Harary | $2.38 | $1.53 | **$3.91** | 1.09% |
| Boele | $6.24 | $2.65 | **$8.89** | 2.00% |
| M Teresa Pulido | $0.71 | $0.80 | **$1.51** | 0.32% |
| Schiava | - | $0.14 | **$0.14** | 0.30% |
| D'Hendencourt | - | $0.20 | **$0.20** | 0.20% |
| Luongo | - | $0.04 | **$0.04** | 0.09% |
| C. Piedrahita | $2.17 | $0.90 | **$3.07** | 0.89% |
| Blum | $5.81 | $3.16 | **$8.97** | 3.13% |
| Bowes | $4.49 | $2.48 | **$6.97** | 2.46% |
| **Total** | $185.68 | $115.12 | **$300.80** | 95.01% |

149.   Based on the allegations contained in this Complaint and other
publicly available estimates with respect to FGG's total revenues prior to 2007,
Defendants' total compensation from the Madoff relationship was many multiples
of the millions of dollars shown in the foregoing chart.

150.   Defendants FGG, FGL, FGBL, FGA, FRS, FHC, LFCM, Noel,
Tucker, Piedrahita, Vijayvergiya, Lipton, McKeefry, Landsberger, Pulido

Mendoza, Smith, and Murphy are referred to collectively as the "Fairfield

Defendants." These are the Fairfield-related defendants against which negligent

misrepresentation, gross negligence, breach of fiduciary duty, and breach-of-

contract claims are asserted. These defendants created and/or disseminated

materially false and misleading documents with reckless disregard for their

veracity, and breached their fiduciary duties to Plaintiffs as well as their

contractual duties to Plaintiffs as third-party beneficiaries. Each of the Fairfield

Defendants is either a Founding Partner, a member of the FGG Executive

Committee, or FGG's Chief Risk or Sales Officer.

151. A subset of the Fairfield Defendants group, comprised of FGG, FGL,

FGBL, FGA, FRS, Noel, Tucker, Piedrahita, Vijayvergiya, Lipton, and McKeefry

are referred to collectively as the "Fairfield Fraud Claim Defendants." These are

Fairfield Defendants against which fraud claims also are brought. The Fairfield

Fraud Claim Defendants were active participants in the preparation and

dissemination of materially false and misleading documents, including offering

memoranda, and had actual knowledge or acted in reckless disregard of the falsity

and material omissions in these documents.

152. Defendants Della Schiava, Toub, Barrenche, Horn, Boele,

d'Hendencourt, Harary, Reyes, Luongo, Greisman, Corina Piedrahita, Blum, and

Bowes are referred to collectively as the "Fairfield Fee Claim Defendants." These
are the Fairfield Defendants against whom only fee-related claims are brought.

　　　　2.　　PricewaterhouseCoopers Defendants

153.　Defendant **PricewaterhouseCoopers International Limited** ("PwC
International") is a United Kingdom membership-based company through which
constituent PricewaterhouseCoopers ("PwC") offices work together as member
firms to "comprise a vigorous global network" according to the global PwC
website. The chairman of PwC International maintains his offices in New York,
New York.

154.　Defendant **PricewaterhouseCoopers LLP** ("PwC Canada") is a
member firm of PwC International with its principal place of business in Ontario,
Canada. PwC Canada audited the Funds for the years 2006 and 2007.

155.　Defendant **PricewaterhouseCoopers Accountants Netherlands
N.V.** ("PwC Netherlands") is a member firm of PwC International with its
principal place of business in Amsterdam, The Netherlands. PwC Netherlands
audited the Greenwich Sentry fund for the year 2004, the Fairfield Sentry funds for
the years 2002, 2003, 2004, and 2005, and the Fairfield Sigma fund for the years
2003, 2004, and 2005.

3.    Citco Defendants

156.   Defendant **Citco Group Limited** ("Citco Group") is a global

organization providing financial services, including hedge fund administration,

custody and fund trading, financial products, and corporate and fiduciary solutions.

It has direct, substantial and continuous contacts with the United States and New

York.  Citco Group maintains offices and conducts extensive business in New

York and elsewhere in the United States, which results in substantial revenues.

Citco Group directly controls the conduct of each of the Citco companies identified

below pursuant to agreements between them, and each Citco company acts as the

agent and alter ego of Citco Group and of each other.

157.   **Defendant Citco Fund Services (Europe) B.V.** ("Citco Fund

Services") is incorporated in The Netherlands.  Citco Fund Services has served as

the administrator, registrar, and transfer agent for Fairfield Sentry and Fairfield

Sigma since at least July 2003, and as the administrator for Greenwich Sentry and

Greenwich Sentry Partners since at least August 2006.  Citco Fund Services'

responsibilities included communicating with the Funds' shareholders or partners

and the public, and independently calculating the Net Asset Values of the Funds

and values of individual investor accounts, as well as fees for the Funds' service

providers.  Citco Fund Services maintained an escrow account at HSBC Bank in

New York, where Fund investors wired their investments.  It also received

39

information from, and relayed information to, BMIS and Fund managers in New

York.

158.    Since at least August 2006, Citco Fund Services has delegated

administrative responsibilities for Greenwich Sentry and Greenwich Sentry

Partners to Defendant **Citco (Canada), Inc.** ("Citco Canada"). Citco Canada is a

corporation organized under the laws of Canada with its principal place of business

in Toronto, Ontario. As sub-administrator, Citco Canada also received information

from, and relayed information to, BMIS and Fund managers in New York.

159.    Defendant **Citco Global Custody N.V.** ("Citco Global") is

incorporated in The Netherlands. Citco Global served as the Custodian for

Fairfield Sentry since at least July 2003, and for Fairfield Sigma since at least

August 2003. In 2006, Citco Global became the Depositary for Fairfield Sentry,

and another Citco entity, Citco Bank, discussed below, became Custodian. Citco

Global's significant responsibilities included holding any securities purchased for

the Fund, or ensuring that the securities were in the custody of a sub-custodian;

maintaining an ongoing, appropriate level of supervision of any sub-custodians,

including BMIS; and maintaining records of securities held for the Funds. Citco

Global engaged with and transferred investor assets to Fairfield Sentry sub-

custodian BMIS in New York, and also regularly communicated with the Funds'

managers in New York.

40

160.   Defendant **Citco Bank Nederland, N.V., Dublin Branch** ("Citco

Bank") is incorporated in The Netherlands and is registered as a branch of an

external company in the Republic of Ireland.  Citco Bank served as the Bank for

Fairfield Sentry since at least July 2003, and for Fairfield Sigma since at least

August 2003.  In 2006, Citco Bank replaced Citco Global as Custodian, and Citco

Global became Depositary for the Fund.  As Custodian, Citco Bank undertook the

same or similar responsibilities as Citco Global had undertaken.  Citco Bank was

responsible for providing brokerage services to the Funds, including placing trades

for the Funds, transmitting securities purchased for the Funds to the custodian or

sub-custodian (BMIS), maintaining records of securities held for the Funds, and

sending bi-monthly statements detailing the Funds' position in each security.  It

was also responsible for assuring that the securities were kept in the custody of any

sub-custodian, and maintaining an ongoing, appropriate level of supervision of any

sub-custodians, including BMIS.  In addition, it undertook to use due care in the

selection of third parties they dealt with in providing brokerage services, and had

the absolute discretion to refuse to execute instructions by the Funds.  Citco Bank

transferred assets to and received assets from the Funds' sub-custodian BMIS in

New York, and also regularly communicated with the Funds' managers in New

York.  In addition, Plaintiffs made investment payments to, and received

redemption payments from, Citco Bank.

41

161.   Defendant **Citco Fund Services (Bermuda) Limited** ("CFSB") is a
corporation organized under the laws of Bermuda with its principal place of
business in Hamilton, Bermuda.  CFSB employed Ian Pilgrim and Brian Francoeur
and directed both employees to serve as directors of FGBL within the scope of
their employment, and in return, FGBL paid CFSB for these services.  As their
employer, CFSB is legally responsible for the actions of Pilgrim and Francoeur as
directors of FGBL.

162.   Citco Group, Citco Fund Services, Citco Global, Citco Canada, Citco
Bank, and CFSB are referenced collectively herein as "Citco."

163.   Defendant **Brian Francoeur** is a director of FGBL.  Francoeur joined
CFSB in 2001 and served as of August 2006 as its Managing Director.  (FS PPM-
8/14/2006, at 8.)  Francoeur served as a director of FGBL as part of his duties and
responsibilities as an employee and officer of CFSB.

164.   Defendant **Ian Pilgrim** was a director of FGBL from 2003 to 2005.
Pilgrim was an employee of CFSB, which he joined in 2001.  Pilgrim served as a
director of FGBL as part of his duties and responsibilities as an employee and
officer of CFSB.

4.   GlobeOp Defendant

165.   Defendant **GlobeOp Financial Services, LLC** ("GlobeOp") is a
Delaware limited liability company that is registered to do business in New York.

GlobeOp served as the Administrator of Greenwich Sentry from January 1, 2004 to
August 2006. As Administrator, GlobeOp was responsible for preparing and
distributing monthly reports showing the amount of the Partnership's net assets,
the amount of any distributions from the Partnership and Performance Allocation,
accounting and legal fees, and all other fees and expenses of the Partnership.
GlobeOp's responsibilities included independently calculating the Fund's NAV
and distributing it to equity holders. GlobeOp's principal office is located at One
South Road, Harrison, New York 10528.

## ALLEGATIONS OF FACT

### A.      Bernard Madoff's Massive Ponzi Scheme

166.    Madoff founded his investment company BMIS in 1960, and
eventually expanded the firm to serve a worldwide client base. Since at least 1990,
Madoff perpetrated a massive Ponzi scheme through the investment advisor
services of BMIS, whereby Madoff fraudulently distributed new investors' assets
to prior investors to create the illusion of profits. BMIS account statements
described purported trading activity in securities holdings, but these statements
were wholly fictitious. Madoff made no securities trades for years. (Madoff and
BMIS are collectively referenced herein as "Madoff.")

167.    On December 11, 2008, Bernard L. Madoff was arrested and
ultimately charged in a criminal complaint after admitting that his money

management operations were "all just one big lie" and "basically, a giant Ponzi

scheme." On March 12, 2009, Madoff pled guilty to an 11-count criminal

complaint, including fraud, perjury, theft from an employee benefit plan, and

international money laundering. He is serving a sentence of 150 years in prison.

### B. Fairfield Greenwich Group's Relationship with Madoff

168. Fairfield Greenwich Group ("FGG") was started in 1983 by its

original partners, Defendants Walter Noel and Jeffrey Tucker. In 2007, Defendant

Andres Piedrahita, who became a principal and partner of FGG in 1997, was

named a "founding" partner of FGG.

169. FGG began its relationship with Madoff in approximately 1990, when

Tucker and another founding partner of FGG, Fred Kolber, introduced Noel to

Madoff. Shortly thereafter, FGG launched the funds Fairfield Sentry Limited

("Fairfield Sentry") and Greenwich Sentry, L.P. ("Greenwich Sentry"). FGG used

Madoff as the investment advisor for both funds, and marketed a supposed

investment strategy of "buying a basket of equities hedged by puts and calls,"

called the "split-strike conversion method." In contravention of standard risk

management practice, Madoff also executed the purported trades through the

broker-dealer operation of BMIS, and served as the custodian or sub-custodian for

the assets of the Funds. Madoff's multiple roles as investment advisor, broker and

custodian were key elements in his ability to perpetrate his fraud.

44

170.  Fairfield Sentry was incorporated in 1990 as an international business company in the Territory of the British Virgin Islands ("BVI").  Because Madoff served as the execution agent and sub-custodian for Fairfield Sentry, substantially all of Fairfield Sentry's assets were held by Madoff.  Fairfield Sentry was primarily marketed to foreign investors, and investments in Fairfield Sentry were made from outside New York.  On July 21, 2009, the Eastern Caribbean Supreme Court in the High Court of Justice of the British Virgin Islands ("BVI Court") ordered that Fairfield Sentry be liquidated, and the BVI Court appointed Kenneth Krys and Christopher Stride as its liquidators.

171.  In 1997, in furtherance of its global expansion, FGG launched the fund Fairfield Sigma Limited ("Fairfield Sigma"), which offered three classes of shares in foreign currencies (Euro, Singapore Dollar, and Yen).  Several other FGG funds, such as Fairfield Lambda, also raised money that was invested in Fairfield Sentry.  Fairfield Sigma was an international business company organized under the laws of the BVI.  Fairfield Sigma's stated business objective was "to obtain capital appreciation of its assets by purchasing shares in Fairfield Sentry Limited." (FΣ PPM-12/08 at 2, 9.)  Because Fairfield Sigma was wholly invested in Fairfield Sentry, Madoff also held substantially all of Fairfield Sigma's assets.  Fairfield Sigma was marketed to foreign investors, and the investments were made from

45

outside New York.  On July 21, 2009, the BVI Court ordered that Fairfield Sigma

be liquidated and appointed Kenneth Krys and Christopher Stride as its liquidators.

172.   Greenwich Sentry is a Delaware limited partnership organized

December 27, 1990 under the name Aspen/Greenwich Limited Partnership.  Its

name was changed to Greenwich Sentry, L.P., on December 4, 1992, and

operations commenced under the new name on January 1, 1993.  Because Madoff

served as the execution agent and custodian for Greenwich Sentry, substantially all

of Greenwich Sentry's assets were held by Madoff.  Greenwich Sentry was

marketed in the United States and sold limited partnership interests to United

States investors, including investors in New York.

173.   In 2006, FGG moved some of its Greenwich Sentry investors into a

fourth fund, Greenwich Sentry Partners, L.P. ("Greenwich Sentry Partners").

Greenwich Sentry Partners is a Delaware limited partnership, organized on April

11, 2006, which commenced operations on May 1, 2006.  Greenwich Sentry

Partners is registered to do business in New York.  Substantially all of Greenwich

Sentry Partners' assets were held by Madoff, which served as the investment

manager, execution agent and custodian for Greenwich Sentry Partners.

Greenwich Sentry Partners was marketed to United States investors and limited

partnership interests were sold to United States investors, including investors in

New York.

174.   The funds identified in paragraphs 169 through 173 are collectively referred to herein as the "Funds."

175.   From December 1, 1995 through December 2008, the Funds handed over approximately $4.5 billion of their investors' money to Madoff. During the same period, investors in the Funds were able to obtain redemptions totaling over $3.5 billion. Plaintiffs could have redeemed their investments in the Funds and recovered their principal at any time during the many years in which redemption requests were being paid. According to an SEC complaint against a senior BMIS employee (*SEC v. DiPascali* (S.D.N.Y., 09 CV 7085)), as of the summer of 2008, BMIS had over $5.5 billion on deposit in a bank account at JPMorgan Chase, which was available to meet redemptions.

### C.   Nature and Structure of the Fairfield Greenwich Group

176.   FGG holds itself out to the public as a partnership among several corporate entities and individuals, and operates as a de facto partnership. FGG's corporate partners include Defendants FGBL, FGL, and FGA, and the other Fairfield corporate Defendants, and FGG's individual partners include Defendants Noel, Tucker and Piedrahita, as well as the other individual Fairfield Defendants and Fairfield Fee Claim Defendants (collectively, the "FGG Partners"). The Executive Committee of FGG controlled the day-to-day operations of FGG and its corporate partners.

47

177. The FGG Partners (i) shared, on a pro rata basis, the profits and losses realized by FGG and the other FGG entities; (ii) made pro rata contributions to the capital of FGG and the other FGG entities; (iii) intended to carry on as co-owners of FGG with the common goal of earning a profit; and (iv) participated in the management of FGG.

178. The FGG Partners held themselves out as partners in FGG by their words and actions. The FGG Partners' identification of the operating entity as FGG and themselves as "partners" was intended by them to induce Plaintiffs to invest in the Funds, and did induce such investments, FGG acted as an agent and alter ego of each of the FGG Partners and each FGG Partner acted as an agent and alter ego of FGG.

179. Business activities of the FGG Partners are attributed by FGG to FGG and to the Partners. For instance, an FGG brochure describes FGG as consisting of "Partners," and attributes the activities of the Partners to FGG, stating: "Under the leadership of its Partners, FGG has built a team of professionals who specialize in product development, risk management, marketing, operations, compliance, and client services on a global basis." ("Fairfield Greenwich Group – the Firm and Its Capabilities," Sept. 2008, at 20.)

180. FGG and the other Fairfield Defendants drafted, reviewed, authorized, or otherwise participated in the preparation and dissemination of private placement

48

and confidential offering memoranda and Fund marketing materials to prospective
and current investors in the Funds, and were responsible for the content of those
materials.

### D. Fairfield Defendants' False Representations and Omissions in Marketing the Funds and Their Breaches of Fiduciary Duties to Investors

181.    Beginning in 1990 and through December 11, 2008, the Fairfield
Defendants marketed the Fairfield Funds on the basis of false and misleading
representations and omissions.  Investors in the Funds or their nominees were
provided copies of the private placement or confidential offering memoranda
("Placement Memoranda") for their respective Funds and were required to
acknowledge that they had received that document as a condition to buying shares
in the Fund.  In addition, the Fairfield Defendants issued to Plaintiffs and published
on the FGG website Fund updates, performance reports, and marketing and sales
materials.  These documents contained uniform misrepresentations and material
omissions that induced Plaintiffs to invest in the Funds and retain their investments
in the Funds.

182.    As set forth herein, the Fairfield Defendants misrepresented to
Plaintiffs that their assets were being invested using a split-strike conversion
strategy, and that assets in the Funds were earning substantial, consistent returns
over time.  The Fairfield Defendants further misrepresented that they and their

financial services providers and auditors were conducting extensive due diligence
and monitoring of Madoff's operations, which served as the Funds' investment
advisor, as well as their broker, execution agent, and sub-custodian or custodian,
and that they had full transparency to all of Madoff's operations.  The Fairfield
Defendants failed to disclose to Plaintiffs the material facts that in reality no one
had conducted meaningful due diligence on Madoff prior to establishing the Funds
and selecting Madoff as broker, execution agent, and custodian; no one was
meaningfully monitoring or independently verifying Madoff's trade activity; they
had effectively no transparency to Madoff's operations; they had no independent,
factual basis for stating that Madoff was executing a split-strike conversion
strategy.

183.    The Fairfield Defendants, as acknowledged in their documents and
marketing materials, recognized the fundamental importance of proper due
diligence and strict monitoring and oversight of the Funds' investment manager,
broker and custodian, and their obligation to perform these functions.
Nevertheless, as set forth herein, the Fairfield Defendants grossly failed to perform
the due diligence that they recognized was essential, and that standard industry
practice requires.  They also wholly disregarded the red flags that surrounded
Madoff and that should have alerted them, as experienced investment
professionals, to the need for heightened scrutiny.  Moreover, when concerns about

Madoff were raised or questions asked, Defendants purposefully gave false or

obfuscated responses.

> 1. Defendants' False Representations and Omissions
> Regarding the Split-Strike Conversion Strategy

184. The Placement Memoranda issued by the Fairfield Defendants

consistently described the investment strategy of the Funds as seeking to obtain

capital appreciation of its assets principally through a "split-strike conversion"

strategy. The Placement Memoranda stated that: "The establishment of a typical

position entails (i) the purchase of a group or basket of equity securities that are

intended to highly correlate to the S&P 100 Index, (ii) the sale of out-of-the-money

S&P 100 Index call options in an equivalent contract value dollar amount to the

basket of equity securities, and (iii) the purchase of an equivalent number of out-

of-the-money S&P 100 Index put options."[1]

185. These representations were false. In reality, no such investment

strategy was being pursued because investors' assets were being funneled into

Madoff's Ponzi scheme in which no legitimate securities transactions whatsoever

were conducted.

186. Furthermore, the Fairfield Defendants failed to disclose to Plaintiffs

the material fact that they had no independent factual basis for their representations

---

[1] FS PPM-7/1/03, at 9-10; FS PPM-10/1/04, at 8; FS PPM-8/14/06, at 9; FΣ PPM- 12/1/08, at 2;
FΣ PPM- 2/21/2006, at 2; GS COM- 8/2006, at 1, 8; GS COM- 5/2006, at 7; GS COM- 1994, at
6; GSP COM-8/2006, at 8.

about the Funds' investment strategy, because they had never undertaken any meaningful steps to confirm that the split-strike conversion strategy was actually being implemented by Madoff.

> 2.   Defendants' False Representations and Omissions
> Regarding the Funds' Track Record of Profitability

187.   The Fairfield Defendants uniformly touted – in Placement Memoranda and other uniform sales materials – the Funds' historical track record of profitability.  They "set[] forth … the prior trading results" of the Funds, and provided a table representing a rate of return that was positive in virtually all prior months of the Fund's operation and showed substantial, consistent annualized rates of return for the Funds.[2]

188.   These representations of the Funds' historical returns were false. Based upon government investigations to date, Madoff did not make any securities transactions in the thirteen years prior to his arrest.  There were thus no profitable months for the Funds, because their assets were not invested.

189.   The Fairfield Defendants failed to disclose to Plaintiffs the material fact that the historical returns were based solely on information provided by Madoff, and that they had failed to verify independently any of the returns they represented the Funds had earned over the years.

---

[2] FS PPM-7/1/03, at 23; FS PPM-10/1/04, at 21-22; Fairfield Sentry Limited update reports for July 2007, December 2007, and January through October 2008.

3.   Defendants' False Representations and Omissions in
Fund Reports to Investors

190.   The Fairfield Defendants regularly provided to Plaintiffs various

uniform reports, including "Semi-Annual Reports" and "Monthly Strategy

Reviews," that purported to inform investors on the Funds' performance and the

"strict risk management principles" they were employing.

191.   The following are representative examples of Fund reports provided

to investors:

a.   The August 8, 2007 Semi-Annual Report for Fairfield

Sentry stated in part:

- Fairfield Sentry will soon be completing its
  seventeenth year of operation.  Over this time the
  Fund has remained faithful to its singular objective of
  seeking non-correlated, low volatility, consistent, risk-
  adjusted returns.  *It has done so all the while applying
  strict risk management principles.*  (Emphasis added.)

- As has been the practice of the Fund for many years,
  when market conditions present attractive entry
  opportunities, *the T-Bill holdings are readily
  liquidated and a position as described above is
  methodically constructed over the course of several
  trading days.*  Two such implementation cycles have
  occurred so far this year and both have contributed
  positively to performance prior to being unwound.
  (Emphasis added.)

b.   "The majority of the Fund's positive performance of 4%

in 2007 was driven by gains in the value of the stock

basket which generated 2.41 % in P&L." The February

20, 2008 Semi-Annual Report stated in part:

- Despite the turbulent environment of the second half
  of 2007, Sentry has performed well, delivering a net
  return of 3.21% for the six-month period ending
  December 31, 2007 and another 0.63% in January
  2008."

- As can be seen in Figure II, over the past year Sentry
  has delivered a net return of 122 basis points above
  the S&P 100 Index with a fraction of the volatility.
  Similarly, the Fund has exceeded the 90-day Treasury
  Bill rate by 295 basis points. These results are quite
  intuitive when one considers the bull spread profile of
  the SSC.

- [T]he Fund typically spends more than half of the
  trading days in each year exposed to movements in
  the S&P 100 Index, albeit on a hedged basis. For the
  rest of the year, the Fund assumes a 'risk-free'
  Treasury position and earns short-term money market
  rates of return as it seeks to protect capital during
  unfavorable market conditions for the SSC. The key
  to switching between these stances boils down to a
  question of timing – and timing, in its various forms,
  is the principal source of alpha in this strategy.

c. The June 2008 Monthly Strategy Review stated in part:

- Fairfield Sentry Limited . . . returned -0.06% net in
  June 2008, only the fifteenth negative month since the
  Fund's inception in December 1990; the Fund has
  returned 2.58% year-to-date.

- The Fund strives to express sound risk management
  principles within the SSC strategy in at least two
  important ways. Firstly, trade activity is governed by
  strict operating guidelines and trading authorizations

that seek to limit market risk by requiring that, upon activation of the SSC strategy, the stock basket is approximately fully protected by an appropriate quantity of long near out-of-the-money S&P 100 Index put options.  Secondly, the Fund seeks to avoid particularly difficult markets by deactivating the SSC strategy and remaining invested in a portfolio of short-dated U.S. Treasury Bills as it awaits the next entry opportunity.  *The defensive stance adopted by the SSC strategy in June is in fact a powerful expression of the Fund's commitment to sound risk management and capital preservation principles.* (Emphasis added.)

d.  The August 8, 2008 Semi-Annual Report stated in part:

- Sentry's overall performance for the first six months of the year has been positive.  Despite the turbulent environment of the first half of 2008, Sentry has performed well, delivering a net return of 2.58% for the six-month period ending June 30, 2008, with positive performance in both quarters (see Figure I).

- The Fund's positive performance for the period exhibits the Fund's bias toward capital preservation during periods of volatile market conditions.  This is mainly due to the fact that when the Fund is not invested in the split-strike conversion strategy (the 'Strategy'), it is invested a portfolio of short-dated U.S. Treasury Bills.  The Strategy aims to identify periods of positive momentum in large-cap U.S. equities and construct a combination stock/options position to participate in the upward move.

- As has been the practice of the Fund for many years, when market conditions present attractive entry opportunities, a position as described above is methodically constructed over the course of several trading days.  There have been two such implementation cycles so far this year and, prior to

being unwound, both have contributed positively to
performance.

e.   The August 2008 Monthly Strategy Review stated in part:

- Fairfield Sentry Limited . . . returned 0.71% net in
  August 2008 and has returned 4.05% year-to-date.
  The S&P 100 Index advanced 1.44% during the
  month and has declined 12.36% year-to-date.

