# EXHIBIT J

Helen Davis Chaitman (4266)
Becker & Poliakoff LLP
45 Broadway
New York, NY 10006
hchaitman@becker-poliakoff.com
*Attorneys for Marsha Peshkin and over*
*800 other Customers of Bernard L.*
*Madoff Investment Securities LLC as*
*Listed on Exhibit A*

**Hearing Date: June 1, 2011 at 10:00 a.m.**
**Objections Due: May 25, 2011 at 4:00 p.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

               Plaintiff,

    v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

               Defendant.

In re:

BERNARD L. MADOFF,

               Debtor.

Adv. Pro. No. 08-01789 (BRL)

SIPA LIQUIDATION

(Substantively Consolidated)

**OBJECTION TO SIXTH APPLICATION OF TRUSTEE AND BAKER & HOSTETLER**
**LLP FOR ALLOWANCE OF INTERIM COMPENSATION FOR SERVICES**
**RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED FROM**
**OCTOBER 1, 2010 THROUGH JANUARY 31, 2011**

      This objection is filed by over 800 investors in Bernard L. Madoff Investment Securities,

LLC ("Madoff")("Objectors")[1], through their attorneys, Becker & Poliakoff LLP, and

incorporates herein all of the grounds for objection asserted in previously-filed objections to the

five prior  applications for interim compensation of the Trustee and B&H.  This objection

---

[1] A complete list of the Objectors is attached as Exhibit A to the accompanying Declaration of Helen Davis
Chaitman ("Chaitman Decl.").

constitutes the Objectors' offer of proof and Objectors request that the Court schedule an

evidentiary hearing at which they can submit evidence substantiating the facts set forth herein.

### Grounds for Objections

1.     The Trustee was appointed by this Court at the request of the Securities Investor

Protection Corporation ("SIPC") in the proceeding instituted in the United States District Court

for the Southern District of New York on December 15, 2008 for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. § 78aaa, *et seq.* ("SIPA").

2.     In the largest financial fraud in history, in a case which is closely watched by

people around the world, this Court has approved the payment of compensation to B&H in the

total amount of $132,329,517.73 and to the Trustee in the total amount of $3,552,286.50.

3.     In the Sixth Fee Application, the Trustee seeks court approval for allowance of

fees of $713,799.00 for the 123-day period from October 1, 2010 through January 31, 2011, and

B&H seeks allowance of fees of $43,177,049.10 (Sixth Fee App. ¶200.)  This works out to

$5,803.24 in daily compensation including weekends and holidays for the Trustee and

$351,032.92 in daily compensation for B&H, again including weekends and holidays.  Thus,

with the Sixth Fee Application, the totals are as follows:

| Interim Period | B&H's Compensation | Trustee's Compensation | Total Trustee & B&H Compensation |
|---|---|---|---|
| 12/15/08-4/30/09 | $14,662,319.83 | $759,228.75 | $15,421,548.58 |
| 5/1/09-9/30/09 | $21,279,101.85 | $835,605.00 | $22,114,706.85 |
| 10/1/09-1/31/10 | $23,884,085.25 | $671,591.25 | $24,555,676.50 |
| 2/1/10-5/31/10 | $33,981,534.45 | $601,202.25 | $34,582,736.70 |
| 6/1/10-9/30/10 | $38,522,476.35 | $684,659.25 | $39,207,135.60 |
| 10/1/10 – 1/31/11 | $43,177,049.10 | $713,799.00 | $43,890,848.10 |
| **TOTAL COMPENSATION** | **$175,506,566.83** | **$4,266,085.50** | **$179,772,652.33** |

4.      While the Trustee has affirmatively led the public to believe that he has not

personally received as compensation even the Trustee's fees of $4,266,085.50 since his

appointment,[2] we believe that the Trustee's contract with B&H entitles him to receive between

35% – 50% of the total amount of fees paid to B&H.  Thus, we believe that, since his

appointment in December 2008, the Trustee (possibly together with Mr. Sheehan) has personally

received compensation of between $60 million and $90 million.  If this is untrue, we invite the

Trustee to file with the Court the contracts between B&H and the Trustee and between B&H and

Mr. Sheehan.  In his March 30, 2011 report, the SEC Inspector General has stated that the

administrative expenses in the Madoff case and in the Lehman case could bankrupt SIPC and

cause it to draw on its $2.5 billion line of credit with the U.S. Treasury.[3]  Thus, there is an

enormous public interest in knowing the compensation of Messrs. Picard and Sheehan.

5.      Despite being paid approximately $180 million in compensation and spending

more than $130 million on forensic accounting experts, the Trustee and his counsel have violated

federal law intended to protect investors through SEC-regulated broker/dealers.

6.      This is not just the opinion of Madoff investors.  This is the opinion of

Congressman Scott Garrett, the Chairman of the Subcommittee on Capital Markets, Insurance,

and Government-Sponsored Enterprises, of the House Financial Services Committee (the

"Subcommittee").   The Subcommittee has direct supervision over SIPC.   Congressman Garrett

---

[2]  The Trustee stated at the hearing on his first fee application as follows:

> As noted at paragraph 33 of my application and contrary to the implication of certain objections
> that have been filed with the Court and before the press, the amounts that will be rewarded either
> today or at another time are going to be turned over to Baker Hostetler, the firm of which I am a
> partner. I want to emphasize I will not retain any portion of the award.

(8/6/09 Hrg. Trans. 14:15-21)  A copy of the 8/6/09 Hrg. Trans. is attached as Exhibit B to the Chaitman Decl.

[3] SEC's Office of Inspector General, Report No. 495, "SEC's Oversight of the Securities Investor Protection
Corporation's Activities," dated March 30, 2011 (the "SEC's Oversight of SIPC Report"), at 22-23.  See Exhibit C
to the Chaitman Decl.

made the following statement when he introduced legislation on December 17, 2010 intended to

enforce the SIPA against the Trustee:

> I am concerned that the trustee in the Madoff case is ignoring this law and failing
> to provide prompt assistance to those who have been thrust into financial chaos.
> He is taking positions on a wide range of issues that are contrary to the Securities
> Investor Protection Act, the Bankruptcy Code, and federal and state laws that are
> intended to protect investors against bad acts on the part of their brokers. This
> legislation is intended to clarify for the trustee and the Bankruptcy Court that
> Congress wants these laws to be followed.

States News Service (12/17/10). A copy of the statement is attached as Exhibit J to the
Chaitman Decl.

7.      The fees of the Trustee and B&H have consistently escaped scrutiny because of

the representation of the Trustee and SIPC, pursuant to SIPA section 78eee(b)(5)(C), that SIPC

has no reasonable expectation of recoupment of its advances for administrative expenses.

8.      In the Sixth Fee Application, Trustee – once again – tries to strip this Court of its

ability to review and analyze his and his firm's compensation by invoking the claim that SIPC

will not be reimbursed. The following statement is contained in the Sixth Fee Application:

> The Trustee has determined, at this time, that he has no reasonable
> expectation that the general estate will be sufficient to make a
> distribution to creditors or pay any administrative expenses. The
> Trustee has been advised by SIPC that it concurs in this belief of
> the Trustee. Therefore, . . . the Trustee and B&H request that . . .
> the Court 'shall award the amounts recommended by SIPC.'
> (citation omitted).

(Sixth Fee App. ¶197-198.)

9.      The Trustee's representation that there is no reasonable expectation that SIPC will

be reimbursed its administrative expenses is patently false. *See* ¶¶14-16 *infra.* It is another

attempt to obtain a blank check from SIPC without the Court's scrutiny.

**1.      The Trustee Has Violated Federal Law By Suing Innocent Investors**

10.     The Trustee has violated SIPA – and caused untold devastation to thousands of

people -- by utilizing the avoidance provisions of the Bankruptcy Code to sue approximately

6,000 innocent investors despite the fact that he is holding sufficient money in the fund of

customer property to pay all allowed customer claims, inclusive of the SIPC advances.  Under

§ 78fff-2(c)(3), a SIPA trustee has the power to use the avoidance provisions of the Bankruptcy

Code to recover property **only** when there are insufficient funds in the estate to pay allowed

customer claims and reimburse SIPC for the amounts paid in SIPC insurance:

> **Whenever customer property is not sufficient to pay in full the
> claims set forth in subparagraphs (A) through (D) of
> paragraph (1)**, the trustee may recover any property transferred by
> the debtor which, except for such transfer, would have been
> customer property if and to the extent that such transfer is voidable
> or void under the provisions of Title 11.  (emphasis added.)

SIPA § 78fff-2(c)(3).

11.    In the 1,000 clawback suits the Trustee has filed against innocent investors, he

relies on § 78fff-2(c)(3) for statutory authority to bring these actions:

> However, such assets will not be sufficient to reimburse the
> customers of BLMIS for the billions of dollars that they invested
> with BLMIS over the years. Consequently, the Trustee must use
> his authority under SIPA and the Bankruptcy Code to pursue
> recovery from customers who received preferences and/or payouts
> of fictitious profits to the detriment of other defrauded customers
> whose money was consumed by the Ponzi scheme. **Absent this or
> other recovery actions, the Trustee will be unable to satisfy the
> claims described in subparagraphs (A) through (D) of SIPA
> section 78fff-2(c)(1).**

See e.g., *Picard v. Shapiro Nominee, et. al.*, Doc. #1, Adv. Pro. No. 10-4328 (the "Shapiro

Nominee Clawback Complaint"), at ¶17 (emphasis added).

12.    Section 78fff-2(c)(1)(A) – (D) sets forth the claims that must be satisfied from the

fund of customer property.  If the fund of customer property is sufficient to satisfy the following

claims, then the Trustee has no power to institute avoidance actions:

> **(A)** first, to SIPC in repayment of advances made by SIPC
> pursuant to <u>section 78fff-3(c)(1)</u> of this title, to the extent such
> advances recovered securities which were apportioned to customer
> property pursuant to <u>section 78fff(d)</u> of this title;

5

(**B**) second, to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities;

(**C**) third, to SIPC as subrogee for the claims of customers;

(**D**) fourth, to SIPC in repayment of advances made by SIPC pursuant to section 78fff-3(c)(2) of this title.

13.    The Trustee has acknowledged that only the second and third priorities of distribution are applicable in this case, *i.e.*, categories "B" and "C." *See* Motion for an Order Approving Initial Allocation of Property to the Fund of Customer Property and Authorizing an Interim Distribution to Customers (the "Interim Distribution Motion"), Doc. # 4048, Case No. 08-01789, at ¶38.

14.    As of May 23, 2011, the Trustee had determined 99.97% of all customer claims. He has allowed claims totaling $6,883,791,021 on which SIPC has advanced a total of $794,890,347. <http://www.madofftrustee. com/Status.aspx>; *see also* Cohen Aff., Ex. A, Interim Distribution Motion ¶7.  Thus, if the Trustee had $6,883,791,021 in the fund of customer property, he could not use the avoidance provisions of the Bankruptcy Code.

15.    The fund of customer property now consists of more than $9.8 billion. The Trustee states that the fund of customer property totals $7.6 billion.  *See* Interim Distribution Motion ¶6.  In his calculation, however, the Trustee does not include $2.2 billion forfeited to the governed by the Picowers, even though he previously represented that "every penny" of the $7.2 billion settlement will be distributed to customers.  *See* Press Release of Irving H. Picard, "$7.2 BILLION RECOVERY AGREEMENT WITH ESTATE OF JEFFRY PICOWER AND PICOWER-RELATED INVESTORS," dated December 17, 2010, available at http://madofftrustee.com/News.aspx. (the "Picower Press Release"), at 1.  A copy of the Picower Press Release is attached as Exhibit D to the Chaitman Decl.

16.     Thus, the Trustee has $9.8 billion in the fund of customer property and he has

allowed claims of less than $6.9 billion, leaving an excess of $2.9 billion.  To summarize:

| Fund of Customer property | | Allowed Customer Claims | |
|---|---|---|---|
| Description | Amount | Payee | Amount |
| Recoveries as of 9/30/2010 | $1,500,000,000 | BLMIS Customers' Net Equity Claims | $6,088,900,674 |
| Picower Family Settlement | $5,000,000,000 | SIPC's Subrogee Claim | $794,890,347 |
| Picower forfeiture to US | $2,200,000,000 | | |
| Shapiro Family Settlement | $550,000,000 | | |
| Union Bancaire Privee Settlement | $470,000,000 | | |
| Hadassah Settlement | $45,000,000 | | |
| Other Preference Settlements | $89,071,011 | | |
| **Fund of Customer Property:** | **$9,854,071,011** | **Customer Claims:** | **$6,883,791,021** |

17.     Since SIPA § 78fff-2(c)(3) only authorizes a trustee to utilize the avoidance

provisions of the Bankruptcy Code when the fund of customer property is insufficient to pay the

allowed customer claims, the Trustee is acting in direct contravention of SIPA by proceeding

with the clawback suits.  *See Trefny v. Bear Stearns Securities Corp*., 243 B.R. 300, 321 (S.D.

Tex. 1999) ("Section 78fff-2(c)(3) comes into effect when the customer's property held by the

debtor is not sufficient to pay customers' claims in full."); *Matter of Bevill, Breslet & Schulman,

Inc.*, 94 B.R. 817, 824 (D.N.J 1989) (citing 15 U.S.C. § 78fff-2(c)(3)) ("[A] trustee's avoidance

power under section 78fff-2(c)(3) of SIPA only comes into effect '[w]henever customer property

is not sufficient to pay in full [certain creditor's claims].")  And, of course, he is causing absolute

devastation among clawback defendants by doing so.[4]

18.     The Trustee's self-serving explanation that he **may** in the future allow additional

claims does not change the fact that his prosecution of 1,000 clawback suits against innocent

investors is *ultra vires* and unlawful.

---

[4] While the Trustee advertises on his website that he is a "compassionate" man, Objectors, to a man, would not say
so.  On the contrary, his "hardship" program – through which, purportedly, his compassion is demonstrated, is an
absolute sham as Objectors will be happy to prove if the Court schedules an evidentiary hearing on this Objection.

**2.      The Trustee Has Violated Federal Law By Failing to Report on BLMIS' Crimes**

19.      Under SIPA, a trustee has an obligation to make to the Court and SIPC "such

written reports as may be required of a trustee in a case under chapter 7 of title 11."  SIPA §

78fff-1(c).  Under SIPA § 78fff-1(d)(3), a trustee is required to "investigate the acts [and]

conduct . . . of the debtor, the operation of its business, and any other matter, to the extent

relevant to the liquidation proceeding, and report thereon to the court."  SIPA § 78fff-1(d)(1).

Having made such an investigation, a trustee is required to:

> report to the court any facts ascertained by the trustee with respect
> to fraud, misconduct, mismanagement, and irregularities, and to
> any causes of action available to the estate.

SIPA §78fff-1(d)(3).

20.      Similarly, under the Bankruptcy Code, a trustee is mandated to "investigate the

financial affairs of a debtor" and, unless otherwise ordered by the court, "furnish such information

concerning the estate and the estate's administration as is requested by a party in interest."  11

U.S.C. § 704(a)(4), (7).

21.      Moreover, a SIPA trustee is required to furnish to customers all information

provided to SIPC unless it is determined that disclosure is not in the public interest.  *See* SIPA

§ 78kkk(a).  The Trustee has treated SIPC as his client and has provided all kinds of information

about BLMIS to SIPC.  Yet, he has failed to provide any of this information to the customers, to

whom he owes a fiduciary duty.

22.      The Trustee has expended over $310 million in legal and forensic accounting fees

— fees that are projected to exceed $1 billion by 2014.[5]  SIPC has approved thus far over $135

---

[5] *See* January 24, 2011 letter from SIPC president Stephen Harbeck to Congressman Scott Garrett, (the "1/24/2011 Harbeck Letter"), at 14-15, attached as Exhibit E to the Chaitman Decl.; *see also* SEC's Oversight of SIPC Report at 22-28.

million in legal fees for the Trustee and B&H. *See ¶2 supra.* The Trustee's forensic accountants have been paid in excess of $130 million. 1/24/2011 Harbeck Letter at 21.

23.    Yet, the Trustee has not provided a single report to the Court or the customers laying out the precise details of how Madoff perpetrated the fraud; the actions of Madoff's co-conspirators; the amount of investor money that was used to actually purchase securities and, indeed, to purchase the very securities shown on customer statements; and the identity of the BLMIS customers who benefited from the purchase of securities with customers' money. Nor has he provided disclosure to customers of the vast amounts of information he has provided to SIPC. Instead, he has pursued an adversarial course of conduct releasing only such information as is consistent with his self-serving view of the facts.

24.    All of the customers are parties in interest. *See Peskin v. Picard*, 413 B.R. 137, 145 (Bankr. S.D.N.Y. 2009) (all claimants in the BLMIS estate are "parties in interest"); *In re Caldor*, 193 B.R. 182, 186 (Bankr. S.D.N.Y. 1996) (creditors of an estate are parties in interest); 1/24/2011 Harbeck Letter at 5 (noting that "customers and creditors who were not given priority" will be "treated as general unsecured creditors" of the estate); *see also Miller v. Austin*, 72 B.R. 893, 898 (S.D.N.Y. 1987) (acknowledging a duty to provide information to SIPA customer as a party in interest).

25.    The reports thus far issued by the Trustee discuss the nature of his investigation in sweeping terms, with a bare minimum of detail and only conclusory statements about what has actually been uncovered. *See, e.g.*, Trustee's Amended Third Interim Report, Doc. #2207, Case No. 08-01789, at ¶¶ 103-157 (concluding that "the Trustee has assembled in substantial detail and for extensive periods of time BLMIS' financial history" but providing no such detail or supporting data). The Trustee has provided customers with none of the underlying data. Clearly,

the customers cannot rely upon the Trustee's self-serving version of the facts, and his reports are insufficient given the statutory mandates and the Trustee's recognition that he is "obligated to . . . report to the court *any* facts ascertained . . . with respect to fraud . . . and to any causes of action available to the estate."  Trustee's Fourth Interim Report, Doc. # 3083, Case No. 08-01789, at ¶ 58.  Moreover, he has failed to produce a single report prepared by the forensic accountants who have already received in excess of $130 million for their work in this case.[6]

26.     As a result, over 1,200 BLMIS customers jointly filed a Motion to Compel the Trustee to Provide a Report of His Investigative Activities and the Financial Affairs of BLMIS (the "Motion to Compel), Doc. #4045, Case No. 08-01789.  That motion is to be argued on June 21, 2011.

**3.     The Trustee Has Violated Federal Law by Reaching Sweetheart Deals with Madoff's Co-Conspirators**

27.     The most inexplicable of the Trustee's conduct has been his persecution of innocent investors while making sweetheart deals with Madoff's criminal co-conspirators.  Madoff has admitted during his interview with the Financial Times that there were four men who were complicit in his scheme:  Jeffry Picower, Norman Levy, Carl Shapiro, and Stanley Chais.[7]

---

[6] The Customers are aware of the Declaration of Joseph Looby, which was filed with the Trustee's motion for an order affirming his determination of net equity.  *In re BLMIS*, doc. no. 524 (Oct. 16, 2009).  That document, however, does not satisfy the Customers' request or the Trustee's statutory obligations.  Indeed, it raises more questions than it answers because Looby concedes that customer funds were used to purchase securities.  See Looby Decl. ¶¶ 9, 17, 18, 19, 26, 27.   In addition to being a year and a half old and acknowledging that it is based on partial information, *see id.* ¶ 7 n.1 ("The books and records of BLMIS are, at best, incomplete.  The Trustee . . . is endeavoring to supplement the corporate books and records with third party records, including banks records, customer records, etc., where available."), it is also framed in conclusory fashion with respect to major elements of the fraud and does not include documentary support for its conclusions.  Moreover, the investigation discussed in the declaration was limited in scope.  *See id.* ¶¶ 81, 87 (noting that the investigation covered only "select" months and baskets of trades from 2002 to 2008).  The customers are entitled to see the documentation relating to the entirety of BLMIS' operations, from its inception to its collapse.

[7] *See* "From Behind bars, Madoff spins his story" by David Gelles and Gillian Tett, April 8 2011, available at <http://www.ft.com/intl/cms/s/2/a29d2b4a-60b7-11e0-a182-00144feab49a.html>.

While the litigation against Chais is still pending, the Trustee has settled with Madoff's three

other criminal co-conspirators for far less than he is demanding from innocent investors.

28.    It was the Trustee himself who alleged that Picower was Madoff's co-conspirator

and the primary beneficiary of the Madoff fraud.[8]  According to the Trustee's complaint,

Picower enjoyed earnings on some accounts of 700% and 900% per year (Picower Complaint at

¶3); received fraudulent back-dated statements showing phony million dollar losses in his

accounts (*Id.* at ¶¶ 4, 63); and withdrew more than $7.2 billion more than he put in (Picower

Dismissal Opp. at 2, 20).  Thus, putting aside the value to Picower of having use of $7.2 billion

over a 38 year period, without having paid taxes on a substantial portion of the earnings, Picower

withdrew $7.2 billion more than he put in.  And that is the precise amount that the Trustee agreed

to accept from Picower's widow:  the net amount in excess of investment withdrawn from

BLMIS, with no accounting for the profits made by Picower from the use of $7.2 billion over a

38-year period, with no return of his original investment that he withdrew, and with no penalty

for perpetrating, with Madoff, the largest financial crime in history.

29.    Yet, from innocent investors who were the victims of Picower's and Madoff's

crimes, the Trustee is demanding 9% prejudgment interest from the date of each withdrawal.  *See

e.g.*, Shapiro Nominee Clawback Complaint at ¶vii. Apparently, in the Trustee's view, the

victims deserve to be punished because they were victimized by Picower and Madoff.

30.    Similarly, with respect to Norman Levy, Picard has alleged that Madoff increased

Levy's wealth from $180 million in 1986 to $1.5 billion in 1998.[9]  During the period from 1992

---

[8] *See Picard v. Jeffry M. Picower, et. al.*, Doc. #1, Adv. Pro. No. 09-01197 (the "Picower Complaint") at ¶28; *see also* MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS UNDER FED. R. BANKR. P. 7012(b) AND 7009, Doc. # 11, Adv. Pro. No. 09-01197 ("Picower Dismissal Opp.") at 2.

[9] *See Picard v. JPMorgan Chase & Co.*, *et als.*, Doc. #18, Adv. Pro. No. 10-4932 (the "Second Redacted Chase Compl.") at ¶246.

11

through 2001, Levy financed Madoff's operation with more than $100 billion. *See* 1/24/2011

Harbeck Letter at 14-15.  In addition, Madoff made a margin loan of more than $2 billion to

Levy's children which was outstanding as of December 11, 2008.[10]  Yet, the Trustee praised

Levy's children when they came forward and offered to settle their $2 billion liability for a mere

$220 million![11]

31.    Furthermore, in the motion seeking approval of the settlement with the Levy

Heirs (the "Levy Settlement Motion"), the Trustee represented that the $220 million offer from

the Levy Heirs was "the entire amount" that the Trustee was entitled to recover.[12]  So, contrary

to the Trustee's representation that he settled for virtually "the entire amount" due, the recovery

represented less than 10% of the Levy Heirs' total contract liability and 0% of the Levy Heirs'

civil liability for their father's crimes. And again, the Trustee was not seeking prejudgment

interest from the children of one of Madoff's criminal co-conspirators.

32.    In the Levy Settlement Motion, the Trustee, once again, commended the Levy

Heirs for being "forthright and sincere in their desire to do the right thing." The Trustee

"appreciate[d] the manner in which the Levys cooperated with him to obtain the information he

needed to arrive at the settlement."  *See* Levy Settlement Motion at ¶11.  Nowhere in the

Settlement Motion did the Trustee disclose to the Court or to investors Levy's $100 billion

---

[10] The Trustee failed to disclose to this Court approximately $8 billion of negative equity balances in accounts of Jeffry Picower and the Levy Heirs.  *See* 1/24/2011Harbeck Letter at 10, fn. 3.  Of that $8 billion, $2 billion was the liability of the Levy Heirs.  In the Picower Complaint, the Trustee asserted that one of Picower's accounts reported a staggering margin balance of approximately $6 billion. *See* Picower Complaint at ¶63(d). Thus, the Levy Heirs had a $2 billion margin loan.  The Trustee has recently acknowledged that the total $8 billion figure represents "amounts owed . . . to BLMIS."  Motion for Interim Distribution ¶ 72.

[11] *See* Press Release of Irving H. Picard, "MADOFF TRUSTEE ANNOUNCES SETTLEMENT OF $220 MILLION," dated January 27, 2010, available at http://www.madofftrustee.com/News.aspx  (the "Levy Family Press Release"), at 1.  A copy of the Levy Family Press Release is attached as Exhibit F to the Chaitman Decl.

[12] Levy Settlement Motion, Doc. #1833, Case No. 08-01789, at ¶12-13; 2/18/2010 Hrg. Trans. on Levy Settlement Motion (the "2/18/2010 Hrg. Trans.") at 7-8.  A copy of the 2/18/2010 Hrg. Trans. is attached as Exhibit G to the Chaitman Decl.

financing of Madoff's scheme or the Levy children's outstanding $2 billion margin loan with BLMIS.

33.    After this Court's approval of the Levy Settlement Motion, explosive information indicative of Norman Levy's active participation in Madoff's fraud was revealed as a result of a written question to Stephen Harbeck, the President of SIPC, from Congressman Scott Garrett.  In his written response, Mr. Harbeck disclosed two facts that the Trustee had concealed, *i.e.,* that Norman Levy financed Madoff's scheme during the period from 1992 through 2001 in an amount exceeding $100 billion and that the Levy children[13] had a $2 billion margin loan outstanding with BLMIS as of December 11, 2008.[14]

34.    While the $100 billion in financing was not sufficiently notable, in the Trustee's view, to be disclosed to the Court and the customers when the Trustee sought approval of the settlement with the Levy children, he did use that fact in order to establish liability of JP Morgan Chase for aiding and abetting Madoff's fraud.[15]  The Trustee has provided no explanation for his unconscionable breach of his statutory obligations to disclose material information[16] even though he admits that he knew of the $100 billion in financing and the $2 billion margin loan at the time he sought approval of the settlement with the Levy Heirs.[17]

---

[13] 1/24/2011 Harbeck Letter at 14-15.

[14] 1/24/2011 Harbeck Letter at 10, fn. 3; *see also* fn. 10 *infra.*

[15] *See* Second Redacted Chase Compl. at ¶¶223-249.

[16] *See* Movants' Reply Brief in Further Support of Motion to Set Aside the Order Approving the Trustee's Settlement with the Levy Heirs for Failure to Disclose Material Information (the "Vacate Motion Reply"), Doc. #3960, Case No. 08-01789, at 5-6.

[17] *See* Trustee's Opposition to Customers' Motion to Set Aside the Order Approving Trustee's Settlement with the Levy Heirs for Failure to Disclosure Material Information (the "Vacate Motion Opp."), Doc. # 3942, Case No. 08-01789, at 7.

35.     Finally, the Trustee settled with Carl Shapiro and his family, including Shapiro's

son-in-law, Robert Jaffee, who fed hundreds of investors to Madoff, for the relatively paltry sum

of $550 million[18] despite the receipt by Shapiro and his family of over $1 billion in fictitious

profits just during the six-year period preceding the liquidation.[19]

**4.     The Trustee Has Violated Federal Law by Unreasonably Delaying
Payments to Customers of SIPC Insurance and from the Fund of Customer
Property**

36.     After 2 ½ years and the payment of over $300 million in professional fees, the

Trustee is now making a paltry first distribution to customers in the total amount of $2.3 billion.

*See* Interim Distribution Motion at ¶7.  While the Trustee is a master of laying the blame for his

own pathetic performance on others, the fact is that, solely as a result of the Trustee's wrongful

conduct, he has unconscionably delayed payments to injured customers.

37.     Congress made absolutely clear its intent to minimize the devastation to

customers of an insolvent broker/dealer through prompt payments of SIPC insurance.  SIPA

requires that SIPC **promptly** pay SIPC insurance to investors of liquidated brokerage firm.  *See*

SIPA U.S.C. § 78fff(a)(1)(B) (recognizing that the purpose of the liquidation proceeding is to "as

promptly as possible satisfy net equity claims of customers"); *see also* SIPA §78fff-4(c) ("SIPC

shall **promptly** satisfy all obligations of the member to each of its customers relating to, or net

equity claims based upon, securities or cash by the delivery of securities or the effecting of

payments to such customer.") (emphasis added); SIPA § 78fff-3(a) ("In order to provide for

prompt payment and satisfaction of net equity claims of customers of the debtor, SIPC shall

advance to the trustee such moneys . . . as may be required to pay or otherwise satisfy claims");

---

[18] Motion For Entry Of Order Pursuant To Section 105(A) Of The Bankruptcy Code And Rules 2002 And 9019 Of
The Federal Rules Of Bankruptcy Procedure Approving An Agreement By And Between The Trustee And The
Shapiro Family, Doc. #3320, Case No. 08-01789, at 1.

[19] *Id.* at ¶8.

SIPA § 78fff-2(b) ("**[T]he trustee shall promptly discharge**" all obligations relating to net

equity claims.") (emphasis added).

38.     Despite this clear statutory mandate, the Trustee unconscionably delayed in

paying SIPC insurance even in the reduced amounts he allowed to the small number of claimants

whose claims he recognized.  Many victims waited a full year or more before receiving any SIPC

insurance.

39.     On January 9, 2009 – less than three weeks after the Trustee's appointment,

Stephen Harbeck, the President of SIPC, met with SEC Commissioner Mary Shapiro, and

obtained her consent to change the definition of "net equity" from what SIPA requires and from

what SIPC enforced for 39 years.  http://www.youtube.com/watch?v=gyywi9zp0qc.

40.     Clearly, this decision was unprecedented in SIPC's history and required judicial

approval because it saved SIPC approximately $1.5 billion and deprived Madoff's victims of that

amount of money in SIPC insurance.  If the Trustee had been acting honestly and in good faith,

he would have immediately sought court approval of SIPC's interpretation of "net equity."

Instead, the Trustee did nothing.

41.     Two different law firms representing investors sought to put the issue before the

court in the spring of 2009. Both attempts were vigorously opposed by the Trustee and the Court

acceded to the Trustee's view.  *See, e.g.,* Letter of David Sheehan dated July 13, 2009, Doc. #10,

Adv. Pro. No. 09-1272.

42.     Finally, in order to resolve one suit filed by three investors, in October 2009, the

Trustee agreed to a briefing schedule for the "net equity" issue, pursuant to which the issue was

not argued until February 2, 2010.[20]  In fact, the Trustee opposed[21] all requests by customers'

counsel to shorten the briefing schedule proposed by the Trustee.[22]

43.    Although this Court issued its decision on the "net equity" issue promptly after

the oral argument and certified the appeal directly to the Second Circuit, the argument before the

Second Circuit did not take place until March 3, 2011 and no decision has yet been handed

down.

44.    Thus, the Trustee's unilateral refusal to promptly litigate the "net equity" issue

has caused a delay in determining the threshold issue in this case, *i.e.*, who is entitled to SIPC

insurance and to distributions from the fund of customer property.

**5.    In Breach of His Fiduciary Duty to Customers, the Trustee Sought to
Protect Picower's Family from the Consequences of Picower's Crimes, Thereby
Forcing Another Delay in Distribution of the Fund of Customer Property**

45.    On December 17, 2010, the Trustee announced that the Picower Defendants (the

"Picower Parties") had settled with him and with the United States by irrevocably forfeiting $7.2

billion of which $5.5 billion would be allocated to settlement of the Trustee's lawsuit (the

"Picower Settlement").  On the same day, the Trustee filed his motion for approval of the

Picower Settlement (the "Picower Settlement Motion," Doc. #25, Adv. Pro. No. 09-01197).   In

the Picower Settlement Motion, the Trustee sought an injunction that would expressly bar not

only claims that "belong to" the Trustee, but also claims that had been asserted by Madoff

victims whose claims the Trustee does not recognize.  In other words, even though it would not

---

[20] *See gen.*, Motion to Authorize /Motion For an Order to Schedule Hearing on "Net Equity" Issue, Doc. #395, Case No. 08-01789, at ¶13.

[21] Response to Motion /Trustee's Response to Objections to Motion of Trustee For an Order To Schedule Hearing on "Net Equity" Issue, Doc. #412, Case No. 08-01789, at ¶10.

[22] *See* e.g., Response to Motion for Order Scheduling Hearing on "Net Equity" Issue filed by Carole Neville on behalf of Sonnenschein Investors, Doc. #406, Case No. 08-01789, at ¶3.

take $1 away from the fund of customer property, the Trustee was seeking to shield the Picower

Parties from liability to other Madoff victims.

46.    The entry of the injunction was not a condition of the settlement.  Indeed,

approval of the Picower Settlement by the bankruptcy court was not even a condition of the

Picower Settlement.  The Picower Settlement Agreement provides that all of the provisions

therein, "including the [mutual releases] contained in paragraphs 3 and 4 , shall become binding

and remain effective and binding on the parties, and shall remain in full force and effect, **even if**

**no Final 9019 Order ever is entered."**  Picower Settlement Agreement, Ex. A, Picower

Settlement Motion, at ¶6 (emphasis added).  The Picower Settlement Agreement simply

obligated the Trustee to use his "best efforts to obtain the Permanent Injunction," not actually

obtain one.  *Id*. at ¶7.  Nevertheless, the Trustee sought, and the bankruptcy court granted, an

injunction against any lawsuits by Madoff victims against the Picower Parties.

47.    The Trustee knew that counsel for these other Madoff victims would vigorously

oppose any such order and he also knew that, if the order was entered by this Court, counsel for

these other Madoff victims would have no alternative but to appeal the order.  Yet, he agreed,

gratuitously with the Picower Parties, that none of the forfeited funds would be distributed until a

final, non-appealable order approving the Picower Settlement was entered.

48.    The Trustee could have dropped the demand for the injunction entirely.  Indeed, it

was unseemly for him to use his office to shield a criminal like Picower from liability to his

victims.  Or he could have asked the bankruptcy court to enter two orders:  one approving the

Picower Settlement and the other enjoining any litigation against the Picower Parties.  Instead, he

specifically asked that one order be entered.  Of course, counsel for the Madoff victims had to

appeal the injunction.

49.     This caused a delay – created solely by the Trustee – in the distribution of the

$7.2 billion of forfeited funds, as part of the fund of customer property.  This is a delay for which

the Trustee bears sole and absolute responsibility.  Yet he casts the blame on the Madoff victims

whose claims he does not recognize.

**6.      The Trustee and B&H Have Charged Excessive Fees and Expenses**

50.     The exhibits submitted in support of the Sixth Fee Application illustrate that there

is gross inefficiency by the Trustee and his counsel with respect to the services rendered and, at

times, that their services are a complete waste of time and resources.

**A.      THE FEES AND EXPENSES SUBSTANTIALLY EXCEED THOSE OF THE TRUSTEE IN THE LEHMAN BROTHERS INC. SIPA LIQUIDATION**

51.     Lehman Brothers Inc. ("LBI") is in a SIPA liquidation in the Southern District of

New York.  It is "'by far the largest and most complex securities broker-dealer liquidation ever

attempted."[23]  James Giddens is Trustee and Hughes, Hubbard & Reed LLP ("HHR") is the

trustee's counsel. "[T]he SIPA [p]roceeding has involved the administration or transfer of well

over $110 billion of cash and securities."  *Id.*  Within a year, the LBI Trustee has effectuated the

transfer of over 110,000 customer accounts involving customer property with a value in excess

of $92.3 billion.  *Id.*  Yet, remarkably, the Trustee and B&H have managed to run up fees and

expenses vastly exceeding the administrative expenses in the Lehman case:  B&H's

compensation for a **21-month period** exceeds the Lehman Trustee's fees and legal expenses of

HHR for a **24-month period** by $30,006,029.60:

---

[23] Trustee's Preliminary Investigation Report And Recommendations (the "LBI Investigative Report"), Doc. # 3604, Case No.08-01420, at ¶22 (citing Memorandum Decision Granting Motion of DCP Parties for Leave to Conduct 2004 Discovery, at 4 (LBI Docket No. 353)).

| LBI LIQUIDATION | | MADOFF LIQUIDATION | |
|---|---|---|---|
| Interim Period | HHR & trustee Awarded Compensation | Interim Period | B&H & Trustee Awarded Compensation |
| 9/13/08-1/31/09 | $14,255.186.91 | 12/15/08-4/30/09 | $15,421,548.58 |
| 2/1/09-5/31/09 | $15,185,697.98 | 5/1/09-9/30/09 | $22,114,706.85 |
| 6/1/09-9/30/09 | $24,754,288.10 | 10/1/09-1/31/10 | $24,555,676.50 |
| 10/1/09-1/31/10 | $23,948,533.80 | 2/1/10-5/31/10 | $34,582,736.70 |
| 2/1/10-5/31/10 | $22,782,301.85 | 6/1/10-9/30/10 | $39,207,135.60 |
| 6/1/10-9/30/10 | $19,204,952.90 | | |
| **Totals:   24 months** | **$105,875,774.63** | **21  months** | **$135,881,804.23** |

52.     Similarly, the expenses incurred by B&H exceed those incurred by HHR by nearly a million dollars:

| LBI LIQUIDATION | | MADOFF LIQUIDATION | |
|---|---|---|---|
| Interim Period | HHR Awarded Expenses | Interim Period | B&H Awarded Expenses |
| 9/13/08-1/31/09 | $213,706.28 | 12/15/08-4/30/09 | $274,203.03 |
| 2/1/09-5/31/09 | $132,764.74 | 5/1/09-9/30/09 | $280,681.62 |
| 6/1/09-9/30/09 | $253,544.54 | 10/1/09-1/31/10 | $390,204.89 |
| 10/1/09-1/31/10 | $354,344.87 | 2/1/10-5/31/10 | $731,371.19 |
| 2/1/10-5/31/10 | $403,977.87 | 6/1/10-9/30/10 | $851,331.34 |
| 6/1/10-9/30/10 | $284,450.53 | | |
| **Totals:   24 months** | **$1,642,788.83** | **21 months** | **$2,527,792.07** |

B.     B&H'S SERVICES ARE GROSSLY INEFFICIENT AND, AT TIMES, ARE A
COMPLETE WASTE OF MONEY

53.     Becker & Poliakff LLP is directly adverse to the Trustee in two matters where the

Trustee sought to enjoin lawsuits commenced in other jurisdictions by Becker & Poliakoff's

clients.  As to those two matters (summarized below), the Trustee seeks total compensation of

$314,822.00 for 750 hours billed by B&H during the relevant four-month time period.

| Task/Matter | Task/Matter Name | Hours | Amount |
|---|---|---|---|
| 22 | Fox & Marshall ("Fox") | 733.80 | $308,332.00 |
| 23 | Canavan, Goldsmith, and Kalman ("Canavan") | 16.20 | $6,490.00 |
| | **TOTAL** | | **$314,822.00** |

(Ex. E., Sixth Fee App.)

54.     In the Canavan matter, B&H is seeking $6,490.00 for 16.20 hours spent preparing

and filing of a Notice of Adjournment of Pre-Trial Conference and an Affidavit of Service.

These are tasks that can be performed by a paralegal using an established form and simply

inserting a few pieces of new information.  It is inconceivable that it could take more than 60

minutes for a paralegal to prepare both of these documents.  For B&H to bill $6,490.00 for this

work is incredible.  While this is a small sum in the context of the enormity of the sums sought in

the Sixth Fee Application, it probably accurately reflects the gross over-billing of the Trustee's

counsel generally.

55.     B&H bolsters its claim for $6,490 by indicating that additional tasks in ¶ 49 were

performed.  However, the tasks outlined in ¶ 49 simply cannot apply to the Canavan matter

during this interim period.  A copy of the ECF docket for the Canavan matter is attached as

Exhibit H to Chaitman Decl.

56.     The Trustee is also adverse to Becker & Poliakoff and co-counsel's clients in the

Fox matter for which it billed $308,332 for 733.8 hours spent allegedly drafting letters to the

Court, submitting a 57-page appellee brief, submitting counter-designations of the record on

appeal, and reviewing submissions from adverse parties. *See* Fifth Interim Rept. ¶129.

57.       It is evident from the ECF docket[24] in the Fox case that the only substantive

activity during this interim period that warranted more than several hours of work was the

appellee brief.  B&H submitted a 57-page brief that listed **seven** B&H attorneys who worked on

it. Even a 57-page brief, however, is not worth over $300,000, particularly when all of the issues

had previously been briefed.  These two examples[25], of which Objectors' counsel have personal

knowledge, indicate that there is, at best, gross inefficiency by the Trustee and his counsel with

respect to the services rendered in this case.  This Court should approve reasonable fees, not

exorbitant ones, especially when those fees raise significant risk that they will bankrupt SIPC.

58.       Aside from the evidence of gouging, the Trustee and his counsel have wasted

millions of dollars asserting claims that are frivolous.  As two different judges in the district

court have held, the Trustee lacks standing to assert claims for aiding and abetting as assignee of

the customers.  Yet B&H has billed the following amounts for preparing its aiding and abetting

claims, just in the four-month period covered by the Sixth Fee Application:

| Task/Matter | Task/Matter Name | Hours | Amount |
|---|---|---|---|
| 27 | JPMorgan Chase | 1,971.30 | $632,244.00 |
| 30 | HSBC | 6,232.80 | $2,632,456.00 |
| 32 | UBS | 1,415.40 | $658,027.50 |
| 34 | Citibank | 383.10 | $164,499.50 |
| 40 | Medici Enterprises | 573.90 | $265,327.50 |
| **TOTAL:** | | **10,576.50** | **$4,352,554.50** |

---

[24] A copy of the ECF docket in the Fox case is attached as Exhibit I to the Chaitman Decl.

[25]  Objectors also offered proof of B&H's gross over-billing in the Canavan and Fox matters in their objections to
the Trustee's and B&H's Fifth Fee Applications. *See* Objection to Trustee's & B&H's Fifth Fee Applications, Doc.
# 3308, Case No. 08-01789, at ¶¶11-18.

(Ex. E, Sixth Fee App.)

59.     In a recent decision, Judge Rakoff raised doubt about the Trustee's standing to bring various state law claims against third parties on behalf of BLMIS customers.  *See gen.*, *Picard v. HSBC Bank PLC*, 2011 WL 1544494.  As to the Trustee's first theory of standing as a successor of a joint tortfeasor, Judge Rakoff recognized that the Trustee's standing "may well be precluded by the so-called "Wagoner" doctrine . . . ." *Id.* at * 7.  He further doubted the Trustee's ability to rely on *Redington v. Touche Ross & Co.*, 592 F.2d 617 (2d Cir. 1978), in support of his alleged  standing to assert common law claims as a subrogee of SIPC's rights and as a bailee of customer property.  *Id.* at *7-11.  He noted that "there are reasons to believe that the precedential force of *Redington* has been weakened, *perhaps fatally* . . . ." *Id.* at *8 (emphasis added).  As to the Trustee's assignee status as the basis for standing, Judge Rakoff noted that "at least four courts have concluded that SIPA only permits assignments of customers' net equity claims and not claims against third parties. *Id.* at *11.

60.     Similarly, on May 23, 2011, Judge McMahon issued a decision in *Picard v. JPMorgan Chase & Co.*, *et. al.*, Doc. #30, Case No. 11-00913, questioning the Trustee's standing to bring aiding and abetting claims on behalf of BLMIS customers (the "McMahon Order").  Agreeing with Judge Rakoff, Judge McMahon acknowledged that recent United States Supreme Court decisions "cast doubt . . . on the Trustee's basis for standing, either as bailee of customer property or as a subrogee of SIPC's subrogation rights." *Id.* at 11-12 (citing *Picard v. HSBC Bank PLC*, 2011 WL 1544494, at **3-4 (S.D.N.Y. April 25, 2011)).  Judge McMahon cited cases holding that SIPA only permits assignments of customers' net equity claims and expressed doubt about the Trustee's ability to bring suits against "parties other than the liquidated estate as an assignee of the estate." *Id.* at 12.

61.     Therefore, B&H's request for $4,352,554.50 in fees for supposedly over 10,000 hours of work spent on claims that the Trustee almost certainly has no standing to pursue is wasteful and unconscionable.

### C.     B&H Appears to be Charging Excessively High Rates and Charging An Impermissible Mark-Up on Temporary Attorneys

62.     B&H is charging a blended rate of $350.67 for 13 attorneys who are not admitted to practice law.  They are charging a blended rate of $308.49 for two attorneys who were admitted in 2011 and $307.98 for 22 attorneys admitted in 2010.  The following chart summarizes the blended rates of the attorneys and represents gross over-charging by any standard.

| Year Admitted (# of attorneys) | Blended Hourly Billing Rate |
|---|---|
| 1984 (1) | $496.86 |
| 1988 (1) | $300.00 |
| 1994 (2) | $312.87 |
| 1997 (1) | $300.04 |
| 1998 (2) | $383.47 |
| 2000 (2) | $389.18 |
| 2001 (3) | $509.03 |
| 2002 (2) | $486.10 |
| 2003 (6) | $481.34 |
| 2004 (14) | $353.14 |
| 2005 (18) | $338.73 |
| 2006 (17) | $350.89 |
| 2007 (26) | $347.34 |
| 2008 (28) | $321.66 |
| 2009 (27) | $309.46 |
| 2010 (22) | $307.98 |
| 2011 (2) | $308.49 |
| Not admitted (13) | $350.67 |

(Ex. D, Sixth Fee App.)

63.     In addition, B&H is passing onto SIPC the cost for clerks, library staff, and other

non-legal staff with a blended rate of $250 an hour! *See* Ex. D, Sixth Fee App.  It appears that

B&H has simply passed onto SIPC the entire overhead of the firm without any disclosure of

how much it pays someone like a library clerk, whose time is billed out at $250 an hour.

64.     If B&H has employed any temporary attorneys, it is required to disclose the actual

cost to the firm and any markups it is charging.  *See In re Worldwide Direct, Inc.*, 316 B.R. 637

(Bankr. D. Del. 2004) (disallowing any amounts billed to the estate for more than firm paid for

the services of temporary lawyers and paralegals).

65.     Forty-two of the approximately 278 B&H attorneys listed on the Sixth Fee

Application were not listed on the firm's website as of the second week in May, even though the

application period is through 1/31/11.   Therefore, it appears that B&H is employing temporary

attorneys without disclosing the actual cost to the firm of these attorneys.

66.     In light of strong evidence suggesting impropriety and lack of professionalism

with respect to B&H's billing, Objectors propose that Stuart Maue be appointed as a Fee

Auditor to assist the Court in analyzing all of the B&H fee applications to assure that they

comply with the high standards of this Circuit.  *See* the Affidavit of John L. Decker in Support

of Order Authorizing the Appointment and Employment of Stuart Maue as Fee Auditor filed

simultaneously herewith.

## **CONCLUSION**

The failure of the Trustee and B&H to comply with applicable federal and state law

compels the denial of any compensation to them and raises serious questions about their

disinterestedness.

For the foregoing reasons, the Sixth Fee Application should be denied in its entirety.  The Court should order the Trustee and his counsel to file with the Court the detailed billing reports from December 11, 2008 to date so that the Court, Mr. Maue, and all interested parties can properly evaluate the reasonableness of compensation, and the disinterestedness of the Trustee and B&H, consistent with the well-established authorities governing professionals in this Circuit.

May 25, 2011                                BECKER & POLIAKOFF LLP


                                            By: /s/ Helen Davis Chaitman
                                            45 Broadway
                                            New York, NY 10006
                                            (212) 599-3322
                                            *Attorneys for Marsha Peshkin and over 800*
                                            *other Customers of Bernard L. Madoff*
                                            *Investment Securities LLC as Listed on Exhibit*
                                            *A*

Helen Davis Chaitman (4266)
Becker & Poliakoff LLP
45 Broadway
New York, NY 10006
hchaitman@becker-poliakoff.com
*Attorneys for Marsha Peshkin and over*
*800 other Customers of Bernard L.*
*Madoff Investment Securities LLC as*
*Listed on Exhibit A*

**Hearing Date: June 1, 2011 at 10:00 a.m.**
**Objections Due: May 25, 2011 at 4:00 p.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>                      Plaintiff, <br><br>      v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>                     Defendant. | Case No.:  08-01789 (BRL) <br><br> SIPA LIQUIDATION <br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>                     Debtor. | |

**DECLARATION OF HELEN DAVIS CHAITMAN**
**IN SUPPORT OF OBJECTION TO SIXTH APPLICATION OF TRUSTEE AND BAKER**
**& HOSTETLER LLP FOR ALLOWANCE OF INTERIM COMPENSATION FOR**
**SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED FROM**
**OCTOBER 1, 2010 THROUGH JANUARY 31, 2011**

I, Helen Davis Chaitman, hereby declare, under penalty of perjury pursuant to 28 U.S.C.

§1746, as follows:

1.      I am a partner with Becker & Poliakoff LLP, counsel to Marsha Peshkin and over

800 other Customers of Bernard L. Madoff Investment Securities LLC.  A non-exclusive list of

my clients is set forth on **Exhibit A** attached hereto (the "Objectors").  I am a member of the bars

of New York and New Jersey, and of this Court. I submit this declaration in support of the

Objection to the Sixth Application of Trustee and Baker & Hostetler LLP ("B&H") for

Allowance of Interim Compensation for Services Rendered and Reimbursement of Expenses

Incurred from October 1, 2010 Through January 31, 2011, requesting that fee application be

denied in its entirety.

2.      True and correct copies of the following documents are attached:

**Exhibit B**:    August 6, 2009 hearing transcript on the First Application for Interim Professional Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred for Baker & Hostetler LLP, et al.

**Exhibit C**:    SEC's Office of Inspector General, Report No. 495, "SEC's Oversight of the Securities Investor Protection Corporation's Activities," dated March 30, 2011.

**Exhibit D**:    December 17, 2010 Press Release of Irving H. Picard, "$7.2 BILLION RECOVERY AGREEMENT WITH ESTATE OF JEFFRY PICOWER AND PICOWER-RELATED INVESTORS."

**Exhibit E**:    Letter from SIPC president Stephen Harbeck to Congressman Garrett dated January 24, 2011.

**Exhibit F**:    January 27, 2010 Press Release of Irving H. Picard, "MADOFF TRUSTEE ANNOUNCES SETTLEMENT OF $220 MILLION."

**Exhibit G**:    February 18, 2010 hearing transcript on Trustee's Motion seeking Court's Approval of an Agreement by and among the Trustee and Jeanne Levy-Church and Francis N. Levy.

**Exhibit H**:    ECF docket in *Picard v. Canavan, et. al.*, Adv. Pro. No. 10-3200 (Bankr. S.D.N.Y).

**Exhibit I**:    ECF docket in *Fox, et. al. v. Picard*, 10-cv-4652 (S.D.N.Y.)

**Exhibit J**:    December 17, 2010 statement of Congressman Garrett.

I declare under penalty of perjury that the foregoing is true and correct.


May 25, 2011                                              /s/ Helen Davis Chaitman

# EXHIBIT A

Investors represented by Becker & Poliakoff, LLP

Abbit, Linda Abbit Family Trust

Abbit, Linda Brodsky Irrevocable Trust

Abbit, Linda Trustee of the Survivors Trust Under the Brodsky Family Trust dated 1/9/02

Abel, David

Accu Plan Employees' Profit Sharing Trust

Ackerman Institute for the Family

Adler, Patricia A.

Alan Sandler

Allen Family Trust

Allen, Jeffrey H.

Allen, Laurel

Allen, Paul

Allen, Robert J.

Alpern, Amanda

Alpern, Jane

Alpern, Lewis

Alvin E. Shulman Pourover Trust

Ambrosino, Ronnie Sue

Arenson, Cynthia

Arenson, Ted

Aster Associates

Atwood Management Profit Sharing Plan

Avergon, Brad

Avergon, Cynthia

Avergon, Jacqueline

Avergon, Robert

Axelrod (John Porges)

Aymes, Barbara

Aymes, Bruce

B.S., a minor, Abe Schy custodian

Babcok, Kathryn

Bader, William

Baer, Beatrice

Baer, Stanley

Barbara Natale Trust

Bartos, Adam P.

Bartos, The Celeste & Adam Bartos Charitable Trust

Benjamin T. Heller Irrevocable Trust

Benjamin, Carolyn Jean

Benjamin, Donald

Benzaia, Peter

Investors represented by Becker & Poliakoff, LLP

Berezin, Evelyn

Berkowitz, Bertha & Calvin Berkowitz-Blau Foundation, Inc.

Berkwitz, Morrey

Bernfeld, Ellen

Bernfeld, H&E

Bernfeld, Herbert

Bernfeld, Joint Venture

Bernfeld, Marilyn

Bernfeld, P&M Joint

Bert Brodsky Associates, Inc. Pension Plan

Bessel, Henry

Bessell, Roz

Bevro Realty Corp. Defined Benefit Pension Plan

Bizzell, Gary

Bizzell, Sharon

Blaine, Andrea

Brandes, Julie P.

Braun, Martin L.

Breen, Rio

Breen, Suzanne

Breie, Margot

Breier Group

Breier, Anita

Brillante, Joyce

Brillante, Michael

Brodsky, Bert

Brodsky, Muriel

Buckley, Brenda

Burich, Kelly

Burich, Megan

Busel, Joel IRA

Busel, Joel Revocable Trust

Busel, Sandra Revocable Trust

Butt, Lila A.

Canavan, Lissa as a member of Lapin Childrenn LLC

Carone Family Trust

Carone Gallery, Inc. Pension Trust

Carone Marital Trust #1 UTD 1-16-00

Carone Marital Trust #2 UTD 1-26-00

Carone, Matthew D. Carone Revocable Trust

Carroll, Sandra

Investors represented by Becker & Poliakoff, LLP

Casey, Diarmuid

Castelli, Denis M.

Cavanaugh, Lisa

Chalek Associates LLC

Chalek, David

Chalek, Isabel

Chalek, Mitchel

Chalek, Morton

Chalek, Richard M.

Chapman, Brenda Joyce

Cheng, Irene

Cholodenko, Paul

Cline, Edwin J.

Clothmasters, Inc.

Cohen William R.

Cohen, Betty

Cohen, Jesse L.

Cohen, Marcia

Cohen, Nancy Dver

Cohen, Nancy Dver Rev. Trust

Cohen, Ronald

Cohen, Teresa Redston

Cohn, Anna IRA

Cooney, Patricia T.

Cooney, Patrick

Corwin, Ronald D.

Cuenca Abela, Joaquin

Cummings, Bruce E.

Cummings, Lynn

Cutroneo, Garynn Rodner

Danels LP

Daniels, Annette

Daniels, Charles D.

Daprex

David W. Stepelton Family Trust

Davis, Walter

De Blacam, Hugh

De Vita, Michael T., Trustee

Decker, Jessica

Del Casino, Anne

Den Bleyker, Diane M.

Investors represented by Becker & Poliakoff, LLP

Denton Family Irrevocable Trust

Denton Labriola, Susan

Diane Holmers

Difazio, Carol

Difazio, Frank

DiGiulian, Bruno L.

DiGiulian, Patsy R.

Dine, Elaine

Dunkle, Carolyn

Dunkle, Don

Durr, Robin

Dusek, Russell

Eaton, Richard G.

Ebel, Maureen Anne

Ehrlich, Leslie

Ehrlich, Stephen

Eisenstat, Susan

Elaine Dine Living Trust Dated 5/12/06

EMM Realty Corp

Engel, Barbara

Englebardt, Marvin

Englebardt, Marvin Retirement Plan

Englebardt, Sabra

English, Alan

English, Rita

Ennis, Sheila E.

Epstein, Jane

Epstein, Joan

Epstein, Michael

Epstein, Muriel

Epstein, Randy

Epstein, Robert

Estate of Jacob M. Dick

Estate of Scott S. Patience

Estate of Steven I. Harnick

Esteban, Fernando M.

Estelle Harwood Family Limited Partnership

Estelle Harwood Revocable Trust

Fairchild, Harriet

Falls, Sharon

FAS Partners L.P.

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 35 of 229
Investors represented by Becker & Poliakoff, LLP

Feinberg, Norman

Feinberg, Sondra

Feldman Rous Grodin Epstein MD PA Profit Sharing Plan 6/25/82

Feldman, Ari

Feldman, Beth P.
Feldman, Beth P. & Beth P. Feldman Trust

Feldman, Mark S.
Feldman, Nancy

Ferber, Robert F.

Figi, John Todd Figi Revocable Trust
Fisher, Carol

Fitzpatrick, John

Fogliano, Nicholas Jr Fogliano, Lynn JT WROS
Forrest, Kathleen

Forrest, Leonard
Forrest, Leonard Rev. Trust

Forrest, Marge

Forrest, Marjorie Rev. Trust

Forte, Joyce

Fox Family Partnership
Fox, Adele

Freshman, Frieda

Freshman, Frieda Freshman Rev Trust

Friedman, Constance

Friedman, Myra
Friedman, Richard

Friedman, Richard Credit Shelter Trust #226

Friedman, Richard Gabriel Friedman Trust #227

Friedman, Shirley

Frucht, Howard
Frucht, Howard & Carolyn Frucht Rev Trust

Gaba Partnership

Gaba, Barbara

Gaba, Richard

Gale Etta M. Lazar and Melvin H. Gale J/T WROS
Gale, Leona

Gale, Melvin

Investors represented by Becker & Poliakoff, LLP

Ganes, Gustine

Ganes, Sol

Gangji, Nur C.
Garten, James

Gattegno, Judith

Gennett, Marth S.
George, Allison

George, Christopher

Gersten, Beth

Getz, Robert N.

Getz, Robert N. LLC Pension Plan/Robert N. Getz Trustee
Getz, Steven S.

Gevirtz, Charles
Ginsburg, Carla H.

Glater, Michelle

Glodstein, David

Glodstein, Elaine Glodstein Revocable Trust

Glodstein, Susan

Gloria Hendler Revocable Trust

Gloria S. Jaffee Investment Partnership

Goldsmith, Leslie

Goldstein, Elliot J. MD PC Money Purchase Pension Trust
Goodman, Andrew M.

Goodman, Audrey M.

Goodman, Bruce

Goodman, James M.

Goodstein, Iris

Goodstein, Iris as TSTEE UAD 6/23/97

Gordon, Allen
Grant, Edwin A., II

Great Western Bank - Trust Department, as Trustee

Green, Jacquelin

Green, Wayne D.

Greene/Lederman LLC

Greenman, Lester

Greenspan, Davina

Investors represented by Becker & Poliakoff, LLP

Greer, Sue

Greiff, James

Grobstein, Cheryl

Grobstein, Jack

Gross Associates
Gross, David

Gross, Herbert

Gross, Irma

Gross, Susan Epstein

Grosvenor Partners LTD
GST Separate Trust FBO Sharon Lohse U/T/A/D 5/29/02

Guardian Angel Trust LLC
Guiducci Family Partnership

Guiducci, Dino

Guiducci, Mary

Guiducci, Sandra

Guttman, Ronald A.
Haber, Jerome

Haber, Ronald J.

Halio, Robert

Harmony Partnership

Harnick, Estate of Steven Harnick

Harnick, Martin R.

Harnick, Martin R.
Harnick, Pamela

Harnick, Steven I. Harnick Revocable Living Trust dated April 2, 2002

Harwood Holding Company II, Inc.

Harwood, Estelle

Harwood, Estelle Family LP

Harwood, Estelle Trust DTD 9/92

Harwood, Family Partnership

Harwood, Lowell
Harwood, Lowell & Craig Trustee Charitable Remainder Trust

Harwood, Sanford
Harwood, Sanford Family LP

Harwood, Sanford Rev Trust DTD 2/10/98

Investors represented by Becker & Poliakoff, LLP

Harwood, The Estelle Family Limited Partnership

Harwood, The Sanford Harwood Family Limited Partnership

Harwood, Toby
Helford, Betty

Helford, Irwin

Heller, Ben

Heller, Benjamin T. Irrevocable Trust

Heller, Patricia

Heller, Warren M.
Hendler, Gloria

Henley, Robert
Herman, Jay

Herman, Sheila

Heyl, Judith Patience
Hiles, Heidi

Hill, Norma
Hirsch, Robert

Hirschhorn, Carla

Hirschhorn, Stanley

Hocatt, Philip A.
Hohl, Myrna

Holloway, Adam

Holloway, Alicia N.

Holloway, Don G.

Holloway, Scott W.
Holmers, Heidi

Hudson Investment Partners, LP
Hulnick, Elsie P.

Hulnick, George H.

Irene Whitman 1990 Trust U.A DTD 4/13/90

Irrevocable Trust FBO Ethan Siegel

Irrevocable Trust FBO Jennifer Gattegno

Israel, Howard

Iuen, Alice

Iuen, Marvin F.
Izes, Jay M. (IRA)

Investors represented by Becker & Poliakoff, LLP

J. J., a minor by Lee Ann Mahrs Jacob

J.S., a minor, Abe Schy custodian

JABA Associates

Jacob M. Dick Rev Living Trust DTD 4/6/01

Jacob, Matthew

Jacob, Steven

Jacobs, Edward M.

Jaffe Family Partnership

Jaffe, Colette

Jaffe, Gloria

Jaffe, Gloria S. Investment Partnership

Jaffe, Manuel O.

Jaffe, Phillip

James M. New Trust dtd 3/19/01

Jane Gray Solomon Trust

Jason, Shari Block

Jeane Ungerleider Springer

Jordan, James A. Living Trust

Jordan, James Allen

Jungreis, Annette Trust

Jungreis, Irving Trust

Kajota, Saulius

Kamenstein, Carol L.

Kamenstein, David R.

Kamenstein, Peter D.

Kamenstein, Sloan G.

Kamenstein, Tracy D.

Kantor, Herbert C.

Katz, Judith

Kaye, Howard

Keller, Barbara

Keller, Gerald

Keller, Gerald and Barbara Keller Family Trust

Kenn Jordan Associates

Kilchernmann, Lee

Kiner, Barbara

Investors represented by Becker & Poliakoff, LLP

Kiner, David

King, Andrea Dee
Kissinger Revocable Trust, Walter

Kissinger, Eugene Trust U/A/D 12/6/99
Kissinger, Eugeneie

Kissinger, John Frans

Kissinger, Thomas VanDrooge

Kissinger, Trust Under Agreement

Kissinger, W. B.  Rev TST 10/23/96
Kissinger, Walter

Kissinger, William D.

Kissinger-Matray, Dana M.

Knopf de Esteban, Margaret

Koehler, H.C.
Kohl, Kenneth M.

Kohl, Myrna L.

Krakauer, Olga

Kringstein, Andrea

Kuntzman Family LLC;

Kurland, Renee

Kurland, Steven

Laks, Jason

Lange, Barbara June

Lapin Children LLC

Lapin, Robert C.
Lawrence-Keane, Loretta

Lazarus Investment Group
Lazarus Schy Family Partnership
Lazarus, Adam
Lazarus, Amber
Lazarus, Audra
Lazarus, Ida
Lazarus, Jared
Lazarus, Linda
Lazarus, Michael
Lazarus, Ronald
Lazarus, Terry

Investors represented by Becker & Poliakoff, LLP

Lazarus, Zipora

Lazarus-Schy Family Partnership

Leeds, Ellen

Lees, Toby

LeFavor, Dana

Lefkowitz, Amanda

Lefkowitz, Ian

Lehrer, Eunice Chervony

Leonard J. Oguss Trust

Leonardi, Emilie

Libby, Stuart A. & Elizabeth A.

Lissauer, Sharon

Liu, David

Login, Gerald

Long, Dora F.

Long, Richard P.

Low, Caren

Low, Frieda

Low, Gary

Low, Robert

Low, Robert K.

Luker, Carol A.  (Carol A. Walsh - married name)

Luker, Donald P.

Luker, Kenneth S.

Luker, Robert C.

Luker, Robert C. Family Partnership

Luker, Sharon R.

Lutsky, Madeline

M&M IN M LLC

M.S., a minor, Abe Schy custodian

Macaluso, Gaetano

Macaluso, Rosalinda

Marema, Dorothea

Marks, Andrea Joy

Marshall, Susanne S.

Martin R. Harnick & Steve Norton Partners

Marxen, Pamela K.

Marylin Turk Revocable Trust

Mast, Rona

Masters Vacation Fund

Mayfair Bookkeeping Services Inc Mayfair Pension Plan

Investors represented by Becker & Poliakoff, LLP

Mayfair Ventures
McKean, Olivia
McKean, Robert
Meyer, Cathy J.
MGM Associates, LLC
Michaelson, Susan
Michalove, Edwin
Miller Family Partnership
Miller Partnership
Miller Trust Partnership
Miller, Alice G. Miller Exemption Trust
Miller, Alice G. Miller Martital Trust
Miller, Bonnie
Miller, Dorothy
Miller, Ellen Danessa
Miller, Jill
Miller, Kenneth A. MD Pension & Profit Sharing PL
Miller, Mark
Miller, Martin Alice Miller Exemption Trust, Miller, Alice Marital Trust
Miller, Martin Miller Living Trust
Miller, Nancy
Miller, Philip
Miller, Steven A.
Miller, Steven F.
Miller, The EDM Trust #1
Millison Investment Mgmt. Pension Plan
Millison, David
Millison, Henry
Millison, Julia
Mishkin Ellen
Mishkin Family Trust
Mishkin, Andrew
Mishkin, Ellen
Mishkin, Grace
Mishkin, Julia
Mishkin, William
Mishkin, William
Mishkin, William S.
Mishler, Dr. Ken Edward
MLSMK Investment Company c/o Stanley M. Katz
MMRN Associates

Investors represented by Becker & Poliakoff, LLP

Moore, Barbara (Sopphia)

Morselife Foundation Inc.

Moskowitz, David

Moskowitz, Peter

Most, Michael

Murray, Callie

Murray, Christine

Murray, Ryan

Murray, Timothy

Myers, Keith

Nahas, Edmund A.

Nelson, Carol

Nelson, Stanley

New, James M.

New, James M.

New, Laura W.

Newman, Abraham

Newman, Mark

Newman, Rita

N-Highmark LLC

Nichols, Trisha

Norman Simons, Dara

Norman, Hannah

Norman, Hannah P. Revocable Trust

North Shore Child & Family Guidance Association, Inc.

Northeast Investment Club

Norton, Steve

Oasis, Russell

Oguss, Gerald M.

Oguss, Jane L.

Oguss, Ronald A.

O'Neal Jr., Louis S.

O'Neal, Darlene

Oren Revocable Trust of Gail B. Oren DTD 9/8/95 Gail B. Oren Tstee

Ostenson-Murray, Callie A.

Oxbridge Associates, LP

P&S Associates General Partnership

Palko Associates General Partnership

Palmedo, Philip F.

Palmer Family Trust

Palmer, Blake

Investors represented by Becker & Poliakoff, LLP

Palmer, Boyer F.

Palmer, Boyer H.

Palmer, Boyer H. Palmer Investment Account

Palmer, Bret

Palmer, Brett

Palmer, Bruce N.

Palmer, Fern C.

Palmer, Fern Trust

Palmer, Kurt B.

Palmer, Kurt C.

Palmer, Oscar

Palmer, Ryan

Palmer, Sophia

Paymer, Laurel

Peerstate Equity Fund LP

Peltzer, Bette Anne

Perlman, Felice

Perlman, Sanford

Pesaturo, Penny

Peshkin, Marsha F.

Peshkin, Marsha Revocable Trust

Peskin, Diane

Peskin, Roger

Petito Investment Group, The  as Agent for J.X. Reynolds & Co., Deferred Profit Sharing Plan

Pillsbury, Edith A.

Placon2

Plafsky, Bernice

Plafsky, Nathan

Plateis, Marvin

Plateis, Roberta

Plati, Robert

Plati, Suzanne

Playso, Corinne G.

Podwill, Michael J.

Podwill, Robert R.

Poland, Richard S.

Posser, Jeffrey

Powell, Harvey L.

Preffer Family Trust

Preffer, Pamela

Preffer, Samuel

Investors represented by Becker & Poliakoff, LLP

Preffer, Shirley

Pressman, William

R.D.A., a minor as beneficiary of the Article 8.1 Trust

R.R. Rosenthal Associates

Rabb Partners

Rabb, John

Rabb, Kenneth

Rabb, Leslie

Rabb, Sumire

Rabb, Susan

Rabb, Sylvia Rabb Trust

Rabb, Yuka

Radosh Butt, Laura B.

Radosh Partners

Radosh, Alaric P.

Radosh, Burnett H.

Radosh, Danielle H.

Radosh, Jeremy L.

Radosh, Katherine M.

Radosh, Lee J.

Radosh, Rachel L.

Raines, Densel L.

RAR Entrepreneurial Fund Ltd.

Rautenberg, Marie S.

Realty Negotiators Inc. Defined Benefit Pension Plan

Rechler, Benjamin Trust

Rechler, D&J Grandkids Trust

Rechler, Donald

Rechler, Donald & Judith Grandchildren Annual Exclusion GST Trust, Mitchell Rechler Trustee

Rechler, Evelyn

Rechler, Glenn

Rechler, Gregg

Rechler, Gregg

Rechler, Judith

Rechler, Mark

Rechler, Mark

Rechler, Mitchell

Rechler, Scott

Rechler, The Benjamin Ian Trust, Mitchell Rechler Trustee

Rechler, The Willi Trust, Mitchell Rechler Trustee

Investors represented by Becker & Poliakoff, LLP

Rechler, Todd

Rechler, Trust F/B/O Glenn, Donald Rechler Trustee

Rechler, Trust F/B/O Mark, Donald Rechler Trustee

Rechler, Trust F/B/O Mitchell, Donald Rechler Trustee
Reckson Generation

Reed, Irwin B.
Reiss, Frances

Reynolds, James

Reynolds, James Reynolds' Deferred Profit Sharing Plan

Reynolds, Jim Profit Sharing Plan (Petito Investment)

Rhodes, Lenore Living Trust Rhodes, Eugene Living Trust TIC
Robert N Getz, LLC

Roberts Family Trust c/o Marvin Roberts
Roger Rechler Revocable Trust

Roman, Joan
Roman, Robert

Rosamilia, Neva

Rosamilia, Nicholas S.

Rosen, Edith
Rosen, Rich

Rosen, Sam
Rosenthal, Alan

Rosenthal, John

Rosenthal, Linda

Rosenthal, R.R. Associates

Rosenthal, Robert

Roth, Alan
Roth, Jeannette

Roth, Lawrence

Rothschild Family Partnership

Rowan, Donna Jean
Rubin, George

Ryan By-Pass Trust

Ryan, Dan

Ryan, Lawrence J. By-Pass Trust Under Declaration of TST DTD Nov 20, 1991, Theresa R.
Ryan Trustee
Ryan, T.R. Trustee

Ryan, Theresa R. Lawrence J. Ryan Trustees U/D/T 11/20/91

Ryan, Theresa Rose
S&P Associates General Partnership

Saland, Abraham

Investors represented by Becker & Poliakoff, LLP

Sandalwood Debt Fund A, LP

Sandalwood Debt Fund B, LP

Sandber, Joel B.

Sandberg, Iris B.

Sanders, E. Ann

Sanders, Ellen W.

Sandler Partners

Sandler, Sandy

SAV005 BJM Diverse Prosperiti Ltd

SAV006 Gardenview Nominees (pty) Ltd.

SAV007 Grange Nominees Limited A/C RMB

SAV008 Equity 360 Ltd

SAV009 Patrice Michael Moyal

SAV010 Mimosa Finance Holdings Limited

SAV011 Pershing Nominees Ltd A/C CCCLT

SAV012 BJM Diverse Prosperiti Ltd – Sid Rebe

SAV013 Trafalgar Securities Ltd.

Savest, Ltd.

Savin, Barbara L.

Savin, Robert S.

Schaffer, Donna

Schaffer, Elaine Revocable Trust

Schaffer, Elaine Ruth

Schaffer, Jeffrey

Schaffer, Keith

Schindler, Alice

Schrager, Hermene E. Trust

Schrager, Roy M.

Schrager, Roy M. Trust

Schupak, Belle

Schupak, Investment

Schupak, Lenore H.

Schupak, Nathan

Schupak, Steven

Schussel, Barry

Schussel, Roberta

Schwartz, Jonathan

Schwartz, Jonathan Trustee for Nancy Riehm

Schwartz, Richard

Schwartz, Roberta

Schwartz, Roberta Trust

Investors represented by Becker & Poliakoff, LLP

Schy Family Partnersip
Schy Ira
Schy, Abe
Schy, Abe
Schy, Doran
Schy, Elan
Schy, Ira
Schy, Lisa
Schy, Rose
Schy, Steve
Schy, Steven and Family

Sedgwick, Nicholas J.
Sedgwick, Robert B.
Seims, Sara
Seissler, Sheldon
Shankman, Dorothee
Shankman, Dorothee TOD Jeffrey Shankman & Susan Shankman Banker
Shankman, Jeffrey
Shankman, Trust Under the Will of Benjamin
Shapiro, Adele
Shapiro, Collen
Shapiro, David
Shapiro, David Nominee
Shapiro, David Nominee #1
Shapiro, David Nominee #2
Shapiro, David Nominee #3
Shapiro, David Nominee #4
Shapiro, Deborah
Shapiro, Emily L.
Shapiro, Emily Lauren Shapiro 1989 Trust
Shapiro, Eric N.
Shapiro, Eric Nathan Shapiro 1989 Trust
Shapiro, Julie Beth
Shapiro, Julie Beth Shapiro 1989 Trust
Shapiro, Lindsay A.
Shapiro, Lindsay Beth Shapiro 1989 Trust
Shapiro, Richard B.
Shapiro, Robin L.
Shapiro, Susan and Michael Shapiro Memorial Foundation
Sherman, Rana
Sherman, Thomas

Investors represented by Becker & Poliakoff, LLP

Shulman Family Corporation

Shulman, Alvin E.

Shulman, Florence W.

Siegman, Henry

Siegman, Miriam Cantor

Silver, Florette Rev TST U/A/D 3/25/88
Silvera, Herbert

Silverstein, Robert, Pauline Silverstein Rev. Trust

Singer, Nina, Executor of the Estate of Laura P. Kaplan

Sirotkin, Lori
SPJ Investments, L.P.

Springer, Noah U.

Springer, Trust Created by Joy Ungerleider-Mayerson U/A/D 1/31/88 F/B/O Noah U. Springer

Sprung, Dennis as Executor of the Estate of Roger Rechler

Stacy Festus & Helen Stacy Foundation, Inc.
Stein, Michael

Stenger, John

Stepelton Douglas Stepelton Trust

Stepelton, Brett

Stepelton, Douglas

Stepelton, Jennifer

Stepelton, Sean

Stepelton, Virilee

Stern, Arlene
Stern, Eugene

Stony Brook Foundation

Sullivan, Ann
Sylvan Associates LLC

Synder, Craig C.
Szymanski, Carla Rev. Trust

Talanksy, Morris GRAT Dated 11/12/02

Talansky, Morris

Taylor, Jess L.

Teufel, Timothy
Teufel, Valerie

Tiletnick, Angela

Triangle Properties #39

Turk, Jeffrey

Tzannes, John

Tzannes, Peter Basant

Tzannes, Robin

Investors represented by Becker & Poliakoff, LLP

Unflat, Gunther

Unflat, Margaret

Ungerleider, Andrew

Ungerleider, Steven

Van Lanen, Delores GST Trust FBO Delores Van Lanen U/T/A/D/ 5/29/02

Van Lanen, Roy GST Separate Trust FBO Roy Van Lanen U/T/A/D/ 5/29/02

Vogel, Barbara & Robert J.

Waldman, Linda

Wallick, Cindy

Walter Freshman Recovable Trust dtd 12/31/92

Walter Freshman Trust A

Warner, Jon G.

Warner, Robin L.

WDG Associates Inc. Retirement Trust

Weaver, Tracey

Webster, Bonnie T.

Wechsler, Brad

Weinstein, Ronald

Weinstein, Ronald

Weinstein, Sheryl

Weinstein, Sheryl as Executrix of Wasserman

Weisfeld, Barry

Westphal, Nina

Whitman Partnership

Whitman Revocable Living Trust U/A/D/8/5/86, Bernard

Whitman Revocable Living Trust U/A/D/8/5/86, Judith

Whitman, Bernard

Whitman, Irene (deceased)

Whitman, Judith

Whitman, Robert

Wilansky Family Fund

Wilansky, Barry

Wilansky, David

Wilansky, Steven

Wilenitz Trust U/ART Fourth O/W/O Israel Wilenitz

Wilenitz, Evelyn Berezin

William Pressman

William Pressman, Inc.

Willis Jr., W. Waite

Wilson, Diane

Winco Real Estate SVCS CBPP 9/25/02

Investors represented by Becker & Poliakoff, LLP

Wingate, David

Wirick, Sybil

Wohl George Partners LP

Wohl, Linda

Wohl, Ronald Gene Credit Shelter Trust

Yaffe, Beverly  (deceased - feb 13, 2001)

Yaffe, Robert

Yesod Fund

Zell-Breier, Sam

Zenkel, Lois

Zraick, DeLuca, Rich

Zraick, Edward

# EXHIBIT B

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------x

     In the Matter

        of                    Case No.

                           1-08-01789


     SIPC V. MADOFF,

               Debtor.

--------------------------------x

                  August 6, 2009

                  United States Custom House

                  One Bowling Green

                  New York, New York 10004


     In Re First Application for Interim Professional
Compensation for Services Rendered and Reimbursement of
Actual and Necessary Expenses Incurred for Baker &
Hostetler LLP, et al.



B E F O R E:

                HON. BURTON R. LIFLAND,

                      U.S. Bankruptcy Judge

2

1

A P P E A R A N C E S:

2

3

4          BAKER HOSTETLER, LLP

5          Attorneys for Irving H. Picard, SIPA Trustee

6               45 Rockefeller Plaza

7               New York, New York 10017

8          BY:    MARC E. HIRSCHFIELD, ESQ.

9                   -and-

10               DAVID J. SHEEHAN, ESQ.

11                   -and-

12               ALISSA M. NANN, ESQ.

13                   -and-

14               IRVING H. PICARD, BLMIS Trustee

15

16

17

18          MILBERG LLP

19               Attorneys for Unofficial

20               Committee of Customers

21               One Pennsylvania Plaza

22               New York, New York 10119

23          BY:    MATTHEW GLUCK, ESQ.

24                   -and-

25               JONATHAN M. LANDERS, ESQ.

3

1

2    A P P E A R A N C E S:  (Continued)

3

4         PHILLIPS NIZER, LLP

5              Attorneys for The Peskins and Maureen Ebel

6              666 Fifth Avenue

7              New York, New York 10103

8         BY:  HELEN DAVIS CHAITMAN, ESQ.

9

10        WINDELS MARK LANE & MITTENDORF, LLP

11        Attorneys for Alan Nisselson Chapter 7 Trustee

12        156 West 56th Street

13        New York, New York  10019

14        BY:   ALAN NISSELSON, ESQ.

15              -and-

16              REGINA GRIFFIN, ESQ.

17

18        SECURITIES INVESTOR PROTECTION CORPORATION

19              805 15th Street, Suite 800

20              Washington,  D.C.  20005

21        BY:   KEVIN H. BELL, ESQ.

22

23

24

25

4

1                           PROCEEDINGS

2                  THE COURT:  SIPC v Madoff.

3                  With respect to the timing of the hearing,

4    I understand there was a fairly long line outside and that

5    is why we were delayed.   It seems to be no deed becomes

6    unpunished because I could have expected the courtroom to

7    be filled up, which it did not.

8                  MR. SHEEHAN:   Good morning, Your Honor.

9                  THE COURT:  Good morning, Mr. Sheehan.

10                  MR. SHEEHAN:   David Sheehan from Baker

11   Hostetler, on behalf of the Irving Picard as Trustee.

12                  We have before Your Honor this morning a

13   number of applications.   As is the normal course we would

14   deal with those that are unopposed and uncontested first.

15                  THE COURT: Certainly.

16                  MR. SHEEHAN:   At this point we would like

17   to introduce Alissa Nann from our office.

18                  MS. NANN:   Good morning, Your Honor.

19   Alissa Nann, on behalf of the trustee.

20                  Your Honor, we have this morning the

21   Trustee's fourth motion for an extension of time by which

22   the Trustee may assume or reject certain contracts or

23   leases.

24                  Your Honor, we were last before you on this

25   issue on July 7, at which time you entered an order

5

1    extending the deadline to assume or reject to July 31.   We

2    filed the instant motion on July 24th, and a bridge order

3    was entered by Your Honor on the 27th which extended the

4    deadline for the assumption or rejection of certain

5    contracts through today's hearing date.

6                   At we explained to the Court the last time

7    we were before Your Honor, this extension motion is made

8    based upon a request by a Serge Trading (phonetic), who is

9    the purchaser of the Debtor's market-making business.

10                  They were still in negotiation with Verizon

11   for certain contracts providing phone and internet

12   services, and those are the only contracts to which the

13   extension will apply.   They were told they are very close

14   to coming to a deal with Verizon, and as we also reported

15   to the Court the last time, Serge will be paying the cost

16   of the service through the date of the extension, which we

17   will extend through the 31st and will be covering any

18   confidential and legal expenses relating to the motion.

19                  We have not received any objection to the

20   motion, and we would ask that it be granted.

21                  THE COURT:   Are they making payments in

22   accordance with the basic contract price?

23                  MS. NANN:   I believe so, yes.

24                  MR. SHEEHAN:   Yes.

25                  THE COURT:  Very well.

6

1               Does anyone want to be heard?

2               There is no response.

3               The application is granted.

4                   MS. NANN:    May I approach, Your Honor?

5                   THE COURT:  Yes, I will entertain it.    I

6       have approved the order.

7                   MS. NANN:    Thank you, Your Honor.

8                   MR. SHEEHAN:    Thank you, Your Honor.

9               Your Honor, there are two other

10      applications for which no objections have been received.

11              First, I would like to offer my objection

12      to the application in the Windels motion.   The

13      representatives for the Windels firm, Mr. Nisselson and

14      Regina Griffin are here on behalf of that application.

15              As Your Honor will recall and the record

16      will reflect, Mr. Nisselson was appointed as Chapter 7

17      Trustee for Bernard Madoff and his firm was appointed as

18      his counsel.

19              Subsequently there was an application by

20      Mr. Picard for substantial consolidation and a good deal of

21      the work was engaged in by Mr. Nisselson and his firm in

22      evaluating the proposals, in the responsibility they have

23      before them and how they should fulfill them in connection

24      with our application.

25              It was found by SIPC and the Trustee that

7

1    these were a very valuable resource to the overall estate

2    as well as to the advancement of what we are trying to

3    achieve in this case.  As a result they submitted their

4    application to our firm and to SIPC.

5              As Your Honor knows from the record that

6    application has been approved.  Obviously, it has been

7    agreed to by the U.S. Trustee.  And more importantly it

8    was approved by SIPC who will advance the funds from its

9    SIPA fund to pay the fees and expenses of Mr. Nisselson and

10   his firm.

11             We would move that application here this

12   morning, Your Honor.

13             THE COURT:  Does anyone want to be heard?

14             MR. BELL:  Kevin Bell, for the Securities

15   Investment Protection Corporation.  We have submitted

16   SIPC's recommendation in support of the application by

17   Windels Marx.  We would ask the Court to grant an order

18   approving it.

19             THE COURT:  It is clear from the prior

20   order of the Court that the compensation would not be

21   coming out of any of the estates, that it is coming purely

22   from SIPC.  So there is no charge in any of the funds that

23   will be made available for distribution either under the

24   Chapter 7 or SIPC.  The application has been granted.

25             MR. BELL:  Thank you.

8

1          MR. SHEEHAN:    We have an order in

2    accordance with the rules of the court.  It is an omnibus

3    form of the order addressing all the fee applications.

4          THE COURT:  We will take that up at the

5    conclusion of the hearing.

6          MR. SHEEHAN:    Thank you, Your Honor.

7          The other unopposed application is that on

8    behalf of the international law firms who have been

9    retained by the Trustee in connection with his

10    investigation, and his efforts to obtain assets and return

11    them to the customer property fund.

12          I wouldn't go through all the applications,

13    Your Honor, since it is unopposed.   As Your Honor is aware

14    through the many applications that were made here over the

15    course of the last several months we have been retaining

16    counsel in Gibraltar, the British Virgin Islands, Bermuda

17    and the United Kingdom and they have been active in

18    assisting us not only in connection with the joint

19    provisional liquidation proceeding in the Court of Great

20    Britain, but also assisting us in these other proceedings.

21    They found those services to be extremely valuable.

22          We have submitted those applications to

23    SIPC who have reviewed them and also approved them and

24    submitted an application in support.   We believe that

25    application should be granted, and I would move that

9

1   application as well, Your Honor.

2                    MR. BELL:   Kevin Bell, on behalf of SIPC.

3                    SIPC has submitted it's recommendation and

4   is in full support of the Court entering an order approving

5   the application.

6                    THE COURT:   Does anyone else want to be

7   heard?

8                    The application is granted.

9                    Essentially, with respect to some of the

10  foreign activities that have been conducted with the aid of

11  these foreign counsel, there has been some international

12  recognition including recognition within the UN of

13  protocols that emanated from this effort.  And the UN

14  guidelines making reference to this activity has recently

15  been approved by the commission, and I think that has been

16  a very interesting aspect of some of these efforts.  The

17  application is granted.

18                   MR. SHEEHAN:   Thank you, Your Honor.

19                   The last application is the application by

20  Mr. Picard, as Trustee, and Baker Hostetler by its counsel

21  to which there has been opposition filed.   Initially, I

22  would ask that Mr. Picard be allowed to speak with regard

23  to his application as Trustee.

24                   THE COURT:  Sure.

25                   MR. PICARD:  Good morning, Your Honor.  I

10

1    was appointed by Judge Stanton on December 15, when just a

2    few days earlier Mr. Madoff had been arrested.   The SEC

3    filed a complaint against Mr. Madoff and Madoff Securities

4    International.

5              Judge Stanton appointed Lee Richards as the

6    receiver.   When that occurred on December 11, Your Honor,

7    when I was appointed for the Bernard L. Madoff Investment

8    Securities, which I will refer to as BLMIS, Mr. Richards

9    was replaced with respect to the Debtor.   He continued

10   with respect to BLMIS until the joint liquidator was

11   appointed.

12             After a hearing on February 4th of this

13   year, Your Honor found that both I and Baker Hostetler met

14   the disinterested standard of the SIPA statute.   Today's

15   hearing, as Mr. Sheehan has stated concerns, interim fees

16   for four and-a-half months through April 30, Your Honor.

17             My activities are set forth in my

18   application and I am prepared to provide a summary of some

19   of the important aspects of it and answer any questions

20   Your Honor may have.

21             I seek $759,228.75 for the four and-a-half

22   month period beginning on December 16.

23             I expended 1,088.5 hours, Your Honor.   20

24   percent of the amount that I seek will be deferred until

25   later in the case, that is $151,845.75, Your Honor.

11

1          So I am seeking payment of $607,383, Your

2     Honor.   I also seek disbursements for local travel.

3          During the period I was operating a portion

4     of the business.  As Your Honor will recall, we tried to

5     maintain initially the propriety trading and market-making

6     operations for sale.   We ultimately did sell them.   We

7     had retained Lazard Freres to help in the marketing of

8     that.

9          We reduced the head count initially from

10    approximately 160 people down to approximately 40 and those

11    people were really necessary for the market-making

12    operations.  When it became obvious to us in March that the

13    market-making operations would be sold to any one of the

14    bidders that we had been talking to without the employees,

15    we let them go.

16          But in each case, Your Honor, that we dealt

17    with the employees and the terminations we had Warren Act

18    problems, ERISA problems both for healthcare, for the 401-K

19    plan that had been maintained and the 401-K plan, Your

20    Honor, was made at Fidelity, and the only investments that

21    the employees could make were funds of Fidelity.

22          So from that vantage point those assets are

23    being managed now by an independent agent, and they are all

24    well protected.

25          But we are still dealing with the

12

1   Department of Labor, Your Honor, which is very concerned

2   about it, and they are doing a review.    We will have a tax

3   return for the 401-K plan that will be filed before the end

4   of the year, Your Honor.

5            In addition to the business and the sale of

6   the market-making operations, I have been involved with the

7   claims and the investment account information, preparation

8   of determination letters and regular communications with my

9   consultants and the claim processing agent, application

10   partners, where the beginning of the claims process is, the

11   review, research, contacting people when we need more

12   information.

13            Together with my counsel I have been

14   involved in a statuary investigation of BLMIS's affairs and

15   had significant contact with both the FBI, the U.S.

16   Attorney's office, SEC, FENRA and, of course, the JPLs in

17   the U.K.  We had numerous contacts, I personally as well as

18   my counsel with various state regulators, as I mentioned

19   the Department of Labor and other regulatory and law

20   enforcement agencies.

21            As I indicated, we retained Lazard with

22   SIPA's approval to help market and sell the market-making

23   operations.   It was a lengthy term.   It took probably

24   longer than we had hoped.   But we ultimately were able to

25   sell it and we have every reason to believe that we will be

13

1    getting additional monies over the next couple of years

2    that the purchaser will be successful and the customers in

3    the long run will benefit from that sale.

4            Your Honor, we also had extensive dealings

5    with the Depository Trust Clearing Corporation, which held

6    Madoff securities that were there.   There were about 1,600

7    positions in the account on December 11, and both the DTCC

8    and the National Securities Stock Corporation were not

9    ready to release a lot of the securities because there were

10   close-outs and all sorts of other issues that had to be

11   resolved.   So that was another piece of the operation that

12   took a lot of time.

13           In addition, a lot of the financial

14   institutions that were holding money were not ready to

15   release those funds.   It took substantial negotiations.

16           As you may recall, in the early stages of

17   the case, a number of stipulations were provided to you

18   which you did approve, whereby when the banks released the

19   funds they also received certain indemnification rights

20   from us.

21           So that, again, was a process that took a

22   bit of time and was not as easy as it might have been in

23   the typical case where you contact the bank and they say

24   here it is.

25           I have also had some involvement in

14

1    Bankruptcy Court litigation, especially in connection with

2    the foreign countries, and we have made a number of

3    appearances in the District Court at Judge Stanton's

4    request in connection with the SEC action.

5                    With respect to my fees, Your Honor, I

6    would like the record to note that I have voluntary reduced

7    my fees by 10 percent.  That is a reduction of about

8    $84,000, Your Honor.  As I indicated there is a deferral

9    of about $150,000 in the laboring case.

10                    Also, I did not bill for, I wrote off

11    approximately 176 hours, which is about another $123,000.

12    So in seeking the $759,228.75, and the approval of payment

13    of $607,383, I submit, Your Honor, those are reasonable

14    requests under the circumstances of this proceeding.

15                    As noted at paragraph 33 of my application

16    and contrary to the implication of certain objections that

17    have been filed with the Court and before the press, the

18    amounts that will be rewarded either today or at another

19    time are going to be turned over to Baker Hostetler, the

20    firm of which I am a partner.  I want to emphasize I will

21    not retain any portion of the award.

22                    I previously reported and can tell you

23    again that the general estate has been and will continue to

24    be insufficient to meet the costs of administration

25    including legal fees.  Thus, under all appropriate

15

1    sections of the statute, SIPC will be required to advance

2    those funds necessary to pay awards of compensation as it

3    has other administration costs as this case has moved

4    along.

5              In its recommendation in support of the

6    application, SIPC has acknowledged that it will advance the

7    necessary funds.

8              Accordingly, I request that the Court award

9    the amounts requested and approved by SIPC.

10             Your Honor, I would like to address a

11   certain number of objections that have been filed.   I will

12   limit my remarks to factual matters.   I do not propose to

13   respond to personal attacks as its contained in the papers

14   and filed by certain of the objectors.

15             But my silence, should not be construed,

16   Your Honor, as an agreement with any of those comments.

17             First, I disagree with the comments that

18   have been made that SIPC is insurance, rather, when raised

19   by statute, SIPC provided an advance to the Trustee to make

20   payments up to the statuary maximum.   So that they don't

21   have to wait until the end of the case, or later on in the

22   case to get a distribution of.

23             Those advances, Your Honor, are deemed a

24   supplement to customer property.

25             Number 2.   Contrary to allegations in a

16

1    number of the objections, Your Honor, I will not be

2    receiving 3 percent of any recovery.   Your Honor has

3    already addressed that, so I won't belabor that point.

4              With respect to a number of other

5    objections, questions have been raised about the claims

6    processing, and why it is necessary to review claims and

7    research them.   That has to do with a disagreement over

8    the methodology of how claims are being handled.

9              But I like to give you a couple of

10   examples, Your Honor, as to why it is necessary to review

11   and research claims.

12             We have many accounts in a single name and

13   in other names but we get more than one claim for that

14   account.   We just can't pay each account whatever it

15   claims it should be paid.   That has to be reviewed so we

16   could determine who the right claimant is, et cetera.

17             We have also received claims from customers

18   that don't comport with the documents that they submitted

19   or in some cases they just submit a signed piece of paper

20   with no information.   Those all need to be reviewed, Your

21   Honor, so that we know what the right amount is, who the

22   right claimant is, et cetera.

23             We have also discovered that several

24   hundred claimants who should be treated as customers

25   submitted claims as general creditors.   So we now in

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 69 of 229

17

1    reviewing all the general creditor claims to right that if

2    someone was a customer filed the wrong form we don't want

3    to penalize them, so the claims processing people are now

4    reviewing that.

5              We have also found that numerous claims

6    were filed both by customers and by attorneys here with the

7    Bankruptcy Court, not with the claims agent.   As long as

8    those claims were filed before July 2, which was the bar

9    date, we are going to honor them.   But, again, we had to

10   collect them from the Court and they have to now be melded

11   into our system.

12             So I just wanted to give you a little bit

13   of a flavor of some of the issues that we are dealing with

14   here.   Mr. Sheehan, I am sure we will deal with some of

15   the other objections.

16             If you have any questions, I would be

17   pleased to answer them.

18             THE COURT:    Thank you.

19             MR. SHEEHAN:    Your Honor, on behalf of the

20   Baker Hostetler we have an application here this morning

21   for fees in the amount of $14,662,319, less the 20 percent

22   retention that Mr. Picard alluded to that the firm has

23   agreed to.   The firm has also agreed to a 10 percent

24   voluntary reduction of the fees in this case.

25             I will not repeat, obviously, what Mr.

08-01789-cgm   Doc 4169-11   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit J
to the Chaitman Decl.   Pg 70 of 229

18

1   Picard has just said or enter into any great detail this

2   morning what has already been laid out in quite some detail

3   in the interim report, we submitted the report and it is

4   available for everyone to see.

5            I think it is important, given the scope

6   and size this which justifies the reasonable nature of our

7   application here today to at least highlight to your Honor

8   some of the things we have encountered here that make this

9   a very, very unusual case.

10           First of all, this is a case that has been

11  talked about in the press incessantly and is one that

12  concerns one of the largest frauds that ever took place in

13  the United States.

14           That is by any measure absolutely true.

15  We do know that to be a fact by virtue of the investigation

16  that has been undertaken here.   That investigation doesn't

17  just require us to look at the November 30, 2008 statements

18  and end the inquiry with regard to the nature and extent of

19  the fraud perpetrated by Madoff and his colleagues.

20           Needless to say we have to go behind that.

21  We have to investigate that clearly and thoroughly, first

22  and foremost because he is a crook.   What are we supposed

23  to do, Your Honor, rely upon the crook's last statement and

24  that becomes somehow the be all and end all of how we

25  investigate this case, would anyone in their right mind

19

1    make that suggestion?

2              Obviously, we have to look behind that

3    fiction and find out what the truth is, Your Honor, and the

4    truth requires us to look back, look back into time,

5    recreate exactly what happened.

6              We know that Mr. Madoff is a liar.   We

7    know that he has lied incessantly throughout his career.

8    Are we supposed to rely upon his allocations?  I don't, Mr.

9    Picard doesn't.  We know it is not true.

10             We are going beyond that.   We are looking

11   to see everything that we can with regard to each of the

12   customers.   We owe that to all of those customers who left

13   their money in there relying upon his lies, and they

14   deserve to have a complete and adequate investigation, so

15   that at the end of the day, Your Honor, they at least get

16   back a fair share of what they entrusted to Mr. Madoff.

17             That requires us to look at hundreds of

18   thousands of records.   These records, as I say, can't be

19   just the customers' statements.  As the SIPA statute says

20   we need to look at the books and records of the Debtor when

21   we make this decision and that requires us to look at bank

22   statements, to be able to trace cash in and cash out.

23   There were no securities, and that is the bedrock of this

24   case, cash in and cash out.   So at the end of the day we

25   can't rely on what Mr. Madoff says is in and out, we have

20

1    to look at bank records, third-party records, counterparts

2    and everyone else with regard to each claimant.

3              Each claimant here, and there was not very

4    many of them, are not very new to the scene.    Many had

5    been there for years, if not decades.    Many of them had

6    accounts they received from others, accounts that they

7    received from their father, their brother, their sister or

8    some other relative.    Well, that account was a fiction.

9    The father didn't have any cash.    What he had was false

10   profits.    His money in was gone years ago.    What are we

11   supposed to do?  Just ignore all of that?  Accept that?  Or

12   are we supposed to go and investigate that?

13             And that is exactly what we have been

14   doing, and a tremendous amount of time spent by Baker

15   Hostetler as well as the foreign counsel and the other

16   consultants we have hired has been spent on that effort.

17   And so we could find out what the truth is and make the

18   payments to those people under the statute, and in

19   accordance with the law and that is what we are doing.

20             Those customer claims that we received, the

21   almost 16,000 of those deserve, each and every one of them

22   to be examined carefully to arrive at exactly what the

23   facts are, not just to accept facially what one might

24   suggest should be the be all and end all.    Each customer

25   deserves to have in this horrible situation the ability to

21

1    know that this Trustee and his counsel have looked

2    carefully at those records, that we looked at the entire

3    history of them.

4            We are trying to assist them in accordance

5    with the statutes, the moneys under SIPA and from the

6    customers' funds be accumulated by the Trustee in excess of

7    $1 billion, soon-to-be 1 billion 5 and growing throughout

8    the course of the litigation that we commenced in this

9    case.

10           Our goal is to create the largest customer

11   fund possible so we could return not just to the people

12   entitled to the SIPA advantages of $500,000, but in

13   significant dollars through the customer fund administered

14   by Mr. Picard.

15           That requires us to look at the customer

16   claims carefully, Your Honor.   It is suggested that we are

17   not moving promptly.   Promptly is a subjective term.   If

18   someone went in and looked at all the work required to look

19   at all of this and find out what the background is, I would

20   suggest we are moving with all due diligence of deliberate

21   speed, and everything we could do to make this move as fast

22   as we have.   We have already paid out over $300 million.

23   We have allowed claims over $3 billion.

24           Those claims have already been adjudicated.

25   We have looked at them carefully, finished their claim.

22

1    Each of those people have received $500,000 or less

2    depending on the amount of their allowed claim.

3              That is just one aspect of this case, Your

4    Honor, requiring the assistance not only of Mr. Picard

5    reviewing these and looking at them, but also his counsel

6    and the people we have hired as our claims agent in it case

7    as well as other investigative means that we have.

8              That is just customer claims, Your Honor.

9    And we have an array of litigation.  Some of which has

10   reached this courthouse in terms of individuals that we

11   have sued for substantial sums of money that's been

12   wrongfully received, as we allege, and we allege based upon

13   a thorough analysis of the books and records.   This is

14   just not a spurious claim.   This is one that has been

15   thoroughly researched by the Trustee and brought to this

16   Court because we believe that money should be returned,

17   returned so that they could be distributed equally on a pro

18   rata basis to all of the legitimate customers and allowed

19   claims in this proceeding.

20             We are continuing that investigation, Your

21   Honor.  Your Honor will see over the succeeding months

22   numerous litigations.   This is a case that unlike almost

23   any other will have more litigation in it than probably any

24   other case that Your Honor has before you in terms of the

25   avoidance actions we have been bringing against literally

08-01789-cgm   Doc 4169-11   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit J
to the Chaitman Decl.   Pg 75 of 229

23

1    hundreds of people.   An argument has been made that we

2    have somehow done is somehow adverse to some of the

3    customers.

4              What I have said publicly, and I will say

5    here, look at what the Trustee does.   The Trustee is not

6    suing little people.   He is not trying to hurt the little

7    guy.   We are suing people who have taken substantial funds

8    out.

9              We had settlements, as Your Honor has

10   approved, at this point, tantamount to 130 million dollars

11   from a foreign feeder fund, a very significant result in

12   this case.

13             In terms of the message it says to other

14   feeder funds that Mr. Picard will not just look back but he

15   will do everything he can to bringing the funds into the

16   estate.   That requires the full service of a lot of

17   attorneys at our firm.

18             Those records have been detailed and we

19   have given you this report because we believe we acted very

20   responsibly and reasonably in pursuing each of these

21   actions.   And not the least is the fact we have this vast

22   array of international litigation which I suspect, Your

23   Honor, as time progresses it will become even larger than

24   the domestic litigation that we have seen.

25             What we're seeing underlying these

24

1   international machinations that one could not comprehend

2   unless you have had access to all the records and see how

3   this money is moving between the banks, principals an

4   feeder funds and organizations that have no purpose other

5   than as to this.

6           This is not suggesting that you could

7   simply look at a bank statement and make a decision as to

8   what is occurring, Your Honor.  You need to have active

9   participation by lawyers, investigators and Trustees to get

10  behind the scenes and find out exactly what is happening,

11  which has cost us, as Your Honor knows, and which we have

12  already dealt with today, is the retention of counsel

13  around the world at this point and it is going to grow

14  simply because this is a fraud that went on for decades.

15          And the architect of it had an amazing

16  amount of time to create this fraud.  We are

17  deconstructing it and I think, quite frankly, I submit to

18  your Honor that the Trustee and his counsel and those he

19  has retained as consultants have in a very short period of

20  time unraveled a good deal of what is going on.  But that

21  onion has been has yet to be pierced to its core.

22          At the end of day all work that's detailed

23  in our time records and all the work we have spelled out in

24  the interim report will be submitted to you as well as to

25  the applications we have submitted here today.  The detail

08-01789-cgm   Doc 4169-11   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit J
to the Chaitman Decl.   Pg 77 of 229

25

1   exactly what I think the Trustee has been doing and why we

2   have been doing it, the purpose it is accomplishing by

3   virtue of what we are doing in this case.

4              I do want to talk a bit about the

5   objections, not because I believe they have any merit.  I

6   think, quite frankly, there's a collateral attack here.

7              One of the objections actually reargued and

8   we have made this statement to your Honor, essentially a

9   cause of action that is completed here, the motion to

10  dismiss is pending.  We do not believe this is the forum

11  for that discussion.  It will be briefed and it will be

12  argued and Your Honor will render a decision as to what the

13  net equity calculation should be in this case as decided by

14  the Trustee, but ultimately by Your Honor.

15             But an objection to our fees here is not

16  the forum in which to discuss those issues, we respectfully

17  submit.

18             Mr. Picard has indicated there are other

19  objections, and most of those emanate from a

20  misapprehension of the law.  Unfortunately, there is a lot

21  of press that is erroneous with regard to the 3 percent

22  that has actually no application in the SIPA statute and,

23  Your Honor, has already alluded to that, to the fact that

24  somehow we are going to get a piece of the action.  There

25  is no basis in the law for that, factually or otherwise.

26

1    None of these objections are accurate.

2                    Rather than deal with them any further, I

3    believe at this point Your Honor should just not ignore

4    them, everyone has an opportunity to come to this Court and

5    make their position known to your Honor, but respectfully

6    they should not stand in the way to your Honor granting

7    your application here today.

8                    Your Honor, that summarily is where I

9    believe we have come in this case to date.   We have a lot

10   more work to do, but I would respectfully request that Your

11   Honor approve our application as stated in our paper.

12                   MR. BELL:   Kevin Bell for SIPC, Your

13   Honor.

14                   Let me put in perspective what this case is

15   about.   In the 38 and three-quarter years that SIPC has

16   been in existence, SIPC has advanced two Trustees 520

17   million to satisfy the claims of hundreds of thousands of

18   customers who have filed claims in over 320 liquidation

19   proceedings.

20                   In this case, Your Honor, through last

21   night, SIPC has committed to advance $311 million to

22   satisfy the customers to whom the Trustee has made the

23   terminations.

24                   That is more than 60 percent, Your Honor,

25   of what SIPC has advanced throughout its history in this

08-01789-cgm   Doc 4169-11   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit J
to the Chaitman Decl.   Pg 79 of 229

27

1   case.

2               I would expect, Your Honor, that in the

3   coming weeks that that number, $520 million will be

4   exceeded in this liquidation proceeding.   That is just the

5   perspective of the dollars that SIPC is putting out for

6   customers and the dollar amount that Mr. Sheehan has talked

7   about of the allowed claims is about $3.4 billion.   That

8   means there is $3.1 billion of claims above the SIPC

9   amount.

10              And the statute clearly requires, Your

11  Honor, the Trustee and his counsel to be aggressive in

12  trying to recover each and every penny that Mr. Madoff and

13  his colleagues took from customers and disbursed worldwide.

14  That effort is required by the Securities Investor

15  Protection Act, Your Honor, and by Congress who intended

16  the Trustee to move forward.

17              Let's go back to the Chandler Act of 1936

18  and look at how 60(E) is constructed, and we can go back

19  and look at the legislative history, the paper crisis in

20  the '60s and we can look at that to see how SIPA was

21  created.

22              The whole program that Congress set up

23  where SIPC would advance funds to supplement whatever the

24  Trustee had in the customer properties.   We have submitted

25  a response to the objections in noting some of the points.

28

1    But this misimpression about the word "insurance" is

2    nowhere in the statute.   It is misleading.   It leads a

3    lot of the innocent victims to, and I have talked to a

4    number of them, to have a miscomprehension of what is

5    happening.   SIPC has used its personnel and its resource

6    to have this happen.

7                       With regard to the Trustee's applications,

8    let me be very clear.   This Court's Order, monthly

9    compensation procedure order of February 25, set forth the

10   procedures.   The Trustee and counsel have submitted to

11   SIPC on a monthly basis their invoices.   Each page of each

12   invoice has been read by the SIPC attorney on the case, by

13   me, as well by SIPC's general counsel, and we have entered

14   into dialogue with regard to some of the entries, with

15   regard to services.   There have been adjustments made with

16   regard to some of those entries.

17                       SIPC has filed its recommendation.   We

18   said we look at applications.   We look at everything in

19   this case.   The oversight that SIPC has is a public

20   responsibility.

21                       We had as you see in the response, we set

22   forth, a complete discussion at Congress when the statute

23   was amended in 1978.   I happen to have been with SIPC for

24   over 36 years.   So I have worked on hundreds of SIPC

25   liquidation proceedings and on a number of fee

29

1    applications.    I guess the three us, the general counsel

2    and I have been have an aggregate of 100 years of work on

3    SIPA matters and on fee applications.    So we bring a level

4    of expertise in reviewing this.

5                    So some of the objections, Your Honor, were

6    by our own people and by bankruptcy practitioners seem to

7    miss the mark about really what the oversight is here

8    because this is a public trust that we have that we

9    represent to the Court in each and every recommendation we

10    make, particularly in cases where it is a no asset case

11    because the legislative history shows the complete

12    discussion of that fact with regard to how Section 5 of the

13    statute, the compensation provision, was created.

14                    SIPC hopefully supports a recommendation of

15    the Trustee and of the Trustee's counsel with regard to the

16    applications that are before the Court and I would be

17    willing to answer any questions that the Court may have

18    with regard to SIPC's position.

19                    THE COURT:  Thank you.

20                    MR. BELL:    Thank you, Your Honor.

21                    THE COURT:  Does anyone want to be heard?

22                    MS. CHAITMAN:    I would like to speak now,

23    Your Honor.  My name is Helen Chaitman.  I am with the law

24    firm of Phillips Nizer.

25                    I would like to outline in detail the

30

1    objection that I have filed on behalf of Diane and Roger

2    Peskin and Maureen Ebel, the basis for which we asked the

3    Court to set a hearing at which we can prove the facts set

4    forth in the objection.

5              The objection is, in fact, an offer of

6    proof of what we would establish at the hearing and we

7    believe that Baker Hostetler and the Trustee have a

8    conflict of interest which under the established standard

9    in this Court disables them from serving in this case and

10   from receiving any compensation.

11             As a bankruptcy Trustee, it is fundamental

12   that the Trustee has a fiduciary duty to the customers of

13   this estate.

14             However that duty, Your Honor, is even more

15   important here because this is a proceeding under the

16   Securities Investor Protection Act which as SIPC has

17   acknowledged was passed in order to protect customers.

18             The protection to the customers under SIPA

19   is that the Trustee will promptly pay customers up to

20   $500,000 in SIPC insurance based upon their last account

21   statements.   That what the statute says, Your Honor, and I

22   understand that the term SIPC insurance is no longer

23   embraced by SIPC, but for the Trustee, but, in fact, it was

24   on the website until this case came down that SIPC started

25   to ignore the statute under which it was enacted.   It was

31

1    always referred to as SIPC insurance and it is not simply

2    an advance to customers, it is an advance to customers

3    where there are no assets in the case.   It is a guaranteed

4    payment to customers up to $500,000 based upon their last

5    statements.

6               I have laid out in the objection, Your

7    Honor, that under the statute there was no contemplation

8    that people would have to file claims.   The Trustee was

9    obligated to look at the last statements and honor the

10   claims.   Congress understood that there would be SIPA

11   liquidations involving crooks where the brokers had never

12   purchased the securities.

13              THE COURT:   Let me see if I understand the

14   thrust of your objection at this point.   It is A, there is

15   some kind of conflict of interest that then disables Baker

16   Hostetler and the Trustee from remaining on the case.   B,

17   that the distribution scheme as it was espoused is opposed

18   by you.

19              Frankly, I have read through your long

20   objection, and I do find it in the main it really

21   constitutes to the support of the Court for the adversary

22   proceeding that you brought which will be subject to

23   further review by this Court now.   So you are in an

24   adversarial position and I don't believe it is the

25   appropriate for you to use that as the a fulcrum to object

32

1    to fees here.

2            We will deal with the motion to dismiss,

3    which is set before the Court when, in September or some

4    time later on in the month.  But the only thing that

5    really remains with respect to your objection is the

6    disinterestedness of the Trustee and counsel.

7            MS. CHAITMAN:  Well --

8            THE COURT:  If you want to speak

9    specifically to that I will be glad to entertain that.

10            MS. CHAITMAN:   I would like to, Your

11    Honor, because if the Trustee and Baker Hostetler were

12    acting solely in the interests of SIPC, they would have

13    handled their retention totally differently.

14            They have defied -- SIPA is not a Chinese

15    menu where you could take one from column A and one from

16    column B.

17            The statute mandates prompt payment of

18    customer claims based upon their last statements.  The

19    statute even prohibits SIPC from changing the definition of

20    net equity which is defined, in essence, as the last

21    statement.  All of this is laid out in the objection.

22            If SIPC chose not to follow the statute for

23    the first time in its 38 and-a-half years  --

24            THE COURT:  That is the issue that is drawn

25    before me in the adversary proceeding, Ms. Chaitman.

33

1          MS. CHAITMAN:  There is more than that.

2          THE COURT: That is what is before me and I

3    am not trying that issue today.

4          MS. CHAITMAN:   I understand that but the

5    point is -- SIPC is running expenses at the rate of $2

6    million a week.   The Trustee and Baker Hostetler are

7    running expenses at the rate of $1 million a week.

8          A great portion of those expenses are

9    solely because they are defying the mandate in the statute.

10   So by your approving fees, Your Honor, based upon a blatant

11   defiance of their statuary obligations, you are sanctioning

12   a conflict of interest.

13         What is important in this case which is

14   unprecedented certainly in SIPC's history is SIPC is

15   insolvent.   It is incapable of paying its debt as they

16   become as Marie Shapiro of the SEC commission, testified on

17   July 14 in Congress --

18         THE COURT:  That is hearsay and media

19   speculation.   I am here only with respect to the

20   appropriateness of granting fees.   I am not trying the

21   other issues, Ms. Chaitman, nor am I interested in what

22   goes on before Congress because it has no effect except the

23   laws that Congress passes and Congress did pass a very

24   peculiar law, if you want to call it that, with respect to

25   SIPA.

34

1          If you look at the wording in the statutes

2     they are very clear and they give this Court, as a matter

3     of fact very little discretion.

4               MS. CHAITMAN:   Your Honor  --

5               THE COURT:  Do you have anything else, Ms.

6     Chaitman, that is not in your papers?

7               MS. CHAITMAN:   I have nothing that is not

8     in my papers, Your Honor.

9               THE COURT:  Thank you.

10               Is there any response?

11               MR. SHEEHAN:   No, Your Honor.

12               MR. BELL:   No, Your Honor.

13               THE COURT:  Does anyone else want to be

14     heard?

15               There is no response.

16               I have considered all of the responses, all

17     of the applications here before me today.   I find no merit

18     to the objections.

19               The last objector, essentially has a

20     disagreement with respect to the distribution scheme, and

21     that is an issue which is a matter that will be brought

22     before me and I would resolve it one way or the other.

23     But the Court has already held a disinterestedness hearing.

24     There was no objection at that time and there are no new

25     facts that have come forward that would change the

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 87 of 229

35

1  disinterestedness concept with respect to the fee

2  application here today.

3                  With respect to the responses that were

4  stated in the objections, they clearly lay out the fact

5  that there has been nothing shown that this Trustee is not

6  acting in good faith.    That is clear.

7                  There is nothing that has been shown that

8  this Trustee is guilty of any kind of fraud or dereliction

9  of duty, another very key important factor that the Court

10 would consider as to whether or not a Trustee should be

11 removed or his disinterestedness.

12                 We come back down to the disagreement in

13 the approach to handling the case, which is a matter that

14 is to be determined by this Court in connection with the

15 adversary proceeding that is pending before me.

16                 On the other hand, it has not been shown at

17 all that the Trustee services have been anything but

18 necessary, have been reasonable.  That have been a product

19 of decades of massive fraud, and I don't think there is any

20 real argument that this is the largest fraud committed in

21 the United States and I don't go back down to anything AD

22 or that appear in the rest of the world, but I am sure this

23 comes close to the top.

24                 And many of the objections that have been

25 alleged are based upon the assumption that by granting fees

36

1    here that in some way it affects the amount of funds to be

2    distributed.   That is absolutely not the case.

3             The statute even reads, and I will quote

4    from the statutes, in any case which allowance are to be

5    paid by SIPC without reasonable expectation of recoupment,

6    therefore, as provided in this chapter and there is no

7    reasonable expectation of recoupment here, and there is no

8    difference between the amounts requested and the amounts

9    recommended by SIPC, the Court awards the amounts

10   recommended by SIPC.

11            The main word "shall" is included.   I am

12   taken by that because I know the difference between may and

13   shall.   That removes a fair amount of discretion on the

14   part of the Court when SIPC agrees with and makes the

15   recommendation with respect to the applications.   So there

16   isn't any real review that court ought to be conducting.

17   But even if the Court were to it is clear that SIPC is the

18   payor.

19            SIPC is the one whose ox is gored because

20   no funds of the claimant or of the victims will be impacted

21   by the granting of fees here, and it is clear from the

22   record before me that SIPC has not been supine as an

23   overseer.   And in each case of the applications that have

24   been run through SIPC, SIPC has reviewed them and has

25   caused an adjustment, and I assume an adjustment downward

08-01789-cgm   Doc 4169-11   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit J
to the Chaitman Decl.   Pg 89 of 229

37

1    in the request.

2              Therefore, there has been the form of

3    monitoring that Congress envisioned.   Now you may fault

4    Congress for the way it set this statute up.   I can fault

5    Congress in many respects.   But I do not have the power or

6    the inclination to do anything other than to implement the

7    law that is promulgated and handed down by Congress.   The

8    1978 amendments, for example, strengthened by a factor of

9    10, the hand of SIPC with respect to the conduct of these

10   cases.

11             I do not find that any basis for changing

12   this Court's view of disinterestedness exists, and I am

13   very familiar with a lot of the activities that have taking

14   place in connection with this matter.

15             As I alluded to before, this case now

16   becomes a poster child for across the board litigation in

17   that the protocols that have been developed and entered

18   into somewhat at the Court's urging and with respect to the

19   cooperation of foreign entities who have an involvement

20   here, those protocols have now found their way into the

21   international community.

22             And now from the official guidelines

23   emanating from the United Nation, the Trustee's services

24   have proven valuable in that regard and, certainly, we all

25   recognize that the fraud that has taken place over the

38

1    decades by a convicted felon has mandated a really

2    extensive forensic activity in order to justify the

3    administration of this case and the handling of the claims

4    process.

5                I note that the Trustee has modified his

6    stance of changing the view of the expectancy in the

7    granting of claims.  And while I don't care much about the

8    media attention to this case, I can't help but read the New

9    York Law Journal every morning and reading about there has

10   been a further relaxation on the distribution scheme in

11   advancing it.

12               So that the sum of the complaints with

13   respect to the acceleration and approval has been adhered

14   to, and that there is a less restrictive approach having

15   been taken with respect to the dissemination of monies.

16               The long and short of it is that despite

17   the disagreement of methodology being applied here in this

18   unique and unusual case, I do find that the services

19   rendered have been reasonable, that they have been done

20   responsibly and to this point have been with a salutary

21   effect.

22               I will approve the application.

23               MR. SHEEHAN:    Thank you, Your Honor.

24               THE COURT:  Not withstanding the fact that

25   according to the Congressional scheme I don't have even

39

1    have a choice, as other courts have held.   I don't

2    necessarily agree with that because all I would have to do

3    if I disagree with the fees is perhaps put them over, but

4    if I have to put them over and I have no basis to do that,

5    but if anyone looks at the architect of the SIPA statute

6    they will see all that does is give SIPC another

7    opportunity to come back and justify the positions that it

8    has taken.   Another waste of time.

9              But, again, that is the way Congress wrote

10   it, and that is the way I will act to administer it.

11             I will entertain an order.

12             MR. SHEEHAN:   Thank you Your Honor.

13             May I approach.

14             THE COURT: Yes.

15             That is notwithstanding, Mr. Sheehan, one

16   condition that you are too old to do this.   That was

17   contained in one of the objections.

18             MR. SHEEHAN:   I am just a spring chicken

19   compared to Mr. Picard, Your Honor.

20             THE COURT:   I have approved the order.

21             MR. SHEEHAN:   Thank you very much, Your

22   Honor.

23             MS. NANN:   Thank you, Your Honor.

24                   *      *      *

25

40

                    C E R T I F I C A T E

STATE OF NEW YORK        }
                         }    ss.:
COUNTY OF NEW YORK       }

                I, MINDY CORCORAN, a Shorthand Reporter

and Notary Public within and for the State of New York, do

hereby certify:

                That I reported the proceedings in the

within entitled matter, and that the within transcript is a

true record of such proceedings.

                I further certify that I am not related, by

blood or marriage, to any of the parties in this matter and

that I am in no way interested in the outcome of this

matter.

                IN WITNESS WHEREOF, I have hereunto set my

hand this 7th day of August, 2009.


                    _____

                    MINDY CORCORAN

# EXHIBIT C



U.S. Securities and Exchange Commission

# Office of Inspector General

## Office of Audits

# SEC's Oversight of the Securities Investor Protection Corporation's Activities



March 30, 2011
Report No. 495



OFFICE OF
INSPECTOR GENERAL

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# MEMORANDUM

March 30, 2011

**To:**  Robert W. Cook, Director, Division of Trading and Markets
Carlo V. di Florio, Director, Office of Compliance Inspections and
Examinations
Mark D. Cahn, General Counsel, Office of the General Counsel

**From:**  H. David Kotz, Inspector General, Office of Inspector General (OIG)

**Subject:**  *SEC's Oversight of the Securities Investor Protection Corporation's
Activities,* Report No. 495

This memorandum transmits the U.S. Securities and Exchange Commission
OIG's final report detailing the results on our audit of the SEC's oversight of the
Securities Investor Protection Corporation's activities.  This audit was conducted
as part of our continuous effort to assess management of the Commission's
programs and operations and as part of our annual audit plan.

The final report contains 12 recommendations which if fully implemented will
enhance the SEC's monitoring of the Securities Investor Protection Corporation's
activities.  The respective offices concurred with all the report's
recommendations.  Your written responses to the draft report are included in
Appendix V.

Within the next 45 days, please provide the OIG with a written corrective action
plan that is designed to address the recommendations.  The corrective action
plan should include information such as the responsible official/point of contact,
timeframes for completing required actions, and milestones identifying how you
will address the recommendations.

Should you have any questions regarding this report, please do not hesitate to contact me.  We appreciate the courtesy and cooperation that you and your staff extended to our auditor during this audit.

Attachment

cc:    Kayla J. Gillan, Deputy Chief of Staff, Office of the Chairman
       Luis A. Aguilar, Commissioner
       Troy A. Paredes, Commissioner
       Elisse B. Walter, Commissioner
       Diego T. Ruiz, Executive Director, Office of the Executive Director
       Lori J. Schock, Director, Office of Investor Education and Advocacy
       Jacob H. Stillman, Solicitor, Office of the General Counsel
       John S. Polise, Associate Director, Office of Compliance Inspections and
         Examinations
       John H. Walsh, Associate Director and Chief Counsel, Office of
         Compliance Inspections and Examinations
       John M. Ramsay, Deputy Director, Division of Trading and Markets

# SEC's Oversight of the Securities Investor Protection Corporation's Activities

## Executive Summary

**Background.**  As a result of the collapse or near collapse of several broker-dealers in the late 1960s,[1] Congress enacted the Securities Investor Protection Act (SIPA) in 1970 to provide investors protection against losses caused by the failure of broker-dealers.  SIPA created the Securities Investor Protection Corporation (SIPC), which is a not-for-profit membership corporation.[2]  SIPC or a SIPC employee either acts as trustee or works with an independent court-appointed trustee in liquidations of troubled brokerage firms to recover funds for investors with the assets of bankrupt or financially troubled brokerage firms.[3]  All broker-dealers registered with the U.S. Securities and Exchange Commission (SEC or the Commission) under Section 15(b) of the Securities Exchange Act of 1934 are members of SIPC with certain limitations.[4]  The Commission is responsible for monitoring the activities of SIPC.  Pursuant to SIPA, the Commission also has delegated authority to conduct inspections of SIPC,[5] review SIPC annual reports,[6] and approve SIPC's bylaws,[7] rules,[8] and any amendments to the bylaws and rules.[9]

**Objectives.**  The audit's objectives were to assess if SEC monitors SIPC's activities in accordance with governing legislation.  In addition, our audit was performed to examine if the Commission performs periodic and systematic inspections of SIPC's activities.  Our audit also focused on determining whether the Commission conducts meaningful reviews of SIPC's annual reports.  The Office of Inspector General (OIG) also determined where improvements and best practices could be implemented for the SEC's oversight process of SIPC.

**Prior OIG Audit Report.**  The OIG performed an audit of the SEC's oversight of SIPC in 2000[10] and made 11 recommendations in its report on that audit.  The Division of Trading and Markets (TM),[11] the Office of Compliance Inspections and Examinations (OCIE), and the Office of Investor Education and Advocacy (OIEA)[12] implemented most of the prior OIG report's recommendations.  However, TM has

---

[1] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 7.
[2] 15 U.S.C. §§ 78ccc(a)(1) and (2).
[3] http://www.sipc.org/media/release2.cfm. *See also* 15 U.S.C. § 78eee(b)(3).
[4] 15 U.S.C. § 78ccc(a)(2).
[5] 15 U.S.C. § 78ggg(c)(1).
[6] 15 U.S.C. § 78ggg(c)(2).
[7] 15 U.S.C. § 78ccc(e)(1).
[8] 15 U.S.C. § 78ccc(e)(2).
[9] 15 U.S.C. §§ 78ccc(e)(1) and (2).
[10] OIG Report No. 301, *Oversight of Securities Investor Protection Corporation* (Mar. 31, 2000).
[11] TM was known as the Division of Market Regulation in 2000.
[12] OIEA was known as the Office of Investor Education and Assistance in 2000.

not implemented the OIG's recommendation to inform SIPC that it should provide written documentation of its reasons for denying coverage in particular cases upon the request of TM and the Division of Enforcement. TM stated that it provided a copy of the issued OIG audit report to SIPC.[13] Additionally, TM and OCIE have not implemented the OIG's recommendation to decide on a review schedule and inspection scope for future inspections of SIPC as of this date. See Finding 2 for further discussion.

Finally, TM, OCIE, and the SEC's New York Regional Office initially implemented the OIG's recommendation to conduct periodic briefings on SIPC-related issues.[14] However, they currently communicate on an as-needed basis and no longer conduct periodic briefings because such briefings were deemed to be inefficient in years when there were no SIPC liquidations, such as 2007,[15] 2009,[16] and 2010.[17]

**Results.** The OIG found that the SEC's oversight of SIPC is generally in compliance with SIPA. However, our audit found that significant improvements could be made to enhance the process of the SEC's monitoring of SIPC. We found that TM and the Office of the General Counsel (OGC) currently do not have adequate written procedures and policies for monitoring SIPC's activities. The written procedures and policies in place for TM's oversight of SIPC are limited to a 1999 memorandum that merely lists the SEC's responsibilities for monitoring SIPC pursuant to SIPA.[18] The 1999 memorandum does not provide detailed information about TM's internal procedures for oversight activities, such as how to process proposed bylaws or amendments that SIPC submitted or how reviews of SIPC's annual reports (including SIPC's financial statements) are to be performed. In addition, we found that some of the limited information contained in the 1999 memorandum is outdated.

Our audit also found that there is inadequate documentation for the SEC's oversight role in OGC. OGC provides legal guidance to TM related to SIPA liquidations and monitors SIPA proceedings that are handled by independent court-appointed trustees and SIPC. Our audit revealed that internal policies or procedures regarding OGC's role relating to SIPC's oversight are not adequately documented.[19] Moreover, during the timeframe in which we conducted our audit, there was a significant staff turnover in the OGC bankruptcy group, as the OGC

---

[13] SEC, memorandum to the OIG, *Information Request on Implementation of Prior OIG Recommendations*, Jan. 24, 2011.

[14] *Id.*

[15] According to SIPC's annual report for 2007. *See* http://www.sipc.org/pdf/SIPC_Annual_Report_2007_FINAL.pdf.

[16] According to SIPC's annual report for 2009. *See* http://www.sipc.org/pdf/2009%20Annual%20Report.pdf.

[17] According to the OIG's review of SIPC's website and inquiry with TM.

[18] TM memorandum, *The Commission's Oversight Role of the Securities Investor Protection Corporation ("SIPC")*, Jun. 24, 1999.

[19] OGC prepared a memorandum for the Commission related to entering notices of appearance in SIPA liquidations. The memorandum briefly discusses OGC's monitoring of SIPA liquidations and reviewing fee applications. However, the memorandum is limited to certain matters and does not list other responsibilities.

attorney who provided oversight of SIPC for a number of years retired and was replaced by another attorney. Due to the inadequate documentation of internal OGC procedures and policies, we found opposing opinions regarding how SIPC monitoring activities should be performed. For instance, the new OGC attorney questioned whether he should conduct certain monitoring efforts that the previous attorney believed were effective mechanisms for scrutinizing SIPA liquidations, stating his opinion that such efforts would be too time-consuming for large SIPA liquidations.

Our audit further found that the SEC does not inspect SIPC's activities in any systematic fashion. The SEC last performed a full inspection of SIPC in 2003 and a follow-up inspection in 2005. Despite having made six findings in its 2003 inspection, the SEC does not have any definite plans to inspect SIPC in the near future.

We found that the Government Accountability Office (GAO) performed an audit of SIPC in 1992, which included a review of the SEC's monitoring of SIPC.[20] In that audit, GAO found that since 1985 the SEC had evaluated SIPC's operations only one time and that the SEC had not followed up on the 1985 evaluation to determine if SIPC addressed its recommendations. GAO recommended that the SEC periodically review SIPC's operations and its efforts to ensure timely and cost-effective liquidations.[21] In response to this recommendation, TM agreed to inspect SIPC "every four to five years."[22] The OIG performed an audit of the SEC's oversight of SIPC's activities in March 2000. The OIG found that since SIPC's inception in 1970, the SEC had inspected SIPC only two times, once in 1985 and a second time in 1994. The OIG also identified several areas not addressed in past SIPC inspections that could improve oversight effectiveness and recommended that TM and OCIE decide on a review schedule and inspection scope for future SIPC inspections. In response to this recommendation, TM and OCIE agreed to prepare a review schedule and inspection scope for future SIPC inspections. Notwithstanding this agreement and this recommendation being closed, our inquiry with TM and OCIE regarding this matter revealed that TM and OCIE had never developed a review schedule or an inspection scope for future SIPC inspections.

In the SEC's 2003 inspection of SIPC, the SEC identified several deficiencies in SIPC's operations regarding its controls over fees, an improperly denied claim, internal policies and guidance, education initiatives, and funding options. Yet without additional inspections, the SEC is unable to ensure that these deficiencies have been appropriately addressed. The SEC has indicated that as a result of its involvement with the liquidations of Lehman Brothers, Inc. (Lehman) and Bernard L. Madoff Investment Securities, LLC (Madoff), it is not

---

[20] GAO, *Securities Investor Protection: The Regulatory Framework Has Minimized SIPC's Losses,* GAO/GGD-92-109 (Sept. 28, 1992).

[21] *Id.* at 62.

[22] OIG Report No. 301, *Oversight of Securities Investor Protection Corporation* (Mar. 31, 2000), p. 5.

necessary to conduct further inspections in the near future. Due to the lack of periodic and systematic inspections of SIPC by the SEC, 14 liquidations,[23] from 2003 to date, have not been subject to the scrutiny of an SEC inspection.[24]

The audit also found that the SEC does not perform a review of trustee fees on a systematic basis. We further found that such reviews are particularly necessary because of the statutory structure in place regarding trustee fees, which provides for few, if any, limits on the fees that may be awarded. First, although SIPA liquidations are similar to ordinary bankruptcy cases, it does not provide any limit on the amount of trustee fees in SIPA liquidations, unlike bankruptcy cases. Second, under SIPA, where payments are made out of the SIPC fund, courts have no discretion whatsoever to limit fees that SIPC has recommended for trustees or their counsel. Thus, even if a court finds the amount of fees awarded to the trustee to be excessive, it is required to approve such excessive fees if SIPC determines that the fees are reasonable. We found that in one case, a Southern District of New York bankruptcy judge deemed fees to be awarded to the trustee in a liquidation to be excessive, but found that he had no choice but to approve the fees.[25] In another instance, a 1974 case decided prior to the amendment of SIPA in 1978,[26] a court refused to allow SIPC to pay what it deemed excessive trustee fees. In this case, a Southern District of New York judge stated, "[We] simply cannot and will not blindly acquiesce—as SIPC apparently has done—in assessing the fees requested against the trust fund administered by SIPC. This case points up the probable need for legislative readjustment of the SIPA and the functions of its administrators."[27] The Southern District of New York judge further stated that, "To be sure, the Trustee and his counsel were additionally faced with somewhat unenviable task of uncovering Charisma's assets—which here totaled less than $15."[28] Third, even where SIPC advances the funds and there is reasonable expectation of recoupment, the statute provides the courts with only limited discretion.

In addition, we found that significant criticism and concern have been expressed about the amount of trustee fees awarded in the two largest liquidations in SIPC's history, Lehman and Madoff. According to the latest published report, the fees paid to the trustee and his counsels processing the Lehman claims for the period from September 2008 to September 2010 (24 months) totaled

---

[23] According to the OIG's comparison of the liquidations reviewed by the SEC based on OCIE's inspection records and the liquidations initiated in 2003 and 2004, as noted in SIPC's annual reports for 2003 and 2004. *See* http://www.sipc.org/who/annual.cfm for SIPC's 2003 and 2004 annual reports.

[24] OGC stated that the predecessor attorney monitored the 14 liquidations to ensure that they were processed timely. The OIG was unable to verify whether such monitoring occurred because there was no evidence of review.

[25] *See In re First State Securities Corp.*, 48 B.R. 45 (Bankr. S.D. Fla. 1985).

[26] TM stated that, "The Court had discretion to reject fees when this case was decided. Congress overruled this case when it amended the SIPA in 1978. This case was relied upon by Congress to mandate that recommendations by SIPC would be binding on the court in 'no-assets cases' unless it results in a controversy with the applicant."

[27] *Securities Investor Protection Corp. v. Charisma Sec. Corp.*, 371 F. Supp. 894, 899 (S.D.N.Y. 1974), *aff'd*, 506 F.2d 1191 (2d Cir. 1974).

[28] *Id.*

approximately $108 million.[29]  According to the fourth interim fee application, as of September 30, 2010, the entire administrative fees, including fees for accountants, consultants, etc., totaled approximately $420 million.[30]  We also found that the fees paid to the trustee and his counsels processing the Madoff claims for the period from December 2008 to September 2010 (21 months) totaled approximately $102 million.[31]  The OIG's review of the trustee fee chart that SIPC prepared revealed that the hourly rate for trustees assigned to the Madoff case ranged from $698 to $742.  For the Lehman liquidation, SIPC's trustee fee chart combined both the trustee's and the counsels' time, and the hourly rate ranged from $437 to $527.  Moreover, the fees paid to date for both the Lehman and Madoff liquidations are a mere fraction of the amounts that will eventually be sought because while there has been significant progress with respect to resolving certain customer claims, significant work relating to customer claims with pending litigation remains to be done.  Because the outcome of the Lehman liquidation is uncertain and SIPC is advancing its own funds to pay the administrative expenses for the Madoff liquidation, the possibility exists that SIPC could deplete its $2.5 billion fund.  If the SIPC fund is or reasonably appears to be insufficient, the SEC is authorized to make loans to SIPC by issuing the Secretary of the Treasury notes or other obligations in an aggregate amount not to exceed $2.5 billion.[32]

Finally, our audit disclosed that many investors are still confused about SIPA coverage.  As indicated by TM and evidenced by OIEA's log of complaints and questions regarding SIPC from investors, it is difficult for investors to understand protection against losses available under SIPA and which securities are covered under SIPA.  We found that certain public service campaigns by SIPC do not fully describe exceptions to SIPA coverage and are misleading.  Due to various factors that determine coverage under SIPA, it is difficult to explain limitations of SIPA and inform investors.  In addition, many investors do not know about SIPA until they become aware of the failure of their broker-dealer.

**Summary of Recommendations**.  Our audit determined that several improvements in the SEC's monitoring of SIPC's processes are needed to ensure proper oversight of SIPC by the SEC pursuant to SIPA.

Specifically, we recommend the following:

> (1) TM should document its procedures and processes for its oversight and monitoring of SIPC pursuant to SIPA.

---

[29] "Trustee's Fourth Interim Report for the Period May 11, 2010 Through October 26, 2010," Exhibit 2, last accessed Mar. 26, 2011, http://dm.epiq11.com/LBI/Project/default.aspx#.  *Go to* Public Reports/Trustee's Interim Reports to the Court/Trustee's Fourth Interim Report: October 26, 2010.

[30] *Id.*

[31] "Trustee's Fourth Interim Report for the Period Ending September 30, 2010," last accessed Mar. 1, 2011, http://www.madofftrustee.com/documents/FourthInterimReport.pdf. *See* "Cash Disbursement" chart located in the back of the Madoff trustee's Fourth Interim Report.

[32] 15 U.S.C. §§ 78ddd(g) and (h).

(2) TM should complete its efforts to update its internal memorandum which describes its oversight responsibilities under SIPA and include its current practices and, where appropriate, the legislative amendments that were made to SIPA in July 2010 by the Dodd-Frank Wall Street Reform and Consumer Protection Act.

(3) OGC should consult with TM to clarify its role in monitoring SIPC and document the responsibilities and procedures it follows in regard to the Commission's oversight of SIPC.

(4) OGC should consider the costs and benefits related to certain activities that the retired attorney performed and determine what, if any, other activities are appropriate to adequately monitor SIPC.

(5) TM and OCIE should conduct meetings, on at least an annual basis, to determine when an inspection of SIPC should occur, based on the ongoing liquidations, to ensure systematic and risk based monitoring of SIPC's operations.  In these meetings, TM and OCIE should develop a schedule for future inspections based upon objective criteria or defined risk-factors, such as conducting inspections based upon the number of SIPC liquidations.

(6) TM and OCIE should perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to the next inspection of SIPC, as they did prior to the commencement of the 2003 inspection of SIPC.  The scope of each future inspection should take into consideration the risk assessment conducted prior to the inspection.

(7) TM, in coordination with OGC, should conduct additional oversight of SIPC's assessments of the reasonableness of trustee fees and encourage SIPC to negotiate with outside court-appointed trustees more vigorously to obtain a reduction in fees greater than 10 percent.

(8) The bankruptcy group in OGC and TM should decide on the scope and frequency of the Commission staff's monitoring of SIPC's assessments of the reasonableness of trustee fees paid by SIPC, rather than relying only on inspections of SIPC, which do not occur on a systematic basis.

(9) TM, in consultation with the Commission, shall determine whether to request that Congress modify SIPA to allow bankruptcy judges who preside over SIPA liquidations to assess the reasonableness of administrative fees in all cases where administrative fees are paid by SIPC.

(10)    TM, in coordination with OIEA, should encourage SIPC to designate an employee whose responsibilities include improving investor education and preventing further confusion among investors about coverage available under SIPA.

(11)    TM should support SIPC's efforts to improve investor education, including encouraging SIPC to strongly consider and, as appropriate, implement OIEA's suggestions to improve investor awareness.

(12)    TM, in coordination with OIEA and in consultation with the Commission, should utilize more effective methods to communicate with investors in case of the failure of broker-dealers, such as notifying investors of the status of the Commission's efforts throughout the liquidation process or designating an employee, as appropriate, who can communicate directly with investors on matters unique to each liquidation case.

A detailed list of our recommendations can be found in Appendix IV.

# TABLE OF CONTENTS

Executive Summary ................................................................................................. iv

Table of Contents ................................................................................................... xi

**Background and Objectives** ............................................................................... 1
    Background ........................................................................................................ 1
    Objectives ......................................................................................................... 6

**Findings and Recommendations** ........................................................................ 7
    Finding 1:  TM and OGC Do Not Maintain Adequate Written Procedures
    and Policies for Oversight of SIPC .................................................................... 7
              Recommendation 1 .................................................................... 9
              Recommendation 2 .................................................................... 9
              Recommendation 3 .................................................................... 9
              Recommendation 4 .................................................................. 10

    Finding 2: TM and OCIE Do Not Inspect SIPC's Activities in a Systematic
    Fashion ........................................................................................................... 10
              Recommendation 5 .................................................................. 16
              Recommendation 6 .................................................................. 16

    Finding 3: The SEC Does Not Review Fees SIPC Pays to Court-
    Appointed Trustees on a Periodic or Systematic Basis .................................... 17
              Recommendation 7 .................................................................. 26
              Recommendation 8 .................................................................. 27
              Recommendation 9 .................................................................. 27

    Finding 4: SIPA Investor Education Coverage Still Needs Improvement ......... 28
              Recommendation 10 ................................................................ 31
              Recommendation 11 ................................................................ 31
              Recommendation 12 ................................................................ 32

**Appendices**
    Appendix I:  Acronyms/Abbreviations ............................................................. 33
    Appendix II: Scope and Methodology ............................................................. 34
    Appendix III: Criteria ...................................................................................... 36
    Appendix IV: List of Recommendations .......................................................... 37
    Appendix V: Management's Comments ........................................................... 40
    Appendix VI: OIG Response to Management's Comments ............................... 48

# Background and Objectives

## Background

In 1970, several prominent broker-dealers, including Walston & Co., Bache & Co., McDonnell & Co., and F.I. duPont, Glore Forgan & Co.,[33] became insolvent or experienced near collapse.  From August 1970 to December 1970, three members or former members of the New York Stock Exchange were forced to go into bankruptcy or to commence liquidation proceedings.[34]  On December 30, 1970, Congress created the Securities Investor Protection Corporation (SIPC) to provide protection against losses to customers from the failure of a securities firm under the Securities Investor Protection Act (SIPA).[35]  SIPA was created to establish a substantial reserve fund that would provide protection to customers of broker-dealers and to reinforce investors' confidence in the securities industry.[36]

**Organizational Structure of SIPC.** SIPC is a not-for-profit membership organization[37] that does not regulate its members or examine their financial condition.[38]  All broker-dealers registered with the U.S. Securities and Exchange Commission (SEC or the Commission) under Section 15(b) of the Securities Exchange Act of 1934, are members of SIPC, with the following exceptions:

> (i) Persons whose principal business, in the determination of SIPC, taking into account business of affiliated entities, is conducted outside the United States and its territories and possessions;

> (ii) Persons whose business as a broker or dealer consists exclusively of (I) the distribution of shares of registered open end investment companies or unit investment trusts, (II) the sale of variable annuities, (III) the business of insurance, or (IV) the business of rendering investment advisory services to one or more registered investment companies or insurance company separate accounts; and

> (iii) Persons who are registered as a broker or dealer pursuant to section 78o(b)(11)(A) of this title.[39]

SIPC has a board consisting of seven directors who determine policies that govern its operations.[40]  SIPC's board of directors is made up of five directors who are appointed by the President of the United States and subject to the U.S.

---

[33] SEC, *Unsafe and Unsound Practices of Brokers and Dealers* (Dec. 1971), pp. 63-65.
[34] H.R. Rep. No. 91-1613 (1970).
[35] *Id.*
[36] *Id.*
[37] 15 U.S.C. §§ 78ccc(a)(1) and (2).
[38] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 7.
[39] 15 U.S.C. § 78ccc(a)(2)(A).
[40] 15 U.S.C. § 78ccc(c)(1).

Senate's approval.[41]  Three of the five directors represent the securities industry and two are from the general public.[42]  One of the five directors is appointed by the Secretary of the Treasury and another director is appointed by the Federal Reserve Board.[43]  The Chairman and the Vice Chairman of SIPC's board of directors are appointed by the President from the public directors.[44]

**SIPC's Role.**  Pursuant to SIPA, SIPC or a SIPC employee either acts as a trustee or works with an independent court-appointed trustee in liquidations of troubled brokerage firms to recover funds for investors with assets held by bankrupt or financially troubled brokerage firms.[45]  The customers of a failed brokerage firm may receive all non-negotiable securities that are already registered in their name or negotiable securities that are in the process of being registered in their name.[46]  SIPA protects the custody function that brokerage firms perform for customers; however, it does not provide protection against a decline in value of any investment, even if the SIPC member defrauded the customer into purchasing the investment.[47]

**SIPC Fund.**  SIPC maintains a fund that consists of assessments paid by SIPC members[48] and interest income earned on SIPC investments.  Upon consultation with self-regulatory organizations, SIPC determines assessments based on the amount necessary to maintain the fund and repay any borrowings by SIPC.[49]  If the SIPC fund is insufficient for payments to customers who have valid SIPA claims, SIPA allows SIPC to borrow from the Commission, which in turn may borrow up to $2.5 billion from the Department of the Treasury.[50]  The SIPC fund may be used to cover valid customer claims against a failed broker-dealer, to pay the costs of administering the liquidation of an estate of a failed broker-dealer, and for other purposes.[51]  Advances from the SIPC fund are limited to $500,000 per customer for claims,[52] and up to $250,000 of the $500,000 can be used to satisfy claims for cash.[53]

**SIPA Coverage.**  SIPA defines "customer" as "any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person

---

[41] 15 U.S.C. § 78ccc(2).
[42] *Id.*
[43] *Id.*
[44] 15 U.S.C. § 78ccc(c)(3).
[45] http://www.sipc.org/media/release2.cfm. *See also* 15 U.S.C. § 78eee(b)(3).
[46] *Id.*
[47] Letter from Stephen Harbeck, President of SIPC, to Ralph Janvey, Receiver of Stanford, August 14, 2009.
[48] 15 U.S.C. § 78ddd(c)(1).
[49] 15 U.S.C. § 78ddd(c)(2).
[50] 15 U.S.C. § 78ddd(g) and (h).
[51] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 8.
[52] 15 U.S.C. § 78fff-3(a).
[53] 15 U.S.C. § 78fff-3(d).

for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer."[54]

Under SIPA, the term "security" means:

> "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, any collateral trust certificate, preorganization certificate or subscription, transferable share, voting trust certificate, certificate of deposit, certificate of deposit for a security, or any security future as that term is defined in section 78c(a)(55)(A) of this title, any investment contract or certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or mineral royalty or lease (if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933 [15 U.S.C. 77a et seq.]), any put, call, straddle, option, or privilege on any security, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase or sell any of the foregoing, and any other instrument commonly known as a security."[55]

SIPA coverage extends to those persons who meet the definition of customer and to property that meets the definition of security.[56]

SIPA liquidations are conducted in U.S. Bankruptcy Courts,[57] with the exception of certain cases where SIPC can institute a direct payment proceeding if certain criteria are met.[58]

**SEC's Oversight.**  The Commission monitors the activities of SIPC.  Pursuant to SIPA, the Commission also has the authority to conduct inspections of SIPC,[59] review SIPC annual reports,[60] and approve SIPC's bylaws,[61] rules,[62] and amendments to the bylaws and rules.[63]  The Office of Broker-Dealer Finances in

---

[54] 15 U.S.C. § 78lll(2).

[55] 15 U.S.C. § 78lll(14).

[56] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 9.

[57] 15 U.S.C. § 78eee(b)(2) and (4).

[58] 15 U.S.C. § 78fff-4.  According to SIPC, Task Force Materials, Tab 3. *Topics and Issues*, E. *Direct Payment Procedure*, *Direct Payments* (single-page, no date), "in certain situations, SIPC may choose to use an out-of-court Direct Payment Procedure instead of initiating a liquidation proceeding.  The Direct Payment Procedure allows SIPC to act quickly and inexpensively to return property to customers."

[59] 15 U.S.C. § 78ggg(c)(1).

[60] 15 U.S.C. § 78ggg(c)(2).

[61] 15 U.S.C. § 78ccc(e)(1).

[62] 15 U.S.C. § 78ccc(e)(2).

[63] 15 U.S.C. §§ 78ccc(e)(1) and (2).

the SEC's Division of Trading and Markets (TM) has primary responsibility for monitoring SIPC. If the Commission is aware of facts that lead it to believe that any broker-dealer is approaching financial difficulty, the Commission must immediately notify SIPC.[64] The Office of the General Counsel (OGC) monitors SIPA liquidations and provides legal guidance. On September 18, 2000, the Commission authorized OGC to enter notices of appearance in SIPA proceedings pursuant to a one-year pilot program, which became permanent on May 20, 2002. The Office of Compliance Inspections and Examinations (OCIE) performs inspections of SIPC jointly with TM. SIPC is required to submit its annual report to the Commission for review, and the Commission must transmit the annual report to the President and Congress.[65]

If SIPC refuses or fails to commit its funds for the protection of customers of any member of SIPC, the Commission may apply to the U.S. district court in which the principal office of SIPC is located for an order requiring SIPC to discharge its obligations under SIPA.[66]

According to interviews we conducted, we learned that SIPC personnel and SEC personnel communicate frequently. The Associate Director from the Office of Broker-Dealer Finances in TM, which has the primary responsibility for monitoring SIPC, attends SIPC's quarterly board of directors meetings. The Chairman of SIPC's board of directors and the SEC's Chairman meet periodically to discuss, among other things, ongoing liquidations and current matters that may impact SIPC's operations and the broker-dealer industry. In particular, the SEC and SIPC have been meeting to discuss matters related to two of the largest liquidations in SIPC's history, Lehman Brothers, Inc. (Lehman) and Bernard L. Madoff Investment Securities, LLC. (Madoff). TM also had numerous phone conversations with SIPC about matters related to the failure of Stanford Group Company (Stanford).

Lehman's liquidation under SIPA commenced in September 2008.[67] The trustee overseeing the $110 billion customer estate[68] Lehman liquidation reported that the liquidation process is complicated because of the size and complexity of the firm and the trustee's limited access to Lehman's books and records. The trustee further stated that the liquidation process is difficult because Lehman did not prepare a preliquidation disaster plan.[69] Hence, concrete provisions for the mechanics of asset transfers were lacking, which contributed to difficulties in the Lehman bankruptcy.[70] As of October 28, 2010, there were approximately 3

---

[64] 15 U.S.C. § 78eee(a)(1).
[65] 15 U.S.C. § 78ggg(c)(2).
[66] 15 U.S.C. § 78ggg(b).
[67] http://dm.epiq11.com/LBI/Project/default.aspx#.
[68] "SIPA Trustee for Lehman Brothers, Inc. Files Preliminary Investigation Report: Lessons Learned and Recommendations to Protect Broker-Dealer Customers," accessed Mar. 25, 2011, *See* http://dm.epiq11.com/LBI/Project/default.aspx. *Go to* Trustee's Investigation/Preliminary Report.
[69] *Id.*
[70] *Id.*

percent of unresolved customer claims in the Lehman case.[71]  The SEC has played a role in the Lehman liquidation from its inception and has met with the trustee assigned to the Lehman case and SIPC throughout the liquidation process to discuss pertinent matters related to the case.

Madoff's SIPA liquidation commenced in December 2008.[72]  Among other matters, the method of payment for customer claims has drawn much attention. Madoff investors have questioned the method used to pay claims, referred to as the "cash-in/cash out method," under which investors who withdrew more money from their Madoff accounts than they deposited would not be compensated, while investors who withdrew less than they put in would be compensated.[73]  On September 22, 2010, SIPC representatives testified before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, Committee on Financial Services, U.S. House of Representatives, to explain the method.[74] On March 1, 2010, Judge Burton Lifland of the U.S. Bankruptcy Court for the Southern District of New York upheld the Madoff trustee's method for adjudicating the Madoff investors' claims because securities positions are nonexistent as a result of a Ponzi scheme in which the securities positions shown on the customers' account statements had not been purchased and could not have been purchased in real market trading.[75]  This decision has been appealed and is now pending before the U.S. Court of Appeals for the Second Circuit.  The Commission filed briefs on the issue of the treatment of investors' claims in both the Bankruptcy Court and the Court of Appeals for the Second Circuit supporting the position of both the trustee and SIPC.  As of February 18, 2011, there were approximately 2 percent of unresolved customer claims.[76]

Investors who were adversely affected by the $8 billion[77] alleged Robert Allen Stanford Ponzi scheme have sought protection under SIPA.  On August 14, 2009, SIPC stated in a letter to the receiver in the Stanford case that it had determined that there was no basis for SIPC to initiate a SIPA liquidation proceeding against Stanford based on the information it had received at the time.[78]  SIPC also asserted, based upon the information it had received, that the certificates of deposit issued by Stanford International Bank Ltd. were formed under the laws of Antigua and Barbados, and Stanford International Bank Ltd. is

---

[71] "State of the Estate October 28, 2010," Progress To Date, Lehman trustee's law firm, last accessed Mar. 25, 2011, http://dm.epiq11.com/LBI/Project/default.aspx. *Go to* Public Reports/Trustee's Presentations/Presentations to the Bankruptcy Court.

[72] http://www.madofftrustee.com/Home.aspx.

[73] "Bankruptcy Judge Backs Madoff Trustee's Payout Calculations," Noeleen G. Walder, (Mar. 2, 2010), accessed Oct. 18, 2010, http://www.law.com/jsp/law/LawArticleFriendly/jsp?id=1202444971605 (site discontinued).

[74] "SIPC Chairman To Defend Method Used To Pay Claims For Madoff Victims," Sarah N. Lynch, (Sept. 22, 2010), accessed Nov. 8, 2010, http://online.wsj.com/article/BT-CO-20100922-711421.html (site discontinued).

[75] *Id.*

[76] http://www.madofftrustee.com/Status.aspx.

[77] http://www.sec.gov/news/press/2009/2009-26.htm.

[78] Letter from Stephen Harbeck, President of SIPC, to Ralph Janvey, Receiver of Stanford, Aug. 14, 2009, p. 3.

not a SIPC member.[79]  Our inquiry with the director and founder of the Stanford Victims Coalition (SVC) indicated that Stanford investors are maintaining that they were led to believe that the certificates of deposit were covered under SIPA.[80]

# Objectives

As part of its annual audit plan, the OIG conducted an audit of the SEC's oversight of SIPC.  The overall objective of this audit was to assess the effectiveness of the SEC's oversight of SIPC.  The audit assessed if the Commission monitors SIPC's activities in accordance with governing legislation.  In addition, our audit was performed to assess if the Commission performs periodic and systematic inspections of SIPC's activities.  Our audit also focused on determining whether the Commission conducts meaningful reviews of SIPC's annual reports.  The OIG also determined where improvements and best practices could be implemented for the SEC's oversight of the SIPC process.

---

[79] *Id.*
[80] Interview with Angie Kogutt, director and founder of the Stanford Victims Coalition, Nov. 22, 2010.

# Findings and Recommendations

## Finding 1:  TM and OGC Do Not Maintain Adequate Written Procedures and Policies for Oversight of SIPC

> TM and OGC currently do not have adequate written procedures and policies for monitoring SIPC's activities.

### Absence of TM's Written Procedures and Policies for Oversight of SIPC

The written procedures and policies in place for the SEC's oversight of SIPC are limited to a 1999 memorandum that merely lists the SEC's responsibilities for monitoring SIPC pursuant to SIPA.[81]  The 1999 memorandum describes in general terms how the Commission monitors SIPC and its operations, as required under SIPA.  Our audit found that TM has not documented the actual internal procedures it follows to provide oversight of SIPC's activities.  The 1999 memorandum does not provide detailed information about TM's internal procedures for oversight activities, such as how to process proposed bylaws or amendments that SIPC submitted or how reviews of SIPC's annual reports (including SIPC's financial statements) are to be performed.

Additionally, SIPA states that the independent public accountant or a firm of independent public accountants that audits SIPC's financial statements and is selected by SIPC must be deemed satisfactory by the Commission.[82]  Our inquiry of TM regarding its procedure for this review revealed that there is no written guidance that sets forth the procedures TM utilizes to determine the competency of an independent public accountant or a firm of independent public accountants hired to audit SIPC's financial statements.[83]

In addition, some of the limited information contained in the 1999 memorandum is outdated.  For instance, the memorandum provides that the amount of SIPC protection available for cash claims is $100,000, even though such coverage was increased in 2010 to $250,000 by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act).[84]

---

[81] TM memorandum, *The Commission's Oversight Role of the Securities Investor Protection Corporation ("SIPC")*, June 24, 1999.
[82] 15 U.S.C. § 78ggg(c)(2).
[83] TM informed the OIG that when SIPC hired its independent auditor in 2002, a senior TM official attended the interviews SIPC staff conducted, and the senior TM official did not oppose SIPC's selection of its new auditing firm.
[84] H.R. 4173, Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 929H, *SIPC Reforms.*

TM acknowledges that having written policies is useful and that documenting its SIPC monitoring procedures would add transparency to its delegated authority and responsibilities under SIPA.  However, TM stated that it believes that the absence of documented procedures has not impacted its ability to perform its tasks related to the oversight of SIPC.  TM also asserted that most of its employees who are responsible for monitoring SIPC's activities are experienced staff members who have performed their assigned duties related to SIPC for many years.  However, staff changes at the SEC are common, and we believe that having documented procedures is critical to ensuring appropriate and effective monitoring and oversight.

TM informed us that it is in the process of preparing an updated version of the 1999 memorandum, which it intends to complete and circulate to relevant TM staff members by March 31, 2011.[85]

## OGC Lacks Adequate Documentation of Its Oversight Role Related to SIPC

Our audit also found that there is inadequate documentation for the SEC's oversight role in OGC.[86] OGC provides legal guidance to TM related to SIPA liquidations and monitors SIPA proceedings that are handled by independent court-appointed trustees and SIPC.  Our tests and interviews with OGC staff members revealed that internal policies or procedures regarding OGC's role relating to SIPC oversight are not adequately documented.  Moreover, during the timeframe in which we conducted our audit, there was a significant staff turnover in the OGC bankruptcy group, as the OGC attorney who provided oversight of SIPC for a number of years retired and was replaced by another attorney.  Due to the lack of adequately documented internal OGC policies and procedures, we found opposing opinions on how SIPC monitoring activities should be performed.  For instance, the retired attorney monitored Public Access to Court Electronic Records (PACER)[87] and reviewed court documents for SIPA liquidations in order to monitor court proceedings to ensure that SIPA liquidations were processed timely and that trustees appointed to the SIPA liquidations and SIPC were properly handling SIPA proceedings.  The retired attorney reviewed, among other matters, disputes arising from customer claims for SIPA liquidations.  In one

---

[85] SEC, memorandum to the OIG, *Information Request on Implementation of Prior OIG Recommendations*, Jan. 24, 2011.

[86] In December 2001, OGC drafted a memorandum to the Commission explaining its procedures for monitoring claims determinations and reviewing fee applications. However, OGC prepared the memorandum to request that the Commission allow OGC to enter notices of appearance in SIPA liquidations permanently.  Additionally, the memorandum focuses on certain issues and does not discuss other monitoring activities OGC performs, such as identifying significant legal issues that could lead to filing briefs in court.

[87] According to its website (http://www.pacer.gov), PACER "is an electronic public access service that allows users to obtain case and docket information from federal appellate, district and bankruptcy courts, and the PACER Case Locator via the Internet.  PACER is provided by the federal Judiciary in keeping with its commitment to providing public access to court information via a centralized service."

instance during her review of filed dockets on PACER, she disagreed with SIPC's denial of a claim and consulted with a TM staff member who agreed with her. The retired attorney and the TM staff member notified SIPC about the disagreement.  On the contrary, the new successor OGC attorney has indicated that monitoring PACER could be time-consuming due to the large number of court documents that are filed in some cases, such as Lehman and Madoff. Hence, he questioned whether such a practice would be efficient.

This example illustrates the necessity that procedures be documented so that decisions on how to conduct oversight can be made in a careful and reasoned manner and do not depend solely on a particular staff member who is working at the SEC at a given time.

### Recommendation 1:

The Division of Trading and Markets should document its procedures and processes for its oversight and monitoring of the Securities Investor Protection Corporation pursuant to the Securities Investor Protection Act.

**Management's Comments.**  TM concurred with this recommendation.  See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that TM concurred with this recommendation

### Recommendation 2:

The Division of Trading and Markets should complete its efforts to update its internal memorandum which describes its oversight responsibilities under the Securities Investor Protection Act (SIPA) and include its current practices and, where appropriate, the legislative amendments that were made to SIPA in July 2010 by the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**Management's Comments.**  TM concurred with this recommendation.  See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that TM concurred with this recommendation.

### Recommendation 3:

The Office of the General Counsel should consult with the Division of Trading and Markets to clarify its role in monitoring the Securities Investor Protection Corporation (SIPC) and document the responsibilities and procedures it follows in regard to the Commission's oversight of SIPC.

**Management Comments.** OGC concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that OGC concurred with this recommendation.

**Recommendation 4:**

The Office of the General Counsel should consider the costs and benefits related to certain activities that the retired attorney performed and determine what, if any, other activities are appropriate to adequately monitor the Securities Investor Protection Corporation.

**Management's Comments.** OGC concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that OGC concurred with this recommendation.

# Finding 2: TM and OCIE Do Not Inspect SIPC's Activities in a Systematic Fashion

TM and OCIE performed a full inspection of SIPC in 2003 and a follow-up inspection in 2005 to assess whether SIPC implemented recommendations from the 2003 inspection. Notwithstanding the SEC's representation to the Government Accountability Office (GAO) that it would inspect SIPC "every four to five years,"[88] the SEC has not conducted a full inspection in nearly 8 years. Currently, the SEC has no definitive plans to inspect SIPC in the near future.

## Findings From Previous Audits of SEC's Oversight of SIPC

GAO performed an audit of SIPC, which included a review of the SEC's monitoring of SIPC, in 1992.[89] In that audit, GAO found that since 1985, the SEC had evaluated SIPC's operations one time and had not followed up on the 1985 evaluation to determine if SIPC addressed its recommendations, such as speeding up the payment of customer claims through an automated liquidation system.[90] GAO recommended that the SEC periodically review SIPC's

---

[88] OIG Report No. 301, *Oversight of Securities Investor Protection Corporation* (Mar. 31, 2000), p. 5.
[89] Report No. GAO/GGD-92-109, GAO, *Securities Investor Protection: The Regulatory Framework Has Minimized SIPC's Losses*, GAO/GGD-92-109 (Sept. 28, 1992).
[90] *Id.* at 61.

operations and its efforts to ensure timely and cost-effective liquidations.[91]  In response to this recommendation, TM agreed to inspect SIPC "every four to five years."[92]

The OIG performed an audit of the SEC's oversight of SIPC's activities in March 2000.[93]  The OIG found that since SIPC's inception in 1970, the SEC had inspected SIPC only two times, once in 1985 and a second time in 1994.[94]  The OIG also identified several areas not addressed in past SIPC inspections that could improve oversight effectiveness[95] and recommended that TM and OCIE decide on a review schedule and inspection scope for future SIPC inspections. Based on this recommendation, TM and OCIE agreed to prepare a review schedule and inspection scope for future SIPC inspections.  Notwithstanding this agreement and this recommendation being closed, our inquiries of TM and OCIE regarding this matter revealed that TM and OCIE never developed a review schedule or an inspection scope for future SIPC inspections.

## The SEC's Inspection of SIPC in 2003 and Follow-up Inspection in 2005

As previously mentioned, TM and OCIE performed an extensive inspection of SIPC in 2003 and a follow-up inspection of SIPC in 2005; however, they have not since performed any inspections of SIPC.  The scope of the 2005 inspection included follow-up work on the recommendations from the 2003 inspection to ensure that SIPC had implemented TM's and OCIE's recommendations.  During the 2005 inspection, TM and OCIE staff also reviewed additional liquidations that were not reviewed in the 2003 inspection.  However, we learned that TM and OCIE reviewed the liquidations solely to follow up on the recommendations from the 2003 inspection.  For example, TM and OCIE staff reviewed the billing records of those additional liquidations to follow up on its 2003 recommendations regarding controls over trustee fees, but they did not review customer claims in those liquidations.

## Results of the SEC's Inspection of SIPC in 2003 and 2005

The six findings TM and OCIE made during their 2003[96] SIPC inspection support the need for the SEC to conduct systematic inspections of SIPC.  TM's and OCIE's SIPC inspection findings were as follows:[97]

---

[91] *Id.* at 63.

[92] OIG Report No. 301, *Oversight of Securities Investor Protection Corporation* (Mar. 31, 2000), p. 5.

[93] *Id.*

[94] *Id.* at 5.

[95] These areas included (1) adequacy of SIPC policies and procedures used to determine whether a customer request to bring a liquidation proceeding has merit under SIPA, (2) sufficiency of SIPC guidance given to trustees regarding evidence necessary to establish a valid customer claim and recognition of legal precedents in liquidation proceedings, and (3) propriety of SIPC decisions made regarding claims submitted to the trustee during a proceeding.  *Id.* at 5-6.

[96] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), pp. 1-2.

(1) SIPC should improve its controls over fees.

(2) SIPC should provide written guidance to SIPC personnel and individual trustees to use in assessing whether claimants have established valid unauthorized trading claims.

(3) One claim in a specified liquidation of a brokerage firm (the brokerage firm liquidation), out of approximately 300 customer claims reviewed by TM and OCIE in the liquidation, was improperly denied by the trustee as time barred.

(4) SIPC lacks a record retention policy for records generated in liquidations where SIPC appoints an outside trustee.

(5) While SIPC has recently undertaken initiatives to educate investors about SIPC, SIPC should review further its publicly disseminated information about SIPC coverage, including the official explanatory statement, website, and brochure, and determine whether revisions are necessary to avoid customer confusion.

(6) SIPC should consider funding options in the event of a catastrophically large broker-dealer liquidation.

TM's and OCIE's finding regarding the claim in the brokerage firm liquidation clearly demonstrates a need for the SEC's ongoing monitoring of customer claim determinations that are made by court-appointed trustees and SIPC, as the SEC's ability to challenge the trustee's determinations becomes nonexistent as time passes.[98]  The claim in the brokerage firm liquidation cited in the SEC's 2003 inspection report involved SIPC's denial of a customer claim that the trustee believed was not timely filed.[99]  Certain SEC staffers indicated that the claim was not time barred and disagreed with the trustee's "assertion that the customer did not meet the requirements that the claim contain a demand by the creditor on the debtor's estate and express an intent to hold the debtor liable for the debt. . . ."[100]  According to the 2003 inspection report, "SIPC stated that even if the claim was timely filed, it would have been denied on the merits."[101] According to SIPC, the allegedly unauthorized trades that were the basis of the customer's claim involved purchases for which the customer never paid and, as a result, the customer did not suffer any loss.[102]  Claimants may appeal the trustee's denial, and the SEC has the right to file a brief with the court supporting

---

[97] *Id.*

[98] Neither the Commission nor SIPC has any power to overrule a decision made by a trustee even if it were to determine immediately that a denial was inappropriate. The Commission or SIPC could; however, challenge the determination in court.

[99] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 45.

[100] *Id.* at 12.

[101] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 44, note 144.

[102] *Id.*

the claimant's appeal and disagreeing with the denial.  In this case, the customer was not made aware of the SEC's position and did not appeal the denial.  Because the claimant did not appeal the denial, the SEC could not take any further action.  This example illustrates the need for the SEC's periodic monitoring of SIPC's activities and SIPA liquidations, especially in customer claims determinations to ensure that court-appointed trustees and SIPC properly administer customer claims.

Furthermore, TM's and OCIE's 2003 inspection disclosed that SIPC lacked a record retention policy for records that are prepared in liquidations and processed by outside trustees.[103]  The SEC was not able to review the records of a completed liquidation, since the trustee had destroyed the records shortly after completion of the liquidation and the SEC had not conducted its inspection in a timely manner.[104]  As a result of the SEC's inspection, SIPC now has a written record retention policy to keep records for five years, which is provided to trustees in the SIPC Trustee Guide.

## The SEC Does Not Currently Have Definitive Plans to Inspect SIPC in the Near Future

As discussed previously, currently OCIE and TM do not have a review schedule or an inspection scope plan for future SIPC inspections.[105]  In early 2010, OCIE and TM stated that they had informally determined that an inspection of SIPC in 2010 would not be feasible due to the ongoing liquidations of Lehman and Madoff.  OCIE and TM indicated that as the SEC's inspection of SIPC involves reviewing liquidations in which customer claims have been satisfied, an inspection of ongoing cases would not be efficient and could possibly disrupt the process of the ongoing liquidations.

OCIE staff members indicated that they meet with TM staff members on an annual basis to discuss goals in preparation for issuing OCIE's Goals Memorandum[106] in September or October of each year.  Both TM and OCIE agreed that they could discuss the schedule and scope for future SIPC inspections at the annual meeting.

OCIE and TM staff members indicated that SIPC has proper controls and procedures in place to process customer claims.  Also, TM and OCIE believe that

---

[103] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 2.
[104] *Id.* at 2.
[105] OCIE is in the process of transitioning to a risk-based program for all inspections.
[106] OCIE stated that the purposes of the memorandum include identifying risks and areas for concentration for annual inspections and informing the Commissioners and the directors of divisions and offices about OCIE's goals.  The memorandum divides OCIE's goals and risks by program.  The risks and the areas for concentration are based on OCIE staff members' observations during past inspections and discussions with other divisions and offices.  The Director and the Deputy Director of OCIE meet with the Chairman and the Commissioners to discuss the memorandum, to obtain their feedback, and to ensure that they agree with OCIE's focus for the inspections.

the frequency of inspecting SIPC depends on the number of liquidations that are
in progress.  If there are no broker-dealer liquidations, then there are no cases
for SIPC to process and none for the SEC to inspect.

However, the OIG found that notwithstanding the SEC's assurances to GAO and
the OIG, and the need for continuous monitoring, there are no systematic
inspections of SIPC and to date the SEC has not established a scope or
schedule for future inspections of SIPC.  Additionally, there have been no formal
discussions between TM and OCIE to plan an inspection of SIPC since the 2005
follow-up inspection.

## SIPA Liquidations That Occurred From 2003 to Date Have Not Been Reviewed

In 2003, TM and OCIE reviewed 14 liquidations that were processed by an
outside trustee and 14 liquidations where the direct payment process was used
or where SIPC was the trustee.[107]  In 2005, the SEC reviewed an additional 11
liquidations solely to follow up on the recommendations from the 2003
inspection.[108]

During the 2003 and 2005 inspections, TM and OCIE did not review 8
liquidations that had been initiated in 2003 and 2004.[109]  Since the SEC's follow-
up inspection in 2005, there have been 9 additional SIPC liquidations to date.[110]
However, the SEC has not reviewed any of these liquidations.

OCIE informed the OIG that the 8 liquidations that were initiated in 2003 and
2004 were not reviewed in 2005 because they were ongoing cases.  TM and
OCIE further informed the OIG that they only review completed liquidations or
liquidations where the customer claims are satisfied with certain litigation matters
pending.  OCIE indicated that the SEC reviewed liquidations where the customer
claims process was complete, but there may still have been pending litigation
because litigation arising out of SIPC liquidations can continue for many years.

The SEC has been heavily involved with the Lehman and Madoff cases from the
inception of the liquidations of both entities.  For instance, a TM staff member
attended SIPC board of directors meetings where the trustees for both cases
presented the status of claims and discussed significant matters.  SIPC also
consulted with OGC and TM regarding a payout method to Madoff claimants.
TM also meets with the trustees assigned to the Lehman and Madoff cases on a
periodic basis.  Additionally, the Commission's Atlanta Regional Office reviewed
claim determinations related to the SIPA liquidation of Hanover Investment

---

[107] OCIE 2003 inspection records.
[108] *Id.*
[109] According to the OIG's comparison of the liquidations reviewed by the SEC and the liquidations initiated
in 2003 and 2004 as noted in SIPC's annual reports for 2003 and 2004.  *See*
http://www.sipc.org/who/annual.cfm for SIPC's 2003 and 2004 annual reports.
[110] SIPC's 2005, 2006, and 2008 annual reports. *See* http://www.sipc.org/who/annual.cfm.

Securities, Inc. (Hanover).  One Atlanta Regional Office employee stated that she disagreed with SIPC's denial of a claim in the Hanover case.  SIPC did not agree with her conclusion, but it eventually paid the claimant.

Despite TM's and OGC's ongoing involvement with the Lehman and Madoff cases and the Atlanta Regional Office's involvement with the Hanover case, there have been 14 additional liquidations[111] in the past 8 years that have completely escaped the SEC's scrutiny.[112]  Although 4[113] of the 14 liquidations are currently ongoing, the remaining 10 liquidation proceedings have either been closed or the customer claims have been satisfied and thus are ripe for the SEC to review.  The SEC has reviewed cases that have been closed and the customer claims that have been satisfied during previous inspections.[114]  None of these liquidations have been reviewed, since the SEC has not conducted a full inspection since 2003.

OCIE and TM staff members informed the OIG that they have no plans to schedule a future inspection of SIPC until after the Lehman and Madoff cases are resolved.  The liquidations of Lehman and Madoff commenced in September 2008 and December 2008, respectively.[115, 116]  While there has been significant progress with respect to determining certain customer claims, substantial work remains to be done relating to resolving the customer claims that are being litigated.  TM also indicated that once the claim determinations are completed, it is possible that additional lawsuits, if they have not already commenced, are expected for both the Lehman and Madoff liquidations.  The majority of claims in Madoff have been determined, but there will be substantial work to resolve these claims because of objections to these determinations and the resulting ongoing litigation.

As TM and OCIE readily acknowledge, the estimated date for the completion of claim determinations, especially for Lehman, is currently unknown.  Thus, there are no assurances or even indications that the SEC will exercise its oversight authority to inspect any other SIPC liquidations in a systematic manner in the foreseeable future.  We do not believe that this approach is consistent with the

---

[111] Out of the 14 liquidations, independent court-appointed trustees processed 6 liquidations, SIPC was the trustee for 6 liquidations, and 2 liquidations were direct payments.

[112] OGC stated that the predecessor attorney monitored the 14 liquidations to ensure that they were processed timely.  The OIG was unable to verify whether such monitoring occurred because there was no evidence of review.

[113] Continental Capital Investment Services, Inc., North American Clearing, Lehman and Madoff.

[114] According to the OIG's review of customer proceedings in process noted in SIPC's 2009 annual report and the OIG's inquiry with SIPC management. See http://www.sipc.org/pdf/2009%20Annual%20Report.pdf for 2009 SIPC annual report.

[115] On September 19, 2008, the United States District Court for the Southern District of New York entered an order granting the application of SIPC for issuance of a Protective Decree adjudicating that the customers of Lehman are in need of protection afforded by the SIPA. See http://dm.epiq11.com/LBI/Project/default.aspx#.

[116] Pursuant to the application of SIPC, on December 15, 2008, the Honorable Louis L. Stanton, a federal judge in the United States District Court for the Southern District of New York, appointed Irving H. Picard as trustee for the liquidation of Madoff. See http://www.madofftrustee.com/Home.aspx.

assurances provided in the SEC's response to GAO's 1992 SIPC report and its response to the OIG's 2000 SIPC report. Based on interviews we conducted and our analysis, the OIG has determined that more frequent SEC SIPC inspections will assist claimants and SIPC.

**Recommendation 5:**

The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should conduct meetings, on at least an annual basis, to determine when an inspection of the Securities Investor Protection Corporation (SIPC) should occur, based on the ongoing liquidations, to ensure systematic and risk based monitoring of SIPC's operations. In these meetings, TM and OCIE should develop a schedule for future inspections based upon objective criteria or defined risk-factors, such as conducting inspections based upon the number of SIPC liquidations.

**Management's Comments.** TM and OCIE concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that TM and OCIE concurred with this recommendation.

In response to TM's comment regarding TM's and OCIE's possible conclusion not to inspect SIPC in certain years, we acknowledge that based on their assessment, TM and OCIE may conclude that it is not appropriate to specify a date for the next SIPC inspection.

In response to OCIE's comment, "In early 2010, OCIE and TM jointly determined that an inspection of SIPC in 2010 would not be prudent due to SIPC's involvement in certain ongoing large liquidations," OIG asserts that our audit found no evidence that supports this statement.

**Recommendation 6:**

The Division of Trading and Markets and the Office of Compliance Inspections and Examinations should perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to the next inspection of the Securities Investor Protection Corporation (SIPC), as they did prior to the commencement of the 2003 inspection of SIPC. The scope of each future inspection should take into consideration the risk assessment conducted prior to the inspection.

**Management's Comments.**  TM and OCIE concurred with this recommendation.  See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that TM and OCIE concurred with this recommendation.


# Finding 3: The SEC Does Not Review Fees SIPC Pays to Court-Appointed Trustees on a Periodic or Systematic Basis

The Commission does not perform a review of the fees SIPC pays to independent court-appointed trustees on a periodic or systematic basis.  TM reviewed trustee fees in 1994.  TM and OCIE reviewed trustee fees during their extensive inspection of SIPC in 2003.  TM's and OCIE's 2005 follow-up inspection was conducted to ensure that SIPC implemented the SEC's recommendations from its 2003 inspection.  However, no reviews of fees paid to trustees have taken place since 2003.

## Background on Trustee Fees under SIPA

According to the SEC's 1994 SIPC inspection report,[117] customers' claims are paid to the maximum extent possible from the assets of the failed broker-dealer.  Customers share on a pro rata basis in a fund of customer property and in the general estate, as explained below.[118]  The term "customer property" means "cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."[119]  With regard to the liquidation of a broker-dealer's general estate, all costs and administration expenses, including the costs and expenses for which SIPC has made advances, must be paid from the general estate before any other claims are satisfied.[120]  The general estate is distributed to creditors in accordance with the priorities set forth in the Bankruptcy Code.[121]  To the extent that customer property and SIPC advances are not sufficient to satisfy a customer's claim in

---

[117] SEC, *SIPC Examination Report* (Jun. 22, 1994), p. 4.
[118] Catherine McGuire, Memorandum Re: SIPA, Aug. 28, 2009, p. 14.
[119] 15 U.S.C. § 78lll(4).
[120] *Id.*, § 78eee(b)(5)(E).
[121] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 7.  *See also* 11 U.S.C. §§ 503(b) and 507 (a)(1).

full, the customer is entitled to participate in the general estate and share pro rata with other unsecured creditors.[122]

**Limit on the Amount of Trustee Fees in a Bankruptcy Case.**  Although SIPA liquidations are similar to ordinary bankruptcy cases, there is no limit on the amount of trustee fees paid in SIPA liquidations, unlike bankruptcy cases. According to the U.S. Code,

> [I]n a case under Chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.[123]

However, with respect to SIPA liquidations, there is no equivalent provision capping fees and, thus, there is no statutory limit on the amount of fees a trustee can earn in a SIPA case.

**The Court's Discretion Under SIPA Is Limited.**  SIPA states that "[i]n any case in which such allowances[124] are to be paid by SIPC without reasonable expectation of recoupment thereof as provided in this chapter and there is no difference between the amounts requested and the amounts recommended by SIPC, the court shall award the amounts recommended by SIPC."[125]

Accordingly, under the statute, even if the court finds the amount of fees awarded to the trustee to be excessive, it is required to approve such excessive fees if SIPC determines that the fees are reasonable.  In a 1985 case, Judge Thomas Britton of the U.S. Bankruptcy Court for the Southern District of Florida deemed fees to be awarded to the trustee in a liquidation to be excessive but found he had no choice but to approve the fees, stating, "The approval or disapproval of this particular application lies exclusively within the discretion of SIPC under the express provisions of 15 U.S.C. § 78eee(b)(5)(C) . . . ."[126]

---

[122] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 7.

[123] 11 U.S.C. § 326, *Limitation on Compensation of Trustee.*

[124] Reasonable compensation for services rendered and reimbursement for proper costs and expenses incurred. 15 U.S.C. §78eee(b)(5)(A).

[125] 15 U.S.C. § 78eee(b)(5)(C).

[126] *See also In re First State Securities Corp.*, 48 B.R. 45, 46 (Bankr. S. D. Fla. 1985).

The Court expressed its displeasure with the statutory scheme, stating,

> This statute either intentionally or inadvertently permits someone connected with SIPC to authorize questionable payments to attorneys from SIPC trust funds under the pretext that these payments have been reviewed, approved, authorized and directed by a federal court. Nothing could be more misleading.

> Reluctantly, therefore, but without a choice, this application for compensation is approved in the amount requested.[127]

The judge considered the interim allowance of $80,933 sought by the trustee to be excessive, but stated he had "no discretion nor any choice" but to approve the exorbitant amounts.[128]

In another instance, in a 1974 case decided prior to the amendment of SIPA in 1978,[129] a court refused to allow SIPC to pay what the court deemed excessive trustee fees. In a SIPC action against Charisma Securities Corp.,[130] Judge Milton Pollack of the U.S. District Court for the Southern District of New York disagreed with SIPC's recommendation and ordered SIPC to pay only $3,500 to the trustee and $6,500 to the trustee's law firm, rather than the $5,000 for the trustee and $25,000 for the law firm that SIPC had recommended.[131] The court found that the trustee hired accountants with extensive experience in financial and securities matters who undertook and performed most of the significant tasks in the liquidation and, therefore, the trustee's law firm's work should have been minimal.[132] The court further noted,

> The liquidation before this Court is, by any and every standard, a small one involving small uncomplicated claims. If the fees requested herein were to be allowed in full, the result would signal a radical departure from the words and intent of the Act created to protect customers' net equities in the hands of enterprises that have foundered.…This Court, therefore, simply cannot and will not blindly acquiesce—as SIPC apparently has done—in assessing the fees requested against the trust fund administered by SIPC. This case points up the probable need for legislative readjustment of the SIPA and the functions of its administrators. For one thing, all appointments of servicing personnel should be subject to court control, and *all* expenses should be submitted to the Court for

---

[127] *Id.*

[128] *Id.*

[129] TM stated that, "The Court had discretion to reject fees when this case was decided. Congress overruled this case when it amended the SIPA in 1978. This case was relied upon by Congress to mandate that recommendations by SIPC would be binding on the court in 'no-assets cases' unless it results in a controversy with the applicant."

[130] *Securities Investor Protection Corp. v. Charisma Sec. Corp.*, 371 F. Supp. 894, 899 (S.D.N.Y. 1974), *aff'd.*, 506 F.2d 1191 (2d Cir. 1974).

[131] *Id.* at 895 and 900.

[132] *Id.* at 895-96.

approval so that a balanced view of the totality thereof can be maintained.[133]

In another case, Judge Bill Parker of the U.S. Bankruptcy Court for the Eastern District of Texas, Tyler Division, found that a SIPC trustee's fee application in the liquidation proceeding for Sunpoint Securities, Inc. (Sunpoint), needed improvement and clarity.[134]  The court found the following significant concerns with the sixth interim fee application in the amount of $439,294 that was submitted by the trustee assigned to the Sunpoint liquidation:[135]

(1) the Application provides insufficient information regarding the background and experience of the employed professionals to justify the hourly rate requested;
(2) the Application references services which were so insufficiently described as to effectively preclude the Court from evaluating the reasonableness and necessity of such services and, therefore, the benefit of such services to the estate were unclear or undemonstrated;
(3) the Application requests compensation for services for which excessive time was billed for the work actually described;
(4) the Application fails to some extent to disclose the precise time increments dedicated to the performance of certain services which inhibits the Court's ability to ascertain the reasonableness of the charges assessed; and
(5) the Application at times batches or lumps various services together in a singular item entry which effectively precludes the Court from evaluating the reasonableness and necessity of each of the particular services contained in such entries.

In the Sunpoint case, notwithstanding the concerns expressed by the court, SIPC recommended the fee proposed by the trustee based on the fee application described above, and because of the statutory language, the court had no discretion to compel SIPC to reduce the fees.

While there is absolutely no discretion on the part of the court to limit fees recommended by SIPC in a no-asset case (i.e., a case where SIPC advances the fees from its fund and there is no reasonable expectation of recoupment) pursuant to the statute, even when there is reasonable expectation of recoupment, the statute only provides the courts with limited discretion.  Under 15 U.S.C. § 78eee(b)(5)(C), in determining the amount of allowances in all cases other than those in which there is no reasonable expectation of recoupment from the general estate and the amounts requested do not differ from SIPC's

---

[133] *Id.* at 899 (emphasis in original).
[134] *In re: Sunpoint Securities, Inc.,* Adversary No. 99-6073 (Bankr. E.D. Tex.), Order Granting Sixth Application for Allowance of Interim Compensation and Reimbursement of Expenses of Jackson Walker, LLP, (Apr.18, 2002).
[135] *Id.* at 3.

recommendation, "the court shall give due consideration to the nature, extent, and value of the services rendered, and shall place considerable reliance on the recommendation of SIPC."[136]

SIPC has stated that in cases where the Court is obligated to rely on its recommendation,

> "The Court forms its independent judgment on whether fees should be allowed, but takes into account SIPC's recommendation, bearing in mind that SIPC 'functions as the entity charged with the administration of SIPA, as an advisor to the court, as the party initiating a liquidation proceeding, and as the party which, to a large extent, is responsible for overseeing the funds available for use in a liquidation proceeding.' S. Rep. No. 763, 95th Cong., 2d Sess. at 11 (1978)."[137]

## SIPC's Review of Trustee Fees

SIPC informed the OIG that since the SEC's 2003 and 2005 inspections it has implemented a policy requiring trustees to file quarterly or monthly invoices, depending on the size and complexity of the liquidation.  SIPC further informed the OIG that independent court-appointed trustees in complex cases send their timesheets and fee applications to SIPC on either a quarterly or monthly basis and these documents are reviewed by SIPC staff attorneys.  SIPC personnel also indicated that the monthly invoices for large cases are generally received by the middle of the subsequent month after the trustee and counsel have reviewed their own bills.  SIPC asserts that it reviews in detail every page of timesheets and invoices submitted by the trustees.  SIPC staff attorneys then prepare a memorandum for the Assistant General Counsel's and the General Counsel's review.  SIPC administrative assistants prepare a fee chart and a summary of ongoing fees that are approved by the Assistant General Counsel and the General Counsel on a quarterly basis.

After the Assistant General Counsel and the General Counsel review and approve the fee applications and the timesheets, SIPC staff attorneys then prepare a memorandum identifying SIPC's recommendations, which are submitted to the bankruptcy court for review.

SIPC stated that it usually asks for a 10 percent reduction in fees and negotiates fees with the trustees before the liquidation process begins.  SIPC also has a holdback policy which allows it to hold off paying the final fee until the case has been completed.

---

[136] 15 U.S.C. § 78eee(b)(5)(C).
[137] Electronic mail from a SIPC staff member, Feb. 9, 2011, Subject: Questions on Discretion over Fees.

## Fees Paid to the Lehman and Madoff Trustees and Trustees' Counsels

According to the latest published report, the fees paid to the trustee's counsels and staff members processing the Lehman claims covering September 2008 to September 2010 (24 months) totaled approximately $108 million.[138] According to the fourth interim fee application as of September 30, 2010, the entire administrative fees, including fees for accountants, consultants, etc., totaled approximately $420 million.[139]

The OIG found that the fees paid to the trustee's counsel and staff members processing the Madoff claims for the period from December 2008 to September 2010 (21 months) totaled approximately $102 million.[140] SIPC noted that in the Madoff case it is advancing SIPC funds to pay all the Madoff case's administrative expenses and that it "is not using any customer money for expenses."[141]

The OIG's review of the trustee fee chart that SIPC prepared revealed that the hourly rate for the trustee assigned to the Madoff case ranged from $698 to $742. For the Lehman liquidation, SIPC's trustee fee chart combined both the trustee's time and the time charged by the law firm the trustee hired. The average hourly rate for the trustee and the law firm personnel involved in the Lehman liquidation ranged from $437 to $527.

The fees paid to date for the Madoff liquidation are a mere fraction of the amount that will eventually be sought because, while there has been significant progress with respect to resolving certain customer claims, significant work remains to be done relating to customer claims with pending litigation.

The trustee assigned to the Madoff case has stated that he currently does not believe there will be sufficient funds in the debtor's estate to make distributions to priority creditors, nonpriority general creditors, and/or broker-dealers.[142] Also, the trustee "does not expect that there will be sufficient funds in the general estate for SIPC to recoup its advances for administrative expenses."[143]

---

[138] "Trustee's Fourth Interim Report for the Period May 11, 2010 Through October 26, 2010," Exhibit 2, last accessed Mar. 26, 2011, http://dm.epiq11.com/LBI/Project/default.aspx#. *Go to* Public Reports/Trustee's Interim Reports to the Court/Trustee's Fourth Interim Report: October 26, 2010.
[139] *Id.*
[140] "Trustee's Fourth Interim Report for the Period Ending September 30, 2010," last accessed Mar. 1, 2011, http://www.madofftrustee.com/documents/FourthInterimReport.pdf. *See* "Cash Disbursement" chart located in the back of the Madoff trustee's Fourth Interim Report.
[141] *The Finance Professionals' Post*, Mar. 17, 2010, "Interview: Stephen Harbeck and Irving Picard on the Lehman and Madoff Cases.*"*
[142] "VII. Claims Administration," "B. Claims of General Creditors," Paragraph 108, p.36, accessed Feb. 1, 2011, http://www.madofftrustee.com/documents/Claims_Process.pdf.
[143] *Id.*

Because the outcome of Lehman liquidation is uncertain and SIPC is advancing its own funds to pay the administrative expenses for the Madoff liquidation, the possibility exists that SIPC could deplete its $2.5 billion fund.  If the SIPC fund is or reasonably appears to be insufficient, the SEC is authorized to make loans to SIPC by issuing the Secretary of the Treasury notes or other obligations in an aggregate amount not to exceed $2.5 billion.[144]

## The SEC's Role in Monitoring Fees

The SEC does not periodically review the fees SIPC pays the court-appointed trustees.  OGC monitors fee applications to ensure that they are timely filed and prepared in a manner that allows for effective review.  TM reviewed trustee fees and other information related to fees in 1994.[145]  TM and OCIE reviewed fee applications and related supporting documents such as timesheets and fee negotiation documents during the 2003 SIPC inspection.  The 2003 inspection report found that SIPC should improve its controls over fees and stated that "[t]he SEC staff found indications of excessive trustee and counsel fees in some liquidations and is concerned about fees charged by certain trustees and their counsel for work related to the Staff's inspection of SIPC."[146]  The inspection also found that the trustees' work descriptions were not detailed and were generic.[147]

In addition, the SEC's 2003 inspection[148] and 2005 follow-up inspection[149] found that some trustees and their counsels did not file quarterly invoices with SIPC and, in the case of large, active liquidations, monthly invoices were not filed.  The SEC also found that certain trustees and their counsels did not provide detailed descriptions of the services they performed in the invoices, which prevented a proper and thorough review of the invoices by SIPC.[150]

## Investors' Concerns Over Fees

The SEC's 2003 inspection report acknowledged that the amount of fees SIPC paid to trustees and their counsel for administering liquidation proceedings pursuant to SIPA had been the subject of criticism from the investing public.  The report noted that groups such as the Public Investors Arbitration Bar Association had questioned the amount of fees SIPC paid trustees and their counsel. It also noted that the past president of the Public Investors Arbitration Bar Association argued that SIPC spent too much money on administrative expenses (trustee and counsel fees) and not nearly enough on satisfying customer claims.[151]

---

[144] 15 U.S.C. §§ 78ddd(g) and (h).

[145] SEC, *SIPC Examination Report* (Jun. 22, 1994), pp. 25-26.

[146] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 1.

[147] *Id.* at 1.

[148] *Id.* at 2.

[149] Letter from the Director of OCIE to SIPC President, Re: SEC Inspection of the Securities Investor Protection Corporation ("SIPC"), Sept. 30, 2005, p. 2.

[150] SEC, *Inspection Report of Securities Investor Protection Corporation* (Apr. 30, 2003), p. 1.

[151] *Id.* at 21.

The criticism and concern expressed with regard to the amount of trustee fees that have been awarded have reemerged with the two largest liquidations in SIPC's history, Lehman and Madoff.  According to a news article, on August 20, 2010, the trustee overseeing the Madoff bankruptcy requested that the U.S. Bankruptcy Court for the Southern District in New York, where the liquidation case is pending, approve a $96.7 million fee request for work that was conducted from February 2010 to May 2010.[152]  The former Madoff investors objected, stating that the trustee and his law firm should not receive any payment for the work because they were improperly trying to minimize SIPC payouts at the expense of Madoff's victims.[153]  However, the judge presiding over the case ruled in favor of SIPC and accepted SIPC's recommended trustee fees.[154]

## The OIG's Audit Testing of Trustee Fees

**The OIG's Review of Trustee Fees.**[155]  SIPC provided the OIG with a list of the fees it paid to 11 independent court-appointed trustees from January 2008 to November 2010, by liquidation.  We selected the Hanover, North American Clearing, Inc. (NAC), Lehman, and Madoff liquidations as part of our review of billing because the SEC referred these cases to SIPC.  The liquidation of these cases commenced in 2008.[156]  There were no SIPC liquidations commenced in 2009 or 2010.[157,158]

SIPC provided the first and second Lehman fee applications to the OIG for our review because this information is available to the public.  For the OIG's review of the Madoff liquidation, the trustee and SIPC provided us with redacted fee applications and timesheets covering our requested timeframe, February 2010 to May 2010.  While SIPC provided us with the fee applications and invoices for both the Lehman and Madoff liquidations, SIPC refused to provide us with documents containing fee negotiations with the trustees.  As recommended in the SEC's 2003 SIPC inspection report, SIPC adopted a policy to document all discussions with trustees and counsel relating to the review of fee applications and any differences between the amounts that were initially sought by the trustees and counsel and those that SIPC recommended for payment.[159]  Our inquiry of SIPC revealed that SIPC attorneys documented fee negotiations with

---

[152] "Madoff victims object to trustee's fees," Bloomberg News, (Sept. 2, 201), accessed Dec. 6, 2010, http://www.crainsnewyork.com/article/20100902/FREE/100909959.
[153] *Id.*
[154] "Bankruptcy Judge Backs Madoff Trustee's Payout Calculations," Noeleen G. Walder, (Mar. 2, 2010), accessed Oct. 18, 2010, http://www.law.com/jsp/law/LawArticleFriendly/jsp?id=1202444971605 (site discontinued).
[155] The OIG did not perform an audit of SIPC's activities and did not review any claim determinations.
[156] 2008 SIPC annual report, page 6. *See* http://www.sipc.org/pdf/SIPC%20Annual%20Report%202008%20FINAL.pdf.
[157] 2009 SIPC annual report, page 6. *See* http://www.sipc.org/pdf/2009%20Annual%20Report.pdf.
[158] According to the OIG's review of SIPC's website (http://www.sipc.org) and inquiry with TM.
[159] Letter from SIPC President to Director of OCIE, *Inspection of Securities Investor Protection Corporation,* June 5, 2003.

trustees in a memorandum or an e-mail, or made notations on the fee charts or invoices.  SIPC stated that providing such information to the OIG while the liquidations are in process would reveal the legal strategies used by the trustees and could jeopardize the liquidation process.

The OIG reviewed fee memoranda and timesheets that were prepared by the court-appointed trustees and interviewed SIPC officials.  We determined that SIPC's attorneys performed detailed reviews of the timesheets and focused on the number of hours and tasks employees performed to ensure the proper division of work, based on the employee's experience.  For complex and large cases such as Lehman and Madoff, the trustees prepare a memorandum that describes, among other things, (1) the nature of the work performed, (2) the overall expenses, and (3) each month's average hourly rate.  Additionally, we found that a SIPC attorney reviewed the legal staff's hours to ensure that the hours and the type of work assigned to each level of the legal staff appeared reasonable.

**Errors Found on Invoices Prepared by the Trustee and His Counsels.** The OIG's review of trustee fees disclosed that errors in Lehman invoices related to expenses for travel and copying invoices, which the trustee and SIPC agreed that SIPC would not be obligated to pay, were properly corrected before the trustee submitted the invoices to SIPC.

Based on the examples we have discussed in which courts have challenged the trustee fees SIPC recommended as being excessive, the limited ability of courts to question or reject SIPC's determination to recommend fees, and the SEC's concerns with SIPC's fee process in the 2003 SIPC inspection, the OIG concludes that a more effective review process and increased oversight of these determinations are needed.  We also believe that SIPC should consider additional steps it can adopt to reduce trustee fees by establishing higher discount rates.

## SIPC's Response to Criticism of Trustee Fees

In the Madoff case, the trustee recovered $7.2 billion in December 2010 from the widow of a longtime Madoff investor.[160]  SIPC did not agree to request more than the 10 percent discount on fees during its negotiations with trustees and stated that the fees were reasonable, considering the complexity and magnitude of the liquidations, especially for the Lehman and Madoff cases.  SIPC further stated that it did not want to sacrifice the quality of work that was required to properly administer SIPC liquidations by trustees and their counsels by seeking further fee reductions.

---

[160] http://money.cnn.com/2010/12/17/news/companies/madoff_picower/index.htm?hpt=T1.

## TM's View on Trustee Fees

TM told the OIG that because it has not reviewed the Lehman and Madoff trustee fees, it has no ability to judge whether these fees are reasonable. However, TM acknowledged that it is fair to question whether the current 10 percent fee reduction is sufficient. Additionally, TM stated that the Commission has no basis to judge whether the trustee fees in the Lehman and Madoff cases are reasonable and has not attempted to make such determinations. A bankruptcy attorney in the SEC's New York Regional Office who is familiar with SIPC cases stated that certain trustees appointed to non-SIPC bankruptcy cases and receivers in SEC enforcement-related cases offer discounts on fees of more than 10 percent. TM acknowledged that in the Lehman and Madoff cases, which are the largest liquidations in SIPC's history, it has been difficult to determine whether the hourly rates the trustees, their counsels, and other legal staff charge SIPC are reasonable. TM added that the fees the trustees collect for the Lehman and Madoff cases are steady income for the trustees' law firms.

## The SEC's Study on Modernizing SIPA Supported Giving Bankruptcy Judges More Discretion Over Fees

In August 2009, a special counsel in TM conducted a study highlighting issues with SIPA and SIPC's rules and bylaws thereunder. TM's study was intended to identify possible changes to SIPA to help modernize it. The study also explored some policy issues that could lead to an expansion of SIPC's responsibilities under SIPA or an expansion of SIPA's protection beyond broker-dealer's customers. One of the topics in the study covered reducing administrative expenses at the discretion of bankruptcy judges.

The study noted that "[w]hile in many cases administrative expenses are borne exclusively by SIPC, SIPC has precedence over general creditors, including certain defrauded investors, when seeking reimbursement for administrative expenses. Thus, there may be public interest in considering whether the requirement under the Bankruptcy Code that bankruptcy judges determine the reasonableness of fees paid to trustees and attorneys should be extended to SIPC cases. Bankruptcy judges could then make use of their experience in other cases to determine the reasonableness of fees."[161]

As previously discussed, there is a lack of discretion by court under SIPA on trustee fees in certain cases. Although SIPA liquidations are similar to ordinary bankruptcy cases, there is no limit on the amount of trustee fees that may be paid in SIPA liquidations, unlike bankruptcy cases where a limit is imposed on trustee fees. Additionally, the SEC does not review trustee fees on a periodic basis. Hence, it would be advisable to have a second party periodically review the trustee fees that SIPC pays.

---

[161] Catherine McGuire, Memorandum Re: SIPA, Aug. 28, 2009.

**Recommendation 7:**

The Division of Trading and Markets, in coordination with the Office of the
General Counsel, should conduct additional oversight of the Securities
Investor Protection Corporation's (SIPC) assessments of the reasonableness
of trustee fees and encourage SIPC to negotiate with outside court-appointed
trustees more vigorously to obtain a reduction in fees greater than 10 percent.

**Management's Comments.**  TM and OGC concurred with this
recommendation.  See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that TM and OGC concurred with this
recommendation.

**Recommendation 8:**

The bankruptcy group in the Office of the General Counsel and the Division of
Trading and Markets should decide on the scope and frequency of the
Commission staff's monitoring of the Securities Investor Protection
Corporation's (SIPC) assessments of the reasonableness of trustee fees paid
by SIPC, rather than relying only on inspections of SIPC, which do not occur
on a systematic basis.

**Management's Comments.**  OGC and TM concurred with this
recommendation.  See Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that OGC and TM concurred with this
recommendation.  We acknowledge that TM and OGC are not in a position to
make an independent assessment of the reasonableness of trustee fees as
they do not actively participate in the actual liquidation proceeding in a
meaningful way.

**Recommendation 9:**

The Division of Trading and Markets, in consultation with the Commission,
shall determine whether to request that Congress modify the Securities
Investor Protection Act (SIPA) to allow bankruptcy judges who preside over
SIPA liquidations to assess the reasonableness of administrative fees in all
cases where administrative fees are paid by the Securities Investor Protection
Corporation.

**Management's Comments.**  TM concurred with this recommendation.  See
Appendix V for management's full comments.

**OIG Analysis.**  We are pleased that TM concurred with this recommendation. The administrative fees identified in our recommendation relate to the trustees and their counsel fees.  Further, the recommendation refers to SIPA provisions in Section 78eee(b)(5)(C).

# Finding 4:  SIPA Investor Education Coverage Still Needs Improvement

Despite the SEC's and SIPC's previous efforts to clarify confusion about SIPC's role and the coverage available under SIPA, many investors still do not sufficiently understand certain limitations on the coverage SIPA provides and the protection against losses resulting from broker-dealer failures.

## Investors Are Still Confused About SIPA's Coverage

As part of this audit, the OIG interviewed officials from OIEA and found that questions and complaints about SIPC that OIEA received from investors have dramatically increased in the past two years as a result of the Lehman and Madoff cases.  Further, our review of OIEA's log of complaints and questions related to SIPC and SIPA from the public covering January 2008 to November 2010 demonstrates that many investors (1) are still confused about the coverage available under SIPA, and (2) believe that as long as their broker-dealers are SIPC members they are covered under SIPA.

The director and founder of SVC, a group of approximately 7,400 Stanford victims,[162] stated that she believed that Stanford investors were misled about their coverage, as their account statements and many of the novelty items they received from Stanford contained the SIPC logo.  The director further stated that based on the materials Stanford provided to Stanford investors about SIPA coverage, Stanford investors had no reason to believe that SIPC would not cover their investments up to SIPA's $500,000 limit per customer[163] for claims of securities.  The director indicated that many Stanford investors invested only up to the $500,000 limit[164] because they thought they would be protected up to this amount under SIPA.

According to the director of SVC, Stanford investors also expressed concerns about the investor alerts and updates that the SEC posted on its website regarding its case against Robert Allen Stanford, and stated that the SEC's updates and notices provided information that Stanford investors already knew and were not helpful.  Additionally, the director of SVC stated that direct

---

[162] Interview of Angie Kogutt, director and founder of the Stanford Victims Coalition, Nov. 22, 2010.
[163] 15 U.S.C. § 78fff-3(a).
[164] *Id.*

communication with employees in TM who could articulate the status of the SEC's efforts would have been helpful.[165]  She further stated that in dealing with the Stanford matter, Stanford investors felt as though the SEC regarded them as adversaries and it seemed at times, that they had to force the SEC to do its job. We also found that many investors assume that SIPA's coverage is equivalent to Federal Deposit Insurance Corporation (FDIC) coverage and believe they are guaranteed to be compensated.  The amount of SIPA protection available for claims of cash is now $250,000,[166] as amended by the Dodd-Frank Act, which is the same amount as the FDIC's limit for deposit insurance.[167]

## Many Investors Do Not Become Aware of SIPA Until Failure of Their Broker-Dealer

The OIG learned that most investors are unaware of SIPC and SIPA until they learn about their broker-dealer's liquidation or failure.  When an investor opens an account with a broker-dealer, he or she is generally not contemplating the possible liquidation of the broker-dealer.  If investors were better educated about SIPA coverage, they could then question the financial condition of the broker-dealer before they made an investment.

## Confusing Advertisements by SIPC

During our audit, we discussed with OIEA SIPC's efforts to publicize its existence and we reviewed SIPC's 2002 and 2007 public service campaigns.  According to the OIEA Director, the segment shots for SIPC's public service campaigns are misleading because they do not fully describe the limitations of SIPA's coverage. Additionally, the Director believes that the campaigns seem to overstate SIPC's role.  For example, one of SIPC's campaigns stated that as an investor, a person's personal safety net includes SIPC.  The campaign did not explain that there are several significant exceptions to SIPA.  A second SIPC campaign compared SIPC to a glove that catches a falling egg, symbolizing an investor's nest egg.  The commercial further states that SIPC helps investors recover their securities if the investor's broker fails.  However, the commercial fails to state that certain securities are not covered under SIPA and that other limitations exist. These campaigns seem to simplify SIPA's coverage and may lead investors to believe that if they lose their securities in the hands of a broker-dealer that is a SIPC member, they can always recover their losses through SIPC under SIPA.

## SIPC's Response to Advertisements

SIPC stated that in March 2008, the collapse of the Bear Stearns Companies, Inc., led SIPC to revise and expand its investor education commitment to assure

---

[165] TM stated that TM staff members did communicate directly with Stanford investors.
[166] 15 U.S.C. § 78fff-3(d).
[167] 12 U.S.C. § 1821(a)(1)(E).

investors that a brokerage firm failure involves protection under SIPA.  SIPC's board of directors authorized an expanded and expedited public relations effort in that regard.

Additionally, SIPC disclosed that in late April 2009, after the failures of Lehman and Madoff, SIPC suspended these efforts because SIPC was constantly in the news and the role of SIPC was examined in great public detail.  Further, in light of the litigation arising from the Madoff case, SIPC believed that it would be the subject of criticism if it were to continue an expensive, high-profile public relations campaign at a time when some claimants were actively litigating with SIPC over the nature and the extent of protection under the statute.

SIPC also stated that it has budgeted for a renewed and revised investor education campaign for late 2011.

## Establishment of SIPC Task Force to Modernize SIPA and Improve Investor Education

According to the SIPC Modernization Task Force website,[168] SIPC created a SIPC Modernization Task Force (Task Force) on June 17, 2010, to perform a comprehensive review of SIPA and SIPC's operations and procedures and to propose reforms to modernize SIPA and SIPC.  The Task Force consists of investors, lawyers, and industry experts from different interests and groups.  The Task Force has been soliciting public comment on a number of issues.  One of the objectives of the Task Force is to assess how SIPC can improve investor education.

A senior official from TM is participating on the Task Force as an observer.  In addition, the OIEA Director provided the Task Force with suggestions for improving investor education.  Specifically, the Director provided ideas to improve investor awareness of SIPC, such as relaying a message (through advertising) to investors about what SIPC is and what SIPC is not, buying Google Ad Words, utilizing social network websites such as Facebook, and preparing advertisements and messages for certain target groups.  For instance, if a broker-dealer in Denver, Colorado, were being liquidated, SIPC could advertise SIPA coverage to Denver residents.  Conducting research through focus group testing could help determine how much the average investor knows about SIPA's coverage.  Focus group testing could also help verify the efficacy of SIPC's message in its public service campaign or identify the need to modify the message.  The OIEA Director also indicated that given today's technology, broker-dealers could identify the assets that are not covered by SIPC in the account statements that are sent to customers.

---

[168] http://www.sipcmodernization.org.

The President of SIPC stated that the Task Force plans to present its findings, conclusions, and recommendations to the SIPC board of directors by the first quarter of 2011.  The SIPC board of directors will then review the report and vote on the recommendations.  SIPC's President further stated that the plan will contain recommendations that could be implemented by amendments to the bylaws which the SEC has the authority to approve under SIPA.  There may also be some recommendations that would need to be implemented through legislative changes.  Our inquiry with the Chairman of the SIPC board of directors revealed that the Task Force has considered designating an employee at SIPC whose focus would be to improve investor education regarding the role of SIPC and the coverage that is available under SIPA.

## TM's Response

In regard to improving ways to communicate with investors, TM indicated that the updates and notices on the SEC's website and SIPC's website and the letters that were sent to Stanford investors who complained to OIEA were sufficient.  TM further stated that it does not have the resources to answer questions directly from investors and that its coordination with OIEA, which is mainly responsible for communicating with investors, is sufficient.  TM further stated that updating investors on matters related to ongoing investigations may jeopardize the SEC's efforts in litigation.  TM also stated that it is difficult to educate the public about SIPA coverage because of the many legal issues and different factual scenarios involved in an analysis of SIPA coverage, and that it has been struggling with this issue for the past 20 years.  However, in light of the issues raised in the Lehman, Madoff, and Stanford matters, it would be useful to consider ways in which the information provided by SIPC to the investing public could be improved and made clearer.

> **Recommendation 10:**
>
> The Division of Trading and Markets, in coordination with the Office of Investor Education and Advocacy, should encourage the Securities Investor Protection Corporation to designate an employee whose responsibilities include improving investor education and preventing further confusion among investors about coverage available under the Securities Investor Protection Act.
>
> **Management's Comments.**  TM concurred with this recommendation.  See Appendix V for management's full comments.
>
> **OIG Analysis.**  We are pleased that TM concurred with this recommendation.

**Recommendation 11:**

The Division of Trading and Markets should support the Securities Investor Protection Corporation's (SIPC) efforts to improve investor education, including encouraging SIPC to strongly consider and, as appropriate, implement the Office of Investor Education and Advocacy's suggestions to improve investor awareness.

**Management's Comments.** TM concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that TM concurred with this recommendation.

**Recommendation 12:**

The Division of Trading and Markets, in coordination with the Office of Investor Education and Advocacy and in consultation with the Commission, should utilize more effective methods to communicate with investors in case of the failure of broker-dealers, such as notifying investors of the status of the Commission's efforts throughout the liquidation process or designating an employee, as appropriate, who can communicate directly with investors on matters unique to each liquidation case.

**Management's Comments.** TM concurred with this recommendation. See Appendix V for management's full comments.

**OIG Analysis.** We are pleased that TM concurred with this recommendation.

Appendix I

# Acronyms/Abbreviations

| | |
|---|---|
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 |
| GAO | Government Accountability Office |
| Hanover | Hanover Investment Securities, LLC |
| NAC | North American Clearing, Inc. |
| OCIE | Office of Compliance Inspections and Examinations |
| OGC | Office of the General Counsel |
| OIEA | Office of Investor Education and Advocacy |
| OIG | Office of Inspector General |
| Lehman | Lehman Brothers, Inc. |
| Madoff | Bernard L. Madoff Investment Securities, LLC |
| SEC or Commission | Securities and Exchange Commission |
| SIPA | Securities Investor Protection Act of 1970 |
| SIPC | Securities Investor Protection Corporation |
| Stanford | Stanford Group Company |
| Sunpoint Securities, Inc. | Sunpoint |
| SVC | Stanford Victims Coalition |
| Task Force | Securities Investor Protection Corporation Modernization Task Force |
| TM | Division of Trading and Markets |

# Scope and Methodology

As part of its annual audit plan, the OIG conducted an audit of the SEC's oversight of SIPC. We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

**Scope.** We obtained TM's internal memorandum listing its responsibilities related to oversight of SIPC's activities. The OIG also obtained OCIE's inspection manual, which was utilized to conduct inspections of SIPC in 2003 and 2005. Additionally, we obtained planning memoranda listing areas of concentration, which were prepared by TM and OCIE for the SEC's inspection of SIPC. We obtained a memorandum from TM and OCIE describing the status of the implementation of prior OIG audit recommendations on this program (*Oversight of Securities Investor Protection Corporation,* Audit No. 301, March 31, 2000).

We conducted our fieldwork from late November 2010 to January 2011. We reviewed documentation on the SEC's monitoring of SIPC's activities covering calendar years 2008 and 2009 and from January to November 2010.

**Methodology.** To accomplish the audit objective of assessing if the SEC monitors SIPC's activities in accordance with governing legislation, we conducted interviews with TM and OGC staff members who are responsible for monitoring SIPC's activities. We further conducted inquires to gain an understanding of the SEC's process for monitoring SIPC. The OIG reviewed SIPA and its related legislative history. We also reviewed bylaw amendments SIPC submitted and correspondence between SIPC and the SEC regarding the bylaw amendments. We reviewed SIPC's fee charts that showed the trustee's fees for SIPA liquidations of Lehman, Madoff, Hanover, and NAC. Additionally, the OIG reviewed fee applications, which included timesheets and invoices prepared by independent court-appointed trustees for the aforementioned SIPA liquidations. We also interviewed OIEA management who coordinated with TM to respond to investors with questions and complaints regarding SIPC. The OIG also reviewed OIEA's log of investors' questions and complaints regarding SIPC, the liquidation of Madoff, and the Stanford case from investors. Further, we interviewed Atlanta Regional Office staff members who worked on the Hanover case.

To accomplish the audit objective of examining whether the Commission performs periodic and systematic inspections of SIPC's activities, we interviewed TM and OCIE staff members who conducted SIPC inspections. We also

**Appendix II**

reviewed the SEC's inspection reports of SIPC, memoranda prepared by OCIE and sent to the Commission regarding SIPC inspections, and responses from SIPC regarding the SEC's findings.

Further, to accomplish the audit objective of determining whether the SEC conducts meaningful reviews of SIPC's annual reports, we reviewed SIPC's annual reports for 2007, 2008, and 2009, and we observed evidence of the SEC's review of SIPC's annual reports. We conducted interviews of TM and OGC staff members who review SIPC's annual reports. To obtain an understanding on the status of certain SIPA liquidations, the OIG also conducted inquiries of SIPC attorneys who were assigned to the Lehman, Madoff, Hanover, and NAC liquidations. Finally, we inquired SIPC management and the Chairman of SIPC's board of directors to gain an understanding of SIPA liquidations and the role of SIPC and the SIPC Task Force, and to obtain an interpretation of the SIPA provision regarding the court's discretion over trustee fees that are paid by SIPC.

**Internal Controls.** During our audit, the OIG reviewed internal controls as they pertained to our audit objectives.

**Judgmental Sampling.** SIPC provided the OIG with 11 listings for the fees it paid to trustees from January 2008 to November 2010, for each liquidation. The OIG selected the Hanover, NAC, Lehman, and Madoff litigations for our review of billing records because the SEC referred these cases to SIPC and the liquidations commenced in 2008,[169] during the scope of our audit. According to SIPC's 2008 annual report, the Great Eastern Securities, Inc., liquidation began in 2008. However, since SIPC is the trustee for Great Eastern Securities, Inc., there were no fees paid to an outside trustee that could be reviewed. Further, there were no SIPC liquidations in 2009[170] or 2010.[171] For the OIG's review of fees for Lehman, SIPC provided the OIG with fee applications and related supporting documents for the first and second fee applications, which are public records. For the Madoff case, SIPC requested that the OIG select a sample of invoices for our review. The OIG selected the fee applications for the quarter ending May 31, 2010, because the trustee fees for that quarter were substantial.

**Prior Audit Coverage.** OIG report *Oversight of Securities Investor Protection Corporation,* Report No. 301, March 31, 2000.

---

[169] According to SIPC's 2008 annual report. *See* http://www.sipc.org/pdf/SIPC%20Annual%20Report%202008%20FINAL.pdf.
[170] According to SIPC's 2009 annual report. *See* http://www.sipc.org/pdf/2009%20Annual%20Report.pdf.
[171] According to the OIG's review of SIPC's website and inquiry with TM.

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 140 of 229

Appendix III

# Criteria

---

**Securities Investor Protection Act of 1970.**  Enacted to provide investors protection against losses caused by failure of broker-dealers.  Created SIPC, which either acts as trustee or works with an independent court-appointed trustee in liquidations of troubled brokerage firms to recover funds for investors with assets of bankrupt or financially troubled brokerage firms.  Adopted December 30, 1970, and last amended July 21, 2010.

**Report of the U.S. House of Representatives Committee on Interstate and Foreign Commerce, House Report No. 95-746, 95th Congress, 1st Session (October 27, 1977).**  Contains the legislative history for the Securities Investor Protection Act amendments of 1978.

**Report of the U.S. Senate Committee on Banking, Housing and Urban Affairs, Senate Report No. 95-763, 95th Congress, 2nd Session (April 25, 1978).**  Contains the legislative history for the Securities Investor Protection Act amendments of 1978.

**SEC Division of Trading and Markets Memorandum Regarding the Commission's Oversight Role of the Securities Investor Protection Corporation (June 24, 1999).**  TM's internal memorandum that describes how the Commission monitors SIPC and its operations, as required under the Securities Investor Protection Act of 1970, and other ways the Commission exercises its oversight responsibilities related to SIPC.

**11 U.S.C. § 326, Limitation on compensation of trustee, Pub. L. 95-598 (November 6, 1978).**  Sets limits on the amount of fees that trustees may be paid in bankruptcy cases under Chapter 7 or 11.

# List of Recommendations

**Recommendation 1:**

The Division of Trading and Markets should document its procedures and processes for its oversight and monitoring of the Securities Investor Protection Corporation pursuant to the Securities Investor Protection Act.

**Recommendation 2:**

The Division of Trading and Markets should complete its efforts to update its internal memorandum which describes its oversight responsibilities under the Securities Investor Protection Act (SIPA) and include its current practices and, where appropriate, the legislative amendments that were made to SIPA in July 2010 by the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**Recommendation 3:**

The Office of the General Counsel should consult with the Division of Trading and Markets to clarify its role in monitoring the Securities Investor Protection Corporation (SIPC) and document the responsibilities and procedures it follows in regard to the Commission's oversight of SIPC.

**Recommendation 4:**

The Office of the General Counsel should consider the costs and benefits related to certain activities that the retired attorney performed and determine what, if any, other activities are appropriate to adequately monitor the Securities Investor Protection Corporation.

**Recommendation 5:**

The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should conduct meetings, on at least an annual basis, to determine when an inspection of the Securities Investor Protection Corporation (SIPC) should occur, based on the ongoing liquidations, to ensure systematic and risk based monitoring of SIPC's operations.  In these meetings, TM and OCIE should develop a schedule for future inspections based upon objective criteria or defined risk-factors, such as conducting inspections based upon the number of SIPC liquidations.

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 142 of 229

Appendix IV

**Recommendation 6:**

The Division of Trading and Markets and the Office of Compliance Inspections and Examinations should perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to the next inspection of the Securities Investor Protection Corporation (SIPC), as they did prior to the commencement of the 2003 inspection of SIPC. The scope of each future inspection should take into consideration the risk assessment conducted prior to the inspection.

**Recommendation 7:**

The Division of Trading and Markets, in coordination with the Office of the General Counsel, should conduct additional oversight of the Securities Investor Protection Corporation's (SIPC) assessments of the reasonableness of trustee fees and encourage SIPC to negotiate with outside court-appointed trustees more vigorously to obtain a reduction in fees greater than 10 percent.

**Recommendation 8:**

The bankruptcy group in the Office of the General Counsel and the Division of Trading and Markets should decide on the scope and frequency of the Commission staff's monitoring of the Securities Investor Protection Corporation's (SIPC) assessments of the reasonableness of trustee fees paid by SIPC, rather than relying only on inspections of SIPC, which do not occur on a systematic basis.

**Recommendation 9:**

The Division of Trading and Markets, in consultation with the Commission, shall determine whether to request that Congress modify the Securities Investor Protection Act (SIPA) to allow bankruptcy judges who preside over SIPA liquidations to assess the reasonableness of administrative fees in all cases where administrative fees are paid by the Securities Investor Protection Corporation.

**Recommendation 10:**

The Division of Trading and Markets, in coordination with the Office of Investor Education and Advocacy, should encourage the Securities Investor Protection Corporation to designate an employee whose responsibilities include improving investor education and preventing further confusion among investors about coverage available under the Securities Investor Protection Act.

**Appendix IV**

**Recommendation 11:**

The Division of Trading and Markets should support the Securities Investor
Protection Corporation's (SIPC) efforts to improve investor education, including
encouraging SIPC to strongly consider and, as appropriate, implement the Office
of Investor Education and Advocacy's suggestions to improve investor
awareness.

**Recommendation 12:**

The Division of Trading and Markets, in coordination with the Office of Investor
Education and Advocacy and in consultation with the Commission, should utilize
more effective methods to communicate with investors in case of the failure of
broker-dealers, such as notifying investors of the status of the Commission's
efforts throughout the liquidation process or designating an employee, as
appropriate, who can communicate directly with investors on matters unique to
each liquidation case.

Appendix V

# Management's Comments

---

<u>**MEMORANDUM**</u>

**TO:**         Office of Inspector General

**FROM:**     Division of Trading and Markets

**CC:**         Mark D. Cahn
                 General Counsel, Office of the General Counsel

                 Carlo V. di Florio
                 Director, Office of Compliance Inspections and Examinations

                 Lori J. Schock
                 Director, Office of Investor Education and Advocacy

**RE:**         The Division of Trading and Markets' Response to the Office of Inspector
                 General Report No. 495, <u>SEC's Oversight of the Securities Investor
                 Protection Corporation's Activities</u>

**DATE:**     March 23, 2011

---

## I.    Introduction

      Thank you for the opportunity to respond to the recommendations in your March 9, 2011 draft report – <u>SEC's Oversight of the Securities Investor Protection Corporation's Activities</u> (the "Report"). At the outset, we want to extend our appreciation for the professionalism of your staff in conducting the audit. The responses to recommendations directed to the Division of Trading and Markets ("TM") are set forth below.[1] This includes responses to all recommendations in the Report except Recommendation 4.

## II.    Recommendations Directed to TM

***Recommendation 1***: *"[TM] should document its procedures and processes for its oversight and monitoring of Securities Investor Protection Corporation ["SIPC"] pursuant to the Securities Investor Protection Act ["SIPA"]."*

      TM concurs with this recommendation. As is noted in the Report, there is an internal TM memorandum dated June 24, 1999 that describes in general terms the Commission's oversight responsibilities under SIPA. TM will update this memorandum and, based on the statutory and other responsibilities identified in the memorandum, create written procedures more specifically detailing TM's role in executing these responsibilities. The updated memorandum and procedures will be distributed to all relevant staff.

---

[1]      We have updated Recommendations 6, 7, 8, and 9 below to reflect revisions to those recommendations based on discussions between TM staff and staff in your office.

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 145 of 229

Appendix V

***Recommendation 2:*** *"[TM] should complete its efforts to update its internal memorandum which describes its oversight responsibilities under the SIPA and include its current practices and, where appropriate, the legislative amendments that were made to [SIPA] in July 2010, by the Dodd-Frank Wall Street Reform and Consumer Protection Act [the "Dodd-Frank Act"]."*

TM concurs with this recommendation. As is discussed in TM's Response to Recommendation 1, TM will update its internal memorandum relating to SIPC oversight, in order to reflect TM's current oversight practices and amendments to SIPA under the Dodd-Frank Act.

***Recommendation 3:*** *"The Office of General Counsel ["OGC"] should consult with [TM] to clarify its role in monitoring [SIPC] and document the responsibilities and procedures it follows in regards to the Commission's oversight of SIPC."*

TM concurs with this recommendation. TM will consult with OGC as suggested by Recommendation 3.

***Recommendation 5:*** *"[TM] and [OCIE] should conduct meetings, at least on an annual basis, to determine when an inspection of [SIPC] should occur based on the ongoing liquidations to ensure systematic and risk-based monitoring of SIPC's operations. In these meetings, TM and OCIE should develop a schedule for future inspections based upon objective criteria or defined risk-factors, such as conducting inspections based upon the number of SIPC liquidations."*

TM concurs with this recommendation, subject to our comments in the following paragraph. We have discussed this recommendation with OCIE and have agreed to meet at least annually to plan for future SIPC inspections. As part of this planning process, TM and OCIE will consider objective criteria and/or defined risk-based factors to be used when assessing whether to commence an inspection of SIPC.

We note that your recommendation that TM and OCIE "determine when an inspection of [SIPC] should occur based on ongoing liquidations" could be interpreted to suggest that each such annual meeting should result in a determination of a specific date for the next SIPC inspection. TM does not expect that its periodic meetings with OCIE will in all cases result in determinations of specific dates for SIPC inspections. In fact, TM and OCIE may conclude during a meeting that it is not yet appropriate to specify the date for the next SIPC inspection. TM and OCIE believe that the timing and scope of future SIPC inspections should continue to include a level of flexibility and prioritization that provides for the efficient and effective allocation of Commission resources. This flexibility also should continue to enable TM and OCIE to plan inspections in a manner that minimizes disruptions to SIPC and SIPA trustees in connection with ongoing liquidations and to focus inspections on current areas of interest and concern. We interpret your recommendation as providing this flexibility.

2

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 146 of 229

**Appendix V**

*Recommendation 6: TM and OCIE should perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to the next inspection of SIPC as they did so prior to the commencement of the 2003 inspection of SIPC. The scope of each future inspection should take into consideration the risk assessment conducted prior to the inspection.*

TM concurs with this recommendation. TM agrees that prior to inspecting SIPC, TM and OCIE should perform a risk assessment designed to determine, with respect to SIPC and SIPA, problematic areas or liquidations deemed to be complex. TM and OCIE should then determine to what degree to focus their inspection efforts on these areas and/or liquidations. This risk-based approach is consistent with the inspection planning process employed in prior SIPC inspections and TM believes that this approach results in an efficient and effective allocation of Commission resources.

*Recommendation 7: TM, in coordination with OGC, should conduct additional oversight over SIPC's assessments of the reasonableness of trustee fees and encourage SIPC to negotiate with outside court-appointed trustees more vigorously to obtain greater than a 10 percent reduction in fees.*

Recommendation 7 is, in effect, two separate recommendations. First, Recommendation 7 states that TM, in coordination with OGC, should conduct additional oversight over SIPC's assessments of the reasonableness of trustee fees. TM concurs with this recommendation. TM and OGC have agreed to coordinate with each other to determine their respective roles relating to the additional oversight as is described in more detail in response to Recommendation 8 below.

The second part of Recommendation 7 states that TM, in coordination with OGC, should encourage SIPC to negotiate with outside court-appointed trustees more vigorously to obtain greater than a 10 percent reduction in fees. TM generally concurs with this recommendation. TM recognizes, however, that the size of a trustee's fee reduction in a SIPA liquidation will likely vary from case to case based on facts and circumstances relevant to a particular liquidation, and, in some cases, SIPC may decide to recommend a trustee that has not agreed to a fee reduction greater than 10 percent based on factors such as the size, complexity and/or location of a liquidation and the limited availability of qualified and experienced persons capable of effectively exercising the powers granted to a trustee under SIPA.

*Recommendation 8: The bankruptcy group in OGC and TM should decide on the scope and frequency of the SEC staff's monitoring of SIPC assessments of the reasonableness of trustee fees paid by SIPC, rather than relying only on inspections of SIPC which do not occur on a systematic basis.*

TM concurs with this recommendation and will consult with OGC to determine the scope and frequency of the SEC staff's monitoring of SIPC's assessments of the reasonableness of trustee fees and to determine the respective roles of TM and OGC in the monitoring. Between inspections, TM and OGC plan to review fee applications in

3

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 147 of 229

**Appendix V**

SIPA cases to make sure trustees follow the U.S. Trustee guidelines and that SIPC has conducted a thorough review of the reasonableness of trustee fees. TM and OGC are not in a position to make an independent assessment of the reasonableness of trustee fees, because TM and OGC would need to, but do not, actively participate in the actual liquidation proceeding in a way that would permit that assessment.

*Recommendation 9: TM, in consultation with the Commission, shall determine whether to request that Congress modify SIPA to allow bankruptcy judges who preside over SIPA liquidations, to assess the reasonableness of administrative fees in all cases where administrative fees are paid by SIPC.*

TM understands from the Report and this recommendation that, as a result of judicial commentary in case law since 1978, you would like TM, in consultation with the Commission, to determine whether to request that Congress modify SIPA to provide for judicial review of administrative fees in SIPC cases where judicial oversight does not currently exist. We assume that when you refer to "administrative fees," you mean the fees of trustees and their counsel, and that you are referring to the provisions of Section 78eee(b)(5)(C) of SIPA that Congress adopted in 1978 to limit the judicial scrutiny of fee awards to trustees and their counsel in "no-asset cases" (i.e., cases in which there is no reasonable expectation that SIPC will recoup from the estate of the debtor allowances awarded by the court). TM will consult with the Commission for purposes of determining whether to make the aforementioned request to Congress.

*Recommendation 10: "[TM], in coordination with [OIEA], should encourage [SIPC] to designate an employee whose responsibilities include improving investor education and preventing further confusion about coverage available under the Securities Investor Protection Act among investors."*

TM concurs with this recommendation and will coordinate with OIEA to encourage SIPC to designate an employee whose responsibilities include improving investor education about SIPC and SIPA coverage.

As noted in the Report, in 2010, SIPC created a Task Force with a mandate to undertake a comprehensive review of SIPA and SIPC's operations and policies, and to propose reforms to modernize SIPA and SIPC. Among other things, the Task Force is considering whether SIPC should employ an individual whose focus would be to improve investor education about SIPC and SIPA. We understand that the Task Force will present its findings, conclusions, and proposals to SIPC's Board of Directors in the near future and that SIPC's Board of Directors will vote on the recommendations.

TM, in coordination with OIEA, will encourage SIPC's Board of Directors to designate an employee whose responsibilities include improving investor education about SIPC and SIPA.

4

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 148 of 229

**Appendix V**

*Recommendation 11:* "*[TM] should support [SIPC's] efforts to improve investor education, including encouraging SIPC to strongly consider and, as appropriate, implement [OIEA's] suggestions to improve investor awareness."*

TM concurs with this recommendation.  TM has supported, and will continue to support, the efforts of SIPC and OIEA to improve investor education and awareness relating to SIPA and SIPC.  We will encourage SIPC to consider and, as appropriate, implement OIEA's suggestions to improve investor awareness.

*Recommendation 12:* "*[TM], in coordination with [OIEA] and in consultation with the Commission, should utilize more effective methods to communicate with investors in case of the failure of broker-dealers such as notifying investors of the status of the Commission's efforts throughout the liquidation process or designating an employee, as appropriate, who can directly communicate with investors on matters unique to each liquidation case."*

TM concurs with this recommendation.  TM will coordinate with OIEA to develop more effective methods to communicate with investors affected by broker-dealer failures and will consult with the Commission as part of this process.

* * * * *

5

### MEMORANDUM

To:    Office of Inspector General

From:  Office of the General Counsel  *JH Stillman*

Subj:  OIG's Draft Report – SEC's Oversight of the Securities Investor Protection
Corporation's Activities

Date:  March 23, 2011

### Introduction

On February 28, 2011, the Office of Inspector General circulated its Discussion
Draft – SEC's Oversight of the Securities Investor Protection Corporation's Activities.
On March 7, 2011 the Office of the General Counsel ("OGC") submitted a memorandum
offering both technical and substantive comments on this Discussion Draft.  On March 9,
2011, the Office of Inspector General circulated its Draft – SEC's Oversight of the
Securities Investor Protection Corporation's Activities.  The OIG has requested that OGC
concur or not concur with its recommendations and to provide comments on this Draft
report.

### OGC's Responses to Recommendations of Draft Report (as amended)

**Recommendation 3** — OGC concurs.

**Recommendation 4** — OGC concurs.

**Recommendation 7** — OGC concurs to the extent that the recommendation affects OGC.

**Recommendation 8** — Joint Comment with TM — TM and OGC generally concur with
this recommendation and will consult with each other to determine the scope and
frequency of the SEC staff's monitoring of SIPC's assessment of the reasonableness of
trustee fees and to determine the respective roles of TM and OGC in the monitoring.
Between examinations, TM and OGC will also review fee applications to make sure they
follow the U.S. Trustee guidelines and that SIPC has conducted a thorough review of the
reasonableness of trustee fees. TM and OGC are not in a position to make an independent
assessment of the reasonableness of trustee fees, because TM and OGC would need to,
but do not, actively participate in the actual liquidation proceeding in a meaningful way.

1

## MEMORANDUM

March 24, 2011

**TO:**        H. David Kotz, Inspector General
              Office of Inspector General

**FROM:**      John H. Walsh, Associate Director-Chief Counsel (Designated Audit Liaison)
              John S. Polise, Associate Director
              Helene K. McGee, Assistant Director *ZD on behalf of HKM*
              Office of Compliance Inspections and Examinations

**COPY:**      Carlo di Florio, Director
              Office of Compliance Inspections and Examinations

              Robert W. Cook, Director
              Division of Trading and Markets

**RE:**        Office of Compliance Inspections and Examinations' Response to the Office of Inspector
              General's Draft Report, *SEC's Oversight of the Securities Investor Protection
              Corporation's Activities*

---

The Office of Compliance Inspections and Examinations ("OCIE") submits this Memorandum in response to the Office of Inspector General's ("OIG") draft report entitled *"SEC's Oversight of the Securities Investor Protection Corporation's Activities,"* dated March 9, 2011 ("Report"). This Memorandum responds to OIG's recommendations that OCIE and the Division of Trading and Markets ("TM") should (1) conduct meetings to determine when an inspection of the Securities Investor Protection Corporation ("SIPC") should occur; and (2) continue to perform risk assessments of problematic areas or liquidations prior to the next inspection of SIPC. You have requested that we indicate whether we "concur" or "non-concur" with each recommendation. We have consulted with TM and are in general agreement that we concur with these recommendations.

Set forth below are our responses to the recommendations directed to OCIE contained in the Report.

***Recommendation 5:*** *"[TM] and [OCIE] should conduct meetings, at least on an annual basis, to determine when an inspection of [SIPC] should occur based on the ongoing liquidations to ensure systematic and risk-based monitoring of SIPC's operation.   In these meetings, TM and OCIE should develop a schedule for future inspections based upon objective criteria or defined risk-factors, such as conducting inspections based upon the number of SIPC liquidations."*

OCIE concurs that regular meetings with TM would be useful in helping us achieve our objective of systematic and risk-based monitoring of SIPC's operations. As noted in the Report, OCIE and TM last performed an inspection of SIPC in 2003 and a follow-up inspection in 2005 to assess SIPC's activities. In early 2010, OCIE and TM jointly determined that an inspection of SIPC in 2010 would not be prudent due to SIPC's involvement in certain ongoing large liquidations. The staff of TM has been

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 151 of 229

**Appendix V**

OCIE's Response to OIG Audit - Report No. 495
March 24, 2011

actively involved in these liquidations and a considerable amount of SIPC's resources have been directed towards these liquidations. Based on these factors, OCIE and TM determined that our resources would be better utilized by waiting for these liquidations to be substantially completed prior to our next inspection of SIPC. We also considered the possible disruption an inspection could cause to SIPC and its activities with respect to these highly complex liquidations and determined that investors would be better served if we waited to commence an inspection of SIPC. We note also that examiners do not review liquidations that are in progress because of the disruption it could cause to the liquidation proceedings.

To date, meetings between OCIE and TM regarding the inspection of SIPC have generally been informal in nature. For example, we consult with TM on an annual basis in preparation of OCIE's memorandum that sets forth the annual goals and objectives of the National Exam Program. The purpose of this memorandum includes identifying risk areas for concentration on inspections. The memorandum generally includes our goals and objectives with respect to SIPC.

We agree that OCIE and TM should conduct more formal periodic meetings regarding inspections of SIPC. We have discussed this recommendation with TM and have agreed to meet at least annually for the purpose of determining when an inspection of SIPC should occur. In these meetings, OCIE and TM will assess whether to commence an inspection of SIPC. OCIE and TM have also agreed to develop objective criteria or defined risk-factors that will be used to develop a schedule for future inspections. We concur with the Report's assessment that an approach that considers objective criteria or defined risk-based factors in determining when SIPC should be inspected is preferable to an approach that calls for a set inspection cycle (e.g., every four to five years) without due consideration to these other factors.

***Recommendation 6:*** *"[TM] and [OCIE] should perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to the next inspection of [SIPC] as they did so prior to the commencement of the 2003 inspection of SIPC. The scope of each future inspection should take into consideration the risk assessment conducted prior to the inspection."*

We are pleased that the Report agrees with the risk-based approach OCIE and TM took prior to the commencement of our 2003 and 2005 inspections of SIPC. OCIE continues to improve and enhance its risk-based approach to examination preparation and execution and draws on multiple sources of data to ensure our risk assessment process is strategic and efficient in identifying problematic areas. For SIPC inspections, this would include identifying high-risk or complex liquidations. We therefore concur with the recommendation that OCIE and TM should continue to perform a risk assessment to determine problematic areas or liquidations that are deemed to be complex prior to inspections of SIPC. We also concur that the scope of each future inspection of SIPC should take into consideration these risk assessments.

2

08-01789-cgm    Doc 4169-11    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit J
to the Chaitman Decl.    Pg 152 of 229

Appendix VI

# OIG Response to Management's Comments

The OIG is pleased that TM, OCIE, and OGC concurred with all of the report's 12 recommendations.  We are also encouraged that TM, OGC, and OCIE have agreed to work together to implement our recommendations and to ensure the effectiveness of the SEC's oversight of SIPC's activities.

We wish to re-emphasize the importance of TM and OCIE developing schedules for regular inspections of SIPC and making determinations at their annual meetings of specific dates for SIPC inspections even if every meeting may not result in a determination of a specific date.  We also believe that it is critical for TM and the bankruptcy group in OGC to engage in significant additional oversight of SIPC's assessments of the reasonableness of trustee fees, including careful and comprehensive review of fee applications; to encourage SIPC to negotiate greater fee reductions; and to seriously consider requesting that Congress modify SIPA to allow bankruptcy judges to scrutinize fees of trustees and their counsel, particularly in no-asset cases.  We believe that the implementation of these recommendations will enhance the SEC's monitoring of SIPC and will further ensure that, consistent with the intent of Congress in enacting SIPA, the investing public is provided adequate protection against losses caused by the failure of broker-dealers.

# Audit Requests and Ideas

The Office of Inspector General welcomes your input.  If you would like to request an audit in the future or have an audit idea, please contact us at

U.S. Securities and Exchange Commission
Office of Inspector General
Attn: Assistant Inspector General, Audits (Audit Request/Idea)
100 F Street, N.E.
Washington D.C.  20549-2736

Tel. #:  202-551-6061
Fax #:  202-772-9265
Email: oig@sec.gov

## Hotline

**To report fraud, waste, abuse, and mismanagement at the SEC, contact the Office of Inspector General at:**

**Phone:  877.442.0854**

**Web-Based Hotline Complaint Form:**

# EXHIBIT D

Media Contact:
Kevin McCue
kmccue@bakerlaw.com
216-861-7576

Press Release of Irving Picard

## $7.2 BILLION RECOVERY AGREEMENT
## WITH ESTATE OF JEFFRY PICOWER AND PICOWER-RELATED INVESTORS

### *Madoff Trustee to get $5 billion and the U.S. Government $2.2 billion*

**NEW YORK, NEW YORK – December 17, 2010** – Irving H. Picard, a partner with Baker & Hostetler LLP and the SIPA Trustee for the consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), announced today that he has entered into a very significant settlement agreement for $5 billion to resolve claims against the estate of the late Jeffry M. Picower and certain related investment entities.

In conjunction with the additional $2.2 billion the Picower group forfeited to the U.S. government, the settlement represents 100 percent payment of the monies received by the Picower estate and related investors, Mr. Picard said. "Every penny of the $7.2 billion recovered through these two settlements will be distributed to BLMIS customers with valid claims."

A motion for approval of the settlement was filed today with the United States Bankruptcy Court for the Southern District of New York. A copy of the settlement motion is available on the Trustee's website at http://www.madofftrustee.com/ or on the Bankruptcy Court's website at http://www.nysb.uscourts.gov/ ; docket no. 08-01789(BRL). The Bankruptcy Court will hold a hearing for approval of the settlement motion on January 13, 2011.

"The importance of this settlement cannot be overstated, as it shows significant progress in our efforts to assemble the largest Customer Fund possible," said Mr. Picard. "Today's $5 billion agreement with the Picower estate and related investors represents one of the largest settlements in any bankruptcy proceeding. If this settlement and the agreements reached recently with Union Bancaire Privée and the Shapiro family are approved by the Court, the Customer Fund will total

more than $7.5 billion – more than one-third of the total principal we currently estimate was lost in the Ponzi scheme," said Mr. Picard. "As soon as is practicable after the settlement is approved by the Bankruptcy Court, we will ask the Court to approve an initial distribution from the Customer Fund to BLMIS customers with allowed claims."

"This agreement puts the best interests of the Madoff customers first, is fair and equitable, and avoids time-consuming litigation which would have offered no certainty on the amount recovered and delayed distributions to Madoff customers with valid claims," said David J. Sheehan, counsel for the Trustee and a partner at Baker & Hostetler LLP, the court-appointed counsel for the Trustee.

"As we have often stated, those who have received other people's money, irrespective of their knowledge of the fraud, should return the monies to the Trustee for payment to those Madoff customers with valid claims who have recovered little or none of their original deposits," said Mr. Sheehan. "Mrs. Picower embraced this concept and has set the appropriate high standard going forward."

Mr. Picard further stated, "When we filed suit against Mr. Picower and others in the spring of 2009, the records available led us to allege that Mr. Picower might have or should have known of Mr. Madoff's fraud. With the benefit of additional records, I have determined that there is no basis to pursue the complaint against Mr. Picower, and we have arrived at a business solution instead.

"I want to thank Mr. Picower's widow, Barbara, the other Picower family members and the legal, business and other advisors who worked with us to arrive at this agreement. This resolution sets a positive example for negotiation and settlement, versus litigation, because Mrs. Picower fully understood the impact of Madoff's crime and wanted to do the best she could to help BLMIS customers," Mr. Picard continued. "While this is a major milestone, we still have much work to do and our focus will remain on recovering additional funds that rightfully belong to the BLMIS customers with valid claims."

Mrs. Picower said, "It is a great tragedy that my husband Jeffry's sudden and untimely death last fall prevented him from seeing the timely and full restoration of his reputation for honesty, integrity and professional achievement and the resumption of his life's work of caring for others and giving back

to society through philanthropy.  He was committed to overcoming the devastation resulting from Bernard Madoff's fraud by reaching a fair and generous settlement with Mr. Picard and also by continuing the important charitable work that had been the focus of our lives for so many years."

William D. Zabel of Schulte, Roth & Zabel, the law firm representing Mrs. Picower and the estate of Jeffry Picower, further noted that Mr. Picower's wills over the past two decades always directed that the vast bulk of his accumulated wealth was to be given to charity following his death.  In due course during the administration of Mr. Picower's estate, pursuant to Mr. Picower's will, his wife Barbara will be establishing a new foundation to continue their charitable legacy.

The Trustee was represented by his firm, Baker & Hostetler.  In addition to Mr. Sheehan, the Trustee acknowledges the contributions of the Baker & Hostetler attorneys who worked on this settlement agreement and filing: Oren Warshavsky, Thomas Lucchesi, Lauren Resnick, Tracy Cole, Seanna Brown, Marc Hirschfield, and Amy Vanderwal.

The Picower estate and related entities were represented by Schulte, Roth & Zabel.  In addition to Mr. Zabel, the Trustee acknowledges the work of Schulte, Roth & Zabel attorneys Marcy Harris, Gary Stein, Susan Frunzi, Frank LaSalle, and Harry Sandick.

# # #

# EXHIBIT E

# SiPC

**SECURITIES INVESTOR PROTECTION CORPORATION**
**805 FIFTEENTH STREET, N. W., SUITE 800**
**WASHINGTON, D. C. 20005-2215**
**(202) 371-8300    FAX (202) 371-6728**
**WWW.SIPC.ORG**

January 24, 2011

**BY MESSENGER**

The Honorable Scott Garrett
Chairman
Subcommittee on Capital Markets and
  Government-Sponsored Enterprises
House Financial Services Committee
United States House of Representatives
2244 Rayburn House Office Building
Washington, D. C. 20515

RE:  **Request for Additional Information on Madoff Matter**

Dear Chairman Garrett:

This is in response to your letter of December 9, 2010, requesting additional information in connection with the failure of the Bernard L. Madoff Investment Securities LLC ("BLMIS") brokerage firm. Members of the SIPC staff and the Trustee's staff have assembled data in response. Before answering your specific inquiries, I believe it makes sense to bring you up to date on a number of recent events, all of which are very positive for the customers of BLMIS firm. Also provided is some background information on the use of avoiding powers.

**Settlements Which Will Increase The Distribution To Customers**

The Securities Investor Protection Act, 15 U.S.C. §78aaa et seq. ("SIPA"), provides that cases under SIPA are to be conducted in accordance with specified provisions of the Bankruptcy Code, to the extent the two statutes are consistent. This allows Irving Picard, the trustee in the BLMIS case, to use the tools that are available to a bankruptcy trustee to recover assets, in order to make the equitable distribution called for under SIPA. Among those tools is the ability to reverse, or, in the statutory parlance, "avoid" transfers of assets made prior to the initiation of the liquidation.

The Honorable Scott Garrett
January 24, 2011
Page 2

Mr. Picard's use of the avoidance powers has been very successful. But Mr. Picard and his attorneys are mindful of the human toll of such lawsuits, and have used discretion and compassion in dealing with the unprecedented realities presented by the largest Ponzi scheme in history.

<u>Successful Negotiations</u>

- Mr. Picard negotiated a settlement with Swiss bank Union Bancaire Privée, which was approved by the Bankruptcy Court. The settlement will result in the addition of approximately $500 million to "customer property" for distribution to customers of BLMIS.

- Mr. Picard negotiated a $550 million settlement with Carl Shapiro, Robert Jaffe, and related entities, which was approved by the Bankruptcy Court. In conjunction with the United States Attorney for the Southern District of New York, the $550 million and an additional $75 million will be distributed by Mr. Picard as Special Master, to Madoff victims as part of a civil forfeiture.

- Mr. Picard negotiated settlements with a number of charitable and nonprofit institutions that received avoidable transfers, in the sum of $80 million. These settlements are practical and equitable solutions to the terrible problems caused by Bernard Madoff. These settlements balance the concerns of both the charities that innocently received stolen funds, and the people whose money was stolen and who will receive distributions as a result of these agreements.

- Teaming with the United States Attorney for the Southern District of New York, Mr. Picard negotiated a settlement with the Estate of Jeffry Picower in the total amount of $7.2 billion. Under the agreement with the Trustee, which was approved by the Bankruptcy Court, $5 billion will come to the Trustee for distribution to customers in the SIPA proceeding. The $2.2 billion received by the United States Attorney also will benefit the victims. This will be distributed by Mr. Picard in the separate capacity of Special Master.

The Trustee will need Bankruptcy Court approval to distribute the funds to customers. The preparation of an application for such relief is underway.

The benefits of these settlements, in both dollars to the victims, and as a template for other future settlements in the BLMIS case, cannot be overstated. It must be emphasized that persons whom the Trustee is suing in avoidance are persons who received <u>other investors'</u> money. In a Ponzi scheme, a dollar more for one victim means a dollar less for another victim. Thus, in the BLMIS case, every dollar received by an investor above the amount that the investor deposited with BLMIS is one dollar less for the investor to whom the money actually belonged. Unless the Trustee is allowed to pursue the avoidance suits, some investors will continue to benefit at the expense of others, even if all are equally innocent.

It also must be emphasized that the customer's "net equity" under SIPA will not necessarily govern a trustee's ability to bring avoidance actions. What a customer is owed in a

The Honorable Scott Garrett
January 24, 2011
Page 3

SIPA case, that is, the customer's "net equity," is as defined in SIPA. Conversely, a trustee's power to avoid transfers is pursuant to provisions of the Bankruptcy Code made applicable under SIPA to a SIPA proceeding.

## The Practical Aspects of Using the Avoiding Powers

The Trustee is using the avoidance powers rationally, with discretion and compassion, and with tangible results. As is evidenced by the settlements with the various charities, there is a balance to be struck here, and I believe the Trustee has done an excellent job of finding the correct solutions on a case by case basis.

The Trustee's balanced approach is evidenced by the Hardship Program implemented before the "avoidance action" complaints were filed. At the start of the liquidation proceeding, in December, 2008, the Trustee instituted a Hardship Program to identify the BLMIS claimants suffering hardship and to accelerate the processing and payment of their claims in the proceeding. The Trustee has announced that he will continue the Hardship Program in connection with the avoidance actions. The Program is designed to encourage investors who have been sued to come forward and to explain to the Trustee why he should not continue the suit against them. Among the factors that the Trustee has announced he will consider are the investor's age, financial condition, medical situation, need to return to work after having retired, inability to pay for the care of dependents, the extent to which withdrawals were made from a BLMIS account to pay for taxes on fictitious sums, and other demonstrated hardship. The Trustee also has set up a toll-free hotline to answer any concerns investors have with respect to avoidance suits. All of this information, as well as the hardship application, is available on the Trustee's web site at www.madofftrustee.com.

In addition, together with each complaint, the Trustee has sent to each "good faith" investor a letter containing the above information and urging the investor to contact the Trustee to discuss the complaint. The Trustee is mindful of the fact that some people who have withdrawn assets periodically over an extended period of time simply have no ability to make any return of assets. Neither SIPC nor the Trustee has any interest in pursuing litigation that is as distressing as it is pointless. But the Trustee also must investigate the facts of each such case, and has established a mechanism to do so.

Further, in anticipation of the "avoidance actions," the Trustee obtained a procedural order in the liquidation proceeding, sent to every party who has been sued, which provides for confidentiality of financial information and mediation of the suits. In most instances, the costs of mediation will be paid for not by the party who has been sued, but by the debtor's estate, with funds advanced by SIPC.

In short, the Trustee is doing, and will do, everything possible to dismiss or settle suits where the financial situation of a party warrants such relief, and otherwise to resolve as expeditiously as possible, all other suits against investors who unknowingly received other investors' money.

The Honorable Scott Garrett
January 24, 2011
Page 4

## The Use of Avoidance Powers In a SIPA Case

It also should be noted that there are reasons unique to SIPA why an "innocent investor" is less often the subject of an avoidance action in a SIPA case than in ordinary bankruptcy.

When a party receives a distribution prior to the collapse of a brokerage firm, it is less likely that the <u>facts</u> are such that a preference or fraudulent transfer may be recovered, at least when all allowed claims are within the limits of SIPA protection.

Here is why:

1. A trustee may recover, in an avoidance action, an amount that <u>exceeds</u> what that person would have received in the liquidation had the distribution not been made. <u>See</u>, for example, 11 U.S.C. §547(b)(5), made applicable to the BLMIS case by 15 U.S.C. §78fff-2(c)(3).

2. In the overwhelming majority of SIPA cases, a theft is identified before a high percentage of customer property is missing. The combination of (i) SIPC advances and (ii) a high percentage of customer property distribution means that the person receiving the pre-liquidation distribution would have received the same amount in the liquidation. Thus, it makes no sense to initiate an avoidance action when the target of such a suit would get the assets back.

To illustrate:

John has a securities account worth $1,000,000 at Brokerage X. He has had that balance for years. He sells his securities, closes the account, and receives a check for $1 million, on December 1. After John cashes the check, Brokerage X is placed into a SIPA proceeding on December 15. At the time of the failure, 10% of all assets owed to customers is missing, and therefore 90% of the assets that are supposed to be held for customers are in fact secure.

What does this mean for John, who received a $1,000,000 distribution during the avoidance period? It means that even if the statutory criteria for bringing an avoidance suit were met, it would make no sense for the trustee to initiate an avoidance action, so long as all allowed customer claims do not exceed the limits of SIPA protection. If John were to return the funds, the trustee would immediately return the exact same amount to him. John would receive $900,000 from customer property, and SIPC would advance $100,000 to the trustee for subsequent distribution to John.[1]

---

[1] An avoidance suit would be necessary if there were over-the-limits customers in the proceeding, that is, customers who would not be made whole through a distribution of customer property in the possession of the trustee combined with the advance of SIPC funds. For example, assume all of the facts in the above hypothetical, except that in addition to John, there is a second customer named Joan with a valid $12 million claim. A 90% distribution of customer property would result in Joan receiving $10.8 million. Coupled with a SIPC advance of $500,000, Joan's total recovery would be $11.3 million, leaving her still owed $700,000. If the trustee were to sue John in avoidance, John, based on the above analysis, would still be made whole because of the SIPC

The Honorable Scott Garrett
January 24, 2011
Page 5

The foregoing example, and innumerable others that could be constructed, show that it would typically take a huge shortfall in customer property, coupled with a very large withdrawal, before an avoidance action is meaningful. That is why avoidance actions in SIPA cases are less common.

3. As illustrated above, the availability of SIPC funds in a SIPA proceeding often reduces the need for avoidance suits unlike the situation in ordinary bankruptcy, where avoidance of preferences is more common. Unfortunately, because of the large sums at stake in BLMIS, and the substantial amounts by which some investors will benefit at the expense of others if he fails to act, the Trustee has no choice but to seek to recover funds by means of avoidance.

A final point before proceeding to the answers to your questions.

As noted above, the Trustee is empowered by both SIPA and the Bankruptcy Code, to the extent consistent with SIPA, to gather assets of the estate for the benefit of all of the creditors, including customers, to the proceeding. The SIPA statutory scheme provides for a priority to be given to those customers who have positive net equity balances in their customer accounts. The BLMIS matter being a Ponzi scheme, there were no earnings or profits, but only other people's money. Thus, the customers who had a positive net equity in their BLMIS accounts are those who did not get all of their money back from BLMIS. These are the customers who are entitled to priority under the SIPA statute. The Trustee utilizes his powers under SIPA and the Bankruptcy Code to gather in assets to form a fund of customer property to take care of these priority claimants in the first instance.

However, as the Trustee for BLMIS, the Trustee is also the representative of all other creditors, including customers, to the proceeding. Once he has fulfilled his obligations to the priority claimants by assembling a customer fund sufficient to return to them all of the money they invested in BLMIS, he can then turn to the effort of satisfying those customers and creditors who were not given priority. In the BLMIS case, the customers and creditors who were not given priority are those "net winners" who were customers of BLMIS but who in fact received more money than they put in. Once the Trustee has satisfied all of the "net losers" who did not get all of their money out, those net losers will then be on the same footing as the net winners, and thereafter, both the net winners and the net losers will be treated as general unsecured creditors who have claims for fraud to the extent of any damages.

The claims for fraud by both the net losers and net winners are predicated upon the fact that Mr. Madoff misrepresented to all of them that he was in fact engaging in a legitimate securities business when in fact he was actually operating a Ponzi scheme. As a result of Mr. Madoff's misrepresentations, all of the customers of BLMIS may have suffered damages which can be recognized as general creditor claims in the BLMIS proceeding.

---

advance. However, Joan would fare better because the additional sum recovered in avoidance from John would be added to the fund of customer property, and result in a larger distribution to Joan. No actual harm comes to John, and SIPC pays a higher amount. That is the situation in the Madoff case.

The Honorable Scott Garrett
January 24, 2011
Page 6

As you know, according to the falsified books and records maintained by Mr. Madoff, BLMIS owed all of its customers the purported sum of at least $65 billion. It is currently the Trustee's estimate that a customer fund of at least $20 billion will be necessary to satisfy the net losers and put them on an equal footing with the net winners in the BLMIS proceeding. Once the Trustee has achieved the $20 billion figure, he will then continue to pursue his avoidance actions and his claims for damages against financial institutions and related entities for the purpose of seeking to obtain additional sums in order to satisfy all of the general creditor claims in the proceeding, including claims for fraud. As has been well publicized, the Trustee has instituted suits against a variety of institutions pursuing avoidance actions and seeking damages in excess of $90 billion. While the outcome of litigations cannot be predicted with any degree of accuracy, it is the goal of the Trustee and his counsel to vigorously pursue all of these litigations in order to recover as much of the damages that have been suffered by all of the customers and creditors of BLMIS. As noted above, the Trustee has had some degree of success already, and it is respectfully submitted that his goal is not only a worthy one, but one which he has demonstrated that if given the opportunity to utilize all of the avoidance powers and litigation authority available to him, he will do his very best to achieve the result. Thus, if the powers afforded the Trustee are left unfettered, he will be in the best position to help all of the victims in BLMIS.

Set forth below is each of your requests for information, followed by the response.

## SECTION ONE

**1a.**    **(Regarding question 1 of the August 20 letter)  Please update the data showing the balance sheet of the SIPC fund, as of December 1, 2010.**

**Response**:

The SIPC Fund, as defined under SIPA, consists of cash on hand or on deposit and amounts invested in United States Government or agency securities.

As of December 1, 2010, rounded to the nearest $100,000, the SIPC Fund consisted of:

| | |
|---|---|
| US Government Securities maturing within 10 years at fair value (including accrued interest receivable) | $1,228,500,000 |
| Cash on hand or on deposit | $7,700,000 |
| Total | $1,236,200,000 |

**1b.**    **Additionally, provide the total paid in advances to Madoff customers, the number of accounts paid, the average payment, and the average elapsed time between claim filing and advance payment.**

The Honorable Scott Garrett
January 24, 2011
Page 7

**Response:**

This question and those that follow use the term "claims" with respect to the information being sought. The answers that follow are predicated upon an analysis of the customer accounts that have been determined, or remain to be determined, by the Trustee and the relationship of those customer accounts to the claims that have been filed. Wherever possible, the Trustee and SIPC encouraged claimants to file claims to preserve any rights the claimants might have. Consequently, there are many more claims than there are customer accounts. It also should be noted that much of the information relating to claims analyzed under a last fictitious statement approach are rough approximations at best. The claims have not been reviewed or analyzed on that basis and some adjustments to the information could become necessary upon actual review. With this background in mind, the answer to question 1b as well as subsequent questions is as follows:

   i. As of December 31, 2010[2], the total in advances committed by SIPC to BLMIS customers was $780,193,242.27 and the total advances paid to claimants was $762,259,841.26. The difference between the SIPC advances committed and the SIPC advances paid is due to the fact that after determination letters are issued, the payments are pending the receipt of fully executed documentation.

   ii. As of December 31, 2010, the total number of accounts committed to be satisfied was 2,053. The number of allowed claims associated with these 2,053 accounts was 2,363 and the total number of accounts for which a payment was made was 1,992 which relate to 2,283 allowed claims. The difference between the SIPC advances committed and the SIPC advances paid arises from the fact that after determination letters are issued, the payments are pending the receipt of fully executed documentation.

   iii. As of December 31, 2010, the average of the SIPC advances committed to these 2,053 accounts was $380,025.93 and the average SIPC advance paid to the 1,992 accounts was $382,660.56. The difference between the SIPC advances committed and the SIPC advances paid arises from the fact that after determination letters are issued, the payments are pending the receipt of fully executed documentation.

   iv. As of December 31, 2010, the average elapsed time between the filing of the claims related to the 2,053 allowed accounts and the commitment of advance payment was 8.8 months.

As discussed in earlier correspondence with Congressman Kanjorski and you, there are certain facts that are very important for a complete understanding of the time needed to determine claims. First, this is not a typical SIPA proceeding in which most customer securities or cash are accounted for, because they are on hand at the time of the failure of

---

[2] Where available, data as of December 31, 2010 has been used in compiling responses to your questions.

The Honorable Scott Garrett
January 24, 2011
Page 8

the brokerage house. Instead, BLMIS involved a Ponzi scheme in which the principal assets were other people's money. Furthermore, the Ponzi scheme was of long standing, extending back over at least 30 years. Since SIPA requires that the investor get back what he put into the scheme, the Trustee was required to do a full forensic analysis of all the books and records of the debtor, going back to at least the early 1980s in order to fully determine the amount of money due to each customer.

More than 16,000 "customer" claims were filed in the proceeding. The forensic analysis for many of the claims involved not only a complete review of the books and records of the failed brokerage house, but also documents received from third parties, such as banking institutions, clearing houses and other brokerage houses, as well as documents received from the customers themselves. There are literally millions of documents that have been reviewed by the Trustee and his staff in connection with the evaluation of each of the customer claims filed. Furthermore, access to books and records required coordination and sharing with law enforcement authorities which complicated and, in some instances, necessarily delayed the review.

Because of the longstanding nature of the Ponzi scheme, many of the customer accounts presented multiple generational investments by customers with Mr. Madoff. Thus, it was not simply a matter of examining a single account for a short period of time, but in many instances, an extensive analysis of multiple accounts going back several decades was required, in order to fully determine the amount of money invested by the customer and whether the customer had invested more money than he or she had received from Mr. Madoff.

Finally, the length of time needed to determine claims was not only impacted by the above factors, but significantly, by the fact that a widespread and serious fraud was involved. Determining who was a participant in and beneficiary of the fraud required the Trustee to scrutinize each claim carefully against the firm's books and records and against the information learned in his investigation of BLMIS and its activities.

**2a.    (Regarding question 4 of the August 20 letter)  For the 1149 approved accounts with claims of $500,000 or greater, provide the aggregate sum for these claims and the aggregate sum of claims using the Final Statement Method (FSM).**

**Response**:

As discussed in more detail below in the response to Question 2c of Section 1, the "Final Statement Method" is based on the last account statement issued by BLMIS to investors. Uniformly, the statements in question reflect non-existent securities "trades" invented by Bernard Madoff to yield fake profits that he decided investors should "receive." When withdrawn, the fake profits that the customers received were actually other investors' money.

The Honorable Scott Garrett
January 24, 2011
Page 9

Between August 1, 2010, and December 31, 2010, the number of allowed accounts valued over $500,000 increased to 1,207, and accordingly, 1,207, instead of 1,149, is used below:

    i. Total Number of Allowed Accounts over $500K: 1,207
    ii. Total Allowed Net Equity: $5,762,794,392.30
    iii. Total Fictitious Equity under a final fictitious statement method: $12,045,355,425.58

**2b.** **For the 744 approved accounts with claims of less than $500,000, provide the aggregate sum of those claims and the aggregate sum of those claims using the FSM.**

**Response**:

Between August 1, 2010, and December 31, 2010, the number of allowed accounts valued at less than or equal to $500,000 increased from 744 to 846. Accordingly, 846, instead of 744, is used below:

    i. Total Number of Allowed Accounts under and equal to $500K: 846
    ii. Total Allowed Net Equity: $176,538,242.27
    iii. Total Fictitious Equity under a final fictitious statement method: $1,577,286,679.78

**2c.** **Prepare a stratification table in segments of $100,000, and for each segment show total number of accounts, total claims using the Net Investment Method (NIM), and total claims using FSM.**

**Response:**

The term "Net Investment Method" ("NIM") is a term that has been used by certain claimants in the BLMIS case. It refers to the calculation of a customer's net equity based on the total amount deposited by the customer into his account, less the total amount of withdrawals from the account.

As mentioned above, the Final Statement Method ("FSM") refers to the value of the customer's account as shown on the customer's last account statement which in this case, includes fictitious profits invented by Bernard Madoff and non-existent trades fabricated by him that do not reflect market reality.

This question seeks a comparison of the net equity value and the fictitious statement value of all allowed accounts with an adjusted cash balance less than or equal to $500,000. However, this comparison is not reliable. The number of accounts that would be allowed under a fictitious statement approach obviously is significantly higher than the number of accounts that have been allowed under the net equity approach. Under the fictitious statement approach, the amount allowed will be higher on an account by account basis because claimants would be entitled to recover the fake profit in addition to their principal.

The Honorable Scott Garrett
January 24, 2011
Page 10

It should be noted that allowance of claims under a fictitious statement approach necessarily reduces the amount of customer property available to satisfy those claimants who have yet to recover their principal since such property is shared pro rata by customers. Enlarging the pool of claimants sharing in customer property means less property for those who have yet to recover their principal and more property for those who, while the firm was in business, withdrew their principal and received other investors' money in the form of fake profits. In other words, investors who already recovered their principal continue to receive fake profits when the firm is in liquidation to the continued detriment of those investors still owed their principal. In addition, because the SIPC advance supplements the distribution of customer property, under a fictitious statement approach, SIPC funds are used to pay customers fake profits the amount of which has been determined by the thief.

Based on the 11/30/2008 customer monthly statements, there were 4,881 customer accounts with a positive fictitious statement method balance, totaling $73,481,352,153.68.[3] The table below provides a stratification of these 4,881 accounts based on their fictitious balance. It should be noted that claims were not filed for some of these 4,881 accounts.

| Category | Accounts | Fictitious Statement Balance |
|---|---|---|
| $0K up to $100K | 222 | $9,236,502.70 |
| $100K up to $200K | 236 | $34,942,027.78 |
| $200K up to $300K | 214 | $52,391,337.08 |
| $300K up to $400K | 177 | $61,967,863.82 |
| $400K up to $500K | 161 | $72,718,064.15 |
| Sub-Total | 1,010 | $231,255,795.53 |
| Greater than $500K | 3,871 | $73,250,096,358.15 |
| Grand Total | 4,881 | $73,481,352,153.68 |

**3a.**    **(Regarding question 5 of the August 20 letter) With respect to the payment of advances, explain the process by which SIPC, through subrogation, establishes a claim to share in customer property. In the priority ranking of claims, where do these claims, as subrogee, stand in relationship to the customer claims? Please cite the authority in SIPA.**

---

[3] The $73.5 billion figure represents the fictitious equity shown on the final fictitious statement for the 4,881 customer accounts with "positive" FSM balances. The difference between this amount and the well-documented figure of $64.8 billion reflects certain accounts with reported negative "equity" balances totaling in excess of $8 billion, 99% of which are in accounts in the name of Jeffry Picower and the children of Norman Levy.

The Honorable Scott Garrett
January 24, 2011
Page 11

**Response**:

Under 15 U.S.C. section 78fff-3(a), SIPC is subrogated, to the extent of its advances, to the claim of any fully satisfied customer. SIPC may not exercise its right of subrogation as to a customer until that customer has been fully satisfied.

Subrogation works as follows:
If all customer property were immediately available to a SIPA trustee at the start of a liquidation proceeding, customer claims would be satisfied first, through the pro rata distribution of customer property, and second, to the extent of any shortfall, through advances of funds from SIPC, within statutory limits. See 15 U.S.C. §§78fff-2(c)(1)(B) and 78fff-3(a). In that situation, SIPC would never share as subrogee in customer property because all customer property would have been distributed initially to customers and none would remain for distribution to SIPC.

In practice, however, because assembling customer property may require the trustee to investigate the debtor's business and to sue third parties – all of which takes time -- SIPC advances may be used initially to satisfy customers notwithstanding that there has been no showing or determination that customer property would be insufficient. 15 U.S.C. §78fff-2(b)(1). Customers may thus be satisfied promptly and not made to wait while the collection of customer property is achieved.

If a customer has been fully satisfied through a SIPC advance by the time customer property becomes available for distribution, then allowing that customer to receive his pro rata share of the property would result in the customer receiving a double recovery on his claim. Instead, SIPC stands in the customer's shoes in the distribution of such property. In that manner, the end result is the same as if customer property first had been fully collected and distributed, and SIPC funds used only to make up the difference between the amounts owed to customers and the customer property available to them.

**3b.    It is reported that in the payment of advances to Madoff customers, SIPC is demanding that recipients execute assignment of claims to customer property. Does such assignment give SIPC a higher priority to customer property than is accorded through subrogation? If so, provide the statutory authority for this improvement in claims priority.**

**Response:**

A report that SIPC is demanding the execution of assignments is incorrect. The Trustee is an independent fiduciary and it is he who determines claims and in consideration of the satisfaction of claims requests assignments from the satisfied customers. The request for an assignment is consistent with and as provided under 15 U.S.C. §78fff-2(b). The assignment does not give SIPC a higher priority in the distribution of customer property. Rather, a central purpose of the assignment is to give the trustee the capacity to sue,

The Honorable Scott Garrett
January 24, 2011
Page 12

standing in the shoes of the person whose claim he has satisfied, in order to recover property from third parties for distribution to all customers.

4.      (Regarding question 6 of the August 20 letter)  How many accounts are involved in the receipt of the 90,000 disbursements?  Beginning with the first year in which these disbursements occurred, list for that year and each succeeding year the number of disbursements, the aggregate value of the disbursements, the number of accounts, the number of disbursements related to account closing and the average amount involved in each such transaction.

Response:

The table that follows includes the number of disbursements in excess of deposits, the aggregate value of disbursements in excess of deposits, the average disbursement amount, the number of accounts, and the number of disbursements related to the closing of an account.

| Year | Number of Disbursements in Excess of Deposits | Aggregate Value of Disbursements in Excess of Deposits | Average Disbursement Amount | Number of Accounts | Account Closing Related Disbursements[4] |
|------|------|------|------|------|------|
| 1981 | 10 | $239,466 | $23,947 | 9 | 6 |
| 1982 | 36 | 487,199 | 13,533 | 23 | 13 |
| 1983 | 37 | 2,431,473 | 65,715 | 19 | 13 |
| 1984 | 38 | 782,991 | 20,605 | 23 | 9 |
| 1985 | 192 | 7,135,066 | 37,162 | 71 | 14 |
| 1986 | 375 | 18,858,068 | 50,288 | 92 | 14 |
| 1987 | 497 | 14,174,763 | 28,521 | 111 | 5 |
| 1988 | 722 | 35,995,555 | 49,855 | 164 | 23 |
| 1989 | 992 | 49,914,278 | 50,317 | 184 | 18 |
| 1990 | 1,122 | 45,713,503 | 40,743 | 225 | 19 |
| 1991 | 1,469 | 71,552,235 | 48,708 | 283 | 33 |
| 1992 | 1,858 | 519,368,321 | 279,531 | 313 | 27 |
| 1993 | 2,500 | 228,463,943 | 91,386 | 424 | 74 |
| 1994 | 2,667 | 282,226,802 | 105,822 | 447 | 74 |
| 1995 | 3,133 | 479,946,926 | 153,191 | 456 | 54 |
| 1996 | 3,932 | 539,182,466 | 137,127 | 528 | 98 |
| 1997 | 3,003 | 668,343,286 | 222,559 | 703 | 344 |
| 1998 | 2,443 | 786,614,902 | 321,987 | 483 | 90 |
| 1999 | 2,995 | 999,865,155 | 333,845 | 625 | 51 |

---

[4] There could be more than one disbursement related to closing a single account.  However, the table above only includes the final disbursement for each respective account.

The Honorable Scott Garrett
January 24, 2011
Page 13

| 2000 | 3,848 | 1,149,561,399 | 298,743 | 848 | 65 |
|---|---|---|---|---|---|
| 2001 | 4,340 | 1,352,096,251 | 311,543 | 922 | 70 |
| 2002 | 4,974 | 1,391,790,937 | 279,813 | 1,082 | 61 |
| 2003 | 6,278 | 1,675,967,743 | 266,959 | 1,288 | 40 |
| 2004 | 6,913 | 1,572,900,380 | 227,528 | 1,439 | 61 |
| 2005 | 7,453 | 1,576,183,767 | 211,483 | 1,627 | 72 |
| 2006 | 8,739 | 1,227,904,383 | 140,509 | 1,840 | 79 |
| 2007 | 9,573 | 1,732,389,729 | 180,966 | 2,072 | 80 |
| 2008 | 9,220 | 1,901,590,538 | 206,246 | 2,090 | 82 |
| **Total** | **89,359** | **$18,331,681,525** | | | **1,589** |

5.    **(Regarding question 7 of the August 20 Letter) How many applications for hardship relief have been filed, how many have been granted, and how many have been denied? In the case of denials, what is the average size of the account, and what are the Trustee's reasons for denial? Also, what is the standard being used to identify "hardship" cases? Is the standard objective or subjective?**

**Response**:

As of December 31, 2010, 394 hardship applications had been received. Of these 394 applications, 44 did not meet the qualifications to participate in the Hardship Program. Most of the ineligible applications were filed on behalf of entities or were filed by individuals who were indirect investors. Of the 350 eligible applications, 275 (78.5%) were approved and 75 (21.5%) were not approved.

The 75 applications that were not approved relate to 77 customer accounts. Of these 77 accounts,

- 22 were net losers with a net equity of $41,605,142.23 at an average of $1,891,142.83. The claims of these claimants were allowed outside of the hardship program.

- 52 were net winners with a net equity of negative $29,648,007.42 at an average of negative $570,153.99.

- 3 were net zeros with a net equity of $0.00 at an average of $0.00.

The standards are by and large objective and the criteria that are the basis for hardship relief are identified in the Trustee's web site at www.madofftrustee.com. As previously discussed, they include:

a.    Advanced age.

b.    Inability to pay for necessary living expenses, such as housing (including loss of home to foreclosure), food, utilities and transportation.

The Honorable Scott Garrett
January 24, 2011
Page 14

    c.  Inability to pay for necessary medical expenses.

    d.  Necessity to return to work after having previously retired from former employment (special consideration will be given to individuals who can no longer return to their former work).

    e.  Declaring personal bankruptcy.

    f.  Inability to pay for the care of dependents.

    g.  The extent to which withdrawals of fictitious profits were used to pay taxes on fictitious sums.

    h.  Otherwise suffering from extreme financial hardship as demonstrated by other circumstances not addressed by the foregoing.

**6.    (Regarding question 10 of the August 20 letter)  The Table presented shows that in years 1998 through 2001 deposits and withdrawals were significantly higher than in other years.  Please provide a detailed explanation for this change in fund flows.  Were these the transactions of institutional investors?  If so, provide detailed information in tabular form for each year by type of institution (hedge fund, mutual fund, etc., and whether foreign or domestic) showing sums deposited and withdrawn and rates of return.  Were there any relationships presenting unusual characteristics (short-term with high return, etc)?  If so, provide detail.**

**Response**:

The Table presented under question 10 of the August 20 letter related to the years 1992 through 2008. The below tables therefore relate to years 1992 through 2008.  The years specifically addressed for 1998 through 2001 are in bold print.  The significant increase in deposits and withdrawals in years 1998 through 2001 was due to the activity in one Investment Advisory account: No. 1L0027 – Norman F. Levy.   The first table below shows the cash in/cash out activity for just Account No. 1L0027 and the second table shows the total activity in all accounts, with the cash activity for Account No. 1L0027 *excluded* from the results.  Norman Levy, now deceased, was an individual investor and not an institutional investor.

**Norman Levy Account 1L0027**

| Year | Cash In | Cash Out |
|------|---------|----------|
| 1992 | $1,108,364,660 | ($994,048,201) |
| 1993 | $1,387,358,368 | ($1,517,903,726) |
| 1994 | $2,279,645,611 | ($2,128,805,955) |
| 1995 | $3,542,773,369 | ($3,453,047,453) |
| 1996 | $5,372,928,546 | ($5,471,231,206) |
| 1997 | $7,067,467,981 | ($7,377,869,833) |
| **1998** | **$10,102,787,010** | **($10,039,234,425)** |
| **1999** | **$15,316,343,975** | **($15,227,808,969)** |

The Honorable Scott Garrett
January 24, 2011
Page 15

| | | |
|---|---|---|
| **2000** | **$23,044,584,696** | **($23,103,627,635)** |
| **2001** | **$35,095,634,103** | **($35,154,090,159)** |
| 2002 | $862,232,070 | ($898,796,993) |
| 2003 | $307,000,000 | ($246,934,119) |
| 2004 | $161,511 | ($49,478,915) |
| 2005 | $137,576 | ($35,629,433) |
| 2006 | $0 | $0 |
| 2007 | $0 | $0 |
| 2008 | $0 | $0 |

**All Accounts Excluding No. 1L0027**

| Year | Cash In | Cash Out |
|---|---|---|
| 1992 | $904,272,560 | ($1,018,689,670) |
| 1993 | $664,370,878 | ($609,219,797) |
| 1994 | $577,959,780 | ($651,932,259) |
| 1995 | $884,907,897 | ($955,450,002) |
| 1996 | $1,303,802,139 | ($1,076,280,471) |
| 1997 | $1,995,752,125 | ($1,259,163,989) |
| **1998** | **$2,718,098,944** | **($1,657,646,062)** |
| **1999** | **$2,606,597,014** | **($1,866,578,080)** |
| **2000** | **$2,584,913,116** | **($2,598,132,080)** |
| **2001** | **$2,309,389,766** | **($2,425,894,417)** |
| 2002 | $2,453,094,123 | ($2,664,015,048) |
| 2003 | $2,855,614,441 | ($3,423,072,194) |
| 2004 | $4,045,208,942 | ($3,477,761,846) |
| 2005 | $3,616,547,123 | ($4,767,292,175) |
| 2006 | $5,950,968,943 | ($4,385,862,882) |
| 2007 | $7,284,217,506 | ($4,506,919,231) |
| 2008 | $6,308,498,696 | ($10,556,646,750) |

## SECTION TWO

1a.    For each year, beginning on January 1, 1992, through the closing of Bernard L. Madoff Investment Securities LLC (BLMIS) in December, 2008, provide opening and closing balances and annual average balances in the Madoff 703 Account at Chase Bank (later JPMorgan Chase).  For each of those years, provide the annual earnings and the source of those earnings.  Have those earnings been credited to customers in the application of the NIM?

The Honorable Scott Garrett
January 24, 2011
Page 16

**Response**:

Monthly account statements for the Madoff 703 Account are available to the Trustee for the period from December 1998 through December 2008. The table below shows the annual and monthly average Closing Ledger Balance in the account.[5] These balances *exclude* any short term or other investments related to the Madoff 703 Account (discussed in further detail below).

| As of: | Madoff 703 Account Only | |
|---|---|---|
| | Closing Ledger Balance | Average Monthly Closing Ledger Balance |
| 12/31/1999 | $2,320,237 | $5,061,827 |
| 12/31/2000 | $20,493,643 | $6,707,467 |
| 12/31/2001 | $26,581,003 | $8,599,687 |
| 12/31/2002 | $2,401,631 | $1,492,461 |
| 12/31/2003 | $4,061,657 | $1,369,215 |
| 12/31/2004 | $1,084,601 | $1,262,028 |
| 12/31/2005 | $323,218 | $1,238,669 |
| 12/31/2006 | $394,700 | $498,220 |
| 12/31/2007 | $742,309 | $633,968 |
| 12/31/2008 | $229,407,266 | $20,116,566 |

Available funds in the Madoff 703 Account were invested in various short term investments, including:

- Overnight Investment Sweeps;
- Overnight Deposits;
- Certificates of Deposit (approximately 1 week outstanding);
- Commercial Paper (approximately 3-4 days outstanding); and
- Treasury Bills (approximately 1-6 months outstanding).[6]

In addition to the short term investments noted above, certain investors deposited Federal Home Loan Bank Notes into Madoff custody accounts held at JPMorgan Chase (account nos. G 54276 and G 13414). The proceeds from redemption and the related interest were

---

[5]    Because only one month of records is available for December 1998, information relating to 1998 is not included.

[6]    Prior to 2002, BLMIS held treasury notes with maturities ranging from 3-10 years. Due to incomplete records for Madoff accounts held at JPMorgan Chase, the date, amount and source of funding for the initial purchase cannot be confirmed for all of these treasury notes. However, as the related interest was received by the Madoff 703 Account, the outstanding balances of the treasury notes are included in this analysis. In the event that the purchase price could not be confirmed, the face value of the treasury notes was used to estimate the outstanding balance.

The Honorable Scott Garrett
January 24, 2011
Page 17

received by Madoff and recorded in the Madoff 703 Account. The face value and related interest of these securities are included in the amounts in the table below.

The following table shows the combined ending balances including the Closing Ledger Balance of the Madoff 703 Account and the outstanding amounts of short term investments and Federal Home Loan Bank Notes. The table also includes the average monthly combined ending balances and the combined annual earnings on the short term investments and the Federal Home Loan Bank Notes.

| As of: | Madoff 703 Account and Related Investments | | |
|---|---|---|---|
| | Combined Ending Balances | Average Monthly Combined Ending Balances | Combined Annual Earnings |
| 12/31/1999 | $794,791,409 | $718,345,089 | $47,122,618 |
| 12/31/2000 | $281,064,815 | $664,061,973 | $43,085,153 |
| 12/31/2001 | $415,806,003 | $311,525,813 | $12,409,793 |
| 12/31/2002 | $403,674,195 | $400,460,464 | $8,895,959 |
| 12/31/2003 | $270,130,888 | $328,438,232 | $5,045,753 |
| 12/31/2004 | $766,510,629 | $522,076,623 | $6,885,896 |
| 12/31/2005 | $231,086,387 | $441,768,824 | $12,460,792 |
| 12/31/2006 | $1,965,795,098 | $888,512,252 | $41,626,409 |
| 12/31/2007 | $4,432,658,084 | $3,992,008,548 | $184,030,207 |
| 12/31/2008 | $229,407,266 | $4,056,000,343 | $106,121,744 |
| | | TOTAL: | $467,684,323 |

Property in the 703 Account was customer property, as defined in 15 U.S.C. §78lll(4), and therefore, interest earned on such property would be customer property as well, to be shared pro rata by customers. Indeed, such property was used as customer property throughout the operation of the Ponzi scheme as the liquidity generated from such interest earned was made available to pay customers and the income still held in the 703 account, upon the liquidation of BLMIS, was part of the customer property seized by the Trustee. Although any earnings would be shared by customers in satisfaction of their net equity claims, the amount of customers' net equities would not be increased due to the fact that interest may have been earned on the 703 Account. There is no basis in the law for such an adjustment. See the definition of net equity at 15 U.S.C. §78lll(11). Moreover, the exercise would be impossible. Tracing dollars into and out of the account as to each and every customer would be impossible given the level of activity in the account and the fungible nature of dollars.

**1b.    If, for the same period, Madoff, BLMIS, or other Madoff-controlled businesses had other accounts at U.S. or foreign banks or other financial institutions, provide annual balance data for these accounts. Provide the annual earnings for each year, and the amount of those earnings credited to BLMIS customers in the application of NIM.**

The Honorable Scott Garrett
January 24, 2011
Page 18

**Response**:

In addition to the Madoff 703 Account and the two BLMIS custody accounts held at JPMorgan Chase as discussed in response to Section Two, Question 1a above, an additional 127 accounts held by Madoff, BLMIS or other Madoff related entities have been identified to date as a result of the investigation. It is important to note that the records available to the Trustee are incomplete and the Trustee does <u>not</u> have a complete population of monthly statements for these 127 accounts. In fact, the level of completeness varies significantly for each account and in some cases, the Trustee has statements for only a few months, or in some cases, no monthly statements for accounts that have been identified. As such, the data presented below and the ability to respond to your inquiry is limited to the information available to the Trustee as of the date of this letter.

Of these 127 accounts, there were eleven (11) accounts which had transfers to and from the Madoff 703 Account, and the year-end balances and annual earnings information is shown on the schedule attached hereto as Exhibit A to the extent the information is available.

Of the remaining 116 accounts that have been identified, there are ten (10) accounts that had a balance greater than $1 million during at least one year-end period for which the Trustee has available records. The other accounts identified either had no available monthly statements or did not report a balance at any year-end date of $1 million or more during the period that monthly statements are available.

It should also be noted that, in addition to these 127 accounts, there were accounts held by Madoff Securities International Ltd. ("MSIL") at various banks and other financial institutions in London. Transfers to and from the Madoff 703 Account and MSIL were through two primary banking institutions in London: Barclays Capital and Royal Bank of Scotland. The average year-end balance in MSIL's USD account at Barclays Capital between 2002 and 2008 was approximately £1.9 million and the average year-end balance in MSIL's USD account at Royal Bank of Scotland between 1996 and 2008 was approximately £1.8 million. Based on the available MSIL records, the combined interest earned on all bank accounts was approximately £8.8 million from 1999 to 2008.[7]

To the extent that the interest earned on these additional Madoff related accounts was transferred into the 703 Account, those amounts have been considered customer property, as defined in 15 U.S.C. §78lll(4), and made available to pay customer claims. However, as noted above, tracing these dollars into and out of the account as to each and every

---

[7] Available MSIL records report interest on USD bank accounts separately for years 2000 to 2002 only. The total interest earned during these years on USD accounts was approximately £125,000. In all other years, interest received from all bank accounts, including accounts denominated in currencies other than USD, were grouped together in one line in MSIL's accounting records. Therefore, the amount included in the response above includes interest earned on all MSIL bank accounts.

The Honorable Scott Garrett
January 24, 2011
Page 19

customer would be impossible given the level of activity in the 703 Account and the fungible nature of cash in the account.

2.  **During the period 1992 – 2008, when Madoff was actively pursuing his Ponzi fraud, he was engaged in market making and proprietary trading. For each of these years provide data on trading volumes and the annual gross and net revenues from this trading activity. Did any of this trading involve the "split-strike conversion" strategy? Can the funding for this trading be traced to customer deposits in BLMIS?**

**Answer**:

The table below includes annual revenue, net income and trading volumes as reported in the FOCUS Reports filed by Madoff with regulatory authorities. Madoff FOCUS Reports were available back to 1983. Therefore, the chart includes data from 1983 to 2008.

| Calendar Year | Reported Revenue | Reported Net Income | Average Monthly Reported Trade Ticket Executions |
|---|---|---|---|
| 1983 | $16,199,780 | $7,478,860 | 8,135 |
| 1984 | 17,111,112 | 2,768,562 | 11,961 |
| 1985 | 19,134,313 | 5,050,340 | 18,588 |
| 1986 | 24,482,469 | 9,006,605 | 34,312 |
| 1987 | 23,826,151 | 6,748,913 | 44,240 |
| 1988 | 25,993,191 | 7,656,011 | 61,382 |
| 1989 | 29,820,883 | 7,291,998 | 147,796 |
| 1990 | 36,381,387 | 5,815,034 | 206,892 |
| 1991 | 45,445,605 | 11,581,744 | 328,892 |
| 1992 | 53,883,499 | 13,218,255 | 403,789 |
| 1993 | 67,365,633 | 16,011,925 | 438,867 |
| 1994 | 82,193,420 | 19,242,696 | 398,360 |
| 1995 | 94,534,180 | 29,896,450 | 506,476 |
| 1996 | 93,155,506 | 25,692,597 | 563,095 |
| 1997 | 102,105,686 | 31,403,757 | 781,390 |
| 1998 | 104,842,134 | 30,000,000 | 1,213,357 |
| 1999 | 164,600,984 | 50,000,000 | 1,932,106 |
| 2000 | 209,788,597 | 41,000,000 | 2,300,629 |
| 2001 | 169,110,236 | 47,000,000 | 2,015,081 |
| 2002 | 106,009,938 | 27,000,000 | 2,238,367 |
| 2003 | 128,868,567 | 40,000,000 | 2,986,238 |
| 2004 | 138,684,401 | 49,000,000 | 3,173,810 |
| 2005 | 113,506,829 | 27,000,000 | 3,217,668 |
| 2006 | 163,150,034 | 57,000,000 | 3,527,327 |

The Honorable Scott Garrett
January 24, 2011
Page 20

| | | | |
|---|---|---|---|
| 2007 | 167,439,512 | 63,000,000 | 3,489,387 |
| 2008[8] | 98,344,669 | 34,000,000 | 5,930,580 |

**In response to the question "Did any of this trading involve the "split-strike conversion" strategy?"**

No.  The trading within the market making and proprietary trading businesses did not involve BLMIS's purported "split-strike conversion" strategy.

**In response to the question "Can the funding for this trading be traced to customer deposits in BLMIS?"**

The table below includes amounts transferred directly or indirectly from the Madoff 703 Account at Chase Bank, the primary bank account used by House 17 (the investment advisory business), to the Madoff 621 Account at The Bank of New York, the primary bank account used by House 5 (the proprietary trading and market making business). House 5 received funds directly and indirectly from the IA business. The direct payments were in the form of checks from the Madoff 703 account that were deposited directly to the Madoff 621 Account.  The indirect payments were wire transfers from the Madoff 703 Account to Madoff affiliated domestic brokerage accounts and/or to Madoff Securities International Limited ("MSIL") and subsequent wire transfers from the domestic brokerage accounts and/or MSIL to the Madoff 621 Account.  As data is unavailable for complete calendar years prior to 2000, the chart includes data from 2000 to 2008.

| Calendar Year | Direct Transfers | Indirect Transfers | Total |
|---|---|---|---|
| 2000 | $42,996,679 | $32,500,000 | $75,496,679 |
| 2001 | $12,410,095 | $59,993,500 | $72,403,595 |
| 2002 | $8,855,299 | $51,628,142 | $60,483,441 |
| 2003 | $4,982,025 | $92,384,791 | $97,366,815 |
| 2004 | $6,852,980 | $82,113,022 | $88,966,002 |
| 2005 | $5,406,024 | $63,901,013 | $69,307,037 |
| 2006 | $0 | $73,217,622 | $73,217,622 |
| 2007 | $0 | $121,243,288 | $121,243,288 |
| 2008[9] | $0 | $75,459,701 | $75,459,701 |
| **Total** | **$81,503,101** | **$652,441,077** | **$733,944,178** |

---

[8] Reported revenue and net income amounts represent year-to-date information through October 31, 2008, the date of the last filed FOCUS Report.

[9] $19,087,449 was received after the last FOCUS Report was filed for October 31, 2008.

The Honorable Scott Garrett
January 24, 2011
Page 21

Because the direct and indirect transfers from House 17 to House 5 were in cash, which is fungible, the transfers cannot be directly traced to House 5 trades. However, the funds transferred from House 17 were recorded by House 5 as revenue and represented a substantial portion of House 5's liquidity. Without these funds from the IA business, House 5 would have incurred annual net losses (i.e., reported net income less funds from the IA business results in a net loss for each period with available data). Notwithstanding the inability to trace these funds to House 5 trades or individual BLMIS customer accounts, the Trustee has treated the proceeds of the sale of the market making and proprietary trading businesses as customer property, and therefore those funds will be included in the amounts distributed to customers with approved claims.

3.    **Provide up-to-date and projected total aggregate cost data, by entity, for amounts billed and amounts paid to Trustee Picard, the Baker Hostetler law firm, and all other entities involved in the SIPC liquidation of BLMIS and its related businesses.**

**Response**:

The amounts are as follow:

| | Entity | Amounts Paid Through 12/31/10 |
|---|---|---|
| *Trustee* | Trustee | $3,275,173.77 |
| *Trustee's Counsel* | Baker & Hostetler LLP | $127,938,847.58 |
| *Special Counsel* | Attias & Levy | $631,183.64 |
| | Eugene F. Collins | $216,383.85 |
| | Higgs & Johnson | $238,793.40 |
| | Kugler Kandestin, LLP | $19,013.09 |
| | Hogan Lovells International LLP | $2,392,861.22 |
| | Mishcon de Reya | $65,926.23 |
| | SCA Creque | $153,197.02 |
| | Schifferli Vafadar Sivilotti | $13,928.00 |
| | Schiltz & Schiltz | $341,908.01 |
| | Williams, Barristers & Attorneys | $644,767.61 |
| | Windels, Marx, Lane & Mittendorf, LLP | $6,004,460.48 |
| | | |
| *Consultants* | AlixPartners | $48,554,739.11 |
| | FTI Consulting | $84,590,786.44 |
| | Renaissance Assoc., Ltd. | $2,580,432.16 |
| | | |
| *Other Consultants* | | $8,974,193.33 |
| | | |
| *Other* | | $1,683,848.95 |
| | | |

The Honorable Scott Garrett
January 24, 2011
Page 22

| Total: | | $288,320,443.89 |
|---|---|---|

**Estimated Future Costs (2011 – 2014)**

| Entity | Amount |
|---|---|
| Irving H. Picard, Trustee | $12,523,164.81 |
| Baker & Hostetler LLP | $603,217,651.28 |
| Special Counsel | $39,893,950.00 |
| Consultants | |
|    AlixPartners | $123,028,096.57 |
|    FTI | $250,327,741.98 |
|    Renaissance | $1,275,000.00 |
| Other Consultants | $65,362,500.00 |

**Total:**                                                    **$1,095,628,104.64**

I would note that these administrative expenses are not paid for by using "customer property." SIPC advances the funds for these costs.

4.      **During a recent Capital Markets Subcommittee hearing, at which testimony was presented by several members of SIPC's Modernization Task Force, there was general agreement that avoidance actions by the Trustee were limited to two years prior to the debtor's bankruptcy under the Federal Bankruptcy Code and to six years under applicable New York statutes. Accordingly, in the BLMIS case, it would appear that disbursements made prior to December, 2002, would be protected from avoidance actions by the statutes of limitation.**

**Since most of the accounts subject to avoidance actions are those determined to have a negative "net equity" under the Trustee's NIM, a very serious consideration is the propriety of using disbursements made earlier than December, 2002, in the calculation of net equity, which, depending on the outcome, may cause the account to be subject to an avoidance action.**

**Given the seriousness of this issue, as it relates to proper adherence to the protections intended and accorded by the statutes of limitation, I ask that the following information be provided with the greatest precision possible. For the 1000 accounts under review by the Trustee for possible avoidance actions, indicate the number of accounts for which disbursements prior to December, 2002, were used in the NIM calculation of net equity, the year/s of disbursement/s, and the aggregate amount disbursed in each year.**

The Honorable Scott Garrett
January 24, 2011
Page 23

**Response**:

It is important to understand that as previously mentioned, the calculation of a customer's net equity and the trustee's use of the avoidance powers are pursuant to separate statutory authority, and involve different concepts. Each customer's "net equity" as of the filing date is based upon the account activity for the entire account history, and is not and cannot be limited to the final two-year and/or six-year period preceding the bankruptcy. Computation of net equity merely measures the account holder's total cash deposits less withdrawals. Once the calculation of each customer's net equity is determined, the trustee can then determine which transfers made by the Estate are avoidable during the two-year and/or six-year period preceding the filing date.

Under SIPA, the customer's net equity reflects the amount of property on deposit with a broker-dealer and therefore owed by the broker-dealer to the customer when the firm fails financially. Disbursements made by a broker to a customer in the ordinary course of business and according to ordinary business terms would not be subject to avoidance by a trustee and, by the same token, would not factor into what the customer is owed as his "net equity," because the disbursed property is no longer in the broker's possession and therefore no longer owed by the broker to the customer.

As a matter of law, in the case of a Ponzi scheme, however, there is no ordinary course of business. In that situation, under SIPA, what the customer is owed is still the property custodied by the customer with the broker. But to the extent the investor received transfers of property from the broker, before the broker failed, which, for example, were for less than reasonably equivalent value or would result in the customer receiving more than he would in liquidation, then the trustee may seek to avoid such transfers.

In the BLMIS case, with the exception of the avoidance of preferential transfers made during the 90 days preceding the filing date, the Trustee is not seeking to recover from any innocent transferee any amount of the customer's principal, that is, the amount deposited by the transferee as a customer with the broker. Instead, against such transferees, the recovery is limited only to fake profits constituting other investors' money. Even assuming that, for the sake of argument only, the Trustee were to seek to recapture principal and be successful, the transferee would have a customer claim for the returned principal, as discussed above under the Use of Avoidance Powers In a SIPA Case.

5.     **How many accounts under consideration for avoidance action were established with Madoff prior to the inception of the Ponzi scheme? In making the NIM determination of net equity for these accounts, has the Trustee used any of the pre-Ponzi disbursements? If so provide details: number of accounts, year and amount of disbursements.**

**Response**:

Based on the Trustee's investigation and upon review of the earliest records available to him, the Trustee has found no evidence indicating that the BLMIS Investment Advisory

The Honorable Scott Garrett
January 24, 2011
Page 24

business has been operated as anything but a Ponzi scheme. Therefore, the Trustee does not believe that there are any accounts under consideration for avoidance action that were established with BLMIS prior to the inception of the Ponzi scheme. However, it should be noted that there were 380 accounts that were established with BLMIS prior to the earliest document/customer account statement included in the net equity calculation. For these accounts, the trustee has taken the most conservative approach – and most beneficial to the account holder – for the dollars allegedly held in such accounts at the time of the earliest records. The net equity determination grants a "Principal Credit" to the account holder for the cash and reported cost basis of the securities allegedly held on behalf of those customers on the first statements included in the net equity determination as if the "equity" in the account had been real. A total of $164,023,720 of initial "Principal Credit" has been credited to these 380 accounts established prior to the earliest customer account statement included in the net equity determination.

**6a.    During its existence, how many broker-dealer bankruptcies has the SIPC resolved? In how many of those cases has the NIM been used to determine customer net equity? If there are such cases, describe the circumstances.**

**Response:**

Since its inception, SIPC has resolved to completion 314 liquidation proceedings and Direct Payment Procedures under SIPA. A calculation of net equity representing the difference between what the broker owes the customer and what the customer owes the broker is consistent with SIPA, see 15 U.S.C. §78lll(11), and therefore, has been applied in determining net equity in every SIPA case.

In the BLMIS case, the Trustee gave effect to the last account statement to the extent of treating the customers' claims as ones for securities instead of cash. The statement provided proof of the customer's reasonable expectation that securities were being held for him. As such, consistent with the law in the Second Circuit, the customer became eligible for up to $500,000 of protection from SIPC, instead of $100,000 which was the limit of protection for cash claims at that time. The Trustee did not honor the last account statement beyond that, because the statements reflected fake profits and non-existent securities transactions invented by Bernard Madoff to yield fake returns pre-determined by him.

SIPC does not keep a record of the number of cases in which the last account statement was not followed because it did not reflect market reality. However, below are some cases presenting such facts:

In re First Ohio Secs. Co. (Plumbers & Steamfitters Local No. 490 Severance and Ret. Fund v. Appleton, Case No. 93-3313, 1994 U. S. App. LEXIS 31347 (6th Cir. Nov. 1, 1994) (sale of fictitious CDs));

The Honorable Scott Garrett
January 24, 2011
Page 25

In re New Times Securities Servs. Inc., 371 F.3d 68 (2d Cir. 2004) (non-existent money market funds). The Court noted the "potential absurdities created by reliance on the entirely artificial numbers contained in the fictitious account statements." 371 F.3d at 88.

Northstar Securities, Inc., Case No. 01-3722-BJH (Bankr. N. D. Tex.): A fictitious bank CD sold by a principal of the brokerage involving a Ponzi scheme. The trustee allowed customer claims for the "CDs" based upon the amount of cash deposited with the brokerage for investment in the CD, minus withdrawals made by the customer in the form of redemptions. Payments of fictitious interest to the customer were deemed by the trustee to be a return of principal.

In re Old Naples Securities, Inc., 311 B. R. 607 (M. D. Fla. 2002): A Ponzi scheme involving the fake "sale" of bonds yielding fictitious returns. The Court characterized as "illogical" "permitting claimants to recover not only their initial capital investment but also the phony 'interest' payments they received and rolled into another transaction...." 311 B.R. at 617.

In re C. J. Wright & Co., 162 B. R. 597 (Bankr. M.D. Fla. 1993): Case involving a Ponzi scheme in which claimants were issued documents showing their participation in a "Deposit Account" investment program, with a fixed interest rate to be received by the investor. The Court held the claimants to be customers, entitled to receive only the principal they invested since that was the amount converted by the broker. Claimants would not be entitled to the purported interest on their investments and any such interest received would be a reduction against the amount recoverable in the SIPA case.

Cases discussed below in Question 6b.

**6b.    In assembling customer property in any of the previous resolutions, has SIPC ever resorted to avoidance actions against the debtor's customers based on a NIM calculation or any legal basis other than complicity with the debtor?**

The below information may be incomplete because SIPC does not keep a record of such data. However, examples of cases in which trustees have initiated such avoidance suits include the following:

Adler Coleman Clearing Corp.: Hanover Sterling, a brokerage that cleared its trades through Adler Coleman, made a market in "house stocks." Shortly before its demise, Hanover caused Adler to send statements to Hanover customers purporting to show the sale in these customers' accounts of the house stocks at very high prices. The stocks supposedly were bought by other customers, but those customers never ordered the purchases. The trustee sought to avoid the trades. The Bankruptcy Court upheld the position of the trustee, noting that the trades were unenforceable, among other reasons, because they were subject to avoidance under the Bankruptcy Code, New York State law, and SIPA, and because they were illegal transactions under New York State law and as a matter of contract. See In re Adler Coleman Clearing Corp., 218 B. R. 689 (Bankr.

S.D.N.Y. 1998).  See also In re Adler Coleman Clearing Corp., 247 B. R. 51 (Bankr. S.D.N.Y. 1999), aff'd, 263 B. R. 406 (S.D.N.Y. 2001).

Donahue Securities, Inc. and S. G. Donahue & Co., Inc., Adv. Case No. 01-1027 (Bankr. S.D. Ohio): 26 former customers received payments to which they were not entitled. The payments consisted of false profits and were of amounts that exceeded the customers' cash investment. The trustee sent letters to the 26 former customers asking for repayment of the false profits. Nine customers negotiated repayment amounts with the trustee. The remaining 17 customers were sued by the trustee. All of the cases were settled.

Park South Securities, LLC:  Trustee sued to avoid transfers made to investors who had received payments from the broker that actually consisted of other investors' money. Following the denial of a motion to dismiss most counts of the complaint, the matter was settled.  See In re Park South Securities, LLC, 326 B. R. 505 (Bankr. S.D.N.Y. 2005).

S. J. Salmon & Co. Inc.:  The firm was placed in liquidation in 1972, shortly after the enactment of SIPC on December 30, 1970. The firm was a market maker for securities sold to some of its customers. With its closure imminent, the firm recorded on the firm's books and records purported sales of the customers' securities positions, knowing that the securities would plunge in value upon the demise of the firm. Following the initiation of the SIPA proceeding, the customers demanded the inflated cash that had been credited to their accounts as a result of the fictional transactions. The trustee sought to avoid the phony sales as fraudulent and void under the Bankruptcy Act and New York State law. The Bankruptcy Court (then Referee in Bankruptcy) upheld the trustee's position, among other things, rejecting the claimants' argument of "fair consideration" and remarking that the evidence showed that the purported "market value had no relationship to reality and that the securities in question simply could not be sold at the purported 'market' quotation." See SIPC v. S. J. Salmon & Co., 1973 U. S. Dist. LEXIS 15606, *32 (S.D.N.Y. Aug. 8, 1973).  See also SIPC v. S. J. Salmon & Co., No. 72 Civ. 560, Decision #2 on Trustee Motion for Summary Judgment Avoiding Certain Transactions Which Occurred February 2d, 1972 (S.D.N.Y. Feb. 5, 1974).

The Honorable Scott Garrett
January 24, 2011
Page 27

        I apologize for the time that it has taken to reply to your letter, however, assembling the information and data that you requested required a sizeable commitment of time and resources by both the SIPC and Trustee staffs.  If we can assist in any other way, please let me know.

                        Sincerely,

                        Stephen P. Harbeck
                        President and Chief Executive Officer


SPH/pmd

cc:  The Hon. Spencer Bachus
The Hon. Barney Frank
The Hon. Maxine Waters
Irving H. Picard, Trustee
David J. Sheehan, Esq.

Att.

EXHIBIT A

Madoff Related Accounts - Year End Balances and Annual Earnings
Accounts with Transfers to and from the Madoff 703 Account
*Amounts are limited to account statements available to the Trustee*

| Name on Account | Bank Name | Acct Number(s) | Purpose of Account | Date Range of Available Statements | Description of Amount | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | YEAR[1] | | | | | | | | |
| Bernard L. Madoff / Ruth Madoff | Bank of New York | 1200202690 | Bernie and Ruth Personal Checking | 12/97-7/10 | Year End Balance | 39,655 | 65,919 | 93,922 | 239,081 | 29,492 | 773,102 | 3,278,144 | 1,297,373 | 1,171,094 | 1,999,211 | 852,506 | 52,842 | |
| | | | | | Annual Earnings | | | | | | | | | | | | | 52,842 |
| Bernard L. Madoff[2] | Bank of New York | 866-1125-621 | Primary Account (Kluge 5) | 1/69-1/09 | Year End Balance | | 680,335 | 6,354,198 | 1,698,833 | 6,131,902 | 5,209,602 | 4,139,060 | 6,410,529 | 16,366,286 | 2,617,740 | 8,129,987 | 6,439,530 | |
| | | | | | Annual Earnings | | | | | | | | | | | | | |
| Bernard L. Madoff | Bank of New York | 234239 | Investment Counsel Account | 3/05-5/07 | Year End Balance | | | | | | | | | (168) | | | | |
| | | | | | Annual Earnings | | | | | | | | | | | | | |
| Bernard L. Madoff Investment Securities LLC | Bankers Trust Company | 00-810-599 | Funded by 703; outflows primarily to IA customers | 12/98-7/00 | Year End Balance[4] | | 708,926 | | | | | | | | | | | |
| | | | | | Annual Earnings | | | | | | | | | | | | | |
| Bernard L. Madoff | Barclays (Lehman) | 831-04398 | Brokerage Account | 1/01-11/08 | Year End Balance | | | | 371,006,169 | 340,367,242 | 220,083,332 | 28,234,070 | 26,959,179 | 11,569,885 | 48,908 | 51,395 | 3.70 | |
| | | | | | Annual Earnings | | | | 20,497,464 | 19,908,743 | 12,358,038 | 7,106,281 | 2,102,391 | 1,529,473 | 192,504 | 2,508 | 1,162.23 | 63,698.58 |
| Bernard L. Madoff | Barclays (Lehman) | 831-76152 | Brokerage Account | 6/03-5/06 | Year End Balance | | | | | | | 49,560,815 | 50,693,956 | 16,368,041 | | | | |
| | | | | | Annual Earnings | | | | | | | 1,892,500 | 7,515,958 | 4,261,230 | 131,311 | | | 13,800,992 |
| Bernard L. Madoff Investment Securities LLC | Barclays (Lehman) | 831-04435 | Brokerage Account | 5/07-11/08 | Year End Balance[4] | | | | | | | | | | | 103,078,880 | 317 | |
| | | | | | Annual Earnings | | | | | | | | | | | 53,602 | 87,460 | 141,000 |
| Bernard L. Madoff[3] | Bear Stearns | 037-72698-163 | Brokerage Account | 6/98-4/06 | Year End Balance | | 561,631,651 | 551,753,445 | 536,818,966 | 385,049,812 | 372,993,578 | 342,554,863 | 267,051,560 | 21,573,290 | | | | |
| | | | | | Annual Earnings | | 15,679,551 | 31,191,962 | 32,524,644 | 34,727,625 | 25,939,695 | 12,594,129 | 10,623,376 | 9,595,758 | 30,886 | | | 172,907.62 |
| Bernard L. Madoff | Fidelity | X08-289043 | Brokerage Account | 12/99-1/09 | Year End Balance | | | 411,010,358 | 386,650,402 | 342,929,789 | 229,638,251 | 71,345,053 | 79,573,671 | 44,968,642 | 30,886 | 3,234 | 3,309 | |
| | | | | | Annual Earnings | | | 16,320,420 | 24,445,254 | 23,323,790 | 10,936,631 | 7,882,045 | 7,215,623 | 8,963,020 | 19,296 | 3,153 | 102 | 101,799,888 |
| Bernard L. Madoff Investment Securities LLC | M & T Securities | AZD474039 | Brokerage Account | 5/07-3/09 | Year End Balance | | | | | | | | | | | 101,845,066 | 4,030,782 | |
| | | | | | Annual Earnings | | | | | | | | | | | 23,048 | 33,467 | 56,515 |
| Bernard L. Madoff | Morgan Stanley | 663010719 | Brokerage Account | 12/99-1/09 | Year End Balance | | | 99,250,056 | 578,186,906 | 503,465,897 | 500,026,904 | 359,305,226 | 359,126,442 | 149,439,444 | 347,670 | 364,447 | 370,913 | |
| | | | | | Annual Earnings | | | | 52,301 | 2,687,559 | 74,657 | 7,555,485 | 1,680,245 | 3,255,279 | 1,859,351 | 16,867 | 6,555 | 16,888,300 |
| | | | | | | | | | | | | | | | | | | $ 369,292,955 |

NOTES:

[1] The earliest available statement was in 1997. Therefore, 1997 is the first period shown in this schedule.
[2] The name on this account changed to Bernard L. Madoff Investment Securities LLC in May 2001.
[3] The name on this account changed to Bernard L. Madoff Investment Securities LLC in May 2004.
[4] The 2008 Year End Balance represents account balance as of 11/30/2008.

# EXHIBIT F

Media Contact:
Kevin McCue
kmccue@bakerlaw.com
216-861-7576

PRESS RELEASE OF IRVING H. PICARD

MADOFF TRUSTEE ANNOUNCES SETTLEMENT OF $220 MILLION


NEW YORK, NY – Irving H. Picard, the SIPA Trustee for the liquidation of the substantively
consolidated estates of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L.
Madoff, announced that he has entered into an agreement with Jeanne Levy-Church and Francis N.
Levy to resolve claims that BLMIS has against members of the Levy family and certain related
entities.  Under the agreement, the Levys will pay the Trustee $220 million, the amount demanded
by the Trustee, to resolve such claims.  This settlement was reached without the need for the
Trustee to commence litigation against the Levys since the Levys voluntarily came forward and
approached the Trustee about the matter.  With this settlement, the Trustee has collected an amount
approaching $1.5 billion for the benefit of the victims of Madoff's fraud.  The Trustee was
represented by his firm, Baker Hostetler, and the Levys were represented by Munger Tolles &
Olson.

"I am very pleased that the Levys came to us to discuss the claims that BLMIS has against them and
that they agreed to return to BLMIS $220 million, the amount we requested, for the benefit of the
victims of Madoff's fraud.  The Levys have acted honorably and are to be commended.  We hope
that others will follow their example," said Mr. Picard.

The Trustee filed a motion with the Bankruptcy Court today seeking approval for the settlement.
The Bankruptcy Court will hold a hearing on the settlement on February 18, 2010.

# EXHIBIT G

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------x

      In the Matter

          of                 Case No.

                            1-08-01789


SECURITIES INVESTOR PROTECTION CORPORATION

          V.

BERNARD L. MADOFF INVESTMENT SECURITIES, et al.,

            Debtors.

-----------------------------------------x

                    February 18, 2010

                    United States Custom House

                    One Bowling Green

                    New York, New York 10004


      Motion for an Entry of Order Pursuant to Section

105(a) of the Bankruptcy Code and Rules 2002 and 9019 of

the Federal Rules of Bankruptcy Procedure Approving an

Agreement by and Among the Trustee and Jeanne Levy-Church

and Francis N. Levy,  et al.


B E F O R E:

                HON. BURTON R. LIFLAND,

                    U.S. Bankruptcy Judge

2

1    A P P E A R A N C E S:

2

3

4            BAKER HOSTETLER, LLP

5            Attorneys for Irving H. Picard, Trustee

6                45 Rockefeller Plaza

7                New York, New York 10017

8            BY:    MARC E. HIRSCHFIELD, ESQ.

9                    -and-

10               PAUL EYRE, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1           Proceedings

2                   THE COURT:  Securities Investor Protection

3     vs. Bernard L. Madoff Investment Securities.

4                   Is that based on the calendar or caption,

5     The Bankruptcy Link?

6                   MR. HIRSCHFIELD:   Calendar.

7                   THE COURT:  So we ought to recaption it

8     then.

9                   MR. HIRSCHFIELD:   Good morning, Your

10    Honor.

11                  THE COURT: Good morning.

12                  MR. HIRSCHFIELD:  I am Marc Hirschfield,

13    from the law firm of Baker Hostetler, on behalf of the

14    Trustee.   With me today is my colleague, Paul Eyre, who

15    helped work on the settlement.

16                  Before the Court today is the motion under

17    Bankruptcy Rule 9019 seeking the Court's approval an

18    agreement with Jeanne Levy-Church and Francis Levy, adult

19    children of Betty and Norman Levy drew up an agreement the

20    Levys will return to the Trustee 220 million dollars.

21                  By way of background, Your Honor, Norman

22    Levy was a real estate executive here in New York.   He

23    began investing with Madoff in the mid-1970s.

24                  Over the years, Mr. Levy opened up a number

25    of accounts with BLMIS for himself, for his wife, and for

4

1    various members of his family including his children and

2    the family and other charitable trusts.   Mr. Levy passed

3    away in 2005, and throughout his life he placed great trust

4    in Mr. Madoff.

5              In his will, he appointed Madoff as one of

6    his executors and that granted Madoff the authority to make

7    unilateral decisions with regard to nonreal estate assets

8    of his estate.

9              Mr. Madoff unfortunately took advantage of

10   that trust and breached it, and after Mr. Levy's death

11   transferred 220 million dollars of non-Madoff assets.

12             THE COURT:  As an executor --

13             MR. HIRSCHFIELD:   Yes.

14             THE COURT:  -- of the Levy estate?

15             MR. HIRSCHFIELD:  Yes. He transferred it to

16   BLMIS and, of course, that money was lost along with all

17   the other money.

18             THE COURT:  This is a bit of lack of

19   integrity we have not seen before.

20             MR. HIRSCHFIELD:   I think there is no

21   floor to Mr. Madoff's integrity.

22             So, essentially, Your Honor, Madoff stole

23   the 220 million dollars from Mr. Levy's heirs.   Even with

24   this 220 million dollars over the years the Levy account

25   holders took out more money from Madoff than they put in.

5

1          Therefore, Your Honor, under our parlance

2    they are not winners.   Last spring Jeanne and Francis

3    Levy, the two heirs of Mr. Norman Levy approached us

4    through their counsel to begin to discuss their potential

5    liability.   We did not contact them.   They contacted us.

6          From the very beginning, Your Honor, they

7    made it very clear to us they want to do the right thing.

8    They felt badly about having other people's money and they

9    wanted to return to the Trustee the profits they received,

10   which was really other people's money.

11         After discussing with them various things

12   and learning about them and their finances and their assets

13   and their liabilities, the Trustee made a demand of them of

14   220 million dollars, which at that time was the six-year

15   number of the money that they took out.

16         In addition to that, Your Honor, the 220

17   million dollars another 84 million of false profits was

18   withdrawn by the Betty and Norman Levy Foundation, which

19   was a charitable trust which Mr. Levy and his wife had set

20   up.   They told us, the Levis, and they gave us evidence to

21   corroborate all of this 84 million dollars which was

22   donated to charitable causes and the foundation has

23   virtually nothing left to which to return anything to the

24   Trustee.

25         Based upon this, the trustee in his

6

1   business judgment made the decision not to seek any

2   recovery from the trust.   Again, to do so, from the

3   foundation rather, to do so would have been futile because

4   as I said they had nothing to give us.   So, therefore,

5   trying to commence a lawsuit against the foundation would

6   have made no sense.

7            The Trustee does believe that the other

8   money withdrawn by the Levys is recoverable under Section

9   544, 548 and 550 of the Bankruptcy Code.

10            When the Levy executed liability to the

11   trust they agreed to pay us the amount we requested, 220

12   million dollars.   That agreement is set forth in a

13   settlement agreement attached to the motion.

14            I will just highlight a few of the terms of

15   the agreement for the Court's reference.

16            Under the agreement, as mentioned the Levys

17   will pay us at closing which will happen very shortly after

18   an order approving the settlement has become final some 220

19   million dollars in one payment.

20            The Trustee and the Levis will exchange a

21   release and the Trustee will agree not to sue certain

22   entities that are related to the Levis.

23            The Levis have agreed, respectively, they

24   will assist us when asked in our effort to recover other

25   money from other people and, finally, there are two

7

1    children of Francis Levy, who unlike the other Levy

2    members, those accounts that they had with Madoff were not

3    losers.

4               They submitted claims before the bar date

5    and those two proofs of claim will be redeemed withdrawn as

6    part of the settlement.   So there will be no recovery at

7    all on those two claims.

8               We believe the settlement is a very good

9    one and we ask for the Court's approval.   In connection

10   with our motion, the Trustee submitted an affidavit to the

11   Court in which he stated that he believes the settlement is

12   appropriate in his business judgment and that the business

13   agreement falls well above the lowest point of

14   reasonableness.

15              While we believe we would have prevailed if

16   we had to sue the Levis, we don't believe we have collected

17   anything more than just getting this settlement.   So,

18   therefore, we think it makes sense to have the settlement

19   agreement.

20              Your Honor, I just have one additional

21   thing to add, as we set forth in our motion and the public

22   statements, the Trustee very much appreciates the manner in

23   which the Levys conducted themselves throughout these

24   discussions.

25              As I said earlier, the discussions were, in

8

1    fact, initiated by the Levis.  There were a lot of people

2    in this case who withdrew false profits and there are some

3    who are fighting us virtually tooth and nail not to return

4    the money, and others like the Levys and Optimal which we

5    previously settled came forward to voluntarily return the

6    money.

7              The Trustee, the Levis should serve as an

8    example to others in this case in a situation similar to

9    the Levys, and should come forward and like the Levys

10    return to us the amounts they've withdrawn.

11              In conclusion, Your Honor, we very much

12    think the settlement is a satisfactory one and we ask for

13    Your Honor's approval.

14              THE COURT:  Does anyone else want to be

15    heard?

16              Well, I am going to approve the settlement,

17    based upon the papers before me and representations here.

18              It is clear that the Trustee has done an

19    appropriate level of due diligence in recommending the

20    settlement.  Especially with respect to the concept of

21    abandoning certain actions based upon the difficulties

22    associated with the collection, that is with respect to the

23    foundation.

24              The settlement does resolve the spectre of

25    an expensive and protracted litigation, and it allows the

9

1    parties to go forward with a degree of comfort that there

2    are lawyers who are now out of the horizon to a certain

3    extent and certainly, the way the settlement has come about

4    and the amount, although interests could have demanded or

5    based upon information received, subsequent to the first

6    offer, it is clear that this settlement is well above the

7    lowest rung in a range of reasonableness and is right on

8    target in that regard and I will entertain an order

9    approving it.

10                    MR. HIRSCHFIELD:    Thank you, Your Honor.

11                    THE COURT: I have approved the order.

12                    MR. HIRSCHFIELD:    Yes.  Thank you, again,

13   Your Honor.

14                    That would be all we have on the calendar

15   for today.

16                    THE COURT:  Thank you.

17

18                        *      *      *

19

20

21

22

23

24

25

10

1

2                        C E R T I F I C A T E

3

4    STATE OF NEW YORK          }
                                 }     ss.:
5    COUNTY OF NEW YORK          }

6                        I, MINDY CORCORAN, a Shorthand Reporter

7    and Notary Public within and for the State of New York, do

8    hereby certify:

9                        That I reported the proceedings in the

10   within entitled matter, and that the within transcript is a

11   true record of such proceedings.

12                       I further certify that I am not related, by

13   blood or marriage, to any of the parties in this matter and

14   that I am in no way interested in the outcome of this

15   matter.

16                       IN WITNESS WHEREOF, I have hereunto set my

17   hand this 19th day of February, 2010.

18

19                        _____

                          MINDY CORCORAN

20

21

22

23

24

25

# EXHIBIT H

# U.S. Bankruptcy Court
## Southern District of New York (Manhattan)
## Adversary Proceeding #: 10-03200-brl

*Assigned to:* Judge Burton R. Lifland                              *Date Filed:* 04/09/10
Show Associated Cases

*Demand:*

   *Nature[s] of Suit:*  72 Injunctive relief - other


**Plaintiff**
-----------------------
**Irving H. Picard, Trustee for the**     represented by **David J. Sheehan**
**Liquidation of Bernard L. Madoff**                 Baker & Hostetler LLP
**Investment Securities LLC**                         45 Rockefeller Plaza
                                         New York, NY 10111
                                         212 589 4200
                                         Fax : 212 589 4201
                                         Email: dsheehan@bakerlaw.com

                                         **Keith R. Murphy**
                                         Baker & Hostetler LLP
                                         45 Rockefeller Plaza
                                         New York, NY 10111
                                         212-589-4200
                                         Fax : 212-589-4201
                                         Email: kmurphy@bakerlaw.com


V.


**Defendant**
-----------------------
**Lissa Canavan, Individually and to**    represented by **Helen Chaitman**
**the extent she purports to represent**                  Becker & Poliakoff, LLP
**a class of those similarly situated**                     45 Broadway
                                         New York, NY 10006
                                         212-599-3322
                                         Fax : 212-557-0295
                                         Email: HChaitman@becker-
                                         poliakoff.com

                                         **Peter W. Smith**
                                         Becker & Poliakoff. LLP
                                         45 Broadway

New York, NY 10006
212-955-3322
Email: psmith@becker-poliakoff.com

**Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated**    represented by

**Helen Chaitman**
(See above for address)

**Peter W. Smith**
(See above for address)

**Judith Kalman, individually and to the extent she purports to represent a class of those similarly situated**    represented by    **Helen Chaitman**
(See above for address)

**Peter W. Smith**
(See above for address)

| Filing Date | # | Docket Text |
|---|---|---|
| 04/09/2010 | 1 | Complaint against Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated, Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated, Judith Kalman, individually and to the extent she purports to represent a class of those similary situated . Nature(s) of Suit: (72 (Injunctive relief - other)) Filed by Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 04/09/2010) |
| 04/09/2010 | 2 | Motion for Temporary Restraining Order /*Memorandum of Law in Support of Trustee's Application For Preliminary Injunction, Enforcement of Stay, Declaration That Canavan, Goldsmith and Kalman Action is Void Ab Initio, and Temporary Restraining Order* filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Attachments: # 1 Appendix A) (Murphy, Keith) (Entered: 04/09/2010) |
| 04/09/2010 | 3 | Affidavit *in Support of the Trustee's Application For Preliminary Injunction, Enforcement of Automatic Stay, Declaration That Canavan, Goldsmith, and Kalman Action is Void Ab Initio And Temporary Restraining Order* (related document(s) 2 ) filed by David J. Sheehan on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit |

| | | |
|---|---|---|
| | | D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I# 10 Exhibit J# 11 Exhibit K# 12 Exhibit L# 13 Exhibit M# 14 Exhibit N# 15 Exhibit O# 16 Exhibit P# 17 Exhibit Q# 18 Exhibit R# 19 Exhibit S# 20 Exhibit T# 21 Exhibit U# 22 Exhibit V) (Sheehan, David) (Entered: 04/09/2010) |
| 04/13/2010 | 4 | Summons with Notice of Pre-Trial Conference issued by Clerk's Office with Pre-Trial Conference set for 5/25/2010 at 10:00 AM at Courtroom 623 (BRL), Answer due by 5/13/2010, (Campbell, Tiffany) (Entered: 04/13/2010) |
| 04/14/2010 | 5 | Order to Show Cause signed on 4/14/2010 As to why the Court should not (1) deem the New Jersey Action as in violation of the automatic stay provisions of Section 362 of the Bankruptcy Code and Section 78eee(b)(2)(B)(i) of SIPA and, thus, declare the New Jersey Action to be void ab initio; and (2) issue a Preliminary Injunction, pursuant to 11 U.S.C. Sections 362(a) and 105(a) and Bankruptcy Rule 7065, enjoining the New Jersey Plaintiffs and those acting in concert or participation with them, or on their behalf, and all defendants, from proceeding with their litigation in the New Jersey Action (related document(s) 2 ). With hearing to be held on 5/18/2010 at 10:00 AM at Courtroom 623 (BRL). (Saenz De Viteri, Monica) (Entered: 04/14/2010) |
| 04/14/2010 | 6 | Certificate of Service *of Order to Show Cause, Memorandum of Law, Affidavit in Support, Complaint and Proposed Order* (related document(s) 1 , 3 , 2 , 5 ) filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 04/14/2010) |
| 04/15/2010 | 7 | Certificate of Service *of Order to Show Cause, Memorandum of Law, Affidavit in Support, Complaint and Proposed Order* (related document(s) 1 , 3 , 2 , 5 ) filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 04/15/2010) |
| 04/21/2010 | | Receipt of Complaint(10-03200) [cmp,cmp] ( 250.00) Filing Fee. Receipt number 635. Fee amount 250.00. (Slinger) (Entered: 04/21/2010) |
| 04/22/2010 | 8 | Summons Service Executed on Judith Kalman, individually and to the extent she purports to represent a class of those similary situated Answer Due: 05/13/2010; Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated |

| | | |
|---|---|---|
| | | Answer Due: 05/13/2010; Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated Answer Due: 05/13/2010. (related document(s) 1 , 4 ) filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 04/22/2010) |
| 04/28/2010 | 9 | Notice of Appearance filed by Helen Chaitman on behalf of Judith Kalman, individually and to the extent she purports to represent a class of those similary situated, Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated, Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated. (Chaitman, Helen) (Entered: 04/28/2010) |
| 04/28/2010 | 10 | Notice of Appearance filed by Peter W. Smith on behalf of Judith Kalman, individually and to the extent she purports to represent a class of those similary situated, Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated, Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated. (Smith, Peter) (Entered: 04/28/2010) |
| 05/04/2010 | 11 | So Ordered Stipulation Modifying Scheduling signed on 5/4/2010 (White, Greg) (Entered: 05/04/2010) |
| 05/05/2010 | 12 | Letter *to Hon. Judge Burton R. Lifland* filed by Peter W. Smith on behalf of Judith Kalman, individually and to the extent she purports to represent a class of those similary situated, Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated, Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated. (Smith, Peter) (Entered: 05/05/2010) |
| 05/05/2010 | 13 | Letter *to Hon. Burton R. Lifland (Doc. 12) with attachment* filed by Peter W. Smith on behalf of Judith Kalman, individually and to the extent she purports to represent a class of those similary situated, Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated, Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated. (Attachments: # 1 Exhibit Attachment)(Smith, Peter) (Entered: 05/05/2010) |
| 05/17/2010 | 14 | Order signed on 5/17/2010 Denying Discovery Sought by |

| | | |
|---|---|---|
| | | Defendants (related document(s) 12 , 13 ). (Saenz De Viteri, Monica) (Entered: 05/17/2010) |
| 05/18/2010 | 15 | So Ordered Stipulation signed on 5/18/2010 Between Lissa Canavan, Leslie Goldmith, and Judith Kalman, individually and to the extent they represent a class of those similarly situated and Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff. RE: Modifying Scheduling (related document(s) 11 , 5 ). With hearing to be held on 6/29/2010 at 10:00 AM at Courtroom 623 (BRL). (Saenz De Viteri, Monica) (Entered: 05/18/2010) |
| 05/25/2010 | 16 | So Ordered Stipulation signed on 5/25/2010 Between Lissa Canavan, Leslie Goldmith, and Judith Kalman, individually and to the extent they represent a class of those similarly situated and Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff (related document(s) 11 , 5 ). RE: Modifying Scheduling. (Saenz De Viteri, Monica) (Entered: 05/25/2010) |
| 05/26/2010 | 17 | Opposition *Notice of Cross-Motion to Dismiss Complaint* (related document(s) 2 ) filed by Helen Chaitman on behalf of Judith Kalman, individually and to the extent she purports to represent a class of those similary situated, Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated, Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated. (Attachments: # 1 Exhibit Proposed Order) (Chaitman, Helen) (Entered: 05/26/2010) |
| 05/26/2010 | 18 | Memorandum of Law *Defendants' Memorandum of Law Opposing Trustee's Motion for an Injunction and Supporting Defendants' Cross-Motion to Dismiss the Complaint* filed by Helen Chaitman on behalf of Judith Kalman, individually and to the extent she purports to represent a class of those similary situated, Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated, Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated. (Chaitman, Helen) (Entered: 05/26/2010) |
| 05/26/2010 | 19 | Certificate of Service (related document(s) 18 , 17 ) filed by Helen Chaitman on behalf of Judith Kalman, individually and to the extent she purports to represent a class of those similary situated, Leslie Goldsmith, individually and to the extent she purports to represent a |

| | | |
|---|---|---|
| | | class of those similarly situated, Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated. (Chaitman, Helen) (Entered: 05/26/2010) |
| 06/16/2010 | 20 | Reply to Motion */ Reply Memorandum Of Law In Further Support Of Trustee's Application For Preliminary Injunction, Enforcement Of Stay, And Declaration That Canavan, Goldsmith And Kalman Action Is Void Ab Initio, And In Opposition To Defendants' Cross-Motion To Dismiss* filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 06/16/2010) |
| 06/18/2010 | 21 | Affidavit of Service *by I. Rodriguez* (related document(s) 20 ) filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 06/18/2010) |
| 06/23/2010 | 22 | Reply to Motion *Defendants' Reply Memorandum of Law in Further Support of Defendants' Cross-Motion to Dismiss the Complaint* (related document(s) 2 ) filed by Helen Chaitman on behalf of Judith Kalman, individually and to the extent she purports to represent a class of those similary situated, Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated, Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated. (Chaitman, Helen) (Entered: 06/23/2010) |
| 06/23/2010 | 23 | Certificate of Service (related document(s) 22 ) filed by Helen Chaitman on behalf of Judith Kalman, individually and to the extent she purports to represent a class of those similary situated, Leslie Goldsmith, individually and to the extent she purports to represent a class of those similarly situated, Lissa Canavan, Individually and to the extent she purports to represent a class of those similarly situated. (Chaitman, Helen) (Entered: 06/23/2010) |
| 06/25/2010 | 24 | Notice of Adjournment of Hearing *on Trustee's Application for Preliminary Injunction, Enforcement of Stay, and Temporary Restraining Order* (related document(s) 2 ) filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. with hearing to be held on 9/15/2010 at 10:00 AM at Courtroom 623 (BRL) (Murphy, Keith) (Entered: 06/25/2010) |
| 06/28/2010 | 25 | Affidavit of Service *of Notice of Adjournment* (related document(s) |

| | | |
|---|---|---|
| | | 24 ) filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 06/28/2010) |
| 07/15/2010 | 26 | Notice of Adjournment of Hearing */Notice of Adjournment of the Pre-Trial Conference to September 21, 2010* filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. with hearing to be held on 9/21/2010 at 10:00 AM at Courtroom 623 (BRL) (Murphy, Keith) (Entered: 07/15/2010) |
| 07/19/2010 | 27 | Affidavit of Service *of Notice of Adjournment of Pre-Trial Conference to September 21, 2010* (related document(s) 26 ) filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 07/19/2010) |
| 08/31/2010 | 28 | Notice of Adjournment of Hearing *on Trustee's Application for Preliminary Injunction, Enforcement of Stay, and Temporary Restraining Order* (related document(s) 2 ) filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. with hearing to be held on 12/29/2010 at 10:00 AM at Courtroom 623 (BRL) (Murphy, Keith) (Entered: 08/31/2010) |
| 09/02/2010 | 29 | Affidavit of Service *of Notice of Adjournment of Hearing on Trustee's Application for Preliminary Injunction, Enforcement of Stay, and Temporary Restraining Order* (related document(s) 2 ) filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 09/02/2010) |
| 12/28/2010 | 30 | Notice of Adjournment of Hearing *Notice of Adjournment of Pre-Trial Conference* filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. with hearing to be held on 3/9/2011 at 10:00 AM at Courtroom 623 (BRL) (Murphy, Keith) (Entered: 12/28/2010) |
| 12/29/2010 | 31 | Affidavit of Service *of Notice of Adjournment of Pre-Trial Conference* (related document(s) 30 ) filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 12/29/2010) |

| | | |
|---|---|---|
| 03/04/2011 | [32](#) | Notice of Adjournment of Hearing / *Notice of Adjournment of Pre-Trial Conference to July 27, 2011* filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 03/04/2011) |
| 03/07/2011 | [33](#) | Notice of Adjournment of Hearing / *Notice of Adjournment of Preliminary Injunction Hearing to July 27, 2011 at 10:00 A.M.* filed by Keith R. Murphy on behalf of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC. (Murphy, Keith) (Entered: 03/07/2011) |

# EXHIBIT I

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:10-cv-04652-JGK

In Re: Bernard L. Madoff

Assigned to: Judge John G. Koeltl

Related Cases:   1:10-cv-07101-JGK

  1:10-cv-07219-JGK

  1:11-cv-01298-JGK

  1:11-cv-01328-JGK

Case in other court:  USBC-SDNY, 08-01789 (BRL)

Cause: 28:0158 Notice of Appeal re Bankruptcy Matter (BA

Date Filed: 06/15/2010

Jury Demand: None

Nature of Suit: 422 Bankruptcy Appeal (801)

Jurisdiction: Federal Question

## In Re

**Bernard L. Madoff**                    represented by   **Jennifer A. Vessells**
Baker & Hostetler LLP (OH)
1900 East Ninth Street
Cleveland, OH 44114
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

## Debtor

**Bernard L. Madoff**                    represented by   **Jennifer A. Vessells**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

## Appellant

**Adele Fox**                    represented by   **John H. Drucker**
*individually and to the extent she*                    Cole, Schotz, Meisel, Forman &
*purports to represent a class of those*                    Leonard, P.A.
*similarly situated*                    900 Third Avenue, 16th Floor
New York, NY 10022-4728
(212) 752-8000
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nolan Edward Shanahan**
Cole, Schotz, Meisel, Forman &
Leonard, P.A (NYC)
900 Third Avenue
16th Floor
New York, NY 10022

(646)-563-8935
Fax: (212)-752-8393
Email: nshanahan@coleschotz.com
*ATTORNEY TO BE NOTICED*

**Appellant**

**Susanne Stone Marshall**              represented by    **Helen Davis Chaitman**
*individually and to the extent she*                      Becker & Poliakoff, LLP
*purports to represent a class of those*                  45 Broadway
*similarly situated*                                      New York, NY 10006
                                                          212-557-3322
                                                          Email: HChaitman@becker-
                                                          poliakoff.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Peter William Smith**
                                                          Phillips Nizer LLP
                                                          666 5th Avenue
                                                          New York, NY 10103
                                                          (212)-841-0730
                                                          Fax: 212)-262-5152
                                                          Email: psmith@becker-poliakoff.com
                                                          *ATTORNEY TO BE NOTICED*

V.

**Appellee**

**Irving H. Picard**                     represented by    **Keith R. Murphy**
*Trustee for the Liquidation of*                           United States Attorney's Office
*Bernard L. Madoff Investment*                             Southern District of New York
*Securities LLC*                                           One St. Andrew's Plaza
                                                           New York, NY 10007
                                                           212-589-4200
                                                           Email: kmurphy@bakerlaw.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Tracy Lynn Cole**
                                                           Baker & Hostetler LLP (NYC)
                                                           45 Rockefeller Plaza
                                                           New York City, NY 10111
                                                           (212) 589-4228
                                                           Fax: (212) 589-4201
                                                           Email: tcole@bakerlaw.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David J. Sheehan**
Baker & Hostetler LLP (NYC)
45 Rockefeller Plaza
New York City, NY 10111
(212) 589-4616
Fax: (212) 589-4201
Email: dsheehan@bakerlaw.com
*ATTORNEY TO BE NOTICED*

**Deborah Hilarie Renner**
SNR Denton US LLP (NY)
1221 Avenue of the Americas
New York, NY 10020
2127686896
Fax: 2127686800
Email: drenner@bakerlaw.com
*ATTORNEY TO BE NOTICED*

**Jennifer A. Vessells**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/15/2010 | 1 | NOTICE OF APPEAL FROM THE BANKRUPTCY COURT TO THE S.D.N.Y. from the Order of Judge Burton R. Lifland dated May 3, 2010. Bankruptcy Court Case Numbers: 10-3114A, 08-1789 (BRL). Certified copies of file received.Document filed by Adele Fox, Susanne Stone Marshall. Appellant Brief due by 7/6/2010. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(bkar) (Entered: 06/15/2010) |
| 06/15/2010 | 2 | DESIGNATION OF BANKRUPTCY RECORD ON APPEAL re: 1 Bankruptcy Appeal,. Document filed by Appellant Susanne Stone Marshall. (bkar) (Entered: 06/15/2010) |
| 06/15/2010 | 3 | DESIGNATION OF BANKRUPTCY RECORD ON APPEAL re: 1 Bankruptcy Appeal,. Document filed by Appellant Adele Fox. (bkar) (Entered: 06/15/2010) |
| 06/15/2010 | 4 | COUNTER DESIGNATION OF BANKRUPTCY RECORD ON APPEAL Document filed by Appellee Irving H. Picard. (bkar) (Entered: 06/15/2010) |

| 06/15/2010 | 5 | AMENDED COUNTER DESIGNATION OF BANKRUPTCY RECORD ON APPEAL Document filed by Appellee Irving H. Picard. (bkar) (Entered: 06/15/2010) |
| 06/15/2010 | | Magistrate Judge James C. Francis is so designated. (bkar) (Entered: 06/15/2010) |
| 06/15/2010 | | Case Designated ECF. (bkar) (Entered: 06/15/2010) |
| 06/16/2010 | | Mailed letter to the United States Bankruptcy Court - Southern District of New York as notification of filing of Bankruptcy Notice of Appeal (Case Number: 08-01789 (BRL).) with the U.S.D.C. - S.D.N.Y. and the assignment of S.D.N.Y. Case Number: 10-cv-4652 (JGK) on 6/16/10. (rdz) (Entered: 06/16/2010) |
| 06/16/2010 | | Mailed notice with REVISED links to Civil Rules and ECF Registration to the attorney(s) of record. www.uscourts.gov/rules, www.nysd.uscourts.gov/ecf_filing.php (rdz) (Entered: 06/16/2010) |
| 06/22/2010 | 6 | NOTICE OF APPEARANCE by Nolan Edward Shanahan on behalf of Adele Fox (Shanahan, Nolan) (Entered: 06/22/2010) |
| 06/23/2010 | 7 | NOTICE OF APPEARANCE by Peter William Smith on behalf of Susanne Stone Marshall (Smith, Peter) (Entered: 06/23/2010) |
| 07/06/2010 | 8 | Appellant's BRIEF. Document filed by Adele Fox. Appellee Brief due by 7/26/2010. (Shanahan, Nolan) (Entered: 07/06/2010) |
| 07/06/2010 | 9 | Appellant's BRIEF. Document filed by Susanne Stone Marshall. Appellee Brief due by 7/26/2010. (Chaitman, Helen) (Entered: 07/06/2010) |
| 07/13/2010 | 10 | NOTICE OF APPEARANCE by Keith R. Murphy on behalf of Irving H. Picard (Murphy, Keith) (Entered: 07/13/2010) |
| 07/13/2010 | 11 | NOTICE OF APPEARANCE by David J. Sheehan on behalf of Irving H. Picard (Sheehan, David) (Entered: 07/13/2010) |
| 07/13/2010 | 12 | NOTICE OF APPEARANCE by Keith R. Murphy on behalf of Irving H. Picard (Murphy, Keith) (Entered: 07/13/2010) |
| 07/13/2010 | 13 | NOTICE OF APPEARANCE by Deborah Hilarie Renner on behalf of Irving H. Picard (Renner, Deborah) (Entered: 07/13/2010) |
| 07/20/2010 | 14 | STIPULATION AND ORDER MODIFYING SCHEDULING: The Trustee shall submit his appellate brief and related documents within two weeks following the later of the entry of (i) an Order, or (ii) a written decision issued by the Bankruptcy Court, determining the Motion to Strike. In such instance, Appellants' reply briefs shall be submitted within three weeks after service of the Trustee's brief and as |

| | | |
|---|---|---|
| | | further set forth in this Order. (Signed by Judge John G. Koeltl on 7/20/2010) (tro) (Entered: 07/20/2010) |
| 09/21/2010 | 15 | TRANSCRIPT of proceedings held on 9/7/10 before Judge John G. Koeltl. (pl) (Entered: 09/23/2010) |
| 10/01/2010 | 16 | STIPULATION MODIFYING SCHEDULING NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BY AND BETWEEN THE TRUSTEE AND APPELLANTS: Appellants shall submit their initial briefs on or before October 5, 2010. Appellants' initial briefs shall be no more than 60 pages in length. The Trustee shall submit his opposing brief on or before November 19, 2010. The Trustee's opposition brief shall be no more than 60 pages in length, Appellants shall submit their reply briefs on Of before December 21, 2010. Appellants' reply briefs shall be no more than 25 pages in length. Nothing contained herein can or shall be construed as an adjudication on the merits of any claims that the Trustee and/or Appellants may have against each other or any other party, or as an admission or acknowledgment of any claim or defense as against the other by either the Trustee or Appellants, with all such claims and defenses preserved. SO ORDERED ( Appellant Reply Brief due by 12/21/2010, Brief due by 10/5/2010, Responses due by 11/19/2010) (Signed by Judge John G. Koeltl on 9/30/2010) (jmi) (Entered: 10/01/2010) |
| 10/05/2010 | 17 | Appellant's BRIEF. Document filed by Susanne Stone Marshall. Appellee Brief due by 10/25/2010. (Chaitman, Helen) (Entered: 10/05/2010) |
| 10/05/2010 | 18 | CERTIFICATE OF SERVICE. Document filed by Susanne Stone Marshall. (Chaitman, Helen) (Entered: 10/05/2010) |
| 10/05/2010 | 19 | Appellant's BRIEF. Document filed by Adele Fox. Appellee Brief due by 10/25/2010. (Shanahan, Nolan) (Entered: 10/05/2010) |
| 10/07/2010 | 20 | CERTIFICATE OF SERVICE. Document filed by Adele Fox. (Shanahan, Nolan) (Entered: 10/07/2010) |
| 10/27/2010 | 21 | MOTION for Jennifer A. Vessells to Appear Pro Hac Vice. Document filed by Bernard L. Madoff, Irving H. Picard.(mro) (Entered: 10/28/2010) |
| 10/29/2010 | 22 | ENDORSED LETTER addressed to Judge John G. Koeltl from Keith R. Murphy dated 10/28/2010 re: Requesting clarification of the applicable appellate briefing schedule of the two pending appeals, civil action numbers 10-cv-4652 and 10-cv-7101. ENDORSEMENT: The October 8 Order is vacated. The Stipulated October 1 Scheduling Order prevails. (Signed by Judge John G. Koeltl on 10/28/2010) (jpo) (Entered: 10/29/2010) |

| | | |
|---|---|---|
| 10/29/2010 | 23 | ENDORSED LETTER addressed to Judge John G. Koeltl from Keith R. Murphy dated 10/28/2010 re: Requesting clarification of the applicable appeallate briefing schedule of the two pending appeals, civil action numbers 10-cv-4652 and 10-cv-7101. ENDORSEMENT: The October 8 Order is vacated. The Stipulated October 1 Scheduling Order prevails. (Signed by Judge John G. Koeltl on 10/28/2010) (jpo) (Entered: 11/01/2010) |
| 11/01/2010 | 24 | ORDER granting 21 Motion for Jennifer A. Vessells to Appear Pro Hac Vice for Bernard L. Madoff, Irving H. Picard. (Signed by Judge John G. Koeltl on 11/1/2010) (jmi) (Entered: 11/03/2010) |
| 11/18/2010 | 25 | ENDORSED LETTER addressed to Judge John G. Koeltl from Keith R. Murphy dated 11/17/10 re: Counsel for Appellants Fox and Marshall have both graciously agreed to an extension of the Trustee's deadline from November 19, 2010 to November 23, 2010 due to illness of counsel for Appellee. Accordingly, we agreed to similarly extend the deadline by which Appellants must submit their reply briefs from December 21, 2010 to December 27, 2010. We respectfully request that Your Honor approve the extensions outlined above. ENDORSEMENT: Application granted. So ordered. (Signed by Judge John G. Koeltl on 11/17/10) (rjm) (Entered: 11/18/2010) |
| 11/18/2010 | | Set Deadlines/Hearings: Appellant Reply Brief due by 12/27/2010. Responses due by 11/23/2010 (rjm) (Entered: 11/18/2010) |
| 11/23/2010 | 26 | Appellee's BRIEF. Document filed by Irving H. Picard. Appellant Reply Brief due by 12/27/2010. (Renner, Deborah) (Entered: 11/23/2010) |
| 12/07/2010 | 27 | NOTICE OF APPEARANCE by Tracy Lynn Cole on behalf of Irving H. Picard (Cole, Tracy) (Entered: 12/07/2010) |
| 12/08/2010 | 28 | STIPULATION ADDRESSING ADMINISTRATIVE MATTERS, BY AND BETWEEN COUNSEL FOR THE TRUSTEE AND COUNSEL FOR THE FLORIDA APPELLANTS: 1. The Trustee is authorized to amend the appendices to the Counter-Designations to be consecutively paginated with citations to the record, and include hard copies of certain items not previously reproduced in the appendices. 2. Nothing contained herein can or shall be construed as an adjudication on the merits of any claims that the Trustee and/or the Florida Appellants may have against each other or any other party, or as an admission or acknowledgement of any claim or defense as against the other by either the Trustee or the Florida Appellants, with all such claims and defenses preserved. (Signed by Judge John G. Koeltl on 12/7/2010) (lnl) (Entered: 12/08/2010) |
| 12/08/2010 | | CASHIERS OFFICE REMARK on 21 Motion to Appear Pro Hac Vice in the amount of $25.00, paid on 10/27/2010, Receipt Number 918998. (jd) (Entered: 12/08/2010) |

| 12/09/2010 | 29 | AMENDED APPENDIX COUNTER- DESIGNATION OF BANKRUPTCY RECORD ON APPEAL Document filed by Appellee Irving H. Picard. (Renner, Deborah) (Entered: 12/09/2010) |
|---|---|---|
| 12/20/2010 | 30 | ENDORSED LETTER addressed to Judge John G. Koeltl from Nolan E. Shanahan dated 12/17/2010 re: Requesting that the time to file and serve reply briefs in this matter be extended until January 7, 2011. ENDORSEMENT: Application granted. So Ordered. (Signed by Judge John G. Koeltl on 12/17/2010) (jpo) (Entered: 12/22/2010) |
| 01/07/2011 | 31 | Appellant's REPLY BRIEF. Document filed by Adele Fox. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C1, # 4 Exhibit C2, # 5 Exhibit C3)(Shanahan, Nolan) (Entered: 01/07/2011) |
| 01/07/2011 | 32 | Appellant's REPLY BRIEF. Document filed by Susanne Stone Marshall. (Chaitman, Helen) (Entered: 01/07/2011) |
| 01/07/2011 | 33 | CERTIFICATE OF SERVICE. Document filed by Susanne Stone Marshall. (Chaitman, Helen) (Entered: 01/07/2011) |
| 03/03/2011 | 34 | NOTICE of Appellee Irving H. Picard, Trustees Notice of Supplemental Authority. Document filed by Irving H. Picard. (Attachments: # 1 Exhibit A)(Murphy, Keith) (Entered: 03/03/2011) |

# EXHIBIT J

**17 December 2010**
**States News Service**
**English**
**(c) 2010 States News Service**

**The following information was released by the office of New Jersey
Rep. Scott Garrett:**

**Rep. Scott Garrett (R-NJ), incoming Chairman of the House Financial
Services Capital Markets and Government-Sponsored Enterprises
Subcommittee, has introduced H.R. 6531, the Equitable Treatment of
Investors Act, to protect ordinary investors who have already been
defrauded and financially devastated by Bernie Madoff from further
"clawbacks" by the Securities Investor Protection Corporation (SIPC)
trustee.**

Garrett issued the following statement after introducing the bill in the House:

**"When investors see the SIPC seal of approval, they should have
confidence in the account statements they receive. These ordinary
investors who knew nothing about the fraud should not be held to a
higher standard than the federal government - which in the case of the
Securities and Exchange Commission (SEC) missed the Madoff fraud in
the first place, and in the case of the Internal Revenue Service (IRS)
was happy to rely on these same statements to collect taxes from the
reported profits.**

**"Customers of registered brokers regulated by the SEC are legally
entitled to rely on their customer statements as evidence of what their
broker owes them - this does not change when a broker engages in
fraud. Indeed, it is there to protect customers in the event of fraud.
Since customers dealing with brokers do not hold physical securities,
there is no other way for customers to verify their holdings.**

**"I am concerned that the trustee in the Madoff case is ignoring this
law and failing to provide prompt assistance to those who have been
thrust into financial chaos. He is taking positions on a wide range of
issues that are contrary to the Securities Investor Protection Act
(SIPA), the Bankruptcy Code, and federal and state laws that are**

intended to protect investors against bad acts on the part of their brokers. This legislation is intended to clarify for the trustee and the Bankruptcy Court that Congress wants these laws to be followed.

"If the current law is not followed, no customer can ever have confidence in his or her dealings with a broker. That is contrary to the policy goal of encouraging investment, which is critical to the economic renewal our country needs."

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Defendant | |

## AFFIDAVIT OF JOHN L. DECKER IN SUPPORT OF ORDER AUTHORIZING THE APPOINTMENT AND EMPLOYMENT OF STUART MAUE AS FEE AUDITOR

STATE OF MISSOURI      )
                                           ) ss:
COUNTY OF ST. LOUIS    )

John L. Decker, being duly sworn, deposes and states as follows:

1.      This Affidavit is submitted in support of Stuart Maue's appointment as fee auditor in the above-captioned bankruptcy proceeding.

2.      This Affidavit is executed on behalf of Stuart Maue, and unless otherwise stated, it is based upon facts upon which I have personal knowledge or information and belief as set forth herein.

3.     Stuart Maue is a legal auditing and bill review firm located at 3840 McKelvey Road, St. Louis, MO, 63044, and employs licensed attorneys; however, Stuart Maue is not engaged in the practice of law.

4.     I am employed as Senior Vice President, Director of Consulting Services at Stuart Maue and have been designated to complete this Affidavit on behalf of and as an officer of Stuart Maue.

5.     I am licensed to practice law in the State of Nebraska and the State of Missouri. I am currently a member of good standing in each of these jurisdictions and am an active member of the bar of the State of Missouri.

6.     Stuart Maue has been appointed as Fee Examiner or consultant in other large complex cases including:  Tribune Company, et al., Case No. 08-13141 (Bankr. D. Del.); Motors Liquidation Company, Inc., et al. Case No. 09-50026 (Bankr. S.D.N.Y.); Plumbing Holdings Corporation, et al., Case No. 09-14113 (Bankr. D. Del.); Catholic Diocese of Wilmington, Inc., Case No. 09-13560 (Bankr. D. Del.); and DBSI Inc., et al, Case No. (09-13560) (Bankr. D. Del.).  The role of Fee Examiner is to act as a special consultant to the Court for professional fee and expense analysis and review to ensure compliance with section 330 of the Bankruptcy Code and other applicable rules and guidelines.  Attached as Exhibit A is a summary of Stuart Maue's twenty more recent Fee Examiner appointments.

7.     In Chapter 11 cases, as Fee Examiner, Stuart Maue reviews fee applications for compliance with sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the **"Local Rules"**), and the United

2

States Trustee Guidelines for Reviewing Applications for Compensation & Reimbursement of Expenses filed under 11 U.S.C. § 330 (28 C.F.R. Part 58, Appendix A) (the "**UST Guidelines**"). In addition, the Fee Examiner reviews fee applications for general compliance with legal precedent established by the United States Bankruptcy Court for the Southern District of New York, the United States District Court for the Southern District of New York, the Second Circuit Court of Appeals, state ethics rules, other applicable precedent, and industry standards.

8.    Pursuant to Section 330 of the Bankruptcy Code, the Court may award professionals "reasonable compensation for actual, necessary services." *11 U.S.C. § 330(a)(1)(A)*. In evaluating the amount of reasonable compensation to be awarded, "the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including (A) the time spent on such services; (B) the rates charged for such services; (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." *11 U.S.C. §§ 330(a)(3)(A-F)*.

9.    A fee applicant bears the burden of proof on all of the elements of a fee application, including proving that the services provided were necessary and reasonable and that the billed expenses were necessary, reasonable, and actually incurred. A fee application must comply with the format and content requirements outlined in the applicable guidelines and bankruptcy rules. Moreover, the exercise of billing judgment by attorneys is ethically mandated; it is an inherent and unavoidable component of every fee application. A fee applicant must make a good faith effort to exclude excessive, redundant or otherwise unnecessary hours from a fee request.

10.    In bankruptcy cases, as Fee Examiner Stuart Maue reviews each quarterly fee application, together with the retention documents and compensation orders, and all related filings and provides a preliminary report to the applicant review and comment. The Fee Examiner then issues a final report (the "**Final Report**") with respect to each quarterly fee application and the firm's final fee application, in a format designed to opine whether the requested fees of the case professional meet the applicable standards of section 330 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and the Guidelines.

11.    In the above captioned matter, the applicants for professional compensation have not filed detailed billing statements with the Bankruptcy Court. Stuart Maue's review typically includes an analysis of the individual timekeeper fee entries, the individual expense charges, and the vendor invoices for costs billed to the law firm and charged to the estate. Even without the billing detail, several areas of concern are present. The timekeeper information provided lists a significant number of attorney timekeepers who are not identified as professionals on the firm's website. The timekeeper information provided lists clerks,

librarians, and other non-professionals who bill hours and fees to the matter. Those activities need to be reviewed to confirm that those charges represent professional services and provide a benefit to the estate. The detail provided by the firm indicates that the firm is billing to conduct conflicts checks, oversee administrative matters, maintain files, and manage and monitor staffing needs. Those activities need to be reviewed to confirm that those charges represent professional services and provide a benefit to the estate. There are several categories of expense charges which need to be reviewed to confirm that those charges represent reasonable and necessary charges and provide a benefit to the estate.

12.    If appointed as Fee Examiner in the above referenced matter, Stuart Maue would need to examine detailed billing statements, not summaries, to effectively review the fees and expenses requested. In reviewing bankruptcy fee applications, as Fee Examiner Stuart Maue reviews the following areas for compliance:

        a.    **Timekeepers' Roles.**    The Fee Examiner reviews fee applications to determine whether the applicant is seeking compensation for fees for duplicative or unnecessary services.

        b.    **Meetings, Conferences, Hearings, and Other Events.**    The Fee Examiner reviews time entries for meetings and conferences to determine if multiple attendees invoice for attending meetings, conferences, hearings or other events.

        c.    **Intraoffice Conferences.**    The Fee Examiner reviews time entries for intraoffice conferences, since frequent intraoffice conferences may indicate inappropriate levels of staffing, unnecessary conferring, or the use of

inexperienced personnel.   The Fee Examiner also reviews intraoffice conferences to determine if two or more timekeepers invoiced fees associated with the same intraoffice conference, and inquires as to the purpose of multiple attendees at intraoffice conferences.

d.  **Complete and Detailed Task Descriptions.**  The Fee Examiner reviews each fee entry to determine whether time descriptions are sufficiently detailed to allow the Court to determine whether all the time, or any portion thereof, is actual, reasonable and necessary.

e.  **Administrative Activities.** The Fee Examiner reviews time entries to determine if applicants are seeking reimbursement for activities associated with the day-to-day operations of the firm, which are considered administrative in nature and typically not allowed as overhead.

f.  **Clerical Activities.**   The Fee Examiner reviews each time entry to determine if applicants are seeking reimbursement for clerical activities, which are tasks that do not require legal acumen and may be effectively performed by administrative assistants, secretaries, or support personnel.

g.  **Travel.**  The Fee Examiner reviews fee applications to ascertain that the applicants appropriately bill time and expenses for travel.

h.  **Expenses.**  The Fee Examiner conducts a thorough review of all requests for reimbursement of expenses, to ensure compliance with applicable rules.

13.    In other bankruptcy cases in which Stuart Maue served or serves as Fee Examiner, the Fee Examiner normally finds questionable billing entries in all of the above referenced areas and typically fees are reduced after the Fee Examiner consults with the applicants and makes recommendations.

14.    In preparing this Affidavit, I have reviewed lists of parties-in-interest and retained professionals in connection with these chapter 11 cases in the court docket of the United States Bankruptcy Court for the Southern District of New York for the above referenced matter.

15.    The facts in this Affidavit as to the relationship between Stuart Maue and the parties-in-interest and the retained professionals are based on our review of the court docket of the United States Bankruptcy Court for the Southern District of New York for the above referenced matter.

16.    Insofar as I have been able to ascertain, Stuart Maue does not have any connection with any of the interested parties listed on the court docket of the United States Bankruptcy Court for the Southern District of New York for the above referenced matter, except Stuart Maue has provided legal auditing services in other bankruptcy proceedings and to other clients and, in that capacity, has audited the fees and expenses of some of the listed case professionals.

17.    Subject to this Court's approval, Stuart Maue intends to charge for its services on an hourly basis in accordance with its ordinary and customary hourly rates in effect on the date services are rendered.    Stuart Maue shall be entitled to receive compensation for its services based on the following hourly rates:  Project Manager/Senior Attorney - $375.00;

7

Senior Legal Auditors (attorneys and accountants) - $275.00 to 350.00/hour; Computer Programmers/Consultants - $175.00/hour, and Data Control Personnel - $75.00/hour. Stuart Maue estimates and typically charges fees which approximate 2% of the total amount of fees and expenses reviewed.

18.    If appointed in the above referenced matter, Stuart Maue will maintain detailed, contemporaneous records of time and will  request reimbursement for actual and necessary expenses incurred in connection with rendering its services and intends to apply to the Court for payment of compensation and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of this Court, the administrative order governing the payment of case professionals in these cases, and any other applicable orders entered in these cases.

19.    Neither I nor any employee or representative of Stuart Maue are related to any judge of the United States Bankruptcy Court or any attorney or other employee of the United States Trustee's Office in a manner that would render my or Stuart Maue's employment improper.

20.    Stuart Maue has not shared or agreed to share any compensation paid or to be paid with any person, other than a managing director, professional, or employee of Stuart Maue.

21.    I submit this Affidavit based upon the information available to me as of the date so executed and will promptly supplement this Affidavit should it become inaccurate or incomplete.

FURTHER AFFIANT SAYETH NOT.

Dated: May 9, 2011

John L. Decker

Subscribed and sworn to before me, this 9th day of May, 2011.

Beverly A. Moore
Notary Public

BEVERLY A. MOORE
Notary Public - Notary Seal
State of Missouri
Commissioned for Jefferson County
My Commission Expires: November 05, 2012
Commission Number: 08409154

My Commission Expires:
November 5, 2012

9

**EXHIBIT A**





Stuart Maue has participated in some of the largest bankruptcy proceedings in recent history. These bankruptcies involved the analysis of millions of dollars in fees and expenses.

## The following is a representative sample of the bankruptcy cases where Stuart Maue served as a Fee Examiner or Fee Auditor:

- Motors Liquidation Company, et al., (GM) (Southern District of New York)

- Tribune Company, et al., (District of Delaware)

- Catholic Diocese of Wilmington, Inc. (District of Delaware)

- Plumbing Holdings Corporation, et al., (District of Delaware)

- KLCG Property, LLC (District of Delaware)

- Indalex Holding Finance, Inc. (District of Delaware)

- Merisant Worldwide Inc. (District of Delaware)

- DBSI, Inc., et al., (District of Delaware)

- Kmart Corporation (Northern District of Illinois)

- HomeBanc Mortgage Corporation, et al., (District of Delaware)

- Winn-Dixie Stores, Inc., et al., (Middle District of Florida)

- Stone & Webster, Inc., et al., (District of Delaware)

- San Jose Medical Management, Inc. (Northern District of California)

- Condor Systems, Inc. (Northern District of California)

- SonicBlue, Inc. (Northern District of California)

- Lernout & Hauspie Speech Products, N.V. (District of Delaware)

- Phar-Mor (Northern District of Ohio)

- Montgomery Ward (District of Delaware)

- Apple Orthodontix, Inc. (Southern District of Texas)

- Multicare AMC, Inc. (District of Delaware)

3840 McKelvey Road, St. Louis, MO 63044          Phone: 314.291.3030          www.stuartmaue.com