# EXHIBIT K

Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin and*
*Maureen Ebel,* with the support of more than
100 other Customers

**Hearing:  August 6, 2009 at 10 a.m.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-01789 (BRL) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**OBJECTION TO FIRST APPLICATIONS OF IRVING H. PICARD, TRUSTEE,**
**AND BAKER & HOSTETLER LLP FOR ALLOWANCE OF INTERIM**
**COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF**
**EXPENSES INCURRED FROM DECEMBER 15, 2008 THROUGH APRIL 30, 2009**

Diane and Roger Peskin and Maureen Ebel ("Objectors"), by their attorneys, Phillips

Nizer LLP, with the support of over 100 other customers of Bernard L. Madoff Investment

Securities, LLC ("Madoff"), object to the applications for interim compensation of Irving H.

Picard, Trustee, and his counsel, Baker & Hostetler LLP ("B&H").  The Trustee was appointed

by this Court at the request of the Securities Investor Protection Corporation ("SIPC") in the

proceeding instituted in the United States District Court for the Southern District of New York

on December 15, 2008 for the liquidation of Madoff under the Securities Investor Protection Act,

15 U.S.C. § 78aaa, *et seq.* ("SIPA").

1.      SIPA was enacted at the behest of the financial services industry to relieve the

industry of the significant expense of registering securities in the names of investors and to allow

the industry to profit from holding securities in street name.  The inducement to investors to

assume the risks of having their securities held in street name was the promise that their accounts

were insured against the brokers' dishonesty by an insurance fund managed by SIPC and funded

by the financial services industry.

2.      SIPC is obligated under SIPA to "promptly" pay up to $500,000 in SIPC

insurance to Madoff customers (the "Customers") based upon their November 30, 2008

statements (their "Statutory Balances").   Customers who reasonably relied upon the promise of

SIPC insurance are now being told by the Trustee that their accounts were not insured for their

Statutory Balances but only for their net investment.  If the Trustee prevails, SIPC will save

billions of dollars it would otherwise have to pay in SIPC insurance to Customers.

3.      The Trustee has served as SIPC trustee in numerous SIPA liquidations.  SIPC, as

the insurer of Customer accounts, is in a direct adversarial position to the Customers, putting the

Trustee and B&H in an untenable conflict of interest.  As set forth herein, the Trustee and B&H

have taken actions to enrich SIPC at the expense of the Customers.  Their actions have been (a)

in violation of the express provisions of SIPA, (b) in contravention of national policy as

evidenced by SIPA's legislative history, (c) in contradiction of controlling Second Circuit

authority, with which SIPC and the Securities and Exchange Commission ("SEC") concurred,

2

and (d) in direct abrogation of the rights of the Customers both under SIPA and under the due process clause of the Fifth Amendment to the United States Constitution.

4.      The Trustee and B&H have a fiduciary duty to Customers.  This obligation is particularly crucial here because the Madoff fraud has caused an economic tsunami, leaving thousands of innocent people in the United States with no means of support, and because this case has received worldwide focus at a time when the integrity of the United States financial system is subject to legitimate question.

5.      The Trustee and B&H are acting in direct contravention of their fiduciary and statutory duty to Customers and to the public and, in the process, are increasing exponentially and unnecessarily the administrative costs of the estate, depleting SIPC funds that should be used to pay Customer claims at a time when SIPC is insolvent.  Indeed, SEC Commissioner Mary Schapiro testified before Congress on July 14, 2009:

> The tragic truth is there is not enough money available to pay off
> all the customer claims.

See Exh. B at 2. (Webcast at 52:51.)

6.      In the circumstances of this case which has bankrupted SIPC, the Trustee and B&H have a conflict of interest which disables them from serving.  For this reason, and for the other reasons set forth below, Objectors file this objection and offer to prove the facts set forth herein at an evidentiary hearing at a time set by the Court.  This objection constitutes their offer of proof.

**INTRODUCTION**

7.      Objectors are typical of thousands of Customers who invested with Madoff, many over a period of 20 – 30 years, in reliance on the SEC's oversight of the securities industry.  In

3

1992, the SEC publicly stated that it had investigated Madoff and found no evidence of fraud.  In

total, the SEC conducted at least seven investigations involving more than 27 SEC personnel as a

result of repeated complaints that Madoff's trading strategy was not accurately represented to

Customers.  The SEC repeatedly gave Madoff its stamp of approval.   Now, Customers are told

that, at least since the 1980's, Madoff never purchased any of the securities reflected on

Customer statements but, instead, used investors' money for his other business and personal

interests.  See Exh. A, ¶ 4 at 2 and ¶ 9 at 5.

8.     Based upon the purchase and sale confirmations that Madoff sent to Customers,

he went into the market five or six times a year, purchased a portfolio of approximately 25 S&P

100 company stocks; hedged the positions with options to protect against the downside; held the

positions for approximately six weeks; then sold the positions and put the proceeds into US

Treasury bills.   Thus, Madoff appeared to have a conservative, diversified trading strategy.

While his returns were relatively consistent, they were not extraordinary.  For example, during

the period of time that Objectors invested in Madoff, they had short term capital gains

appreciation of approximately 10% per year whereas they could have invested in funds of any of

the large mutual fund companies and, over this period of time, earned 20-30% per year on a long

term capital gains basis.

9.     By virtue of the fact that Madoff began his investment advisory business in the

1960's and by virtue of the esteem with which he was treated by the SEC and FINRA, thousands

of Customers had put all of their life savings and retirement accounts into Madoff.  The

Customers, a substantial portion of whom are 70 or older, relied upon regular periodic

distributions from their Madoff accounts in order to fund their daily living expenses, the payment

of their taxes, and their support obligations for family members, as well as to comply with the

4

mandatory withdrawals from their tax-deferred retirement accounts. The collapse of Madoff on December 11, 2008 terminated without warning the sole means of support of many Customers and their family members across the United States, leaving them without the ability to pay their mortgages, their taxes, their food bills, or their medical bills.

10.    If ever there was a case where it was essential to comply with Congress' mandate that SIPC insurance be paid "promptly" to investors, this is such a case. Yet, with full knowledge of the devastation that Madoff caused to Customers, and despite the clear provisions of SIPA as incorporated into this Court's December 23, 2008 order, the Trustee and B&H have caused needless devastation to Customers by ignoring SIPA's mandate that Customer claims be paid "promptly" based upon their Statutory Balances. In the process, the Trustee and B&H have misrepresented the law to destitute Customers who cannot afford to retain their own counsel, with the clear intent of inducing Customers to accept less in SIPC insurance than they are entitled to receive.

11.    While the Trustee has reported that he has already "recovered" $1,088,507,818 (Trustee's First Interim Report at 3), of this amount, $946 million was simply sitting in bank accounts in Madoff's name at the time the Trustee was appointed, including $301,407,190 at Mellon Bank, $233,500,000 at JP Morgan Chase, $300 million in securities, and $29 million at Bank of New York. Bloomberg.com 1/29/09.

12.    The Trustee's most important function is to promptly pay SIPC insurance to customers because the United States Attorney's Office has the duty to assure restitution to victims of Madoff's fraud. On this score, the Trustee has been an abysmal failure. Of the more than 15,400 Customer claims in this case, the Trustee has allowed a mere 747 claims in eight months, although even these 747 Customers have not all been paid by SIPC.

5

http://madofftrustee.com/AdditionalInformation.html.  Despite this pathetic track record, the

Trustee and B&H, exclusive of the numerous other professionals the Trustee has hired, seek

approval of fees and expenses for the period December 15, 2008 through April 30, 2009 as

follows:

> Baker & Hostetler LLP as Counsel to the Trustee
> Fees: $14,662,319.83    Expenses: $274,203.03
>
> Irving H. Picard, Esq. as SIPA Liquidation Trustee
> Fees: $759,228.75    Expenses:  $45.00

13.    The payment of $15 million of SIPC's money to the Trustee and B&H means that

30 destitute Customers will not be paid the SIPC insurance to which they are entitled by the

express language of SIPA.  This depletion of SIPC's funds is unjustifiable.  The Trustee still has

not paid SIPC insurance to hundreds of Customers who, as readily determinable from Madoff's

records, are indisputably entitled to $500,000 from SIPC.  Indeed, there are Customers who, the

Trustee has acknowledged in writing, are entitled to $500,000 in SIPC insurance and yet the

Trustee has refused to pay these Customers because the Customers have additional claims and

will not release them as a condition of payment.  Nowhere in SIPA is the Trustee authorized, as

he has done, to withhold insurance payments from customers solely because they have additional

claims against SIPC or because they will not give SIPC a general release.  *See* the various

Objections to the Trustee's Determination that have been filed with the Court which are

incorporated in full herein by reference.  The Trustee has not scheduled a hearing on a single one

of these Objections.

14.    At this rate, the Trustee and B&H, exclusive of all the other professionals retained

in this case, will incur administrative expenses of $45 - $60 million a year and, undoubtedly, will

keep the case open for seven to ten years.  Thus, the administrative expenses for the Trustee and

6

B&H alone could easily exceed $500 million.  The administrative expenses are to be paid by

SIPC which, itself, is insolvent and does not have sufficient money to fulfill its insurance

obligations to Customer.  Thus, every dollar paid to the Trustee and B&H is a dollar taken away

from Customers – innocent, law abiding citizens who believed that SIPA was the law of the land

and that their accounts were insured by SIPC for up to $500,000 against the dishonesty of their

broker.

15.     Rather than draw upon the lines of credit available to SIPC under SIPA, SIPC,

with the concurrence of the Trustee and B&H, have devised a scheme to allow SIPC to avoid

paying the insurance to which Customers are indisputably entitled.  This scheme began with the

Trustee's invention of a new definition of "net equity."

16.     In blatant disregard of the law, the Trustee has denied SIPC insurance to anyone

who does not have a net investment over the life of his investment with Madoff.  Under the

Trustee's theory, an investor who invested $100,000 in 1970, which appreciated to $1,600,000 in

2008, is not entitled to any SIPC insurance if, over the course of 37 years, the investor took out

$100,000 to pay taxes.   Similarly, according to the Trustee and B&H, a Customer who had an

IRA account from which the Customer took the annual withdrawals mandated by federal law and

paid taxes on the money is not entitled to SIPC insurance if his mandatory withdrawals exceeded

his investment.

17.     By ignoring SIPA, the Trustee has necessitated the additional administrative

expense of having "forensic" accountants determine the net investment of each Customer, in

many cases encompassing 30 – 40 years of records.   The "forensic" accountants, of course, are

also being paid by SIPC with money which should be paid to Customers.  The Trustee's self-

serving *legerdemain* is calculated to save SIPC billions of dollars and, at the same time,

7

necessitates the incurrence of tens of millions of dollars of unnecessary administrative expenses that would be avoided if the Trustee simply complied with the law.

18.    As a result of the Trustee's defiance of SIPA, Customers have suffered tragic additional losses.  Many Customers have been forced to sell their homes on a fire-sale basis in an extraordinarily depressed market, simply because they did not have the money to cover the monthly housing expenses for a sufficient period to sell their homes over a more reasonable time period.  Customers have been forced to put loved ones into nursing homes because they could not afford to continue to support them in their own homes.  Customers on chemotherapy drugs have not had the funds to pay for their medical treatment.

19.    In recognition of the unconscionable delay in payment of SIPC insurance to destitute Customers, but without any statutory authority, the Trustee established a "Hardship Program" pursuant to which Customers who, through the disclosure of the most intimate personal information, are deemed in the Trustee's sole discretion to be hardship cases, are entitled to receive "expedited" treatment.

20.    However, the Trustee has given himself more time to pay "hardship" cases than SIPA contemplates a trustee will need to pay all customers.  The Trustee has given himself an initial period of 20 days to decide whether or not an individual qualifies for the Hardship Program.  See Exh. C, ¶ 3.c at 1.  If an individual does qualify, then his claim "will be expedited in the claims process" but "the Trustee cannot guaranty the timing of determination of any claim."  *Id*.  The best that an individual can hope for is that, if his account was opened after January 1, 2006, "the Trustee will endeavor to mail a determination of [the] claim within 20 days of [the] claim qualifying for the Hardship Program."  *Id*.  Thus, if an individual's account was opened after January 1, 2006, the Trustee will "endeavor" (but does not promise) to mail a

8

determination of claim within 40 days, but only if the Customer discloses absolutely everything about his finances first. Of course, the time between determination and payment can be another 60 days.

21.     There is no provision in SIPA that contemplates that a trustee will take 60 days to determine a claim, no matter when the investment was made. There is nothing in SIPA that restricts prompt payment to those who can demonstrate to the Trustee's satisfaction that they are suffering "hardship." There is nothing in SIPA which allows a trustee to provide for prompt payment to recent customers and delayed payment to long-standing customers. That is precisely why SIPA requires the Trustee to fix a customer's claim at his Statutory Balance.

22.     The Trustee's conduct has been particularly injurious to elderly investors. He has denied SIPC insurance to "hardship" Customers whose investments in Madoff date back 15-40 years who did not retain their records of deposits. The Trustee and B&H have taken the position that it is the Customer's burden to prove his investments and, if the Customer did not retain records from 15-40 years ago, the Customer loses and SIPC wins. In fact, B&H has informed Customers that the Trustee will not provide Customers with Madoff's own records – as to which the Trustee has exclusive access. Thus, even if the Trustee has a record of Customer deposits, the Trustee will not make those records available to Customers. In this way, of course, SIPC can deny coverage to Customers who had no reason to, and did not, retain records of deposits going back 15-40 years.

23.     As to the remainder of the "hardship cases, the Trustee and B&H have taken months to resolve "hardship" cases, during which the Trustee has sought to exact compromises from elderly, destitute Customers. In several instances, attorneys at B&H have affirmatively misrepresented the law to "hardship" cases in order to induce them to accept from SIPC less than

9

the sums to which they are indisputably entitled. In addition, the Trustee has regularly deducted

from Customers' SIPC insurance alleged "preferences," despite the fact that SIPC does not

authorize such offsets and despite the fact that there is a substantial question as to whether the

preference provision of the Bankruptcy Code applies to Customers who simply received

distributions from their accounts of their own money, in the ordinary course of business of

themselves and Madoff.

**THE TRUSTEE AND B&H HAVE A CONFLICT OF INTEREST**

24.    This Court has a fundamental obligation to monitor the integrity of proceedings

before it. *In re Plaza Hotel Corp.,* 111 B.R. 882, 891 (B.E.D. Cal. 1990).

25.    The Trustee owes a fiduciary duty to Customers. *See In re Adler, Coleman*

*Clearing Corp.*, 1998 Bankr. LEXIS 1076 (B. S.D.N.Y. Aug. 25, 1998) ("The parties agree that

a SIPA trustee owes a fiduciary duty to the customers and creditors of a liquidating broker dealer

akin to the fiduciary duty a bankruptcy trustee owes a debtor's estate and creditors"); *Germain v.*

*The Connecticut National Bank,* 988 F. 2d 1323, 1330 n. 8 (2d Cir. 1993).   A fiduciary duty is

the highest duty imposed by law.  *See Roberts v. Dayton Hudson Corp.*, 914 F. Supp. 1421, 1423

(N.D. Tex. 1996); *see also Enzo Biochem, Inc. v. Johnson & Johnson,* 1992 U.S. Dist. LEXIS

15723, at *29 (S.D.N.Y. Oct. 15, 1992).

26.    The disinterestedness of a trustee's counsel is "so crucial to the proper functioning

of the bankruptcy system that a court may raise it and dispose of it whenever its sanctity is

questioned." *In re Vebeliunas,* 231 B.R. 181 (B.S.D.N.Y. 1999), *citing In re Martin*, 817 F. 2d

175, 180 (1st Cir. 1978).  A "trustee/fiduciary must be free from any hint of bias," and "either an

appearance of impropriety or a potential conflict of interest . . . is a viable cause for removal" of

10

a trustee. *In re AFI Holding, Inc.*, 355 B.R. 139 (9th Cir. BAP 2006) (affirming bankruptcy

court's removal of Chapter 7 trustee).

27.    The attorney for a trustee must be "disinterested," meaning that the attorney does

not have an interest materially adverse to a party in interest in the bankruptcy. *In re Marvel*

*Entertainment Group, Inc.,* 140 F. 3d 463, 476 (3d Cir. 1998). *See* Collier Bankruptcy Manual §

101.13 ("professionals engaged in the conduct of a bankruptcy case should be free of the

slightest personal interest which might be reflected in their decisions concerning matters of the

debtor's estate or which might impair the high degree of impartiality and detached judgment

expected of them during the course of administration."). *See also, In re Crivello,* 134 F. 3d 831,

835 (7th Cir. 1998)*; In re Cook,* 223 B.R. 782, 798 (10th Cir. BAP 1998); *In re BH & P, Inc.,*

119 B.R. 35, 42 (D.N.J. 1990); *In re Leslie Fay Cos.,* 175 B.R. 525, 532 (B.S.D.N.Y.

1994)(counsel removed from all new matters in case where counsel was investigating financial

irregularities of debtor and did not disclose relationships with directors who were targets of

investigation).

28.    Aside from the disinterestedness standard in bankruptcy, under the Rules of

Professional Conduct, an attorney cannot represent adverse interests. Rule 1.7(a) of the New

York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.7(a). An attorney must avoid even

the "appearance of a conflict" pursuant to § 327(a) of the Bankruptcy Code. *In re Hot Tin Roof,*

205 B.R. 1000, 1003 (1st Cir BAP 1997). Here, B&H represents the Trustee who has a fiduciary

duty to Customers. Yet, B&H is deliberately acting to delay and frustrate the payment of

Customer claims, even to the point of misrepresenting the law to destitute Customers who cannot

afford to retain their own counsel. Such misrepresentation is grounds for denial of fees. *See In*

*re Mercury*, 122 Fed. Appx. 528 (2d Cir. 2004) (affirming denial of compensation to firm that

11

acted as counsel for debtors and counsel for trustee, where the attorneys acted in the interest of the trustee instead of debtors and incorrectly advised debtors regarding their rights to convert Chapter 7 filing to Chapter 11 filing).  It also violates B&H's ethical obligations.  *See* Rule 4.1 of the New York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.32 ("In the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person.")

29.    Under SIPA, SIPC is deemed to be "disinterested."  15 U.S.C. §§ 78eee(b)(6)(A). However, SIPA does not, and could not, provide that a trustee, who is not an employee of SIPC, is "disinterested" or that an attorney retained by the Trustee is deemed, as a matter of law, to be "disinterested," particularly in a case like this where the Trustee and his counsel have flatly rejected the fundamental mandates of SIPA that were intended to protect customers.   In *In re First State Securities Corp.,* 39 B.R. 26 (B.S.D. Fla. 1984), the bankruptcy court assumed, without analysis or authority, that a trustee who, the court found, was a mere "puppet" of SIPC, was entitled to the imputation of disinterestedness provided by 15 U.S.C. § 78eee(b)(6)(A).  The court simply cited the statute which states:

> SIPC shall in all cases be deemed disinterested, and an employee of SIPC shall be deemed disinterested if such employee would, except for his association with SIPC, meet the standards set forth in this subparagraph.

Since neither the Trustee nor B&H is an employee of SIPC, this provision cannot insulate them from the requirement that the Trustee and his counsel be free of any conflict of interest.

30.    The Trustee and B&H have a conflict of interest as a result of which they are barred from receiving any compensation under established precedents and principles of professional conduct.  *See In re Angelika Films 57th, Inc.*, 246 B.R. 176 (S.D.N.Y. 2000) (affirming bankruptcy court's denial **in its entirety** of fee application of debtor's counsel where

12

counsel represented debtor's principal in other matters and took actions in the bankruptcy that "placed the interests of the Debtor's principal. . . over those of the Debtor.")

