# EXHIBIT L

Helen Davis Chaitman (4266)                          **Hearing Date: December 17, 2009**
Phillips Nizer LLP                                   **Hearing Time: 10:00 a.m.**
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Diane and Roger Peskin,*
*Maureen Ebel, and a large group of other*
*customers*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION
CORPORATION,

                          Plaintiff,                 Adv. Pro. No. 08-01789 (BRL)

          v.                                         SIPA LIQUIDATION

BERNARD L. MADOFF INVESTMENT                         (Substantively Consolidated)
SECURITIES LLC,

                          Defendant.

In re:

BERNARD L. MADOFF,

                          Debtor.

**OBJECTION TO SECOND APPLICATIONS OF IRVING H. PICARD, TRUSTEE,**
**AND BAKER & HOSTETLER LLP FOR ALLOWANCE OF INTERIM**
**COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF**
**EXPENSES INCURRED FROM MAY 1, 2009 THROUGH SEPTEMBER 30, 2009**

        Diane and Roger Peskin, Maureen Ebel, and a large group of other customers of Bernard

L. Madoff Investment Securities, LLC ("Madoff") [1] ("Objectors"), by their attorneys, Phillips

Nizer LLP, object to the second applications for interim compensation of Irving H. Picard,

Trustee, and his counsel, Baker & Hostetler LLP ("B&H").  The Trustee was appointed by this

---

[1] Phillips Nizer LLP files this objection on behalf of all of the customers for whom it has filed objections to the
Trustee's determinations of claims.

Court at the request of the Securities Investor Protection Corporation ("SIPC") in the proceeding

instituted in the United States District Court for the Southern District of New York on December

15, 2008 for the liquidation of Madoff under the Securities Investor Protection Act, 15 U.S.C. §

78aaa, *et seq.* ("SIPA").

1.      SIPA was enacted at the behest of the financial services industry to relieve the

industry of the significant expense of registering securities in the names of investors and to allow

the industry to profit from holding securities in street name.  The inducement to investors to

assume the risks of having their securities held in street name was the promise that their accounts

were insured against the brokers' dishonesty by an insurance fund managed by SIPC and funded

by the financial services industry.

2.      SIPC is obligated under SIPA to "promptly" pay up to $500,000 in SIPC

insurance to Madoff customers (the "Customers") based upon their November 30, 2008

statements (their "Statutory Balances").

3.      The promise of SIPC insurance has been made, for the 40 years of SIPC's

existence, on SIPC's website, in public statements made by Stephen Harbeck, SIPC's President,

by SIPC's members, and by SIPC and the SEC in court filings.  Yet, the Trustee and SIPC have

breached that promise to the Customers, after they placed their reliance on the representation of

coverage.

4.      Instead, the Trustee has invented a new qualification for SIPC insurance: a

customer is only insured, according to the Trustee, for his net investment over generations of

account holders.

5.      However, even as to Customers who have a net investment, the Trustee has defied

his statutory obligation to promptly pay Customers up to $500,000 in SIPC insurance.  As he

2

admits on his website, the Trustee has determined only 3,062 claims, and has allowed only 1,641

of such claims.  http://www.madofftrustee.com/Status.aspx.  The Trustee has also admitted that,

of the 4,903 active accounts that Madoff had as of December 11, 2008, only 2,335 customers,

whose claims total approximately $20 billion, actually lost money under the Trustee's net

investment calculation, even though the November 30, 2008 balances on all the accounts totaled

$64.8 billion.  Exh. A hereto.  Thus, in a period of one year, the Trustee has determined only

approximately 70% of the claims *he acknowledges are valid* and he has wrongfully denied SIPC

insurance to the 2,569 account holders (and others) who are clearly entitled to SIPC insurance

under the plain language of SIPA.

6.       The Trustee has served as SIPC trustee in numerous SIPA liquidations.  SIPC, as

the insurer of Customer accounts, is in a direct adversarial position to the Customers, putting the

Trustee and B&H in an untenable conflict of interest.  As set forth herein, the Trustee and B&H

have taken actions to enrich SIPC at the expense of the Customers, and have done so in direct

contravention of the law.  The adversarial attitude of the Trustee and his counsel is evidenced,

*inter alia,* by the argument they made in their net equity brief that the Customers are chargeable

with Madoff's fraud.   Exh. B at 48-49.

7.       The breach of fiduciary duty by the Trustee and B&H is particularly egregious in

this case because the Madoff fraud has caused an economic tsunami, leaving thousands of

innocent people in the United States with no means of support, and because this  case has

received worldwide focus at a time when the integrity of the United States financial system is

subject to legitimate question.

8.      Yet, rather than fulfill his fiduciary duty, the Trustee is persecuting innocent people who have lost their life savings by threatening to take away their homes and their theft loss tax refunds, which is all they have in the world.

9.      The Trustee and B&H are acting in direct contravention of their fiduciary and statutory duty to Customers and to the public and, in the process, are increasing exponentially and unnecessarily the administrative costs of the estate, depleting SIPC funds that should be used to pay Customer claims at a time when SIPC is insolvent.  Indeed, SEC Commissioner Mary Schapiro testified before Congress on July 14, 2009:

> The tragic truth is there is not enough money available to pay off
> all the customer claims.

See Exh. C at 2. (Webcast at 52:51.)

10.      In the circumstances of this case which has bankrupted SIPC, the Trustee and B&H have a conflict of interest which disables them from serving.  For this reason, and for the other reasons set forth below, Objectors file this objection and offer to prove the facts set forth herein at an evidentiary hearing at a time set by the Court.  This objection constitutes their offer of proof.

**INTRODUCTION**

11.      Objectors are typical of thousands of Customers who invested with Madoff, many over a period of 20 – 30 years, in reliance on the SEC's oversight of the securities industry.  In 1992, the SEC publicly stated that it had investigated Madoff and found no evidence of fraud.  In total, the SEC conducted at least seven investigations involving more than 27 SEC personnel as a result of repeated complaints that Madoff's trading strategy was not accurately represented to Customers.  The SEC repeatedly gave Madoff its stamp of approval.   Now, Customers are told

4

that, at least since the 1980's, Madoff never purchased any of the securities reflected on

Customer statements but, instead, used investors' money for his other business and personal

interests.  See Exh. D, ¶ 4 at 2 and ¶ 9 at 5.

12.    Based upon the purchase and sale confirmations that Madoff sent to Customers,

he went into the market five or six times a year, purchased a portfolio of approximately 25 S&P

100 company stocks; hedged the positions with options to protect against the downside; held the

positions for approximately six weeks; then sold the positions and put the proceeds into US

Treasury bills.   Thus, Madoff appeared to have a conservative, diversified trading strategy.

While his returns were relatively consistent, they were not extraordinary.

13.    By virtue of the fact that Madoff began his investment advisory business in the

1960's and by virtue of the esteem with which he was treated by the SEC and the NASD/FINRA,

thousands of Customers had put all of their life savings and retirement accounts into Madoff.

The Customers, a substantial portion of whom are 70 or older, relied upon regular periodic

distributions from their Madoff accounts in order to fund their daily living expenses, the payment

of their taxes, and their support obligations for family members, as well as to comply with the

mandatory withdrawals from their tax-deferred retirement accounts.  The collapse of Madoff on

December 11, 2008 terminated without warning the sole means of support of many Customers

and their family members across the United States, leaving them without the ability to pay their

mortgages, their taxes, their food bills, or their medical bills.

14.    If ever there was a case where it was essential to comply with Congress' mandate

that SIPC insurance be paid "promptly" to investors, this is such a case.  Yet, with full

knowledge of the devastation that Madoff caused to Customers, and despite the clear provisions

of SIPA as incorporated into this Court's December 23, 2008 order, the Trustee and B&H have

caused needless devastation to Customers by ignoring SIPA's mandate that Customer claims be

paid "promptly" based upon their Statutory Balances.  In the process, the Trustee and B&H have

misrepresented the law to destitute Customers who cannot afford to retain their own counsel,

with the clear intent of inducing Customers to accept less in SIPC insurance than they are

entitled to receive.

15.    While the Trustee has reported that he has already "recovered" $1,183,779,811.89

(Trustee's Second Interim Report at 17), of this amount, $946 million was simply sitting in bank

accounts in Madoff's name at the time the Trustee was appointed, including $301,407,190 at

Mellon Bank, $233,500,000 at JP Morgan Chase, $300 million in securities, and $29 million at

Bank of New York.  Bloomberg.com 1/29/09.

16.    The Trustee's most important function is to promptly pay SIPC insurance to

customers because the United States Attorney's Office has the duty to assure restitution to

victims of Madoff's fraud.  On this score, the Trustee has been an abysmal failure.  Of the more

than 15,400 Customer claims in this case, the Trustee has allowed a mere 1,641 claims in

approximately one year, although even these 1,641 Customers have not all been paid by SIPC.

http://www.madofftrustee.com/Status.aspx.  Despite this pathetic track record, the Trustee and

B&H, exclusive of the numerous other professionals the Trustee has hired, seek approval of fees

and expenses for the period May 1, 2009 through September 30, 2009 as follows:

> Baker & Hostetler LLP as Counsel to the Trustee
> Fees: $21,279,101.85     Expenses: $280,681.62

> Irving H. Picard, Esq. as SIPA Liquidation Trustee
> Fees: $835,605.00         Expenses:  $921.25

17.    The payment of $22 million of SIPC's money to the Trustee and B&H means that

44 destitute Customers will not be paid the SIPC insurance to which they are entitled by the

<center>6</center>

express language of SIPA.  This depletion of SIPC's funds is unjustifiable.  The Trustee still has

not paid SIPC insurance to hundreds of Customers who, as readily determinable from Madoff's

records, are indisputably entitled to $500,000 from SIPC.

18.    At this rate, the Trustee and B&H, exclusive of all the other professionals retained

in this case, will incur administrative expenses of $52 million a year and, undoubtedly, will keep

the case open for seven to ten years.  Thus, the administrative expenses for the Trustee and B&H

alone could easily exceed $500 million.  The administrative expenses are to be paid by SIPC

which, itself, is insolvent and does not have sufficient money to fulfill its insurance obligations

to Customer.  Because of SIPC's insolvency, every dollar paid to the Trustee and B&H is a

dollar taken away from Customers – innocent, law abiding citizens who believed that SIPA was

the law of the land and that their accounts were insured by SIPC for up to $500,000 against the

dishonesty of their broker.

19.    Rather than draw upon the $2 billion lines of credit available to SIPC under SIPA,

SIPC, with the concurrence of the Trustee and B&H, have devised a scheme to allow SIPC to

avoid paying the insurance to which Customers are indisputably entitled.  This scheme began

with the Trustee's invention of a new definition of "net equity."  Although the Trustee's

definition of "net equity" will not be discussed at length here in light of the anticipated

determination of that issue through a separate briefing schedule, his use of such definition should

be mentioned.

20.    In blatant disregard of the law, the Trustee has denied SIPC insurance to anyone

who does not have a net investment over the life of his investment with Madoff.  Under the

Trustee's theory, an investor who invested $100,000 in 1970, which appreciated to $1,600,000 in

2008, is not entitled to any SIPC insurance if, over the course of 37 years, the investor took out

7

$100,000 to pay taxes.   Similarly, according to the Trustee and B&H, a Customer who had an

IRA account from which the Customer took the annual withdrawals mandated by federal law and

paid taxes on the money is not entitled to SIPC insurance if his mandatory withdrawals exceeded

his investment.

21.      By ignoring SIPA, the Trustee has necessitated the additional administrative

expense of having "forensic" accountants determine the net investment of each Customer, in

many cases encompassing 30 – 40 years of records.   The "forensic" accountants, of course, are

also being paid by SIPC with money which should be paid to Customers.  The Trustee's self-

serving *legerdemain* is calculated to save SIPC billions of dollars and, at the same time,

necessitates the incurrence of tens of millions of dollars of unnecessary administrative expenses

that would be avoided if the Trustee simply complied with the law.

22.      As a result of the Trustee's defiance of SIPA, Customers have suffered tragic

additional losses.  Many Customers have been forced to sell their homes on a fire-sale basis in an

extraordinarily depressed market, simply because they did not have the money to cover the

monthly housing expenses for a sufficient period to sell their homes over a more reasonable time

period.   Customers have been forced to put loved ones into nursing homes because they could

not afford to continue to support them in their own homes.  Customers on chemotherapy drugs

have not had the funds to pay for their medical treatment.

23.      In recognition of the unconscionable delay in payment of SIPC insurance to

destitute Customers, but without any statutory authority, the Trustee established a "Hardship

Program" pursuant to which Customers who, through the disclosure of the most intimate

personal information, are deemed in the Trustee's sole discretion to be hardship cases, are

entitled to receive "expedited" treatment.

8

24.    However, the Trustee has given himself more time to pay "hardship" cases than

SIPA contemplates a trustee will need to pay all customers.  The Trustee has given himself an

initial period of 20 days to decide whether or not an individual qualifies for the Hardship

Program.  See Exh. E, ¶ 3.c at 1.  If an individual does qualify, then his claim "will be expedited

in the claims process" but "the Trustee cannot guaranty the timing of determination of any

claim."  *Id*.  The best that an individual can hope for is that, if his account was opened after

January 1, 2006, "the Trustee will endeavor to mail a determination of [the] claim within 20 days

of [the] claim qualifying for the Hardship Program."  *Id*.  Thus, if an individual's account was

opened after January 1, 2006, the Trustee will "endeavor" (but does not promise) to mail a

determination of claim within 40 days, but only if the Customer discloses absolutely everything

about his finances first.  Of course, the time between determination and payment can be another

60 days.

25.    There is no provision in SIPA that contemplates that a trustee will take 60 days to

determine a claim, no matter when the investment was made.  There is nothing in SIPA that

restricts prompt payment to those who can demonstrate to the Trustee's satisfaction that they are

suffering "hardship."  There is nothing in SIPA which allows a trustee to provide for prompt

payment to recent customers and delayed payment to long-standing customers.  That is precisely

why SIPA requires the Trustee to fix a customer's claim at his Statutory Balance.

26.    In fact, the Trustee has denied SIPC insurance to most of the "hardship" cases

because they are elderly, long-term investors who took out more than then invested.   He has also

put the burden on such investors to produce documentary evidence of deposits going back 15 –

40 years.  The Trustee and B&H have taken the position that it is the Customer's burden to prove

his investments and, if the Customer did not retain records from 15-40 years ago, the Customer

9

loses and SIPC wins.  In fact, B&H has informed Customers that the Trustee will not provide Customers with Madoff's own records – as to which the Trustee has exclusive access.  Thus, even if the Trustee has a record of Customer deposits, the Trustee will not make those records available to Customers.  In this way, of course, SIPC can deny coverage to Customers who had no reason to, and did not, retain records of deposits going back 15-40 years.

27.    As to the remainder of the "hardship" cases, the Trustee and B&H have taken months to resolve "hardship" cases, during which the Trustee has sought to exact compromises from elderly, destitute Customers.  In several instances, attorneys at B&H have affirmatively misrepresented the law to "hardship" cases in order to induce them to accept from SIPC less than the sums to which they are indisputably entitled.  In addition, the Trustee has regularly deducted from Customers' SIPC insurance alleged "preferences," despite the fact that SIPA does not authorize such offsets and despite the fact that the Trustee has no right to recover preferential payments from Customers.

28.    The Trustee and his counsel have affirmatively misrepresented the law to elderly "hardship" cases in order to induce them to settle threatened fraudulent conveyance actions before the Trustee has filed a complaint.

29.    Finally, the Trustee and his counsel have secretly subpoenaed bank records concerning Customers for no reason other than to determine if the customers have sufficient assets to satisfy a fraudulent conveyance judgment.  This conduct is unethical and impermissible under applicable law.

**THE TRUSTEE AND B&H HAVE A CONFLICT OF INTEREST**

30.    This Court has a fundamental obligation to monitor the integrity of proceedings before it.  *In re Plaza Hotel Corp.,* 111 B.R. 882, 891 (B.E.D. Cal. 1990).

10

31.    The Trustee owes a fiduciary duty to Customers. *See In re Adler, Coleman Clearing Corp.*, 1998 Bankr. LEXIS 1076 (B. S.D.N.Y. Aug. 25, 1998) ("The parties agree that a SIPA trustee owes a fiduciary duty to the customers and creditors of a liquidating broker dealer akin to the fiduciary duty a bankruptcy trustee owes a debtor's estate and creditors"); *Germain v. The Connecticut National Bank,* 988 F. 2d 1323, 1330 n. 8 (2d Cir. 1993).   A fiduciary duty is the highest duty imposed by law. *See Roberts v. Dayton Hudson Corp*., 914 F. Supp. 1421, 1423 (N.D. Tex. 1996); *see also Enzo Biochem, Inc. v. Johnson & Johnson,* 1992 U.S. Dist. LEXIS 15723, at *29 (S.D.N.Y. Oct. 15, 1992).

32.    The disinterestedness of a trustee's counsel is "so crucial to the proper functioning of the bankruptcy system that a court may raise it and dispose of it whenever its sanctity is questioned." *In re Vebeliunas,* 231 B.R. 181 (B.S.D.N.Y. 1999), *citing In re Martin*, 817 F. 2d 175, 180 (1st Cir. 1978).   A "trustee/fiduciary must be free from any hint of bias," and "either an appearance of impropriety or a potential conflict of interest . . . is a viable cause for removal" of a trustee. *In re AFI Holding, Inc*., 355 B.R. 139 (9th Cir. BAP 2006) (affirming bankruptcy court's removal of Chapter 7 trustee).

33.    The attorney for a trustee must be "disinterested," meaning that the attorney does not have an interest materially adverse to a party in interest in the bankruptcy. *In re Marvel Entertainment Group, Inc.,* 140 F. 3d 463, 476 (3d Cir. 1998). *See* Collier Bankruptcy Manual § 101.13 ("professionals engaged in the conduct of a bankruptcy case should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration."). *See also, In re Crivello,* 134 F. 3d 831, 835 (7th Cir. 1998)*; In re Cook,* 223 B.R. 782, 798 (10th Cir. BAP 1998); *In re BH & P, Inc.,*

11

119 B.R. 35, 42 (D.N.J. 1990); *In re Leslie Fay Cos.,* 175 B.R. 525, 532 (B.S.D.N.Y. 1994)(counsel removed from all new matters in case where counsel was investigating financial irregularities of debtor and did not disclose relationships with directors who were targets of investigation).

34.    Aside from the disinterestedness standard in bankruptcy, under the Rules of Professional Conduct, an attorney cannot represent adverse interests.  Rule 1.7(a) of the New York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.7(a).  An attorney must avoid even the "appearance of a conflict" pursuant to § 327(a) of the Bankruptcy Code.  *In re Hot Tin Roof,* 205 B.R. 1000, 1003 (1st Cir BAP 1997).  Here, B&H represents the Trustee who has a fiduciary duty to Customers.  Yet, B&H is deliberately acting to delay and frustrate the payment of Customer claims, even to the point of misrepresenting the law to destitute Customers who cannot afford to retain their own counsel.  Such misrepresentation is grounds for denial of fees.  *See In re Mercury*, 122 Fed. Appx. 528 (2d Cir. 2004) (affirming denial of compensation to firm that acted as counsel for debtors and counsel for trustee, where the attorneys acted in the interest of the trustee instead of debtors and incorrectly advised debtors regarding their rights to convert Chapter 7 filing to Chapter 11 filing).  It also violates B&H's ethical obligations.  *See* Rule 4.1 of the New York Rules of Professional Conduct, 22 N.Y.C. R.R. § 1200.32 ("In the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law to a third person.")

35.    Under SIPA, SIPC is deemed to be "disinterested."  15 U.S.C. §§ 78eee(b)(6)(A). However, SIPA does not, and could not, provide that a trustee, who is not an employee of SIPC, is "disinterested" or that an attorney retained by the Trustee is deemed, as a matter of law, to be "disinterested," particularly in a case like this where the Trustee and his counsel have flatly

rejected the fundamental mandates of SIPA that were intended to protect customers.   In *In re First State Securities Corp.,* 39 B.R. 26 (B.S.D. Fla. 1984), the bankruptcy court assumed, without analysis or authority, that a trustee who, the court found, was a mere "puppet" of SIPC, was entitled to the imputation of disinterestedness provided by 15 U.S.C. § 78eee(b)(6)(A).  The court simply cited the statute which states:

> SIPC shall in all cases be deemed disinterested, and an employee of SIPC shall be deemed disinterested if such employee would, except for his association with SIPC, meet the standards set forth in this subparagraph.

Since neither the Trustee nor B&H is an employee of SIPC, this provision cannot insulate them from the requirement that the Trustee and his counsel be free of any conflict of interest.

36.    The conflict between the Customers and the Trustee and B&H cannot be more clear.  Indeed, in his brief on the net equity issue, the Trustee argued that the Customers should be chargeable with Madoff's fraud.  Exh. B hereto.  Specifically, the Trustee, through his counsel, B&H, stated that "[t]o the extent the claimants wish to give effect to the transactions reflected on their BLMIS customer statements at the expense of other innocent parties, they would be improperly attempting to benefit from their agent's fraud."  Exh. B at 48-49.

37.    Thus, the Trustee and B&H are far from "disinterested," as shown by their own arguments in this case and have a conflict of interest as a result of which they are barred from receiving any compensation under established precedents and principles of professional conduct. *See In re Angelika Films 57th, Inc*., 246 B.R. 176 (S.D.N.Y. 2000) (affirming bankruptcy court's denial **in its entirety** of fee application of debtor's counsel where counsel represented debtor's principal in other matters and took actions in the bankruptcy that "placed the interests of the Debtor's principal. . . over those of the Debtor.").  They thus should not receive any compensation.

13

## SIPA VIOLATES THE CUSTOMERS' RIGHT TO DUE PROCESS OF LAW

38.    If this Court holds that the Trustee and B&H are deemed as a matter of law to be disinterested notwithstanding their obvious conflict of interest, then the Customers have been denied due process of law as guaranteed to them under the Due Process Clause of the Fifth Amendment to the United States Constitution.  "The bankruptcy power, like other great substantive powers of Congress, is subject to the Fifth Amendment." *Louisville Bank v. Radford*, 295 U.S. 555, 589, 602 (1935); *see also In re Phillips*, 13 B.R. 82 (B. C.D. Ill. 1981). Accordingly, any statutory scheme resulting from Congress' exercise of its Constitutional bankruptcy powers must be constrained by the requirements of the Due Process Clause of the Fifth Amendment.

39.    Evaluating a Fifth Amendment due process claim begins with a two-part analysis: 1) whether the interest asserted rises to the level of a "property interest"; and 2) if it does, the court must weigh the competing interests of the individual and the state to determine what process is constitutionally required.  *Stretten v. Wadsworth Veterans Hospital*, 537 F.2d 361 (9th Cir. 1976).  Congress, through SIPA, has statutorily created a property interest for the Customers: the right to receive SIPC insurance of up to $500,000.  *See* 15 U.S.C. § 78(fff-3). This is a protected "property interest" under the Fifth Amendment  because it is an entitlement to a government benefit conferred by statute.  *See S & D Maintenance Co., Inc. v. Goldin*, 844 F.2d 962, 965 (2d. Cir. 1988); *Garcia v. U.S.*, 666 F.2d 690 (5th Cir. 1982).

40.    While SIPC is not a governmental agency, it is a creation of Congress and performs public functions, one of which is the designation of trustees and counsel in bankruptcy proceedings who have the power, in the first instance, to determine claims.  The conduct of a private entity amounts to state action when, like SIPC, it acts in a judicial or quasi-judicial

14

capacity pursuant to a legislative delegation of authority. *See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 617 (1993); *see also Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447 (1ˢᵗ Cir. 1983).    Here, Congress has created SIPC which functions in a quasi-judicial capacity pursuant to a legislative delegation of authority.

41.    It is axiomatic that "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." *Schweiker v. McClure*, 456 U.S. 188, 195 (1982).  Congress has impermissibly created a statutory scheme that is permeated by partiality, conflicts of interest, and bias by permitting SIPC to appoint and control the Trustee and the Trustee's counsel, regardless of the obvious conflict of interest between SIPC and the Customers.  SIPC has a financial incentive to deny Customer claims and has acted solely to protect its members, the Financial Services Industry, from the obligation to fund the payments to Customers.

42.    In *Schweiker*, the Supreme Court would have found a violation of due process if the carriers, who appointed the hearing officers, had a financial interest in the outcome. *Schweiker*, 456 U.S. at 197 ("In the absence of proof of financial interest on the part of the carriers, there is no basis for assuming a derivative bias among their hearing officers").  SIPA's grant of power to SIPC to select the trustee who, in turns, chooses counsel in bankruptcy proceedings, and designation of SIPC and its employees as statutorily disinterested, violates the Customers' due process rights.  *See Concrete Pipe,* 508 U.S. at 618-19 (where trustee functions in an adjudicative capacity, appearance of bias alone violates Due Process).

**THE TRUSTEE AND B&H HAVE VIOLATED SIPA'S**
**MANDATE TO "PROMPTLY" PAY CUSTOMER CLAIMS**

43.     Congress made absolutely clear its intent to minimize the devastation to

customers of an insolvent broker/dealer through prompt payment of SIPC insurance.  SIPA

requires that SIPC "promptly" pay SIPC insurance to investors of a liquidated brokerage firm:

GENERAL PROVISIONS OF A LIQUIDATION PROCEEDING

**(a) PURPOSES**

The purposes of a liquidation proceeding under this chapter shall be—

(1) **as promptly as possible** after the appointment of a trustee in such liquidation
proceeding, and in accordance with the provisions of this chapter—

(A) to deliver customer name securities to or on behalf of the customers of the
debtor entitled thereto as provided in §78fff-2(c)(2) of this title; and

(B) to distribute customer property and (in advance thereof or concurrently
therewith) otherwise satisfy net equity claims of customers to the extent provided
in this section.

**PAYMENT TO CUSTOMERS.-SIPC shall promptly satisfy all obligations of**
**the member to each of its customers relating to, or net equity claims** based
upon, securities or cash by the delivery of securities or the effecting of payments
to such customer (subject to the provisions of section8 (d) and section **9** (a) )
insofar as such obligations are ascertainable from the books and records of the
member or are otherwise established to the satisfaction of SIPC.

15 U.S.C. **§**78fff-2(c)(2); emphasis added.  *See also,* 15 U.S.C. § 78fff-3(a).

44.     Congress intended for the trustee to promptly pay customer claims based upon the

debtor's books and records, without the filing of proofs of claim:

**[SIPA] establishes procedures** for prompt orderly liquidation of SIPC members
when required and **for making prompt distributions and payments on account**
**of customers' claims without need for formal proofs of claim.**

*             *             *

16

The committee also believes that **it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations.**

\*        \*        \*

**Because of the difficulties involved in filing proofs of claim . . ., the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.**

See Exh. F; emphasis added. (S. Rep. 91-1218, at 10, 11, 12 (1970), *reprinted in* Federal

Securities Laws Legislative History 1933-1982, Vol. IV, at 4642, 4643, 4644 (1983)).

45.    This Court itself has recognized Congress' intent that SIPC proceedings be

conducted quickly in order to minimize the devastation to customers:

Congress itself has commanded **swift** action. For example, the SEC and self-regulatory organizations are required to "**immediately notify**" SIPC of concerns about the financial stability of a SIPC member. 15 U.S.C.A. § 78eee(a)(1). A Court determining that a protective decree is warranted must "**forthwith**" appoint a trustee, 15 U.S.C.A. § 78eee(b)(3), and remove the case to a Court with jurisdiction over bankruptcy cases. 15 U.S.C.A. § 78eee(b)(4). The trustee is required to investigate the operation of the debtor's business and report its results to SIPC "**as soon as practicable**." 15 U.S.C.A. § 78fff-1(d). Among the stated purposes of a liquidation proceeding is to make customers whole "**as promptly as possible after the appointment of a trustee," 15 U.S.C.A. § 78fff(a), who is required to "promptly discharge** . . all obligations of the debtor to a customer relating to securities." 15 U.S.C.A. § 78fff-2(b). **SIPC fund moneys must be advanced to the trustee up to certain limits "to provide for prompt payment and satisfaction of . . . claims of customers." 15 U.S.C.A. § 78fff-3(a). Congress has commanded customer damages to be repaired promptly.**

*In re Donald Sheldon & Co., Inc.*, 153 B.R. 661, 667 (B. S.D.N.Y. 1993); emphasis added.

46.    The December 23, 2008 order entered in this case specifically incorporates the

time periods mandated by SIPA. The Order states:

ORDERED, that the Trustee be, and he hereby is, authorized to satisfy, **within the limits provided by SIPA**, those portions of any and all customer claims and accounts which agree with the Debtor's books and records, or are otherwise

17

established to the satisfaction of the Trustee pursuant to 15 U.S.C. §78fff-2(b),
provided that the Trustee believes that no reason exists for not satisfying such
claims and accounts

December 23, 2008 Order at 5; emphasis added.

47.    The Trustee's complete failure to fulfill his statutory obligations is shown by the

contrast between the treatment of customers by the FDIC and the treatment of Customers in this

case.  As stated in the legislative history of SIPA:

The intention of SIPC, like the FDIC, is to minimize losses to and to maintain
public confidence in the institutions the public deals with.

S. Rep. 91-1218, at 9, *reprinted in* Federal Securities Laws Legislative History 1933-

1982, Vol. IV, at 4641.  See Exh. F.

48.    According to the FDIC's website, "It is the FDIC's goal to make deposit

insurance payments within two business day[s] of the failure of the insured institution."

http://www.fdic.gov/consumers/banking/facts/payment.html.  Yet in this case, the Trustee has

allowed a mere 1,641 claims in approximately one year, although even these 1,641 Customers

have not all been paid by SIPC.  http://www.madofftrustee.com/Status.aspx.

**THE TRUSTEE AND B&H HAVE VIOLATED SIPA'S MANDATE
TO HONOR THE "LEGITIMATE EXPECTATIONS" OF CUSTOMERS**

**The Motivation of the Financial Services Industry to Enact SIPA**

49.    SIPA was enacted in 1970 at the behest of the SEC-regulated broker/dealers (the

"Financial Services Industry") which was seeking to relieve itself of the administrative burden of

having to register customer securities with the issuing corporations every time a customer

purchased new securities for his account.  *See* Joel Seligman, *The Transformation of Wall Street:*

*A History of the Securities Exchange Commission and Modern Corporate Finance,* 451 n.31

(1995) (Prior to enactment of SIPA, "Stock certificates and related documents were 'piled

18

halfway to the ceiling' in some offices; clerical personnel were working overtime, six and seven

days a week, with some firms using a second or even a third shift to process each day's

transactions.").