- In August, the Fund continued its third
  implementation of the split-strike conversion strategy
  with an approximately 40% position which was first
  initiated in July. Early in the month, an attractive
  entry opportunity was identified and therefore another
  20% was added to the Fund's position in the SSC and
  an appropriate quantity of stocks and S&P 100 Index
  options were acquired. Prior to options expiration, the
  Fund unwound the previously constructed August
  options collars (consisting of long S&P 100 Index put
  options and short S&P 100 Index call options) and re-
  implemented a new collar for September expiration.
  This combination stock/option portfolio was
  maintained for the remainder of the month.

f.   The September 2008 Monthly Strategy Review stated in part:

- Fairfield Sentry Limited . . . returned +0.50% net in
  September 2008 and has returned +4.57% net year-to-
  date. The S&P 100 Index declined 7.60% during the
  month and has declined 19.02% year-to-date.

- In September, the Fund continued its third
  implementation of the split-strike conversion strategy
  (the 'Strategy') this year with a 60% invested position
  first initiated in July. Early in the month, the Fund
  temporarily unwound the existing short S&P 100
  Index call option position and then reimplemented it
  on the next trading day as the S&P 100 Index rallied.
  This resulted in the capture of additional call option
  premium and contributed to positive performance this

month.  By the middle of the month, the stock and
options positions were methodically unwound over
two trading days and the Strategy returned to a cash
stance consisting of short-dated Treasury Bills.  This
position was maintained for the balance of the month.
As investors flocked to the safety of U.S. Treasury
Bills during the latter half of September, the Fund's
holdings in U.S. Treasury Bills made additional
contributions as short-term yields declined markedly.

192.   These statements regarding Fund performance and risk management

activity were false because the Funds' assets were not being invested and no

meaningful risk management was being undertaken.  Furthermore, the Fairfield

Defendants failed to disclose to Plaintiffs that their risk management was grossly

deficient as to the investment with Madoff and that they had no independent basis

for their representations about Fund performance, which were based on

information provided by Madoff with no independent verification.

4.   Defendants' False Representations and Omissions
     Concerning Due Diligence and Oversight of Madoff

193.   The Fairfield Defendants uniformly and consistently represented to

existing and potential investors that they conducted thorough due diligence and

strict oversight of Madoff's operations, that they independently verified his

transactions, and even that they had full transparency and privileged access to

Madoff.  Through these statements, the Fairfield Defendants recognized the type of

diligence and monitoring that they should have been conducting as to Madoff, yet

they failed to perform it.

194.   The Fairfield Defendants represented in Placement Memoranda that

defendant FGBL (the Funds' investment manager/general partner) was

"responsible for the management of the Fund's investment activities, the selection

of the Fund's investments, monitoring its investments and maintaining the

relationship between the Fund and its escrow agent, custodian, administrator,

registrar and transfer agent." (*See, e.g.*, FS July 1, 2003, at 7; FS Oct. 1, 2004

PPM, at 6.)  They further represented that, "throughout its history," when using

"external managers" such as Madoff, they "obtain[] underlying portfolio

information for monitoring and client communication purposes." (Id.)

195.   The Fairfield Defendants also represented in Placement Memoranda

that they imposed guidelines on Fund accounts held by Madoff for implementation

of the split-strike conversion strategy:

> The Split Strike Conversion strategy is implemented by
> Bernard L. Madoff Investment Securities LLC ("BLM")
> [BMIS], a broker-dealer registered with the Securities
> and Exchange Commission, through accounts maintained
> by the Fund at that firm.  The accounts are subject to
> certain guidelines which, among other things, impose
> limitations on the minimum number of stocks in the
> basket, the minimum market capitalization of the equities
> in the basket, the minimum correlation of the basket
> against the S&P 100 Index, and the permissible range of
> option strike prices.[3]

---

[3]   FS PPM-8/14/06, at 9-10; FS PPM-5/8/06, at 9-10; FΣ PPM-12/1/08, at 9; FΣ-PPM 2/21/06, at
8; GS COM-8/2006, at 8-9; GS COM- 5/2006, at 7-8; GSP COM-8/2006, at 8.

196.    The Fairfield Defendants expanded on these representations in their

uniform marketing materials and related documents provided to investors.  They

repeatedly represented that they conducted daily monitoring of Madoff's activities

and compliance with Fund guidelines.  For example, they indicated that they

conducted "detailed daily compliance monitoring of portfolio activity against all

risk limits" and "daily positions-based risk measurement, performance attribution

and other quantitative analytics."  (Fairfield Sentry Limited Standardized

Responses, Dec. 2008 ¶¶ 54, 69.)  They similarly represented that "portfolio

holdings are reconciled daily" using "proprietary software."  (Fairfield Sentry

Limited Due Diligence Questionnaire, Oct. 2007, at 21.)  They further represented

that:  "The Investment Manager monitors compliance of the SSC strategy against

these risk limits and guidelines each day."  (Fairfield Sentry Limited Standardized

Responses, Dec. 2008, ¶ 77.)

197.    The Fairfield Defendants regularly represented that "regular on-site

visits [of Madoff's firm] are conducted by a number of senior members of FGG's

legal, operations, and risk teams.  [PricewaterhouseCoopers], the Fund's Auditor,

has also conducted periodic on-site checks."  (Fairfield Sentry Limited Due

Diligence Questionnaire, Oct. 2007, at 16.)

198.    The Fairfield Defendants represented, in a document called "FGG's

Value-Added Investment Process," that "FGG employs an in-depth, multi-faceted

due diligence and risk monitoring process which is designed to uncover" risk from

"faulty or incomplete due diligence by investors or their advisors." (Fairfield

Greenwich Group, Due Diligence and Risk Monitoring:  FGG's Value-Added

Investment Process, at 2.)  They also represented that they conducted an

"[a]nalysis of portfolio composition, portfolio stress testing, risk management,

asset verification, peer group comparison, operational procedures, information

technology, and a review of offering documents and financial statements." (Id.)

They recognized that "lack of regular and comprehensive follow-up risk

monitoring are often revealed as the reasons why [investors or their advisors] were

not aware of and/or did not react to risks or behavior that eventually became the

cause of a fund's unexpectedly high level of losses." (Id.)

199.   Throughout their materials, the Fairfield Defendants consistently

asserted the fundamental importance of having transparency into Madoff's

operations as Fund manager.  For instance, they acknowledged that "[o]nly by

receiving full transparency from its managers can FGG assure itself and its clients

that every FGG fund continues to act according to the principles, agreements, and

strategies that are specified to FGG and investors." (Fairfield Greenwich Group,

Due Diligence and Risk Monitoring, at 2.)

200.   The Fairfield Defendants specifically represented that they required

full transparency from all of their Fund managers, including Madoff.  For example,

they stated that they "maintain full transparency to [Madoff] accounts" and

perform "[i]ndependent verification of prices and account values." (Fairfield

Greenwich Group: Fairfield Sentry Limited Presentation, May 2006, at 17;

Fairfield Greenwich Group Fairfield Sentry Limited Presentation, Oct. 2008, at 8.)

They similarly represented that, "[f]or risk monitoring purposes, FGG obtains

portfolio transparency from all managers which are included in its multi-strategy

funds." (Fairfield Sentry Limited October 2008 Update.) They even claimed that

their "business model enables the firm to have privileged access to all aspects of a

manager's operation and investment process, including security level transparency

which is employed on a confidential basis." (Fairfield Greenwich Group, Due

Diligence and Risk Monitoring, Apr. 2008, at 2.)

     201.   The Fairfield Defendants represented that, in the fund manager

selection process, transparency was a key criterion. They stated that among the

qualities they "look[ed] for in managers," were "strong risk management"; "solid

investment process"; "operational procedures"; "legal compliance"; and

"transparency." (Fairfield Greenwich Group, Investment Process and Risk

Management Overview, Apr. 2006, at 4-5.) They further claimed they verified a

potential manager's "portfolio analysis," "financial statements," "backoffice

procedures," and "regulatory/legal procedures" before selecting a manager. (Id.)

They also represented that their due diligence process involved "check[ing] for a

'reputable' auditor," and an "understand[ing]…of explanation of valuation

methods used [and] trade execution process." (Id. at 14-15.)

202.    The Fairfield Defendants further represented that they maintained

"deep, ongoing joint venture relationships" with their fund managers and would

review on an ongoing basis "audited financials and auditor's management letter

comments"; "accounting controls: from trade execution; to trade capture; to trade

reconciliation with the Street, administrator, and fund; to fund's books and

records"; "bank reconciliations for irregular or outstanding items"; and "broker

reconciliations to ensure completeness and existence of all securities." (Fairfield

Greenwich Group, Due Diligence and Risk Monitoring, at 7; Fairfield Greenwich

Group: The Firm and Its Capabilities, Sept. 2008, at 18.)

203.    The Fairfield Defendants even went so far as to assert that their

oversight, monitoring, and risk management processes were so superior that they

would have uncovered the significant Bayou Fund fraud that had deceived other

investment managers several years before.  They represented that they would never

have invested in the Bayou Fund Ponzi scheme because they would have

"[v]isit[ed][the potential fund manager's] office, have [had] several face-to-face

meetings" and "[w]atch[ed] for inconsistent answers, refusal to give information,"

in addition to "[v]erif[ying] assets under management for all funds directly with

the prime broker/ administrator" and conducting an "independent, third party

confirmation of assets." (Fairfield Greenwich Group, Investment Process and Risk
Management Overview, Apr. 2006, at 21-22.)

204.    The Fairfield Defendants represented that they understood the risks of
the hedge fund business and knew how to avoid "blow ups" by applying principles
which, in actuality, they ignored. They stated, "When one reads about a hedge
fund 'blow-up' in the media, it is most likely the result of operational failure or
fraud … **Operational failures, including misrepresentation of valuations and
outright fraud, constitute a majority of instances where massive investor
losses occur**… The inadequacy or lack of independence or transparency of
valuation procedures, contingency plans, and other trading and settlement
procedures may cause FGG to reject an otherwise appealing manager." (Fairfield
Greenwich Group, Due Diligence and Risk Monitoring, at 5) (emphasis in
original).

205.    The foregoing representations were all knowingly false as to Madoff
when made. The Fairfield Defendants knowingly disregarded the fundamentally
important operating and risk management principles that they touted, and they
failed to disclose to Plaintiffs that they were not fulfilling these important
functions. The Fairfield Defendants in fact were not engaging in customary, or any
other meaningful, due diligence to verify that the Plaintiffs' assets were being
properly invested and managed by Madoff, or even that the assets that had been

entrusted to Madoff still existed. The Fairfield Defendants had no transparency
(much less "full" transparency), and no access (much less "privileged" access) to
Madoff's operations.

206.   Because the Fairfield Defendants knew that they had not conducted
due diligence and oversight as represented to Plaintiffs, in 2008 they
acknowledged internally that "[t]he biggest single counterparty risk exposure we
have at FGG is [Madoff]" and admitted there existed what they euphemistically
referred to as "gaps" in their knowledge of Madoff's operations, a fact they failed
to disclose to Plaintiffs.

207.   Internal FGG emails disclosed in the Massachusetts Proceeding
demonstrate that each of the individual Fairfield Defendants – Noel, Tucker,
Piedrahita, Vijayvergiya, Lipton, McKeefry, Landsberger, Smith, and Murphy –
was aware of FGG's lack of knowledge of Madoff's operations.

208.   On September 22, 2008, Defendant Landsberger sent an email to
Defendants Vijayvergiya, Tucker and the Executive Committee (Defendants
Piedrahita, Smith, and Murphy), asking "[c]an we get some clarity from BLM on
how he sees the markets and liquidity from his counterparties on the options?"

209.   Defendant Vijvergiya, in an email dated September 24, 2008, to
defendants Smith, Landsberger, Tucker, Lipton, and the "Executive Committee"
("ExecutiveCommittee@fggus.com," including defendant Piedrahita), stated that

64

"[w]e have a number of questions for BLM relating to the derivatives [counter-parties] – including his views on the willingness of the options [counter-parties] that have been historically used to continue trading with BLM, as Agent in this environment. These are in addition to several other important questions we have for BLM relating to their operations and trading (Bernie has already been sent a fax of our questions).... [M]y preference would be to approach Bernie with well thought out, reasoned questions that focus on filling the gaps in our knowledge."

210.   Among other things, the Fairfield Defendants had no access to Madoff's accounts, so they could not possibly confirm that Fund investment guidelines were being followed, as represented. The Fairfield Defendants could not have monitored Madoff's positions and risk profiles on a daily basis as represented, because they did not receive trade confirmations from Madoff until three to five days after trades had been purportedly executed – a highly unusual and suspicious delay – which gave Madoff time to concoct fake trading records.

211.   The Fairfield Defendants knew that Madoff had never permitted them to examine "prime broker trading records" in a manner that would permit verification that transactions were even made, much less the transaction price or account value. The Fairfield Defendants never contacted any of Madoff's purported counterparties to verify that trades supposedly made by Madoff had in

fact occurred.  Nor could senior Fairfield personnel describe the proprietary

models and algorithms that Madoff supposedly used to implement the strategy.

212.   The Fairfield Defendants acquiesced to the unusual arrangement by

which BMIS served as both the sub-custodian or custodian of Fund assets and the

executing broker, as well as the investment manager, without heightening their

scrutiny or taking steps to confirm that Madoff actually held the securities he was

purporting to trade.  This meant that any verification of the custodian's records

against the broker's records was merely a comparison of information received from

Madoff against other information received from Madoff.  In reality, it was no

check at all.

213.   Based on the Fairfield Defendants' public statements, it appears that

the only attempt they ever made to confirm that Madoff was actually making trades

was a 2001 visit to Madoff's office by Jeffrey Tucker during which Madoff

showed him a few purported records of trading in a single stock.  (*See*

Massachusetts Proceeding, Consent Order, Sept. 8, 2009, ¶¶ 102-04.)

214.   Tucker's testimony demonstrates that the Fairfield Defendants failed

to perform the due diligence that they represented to Plaintiffs:

> Q.    Have you ever had a tour of the part of Madoff's
> offices where he engaged in the split strike conversion
> strategy?
> A.    No.

> Q.    Do you know of anyone else at Fairfield who has
> had a tour of the portion of Madoff's offices where he
> engages in the split strike conversion strategy?
> A.    I don't know.
> Q.    You don't know of anybody?
> A.    I'm not aware of anybody that had access to it.
> Q.    With respect to the SSC strategy that Madoff had
> been executing for the Sentry Fund, could you please
> describe those proprietary models and algorithms?
> A.    I don't --- I'm not familiar with them.
> Q.    Do you know anything about them?
> A.    No.

(Massachusetts Proceeding, Consent Order, ¶¶ 102, 104.)

215.    Further evidence of the Fairfield Defendants' failure to perform any

meaningful due diligence and monitoring arises from the fact that Madoff sent

FGG confirmations for hundreds of trades that purportedly were made at prices

that were outside the actual trading range for those securities on the dates in

question; any comparison of Madoff's reports to market prices would have led to

discovery of the fraud.  Similarly, Madoff reported making trades on weekends,

which could not have occurred, and reported purchases of options on equity trades

that had not yet been executed.

216.    Although Madoff stated to the Fairfield Defendants that he

"maintained accurate records as to voting of ... proxies that will enable the

investment advisor to periodically review ... actions taken on individual voting

situations" with respect to the purported assets, the Fairfield Defendants never

received or reviewed any proxy materials from Madoff in connection with the

equities he was supposedly holding.  Had they done so as part of their represented

due diligence, they would have discovered that Madoff was not, in fact, buying and

selling the securities.  Monitoring proxies was yet another basic, normal-course-of-

dealing due diligence step that the Fairfield Defendants failed to undertake.

### E.    The Fairfield Defendants Ignored Red Flags of Madoff's Fraud

217.    The misrepresentations and omissions of the Fairfield Defendants are

even more egregious when viewed against the backdrop of the warning signs and

suspicious conduct by Madoff that they ignored.  These red flags violated some of

the most basic tenets of sound investment management that Defendants

represented they were following.  The red flags included the lack of any

transparency into Madoff's operations, that key positions were held by Madoff

family members, the lack of segregation of important functions, such as investment

management, brokerage, and custodianship, inadequate auditing, Madoff's use of

paper trading records, and the implausibly consistent positive returns for a fund

pursuing a market-based strategy.  In addition to flagrantly disregarding these red

flags, the Fairfield Defendants knowingly concealed the existence of these warning

signs from Plaintiffs.  Some of the red flags included the following:

1.    Madoff's Secretive Operations

218.    Madoff refused to answer even basic questions about BMIS and its

operations, let alone to permit the kind of due diligence and transparency that the

Fairfield Defendants represented was necessary, was being undertaken, and that

they should have undertaken. As an example, a "BLM Operational Due

Diligence" memorandum, dated October 2, 2008, purporting to memorialize a

meeting at BMIS with FGG partners Noel and Tucker, reflects that, on one of the

rare occasions when the Fairfield Defendants actually inquired about his

operations, Madoff refused to provide answers.

219. The Fairfield Defendants ignored this breach of their asserted due

diligence protocol, and failed to disclose Madoff's alarming lack of transparency to

investors. The lack of transparency was even more suspicious in light of the fact

that the Fairfield Defendants knew that the Funds collectively were Madoff's

largest investors.

2.     <u>Key Positions Held by Madoff Family Members</u>

220. Madoff's secrecy was exacerbated by the fact that Madoff family

members controlled key positions at the firm, thus limiting third party

involvement. The Fairfield Defendants knew about this arrangement, yet ignored

the risk it presented, and concealed this risk from Plaintiffs.

3.     <u>Madoff's Custody of Assets</u>

221. Another red flag ignored and concealed by the Fairfield Defendants

was that Madoff failed to trade through an independent broker and, instead, self-

cleared all Fund activities through his wholly-owned company BMIS. In addition,

69

Madoff served as his own custodian or sub-custodian for the Funds' assets, even

though this greatly increased the risk of Madoff perpetrating a fraud. At minimum,

this arrangement should have alerted the Defendants to the need for heightened

scrutiny, monitoring, and verification of transactions, yet Defendants ignored this

risk, and failed to disclose that they had taken no meaningful precautionary steps to

mitigate this risk.

    4.    <u>Madoff's Unknown Auditing Firm</u>

222.    Another warning sign was Madoff's use of Friehling & Horowitz

("F&H"), an unknown accounting firm that was plainly unequipped to audit a

company of BMIS's size. The firm had only three employees – a retired partner

living in Florida, a secretary, and one active certified public accountant. While

F&H was a member of the American Institute of Certified Public Accountants

("AICPA"), it had not been subject to a peer review since 1993 – a requirement of

membership in AICPA – because F&H represented to the AICPA, in writing, that

it did not perform any audits. This material information was ignored and

concealed from Plaintiffs.

    5.    <u>Madoff's Paper Trading Records</u>

223.    While Madoff claimed his operation to be technologically advanced,

and the Fairfield Defendants claimed they had transparency to Madoff and his

operations, in fact, Madoff reported his trades to Defendants using only paper

confirmation forms, with copies of the tickets received by Fairfield Defendants 3-5

days after the trades supposedly occurred. Based on standard industry practices in

the 21st century, the lack of access to real-time electronic reporting should have

raised significant concerns about the BMIS operation. The use of delayed paper

trade records, which are patently susceptible to manipulation, was another red flag

ignored by the Fairfield Defendants, and which they concealed from Plaintiffs.

      6.   Madoff's Consistent Investment Returns

The impossible consistency of Madoff's reported results using the split-

strike conversion strategy and the resulting investment returns was another

warning sign. Among other things: (1) Madoff generally reported that he bought

near daily lows and sold near highs with uncanny consistency; (2) Madoff reported

trades at prices that were outside the stocks' actual trading ranges or took place on

weekends, both of which are impossible; (3) Madoff always claimed to be fully

invested in treasury bills at the end of each quarter; and (4) Madoff's reported

results were inconsistent with the split-strike strategy, which might reduce

volatility but could not produce gains in a declining stock market. Madoff's

reported results were unattainable and not repeatable by others, yet the Fairfield

Defendants ignored this warning sign.

224. Rather than ignoring these and other red flags (as the Fairfield

Defendants did), other investment banks and investment professionals conducted

due diligence concerning Madoff and his purported investment strategy, which led

to serious doubts about Madoff's legitimacy and caused them either to refuse to

invest or to withdraw investments with Madoff.  For example, *The New York Times*

reported that Société Générale conducted routine due diligence and concluded that

Madoff's numbers "simply did not add up," and prohibited its investment banking

division from doing business with him.

**F.      The Fairfield Defendants Falsely Reassured Investors Who Made
         Inquiries**

225.    When various Fund investors raised questions about Madoff, the

Fairfield Defendants repeatedly – and falsely – assured them that they had nothing

to worry about.  For example, in 2005, in response to the failure of another

investment fund, a Fairfield client asked with respect to Fairfield Sentry, "who

supervises that everything is in order?"  In order to respond to this basic question,

the Fairfield Defendants scrambled to find out information about F&H, Madoff's

auditing firm.  They discovered that F&H was operating out of a strip mall in New

City, New York, and that "[i]t appears Friehling is the only employee."  (E-mail

from G. McKenzie to J. Tucker, D. Lipton & C. Castillo, with copies to L.

Barreneche and McKeefry, Sept. 14, 2005.)  Yet, with absolutely no basis,

Defendant Lipton, FGG's chief financial officer, told those scheduled to speak to

the inquiring client that F&H is "a small to medium size financial services audit

and tax firm, specializing in broker-dealers and other financial services firms," and

that the firm had "100's of clients and are well respected in the local community."
(E-mail from D. Lipton to C. Castillo & J. Tucker, Sept. 12, 2005.)

226.    When, after Madoff's arrest, the Fairfield Defendants inquired about
the auditing firm they had touted earlier, they confirmed that F&H only had one
employee and approximately $180,000 in annual revenues. Despite FGG's
representations about the accounting firm, it appears that none of the Fairfield
Defendants had ever spoken to F&H, other than in a purported five- to ten-minute
conversation with a partner at F&H in 2005. This total lack of due diligence and
knowledge about the accounting firm is apparent from an e-mail to Defendant
Vijayvergiya on August 20, 2008, in which Defendant Lipton asked, "Do we know
any of the other client [sic] of BLM's [BMIS's] auditors? Or how big they are? I
remember we called over there a while ago." The Fairfield Defendants'
representations that F&H had the ability to properly and independently monitor an
operation the size of Madoff's were false and lacked any good faith basis.

227.    Although the Fairfield Defendants failed to conduct any due diligence
of Madoff's auditors, they represented to Plaintiffs that they had conducted such
due diligence. For example, in an April 2006 marketing piece titled, "Fairfield
Greenwich Group, Investment Process and Risk Management Overview April
2006," FGG recognized that due diligence requires "check[ing] for 'reputable'
auditor," and claimed that FGG would not have invested in another fund which had

been found to be fraudulent because it would have "question[ed]" the fund's

"obscure auditing firm." (*See* Fairfield Greenwich Group, Investment Process and

Risk Management Overview, Apr. 2006, at 14, 21.) These representations were

knowingly false when made because, as the Fairfield Defendants knew, they had

never attempted to conduct any manner of credible due diligence on Madoff's

purported auditors.

228.   In response to a May 2008 client request, the Fairfield Defendants

were unable to provide information concerning such basic matters as account

segregation, audits, and trade confirmations; recognizing that "[u]nfortunately

there are certain aspects of [Madoff's] operations that remain unclear," thus they

turned belatedly to Madoff for answers they should have already known and

independently verified before they made any representations to Plaintiffs. (E-mail

from A. Vijayvergiya to C. Murphy, Piedrahita, Toub, Tucker, the Executive

Committee and others, Aug. 19, 2008.)

229.   Notwithstanding their lack of knowledge about Madoff's operations,

the Fairfield Defendants continued to assuage their clients' questions with the same

unsubstantiated assurances. For example, on September 16, 2008, defendant

Vijayvergiya sent an email to Fairfield Sentry investors stating that Fairfield Sentry

had dodged the market meltdown over the Lehman Brothers bankruptcy because

"[c]urrently the [split-strike conversion] portfolio of Sentry is fully invested in

short date U.S. Treasury bills." And, in an effort to dissuade a client from

redeeming over 10,000 shares in one of the Funds, on October 20, 2008, Defendant

Barreneche assured the client that "the Fund has protected capital this year through

Sept'08 and has in fact been in US T-bills since September 16, 2008 to date, when

the S&P 100 has dropped close to 20% for the same period." As for the client's

concerns about counterparty risk, Defendant Barreneche assured the client that the

Fund "has not had any exposure to Lehman Bros, Merrill Lynch or AIG. Sentry's

executing broker uses derivatives dealers and international banks for the majority

of the OTC options trades and counterparty risk is diversified amongst

approximately 20 dealers in order to reduce exposure to any single counterparty.

These counterparties are highly rated and maximum exposure to a single

counterparty is currently 10%." These representations were false when made and

the Fairfield Defendants knew they had no factual basis upon which to make them,

particularly in view of their failure to conduct the represented due diligence and

oversight of Madoff.

    230.   On October 2, 2008, defendants Noel, Tucker, McKeefry and

Vijayvergiya (by telephone) finally attended a due diligence meeting at BMIS with

Madoff and Frank Di Pascali. (BMIS Operational Due Diligence Memo., Oct. 2,

2008.) During that meeting, Madoff refused to answer many of the central

questions that FGG had asked in a questionnaire. For example, he refused to

supply the names of key personnel involved in implementation of the split-strike

conversion strategy and would not identify the persons responsible for placing

trade orders or their supervisors.  Despite the fact that they had received numerous

customer inquiries regarding counterparty risk and the identities of counterparties,

the Fairfield Defendants did not press Madoff for this and other important

information or otherwise follow up with any due diligence.