## SIPA VIOLATES THE CUSTOMERS' RIGHT TO DUE PROCESS OF LAW

31.    If this Court holds that the Trustee and B&H are deemed as a matter of law to be disinterested notwithstanding their obvious conflict of interest, then the Customers have been denied due process of law as guaranteed to them under the Due Process Clause of the Fifth Amendment to the United States Constitution.  "The bankruptcy power, like other great substantive powers of Congress, is subject to the Fifth Amendment." *Louisville Bank v. Radford*, 295 U.S. 555, 589, 602 (1935); *see also In re Phillips*, 13 B.R. 82 (B. C.D. Ill. 1981). Accordingly, any statutory scheme resulting from Congress' exercise of its Constitutional bankruptcy powers must be constrained by the requirements of the Due Process Clause of the Fifth Amendment.

32.    Evaluating a Fifth Amendment due process claim begins with a two-part analysis: 1) whether the interest asserted rises to the level of a "property interest"; and 2) if it does, the court must weigh the competing interests of the individual and the state to determine what process is constitutionally required.  *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361 (9th Cir. 1976).  Congress, through SIPA, has statutorily created a property interest for the Customers: the right to receive SIPC insurance of up to $500,000.  *See* 15 U.S.C. § 78(fff-3). This is a protected "property interest" under the Fifth Amendment  because it is an entitlement to a government benefit conferred by statute.  *See S & D Maintenance Co., Inc. v. Goldin*, 844 F.2d 962, 965 (2d. Cir. 1988); *Garcia v. U.S.*, 666 F.2d 690 (5th Cir. 1982).

33.    While SIPC is not a governmental agency, it is a creation of Congress and performs public functions, one of which is the designation of trustees and counsel in bankruptcy

13

proceedings who have the power, in the first instance, to determine claims.  The conduct of a

private entity amounts to state action when, like SIPC, it acts in a judicial or quasi-judicial

capacity pursuant to a legislative delegation of authority.  *See Concrete Pipe & Prods. v. Constr.*

*Laborers Pension Trust*, 508 U.S. 602, 617 (1993); *see also Gerena v. Puerto Rico Legal*

*Services, Inc.*, 697 F.2d 447 (1st Cir. 1983).    Here, Congress has created SIPC which functions

in a quasi-judicial capacity pursuant to a legislative delegation of authority.

34.      It is axiomatic that "due process demands impartiality on the part of those who

function in judicial or quasi-judicial capacities." *Schweiker v. McClure*, 456 U.S. 188, 195

(1982).  Congress has impermissibly created a statutory scheme that is permeated by partiality,

conflicts of interest, and bias by permitting SIPC to appoint and control the Trustee and the

Trustee's counsel, regardless of the obvious conflict of interest between SIPC and the

Customers.  SIPC has a financial incentive to deny Customer claims and has acted solely to

protect its members, the Financial Services Industry, from the obligation to fund the payments to

Customers.

35.      In *Schweiker*, the Supreme Court would have found a violation of due process if

the carriers, who appointed the hearing officers, had a financial interest in the outcome.

*Schweiker*, 456 U.S. at 197 ("In the absence of proof of financial interest on the part of the

carriers, there is no basis for assuming a derivative bias among their hearing officers").  SIPA's

grant of power to SIPC to select the trustee who, in turns, chooses counsel in bankruptcy

proceedings, and designation of SIPC and its employees as statutorily disinterested, violates the

Customers' due process rights.  *See Concrete Pipe,* 508 U.S. at 618-19 (where trustee functions

in an adjudicative capacity, appearance of bias alone violates Due Process).

14

**THE TRUSTEE AND B&H HAVE VIOLATED SIPA'S
MANDATE TO "PROMPTLY" PAY CUSTOMER CLAIMS**

36.    Congress made absolutely clear its intent to minimize the devastation to

customers of an insolvent broker/dealer through prompt payment of SIPC insurance.  SIPA

requires that SIPC "promptly" pay SIPC insurance to investors of a liquidated brokerage firm:

GENERAL PROVISIONS OF A LIQUIDATION PROCEEDING

**(a) PURPOSES**

The purposes of a liquidation proceeding under this chapter shall be—

(1) **as promptly as possible** after the appointment of a trustee in such liquidation
proceeding, and in accordance with the provisions of this chapter—

(A) to deliver customer name securities to or on behalf of the customers of the
debtor entitled thereto as provided in §78fff-2(c)(2) of this title; and

(B) to distribute customer property and (in advance thereof or concurrently
therewith) otherwise satisfy net equity claims of customers to the extent provided
in this section.

**PAYMENT TO CUSTOMERS.-SIPC shall promptly satisfy all obligations of
the member to each of its customers relating to, or net equity claims** based
upon, securities or cash by the delivery of securities or the effecting of payments
to such customer (subject to the provisions of section8 (d) and section **9** (a) )
insofar as such obligations are ascertainable from the books and records of the
member or are otherwise established to the satisfaction of SIPC.

15 U.S.C. §78fff-2(c)(2); emphasis added.  *See also,* 15 U.S.C. § 78fff-3(a).

37.    Congress intended for the trustee to promptly pay customer claims based upon the

debtor's books and records, without the filing of proofs of claim:

**[SIPA] establishes procedures** for prompt orderly liquidation of SIPC members
when required and **for making prompt distributions and payments on account
of customers' claims without need for formal proofs of claim.**

\*        \*        \*

15

The committee also believes that **it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations.**

\*       \*       \*

**Because of the difficulties involved in filing proofs of claim . . ., the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.**

See Exh. D; emphasis added. (S. Rep. 91-1218, at 10, 11, 12 (1970), *reprinted in* Federal

Securities Laws Legislative History 1933-1982, Vol. IV, at 4642, 4643, 4644 (1983)).

38.    This Court itself has recognized Congress' intent that SIPC proceedings be

conducted quickly in order to minimize the devastation to customers:

> Congress itself has commanded **swift** action.  For example, the SEC and self-regulatory organizations are required to "**immediately notify**" SIPC of concerns about the financial stability of a SIPC member.  15 U.S.C.A. § 78eee(a)(1).  A Court determining that a protective decree is warranted must "**forthwith**" appoint a trustee, 15 U.S.C.A. § 78eee(b)(3), and remove the case to a Court with jurisdiction over bankruptcy cases.  15 U.S.C.A. § 78eee(b)(4).  The trustee is required to investigate the operation of the debtor's business and report its results to SIPC "**as soon as practicable**." 15 U.S.C.A. § 78fff-1(d).  Among the stated purposes of a liquidation proceeding is to make customers whole "**as promptly as possible after the appointment of a trustee," 15 U.S.C.A. § 78fff(a), who is required to "promptly discharge .** . all obligations of the debtor to a customer relating to securities." 15 U.S.C.A. § 78fff-2(b).  **SIPC fund moneys must be advanced to the trustee up to certain limits "to provide for prompt payment and satisfaction of . . . claims of customers."  15 U.S.C.A. § 78fff-3(a).  Congress has commanded customer damages to be repaired promptly.**

*In re Donald Sheldon & Co., Inc.*, 153 B.R. 661, 667 (B. S.D.N.Y. 1993); emphasis added.

39.    The December 23, 2008 order entered in this case specifically incorporates the

time periods mandated by SIPA.  The Order states:

> ORDERED, that the Trustee be, and he hereby is, authorized to satisfy, **within the limits provided by SIPA**, those portions of any and all customer claims and

accounts which agree with the Debtor's books and records, or are otherwise established to the satisfaction of the Trustee pursuant to 15 U.S.C. §78fff-2(b), provided that the Trustee believes that no reason exists for not satisfying such claims and accounts

December 23, 2008 Order at 5; emphasis added.

40.    The Trustee's complete failure to fulfill his statutory obligations is shown by the contrast between the treatment of customers by the FDIC and the treatment of Customers in this case.  As stated in the legislative history of SIPA:

The intention of SIPC, like the FDIC, is to minimize losses to and to maintain public confidence in the institutions the public deals with.

S. Rep. 91-1218, at 9, *reprinted in* Federal Securities Laws Legislative History 1933-1982, Vol. IV, at 4641.  See Exh. D**.**

41.    According to the FDIC's website, "It is the FDIC's goal to make deposit insurance payments within two business day[s] of the failure of the insured institution." http://www.fdic.gov/consumers/banking/facts/payment.html.  Yet in this case, more than eight months after the institution of the liquidation proceedings, the Trustee has allowed only 747 claims out of at least 15,400 claims filed, and not all 747 claims have been paid.

**THE TRUSTEE AND B&H HAVE VIOLATED SIPA'S MANDATE TO HONOR THE "LEGITIMATE EXPECTATIONS" OF CUSTOMERS**

**The Motivation of the Financial Services Industry to Enact SIPA**

42.    SIPA was enacted in 1970 at the behest of the SEC-regulated broker/dealers (the "Financial Services Industry") which was seeking to relieve itself of the administrative burden of having to register customer securities with the issuing corporations every time a customer purchased new securities for his account.  *See* Joel Seligman, *The Transformation of Wall Street: A History of the Securities Exchange Commission and Modern Corporate Finance,* 451 n.31

17

(1995) (Prior to enactment of SIPA, "Stock certificates and related documents were 'piled halfway to the ceiling' in some offices; clerical personnel were working overtime, six and seven days a week, with some firms using a second or even a third shift to process each day's transactions.").

43.    In addition to the administrative burden of registering securities, the Financial Services Industry wanted the flexibility and profits that would come with investors allowing the firms to hold securities in street name.  *See An Investor's Guide to the Alternatives of Holding Physical Certificates,* published by the Securities Industry and Financial Market Association, available at http://www.sifma.org/services/publications/pdf/PhysCertGuide2alternatives.pdf (stating that the Securities Industry and Financial Market Association "strongly supports and encourages [street name] type of ownership".

44.    Securities held in street name could be utilized by the brokerage firms to generate profits for themselves.  The securities could be loaned out, could be sold and repurchased, and could be borrowed against, while in the possession of the brokerage firms, whereas securities directly registered in the name of the customer could not be utilized for any purpose by the brokerage firms.  *See, e.g.,* 17 C.F.R. 240.8c-1; 17 C.F.R. 15c-1.

45.    In order to induce investors to allow brokerage firms to hold securities in street name, the Financial Services Industry realized it would have to provide some insurance to investors for the risk that a broker might be dishonest and steal the street name securities or not purchase them in the first place.  Hence, the Industry developed the idea of SIPA to provide SIPC insurance to investors and, thereby, to induce them to invest in securities held in street name.  This would allow the Financial Services Industry to utilize the investors' securities for their own enrichment while in the brokers' possession.  As a result of the enactment of SIPA,

18

tens of billions of dollars was invested in the Financial Services Industry in street name securities.

46.    SIPC insurance is funded by the Financial Services Industry which constitutes SIPC's membership.  In order to enrich its membership, SIPC chose to charge each member a mere $150 per year for the privilege of printing on hundreds of billions of dollars of trade confirmations that customer accounts were insured up to $500,000 by SIPC.  Thus, for example, Goldman Sachs paid a mere $150 per year to SIPC.  This allowed the Financial Services Industry to make tens of billions of dollars of profits in the past ten years because the false assurance that accounts were insured up to $500,000 induced gullible investors to pour money into brokerage firms.

47.    SIPC's generosity towards its members left it with insufficient funds to pay Customer claims.  While SIPA allows SIPC to borrow money, SIPC has apparently decided that it would rather cheat Customers out of their insurance than borrow money and have to assess the brokerage firms to repay the loans.  *See* 15 U.S.C. § 78 ddd(g) and (h).

**IN ORDER TO ENRICH SIPC AT THE CUSTOMERS' EXPENSE, THE TRUSTEE HAS CHANGED SIPA'S DEFINITION OF "NET EQUITY," DESPITE AN EXPRESS STATUTORY PROHIBITION**

48.    Pursuant to SIPA, the Trustee is obligated to "satisfy net equity claims of customers." 15 U.S.C. § 78fff(a)(1)(A)-(B).  SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.  This is the Statutory Balance of each customer's account.

The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by –

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus

(B) any indebtedness of such customer to the debtor on the filing date. . .

15 U.S.C. §78lll(11).

49.     Congress specifically prohibited SIPC from changing any definitions contained in § 78lll, which section includes the definition of "net equity."  As stated in SIPA:

SIPC shall have the power. . . to adopt, amend and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to . . .the definition of terms in this chapter, **other than those terms for which a definition is provided in section 78lll of this title. .**

15 U.S.C. § 78ccc(b)(4)(A) (emphasis added).  Because SIPC has no power to change the statutory definition of "net equity," the Trustee has no power to employ his "cash in minus cash out" definition of net equity.

50.     Unfortunately, at the first and only creditors' meeting, the Trustee and B&H announced their definition of "net equity" as if it were the law, without any indication that SIPA contradicts what the Trustee and B&H were saying.  By this conduct, the Trustee chilled the filing of SIPC claims by Customers who believed the Trustee and his counsel would not misrepresent the law and concluded that they had no right to SIPC insurance.  This is another example of the conflict of interest which prohibits the Trustee and B&H from continuing to serve in this case.

51.     In a May 2001 Report, the United States General Accounting Office, wrote:

SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash and/or securities held at a failed firm**.  SIPC fulfills its mission** by initiating liquidation proceedings where appropriate and transferring customer accounts to another securities firm or returning the cash or securities to the customer **by restoring to the customer accounts the customer's "net equity."  SIPA defines net equity as the value of**

20

**cash or securities in a customer's account as of the filing date, less any money owed to the firm by the customer, plus any indebtedness the customer has paid back** with the trustee's approval within 60 days after notice of the liquidation proceeding was published.

GAO Report to the Ranking Minority Member, Energy and Commerce Committee, House of Representatives entitled "Securities Investor Protection: Steps Needed to Better Disclose SIPC Policies to Investors," (the "GAO Report") at 15; emphasis added).

52.    The Second Circuit has recognized the statutory definition of net equity:

Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" corrected for "any indebtedness of such customer to the debtor on the filing date."

*In re New Times Securities Services, Inc.*, 371 F.3d 68, 72 (2d Cir. 2004); *see also Securities Investor Protection Corp. v. BDO Seidman, LLP,* 49 F. Supp. 2d 644, 649 (S.D.N.Y. 1999) ("As defined by SIPA, 'net equity' is the amount that the broker would have owed a customer had it liquidated all the customer's holdings on the date SIPC filed for a protective decree, less any outstanding debt the customer owed to the broker."); *In re Adler Coleman Clearing Corp.*, 247 B.R. 51, 61 n. 2 (B. S.D.N.Y. 1999) ("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

53.    This Court itself in this case adopted the statutory definition of "net equity" when it wrote, in the December 23, 2008 Order that:

**ORDERED, that the Trustee be, and he hereby is, authorized to satisfy such customer claims and accounts** (i) by delivering to a customer entitled thereto "customer name securities," as defined in 15 U.S.C. §78*lll*(3); (ii) **by satisfying a customer's "net equity" claim, as defined in 15 U.S.C. §78*lll*(11),** by distributing on a ratable basis securities of the same class or series of an issue on hand *as* "customer property," as defined in 15 U.S.C. §78*lll*(4), and, if necessary, by distributing cash from such customer property or cash advanced by SIPC, or

21

purchasing securities for customers as set forth in 15 U.S.C. §78fff-2(d) within the limits set forth in 15 U.S.C. §78fff-3(a); and/or (iii) by completing contractual commitments where required pursuant to 15 U.S.C. §78fff-2(e) and SIPC's Series 300 Rules, 17 C.F.R. §300.300 et seq., promulgated pursuant thereto; and it is further

**ORDERED, that with respect to claims for "net equity," as defined in 15 U.S.C. § 78*lll*(11), the Trustee be, and he hereby is, authorized to satisfy claims out of funds made available to the Trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the Debtor available to satisfy such claims;**

December 23, 2008 Order at 5; emphasis added.

54.    In the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a lengthy period and had never purchased the securities reflected on the customers' monthly statements.

55.    In fact, SIPC's President, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 **including the appreciation** in their accounts.  As Mr. Harbeck explained, if customers are led to believe that "real, existing" securities had been purchased for their accounts, then those customers are entitled to get the full value of their securities positions as of the filing date even if the securities had never been purchased:

MR. HARBECK:  **Even if they're not there.**

THE COURT:  Even if they're not there.

MR. HARBECK:  Correct.

THE COURT:  In other words, **if the money was diverted, converted –**

MR. HARBECK:  And the **securities were never purchased**.

THE COURT:  Okay.

22

MR. HARBECK:  **And, if those positions triple, we will gladly give the people their securities positions**.

Hearing Transcript at 37-38, *In re New Times Sec. Servs. Inc.*, 371 F.3d 68 (B. E.D.N.Y. 2000) (emphasis added), annexed as Exh. E.

56.     In a brief SIPC submitted to the Second Circuit in 2005, SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities.  SIPC wrote:

> [R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality.  Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at 23-24 (citing *New Times*)(emphasis added).

57.     The Trustee's position in the Madoff case is directly contradicted, not only by SIPC's prior treatment of customers in *New Times*, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each.  So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares,

even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog,
http://www.streetinsider.com/Insiders+Blog/SIPCs+Role+In+Madoff-Of-All-Scams+Could+Save+The+Stock+Market/4243249.html

58.     The Trustee's position conflicts with other federal statutes including the Internal Revenue Code and ERISA.  For example,

(a)     IRS Form 4506 requires the IRS to destroy returns after seven years.  Yet, the Trustee is refusing to pay SIPC insurance to Customers who cannot produce records of deposits dating back 15 – 20 years.

(b)     Rev. Proc. 2009-20, issued by Commissioner Shulman on March 17, 2009, expressly recognizes the income earned by Customers, on which they paid taxes annually.  Yet, the Trustee has taken the position that the income earned by Customers is not their money.

(c)     Rev. Proc. 2009-20 provides for a five-year carryback of the theft loss.  Yet, the Trustee has indicated he intends to "claw back" income withdrawn by Customers over the last six years.

(d)     Customers were required by law to take mandatory withdrawals from their IRA accounts.  Yet, the Trustee is deducting from SIPC insurance the mandatory withdrawals that Customers took and paid taxes on.

59.     Because of his refusal to comply with SIPA's mandate that he "promptly" satisfy customer claims based on the Statutory Balances, 15 U.S.C. § 78fff-3(a) and 4(c), the Trustee has decided that he needs a vast team of forensic accountants to pore through decades of records to determine each Customer's net investment before SIPC pays any amount to a Customer.  Clearly, this is inconsistent with the statutory scheme and the legislative intent.

60.    Customers' "securities positions" are readily ascertainable from their November 30, 2008 statements.  Moreover, the Customers did not have any "indebtedness" to Madoff. They did not owe Madoff any cash or securities since they did not borrow from Madoff on margin.  *See* H.R. Rep. No. 95-746, at 4754 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"), *Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (under the 1970 statutory regime, when there were shortages of securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *In re First Street Sec. Corp.*, 34 B.R. 492, 497 (B. S.D. Fla. 1983) (offsetting indebtedness of customer to broker from claim amount where unauthorized stock purchase was partially funded by borrowing on margin).  Because the Customers have no indebtedness to Madoff, there is no need to perform any calculations whatsoever to determine the amount of Customers' net equity.  Their net equity is simply the "securities positions" set forth on their last statements.