50.    In addition to the administrative burden of registering securities, the Financial

Services Industry wanted the flexibility and profits that would come with investors allowing the

firms to hold securities in street name. *See An Investor's Guide to the Alternatives of Holding*

*Physical Certificates,* published by the Securities Industry and Financial Market Association,

available at http://www.sifma.org/services/publications/pdf/PhysCertGuide2alternatives.pdf

(stating that the Securities Industry and Financial Market Association "strongly supports and

encourages [street name] type of ownership".

51.    Securities held in street name could be utilized by the brokerage firms to generate

profits for themselves.  The securities could be loaned out, could be sold and repurchased, and

could be borrowed against, while in the possession of the brokerage firms, whereas securities

directly registered in the name of the customer could not be utilized for any purpose by the

brokerage firms**.** *See, e.g.,* 17 C.F.R. 240.8c-1; 17 C.F.R. 15c-1.

52.    In order to induce investors to allow brokerage firms to hold securities in street

name, the Financial Services Industry realized it would have to provide some insurance to

investors for the risk that a broker might be dishonest and steal the street name securities or not

purchase them in the first place.  Hence, the Industry developed the idea of SIPA to provide

SIPC insurance to investors and, thereby, to induce them to invest in securities held in street

name.  This would allow the Financial Services Industry to utilize the investors' securities for

their own enrichment while in the brokers' possession.  As a result of the enactment of SIPA,

19

tens of billions of dollars was invested in the Financial Services Industry in street name

securities.

53.     SIPC insurance is funded by the Financial Services Industry which constitutes

SIPC's membership.  In order to enrich its membership, SIPC chose to charge each member a

mere $150 per year for the privilege of printing on hundreds of billions of dollars of trade

confirmations that customer accounts were insured up to $500,000 by SIPC.  Thus, for example,

Goldman Sachs paid a mere $150 per year to SIPC.  This allowed the Financial Services Industry

to make tens of billions of dollars of profits in the past ten years because the false assurance that

accounts were insured up to $500,000 induced gullible investors to pour money into brokerage

firms.

54.     SIPC's generosity towards its members left it with insufficient funds to pay

Customer claims.  While SIPA allows SIPC to borrow money, SIPC has apparently decided that

it would rather cheat Customers out of their insurance than borrow money and have to assess the

brokerage firms to repay the loans.  *See* 15 U.S.C. § 78 ddd(g) and (h).

**THE TRUSTEE IS DESTROYING INVESTOR CONFIDENCE
NATIONALLY IN DIRECT VIOLATION OF CONGRESSIONAL INTENT**

55.     The purpose of SIPA, as evidenced by its title, was to "protect" investors who

allowed the Financial Services Industry to hold their life savings in street name securities.  *See,*

*e.g.,* H.R. Rep. No. 91-1613, at 3-4 (1970)("[SIPA] will reinforce the confidence that investors

have in the U.S. securities markets.").  *See also In re New Times*, 371 F.3d at 87 ("[T]he [SIPA]

drafters' emphasis was on promoting investor confidence in the securities markets and protecting

broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 794 (6th Cir.

1995) ("'Congress enacted [SIPA] to . . . restore investor confidence in the capital markets[ ] and

20

upgrade the financial responsibility requirements for registered brokers and dealers.")(citations

omitted).  SIPA attempted to do this initially by satisfying customers' "net equity" claims for

securities with actual securities only if the debtor held securities of the appropriate class and kind

to satisfy customers' claims, while otherwise customers would receive the cash equivalent of the

value of their securities on the filing date.  SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat.

1636, 1648-50 (1970); H.R. Rep. No. 95-746 (39-41)(statement of SIPC Chairman Hugh F.

Owens).

56.    When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest

shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments],

*[i.e.],* . . . **the failure to meet legitimate customer expectations of receiving what was in their**

**account at the time of their broker's insolvency**."  D 922 Cong. Rec. H. 36326 (daily ed. Nov.

1, 1977)(statement of Rep. Robert C. Eckhardt)(emphasis added).  See also Hearing on H.R.

8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm. On Interstate

and Foreign Commerce, 94th Cong. 63 (1975)("The basic framework of the 1970 Act in regard to

satisfaction of customers' claims should be modified to better meet the legitimate expectations of

customers.") (report to the SIPC Board of Directors by the Special Task Force to consider

possible amendments to SIPA); Hearing on H.R. 8331 before the Subcomm. on Consumer

Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 95th Cong. 81

(1977) ("The proposed [1978] amendments carry out the Task Force recommendations and are

designed to make the Act more responsive to the reasonable expectations of investors.")

(statement of SIPC Chairman Hugh F. Owens); Hearing on H.R. 8064 Before the Subcomm. on

Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce, 94th

Cong. 161-162 ("[T]he principal purpose of these amendments is to meet more nearly the

21

reasonable expectations of brokerage firm customers.")(statement of SEC Commissioner Philip

A. Loomis, Jr.).

57.    A customer's reasonable expectations were that their actual securities, as shown

on their statements, would be returned to them "in the form they existed on the filing date." H.R.

Rep. No. 95-746, at 21.  Thus, SIPA was amended to state that "[t]he trustee shall, to the extent

that securities can be purchased in a fair and orderly market, purchase securities as necessary for

the delivery of securities to customers in satisfaction of their claims for net equities. . ." 15

U.S.C. § 78fff-2(d); SIPA § 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978).

58.    Here, the legitimate expectations of the Customers were contained in the account

statements and trade confirmations they received.  They expected that their accounts held the

securities reflected therein.  Thus, recognizing Customer claims in the amount of their Statutory

Balances will further the goals of SIPA, as memorialized in the legislative history.

59.    Congress **specifically contemplated** that "securities positions" reflected in a

customer's statements could include securities that were never actually purchased, as was the

case here.  The Senate and House Reports on the 1978 amendments to SIPA show that SIPA was

intended to cover securities that the broker-dealer did not actually purchase:

> Under present law, because securities belonging to customers may have been lost,
> improperly hypothecated, misappropriated, **never purchased** or even stolen, it is
> not always possible to provide to customers that which they expect to receive, that
> is, securities which they maintained in their brokerage account. . . By seeking to
> make customer accounts whole and returning them to customers in the form they
> existed on the filing date, the amendments. . . would satisfy the customers'
> legitimate expectations. . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

> A customer generally expects to receive what he believes is in his account at the
> time the stockbroker ceases business.  But because securities may have been lost,
> improperly hypothecated, misappropriated, **never purchased**, or even stolen, this

is not always possible.  Accordingly, [when this is not possible, customers] will
receive cash based on the market value as of the filing date.

H.R. Rep. No. 95-746 at 21 (emphasis added).

60.    Thus, there is absolutely no support for the Trustee's "cash in minus cash out"
theory in either SIPA or its legislative history.  Instead, the legislative history is in accordance
with the statute: Customers are entitled to claims in the amount of their Statutory Balances,
consistent with their legitimate expectations.

**THE TRUSTEE HAS WASTED SIPC'S FUNDS**

61.    The fees of the Trustee and B&H should not be granted for that portion of their
fees that relates to subpoenaing Customers' financial records from their banks and other sources.
The subpoenas, which have been issued under Bankruptcy Rule of Procedure 2004, seek
information from Customer's banks regarding the Customer's general assets, not just any
investments or withdrawals in Madoff.  Specifically, the subpoenas seek:

All documents concerning any Fund Account, including:

(a) monthly statements, including account numbers;

(b) present and historical account balance information;

(c) incoming and outgoing wire transfer records;

(d) copies of checks, both deposited and drawn;

(e) records reflecting cash activity:

(f) account opening documents and any credit file;

(g) administrative or custodial agreements between the holder of the Fund Account and
[bank]; and

(h) account closing documents.

23

62.     The subpoenas also seek "documents reflecting transfers and/or transactions between Fund Accounts," "documents that reflect or relate to any communications and/or correspondence pertaining to any Fund Account," and "documents, agreements and/or contracts . . . related to any lines of credit/letters of credit maintained by or for the benefit of any of the Fund Accounts or holders of the Fund Accounts."  "Fund Account" is defined as "any account into which any [bank] customer received funds, whether by wire transfer or check, from Madoff. . ."

63.     Although discovery under Rule 2004 is broad, it is not without limitation, particularly as to third parties and as to matters unrelated to the debtor.  *See In re Drexel Burnham Lambert Group, Inc.,* 123 B.R. 702, 711 (B. S.D.N.Y. 1991).  "The examination of a witness about matters having no relationship or no effect on the administration of an estate is improper."  *Id*. (citing *In re Johns-Manville Corp.,* 42 B.R. 362, 364 (S.D.N.Y. 1984) (scope of Rule 2004 discovery is subject to "general restriction of inquiry to the financial affairs of the debtor")).  "It is clear that Rule 2004 may not be used as a device to launch into a wholesale investigation of a non-debtor's private business affairs."  *Matter of Wilcher,* 56 B.R. 428, 434 (B. N.D. Ill. 1985) (language of Rule 2004 "makes it 'evident that an examination may be had only of those persons possessing knowledge of a debtor's acts, conduct or financial affairs so far as this relates to a debtor's proceeding in bankruptcy'") (quoting *In Re GHR Energy Corp*., 35 B.R. 534, 537 (B. D. Mass. 1983)).

64.     B&H has admitted that the sole reason for the subpoenas it has served on Customers' banks is to determine if the Customers have sufficient assets to satisfy a fraudulent conveyance judgment.   However, discovery of an adversary's assets is impermissible absent a judgment.  *Sequa Corp. v. Gelmin,* 1995 WL 404726, *2 (S.D.N.Y. 1995).  "[S]uch discovery is

24

properly reserved for post-judgment proceedings, when a judgment creditor seeks the

information necessary to permit it to enforce the judgment." *Id*. at *3. The only information

concerning Customers' assets that could possibly be relevant at this point in the proceedings

would be information relating to Madoff. But the subpoenas that B&H have served are

unrestricted: they seek all documents concerning the Customers.

65.     In addition, to the extent that Customers are being subpoenaed in order to obtain

information that will allow the Trustee to bolster fraudulent conveyance claims against them

when such claims are ultimately filed, they are improper. The Trustee's effort to circumvent the

traditional rules of discovery by using Rule 2004 is not permitted. *See* 10 Collier on Bankruptcy

¶ 7026.01, 7026-3 (15th ed. 2007) ("If an adversary proceeding or contested matter is pending <u>or</u>

<u>is likely to be filed</u>, it is improper for one of the parties to use a Rule 2004 examination as a

substitute for, or in addition to, discovery pursuant to Rule 26 . . . or to circumvent the rule's

procedural protections provided to the parties and witnesses") (emphasis added) (citing *In re*

*Bennet Funding Group*, 203 B.R. 24 (B. N.D.N.Y. 1996); *In re GHR Energy Corp.*, 35 B.R. 534,

538 (B. D. Mass. 1983) (once party is in position to file suit, it cannot use Rule 2004 to

circumvent FRCP procedural safeguards)).

66.     This pattern of conduct by the Trustee and B&H is another example of them

taking the law into their own hands and disregarding established law in order to accomplish

SIPC's goal of cheating Customers of their statutory rights.

67.     Any fees associated with the subpoena of Customers' bank records, such as

preparation of the subpoenas, motions to compel productions in response to the subpoenas,

responding to objections to subpoenas and related costs should not be allowed by this Court

because such fees were incurred for an illegal and improper purpose. "Sections 329 and 330

25

limit compensation in a bankruptcy case to the reasonable value of the services provided by the
professional. If the compensation paid or agreed to be paid exceeds the reasonable value of
services, the court may order the return of any excess payment to the bankruptcy estate. 11
U.S.C. § 329(b). Even if there are no objections to a fee application, the court has an obligation
to review all fee applications to prevent waste of estate assets or overreaching by attorneys." *In
re: Williams*, 2007 Bankr. LEXIS 2214, at *9 (B.N.D.Ohio June 27, 2007) (disallowing fees in
Chapter 7 case arising from attorneys' filing of improper schedules). *See also In re: Bush*, 131
B.R. 364, 365-67 (B.W.D. Mich. 1991) (reducing amount of fees awarded in Chapter 13 case
from amount requested due to inflated time entries and stating that "[t]he court has an obligation
to examine the propriety of fees and expenses requested even if no objections are raised").

68.    Moreover, if, as here, fees are incurred for "services which were neither
reasonably provided nor necessary in the context of this case," the Court may decline to award
such fees. *In re: Schweitzer, Inc.*, 1999 Bankr. LEXIS 2038, at *19 (B.D.Ida. Jan. 8, 1999)
(declining to award fees for services that the court did not deem necessary or beneficial). Thus,
the Court should deny that portion of the fees that have any relation to the subpoenas served on
the Customers' banks. It appears that these fees would have been incurred in the "Trustee
Investigation" Task Code, which lists "overseeing B&H's issuance of hundreds of inquiry letters
and subpoenas to potentially related third parties concerning BLMIS litigation" as one of the
tasks undertaken. Second Interim Fee Application at 16. The Court should disallow all such
fees and the related expenses.

**CONCLUSION**

For the foregoing reasons, Objectors ask the Court to set a date for an evidentiary hearing
at which they can prove the objections set forth herein. The Trustee and B&H are disabled from

26

serving because, as they have demonstrated repeatedly in the first full year of their service, they

have a fundamental conflict of interest and are working, outside the law, solely to enrich SIPC at

the expense of the Customers to whom they owe a fiduciary duty.

December 14, 2009

PHILLIPS NIZER LLP


By: /s/ Helen Davis Chaitman
666 Fifth Avenue
New York, New York 10103-0084
(212) 841-1320

*Attorneys for Diane and Roger Peskin,
Maureen Ebel, and a large group of other
customers*

27

# EXHIBIT A

## 10/28/09 STATEMENT OF
## IRVING H. PICARD
## COURT-APPOINTED TRUSTEE,
## BERNARD L. MADOFF INVESTMENT SECURITIES
## LLC (BLMIS)

**GOOD MORNING.**

**WELCOME TO THIS NEWS CONFERENCE.**

**MY NAME IS IRVING H. PICARD.  I AM THE COURT-
APPOINTED TRUSTEE FOR THE LIQUIDATION OF
BERNARD L. MADOFF INVESTMENT SECURITIES
LLC...WHICH I WILL REFER TO AS B-L-M-I-S OR
MADOFF.  I ALSO AM A PARTNER IN THE LAW FIRM
OF BAKER & HOSTETLER LLP.**

**AS YOU HAVE HEARD, I AM JOINED TODAY BY
SECURITIES INVESTOR PROTECTION
CORPORATION PRESIDENT STEPHEN HARBECK.**

1

WE WILL BOTH MAKE BRIEF OPENING STATEMENTS
AND THEN TAKE YOUR QUESTIONS.

OUR PURPOSE TODAY IS TO GIVE YOU A DETAILED
UPDATE ON THE MADOFF LIQUIDATION
PROCEEDING – PRIMARILY CUSTOMER CLAIMS
INFORMATION THAT IS NEW AND HAS NOT YET
BEEN DISCLOSED PUBLICLY.

WHAT WE ARE REALLY HERE TODAY TO TALK
ABOUT ARE MAJOR "MILESTONES" – ONE IN
RELATION TO THE MADOFF PROCEEDING AND ONE
IN RELATION TO SIPC HISTORY.  I WILL FOCUS ON
THE FORMER AND STEVE HARBECK WILL ADDRESS
THE LATTER.

I AM REPORTING TO YOU ON THE ACHIEVEMENT OF
A MAJOR MILESTONE IN THE MADOFF LIQUIDATION
PROCEEDING: OVER HALF A BILLION DOLLARS IN
SIPC ADVANCES HAVE BEEN COMMITTED SO FAR
TO MADOFF CUSTOMERS.

2

AS OF NOON EASTERN TIME YESTERDAY THE
TOTAL AMOUNT OF SIPC ADVANCES COMMITTED
TO CUSTOMERS IN THE BLMIS LIQUIDATION
PROCEEDING HAS TOPPED HALF A BILLION
DOLLARS.

I WILL TURN TO CUSTOMER ACCOUNT AND CLAIMS
INFORMATION.. OVER THE LIFE OF BLMIS, WE HAVE
DETERMINED THAT THERE WERE 8,095 CUSTOMER
ACCOUNTS, OF WHICH 4,903 WERE ACTIVE ON
DECEMBER 11, 2008.

BASED ON THE MONEY IN/MONEY OUT
METHODOLOGY WE ARE USING, 2,335 ACCOUNTS
OF THE 4,903 HAD NET LOSSES OF
APPROXIMATELY $21.2 BILLION, AND 2,568
ACCOUNTS RECEIVED MORE THAN WAS
DEPOSITED.

3

AS OF JULY 2, 2009, THE STATUTORY BAR DATE,
WE RECEIVED 15,910 CUSTOMER CLAIMS.  AFTER
THAT DATE, WE HAVE RECEIVED AN ADDITIONAL
64.  THAT IS A TOTAL OF 15,974 CUSTOMER CLAIMS.

OF THE 2,335 "NET LOSER" ACCOUNTS, WE
RECEIVED CLAIMS FOR 2,275 ACCOUNTS.  59
ACCOUNT HOLDERS DID NOT FILE CLAIMS.  WE
HAVE DETERMINED AND ALLOWED 1,558 DIRECT
CLAIMS INCLUDING DUPLICATES ASSOCIATED WITH
1,368 OF THE 2,276 NET LOSER ACCOUNTS.  THAT
IS, WE HAVE DETERMINED AND ALLOWED THE
CLAIMS FOR 56.5% OF THOSE ACCOUNTS.  WE
ALSO HAVE DETERMINED AND DENIED 1,303
CLAIMS.  THUS, TO DATE, WE HAVE DETERMINED
2,861 DIRECT CUSTOMER CLAIMS.

ONE WORD OF CAUTION, I EXPECT THAT THESE
CUSTOMER CLAIM STATISTICS, INCLUDING THE
NUMBER OF CLAIMS FILED, WILL CHANGE AS WE
CONTINUE TO REVIEW AND EVALUATE THEM.  FOR

4

EXAMPLE, WE ARE FINDING THAT MORE THAN ONE
CLAIM MAY HAVE BEEN CLIPPED TOGETHER AND
CONTINUE TO GET MORE VISIBILITY INTO ACCOUNT
HISTORIES.

WE HAVE RECEIVED IN EXCESS OF 11,000 INDIRECT
CUSTOMER CLAIMS.  THEY INCLUDE CLAIMS FROM
INVESTORS IN FEEDER FUNDS, IN VARIOUS
ENTITIES AND WHERE MORE THAN ONE PERSON
HAS FILED A CLAIM FOR ONE ACCOUNT.

LET ME GIVE YOU SOME MORE SPECIFIC DETAIL.
SIPC COMMITTED ADVANCES FOR THE ALLOWED
CUSTOMER CLAIMS FOR 1,368 ACCOUNTS TOTAL
$534,250,113.22.  THAT'S $534.25 MILLION.

YOU WILL HEAR FROM STEVE HARBECK IN A
MOMENT.  HE WILL PUT THAT INTO PERSPECTIVE
FOR YOU IN TERMS OF SIPC HISTORY.

5

I WANT TO MAKE CLEAR THAT THE $534.25 MILLION IN SIPC COMMITTED ADVANCES FOR THE ALLOWED CUSTOMER CLAIMS THAT HAVE BEEN DETERMINED IS A SUBSET OF THE TOTAL ALLOWED CLAIM FIGURE OF $4.43 BILLION.

TO THE EXTENT THAT WE RECOVER CUSTOMER PROPERTY FROM WHATEVER SOURCE, WE WILL BE ABLE TO MAKE PRO RATA DISTRIBUTIONS AGAINST THAT LARGER ALLOWED CLAIM TOTAL.

IN CLOSING, I WANT TO EMPHASIZE HOW PLEASED I AM TO BE ABLE TO REPORT THAT WE HAVE MADE SIGNIFICANT HEADWAY IN RECENT MONTHS IN THE PROCESSING OF BLMIS CUSTOMER CLAIMS UNDER WHAT HAVE BEEN VERY CHALLENGING CIRCUMSTANCES.

WITH MORE THAN $4.43 BILLION IN CUSTOMER CLAIMS ALREADY ALLOWED AND ADVANCES OF OVER HALF A BILLION COMMITTED BY SIPC, MY

6

**STAFF CONTINUES TO WORK TIRELESSLY TO ENSURE THAT EVERY BLMIS CUSTOMER WITH A VALID CLAIM IS GIVEN FULL CONSIDERATION AND HANDLED AS EXPEDITIOUSLY AS POSSIBLE.**

**THAT WILL CONTINUE TO BE OUR FOCUS IN THE COMING WEEKS AND MONTHS.**

**THAT CONCLUDES MY OPENING REMARKS.  I LOOK FORWARD TO TAKING YOUR QUESTIONS.**

# Madoff Trustee Advances $534 Million to Customers (Update3)

**Share | Email | Print | A A A**

By Erik Larson

Oct. 28 (Bloomberg) -- The liquidator for **Bernard Madoff's** firm approved initial repayments of $534.2 million to 1,558 victims who invested directly with the con man's firm. Another 1,303 victims had their claims denied.

The payments are advances on the group's allowed claims of $4.43 billion, trustee **Irving Picard** said today in a conference call. Verified losses from the fraud now exceed $21 billion, he said.

"We have made significant headway in recent months in processing customer claims in challenging circumstances," said Picard, hired by the Securities Investor Protection Corp. to wind down Bernard L. Madoff Investment Securities LLC. "We are handling these claims as expeditiously as possible."

About 16,000 have been filed since Madoff's Dec. 11 arrest for running a $65 billion Ponzi scheme, Picard said. The sum includes more than 11,000 indirect claims from investors whose money went to Madoff through third-party entities, such as hedge funds.

Picard's team has recovered about $1.4 billion in assets to repay victims, and filed so-called clawback lawsuits seeking the return of about $15 billion in fake profit from Madoff's biggest investors and beneficiaries. More suits will be filed, he said. Victims with allowed claims will receive a share of the money Picard recovers.

$21.2 Billion Loss

Picard's method for calculating claims, using cash deposits minus withdrawals, triggered objections in U.S. Bankruptcy Court in New York. Many victims want years' worth of fake profit included in their claims. A judge will decide if his methodology is correct at a hearing scheduled for Feb. 2.

Madoff's fraud resulted in an actual loss of $21.2 billion for 2,335 accounts, Picard said. The previous number of about $13 billion came from records in the criminal case in June and applied to fewer accounts, he said. The figure could rise as more data is uncovered.

Over the life of Madoff's New York-based company, there were about 8,000 accounts, of which about 4,900 were active when the fraud collapsed, Picard said. More than 2,500 customers took more money than they deposited and may be sued, he said.

Review Accounts

"Over the next six to nine months, we're going to be taking a very close look at those accounts on an individual basis," Picard said. "We're not going to be suing people who don't have money."

Picard's team had reviewed claims as far back as 1983, and plans to review accounts from the 1970s by analyzing Madoff records on microfilm and microfiche, he said.

Madoff, 71, pleaded guilty to the fraud and is serving a 150-year sentence.

The bankruptcy case is already bigger than all 321 SIPC liquidations performed since 1970, when Congress passed the law that creating the entity, SIPC President **Stephen Harbeck** said. SIPC is funded by the brokerage industry.

The case is Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, 08-01789, U.S. Bankruptcy Court, Southern District of New York (Manhattan).

To contact the reporter on this story: **Erik Larson** in New York at **elarson4@bloomberg.net**.

*Last Updated: October 28, 2009 14:11 EDT*

©2009 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

# EXHIBIT B

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

Hearing Date:   February 2, 2010
Hearing Time:  10:00 AM (EST)
Objection Deadline: November 13, 2009

*Attorneys for Irving H. Picard, Esq., Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER UPHOLDING TRUSTEE'S DETERMINATION DENYING "CUSTOMER" CLAIMS FOR AMOUNTS LISTED ON LAST CUSTOMER STATEMENT, AFFIRMING TRUSTEE'S DETERMINATION OF NET EQUITY, AND EXPUNGING THOSE OBJECTIONS WITH RESPECT TO THE DETERMINATIONS RELATING TO NET EQUITY**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

PROCEDURAL HISTORY ..............................................................................3

STATEMENT OF FACTS ................................................................................6

I.     The Structure of BLMIS And Its Collapse ............................................6

II.    The Fraudulent Scheme .........................................................................9

    A.    The Purported "Split-Strike Conversion" Strategy ....................9

    B.    Non-Split-Strike Conversion Customer Accounts ...................12

    C.    Entry Into The BLMIS Fund ....................................................13

    D.    The BLMIS 703 Account .........................................................14

    E.    Generation Of The BLMIS Customer Statements....................16

    F.    Customers Did Not Have Enough Funds To Purchase Securities On Their Statements .................................................17

    G.    BLMIS Customers' Investments Were Never Exposed To The Market............................................................................18

III.   SIPA and SIPC .....................................................................................20

    A.    Congress Enacted SIPA To Promote And Protect The Market Economy By Providing Protection To Customers Against Broker Insolvency.................................................................20

         1.    The Chandler Act....................................................21

         2.    SIPA As Enacted In 1970........................................22

         3.    SIPA As Amended ..................................................24

         4.    Net Equity Under SIPA ...........................................24

         5.    Use Of SIPC Funds To Satisfy Customer Claims ........................25

         6.    Determination Of Whether Claims Are For Cash Or For Securities ...........................................................25

         7.    The "Books and Records" Requirement....................................26

IV.   Customer Claimants .............................................................................27

    A.    "Net Winners" ..........................................................................27

    B.    "Over-the-Limits Net Losers That Have Received Full SIPC Protection"...............................................................................28

    C.    "Under-the-Limits Net Losers That Will Not Receive A Full $500,000 in SIPC Protection" .................................................28

## TABLE OF CONTENTS

(continued)

Page

ARGUMENT ...................................................................................................30

I.  The Trustee's "Cash-In/Cash-Out" Calculation Of Net Equity Mirrors The
    Standard Judicial Treatment of Ponzi Schemes And Has Been Specifically
    Upheld Under SIPA..................................................................................30

    A.  The Standard Treatment Of Ponzi Schemes Is Based On Net
        Investment. ....................................................................................30

    B.  The "Cash In/Cash Out" Methodology Has Been Applied To Prior
        Ponzi Schemes Under SIPA. ..........................................................33

    C.  Fictitious Profits Paid Out In Ponzi Schemes Are Recoverable..............33

    D.  The Second Circuit's Decision In *New Times I* Supports The
        Trustee's Methodology ...................................................................35

        1.  *New Times I* Held That Customers Have Claims For
            Securities Where They Receive Confirmation Statements
            and That Net Equity Claims In A Ponzi-Scheme Case
            Should Not Be Based Upon Fictitious Profits.............................35

        2.  SIPA Does Not Protect Customer Expectations In Fictitious
            Profits. ...............................................................................37

        3.  Because BLMIS Created Fictitious Transactions In A
            Fictitious Market, Customer Claims Should Not Include
            Paper Profits That Have No Relation to Reality. .........................40

II. The Trustee's "Cash in/Cash out" Methodology Is The Only One
    Consistent With SIPA..............................................................................44

    A.  The Fictitious Customer Statements Do Not Reflect Real
        "Securities Positions" ....................................................................44

    B.  The "Books and Records" Requirement Precludes Claims Based
        Upon Fictitious Profits ...................................................................44

    C.  "Customer" Claims Cannot Be Based On Fraudulent Transactions. .......45

    D.  The "Cash In/Cash Out" Method Is The Only One Consistent With
        The Trustee's Power To Avoid Fraudulent Transfers Under SIPA
        and Other Applicable Law................................................................46

    E.  Customers Must Have Valid Net Equity Claims Before They Are
        Entitled  to SIPC Protection. ...........................................................49

III. *Visconsi v. Lehman Brothers* Does Not Support the Objectors.....................51

IV. Basing Net Equity Upon Fictitious BLMIS Customer Statements Would
    Be Inequitable And Make for Poor Public Policy. ......................................52

CONCLUSION ...............................................................................................53

# TABLE OF AUTHORITIES

<div align="right">Page</div>

## Cases

*Abrams v. Eby (In re Young)*, 294 F. 1 (4th Cir. 1923) ................................................31

*Anderson v. Stephens,* 875 F.2d 76 (4th Cir. 1989) .......................................................32

*Arford v. Miller (In re Stratton Oakmont, Inc.)*, 239 B.R. 698 (S.D.N.Y. 1999),
    *aff'd*, 210 F.3d 420 (2d Cir. 2000).........................................................................51

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou
    Group, LLC)*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008)...................................................34

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group,
    LLC)*, 362 B.R. 624 (Bankr. S.D.N.Y. 2007) ............................................................34

*CFTC v. Equity Fin. Group, LLC,* No. Civ. 04-1512, 2005 WL 2143975 (D.N.J.
    Sept. 2, 2005), *adopted in* No. Civ. 04-1512, 2005 WL 2864783 (D.N.J. Oct.
    26, 2005)..................................................................................................31

*CFTC v. Franklin,* 652 F. Supp. 163 (W.D. Va. 1986) ...................................................32

*CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107 (9th Cir. 2000) .......................................31

*Cunningham v. Brown,* 265 U.S. 1 (1924) ...............................................30, 31, 32, 52

*Danning v. Bozek* (*In re Bullion Reserve of N. Am.*), 836 F.2d 1214 (9th Cir.
    1988).......................................................................................................45

*Donell v. Kowell*, 533 F.3d 762 (9th Cir.), *cert. denied*, 129 S. Ct. 640 (2008) .........................34

*Duel v. Hollins*, 241 U.S. 523 (1916) ..........................................................................21

*Exch. Nat'l Bank of Chicago v. Wyatt,* 517 F.2d 453 (2d Cir. 1975)............................20

*Focht v. Athens (In re Old Naples Sec., Inc.)*, 311 B.R. 607 (M.D. Fla. 2002) .....................32, 33

*In re Adler Coleman Clearing Corp.*, 195 B.R. 266 (Bankr. S.D.N.Y. 1996).......................46, 52

*In re Adler Coleman Clearing Corp.*, 198 B.R. 70 (Bankr. S.D.N.Y. 1996).........................20, 21

*In re Brentwood Sec., Inc.*, 925 F.2d 325 (9th Cir. 1991) ..............................................52

*In re New Times Sec. Servs.*, 371 F.3d 68 (2d Cir. 2004).......................................passim

*In re Taubman*, 160 B.R. 964, 986-88 (Bankr. S.D. Ohio 1993) ...................................34