231.   The Fairfield Defendants continued to tout their due diligence, even

after Madoff refused to provide the information they belatedly requested.  For

example, on October 21, 2008, defendant Barreneche emailed a prospective client

and boasted that "Fairfield Greenwich (Bermuda) has been facilitating rigorous

and very thorough investment and operational due diligence on Fairfield Sentry

Limited in response to our clients' requests and in line with institutional demand."

At the time when Defendant Barreneche made that representation, she had no basis

in fact to assert that the recent Madoff due diligence expedition had been anything

but an abject failure.

232.   Thus, during the fall of 2008, the Fairfield Defendants were finally

seeking answers from Madoff to basic questions which they had been representing

to Fund investors for years that they were not only asking (which they were not),

but that they were receiving satisfactory answers to (which they had not).  When

Madoff failed to answer those questions, the Fairfield Defendants continued falsely

to represent that they were in complete control over the operations of the Funds

and had complete transparency into Madoff's operations.  At no time did

Defendants disclose that Madoff was not providing access to, or even basic

information about, his operations and Plaintiffs' assets.

233.   In the face of their lack of due diligence and, thus, lack of information

about Madoff, and in furtherance of their fraudulent scheme, the Fairfield

Defendants developed over a long period of time a set of standardized responses

specifically for use by any FGG employee who might be asked questions regarding

the operation of the Fairfield Sentry Fund.  The database responses confirm that

the Fairfield Defendants falsely represented that controls existed to ensure the

legitimacy of Madoff's operations, including the handling of the Fairfield Funds'

assets, such as (i) annual reports by F&H, the purported independent auditors, with

respect to Madoff's internal controls; (ii) bi-annual audits by

PricewaterhouseCoopers concerning "controls and systems at . . . [BMIS], the

front-office and trading practices, procedures in respect to supervision and

monitoring, procedures in respect of stock reconciliation, procedures in respect to

trade allocation of bunched orders, error handling and a number of other items";

and (iii) the Fairfield Defendants' own "periodic[] … on-site due diligence visits to

. . . [BMIS to] independently assess the suitability of operational controls, systems

and procedures."  (E-mail from D. Attavar to Sentry Team, Nov. 14, 2008.)  The

final codification of these "talking points" took the form of a document entitled

"Fairfield Sentry Limited – Standardized Responses" and was dated December

2008. Even as of that late date, the Fairfield Defendants continued to falsely

represent that trade confirmations were "reconciled immediately"; that they had

"full position transparency" and "granular position transparency" which allowed

them to conduct "detailed daily compliance monitoring of portfolio activity against

all risk limits"; that they "monitor[ed] compliance of the SSC strategy against

these risk limits and guidelines each day"; that "[t]he portfolio is priced daily by

the broker and the Investment Manager – Fairfield Greenwich (Bermuda) Ltd.";

and that "[t]he Fund trades in highly liquid, large cap stocks all of which are

members of the S&P 100 Index. These stocks are amongst the most well traded,

liquid issues in US equity markets." (Fairfield Sentry Limited Standardized

Responses, Dec. 2008, ¶¶ 24, 27, 59, 69, 89.) Like the other representations made

by the Fairfield Defendants, the representations in the standardized responses were

false and omitted material facts, and the Fairfield Defendants had no basis upon

which to make them.

### G.    The Fairfield Defendants Assisted Madoff in Thwarting an SEC Investigation

234.    In 2005, the Fairfield Defendants knowingly assisted Madoff in

thwarting an SEC investigation into his operations. Knowing that, as Madoff's

largest investor, FGG would be a key witness in the SEC's investigation, the

Fairfield Defendants sought and followed Madoff's instructions on how to approach their upcoming testimony. In a telephone conversation that began with Madoff telling Vijayvergiya and McKeefry that "this conversation never happened," Madoff proceeded to instruct the Fairfield Defendants in what to say and what not to say to the SEC. Rather than taking the SEC investigation as an opportunity to acquire valuable knowledge about Madoff's operations – to which Plaintiffs had committed billions of dollars in reliance on the Fairfield Defendants' representations – the Fairfield Defendants aided Madoff in deceiving the SEC and, ultimately, Plaintiffs. The Fairfield Defendants then compounded this betrayal of trust by citing to the inconclusive result of the SEC investigation in their public statements to Fund investors as proof that Madoff and BMIS could be trusted as faithful manager and custodian of the Funds' assets.

### H. The Fairfield Defendants Attempted to Raise Money to Keep Madoff Afloat in Late 2008

235. In addition to covering up for Madoff, the Fairfield Defendants tried to prop him up. In 2008, Madoff desperately pressed the Fairfield Defendants to bring in new infusions of cash. The Fairfield Defendants redoubled their efforts to raise new capital to be funneled to Madoff through a newly-created "Emerald Fund" and other leveraged versions of the Fairfield Funds. This effort continued until December 11, 2008, when Madoff's fraud was revealed.

## I.    The Fairfield Defendants and Fairfield Fee Claim Defendants Earned Massive Fees from Funneling Plaintiffs' Assets into the Madoff Fraud

236.    During the entire period from the Fairfield Funds' inception until December 2008, the Fairfield Defendants collected enormous fees in return for services ostensibly provided.  These fees were calculated on the basis of non-existent profits and asset values that were reported by Madoff.  On this basis, the Fairfield Defendants and the Fairfield Fee Claim Defendants were paid hundreds of millions of dollars in fees which they never legitimately earned.  These fees took a number of forms.

237.    Placement Fees.  In 2006, the Fairfield Sentry PPM specified that FGL, the Fund's Placement Agent, could charge placement fees not to exceed 3% of the shareholder's investment. (FS PPM-8/14/06, at 2, 8.)  In 2003 and 2004, the PPMs specified that placement fees not to exceed 3% could be charged by FGBL (which was the Fund's Investment Manager) or an affiliate.  (FS PPM-10/1/04, at 2, 10; FS PPM-7/1/03, at 2, 8.)

238.    Performance Fees.  As Placement Agent, FGL received "for each calendar quarter, a performance fee (the "Performance Fee") in an amount equal to 20% of the net realized and net unrealized appreciation in the Net Asset Value of each Share in such calendar quarter ("Net Profits")."  (FS PPM-8/14/06, at 4, 15.)

In earlier years, the PPMs specified that FGBL, the investment manager, would

receive the performance fee.  (FS PPM-10/1/04, at 4, 13; FS PPM-7/1/03, at 4, 15.)

| "Performance Fees" Paid by Fairfield Sentry | |
|---|---|
| Year | Fee |
| 2002 | $  83,591,000 |
| 2003 | $  80,515,000 |
| 2004 | $  81,278,000 |
| 2005 | $  87,225,000 |
| 2006 | $107,779,000 |
| 2007 | $  61,063,000 |
| 2008 (through June 30) | $  46,070,000 |
| Total | $547,521,000 |

(Fairfield Sentry Directors' Report and Financial Statements for the year ended

December 31, 2003 Auditor's Report, at 8; Fairfield Sentry Directors' Report and

Financial Statements for the year ended December 31, 2005 Auditor's Report, at 8;

Fairfield Sentry Directors' Report and Financial Statements for the years ended

December 31, 2007 and 2006 Auditor's Report, at 8; Fairfield Sentry Directors'

Report and Financial Statements for the period January 1, 2008 to June 30, 2008

Auditor's Report, at 7.)

239.   Management Fees.  In 2006, the Fairfield Sentry PPM stated that FGL

(the Placement Agent) "will receive for each month a management fee (the

'Management Fee') in an amount equal to one-twelfth of one percent (0.0833%)

(approximately 1% per annum) of the Net Asset Value of the Fund before

Performance Fees."  It further provides that "FGL may pay a portion of the

Management Fee to an affiliate of FGL and the Investment Manager....," and that
"FGL will pay the Investment Manager [FGBL] a fixed fee for providing certain
managerial services to the Fund...." (FS PPM-8/14/06, at 4, 14, 15.) In earlier
years, the PPMs stated that "the Manager" (FGBL) would receive the above-
mentioned fee. (FS PPM-10/1/04, at 4, 13; FS PPM 7/1/03, at 4, 14.)

| "Management Fees" Paid by Fairfield Sentry | |
|---|---|
| Year | Fee |
| 2002 | $   3,884,000 |
| 2003 | $   5,221,000 |
| 2004 | $ 21,549,000 |
| 2005 | $ 51,127,000 |
| 2006 | $ 50,465,000 |
| 2007 | $ 32,393,000 |
| 2008 (through June 30) | $ 36,134,000 |
| Total | $200,773,000 |

(Fairfield Sentry Directors' Report and Financial Statements for the year ended
December 31, 2003 Auditor's Report, at 8; Fairfield Sentry Directors' Report and
Financial Statements for the year ended December 31, 2005 Auditor's Report, at 8;
Fairfield Sentry Directors' Report and Financial Statements for the years ended
December 31, 2007 and 2006 Auditor's Report, at 8; Fairfield Sentry Directors'
Report and Financial Statements for the period January 1, 2008 to June 30, 2008
Auditor's Report, at 7.)

240. Fees for Administrative Services and Back Office Support by Fund
Affiliates. In 2003, Fairfield Sentry's PPM stated that "[t]he Fund pays an annual
expense reimbursement to Fairfield Greenwich Advisors LLC, an affiliate of the

Manager, on a quarterly basis in an amount equal to one-fortieth of one percent

(0.025%) of the Net Asset Value in the last day of each calendar quarter (ten basis

points per annum) of the Fund for providing certain administrative services and

back-office support to the Fund." (FS PPM-7/1/03, at 15.)  In addition, FGBL was

to pay FGL an "expense reimbursement" equaling 15% of its own management fee

for "bearing certain of the Fund's internal accounting and operational expenses."

(Investment Management Agreement between Fairfield Sentry Limited and

Fairfield Greenwich (Bermuda) Limited, dated Oct. 1, 2004 ("Investment

Management Agreement") ¶ 9; *see also* Investment Management Agreement

between Fairfield Sigma Limited and Fairfield Greenwich (Bermuda) Ltd., dated

Oct. 1, 2001 ("Sigma Investment Management Agreement") ¶ 9.)

    241.   These Fairfield Sentry fees were calculated on the basis of fraudulent

information, which the Fairfield Defendants never verified was accurate.

    242.   Fairfield Sigma's assets were invested in Fairfield Sentry, and

therefore, Fairfield Sigma investors were subject to the Fairfield Sentry fee

structure.  The Fairfield Sigma PPMs ("FΣ PPM") discussed the fee schedule

established by Fairfield Sentry and the means by which FGBL and Citco Fund

Services would be compensated.  (FΣ PPM-12/1/08, at 2, 4, 15, 18, 20; FΣ PPM-

2/21/06, at 2, 4, 14, 15, 16.)  It also established the expense reimbursement that

would be received by FGA and certain directors:  "Fairfield Greenwich Advisors

LLC, an affiliate of the Investment Manager, will receive an annual expense
reimbursement from the Fund, payable quarterly, in an amount equal to 0.0375%
of the Fund's Net Asset Value (0.15% on an annual basis) as of the last day of each
calendar quarter, for providing certain administrative services and back-office
support to the Fund." (FΣ PPM-12/1/08, at 4, 15; FΣ PPM-2/21/06, at 3, 14.)

   243.   Fairfield Sigma investors paid the following fees:

| Expense Reimbursement and Administration Fees for Fairfield Sigma ||
|---|---|
| Year | Fee |
| 2002 | €    57,665 |
| 2003 | €  111,678 |
| 2004 | €  341,170 |
| 2005 | €  570,270 |
| 2006 | €  693,441 |
| 2007 | €1,174,665 |
| Total | €2,948,889 |

(Fairfield Sigma Limited Financial Statements for the year ended December 31,
2003, at 7; Fairfield Sigma Limited Financial Statements for the year ended
December 31, 2004, at 7; Fairfield Sigma Limited Financial Statements for the
year ended December 31, 2005, at 7; Fairfield Sigma Limited Financial Statements
for the years ended December 31, 2007 and 2006, at 6).  FGBL calculated these
fees based on false data provided by BMIS that, notwithstanding the Fairfield
Defendants' representations of performing extensive due diligence, they never
verified.

244.   These Fairfield Sigma fees were also calculated on the basis of
fraudulent information, which the Fairfield Defendants never verified was
accurate.

245.   <u>Incentive/Performance Fees</u>.  The Greenwich Sentry Confidential
Offering Memoranda ("GS COMs") specified that "at the end of each fiscal
quarter, 20% of the Partnership's realized and unrealized net capital appreciation
allocable to the capital accounts of the Limited Partners will be allocated to the
General Partner [FGBL] (the "Performance Fee")" (GS COM- 8/2006, at 3, 13; GS
COM-5/2006, at 3-4, 12; GS COM-1994, at 3, 9, 14; GSP COM-8/2006, at 3, 13.)
"Since the [performance fee] is calculated on a basis that includes unrealized
appreciation of assets, such allocation may be greater than if it were based solely
on realized gains."  (GS COM- 8/2006, at 14; GS COM-5/2006, at 14; GSP COM-
8/2006, at 15.)

246.   <u>Management Fees</u>.  In 2006, the COMs stated that "the General
Partner generally receives a monthly management fee calculated at the annual rate
of approximately 1% (0.0833% per month) of each Limited Partner's Capital
Account (the "Management Fee").  (GS COM- 8/2006, at 19; GS COM-5/2006, at
17; GSP COM-8/2006, at 18.)  The General Partner began charging these fees on
May 1, 2006.  (Greenwich Sentry, L.P., Financial Statements for the years ended

December 31, 2007 and 2006, at 10.)  The General Partner collected $282,277 in

2006 and $987,153 in 2007.  (*Id.*)

247.   <u>Fees for Administrative Services and Back Office Support by Fund

Affiliates</u>.  In 2006, the COMs stated that "the Partnership may pay Fairfield

Greenwich Advisors LLC, an affiliate of the General Partner, an amount equal to

one-fortieth of one percent (0.025%) of the value of the Limited Partners' Capital

Accounts as of the first day of each fiscal quarter (10 basis points per annum) for

providing certain administrative services and back-office support to the Partnership

(the "Expense Reimbursement")" (GS COM- 8/2006, at 19; GS COM-5/2006, at

18; GSP COM-8/2006, at 18.)

248.   These Greenwich Sentry and Greenwich Sentry Partners fees were

also on the basis of fraudulent information, which the Fairfield Defendants never

verified was accurate.

249.   Following the revelation of Madoff's Ponzi scheme on December 11,

2008, the Fairfield Defendants and Fairfield Fee Claim Defendants have failed to

repay compensation that they received which was calculated on the basis of

Madoff's fraudulent investment returns.  They continue to claim that they are owed

tens of millions of dollars in fees from the few tangible assets that remain.  While

the Fairfield Defendants and Fairfield Fee Claim Defendants continue to profess

their shock and innocence about what has transpired, the many investors in the

Fairfield Funds face the loss of their entire investments, amounting to billions of
dollars.

### J.  Fairfield Defendants Agreed to Provide Full Restitution to Massachusetts Investors in the Funds

250.   On April 1, 2009 the Securities Division of the Office of the Secretary
of the Commonwealth of Massachusetts ("Securities Division") filed a 110-page
Administrative Complaint against Defendants FGA and FGBL (referred to in the
Administrative Complaint collectively as "Fairfield"), thereby commencing the
Massachusetts Proceeding.

251.   The Administrative Complaint was the result of an investigation
conducted by the Securities Division, which included documents produced by FGG
and interviews conducted by the Division of defendants in this action, including
Noel, Tucker, Vijayvergiya and Lipton.

252.   The Administrative Complaint was "based on a profound disparity
between the due diligence Fairfield represented to its investors that it would
conduct with respect to [BMIS] and the due diligence it actually conducted, as well
as misrepresentations to investors in its Sentry funds about Fairfield's degree of
knowledge and comfort with respect to Madoff's operations." *See* Administrative
Complaint, page 1.

253.   The Administrative Complaint also alleged that the defendants "were
blinded by the fees they were earning, did not engage in meaningful due diligence

and turned a blind eye to any fact that would have burst their lucrative bubble."
Among other things, the Complaint alleged that the defendants assisted Madoff in
misleading the SEC. *See* Administrative Complaint, page 5.

254.    The Complaint observed that "Fairfield has not offered to repay the
enormous performance fees it reaped, even though it now knows that the
performance upon which those fees are based is fictitious." *See* Administrative
Complaint, page 37.

255.    The allegations in the Administrative Complaint were supported by
extensive and detailed proof, including quotations from emails and other internal
FGG documents, and 61 appended documents.

256.    On August 12, 2009, the two Fairfield defendants named in the
Massachusetts Proceeding filed a Pre-Hearing Memorandum with the Securities
Division, "consent[ing] to the entry of the findings of the facts alleged in the
Complaint."

257.    On September 8, 2009, the Massachusetts Securities Division entered
into a Consent Order with FGA and FGBL.  In the Consent Order, FGA and FGBL
agreed (a) to permanently cease and desist from violations of the Massachusetts
Uniform Securities Act, (b) to be censured by the Securities Division, (c) to pay
the Securities Division a civil penalty of $500,000, an amount commensurate with
the costs of the Division's investigation in, and (d) to provide restitution to all

Massachusetts residents who were investors in the Fairfield Sentry, Greenwich

Sentry, and Greenwich Sentry Partners funds, in the approximate amount of $8

million.

258.  By causing FGA and FGBL to enter into the Consent Order, FGG

acknowledged that it had obligations directly to investors in the Funds.

### K.  PricewaterhouseCoopers Failed to Audit the Funds According to U.S. and International Standards and Misrepresented the Financial Condition of the Funds

259.  PwC Netherlands and PwC Canada were retained to conduct

independent audits of the Funds; they started to audit certain of the Funds in 2002

or earlier and continued to audit the Funds through 2007.  As set forth below, PwC

continuously audited the Funds during this period, and PwC and the Funds had a

mutual understanding that PwC would continue indefinitely to provide recurring

auditing and related services to the Funds.  For example, in an engagement letter to

FGG dated February 7, 2006, PwC Netherlands referred to "our ongoing

appointment as auditors of the Fairfield Funds" and the document provided that

"this engagement letter is also effective for years subsequent to 2005, until it is

replaced by a new engagement letter, unless the engagement is terminated."

260.  PwC provided auditing, tax, and other consulting services to the

Funds on a regular and recurring basis.  In preparing and certifying annual

financial statements for the Funds, PwC relied on audits that it prepared in prior

periods and reaffirmed that the financial information in the certified financial

statements, both past and present, was prepared in accordance with GAAP, GAAS,

International Accounting Standards, and all applicable accounting standards and

that the statements were an accurate representation of the financial condition of the

Funds.  Among other tasks, PwC expressly undertook to conduct "tests of physical

existence, ownership and recorded value of selected assets", "tests of selected

recorded transactions with documentation required by law and good business

practice", and "direct confirmation with selected third parties (e.g., banks,

customers, suppliers) of amounts due to or by them and other relevant

information."  PwC misrepresented that it performed these tests, when it did not,

and fraudulently concealed its misconduct from Plaintiffs, thereby preventing

Plaintiffs from discovering that the Funds' financial statements were false and

misleading.

       1.    <u>PwC Issued Clean Audit Opinions for the Funds</u>

    261.   PwC Netherlands issued an unqualified (or clean) audit opinion for

the financial statements of Greenwich Sentry for the year ended December 31,

2005.  PwC certified that the financial statements were presented in conformity

with United States generally accepted accounting principles ("GAAP") and the

audit was conducted in accordance with United States generally accepted auditing

standards ("GAAS").

262.   PwC Canada issued an unqualified (or clean) audit opinion for the financial statements of Greenwich Sentry for the years ended December 31, 2006 and 2007.  PwC certified that the financial statements were presented in conformity with GAAP and the audit was conducted in accordance with GAAS.

263.   PwC Netherlands issued an unqualified (or clean) audit opinion for the financial statements of Fairfield Sentry for the years ended December 31, 2002, 2003, 2004 and 2005.  PwC certified that the financial statements were presented in conformity with International Financial Reporting Standards ("IFRS") and the audit was conducted in accordance with International Standards of Auditing ("ISA").

264.   PwC Canada issued an unqualified (or clean) audit opinion for the financial statements of Fairfield Sentry for the years ended December 31, 2006 and 2007.  PwC Canada certified that the financial statements were presented in conformity with IFRS and the audit was conducted in accordance with GAAS.

265.   PwC Netherlands issued an unqualified (or clean) audit opinion for the financial statements of Fairfield Sigma for the years ended December 31, 2003, 2004, and 2005.  PwC certified that the financial statements were presented in conformity with IFRS and the audit was conducted in accordance with International Standards of Auditing.

266.   PwC Canada issued an unqualified (or clean) audit opinion for the

financial statements of Fairfield Sigma for the years ended December 31, 2006 and

2007.  PwC certified that the financial statements were presented in conformity

with IFRS and the audit was conducted in accordance with GAAS.

267.   PwC Canada issued an unqualified (or clean) audit opinion for the

financial statements of Greenwich Sentry Partners for the years ended December

31, 2006 and 2007.  PwC certified that the financial statements were presented in

conformity with GAAP and the audit was conducted in accordance with GAAS.

2.    PwC Operates As a Unitary International Professional
      Services Organization

268.   PwC International serves as an umbrella organization coordinating the

accounting and auditing activities of the various PricewaterhouseCoopers

accounting firms.  PwC International's literature and its global website refer to

these constituent members, including PwC Netherlands and PwC Canada, as

"PricewaterhouseCoopers" or "PwC."  Accordingly, in this complaint, PwC is used

to refer to all the PricewaterhouseCoopers entities.

269.   PwC International provides a global governance structure for all

PricewaterhouseCoopers entities.  This global structure is predominantly made up

of members of the U.S. and U.K. firms and includes the Network Leadership

Team, which in turn includes representatives from PricewaterhouseCoopers in the

United States; the Global Board, which is made up of members from the United

States, the UK, and ten other countries; the Strategy Council, made up of twenty-

one representatives from different countries, with a representative from the United

States as its chair; and the Network Executive Team, which has representatives

from the United States and UK.

270.   With respect to the Funds, PwC Netherlands and PwC Canada acted

as agents of PwC International, pursuant to agreements between them, and

provided services under the auspices, at the direction, and for the benefit of PwC

International.  PwC International controls the acts of its member firms and is

responsible for the acts of its member firms, including PwC Netherlands and PwC

Canada.  As an example, the audit reports prepared by PwC Canada and issued to

the Funds' partners and shareholders stated that "PricewaterhouseCoopers refers to

the Canadian firm … and other member firms of PricewaterhouseCoopers

International Limited."[4]  All references herein to "PwC" shall include PwC

International, PwC Netherlands, and PwC Canada.

271.   In addition to auditing the Funds, PwC also audited at least eight other

"feeder funds" to Madoff, including funds with purported multi-billion dollar

values, such as Optimal Strategies U.S. Equity Ltd., Kingate Global Fund, and

Thema International Fund.  In these audits, PwC undertook a concerted, global

---

[4]  Fairfield Sentry Directors' Report and Financial Statements for the years ended December 31,
2007 and 2006, at 9; Fairfield Sigma Directors' Report and Financial Statements for the years
ended December 31, 2007 and 2006, at 7; Greenwich Sentry Financial Statements for the years
ended December 31, 2007 and 2006, at 3; Greenwich Sentry Partners Financial Statements for
the years ended December 31, 2007 and 2006, at 3.

effort with various PwC offices assisting and relying upon each other to conduct

and coordinate the audits.  For example, in connection with its audit of the Funds,

on March 15, 2005, PwC Netherlands wrote to Defendant Lipton stating that in

December 2004 PwC Bermuda had conducted a meeting with Madoff "in order to

obtain and/or update *PwC's understanding of the procedures in place at . . .*

[BMIS]."  (Emphasis supplied.)  The letter stated that the purpose was to "obtain[]

an understanding of certain procedures and organization aspects of . . . [BMIS] for

the purpose of gaining comfort thereon for *the audits by several PwC offices* of a

number of funds having moneys managed by . . . [BMIS]."  (Emphasis supplied.)

272.  An internal, "strictly confidential" PwC memorandum memorialized a

meeting between PwC and Madoff in connection with PwC's audit of Optimal, a

"feeder fund" that, like Fairfield, turned over its investors' funds to BMIS.   The

memorandum reported that Madoff told PwC's representatives that "99% of all

trades are electronic, therefore records are updated daily and all reconciliations are

performed daily (automated process)."  PwC accepted Madoff's representation at

face value and did not perform any independent confirmation or analysis of the

purported trades, or even review the purported electronic confirmations, despite the

fact that it knew that Madoff did not provide electronic confirmations to the Funds

that he managed, and instead gave them delayed, paper confirmation of supposed

trades. Had PwC engaged in the most rudimentary investigation, it would have
discovered that there were no electronic records of trades.

273. The PwC memorandum further stated that "[t]rades are initiated by
the system without trader intervention and routed in accordance with the firms [sic]
routing priority. Trades are bunch but the system maintains detail by account,
which upon electronic conformation of execution is automatically posted to each
individual . . ." PwC again blindly accepted Madoff's representations without any
attempt to confirm them with documentary evidence. For example, the lack of
"trader intervention" in order to implement BMIS' purported trading strategies
could have been tested by a cursory review of the trading programs employed. In
addition, prioritized bunch trades posted to an array of accounts would have
generated substantial back office data, including daily compliance runs and
digitized records, none of which PwC attempted to review.