**THE TRUSTEE IS DESTROYING INVESTOR CONFIDENCE
NATIONALLY IN DIRECT VIOLATION OF CONGRESSIONAL INTENT**

61.    The purpose of SIPA, as evidenced by its title, was to "protect" investors who allowed the Financial Services Industry to hold their life savings in street name securities.  *See, e.g.,* H.R. Rep. No. 91-1613, at 3-4 (1970)("[SIPA] will reinforce the confidence that investors have in the U.S. securities markets.").  *See also In re New Times*, 371 F.3d at 87 ("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 794 (6th Cir. 1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[ ] and upgrade the financial responsibility requirements for registered brokers and dealers.")(citations

25

omitted).  SIPA attempted to do this initially by satisfying customers' "net equity" claims for

securities with actual securities only if the debtor held securities of the appropriate class and kind

to satisfy customers' claims, while otherwise customers would receive the cash equivalent of the

value of their securities on the filing date.  SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat.

1636, 1648-50 (1970); H.R. Rep. No. 95-746 (39-41)(statement of SIPC Chairman Hugh F.

Owens).

62.    When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest

shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments],

*[i.e.]*, . . . **the failure to meet legitimate customer expectations of receiving what was in their**

**account at the time of their broker's insolvency**."  D 922 Cong. Rec. H. 36326 (daily ed. Nov.

1, 1977)(statement of Rep. Robert C. Eckhardt)(emphasis added).  See also Hearing on H.R.

8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. On Interstate

and Foreign Commerce, 94th Cong. 63 (1975)("The basic framework of the 1970 Act in regard to

satisfaction of customers' claims should be modified to better meet the legitimate expectations of

customers.") (report to the SIPC Board of Directors by the Special Task Force to consider

possible amendments to SIPA); Hearing on H.R. 8331 before the Subcomm. on Consumer

Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81

(1977) ("The proposed [1978] amendments carry out the Task Force recommendations and are

designed to make the Act more responsive to the reasonable expectations of investors.")

(statement of SIPC Chairman Hugh F. Owens); Hearing on H.R. 8064 Before the Subcomm. on

Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th

Cong. 161-162 ("[T]he principal purpose of these amendments is to meet more nearly the

reasonable expectations of brokerage firm customers.")(statement of SEC Commissioner Philip A. Loomis, Jr.).

63.    A customer's reasonable expectations were that their actual securities, as shown on their statements, would be returned to them "in the form they existed on the filing date." H.R. Rep. No. 95-746, at 21.  Thus, SIPA was amended to state that "[t]he trustee shall, to the extent that securities can be purchased in a fair and orderly market, purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities. . ." 15 U.S.C. § 78fff-2(d); SIPA § 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978).

64.    Here, the legitimate expectations of the Customers were contained in the account statements and trade confirmations they received.  They expected that their accounts held the securities reflected therein.  Thus, recognizing Customer claims in the amount of their Statutory Balances will further the goals of SIPA, as memorialized in the legislative history.

65.    Congress **specifically contemplated** that "securities positions" reflected in a customer's statements could include securities that were never actually purchased, as was the case here.  The Senate and House Reports on the 1978 amendments to SIPA show that SIPA was intended to cover securities that the broker-dealer did not actually purchase:

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, **never purchased** or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments. . . would satisfy the customers' legitimate expectations. . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business.  But because securities may have been lost, improperly hypothecated, misappropriated, **never purchased**, or even stolen, this

27

is not always possible.  Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. No. 95-746 at 21 (emphasis added).

66.    Thus, there is absolutely no support for the Trustee's "cash in minus cash out" theory in either SIPA or its legislative history.  Instead, the legislative history is in accordance with the statute: Customers are entitled to claims in the amount of their Statutory Balances, consistent with their legitimate expectations.

## THIS COURT IS BOUND BY SECOND CIRCUIT AUTHORITY ENTITLING CUSTOMERS TO CLAIMS IN THE AMOUNT OF THEIR STATUTORY BALANCES

67.    In *New Times*, the trustee and SIPC took the position that the claims of customers who received trade confirmations and account statements reflecting the purchase of real securities should be allowed in the amount of their last statements.  Here, the Customers are in the exact same position as the *New Times* customers whose claims were satisfied – they all received statements showing securities positions in actual, existing securities.

68.    *New Times'* principal, William Goren, engaged in a "classic Ponzi scheme" where new investors' money was used to pay earlier investors.  *In re New Times Sec. Servs. Inc.* ("*New Times I"*), 371 F.3d 68, 72 n.2 (2d Cir. 2004).  However, while Madoff presented Customers with trade confirmations and statements showing securities positions in real securities, only some *New Times* customers were presented with statements showing investments in mutual funds that actually existed (the "Existent Securities"); the remaining *New Times* customers received statements showing that they were invested in money market funds that were totally fictitious (the "Non-Existent Securities").  371 F.3d at 71-72.

69.    SIPC treated the two categories of customers differently.  SIPC applied the statutory net equity definition to the Existent Securities customers' claims by paying the claims

28

according to the full value of those securities positions as of the date of the liquidation filing, and

the Second Circuit endorsed that treatment.    However, with respect to customers whose

statements showed Non-Existent Securities, SIPC used the net investment methodology that the

Trustee is using in this case.  The customers with Non-Existent Securities appealed SIPC's

treatment.  The Second Circuit took particular note of SIPC's position:

> investors who were misled by Goren to believe that they were investing in mutual
> funds that in reality existed were treated much more favorably.  Although they
> were not actually invested in those real funds – because Goren never executed the
> transactions, the information that these claimants received on their account
> statements "mirrored what would have happened had the given transaction been
> executed."  [Br. for New Times Trustee and SIPC] at 7 n.6.  As a result, the
> Trustee deemed those customers' claims to be "securities claims" eligible to
> receive up to $500,000 in SIPC advances.  *Id*.  The Trustee indicates that this
> disparate treatment was justified because he could purchase real, existing
> securities to satisfy such securities claims.  *Id.*  Furthermore, the Trustee notes
> that, if they were checking on their mutual funds, the "securities claimants," in
> contrast to the "cash claimants" bringing this appeal, could have confirmed the
> existence of those funds and tracked the funds' performance against Goren's
> account statements. *Id.*

*New Times I*, 371 F.3d at 74.

70.    The Second Circuit found that the customer's legitimate expectations based on

written confirmations and account statements control how a "net equity" claim is determined,

citing SIPC's Series 500 Rules, 17 C.F.R. §§ 300.500-300.503, which confirm the importance of

written confirmations.  The Court explained that "the premise underlying the Series 500 Rules

[is] that a customer's 'legitimate expectations' based on written confirmations of transactions,

ought to be protected."  371 F.3d at 87.  It noted that "Under the Series 500 Rules, whether a

claim is treated as one for securities or cash depends not on what is *actually* in the customer's

account, but on what the customer has been told by the debtor in written confirmations."  *Id* at 86

(emphasis in original).  *See also In re Oberweis Sec., Inc*., 135 B.R. 842, 847 n. 1 (B. N.D. Ill.

1991) ("The court agrees with the trustee's argument that Congress did not intend to treat

customers without confirmations the same as those with confirmations; that customers with

confirmations have a legitimate expectation of receiving securities, but customers without

confirmations do not have the same expectation.").

71.      In contrast to those *New Times* customers whose statements showed Existent

Securities, the Second Circuit held that the net equity of *New Times* customers whose statements

showed Non-Existent Securities should be determined as the amount of money invested minus

any withdrawals.  *New Times I*, 371 F.3d at 88.   The court held that customer recoveries based

on "fictitious amounts in the firm's books and records would allow customers to recover

arbitrary amounts that necessarily have no relation to reality." *Id.* Obviously, customers whose

confirmations indicated the purchase of Non-Existent Securities could not have had a legitimate

expectation that they owned those securities. Thus, only when securities positions "necessarily

have no relation to reality," *i.e.*, are based on securities that *do not exist*, should a "cash in minus

cash out" methodology be employed.

72.      Here, each Customer received trade confirmations and account statements

showing investments in real securities.  Thus, each Customer had a legitimate expectation that he

owned the assets shown on his last statement and is entitled to a claim in the amount of the

balance on his November 30, 2008 statement.

73.      In *New Times II*, a different Second Circuit panel considered related issues and

found, once again, "[i]t is a customer's legitimate expectations on the filing date . . . that

determines the availability, nature and extent of customer relief under SIPA." *In re New Times*

*Sec. Servs., Inc.* 463 F.3d 125, 128 (2d Cir. 2006) (*New Times II*).  The Second Circuit in *New*

*Times II* added that, in the case of customers who believed they held fictitious securities:

30

Because there were no such securities, and it was therefore impossible to
reimburse customers with the actual securities or their market value on the filing
date (the usual remedies when customers hold specific securities), the [*New Times
I* Court] determined that the securities should be valued according to the amount
of the initial investment.  The court declined to base the recovery on the rosy
account statements telling customers how well the imaginary securities were
doing, because treating the fictitious paper profits as within the ambit of the
customers' "legitimate expectations" would lead to the absurdity of "duped"
investors reaping windfalls as a result of fraudulent promises made on fake
securities . . . The court looked to the initial investment as the measure for
reimbursement because the initial investment amount was the best proxy for the
customers' legitimate expectations.

*New Times II*, 463 F.3d at 129-30 (citations omitted).

74.     SIPC and the *New Times* Trustee valued Existent Securities customers' claims in

accordance with the statutory definition of net equity even when those claims included mutual

fund shares that were purchased through "dividend reinvestments," despite the fact that since the

initial securities had never been purchased, the customers **had received no dividends to

reinvest**.  Specifically:

[I]nvestors who believed that their accounts held shares of mutual funds that
actually existed (but were never purchased for their accounts) are having their
claims (both as to shares of mutual funds never purchased by Goren and shares
shown in customer statements as purchased through dividend reinvestment)
satisfied by the Trustee up to the statutory maximum of $500,000.

Claimants' Joint Mem. of Law in Opposition to Joint Motion of Trustee and SIPC for Order

Upholding Determinations at 3, SEC v. Goren 206 F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-

CV-970).

[W]hereas the Trustee has disallowed that portion of the claim of [the Non-
existent Securities] investors representing shares of [the Non-existent Securities]
purchased through dividend reinvestment, the Trustee has allowed that portion of
the mutual fund investors' claims [i.e., "Existent Securities" investors' claims] as
represents shares of such mutual funds purchased by them through dividend
reinvestment.

31

Limited Objection to Trustee's Determination of Claim at 6 n.4, SEC v. Goren, 206 F. Supp.2d

344 (E.D.N.Y. 2002) (No. 00-CV-970).

75.    SIPC and the Trustee described their method in the *New Times* liquidation:

In every case [of an 'Existent Security' customer], the Trustee has been able to
identify the actual mutual fund in question by cross-checking the information
supplied by Goren on the customer statements, including share price information,
with publicly available information and then been able to purchase that security.

Joint Mem. of Law in Support of Trustee's Motion for an Order Upholding the Trustee's

Determinations with Respect to Claims Filed for Investments in Non-Existent Money Market

Funds and Expunging Objections to Those Determinations, *SEC v. Goren*, F. Supp. 2d 344

(E.D.N.Y. 2002) (No. 00-CV-970).  They further stated that where customers' statements

reflected securities positions in closed mutual funds, "the Trustee properly gave the customers

cash equal to the filing date values of the closed mutual funds."  Reply Mem. in Further Support

of Trustee's Motion for Order Upholding Determinations at 20, *S.E.C. v. Goren*.

76.    Even when challenged regarding their position by customers of the "Non-existent

Securities," SIPC (and the SEC) stood by their approach with respect to the Existent Securities

customers.  In an *amicus curiae* brief, the SEC stated "[o]ur view [is] that when possible, SIPA

should be interpreted consistently with a customer's legitimate expectations based on

confirmations and account statements."  Br. of the SEC, Amicus Curiae, In Partial Support of the

Position of Appellants and In Partial Support of the Position of Appellees ("SEC Amicus Curiae

Brief") at 13, New Times I (No. 02-6166).

77.    The briefs filed by SIPC and the *New Times'* Trustee likewise stated that:

In those cases [concerning the payment of interest and dividends on bona fide
mutual funds] the claimants had an objectively legitimate expectation of receiving
interest/dividends because the security in question had actually earned them.

32

Here, the bogus mutual fund [the Ficitious New Age Fund] was never organized
as a mutual fund and had no assets or investments.

Br. for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of New

Times Securities Services, Inc. and New Age Financial Services, Inc. and Securities Investor

Protection Corporation, at 38, *New Times I* (No. 02-6166).

78.    SIPC stated in its brief in *New Times II* that:

[R]easonable and legitimate claimant expectations on the filing date are
controlling even where inconsistent with transaction reality.  Thus, for example,
**where a claimant orders a securities purchase and receives a written
confirmation statement reflecting that purchase, the claimant generally has a
reasonable expectation that he or she holds the securities identified in the
confirmation and therefore generally is entitled to recover those securities
(within the limits imposed by SIPA), even where the purchase never actually
occurred and the debtor instead converted the cash deposited by the
claimant to fund that purchase** . . . [T]his emphasis on reasonable and
legitimate claimant expectations frequently yields much greater 'customer'
protection than would be the case if transactional reality, not claimant
expectations, were controlling, as this Court's earlier opinion in this liquidation
well illustrates.

Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at 23-24 (citing *New

Times*)(emphasis added).  Thus, SIPC recognized that it is "claimant expectation," rather than

"transactional reality" that controls. [1]

---

[1] The complete disavowal by the Trustee and SIPC of the position they took in *New Times* is
impermissible under the doctrine of judicial estoppel.  This doctrine prevents SIPC from taking one
position in one case and then, when it is convenient to do so, taking a diametrically opposite position in
another case.  *See Simon v. Satellite Glass Corp*., 128 F.3d 6 (2d Cir. 1997) ("judicial estoppel prevents a
party in a legal proceeding from taking a position contrary to a position the party has taken in an earlier
proceeding.").  The Court in *New Times* explicitly endorsed the procedure of paying the claims of
customers whose statements indicated the purchase of Existing Securities in accordance with their
statutory net equity, noting that "investors who were misled by Goren to believe that they were investing
in mutual funds that in reality existed were treated much more favorably. . . The Trustee indicates that this
disparate treatment was justified because he could purchase real, existing securities to satisfy such
securities claims."  371 F.3d at 74.  Thus, the Second Circuit "accepted the claim at issue by rendering a
favorable decision," as required for judicial estoppel.  *Simon*, 128 F.3d at 12.

Judicial estoppel ensures that "abandonment of a claim to obtain a litigation advantage precludes the later
reassertion of that claim."  *HSBC Bank USA v. Adelphia Comms. Corp*., 2009 U.S. Dist. LEXIS 10675, at

33

79.    There were no "imaginary securities" listed on the Madoff account statements.

Thus, *New Times II* does not apply. Yet, in direct contravention of SIPC's position in *New Times*,

in which SIPC "gladly" paid customers whose statement showed Existent Securities that were

never purchased their full claims, even if the actual securities' value had "triple[d]," here, the

Trustee has refused to recognize the Customers' Statutory Balances.

80.    Customers such as Objectors had the legitimate expectation that they owned real

securities.  Indeed, they could have had no other expectation, based upon the trade confirmations

and account statements they received.  Thus, the Trustee must employ the same method used in

*New Times* and honor Customer claims in the amount of their Statutory Balances.

**SIPC'S JUSTIFICATION FOR THE TRUSTEE'S VIOLATION OF SIPA IS SPECIOUS**

81.    SIPC has justified the Trustee's rejection of SIPA's definition of "net equity" by

claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a
> claimant is owed perpetuates the Ponzi Scheme.  It allows the thief . . . Mr.
> Madoff . . . to determine who receives a larger proportion of the assets collected
> by the Trustee.

www.foxbusiness.com/.../madoff-victims-greater-transparency-questions-linger/.  This

justification is completely specious.  SIPA honors the legitimate expectation of the customer,

even if the customer is dealing with a thief.  For precisely this reason, SIPC persuaded the

Second Circuit to accept a thief's books and records in *New Times* as to all customers who had a

legitimate expectation that their statements were accurate.

---

*46 (W.D.N.Y. Feb. 12, 2009).  Here, SIPC plainly decided in *New Times* that its "cash in minus cash
out" position with respect to the Non-Existent Securities customers would be more palatable to the court
if it was not also applied to the Existent Securities customers.  Having prevailed in its argument in *New
Times*, SIPC cannot now take the position that "net equity" should be determined as "cash in minus cash
out" for customers who had a "legitimate expectation" that they owned real securities.

34

82.    In fact, SIPC's "thief" rationale was flatly rejected in *New Times I,* when the district court held that the Trustee's determination that holders of Non-Existent securities were not entitled to claims in the amount listed on their account statements erroneously 'hinged on the unilateral actions of the fraud-feasor who embezzled his client's funds.'" 371 F.3d at 75. The Second Circuit, similarly, did not take the fraud-feasor's role into account when vacating in part the district court's decision.

83.    After eight months of investigation, the Trustee has identified only a few Madoff investors who might not have had a "legitimate expectation" that their November 30, 2008 statements were accurate. For example, the Trustee has sued Jeffrey Picower and Stanley Chais alleging that they had extraordinary returns in their accounts and received restated account statements showing retroactive $100 million losses. Assuming these allegations are true (and Picower has raised substantial question as to their truthfulness in his July 31, 2009 motion to dismiss, including the fact that his securities were held for long-term investment), Picower and Chais could not have had a "legitimate expectation" that their account statements were accurate. However, the fact that the Trustee has identified one or two customers who may not have had a legitimate expectation that their statements were accurate does not justify rejecting the statutory definition of "net equity" and frustrating the legitimate expectations of thousands of Customers.

**THE TRUSTEE'S POSITION IS UNPRECEDENTED IN SIPC'S HISTORY**

84.    The Trustee's defiance of SIPA's definition of net equity, despite the fact that Customers received account statements and written confirmations showing investments in real securities, is inconsistent with 39 years of SIPC's history. Stephen Harbeck admitted as much in January 2009 when he announced: "We've modified our usual claim form to ask investors a question that's unique to this case, which is how much money did you put in and how much

35

money did you take out." (Jan. 6, 2009, CNBC). He also stated that "[O]ne of the first things

that we did . . . was to modify our standard claim form to make sure that we asked the claimants

themselves what evidence they had in terms of money in and money out, because that's going to

be one of the critical factors." (Jan. 5, 2009, Stephen Harbeck, testimony before House Financial

Services Committee). In fact, the Madoff Customer Claim form contains the unprecedented

language:

> In particular, you should provide all documentation (such as cancelled checks,
> receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or
> securities with the Debtor from as far back as you have documentation. You
> should also provide all documentation or information regarding any withdrawals
> you have ever made or payments received from the Debtor.

85.    Thus, Harbeck recognized the unprecedented nature of SIPC's approach which, in

fact, is inconsistent with the position it has taken in its 39 year history. Indeed, SIPC always led

investors to believe that SIPC insurance was based upon their last brokerage statement:

> In the unlikely event your brokerage firm fails, you will need to prove that cash
> and/or securities are owed to you. This is easily done with a copy of your most
> recent statement and transaction records of the items bought or sold after the
> statement.

 *See* SIPC/SIFMA brochure Understanding Your Brokerage Account Statements, at 5, SIPC

Website 2009.

> How is the amount of a customer's claim determined? The amount of the
> customer's claim, excluding any securities registered in his name and returned to
> him, is called his "net equity." **The net equity of a customer's account is
> determined by adding the total value of cash and securities the firm owes the
> customer and subtracting the total value of cash and securities the customer
> owes the firm.**

*See* How SIPC Protects You at 14, 1994 (emphasis added), www.jprcapital.com/howsipc.pdf.