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406
    (S.D.N.Y. 2001)............................................................................................49

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Lawless v. Anderson* (*In re Moore*), 39 B.R. 571 (Bankr. M.D. Fla 1984)...................................34

*McKenny v. McGraw (In re Bell & Beckwith)*, 104 B.R. 852 (Bankr. N.D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991) ..............................................................25

*Merrill v. Abbott* (*In re Indep. Clearing House Co.*), 77 B.R. 843 (D. Utah 1987).....................34

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 247 B.R. 51 (Bankr. S.D.N.Y. 1999), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001) ........................................48, 49

*Official Cattle Contract Holders Comm. v. Commons (In re Tedlock Cattle Co.),* 552 F.2d 1351 (9th Cir. 1977)........................................................................................31

*Official Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442 (Bankr. S.D.N.Y. 2007)........................................45

*Picard v. Madoff, et al.*, No. 09-1503 (BRL) ..................................................................15

*Picard v. Madoff*, No. 09-1391 (BRL) .............................................................................15

*Picard v. Taylor (In re Park South Securities LLC)*, 326 B.R. 505 (Bankr. S.D.N.Y. 2005).........................................................................................................46

*Scholes v. Lehmann*, 56 F.3d 750, 757-58 (7th Cir. 1995)............................................34

*SEC v. Albert & Maguire Sec. Co.*, 378 F. Supp. 906 (E.D. Pa. 1974)......................................21

*SEC v. Byers*, 08 Civ. 7104, --- F.Supp.2d ----, 2009 WL 2185491 (S.D.N.Y. Jul. 23, 2009)..............................................................................................................32

*SEC v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000), *aff'd*, 290 F.3d 80 (2d Cir. 2002) ..................................................32

*SEC v. F.O. Baroff Co.*, 497 F.2d 280 (2d Cir. 1974) ..................................................20

*SEC v. Funding Res. Group*, No. 3-98-CV-2689-M, 2004 WL 1189996 (N.D. Tex. May 27, 2004), *adopted as modified*, No. Civ.A 398CV2689M, 2004 WL 1882972 (N.D. Tex. Aug. 20, 2004)........................................................................31

*SEC v. Packer, Wilbur & Co.*, 498 F.2d 978 (2d Cir. 1974)............................................20, 48, 51

*SEC v. S.J. Salmon & Co.*, 375 F. Supp. 867 (S.D.N.Y. 1974)....................................52

*SEC v. S.J. Salmon & Co.*, 72 Civ. 560, 1973 U.S. Dist. LEXIS 15606 (Aug. 8, 1973)..........................................................................................................47, 48

*Secs. Investor Prot. Corp. v. Barbour*, 421 U.S. 412 (1975) ........................................20

**TABLE OF AUTHORITIES**
(continued)

Page

*Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 401 B.R. 629
(Bankr. S.D.N.Y. 2009)................................................................................45

*Secs. Investor Prot. Corp. v. C.J. Wright & Co. (In re C.J. Wright & Co.)*, 162
B.R. 597 (Bankr. M.D. Fla. 1993)................................................................32

*Secs. Investor Prot. Corp. v. Charisma Sec. Corp.*, 371 F. Supp. 894 (S.D.N.Y.),
*aff'd*, 506 F.2d 1191 (2d Cir. 1974)..............................................................52

*Secs. Investor Prot. Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314 (2d Cir.
1976)..............................................................................................................51

*Sender v. Buchanan* (*In re Hedged-Investments Assoc., Inc.*), 84 F.3d 1286 (10th
Cir. 1996).....................................................................................................34

*Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Investments
Assocs.)*, 48 F.3d 470 (10th Cir. 1995)........................................................45

*Stafford v. Giddens (In re New Times Secs. Servs.)*, 463 F.3d 125 (2d Cir. 2006) ......49

*Teletronics, Ltd. v. Kemp*, 649 F.2d 1237 (7th Cir. 1981)..............................32, 33

*United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) ............11

*United States v. Friehling*, No. 09-MJ-00729 (S.D.N.Y. Mar. 17, 2009).....................8

*United States v. Madoff*, No. 09-CR-213 (DC) ........................................................8

*Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827 (6th Cir. 2007)......51

*Wider v. Wootton*, 907 F.2d 570 (5th Cir. 1990)....................................................45

**Statutes**

§ 15(b) of the Securities Exchange Act of 1934................................................6

Section 10(b) of the Securities Exchange Act of 1934....................................48

11 U.S.C. § 96e (repealed 1979) ....................................................................22

11 U.S.C. § 96e(2) (repealed 1979)................................................................22

15 U.S.C. § 78aaa *et seq.*..................................................................................1

    78ccc ........................................................................................................20

    78ddd ........................................................................................................20

## TABLE OF AUTHORITIES
(continued)

Page

78eee(a)(3) ...................................................................................................................4

78eee(a)(4)(A) ..............................................................................................................4

78eee(b)(3) ...................................................................................................................4

78eee(b)(4) ...................................................................................................................4

78ff ..............................................................................................................................3

78fff(b) .............................................................................................................5, 20, 21

78fff-1(a) .....................................................................................................................5

78fff-2(a)(2) .................................................................................................................4

78fff-2(b) ...............................................................................................26, 39, 44

78fff-2(b),(c)(1) ..........................................................................................................50

78fff-2(c)(1)(B) ...........................................................................................................24

78fff-2(c)(3) ..........................................................................................................35, 46

78fff-2(d) ..............................................................................................................26, 39

78fff-3(a) ........................................................................................................25, 26, 50

78fff-3(a)(3) ..........................................................................................................26, 39

78j(b) ........................................................................................................................3, 48

78*lll*(11) ...........................................................................................5, 24, 43, 44

78*lll*(2) ....................................................................................................................45

78*lll*(3) ....................................................................................................................24

78*lll*(4) ....................................................................................................................24

78*lll*(7)(B) .................................................................................................................4

78*o*(b) ........................................................................................................................6

15 U.S.C. 78j(b) ...........................................................................................................6

N.Y. Gen. Bus. L. § 352 (McKinney 2009) ..............................................................48

## TABLE OF AUTHORITIES
### (continued)

**Page**

Section 10(b) of the Securities Exchange Act of 1934.................................................................48

**Rules**

12 C.F.R. § 220.1..............................................................................................................41

17 C.F.R. § 240.13f-1 ........................................................................................................10

17 C.F.R. § 240.15c3-3 ........................................................................................................9

17 C.F.R. § 300.501(a) ......................................................................................................38

17 C.F.R. § 300.502(a)(1)....................................................................................................25

17 C.F.R. § 300.503(a) ......................................................................................................47

17 C.F.R. § 300.503(b) ..................................................................................................46, 47

17 C.F.R. 240.10b-5 ...........................................................................................................3

**Treatises**

3 *Collier on Bankruptcy* ¶¶ 60.73-60.76 (14th ed. 1978)...........................................................21

**Other Authorities**

Michael E. Don & Josephine Wang, *Stockbroker Liquidations Under the
Securities Investor Protection Act and Their Impact on Securities Transfers*,
12 Cardozo L. Rev. 509, 526 (1990)........................................................................21, 22, 23

*Report of Special Study of Securities Markets of the Securities and Exchange
Commission*, H.R. Doc. No. 95, pt. 1, at 411-412 (1963) ......................................................23

Pursuant to this Court's Order of September 16, 2009 scheduling adjudication of the net equity issue (the "Scheduling Order"), Irving H. Picard, trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Corporation Act, 15 U.S.C. § 78aaa *et seq*. ("SIPA"),[1] and for Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this Memorandum of Law in Support of the Trustee's motion ("Motion") seeking an order (a) upholding the Trustee's determinations denying the claims in question for the securities and credit balances listed on the claimants' last BLMIS customer statement, (b) affirming the Trustee's "cash in/cash out" determinations of net equity with respect to each customer claim, and (c) expunging the objections to the Trustee's determinations to the customer claims in question insofar as they relate to net equity.  This memorandum is based upon the law set forth below as well as the facts set forth in the declarations of Joseph Looby ("Looby Dec."), Seanna R. Brown ("Brown Dec."), and Bik Cheema ("Cheema Dec."), filed herewith.

## INTRODUCTION

Certain claimants have objected to the Trustee's calculation of their Net Equity[2] under SIPA, asserting that it should be exclusively calculated based upon the amounts listed on their last customer statements from BLMIS, rather than upon the actual net amount that they invested with BLMIS.  The Trustee has calculated each customer's Net Equity by crediting the amount of cash deposited by the customer into his BLMIS customer account, less any amounts already withdrawn by him from his BLMIS customer account (the "cash in/cash out approach").  The

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

[2] Capitalized terms used in the Introduction but not defined herein shall have the meanings assigned to them in this Memorandum of Law.

Trustee submits that only the Trustee's method of calculating Net Equity is consistent with the letter and spirit of SIPA, bankruptcy law, and principles of equity, as well as common sense.

As will be described below, the labor of many individuals was required in order to fabricate the fraudulent world of the stock brokerage or investment advisory business ("IA Business") of BLMIS, through which customer funds were purportedly invested. At bottom, however, this fraudulent "world" was created solely by Madoff, and existed only as a complete fantasy. Regardless of whether the stocks of actual, existing companies or government debt obligations were reflected on customer statements, no such transactions were ever executed on behalf of the split-strike conversion customers of BLMIS's stock brokerage or IA Business. Because there is no evidence of any profitable economic activity having been undertaken by the IA Business of BLMIS, any gains that appeared to be associated with BLMIS customer accounts were entirely fabricated. As a result, the only source of funds that BLMIS had to pay each customer was those sent to BLMIS by the collective pool of BLMIS customers.

During the operation of the Madoff Ponzi scheme, when customers requested and received distributions of purported "profits" in their accounts, they were paid with the cash available on hand. Because the BLMIS IA Business was no more than a Ponzi scheme, and the profits nonexistent, the money these customers withdrew was simply taken from the money invested by other customers. In short, they received nothing more than other people's money.

The alleged split-strike conversion trading or investments described in the BLMIS customer statements did not actually take place. Although BLMIS customers received regular customer statements from BLMIS listing the securities that were purportedly held in or had been traded through their accounts and the alleged growth in value of and profit from those securities over time, the trades reported on the BLMIS customer statements, and hence, any profits

associated with these trades, were fabricated.  The split-strike securities trades depicted in the

BLMIS customer statements never occurred, and the profits reported were entirely fictitious.

The only place those securities transactions existed was within the closed system of BLMIS's

AS/400 computer system.

Because no securities were purchased, and no profits obtained, the customers that

benefited the most from the last customer statement approach were those that were in the Ponzi

scheme for the maximum amount of time, which allowed their fictitious profits to accrue year

after year.  Thus, the claims of earlier customers are largely made up of fictitious profits.  The

claims of later customers are largely for their real dollars.   To allow customers' Net Equity

claims in the amounts listed on their last BLMIS customer statement is to legitimize and

perpetuate a fiction – that the securities and "profits" listed on their customer statements were

purchased and achieved.

At bottom, a distribution in this SIPA liquidation, similar to those in all Ponzi schemes, is

a zero-sum game.  Every dollar paid to reimburse a fictitious profit would be one less dollar

available to pay a claim for money actually invested.  Instead, the Trustee's approach of

returning to customers only their real dollars invested puts *all* customers on equal footing.  To

allow Net Equity claims on the basis of anything other than "cash in/cash out" is to permit

certain claimants to reap the benefits of Madoff and BLMIS's fraud at the expense of others.

## PROCEDURAL HISTORY

On December 11, 2008, Madoff was arrested by the FBI in his Manhattan home and was

criminally charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C.

§§ 78j(b) & 78ff and 17 C.F.R. 240.10b-5 in the United States District Court for the Southern

District of New York, captioned *United States v. Madoff*, No. 08-MJ-2735 (the "Criminal

Action").[3]   Also on December 11, 2008 (the "Filing Date"),[4]   the Securities and Exchange

Commission ("SEC") filed a complaint in the United States District Court for the Southern

District of New York (the "District Court") against Madoff and BLMIS, among others (Case No.

08-CV-10791) (the "SEC Action").

On December 15, 2008, under section 78eee(a)(4)(A) of SIPA, the SEC consented to a

combination of the SEC Action with an application of the Securities Investor Protection

Corporation ("SIPC").   Thereafter, under section 78eee(a)(3) of SIPA, SIPC filed an application

in the District Court alleging that BLMIS was not able to meet its obligations to securities

customers as they came due and that its customers needed the protection afforded by SIPA.

That same day, the District Court entered a protective decree, to which BLMIS

consented, which, in pertinent part:

> 1.    appointed the Trustee for the liquidation of the business of the Debtor
> pursuant to section 78eee(b)(3) of SIPA;
>
> 2.    appointed Baker & Hostetler, LLP ("B&H") as counsel to the Trustee
> pursuant to section 78eee(b)(3) of SIPA; and
>
> 3.    removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

On December 23, 2008, this Court entered a claims procedure order specifying the

procedures for filing, determining, and adjudicating customer claims in this proceeding.   The

order provides, in pertinent part, that under section 78fff-2(a)(2) of SIPA, all claims against

BLMIS must be filed with the Trustee.   The order further provides that the Trustee will

determine customer and creditor claims in writing and allows any claimant who opposes the

---

[3] On March 10, 2009, the Criminal Action was assigned to Judge Denny Chin in the United States District Court for
the Southern District of New York and was assigned a new docket number, No. 09-CR-213 (DC).

[4] In this case, the Filing Date is the date on which the SEC commenced its suit against BLMIS, December 11, 2008,
which resulted in the appointment of a receiver for the firm.   *See* Section 78*lll*(7)(B) of SIPA.

Trustee's determination to file an objection with this Court, after which the Court will hear the matter.

The Trustee appointed under SIPA is responsible for recovering and distributing customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee, in addition to the powers granted by SIPA.  Pursuant to section 78fff(b) of SIPA, Chapters 1, 3, 5 and subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case, to the extent they are consistent with SIPA.

In accordance with his statutory responsibilities, the Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets for the benefit of the estate's customers and creditors is well underway.  To date, the Trustee has recovered more than $1.2 billion in assets to date, although it is not expected that the total value of assets ultimately recovered will be sufficient to fully reimburse the customers of BLMIS for the many billions of dollars they invested with BLMIS over the years.  In addition, the Trustee has determined more than 1,530 customer claims and has committed to pay over $484 million to BLMIS customers in funds advanced from SIPC in full or partial satisfaction of those claims, upon the return of the appropriate assignment and release.

The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that customers share *pro rata* in customer property to the extent of their "net equity," as defined in section 78*lll*(11) of SIPA ("Net Equity").  For customers with a valid Net Equity claim,  SIPC shall advance funds to the SIPA trustee up to $500,000 for securities for that customer, if their ratable share of customer property is insufficient to make them whole up, to the amount of their Net Equity.  Thus, at the outset of the claims determination process, regardless of

the funds to be advanced by SIPC, it is necessary to calculate correctly each customer's *pro rata* share of customer property vis-à-vis other customers.

The Trustee has determined each customer's Net Equity by crediting the amount of cash deposited by the customer into her BLMIS account, less any amounts withdrawn from her BLMIS customer account, otherwise known as the "cash in/cash out" approach. After certain claimants objected to the Trustee's interpretation of Net Equity, the Trustee moved the Court for a briefing schedule and hearing on the matter. This memorandum follows.

## STATEMENT OF FACTS

### I.    The Structure of BLMIS And Its Collapse

BLMIS is a New York limited liability company wholly owned by Madoff. Initially founded in 1960 as a sole proprietorship, BLMIS operated for many years up until the Filing Date from its principal place of business at 885 Third Avenue, New York, New York. (Looby Dec. ¶ 8). Madoff, as founder, chairman, and chief executive officer, ran BLMIS, together with several Madoff family members and a number of employees. (*Id.*). BLMIS had three business units: market making, proprietary trading, and investment advisory. (Looby Dec. ¶ 9). BLMIS registered with the SEC as a broker-dealer on January 19, 1960 under § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b)), and, beginning in 2006, as an investment adviser. However, the investment advisory registration was falsified, and only 23 of the thousands of the investment advisory business ("IA Business") customers were reported to the SEC. By virtue of its registration as a broker-dealer, BLMIS was a member of SIPC. (Looby Dec. ¶ 10). In addition, Madoff also began operating a London branch of the broker-dealer in London, England in February 1983, which was incorporated under the name Madoff Securities International Ltd. ("MSIL"). (Looby Dec. ¶ 11).

Although the business units were financially interconnected, the proprietary trading and market making desks of BLMIS were largely run as enterprises separate and apart from the IA Business. (Looby Dec. ¶ 26). The market making desk competed with other market makers. The proprietary trading desk was used to trade on behalf of the firm for profit.

As the market making and proprietary trading business units were involved generally in legitimate trading with institutional counterparties, they utilized live computer systems and trading platforms that interfaced with multiple third-party feeds and outside data sources often necessary for trading. (Looby Dec. ¶ 28). BLMIS employed a sizeable information technology staff to support and maintain these trading platforms, as well as other technology associated with these business units. (*Id.*). In addition, the market making and proprietary trading desks were subject to compliance and risk monitoring programs, by the exchanges they traded on, the clearing houses they utilized, and the National Association of Securities Dealers ("NASD"), and then its successor, Financial Industry Regulatory Authority ("FINRA"), among others. (Looby Dec. ¶ 31). In short, these businesses appear to have been largely conducted as legitimate, if ultimately unprofitable, enterprises. Neither of these business units would have been viable without the fraudulent IA Business, the proceeds of which were used to prop up these business units from at least 2007 forward. (Looby Dec. ¶ 27).

Madoff operated his fraudulent IA Business from the 17th floor of the BLMIS offices (the "17th Floor") at 885 Third Avenue with a cadre of employees. Outwardly, BLMIS functioned as both an investment adviser to its customers and a custodian of their securities. (Looby Dec. ¶ 32). Its annual audits were purportedly performed by Friehling & Horowitz, CPAs, P.C., an accounting firm of three employees, one of whom was semi-retired, with offices

located in a strip mall in Rockland County, New York.[5]  (Looby Dec. ¶ 12).  The precise date on

which BLMIS began purportedly engaging in investment advisory services has not been

established, but it appears that BLMIS was offering such services as far back as the 1960s.

(Looby Dec. ¶ 32).  The Trustee's investigation to date establishes that, to the extent records are

available, BLMIS never acted as a true investment adviser in the interest of its customers.

(Looby Dec. ¶ 80).

Madoff solicited billions of dollars from investors for his fraudulent IA Business.  The

final customer statements issued by BLMIS as of November 30, 2008 falsely record nearly $64.8

billion[6] of net investments and related fictitious gains from those investments with BLMIS as of

the Filing Date.  (Looby Dec. ¶ 22).  Madoff himself admitted that, "I never made the

investments I promised clients, who believed they were invested with me in the split strike

conversion strategy."  *See* Plea Allocution of Bernard L. Madoff, *United States v. Madoff*, No.

09-CR-213 (DC), Dkt. No. 50 at p. 3 ("Madoff Allocution"), annexed to the Brown Dec. as

Exhibit 1.  Instead, investors' funds were principally deposited into a bank account at J.P.

Morgan Chase Manhattan Bank ("Chase Bank"), Account Number 140081703 (the "703

Account").  *See* Madoff Allocution, at p. 1.

Madoff's purported "split-strike conversion" strategy appeared to generate remarkably

consistent and above-average returns for his customers.  Instead of investing client monies,

BLMIS used customer funds to support operations and meet withdrawal requests made by or on

behalf of investors and to make other improper transfers.  (Looby Dec. ¶ 19).  The money

---

[5] David Friehling is the subject of a criminal information filed by the United States charging him with, *inter alia*, securities fraud.  *See* Friehling Information, *United States v. Friehling*, No. 09-CR-0700 (AKH) (S.D.N.Y. July 17, 2009), Dkt. No. 14.

[6] The $64.8 billion balance recorded on customer statements is net of "negative" accounts that approximate $8.3 billion.  The total amount shown on the November 30, 2008 customer statements aggregates to $73.1 billion. (Looby Dec. ¶ 23).  `

received from each customer was not invested in securities[7] for the benefit of that customer as purported, but instead was primarily used to make distributions to, or payments on behalf of, other investors, as well as withdrawals and payments to Madoff family members and employees. In other words, BLMIS was able to stay afloat only by using the principal invested by customers to pay other customers.  In pleading guilty to the crimes he committed, Madoff admitted that the IA Business of BLMIS was used to operate a Ponzi scheme.  *See* Madoff Allocution, at pp. 1-2. The Ponzi scheme worked as planned until, inevitably, customers' requests for redemptions overwhelmed the flow of new investments and caused the collapse of the scheme in December 2008.  On June 29, 2009, Madoff was sentenced to 150 years incarceration for his crimes.

## II.    **The Fraudulent Scheme**

### A.    **The Purported "Split-Strike Conversion" Strategy**

The fraudulent IA Business of BLMIS was staffed by more than 25 employees and was directed on a day-to-day basis by Madoff and Frank DiPascali, Jr. ("DiPascali"), among others. (Looby Dec. ¶ 33 & ¶ 38).  Physically segregated on the 17th floor from the other BLMIS business units, Madoff was able to limit access to the premises to certain key employees and insiders.  (Looby Dec. ¶ 14).

Outwardly, Madoff ascribed the success he purported to achieve in his IA Business to the "split-strike conversion" strategy, which was ostensibly carried out by Madoff, DiPascali, and the employees who worked for them.  (Looby Dec. ¶ 48).  Madoff represented that his strategy was to invest customer funds in a subset (or "basket") of common stocks that comprised the

---

[7] Nor were customer funds segregated in a "15c3-3" account.  Per SEC Rule 15c3-3(e), 17 C.F.R. § 240.15c3-3, promulgated under the Securities Exchange Act of 1934, brokers and dealers are required to maintain a "Special Reserve Bank Account for the Exclusive Benefit of Customers."  This special reserve bank account is "separate from any other bank account of the broker or dealer."  The special reserve account is required to maintain a certain minimum balance.  *See* Rule 15c3-3a.  BLMIS maintained a balance of $20,000 from late 2002 until the Filing Date, which was inadequate given the purported value of its customer accounts.

Standard & Poor's 100 Index.  The fictitious strategy focused on large cap stocks, presumably to preclude inquiry into the volume of stocks in which BLMIS was purportedly trading.  (Looby Dec. ¶ 49).

Madoff's purported strategy included the careful execution of purchases and sales, with the goal of timing the market by purchasing the basket before the prices increased and selling the basket after such time, so as to maximize value.  (Looby Dec. ¶ 50).  Several times a year, customer funds would purportedly move "into the market," which consisted of allegedly "purchasing" a basket of stocks.  Then customer funds were moved completely "out of the market" to purported investments in United States Treasury Bills ("T-bills"), Fidelity money market funds, and cash reserves until the next presumed trading opportunity arose.  At the end of each quarter, all baskets would be sold and invested in T-bills or other money market funds, and cash reserves.  (*Id.*).  By purporting to liquidate the split-strike security basket positions by quarter end, the equities in the baskets were not required to be disclosed in SEC Form 13F.[8] (Looby Dec. ¶ 55).

BLMIS also concocted a fictitious hedging strategy for the baskets of stock.  BLMIS purported to purchase and sell S&P 100 index option contracts that corresponded to the stocks in the basket, thereby controlling both the downside risk associated with possible adverse price changes in the basket of stocks and limiting profits associated with increases in underlying stock prices.[9]  (Looby Dec. ¶ 48).

---

[8] Institutional investment managers who exercise investment discretion over $100 million or more in Section 13(f) securities must report their holdings on SEC Form 13F to the SEC.  SEC Form 13F requires disclosure of the names of the institutional investment managers, the names of the securities they manage and the class of securities, the CUSIP number, the number of shares owned, and the total market value of each security.  *See* 17 C.F.R. § 240.13f-1.

[9] BLMIS would have had to execute massive options trades to implement the split-strike conversion strategy it was purportedly using.  Indeed, in many instances, there were not enough put and/or call option contracts available at the Chicago Board Options Exchange ("CBOE") to properly hedge the required volume, and in fact accomplish a split-strike conversion strategy, for the securities positions recorded on the BLMIS customer statements.  Thus, the

None of these investment strategies were ever implemented.  The trades, order tickets, customer statements, and other records created in furtherance of the fraud were fabricated. (Looby Dec. ¶ 67).  In fact, one of the money market funds in which customer resources were purportedly invested through BLMIS, as reflected on customer statements, was the Fidelity Brokerage Services LLC's "Fidelity Spartan U.S. Treasury Money Market Fund."  Fidelity has acknowledged that from 2005 onwards, the organization did not offer participation in any such money market fund for investment.  (Looby Dec. ¶ 57).

At no point while customer funds were purportedly either "in the market" or "out of the market," however, were such funds invested as shown on the statements. Instead, they were held in the BLMIS 703 Account at Chase Bank.  (Looby Dec. ¶ 56).

To create the illusion that these stocks had been purchased or sold, BLMIS employees would compile historical price (high, low, open, and close) and volume data for each stock selected within the basket.  (Looby Dec. ¶ 62).  Because they were selecting stocks after the fact, BLMIS employees were able to cherry-pick advantageous historical prices.  (Looby Dec. ¶ 63). Hence, the selection process was virtually guaranteeing that the purported trading would appear profitable.  As DiPascali stated at his plea hearing, "[o]n a regular basis, [he] used hindsight to file historical prices on stocks then [he] used those prices to post purchase of sales [sic] to customer accounts as if they had been executed in realtime."  DiPascali Plea Allocution, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), at p. 47, annexed to the Brown Dec. as Exhibit 2.

With the benefit of backdating, Madoff and his employees at BLMIS were able to consistently "generate" purported annual returns of between 10 and 17% for those customers

---

"fictitious market" created by BLMIS, as recorded on the customer statements, could not have been replicated in the real market based on this fact alone.

whose funds were purportedly invested in the "split-strike conversion" strategy.  (Looby Dec. ¶ 66).  The baskets were monitored to ensure that the prices chosen after-the-fact obtained returns that were neither too high nor too low.  (Looby Dec. ¶ 65).  Because no actual purchases or sales were taking place, and were "transacted" only within the fraudulent "world" of Madoff, BLMIS could engineer the trades on the perfect dates at the best available prices to achieve the targeted rates of return.  (Looby Dec. ¶ 66).

### B.    Non-Split-Strike Conversion Customer Accounts

The vast majority of the BLMIS customer accounts were purportedly invested in the split-strike conversion strategy, and DiPascali had primary responsibility for those accounts.  The remainder of the customer accounts, however, were not "invested" in the split-strike conversion strategy, and were administered by other BLMIS employees.  As of the Filing Date, there were less than 245 active non-split-strike conversion customer accounts at BLMIS, representing approximately 5% of total active BLMIS customer accounts as of the Filing Date.  (Looby Dec. ¶ 75).  The non-split-strike conversion accounts included long-time customers, such as Stanley Chais, Jeffry Picower's personal and business accounts, and the customer accounts held by various Madoff family members and employees.  (*Id.*).  Even by BLMIS standards, the non-split-strike conversion accounts reported unusually high rates of return, in excess of the 10-17% "profits" that the split-strike strategy accounts received.  (Looby Dec. ¶ 76).

Rather than execute trades using the basket approach simulated by DiPascali, the non-split-strike conversion accounts were handled on an account-by-account basis.  (Looby Dec. ¶ 78).  This required the manual input of fictitious, backdated transactions to represent each trade that purportedly was executed on behalf of each account, a time-consuming endeavor.  (Looby Dec. ¶ 78).  As labor-intensive as this may have been, however, it too boiled down to the same fraudulent scheme: the manufacturing of false customer statements based on after-the-fact

selections of stock and related prices using already published trading data.    As with the

DiPascali-managed accounts, and with the exception of a few isolated trades and physical

custody of a very limited number of securities entrusted to BLMIS by certain customers, the

trading represented on the BLMIS customer statements of the non-split-strike conversion

customer account holders did not take place.  (Looby Dec. ¶ 79).

### C.    Entry Into The BLMIS Fund

In part due to the cover provided by the market making and proprietary trading desks of

BLMIS, Madoff was extremely successful in soliciting investments from customers.    As a

general rule, customers sent their money to the 703 Account at Chase Bank, with the

understanding that Madoff would invest those funds on their behalf.  However, Madoff failed to

do so.

Entry into the BLMIS IA Business was portrayed, and perceived, as tightly controlled

and granted to a select array of customers.  This aura of exclusivity, akin to membership in an

elite "club," when combined with the secrecy surrounding Madoff's "proprietary trading

strategy," limited the transparency of the IA Business to prospective investors, particularly to the

non-institutional clients such as individual customers.

Upon the opening of their BLMIS customer account, customers signed standardized

customer agreements documents, in which they relinquished all investment authority to "Bernard

L. Madoff."  For example, a standard BLMIS customer agreement titled "Trading Authorization

Limited to Purchases and Sales of Securities and Options," contained terms that authorized

Madoff as the customer's "agent and attorney in fact to buy, sell and trade in stocks, bonds,

options and any other securities in accordance with [Madoff's] terms and conditions."  (Looby

Dec. ¶ 35 , Ex. 3).

Further, customers agreed that, "[i]n all such purchases, sales or trades [Madoff is] authorized to follow the instructions of Bernard L. Madoff in every respect concerning the undersigned's account with [Madoff]; and [Madoff]is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades. All purchases, sales or trades shall be executed strictly in accordance with the established trading authorization directive."  (*Id.*).

In essence, customers deposited their cash and were able to make withdrawals upon request, but ceded to Madoff all other rights associated with their accounts, including the authority to make investment decisions.  As may be fitting, at least in hindsight, a customer's individual dealings with BLMIS were solely in cash.  She deposited cash.  She withdrew cash. At no time did any customers, with the exception of one customer, direct the purchase or sale of any specific securities.[10]

### D.    The BLMIS 703 Account

The BLMIS 703 Account at Chase Bank was little more than a "slush fund" for Madoff and the other individuals who benefited from the Madoff Ponzi scheme.  Customer funds were deposited into the 703 Account and, when requested, withdrawals were paid to customers from this account.  (Looby Dec. ¶ 18).  As Madoff stated at his plea hearing, "Up until I was arrested . . . I never invested [customer] funds in the securities, as I had promised.  Instead, those funds were deposited in [the 703 Account].  When clients wished to receive the profits they believed

---

[10] The investigation thus far indicates that only one customer engaged in a small number of purchases and sales of specific securities.  There were, however, "friends and family" accounts, such as Jeffry Picower, Stanley Chais, et al., which actually directed phony securities transactions for their accounts.

they had earned with me or to redeem their principal, I used the money in the [703 Account] that

belonged to them or other clients to pay the requested funds." Madoff Allocution, at p. 24.