274. PwC's coordinated audits of other "feeder" funds also provided the
firm with a unique ability and opportunity to verify information about BMIS. That
information, particularly in the aggregate, should have raised significant suspicions
about Madoff's operations and the Funds' assets. For example, in a January 7,
2008 filing with the SEC on Form ADV, BMIS represented that its assets under
management totaled $17,091,640,696. Yet, PwC knew or easily could have
determined, that, as of the end of 2007, PwC alone was auditing Madoff "feeder

funds" which had assets under management that approximated the total amount of

Madoff's SEC-reported assets under management:

| PwC Audited Feeder Fund | Assets Under Management - 2007 |
|---|---|
| Fairfield Sentry (inclusive of Fairfield Lambda & Sigma) | $ 7,277,386,000 |
| Greenwich Sentry, LP | $ 262,531,000 |
| Kingate Global, Ltd | $ 2,754,291,825 |
| Kingate Euro Fund, Ltd | $ 766,322,771 |
| Optimal Strategies US Equity, Ltd. | $ 3,100,000,000 |
| Thema International Fund, PLC | $ 1,447,688,803 |
| Zeus Partners, Ltd | $ 300,000,000 |
| Defender Fund Ltd | $ 312,282,024 |
| Plaza Investments International Ltd./ Notz Stucki & Cie. | $ 657,241,006 |
| **Total** | **$16,877,743,429** |

3.    PwC Owed Duties to Plaintiffs and Knew Investors in the
      Funds Would Rely on Clean Audit Opinions

275.    PwC addressed audit reports to the shareholders of Fairfield Sentry

and Fairfield Sigma and to the partners of Greenwich Sentry and Greenwich Sentry

Partners, whom PwC knew would rely on the audit reports in acquiring and

holding shares or partnership interests of the Funds.[5]  PwC thus understood and

accepted that it owed a direct duty to Plaintiffs to conduct proper audits of the

Funds.

---

[5] *See* Fairfield Sentry Directors' Report and Financial Statements for the Years Ended Dec. 31,
2007 and 2006; Fairfield Sigma Financial Statements for the Years Ended Dec. 31, 2007 and
2006; Fairfield Sentry Directors' Report and Financial Statements for the Year Ended Dec. 31,
2005; Fairfield Sentry Directors' Report and Financial Statements for the Year Ended Dec. 31,
2003; Greenwich Sentry Financial Statements for the Years Ended Dec. 31, 2007 and 2006;
Greenwich Sentry Partners Financial Statements for the Years Ended Dec. 31, 2007 and 2006;
Greenwich Sentry Financial Statements for the Years Ended Dec. 31, 2005 and 2004.

276.   In fact, in a report to the Investment Manager of FGG on its Audit

Plan for the year ending December 31, 2008 ("the Audit Plan"), PwC recognized

that it was "responsible for reporting to the...shareholders and/or partners on the

financial statements of the Funds...." Audit Plan at 8.  PwC's acknowledgement

of its obligations and duties as auditor as set out in the Audit Plan applies equally

to the audits that are the subject of this action.

277.   In addition, PwC knew that its name was used by the Funds in

marketing so as to give the Funds legitimacy and, therefore, to draw investors to

the Funds.  PwC also knew that its audit letters would be provided or made

available to potential investors and to existing investors.  PwC knew that investors

and potential investors, including Plaintiffs, would rely upon the facts that PwC

was the auditor of the Funds, represented it conducted proper audits of the Funds,

and issued unqualified, or clean, opinions on the Funds' financial statements.

Indeed, PwC acknowledged in the Audit Plan that its audit engagement involved

"delivering" to "shareholders and other stakeholders" in the Funds "independent

opinions and reports that provide assurance on financial information released by

the Funds." *Id.*

278.   For example, PwC Canada, in engagement letters dated January 11,

2007 and October 17, 2007, and PwC Netherlands, in an engagement letter dated

February 7, 2006 (the only engagement letters publicly available), each entered

into with FGG, retained the right to object to the publication of its name in any
document made available to third parties. Thus, the inclusion of the PwC name in
the PPMs and COMs reflects PwC's consent and knowledge that its role as the
Funds' auditor was being published to investors. Plaintiffs reasonably understood
that the reference to PwC as the Funds' auditor in the PPMs and COMs was an
actual or implicit representation to investors that PwC had consented to the use of
its name in association with the Funds' historical financial statements and that
PwC had issued unqualified or "clean" audit reports on the Funds' financial
condition in accordance with GAAP. Moreover, the Funds' audited financial
statements, containing PwC's opinion letter, addressed to shareholders or limited
partners, were provided to existing investors on an annual basis.

279. PwC also knew that there was no independent market mechanism or
evidence to value the shares and limited partnership interests in the Funds, and that
there was no other independently-verified third party financial information about
the Funds besides the audited financial statements. PwC knew that the primary
purpose of its audits was to provide investors in the Funds with assurance that the
Funds' assets were legitimately invested and accurately valued. PwC also knew
that the Funds were not in any sense "operating" businesses but were, instead,
merely vehicles to aggregate investments and transfer them to Madoff.

4.   PwC Recklessly Performed Its Audits and Made
Misrepresentations Regarding the Funds

a)   *PwC Was Required, at a Minimum, to
Obtain Independent Verification that the
Funds' Assets Existed.*

280.   The American Institute of Certified Public Accountants ("AICPA"),

the professional organization that promulgates the national auditing standards

known as GAAS, develops the objectives for audits conducted in accordance with

GAAS. GAAS set the minimum level of performance and quality that auditors are

expected to meet. Through its Auditing Standards Board, the AICPA has in its

Statements of Accounting Standards codified a detailed interpretation of GAAS,

which is cited as "AU" in this complaint. The International Auditing and

Assurance Standards Board ("IAASB") of the International Federation of

Accountants promulgates the International Standards on Auditing (ISA). Those

pronouncements are consistent with U.S. GAAP in all material respects.

Accordingly, references herein to GAAS and ISA are intended to be synonymous

and references to GAAS are intended to include references to ISA.

281.   Generally Accepted Accounting Principles, or "GAAP," are those

principles recognized by the accounting profession as the uniform rules,

conventions, and procedures necessary to define generally accepted accounting

principles in the United States. AU § 411. The International Financial Reporting

Standards (IFRS) govern the framework for the preparation of financial statements

adopted by the International Accounting Standards Board. The IFRS mirror

GAAP with respect to the form and content of the Funds' financial statements.

References herein to GAAP and IFRS are intended to be synonymous and,

accordingly, references to GAAP shall include reference to IFRS.

282. The AICPA and the IAASB prohibit members from expressing an

opinion or stating affirmatively that financial statements or other financial data

"present fairly … in conformity with generally accepted accounting principles," if

such information departs from applicable accounting principles.

283. There are ten Generally Accepted Auditing Standards established by

the AICPA which PwC had a duty to follow in the audits of the Funds: General

Standards, Standards of Field Work, and Standards of Reporting.

> *General Standards*
>
> 1. The auditor must have adequate technical training and proficiency to perform the audit.
>
> 2. The auditor must maintain independence in mental attitude in all matters relating to the audit.
>
> 3. The auditor must exercise due professional care in the performance of the audit and the preparation of the report.
>
> *Standards of Field Work*
>
> 1. The auditor must adequately plan the work and must properly supervise any assistants.

2. The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.

3. The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*

1. The auditor must state in the auditor's report whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

2. The auditor must identify in the auditor's report those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3. When the auditor determines that informative disclosures are not reasonably adequate, the auditor must so state in the auditor's report.

4. The auditor must either express an opinion regarding the financial statements, taken as a whole, or state that an opinion cannot be expressed, in the auditor's report. When the auditor cannot express an overall opinion, the auditor should state the reasons therefore in the auditor's report. In all cases where an auditor's name is associated with financial statements, the auditor should clearly indicate the character of the auditor's work, if any, and the degree of responsibility the auditor is taking, in the auditor's report.

AU § 150.02. The International Standards on Auditing are effectively the same as

GAAS insofar as material to PwC's audits of the Funds' financial statements. *See*

ISA 200 "Objective and General Principles Governing an Audit of Financial

Statements."

284.   PwC was thus required to exercise due professional care "to plan and

perform the audit to obtain *reasonable assurance* about whether the financial

statements are free of material misstatement, *whether caused by error or fraud.*"

AU § 110.02 (emphasis added); *see also* AU § 230.03 (concerning the auditors'

responsibility to conduct their work exercising due professional care); ISA 240

("The Auditor's Responsibility to Consider Fraud and Error in an Audit of

Financial Statements"); ISA 300 ("Planning"). PwC specifically acknowledged

this obligation by quoting the GAAS provision in the Audit Plan's section entitled

"PwC's Role." (Audit Plan at 24.)

285.   In order to state an opinion with regard to an audited entity's financial

statements, GAAS states that "the auditor must obtain a sufficient understanding of

the entity and its environment, including its internal controls, as to assess the risk

of material misstatement of the financial statements, whether due to error or

fraud." AU § 314.01; *see also* ISA 310 ("Knowledge of Business").

286.   Audit risk and materiality must be considered by the auditor in

designing the nature, timing, and extent of audit procedures and in evaluating the

results of those procedures.  AU § 312.01.  GAAS requires the auditor use

professional judgment and, in particular, professional skepticism in determining

whether a risk factor is present and should be considered in identifying and

assessing the risks of material misstatement due to fraud.  AU §§, 230.07-09,

316.12, 316; *see also* ISA 400 ("Risk Assessments and Internal Controls").

287.  In the Audit Plan, PwC acknowledged the importance of assessing the

risk posed by a particular business when conducting of an audit:  "Business risk

directly affects audit risk."  Audit Plan at 4.  PwC went on to state that "it adjust[s]

[its] audit approach to focus on identified higher risk areas that could have an

impact on the financial statements." *Id.*  PwC further represented that its audit

procedures must "[i]dentify and assess specific fraud risks based on the

information gathered, and develop appropriate audit procedures to address the

identified risks." *Id.* at 25.

288.  PwC acknowledged in the Audit Plan that, as part of the process of

assessing audit risks, it was required to "[c]onsider whether the programs and

controls that address identified risks of material misstatement due to fraud have

been suitably designed and placed in operation" by the Funds. *Id.* at 24.

289.  In particular, the auditor is required to consider the competency and

sufficiency of the audit evidence.  Since audit evidence is gathered and evaluated

throughout the audit, professional skepticism should be exercised throughout the
audit process. AU § 230.08; *see also* ISA 200.

290.    Moreover, GAAS recognizes that the audit of an entity with securities
investments requires special procedures: "The inherent risk for an assertion about a
derivative or security is its susceptibility to a material misstatement, assuming
there are no related controls." AU § 332.08.

291.    Thus, when auditing the existence of a security, auditors must perform
substantive procedures, such as confirmations with the security's issuer or physical
inspections of the security.

> Existence assertions address whether the derivatives and
> securities reported in the financial statements through
> recognition or disclosure exist at the date of the statement
> of financial position. Occurrence assertions address
> whether derivatives and securities transactions reported
> in the financial statements, as a part of earnings, other
> comprehensive income, or cash flows or through
> disclosure, occurred. Paragraph .19 provides guidance
> on the auditor's determination of the nature, timing, and
> extent of substantive procedures to be performed.
> Examples of substantive procedures for existence or
> occurrence assertions about derivatives and securities
> include—
>
> > • *Confirmation with the issuer of the security.*
> >
> > • Confirmation with the holder of the security,
> > including securities in electronic form, or with the
> > counterparty to the derivative.
> >
> > • *Confirmation of settled transactions with the
> > broker-dealer or counterparty.*

- Confirmation of unsettled transactions with the broker-dealer or counterparty.

- *Physical inspection of the security or derivative contract.*

- Reading executed partnership or similar agreements.

- Inspecting underlying agreements and other forms of supporting documentation, in paper or electronic form, for the following:

  — Amounts reported
  — Evidence that would preclude the sales treatment of a transfer
  — Unrecorded repurchase agreements

- *Inspecting supporting documentation for subsequent realization or settlement after the end of the reporting period.*

- *Performing analytical procedures.* For example, the absence of a material difference from an expectation that interest income will be a fixed percentage of a debt security based on the effective interest rate determined when the entity purchased the security provides evidence about existence of the security.

AU § 332.21 (emphasis added)

292.    PwC was well aware of the enormous risks posed by the type of

investments such as the Funds' investments with Madoff.  In 2007, for example,

claiming a "leadership position as auditors for both investee funds and investor

entities," PwC issued a publication setting out its "perspective" on the "audit

105

requirements related to investor entities that invest in alternative investments,"
such as those made in BMIS for the Funds.  ("PwC Guide" at Intro., 1.)  PwC
recognized the "unique audit risks" posed by these investments, admitting that the
key question when auditing a fund is "Do the investor entity's alternative
investments exist at the financial statement date, and have the related transactions
occurred during the period?"  (PwC Guide at 32, Intro.)  For example, PwC
acknowledged that:

- An auditor cannot audit what management has not done" and that management's internal controls "are particularly important because they can affect the nature, timing and extent of audit procedures performed by the investor entity's auditor over alternative investments.  (PwC Guide at 4.)

- transparency and due diligence" were "two of the main themes" and that "the auditor should not rely exclusively on information obtained from the fund manager while ignoring the investor entity's controls, including its monitoring process.  (PwC Guide at Intro., 2.)

- it [is] necessary for the auditor to request confirmation of the fund's holdings on a security-by-security basis.  (PwC Guide at 3.)

- Even if the auditor obtains a detailed confirmation of the fund's holdings, the AICPA Practice Aid states that the auditor may need to perform additional procedures, depending on the significance of the alternative investments to the entity's financial statements.  (PwC Guide at 24.)

293.   PwC represents that it not only meets, but exceeds, these standards,

and is at "the leading edge of best practice":

> [T]he knowledge and experience necessary to help
> [clients] with complex financial accounting issues. . . .
> Our member firms audit many of the world's best-known
> companies and thousands of other organizations both
> large and small.  Our audit approach, *at the leading edge
> of best practice*, is tailored to suit the size and nature of
> [the clients'] organization and draws upon our extensive
> industry knowledge.

http://www.pwc.com/gx/en/audit-services/index.jhtml (last visited Sept. 29,

2009) (emphasis supplied).

294.   In fact, in its 2008 Global Annual Review, PwC represented that its

member firms' compliance with accepted or normal auditing, accounting, and

professional standards "is a given," because those standards serve only as the

"expected performance baseline for everything we do."

295.   Similarly to the PwC Guide, the AICPA *Audit & Accounting Guide,

Investment Companies* (the "Guide") directs auditors of investment funds to gain

an understanding of the attitude of the fund's management concerning internal

control and its importance in reliable financial reporting.  Guide § 5.64.  Auditors

must consider testing the fund's control and monitoring procedures.  Guide § 5.64.

The Guide further directs auditors to consider whether the fund's investment in an

underlying fund is so significant as to require modification of financial statements.

Guide § 5.48.

107

296.   As member firms of PwC International, PwC Netherlands and PwC Canada were bound by the foregoing standards and guidelines.

297.   Indeed, because PwC knew that the Funds constituted conduits for investments that were controlled by Madoff, PwC was required to plan and conduct audits that verified the existence of the Funds' investments.  In order to do so, PwC was required to understand the Funds' "information systems for derivatives and securities," including its investments held by BMIS.  AU § 332.05. An understanding of the Funds' internal controls was particularly important to a properly planned audit because, absent effective internal controls, the Funds were not in a position to accurately and reliably validate the existence, or value, of the investments through BMIS.

298.   Moreover, in addition to the requirements imposed by the foregoing standards, PwC should have treated BMIS as a service organization because its services were part of the Funds' information system for derivatives and securities that affected (1) how the Funds' derivatives and securities transactions were purportedly initiated and (2) the accounting records, supporting information, and specific accounts in the financial statements involved in the processing and reporting of the Funds' derivatives and securities transactions.  AU §§ 332.11, 332.20, and 324; *see also* ISA 402 ("Audit Considerations Relating to Entities Using Service Organization").

299.    PwC was thus required to consider the controls put in place by BMIS:

> Following the guidance in Section 324, Service
> Organizations, a service organization's services are part
> of an entity's information system for derivatives and
> securities if they affect any of the following:
>
> a.    How the entity's derivatives and securities
> transactions are initiated.
>
> b.    The accounting records, supporting
> information, and specific accounts in the
> financial statements involved in the
> processing and reporting of the entity's
> derivatives and securities transactions.

AU § 332.11.

300.    PwC was also required to perform additional procedures required in
situations where, as here, there is a lack of segregation of duties at a service
organization.  With respect to the Funds, BMIS initiated the securities transactions
held and serviced the securities as custodian and prepared trading and account
information.  Even the Funds acknowledged that there was a risk of
misappropriation of the assets due to the fact that they did not have custody of
them.[6]  This heightened risk required PwC to perform additional procedures to
opine on the financial statements of the Funds.  AU § 332.16 specifically directs
that confirmations from service organizations are not sufficient audit evidence.

---

[6]  *See* FS PPM-8/14/06, at 21; FS PPM-10/1/04, at 19; FS PPM-7/1/03, at 21; FΣ PPM-12/1/08,
at 23; FΣ PPM-2/21/06, at 20.

301.   Moreover, where, as here, the service organization (BMIS) both initiated the transactions and held and serviced the securities, the greater risk of fraud requires the auditor to perform additional procedures, including site visits to inspect documentation, and identification of controls by the service organization:

> — *If one service organization initiates transactions as an investment adviser and also holds and services the securities, all of the information available to the auditor is based on the service organization's information. The auditor may be unable to sufficiently limit audit risk without obtaining audit evidence about the operating effectiveness of one or more of the service organization's controls.* An example of such controls is establishing independent departments that provide the investment advisory services and the holding and servicing of securities, then reconciling the information about the securities that is provided by each department.

AU § 332.20 (emphasis added).

302.   In light of the nature of the Funds and of the circumstances surrounding them, PwC also had an obligation to discuss with BMIS' independent auditor, F&H, the result of F&H's most recent audit of BMIS.  Guide § 5.59; AU § 332.11.  In this regard, PwC was required to examine the control environment at BMIS and should have either requested or performed additional tests of controls.  Guide §§ 5.66-67.

303.   Because F&H's "audits" of BMIS' were unsatisfactory,  PwC had the additional obligation to apply appropriate auditing procedures:

110

If the investee's financial statements are not audited, or if
the investee auditor's report is not satisfactory to the
investor's auditor for this purpose, the investor's auditor
should apply, or should request that the investor arrange
with the investee to have another auditor apply,
appropriate auditing procedures to such financial
statements, considering the materiality of the investment
in relation to the financial statements of the investor.

AU § 332.30.

        b)     *PwC Failed to Verify the Existence of the*
                *Funds' Madoff Investments*

304.   PwC failed in its obligation to obtain reasonable assurance that the
assets included in the Funds' Statements of Assets and Liabilities in fact existed
and were appropriately valued.  The following tables show, on a yearly basis, the
asset valuations for which PwC offered an unqualified opinion as to conformance
with GAAP (*i.e.*, for which PwC purported to have "reasonable assurance" that
such valuations were free of material misstatement):

| FAIRFIELD SENTRY ASSETS BY YEAR[7] | |
|---|---|
| Year | Assets |
| 2007 | $7,227,386,000 |
| 2006 | $6,210,966,000 |
| 2005 | $4,977,749,000 |
| 2004 | $5,157,860,000 |
| 2003 | $4,551,211,000 |

---

[7] Fairfield Sentry Directors' Report and Financial Statements for the Years Ended Dec. 31, 2007
and 2006; Fairfield Sentry Directors' Report and Financial Statements for the Year Ended Dec.
31, 2005; Fairfield Sentry Directors' Report and Financial Statements for the Year Ended Dec.
31, 2003; Fairfield Sentry Directors' Report and Financial Statements for the Year Ended Dec.
31, 2002.

| FAIRFIELD SENTRY ASSETS BY YEAR[7] | |
|---|---|
| 2002 | $4,085,538,000 |
| 2001 | $3,605,909,000 |

| FAIRFIELD SIGMA ASSETS BY YEAR[8] | |
|---|---|
| Year | Assets |
| 2007 | €775,354,793 |
| 2006 | €493,419,529 |
| 2005 | €333,138,505 |
| 2004 | €237,484,165 |
| 2003 | €198,806,354 |
| 2002 | €146,025,179 |

| GREENWICH SENTRY ASSETS BY YEAR[9] | |
|---|---|
| Year | Assets |
| 2007 | $261,531,458 |
| 2006 | $149,925,210 |
| 2005 | $123,628,704 |

| GREENWICH SENTRY PARTNERS ASSETS BY YEAR | |
|---|---|
| Year | Assets |
| 2007 | $9,801,583 |
| 2006 | $10,493,818 |

305.    Contrary to the applicable accounting standards, PwC failed to gather

sufficient, competent evidential matter to support its opinion that the Funds'

financial statements were free of material misstatement with respect to the claimed

---

[8] Fairfield Sigma Financial Statements for the Years Ended Dec. 31, 2007 and 2006.
[9] Greenwich Sentry Financial Statements for the Years Ended Dec. 31, 2007 and 2006;
Greenwich Sentry Financial Statements for the Years Ended Dec. 31, 2005 and 2004.

112

assets, instead inappropriately relying on the Funds' management's representations

AU § 333; *see also* ISA 580 ("Management Representations"). As a result,

although PwC opined that the multi-billion dollar valuations of the Funds'

investments were fairly presented in the financial statements, PwC failed to

determine whether the assets, which constituted over 95% of the Funds' value,

even existed.

306.    PwC also did not perform the necessary procedures to audit the

existence of the transactions which constituted the split-strike conversion strategy.

PwC was aware that the Funds were purportedly using that strategy, a

nontraditional options trading strategy. Due to the strategy's heavy use of options

trading, PwC should have performed substantive procedures or testing, although it

recognizes that "[a]n audit includes examining, on a test basis, evidence supporting

the amounts and disclosures in the financial statements." Audit Plan at 5. In fact,

in its Audit Plan, PwC represented that its audit procedure involves "perform[ing]

substantive tests," something it did not do when it audited the Funds. *Id.*

307.    PwC's Audit Plan specifically addressed BMIS as it related to the

audit of the Funds. Noting that BMIS served as custodian, sub-custodian, and

prime broker, PwC stated that as part of its audit, "[t]hrough discussion and

enquiry with . . . [BMIS], we will obtain an understanding of the key control

activities as they relate to the operations and processes over the custodian, sub-

custodian and prime broker functions." *Id.* at 11. Significantly, PwC represented that as part of its audits of the Funds it "will perform transaction testing on the investment strategy applied by . . . [BMIS] for the applicable Funds." *Id.* PwC failed to conduct the testing of Madoff's operations that its own Audit Plan recognized was appropriate.

308.    Had PwC undertaken the proper analysis and testing of the strategy purportedly employed by Madoff, it would have determined that the strategy, including the claimed liquidation of all positions at the end of each quarter to acquire U.S. Treasury bonds, could not have functioned as described within market parameters. Moreover, PwC would have determined that BMIS' claimed consistent, positive returns were not achievable.

309.    PwC also acknowledged that its audit would properly require independent testing of the prices used by Citco so as to verify the accuracy of the reported valuations (Audit Plan at 12), something it again failed to do. PwC further represented that, "in the absence of an exchange-traded price," it would perform "alternative valuation procedures," including "understanding the methodology used to determine the estimated fair value of the investments" and "assessing the nature of the investments, including...the frequency of trading activity." *Id.* Here again, PwC failed to perform the acts its own Audit Plan recognized were necessary.

310.   In addition, despite its knowledge of the interconnection between the Funds and BMIS, and of the Funds' reliance on the supposed integrity of BMIS' operations, PwC did not review the data required by the auditing standards with respect to an auditor's obligation to examine the "controls over derivatives and securities transactions from their initiation to their inclusion in the financial statements." PwC did not test the trades supposedly made by BMIS or confirm the actual existence of securities in BMIS accounts. If PwC had made any such efforts, it would have discovered the securities did not exist.

311.   PwC also improperly relied on the financial information provided by BMIS without inquiring into F&H, BMIS' auditor, even though F&H had represented to the AICPA that it did not perform audits and was, therefore, not subject to the annual peer review process. PwC should have, but did not, perform additional procedures such as visiting the offices of F&H to discuss the audit procedures. Had PwC taken this necessary step, it would have discovered that there was no effective audit of BMIS.

                    c)      *PwC Violated Its Duties to Fund Investors*

312.   As the independent party charged with certifying that it had reasonable assurance that the Funds' financial statements were free of material misstatement, PwC failed to meet its obligation to the Funds' investors when it issued its audit opinions – opinions upon which it knew those parties would rely.

313.   Had PwC performed appropriate audits (as it represented it had), it would have learned that the securities transactions purportedly conducted by Madoff did not occur and the assets of the Funds did not exist.