> A customer's "net equity" is, in general, what the broker owes the customer less
> what the customer owes the broker, exclusive of "specifically identifiable
> property." Essentially, Section 6(c)(2)(A)(iv) [codified at 15 U.S.C. § 78lll(11)]
> defines "net equity" as the dollar amount of a customer's account determined after

giving effect to the completion of any open contractual commitments (discussed below), excluding therefrom any specifically identifiable property reclaimable by the customer, and subtracting the indebtedness (if any) of the customer to the debtor from the sum which would have been owing by the debtor to the customer had the debtor liquidated all other securities and contractual commitments to the customer on the filing date. In short, a customer's "net equity" claim is for a liquidated sum.

*See* SIPC Annual Report 1973, annexed as Exh. F, at 21.

86.    Having induced investor reliance upon the promise of SIPC insurance based upon the investors' last statement, SIPC cannot now change the rules, simply because it did not sufficiently assess its members to fund its own liabilities.

**THE TRUSTEE AND B&H HAVE TREATED THE PESKINS DISHONESTLY**

87.    The treatment of the Peskins by the Trustee and B&H is just one example of their callous and dishonest treatment of Customers.

**The Peskins' Madoff investment**

88.    Roger Peskin began publishing the Art Now Gallery Guide (the "Guide") in 1970 and, over time, built it up to become the most comprehensive source of information on gallery and museum exhibitions in major cities across the United States and, at times, in Europe, South America and Japan. See Exh. G. By 2004, he employed approximately 20 people and published a 300+ page magazine which included art reproductions, gallery, museum and art fair information, and area maps of all the major cities in the world. *Id*. ¶ 4.

89.    The Guide was sold in August 2004 and the Peskins invested with Madoff the after-tax proceeds of the sale, along with the proceeds of two properties they sold. *Id*. ¶ 5. On or about October 18, 2005, they invested $2,586,412.99 with Madoff. *Id*. ¶ 6. In early May, 2008, they invested another $181,000 into Madoff. *Id*. ¶ 7. On or about November 12, 2008, they invested $470,265.98 into Madoff. *Id*. ¶ 8.

37

90.     Every month they received from Madoff trade confirmations indicating the purchase and sale of S&P 100 company stocks; the purchase and sale of Treasury bills; and the purchase and sale of options to hedge the securities positions.  In addition, they received monthly account statements from Madoff showing their securities positions.  *Id.* ¶ 9.  In each instance, the trade confirmations and account statements reflected the purchase and sale of securities of S&P 100 companies at prices consistent with those reported in the media.  *Id.* ¶ 10.

91.     During the years of their investment in Madoff, the Peskins earned 9 – 11% each year, in short term capital gains, subject to the highest tax rate.  *Id.* ¶ 12.  In the ordinary course of their lives, they regularly withdrew funds from their Madoff account to fund family living expenses, to pay taxes on their Madoff income, and for special expenditures.  *Id.* ¶ 13.

92.     On September 15, 2008, they received a check from Madoff for $50,000 which cleared their account on September 17, 2008.  *Id.* ¶ 14.  On October 1, 2008, they received a check from Madoff for $33,000.  *Id.* ¶ 15.  On November 6, 2008, they received a check from Madoff for $30,000.  *Id.* ¶ 16.  At no time did the Peskins have any reason to believe that Madoff was dishonest.  *Id.* ¶ 17.

93.     As of November 30 2008, the last month for which they received a Madoff account statement, the value of their account was $3,247,367.40.  *Id.* ¶ 18.

94.     Following December 11, 2008, the Peskins' lives were decimated.  The sudden termination of their sole source of income left them with no funds for their regular monthly payments, for the tuition for their children's school, or to fund their other obligations.  *Id.* ¶ 19.

**The Trustee's deliberate frustration of the Peskins' right to prompt payment**

95.     The Peskins, who later qualified for the Trustee's "Hardship Program," filed a SIPC claim on February 19, 2009.  See Exh. H.  The Peskins received no response whatsoever to

38

their SIPC claim until almost four months later.  On June 3, 2009, they were contacted by an

attorney at B&H who informed them that they were only entitled to receive $387,000 as their full

SIPC payment.  The attorney said that the Trustee was entitled to deduct from their SIPC

payment the $113,000 that they withdrew from their Madoff account in the three months

preceding December 15, 2008.  See Exh. I.

96.    The Peskins were astonished and devastated.  They had been counting on the full

$500,000 to carry them through until they could obtain a tax refund from the Internal Revenue

Service based upon their theft loss.  *Id*. ¶ 4.  The Peskins pointed out to the Trustee's attorney

that, although they had withdrawn $113,000 from Madoff within the 90 days before December

15, 2008, they had also invested $470,265.98 with Madoff on November 12, 2008, after they

received the $113,000.  *Id*. ¶ 5.  Mrs. Peskin broke down in tears on the phone and begged the

attorney for the full $500,000.  *Id*. ¶ 6.  The attorney at B&H apologized to the Peskins and said

that he would review the situation with the Trustee and get back to them.  *Id*. ¶ 7.

97.    Approximately one week later, the attorney at B&H called the Peskins and told

them that he had reviewed their situation with the Trustee and that the Trustee was very sorry but

he had no alternative under the law but to withhold $113,000 from their SIPC payment.   The

attorney added that the law was absolutely clear on this subject.  *Id*. ¶ 8.  The Peskins asked

whether the $113,000 would go into a fund to be distributed to Customers and the attorney told

them: "No, it would just reduce the amount that SIPC had to pay them."  *Id*. ¶ 9.

98.    The Peskins then were forced by the situation to consult counsel and they became

plaintiffs in a lawsuit filed against the Trustee on June 10, 2009 for a declaratory judgment that

the Trustee was violating SIPA through his rejection of SIPA's definition of net equity and his

failure to promptly pay SIPC insurance to Customers, for a declaratory judgment that the Trustee

39

has no right to deduct from the Peskins the $113,000 that they withdrew within 90 days of

December 15, 2008, and for compensatory damages for breach of fiduciary duty. *Id.* ¶ 20.

99.    As set forth in the complaint, the Trustee's counsel had flatly misrepresented the

law to the Peskins.  The legislative history of the preference provision of the Bankruptcy Code,

11 U.S.C. § 547, makes clear that its purpose was to assure an equal distribution of the debtor's

assets among all creditors.  Congress recognized that, in the 90 days before a debtor files in

chapter 11, some creditors may be able to exert more pressure on the debtor to pay them on

antecedent debt than other creditors and, hence, Congress felt it was equitable to reverse all

payments out of the ordinary course of business, to require creditors who received preferential

transfers to return them to the estate for the benefit of all creditors.  Thus, 11 U.S.C. § 547(b)

provides:

>    b) Except as provided in subsection (c) of this section, the trustee may avoid any
> transfer of an interest of the debtor in property -
>
>     (1) to or for the benefit of a creditor;
>
>     (2) for or on account of an antecedent debt owed by the debtor before such
> transfer was made;
>
>     (3) made while the debtor was insolvent;
>
>     (4) made -
>
>     (A) on or within 90 days before the date of the filing of the petition; or
>
>     (B) between ninety days and one year before the date of the filing of the
> petition, if such creditor at the time of such transfer was an insider; and
>
>     (5) that enables such creditor to receive more than such creditor would receive
> if -
>
>     (A) the case were a case under chapter 7 of this title;
>
>     (B) the transfer had not been made; and

40

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

100.    The purpose of this provision is twofold:  first, by permitting the trustee to avoid pre-bankruptcy transfers that occur within a short period before the bankruptcy, creditors are discouraged from racing to the courthouse during the debtor's slide into bankruptcy, and second (and more importantly) the preference provision facilitates the bankruptcy policy of equality of distribution among the debtor's creditors by requiring any creditor that received a preferential payment to disgorge that payment so that all creditors of the estate may share equally in the debtor's assets.  5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.  Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally") (quotations omitted).

101.    Because of the circumstances here, the "race to the courthouse" rationale is irrelevant.  The only relevant purpose here would be to bring money back into the estate so that all the Customers can share equally in the debtor's assets.  However, that purpose is not being effectuated here.  Instead, the Trustee is seeking to utilize the preference provision of the Bankruptcy Code to enrich SIPC because, as his attorney stated, any reduction in the SIPC insurance payments to the Peskins (and other Customers) will simply enrich SIPC.  It will not

41

enrich the estate of Customer property.  Thus, the Trustee's invocation of § 547 of the

Bankruptcy Code violates its purpose and violates the Trustee's duty to carry out the provisions

of SIPA.

102.    Moreover, the Trustee's attorney misrepresented the law to the Peskins.  Within

90 days of the filing of this proceeding, the Peskins withdrew $113,000 from their Madoff

account and, thereafter, deposited $470,000 into their Madoff account.  The Peskins were

informed by the Trustee's attorney that the Trustee had no choice under the law but to reduce

their SIPC insurance by $113,000.  The Trustee's attorney ignored §§547(a)(2) of the

Bankruptcy Code which provides that there is no liability for a preferential transfer to the extent

the creditor provides "new value" within the 90 day preference period.  "New value" is defined

as:

> money or money's worth in goods, services, or new credit, or release by a
> transferee of property previously transferred to such transferee in a transaction
> that is neither void nor voidable by the debtor or the trustee under any applicable
> law, including proceeds of such property, but does not include an obligation
> substituted for an existing obligation.

103.    Pursuant to § 547(c)(4) of the Bankruptcy Code:

(c)  The trustee may not avoid under this section a transfer –

(4)  to or for the benefit of a creditor, to the extent that, after such transfer,
such creditor gave new value to or for the benefit of the debtor –

(A)  not secured by an otherwise unavoidable security interest; and

(B)  on account of which new value the debtor did not make an otherwise
unavoidable transfer to or for the benefit of such creditor.

104.    The policy behind this exception is to encourage creditors to work with troubled

companies and also serves to facilitate the purpose of equality of creditors because, if a creditor

advances new value to the debtor, the debtor's assets have not been depleted to the disadvantage

of other creditors.  *Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 257 (8th Cir.

1996); *see also In re: David Schick*, 1998 U.S. Dist. LEXIS 10603, at *13 (S.D.N.Y. July 16,

1998) ("The purpose of the "new value" defense is to protect transactions to the extent they

simultaneously replenish the bankruptcy estate.").  Generally, to qualify for a new value defense,

a creditor must prove (1) new value was given to the debtor after the preferential transfer, (2) the

new value was unsecured, and (3) the new value remains unpaid. *Mosier v. Ever-Fresh Food

Co.*, 52 F.3d 228, 230 (9th Cir. 1995).

105.    Here, the Peskins can prove each of those elements.  The Peskins provided new

value after the allegedly preferential transfers to them because, on November 12, 2008, they

invested $470,265.98, after having withdrawn a total of $113,000 on September 15, 2008,

October 1, 2008 and November 6, 2008.  Exh G ¶ 14-16, 22.   Thus, there is no basis for the

Trustee to deduct $113,000 from the $500,000 SIPC payment to which they are entitled.

106.    Aside from the new value defense, the preference provision is inapplicable to

customers in a SIPA liquidation for several reasons.  First, any withdrawal by a customer from

his account constitutes a withdrawal of the customer's money; it does not constitute "property of

the debtor."    Thus, 11 U.S.C. § 547(b) is inapplicable.

107.    Second, the purpose of § 547 is to bring back assets of the debtor for equal

distribution to all creditors.  Here, however, the Trustee's counsel admitted that the $113,000 not

paid to the Peskins would not go into a fund for distribution to Customers; rather it would simply

save SIPC $113,000.  Congress did not enact § 547 to enrich the Financial Services Industry at

the expense of customers.  On the contrary, Congress created SIPC to protect customers of the

Financial Services Industry against the dishonesty of broker-dealers by insuring the legitimate

43

expectations of customers.  Clearly, it is inconsistent with SIPA for the Trustee to reduce the

SIPC insurance payable to each customer so as to save SIPC money.

108.    Even if a SIPC trustee is empowered to utilize the avoidance provisions of the

Bankruptcy Code against a customer, the Trustee cannot recover from the Peskins under 11

U.S.C. § 547 because the withdrawals they received within 90 days of December 15, 2008

constituted their own property and were transferred to them in the ordinary course of business of

the Peskins and Madoff on ordinary business terms.   Thus, they were not transfers on account of

antecedent debt.

109.    Although this was not disclosed to the Peskins by the Trustee or B&H, 11 U.S.C.

§ 547(c) provides an affirmative defense to a preference claim.  It provides that:

> The trustee may not avoid under this section a transfer –
>
> (1) to the extent that such transfer was -
>
> (A) intended by the debtor and the creditor to or for whose benefit such
> transfer was made to be a contemporaneous exchange for new value given to the
> debtor; and
>
> (B) in fact a substantially contemporaneous exchange;
>
> (2) to the extent that such transfer was -
>
> (A) in payment of a debt incurred by the debtor in the ordinary course of
> business or financial affairs of the debtor and the transferee;
>
> (B) made in the ordinary course of business or financial affairs of the debtor
> and the transferee; and
>
> (C) made according to ordinary business terms.

110.    The balance of the securities positions reflected on the Peskins' November 30,

2008 account statement (the last statement prior to the liquidation proceeding filing date) was

$3,247,367.40. They are entitled to a claim in this amount. Moreover, they are entitled to the full $500,000 of SIPC insurance.

111.    By letter dated June 26, 2009, Mr. Sheehan wrote to Ms. Chaitman that the Peskins

> received no preferential payment in the 90 days preceding the filing date of this action. Thus, we will promptly determine their customer claim for the full amount. Upon their receipt of the Trustee's determination letter, please have them execute the Partial Assignment and Release and return it to the Trustee. Once they have done so, the Trustee will promptly send them $500,000 advanced by SIPC.

See Exh. J.

112.    Thus, after the Peskins were forced to retain counsel and file a lawsuit, the Trustee finally acknowledged he had no preference claim against them. However, the Trustee waited until July 16, 2009 to send the Peskins a determination letter with a proposed partial assignment and release. See Exh. K.

113.    The form of the partial assignment and release was unacceptable, as Ms. Chaitman explained to the Trustee's counsel by letter dated July 21, 2009. See Exh. L. By letter dated July 22, 2009, the Trustee's counsel sent a revised partial assignment and release which was acceptable. This document has been signed by the Peskins and mailed to the Trustee. Hopefully, the Peskins will receive their $500,000 SIPC insurance check within the next few days.

**THE CALLOUS TREATMENT OF MS. EBEL BY THE TRUSTEE AND B&H**

**Ms. Ebel's Madoff investment**

114.     Ms. Ebel is a widow.  Her husband, Dr. Marc Ebel, died as a result of medical

malpractice in 2000 at the age of 53.  At the time of his death, the Ebels had been married 27

years.  See Exh. M.  Ms. Ebel had been a nurse but she stopped working in 1989.  *Id.* ¶ 3.

115.     In 2003, she invested all of her funds with Madoff based upon the

recommendation of a person who told her that Madoff had been in existence for more than 25

years; that he had been approved by the SEC; and that he had a very conservative investment

strategy.  *Id.* ¶ 4.  Ms. Ebel opened two accounts with Madoff.  The first account was a direct

IRA account in which she invested $1,348,877.12 on February 24, 2003.  She never withdrew

any funds from this account and it had a balance on November 30, 2008 of $2,532,140.66.  *Id.* ¶

5.  The second account Ms. Ebel opened with Madoff was a direct investment account in which

she invested a total of $3,831,387.49 beginning on March 17, 2003 and ending on July 23, 2004.

The balance in this account as of November 30, 2008 was $4,729,125.04. *Id.*  ¶ 6.

116.     With respect to each account, every month Ms. Ebel received from Madoff trade

confirmations indicating the purchase and sale of S&P 100 company stocks; the purchase and

sale of Treasury bills; and the purchase and sale of options to hedge the securities positions.  In

addition, she received monthly account statements showing the securities positions. *Id.* ¶ 37.  In

each instance, the trade confirmations and account statements reflected the purchase and sale of

securities of S&P 100 companies at prices consistent with those reported in the media.  *Id.* M ¶ 8.

117.     Ms. Ebel withdrew funds from her direct investment account on a regular basis

and utilized the funds to provide support for herself and her family, to pay for the educational

expenses of family members, and to fund charitable donations.  This was her sole source of

income.  *Id.* ¶ 9.  As part of her normal withdrawal of funds from her account, on September 15,

2008 she received a $102,000 check from Madoff dated September 11, 2008.  She deposited the

check in her account on September 15, 2008.  *Id.* ¶ 10.

118.    After December 11, 2008, Ms. Ebel was forced to go to work in order to support

herself.  She worked as a house maid; a caretaker for an elderly patient; a driver; a cashier; and in

a ladies' clothing store.  In short, she did anything she could to earn money to pay her living

expenses.  She was forced to sell a car, jewelry, household items, and a condominium she had in

Florida since 1984, at greatly depressed prices because she needed money to live on and had not

promptly received her SIPC insurance.  *Id.* ¶ 11.

119.    She filed her SIPC claim for both accounts on February 14, 2008.  *Id.* ¶ 12.  She

heard nothing from the Trustee for several months.  Finally, on May 20, 2009, she received a

determination letter requiring that she acknowledge that her claim with respect to the IRA

account was for only $1,348,877.12, the amount of her original investment.  See Exh. N.  She

was informed that it was a pre-condition to her receiving SIPC insurance on this account for her

to acknowledge that she was not entitled to a claim for any appreciation in that account.  Because

she was financially desperate and she had no alternative but to accede to the Trustee's demand,

she signed the required acknowledgment and, on June 6, 2009, she received a check from SIPC

for $500,000 with respect to this account.  Exh. M ¶ 14.

120.    Thereafter, she had several communications with an attorney from B&H

concerning her other account.  She was told that the Trustee was obligated under the law to

withhold $102,000 from her SIPC payment with respect to her direct investment account because

the Trustee was entitled to deduct the $102,000 payment she received in September 2008.  She

was also told that this money would simply reduce SIPC's obligations.  The money would not be

used to pay other investors. *Id.* ¶ 15. She asked if she could accept the $398,000 check and yet reserve her right to claim the $102,000 that the Trustee was going to withhold. She was told that she would not be able to do that and, if she wanted the check for $398,000, she would have to relinquish her claim to the $102,000. She explained that she was uncertain whether she should waive her claim to the $102,000. *Id.* ¶ 16. At that point, Ms. Ebel consulted with counsel. She did not advise B&H that she was willing to relinquish her claim to the $102,000.

121.    On May 29, 2009, she received another phone call from the B&H attorney with whom she had been speaking. He told her that there had been a change in strategy by the Trustee and that, because she was a "hardship" case, she would not have to relinquish her claim to the $102,000 if she accepted the $398,000. She was told that she would be sent a revised determination letter and accompanying documents. *Id.* ¶ 18.

122.    She received a determination letter dated June 9, 2009 which stated that because she qualified for the "Hardship Program," she would receive the undisputed portion of her claim, $398,000. See Exh. O. The June 9, 2009 letter required Ms. Ebel to sign a partial assignment and release in order to receive the $398,000 which the Trustee admits is due and owing to her.

123.    By letter dated June 16, 2009, Ms. Ebel's counsel, Helen Davis Chaitman, wrote to the Trustee explaining that Ms. Ebel accepted the Trustee's offer to pay her $398,000 with her reserving her claim for the additional $102,000 "provided that you also agree that, in the event your definition of "net equity" is rejected by the courts, Ms. Ebel's claim will be recognized for the full amount of $4,729,125.04." See Exh. P.