Each day, BLMIS employees on the 17th floor prepared reports for Madoff indicating the

amount of customer deposits into and withdrawals from the 703 Account.  (Looby Dec. ¶ 21).

Any net cash balances in this account at the end of each business day were transferred to

affiliated overnight investment accounts at Chase Bank to purchase United States Treasuries or

other short-term paper until additional monies were needed to fund additional withdrawal

requests by customers, capital needs of the broker-dealer operation of BLMIS, or Madoff's (and

other insiders') personal needs.  (Looby Dec. ¶ 19).  Funds were misappropriated from the 703

Account for the benefit of, and to enrich, various individuals associated with BLMIS.  *See, e.g.*,

Slattery Aff., Dkt. No 197; Complaint against Ruth Madoff, *Picard v. Madoff*, No. 09-1391

(BRL), Dkt. No. 1; Complaint against Madoff Family, *Picard v. Madoff, et al.*, No. 09-1503

(BRL), Dkt. No. 1.

In short, the customer funds sent to BLMIS were simply used to keep the Madoff Ponzi

going and, more substantially, to enrich Madoff and his associates, until such time as the requests

for redemptions in December 2008 overwhelmed the flow of new investments and caused the

inevitable collapse of the Ponzi scheme.  BLMIS was only able to stay afloat as long as it had

enough new principal invested by some BLMIS customers to honor requests for withdrawals by

other BLMIS customers or their designees, including the withdrawal of funds used to support

Madoff, his family, and his close associates in the manner to which they had become accustomed

over time.  At all times relevant hereto, the monthly purported equity balances of the BLMIS

customer accounts far exceeded the amount of capital deposited in the 703 Account.  (Looby

Dec. ¶ 25).

### E.    Generation Of The BLMIS Customer Statements

Unlike the market making and proprietary trading desks, which utilized a "live" trading platform to interface with third party feeds, the fraudulent machinations of the IA Business were conducted using a computer system known as the AS/400, consisting of an IBM computer and custom software programs dating to the early 1990's.  (Looby Dec. ¶ 15).  Information relating to BLMIS customer accounts was stored in the AS/400 computer, which was located on the 17th floor.  (Looby Dec. ¶ 40).  The AS/400 was additionally programmed by BLMIS to record the fictitious securities positions allegedly bought and sold, customer cash transactions, prepare BLMIS customer statements, and produce BLMIS trade confirmations.  (*Id.*.).  The AS/400 system was not programmed or enabled to communicate, facilitate, or execute trading of any kind.  (Looby Dec. ¶ 41).  Because the fictitious trades required no opposite broker to execute, no counterparties existed and no such information was reflected in the AS/400 system.  (Looby Dec. ¶ 47).  None of the split strike trades entered into the AS/400 were reconciled (or reconcilable) with the Depository Trust & Clearing Corporation ("DTCC"),[11] which serves as a custodian for most stock and government debt securities issued in the United States.  (*Id.*).

The AS/400 had software that could be utilized to enter a "basket" of fictitious "trades" with any desired price or trade date that could then be allocated, *pro rata*, to the various BLMIS customer accounts residing within the database.  (Looby Dec. ¶ 64).  Once a "basket trade" was identified as one that achieved the fictitious return desired, certain employees, known as "key punch operators," were provided with the relevant pricing information that they entered manually into the AS/400 database.  The initial basket trade was replicated in each BLMIS customer account automatically and proportionally according to the fraction or number of

---

[11] DTCC, through its subsidiaries, provides clearing, settlement, and information services for equities, corporate and municipal bonds, government and mortgage-backed securities, money market instruments, and over-the-counter derivatives.  DTCC records were made available from 2002-2008.  (Looby Dec. ¶ 82).

baskets each customer could purportedly afford.   The AS/400 was then used to generate the

BLMIS customer statements and associated trade confirmations that may have been mailed or

otherwise provided to customers in the month following the initial investment of principal and

each month thereafter.   The routine and monthly application of these AS/400 programs, and the

fictitious split strike strategy as applied by BLMIS, compounded customer false profits over and

over again during the course of the Madoff Ponzi scheme (Looby Dec. ¶ 67).

BLMIS did not provide its customers with electronic real-time online access to their

accounts, which certainly by the year 2000 was customary in the industry.[12]   (Looby Dec. ¶ 37).

Instead, BLMIS utilized technology that was severely outmoded relative to other participants in

the exchange traded equity market to communicate with its clients, such as paper trade

confirmations.   The use of paper statements and confirmations, sent by United States mail,

facilitated the Madoff Ponzi scheme by allowing BLMIS more time to alter trading records and

delay the delivery of information.   (*Id.*).

### F.    Customers Did Not Have Enough Funds To Purchase Securities On Their Statements

BLMIS used historical information to price the purported purchase of securities, and the

initial BLMIS customer statement reflected purported purchases of stock and/or options

equivalent to the amount of principal invested with BLMIS.  (Looby Dec. ¶ 63).  The following

month, and each month thereafter, the only transactions contained on BLMIS customer

statements that bore any relation to reality were the subsequent cash deposits into and/or cash

withdrawals from the particular customer account.   (Looby Dec. ¶ 71).   Whether or not the

customer conducted any cash transactions, the BLMIS customer statements would reflect

---

[12] Of its thousands of customers, BLMIS provided customer statements in electronic form to two customers, representing only six accounts.  Even though they were electronic, the statements consisted only of data files.  No customer had real time access to her account information and trading data because there was no such data or information to be had, as no trading was actually conducted.  (Looby Dec. ¶ 37 n.3).

purported trading activity and resulting gains on the securities supposedly purchased and/or sold on behalf of customers. (*Id.*). These gains were, at all times, fictional. Although initial deposits made by BLMIS customers may have been sufficient to "cover" the initial fake "purchase" of securities reported on the BLMIS customer statements, without additional customer deposits, any subsequent "purchases" of equal or greater nominal value could generally only be afforded by virtue of the "profits" generated from fictitious sales or returns generated on fictitious securities positions. (Looby Dec. ¶ 69).

In other words, in the case of a customer who made a single initial investment, the customer did not invest sufficient capital or have any real gains or other credits to her account to purchase anything other than any securities of value equivalent to those that were listed on her BLMIS first customer statement.[13] Thus, she did not have sufficient capital for any subsequent purchases of securities, unless additional cash deposits were made. And in the case of customers who deposited additional funds beyond their initial investments, they could afford to purchase securities only in the amount of their net cash investment, as the "profits" were equally fictitious. (Looby Aff. ¶¶ 70, 71).

### G.    BLMIS Customers' Investments Were Never Exposed To The Market

The statements and confirmations sent by BLMIS to its customers were phony, created to further its fraudulent scheme. The transactions depicted on the BLMIS customer statements and confirmations were fake, as the underlying trades had not been executed. The prices "confirmed" on BLMIS trade confirmations and printed on BLMIS customer statements were simply made up by BLMIS after reviewing historic highs and lows for a given prior period, and selecting a result consistent with the desired rate of return. (Looby Dec. ¶ 66). Thus, the

---

[13] Consistent with the fact that the prices selected for the purchase of securities for customer accounts were backdated and manipulated, the customer in most instances did not probably invest adequate capital to purchase even those securities listed on her first BLMIS customer statement. (Looby Dec. ¶ 72).

components of the purported trade, (*e.g.* stock/option, price, date, and volume) could be advantageously determined by BLMIS with knowledge of the previously published price history. The AS/400 computer system used by the IA Business enabled system operators to record such fake trades, on a given date, with a selected price, and print BLMIS customer statements and confirmations that reflected these fictitious trades. (Looby Dec. ¶ 64). These transactions were fictitious not only because they did not occur, but because they *could not* have occurred. Had it been possible, the massive volume of the transactions printed on BLMIS customer statements in aggregate would have had an impact on the market price of the underlying securities purportedly bought or sold by Madoff. (Looby Dec. ¶ 103).

Because the fraudulent "world" in which the IA Business of BLMIS operated was created by its own sleight-of-hand, and bore no relation to the United States securities market in which it was purportedly transacting business, customer funds were never, at any point, exposed to the uncertainties associated with price movement in the market. (Looby Dec. ¶ 73). Instead, customer accounts at BLMIS generally only increased in value, regardless of the realities of investment in the actual market for any particular period because Madoff and his staff were able to fabricate trades after-the-fact. The fictitious gains depicted on BLMIS customer statements were thus "paper profits" in the truest sense. These false profits were compounded time and again, through the execution of the fictitious split-strike strategy. (Looby Dec. ¶ 70). BLMIS customer statements and confirmations were routinely printed containing the ever-increasing output of this fiction. (Looby Dec. ¶ 67).

## III.    SIPA and SIPC

### A.    Congress Enacted SIPA To Promote and Protect The Market Economy By Providing Protection To Customers Against Broker Insolvency

Congress's goals in enacting SIPA were to prevent the failure of brokerage houses, restore investor confidence in capital markets after a period of business contraction, and upgrade financial responsibility requirements for registered broker-dealers. *See SIPC v. Barbour*, 421 U.S. 412, 415 (1975). With SIPA, Congress also created SIPC, a nonprofit, private membership corporation to which most registered broker-dealers are required to belong. *See* Section 78ccc of SIPA. The SIPC Fund, a Congressionally-mandated protection program, is authorized under section 78ddd of SIPA and is designed to protect the customers of SIPC member broker-dealers from loss in case of the financial failure of a SIPC-member brokerage house.

As described by the Second Circuit, "[t]he object of [SIPA], and the function of the [SIPC] it created, is to protect the public customers of securities dealers from suffering the consequences of financial instability in the brokerage industry." *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 281 (2d Cir. 1974); *see also SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 980 (2d Cir. 1974) (SIPA "was a legislative effort to reinforce the flagging confidence in the securities market by providing an extra margin of protection for the small investor").

SIPA created a new form of liquidation proceeding applicable only to SIPC member firms and designed to return promptly customer property. *See Barbour,* 421 U.S. at 416. A liquidation under SIPA, however, is essentially a bankruptcy proceeding. *See, e.g.*, *Exch. Nat'l Bank of Chicago v. Wyatt,* 517 F.2d 453, 457-459 (2d Cir. 1975); *In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 74 (Bankr. S.D.N.Y. 1996). Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11," to the

extent that such provisions are consistent with SIPA.  *See* Section 78fff(b) of SIPA; *In re Adler Coleman Clearing Corp.*, 198 B.R. at 74.  Where SIPA is inconsistent with the Bankruptcy Code, however, it is the specific provisions of SIPA that control.  *See* Section 78fff(b) of SIPA. SIPA is supported by "both the bankruptcy provision in the United States Constitution and also by the commerce clause."  *SEC v. Albert & Maguire Sec. Co.*, 378 F. Supp. 906, 911 (E.D. Pa. 1974).

In order to understand the application and interpretation of SIPA today, a brief historical overview is detailed herein.

### 1.    The Chandler Act

Prior to 1938, customers of a bankrupt stockbroker were treated as general creditors if they could not reclaim cash or securities that they could trace into the broker's possession.  *Duel v. Hollins*, 241 U.S. 523, 527-29 (1916).  The reclamation process prior to 1938 lent itself to uneven treatment of customers.  In response, Congress enacted Section 60e of the Bankruptcy Act of 1938,[14] also known as the Chandler Act, to deal with the liquidation of stockbrokers.[15]

The Chandler Act provided that customers of stockbrokers in bankruptcy were to be treated preferentially over other creditors.  Fully-paid securities that were identifiable to the customers as their property, such as by certificate number, could be reclaimed by "cash customers," that is, by customers who had no debit balance and who were entitled to immediate delivery of securities.  *See* Michael E. Don & Josephine Wang, *Stockbroker Liquidations Under the Securities  Investor Protection Act and Their Impact on Securities Transfers*, 12 Cardozo L. Rev. 509, 526 (1990) ("Don & Wang").  Otherwise, customers' cash and securities comprised a "single and separate fund."  *Id.*  Other than specifically identifiable property, the single and

---

[14] A more detailed discussion of section 60e is contained in 3 *Collier on Bankruptcy* ¶¶ 60.73-60.76 (14th ed. 1978).

[15] Chandler Act, ch. 575, § 60e, 52 Stat. 840 (1938) (codified at 11 U.S.C. § 96(e) (1976) (repealed 1979).

separate fund was used to satisfy claims of the "single and separate class of creditors," on a *pro rata* basis, to the exclusion of general creditors. 11 U.S.C. § 96e(2) (repealed 1979).

Claimants who were customers were preferred over other creditors. 11 U.S.C. § 96e (repealed 1979). A person who qualified as a customer received a *pro rata* distribution of the fund according the net equity of his account. "Net equity" was defined by excluding the specifically identifiable securities, and then "subtracting the indebtedness of the customer to the stockbroker from the sum which would have been owing by the stockbroker to the customer had the stockbroker liquidated, by sale or purchase on the date of bankruptcy, the remaining securities or security commitments of the customer." *Id.*

## 2.    SIPA As Enacted In 1970

Because the single and separate fund was usually inadequate to satisfy customer claims, section 60e did not prevent customer losses. Customer losses mounted when the rate of brokerage failures accelerated in 1969 and 1970. At that time, an unprecedentedly high volume of trading resulted in widespread accounting and reporting mistakes at brokerage houses, because the antiquated centralized and backroom systems then in use were unable to keep up with the volume, and costly attempts to implement data processing systems were frequently riddled with problems. Failure to complete trades became common. When a decline in trading volume and price hit in 1969 and continued through the following year, many brokerages failed. *See* Don & Wang, *supra*, at 510-11.

While in a perfect world, securities held by the failed brokers would have been available for recovery, many problems intervened, including pledges of securities (both permitted and wrongful), misappropriations, simple errors, and failures to complete transactions – sometimes even of orders that had been reported to the client as executed (a circumstance referred to as a "bucketed" order). In addition, the process of unwinding the brokerages was a lengthy one. As

a result, many brokerage clients were deprived of their holdings for reasons having nothing to do with their investment acumen, and everything to do with the business woes of their brokerages, a circumstance that many feared would lead to small investors – critical to the economy – shunning the market. That, in turn, it was feared, would further weaken a system already in crisis because of the interlinked effects of the collapse of each brokerage upon others that dealt with it. *See* Don & Wang, *supra*, at 521-22.

Congress responded to the crisis by enacting SIPA. S. Rep. No. 1218 (1970); *see also* H.R. Rep. No. 1613 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5255; *Barbour*, 421 U.S. at 415. It created SIPC to take oversee the liquidation under SIPA of failed securities brokerage firms. The liquidation would be administered by a court-appointed trustee specified by SIPC. SIPA was intended to shore up the critical market economy by implementing financial rules to help prevent brokerage collapses in the first place, and by providing greater and swifter protections, especially to the small investor, when such collapses did occur. One of the paramount features of SIPA is that it created SIPC to advance funds for the protection of customers of financially troubled member broker-dealers.

Like section 60e, SIPA established a "single and separate fund" in which all "customers" in the "single and separate class of creditors" shared *pro rata* and to the exclusion of general creditors. Thus, those who fit the definition of "customer" under section 60e or SIPA were accorded preferential treatment in the form of a priority over general creditors. *See Report of Special Study of Securities Markets of the Securities and Exchange Commission*, H.R. Doc. No. 95, pt. 1, at 411-412 (1970). To the extent customer claims could not be satisfied from the single and separate fund, SIPC funds were used, within the limits of protection, to augment the single and separate fund.

### 3.    SIPA As Amended

In 1978, SIPA was amended[16] to provide greater flexibility to SIPC in satisfying customer claims in an expeditious fashion, and where possible, in kind, with actual securities. The essential elements of a SIPA proceeding remained unchanged.  The concept of a "single and separate fund" was altered to a fund of "customer property," *see* section 78*lll*(4), encompassing a somewhat broader range of assets than the "single and separate fund."   Under the 1978 version, the concept of  "specifically identifiable property" was abolished, and only customers to whom "customer name securities" were owed, that is, securities registered in the customer's name or in the process of registration on the date SIPC filed the application to place the firm into liquidation, section 78*lll*(3), could receive the securities back outright, without regard to the limits of SIPA protection.  *See* section 78*lll*(3).

### 4.    Net Equity Under SIPA

Under section 78*lll*(11) of SIPA, "net equity" is defined in relevant part as "the dollar amount of the account or accounts of a customer, to be determined by . . . (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus (B) any indebtedness of such customer to the debtor on the filing date[.]"  Section 78*lll*(11) of SIPA.   Distributions of customer property are by statute to be made to the customers "ratably  . . .on the basis or to the extent of their respective net equities."  Section 78fff-2(c)(1)(B) of SIPA.

---

[16]  SIPA has been amended by Pub. L. No. 94-29, 89 Stat. 163 (1975); Pub. L. No. 95-283, 92 Stat. 249 (1978); Pub. L. No. 95-598, 92 Stat. 2674 (1978); Pub. L. No. 96-433,  94 Stat. 1855 (1980); Pub. L. No. 97-258, 96 Stat. 1067 (1982); Pub. L. No. 97-303, 96 Stat. 1410 (1982); Pub. L. No. 100-181, 101 Stat. 1265 (1987); Pub. L. No. 106-554, 114 Stat. 2763, 2763A-424  (2000); Pub. L. 109-8, 119 Stat. 217 (2005); and Pub. L. No. 109-390, 120 Stat. 2698 (2006).

### 5.    Use Of SIPC Funds To Satisfy Customer Claims

Where a customer has a valid Net Equity claim, and the customer's claim cannot be immediately satisfied from the fund of customer property, SIPC's funds are used, within the limits of protection, to supplement the fund of customer property and hasten the delivery of that property to customers.    Thus, under SIPA, recoveries to customers are accelerated, and supplemented, by having SIPC advance funds to the trustee to distribute to those customers up to the lesser of their Net Equity claims or the dollar limits set out in the Act.  SIPC retains a right of subrogation against these advances should the customer's Net Equity claim eventually be paid in full.  *See* Section 78fff-3(a) of SIPA; *see also McKenny v. McGraw (In re Bell & Beckwith)*, 104 B.R. 852 (Bankr. N.D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991).    Accordingly, a customer's net equity determines the share that each customer will receive of the "customer property" of BLMIS, and the presence or absence of net equity determines whether any SIPC advance can be made.

### 6.    Determination Of Whether Claims Are For Cash Or For Securities

Under SIPA, the limits of protection per customer are $500,000 for cash and securities, of which up to $100,000 may be based on a claim for cash alone.  Section 78fff-3(a) of SIPA.  A customer who has cash in an account nevertheless has a claim for securities as to any authorized securities purchase if the debtor has sent written confirmation to the customer that the securities have been bought for or sold to the customer.  17 C.F.R. § 300.502(a)(1).    Under this rule, "whether a claim is treated as one for securities or cash depends not on what is *actually* in the customer's account but on what the customer has been told by the debtor in written confirmations."  *In re New Times Sec. Servs.*, 371 F.3d 68, 86 (2d Cir. 2004) (hereafter "*New Times I*").  The customer's "legitimate expectations" are the focus of this rule, which makes the cash/securities determination largely dependent upon the receipt of written confirmations.  *See*

*id.* at 75 n.8.  Thus, upon written confirmation that an authorized securities purchase has been made, the cash in the customer's account becomes a valid claim for securities.  *Id.*  Claims for securities are protected by SIPC up to $500,000.  Section 78fff-3(a) of SIPA.

Valid claims for cash or securities are satisfied in kind.  With respect to securities that are not in the debtor's possession or control, the trustee may purchase them for delivery to the customer so long as there is a fair and orderly market for them.  Section 78fff-2(d) of SIPA.  If the securities cannot be bought in a fair and orderly market, the customer receives a cash payment based on the market value of the security as of the filing date.  Sections 78fff-3(a)(3) & 78fff-2(b) of SIPA.  For a variety of reasons, unless a specific fact situation calls for another conclusion, the Trustee and SIPC have treated the claims in this case as subject to the $500,000 limit for claims for securities rather than as claims for cash.

### 7.    The "Books and Records" Requirement

In order to be satisfied by a SIPA trustee, obligations to customers "must be ascertainable from the books and records of the debtor or . . . otherwise established to the satisfaction of the trustee."  Section 78fff-2(b) of SIPA.

Numerous customers have pointed to the last fictitious BLMIS customer statement as the only source of "books and records" to support their claims.  While the BLMIS customer statements and confirmations received by customers may be construed as part of the debtor's "books and records," the books and records of BLMIS in fact comprise many more sources of information that reflect the actual financial transactions that occurred and that negate the accuracy of the BLMIS customer statements.  Relevant books and records include financial records including bank records, annual reports, the DTCC account information, other corporate documents, and customer-related files such as account maintenance folders.

For example, all of the records relating to the BLMIS 703 Account constitute an important part of BLMIS's books and records, as these reflect each BLMIS's customer's deposits and withdrawals from BLMIS during the operation of the Madoff Ponzi scheme. BLMIS also maintained a book that tracked certain customers' cash deposits and withdrawals in the Ponzi scheme. Notably, these "books and records" other than the customer statements indicate that trades were not made on behalf of customers or actually paid for by the customers or a reflection of genuine market activity or pricing.

## IV.    Customer Claimants

For purposes of this motion, customer claimants can be broadly grouped into three categories.[17]    Certain claimants from each of these categories object to the Trustee's Net Equity methodology and, instead, claim that they are due the fabricated amounts shown on their respective fictitious final customer statements.

### A.    "Net Winners"

Under the parlance of this proceeding, a "net winner" is defined as a BLMIS customer that withdrew more funds from BLMIS than the customer deposited with BLMIS. Thus, the customer received payments constituting a full return of her principal investment, plus some amount of fictitious "profits" generated by BLMIS. Although she has already withdrawn all of her principal, along with some amount of fictitious profits (in reality, funds deposited by other customers), the "net winner" customer who objects to the Trustee's methodology is claiming that she is due the fictitious amount fabricated on her final November 30, 2008 BLMIS customer statement.

---

[17] The Cheema Declaration filed herewith sets forth information and data specific to each customer claimant whose customer claim determination the Trustee seeks to affirm in this Motion.

### B.    "Over-the-Limits Net Losers That Have Received Full SIPC Protection"

Under the "cash in/cash out" approach, the customers that fall within the category of "over-the-limits net losers that have received full SIPC protection" are customers that withdrew less money from BLMIS than they deposited over time, and had net investment amounts in excess of $500,000.  They are entitled to an allowed claim for the amount that they invested, less the amount that they have withdrawn from BLMIS.  The difference between the amount invested and the withdrawn amount over time is the customer's Net Equity.  The customer has received or will receive a *pro rata* share of any customer property based upon her Net Equity, and will receive a check from the Trustee of $500,000 from funds advanced by SIPC against her share of customer property.  Although the claims of these investors should be based on their Net Equity as measured by the net amount invested, these claimants assert that the amount of their Net Equity should be equal to the fictitious amounts represented on their final November 30, 2008 BLMIS customer statement.  Some of these claimants also argue that their claim for this last reported fictitious amount should be satisfied in securities and not cash.

### C.    "Under-the-Limits Net Losers That Will Not Receive a Full $500,000 in SIPC Protection"

Like the previous category, customers that fall within this category also have allowable claims because they invested more over time than they withdrew from the fraudulent scheme. The net investment amount is less than $500,000, so their respective SIPC protection is limited to the amount of their respective net investment.  They will not be entitled to a further distribution from the fund of customer property because their Net Equity claim will have been fully satisfied by the SIPC advance, and SIPC will receive the customers' share of customer property as subrogee.  These customers' respective final November 30, 2008 BLMIS customer statements may, however, show a balance higher than $500,000.

## SUMMARY OF ARGUMENT

Certain claimants have taken the position that the Trustee is obligated to look exclusively to the last BLMIS customer statements issued to those claimants by BLMIS as establishing their Net Equity for purposes of SIPA.  This position – which would credit phony transactions that could have never occurred in the marketplace and which would sanction the allocation of the customer fund based upon fraud – is unsupportable as a matter of statute, case law, equity, and public policy.  To allocate customer funds in a Ponzi scheme based upon fictitious gains would require more recent investors to give up a share of their actual dollars invested to benefit earlier investors, whose accounts on paper appear to have accrued additional fictitious profits over time.  At bottom, a distribution in this liquidation, as with all Ponzi schemes, is a zero-sum game.  The "cash in/cash out" methodology is the only approach consistent with prior Ponzi scheme cases, bankruptcy law, the language of SIPA, and equity.

The Net Equity issue impacts all BLMIS customers.  Because the Trustee is dealing with a limited pool of money for *pro rata* distributions, any interpretation of Net Equity that helps one group of customers will hurt others.  The ultimate amounts distributed to customers depends on a number of variables, many of which have yet to be determined.  Regardless of the particular impact on any particular investor, the Net Equity issue is a legal one that must be consistent with and supported by the provisions and policies of SIPA.  Interpretation of Net Equity should not be outcome-determinative, but instead based upon the proper interpretation and reading of the requirements of the law.  Only the "cash in/cash out" approach, and not the last fictitious statement approach, meets this test.

**ARGUMENT**

I.    **The Trustee's "Cash-In/Cash-Out" Calculation Of Net Equity Mirrors The
Standard Judicial Treatment Of Ponzi Schemes And Has Been Specifically Upheld
Under SIPA.**

While certain claimants advocate for the distribution of customer funds based upon
fictitious account statements, well-established case law in Ponzi schemes mandates that
distributions be calculated using an investor's net investment – equivalent to the Trustee's "cash
in/cash out" methodology here.

A.    **The Standard Treatment Of Ponzi Schemes Is Based On Net Investment.**

The "cash-in/cash-out" method of calculating net equity mirrors how courts generally
treat claims and claimants in Ponzi scheme cases.  Despite the façade of complexity associated
with the BLMIS IA Business, at its core it was a very simple form of deception.  The hallmark of
a Ponzi scheme is that investors are promised – and shown or actually paid – high returns on
some seemingly money-making venture when, in reality, there are no such profits and, often, not
even such a venture.  Instead, initial investors are paid from monies provided by other later
investors.  The word of the fake "profits" and the supposedly positive experience of the initial
investors serves to bring more funds into the scheme.  *See Cunningham v. Brown,* 265 U.S. 1, 13
(1924) (describing the scheme of Charles Ponzi and stressing the importance of treating victims
in such a scheme equally).

When faced with the particular circumstances of Ponzi schemes, where there is not
enough money to repay all victims in full, courts have routinely taken the position that investors
are entitled to share proportionally to their actual losses on dollars invested, not based on the
"fictitious" profits, and that funds that they received back during the course of the scheme must
be deducted.  Such an approach is consistent with the fundamental principle, whether under

equity, bankruptcy, or SIPA, that in any distribution, similarly situated investors must be treated alike in any distribution.

In *Cunningham v. Brown*, the Supreme Court set forth the principle that all investors in a Ponzi scheme must be treated equally and that "equality is equity and this is the spirit of the bankrupt law." 265 U.S. at 13. To recognize fictitious gains would do precisely the opposite – it would unfairly require more recent investors to give up a share of their actual dollars to subsidize earlier investors, whose accounts appeared on paper to have accrued additional fictitious profits. Accordingly, courts generally hold that when a Ponzi scheme collapses, and there is not enough money to repay all the funds invested by victims, the victims should recover proportionately in accordance with their respective actual losses, *i.e.*, their unrecovered cash investments, not their phony inflated profits. *See, e.g., CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115-16 (9th Cir. 2000) (upholding net investment method); *Official Cattle Contract Holders Comm. v. Commons (In re Tedlock Cattle Co.)*, 552 F.2d 1351 (9th Cir. 1977) (per curiam) (investors in Ponzi scheme treated *pro rata* on "cash-in-cash-out" basis, following *Abrams v. Eby (In re Young)*, 294 F. 1 (4th Cir. 1923) (claimant who received back amount of his initial investment could not share in remaining funds until he had accounted for false profits, which had been paid at expense of other equally innocent investors)); *CFTC v. Equity Fin. Group, LLC*, No. Civ. 04-1512, 2005 WL 2143975, at *22-24 (D.N.J. Sept. 2, 2005), *adopted in* No. Civ. 04-1512, 2005 WL 2864783 (D.N.J. Oct. 26, 2005) (*pro rata* distribution based on initial investment, with previously paid "profits" offset); *SEC v. Funding Res. Group*, No. 3-98-CV-2689-M, 2004 WL 1189996 (N.D. Tex. May 27, 2004), *adopted as modified*, No. Civ.A 398CV2689M, 2004 WL 1882972 (N.D. Tex. Aug. 20, 2004) (in equity receivership arising out of Ponzi scheme, no claim or further recovery allowed to "victim" who had already received back more than he had paid in); *Focht v.*

*Athens (In re Old Naples Sec., Inc.)*, 311 B.R. 607, 616-17 (M.D. Fla. 2002) (*citing SIPC v. C.J. Wright & Co. (In re C.J. Wright & Co.)*, 162 B.R. 597, 609-10 (Bankr. M.D. Fla. 1993)) (Ponzi-scheme participants in SIPA case are entitled to receive amount invested less any payments received, not fictitious profits); *SEC v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395, 2000 WL 1752979, at *40-41 (S.D.N.Y. Nov. 29, 2000), *aff'd*, 290 F.3d 80 (2d Cir. 2002) (*pro rata* recoveries are based on investment losses and not on paper profits); *CFTC v. Franklin,* 652 F. Supp. 163, 169-70 (W.D. Va. 1986)*, rev'd on other grounds sub nom. Anderson v. Stephens,* 875 F.2d 76 (4th Cir. 1989) (pro rata distribution based on initial investment). *But cf. SEC v. Byers*, 08 Civ. 7104, --- F.Supp.2d ----, 2009 WL 2185491, at *14 (S.D.N.Y. Jul. 23, 2009) (approving plan using "net investor method," under which cash distributions received prior to SEC's lawsuit were added to total amount invested to form starting point for *pro rata* distribution).