314.   In addition, the audits PwC represented it conducted, even the limited audit work that PwC must have conducted would have given it  actual knowledge or information that it willfully ignored,  that:

- BMIS was not audited pursuant to GAAS by a "qualified and reputable independent audit firm";

- The Funds and the Fairfield Defendants as Fund managers performed no meaningful due diligence on BMIS;

- The Funds did not test the validity of Madoff's performance or strategy;

- The Funds had no process in place to verify the fair value of the investments purportedly made by BMIS;

- The Funds did not verify the supposed trades made by Madoff with counterparties or other third parties and, thus, did not verify the existence of the securities and other assets

315.   PwC breached its duties as the independent auditor of the Funds at least as follows:

- PwC failed to exercise due professional care and professional skepticism in its audit of the Funds. Specifically, PwC failed to use professional skepticism "when considering the risk of material misstatement due to fraud";

- PwC failed to obtain a sufficient understanding of the Funds and their environment, including their internal controls, to assess the risk of material misstatement of the financial statements whether due to error or fraud;

- PwC failed to obtain sufficient competent audit evidence with respect to existence of the Funds' investments through BMIS and PwC did not perform the necessary procedures to audit the existence of the Funds' securities;

- PwC failed to obtain an understanding of the internal controls (or lack thereof) of BMIS and did not perform the necessary procedures to audit the occurrence of the transactions which constituted the purported split-strike conversion strategy, such as confirmation with counterparties, confirmation of settled transactions, physical inspection of the securities, or performance of analytical procedures;

- PwC failed to perform additional procedures required in situations where, as here, there was a lack of segregation of duties at a service organization. Numerous red flags, discussed above, indicating that Madoff was a fraud existed and required PwC to investigate further and perform additional audit procedures prior to opining on the presentation of the Funds' financial positions.

- Any reliance by PwC on the financial statements of BMIS was improper because F&H was not qualified or able to audit BMIS in accordance with GAAP.

5.  PwC's Substantial Assistance to Fairfield Defendants'
    Fraud and Breaches of Fiduciary Duty

316. In the course of its audits of the Funds, PwC acquired knowledge that:

(i) all of the Funds' assets were managed by Madoff; (ii) Madoff was both the

investment advisor and the broker-dealer with respect to those assets; and (iii)

Madoff was also the custodian of the assets. PwC thus knew that Madoff was

responsible for managing, trading and holding the Funds' assets, an unusual

multiple-role situation that facilitated Madoff's fraudulent scheme. PwC failed to

conduct the audits of the Funds in accordance with GAAS, ISA, and customary

practices followed by independent auditors,  As a consequence, PwC's audit

reports misrepresented that PwC had conducted the audits in compliance with

GAAS and ISA and misrepresented that the Funds' financial statements set out the

true financial condition of the Funds. Indeed, PwC's failure to comply with

GAAS, ISA, and its own policies and procedures was so egregious that PwC failed

to detect that the purported Fund assets did not even exist. In sum, PwC's audits

were so deficient that in reality there were no audits at all.

317. Moreover, in the course of even an inadequate audit, PwC must have

known or willfully ignored  that the Fairfield Defendants did not, in fact, conduct

the due diligence they falsely represented that they conducted. PwC further must

have known or willfully ignored that the Fairfield Defendants did not monitor or

verify the investments purportedly made by Madoff in order to confirm that BMIS

118

operated legitimately, using the represented investment strategy, and in accordance
with the legal and regulatory requirements.

318.   In conducting its audits, PwC was willfully blind to the Fairfield
Defendants' breaches of fiduciary duty and fraud, and PwC thereby provided
substantial assistance to the Fairfield Defendants in that regard by providing clean
audit opinions and by failing in its other duties as set forth above.

### L.    Citco Violated Its Obligations to Provide Financial Services to Fund Investors

#### 1.    Citco Operates as a Single Global Financial Services Provider

319.   Citco holds itself out as a "global industry leader" in financial
services, including hedge fund administration, custody and fund trading.
(http://www.citco.com/Index.jsp (last visited Sept. 29, 2009).)

320.   Citco provides financial services to its customers through four
"divisions." The executive committee of Citco Group hires division directors to
oversee the daily operations of its divisions, and reviews the directors'
performance. The directors act on behalf of Citco Group.

321.   Citco's Fund Services division – the relevant division here – offers its
services to customers globally through "16 strategic centers." (http://www.citco.
com/Divisions_Fund_Services.jsp (last visited Sept. 29, 2009).) It is controlled by
a director appointed by the Citco Group's executive committee, and the director

acts on behalf of the Citco Group. The use of global "strategic centers" reflects

Citco's philosophy to provide support where its clients are located. The 16

strategic centers function under common management, direction and control as

regional offices of Citco, not as independent companies.

322. In its marketing, Citco does not distinguish between its individual

companies, stating only that the organization, has more than 78 offices in 34

countries employing more than 3,400 employees. (*Funds of Hedge Funds: A*

*Unique Approach* (2007), http://www.citco.com/docs/FundofFundsBrochure.pdf,

at 12.)

323. The individual companies that comprise the "Citco Fund Services"

division, including the Citco companies named as defendants here, are controlled

and operated by Citco Group and its director, and function as part of its unified

"Citco Fund Services" division. Engagements with companies in the Citco Fund

Services division expressly provide that services may be provided by Citco Group

or any of its companies, not just the company that is engaged. (*See, e.g.*, Feb. 20,

2003 Administration Agreement between Fairfield Sentry and Citco Fund

Services, § 2.4.) Its marketing materials refer to Citco Fund Services as a single

administrator, stating: "Citco Fund Services administer more than 2,000 funds with

more assets than any other hedge fund administrator." (*Moving Fund Services*

*Forward* (2007), (http://www.citco.com/Divisions_ Fund_Services_Brochures.jsp,

at 1.)  Similarly, Citco's website states that Citco Fund Services, as a whole,

"*draws upon a global team* of more than 3,000 experienced, knowledgeable and

highly trained staff to ensure that each fund is supported appropriately and service

quality standards are not only met, but consistently exceeded."  (http://www.citco.

com/Divisions_ Fund_Services.jsp (last visited Sept. 29, 2009).) (emphasis added).

It touts the ability of its staff "to transfer between offices and divisions, meaning

between the individual companies."  (*Moving Fund Services Forward* (2007),

http://www.citco.com/Divisions_ Fund_Services_Brochures.jsp, at 3.)  Thus,

irrespective of what Citco company is technically engaged, customers are provided

services from, and on behalf of, Citco as a whole.  Pursuant to agreements between

them, all of the composite companies are agents of Citco Group and of each other.

     2.     Citco Holds Itself Out as a Superior Financial Services
             Provider

    324.    Citco holds its Fund Services division companies out as "the world's

pre-eminent hedge fund administrators" with "35 years experience in the provision

of administration and other services to their hedge fund clients, many of whom are

leading names in the industry."  (http://www.citco.com/Divisions_Fund_

Services.jsp (last visited Sept. 29, 2009).)  It asserts that its companies "have

consistently been ranked 'Best in Class' and 'Top-Rated' across all locations in

recognized industry surveys of hedge fund administrators for both single manager

funds and funds of hedge funds."  (Id.)  In addition, Citco boasts that all division

staff are provided with "career development initiatives and extensive training
programs to ensure staff are equipped to handle the complexities of hedge funds."
(Id.)

325.  Citco recognizes that its "reputation for independence and high-
quality client services has earned it the trust of its clients." (*Funds of Hedge Funds:
A Unique Approach* (2007), http://www.citco.com/docs/FundofFundsBrochure.pdf,
at 12.)  Citco has also stated on its website: "By providing fully independent
services, we act as a reliable fiduciary to safeguard the interests of investors."
Thus, Citco recognizes that it is a fiduciary to the investors of its fund customers,
such as Plaintiffs here.

326.  Citco provides substantial financial services to funds, beyond the
services typical of fund administrators or custodians.  Citco acknowledges that it
seeks "to provide funds with a quality and scope of services beyond what is merely
required." (*Moving Fund Services Forward* (2007), http://www.citco.com/
Divisions_Fund_Services_Brochures.jsp, at 1.)  The middle office services Citco
claims to provide to its fund clients include: "independent pricing of funds
portfolio on a monthly basis," "daily position, proceeds and trade reconciliation to
Prime Brokers," and "verification." (http://www.citco.com/Divisions_Fund
_Services_Services_Hedge_Funds.jsp (last visited Sept. 29, 2009).)  The back
office services include: "monthly independent portfolio verification," "positions

and balances reconciliation," and "investment restriction compliance monitoring."
(http://www.citco.com/Divisions_Fund_Services_Services_Hedge_Funds.jsp (last
visited Sept. 29, 2009).)

      3.    Citco Committed to Serve as the Funds' Administrator

    327.  As administrator for the Funds, Citco (with Citco Fund Services and
Citco Canada as the contracting companies) undertook responsibilities beyond that
of a typical Fund administrator.  For example, Citco committed to provide
"reconciliation of cash and other balances at brokers," "independent reconciliation
of the Fund's portfolio holdings," and "calculation of the Net Asset Value and the
Net Asset Value per Share on a monthly basis in accordance with the Fund
Documents."  (Sentry Administration Agreement, Sched. 2, Pt. 1; Sigma
Administration Agreement, Sched. 2, Pt. 1.)  Citco was also responsible for
preparing monthly financial statements in conformity with International
Accounting Standards, which would include portfolio listings; preparing books and
records to facilitate the external audit; and liaising with auditors to review and
prepare the financial statements.  (Id.)  Citco also committed to provide a
"reconciliation of information provided by the Fund's prime broker and custodian
with information provided by the Investment Manager."  (Sentry Administrative
Agreement, Sched. 2, Pt. 2; Sigma Administration Agreement, Sched. 2, Pt. 2.)
Citco was obligated to provide the services of individuals or corporations to serve

as Directors and other Officers of funds if requested. (Sigma Administration Agreement, Sched. 2, Pt. 4.)

328.   Furthermore, Citco was to serve as the Funds' agent with the general public, and was specifically responsible for communications with investors. (Sentry Administration Agreement, Sched. 2, Pt. 3; Sigma Administration Agreement, Sched. 2, Pt. 3.)  Citco communicated directly with Plaintiffs, and Plaintiffs with Citco.  Plaintiffs sent their subscription documents directly to Citco, sent funds for investments to Citco, and received investment confirmations from Citco.

329.   Citco agreed to act in good faith in the performance of these and other services as Fund administrator.  Citco was permitted only to rely on information it received without making further inquiries if that information demonstrated an "absence of manifest error." (Sentry Administration Agreement § 6.2, and Sched. 2, Pt. 1; Sigma Administration Agreement § 6.2(c).)

> 4.   Citco Committed to Serve as Custodian for Fairfield
>      Sentry and Sigma

330.   As custodian, bank, and depositary for Fairfield Sentry and Fairfield Sigma, Citco (with Citco Global and Citco Bank as the contracting companies) undertook significant additional discretionary responsibilities, beyond that of a typical fund custodian, bank, or depositary.  Citco was responsible for taking "due care . . . in the selection and ongoing appropriate level of monitoring of any . . .

sub-custodian" appointed by the Fund – including BMIS. (Sentry 2006 Custodian
Agreement § 4.3; Sentry 2003 Custodian Agreement § 4.3; Sigma 2003 Custodian
Agreement § 5.2.) It was also obligated to "to keep the securities in the custody of
the Custodian or procure that they are kept in the custody of any sub-custodian,"
(Sentry 2006 Custodian Agreement § 6.1.1; Sentry 2003 Custodian Agreement §
6.1.1; Sigma 2003 Custodian Agreement § 7.1), and agreed that "Securities held at
any one time by the Custodian or any sub-custodian shall be recorded in and
ascertainable from the books and/or ledgers of the Custodian...." (Sentry 2006
Custodian Agreement § 6.2; Sentry 2003 Custodian Agreement § 6.2; Sigma 2003
Custody Agreement § 7.2.) Citco agreed to employ "financial or other experts" in
execution of its duties. (Sentry 2006 Custodian Agreement § 6.1.6; Sentry 2003
Custodian Agreement § 6.1.6; Sigma 2003 Custodian Agreement § 7.1.6.)
Furthermore, Citco had the authority to "act without first obtaining instructions
from the Fund" if such action were necessary "in order to preserve or safeguard the
Securities or other assets of the Fund." (Sentry 2006 Custodian Agreement § 6.3;
Sentry 2003 Custodian Agreement § 6.3; Sigma 2003 Custody Agreement § 7.3.)
As the Funds' bank, Citco also undertook to use due care in the selection of third
parties it dealt with in providing brokerage services, and had the absolute
discretion to refuse to execute instructions by the Fund. (Sentry 2006 Custodian

125

Agreement § 6.3; Sentry 2003 Custodian Agreement § 6.3; Sigma 2003 Custody

Agreement § 7.3.)

331.    Citco also committed to use its "best efforts and judgment and due

care in performing its obligations and duties," and represented that it would act in

good faith and with reasonable care in the execution of its duties.  (Sentry 2006

Custodian Agreement § 8.2; Sentry 2003 Custodian Agreement § 8.3; Sigma 2003

Custody Agreement § 10.2.)  Citco was only permitted to "rely on the genuineness

of any document," to the extent Citco believed in "good faith" that the document

was "validly executed by or on behalf of the Fund."  (Sentry 2006 Custodian

Agreement § 8.6; Sentry 2003 Custodian Agreement § 8.6; Sigma 2003 Custody

Agreement § 4.5.)

> 5.    Citco Owed Duties to Plaintiffs as Fund Investors

332.    Citco was a fiduciary to Plaintiffs, and owed Plaintiffs a duty of due

care in the performance of the financial services it provided.

333.    Citco was aware that potential and current investors knew that Citco

was providing significant financial services to the Funds, and were relying on

Citco in making their investment decisions.  Citco was aware that its involvement

in the Funds lent significant credibility to the Funds, and provided potential and

current investors with assurance about the quality of financial services provided to

the Funds, the security of the assets held by the Funds, and the accuracy of the

reported values of the Funds and of the investors' individual accounts. In short,

Citco knowingly placed its imprimatur on the Funds.

334. As fully intended by Citco, the Plaintiffs reposed their trust and

confidence in Citco, which occupied a superior position, to provide these financial

services, when Plaintiffs made their initial investment in the Funds, re-invested in

the Funds, and retained those investments in the Funds. Plaintiffs also relied on

Citco as a fiduciary in the period after they sent their money for investment, but

before their assets were turned over to Madoff.

335. The NAV, which was to be independently calculated and reported by

Citco, was fundamental to Plaintiffs' initial investment decisions, decisions to

invest additional funds, and decisions to maintain the investments over time. The

number of shares that Plaintiffs received in exchange for their investment amounts

depended on Citco's NAV calculations. Plaintiffs' subsequent reported profits also

turned on Citco's calculations. Therefore, Plaintiffs necessarily relied on Citco's

NAV calculations. Their initial and subsequent investments were sent directly to

Citco. Plaintiffs who invested in Fairfield Sentry and Sigma also relied on Citco to

fulfill its duties as custodian, bank and depositary. Plaintiffs reasonably and

foreseeably reposed trust and confidence in Citco to safeguard their assets, to

record the securities purchased for them, to monitor anyone else assigned to hold

those assets (*i.e.* BMIS), and to ensure those third parties were safely holding the
securities.

6.    Citco's Performance of Its Duties to Plaintiffs Was
      Grossly Deficient

336.    Citco was grossly deficient in the fulfillment of its duties to Plaintiffs.
Citco utterly failed to take reasonable, industry-standard steps to fulfill its duties as
administrator, custodian, bank, and depositary.

337.    For instance, in contravention of its commitments in Schedule 2 of its
Administration Agreement, Citco failed to take reasonable steps, industry-standard
to calculate the Funds' NAV; to reconcile balances at the Funds' broker, Madoff;
to independently reconcile the Funds' portfolio holdings with Madoff; to reconcile
information provided by Madoff as the Funds' prime broker with information
provided by the Investment Manager; to prepare the monthly financial statements
in accordance with International Accounting Standards; or to relay accurate
information to investors.

338.    Rather, Citco blindly and recklessly relied on information provided by
Madoff and the Funds to calculate and disseminate the Funds' NAV, and to
perform its other duties, even though that information was manifestly erroneous
and should not have been relied on.  Citco could not have reasonably relied on this
information because the roles of investment manager, sub-custodian and trade
execution agent were consolidated in Madoff, thus hugely increasing the risk of

fraud, and the need for independent verification and scrutiny, as Citco was well
aware.  Furthermore, as alleged above, the trade and profit information provided by
Madoff was, on its face, virtually impossible to achieve.  Moreover, the numerous
red flags surrounding Madoff's operations and purported results should have
caused Citco to increase its scrutiny of the information provided, and seek
independent verification.

339.   Citco also grossly failed in the execution of its custodial
responsibilities.  It did not take reasonable, industry-standard steps to safeguard the
assets that were entrusted to it as custodian.  Rather, in contravention of its duties
under the Custodian Agreements, Citco blindly and recklessly handed investors'
assets over to Madoff as sub-custodian and broker without independent or
sufficient due diligence and monitoring, and without any reasonable, good faith
basis for relying on information provided by the Fairfield Defendants or Madoff.
It further failed to record accurately the securities held by the sub-custodian
because no securities were actually being held by Madoff as sub-custodian, or to
take any reasonable steps to verify that the securities were being held by Madoff.
The consolidation of the roles of investment manager, sub-custodian and execution
agent, and the numerous red flags surrounding Madoff, set forth above, mandated
an even higher level of scrutiny over information provided by Madoff, which Citco
failed to provide.

340.   If Citco had not breached its duties as set forth above, Plaintiffs would

not have invested in the Funds, or retained their investments in the Funds.

Plaintiffs could have redeemed their investments and recovered their principal at

any time during the many years in which the Funds were making redemptions,

prior to the revelation of Madoff's fraud in December 2008.

7.   Citco Provided Substantial Assistance to the Fairfield
Defendants' Fraud and Breaches of Fiduciary Duty

341.   Citco knowingly provided substantial assistance to the Fairfield Fraud

Claim Defendants and Fairfield Defendants in the fraud and breaches of fiduciary

duty that they perpetrated on investors.  By virtue of Citco's long-standing

involvement in the Funds, and its experience in fund management, Citco knew or

was willfully blind to the fact that the due diligence and risk controls employed by

the Fairfield Defendants were grossly deficient.  Citco further knew that the

Fairfield Defendants uniformly represented to Plaintiffs that they employed

thorough due diligence, monitoring and verification of Fund managers, including

Madoff, and strict risk controls – representations which Citco knew to be false or

was willfully blind to the evident falsity.

342.   Rather than alerting investors to these problems, Citco provided

substantial assistance to the Fairfield Defendants.  For example, Citco assisted the

Fairfield Defendants by receiving investments from Plaintiffs and transferring their

funds to BMIS; sending Plaintiffs investment confirmations; calculating the Funds'

NAV and disseminating the NAV values; receiving and transmitting other Fund

information from the Fairfield Defendants to Plaintiffs; allowing Citco's name and

the services it was ostensibly providing to be included in the Funds' placement

memoranda and other documents; and recording the securities Madoff said he was

holding.  The Fairfield Defendants could not have perpetrated their fraud and

breaches of fiduciary duty without this substantial assistance by Citco.  If Citco

had refused to fulfill the instructions of the Fairfield Defendants or rely on the

information they transmitted, as it had a right to do, or alerted investors to the

conduct of the Fairfield Defendants, Plaintiffs' investments would have been

saved.

### 8.   Citco Collected Unearned Fees

343.   While grossly failing in its duties to investors, Citco was collecting

millions of dollars in fees – fees that were calculated on the basis of fictitious

profits reported by Madoff.[10]  Because the fees were calculated on the basis of

fraudulent data, and Citco did not perform its obligations, it did not earn these fees,

and the fees should be returned to Plaintiffs.

### M.   **GlobeOp Violated Its Obligations to Greenwich Sentry Investors**

344.   GlobeOp also provided administrative services to Greenwich Sentry

from approximately January 2004 to August 2006.  GlobeOp touts on its website

---

[10] FS PPM-8/14/06, at 17; FS PPM-10/1/04, at 15; FS PPM-7/1/03, at 17; Sentry Agreement Sched. 3, Pt. 1; Sigma
Administration Agreement, Sched. 3, Pt. 1; Sentry 2006 Custodian Agreement Sched. 1; Sentry 2003 Custodian
Agreement Sched. 1; Sigma 2003 Custodian Agreement Sched. 1.

that its "independence, technology leadership and deep knowledge of complex

financial instruments uniquely positions us to provide truly independently derived

net-asset-value (NAV) reports and best-practice administration support for

domestic and offshore funds." (http://www.globeop.com/globeop/proserv/

fund_administration/ (last visited Sept. 29, 2009).)

345.  In its role as administrator, GlobeOp undertook significant

discretionary responsibilities that included preparing and distributing "monthly

reports that contain the amount of the Partnership's net assets, the amount of any

distributions from the Partnership and Incentive Allocation, accounting and legal

fees, and all other fees and expenses of the Partnership." (GS COM-5/2006, at 10.)

346.  Plaintiffs who invested in Greenwich Sentry reasonably and

foreseeably reposed their trust and confidence in GlobeOp to fulfill its duties.

Therefore, GlobeOp was a fiduciary to Plaintiffs and owed Plaintiffs a duty of care

in the performance of its duties.

347.  GlobeOp was grossly deficient in the fulfillment of its duties to

investors.  Among other things, GlobeOp should have, but did not, take reasonable,

industry-standard steps to calculate the Fund's NAV, or to verify independently or

even minimally scrutinize the information provided to it.  GlobeOp also blindly

and recklessly relied on information provided by BMIS and the Fund to calculate

and disseminate the Fund's NAV. Had GlobeOp fulfilled its duties, Plaintiffs
would not have invested, re-invested, or retained their investments in the Fund.

### N.     <u>Defendants' Fraudulent Concealment of Their Breaches of Duty</u>

348.   Plaintiffs did not discover and could not have discovered, through the
exercise of reasonable diligence, the existence of the Madoff Ponzi scheme and the
wrongful conduct of Defendants as alleged herein until after December 11, 2008,
when the news of Madoff's confession and arrest became known in the
marketplace.

349.   Defendants actively and fraudulently concealed their failure to
perform any material due diligence on or monitoring of the operations of BMIS
and Madoff, and affirmatively misrepresented that they were performing constant
and intensive due diligence on every aspect of the implementation of the split-
strike conversion strategy when in fact they were performing virtually no such due
diligence.

350.   The affirmative acts of the Defendants alleged herein, including the
lack of any material due diligence and the failure to perform their duties and
obligations to Plaintiffs to monitor and protect their investments, were inherently
self-concealing and were carried out in a manner that precluded detection.

# CLASS ACTION ALLEGATIONS

351.   Plaintiffs bring this action as a class action pursuant to Rules 23(a)

and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all shareholders

in Fairfield Sentry Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P., and

Greenwich Sentry Partners, L.P., as of December 10, 2008 (the "Class"), who

suffered a net loss of principal invested in the Funds.  Excluded from the Class are

the Defendants herein, and any entity in which the Defendants have a controlling

interest, and the officers, directors, affiliates, legal representatives, immediate

family members, heirs, successors, subsidiaries, and/or assigns of any such

individual or entity.

352.   Plaintiffs seek to designate four subclasses, one for the class members

who invested in each of the four Funds managed by FGG:  Fairfield Sentry

Limited, Fairfield Sigma Limited, Greenwich Sentry, L.P., and Greenwich Sentry

Partners, L.P.

353.   The Class satisfies the requirements of Rules 23(a) and 23(b)(3) of the

Federal Rules of Civil Procedure:

> **Numerosity**.  During the Class Period, shares in the
> Funds were sold to thousands of investors.  The
> membership of the Class is so numerous as to render
> joinder impracticable.  The precise number of Class
> members remains indeterminate and can only be
> ascertained through discovery, but Plaintiffs believe it is
> in the thousands.

**Typicality**.  The losses suffered by the named Plaintiffs were caused by the same events, patterns of practice, and courses of conduct that give rise to the claims of the other members of the Class.  The named Plaintiffs are members of the Class and the losses to the named Plaintiffs are based on the same legal theories.