124.    By letter dated June 23, 2009, the Trustee's counsel, David J. Sheehan, wrote to Ms. Chaitman, stating:

> Several individuals, including you and your clients, have disputed the propriety of the money in/money out approach. This issue will be determined by the court in due course. Should a final order overrule the use of the money in/money out approach, we will be bound by that order and will apply it retroactively to all previously determined allowed customer claims. Thus, any future rulingS regarding the satisfaction of customer claims will apply to all customers, whether or not their individual claim has been determined at that time.

See Exh. Q at 1.

125.    Mr. Sheehan requested, based upon this position, that the Peskins and Ms. Ebel withdraw their complaint. Ms. Chaitman responded to Mr. Sheehan's letter on June 23, 2009 explaining that the Peskins and Ms. Ebel could not possibly withdraw the complaint until their claims were resolved, particularly in view of the substantial damages they had incurred as a result of the Trustee's delay in paying them their SIPC insurance. See Exh. R.

126.    By letter dated June 26, 2009, Mr. Sheehan wrote to Ms. Chaitman enclosing a form of partial assignment and release that had been sent to Ms. Ebel on June 9, 2009 and stating that Ms. Ebel would be paid after she executed that document. See Exh. S. By letter dated June 29, 2009, Ms. Chaitman explained to Mr. Sheehan that Ms. Ebel could not sign the June 9, 2009 partial assignment and release (the "Document") for three reasons:

a.    The Document did not state that Ms. Ebel's claim would be the balance on her November 30, 2008 statement if the Trustee's determination of the amount of her claim was rejected by the courts.

b.    The Document required Ms. Ebel to give the Trustee and SIPC a general release, which she could not possibly do given her substantial claims against the Trustee.

c.    The Document required Ms. Ebel to leave in the Trustee's control the timing of the judicial determination of her claim for the remaining $102,000. In the June 29, 2009 letter,

49

Ms. Chaitman explained that Ms. Ebel would be breaching her duty to mitigate her damages if she agreed to such a provision.  See Exh. T at 2.

127.    Ms. Chaitman has received no response to this letter, despite the fact that Ms. Ebel is, in the Trustee's view, a "Hardship" case entitled to expedited treatment.  Nevertheless, the Trustee's counsel has finally dealt with two of these objections with respect to the Peskins because, in the form of partial assignment and release that B&H sent Ms. Chaitman for the Peskins on July 22, 2009, the document does not include a general release but a release "only to the extent that the SIPA Trustee and/or SIPC has paid monies to the Assignor to satisfy Assignor's Customer Claim."  Thus, the Trustee has agreed, with respect to the Peskins, to pay the $500,000 in SIPC insurance while they are preserving their claims as asserted in their complaint.

128.    In addition, the July 22, 2009 form of partial assignment and release for the Peskins provides that their claim will be recognized for the balance on their November 30, 2008 statement in the event the Trustee's interpretation of "net equity" is rejected by the courts.  See Exh. U at 3.  The Trustee has not agreed to similar provisions for Ms. Ebel.

129.    The balance of the securities positions reflected on Ms. Ebel's November 30, 2008 IRA account statement was $2,532,140.66 and the balance of the securities positions reflected on Ms. Ebel's direct investment November 30, 2008 account statement was $3,831,387.49.  These are the amounts of her claims pursuant to SIPA.

50

**CONCLUSION**

For the foregoing reasons, Objectors, joined by more than 100 additional Customers, ask the Court to set a date for an evidentiary hearing at which they can prove that the Trustee and B&H are disabled from serving because they have a fundamental conflict of interest and are therefore not entitled to any compensation for the services they have rendered in this case.

August 3, 2009

PHILLIPS NIZER LLP

By: /s/ Helen Davis Chaitman
666 Fifth Avenue
New York, New York 10103-0084
(212) 841-1320

*Counsel for Diane and Roger Peskin and Maureen Ebel,* with the support of more than 100 other Customers

1087614.1

# EXHIBIT A

JUDGE CHIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

     -v-               :

BERNARD L. MADOFF,              :

        Defendant.     :

- - - - - - - - - - - - - - - x

# 09 CRIM 213

**INFORMATION**

09 Cr.

USDC SDNY
DOCUMENT
ELECTRONICALLY
DOC #: _____
DATE FILED: MAR 10 2009

### COUNT ONE
(Securities Fraud)

The United States Attorney charges:

#### Relevant Persons and Entities

    1.   At all times relevant to this Information, Bernard L. Madoff Investment Securities LLC, and its predecessor, Bernard L. Madoff Investment Securities (collectively and separately, "BLMIS"), had its principal place of business in New York, New York, most recently at 885 Third Avenue, New York, New York. BLMIS was a broker-dealer that engaged in three principal types of business:  market making; proprietary trading; and investment advisory services.  BLMIS was registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer and was, beginning in or about 2006, registered with the SEC as an investment adviser.

    2.   At all times relevant to this Information, Madoff Securities International Ltd. ("MSIL") was a corporation

MICROFILMED

MAR 10 2009 -2 10 PM

incorporated in the United Kingdom.  MSIL was an affiliate of
BLMIS which engaged principally in proprietary trading.

      3.   BERNARD L. MADOFF, the defendant, was the founder
of BLMIS, and served as its sole member and principal.  In that
capacity, MADOFF controlled the business activities of BLMIS.
MADOFF owned the majority of the voting shares of MSIL, and
served as the Chairman of MSIL's Board of Directors.  MADOFF also
served on the Board of Directors of the National Association of
Securities Dealers Automated Quotations ("NASDAQ"), and for a
period served as the Chairman of NASDAQ.

### The Scheme to Defraud

      4.   From at least as early as the 1980s through on or
about December 11, 2008, BERNARD L. MADOFF, the defendant,
perpetrated a scheme to defraud the clients of BLMIS by
soliciting billions of dollars of funds under false pretenses,
failing to invest investors' funds as promised, and
misappropriating and converting investors' funds to MADOFF's own
benefit and the benefit of others without the knowledge or
authorization of the investors.

      5.   To execute the scheme, MADOFF solicited and caused
others to solicit prospective clients to open trading accounts
with BLMIS, based upon, among other things, his promise to use
investor funds to purchase shares of common stock, options and
other securities of large, well-known corporations, and

representations that he would achieve high rates of return for clients, with limited risk. In truth and in fact, as MADOFF well knew, these representations were false. MADOFF failed to honor his promises to BLMIS clients by, among other things, failing to invest the BLMIS investment advisory clients' funds in securities as he had promised. Instead, notwithstanding his promises to the contrary, and notwithstanding representations that MADOFF made and caused to be made on tens of thousands of account statements and other documents sent through the United States Postal Service to BLMIS clients throughout the operation of this scheme, MADOFF operated a massive Ponzi scheme in which client funds were misappropriated and converted to the use of MADOFF, BLMIS, and others.

6. In connection with this Ponzi scheme, BERNARD L. MADOFF, the defendant, accepted billions of dollars of investor money, cumulatively, from individual investors, charitable organizations, trusts, pension funds, and hedge funds, among others, and established on their behalf thousands of accounts at BLMIS. From the outset of the scheme, and continuing throughout its operation, MADOFF obtained investor funds through interstate wire transfers from financial institutions located outside New York State and through mailings delivered by the United States Postal Service.

08-01789-cgm   Doc 4169-12   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit K
Case 1:09-cr-00213-DC to the Chaitman Decl Filed 03/10/2009   Page 4 of 25
Part b   Document 38   Pg 57 of 100

7.    In the course of carrying out this scheme, BERNARD
L. MADOFF, the defendant, made, and caused others to make, false
representations concerning his investment strategies to clients
and prospective clients of BLMIS. Among other things, MADOFF
marketed to clients and prospective clients an investment
strategy referred to as a "split strike conversion" strategy.
Clients were promised that BLMIS would invest their funds in a
basket of approximately 35-50 common stocks within the Standard &
Poor's 100 Index (the "S&P 100"), a collection of the 100 largest
publicly traded companies in terms of their market
capitalization. MADOFF claimed that he would select a basket of
stocks that would closely mimic the price movements of the S&P
100. MADOFF further claimed that he would opportunistically time
those purchases, and would be "out of the market" intermittently,
investing clients' funds in these periods in United States
Government-issued securities such as United States Treasury
bills. MADOFF also claimed that he would hedge the investments
that he made in the basket of common stocks by using investor
funds to buy and sell option contracts related to those stocks,
thereby limiting potential losses caused by unpredictable changes
in stock prices.

8.    Further, to induce new and continued investments
by clients and prospective clients, MADOFF promised certain
clients annual returns in varying amounts up to at least

4

08-01789-cgm   Doc 4169-12   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit K
Case 1:09-cr-00213-DC the Chaitman Decl Filed 03/10/2009   Page 5 of 25
Part b to the Document 38   Pg 58 of 100

approximately 46 percent per year.  MADOFF also told certain
clients that the fee for his services would be based on an
approximately $0.04 per share commission on the stocks that
MADOFF traded for such clients.

9.    Contrary to his promises to those clients that he
would use their funds to purchase securities on their behalf, and
would invest client funds pursuant to the strategies he had
marketed, MADOFF used most of the investors' funds to meet the
periodic redemption requests of other investors.  In addition,
MADOFF took some of these clients' investment funds as
"commissions," which he used to support the market making and
proprietary trading businesses of BLMIS, and from which he and
others received millions of dollars in benefits.

10.   BERNARD L. MADOFF, the defendant, created and
caused to be created a broad infrastructure at BLMIS to generate
the impression and support the appearance that BLMIS was
operating a legitimate investment advisory business in which
client funds were actively traded as he had promised, and to
conceal the fact that no such business was actually being
conducted.  Among other things, MADOFF hired numerous employees
to serve as a "back office" for this investment advisory
business.  Many of the employees hired to perform those functions
had little or no prior pertinent training or experience in the
securities industry.  MADOFF caused those BLMIS employees to,

among other things, communicate with clients and generate false

and fraudulent documents including, but not limited to, monthly

client account statements and trade confirmations that

purportedly reflected the purchases and sales of securities that

MADOFF claimed had been conducted on behalf of BLMIS's clients.

MADOFF further caused account statements and trade confirmations

that were sent to clients to reflect fictitious returns

consistent with the returns that had been promised to those

clients.

   11. Moreover, to support BLMIS's market making and

proprietary trading businesses, between at least as early as in

or about 2002 and in or about 2008, BERNARD L. MADOFF, the

defendant, caused more than $250 million of BLMIS investment

advisory clients' funds to be directed, through a series of wire

transfers, to the operating accounts that funded the operations

of these businesses.  Specifically, MADOFF caused those investor

funds to be sent from a BLMIS account in New York, New York (the

"BLMIS Client Account"), to accounts held by MSIL in London,

United Kingdom (the "MSIL Accounts"), and further caused funds to

be transferred from the MSIL Accounts to either the BLMIS Client

Account or to another bank account in New York, New York, which

was principally used to fund BLMIS's operations (the "BLMIS

Operating Account").  MADOFF directed these funds transfers, in

part, to give the appearance that he was conducting securities

6

08-01789-cgm   Doc 4169-12   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit K
Case 1:09-cr-00213-DC   the Chaitman Decl   Filed 03/10/2009   Page 7 of 25
Part I to the Document 38   Pg 60 of 100

transactions in Europe on behalf of the investors when, in fact,
he was not conducting such transactions.  MADOFF also directed
the transfer of funds from the MSIL Accounts to purchase and
maintain property and services for the personal use and benefit
of MADOFF, his family members and associates.

12.  To conceal his scheme, BERNARD L. MADOFF, the
defendant, among other things, withheld information from
regulators and repeatedly lied to the SEC in written submissions
and in sworn testimony.

13.  In furtherance of the scheme, BERNARD L. MADOFF,
the defendant, caused false and fraudulent certified financial
statements for BLMIS, including balance sheets, statements of
income, statements of cash flows, and reports on internal
control, to be created.  MADOFF further caused such false and
fraudulent financial statements to be sent to clients and
prospective clients through the United States Postal Service, and
also caused such false and fraudulent financial statements to be
filed with the SEC.  Among other things, MADOFF knew that the
certification attached to the BLMIS financial statements falsely
averred that those statements had been prepared in accordance
with Generally Accepted Auditing Standards and Generally Accepted
Accounting Principles.

14.  As of on or about November 30, 2008, BLMIS had
approximately 4,800 client accounts.  On or about December 1,

7

2008, BLMIS issued account statements for the calendar month of November 2008 reporting that those client accounts held a total balance of approximately $64.8 billion. In fact, BLMIS held only a small fraction of that balance on behalf of its clients.

### Statutory Allegation

15.   From at least the 1980s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in transactions, acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18 United States Code, Section 2.)

08-01789-cgm   Doc 4169-12   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit K
Case 1:09-cr-00213-DC   the Chaitman Decl   Filed 03/10/2009   Page 9 of 25
Part I to the   Document 38   Pg 62 of 100

### COUNT TWO
(Investment Adviser Fraud)

The United States Attorney further charges:

16.    The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

17.    From at least the 1980s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, acting as an investment adviser with respect to clients and potential clients of BLMIS, unlawfully, willfully, and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, directly and indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative.

(Title 15, United States Code, Sections 80b-6 and 80b-17; Title 18, United States Code, Section 2.)

### COUNT THREE
(Mail Fraud)

The United States Attorney further charges:

18.    The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

9

08-01789-cgm   Doc 4169-12   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit K
Case 1:09-cr-00213-DC the Chairman Decl Filed 03/10/2009   Page 10 of 25
Part I to the Chairman Decl   Document 38   Pg 63 of 100

19.   From at least as early as the 1980s through on or
about December 11, 2008, in the Southern District of New York and
elsewhere, BERNARD L. MADOFF, the defendant, unlawfully,
willfully, and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, for the purpose of executing such
scheme and artifice and attempting so to do, did place in post
offices and authorized depositories for mail matter, matters and
things to be sent and delivered by the Postal Service, and did
deposit and cause to be deposited matters and things to be sent
and delivered by private and commercial interstate carriers, and
did take and receive therefrom such matters and things, and did
knowingly cause to be delivered, by mail and such carriers
according to the directions thereon, and at the places at which
they were directed to be delivered by the persons to whom they
were addressed, such matters and things, to wit, on or about
December 1, 2008, MADOFF sent and caused to be sent and delivered
via the Postal Service a false and fraudulent account statement
from BLMIS to a client in New York, New York.

(Title 18, United States Code, Sections 1341 and 2.)

10

08-01789-cgm   Doc 4169-12   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit K
Case 1:09-cr-00213-DC   to the Chaitman Decl   Filed 03/10/2009   Page 11 of 25
Part I to the Chaitman Decl   Document 33   Pg 64 of 100

## COUNT FOUR
(Wire Fraud)

The United States Attorney further charges:

20.   The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

21.   From at least as early as the 1980s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, on or about August 5, 2008, MADOFF caused approximately $2 million of investor funds to be sent by wire from Bloomington, Minnesota to New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

11

08-01789-cgm   Doc 4169-12   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit K
Case 1:09-cr-00213-DC   the Chaitman Dec Filed 03/10/2009   Page 12 of 25
Part I to the Chaitman Dec Document 38   Pg 65 of 100

## COUNT FIVE

(International Money Laundering To Promote
Specified Unlawful Activity)

The United States Attorney further charges:

22.    The allegations contained in paragraphs 1 through
14, above, are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

23.    From at least as early as in or about 2002,
through on or about December 11, 2008, in the Southern District
of New York, the United Kingdom, and elsewhere, BERNARD L.
MADOFF, the defendant, in an offense involving and affecting
interstate and foreign commerce, unlawfully, willfully and
knowingly, transported, transmitted and transferred, attempted to
transport, transmit and transfer, and caused others to transport,
transmit and transfer, and attempt to transport, transmit, and
transfer, funds from a place in the United States to a place
outside the United States, and funds from a place outside the
United States to a place within the United States, with the
intent to promote the carrying on of specified unlawful activity,
to wit, fraud in the sale of securities, mail fraud, wire fraud,
and theft from an employee benefit plan, to wit, MADOFF caused
funds to be wire transferred from BLMIS bank accounts, including
the BLMIS Investor Account in New York, New York, to the MSIL
Accounts in London, England, in the United Kingdom, and to be
transferred from the MSIL Accounts in London, England, in the

12

United Kingdom, to BLMIS bank accounts, including the BLMIS

Operating Account, in New York, New York, in order to promote

fraud in the sale of securities, mail fraud, wire fraud, and

theft from an employee benefit plan.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

### COUNT SIX
(International Money Laundering To Conceal And Disguise
The Proceeds of Specified Unlawful Activity)

The United States Attorney further charges:

24.    The allegations contained in paragraphs 1 through

14, above, are hereby repeated, realleged and incorporated by

reference as if fully set forth herein.

25.    From at least as early as in or about 2002,

through on or about December 11, 2008, in the Southern District

of New York, the United Kingdom, and elsewhere, BERNARD L.

MADOFF, the defendant, in an offense involving and affecting

interstate commerce, knowing that the property involved in

certain financial transactions, to wit, investor funds in the

custody and care of BLMIS, represented the proceeds of some form

of unlawful activity, unlawfully, willfully and knowingly would

and did conduct and attempt to conduct such financial

transactions which in fact involved the proceeds of specified

unlawful activities, to wit, fraud in the sale of securities,

mail fraud, wire fraud, and theft from an employee benefit plan,

knowing that the transactions were designed in whole and in part

to conceal and disguise the nature, the location, the source, the

13

ownership and the control of the proceeds of said specified

unlawful activity.

      26. Such financial transactions included, but were not

limited to, the following:

      a.    From at least in or about 2006, through on or

about December 11, 2008, BERNARD L. MADOFF, the defendant, caused

funds to be wire transferred from BLMIS bank accounts in New

York, New York, including the BLMIS Investor Account, to the MSIL

Accounts in London, England, in the United Kingdom, and

thereafter to be transferred from the MSIL Accounts in the United

Kingdom to BLMIS bank accounts in New York, New York, including

the BLMIS Investor Account and the BLMIS Operating Account, which

transfers were designed to give the false and fraudulent

appearance that BLMIS was operating a legitimate investment

advisory business in which client funds were being used to

purchase and sell securities as MADOFF had promised, and to

conceal the fact that no such purchases or sales were actually

being made; and

      b.    From at least in or about 2002, through on or

about December 11, 2008, MADOFF caused funds to be wire

transferred from BLMIS bank accounts in New York, New York,

including the BLMIS Investor Account, to the MSIL Accounts in

London, England, in the United Kingdom, and thereafter to be

transferred from the MSIL Accounts in the United Kingdom to

purchase and maintain property and services for the personal use
and benefit of MADOFF, his family members and associates.

(Title 18, United States Code, Sections
1956(a)(1)(B)(i) & (f) and 2.)

### COUNT SEVEN
(Money Laundering)

The United States Attorney further charges:

27.    The allegations contained in paragraphs 1 through
14, above, are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

28.    From at least in or about the 1980s, through on or
about December 11, 2008, in the Southern District of New York and
elsewhere, BERNARD L. MADOFF, the defendant, in an offense
involving and affecting interstate and foreign commerce,
unlawfully, willfully, and knowingly engaged and attempted to
engage in and cause others to engage in a monetary transaction in
criminally derived property that was of a value greater than
$10,000 and was derived from specified unlawful activity; to wit,
on or about April 13, 2007, MADOFF caused approximately
$54,485,750 derived from fraud in the sale of securities, mail
fraud, wire fraud, and theft from an employee benefit plan, to be
transferred from the BLMIS Investor Account in New York, New
York, to one of the BLMIS Accounts in London, England, in the
United Kingdom.