In *SEC v. Credit Bancorp, Ltd.*, 2000 WL 1752979, the district court was presented with competing distribution proposals in a Ponzi-scheme receivership. The court set forth two rationales for adopting a net investment approach instead of a fictitious profits approach: First, the court held "it is in the nature of a Ponzi scheme that customer returns are generated not from legitimate business activity but, rather, through the influx of resources from new customers. 'Since all the funds were obtained by fraud, to allow some investors to stand behind the fiction that [the] Ponzi scheme had legitimately withdrawn money to pay them 'would be carrying the fiction to a fantastic conclusion.'" *Id.* at *40 (*quoting Teletronics, Ltd. v. Kemp*, 649 F.2d 1237, 1241 (7th Cir. 1981) (*quoting Cunningham v Brown,* 265 U.S. at 13)). As a result, "permitting customers to retain such gains comes at the expense of the other customers." *Id.* Second, the court continued, "recognizing claims to profits from an illegal financial scheme is contrary to

public policy because it serves to legitimate the scheme." *Id.* (internal citations omitted). Both of these rationales apply equally to this case.

B.    **The "Cash In/Cash Out" Methodology Has Been Applied To Prior Ponzi Schemes Under SIPA.**

Consistent with the body of case law holding that the proper method for valuing claims in Ponzi schemes is based on an investor's net investment, courts have upheld the net investment method in Ponzi scheme liquidations under SIPA.

In *In re Old Naples Securities*, 311 B.R. 607, the district court was confronted with facts similar to those here. The court held that a net investment approach, not a fictitious-statement approach, was the proper way to calculate a customer's net equity in an investment Ponzi scheme case. The court noted that "permitting claimants to recover not only their initial capital investment but also the phony 'interest' payments they received and rolled into another transaction is illogical. No one disputes that the interest payments were not in fact interest at all, but were merely portions of other victims' capital investments." *In re Old Naples Sec., Inc.*, 311 B.R. at 616-17. The court further held that if the promised fictitious returns were upheld, "the fund would likely end up paying out more money than was invested in [the] Ponzi scheme." *Id.* at 617. "This result is not consistent with the goals of SIPA, which does not purport to make all victimized investors whole but only to partially ameliorate the losses of certain classes of investors." *Id.* *In re Old Naples Securities* was cited with approval by the Second Circuit in *New Times I,* 371 F.3d 68, discussed more fully below.

C.    **Fictitious Profits Paid Out In Ponzi Schemes Are Recoverable.**

Not only do courts generally make distributions in Ponzi scheme cases based on original investments net of return payments, they uphold the use of fraudulent conveyance principles to recover payments in excess of the net amounts paid in to the scheme to prevent earlier

participants in Ponzi investment schemes from profiting at the expense of later investors. *See,
e.g., Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir.), *cert. denied*, 129 S. Ct. 640 (2008) (in
Ponzi-scheme cases, "the general rule is that to the extent innocent investors have received
payments in excess of the amounts of principal that they originally invested, those payments are
avoidable as fraudulent transfers . . . ."); *Sender v. Buchanan (In re Hedged-Investments Assoc.,
Inc.*), 84 F.3d 1286, 1290 (10th Cir. 1996) (allowing bankruptcy trustee in Ponzi scheme case to
recover payments in excess of investor's investment on fraudulent conveyance grounds); *Scholes
v. Lehmann*, 56 F.3d 750, 757-58 (7th Cir. 1995) (receiver in Ponzi-scheme case could recover
transfers to investors in excess of investors' actual payments into the scheme); *Merrill v. Abbott
(In re Indep. Clearing House Co.*), 77 B.R. 843, 869-70 (D. Utah 1987) (payouts of false Ponzi
scheme profits avoidable as fraudulent transfers); *Bayou Accredited Fund, LLC v. Redwood
Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810, 843, 854, 860 (Bankr. S.D.N.Y.
2008) (awarding debtor summary judgment in fraudulent conveyance cases against investors
who had closed out Ponzi scheme accounts; as to claimants establishing issue of fact as to good
faith defense, recovery by the debtor is limited to payments made in respect of fictitious profits);
*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R.
624, 636 (Bankr. S.D.N.Y. 2007) ("Plaintiffs are correct in asserting in their brief that virtually
every court to address the question has held unflinchingly that to the extent that investors have
received payments in excess of the amounts they have invested, those payments are voidable as
fraudulent transfers.") (internal quotations omitted); *In re Taubman*, 160 B.R. 964, 986-88
(Bankr. S.D. Ohio 1993) (allowing trustee of Ponzi scheme estate to avoid payments of "false
profits" by debtor to investor because such payments were fraudulent transfers); *Lawless v.
Anderson (In re Moore*), 39 B.R. 571, 574-75 (Bankr. M.D. Fla 1984) (payment to Ponzi scheme

victim in excess of investment was fraudulent transfer recoverable by chapter 7 trustee of Ponzi-scheme estate).

Indeed, in enacting SIPA, Congress specifically granted SIPA trustees the power to avoid fraudulent transfers. *See* section II(D) *infra*, at p. 46; *see also* Section 78fff-2(c)(3) of SIPA ("[T]he trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11"). Thus, as in other Ponzi cases, the Trustee here is empowered to avoid "false profits" obtained by certain investors for the benefit of all customers.

**D.    The Second Circuit's Decision In *New Times I* Supports The Trustee's Methodology**

In various filings, certain claimants have asserted that the Trustee's interpretation of net equity is inconsistent with the decision of the Second Circuit in *New Times I*, 371 F.3d 68  To the contrary, *New Times I* not only supports the Trustee's interpretation, it is a logical extension of the body of law developed concerning Ponzi schemes and prior SIPA decisions.

**1.    *New Times I* Held That Customers Have Claims For Securities Where They Receive Confirmation Statements And That Net Equity Claims In A Ponzi-Scheme Case Should Not Be Based Upon Fictitious Profits**

The *New Times* litigation involved a Ponzi scheme in which investors were fraudulently induced to purchase three sets of securities: (i) fake promissory notes that did not fall under the SIPA definition of "securities," (ii) real mutual funds that were never purchased despite being otherwise represented on customer statements, and (iii) nonexistent money market funds. Instead of investing these customers' funds as represented, the debtors misappropriated the money. *See New Times I*, 371 F.3dd at 71-72.

The *New Times* trustee determined that those customers who invested in the non-existent money market funds had "claims for cash," eligible for SIPC protection of up to $100,000.  Their

claims were valued according to the amount paid to the debtors to purchase the bogus shares, less any withdrawals or redemptions by the claimants. Thus, amounts shown as interest or dividends on the bogus funds were not included in the calculation of their claim. *Id.* at 71, 73-75. Meanwhile, investors who were misled to believe that they were investing in mutual funds that in reality existed – but whose funds were never actually invested – were deemed to have "claims for securities," eligible for SIPC protection of up to $500,000. *Id.* at 71, 74-75.

The claimants that purchased the nonexistent money market funds objected to the trustee's determination of their claims.[18] They set forth two bases for their objection: "(i) the Trustee's determination of their claims as cash claims, and (ii) his refusal to compensate them for interest and dividend reinvestments." *Id.* at 74. The district court agreed with the claimants as to both issues, and the trustee appealed.

The Second Circuit upheld the district court's determination that the claimants had claims for securities, not claims for cash. *Id.* at 71, 87. The SEC, the trustee, and SIPC had different positions on appeal with respect to whether the non-existent money market fund customers had claims for cash or for securities. The trustee and SIPC viewed the claims as cash claims because there were no securities to liquidate on the filing date. The SEC, on the other hand, contended that the claimants should be treated as having securities claims despite the fact that the securities were fictitious because they received confirmations and customer statements from the debtors.

The Second Circuit held that the claimants had securities claims because they had received written confirmations of transactions and because the SIPC Series 500 Rules sought to protect their legitimate expectations that they had purchased securities. This reasoning was

---

[18] The *New Times I* decisions only dealt with those investors that purchased the imaginary money market funds. The Trustee's determinations as to the claims of those investors that paid for existing mutual funds that were never purchased were not objected to.

"more in line with the goals of the statute and with the legislators' intent in introducing the securities/cash distinction . . . ." *New Times I*, 371 F.3d at 87.

The Second Circuit reversed the district court's holding that Net Equity claims should be based upon imaginary paper profits (fictitious interest and dividend reinvestments) that were listed on the customer statements. *Id.* at 71, 87-88. The Second Circuit upheld the joint position of SIPC and the SEC that net equity should be based upon the net cash invested in the scheme, not upon the fictitious interest and dividend reinvestments set forth on their customer statements. The Court agreed that basing recovery on fictitious interest was "irrational and unworkable" and that to base customer recoveries on "fictitious amounts in the firm's books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality." *Id.* at 88. The Court thus held that Net Equity should be based upon the claimant's initial cash investments and should not include "the artificial interest or dividend reinvestments reflected in the fictitious account statements that the Claimants received from the Debtors." *Id.*

## 2.    SIPA Does Not Protect Customer Expectations In Fictitious Profits.

Certain customer claimants, in arguing that they are entitled to the fictitious profits listed on their BLMIS customer statements in valuing their Net Equity, have asserted that any other result is contrary to their "legitimate expectations." In doing so, they have conflated the two distinct holdings of *New Times I* interpreting SIPA.

The Series 500 Rules, and the *New Times I* decision interpreting those Rules, credit a customer's legitimate expectation that securities have been purchased on her behalf. Under those Rules, a customer has a legitimate expectation – and thus a claim for securities (as opposed to a claim for cash) – where she received confirmations showing that securities had been purchased for her, whether or not such securities had actually been purchased. Accordingly, the customer is treated as having a claim for securities rather than cash and is entitled to receive up to the full

$500,000 securities advance limit of SIPC protection (as opposed to the $100,000 limit had it been a claim for cash). *See New Times I*, 371 F.3d at 86; *see also* 17 C.F.R. § 300.501(a). This is what the Trustee has done in this case.

But the Series 500 Rules do not speak to the expectation – legitimate or not – that the customer has actually earned the fictitious profits shown on her fraudulent customer statements. The Series 500 Rules treat confirmation statements as relevant only to the issue of whether it is a cash claim or a securities claim, and *New Times I* does not hold otherwise.

Unlike the trustee in the *New Times* litigation, who initially attempted to treat some customers as having claims for cash rather than claims for securities, the Trustee here is satisfying all customer claims as though they were claims for securities. As a result, each BLMIS customer who received a statement showing securities held for her by BLMIS on the Filing Date is eligible to have her claim satisfied by the Trustee with up to $500,000 provided to her by SIPC, based on the value of her Net Equity. Therefore, the legitimate expectations of a BLMIS customer – that she has a claim for securities – has been satisfied. Thus, the Trustee is allowing and satisfying claims in accordance with the dictates of *New Times I* and has endeavored to treat customers as fairly and as generously as the statute and relevant case law will allow.

But to read into SIPA a requirement that a customer's expectations that she has earned the fruits of the Ponzi scheme must be validated would run afoul of SIPA, the Trustee's power to avoid fraudulent transfers, and the net investment method of asset distribution embraced by courts confronted by Ponzi schemes. It would improperly legitimize Madoff's fraud by allocating funds based upon the "success" of one's participation in that fraud. It would allow the fraudster, not the markets, to determine who wins and who loses. And it would embrace

fictitious, backdated trades effectuated only in Madoff's fraudulent "world" that have no relation to reality or the normal functioning of the marketplace. That cannot be the law.

It bears noting that under SIPA, valid claims for securities are satisfied in kind where there is a fair and orderly market for them. Section 78fff-2(d) of SIPA. If the securities cannot be bought in a fair and orderly market, the customer receives a cash payment based on the market value of the securities as of the filing date. Sections 78fff-3(a)(3) & 78fff-2(b) of SIPA. Here, even though the Trustee has deemed claims in this liquidation proceeding as claims for securities, he cannot satisfy those claims with the securities listed on the last BLMIS customer statements for a variety of reasons. First, because of the substantial number of "buys" and "sells" purportedly occurring over a long period of time in any single account, it is impossible to trace a customer's "real" money to any particular securities. (Looby Dec. ¶ 72). In fact, as set forth above, other than the amount of her initial investment of principal, no customer ever had enough actual funds to purchase the securities listed on her last BLMIS customer statement. Because the particular securities that were actually paid for by a customer are unidentifiable, no market price can be ascertained. (Looby Dec. ¶ 73).

Second, even if the particular securities that the customer purchased were somehow identifiable, because none were ever bought, the Trustee's purchase of them now would wreak havoc in the marketplace. Given the large volume of securities and options involved, there is no "fair and orderly" market in which to purchase them, even assuming that the funds in the customer account were sufficient to do so. *See* Section 78fff-2(b) of SIPA.

In sum, the Trustee has allowed valid customer claims in this liquidation to be partially satisfied up to the full $500,000 SIPC advance limit for claims for securities, thereby satisfying the customers' "legitimate expectations" in accordance with the statute and relevant case law.

    **3.**    **Because BLMIS Created Fictitious Transactions In A Fictitious Market, Customer Claims Should Not Include Paper Profits That Have No Relation To Reality.**

The Second Circuit's holding in *New Times I* that Net Equity should be valued according the claimants' net investment, without regard to any bogus interest or dividend reinvestments in the fake mutual funds in which their funds were purportedly invested, applies equally here. *New Times I,* 371 F.3d at 88. Just as in *New Times I*, to base Net Equity here on fictitious customer statements that bear no relationship to the actual securities markets would allow "customers to recover arbitrary amounts that necessarily have no relation to reality." *Id.* at 88. The securities listed on BLMIS customer statements were neither bought nor sold, and no profits were ever realized on any securities transactions. The BLMIS customer statements were merely fictitious vehicles used to deceive customers into believing that they were making certain rates of return in order to perpetuate Madoff's Ponzi scheme.

When viewed in their totality, the factual underpinnings of the fraud as executed by Madoff demonstrate that BLMIS customers most closely resemble those investors in *New Times I* whose customer statements reflected investments in imaginary mutual funds, who also sought to recover fictitious profits. First, as with imaginary mutual funds, the securities positions reflected in BLMIS customer statements could not have been purchased as shown on the statement because the fictitious trades were concocted *after the fact* based on historical prices. *See* DiPascali Plea Allocution, at p. 47. The purchases and sales reflected on customer statements could not have been obtained in the market, but only through the fictitious backdating and historical analysis utilized by BLMIS. (Looby Dec. ¶ 60). This made not just the trades, but the entire market, fictitious.

The transactions were impossible for other reasons as well. On certain days, BLMIS "confirmed" to customers the purchase of stock or options that, in the aggregate, totaled more

than the total volume of such securities or options traded that day on listed exchanges. (Looby Dec. ¶ 100). Moreover, BLMIS customers did not have enough actual monies in their accounts to permit "purchases" of the securities shown on the final fictitious BLMIS customer statements. (Looby Dec. ¶ 71). To do so would have been in clear violation of the margin rules. *See* 12 C.F.R. § 220.1. Certain securities listed on the BLMIS customer statements did not exist; some customer statements showed investments (while purportedly "out of the market") in Fidelity Spartan U.S. Treasury Money Market Fund as late as 2008, despite the fact that Fidelity has not offered a fund by that name since 2005. (Looby Dec. ¶ 57). And the fictitious BLMIS customer statements sometimes showed securities bought and sold outside the price range that the securities traded on a given day. (Looby Dec. ¶ 106).

Thus, the BLMIS customer statements reflect ex post facto paper justifications for resulting fictitious profits, based upon an after-the-fact examination of the movements that stocks had taken from day to day, and even based upon investments in illusory funds. These "transactions" thus were not subject to any of the risks of the market, because these "transactions" were mere collections of fictitious backdated trades. This made the market itself, like the trades, fictitious. As with the imaginary mutual fund investors in *New Times,* to credit customers for these fake BLMIS "transactions" would effectuate fictitious trades in a fictitious marketplace and not reflect the actual risks associated with investing in securities.

It is true that for claimants who believed that they had invested in "real" mutual funds in *New Times*, the trustee calculated net equity based upon the "earnings" on those investments as represented on their customer statements. But those claimants are far different from the BLMIS claimants. In *New Times*, those customers were defrauded because legitimate securities that they ordered and paid for were never actually purchased. The subsequent "earnings" of those

securities in the marketplace, as reflected on the customers' customer statements, were real,
ascertainable, un-manipulated, and subject to market risks.    These customers' securities
(although they had not been purchased) behaved "on paper" the way the actual securities
performed in the marketplace.    (*See* Brown Affidavit, Ex. 3, p. 7 n.6).    Based on their statements,
these customers received only what those securities would have earned had they been purchased
as represented, whether those investments increased or decreased in value.    In other words, Net
Equity was based upon the profits that investors would have achieved in the market *but for* the
fraud.

Here, in contrast, the objecting claimants desire their net equity to be based upon profits
they "earned" only *as a result* of the fraud – by crediting imaginary transactions manufactured
after the fact from historical prices to justify particular levels of returns promised to investors.
The purported transactions had no relationship to the marketplace, nor could they have.

Moreover, there is no way to know what the customers would have purchased under
legitimate circumstances with the funds actually available to them, were they doing anything
other than delegating those decisions entirely to Madoff. Given that the transactions were
backdated, the BLMIS customer statements did not and could not reflect securities transactions
that were actually contemplated by BLMIS customers.    Indeed, the final fictitious BLMIS
customer statements did not represent the growth of long-term holdings over time, as Madoff
purported to regularly cash out the stock positions of his customers.    Accordingly, the net cash
value of the BLMIS customer investments is the best proxy for the value of securities that the
BLMIS customers might have purchased had BLMIS not been a Ponzi scheme.

Another key distinction between those *New Times* investors who believed that they had
purchased real mutual funds and BLMIS customers is that the *New Times* investors paid for their

securities.  The definition of "net equity" under SIPA requires the Trustee to offset securities positions with the "indebtedness of such customer to the debtor on the filing date."  Section 78*lll*(11) of SIPA.  Thus, inherent in the definition of Net Equity is that securities actually be paid for by the customer.

BLMIS customers, in contrast to *New Times* investors in real mutual funds, did not pay for the securities reflected on their BLMIS customer statements, except to the extent of their net cash investments.  (Looby Dec. ¶ 72).  Because BLMIS customers should not be permitted to pay for real securities with fictitious and manipulated profits, in order to receive the securities listed on their final fictitious BLMIS customer statements, customers would have to pay the astronomical sum reflecting the difference between the value of the securities positions reflected on their BLMIS customer statements and what those customers actually paid in to the fraudulent BLMIS scheme.  Accordingly, the net cash value of the BLMIS customer investments is the best measure of Net Equity.

Given the absence of "securities positions" in the BLMIS customer accounts at all, much less ones that legitimately reflected a fair and orderly marketplace in securities, Net Equity cannot be calculated based upon the amounts set forth in these final fictitious BLMIS customer statements.  As a result, the Trustee has calculated Net Equity based upon the only ascertainable property that was custodied with the broker-dealer by or for the claimants and is attributable to the claimants – the actual cash that these customers deposited with BLMIS, net of the amount that these customers withdrew.  This is the result that comports with SIPA.

Moreover, objecting claimants here seek securities positions that, although they exist in name, do not exist in sufficient volume such that the securities can be purchased in a "fair and orderly" market to be returned to the customers.  Like the *New Times I* investors who

"purchased" imaginary mutual funds – transactions which could not have ever been effected –
the transactions purportedly conducted by BLMIS could not – and cannot – have been effected in
the volumes indicated on the final customer statements in a fair and orderly market.  They could
only, and did only, exist within the confines of the fraudulent world of BLMIS.

For each of these reasons, as between calculating Net Equity based upon the fictitious
securities positions set forth in the final fictitious BLMIS customer statements or based on the
"cash-in/cash-out" method, only the latter is consistent with *New Times I*.

II.    **The Trustee's "Cash in/Cash out" Methodology Is The Only One Consistent With
SIPA**

A.    **The Fictitious Customer Statements Do Not Reflect Real "Securities
Positions"**

Under section 78*lll*(11), "net equity" requires "calculating the sum which would have
been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the
filing date, all securities positions of such customer (other than customer name securities
reclaimed by such customer)[.]"

The claimants contend that their last account statements show their "securities positions."
But, as described above, the claimants have no real securities positions, as Madoff (with a few
inconsequential exceptions) did not purchase and sell the securities reflected on BLMIS
customer statements.  Thus, Net Equity cannot be based upon those statements.

B.    **The "Books and Records" Requirement Precludes Claims Based Upon
Fictitious Profits**

In order to be satisfied by a SIPA trustee, obligations to customers "must be ascertainable
from the books and records of the debtor or . . . otherwise established to the satisfaction of the
trustee."  Section 78fff-2(b) of SIPA.  A claim for cash or securities based on fictitious trades
does not establish a broker's obligation to a customer under SIPA to the satisfaction of the

trustee where the records otherwise demonstrate that the position has been purportedly "bought" with fictitious dollars. In such a circumstance, the Trustee must be able to ascertain to his satisfaction the actual obligation to a customer.

While the BLMIS customer statements are one aspect of BLMIS's books and records, those particular records are false. The other books and records of BLMIS, in contrast, confirm that none of the transactions reflected on those BLMIS customer statements were actually consummated, nor could they have been. The only hard numbers available to the Trustee, viewing the books and records of BLMIS as a whole, are the amounts of cash invested and withdrawn. (Looby Dec. ¶ 24).

### C.    "Customer" Claims Cannot Be Based On Fraudulent Transactions.

The Trustee's methodology is also the only one consistent with the definition of "customer." While a claimant is a "customer" under SIPA if, as here, she entrusts her cash for the purchase of securities, *see SIPC v. Bernard L. Madoff Inv. Sec., LLC*, 401 B.R. 629, 635 (Bankr. S.D.N.Y. 2009), she has no claim as a "customer" to the particular securities set forth on her BLMIS customer statement unless the purchase of those securities occurred in the broker-dealer's "ordinary course of business." *See* Section 78*lll*(2) of SIPA ("customer" defined as person with a "claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer"). Transfers to investors in furtherance of a Ponzi scheme from other investors' accounts are not in a broker's "ordinary course of business." *See Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Investments Assocs.)*, 48 F.3d 470, 475-76 (10th Cir. 1995); *Wider v. Wootton*, 907 F.2d 570, 572 (5th Cir. 1990); *Danning v. Bozek* (*In re Bullion Reserve of N. Am.*), 836 F.2d 1214, 1219 (9th Cir. 1988); *see also Official Comm. of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 462 (Bankr. S.D.N.Y. 2007) (ordinary course of business

defense to preference action unavailable to investors in Ponzi schemes because "the ordinary business terms of investment companies does not include payment to early investors of profits fraudulently derived from later investors rather than from legitimate business activity").

Thus, while a claimant is a customer for purposes of the cash she entrusted to BLMIS to purchase securities, she cannot be a customer for claims to particular securities whose purported "purchase" was made in furtherance of Madoff's Ponzi scheme. Accordingly, just as the Trustee's methodology with respect to Net Equity values cash deposited but not transfers made in furtherance of the Ponzi scheme, the definition of "customer" recognizes claims for cash deposited with the intent to purchase securities, but not claims based upon fictitious transactions.

**D.    The "Cash In/Cash Out" Method Is The Only One Consistent With The Trustee's Power To Avoid Fraudulent Transfers Under SIPA And Other Applicable Law.**

The Trustee's "cash-in/cash-out" method is the only one consistent with the Trustee's authority under section 78fff-2(c)(3) and SIPC Rule 503 to avoid fraudulent transfers. The Trustee has authority under SIPA to recover property constituting a fraudulent transfer when, as here, customer property is not sufficient to pay in full the claims of customers. *See* Section 78fff-2(c)(3) of SIPA ("the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11"); *see also Picard v. Taylor (In re Park South Securities LLC)*, 326 B.R. 505, 512 (Bankr. S.D.N.Y. 2005) (SIPA trustee has standing to avoid fraudulent transfers).

The SIPA Rules, which have the force of law, *see In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 275 (Bankr. S.D.N.Y. 1996), provide similarly. SIPC Rule 503, which governs voidable transactions, states that "[n]othing in these Series 500 Rules shall be construed as limiting the rights of a trustee in a liquidation proceeding under the Act to avoid any securities

transaction as fraudulent, preferential, or otherwise voidable under applicable law." 17 C.F.R. § 300.503(a).    The rules further provide that "[n]othing in these Series 500 Rules shall be construed as limiting the right of the Securities Investor Protection Corporation . . . to reject a claim for cash or a claim for securities if such claim arose out of a securities transaction which could have been avoided in a liquidation proceeding under the Act." 17 C.F.R. § 300.503(b).

As the Trustee can act to recover fraudulent transfers, Net Equity should not be based upon the final fictitious BLMIS customer statements, which contained fictitious securities purchases that did not involve a reasonably equivalent exchange of value. Indeed, these powers of the Trustee – as specifically granted to him by Congress under SIPA and the Bankruptcy Code – are in direct contrast to the claimants' theory that their net equity should be valued as of the date of their last BLMIS customer statement. If the claimants' construction of net equity were upheld, in contrast, the Trustee would have the obligation to allocate customer property based upon the fictitious world created by Madoff's Ponzi scheme, but simultaneously retain the authority to avoid transactions and recover property transferred in furtherance of that same fraudulent scheme. Net Equity should not be read to credit the very transactions that the Trustee would be able to avoid under SIPA and the Bankruptcy Code. That cannot be the law.

Indeed, case law developed in prior Ponzi-scheme cases is to the contrary, upholding trustees' use of fraudulent-transfer principles to recover fictitious profits. *See* section I(C), *supra*, at p. 33.    Other cases not involving Ponzi schemes hold similarly. For example, in *SEC v. S.J. Salmon & Co.*, 72 Civ. 560, 1973 U.S. Dist. LEXIS 15606 (Aug. 8, 1973), the district court upheld the trustee's right in a SIPA case to reject claims based upon transactions made by a broker in anticipation of liquidation because the transactions were fraudulent transfers. The district court rejected the notion that the prices set forth on the customers' account statements

should prevail because, the court held, those prices could not actually have been secured in the market. As the court held, "market quotations are not conclusive evidence and must give way before other evidence. The evidence in the instant case clearly shows that market value had no relationship to reality . . . ." *Id.* at *32. The court further rejected the argument that SIPA's provisions somehow negated the law of fraudulent transfer: "SIPA was not intended to make the fraudulent transfer provisions of the Bankruptcy Act inoperative as to stockbroker-debtors in SIPA proceedings. While SIPA was intended to protect customers there is nothing in its provisions to indicate that less preferred creditors are to be denied the protection of the provisions which bar a debtor from making fraudulent transfers at their expense." *Id.* at *31.

In addition to fraudulent transfer actions, trustees can also seek to avoid fictitious trades and transfers as illegal contracts under federal and state securities laws as well as common-law fraud – all of which apply with equal force here. *See, e.g., Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.),* 247 B.R. 51, 134 (Bankr. S.D.N.Y. 1999), *aff'd,* 263 B.R. 406 (S.D.N.Y. 2001) (upholding rescission of trades as illegal contracts under Section 10(b) of the Securities Exchange Act of 1934, the criminal provisions of SIPA, 15 U.S.C. § 78j(b), the Martin Act, N.Y. Gen. Bus. L. § 352 (McKinney 2009) and common-law fraud principles); *Securities & Exchange Commission v. Packer, Wilbur & Co.,* 362 F. Supp. 510 (S.D.N.Y. 1973), *aff'd,* 498 F.2d 978 (2d Cir. 1974) (claim of an investor denied under SIPA because the investor had tried to buy stock without any actual cash investment in violation of securities rules).

Indeed, to give effect to the final fictitious customer statements would improperly allow certain claimants to benefit from the fraud of their agent at the expense of others. Pursuant to the relevant customer agreements, BLMIS customers gave full discretion to Madoff to "trade" securities on their behalf. (Looby Dec. ¶ 35). To the extent the claimants wish to give effect to

the transactions reflected on their BLMIS customer statements at the expense of other innocent

parties, they would be improperly attempting to benefit from their agent's fraud. "Under New

York agency law, the principal may not accept the fruits of the agent's fraud and then attempt to

divorce himself from the agent by repudiating the agent and his knowledge," even if the principal

has no knowledge of the fraud and no fraudulent intent. *Jackson v. Mishkin (In re Adler,*

*Coleman Clearing Corp.)*, 263 B.R. 406, 454 (S.D.N.Y. 2001). The court in *Jackson* upheld the

trustee's right to rescind or avoid the challenged trades on this and other grounds.

Because the Trustee would have the right to avoid or rescind transfers made pursuant to

Madoff's scheme, even if the claimants had no knowledge of the fraud, SIPA cannot be read to

give force to the "legitimate expectations of the bargains of . . . concededly fraudulent

transactions[.]" *Jackson* at 433. To the contrary, the bankruptcy court in *Ensminger* observed

that it would "not permit the Claimants to reap the benefits of the fraud" of the broker. 247 B.R.

at 127. *See also Stafford v. Giddens (In re New Times Secs. Servs.),* 463 F.3d 125, 130 (2d Cir.

2006) ("treating . . . fictitious paper profits as within the ambit of the customers' 'legitimate

expectations' would lead to the absurdity of 'duped' investors reaping windfalls as a result of

fraudulent promises made on fake securities").

### E.    Customers Must Have Valid Net Equity Claims Before They Are Entitled To SIPC Protection.

Some customers contend that because their BLMIS customer statements show securities

held for them on the Filing Date, despite the fact that they have negative Net Equity based on the

"cash in/cash out" method, they are entitled to the $500,000 of SIPC protection. This is

incorrect.

As discussed above in Part III of the Statement of Facts, SIPA and its statutory

predecessors are limited in nature. In order to receive a distribution in a SIPA liquidation, the

claimant must be a "customer" and must have a valid claim of Net Equity as those terms are

defined under SIPA.  Only then are customers entitled to share in "customer property," and, if

their *pro rata* share from such customer property is insufficient to fully satisfy their "net equity,"

receive a SIPC advance of that property.  *See* Sections 78fff-2(b),(c)(1) & 78fff-3(a) of SIPA.

Because this was a Ponzi scheme, the only source of monies in the fund of "customer

property" under SIPA that can be distributed is other customers' money.  To the extent that a

"net winner" customer has already withdrawn all of her principal from BLMIS, whether

wittingly or unwittingly, she has nothing left to lay claim to in the fund of customer property

because she has already received her share of that fund.  In fact, she has received even more –

dollar for dollar - as opposed to "net losers" who will, for the most part, not be fully repaid.

Therefore, the only customers that are still entitled to share in the fund of customer property are

those who have not recovered the funds they actually invested with Madoff.  To calculate net

Equity upon anything other than "cash in/cash out" method, given the source of the fund of

customer property, is to suggest that some other resource exists to infuse cash into the fund of

customer property, which consists solely of cash actually invested by customers.

Various claimants may look to funds advanced by SIPC as an alternative source.  But

entitlement to a SIPC advance arises only when a customer can show that she is entitled to share

in the fund of customer property – *i.e.,* by having a valid Net Equity claim.  Only those

customers that have not received the return in full of their principal are entitled to share in the

fund of customer property, and thus only those customers are entitled to a SIPC advance (and

even then, only those customers that are not fully satisfied from the fund of customer property).