**Common Questions**.  The numerous predominant questions of law and fact that are common to the Class include the following:

a.     Whether the Fairfield Fraud Claim Defendants are liable for fraud in making statements through private placement memoranda regarding the investment strategy for the Fairfield Funds and historical results achieved by such Funds without regard to their truth or falsity;

b.     Whether such statements were, alternatively, negligent misrepresentations;

c.     Whether the Fairfield Defendants recklessly or negligently misrepresented, *inter alia*, the  services that would be provided by the Fairfield Defendants; the extent and quality of the due diligence, ongoing risk monitoring, and transaction verification that they would and were performing on Madoff; the Fairfield Defendants' transparency to Madoff; the split-strike conversion method ostensibly used by Madoff; each Fund's value and appreciation; and Madoff's qualifications to serve as investment manager, broker, and custodian for the Funds;

d.     Whether the Fairfield Defendants breached their

fiduciary duty to investors;

e.     Whether the Fairfield Defendants, PwC and Citco

violated the securities laws by making misrepresentations or material

omissions.

f.     Whether and to what extent Plaintiffs were damaged by

the Fairfield Defendants' misrepresentations and breaches of fiduciary duty;

g.     Whether the Fairfield Defendants were grossly negligent

in:

i.     failing to perform adequate due diligence before

selecting Madoff as each Fund's investment manager, execution agent for

the purported split-strike conversion strategy, and custodian for the Funds;

ii.     failing to monitor Madoff and BMIS on an

ongoing basis to any meaningful degree; and

iii.     failing to take adequate steps to confirm BMIS's

purported account statements, transactions and holdings of each Fund's

assets;

h.     Whether Plaintiffs are entitled to the imposition of a

constructive trust on all monies and other property in the possession of the

Fairfield Defendants and Fairfield Fee Claim Defendants which derive from

their compensation in the form of management and performance and other
fees based on Madoff's fraudulent reports;

   i.       Whether Plaintiffs are entitled to an accounting of:  (1)
the actual investments and transactions done on Plaintiffs' behalf, (2) the
actual calculation used to determine each management and performance fee,
and (3) the amounts taken in management and performance fees;

   j.       Whether PwC breached its duties and obligations to
Plaintiffs by its negligence and gross negligence in auditing the Funds by:

      i.       Failing to verify the existence of the assets that
purportedly constituted 95% of the Funds' assets;

      ii.      failing to exercise due professional care and
professional skepticism in its audits of the Funds;

      iii.     failing to obtain sufficient understanding of the
Funds and their environment, including their internal controls, to assess the
risk of material misstatement of the financial statements whether due to error
or fraud;

      iv.      failing to obtain sufficient competent audit
evidence with respect to existence of the Funds' investments through BMIS
and failing to perform the necessary procedures to audit the existence of the
Funds' assets;

137

v.    failing to obtain an understanding of the internal controls (or lack thereof) of BMIS and failing to perform the necessary procedures to audit the occurrence of the transactions involving the Funds' assets;

vi.    failing to perform additional procedures required in situations where, as here, there was a lack of segregation of duties at a service organization;

vii.    failing to investigate and follow up the numerous red flags, discussed above, indicating that Madoff was a fraud;

viii.    improperly relying on the financial statements of BMIS because, among other things, F&H was not qualified or able to audit BMIS in accordance with GAAS.

k.    Whether PwC aided and abetted the Fairfield Defendants' breach of fiduciary duties to Plaintiffs.

l.    Whether PwC aided and abetted the Fairfield Fraud Claim Defendants' fraud.

m.    Whether PwC made negligent misrepresentations to Plaintiffs regarding the financial statements of the Funds.

n.      Whether PwC Canada and PwC Netherlands made false representations and omissions in connection with Plaintiffs' purchase of their interests in the Funds.

o.      Whether PwC International was a control person liable for those misrepresentations and omissions.

p.      Whether Citco breached its fiduciary duties, by:

i.      failing to exercise due care and diligence in the selection and supervision of BMIS as the Funds' sub-custodian;

ii.     failing to make appropriate inquiries to confirm that BMIS's obligations were being competently discharged;

iii.    failing to take proper steps to confirm information received from Madoff and BMIS;

iv.     misrepresenting that BMIS was a qualified sub-custodian and misrepresenting the care Citco Bank had taken with respect to selection and supervision of BMIS;

v.      permitting the Funds' investment manager and execution agent to serve as sub-custodian;

vi.     carelessly entrusting Plaintiffs' assets to BMIS;

vii.    profiting at Plaintiffs' expense;

viii.   failing to perform adequate due diligence of

BMIS;

ix.   failing to monitor Madoff and BMIS on an

ongoing basis to any reasonable degree;

x.   failing to take adequate steps to confirm the

accuracy and plausibility of the data received from BMIS and recklessly

creating and disseminating to Fund investors purported account statements,

transactions and holdings of Fund assets based upon such unsubstantiated

data; and

xi.   furnishing to Fund investors monthly statements

and net asset value calculations that Citco did not independently verify.

q.   Whether Citco aided and abetted the Fairfield

Defendants' breach of fiduciary duties to Plaintiffs.

r.   Whether Citco aided and abetted the Fairfield Fraud

Claim Defendants' fraud.

s.   Whether Citco recklessly made false statements to

investors.

t.   Whether the Citco Defendants (excluding Citco Group)

made false representations and omissions in connection with Plaintiffs'

purchase of their interests in the Funds.

140

u.      Whether Citco Group was a control person liable for

those misrepresentations and omissions.

v.      Similar questions of fact and law are common with

respect to Plaintiffs' claims against the other Defendants.

**Adequate Representation**.  The representative Plaintiffs
will fairly and adequately protect the interests of the
Class.  Plaintiffs have retained experienced counsel
qualified in class action litigation who are competent to
assert the interests of the Class.

**Superiority**.  A class action in superior to other methods
for the fair and efficient adjudication of this controversy
involving thousands of similarly situated investors.

## CLAIMS FOR RELIEF

### Count 1
### Fraud against Fairfield Fraud Claim Defendants (Purchaser Claims)

354.    The foregoing paragraphs are realleged herein.

355.    The Fairfield Fraud Claim Defendants falsely represented to Plaintiffs

in connection with their purchase of shares and/or equity interests in the Fairfield

Funds that:  (i) the Funds would invest their monies into a legitimate fund,

principally relying upon the SSC investment strategy involving the purchase of

equities and options; (ii) that by using this strategy, the Funds historically had

consistent profitable returns since inception; (iii) the Fairfield Fraud Claim

Defendants would conduct due diligence into, monitor, and verify the investments

made by them in the Funds operated by Madoff to confirm that the Funds were

operated legitimately, using the stated investment strategy, and in accordance with
the required legal and regulatory requirements.

356. The Fairfield Fraud Claim Defendants failed to disclose the following
material information, among other things, which rendered their other
representations false and misleading: (i) that the Fairfield Fraud Claim Defendants
were in fact not engaging in customary, or even minimal, due diligence to verify
that the Funds' assets were being properly invested and managed by Madoff and
BMIS, or that the assets even existed; (ii) the existence of numerous red flags
regarding the Funds including, among others, the lack of transparency into
Madoff's actual operations, the lack of segregation of duties, inadequate auditing
of Madoff, and the attainability of consistently profitable returns for a fund
pursuing the stated strategy.

357. The Fairfield Fraud Claim Defendants made these false and
misleading representations and omissions knowingly, recklessly, without regard
for their truth or falsity, and with the intent to induce Plaintiffs to rely upon them
by investing assets in the Funds.

358. Plaintiffs justifiably relied upon the false representations made by the
Fairfield Fraud Claim Defendants by investing their assets in the Fund.

359. As a direct and proximate result of their reliance upon the false
representations and omissions of the Fairfield Fraud Claim Defendants, Plaintiffs

have suffered damages, including the loss of their investments in the Funds, and

the Fairfield Fraud Claim Defendants, in turn, have wrongfully taken substantial

assets belonging to the Plaintiffs in the form of improper and unearned fees.

**Count 2**
**Fraud against Fairfield Fraud Claim Defendants (Holder Claims)**

360.    The foregoing paragraphs are realleged herein.

361.    The Fairfield Fraud Claim Defendants induced purchasers to hold

their positions in the Fairfield Funds by falsely representing to Plaintiffs that: (i)

the Fairfield Fraud Claim Defendants had conducted thorough due diligence and

exercised oversight of Madoff's operations and had determined that those

operations were legitimate, utilized the SSC investment strategy, and had a long

track record of achieving positive investment returns; (ii) Plaintiffs' assets invested

in the Funds operated by the Fairfield Fraud Claim Defendants would, in turn, be

invested in the legitimate funds operated by Madoff that utilized the SSC

investment strategy; (iii) the Fairfield Fraud Claim Defendants would monitor the

investments made by them in the Funds operated by Madoff to confirm that the

Funds were operated legitimately, using the SSC investment strategy, and in

accordance with all legal and regulatory strictures, and further that the Fairfield

Fraud Claim Defendants would verify Fund transactions, including that the Madoff

funds actually made the represented trades and held the represented assets; (iv) the

due diligence and oversight process employed by the Fairfield Defendants was so

143

thorough as to be privileged in providing full transparency to all aspects of

Madoff's operations, which allowed the Fairfield Fraud Claim Defendants to

assure that the Funds invested with Madoff were being actually and legitimately

invested; and (v) Madoff's operations and accounts were audited by reputable,

independent auditors utilizing appropriate and accepted accounting and auditing

procedures, which provided further assurance that Madoff's accounts actually held

the represented assets and were otherwise operated lawfully.

362.    The Fairfield Fraud Claim Defendants made the representations

knowing that they were false in that:  (i) the Fairfield Fraud Claim Defendants did

not, in fact, conduct thorough or appropriate due diligence of, or exercise oversight

over Madoff and his operations and had not determined that Madoff actually

invested assets utilizing the SSC investment strategy, with a long track record of

achieving positive investment returns; (ii) the Fairfield Fraud Claim Defendants

did not invest Plaintiffs' assets in legitimate funds that utilized the SSC investment

strategy; (iii) the Fairfield Fraud Claim Defendants did not meaningfully monitor

the investments in the Funds operated by Madoff to confirm that the Funds were

operated legitimately using the SSC investment strategy and in accordance with all

legal and regulatory structures, and did not verify Fund transactions, including that

Madoff actually made the represented trades and that the Funds held the

represented assets; (iv) the due diligence and oversight processes employed by the

Fairfield Fraud Claim Defendants were non-existent, much less so thorough as to
be privileged in providing total transparency to all aspects of Madoff's operations,
and did not allow the Fairfield Fraud Claim Defendants the ability to assure that
the assets provided to Madoff were actually and legitimately invested; and (v)
Madoff's operations and accounts were not audited by reputable, independent
auditors utilizing appropriate and accepted accounting and auditing procedures,
and thus did not provide any assurance that the Fairfield Funds actually held the
represented assets and were otherwise operated lawfully.

363.    When they made their false statements and committed their omissions,
the Fairfield fraud Claim Defendants knew facts or had access to information
suggesting that their public statements were not accurate or failed to check
information they had a duty to monitor and which would have demonstrated the
falsity of their statements.

364.    The Fairfield Fraud Claim Defendants made the false representations
knowing of their falsity and with the intent to induce Plaintiffs to rely upon the
false representations by holding assets in the Funds.

365.    Plaintiffs justifiably relied upon the false representations made by the
Fairfield Fraud Claim Defendants in holding their assets in the Funds.

366.    As a direct and proximate result of their reliance upon the false
representations and omissions of the Fairfield Fraud Claim Defendants, Plaintiffs

have suffered damages, namely the loss of their investments in the Funds, and the

Fairfield Fraud Claim Defendants, in turn, have wrongfully taken substantial assets

belonging to the Plaintiffs in the form of improper and unearned fees.

**Count 3
Violation of Section 10(b) and Rule 10b-5 against Fairfield Fraud Claim
Defendants**

367.    The foregoing paragraphs are realleged herein.

368.    This Count is asserted against the Fairfield Fraud Claim Defendants

and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule

10b-5 promulgated thereunder.

369.    The Fairfield Fraud Claim Defendants directly engaged in a common

plan, scheme, and unlawful course of conduct, pursuant to which they knowingly

or recklessly engaged in acts, practices, and courses of business which operated as

a fraud and deceit upon Plaintiffs, and made various deceptive and untrue

statements of material facts and omitted to state material facts necessary in order to

make the statements made, in light of the circumstances under which they were

made, not misleading to Plaintiffs.  The purpose and effect of this scheme, plan,

and unlawful course of conduct was, among other things, to induce Plaintiffs to

purchase shares in the Funds.

370.    The Fairfield Fraud Claim Defendants, pursuant to said scheme, plan,

and unlawful course of conduct, knowingly and recklessly issued, caused to be

issued, participated in the issuance of, the preparation and issuance of deceptive

and materially false and misleading statements to Plaintiffs as particularized above.

371.    When they made false statements and committed their omissions, the

Fairfield Fraud Claim Defendants knew facts or had access to information

suggesting that their public statements were not accurate or recklessly failed to

check information they had a duty to monitor and which would have demonstrated

the falsity of their statements.

372.    The Fairfield Fraud Claim Defendants were motivated to commit

wrongful acts by the hundreds of millions of dollars in fees they received based on

Plaintiffs' investments and the illusory profits from those investments.

373.    In ignorance of the false and misleading nature of the statements

described above and the deceptive and manipulative devices and contrivances

employed by the Fairfield Fraud Claim Defendants, Plaintiffs relied, to their

detriment, on such misleading statements and omissions in purchasing limited

partnerships or shares in the Funds.  Plaintiffs have suffered substantial damages as

a result of the wrongs alleged herein.

374.    By reason of the foregoing, the Fairfield Fraud Claim Defendants

directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

thereunder in that they: (a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts

147

necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; or (c) engaged in acts, practices, and

a course of business which operated as a fraud and deceit upon Plaintiffs in

connection with their investments in the Fund.

**Count 4**
**Violation of Section 20(a) against Fairfield Fraud Claim Defendants and**
**Defendants Landsberger, Murphy, and Smith**

375.    The foregoing paragraphs are realleged herein.

376.    The Fairfield Fraud Claim Defendants and defendants Landsberger,

Murphy, and Smith (as members of FGG's Executive Committee) each acted as a

controlling person of the Funds within the meaning of Section 20(a) of the

Exchange Act as alleged herein. By virtue of their high level position, participation

in and/or awareness of the Funds' operations, and/or intimate knowledge of the

Funds' products, sales, accounting, plans and implementation thereof, they had the

power to influence and control and did influence and control, directly or indirectly,

the decision-making of the Funds, including the content and dissemination of the

various statements that were false and misleading.  The Fairfield Fraud Claim

Defendants, and defendants Landsberger, Murphy, and Smith, had the ability to

prevent the issuance of the statements or cause the statements to be corrected.

377.    The Fairfield Fraud Claim Defendants, and defendants Landsberger,

Murphy, and Smith, had direct and supervisory involvement in the day-to-day

operations of the Fund and, therefore, are presumed to have had the power to

control or influence the particular statements giving rise to the securities violations

as alleged herein, and exercised the same.

378.    By virtue of their position as controlling persons, the Fairfield Fraud

Claim Defendants and defendants Landsberger, Murphy, and Smith are liable

pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of

the wrongful conduct, Plaintiffs suffered damages in connection with their

investments in the Funds.

### Count 5
### Negligent Misrepresentation against Fairfield Defendants (Purchaser Claims)

379.    The foregoing paragraphs are realleged herein.

380.    Based on their unique or special expertise with respect to investments

generally and the Madoff Funds in particular, the Fairfield Defendants had a

special relationship of trust or confidence with Plaintiffs, which created a duty on

the part of the Fairfield Defendants to impart full and correct information to

Plaintiffs.

381.    The Fairfield Defendants falsely represented to Plaintiffs in

connection with their purchase of shares and partnership interests in the Funds that:

(i) the Funds would invest their monies into a legitimate fund, principally relying

upon a SSC involving the purchase of equities and options; (ii) that by using this

strategy, the Funds historically had achieved consistent profitable returns and had a

long track record of achieving positive investment returns; (iii) the Fairfield

Defendants would monitor the investments made by them in the Funds operated by

Madoff to confirm that the Funds were operated legitimately, using the stated

investment strategy, and in accordance with all legal and regulatory strictures.

382.    The Fairfield Defendants failed to disclose the following material

information, among other things, which rendered their other representations false

and misleading:  (i) that the Fairfield Defendants were in fact not engaging in

customary, or any other meaningful, due diligence to verify that the Funds' assets

were being properly invested and managed by the fund manager, or that the assets

even existed; (ii) the existence of numerous red flags regarding the Fairfield Funds

including, among others, the lack of transparency into Madoff's actual operations,

the lack of segregation of duties, inadequate auditing of Madoff, and  the

unattainability of consistently profitable returns for a fund pursuing the stated

strategy.

383.    The Fairfield Defendants made the false representations and material

omissions knowing that Plaintiffs would use and rely upon the representations and

omissions for the particular purpose of determining where and how to invest their

assets and, in particular, to decide to invest their assets in the Funds.

384.   Plaintiffs justifiably relied upon the false representations and material

omissions made by the Fairfield Defendants in furtherance of that particular

purpose by investing their assets in the Funds.

385.   The Fairfield Defendants knew that Plaintiffs were investors and

understood that they would rely upon the false statements and material omissions

for the particular purpose of investing their assets in the Funds.

386.   As a result of their reliance upon the false representations and material

omissions of the Fairfield Defendants, Plaintiffs have suffered damages, namely

the loss of their investments in the Funds, and the Fairfield Defendants, in turn,

have derived substantial profits.  Defendants' misconduct was the direct and

proximate cause of Plaintiffs' losses.

## Count 6
## Negligent Misrepresentation against Fairfield Defendants (Holder Claims)

387.   The foregoing paragraphs are realleged herein.

388.   Based on their unique or special expertise with respect to investments

generally and the Madoff funds in particular, the Fairfield Defendants had a special

relationship of trust or confidence with Plaintiffs, which created a duty on the part

of the Fairfield Defendants to impart correct information to Plaintiffs.

389.   The Fairfield Defendants induced purchasers to hold their positions in

the Fairfield Funds by falsely representing to Plaintiffs that:  (i) the Fairfield

Defendants had conducted thorough due diligence and exercised oversight of

Madoff's operations and had determined that those operations were legitimate,
utilized the SSC investment strategy, and had a long track record of achieving
positive investment returns; (ii) Plaintiffs' assets invested in the funds operated by
the Fairfield Defendants would, in turn, be invested in a legitimate manner by
Madoff that utilized the SSC investment strategy; (iii) the Fairfield Defendants
would monitor the investments made by Madoff to confirm that the Funds were
operated legitimately, using the SSC investment strategy, and in accordance with
all legal and regulatory strictures, and further that the Fairfield Defendants would
verify Fund transactions, including that the Madoff funds actually made the
represented trades and that the Funds held the represented assets; (iv) the due
diligence and oversight process employed by the Fairfield Defendants was so
thorough as to be privileged in providing total transparency to all aspects of
Madoff's operations, which allowed the Fairfield Defendants to assure that the
funds invested with Madoff were being actually and legitimately invested; (v) the
net asset values of Plaintiffs' investments were true and correct reflections of the
value of their investments in the Funds; and (vi) Madoff's operations and accounts
were audited by reputable, independent auditors utilizing appropriate and accepted
accounting and auditing procedures, which provided further assurance that the
Fairfield Funds actually held the represented assets and were otherwise operated
lawfully.

390. The representations made by the Fairfield Defendants were false in

that, among other things: (i) the Fairfield Defendants did not, in fact, conduct

thorough due diligence of, or exercise oversight over, Madoff and his operations

and had not determined that Madoff actually invested assets utilizing the SSC

investment strategy, with a long track record of achieving positive investment

returns; (ii) the Fairfield Defendants did not invest Plaintiffs' assets in legitimate

funds that utilized the SSC investment strategy; (iii) the Fairfield Defendants did

not intend to monitor the investments in the Funds operated by Madoff to confirm

that the funds were operated legitimately using the SSC investment strategy and in

accordance with all legal and regulatory structures, and did not intend to verify

Fund transactions, including that Madoff actually made the represented trades and

that the Funds actually held the represented assets; (iv) the due diligence and

oversight process employed by the Fairfield Defendants was non-existent, much

less so thorough as to be privileged in providing total transparency to all aspects of

Madoff's operations, and thus did not allow the Fairfield Defendants the ability to

assure that the assets provided to Madoff were actually and legitimately invested;

(v) Madoff's operations and accounts were not audited by reputable, independent

auditors utilizing appropriate and accepted accounting and auditing procedures,

and thus did not provide any assurance that the Fairfield Funds actually held the

represented assets and were otherwise operated lawfully, and (vi) the purported net asset values of Plaintiffs' investments in the Funds were fictitious.

391.    The Fairfield Defendants made the false representations knowing that Plaintiffs would use and rely upon the representations for the particular purpose of determining whether to hold their assets in the Funds.

392.    Plaintiffs justifiably relied upon the false representations made by the Fairfield Defendants in furtherance of that particular purpose by continuing to hold their assets in the funds operated by the Fairfield Defendants.

393.    The Fairfield Defendants knew that Plaintiffs were investors in the funds and understood that Plaintiffs would rely upon the false statements for the particular purpose of continuing to hold their assets in the Funds.

394.    As a result of their reliance upon the false representations made by the Fairfield Defendants, Plaintiffs have suffered damages, namely the loss of their investments in the Funds, and the Fairfield Defendants, in turn, have derived substantial profits.  The Fairfield Defendants' misconduct was the direct and proximate cause of Plaintiffs' losses.

## Count 7
## Gross Negligence against Fairfield Defendants

395.    The foregoing paragraphs are realleged herein.

396.    The Fairfield Defendants, as investment advisors, managers, and placement agents with discretionary control over Fund assets, had a special

relationship with Plaintiffs that gave rise to a duty to exercise due care in the
management of Plaintiffs' assets invested in the Funds, and in the selection and
monitoring of Fund managers and sub-custodians. The Fairfield Defendants knew
or should have known that Plaintiffs were relying on the Fairfield Defendants to
manage the investments entrusted to the Funds with reasonable care, and Plaintiffs
did reasonably and foreseeably rely on the Fairfield Defendants to exercise such
care by entrusting their assets to their Fund.

397.    The Fairfield Defendants grossly failed to exercise due care, and acted
in reckless disregard of their duties, and thereby injured Plaintiffs. The Fairfield
Defendants failed to exercise the degree of prudence, caution, and good business
practice that would be expected of any reasonable investment professional. The
Fairfield Defendants failed to perform adequate due diligence before selecting
BMIS as the Funds' execution agent for its SSC method, and before allowing
BMIS to serve as sub-custodian for the Funds; failed to monitor Madoff and BMIS
on an ongoing basis to any reasonable degree; failed to take adequate steps to
confirm BMIS's purported account statements, transactions and holdings of Fund
assets.

398.    If the Fairfield Defendants had not been grossly negligent with respect
to Plaintiffs' assets invested in the Funds, they would have discovered that Madoff

was a fraud, and would not have entrusted Plaintiffs' assets invested in the Funds

to Madoff and BMIS.

399.    As a direct and proximate result of the Fairfield Defendants' gross

negligence with respect to Plaintiffs' assets invested in the Fairfield Funds,

Plaintiffs have lost all, or substantially all, their investment in the Funds.

400.    By reason of the foregoing, the Fairfield Defendants are jointly and

severally liable to Plaintiffs.

401.    Because of the outrageous nature of the Fairfield Defendants' willful

and wanton conduct, Plaintiffs are entitled to punitive damages.

## Count 8
## Breach of Fiduciary Duty against Fairfield Defendants

402.    The foregoing paragraphs are realleged herein.

403.    The Fairfield Defendants had substantial discretion and control over

Plaintiffs' assets in the Madoff feeder funds, the marketing of those Funds, and

communications to Plaintiffs.

404.    This discretion and control gave rise to a fiduciary duty and duty of

care on the part of the Fairfield Defendants to the Plaintiffs.

      a.    The Fairfield Defendants occupied a superior
position over Plaintiffs with respect to their
management and control over their assets in the
Funds, and had superior access to confidential
information about the investment of the assets and
about Madoff and BMIS.

156

     b.     The Fairfield Defendants' superior position
necessitated that Plaintiffs repose their trust and
confidence in the Fairfield Defendants to fulfill
their duties, and Plaintiffs did so by investing in
the Funds.

     c.     The Fairfield Defendants held themselves out as
providing superior client investment services, and
evinced an understanding that they were the
fiduciaries of the investors.  Plaintiffs reasonably
and foreseeably relied on such representations, and
trusted in the Fairfield Defendants' purported
expertise and skill.

405.  FGBL has served as the General Partner of Greenwich Sentry since
March 1, 2006, and as the General Partner of Greenwich Sentry Partners, since its
organization in April 2006.  As the General Partner, FGBL was responsible for
directing the Funds' investment and trading activities and owed fiduciary duties to
the Plaintiffs.

406.  From January 1998 to February 2006, FGL served as the General
Partner of Greenwich Sentry.  From January 1, 1993, the date of inception of the
Partnership, to January 1998, Walter Noel and Jeffrey Tucker were the General
Partners of Greenwich Sentry.  FGG recognized in its publications to shareholders
that "the General Partner has a fiduciary duty to the Partnership to exercise good
faith and fairness in all of its dealings with it." (GS COM- 8/2006, at 21; GS
COM-5/2006, at 20; GSP COM-8/2006, at 20.)  The General Partner is responsible

for the supervision of the Administrator and Sub-Administrator in the completion

of their duties. (GS COM- 8/2006, at 11; GSP COM-8/2006, at 10.)

407.   FRS serves on the Risk Management team for FGG, and provides risk

management services to Fairfield Sentry and to the other Funds.

a.   FRS was responsible for conducting "both the pre-
and post-investment quantitative analyses of hedge
fund managers, monitors the market risk and
provides the quantitative analyses supporting the
asset allocation decisions across the firm's multi-
strategy funds." (FS PPM-8/14/06, Appendix A,
Items 4.A.(5) and 4.(B).(8), Mar. 27, 2008, at 7.)

b.   FRS was also responsible for generating monthly
reports on the Funds, including an analysis of
"Exposures, Sensitivities, Scenarios and Stress
Tests, VaR, Correlations Analysis, and Attribution
Analysis." (Id.) This suite of reports was for
review and discussion at "FGG's Investment
Committee at a formal monthly risk meeting."
(Id.)

408.   The Fairfield Defendants breached their fiduciary duties to Plaintiffs

by failing to conduct adequate due diligence and monitoring with respect to the

Funds' investments, by failing to follow-up on red flags that would have caused

them to discover that Madoff was conducting Ponzi scheme, and by pocketing

hundreds of millions of dollars in fees based on fraudulent asset values and

investment returns.

409.  Plaintiffs have been damaged as a proximate result of these breaches

of fiduciary duty and are entitled to damages, and appropriate equitable relief,

including accounting and imposition of a constructive trust.

### Count 9
### Third-Party Beneficiary Breach of Contract against Fairfield Defendants and
### Fairfield Fee Claim Defendants

410.  The foregoing paragraphs are realleged herein.

411.  Plaintiffs are third-party beneficiaries of contracts entered by certain

Fairfield Defendants with the Funds, including the Investment Management

Agreements and general partnership agreements entered by FGL and FGBL

agreements evince a clear intent to benefit shareholders, for instance, by requiring

FGBL to seek "suitable investment opportunities" for the Funds (Investment

Management Agreement ¶ 2) to "obtain capital appreciation" and return on

Plaintiffs' investments (FS PPM-8/14/06, at 9.)

412.  The benefits to Plaintiffs under the Investment Management

Agreements between the Funds and FGBL were immediate, not simply incidental,

in that the Funds' only motivations for executing the Investment Management

Agreements were to provide investors with capital appreciation and returns on their

investments in the Funds.