(Title 18, United States Code, Sections 1957 and 2.)

15

## COUNT EIGHT
(False Statements)

The United States Attorney further charges:

29.   The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

30.   Beginning in or about 2006, as described in paragraph 1 above, BLMIS was, among other things, an investment adviser registered with the SEC. As such, BLMIS was subject to periodic examinations by the SEC, and was required to file an SEC Form ADV Uniform Application for Investment Adviser Registration ("ADV").

31.   On or about January 7, 2008, BERNARD L. MADOFF, the defendant, filed and caused to be filed an ADV with the SEC (the "BLMIS ADV"). The BLMIS ADV was signed by MADOFF, who certified, under penalty of perjury under the laws of the United States, that the information and statements made therein were true and correct, and that he was signing the BLMIS ADV as a free and voluntary act.

32.   The BLMIS ADV contained false statements made for the purpose of deceiving the SEC and hiding the defendant's unlawful conduct described in paragraphs 4 through 14, above. The BLMIS ADV filed with the SEC stated, among other things, in substance, that BLMIS had custody of advisory clients' securities.

16

33.   On or about January 7, 2008, in the Southern
District of New York, BERNARD L. MADOFF, the defendant,
unlawfully, willfully, and knowingly, in a matter within the
jurisdiction of the executive branch of the Government of the
United States, namely, the SEC, made materially false,
fictitious, and fraudulent statements and representations, to
wit, MADOFF filed the BLMIS ADV with the SEC, in which he made
the following false statement that was material to the SEC's
oversight of BLMIS's investment adviser business:

### Specification

MADOFF falsely stated that BLMIS had "custody of . . .
advisory clients' . . . securities."

(Title 18, United States Code, Section 1001(a).)

### COUNT NINE
(Perjury)

The United States Attorney further charges:

34.   The allegations contained in paragraphs 1 through
14, above, are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

35.   As described in paragraph 1 above, BLMIS was at
certain times, among other things, a broker-dealer and investment
adviser registered with the SEC.  As such, BLMIS was subject to
periodic examinations by the SEC.  The SEC has broad authority to
conduct investigations into various aspects of the securities
markets and, in or about 2006, was conducting such an

17

investigation. As part of that investigation, on or about May

19, 2006, employees of the SEC took the voluntary testimony of

BERNARD L. MADOFF, the defendant, under oath (the "MADOFF SEC

Testimony").

36. During the course of the MADOFF SEC Testimony,

BERNARD L. MADOFF, the defendant, made numerous false and

misleading statements for the purpose of deceiving the SEC and

hiding his unlawful conduct described in paragraphs 4 through 11,

above. MADOFF testified, among other things, in substance, that:

(a) BLMIS executed trades of common stock on behalf of its

investment advisory clients; (b) BLMIS executed options contracts

on behalf of its investment advisory clients; (c) BLMIS had

custody of the assets managed on behalf of its investment

advisory clients; and (d) BLMIS used the same trading strategy

for all its investment advisory clients.

37. On or about May 19, 2006, in the Southern District

of New York, BERNARD L. MADOFF, the defendant, having taken an

oath before a competent tribunal, officer and person, in a case

in which the law of the United States authorizes an oath to be

administered, namely, in testimony before an officer of the SEC,

that he would testify, declare, depose and certify truly, and

that any written testimony, declaration, deposition and

certificate by him subscribed, would be true, unlawfully,

willfully, knowingly, and contrary to such oath, stated and

subscribed material matters which he did not believe to be true,

18

namely, in his testimony on or about May 19, 2006, MADOFF

knowingly testified falsely as to the material matters in the

portions of his cited testimony underlined below:

### Specification One
(Page 55, Lines 20-25)

Q:   Let's just get back to some of the basics that we
     discussed before.  You mentioned earlier that the
     basket in the institutional trading business may be
     hedged with options.  Does that in fact happen?

A:   <u>Yes</u>.

### Specification Two
(Page 57, Lines 15-20)

Q:   Let's focus on the actual execution portion of it.
     Let's go back to the equities.  You mentioned that you
     used this AHOE system, and you mention[ed] that it
     exposes a sliced order to the European market.  Is it
     correct then that the equities are traded in Europe?

A:   <u>Yes</u>.

### Specification Three
(Page 63, Lines 11-23)

Q:   Now you mentioned that there was a group of dealers to
     whom you put out this indication of interest each time.
     Generally, with how many of them do you end up trading
     in each execution?

A:   <u>Within the basket, we're probably interacting with 40,
     close to 50</u>.

Q:   That's for equities and options.

A:   <u>Equities. Options is a dozen</u>.

Q:   A dozen.  Do all of them end up trading usually?

A:   <u>Pretty much.  They all trade on a - yes.  It's usually
     that they all participate during the trading.  They
     have an interest in these stocks.  These stocks are the
     marketplace.</u>

### Specification Four
(Page 65, Lines 16-18)

Q:   Who are the counterparties to the options contracts?

A:   <u>They're basically European banks.</u>

### Specification Five
(Page 66, Line 19 - Page 67, Line 20)

Q:   So how does the time frame for the options trading
     relate to the time frame for the equities trading?

A:   <u>First we're putting the equity basket on, and then
     we're putting the options on after the equity basket is
     complete, so the options are being done basically in
     the morning typically between 8:00 and 9:00 a.m.</u>

. . . .

Q:   With the options trades, is there any documentation
     generated?  For example, for some derivatives, there is
     an after agreement and you have a confirmation, a 2-
     page document.  Is there something like that for the
     options trades?

A:   <u>Yes, there's an affirmation that's generated
     electronically, and there's a master option agreement
     that's attached to that that's also electronic.</u>

Q:   And the electronic affirmation stores data for each
     trade with each particular dealer.

A:   <u>Correct.</u>

Q:   So if you wanted to find out with whom you bought these
     contracts on a particular day, that's where you would
     go.

A:   <u>Right.</u>

### Specification Six
(Page 85, Lines 2-3)

Q:   Who has the custody of the assets?

A:   <u>We do.</u>

### Specification Seven
(Page 116, Line 17 - Page 117, Line 2)

Q:   I wanted to go back to the question that [an SEC
     attorney] asked you about other persons, persons other
     than the institutional customers that we discussed so
     far and proprietary situations.  The trading for these
     persons, is it also pursuant to the same strategy [as]
     in the institutional trading business?

A:   <u>Yes</u>.

Q:   What is approximately the total amount of assets traded
     for these persons?

A:   My guess would be something, <u>a few hundred million
     dollars</u>.

     (Title 18, United States Code, Section 1621.)

### COUNT TEN
(False Filing With The Securities And Exchange Commission)

38.   The allegations contained in paragraphs 1 through
14, above, are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

39.   On or about December 20, 2007, in the Southern
District of New York, BERNARD L. MADOFF, the defendant,
unlawfully, willfully, and knowingly, in applications, reports,
and documents required to be filed with the SEC under the
Securities Exchange Act of 1934, and the rules and regulations
thereunder, did make and cause to be made statements that were
false and misleading with respect to material facts, to wit,

MADOFF caused a false and misleading certified BLMIS audit report to be filed with the SEC.

(Title 15, United States Code, Sections 78q(e) and 78ff; Title 17, Code of Federal Regulations, Sections 240.17a-5, 240.17a-13 and 210.2-01; Title 18, United States Code, Section 2.)

### COUNT ELEVEN
(Theft From An Employee Benefit Plan)

40.    The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

41.    From at least as early as the 1990s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, unlawfully, willfully, and knowingly, embezzled, stole, abstracted and converted to his own use, and to the use of others, moneys, funds, securities, premiums, credits, properties, and other assets of employee welfare benefit plans and employee pension benefit plans and funds connected therewith, to wit, on or about September 24, 2008, MADOFF failed to invest as promised approximately $10 million in pension fund assets sent to BLMIS by a master trust on behalf of approximately 35 labor union pension plans, and instead converted those funds to his use and the use of others.

(Title 18, United States Code, Sections 664 and 2.)

22

## FORFEITURE ALLEGATION
(Offenses Constituting Specified Unlawful Activity)

42.   As the result of committing the offenses
constituting specified unlawful activity as defined in 18 U.S.C.
§ 1956(c)(7), as alleged in Counts One, Three, Four, and Eleven
of this Information, BERNARD L. MADOFF, the defendant, shall
forfeit to the United States, pursuant to 18 U.S.C.
§ 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and
personal, that constitutes or is derived from proceeds traceable
to the commission of the said offenses.

### Substitute Asset Provision

43.   If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due
diligence;

b.   has been transferred or sold to, or deposited
with, a third person;

c.   has been placed beyond the jurisdiction of
the Court;

d.   has been substantially diminished in value;
or

e.   has been commingled with other property which
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), to seek forfeiture of any

23

08-01789-cgm   Doc 4169-12   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit K
Case 1:09-cr-00213-DC   Part I to the Chaitman Decl   Filed 03/10/2009   Page 24 of 25
Document 38   Pg 77 of 100   Page 24 of 25

other property of the defendant up to the value of the

forfeitable property described above.

>   (Title 18, United States Code, Sections 981(a)(1)(C),
>     and Title 28, United States Code, Section 2461.)

### FORFEITURE ALLEGATION
(Money Laundering)

44.   As the result of committing one or more of the

money laundering offenses in violation of 18 U.S.C. §§ 1956

and 1957, alleged in Counts Five through Seven of this

Information, BERNARD L. MADOFF, the defendant, shall forfeit to

the United States, pursuant to 18 U.S.C. § 982, all property,

real and personal, involved in the said money laundering offenses

and all property traceable to such property.

### Substitute Asset Provision

45.   If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

> a.   cannot be located upon the exercise of due
>      diligence;
>
> b.   has been transferred or sold to, or deposited
>      with, a third person;
>
> c.   has been placed beyond the jurisdiction of
>      the Court;
>
> d.   has been substantially diminished in value;
>      or
>
> e.   has been commingled with other property which
>      cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18,

United States Code, Section 982(b) and Title 21, United States

Code, Section 853(p), to seek forfeiture of any other property of

the defendant up to the value of the forfeitable property

described above.

(Title 18, United States Code, Section 982.)

LEV L. DASSIN
Acting United States Attorney

25

# EXHIBIT B

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and
Government Sponsored Enterprises
July 14, 2009

**Mr. Ackerman: (At 8:55 on webcast)**

**Mr. Ackerman:** Thank you Mr. Chairman. Good morning. Mary Schapiro, there are an
awful lot of people watching this hearing that aren't too interested in
regulatory reform. They're not too concerned about resolution authority
or the clearing of derivatives. And they aren't too worried about whether
congress complies with your request to increase funding for the SEC
Enforcement Division. Madam Chairman, there are thousands of now
penniless victims of Bernard Madoff ponzi schemer who are interested in
just one thing, making sure their government lives up to its word. As you
know, the Securities Investor Protection Corporation. That's *investor
protection.* Indicating that it has something to do with protecting the
investors. SIPC provides insurance of up to $500,000 for securities
investors in the event that a broker-dealer fails. It's been seven months
now since the collapse of Mr. Madoff's fraud and, to date, of the
15,000,400 claims that have been submitted, only 450 victims have
received even a portion of their SIPC insurance. Part of the delay stems
from the confusion over the eligibility requirements for SIPC coverage. If
you believe the law, as interpreted by SIPC general counsel Josephine
Wang, SIPC is obligated to provide up to $500,000 per account for
securities to any investor that believes that they own securities in Madoff's
investment statements. But if you believe Irving Picard, the court
appointed trustee in the Madoff case, based on the judicial precedence
from the 1920s, SIPC is obligated to insure only the funds that Madoff
victims initially invested, minus any withdrawals. According to Mr.
Picard's interpretation, many Madoff victims are not entitled to their
insurance payments. Madam Chairman, that Madoff was able to conduct
his fraud unmolested by the SEC for decades and despite the red flags
raised by Harry Markopolos is tragic. That the court appointed trustee in
the Madoff case is seeking to delay and, ultimately, deny the insurance
payments due Madoff's victims is absolutely shameful. Many of
Madoff's victims are in complete financial ruin. Many have lost their
homes and have moved in with their children or friends. The lucky ones
don't know how to make their next mortgage payment. At a minimum,
they deserve the insurance they believe, and to which the law says, they're
entitled. I hope that you can put an end to the confusion today by
clarifying specific eligibility requirements. And I yield back the balance
of my time.

**Q&A between Mr. Ackerman and Ms. Schapiro (At 52:00 on webcast)**

**Q. Mr. Ackerman:** Madam Chairman, the issue that I addressed in my opening
statement to refresh your memory as to the Madoff victims and the terrible
situation that we're looking where we actually have classes of victims

1

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and
Government Sponsored Enterprises
July 14, 2009

pitted against each other in addition to all the other confusion. Which Madoff investors are eligible for their SIPC insurance?

**A. Ms. Schapiro:** Congressman, let me just say that this is -- it shouldn't be such a difficult issue, but it is. And, of course, it's a very heartbreaking issue. Because the tragic truth is that there is not enough money available to pay off all of the customer claims. And, as you point out, there are --

**Q. Mr. Ackerman:** That leads us -- if I could just interject there -- a larger problem. Because that means that our citizens are not entitled to have confidence in the system.

**A. Ms. Schapiro:** Well, there is no doubt that what has happened with Madoff has shaken everybody's confidence in the integrity of the financial services industry and in the regulatory system to protect investors. With respect, specifically, to the SIPC question, as you know, the trustee has chosen a cash-in/cash-out view when determining net equity on which claims, and at what amount, to pay out. There are a group of investors who believe that net -- so that if you paid in $2 million, over time you took out a million dollars, your net equity would be $1 million. There's a group of investors --

**Q. Mr. Ackerman:** But these, unfortunately, are people that we have encouraged and assured by virtue of the fact that we provide the supervision and these people knew that there were questions raised about Madoff and the government, basically, gave him a clean bill of health year after year. People knew about Mr. Markopolos. People knew about other people, as well, that had raised questions that were dismissed and then felt the government is saying that this guy is okay. And the million dollars that I put in has grown over the years and I have this money to live on now.

**A. Ms. Schapiro:** I understand that and there's a group of investors who feels very deeply that their net equity on which they would be paid to be determined by looking, as you point out, at their last account statement, so they may have paid in $2 million but that amount of money has grown to $10 million and they were relying on that $10 million to be there for them.

**Q. Mr. Ackerman:** Well, they weren't relying on the $2 million, which they were, of course. They were relying on the government's assurance that they had the $2 million. And they made life decisions based on that. So, where do you come down Madam Chairman?

**A. Ms. Schapiro:** Well, we've been with SIPC and with the lawyers for the investors who would like to calculate the net equity based on the last account

2

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and
Government Sponsored Enterprises
July 14, 2009

statement in hopes of trying to find a way to settle this matter and,
between the two groups, to expedite getting these payments out to people
who are very dependant upon them. These investors have challenged the
trustee's cash-in/cash-out methodology in court and that is before --

**Q. Mr. Ackerman:** Well, we're going to have to make a decision and someone has to
make a choice here.

**A. Ms. Schapiro:** I understand and --

**Q. Mr. Ackerman:** Here's a case. A woman who has a small business, a publishing
business, she sells it for $3 million and that's everything she owns in the
world, $3 million. It's in Madoff. She gets a check for $30,000 a month
that she's taking out, which is the money she's making on it. She still has
the equity in there. She buys a huge apartment in Manhattan. That's the
only asset that she has. The asset is now under water. She spends the
$30,000 a month to pay her taxes, pay her mortgage and her maintenance
and her living expenses. She's done this for a couple of years. Suddenly,
one month when Madoff turns himself in, she has no income. The unit she
lives in upside down, as they say, she can't sell it for what it's worth, she
owes $15,000 a month in carrying charges, she'll get nothing from it if she
sells it, and has $1,500 in her bank and is waiting for her $30,000 return
from Madoff. She's homeless. She has no assets. Her $3 million has
been stolen. And then, on top of that, she's being told that the $30,000 a
month that she's gotten, that she's paid taxes on with half, and half to her
mortgage, she suddenly owes back, because of a claw-back thing that
they're claiming, where is she going to get the $30,000 a month that she's
collected to give back? I mean, these people are absolutely destitute. And
they were reliant on the government's seal of approval that this guy is
legit, that he's up and up. How can we turn our back on these people?

**A. Ms. Schapiro:** We cannot turn our back on them and we should not turn our back on
them. And, I'm committed to working as aggressively as we possibly can
with SIPC and take the most expansive possible view of how to repay
these claims and to do it in as quick a fashion as we possibly can. That
specific issue is before the bankruptcy judge right now. I don't have --
although I'd be happy get for you -- some indication of timing or when it
might be resolved. But I agree that we need to push very hard to make
people whole to the greatest extent possible.

**Q. Mr. Ackerman:** I thank you for your concern and your actions. Mrs. Chairman, if I
could just have another couple of seconds to add -- some of our colleagues
have raised an accountability question and I just want to compliment the
Chairman. That rather bombastic initial hearing that we had with people

3

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and
Government Sponsored Enterprises
July 14, 2009

> from the agency before that got an awful lot of attention because it was the
> first one.  The Chairman called me immediately after the hearing and said
> she aghast that some of the things that she had heard during the testimony
> --

**Unknown Speaker:**  You mean she called you too?

**Q. Mr. Ackerman:**  Yes, she did [laughter].  Even me.  And, by the end of that week,
two of those people were gone from the agency and I just want to say that
that's accountability that I've never seen in my fourteen terms here and I
want to thank the Chairman for swift action and dedication to our mission.
I yield back the balance of my time.

4

# EXHIBIT C

Madoff Trustee Site

BERNARD L. MADOFF

Investment Securities LLC

Home    More Information    Court Filings    Claims Packages    Hardship Program    Press    Contact Us    Creditors Meeting

## HARDSHIP PROGRAM

### 1. The Hardship Program

a.   In an effort to accelerate Securities Investor Protection Corporation ("SIPC") protection for individual victims of Bernard L. Madoff Investment Securities LLC ("BLMIS") who are suffering hardship, the Trustee is instituting a Hardship Program as outlined below. The purpose of the Hardship Program is to provide a mechanism by which customers of BLMIS that are suffering hardship can accelerate the determination of their claims and the payment by the Trustee of the SIPC protection afforded to such customers. The SIPC protection is an amount not to exceed $500,000.00.

b.   The Hardship Program is a supplement to and not a replacement of or alternative to the existing claims procedure. All customers seeking to enter the Hardship Program must have previously submitted a claim or must submit a claim concurrently with submission of the Hardship Application. Please note that the claims bar date is July 2, 2009.

c.   The Hardship Program is only available to individual account holders, and not to corporations, partnerships and other business entities that are account holders of BLMIS or indirect investors through feeder funds or other investment vehicles.

**If you would like to receive a Hardship Application package in the mail, you may either contact the Claims Processing Center at 888-727-8695, or click here to submit a request for a Hardship Application Package.**

### 2. The Hardship Standard

Based on the Hardship Application that you submit, the Trustee will assess whether you qualify for the Hardship Program based on the following indicators of hardship:

a.   Inability to pay for necessary living expenses, such as housing, food, utilities and transportation.

b.   Inability to pay for necessary medical expenses.

c.   Necessity to return to work, at the age of 65 or older, after having previously retired from former employment (special consideration will be given to individuals that can no longer return to their former work).

d.   Declaring personal bankruptcy.

e.   Inability to pay for the care of dependents.

f.   Otherwise suffering from extreme financial hardship as demonstrated by other circumstances not addressed by the foregoing.