There can be no SIPC advance without a valid Net Equity claim.

**III.** *Visconsi v. Lehman Brothers* **Does Not Support The Objectors.**

Certain of the claimants suggest that *Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827 (6th Cir. 2007), supports their interpretation of Net Equity.  In *Visconsi*, victims of a fraudulent investment scheme perpetrated by a Lehman Brothers broker sued Lehman Brothers for fraud.  The Sixth Circuit upheld an arbitrator's award of an amount that was less than a third of the amount shown on the fictitious statement but substantially in excess of the cash-in/cash-out method.

*Visconsi* has no bearing on the meaning of Net Equity.  *Visconsi* was a tort lawsuit against a then-solvent entity, Lehman Brothers, in which the victims sought to make themselves whole for the fraud perpetrated against them by their broker, and in which they could do so without necessarily detrimentally impacting any other victim.  This case, by contrast, is a liquidation proceeding under SIPA against an insolvent entity in which limited customer funds are available for distribution.  The damages that may have been recoverable in the *Visconsi* case are not equivalent to Net Equity under SIPA.  SIPA was designed to give certain claimants of insolvent brokerages a preferential claim against those limited customer funds and protect customers against brokers' misappropriation of their assets.  It was *not* designed as a substitute for fraud or breach of contract claims, was never intended to make all customers whole from broker fraud, and does not guarantee the results of artificial inflation of those assets by fraudulent manipulation.  *See, e.g., Arford v. Miller (In re Stratton Oakmont, Inc.)*, 239 B.R. 698, 701-02 (S.D.N.Y. 1999), *aff'd*, 210 F.3d 420 (2d Cir. 2000) ("SIPA does not protect against all cases of alleged dishonesty and fraud."); *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1317 n.4 (2d Cir. 1976) (*quoting SEC v. Packer, Wilbur & Co.*, 498 F.2d at 983) ("SIPA was not designed to provide full protection to all victims of a brokerage collapse."); *SIPC v. Charisma Sec. Corp.*, 371 F. Supp. 894, 899 n.7 (S.D.N.Y.) (general contract and fraud claims not included in umbrella

of SIPA protections), *aff'd*, 506 F.2d 1191 (2d Cir. 1974); *SEC v. S.J. Salmon & Co.*, 375 F.

Supp. 867 (S.D.N.Y. 1974) (investor's claim for rescission on account of fraudulent inducement

was not a protected customer claim under SIPA); *In re Adler Coleman Clearing Corp.*, 195 B.R.

at 273 ("SIPC's role in a SIPA liquidation is limited by statute; it does not attempt to make all

customers whole."); *see also In re Brentwood Sec., Inc.*, 925 F.2d 325, 330 (9th Cir. 1991) (SIPA

"does not comprehensively protect investors from the risk that some deals will go bad or that

some securities issuers will behave dishonestly").

**IV.    Basing Net Equity Upon Fictitious BLMIS Customer Statements Would Be
Inequitable And Make For Poor Public Policy.**

Calculating net equity based upon fictitious transactions is not only inconsistent with

SIPA; it is also inequitable.  As noted in *Cunningham*, 265 U.S. at 13, in a Ponzi scheme, as

among equally innocent victims, "equality is equity."  In a scheme such as Madoff's, although

many of the victims, individually, are sympathetic, the fact remains that there are limited funds

to distribute.  As in all Ponzi schemes, the investors who obtained "profits" were paid using the

money of other investors, and the latter should not be made to suffer disproportionately.

Treating the phony "profits" concocted in the fraudulent world of Madoff's Ponzi scheme as real

would reward claimants who have already received back all their capital, at the expense of those

who lost everything.   Each customer's gain in fictitious profits on their BLMIS customer

statement would result in another person's loss of actual cash invested.  A slavish adherence to

the final ficitious customer statement – in spite of all of the evidence demonstrating the falsity of

those statements with respect to securities transactions – permits Madoff to determine who wins

and loses.  Doing so would be contrary to the strong consensus among courts that have dealt with

Ponzi scheme distributions that a net investment approach is the most equitable means to allocate

limited resources among equally deserving victims.   *See* Section I(A), *supra*, at p. 30.

To allocate limited resources based upon the final fictitious BLMIS customer statements would also be bad public policy. The position of the objecting claimants amounts to this: if a broker-dealer pretends to have purchased securities in fictional transactions with imaginary money at orchestrated prices that are impossible under normal and orderly functioning of the markets, the SIPA trustee and SIPC may not look behind the pretense but must pay out money and assets as if each supposed transaction were a real and normal part of the legitimate securities commerce of this country. In other words, the objecting claimants would have the obligations of the SIPA trustee and SIPC, a quasi-public entity, determined solely by the fantasies of a fraudster. Nothing in the language of SIPA or case law dictates such a result.

## CONCLUSION

Certain claimants have suggested that the Trustee include an interest factor when calculating a customer's "cash-in/cash-out" figure to reflect the various entry points of investors in Madoff's lengthy scheme. Whether and to what extent such a calculation is appropriate is not before the Court in this briefing, nor are other particular nuances of the "cash-in/cash-out" method.

Regardless of the outcome of these later determinations, the fact remains that only the "cash-in/cash-out" method hews to the letter and spirit of SIPA, case law, public policy, and the equities of this case, as well as common sense. For the reasons set forth above, the Court should affirm the Trustee's determination of net equity based upon the "cash-in/cash-out" method.

Respectfully submitted,

Dated: New York, New York
        October 16, 2009

Of Counsel:                          /s/ David J. Sheehan

Baker & Hostetler LLP                Baker & Hostetler LLP
3200 National City Center            45 Rockefeller Plaza
Cleveland, Ohio 44114                New York, New York 10111
Telephone: (216) 621-0200            Telephone: (212) 589-4200
Facsimile: (216) 696-0740            Facsimile: (212) 589-4201
Thomas D. Warren                     David J. Sheehan
Email: twarren@bakerlaw.com          Email: dsheehan@bakerlaw.com
Wendy J. Gibson                      Marc Hirschfield
Email: wgibson@bakerlaw.com          Email: mhirschfield@bakerlaw.com
                                     Seanna R. Brown
                                     Email: sbrown@bakerlaw.com

                                     *Attorneys for Defendant Irving H. Picard,
                                     Trustee for the Substantively Consolidated
                                     SIPA Liquidation of Bernard L. Madoff
                                     Investment Securities LLC and Bernard L.
                                     Madoff*

# EXHIBIT C

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and
Government Sponsored Enterprises
July 14, 2009

**Mr. Ackerman: (At 8:55 on webcast)**

**Mr. Ackerman:** Thank you Mr. Chairman. Good morning. Mary Schapiro, there are an
awful lot of people watching this hearing that aren't too interested in
regulatory reform. They're not too concerned about resolution authority
or the clearing of derivatives. And they aren't too worried about whether
congress complies with your request to increase funding for the SEC
Enforcement Division. Madam Chairman, there are thousands of now
penniless victims of Bernard Madoff ponzi schemer who are interested in
just one thing, making sure their government lives up to its word. As you
know, the Securities Investor Protection Corporation. That's *investor
protection.* Indicating that it has something to do with protecting the
investors. SIPC provides insurance of up to $500,000 for securities
investors in the event that a broker-dealer fails. It's been seven months
now since the collapse of Mr. Madoff's fraud and, to date, of the
15,000,400 claims that have been submitted, only 450 victims have
received even a portion of their SIPC insurance. Part of the delay stems
from the confusion over the eligibility requirements for SIPC coverage. If
you believe the law, as interpreted by SIPC general counsel Josephine
Wang, SIPC is obligated to provide up to $500,000 per account for
securities to any investor that believes that they own securities in Madoff's
investment statements. But if you believe Irving Picard, the court
appointed trustee in the Madoff case, based on the judicial precedence
from the 1920s, SIPC is obligated to insure only the funds that Madoff
victims initially invested, minus any withdrawals. According to Mr.
Picard's interpretation, many Madoff victims are not entitled to their
insurance payments. Madam Chairman, that Madoff was able to conduct
his fraud unmolested by the SEC for decades and despite the red flags
raised by Harry Markopolos is tragic. That the court appointed trustee in
the Madoff case is seeking to delay and, ultimately, deny the insurance
payments due Madoff's victims is absolutely shameful. Many of
Madoff's victims are in complete financial ruin. Many have lost their
homes and have moved in with their children or friends. The lucky ones
don't know how to make their next mortgage payment. At a minimum,
they deserve the insurance they believe, and to which the law says, they're
entitled. I hope that you can put an end to the confusion today by
clarifying specific eligibility requirements. And I yield back the balance
of my time.

**Q&A between Mr. Ackerman and Ms. Schapiro (At 52:00 on webcast)**

**Q. Mr. Ackerman:** Madam Chairman, the issue that I addressed in my opening
statement to refresh your memory as to the Madoff victims and the terrible
situation that we're looking where we actually have classes of victims

1

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and
Government Sponsored Enterprises
July 14, 2009

pitted against each other in addition to all the other confusion.  Which
Madoff investors are eligible for their SIPC insurance?

**A. Ms. Schapiro:**  Congressman, let me just say that this is -- it shouldn't be such a
difficult issue, but it is.  And, of course, it's a very heartbreaking issue.
Because the tragic truth is that there is not enough money available to pay
off all of the customer claims.  And, as you point out, there are --

**Q. Mr. Ackerman:**  That leads us -- if I could just interject there -- a larger problem.
Because that means that our citizens are not entitled to have confidence in
the system.

**A. Ms. Schapiro:**  Well, there is no doubt that what has happened with Madoff has
shaken everybody's confidence in the integrity of the financial services
industry and in the regulatory system to protect investors.  With respect,
specifically, to the SIPC question, as you know, the trustee has chosen a
cash-in/cash-out view when determining net equity on which claims, and
at what amount, to pay out.  There are a group of investors who believe
that net -- so that if you paid in $2 million, over time you took out a
million dollars, your net equity would be $1 million.  There's a group of
investors --

**Q. Mr. Ackerman:**  But these, unfortunately, are people that we have encouraged and
assured by virtue of the fact that we provide the supervision and these
people knew that there were questions raised about Madoff and the
government, basically, gave him a clean bill of health year after year.
People knew about Mr. Markopolos.  People knew about other people, as
well, that had raised questions that were dismissed and then felt the
government is saying that this guy is okay.  And the million dollars that I
put in has grown over the years and I have this money to live on now.

**A. Ms. Schapiro:**  I understand that and there's a group of investors who feels very
deeply that their net equity on which they would be paid to be determined
by looking, as you point out, at their last account statement, so they may
have paid in $2 million but that amount of money has grown to $10
million and they were relying on that $10 million to be there for them.

**Q. Mr. Ackerman:**  Well, they weren't relying on the $2 million, which they were, of
course.  They were relying on the government's assurance that they had
the $2 million.  And they made life decisions based on that.  So, where do
you come down Madam Chairman?

**A. Ms. Schapiro:**  Well, we've been with SIPC and with the lawyers for the investors
who would like to calculate the net equity based on the last account

2

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and
Government Sponsored Enterprises
July 14, 2009

statement in hopes of trying to find a way to settle this matter and,
between the two groups, to expedite getting these payments out to people
who are very dependant upon them. These investors have challenged the
trustee's cash-in/cash-out methodology in court and that is before --

**Q. Mr. Ackerman:** Well, we're going to have to make a decision and someone has to
make a choice here.

**A. Ms. Schapiro:** I understand and --

**Q. Mr. Ackerman:** Here's a case. A woman who has a small business, a publishing
business, she sells it for $3 million and that's everything she owns in the
world, $3 million. It's in Madoff. She gets a check for $30,000 a month
that she's taking out, which is the money she's making on it. She still has
the equity in there. She buys a huge apartment in Manhattan. That's the
only asset that she has. The asset is now under water. She spends the
$30,000 a month to pay her taxes, pay her mortgage and her maintenance
and her living expenses. She's done this for a couple of years. Suddenly,
one month when Madoff turns himself in, she has no income. The unit she
lives in upside down, as they say, she can't sell it for what it's worth, she
owes $15,000 a month in carrying charges, she'll get nothing from it if she
sells it, and has $1,500 in her bank and is waiting for her $30,000 return
from Madoff. She's homeless. She has no assets. Her $3 million has
been stolen. And then, on top of that, she's being told that the $30,000 a
month that she's gotten, that she's paid taxes on with half, and half to her
mortgage, she suddenly owes back, because of a claw-back thing that
they're claiming, where is she going to get the $30,000 a month that she's
collected to give back? I mean, these people are absolutely destitute. And
they were reliant on the government's seal of approval that this guy is
legit, that he's up and up. How can we turn our back on these people?

**A. Ms. Schapiro:** We cannot turn our back on them and we should not turn our back on
them. And, I'm committed to working as aggressively as we possibly can
with SIPC and take the most expansive possible view of how to repay
these claims and to do it in as quick a fashion as we possibly can. That
specific issue is before the bankruptcy judge right now. I don't have --
although I'd be happy get for you -- some indication of timing or when it
might be resolved. But I agree that we need to push very hard to make
people whole to the greatest extent possible.

**Q. Mr. Ackerman:** I thank you for your concern and your actions. Mrs. Chairman, if I
could just have another couple of seconds to add -- some of our colleagues
have raised an accountability question and I just want to compliment the
Chairman. That rather bombastic initial hearing that we had with people

3

Testimony of Mary Schapiro before Subcommittee on Capital Markets, Insurance and
Government Sponsored Enterprises
July 14, 2009

from the agency before that got an awful lot of attention because it was the
first one. The Chairman called me immediately after the hearing and said
she aghast that some of the things that she had heard during the testimony
--

**Unknown Speaker:** You mean she called you too?

**Q. Mr. Ackerman:** Yes, she did [laughter]. Even me. And, by the end of that week,
two of those people were gone from the agency and I just want to say that
that's accountability that I've never seen in my fourteen terms here and I
want to thank the Chairman for swift action and dedication to our mission.
I yield back the balance of my time.

4

# EXHIBIT D

08-01789-cgm  Doc 4169-15  Filed 06/15/11  Entered 06/15/11 19:56:51  Exhibit L
to the Chaitman Decl.  Pg 107 of 152
Case 1:09-cr-00213-DC  Document 38  Filed 03/10/2009  Page 1 of 25

JUDGE CHIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

    -v-      :

BERNARD L. MADOFF,      :

        Defendant.      :

- - - - - - - - - - - - - - - x

**09 CRIM 213**

**INFORMATION**

09 Cr.

USDC SDNY
DOCUMENT
ELECTRONICALLY
DOC #: _____
DATE FILED: MAR 1 0 2009

### COUNT ONE
(Securities Fraud)

The United States Attorney charges:

### Relevant Persons and Entities

1.    At all times relevant to this Information, Bernard L. Madoff Investment Securities LLC, and its predecessor, Bernard L. Madoff Investment Securities (collectively and separately, "BLMIS"), had its principal place of business in New York, New York, most recently at 885 Third Avenue, New York, New York. BLMIS was a broker-dealer that engaged in three principal types of business: market making; proprietary trading; and investment advisory services. BLMIS was registered with the United States Securities and Exchange Commission ("SEC") as a broker-dealer and was, beginning in or about 2006, registered with the SEC as an investment adviser.

2.    At all times relevant to this Information, Madoff Securities International Ltd. ("MSIL") was a corporation

MICROFILMED
MAR 1 0 2009 ~2 ☒ PM

08-01789-cgm    Doc 4169-15    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit L
Case 1:09-cr-00219-DC    Document 38    Filed 03/10/2009    Page 2 of 25
to the Chairman Decl.    Pg 108 of 152

incorporated in the United Kingdom.  MSIL was an affiliate of

BLMIS which engaged principally in proprietary trading.

        3.    BERNARD L. MADOFF, the defendant, was the founder

of BLMIS, and served as its sole member and principal.  In that

capacity, MADOFF controlled the business activities of BLMIS.

MADOFF owned the majority of the voting shares of MSIL, and

served as the Chairman of MSIL's Board of Directors.  MADOFF also

served on the Board of Directors of the National Association of

Securities Dealers Automated Quotations ("NASDAQ"), and for a

period served as the Chairman of NASDAQ.

### The Scheme to Defraud

        4.    From at least as early as the 1980s through on or

about December 11, 2008, BERNARD L. MADOFF, the defendant,

perpetrated a scheme to defraud the clients of BLMIS by

soliciting billions of dollars of funds under false pretenses,

failing to invest investors' funds as promised, and

misappropriating and converting investors' funds to MADOFF's own

benefit and the benefit of others without the knowledge or

authorization of the investors.

        5.    To execute the scheme, MADOFF solicited and caused

others to solicit prospective clients to open trading accounts

with BLMIS, based upon, among other things, his promise to use

investor funds to purchase shares of common stock, options and

other securities of large, well-known corporations, and

representations that he would achieve high rates of return for

clients, with limited risk. In truth and in fact, as MADOFF well

knew, these representations were false. MADOFF failed to honor

his promises to BLMIS clients by, among other things, failing to

invest the BLMIS investment advisory clients' funds in securities

as he had promised. Instead, notwithstanding his promises to the

contrary, and notwithstanding representations that MADOFF made

and caused to be made on tens of thousands of account statements

and other documents sent through the United States Postal Service

to BLMIS clients throughout the operation of this scheme, MADOFF

operated a massive Ponzi scheme in which client funds were

misappropriated and converted to the use of MADOFF, BLMIS, and

others.

     6.   In connection with this Ponzi scheme, BERNARD L.

MADOFF, the defendant, accepted billions of dollars of investor

money, cumulatively, from individual investors, charitable

organizations, trusts, pension funds, and hedge funds, among

others, and established on their behalf thousands of accounts at

BLMIS. From the outset of the scheme, and continuing throughout

its operation, MADOFF obtained investor funds through interstate

wire transfers from financial institutions located outside New

York State and through mailings delivered by the United States

Postal Service.

3

7.     In the course of carrying out this scheme, BERNARD
L. MADOFF, the defendant, made, and caused others to make, false
representations concerning his investment strategies to clients
and prospective clients of BLMIS. Among other things, MADOFF
marketed to clients and prospective clients an investment
strategy referred to as a "split strike conversion" strategy.
Clients were promised that BLMIS would invest their funds in a
basket of approximately 35-50 common stocks within the Standard &
Poor's 100 Index (the "S&P 100"), a collection of the 100 largest
publicly traded companies in terms of their market
capitalization. MADOFF claimed that he would select a basket of
stocks that would closely mimic the price movements of the S&P
100. MADOFF further claimed that he would opportunistically time
those purchases, and would be "out of the market" intermittently,
investing clients' funds in these periods in United States
Government-issued securities such as United States Treasury
bills. MADOFF also claimed that he would hedge the investments
that he made in the basket of common stocks by using investor
funds to buy and sell option contracts related to those stocks,
thereby limiting potential losses caused by unpredictable changes
in stock prices.

8.     Further, to induce new and continued investments
by clients and prospective clients, MADOFF promised certain
clients annual returns in varying amounts up to at least

4

08-01789-cgm   Doc 4169-15   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit L
Case 1:09-cr-00219-DC   Document 38   Filed 03/10/2009   Page 5 of 25
to the Chairman Reqd.   Pg 114 of 152

approximately 46 percent per year.  MADOFF also told certain

clients that the fee for his services would be based on an

approximately $0.04 per share commission on the stocks that

MADOFF traded for such clients.

          9.   Contrary to his promises to those clients that he

would use their funds to purchase securities on their behalf, and

would invest client funds pursuant to the strategies he had

marketed, MADOFF used most of the investors' funds to meet the

periodic redemption requests of other investors.  In addition,

MADOFF took some of these clients' investment funds as

"commissions," which he used to support the market making and

proprietary trading businesses of BLMIS, and from which he and

others received millions of dollars in benefits.

          10.  BERNARD L. MADOFF, the defendant, created and

caused to be created a broad infrastructure at BLMIS to generate

the impression and support the appearance that BLMIS was

operating a legitimate investment advisory business in which

client funds were actively traded as he had promised, and to

conceal the fact that no such business was actually being

conducted.  Among other things, MADOFF hired numerous employees

to serve as a "back office" for this investment advisory

business.  Many of the employees hired to perform those functions

had little or no prior pertinent training or experience in the

securities industry.  MADOFF caused those BLMIS employees to,

5

among other things, communicate with clients and generate false
and fraudulent documents including, but not limited to, monthly
client account statements and trade confirmations that
purportedly reflected the purchases and sales of securities that
MADOFF claimed had been conducted on behalf of BLMIS's clients.
MADOFF further caused account statements and trade confirmations
that were sent to clients to reflect fictitious returns
consistent with the returns that had been promised to those
clients.

    11.   Moreover, to support BLMIS's market making and
proprietary trading businesses, between at least as early as in
or about 2002 and in or about 2008, BERNARD L. MADOFF, the
defendant, caused more than $250 million of BLMIS investment
advisory clients' funds to be directed, through a series of wire
transfers, to the operating accounts that funded the operations
of these businesses.  Specifically, MADOFF caused those investor
funds to be sent from a BLMIS account in New York, New York (the
"BLMIS Client Account"), to accounts held by MSIL in London,
United Kingdom (the "MSIL Accounts"), and further caused funds to
be transferred from the MSIL Accounts to either the BLMIS Client
Account or to another bank account in New York, New York, which
was principally used to fund BLMIS's operations (the "BLMIS
Operating Account").  MADOFF directed these funds transfers, in
part, to give the appearance that he was conducting securities

08-01789-cgm    Doc 4169-15    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit L
Case 1:09-cr-00213-DC    Document 38    Filed 03/10/2009    Page 7 of 25
to the Chaitman Decl.    Pg 113 of 152

transactions in Europe on behalf of the investors when, in fact,
he was not conducting such transactions. MADOFF also directed
the transfer of funds from the MSIL Accounts to purchase and
maintain property and services for the personal use and benefit
of MADOFF, his family members and associates.

12. To conceal his scheme, BERNARD L. MADOFF, the
defendant, among other things, withheld information from
regulators and repeatedly lied to the SEC in written submissions
and in sworn testimony.

13. In furtherance of the scheme, BERNARD L. MADOFF,
the defendant, caused false and fraudulent certified financial
statements for BLMIS, including balance sheets, statements of
income, statements of cash flows, and reports on internal
control, to be created. MADOFF further caused such false and
fraudulent financial statements to be sent to clients and
prospective clients through the United States Postal Service, and
also caused such false and fraudulent financial statements to be
filed with the SEC. Among other things, MADOFF knew that the
certification attached to the BLMIS financial statements falsely
averred that those statements had been prepared in accordance
with Generally Accepted Auditing Standards and Generally Accepted
Accounting Principles.

14. As of on or about November 30, 2008, BLMIS had
approximately 4,800 client accounts. On or about December 1,

2008, BLMIS issued account statements for the calendar month of

November 2008 reporting that those client accounts held a total

balance of approximately $64.8 billion. In fact, BLMIS held only

a small fraction of that balance on behalf of its clients.

### Statutory Allegation

15.   From at least the 1980s through on or about

December 11, 2008, in the Southern District of New York and

elsewhere, BERNARD L. MADOFF, the defendant, unlawfully,

willfully, and knowingly, directly and indirectly, by the use of

means and instrumentalities of interstate commerce, the mails,

and the facilities of national securities exchanges, in

connection with the purchase and sale of securities, did use and

employ manipulative and deceptive devices and contrivances, in

violation of Title 17, Code of Federal Regulations, Section

240.10b-5, by: (a) employing devices, schemes, and artifices to

defraud; (b) making untrue statements of material facts and

omitting to state material facts necessary in order to make the

statements made, in light of the circumstances under which they

were made, not misleading; and (c) engaging in transactions,

acts, practices, and courses of business which operated and would

operate as a fraud and deceit upon persons.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18 United States Code, Section 2.)

## COUNT TWO
(Investment Adviser Fraud)

The United States Attorney further charges:

16.   The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

17.   From at least the 1980s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, acting as an investment adviser with respect to clients and potential clients of BLMIS, unlawfully, willfully, and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, directly and indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
Title 18, United States Code, Section 2.)

## COUNT THREE
(Mail Fraud)

The United States Attorney further charges:

18.   The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

08-01789-cgm   Doc 4169-15   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit L
to the Chaitman Decl.   Pg 116 of 152
Case 1:09-cr-00213-DC   Document 38   Filed 03/10/2009   Page 10 of 25

19.   From at least as early as the 1980s through on or
about December 11, 2008, in the Southern District of New York and
elsewhere, BERNARD L. MADOFF, the defendant, unlawfully,
willfully, and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, for the purpose of executing such
scheme and artifice and attempting so to do, did place in post
offices and authorized depositories for mail matter, matters and
things to be sent and delivered by the Postal Service, and did
deposit and cause to be deposited matters and things to be sent
and delivered by private and commercial interstate carriers, and
did take and receive therefrom such matters and things, and did
knowingly cause to be delivered, by mail and such carriers
according to the directions thereon, and at the places at which
they were directed to be delivered by the persons to whom they
were addressed, such matters and things, to wit, on or about
December 1, 2008, MADOFF sent and caused to be sent and delivered
via the Postal Service a false and fraudulent account statement
from BLMIS to a client in New York, New York.

(Title 18, United States Code, Sections 1341 and 2.)

10

## COUNT FOUR
(Wire Fraud)

The United States Attorney further charges:

20.   The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

21.   From at least as early as the 1980s through on or about December 11, 2008, in the Southern District of New York and elsewhere, BERNARD L. MADOFF, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, on or about August 5, 2008, MADOFF caused approximately $2 million of investor funds to be sent by wire from Bloomington, Minnesota to New York, New York.

(Title 18, United States Code, Sections 1343 and 2.)

11

## COUNT FIVE
(International Money Laundering To Promote
Specified Unlawful Activity)

The United States Attorney further charges:

22.   The allegations contained in paragraphs 1 through
14, above, are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

23.   From at least as early as in or about 2002,
through on or about December 11, 2008, in the Southern District
of New York, the United Kingdom, and elsewhere, BERNARD L.
MADOFF, the defendant, in an offense involving and affecting
interstate and foreign commerce, unlawfully, willfully and
knowingly, transported, transmitted and transferred, attempted to
transport, transmit and transfer, and caused others to transport,
transmit and transfer, and attempt to transport, transmit, and
transfer, funds from a place in the United States to a place
outside the United States, and funds from a place outside the
United States to a place within the United States, with the
intent to promote the carrying on of specified unlawful activity,
to wit, fraud in the sale of securities, mail fraud, wire fraud,
and theft from an employee benefit plan, to wit, MADOFF caused
funds to be wire transferred from BLMIS bank accounts, including
the BLMIS Investor Account in New York, New York, to the MSIL
Accounts in London, England, in the United Kingdom, and to be
transferred from the MSIL Accounts in London, England, in the

12

08-01789-cgm    Doc 4169-15    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit L
to the Chaitman Decl.    Pg 119 of 152
Case 1:09-cr-00213-DC    Document 36    Filed 03/10/2009    Page 13 of 25

United Kingdom, to BLMIS bank accounts, including the BLMIS
Operating Account, in New York, New York, in order to promote
fraud in the sale of securities, mail fraud, wire fraud, and
theft from an employee benefit plan.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

### COUNT SIX
(International Money Laundering To Conceal And Disguise
The Proceeds of Specified Unlawful Activity)

The United States Attorney further charges:

24.    The allegations contained in paragraphs 1 through
14, above, are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

25.    From at least as early as in or about 2002,
through on or about December 11, 2008, in the Southern District
of New York, the United Kingdom, and elsewhere, BERNARD L.
MADOFF, the defendant, in an offense involving and affecting
interstate commerce, knowing that the property involved in
certain financial transactions, to wit, investor funds in the
custody and care of BLMIS, represented the proceeds of some form
of unlawful activity, unlawfully, willfully and knowingly would
and did conduct and attempt to conduct such financial
transactions which in fact involved the proceeds of specified
unlawful activities, to wit, fraud in the sale of securities,
mail fraud, wire fraud, and theft from an employee benefit plan,
knowing that the transactions were designed in whole and in part
to conceal and disguise the nature, the location, the source, the

13

08-01789-cgm    Doc 4169-15    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit L
Case 1:09-cr-00213-DC    Document 38    Filed 03/10/2009    Page 14 of 25
to the Chairman Decl.    Pg 120 of 152

ownership and the control of the proceeds of said specified
unlawful activity.

26.    Such financial transactions included, but were not
limited to, the following:

a.    From at least in or about 2006, through on or
about December 11, 2008, BERNARD L. MADOFF, the defendant, caused
funds to be wire transferred from BLMIS bank accounts in New
York, New York, including the BLMIS Investor Account, to the MSIL
Accounts in London, England, in the United Kingdom, and
thereafter to be transferred from the MSIL Accounts in the United
Kingdom to BLMIS bank accounts in New York, New York, including
the BLMIS Investor Account and the BLMIS Operating Account, which
transfers were designed to give the false and fraudulent
appearance that BLMIS was operating a legitimate investment
advisory business in which client funds were being used to
purchase and sell securities as MADOFF had promised, and to
conceal the fact that no such purchases or sales were actually
being made; and

b.    From at least in or about 2002, through on or
about December 11, 2008, MADOFF caused funds to be wire
transferred from BLMIS bank accounts in New York, New York,
including the BLMIS Investor Account, to the MSIL Accounts in
London, England, in the United Kingdom, and thereafter to be
transferred from the MSIL Accounts in the United Kingdom to

14

08-01789-cgm    Doc 4169-15    Filed 06/15/11    Entered 06/15/11 19:56:51    Exhibit L
to the Chaitman Decl.    Pg 121 of 152
Case 1:09-cr-00213-DC    Document 38    Filed 03/10/2009    Page 15 of 25

purchase and maintain property and services for the personal use
and benefit of MADOFF, his family members and associates.

(Title 18, United States Code, Sections
1956(a)(1)(B)(i) & (f) and 2.)

### COUNT SEVEN
(Money Laundering)

The United States Attorney further charges:

27. The allegations contained in paragraphs 1 through
14, above, are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

28. From at least in or about the 1980s, through on or
about December 11, 2008, in the Southern District of New York and
elsewhere, BERNARD L. MADOFF, the defendant, in an offense
involving and affecting interstate and foreign commerce,
unlawfully, willfully, and knowingly engaged and attempted to
engage in and cause others to engage in a monetary transaction in
criminally derived property that was of a value greater than
$10,000 and was derived from specified unlawful activity; to wit,
on or about April 13, 2007, MADOFF caused approximately
$54,485,750 derived from fraud in the sale of securities, mail
fraud, wire fraud, and theft from an employee benefit plan, to be
transferred from the BLMIS Investor Account in New York, New
York, to one of the BLMIS Accounts in London, England, in the
United Kingdom.