413.  FGBL has been Fairfield Sentry's Investment Manager since 2003,

and in that capacity, controlled the assets of both the Fairfield Sentry and Fairfield

Sigma investors. (Investment Management Agreement ¶ 1; Sigma Investment

Management Agreement ¶ 1.)

     a.     FGBL's duties include "management of the Fund's investment activities, the selection of the Fund's investments, monitoring its investments and maintaining the relationship between the Fund and its custodian, administrator, registrar and transfer agent." (FS PPM-8/14/06, at 7; Investment Management Agreement ¶ 1; Sigma Investment Management Agreement ¶¶ 1-2.)

     b.     FGBL was to use "best efforts to (a) seek suitable investment opportunities and manage the investment portfolio of the Fund; (b) perform or oversee the day-to-day investment operations of the Fund; (c) act as investment adviser for the Fund in connection with investment decisions; (d) provide information in connection with the preparation of all reports to the Fund's shareholders described in the Memorandum; and (e) arrange for and oversee the services of the Fund's administrator, custodian(s), auditors and counsel to act on behalf of the Fund; provided, however, that the Investment Manager is not authorized to enter into agreements in the name of the Fund with such providers of services." (Investment Management Agreement ¶ 2; Sigma Investment Management Agreement ¶¶ 1-2.)

     c.     FGBL was obligated to "send to the Fund weekly and monthly valuations of the [split-strike conversion] Investments." (Sigma Investment Management Agreement ¶ 3.) FGBL was to be "available at all times" for consultation regarding this information. (Sigma Investment Management Agreement ¶ 3.)

     d.    FGBL agreed that it would execute its duties in the
absence of "willful misfeasance, bad faith or gross
negligence" or a "reckless disregard of their
obligations and duties." (Id. ¶ 10(a).)

414.   Before FGBL assumed the role of investment manager for Fairfield
Sentry in 2003, FGL served as the Investment Manager, and had contractual
obligations similar to FGBL.

415.   FGBL has also served as the General Partner of Greenwich Sentry
since March 2006 and of Greenwich Sentry Partners since April 2006.  Prior to
FGBL, FGL served as General Partner of Greenwich Sentry.  As General Partner,
FGL and FGBL undertook similar responsibilities as they undertook for Fairfield
Sentry and Sigma.

416.   FGBL and FGL breached their investment management and general
partnership contracts by grossly failing to meet the obligations of these agreements
to provide competent investment management services to the Funds.  They also
breached their contracts by receiving and holding fees based on fictitious profits
and for services not properly performed.  Both are liable to Plaintiffs as third party
beneficiaries of those contracts.

## Count 10
## Constructive Trust against Fairfield Defendants and Fairfield Fee Claim
## Defendants

417.   The foregoing paragraphs are realleged herein.

418.   The Fairfield Defendants and Fairfield Fee Claim Defendants had a

fiduciary relationship with Plaintiffs which included an obligation to invest

Plaintiffs' assets in legitimate investments, and perform adequate due diligence and

monitoring as set forth in the Private Placement Memoranda and Confidential

Offering Memoranda.

419.   The Fairfield Defendants and Fairfield Fee Claim Defendants were

compensated by Plaintiffs with fees that were calculated based on the "Net Profits"

and current assets of the Funds.

420.   The Fairfield Defendants and Fairfield Fee Claim Defendants were

unjustly enriched by the retention of fees that were predicated on fictitious profits

and assets.  Plaintiffs are entitled to have a constructive trust imposed on the

amount of all monies and other property in the possession of the Fairfield

Defendants and Fairfield Fee Claim Defendants which relate to fees paid to them

on account of fictitious profits and assets of the Funds, the amount of which is to

be determined.

## Count 11
## Mutual Mistake against Fairfield Defendants and Fairfield Fee Claim Defendants

421.   The foregoing paragraphs are realleged herein.

422.   Pursuant to the PPMs and CMOs and other agreements with investors,

the Fairfield Defendants and Fairfield Fee Claim Defendants were paid fee

amounts estimated to range from approximately $100 million to $200 million per year. Each year the FGG Partners were allocated a proportionate share of the fees.

423. The Fairfield Defendants and Fairfield Fee Claim Defendants were paid those fees under a mutual mistake of the parties as to the amount and value of net assets under management and the amount of profits. In fact, there were no assets under management and no profits.

424. Plaintiffs' investments were used to pay the foregoing fees to the Fairfield Defendants and Fairfield Fee Claim Defendants.

425. Plaintiffs demand recovery of the foregoing fee payments made pursuant to a mutual mistake.

## Count 12
## Gross Negligence against PricewaterhouseCoopers

426. The foregoing paragraphs are realleged herein.

427. PwC, as the Funds' auditors, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care.

428. For example, PwC addressed audit reports to the shareholders and limited partners of the Funds. PwC knew that its audit reports would be relied upon by Plaintiffs in deciding to make or retain investments in the Funds in that, among other things, PwC addressed its audit reports to investors in the Funds, and PwC knew the Funds advised Plaintiffs and the investment community that PwC

audited the Funds' financial statements and had given the Funds "clean" audit
reports.

429.    Plaintiffs foreseeably and reasonably relied, directly or indirectly, on
PwC to exercise such care as ordinarily exercised by auditors generally and as
required by GAAS and other applicable auditing standards in conducting the audits
of the Funds.

430.    PwC was grossly negligent in knowingly failing to properly audit the
Funds in accordance with GAAS and other applicable auditing standards, and then
misrepresenting that it had conducted proper audits of the Funds.  Moreover, PwC
willfully turned a blind eye to numerous red flags both as to Madoff's fraud and
the Fairfield Fraud Defendants' misrepresentations, omissions, and breaches of
duty.  PwC nevertheless recklessly issued clean audit opinions that the Funds'
financial statements fairly represented the financial condition of the Funds.

431.    Had PwC not acted recklessly and with willful blindness it would
have not issued the clean audits of the Funds.

432.    As a result of PwC's gross negligence, Plaintiffs have lost all or, or
substantially all, of their investments in the Funds.

## Count 13
## Negligence against PricewaterhouseCoopers

433.    The foregoing paragraphs are realleged herein.

434.   PwC, as the Funds' auditors, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care.

435.   PwC addressed audit reports to the shareholders and limited partners of the Funds.  In addition, PwC knew that its audit reports would be relied upon, directly or indirectly, by Plaintiffs in deciding to make or retain investments in the Funds in that, among other things, PwC addressed its audit reports to investors in the Funds, and knew the Funds advised Plaintiffs and the investment community that PwC audited the Funds' financial statements and had given the Funds "clean" audit reports.

436.   Plaintiffs foreseeably and reasonably relied, directly or indirectly, on PwC to exercise such care as ordinarily exercised by auditors generally and as required by GAAS and other auditing standards in conducting the audits of the Funds.

437.   PwC negligently failed to exercise due care by failing to properly audit the Funds in accordance with GAAS and other applicable auditing standards and thereby caused injury to the Plaintiffs, who have lost all, or substantially all, of their investments in the Funds.

## Count 14
## Negligent Misrepresentation against PricewaterhouseCoopers

438.   The foregoing paragraphs are realleged herein.

439.   Based on its role as the auditor for the Funds and its unique or special expertise with respect to the performance of audits, including audits of feeder funds, and with respect to the Madoff funds in particular, PwC had a special relationship of trust or confidence with Plaintiffs, which created a duty on the part of PwC to impart correct information to Plaintiffs.

440.   PwC induced purchasers to hold their positions in the Funds and to purchase additional interests in the Funds by falsely representing to Plaintiffs that (i) it had conducted its audits in accordance with GAAS or ISA and (ii) the Funds' financial statements "present[ed] fairly, in all material respects, the financial position of [the Funds]...."

441.   These representations made by PwC were false in that:  (i) PwC failed to conduct the audits of the Funds in accordance with GAAS and ISA; and (ii) the Funds' financial statements, including the claimed value of the Funds' investments through Madoff, did not present fairly in all respects the financial position of the Funds.  In fact, PwC made the false statements without so much as properly confirming the existence of the Funds' assets.

442.   PwC made the false representations knowing that Plaintiffs would use and rely upon the representations for the particular purpose of determining whether to hold their assets in the Funds and whether to purchase additional interests in the Funds.

443.    Plaintiffs justifiably relied upon the false representations made by PwC in furtherance of that particular purpose by continuing to hold their assets in the Funds and by purchasing additional interests in the Funds.

444.    PwC knew that Plaintiffs were investors in the Funds and understood that Plaintiffs would rely upon the false statements for the particular purpose of continuing to hold their assets in the Funds and to purchase additional interests in the Funds.

445.    As a result of their reliance upon the false representations made by PwC, Plaintiffs have suffered damages, namely the loss of their investments in the Funds, and PwC, in turn, derived substantial audit fees.  PwC's misconduct was the direct and proximate cause of Plaintiffs' losses.

## Count 15
## Third-Party Beneficiary Breach of Contract against PricewaterhouseCoopers

446.    The foregoing paragraphs are realleged herein.

447.    PwC entered into contracts with the Funds to perform audits in accordance with GAAS and other applicable auditing standards.

448.    The contracts evince a clear intent to benefit Plaintiffs, who had invested in the Funds, to whom the audit reports were addressed, and who relied upon PwC to audit the financial statements of the Funds and to opine that the financial statements fairly represented the financial condition of the Funds only if that professional opinion was based upon a proper audit of the Funds conducted in

accordance with GAAS and other applicable auditing standards. The benefits to Plaintiffs under the contracts were immediate, not simply incidental.

449. PwC breached its agreements to perform audits for the Funds, and this breach proximately caused Plaintiffs' losses.

450. PwC is liable to Plaintiffs as third party beneficiaries of those contracts.

## Count 16
## Aiding and Abetting Breach of Fiduciary Duty against PricewaterhouseCoopers

451. The foregoing paragraphs are realleged herein.

452. As the auditor for the Funds, PwC was aware of the fiduciary duties owed by the Fairfield Defendants to Plaintiffs as alleged above. PwC acted with willful blindness or recklessness in conducting its audits and is thus charged with constructive knowledge that:

    a.    The Fairfield Defendants had the discretion and control giving rise to a fiduciary duty and duty of care to the Plaintiffs.

    b.    The Fairfield Defendants occupied a superior position over Plaintiffs with respect to their management and control over their assets in the Funds, and had superior access to confidential information about the investment of the assets and about Madoff and BMIS.

    c.    The Fairfield Defendants' superior position necessitated that Plaintiffs repose their trust and confidence in the Fairfield Defendants to fulfill

their duties, and that Plaintiffs did so by investing
in the Funds.

d.　The Fairfield Defendants held themselves out as
providing superior client investment services, and
evinced an understanding that they were the
fiduciaries of the investors. PwC was further
aware that Plaintiffs reasonably and foreseeably
relied on such representations, and trusted in the
Fairfield Defendants' purported expertise and skill.

453.　PwC substantially assisted the Fairfield Defendants by issuing "clean"
audit reports on the Funds and failing to conduct proper independent audits of the
Funds, including PwC's failure to disclose that the representations made by
management in the financial statements could not be relied upon.

454.　As a direct and natural result of (a) the Fairfield Defendants' breaches
of their fiduciary duties and (b) PwC's aiding and abetting those breaches, the
Plaintiffs have suffered substantial damages.

## Count 17
## Aiding and Abetting Fraud against PricewaterhouseCoopers

455.　The foregoing paragraphs are realleged herein.

456.　As alleged above, a fraud was perpetrated on Plaintiffs by the
Fairfield Fraud Claim Defendants.

457.　PwC acted with willful blindness or recklessness in conducting its
audits and is thus charged with constructive knowledge that:

a.　The Fairfield Fraud Claim Defendants falsely
represented to Plaintiffs in connection with their

169

purchase of shares and/or equity interests in the
Fairfield Funds that: (i) the Funds would invest
their monies into a legitimate fund, principally
relying upon the SSC investment strategy
involving the purchase of equities and options; (ii)
that by using this strategy, the Funds historically
had consistent profitable returns since inception;
(iii) the Fairfield Fraud Claim Defendants would
conduct due diligence into, monitor, and verify the
investments made by them in the Funds operated
by Madoff to confirm that the Funds were operated
legitimately, using the stated investment strategy,
and in accordance with the required legal and
regulatory requirements.

b.   The Fairfield Fraud Claim Defendants failed to
disclose the following material information, among
other things, which rendered their other
representations false and misleading: (i) that the
Fairfield Fraud Claim Defendants were in fact not
engaging in customary, or even minimal, due
diligence to verify that the Funds' assets were
being properly invested and managed by Madoff
and BMIS, or that the assets even still existed; (ii)
the existence of numerous red flags regarding the
Funds including, among others, the lack of
transparency into Madoff's actual operations, the
lack of segregation of duties, inadequate auditing
of Madoff, and the attainability of consistently
profitable returns for a fund pursuing the stated
strategy.

c.   The Fairfield Fraud Claim Defendants induced
purchasers to hold their positions in the Fairfield
Funds by falsely representing to Plaintiffs that: (i)
the Fairfield Fraud Claim Defendants had
conducted thorough due diligence and exercised
oversight of Madoff's operations and had
determined that those operations were legitimate,
utilized the SSC investment strategy, and had a

170

long track record of achieving positive investment
returns; (ii) Plaintiffs' assets invested in the Funds
operated by the Fairfield Fraud Claim Defendants
would, in turn, be invested in the legitimate funds
operated by Madoff that utilized the SSC
investment strategy; (iii) the Fairfield Fraud Claim
Defendants would monitor the investments made
by them in the funds operated by Madoff to
confirm that the Funds were operated legitimately,
using the SSC investment strategy, and in
accordance with all legal and regulatory strictures,
and further that the Fairfield Fraud Claim
Defendants would verify Fund transactions,
including that the Madoff funds actually made the
represented trades and held the represented assets;
(iv) the due diligence and oversight process
employed by the Fairfield Defendants was so
thorough as to be privileged in providing total
transparency to all aspects of Madoff's operations,
which allowed the Fairfield Fraud Claim
Defendants to assure that the Funds invested with
Madoff were being actually and legitimately
invested; and (v) Madoff's operations and accounts
were audited by reputable, independent auditors
utilizing appropriate and accepted accounting and
auditing procedures, which provided further
assurance that Madoff's accounts actually held the
represented assets and were otherwise operated
lawfully.

d.    The Fairfield Fraud Claim Defendants made the
representations knowing that they were false in
that:  (i) the Fairfield Fraud Claim Defendants did
not, in fact, conduct thorough or appropriate due
diligence of, or exercise oversight over Madoff and
his operations and had not determined that Madoff
actually invested assets utilizing the SSC
investment strategy, with a long track record of
achieving positive investment returns; (ii) the
Fairfield Fraud Claim Defendants did not invest

Plaintiffs' assets in legitimate funds that utilized the SSC investment strategy; (iii) the Fairfield Fraud Claim Defendants did not intend to monitor the investments in the Funds operated by Madoff to confirm that the Funds were operated legitimately using the SSC investment strategy and in accordance with all legal and regulatory structures, and did not intend to verify Fund transactions, including that Madoff actually made the represented trades and that the Funds held the represented assets; (iv) the due diligence and oversight processes employed by the Fairfield Fraud Claim Defendants were non-existent, much less so thorough as to be privileged in providing total transparency to all aspects of Madoff's operations, and thus did not allow the Fairfield Fraud Claim Defendants the ability to assure that the assets provided to Madoff were actually and legitimately invested; and (v) Madoff's operations and accounts were not audited by reputable, independent auditors utilizing appropriate and accepted accounting and auditing procedures, and thus did not provide any assurance that the Fairfield Funds actually held the represented assets and were otherwise operated lawfully.

458.   PwC substantially assisted the Fairfield Defendants by issuing "clean" audit reports and failing to conduct proper independent audits of the Funds, including its failure to disclose that the representations made by management in the financial statements could not be relied upon.

459.   As a direct and natural result of (a) the Fairfield Fraud Claim Defendants' fraudulent scheme and (b) PwC's aiding and abetting that fraudulent scheme, the Plaintiffs have suffered substantial damages.

### Count 18
### Violation of Section 10(b) and Rule 10b-5 against PwC Canada and PwC
### Netherlands

460.    The foregoing paragraphs are realleged herein.

461.    This Count is asserted against PwC and is based upon Section 10(b) of
the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

462.    PwC Canada and PwC Netherlands issued audit opinions that
constituted the presentation of false and misleading information as to the assets of
the Funds.  Instead of billions of dollars, as represented, virtually no assets existed.
These statements were made recklessly, and constitute deceptive and untrue
statements of material facts and omissions of material facts necessary in order to
make the statements made, in light of the circumstances under which they were
made, not misleading.  These statements induced Plaintiffs to make additional
investments in the Funds.

463.    PwC Canada and PwC Netherlands issued audit opinions with respect
to the Funds' financial statements in which they (i) stated that they conducted the
audits in accordance with GAAS or ISA and (ii) expressed its unqualified opinion
that the Funds' financial statements "present[ed] fairly, in all material respects, the
financial position of [the Funds]...."  Those statements were false.  In truth, PwC
Canada and PwC Netherlands did not confirm the existence of the Fund's assets.
While purporting to conduct an audit, they did not take the most fundamental and

173

obvious step of confirming the existence of the Funds' assets, and did not do so

despite the requirements of GAAS or ISA and statements in audit plans, as set

forth above, that it would do so.

464.   PwC Canada and PwC Netherlands acted recklessly in making the

false statements and their conduct in performing the audits was highly

unreasonable and represented an extreme departure from the standards of ordinary

care.  Moreover, when they made their false statements and committed their

omissions, PwC Canada and PwC Netherlands knew facts or had access to

information suggesting that their public statements were not accurate or failed to

check information they had a duty to monitor and which would have demonstrated

the falsity of their statements.

465.   For example, assuming they conducted audits of the Funds, PwC

Canada and PwC Netherlands knew that: the management of the Funds did not

have effective internal controls and performed little to no due diligence or

oversight over BMIS; the Funds did not have in place processes to verify the value

of the investments purportedly made by BMIS; the Funds did not verify the

existence of the assets invested through BMIS; the Funds did not test the validity

of Madoff's investment strategy or claimed returns.  Even the most minimal of

audits, let alone one performed in accordance with accepted auditing standards,

gave PwC knowledge that the Funds' management had no verification that the

assets invested through BMIS even existed.

466.   PwC Canada and PwC Netherlands knew that substantially all of the

Funds' assets were managed by Madoff, who was the investment advisor, the

broker-dealer, and the custodian of the assets, highly-unusual multiple roles that

facilitated Madoff's fraud.  Yet, PwC Canada and PwC Netherlands failed, as

detailed above, to conduct the minimal steps needed to independently confirm the

existence of the Funds' assets, so that PwC Canada's and PwC Netherland's audits

failed to uncover the fact that the assets did not exist.

467.   To issue clean audit opinions that the Funds had hundreds of millions

or billions of dollars of assets without any independent confirmation that any of the

assets existed is a textbook definition of such a reckless audit as to constitute,

essentially, no audit at all.  Issuing clean audit opinions in the circumstances here,

with the multiple red flags set forth above, is more reckless yet.  The failure of

PwC Canada and PwC Netherland to acquire evidential matter from independent

third parties, such as counterparties to the alleged trades made by BMIS, or to

acquire direct personal knowledge, such as by inspections and physical

examination of the assets, not only was a blatant violation of auditing standards

and their audit plans, but violated the most commonsense and obvious purpose of

an audit—to confirm that reported assets in fact exist.

175

468.   In ignorance of the false and misleading nature of the statements

described above, Plaintiffs relied, to their detriment, on such misleading statements

and omissions contained in PwC Canada's and PwC Netherlands' clean audit

opinions by investing additional monies in the Funds.  Plaintiffs have suffered

substantial damages as a result of the wrongs alleged herein.

### Count 19
### Violation of Section 20(a) against PricewaterhouseCoopers International

469.   The foregoing paragraphs are realleged herein.

470.   PwC International acted as a controlling person of PwC Canada and

PwC Netherlands within the meaning of Section 20(a) of the Exchange Act as

alleged herein. By virtue of its high level position, control, participation in and/or

awareness of the operations of PwC Canada and PwC Netherlands, and/or intimate

knowledge of the audit work and resulting audit opinions PwC Canada and PwC

Netherlands issued on the Funds, PwC International had the power to influence and

control and did influence and control, directly or indirectly, the decision-making of

PwC Canada and PwC Netherlands, including the content and dissemination of the

audit statements that were false and misleading.  PwC had the ability to prevent the

issuance of the audit statements or cause the statements to be corrected or not

issued.

471.   PwC International had direct and supervisory involvement and control

in the day-to-day operations of PwC Canada and PwC Netherlands and, therefore,

176

is presumed to have had the power to control or influence the audit statements

giving rise to the securities violations as alleged herein, and exercised the same.

472. By virtue of its position as a controlling person, PwC International is

liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate

result of the wrongful conduct, Plaintiffs suffered damages in connection with their

investments in the Funds.

### Count 20
### Third-Party Beneficiary Breach of Contract against Citco

473. The foregoing paragraphs are realleged herein.

474. Citco entered contracts with the Funds, and it breached its obligations

to the Plaintiffs as third party beneficiaries of those contracts.

475. The Administration Agreements for Fairfield Sentry and Fairfield

Sigma evince a clear intent to benefit Plaintiffs by affirmatively recognizing

Citco's obligation to keep Fund shareholders informed of the status and

performance of their investments in furtherance of the Funds' goal of seeking

"capital appreciation of its assets" for the benefit of shareholders. (Sigma 2003

Administration Agreement, Sched. 1; Sentry Administrative Agreement, Sched. 1.)

The benefits to Plaintiffs under the Administration Agreements were immediate,

not simply incidental, in that the Funds' motivation for entering the Administration

Agreements was to provide investors with capital appreciation and returns on their

investments.

177

476. Citco agreed to act in good faith in the performance of its services as
Fund Administrator. (Sentry Administrative Agreement ¶ 6.2; Sigma
Administration Agreement ¶ 6.2.) Citco' duties that required good faith, due care
and diligence in their execution included the following: "reconciliation of cash and
other balances at brokers"; "reconciliation of bank accounts"; "calculation of
income and expense accruals"; "calculation of management and
performance/performance fees with supporting schedules"; "independent
reconciliation of the Fund's portfolio holdings"; "calculation of the Net Asset
Value and the Net Asset Value per Share on a monthly basis in accordance with
the Fund Documents"; "Preparation of monthly financial statements, in conformity
with the International Accounting Standards," including "Statement of Assets and
Liabilities," "Statement of Operations," "Statement of Changes in Net Assets,"
"Statement of Cash Flows," and "Portfolio listings"; "Preparation of books and
records (including specific schedules and analysis) to facilitate external audit, and
liaising with the Fund's auditors in their review and preparation of the annual
financial statements"; "Provision of accounting or accounting related reports
and/or support schedules as agreed between the Administrator and the Investment
Manager"; and "Disbursement of payments for third party fees and expenses
incurred by the Fund." (Sentry Administrative Agreement, Sched. 2, Part 1; Sigma
Administration Agreement, Sched. 2, Part 1.) Citco was only permitted to rely on

information it received without making further inquiries if that information

demonstrated an "absence of manifest error." (Sentry Administrative Agreement ¶

6.2(c); Sigma Administration Agreement ¶ 6.2(c).)

477. Citco agreed to make the following communications directly to

shareholders in Fairfield Sentry and Fairfield Sigma: "publishing the Net Asset

Value per Share (of each class if appropriate) as requested by the Fund";

"reconciliation of information provided by the Fund's prime broker and custodian

with information provided by the Investment Manager"; "dealing with and

replying to all correspondence and other communications addressed to the Fund in

relation to the subscription, redemption, transfer (and where relevant, conversion)

of Shares"; "despatching to Shareholders notices, proxies and proxy statements

prepared by or on behalf of the Fund in connection with the holding of meetings of

Shareholders"; "despatching to Shareholders and anyone else entitled to receive

the same in accordance with the Fund Documents and any applicable law copies of

the audited financial statements." (Sentry Administrative Agreement, Sched. 2,

Part 2; Sigma Administration Agreement, Sched. 2, Part 2(e).)

478. The Administration Agreements for Greenwich Sentry and Greenwich

Sentry Partners also evince a clear intent to benefit limited partners by

affirmatively recognizing Citco Fund Services' obligation to keep Fund partners

informed of the status and performance of their investments in furtherance of the

Fund's goal of seeking "capital appreciation of its assets" for the partners' benefit.
(GS COM-1994 at 6; GS COM-5/2006 at 7; GS COM-8/2006 at 8; GSP COM-
8/2006 at 7.)  The benefits to Plaintiffs were immediate, not simply incidental, in
that the Funds' motivation for entering into the Administration Agreement was to
provide limited partners with capital appreciation and returns on their investments
in the Funds.

479.   Under the Administration Agreements with Greenwich Sentry and
Greenwich Sentry Partners, Citco is responsible for "communicating with Limited
Partners; maintaining the record of accounts; processing subscriptions and
withdrawals; preparing and maintaining the Partnership's financial and accounting
records and statements; calculating each Limited Partner's capital account balance
(on a monthly basis); preparing financial statements; arranging for the provision of
accounting, clerical and administrative services; and maintaining corporate
records." (GS COM- 8/2006, at 12; GSP COM-2006, at 11.)