### 3. Administration of the Hardship Program

a.   Applicants for the Hardship Program must complete a Hardship Application which requires identifying information, a short explanation of the basis for seeking inclusion in the Hardship Program and limited financial information. The Hardship Application form can be downloaded by clicking here.

b.   The Hardship Application must be mailed with proof of delivery to Irving H. Picard, Esq., Trustee for Bernard L. Madoff Investment Securities LLC, Claims Processing Center, 2100 McKinney Ave., Suite 800, Dallas, TX 75201.

c.   Assuming that you have filed a claim and assuming that your Hardship Application is properly completed, the Trustee will notify you in writing within 20 days of receipt of the Hardship Application by the Trustee whether or not you qualify for the Hardship Program. To the extent that the Hardship Application is incomplete or the Trustee requires further information, the Trustee will notify you within 20 days of receipt of the initial Hardship Application and you will be requested to resubmit the Hardship Application with the additional information requested by the Trustee. Once you resubmit your Hardship Application in compliance with the Trustee's information request, the Trustee will reconsider the Hardship Application and will notify you

in writing within 20 days of whether or not you qualify for the Hardship Program.

d.   The determination of the Trustee whether customers qualify for the Hardship Program shall be final, not subject to review by court, and shall not affect the claim process or your ultimate allowed claim.

e.   Once the Trustee determines that you qualify for the Hardship Program, your claim or claims will be expedited in the claims process by the Trustee. Given that BLMIS's records are currently incomplete and that the Trustee is currently working to reconstitute the financial records of BLMIS, the Trustee cannot guaranty the timing of determination of any claim; provided, however:

    i.   <u>Post-1995 accounts</u>: if your account was opened at BLMIS after January 1, 1996, the Trustee will endeavor to mail a determination of your claim within 20 days of your claim qualifying for the Hardship Program.

    ii.   <u>Pre-1996 Accounts</u>: Although the Trustee is working to reconstruct BLMIS's records for the time periods prior to January 1, 1996, full records for this period currently are not available. As such, the Trustee will not be able to render determinations on these accounts until full information is available. Reconstruction of BLMIS's records is a laborious and time consuming endeavor, and it is imperative to the expeditious treatment of your claims that you aid the Trustee by providing all documentation in your possession to the Trustee as soon as possible. **The Trustee strongly urges that you include all information in your possession (including proof of your deposits made to BLMIS) with your initial Hardship Application.** The Trustee is committed to determining pre-1996 accounts as soon as possible, but full information on your account will be needed in order to render a determination. The Trustee hopes that you and he can work together cooperatively to reconstruct the account history as quickly as possible, and as pre-1996 records are reconstructed on a rolling year-by-year basis starting with 1995 and moving back in time, the Trustee will work to quickly determine claims related to accounts that were opened in those years where the Trustee has the newly reconstructed records. Thus, for example, if you opened your account in 1994, the Trustee will quickly determine your claim once the records for 1994 and 1995 are reconstructed.

f.   Upon determination of a claim in the Hardship Program, the Trustee will mail a Determination Notice and either a Full or Partial Assignment and Release Agreement to you. The Determination Notice will set forth the Trustee's proposed treatment of your claim. Pursuant to the terms of the Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing other Relief (the "Claims Process Order"), you have 30 days to agree to the Trustee's determination or object to such determination as required by the Claims Process Order. A copy of the Claims Process Order can be obtained by clicking <u>here</u>. As provided in the Claims Process Order, you can agree to the determination by returning the Full or Partial Assignment and Release Agreement (whichever one you received) or by taking no action within 30 days of the mailing of the Determination Notice by the Trustee.

g.   If the Determination Notice states that the Trustee has determined that your claim is entitled to the protection afforded by SIPC, you can consent to this determination by taking no action for 30 days or by submitting a fully executed and notarized Full Assignment and Release Agreement (which is included with the Determination Notice if the SIPC protection will fully pay your claim) or a Partial Assignment and Release Agreement (which is included with the Determination Notice if the maximum SIPC protection will only partially pay your claim). Upon receipt by the Trustee of the fully executed Partial or Full Assignment and Release Agreement, as the case may be, the Trustee will pay you the SIPC protection set forth in your Determination Notice (an amount up to $500,000.00). The remainder of your claim, if any, will be paid at a later date when the Trustee makes additional distributions. The amount and timing of further distributions is not yet known.

    For example, if you invested $1,000,000.00 with BLMIS and never received a payment from BLMIS, the Trustee will send you a Determination Notice proposing to allow your claim for $1,000,000.00 and offering to pay you $500,000.00 in SIPC protection once you return the Partial Assignment and Release that is included with your Determination Notice. Although you have 30 days to consider the Determination Notice, as soon as you return the Partial Assignment and Release, the Trustee will process your check for the SIPC protection of $500,000.00 in this example. The unpaid portion of your claim will go into the pool of unpaid customer claims on which the Trustee intends to make distributions in the future. Please note that the Trustee is not giving you credit for the fictitious profits that BLMIS fabricated on your monthly statements. As previously announced, the Trustee is only considering cash in and out of BLMIS when determining claims.

h.   If you dispute the Trustee's proposed treatment of your claim and follow the procedure below, the Trustee will pay the undisputed portion of your claim up to the limits of the SIPC protection (an amount up to $500,000.00) even though there is not yet agreement on the treatment of your entire claim. The payment of the undisputed amount of your claim will be without prejudice to the Trustee's and your rights, claims and defenses with respect to the disputed portion of your claim. You should comply with the following procedure:

    i.   You must submit a Statement of Dispute to the Trustee. A form of Statement of Dispute is available

by clicking here. The Statement of Dispute must be delivered (with proof of delivery) to the Trustee within 30 days of the date on your Determination Notice otherwise you will be deemed to have consented to the treatment of your claim in the Determination Notice. The Statement of Dispute must be delivered to the Trustee at the following address: Irving Picard, c/o Heather R. Wlodek, Trustee for Bernard L. Madoff Investment Securities LLC, Baker & Hostetler LLP, 45 Rockefeller Plaza, 11th Floor, New York, NY 10111. A copy of the Statement of Dispute should be delivered to the Trustee's counsel: Kelly Burgan, Baker & Hostetler LLP, 3200 National City Center, 1900 E. Ninth Street, Cleveland, Ohio, 44114. If you fail to keep or provide a record of proof of delivery of the Statement of Dispute, the date of receipt by the Trustee will be the date that the Trustee asserts he actually received your Statement of Dispute. Thus, you risk missing the 30 day deadline to submit your Statement of Dispute if you do not keep proof of delivery.

ii.   The Statement of Dispute must clearly state (a) the amount of the Trustee's determination that you do not dispute, (b) the amount which you dispute and (c) the reasons for your dispute of the Trustee's determination.

iii.   In order to receive SIPC protection of up to $500,000.00 on account of the undisputed portion of your claim, you will need to submit a Partial Assignment and Release for that amount to the Trustee. As soon as the Trustee has received the Partial Assignment and Release, he will process and send a check for the undisputed amount of your claim representing your SIPC protection. A Partial Assignment and Release form for the undisputed amount of your claim will be sent to you by the Trustee if you request it in writing to Kelly Burgan, Baker & Hostetler LLP, 3200 National City Center, 1900 E. Ninth Street, Cleveland, Ohio, 44114 or by email kburgan@bakerlaw.com. Please note that you can return the Partial Assignment and Release with your Statement of Dispute or anytime time thereafter.

1. For example, if the Trustee sends you a Determination Notice approving your claim at $1,000,000.00 and offering to pay $500,000.00 in SIPC protection to you, but you believe that your claim should be approved at $2,000,000.00, you should mail (with proof of delivery) a Statement of Dispute to the Trustee which clearly states (a) the amount of the Trustee's determination that you do not dispute (here, $1,000,000.00), (b) the amount which you dispute (here, you believe your claim should be approved at $2,000,000.00) and (c) the reasons for your dispute of the Trustee's determination. Because the undisputed portion of your claim is more than the $500,000.00 limit of the SIPC protection, the Trustee is willing to send you a check for $500,000.00 representing your undisputed SIPC protection; however, you must deliver a Partial Assignment and Release for your $500,000.00 SIPC protection to the Trustee before the Trustee will process your check.

2. For further example, if the Trustee sends you a Determination Notice approving your claim at $300,000.00 and offering to pay $300,000.00 in SIPC protection to you, but you believe that your claim should be approved at $2,000,000.00, you should mail (with proof of delivery) a Statement of Dispute to the Trustee which clearly states (a) the amount of the Trustee's determination that you do not dispute (here, $300,000.00), (b) the amount which you dispute (here, you believe your claim should approved at $2,000,000.00) and (c) the reasons for your dispute of the Trustee's determination. Because the undisputed portion of your claim is less than the $500,000.00 limit of the SIPC protection, the Trustee is willing to send you a check for $300,000.00 representing your undisputed SIPC protection; however, you must deliver a Partial Assignment and Release for your $300,000.00 SIPC protection to the Trustee before the Trustee will process your check. If it is later determined that the Trustee is correct, $300,000.00 will be your allowed claim and you will have no further claim. If it is later determined that you are correct, you will receive the remainder of your SIPC protection (here, $200,000.00) and you will have an additional allowed claim of $1,500,000.00. The unpaid portion of your claim will go into the pool of unpaid customer claims on which the Trustee intends to make further distributions in the future.

iv.   Once your SIPC protection check has been issued to you, the Trustee will work with you in good faith to reconcile the disputed portion of your claim.

v.   If the parties are not able to resolve the dispute, you and the Trustee will file a stipulation with the Bankruptcy Court stating that the undisputed portion of the claim that has been paid and describing the nature of the dispute. A hearing will be set by the Bankruptcy Court to determine the dispute.

vi.   If you have questions regarding the process for seeking the payment of the undisputed portion of your claim, you can contact Kelly Burgan at (216) 861-7665 or at kburgan@bakerlaw.com.

# EXHIBIT D

# Calendar No. 1236

| 91st Congress<br>2d Session | } | SENATE | { | Report<br>No. 91–1218 |

## SECURITIES INVESTOR PROTECTION CORPORATION

---

September 21, 1970.—Ordered to be printed

---

Mr. Muskie, from the Committee on Banking and Currency,
submitted the following

## REPORT

### [To accompany S. 2348]

The Committee on Banking and Currency, to which was referred the bill (S. 2348) to establish a Federal Broker-Dealer Insurance Corporation, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

#### THE NATURE AND PURPOSE OF THE LEGISLATION

By amendment of the Securities Exchange Act of 1934, S. 2348 establishes the Security Investor Protection Corporation (SIPC), the broad purpose of which is to afford financial protection for the customers of registered brokers and dealers and members of national securities exchanges. The Corporation would be private, nonprofit, and membership in nature, with a five member board of directors the majority of whom would be public officials serving *ex officio*. The Corporation would maintain and administer an insurance fund which would provide coverage against customer losses up to $50.000 resulting from broker-dealer firms' insolvency. The fund would, at the outset, aggregate $75 million in lines of credit and cash raised by assessment of member firms. It would eventually total $150 million composed entirely of cash. For backstop protection, Treasury borrowing authority of $1 billion would be available in the event of exhaustion of these funds. The Securities and Exchange Commission is given, in this proposal, plenary authority over the Corporation's exercise of its powers and responsibilities. The Commission is accorded, moreover, unambiguous power to provide safeguards with respect to the financial responsibility of brokers and dealers to whatever extent is required by the public interest. This is accomplished through redefinition and clarification of existing rule-making authority.

48–010

Item 237

## 2

### HISTORY OF THE LEGISLATION

The bill, S. 2348, was introduced by Senator Edmund S. Muskie on June 9, 1969, and was referred to the Committee on Banking and Currency. An amendment to this bill was introduced by Senator Muskie on April 9, 1970, and hearings were held by the Committee on April 16 and 17, June 18, and July 16, 1970. On September 15, the full Committee met in executive session and ordered S. 2348, as amended, to be reported to the Senate.

The title of the original S. 2348 has been changed to be more consistent with the provisions of the amended bill, the title reported by the Committee is, "To provide greater protection for customers of registered brokers and dealers and members of national securities exchanges."

### THE NEED FOR LEGISLATION

The economic function of the securities markets is to channel individual and institutional savings to private industry and thereby contribute to the growth of capital investment. Without strong capital markets it would be difficult for our national economy to sustain continued growth; indeed, the state of U.S. capital market development more advanced than that of any other industrial country, is an important contributing factor in the rapid economic growth this country has experienced. Securities brokers support the proper functioning of these markets by maintaining a constant flow of debt and equity instruments. The continued financial well-being of the economy thus depends, in part, on public willingness to entrust assets to the securities industry.

There are in this country approximately 26 million securities investors, many of whom have either cash or securities or both in the custody of broker-dealers. There are, in addition, perhaps 100 million people who have interests in securities through mutual funds, banks, pension funds, insurance companies, and other institutions. At the beginning of 1970, New York Stock Exchange member firms held just under $3 billion in free credit balances; a year earlier, the figure was as high as $3.7 billion. Free credit balances are funds left with a brokerage firm by customers who have the right to withdraw them on demand. These credit balances are used by the broker, as by banks, in the conduct of his business—to maintain positions in securities, to finance margin purchases of other customers, and for other general purposes.

Similarly, broker-dealer firms hold substantial amounts of securities for safekeeping; customers have an unrestricted right to delivery of those securities which belong to them. Typically, these securities are freely transferable by the broker-dealer. This permits prompt execution of customer orders, but also invites the risk that transfer may occur without express customer orders, or may be reached by creditors of the firm if the requirements of "segregation" are not properly observed. Data are not available to indicate the value of securities thus held, but it is known that the largest brokerage firm has holdings of about $18 billion. A common estimate of cash and securities in the custody of brokers is $50 billion.

The securities industry has for some time been in a precarious condition. A number of events have conspired over the past few

**3**

years to create a significant number of failures of brokerage firms both large and small, and substantial operating losses in many others. The rapid growth of the industry during the 1960's, spurred by the enormous unanticipated increase of trading volume, laid the foundation for the industry's present difficulties. Increasing volume could not be handled by traditional methods, and by the latter part of the decade evidence mounted of general breakdown in the industry. "Fails" to deliver securities became a commonplace complaint; errors of reporting and accounting, as well as fraud, multiplied.

Brokerage houses began, sporadically, to take steps to correct the ills created by high volume. Automation and other innovations were gradually introduced, albeit at high cost. Such costs could be sustained in the high-profit period that came to a close in 1969, as could the expanded commitments of office space, personnel and other administrative factors that the industry undertook in this period. But with the decline of stock market volume and price, the high-cost inheritance of the earlier years added an unmanageable burden to the problems of the industry. Insolvencies rose sharply in 1969 and 1970, and dollar losses mounted correspondingly.

In April of this year, the Securities and Exchange Commission approved a temporary surcharge on brokerage commissions because of the industry's deteriorating financial condition. Chairman Budge, after expressing his concern with "the financial problems of the industry and the losses sustained in the past year and during the first quarter of 1970," stated that the Commission had imposed the surcharge on the understanding that the industry required "immediate financial relief." Following a recent SEC hearing, the Commission decided to extend the surcharge indefinitely; the financial circumstances of the industry had not improved by that date.

The self-regulated stock exchanges had by 1964 begun to create voluntary trust funds based on assessments of member firms, and by 1968 all major exchanges had established such funds. But they are small in comparison with the total dollar volume of trading, with the value of customer assets held by brokerage firms, or with the net losses created by insolvencies of member firms in the past two years. Moreover, the exchanges maintain that the establishment of trust funds and associated publicity nevertheless creates no legal obligation to the customers of member firms, although questions in this regard have recently been raised. The New York Stock Exchange alone has commitments against its trust fund totalling about $55 million, which required an infusion of $30 million this spring. But without additional assessments, the industry's ability to meet any new customer losses is at best conjectural. Finally, no trust fund exists for the customers of broker-dealers who are not members of an exchange.

Apart from the voluntary trust funds, there is no protection presently available under existing securities laws for the investor whose broker goes bankrupt. The Securities Act of 1933 requires that investors have adequate information to exercise sound judgment concerning the securities they purchase; and the Securities Exchange Act of 1934 insures that they will not be victimized by fraudulent, manipulative, or deceptive selling schemes. But neither statute prevents the investor from losing his entire investment if his broker fails because of operational and, ultimately, financial difficulties.

## 4

The Security Investors Protective Corporation (SIPC), like the Federal corporations that ensure savings and demand deposits, is intended to serve several purposes: to protect individual investors from financial hardship; to insulate the economy from the disruption which can follow the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss.

This bill makes no change in existing law relating to the acceptance of deposits by brokers and dealers. Section 21 of the.Banking Act of 1933 forbids underwriters to accept deposits. That section also makes it a criminal offense for others to engage in the business of accepting deposits unless they conform to the requirements which banks are chartered, supervised and examined (Title 12 U.S.C. 378).

### SECTION-BY-SECTION ANALYSIS

The purposes of this legislation are accomplished by amending existing section 15(c)(3) of the, Securities Exchange Act of 1934 and by adding,. as section 2, new section 35 to the Act.

*Section 35(a)* establishes the Securities Investor Protection Corporation (SIPC) as a non-profit corporation under the District of Columbia Non-Profit Corporation Act, and specifically designates it not to be an agency of the United States Government. This provision is intended to. maintain consistency with the self-regulatory character of the securities industry under the overall supervision and oversight of the SEC. The Corporation. is a membership corporation· whose. members are to consist of brokers and dealers registered with the Commission, and members of national securities exchanges. Unless otherwise exempted. by the Commission, membership is obligatory except for those brokers and dealers who neither hold free credit balances for customers nor hold securities for them which may be "hypothecated"— i.e., pledged by the broker against loans. For this category, membership in SIPC is voluntary. The purpose of this distinction is to place the burden of membership costs in SIPC upon those brokers and dealers whose activities place their customers' securities and or cash holdings at risk. At the same time, there may well be brokers and dealers who, although they create no such risks for their customers, may wish to take advantage of SIPC membership as a general asset in the conduct of their business.

*Section 35(b)* vests control of the Corporation in a Board of Directors of not more than five persons. Control of the Board is vested in a majority of three directors serving *ex officio:* The Chairman of the Securities and Exchange Commission, the Chairman of the Federal Reserve Board, and the Secretary of the Treasury. The Committee indicated its preference that the Chairman of the Securities and Exchange Commission serve as Chairman of the Board of SIPC, but determined to leave this choice, from among these three directors, to the discretion of the President. In addition, two members would be appointed by the President, with the advice and consent of the Senate, from the public.

The Chairman of the SEC lends to the SIPC the authority and experience with securities regulatory matters that will be essential to the proper operation of an insurance plan for the industry. The

5

Chairman of the Federal Reserve Board represents the important relationship that exists between the securities industry and the banking community, already acknowledged by the fact that the Federal Reserve Board exercises control over margin requirements. A place on the Board of Directors for the Secretary of the Treasury is appropriate because of the important role that the Treasury borrowing authority plays in the SIPC proposal. The minority membership of the Board is reserved to two Presidential appointees who, in the Committee's recommendation, would be selected, among other reasons, for their experience and background in the securities industry. This will ensure a high degree of industry participation in the management of SIPC.