(Title 18, United States Code, Sections 1957 and 2.)

15

## COUNT EIGHT
(False Statements)

The United States Attorney further charges:

29. The allegations contained in paragraphs 1 through 14, above, are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

30. Beginning in or about 2006, as described in paragraph 1 above, BLMIS was, among other things, an investment adviser registered with the SEC. As such, BLMIS was subject to periodic examinations by the SEC, and was required to file an SEC Form ADV Uniform Application for Investment Adviser Registration ("ADV").

31. On or about January 7, 2008, BERNARD L. MADOFF, the defendant, filed and caused to be filed an ADV with the SEC (the "BLMIS ADV"). The BLMIS ADV was signed by MADOFF, who certified, under penalty of perjury under the laws of the United States, that the information and statements made therein were true and correct, and that he was signing the BLMIS ADV as a free and voluntary act.

32. The BLMIS ADV contained false statements made for the purpose of deceiving the SEC and hiding the defendant's unlawful conduct described in paragraphs 4 through 14, above. The BLMIS ADV filed with the SEC stated, among other things, in substance, that BLMIS had custody of advisory clients' securities.

16

33.  On or about January 7, 2008, in the Southern
District of New York, BERNARD L. MADOFF, the defendant,
unlawfully, willfully, and knowingly, in a matter within the
jurisdiction of the executive branch of the Government of the
United States, namely, the SEC, made materially false,
fictitious, and fraudulent statements and representations, to
wit, MADOFF filed the BLMIS ADV with the SEC, in which he made
the following false statement that was material to the SEC's
oversight of BLMIS's investment adviser business:

### Specification

MADOFF falsely stated that BLMIS had "custody of . . .
advisory clients' . . .  securities."

(Title 18, United States Code, Section 1001(a).)

### COUNT NINE
(Perjury)

The United States Attorney further charges:

34.  The allegations contained in paragraphs 1 through
14, above, are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

35.  As described in paragraph 1 above, BLMIS was at
certain times, among other things, a broker-dealer and investment
adviser registered with the SEC.  As such, BLMIS was subject to
periodic examinations by the SEC.  The SEC has broad authority to
conduct investigations into various aspects of the securities
markets and, in or about 2006, was conducting such an

17

investigation.  As part of that investigation, on or about May

19, 2006, employees of the SEC took the voluntary testimony of

BERNARD L. MADOFF, the defendant, under oath (the "MADOFF SEC

Testimony").

36.  During the course of the MADOFF SEC Testimony,

BERNARD L. MADOFF, the defendant, made numerous false and

misleading statements for the purpose of deceiving the SEC and

hiding his unlawful conduct described in paragraphs 4 through 11,

above.  MADOFF testified, among other things, in substance, that:

(a) BLMIS executed trades of common stock on behalf of its

investment advisory clients; (b) BLMIS executed options contracts

on behalf of its investment advisory clients; (c) BLMIS had

custody of the assets managed on behalf of its investment

advisory clients; and (d) BLMIS used the same trading strategy

for all its investment advisory clients.

37.  On or about May 19, 2006, in the Southern District

of New York, BERNARD L. MADOFF, the defendant, having taken an

oath before a competent tribunal, officer and person, in a case

in which the law of the United States authorizes an oath to be

administered, namely, in testimony before an officer of the SEC,

that he would testify, declare, depose and certify truly, and

that any written testimony, declaration, deposition and

certificate by him subscribed, would be true, unlawfully,

willfully, knowingly, and contrary to such oath, stated and

subscribed material matters which he did not believe to be true,

18

08-01789-cgm   Doc 4169-15   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit L
to the Chaitman Decl.   Pg 125 of 152
Case 1:09-cr-00213-DC   Document 38   Filed 03/10/2009   Page 19 of 25

namely, in his testimony on or about May 19, 2006, MADOFF
knowingly testified falsely as to the material matters in the
portions of his cited testimony underlined below:

### Specification One
(Page 55, Lines 20-25)

Q:   Let's just get back to some of the basics that we
     discussed before.  You mentioned earlier that the
     basket in the institutional trading business may be
     hedged with options.  Does that in fact happen?

A:   <u>Yes</u>.

### Specification Two
(Page 57, Lines 15-20)

Q:   Let's focus on the actual execution portion of it.
     Let's go back to the equities.  You mentioned that you
     used this AHOE system, and you mention[ed] that it
     exposes a sliced order to the European market.  Is it
     correct then that the equities are traded in Europe?

A:   <u>Yes</u>.

### Specification Three
(Page 63, Lines 11-23)

Q:   Now you mentioned that there was a group of dealers to
     whom you put out this indication of interest each time.
     Generally, with how many of them do you end up trading
     in each execution?

A:   <u>Within the basket, we're probably interacting with 40,
     close to 50</u>.

Q:   That's for equities and options.

A:   <u>Equities. Options is a dozen</u>.

Q:   A dozen.  Do all of them end up trading usually?

A:   <u>Pretty much.  They all trade on a - yes.  It's usually
     that they all participate during the trading.  They
     have an interest in these stocks.  These stocks are the
     marketplace.</u>

19

08-01789-cgm   Doc 4169-15   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit L
to the Chaitman Decl.   Pg 126 of 152
Case 1:09-cr-00213-DC   Document 38   Filed 03/10/2009   Page 20 of 25

### Specification Four
(Page 65, Lines 16-18)

Q:    Who are the counterparties to the options contracts?

A:    They're basically European banks.

### Specification Five
(Page 66, Line 19 - Page 67, Line 20)

Q:    So how does the time frame for the options trading
      relate to the time frame for the equities trading?

A:    First we're putting the equity basket on, and then
      we're putting the options on after the equity basket is
      complete, so the options are being done basically in
      the morning typically between 8:00 and 9:00 a.m.

. . . .

Q:    With the options trades, is there any documentation
      generated?  For example, for some derivatives, there is
      an after agreement and you have a confirmation, a 2-
      page document.  Is there something like that for the
      options trades?

A:    Yes, there's an affirmation that's generated
      electronically, and there's a master option agreement
      that's attached to that that's also electronic.

Q:    And the electronic affirmation stores data for each
      trade with each particular dealer.

A:    Correct.

Q:    So if you wanted to find out with whom you bought these
      contracts on a particular day, that's where you would
      go.

A:    Right.

### Specification Six
(Page 85, Lines 2-3)

Q:    Who has the custody of the assets?

A:    We do.

20

## Specification Seven
(Page 116, Line 17 - Page 117, Line 2)

Q:   I wanted to go back to the question that [an SEC
     attorney] asked you about other persons, persons other
     than the institutional customers that we discussed so
     far and proprietary situations.  The trading for these
     persons, is it also pursuant to the same strategy [as]
     in the institutional trading business?

A:   <u>Yes</u>.

Q:   What is approximately the total amount of assets traded
     for these persons?

A:   My guess would be something, <u>a few hundred million
     dollars</u>.

     (Title 18, United States Code, Section 1621.)

## COUNT TEN
(False Filing With The Securities And Exchange Commission)

        38.   The allegations contained in paragraphs 1 through

14, above, are hereby repeated, realleged and incorporated by

reference as if fully set forth herein.

        39.   On or about December 20, 2007, in the Southern

District of New York, BERNARD L. MADOFF, the defendant,

unlawfully, willfully, and knowingly, in applications, reports,

and documents required to be filed with the SEC under the

Securities Exchange Act of 1934, and the rules and regulations

thereunder, did make and cause to be made statements that were

false and misleading with respect to material facts, to wit,

21

MADOFF caused a false and misleading certified BLMIS audit report
to be filed with the SEC.

      (Title 15, United States Code, Sections 78q(e) and 78ff;
    Title 17, Code of Federal Regulations, Sections 240.17a-5,
240.17a-13 and 210.2-01; Title 18, United States Code,
                  Section 2.)

### COUNT ELEVEN
(Theft From An Employee Benefit Plan)

      40.   The allegations contained in paragraphs 1 through
14, above, are hereby repeated, realleged and incorporated by
reference as if fully set forth herein.

      41.   From at least as early as the 1990s through on or
about December 11, 2008, in the Southern District of New York and
elsewhere, BERNARD L. MADOFF, the defendant, unlawfully,
willfully, and knowingly, embezzled, stole, abstracted and
converted to his own use, and to the use of others, moneys,
funds, securities, premiums, credits, properties, and other
assets of employee welfare benefit plans and employee pension
benefit plans and funds connected therewith, to wit, on or about
September 24, 2008, MADOFF failed to invest as promised
approximately $10 million in pension fund assets sent to BLMIS by
a master trust on behalf of approximately 35 labor union pension
plans, and instead converted those funds to his use and the use
of others.

      (Title 18, United States Code, Sections 664 and 2.)

22

## FORFEITURE ALLEGATION
(Offenses Constituting Specified Unlawful Activity)

42.   As the result of committing the offenses

constituting specified unlawful activity as defined in 18 U.S.C.

§ 1956(c)(7), as alleged in Counts One, Three, Four, and Eleven

of this Information, BERNARD L. MADOFF, the defendant, shall

forfeit to the United States, pursuant to 18 U.S.C.

§ 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and

personal, that constitutes or is derived from proceeds traceable

to the commission of the said offenses.

### Substitute Asset Provision

43.   If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

> a.   cannot be located upon the exercise of due
>      diligence;
>
> b.   has been transferred or sold to, or deposited
>      with, a third person;
>
> c.   has been placed beyond the jurisdiction of
>      the Court;
>
> d.   has been substantially diminished in value;
>      or
>
> e.   has been commingled with other property which
>      cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

23

other property of the defendant up to the value of the

forfeitable property described above.

> (Title 18, United States Code, Sections 981(a)(1)(C),
> and Title 28, United States Code, Section 2461.)

### FORFEITURE ALLEGATION
(Money Laundering)

44. As the result of committing one or more of the

money laundering offenses in violation of 18 U.S.C. §§ 1956

and 1957, alleged in Counts Five through Seven of this

Information, BERNARD L. MADOFF, the defendant, shall forfeit to

the United States, pursuant to 18 U.S.C. § 982, all property,

real and personal, involved in the said money laundering offenses

and all property traceable to such property.

### Substitute Asset Provision

45. If any of the above-described forfeitable

property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due
diligence;

b. has been transferred or sold to, or deposited
with, a third person;

c. has been placed beyond the jurisdiction of
the Court;

d. has been substantially diminished in value;
or

e. has been commingled with other property which
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18,

United States Code, Section 982(b) and Title 21, United States

08-01789-cgm   Doc 4169-15   Filed 06/15/11   Entered 06/15/11 19:56:51   Exhibit L
to the Chaitman Decl.   Pg 131 of 152
Case 1:09-cr-00213-DC   Document 36   Filed 03/10/2009   Page 25 of 25

Code, Section 853(p), to seek forfeiture of any other property of

the defendant up to the value of the forfeitable property

described above.

(Title 18, United States Code, Section 982.)


LEV L. DASSIN
Acting United States Attorney

25

# EXHIBIT E

Madoff Trustee Site

BERNARD L. MADOFF

Investment Securities LLC

Home     More Information     Court Filings     Claims Packages     Hardship Program     Press     Contact Us     Creditors Meeting

**HARDSHIP PROGRAM**

### 1. The Hardship Program

a.   In an effort to accelerate Securities Investor Protection Corporation ("SIPC") protection for individual victims of Bernard L. Madoff Investment Securities LLC ("BLMIS") who are suffering hardship, the Trustee is instituting a Hardship Program as outlined below. The purpose of the Hardship Program is to provide a mechanism by which customers of BLMIS that are suffering hardship can accelerate the determination of their claims and the payment by the Trustee of the SIPC protection afforded to such customers. The SIPC protection is an amount not to exceed $500,000.00.

b.   The Hardship Program is a supplement to and not a replacement of or alternative to the existing claims procedure. All customers seeking to enter the Hardship Program must have previously submitted a claim or must submit a claim concurrently with submission of the Hardship Application. Please note that the claims bar date is July 2, 2009.

c.   The Hardship Program is only available to individual account holders, and not to corporations, partnerships and other business entities that are account holders of BLMIS or indirect investors through feeder funds or other investment vehicles.

**If you would like to receive a Hardship Application package in the mail, you may either contact the Claims Processing Center at 888-727-8695, or click <u>here</u> to submit a request for a Hardship Application Package.**

### 2. The Hardship Standard

Based on the Hardship Application that you submit, the Trustee will assess whether you qualify for the Hardship Program based on the following indicators of hardship:

a.   Inability to pay for necessary living expenses, such as housing, food, utilities and transportation.

b.   Inability to pay for necessary medical expenses.

c.   Necessity to return to work, at the age of 65 or older, after having previously retired from former employment (special consideration will be given to individuals that can no longer return to their former work).

d.   Declaring personal bankruptcy.

e.   Inability to pay for the care of dependents.

f.   Otherwise suffering from extreme financial hardship as demonstrated by other circumstances not addressed by the foregoing.

### 3. Administration of the Hardship Program

a.   Applicants for the Hardship Program must complete a Hardship Application which requires identifying information, a short explanation of the basis for seeking inclusion in the Hardship Program and limited financial information. The Hardship Application form can be downloaded by clicking <u>here</u>.

b.   The Hardship Application must be mailed with proof of delivery to Irving H. Picard, Esq., Trustee for Bernard L. Madoff Investment Securities LLC, Claims Processing Center, 2100 McKinney Ave., Suite 800, Dallas, TX 75201.

c.   Assuming that you have filed a claim and assuming that your Hardship Application is properly completed, the Trustee will notify you in writing within 20 days of receipt of the Hardship Application by the Trustee whether or not you qualify for the Hardship Program. To the extent that the Hardship Application is incomplete or the Trustee requires further information, the Trustee will notify you within 20 days of receipt of the initial Hardship Application and you will be requested to resubmit the Hardship Application with the additional information requested by the Trustee. Once you resubmit your Hardship Application in compliance with the Trustee's information request, the Trustee will reconsider the Hardship Application and will notify you

in writing within 20 days of whether or not you qualify for the Hardship Program.

d.   The determination of the Trustee whether customers qualify for the Hardship Program shall be final, not subject to review by court, and shall not affect the claim process or your ultimate allowed claim.

e.   Once the Trustee determines that you qualify for the Hardship Program, your claim or claims will be expedited in the claims process by the Trustee. Given that BLMIS's records are currently incomplete and that the Trustee is currently working to reconstitute the financial records of BLMIS, the Trustee cannot guaranty the timing of determination of any claim; provided, however:

> i.   <u>Post-1995 accounts</u>: if your account was opened at BLMIS after January 1, 1996, the Trustee will endeavor to mail a determination of your claim within 20 days of your claim qualifying for the Hardship Program.

> ii.  <u>Pre-1996 Accounts</u>: Although the Trustee is working to reconstruct BLMIS's records for the time periods prior to January 1, 1996, full records for this period currently are not available. As such, the Trustee will not be able to render determinations on these accounts until full information is available. Reconstruction of BLMIS's records is a laborious and time consuming endeavor, and it is imperative to the expeditious treatment of your claims that you aid the Trustee by providing all documentation in your possession to the Trustee as soon as possible. **The Trustee strongly urges that you include all information in your possession (including proof of your deposits made to BLMIS) with your initial Hardship Application.** The Trustee is committed to determining pre-1996 accounts as soon as possible, but full information on your account will be needed in order to render a determination. The Trustee hopes that you and he can work together cooperatively to reconstruct the account history as quickly as possible, and as pre-1996 records are reconstructed on a rolling year-by-year basis starting with 1995 and moving back in time, the Trustee will work to quickly determine claims related to accounts that were opened in those years where the Trustee has the newly reconstructed records. Thus, for example, if you opened your account in 1994, the Trustee will quickly determine your claim once the records for 1994 and 1995 are reconstructed.

f.   Upon determination of a claim in the Hardship Program, the Trustee will mail a Determination Notice and either a Full or Partial Assignment and Release Agreement to you. The Determination Notice will set forth the Trustee's proposed treatment of your claim. Pursuant to the terms of the Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing other Relief (the "Claims Process Order"), you have 30 days to agree to the Trustee's determination or object to such determination as required by the Claims Process Order. A copy of the Claims Process Order can be obtained by clicking <u>here</u>. As provided in the Claims Process Order, you can agree to the determination by returning the Full or Partial Assignment and Release Agreement (whichever one you received) or by taking no action within 30 days of the mailing of the Determination Notice by the Trustee.

g.   If the Determination Notice states that the Trustee has determined that your claim is entitled to the protection afforded by SIPC, you can consent to this determination by taking no action for 30 days or by submitting a fully executed and notarized Full Assignment and Release Agreement (which is included with the Determination Notice if the SIPC protection will fully pay your claim) or a Partial Assignment and Release Agreement (which is included with the Determination Notice if the maximum SIPC protection will only partially pay your claim). Upon receipt by the Trustee of the fully executed Partial or Full Assignment and Release Agreement, as the case may be, the Trustee will pay you the SIPC protection set forth in your Determination Notice (an amount up to $500,000.00). The remainder of your claim, if any, will be paid at a later date when the Trustee makes additional distributions. The amount and timing of further distributions is not yet known.

> For example, if you invested $1,000,000.00 with BLMIS and never received a payment from BLMIS, the Trustee will send you a Determination Notice proposing to allow your claim for $1,000,000.00 and offering to pay you $500,000.00 in SIPC protection once you return the Partial Assignment and Release that is included with your Determination Notice. Although you have 30 days to consider the Determination Notice, as soon as you return the Partial Assignment and Release, the Trustee will process your check for the SIPC protection of $500,000.00 in this example. The unpaid portion of your claim will go into the pool of unpaid customer claims on which the Trustee intends to make distributions in the future. Please note that the Trustee is not giving you credit for the fictitious profits that BLMIS fabricated on your monthly statements. As previously announced, the Trustee is only considering cash in and out of BLMIS when determining claims.

h.   If you dispute the Trustee's proposed treatment of your claim and follow the procedure below, the Trustee will pay the undisputed portion of your claim up to the limits of the SIPC protection (an amount up to $500,000.00) even though there is not yet agreement on the treatment of your entire claim. The payment of the undisputed amount of your claim will be without prejudice to the Trustee's and your rights, claims and defenses with respect to the disputed portion of your claim. You should comply with the following procedure:

> i.   You must submit a Statement of Dispute to the Trustee. A form of Statement of Dispute is available

by clicking here. The Statement of Dispute must be delivered (with proof of delivery) to the Trustee within 30 days of the date on your Determination Notice otherwise you will be deemed to have consented to the treatment of your claim in the Determination Notice. The Statement of Dispute must be delivered to the Trustee at the following address: Irving Picard, c/o Heather R. Wlodek, Trustee for Bernard L. Madoff Investment Securities LLC, Baker & Hostetler LLP, 45 Rockefeller Plaza, 11th Floor, New York, NY 10111. A copy of the Statement of Dispute should be delivered to the Trustee's counsel: Kelly Burgan, Baker & Hostetler LLP, 3200 National City Center, 1900 E. Ninth Street, Cleveland, Ohio, 44114. If you fail to keep or provide a record of proof of delivery of the Statement of Dispute, the date of receipt by the Trustee will be the date that the Trustee asserts he actually received your Statement of Dispute. Thus, you risk missing the 30 day deadline to submit your Statement of Dispute if you do not keep proof of delivery.

ii.   The Statement of Dispute must clearly state (a) the amount of the Trustee's determination that you do not dispute, (b) the amount which you dispute and (c) the reasons for your dispute of the Trustee's determination.

iii.   In order to receive SIPC protection of up to $500,000.00 on account of the undisputed portion of your claim, you will need to submit a Partial Assignment and Release for that amount to the Trustee. As soon as the Trustee has received the Partial Assignment and Release, he will process and send a check for the undisputed amount of your claim representing your SIPC protection. A Partial Assignment and Release form for the undisputed amount of your claim will be sent to you by the Trustee if you request it in writing to Kelly Burgan, Baker & Hostetler LLP, 3200 National City Center, 1900 E. Ninth Street, Cleveland, Ohio, 44114 or by email kburgan@bakerlaw.com. Please note that you can return the Partial Assignment and Release with your Statement of Dispute or anytime time thereafter.

1. For example, if the Trustee sends you a Determination Notice approving your claim at $1,000,000.00 and offering to pay $500,000.00 in SIPC protection to you, but you believe that your claim should be approved at $2,000,000.00, you should mail (with proof of delivery) a Statement of Dispute to the Trustee which clearly states (a) the amount of the Trustee's determination that you do not dispute (here, $1,000,000.00), (b) the amount which you dispute (here, you believe your claim should be approved at $2,000,000.00) and (c) the reasons for your dispute of the Trustee's determination. Because the undisputed portion of your claim is more than the $500,000.00 limit of the SIPC protection, the Trustee is willing to send you a check for $500,000.00 representing your undisputed SIPC protection; however, you must deliver a Partial Assignment and Release for your $500,000.00 SIPC protection to the Trustee before the Trustee will process your check.

2. For further example, if the Trustee sends you a Determination Notice approving your claim at $300,000.00 and offering to pay $300,000.00 in SIPC protection to you, but you believe that your claim should be approved at $2,000,000.00, you should mail (with proof of delivery) a Statement of Dispute to the Trustee which clearly states (a) the amount of the Trustee's determination that you do not dispute (here, $300,000.00), (b) the amount which you dispute (here, you believe your claim should be approved at $2,000,000.00) and (c) the reasons for your dispute of the Trustee's determination. Because the undisputed portion of your claim is less than the $500,000.00 limit of the SIPC protection, the Trustee is willing to send you a check for $300,000.00 representing your undisputed SIPC protection; however, you must deliver a Partial Assignment and Release for your $300,000.00 SIPC protection to the Trustee before the Trustee will process your check. If it is later determined that the Trustee is correct, $300,000.00 will be your allowed claim and you will have no further claim. If it is later determined that you are correct, you will receive the remainder of your SIPC protection (here, $200,000.00) and you will have an additional allowed claim of $1,500,000.00. The unpaid portion of your claim will go into the pool of unpaid customer claims on which the Trustee intends to make further distributions in the future.

iv.   Once your SIPC protection check has been issued to you, the Trustee will work with you in good faith to reconcile the disputed portion of your claim.

v.   If the parties are not able to resolve the dispute, you and the Trustee will file a stipulation with the Bankruptcy Court stating that the undisputed portion of the claim that has been paid and describing the nature of the dispute. A hearing will be set by the Bankruptcy Court to determine the dispute.

vi.   If you have questions regarding the process for seeking the payment of the undisputed portion of your claim, you can contact Kelly Burgan at (216) 861-7665 or at kburgan@bakerlaw.com.

Home                                Copyright ©2009 AlixPartners, LLP  |  All rights reserved.  |  (121)   AlixPartners

http://www.madofftrustee.com/HardshipProgram.html

# EXHIBIT F

# Calendar No. 1236

| 91ST CONGRESS<br>2d Session | SENATE | REPORT<br>No. 91–1218 |
| --- | --- | --- |

## SECURITIES INVESTOR PROTECTION CORPORATION

SEPTEMBER 21, 1970.—Ordered to be printed

Mr. MUSKIE, from the Committee on Banking and Currency,
submitted the following

## REPORT

[To accompany S. 2348]

The Committee on Banking and Currency, to which was referred
the bill (S. 2348) to establish a Federal Broker-Dealer Insurance
Corporation, having considered the same, reports favorably thereon
with amendments and recommends that the bill as amended do pass.

### THE NATURE AND PURPOSE OF THE LEGISLATION

By amendment of the Securities Exchange Act of 1934, S. 2348
establishes the Security Investor Protection Corporation (SIPC), the
broad purpose of which is to afford financial protection for the custo-
mers of registered brokers and dealers and members of national securi-
ties exchanges. The Corporation would be private, nonprofit, and
membership in nature, with a five member board of directors the
majority of whom would be public officials serving *ex officio*. The Cor-
poration would maintain and administer an insurance fund which
would provide coverage against customer losses up to $50.000 resulting
from broker-dealer firms' insolvency. The fund would, at the outset,
aggregate $75 million in lines of credit and cash raised by assessment of
member firms. It would eventually total $150 million composed
entirely of cash. For backstop protection, Treasury borrowing au-
thority of $1 billion would be available in the event of exhaustion of
these funds. The Securities and Exchange Commission is given, in this
proposal, plenary authority over the Corporation's exercise of its
powers and responsibilities. The Commission is accorded, moreover,
unambiguous power to provide safeguards with respect to the financial
responsibility of brokers and dealers to whatever extent is required by
the public interest. This is accomplished through redefinition and
clarification of existing rule-making authority.

48–010

**Item 237**

## 2

### HISTORY OF THE LEGISLATION

The bill, S. 2348, was introduced by Senator Edmund S. Muskie on June 9, 1969, and was referred to the Committee on Banking and Currency. An amendment to this bill was introduced by Senator Muskie on April 9, 1970, and hearings were held by the Committee on April 16 and 17, June 18, and July 16, 1970. On September 15, the full Committee met in executive session and ordered S. 2348, as amended, to be reported to the Senate.

The title of the original S. 2348 has been changed to be more consistent with the provisions of the amended bill, the title reported by the Committee is, "To provide greater protection for customers of registered brokers and dealers and members of national securities exchanges."

### THE NEED FOR LEGISLATION

The economic function of the securities markets is to channel individual and institutional savings to private industry and thereby contribute to the growth of capital investment. Without strong capital markets it would be difficult for our national economy to sustain continued growth; indeed, the state of U.S. capital market development more advanced than that of any other industrial country, is an important contributing factor in the rapid economic growth this country has experienced. Securities brokers support the proper functioning of these markets by maintaining a constant flow of debt and equity instruments. The continued financial well-being of the economy thus depends, in part, on public willingness to entrust assets to the securities industry.

There are in this country approximately 26 million securities investors, many of whom have either cash or securities or both in the custody of broker-dealers. There are, in addition, perhaps 100 million people who have interests in securities through mutual funds, banks, pension funds, insurance companies, and other institutions. At the beginning of 1970, New York Stock Exchange member firms held just under $3 billion in free credit balances; a year earlier, the figure was as high as $3.7 billion. Free credit balances are funds left with a brokerage firm by customers who have the right to withdraw them on demand. These credit balances are used by the broker, as by banks, in the conduct of his business—to maintain positions in securities, to finance margin purchases of other customers, and for other general purposes.

Similarly, broker-dealer firms hold substantial amounts of securities for safekeeping; customers have an unrestricted right to delivery of those securities which belong to them. Typically, these securities are freely transferable by the broker-dealer. This permits prompt execution of customer orders, but also invites the risk that transfer may occur without express customer orders, or may be reached by creditors of the firm if the requirements of "segregation" are not properly observed. Data are not available to indicate the value of securities thus held, but it is known that the largest brokerage firm has holdings of about $18 billion. A common estimate of cash and securities in the custody of brokers is $50 billion.

The securities industry has for some time been in a precarious condition. A number of events have conspired over the past few

## 3

years to create a significant number of failures of brokerage firms both large and small, and substantial operating losses in many others. The rapid growth of the industry during the 1960's, spurred by the enormous unanticipated increase of trading volume, laid the foundation for the industry's present difficulties. Increasing volume could not be handled by traditional methods, and by the latter part of the decade evidence mounted of general breakdown in the industry. "Fails" to deliver securities became a commonplace complaint; errors of reporting and accounting, as well as fraud, multiplied.

Brokerage houses began, sporadically, to take steps to correct the ills created by high volume. Automation and other innovations were gradually introduced, albeit at high cost. Such costs could be sustained in the high-profit period that came to a close in 1969, as could the expanded commitments of office space, personnel and other administrative factors that the industry undertook in this period. But with the decline of stock market volume and price, the high-cost inheritance of the earlier years added an unmanageable burden to the problems of the industry. Insolvencies rose sharply in 1969 and 1970, and dollar losses mounted correspondingly.

In April of this year, the Securities and Exchange Commission approved a temporary surcharge on brokerage commissions because of the industry's deteriorating financial condition. Chairman Budge, after expressing his concern with "the financial problems of the industry and the losses sustained in the past year and during the first quarter of 1970," stated that the Commission had imposed the surcharge on the understanding that the industry required "immediate financial relief." Following a recent SEC hearing, the Commission decided to extend the surcharge indefinitely; the financial circumstances of the industry had not improved by that date.

The self-regulated stock exchanges had by 1964 begun to create voluntary trust funds based on assessments of member firms, and by 1968 all major exchanges had established such funds. But they are small in comparison with the total dollar volume of trading, with the value of customer assets held by brokerage firms, or with the net losses created by insolvencies of member firms in the past two years. Moreover, the exchanges maintain that the establishment of trust funds and associated publicity nevertheless creates no legal obligation to the customers of member firms, although questions in this regard have recently been raised. The New York Stock Exchange alone has commitments against its trust fund totalling about $55 million, which required an infusion of $30 million this spring. But without additional assessments, the industry's ability to meet any new customer losses is at best conjectural. Finally, no trust fund exists for the customers of broker-dealers who are not members of an exchange.

Apart from the voluntary trust funds, there is no protection presently available under existing securities laws for the investor whose broker goes bankrupt. The Securities Act of 1933 requires that investors have adequate information to exercise sound judgment concerning the securities they purchase; and the Securities Exchange Act of 1934 insures that they will not be victimized by fraudulent, manipulative, or deceptive selling schemes. But neither statute prevents the investor from losing his entire investment if his broker fails because of operational and, ultimately, financial difficulties.

4

The Security Investors Protective Corporation (SIPC), like the Federal corporations that ensure savings and demand deposits, is intended to serve several purposes: to protect individual investors from financial hardship; to insulate the economy from the disruption which can follow the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss.

This bill makes no change in existing law relating to the acceptance of deposits by brokers and dealers. Section 21 of the Banking Act of 1933 forbids underwriters to accept deposits. That section also makes it a criminal offense for others to engage in the business of accepting deposits unless they conform to the requirements which banks are chartered, supervised and examined (Title 12 U.S.C. 378).

### SECTION-BY-SECTION ANALYSIS

The purposes of this legislation are accomplished by amending existing section 15(c)(3) of the Securities Exchange Act of 1934 and by adding, as section 2, new section 35 to the Act.