480.   Citco Bank and Citco Global entered Custodian Agreements with
Fairfield Sentry and Fairfield Sigma.  Plaintiffs who invested in Fairfield Sentry
and Fairfield Sigma are third-party beneficiaries under those Agreements.  The
Agreements evince a clear intent to benefit shareholders by affirmatively
recognizing Citco's obligation to receive and/or hold shareholder assets and ensure
that sub-custodians were qualified to hold the assets.  The benefits to Plaintiffs

were immediate, not simply incidental, in that the Funds' motivation for entering

the Agreement was to ensure shareholders' assets invested in the Funds would be

securely held.

481.  Under the Custodian Agreements, Citco was responsible for holding

the Plaintiffs' assets in Fairfield Sentry and Fairfield Sigma and, if a sub-custodian

was appointed, ensuring that the sub-custodian properly performed its duties.  One

of Citco's duties was to maintain an "ongoing appropriate level of monitoring" of

any sub-custodian for Fairfield Sentry.  (Sentry 2006 Custodian Agreement ¶ 4.3.)

Citco had authority to "act without first obtaining instructions from the Fund" if

such action were necessary "in order to preserve or safeguard the Securities or

other assets of the Fund."  (Sentry 2006 Custodian Agreement ¶ 6.3.)  Citco agreed

to employ "financial or other experts" in execution of its duties as Custodian.

(Sentry 2006 Custodian Agreement ¶ 6.1.6.)

482.  Citco committed to use its "best efforts and judgment and due care in

performing its obligations and duties" as Custodian.  (Sentry 2006 Custodian

Agreement ¶ 8.2.)  Citco represented that it would act in good faith and reasonable

care in its execution of its duties.  (Id.)  Under the Custodian Agreement, Citco was

only able to "rely on the genuineness of any document," to the extent Citco

believed in "good faith" that the document was "validly executed by or on behalf

of the Fund."  (Sentry 2006 Custodian Agreement ¶ 8.6.)

483.   In addition, as Depository, Citco has the responsibility of holding

securities on behalf of the Fund.  Under the Custodian Agreement, Citco received

instructions from the Fund through the Custodian.  Along with Citco Bank, Citco

Global was authorized to "enter into further agreements for the appointment" of

sub-custodians.  (Sentry 2006 Custodian Agreement ¶ 4.1.)  Citco Global agreed to

perform its services as Depository without "willful misfeasance, bad faith, fraud or

negligence."  (Sentry 2006 Custodian Agreement ¶ 6.8.)

484.   Citco breached the Administration Agreements with the Funds by,

among other omissions, grossly failing to discharge its responsibility to calculate

accurately the Funds' NAVs.  Citco is liable to Plaintiffs as third party

beneficiaries of those contracts.

485.   Citco breached the Custodian Agreements with Fairfield Sentry and

Fairfield Sigma by, among other omissions, handing Plaintiffs' investments over to

BMIS, and failing to monitor BMIS as sub-custodian and ensure it was qualified to

hold Plaintiffs' assets.

486.   Citco is liable to Plaintiffs who invested in Fairfield Sentry and

Fairfield Sigma as third party beneficiaries of those contracts.

## Count 21
## Breach of Fiduciary Duty against Citco

487.   The foregoing paragraphs are realleged herein.

488. As Administrator to the Funds, Citco Fund Services had discretion regarding Plaintiffs' assets in Fairfield Sentry, Fairfield Sigma, Greenwich Sentry Partners, and Greenwich Sentry, including the calculation of the Funds' net asset value ("NAV"), accounting for the Funds, communications to the Plaintiffs about their investments, and receipt of Plaintiffs' investment amounts.

489. Citco Canada was delegated all or some of Citco Fund Services' responsibilities as administrator for Greenwich Sentry and Greenwich Sentry Partners, including the accounting, registrar, and transfer services, and also had discretion regarding Plaintiffs' assets invested in Greenwich Sentry and Greenwich Sentry Partners.

490. As Custodian and Bank to Fairfield Sentry and Sigma, Citco Bank and Citco Global had discretion and control regarding Plaintiffs' assets in Fairfield Sentry and Fairfield Sigma, including receiving and safeguarding Plaintiffs' investments, receiving and sending Plaintiffs' redemption amounts, monitoring BMIS as a sub-custodian, ensuring BMIS was qualified to hold Plaintiffs' assets, and transferring the assets to BMIS.

491. Citco also was responsible for receiving and holding investors' assets, sending investment confirmation statements to Plaintiffs, and sending investors' assets to Madoff.

492.    Citco occupied a superior position over Plaintiffs with respect to their
discretionary responsibilities, and had superior access to confidential information
about the investments, including the location, security, and value of the assets.
Citco held itself out as providing superior administrative, custodial, and other
financial services.

493.    Citco's superior position necessitated that Plaintiffs repose their trust
and confidence in Citco to fulfill its duties, and Plaintiffs did so by investing in the
Funds, and retaining their investments in the Funds.  Plaintiffs reasonably and
foreseeably trusted in the Citco's purported expertise and skill, and Citco
recognized that Plaintiffs would rely on and repose their trust in Citco when
deciding to invest and retain their investments in the Funds.

494.    Citco's discretion, control and superior position over Plaintiffs gave
rise to a fiduciary duty and duty of care on the part of Citco to the Plaintiffs who
invested in the Funds.

495.    Citco Fund Services and Citco Canada breached their fiduciary duties
to Plaintiffs by, among other omissions, failing to discharge properly their
responsibilities as Administrators and Sub-Administrators, including in calculating
the Funds' NAV and communicating fictitious Fund valuations to Plaintiffs.

496.    Citco Bank and Citco Global breached their fiduciary duties by,
among other omissions, failing to discharge properly their responsibilities as

Custodian and Bank, sub-delegating responsibilities to BMIS without adequate
supervision or control, failing to supervise or monitor BMIS as a sub-custodian,
and handing over Plaintiffs' investments to BMIS.

497.    Citco's fiduciary duties could not be delegated to BMIS or any third
party and the fact that Citco entrusted its responsibilities to BMIS without adequate
supervision or control of the constituted a *per se* breach of fiduciary duty.

498.    Plaintiffs have been damaged as a proximate result of Citco's breach
of fiduciary duties. Had Citco fulfilled its fiduciary duties, Plaintiffs would not
have invested or re-invested in the Funds, Plaintiffs would not have retained their
investments in the Funds, Plaintiffs' assets would not have been turned over to
BMIS, and Plaintiffs would not have lost their investments.

499.    Citco collected fees in return for the services they were ostensibly
providing. A substantial portion of those fees was calculated on the basis of
Madoff's fictional profits that were never actually earned. Because the fees were
calculated on the basis of fraudulent information, and Citco did not fulfill its
duties, Citco did not earn these fees, and they should be repaid to Plaintiffs.

500.    By reason of the foregoing, Citco is liable to Plaintiffs, and Plaintiffs
are entitled to a constructive trust on fees received, damages, and appropriate
equitable relief.

## Count 22
### Gross Negligence against Citco

501.  The foregoing paragraphs are realleged herein.

502.  Citco, as the Funds' financial services provider, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the performance of its duties.  Citco knew or should have known that Plaintiffs were relying on Citco to exercise reasonable care in providing financial services to the Funds, and Plaintiffs did reasonably and foreseeably rely on Citco to exercise such care by entrusting their assets to their Funds and to Citco by maintaining their assets in the Funds.

503.  Citco grossly failed to exercise due care, and acted in reckless disregard of their duties.  Citco failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

504.  Plaintiffs have been damaged as a proximate result of Citco's gross negligence.

## Count 23
### Negligence against Citco

505.  The foregoing paragraphs are realleged herein.

506.  Citco, as the Funds' financial services provider, had a special relationship with Plaintiffs that gave rise to a duty to exercise due care in the

186

performance of its duties.  Citco knew or should have known that Plaintiffs were

relying on Citco to exercise reasonable care in providing financial services to the

Funds, and Plaintiffs did reasonably and foreseeably rely on Citco to exercise such

care by entrusting their assets to their Funds, and to Citco by maintaining their

assets in the Funds.

507.    Citco negligently failed to exercise due care and failed to exercise the

degree of prudence, caution, and good business practice that would be expected of

any reasonable investment professional.

508.    Plaintiffs have been damaged as a proximate result of Citco's

negligence.

### Count 24
### Aiding and Abetting Breach of Fiduciary Duty against Citco

509.    The foregoing paragraphs are realleged herein.

510.    As alleged above, the Fairfield Defendants breached their fiduciary

duties to Plaintiffs.

511.    Citco had actual knowledge of and substantially participated in the

breaches of fiduciary duty committed by the Fairfield Defendants which are

alleged above.

512.    As administrator, custodian, bank, and depository for the Funds, Citco

gained significant knowledge of the operations of the Funds and their investment

managers and other service providers.  As a leading provider of back office

187

services to the hedge fund industry, and by virtue of their long-standing

relationship with the Funds, Citco knew that the Fairfield Defendants owed a

fiduciary duty to the Plaintiffs. Citco also knew that the due diligence and risk

controls employed by the Fairfield Defendants were grossly deficient in breach of

their fiduciary duties.

513. With knowledge that the Fairfield Defendants were breaching their

fiduciary duties owed to the Plaintiffs, Citco substantially assisted the Fairfield

Defendants in this breach. For example, Citco substantially assisted the Fairfield

Defendants by receiving investments from Plaintiffs and transferring their

investments directly to BMIS; calculating the Funds' NAV and disseminating the

NAV values; receiving and transmitting other Fund information from the Fairfield

Defendants to Plaintiffs; and allowing Citco's name and the services it was

ostensibly providing to be included in the Funds' placement memoranda and other

documents. The Fairfield Defendants' breach of fiduciary duty would not have

occurred without this substantial assistance by Citco.

514. As a direct and natural result of (a) the Fairfield Defendants' breach of

fiduciary duty and (b) Citco's aiding and abetting in that breach, Plaintiffs have

suffered substantial damages.

## Count 25
## Aiding and Abetting Fraud against Citco

515. The foregoing paragraphs are realleged herein.

188

516.   As alleged above, a fraud was perpetrated on Plaintiffs by the
Fairfield Fraud Claim Defendants.

517.   Citco had actual knowledge of and substantially assisted in the
fraudulent scheme perpetrated by the Fairfield Fraud Claim Defendants.

518.   As administrator, custodian, bank, and depository for the Funds, Citco
gained significant knowledge of the operations of the Funds and their investment
managers and other service providers.  Citco knew that the Fairfield Fraud Claim
Defendants were falsely representing to Plaintiffs that they had undertaken
meaningful due diligence and implemented risk controls, and were failing to
disclose clear deficiencies in their internal controls and monitoring of BMIS's
activities.

519.   Citco substantially assisted the Fairfield Fraud Claim Defendants in
the fraud perpetrated on Plaintiffs by means of the actions alleged above.  The
Fairfield Defendants could not have perpetrated their fraud without this substantial
assistance by Citco.

520.   As a direct and natural result of (a) the Fairfield Defendants'
fraudulent scheme and (b) Citco's aiding and abetting in that fraudulent scheme,
Plaintiffs have suffered substantial damages.

## Count 26
## Violation of Section 10(b) and Rule 10b-5 against Citco Fund Services and Citco Canada

521.    The foregoing paragraphs are realleged herein.

522.    This Count is asserted against Citco Fund Services and Citco Canada (for purposes of this Count, "Citco Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

523.    The Citco Defendants issued false statements containing inflated NAV calculations and account balance information.  In issuing the statements, the Citco Defendants acted recklessly because they knew or had access to information suggesting that their public statements were not accurate, including that the values and profits reported to Plaintiffs were not attainable under the circumstances.

524.    Moreover, the Citco Defendants acted recklessly by failing to check or verify the information received from BMIS despite a duty to scrutinize and verify independently the information relating to the NAV and account balances.  Their failure to check or verify the information was also reckless because the Citco Defendants were aware of the red flags surrounding BMIS, including the consolidation of the roles of investment manager, custodian and execution agent in Madoff and BMIS.

525.   Plaintiffs justifiably relied on the information contained in the Citco

Defendants' statements.  Moreover, the Citco Defendants were paid substantial

fees for performing these services.

526.   Plaintiffs relied, to their detriment, on the Citco Defendants' false

statements and omissions, in ignorance of their falsity, by making their initial

investments in the Funds, retaining their investments in the Funds, and (where

applicable) making additional investments in the Funds.  Plaintiffs have suffered

substantial damages as a result of the wrongs alleged herein.

## Count 27
## Violation of Section 20(a) against Citco Group

527.   The foregoing paragraphs are realleged herein.

528.   Citco Group acted as a controlling person of Citco Fund Services and

Citco Canada (for purposes of this Count, "Citco Defendants") within the meaning

of Section 20(a) of the Exchange Act as alleged herein. By virtue of its high level

position, control, participation in and/or awareness of the operations of the Citco

Defendants, and/or intimate knowledge of the duties, obligations and

representations of the Citco Defendants to Plaintiffs, Citco Group had the power to

influence and control and did influence and control, directly or indirectly, the

decision-making of the Citco Defendants, including the content and dissemination

of the statements that were false and misleading.  Citco Group had the ability to

prevent the issuance of the false statements or cause the statements to be corrected
or not issued.

529.    Citco Group had direct and supervisory involvement and control in
the day-to-day operations of the Citco Defendants and, therefore, is presumed to
have had the power to control or influence the false statements giving rise to the
securities violations as alleged herein, and exercised the same.

530.    By virtue of its position as a controlling person, Citco Group is liable
pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of
the wrongful conduct, Plaintiffs suffered damages in connection with their
investments in the Funds.

### Count 28
### Negligent Misrepresentation against Citco Fund Services, Citco Canada, and Citco Group

531.    The foregoing paragraphs are realleged herein.

532.    This Count is asserted against Citco Fund Services and Citco Canada
(for purposes of this Count, "Citco Defendants"), as well as Citco Group.

533.    Based on their role as the administrator for the Funds and their unique
or special expertise and superior position with respect to providing financial
services and calculating the Funds' NAV and account balances, and with respect to
the Madoff funds in particular, the Citco Defendants had a special relationship of

trust or confidence with Plaintiffs, which created a duty on the part of the Citco

Defendants to impart correct information to Plaintiffs.

534. The Citco Defendants induced Plaintiffs to make their initial

investments in the Funds, to retain their investments in the Funds, and (where

applicable) to make additional investments in the Funds by issuing false NAV and

account balance statements for the Funds that they then disseminated to Plaintiffs,

or knew would be disseminated to Plaintiffs.

535. The Citco Defendants knew that Plaintiffs would rely upon the false

NAV and account balance statements for the particular purpose of deciding

whether to invest in the Funds, retain their investments in the Funds, and (where

applicable) making additional investments in the Funds.

536. The Citco Defendants' NAV calculations and account balance

information were false. In issuing the statements, the Citco Defendants acted

recklessly because they knew or had access to information suggesting that their

statements were not accurate, including numerous red flags described above.

537. Moreover, the Citco Defendants acted recklessly by failing to verify

the information received from BMIS despite a duty to scrutinize and verify

independently information relating to the NAV and account balances. In addition,

their failure to check or verify the information was reckless because the Citco

Defendants were aware of the red flags surrounding BMIS, including the

consolidation of the roles of investment manager, custodian and execution agent in
Madoff and BMIS.

538.   Plaintiffs justifiably relied on the information contained in the Citco
Defendants' statements.  Moreover, the Citco Defendants were paid substantial
fees for performing these services.

539.   Plaintiffs justifiably relied, to their detriment, on the Citco
Defendants' false statements and omissions, in ignorance of their falsity, by
making their initial investments in the Funds, retaining their investments in the
Funds, and (where applicable) making additional investments in the Funds.
Plaintiffs have suffered substantial damages as a result of the wrongs alleged
herein.

540.   The Citco Defendants were acting as agents or alter egos of Citco
Group when committing the acts alleged herein.  Therefore, Citco Group is also
liable to Plaintiffs for this conduct.

## Count 29
## Breach of Fiduciary Duty against GlobeOp

541.   The foregoing paragraphs are realleged herein.

542.   In providing administrative services to Greenwich Sentry, GlobeOp
was responsible for accounting, registrar, and transfer services, and also had
discretion regarding Plaintiffs' assets invested in Greenwich Sentry.

543.  GlobeOp occupied a superior position over Plaintiffs with respect to its discretionary responsibilities, and had superior access to confidential information about the investments, including the location, security, and value of the assets.  GlobeOp held itself out as providing superior administrative services to financial firms.

544.  GlobeOp's superior position necessitated that Plaintiffs repose their trust and confidence in GlobeOp to fulfill its duties, and Plaintiffs did so by investing in Greenwich Sentry, and retaining their investments in the Fund. Plaintiffs reasonably and foreseeably trusted in GlobeOp's purported expertise and skill, and GlobeOp recognized that Plaintiffs would rely on and repose their trust in it when deciding to invest and retain their investments in Greenwich Sentry.

545.  GlobeOp's discretion, control, and superior position over Plaintiffs gave rise to a fiduciary duty and duty of care on the part of GlobeOp to the Plaintiffs who invested Greenwich Sentry.

546.  GlobeOp breached its fiduciary duties to Plaintiffs by, among other omissions, failing to discharge properly its responsibilities as administrator, including in calculating Greenwich Sentry's NAV, reviewing information provided to it, and communicating fictitious Fund valuations to Plaintiffs.

547.  Plaintiffs have been damaged as a proximate result of GlobeOp's breach of fiduciary duties.

548.   GlobeOp collected fees in return for the services it was ostensibly

providing.  Those fees were calculated in large part on the basis of Madoff and

BMIS's fictional profits and assets under management that never existed.  Because

the BMIS investments never existed, and GlobeOp did not fulfill its duties, it did

not earn these fees, and they should be repaid to Plaintiffs.

549.   By reason of the foregoing, GlobeOp is liable to Plaintiffs who

invested in Greenwich Sentry, and Plaintiffs are entitled to a constructive trust on

fees received, damages, and appropriate equitable relief.

## Count 30
## Gross Negligence against GlobeOp

550.   The foregoing paragraphs are realleged herein.

551.   In providing administrative services to Greenwich Sentry, GlobeOp

had a special relationship with Plaintiffs that gave rise to a duty to exercise due

care in the performance of its duties.  GlobeOp knew or should have known that

Plaintiffs were relying on it to exercise reasonable care in providing its services to

Greenwich Sentry, and Plaintiffs did reasonably and foreseeably rely on GlobeOp

to exercise such care by reinvesting in Greenwich Sentry.

552.   GlobeOp was grossly negligent and acted in reckless disregard of its

duties as administrator.  It relied recklessly and blindly on information provided by

BMIS in calculating the NAV, and relayed such fictitious information to Plaintiffs,

without scrutiny or verification of the information.  GlobeOp was obligated to
scrutinize and verify independently the information it was provided in calculating
the NAV, but grossly failed to do so.  GlobeOp was not entitled to rely on such
information because of the red flags surrounding BMIS, the consolidation of the
roles of investment manager, custodian and execution agent in BMIS, and because
the information was manifestly incorrect.

553.   Plaintiffs have been damaged as a proximate result of GlobeOp's
gross negligence.

## Count 31
## Negligence against GlobeOp

554.   The foregoing paragraphs are realleged herein.

555.   In providing administrative services to Greenwich Sentry, GlobeOp
had a special relationship with Plaintiffs that gave rise to a duty to exercise due
care in the performance of its duties.  GlobeOp knew or should have known that
Plaintiffs were relying on it to exercise reasonable care in providing financial
services to Greenwich Sentry, and Plaintiffs did reasonably and foreseeably rely on
GlobeOp to exercise such care by investing in Greenwich Sentry.

556.   GlobeOp negligently failed to exercise due care in its role as
administrator, and failed to exercise the degree of prudence, caution, and good
business practice that would be expected of any reasonable financial professional.

557.   Plaintiffs have been damaged as a proximate result of GlobeOp's
gross negligence.

### Count 32
### Breach of Fiduciary Duty against Francoeur, Pilgrim and Citco

558.   The foregoing paragraphs are realleged herein.

559.   Brian Francoeur began his employment for CFSB in 2001.  As part of
his employment with CFSB, Francoeur was appointed as a director of FGBL.

560.   Ian Pilgrim began his employment for CFSB in 2001.  As part of his
employment with CFSB, Pilgrim was appointed as a director of FGBL.

561.   FGBL's Board of Directors had responsibility for FGBL, which as
investment manager, had day-to-day management responsibility for the Funds,
including selecting the Fund's investments and investment advisors, monitoring
those investments and advisors, and maintaining relationships between the Funds
and their advisors, custodians, administrators, and transfer agents.

562.   Defendants Francoeur and Pilgrim breached their fiduciary duties by
failing to supervise the Funds' managers and investments that were entrusted to
Madoff and in failing to pursue red flags that should have alerted them to the
presence of unlawful activity.

563.   At the time the tortious conduct that injured Plaintiffs was committed
by Francoeur and Pilgrim as described above, Francoeur and Pilgrim were acting
within the course and scope of their employment with CFSB, and CFSB was paid

for the services provided by Francoeur and Pilgrim to FGBL. Such tortious

conduct is thus imputable to CFSB under the doctrine of respondeat superior.

564.    Furthermore, CFSB was one of the companies that comprised the

Fund Services division of Citco Group. In designating Francoeur and Pilgrim for

appointment as directors of FGBL, CFSB was acting as an agent of Citco Group

and the other Citco defendants, to solidify further their relationship with FGG, an

important customer. In addition, Francoeur and Pilgrim were acting as agents of

Citco Group and the other Citco defendants. Therefore, Citco Group and the other

Citco defendants are also liable for the conduct of Francoeur and Pilgrim.

565.    As a direct and proximate result of the wrongful conduct perpetrated

by Francoeur and Pilgrim in their capacity as directors of FGBL, which was taken

in the course and scope of performing their duties as employees of CFSB,

Plaintiffs have suffered damages, including the loss of all, or substantially all, of

their investments.

## Count 33
## Unjust Enrichment against All Defendants

566.    The foregoing paragraphs are realleged herein.

567.    This Count is asserted against all Defendants.

568.    The Defendants all benefitted from their unlawful acts and omissions

and breached their fiduciary duties to Plaintiffs. These unlawful acts and

omissions and fiduciary breaches caused Plaintiffs to suffer injury and monetary
loss.

569.    As a result of the foregoing, it is unjust and inequitable for the
Defendants to have enriched themselves through the collection of fees for their
services.

570.    Equity and good conscience require that Defendants disgorge all such
unjust enrichment and that Defendants should pay the amounts by which they were
unjustly enriched to Plaintiffs in an amount to be determined at trial.

571.    Plaintiffs seek restitution from these Defendants, and seek an order of
this Court disgorging all profits, benefits and other compensation obtained by
Defendants from their wrongful conduct and fiduciary breaches.

572.    Plaintiffs are entitled to the establishment of a constructive trust
impressed upon the benefits derived by the Defendants from their unjust
enrichment and inequitable conduct.

Case 7:09-cv-00918-VM    THR Document 273    Filed 06/29/09    Page 216 of 219

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following:

a)     Certification of this action as a class action proper and maintainable pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaration of the proposed named Plaintiffs as proper Class representatives;

b)     Such preliminary and permanent equitable relief, including imposition of a constructive trust, as is appropriate to preserve the assets wrongfully taken from Plaintiffs;

c)     Compensatory, consequential, and general damages in an amount to be determined at trial;

d)     Disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts and practices;

e)     Punitive damages for each claim to the maximum extent available under the law on account of the outrageous nature of Defendants' willful and wanton disregard of Plaintiffs' rights;

f)     Costs and disbursements of the action;

g)     Pre- and post-judgment interest;

h)     Reasonable attorneys' fees; and

Case 1:09-cv-00118-VM-THK    Document 273    Filed 09/29/09    Page 218 of 220

    i)      Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a jury trial.

Dated:  September 29, 2009

Respectfully submitted,

By: _____

David Boies
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY  10504
(914) 749-8200

David A. Barrett
Howard L. Vickery
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY  10022
(212) 446-2300

Stuart H. Singer
Carlos M. Sires
Sashi Bach Boruchow
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, #1200
Ft. Lauderdale, Florida 33301
(954) 356-0011

Robert C. Finkel
Carl L. Stine
James A. Harrod
E. Elizabeth Robinson
WOLF POPPER LLP
845 Third Avenue
New York, NY  10022
(212) 759-4600

202

Christopher Lovell
Victor E. Stewart
LOVELL STEWART HALEBIAN LLP
61 Broadway, Suite 501
New York, NY 10006
(212) 608-1900

*Interim Co-Lead Counsel for
Plaintiffs and Counsel for PSLRA
Plaintiffs*

Of Counsel:

Robert S. Schachter
Hilary Sobel
ZWERLING, SCHACHTER &
ZWERLING, LLP
41 Madison Avenue
New York, NY 10010
(212) 223-3900

*Counsel for Plaintiffs Nadav and Rohit Zohar*

Steven J. Toll
S. Douglas Bunch
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
(202) 408-4600

Case 7:09-cv-00118-VM-THK    Document 273    Filed 06/29/09    Page 219 of 219

Jacob Sabo
The Tower
#3 Daniel Frisch St.
Tel Aviv, Israel
011 (972) 3607-8888

*Counsel for Plaintiffs Arie and Dafna Gruber,*
*Carling Investment Ltd., Madanes Investment &*
*Enterprise Ltd., and Shimon Laor*


Daniel W. Krasner
Gregory M. Nespole
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
(212) 545-4600

*Counsel for Plaintiff The Knight Services*
*Holdings Limited*


David A. Gehn
GUSRAE, KAPLAN, BRUNO & NUSBAUM PLLC
120 Wall Street
New York, NY 10005
(212) 269-1400

*Counsel for Plaintiff Pacific West Health*
*Medical Center, Inc. Employee's Retirement Trust*