The Committee considered several alternative Board arrangements. In structuring SIPC, the Committee has been conscious of the history of self-regulation in the securities industry and of the desire of the industry to preserve that system. Thus, SIPC is established as a private membership corporation. But because SIPC will have ultimate access to public funds by provision of the $1 billion of Treasury borrowing authority, it was considered in the public interest to provide a majority of the Board of Directors, including the Chairman, from the public sector. Similarly, proposals were rejected that would involve a private Board which, in the event of a Treasury borrowing, would add public officials to constitute a public majority. Since the rate of use of the private funds, under a private majority, must affect the speed with which SIPC arrives at the need for Treasury borrowing, it is evident that the private board would in this case have a real and potentially undesirable influence on the use of public funds.

*Section 35(c)* establishes the general corporate powers of SIPC, which will, in addition, have the powers of a corporation under the D. C. Non-Profit Corporation Act. The powers conferred here are in addition to those specifically granted elsewhere in section 35.

*Section 35(d)(1) and (2)* grants power to the Securities and Exchange Commission to inspect the Corporation and to require books and reports without resort to subpoena power. The SIPC is also authorized and directed to establish a fiscal year and to prepare and submit annual reports, including certified financial statements, to the Commission upon which the Commission may comment and then forward to the President and the Congress.

*Section 35(e)* establishes the insurance fund, into which all moneys are to be paid and from which all expenditures are made. Moneys collected or received may be revenues from regular assessments, revenues from a transaction charge when and if levied, any transfers to the Corporation from existing trust funds, the proceeds of any borrowing by the Corporation, and recoveries the Corporation may make, as subrogee, from the estates of bankrupt brokers and dealers, and interest earnings. Expenditures include the salaries of officers, directors, or employees of the Corporation, administrative and business expenses, advances to complete open contracts for customers, and advances to pay the claims which are the main purpose of this proposal: to pay unsatisfied claims of customers up to $50,000.

This section also establishes initial and future funding levels for the Corporation. The fund is to aggregate $75 million within 120 days. Part of this will be a firm line of credit which industry representatives are presently negotiating with a consortium of banks. The Committee

4637

6

understands that this firm line of credit will initially amount to $65 million, and will decline annually by $10 million. The Committee further understands that negotiation of this firm line of credit is not yet complete, but will in fact be so by the effective date of this proposed legislation.

In addition to the line of credit, the fund will be invested at the outset—within 120 days—with at least $10 million in cash. This will result from an assessment of one-eighth of 1 percent of 1969 gross revenues of SIPC members, which is expected to yield approximately $7 million, and a transfer of about $3 million from existing trust funds of self-regulatory bodies. Thus the Corporation will commence operations with assets within 120 days of $75 million to provide almost immediate protection against customer losses. Industry representatives have made clear to the Committee that such losses sustained by firms in capital violation prior to the effective date of this legislation are regarded as an industry responsibility. The Committee is nevertheless aware that additional weaknesses may appear on the horizon which may require substantial financial assistance. Hopefully, the very establishment of SIPC will serve to reduce this likelihood.

Apart from the initial assessment rate of one-eighth of 1 percent, the regular annual assessment, to be in effect until the fund aggregates $150 million, will be one-half of 1 percent of the gross revenues of the previous 12 month period. The dollar implications of this assessment rate, which commences with enactment of the legislation, will of course depend on the course of future gross revenues in the securities industry. On the assumption of growth of 5 percent annually, this assessment rate would enable the fund to reach $150 million before the end of the fifth year of operation. More or less rapid growth of industry revenues would, of course, either shorten or lengthen this period.

The proposal provides that upon reaching $150 million, the Corporation will phase out of its fund all lines of credit, replacing these lines with cash. During this period of credit phase-out, the Corporation will endeavor to reduce the annual assessment rate to an average level no higher than one-quarter of 1 percent. When eventually the fund consists of all cash, the assessment rate presumably would be reduced further to a sustaining level. In the event that the fund at any time falls below $100 million (or a lesser amount, if the Commission, with the approval of the Secretary of the Treasury, determines) the assessment rate is to revert to the one-half of 1 percent level.

Except during periods when the maximum rate is in effect, the Committee does not contemplate that all members of SIPC would pay the same assessment rate. The bill contemplates that the SIPC, subject to Commission determination, will develop a formula by which assessments will be geared to any or all of several risk factors, as well as to gross revenues of the member firm: such factors specifically include net capital, the nature of the business, the number of customers, the dollar volume of transactions, and such other factors as the Commission may regard as pertinent.

In developing the assessment schedule. the Committee was guided by a number of considerations. Among these is the recent history of numerous failures in the industry, and the evidently substantial amounts required to protect customers of the major exchanges against loss. In addition, there emerged some question about the viability of

7

the proposee bank line of credit, which seemed to be based on uncertainty on the part of the banking community over the adequacy of the Fund's cash endowment as contemplated in an earlier industry proposal. Accordingly, after consultation with Treasury officials and others, the present assessment schedule was adopted; the Administration and the Committee agree that this schedule provides for adequate growth of financial strength, without being excessively onerous by comparision with other federally sponsored insurance programs.

"The language provides, in Section 35(e)(3), that the maximum assessment for any twelve-month period shall not be in excess of one half of 1 percent. During the first twelve-month period, however, the effective rate of assessment will be five eighths of 1 percent, because of the one-time start-up assessment of one-eighth of 1 percent. The Committee has left to SIPC the responsibility for developing a suitable schedule for payment of the assessment, subject only to the limits provided by the legislation.

Section 35(f)(1) defines "gross revenue" as income derived from eleven enumerated sources. Each source is intended to be computed separately, and thus a loss in one area cannot be taken as a set-off against the others, nor is provision made for a carry-over from year to year. The eleven sources of revenue are (1) commissions from transactions in securities and markups on transactions; (2) execution and clearance; (3) net realized gain from trading accounts; (4) net underwriting profit; (5) interest on customer accounts; (6) advisory fees or management fees; (7) fees for proxy solicitation; (8) services charges or surcharges; (9) dividends and interests on investment accounts; (10) fees for puts and calls; and (11) income from other investment banking services. The Committee, by amendment, expressly considered the term "securities" to include real estate and oil and gas interests, whether or not they are registered with the Commission. The "business" of a broker or dealer includes subsidiaries and any business to which it has succeeded. The definitions in this section may be elaborated on by the Corporation.

Section 35(f)(2) provides for the filing by brokers and dealers of reports concerning their activities including the amount and sources of revenues. The reports are filed with the broker's examining authority, which is a self-regulatory body selected by the Corporation to assume responsibility for examining that broker. The provision is intended to avoid duplication in the case of membership in more than one self-regulatory organization. The Commission itself will act as examining authority for SECO brokers. These reports must be filed, in whole or in part, with the Corporation, to the extent that the Corporation prescribes.

Section 35(f)(3) provides that assessments are to be collected by the examining authority; where the Commission is the examining authority they are to be paid directly to the Corporation.

Section 35(f)(4) provides for the transfer of existing trust funds to the Corporation, and makes these transfers a credit against future assessments on the members of the organization which made the transfer. No credit is given, however, when a borrowing from the Treasury is outstanding. As noted earlier, testimony given by representatives of the industry indicated that such transfers at the outset of the program would amount to some $3 million.

8

*Section 35(f)(5)* establishes the general power of the Corporation to borrow and to pledge to secure borrowings. The Corporation may determine the terms of any borrowing except borrowings from the Treasury. Such borrowings are technically effected through the Commission, and must be at a rate of interest equal to that payable by the Commission to the Treasury.

*Section 35(g)* provides, in essence, for borrowing by the Corporation (indirectly) from the Treasury of up to $1 billion. The borrowings are to be made by the Commission from the Treasury, and thereafter lent by the Commission to the Corporation. The Corporation must file with the Commission a statement with respect to the use of the proceeds and the Commission must certify to the Secretary of the Treasury that such a loan is necessary. The interest on the loan is to be set at a level related to the then-current yield on comparable Government obligations.

The Committee sets the Treasury borrowing authority at $1 billion as a figure unlikely to be required in any except the most extreme situations of financial stress. Throughout the recent lengthy period of strain and instability in the securities markets, the accumulated losses of all firms that have become insolvent have not, taken together, begun to approach this figure—indeed, they appear not to have aggregated as much as the $75 million fund with which SIPC will start its career. But for insurance of this type to be effective, it must be adequate to meet an extreme situation, no matter how remote may be the possibility of its occurrence. The Committee believes that $1 billion is sufficient to assure that all claims will be met, even in situations of extreme financial distress.

Assessments as described in a preceding section should be sufficient to finance the insurance fund under non-extreme conditions. However, those assessments would not be adequate to service and to repay any large borrowings from the Treasury. This will be particularly true during the early years of the fund, when a large (but declining) proportion of the private fund will consist of standby credits from private banks. If, as may reasonably be expected, the Corporation will be able to confine its borrowing to commercial banks under the line of credit, the entire one-half of 1 percent would be available to service such loans, allowing full repayment in an acceptably short time period. However, if the Corporation finds it necessary, in addition, to borrow from the Treasury, only half of the annual assessment (i.e., one-quarter of 1 percent) would remain available to repay bank credit, because the rest must be set aside for servicing the Government's loan. In light of this, the bank line of credit now being negotiated by industry representatives provides that the Corporation will reduce the principal amount of the agreement by $10 million annually.

The Corporation would then have revenue from the remaining one-quarter percent for servicing the borrowing from the Government, plus any unused portion of the remaining one-quarter of 1 percent. If industry gross revenues rise by 5 percent annually, this assessment rate would be enough to pay interest on, but not amortize, a Government loan ranging from $144 million to $321 million, depending upon the market rate of interest. If provision is made for repayment, the amount would be correspondingly smaller.

For this reason, the Committee considered that an additional, contingent source of revenue might prove necessary to assure repayment

9

of funds advanced by the Government. A transactions charge of up
20 cents per $1 thousand is therefore provided by determination of
the Commission in the event of a borrowing from the Treasury. The
transactions charge does not apply to transactions under $5,000; its
incidence, therefore, falls largely on institutional and other substantial
investors and only to a minor extent upon individuals with more
modest security holdings. The charge would raise an estimated $31
million if imposed in the current year. The additional revenue will
permit the servicing of very substantial additional amounts of Govern-
ment borrowing: for example, during the first year at a 7½ percent
interest rate the Corporation could pay interest on $410 million
additional borrowing, or repay an additional $176 million. The trans-
actions fee would be imposed on public purchasers or brokers buying
for investment, except that the Commission may exempt certain
over-the-counter transactions in order to make the conditions of
imposition of fees in the over-the-counter market comparable with
those pertaining to exchange transactions. This is intended to deal
with the situation in the over-the-counter and exchange market where
there may be more than one dealer acting as principal between the
seller and the purchaser.

The assessment rate and the contingency transaction charge
will make the SIPC operation self-financing to a significant degree,
although not entirely. The insurance funds available from combined
private and Government accounts would have been more than
sufficient to meet any requirement of the recent or distant past.
However, the assessment rate has not been actually determined
on the basis of risk experience in the manner of a private insurance
fund. The intention of SIPC, like the FDIC, is to minimize losses
to and to maintain public confidence in the institutions the public
deals with. The Committee has been informed that these arrangements
meet with Treasury approval.

Section 35(h) provides that membership in the Corporation
compulsory only for those brokers and dealers who hold securities
and/or free credit balances for customers. It further provides that
the Commission may exempt from membership in the Corporation any
broker or dealer, or class of brokers and dealers, on any terms it
finds appropriate. The thrust of this subsection is to permit exemption
of those firms which do not, in the nature of their business, expose
public customers to risk of loss. There is, however, provision for
voluntary membership in the Corporation.

Section 35(i)(1) defines the terms "self-regulatory organization,"
"financial responsibility rules," and "examining authority" and de-
termines which self-regulatory organization examines each broker-
dealer.

Section 35(i)(2) exhorts the Corporation and the self-regulatory
organizations to cooperate in establishing standard procedures for
inspections and examinations which will minimize the risk to the fund.

Section 35(i)(3) provides for the filing with the Corporation of such
copies of such reports of inspections and examinations as it shall
prescribe.

Section 35(j) grants to the Commission, in addition to its existing
powers under the '34 Act, the power by rule or regulation to require
any self-regulatory organization: (i) to adopt or amend rules relating
to the frequency and scope of inspections of the financial condition of

10

its members; (ii) to file reports of financial inspections with the Corporation and the Commission; and (iii) to conduct inspections of such of members as the Commission may designate. In exercising its rule-making authority under this subsection the Commission is required by subsection (o) to give notice and opportunity for an Administrative Procedure Act hearing and for the submission of views. The giving a hearing, however, shall not prevent the rule or regulation from becoming effective within 30 days.

*Section 35(k)(1)* provides for adoption by the Board of Directors of initial bylaws, rules and regulations within 45 days after enactment of this Act and the filing of those bylaws with the Commission.

*Section 35(k)(2)* provides that bylaws, rules and regulations and any subsequent amendment or addition thereto shall become effective on the 30th day after filing unless the Commission disapproves them.

*Section 35(k)(3)* provides that the Commission may, by rule or regulation, require (i) adoption of any initial bylaw, rule or regulation and (ii) the adoption, amendment or decision of any bylaw relating to assessments whenever adopted. Like subsection (j), in exercising its rule making authority under this subsection, the Commission must give notice and opportunity for an Administrative Procedure Act hearing and for submission of views.

*Section 35(k)(4)* allows the Commission to request the adoption of any alteration of or supplement to any other bylaw, rule or regulation and if the request is not complied with within 30 days, to order such adoption. The Commission must, however, provide notice and opportunity for a hearing before it enters such order. This procedure is similar to the Commission's authority over exchanges under section 19(b) of the Securities Exchange Act and over the NASD under section 15A(k) of that Act.

*Section 35(l)* provides that it shall be unlawful for a member to engage in business if it fails to pay any assessment or file any report within 5 days after notice from the Corporation that such a report or payment is overdue. In the case of a disputed assessment the member must first pay the assessment and then sue for its recovery.

*Section 35(m)* establishes procedures for prompt orderly liquidation of SIPC members when required and for making prompt distributions and payments on account of customers' claims without need for formal proofs of claim. The liquidation of stockbrokers is at present governed by section 60e of the Bankruptcy Act (11 U.S.C. 96), enacted in 1938. Over the years certain shortcomings in section 60e have become apparent (see, for example, Report of the Special Study of Securities Markets, Part I, page 410 ff.). Because payments of SIPC funds to customers of SIPC members in liquidation can be made only as an integral part of liquidation proceedings, the bill provides that SIPC members will be liquidated in special proceedings outside the Bankruptcy Act. In so doing, it also remedies the shortcomings in section 60e referred to above.

While liquidation proceedings will be under the Securities Exchange Act of 1934, as amended by the bill, and not under the Bankruptcy Act, the bill provides (section 35(m)(6)) that the proceedings will be conducted in accordance with, and as though they were being conducted under, certain prescribed provisions of the Bankruptcy Act. In addition, the bill uses certain terms defined in section 60e with the meanings there established, except as further defined in the bill.

## 11

*Initiation of Proceedings.* The bill provides that SIPC may in its discretion apply to the appropriate federal district court for the appointment of a trustee whenever it appears to it that a SIPC member is in danger of failing to meet its obligations to customers and any of certain other enumerated conditions exist (such as failure to meet applicable financial responsibility rules). If a SIPC member with respect to whom an application is filed (hereinafter called a debtor) fails adequately to controvert any material allegation of the application within three days, the court is required to appoint for the debtor a trustee designated by SIPC: An application may be filed notwithstanding the pendency of any bankruptcy, receivership or other similar proceedings, and all such proceedings are required to be stayed pending and upon appointment of a trustee.

*Liquidation.* In the opinion of the committee, the completion of open securities transactions will be in the interest of the public. It is designed to minimize the disruption caused by a failure of a broker/dealer, precluding the "domino effect" of such failure. Accordingly, the bill requires the trustee to complete all the debtor's open contractual commitments relating to securities transactions in which a customer had an interest. Experience may show that there are certain types of customer transactions which should not be completed, and certain types of non-customer transactions which should be completed. The SEC is therefore given rule-making authority to prohibit or direct completion of these types of transactions. Completion essentially involves a question of the adequacy of working capital. Accordingly, if and to the extent the debtor's available funds are insufficient to complete transactions, SIPC is to provide the funds, with reimbursement to be made to it on a priority basis.

The committee also believes that it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations. The bill requires a trustee to publish and mail notice of liquidation proceedings to customers and, with certain exceptions, requires claims to be filed during a period fixed by the court, but not more than 60 days after publication of the notice. To the extent not previously distributed, securities would be distributed promptly upon the expiration of this period.

Section 60e of the Bankruptcy Act provides for the return to customers of fully paid securities which are "specifically identifiable" as their property. The bill carries forward the 60e concept, among other things, of specific identification except that identification need be made only as of the filing date of the application for appointment of a trustee and except that the bill makes it clear that securities held in bulk segregation or in central certificate services are specifically identifiable. To provide for future developments in the processing and custody of securities, the bill gives the SEC rulemaking authority to establish other types of custody which would constitute specific identification.

Section 60e also provides that property held for customers (other than specifically identifiable property) constitutes a "single and separate fund" in which customers of the debtor are entitled to share ratably. This concept is also carried forward in the bill, except that it is intended that to the extent possible the trustee will deliver to a customer against his claim for securities, the same securities (that is,

12

securities of the same issuer, class and series) which were held for his account on the filing date. For purposes of valuing claims of customers for securities and the extent to which they have been discharged, securities will be valued as of the filing date. To the extent that property in the single and separate fund is insufficient to discharge claims of customers payable out of that fund, SIPC is required to advance funds to the trustee to discharge such claims, but only to the extent that claims of a customer do not exceed $50,000. For this purpose, a broker/dealer is not considered a customer of the debtor except to the extent that claims of such broker/dealer arise out of transactions for customers of such broker/dealer, in which event, each such customer is deemed a separate customer of the debtor.

Because of the difficulties involved in filing proofs of claim involving numerous transactions and varieties of interests, the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.

*Powers of Trustee and Court.* The bill gives the trustee the powers of a trustee in bankruptcy and of a trustee in a Chapter X reorganization. The committee considers it appropriate to vest the trustee with the latter reorganization powers because such powers will be required to operate the business of the debtor pending completion of open transactions, and the delivery of cash securities to customers. The bill specifically provides that no plan of reorganization may be formulated. Reports to the court by the trustee are to be in such form and detail as shall be determined by the SEC, having regard to the record-keeping requirements under the Securities Exchange Act of 1934, and the magnitude of items and transactions involved in the securities business.

In general, the court in which an application is filed is vested with the powers of a court in a Chapter X reorganization and certain powers of a trustee in bankruptcy. The court is specifically denied the power to abrogate the rights of set-off provided in section 68 of the Bankruptcy Act or the right to enforce a valid, non-preferential lien, but it may stay enforcement of such rights for an appropriate period of short duration.

*Section 35(m)(1)* permits the Corporation to apply to a court for a decree adjudicating that customers of a member are in need of protection whenever it concludes that such member is in danger of failing to meet its obligations to customers or is notified of such a situation by the Commission or any self-regulatory body and determines that one or more of certain specified conditions exist. The court must grant such application if it finds any of five specified conditions to exist. These are (i) insolvency in the bankruptcy or equity sense, (ii) the commission of an act of bankruptcy, (iii) the pendency of a proceeding in which a receiver, trustee, or liquidator has been appointed, (iv) noncompliance with financial responsibility rules or rules governing the hypothecation of customers' securities or, (v) inability to make computations necessary to establish compliance.

The paragraph further provides that the Commission may join any other action with such application and finally, that such application supersedes any previously instituted action of a nature indicative of bankruptcy or financial difficulty (e.g. mortgage foreclosure or reorganization) against the member (hereafter called the debtor).