*Section 35(a)* establishes the Securities Investor Protection Corporation (SIPC) as a non-profit corporation under the District of Columbia Non-Profit Corporation Act, and specifically designates it not to be an agency of the United States Government. This provision is intended to maintain consistency with the self-regulatory character of the securities industry under the overall supervision and oversight of the SEC. The Corporation is a membership corporation whose members are to consist of brokers and dealers registered with the Commission, and members of national securities exchanges. Unless otherwise exempted by the Commission, membership is obligatory except for those brokers and dealers who neither hold free credit balances for customers nor hold securities for them which may be "hypothecated"—i.e., pledged by the broker against loans. For this category, membership in SIPC is voluntary. The purpose of this distinction is to place the burden of membership costs in SIPC upon those brokers and dealers whose activities place their customers' securities and or cash holdings at risk. At the same time, there may well be brokers and dealers who, although they create no such risks for their customers, may wish to take advantage of SIPC membership as a general asset in the conduct of their business.

*Section 35(b)* vests control of the Corporation in a Board of Directors of not more than five persons. Control of the Board is vested in a majority of three directors serving *ex officio:* The Chairman of the Securities and Exchange Commission, the Chairman of the Federal Reserve Board, and the Secretary of the Treasury. The Committee indicated its preference that the Chairman of the Securities and Exchange Commission serve as Chairman of the Board of SIPC, but determined to leave this choice, from among these three directors, to the discretion of the President. In addition, two members would be appointed by the President, with the advice and consent of the Senate, from the public.

The Chairman of the SEC lends to the SIPC the authority and experience with securities regulatory matters that will be essential to the proper operation of an insurance plan for the industry. The

5

Chairman of the Federal Reserve Board represents the important
relationship that exists between the securities industry and the bank-
ing community, already acknowledged by the fact that the Federal
Reserve Board exercises control over margin requirements. A place
on the Board of Directors for the Secretary of the Treasury is appro-
priate because of the important role that the Treasury borrowing
authority plays in the SIPC proposal. The minority membership of
the Board is reserved to two Presidential appointees who, in the
Committee's recommendation, would be selected, among other
reasons, for their experience and background in the securities industry.
This will ensure a high degree of industry participation in the manage-
ment of SIPC.

The Committee considered several alternative Board arrangements.
In structuring SIPC, the Committee has been conscious of the history
of self-regulation in the securities industry and of the desire of the
industry to preserve that system. Thus, SIPC is established as a
private membership corporation. But because SIPC will have ultimate
access to public funds by provision of the $1 billion of Treasury
borrowing authority, it was considered in the public interest to provide
a majority of the Board of Directors, including the Chairman, from
the public sector. Similarly, proposals were rejected that would involve
a private Board which, in the event of a Treasury borrowing, would
add public officials to constitute a public majority. Since the rate of
use of the private funds, under a private majority, must affect the speed
with which SIPC arrives at the need for Treasury borrowing, it is
evident that the private board would in this case have a real and
potentially undesirable influence on the use of public funds.

*Section 3δ(c)* establishes the general corporate powers of SIPC,
which will, in addition, have the powers of a corporation under the
D. C. Non-Profit Corporation Act. The powers conferred here are in
addition to those specifically granted elsewhere in section 35.

*Section 35(d)(1) and (2)* grants power to the Securities and Exchange
Commission to inspect the Corporation and to require books and
reports without resort to subpoena power. The SIPC is also author-
ized and directed to establish a fiscal year and to prepare and submit
annual reports, including certified financial statements, to the Com-
mission upon which the Commission may comment and then forward
to the President and the Congress.

*Section 35(e)* establishes the insurance fund, into which all moneys
are to be paid and from which all expenditures are made. Moneys
collected or received may be revenues from regular assessments,
revenues from a transaction charge when and if levied, any transfers
to the Corporation from existing trust funds, the proceeds of any
borrowing by the Corporation, and recoveries the Corporation may
make, as subrogee, from the estates of bankrupt brokers and dealers,
and interest earnings. Expenditures include the salaries of officers,
directors, or employees of the Corporation, administrative and busi-
ness expenses, advances to complete open contracts for customers,
and advances to pay the claims which are the main purpose of this
proposal: to pay unsatisfied claims of customers up to $50,000.

This section also establishes initial and future funding levels for the
Corporation. The fund is to aggregate $75 million within 120 days.
Part of this will be a firm line of credit which industry representatives
are presently negotiating with a consortium of banks. The Committee

6

understands that this firm line of credit will initially amount to $65 million, and will decline annually by $10 million. The Committee further understands that negotiation of this firm line of credit is not yet complete, but will in fact be so by the effective date of this proposed legislation.

In addition to the line of credit, the fund will be invested at the outset—within 120 days—with at least $10 million in cash. This will result from an assessment of one-eighth of 1 percent of 1969 gross revenues of SIPC members, which is expected to yield approximately $7 million, and a transfer of about $3 million from existing trust funds of self-regulatory bodies. Thus the Corporation will commence operations with assets within 120 days of $75 million to provide almost immediate protection against customer losses. Industry representatives have made clear to the Committee that such losses sustained by firms in capital violation prior to the effective date of this legislation are regarded as an industry responsibility. The Committee is nevertheless aware that additional weaknesses may appear on the horizon which may require substantial financial assistance. Hopefully, the very establishment of SIPC will serve to reduce this likelihood.

Apart from the initial assessment rate of one-eighth of 1 percent, the regular annual assessment, to be in effect until the fund aggregates $150 million, will be one-half of 1 percent of the gross revenues of the previous 12 month period. The dollar implications of this assessment rate, which commences with enactment of the legislation, will of course depend on the course of future gross revenues in the securities industry. On the assumption of growth of 5 percent annually, this assessment rate would enable the fund to reach $150 million before the end of the fifth year of operation. More or less rapid growth of industry revenues would, of course, either shorten or lengthen this period.

The proposal provides that upon reaching $150 million, the Corporation will phase out of its fund all lines of credit, replacing these lines with cash. During this period of credit phase-out, the Corporation will endeavor to reduce the annual assessment rate to an average level no higher than one-quarter of 1 percent. When eventually the fund consists of all cash, the assessment rate presumably would be reduced further to a sustaining level. In the event that the fund at any time falls below $100 million (or a lesser amount, if the Commission, with the approval of the Secretary of the Treasury, determines) the assessment rate is to revert to the one-half of 1 percent level.

Except during periods when the maximum rate is in effect, the Committee does not contemplate that all members of SIPC would pay the same assessment rate. The bill contemplates that the SIPC, subject to Commission determination, will develop a formula by which assessments will be geared to any or all of several risk factors, as well as to gross revenues of the member firm: such factors specifically include net capital, the nature of the business, the number of customers, the dollar volume of transactions, and such other factors as the Commission may regard as pertinent.

In developing the assessment schedule, the Committee was guided by a number of considerations. Among these is the recent history of numerous failures in the industry, and the evidently substantial amounts required to protect customers of the major exchanges against loss. In addition, there emerged some question about the viability of

7

the proposee bank line of credit, which seemed to be based on uncertainty on the part of the banking community over the adequacy of the Fund's cash endowment as contemplated in an earlier industry proposal. Accordingly, after consultation with Treasury officials and others, the present assessment schedule was adopted; the Administration and the Committee agree that this schedule provides for adequate growth of financial strength, without being excessively onerous by comparision with other federally sponsored insurance programs.

"The language provides, in Section 35(e)(3), that the maximum assessment for any twelve-month period shall not be in excess of one half of 1 percent. During the first twelve-month period, however, the effective rate of assessment will be five eighths of 1 percent, because of the one-time start-up assessment of one-eighth of 1 percent. The Committee has left to SIPC the responsibility for developing a suitable schedule for payment of the assessment, subject only to the limits provided by the legislation.

*Section 35(f)(1)* defines "gross revenue" as income derived from eleven enumerated sources. Each source is intended to be computed separately, and thus a loss in one area cannot be taken as a set-off against the others, nor is provision made for a carry-over from year to year. The eleven sources of revenue are (1) commissions from transactions in securities and markups on transactions; (2) execution and clearance; (3) net realized gain from trading accounts; (4) net underwriting profit; (5) interest on customer accounts; (6) advisory fees or management fees; (7) fees for proxy solicitation; (8) services charges or surcharges; (9) dividends and interests on investment accounts; (10) fees for puts and calls; and (11) income from other investment banking services. The Committee, by amendment, expressly considered the term "securities" to include real estate and oil and gas interests, whether or not they are registered with the Commission. The "business" of a broker or dealer includes subsidiaries and any business to which it has succeeded. The definitions in this section may be elaborated on by the Corporation.

*Section 35(f)(2)* provides for the filing by brokers and dealers of reports concerning their activities including the amount and sources of revenues. The reports are filed with the broker's examining authority, which is a self-regulatory body selected by the Corporation to assume responsibility for examining that broker. The provision is intended to avoid duplication in the case of membership in more than one self-regulatory organization. The Commission itself will act as examining authority for SECO brokers. These reports must be filed, in whole or in part, with the Corporation, to the extent that the Corporation prescribes.

*Section 35(f)(3)* provides that assessments are to be collected by the examining authority; where the Commission is the examining authority they are to be paid directly to the Corporation.

*Section 35(f)(4)* provides for the transfer of existing trust funds to the Corporation, and makes these transfers a credit against future assessments on the members of the organization which made the transfer. No credit is given, however, when a borrowing from the Treasury is outstanding. As noted earlier, testimony given by representatives of the industry indicated that such transfers at the outset of the program would amount to some $3 million.

8

*Section 35(f)(5)* establishes the general power of the Corporation to borrow and to pledge to secure borrowings. The Corporation may determine the terms of any borrowing except borrowings from the Treasury. Such borrowings are technically effected through the Commission, and must be at a rate of interest equal to that payable by the Commission to the Treasury.

*Section 35(g)* provides, in essence, for borrowing by the Corporation (indirectly) from the Treasury of up to $1 billion. The borrowings are to be made by the Commission from the Treasury, and thereafter lent by the Commission to the Corporation. The Corporation must file with the Commission a statement with respect to the use of the proceeds and the Commission must certify to the Secretary of the Treasury that such a loan is necessary. The interest on the loan is to be set at a level related to the then-current yield on comparable Government obligations.

The Committee sets the Treasury borrowing authority at $1 billion as a figure unlikely to be required in any except the most extreme situations of financial stress. Throughout the recent lengthy period of strain and instability in the securities markets, the accumulated losses of all firms that have become insolvent have not, taken together, begun to approach this figure—indeed, they appear not to have aggregated as much as the $75 million fund with which SIPC will start its career. But for insurance of this type to be effective, it must be adequate to meet an extreme situation, no matter how remote may be the possibility of its occurrence. The Committee believes that $1 billion is sufficient to assure that all claims will be met, even in situations of extreme financial distress.

Assessments as described in a preceding section should be sufficient to finance the insurance fund under non-extreme conditions. However, those assessments would not be adequate to service and to repay any large borrowings from the Treasury. This will be particularly true during the early years of the fund, when a large (but declining) proportion of the private fund will consist of standby credits from private banks. If, as may reasonably be expected, the Corporation will be able to confine its borrowing to commercial banks under the line of credit, the entire one-half of 1 percent would be available to service such loans, allowing full repayment in an acceptably short time period. However, if the Corporation finds it necessary, in addition, to borrow from the Treasury, only half of the annual assessment (i.e., one-quarter of 1 percent) would remain available to repay bank credit, because the rest must be set aside for servicing the Government's loan. In light of this, the bank line of credit now being negotiated by industry representatives provides that the Corporation will reduce the principal amount of the agreement by $10 million annually.

The Corporation would then have revenue from the remaining one-quarter percent for servicing the borrowing from the Government, plus any unused portion of the remaining one-quarter of 1 percent. If industry gross revenues rise by 5 percent annually, this assessment rate would be enough to pay interest on, but not amortize, a Government loan ranging from $144 million to $321 million, depending upon the market rate of interest. If provision is made for repayment, the amount would be correspondingly smaller.

For this reason, the Committee considered that an additional, contingent source of revenue might prove necessary to assure repayment

9

of funds advanced by the Government. A transactions charge of up 20 cents per $1 thousand is therefore provided by determination of the Commission in the event of a borrowing from the Treasury. The transactions charge does not apply to transactions under $5,000; its incidence, therefore, falls largely on institutional and other substantial investors and only to a minor extent upon individuals with more modest security holdings. The charge would raise an estimated $31 million if imposed in the current year. The additional revenue will permit the servicing of very substantial additional amounts of Government borrowing: for example, during the first year at a 7½ percent interest rate the Corporation could pay interest on $410 million additional borrowing, or repay an additional $176 million. The transactions fee would be imposed on public purchasers or brokers buying for investment, except that the Commission may exempt certain over-the-counter transactions in order to make the conditions of imposition of fees in the over-the-counter market comparable with those pertaining to exchange transactions. This is intended to deal with the situation in the over-the-counter and exchange market where there may be more than one dealer acting as principal between the seller and the purchaser.

The assessment rate and the contingency transaction charge will make the SIPC operation self-financing to a significant degree, although not entirely. The insurance funds available from combined private and Government accounts would have been more than sufficient to meet any requirement of the recent or distant past. However, the assessment rate has not been actually determined on the basis of risk experience in the manner of a private insurance fund. The intention of SIPC, like the FDIC, is to minimize losses to and to maintain public confidence in the institutions the public deals with. The Committee has been informed that these arrangements meet with Treasury approval.

Section 35(h) provides that membership in the Corporation compulsory only for those brokers and dealers who hold securities and/or free credit balances for customers. It further provides that the Commission may exempt from membership in the Corporation any broker or dealer, or class of brokers and dealers, on any terms it finds appropriate. The thrust of this subsection is to permit exemption of those firms which do not, in the nature of their business, expose public customers to risk of loss. There is, however, provision for voluntary membership in the Corporation.

Section 35(i)(1) defines the terms "self-regulatory organization," "financial responsibility rules," and "examining authority" and determines which self-regulatory organization examines each broker-dealer.

Section 35(i)(2) exhorts the Corporation and the self-regulatory organizations to cooperate in establishing standard procedures for inspections and examinations which will minimize the risk to the fund.

Section 35(i)(3) provides for the filing with the Corporation of such copies of such reports of inspections and examinations as it shall prescribe.

Section 35(j) grants to the Commission, in addition to its existing powers under the '34 Act, the power by rule or regulation to require any self-regulatory organization: (i) to adopt or amend rules relating to the frequency and scope of inspections of the financial condition of

10

its members; (ii) to file reports of financial inspections with the Corporation and the Commission; and (iii) to conduct inspections of such of members as the Commission may designate. In exercising its rule-making authority under this subsection the Commission is required by subsection (o) to give notice and opportunity for an Administrative Procedure Act hearing and for the submission of views. The giving a hearing, however, shall not prevent the rule or regulation from becoming effective within 30 days.

*Section 35(k)(1)* provides for adoption by the Board of Directors of initial bylaws, rules and regulations within 45 days after enactment of this Act and the filing of those bylaws with the Commission.

*Section 35(k)(2)* provides that bylaws, rules and regulations and any subsequent amendment or addition thereto shall become effective on the 30th day after filing unless the Commission disapproves them.

*Section 35(k)(3)* provides that the Commission may, by rule or regulation, require (i) adoption of any initial bylaw, rule or regulation and (ii) the adoption, amendment or decision of any bylaw relating to assessments whenever adopted. Like subsection (j), in exercising its rule making authority under this subsection, the Commission must give notice and opportunity for an Administrative Procedure Act hearing and for submission of views.

*Section 35(k)(4)* allows the Commission to request the adoption of any alteration of or supplement to any other bylaw, rule or regulation and if the request is not complied with within 30 days, to order such adoption. The Commission must, however, provide notice and opportunity for a hearing before it enters such order. This procedure is similar to the Commission's authority over exchanges under section 19(b) of the Securities Exchange Act and over the NASD under section 15A(k) of that Act.

*Section 35(l)* provides that it shall be unlawful for a member to engage in business if it fails to pay any assessment or file any report within 5 days after notice from the Corporation that such a report or payment is overdue. In the case of a disputed assessment the member must first pay the assessment and then sue for its recovery.

*Section 35(m)* establishes procedures for prompt orderly liquidation of SIPC members when required and for making prompt distributions and payments on account of customers' claims without need for formal proofs of claim. The liquidation of stockbrokers is at present governed by section 60e of the Bankruptcy Act (11 U.S.C. 96), enacted in 1938. Over the years certain shortcomings in section 60e have become apparent (see, for example, Report of the Special Study of Securities Markets, Part I, page 410 ff.). Because payments of SIPC funds to customers of SIPC members in liquidation can be made only as an integral part of liquidation proceedings, the bill provides that SIPC members will be liquidated in special proceedings outside the Bankruptcy Act. In so doing, it also remedies the shortcomings in section 60e referred to above.

While liquidation proceedings will be under the Securities Exchange Act of 1934, as amended by the bill, and not under the Bankruptcy Act, the bill provides (section 35(m)(6)) that the proceedings will be conducted in accordance with, and as though they were being conducted under, certain prescribed provisions of the Bankruptcy Act. In addition, the bill uses certain terms defined in section 60e with the meanings there established, except as further defined in the bill.

## 11

*Initiation of Proceedings.* The bill provides that SIPC may in its discretion apply to the appropriate federal district court for the appointment of a trustee whenever it appears to it that a SIPC member is in danger of failing to meet its obligations to customers and any of certain other enumerated conditions exist (such as failure to meet applicable financial responsibility rules). If a SIPC member with respect to whom an application is filed (hereinafter called a debtor) fails adequately to controvert any material allegation of the application within three days, the court is required to appoint for the debtor a trustee designated by SIPC. An application may be filed notwithstanding the pendency of any bankruptcy, receivership or other similar proceedings, and all such proceedings are required to be stayed pending and upon appointment of a trustee.

*Liquidation.* In the opinion of the committee, the completion of open securities transactions will be in the interest of the public. It is designed to minimize the disruption caused by a failure of a broker/dealer, precluding the "domino effect" of such failure. Accordingly, the bill requires the trustee to complete all the debtor's open contractual commitments relating to securities transactions in which a customer had an interest. Experience may show that there are certain types of customer transactions which should not be completed, and certain types of non-customer transactions which should be completed. The SEC is therefore given rule-making authority to prohibit or direct completion of these types of transactions. Completion essentially involves a question of the adequacy of working capital. Accordingly, if and to the extent the debtor's available funds are insufficient to complete transactions, SIPC is to provide the funds, with reimbursement to be made to it on a priority basis.

The committee also believes that it is in the interest of customers of a debtor that securities held for their account be distributed to them as rapidly as possible in order to minimize the period during which they are unable to trade and consequently are at the risk of market fluctuations. The bill requires a trustee to publish and mail notice of liquidation proceedings to customers and, with certain exceptions, requires claims to be filed during a period fixed by the court, but not more than 60 days after publication of the notice. To the extent not previously distributed, securities would be distributed promptly upon the expiration of this period.

Section 60e of the Bankruptcy Act provides for the return to customers of fully paid securities which are "specifically identifiable" as their property. The bill carries forward the 60e concept, among other things, of specific identification except that identification need be made only as of the filing date of the application for appointment of a trustee and except that the bill makes it clear that securities held in bulk segregation or in central certificate services are specifically identifiable. To provide for future developments in the processing and custody of securities, the bill gives the SEC rulemaking authority to establish other types of custody which would constitute specific identification.

Section 60e also provides that property held for customers (other than specifically identifiable property) constitutes a "single and separate fund" in which customers of the debtor are entitled to share ratably. This concept is also carried forward in the bill, except that it is intended that to the extent possible the trustee will deliver to a customer against his claim for securities, the same securities (that is,

12

securities of the same issuer, class and series) which were held for his account on the filing date. For purposes of valuing claims of customers for securities and the extent to which they have been discharged, securities will be valued as of the filing date. To the extent that property in the single and separate fund is insufficient to discharge claims of customers payable out of that fund, SIPC is required to advance funds to the trustee to discharge such claims, but only to the extent that claims of a customer do not exceed $50,000. For this purpose, a broker/dealer is not considered a customer of the debtor except to the extent that claims of such broker/dealer arise out of transactions for customers of such broker/dealer, in which event, each such customer is deemed a separate customer of the debtor.

Because of the difficulties involved in filing proofs of claim involving numerous transactions and varieties of interests, the bill provides in general for the trustee to make payments and deliveries based upon the books and records of the debtor or when otherwise established to his satisfaction, without requiring customers to file proofs of claim.

*Powers of Trustee and Court.* The bill gives the trustee the powers of a trustee in bankruptcy and of a trustee in a Chapter X reorganization. The committee considers it appropriate to vest the trustee with the latter reorganization powers because such powers will be required to operate the business of the debtor pending completion of open transactions, and the delivery of cash securities to customers. The bill specifically provides that no plan of reorganization may be formulated. Reports to the court by the trustee are to be in such form and detail as shall be determined by the SEC, having regard to the record-keeping requirements under the Securities Exchange Act of 1934, and the magnitude of items and transactions involved in the securities business.

In general, the court in which an application is filed is vested with the powers of a court in a Chapter X reorganization and certain powers of a trustee in bankruptcy. The court is specifically denied the power to abrogate the rights of set-off provided in section 68 of the Bankruptcy Act or the right to enforce a valid, non-preferential lien, but it may stay enforcement of such rights for an appropriate period of short duration.

*Section 35(m)(1)* permits the Corporation to apply to a court for a decree adjudicating that customers of a member are in need of protection whenever it concludes that such member is in danger of failing to meet its obligations to customers or is notified of such a situation by the Commission or any self-regulatory body and determines that one or more of certain specified conditions exist. The court must grant such application if it finds any of five specified conditions to exist. These are (i) insolvency in the bankruptcy or equity sense, (ii) the commission of an act of bankruptcy, (iii) the pendency of a proceeding in which a receiver, trustee, or liquidator has been appointed, (iv) noncompliance with financial responsibility rules or rules governing the hypothecation of customers' securities or, (v) inability to make computations necessary to establish compliance.

The paragraph further provides that the Commission may join any other action with such application and finally, that such application supersedes any previously instituted action of a nature indicative of bankruptcy or financial difficulty (e.g. mortgage foreclosure or reorganization) against the member (hereafter called the debtor).

## 13

*Section 35(m)(2)* gives the court exclusive jurisdiction over the property of the debtor and allows the court to stay any previous action against the debtor which relates to bankruptcy or the like.

*Section 35(m)(3)* provides for the prompt appointment of a trustee for the liquidation of the debtor's business if the debtor consents to or fails to controvert adequately any material allegation of the application.

*Section 35(m)(4)* provides the trustee with the same powers as a bankruptcy or Chapter X trustee have with respect to the debtor's property and the additional powers to hire persons to liquidate the debtor and to operate the business in order to complete open contractual commitments (the limits of which are defined in paragraph (m)(9) below). The Corporation is authorized to advance monies to pay expenses of liquidation, and is required to advance monies to the extent required to complete open contractual commitments.

*Section 35(m)(5)* imposes on the trustee the same duties as a trustee under the Bankruptcy Act except that he need not reduce securities to cash.

*Section 35(m)(6)* provides that, except that the debtor may not be reorganized, the proceedings shall be conducted in accordance with Chapter X of the Bankruptcy Act and so much of Chapters I-VII as § 102 of Chapter X makes applicable. In addition the court may stay, but not abrogate, the rights of set-off provided in section 68 of the Bankruptcy Act and the right to enforce a valid lien.

*Section 35(m)(7)* defines the purposes of a proceeding under this subsection as: (A) The appointment of a trustee to return "specifically identifiable" property and distribute the "single and separate fund" (as set up in section 60e of the Bankruptcy Act with the modifications introduced by subsection (m)) as quickly as possible. (B) To complete certain contractual commitments which in general are those in which a customer had an interest and those others whose completion the Commission may determine to be in the public interest. (C) To enforce the Corporation's rights of subrogation, and (D) To liquidate the debtor.

*Section 35(m)(8)* sets up a number of terms or rights applicable to subsection (m) proceedings. In brief: (A) All terms have the same meaning as in 60e of the Bankruptcy Act except where specifically changed. (B) "Stockbroker" means the debtor and "customer" means those who deal with the debtor but not those whose claim against the debtor is for property which is part of the debtor's capital. (C) Customers have the same rights as in 60e in addition to those provided in this section. (D) The trustee may use any property of the debtor to complete contractual commitments. (E) In distributing the "single and separate fund" property is valued as of the filing date and advances by the Corporation to the trustee for completion of open contracts and certain priority claims specified in section 64a of the Bankruptcy Act are paid first. Securities are to be delivered to customers in kind to the extent possible. (F) To the extent that securities are in bulk or individual segregation or in a central depository they are considered specifically identified and therefore directly recoverable by the customer. In addition, the Commission may define other methods of holding property as constituting specific identification. Customers share ratably in these securities if they are insufficient

14

to pay all claims. Each customer, however, shares ratably only in the "pool" of securities of the issuer and class which he owned.

*Section 35(m)(9)* makes it the obligations of the trustee to discharge as promptly as possible obligations of the debtor which are ascertainable from the books and records whether or not the customer files a formal proof of claim. Customers must, however, file with the trustee such documents or execute such releases or other papers as the trustee requires.

*Section 35(m)(10)* excludes "associated persons" or persons owing 5 percent of the stock of the debtor from participation without formal proof of claim, though such persons may file such proof and thereby recover on their claims.

*Section 35(m)(11)* authorizes the Corporation to advance monies to the trustee to satisfy the claims of each customer up to $50,000. Further, a customer who holds accounts in separate capacities is a different customer in each capacity. Claims of partners, officers, directors or substantial owners (5 percent) of the debtor may not be paid from the moneys of the Corporation. Finally, to the extent that monies are advanced, the Coproration is subrogated to the claims of the customers who are paid.

*Section 35(m)(12)* simply reiterates the rights of persons to make claims against the debtor under the existing Bankruptcy Act.

*Section 35(m)(13)* first provides that the trustee shall publish notice of the commencement of the proceedings in accordance with the same requirements as in the Bankruptcy Act and, in addition, shall mail notice to each customer at the address appearing in the books and records of the debtor. The section limits the time for the filing of claims in a two-fold manner. First, claims in general must be filed within the time set by the court but not to exceed 60 days after publication of notice. Except as the trustee may otherwise permit, claims which are filed after that period may be paid only from the general estate of the debtor and thus are not payable from SIPC funds, or from most types of specifically identifiable property or from the single and separate fund. Secondly, claims which are not filed within the time provided in section 57 of the Bankruptcy Act are barred.

*Section 35 (m)(14)* provides that reports to the court by the trustee shall be in such form as the Commission determines will fairly reflect the results.

*Section 35(n)* bars from the business of broker-dealer any person for whom a trustee has been appointed under this Act unless the Commission otherwise determines in the public interest. In addition, the Commission may, by order, bar or suspend any officers, directors, general partners, owners of more than 10 percent of the voting stock or controlling persons of such debtor.

*Section 35(o)* as previously mentioned, requires notice and opportunity for a hearing as specified in section 4f of the Administrative Procedure Act and the submission of views of interested persons. In order to assure the speedy and efficient execution of the policies of this Act, such rules are not stayed within the 30-day period even though a hearing is being held. In addition, the hearing is not required to be on a record as specified in the Administrative Procedure Act.

15

*Section 35(p)* accords the Commission the power to apply to a District Court for an order in the nature of a mandatory injunction in the unlikely event that the Corporation refuses to carry out its duties.

*Section 35(q)* makes the provisions of subsection 20(a) of the '34 Act inapplicable to any liability under this section. Subsection 20(a) makes controlling persons jointly and severally liable for violations of '34 Act rules and regulations to the same extent that any controlled person is liable unless the controlled person acted in good faith and did not cause the violation of the rule or regulation. It is not considered to be appropriate to create such additional liabilities for controlling persons for acts taken or omitted under section 35.

*Section 35(r)* limits the public disclosure of reports and documents filed under this section unless the Commission or SIPC determine such disclosure to be in the public interest.

*Section 35(s)* limits the application of the provisions of this Act in relation to those offices of foreign broker-dealers which are located within the United States.

*Section 35(t)* deals with the tax ramifications of this Act. It makes the Corporation a tax exempt entity except that it is subject to State and local real and personal property taxes. In addition, it provides that the payment of assessments shall constitute an ordinary and necessary business expense of the broker or dealer. Moreover, contributions from existing trust funds by a self-regulatory body shall not result in taxable gain to the self-regulatory body. Finally, upon dissolution of the Corporation, the assets may not inure to the benefit of the Corporation's members.

*Section 35(u)* provides criminal penalties for misuse of the corporate assets.

*Section 35(v)* exculpates from liability a member of the Corporation as a member of the Corporation for the acts of any other member of the Corporation or for the debts and liabilities of the Corporation itself. It is not intended to exculpate members from liabilities they may have as members of a self-regulatory organization or otherwise.

*Section 35(w)* exculpates from liability the Corporation and its Board of Directors for actions taken in good faith. It is essentially consistent with general corporate law practice.

*Section 35(x)* exculpates the self-regulatory organization from any liability to any person for action taken or omitted in good faith in connection with the giving of notice pursuant to paragraph (m)(1). This subsection is intended only to relate to this Act and does not alter any liability of self-regulatory organizations which may already exist.

*Section 35(y)* prevents members of the Corporation from displaying in signs or advertising their participation in the Corporation and the protection provided thereby. It is intended to prevent brokers from soliciting accounts on the grounds that the customer is protected and his accounts "guaranteed."

*Section 3.* This section of the bill amends section 15(c)(3) of the 1934 Act. Testifying before the House Subcommittee on Commerce and Finance on July 9, Chairman Budge of the SEC noted that "certain doubts . . . have arisen over the years, primarily as a result of unsuccessful legislative proposals and of recommendations of the

16

Commission's Special Study of Securities Markets, as to the extent of
the Commission's broad powers to provide safeguards with respect to
the financial responsibility of broker-dealers to whatever extent the pub-
lic interest requires, whether by capital rules or otherwise." The Com-
mittee wishes to dispel such doubts by amendment section 15(c)(3)
to specify the applicability of the section to broker-dealers who do
business only on an exchange and by reaffirming the Commission's
authority with regard to financial responsibility of brokers and dealers,
including practices that bear on that responsibility such as the custody
and use of customers' securities, and the carrying and use of customers'
deposits or credit balances.

*Section 4* sets the effective date of this Act as the date of its enact-
ment.

### CORDON RULE

In the opinion of the Committee, it is necessary to dispense with the
requirements of subsection 4 of rule XXIX of the Standing Rules of
the Senate in order to expedite the business of the Senate in connection
with this report.

○